LOCATION:  Polaris Shopping Center
Columbus, Ohio

# LEASE

Between

# CIRCUIT CITY STORES, INC.,

as Tenant

and

# POLARIS CIRCUIT CITY, LLC

as Landlord

dated _June 15_____, 2004

# POLARIS SHOPPING CENTER

~CHGO2:20156016.v9 |6/7/04

# TABLE OF CONTENTS

**PARAGRAPH**

**PAGE**

1.    Leased Property ...................................................................................................................

2.    Construction of Building and Improvements; Tenant Improvement Allowance.................1

3.    Lease Term..........................................................................................................................2

4.    Base Rent; Ground Rent .....................................................................................................3

5.    Development of Shopping Center by Landlord...................................................................3

6.    Easements ...........................................................................................................................5

7.    Common Areas and Common Area Maintenance...............................................................6

8.    Signs and Communications Equipment...............................................................................7

9.    Taxes..................................................................................................................................11

10.   Maintenance, Repairs and Replacements .........................................................................12

11.   Utility Service Provider; Payment of Utility Bills...........................................................13

12.   Alterations.........................................................................................................................14

13.   Mechanics' Liens...............................................................................................................15

14.   Insurance............................................................................................................................15

15.   Damages by Fire or Other Casualty..................................................................................16

16.   Condemnation....................................................................................................................19

17.   Assignment and Subletting................................................................................................20

18.   Use.....................................................................................................................................22

19.   Warranties, Representations and Covenants......................................................................24

20.   Estoppel Certificates.........................................................................................................25

21.   Subordination, Non-Disturbance and Attornment............................................................33

22.   Tenant's Financing.............................................................................................................34

......................................................................................................................................................34

**PARAGRAPH**

23.    Tenant's Property and Waiver of Landlord's Lien ..................................................

24.    Memorandum of Lease; Commencement Date Agreement ..............................35

25.    Expiration of Term and Holding Over ................................................................35

26.    Force Majeure .....................................................................................................35

27.    Events of Tenant's Default .................................................................................35

28.    Landlord's Remedies ..........................................................................................35

29.    Events of Landlord's Default; Tenant's Remedies .............................................36

30.    Waiver .................................................................................................................38

31.    Compliance with Applicable Laws .....................................................................40

32.    Notices ................................................................................................................40

33.    Brokers ...............................................................................................................41

34.    Miscellaneous .....................................................................................................41

35.    Effectiveness of Lease; Tenant's Right to Terminate ........................................42

36.    Intentionally Omitted .........................................................................................44

37.    Intentionally Omitted .........................................................................................46

38.    Intentionally Omitted .........................................................................................46

39.    Importance of Each Covenant ............................................................................46

40.    "For Rent" Signs .................................................................................................47
                                                                                                                  47

## EXHIBITS

"A"      Site Plan
"A-1"    Shopping Center Legal Description
"B"      Index of Definitions
"C"      Construction Provisions
         Attachment "1" Utilities Survey
         Attachment "2" Schematic Floor Plan and Elevations
         Attachment "3" Phase 1 Summary
"C-1"    Design and Construction Specifications
"D"      Intentionally Deleted
"E"      Sign Plans
"F"      Permitted Encumbrances
"G"      Subordination, Non-Disturbance and Attornment Agreement
"H"      Memorandum of Lease
"I"      Commencement Date Agreement
"J"      Indemnification Agreement

Polaris Shopping Center
Columbus, Ohio

## LEASE

THIS LEASE ("**Lease**") is made as of the _15th_ day of _June_, 2004, by and between **POLARIS CIRCUIT CITY, LLC**, an Ohio limited liability company having an address at 8800 Lyra Drive, Suite 550, Columbus, Ohio 43250 ("**Landlord**"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("**Tenant**").

## W I T N E S S E T H:

The parties hereto agree as follows:

1.    **Leased Property**.  Landlord leases to Tenant the "**Premises**" (as defined in paragraph 2), which when constructed or renovated as provided in this Lease will contain a building thereon containing approximately 34,772 square feet of "ground-floor gross leasable area" (as defined in paragraph 7(c) below) on that certain land (the "**Land**") outlined in red on Exhibit "**A**" (the "**Site Plan**"), together with exclusive rights to the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan, with the "Other Improvements" (defined below) and with the easements described in paragraph 6 below; all located in an in-line store center totaling 5.09 acres adjacent to Polaris Fashion Place (such in-line center herein referred to as the "**Shopping Center**"), located at Polaris Parkway and Lyra Drive, in the City of Columbus (the "**City**"), County of Delaware, State of Ohio (the "**State**"), shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "**A-1**" attached hereto.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  Landlord grants to Tenant all of those certain rights, in common with others, granted Landlord under (a) that certain Declaration of Protective Covenants for Polaris Centers of Commerce dated August 20, 1992, recorded in Volume 0548, Pages 720 – 752 of the Deed Records of Delaware County, Ohio, as amended by Amendment to Declaration of Protective Covenants dated February 1, 1994, recorded in Book 0026, Pages 751 – 753 of the Deed Records of Delaware County, Ohio, and as further amended by Amendment to Declaration of Protective Covenants dated July 16, 1999, recorded in Volume 0034, Pages 539 – 540 of the Deed Records of Delaware County, Ohio and as further amended by Ninth Amendment to Declaration of Protective Covenants recorded on November 16, 2001 in Volume 0144, Pages 1941-1943 of the Deed of Records of Delaware County, Ohio; (b) that certain Declaration of Restrictions dated June 28, 2001, recorded in Volume 0108, Pages 0261 – 0300 of the Deed Records of Delaware County, Ohio; and (c) that certain Curb Cut and Access Maintenance Agreement dated August 31, 2000, as amended by First Amendment to the Curb Cut and Access Maintenance Agreement dated February 25, 2002, all as recorded against record title of the Shopping Center (collectively, the "**Protective Covenants**").  Landlord agrees (i) that it will not consent to, approve, or otherwise agree to any modification of the Protective Covenants at any time during the term of this Lease, to the extent the Protective Covenants being modified relate to Tenant's Preferred Area or primary access to the Shopping Center or parking ratio or the

visibility of Tenant's Premises or which would diminish Tenant's rights under this Lease or would increase Tenant's obligations under this Lease, without Tenant's prior written approval (which may be withheld in Tenant's reasonable discretion); (ii) will enforce the terms of the Protective Covenants for Tenant's benefit, consistent with Landlord's obligations under this Lease; and (iii) will exercise all approval rights granted Landlord under the Protective Covenants in favor of enforcement of the terms of this Lease. Landlord further agrees that it will not consent to, approve or establish any rules and regulations applicable to the Shopping Center, as permitted under the Protective Covenants, without Tenant's prior consent, which will not be unreasonably withheld.

2.    **Construction of Building and Improvements; Tenant Improvement Allowance**.

(a)    Landlord shall complete the "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as **Exhibit "C"** and incorporated herein by reference for all purposes) on the date of this Lease, which date shall be the **"Delivery Date"** for purposes of this Lease. Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing approximately 34,772 square feet of "ground-floor gross leasable area" plus mezzanine, with provisions for car stereo installation facilities, initially for use as a Circuit City Superstore (the **"Building"**), together with loading ramps, truck wells, sidewalks, trash compactor, transformer pad and other improvements (collectively, the **"Other Improvements"**), set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the **"Improvements"**. The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined below. The Improvements and the Land are referred to herein as the **"Premises"**.

(b)    Upon the date that (x) Substantial Completion (as defined in the Construction Provisions) has occurred; and (y) Tenant has furnished to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of **Exhibit "J"** attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, and (iii) a square footage building perimeter survey certified to Tenant and Landlord, Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to Seventy Four Dollars ($74) per square foot of ground-floor gross leasable area of the Building (which shall be determined by the amount of ground-floor gross leasable area shown in Tenant's square footage building perimeter survey mentioned above), payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after the date that all of the matters described in (x) and (y) above have occurred. If the Base Rent is increased or decreased pursuant to paragraph 4(b) of this Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased. The amount of ground floor gross leasable area

of Tenant's Building, as set forth on said survey, shall be deemed conclusive unless Landlord objects to same in writing within fifteen (15) days of receipt of such survey. If Landlord objects, the Tenant and Landlord shall jointly select, at their shared expense, an independent architect or engineer to measure such ground floor gross leasable area, which measurement shall be final and binding upon Landlord and Tenant.

