# EXHIBIT "A"

## SITE PLAN



# EXHIBIT "A-1"

## LEGAL DESCRIPTION

**(attached)**

**5.090 Acres**

Situated in the State of Ohio, County of Delaware, City of Columbus, Section 4, Township 3, Range 18, United States Military Lands, Farm Lots 12 and 13, and being 1.692 acres out of said Farm Lot 12 and being 3.398 acres out of Farm Lot 13 and also being 1.349 acres out of a 59.424 acre tract as conveyed to N.P. Limited Partnership (Parcel 1) of record in Deed Book 486, Page 547 and being 0.280 acres out of a 134.411 acre tract as conveyed to N.P. Limited Partnership Trustee U/A of record in Official Record 26, Page 445 and being 1.088 acres out of an original 26.928 acre tract as conveyed to N.P. Limited Partnership of record in Official Record 26, Page 439 and being 2.393 acres out of a 9.896 acre tract as conveyed to N.P. Limited Partnership of record in Deed Book 608, Page 653 (all records being of the Recorder's Office, Delaware County, Ohio) and being more particularly described as follows:

Beginning for reference at a found Iron Pin at the centerline Intersection Lyra Drive (100.00 feet wide) as recorded in Plat Cabinet 1, Slide 632 and Polaris Parkway (164.00 feet wide) as recorded in Plat Book 24, Page 137;

Thence North 06°28'44" West crossing said Polaris Parkway and with the centerline of Lyra Drive as recorded in Plat Cabinet 2, Slide 398, a distance of 142.70 feet to a point;

Thence South 83°31'16" West crossing said Lyra Drive, a distance of 50.00 feet to a 1" iron pipe set with an EDG cap and being a point on the westerly right-of-way line of said Lyra Drive and being the true point of beginning;

Thence through said Farm Lots 12 and 13 and through said 134.411 acre tract, 59.424 acre tract, 26.928 acre tract, and 9.896 acre tract, the following nine (9) courses;

1) North 61°04'14" West, a distance of 549.92 feet to a 1" iron pipe set with an EDG cap;

2) North 33°38'16" West, a distance of 190.05 feet to a 1" iron pipe set with an EDG cap and being a point of curvature;

3) With a curve northeasterly and to the left having a radius of 1919.00 feet, a central angle of 11°10'44", a chord bearing of North 57°56'24" East, a distance of 373.82 feet to a 1" iron pipe set with an EDG cap;

4) South 83°46'24" East, a distance of 79.45 feet to a 1" iron pipe set with an EDG cap and being a point of curvature;

5) With a curve southeasterly and to the left having a radius of 263.00 feet, a central angle of 13°38'44", a chord bearing of South 54°16'02" East, a distance of 62.34 feet to a 1" iron pipe set with an EDG cap;

6) South 61°04'25" East, a distance of 200.42 feet to a 1" iron pipe set with an EDG cap;

7) South 35°54'20" East, a distance of 35.75 feet to a 1" iron pipe set with an EDG cap and being a point on a curve on the westerly right-of-way line of said Lyra Drive;

8) With said westerly right-of-way line and with a curve to the left having a radius of 750.00 feet, a central angle of 30°57'17", a chord bearing of South 08°59'55" West, a distance of 400.29 feet to a 1" iron pipe set with an EDG cap;

9) South 06°28'44" East continuing with said westerly right-of-way line, a distance of 56.75 feet to the true point of beginning and containing 5.090 acres of land more or less.

This description was prepared by Environmental Design Group Inc., Columbus, Ohio. The basis of bearing is based on the Grid Bearing of North 88°20'26" West, from the Ohio State Plane Coordinate System, North Zone, as determined between stations "11-009 and "11-0101", established by Delaware County Engineer.

Maynard H. Thompson, P.S. #7128    6/4/01    Date

1/23/01
S:\POLARIS\461601\Job_da87\survey\LEGALS\5_090.doc



# EXHIBIT "B"

## INDEX OF DEFINITIONS

| **Term** | **Paragraph Where Defined** |
|---|---|
| Additional Areas | 14(e) |
| Adjacent Tract | 37 |
| Base Rent | 4 |
| Broker | 33 |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year(s) | 7(c) |
| Circuit City Specifications | Ex. "C", para. 1(a) |
| City | 1 |
| Civil Plans | Ex. "C", para. 1(a) |
| Commencement Date | 4 |
| Common Area Easement | 6(b) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| Cotenancy Requirement | 38 |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery Date | 29(c) |
| Delivery of the Land | Ex. "C", para. 1(a) |
| Effective Date | 34(q) |

| Term | Paragraph Where Defined |
|---|---|
| Event of Default (Landlord) | 29 |
| Event of Default (Tenant) | 27 |
| Gross Sales | Ex. "K" |
| Ground Lease | 21(a) |
| Ground Lessor | 21(a) |
| Hazardous Substances | 19(a)(v) |
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1 |
| Landlord's Premises | 1 |
| Lawful Requirements | 31 |
| Lease Year | 3 |
| Main Term | 3 |
| Measuring Period | 42 |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Offer | 36 |
| Option Period(s) | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |

