MCHENRY, ILLINOIS

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## RUBLOFF MCHENRY EAST, L.L.C.,

as Landlord

dated *May 23*, 2001

MCHENRY TOWNE CENTRE SHOPPING CENTER

## TABLE OF CONTENTS

| Paragraph | | Page |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Lease Term | 2 |
| 4. | Base Rent | 3 |
| 5. | Development of Shopping Center by Landlord | 4 |
| 6. | Easements | 4 |
| 7. | Common Areas and Common Area Maintenance | 6 |
| 8. | Signs and Communications Equipment | 10 |
| 9. | Taxes | 11 |
| 10. | Maintenance, Repairs and Replacements | 13 |
| 11. | Utility Service Provider:  Payment of Utility Bills | 14 |
| 12. | Alterations | 15 |
| 13. | Mechanics' Liens | 15 |
| 14. | Insurance | 16 |
| 15. | Damages by Fire or Other Casualty | 20 |
| 16. | Condemnation | 22 |
| 17. | Assignment and Subletting | 24 |
| 18. | Use | 25 |
| 19. | Warranties, Representations and Covenants | 27 |
| 20. | Estoppel Certificates | 35 |
| 21. | Subordination, Non-Disturbance and Attornment | 35 |

258343_8 [51-36 (11919)]

| Paragraph | | Page |
|---|---|---|
| 22. | Tenant's Financing | 37 |
| 23. | Tenant's Property and Waiver of Landlord's Lien | 37 |
| 24. | Memorandum of Lease; Commencement Date Agreement | 38 |
| 25. | Expiration of Term and Holding Over | 38 |
| 26. | Force Majeure | 38 |
| 27. | Events of Tenant's Default | 39 |
| 28. | Landlord's Remedies | 39 |
| 29. | Events of Landlord's Default; Tenant's Remedies | 41 |
| 30. | Waiver | 44 |
| 31. | Compliance with Applicable Laws | 44 |
| 32. | Notices | 45 |
| 33. | Brokers | 46 |
| 34. | Miscellaneous | 46 |
| 35. | Effectiveness of Lease; Tenant's Right to Terminate | 48 |
| 36. | Confidentiality [Intentionally Deleted] | 50 |
| 37. | Rules and Regulations | 50 |
| 38. | Conveyance by Landlord | 50 |
| 39. | Consequential/Punitive Damages | 51 |
| 40. | Limitation of Right of Recovery | 51 |
| 41. | "For Rent" Signs | 51 |

258343_8 [51-36 (11919)]

## EXHIBITS

"A"    Site Plan

"A-1"  Shopping Center Legal Description

"B"    Index of Definitions

"C"    Construction Provisions

"C-1"  Design and Construction Specifications

"D"    Removable Trade Fixtures

"E"    Sign Plans

"F"    Permitted Encumbrances

"G"    Subordination, Non-Disturbance and Attornment Agreement

"H"    Memorandum of Lease

"I"    Commencement Date Agreement

"J"    Indemnification Agreement

"K"    Declaration of Restrictive Covenants

258343_8 [51-36 (11919)]

**MCHENRY, ILLINOIS**

LEASE

This LEASE is made as of the 28th day of May, 2001, by and between **RUBLOFF MCHENRY EAST, L.L.C.**, an Illinois limited liability company, having an address at 6277 East Riverside Boulevard, Rockford, Illinois 61114 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H:

The parties hereto agree as follows:

1.    Leased Property. Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that approximately 33,370 square foot parcel (the "Land"), outlined in red on Exhibit "A" (the "Site Plan"), together with exclusive rights in the three (3) automobile loading stalls labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, the exclusive rights in the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and with the easements described in paragraph 6 below; all located in the McHenry Towne Centre Shopping Center (herein referred to as the "Shopping Center"), located at the intersection of Route 31 and proposed Route 53, in the City of McHenry (the "City"), County of McHenry, State of Illinois (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto. All of the Shopping Center exclusive of the Premises is "Landlord's Premises". Landlord hereby grants to Tenant all of those certain rights granted to Landlord, in common with others, under that certain Operation Easement Agreement dated October 4, 2000 and executed by Landlord and Kohl's Department Stores, Inc. ("Kohl's") and to be recorded against record title of the Shopping Center (the "REA"). Landlord agrees that it will not consent to any modification of the REA during the term of this Lease which is inconsistent with the terms of this Lease, and will exercise all approval rights granted Landlord under the REA in favor of enforcement of the terms hereof. Tenant agrees that it will not violate the terms of the REA, except that Tenant may utilize exposed neon tubes as part of its exterior lighting, and intermittent sound may be audible from the car stereo installation bays of the Building. Landlord agrees to use its best efforts to enter into an amendment to the REA with Kohl's and any other party whose consent is necessary to expressly permit the foregoing, as well as the exclusive use by Tenant of the customer pick-up, car stereo parking spaces, and promotional area

1

described below, and use by Tenant of a 20,000 square foot staging area. If Landlord is unable to enter into such amendment despite its best efforts, then Landlord will not be in default as a result thereof. Landlord agrees that Landlord will not enforce the provisions of the REA that may prohibit such matters set forth in such amendment, unless another party to the REA requests in writing that Landlord enforce such provision.

      2.    <u>Construction of Building and Improvements</u>.  Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as <u>Exhibit "C"</u> and incorporated herein by reference for all purposes), Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing approximately 33,370 square feet of ground-floor gross leasable area, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Improvements and the Land are referred to herein as the "Premises".

      3.    <u>Lease Term</u>.  Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

      In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for three (3) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days

2

prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    <u>Base Rent</u>. During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to paragraph 3 of the Construction Provisions) on the date on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(i)    <u>First Fifteen Years</u>. Subject to the terms of subparagraph (iv) below, during the first fifteen (15) Lease Years, Tenant shall pay annual Base Rent in the amount of Five Hundred Thousand Five Hundred Fifty and No/100 Dollars ($500,550.00), payable in equal monthly installments of Forty-One Thousand Seven Hundred Twelve and 50/100 Dollars ($41,712.50).

