## EXHIBIT "A"

### SITE PLAN

Components:          Premises (outlined in red) - 33,370 square feet

Tenant's Preferred Area

Permissible Building Areas (extended rear line)

Customer Pick-Up

Pylon/Monument Signage

Truck Well(s)/Trash Compactor

Car Stereo Parking

Shopping Center - does not include Kohl's parcel

Staging Area (front of Building)

Main Entrance

258343_8 [51-36 (11919)]

## EXHIBIT "A-1"

## LEGAL DESCRIPTION

Lots 2 and 3 as designated upon the Final Plat of Rubloff Towne Centre Subdivision, recorded March 7, 2001, as Document No. 2001R0013473 in the real property records of McHenry County, Illinois, being a subdivision in that part of the Southeast Corner of Section 23, Township 45 North, Range 8, East of the Third Principal Meridian, in McHenry County, Illinois.

258343_8 [51-36 (11919)]

## EXHIBIT "B"

### INDEX OF DEFINITIONS

| <u>Term</u> | <u>Paragraph where defined</u> |
|---|---|
| Additional Areas | 14(e) |
| Architect | 15(b) |
| Base Rent | 4 |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year(s) | 7(c) |
| City | 1 |
| Civil Plans | Ex. "C", para. 1(b) |
| Commencement Date | 4 |
| Common Area Easement | 6(a) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| CPI-U | 4(iii) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery Date | 29(c) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Effective Date | 34(p) |
| Event of Default (Landlord) | 29 |
| Event of Default (Tenant) | 27 |
| Foreclosure | 21(a) |
| Ground Lease | 21 |
| Ground Lessor | 21(a) |
| Hazardous Substances | Ex. "C", para. 1(a) |
| Improvements | 2 |

258343_8 [51-36 (11919)]

| Term | Paragraph where defined |
|------|------------------------|
| Incidental Use | 19(a)(vi) |
| Land | 1 |
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1(d) |
| Landlord's Premises | 1 |
| Lawful Requirements | 31 |
| Lease Year | 3 |
| Main Term | 3 |
| Modified Proctor | Ex. "C-1", I-B(1) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Offer | 37 |
| Option Period(s) | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 22 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 2 |
| Products | 18(a) |
| REA | 1 |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Work | Ex. "C", para. 1(b) |

258343_8 [51-36 (11919)]

| Term | Paragraph where defined |
|------|-------------------------|
| Staging Area | 6(a) |
| Standard Specifications | Ex. "C", para. 1(b) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(d) |
| Substantial Completion Anniversary | Ex. "C", para. 3 |
| Substantially All of the Premises | 16(a) |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Tenant's Soils Report | Ex. "C", para. 1(b) |
| Term | 3 |
| Transfer | Ex. "C", para. 3 |
| worth at the time of the award | 28(b) |

258343_8 {51-36 (11919)}

MCHENRY, ILLINOIS

<u>EXHIBIT "C"</u>

CONSTRUCTION PROVISIONS

These CONSTRUCTION PROVISIONS are made a part of the Lease between Landlord and Tenant and are attached as <u>Exhibit "C"</u>.

1.      <u>Landlord's Delivery of the Land; Other Landlord Work</u>. All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)      <u>Hazardous Substances</u>. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as its deems necessary.

(b)      <u>Site Work</u>. Landlord acknowledges receipt of, and covenants to comply with, Circuit City Stores, Inc. Standard Design and Construction Specifications (the "Standard Specifications") attached hereto as <u>Exhibit "C-1"</u> in the completion of the Landlord Work. Landlord, at its sole cost and expense, shall: (i) verify that its proposed development of the Shopping Center and its civil engineering plans comply with Tenant's geotechnical evaluation of the Land dated June 12, 2000 and prepared by Law Engineering, Inc. (the "Tenant's Soils Report") and with the Standard Specifications; (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to Delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements, improvements and tenancies; (iii) complete grading of the Land and the Common Areas in accordance with Tenant's Soils Report and the "Standard Specifications", and with the final plans prepared by Landlord's civil engineer, which are subject to Tenant's written approval (the "Civil Plans"). Landlord's final civil engineering plans which have been approved by Tenant in writing and prepared by Marcus Engineering, consisting of sheets CE-1 to CE-12 dated September 21, 2000, latest revision March 9, 2001, Job No. 00-057 (the "Civil Plans")]; (iv) complete Tenant's building pad strictly in accordance with Tenant's Soils Report and the Standard Specifications; (v) obtain approvals for all curbcuts indicated on the Civil Plans and all on and off-site permits required for any work to be performed by Landlord necessary to

develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all curbcuts for Tenant's Preferred Area, (B) 20,000 (12,000 square feet if Kohl's objects to use of 20,000) square feet of Staging Area outside of but adjacent to Tenant's building pad to either be paved or stone to provide for all weather use, and (C) an all-weather construction access road to the Land and around Tenant's building pad no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, all in accordance with the Civil Plans; and (vii) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vii) above is, collectively, the "Site Work". No changes shall be made to any of the Site Work, including but not limited to any plans and specifications therefor, without Tenant's prior written consent. The Site Work shall be performed in accordance with the Construction Schedule attached hereto as Attachment "1". Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Tenant shall have the right to temporarily locate a trailer in the Shopping Center during the eight (8) weeks prior to the store opening in a mutually agreeable location designated on the Site Plan, to be used as a Human Resource Hiring Center for Tenant's store employees.

Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted and new pad certifications provided as described in Exhibit "C-1", paragraph 1(B)(4).

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to provide temporary utilities to within five (5) feet of the building pad at Tenant's designated points of entry as set forth in the Plans and Specifications, as

258343_8 [51-36 (11919)]


contemplated in paragraph 1(c) below, and temporary telephone service to the Premises and the Staging Area, in accordance with the dates established therefor in the Construction Schedule, to the end that promptly upon completion of such requirements (collectively, "Delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of the Shopping Center. Landlord agrees that Delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. In addition, Landlord shall pay all impact fees assessed with respect to Tenant's construction of the Premises. Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work. Upon Delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached to <u>Exhibit "C"</u> as <u>Attachment "2"</u>.

Should the Site Work require minor adjustments in order to be in accordance with the Standard Specifications or the Civil Plans, Tenant may, following three (3) days' written notice to Landlord after which the adjustment has not been made by Landlord, direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).

(c)    <u>Paving, Lighting, Utilities, Landscaping and Drainage</u>. Landlord shall deliver to Tenant full and complete civil engineering plans on or before the date set forth in <u>Attachment "1"</u>. Landlord, at its sole cost and expense (except with respect to the pylon sign(s) which are subject to reimbursement as set forth in paragraph 8 of the Lease), and in accordance with <u>Attachment "1"</u>, shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the Standard Specifications; (ii) the construction and installation within five (5) feet of the Building, of permanent telephone service and permanent utilities, including but not limited to gas, electric, domestic water and fire protection water (in size sufficient to satisfy local fire codes) and sanitary sewer as described in the Standard Specifications, each at Tenant's required entry points

258343_8 [51-36 (11919)]

shown in the Civil Plans, at depths adequate for Tenant's tie-in without additional cost above that contemplated by the "Plans and Specifications" (as defined in paragraph 2(b) below); (iii) the construction and installation of the storm water drainage system at Tenant's required location shown in the Civil Plans; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the Civil Plans and Standard Specifications; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan which shall be subject to Tenant's approval, not to be unreasonably withheld; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" as described in the Standard Specifications; and (vii) Landlord's installation of the pylon sign(s) identifying the Shopping Center as described in paragraph 8 of the Lease, all no later than the dates established therefor in the Construction Schedule.

(d)    Landlord Work.  All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who carry sufficient errors and omissions coverage, and contractors, who are bondable, all licensed in the State and of good reputation. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. All Landlord Work shall be completed in accordance with these Construction Provisions and all attachments hereto and the Civil Plans. In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise the rights set forth in this paragraph 1(d) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that portion of the Landlord Work from Landlord. In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and

provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work. Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed. In the event that Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

2.      <u>Tenant Improvements</u>.

(a)      <u>Building Construction</u>.   Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by the Standard Specifications) of Delivery of the Land in the form of <u>Attachment "2"</u>. Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided Tenant does not elect its self-help remedies set forth in this Lease. Upon completion of any such previously unmet requirements, Tenant shall within a reasonable time commence and pursue to completion with due diligence the construction of the Improvements and storefront sidewalk. The construction work on the Improvements and storefront sidewalk shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the "Plans and Specifications" (defined below).

(b)      <u>Plans and Specifications</u>.  Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications including building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached to <u>Exhibit "C"</u> as <u>Attachment "3"</u>.  Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation, within ten (10) business days after receipt thereof.  If the Plans and Specifications are not disapproved by Landlord within fifteen (15) days of delivery thereof to Landlord, they will be deemed approved.  The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld,

5 - Ex. "C"

conditioned or delayed. Any changes which Landlord desires to make to the Plans and Specifications (which are different than a Building based on the Schematic Floor Plan and Elevation utilizing Tenant's prototypical elevations and building materials) shall be at Landlord's sole cost and expense, and Tenant shall not be required to increase the Base Rent payable hereunder, or accept a reduction in the Tenant Improvement Allowance, as a result of such changes.

(c)    Permits. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)    Substantial Completion. Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.

3.    Costs. Upon Substantial Completion and Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, and (iii) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to $70.00 per square foot of gross leasable area of the Building (which shall be conclusively determined by the amount of gross leasable area shown in Tenant's as-built survey), payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (i), (ii) and (iii) above. If the Base Rent is increased or decreased pursuant to paragraph 4(ii) of the Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased. If Landlord fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt of items (i), (ii) and (iii) above, Landlord shall be in default hereunder, no Ground Rent, Base Rent or CAM Charges shall be due or owing to Landlord until the same is paid to Tenant, together

with interest which shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Tenant Improvement Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent equal to Seventy-Five Thousand and No/100 Dollars ($75,000.00) per annum during the first year following the Substantial Completion Anniversary, Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the second year following the Substantial Completion Anniversary, and Twenty-Five Thousand and No/100 Dollars ($25,000.00) per annum thereafter during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of the Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

Notwithstanding the foregoing, at any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 21 of the Lease.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Transfer. Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

Attachments:

"1"  Construction Schedule

"2"  Site Work Certification

"3"  Schematic Floor Plan and Elevation

258343_8 [51-36 (11919)]

## Attachment "1"

### Construction Schedule

| | **Landlord's Task** | **Completion Date** |
|---|---|---|
| 1. | Landlord's delivery of full and complete civil engineering plans for the Shopping Center and architectural scale building elevations for the remainder of the Shopping Center. | May 1, 2001 |
| 2. | Landlord's dates for off-site improvements/ obtaining permits, etc. | October 15, 2001 |
| 3. | Construction of all-weather construction access road to the Premises. | May 18, 2001 |
| 4. | Completion of Staging Area. | May 25, 2001 |
| 5. | Completion of curbcuts in Tenant's Preferred Area. | May 20, 2001 |
| 6. | Completion of Site Work, including approval for all curbcuts, except as specifically noted otherwise in this Schedule. | June 25, 2001 |
| 7. | Installation of temporary utilities. | May 16, 2001 |
| 8. | Landlord's Delivery of the Land to Tenant, except grading required as part of Site Work shall commence upon execution of the Lease in the area surrounding the Land and be complete as to Common Areas by June 30, 2001. | May 1, 2001 |
| 9. | Landlord's delivery of pad certification from soils engineer. | May 1, 2001 |
| 10. | Construction and installation of permanent utilities including permanent telephone service. | July 1, 2001 |
| 11. | Construction and installation of storm water drainage. | July 1, 2001 |
| 12. | Construction and installation of paving (including heavy-duty paving) and curbing. | September 1, 2001 |
| 13. | Completion of landscaping at Shopping Center. | September 1, 2001 |
| 14. | Construction and installation of exterior lighting in the Shopping Center. | September 1, 2001 |
| 15. | Construction and installation of pylon sign(s) identifying the Shopping Center. | September 1, 2001 |

Attachment "2"

Site Work Certification

Date: _____

To:   Circuit City Stores, Inc.
      Deep Run I
      9950 Mayland Drive
      Richmond, Virginia 23233
      Attention: Vice President-Real Estate

      Re:   Circuit City Store/McHenry, Illinois-
            Lease Agreement dated _____

Ladies and Gentlemen:

      The undersigned, as Landlord under the Lease has caused "Delivery of the Land" to occur on _____, 2001, and accordingly, completion of the Site Work (except grading required as part of Site Work, which shall be completed in accordance with item 8 of the Construction Schedule), all in accordance with the terms of the Lease. Specifically the undersigned hereby certifies that: (i) the grading of the Land and construction access road has occurred in accordance with the Standard Specifications, attached to the Lease, and Tenant's building pad has been prepared strictly in accordance with Tenant's Soils Report; (ii) the Staging Area will be completed by May 25, 2001, and (iii) an all-weather construction access road to the Land no less than 24 feet in width will be prepared and ready for your use by May 18, 2001.

      All conditions precedent to issuance of your building permit have been satisfied by Landlord, and we certify that all elements of the Site Work and Delivery of the Land required by the date hereof have been satisfied in accordance with the Lease.

                        **RUBLOFF MCHENRY EAST, L.L.C.,**
                        an Illinois limited liability company

                        By:    Rubloff Development Group, Inc.,
                               its Managing Member


                        By: _____
                        Name: _____
                        Title: _____

9 - Ex. "C"
Attachment "2"                                                    258343_11 [51-36 (11919)]

Attachment "3"

Schematic Floor Plan and Elevations

(attached)

WEST ELEVATION

SOUTH ELEVATION

NORTH ELEVATION

EAST ELEVATION

Attachment "3"
Page 1 of 2

FIXTURE PLAN

NORTH

Attachment "3"
Page 2 of 2

## EXHIBIT "C-1"

## STANDARD DESIGN AND CONSTRUCTION SPECIFICATIONS

for a proposed

Circuit City Superstore

McHenry Towne Centre

McHenry, Illinois

to be developed by

Rubloff McHenry East, L.L.C.

Dated _____, 2001

258343_8 [51-36 (11919)]

I.   STANDARDS FOR GRADING WORK

    A.   Grading Requirements.  The Land and the Shopping Center shall be graded in accordance with the following:

        1.   The Civil Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations.  Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

        2.   The Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

        3.   Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%.  All water shall be sheet drained away from Tenant's doors.

