UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                          .     Case No. 08-35653(KRH)
                                .
                                .
                                .
CIRCUIT CITY STORES             .     701 East Broad Street
INC.,                           .     Richmond, VA 23219
                                .
                                .
            Debtor.             .     April 14, 2009
. . . . . . . . . . . . ..            10:07 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          McGuireWoods LLP
                         By:  DOUGLAS FOLEY, ESQ.
                         9000 World Trade Center
                         101 W. Main St.
                         Norfolk, VA  23510

For IBM:                 ThompsonMcMullan, PC
                         By:  ROBERT DYBING, ESQ.
                         100 Shockoe Slip
                         Richmond, VA  23219

For Simon Properties:    Law Office of Mitchell Weitzman
                         By:  MITCHELL WEITZMAN, ESQ.
                         2300 Wilson Blvd
                         Arlington, VA  22201




Proceedings recorded by electronic sound recording, transcript
produced by transcription service

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES: (Contd')

For Dollar Tree Stores:    Williams Mullen
                           By:  WILLIAM SCHWARZCSCHILD, III, ESQ.
                           1021 East Cary Street
                           Richmond, VA  23218

                           Hofheimer Gartlir & Gross, LLP
                           By:  SCOTT KIPNIS, ESQ.
                           530 Fifth Avenue
                           New York, NY  10036
                           (Telephonic Appearance)

3

# I N D E X

PAGE

**WITNESSES FOR SIMON PROPERTIES**

KENNETH BROWN

   Direct Examination by Mr. Weitzman            25

   Cross Examination by Mr. Foley               32

   Redirect Examination by Mr. Weitzman         38

   Recross Examination by Mr. Foley             39


**EXHIBITS**                                        **ID.**   **EVD.**

Exhibit 1   Photograph and site plan           16      32
Exhibit 2   Overlease - Simon Properties       16      32
Exhibit 3   Reciprocal easement agreement      16      32
Exhibit 4   Dollar Tree sublease               16      32
Exhibit 5   Letter from Dollar Tree            16      32
Exhibit 6   Cash flow model                    17      32
Exhibit 7   2007 and 2008 tax returns          17      32
Exhibit 8   Executed sale assumption           17      32
              and assignment agreement
Exhibit 9   Objection by Simon Properties      17      32
Exhibit 10  Transcript of Mr. Brown dep.       17      32


Exhibit 1   Lease document.                    18      32
Exhibit 6   Summary of restrictions            18      32
Exhibit 7   Document                           18      32


**J&J COURT TRANSCRIBERS, INC.**

4

1          THE CLERK:  In the matter of Circuit City Stores,

2    Incorporated.  Hearing on Items 1 through 15 as set out on

3    debtors' agenda.

4          MR. FOLEY:  Good morning, Your Honor.  Doug Foley

5    with McGuire Woods on behalf of Circuit City.  With me today is

6    Jim Marcum who's the CEO of Circuit City, as well as Jim Avalon

7    who's with DJM Realty who's been the professional assigned with

8    overseeing and marketing the disposition of the debtor's real

9    estate assets.

10         Your Honor, we have 15 items on the agenda, only one

11   of which may take a little bit of time because it's contested,

12   the last matter, and we'll address that shortly.  But, to go

13   through the other items on the agenda, Your Honor.  Item Number

14   1 is actually the -- we need to make a correction to the status

15   line there.  This is the motion to approve the settlement

16   agreement with IBM under Rule 9019.  This is actually going --

17   this motion's actually to be deemed withdrawn by the debtors.

18         Your Honor, there was a stipulation, an order that

19   was resubmitted, I believe, yesterday that we had a snafu on a

20   couple of weeks ago that will govern the rights of the parties

21   going forward.  Counsel for IBM is here today.  That

22   stipulation doesn't resolve every single issue with IBM, there

23   are still some claim issues, including some potential

24   administrative claim issues that they would want to assert and

25   we'll have to deal with through the administrative claim

1  process, but otherwise, this motion is deemed withdrawn.

2          THE COURT:  All right, very good.

3          MR. DYBING:  Good morning, Your Honor.  Robert Dybing

4  for IBM.  We understand that the debtor has withdrawn the

5  motion and that is satisfactory and understandable to IBM.  We

6  are not -- as of nine this morning, we were not aware of the

7  refiling of the stipulation and IBM, at this point, has no

8  comment as to whether the stipulation addresses and resolves

9  the matters in dispute.  And it certainly may, it's just that

10 this is late developing and we'll reserve our rights to take

11 issue with it if it has some merits.

12         THE COURT:  All right, Mr. Dybing.  I believe that I

13 entered the stipulation and order yesterday, because I recall

14 reviewing that.  So, I believe that it was entered.

15         MR. DYBING:  I'm sure the docket entries will reflect

16 that.

17         THE COURT:  Sure.

18         MR. FOLEY:  Thank, Your Honor.  I do believe I did

19 see a docket entry on that.  But, just to confirm with counsel,

20 we are not asserting that that stipulation resolves all issues

21 with IBM.  We do acknowledge that there are some leftover

22 issues that still have to be dealt with, including claim

23 issues.  I just confirmed with co-counsel on that point.

24         MR. DYBING:  Very good.  Fair enough.

25         THE COURT:  All right, thank you both.

1          MR. DYBING:  Thank, Your Honor.

2          THE COURT:  That will be deemed withdrawn then.

3          MR. FOLEY:  Thank, Your Honor.  Item Number 2 is the

4  AT&T motion for payment of administrative claim.  Your Honor,

5  this was the leftover part of their motion that we had not yet

6  resolved.  It had to do with payment of rent for certain

7  equipment for the month of April 2009.  We have resolved that

8  with AT&T and submitted payment to them, so this matter can be

9  deemed resolved.

10          THE COURT:  All right.

11          MR. FOLEY:  Your Honor, Item Number 3 again is our

12  motion to establish sell down procedures for trading and equity

13  securities and claims.  As Your Honor is aware, we've been

14  continuing this motion for a long time to evaluate whether or

15  not the net operating losses have any value in liquidating the

16  estate.  At this point, it probably makes sense to adjourn this

17  for a longer period of time, and so we've proposed to adjourn

18  this motion until after the time that we would be filing our

19  plan, so we have a July 23rd hearing date and we would ask the

20  Court to adjourn the matter until then.

21          THE COURT:  Okay.  It will be continued to July 23.

22          MR. FOLEY:  Your Honor, Item Number 4, this is

23  Federal Warranty and Assurance motion to compel assumption and

24  rejection of contracts and a motion for relief from stay to

25  terminate agreements.  As Your Honor is aware, we've been in

J&J COURT TRANSCRIBERS, INC.

1    global negotiations with Federal Warranty, an assurant.  We are

2    in the process of hopefully documenting a complete settlement

3    with these entities, we're just not prepared, we're not there

4    yet, and so they've agreed to continue our discussions and

5    adjourn their motion until the June 23rd hearing date at

6    2 p.m., Your Honor.

7              I believe throughout the agenda today we mistakenly

8    noted that the June 23rd date is at ten rather than two

9    o'clock, which is when it's scheduled.  So, I apologize for

10   that error.  But, all of the adjournments to June 23rd will be

11   at 2 p.m., Your Honor.

12             THE COURT:  All right, very good.  It will be

13   continued to June 23rd.

14             MR. FOLEY:  Your Honor, Item Number 5, this is

15   DirecTV's motion for relief from stay to effectuate a setoff.

16   This is the matter in which we are actually allowing physical

17   reclamation of product that, again, we hope will result in

18   significant value coming to the estate upon reconciliation of

19   all of the amounts.  DirecTV is continuing that process with

20   representatives from the company, and they have agreed and

21   asked that their motion be adjourned until the June 23rd

22   hearing date, Your Honor.

23             THE COURT:  All right.  That will be continued to

24   June 23rd.

25             MR. FOLEY:  Your Honor, Item Number 6, which is

**J&J COURT TRANSCRIBERS, INC.**

8

1   Sony's motion for the payment of administrative claim.  This is

2   a matter that we have been negotiating with them for some time.

3   We had finally made a very extensive counter offer to them

4   earlier this week -- or late last week and they are evaluating

5   that.  I've spoken to Mr. Black, Paul Black, who's our local

6   counsel, and he's agreeable and requested to advise the Court

7   that they want their motion to be adjourned until the June 23rd

8   hearing date so that they can continue to evaluate our counter

9   offer.

10          THE COURT:  Very good.  That will be continued to

11  June 23rd.

12          MR. FOLEY:  Your Honor, Item Number 7, South Peak

13  Interactive.  This is a vendor seeking payment of an

14  administrative claim.  The companies continue to reconcile the

15  amounts with this particular vendor and they've requested that

16  their matter be adjourned until the June 23rd hearing date.

