LOCATION: 4910 S.Broadway
Tyler, Texas 75603
(Smith County)

LEASE

between

CIRCUIT CITY STORES, INC.,

as Tenant

and

WOLVERINE EQUITIES COMPANY 95A L. P.,

as Landlord

dated February 24, 1995





## Table of Contents

| | | |
|---|---|---|
| 1. | Certain Definitions | 1 |
| 2. | Demise of Premises | 5 |
| 3. | Term | 5 |
| 4. | Rent | 6 |
| 5. | Net Lease; True Lease | 7 |
| 6. | Title and Condition | 8 |
| 7. | Taxes; Insurance and Legal Requirements | 9 |
| 8. | Use | 10 |
| 9. | Maintenance and Repair | 11 |
| 10. | Liens | 13 |
| 11. | Alterations | 13 |
| 12. | Condemnation | 13 |
| 13. | Insurance | 17 |
| 14. | Damage, Destruction | 20 |
| 15. | Restoration | 21 |
| 16. | Subordination to Financing | 22 |
| 17. | Assignment, Subleasing | 24 |
| 18. | Permitted Contests | 27 |
| 19. | Default | 28 |
| 20. | Landlord's Remedies | 29 |
| 21. | Notices | 31 |

22.    Memorandum of Lease; Estoppel Certificates . . . . . . . . . . . . . . . . 32

23.    Surrender and Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

24.    No Merger of Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

25.    Landlord Exculpation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

26.    Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

27.    Entry by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

28.    Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

29.    No Usury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

30.    Broker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

31.    Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

32.    No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

33.    Separability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

34.    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

35.    Lender as Third Party Beneficiary . . . . . . . . . . . . . . . . . . . . . . . 39

36.    Tenant to Comply With Reciprocal Easement Agreement . . . . . . . . . . 39

37.    Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

38.    Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

39.    Successors, Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

40.    Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

41.    Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

42.    Transfer of Landlord's Interest . . . . . . . . . . . . . . . . . . . . . . . . . 40

43.    Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

THIS LEASE AGREEMENT is made as of this 24th day of February , 1995, by and between WOLVERINE EQUITIES COMPANY 95A L. P., a Texas limited partnership ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation, having its principal office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant hereby covenant and agree as follows:

1.    Certain Definitions.

(a)    "Additional Rent" shall mean all sums required to be paid by Tenant to Landlord or Lender hereunder other than Basic Rent, which sums shall constitute rental hereunder.

(b)    "Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining any of the Leased Premises.

(c)    "Alteration" or "Alterations" shall mean any or all changes, additions, improvements, reconstructions or replacements of any of the Improvements, both interior or exterior, and ordinary and extraordinary.

(d)    "Basic Rent" shall mean Basic Rent as defined in Paragraph 4.

(e)    "Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 4.

(f)    "Claim Deadline" shall mean the Claim Deadline as defined in paragraph 34.

(g)    "Commencement Date" shall mean the Commencement Date as defined in Paragraph 3.

(h)    "Condemnation" shall mean a Taking and/or a Requisition.

(i)    "Cross Defaulted Leases" shall be those leases with Landlord dated as of the date hereof affecting the premises (other than the Leased Premises) listed on Exhibit D attached hereto and made a part hereof.

(j)    "Default Rate" shall mean an annual rate of interest equal to two (2%) percent per annum above the therein current Prime Rate.

(k)    "Event of Default" shall mean an Event of Default as defined in Paragraph 19.

(l)    "Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy, and whenever Tenant shall be engaged in making any Alteration or Alterations, repairs or construction work of any kind (collectively, "Work"), the term "Insurance Requirement" or "Insurance Requirements" shall be deemed to include a requirement that Tenant obtain or cause its contractor to obtain completed value builder's risk insurance when the estimated cost of the Work in any one instance exceeds the sum of One Hundred Thousand ($100,000.00) Dollars and that Tenant or its contractor shall obtain worker's compensation insurance or other adequate insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or bodily injury claims could be asserted against Landlord.

(m)    "Law" shall mean any constitution, statute or rule of law.

(n)    "Leased Premises" shall mean the Leased Premises as defined in Paragraph 2.

(o)    "Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those which by their terms are not applicable to and do not impose any obligation on Tenant, Landlord or the Leased Premises) and all covenants, restrictions and conditions (including, without limitation, reciprocal easement agreements) now or hereafter of record which may be applicable to Tenant, to Landlord or to any of the Leased Premises, or to the ownership, use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or reconstruction of any of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the "Americans with Disabilities Act")

2




or results in interference with the use or enjoyment of any of the Leased Premises or (ii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

       (p)   "Lender" shall mean the entity identified from time to time, to Tenant as such in writing, which makes a Loan to Landlord, secured by a Mortgage and evidenced by a Note or which is the holder of a Mortgage and Note as a result of an assignment thereof.

       (q)   "Loan" shall mean a loan made by a Lender to Landlord secured by a Mortgage and evidenced by a Note.

       (r)   "Mortgage" shall mean a first priority mortgage, deed of trust or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender.

       (s)   "Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any actual and reasonable expenses incurred by Landlord in collecting such award.

       (t)   "Net Proceeds" shall mean the entire proceeds paid as a result of any property casualty payable under insurance required under Paragraph 13.(a), less any actual and reasonable expenses incurred by Landlord in collecting such proceeds.

       (u)   "Note" or "Notes" shall mean a promissory note or notes hereafter executed from Landlord to Lender, which Note or Notes will be secured by a Mortgage and an assignment of leases and rents.

       (v)   "Permitted Encumbrances" shall mean Taxes, Legal Requirements, any matters consented to by Tenant, those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of Landlord's acquisition thereof, whether recorded or unrecorded excepting, however, any such matters arising from the acts of Landlord (such as liens arising as a result of judgments against Landlord) unless consented to by Tenant or requested by Tenant under Section 6(d).

       (w)   "Prime Rate" shall mean the rate of interest announced publicly by Citibank, N.A. or its successor, from time to time, as Citibank, N.A.'s or such successor's base rate, or if there is no such base rate, then the rate of interest charged by Citibank, N.A. or such successor to its most creditworthy customers on commercial loans having a ninety (90) day duration.

3



(x)    "Rent" shall mean Basic Rent and Additional Rent, collectively.

(y)    "Requisition" shall mean any temporary condemnation or confiscation of the use or occupancy of any of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

(z)    "Restoration" shall mean the restoration of the Leased Premises after any Taking or damage by casualty, as nearly as possible to their value, condition and character immediately prior to such Taking or damage.

(aa)    "State" shall mean the State or Commonwealth in which the Leased Premises are situate.

(ab)    "Taking" shall mean any taking of any of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation.

(ac)    "Taxes" shall mean taxes of every kind and nature (including real, *ad valorem* and personal property, income, franchise, withholding, profits and gross receipts taxes), all charges and/or taxes for any easement or agreement maintained for the benefit of any of the Leased Premises, all general and special assessments, levies, permits, inspection and license fees, all water and sewer rents and other utility charges, all ground rents, and all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed upon or assessed, prior to or during the Term, against Landlord, Tenant or any of the Leased Premises as a result of or arising in respect of the ownership, occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Leased Premises, or the Basic Rent or Additional Rent, including without limitation, any gross income tax, sales tax, occupancy tax or excise tax levied by any governmental body on or with respect to such Basic Rent or Additional Rent.

(aa)    "Term" shall mean the initial term of this Lease, as extended pursuant to any renewal that has become effective.

4



(bb)    "Termination Date" shall mean the Termination Date as defined in Paragraph 12.(b).

(cc)    "Trade Fixtures" shall mean all warehouse racking systems, counters, cases, shelving and similar fixtures, which are owned by Tenant and used in the operation of the business conducted on the Leased Premises.

2.    Demise of Premises.  Landlord hereby leases, demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the Term or terms and upon the provisions hereinafter specified the following described property (collectively, the "Leased Premises"): (i) the premises described in Exhibit "A" attached hereto and made a part hereof together with the easements, rights and appurtenances thereunto belonging or appertaining (collectively, the "Land"); (ii) the buildings, structures, fixtures and other improvements constructed and to be constructed on the Land (collectively, the "Improvements"), together with all Alterations and other additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease excepting therefrom Tenant's Trade Fixtures.

3.    Term.  Tenant shall have and hold the Leased Premises for an initial term commencing on February 24, 1995 (the "Commencement Date") and ending on February 28, 2017 (the "Expiration Date").  Provided the Lease shall not have been terminated pursuant to the provisions hereof, this Lease and the Term thereof shall be automatically extended for two (2) renewal terms of ten (10) years each upon condition that (a) at the commencement of each renewal term, no Event of Default shall exist (provided, that, Landlord may, in its sole discretion, waive the conditions of this Section 3(a)) and (b) Tenant may cancel any renewal term by giving notice to Landlord in writing at least twelve (12) months prior to the expiration of the then current Term.  Upon the giving of such notice this Lease and the Term thereof shall terminate and come to an end on the expiration date of the then current Term.  Any such extension or renewal of the Term shall be subject to all of the provisions of this Lease, and all such provisions shall continue in full force and effect, except that the Basic Rent for each renewal term shall be the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof.  In the event that Tenant exercises its option to cancel any renewal Term as hereinabove provided, then Landlord shall have the right during the remainder of the Term then in effect to (i) advertise the availability of the Leased Premises

5



for sale or for reletting, and (ii) show the Leased Premises to prospective purchasers, lenders or tenants at such reasonable times during normal business hours as Landlord may select. If Tenant shall timely give such notice of its election to cancel any renewal option, then all options with regard to subsequent extensions or renewals of the Term shall expire and be null and void.

