# MASTER DEALER AGREEMENT

**THIS MASTER DEALER AGREEMENT** ("Master Agreement") is made as of the 1st day of March, 2008 (the "Effective Date") by and between **CIRCUIT CITY STORES, INC.**, a Virginia corporation with its principal office at 9950 Mayland Drive, Richmond, VA 23233-1464, and its affiliates and subsidiaries ("Circuit City") and **SLAM BRANDS, INC.**, a Washington corporation with its principal office at 2260 152nd Ave. NE, Redmond, WA 98052 ("Vendor"). Circuit City and Vendor shall be sometimes referred to in this Master Agreement individually as a "Party" and collectively as the "Parties."

## Recital

Circuit City and Vendor desire to enter into this Master Agreement to set forth certain terms and conditions under which Circuit City will purchase consumer electronics and related products from Vendor for resale by Circuit City to its customers.

## Agreement

In consideration of these premises, and the mutual agreements set forth below, the Parties agree as follows:

1.      **APPOINTMENT**. Vendor agrees to sell to Circuit City, and Circuit City agrees to purchase from Vendor, certain products (the "Products") that are more particularly described in one or more Product Addenda that may be entered into from time to time by the Parties (each a "Product Addendum"). Each such Product Addendum shall reference this Master Agreement, shall be attached to this Master Agreement as an exhibit, and are incorporated herein by this reference. While the Parties acknowledge that Circuit City intends to sell the Products primarily to consumers through its retail locations and its Internet web site, the Parties agree that Circuit City may sell the Products to any other persons or entities it may desire through any method of sale it may elect.

2.      **PRICE AND TERMS OF SALE**. Vendor will sell and Circuit City will purchase Products upon the terms and at the prices specified in the applicable Product Addendum and subject to this Master Agreement. Circuit City will unilaterally establish its own prices and terms for the resale of the Products to the public, and Vendor will not advise, instruct or in any way interfere with Circuit City's independent establishment of its retail prices. Unless stated otherwise in a Product Addendum, Circuit City will have the right to set off any amounts owed to it by Vendor against any amount owing by it to Vendor. In addition, in the event Vendor is ever in a debit balance with Circuit City, Vendor will remit payment of any such amounts to Circuit City by certified check or wire transfer within thirty (30) days of demand by Circuit City.

3.      **ORDERS AND OPERATING PROCEDURES**.

    3.1    As described in the applicable Product Addendum, Circuit City may order certain Products for delivery by Vendor to one of Circuit City's domestic locations as directed by Circuit City (a "Domestic Order"), or alternatively Circuit City may accept delivery of certain Products directly from Vendor's factory located outside of the United States for import by Circuit City (a "Direct Import Order"). For Domestic Orders, Vendor agrees to comply with the requirements contained in (i) Circuit City's **Vendor Operating Guidelines** (the "Vendor Operating Guidelines") and (ii) the Circuit City **Vendor Supply Chain Standards** (the "Supply Chain Standards"), each of which is incorporated into this Master Agreement by this reference. For

Direct Import Orders, Vendor agrees to comply with the requirements contained in Circuit City's **Direct Import Vendor Guide** (the "DIVG"), which is incorporated into this Master Agreement by this reference. Vendor acknowledges receipt of the Vendor Operating Guidelines, the Supply Chain Standards, and the DIVG as of the Effective Date hereof. Circuit City may publish updated versions of the Vendor Operating Guidelines, the Supply Chain Standards, and/or the DIVG in its sole discretion from time to time upon at least thirty (30) days' written notice to Vendor prior to the effective date of any such updated version, which updated versions may be delivered electronically or made available via web portal. Vendor will be expected to acknowledge receipt of any updated version; however, in the absence of such acknowledgment Vendor will be deemed to have accepted the updated version unless it objects to the same in writing prior to its effective date. In the event Vendor objects in writing to an updated version, the Parties agree to negotiate in good faith with regard to the objection. During the pendency of such negotiations, unless the Parties otherwise agree in writing, the terms of such updated version shall be in force. Any agreement reached by the Parties resolving the objection will be set forth in writing signed by the Parties as an amendment to the applicable updated version. In the event the Parties are unable to reach agreement with regard to the objection, Vendor's sole recourse will be to terminate this Master Agreement in accordance with Section 8.2 below.

