1  TRAINOR FAIRBROOK
   NANCY HOTCHKISS [SBN 107692]
2  980 Fulton Avenue
   Sacramento, California 95825
3  Telephone: (916) 929-7000
   Facsimile: (916) 929-7111
4  jlp:0559100.719389.1

5  Attorneys for Creditor
   GREENBACK ASSOCIATES, LLC,
6  a California limited liability company

7

8              UNITED STATES BANKRUPTCY COURT

9               EASTERN DISTRICT OF VIRGINIA

10                   RICHMOND DIVISION

11

12  IN RE:                          Chapter 11

13  CIRCUIT CITY STORES, INC., *et al.*,    Case No. 08-35653-KRH

14          Debtors.               Jointly Administered

15                                 **RESPONSE OF GREENBACK
                                   ASSOCIATES, LLC TO DEBTORS'**
16                                 **TENTH OMNIBUS OBJECTION TO**
                                   **CERTAIN DUPLICATE CLAIMS**
17

18       This response is filed by Greenback Associates, LLC, a California limited liability

19  company ("Greenback") to the Debtor's Tenth Omnibus Objection to Certain Duplicate Claims

20  (the "Debtors' Objection"). In the Objection, Debtors' assert that Greenback's Claim No. 12681 in

21  the amount of $737,801.12 and Claim No. 12871 in the amount of $60,831.93 are duplicative of

22  Greenback's Claim Nos. 12522 and 12523, respectively.

23       Greenback disputes Debtors' Objection on the grounds both sets of claims arise from

24  different and distinct legal obligations against different Debtors, have merit, and are not

25  duplicative.

26       Claim Nos. 12681 and 12871 were filed in the Circuit City Stores West Coast, Inc. case

27  (Case No. 08-35654) and are based on the rejection of a nonresidential lease between Greenback

28  Associates and Circuit City West Stores, Inc., as set forth in detail in Claims Nos. 12681 and

TRAINOR FAIRBROOK
Attorneys At Law
980 FULTON AVENUE
SACRAMENTO, CALIFORNIA 95825-4558
Telephone: (916) 929-7000
Facsimile: (916) 929-7111

TRAINOR FAIRBROOK
Attorneys At Law
980 FULTON AVENUE
SACRAMENTO, CALIFORNIA 95825-4558
Telephone: (916) 929-7000
Facsimile: (916) 929-7111

1    12871.

2        Claim Nos. 12522 and 12523 were filed in Circuit City Stores, Inc. case (Case No. 08-

3    35653) and are based upon the assignment between Circuit City Stores, Inc. and Circuit City

4    Stores West Coast, Inc.

5        Attached hereto as **Exhibit A** is a true and correct copy of the original Lease dated

6    January 1, 1987 between Circuit City Stores, Inc. and Greenback Associates, LLC (the "Lease").

7    Attached as **Exhibit B** is a true and correct copy of Assignment and Assumption of Lease dated

8    May 1, 1994 between Circuit City Stores, Inc. and Circuit City Stores West Coast, Inc. (the

9    "Assignment").

10       Under the Assignment, Circuit City Stores, Inc., as assignor, expressly obligated itself to

11   perform Circuit City Stores West Coast's obligations under the Lease and was to "remain

12   primarily liable for said performance, including without limitation, the payment of rent and the

13   performance of all of the lessee's other obligations throughout the remainder of the term of the

14   Lease." Likewise, under the Lease and Assignment, Circuit City Stores West Coast, as lessee,

15   was contractual obligated to perform under the terms of the Lease.

16       These documents demonstrate that the obligation of Circuit City Stores West Coast, Inc.

17   under the Lease as set forth in Claim Nos. 12681 and 12871 is a separate and distinct contractual

18   obligation from the obligation of Circuit City Stores, Inc. under the Assignment as set forth in

19   Claims Nos. 12522 and 12523.

20       Based thereon, Greenback requests that the court deny the Debtors' objection to

21   Greenback's Claim Nos. 12681 and 12871 as duplicative claims.

22   Dated: June 26, 2009                        TRAINOR FAIRBROOK

23

24                                               By: _____/s/ Nancy Hotchkiss_____

25                                                   NANCY HOTCHKISS

26

27

28

# EXHIBIT A

GROUND LEASE

BY

GREENBACK ASSOCIATES

AND

CIRCUIT CITY STORES, INC.

132A0006-A

# TABLE OF CONTENTS

Page No.

RECITALS ................................................ 1

ARTICLE I.     DEFINITIONS.............................. 1

ARTICLE II.    DEMISING PROVISIONS..................... 3

2.1   Land......................................... 3
2.2   Relocation and Common Uses............... 3
2.3   Standard Oil Lease....................... 4
2.4   Term..................................... 5
2.5   Extension of Term........................ 5
2.6   Master Lease............................. 6
2.7   Lease "As Is"............................ 6
2.8   Boundary Line Adjustment................. 6

ARTICLE III.   RENT.................................... 7

3.1   Minimum Base Rent........................ 7
3.2   Rent Commencement Date................... 7
3.3   Monthly Installments..................... 7
3.4   Percentage Rent.......................... 8
3.5   Gross Sales Defined...................... 8
3.6   Payment of Percentage Rent............... 9
3.7   Bookkeeping and Inspection............... 10
3.8   Adjustments.............................. 10
3.9   Interest on Arrearages................... 11

ARTICLE IV.    PROPERTY TAXES.......................... 11

4.1   Definition............................... 11
4.2   Payment.................................. 12
4.3   Jointly Assessed Properties.............. 12
4.4   Personal Property Taxes.................. 13
4.5   Contests................................. 13

ARTICLE V.     INDEMNITY AND INSURANCE................. 13

5.1   Indemnity................................ 13
5.2   Liability Insurance...................... 14
5.3   Property Insurance....................... 14
5.4   General.................................. 15
5.5   Mechanics' Liens......................... 15

132A0006-A

TABLE OF CONTENTS
(cont'd)

                                                        Page No.

ARTICLE VI      USE OF PREMISES..........................    16

        6.1     Permitted Uses...........................    16
        6.2     Prohibited Uses..........................    17
        6.3     Compliance with Law......................    17
        6.4     Good Condition...........................    17
        6.5     Utilities................................    17
        6.6     Entry by Lessor..........................    17

ARTICLE VII.    MAINTENANCE AND REPAIRS..................    18

        7.1     Lessor's Obligations.....................    18
        7.2     Lessee's Obligations.....................    18
        7.3     Default by Lessee........................    18
        7.4     Surrender................................    18

ARTICLE VIII.   CONSTRUCTION OF IMPROVEMENTS.............    19

        8.1     Retail Facility..........................    19
        8.2     Construction in General..................    19
        8.3     Personal Property........................    20
        8.4     Title to Improvements....................    20
        8.5     Permits or Approvals.....................    20

ARTICLE IX      DESTRUCTION.............................    21

        9.1     Duty to Rebuild..........................    21
        9.2     No Abatement of Rent.....................    21
        9.3     Destruction Near End of Term.............    21

ARTICLE X.      CONDEMNATION............................    22

        10.1    Definitions of Terms.....................    22
        10.2    Rights...................................    22
        10.3    Total Taking.............................    23
        10.4    Partial Taking...........................    23
        10.5    Short-Term Temporary Taking..............    23
        10.6    Long-Term Total Temporary Taking.........    24
        10.7    Long-Term Partial Temporary Taking.......    24

-ii-

132A0006-A

TABLE OF CONTENTS
(cont'd)

Page No.

ARTICLE XI.    DEFAULT AND REMEDIES....................    25

    11.1    Default Defined.........................    25
    11.2    Lessor's Right to Terminate.............    26
    11.3    Lessor's Right Not to Terminate.........    27
    11.4    General.................................    27
    11.5    Lessor's Default........................    27

ARTICLE XII.   ASSIGNMENT AND SUBLETTING...............    28

    12.1    General Restrictions....................    28
    12.2    Consent Required........................    28
    12.3    Notice to Lessor........................    28
    12.4    Permitted Assignments and Subletting....    29
    12.5    Miscellaneous Provisions................    29
    12.6    Administrative Fee......................    29

ARTICLE XIII.  LOAN OR SALE...........................    30

    13.1    Estoppel Certificates, etc..............    30
    13.2    Failure to Deliver Estoppel Certificates  30
    13.3    Liability of Transferee.................    30
    13.4    Leasehold Mortgages.....................    31

ARTICLE XIV.   MORTGAGEE PROTECTION....................    35

    14.1    Subordination or Superiority............    35
    14.2    Nondisturbance..........................    35
    14.3    Attornment..............................    35
    14.4    Mortgagee's Right to Cure Lessor's
            Defaults................................    35

ARTICLE XV.    MISCELLANEOUS PROVISIONS................    36

    15.1    Headings................................    36
    15.2    Waiver..................................    36
    15.3    Notices.................................    36
    15.4    Attorneys' Fees.........................    36
    15.5    Successors..............................    37
    15.6    Holding Over............................    37
    15.7    Surrender of Lease Not Merger...........    37
    15.8    Entire Agreement........................    37
    15.9    Recording...............................    37
    15.10   Brokerage Commissions...................    37

-iii-

This Ground Lease ("Lease") is dated, for reference purposes only, June 1, 1987, and is executed, on the dates set opposite the signatures below, by and between Greenback Associates, a California general partnership ("Lessor"), whose current mailing address is 7700 College Town Drive, Suite 109, Sacramento, California 95826, and Circuit City Stores, Inc., a Virginia corporation ("Lessee"), whose current mailing address is 2040 Thalbro Street, Richmond, Virginia 23230.

## RECITALS

A.    Lessor owns a leasehold interest in land located in the County of Sacramento, State of California pursuant to a Ground Lease (hereinafter identified as the Master Lease).

B.    Lessee desires to lease from Lessor, and Lessor desires to lease to Lessee, pursuant to the terms and conditions of this Lease, a portion of said land (which portion is hereinafter identified as the Land).

NOW, THEREFORE, Lessor and Lessee, in consideration of the various obligations set forth in this Lease, agree as follows:

## ARTICLE I

## DEFINITIONS

For purposes of this Lease, the following words and phrases shall have the indicated meanings:

1.1    "Access Area" means the area labeled Ingress and Egress Easement on Exhibit "A-1" attached hereto and incorporated herein by this reference, subject to relocation by Lessor as provided in Section 2.2;

1.2    "Improvements" means all excavations, paving, landscaping, utility lines, buildings, and other structures and permanent improvements located on the Land, whether presently in existence or hereafter erected or placed upon the Land, and without regard to whether ownership thereof is in Lessor or Lessee;

132A0006/1                                    1

1.3  "Land" means collectively the land located in the County of Sacramento, State of California and identified in this Lease as the Primary Site, the Parking Area, and the Access Area, exclusive of any Improvements, notwithstanding that any such Improvements may or shall be construed as affixed to or as constituting part of the real property, and without regard to whether ownership of the Improvements is in Lessor or in Lessee;

1.4  "Master Lease" means the Ground Lease dated January 30, 1969 by and between Bernice Mitchell, Theodore C. Mitchell, and Janet D. Mitchell, jointly as lessor (collectively "Mitchells"), and Gus C. Gianulias, Ernest G. Cheonis, Julie Gianulias, and Merry Cheonis, jointly as lessee (collectively "Gianulias and Cheonis"), the leasehold interest under which was thereafter assigned by Gianulias and Cheonis to Lessor by an Assignment of Lease and Consent dated March 22, 1972, as modified by an Amendment and Modification to Lease dated November 21, 1972 by and between Lessor and the Mitchells and as modified by a Second Amendment and Modification to Lease dated September 14, 1983 by and between Lessor and the Mitchells;

1.5  "Master Lessor" means the Mitchells and their successors and assigns in interest under the Master Lease;

1.6  "Parking Area" means the parcel labeled Parking Lot on Exhibit "A-1" attached hereto and incorporated herein by this reference, subject to relocation by Lessor as provided in Section 2.2;

1.7  "Personal Property" means all furnishings, equipment, inventory, trade fixtures, and other personal property owned by Lessee or by any other person or entity holding an interest in the Premises under Lessee and located, from time to time, on or about the Premises and not included in the definition of Improvements set forth in Section 1.2; and

1.8  "Premises" means collectively the Land and the Improvements.

1.9  "Primary Site" means collectively Lot 7 and Parcel A shown on Exhibit "A-1" attached hereto and incorporated herein by this reference, which Primary Site is also described in Exhibit "A-2" attached hereto and incorporated herein by this reference.

132A0006/1

2

## DEMISING PROVISIONS

2.1  Land.  Subject to the terms and conditions of this Lease, and for the term set forth in Section 2.4, Lessor hereby leases the Land to Lessee, and Lessee hereby leases the Land from Lessor, subject to the Master Lease and all easements, covenants, conditions, restrictions, leases, assessments, bonds, property taxes, deeds of trust, and other liens and encumbrances disclosed in or by the Official Records of Sacramento County, California. A Title Report respecting the Land dated November 26, 1986 and issued by North American Title Company ("Title Report") is attached hereto as Exhibit "B" and incorporated herein by this reference.

2.2  Relocation and Common Uses.  Notwithstanding the provisions of Section 2.1 or any other provision of this Lease, the Parking Area, the Access Area, and the Primary Site are subject to the following provisions:

(a)  Lessee's rights respecting, and Lessee's interest in, the Access Area are limited to non-exclusive use thereof for pedestrian and vehicular access between Arcadia Drive and the Parking Area in common with uses thereof by other persons and entities owning or having interests therein from time to time, with Lessor having the right and power, which right and power is hereby reserved, to grant non-exclusive access and easement rights in the Access Area to other persons and entities from time to time in the future and, if desired by Lessor, to relocate the Access Area (at Lessor's cost to relocate and improve) from time to time in the future, provided such relocation does not unreasonably interfere with, and allows continuing fulfillment of, said purposes of the Access Area, namely, for ingress and egress to and from the Parking Area, all in Lessor's absolute and reasonable discretion; and if and when Lessor exercises said right and power, Lessee shall execute and deliver an appropriate amendment to this Lease as Lessor may request.  Should parties other than Lessee use the Access Area, then maintenance costs therefor shall be borne equitably in accordance with use.

(b)  Although Lessee does have, pursuant to this Lease, the right to possession of the Parking Area, parking of motor vehicles is the only use contemplated or permitted in the Parking Area, and therefore, Lessor reserves the right and power to designate a different area, at any time, and from time to time, in substitution for the Parking Area shown on Exhibit "A-1" to this Lease, together with any necessary and related change or changes in the Access Area, provided such different Parking Area

is either close to or the same distance fr the Primary Site
and provided all costs associated with relocating the Parking
Area and/or improving the such different Parking Area shall be
borne by Lessor; and if Lessor does designate such different
area, then, upon request by Lessor, Lessee shall execute and
deliver an amendment to this Lease that appropriately changes the
description of the Parking Area and also makes any necessary and
related change or changes in the Access Area.

(c)    Those portions of the Land, including, but
not limited to, the Primary Site, as are, from time to time,
designed for ingress and egress or as traffic lanes may be used,
for ingress and egress, or as traffic lanes, but not for parking,
for the common benefit of the Land and all other parcels or
properties now owned or leased or hereafter owned or leased by
Lessor in the general vicinity of the Land, including, but not
limited to, all of the premises described in the Master Lease, by
Lessor and by other persons or entities having, from time to ·
time, titles to or interests in all or any portion of said other
parcels or properties and their lessees, tenants, customers, and
invitees, and Lessor hereby reserves such rights of non-exclusive
use in common with Lessee; provided that no such use shall
unreasonably interfere with Lessee's rights, powers, and
obligations under this Lease, including, but not limited to,
Lessee's rights, powers, and obligations respecting construction,
replacement, rebuilding, and restoration of Improvements as set
forth in Article VIII.

