# Exhibit A - Part 1

PLANO, TEXAS

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## PARKER CENTRAL PLAZA, LTD.,

as Landlord

dated February 9, 1996

# TABLE OF CONTENTS

1. Leased Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. Construction of Building and Improvements . . . . . . . . . . . . . . . . . . 2

3. Lease Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4. Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5. Development of Shopping Center by Landlord . . . . . . . . . . . . . . . . . 5

6. Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7. Common Areas and Common Area Maintenance . . . . . . . . . . . . . . . 10

8. Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

9. Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10. Maintenance, Repairs and Replacements . . . . . . . . . . . . . . . . . . . . 19

11. Payment of Utility Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

12. Alterations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

13. Mechanics' Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14. Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15. Damages by Fire or Other Casualty . . . . . . . . . . . . . . . . . . . . . . . . 29

16. Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

17. Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18. Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

19. Warranties and Representations . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

20. Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

21. Subordination, Nondisturbance and Attornment . . . . . . . . . . . . . . . 43

u(4313):\circuit\plano\lease.006

22. Change of Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

23. Tenant's Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

24. Tenant's Property and Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . 46

25. Memorandum of Lease; Commencement Date Agreement . . . . . . . . . . . . . 47

26. Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

27. "For Rent" Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

28. Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

29. Events of Tenant's Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

30. Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

31. Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . . . . . . . 51

32. Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

33. Compliance with Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . 52

34. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

35. Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

36. Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

37. Effectiveness of Lease; Tenant's Right to Terminate . . . . . . . . . . . . . . . . 56

38. Right to Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

39. Tenant's Opening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

u(4313):\circuit\plano\lease.006

## EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "A-2" | Alternative Site Plan |
| "A-3" | Alternative Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Nondisturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnity |

u(4313):\circuit\plano\lease.006

LEASE

THIS LEASE is made as of the ____ day of February, 1996, by and between
PARKER CENTRAL PLAZA, LTD., a Texas limited partnership having an address at 5068
W. Plano Parkway, Suite 215, Plano, Texas 75093 (the "Landlord"), and CIRCUIT CITY
STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive,
Richmond, Virginia 23233 (the "Tenant").

W I T N E S S E T H:

That for and in consideration of the mutual covenants herein contained and other good
and valuable consideration, the receipt and sufficiency of which are hereby acknowledged,
the parties hereto agree as follows:

1.    Leased Property.  Landlord demises and leases to Tenant and Tenant leases
and takes from Landlord, commencing on Landlord's delivery of the "Land" (defined below)
to Tenant, all those certain "Premises" consisting of the "Building" and additional
"Improvements" (both as defined below), as and when same are constructed or renovated,
together with that approximately 42,687 square foot parcel (the "Land"), on which the
Improvements are or will be located, as more particularly shown (approximately) outlined in
red on Exhibit "A" hereto (the "Site Plan"), together with exclusive rights in the four (4)
parking spaces labelled "Customer Pick-Up" in front of the Building and with the easements
described in paragraph 6 below, all located in the "Shopping Center", which consists of that
certain real property with buildings and improvements constructed or to be constructed
thereon, located at the intersection of North Central Expressway and Parker Road, lying and
being in the City of Plano, State of Texas, and more particularly shown on the Site Plan and
described by metes and bounds or platted lot legal description on Exhibit "A-1" attached
hereto and made a part hereof for all purposes.  Notwithstanding the foregoing, Landlord
shall have the right to substitute the site plan attached as Exhibit "A-2" hereto for the
Site Plan attached hereto as Exhibit "A" so that the site plan attached as Exhibit "A-2" shall
be deemed to be the "Site Plan" as referenced in this Lease for all purposes, and the legal
description attached as Exhibit "A-3" shall be deemed to be the legal description of the
Shopping Center as referenced in this Lease for all purposes.  All of the Shopping Center
exclusive of the Premises is "Landlord's Premises".

2.    <u>Construction of Building and Improvements</u>. Tenant has the right to construct on the Land certain improvements, namely a one-story retail building, containing approximately 42,687 square feet of ground-floor space plus mezzanine, with provisions for customer pick-up, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor and other such appurtenances, as more particularly set forth in the construction provisions attached hereto as <u>Exhibit "C"</u> (the "Other Improvements"). The Building and the Other Improvements are sometimes referred to as the "Improvements". The Improvements shall be constructed in accordance with the plans and specifications prepared by Tenant as specified in <u>Exhibit "C"</u>, shall be accepted by Tenant as so constructed, and shall be substantially completed, subject to force majeure, on or before May 1, 1996. Except as otherwise provided herein, the Improvements shall belong to Landlord upon payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.

3.    <u>Lease Term</u>. Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date Landlord closes on its purchase of the Land from Tenant, which shall be no later than March 15, 1996, and shall end on the "Rent Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of this Lease shall commence on the Rent Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Rent Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend this Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of any right to renew or extend as aforesaid, if Tenant shall fail to give any such notice within the aforesaid time limit and shall not have given Landlord prior written notice of its intention not to renew or extend as aforesaid, then and as often as the same shall

2

occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired) until ten (10) business days after Landlord shall have given Tenant notice of Landlord's election to terminate the Renewal Option, and Tenant may exercise its Renewal Option at any time prior to expiration of said ten (10) business day period, provided that the first date of such Option Period, notwithstanding the exercise date of such Renewal Option, shall be the first date after the expiration of the Main Term or Option Period, as applicable.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the term of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term".  The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the First Lease Year shall commence on the Rent Commencement Date and shall end on the last day of January following the first anniversary of the Rent Commencement Date.

4.    Rent.  Tenant agrees to pay base rent ("Base Rent") for the Premises, commencing (subject to the provisions of Exhibit "C") on the earlier to occur of (i) May 1, 1996, or (ii) the date on which Landlord makes payment of the Tenant Improvement Allowance, as set forth in Exhibit "C" (the "Rent Commencement Date"); provided, however, if Tenant opens for business prior to the date on which Landlord makes payment of the Tenant Improvement Allowance, Tenant may, commencing with the payment of Base Rent next following the date of payment of the Tenant Improvement Allowance by Landlord, withhold and retain an amount of the Base Rent equal to "Tenant's Cost of Funds".  Tenant's Cost of Funds shall be equal to the interest accrual on the unpaid Tenant Improvement Allowance commencing with the first payment of Base Rent hereunder, until the date of receipt of the Tenant Improvement Allowance by Tenant, using a per annum interest figure equal to the interest rate accruing on Landlord's construction loan. Tenant's Cost of Funds reduction from Base Rent hereunder shall not exceed thirty percent (30%) for any monthly

3

payment of Base Rent; however, any amount of Tenant's Cost of Funds not withheld due to such limitation shall be withheld from the next successive payment(s) of Base Rent until repaid in full. In the event Landlord fails to pay the Tenant Improvement Allowance within thirty (30) days following the date Tenant achieves Substantial Completion of the Building and Landlord receives the Construction Documents (as defined in Exhibit "C"), the provisions of Exhibit "C" shall govern Tenant's obligation to pay Base Rent hereunder.

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial month or Lease Year, to the address given for Landlord at paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable. Unless adjusted as provided in (b) below or in paragraph 3 of Exhibit "C", Base Rent shall be paid pursuant to the following schedule:

(a)    First Five Years. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Fifty-Eight Thousand Eight Hundred Eighty-Five and 25/100 Dollars ($458,885.25), payable in monthly installments of Thirty-Eight Thousand Two Hundred Forty and 44/100 Dollars ($38,240.44).

(b)    Reduction/Increase in Base Rent. Notwithstanding the provisions of (a) above, in the event that the ground floor gross leasable area of the Building when constructed is either greater than or less than 42,687 square feet excluding loading docks, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground floor gross leasable area of the Building (as shown in the Plans and Specifications), multiplied by $10.75. Tenant agrees that the Building shall be constructed in accordance with the Plans and Specifications to within a tolerance of $\pm$ 200 square feet unless otherwise approved by Landlord. In determining the aforesaid gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year.

u(4313):\circuit\plano\lease.006

In the event of any adjustment to the Base Rent as a result of the ground floor gross leasable area of the Building being greater or less than 42,687 square feet, then the Tenant Improvement Allowance shall also be adjusted proportionately.