3.    **Lease Term**. Subject to paragraph 35, the construction term (the "**Construction Term**") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in the condition specified in the Construction Provisions and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "**Main Term**") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (a "**Renewal Option**") to renew and extend the Lease for three (3) consecutive five (5) year periods (each period referred to as an "**Option Period**") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period. If, during such one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "**Term**". The term "**Lease Year**" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    **Base Rent; Ground Rent**. During the Construction Term, Tenant shall pay no rent or Real Estate Tax (as defined in paragraph 9 below) or CAM Charges (as defined in paragraph 7 below) or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("**Base Rent**") for the Premises in the amounts and manner specified hereunder, commencing on the date (the "**Commencement Date**") which is the later to occur of (i) the date on which Landlord makes payment of the Tenant Improvement Allowance, and (ii) the date of Substantial Completion of the Improvements. "**Ground Rent**," in lieu of Base Rent, shall be due under certain circumstances, as described in subparagraph 4(i) below, and when due, shall be payable in the same manner as Base Rent. Notwithstanding the foregoing, until Landlord has completed, executed and delivered to Tenant a W-9 form (the form of which will be delivered to Landlord by Tenant together with this Lease for execution), no Base Rent, Ground Rent or other sums shall be due Landlord by Tenant hereunder.

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 2 above relating to the Tenant Improvement Allowance (it being intended by Landlord and Tenant that the same square footage be used for purposes of determining the Base Rent and Tenant Improvement Allowance), Base Rent shall be paid in equal monthly installments in advance on the first day of each calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(a)    **First Five Lease Years**. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Six Hundred Twenty Five Thousand Eight Hundred Ninety Six and 00/100 Dollars ($625,896.00), payable in equal monthly installments of Fifty Two Thousand One Hundred Fifty Eight and 00/100 Dollars ($52,158.00).

(b)    **Lease Years 6-10**. During Lease Years six through ten, Tenant shall pay annual Base Rent in the amount of Six Hundred Forty Three Thousand Two Hundred Eighty Two and 00/100 Dollars ($643,282.00), payable in equal monthly installments of Fifty Three Thousand Six Hundred Six and 83/100 Dollars ($53,606.83).

(c)    **Lease Years 11-15**. During Lease Years eleven through fifteen, Tenant shall pay annual Base Rent in the amount of Six Hundred Sixty Thousand Six Hundred Sixty Eight and 00/100 Dollars ($660,668.00), payable in equal monthly installments of Fifty Five Thousand Fifty Five and 66/100 Dollars ($55,055.66).

(d)    **Adjustment in Base Rent**. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 34,772 square feet of ground-floor gross leasable area, annual Base Rent during the first fifteen (15) Lease Years shall be adjusted based upon the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above) by $18 (for the first 5 Lease Years), $18.50 (for Lease Years 6-10) and $19 (for Lease Years 11-15) (i.e., being the annual Base Rent rate per square foot of ground-floor gross leasable area of the Building for each such Lease Year, as described in subsections (a) – (c) above). In determining the ground-floor gross leasable area, measurements shall be made in accordance with paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(e)    **Lease Years 16-20**. During Lease Years 16 through 20, Tenant shall pay annual Base Rent in an amount equal to the lesser of (i) the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), by $20, and (ii) the product obtained by multiplying the annual Base Rent payable during the fifteenth (15th) Lease Year times the sum of one plus ten (10) times the percentage

increase (expressed as a decimal) in the "CPI" (as defined below in paragraph 4(h)) during said fifteenth (15th) Lease Year.

(f)    **Lease Years 21-25**. During Lease Years 21 through 25, Tenant shall pay annual Base Rent in an amount equal to the lesser of (i) the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), by $21, and (ii) the product obtained by multiplying the annual Base Rent payable during the twentieth (20th) Lease Year times the sum of one plus ten (10) times the percentage increase (expressed as a decimal) in the "CPI" during said twentieth (20th) Lease Year.

(g)    **Lease Years 26-30**. During Lease Years 26 through 30, Tenant shall pay annual Base Rent in an amount equal to the lesser of (i) the product obtained by multiplying the actual ground-floor gross leasable area of the Building (as evidenced by the square footage building perimeter survey described in paragraph 2 above), by $22, and (ii) the product obtained by multiplying the annual Base Rent payable during the twenty fifth (25th) Lease Year times the sum of one plus ten (10) times the percentage increase (expressed as a decimal) in the "CPI" during said twenty fifth (25th) Lease Year.

(h)    **CPI**. For purposes of this Lease, the term "CPI" shall mean the Consumer Price Index -- All Urban Consumers (U.S. City Average, All Items:  Base 1982-84-100) as published by the United States Department of Labor, Bureau of Labor Statistics. Should the CPI publication be discontinued or the CPI be published less frequently or in some manner altered, Tenant shall select a substitute index or procedure which reasonably reflects consumer prices and has been generally accepted as a substitute index for CPI.

(i)    **Ground Rent**. Subject to Tenant having received all permits, approvals and other clearances necessary to permit the completion of Tenant's Site Work and the Tenant Improvements and subject to *force majeure*, if the Commencement Date has not then occurred, then during the period commencing on the date which is one hundred eighty (180) days following the Delivery of the Land and ending on the day before the Commencement Date, Tenant shall pay to Landlord Ground Rent. For purposes hereof, annual "Ground Rent" shall equal Three Hundred Sixty Nine Thousand and 00/100 Dollars ($369,000.00), payable in equal installments of $30,750.00 and Tenant's prorata share of CAM Charges and Real Estate Taxes (to the extent separately assessed for the Land) as set forth herein; provided, however, that said annual Ground Rent amount shall be adjusted, as applicable, based upon the actual ground-floor gross leasable area of the Building being less than or greater than 34,772 square feet (as evidenced by the square footage building perimeter survey described above).

5.    **Development of Shopping Center by Landlord**. Landlord covenants to operate a first-class shopping center. The location of buildings and other tenant space will only be within the "**Permissible Building Areas**" designated on the Site Plan, **Exhibit "C"** (Construction Provisions) and **Exhibit "C-1"** (Standard Design and Construction Specifications). The parking ratio for the Shopping Center shall be at least as shown thereon, but



in no event shall said ratio be less than the greater of (i) 201 total parking spaces, or (ii) that required by applicable zoning requirements, without variance. All parking shall be at ground level. Landlord hereby acknowledges, agrees and covenants that there are no outparcels and shall be no outparcels within the Shopping Center. Landlord shall construct all improvements in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend (with legal counsel reasonably acceptable to Tenant) and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction activities. Landlord's construction activities shall not unreasonably interfere with the conduct of Tenant's business. If Landlord fails to maintain the above required parking ratio (except as a result of a condemnation event), Tenant shall, in addition to any other legal or equitable remedy, including specific performance, have the right to pay, in lieu of any scheduled Base Rent and other charges that would be otherwise payable under this Lease, one-half (1/2) of the scheduled Base Rent hereunder from time to time together with one-half (1/2) of all other scheduled charges payable hereunder from time to time, until such time as the above-specified parking ratio is again maintained.

    6.    **Easements**.  Landlord also grants to Tenant those nonexclusive leasehold easements over Landlord's Premises, which shall run as covenants with Landlord's Premises and the Premises during the Term, as are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

    (a)    **Construction Easements**.  During the Construction Term, any period of renovation or reconstruction thereafter, and during any period which Tenant desires to install additional utility services including television cable, fiber optic line or other systems serving the Premises, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "**Staging Area**") of approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in constructing the Improvements, (ii) an easement to permit the Building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon Landlord's Premises, (iii) an easement for such additional underground, public or private utility or cable, fiber optic or other easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas by Landlord and other tenants of the Shopping Center and their respective employees, customers and invitees, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility or other service provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to prompt restoration of the Common Areas following such installation. Notwithstanding anything to the contrary contained herein, except for initial alterations by Tenant in no event may any work be performed in easement areas described in (iii) above during the months of October, November, December or January (except for emergency repairs).

(b)   **Common Area Easements**. Landlord grants to Tenant an easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge. Tenant shall have the right to install up to four (4) cart corrals within the parking area located in the Tenant's Preferred Area as shown on the Site Plan (or other mutually agreeable location), and Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals. Said cart corrals shall be appropriately screened as approved by the Polaris Design Review Committee. Tenant agrees to use reasonable efforts to periodically remove its shopping carts from the Common Areas. Tenant shall also have the right to use such Common Areas immediately adjacent to Tenant's Improvements and within Tenant's Preferred Area for "sidewalk sales", seasonal and promotional sales and demonstrations and other sales customary to Tenant's business operations exclusively for Tenant's customers, invitees and patrons. Such sales shall not exceed seven (7) days per sale period, and shall not occur in excess of four (4) times per year.

7.   **Common Areas and Common Area Maintenance**.