~CHGO2:20156016.v9 |6/3/04

| **Term** | **Paragraph Where Defined** |
| --- | --- |
| Personalty | 22 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 2 |
| Pro Rata Share | 7(c) |
| Products | 18(a) |
| Real Estate Taxes | 9(a) |
| Reduction Amount | 42 |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Delivery Work | Ex. "C", para. 1(a) |
| Staging Area | 6(a) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(d) |
| Substantial Completion Anniversary | 29(e) |
| Substantially All of the Premises | 16(a) |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | 2 |
| Tenant's Preferred Area | Ex. "A" |

~CHGO2:20156016.v9  |6/3/04

| **Term** | **Paragraph Where Defined** |
| --- | --- |
| Tenant's Soils Report | Ex. "C", para. 1(a) |
| Term | 3 |
| Transfer | 17 |

Polaris Shopping Center
Columbus, Ohio

## EXHIBIT "C"

## CONSTRUCTION PROVISIONS

These CONSTRUCTION PROVISIONS are made a part of the Lease between Landlord and Tenant and are attached as **Exhibit "C"**.

1.    **Landlord's Delivery of the Land; Other Landlord Work**. These Construction Provisions contemplate that Landlord shall deliver the land comprising the Shopping Center upon execution of the Lease by the parties thereto and that Tenant shall construct the Site Work (defined below) for the entire Shopping Center, and may remediate any deficiencies in the required condition of the Shopping Center, subject to reimbursement and other remedies as set forth below. Tenant shall also have the right to construct its Building and all Improvements on the Land, all in accordance with the following:

(a)    **Landlord Delivery**. Landlord shall deliver the Shopping Center to Tenant on the date of this Lease.

Landlord covenants and agrees to provide utilities to the Shopping Center at the designated points of entry as set forth in the "Utilities Survey" attached hereto as Attachment 1, to the end that promptly upon completion of such requirements and delivery of the Shopping Center to Tenant (collectively, **"Delivery of the Land"**), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Tenant's Site Work.

Landlord shall pay all impact fees and assessments assessed with respect to Tenant's construction of the Tenant's Site Work and the Premises (excluding utility line extension, tap on and similar connection fees which are required for the construction of the Premises and not Tenant's Shopping Center site work in general).

(b)    **Landlord Work**. All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. If Landlord fails to timely reimburse Tenant for costs incurred in completing Landlord's Work, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

2.    **Tenant's Site Work**. Within sixty (60) days after occurrence of the Delivery of the Land, Tenant shall commence construction of the Site Work in accordance with the final



plans prepared by Tenant's civil engineer (the "Civil Plans"). For purposes of the Lease, "Site Work" shall mean all improvements and infrastructure constructed on and under the Shopping Center, excluding those Improvements constructed within the area bordered by the sidewalk curb that shall surround the Premises. The Civil Plans shall be prepared in accordance with the specifications set forth in Exhibit C-1 (the "Circuit City Specifications"). Tenant's obligations to commence construction of Tenant's Site Work shall also be conditioned on Tenant's receipt of all permits, approvals and other clearances necessary to permit the completion of Tenant's Site Work and the Improvements. Landlord shall reimburse Tenant for Landlord's Share (as defined in Section 7(a) of the Lease) of the total cost of all the Site Work which is completed in material compliance with the requirements set forth on Exhibit "C-1" attached hereto, including, without limitation, all design costs, costs to obtain the necessary permits, approvals and other clearances and all other costs of constructing the Site Work. If Landlord fails to reimburse Tenant within fifteen (15) days of written demand from Tenant, Tenant shall be entitled to deduct the Landlord's Share of such costs from rentals and other payments due under the Lease, together with interest at the Default Rate.

Tenant shall have the right to temporarily locate a trailer in the Shopping Center during the eight (8) weeks prior to the store opening in a mutually agreeable location designated on the Site Plan, to be used as a Human Resource Hiring Center for Tenant's store employees.

(a)  **Paving, Lighting, Utilities, Landscaping and Drainage.** As part of the Site Work and in accordance with the Civil Plans, Tenant shall, subject to reimbursement from Landlord, cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the Circuit City Specifications; (ii) the construction and installation within five (5) feet of the Building, of permanent telephone service and permanent utilities, including but not limited to gas, electric, domestic water and fire protection water (in size sufficient to satisfy Tenant's fire consultant, without need for a fire pump) and sanitary sewer as described in the Circuit City Specifications, each at Tenant's required entry points shown in the Civil Plans, at depths adequate for Tenant's tie-in without additional cost above that contemplated by the Plans and Specifications; (iii) the construction and installation of the storm water drainage system at Tenant's required location shown in the Civil Plans; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the Circuit City Specifications; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" as described in the Circuit City Specifications; and (vii) installation of the sign(s) (if any) identifying the Shopping Center as described in paragraph 8 of the Lease.