(ii)    <u>Adjustment in Base Rent</u>. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal

3

33,370 square feet, annual Base Rent during the first fifteen (15) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (either party shall have the right to verify same based on an as-built survey), multiplied by $15.00. In determining the ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below, but in no event shall the Building contain less than 31,701 square feet of ground-floor leasable area, nor shall the Tenant Improvement Allowance be calculated using less than 31,701 square feet. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    Increases in Base Rent. Annual Base Rent shall increase on the first day of the sixteenth and every succeeding fifth Lease Year, over the initial Base Rent by five percent (5%).

(iv)    Rent Abatement. Notwithstanding anything contained herein to the contrary, no Base Rent shall be due for the first (1st) and second (2nd) months of the first Lease Year.

5.    Development of Shopping Center by Landlord. Landlord covenants to construct, develop and operate a first-class shopping center, provided only the Common Areas of the Shopping Center and the exterior (including the shell and all utilities thereto) of the building adjacent to the Premises need be completed at the time Tenant opens its store. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan. Subject to paragraph 16 (condemnation), the parking ratio for the Shopping Center shall in no event be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements. All parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. To the extent Landlord constructs any improvements or permits any other person or party to construct any improvements, such construction shall not interfere with the conduct of Tenant's business within the Premises and Tenant's Preferred Area, and no part of the construction access route therefor shall be located in front of the Premises.

6.    Easements. Landlord also grants to Tenant, in common with other occupants of the Shopping Center from time to time entitled to use same, those nonexclusive leasehold easements

4

which shall run as covenants with Landlord's Premises and the Premises during the Term, over Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, limited to:

(a)    Construction Easements. During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area"), that utilized during the Construction Term to be approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in constructing the Improvements (the initial staging area being shown on the Site Plan); (ii) an easement to permit the Building to abut adjacent buildings; provided the foundations, footings, and roof projections shall not bear structurally upon Landlord's Premises, nor shall those of Landlord's adjacent building bear structurally on the Building, Landlord hereby agreeing to deliver to Tenant Landlord's plans and specifications for said adjacent building prior to commencement of construction of same, so that Tenant may approve the intended tie-in of the buildings and provisions for snow loads, which approval will not be unreasonably withheld, conditioned or delayed; (iii) subject to Landlord's prior written consent, which will not be unreasonably withheld, delayed or conditioned, an easement for such additional underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.

(b)    Common Area Easements. Landlord does hereby additionally grant to Tenant an easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and

258343_8 [51-36 (11919)]

Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor. It is specifically agreed that with respect to the automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, with Landlord's prior consent, which will not be unreasonably withheld, conditioned or delayed, to relocate the same to other areas adjacent to the Improvements and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such automobile loading stalls shall be used exclusively by Tenant's customers, invitees and patrons. Tenant shall also have the right to use such Common Areas immediately adjacent to Tenant's Improvements and within Tenant's Preferred Area as shown on the Site Plan for promotional demonstrations and for Tenant's "Customer Pick Up" used exclusively for Tenant's customers, invitees and patrons. If, despite Landlord's best efforts to obtain the REA amendment described in paragraph 1 above, Landlord is unable to obtain same, Landlord shall not be required to police or enforce Tenant's exclusive rights to the above-mentioned parking spaces or staging area exceeding 12,000 square feet.

      7.     <u>Common Areas and Common Area Maintenance</u>.

      (a)    <u>Definition of Common Areas</u>. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants), the reasonable cost of security, utilities for the Common Areas, the cost of insurance carried by Landlord as required under paragraph 14 hereof, and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a first-class manner, including, without limitation, cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining,

6

replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating, maintaining, repairing and replacing the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management or administration fee) which shall not exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction defect to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas;

(4)    repairs or replacements necessitated by any governmental entity due to laws enacted after the initial construction of the Common Area, so long as such costs are amortized over the useful life of the improvements, or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)    amounts paid to entities related to Landlord in excess of the usual and customary cost of such services at competitive rates;

(6)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

7

258343_8 [51-36 (11919)]

(7)     premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8)     repairs or replacements of a capital nature (whether or not capitalized), except if amortized over the useful life of the improvement;

(9)     improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first seven (7) "CAM Years" (as defined below);

(10)    reserves for anticipated future expenses;

(11)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12)    Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(14)    any new improvements to the Shopping Center or Common Areas, including but not limited to renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center (excluding routine replacement of landscape items not resulting from negligence of Landlord):

(15)    amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own premises; or

(16)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall in all events be obtained at competitive rates pursuant to a proposed Common Area Maintenance budget delivered to Tenant on or before the end of each CAM Year in accordance with subparagraph (c) below.

(c)     Tenant Payments. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord $2.00 per square foot of ground-floor gross leasable area in the Building per annum, payable in equal monthly installments, as its estimated share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period, including the first Lease Year, is a "CAM Year"), and shall be paid by Tenant in equal monthly

8

installments, on the first day of each month during such CAM Year. CAM Charges, excluding costs of insurance, utilities and snow removal, shall not exceed by more than five percent (5%) those in effect during the preceding CAM Year. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 94,000 square feet. The remainder of CAM Charges shall be borne by Landlord and/or other tenants. Until Landlord's budget for an ensuing year is available, Tenant shall continue to pay its Pro Rata Share of CAM Charges based on the prior year's CAM budget.