        4.   Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%.  Entrances and access drives shall have a maximum slope of 6.0%.

        5.   Surface drainage swales will not be allowed without prior approval of Tenant.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

        6.   The cut and fill on the Shopping Center site should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

        7.   No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

    B.   Tenant's Pad Area:  "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls, truck dock and ramp area and the Customer Pick Up and Car Stereo Installation areas, or to the back of curbing around the Building, whichever is further.  The Site Work shall comply with the following additional requirements:

        1.   Landlord shall be responsible for preparing Tenant's Pad Area subgrades to within plus or minus one-tenth of a foot as set by Tenant's architect. Tenant's subgrades are 8" below finished floor elevation. Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the modified proctor soil test for water content and compaction levels ("Modified Proctor") on the Land, so as to enable Tenant to perform

construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard spread footings and without the necessity of pilings or other extraordinary foundation work. Tenant's minimum slab thickness and under slab fill will be established in accordance with Tenant's Soil Report. All compacted areas of the site shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with Tenant's Soils Report and shall be furnished to Tenant upon completion of the Site Work.

2. Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

3. During the preparation of Tenant's Pad Area, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of Tenant's Pad Area in accordance with Tenant's Soils Report. Landlord shall perform one in-place compaction test per 5,000 square feet of pad area per lift.

4. On or before the date of Delivery of the Land, Landlord shall provide Tenant with:

    a. An independent soils engineer's written certification that all pad work was completed in accordance with Tenant's Soils Report, Civil Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification. A copy of such certification shall be delivered to Tenant's Vice President-Construction at Tenant's address set forth in paragraph 32.

    b. A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying markers.

5. Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

258343_8 [51-36 (11919)]

6.    Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

7.    All material, including native and fill, within 5 feet of any surface of the building including foundation concrete, shall be nonexpansive with a plasticity index of 12 or less. The material shall also have sufficient cohesion to stand vertically for 3 feet. No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

8.    The Civil Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

9.    All outlots or future building areas shall be rough graded and planted with grass seed.

## II.   UTILITIES SPECIFICATIONS

A.    <u>Temporary Utilities</u>: Landlord will provide the following temporary utilities to the Staging Area in a location selected by Tenant no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

water (2" line), electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) and temporary telephone for use by Tenant in its construction of the Improvements.

B.    <u>Permanent Utilities</u>: Landlord will provide the following permanent utilities to within five (5) feet of the Premises or the sidewalk at Tenant's identified entry points (but in any event the stub point of such utilities shall not be covered by paving) no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

gas (if available), telephone, permanent electricity (adequate for an 800-amp panel), 3-phase, 277/480 volt), storm sewer system (in accordance with Civil Plans), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system with the fire pump, as approved by Tenant's fire protection consultant). (Landlord to reimburse Tenant for cost of fire water pump, up to $25,000.00.

III.   PAVING SPECIFICATIONS

    A.   Parking Area and Roadway Surfacing:

       1.   Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

       2.   All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of Tenant's Soils Report.

       3.   Heavy duty paving must be used in main drives and service areas as required by Tenant's Soils Report.

    B.   Sidewalks and Curbs:

       1.   Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks except for sidewalks in front of the Building.

       2.   All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building.  All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by Landlord's architect with respect to the Common Area), over a suitable granular base. Salt finish is not acceptable.

       3.   Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted.  Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete.  Extruded asphalt or concrete curbing may not be used.

       4.   Curbs at all non-parking areas shall be painted red with an exterior flat red latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

IV.   SHOPPING CENTER LIGHTING SPECIFICATIONS

    A.   Design Standards for Lighting of the Shopping Center:

       1.   The Developer shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

258343_8 [51-36 (119919)]

2.     Illumination provided by metal halide lighting, as measured at pavement: 5 foot candles minimum maintained within 50 feet of Tenant's entry; 2 foot candles minimum maintained throughout, measured at grade. Entry canopy soffit: 40.0 foot candles. Landlord to provide (4) 1000 w. spot lights focused on Tenant's entry canopy.

3.     Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn). The security lighting layout and pattern shall be subject to Tenant's approval.

4.     Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5.     Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel. All security lighting shall be placed on photo-cell switching.

6.     The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

258343_8 [51-36 (11919)]

## EXHIBIT "D"

### REMOVABLE TRADE FIXTURES

STORE FIXTURES
ALL STORAGE RACKING
ALL SECURITY SYSTEM ITEMS
TELEPHONES AND PAGING SYSTEMS
COMPUTER SYSTEM
OFFICE FURNITURE AND TRASH RECEPTACLES
BATTERY CHARGER
TRASH COMPACTOR
SIGNS (INTERIOR/EXTERIOR)
ANTENNA SYSTEM
ELECTRONIC SWITCHING
AIR COMPRESSOR (ROADSHOP)
SAFE
CONVEYOR
MEDECO CYLINDER LOCKS (5)
REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES
TACK BOARDS
WATER COOLER
FIRE EXTINGUISHERS
AUDIO ROOM FIXTURES AND SWITCHGEAR
PICTURES
WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS, DOLLIES, ETC.)
TRACK LIGHTS (CANS ONLY, NOT TRACKS)

THE FIRE PUMP IS NOT A REMOVABLE TRADE FIXTURE

258343_8 [51-36 (11919)]

# EXHIBIT "E"

## SIGN PLANS AND CRITERIA

(attached)

258343_8 [51-36 (11919)]





28'-6"

EQ    16'-6"    EQ

1-30 amp 120 volt circuit required (29.5 amps)    1-30 amp 120 volt circuit required (20.0 amps)

4'-6"

18"

4'-6"

*CIRCUIT CITY* (drawing)

T-11 BOX 2 GANG
HOUSING TWO
D.P 30AMP SWITCHES
SEE ELEVATION
SHEET FOR EXACT
PLACEMENT OF BOX

(4) 30 AMP
CIRCUIT REQUIRED

1-30 amp 120 volt circuit required (19.3 amps)    1-30 amp 120 volt circuit required (14 amps)

SPACING - 20
SLANT - 10%

**SIGN Ⓑ LAYOUT  SCALE 3/16" = 1'-0"**

**SIGN B:**
    MANUFACTURE ONE SET OF 54" BOX CHANNEL LETTERS WITH FIVE (5) ROWS
    OF EXPOSED WHITE TUBING.

**MESSAGE:** *CIRCUIT CITY* (11 CHARACTERS)

**MATERIALS:**
    CHANNELS CONSTRUCTED OF .040 ALUMINUM 12" DEEP SPRAYED
        MATTHEWS BRUSHED ALUMINUM #41-342 ON ALL SURFACES.
        NOTE: WHERE MOUNTING CLIPS ARE REQUIRED PAINT WITH MEXICALI
        RED #42-214 TO MATCH ALUCOBOND BACKGROUND.
    LIGHTING FROM FIVE (5) ROWS OF WHITE 15MM EXPOSED TUBING
        POWERED BY 60MA TRANSFORMERS LOCATED INSIDE EACH LETTER.
        ALL WIRING AND MATERIALS TO BE U.L. APPROVED.
    MOUNT LETTERS DIRECTLY TO RED ALUCOBOND FACIA WITH 1/2" ALUMINUM
        ALLTHREAD FASTENED THRU WALL AND SECURED ON INTERIOR TO
        STEEL UNISTRUT CHANNELS. UNISTRUT CHANNELS TO BE INSTALLED
        BY SIGN INSTALLER AS SHOWN ON DRAWING.
    ELECTRICAL TO SIGN LOCATION(S) BY OTHERS. FOUR (4) 30 AMP 120 VOLT
        CIRCUITS REQUIRED. EACH CIRCUIT WILL HAVE A DISCONNECT
        SWITCH AND LETTERS WILL BE SUPPLIED WITH 20" SECTION OF LIQUID
        TITE GREENFIELD FOR PRIMARY FEED ALONG WITH JUNCTION BOX
        AND CABLE TO INTERCONNECT ALL LETTERS. LOCAL INSTALLER TO
        MAKE ALL INTERCONNECTIONS AND MAKE FINAL HOOK-UP TO
        CIRCUITS PROVIDED BY OTHERS OR COORDINATE WITH JOB
        ELECTRICIAN.
    NOTE: ALL MOUNTING AND ELECTRICAL PENETRATIONS THRU FACIA SEALED
        WITH SILICONE ADHESIVE.

SIGN SPECIFICATIONS
BUILDING EXTERIOR SIGNS

*CIRCUIT CITY* (STANDARD)
SIZE: 54"
COLOR: ALUMINUM



SERVICE NEON
SIGNS INC.

SIGN PLAN

*CIRCUIT CITY
STORES INC.*



ALUMINUM OPEN FACED
BOX CHANNEL LTRS. PTD.:
• BRUSHED ALUM. FOR COPY
  PLACED ON RED ALUCOBOND
  TOWER & DR. GREY WALLS
• MEXICALI RED FOR COPY ON
  LIGHT OR MED. GREY WALLS

(4) ROWS OF 15MM
WHITE EXPOSED
TUBING IN 28", 31"
36", 42" & 48" COPY
(5) ROWS IN 54" COPY
(6) ROWS IN 60" COPY

NOTE: ALL WIRING &
MATERIALS USED WILL
BE U.L. APPROVED &
IN ACCORDANCE W/
N.E.C. REQUIREMENTS

ALUCOBOND
FACIA
12"
DEPTH

MASONRY &
CONCRETE FACIA
12"    2"
DEPTH

3/8" OR 1/2"
ALUMINUM
ALLTHREAD

3/8" LAG INTO
EXPANSION SHIELD

1/8" PLATE
14 GA.
UNISTRUT
STEEL

120 VOLT
CIRCUITS

INTERCONNECT
EACH LTR.

3/8" ALUMINUM
STRAP DRILLED
& TAPPED FOR
ALLTHREAD

6" STEEL CHANNEL
18 GA - 24" O.C.

SERVICE NEON
SIGNS INC.

SIGN PLAN

CIRCUIT CITY
STORES INC.

CIRCUIT CITY COPY
EXPOSED NEON



ALUMINUM SELF-CONTAINED
CHANNEL LTR. W/ ACRYLIC FACES
- WHITE FACES W/ SILVER TRIM-CAP
  & EDGES PTD. BRUSHED ALUM.
  INSTALLED ON RED ALUCOBOND
  TOWER & DARK GREY WALLS
- RED FACES W/ SILVER TRIM-CAP
  & EDGES PTD. MEXICALI RED
  INSTALLED ON LIGHT & MEDIUM
  GREY WALLS

SILVER
TRIM-CAP

BRUSHED
ALUM. OR
MEX. RED
PAINTED EDGE.

3/16" THICK ACRYLIC
WHITE #7328 OR
RED #2283

INTERNAL LIGHTING
FROM 15 MM TUBING
WHITE 6500 OR
CLEAR RED NEON

NOTE: ALL WIRING &
MATERIALS USED WILL
BE U.L. APPROVED &
IN ACCORDANCE W/
N.E.C. REQUIREMENTS

ALUCOBOND
FACIA

MASONRY &
CONCRETE FACIA

10"
DEPTH

10"    2"
DEPTH

3/8" OR 1/2"
• ALUMINUM
  ALLTHREAD

3/8" LAG INTO
EXPANSION SHIELD

• 1/8" PLATE

14 GA.
• UNISTRUT
  STEEL

120 VOLT
CIRCUITS

INTERCONNECT
EACH LTR.

3/16" ALUMINUM
STRAP DRILLED
& TAPPED FOR
ALLTHREAD

6" STEEL CHANNEL
18 GA. - 24" O.C.

SERVICE NEON
SIGNS INC.

SIGN PLAN

CIRCUIT CITY
STORES INC.

CIRCUIT CITY COPY
ACRYLIC FACES



SIGN **C** LAYOUT
SCALE 3/4" = 1'-0"

**SIGN: C**
MANUFACTURE ONE (1) 16" x 8'-0" SINGLE-FACED
NON-ELECTRIC LOZENGE SHAPED SIGN.

**MESSAGE: Merchandise Pick-Up**

**MATERIALS:**
SIGN CONSTRUCTED OF .063 ALUMINUM ON FACE WITH AN .063
2" DEEP ALUMINUM EDGE. ALL SURFACES SPRAYED MATTHEWS
MEXICALI RED #42-214.

COPY AND INSET BORDER OF APPLIED LIGHT SILVER METALLIC
#3650-220 VINYL

**MOUNTING:**
SIGN INSTALLED FLAT AGAINST WALL WITH CONCEALED FASTENERS.

**SIZE OPTIONS:**
**16" x 8'-0"**
**12" x 6'-0"**
**9" x 4'-0"**



SERVICE NEON SIGNS INC

**SIGN PLAN**

*CIRCUIT CITY*
*STORES, INC.*



**SIGN E LAYOUT**
SCALE 3/4" = 1'-0"

**SIGN: E**
MANUFACTURE ONE (1) 18" X 8'-0" SINGLE FACED NON-ELECTRIC LOZENGE SHAPED SIGN.

**MESSAGE: CAR STEREO INSTALLATION**

**MATERIALS:** SIGN CONSTRUCTED OF .063 ALUMINUM ON FACE WITH AN .063 2" DEEP ALUMINUM EDGE. ALL SURFACES SPRAYED MATTHEWS MEXICALI RED #42-214.

COPY AND INSET BORDER OF APPLIED LIGHT SILVER METALLIC #3650-220 VINYL.

**MOUNTING:** SIGN INSTALLED FLAT AGAINST WALL WITH CONCEALED FASTENERS.

SIGN SPECIFICATIONS
BUILDING EXTERIOR SIGNS

CAR STEREO INSTALLATION

SIZE: 18" x 8'-0"







EXHIBIT "F"

**I.   EXCLUSIVE USES:**

INITIAL LEASE-UP

Tenant recognizes and acknowledges that, as part of Landlord's initial lease-up efforts for the Shopping Center (i.e. the eighteen (18) month period following the Effective Date), Landlord may endeavor to enter into one or more leases or other occupancy agreements with certain nationally known retailers occupying 17,000 square feet or more of gross leasable area within the Shopping Center, who may require that Tenant be bound by their exclusive use, which Tenant agrees to honor and be bound by to the extent such exclusive use does not conflict with Tenant's sale of the Products, so long as (i) the occupant in whose favor the exclusive use is granted honors and is bound by Tenant's exclusive use set forth in this Lease, and (ii) Landlord has delivered written notice to Tenant of such retailer's exclusive use granted by Landlord on or before Tenant entering into any agreement allowing such exclusive use.