17          THE COURT:  All right, that will be continued, as

18  well, to June 23rd.

19          MR. FOLEY:  Your Honor, Item Number 8, this is the

20  Vertis' motion for approval of being able to file a late proof

21  of claim.  Again, not wanting to -- they don't want to have to

22  prosecute that motion until they know there's any -- makes any

23  sense to do it.  So, they've asked to adjourn their motion

24  until the next hearing date of June 23rd.

25          THE COURT:  That will be continued to June 23rd.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. FOLEY:  Your Honor, Item Number 9, this is

2    Newport News' motion for payment of a tax claim, application

3    for payment of taxes.  We've been in discussion with them and

4    they acknowledge that this -- it makes more sense to probably

5    resolve as part of the claims resolution process, and so that's

6    not going to happen, obviously, until after the administrative

7    bar date and our evaluation of the Government claims that have

8    just been filed.  They've asked that their motion be adjourned

9    until the July 23rd hearing date after the time we should have

10   a plan on file.

11         THE COURT:  All right.  That will be continued to

12   July 23rd.

13         MR. FOLEY:  Your Honor, Items Number 10 and 11 and

14   12, Your Honor, these are all motions by landlords.  Item

15   Number 10 is Washington Green TIC, Item Number 11 is Cardinal

16   Court, LLC, and Item Number 12 is THF Chesterfield II

17   Development, THF Clarksburg, THF Harrisonburg, THF St.

18   Clairsville.  These are all motions under Section 365(d)(3) and

19   503(b)(1) of the code for payment of administrative rent.  All

20   of these landlords have been advised that there is a hearing on

21   the 23rd to deal with many of these similarly situated issues

22   and they've all agreed to adjourn their motions to that hearing

23   date.

24         In the meantime, the professionals and the company

25   representatives are working with all of these landlords to try

1   to resolve these issues relating to ancillary administrative

2   rent, fees and the like.  Your Honor, we are also in the

3   process of trying to resolve all issues with all landlords

4   relating to the stub rent issue to moot the appeal.  And we

5   hope to accomplish most of that before the June 23rd hearing

6   date.

7               THE COURT:  Very good.  I wish you success on that.

8               MR. FOLEY:  Thank you, Your Honor.  Item Number 13,

9   Your Honor.  This is a motion that we've asked the Court to

10  approve a second amendment to a lease termination agreement

11  with Regency Centers, LP under 363(b)(1) and 362(d)(1).  Your

12  Honor, this involves two leases with Regency; one referred to

13  in the motion as the Santa Barbara lease and one referred to as

14  the Pal Street Lease.  The chronological history of what

15  happened with respect to this particular landlord and these

16  leases is set forth in the motion.  But, last August we entered

17  into negotiations for an early termination with this particular

18  landlord that was going to be finally effective February 29th,

19  '09 and it involved a payment of a termination fee by the

20  landlord to Circuit City of $6 million paid in two

21  installments; first in cash, which would be escrowed, and,

22  second, secured by a standby letter of credit.

23              During the contingency period we were unable to

24  finalize the transaction and so we entered into an amendment to

25  the termination agreement in September of '08 which had a

1  15-day contingency period which was able to be satisfied.  And

2  the first installment of the $6 million termination fee was

3  paid to Circuit City.

4          The balance of the termination fee that was being

5  held by Chicago Title as the escrow agent was not paid in

6  February of 2009 because there was a declaration of default

7  under the termination agreement by Circuit City with respect to

8  amounts owed on the Santa Barbara location in the amount of

9  $107,153.95.  And then there was also some administrative rent

10 owed with respect to the Pal Street lease which was rejected in

11 the amount of $37,941.19.  The combined total of that, Your

12 Honor, is $145,095.14.  And in order to effectuate payment of

13 the second installment of this lease termination agreement, we

14 have entered into a second amendment, which we're asking the

15 Court to approve today, which on a net, net, net basis will

16 result in the $145,095.14 being set off or recouped under the

17 agreement for a net payment to the estate of $2,854,904.86 with

18 concomitant releases being executed between the parties.

19         Your Honor, we believe the provisions of the second

20 amendment to the lease termination agreement satisfied the

21 business judgment rule under 363 and that the automatic stay

22 should be lifted to allow the setoff and recoupment

23 contemplated by the agreement.  We have not received any

24 objections.  We have been in consultation with the committee

25 over this resolution and we would ask the Court to approve the

1  motion.

2          THE COURT:  Does any party wish to be heard in

3  connection with the debtors' motion?

4          (No audible response).

5          THE COURT:  All right, the motion will be granted.

6  Submit an order, please.

7          MR. FOLEY:  Thank you, Your Honor.  Item Number 14,

8  Your Honor, is a follow-on to the bridge order that Your Honor

9  has already entered.  This is our motion to extend the time to

10  remove actions under 28 U.S.C. 1452 and Federal Rule of

11  Bankruptcy Procedure 9027.  Your Honor, the motion seeks an

12  extension of time for this period until October 6th or 30 days

13  after relief has been granted by any particular party to go

14  forward with an action.  Your Honor, we don't believe this

15  prejudices any party, but just preserves the estate's rights to

16  manage any litigation in foreign jurisdictions in a way that

17  makes sense to the estate.  So, we would ask the Court to

18  approve the motion and extend the time period until October 6th

19  or 30 days after my party gets relief from the automatic stay.

20          THE COURT:  Does any party wish to be heard in

21  connection with the debtors' motion?

22          (No audible response).

23          THE COURT:  All right, Mr. Foley, there being no

24  objection, that motion will be granted.  Please submit an

25  order.

13

1          MR. FOLEY:  Thank you, Your Honor.  That brings us to

2  the last item, Your Honor.  This was originally on the docket

3  last Wednesday.  This is our motion to assume and assign the

4  lease at the Bloomingdale, Illinois location to Creative Retail

5  and Management Inc.  Your Honor, I think it might make sense, I

6  believe we had some issues getting witnesses here.  We do have

7  some exhibits that I was talking to counsel about before we

8  began the hearing.  If we could take a very short recess to see

9  if we cannot narrow the issues for the Court to consider and

10 maybe stipulate to the admissibility of some of these exhibits

11 to make the proceedings go a little bit quicker.  I think we

12 could use that maybe 15 minutes of time if that pleases the

13 Court.

14         THE COURT:  Well, I certainly think that that makes

15 sense.  Does counsel agree?

16         MR. WEITZMAN:  Good morning, Mitchell Weitzman for

17 Simon Properties.  The witness is actually en route from the

18 Richmond Airport right now here, and plus, we can utilize this

19 time to review the exhibits.

20         THE COURT:  Do you think that the witness will be

21 able to get here in 15 minutes?

22         MR. WEITZMAN:  I said that because I don't think 15

23 minutes would do it, actually.

24         THE COURT:  Okay.  Why don't we be in recess until

25 eleven o'clock.  That will give you a half an hour.  And then

J&J COURT TRANSCRIBERS, INC.

14

1  we'll start back then.  If for some reason there's a tie up in

2  traffic, just let the Court know.  But, otherwise, we'll start

3  at eleven o'clock.

4         MR. WEITZMAN:  Thank you.

5         MR. FOLEY:  Thank you, Your Honor.

6                    (Recess)

7         THE COURT:  Mr. Foley, were you able to resolve it?

8         MR. FOLEY:  Not completely, but we've narrowed the

9  issues dramatically, we believe, Your Honor.

10        THE COURT:  Very good.

11        MR. FOLEY:  Some housekeeping matters, Your Honor.

12  This lease involves also a dislocation.  It involves not only

13  the overlease with Simon Properties, which is the party whose

14  objection is still alive, but it also involves the sublease to

15  Dollar Tree Stores, Mr. Schwarzchild's client.  We have made a

16  couple of edits to the proposed form of order that I would hand

17  up to the Court.  To accommodate the changes requested by

18  Dollar Tree and with these changes they are satisfactory, it

19  satisfactorily resolves the issues that Dollar Tree has.

20        Your Honor, the changes that we made are basically

21  reservations of rights that Dollar Tree wanted to have in the

22  form of the order, particularly with the findings with respect

23  to Paragraph Q.  What we've handed Your Honor is a blackline

24  version, and then also Paragraph 21.  The language simply

25  states that notwithstanding foregoing the subtenant, which is

1  Dollar Tree, shall not be deemed to have waived and shall be

2  permitted to enforce its rights subject to obtaining relief

3  from the automatic stay or other injunction to indemnification

4  as to third party claims whenever asserted, but only to the

5  extent that such third-party claims are covered by insurance

6  policies maintained by the debtors and will not subject the

7  debtors to any liability or defense costs or expenses,

8  including without limitation, attorneys' fees and expenses.