    4. <u>Rent</u>.

    (a) Tenant shall pay to Landlord or Lender, if directed by Landlord or Lender, as annual rent for the Leased Premises during the Term, the amounts determined in accordance with the schedule set forth in Exhibit "B" attached hereto and made a part hereof ("Basic Rent"), which rent shall be paid in equal monthly installments commencing on the last day of the first month next following the Commencement Date and continuing on the last day of each month thereafter during the Term (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place or to such other person or persons (not exceeding four (4) in number) and in such proportions as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America and if required by Landlord or Lender by wire transfer in immediately available federal funds to such account in such bank as Landlord or Lender shall designate from time to time. Pro rata Basic Rent shall be due for the period from and including the Commencement Date to the first day of the month next following the Commencement Date computed as set forth in Exhibit "B" and shall be paid in advance on the Commencement Date, except that if the Commencement Date shall occur on the first day of a calendar month, the full monthly installment of Basic Rent for such first month shall be paid on the last day of the month in which the Commencement Date shall occur.

    (b) If any installment of Basic Rent is not paid on the date due, Tenant shall pay Landlord interest on such overdue payment at the Default Rate, accruing from the due date of such payment until the same is paid.

    (c) Tenant shall pay and discharge before the imposition of any fine, lien, interest or penalty may be added thereto for late payment thereof, as Additional Rent, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added by the party

6



to whom such payment is due for nonpayment or late payment thereof. In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of nonpayment of Basic Rent.

   5. <u>Net Lease: True Lease</u>. (a) It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events, and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease. This is a net Lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense, except as otherwise specifically set forth herein. Tenant shall pay all operating expenses related to the leasing, use, occupancy, management, maintenance, repair, operation or possession of the Leased Premises, and to the extent required hereunder, Taxes and insurance costs. This Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term (except as otherwise expressly provided herein). Tenant agrees that, except as otherwise expressly provided herein, it shall not take any action to terminate, reject, rescind or avoid this Lease, notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, Tenant or any assignee or subtenant of Tenant, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, or (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise, or (iv) the conditions of the Leased Premises. Tenant waives all rights which are not expressly stated herein but which may now or hereafter otherwise be conferred by law to quit, terminate or surrender this Lease or any of the Leased Premises; to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable

7



under this Lease, except as otherwise expressly provided herein; and for any statutory lien or offset right against Landlord or its property.

(b) Landlord and Tenant agree that this Lease is a true lease and does not represent a financing arrangement. Each party shall reflect the transaction represented hereby in all applicable books, records and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

6.    Title and Condition.

(a)    The Leased Premises are demised and let subject to the Permitted Encumbrances and all Legal Requirements and Insurance Requirements, including any existing violation of any thereof; without representation or warranty by Landlord; it being understood and agreed, however, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any thereof which for any reason may have expired.

(b) **EXCEPT FOR LANDLORD'S WARRANTY SET FORTH IN PARAGRAPH 8.(c), THE LANDLORD MAKES NO, AND EXPRESSLY HEREBY DENIES ANY, REPRESENTATIONS OR WARRANTIES REGARDING THE CONDITION OR SUITABILITY OF, OR TITLE TO, THE LEASED PREMISES. TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, TENANT WAIVES ANY RIGHT OR REMEDY OTHERWISE ACCRUING TO TENANT ON ACCOUNT OF THE CONDITION OR SUITABILITY OF THE LEASED PREMISES, OR (EXCEPT WITH RESPECT TO LANDLORD'S WARRANTY SET FORTH IN PARAGRAPH 8(C)) TITLE TO THE LEASED PREMISES, AND TENANT AGREES THAT IT TAKES THE LEASED PREMISES "AS IS," WITHOUT ANY SUCH REPRESENTATION OR WARRANTY.**

(c)    Landlord hereby conditionally assigns, without recourse or warranty whatsoever, to Tenant, all warranties, guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of any of the Leased Premises, including, but not limited to, any rights and remedies existing under contract or pursuant to the Uniform Commercial Code (collectively, the "guaranties"). Such assignment shall remain in effect so long as no Event of Default exists hereunder or until the termination of this Lease. Landlord shall also retain the right (but without

8



any obligation to do so) to enforce any guaranties assigned in the name of Tenant or Landlord upon the occurrence of an Event of Default. Landlord hereby agrees to execute and deliver at Tenant's expense such further documents, including powers of attorney (which shall contain indemnity agreements from Tenant to Landlord which shall be in form reasonably satisfactory to Landlord), as Tenant may reasonably request (and which in the good faith judgment of Landlord, do not adversely affect a substantial general interest of Landlord), in order that Tenant may have the full benefit of the assignment of guaranties effected or intended to be effected by this Paragraph 6(c). Upon the occurrence of an Event of Default or termination of this Lease, the guaranties shall automatically revert to Landlord. The foregoing provision of reversion shall be self-operative and no further instrument of reassignment shall be required. In confirmation of such reassignment Tenant shall execute and deliver promptly any certificate or other instrument which Landlord may request. Any monies collected by Tenant under any of the guaranties after the occurrence of and during the continuation of an Event of Default shall be held in trust by Tenant and promptly paid over to Landlord.

(d)    Landlord agrees to enter into with Tenant, at Tenant's expense, such easements, covenants, waivers, approvals or restrictions for utilities, parking or other matters as desirable for operation of the Leased Premises or properties adjacent thereto (collectively, "Easements") as requested by Tenant, subject to Lender's and Landlord's approval of the form thereof, not to be unreasonably withheld or delayed; provided, however, that no such Easement shall result in any diminution in the value or utility of the Leased Premises for use as a retail store site and further provided that no such Easement shall render the use of the Leased Premises dependent upon any other property or condition the use of the Leased Premises upon the use of any other property. If either Landlord or Lender shall fail to approve or disapprove the form of any such Easements, within a period of thirty (30) days from receipt, then either Landlord or Lender, as the case may be, shall be deemed to have approved the form of any such Easement.

7.    Taxes; Insurance and Legal Requirements .

(a) .    Tenant shall, subject to the provisions of Paragraph 18 hereof relating to contests, before interest or penalties are due thereon, pay and discharge all Taxes. Landlord shall promptly deliver to Tenant any bill or invoice it receives with respect to any Tax.

9



Nothing herein shall obligate Tenant to pay, and the term "Taxes" shall exclude, federal, state or local (i) franchise, capital stock or similar taxes if any, of Landlord, (ii) income, excess profits or other taxes, if any, of Landlord, determined on the basis of or measured by its net income, or (iii) any estate, inheritance, succession, gift, capital levy or similar taxes unless the taxes referred to in clauses (i) and (ii) above are in lieu of or a substitute for any other tax or assessment upon or with respect to any of the Leased Premises which, if such other tax or assessment were in effect at the commencement of the Term, would be payable by Tenant. In the event that any assessment against any of the Leased Premises may be paid in installments, Tenant shall have the option to pay such assessment in installments; and in such event, Tenant shall be liable only for those installments which become due and payable in respect of the Term. Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Taxes. Tenant shall deliver to Landlord, within twenty (20) days of Landlord's request therefor, copies of all settlements and notices pertaining to the Taxes which may be issued by any governmental authority and receipts for payments of all Taxes made during each calendar year of the Term, within thirty (30) days after payment.

(b)    Tenant shall promptly comply with and conform to all of the Legal Requirements and Insurance Requirements, subject to the provisions of Paragraph 18 hereof.

8.    Use.

(a)    Tenant may use the Leased Premises for any lawful purpose other than any use that will (i) have an adverse effect on the value of the Leased Premises, (ii) increase the likelihood that Landlord or Lender would incur liability under any provisions of the Acts referred to in Paragraph 26 of this Lease, or (iii) result or give rise to any material environmental deterioration or degradation of the Leased Premises. In no event shall the Leased Premises be used for any purpose which shall violate any of the provisions of any recorded covenants, restrictions or agreements applicable to the Leased Premises or to any shopping center of which the Leased Premises may be a part. Tenant agrees that with respect to any such recorded covenants, restrictions or agreements, Tenant shall observe, perform and comply with and carry out the provisions thereof required therein to be observed and performed by Landlord.

(b)    Tenant shall not permit any unlawful occupation, business or trade to be conducted on any of the Leased Premises or any use to be made thereof contrary to

10



applicable Legal Requirements or Insurance Requirements. Tenant shall not use, occupy or permit any of the Leased Premises to be used or occupied, nor do or permit anything to be done in or on any of the Leased Premises, in a manner which would (i) violate any certificate of occupancy or equivalent certificate affecting any of the Leased Premises, (ii) make void or voidable any insurance which Tenant is required hereunder to maintain then in force with respect to any of the Leased Premises, (iii) affect in any manner the ability of Tenant to obtain any insurance which Tenant is required to furnish hereunder, (iv) cause any injury or damage to any of the Improvements unless pursuant to Alterations permitted under Paragraph 11 hereof, or (v) constitute a public or private nuisance or waste.