3.2    Without limiting the generality of the foregoing, Circuit City will order Products by submitting its purchase order ("Purchase Order") to Vendor via Electronic Data Interchange ("EDI"). Purchase Orders shall be governed by the general terms and conditions contained in the Vendor Operating Guidelines, notwithstanding the fact that such terms and conditions may not be transmitted with the actual Purchase Order. Circuit City may amend the form of the Purchase Order in its sole discretion from time to time by updated version of the Vendor Operating Guidelines published as set forth in Section 3.1 above. The general Purchase Order terms and conditions contained in the Vendor Operating Guidelines and any other terms actually transmitted with the Purchase Order are specifically included in and made a part of this Master Agreement. In the event of a conflict between the Purchase Order and this Master Agreement, this Master Agreement will control.

3.3    Any terms proposed or submitted by Vendor at any time, including but not limited to, any provisions or terms contained in Vendor's franchise agreement(s), invoices, billing statements, documents used in the ordinary course of filling, accepting or acknowledging orders, or other similar documents, will be of no force or effect. Vendor will fill each order in accordance with the Purchase Order unless Vendor rejects the Purchase Order. In addition to any other remedies Circuit City may have, Circuit City may, at its option, cancel any Purchase Order without further obligation or liability, and may refuse and/or return the Products to Vendor at Vendor's expense if the terms and conditions set forth in any Purchase Order or in this Master Agreement are not met by Vendor.

4.    **COMPLIANCE WITH LAWS**. Vendor represents and warrants that it shall comply with all applicable national, state and local laws and regulations of all applicable countries and jurisdictions in performing its obligations hereunder including without limitation each Product Addendum. Vendor further represents and warrants that the Products will have been designed, manufactured, sold, and delivered hereunder in strict accordance with all applicable laws, regulations and codes to which the Products are subject, and that such Products will comply with and are manufactured in accordance with the provisions of all United States federal and state laws, rules and regulations, including without limitation environmental laws and regulatory agency requirements. If Vendor discovers a breach of any of the representations and warranties in this Section 4, it shall immediately notify Circuit City of such breach in writing, explaining the circumstances constituting the breach and identifying the Product(s) involved.

5.  **INDEMNIFICATION.**

    5.1  Vendor agrees to defend (through counsel reasonably satisfactory to Circuit City), indemnify and hold harmless Circuit City and its affiliates, and their respective directors, officers, employees, agents, successors and assigns from and against any and all actions, judgments, claims, losses, damages, expenses or costs (including attorneys' fees and costs and expenses of defense) and liabilities which arise out of, relate to or are in any way connected with (i) the sale, resale and/or use or failure of the Products, including, without limitation, liability based upon death or injury to any person (including Circuit City employees) or damage to property resulting or arising from or alleged to result or arise from or out of the sale, resale, use and/or failure of the Products, (ii) Vendor's actual or alleged breach of this Master Agreement, including, but not limited to breach of any warranty set forth in any Product Addendum, (iii) Vendor's actual or alleged violation of any of the laws of any governmental entity with respect to the Products, or (iv) any representations made by Vendor to Circuit City which Circuit City uses or incorporates into its advertising or upon which Circuit City relies when selling the Products under this Master Agreement.