(d)    Lessee agrees to design, construct, and
maintain those portions of Improvements that are, from time to
time, located on the Primary Site and designed for ingress and
egress or as traffic lanes (collectively "Traffic Lane Improve-
ments") in such configuration as to permit vehicular access
through the Traffic Lane Improvements between Greenback Lane and
Parcel D ("Parcel D") and between Arcadia Drive and Parcel D,
which Parcel D is shown on that certain Parcel Map entitled
"Parcel Map of Portion of Lots 2 & 3, Aeolia Heights," recorded
in the office of the Recorder of Sacramento County in Book 10 of
Parcel Maps, at page 36, subject, however, to the boundary
adjustment described in Section 2.8 that will reduce the size of
Parcel D.  Lessee acknowledges that the foregoing special rights
of access through the Traffic Lane Improvements for the benefit
of Parcel D are necessary, according to representations made to
Lessee by Lessor, in order to obtain approval of the boundary
line adjustment described in Section 2.8.

2.3    Standard Oil Lease.  Without limiting the
generality of the provisions of Section 2.1, this Lease is made
subject to a lease of a portion of the Land from Lessor to
Standard Oil of California ("Standard Oil Lease").  The Standard

Oil Lease expires in approximately September  , 1987 and contains
a covenant by Standard Oil of California to remove all of its
improvements at or about the expiration of the Standard Oil
Lease.  Although this Lease and delivery of possession of the
Land to Lessee are both subject to the Standard Oil Lease and the
rights of Standard Oil of California thereunder, Lessee is not
assuming any of Lessor's rights or obligations under the Standard
Oil Lease, and Lessor shall continue to have and to bear all of
those rights and obligations, including, but not limited to, the
right to collect rent under the Standard Oil Lease until it
expires and Standard Oil of California has surrendered possession
of the premises thereunder.  Should the Standard Oil Lease not
terminate, for whatever reason, or should Standard Oil of
California not surrender possession of the premises on or before
February 1, 1988, then at Lessee's option, upon written notice to
Lessor within fifteen (15) days after February 1, 1988, Lessee
may cancel this Lease.

     2.4  Term.  The term of this Lease shall be twenty (20)
years, commencing on May 1, 1987, and expiring on April 30, 2007,
subject to extension as provided elsewhere in this Lease, and
subject to earlier termination as provided elsewhere in this
Lease.

     2.5  Extension of Term.  Notwithstanding the date
specified elsewhere in this Lease for expiration of the term of
this Lease, Lessor hereby grants to Lessee the right and option
to extend the term of this Lease for two (2) additional periods
of five (5) years each, subject to the following terms and
conditions:

     (a)  Lessee must give Lessor a written notice of
extension for each such additional period no later than six (6)
months prior to the expiration of the then existing term of this
Lease;

     (b)  Lessee must not be in default under any
provision of this Lease beyond any applicable cure period set
forth in this Lease both at the time a notice of extension is
given and at the time the extension period commences;

     (c)  As used in this Lease, the phrase "term of
this Lease" shall include any such period of extension if
exercised by Lessee; and

     (d)  All provisions of this Lease shall remain in
full force and effect and binding on Lessor and Lessee during any
extension period, except that Lessee shall have no right or
option to extend the term of this Lease beyond the two (2)
extension periods described above.

132A0006/1                      5

2.6  Master Lease.  Lessor warrants and represents to Lessee that Lessor has provided to Lessee a true and correct copy of the Master Lease, and Lessee agrees and acknowledges that it has read said copy of the Master Lease, understands the contents thereof, has had ample opportunity to have said copy reviewed by Lessee's legal counsel, and accepts this Lease and the leasehold interest hereby created subject to the Master Lease, as well to all matters set forth in the Official Records of Sacramento County, California.

2.7  Lease "As Is".  Except with regard to responsibility for hazardous or toxic wastes resulting from Standard Oil's use of a portion of the Land and/or removal of its Improvements therefrom as recited herein, Lessee accepts the Land pursuant to Section 2.1 in its present condition "as is" and acknowledges that neither Lessor nor any agent or representative of Lessor has made any representation or warranty concerning the condition of the Land or any Improvements located on the Land at the time the term of this Lease commences or concerning suitability of the Land for any particular use or purpose. Except for removal of certain Improvements as required by the Standard Oil Lease, and except for the boundary line adjustment described in Section 2.8 (as to both of which matters, Lessor shall be responsible to accomplish prior to February 1, 1988), any and all Improvements located on the Land at the time the term of this Lease commences may be used, altered, demolished, or removed as Lessee may, at its election, choose in connection with its construction work described in Article VIII, all at Lessee's sole cost and expense.

2.8  Boundary Line Adjustment.  As shown in the Title Report, the current northern boundary line of that portion of the Primary Site that is labeled Parcel A on the map attached hereto as Exhibit "A-1" is presently located approximately forty-five (45) feet south of the southern boundary line of that portion of the Primary Site that is labeled Lot 7 on said map, thus leaving a gap between said two (2) portions of the Primary Site. Lessor agrees to use its best efforts, at Lessor's sole cost and expense, to secure approval by the County of Sacramento of a boundary line adjustment respecting said Parcel A so that its northern boundary line becomes contiguous with the southern boundary line of said Lot 7 as shown by the dotted line on said Exhibit "A-1". If Lessor cannot secure approval of said boundary line adjustment, then Lessor shall use its best efforts, at Lessor's sole cost and expense, to obtain the necessary and appropriate non-exclusive easement to permit Lessee's improvement and use of the area between the northern boundary line of said Parcel A and the southern boundary line of said Lot 7, so that Lessee may proceed with construction of Improvements as set forth

132A0006/1                              6

In Article VIII Lessee would use such area to the sa. extent as Lessee
could use that area under this Lease had a boundary line
adjustment been approved by said County.  If neither said
boundary line adjustment nor said easement has been secured or
obtained by Lessor on or before February 1, 1988, then at
Lessee's option, upon written notice to Lessor within fifteen
(15) days after February 1, 1988, Lessee may cancel this Lease.

## ARTICLE III

### RENT

3.1  Minimum Base Rent.  In addition to any and all
other amounts payable from Lessee to Lessor pursuant to this
Lease, Lessee agrees to pay to Lessor, and Lessor agrees to
accept from Lessee, as rent for the use and occupancy of the
Land, commencing on the Rent Commencement Date (defined below)
and continuing throughout the balance of the term of this Lease,
a minimum base rent of One Hundred Forty-Five Thousand Two
Hundred Dollars ($145,200.00) per year, subject to adjustments as
provided elsewhere in this Lease and subject to payment in
advance monthly installments as provided elsewhere in this Lease
("Minimum Base Rent").

3.2  Rent Commencement Date.  The term "Rent
Commencement Date," as used in this Lease, means the earlier of:

(a)  The date that is the first anniversary of the
date the term of this Lease commences; or

(b)  The date that Lessee opens for business at
the Premises or has any Gross Sales (as defined below).

3.3  Monthly Installments.  The Minimum Base Rent for
each year shall be paid in equal monthly installments, in
advance, on the first (1st) day of each calendar month during
that year, commencing on the Rent Commencement Date and
continuing on the first (1st) day of each calendar month
throughout the balance of the term of this Lease.  If, however,
the Rent Commencement Date is not the first (1st) day of a
calendar month, then Lessee shall pay to Lessor, on the Rent
Commencement Date, the amount obtained by multiplying the amount
of the regular monthly installment by a fraction, the numerator
of which is the number of days starting on, and including, the
Rent Commencement Date and ending on, and including, the last day
of the calendar month in which the Rent Commencement Date occurs,
and the denominator of which is thirty (30), so as to prorate, as
of the Rent Commencement Date, the monthly installments of
Minimum Base Rent.  Likewise, if the term of this Lease expires

132A0006/1                         7

On a date that not the last day of a calendar month, the last
monthly installment of Minimum Base Rent payable during the term
of this Lease shall be reduced in order to effect a proration
thereof as of such expiration date.  Said monthly installments of
Minimum Base Rent shall be paid in lawful money of the United
States of America at such place or places as Lessor shall
designate from time to time.

    3.4  <u>Percentage Rent</u>.  In addition to the Minimum Base
Rent, and in addition to all other monetary obligations of Lessee
under this Lease, Lessee shall pay to Lessor additional rent
("Percentage Rent") in an amount equal to one-half of one percent
(.5%) of the amount by which Gross Sales (as defined below) for
any calendar year during the term of this Lease exceeds Twenty
Million Dollars ($20,000,000.00) ("Gross Sales Breakpoint"),
subject to adjustments as provided elsewhere in this Lease.  If
the term of this Lease commences on a date that is not the first
(1st) day of a calendar year or expires on a date that is not the
last day of a calendar year, then the Percentage Rent shall be
appropriately prorated, as of such commencement or expiration of
the term of this Lease, by reducing the Gross Sales Breakpoint
for the partial calendar year involved proportionately to the
number of days in such partial year compared to the number of
days in the full calendar year.  Neither the Minimum Base Rent
nor any other amounts to be paid by Lessee under this Lease shall
offset, reduce, or be deductible from the Percentage Rent.

    3.5  <u>Gross Sales Defined</u>.  The term "Gross Sales," as
used in this Lease, is defined to be the total of the selling
prices of all merchandise and services sold in or from the
Premises by Lessee, its subtenants, licensees, and concession-
aires, whether for cash or on credit, excluding therefrom the
following:

        (a)  Sales taxes, use taxes, so-called luxury
taxes, consumers' excise taxes, gross receipt taxes and other
similar taxes now or hereafter imposed upon the sale of
merchandise or services, when such taxes are added separately to
the selling prices of merchandise or services and collected from
customers;

        (b)  Bulk sale of all or substantially all goods
on the Premises not in the ordinary course of Lessee's business
nor in the ordinary course of the business of any subtenant,
licensee, or concessionaire of Lessee;

        (c)  Sales of fixtures, trade fixtures, equipment
or property that is not stock-in-trade;

(d)   The sel... prices of all ...erchandise or products returned by customers and accepted for full credit or the amount of credit for discounts and allowances made in lieu of acceptance thereof;

(e)   Exchange of merchandise between stores of Lessee where such exchanges are made solely for the convenient operation of Lessee's business and not for the purpose of consummating a sale that has been made at, in, on or from the Premises or for the purpose of depriving Lessor of the benefit of sales that otherwise would be made at, in, on or from the Premises;

(f)   Sums and credits received in the settlement of claims for loss of or damage to merchandise;

(g)   Interest or sales carrying charges or other charges, however denominated, paid by customers for extensions of credit on sales where not included in the merchandise sales price;

(h)   Receipts from warranty or extended warranty policies for servicing or repairing merchandise provided that receipts from the extended warranty policies do not exceed six percent (6%) of all merchandise sales; and

(i)   Sales that are uncollectible and written off Lessee's books as uncollectible provided, however, that this deduction or exclusion from Gross Sales shall not exceed one percent (1%) of Lessee's Gross Sales in any calendar year, calculated on a non-cumulative basis, and such deduction or exclusion shall relate only to the sales price and not to any interest, carrying or service charges in connection therewith. If such sales are subsequently collected, then they shall be deemed a part of Gross Sales in the calendar year in which collected.

3.6   Payment of Percentage Rent.  Within thirty (30) days after the end of each calendar quarter following the Rent Commencement Date, Lessee shall deliver to Lessor a written statement, certified by Lessee to be correct, showing total Gross Sales for that calendar quarter, and if said total Gross Sales plus Gross Sales for all of the prior calendar quarters of that calendar year exceed the Gross Sales Breakpoint multiplied by a fraction, the numerator of which is the number of said calendar quarters elapsed and the denominator of which is four (4), then Lessee shall include with said statement a payment to Lessor of Percentage Rent for the partial calendar year then elapsed. Within thirty (30) days after the end of each calendar year following the Rent Commencement Date and, if the term of this Lease expires on a date that is not the last day of a calendar

132A0006/1                                9

year, within thirty (30) days of the expiration of the term of
this Lease, Lessee shall deliver to Lessor a written statement,
certified by Lessee to be correct, showing total Gross Sales by
calendar quarters for that calendar year, together with payment
by Lessee to Lessor of the balance, if any, of Percentage Rent
for that entire calendar year not previously paid.  If, at the
time said yearly statement is delivered to Lessor, it shows that
the total of quarterly payments of Percentage Rent made
previously during that calendar year exceeds Percentage Rent for
the entire calendar year, the excess shall be credited to Minimum
Base Rent or Percentage Rent next becoming due under this Lease
but shall not be credited to any other monetary obligations of
Lessee under this Lease.

        3.7  Bookkeeping and Inspection.  Lessee shall keep
full, complete and proper books, records and accounts of its
daily Gross Sales, both for cash and on credit, whether by Lessee
or by sublessees, concessionaires or licensees of Lessee.  Such
books, records and accounts shall be kept at the Premises or at
Lessee's West Coast Division office or at such other place as
Lessor may approve in writing.  Lessor and its agents, employees
and representatives shall have the right at any and all times,
during regular business hours, and upon no less than ten (10)
days written notice, to examine, inspect and copy all such books,
records and accounts, including any sales or use tax reports or
returns pertaining to the business of Lessee conducted in, upon
or from the Premises for the purpose of investigating and
verifying the accuracy of any statement of Gross Sales.  Lessor
may once in any calendar year cause an audit of the business of
Lessee to be made by an accountant of Lessor's selection, and if
a statement or statements of Gross Sales previously delivered to
Lessor shall be found to be inaccurate, then there shall be an
adjustment, and one party shall pay to the other on demand such
sums as may be necessary to settle in full the accurate amount of
said Percentage Rent that should have been paid for the period or
periods covered by such inaccurate statement or statements.
Lessee shall keep all said records for three (3) years.  If said
audit shall disclose an inaccuracy in favor of Lessee of greater
than a two percent (2%) error with respect to the amount of
Percentage Rent paid by Lessee for the period that was audited,
then Lessee shall immediately pay to Lessor the reasonable cost
of such audit; otherwise, the cost of such audit shall be paid by
Lessor.  If such audit shall disclose any willful inaccuracies,
this Lease may thereupon be cancelled and terminated at the
option of Lessor.

        3.8  Adjustments.  The Minimum Base Rent and the Gross
Sales Breakpoint shall each increase periodically during the term
of this Lease as follows:  Effective at the beginning of the
sixth (6th), eleventh (11th), sixteenth (16th), twenty-first

132A0006/1                         10

(Fifth), and Ever. Door Sixth   (Tenth) Years of the term of this Lease,
the Minimum Base Rent and the Gross Sales Breakpoint shall each
increase and become fifteen percent (15%) more than it was during
the immediately preceding five (5) year period.

     3.9   Interest on Arrearages.   Lessee agrees to pay to
Lessor interest on any monthly installment of Minimum Base Rent
and Percentage Rent not paid when due and upon all other amounts
becoming due to Lessor under this Lease, whether or not such
amounts constitute rent, which interest shall accrue from the
date the rent or other amount becomes due and continue until the
rent or other amount is paid in full.   Said interest shall become
due and payable daily as it accrues, without necessity of demand
for payment, and shall be calculated at the rate of ten percent
(10%) per annum; provided, however, that no such interest shall
be due or payable for any default that is cured within any
applicable cure period set forth in this Lease.   Lessor may apply
all payments received under this Lease first to interest accrued
and payable, and second to delinquent rent and other monetary
obligations.