(c)    Increases in Base Rent.  Annual Base Rent shall increase (i) on the first day of the sixth, eleventh and sixteenth Lease Year of the Main Term, in an amount equal to the lesser of ten percent (10%) of the Base Rent for the immediately preceding Lease Year or the increase in the "CPI-U" (as defined below) during the immediately preceding five (5) year period ending on October 31 of the fifth, tenth or fifteenth Lease Year, as applicable and (ii) on the first day of each Option Period, in an amount equal to the lesser of ten percent (10%) of the Base Rent for the immediately preceding Lease Year, or the increase in the CPI-U during the immediately preceding five (5) year period ending on October 31 of the immediately preceding Lease Year.  As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers for the Dallas, Texas Standard Metropolitan Statistical Area (1982-84 = 100).  If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the aforesaid Bureau of Labor Statistics or a successor or other similar index most nearly equivalent to the CPI-U.  Notwithstanding anything herein to the contrary, in no event shall the Base Rent be decreased pursuant to this paragraph 4(c).

(d)    Interest on Past Due Installments.  All past due installments of Base Rent and other amounts payable by Tenant to Landlord hereunder shall bear interest at the Default Rate until paid.

5.    Development of Shopping Center by Landlord.  Landlord covenants to construct and develop a first-class shopping center.  The location of buildings and other tenant space therein will be within the "Permissible Building Areas" designated on Exhibit "A" as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than 5 spaces per 1,000 square feet of gross leasable area in the Shopping Center.  Notwithstanding the foregoing, Landlord covenants that it shall comply with all applicable development, zoning and parking requirements in effect from time to time promulgated by governmental entities.  All such

u(4313):\circuit\plano\lease.006

parking shall be at ground level.  Landlord shall construct or cause all improvements
constituting the Shopping Center to be constructed in a good and workmanlike manner, lien-
free, in accordance with paragraph 13 below, and shall indemnify, defend and hold Tenant
harmless for any loss or damage suffered by Tenant as a result of Landlord's construction.
Landlord shall not permit construction traffic over the Premises and Landlord shall refrain
from unreasonably interfering with the conduct of Tenant's business.  Tenant acknowledges
that Landlord shall be undertaking certain construction work with respect to the Shopping
Center, and that Tenant may suffer certain temporary inconveniences, such as temporary lack
of access to certain areas of the Shopping Center, as a result of such construction work
undertaken by Landlord; provided, however, that such construction work shall not cause
Tenant lack of access to any areas within Tenant's Preferred Area.  Landlord shall use
reasonable best efforts to minimize such inconveniences to Tenant, and shall give Tenant
thirty (30) days advance written notice of any such construction work which shall potentially
cause any inconvenience to Tenant.  Landlord shall keep and maintain or cause the
improvements and the "Common Areas" (as defined in paragraph 7) in the Shopping Center
to be kept and maintained in good condition and repair and shall not operate, or permit to be
operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the
available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix)
or the prohibited activities set forth in subparagraph 19(a)(viii).

      6.    <u>Easements</u>.  In addition to and simultaneously with the lease of the Premises,
Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain
areas of Landlord's Premises, as set forth below, which easements shall run with Landlord's
Premises and the Premises during the Term and shall expire or terminate simultaneously with
this Lease, except as provided below.

      (a)    <u>Construction Easements</u>.  During the Construction Term, Landlord
grants to Tenant a nonexclusive easement across a mutually agreeable designated route
providing access to and from public roadways nearest to the Land over the Common Areas
(as defined in paragraph 7 below) for the purpose of construction access to the Premises.  In
addition, Landlord grants to Tenant an exclusive easement for a construction staging area
(the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas

u(4313):\circuit\plano\lease.006

of the Shopping Center (if commercially feasible to so locate Tenant's Staging Area) at a
mutually agreeable location within a reasonable distance of the Land for Tenant's use in
storing its construction equipment, construction vehicles, construction workers' vehicles,
trailers, materials, sheds and other items to be used by Tenant in the course of its
construction, for which items Tenant shall be solely responsible. During any period of
renovation, remodeling or any reconstruction of the Premises subsequent to the Construction
Term, Landlord agrees to reasonably accommodate Tenant's needs for the nonexclusive
easements for the purpose of construction access and the exclusive easement for the Staging
Area as described above. The use of such easements by Tenant shall not result in damage or
injury to the buildings or other improvements of Landlord, and shall not unreasonably
interfere with the business or construction operations conducted by Landlord or other tenants
in the Shopping Center, and said easements shall be subject to such other reasonable
conditions as Landlord shall require from time to time. Tenant will indemnify, defend and
hold Landlord harmless from such damage or injury to the buildings, roads, utilities,
landscaping or other improvements of Landlord, from unreasonable interference with the
business or construction operations conducted by Landlord on Landlord's Premises or other
tenants in the Shopping Center, and from any and all claims, liability, costs or expenses in
connection with death or personal injury or otherwise resulting from Tenant's use of these
easements. After the initial construction of the Improvements, these easements shall
automatically terminate; provided, however, Landlord agrees to grant Tenant equivalent
construction easements in connection with any required, approved or permitted
reconstruction, alteration or repairs as provided herein.

     (b)   <u>Footing and Foundation Easements</u>. Subject to Tenant's obligations to
construct the Building in accordance with the Plans and Specifications, Landlord grants to
Tenant, and Tenant grants to Landlord, nonexclusive easements and rights in Landlord's
Premises (not including any area beyond five (5) feet from the perimeter of the Land or any
areas leased to third party tenants) and the Premises, as appropriate, (i) for the construction
and maintenance of foundations, footings, supports and demising walls reasonably necessary
in connection with the construction of the other's improvements on the Premises or
Landlord's Premises, as appropriate, provided same does not materially adversely affect

7

existing construction on Landlord's Premises or the Premises; and provided same does not affect the separate insurance rating of the other party's building; (ii) to allow their respective buildings to abut and connect (but not to bear structurally upon each other unless and except as otherwise provided herein); and (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets. No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made. The grantee shall repair, at its sole expense, any damage to any building of the grantor caused in making or maintaining said attachment and shall indemnify, defend and hold the grantor harmless from any and all claims, liability, costs and expenses, whether in connection with death, personal injury, or property damage, which result or arise out of the making or maintenance of such attachment. The parties will cooperate and cause their respective contractors to cooperate with each other in the coordination of construction schedules so as to facilitate construction on the Premises and Landlord's Premises and the connection of other buildings in the Shopping Center. The Building shall not be used by Landlord for load-bearing purposes, nor shall Landlord's buildings be used by Tenant for load-bearing purposes. The easements set forth in this subparagraph 6(b) shall apply only to initial construction and any reconstruction provided in this Lease.

(c)     Encroachments.  While it is the intention of the parties to confine their improvements to the limits of the Premises and Landlord's Premises (not including areas leased to third party tenants), as applicable, they acknowledge that this result is not always achieved in a shopping center developed by multiple parties. Accordingly, each party grants to the other a non-exclusive easement, not to exceed twelve inches (12") in width (unless the grantor thereof approves in advance a greater width) for the maintenance of canopies, decorative fascia, roofs and other overhangs, awnings, utility vaults, staircases, signs, lights, pillars and other like projections and encroachments over and across Landlord's Premises or the Premises, as applicable, to the extent that such projections and encroachments shall exist after completion of all construction or reconstruction (if any part is damaged or destroyed and then rebuilt), provided that such use shall not unreasonably interfere with any other tenants in the Shopping Center.

8

(d)    <u>Utility Easements</u>.  During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in <u>Exhibit "C"</u>), Landlord agrees to use reasonable efforts to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord or any other tenants in the Shopping Center of the Common Areas; provided, however, Landlord shall be reimbursed for any actual and necessary costs incurred in obtaining such easements, including, but not limited to, reasonable attorneys' fees.  For the purpose of exercising the rights granted in this subparagraph 6(d), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas upon such installation and any other reasonable conditions and requirements imposed by Landlord; provided, however, Tenant shall indemnify, defend and hold Landlord harmless from any damages, loss or liability which result from Tenant's acts or omissions in connection with the installation of such utility services.

To the extent possible, no such work shall be performed on weekends or during holiday seasons.

(e)    <u>Common Area Easement</u>.  During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor.  Landlord shall have no right to take any action regarding the Common Areas which would violate the Site Covenants, but shall have the right to temporarily block off access to the Common Areas, but no more often than Landlord and its attorneys reasonably deem to be legally necessary in order to avoid the implication of dedicating the same for public use or of creating prescriptive rights therein as a matter of

u(4313):\circuit\plano\lease.006

law, such barriers to be temporarily erected for such purpose, if possible, at a time or upon a day when the Shopping Center is not open for business, and then for only the minimum time required to accomplish such purpose.  Tenant shall exercise reasonable efforts to cause its employees to park in the parking area at the side of the Shopping Center or in other areas reasonably designated by Landlord, provided that such area is adequately lighted and does not present a security risk to Tenant's employees.