(a)   **Definition of Common Areas**. The term "**Common Areas**" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), if any, directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within adjacent tracts (including without limitation, Polaris Fashion Place) but reserved for the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall operate, maintain, repair and replace the Common Areas in good condition, including, without limitation, sweeping and cleaning, maintenance of Landlord's pylon and other sign structure(s), including traffic directional signs, markers and lines and informational signs, snow removal and ice treatment, removal of Common Area trash, debris and garbage, lighting (including lighting of signage and Common Areas), repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping and sprinkler systems, storm drains, sewers and other utility lines and facilities not dedicated to the public or owned by a private utility company, which are necessary for the operation of the Shopping Center, customary and reasonable security services, and maintaining all insurance required under this Lease to be maintained by Landlord, all such work to be referred to collectively as "**Common Area Maintenance**".

If Tenant reasonably determines that the Common Areas are being maintained at a level that impairs the sale of Products at Tenant's Premises, Tenant may elect to provide the Common Area Maintenance for the Shopping Center upon 90 days' prior notice to Landlord, in which event Landlord shall reimburse Tenant for its Landlord's Share (as defined below) of Tenant's actual costs within 15 days after demand therefor. Tenant's administrative fee for these services shall be subject to the same limitation provided in Section 7 (b) (ii) below on the administrative fee which Landlord may charge. For purposes of this Lease, **"Landlord's Share"** shall mean a percentage, calculated by dividing the ground floor gross leasable area in the Shopping Center (other than the Building) by the aggregate ground floor gross leasable area in the Shopping Center (including the Building). As of the date of this Lease, the Landlord's share is projected to be 14.32% (using 5,810 ground floor gross leasable area in the Shopping Center, excluding the Building, divided by 40,582 ground floor gross leasable area in the Shopping Center, including the Building). Tenant may, upon at least 90 days' prior written notice, cause Landlord to resume its obligation to perform the Common Area Maintenance.

(b)    **CAM Charges**. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the **"CAM Charges"**) shall include (i) Landlord's reasonable direct costs and expenses of operating and maintaining the Common Areas, and (ii) Landlord's overhead expenses for administering same, or in lieu thereof a management fee, neither of which shall exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, "Real Estate Taxes" [as defined in paragraph 9 below] and utilities serving the Common Areas). CAM Charges shall not include any Common Area Maintenance to the extent Tenant elects to provide same pursuant to Section 7(a) above. Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction defect or condition with respect to any buildings (including the roof and exterior walls) or to any utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction

defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)     amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6)     amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)     premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8)     repairs or replacements of a capital nature, unless made after the expiration of the first two (2) CAM Years (as defined below) and only to the extent each such item is amortized over its useful life in accordance with generally accepted accounting principles consistently applied;

(9)     improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first six (6) full "CAM Years" (as defined below), except that after the sixth (6th) full CAM Year of the Term and only at six (6) year intervals thereafter, the amortized cost of resurfacing may be included in CAM Charges, provided the included cost shall be limited to the amount amortized over the useful life of such expenditure in accordance with generally accepted accounting principles consistently applied;

(10)     reserves for anticipated future expenses;

(11)     interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12)     Landlord's personnel, overhead, home office or administrative expenses, except as set forth in subparagraph (b)(ii) above;

(13)     amounts incurred to remediate any Hazardous Substances (as defined in paragraph 19(a)(v) below);

(14)     any new improvements to the Shopping Center or Common Areas, including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center;

(15)     amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains the Premises;

(16)     holiday or other decorations;

~CHGO2:20156016.v9 |6/3/04

(17)   other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the beginning of each CAM Year; or

(18)   premiums for any "rent loss" insurance carried by Landlord or its affiliates; provided, Tenant agrees not to abate its Rent upon the occurrence of a casualty event.

(c)   **Tenant's Estimated and Actual Payments**.  During each calendar year ("**CAM Year**") commencing on the Commencement Date, Tenant shall make estimated payments of its Pro Rata Share (as hereinafter defined) of the CAM Charges to Landlord.  Tenant's estimated payments of its Pro Rata Share of CAM Charges incurred by paid by Tenant in equal monthly installments on the first day of each month during a CAM Year.  Tenant's estimated payments of its Pro Rata Share (and its actual Pro Rata Share) of CAM Charges payable for the first 4 CAM Years shall not exceed by more than four percent (4%) those in effect during the preceding applicable CAM Year and during the remaining 11 CAM Years of the Term, shall not exceed by more than five percent (5%) those in effect during the preceding applicable CAM Year (in either case, excluding from the aforementioned caps, snow removal expenses, insurance expenses, utilities serving the Common Areas, real estate taxes and the annual Ring Road maintenance assessment).  For any period within the Term which is less than a full CAM Year, Tenant's Pro Rata Share of CAM Charges shall be appropriately pro rated.  Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center.  Any necessary adjustment with respect to amounts owed by either party based upon the actual amount of CAM Charges paid by Landlord for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the next year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant.

Tenant's pro rata share of CAM Charges (herein referred to as "**Pro Rata Share**") shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center.  In determining the "**ground-floor gross leasable area**" of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters

of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 40,582 square feet of ground-floor gross leasable area. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    **Examination of Landlord's Records**.  Tenant shall have the right, once as to any CAM Year and no later than three (3) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the actual cost of such examination or audit, including, but not limited to, reasonable travel expenses, together with interest thereon at the Default Rate ( as defined in paragraph 9(b) below) from the date paid by Tenant until reimbursement.

(e)    Tenant shall also pay its Pro Rata Share of charges incurred by the Shopping Center for annual maintenance to the Ring Road identified on the Site Plan, and the Polaris Mall Owners Association assessment, provided such Pro Rata Share of the Ring Road maintenance charge and association assessment shall not initially exceed Tenant's Pro Rata Share of $3,600 and shall not increase by more than 10% upon each 3-year anniversary of this Lease.

8.    **Signs and Communications Equipment**.

(a)    **Signs**.  Tenant, at its sole cost and expense, may construct and install upon the Common Areas at the location shown on the Site Plan, a monument sign structure (with electrical wired box installed) with doublesided "face panels" identifying Tenant's store, which sign structure shall comply with all applicable laws, covenants and restrictions as long as approved by the Polaris Design Review Committee (as required). If other face panels are available on Tenant's pylon sign, Tenant shall permit other tenants of the Shopping Center to install a sign panel on such pylon sign, provided such tenant provides such sign panel and installation at its sole cost and reimburses Tenant for its proportionate share of the costs incurred by Tenant in constructing the pylon sign, which proportionate share shall be based on such tenant's signage area against the total panel-signage area on said pylon sign. If at any time during the Term there becomes available a face panel on any of the Shopping Center pylon or monument signs which would permit Tenant's presence in the Shopping Center to be designated in a higher pylon or monument panel position, then Tenant shall have the right to relocate its pylon or monument sign panel to such higher sign position. Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Attached as a portion of **Exhibit "E"** are plans and specifications for the monument sign

structure, Tenant's current prototypical face panels and for Tenant's building signage, as presented to the Polaris Design Review Committee, which Landlord hereby approves. Tenant, its successors, subtenants and assigns shall be entitled with Landlord's and Polaris Design Review Committee's consent, and subject to governmental requirements, to replace all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans.

(b)    **Communications Equipment**.    Tenant may install, maintain and/or replace any satellite dishes, antennas, cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided (i) same shall not adversely and materially affect the roof or its structural elements, (ii) any such rooftop equipment shall be screened with materials consistent with the Tenant's Building design, and (iii) Tenant, not Landlord, shall be responsible for any roof maintenance, repair or replacement necessitated by the installation, penetration, operation and/or removal of such equipment. Tenant shall use the same roof contractor as used on the base Building when making any roof penetrations to maintain any roof warranty.

9.    **Taxes**.

(a)    **Taxes Contemplated Hereunder**.    The term **"Real Estate Taxes"** shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

(b)    **Payment of Real Estate Taxes**.    After the Commencement Date has occurred, at such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) of Real Estate Taxes levied against the tax parcel or parcels comprising the Shopping Center (the **"Tax Parcel"**). For purposes of determining Tenant's Pro Rata Share of Real Estate Taxes, Real Estate Taxes shall be reduced by any early-payment discounts available at the time Tenant's payment is due and any real estate tax and assessment amounts which are paid directly by other tenants or occupants of the Shopping Center to the applicable taxing authority. Tenant's Pro Rata Share of Real Estate Taxes for the first Lease Year of the Term are unlikely to exceed Two and 00/100 Dollars ($2.00) per square foot of ground-floor gross leasable area of the Building. Tenant shall pay to Landlord Tenant's Pro Rata Share of Real Estate Taxes within twenty (20) days after Tenant's receipt of Landlord's statement (or within the same time period granted to the Landlord to pay such tax bill – e.g., if Landlord is delivered a copy of the bill 30 days in advance of its due date by the

applicable governmental entity, then Tenant shall have 30 days after receipt of a copy of the tax bill from Landlord), accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost are added, become due, or are imposed by operation of law for nonpayment or late payment. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease (i.e., such that Tenant shall not be required to pay for any Real Estate Taxes which are levied or assessed for periods prior to the Commencement Date or after the expiration or earlier termination of this Lease), and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due and in such event Tenant may deduct the cost, plus interest at the lesser of ten percent (10%) per annum or the highest rate permitted by State law (the "**Default Rate**"), from the next installment(s) of Base Rent and other charges due.