(b)  All Tenant's Site Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants and contractors, who are bondable, all licensed in the State and of good reputation.



3.   **Tenant Improvements**.

(a)   **Building Construction**.  Upon completion of all of the Site Work, Tenant shall within a reasonable time commence and pursue to completion with due diligence the construction of the Improvements and storefront sidewalk. The construction work on the Improvements and storefront sidewalk shall·be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the Plans and Specifications.

(b)   **Plans and Specifications**.  Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications including building elevations (the "**Plans and Specifications**") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "**Schematic Floor Plan and Elevation**" (which are hereby approved by Landlord) attached hereto as **Attachment "2"**. Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation, within ten (10) business days after receipt thereof. If the Plans and Specifications are not disapproved by Landlord within such 10-day period, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, any changes made by Tenant to its prototypical store prior to commencement of construction by Tenant shall be deemed approved by Landlord. Any changes which Landlord desires to make to the Plans and Specifications which are different than a Building based on the Schematic Floor Plan and Elevation utilizing Tenant's prototypical elevations and building materials or different from the initial plans and specifications submitted by Tenant to Landlord shall be subject to Tenant's approval, which may be withheld in Tenant's sole discretion, and made at Landlord's sole cost and expense, and Tenant shall not be required to increase the Base Rent payable hereunder, or accept a reduction in the Tenant Improvement Allowance, as a result of such changes.

(c)   **Permits**.  Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises in accordance with the Plans and Specifications. Notwithstanding the foregoing, Landlord shall pay all costs necessary to satisfy conditions imposed by any governmental entity on Tenant's permit which are not the sole result of or solely related to Tenant's intended construction of the Improvements. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates.  Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)   **Substantial Completion**.  Substantial completion of the Improvements ("**Substantial Completion**") shall be deemed to occur when a certificate of occupancy,



whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.

**Attachments**:

"1"  Utilities Survey
"2"  Schematic Floor Plan and Elevation
"3"  Phase 1 Summary

# ATTACHMENT "1"

## UTILITIES SURVEY

**(attached)**



Existing Utilities
on Cirucit City Site

# ATTACHMENT "2"

## SCHEMATIC FLOOR PLAN AND ELEVATIONS

### (attached)



# ATTACHMENT "3"

## PHASE 1 SUMMARY

**(attached)**

# BRIAN MILNER CONSULTING L.L.C.

April 26, 2004

Mr. Patrick Zampetti
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23233-1464

Subject:    Store #3572: Proposed Circuit City Store, Polaris Site, Columbus,
Ohio: Review of Phase I Environmental Site Assessment Report
(Our reference 1118.001.04)

Dear Patrick:

Please find below our review comments for the above referenced report submitted by MACTEC
Engineering and Consulting, Inc. (MACTEC, ref. 3350-04-1975-02). Our comments follow.

MACTEC's review of historical aerial photographs from 1940 (the earliest available) until 1988,
shows the subject property and adjacent properties as agricultural land with no structures
evident. At the time of their site reconnaissance, the subject property was an undeveloped,
grass-covered land tract in a recently developed commercial and retail area. MACTEC did not
observe evidence of environmental impairment on the subject property or adjacent properties
that might impact the subject site.

From their review of regulatory databases, MACTEC found no listings for the subject property.
One off-site listing was located within the ASTM recommended search distances. The
Marathon gas station located to the south-southeast of the subject property had two registered
underground storage tanks (USTs). MACTEC concluded that impacts from the gas station were
unlikely based on the relatively recent installation (1990) of the tanks and their anticipated
cross-gradient location.

MACTEC appears to have prepared their report in general conformance with the ASTM E 1527
standard practice. From the data collected, MACTEC has assessed a low risk of environmental
impairment at the subject site. Based on the information provided in the report, we agree with
the conclusions.

Circuit City Stores # 3572
Polaris Site, Columbus, Ohio

We have endeavored to provide our review comments in a manner of care and skill ordinarily exercised by members of the profession currently practicing in the same locality and under similar conditions for this project. No other representation, express or implied, is included or intended, and no warranty or guarantee is included or intended in this agreement, or any report, opinion, document, or other instrument of service. Our comments assume that MACTEC performed the data searches, site reconnaissance, and reporting according to the standard of care for such tasks.

We appreciate the opportunity to be of service for this project. Please do not hesitate to contact us if clarification is needed for any aspect of the review.

Very truly yours,
Brian Milner Consulting L.L.C.