(d)    Examination of Landlord's Records. Tenant shall have the right, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10)

258343_8 [51-36 (11919)]

days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. If the audit discloses any underpayment in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Tenant shall reimburse Landlord the amount of such underpayment by Tenant. Any examination by Tenant shall be conducted by an accounting firm or auditor retained by Tenant, and Tenant will request that said party keep all records and information obtained therefrom confidential. Only the party charged the CAM Charges in question shall have the right to contest same, and such right shall survive for two (2) years following such party's interest in this Lease.

       8.    Signs and Communications Equipment.

       (a)    Signs. Landlord, at its sole cost and expense (but subject to reimbursement by Tenant of Tenant's pro rata share (based on the relative square footage of the panels of each party identified on said sign) of the reasonable cost of same (Landlord's reasonable cost of same not to exceed $85,000.00), no later than the date set forth on Attachment "1" to the Construction Provisions, shall construct and install upon the Common Areas at the location(s) so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon in the second tenant position (beneath Kohl's only) on the pylon located at the southernmost entrance to the Shopping Center off of Route 31 (shown on the Site Plan), and if Kohl's or Landlord installs a second pylon in the Shopping Center, in the second position also (beneath Kohl's only), provided applicable laws would permit identification of any party other than Kohl's on said second pylon, for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed by Tenant at Tenant's sole cost and expense. Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. No panel on the pylon signs shall be larger than Tenant's panel, except Kohl's or its successors and assigns. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage (including identification of the store on the side of the Building and, if allowed by applicable codes, on the rear of the Building if Tenant so elects), which Landlord hereby approves upon its execution of this Lease. No other exterior building signage shall be permitted without Landlord's consent, which will not be unreasonably withheld, conditioned or delayed.

10

Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns', if a national or regional retailer) then-current prototypical sign plans, subject to terms of the REA and applicable codes.

(b)    <u>Communications Equipment</u>.  Subject to the terms of the REA, Tenant may install, maintain and/or replace any satellite dishes, antennas cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the Building for use only by Tenant as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof.  Tenant shall maintain all such equipment at Tenant's cost.  Any roof penetrations shall be performed so as to preserve roof warranties and Tenant shall reimburse Landlord the amount of any reasonable cost incurred by Landlord to repair any roof damage caused by Tenant's equipment during the Term and upon removal and shall indemnify Landlord for all damage related thereto.  Tenant's warranty for the roof initially constructed and installed on the Building will be for a term of at least ten (10) years.

9.    <u>Taxes</u>.

(a)    <u>Taxes Contemplated Hereunder</u>.  The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority, and all charges specifically imposed in lieu of any such taxes.  Real Estate Taxes shall exclude any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease, except, with respect to rent taxes, only to the extent in substitution of all or any part of Real Estate Taxes.

(b)    <u>Payment of Real Estate Taxes</u>.  At such intervals as Landlord is required by the taxing authority or by its lender (but no more frequently than monthly) to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel").  Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due.

11

Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered (which may be the prior year's tax bill if the current year's tax statement is not yet received by Landlord, to be adjusted when actual taxes for that year are known). Real Estate Taxes shall exclude any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof (excluding Tenant's Pro Rata Share thereof), plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

      (c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within fifteen (15) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

      (d)    Payment Following Appeal. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of

12

such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment; provided, the party who contested the taxes shall first be entitled to reimbursement from any overpayment by occupants of the Shopping Center of all reasonable costs of such contest. Landlord agrees to contest the Real Estate Taxes utilizing a company compensated on a contingency basis only, such that no fee is due for such contest if a tax savings is not achieved, and the company's fee is based on a portion of the savings won.

10.    Maintenance, Repairs and Replacements. Except (i) for costs covered by Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), unless covered by Tenant's insurance, or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance, repair and replacement of the exterior and interior non-structural elements of the Building, including the HVAC system. Notwithstanding anything contained above to the contrary, if, during the last five (5) Lease Years, Tenant is required to expend any sum in satisfaction of its replacement obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), Tenant shall so notify Landlord and provide Landlord with a copy of the proposal for such work and Landlord shall either (a) direct Tenant that Landlord elects not to cause Tenant to make such capital expenditure and Tenant shall thereby be relieved of any liability for such replacement obligation (unless such capital expenditure involves a Building system critical to the operation of Tenant's business, in which event Landlord shall be deemed to have elected (b) immediately following), or (b) direct Tenant to make such capital expenditure, in which event Tenant shall be reimbursed by Landlord at the end of the Term by that amount of the cost associated with such replacement, construction or alteration (but not repair costs) for the period beyond the remainder of the Term (with consideration to the exercise of any additional Renewal Options). Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof, roof structure, flooring system, floor slab, foundation, load bearing walls and

13

exterior structural walls. In addition, Landlord agrees to maintain the Other Improvements (except Tenant's trash compactor) immediately surrounding the Building, as well as sidewalks and landscaping, as part of Common Area Maintenance. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    <u>Utility Service Provider: Payment of Utility Bills</u>. Tenant shall be entitled, subject to State law and Tenant's ability to elect a provider of service at no additional cost to Landlord or other occupants of the Shopping Center, to select the utility service provider which shall provide electric, gas, cable, and telecommunication services to the Premises. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements and will pay to Landlord (who will timely pay the appropriate utility) Tenant's pro rata share of water and sanitary sewer charges. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center, such costs to be included as CAM Charges. Landlord

14

shall not be responsible or liable for the quality, stoppage or interruption of any utility services unless due to the actions or omissions of Landlord.

12.    Alterations. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire; provided, however, the Building footprint shall not be expanded nor shall the Building's structural integrity be compromised by the modifications, and a copy of Tenant's plans and specifications shall be delivered to Landlord. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall otherwise have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.    Mechanics' Liens. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution

15

of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.    Insurance.