Landlord agrees, that in the event Office Max does not lease the building immediately adjacent to the Building, as shown on the Site Plan, Landlord will use best efforts to cause Michael's to be located in the space formerly intended for Office Max. Additionally, Landlord agrees that if the retail space immediately adjacent to the Building is not completed by the time Tenant opens for business at the Premises, Landlord will have completed at least the building shell of said adjacent space and all exterior construction and utilities relating thereto.

**II.   PERMITTED TITLE EXCEPTIONS:**

A.   Operation and Easement Agreement, dated October 4, 2000, made and entered into by and between Kohl's Department Stores, Inc., and Rubloff McHenry East, L.L.C., recorded March 7, 2001, as Document No. 2001R0013487 in the real property records of McHenry County, Illinois.

B.   Declaration imposing the prohibition described in paragraph 19(a)(viii)(NN) of this Lease, which prohibition shall be effective so long as this Lease is in effect.

**NOTE: THE FOLLOWING DOCUMENT SHALL NOT BE AN EXCEPTION TO THIS LEASE UNTIL RECEIPT BY TENANT OF A CURRENT ALTA/ACSM LAND TITLE SURVEY OF THE SHOPPING CENTER ACCEPTABLE TO TENANT WHICH CONFIRMS THAT SUCH DOCUMENT ENCUMBERS THE SHOPPING CENTER:**

C.   Gas Pipe Line Right of Way on Public Highway, dated March 11, 1959, executed and delivered by Bernard and Florence Blake, as grantor, to Northern Illinois Gas Company, as grantee, recorded June 16, 1959, as Document No. 355521 in the real property records of McHenry County, Illinois.

258343_11 [51-36 (11919)]

**NOTE:** **THE FOLLOWING DOCUMENTS SHALL NOT BE PERMITTED EXCEPTIONS TO THIS LEASE UNTIL RECEIPT BY CIRCUIT CITY STORES, INC. OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENTS EXECUTED BY THE LENDERS WHICH COMPLY WITH THE TERMS OF PARAGRAPH 21 AND EXHIBIT "G" OF THE LEASE:**

D.    Construction Mortgage, dated September 29, 2000, executed and delivered by Rubloff McHenry East, L.L.C., as mortgagor, to Barrington Bank & Trust Company, N.A., as mortgagee, recorded October 11, 2000, as Document No. 2000R0055637 in the real property records of McHenry County, Illinois.

E.    Mortgage, dated October 4, 2000, executed and delivered by Rubloff McHenry East, L.L.C., as mortgagor, to The Chicago Trust Company, as mortgagee, recorded October 10, 2000, as Document No. 2000R0055639 in the real property records of McHenry County, Illinois.

F.    Assignment of Rents, dated September 29, 2000, executed and delivered by Rubloff McHenry East, L.L.C., as assignor, to Barrington Bank & Trust Company, N.A., as assignee, recorded October 11, 2000, as Document No. 2000R0055638 in the real property records of McHenry County, Illinois.

G.    UCC-2 Financing Statement, filed by Barrington Bank & Trust Company, N.A., as secured party, against Rubloff McHenry East, L.L.C., as debtor, recorded October 11, 2000, as Document No. 2000U0000675 in the real property records of McHenry County, Illinois.

**NOTE:** **THE EXCEPTIONS REFLECTED ON THE ATTACHED TITLE COMMITMENT SHALL BE ADDITIONAL PERMITTED ENCUMBRANCES TO THE EXTENT CONFIRMED BY A CURRENT ALTA SURVEY TO NOT CONTAIN EASEMENT RIGHTS OF THIRD PARTIES TO OR UNDER THE PREMISES OR THE LAND.**

**Notwithstanding anything contained in this Exhibit "F" to the contrary, nothing contained herein shall be construed to prohibit or limit in any manner Tenant's exclusive use rights set forth in paragraph 18(a) of the Lease.**

258343_11 [51-36 (11919)]

# CHICAGO TITLE INSURANCE COMPANY

## COMMITMENT FOR TITLE INSURANCE

## SCHEDULE B

ORDER NO.: 1409 000239861 NSC

1. IF EXTENDED COVERAGE OVER THE FIVE GENERAL EXCEPTIONS IS
   REQUESTED, WE SHOULD BE FURNISHED THE FOLLOWING:

   A. A CURRENT ALTA/ACSM OR ILLINOIS LAND TITLE SURVEY CERTIFIED TO
      CHICAGO TITLE INSURANCE COMPANY;

   B. A PROPERLY EXECUTED ALTA STATEMENT;

   C. UTILITY LETTERS FROM THE MUNICIPALITY OR COUNTY (IF
      UNINCORPORATED), LOCAL GAS, ELECTRIC AND TELEPHONE COMPANIES
      AND IF APPLICABLE, THE LOCAL CABLE TELEVISION COMPANY.

   MATTERS DISCLOSED BY THE ABOVE DOCUMENTATION WILL BE SHOWN
   SPECIFICALLY.

   NOTE: THERE WILL BE AN ADDITIONAL CHARGE FOR THIS COVERAGE.

2. NOTE FOR INFORMATION: THE COVERAGE AFFORDED BY THIS COMMITMENT AND
   ANY POLICY ISSUED PURSUANT HERETO SHALL NOT COMMENCE PRIOR TO THE
   DATE ON WHICH ALL CHARGES PROPERLY BILLED BY THE COMPANY HAVE BEEN
   FULLY PAID.

A 3. TAXES FOR THE YEAR(S) 2000 AND 2001.
   2000 AND 2001 TAXES ARE NOT YET DUE OR PAYABLE.

   TAXES FOR THE YEAR 1999 ARE $277.90 ON PERMANENT PROPERTY INDEX NO.
   09-23-400-002 AND $3,224.24 ON PERMANENT PROPERTY INDEX NO. 09-23-400-017.

   PERMANENT INDEX NUMBER(S): 09-23-400-017 AND 09-23-400-002 COVER THE LAND AND
   OTHER LAND.

C ~~4. MORTGAGE DATED MAY 19, 2000 AND RECORDED MAY 24, 2000 AS DOCUMENT~~
   2000R0026330, MADE BY FIRST MIDWEST TRUST COMPANY, ~~NATIONAL ASSOCIATION,~~
   SUCCESSOR TRUSTEE TO MCHENRY STATE BANK, ~~AS TRUSTEE UNDER~~ TRUST AGREEMENT
   DATED JULY 17, 1989 AND KNOWN ~~AS TRUST NUMBER~~ 4714, TO FIRST MIDWEST BANK,
   NATIONAL ASSOCIATION, ~~TO SECURE~~ A NOTE FOR $129,124.00.
   AFFECTS ~~PARCELS 1~~ AND 2 NOTED HEREIN AT EXCEPTION REFERENCE LETTER AX AND
   ~~OTHER LAND.~~

AB 5. MORTGAGE DATED SEPTEMBER 29, 2000 AND RECORDED OCTOBER 11, 2000 AS DOCUMENT
   NO. 2000R55637 MADE BY RUBLOFF MCHENRY EAST, LLC TO BARRINGTON BANK & TRUST
   COMPANY, N.A. TO SECURE AN INDEBTEDNESS IN THE AMOUNT OF $5,000,000.00.
   AFFECTS THE LAND EXCEPT THAT PART OF THE LAND NOTED HEREIN AT EXCEPTION
   REFERENCE LETTER AI

AC ~~6. MORTGAGE DATED OCTOBER 4, 2000 AND RECORDED OCTOBER 11, 2000 AS DOCUMENT NO.~~
   ~~2000R55639 MADE BY RUBLOFF MCHENRY EAST, L.L.C. TO THE CHICAGO TRUST COMPANY~~
   ~~TO SECURE AN INDEBTEDNESS IN THE AMOUNT OF $500,000.00.~~

CHICAGO TITLE INSURANCE COMPANY

## COMMITMENT FOR TITLE INSURANCE
## SCHEDULE B (CONTINUED)

ORDER NO.: 1409  000239861 NSC

AFFECTS THE LAND EXCEPT THAT PART OF THE LAND NOTED HEREIN AT EXCEPTION
REFERENCE LETTER AI

AD   7. ASSIGNMENT OF RENTS RECORDED OCTOBER 11, 2000 AS DOCUMENT NO. 2000R55638 MADE
BY RUBLOFF MCHENRY EAST, LLC TO BARRINGTON BANK & TRUST COMPANY, N.A.
AFFECTS THE LAND EXCEPT THAT PART OF THE LAND NOTED HEREIN AT EXCEPTION
REFERENCE LETTER AI

AA   8. SECURITY INTEREST OF BARRINGTON BANK & TRUST OCMPANY, N.A. , SECURED PARTY, IN
CERTAIN DESCRIBED CHATTELS ON THE LAND, AS DISCLOSED BY FINANCING STATEMENT
EXECUTED BY RUBLOFF MCHENRY EAST, L.L.C., DEBTOR, AND FILED OCTOBER 11, 2000
AS DOCUMENT NO. 2000U675.
AFFECTS THE LAND EXCEPT THAT PART OF THE LAND NOTED HEREIN AT EXCEPTION
REFERENCE LETTER AI

D   9. PLAT OF TRANSIT LINE F.A. ROUTE 201 RECORDED FEBRUARY 21, 1975 AS DOCUMENT NO.
631867 AND THE PROVISIONS THEREIN CONTAINED.

E   10. PLAT OF TRANSIT LINE F.A. ROUTE 201 RECORDED MAY 5, 1975 AS DOCUMENT NO.
636003 AND THE PROVISIONS THEREIN CONTAINED.

F   11. RIGHTS OF WAY FOR DRAINAGE TILES, DITCHES, FEEDERS, LATERALS AND UNDERGROUND
PIPES, IF ANY.

H   12. EASEMENT IN FAVOR OF NORTHERN ILLINOIS GAS COMPANY, AND ITS/THEIR RESPECTIVE
SUCCESSORS AND ASSIGNS, TO INSTALL, OPERATE AND MAINTAIN ALL EQUIPMENT
NECESSARY FOR THE PURPOSE OF SERVING THE LAND AND OTHER PROPERTY, TOGETHER
WITH THE RIGHT OF ACCESS TO SAID EQUIPMENT, AND THE PROVISIONS RELATING
THERETO CONTAINED IN THE GRANT RECORDED/FILED AS DOCUMENT NO. 355521.

I   13. NOTICE BY THE STATE OF ILLINOIS, DEPARTMENT OF PUBLIC WORKS AND BUILDINGS OF
AN ORDER ESTABLISHING A FREEWAY BY INSTRUMENT RECORDED JANUARY 27, 1964 AS
DOCUMENT NO. 424540 AND THE PROVISIONS CONTAINED IN SAID INSTRUMENT.

J   14. PLAT OF TRANSIT LINE F.A. ROUTE 201, SECTION 9 RECORDED MARCH 29, 1963 AS
DOCUMENT NO. 413547 AND THE PROVISIONS THEREIN CONTAINED.

K   15. WE SHOULD BE FURNISHED A STATEMENT THAT THERE IS NO PROPERTY MANAGER EMPLOYED
TO MANAGE THE LAND, OR, IN THE ALTERNATIVE, A FINAL LIEN WAIVER FROM ANY SUCH
PROPERTY MANAGER.

L   16. EXISTING UNRECORDED LEASES AND ALL RIGHTS THEREUNDER OF THE LESSEES AND OF ANY
PERSON OR PARTY CLAIMING BY, THROUGH OR UNDER THE LESSEES.

M   17. ANY NEW CONSTRUCTION REQUIREMENTS.

O   18. WE SHOULD BE FURNISHED (A) CERTIFICATION FROM THE ILLINOIS SECRETARY OF STATE
THAT RUBLOFF MCHENRY, L.L.C. HAS PROPERLY FILED ITS ARTICLES OF ORGANIZATION,

# CHICAGO TITLE INSURANCE COMPANY

## COMMITMENT FOR TITLE INSURANCE
## SCHEDULE B (CONTINUED)

ORDER NO.: 1409  000239861 NSC

~~(B) A COPY OF THE ARTICLES OF ORGANIZATION, TOGETHER WITH ANY AMENDMENTS~~
THERETO, (C) A COPY OF THE OPERATING AGREEMENT, IF ANY, TOGETHER WITH ANY
AMENDMENTS THERETO, (D) A LIST OF INCUMBENT MANAGERS OR OF INCUMBENT MEMBERS
IF MANAGERS HAVE NOT BEEN APPOINTED, AND (E) CERTIFICATION THAT NO EVENT OF
DISSOLUTION HAS OCCURRED.

NOTE: IN THE EVENT OF A SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE
L.L.C. OR OF A SALE OF L.L.C. ASSETS TO A MEMBER OR MANAGER, WE SHOULD BE
FURNISHED A COPY OF A RESOLUTION AUTHORIZING THE TRANSACTION ADOPTED BY THE
MEMBERS OF SAID L.L.C. AFFECTS PARCEL 3 NOTED HEREIN AT EXCEPTION REFERENCE
LETTER AX

AF   19. WE SHOULD BE FURNISHED (A) CERTIFICATION FROM THE ILLINOIS SECRETARY OF STATE
THAT RUBLOFF MCHENRY EAST, L.L.C. HAS PROPERLY FILED ITS ARTICLES OF
ORGANIZATION, (B) A COPY OF THE ARTICLES OF ORGANIZATION, TOGETHER WITH ANY
AMENDMENTS THERETO, (C) A COPY OF THE OPERATING AGREEMENT, IF ANY, TOGETHER
WITH ANY AMENDMENTS THERETO, (D) A LIST OF INCUMBENT MANAGERS OR OF INCUMBENT
MEMBERS IF MANAGERS HAVE NOT BEEN APPOINTED, AND (E) CERTIFICATION THAT NO
EVENT OF DISSOLUTION HAS OCCURRED.