9  And two, any party shall not be deemed to have waived any

10 rights he may have against landlord or its insurance carrier by

11 reason of any third party tort claim.

12        And then Paragraph 21 similarly says that

13 notwithstanding the foregoing the subtenant shall not be deemed

14 to have waived and shall be permitted to enforce its rights

15 subject to obtaining relief from the automatic stay or other

16 injunction to the indemnification as to the reserved claims,

17 which are a defined term in Paragraph Q.  With those edits to

18 the order, Dollar Tree has no objection to the assumption and

19 assignment of its sublease to the proposed assignee set forth

20 in the motion, Your Honor.

21        THE COURT:  And I see we've also figured out that

22 this is in Illinois, not in Minnesota.

23        MR. FOLEY:  Yes, Your Honor.  St. Cloud was in

24 Minnesota, Bloomingdale's in Illinois.

25        THE COURT:  Mr. Schwarzschild?

1          MR. SCHWARZSCHILD:  Good morning, Your Honor.

2   William Schwarzschild here on behalf of Dollar Tree Stores.

3   Your Honor, Mr. Foley has accurately set forth Dollar Tree's

4   agreement to the form of the order that's being presented.

5   Also, I'd like to introduce Scott Kipnis who I believe is on

6   the phone.  Mr. Kipnis has been admitted pro hac in this case

7   and serves as general bankruptcy counsel for Dollar Tree around

8   the country.  I don't know if Mr. Kipnis will have occasion to

9   participate in the hearing, but he is on the phone.

10         THE COURT:  All right.  And I previously entered an

11  order granting him leave to attend this hearing by telephone.

12         MR. SCHWARZSCHILD:  Thank you, Your Honor.

13         MR. FOLEY:  Your Honor, we also have a stipulation to

14  several exhibits for admission into evidence.

15         THE COURT:  All right.

16         MR. FOLEY:  Some of them have some caveats to them

17  which we'll explain.  I have three exhibit books here for the

18  Court.  They're all identical.  One could be for the witness

19  stand, one could be for Your Honor, one could be for your law

20  clerk.

21         THE COURT:  That will be good.

22         MR. FOLEY:  Just to run through what they are, Your

23  Honor.  And we also have another exhibit book, too, that Simon

24  can discuss.  These exhibits, Your Honor, Exhibit Number 1 is

25  an aerial photograph and a site plan of this particular

1   location.  Exhibit Number 2, Your Honor, is the overlease with

2   Simon Properties.  Exhibit Number 3, Your Honor, is what we

3   refer to as the REA, the Reciprocal Easement Agreement.

4   Exhibit Number 4, Your Honor, is the Dollar Tree sublease.

5   Exhibit Number 5, Your Honor, is a letter from Dollar Tree

6   exercising their renewal rights with respect to the sublease

7   through 2015.  Exhibit Number 6, Your Honor, is a cash flow

8   model of this particular location providing for the rent that

9   Circuit City pays to Simon and the rent that Dollar Tree pays

10  to Circuit City.  Exhibit Number 7, Your Honor, are the 2007

11  and 2008 tax returns of Creative Retail and Management.

12  Exhibit Number 8, Your Honor, is the executed sale assumption

13  and assignment agreement with Creative Retail Management,

14  Realty Management, LLC.  And Exhibit Number 9, Your Honor, is

15  the objection filed by Simon Properties.  And Exhibit Number

16  10, Your Honor, is the transcript of a deposition we took last

17  night of Mr. Brown, who is here to testify today in court.

18          Your Honor, there is also exhibits that Simon has.

19  I believe Number 1 is the identical exhibit to our Number 1,

20  which is a site plan, is that correct?

21          MR. WEITZMAN:  Yes, that's right.

22          MR. FOLEY:  Do you have extra books that you wanted

23  to --

24          MR. WEITZMAN:  I do.  I'll hand up.  May I approach?

25          MR. FOLEY:  You may.

1        MR. WEITZMAN:  I'm handing up our exhibit book, only

2   a few of which will be offered, because the cure issue is being

3   reserved for after this hearing.

4        THE COURT:  All right.

5        MR. WEITZMAN:  It's a very narrow issue, by the way,

6   the cure issue.  But, Your Honor, I can just summarize what

7   these exhibits are.  It's only -- we're only offering 1, 6 and

8   7; 1 is the same lease document, 6 is a listing, a summary of

9   restrictions in other leases at the project, both exclusives

10  and prohibited uses, and so is Exhibit 7 similar information.

11  And if I can just state a limited evidentiary stipulation that

12  Mr. Foley and I have reached with respect to 6 and 7, and that

13  is admittedly this is a summary.  We're going to get the actual

14  leases to Mr. Foley in connection with -- or under a protective

15  order to protect confidential information and restrict the

16  dissemination just among the parties in this case.  And if

17  after Mr. Foley's review he finds that these summaries are not

18  accurate in any way, then to the extent this Court's ruling is

19  affected by that, then we would consent to relief from the

20  ruling, to that portion of the ruling that relied upon these

21  exclusives and restrictions.  We're confident that the

22  documents will support Exhibits 6 and 7.  So, I think on that

23  basis alone with Mr. Foley reserving all other substantive

24  rights with respect to the exclusives and restrictions, 6 and 7

25  would be admitted, is that right?

1          MR. FOLEY:  That's correct, Your Honor.  This was our

2    way to get around the authentication evidentiary problem.  Mr.

3    Brown, he's not a lawyer, these are legal summaries prepared by

4    the legal department and signed them when I deposed him last

5    night.  They were handed to him, he didn't prepare them, so

6    there was an issue there.  As long as we preserve all the legal

7    arguments and we can see the backup documentation for

8    ourselves, we have no problem with the stipulated evidentiary

9    admission as set forth by counsel.

10          THE COURT:  I understand.

11          MR. WEITZMAN:  And then there's a final exhibit

12   that's not in the notebook, and that's an affidavit of counsel

13   fees and costs with attached billing statements, Section 17-2

14   of the lease provides for recovery of counsel fees in the event

15   of reentry or termination, which could be an offshoot of any

16   denial of the assignment motion.  And there is authority, which

17   I'll bring to the Court's attention later, that gives landlords

18   the right to recover in the context of contested assignments.

19          THE COURT:  All right, very good.

20          MR. FOLEY:  Your Honor, also, we have stipulated --

21   the debtors have stipulated that the provisions of 365(b)(3)

22   pertaining to adequate assurance relating to shopping center

23   locations are applicable, that this is a shopping center, so

24   there's no dispute, factually, with respect to that.

25          Your Honor, there is also a cure issue that was

1 mentioned earlier.  We are going to ask the Court, and I don't

2 believe counsel opposes this, to follow the same protocol

3 depending on the Court's ruling, obviously, to deal with the

4 cure issue off the June 23rd hearing date with some similarly

5 situated issues.  Just so the Court is aware, at this point

6 we've been working pretty hard to try to reconcile the

7 difference between what the estate says the cure amount is and

8 what Simon Properties says the cure amount is.  The estate

9 believes the cure amount is $145,802.63.  And this is an e-mail

10 I received just a few minutes ago with representatives from

11 Simon and representatives of the debtor.

12        Simon believes the cure amount is $157,052.63, which

13 is a difference of approximately $11,250.  That difference,

14 Your Honor, is made up of the full month's rent of June which,

15 if Your Honor approves this motion, the order provides for that

16 to be prorated between the estate and the assignee, so that

17 will be -- the full month of June rent would be paid if the

18 assignment is approved.  It will just be prorated as set forth

19 in the order.  And then the balance is the attorneys' fees that

20 Mr. Weitzman just referred to.  So that's what's left of the

21 cure dispute, Your Honor, which is very little, but we can deal

22 with that on the 23rd.

23        THE COURT:  I'm not dealing with that today.

24        MR. FOLEY:  Not at all.

25        THE COURT:  All right.

1          MR. FOLEY:  So, Your Honor, I believe the only issue

2    that the Court has to deal with today is the issues raised in

3    the objection by Simon under 365(b)(3)(c) and (d) which --

4          MR. WEITZMAN:  May I add something?  The cure issue

5    is resolved for -- will be resolved at a later date except for

6    the claim for counsel fees and costs.  If we can get the

7    Judge's ruling on that today.

8          THE COURT:  And just so we have it straight.  We're

9    recording this so we can have a transcript if necessary.  So

10   when counsel speaks, I need to have you identify yourself each

11   time so we know who's speaking, because obviously we don't have

12   a court reporter here that's being able to identify who's the

13   person that's saying what.  So, I would just ask you each when

14   you come to the podium, just identify yourself once again.