(c)    Subject to all of the provisions of this Lease, so long as no Event of Default exists hereunder, Landlord covenants that neither it nor any party claiming by, through or under it, shall do any act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant, provided that Landlord may enter upon and examine any of the Leased Premises at reasonable times after reasonable notice and during business hours and exercise any rights and privileges granted to Landlord under the provisions of this Lease.

9.    Maintenance and Repair.

(a)    Except for any Alterations that Tenant is permitted to make hereunder, Tenant shall at all times, including without limitation, any Requisition period, put, keep and maintain the Leased Premises, including, without limitation, the roof, landscaping, walls, footings, foundations, HVAC, mechanical and electrical systems in or serving the Leased Premises and structural and nonstructural components and systems of the Leased Premises, and the Adjoining Property, in good repair and appearance, and shall promptly make all repairs and replacements (substantially equivalent in quality and workmanship to the original work) of every kind and nature, whether foreseen or unforeseen, which may be required to be made upon or in connection with any of the Leased Premises in order to keep and maintain the Leased Premises in as good repair and appearance as they were originally, except for ordinary wear and tear. Tenant shall do or cause others to do all shoring of the Leased Premises or Adjoining Property or of foundations and walls of the Improvements and every other act necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon any of the Leased Premises or Adjoining Property,

11



whether or not Landlord shall, by reason of any Legal Requirements or Insurance Requirements, be required to take such action or be liable for failure to do so. Landlord shall not be required to make any repair, replacement, maintenance or other work whatsoever, whether foreseen or unforeseen, or to maintain any of the Leased Premises or Adjoining Property in any way, and Tenant hereby expressly waives the right to make repairs, replacements or to perform maintenance or other work at the expense of the Landlord, which right may be provided for in any law now or hereafter in effect. Nothing in the preceding sentence shall be deemed to preclude Tenant from being entitled to insurance proceeds or condemnation awards for Restoration pursuant to the terms of this Lease. Tenant shall, in all events, make all repairs, replacements and perform maintenance and other work for which it is responsible hereunder promptly, and all repairs, replacements, maintenance and other work shall be in a good, proper and workmanlike manner.

(b)    If Tenant shall be in default under any of the provisions of this Paragraph 9, Landlord may, after thirty (30) days notice to Tenant and failure of Tenant to commence to cure during said period or to diligently prosecute such cure to completion once begun, but immediately upon notice in the event of an emergency, do whatever is necessary to cure such default as may be reasonable under the circumstances for the account of and at the expense of Tenant. In the event of an emergency, before Landlord may avail itself of its rights under this Paragraph 9(b), Landlord shall send notice to Tenant of the situation by phone or other available communication. All actual and reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred by Landlord, together with interest thereon at the Default Rate from the date of payment or incurring the expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand.

(c)    Tenant shall from time to time replace with other operational equipment or parts any of the mechanical systems or other equipment included in the Improvements which shall have become worn out, obsolete or unusable for the purpose for which it is intended, been taken by a Condemnation, or been lost, stolen, damaged or destroyed. Tenant shall repair at its sole cost and expense all damage to the Leased Premises caused by the removal of equipment or other personal property of Tenant.

12

10.    <u>Liens</u>.  Tenant shall not, directly or indirectly, create or permit to be created or to remain, and shall promptly discharge, any lien on any of the Leased Premises, on the Basic Rent, Additional Rent or on any other sums payable by Tenant under this Lease, other than the Mortgage (and any assignment of leases or rents collateral thereto), the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting from any act or omission by Landlord or those claiming by, through or under Landlord (except Tenant).

11.    <u>Alterations</u>.  Tenant shall not make any Alterations which would result, after giving consideration to the completed Alteration, in a diminution in the value of the Leased Premises, without Landlord's written consent.  Tenant may make any other Alterations without the prior written consent of the Landlord provided such Alterations comply with all of the provisions of the following sentence.  In the event that Landlord gives its prior written consent to any Alterations, or if such consent is not required, Tenant agrees that in connection with any Alteration (i) all such Alterations shall be performed in a good and workmanlike manner, and shall be expeditiously completed in compliance with all Legal Requirements, (ii) all work done in connection with any such Alteration shall comply with all Insurance Requirements, (iii) Tenant shall promptly pay all costs and expenses of any such Alteration, and shall discharge all liens filed against any of the Leased Premises arising out of the same, (iv) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, (v) all such Alterations shall be the property of Landlord and shall be subject to this Lease, and (vi) any Alteration the estimated cost of which in any one instance exceeds Two Hundred Fifty Thousand Dollars ($250,000.00) shall be made under the supervision of a licensed architect or engineer in accordance with detailed plans and specifications which shall be submitted to Landlord at least ten (10) days prior to the commencement of the Alterations.

12.    <u>Condemnation</u>.

(a)    Immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, Tenant shall notify Landlord thereof and Landlord shall be entitled to participate in any Condemnation proceeding at Tenant's expense.  Landlord, immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Tenant thereof and Tenant shall have the right to participate in such proceedings at

13



its own expense.  Subject to the provisions of this Paragraph 12 and Paragraph 15, Tenant hereby irrevocably assigns to Lender or to Landlord, in that order, any award or payment in respect of any Condemnation of the Leased Premises, except that nothing in this Lease shall be deemed to require (i) the assignment to Landlord or Lender any award or payment on account of Tenant's leasehold interest hereunder, Tenant's Trade Fixtures, or other tangible personal property, moving expenses and similar claims, if available, to the extent Tenant shall have a right to make a separate claim therefor against the condemnor or (ii) any act or circumstance that impairs Tenant's right to any such award or payment.  All reasonable costs and expenses incurred by Landlord after notice to Tenant that such costs will be incurred in any condemnation proceeding shall be paid by Tenant within ten days after demand as Additional Rent.

        (b)     If (i) the entire Leased Premises or (ii) at least ten percent (10%) of the Land or the building constructed on the Land, the loss of which even after restoration would, in Tenant's reasonable business judgment, be substantially and materially adverse to the business operations of Tenant at the Leased Premises, shall be subject of a Taking by a duly constituted authority or agency having jurisdiction, then Tenant shall, not later than sixty (60) days after a Taking has occurred, serve notice upon Landlord and Lender ("Tenant's Termination Notice") of its intention to terminate this Lease on any Basic Rent Payment Date specified in such notice, which date (the "Termination Date") shall be no sooner than the first, nor later than the third, Basic Rent Payment Date occurring at least thirty (30) days after the date of Tenant's Termination Notice.  In the event that during the initial term Tenant shall serve such notice upon Landlord and Lender of its intention to terminate this Lease on the Termination Date, Tenant shall, as part of such notice, offer (which offer may be rejected by Landlord as set forth below) to purchase the Leased Premises and the award, or if no part of the Leased Premises shall remain, the entire award for the applicable price computed in accordance with the schedule annexed hereto and marked Exhibit "C" (the "Purchase Price") plus all other amounts which may be due and owing to Lender or Landlord as Additional Rent or by reason of any default by Tenant in complying with its obligations under this Lease (the "Additions to Purchase Price").  Any such Tenant's Termination Notice served upon Landlord and Lender without the offer to purchase as described above shall nevertheless be deemed to include an offer to purchase as described above.  If Landlord and Lender shall not elect to accept Tenant's said

14

offer to purchase, Landlord shall give notice rejecting such offer to Tenant within thirty (30) days after the giving of Tenant's Termination Notice, in which case this Lease shall be terminated as above provided and the entire award made in the Condemnation proceeding shall be paid to Lender, or if there is no Lender, to Landlord or, if the amount of such award is greater than the amount owing to Lender, the excess shall be paid to Landlord.  If there is a Lender on the date of Tenant's Termination Notice, Landlord's notice to reject Tenant's said offer to purchase shall be void and of no effect unless accompanied by the written notice of Lender to the effect that Lender also elects not to accept Tenant's said offer to purchase.  Should said notices of Landlord and Lender rejecting Tenant's said offer to purchase not be served within said period of thirty (30) days, then and in that event, the said offer shall be deemed accepted.

In the event that Landlord and Lender shall accept or be deemed to have accepted Tenant's offer to purchase, title shall close and Purchase Price and Additions to Purchase Price shall be paid as hereinafter provided and in such event Tenant shall be entitled to and shall receive any and all awards then or thereafter made in the Condemnation proceeding and Landlord shall assign or in case of any award previously made with respect to such Condemnation, deliver to Tenant on the Closing Date such award as may be made, provided, that this Lease shall not terminate and Tenant's obligations hereunder shall continue until the purchase of the Property by Tenant has closed.  In the event Landlord and Lender shall accept Tenant's offer to purchase, or be deemed to have accepted Tenant's offer, title shall close thirty (30) days after the Termination Date hereinbefore defined (the "Closing Date"), at noon at the local office of Landlord's counsel, or at such other time and place as the parties hereto may agree upon, this Lease shall be automatically extended to and including the Closing Date (or, if applicable, the extended Closing Date hereinafter described) and Tenant shall pay the Purchase Price and Additions to Purchase Price by transferring immediately available federal funds to such account or accounts and in such bank or banks as Lender or Landlord, in that order, shall designate, upon delivery of a special warranty deed conveying the Leased Premises and all other required documents including an assignment of any award in connection with such Taking.  The special warranty deed shall convey a good and clear record and marketable title, free from encumbrances other than (i) Permitted Exceptions, (ii) liens or encumbrances created or suffered

15

through or by Tenant failing to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (iii) any installments of Taxes due and payable after the Closing Date, and (iv) this Lease. Such deed shall contain an agreement by grantee to observe and perform all of the covenants, conditions and restrictions contained in any instruments of record which apply with respect to any Permitted Exceptions. The Purchase Price and Additions to Purchase Price payable as hereinabove provided shall be charged or credited, as the case may be, on the Closing Date, to reflect adjustments of Basic Rent paid or payable to and including the Closing Date, apportioned as of the Closing Date. The acceptance of a deed by Tenant shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Landlord to be performed pursuant to the provisions hereof. Tenant shall pay all conveyance, transfer, sales and like taxes and other governmentally-imposed fees and charges required in connection with the purchase.