    5.2  Further, Vendor specifically agrees to defend, indemnify and hold harmless Circuit City and its affiliates their respective directors, officers, employees and agents from and against any and all actions, judgments, claims, losses, damages, liabilities, expenses and costs (including attorneys' fees and expenses of defense) that Circuit City may incur or be liable for as a result or arising out any actual or alleged infringement, misappropriation or other violation by Vendor of any patent, copyright, trademark, trade secret or other proprietary or intellectual property rights of any third party, including without limitation Vendor's (i) failure to obtain, as required, licenses from the holder(s) of patents or other intellectual property rights on technologies related to the Products; (ii) failure to pay royalties owed under such licenses; (iii) falsification of royalty and/or other records related to such licenses; and (iv) any other failure by Vendor to comply with the terms of such required licenses. The foregoing indemnification shall include the costs and expenses incurred by Circuit City in the liquidation of any infringing inventory in the event of any claim arising hereunder or other discovery by Circuit City of the infringement by Vendor of third party intellectual property rights.

6.  **INSURANCE.**  During the term of this Master Agreement, Vendor will maintain a policy of commercial general liability insurance, including products–completed operations coverage, with an insurance carrier authorized to do business in the United States and having a rating of "A-", or better by A.M. Best Company and a Financial Size Category rating of at least Class VIII, with limits of no less than US$2,000,000 per occurrence and US$10,000,000 aggregate. Products-completed operations coverage will be maintained for the time period covered by this Master Agreement and for at least five (5) years after the latest of the Products to be delivered under this Master Agreement have been delivered to Circuit City. Such policies will name "Circuit City Stores, Inc." as an additional insured. All certificates will provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to under this Master Agreement. A certificate of insurance meeting these requirements will be delivered to Circuit City (i) prior to the initial delivery of the Products; (ii) upon renewal of the insurance policy and annually thereafter, and (iii) upon reasonable request.

7.  **LIMITATION OF LIABILITY.  IN NO EVENT WILL CIRCUIT CITY BE LIABLE TO VENDOR FOR ANY LOSS OF PROFITS OR REVENUE OR FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES RESULTING**

**FROM ANY PERFORMANCE, NON-PERFORMANCE, BREACH OR TERMINATION OF THIS MASTER AGREEMENT.**

8. **TERM AND TERMINATION.**

   8.1   The initial term of this Master Agreement will commence on the Effective Date and will continue until February 28, 2009. The term will automatically renew for successive one-year periods thereafter unless either Party terminates this Master Agreement by giving the other Party at least forty-five (45) days' written notice prior to the end of the initial or any renewal term.

   8.2   Notwithstanding the foregoing, this Master Agreement may be terminated with or without cause by either Party without liability or obligation upon not less than forty-five (45) days' written notice to the other Party.

   8.3   In addition, either party may terminate this Master Agreement immediately, without liability or further obligation, upon written notice to the other party if the other party (i) breaches the confidentiality obligations set forth in Section 9 hereof; (ii) breaches any other term of this Master Agreement and fails to cure the breach within ten (10) business days following receipt of notice of such breach, (iii) becomes insolvent, files (or has filed against it) a petition in bankruptcy, makes an assignment for the benefit of creditors or ceases normal business operations, or (iv) assigns or attempts to assign this Master Agreement or any of the rights and obligations under this Master Agreement without first obtaining consent as required under this Master Agreement. The foregoing termination rights will be in addition to, and will not be construed to limit or restrict, any other rights Circuit City may have with regard to cancellation, termination, refusal, return or rejection of any order of Products, whether at law, in equity, or pursuant to this Master Agreement including without limitation any Product Addendum.

   8.4   Upon termination of this Master Agreement, the Receiving Party shall either return the Disclosing Party's Confidential Information in its possession (including all copies) or shall, at the Disclosing Party's direction, destroy the Receiving Party's Confidential Information (including all copies) and certify its destruction to the Disclosing Party. Notwithstanding the foregoing, each Party may retain an archival copy of the Confidential Information, provided such copy is maintained in accordance with Section 9 herein.