ARTICLE IV

PROPERTY TAXES

     4.1   Definition.   For purposes of this Lease, the term
"Property Taxes":

     (a)   means and includes all taxes, assessments,
and other governmental charges of every kind and nature
whatsoever, whether general or special, ordinary or
extraordinary, including, but not limited to, assessments for
public improvements or benefits, that have been heretofore or
shall be during the term of this Lease (i) assessed, levied, or
imposed upon, or become due and payable and a lien upon, the
Premises or any part thereof; or (ii) assessed, levied, or
imposed by reason of the use or occupancy or change in ownership
of the Premises or any part thereof; or (iii) assessed, levied,
or imposed upon this Lease or Lessee's rental obligations or
Lessor's right to receive rents or other sums under this Lease;
or (iv) assessed, levied, or imposed by reason of Lessor's or
Master Lessor's ownership or interest in all or any part of the
Premises, this Lease, or rents or other sums accruing under this
Lease, including, but not limited to, a tax or excise on rents;
or (v) assessed, levied, or imposed in lieu of any of the
foregoing taxes, assessments, or other governmental charges; but

     (b)   does not mean or include franchise, estate,
inheritance, successor, capital levy, transfer, net income, or

132A0006/1                                    11

(c)  if, at any time during the term of this
Lease, any portion of the Premises is jointly assessed, for
property tax purposes, with other real property that is not a
part of the Premises, then Lessor shall make a reasonable
allocation of the taxes, assessments, or other governmental
changes that are assessed, levied, or imposed thereon, and only
the portion thereof reasonably attributable to the Premises or
some portion thereof shall be deemed Property Taxes payable by
Lessee as set forth in Section 4.2, which allocation may be based
upon any and all records, memoranda, and notes available at the
Assessor's Office, calculations of respective square footage,
evaluation of respective permanent improvements and uses, and
other relevant evidence available to Lessor at no substantial
cost or provided by Lessee.

4.2  Payment.  Lessee agrees to pay to Lessor, not
later than thirty (30) days before the delinquency date or dates
of the appropriate governmental authority or authorities, as rent
additional to all other rent reserved in this Lease, all Property
Taxes (as defined above) for each fiscal tax year or portion
thereof that is within the term of this Lease, prorated between
Lessor and Lessee for each fiscal tax year that is not entirely
within the term of this Lease in the same ratio as the number of
days of such fiscal tax year that are within the term of this
Lease bears to the number of such days that are outside the term
of this Lease.  With respect to Property Taxes that may, under
the laws then in force, be paid in installments, Lessee shall be
required to pay hereunder only such installments as Lessor shall
be required by law or by the Master Lease to pay, prorated
between Lessor and Lessee for partial fiscal tax years as above
provided.  In the event that Lessee fails to pay to Lessor any
Property Taxes thirty (30) days before delinquency, Lessor shall
have the right and option, but no obligation, to pay such
Property Taxes or any portion thereof before or after the
delinquency date and any and all fines, penalties, and interest
thereon, and Lessee agrees to reimburse Lessor immediately for
the total amount so paid by Lessor, as rent additional to all
other rent reserved in this Lease.  In the event that Lessor has
paid, before the date the term of this Lease commences, any
Property Taxes or installment thereof for a fiscal tax year or
portion thereof that is in part within the term of this Lease,
Lessee agrees to pay to Lessor, on the date the term of this
Lease commences, Lessee's prorata portion thereof.

4.3  Jointly Assessed Properties.  With respect to any
Property Taxes attributable to a portion of the Premises jointly
assessed with other real property that is not a part of the

Premises, Lessor shall pay, or cause to be paid, the payment of, all such jointly assessed taxes before any fine, penalty, interest, or cost may be added thereto or become due or be imposed by operation of law for the nonpayment or late payment thereof, whether or not such payment should have been made by a tenant or other third party, provided that Lessee has paid to Lessor its share thereof as required by this Lease.  If Lessee has paid its share of such jointly assessed taxes and Lessor fails to pay, or cause to be paid, as above provided, the total of such jointly assessed taxes, then Lessee shall have the right to cure by payment of such jointly assessed taxes and may deduct the cost thereof, plus interest at the highest legal rate, from the next installment of Base or Percentage Rent due hereunder.

4.4  _Personal Property Taxes_.  Lessee agrees to pay, or cause to be paid, directly to the taxing authority or authorities before delinquency any and all taxes that are levied or assessed upon Personal Property.  If any such taxes are assessed, levied, or imposed upon Lessor or upon all or any part of the Premises or of Lessor's or the Master Lessor's interest in the Premises or this Lease, or if such taxes become a lien upon or may be enforced against Lessor or the Master Lessor or all or any part of the Premises or against Lessor's interest in the Premises or in this Lease, Lessor shall have the right and option, but no obligation, to pay such taxes or any portion thereof before or after the delinquency date, and Lessee agrees to reimburse Lessor immediately therefor, including, but not limited to, any and all late payment penalties or fines and interest paid by Lessor, as rent additional to all other rent reserved in this Lease.

4.5  _Contests_.  Nothing herein shall prevent Lessee from contesting, and Lessee may contest and institute all proceedings reasonably necessary to contest, in good faith, the validity or amount of any Property Taxes, provided Lessee protects the Premises and the interests of Lessor and the Master Lessor, either by arranging with Lessor for the payment by Lessee of the Property Taxes under protest not later than thirty (30) days before delinquency or by a surety bond.

ARTICLE V

INDEMNITY AND INSURANCE

5.1  _Indemnity_.  Except if arising from the active negligence of Lessor (or the Master Lessor, if applicable) or its or their agents or employees, Lessee agrees to indemnify Lessor against and hold Lessor harmless and free from any and all liability, loss, cost, expense, or obligation (including without limitation reasonable attorneys' fees, court costs, and other

132A0006/1                              13

expenses, whether or not taxable, incurred . Lessor or by the
Master Lessor in defending itself against claims or otherwise
connected therewith) on account of or arising out of, and this
Lease is made on the express condition that Lessor and the Master
Lessor shall not be liable for, or suffer loss or incur any
liability by reason of, injury to or death of any person or
persons or damage to or loss of use of property, from whatever
cause in any way connected with the condition or use of the
Premises or the Personal Property or connected with activities of
Lessee or of any of its employees, agents, invitees, contractors,
or licensees, including, without limitation, any and all
liability for injury to or death of, or damage to or loss of the
use of the property of, Lessee or any of Lessee's employees,
agents, invitees, contractors, or licensees.

        5.2  Liability Insurance.  Lessee agrees to procure and
maintain, at its sole cost and expense, during the term of this
Lease, comprehensive public liability insurance insuring against
liabilities related to the condition of or use of the Premises
with limits not less than One Million Dollars ($1,000,000.00) for
bodily injury or death and Five Hundred Thousand Dollars
($500,000.00) for damage to or loss of use of property (subject
to periodic increases as provided below), specifically
(a) insuring performance by Lessee of its indemnify obligations
under Section 5.1, (b) providing that the coverage is primary and
that any coverage that Lessor or the Master Lessor may maintain
shall be in excess thereof, (c) naming Lessor and the Master
Lessor as additional insureds, (d) providing that the policy
cannot be cancelled or modified without twenty (20) days' prior
written notice to Lessor and the Master Lessor, and (e) including
a cross-liability or severability-of-interests endorsement in the
event that the basic policy obtained by lessee does not contain
such a provision.  Neither the maintenance nor the amount of any
such public liability insurance shall be construed to limit in
any way Lessee's obligations under any indemnity or hold harmless
agreement set forth in this Lease.  At the request of Lessor, the
amount of said public liability insurance shall be increased
periodically as may be reasonable from time to time based upon
such criteria as inflation, size of jury verdicts in general,
]xperiences at the Premises respecting public liability, and
customary practices in first-class shopping centers in the
Sacramento, California area.

        5.3  Property Insurance.  Lessee agrees to procure and
maintain, at its sole cost and expense, during the term of this
Lease standard form fire, extended coverage, vandalism, malicious
mischief, and special extended coverage insuring the Improvements
in an amount at least equal to the full replacement cost
thereof.  Said policy or policies shall specifically (a) be
issued for the benefit of Lessor, Lessee, and any mortgagee or

beneficiary of a deed of trust as an interest therein as
their interests appear, and (b) prohibit cancellation or
modification by the insurer without twenty (20) days' prior
written notice to Lessor and any such mortgagee or beneficiary.
Provided, however, that if, and only so long as, Lessee has a
reported net worth of not less than One Hundred Million Dollars
($100,000,000.00), Lessee may maintain such insurance with
commercially reasonable "deductible" amounts or may self-insure
the Improvements.

5.4   _General_.   Each insurance policy required by this
Lease to be procured and maintained by Lessee shall be issued by
a company approved by Lessor, but may be a part of a blanket
policy, which approval Lessor agrees not to withhold
unreasonably.   Lessee agrees to deliver to Lessor (a) on or
before the commencement of the term of this Lease a copy of each
such policy, or binder therefor, and a certificate certifying
that it contains the provisions required by this Lease, and   -
(b) upon each renewal thereof not later than five (5) days prior
to the expiration of the policy.   Lessor and Lessee hereby waive
any and all rights of recovery against each other for any loss or
damage to the Premises or the contents contained therein on
account of fire or other casualty to the extent the loss is
covered by property insurance maintained by Lessor or Lessee; and
each party's policies of insurance applicable to the Premises
shall contain appropriate provisions recognizing this mutual
release and waiving of all rights of subrogation by the
respective insurance carriers.

5.5   _Mechanics' Liens_.   Lessee agrees (a) to pay for
all labor and services performed for, and for all materials used
by or furnished to, Lessee or any contractor employed by Lessee
with respect to the Premises or any part thereof, whether or not
such labor, services, or materials were related to trade fixtures
or other works of improvement; (b) to indemnify and hold Lessor
and the Premises free and harmless from any and all liabilities,
claims, liens, encumbrances, and judgments created or suffered in
connection with such labor, services, or materials; and (c) to
permit Lessor and the Master Lessor to post and maintain notices
of nonresponsibility on the Premises in accordance with
California Civil Code Section 3094 or other similar statute
hereafter enacted.   Nothing herein shall prevent Lessee from
contesting in good faith the validity or amount of any lien,
claim, encumbrance, or judgment, provided that, in the case of a
mechanics' or materialman's lien, Lessee obtains and records an
appropriate bond as provided by law to remove the record lien
created thereby.

## USE OF PREMISES

6.1   Underline{Permitted Uses}.   Lessee shall use the Premises only for conduct of its usual retail business of selling to the public home appliances, consumer electronic goods and furnishings, and equipment with incidental service, installation in motor vehicles, and storage of same, all in such manner as to maximize Gross Sales and for no other purpose whatsoever without the prior written consent of Lessor, which consent shall not be unreasonably withheld or delayed; except that uses of the Access Area and the Parking Area are further limited as set forth in Section 2.2.   Lessee acknowledges that, by reason of Lessee's covenant to pay Percentage Rent, Lessor has a legitimate, economic interest in the nature and extent of business conducted by Lessee on or about the Premises, and that default by Lessee with respect to any of its agreements contained in this Section 6.1 shall constitute a material breach of this Lease by Lessee for which Lessor may, at its option, and in addition to all other remedies available, terminate this Lease.   Without limiting the generality of the foregoing agreement by Lessee to conduct its business at the Premises in such manner as to maximize Gross Sales, Lessee agrees specifically to comply constantly throughout the term of this Lease with the following requirements respecting use of the Premises:

(a)   To be open for business on all such days of the year and for such hours in each day as the majority of Lessee's stores are open and for such hours as shall be consistent with Lessee's reasonable business judgment as a national retail chain;

(b)   To keep the Premises well-stocked with appropriate merchandise and operated and managed by adequate numbers of competent personnel consistent with Lessee's reasonable business judgment as a national retail chain;

(c)   To advertise in newspapers and magazines, by direct mail, and on radio and television in the local market area and to evaluate the results of such advertising so as to make appropriate changes in the nature of such advertisements and to achieve a good mix of media used;

(d)   To conduct periodic "sales" of merchandise for the purpose of attracting new customers;

(e)   Generally to conduct business in such a manner as is customary and to be competitive within Lessee's industry; and

132A0006/1                                          16

(f)  Not to open or operate, or be affiliated, either directly or indirectly, with, a competing store within a three (3) mile radius of the Premises.

6.2  Prohibited Uses.  Lessee agrees not to do or permit anything to be done on or about the Premises and agrees not to bring or keep anything thereon that constitutes a violation of Section 6.1 or a nuisance or constitutes waste or damages the Premises or any part thereof.

6.3  Compliance with Law.  Lessee agrees to comply promptly, at its sole cost and expense, with the requirements of all municipal, state, federal, and other governmental authorities now or hereafter in force, whether such requirement is imposed by statute, ordinance, rule, regulation, or judicial or administrative order, decree, or judgment or otherwise, and with the requirements of any board of fire underwriters or other similar body now or hereafter constituted relating to or affecting the condition, use, or occupancy of the Premises or any part thereof.  Lessee, at its sole cost and expense, may contest, by appropriate legal proceedings, the validity of any law or regulation if operation of the law or regulation can be suspended until final determination of its validity or application without subjecting Lessor to liability.

6.4  Good Condition.  Lessee acknowledges that neither Lessor nor any agent or representative of Lessor has made any representation or warranty with respect to the Land or the Improvements, or any part thereof, nor has Lessor agreed to undertake any modification, alteration, or improvement to the Land or any part thereof except as expressly provided in this Lease.  The taking of possession of the Land by Lessee shall conclusively establish that the Land was at that time in satisfactory condition.

6.5  Utilities.  Lessee agrees to pay for all water, natural gas, electricity, telephone, and other utilities and services supplied to the Premises together with any and all taxes thereon, and for any and all hook-up charges and cost of installation of utility lines.

6.6  Entry by Lessor.  In addition to any and all other rights of entry granted or reserved to Lessor by this Lease, Lessee agrees to permit Lessor, its agents, representatives, and appraisers, and prospective purchasers and lenders to enter the Premises at all reasonable times (a) to post notices of nonresponsibility; (b) to place upon the Premises any usual "For Lease" or "For Sale" signs at any time within six (6) months prior to the expiration of the term of this Lease; or (c) upon no

less than ten (10) days notice to Lessee, and without unreason-
able interruption of Lessee's normal business activities,
generally to inspect the Premises to evaluate their condition and
to determine whether Lessee is in compliance with the provisions
of this Lease.


## ARTICLE VII

### MAINTENANCE AND REPAIRS

7.1  <u>Lessor's Obligations</u>.  Lessor shall have no
obligation whatsoever to maintain or repair the Premises or any
portion thereof.

7.2  <u>Lessee's Obligations</u>.  Subject to the provisions
of Article IX, Lessee agrees to keep and maintain in good and
sanitary order, condition, and repair, including replacements as
needed, at Lessee's sole cost and expense, the Premises and every
part thereof, including, but not limited to, the roof, exterior,
interior, foundation, structural parts, operational parts,
paving, and landscaping.  Lessee expressly waives the benefit of
any law, whether by statute, judicial decision, ordinance, or
otherwise, now or hereafter in effect, that would otherwise
accord Lessee the right to make repairs at Lessor's expense or to
terminate this Lease because of Lessor's failure to keep the
Premises or any portion thereof in good order, condition, or
repair.