(f)     Non-Dedication.  None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

(g)     Termination of Easements.  All of the easements described in this paragraph 6 or elsewhere in this Lease shall (unless terminated earlier as set forth herein) automatically terminate upon the expiration of the Term or earlier termination of this Lease.  Although no release agreement shall be necessary to terminate such easements, Tenant agrees to execute a release agreement terminating the easements described in this Lease promptly upon request by Landlord.  Tenant agrees to be bound by the reasonably imposed rules and regulations for the Shopping Center proposed by Landlord, provided that Tenant shall have the reasonable right to approve the form of such rules and regulations prior to enactment, which approval shall not be unreasonably withheld, and such rules and regulations must be uniformly enforced among all tenants in the Shopping Center and shall not conflict with any of the terms, provisions and conditions contained in this Lease.

7.     Common Areas and Common Area Maintenance.

(a)     Definition of Common Areas.  The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels but reserved to the benefit of the Shopping Center occupants) and intended and available for the

u(4313):\circuit\plano\lease.006

common use of all of the tenants within the Shopping Center (including any outparcel occupants which contribute toward "CAM Charges" (as defined below) and are not responsible for separate maintenance of such outparcels), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing, replacing, insuring, equipping, controlling, and lighting the Common Areas, as reasonably necessary, in a first-class manner, including cleaning, maintenance of Landlord's pylon sign structure(s), the roof and roof structure of all buildings, snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, nonstructural maintenance of exterior walls contained within the Shopping Center and replanting and replacing landscaping, all such work to be collectively "Common Area Maintenance". Common Area Maintenance shall further include, to the extent deemed necessary by Landlord for the maintenance of the Shopping Center in a first-class manner, the maintenance of the portion of the right-of-way along North Central Expressway and Parker Road from the edge of the boundary line of the Shopping Center to the curb of such thoroughfares as the same shall exist from time to time.

(b)    CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) all of Landlord's reasonable and proper direct costs and expenses of operating, maintaining, repairing, insuring (including both the Common Areas and other areas of Shopping Center required to be insured by Landlord under paragraph 14 hereof), equipping, controlling and lighting (including, without limitation, (1) painting and cleaning of exterior walls and other surfaces, (2) annual drainage fees, if any, charged by governmental authorities, and (3) policing and securing) the Common Areas, including normal roof maintenance (but excluding Capital Costs (as hereinafter defined)) and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount equal to six percent (6%) of the total of such costs (specifically excluding from such total, the amounts paid by Landlord and Tenant for non-CAM Charges such as insurance, capital expenditures, Real Estate Taxes, and utilities not serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges: (1) Real Estate Taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels; (2) any dues or charges for

11

a merchants' or other association of the tenants in the Shopping Center; (3) routine maintenance, repairs or replacements to the interior of any buildings (excluding exterior walls thereof) or utility systems not servicing the Common Areas; (4) repairs or replacements necessitated by the negligence or the wrongful action of Landlord (including failure to construct any portion thereof in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Rent Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions; (5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source; (6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7; (7) premiums for Common Area liability insurance or other insurance required to be maintained by Landlord under this Lease in excess of the premium limits established in paragraph 14(e) below; (8) Capital Costs (as hereinafter defined); (9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below); (10) reserves for anticipated future expenses; or (11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner (so long as Tenant has paid "Tenant's Pro Rata Share" (as defined below) of CAM Charges relating to such bills to Landlord in a timely manner). CAM Charges shall be in an amount reasonably consistent with the costs incurred by other landlords of first class power centers in the Plano, Texas market. Capital Costs shall be defined as costs expended by Landlord in the operation, maintenance, repair, replacement and reconstruction of the Shopping Center which must be amortized or capitalized, rather than expensed or deducted, for federal income tax purposes, notwithstanding any "one-time" or pro rata right to expense, amortize or allocate an otherwise capital expenditure.

      (c)    <u>Tenant Payments</u>. Commencing on the Rent Commencement Date, Tenant shall pay to Landlord a fee (which Landlord estimates to be $0.75 per square foot of ground floor area in the Building per annum), payable in equal monthly installments, as its share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of

periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. During the first two (2) CAM Years, Tenant shall pay Tenant's Pro Rata Share of the actual CAM Charges; however, beginning with the third (3rd) CAM Year and continuing for each CAM Year thereafter, CAM Charges shall not exceed by more than seven percent (7%) those in effect during the preceding CAM Year (provided that such limitation on CAM Charges shall not be applicable to insurance, utility charges and other fixed costs which are not within the control of Landlord). For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground floor gross leasable space in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated based upon the CAM Charges for the prior CAM Year and an estimated increase, if any, as may be reasonably determined by Landlord. Subject to adjustments as herein contemplated, Tenant's share of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction (such fraction being referred to herein as "Tenant's Pro Rata Share"), the numerator of which is the number of square feet of the ground floor gross leasable space in the Building (excluding exterior truck wells, exterior trash compactor facilities and exterior customer pickup areas) and the denominator of which is the number of square feet of the ground floor gross leasable space (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in

u(4313):\circuit\plano\lease.006

applicable floor areas shall result in corresponding pro rata adjustments, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share of CAM Charges is determined be less than the gross leasable area of the Shopping Center as shown on Exhibit "A", except in the event of a condemnation action not resulting in the termination of this Lease. The remainder of CAM Charges shall be borne by Landlord and/or other tenants. Notwithstanding the foregoing, Tenant agrees to pay all CAM Charges related to the approximately 4.5 acre parcel on which the Improvements are or will be located, as more particularly shown as "Phase Two" on Exhibit "A", for the period of time from the Rent Commencement Date to the date on which the remainder of the Shopping Center is completed (the "CAM Payment Period"); provided, however, that in no event shall the CAM Payment Period exceed one hundred twenty (120) days.

(d)    Examination of Landlord's Records.  Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after Tenant receives the year-end statement for such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year.  Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on at least ten (10) days' prior notice to Landlord.  If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of Tenant's actual share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.  Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.  Tenant shall not intentionally disclose the results of any such audit to any third party, except for any necessary lender, attorney, accountant or similar party.

(e)    Rights Reserved to Landlord.  Notwithstanding any other provisions to the contrary, Landlord expressly reserves the right, at any time and from time to time, to modify or alter the Shopping Center other than the Premises and Tenant's Preferred Area (as herein defined), which Tenant's Preferred Area shall include ingress and egress from and to the North Central Expressway access road and Parker Road, without the prior written consent of Tenant, provided that (i) the Shopping Center shall at all times be operated as a

14                              u(4313):\circuit\plano\lease.006

first-class retail center, and (ii) no modification or alteration will materially and adversely affect Tenant's or its customers' access to, or the use, visibility or operation of the Premises, reduce the parking ratio below the parking ratio specified in paragraph 5, or violate any of the provisions of paragraph 19(a) below.

8.    Signs.  Tenant shall have a permanent, non-exclusive easement for the maintenance, repair and construction of a freestanding sign at the location designated as "Circuit City Pylon Sign" on the Site Plan.  The size of the Circuit City Pylon Sign may be up to one hundred (100) square feet in area.  Tenant shall submit to Landlord plans and specifications for the structure of the Circuit City Pylon Sign prior to construction and installation thereof for Landlord's written approval, which shall not be unreasonably withheld or delayed.  Tenant may install, maintain and repair the Circuit City Pylon Sign at its sole cost during such hours and in such manner as does not cause any unreasonable interference with the operation of business at the Shopping Center.  The designation of the location of the Circuit City Pylon Sign shall in no way obligate Tenant to construct such freestanding sign.  However, if such freestanding sign is constructed, Tenant shall be responsible for the sign's construction, operation and maintenance in good condition and repair.  Notwithstanding the foregoing, if a freestanding monument or pylon sign identifying the Shopping Center (the "Shopping Center Monument Sign") shall be constructed by Landlord at the Shopping Center, such Shopping Center Monument Sign shall be constructed and installed at Landlord's sole cost and expense upon the Common Areas at the location so shown on the Site Plan.  If the Shopping Center Pylon Sign (i) is constructed and (ii) identifies both the Shopping Center and any of the tenants or other occupants of the Shopping Center, the Shopping Center Pylon Sign structure (with electrical power source available) shall have sufficient space thereon in the top or first tenant position for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense.  If the Shopping Center Pylon Sign is constructed but identifies only the Shopping Center and not any of the tenants or other occupants of the Shopping Center, Tenant shall not have the right to install "face panels" identifying Tenant's store on such Shopping Center Pylon Sign.  Landlord shall submit to Tenant plans and specifications for such Shopping Center Pylon Sign (including colors, design, dimensions,

15

u(4313):\circuit\plano\lease.006

type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Attached as a portion of <u>Exhibit "E"</u> are plans and specifications for Tenant's current prototypical face panels (which shall be adapted for use on the Circuit City Pylon Sign and the Shopping Center Pylon Sign) and for Tenant's building signage, which Landlord hereby approves. Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs (including the Circuit City Sign and Tenant's face panels on the Shopping Center Pylon Sign) with signage consistent with Tenant's then-current prototypical sign plans, provided such replacement signage is compatible with and does not adversely affect the other then-existing signage on the pylon used by the other tenants in the Shopping Center. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, and the other restrictions described herein, as aforesaid.