(c)    **Contest of Real Estate Taxes and/or Assessed Valuation of Property**. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall reasonably cooperate with Tenant, execute all documents reasonably required and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution.

(d)    **Payment Following Appeal**. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.

10.    **Maintenance, Repairs and Replacements**.    Except (i) for costs covered by Landlord's insurance required to be maintained, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of

13



Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including painting of the exterior of the Building. Notwithstanding the foregoing, Tenant shall have no obligation to install or construct alterations or incur expenditures pursuant to this paragraph during the last five (5) years of the Lease Term; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations relating to the HVAC system serving the Premises, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term, then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such repairs, construction or alteration for the period beyond the remainder of the Term. Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises) including the roof, roof structure, flooring system, floor slab, foundation, load-bearing walls and exterior structural walls. Upon request, Tenant agrees to assign to Landlord the benefit of all warranties issued by contractors constructing improvements in the Common Areas. In addition, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, as well as sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that with respect to the exterior of the Building, the deterioration thereof has escalated beyond that of the surrounding buildings in the Polaris Fashion Place outparcels and the curing party shall give the non-performing party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that the thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within the thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The non-performing party shall reimburse the curing party on demand for the reasonable and actual amount expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations, Tenant and Landlord, as applicable, shall provide to the other party all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease; however, Tenant shall not be required to perform the foregoing obligation so long as the Tenant Improvement Allowance remains unpaid.

11.    **Utility Service Provider; Payment of Utility Bills.**  Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements.  Landlord shall pay when due all utility charges incurred in the operation of

14



the Common Areas and the Shopping Center. Tenant shall cause, as part of Tenant's Site Work, all utilities serving the Premises to be separately metered.

12.    **Alterations.** During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent but subject to approval of the Polaris Design Review Committee (if required) to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire, provided such exterior design is not inconsistent with the existing design and architecture of the other buildings in Polaris Fashion Place Outparcels. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed and the approval of the Polaris Design Review Committee, Tenant shall have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required by Tenant.

13.    **Mechanics' Liens.** Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party (collectively, "**Adequate Lien Removal**"). Failure to provide Adequate Lien Removal within five (5) days after written notice from Landlord (which states in all caps and bold letters on the front "FAILURE TO REMOVE THE LIEN DESCRIBED IN THIS NOTICE WITHIN 5 DAYS SHALL BE DEEMED AN AUTOMATIC DEFAULT UNDER THE LEASE"), which notice shall be delivered after expiration of the 30-day time period specified herein, shall be an automatic Event of Default under the Lease.

14. **Insurance**.

(a) **Property Damage**. During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all construction. During the Term, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy as additional insureds and certificate holders as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b) **Liability and Builder's Risk Insurance**. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds and certificate holders as their respective interests may appear. The limits of such commercial general liability policy (maintained under a primary policy or by a combination of primary plus umbrella insurance) shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible. Additionally, Tenant shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Building, for the full replacement value of all such construction.

(c) **Workers' Compensation Insurance**. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d) **Self-Insurance**. Notwithstanding anything to the contrary contained herein, upon notice to Landlord, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000). For purposes of this subparagraph, "self-insure" shall mean the complete absence of a required commercial general liability policy or the complete absence of a Special Form/All-Risk policy insuring against property damage.

~CHGO2:20156016.v9  |6/3/04

(e)   **Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.** During the Term, Landlord shall keep in full force and effect policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (the "**Additional Areas**"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed $5,000 for Common Area liability coverage. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. In the event and during any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

(1)   Workers' Compensation - Statutory Limits; Employer's Liability - $500,000;

(2)   Automobile Liability for all vehicles with limits of $3,000,000; and

(3)   Commercial General Liability to include premises operations and products/completed operations coverage with limits of $3,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f) **Policy Provisions**. All policies of insurance (other than self-insurance) shall be provided by insurance carriers with a Best's rating of not less than A-VIII. Any insurance coverage may be effected by a blanket policy of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g) **Waiver of Right of Recovery and Subrogation**. To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas that is covered by (or would be covered by) the insurance required of the waiving party hereunder; and each party's policies of insurance shall contain provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h) **Evidence of Insurance**. Subject to Tenant's right to self-insure, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to policy expiration, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i) **Indemnities**. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable), Tenant agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use.



Except if arising from the negligent or willful acts of the other party or its agents or employees (to the extent that paragraph 14(g) is inapplicable), each party agrees to indemnify, defend and hold the other party harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, or resulting from the use by the indemnifying party, its agents or employees.

15.    **Damages by Fire or Other Casualty**.

(a)    **First Thirteen Lease Years**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas during the first thirteen (13) Lease Years, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured), Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    **Last Two Lease Years**.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, during (i) the last two (2) years of the Main Term or any Option Period which would require a restoration period in excess of two hundred ten (210) days, or (ii) the last two (2) years of the Term, regardless of the duration of restoration activities, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord (i) all insurance proceeds paid by Tenant's insurance carrier, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the

Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above. In the event Tenant does not elect to terminate this Lease, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same.

16.     **Condemnation**.

(a)     **Definition of Taking and Substantial Taking**. For the purpose of this Lease, a "**Taking**" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "**Date of Taking**" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion is taken by the condemning authority; and "**Substantially All of the Premises**" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center (excepting therefrom the outparcels shown on the Site Plan) as reduces the parking ratio by ten percent (10%) or more below the 201 parking spaces shown on the Site Plan or that ratio which is required by the zoning ordinance applicable to the Shopping Center (excepting therefrom the outparcels shown on the Site Plan), and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is unreasonably impeded and a reasonably similar substitute means of access is not promptly provided.

(b)     **Tenant's Rights Upon Taking or Substantial Taking**. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

~CHGO2:20156016.v9 |6/3/04

(c)   **Tenant's Rights Upon Less Than Substantial Taking**. In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated) and the portion of Landlord's Improvements award, excluding land, allocable to the Premises, which Landlord shall make available to Tenant for such restoration. If the Taking occurs within the last two (2) years of the Term and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)   **Landlord's Obligations Upon Any Taking**. In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)   **Rights Upon Temporary Taking**. In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding ninety (90) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant and Landlord in accordance with their respective interests. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of ninety (90) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)   **Taking of the Pylon Sign(s)**. In the event of a taking, whether permanent or temporary, of any pylon or monument sign on which Tenant has installed identification panels, Tenant shall be permitted to construct a substitute pylon or monument sign, with adequate electrical power, located so as to be visible to vehicular



traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center.

(g) **Tenant's Right Upon Condemnation.** In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law; provided, however, that any reward for the value of fee interest or reversion interest shall belong to Landlord.

(h) **Interest Applicable Solely to Landlord.** Landlord shall also be entitled to claim compensation from the condemning authority for the value of its unamortized improvements paid for by Landlord and any other items to which Landlord is entitled under applicable law, subject to subsection (g) above.

17. **Assignment and Subletting.** Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "**Transfer**") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent. In the event of a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord so long as this Lease is not changed, modified or amended without Tenant's consent. Should Tenant wish to be relieved of its obligations upon a Transfer, Landlord's and Mortgagee's prior consent to a Transfer shall be required, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the immediately preceding sentence, in the event any transferee subsequent to a Transfer has a net worth calculated in accordance with generally accepted accounting principles equal to or greater than Two Hundred Fifty Million and No/Dollars ($250,000,000.00), neither the consent of Landlord nor Mortgagee shall be necessary to such Transfer, and Tenant shall thereafter be relieved of any further obligation under this Lease. Tenant shall not be relieved of unfulfilled or past obligations unless assumed by the new Tenant. Landlord acknowledges and agrees that it shall be unreasonable for Landlord to withhold its consent to any Transfer for the purpose of obtaining a material amendment or modification to the terms of this Lease. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer and may be effected without Landlord's knowledge or consent.