Brian Milner, C.P.G.

c:    Mark Keschl, Millennium Retail Partners LLC

# BRIAN MILNER CONSULTING L.L.C.

April 26, 2004

Mr. Patrick Zampetti
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23233-1464

Subject:    Store #3572: Proposed Circuit City Store, Polaris Site, Columbus,
Ohio: Review of Phase I Environmental Site Assessment Report
(Our reference 1118.001.04)

Dear Patrick:

Please find below our review comments for the above referenced report submitted by MACTEC
Engineering and Consulting, Inc. (MACTEC, ref. 3350-04-1975-02). Our comments follow.

MACTEC's review of historical aerial photographs from 1940 (the earliest available) until 1988,
shows the subject property and adjacent properties as agricultural land with no structures
evident. At the time of their site reconnaissance, the subject property was an undeveloped,
grass-covered land tract in a recently developed commercial and retail area. MACTEC did not
observe evidence of environmental impairment on the subject property or adjacent properties
that might impact the subject site.

From their review of regulatory databases, MACTEC found no listings for the subject property.
One off-site listing was located within the ASTM recommended search distances. The
Marathon gas station located to the south-southeast of the subject property had two registered
underground storage tanks (USTs). MACTEC concluded that impacts from the gas station were
unlikely based on the relatively recent installation (1990) of the tanks and their anticipated
cross-gradient location.

MACTEC appears to have prepared their report in general conformance with the ASTM E 1527
standard practice. From the data collected, MACTEC has assessed a low risk of environmental
impairment at the subject site. Based on the information provided in the report, we agree with
the conclusions.

P.O. Box 71746, Richmond, Virginia 23255-1746
Phone (804) 869-6879    Fax 804-741-5040    bmilner@bm1consult.com

Circuit City Stores # 3572
Polaris Site, Columbus, Ohio

We have endeavored to provide our review comments in a manner of care and skill ordinarily exercised by members of the profession currently practicing in the same locality and under similar conditions for this project. No other representation, express or implied, is included or intended, and no warranty or guarantee is included or intended in this agreement, or any report, opinion, document, or other instrument of service. Our comments assume that MACTEC performed the data searches, site reconnaissance, and reporting according to the standard of care for such tasks.

We appreciate the opportunity to be of service for this project. Please do not hesitate to contact us if clarification is needed for any aspect of the review.

Very truly yours,

Brian Milner Consulting L.L.C.

Brian Milner, C.P.G.

c:       Mark Keschl, Millennium Retail Partners LLC

---

**Reference: 1118-001-04 / April 26, 2004**          - 2 -                     Brian Milner Consulting L.L.C.

# EXHIBIT "C-1"

# CIRCUIT CITY SPECIFICATIONS

### for a proposed

### Circuit City Superstore

### Polaris Shopping Center

### Columbus, Ohio

Dated _____, 2004



# I. STANDARDS FOR GRADING WORK

A. **Grading Requirements.** The Land and the Shopping Center shall be graded in accordance with the following:

1. The Civil Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations. Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

2. The Building will be accessible by grade level parking only. Steps and stairs are not permitted.

3. Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All water shall be sheet drained away from Tenant's doors.

4. Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%. Entrances and access drives shall have a maximum slope of 6.0%.

5. Surface drainage swales will not be allowed without prior approval of Tenant. Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

6. The cut and fill on the Shopping Center site should be balanced, if practical. All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

7. No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

B. **Tenant's Pad Area:** "**Tenant's Pad Area**" shall be defined as the area extending fifteen (15) feet beyond the Building walls, truck dock and ramp area and the Car Stereo Installation area, or to the back of curbing around the Building, whichever is further. The Site Work shall comply with the following additional requirements:

1. Prepare Tenant's Pad Area subgrades to within plus or minus one-tenth of a foot as set by Tenant's architect. Tenant's subgrades are 8" below finished floor elevation. Complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the modified proctor soil test for water content and compaction levels ("**Modified Proctor**") on the



Land, so as to enable Tenant to perform construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard spread footings and without the necessity of pilings or other extraordinary foundation work. Tenant's minimum slab thickness and under slab fill will be established in accordance with Tenant's Soil Report.

2.  Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed as necessary to meet this minimum requirement.

3.  During the preparation of Tenant's Pad Area, an independent professional soils engineering test laboratory shall monitor and certify the preparation of Tenant's Pad Area in accordance with Tenant's Soils Report. Landlord shall perform one in-place compaction test per 5,000 square feet of pad area per lift.

4.  On or before the date the Site Work is fully completed, prepare:

    a.  An independent soils engineer's written certification that all pad work was completed in accordance with Tenant's Soils Report, Civil Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.

    b.  A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Cause the surveyor or engineer to designate the corners of the Land by means of standard surveying markers.