(a)    Property Damage. During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for one hundred percent (100%) of the full replacement value of all such construction. During the Main Term and all Option Periods, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible, and on Tenant's personal property located within the Premises. Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b)    Liability Insurance. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises, Customer Pick-Up area, Car Stereo Parking area, the sidewalks adjacent to the Premises, and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    Workers' Compensation Insurance. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

258343_8 [51-36 (11919)]

(d)    Self-Insurance. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Million Dollars ($100,000,000).

(e)    Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction. During the Term, Landlord shall keep in full force and effect policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant has insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas (and if Landlord's insurance policy covers all of the Shopping Center, then the Shopping Center) shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed a commercially reasonable amount for Common Area liability coverage. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event

17

of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)    Workers' Compensation - Statutory Limits;
      Employers Liability - $500,000;

2)    Automobile Liability for all vehicles with limits of $3,000,000; and

3)    Commercial General Liability to include premises operations and products/completed operations coverage with limits of $5,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)    Policy Provisions. All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

258343_8 [51-36 (11919)]

(g)    <u>Waiver of Right of Recovery and Subrogation</u>. To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)    <u>Evidence of Insurance</u>. Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i)    <u>Indemnities</u>. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises, Customer Pick-Up parking spaces and Car Stereo Parking Area, or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, Customer Pick-Up parking spaces and Car Stereo Parking Area, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

(j)    No more frequently than once every five (5) years, Landlord and Tenant may adjust the insurance requirements set forth in this Lease to the then-current industry standards, by mutual agreement.

19

15.    Damages by Fire or Other Casualty.

(a)    Less Than 210 Days to Restore.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which would, in the opinion of the Architect (defined below), take less than two hundred ten (210) days after the casualty event to repair, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred ten (210) days following the casualty event (ninety (90) days following the casualty event for Common Areas), permits for which the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    210 Days or More.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which would, in the opinion of the Architect (defined below) take more than two hundred ten (210) days after the casualty event to repair, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available

258343_8 [51-36 (11919)]

to Landlord (i) all insurance proceeds paid by the insurance carrier issuing the policy of insurance required to be maintained pursuant to paragraph 14(a) above, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above. In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred ten (210) days after the casualty event, permits for which Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

For purposes of determining the period required for any casualty repair hereunder, Landlord and Tenant shall promptly select an A.I.A. designated architect licensed in the State (the "Architect") for the sole purpose of determining the time required to repair damage caused by a casualty. The cost of such Architect shall be shared equally by Landlord and Tenant. In the event that Landlord and Tenant cannot agree upon the identity of the Architect within fifteen (15) days of the casualty event, then, upon request of either Landlord or Tenant, the local A.I.A. representative board shall appoint the Architect who shall not be affiliated with either Landlord or Tenant and shall be experienced in commercial retail construction for purposes of determining the period required for such repair, which appointment shall be binding upon Landlord and Tenant.

(c)     Last Two (2) Years of Main Term or Option Period. Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant (i.e. would take more than two (2) months following the casualty event to rebuild), Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's or Landlord's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to the other party, and Landlord shall receive (i) the proceeds of any insurance (together with any applicable deductible) which are paid by the insurance carrier issuing the policy of insurance required to be maintained pursuant to paragraph 14(a) above, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above. Notwithstanding the foregoing, Tenant may void Landlord's termination by exercising the next succeeding Renewal Option, if any.

16.     Condemnation.

(a)     Definition of Taking and Substantial Taking. For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein (i.e. at least thirty percent (30%) of the Shopping Center is taken), (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of 4.5 spaces (for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide

22

substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) any portion of the access drives which are part of Tenant's Preferred Area, except for the Main Entrance, is taken.

'(b)    Tenant's Rights Upon Taking or Substantial Taking.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion of the Premises condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate (i) at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord; or (ii) at Landlord's option upon no less than ninety (90) days' prior written notice to Tenant, which termination Tenant may supercede and void by exercising its next succeeding Renewal Option.

(d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction

23

obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)    Rights Upon Temporary Taking. In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding ninety (90) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect, including Tenant's obligation to pay rent under this Lease. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of ninety (90) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraphs (a), (b) and (c) above, as applicable.

(f)    Taking of the Pylon Sign(s). In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide within ninety (90) days a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

(g)    Tenant's Right Upon Condemnation. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant (exclusive of any leasehold improvements paid for by Tenant's Improvement Allowance to which Landlord shall have the sole right), relocation expenses and any other items to which Tenant is entitled under applicable law.

17.    Assignment and Subletting. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior

24                                                    258343_8 [51-36 (11919)]

consent. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder to the extent this Lease is not changed, modified or amended by Landlord and any transferee. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent. Upon request by Landlord following any Transfer, Tenant shall deliver to Landlord a true and correct copy of the instrument evidencing the Transfer. Notwithstanding the foregoing, in the event Tenant desires to assign or sublease all or a portion of the Premises to an unrelated third party, Tenant shall give Landlord written notice of such proposed assignment or sublease along with a copy of the proposed assignment of lease document or proposed sublease document and the then-current amount of Tenant's unamortized costs related to the Premises, and Landlord shall notify Tenant of its disapproval or approval of such proposed assignment or sublease within twenty (20) days of Landlord's receipt of said document. If Landlord disapproves of such transaction within such twenty (20) day period, the Lease covering the portion of the Premises affected thereby shall be terminated and Landlord shall recapture all or such portion of the Premises in accordance with this paragraph 17. Landlord's full or partial termination of this Lease pursuant to this paragraph 17 shall be effective on the date of Tenant's proposed assignment or sublease set forth in Tenant's notice. Tenant shall thereafter have no liability under this Lease with respect to the portion of the Premises recaptured by Landlord. In the event of a partial termination of the Lease, this Lease shall be reformed to exclude the portion of the Premises that were recaptured by Landlord and Tenant's payment and other obligations hereunder shall be reformed to reflect the remainder of the Premises still occupied by Tenant. In the event Landlord exercises its option to terminate all or a portion of this Lease as provided in this paragraph 17, Landlord shall be obligated to pay Tenant its unamortized cost of the portion of the Building and Improvements recaptured by Landlord to the date of such termination, including the unamortized cost of all renovations made by Tenant to the applicable portion of the Building from and after the date hereof.