NOTE: IN THE EVENT OF A SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS OF THE
L.L.C. OR OF A SALE OF L.L.C. ASSETS TO A MEMBER OR MANAGER, WE SHOULD BE
FURNISHED A COPY OF A RESOLUTION AUTHORIZING THE TRANSACTION ADOPTED BY THE
MEMBERS OF SAID L.L.C.
AFFECTS PARCELS 1 AND 2 NOTED HEREIN AT EXCEPTION REFERENCE LETTER AX

Q    20. INTEREST OF GLENDELL REALTY PARTNERS, INC. UNDER AN AGREEMENT TO PURCHASE
PARCEL 1 NOTED HEREIN AT EXCEPTION REFERENCE LETTER AX OF THE LAND AND OF ALL
~~PARTIES CLAIMING THEREUNDER.~~

R    ~~21.~~           ~~REQUIREMENTS FOR ZONING ENDORSEMENT 3.1~~

IN ORDER TO CONSIDER ISSUANCE OF A ZONING ENDORSEMENT 3.1, WE SHOULD BE
FURNISHED THE FOLLOWING PRIOR TO CLOSING:

1. A CURRENT SURVEY, CERTIFIED TO CHICAGO TITLE INSURANCE COMPANY AND DRAWN
TO ALTA OR ILTA STANDARDS.

2. A DESCRIPTION OF THE INTENDED USE OF THE LAND, PREFERABLY IN WRITING.

3. IF APPLICABLE, CERTIFIED COPIES OF SPECIAL USES OR VARIATIONS, TOGETHER
WITH EVIDENCE OF COMPLIANCE WITH ANY REQUIREMENTS CONTAINED IN THE ZONING
ORDINANCE.

4. IF THE PROPERTY HAS BEEN RECENTLY ANNEXED, COPIES OF NOTICES AND
TRANSCRIPTS OF HEARINGS AND EVIDENCE OF COMPLIANCE WITH THE APPLICABLE
ORDINANCES AND STATUTES.

5. IF THE USE(S) OR IMPROVEMENT(S) ARE NON-CONFORMING, PROOF OF THE DATE ON
WHICH THE USE WAS ESTABLISHED AND/OR THE DATE ON WHICH ALL PORTIONS OF THE
IMPROVEMENTS WERE COMPLETED. OTHER RELEVANT INFORMATION MAY ALSO BE REQUIRED.

CHICAGO TITLE INSURANCE COMPANY

# COMMITMENT FOR TITLE INSURANCE
## SCHEDULE B (CONTINUED)

ORDER NO.: 1409 000239861 NSC

6. ~~IF COVERAGE WITH RESPECT TO THE NUMBER OF PARKING SPACES IS DESIRED, A~~ STATEMENT AS TO THE NUMBER AND SIZE OF ON-SITE PARKING SPACES. A SURVEYOR'S CERTIFICATION MAY BE REQUIRED.

NOTE: IF THE ENDORSEMENT IS TO BE BASED ON PLANS AND SPECIFICATIONS, A SITE PLAN WILL BE REQUIRED. IN ADDITION, THE ARCHITECTS' ZONING CALCULATIONS MAY BE REQUIRED.

NOTE: AS WITH ANY ENDORSEMENT, WE WILL ASSESS OUR RISK AND MAY REQUIRE ADDITIONAL DOCUMENTATION, MAY ADJUST THE PREMIUM OR MAY DECLINE TO ISSUE THE ENDORSEMENT IF THE RISK SO WARRANTS.

W 22. AN EXECUTED COPY OF THE LEASE CREATING THE TITLE TO THE LEASEHOLD ESTATE DESCRIBED IN SCHEDULE A SHOULD BE FURNISHED (TO BE RETAINED BY THE COMPANY), AND THIS COMMITMENT IS SUBJECT TO SUCH FURTHER EXCEPTIONS, IF ANY, AS MAY THEN BE DEEMED NECESSARY.

X 23. THE LEASE CREATING THE LEASEHOLD ESTATE DESCRIBED IN SCHEDULE A HEREOF, OR A PROPER MEMORANDUM THEREOF, SHOULD BE RECORDED, AND THIS COMMITMENT IS SUBJECT TO SUCH FURTHER EXCEPTIONS, IF ANY, AS MAY THEN BE DEEMED NECESSARY.

Y 24. OUR TITLE FINDING IS FOR CONVENIENCE ONLY AND IS BASED ON THE ASSUMPTION THAT SAID PARTY(IES) WILL BE NAMED AS THE LESSEE(S) IN THE CONTEMPLATED LEASE.

NOTE FOR INFORMATION ONLY: FEE TITLE AS OF MARCH 16, 2001:

RUBLOFF MCHENRY, L.L.C., AN ILLINOIS LIMITED LIABILITY COMPANY, TO: THAT PART OF LOT 4 FALLING IN PARCEL 3 NOTED HEREIN AT EXCEPTION REFERENCE LETTER AX;

AND

RUBLOFF MCHENRY EAST, L.L.C., AN ILLINOIS LIMITED LIABILITY CORPORATION, TO: LOTS 2, 3, 5 AND 6 AND THE REMAINDER OF LOT 4

Z 25. RUBLOFF DEVELOPMENT GROUP, INC., HAVING NO APPARENT INTEREST IN THE LAND, CONVEYED THE LAND TO RUBLOFF MCHENRY EAST, L.L.C. BY DEED RECORDED OCTOBER 11, 2000 AS DOCUMENT NUMBER 2000R55636. THIS SHOULD BE EXPLAINED AND THIS COMMITMENT IS SUBJECT TO SUCH FURTHER EXCEPTIONS AS THEN MAY BE DEEMED NECESSARY.
~~AFFECTS PARCEL 3 NOTED HEREIN AT EXCEPTION REFERENCE LETTER AX~~

AE 26. WITHOUT LIMITING THE GENERALITY OF THE EXCLUSIONS ON THE POLICY JACKET, WE NOTE ORDINANCE AUTHORIZING THE ANNEXATION OF THE RUBLOFF DEVELOPMENT GROUP 1 ACRE PARCEL RECORDED DECEMBER 4, 2000 AS DOCUMENT NO. 2000R66385 AND THE PROVISIONS THEREIN CONTAINED.
AFFECTS PARCEL 3 NOTED HEREIN AT EXCEPTION REFERENCE LETTER AX

AI 27. THE FOLLOWING REFERS TO EXCEPTION REFERENCE LETTERS AA, AB, AC AND AD

CHICAGO TITLE INSURANCE COMPANY

# COMMITMENT FOR TITLE INSURANCE
## SCHEDULE B (CONTINUED)

**ORDER NO.: 1409  000239861 NSC**

THAT PART OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 45 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION; THENCE NORTH 89 DEGREES 28 MINUTES 57 SECONDS EAST, ALONG THE SOUTH LINE OF SAID SECTION, 40 FEET TO A POINT ON THE EAST LINE OF ILLINOIS ROUTE 31 PER CASE NUMBER 73-3756; THENCE NORTH 00 DEGREES 12 MINUTES 35 SECONDS WEST ALONG THE EAST LINE OF SAID ROUTE 31, 601.63 FEET; THENCE NORTH 08 DEGREES 19 MINUTES 16 SECONDS EAST ALONG THE EAST LINE OF SAID ROUTE 31, 101.12 FEET; THENCE NORTH 02 DEGREES 04 MINUTES 51 SECONDS EAST ALONG THE EAST LINE OF SAID ROUTE 31, 426.31 FEET TO THE POINT OF BEGINNING OF THE LAND TO BE DESCRIBED; THENCE NORTH 02 DEGREES 04 MINUTES 51 SECONDS EAST, ALONG THE EAST LINE OF SAID ROUTE 31, 74.09 FEET; THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST, 33.04 FEET; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST 24.05 FEET; THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS EAST 181.08 FEET; THENCE NORTH 45 DEGREES 00 MINUTES 00 SECONDS EAST 21.21 FEET; THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS EAST 155.00 FEET; THENCE SOUTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 216.07 FEET TO A POINT ON THE EAST LINE OF SAID ROUTE 31; THENCE NORTH 05 DEGREES, 15 MINUTES 10 SECONDS EAST 455.71 FEET ALONG THE EAST LINE OF SAID ROUTE 31 TO A POINT ON THE SOUTH LINE OF THAT PART OF LAND CONVEYED OR TAKEN BY THE STATE OF ILLINOIS PER CASE NUMBER 73-3756; THENCE SOUTH 89 DEGREES 41 MINUTES 03 SECONDS EAST 281.78 FEET ALONG SAID SOUTH LINE; THENCE SOUTH 82 DEGREES 45 MINUTES 57 SECONDS EAST 213.60 FEET ALONG SAID SOUTH LINE; THENCE SOUTH 64 DEGREES 35 MINUTES 45 SECONDS EAST 429.23 FEET ALONG SAID SOUTH LINE; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST 331.02 FEET; THENCE SOUTH 17 DEGREES 19 MINUTES 16 SECONDS WEST 94.66 FEET; THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS WEST 383.65 FEET; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST 46.44 FEET; THENCE NORTH 90 DEGREES 00 MINUTES 00 SECOND WEST 198.50 FEET; THENCE SOUTH 00 DEGREES 00 MINUTES 00 SECONDS WEST 13.00 FEET; THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS WEST 105.10 FEET; THENCE NORTH 00 DEGREES 00 MINUTES 00 SECONDS WEST 19.00 FEET; THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS WEST 222.09 FEET TO THE POINT OF BEGINNING, IN MCHENRY COUNTY, ILLINOIS.


AM   28. SIDEWALK EASEMENT AS SHOWN ON THE PLAT OF THE SUBDIVISION.
     AFFECTS THE SOUTH 10 FEET OF LOTS 2 AND 6

AN   29. LEGEND ON THE PLAT OF THE SUBDIVISION THAT LOT 3 IS A STORM WATER DETENTION
     AREA IN ITS ENTIRETY.

AO   30. PUBLIC UTILITIES EASEMENT AS SHOWN ON THE PLAT OF THE SUBDIVISION.

AP   31. LEGENDS ON THE PLAT OF THE SUBDIVISION AS FOLLOWS:

     PERPETUAL ACCESS EASEMENT GRANTED BY RUBLOFF MCHENRY EAST L.L.C. AND/OR KOHL'S
     DEPARTMENT STORES, INC., THE TERMS AND CONDITIONS OF WHICH ARE SET FORTH IN
     OPERATION AND EASEMENT AGREEMENT DATED MARCH 7 AND RECORDED AS DOCUMENT NO.
     20001R13487.

     DIRECT VEHICULAR INGRESS OR EGRESS FROM LOT 1 WILL NOT BE ALLOWED TO LOTS 4
     AND 5 WITHIN 200 FEET AS MEASURED AT A RIGHT ANGLE FROM THE EASTERLY RIGHT OF
     WAY LINE OF ROUTE 3.

CHICAGO TITLE INSURANCE COMPANY

## COMMITMENT FOR TITLE INSURANCE
### SCHEDULE B (CONTINUED)

ORDER NO.: 1409  000239861 NSC

DIRECT VEHICULAR INGRESS OR EGRESS FROM BLAKE BOULEVARD WILL NOT BE ALLOWED WITHIN 200 FEET AS MEASURED AT A RIGHT ANGLE FROM THE EASTERLY RIGHT OF WAY LINE OF ROUTE 31.

NOTE: DIRECT VEHICULAR ACCESS FROM LOTS 4, 5 AND 6 TO ROUTE 31 IS NOT ALLOWED. THERE SHALL BE ONE FULL ACCESS LABELED BLAKE BLVD. AS SHOWN TO ILLINOIS ROUTE 31. THERE SHALL BE ONE "RIGHT IN - RIGHT OUT ONLY" ACCESS BETWEEN LOTS 4 AND 5 AS DEPICTED TO ILLINOIS ROUTE 31.

AQ 32. EASEMENT IN FAVOR OF COMMONWEALTH EDISON COMPANY, CABLE TELEVISION COMPANY OR FRANCHISES AND AMERITECH, AND ITS/THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, TO INSTALL, OPERATE AND MAINTAIN ALL EQUIPMENT NECESSARY FOR THE PURPOSE OF SERVING THE LAND AND OTHER PROPERTY, TOGETHER WITH THE RIGHT OF ACCESS TO SAID EQUIPMENT, AND THE PROVISIONS RELATING THERETO CONTAINED IN THE PLAT RECORDED/FILED AS DOCUMENT NO. 2001R13473.

AR 33. EASEMENT IN FAVOR OF NICOR AND ITS/THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, TO INSTALL, OPERATE AND MAINTAIN ALL EQUIPMENT NECESSARY FOR THE PURPOSE OF SERVING THE LAND AND OTHER PROPERTY, TOGETHER WITH THE RIGHT OF ACCESS TO SAID EQUIPMENT, AND THE PROVISIONS RELATING THERETO CONTAINED IN THE PLAT RECORDED/FILED AS DOCUMENT NO. 2001R13473.

AS 34. A NON-EXCLUSIVE EASEMENT FOR SERVING THE SUBDIVISION AND OTHER PROPERTY WITH ELECTRIC, COMMUNICATIONS, SEWER, WATER, GAS AND DRAINAGE SERVICE IS HEREBY RESERVED FOR AND GRANTED TO THE CITY OF MCHENRY, ILLINOIS; NORTHERN ILLINOIS GAS COMPANY, COMMONWEALTH EDISON COMPANY; ILLINOIS BELL TELEPHONE COMPANY; COMMUNITY CABLEVISION, INC., THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, JOINTLY AND SEVERALLY, TO INSTALL, OPERATE, MAINTAIN AND REMOVE FROM TIME TO TIME, FACILITIES USED IN CONNECTION WITH UNDERGROUND TRANSMISSION AND DISTRIBUTION OF ELECTRICITY, SOUNDS AND SIGNALS, GAS MAINS, SEWER AND WATERMAINS AND DRAINAGE IN, UNDER, ACROSS, ALONG AND UPON THE SURFACE OF THE PROPERTY SHOWN WITHIN THE DASHED LINES ON THE PLAT AND MARKED WITH THE WORDS "EASEMENT", "UTILITY EASEMENT", "DRAINAGE EASEMENT" OR SIMILAR WORDS TOGETHER WITH THE RIGHT TO INSTALL REQUIRED SERVICE CONNECTIONS UNDER THE SURFACE OF EACH LOT TO SERVE IMPROVEMENTS THEREON, THE RIGHT TO CUT, TRIM OR REMOVE TREES, BUSHES AND ROOTS AS MAY BE REASONABLY REQUIRED INCIDENT TO THE RIGHTS HEREIN GIVEN AND THE RIGHTS GIVEN, AND THE RIGHT TO ENTER THE SUBDIVIDED PROPERTY FOR ALL SUCH PURPOSES. OBSTRUCTIONS SHALL NOT BE PLACED OVER GRANTEE'S FACILITIES OR IN, UPON, OR OVER THE PROPERTY WITHIN THE DASHED LINES MARKED AS ABOVE INDICATED WITHOUT PRIOR WRITTEN CONSENT OF GRANTEES. AFTER INSTALLATION OF ANY SUCH FACILITIES, THE GRADE OF THE SUBDIVIDED PROPERTY SHALL NOT BE ALTERED IN A MANNER SO AS TO INTERFERE WITH THE PRIOR OPERATION AND MAINTENANCE THEREOF

AT 35. FIFTY FOOT PARKING AND BUILDING SETBACK LINE AS SHOWN ON THE PLAT OF THE SUBDIVISION.