15         MR. WEITZMAN:  Thank you.

16         THE COURT:  Thank you.  All right, is that acceptable

17   to you, Mr. Foley, that we are going to resolve the issue with

18   regard to the entitlement to attorneys' fees?

19         MR. FOLEY:  Yes, Your Honor.  That obviously

20   presupposes a ruling that Your Honor might make as to the

21   ultimate outcome of the motion, but obviously it's --

22         THE COURT:  I understand that.  I just wanted to know

23   what I needed to be prepared to address.

24         MR. FOLEY:  Yes, Your Honor.  With that, Your Honor,

25   we have again two witnesses available on the debtors' side, but

1 given the narrowing of the issues that we've just gone through

2 with the Court and the focus here on 365(b)(3), (c) and (d)

3 provisions of the Bankruptcy Code, Mr. Marcum, who is the chief

4 executive officer of the debtor, as well as Jim Avallone who is

5 with DJM Realty.  They would -- if I was to proffer their

6 testimony, they would testify that this lease assignment with

7 Creative Realty was negotiated at arm's length and good faith

8 and that it's determined in their business judgment to be the

9 best available disposition of this property.  It does obviously

10 assume and assign both the sublease and the overlease to the

11 assignee, has consideration set forth in the motion of

12 $175,000.  There's a deposit that's been paid of $28,000 by the

13 proposed assignee.  Obviously, the cure amount is less than

14 that, but it also alleviates certain claims.  And, Your Honor,

15 we believe that the assignment is in the best interest of the

16 estate.

17          The assignee has also communicated with both DJM

18 Realty and the debtors and counsel for the debtors that they

19 will obviously, and the order so provides -- the assignment

20 agreement so provides, that they will honor all the lease

21 terms, including any restrictions on use with respect to the

22 property and would not sublet the premises in any way that

23 would be violative of the use restrictions provided for in the

24 lease or the real estate, or the REA or any of these exclusive

25 provisions contained in other tenants' leases to the extent

23

1  they apply to this location that's covered by this lease.  With

2  that, they would have no further testimony, Your Honor, we'd

3  offer that as a proffer.

4        THE COURT:  All right.  Do you wish to cross examine

5  either of the proffered witnesses?

6        MR. WEITZMAN:  No, Your Honor.  I accept those

7  proffers.

8        THE COURT:  Okay.  The Court will then accept the

9  proffers.

10        MR. FOLEY:  Your Honor, I believe that concludes our

11  case in chief with respect to the motion.  And the exhibits,

12  again, we've asked the Court to admit our exhibits, which are

13  stipulated to.  And, otherwise, I believe our position as legal

14  argument subject to whatever evidence Simon presents, Your

15  Honor.

16        THE COURT:  And as I understand it, all of your

17  exhibits have been stipulated.  And then I'm looking at the

18  other exhibits, at Exhibits 1, 6 and 7, you you've stipulated

19  to those.

20        MR. FOLEY:  With the caveat as to 6 and 7, Your

21  Honor, yes.

22        THE COURT:  Exactly, okay.  All right.

23        MR. WEITZMAN:  Your Honor, Mitchell Weitzman for

24  Simon Properties, the landlord in this case.  Before I present

25  my witness, I think it might be useful for me to just explain

1  our case, the nature of our objection a little bit.

2           THE COURT:  It would help.

3           MR. WEITZMAN:  The use clause in this lease, which

4  governs at this period of time, which is after the initial

5  period of that lease with the first tenant, is that it must be

6  used for other lawful retail sales and services, including

7  without limitation, storage, merchandise, offices and such

8  other purposes as may be incidental thereto.  The question

9  presented in this case is looking at Section 365(b)(3)(c) and

10 (d) of the shopping center provisions of the Code, the Court

11 and the landlord are entitled to inquire about how the proposed

12 assignment impacts the considerations stated in (c) and (d) --

13 (c) relating to radius location use exclusivity and (d)

14 relating -- and it's and, semicolon and after (c) -- whether

15 the assumption or assignment will disrupt any tenant mix.

16          And the precise legal issue is, if a debtor proposes

17 an assignment and is prepared to say just the following and

18 nothing else, that the proposed assignee takes the lease as is,

19 that that somehow entitles the debtor to automatic granting of

20 the assignment, without telling us anything about the proposed

21 assignee and what they do and how they, in fact, will use the

22 premises.

23          Now, the Court will see in the exhibits in the

24 debtors' notebook that this is a real estate company.  It's not

25 a retail company.  In a sense, we feel that this motion is

1  premature, because we don't have the end user here before the

2  Court.  They just identified this as a real estate firm.

3  Hypothetically, it could be a competing developer who wants to

4  take a big space and turn it into a mini shopping center.  So,

5  we don't -- for reasons of their own, they simply won't say

6  what is the use so that the debtor -- so that the landlord,

7  that is, and the Court can make their own judgments about

8  whether or not (c) and (d) are impacted.  So, that's really the

9  legal question.

10        And at the end of the evidence, I will bring to the

11  Court's attention a case that is remarkably on point, but with

12  some distinction, and that's Sun TV Appliances at 234 B.R. 356

13  from Delaware (1999), which I provided to Mr. Foley a few days

14  ago.  I don't want to say now what I'll say in my closing

15  argument, but just to say that part of the reason why the Court

16  there did not approve the assignment is that the use, the

17  actual use was not disclosed.  It was a -- the Court recognized

18  in that case it wasn't a straight assignment, it was approving

19  a transaction to Hilco to hold it for 90 days and reconvey the

20  ultimate use not known.  And for that reason, expressly, the

21  assignment was rejected.  So, that's our case, basically.  And

22  I'd like to present Ken Brown as our first witness.

23        THE COURT:  All right.  Mr. Brown, please come

24  forward and be sworn.

25              KENNETH E. BROWN, WITNESS, SWORN

**J&J COURT TRANSCRIBERS, INC.**

Brown - Direct                           26

1                    DIRECT EXAMINATION
2  BY MR. WEITZMAN:
3  Q    Could you please state your name?
4  A    Kenneth Edward Brown.
5  Q    And what is your occupation?
6  A    I'm a property manager for Simon Property Group.
7  Q    And are you employed in connection with this
8  Bloomingdale's retail project?
9  A    Yes.
10 Q    And your title there is?
11 A    I'm the property manager of Bloomingdale Court.
12 Q    And what are your actual duties in connection with that
13 job?
14 A    I oversee the day-to-day operations, budgeting, capital
15 planning, accounting.  I'm responsible for some leasing, mostly
16 with local, smaller tenants.  I oversee any marketing efforts
17 at the property, any security efforts at the property, and also
18 have reporting responsibilities to my corporate office.
19 Q    How long have you been employed by Simon Properties?
20 A    Approximately, 17 years.
21 Q    And how long have you been employed in connection with
22 this retail project?
23 A    I've been a property manager of Bloomingdale Court for a
24 little over one year.
25 Q    And through your employment have you become familiar with

                    **J&J COURT TRANSCRIBERS, INC.**

Brown - Direct                                    27

1  the leasing policies and objectives of Simon Properties?

2  A    Yes.

3  Q    And have you become familiar with the implementation of

4  those policies?

5  A    Yes.

6  Q    You indicated you did some leasing.  What leasing -- or

7  you've become involved in some leasing, what kinds of leases do

8  you become involved in?

9  A    I'm typically responsible for short term leasing, which

10  would be a month-to-month type leasing, and also a leasing of

11  smaller spaces to local tenants.

12          MR. WEITZMAN:  Your Honor, may I hand the witness the

13  duplicate exhibits that I've --

14          THE COURT:  You may.

15  Q    Mr. Brown, I won't ask you too much about the detailed

16  provisions because the document is before the Court and it

17  speaks for itself.  But, I'll just ask you, can you identify

18  that as the lease between the current parties in this matter;

19  that is, the landlord and the debtor?

20  A    Yes.

21  Q    Through succession of interest that is?

22  A    Yes.

23  Q    And the lease to Circuit City involves how much square

24  footage?

25  A    Approximately 35,000 square feet, a little bit above that.

Brown - Direct                              28

1  Q    Okay.  And you've become aware that a portion of that is

2  sublet to the Dollar Tree, is that right?

3  A    Yes.

4           MR. WEITZMAN:  These questions are of a

5  non-controversial nature, so I'll just ask some leading to

6  speed it along.