In the event that during any renewal term Tenant shall serve Tenant's Termination Notice upon Landlord, this Lease and the Term hereof shall terminate on the Termination Date. In such event the entire award made in Condemnation proceeding shall be paid to Lender, or to Landlord, in that order.

(c)    In the event of any other Condemnation of part of the Leased Premises which does not result in a Termination of this Lease, subject to the requirements of Paragraph 15, the Net Award of such Condemnation, *i.e.*, after deducting therefrom all expenses incurred in the collection thereof, shall be retained by Landlord and, promptly after such Condemnation, Tenant shall commence and diligently continue to perform the Restoration of the Leased Premises.

Upon the payment to Landlord of the Net Award of a Taking which falls within the provisions of this subparagraph (c), Landlord and Lender shall, to the extent received, make that portion of the Net Award equal to the cost of Restoration, (the "Restoration Award") available to Tenant for Restoration, in accordance with the provisions of Paragraph 15, and at Landlord's election of which Landlord shall advise Tenant in writing promptly after the completion of the Restoration either (i) the balance remaining (the "Net surplus award") shall be the property of Lender or Landlord in that order, and the monthly installment of Basic Rent for each month thereafter during the term hereof shall be reduced by an amount equal to one-

16





twelfth (1/12) of 10.47 percent (if during the initial term hereof; if during the first renewal term 11.52 percent and if during the second renewal term 12.56 percent) of the net surplus award retained by Landlord or paid to Lender, or (ii) the net surplus award shall be paid to Tenant and all Rent shall continue unabated.

In the event of a Requisition of any of the Leased Premises, the Net Award of such Requisition shall be paid to Tenant to the extent such amount relates to any period within the Term, and all Rent shall continue unabated.

(d) Except with respect to an award or payment to which Tenant is entitled pursuant to the foregoing provisions of this Paragraph 12, no agreement with any condemnor in settlement of or under threat of any Condemnation shall be made by either Landlord or Tenant without the written consent of the other, and of Lender, if the Leased Premises are then subject to a Mortgage, which consent shall not be unreasonably withheld or delayed.

(e) In the case of any Condemnation proceeding, all Rent obligations shall continue unabated (except for a reduction of Basic Rent pursuant to Landlord's election under subparagraph (c) above) until the termination of this Lease or Tenant's purchase of the Leased Premises pursuant to Section 13(b).

13.  Insurance.

(a) Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i) Insurance against loss or damage to the Improvements under an All Risk Policy (which shall include windstorm, flood, and earthquake coverage if the Leased Premises is located in an area in which such hazards are customarily insured against by prudent commercial property owners), which may contain such exclusions as are standard in the industry, in amounts to prevent Landlord or Tenant from becoming a co-insurer under the applicable policies, and in any event in amounts not less than the actual replacement cost of the Improvements (excluding footings and foundations and parts of the Improvements which are not insurable).

(ii) Contractual and comprehensive general liability insurance against claims for bodily injury, death or property damage occurring on, in or about any of the

17

Leased Premises or the Adjoining Property, which insurance shall be written on a so-called
"occurrence basis," and shall provide minimum protection with a combined single limit in an
amount not less than the greater of (x) Five Million ($5,000,000) Dollars (or in such increased
limits from time to time to reflect declines in the purchasing power of the dollar as Landlord
may reasonably request) or (y) the aggregate amount of such insurance carried by Tenant, for
bodily injury, death and property damage in any one occurrence.

(iii)   Worker's compensation insurance covering all persons
employed by Tenant on the Leased Premises in connection with any work done on or about any
of the Leased Premises.

(b)     During such time as no Event of Default is outstanding hereunder,
and the tangible net worth of Tenant shall be not less than Two Hundred Million
($200,000,000.00) Dollars as determined in accordance with generally accepted accounting
principles consistently applied, Tenant may self-insure the coverage referred to in Paragraph
13(a), provided that the self insurance program of this subparagraph (b) does not violate any
Legal Requirements applicable to the Leased Premises or Tenant. Tenant shall provide annually
to the Landlord a certificate indicating its decision to self-insure together with the evidence that
self-insurance is permitted hereunder, all in form reasonably satisfactory to Landlord.

(c)     The insurance required by Paragraph 13(a) shall be written by
companies having a Best's rating of at least B during such time as Tenant shall have such
tangible net worth of not less than Two Hundred Million ($200,000,000) Dollars and at all other
times written by companies having a Best's rating of A- and all such companies shall be
authorized to do an insurance business in the State or otherwise agreed to by Landlord and
Lender. Sums due from Tenant in lieu of insurance proceeds because of such self-insurance
programs shall be treated as insurance proceeds for all purposes under this Lease. The insurance
policies shall be for a term of not less than one year,  and shall (except for worker's
compensation insurance) name Landlord, Tenant and any Lender as additional insured parties
and/or loss payees, as appropriate, as their respective interests may appear.  If said insurance
or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof
by Tenant or become void or unsafe by reason of the failure or impairment of the capital of any

18

 

insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and Lender.

(d)     Each insurance policy referred to above shall, to the extent applicable, contain standard non-contributory mortgagee clauses in favor of any Lender. The certificate delivered by Tenant in respect of each policy shall provide that it may not be cancelled except after 30 days prior notice to Landlord and any Lender. The certificate delivered by Tenant in respect of each policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Lender pursuant to any provision of the Mortgage upon the happening of an event of default therein, or (iv) any change in title or ownership of any of the Leased Premises.

(e)     Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 13, shall renew or replace each policy, and shall deliver to Landlord and Lender, a certificate or other evidence (reasonably satisfactory to Lender and Landlord) of the existing policy and such renewal or replacement policy within 30 days following such renewal or replacement. The certificate delivered by Tenant in respect of each such policy shall provide that it shall not expire until the Landlord and Lender shall receive a notice from the insurer to the effect that a policy will expire on a date (the "Policy Expiration Date") which shall be thirty (30) days following the date of notice to Landlord and Lender. In the event of Tenant's failure to comply with any of the foregoing requirements of this Paragraph 13, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(f)     Anything in this Paragraph 13 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 13(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 13.

19



In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender a certified copy of those provisions of the blanket policy that pertain to the Leased Premises, if any, to evidence the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 13.

14.    Damage, Destruction.

(a)    In the event of any casualty loss exceeding $100,000, Tenant shall give Landlord immediate notice thereof. Tenant shall adjust, collect and compromise any and all such claims, with the consent of Lender and Landlord, not to be unreasonably withheld or delayed and Landlord and Lender shall have the right to join with Tenant therein. If the estimated cost of Restoration or repair shall be Five Hundred Thousand ($500,000.00) Dollars or less, all proceeds of any insurance required under Paragraph 13(a) shall be payable to Tenant, provided that Tenant at such time shall have a tangible net worth of not less than Two Hundred Million Dollars ($200,000,000.00) as determined in accordance with generally accepted accounting principles, consistently applied, and in all other events to a Trustee which shall be a federally insured bank or other financial institution, selected by Landlord and Tenant and reasonably satisfactory to Lender (the "Trustee"). If the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee. Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant hereby appoints such Trustee as Tenant's attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease after approval by Tenant of such Trustee, if Trustee is other than Lender.

(b)    In the event of any casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder. The Net Proceeds of such insurance payment shall be retained by the above-mentioned Trustee and, promptly after such casualty, Tenant shall commence and diligently continue to perform the Restoration to the Leased Premises. Upon payment to the Trustee of such Net Proceeds, the Trustee shall, to the extent available, make the Net Proceeds available to Tenant for restoration, in accordance with the provisions of

20



Paragraph 15. Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace the Improvements in accordance with the provisions of this Lease (including Tenant's making any desired Alterations allowed hereunder) and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof.

(c)    In the event that any damage or destruction shall be subject to the self insurance provisions provided for in 13(b), Tenant shall pay to the Trustee the amount of the proceeds that would have been payable had such self insurance program not been in effect (the "Tenant Insurance Payment").

15.    Restoration. The Net Proceeds, Restoration Award and Tenant Insurance Payment (the aggregate of which being herein defined as the "Restoration Fund") shall be disbursed by the Trustee in accordance with the following conditions:

(a)    At the time of any disbursement, no Event of Default shall exist, no default on Tenant's part with respect to the payment of money shall exist (regardless whether such default has ripened into an Event of Default) and no construction, mechanics' or materialmen's liens shall have been filed and remain undischarged and unbonded.