9.  **CONFIDENTIALITY**. To the extent necessary to perform the obligations related to this Master Agreement, a Party (the "Disclosing Party") may share with the other Party (the "Receiving Party") certain documents and information, including, but not limited to, information pertaining to products, business practices, schedules, services, methods, data, processes, advertising plans, sales, financial information and operating procedures which the Disclosing Party considers to be, and treats as, confidential ("Confidential Information"), whether or not specifically identified as such. Information shared under the terms of any confidentiality agreement executed by the Parties in contemplation of the relationship set forth herein is also deemed to be "Confidential Information" subject to this Section 9. The Receiving Party shall maintain the Disclosing Party's Confidential Information in confidence, shall protect it with the same degree of care which it uses to protect its own Confidential Information (which shall be not less than reasonable care), and shall use it for the sole purpose of performing under this Master Agreement. Confidential Information shall not be distributed, disclosed, conveyed or in any other manner made available to any consultant, subcontractor or any third party unless such third party is bound by confidentiality restrictions or agreements sufficient to enable the Receiving Party to comply with its obligations hereunder. For purposes of this Section, the term "Confidential

Information" shall not include any information which: (a) is in the public domain at the time of disclosure or enters the public domain following disclosure through no fault of the Receiving Party; (b) the Receiving Party can demonstrate was already in its possession prior to disclosure hereunder or is subsequently disclosed to the Receiving Party with no obligation of confidentiality by a third party having the right to disclose it; or (c) is independently developed by the Receiving Party without reference to the Disclosing Party's Confidential Information, provided that the Receiving Party can clearly demonstrate such independent development through contemporaneous records showing such development. The Receiving Party may disclose the Disclosing Party's Confidential Information upon the order of any court of competent jurisdiction or as otherwise required by law or legal process, provided that prior to such disclosure the Receiving Party shall inform the Disclosing Party of such order if permitted by law, in order to provide the Disclosing Party with an opportunity to contest such order or to seek such other protective action as the Disclosing Party may elect. Vendor and Circuit City agree that the confidentiality covenants in this Section 9 apply to all Confidential Information disclosed to it during the term of this Master Agreement (including any renewal terms) and for a period of three (3) years after termination. In the event of a violation of this Section 9, because of the unique nature of the Confidential Information, the Disclosing Party would suffer irreparable harm, and money damages and other remedies at law available in the event of a breach or a threatened breach would not be adequate to compensate for the harm caused by the breach or the threatened breach. Accordingly, in addition to any other remedies it may have hereunder or at law or in equity, the Disclosing Party shall have the right to obtain injunctive relief for violation of this Section 9.

10.     **RELATIONSHIP OF THE PARTIES**. The relationship between Circuit City and Vendor is that of buyer and seller only. Nothing in this Master Agreement will be construed as creating any other relationship (including, but not limited to, principal and agent, master and servant, employer and employee, franchisor and franchisee or joint venturer) whatsoever between the parties. Both parties are independent contractors and neither has any express or implied authority to create or assume any obligation on behalf of the other.

11.     **NOTICES**. Any notice required or permitted under this Master Agreement or any Product Addendum hereunder and not otherwise addressed pursuant to specific instructions relating to contact information shall be in writing and shall be sent to the address given below of the party to be notified, unless such party has previously notified the other of a change of address, in which case notice shall be sent to such changed address.

| If to Circuit City: | If to Vendor: |
|---|---|
| Circuit City Stores, Inc. | Slam Brands, Inc. |
| 9950 Mayland Drive | 2260 152nd Ave. NE |
| Richmond, VA  23233-1464 | Redmond, WA 98052 |
| Attention: Vendor Relations | Attention: _____ |
| | |
| With a copy to: | With a copy to: |
| Circuit City Stores, Inc. | Slam Brands, Inc. |
| 9950 Mayland Drive | 2260 152nd Ave. NE |
| Richmond, VA  23233-1464 | Redmond, WA 98052 |
| Attention: Legal Department – Commercial | Attention: _____ |

CC LD Ref.#2921                                              5

Any notice shall be sent by prepaid registered or certified United States mail, return receipt requested, or via any national overnight mail service, and shall be deemed to have been duly given or rendered five (5) days after mailing, or upon delivery, whichever is earlier.