7.3  <u>Default by Lessee</u>.  If Lessee fails to maintain
the Premises as required by Section 7.2, Lessor may, but shall
have no obligation to, enter the Premises to do, or to permit its
contractors or agents to do, such acts at the expense of Lessee
as are reasonably required to perform the maintenance or repair
work required of Lessee, provided that, except in the case of an
emergency involving imminent danger to persons or property,
Lessor shall not have a right to do such work until the
expiration of thirty (30) days from the date Lessor gives Lessee
notice that it intends to enter to perform such maintenance or
repair work.  Any amount so expended by Lessor shall be paid by
Lessee to Lessor promptly upon demand, and shall be additional
rent hereunder.  Lessor shall have no liability to Lessee for any
loss or damage suffered by Lessee resulting from Lessor's
performance of such maintenance or repair work.

7.4  <u>Surrender</u>.  Upon the expiration or termination of
the term of this Lease, Lessee shall surrender the Land and
Improvements to Lessor, all in good condition, ordinary wear and
tear excepted, and, subject to the provisions of Articles IX and
X, casualty and condemnation losses excepted, at which time, and

132A0006/1                          18

upon such surrende., fee ti    Improve. .ts shall auto-
matically pass to Lessor.  Lessee agrees to execute, acknowledge,
and deliver to Lessor such quitclaim deed and such other
instruments and documents as Lessor shall reasonably request in
order to assure and show of record Lessor's fee title to the Land
and the Improvements free of any interest or claim of Lessee.


ARTICLE VIII

CONSTRUCTION OF IMPROVEMENTS

        8.1  Retail Facility.  Lessee agrees, at its sole cost
and expense, and commencing immediately after the term of this
Lease commences, and subject to the requirements of Section 8.2,
to design and build, using such licensed architects, engineers,
contractors, and other experts Lessee shall select, on the Land a
retail facility ("Retail Facility") that is appropriate for  .
conduct of Lessee's business, which Retail Facility shall
include, but is not limited to, a building consisting of
approximately thirty thousand (30,000) net usable square feet and
a vehicle parking area and access as required by local
governmental authorities, all in general conformity with the
Concept Plan attached hereto as Exhibit "C" and incorporated
herein by this reference.  The Retail Facility shall be part of
the Improvements as defined in this Lease.  Subject to force
majeure, Lessee agrees to use its best efforts to complete
construction of the Retail Facility, open for business, and have
Gross Sales, all before the Rent Commencement Date.

        8.2  Construction in General.  In addition to Lessee's
obligation to build the Retail Facility on the Land as set forth
in Section 8.1, Lessee may, from time to time, but shall not be
obligated to, construct additional Improvements upon the Land,
alter and make additions to Improvements on the Land, and replace
obsolete Improvements on the Land, provided that all such
construction and the initial building of the Retail Facility, as
well as any rebuilding or restoration of damaged or destroyed
Improvements under Article IX, shall comply with the following
requirements:

        (a)  All such Improvements shall be designed and
constructed in a good and workmanlike manner and in accordance
with plans and specifications that have been previously reviewed
and approved in writing by Lessor, which approval Lessor agrees
not to withhold or delay unreasonably; provided, however, that
alterations, replacements, or additions to Improvements (not
including initial construction of the Retail Facility) shall
require written approval by Lessor only if they are structural in
nature or if the cost of construction thereof, at any one time,

132A0006/1                        19

exceeds Fifty Thousand Dollars ($50,000.00) as adjusted from time to time based upon changes, measured from the commencement of the term of this Lease, in the Consumer Price Index, all items, for All Urban Consumers, as periodically published by the Department of Labor, Bureau of Labor Statistics, U.S. City Average;

(b)   The design and construction of all such Improvements shall comply with all laws, rules, and regulations of those governmental bodies and agencies asserting jurisdiction over the Premises;

(c)   Lessee shall diligently prosecute such construction so that all such Improvements are completed within a reasonable time after construction commences; and so as to cause the least amount of delay respecting or interference with, the generation of maximum Gross Sales;

(d)   The entire cost of construction of all such Improvements, including, but not limited to, any off-site work, plans and specifications, and all permits, fees, and licenses therefor, shall be paid by Lessee; and

(e)   In the event of a required dedication for public use of a part of the Land in connection with construction of such Improvements, Lessor agrees to join with Lessee, at Lessee's request, in such dedication.

8.3   <u>Personal Property</u>.  Personal Property may be removed from the Premises by Lessee at any time during the term of this Lease and shall be removed from the Premises by Lessee upon the expiration or termination of the term of this Lease. Lessee agrees promptly to repair, at its sole cost and expense, any damage or injury to the Premises or any part thereof that is caused by any such removal.

8.4   <u>Title to Improvements</u>.  Improvements constructed at Lessee's sole cost and expense shall be the property of Lessee during the term of this Lease, and title thereto shall automatically pass to Lessor at the expiration or termination of the term of this Lease.

8.5   <u>Permits or Approvals</u>.  Lessor agrees to join with Lessee, at Lessee's request, as required for any permit applications and other governmental approvals related to Lessee's construction of Improvements, at no cost or expense to Lessor.

## DESTRUCTION

9.1  Duty to Rebuild.  In the event that Improvements
are damaged or destroyed in whole or in part by any casualty,
whether or not covered by insurance, and subject to the provi-
sions of Section 9.3, Lessee shall forthwith, and in accordance
with the requirements of Article VIII, rebuild or restore them to
their prior condition with such alterations as Lessee may desire,
subject to compliance with Article VIII, which rebuilding or
restoration Lessee shall complete within a reasonable period of
time, but in no event, subject to force majeure, later than
twelve (12) months after commencement thereof.  Lessee shall be
entitled to receive any property insurance proceeds available to
reimburse Lessee for the costs and expenses incurred.

9.2  No Abatement of Rent.  There shall be no abatement
of rent by reason of damage to or destruction of the Premises in
whole or in part.  Lessee hereby expressly waives the provision
of Section 1932, Subdivision 2, and Section 1933, Subdivision 4,
of the California Civil Code, and all present and future
amendments thereto, and all other laws, whether nor or hereafter
in force, that would permit or cause termination of a lease or
abatement of rental obligations upon damage to or destruction of
the property subject thereto.

9.3  Destruction Near End of Term.  Notwithstanding any
other provision of this Article IX, if, as a result of any
casualty that occurs during the last two (2) years of the term of
this Lease, the Improvements are destroyed or so severely damaged
as to have a material impact on Lessee's ability to conduct
business, as reasonably determined by Lessee, Lessee may elect,
by giving written notice to Lessor no later than sixty (60) days
after such casualty occurs, to terminate this Lease, effective on
the date said notice is given.  If Lessee does so elect to
terminate this Lease, then Lessee shall have no duty to rebuild
or restore the Improvements under Section 9.1, and Lessee shall
promptly execute and deliver to Lessor all instruments and
documents that may be appropriate to insure that Lessor receives
all related insurance proceeds, and Lessee shall pay to Lessor
the amount of any "deductible" amount or amounts under such
insurance and any and all amounts that, but for such termination
of this Lease by Lessee, would have been paid by Lessee for
rebuilding, reconstruction, or repairs under Lessee's self-
insurance plan.

## CONDEMNATION

10.1 <u>Definitions of terms</u>.  For the purposes of this Lease, the term

(a)  "Taking" means a taking of the Premises or an interest therein pursuant to, or damage related to the exercise of, the power of condemnation and includes a voluntary conveyance to any agency, authority, public utility, person, corporation, or other entity empowered to condemn property in lieu of court proceedings;

(b)  "Total Taking" means a Taking of the entire Premises as to prevent or substantially impair the use thereof by Lessee for the uses provided in this Lease;

(c)  "Partial Taking" means a Taking of only a portion of the Premises that does not constitute a Total Taking;

(d)  "Date of Taking" means the date upon which title to the Premises, an interest therein, or a portion thereof passes to and vests in the condemnor, the date damage related to the exercise of the power of condemnation is suffered, or the effective date of any order for possession if that order is issued prior to the date title vests in the condemnor;

(e)  "Award" means the amount of any award made, compensation paid, or damages ordered as a result of a Taking;

(f)  "Total Temporary Taking" means a Total Taking for a temporary term;

(g)  "Partial Temporary Taking" means a Partial Taking for a temporary term.

10.2 <u>Rights</u>.  Lessor and Lessee agree that, in the event of a Taking, all rights between them and in and to an Award shall be as set forth herein, and Lessee shall have no right to any Award except as set forth herein.  In no event shall any portion of the Award that is attributable to Lessee's leasehold interest in the Land be paid to Lessee.

10.3 <u>Total Taking</u>.  In the event of a Total Taking during the term of this Lease that is not a Total Temporary Taking, (a) the rights of Lessee under this Lease and the leasehold estate of Lessee in and to the Land shall cease and terminate as of the Date of Taking, (b) Lessor shall refund to Lessee any prepaid rent prorated as of the Date of Taking,

132A0006/1                                    22

(c) Lessee shall pay to Lessor any rent or other sums due to Lessor under this Lease prorated as of the Date of Taking, with no further obligations thereafter accruing under this Lease, (d) Lessee shall receive from the Award those portions of the Award that are attributable to (i) the value of, and paid as compensation for, Lessee's interest in the Improvements, (ii) removal and relocation of Personal Property, and (iii) any special damages to Lessee, such as for loss of business goodwill or business moving expenses, and (e) the remainder of the Award, which shall include the unencumbered fee value of the Land, shall be paid to Lessor, all subject, of course, to the rights of the Master Lessor under the Master Lease or by law.

10.4 <u>Partial Taking</u>.  In the event of a Partial Taking during the term of this Lease that is not a Partial Temporary Taking, (a) the rights of Lessee under this Lease and the leasehold estate of Lessee in and to the portion of the Land taken shall cease and terminate as of the Date of Taking, with no further obligations thereafter accruing under this Lease with respect to that portion, (b) from and after the Date of Taking the Minimum Base Rent shall be adjusted to be equal to the product obtained by multiplying the then Minimum Base Rent under this Lease by the quotient obtained by dividing the fair market value of the Land still subject to this Lease after the Taking by the fair market value of the Land prior to the Taking, (c) Lessee shall only receive from the Award those portions of the Award that are attributable to (i) the value of, and paid as compensation for, Lessee's interest in the Improvements, (ii) removal and relocation of the Personal Property, and (iii) any special damages to Lessee, such as loss of business goodwill or business moving expenses (d) the remainder of the Award, which shall include the unencumbered fee value of the portion of the Land taken, shall be paid to and be the property of Lessor, and (e) Lessor agrees to use whatever severance damages it receives by reason of the Partial Taking, to pay the cost of restoring, if necessary after all severance damages received by Lessee have been expended to pay the cost of restoring, any Improvements that are a part of the portion that is not taken if the Partial Taking causes such Improvements to be no longer reasonably suitable for the use and occupancy by Lessee contemplated hereunder, fully restored, provided that such severage damages are available to Lessor and Lessee and are not taken by a mortgagee under a mortgage or beneficiary of a deed of trust, all subject, of course, to the rights of the Master Lessor under the Master Lease or by law.

10.5 <u>Short-Term Temporary Taking</u>.  In the event of a Total or Partial Temporary Taking during the term of this Lease for a period ending on or before the expiration of the term of this Lease:  (a) this Lease shall continue in full force and

effect, (b) that portion of the Award attributable to the rental
value of the Land for the period of the Total or Partial
Temporary Taking shall be paid to Lessor and credited by Lessor
to the Minimum Base Rent, the Percentage Rent, and other sums
that become due during the period of the Total or Partial
Temporary Taking, (c) any excess of the Award over the amounts
paid to Lessor shall be paid to Lessee, and (d) if the portion of
the Award paid to Lessor under "(b)" above is not sufficient to
pay the Minimum Base Rent, the Percentage Rent, and other
obligations of Lessee as they become due during the period of the
Total or Partial Temporary Taking, the deficiency shall be paid
by Lessee to Lessor as the Minimum Base Rent, the Percentage Rent
and other obligations become due.

    10.6 <u>Long-Term Total Temporary Taking</u>.  In the event of
a Total Temporary Taking for a period ending subsequent to the
expiration date of the term of this Lease, (a) the rights of
Lessee under this Lease and the leasehold estate of Lessee in and
to the Land shall cease and terminate as of the Date of Taking,
(b) Lessor shall refund to Lessee any prepaid rent prorated as of
the Date of Taking, with no further obligation thereafter
accruing under this Lease, (c) Lessee shall pay to Lessor any
rent or other sums due to Lessor under this Lease prorated as of
the Date of Taking, (d) Lessee shall receive from the Award only
those portions of the Award that are attributable to (i) the
value of, and paid as compensation for, Lessee's interest in the
Improvements, (ii) removal and relocation of Personal Property,
and (iii) any special damages to Lessee, such as for loss of
business goodwill or business moving expenses, and (e) the
remainder of the Award, which shall include the unencumbered fee
value of the Land, shall be paid to Lessor, all subject, of
course, to the rights of the Master Lessor under the Master Lease
or by law.

    10.7 <u>Long-Term Partial Temporary Taking</u>.  In the event
of a Partial Temporary Taking for a period ending subsequent to
the expiration of the term of this Lease, (a) the rights of
Lessee under this Lease and the leasehold estate of Lessee in and
to the portion of the Land taken shall cease and terminate as of
the Date of Taking, with no further obligations thereafter
accruing under this Lease with respect to that portion, (b) from
and after the Date of Taking the Minimum Base Rent shall be
adjusted to be equal to the product obtained by multiplying the
then Minimum Base Rental under this Lease by the quotient
obtained by dividing the fair rental value of the Land still
subject to this Lease after the Taking by the fair rental value
of the Land prior to the Taking, (c) Lessee shall receive from
the Award only those portions of the Award that are attributable
to (i) the value of, and paid as compensation for, Lessee's
interest in the Improvements, (ii) removal and relocation of the

Personal Property, and (iii) special damages of Lessee, such as loss of business goodwill or business moving expenses, (d) the remainder of the Award, which shall include the unencumbered fee value of the portion of the Land taken, shall be paid to and be the property of Lessor, and (e) Lessor agrees to use whatever severance damages it receives by reason of the Partial Taking to pay the cost of restoring, if necessary after all severance damages received by Lessee have been expended to pay the cost of restoring, any Improvements that are a part of the portion that is not so taken if the Partial Taking causes such Improvements to be no longer reasonably suitable for the use and occupancy by Lessee contemplated hereunder, provided that such severage damages are available to Lessor and Lessee and are not taken by a mortgagee under a mortgage or beneficiary of a deed of trust, all subject, of course, to the rights of the Master Lessor under the Master Lease or by law.

## ARTICLE XI

## DEFAULT AND REMEDIES

11.1 <u>Default Defined</u>.  For the purposes of this Lease, the terms "Default by Lessee" and "Lessee's Default" both mean the occurrence of any one or more of the following events:

(a)   failure of Lessee to pay when due any Minimum Base Rent, Percentage Rent, Property Taxes, premiums for insurance required to be maintained by Lessee under this Lease, or other sums of money required to be paid by Lessee pursuant to the provisions of this Lease (hereinafter collectively "Rent and Sums Equivalent to Rent");

(b)   commencement of any action or proceeding by or against Lessee under any federal or state bankruptcy or insolvency law or other debtors' relief law, whether now or hereafter in force, if such proceedings continued for a period of ninety (90) days after such commencement, and provided no law then prohibits the treatment of such commencement as a default under a lease;

(c)   appointment, either voluntarily or involuntarily, of a receiver, trustee, keeper, or other person to take possession of all or substantially all of the assets of Lessee, if such appointment and possession continues for a period of ninety (90) days after commencement, and provided no law then prohibits the treatment of such appointment as a default under a lease;

132A0006/1                                25

(d)   execution or issuance of an assignment for the benefit of creditors of all or substantially all of its assets that are available by law for the satisfaction of claims of judgment creditors of Lessee; or

(e)   breach by Lessee of any provision of this Lease, except those mentioned in subparts "(a)" through "(d)" of this Section 11.1, not cured within sixty (60) days after Lessor gives Lessee written notice of the breach, or, in the case of breaches reasonably requiring more than sixty (60) days to cure, not cured within a reasonable time after the giving of such notice, provided that the curing of the breach is commenced within said sixty (60) days after the giving of such notice and is diligently prosecuted to completion thereafter.

11.2 <u>Lessor's Right to Terminate</u>.  In the event of Default by Lessee, Lessor shall have the right to terminate this Lease and Lessee's right to possession of the Land by giving written notice of termination to Lessee (provided that any notice to quit or of termination of this Lease given pursuant to California law by reason of Lessee's failure to pay any Rent and Sums Equivalent to Rent shall allow Lesse at least ten (10) days from service of said notice to cure such failure, rather than the minimum of three (3) days permitted under California Law) and to recover from Lessee:

(a)   the worth at the time of award (computed by including interest at the rate specified elsewhere in this Lease for arrearages) of the unpaid Rent and Sums Equivalent to Rent required to be paid by Lessee under this Lease that had been earned at the time of termination;

(b)   the worth at the time of award (computed by including interest at the rate specified elsewhere in this Lease for arrearages) of the amount by which the unpaid Rent and Sums Equivalent to Rent required to be paid by Lessee under this Lease that would have been earned after termination until the time of award exceeds the amount of such rental loss that Lessee proves could have been reasonably avoided;

(c)   the worth at the time of award (computed by discounting at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%)) of the amount by which the unpaid Rent and Sums Equivalent to Rent required to be paid by Lessee under this Lease for the balance of the term of this Lease after the time of award exceeds the amount of such rental loss that Lessee proves could be reasonably avoided; and

(d) any and all other amounts necessary to compensate Lessor for detriment proximately caused by the Default by Lessee or which in the ordinary course of events would be likely to result therefrom.

11.3 <u>Lessor's Right Not to Terminate</u>. Unless and until Lessor elects to terminate this Lease and Lessee's right to possession as provided in Section 11.2, this Lease shall continue in full force and effect after Default by Lessee, and Lessor may enforce all of its rights and remedies under this Lease, including, but not limited to, the right to recover or enforce payment of Rent and Sums Equivalent to Rent as they become due under this Lease.

11.4 <u>General</u>. Efforts by Lessor to mitigate damages caused by any Default by Lessee shall not constitute a waiver by Lessor of any of Lessor's rights or remedies under this Lease, and nothing contained in this Lease shall affect the right of Lessor under this Lease to indemnification for liability for personal injuries or property damages arising prior to termination of this Lease. Neither reasonable acts of repair, alteration, maintenance, or preservation of the Premises, nor efforts to relet the Land or Premises, nor the appointment of a receiver or trustee, whether in bankruptcy proceedings or otherwise, upon initiative of Lessor to protect Lessor's interests under this Lease, shall constitute an election by Lessor to terminate this Lease or Lessee's right to possession of the Land. If Lessor permits this Lease to continue in full force and effect after a Default by Lessee, Lessor may, nevertheless, at any time thereafter elect to terminate this Lease and Lessee's right to possession of the Land under the provisions of Section 11.2., for such previous Default by Lessee, provided the Default by Lessee has not then been cured. The rights and remedies of Lessor under this Article XI shall be additional to all other rights and remedies provided to Lessor in this Lease or by law, whether now in force or hereafter enacted, including, but not limited to, injunctions and other equitable relief.

11.5 <u>Lessor's Default</u>. If Lessor shall be in default hereunder, Lessee, after thirty (30) days written notice that Lessee intends to cure such default, or without notice if in Lessee's reasonable judgment an emergency shall exist, shall have the right, but not the obligation, to cure such default, and Lessor shall pay to Lessee upon demand the reasonable cost thereof plus interest at the rate of ten percent (10%) per annum. Except when in Lessee's reasonable judgment an emergncy shall exist, Lessee shall not commence to cure any default of such a nature that could not reasonably be cured within such thirty (30) days if Lessor has commenced to cure same within said period so long as Lessor proceeds with reasonable diligence and in good faith to cure such default.

ARTICLE XII

ASSIGNMENT AND SUBLETTING

12.1 General Restrictions.  No assignment of this Lease
or subleasing of the Premises or any part thereof shall be
permitted except as provided in this Article XII.

12.2 Consent Required.  Lessee shall not, without prior
written consent of Lessor, which consent shall not be unreason-
ably withheld or delayed, assign or encumber this Lease or any
interest herein or sublet the Premises or any part thereof or
permit use of the Premises by any party other than Lessee.  Any
of the foregoing acts without such consent shall be void and
shall, at the option of Lessor, terminate this Lease.  This Lease
shall not, nor shall any interest of Lessee herein, be assignable
by operation of law without the written consent of Lessor, which
consent shall not be unreasonably withheld or delayed.

12.3 Notice to Lessor.  If, at any time, or from time
to time, during the term of this Lease, Lessee desires to assign
this Lease or sublet all or any part of the Premises, Lessee
shall give written notice to Lessor setting forth the terms and
conditions of the proposed assignment or sublease and the
identity of the proposed assignee or subtenant, together with a
written statement of the amount of the unamortized book value of
Lessee's Improvements.  Lessee shall promptly supply Lessor with
such information concerning the business background and financial
condition of such proposed assignee or subtenant as Lessor may
reasonably request.  Lessor shall have the option, exercisable by
written notice given to Lessee within fifteen (15) days after
Lessee's notice is given and other information is given, either
to sublet such space from Lessee at the rental and upon the other
terms and conditions set forth in this Lease for the term set
forth in Lessee's notice, or, in the case of an assignment, to
terminate this Lease, and if termination is elected by Lessor,
Lessor shall pay to Lessee, upon such termination, the amount of
said unamortized book value of Lessee's Improvements.  If Lessor
does not exercise such option, Lessee may assign the Lease or
sublet such space to such proposed assignee or subtenant on the
following further conditions:  (a) Lessor shall have the right to
approve such proposed assignee or subtenant, which approval shall
not be unreasonably withheld or delayed; (b) the assignment or
sublease shall be on the same terms and conditions set forth in
the notice given to Lessor; (c) no assignment or sublease shall
be valid, and no assignee or sublessee shall take possession of
the Premises, unless and until an executed counterpart of such
assignment or sublease has been delivered to Lessor; (d) no

132A0006/1                          28

assignee or sublessee shall have further right to assign or
sublet except on the terms herein contained; and (e) one-half
(1/2) of any and all money and other economic consideration, if
any, received by Lessee as a result of such assignment or
subletting, however denominated under the assignment or sublease,
that exceed, in the aggregate, (i) the total sums that Lessee is
obligated to pay to Lessor under this Lease (prorated to reflect
obligations allocable to any portion of the Premises subleased),
plus (ii) any real estate brokerage commissions or fees payable
in connection with such assignment or subletting, plus (iii) the
reasonable costs of renovations to the Improvements required in
order to accomplish the assignment or subletting, shall be paid
to Lessor as additional rent under this Lease without affecting
or reducing any other obligations of Lessee hereunder.

      12.4 <u>Permitted Assignments and Subletting</u>.
Notwithstanding the provisions of Sections 12.2 and 12.3, Lessee
may assign this Lease or sublet the Premises, or any portion
thereof, without Lessor's consent and without extending any
recapture or termination option to Lessor, to any corporation
which controls, is controlled by, or is under common control with
Lessee, or to any corporation resulting from merger or consolida-
tion with Lessee, or to any other person or entity which acquires
substantially all the assets of Lessee's business in Northern
California as a going concern, provided that (a) the assignee or
sublessee assumes, in full, the obligations of Lessee under this
Lease, and (b) Lessee remains fully liable under this Lease.

      12.5 <u>Miscellaneous Provisions</u>.  No subletting or
assignment shall release Lessee from Lessee's obligations under
this Lease or alter the primary liability of Lessee to pay rent
and to perform all other obligations to be performed by Lessee
hereunder.  The acceptance of rent by Lessor from any other
person shall not be deemed to be a waiver of Lessor of any
provision of this Article XII.  Consent to one assignment or
subletting shall not be deemed consent to any subsequent
assignment or subletting.  In the event of default by an assignee
or sublessee or by Lessee or by any successor to Lessee in the
performance of any of the terms hereof, Lessor may proceed
directly against Lessee without the necessity of exhausting
remedies against such assignee, sublessee, or successor.

      12.6 <u>Administrative Fee</u>.  If Lessee assigns this Lease
or sublets the Premises or any part thereof or requests the
consent of Lessor to any assignment or subletting, then Lessee
shall, upon demand, pay Lessor an administrative fee of Three
Hundred and no/100 Dollars ($300.00) plus any attorneys' fees
reasonably incurred by Lessor in connection with such act or
request.

ARTICLE XIII

LOAN OR SALE

13.1 <u>Estoppel Certificates, etc.</u> Each party (both Lessor and Lessee) agrees within ten (10) days following request by the other:

(a) to execute and deliver to the requesting party any and all instruments and documents (including an estoppel certificate (i) certifying that this Lease is unmodified and in full force and effect, or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect, and certifying the date to which the rent and other charges are paid in advance, if any, and (ii) acknowledging that there are not, to such party's knowledge, any uncured defaults on the part of either party hereunder, or specifying such defaults if they are claimed) evidencing the status of this Lease;

(b) in Lessee's case, to deliver to Lessor current, non-confidential certified financial statements of Lessee, including a balance sheet and a profit and loss statement for at least two (2) years, all prepared in accordance with generally accepted accounting principles consistently applied; and

(c) in Lessee's case, to execute and deliver to Lessor written consent of Lessee to any assignment by Lessor of this Lease, provided that the assignee agrees to assume all obligations of Lessor hereunder arising subsequent to the assignment as a part of such assignment and agrees to recognize Lessee's tenancy hereunder.

13.2 <u>Failure to Deliver Estoppel Certificates</u>. If either party shall fail to deliver, within the time required by Section 13.1, any such estoppel certificate, then any third party, such as, but not limited to, a party purchasing assets or lending money, may rely exclusively upon representations and warranties made by Lessor or Lessee, as the case may be, respecting the status of this Lease, and the other party shall be estopped to assert or claim anything respecting the status of this Lease that is contrary to such representations and warranties made by Lessor.

13.3 <u>Liability of Transferee</u>. In the event that Lessor shall sell or otherwise transfer its title to the Land, after the effective date of such sale or transfer, and upon assumption of Lessor's obligations hereunder, whether expressly or by operation

132A0006/1

30

of law, Lessor shall have no right of liability under this Lease
to Lessee except as to matters of liability which have accrued
and are unsatisfied as of the date of sale or transfer, and
Lessee shall thereafter seek performance solely from Lessor's
successor.

13.4 <u>Leasehold Mortgages</u>. Notwithstanding the provi-
sions of Article XII, Lessor and Lessee agree as follows:

(a)  Any pledge, mortgage, or encumbrance of this
Lease by Lessee or of Lessee's leasehold estate hereunder, as the
same may be modified, extended, amended, or replaced, is herein
referred to as a "Leasehold Mortgage" or, collectively, as
"Leasehold Mortgages," and the holder or holders of Leasehold
Mortgages are herein referred to as a "Leasehold Mortgagee" or
"Leasehold Mortgagees."  The term "Leasehold Mortgage" shall
include all instruments executed in connection with a lease-
leaseback transaction.  Notwithstanding anything to the contrary
contained in this Lease, the provisions of this Section 13.4
shall extend only to a Leasehold Mortgagee with respect to which
Lessor shall have received the name and address of the Leasehold
Mortgagee together with a copy of the Leasehold Mortgage and
shall otherwise not be binding on Lessor.  The rights granted to
Leasehold Mortgagees under this Section 13.4 shall be in addition
to, and not in lieu of, other rights, if any, granted to
Leasehold Mortgagees under this Lease.

(b)  Lessor hereby agrees with and for the benefit
of any and all Leasehold Mortgagees and their heirs, personal
representatives, successors and assigns:

(i)  When giving any notice to Lessee with
respect to this Lease or any exercise of any right to terminate
this Lease, Lessor will also give a copy of any such notice by
registered or certified mail to each Leasehold Mortgagee at the
address of each Leasehold Mortgagee as provided to Lessor as
required by subsection (a) above, and no such notice to Lessee
shall be deemed to have been duly given, nor shall such notice be
effective, unless such notice is so given to each Leasehold
Mortgagee, the date shown on the return receipt being deemed the
date such notice was given.

(ii)  Should Lessee default in respect of any
of the provisions of this Lease, any Leasehold Mortgagee shall
have the right, but not the obligation, to cure such default
whether the same consists of the failure to pay Rent and Sums
Equivalent to Rent or the failure to perform any other matter or
thing which Lessee is required to do or perform under the Lease,
and Lessor shall accept performance by or on behalf of Leasehold
Mortgagee as though, and with the same effect as if, it had been

done or performed by Lessee, the Leasehold Mortgagee will have
a period of time after the giving of such notice to it within
which to cure the default specified in such notice, or cause it
to be cured, which is the same period for cure, if any, as is
given to Lessee under this Lease in respect of the specified
default after the giving of such notice to Lessee, plus an
additional period of thirty (30) days.  In the event of a default
which cannot reasonably be cured within said period (which does
not include, among others, any default that can be cured by the
payment of money, such as, but not limited to, default in the
payment of Rent and Sums Equivalent to Rent), the period of time
for cure shall be extended for so long as any Leasehold Mortgagee
has initiated within said period and is diligently thereafter
proceeding to attempt to cure such default.

(iii)  After any default by Lessee under the
provisions of this Lease that cannot be cured by a party who does
not have possession of the Premises ("Possessory Default"), and
provided that any and all other defaults by Lessee have been and
continue to be cured either by Lessee or by a Leasehold Mortgagee
as provided in this Lease or by law, then Lessor agrees not to
terminate this Lease by reason of such Possessory Default so long
as the Leasehold Mortgagee has commenced, within the cure period
set forth in subsection (ii) of this subsection (b) of this
Section 13.4, a foreclosure or other appropriate proceedings
under the Leasehold Mortgage to acquire possession of, or title
to, Lessee's leasehold estate hereunder and thereafter diligently
prosecutes said foreclosure or other proceedings to completion;
provided that the Leasehold Mortgagee so attempting to obtain
possession or title shall deliver to Lessor, no later than sixty
(60) days after the expiration of the grace period applicable to
such Leasehold Mortgagee as to the particular default, an acknow-
ledged instrument by which such Leasehold Mortgagee undertakes
(subject to the limitations of liability set forth below) that:

(A)  during the pendency of any such
foreclosure or other proceedings and until possession of the
Premises shall be obtained by such Leasehold Mortgagee, such
Leasehold Mortgagee will pay or cause to be paid to Lessor, when
and as it shall become due (but without giving effect to any
right of acceleration of rentals in the event of default), the
Rent and Sums Equivalent to Rent provided for in this Lease and
will perform the other obligations of Lessee under this Lease
default under which would not constitute a Possessory Default.

(B)  when, as and if possession of,
title to, or control over the Premises shall be obtained by such
Leasehold Mortgagee, or its successor, whether voluntarily, as a
result of Foreclosure (as hereafter defined), or otherwise, such
Leasehold Mortgagee or its successor shall (1) thereafter perform

Case 08-35653-KRH   Doc 3854   Filed 06/29/09   Entered 06/29/09 18:41:41   Desc
Page 40 of 73

all the covenants of this Lease on Lessee's part to be performed including those that Lessee shall have failed to perform prior to the date on which such title, possession, or control by Leasehold Mortgagee or its successor is obtained, except for those covenants which are not reasonably susceptible of being performed by such Leasehold Mortgagee or its successor, and (2) pay all Rent and Sums Equivalent to Rent accruing thereafter. If the default in respect of which Lessor shall have given any notice contemplated by this subsection (b) shall have been cured and possession of the Premises shall have been restored to Lessee, the undertaking of Leasehold Mortgagee provided for in this subsection (b)(iii) shall automatically terminate and be null and void. No Leasehold Mortgagee shall be required to commence or continue any Foreclosure or other proceedings or to obtain or continue possession of the Premises.

(iv) Anything in subsection (b)(iii) to the contrary notwithstanding, any default of Lessee under any provision of this Lease which is not reasonably susceptible of being cured by a Leasehold Mortgagee or its successor after it obtains title to, possession of, or control over the Premises shall be deemed to have been waived by Lessor upon completion of foreclosure proceedings or when the Leasehold Mortgagee or its successor shall otherwise acquire title to Lessee's leasehold estate. Any default which is reasonably susceptible of being cured after such acquisition shall thereafter be cured with reasonable diligence. Without limiting the generality of the foregoing, as used in this Section a default not "reasonably susceptible" of being cured or performed by a Leasehold Mortgagee or its successor shall include (A) the failure by Lessee to keep books and records and deliver statements as required by this Lease; (B) the inaccuracy or incompleteness of any warranty made by Lessee; (C) any default related to the bankruptcy or insolvency of Lessee; and (D) failure of Lessee to give any notice, certificate, statement, document, or information required by this Lease.

(v) Any Leasehold Mortgagee or its successor may become the legal owner and holder of Lessee's leasehold estate, by foreclosure or other enforcement proceedings, or by obtaining an assignment of this Lease or Lessee's lessehold estate in lieu of foreclosure or through settlement of or arising out of any pending or threatened foreclosure proceeding (collectively referred to as "Forelosure"), without Lessor's consent and without any obligation to assume this Lease, subject to the applicable terms and provisions of this Lease including Leasehold Mortgagee's right to cure any subsequent defaults. Upon Foreclosure, the purchaser at such Foreclosure or the assignee under such assignment in lieu of Foreclosure shall become Lessee, and shall be substituted as the owner and holder

of the leasehold estate under this Lease and Lessee's interests
under this Lease for all purposes, except that nothing herein
shall be deemed to create any personal liability of the part of
Leasehold Mortgagee or any such purchaser or assignee for the
payment of Rent and Sums Equivalent to Rent under this Lease, but
all other rights and remedies available to Lessor under this
Lease or by law shall continue in full force and effect as
against the Leasehold Mortgagee and such purchaser or assignee,
including, but not limited to, the right to terminate this Lease
and the right to possession hereunder upon any subsequent default
as provided in Article XI.

(c)   Any notice or other communication which
Lessor shall desire or is required to give to or served upon any
Leasehold Mortgagee shall be in writing and shall be served by
registered or certified mail, addressed to such Leasehold
Mortgagee at its address as set forth in its notice in writing
received by Lessor.  Any notice or other communication which any
Leasehold Mortgagee shall desire or is required to give or to
serve upon Lessor shall be deemed to have been given or served on
the date shown on the return receipt if sent by registered or
certified mail addressed to Lessor at Lessor's address as set
forth in this Lease, or at such other address as shall be
designated from time to time by Lessor by notice in writing given
to such Leasehold Mortgagee by registered or certified mail.

(d)   Lessor will not modify, amend, cancel or
accept a surrender of this Lease without the prior written
consent of all Leasehold Mortgagees.  Any such modification,
amendment, cancellation, or surrender without the written consent
of all Leasehold Mortgagees shall be void and of no force or
effect as against such Leasehold Mortgagee, but shall be binding
and effective between Lessor and Lessee.

(e)   The union of the interests of Lessor and
Lessee shall not result in a merger of this Lease and the
interests of Lessor in the Premises without the prior written
consent of all Leasehold Mortgagees.  The acquisition of all or
any portion of Lessor's interest in the Premises, Tenant's
leasehold estate, or any right or interest in this Lease by any
Leasehold Mortgagee shall not result in a merger thereof with the
Leasehold Mortgage held by such Leasehold Mortgagee, unless such
Leasehold Mortgagee consents thereto in writing.

132A0006/1                        34

## MORTGAGEE PROTECTION

14.1 <u>Subordination or Superiority</u>. Subject to the provisions of Section 14.2, the rights of Lessee under this Lease are and shall be, at the option of Lessor, either subordinate or superior to any mortgage or deed of trust (including a consolidated mortgage or deed of trust) constituting a lien on Lessor's interest the Land, whether such mortgage or deed of trust has heretofore been, or may hereafter be, executed by Lessor.  To further assure the foregoing subordination or superiority, Lessee shall, upon Lessor's request, together with the request of any mortgagee or beneficiary under a deed of trust execute any instrument (including without limitation an amendment to this Lease that does not materially and adversely affect Lessee's rights or duties under this Lease) or instruments intended to subordinate this Lease, or, at the option of Lessor, to make it superior, to any such mortgage or deed of trust.

14.2 <u>Nondisturbance</u>. If Lessor requests, as provided in Section 14.1, that this Lease be made subordinate to any mortgage or deed of trust, then Lessee need not execute any instrument or document intended to effect such subordination unless, concurrently therewith or prior thereto, the mortgagee or beneficiary under the deed of trust enters into a nondisturbance agreement with Lessee in usual and reasonable form that (a) assures Lessee's right to continued possession of the Premises under this Lease after any foreclosure of such mortgage or deed of trust provided Lessee continues to perform all of its obligations under, and is not in default, beyond any applicable cure period, under this Lease, and (b) provides that all casualty and condemnation proceeds shall be applied in accordance with the terms and provisions of this Lease.

14.3 <u>Attornment</u>. Notwithstanding the provisions of Section 14.1, Lessee agrees (a) to attorn to any mortgagee or beneficiary of a deed of trust encumbering Lessor's interest in the Land and to any party acquiring title thereto by, judicial foreclosure, trustee's sale, or deed in lieu of foreclosure, and (b) to execute any attornment agreement reasonably requested by any such mortgagee or beneficiary or by a party so acquiring title to the Land.

14.4 <u>Mortgagee's Right to Cure Lessor's Defaults</u>. In the event of any default on the part of Lessor under this Lease, Lessee agrees to give notice by certified mail to any beneficiary of a deed of trust or mortgagee under a mortgage encumbering the Land, whose address shall have been furnished to Lessee, and offer such beneficiary or mortgagee, except in the case of

132A0006/1                              35

emergency, a reasonable opportunity of up to sixty (60) days, to cure the default, which cure period shall be concurrent with that provided Lessor hereunder.

ARTICLE XV

MISCELLANEOUS PROVISIONS

15.1 <u>Headings</u>. The article and section headings used in this Lease are for purposes of convenience only. They shall not be construed to limit or to extend the meaning of any part of this Lease.

15.2 <u>Waiver</u>. Waiver by Lessor of any breach of any provision of Lease shall not be deemed to be a waiver of such provision or of any subsequent breach of the same or of any other provision of this Lease.

15.3 <u>Notices</u>. Any notice, demand, approval, consent, or other communication required or desired to be given under this Lease in writing shall be personally served or given by overnight express carrier or by mail, and if mailed, shall be deemed to have been given when two (2) business days have elapsed from the date of deposit in the United States mails, certified and postage prepaid, addressed to the party to be served at the last address given by that party to the other under the provisions of this part, and if to Lessee, to the attention of Corporate Secretary. At the date of execution of this Lease, the respective mailing addresses of Lessor and Lessee are those set forth at the beginning of this Lease.

15.4 <u>Attorneys' Fees</u>. In the event that legal proceedings are commenced to enforce or interpret any of the terms or conditions of this Lease, for breach of any such terms or conditions, or to terminate the leasehold interest or right to possession of Lessee granted by this Lease, each party shall waive its right to trial by jury and the prevailing party in any such proceedings shall receive from the losing party such reasonable sum for attorneys' fees and costs incurred, not limited to taxable costs, as may be fixed by the court, in addition to all other relief to which prevailing party may be entitled. If any person not a party to this Lease shall institute an action against Lessee, in which Lessor involuntarily and without cause shall be made a party defendant, Lessee shall indemnify and save Lessor harmless from all liabilities by reason thereof, including reasonable attorneys' fees and all costs incurred by them in such action.

132A0006/1                                36

15.5  Successors. Without limiting or otherwise affecting any restrictions on assignments of this Lease or rights or duties under this Lease, this Lease and all of its terms and conditions shall run with the land and shall be binding upon and inure to the benefit of the successors and assigns of Lessor and Lessee.

15.6  Holding Over.  This Lease shall terminate without further notice at the expiration date of the Term.  Any holding over by Lessee after the expiration of the term of this Lease shall not constitute a renewal or extension and shall not give Lessee any rights in or to the Premises or any part thereof except as expressly provided in this Lease.  Any holding over after the expiration of the term of this Lease with the consent of Lessor shall be construed to be a tenancy from month to month on the same terms and conditions set forth in this Lease insofar as such terms and conditions can be applicable to a month-to-month tenancy, except that the Minimum Base Rent during such hold-over period shall be an amount equal to one hundred fifty percent (150%) of the then applicable Minimum Base Rent under this Lease.

15.7  Surrender of Lease Not Merger.  Neither the voluntary or other surrender of this Lease by Lessee nor a mutual cancellation hereof shall cause a merger of the titles of Lessor and Lessee, but such surrender or cancellation shall operate as an assignment to Lessor of any or all such subleases that have been approved in writing by Lessor.

15.8  Entire Agreement.  This Lease sets forth the entire agreement between Lessor and Lessee and supersedes all prior negotiations and agreements, written or oral, concerning or relating to the subject matter of this Lease, and may not be modified except by a writing executed by both parties.

15.9  Recording.  Either party shall, upon request of the other, execute, acknowledge, and deliver to the other a short form memorandum of this Lease for recording purposes, such recording to be at the expense of the recording party.  In no event shall this Lease, but only a short form hereof so executed that is sufficient to give constructive notice of this Lease, be recorded in the Official Records of Sacramento County, California

15.10  Brokerage Commissions.  Lessor and Lessee each warrant and represent to the other that no finder's fee or brokerage commission shall become due or payable by reason of the execution of this Lease or any of the transactions contemplated by this Lease except the amount owed exclusively by Lessee to Steven L. Soboroff and the amount owed exclusively by Lessor to Steven Fishbein.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Lease on the dates set opposite their signatures below.

Date: _August 31_, 19_87_

"Lessor"
GREENBACK ASSOCIATES
a California general partnership

By: _____, general partner

By: _____, general partner

Date: _August 21_, 19_87_

"Lessee"
CIRCUIT CITY STORES, INC.
a Virginia corporation

By: _Donald L. Chasen_
Its: _Asst. V.P._

By: _B.B. Cummings Jr._
Its: _Asst Secty_

132A0006/1                              38

Concept Plan

EXHIBIT "A-1"

1.   PRIMARY SITE.

Lot 7, as shown on the "Plat of Mitchell Farms", recorded in the office of the Recorder of Sacramento County, in Book 139 of Maps, Map No. 16.

Parcel A as shown on that certain Parcel Map entitled "Portion of Lots 2 and 3, Aeolia Heights", filed for record in Book 10 of Parcel Maps at Page 36, Sacramento County Official Records.

TOGETHER WITH and including thereto the following described property:

BEGINNING at a point on the centerline of Arcadia Drive, as shown on that certain Plat entitled "Mitchell Farms", recorded in Book 139 of Maps, Map No. 16, said point also being the Northeast corner of Parcel D as shown on that certain Parcel Map entitled "Portion of Lots 2 and 3, Aeolia Heights", recorded in Book 10 of Parcel Maps at Page 36, Sacramento County Official Records; thence from said point of beginning, South 00o 44' 07" East, 45.00 feet; thence along the South line of Parcel D, said South line also being the North line of Parcel A as shown on said Parcel Map, South 88o 34' 02" West, 130.00 feet; thence North 00o 44' 10" West 45.00 feet to the North line of Parcel D, said North line also being the South line of lot 7 as shown on said Plat of "Mitchell Farms"; thence North 88o 34' 02" East 130.00 feet to the point of beginning.

RESERVING THEREFROM all that real property lying within the rights of way of Greenback Lane and Arcadia Drive, both being County roads.

EXHIBIT "A-2"

TITLE
COMPANY

cc:  Bill Hunter, Esq.          Sacramento County        I.O. 7-16-86
                                                         IMPORTANT
                                                When replying refer to
Greenback Associates                            Our No. 151619-JM
7700 College Town Drive, #109                   Escrow Officer: Julie Morotti
Sacramento, CA                                  Address:  1565 River Park Drive
Attn: Andy Gianulias                            Sacramento, CA  95815
                                                Phone No:  (916) 924-1062
                                                Your No.:

In Response to the above referenced application for a policy of title insurance,
Pioneer Title Company of California, Inc., hereby reports that it is prepared to
issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title
Insurance from Ticor Title Insurance Company of California, describing the land and
the estate or interest therein hereinafter set forth, insuring against loss which may
be sustained by reason of any defect, lien or encumbrance not shown or referred to as
an Exception below or not excluded from coverage pursuant to the printed Schedules
Conditions and Stipulations of said policy forms

The Printed Exceptions and Exclusions from the coverage of said Policy or Policies
are set forth on the attached cover.  Copies of the Policy forms should be read.
They are available from the office which issued this Report.

This report (and any supplements or amendments thereto) is issued solely for the
purpose of facilitating the issuance of a Policy of Title Insurance and no liability
is assumed hereby.  If it is desired that liability be assumed prior to the issuance
of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of November 26, 1986, at 7:30 a.m. Title Officer *Stephen R. Olson*
                                                          STEPHEN OLSON

This Form  of Policy of Title Insurance contemplated by this Report is:
. ALTA Residential title Insurance Policy - 1979
. ALTA Loan Policy - 1970 with ALTA Endorsement Form 1 Coverage (Amended 10-17-70)
X CLTA Standard Coverage Policy - 1973
. ALTA Owner's Policy Form B - 1970 (Amended 10-17-70)

 The estate or interest in the land hereinafter described or referred to covered by
this Report

Title to said estate or interest at the date hereof is vested in:

GREENBACK ASSOCIATES, A GENERAL PARTNERSHIP

At the date hereof exceptions to coverage in addition to the printed exceptions and
exclusions contained in said policy form would be as follows:

EXHIBIT "B"

Code Area                    :   54-444
Tax Bill No.                 :   86117275
Land                         :   $None
Improvements                 :   $None
Exemption                    :   $None

1st Installment              :   $503.98 Open
2nd Installment              :   $503.98 Open
Said Matter Affects          :   Lot 7

a.  General and Special County taxes for the fiscal year 1986-1987:
Parcel No.                   :   243-0081-023-0000
Code Area                    :   54-444
Tax Bill No.                 :   86117276
Land                         :   $141,583
Improvements                 :   $381,660
Exemption                    :   $None

1st Installment              :   $2,728.68 Open
2nd Installment              :   $2,728.68 Open
Said Matter Affects          :   Parcel D

b.  General and special County taxes for the fiscal year 1986-1987:
Parcel No.                   :   243-0081-024-0000
Code Area                    :   54-444
Tax Bill No.                 :   86317374
Land                         :   $125,577
Improvements                 :   $None
Exemption                    :   $None

1st Installment              :   $654.87 Open
2nd Installment              :   $654.87 Open
Said Matter Affects          :   A portion of Lot 8

c.  General and Special County taxes for the fiscal year 1986-1987:
Parcel No.                   :   243-0082-003-0000
Code Area                    :   54-440
Tax Bill No.                 :   86117277
Land                         :   $39,165
Improvements                 :   $None
Exemption                    :   $None

1st Installment              :   $199.02 Open
2nd Installment              :   $199.02 OPen
Said Matter Affects          :   A portion of Lot 8

-2-

```
Code Area                  :  54-444
Land                       :  $None
Improvements               :  $None
Exemption                  :  $None


1st Installment            :  $43.63 Open
2nd Installment            :  $43.63 Open
Said Matter Affects        :  A portion of Lot 8
```

e.  General and Special County taxes for the fiscal year 1986-1987:

```
Parcel No.                 :  243-0082-005-0000
Code Area                  :  54-444
Tax Bill No.               :  86117279
Land                       :  $1,412
Improvements               :  $None
Exemption                  :  $None


1st Installment            :  $7.35 Open
2nd Installment            :  $7.35 Open
Said Matter Affects        :  That portion lying within Arcadia Drive
```

f.  General and special County taxes for the fiscal year 1986-1987:

```
Parcel No.                 :  243-0082-006-0000
Code Area                  :  54-444
Tax Bill No.               :  86117280
Land                       :  $129,271
Improvements               :  $None
Exemption                  :  $None


1st Installment            :  $674.14 Open
2nd Installment            :  $674.14 Open
Said Matter Affects        :  A portion of Parcel B
```

g.  General and Special County taxes for the fiscal year 1986-1987:

```
Parcel No.                 :  243-0082-007-0000
Code Area                  :  54-440
Tax Bill No.               :  86173753
Land                       :  $245,340
Improvements               :  $223.023
Exemption                  :  $None


1st Installment            :  $2,442.48 Open
2nd Installment            :  $2,442.48 Open
Said Matter Affects        :  A portion of Lot 7
```

-3-

```
Code Area              :
Tax Bill No.           : 86117281
Land                   : $4,882
Improvements           : $None
Exemption              : $None

1st Installment        : $218.27 Open
2nd Installment        : $218.27 Open
Said Matter Affects    : A portion of Parcel B
```

i.  General and Special County taxes for the fiscal year 1986-1987:

```
Parcel No.             : 243-0082-024-0000
Code Area              : 54-444
Tax Bill No.           : 86117286
Land                   : $114,498
Improvements           : $None
Exemption              : $None

1st Installment        : $597.10 Open
2nd Installment        : $597.10 Open
Said Matter Affects    : Parcel A
```

j.  Tax Defaulted Property for general and special taxes and subsequent delinquencies for the

```
Fiscal Year            : 1983-1984
Taxing Authority       : State of California
Parcel No.             : 243-0082-005-0000
Tax Sale No.           : 83-090156
```

Amount to pay prior to December 31, 1986 is $36.34.
Amount to pay prior to January 31, 1987 is $36.45.

k.  "The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California."

l.  Any possible outstanding charges for utility services.  Amounts may be obtained by contacting the County of Sacramento's Utility Services and Billing Department.

-4-

2. Rights of the public in and to so much of the herein described land as lies within the boundaries

3. A leasehold estate created by that certain lease of said land, executed by and between the parties named herein, for the term and upon the terms, covenants, and conditions therein provided.

| | | |
|---|---|---|
| Type of Lease | : | Ground Lease |
| Dated | : | January 30, 1969 |
| Lessor | : | Bernice Mitchell and Theodore C. Mitchell, and Janet D. Mitchell |
| Lessee | : | Gus C. Gianulias and Ernest G. Cheonis and Julie Gianulias and Merry Cheonis |
| Term | : | Not shown |
| Recorded | : | March 3, 1969, in book 6903-03, page 73, Official Records. |
| Affects | : | The herein described land and other land |

An Assignment of Lease

| | | |
|---|---|---|
| By | : | Gus C. Gianulias, Julie Gianulias, Ernest G. Cheonis and Merry Cheonis, to Greenback Associates, a general partnership |
| Dated | : | March 22, 1972 |
| Recorded | : | December 21, 1972, in Book 72-12-21, page 554 Official Records |

Said lease was amended by an instrument executed by Bernice Mitchell etal and Greenback Associates, recorded September 26, 1983 in Book 8309-26, page 80, Official Records.

4. An easement affecting the portion of said land and for the purposes stated herein, and incidental purposes,

| | | |
|---|---|---|
| In favor of | : | County of Sacramento, a political subdivision of the State of California |
| For | : | A sanitary sewer |
| Recorded | : | August 2, 1972, in book 7208-02, page 337 Official Records. |
| Affects | : | All that portion of Lots 2 and 3, as shown on the official "Plat of Aeolia Heights," described as follows: |

AFFECTS CONT... SEE NEXT PAGE

-5-

RESTATED JDR 1, Doc (3954, Recorded 06/29/00, Entered 06/29/00 18:41:41, Desc, Page 54 of 73

Beginning at a point from which the southeast corner of said Lot 3 bears the following two courses: South 06°49'09" East 59.79 feet; thence North 88°34'02" East 59.79 feet; thence from said point of beginning North 00°44'07" West 239.70 feet; thence curving to the right on an arc of 295.00 feet radius, said arc being subtended by a chord bearing North 06°31'13" East 74.51 feet; thence North 13°46'32" East 45.00 feet; thence South 76°13'27" East 405.14 feet; thence curving to the left on an arc of 305.00 feet radius; said arc being subtended by a chord bearing South 80°06'27" East 41.31 feet; thence South 83°59'27" East 237.28 feet; thence North 06°00'33" East 97.00 feet to an existing sewer manhole and the end of said centerline.

5.  An easement affecting the portion of said land and for the purposes stated herein, and incidental purposes,

| | |
|---|---|
| In favor of | : The County of Sacramento |
| For | : Public Highway or Road and all necessary utilities |
| Recorded | : November 22, 1972, in book 7211-22, page 438 Official Records. |
| Affects | : The West 60.00 feet of the East 94.79 feet of Lot 3, |

of Aeolia Heights, recorded December 22, 1921 in Book 16 of Maps, Map No. 39 in the office of the Recorder of Sacramento County.

Together with all that portion lying Southwesterly of an arc of a curve concave to the Northeast with a 25.00 foot radius, the ends of said arc being tangent to the North line of the Southerly 30.00 feet of said lot and also being tangent to a line parallel to and 34.79 feet West of the East line of Lot 3 said subdivision. Together with all that portion lying Southeasterly of an arc of a curve concave to the Northwest with a 25.00 foot radius, the ends of said arc being tangent to the North line of the Southerly 30.00 feet of said lot and also being tangent to a line parallel to and lying 94.01 feet West of the East line of Lot 3, said Subdivision.

| | |
|---|---|
| Affects | : Portions of Parcels A, B & D of Parcel Map Book 10, page 36, lying within Arcadia Drive. |

6.  A covenant and agreement

| | |
|---|---|
| Executed by | : Bernice Mitchell, Theodore C. Mitchell and Janet D. Mitchell, Greenback Associates, a partnership |
| In favor of | : Standard Oil Company of California, a Delaware corporation |
| Recorded | : December 21, 1972, in book 7212-21, page 557, Official Records. |

-6-

Type                      :   ABCDEF 58 of 73

Dated                     :
Lessor                    :   Greenback Associates, a General Partnership
Lessee                    :   Standard Oil Company of California, a Delaware
                              corporation
Recorded                  :   December 21, 1972, in book 7212-21, page 565,
                              Official Records.
Affects                   :   All that portion of Lot 3, as shown on the official
"Plat of Aeolia Heights" recorded in the office of the Recorder of Sacramento County
in Book 16 of Maps, Map No. 39, described as follows:

Beginning at a point on the South line of said Lot 3, from which point of beginning
the southeast corner of said Lot 3 bears North 88°34'02' East 654.79 feet: thence
from said point of beginning along said South line of Lot 3 South 88°34'02" West
130.00 feet:  thence North 00°44'07" West 235.00 feet: thence North 88°34'02" East
130.00 feet:  thence South 00°44'07" East 235.00 feet to the point of beginning,
containing 0.701 acre, more or less.

8.  An easement affecting the portion of said land and for the purposes stated
herein, and incidental purposes,
In favor of                :   County of Sacramento, a political subdivision of
                               the State of California
For                        :   A drainage pipeline
Recorded                   :   February 7, 1973, in book 7302-07, page 343
                               Official Records.
Affects                    :   All that portion of Lots 2 and 3, as shown on the Plat
of Aeolia Heights, described as follows: A strip of land 10.00 feet in width lying
5.00 feet on each side of the centerline described as follows:  Beginning at a point
from which the Southeast corner of said Lot 3 bears the following two courses:  (1)
South 00°44'07" East 202.00 feet and (2) North 88°34'02" East 64.79 feet; thence from
said point of beginning along said centerline North 34°02'02" East 170.00 feet.

9.  An "Irrevocable Offer to Dedicated" affecting the portion of said land and for
the purposes stated herein, and incidental purposes,
In favor of                :   County of Sacramento, a political subdivision of the
                               State of California
For                        :   Any public purpose
Recorded                   :   February 9, 1973, in book 7302-09, page 350,
                               Official Records.
Affects                    :   See next page

AFFECTS CONT... SEE NEXT PAGE

-7-

Plat of said Aeolia Heights, from which point of beginning the Southeast corner of said Parcel from which (2) South 00°13'18" East 30.00 feet Secure from said point of beginning along the North line of said Greenback Lane South 88°34'02" West 110.01 feet; thence curving to the left on an arc of 25.00 feet radius, said arc being subtended by a chord bearing North 43°54'57" East 35.14 feet; thence North 00°44'07" West 405.36 feet; thence curving to the right on an arc of 330.00 feet radius, said arc being subtended by a chord bearing North 06°31'13" East 83.35 feet; thence curving to the left on an arc of 20.00 feet radius, said arc being subtended by a chord bearing North 31°13'27" West 28.28 feet; thence North 76°13'27" West 100.00 feet; thence curving to the right on an arc of 530.00 feet radius said arc being subtended by a chord bearing North 72°09'50" West 75.05 feet; thence curving to the right on an arc of 470.00 feet radius, said arc being subtended by a chord bearing North 71°37'21" West 57.69 feet; thence North 75°08'29" West 10.05 feet to a point on the West line of the East one-half of said Lot 3; thence North 00°44'07" West 20.55 feet to the Northwest corner of said East one-half of Lot 3; thence along the North line of said Lot 3 North 88°28'33" East 118.18 feet; thence curving to the left on an arc of 470.00 feet radius, said arc being subtended by a chord bearing South 74°10'32" East 33.60 feet; thence South 76°13'27" East 427.25 feet; thence South 00°30'18" East 61.91 feet; thence North 76°13'27" West 242.53 feet; thence curving to the left on an arc of 20.00 feet radius said arc being subtended by a chord bearing South 58°46'33" West 28.28 feet; thence curving to the left on an arc of 270.00 feet radius, said arc being subtended by a chord bearing South 06°31'13" West 68.20 feet; thence South 00°44'07" East 404.03 feet; thence curving to the left on an arc of 25.00 feet radius, said arc being subtended by a chord bearing South 46°05'02" East 35.57 feet to the point of beginning.

10. An easement affecting the portion of said land and for the purposes stated herein, and incidental purposes,

| | | |
|---|---|---|
| In favor of | : | County of Sacramento, a political subdivision of the State of California |
| For | : | A drainage canal, ditch or pipeline |
| Recorded | : | February 9, 1973, in book 7302-09, page 354 Official Records. |
| Affects | : | All that portion of Lot 2, 3, and 6, as shown on the official Plat of Aeolia Heights, described as follows: |

AFFECTS CONT... SEE NEXT PAGE

-8-

Beginning at a point on the South line of said Lot 2, from which point of beg[...]
the Southwest corner of said Lot 2 bears South 88°34'02" West 185.09 feet; the[...]
from said point of beginning North 00°30'18" West 120.00 feet; thence North 10[...]
West 290.00 feet; thence North 17°01'30" West 144.56 feet; thence North 14°00[...]
West 270.00 feet; thence North 00°30'00" East 285.00 feet, more or less to Ar[...]
Creek.

11. An easement affecting the portion of said land and for the purposes stat[...]
herein, and incidental purposes,

| | |
|---|---|
| In favor of | : Northeast Sacramento County Sanitation Distric[...] |
| | political subdivision of the State of Californ[...] |
| For | : Sanitary sewer |
| Recorded | : February 9, 1973, in book 7302-09, page 356 |
| | Official Records. |
| Affects | : All that portion of Lots 2 and 3, as shown on |
| | official "Plat of Aeolia Heights," described [...] |
| | follows: |

A strip of land 10.00 feet in width lying 5.00 feet on each side of the cent[...]
described as follows:

Beginning at a point from which the Southeast corner of said Lot 3 bears the[...]
following two courses: (1) South 00°44'07" East 220.00 feet and (2) North 8[...]
East 59.79 feet; thence from said point of beginning North 00°44'07" West 2[...]
feet; thence curving to the right on an arc of 295.00 radius, said arc being[...]
subtended by a chord bearing North 06°31'40" East 405.14 feet; thence curving to[...]
East 45.00 feet; thence South 76°13'27" East 405.14 feet; thence curving to[...]
on an arc of 305.00 feet radius, said arc being subtended by a chord bearin[...]
80°06'27" East 41.31 feet; thence South 83°59'27" East 237.28 feet; thence [...]
06°00'33" East 97.00 feet to an existing sewer manhold and the end of said [...]
line.

In favor of                        : the State of Californ'
For                                : A drainage canal, ditch or pipeline
Recorded                           : February 13, 1973, in book 7302-13, page 631
                                     Official Records.
Affects                            : All that portion of Lots 2 and 3, as shown on the
                                     Plat of Aeolia Heights, described as follows:

A strip of land 10.00 feet in width lying 5.00 feet on each side of the center line
described as follows:

Beginning at a point from which the Southeast corner of said Lot 3 bears the
following two courses: (1) South 00°44'07" East 262.00 feet and (2) North 88°34'02"
East 64.79 feet; thence from said point of beginning along said center line North
88°34'02" East 170.00 feet.

13. An easement affecting the portion of said land and for the purposes stated
herein, and incidental purposes,
In favor of                        : Sacramento Municipal Utility District, a municipal
                                     utility district
For                                : Electrical Facilities
Recorded                           : April 18, 1973, in book 7304-18, page 353
                                     Official Records.
Affects                            : A portion of Lot 2, as said lot is shown on the
official Plat of "Aeolia Heights", described as follows:

The route of said right of way shall be within a strip of land of the uniform width
of 5 feet the South line of which is described as follows:

Beginning at a point on the West line of said Lot 2 from which point the Southwest
corner of said Lot 2 bears South 00°44'08" East 30 feet; thence from said point of
beginning North 88°34'02" East 231.21 feet to a point on the East line of Parcel "C"
as said parcel is shown on that certain parcel map entitled "Portion of Lots 2 & 3,
Aeolia Heights" recorded in said Recorder's office on February 13, 1973 in Book 10 o
Parcel Maps at page 36.

--

-10-

In favor of : Sacramento Municipal Utility District, a municipal

For : Electric Facilities consisting of underground
conduits, wires and cables with associated above-
ground or belowground transformers, transformer pads,
pedestals, service, terminal, splicing, switching,
pull boxes, switch and fuse cubicles, cubicle pads

Recorded : April 18, 1973, in book 7304-18, page 355
Official Records.

Affects : 1.  Within a strip of land of the uniform width of 5
feet the west line of which is described as follows:  Beginning at a point on the
West line of the East One-Half of Lot 3 as said west line is shown on the certain
Parcel Map entitled "Portion of Lots 2 & 3, Aeolia Heights", recorded in said
Recorder's office on February 13, 1973, in Book 10 of Parcel Maps at Page 36, from
which point the southwest corner of said East One-half of Lot 3 bears South 00°44'07"
East 245 feet; thence from said point of beginning North 00°44'07" West 65 feet to a
point hereinafter referred to as Point "A".
2.  Within a strip of land of the uniform width of 25 feet the south line of which is
described as follows:  Beginning at said Point "A"; thence from said point of
beginning North 88°34'02" East 15 feet to a point hereinafter referred to as Point
"B".
3.  Within a strip of land of the uniform width of 5 feet the south and east lines of
which are described as follows:  Beginning at said Point "B"; thence from said point
of beginning North 88°34'02" East 221 feet; thence South 00°44'07" East 80.5 feet to
a point hereinafter referred to as Point "C"; thence South 00°44'07" East 174.81
feet; thence along the arc of a curve to the right, having a radius of 25 feet,
subtended by a chord bearing South 43°54'57" West 35.14 feet; thence South 88°34'02"
West 10 feet.
4.  Within a strip of land of the uniform width of 5 feet the center line of which is
described as follows:  Beginning at said Point "C"; thence from said point of
beginning South 88°34'02" West 28 feet to a point hereinafter referred to as Point
"D".
5.  Within a strip of land of the uniform width of 10 feet the center line of which
is described as follows:  Beginning at said Point "D"; thence from said point of
beginning South 88°34'02" West 10 feet.
6.  Within a strip of land of the uniform width of 5 feet the North line of which is
described as follows:  Beginning at a point on the East line of said Lot 3 from which
point the Southeast corner of said Lot 3, as said southeast corner is shown on said
Parcel Map, bears South 00°44'08" East 35 feet; thence from said point of beginning
South 88°34'02" West 24.25 feet to a point on the easterly line of that certain
60-foot road right of way recorded in said Recorder's office in Book 72-11-22 of
Official Records at Page 438.

-11-

parties named herein, and
therein provided

| | | |
|---|---|---|
| Dated | : | April 16, 1972 |
| Lessor | : | Greenback Associates |
| Lessee | : | The Goodyear Tire & Rubber Company, an Ohio corporation |
| Term | : | Fifteen (15) years |
| Recorded | : | May 3, 1973, in book 7305-03, page 520, Official Records. |
| Affects | : | All that portion of Lots 2 and 3, as shown on the |

official "Plat of AEOLIA HEIGHTS", recorded in the office of the Recorder of
Sacramento County in Book 16 of Maps, Map No. 39, described as follows:
Beginning at the southwest corner of said lot 3; thence from said point of beginning
along the South line of said Lot 3, South 88°34'02" West 64.79 feet; thence North
00°44'07" West 280.00 feet; thence North 88°34'02" East 170.00 feet; thence South
00°44'07" East 280.00 feet to a point on the South line of said Lot 2; thence along
said South line South 88°34'02" West 105.21 feet to the point of beginning; The
Westerly 30 feet and the Southerly 30 feet of said parcel shall be relinquished for
road purposes whereby said parcel will have a net usable area of 140 feet along
Greenback Lane and a depth of 250 feet along an unamed street to be constructed.


16.  An easement affecting the portion of said land and for the purposes stated
herein, and incidental purposes,

| | | |
|---|---|---|
| In favor of | : | The County of Sacramento, a political subdivision of the State of California |
| For | : | Traffic control signals |
| Recorded | : | July 26, 1973, in book 7307-26, page 411 Official Records. |
| Affects | : | All that portion of Parcel "B" of "Parcel Map" of |

portion of Lot 2 and 3 Aeolia Heights" recorded February 13, 1973, in Book 10 of
Parcel Maps, at page 36, in the office of the recorder of Sacramento County,
described as follows:

BEGINNING at a point on the easterly right of way line of Arcadia Drive located North
00°44'07" West 70.30 feet and North 88°34'02" East 30.0 feet from the intersection of
the centerline of Greenback Lane and the centerline of Arcadia Drive; thence from
said point of beginning North 89"15'53" East 3.00 feet; thence curving to the left on
an arc of 22.00 feet radius, said arc being subtended by a chord bearing South
46"05'02" East 31.30 feet; thence South 1"25'58" East 3.00 feet; thence curving to
the right on an arc of 25.00 foot radius, said arc being subtended by a chord bearing
North 46"05'02' West 35.57 feet to the point of beginning.

-12-

| Dated | : | April 18, 1972 |
| Lessor | : | Greenback Associates |
| Lessee | : | The Goodyear Tire & Rubber Company, an Ohio corporation |
| Term | : | Fifteen (15) years |
| Recorded | : | July 26, 1973, in book 7307-26, page 567, Official Records. |
| Affects | : | All that portion of Lots 2 and 3, as shown |

official "Plat of Aeolia Heights", recorded in the office of the Recorder
Sacramento county in Book 16 of Maps, Map no. 39, described as follows:
Beginning at the southeast corner of said lot 3; thence from said point o
along the South line of said Lot 3, South 88°34'02" West 64.79 feet; then
00°44'07" West 280.00 feet; thence North 88°34'02" East 170.00 feet; then
00°44'07" East 280.00 feet to a point on the South line of said Lot 2; th
said South line South 88°34'02" West 105.21 feet to the point of beginning
Westerly 30 feet and the Southerly 30 feet of said parcel shall be relinq
road purposes whereby said parcel will have a net usable area of 140 feet
Greenback Lane and a depth of 250 feet along an unnamed street to be cons
together with all structures now existing and to be erected thereon and a
appurtenances thereto, herein called "premises."

18.  An easement affecting the portion of said land and for the purposes
herein, and incidental purposes,

| In favor of | : | Sacramento Municipal Utility District, a m utility district |
| For | : | Electrical facilities consisting of underg conduits, wires and cables, with associate aboveground or below ground transformers, pads, pedestals, service, terminal, splic switching and pull boxes, switch and fuse cubicle pads, riser poles |
| Recorded | : | April 5, 1974, in book 7404-05, page 424 Official Records. |
| Affects | : | 1. Within a strip of land of the uniform |

feet, the center line of which is described as follows:  Beginning at a
point hereinafter referred to as Point "A", in the east line of Parcel B
parcel is shown on that certain Parcel Map entitled "PORTION OF LOTS 2 &
HEIGHTS" recorded in the office of the Recorder of Sacramento County on
1973 in Book 10 of Parcel maps at Page 36, from which point the northeas
said Parcel B bears North 00°44'07" West 50.60 feet; thence from said po
beginning South 88°34'02" West 140 feet to a point in the east line of a
public street, now known as Arcadia Drive.  2. Within a strip of land of
width of 10 feet, the center line of which is desribed as follows:  Beg:
Point "A"; thence from said point of beginning South 88°34'02" West 10 f

-13-

Lessor                    : Greenback Associates, a general partnership
Lessee                    : CBS, Inc., a New York corporation
Recorded                  : May 29, 1979, in book 7905-29, page 1015,
                            Official Records.
Affects                   : Parcel D

Said lease was amended by an instrument entitled "Memorandum of Amended Lease",
executed by Greenback Associates and Pacific Stereo Corporation, recorded February
20, 1986, in Book 8602-20, page 1281, Official Records.

20. An easement affecting the portion of said land and for the purposes stated
herein, and incidental purposes,
In favor of               : Sacramento Municipal Utility District
For                       : Electrical facilities
Recorded                  : July 26, 1979, in book 7907-26, page 984
                            Official Records.
Affects                   : Strips of land 10 and 20 feet in width traversing
                            portions of premises

21. An easement affecting the portion of said land and for the purposes stated
herein, and incidental purposes, shown or dedicated by the map of
Tract                     : Mitchell Farms
For                       : Maintaining trees, installation and maintenance of
                            electroliers, traffic control devices, water and gas
                            pipes and for underground wires and conduits for
                            electric and telephone services
Affects                   : The Westerly 12.5 feet of Lots 8 and 9 and the
                            Southerly 12.5 feet of Lot 9

22. A deed of trust to secure an indebtedness of the amount stated herein
Dated                     : July 3, 1986
Amount                    : $1,850,000.00
Trustor                   : Greenback Associates, a California general
                            partnership
Trustee                   : Capital Conveyance Company, a California corporation
Beneficiary               : Capital Federal Savings and Loan Association, a
                            United States corporation
Recorded                  : July 16, 1986, in book 8607-16, page 1571,
                            Official Records
Instrument No.            : 132809
Loan No.                  : 01306170

-14-

Statement of Leases as follows.

| Tenant | Term |
|--------|------|
| Standard Oil | 9/14/87 |
| Space Shuttle | 1/31/19 |
| Econo Lube | 9/30/01 |
| Goodyear | 1/31/89 |
| Orotho Mattress | 2/8/99 |
| Pacific Stereo | 9/30/90 |
| Wendy's | 8/1/99 |

24. Possible reciprocal rights for ingress, egress and parking bet
herein described and adjacent parcels as disclosed by an inspection

25. Any easement or lesser right due to the existence of the follo
by an inspection of said land:
a) Various utility boxes and/or vaults for water, gas and electrici
   Affects portions of said land located within the planter areas a
   portion of the parking area.
b) Traffic control signals and street lights         .
   Affects a Southerly portion of Parcel 1 adjacent to Greenback La

Statement of General Partnership of: Greenback Associates
Recorded                      : July 16, 1986, in book 8607-16, page 155
                                Official Records
Disclosing the General Partners as then being: Greenback Associates

Re-Recorded                   : August 14, 1986, in book 8608-14, page (
                                Official Records

NOTE: Unless shown in the body of this preliminary report, there a
transfers, or agreements to transfer, the land described herein rec
Period of six months prior to the date of this report, except as fc

The land referred to herein is described as follows:

All that certain real property situate, lying and being in the County of Sacramento, State of California, described as follows:

PARCEL NO. 1:

Parcels A, B and D, as shown on that certain Parcel Map entitled "Parcel Map of Portion of Lots 2 & 3, Aeolia Heights", recorded in the office of the Recorder of Sacramento County in Book 10 of Parcel Maps, at page 36.

PARCEL: NO. 2:

Lots 7, 8 and 9, as shown on the "Plat of Mitchell Farms", recorded in the office of the Recorder of Sacramento County, in Book 139 of Maps, Map No. 16.

ag/8219

-16-



LEGEND:

X.......FOUND IRON BAR TAGGED L.S. 2546

/.......FOUND 1/2" IRON PIPE



PARCEL
TWO

Farms, R.M. Bk.139 Pg.16 (3-19-80)

# EXHIBIT B

Location #251
7980 Arcadia Blvd.
Citrus Heights, CA

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE ("Assignment") is made as of May 1, 1994, by and between CIRCUIT CITY STORES, INC., a Virginia corporation ("Assignor"); and CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Assignee").

### RECITALS:

A.   Assignor is the lessee under that certain lease or sublease described in Exhibit A attached hereto (as now or hereafter amended, "the Lease") for the premises described in the Lease (the "Leased Premises").

B.   Assignee is a wholly-owned subsidiary of Assignor.

C.   Assignor desires to assign its right, title and interest in the Lease to Assignee, and Assignee desires to accept such assignment and assume the performance of all of Assignor's obligations under the Lease on the terms set forth herein.

### AGREEMENTS:

NOW, THEREFORE, it is mutually agreed among the parties as follows:

1.   As of the date hereof, Assignor assigns, transfers, sells and conveys to Assignee (a) all of Assignor's right, title, interest and estate in and to the Lease and (b) all of Assignor's other rights, title and interest with respect to the Leased

Premises, including without limitation, all licenses, rights, permits, warranties and entitlements applicable to the Leased Premises.

2.   As of the date hereof, Assignee accepts said assignment and expressly assumes the payment and performance of all of Assignor's obligations under the Lease arising from and after the date hereof.

3.   Notwithstanding anything to the contrary contained herein, Assignor shall not be released from the performance of the lessee's obligations under the Lease, and Assignor shall remain primarily liable for said performance, including without limitation, the payment of all rent and the performance of all of the lessee's other obligations throughout the remainder of the term of the Lease.

4.   Assignor warrants that it has good and marketable leasehold title to, and lawful possession of, the Leased Premises pursuant to the Lease.  Assignor shall indemnify, defend and hold harmless Assignee from and against any loss, damage, claim, cost or expense (including reasonable attorneys' fees and litigation expenses) incurred or suffered by, or asserted against, Assignee as a result of a breach by Assignor of the foregoing warranty of title contained herein.

5.   This Assignment shall be binding upon and inure to the benefit of the parties hereto, their respective successors and assigns.

2

WITNESS the following signatures.

ASSIGNOR:

CIRCUIT CITY STORES, INC.

By: _P Dunn_____

Title: Treasurer_____

ASSIGNEE:

CIRCUIT CITY STORES WEST
COAST, INC.

By: _P Dunn_____

Title: Treasurer + CFO_____

3

## EXHIBIT A

The lease dated June 1, 1987 for the following premises between Greenback Associates and Circuit City Stores, Inc. as now or hereafter amended:

Location #251
7980 Arcadia Blvd.
Citrus Heights, CA

TRAINOR FAIRBROOK
Attorneys At Law
980 FULTON AVENUE
SACRAMENTO, CALIFORNIA 95825-4558
Telephone: (916) 929-7000
Facsimile: (916) 929-7111

1  **PROOF OF SERVICE BY OVERNIGHT DELIVERY**

2   I am a citizen of the United States and employed in Sacramento County, California. I am

3  over the age of eighteen years and not a party to the within-entitled action. My business address

4  is 980 Fulton Avenue, Sacramento, California 95825-4558. On June 29, 2009, I deposited, with

5  Federal Express, a true and correct copy of the within documents:

6  **RESPONSE OF GREENBACK ASSOCIATES, LLC TO
   DEBTORS' TENTH OMNIBUS OBJECTION TO CERTAIN
7  DUPLICATE CLAIMS**

8  in a sealed envelope, addressed as follows:

9

10  Gregg M. Galardi, Esquire                Dion W. Hayes, Esquire
    Ian S. Fredericks, Esquire               Douglas M. Foley, Esquire
    Skadden, Arps, Slate, Meagher &          McQuire Woods LLP
11  Flom, LLP                                One James Center
    One Rodney Square                        901 E. Cary Street
12  post Office Box 636                      Richmond, California Virginia 23219
    Wilmington, Delaware 19899-0636
13

14  Chris L. Dickerson, Esquire              Robert B. Van Arsdale
    Skadden, Arps, Slate, Meagher &          Office of the United States Trustee
15  Flom, LLP                                Richmond, Virginia office
    333 West Wachker Drive, Suite 2000       701 East Broad Street, Suite 4304
16  Chicago, Illinois 60606                  Richmond, Virginia 23219-1888

17   Following ordinary business practices, the envelope was sealed and placed for collection

18  by Federal Express on this date, and would, in the ordinary course of business, be retrieved by

19  Federal Express for overnight delivery on this date.

20   I declare under penalty of perjury under the laws of the State of California that the above

21  is true and correct.

22   Executed on June 29, 2009, at Sacramento, California.

23

24

25                                          Sandra Morris

26

27

28