     9.   <u>Taxes</u>.

     (a)   <u>Taxes Contemplated Hereunder</u>.  The term "Real Estate Taxes" shall mean all general and special real estate taxes, special assessments and other ad valorem taxes, rates, levies and assessments paid upon or with respect to the Shopping Center, including the Premises (or other form of tax specifically levied in lieu of, and not in addition to, one or more forms of Real Estate Taxes), for a calendar year or a portion thereof to any governmental agency or authority and all taxes specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any income, profits, gross receipts or renewal tax or charge upon the rent payable by Tenant under this Lease.

     (b)   <u>Payment of Real Estate Taxes</u>.  Tenant shall pay its share of the Real Estate Taxes levied against the tax parcel or parcels comprising the Shopping Center (the "tax parcel"). Tenant's share shall be calculated by multiplying the total Real Estate Taxes

16

assessed, net of any early-payment discounts available at the time Tenant's payment is due, by Tenant's Pro Rata Share (as defined and determined in accordance with paragraph 7(c)). Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within fifteen (15) days after Tenant's actual receipt of Landlord's statement therefor (but in no event more than fifteen (15) days before Landlord shall either lose the benefit of any discount given by the taxing authority for early payment or incur any interest charge or penalty for late payment), accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof (so long as Tenant has paid Tenant's Pro Rata Share of such Real Estate Taxes to Landlord in a timely manner). In the event that Tenant's payment of Tenant's Pro Rata Share of Real Estate Taxes is not timely tendered to Landlord, Tenant shall be liable to Landlord for its share of any discount which would have been available to Tenant as aforesaid had Tenant made timely payment thereof or, as applicable, for its share of any penalty which would have been avoided by such timely payment, notwithstanding the fact that Landlord may actually have made timely payment and received the discount or avoided the penalty. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant. Real Estate Taxes shall be prorated as of the Rent Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of Real Estate Taxes and any interest and penalties due thereon and may deduct the cost thereof, plus interest at the lesser of sixteen percent (16%) per annum or the highest rate permitted by Texas law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder. If Landlord's "Mortgagee" (as defined in paragraph 21 below) requires a monthly impound or escrow of Real Estate Taxes, Landlord shall have the right to

17

estimate Real Estate Taxes and Tenant shall pay on a monthly basis Tenant's Pro Rata Share of such estimate of Real Estate Taxes. Within sixty (60) days following the end of each year during the Term, Landlord shall furnish to Tenant a statement setting forth the Real Estate Taxes for such preceding year for which Landlord has received a bill, assessment, levy, notice of imposition or other evidence of Real Estate Taxes due or payable. If the actual amount of Tenant's Pro Rata Share of Real Estate Taxes is less than the total estimated amount theretofore paid by Tenant, the excess shall be refunded to Tenant within thirty (30) days of Tenant's receipt of such statement, or, in the case of the last Lease Year of the Term, within sixty (60) days after the expiration of the Term. If the actual amount of Tenant's Pro Rata Share of Real Estate Taxes shall exceed the total estimated amount theretofore paid by Tenant, Tenant shall pay to Landlord, within thirty (30) days following the receipt of Landlord's statement, the total amount of any underpayment of Tenant's Pro Rata Share of Real Estate Taxes.

(c)    <u>Contest of Real Estate Taxes</u>.  Landlord covenants that it shall, upon receipt of written notice from Tenant, contest the amount of Real Estate Taxes imposed against the Shopping Center as a CAM Charge. Landlord shall be relieved of such covenant in the event other tenants in the Shopping Center occupying more than fifty thousand (50,000) square feet of rentable area in the Shopping Center object in writing to such tax contest after notice thereof. In addition, Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant, within ten (10) days of receipt of such notice, that Landlord intends to contest same.

(d)    <u>Reduction in Assessed Valuation of Property</u>.  Tenant, at its sole cost and expense, shall have the right to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents reasonably required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

18

(e)    Expenses.  Upon the termination of the proceedings set forth in (c) or (d) (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings.  In addition, Tenant shall be solely responsible for any costs, fees, interest, penalties or other liabilities incurred in connection with such proceedings.  Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, after deducting therefrom all costs, fees, penalties or interest thereon, which shall be reimbursed to the contesting party.  In the event the Real Estate Taxes for the Shopping Center are increased as a result of Tenant's actions contesting or requiring that Landlord contest such Real Estate Taxes then Tenant shall be liable to Landlord for the increase in Real Estate Taxes on the Shopping Center.

10.    Maintenance, Repairs and Replacements.  Except as set forth below or arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), Tenant shall be solely responsible for maintenance of the exterior and interior of the Building, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems, Tenant's storefront, door glass, doors, door closure devices, window and door frames, molding, locks and hardware, and floor covering, but excluding such maintenance to the exterior of the Building for which Landlord shall be responsible in accordance with paragraph 7 above.  In the event Tenant is required to repair or replace the HVAC system during the last three (3) years of the Term and the resulting repair or replacement cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of such Term, then Landlord shall reimburse Tenant at the end of the Term (including those Option Periods resulting from Tenants' previous exercise of a Renewal Option, if any) for the amount of such costs associated with the repair or replacement for the period beyond the remainder of the Term.  If as a result of such repairs or replacement of the HVAC Landlord would be required to reimburse Tenant for a portion of the cost thereof, Tenant covenants to consult with Landlord prior to the repairs or

19

replacement and purchase of any such HVAC system and give to Landlord the option, at Landlord's election, to repair or replace and purchase the HVAC equipment at Landlord's sole cost and expense. Landlord shall be responsible for the obligation to repair, replace and maintain the roof, roof structure, flooring system, floor slab and structural damage, defects or weaknesses in load-bearing and structural walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof. Notwithstanding the foregoing, Landlord shall not be responsible for any repairs or maintenance required as a direct result of Tenant's construction defects or deficiencies relating to the Building or Tenant's failure to comply (with respect to the interior of the Premises) with any applicable laws, rules, or regulations, including the Americans with Disabilities Act of 1990, as amended, and related state and municipal laws regarding Tenant's use of the Premises. In addition, Landlord shall not be responsible for Tenant's failure to comply with any applicable laws, rules, or regulations, including the Americans with Disabilities Act of 1990, as amended, and related state and municipal laws regarding Tenant's use of the Premises, if such compliance is required due to a specific change in the use of the Premises by Tenant. Should either party fail to perform its obligations under this paragraph 10, the other may, at its option, effect such maintenance or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required). The nonperforming party shall reimburse the other on demand for the reasonable and actual amount so expended, plus interest at the Default Rate. All maintenance, repairs or replacements shall be done by Tenant or Landlord in a manner consistent with the then-existing Shopping Center of which the Building is a part. In order for Landlord effectively to perform its maintenance obligations hereunder, upon payment of the Tenant Improvement Allowance, Tenant shall assign to Landlord any and all manufacturers' and contractors' warranties relating to those elements which Landlord is required to maintain, repair and replace (including a ten year roof membrane warranty) and to the extent same may not be assignable, Tenant shall exercise reasonable efforts (without liability for any loss, cost or expense) to enforce, and shall reasonably cooperate with Landlord in the enforcement of, such warranties. Landlord shall have the right to enter the

20

Premises during reasonable business hours upon 24 hours prior written notice (or at any time in case of an emergency) for inspection and to make any repairs or replacements required of it to be made; provided, however, that Landlord shall notify the store manager or other person in charge at the Premises, and Landlord's employees, agents, and contractors shall identify themselves to such person upon entering the Premises.

11.    Payment of Utility Bills.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for separately metered gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements.  Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center which are payable by Landlord.

12.    Alterations.  During the Term, Tenant shall have the right, at its discretion and its sole cost, without obtaining the prior consent from Landlord, to make (i) any non-structural alterations or modifications necessary in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire; provided, however, if such alterations (a) would affect any of the electrical system, plumbing system, or HVAC system, or (b) would adversely affect other tenants located in the Shopping Center, or (c) require the construction of any demising walls or other significant structural improvements to the interior of the Premises, then Tenant must obtain Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed.  Tenant shall provide Landlord with ten (10) days prior written notice of any such alterations.  With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Building or Improvements.  Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same would impair the structural integrity of the Building and, as to exterior alterations or modifications, only if same are materially inconsistent with the then-existing architecture of the Shopping Center; provided, however, Tenant's then-current prototype for similarly sized stores shall be deemed to be consistent with the then-existing architecture of the Shopping Center.  Notwithstanding the foregoing, Tenant shall not, without Landlord's prior written consent, construct a second story or

u(4313):\circuit\plano\lease.006

expand exterior walls beyond their initially constructed location. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at the cost of Tenant in a workmanlike manner and in compliance with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes. Tenant shall reimburse Landlord for any actual and reasonable costs, fees and expenses incurred by Landlord in connection herewith.

In addition, Tenant may, from time to time, install, maintain and/or replace any satellite dish or antennas on the roof or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof, parapet or the structural elements thereof or cause the breach or termination of the warranty given by the roof contractor as described in Exhibit "C". Upon removal by Tenant of any satellite dish or antennas, Tenant shall repair any damage done in connection with such removal. Tenant shall be liable for any damage to person or property caused by it in connection with the installation, maintenance, existence or removal of the satellite dish or antennae, or due to any environmental hazards caused by the presence of such satellite dish for Tenant. Tenant shall be obligated, at Tenant's sole cost, except to the extent any damage thereto is caused by Landlord, to maintain, repair and replace such satellite dish or antennae. Tenant shall exercise reasonable efforts to insure that such satellite dish shall not interfere with the operations of any other tenant in the Shopping Center or any other satellite dish used by another tenant in the Shopping Center. Landlord shall exercise reasonable efforts to ensure that no satellite dish or antennae used by any other tenant in the Shopping Center shall interfere with the business operations of Tenant, or Tenant's satellite dish or antennae. Landlord may request Tenant, at Landlord's sole cost and expense, to relocate the satellite dish or antennae if Landlord is required to do so by law. Landlord shall identify an alternate location on or about the Premises which will comply with such legal requirements and

provide Tenant with adequate reception for its satellite dish or antennae. The initial location of the satellite dish or antennae shall be shown in the Plans and Specifications delivered by Tenant to Landlord. Original installation of the satellite dish or antennae shall be performed in conjunction with the original construction of the roof and with the cooperation of the roofing contractor performing such original construction, as shall be all subsequent modifications thereto, the relocation thereof and the like, it being the intention of the parties that the roof warranty applicable to the Premises shall in no way be adversely affected by the installation of the satellite dish or antennae.

     13.   <u>Mechanics' Liens</u>.  Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment lien or mechanics and materialmen's lien or claim of any nature relating to labor or services rendered, as applicable, to be filed against the Premises or the Shopping Center.  Should any judgment lien or mechanics or materialman's lien or claim of any nature relating to labor or services rendered be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within sixty (60) days after receipt of written notice of such lien, cause said lien to be removed by substitution of collateral, posting a bond therefor or such other method as may be permissible pursuant to the Texas Property Code, as amended from time to time, and reasonably acceptable to the other party hereto.  In the event either of Tenant or Landlord fails to cause any of such liens to be removed or avoided as aforesaid, within such sixty (60) day period, then such failure shall be deemed an event of default hereunder by the non-defaulting party, and the non-defaulting party may at its option take such actions it deems reasonably necessary to remove such lien, and all costs incurred in connection with the removal and/or avoidance of such lien (including reasonable attorneys' fees), shall be payable to the non-defaulting party, plus interest at the Default Rate.

     14.   <u>Insurance</u>.

        (a)   <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of "all risk" insurance

23

covering loss or damage to the Improvements for the full replacement value of all such construction. During the Main Term and all Option Periods, Tenant shall keep in full force and effect, in a form reasonably acceptable to Landlord, a policy of fire and extended coverage insurance covering loss or damage to the Premises in the amount of the full replacement value of the Building thereon, exclusive of excavation, footings and foundations (which initial amount shall be not less than the Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and Landlord's Mortgagees, as changed from time to time, shall be named in such policy or policies as additional insureds as their respective interests may appear. Tenant shall furnish to Landlord a duplicate certificate of insurance showing insurance existing in such amount.

(b)   Liability Insurance. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than a Three Million and No/100 Dollars ($3,000,000.00) combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)   Workers' Compensation Insurance. Tenant shall maintain workers' compensation insurance in statutory limits.

(d)   Self-Insurance. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000), as computed in accordance with generally accepted accounting principles consistently applied. Tenant agrees to provide Landlord with evidence of such net worth upon request (but not more than twice during any calendar year), and if Tenant fails to do so, then Tenant shall not have the right to self-insure, as set forth herein. As long as the stock of Tenant is publicly traded on a nationally recognized exchange, copies of Tenant's most recently filed quarterly or annual reports, if such reports set forth Tenant's net worth,

24

shall suffice for such purpose.  To the extent Tenant elects to self-insure as provided herein, Tenant agrees to disburse funds in accordance with the terms of this Lease in the same amounts and at such times as would be disbursed pursuant to an insurance policy which would otherwise be required to be maintained by Tenant in the event Tenant had not elected to self-insure against any of the risks or portions thereof set forth in subparagraphs (a), (b) and (c) above, and Tenant shall notify Landlord in writing of such election to self-insure and confirm Tenant's agreement to disburse funds as provided in this Lease.  Landlord shall (at Landlord's sole cost and expense without reimbursement from Tenant) have the right, but not the obligation, to purchase insurance that covers the potential loss, damage or liabilities covered by such self-insurance.  If and to the extent that Tenant elects to self-insure under this paragraph, Tenant hereby agrees to indemnify, hold harmless and defend Landlord from and against any and all claims, demands, suits, costs, expenses, liabilities and losses that Landlord may suffer or incur as a result thereof and that Landlord would not have incurred but for Tenant's self-insurance.  The foregoing indemnification shall include, without limitation, all reasonable attorney's fees incurred by Landlord and any claims arising out of the negligence of Landlord, to the extent same would have been covered by the insurance policies required to be maintained by Tenant under this Lease but for Tenant's election to self-insure.  Tenant additionally agrees to provide to Landlord, upon reasonable request, such agreements and documents with respect to Tenant's self-insurance as Landlord or any Mortgagee may reasonably require from time to time.

(e)    Common Area Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.  During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights, but which do not constitute a portion of the Common Areas (such areas are sometimes collectively referred to as the "Additional Areas").  The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or

25

u(4313):\circuit\plano\lease.006

otherwise, and (iii) constructed portions of the Shopping Center (excluding furniture, fixtures and equipment within such portions of the Shopping Center, i.e., the building shell finish-out and systems only). Said liability policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The reasonable cost of the premiums for coverages relating to the Shopping Center shall be an element of CAM Charges, provided that Tenant shall not be liable for its Pro Rata Share of any premium for coverage in excess of that coverage which is reasonable or appropriate to cover the risks insured in Landlord's reasonable discretion. In this regard, Landlord agrees to submit bids to at least five (5) insurance carriers selected by Landlord and two (2) insurance carriers selected by Tenant at Tenant's option, with a Best rating of not less than B+X in order to obtain the most reasonable cost for the insurance coverages permitted under this Lease. Landlord shall use its reasonable efforts to assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)   Workers' Compensation - Statutory Limits; Employers Liability - $500,000;
2)   Automotive Liability for all vehicles with limits of $2,000,000; and
3)   Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an

26

u(4313):\circuit\plano\lease.006

insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a party insured to the extent of its insurable interest.

       (f)   <u>Policy Provisions</u>.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than B+X.  Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Building and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.  All policies shall provide that no cancellation of insurance shall be effective until at least thirty (30) days written notice to both Landlord and Tenant.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Building and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.  It shall not be necessary for either party to deliver the original of any such blanket or other policy to the other, but the other party shall be furnished with a certificate or duplicate (whichever is requested by the other party) of such policy reasonably acceptable to such other party upon (i) commencement of the Main Term (as to casualty insurance), (ii) upon delivery of the Land (as to liability insurance), (iii) no less than annually thereafter, or (iv) immediately upon the renewal of the policies thereafter or the inception of a new policy.

       (g)   <u>Waiver of Right of Recovery and Subrogation</u>.  Landlord and Tenant hereby agree that to the extent that a loss is covered by insurance or is self-insured (with the deductible under any policy being deemed to be self-insured), they hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of

27

insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers. If Tenant elects to self-insure as provided herein (with the deductible of any policy being deemed to self-insure or the failure by Tenant to obtain an insurance policy being deemed to be an election to self-insure), then the release of claims and waivers of subrogation set forth in this subparagraph (g) shall apply for an amount equal to the full liability, loss or damage which may occur and for which Tenant is responsible under this Lease or at law; provided, that such release and waiver shall not be applicable to, and shall not in any way diminish, Tenant's self-insurance obligations or the indemnification agreement of Tenant set forth in paragraph 14(d) above.

(h)    Evidence of Insurance.    Subject to Tenant's right to self-insure hereunder, Tenant and Landlord shall cause to be issued to each other appropriate certificates or other evidence of insurance (or self-insurance) evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(i)    Indemnities.    Except to the extent of any claims, costs, liability, damage or expense arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that subparagraph (g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring within the Premises or occurring within the Shopping Center resulting from the use thereof by Tenant, its agents or employees.

Except to the extent of any claims, costs, liability, damage or expense arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that subparagraph (g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center (exclusive of the Premises) or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

28

15.    <u>Damages by Fire or Other Casualty</u>.

(a)    <u>Less Than Forty Percent (40%)</u>.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of less than forty percent (40%) of the then-total replacement cost of any of the Improvements, Common Areas and/or Additional Areas, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements (including substantially equivalent value in equipment, furniture and fixtures owned by Tenant), and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures owned by Landlord), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in the event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction and replacement.

(i)    <u>Application of Funds</u>.  All insurance (or self-insurance) proceeds received on account of such damage or destruction, less the cost, if any, of such recovery,

29

shall be applied pursuant to the terms of this Lease to the payment of the cost of such restoration, repair, replacement, rebuilding, or alteration (the "Work"), including expenditures made for temporary repairs or for the protection of property pending the completion of permanent restoration, repair, replacement, rebuilding, or alteration, and, if required by any Mortgagee, shall be held by a mutually agreeable third party escrow agent (which is, for these purposes, the "Escrow Agent"), in an interest bearing account in a federally insured financial institution or institutions such that all funds are deposit insured (or otherwise assured in a manner acceptable to the parties), to be paid out, as provided below, from time to time (but no more often than once monthly), as the Work progresses, upon Tenant's written request in event of work by Tenant, or Landlord's written request in event of work by Landlord, accompanied by a certificate of the architect or engineer in charge of the Work (the "Certificate"), dated not more than seven (7) days prior to such request, stating that the sum then requested either has been paid by Tenant or Landlord, as applicable, or is justly due to the named contractors, subcontractors, materialmen, engineers, architects, or other persons (whose addresses shall also be stated) who have rendered services or furnished materials for certain portions of the Work, lien waivers, releases, bills and invoices as Landlord or any Mortgagee may reasonably, request, evidence satisfactory to Landlord and any Mortgagee that all construction work is being and will be performed in accordance with all applicable governmental requirements, and evidence that all construction work is being insured in accordance with the terms of this Lease. The Certificate shall give a brief description of such services and materials, shall list the several amounts so paid or owing to each of such persons, shall state the cost of the Work at the date of the requisition, and shall state that no part of such expenditures has been or is being made the basis for any other request for payment. The Certificate shall state also that, except for the amounts listed therein, there is no outstanding indebtedness known to such architect or engineer, after due inquiry, for labor, wages, materials, supplies, or services in connection with the Work which, if unpaid, might become the basis of a vendor's, mechanic's, laborer's, materialman's, or similar lien upon the Work or upon the Premises or any part thereof.

(ii)     Disbursement.  Upon compliance with the foregoing provisions of paragraph 15(a)(i), the Escrow Agent shall pay, out of the escrowed funds, to the persons

30

named in the Certificate the respective amounts stated to be due to them or shall pay to Tenant, in the event of Tenant work, or Landlord, in the event of Landlord work, the amount stated to have been paid by Tenant or Landlord, as applicable; provided, however, that such payments shall not exceed in amount the cost of the relevant Work as stated in the Certificate. If the insurance proceeds or reconstruction funds paid by Tenant or Landlord, as applicable, to the Escrow Agent exceed the amount required to pay the total cost of the Work, the party paying such amount to the Escrow Agent, as applicable, after payment of all costs of the Work, shall be entitled to receive or retain, as applicable, such excess.

(b)    Forty Percent (40%) or More. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of forty percent (40%) or more of the then-total reconstruction cost of any of said areas, or in the event of any uninsured casualty, Landlord and Tenant each shall have the option of terminating this Lease. Either party shall notify the other of its exercise of such option within sixty (60) days following the occurrence of such casualty and Tenant shall thereupon make available to Landlord the greater of (i) all insurance proceeds actually received by Tenant (or payable by Tenant under this Lease in the event Tenant self-insures) or (ii) the actual cost of repairing and restoring the damaged Improvements to their previous condition, as estimated by an established and reputable shopping center contractor or architect reasonably acceptable to Landlord and Tenant. In the event neither Landlord nor Tenant elects to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and the payment of insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). If Tenant elects to reconstruct the Improvements pursuant to this paragraph 15(b), the provisions of paragraphs 15(b)(i) and 15(b)(ii) shall apply. Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas

31

and Additional Areas in the manner specified by paragraph 15(a) above regardless of the amount of damage to same. Additionally, Landlord shall use its best efforts to assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    Last Two (2) Years of Main Term or Option Period. Notwithstanding anything in this paragraph 15 to the contrary, if any such casualty loss occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, and Landlord shall receive the greater of (i) all insurance proceeds actually received by Tenant (or payable by Tenant under this Lease in the event Tenant self-insures) or (ii) the actual cost of repairing and restoring the damaged Improvements to their previous condition, as estimated by an established and reputable shopping center contractor or architect reasonably acceptable to Landlord and Tenant.

16.    Condemnation.

(a)    Definition of Taking and Substantial Taking. For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power and any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Building as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the

u(4313):\circuit\plano\lease.006

Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below 4.2 per 1000 square feet of gross leasable area in the Shopping Center (but in no event less than the zoning and development ordinance applicable to Shopping Center), and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within ninety (90) days (with respect to Tenant's Preferred Area) or one hundred eighty (180) days (with respect to the remaining Common Area) after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is materially and adversely impeded.

(b)     Rights Upon Taking or Substantial Taking.  In the event of a Taking of Substantially All of the Premises, Tenant may, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)     Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and justly in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Building and the Premises so that the portions of the Building and the Premises not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Premises and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If required by a Mortgagee, such awards shall be escrowed and disbursed in accordance with the procedure set forth in paragraph 15(a) above.  If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option.

u(4313):\circuit\plano\lease.006

(d)   <u>Rights Upon Temporary Taking</u>.  In the event of a Taking of the Premises or any portion thereof, for temporary use, without the taking of the fee simple title thereto, this Lease shall remain in full force and effect, and the Taking shall not relieve Tenant from its duty and obligation fully and completely to keep, observe, perform, satisfy and comply with each and every agreement, term, covenant, condition, requirement, provision and restriction of this Lease.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking allocable to Tenant's leasehold interest in the Premises for periods prior to the expiration of this Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of this Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of six (6) months may, at Tenant's option, be deemed a permanent Taking and shall be governed by (b) or (c) above, as applicable.

(e)   <u>Taking of the Pylon Sign(s)</u>.  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide a substitute site therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and rebuild any such signage so taken at its sole cost.

(f)   <u>Tenant's Right Upon Condemnation</u>.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

17.   <u>Assignment and Subletting</u>.  Provided Tenant is not in monetary default hereunder (subsequent to the expiration of any applicable right to cure) and subject to any exclusive use rights previously granted by Landlord and approved by Tenant in writing (which exclusive use rights Tenant shall not violate in the exercise of any rights under this paragraph 17 or any of the restrictions on Tenant's use as set forth in paragraph 18 below), Tenant shall have the right to sublet, assign, transfer and reassign (a "transfer") all or any

u(4313):\circuit\plano\lease.006

part of the Premises and any of Tenant's rights and obligations under this Lease during the Term upon delivery to Landlord of written notice of such transfer and an assumption agreement executed by an assignee, sublessee or other transferee. Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder provided that Tenant shall not be liable for any obligation arising in connection with any agreement, modification, amendment or change to this Lease which is not approved by Tenant in writing and any such agreement, modification, amendment or change to this Lease shall not be binding upon Tenant and shall be deemed to be of no force or effect with respect to Tenant's liability hereunder. Notwithstanding the foregoing, Tenant shall not be permitted to subdivide the Premises into more than three (3) separate areas. Tenant may also grant licenses and/or concessions without the consent of Landlord, provided such licenses and/or concessions comply with the terms of this Lease. Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in Tenant shall not be deemed a transfer hereunder and same may be effected without Landlord's knowledge or consent. A sale of all or substantially all of Tenant's assets or a majority of its stores in the State of Texas shall not be deemed a transfer hereunder and may be effected without Landlord's consent, but otherwise shall be subject to the terms of this paragraph 17.

Any assignment or subletting of this Lease shall be executed by the assignor or sublessor and the assignee or sublessee. Each assignee or sublessee shall, for the benefit of Landlord, agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant after the date of such subletting or assignment. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord. Landlord shall be entitled to receive an amount equal to one-half of the net amounts received by Tenant in connection with such assignment or sublease in excess of the Base Rent. Such net amounts shall be determined by subtracting the amounts incurred by Tenant for all reasonable costs, fees, charges and expenses, including but not limited to commissions and finish-out costs, incurred by Tenant in the execution of the assignment or sublease and payment of all other amounts due hereunder from the gross amounts to be paid to Tenant under any assignment or sublease.

35

18.   <u>Use</u>.  Tenant shall initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products. Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants as shown on <u>Exhibit "F"</u>, (iv) in violation of any applicable provision of the "Permitted Encumbrances" contained in <u>Exhibit "F"</u>, or (v) as a restaurant.  Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

19.   <u>Warranties and Representations</u>.

(a)   Landlord represents, warrants and covenants to Tenant that:

(i)   <u>Quiet and Peaceful Enjoyment</u>.  Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants and represents that, so long as Tenant is not in default hereunder beyond any applicable cure period, it shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)   <u>Title</u>.  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, declarations, agreements, leases, tenancies or restrictions, except those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's initial

36

u(4313):\circuit\plano\lease.006

use of the Premises for the sale of items specifically referred to in paragraph 18 hereof or would restrict in any respect the right of Tenant, its employees, customers, and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to (i) object to Tenant's tenancy hereunder, (ii) prohibit the selling, renting, servicing, repairing or warehousing of the Products, or (iii) approve of or consent to any feature of the Improvements or Tenant's signage. This representation and warranty is a material inducement to Tenant's execution of this Lease.

(iii)   Certificate of Authority. Landlord is a duly constituted limited partnership organized under the laws of the State of Texas; that it has the authority to enter into this Lease and perform Landlord's obligations hereunder; and that the party executing this Lease on Landlord's behalf has the lawful right and authority to do so.

(iv)   No Litigation. There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)   Hazardous or Toxic Materials. Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in Exhibit "C") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any such Hazardous Substances are discovered at the Shopping Center which are required to be removed from the Shopping Center under applicable laws, rules, regulations and orders (unless introduced by Tenant, its agents or employees), all costs of removal incurred by Tenant, and all liability imposed upon, or damages suffered by Tenant, because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to hold Tenant harmless from and against all such costs, liability and damages, including,

u(4313):\\circuit\plano\lease.006

without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage, actions, administrative proceedings, judgments, compensatory and punitive damages, penalties, fines, costs, losses, attorneys, fees (through all levels of proceedings), consultants, or experts, fees and all costs incurred in enforcing this indemnity. This representation, warranty and indemnity shall survive the termination of this Lease.

        (vi)   <u>Tenant's Exclusive Use</u>. So long as the Premises are used for the sale of Products, no other tenant or occupant of the Shopping Center shall be entitled to use more than 500 square feet of its premises for the sale of Products, rental of consumer, office and automotive electronics equipment, computer hardware and appliances, or repair of the Products, subject only to the rights of Computer City to use its premises for the following uses: (i) the sale, lease, service or supply of any item covered by its exclusive use as described on <u>Exhibit "F"</u>, and (ii) the sale, lease, service and supply of any other product or device that has an office, home-office or personal productivity use or application (including, by way of example and without limitation, paper goods, ribbons, calculators, personal organizers, hand-held electronic devices, hand-held computers, copiers, facsimile machines, cellular phones and office furniture). The foregoing exception to Tenant's exclusive use shall be in effect only if any exclusive use provisions of Computer City shall not be applicable to Tenant, and only so long as Computer City is open and operating for business in the Shopping Center.

        (vii)  <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit: (i) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (ii) the initial use of the Premises described in paragraph 18 of this Lease.

        (viii)  <u>Prohibited Activities</u>. Neither Landlord nor Tenant shall operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use as (A) a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to or derived from food service, (B) a bowling alley, (C) a billiard or bingo parlor, (D) a flea market, (E) a massage parlor, (F) a

38

u(4313):\circuit\plano\lease.006

funeral home, (G) a facility for the sale of paraphernalia for use with illicit drugs, (H) a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located), (I) an off-track betting parlor, (J) a carnival, amusement park or circus, (K) a gas station, car wash or auto repair or body shop (the parties specifically acknowledge that Tenant's car stereo installation facility is not included in this prohibition (K)), (L) a facility for the sale of new or used motor vehicles, trailers or mobile homes, (M) any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center, (N) a skating rink (O) an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate or display for sale no more than four (4) such electronic games incidentally to their primary operations), (P) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses which are located within three hundred (300) feet from the front entrance to the Building except for (i) offices and storage facilities incidental to a primary retail operation and (ii) an on-site service oriented facility for the pick-up and delivery of laundry and dry-cleaning by the ultimate consumer, including nominal supporting facilities, as the same may be found in similar retail shopping centers in the Plano, Texas metropolitan area (but in no event shall such facility contain or use any laundry equipment, chemicals or detergent or any dry-cleaning equipment, detergent, fluids or other chemicals), (Q) a banquet hall, auditorium or other place of public assembly, (R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers) within five hundred (500) feet from the front entrance to the Building, (S) a theater of any kind within five hundred (500) feet from the front entrance to the Building, or (T) a gymnasium, sport or health club or spa within five hundred (500) feet from the front entrance to the Building.  Nothing in this paragraph shall be deemed to prohibit Landlord from operating or leasing within any building in the Shopping Center a children's recreational facility such as Discovery Zone or Leaps and Bounds, provided such facility is not located within three hundred (300) feet from the front entrance of the Building. Landlord shall not operate, lease or permit to be operated or leased any restaurant within any

building on Landlord's Premises which immediately abuts "Tenant's Preferred Area" (as shown on Exhibit "A") or which is located within three hundred (300) feet from the front entrance to the Building.  Notwithstanding the foregoing, Just For Feet, Inc. shall be permitted to operate a restaurant within its leased building so long as such building is open and operating as a Just For Feet store and such restaurant is ancillary to Just For Feet's operations in accordance with its lease with Landlord.  In addition, no auction, fire or going-out-of business sale shall be conducted in the Shopping Center.

      (ix)    Site Covenants.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

      (A)    Building Height and Location.  No building adjacent to the Premises shall exceed thirty-five (35) feet in height above finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located in Tenant's Preferred Area, and no building located on an outparcel elsewhere in the Shopping Center shall exceed one story, twenty (22) feet in height above finished grade, except for (i) architectural features which shall not exceed twenty-five (25) feet above finished grade, (ii) the Just For Feet building which shall not exceed twenty-seven (27) feet above finished grade, and (iii) the Hoffbrau Restaurant building which shall not exceed its current height above finished grade as of the date hereof.  In no event shall any building located on an outparcel exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas.  No development shall occur within the Shopping Center except as shown on the Site Plan.

      (B)    Construction and Alterations.  Following the end of the First Lease Year, no construction shall be permitted in the Shopping Center during the months of October, November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs.  In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference

u(4313):\circuit\plano\lease.006

with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges, except as same relate to Tenant's Building.  Except as permitted in paragraph 7(e), Landlord shall make no changes in the Common Areas (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's consent, which Tenant may, in its sole discretion, withhold, provided that Tenant shall not unreasonably withhold its consent to any such change in the Common Areas outside of Tenant's Preferred Area.

(C)    <u>Prohibited Uses in Common Areas</u>.  Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for pylon and/or monument signs described in paragraph 8 or erected for or by each tenant of the Shopping Center, the "for rent" signs described in paragraph 27 and traffic control signs except tenants' identification signs along walkways and the billboard signage shown on the Site Plan; (2) display or sale of merchandise (except for sales of merchandise on the sidewalks located directly in front of the buildings in the Shopping Center), provided that no outdoor sales area shall unreasonably interfere with Tenant's or Tenant's customers' use of the Premises or any portion of the Common Areas; (3) operation of loudspeakers or other sound electronically amplified within Tenant's Preferred Area; or (4) imposition of a charge for parking.  Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein, except for any variance which is necessary to permit Landlord to maintain the parking ratios described herein.

u(4313):\circuit\plano\lease.006

(x)     <u>Interference with Tenant's Reception/Transmission</u>.   Landlord
shall not install or permit to be installed by Landlord, and shall reasonably attempt to
prohibit any other tenant or other person anywhere in the Shopping Center from installing,
any radio transmitting equipment which would cause any interference with satellite, radio or
television reception or transmission in or from the Building.

(xi)     <u>Notices Affecting the Premises</u>.   Landlord shall promptly
forward to Tenant any notice or other communication affecting the Premises or the Shopping
Center, received by Landlord from any owner of property adjoining, adjacent or nearby to
the Premises or the Shopping Center or from any municipal or governmental authority, in
connection with any hearing or other administrative procedure relating to the use of the
Premises, Shopping Center or any such neighboring property.

(xii)     <u>Constructive Trust</u>.   Landlord covenants that all sums paid by
Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way
of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and
shall be applied only for such third-party payments, as and when due.

(b)     Tenant represents, warrants and covenants to Landlord that:

(i)     <u>Tenant's Authority</u>.   Tenant is a duly constituted corporation
organized under the laws of the Commonwealth of Virginia; it has the power to enter into
this Lease and perform Tenant's obligations hereunder; and the Vice President executing this
Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)     <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>.   As to
Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not
introduce, discharge, dump, spill or store or permit to be deposited within the Premises or
the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold
Landlord harmless from and against all costs, liability and damages as a result thereof, to the
same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v)
above. This warranty and indemnity shall survive the termination of this Lease.   .

(c)     In the event there is a condition at variance with the foregoing
representations and warranties of Landlord with respect to the Premises or the Shopping
Center which prevents or in any material way inhibits the use of the Premises or any part

42                          u(4313):\circuit\plano\lease.006

thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord (or such additional time as may be reasonably necessary if Landlord cannot reasonably cure its default within such thirty (30) day-period), obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such default. Landlord shall be entitled to a corresponding remedy for breach of Tenant's warranty regarding Hazardous Substances.

20.    Estoppel Certificates.  Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any present or proposed mortgagee, purchaser, sublessee or assignee, any other individual, partnership, corporation, trust, unincorporated association or joint venture, government or any department or agency thereof, or any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, in accordance with its tenor as then constituted, to the best knowledge of the party so certifying; (c) as to the existence of any default thereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses thereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested.  Any such certificate may be relied upon by the party requesting it and any person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Nondisturbance and Attornment.

(a)    Landlord shall have the right to obtain financing and subject the Property to mortgages, and this Lease shall be subject and subordinate to the lien of any and

43

all Mortgages (as defined below) now or hereafter encumbering the Premises and placed thereon by Landlord and to all renewals, modifications, replacements and extensions of such Mortgages; provided, however, that the subordination herein contained shall not be effective with respect to any Mortgage unless the holder of such Mortgage (the "Mortgagee") shall execute and deliver a subordination, nondisturbance and attornment agreement, in the form attached as Exhibit "G" with such changes thereto as may be reasonably requested by each Mortgagee and approved by Tenant, providing that, in the event the Mortgage shall be foreclosed or the Mortgagee shall accept a deed in lieu thereof (either of which events shall be a "Foreclosure"), so long as Tenant shall not then be in default beyond any cure period provided herein, and so long as Tenant shall attorn to the Mortgagee or purchaser upon Foreclosure, (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure, its or his successors or assigns, shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under this Lease arising from and after the date of such Foreclosure, (iv) Tenant shall not be named as a party in any action for Foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all net proceeds arising from casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof.  Landlord agrees that as a condition to Tenant's subordination of its interest under this Lease, it shall obtain a subordination, nondisturbance and attornment agreement in a form reasonably acceptable to Tenant from all existing Mortgagees simultaneously with the execution of this Lease and from all future Mortgagees within thirty (30) days of the closing of the loan from such Mortgagee to Landlord.  As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises.

    (b)  As a part of such subordination, nondisturbance and attornment agreement which Tenant agrees to execute from time to time during the Term, if requested by any Mortgagee, Tenant shall agree to provide to such Mortgagee (simultaneously with notice to Landlord) notice of Landlord's defaults and the same periods for such Mortgagee to

44

cure such defaults as those provided Landlord herein, together with such agreements as are typically found in subordination, nondisturbance and attornment agreements with institutional lenders as may be satisfactory to Tenant.

22.    <u>Change of Landlord</u>.  In the event Landlord's interest in the Premises passes to a successor ("Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were Landlord under this Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant, but without the execution of any further instrument on the part of either of the parties hereto immediately upon the Successor's succeeding to the interest of Landlord under this Lease; provided, however, that in order for the foregoing to be effective against Tenant, such Successor must be bound to Tenant in respect of all of Landlord's duties and obligations hereunder subject to the limitation on Landlord's liability in paragraph 31(b), such binding effect on the Successor to be effective and self-operative without the execution of any further instrument on the part of either of the parties hereto (except notice as required above), immediately upon the Successor's succeeding to the interest, duties and obligations of Landlord under this Lease. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all claims, loss or damage suffered by Tenant as a result of Landlord's failure to provide Tenant with notice of such Successor.

23.    <u>Tenant's Financing</u>.  Tenant may, from time to time, provided that Tenant is not then in default hereunder beyond the applicable cure period, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of

45                                    u(4313):\circuit\plano\lease.006

securing Tenant's indebtedness. If Tenant is not then in default hereunder beyond the applicable cure period, Landlord agrees, upon written request by Tenant, to evidence Landlord's consent in writing to such security interest and assignment, and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to use reasonable efforts to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below. Notwithstanding the foregoing, any agreement executed by Tenant with any lender covering financing for any of the Personalty shall obligate such lender to, upon receipt by such lender of written notice from Landlord that this Lease has been terminated, (i) remove such Personalty so pledged within thirty (30) days subsequent to the date of such notice, and (ii) exercise reasonable efforts to prevent damage from occurring to the Building during the removal of such Personalty. Such documentation shall also contain a provision to the effect that if Tenant's lender fails to claim the Personalty within such thirty (30) day period, then the Personalty shall be deemed abandoned and shall become Landlord's property to be disposed of as Landlord reasonably determines.

24.     Tenant's Property and Waiver of Landlord's Lien. All of the Personalty shall be and remain the personal property of Tenant, removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. Those improvements that are integrated into the physical structure of the Building shall not be removed and shall become the property of Landlord. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Landlord expressly waives its statutory or common law landlord's lien and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the

46

Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

    25.    <u>Memorandum of Lease; Commencement Date Agreement</u>.  Landlord agrees, at Tenant's request and Tenant's sole expense, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by Texas law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as <u>Exhibit "I"</u>, once the Rent Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  Tenant agrees to execute a release of such Memorandum of Lease on the expiration or earlier termination of this Lease.

    26.    <u>Holding Over</u>.  Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of this Lease without the written consent of Landlord and Tenant.  Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred fifty percent (150%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

    27.    <u>"For Rent" Signs</u>.  Tenant hereby permits Landlord during the last one hundred eighty (180) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding six (6) feet by eight (8) feet in size, on the parking lot of the Shopping Center.  Tenant will also allow Landlord or its agents, accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

    28.    <u>Force Majeure</u>.  Except as otherwise specifically contemplated in paragraph 4 of <u>Exhibit "C"</u>, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (other than the payment of

u(4313):\circuit\plano\lease.006