(a) Except in connection with an "Intracorporate Transfer/Bulk Sale", if Tenant shall desire to assign or sublease all or any portion of the Premises, Tenant shall deliver written notice thereof ("**Assignment/Sublet Notice**") to Landlord, which Assignment/Sublet Notice shall, among other things, conspicuously state thereon that if Landlord does not deliver the Recapture Notice (defined below) within the 30 day period described below, Landlord shall be deemed to have elected not to exercise its recapture and termination right under this subparagraph (b). If available, Tenant shall include a copy of a letter of intent, the name of the proposed assignee or subtenant, any financial information delivered by said assignee or subtenant (but only to the extent Tenant is not required by law to keep such financial information confidential) and the rent and other material terms of the proposed assignment or sublease transaction. Landlord shall have the right to recapture and terminate this Lease with respect to the portion of the Premises



which is the subject of the proposed assignment or sublease by delivering written notice ("**Recapture Notice**") to Tenant thereof within thirty (30) days after receipt of Tenant's Assignment/Sublet Notice. Upon recapture, this Lease shall terminate in full (in the event of an assignment) or with respect to the portion of the Premises which Tenant proposes to sublet (in the event of a sublease) on the termination date set forth in Landlord's Recapture Notice to Tenant, which termination date shall occur no earlier than thirty (30) days, and no later than sixty (60) days, after the delivery date of Landlord's Recapture Notice. If Landlord shall elect to recapture and terminate this Lease as set forth herein, then Landlord shall pay to Tenant on the effective date of recapture the "Amount of Tenant's Unamortized Leasehold Improvements" (as defined below) with respect to those leasehold improvements made to the portion of Premises recaptured (based upon Tenant's records therefor which Tenant shall make available to Landlord promptly upon demand). Notwithstanding anything contained herein to the contrary: (i) Landlord shall have ten (10) business days after receipt of Tenant's calculation of the Amount of Tenant's Unamortized Leasehold Improvements to rescind Landlord's Recapture Notice in writing, and (ii) if Landlord does not so rescind Landlord's Recapture Notice, Landlord's obligation to pay to Tenant the Amount of Tenant's Unamortized Leasehold Improvements shall survive the expiration of or termination of this Lease. If only a portion of the Premises is recaptured (i) all monetary sums payable by Tenant under this Lease shall be reduced proportionately based on the ratio that ground-floor gross leasable area of the portion of the Premises recaptured bears to ground-floor gross leasable area of the full Premises; (ii) Tenant shall, at its expense, construct a demising wall separating the portion of the Premises recaptured from the balance of the Premises which remain following the recapture; and (iii) Landlord shall, at its expense, separate the Building systems which may economically and efficiently be separated. To the extent that any systems which service the Building cannot be economically and efficiently separated, Landlord and Tenant shall, in good faith, agree upon a sharing arrangement for the maintenance, usage of, accessibility to, and payment for the use of, such systems. Landlord's exercise of the recapture right under this paragraph 17(b) shall be irrevocable. If Tenant does not receive said Recapture Notice from Landlord within the thirty (30) day period granted to Landlord above, then Landlord shall be deemed to have elected not to recapture and terminate this Lease pursuant to this paragraph 17(b) with respect to the proposed assignment or sublet, provided that any subsequent assignment and sublet shall remain subject to the terms and conditions of this paragraph 17(b). For purposes of this paragraph, an "**Intracorporate Transfer/Bulk Sale**" shall mean any of the following transfers: (i) to any entity or corporation which has the power to direct Tenant's management and operation, or any corporation or entity whose management and operation is controlled by Tenant; or (ii) to any corporation or entity, a majority of whose voting stock or interests are owned by Tenant; or (iii) to any corporation or entity in which or with which Tenant, its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions of merger or consolidation of corporations or entities; or (iv) to any corporation or entity acquiring this Lease and all or substantially all of Tenant's assets; or (v) to any corporate successor to a successor corporation becoming such by either of the methods described in subsections (iii) or (iv); or (vi) to any entity (or member of a group of affiliated entities)

which is acquiring either the majority of Tenant's other stores within the Columbus, Ohio metro area or a number of Tenant's other similar stores. For purposes of this Lease, the term "**Amount of Tenant's Unamortized Leasehold Improvements**" shall mean an amount equal to the unamortized portion of the difference which is obtained by subtracting Landlord's monetary contributions (including, without limitation, the Tenant Improvement Allowance) theretofore paid by Landlord to Tenant on account of Tenant's leasehold improvements (including, without limitation, the Building) made to the Premises from the total hard construction costs of Tenant's leasehold improvements made to the Premises, amortized on a straight line basis in accordance with generally accepted accounting principles over the term remaining in the Lease when such improvement was made.

18.    **Use**.

(a)    Tenant may initially use and operate the Premises as a retail store for (i) the sale of consumer, office, business and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers, video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items are collectively referred to as the "**Products**"), and (ii) renting, servicing, repairing and warehousing of the Products.

(1)    Tenant shall also have the right to use the Premises for any lawful use; provided, however, that, without limiting Tenant's use rights under paragraph 18(a) above, the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants, in each case which is executed prior to this Lease and all of which are set forth in full on **Exhibit "F"**, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in **Exhibit "F"**.

(2)    Nothing contained in this Lease shall be construed to require Tenant to open for business to the public at the Premises or, except as provided herein, to operate the Premises continuously either for the use first stated or for any other use. In the event that Tenant opens for business and subsequently elects to cease its business operations at the Premises (except under circumstances listed below), such cessation shall not be deemed to be an Event of Default as long as Tenant has not violated any of Tenant's monetary obligations hereunder (beyond applicable notice and cure periods), nor shall such cessation relieve Tenant of any of its liabilities or obligations under this Lease. Upon its determination to cease operations, Tenant shall notify Landlord in writing of such decision ("**Tenant's**

24

Notice"), whereupon Landlord shall have the option of recapturing the full Premises by terminating this Lease. Such option shall be exercisable by Landlord only during the period (time being of the essence) commencing on the date (the "**Landlord's Recapture Right Commencement Date**") which is one hundred eighty (180) days after the earlier to occur of (i) the date Tenant notifies Landlord, by Tenant's Notice, that Tenant is ceasing to operate in the Premises, or (ii) the date Tenant actually ceases operation in the Premises, as applicable, and ending on the date which is the six (6) month anniversary of Landlord's Recapture Right Commencement Date, provided that – prior to exercise by Landlord of its option herein granted – Tenant has not effected an assignment or subletting pursuant to paragraph 17 above or reopened for business to the public in the Premises. Landlord shall exercise such recapture option by delivering notice to Tenant that it intends to terminate this Lease ("**Landlord's Notice**"), in which event this Lease shall terminate ninety (90) days after receipt of Landlord's Notice unless the aforementioned assignment or subletting has occurred. If Landlord fails to timely exercise said option to terminate and recapture and Tenant (or any assignee or sublessee) thereafter reopens for business to the public, Landlord shall once again have such option to terminate and recapture pursuant to the provisions of this paragraph 18(a)(2) if the occupant of the Premises thereafter ceases operating for one hundred eighty (180) consecutive days or provides Tenant's Notice stating that Tenant is ceasing to operate in the Premises. Upon any recapture and termination described in this paragraph 18(a)(2), Tenant and Landlord shall be relieved of and from any and all further liability or obligation to the other under and pursuant to this Lease with respect to matters accruing under the Lease from and after the effective date of the recapture, and further, Landlord shall pay to Tenant the Amount of Tenant's Unamortized Leasehold Improvements, if any.

19. <u>**Warranties, Representations and Covenants**</u>.

(a)     Landlord represents and warrants and, with respect to subparagraphs (v), (vi), (viii), (ix), (x), (xi) and (xii) below, additionally covenants, to Tenant that:

(i)     <u>**Quiet and Peaceful Enjoyment**</u>.  Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)     <u>**Title**</u>.  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on **Exhibit "F"** attached and entitled "**Permitted Encumbrances**".  Nothing contained in any other agreement or instrument which encumbers Landlord or the Shopping Center shall restrict Tenant's rights under this Lease.  Landlord specifically warrants, to the best of Landlord's knowledge, that no third party has the right to (x) object to Tenant's tenancy, (y) prohibit the sale, rental, servicing, repair or warehousing of the Products, or (z) consent to any feature of the Improvements or Tenant's signage except as expressly provided herein.  This

representation and warranty and those following are a material inducement to Tenant's execution of this Lease.

To the best of Landlord's knowledge and except as provided in the Permitted Encumbrances existing as of the date of this Lease, Landlord represents and warrants to Tenant the following:

(1)    There are no existing utility lines, easements or facilities or other easements of any kind located or proposed to be located in, on or under the Land, and no blanket easement encumbers the Land.

(2)    There are no existing or proposed easements which conflict with or which are located under any access drive or drive aisle within the Shopping Center, which would prevent or hinder the use of same for vehicular and pedestrian traffic over same.

(3)    Except as expressly set forth on Exhibit F, there are no covenants or restrictions of record or laws, codes or ordinances which would prohibit, restrict, hinder or limit Tenant's intended use of the Premises for the sale, rental, servicing, repair or warehousing of electronic products (including the Products) or sale and installation of car stereos and other accessories, use of roof-mounted satellite equipment or installation of Tenant's proposed signage and subsequent rights to alter same to conform to Tenant's prototypical signage and/or design motif.

(4)    Intentionally Omitted.

(5)    Occupants of the Shopping Center have rights of ingress and egress to and from the mall ring road and the mall entrance drives, which are private streets maintained by Polaris Fashion Mall pursuant to the Reciprocal Easement Agreement for Polaris Fashion Mall.

(6)    No third party has rights to drill, mine, explore for or develop, produce or extract any minerals located on or beneath the Shopping Center and no drilling, mining, exploration for or production, development or extraction of any minerals shall be permitted on the Shopping Center.

(7)    With respect to the Protective Covenants, Landlord is in good standing and there are no outstanding dues or assessments owing against the Land.

(8)    No third party except Landlord's mortgagee, if any, has any right of first refusal or repurchase or re-entry with respect

to the Land and no third party has any prior approval of a future purchaser or tenant or occupant of the Land.

(9)    There are no notices of violations of covenants, conditions, restrictions, laws or regulations relating to environmental protection recorded or filed in the public records and Landlord has not received any such notices from any state, federal or local governmental or quasi-governmental authority.

(10)    There are no mortgages currently encumbering the Land.

(11)    There are no mechanic's, laborer's or materialmen's liens or judgments encumbering the Land and Landlord has not received notice of any pending or potential liens or judgments to be filed against the Land.

(12)    There are no delinquent taxes, assessments or utility charges or fines or penalties related thereto owning against the Land and Landlord has not received any notice thereof.

For purposes of this Lease, the term "**Landlord's Knowledge**" shall mean the actual knowledge of Franz A. Geiger, being the Vice President of Landlord, and being the person affiliated with Landlord that is most responsible for, and knowledgeable about, the acquisition, development and operation of the Shopping Center, with an affirmative obligation of such person to review all of Landlord's and its affiliates' files respecting the acquisition, development and operation of the Shopping Center and to inquire from other management and personnel of Landlord and its affiliates, and Landlord's management company (if any) that are likely to have knowledge about the issue for which the applicable representation, warranty or covenant is being made.

(iii)    **Certificate of Authority**.  Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Ohio, and that its President, who is acting as its signatory in this Lease, is duly authorized and empowered to act on behalf of the Company.  Landlord has furnished Tenant with evidence of (a) the existence of the Company, and (b) the authority of the President to bind the Company as contemplated herein.

(iv)    **No Litigation**.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which would preclude or interfere with, the construction, occupancy and use of the Premises for the purposes contemplated.

(v)    **Hazardous or Toxic Materials**.    Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as hereinafter

defined in this subparagraph (v)) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the Effective Date, or any Hazardous Substances are discovered at the Shopping Center (unless introduced by Tenant, its agents, customers, invitees, representatives or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, as long as Landlord or any of the tenants or occupants of the Shopping Center (other than Tenant) is the cause of the Hazardous Substances at the Shopping Center, and Landlord indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity as long as Landlord or any of the tenants or occupants of the Shopping Center (other than Tenant) is the cause of the Hazardous Substances at the Shopping Center. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State and/or the United States government (herein collectively referred to as "**Hazardous Substances**"). Tenant has performed a Phase 1 on the Premises and, for information purposes only, the summary of that Phase 1 is attached hereto as Attachment "3" to **Exhibit "C"**.

The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)   **Tenant's Exclusive Use**. So long as the Premises are used for the initial uses set forth in paragraph 18(a), no other tenant or occupant of the Shopping Center or any adjacent parcel to the Shopping Center (including parcels separated by a public or private street from the Shopping Center) owned by Landlord or an affiliate, shall be entitled to sell or rent (or rent to own), service, repair or warehouse any of the Products, subject only to existing rights granted to Fortune V d/b/a Sofa Express and Lifeway Center, LLC, Max & Erma's and Solomon Oil Company; provided, however, that the foregoing exclusive use right shall not prohibit Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant. As used herein, "**Incidental Sale**" shall mean the sale, rental, servicing, repairing or warehousing of item(s) in an area comprising the lesser of (i) one thousand (1,000) square feet, and (ii) ten percent (10%) of such occupant's or tenant's display area. In addition to any other remedies which Tenant may have in

connection with a violation of the exclusive use right granted Tenant herein, payment of Base Rent, Ground Rent, CAM Charges, Real Estate Taxes and all other sums due Landlord hereunder shall abate (and shall not accrue) during any time in which such violation exists.

(vii)   **Zoning and Subdivision**.  The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18(a) of this Lease.

(viii)   **Prohibited Activities**.  Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center in violation of the Declaration of Restriction or for use as:

(A)   a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)   a bowling alley;

(C)   a billiard or bingo parlor;

(D)   a flea market;

(E)   a massage parlor;

(F)   a funeral home;

(G)   a facility for the sale of paraphernalia for use with illicit drugs;

(H)   a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)   an off-track betting parlor;

(J)   a carnival, amusement park or circus;

(K)   a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)   a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer game room (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments [other than a dry cleaning store with drop-off services only]) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation; except that up to one such service-oriented office equal to or less than 2,000 square feet shall be permitted in the Shopping Center;

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods; or

(U)    a gymnasium, sport or health club or spa, except that one of the foregoing uses, comprising 1,500 square feet or less, shall be permitted in the Shopping Center.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within the Shopping Center unless such restaurant solely provides take-out service from the restaurant and not sit-down service in the restaurant. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

(ix)  **Site Covenants**.  Landlord makes the following covenants (the "Site Covenants"):

(A)  **Building Height and Location**.  No building within the Shopping Center shall exceed twenty-eight (28) feet in height above finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area (as depicted on the Site Plan attached hereto as Exhibit A).  No development shall occur within the Shopping Center except as shown on the Site Plan except the possibility of an ATM drive-up in the area shown on the Site Plan.

(B)  **Construction and Alterations**.  Following Tenant's opening for business to the public at the Premises, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view, as requested by Tenant, in Tenant's reasonable judgment.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges.  Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold.  Landlord shall not make any other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's consent, which may be withheld in Tenant's reasonable discretion.  Without limiting any of the express restrictions set forth in this Lease, any other changes to the Common Areas may be made without Tenant's express written consent.

(C)  **Prohibited Uses in Common Area**.  Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the

Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 40 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(D)    **Easements**. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas except utility easements if they do not affect Tenant's use of its Premises without Tenant's prior written consent.

(x)    **Interference with Tenant's Reception/Transmission**. Landlord shall not install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

(xi)    **Notices Affecting the Premises**. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)    **Constructive Trust**. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments when due.

(b) Tenant represents and warrants and, with respect to subparagraph (ii) below also covenants, to Landlord that:

(i) **Tenant's Authority**. Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii) **Tenant's Warranty as to Hazardous or Toxic Materials**. As to Tenant's use and occupancy of the Premises and use of the Common Areas, neither Tenant nor its agents or employees will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c) In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ or action of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants in this paragraph 19 are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach.

20. **Estoppel Certificates**. Without charge, at any time within thirty (30) days after receipt of written request by either party, the other party shall certify, in writing, to any other entity ("**Person**") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be requested. In addition, without charge, at any time within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under its obligations under this Lease following the date of any assignment or subletting, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant, including but not limited to the direct payment of rentals to Landlord. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    **Subordination, Non-Disturbance and Attornment**.

(a)    Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center, a subordination, non-disturbance and attornment agreement in the form and substance of **Exhibit "G"** attached, executed by the landlord under any such Ground Lease ("**Ground Lessor**") or the holder of such Mortgage ("**Mortgagee**"), as applicable.  In addition, throughout the term, Landlord shall deliver to Tenant a subordination, non-disturbance and attornment agreement in the form of **Exhibit "G"** executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages.  Upon Tenant's execution of said subordination, non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage.  Landlord shall cause any present or future Mortgagee or Ground Lessor to deliver a subordination, non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time the lien of the Mortgage is filed against record title to the Shopping Center or Ground Lease is executed, as applicable.  As used in this paragraph 21, the term "**Mortgage**" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "**Ground Lease**" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof.

(b)    Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such subtenant agrees that it will attorn to Landlord on the terms of said sublease and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment.

(c)    In the event of Landlord's failure to deliver to Tenant the subordination, non-disturbance and attornment agreements on a timely basis as required under paragraphs 21(a) and (b) above and in paragraph 35 hereof, Tenant shall be entitled to two (2) days' abatement of Base Rent for each day that the non-disturbance and attornment agreement is past due, notwithstanding any other remedies available to Tenant in connection therewith otherwise in this Lease.  Such rental abatement shall be applied by Tenant as Tenant so desires, and if Base Rent is not then due, abatement in the amount of the Base Rent shall be applicable to Ground Rent if Ground Rent is then due, but in the amount of Base Rent as if Base Rent were due.

22.    **Tenant's Financing**.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, secure financing or general credit lines and grant the lenders, as security, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "**Personalty**"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with

rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to act in good faith, and upon reasonably customary terms, to consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described in paragraph 23 below.

23.   **Tenant's Property and Waiver of Landlord's Lien**.  All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent against any Personalty of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time upon Tenant's request.

24.   **Memorandum of Lease; Commencement Date Agreement**.  Landlord and Tenant agree, at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached **Exhibit "H"**, setting forth such provisions hereof including an automatic termination provision as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached as **Exhibit "I"**, once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.   **Expiration of Term and Holding Over**.  At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises in a broom clean condition.  Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

26.   **Force Majeure**.  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or prevented from, the performance of any non-monetary act required by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) and (d) of this Lease.

27.   **Events of Tenant's Default**.  Any of the following occurrences by Tenant shall constitute an "Event of Default" under this Lease:

(a)    **Failure to Pay Rent; Breach**. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue (provided, such notice shall only be required to be delivered two times in any Lease Year); or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    **Bankruptcy**. Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, including an assignment of the benefit of creditors, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

(c)    **Financial Insolvency**. Tenant shall notify or admit in writing to Landlord that Tenant is insolvent and unable to pay its debts and has commenced or otherwise filed a petition to commence one of the insolvency or bankruptcy proceedings described in (b), above.

28.    **Landlord's Remedies**. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)    **Continue Lease**. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and any other charges due Landlord as specified herein when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages as provided herein (which Landlord agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord.

(b)    **Terminate Lease**. Landlord may terminate this Lease by written notice to Tenant specifying a date, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified. In



the event of such termination, Landlord shall be entitled to accelerate the Base Rent. If Landlord does accelerate the Base Rent due hereunder, then the accelerated Base Rent shall be equal to the Base Rent which accrued prior to the date of termination plus the Base Rent that would have accrued during the balance of the Lease Term (as if this Lease had not been terminated) less the fair rental value of the Premises for the corresponding period (after taking into consideration reasonable assumptions concerning vacancy, reletting, abatement during tenant build out, cost of broker's commissions attributable to reletting, etc). The positive difference between the accelerated Base Rent less the fair rental value of the Premises for the corresponding period shall be discounted to present value at an annual interest rate equal to eight percent (8%). Upon payment to Landlord of such positive difference between accelerated Base Rent less the fair rental value of the Premises for the corresponding period, after being discounted to present value as provided herein, Tenant shall be released from all further liability under this Lease. Landlord shall never be entitled to recover from Tenant any consequential, punitive or incidental damages (including, without limitation, lost business opportunity), or to dispossess Tenant of the Premises pursuant to any "lock-out" or other non-judicial remedy.

(c)   **Remedies Are Cumulative; Mitigation**.  The various rights and remedies reserved to Landlord are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review. Landlord further agrees to take all reasonable measures to mitigate Landlord's damages arising from an Event of Default.

Notwithstanding the foregoing, any obligation imposed by law upon Landlord to relet the Premises shall be subject to the then-existing exclusive uses and the retail nature of the Shopping Center.

(d)   **Additional Landlord Rights Due to Construction Delays by Tenant**. In the event, for any reason and regardless of *force majeure*, Tenant after diligently pursuing substantial completion, shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then Landlord shall be entitled, as its sole remedy for Tenant's failure to so achieve Substantial Completion, to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default provided another Tenant-default (for which Tenant has been given notice) does not then exist; in the event that Landlord so terminates this Lease, Landlord shall pay to Tenant, on or before the date of termination and as a condition to such termination, the amount of Tenant's then unamortized cost of the Improvements (based upon Tenant's records with respect thereto [which records Tenant shall make available to Landlord promptly upon demand]), provided that Tenant's



amortization shall be on a straight-line basis in accordance with generally accepted accounting principles.

29.    **Events of Landlord's Default; Tenant's Remedies**.

(a)    **Default by Landlord**.  Any of the following shall constitute an "**Event of Default**": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion.  In the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

(b)    **Remedies Upon Landlord's Default**.  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following:  (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against not more than 50% of the next monthly installments(s) of Base Rent, CAM Charges and all other amounts and charges due Landlord, or (ii) withhold up to 50% of Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest, transaction costs and attorney's fees, is cured by Landlord, or (iii) terminate this Lease and sue for damages, including, without limitation, interest, transaction costs and attorneys' fees.  If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.  All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings.  The various rights and remedies reserved to Tenant are cumulative, and Tenant may pursue all rights and remedies, whether at the same time or otherwise.  Wherever in this Lease Tenant's right to offset Base Rent, CAM Charges or any other amounts and charges due Landlord is limited to a percentage of such costs, Tenant may exceed such percentage if required to completely offset the entirety of the amount due Tenant prior to the expiration of the Term.

(c)    **Intentionally Omitted**.

(d)    **Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord**.  In the event that Landlord defaults at any time in completion of any component of the Landlord Work (as defined in **Exhibit "C"** attached hereto) required for Landlord to perform Delivery of the Land when required hereunder, in addition to any other rights and remedies set forth hereinabove, Tenant shall have the right, but not the obligation, to do any or all of the following:

(i)    Intentionally deleted;

(ii)    seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations hereunder, all costs of which litigation (including Tenant's attorneys' fees and court costs) shall be borne by Landlord; and/or

(iii)    seek such other legal remedies as may be available to Tenant at law and/or in equity, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

(e)    **Tenant Remedies Due to Landlord's Failure to Pay the Tenant Improvement Allowance**.  If Landlord fails to pay the Tenant Improvement Allowance in full on or before its due date and as provided in this Lease, Landlord shall be in default hereunder, and no Ground Rent (except for Ground Rent which has been theretofore paid pursuant to Section 4(i) above), Base Rent or CAM Charges or other amounts (including, without limitation, Real Estate Taxes) under this Lease shall be due or owing to Landlord until the same is paid to Tenant, together with interest which shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following the date that the Tenant Improvement Allowance is due pursuant to the provisions of paragraph 2 above until the date of payment of the Tenant Improvement Allowance,   In addition, if Landlord has not tendered payment of the Tenant Improvement Allowance and interest by that date which is one (1) year from the date that the Tenant Improvement Allowance is due pursuant to the provisions of paragraph 2 above (the "**Allowance Due Date Anniversary**"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of this Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

If Landlord has not tendered payment of the Tenant Improvement Allowance and interest by the Allowance Due Date Anniversary, then at any time following the said



Allowance Due Date Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "**Leasehold Premises Transfer**") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 22 of this Lease.

Landlord covenants to (i) execute all documents reasonably acceptable to Landlord which are necessary to permit Tenant to effect the Leasehold Premises Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Leasehold Premises Transfer. Notwithstanding such Leasehold Premises Transfer, Tenant or its transferee, as the case may be, shall continue to pay the ground rentals described in this subparagraph (e) during the remainder of the Term.

(f)    **Exercise of Remedies**. Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to Tenant under this paragraph 29 shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due.

30.    **Waiver**. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.    **Compliance with Applicable Laws**. During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters (collectively, the "**Lawful Requirements**") respecting Tenant's use and occupancy of the interior of Improvements and Landlord shall comply with all Lawful Requirements relating to the exterior of the Building and Common Areas. In the event that Tenant, after thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, following thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which

Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct no more than fifty percent (50%) of the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent until Tenant is fully reimbursed.

32.    **Notices**.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:

> CIRCUIT CITY STORES, INC.
> Deep Run I
> 9950 Maryland Drive
> Richmond, Virginia 23233
> Attention:  Vice President of Real Estate

with a copy to:

> CIRCUIT CITY STORES, INC.
> Deep Run I
> 9950 Mayland Drive
> Richmond, Virginia 23233
> Attention:  Corporate Secretary

If to Landlord:

> Polaris Circuit City, LLC
> 8800 Lyra Drive, Suite 550
> Columbus, Ohio 43240
> Attention:  Franz A. Geiger

or to such other addressees as any party shall from time to time give notice to the other party in accordance with this paragraph.

33.    **Brokers**.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Millenium Retail Partners, LLC and Polaris Real Estate Company which is representing Landlord (collectively, "**Brokers**"), which shall be paid a commission by Landlord pursuant to a separate written agreement with Brokers, a copy of which Landlord agrees to deliver to Tenant on or before the Effective Date. Landlord agrees that Brokers are representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Brokers of the Broker's commission, the Brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party has purported to have dealt.  If Landlord fails to timely pay the brokerage commissions described above, Tenant may, at Tenant's option, elect to do so,

whereupon Landlord shall reimburse to Tenant the amount so paid within fifteen (15) days following receipt from Tenant of notification thereof, together with interest at the Default Rate from the date of Tenant's payment through the date of reimbursement. If Landlord has failed to pay such amount within such fifteen (15) day period, Tenant may, at its election, offset such amounts from its payments of Base Rent, Ground Rent, CAM Charges and other amounts due hereunder. Landlord represents to Tenant that Landlord has entered into a binding brokerage commission agreement in writing with Brokers and heretofore or simultaneously herewith delivered a copy thereof to Tenant.

34.    **Miscellaneous**.

(a)    **Headings and Gender**.    All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    **Construction**.  The parties agree that all the provisions are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph.

(c)    **Waiver of Jury Trial**.  In the event of any court action arising out of this Lease, each party waives its right to trial by jury.

(d)    **Relationship of Landlord-Tenant**.  Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)    **Entire Agreement; Merger**.  This Lease, including all exhibits (which are incorporated by reference for all purposes), contains the full and final agreement between the parties concerning the subject matter of this Lease, and all preliminary negotiations and agreements between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)    **Attorneys' Fees**.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)    **Partial Invalidity**.  If any provision of this Lease or the application to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this

Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part.

(h)   **Consents**.  Any consent or approval granted by either party shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)   **Holidays**.  If the day on which rent or any other payment due date falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j)   **Applicable Law**.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)   **Successors and Assigns**.  All rights, obligations and liabilities given to or imposed upon any party shall extend to the permitted successors and assigns of such party.

(l)   **Counterparts**.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)   **Trademarks and Trade Names**.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)   **Exhibits**.  All of the exhibits to this Lease are incorporated by reference for all purposes and are part of this Lease.

(o)   **No Construction Against Either Party**.  This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)   **Transfer of Landlord's Interest**.  Landlord may not sell or transfer all or part of its ownership of the Shopping Center until and unless the Tenant Improvement Allowance is paid in full to Tenant, and thereafter, Landlord shall not transfer all or part of its ownership of the Shopping Center without first notifying Tenant of the intended purchase or assignment, and upon completion of the purchase or assignment, delivering to Tenant evidence that the purchaser or assignee has assumed all obligations of Landlord under this Lease.

(q)    **Effective Date**. This Lease shall be deemed executed on the date (the "**Effective Date**") on which it is fully executed and delivered by all parties, and such Effective Date shall be the date set forth in the opening paragraph of this Lease.

(r)    **Trademark**. The parties hereby acknowledge that the names "Polaris" and "POLARIS Centers of Commerce" (the "**Names**") are names and marks which have been (a) registered with both the State of Ohio and the U.S. Patent and Trademark Office and (b) licensed to Landlord for its limited use generally in connection with the operation of the Shopping Center. Accordingly, other than the use of the "Polaris Circuit City" and "Polaris Shopping Center" names to identify the location of Tenant's store (in advertisements and other media), authorized users shall use no symbol, design, name, mark or insignia adopted by or identifying Landlord, including without limitation the Names, without the prior approval of Landlord, which approval shall not be unreasonably withheld. Because of the uniqueness of the Names and the lack of any other adequate remedy at law, in the event any user fails to observe the restrictions of this provision, either or both of the Landlord and the licensor of the Names shall be entitled to a temporary restraining order, preliminary and permanent injunctions, and specific performance.

(s)    **Facsimile Signature**. The use of facsimile signatures is acceptable and such signatures shall be deemed as originals.

(t)    **Liability of Landlord**. If Landlord shall be in default under this Lease and if, as a consequence of such default, Tenant shall recover a money judgment against Landlord, such judgment shall be satisfied only out of the right, title and interest of Landlord in the Shopping Center as the same may then be encumbered, the Landlord's income (including all rents) from the Shopping Center and the insurance proceeds applicable to the Shopping Center, and neither Landlord nor any person or entity comprising Landlord shall be personally liable for any deficiency. In no event shall Tenant have the right to levy execution against any property of Landlord nor any person or entity comprising Landlord other than its interest in the Shopping Center as herein expressly provided.

(u)    **Governing Law; Venue**. This lease has been negotiated and executed in the State of Ohio and relates to real property located in the State of Ohio.

All questions concerning the validity or intention of this lease shall be resolved under the laws of the State of Ohio. The parties to this lease hereby designate the Court of Common Pleas of Delaware County, Ohio, as the court of proper jurisdiction and exclusive venue for any actions or proceedings relating to this lease; hereby irrevocably consent to such designation, jurisdiction and venue; and hereby waive any objections or defenses relating to jurisdiction or venue with respect to any action or proceeding initiated in the Court of Common Pleas of Delaware County, Ohio.

35.    **Effectiveness of Lease; Tenant's Right to Terminate**. Notwithstanding the execution of this Lease or any provision to the contrary, the parties agree that the effectiveness of

this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions within ninety (90) days after the date of this Lease:

(a)    Tenant's receipt, simultaneously with or prior to the execution of this Lease, of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) an ALTA survey of the Shopping Center (to be obtained by Tenant, and the cost of which shall be reimbursed to Tenant upon delivery of an invoice therefor to Landlord), at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution of this Lease.

(c)    Landlord's Delivery of the Land by the Delivery Date.

(d)    Tenant's obtaining: (i) written confirmation from appropriate local authorities that current zoning and use regulations allow construction of the Improvements on the Premises; and (ii) the required City, County, State and other necessary governmental agency permits and approvals to construct said Improvements on the Premises. Tenant agrees to apply for such permits promptly as provided, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

(f)    Tenant's obtaining, if applicable, from Landlord copies of soils and Hazardous Substances reports satisfactory to Tenant. Landlord shall not be obligated to create new soil and Hazardous Substances reports in connection with Tenant's execution of this Lease.

(g)    Tenant's obtaining satisfactory assurances, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity in amounts sufficient to support Tenant's operations.



(h)    Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, planned unit developmental boards and other necessary entities, and all necessary reciprocal use and easement agreements have been obtained.

(i)    Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center.

(j)    Intentionally Omitted.

(k)    Upon execution of this Lease, Landlord's delivery to Tenant of the W-9 form, completed and executed by Landlord, submitted to Landlord by Tenant with the Lease.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived within the ninety (90) day period, the parties expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to expiration of the ninety (90) day period by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) shall survive such termination) upon Tenant's delivery of said notice to Landlord. All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time thereafter provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall be null and void.

36.    **Intentionally Omitted**.

37.    **Intentionally Omitted**.

38.    **Intentionally Omitted**.



39.    **Importance of Each Covenant**. Each covenant and agreement on the part of one party hereto is understood and agreed to constitute an essential part of the consideration for each covenant and agreement on the part of the other party.

40.    **"For Rent" Signs**. Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot portion of Tenant's Preferred Area. During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

## [END OF PAGE; SIGNATURES ON FOLLOWING PAGE]



**WITNESS** the following signatures and seals:

**LANDLORD**:

**POLARIS CIRCUIT CITY, LLC,** an
Ohio limited liability company

By: _____

Name: Robert C. Echele
Title: President

Date: _____

Landlord's counsel:

_____
_____
_____

**TENANT**:

**CIRCUIT CITY STORES, INC.,** a
Virginia corporation

By:_____

Thomas C. Nolan, Vice President of
Real Estate

Date: _____

Tenant's counsel:

Piper Rudnick LLP
203 North LaSalle Street
Chicago, Illinois 60601
Attn:  Dov J. Pinchot, Esq.

Approved for Signature:

_____ Responsible Atty.
_____ Reviewing Atty.
_____ RE Manager

48

~CHGO2:20156016.v9 |6/3/04

**WITNESS** the following signatures and seals:

**LANDLORD**:

**POLARIS CIRCUIT CITY, LLC,** an Ohio limited liability company

By:_____

Date: _____

    Name: Robert C. Echele
    Title: President

Landlord's counsel:

_____
_____
_____

**TENANT**:

**CIRCUIT CITY STORES, INC.,** a Virginia corporation

By:_____

Date: June 15, 2004

    Thomas C. Nolan, Vice President of
    Real Estate

Tenant's counsel:

Piper Rudnick LLP
203 North LaSalle Street
Chicago, Illinois 60601
Attn:  Dov J. Pinchot, Esq.

Approved for Signature:

_____ Responsible Atty.
_____ Reviewing Atty.
_____ RE Manager

~CHGO2:20156016.v9  |6/3/04

48