5.  Landscaping slopes and berms shall be set to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

6.  Top soil excavated during grading of the Shopping Center shall be stockpiled and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.



7. All material, including native and fill, within 5 feet of any surface of the building including foundation concrete, shall be non-expansive with a plasticity index of 12 or less. The material shall also have sufficient cohesion to stand vertically for 3 feet. No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

8. The Civil Plans shall not be materially changed without the prior consent of Landlord, which consent shall not be unreasonably withheld or delayed.

9. All outlots or future building areas shall be rough graded and planted with grass seed.

## I.   UTILITIES SPECIFICATIONS

C.   **Temporary Utilities**:  Provide the following temporary utilities to the Staging Area in a location selected by Tenant:

water (2" line, with sufficient pressure that pumping is not necessary), electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) and temporary telephone for use by Tenant in its construction of the Improvements.

D.   **Permanent Utilities**:  Provide the following permanent utilities to within five (5) feet of the Premises or the sidewalk at Tenant's identified entry points (but in any event the stub point of such utilities shall not be covered by paving):

gas (if available), telephone, permanent electricity (adequate for an 800-amp panel, 3-phase, 277/480 volt), storm sewer system (in accordance with Civil Plans), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant).

Tenant shall pay any tap-on fees associated with making these utilities available for consumption; Landlord shall pay any recapture or oversizing charge imposed in connection with the delivery of the utility as provided above.

## II.   PAVING SPECIFICATIONS

A.   **Parking Area and Roadway Surfacing**:

1. Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.



2.  All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of Tenant's Soils Report.

3.  Heavy duty paving must be used in main drives and service areas as required by Tenant's Soils Report.

B.  **Sidewalks and Curbs**:

1.  Provide and install all curbs and sidewalks including perimeter curbs and sidewalks except for sidewalks in front of the Building.

2.  All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture, over a suitable granular base. Salt finish is not acceptable.

3.  Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete. Extruded asphalt or concrete curbing may not be used.

4.  Curbs at all non-parking areas shall be painted red with an exterior flat red latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

III.  **SHOPPING CENTER LIGHTING SPECIFICATIONS**

A.  **Design Standards for Lighting of the Shopping Center**:

1.  Prepare plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment. Also subject to DRC approval.

2.  Illumination as measured at pavement shall be:

a.  7.0 foot candles minimum maintained within 50' of Tenant's entry.

b.  7.0 foot candles minimum maintained throughout, measured at grade.

c.  Entry canopy soffit: 40.0 foot candles. Provide four (4) 1000 w. spot lights focused on Tenant's front building elevation.



3. Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn). The security lighting layout and pattern shall be subject to Tenant's approval.

4. Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5. Install a seven-day time switch to control all parking area lighting wired to a common house panel. All security lighting shall be placed on photo-cell switching.

IV. The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

# EXHIBIT "D"

## INTENTIONALLY DELETED

# EXHIBIT "E"

## SIGN PLANS AND CRITERIA

**(attached)**

SQUARE FOOTAGE
324 Boxed SF
299 Circular SF

ELECTRICAL
Total Amps: 12.95
Circuits: (1) 20 amp
Volts: 120

CHANNEL LETTERS ON BACKGROUND
Background: .090 aluminum painted to
  match PMS485 red.
Ring outer perimeter return: 8.50 x.063
  aluminum pre-finished to match Matthews
  #41-313.
Ring channel inside: paint white.
Letter returns: 8.50 x .063 pre-finished
  414-313 Bronze, inside white.
Trademark: paint background to match PMS
  485 red with 3M 363040 white vinyl 1st
  surface.
Letter face: .150 7328 white polycarbonate.
Trimcap: 1" white Jewelite.
Neon: 15mm 6500 white.



18'-0"
diameter
channel
letter logo

Table of Contents





16'-0"

18'-0"

17'-1"

11'-6 7/16"

7'-9 5/8"

5'-9 3/8"

17°



8"

return
trimcap
face
mounting hardware
face
boot
GTO/sleeve
neon
transformer
back
connector
strain relief
conduit
switch
tubesupport
  w/pad
weep hole
mounting hardware

Channel Letter Mounting Cross Section
equipment grounded

**SQUARE FOOTAGE**
144 Boxed SF
113 Circular SF

**ELECTRICAL**
Total Amps: 7.6
Circuits: (1) 20 amp
Volts: 120

**CHANNEL LETTERS ON BACKGROUND**
Background: .090 aluminum painted to
match PMS485 red.
Ring outer perimeter return: 8.50 x.063
aluminum pre-finished to match Matthews
#41-313.
Ring channel inside: paint white.
Letter returns: 8.50 x .063 pre-finished
414-313 Bronze, inside white.
Trademark: paint background to match PMS
485 red with 3M 3630-10 white vinyl 1st
surface.
Letter face: .150 7328 white polycarbonate.
Trimcap: 1" white Jewelite.
Neon: 15mm 6500 white.



12'-0"
diameter
channel
letter log



▢ Table of Contents



return
trimcap
face
mounting hardware
face
boot
GTO/sleeve
neon
transformer
back
connector
strain relief
conduit
switch
tubesupport
w/pad
weep hole
mounting hardware



8"

**Channel Letter Mounting Cross Section**
equipment grounded

# EXHIBIT "F"

A.    Tenant exclusive uses: None

B.    Permitted Title Exceptions: [to come] attached

Notwithstanding anything contained in this **Exhibit "F"** to the contrary, nothing contained herein shall be construed to prohibit the exercise of the rights and privileges granted to Tenant under the Lease, including but not limited to Tenant's exclusive use rights set forth in paragraph 18 of the Lease.



6. Taxes which are a lien not yet due and payable.

7. Platted roads, easements, set backs, covenants, terms and restrictions as recorded in Plat Book 24, page 137, Recorder's Office, Delaware County, Ohio.

8. Platted roads, easements, set backs, covenants, terms and restrictions as recorded on the Plat for Lyra Drive as recorded in Plat Cabinet 2, Slide 396, Recorder's Office, Delaware County, Ohio.

9. Right of Way and Easement to Columbus and Southern Ohio Electric Company, as recorded in Deed Book 357, page 712, Recorder's Office, Delaware County, Ohio.

10. Right of Way and Easement to Columbus and Southern Ohio Electric Company, as recorded in Deed Book 357, page 714, Recorder's Office, Delaware County, Ohio.

CARDINAL TITLE AGENCY, INC. • TWO MIRANOVA PLACE, SUITE 300 • COLUMBUS, OHIO 43215

11. Right of Way and Easement to Columbus Southern Power Company, as recorded in Deed Book 525, page 291, Recorder's Office, Delaware County, Ohio.

12. Easement of record in Official Records Vol. 17, page 610, Recorder's Office, Delaware County, Ohio.

13. Easement of record in Official Records Vol. 93, page 2056, Recorder's Office, Delaware County, Ohio.

14. Deed of easement to City of Columbus as recorded in Official Records Vol. 117, page 1667, Recorder's Office, Delaware County, Ohio.

15. Easement and Right of Way to Columbus Southern Power Company as recorded in Official Records Vol. 259, page 1804, Recorder's Office, Delaware County, Ohio.

16. Declaration of Protective Covenants as recorded in Deed Book 548, page 720; and as amended in Amendment to Declaration of Protective Covenants as recorded in Agreements and P/A Vol. 26, page 751; and further amended in Amendment to Declaration of Protective Covenants as recorded in Deed Book 573, page 427; and further amended in Amendment to Declaration of Protective Covenants as recorded in Vol. 34, page 539, Recorder's Office, Delaware County, Ohio.

17. Declaration of Restrictions as recorded in D.B. 573, page 433, Recorder's Office, Delaware County, Ohio.

18. Declaration of Outparcel Development Standards recorded in Official Records Vol. 48, page 2323, Recorder's Office, Delaware County, Ohio.

19. Declaration of Restrictions by and between Polaris Mall, LLC and N.P. Limited Partnership, recorded July 3, 2001 in Official Records Vol. 108, page 261, Recorder's Office, Delaware County, Ohio.

20. Storm Water Drainage Easement by and between Polaris Mall, LLC and N.P. Limited Partnership, recorded July 3, 2001 in Official Records Vol. 108, page 301, Recorder's Office, Delaware County, Ohio.

**NOTE:** If policy is to be issued in support of a mortgage loan, attention is directed to the fact that the Company can assume no liability under its policy, the closing instructions or insured Closing Service for compliance with the requirements of any consumer credit protection or truth in lending law in connection with said mortgage loan.

CARDINAL TITLE AGENCY, INC. • TWO MIRANOVA PLACE, SUITE 300 • COLUMBUS, OHIO 43215

## EXHIBIT "G"

After recording return to:

# SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
### (Mortgage)

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, dated the _____ day of _____, _____, between_____ _____, a _____ ("Mortgagee"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

## W I T N E S S E T H :

(a)    Tenant has entered into a certain lease (the "Lease") dated _____ _____ with Polaris Circuit City, LLC ("Landlord"), covering premises located within that certain property known as Polaris Shopping Center, located in the City of Columbus, Delaware County, Ohio, and more particularly described in **Schedule A** hereto; and

(b)    Mortgagee has made a loan to Landlord as evidenced and secured by a Deed of Trust recorded _____, _____ in the land records of _____ _____, in Book _____ at page _____ (the "**Mortgage**"), encumbering the property described in **Schedule A**; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

**NOW, THEREFORE**, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.    The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.    Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.    In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure

proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4. Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5. In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

(a) liable for any act or omission of any prior lessor (including Landlord); or

(b) liable for the return of any security deposits unless delivered to Mortgagee; or

(c) bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d) bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6. Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease, including the right to set-off against all Rent, with Default Interest, any portion of the Tenant Improvement Allowance which is not paid, and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

7. Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

8. Mortgagee, Landlord and Tenant, respectively, represent and warrant to each other that each has the requisite power and authority to enter into this Agreement; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Agreement; that the signatories executing this Agreement on behalf of Mortgagee, Landlord and Tenant have been duly authorized and empowered to execute this Agreement on behalf of Mortgagee, Landlord and Tenant, respectively; and that this Agreement is valid and shall be binding upon and enforceable against Mortgagee and Tenant shall inure to the benefit of the parties hereto, and their successors and assigns.

9.      Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Mortgagee shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Mortgagee at the following address, in the same method for notice as is required under the Lease.

10.      All notices between the parties hereto shall be in writing and comply with the terms of paragraph 32 of the Lease.

**IN WITNESS WHEREOF**, the parties hereto have executed these presents the day and year first above written.

ATTEST:

 

_____
Its:_____

 

 

ATTEST:

 

_____
Its:_____

MORTGAGEE:

**COMPANY NAME**

By:_____
   Name:_____
   Title:_____

 

**TENANT:**

**CIRCUIT CITY STORES, INC.,** a
Virginia corporation

By:_____
   Thomas C. Nolan, Vice President of
Real Estate

**[Note:  Attach appropriate notary blocks for the State]**

**EXHIBIT "G"**

After recording return to:

# SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
## (Ground Lease)

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, dated the _____ day of _____, _____, between_____, a _____ ("**Ground Lessor**"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("**Tenant**").

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

(a)     Tenant has entered into a certain lease (the "**Lease**") dated _____ _____ with _____, located within that certain property known as _____ ("**Landlord**"), covering premises located in the City of _____, Shopping Center, County, _____, and more particularly described in **Schedule A** hereto; and

(b)     Ground Lessor has entered into a Lease with Landlord as evidenced and recorded _____, _____ in the land records of _____ County, _____, _____, in Book _____ at page _____ (the "**Ground Lease**"), covering the property described in **Schedule A**; and the parties hereto desire to set forth their agreement with regard to the priority of the Ground Lease and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

**NOW, THEREFORE**, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.     The Lease is a sublease and shall be subordinate to the Ground Lease insofar as it affects the real property of which the premises form a part thereof.

2.     Tenant agrees that it will attorn to Ground Lessor and any successor to the Ground Lessor by deed or otherwise as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease, in the event of a termination of the Ground Lease.

3.     In the event that it should become necessary to terminate the Ground Lease, Ground Lessor thereunder will not terminate the Lease nor join Tenant in summary proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.



4.      Ground Lessor consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Ground Lease has been terminated.

5.      In the event that Ground Lessor shall succeed to the interest of Landlord under the Lease, Ground Lessor shall not be:

(a)      liable for any act or omission of any prior lessor (including Landlord); or

(b)      liable for the return of any security deposits unless delivered to Ground Lessor; or

(c)      bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d)      bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

Notwithstanding the foregoing, Ground Lessor acknowledges and agrees that if Ground Lessor shall succeed to the interest of Landlord under this Lease, Ground Lessor shall be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

6.      Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Ground Lessor terminates the Ground Lease, Ground Lessor shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Leasehold Premises Transfer all in accordance with the terms of the Lease.

7.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

8.      Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Ground Lessor shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Ground Lessor at the following address, in the same method for notice as is required under the Lease:

_____

_____

_____

9.      All notices between the parties hereto shall be in writing and comply with the terms of paragraph 32 of the Lease.



**IN WITNESS WHEREOF,** the parties hereto have executed these presents the day and year first above written.

**ATTEST:**

        **GROUND LESSOR:**

        **COMPANY NAME**

_____

Its:_____

        By:_____

           Name:_____

           Title:_____

**ATTEST:**

        **TENANT:**

        **CIRCUIT CITY STORES, INC.,** a Virginia corporation

_____

Its:_____

        By:_____

           Name:_____

           Title:  Vice President

**[Note: Attach appropriate notary blocks for the State]**

## EXHIBIT "H"

After recording, return to:

Dov J. Pinchot
Piper Rudnick LLP
203 N. LaSalle Street
Suite 1800
Chicago, Illinois 60601

## MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE is made this _____ day of _____, 2004, between **POLARIS CIRCUIT CITY, LLC,** an Ohio limited liability company, having an address of 8800 Lyra Drive, Suite 550, Columbus, Ohio 43250 (hereinafter referred to as **"Landlord"**), and **CIRCUIT CITY STORES, INC.,** a Virginia corporation, having an address of Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 (hereinafter referred to as **"Tenant"**).

## W I T N E S S E T H :

Landlord and Tenant have entered into a Lease (the **"Lease"**) dated _____, 2004, whereby Landlord has leased to Tenant a portion of the real property (the **"Property"**) commonly known as the Polaris Shopping Center in Columbus, Delaware County, Ohio, the legal description of which Property is set forth on **Exhibit "A-1"** attached hereto, together with certain non-exclusive easements in, over, upon, across, under and through certain areas of the Property defined in the Lease as Landlord's Premises, and all easements and rights pertaining thereto, including, without limitation, those certain rights and non-exclusive easements granted to or inuring to the benefit of Landlord under that certain (REA or OEA and other easement estates of record) recorded in Book ____, beginning at Page ____ of the real property records of _____ County, _____, in, over, upon, across, under and through the land described therein. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.     **Term.**  The term of the Lease is for a period of fifteen (15) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for three (3) successive periods of five (5) years each.

II.     **Exclusive Use Rights.**  The Lease provides that Tenant shall enjoy the sole and exclusive privilege within the Property to sell, rent, service, repair or rent to own consumer, office, business and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include,

1

but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "**Products**"), and the renting, servicing, repairing and warehousing of the Products; provided, however, that the foregoing exclusive use right shall not prohibit Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant. As used herein, "**Incidental Sale**" shall mean the sale, rental, servicing, repairing or warehousing of item(s) in an area comprising the lesser of (i) two hundred (200) square feet, and (ii) five percent (5%) of such occupant's or tenant's display area.

III.   <u>Successors</u>. The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.   <u>Incorporation of Lease</u>. All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.   <u>Conflicts with Lease</u>. This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter, modify, expand, diminish or supplement the provisions of the Lease. In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern. This Memorandum of Lease shall automatically terminate and be null and void upon the termination of the Lease.

**IN WITNESS WHEREOF**, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

LANDLORD:

**POLARIS CIRCUIT CITY, LLC,**
an Ohio limited liability company

By:_____
    Name:_____
    Title:_____

Note: Attach appropriate notary block for the State]

TENANT:

**CIRCUIT CITY STORES, INC.,** a
Virginia corporation

By:_____
    Thomas C. Nolan, Vice President of
    Real Estate

**COMMONWEALTH OF VIRGINIA**     )
                                   ) ss.
**COUNTY OF HENRICO**             )

    I certify that on _____, _____, before me, the undersigned, a Notary Public in and for said State, personally appeared Thomas C. Nolan, Vice President of Real Estate of **CIRCUIT CITY STORES, INC.,** a Virginia corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.



**WITNESS** my hand and official seal.

_____

Notary Public in and for the Commonwealth of
Virginia, residing at _____
My Commission expires: _____

_____

[Type or Pint Notary Name]

## EXHIBIT "I"

## COMMENCEMENT DATE AGREEMENT

This COMMENCEMENT DATE AGREEMENT, made as of this ____ day of _____, _____, between_____, a _____ (herein called "**Landlord**"), and CIRCUIT CITY STORES, INC., a Virginia corporation (herein called "**Tenant**"):

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in _____ _____ County, _____ (herein called the "**Premises**"); and

WHEREAS, by that certain Lease dated _____ (herein called the "**Lease**"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of _____ County, _____, on the ____ day of _____, ____, in Book _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 24 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, _____. The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2.    The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4.     The date of commencement of the third Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed the day and year first above written.

**LANDLORD:**

POLARIS CIRCUIT CITY, LLC, an
Ohio limited liability company

By:_____
    Name:_____
    Title:_____

**TENANT:**

**CIRCUIT CITY STORES, INC.**, a
Virginia corporation

By:_____
    Thomas C. Nolan, Vice President of
    Real Estate

## EXHIBIT "J"

## INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT is made this _____ day of _____, _____, between POLARIS CIRCUIT CITY, LLC, an Ohio limited liability company (hereinafter referred to as "**Landlord**") and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "**Tenant**").

## W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "**Lease**"), dated _____ whereby Landlord has leased to Tenant a portion of the real property located in Columbus, Delaware County, Ohio (the "**Shopping Center**") and Tenant has constructed on such real property a store premises (the "**Premises**").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense resulting from mechanics and materialmen filing liens, or otherwise making claims against Landlord's interest in the Premises and the Shopping Center, arising out of Tenant's construction activities at the Shopping Center.  In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center, based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.    Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.



**EXECUTED** this _____ day of _____, _____.

LANDLORD:

**POLARIS CIRCUIT CITY, LLC**, an
Ohio limited liability company

By:_____

    Name:_____

    Title:_____

TENANT:

**CIRCUIT CITY STORES, INC.**, a
Virginia corporation

By:_____

    Thomas C. Nolan, Vice President of
    Real Estate

2