18.    Use.

(a)    Tenant may initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited

258343_8 [51-36 (11919)]

to, records, game cartridges, video tapes, cassettes and compact discs), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products; and further provided that in no event shall the Premises be used in violation of the terms of the REA.

(b)     Tenant shall also have the right to use the Premises, and the Premises shall only be used for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below or the REA, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

(c)     Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use; however, in the event that Tenant ceases its business operations at the Premises, such cessation shall not be deemed to be an event of default hereunder, nor shall such cessation relieve Tenant of any of its liabilities or obligations under and pursuant to this Lease. Upon its determination to cease operation, Tenant shall notify Landlord in writing of such decision ("Tenant's Notice") and of the amount of Tenant's then-unamortized costs relating to the Premises, whereupon Landlord shall have the option (but not the obligation) of recapturing the Premises by terminating this Lease. Such option may only be exercisable by Landlord from and after the date which is two hundred seventy (270) days following the date of Tenant's Notice until the date one (1) year following Landlord's receipt of Tenant's Notice, provided that prior to exercise by Landlord of its option herein granted, Tenant has not effected an assignment or subletting pursuant to paragraph 17 or recommenced operations in the Premises. Landlord shall exercise such option by delivering notice to Tenant that it intends to terminate this Lease (the "Landlord's Notice"), in which event this Lease shall terminate entirely on the date contained in Tenant's Notice unless the aforementioned assignment, subletting or recommencement has occurred. If Landlord fails to timely exercise said option to terminate, and Tenant (or any assignee or sublessee) thereafter reopens, Landlord shall once again have such right if the occupant of the Premises once again ceases operating for the two hundred seventy (270) day

period described above. Upon such termination, Tenant and Landlord shall be relieved of and from any and all further liability or obligation to the other under and pursuant to this Lease, and further, Landlord shall pay to Tenant the value of its unamortized improvements made to the Premises, which amount shall include the unamortized amount of Tenant Improvement Allowance only if Landlord has not paid such amount pursuant to the Construction Provisions. Notwithstanding anything contained herein to the contrary, Landlord's obligation to reimburse Tenant for its unamortized improvements shall survive the expiration or termination of Lease in the event Landlord exercises its recapture option as provided above. For purposes of this paragraph, "cessation" of operation at the Premises shall not mean or include any period during which Tenant is not operating within the Premises due to a casualty event, condemnation, reconstruction, alterations, modifications, maintenance or repair, or preparing the Premises for occupation by an assignee or subtenant.

      19.    <u>Warranties, Representations and Covenants.</u>

      (a)    Landlord represents, warrants and covenants to Tenant that:

      (i)    <u>Quiet and Peaceful Enjoyment.</u> Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises, by, through or under Landlord.

      (ii)    <u>Title.</u> Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on <u>Exhibit "F"</u>, shall restrict Tenant's right to sell the Products in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing (i.e. inventory storage) of the Products, or, except for governmental authorities and parties permitted to enforce the terms of the REA, the right to consent to any feature of the Improvements or Tenant's signage. This representation, warranty and covenant is a material inducement to Tenant's execution of this Lease.

      (iii)    <u>Certificate of Authority.</u> Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Illinois, and that its managing

member who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the limited liability company. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the limited liability company, and (b) the authority of the managing member to bind the limited liability company as contemplated herein.

(iv)    No Litigation.  There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials.  To the best of Landlord's knowledge, Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease. Notwithstanding the foregoing, in the event any Hazardous Substances are introduced to the Shopping Center by unrelated third parties, Landlord shall be responsible for the expeditious removal thereof, to the extent required by law or affecting Tenant's operation, Tenant's business or Tenant's Preferred Area, but Landlord shall not be required to indemnify, defend or hold Tenant harmless against any claims asserted by third parties against Tenant arising out of such Hazardous Substances or be liable for any claims by Tenant for compensatory and punitive damages, lost profits or other consequential

258343_8 [51-36 (11919)]

damages resulting therefrom, so long as Landlord promptly and diligently pursues the clean-up and remediation of the Hazardous Substances as required above. Nothing contained in the foregoing sentence shall be construed to limit Tenant's rights against third parties.

(vi)    Tenant's Exclusive Use. So long as the Premises are used for the initial uses set forth in paragraph 18(a), no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on Exhibit "F", and subject to Landlord's right to permit the operation of one (1) videotape rental store in the Shopping Center, such as Blockbuster, Hollywood Video or similar store, so long as it is operating as it is as of the Effective Date. Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence. As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such operator or tenant's display area. Notwithstanding anything contained herein to the contrary, (i) in the event any existing tenant leases provide that the tenant thereunder may change its use, Landlord, to the extent it has a right to do so under such lease, will exercise any approval rights in favor of protecting Tenant's exclusive use provided above, and (ii) Office Max, so long as Office Max is operating substantially as it is operating as of the Effective Date, shall be permitted to operate in the Shopping Center. Landlord agrees to deliver to Tenant for recording, on or before Landlord's execution of this Lease, the two (2) agreements relating to exclusives and other matters set forth in Exhibit "K", fully executed and complying with the terms of paragraph 35(f) below.

(vii)    Zoning and Subdivision. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    Prohibited Activities. Neither Landlord or Tenant shall operate or lease (nor shall Landlord permit to be operated or leased) any building or tenant space in Tenant Preferred Area or elsewhere in the Shopping Center for use as:

(A)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service; provided, the

29

foregoing restriction shall not preclude the operation of restaurants such as Applebees, Chili's, Cheddars, Ruby Tuesday and TGI Fridays, as same are operating as of the Effective Date;

    (B)    a bowling alley;

    (C)    a billiard or bingo parlor;

    (D)    a flea market;

    (E)    a massage parlor;

    (F)    a funeral home;

    (G)    a facility for the sale of paraphernalia for use with illicit drugs;

    (H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

    (I)    an off-track betting parlor;

    (J)    a carnival, amusement park or circus;

    (K)    a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

    (L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

    (M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

    (N)    a skating rink;

    (O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

    (P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses, except for offices and storage facilities incidental to a primary retail operation, in more than 10% of the gross leasable area of the Shopping Center, no one such occupant or tenant to occupy more than 12,000 square feet of floor area;

    (Q)    a banquet hall, auditorium or other place of public assembly;

    (R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

    (S)    a theater of any kind;

    (T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods unless same is a regional or national retailer such as Marshall's, TJ Maxx, Goody's, Burlington Coat Factory, or similar store;

    (U)    a gymnasium, sport or health club or spa;

    (V)    any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any building in the Shopping Center (except that this provision shall not prohibit normal cooking odors which are associated with a first-class restaurant operation nor to Tenant's car stereo installation areas);

    (W)    any operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation;

(X)   any "second hand" store or "surplus" store, thrift shop or other business principally engaged in the sale of used merchandise;

(Y)   any mobile home park, trailer court, labor camp, junkyard or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or maintenance);

(Z)   any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors located near the rear of any building);

(AA)   any fire sale, going-out-of-business sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

(BB)   any central laundry, central dry cleaning plant or laundromat (except that this provision shall not prohibit nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in first-class shopping centers);

(CC)   any automobile, truck, trailer or recreational vehicles sales, leasing, display, body shop or repair operation;

(DD)   any movie theater, night club or live performance theater;

(EE)   any living quarters, sleeping apartments or lodging rooms;

(FF)   any veterinary hospital or animal raising facility (except that this prohibition shall not prohibit pet shops or pet supply superstores and veterinary services which are incidental thereto);

(GG)   any mortuary, funeral home or crematory;

(HH)   any adult book store, adult video store, adult movie theater or other establishment selling, renting or exhibiting pornographic materials or drug-related paraphernalia (except that this provision shall not prohibit the operation of a bookstore or video store which carries a broad inventory of books or videos and other materials directed towards the interest of the general public [as opposed to specific segment thereof]);

(II)   any flea market, amusement or video arcade, pool or billiard hall, car wash, tattoo parlor or dance hall (except that this provision shall not prohibit a restaurant from including video games as an incidental use to its operations);

(JJ)   any training or educational facility, including, but not limited to, beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers (except that this provision shall not prohibit on-site employee training [whether for employment at the Shopping Center or at another business location of such occupant] by an occupant incidental to the conduct of its business at the Shopping Center);

(KK)   any church, school, day care center or related religious or educational facility or religious reading room;

(LL)   any massage parlor (except that this provision shall not prohibit massages in connection with a beauty salon, health club or athletic facility);

(MM)   any casino or other gambling facility or operation, including, but not limited to, off-track or sports betting parlors, table games such as black-jack or poker, slot machines, video gambling machines and similar devices, and bingo halls; or

(NN)   no portion of the Shopping Center shall be used, purchased or leased by a direct competitor of Border's, Inc. with types of tenants such as Barnes & Noble, Media Play, Books a Million, Crown Books and/or B. Dalton.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant in the Shopping Center within three hundred (300) feet of the front entrance to the Building or bookstore with an eating facility, unless there is no separate entrance for the eating establishment or its door, if separate, is located at the furthest end of the building in which it is located, from the Building.

(ix)    Site Covenants.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A)    Building Height and Location.  No buildings shall exceed the building heights set forth in the REA.  Development shall only occur within the area shown on the Site Plan as Permissible Building Area, except that the rear wall of any of the in-line buildings may be extended east as far as possible while still maintaining the rear service drive as shown on the Site Plan.

(B)    Construction and Alterations.  Following the end of the first Lease Year, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap in fees and other similar construction-related charges.  Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold.  Landlord shall not make any

258343_11 [51-36 (11919)]

other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's consent.

(C) <u>Prohibited Uses in Common Area</u>. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas, nor will Tenant do the following: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 41 and traffic control signs; (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center may be designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.

(D) <u>Easements</u>. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas without Tenant's prior written consent.

(x) <u>Interference with Tenant's Reception/Transmission</u>. Landlord shall not install and use its best efforts to not permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi) <u>Notices Affecting the Premises</u>. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing

or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)    Constructive Trust. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    Tenant's Authority. Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Assistant Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    Tenant's Warranty as to Hazardous or Toxic Materials. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants of Landlord set forth in this paragraph 19 are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

In addition to such other remedies as may be accorded Landlord at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of Tenant's representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or (ii) in the event that Landlord suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties,

34

Tenant shall defend, indemnify and hold Landlord harmless from any of such loss, costs, liability or damage incurred as a result of Tenant's breach hereunder.

20.    Estoppel Certificates. Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. In addition, without charge, at any time any from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder, including but not limited to the direct payment of rentals to Landlord; provided, such acceptance by Landlord shall not constitute a waiver of Tenant's obligations under the Lease not cured by the assignee or sublessee and such assignee or sublessee shall have the same cure period as Tenant. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Non-Disturbance and Attornment.

(a)    Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a subordination, non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a subordination, non-disturbance and attornment agreement in the form of Exhibit "G" executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages, which have priority over this Lease, if any, and with regard to all renewals, modifications,

258343_8 [51-36 (11919)]

replacements and extensions of such Ground Leases or Mortgages, to the extent any would have priority over this Lease. Such Agreement shall contain, at a minimum, the following: (i) the Lease shall not terminate by reason of a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed so long as Tenant is not in default beyond any applicable cure period, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Shopping Center available for restoration of the Improvements in accordance with the terms hereof. Upon Tenant's receipt and execution of said subordination, non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage. Landlord shall use reasonable efforts to cause any future Mortgagee or Ground Lessor to deliver a subordination, non-disturbance and attornment agreement in accordance with this paragraph 21 and the form attached as Exhibit "G"; provided Tenant shall not be required to subordinate its rights under this Lease to the lien of such future Mortgage or Ground Lease until such subordination, nondisturbance and attornment agreement is delivered to Tenant. Tenant agrees to execute and deliver such agreement to Landlord and Landlord's lender within thirty (30) days of receipt, so long as it is in the form required hereunder. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof. After the delivery by Landlord of the non-disturbance and attornment agreement issued by the Mortgagee providing the Tenant Improvement Allowance, Landlord agrees to pay Tenant's reasonable attorney's fees incurred in negotiating any additional non-disturbance and attornment agreements not conforming to the terms of Exhibit "G" attached hereto, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same (including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such

258343_8 [51-36 (11919)]

services), the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document.

(b)     So long as Tenant's sublease requires the sublessee to abide and be bound by, and perform all of the terms of this Lease and Tenant remains primarily liable under this Lease, Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing that if Tenant defaults under this Lease, Landlord shall (a) give such sublessee notice of the default or other occurrence in the manner provided in this Lease; and (b) give such sublessee the same time as is given Tenant under this Lease to cure the default or rectify the other occurrence; provided in no event shall the curing of any default or the rectifying of any other occurrence by any sublessee act as a release or waiver of any of Tenant's primary obligations under this Lease, and Landlord agrees to exercise no remedies with respect to any default unless the sublessee has been given such notice and opportunity to cure, and fails to cure said default within the applicable cure period.

22.     Tenant's Financing. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's removable trade fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.  In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 23 below.

23.     Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time)

258343_8 [51-36 (11919)]

and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request. The foregoing is not intended to apply to judgment liens.

24.     Memorandum of Lease; Commencement Date Agreement.  Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.     Expiration of Term and Holding Over.  At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises and Improvements in the same condition as existed on the Commencement Date, less reasonable wear and tear and in broom clean condition.  Should Tenant hold over without the written consent of Landlord, Tenant shall pay Landlord an amount equal to one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year for each month (prorated for any portion thereof) that Tenant holds over.  CAM Charges and Tenant's Pro Rata Share of Real Estate Taxes shall additionally be due by Tenant, prorated for any partial month, during such holdover period.

26.     Force Majeure.  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) of this Lease.

258343_8 [51-36 (11919)]

27.    Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest of Real Estate Taxes), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy. Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.    Landlord's Remedies. After the occurrence of an Event of Default by Tenant, and without its actions being deemed an election of remedies or a cure of Tenant's default, Landlord shall have the right to exercise the following remedies:

(a)    Continue Lease. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease but terminating Tenant's possession, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any

39

reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.

(b)     Terminate Lease.  Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term.  In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)     The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)     The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of the Default Rate for past due obligations, and a discount rate to net present value of ten percent (10%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.  In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings.  Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)     Remedies Are Cumulative.  Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including, without limitation, injunctive relief, to the extent not inconsistent with specific provisions of this Lease. The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease).  Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or

258343_8 [51-36 (11919)]

otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(d)  <u>Additional Landlord Remedies Due to Construction Delays by Tenant</u>.  If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following Delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of Ground Rent (as hereinafter defined) on the date which is two hundred ten (210) days following Delivery of the Land.

If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment of Ground Rent on the date which is two hundred forty (240) days following Delivery of the Land, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof. Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime and acceleration charges paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

For purposes hereof, annual Ground Rent shall equal $220,242.00, payable monthly in equal installments of 1/12 each of the amount of the annual Ground Rent, in lieu of Base Rent, for so long as Tenant's failure continues.

29.  <u>Events of Landlord's Default; Tenant's Remedies</u>.

(a)  <u>Default by Landlord</u>.  Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33 hereof, within ten (10) days after the receipt of written notice

41

from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, except as may be specifically set forth in Exhibit "C", it being agreed that with respect to the dates set forth therein time is of the essence.

(b)    Remedies Upon Landlord's Default.    Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) if the Event of Default is curable by Landlord, withhold, to the extent commensurate with Landlord's default, Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default, including payment of interest, transaction costs and attorney's fees specified in subsection (i) above, is cured by Landlord whereupon all such amounts so withheld by Tenant shall be paid to Landlord, (iii) following a second written notice given by Tenant to Landlord, terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. The various

42

rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.

      (c)     <u>Additional Tenant Remedies Due to Construction Delays by Landlord</u>. In the event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish Delivery of the Land in the condition specified herein the Effective Date or earlier date if an early entry agreement is entered into by Landlord and Tenant separate from this Lease (the "Delivery Date"), Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by October 1, 2001. Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

      In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is fifteen (15) days following the Delivery Date, or to complete any subsequent element of the Landlord Work by the completion date established therefor in <u>Attachment "1"</u> of <u>Exhibit "C"</u> attached hereto (the Construction Schedule), Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for Delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its actual costs thereof, including interest on such costs at the Default Rate. Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

      In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete Delivery of the Land to Tenant by the date which is thirty (30) days from the Delivery

258343_8 [51-36 (11919)]

Date, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) or Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Ground Rent, Base Rent, Real Estate Taxes or CAM Charges. In such event, Landlord shall deliver the Land and complete the Site Work on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

(d)     Exercise of Remedies. Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to Tenant under paragraph 29(c) hereof shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder.

(e)     Time is of the Essence. Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth herein.

30.     Waiver. If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.     Compliance with Applicable Laws. During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the

44

258343_8 [51-36 (11919)]

Improvements, and of the board of fire underwriters (collectively, the "Lawful Requirements") respecting Tenant's use and occupancy of the Improvements and the interior of the Building, and Landlord shall comply with all Lawful Requirements otherwise relating to the Improvements. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

32.    <u>Notices</u>.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:        CIRCUIT CITY STORES, INC.
                     Deep Run I
                     9950 Mayland Drive
                     Richmond, Virginia 23233
                     Attention:  Corporate Secretary

with a copy to:      CIRCUIT CITY STORES, INC.
                     Deep Run I
                     9950 Mayland Drive
                     Richmond, Virginia 23233
                     Attention:  Vice President of Real Estate

45

If to Landlord:        RUBLOFF MCHENRY EAST, L.L.C.
                       6277 East Riverside Boulevard
                       Rockford, Illinois 61114
                       Attention: Robert Brownson

with a copy to:        RUBLOFF MCHENRY EAST, L.L.C.
                       6277 East Riverside Boulevard
                       Rockford, Illinois 61114
                       Attention: General Counsel

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

33.    Brokers. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Interstate Commercial, and The Equity Group (together, "Brokers"), each of which shall be paid a commission by Landlord pursuant to their separate written agreement. Landlord agrees that, if Landlord fails to pay either of such Brokers its commission when due, Tenant may pay same and offset such amount against the amounts then next becoming due from Tenant to Landlord hereunder. Landlord agrees that Brokers are representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Brokers of the Broker's commission, the Brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

34.    Miscellaneous.

(a)    Headings and Gender. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    Construction. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

46

258343_8 [51-36 (11919)]

(c)     Waiver of Jury Trial. In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)     Relationship of Landlord-Tenant. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)     Entire Agreement; Merger. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant. The provisions of any letter of intent related to this Lease or the Premises are hereby declared null and void.

(f)     Attorneys' Fees. In the event either party shall be required to commence or defend any action or proceeding against or by the other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding against or by the other party in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)     Partial Invalidity. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)     Consents. Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)     Holidays. If the day on which rent or any other payment due hereunder is payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

258343_8 (51-36 (11919))

(j)    Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)    Successors and Assigns.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)    Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)    Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)    Exhibits.  All of the exhibits to this Lease are hereby incorporated herein by reference for all purposes and are part of this Lease.

(o)    No Construction Against Either Party.  This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)    Effective Date.  This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

35.    Effectiveness of Lease; Tenant's Right to Terminate.  Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof (except for the survey), of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) within thirty (30) days of execution hereof, an ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and

48

Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)     Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)     Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d)     Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

(e)     Prior to execution of this Lease by Landlord, Landlord has caused (i) the outparcels to be burdened with, and the current lessee, if any, and owner of such parcel to be bound by, certain terms relative to this Lease, and (ii) the Encumbered Lots owned by Landlord to be burdened with a prohibition on use as an electronics superstore, and delivered to Tenant fully executed agreements evidencing same for recording in the real property records of the County, said agreements to be in form and substance identical to that attached hereto as Exhibit "K".

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord. All conditions contained in this paragraph except subparagraphs (a) and (g) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt thereof by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

36.    Confidentiality [Intentionally Deleted].

37.    Rules and Regulations. Tenant agrees to observe the following rules and reasonable regulations, which rules shall apply uniformly to Tenant and each of the other tenants in the Building:

(a)    No loudspeakers, television sets, radios, or other devices shall be used in a manner as to be heard outside the Premises.

(b)    No person shall use the Premises as sleeping quarters, sleeping apartments or lodging rooms.

(c)    Tenant shall obtain and keep in force and effect all permits or licenses necessary or required to conduct its business.

(d)    No live animals other than fish in an aquarium shall be kept or displayed upon the Premises.

38.    Conveyance by Landlord.    If Landlord or any successor owner of the Shopping Center shall convey or otherwise transfer the Shopping Center, or any portion thereof, or Landlord's interest in this Lease to another person, including any mortgagee, which party assumes all of Landlord's obligations under this Lease arising after the date of such transfer, such transferee shall, upon written notice by Landlord given to Tenant, be and become Landlord hereunder and shall be liable upon all liabilities and obligations of this Lease to be performed by Landlord that first arise after the date of such conveyance and such transferor shall be released from any responsibility, liability, and claims under this Lease arising after the date of such conveyance and assumption.

50

39.    Consequential/Punitive Damages.  Notwithstanding any provision in this Lease to the contrary, neither party to this Lease shall be liable to the other for any consequential or punitive damages, except in the event of a breach by Landlord of the exclusive use granted Tenant in paragraph 19(a)(vi) above.

40.    Limitation of Right of Recovery.  It is specifically understood and agreed that there shall be no personal liability of Landlord with respect to any of the covenants, conditions or provisions of this Lease, except Landlord's obligation to pay the Tenant Improvement Allowance (defined in Exhibit "C").  In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to Landlord's interest in the Shopping Center and Landlord's equity, including all rents, profits and proceeds (including, without limitation, those from insurance, condemnation, sales and financing or refinancing) in the Shopping Center for the satisfaction of Tenant's remedies.  Notwithstanding anything contained in this paragraph, however, the limitation of personal liability set forth herein shall not be applicable to events occurring due to Landlord's willful misconduct, fraud or intentional acts.

41.    "For Rent" Signs.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot portion of Tenant's Preferred Area. During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business. WITNESS the following signatures and seals:

258343_8 [51-36 (11919)]

LANDLORD

**RUBLOFF MCHENRY EAST, L.L.C.,**
an Illinois limited liability company

By:    Rubloff Development Group, Inc.,
its Managing Member

By: _Robert S Brown_____

Name: ___Robert S. Brownson_____

Title: _____Member_____

52

TENANT

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____
     Stanley L. Heller, Assistant Vice President