AU 36. PERPETUAL ACCESS EASEMENT AS SHOWN ON THE PLAT OF THE SUBDIVISION. AFFECTS LOTS 1 AND 2

AV 37. THE PLAT OF THE SUBDIVISION RECORDED AS DOCUMENT 2001R13473 MAY BE DEFECTIVE IN THAT IN THE WRITTEN PORTION OF PARCEL 2 THERE IS A CALL MISSING. IN LINE 7

CHICAGO TITLE INSURANCE COMPANY

# COMMITMENT FOR TITLE INSURANCE
## SCHEDULE B (CONTINUED)

ORDER NO.: 1409  000239861 NSC

AFTER 452.17 FEET) IT SHOULD READ: "THENCE SOUTH 57 DEGREES 26 MINUTES 46
SECONDS EAST, 4.80 FEET (MEASURED = SOUTH 65 DEGREES 02 MINUTES 27 SECONDS
EAST, 4.81 FEET)". ALSO IN LINE 20 OF THE WRITTEN PORTION OF PARCEL 2 OF THE
LEGAL DESCRIPTION IT READS 12 MINUTES 35 SECONDS EAST, 302.77 FEET WHEREAS THE
DRAWN PORTION READS 12 MINUTES 35 SECONDS EAST 302.75 FEET. FINALLY, THE PLAT
IS NOT SIGNED BY THE RECORD OWNERS, RUBLOFF MCHENRY EAST, L.L.C. TO PARCELS 1
AND 2 AND RUBLOFF MCHENRY, L.L.C. TO PARCEL 3 AND THE ACKNOWLEDGMENT IS NOT IN
CORPORATE FORM.

SAID INSTRUMENT SHOULD BE CORRECTED AND RERECORDED, OR A NEW INSTRUMENT IN
PROPER FORM SHOULD BE OBTAINED AND PLACED OF RECORD. A "LATER DATE" OF THIS
COMMITMENT WHICH COVERS SAID RECORDING THEN SHOULD BE REQUESTED AND THIS
COMMITMENT IS SUBJECT TO SUCH FURTHER EXCEPTIONS, IF ANY, AS THEN MAY BE
DEEMED NECESSARY.

AN  38. ACCESS CONTROL LIMITS LINE AS SHOWN ON THE PLAT OF THE SUBDIVISION.
AFFECTS THE THE WEST LOT LINE OF LOTS 4, 5 AND 6 AND THE NORTHERLY LOT LINE OF
LOT 3

AX  39. THE FOLLOWING LEGAL DESCRIPTION REFERS TO THE TITLE FINDINGS AND EXCEPTION
REFERENCE LETTERS C, O, Q AND AF;

PARCEL 1: THAT PART OF THE SOUTHEAST 1/4 OF SECTION 23, TOWNSHIP 45 NORTH,
RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING
AT THE SOUTHWEST CORNER OF SAID SECTION; THENCE SOUTH 89 DEGREES 28 MINUTES 57
SECONDS EAST, ALONG THE SOUTH LINE OF SAID SECTION, 40.00 FEET TO A POINT ON
THE EAST LINE OF ILLINOIS ROUTE 31 PER CASE NUMBER 73-3756; THENCE NORTH 00
DEGREES 12 MINUTES 35 SECONDS WEST ALONG THE EAST LINE OF SAID ROUTE 31,
507.00 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING ALONG THE LAST
DESCRIBED LINE, 94.63 FEET; THENCE NORTH 08 DEGREES 19 MINUTES 16 SECONDS
EAST, ALONG THE EASTERLY LINE OF ILLINOIS ROUTE 31 AS CONVEYED OR TAKEN BY THE
STATE OF ILLINOIS PER CASE NUMBER 73-3756, FOR A DISTANCE OF 101.12 FEET;
THENCE NORTH 02 DEGREES 04 MINUTES 51 SECONDS EAST, 375.29 FEET; THENCE NORTH
89 DEGREES 47 MINUTES 25 SECONDS EAST, 222.51 FEET; THENCE NORTH 00 DEGREES 12
MINUTES 35 SECONDS WEST, 200.00 FEET; THENCE SOUTH 89 DEGREES 47 MINUTES 25
SECONDS WEST, 210.56 FEET TO A POINT ON THE EASTERLY LINE OF SAID ROUTE 31 PER
CASE NUMBER 73-3756; THENCE NORTH 05 DEGREES 05 MINUTES 10 SECONDS EAST,
527.42 FEET (MEASURED = 498.17 FEET); THENCE SOUTH 89 DEGREES 41 MINUTES 03
SECONDS EAST, 281.78 FEET (MEASURED - SOUTH 89 DEGREES 11 MINUTES 53 SECONDS
290.73 FEET); THENCE SOUTH 82 DEGREES 45 MINUTES 57 SECONDS EAST, 213.60 FEET
(MEASURED = SOUTH 83 DEGREES 11 MINUTES 39 SECONDS EAST); THENCE SOUTH 64
DEGREES 35 MINUTES 45 SECONDS EAST, 151.22 FEET (MEASURED = SOUTH 65 DEGREES
01 MINUTES 27 SECONDS EAST 143.54 FEET); THENCE SOUTH 00 DEGREES 12 MINUTES 35
SECONDS EAST, 1195.29 FEET (MEASURED = 1170.03 FEET) TO A POINT ON A LINE
NORTH OF AND PARALLEL WITH THE SOUTH LINE OF SAID SECTION; THENCE SOUTH 89
DEGREES 28 MINUTES 57 SECONDS WEST, ALONG SAID PARALLEL LINE, 720.57 FEET TO
THE POINT OF BEGINNING, IN MCHENRY COUNTY, ILLINOIS.
ALSO
PARCEL 2: THAT PART OF THE SOUTHEAST QUARTER OF SECTION 23, TOWNSHIP 45 NORTH,
RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING
AT THE SOUTHWEST CORNER OF SAID SECTION; THENCE NORTH 89 DEGREES 28 MINUTES 57

CHICAGO TITLE INSURANCE COMPANY

# COMMITMENT FOR TITLE INSURANCE
## SCHEDULE B (CONTINUED)

ORDER NO.: 1409  000239861 NSC

SECONDS EAST ALONG THE SOUTH LINE OF SAID SECTION, 40.0 FEET TO A POINT ON THE
EAST LINE OF ILLINOIS ROUTE 31 PER DOCUMENT NUMBER 73-3756; THENCE NORTH 00
DEGREES 12 MINUTES 35 SECONDS WEST ALONG THE EAST LINE OF SAID ROUTE 31,
507.00 FEET; THENCE NORTH 89 DEGREES 28 MINUTES 57 SECONDS EAST ALONG A LINE
NORTH OF AND PARALLEL WITH THE SOUTH LINE OF SAID SECTION, 720.57 FEET TO THE
POINT OF BEGINNING; THENCE NORTH 00 DEGREES 12 MINUTES 35 SECONDS WEST,
1195.29 (MEASURED = 1170.03 FEET) FEET TO A POINT ON THE SOUTH LINE OF THAT
PART OF LAND CONVEYED OR TAKEN BY STATE OF ILLINOIS PER CASE NUMBER 73-3756;
THENCE SOUTH 64 DEGREES 35 MINUTES 45 SECONDS EAST ALONG SAID SOUTH LINE,
449.30 FEET (MEASURED = SOUTH 65 DEGREES 01 MINUTES 27 SECONDS EAST  452.17
FEET); THENCE SOUTH 57 DEGREES 26 MINUTES 46 SECONDS EAST, 4.80 FEET (MEASURED
= SOUTH 65 DEGREES 02 MINUTES 27 SECONDS EAST, 4.81 FEET); THENCE SOUTH 00
DEGREES 13 MINUTES 00 SECONDS EAST, 595.00  FEET (MEASURED = 574.15 FEET);
THENCE NORTH 90 DEGREES 00 MINUTES 00 SECONDS WEST, 198.02 FEET; THENCE SOUTH
00 DEGREES 12 MINUTES 35 SECONDS EAST, 302.77 FEET; THENCE SOUTH 00 DEGREES 12
MINUTES 40 SECONDS EAST, 100.30 FEET TO A POINT ON SAID PARALLEL LINE; THENCE
SOUTH 89 DEGREES 28 MINUTES 57 SECONDS WEST, ALONG SAID PARALLEL LINE, 211.24
FEET TO THE POINT OF BEGINNING, IN MCHENRY COUNTY, ILLINOIS.
ALSO
PARCEL 3: THAT PART OF THE SOUTHEAST QUARTER OF SECTION 23, DESCRIBED AS
FOLLOWS: COMMENCING AT THE NORTHWEST CORNER OF THE SOUTHEAST QUARTER OF SAID
SECTION 23 AND RUNNING THENCE SOUTH ON THE WEST LINE THEREOF FOR A DISTANCE OF
1363.13 FEET (MEASURED = 1328.91 FEET) TO A POINT; THENCE EAST AT RIGHT ANGLES
TO THE LAST DESCRIBED LINE, AT THE LAST DESCRIBED POINT FOR A DISTANCE OF 82.5
FEET TO A POINT FOR THE PLACE OF BEGINNING; THENCE CONTINUING EAST ON THE LAST
DESCRIBED LINE FOR A DISTANCE OF 210.01 (MEASURED = 210.56 FEET) FEET TO A
POINT; THENCE SOUTH AT RIGHT ANGLES TO THE LAST DESCRIBED LINE AT THE LAST
DESCRIBED POINT FOR A DISTANCE OF 200 FEET TO A POINT; THENCE WEST AT RIGHT
ANGLES TO THE LAST DESCRIBED LINE AT THE LAST DESCRIBED POINT FOR A DISTANCE
OF 223.41 FEET (MEASURED = 222.51 FEET) TO A POINT, WHICH IS 69.10 FEET EAST
OF THE WEST LINE OF SAID SOUTHEAST QUARTER; THENCE NORTHEASTERLY 125.14
(MEASURED = 125.11 FEET) FEET TO A POINT 75 FEET EAST OF THE EAST LINE OF SAID
SOUTHEAST QUARTER; THENCE NORTHEASTERLY 75.38 (MEASURED = 75.32 FEET) FEET TO
THE PLACE OF BEGINNING, IN MCHENRY COUNTY, ILLINOIS.

AZ    40. (A)  TERMS, PROVISIONS, AND CONDITIONS RELATING TO THE EASEMENT DESCRIBED AS
PARCEL 2 CONTAINED IN THE INSTRUMENT CREATING SAID EASEMENT.

(B)  RIGHTS OF THE ADJOINING OWNER OR OWNERS TO THE CONCURRENT USE OF SAID
EASEMENT.

BA    41. COVENANTS, CONDITIONS, RESTRICTIONS, EASEMENTS, TERMS AND PROVISIONS CONTAINED
IN THE OPERATION AND EASEMENT AGREEMENT RECORDED MARCH 7, 2001 AS DOCUMENT NO.
2001R13487.
(FOR FURTHER PARTICULARS, SEE RECORD.)

V     42. FOR EXAMINING INQUIRIES REGARDING THIS COMMITMENT PLEASE CONTACT MARILYN MUTH
IN THE SUBURBAN COMMERCIAL DIVISION IN MT PROSPECT AT (847) 758-4747.

TO SCHEDULE A CLOSING AT ANY CHICAGO TITLE NORTH SUBURBAN LOCATION, PLEASE

06/08/2001  10:24  815-877-1107  RUBLOFF DEVELOPMENT  PAGE  07

04-19-11 07:15AM  FROM KRCL REAL ESTATE  TO 547IH11319H19158  P005/023

# CHICAGO TITLE INSURANCE COMPANY
## COMMITMENT FOR TITLE INSURANCE
### SCHEDULE B (CONTINUED)

ORDER NO.: 1409  000239861 NBC

CALL (847) 758-4747.

TO FAX CLOSING FIGURES, PLEASE CALL (847) 758-2307.

** END **

43. Declaration of Restrictive Covenants dated
May 22, 2001 by Rubloff McHenry East, LLC.
(borders restriction)

This instrument was prepared
by and after recording
should be returned to:


Rubloff McHenry East, L.L.C.
6277 East Riverside Blvd.
Rockford, IL 61114


## DECLARATION OF RESTRICTIVE COVENANTS

THIS DECLARATION OF RESTRICTIVE COVENANTS (the "Declaration") is made as of this 22nd day of ____May____, 2001 by RUBLOFF McHENRY EAST, L.L.C., an Illinois Limited Liability Company (hereinafter referred to as "Declarant").

### RECITALS:

A.      Declarant is the owner of Lots 2, 3, 4, 5 and 6 as designated upon the Final Plat of McHenry Towne Centre Subdivision ("Plat of McHenry Towne Centre"), being a Subdivision in that part of the Southeast Quarter of Section 23, Township 45 North, Range 8, East of the Third Principal Meridian, in McHenry County, Illinois, recorded as Document No. 2001R0013473 on March 7, 2001, in the McHenry County Recorder's Office, Illinois.

B.      This Declaration is intended to be for the benefit of Lot 7 in Meijer/Home Depot Subdivision, being a Subdivision of Part of Lot 3 of the County Clerk's Plat of the Southwest Quarter, also part of the West half of the Southwest Quarter of Section 23, Township 45 North, Range 8, East of the Third Principal Meridian, in McHenry County, Illinois; and recorded on December 8, 2000 as Document No. 2000 R 0067575 in the McHenry County Recorder's Office, McHenry County, Illinois ("Benefitted Property") and the owner from time to time thereof (the "Benefitted Owner").

C.      RUBLOFF McHENRY, L.L.C. is the current owner of the Benefitted Property and has entered into a Purchase and Sale Agreement with Insite Real Estate Development, L.L.C. ("Insite") for the Benefitted Property. Pursuant to the terms of said Purchase and Sale Agreement with Insite, RUBLOFF McHENRY, L.L.C. is required to obtain this Declaration for the benefit of the Benefitted Property. Insite has entered, or will be entering, into a lease agreement ("Border's Lease") with Border's, Inc. ("Border's") for the Benefitted Property.

D.      Declarant desires to subject all of the Encumbered Lots to the covenants, conditions and restrictions hereinafter set forth (collectively referred to herein as the "Covenants"), each of which is and shall be binding upon all Encumbered Lots and each owner thereof and any other party having any interest therein.

NOW THEREFORE, for an in consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Declarant declares that the Encumbered Lots are and shall be held, transferred, sold conveyed, used and occupied subject to the following Covenants:

1

## ARTICLE I

### Definitions

For purposes of this Declaration, the following terms have the following meanings:

A.     **Owners.**  The term "Owner or Owners" means and includes the Declarant and owners from time to time of any of the Encumbered Lots and their respective heirs, successors and assigns (including mortgagees).

B.     **Permitees.**  The term "Permitees" means and refers to all Owners and any person or persons who are entitled to the use and occupancy of any Encumbered Lot from time to time under any lease, sublease, license or concession agreement or any other instrument or arrangement under which such rights are acquired, and other invitees of Owners.

## ARTICLE II

### Declaration of Conditions and Restrictions

The purpose of this Declaration is to impose protective restrictions on the Encumbered Lots for the benefit of the Benefitted Owner and the Benefitted Property.  Declarant declares that all Encumbered Lots shall be subject to the terms of this Declaration and that any conveyance or transfer of any Encumbered Lot or part thereof will remain subject to the following:

No Encumbered Lot or part thereof shall be used, purchased or leased by a direct competitor of Border's, Inc. with types of tenants such as Barnes & Noble, Media Play, Books a Million, Crown Books; and/or B.J. Dalton.

## ARTICLE III

### Remedies for Breach

The Benefitted Owner shall have the right to sue for and obtain a prohibitive or mandatory injunction or any other equitable remedy to prevent the breach of, or to enforce the observance of, the Covenants set forth in this Declaration. In addition, any such party shall have the right to bring a monetary action for damages. These remedies will all be cumulative with, in addition to and non-exclusive of one another and any other remedies available to the Benefitted Owner at law or in equity, and any or all such remedies may be pursued by the Benefitted Owner, either successively or concurrently as the Benefitted Owner may determine, and the exercise of any one remedy will not be construed as or constitute a bar to the exercise of any other remedy.  In the event any legal action is commenced, the prevailing party has the right to collect from the other person or persons actual attorney fees and costs as may be fixed by the court.

## ARTICLE IV

### Covenants Binding

This Declaration will run with the land and the ownership of the Encumbered Lots, and the various provisions hereof will act as an appurtenant burden for each Encumbered Lot.  Such burdens will inure to the applicable Owners and their respective Permitees, successors, transferees and assigns as to each such Owner's Lot. All express benefits and burdens of Declarant hereunder will attach to each of the Encumbered Lots owned by Declarant.  If any Owner conveys all or any portion of its interest in all or any portion of a given Lot by an instrument recorded in the county recorder's office of the recorder ("Recorder's Office") in the county in which the Encumbered Lots are located, then the transferee will automatically be deemed to have assumed and agreed to be

2

bound by this Declaration, and the transferor will thereupon be released and discharged from any and all obligations under this Declaration applicable to the pertinent Lot, or portion thereof, so transferred that accrue after the date of transfer. This Declaration shall be for the benefit of, and appurtenant to, the Benefitted Property. Such benefits will accrue to the Benefitted Owner and its respective successors, transferees and assigns and to the Benefitted Property.

Notwithstanding the current vesting of title to the entirety of the Encumbered Lots and the Benefitted Property in Declarant, and notwithstanding any future vesting of title to two or more Encumbered Lots and/or the Benefitted Property in the same party, such commonality of ownership interests will not give rise to any extinguishment or merger of any provisions hereof, it being the controlling and dominant intent of Declarant that no such merger or extinguishment will occur, and that all such provisions of this Declaration will remain in full force and effect regardless of any commonality of ownership interests in the various Encumbered Lots and/or the Benefitted Property. Except as otherwise expressly provided herein, any such provision of this Declaration may be extinguished as it applies to a particular Encumbered Lot only by the written consent of the owner of the Benefitted Property which consent must be recorded in the Recorder's Office.

## ARTICLE V

### Severability

If any provision of this Declaration is held invalid or unenforceable, no other provision of this Declaration will be affected by such holding and all other provisions of this Declaration will continue in full force and effect. This Declaration is governed by and construed under the laws of the State of Illinois.

The term of this Declaration, and the benefits and burdens of the provisions hereof, shall commence on the Effective Date (as hereinafter defined) and shall expire upon the earlier of the expiration or termination of the Border's Lease (as may be extended from time to time) or Border's right to possession thereunder. This Declaration may be amended from time to time or terminated only upon the written consent of the owner of the Benefitted Property, the Declarant and the Owners of all of the Encumbered Lots; provided this Declaration may be terminated solely by the owner of the Benefitted Property. Any such amendment or termination of this Declaration will become effective upon its recordation in the Recorder's Office. As used herein, the term "Effective Date" shall mean the date that the Border's Lease is executed by all parties thereto and a memorandum of same is recorded in the McHenry County Recorder's Office.

No breach of this Declaration will entitle any Owner of an Encumbered Lot to cancel, rescind or otherwise terminate this Declaration, but such limitation will not affect in any manner any other rights or remedies which the Benefitted Owner may have hereunder by reason of such breach. No purported relinquishment by any Owner of any of its rights or benefits under this Declaration will absolve such Owner of any of its obligations, including, without limitation, its obligation to pay any amounts owed, under this Declaration.

## ARTICLE VI

### Notices

Any notices required or permitted under this Declaration must be in writing and will be deemed given and received (1) when hand delivered; (2) three business days after mailed, United States mails, postage pre-paid, registered or certified, return receipt requested, or (3) delivered to a nationally recognized overnight courier, with delivery charges for next business day delivery prepaid and addressed to any Owner at their current address. Declarant and any Owner entitled to notice under this Declaration may change the address to which notices are to be given by written notice given in accordance with this article.

3

The current address for the Declarant is:    Rubloff McHenry East, L.L.C.
                   6277 E. Riverside Blvd.
                   Rockford, IL 61114

The current address for the Benefitted Owner is:   Rubloff McHenry, L.L.C.
                   6277 E. Riverside Blvd.
                   Rockford, IL 61114

IN WITNESS WHEREOF, this Declaration has been signed as of this ____ day of ____ May ____, 2001.

DECLARANT:

Rubloff McHenry East, L.L.C., an Illinois
Limited Liability Company

By: Rubloff Development Group, Inc., Its
  Managing Member

By: _____
Its: _____

STATE OF ILLINOIS      )
             ) ss.
COUNTY OF WINNEBAGO    )

      I, _Anita Burkholder_, a Notary Public, in and for such County and State
hereby certify that _Mark A. Rohnson_ as President of RUBLOFF DEVELOPMENT GROUP, INC., the
Managing Member of Rubloff McHenry East, L.L.C., an Illinois Limited Liability Company appeared before me
this day in person, and acknowledged that he signed and delivered this instrument in his stated capacity for the uses
and purposes set forth.

   Given under my hand and notarial seal this _22nd_ day of _May_ _2001.

            _Anita R Burkholder_
            Notary Public

> "OFFICIAL SEAL"
> ANITA R. BURKHOLDER
> Notary Public, State of Illinois
> My Commission Expires 6/12/2004



4

## EXHIBIT "G"

After recording return to:
Kane, Russell, Coleman & Logan, P.C.
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Attention: Pamela G. Kostas

SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

(Mortgage)

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, dated the _____ day of _____, 200_, between _____, a _____ (together with its successors and assigns, including loan participants, referred to herein as "Mortgagee"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

### W I T N E S S E T H:

(a) Tenant has entered into a certain lease (the "Lease") dated _____, _____ with RUBLOFF MCHENRY EAST, L.L.C., an Illinois limited liability company ("Landlord"), covering premises located within that certain property known as McHenry Towne Centre, located in the City of McHenry, McHenry County, Illinois, and more particularly described in Schedule A hereto; and

(b) Mortgagee has made a loan to Landlord as evidenced and secured by a mortgage or Deed of Trust recorded _____, 200_ in the land records of McHenry County, Illinois, in Book _____ at page _____ (the "Mortgage"), encumbering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.     The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals,

258343_8 [51-36 (11919)]

modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.      Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, and Mortgagee if Mortgagee succeeds to Landlord's interest in the Lease, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.      In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease unless joinder is necessary to foreclose the Mortgage, and then only to foreclose the Mortgage and not for the purpose of terminating the Lease, unless Tenant is in default under the Lease beyond any applicable cure period.

4.      Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.      In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

    (a)    liable for any act or omission of any prior lessor (including Landlord); or

    (b)    liable for the return of any security deposits unless delivered to Mortgagee; or

    (c)    bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord);

    (d)    bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed;

    (e)    subject to offsets and defenses Tenant may have against any prior landlord (including Landlord) except to the extent set forth in paragraph 6 below; or

      (f)      bound by, or liable for any breach of, any representation or warranty or indemnity agreement contained in the Lease, or otherwise made by any prior landlord (including Landlord), unless the breach is continuing; or

      (g)      personally liable for any obligations under the Lease, except for payment of the Tenant Improvement Allowance if it remains unpaid and for events occurring due to Mortgagee's willful misconduct, fraud or intentional acts.

6.      Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall, to the extent Tenant has given Mortgagee notice and an opportunity to cure a Landlord default, be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

7.      Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

8.      Mortgagee, Landlord and Tenant, respectively, represent and warrant to each other that each has the requisite power and authority to enter into this Agreement; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Agreement; that the signatories executing this Agreement on behalf of Mortgagee, Landlord and Tenant have been duly authorized and empowered to execute this Agreement on behalf of Mortgagee, Landlord and Tenant, respectively; and that this Agreement is valid and shall be binding upon and enforceable against Mortgagee, Landlord and Tenant shall inure to the benefit of the parties hereto, and their successors and assigns and shall inure to the benefit of Mortgagee.

258343_8 (51-36 (11919)]

9.    Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Mortgagee shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Mortgagee at the following address, in the same method for notice as is required under the Lease:

_____

_____

_____

10.    All notices between the parties hereto shall be in writing and comply with the terms of paragraph 34 of the Lease.

11.    If Landlord defaults under the Lease, Tenant shall (a) give Mortgagee notice of the default or other occurrence in the manner provided in this Agreement; and (b) give Lender the same time as is given Landlord under the Lease to cure the default or rectify the other occurrence. Notwithstanding any provision in the Lease or any other instrument to the contrary, Tenant may not terminate the Lease, claim an offset against rent, or exercise any right or remedy, until Mortgagee has been given notice and an opportunity to cure the default. For purpose of this paragraph, Tenant shall not exercise a remedy for Landlord's default until all grace and/or cure periods applicable under the Lease have lapsed without Landlord having effectuated a cure thereof.

12.    Landlord has, or will, by separate Assignment of Leases and Rents ("Assignment") assign its interest in the rents and payments due under the Lease as security for the repayment of the Mortgage. All rents due under the Lease shall be paid to Landlord so long as Landlord is not in default under the Mortgage. Mortgagee may, at its option, require that Tenant pay all rents and other payments due under the Lease directly to Mortgagee. Tenant agrees to pay any payment due under the Lease to Mortgagee on notice that Mortgagee has exercised this option, Landlord, by its signature below, directing Tenant to comply with Mortgagee's notice. The Assignment does not diminish any obligation of Landlord under the Lease or impose any such obligation on Mortgagee.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

ATTEST:

_____

Its: _____

By: _____
      Stanley L. Heller, Assistant Vice President


COMMONWEALTH OF VIRGINIA          )
                                                          ) ss.
COUNTY OF HENRICO                        )


I certify that on _____, 200__, before me, the undersigned, a Notary Public in and for said State, personally appeared Stanley L. Heller, Assistant Vice President of **CIRCUIT CITY STORES, INC.,** a Virginia corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

**WITNESS** my hand and official seal.


_____
Notary Public in and for the Commonwealth of
Virginia, residing at _____
My commission expires: _____

_____
[Type or Print Notary Name]

MORTGAGEE NAME

ATTEST:

_____

Its: _____

By: _____
Name: _____
Title: _____


**[Note: Attach appropriate notary block for the State]**


5 - Ex. "G"

258343_8 [51-36 (11919)]

## EXHIBIT "G"

After recording return to:
Kane, Russell, Coleman & Logan, P.C.
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Attention: Pamela G. Kostas

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

(Ground Lease)

This SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, dated the _____ day of _____, 200_, between _____, a _____ (together, with its successors and assigns, referred to herein as "Ground Lessor"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

### WITNESSETH:

(a) Tenant has entered into a certain lease (the "Lease") dated _____, _____ with RUBLOFF MCHENRY EAST, L.L.C., an Illinois limited liability company ("Landlord"), covering premises located within that certain property known as McHenry Towne Centre, located in the City of McHenry, McHenry County, Illinois, and more particularly described in Schedule A hereto; and

(b) Ground Lessor has entered into a Lease with Landlord as evidenced and recorded _____, 200_ in the land records of McHenry County, Illinois, in Book _____ at page _____ (the "Ground Lease"), covering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Ground Lease and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.    The Lease is a sublease and shall be subordinate to the Ground Lease insofar as it affects the real property of which the premises form a part thereof.

258343_8 [51-36 (11919)]

2.      Tenant agrees that it will attorn to Ground Lessor and any successor to the Ground Lessor by deed or otherwise as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease, in the event of a termination of the Ground Lease.

3.      In the event that it should become necessary to terminate the Ground Lease, Ground Lessor thereunder will not terminate the Lease nor join Tenant in summary proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.      Ground Lessor consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Ground Lease has been terminated.

5.      In the event that Ground Lessor shall succeed to the interest of Landlord under the Lease, Ground Lessor shall not be:

(a)      liable for any act or omission of any prior lessor (including Landlord); or

(b)      liable for the return of any security deposits unless delivered to Ground Lessor; or

(c)      bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord);

(d)      bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed; or

(e)      subject to offsets and defenses Tenant may have against any prior landlord (including Landlord) except to the extent set forth in paragraph 6 below; or

(f)      bound by, or liable for any breach of, any representation or warranty or indemnity agreement contained in the Lease, or otherwise made by any prior landlord (including Landlord), unless the breach is continuing; or

(g)      personally liable for any obligations under the Lease, except for events occurring due to Mortgagee's willful misconduct, fraud or intentional acts.

Notwithstanding the foregoing, Ground Lessor acknowledges and agrees that if Ground Lessor shall succeed to the interest of Landlord under this Lease, Ground Lessor shall be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights

258343_8 [51-36 (11919)]

of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

6.       Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Ground Lessor terminates the Lease, Ground Lessor shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

7.       This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, and their successors and assigns.

8.       Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Ground Lessor shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Ground Lessor at the following address, in the same method for notice as is required under the Lease:

_____

_____

_____

9.       All notices between the parties hereto shall be in writing and comply with the terms of paragraph 34 of the Lease.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

_____

Its: _____

By: _____
       Stanley L. Heller, Assistant Vice President

258343_8 [51-36 (11919)]

COMMONWEALTH OF VIRGINIA     )
    ) ss.
COUNTY OF HENRICO     )

       I certify that on _____, 200__, before me, the undersigned, a Notary Public in and for said State, personally appeared Stanley L. Heller, Assistant Vice President of **CIRCUIT CITY STORES, INC.**, a Virginia corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

       **WITNESS** my hand and official seal.

                     _____
                     Notary Public in and for the Commonwealth of
                     Virginia, residing at _____
                     My commission expires: _____

                     _____
                     [Type or Print Notary Name]

                     COMPANY NAME

ATTEST:

_____

Its: _____

                     By: _____
                     Name: _____
                     Title: _____

       [Note: Attach appropriate notary blocks for the State]

258343_8 [51-36 (11919)]

EXHIBIT "H"

After recording return to:
Kane, Russell, Coleman & Logan, P.C.
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Attention: Pamela G. Kostas

## MEMORANDUM OF LEASE

This **MEMORANDUM OF LEASE** is made this _____ day of _____, 2001, between **RUBLOFF MCHENRY EAST, L.L.C.**, an Illinois limited liability company (hereinafter referred to as "Landlord"), having an address of 6277 East Riverside Boulevard, Rockford, Illinois 61114, and **CIRCUIT CITY STORES, INC.**, a Virginia corporation (hereinafter referred to as "Tenant"), having an address of Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated _____, 2001, whereby Landlord has leased to Tenant a portion of the real property (the "Property"), McHenry, McHenry County, Illinois, the legal description of which Property is set forth on Exhibit "A-1" attached hereto, together with certain non-exclusive easements in, over, across, under and through certain areas of the Property defined in the Lease as Landlord's Premises, and those certain rights and non-exclusive easements granted to or inuring to the benefit of Landlord under that certain Operation and Easement Agreement, dated October 4, 2000, made and entered into by and between Kohl's Department Stores, Inc., and Rubloff McHenry East, L.L.C., recorded March 7, 2001, as Document No. 2001R0013487 in the real property records of McHenry County, Illinois, in, over, upon, across, under and through the land described therein. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.      Term. The term of the Lease is for a period of fifteen (15) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for three (3) successive periods of five (5) years each.

II.     Exclusive Use Rights. The Lease provides that:

"So long as the Premises are used for the initial uses set forth in paragraph 18(a), no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted

1 - Ex. "H"

any such tenants under leases in existence as of the date of this Lease and described on Exhibit "F", and subject to Landlord's right to permit the operation of one (1) videotape rental store in the Shopping Center, such as Blockbuster, Hollywood Video or similar store, so long as it is operating as it is as of the Effective Date. Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence. As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such operator or tenant's display area. Notwithstanding anything contained herein to the contrary, (i) in the event any existing tenant leases provide that the tenant thereunder may change its use, Landlord, to the extent it has a right to do so under such lease, will exercise any approval rights in favor of protecting Tenant's exclusive use provided above, and (ii) Office Max, so long as Office Max is operating substantially as it is operating as of the Effective Date, shall be permitted to operate in the Shopping Center. Landlord agrees to deliver to Tenant for recording, on or before Landlord's execution of this Lease, the two (2) agreements relating to exclusives and other matters set forth in Exhibit "K", fully executed and complying with the terms of paragraph 35(f) below."

III.    Successors. The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.    Incorporation of Lease. All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.    Conflicts with Lease. This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter modify, expand, diminish or supplement the provisions of the Lease. In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

**IN WITNESS WHEREOF**, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

[This space intentionally left blank.]

**LANDLORD:**

Witnesses:

**RUBLOFF MCHENRY EAST, L.L.C.,**
an Illinois limited liability company

_____
Printed Name: _____

By:    Rubloff Development Group, Inc.,
        its Managing Member

_____
Printed Name: _____

By:   _____
Name: _____
Title: _____


**STATE OF** _____    )
                       ) ss.
**COUNTY OF** _____ )

    I certify that on _____, 2001, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, the _____ of Rubloff Development Group, Inc., Managing Member of **RUBLOFF MCHENRY EAST, L.L.C.,** an Illinois limited liability company, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person or the entity upon behalf of which he/she acted executed the instrument.

    **WITNESS** my hand and official seal.


_____
Notary Public in and for the State of _____
_____, residing at _____
My commission expires: _____
_____
[Type or Print Notary Name]

258343_8 [51-36 (11919)]

**TENANT:**

**Witnesses:**

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

_____
Printed Name: _____

By: _____
      Stanley L. Heller, Assistant Vice President

_____
Printed Name: _____

**COMMONWEALTH OF VIRGINIA**          )
                                                                    ) ss.
**COUNTY OF HENRICO**                          )

     I certify that on _____, 2001, before me, the undersigned, a Notary Public in and for said State, personally appeared Stanley L. Heller, Assistant Vice President of **CIRCUIT CITY STORES, INC.**, a Virginia corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

     **WITNESS** my hand and official seal.

_____
Notary Public in and for the Commonwealth of
Virginia, residing at _____
My commission expires: _____
_____
[Type or Print Notary Name]

## EXHIBIT "A-1"

Lots 2 and 3 as designated upon the Final Plat of Rubloff Towne Centre Subdivision, recorded March 7, 2001, as Document No. 2001R0013473 in the real property records of McHenry County, Illinois, being a subdivision in that part of the Southeast Corner of Section 23, Township 45 North, Range 8, East of the Third Principal Meridian, in McHenry County, Illinois.

EXHIBIT "I"

## COMMENCEMENT DATE AGREEMENT

This COMMENCEMENT DATE AGREEMENT, made as of this ____ day of _____, 200_, between RUBLOFF MCHENRY EAST, L.L.C., an Illinois limited liability company (herein called "Landlord"), and CIRCUIT CITY STORES, INC. (herein called "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in McHenry, McHenry County, Illinois (herein called the "Premises"); and

WHEREAS, by that certain lease dated _____ __, 200_ (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of McHenry County, Illinois, on the ____ day of _____, 200_, in Book _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 200_. The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2.      The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3.      The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4.      The date of commencement of the third Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease

258343_8 [51-36 (11919)]

shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

     5.    The date of commencement of the fourth Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

     6.    The date of commencement of the fifth Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless the Lease terminates earlier as provided in the Lease.

     IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**RUBLOFF MCHENRY EAST, L.L.C.,**
an Illinois limited liability company

Attest or Witness:

     By:   Rubloff Development Group, Inc.,
          its Managing Member

_____

     By: _____
     Name: _____
     Title: _____

Attest:

     **CIRCUIT CITY STORES, INC.,**
     a Virginia corporation

_____
Assistant Secretary

     By: _____
     Assistant Vice President

258343_8 [51-36 (11919)]

<u>EXHIBIT "J"</u>

INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT is made this _____ day of _____, 200_, between RUBLOFF MCHENRY EAST, L.L.C., an Illinois limited liability company(hereinafter referred to as "Landlord") and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated _____ whereby Landlord has leased to Tenant a portion of the real property located in McHenry, McHenry County, Illinois (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.      Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

258343_8 [51-36 (11919)]

EXECUTED this _____ day of _____, 200_.

<u>LANDLORD</u>

**RUBLOFF MCHENRY EAST, L.L.C.,**
an Illinois limited liability company

By:    Rubloff Development Group, Inc.,
       its Managing Member


By: _____
Name: _____
Title: _____


<u>TENANT</u>

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation


By: _____
Name: _____
Title: _____

EXHIBIT "K"

DECLARATION OF RESTRICTIVE COVENANTS
(Lots 3, 4, 5, 6, 7 and 8)

**DRAFT: 04-18-01**

This instrument was prepared
by and after recording
should be returned to:

Rubloff McHenry, L.L.C.
6277 East Riverside Blvd.
Rockford, IL 61114

## **DECLARATION OF RESTRICTIVE COVENANTS**

THIS DECLARATION OF RESTRICTIVE COVENANTS (the "Declaration") is made as of this ___ day of _____, 2001 ("Effective Date") by RUBLOFF McHENRY, L.L.C., an Illinois Limited Liability Company (hereinafter referred to as "Declarant").

### **RECITALS:**

A.      Declarant is the owner of Lots 3, 4, 5, 6, 7 and 8 in Meijer/Home Depot Subdivision, being a Subdivision of Part of Lot 3 of the County Clerk's Plat of the Southwest Quarter, also part of the West half of the Southwest Quarter of Section 23, Township 45 North, Range 8, East of the Third Principal Meridian, in McHenry County, Illinois (individual Lots are referred to in this Declaration by their lot number and all lots are referred to in this Declaration collectively as the "Encumbered Lots").

B.      This Declaration is intended to be for the benefit of Lot 2 ("Benefitted Property") as designated upon the Final Plat of McHenry Towne Centre Subdivision, being a Subdivision in that part of the Southeast Quarter of Section 23, Township 45 North, Range 8 East of the Third Principal Meridian, in McHenry County, Illinois, and recorded as Document No. 2001R0013473 on the 7th day of March, 2001 and the owner and Circuit City Stores, Inc., and their successors and assigns (respectively, the "Benefitted Owner" or "Benefitted Occupant"). In reliance upon this Declaration, and/or as a condition to entering into the Circuit City Lease (as hereinafter defined), the Benefitted Owner has entered into that certain lease agreement dated _____, 2001 with Circuit City Stores, Inc. (the "Circuit City Lease") for a portion of the Benefitted Property.

258343_8 [51-36 (11919)]



C.    Declarant desires to subject all of the Encumbered Lots to the covenants, conditions and restrictions hereinafter set forth (collectively referred to herein as the "Covenants"), each of which is and shall be binding upon all Encumbered Lots and each owner thereof and any other party having any interest therein, in consideration of the Benefitted Owner's agreement to simultaneously record for the benefit of Declarant that certain Declaration of Restrictive Covenants that will encumber Lots 2, 3, 4, 5 and 6 as designated upon the Final Plat of McHenry Towne Centre Subdivision, being a Subdivision in that part of the Southeast Quarter of Section 23, Township 45 North, Range 8, East of the Third Principal Meridian, in McHenry County, Illinois and in consideration of the Benefitted Owner's agreement to bind the tenant under the Circuit City Lease to certain use restrictions set forth in the Circuit City Lease.

NOW THEREFORE, for an in consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Declarant declares that the Encumbered Lots are and shall be held, transferred, sold conveyed, used and occupied subject to the following Covenants:

## ARTICLE I

### Definitions

For purposes of this Declaration, the following terms have the following meanings:

A.    **Owners.** The term "Owner or Owners" means and includes the Declarant and owners from time to time of any of the Encumbered Lots and their respective heirs, successors and assigns (including mortgagees).

B.    **Permitees.** The term "Permitees" means and refers to all Owners and any person or persons who are entitled to the use and occupancy of any Encumbered Lot from time to time under any lease, sublease, license or concession agreement or any other instrument or arrangement under which such rights are acquired, and other invitees of Owners.

## ARTICLE II

### Declaration of Conditions and Restrictions

The purpose of this Declaration is to impose protective restrictions on the Encumbered Lots for the benefit of the Benefitted Owner and the Benefitted Property. Declarant declares that all Encumbered Lots shall be subject to the terms of this Declaration and that any conveyance or transfer of any Encumbered Lot or part thereof will remain subject to the following:

No Encumbered Lot or part thereof shall be used, purchased or leased by a direct competitor of Circuit City Stores, Inc., such as Best Buy or Rex.

## ARTICLE III

### Remedies for Breach

The Benefitted Owner and/or Benefitted Occupant shall have the right to sue for and obtain a prohibitive or mandatory injunction or any other equitable remedy to prevent the breach of, or to enforce the observance of, the Covenants set forth in this Declaration. In addition, any such party shall have the right to bring a monetary action for damages. These remedies will all be cumulative with, in addition to and non-exclusive of one another and any other remedies available to the Benefitted Owner and Benefitted Occupant at law or in equity, and any or all such remedies may be pursued by the Benefitted Owner and/or Benefitted Occupant, either successively or concurrently as the Benefitted Owner and Benefitted Occupant may determine, and the exercise of any one remedy will not be construed as or constitute a bar to the exercise of any other remedy. In the event any legal action is commenced, the prevailing party has the right to collect from the other person or persons actual attorney fees and costs as may be fixed by the court.

## ARTICLE IV

### Covenants Binding

This Declaration will run with the land and the ownership of the Encumbered Lots, and the various provisions hereof will act as an appurtenant burden for each Encumbered Lot. Such burdens will inure to the applicable Owners and their respective Permitees, successors, transferees and assigns as to each such Owner's Lot. All express benefits and burdens of Declarant hereunder will attach to each of the Encumbered Lots owned by Declarant. If any Owner conveys all or any portion of its interest in all or any portion of a given Lot by an instrument recorded in the county recorder's office of the recorder ("Recorder's Office") in the county in which the Encumbered Lots are located, then the transferee will automatically be deemed to have assumed and agreed to be bound by this Declaration, and the transferor will thereupon be released and discharged from any and all obligations under this Declaration applicable to the pertinent Lot, or portion thereof, so transferred that accrue after the date of transfer. This Declaration shall be for the benefit of, and appurtenant to, the Benefitted Property. Such benefits will accrue to the Benefitted Owner and Benefitted Occupant and their respective successors, transferees and assigns and to the Benefitted Property.

Notwithstanding the current vesting of title to the entirety of the Encumbered Lots in Declarant, and notwithstanding any future vesting of title to two or more Encumbered Lots and/or the Benefitted Property in the same party, such commonality of ownership interests will not give rise to any extinguishment or merger of any provisions hereof, it being the controlling and dominant intent of Declarant that no such merger or extinguishment will occur, and that all such provisions of this Declaration will remain in full force and effect regardless of any commonality of ownership interests in the various Encumbered Lots and/or the Benefitted Property. Except as otherwise expressly provided herein, any such provision of this Declaration may be extinguished as it applies to a particular Encumbered Lot only by the written consent of the owner of the Benefitted Property which consent must be recorded in the Recorder's Office.

258343_8 [51-36 (11919)]

## ARTICLE V

### Severability

If any provision of this Declaration is held invalid or unenforceable, no other provision of this Declaration will be affected by such holding and all other provisions of this Declaration will continue in full force and effect. This Declaration is governed by and construed under the laws of the State of Illinois.

The term of this Declaration, and the benefits and burdens of the provisions hereof, shall commence on the Effective Date and shall expire upon the earlier of the expiration or termination of the Circuit City Lease (as may be extended from time to time) or Circuit City's right to possession thereunder. This Declaration may be amended from time to time or terminated upon the written consent of the owner of the Benefitted Property, Benefitted Occupant, the Declarant and the Owners of all of the Encumbered Lots; provided this Declaration may be terminated solely by the owner of the Benefitted Property. Any such amendment or termination of this Declaration will become effective upon its recordation in the Recorder's Office.

No breach of this Declaration will entitle any Owner of an Encumbered Lot to cancel, rescind or otherwise terminate this Declaration, but such limitation will not affect in any manner any other rights or remedies which the Benefitted Owner may have hereunder by reason of such breach. No purported relinquishment by any Owner of any of its rights or benefits under this Declaration will absolve such Owner of any of its obligations, including, without limitation, its obligation to pay any amounts owed, under this Declaration.

## ARTICLE VI

### Notices

Any notices required or permitted under this Declaration must be in writing and will be deemed given and received (1) when hand delivered; (2) three business days after mailed, United States mails, postage pre-paid, registered or certified, return receipt requested, or (3) delivered to a nationally recognized overnight courier, with delivery charges for next business day delivery prepaid and addressed to any Owner at their current address. Declarant and any Owner entitled to notice under this Declaration may change the address to which notices are to be given by written notice given in accordance with this article.

The current address for the Declarant is:    Rubloff McHenry, L.L.C.
6277 E. Riverside Blvd.
Rockford, IL  61114

The current address for the Benefitted Owner is:    Rubloff McHenry East, L.L.C.
6277 E. Riverside Blvd.
Rockford, IL  61114

258343_8 [51-36 (11919)]

The current address for the Benefitted Occupant is: Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, VA 23233

IN WITNESS WHEREOF, this Declaration has been signed as of this ___ day of
_____, 2001.

## DECLARANT:

Rubloff McHenry, L.L.C., an Illinois
Limited Liability Company

By:   Rubloff Development Group, Inc., Its
Managing Member
By:     _____
Its:     _____

STATE OF ILLINOIS             )
                              ) ss.
COUNTY OF WINNEBAGO           )

I, _____, a Notary Public, in and for such County and State hereby
certify that _____ as President of RUBLOFF DEVELOPMENT GROUP,
INC., the Managing Member of Rubloff McHenry, L.L.C., an Illinois Limited Liability Company
appeared before me this day in person, and acknowledged that he signed and delivered this
instrument in his stated capacity for the uses and purposes set forth.

Given under my hand and notarial seal this _____ day of _____,2001.

_____
Notary Public

5 - Ex. "K"                                                      258343_8 [51-36 (11919)]

DECLARATION OF RESTRICTIVE COVENANTS
(Lots 4, 5 and 6)

**DRAFT: 04-18-01**

This instrument was prepared
by and after recording
should be returned to:

Rubloff McHenry East, L.L.C.
6277 East Riverside Blvd.
Rockford, IL 61114

## <u>DECLARATION OF RESTRICTIVE COVENANTS</u>
(OUTLOTS)

THIS DECLARATION OF RESTRICTIVE COVENANTS (the "Declaration") is made as of this ___ day of _____, 2001 ("Effective Date") by RUBLOFF McHENRY EAST, L.L.C., an Illinois Limited Liability Company (hereinafter referred to as "Declarant").

### RECITALS:

A.    Declarant is the owner of Lots 4, 5 and 6 (individually, an "Encumbered Lot" and collectively, the "Encumbered Lots") as designated upon the Final Plat of McHenry Towne Centre Subdivision ("Plat of McHenry Towne Centre"), being a Subdivision in that part of the Southeast Quarter of Section 23, Township 45 North, Range 8, East of the Third Principal Meridian, in McHenry County, Illinois, recorded as Document No. 2001R0013473 on March 7, 2001, in the McHenry County Recorder's Office, Illinois.  Declarant is also the owner of the Benefitted Property (as hereinafter defined).

B.    This Declaration is intended to be for the benefit of Lot 2 ("Benefitted Property") as designated upon the Plat of McHenry Towne Centre and the owner from time to time thereof ("the "Benefitted Owner").  In reliance upon this Declaration, and/or as a condition to entering into the Circuit City Lease (as hereinafter defined), the Benefitted Owner has entered into that certain lease (the "Circuit City Lease") agreement dated _____, 2001 with Circuit City Stores, Inc. (together with its successors, sublessees and assigns, "Circuit City") for a portion of the Benefitted Property.

C.    Declarant desires to subject all of the Encumbered Lots to the covenants, conditions and restrictions hereinafter set forth (collectively referred to herein as the  "Covenants"), each of which is and shall be binding upon all Encumbered Lots and each owner thereof and any other party having any interest therein.

1 - Ex. "K"

258343_8 [51-36 (11919)]

NOW THEREFORE, for an in consideration of One Dollar and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Declarant declares that the Encumbered Lots are and shall be held, transferred, sold conveyed, used and occupied subject to the following Covenants:

## ARTICLE I

### Definitions

For purposes of this Declaration, the following terms have the following meanings:

A.     **Owners.** The term "Owner or Owners" means and includes the Declarant and owners from time to time of any of the Encumbered Lots and their respective heirs, successors and assigns (including mortgagees).

B.     **Permitees.** The term "Permitees" means and refers to all Owners and any person or persons who are entitled to the use and occupancy of any Encumbered Lot from time to time under any lease, sublease, license or concession agreement or any other instrument or arrangement under which such rights are acquired, and other invitees of Owners.

## ARTICLE II

### Declaration of Conditions and Restrictions

The purpose of this Declaration is to impose protective restrictions on the Encumbered Lots for the benefit of the Benefitted Owner, the Benefitted Property, and Circuit City. Declarant declares that all Encumbered Lots shall be subject to the terms of this Declaration and that any conveyance or transfer of any Encumbered Lot or part thereof will remain subject to the following:

1.     So long as that portion of a Benefitted Property that is leased by Circuit City Stores, Inc. pursuant to the Circuit City Lease is used as a retail store for (i) the sale of consumer, office and automotive electronic products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact disks), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all such items being herein collectively referred to as "Products") and (ii) renting, servicing, repairing and warehousing of the Products, then no other tenant or occupant of the Encumbered Lots shall be entitled to sell or rent (or rent to own) any of the Products, subject to Declarant's right to permit the operation of one (1) videotape rental store such as Blockbuster, Hollywood Video or

2 - Ex. "K"                                    258343_8 [51-36 (11919)]

similar store, so long as it is operating as it is as of the "Effective Date" of the Lease. Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence. As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such operator's or tenant's display area.

2.      The Owners of the Encumbered Lots shall not enter into any amendment to that certain Operation and Easement Agreement ("OEA") between Kohl's Department Stores, Inc. and Rubloff McHenry East, L.L.C., recorded as Document No. 2001R0013487 on March 7, 2001 in the McHenry County Recorder's Office, McHenry, Illinois ("OEA") modifying or amending Sections 3.1, 3.2, 3.3, 4.1, 4.2, 5.1, 5.2, 7.1, 7.2, 7.3 and 9.3 of the OEA without the prior written consent of the Benefitted Owner and Circuit City.

## ARTICLE III

### Remedies for Breach

The Benefitted Owner shall have the right to sue for and obtain a prohibitive or mandatory injunction or any other equitable remedy to prevent the breach of, or to enforce the observance of, the Covenants set forth in this Declaration. In addition, any such party shall have the right to bring a monetary action for damages. These remedies will all be cumulative with, in addition to and non-exclusive of one another and any other remedies available to the Benefitted Owner at law or in equity, and any or all such remedies may be pursued by the Benefitted Owner, either successively or concurrently as the Benefitted Owner may determine, and the exercise of any one remedy will not be construed as or constitute a bar to the exercise of any other remedy. In the event any legal action is commenced, the prevailing party has the right to collect from the other person or persons actual attorney fees and costs as may be fixed by the court.

## ARTICLE IV

### Covenants Binding

This Declaration will run with the land and the ownership of the Encumbered Lots, and the various provisions hereof will act as an appurtenant burden for each Encumbered Lot. Such burdens will inure to the applicable Owners and their respective Permitees, successors, transferees and assigns as to each such Owner's Lot. All express benefits and burdens of Declarant hereunder will attach to each of the Encumbered Lots owned by Declarant. If any Owner conveys all or any portion of its interest in all or any portion of a given Lot by an instrument recorded in the county recorder's office of the recorder ("Recorder's Office") in the county in which the Encumbered Lots are located, then the transferee will automatically be deemed to have assumed and agreed to be bound by this Declaration, and the transferor will thereupon be released and discharged from any and all obligations under this Declaration applicable to the pertinent Lot, or portion thereof, so transferred

258343_8 [51-36 (11919)]

that accrue after the date of transfer. This Declaration shall be for the benefit of, and appurtenant to, the Benefitted Property. Such benefits will accrue to the Benefitted Owner and Circuit City and their respective successors, transferees and assigns and to the Benefitted Property.

Notwithstanding the current vesting of title to the entirety of the Encumbered Lots and the Benefitted Property in Declarant, and notwithstanding any future vesting of title to two or more Encumbered Lots and/or the Benefitted Property in the same party, such commonality of ownership interests will not give rise to any extinguishment or merger of any provisions hereof, it being the controlling and dominant intent of Declarant that no such merger or extinguishment will occur, and that all such provisions of this Declaration will remain in full force and effect regardless of any commonality of ownership interests in the various Encumbered Lots and/or the Benefitted Property. Except as otherwise expressly provided herein, any such provision of this Declaration may be extinguished as it applies to a particular Encumbered Lot only by the written consent of the owner of the Benefitted Property which consent must be recorded in the Recorder's Office.

## ARTICLE V

### Severability

If any provision of this Declaration is held invalid or unenforceable, no other provision of this Declaration will be affected by such holding and all other provisions of this Declaration will continue in full force and effect. This Declaration is governed by and construed under the laws of the State of Illinois.

The term of this Declaration, and the benefits and burdens of the provisions hereof, shall commence on the Effective Date and shall expire upon the earlier of the expiration or termination of the Circuit City Lease (as may be extended from time to time) or Circuit City's right to possession thereunder. This Declaration may be amended from time to time or terminated upon the written consent of the owner of the Benefitted Property, the Declarant, Circuit City, and the Owners of all of the Encumbered Lots; provided this Declaration may be terminated solely by the owner of the Benefitted Property. Any such amendment or termination of this Declaration will become effective upon its recordation in the Recorder's Office.

No breach of this Declaration will entitle any Owner of an Encumbered Lot to cancel, rescind or otherwise terminate this Declaration, but such limitation will not affect in any manner any other rights or remedies which the Benefitted Owner may have hereunder by reason of such breach. No purported relinquishment by any Owner of any of its rights or benefits under this Declaration will absolve such Owner of any of its obligations, including, without limitation, its obligation to pay any amounts owed, under this Declaration.

## ARTICLE VI

### Notices

Any notices required or permitted under this Declaration must be in writing and will be deemed given and received (1) when hand delivered; (2) three business days after mailed, United States mails, postage pre-paid, registered or certified, return receipt requested, or (3) delivered to a nationally recognized overnight courier, with delivery charges for next business day delivery prepaid and addressed to any Owner at their current address. Declarant and any Owner entitled to notice

258343_8 [51-36 (11919)]

under this Declaration may change the address to which notices are to be given by written notice given in accordance with this article.

The current address for the Declarant is:

Rubloff McHenry East, L.L.C.
6277 E. Riverside Blvd.
Rockford, IL 61114

The current address for the Benefitted Owner is:

Rubloff McHenry East, L.L.C.
6277 E. Riverside Blvd.
Rockford, IL 61114

The current address for the Benefitted Occupant is:

Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, VA 23233

IN WITNESS WHEREOF, this Declaration has been signed as of this ___ day of _____, 2001.

## DECLARANT:

Rubloff McHenry East, L.L.C., an Illinois
Limited Liability Company

By: Rubloff Development Group, Inc., Its
Managing Member

By: _____
Its: _____

STATE OF ILLINOIS          )
                           ) ss.
COUNTY OF WINNEBAGO        )

I, _____, a Notary Public, in and for such County and State hereby certify that _____ as President of RUBLOFF DEVELOPMENT GROUP, INC., the Managing Member of Rubloff McHenry East, L.L.C., an Illinois Limited Liability Company appeared before me this day in person, and acknowledged that he signed and delivered this instrument in his stated capacity for the uses and purposes set forth.

Given under my hand and notarial seal this _____ day of _____, 2001.

_____
Notary Public

5 - Ex. "K"