7  Q    Does Dollar Tree occupy a little bit more than one-third

8  of the original Circuit City space?

9  A    Yes.

10  Q    If you take a look, please, at Section 8.1 of the lease,

11  and do you see that that is the use provision in the lease?

12  A    Yes.

13  Q    Now, I've already stated what's in the opening paragraph

14  with respect to the use.  Are there other provisions of this

15  particular provision which restrict uses by the tenant?

16  A    Yes.

17  Q    And could you briefly point those out for us?

18  A    Section 5 prohibits purveyors of meats, bakery products,

19  groceries, delicatessen products, and some other uses, and then

20  8.1, Section 6, prohibits manufacturing, warehousing, theaters,

21  liquor stores.  I can -- do you want me to go through the list

22  or --

23  Q    No, that's fine.

24  A    Okay.

25  Q    And just take you please to the assignment provision of

**J&J COURT TRANSCRIBERS, INC.**

Brown - Direct                                    29

1  the lease, Section 13.1.  Do you see that?

2  A    Yes.

3  Q    Just briefly indicate, are there restrictions in here with

4  respect to assignment and the landlords either approving or

5  withholding consent to assignment in certain circumstances?

6  A    Yes.

7  Q    And just briefly point those out, where they are.

8  A    Section 13.1, second paragraph, talks about within the

9  first five years of the lease term.

10 Q    We're beyond that now, so --

11 A    Yes.

12 Q    -- is there another section after the first five years?

13 A    Yes.  It would be the third paragraph in Section 13.1

14 where it talks about after the first five years of the lease

15 term that the tenant may assign the lease for the purpose of

16 lawful retail sales and services.

17 Q    And it incorporates Section 8.5 restrictions, is that

18 right?

19 A    Yes.

20 Q    Okay.  Take a look at Exhibit 1 again.  Would you consider

21 Exhibit 1 a big box lease?

22 A    Yes.

23 Q    And in your vernacular, is that like an anchor tenant

24 lease at the project?

25 A    Yes.

1  Q    And what is the -- aside from what is allowed under the

2  law, what's the landlord's wishes, desires, objectives for the

3  use of that space?

4  A    I think the intent of the lease was for it to be occupied

5  by a single tenant.

6  Q    And why would you prefer a single tenant or a single user

7  to operate from that space?

8  A    I think the strength of the center is the proliferation of

9  big box users, it's about 70 percent of the tenant mix, and I

10 think in this individual situation, that's the strength of the

11 center, similar to where anchor tenants would be the strength

12 of an enclosed mall.

13 Q    And in your 17 years of experience, have you seen the

14 landlord been asked to consider a proposed assignment where no

15 use is specified for the proposed assignee?

16 A    No, I have not.

17 Q    Is the landlord prepared to state really one way or the

18 other -- well, let me put it a different way.  Is the landlord

19 prepared to state it consents to the proposed assignment here

20 today without knowing what the actual use will be?

21 A    No.

22 Q    Is the landlord able to assess the impact on tenant mix at

23 this project without knowing what the actual use is?

24 A    No.

25 Q    Could you take a look at Exhibit 6 and tell me if that --

**J&J COURT TRANSCRIBERS, INC.**

                                   Brown - Direct                          31

1  well, what is Exhibit 6?

2  A    It's a summary of both exclusives and prohibited uses that

3  can be found in the different leases of the individual tenants

4  at Bloomingdale Court.

5  Q    And have you reviewed this document?

6  A    Yes.

7  Q    And through your employment, have you reviewed from time

8  to time the various leases referenced here?

9  A    Yes.

10 Q    Do you consider this to be a reliable summary of those

11 provisions?

12 A    I do.

13 Q    And does the landlord intend to produce the full leases?

14 A    Yes.

15 Q    And could you take a look at Exhibit 7?  Is that a further

16 description of exclusives and other provisions from the various

17 leases identified?

18 A    Yes.

19 Q    And does that appear accurate to you?

20 A    It does.

21 Q    Is the landlord able to assess whether or not this

22 proposed assignment to Creative Management impacts the

23 provisions set forth in Exhibits 6 and 7?

24 A    No.

25 Q    Has anybody told you what the proposed or planned use will


                         **J&J COURT TRANSCRIBERS, INC.**

1  be by this entity known as Creative Management, Inc.?

2  A     No.

3  Q     Is the landlord seeking the recovery of its reasonable

4  counsel fees and costs in connection with this matter?

5  A     Yes.

6  Q     Have you reviewed the affidavit tendered to the Court and

7  the billing statements attached to it?

8  A     I have.

9        MR. WEITZMAN:  I'll show the witness this, which is

10 before the Court already, and counsel.

11 Q     Have you reviewed those billing entries, both the time and

12 the amount?

13 A     Yes, I have.

14 Q     And do you feel that they're reasonable, both in terms of

15 expenditure of time and hourly rates?

16 A     I do.

17 Q     Are you seeking reimbursement under Section 17.2 of the

18 lease?

19 A     Yes.

20       MR. WEITZMAN:  At this point, Your Honor, I have no

21 further questions of the witness.  I offer my exhibits.

22       THE COURT:  The exhibits are admitted.  Mr. Foley,

23 cross examination?

24                         CROSS EXAMINATION

25 BY MR. FOLEY:


                    **J&J COURT TRANSCRIBERS, INC.**

1  Q    Good morning, Mr. Brown.  You referred to Section 13.1 of

2  the lease.  When you read the language about what the tenant

3  may use the premises for or sublet the premises for, you left

4  out the phrase -- this is after the first five years --

5  "without the consent of the landlord," do you recall that?

6  A    Where did I leave that out?

7  Q    Do you agree that after the first five years of this

8  lease, the tenant can assign this lease without the consent of

9  the landlord?  Second line, "After the first five years of the

10 lease term have elapsed, tenant may, without the consent of the

11 landlord, assign this lease or sublet all or any portion of the

12 premises or building thereon for the purpose of lawful retail

13 sales and services and uses incidental thereto"?

14 A    Yes, I see that.

15 Q    So, Circuit City, notwithstanding the bankruptcy, doesn't

16 need Simon's consent to sublet all or a portion of this

17 premises to any other tenant, as long as the property will be

18 used for retail sales, services or other incidental uses, is

19 that correct?

20 A    Yes, as long as it's lawful retail sales, services or

21 other incidental uses, yes.

22 Q    And you're not aware, are you, of any other document that

23 would restrict the ability of the tenant to subdivide the

24 balance of this space, is that correct?

25 A    I'm not aware of any document that would stipulate that,

Brown - Cross                              34

1  no.

2  Q    And you heard the proffered stipulation that the assignee

3  in this case, Creative Realty Management, LLC will abide by all

4  of the lease restrictions that you identified, as well as to

5  the extent applicable, not violate any exclusivity provision of

6  any other lease of any other tenant in the shopping center,

7  correct?

8  A    I did hear that, yes.

9  Q    You said that this space is an anchor space of the

10 shopping center, correct?

11 A    A big box space.

12 Q    Well, if you could turn to Exhibit 8 of the black book --

13 I'm sorry, not Exhibit 8, Exhibit 6, I'm sorry.  I think you

14 testified that the space was 35,000 square feet, but that's

15 actually what Circuit City was using.  The actual site for this

16 space is 50,000 square feet, is that correct?

17 A    Correct.

18 Q    That you would consider that an anchor of the shopping

19 center, correct?

20 A    Consider that a big box space, yes.

21 Q    Would you consider it an anchor?

22 A    Anchors, typically in a strip center, they're referred to

23 as big boxes, whereas an enclosed mall you would have an anchor

24 which is much larger than a big box.

25 Q    But, you're essentially using those terms synonymously?

**J&J COURT TRANSCRIBERS, INC.**

Brown - Cross                              35

1  A     Sure.

2  Q     And if you go to Exhibit 1 in that book, which is the site

3  plan, and you look at all of the spaces of the tenants on the

4  bottom half of the mall, Wal-Mart, Dick's, Circuit City, TJ

5  MAXX, Best Buy, Joanne, all those are -- although Walmart's the

6  largest, all the rest are similar in size.  You would consider

7  all those big box anchor locations?

8  A     Yes.

9  Q     Okay.  If you could turn to Exhibit -- your Exhibit 6 in

10  the white binder, and this is where the exclusive summaries are

11  listed for the other tenants.  If you look at the first one,

12  just as an example, After Hours Formal Wear, they have an

13  exclusive for the principal use of formalwear in the area

14  between Wal-Mart and the theater.  I guess if you look at the

15  site plan you could figure that out.  But, my question goes to

16  the second sentence.  "The foregoing does not apply to existing

17  tenants and anchors over 20,000 square feet."  So the exclusive

18  that they have with respect to formalwear doesn't apply to

19  existing tenants or big box anchor tenants, is that correct?

20  A     That particular exclusive, yes.

21  Q     Now, if you go through this list, you will see that phrase

22  repeated several times.  This does not apply to existing

23  tenants, major tenants, outlet occupants, that's for Famous

24  Footwear, Garibaldi's, this does not apply to existing tenants.

25  Number 4, Jenny Craig Weight Loss Centers.  This does not apply

1  to anchor tenants or outlet parcels.   Number 5, Countrywide

2  Home Loans.   This does not apply to existing tenants, anchor

3  tenants over 20,000 square feet or outlet occupants.   So, isn't

4  it correct that a lot of these exclusives that is on this

5  exhibit don't have any application to how the Circuit City

6  space is going to be used, because they simply don't apply,

7  right?

8  A    They apply to a portion of the space, yes.   If you take

9  into account Dollar Tree being less than 15,000 square feet,

10  they do take into account part of that space, yes.

11  Q    But, the tenant here is Circuit City.   The subtenant is

12  Dollar Tree.   And the potential other subtenants of Creative,

13  could be PetsMart, could be Hobby Lobby, we discussed during

14  your deposition.   This space is 50,000 square foot prime lease

15  with Simon.   Simon has no right to consent to subletting, as

16  you pointed out in the lease.   So, are you saying that these

17  tenants would have rights that are superior to Simon's rights?

18  I'm not following --

19  A    I'm not following your logic.   What are you asking me?

20  Q    These exclusives that you apparently are concerned about

21  that exist in other tenants' leases, exclude their application

22  to existing tenants, which this lease is, correct?

23  A    I would think that would be open to interpretation.

24  Q    Okay.   But, it's an existing tenant, it's an existing

25  lease, it's a live lease.

1  A    It's an existing lease, it's not an existing tenant.   And

2  I would -- I'm not a lawyer.   I would think there would be

3  some, I would think there would be some gray area when we're

4  talking about existing tenants.

5  Q    But, the point is, that's for the other tenants to raise,

6  is that correct?

7  A    Yes.

8  Q    As to whether or not their exclusive might be violated or

9  whether or not there's an exclusion from the exclusive.   My

10 point is there are exclusions from the exclusives.   Do you

11 agree with that?

12 A    It would be for the tenant to raise, but the penalties

13 would be or could be against Simon.

14 Q    Understood.   But, you agree that there are exclusions from

15 the exclusions?

16 A    Yes.

17 Q    Okay.   Do you know if the landlord here has signed letters

18 of intent with other prospective tenants to take over the

19 Circuit City space?

20 A    I do not know that?

21 Q    I believe you testified in your deposition that you knew

22 that there were some negotiations going on with respect to

23 that?

24 A    I was aware of a conversation with Hobby Lobby in our

25 development department.

Brown - Redirect                          38

1  Q    Do you know if there are -- between last night in your

2  deposition and this morning I asked for copies of any

3  information that Simon has with respect to executed letters of

4  intent for Circuit City space.  Have you been able to find any

5  since your deposition or your communications with your

6  colleagues this morning?

7  A    I have not communicated with my colleagues, I've been

8  traveling.  I haven't had an opportunity to review.  That was

9  between counsel and Simon's legal counsel.

10 Q    You're not aware of any master agreement that affects the

11 entire shopping center, are you?

12 A    No.  No.

13 Q    And you are aware that the proposed assignee here has

14 agreed to abide by any restrictions to the extent they apply in

15 the reciprocal easement agreement, which is Exhibit 3 in the

16 black binder that affects all the various tenants in the

17 shopping center?

18 A    I understand that's what they've said, yes.

19         MR. FOLEY:  I have no further questions, Your Honor.

20         THE COURT:  All right.  Thank you.  Any redirect?

21         MR. WEITZMAN:  Yes.  Just one or two follow ups.

22 REDIRECT EXAMINATION BY MR. WEITZMAN:

23 Q    Mr. Brown, Mr. Foley asked you or stated that it was up to

24 the other tenants to raise violations of the restrictions and

25 exclusives, is that right?

**J&J COURT TRANSCRIBERS, INC.**

Brown - Recross                                39

1  A    Yes.

2  Q    Do you feel that the landlord has a role also in terms of

3  protecting those provisions?

4  A    Absolutely.

5  Q    And why is that?

6  A    I think for the integrity of the center and the tenant mix

7  of the center, and also the exclusives can have financial

8  implications for the owner if those exclusives are violated.

9        MR. WEITZMAN:  Nothing further.  Thank you.

10 RECROSS EXAMINATION BY MR. FOLEY:

11 Q    You mentioned in your last answer the tenant mix, but I

12 recall -- you're not aware of any provisions in the Circuit

13 City lease that outline any tenant mix, do you?

14 A    Other than the restrictions we covered earlier, no.

15 Q    Okay.  So, the prohibited uses in Section 8.5 that are

16 very specific about prohibited uses, other than that, you're

17 not aware of any document, governing document, binding

18 document, that affects Circuit City with respect to some design

19 or tenant mix desired by Simon in any of the contractual

20 arrangements?

21 A    That's correct.

22        MR. FOLEY:  Okay.  No further questions.

23        THE COURT:  All right.  Anything further for this

24 witness?

25        MR. WEITZMAN:  Nothing further, Your Honor.

1          THE COURT:  All right.  You may step down, sir.

2          THE WITNESS:  Thank you.

3          MR. WEITZMAN:  Your Honor, with respect to the

4     landlord's objection, we have no further evidence.

5          THE COURT:  Very good.  I'll hear your arguments

6     then.

7          MR. FOLEY:  Your Honor, I know everybody's familiar

8     with a term called buyer's remorse.  I think we have the

9     opposite situation here.  We have a situation where the

10    landlord is having non-buyer's remorse.  They want to control

11    the disposition of this particular lease without actually

12    having participated or made an offer or bid on the lease

13    location when they had every opportunity to do so.  Now,

14    they're in a position of wanting to make arguments to deprive

15    the estate of the value of this lease when there is absolutely

16    no restrictions on assignment in the lease.  The assignee is

17    not proposing to violate any use terms, or any prohibited use

18    or any exclusivity provision of any other lease of any other

19    tenant in the center.

20         This landlord, if Your Honor approves this

21    assignment, is getting the full benefit of its bargained-for

22    exchange in all of its documents.  The Bankruptcy Code gives it

23    nothing more than that.  The debtor cannot be put in a worse

24    position in having filed bankruptcy than they would be outside

25    of bankruptcy with respect to assigning or subletting this

1  space.

2       And the case law that was referenced by counsel, the

3  _Sun TV_ case in particular, is actually completely inapplicable

4  to this situation because that situation involved the Court's

5  analysis of a ground lease for an outparcel, and the issue in

6  that case is whether or not the outparcel was part of a

7  shopping center.  If the Court determined that it was not part

8  of a shopping center, then Hilco wanted to take designation

9  rights, not an assignment.  Here we have an -- this tenant,

10 Creative Realty Management, is taking an assumption and

11 assignment of this lease.  They will be fully bound by its

12 terms.

13      In the _Sun_ case, it was a situation where Hilco

14 simply wanted designation rights to see if they could find

15 somebody else to flip it.  They knew it would be more difficult

16 if they have to satisfy shopping center provisions.  The Court

17 went through an exhaustive analysis and said, as counsel stated

18 in his opening, the sale here is not a straight assumption and

19 assignment of the lease.  Rather, the debtor seeks to assign

20 its right to assign the lease to Hilco CLAF (phonetic) for a

21 period of 90 days after entry of a final order on the

22 landlord's objection.  During this period, Hilco CLAF intends

23 to shop the lease and direct the debtor to file a motion to

24 assign the lease to a party chosen by Hilco CLAF in order to be

25 able to freely shop the lease, Hilco CLAF requires a finding

42

1  that the lease is not subject to provisions of Section

2  365(b)(3).  Completely different situation, Your Honor.

3        Here the assignee is stepping into the shoes of

4  Circuit City and will be responsible as provided for in the

5  actual assignment agreement which is one of the exhibits, Your

6  Honor.  Paragraph -- Exhibit 8, Your Honor, Paragraph 3 says,

7  "The assignee does hereby assume and does hereby agree to

8  observe, perform fully and discharge all of the assignor's

9  duties, obligations and liabilities of whatever nature that are

10  required to be performed that accrue or relate to the period on

11  or after the effective date under the leases in the order."  So

12  the assignee here is fully, legally obligated and bound by

13  every term of the lease.  That was not the case in <u>Sun</u>

14  <u>Properties</u>.

15        We think that the courts should look to the authority

16  in this jurisdiction, that the Court is familiar with, which is

17  the <u>Track Auto</u> case, as well as the Fourth Circuit's opinion in

18  <u>Track Auto</u>, because in <u>Track Auto</u> there was an issue raised

19  about 365(b)(3)(c) and (d).  In that particular case, there was

20  a provision that prohibited assignment and there was also a use

21  provision that actually required the <u>Track Auto</u> lease to be

22  used for an auto parts store.  It was a very narrow, specific

23  required use clause.  And the argument was, that is such a

24  narrow, restricted use provision that it's de facto in

25  anti-assignment provision.  Judge Adams and Judge Jackson found

1 that that was a de facto anti-assignment clause.  The Fourth

2 Circuit reversed on that issue.  However, another issue that

3 percolated through all of those opinions was the issue of

4 whether or not and how you interpret Section 365(b)(3)(c) and

5 (d) with respect to this tenant mix issue.  And all of the

6 cases, including the Fourth Circuit case, cite to the <u>Ames</u>

7 <u>Department Store</u> case which provide that in order for the Court

8 to analyze it looks to the contractual obligations between the

9 parties.  The issue of tenant mix is governed by 363(b)(3), in

10 particular, the lease at issue.  In keeping with general rules

11 of statutory construction, the Court is not to read into the

12 lease additional terms not contained therein.  What 365

13 requires is that a shopping center tenant be held to its

14 bargain with the landlord and to leave intact the property

15 interest of the debtor and the landlord as set forth in that

16 bargain, the Court should not imply additional non-bargained

17 for terms; 277 Bankruptcy Reporter 655.

18     Again, citing that <u>Ames Department Store</u> case at 121

19 B.R. 160 out of the Southern District of New York, the statute

20 itself thus directs tenant mix inquiry to the contractual

21 provisions rather than general notions of tenant mix.  So, Your

22 Honor, what you have before you is evidence and legal authority

23 for the proposition that this particular proposed assignee

24 should be able to take the assumption and assignment of this

25 lease because it has stipulated and will be bound by all the

1 lease terms.  Nobody is seeking, Your Honor, to blue pencil

2 this lease, or strike a clause or say we don't have to file

3 this particular provision because it's an anti-assignment

4 clause.  We're taking the lease as written.  The order will so

5 provide.  To the extent there are any disputes that arise

6 later, Your Honor obviously has jurisdiction to enforce its own

7 orders and, you know, they can come back here if they so

8 choose.

9          But, there is no issue here because the proposed

10 assignee is going to honor the bargained-for exchange between

11 the debtor and the landlord under all of the applicable lease

12 documents.  So, we would ask the Court to overrule assignor's

13 objection and to approve the proposed assignment as provided

14 for in the assignment agreement.  Thank you, Your Honor.

15          THE COURT:  Thank you, Mr. Foley.

16          MR. WEITZMAN:  Again, Mitchell Weitzman, counsel for

17 Simon Properties.  Your Honor, the Sun TV case, we feel, is

18 highly applicable.  Now, there was a use clause in there that

19 is different than the one before the Court.  And a large

20 portion of that decision does involve whether or not a shopping

21 center was involved.  However, the substance of what happened

22 there was that the Court -- and I'm going to read the short

23 holding at the very end, and I have a copy for the Court if the

24 Court would like it.  I am handing up that great Fourth Circuit

25 Track Auto case, as well.

45

1          THE COURT: I'm very familiar with the Track Auto

2  case.  I'm not familiar with the Sun TV case.

3          MR. WEITZMAN:  The Sun TV case, Your Honor, that

4  court was unwilling to approve an assignment where the simple

5  fact was that the Court did not know what the use was going to

6  be.  Following their shopping center discussion at the very

7  end, Page 9 of 10, of what I've handed up to the Court.  The

8  Court says, "At this time, neither Hilco CLAF nor the debtor

9  are able to tell the landlord or this Court what use will

10 ultimately be made of the demised premises.  It is clear that

11 Hilco does not intend to use the premises itself.  Absent

12 knowledge of the ultimate intended use, we cannot determine

13 that such use, if it does vary from the use provision of the

14 lease, would have an insubstantial impact on the landlord and

15 its other tenants."

16         So before proceeding to that next paragraph, Your

17 Honor, it's untenable to ask the landlord and the Court to make

18 a determination about whether or not this real estate firm, as

19 identified on their tax returns, is able to or willing or

20 intends to use this as a retail use.  And we're entering into

21 this transaction blindly.  We're being asked to accept the

22 debtor's representations, expectations, hopes with respect to

23 this assignee.  Why is it that this proposed assignee or the

24 debtor will not testify what their planned use is?  I mean,

25 it's not an end user, it's kind of like a designation, because

1 it's a real estate firm.  You know, would it be permissible for

2 the debtor to simply say we're going to assign this lease to

3 Union Carbide, and somehow we're supposed to have a comfort

4 level that Union Carbide will use this premises for all lawful

5 uses, et cetera, having nothing to do with the business of

6 Union Carbide.  They're proposing to assign the lease to a real

7 estate firm.

8        And then the final paragraph of <u>Sun TV</u> states that,

9 the Court -- "Treatment of use provisions in a shopping center

10 undercut the debtor's argument that they are insubstantial.

11 Rather the provisions are the heart of the interdependence of

12 shopping centers as recognized by congress.  They are crucial

13 to tenant mix, the mix of customers," et cetera.  So, the

14 landlord would be violating its obligations to all the other

15 tenants at this project if it were to consent, in these

16 circumstances.  And we're not objecting solely for

17 precautionary liability reasons.  The landlord simply has not

18 had prior experience in stating a position with respect to a

19 mysterious use coming in to occupy a big box space.  And we

20 feel it's almost not ripe for the Court's consideration,

21 because the end use has not been sufficiently explained and the

22 assignee not sufficiently identified.

23        And the witness did testify that the landlord is

24 unable to impact tenant mix and other restrictions, lease

25 restrictions, in the circumstances.  The lease also, in Section

**J&J COURT TRANSCRIBERS, INC.**

47

1  17.2, does provide for the recovery of counsel fees and costs

2  in the event of a termination.  That's an interpretation

3  question by the Court about whether this constitutes a

4  termination.

5        However, if the assignment is not permitted and

6  eventually there's a rejection of this lease, then that is

7  tantamount to a termination and there's ample authority that

8  landlords are permitted to recover their counsel fees in

9  connection with motions to compel assumption or rejection of

10 lease that's -- and, you know, I could provide this authority

11 to the Court later if the Court needs these citations.  It is

12 within the Court's discretion.  But, that's the In re Ribs

13 case, Greenwich Village 57 B.R. 319, contested assumption and

14 assignment issues.

15       In addition, In re Westview 74th Street Drug Corp.,

16 motions to compel assumption and assignment -- assumption or

17 rejection of lease, and Foreign Crafting, Inc.  It's not a lot

18 of counsel fees being sought, Your Honor, in the last five days

19 of intensive litigation over this matter.  The landlord feels

20 strongly about this issue.  The landlord feels that it's being

21 asked for a lot in terms of going into this transaction without

22 further information.

23       Finally, Your Honor, the proposed --

24       THE COURT:  Do I have to find that there is a

25 termination of the lease in order to be able to award the

J&J COURT TRANSCRIBERS, INC.

48

1  counsel fees that you're requesting?

2        MR. WEITZMAN:  The provision can be interpreted that

3  way.  However, more broadly, based on what I've said -- well,

4  I'll leave it at that.  It says what it says.

5        And then, finally, Your Honor, as far as the proposed

6  order, I need more time to look at the proposed order.  It

7  refers to an estoppel certificate which I need to look at

8  again.  As I recall, I saw a few provisions of that landlord

9  estoppel certificate that I might have objection to.  It's not

10 attached to that very last redline of the order.  So, I just

11 need to review that before a final ruling in this case.

12        We would -- our aim here is to have this space

13 continue as a big box tenant.  That's the aim.  And so if the

14 order can somehow spell that out, but we think that their

15 assignments should be rejected.

16        THE COURT:  Speak to, when you say that you don't

17 know what the end use is going to be, Mr. Foley makes the

18 argument in the sale and assumption and assignment agreement

19 that Paragraph 3 provides that the assignee is going to assume

20 all of the obligations under the lease and it will be obligated

21 to perform those obligations.  How does that not offer you the

22 protection or the benefit of your bargain?

23        MR. WEITZMAN:  We'd be basically guessing about

24 whether or not that will happen.

25        THE COURT:  But, as I understand it, the only

49

1   restriction in the lease regarding prohibitive uses is found in

2   Section 8.5 of the lease.  And so long as they operated as a

3   retail, a lawful retail enterprise and don't violate any of the

4   prohibitive uses in Section 8.5, haven't you gotten the benefit

5   of your bargain?

6         MR. WEITZMAN:  It might turn out that way, Your

7   Honor.

8         THE COURT:  Well, if they don't, then they violate

9   the lease and then you have a breach of the lease situation and

10  you can enforce your remedies that are provided in the lease.

11        MR. WEITZMAN:  And we would intend to do so.  That's

12  true.

13        THE COURT:  You'd have every right to do so and you'd

14  have somebody that's on the hook for it because they've assumed

15  that obligation.

16        MR. WEITZMAN:  But, the use provision talks about

17  retail sales, I mean, that threshold objective under the lease.

18  And why is it that we cannot know from the debtor or from

19  post-assignee what Creative Management is in the business of?

20  Doesn't that --

21        THE COURT:  You said that they were a real estate

22  company.

23        MR. WEITZMAN:  Just a real estate company.  They're

24  not a retailer.  I mean, that raises a red flag.  They're

25  identified as a real estate firm.  They're not a retailer.  And

1   retailers normally occupy spaces in shopping centers.

2           THE COURT:  Is there someplace in the lease that says

3   that it cannot be assigned except to a retailer?

4           MR. WEITZMAN:  The assignment provision, as I recall

5   -- let's see.  Even after the first five years, assignment is

6   not permissible.  This is right in the middle of Page 18.

7           THE COURT:  I see it.

8           MR. WEITZMAN:  Assignment is not permissible if it's

9   not going to be lawful, retail sales and services.  And, again,

10  when the assignee is identified as a real estate firm, not a

11  retail user -- I mean, to me it seems like they have an

12  intention to -- it's kind of like a designation to take the

13  property and flip it, and we don't know what's going to happen

14  to this space.  They're an intermediary, clearly.  It appears

15  that they are an intermediary.  And the fact that they identify

16  themselves as a real estate firm raises the flag and casts

17  doubt on whether or not they operated as a retail use.

18          THE COURT:  I guess I'm having trouble with that,

19  because so long as they lease it or sublet some portion of the

20  space that is being assigned to them for lawful retail sales

21  and services, why aren't they complying completely with the

22  terms of the lease and you getting the benefit of your bargain?

23  And if they violate that, then you have the right to enforce

24  the lease.  They can't put a manufacturing facility in there

25  for instance.  But, as long as they put a retailer in there,

51

1  what's wrong with that?

2          MR. WEITZMAN:  Well, how does that answer the

3  question then in <u>Sun TV</u> where the Court was not prepared to

4  rule without knowing what the actual use was going to be?

5      THE COURT:  Because there the Court had to apply the

6  provisions of 365(b)(3), and here you don't have those kinds of

7  restrictions in your lease, as I read your lease.

8          MR. WEITZMAN:  The Court has just referred to Section

9  365(b) which one?

10         THE COURT:  (b)(3).  That's the portion that's for

11 shopping centers and where the Court --

12         MR. WEITZMAN:  Right, well, that does apply.

13         THE COURT:  -- has to make sure that the assignment

14 of the lease is subject to all the provisions of the lease such

15 as radius, location, use, exclusivity provision, et cetera and

16 will not disrupt any tenant mix or balance and such.  But, we

17 don't have those kinds of restrictions in your lease.

18         MR. WEITZMAN:  But, I do want to make clear, the

19 parties have stipulated that these shopping center provisions

20 do apply to this.  This provision -- I mean, whether or not

21 there are radius restrictions and exclusives which are violated

22 by this assignment, that's a separate question.  But, these

23 provisions and requirements apply to this case because there

24 has been a stipulation that this is a shopping center.  And

25 that's the reason for that stipulation, to dispense with the

52

1  issues that <u>Sun TV</u> dealt with the first 70 percent of its

2  opinion.  So, it's a shopping center as in <u>Track Auto</u> as in <u>Sun</u>

3  <u>TV</u>, and all these provisions apply and the landlord and the

4  Court get to make their own inquiries and then the Court makes

5  the judgment about whether or not the proposed assignment

6  impacts these.  And the landlord has testified we can't know

7  that without knowing what, at least in the first instance, the

8  use is going to be by this real estate firm.  So, that's our

9  argument.

10        THE COURT:  Okay.  I understand your argument.

11        MR. FOLEY:  Your Honor, just to follow up on that

12  last line of inquiry.  You're correct, there is no contractual

13  provision that provides for either a dictated tenant mix.

14  There's no contractual provision that prohibits or outlaws

15  subdividing the space.  There's no restriction on assigning or

16  subletting.  We don't even need the landlord's consent.  They

17  keep saying we're asking them to consent to something that's a

18  mysterious use.  We're not asking for their consent, at all.

19  We don't need it.  We don't need it under the documents.  All

20  we have to do is make sure that the assignee honors the terms

21  of the documents, which they've said they are going to do.

22  This is not like <u>Track Auto</u> in a sense where we're asking the

23  Court to strike a provision as an anti-assignment clause.  This

24  assignee who is in the real estate business who's going to be a

25  sub-landlord here, is in the business of making money, saw

1  enough value in this lease and to be able to take it as is

2  written without any changes to it and be able, as Your Honor

3  said, to find a subtenant to occupy the balance of the space

4  and hopefully make some money.  That's what they're in the

5  business of doing.  And they are going to be responsible to

6  Simon under this lease if they don't honor all of the terms of

7  the lease as written.  They have to abide by all the

8  restrictions of use.  They have to find retail tenants to take

9  the space.  They've stepped up and said, we're ready to step

10  into your shoes.

11         This is not <u>Sun TV</u> where somebody just wanted to

12  dabble, but not commit.  We've got somebody who's committed,

13  I'm obligated by the lease, I will honor every term, and I

14  don't want anything changed.  And for that, they're paying the

15  estate value, and we believe that the estate should be able to

16  realize that value.  Thank you, Your Honor.

17         THE COURT:  All right.  Thank you.  Anything further,

18  Mr. Weitzman?

19         MR. WEITZMAN:  Nothing further, Your Honor.

20         THE COURT:  All right.  The Court has heard the

21  testimony and the argument of counsel.  The Court is going to

22  overrule the objection and approve the assignment -- assumption

23  and assignment of this lease.  The Court finds that Section

24  13.1 of the lease gives the landlord the right, after five

25  years, without the consent of the landlord, to assign the

**J&J COURT TRANSCRIBERS, INC.**

1  lease.   And I think that that provision is controlling.

2       I think that the assumption and assignment agreement

3  does obligate the assignee to abide by all of the terms and

4  conditions of the lease.   The landlord is getting the full

5  benefit of its bargain and can obviously enforce the lease

6  against the assignee, who will be fully liable for any breach

7  of the lease in the future if there was some attempt, which the

8  Court does not find there is, to operate something other than a

9  retail sales and services enterprise from the premises that are

10 being assigned.   So, for those reasons, the Court will approve

11 the assumption and assignment of the lease.

12      There was a question about the estoppel certificate.

13 Before you submit the order, I would like counsel to have an

14 opportunity to review the estoppel certificate.   If there is

15 any problem with the estoppel certificate, then you may each

16 submit your own versions of it and the Court will enter the

17 version that it thinks is appropriate.   Any question regarding

18 the Court's ruling?

19      MR. FOLEY:   No.   Thank you, Your Honor.   As to the

20 estoppel certificate, I don't think, once counsel gets a chance

21 to look at it -- I know he was just brought into this matter

22 recently -- I don't believe he's going to have any issues with

23 it.   It's very plain vanilla.

24      THE COURT:   Okay.

25      MR. WEITZMAN:   I have no other questions other than

55

1  to point out hopefully we'll resolve this cure issue.  It

2  sounds like it's --

3          THE COURT:  I certainly hope you will be able to, as

4  well.

5          MR. WEITZMAN:  Thank you.

6          THE COURT:  All right.

7                    *  *  *  *  *

8               **C E R T I F I C A T I O N**

9          I, RITA BERGEN, court approved transcriber, certify

10 that the foregoing is a correct transcript from the official

11 electronic sound recording of the proceedings in the

12 above-entitled matter, and to the best of my ability.

13

14 /s/ Rita Bergen                DATE:  June 23, 2009

15 RITA BERGEN

16 J&J COURT TRANSCRIBERS, INC.

17

18

19

20

21

22

23

24

25 (CR)

**J&J COURT TRANSCRIBERS, INC.**