(b)    If the cost of Restoration exceeds $250,000 prior to commencement of the Restoration, the architects, contracts, contractors, plans and specifications for the Restoration shall have been approved by Landlord and Lender, which approval shall not be unreasonably withheld or delayed.

(c)    Each request for disbursement shall be accompanied by a certificate of Tenant, signed by the President, Treasurer or any Vice President of Tenant, describing the work for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been completed and complies with the applicable requirements of this Lease.

(d) Disbursements shall be made from time to time in an amount not exceeding the cost of the work completed since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (2) waivers of liens, (3) a

21





satisfactory bring down of title insurance, and (4) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed in place and free and clear of mechanics', construction and materialmen's lien claims.

(e)    The Trustee may retain ten percent of the Restoration Fund until the Restoration is fully completed in the reasonable judgment of the Lender.

(f)    The Restoration Fund shall be kept in a separate interest-bearing federally insured account by the Trustee or by Lender.

Prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord, exceeds the amount of the Restoration Fund, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund or, upon Landlord's approval, Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration. Except for the payment to Landlord of the net surplus award, referred to in Paragraph 12(c), any sum in the Restoration Fund which remains in the Restoration Fund upon the completion of Restoration and payment in full of all amounts due with respect thereto, shall be paid to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or the Restoration Award shall be deemed to be disbursed prior to any amount added by Tenant.

16.    Subordination to Financing.

(a)    Subject to the following provisions of this Paragraph 16(a), Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination. So long as no Event of Default shall be outstanding, Tenant's tenancy shall not be disturbed, nor shall this Lease be affected by any default under such Mortgage, and in the event of a foreclosure or other enforcement of any such Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the Term of this Lease and any extensions thereof, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default by Tenant has occurred and is continuing. So long as no Event of

22

 

Default by Tenant has occurred and is continuing, Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law. Any Mortgage to which this Lease is now or hereafter subordinate shall provide, in effect, that during the time this Lease is in force insurance proceeds and Restoration Award shall be permitted to be used for restoration in accordance with the provisions of this Lease. Notwithstanding an Event of Default, the provisions of this Paragraph 16.(a) shall continue to apply for the benefit of any Qualified Subtenant referred to in Paragraph 17.(c).

(b)    Notwithstanding the provisions of subdivision (a) of this Paragraph 16, the holder of the Mortgage to which this Lease is subject and subordinate, as provided in said subdivision (a), shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to this Lease by recording a unilateral declaration to such effect.

(c)    At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16(a) above, to attorn, from time to time, to any such owner or Lender, upon the then executory terms and conditions of this Lease, for the remainder of the Term originally demised in this Lease and for any renewal term, provided that such owner or Lender, shall then be entitled to possession of the Leased Premises subject to the provisions of this Lease. The provisions of this subdivision (c) shall enure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions. Tenant, any owner and Lender, however, upon demand of the other, hereby agrees to execute, from time to time, instruments in confirmation of the foregoing provisions of subdivisions (a) and (c), reasonably satisfactory to the requesting party acknowledging such subordination, non-disturbance and attornment as are provided in such subsections and setting forth the terms and conditions of its tenancy.

(d)    Tenant agrees that, if requested by Landlord, Tenant shall, without charge, enter into (i) a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Lender, provided such agreement contains provisions relating to non-disturbance

23

 

in accordance with the provisions of subparagraph (a), and (ii) an agreement with Lender whereby Tenant shall agree for the benefit of Lender that Tenant will not, without in each case the prior written consent of Lender, (a) amend, modify, cancel or surrender the term of this Lease except as expressly permitted by the provisions of this Lease, or enter into any agreement with Landlord so to do, or (b) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

17.    Assignment, Subleasing.

(a)    The Leased Premises may be sublet in whole or in part without the consent of Landlord.  Except as expressly permitted below, Tenant shall not assign its interest in this Lease without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.  The net worth, credit and financial responsibility of the proposed assignee shall not be considered by Landlord in determining whether to grant or withhold its consent to the proposed assignment. The assignment of this Lease by Tenant named herein to any purchaser of all or substantially all of the Circuit City Stores in the State shall not require the prior written consent of Landlord.  Assignment of this Lease by Tenant to a parent, subsidiary or affiliate of Tenant shall not require the consent of Landlord.  An "affiliate" of Tenant shall mean any corporation, partnership or other business entity which controls or is controlled by, or is under common control with Tenant.   The word "control" (including "controlled by," "under common control with" and "controlling") as used with respect to any corporation, partnership or other business entity, shall mean the possession of the power to direct or cause the direction of the management and policies of such corporation, partnership or other business entity, whether through the ownership of voting securities or contract.

(b)    Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease.  No assignment or sublease made as permitted by this Paragraph 17 or otherwise, shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made.  Tenant agrees that in the case of an assignment, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Landlord (i) a duplicate original of such assignment in recordable form and (ii) an agreement executed and acknowledged

24

by the assignee in recordable form wherein the assignee shall agree to assume and agree to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such assignment, and, in the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord a duplicate original of such sublease.

(c)    Landlord recognizes that there may currently be constructed or Tenant may intend to construct certain leasable space (the "Spec Space") at the Leased Premises other than the portion of the Leased Premises currently operated as a Circuit City Store, which Spec Space is or shall be either a separate building or connected to the other Improvements but separated therefrom by a demising wall, for the specific purpose of generating sublease income to the Tenant. Any such additional Spec Space shall be constructed at Tenant's sole cost and expense, and such construction shall be deemed an Alteration under this Lease and shall be performed in accordance with the terms of this Lease, however, Landlord agrees that Paragraph 11(vi) shall not apply to the construction of the Spec Space. Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into a nondisturbance and attornment agreement with any Qualified Subtenant, as defined below, of the Spec Space (a "Shop Tenant") or any Qualified Subtenant of the entire portion (the "Anchor Space") of the Leased Premises currently operated by Circuit City as a Circuit City retail store (an "Anchor Tenant") upon the terms described below, pursuant to which Landlord shall agree, for so long as such Qualified Subtenant is not in default under its Qualified Sublease, as defined below, that the Qualified Sublease shall not be terminated as a result of any termination of this Lease and such Qualified Subtenant's use and occupancy of the premises demised pursuant to the Qualified Sublease shall not be disturbed by Landlord, and pursuant to which such Qualified Subtenant shall agree to attorn to Landlord or its successor as landlord under the Qualified Sublease upon any termination of this Lease. Said agreement shall further provide that nothing therein contained shall impose any obligation on the Landlord, the then owner or the Lender to (a) return or apply any security deposited under such sublease, unless such security shall be transferred and turned over to the Landlord, such then owner or Lender or its successors, (b) expend any sums to make any installations or alterations provided to be made by the sublessor under said sublease or reimburse the subtenant under said sublease for any installations or

25

alterations made by it, (c) be liable for any act or omission of any prior sublessor except that the foregoing shall not prevent any subtenant's exercising any right of termination (and, with respect to any Shop Tenant, any right of substitute cure and resulting offsets against rent) as the result of any continuing default of the prior sublessor relating to its repair, maintenance or service obligations under the Qualified Sublease, (d) be subject to any offsets or defense which such subtenant might have against any prior sublessor, (e) be bound by any rent or additional rent which such subtenant might have paid for more than the current rent (which shall not be paid more than one month in advance) to any prior sublessor, or (f) be bound by any amendment or modification of the sublease made without the prior written consent of Landlord, the terms of which amendment or modification if included in the original sublease would have prevented such sublease from meeting the criteria for a Qualified Sublease.  Any subtenant under a Qualified Sublease, as defined below, is a "Qualified Subtenant."  With respect to any Spec Space, a "Qualified Sublease" shall be any sublease of the Spec Space, or any portion thereof that (w) requires the tenant thereunder to pay at least its pro rata share (based on the portion of the gross leasable area at the Leased Premises demised under the Qualified Sublease) of Taxes assessed against the Leased Premises and common area facility and maintenance costs and operating expenses incurred with respect to the Leased Premises (which payment amounts may be included in the rent such Qualified Subtenant is required to pay), (x) exculpates the Landlord, its successor and assigns (including any mortgagee of Landlord or purchaser at sale pursuant to foreclosure under any mortgage granted by Landlord) from all personal liability whatsoever under the Qualified Sublease regardless of whether Landlord or such successor or assign becomes the landlord under the Qualified Sublease, and (y) requires such Qualified Subtenant to maintain the nonstructural components of the premises demised under the Qualified Sublease in accordance with the maintenance standards set forth in this Lease, and (z) requires the Qualified Subtenant to maintain insurance coverage in accordance with the standards set forth in paragraph 13 (or reimburse the sublessor for maintaining such coverage).  With respect to the Anchor Space, a "Qualified Sublease" shall be any "bond" or "absolute net" sublease (that is, a sublease that requires the uninterrupted payment of rent without offset or diminution and that places no obligations upon the sublessor thereunder other than those of the type placed upon Landlord hereunder) of the entire Anchor Space expiring no later than the last day of the second

26

 

renewal period hereunder pursuant to which the subtenant thereunder had, at the time such sublease was entered into, a Standard & Poor's investment grade rating of at least BBB- or a Moody's investment grade rating of at least Baa3 (or equivalent rating of any other generally recognized rating organization) and was not on credit watch and pursuant to which the subtenant thereunder is required to fulfill all of the obligations of Tenant hereunder with respect to the anchor space, including, without limitation, payment of rent at a rate equal to or greater than the rate at which Tenant is required to pay Rent (including all Additional Rent) hereunder.

(d)    Upon the occurrence of an Event of Default under this Lease, Landlord shall have the right to collect and enjoy all rents and other sums of money payable under any sublease of any of the Leased Premises, and Tenant hereby irrevocably and unconditionally assigns such rents and money to Landlord, which assignment may be exercised upon and after (but not before) the occurrence of an Event of Default.

18.    Permitted Contests.  Notwithstanding any provision of this Lease to the contrary, after prior written notice to Landlord, Tenant shall not be required to (i) pay any Tax, (ii) comply with any Legal Requirement, or (iii) discharge or remove any lien, so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (v) the collection of, or other realization upon, the Tax or lien so contested, (w) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same and to pay any damages caused by the violation of any such Legal Requirement, (x) any interference with the use or occupancy of any of the Leased Premises, (y) any interference with the payment of any Basic Rent or any Additional Rent, and (z) the cancellation of any fire or other insurance policy.  In no event shall Tenant pursue any contest with respect to any Tax, Legal Requirement, or lien referred to above in such manner that exposes Landlord to any criminal or material civil liability, penalty or sanction for which Tenant has not made provisions acceptable to Landlord and Lender in its sole discretion.  While any such proceedings are pending and being prosecuted as required hereunder and the required security is held by Lender or Landlord, in that order, Lender or Landlord, as the case may be, shall not have the right to pay, remove or cause to be discharged the Tax, Legal requirement or lien thereby being

27



contested unless any one or more of the conditions in subdivisions (v) through (z) shall not be prevented during the pendency of the contest. Upon reasonable notice to Tenant, Landlord and Lender shall be entitled to intervene in any such contest, at Tenant's expense, if such intervention is reasonably deemed necessary by either such party's counsel. Tenant further agrees to keep Landlord and Lender informed as to the status of any such contest and to provide Landlord and Lender information reasonably requested with respect thereto. Tenant further agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as all of the conditions of the first sentence of this Paragraph 18 are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations. Tenant shall promptly pay any and all judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof, before any action may be taken with respect to the foreclosure or other enforcement of any such judgments or decrees.

19.    Default. The occurrence of any one or more of the following events shall constitute an Event of Default under this Lease:

(a) Tenant's failure to make any payment of Basic Rent which continues unremedied for a period of five (5) days after notice thereof from Landlord or Lender.

(b) Tenant's failure to make payment of Additional Rent or other sum herein required to be paid by Tenant and such default shall continue for a period of fifteen (15) days after notice by Landlord or Lender to Tenant.

(c) Tenant's failure to duly perform and observe, or Tenant's violation or breach of, any other provision hereof if such failure shall continue for a period of thirty (30) days after notice thereof from Landlord or Lender or if such failure cannot be cured within such period of thirty (30) days, such period shall be extended for such longer time as reasonably necessary provided that Tenant has commenced to cure such default within said initial period of

28




thirty (30) days and is actively, diligently and in good faith proceeding with continuity to remedy such failure.

(d) The original Tenant named herein shall (i) voluntarily be adjudicated a bankrupt or insolvent, or (ii) consent to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (iii) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (iv) make a general assignment for the benefit of creditors.

(e) A court shall enter an order, judgment or decree appointing, with the consent of Tenant, a receiver or trustee for it or for any of the Leased Premises or approving a petition filed against Tenant which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain in force, undischarged or unstayed, sixty days after it is entered.

(f) The original Tenant named herein shall in any insolvency proceedings be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution.

(g) The estate or interest of Tenant in any of the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within sixty (60) days after such levy or attachment.

(h) The occurrence of an "Event of Default" under any Cross-Defaulted Lease that arises from a failure by Tenant to make payment of Basic Rent or Additional Rent or other sum required to be paid by Tenant to Landlord or from the failure of Tenant to maintain any insurance required to be maintained under such Cross-Defaulted Lease; provided, that at Landlord's sole option and discretion, upon written notice thereof to Tenant from Landlord and Lender, the Landlord may forever waive its rights to have the events described in this subparagraph (h) constitute an Event of Default under this Lease.

20.    Landlord's Remedies. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a) Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Leased Premises, in which event Landlord shall have the right to collect Basic Rent, Additional Rent and other charges when due.

29

 

In the alternative, Landlord shall have the right to peaceably re-enter the Leased Premises on the terms set forth in subparagraph (b) below, but without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Leased Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Leased Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Leased Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Leased Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b) Landlord (with the written concurrence of Lender) may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant the worth at the time of the award of all of the following:

(i) Any obligation which has accrued prior to the date of termination.

(ii) The amount by which the unpaid Basic Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.



(iii)  The amount by which the unpaid Rent for the balance of the Term (excluding any option periods or portions thereof) after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided.

As used in this Paragraph the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of nine percent (9%) for past due obligations, and a discount rate to net present value of nine percent (9%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.  In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Leased Premises and remove all persons and property therefrom, by summary dispossession proceedings.

(c)    Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Leased Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in performing the defaulted obligations of Tenant hereunder and in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)  The various rights and remedies reserved to Landlord herein, are cumulative, the rights and remedies described in paragraph 20(a)-(d) shall survive the termination of this Lease, and Landlord may pursue any and all such rights and remedies and all other rights and remedies available to Landlord under applicable laws of the State.

21.    Notices.  All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes on the earlier of (i) three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or (ii) one (1) day after

31

 

having been sent by Federal Express or other nationally recognized air courier service, to the Addresses stated below, or (iii) on the date actually received by the recipient, whether sent by personal delivery, mail, air carrier, facsimile or otherwise:

(a) If to Landlord, at the address set forth on the first page of this Lease.

With a copy to:                Lorne O. Liechty, Esq.
                               Liechty, McGinnis & Kolitz
                               12750 Merit Drive, Suite 1150
                               Dallas, Texas 75251

(b) If to Tenant, at the address set forth on the first page of this Lease, Attention: Corporate Secretary,

With a copy to:                McGuire, Woods, Battle & Boothe, L.L.P.
                               One James Center
                               Richmond, Virginia 23219
                               Attention: Robert L. Burrus, Jr.

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and stating in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall serve a copy of such Notice upon Lender in the manner aforesaid. For the purposes of this Paragraph, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above.

22.    **Memorandum of Lease; Estoppel Certificates.**    Tenant shall execute, deliver and record, file or register from time to time all such instruments as may be required by any present or future law in order to evidence the respective interests of Landlord and Tenant in any of the Leased Premises, and shall cause a memorandum of this Lease, and any supplement hereto or to such other instrument, if any, as may be appropriate, to be recorded, filed or registered and re-recorded, refiled or re-registered in such manner and in such places as may be required by any present or future law in order to give public notice and protect the validity of this Lease. In the event of any discrepancy between the provisions of said recorded memorandum of this Lease or any other recorded instrument referring to this Lease and the provisions of this Lease, the provisions of this Lease shall prevail. Landlord and Tenant shall, at any time and from time to time, upon not less than twenty days' prior written request by the

32




other, execute, acknowledge and deliver to the other a statement in writing, executed by Landlord or Tenant or if other than an individual by a President, Vice President or authorized general partner, principal officer or agent certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent payable hereunder has been paid, (iii) that to the knowledge of the signer of such certificate no default by either Landlord or Tenant exists hereunder or specifying each such of which the signer may have knowledge; (iv) the remaining Term hereof; and (v) with respect to a certificate signed on behalf of Tenant, that to the knowledge of the signer of such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said signer's knowledge, specifying and describing the same.   It is intended that any such statements may be relied upon by Lender (and shall be addressed to Lender upon request), the recipient of such statements or their assignees or by any prospective purchaser, assignee or subtenant of the Leased Premises.

23.    .Surrender and Holding Over.  Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord in the same condition in which the Leased Premises were originally received from Landlord at the commencement of this Lease, except as to any repair or Alteration as permitted or required by any provision of this Lease, and except for ordinary wear and tear and damage by fire, casualty or condemnation that Tenant is not required to repair hereunder.  Tenant may remove from the Leased Premises on or prior to such expiration or earlier termination Tenant's Trade Fixtures and personal property which are owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal.  Tenant's Trade Fixtures and personal property not so removed at the end of the Term or within thirty days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises.  Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of

33



Landlord is a result of such expiration or earlier termination. Upon such expiration on earlier termination, no party shall have any further rights or obligations except as specifically provided herein.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as tenancy at sufferance or at will only, at one hundred fifty percent (150%) of the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease except that no renewal options or extensions shall apply. Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred fifty percent (150%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 20.

24.    No Merger of Title.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (ii) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership.  No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (x) this Lease or the leasehold estate created by this Lease and (y) the fee estate in or ownership of the Leased Premises including, without limitation, Lender's interest therein, or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

25.    Landlord Exculpation.    Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in the Leased Premises and shall not be enforced against the Landlord individually or personally.

26.    Hazardous Substances.

(a)    Tenant represents and warrants that it will not on, about, or under the Leased Premises, make, treat or dispose of any "hazardous substances" as that term is

34



defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 *et seq.* (the "Act"), but the foregoing shall not prevent the use to the extent necessary and customary in normal retail operations of any such substances in accordance with applicable laws and regulations and Tenant represents and warrants that it will at all times comply with the Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials or other laws pertaining to health, safety or the environment (including, without limitation, the Act and the laws, statutes and regulations specified later in this paragraph, collectively, the "Acts"). Hazardous Materials as used herein shall include, without limitation, all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; solid waste under the Resource Conservation and Recovery Act of 1976, as amended; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.*; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, *et seq.*, any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq.*, any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, *et seq.*, any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

        (b)    To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the Initial Term or any extension or renewal Term thereof. Tenant shall and hereby does agree to defend, indemnify and hold Lender and Landlord, their officers, directors, shareholders, partners and employees




harmless for, from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of the Acts or any other applicable federal, state or local environmental health or safety law, rule or regulation on, from or with respect to the Leased Premises, whether before or after the date of this Lease; (ii) the "release" or "threatened release" of or failure to remove, as required by this Paragraph 26, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) onto or from the Leased Premises or any portion or portions thereof, now or hereafter existing during the Initial Term and any extension or renewal Term whether or not arising out of or in any manner connected with Tenants' occupancy of the Leased Premises during the Initial Term or any extension or renewal Term. This indemnification shall survive the expiration or earlier termination of this Lease until the Claim Deadline as described in paragraph 34.

(c)     The Tenant represents and warrants that it will not install any underground storage tank without specific, prior written approval from the Landlord. The Tenant will not store combustible or flammable materials on the Leased Premises in violation of the Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials.

27.     Entry by Landlord. Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than 48 hours except in the case of emergency) to enter the Leased Premises at all reasonable business hours, and at all other times in the event of an emergency, for (i) the purpose of inspecting the same or for the purpose of doing any work under Paragraph 9, and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), and (ii) the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within twelve (12) months prior to the expiration of the Term of this Lease for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.





28.    Statements.  Tenant named herein shall submit to Lender and Landlord (i) within 45 days of the end of each quarter, quarterly balance sheets, income and cash flow statements for Tenant named herein; (ii) within 90 days of the end of each year, annual balance sheets, income and cash flow statements for Tenant named herein.  Quarterly 10Qs as filed with the Securities and Exchange Commission shall satisfy the requirements contained in (i) herein. Copies of the 10Ks filed with the Securities and Exchange Commission will satisfy the requirement contained in (ii) herein.  The obligations of Tenant named herein shall continue whether or not this Lease shall have been assigned.

29.    No Usury.  The intention of the parties being to conform strictly to the usury laws now in force in the State, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

30.    Broker.  Landlord and Tenant represent and warrant to each other that neither party negotiated with any broker in connection with this Lease and that this Lease was negotiated directly by Landlord and Tenant.  Each party hereby agrees to indemnify the other for all losses, damages, claims and expenses (including attorneys' fees) incurred by the indemnified party as a result of the actions of the indemnifying party to the extent such actions are in conflict with the foregoing representation and warranty.

31.    Waiver of Landlord's Lien.  Landlord hereby waives any right to distrain Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is created or otherwise.  Landlord agrees, at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant.  Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that Trade Fixtures are Tenant's property and not part of Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

37



32.    No Waiver.  No delay or failure by either party to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.

33.    Separability.  If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

34.    Indemnification.  Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender and their respective officers, directors, shareholders, partners, agents, employees and representatives for, from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from Tenants' breach of its obligations hereunder (including without limitation under paragraph 26 above) or arising from any of the Leased Premises or Adjoining Property or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of any of the Leased Premises or Adjoining Property, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon (collectively, "Losses"), whether or not Landlord or Lender has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said Loss.  In case any action or proceeding is brought against an indemnified party by reason of any such Loss, Tenant covenants upon notice from Landlord or such indemnified party to defend Landlord and such indemnified party in such action, with the expenses of such defense paid by Tenant, and Landlord will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.  Tenant's indemnification obligations under this paragraph 34 and under any other provision of this Lease shall survive the expiration or earlier termination of this Lease but shall expire and be of no further force and effect unless Landlord or Lender has served written notice upon Tenant, by the Claim Deadline, as defined below, of the intent to make a claim upon Tenant under such indemnity.  The "Claim Deadline" shall be:

38

  

        (a)     to the extent of any indemnification obligation (other than an indemnification obligation arising under paragraph 26 of this Lease) arising as a result of the claim by a third party against Landlord or Lender or any other indemnified party, or the claim of a third party against the Leased Premises, the date that is 30 days after the expiration of the period during which such third party claim may be brought under the applicable statute of limitations or if later, 30 days after an indemnified party is served with notice of suit filed within such statute of limitations period;

        (b)     with respect to any indemnification obligation of Tenant other than those described in subparagraph (a) above, the day that is two years after the expiration or earlier termination of this Lease.

        35.     <u>Lender as Third Party Beneficiary</u>.  Lender shall be deemed a third party beneficiary with respect to all provisions of this Lease that purport to confer benefits upon Lender or impose obligations upon Tenant or Landlord in order to protect the interests of Lender.

        36.     <u>Tenant to Comply With Reciprocal Easement Agreement</u>.  Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any reciprocal easement agreement or any other agreement or document of record now affecting the Leased Premises, herein referred to collectively as "REA", and that Tenant shall comply with all of the terms and conditions of the REA during the term of this Lease.  Tenant shall be deemed the "Owner" of the Leased Premises for purposes of the REA.  Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Lender for, form and against any claim, loss or damage suffered by Landlord or Lender by reason of Tenant's failure to perform any obligations or pay any expenses as required under any REA or comply with the terms and conditions of any REA as hereinabove provided during the term of this Lease.  Tenant shall further indemnify and hold harmless Landlord for, from and against all damages, claims, costs and expenses (including attorneys fees) incurred by Landlord as a result of Tenant's entering into any amendment or supplement or modification of any REA that diminishes in any amount the value of the Leased Premises.

39




37.    Headings.    The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

38.    Modifications.    This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

39.    Successors. Assigns.    The covenants of this Lease shall run with the Land and bind Tenant, the heirs, distributees, personal representatives, successors and permitted assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns. In the event there is more than one Tenant, the obligation of each shall be joint and several.

40.    Counterparts.    This Lease may be executed in several counterparts, which together shall be deemed one and the same instrument.

41.    Governing Law.    This Lease shall be governed by and construed according to the laws of the State.

42.    Transfer of Landlord's Interest.    Nothing contained herein shall be deemed to limit Landlord's right to sell, assign or otherwise transfer the Leased Premises and this Lease. On a transfer or assignment by Landlord of its interest in this Lease (other than a collateral assignment) or all or part of the Leased Premises, Landlord shall thereby be released from any further personal obligations hereunder, and Tenant shall look solely to the interest of Landlord and its successors and assigns in and to the Leased Premises.

43.    Attorneys' Fees.    In the event either party to this Lease shall be required to commence or defend any action or proceeding against any other party to this Lease by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease, or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

40



IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

LANDLORD:

WOLVERINE EQUITIES COMPANY
95A L.P.

By: Wolverine Holding Company, its general
partner

By: _____
Its: _____

TENANT:

CIRCUIT CITY STORES, INC.

By: _____
Its: _____

A:\TYLER-TX.LSE

41



## EXHIBIT A

### TRACT I

That certain lot, tract or parcel of land containing 1.62 acres, more or less, part of the ROBERT FLETCHER SURVEY, A-359, in Tyler, Smith County, Texas, more particularly described as Lot 4-D, New City Block 1293, Pavillion Addition, according to corrected Final Plat recorded in Cabinet C, Slide 112-D, Plat Records of Smith County, Texas.

### TRACT II

Easements set out and defined in (a) Reciprocal Easement and Operation Agreement between Broadway Pavilion Partners, Ltd., and Circuit City Stores, Inc., recorded in Volume 3535, page 284 and (b) Restrictive Covenants recorded in Volume 3523, page 395, as assigned in Volume 3535, page 326.

\circuit\staubach\legal.ttx



## EXHIBIT B

1.     Basic Rent for the initial term shall be at the annual rate of TWO HUNDRED THIRTY THOUSAND THREE HUNDRED FORTY AND 00/100 DOLLARS ($230,340.00).


2.     Basic Rent for the first renewal term shall be at the annual rate of TWO HUNDRED FIFTY-THREE THOUSAND THREE HUNDRED SEVENTY-FOUR AND 00/100 DOLLARS ($253,374.00).


3.     Basic Rent for the second renewal term shall be at the annual rate of TWO HUNDRED SEVENTY-SIX THOUSAND FOUR HUNDRED EIGHT AND 00/100 DOLLARS ($276,408.00).

43

Rejectable Offer Schedule-Tyler

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 1 | $2,200,000 |
| 2 | $2,197,342 |
| 3 | $2,194,664 |
| 4 | $2,191,965 |
| 5 | $2,189,247 |
| 6 | $2,186,508 |
| 7 | $2,183,748 |
| 8 | $2,180,968 |
| 9 | $2,178,166 |
| 10 | $2,175,344 |
| 11 | $2,172,500 |
| 12 | $2,169,635 |
| 13 | $2,166,749 |
| 14 | $2,163,841 |
| 15 | $2,160,911 |
| 16 | $2,157,959 |
| 17 | $2,154,985 |
| 18 | $2,151,988 |
| 19 | $2,148,969 |
| 20 | $2,145,927 |
| 21 | $2,142,862 |
| 22 | $2,139,775 |
| 23 | $2,136,664 |
| 24 | $2,133,529 |
| 25 | $2,130,372 |
| 26 | $2,127,190 |
| 27 | $2,123,984 |
| 28 | $2,120,755 |
| 29 | $2,117,501 |
| 30 | $2,114,223 |
| 31 | $2,110,920 |
| 32 | $2,107,592 |
| 33 | $2,104,239 |
| 34 | $2,100,861 |
| 35 | $2,097,458 |
| 36 | $2,094,028 |
| 37 | $2,090,574 |
| 38 | $2,087,093 |
| 39 | $2,083,586 |
| 40 | $2,080,053 |
| 41 | $2,076,493 |
| 42 | $2,072,906 |
| 43 | $2,069,293 |
| 44 | $2,065,652 |
| 45 | $2,061,984 |
| 46 | $2,058,288 |
| 47 | $2,054,565 |
| 48 | $2,050,814 |
| 49 | $2,047,034 |
| 50 | $2,043,226 |
| 51 | $2,039,389 |
| 52 | $2,035,524 |
| 53 | $2,031,629 |
| 54 | $2,027,705 |
| 55 | $2,023,752 |
| 56 | $2,019,769 |
| 57 | $2,015,756 |
| 58 | $2,011,713 |
| 59 | $2,007,639 |
| 60 | $2,003,535 |
| 61 | $1,999,400 |

**Rejectable Offer Schedule-Tyler**

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 62 | $1,995,234 |
| 63 | $1,991,037 |
| 64 | $1,986,808 |
| 65 | $1,982,547 |
| 66 | $1,978,254 |
| 67 | $1,973,929 |
| 68 | $1,969,572 |
| 69 | $1,965,182 |
| 70 | $1,960,758 |
| 71 | $1,956,302 |
| 72 | $1,951,812 |
| 73 | $1,947,288 |
| 74 | $1,942,730 |
| 75 | $1,938,138 |
| 76 | $1,933,512 |
| 77 | $1,928,850 |
| 78 | $1,924,154 |
| 79 | $1,919,422 |
| 80 | $1,914,655 |
| 81 | $1,909,852 |
| 82 | $1,905,013 |
| 83 | $1,900,137 |
| 84 | $1,895,225 |
| 85 | $1,890,276 |
| 86 | $1,885,289 |
| 87 | $1,880,266 |
| 88 | $1,875,204 |
| 89 | $1,870,104 |
| 90 | $1,864,966 |
| 91 | $1,859,790 |
| 92 | $1,854,574 |
| 93 | $1,849,320 |
| 94 | $1,844,026 |
| 95 | $1,838,692 |
| 96 | $1,833,317 |
| 97 | $1,827,903 |
| 98 | $1,822,448 |
| 99 | $1,816,952 |
| 100 | $1,811,414 |
| 101 | $1,805,835 |
| 102 | $1,800,214 |
| 103 | $1,794,551 |
| 104 | $1,788,845 |
| 105 | $1,783,096 |
| 106 | $1,777,304 |
| 107 | $1,771,469 |
| 108 | $1,765,589 |
| 109 | $1,759,666 |
| 110 | $1,753,698 |
| 111 | $1,747,685 |
| 112 | $1,741,626 |
| 113 | $1,735,523 |
| 114 | $1,729,373 |
| 115 | $1,723,177 |
| 116 | $1,716,935 |
| 117 | $1,710,646 |
| 118 | $1,704,309 |
| 119 | $1,697,925 |
| 120 | $1,691,493 |
| 121 | $1,685,012 |

Exhibit "C"
Rejectable Offer Schedule-Tyler



| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 122 | $1,678,483 |
| 123 | $1,671,905 |
| 124 | $1,665,277 |
| 125 | $1,658,599 |
| 126 | $1,651,872 |
| 127 | $1,645,093 |
| 128 | $1,638,264 |
| 129 | $1,631,383 |
| 130 | $1,624,451 |
| 131 | $1,617,467 |
| 132 | $1,610,430 |
| 133 | $1,603,340 |
| 134 | $1,596,197 |
| 135 | $1,589,000 |
| 136 | $1,581,749 |
| 137 | $1,574,443 |
| 138 | $1,567,083 |
| 139 | $1,559,667 |
| 140 | $1,552,196 |
| 141 | $1,544,668 |
| 142 | $1,537,084 |
| 143 | $1,529,443 |
| 144 | $1,521,744 |
| 145 | $1,513,988 |
| 146 | $1,506,173 |
| 147 | $1,498,300 |
| 148 | $1,490,367 |
| 149 | $1,482,375 |
| 150 | $1,474,322 |
| 151 | $1,466,209 |
| 152 | $1,458,035 |
| 153 | $1,449,800 |
| 154 | $1,441,503 |
| 155 | $1,433,143 |
| 156 | $1,424,721 |
| 157 | $1,416,235 |
| 158 | $1,407,685 |
| 159 | $1,399,071 |
| 160 | $1,390,393 |
| 161 | $1,381,649 |
| 162 | $1,372,839 |
| 163 | $1,363,964 |
| 164 | $1,355,021 |
| 165 | $1,346,012 |
| 166 | $1,336,934 |
| 167 | $1,327,789 |
| 168 | $1,318,574 |
| 169 | $1,309,290 |
| 170 | $1,299,937 |
| 171 | $1,290,513 |
| 172 | $1,281,019 |
| 173 | $1,271,453 |
| 174 | $1,261,815 |
| 175 | $1,252,105 |
| 176 | $1,242,321 |
| 177 | $1,232,465 |
| 178 | $1,222,534 |
| 179 | $1,212,528 |
| 180 | $1,202,447 |
| 181 | $1,192,291 |

Exhibit "C"
Rejectable Offer Schedule-Tyler

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 182 | $1,182,058 |
| 183 | $1,171,748 |
| 184 | $1,161,361 |
| 185 | $1,150,895 |
| 186 | $1,140,351 |
| 187 | $1,129,728 |
| 188 | $1,119,025 |
| 189 | $1,108,241 |
| 190 | $1,097,377 |
| 191 | $1,086,430 |
| 192 | $1,075,402 |
| 193 | $1,064,290 |
| 194 | $1,053,095 |
| 195 | $1,041,816 |
| 196 | $1,030,452 |
| 197 | $1,019,003 |
| 198 | $1,007,467 |
| 199 | $995,845 |
| 200 | $984,135 |
| 201 | $972,338 |
| 202 | $960,452 |
| 203 | $948,476 |
| 204 | $936,411 |
| 205 | $924,254 |
| 206 | $912,007 |
| 207 | $899,667 |
| 208 | $887,235 |
| 209 | $874,709 |
| 210 | $862,089 |
| 211 | $849,374 |
| 212 | $836,563 |
| 213 | $823,656 |
| 214 | $810,653 |
| 215 | $797,551 |
| 216 | $784,351 |
| 217 | $771,052 |
| 218 | $757,652 |
| 219 | $744,153 |
| 220 | $730,551 |
| 221 | $716,847 |
| 222 | $703,041 |
| 223 | $689,130 |
| 224 | $675,115 |
| 225 | $660,995 |
| 226 | $646,769 |
| 227 | $632,435 |
| 228 | $617,994 |
| 229 | $603,444 |
| 230 | $588,785 |
| 231 | $574,016 |
| 232 | $559,136 |
| 233 | $544,143 |
| 234 | $529,039 |
| 235 | $513,820 |
| 236 | $498,488 |
| 237 | $483,040 |
| 238 | $467,475 |
| 239 | $451,794 |
| 240 | $435,995 |
| 241 | $420,078 |

**Rejectable Offer Schedule-Tyler**

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 242 | $404,040 |
| 243 | $387,882 |
| 244 | $371,603 |
| 245 | $355,201 |
| 246 | $338,676 |
| 247 | $322,027 |
| 248 | $305,252 |
| 249 | $288,352 |
| 250 | $271,324 |
| 251 | $254,169 |
| 252 | $236,884 |
| 253 | $219,470 |
| 254 | $201,924 |
| 255 | $184,247 |
| 256 | $166,437 |
| 257 | $148,493 |
| 258 | $130,414 |
| 259 | $112,200 |
| 260 | $93,848 |
| 261 | $75,359 |
| 262 | $56,730 |
| 263 | $37,961 |
| 264 | $19,052 |
| 265 | $0 |

 

# EXHIBIT D

## List of Properties Subject to Cross Defaulted Leases

Location

**LUBBOCK**

6701 Slide Street
Lubbock, TX 79424
(Lubbock County)

**CLACKAMAS**

10722 SE 82nd Avenue
Portland, OR 97266
(Clackamas County)

**TYLER/BROADWAY**

4910 S. Broadway
Tyler, TX 75603
(Smith County)

**LONGVIEW**

406 N. Loop 281
Longview, TX 75605
(Gregg County)

**MIAMI WAREHOUSE**

3245 Meridian Parkway
Ft. Lauderdale, FL 33331
(Broward County)

**CARMAX-COBB**

1215 Ernest Barrett Parkway
Marietta, GA
(Cobb County)