12.    **FORCE MAJEURE**.  Neither party will be liable to the other party for failure or delay in performance under this Master Agreement due in whole or in part to an act of God, strike, lockout or other labor dispute, civil commotion, sabotage, fire, flood, explosion, acts of any government, unforeseen shortages or unavailability of fuel, power, transportation, or supplies, inability to obtain or delay in obtaining governmental approvals, permits, licenses, or allocations, and any other causes which are not within such party's reasonable control, whether or not of the kind specifically enumerated above.  During any period of Vendor's inability to perform, Circuit City in its sole discretion may (i) cancel Purchase Orders or portions thereof as appropriate, (ii) acquire from others, without incurring liability to Vendor, similar products as Circuit City may deem necessary under the circumstances, and (iii) appropriately reduce the quantity of Products ordered from Vendor hereunder.

13.    **AUDIT**.  Each party shall have the right to audit the books and records of the other party relating to the business transacted hereunder upon reasonable prior written notice, which audit is to be conducted during regular business hours at the business location of the audited party.  Such audit may be conducted by the auditing party alone or together with qualified accountants.  The auditing party shall bear the cost of the audit.  In the event of any such audit, the party being audited shall extend its full and complete cooperation to the auditing party.  The auditing party shall ensure that such accountants and/or individuals safeguard Confidential Information in accordance with Section 9 of this Master Agreement.  The foregoing right of a party to audit books and records of the other party shall terminate as to any transaction hereunder as of the third anniversary of the date such transaction occurred.

14.    **SURVIVAL**.  All provisions of this Master Agreement which by their nature and context should survive the expiration or termination of this Master Agreement shall survive such expiration or termination, including without limitation the terms of Sections 4, 5, 6, 7, 9, 13, 14, 16, 17, 18 and 19.

15.    **CALCULATION OF DATES**.  For purposes of calculating the date on which any obligation is required or performance is due hereunder, in the event that a day expressed as a date certain, or the last day of any time period expressed as a certain number of days, would otherwise fall on a Saturday, a Sunday or any other day recognized as a public holiday by the Federal government of the United States (a "Non-Business Day"), such date of obligation or time period will be extended such that it will occur or end on the next occurring day that is not a Non-Business Day.

16.    **NO ASSIGNMENT; NO WAIVER**.  Neither party may assign this Master Agreement or any of its rights or duties under this Master Agreement without the prior written consent of the other party.  Neither party will be deemed to have waived any right, power, privilege or remedy unless the waiver is in writing and duly executed by it.

17.    **GOVERNING LAW**.  This Master Agreement will be governed by the laws of the Commonwealth of Virginia (other than its conflicts of laws provisions).

18.    **ENTIRE AGREEMENT; SEVERABILITY**.  This Master Agreement, including any documents incorporated or referenced under this Master Agreement, constitutes the entire agreement between the parties with respect to the subject matter of this Master Agreement and

supersedes any prior agreements between the parties with respect to such subject matter. If any provision of this Master Agreement is determined by a court of competent jurisdiction to be unenforceable, the provision will be deemed to be severed, and the remaining provisions of this Master Agreement will remain in full force and effect.

19.    **MISCELLANEOUS**. For purposes of clarity, all references to the United States herein shall include all fifty (50) states and its territories. The headings in this Master Agreement are for convenience of reference only and will not affect its interpretation or construction. This Master Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, together shall constitute one and the same instrument. Facsimile signatures shall be binding upon receipt, and the parties agree to exchange original signature pages as soon as reasonably possible after facsimile transmission.

IN WITNESS WHEREOF, the Parties have caused this Master Dealer Agreement to be executed as of the date and year first above written.

| Circuit City: | Vendor: |
|---|---|
| **CIRCUIT CITY STORES, INC.** | **SLAM BRANDS, INC.** |
| By: _____ | By: _____ |
| Name: _____ | Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |