# Exhibit A - Part 2

## EXHIBIT "I"

## COMMENCEMENT DATE AGREEMENT

THIS AGREEMENT, made as of this ____ day of _____, 19__, between PARKER CENTRAL PLAZA, LTD. (herein called "Landlord"), and CIRCUIT CITY STORES, INC. (herein called "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in the City of Plano, Collin County, Texas (herein called the "Premises"); and

WHEREAS, by that certain lease dated February __, 1996, (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of Collin County, _____, on the ____ day of February 1996, in Book _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The term of the Lease commenced on, and the Rent Commencement Date (as such term is defined in the Lease) was, _____, 1996. The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2. The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

u(4313):\circuit\plano\lease.006

4. The date of commencement of the third Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the fourth Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

PARKER CENTRAL PLAZA, LTD.,
a Texas limited partnership

ATTEST:

By: Parker Central Partners, LLC, a Texas limited
liability company

By:_____
Its:_____

By:_____
Name:  Wayne L. Nash
Title:  Manager

Attest:

CIRCUIT CITY STORES, INC., a Virginia corporation

_____
Assistant Secretary

By: _____
Vice President

I-2

## EXHIBIT "J"

### INDEMNIFICATION AGREEMENT

This Indemnification Agreement (this "Agreement) is made this _____ day of _____ 1996, between PARKER CENTRAL PLAZA, LTD., a Texas limited partnership (hereinafter referred to as "Landlord") and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated _____ whereby Landlord has leased to Tenant a portion of the real property located in the City of Plano, Collin County, Texas (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.     Tenant hereby indemnifies and agrees to defend and hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center based upon materials or services provided under contract with Tenant or otherwise arising out of or in connection with the construction by Tenant of the Premises within the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall defend, hold harmless and protect Landlord from any loss, payment, claim or expense related thereto, including attorney's fees and court costs incurred by Landlord.

2.     Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This Agreement to indemnify, defend and hold harmless Landlord shall not apply to any liens or claims caused by Landlord or Landlord's agents.

3.     This Agreement may be assigned by Landlord and shall be binding upon, and shall inure to the benefit of, Landlord and Tenant and their respective successors and assigns.

EXECUTED this _____ day of _____, 1996.

J-1

u(4313):\circuit\plano\lease.006

**EXHIBIT A-1**



EXHIBIT "A"

## EXHIBIT "A-1"

Whereas Clifton R. Haggard Trust is the owner of land situated in the City of Plano, Texas, out of the Daniel Rowlett Survey, Abstract No. 738, said tract includes Tract A and Part of Tract B of Las Tiendas Subdivision, an addition to the City of Plano and as recorded in Volume 9, Page 59 of the Map Records of Collin County, Texas and being more particularly described as follows:

Beginning at a 1 inch iron rod found for point in the Southeast line of U.S. Highway No. 75, said point being the most Westerly corner of Fairview Farm Marketplace Addition, according to the recorded map thereof, in Drawer G, Page 630 in the Map Records, Collin County, Texas;

Thence South 89 degrees 40 minutes 25 seconds East along the South line of said Fairview Farm Marketplace Addition, a distance of 815.12 feet to a 1 inch iron rod found for corner in the Westerly line of a 100 foot Dart Railroad right-of-way;

Thence South 18 degrees 57 minutes 48 seconds West along said right-of-way line, a distance of 58.51 feet to the beginning of a curve to the left having a central angle of 13 degrees 40 minutes 07 seconds, a radius of 2,914.93 feet and a tangent length of 349.36 feet to a 1/2 inch iron rod set for corner;

Thence along said curve to the left, an arc length of 695.40 feet to a point in the North line of Parker Road (100 foot R.O.W.), to a concrete monument set for corner;

Thence North 87 degrees 37 minutes 25 seconds West, along said North line of Parker Road, a distance of 597.72 feet to a 1/2 inch iron rod set for corner;

Thence North 17 degrees 10 minutes 47 seconds West, a distance of 119.14 feet to a 1 inch iron rod found for corner;

Thence North 57 degrees 14 minutes 48 seconds West, a distance of 113.32 feet to a 1/2 inch iron rod set for corner;

Thence North 66 degrees 42 minutes 15 seconds West, a distance of 100.71 feet to a 1 inch iron rod found for corner;

Thence North 21 degrees 13 minutes 20 seconds West, a distance of 70.06 feet to a point in the Southeast line of U.S. Highway No. 75, a 1 inch iron rod found for corner;

Thence North 24 degrees 15 minutes 35 seconds East along said line of said Highway, a distance of 475.15 feet to the Point of Beginning and containing 575,596 square feet or 13.2139 acres of land, more or less.

4313U:\CIRCUIT\PLANO\EXH-A1.001

EXHIBIT A-2
Landlord's Site Plan



EXHIBIT A-3
Legal Description

Exhibit A

TRACT 1

Being a tract of land situated in the City of Plano, Texas, out of the Daniel
Rowlett Survey, Abstract No. 738, said tract includes TRACT A and Part of TRACT
B of Las Tiendas Subdivision, an addition to the City of Plano and as recorded
in Volume 9, Page 59 of the Map Records of Collin County, Texas, and being more
particularly described as follows:

BEGINNING at a concrete monument found for point in the southeast line of U. S.
Highway No. 75, said point being the most westerly corner of Fairview Farm
Marketplace Addition, according to the recorded map thereof, in Drawer G, Page
630 in the Map Records, Collin County, Texas;

THENCE South 89 degrees 40 minutes 25 seconds East along the south line of said
Fairview Farm Marketplace Addition, a distance of 815.12 feet to a 1 inch iron
rod found for corner in the westerly line of a 100 foot Dart Railroad
right-of-way;

THENCE South 18 degrees 57 minutes 48 seconds West along said DART right-of-way
line, a distance of 58.51 feet to the beginning of a curve to the left having a
central angle of 08 degrees 48 minutes 47 seconds, a radius of 2,914.93 feet
and a tangent length of 224.62 feet;

THENCE along said curve a distance of 448.36 feet to a 1/2 inch iron rod found
for corner, said point being the northeast corner of a tract of land as deeded
to Circuit City Stores, Inc. as recorded in County Clerk Records File No.
95-0063681 of the Deed Records, Collin County, Texas;

THENCE continuing along the curve to the left a distance of 247.04 feet to a
concrete monument in the north line of Parker Road (a 100 foot right-of-way),
said curve having a central angle of 04 degrees 51 minutes 21 seconds, a radius
of 2,914.93 feet and a tangent of 123.59 feet, said point also being the
southeast corner of said CIRCUIT CITY STORES, INC. tract;

THENCE North 87 degrees 37 minutes 25 seconds West, along said north line of
Parker Road, a distance of 597.72 feet to a 1/2 inch iron rod found for corner;

THENCE North 17 degrees 10 minutes 47 seconds West, a distance of 119.14 feet
to a 1 inch iron rod found for corner;

THENCE North 57 degrees 14 minutes 48 seconds West, a distance of 113.32 feet
to a 1/2 inch iron rod found for corner;

THENCE North 66 degrees 42 minutes 15 seconds West, a distance of 100.71 feet
to a 1 inch iron rod found for corner;

THENCE North 21 degrees 13 minutes 20 seconds West, a distance of 70.06 feet to
a point in the southeast line of U. S. Highway No. 75, a 1 inch iron rod found
for corner;

THENCE North 24 degrees 15 minutes 35 seconds East along said easterly line of

Exhibit A   (Continued)                    GF-Number 96R00280

said Highway U. S. 75 Frontage Road, a distance of 191.20 feet to a 1/2 inch
iron rod set for corner said point being the northwest corner of said Circuit
City Stores, Inc. tract;

THENCE continuing along the east line of said U. S. 75 Highway Frontage Road a
distance of 283.95 feet to the POINT OF BEGINNING and containing 575,597.48
square feet or 13.2139 acres of land.


TRACT 2:  EASEMENT ESTATE

Being a Non-exclusive, continuous and perpetual easement and right-of-way for
underground drainage, including, but not limited to, the installation of pipes,
culverts and other drainage facilities, in, upon, under and across the
property, together with the right of ingress, egress and regress over the
Easement Tract (as defined therein) for the purpose of constructing, improving,
operating, inspecting, maintaining, repairing, replacing, reconstructing,
removing and relocating any Drainage Facilities (as defined therein) located
with the Easement Tract and the right to remove (or to prevent the construction
or growth of, as applicable) all trees, shrubs, structures, improvements or any
encroachment or obstructions which endanger or may interfere with the
efficiency of use of any Drainage Facilities, as granted or purported to be
granted in Drainage Easement dated August 28, 1995, recorded under County
Clerk's File No. 95-0063684 and County Clerk's File No. 95-0063685 of the Land
Records of Collin County, Texas, and as shown on Survey Plat date January ,
1996, prepared by Needham Wright Laskey Engineers Inc., Robert M. Needham,
R.P.L.S. No. 3759.  Said easement is described on Exhibit G of County Clerk's
File Nos. 95-0063684 and 94-0063685, said property being described as follows:

BEING a tract of land in the City of Plano, Texas, out of the Daniel Rowlett
Survey, ABS No. 738, Collin County, Texas and being more particularly described
as follows:

COMMENCING at a 1" iron rod found at the southeast corner of Fairview Farm
Market Place Addition according to the recorded map thereof, in Drawer G, Page
630 in the Map Records of Collin County, Texas;

THENCE North 89 degrees 40 minutes 25 seconds West along the south line of said
Fairview Farm Market Place Addition a distance of 77.42 feet to a point;

THENCE North 00 degrees 19 minutes 35 seconds East a distance of 5.00 feet to a
point for the POINT OF BEGINNING;

THENCE northeasterly along a curve that has an interior angle of 34 degrees 36
minutes 12 seconds a radius of 169.52 feet, a chord bearing of North 59 degrees
04 minutes 24 seconds East and an arch length of 102.38 feet to a point;

THENCE South 18 degrees 57 minutes 48 seconds West a distance of 55.20 feet;

THENCE North 89 degrees 40 minutes 25 seconds West a distance of 68.56 feet to
the POINT OF BEGINNING and containing 1275 square feet or 0.0293 acres.

NOW KNOWN AS being part of Lot 1, Block A of FAIRVIEW FARM MARKETPLACE, an

Exhibit A   (Continued)

Addition to the City of Plano, Texas, according to the Map thereof recorded in
Volume G, Page 630, Map Records of Collin County, Texas.

## EXHIBIT "B"

### INDEX OF DEFINITIONS

| <u>Term</u> | <u>Paragraph where defined</u> |
|---|---|
| Access Easement | 19(a) |
| Adjacent Property | 19(a) |
| Alternative Access Easement | 19(a) |
| Base Rent | 4(a) |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year | 7(c) |
| Capital Costs | 7(b) |
| Certificate | 15(a)(i) |
| Common Area Easement | 6(e) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| CPI-U | 4(c) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery of Land | Exh. "C", para. 1(b) |
| Escrow Agent | 15(a)(i) |

B-1

u(4313):\circuit\plano\lease.006

| Term | Paragraph where defined |
|------|-------------------------|
| Event of Default (Landlord) | 30 |
| Event of Default (Tenant) | 29 |
| Foreclosure | 21(a) |
| Grading Plans | Exh. "C", para. 1(b) |
| Hazardous Substances | Exh. "C", para. 1(a) |
| Improvements | 1 |
| Land | 1 |
| Landlord | Introduction |
| Landlord's Premises | 1 |
| Landlord Work | Exh. "C", para. 1 |
| Lease Year | 3 |
| Main Term | 3 |
| Modified Proctor | Exh. "C", para. 1(b) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Option Periods | 3 |
| Permissible Building Areas | Exhibit "A" |
| Permitted Encumbrances | Exhibit "F" |
| Person | 20 |
| Personalty | 23 |

u(4313):\circuit\plano\lease.006

| Term | Paragraph where defined |
|---|---|
| Plans and Specifications | Exh. "C", para. 2(b) |
| Premises | 1 |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Rent Commencement Date | 4(a) |
| Schematic Floor Plans and Elevations | Exh. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Work | Exh. "C", para. 1(b) |
| Soils Report | Exh. "C", para. 1(b) |
| Staging Area | 6(a) |
| Substantial Completion | Exh. "C", para. 2(e) |
| Substantially All of the Premises | 16(a) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant's Cost of Funds | 4 |
| Tenant Improvement Allowance | Exh. "C", para. 3 |

u(4313):\circuit\plano\lease.006

| Term | Paragraph where defined |
|------|-------------------------|
| Tenant's Opening | 39 |
| Tenant's Preferred Area | Exhibit "A" |
| Term | 3 |
| Work | 1 5(a)(i) |
| Worth at the Time of Award | 30(b)(i) |

B-4

EXHIBIT "C"

CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.      Landlord's Delivery of the Land.

(a)     Hazardous Substances. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as regulated by any local governmental authority, the State of Texas or the United States Government (herein collectively referred to as "Hazardous Substances").  During the Construction Term, Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as it deems necessary at reasonable times and upon reasonable notice.  Tenant covenants that Tenant will conduct such soil and environmental tests in a manner that will not materially interfere with Landlord's construction and development and operations at the Shopping Center. Furthermore, except to the extent of any claims, costs, liability, damage, or expense arising from the neglect or willful acts of Landlord or its agents or employees, Tenant agrees to indemnify and hold Landlord harmless from any and all claims, costs, liability, damage or expense resulting from the negligent acts of Tenant or its agents or employees in connection with such soil and environmental tests.

C-1

u(4313):\circuit\plano\lease.006

(b)    Common Wall.  The north wall of Tenant's building may be a common wall between Tenant and future retail areas.  The aforementioned common wall provides benefits to both Tenant and Landlord's future adjacent tenants.  Landlord and Tenant agree that all costs associated with common walls, including excavation, footings and tilt wall shall be shared on an equal basis.  If such common walls are built, then the costs shall be identified as those costs noted under a bid item in Tenant's bid package.

2.    Tenant Improvements.

(a)    Plans and Specifications.  Tenant has prepared and furnished to Landlord, and Landlord has approved, complete architectural drawings and specifications (the "Plans and Specifications") for the construction of the Building and Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached as Attachment "1".  The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.

(b)    Permits.  Tenant, at its sole cost and expense, shall obtain or cause to be obtained all building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications.  Landlord agrees to assist and cooperate fully with Tenant, at Tenant's sole cost and expense, in obtaining such permits, licenses, approvals and certificates.  Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

C-2

(c)    <u>Landlord Inspections</u>.  During the course of construction of the Improvements, Landlord and Landlord's lender (or its designated agent) may, at their own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(d)    <u>Substantial Completion</u>.  Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.  The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications.

3.    <u>Costs</u>.  Within thirty (30) days after Substantial Completion and Tenant's Opening and upon Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity substantially in the form attached hereto as <u>Exhibit "J"</u> and documentation reasonably necessary (other than final lien waivers) for a title insurance underwriter to delete exceptions for mechanic's and materialman's liens, (iii) a bill of sale conveying title to the Improvements to Landlord, (iv) the certificate of occupancy, and (v) an architect's certificate from Tenant's architect or Vice President of Construction, stating that Tenant has achieved Substantial Completion in accordance with the Plans and Specifications (hereinafter those items described in (i) through and including (v) above are referred to as, the "Construction Documents"), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to Two Million One Hundred Fifty-

Five Thousand Six Hundred Ninety-Three and 50/100 Dollars ($2,155,693.50), payable by wire transfer of funds by Landlord to Tenant's account.  Tenant covenants to obtain, within one hundred eighty (180) days following the date of Substantial Completion, assignment of all warranties from the general contractor or subcontractors (including but not limited to a general contractor's warranty covering a period of one (1) year from Substantial Completion, in form reasonably acceptable to Landlord), unless such warranty relates to any obligation of Tenant to maintain the Premises, and a roofing manufacturer's limited service warranty agreement, including flashing endorsement, signed by an authorized representative of the contractor and covering a period of ten (10) years from Substantial Completion, but such covenant shall not relieve Landlord of its obligation to timely pay the Tenant Improvement Allowance in accordance with the foregoing.  If the Base Rent is increased or decreased pursuant to paragraph 4(b) of the Lease, the Tenant Improvement Allowance shall likewise be increased or decreased.  If Landlord fails to tender payment of the Tenant Improvement Allowance in full within thirty (30) days following the date of Substantial Completion and Tenant's Opening and Tenant's delivery of the Construction Documents, then any obligation to pay any Base Rent shall, for the next thirty (30) day period, be reduced, in addition to any other reduction in Base Rent already applicable, by an amount equal to Eleven Thousand Six Hundred and No/100 Dollars ($11,600,00), and thereafter Base Rent shall abate until the payment of the Tenant Improvement Allowance (it being understood that any abated payments of Base Rent shall be forfeited by Landlord).  If Landlord fails to tender payment of the Tenant Improvement Allowance within one (1) year after the date it becomes due and payable, Base Rent shall convert to ground rent equal to Seventy Five Thousand and No/100

C-4

Dollars ($75,000) per annum during the second year following the date of Substantial Completion and Tenant's Opening, Fifty Thousand and No/100 Dollars ($50,000) per annum during the third year following the date of Substantial Completion and Tenant's Opening and Twenty-Five Thousand and No/100 Dollars ($25,000.00) per annum thereafter during the Term of the Lease, and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Paragraph 14(a) of the Lease. Notwithstanding the foregoing, at any time following ninety (90) days following the date of the Substantial Completion and Tenant's Opening and upon thirty (30) days prior written notice, provided that Landlord has not then paid the Tenant Improvement Allowance and Tenant has delivered the Construction Documents to Landlord, Tenant shall have the right, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease.  Such right shall be in addition to the rights of Tenant set forth in paragraph 21 of the Lease.  Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lenders and third parties arising as a result of such Transfer.  Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

    4.   <u>Construction Delays</u>.

(a)    <u>Delays by Tenant</u>.  If, subject to force majeure and delays caused by
Landlord, Tenant shall fail to achieve Substantial Completion and deliver the Construction
Documents by June 1, 1996, Landlord, at its option, upon prior written notice to Tenant,
may either (i) complete Tenant's construction, prepare the Construction Documents and
deduct the cost of such construction and preparation of the Construction Documents from the
Tenant Improvement Allowance and require Tenant to commence payment of Base Rent,
CAM Charges and all other sums due hereunder by Tenant on August 1, 1996, or (ii)
(subject to payment of the Tenant Improvement Allowance) require Tenant to proceed with
its construction and thereafter deliver the Construction Documents to Landlord, commence
payment of Base Rent and CAM Charges on August 1, 1996, and reimburse Landlord for its
fixed and ascertainable costs incurred as a result thereof.  Such costs shall be limited to
Landlord's out-of-pocket expenses of construction overtime, acceleration charges and bonuses
paid to Landlord's contractors or subcontractors, charges for the scheduling of construction
crews on days on which work cannot be performed on account of the aforesaid delays by
Tenant, the cost of erecting barricades around Tenant's unfinished work and construction
period interest charges to the extent that such charges exceed those which would have
accrued without such delay.  In the event, for any reason whatsoever and regardless of force
majeure, Tenant shall fail to achieve Substantial Completion, open for business and deliver
the Construction Documents by that date which is one (1) year following Landlord's delivery
of the Land, Landlord shall, in addition to any other remedies available at law or in equity,
be entitled to terminate this Lease.

u(4313):\circuit\plano\lease.006

(b)   <u>Miscellaneous</u>. For purposes hereof, any delays occasioned by the other party (and to the extent so occasioned), other than as specified above, shall be deemed events of force majeure for the purpose of determining dates for the performance of the delayed party's obligations. Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies. All sums owing to Landlord under subparagraph (a) above shall, to the extent applicable and except for Base Rent and CAM Charges, be deducted from the Tenant Improvement Allowance. In the event that Landlord is prevented from obtaining construction draws from its construction lender due to the existence of a lien filed against the Shopping Center by Tenant's general contractor, or other parties supplying services or materials in connection with Tenant's construction contract, Tenant agrees that it shall within thirty (30) days cause such lien to be bonded, removed or otherwise satisfied so that Landlord may receive a down date endorsement from its title company permitting it to receive construction funds from its construction lender.

5.   <u>Attachments</u>.

"1"   Schematic Floor Plan and Elevation

C-7

# ATTACHMENT I
## Schematic Floor Plan Elevation



**EXHIBIT D**
**Non-exclusive list of tenant's removable fixtures**

## EXHIBIT "D"

### REMOVABLE TRADE FIXTURES

STORE FIXTURES
ALL STORAGE RACKING
ALL SECURITY SYSTEM ITEMS
TELEPHONES AND PAGING SYSTEMS
COMPUTER SYSTEM
OFFICE FURNITURE AND TRASH RECEPTACLES
BATTERY CHARGER
TRASH COMPACTOR
SIGNS (INTERIOR/EXTERIOR)
ANTENNA SYSTEM
ELECTRONIC SWITCHING
MR COMPRESSOR (ROADSHOP)
SAFE
CONVEYOR
MEDECO CYLINDER LOCKS (5)
REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES
TACK BOARDS
WATER COOLER
FIRE EXTINGUISHERS
AUDIO ROOM FIXTURES AND SWITCHGEAR
PICTURES
WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS,
DOLLIES, ETC.)
TRACK LIGHTS (CANS ONLY, NOT TRACKS)

u(4313):\circuit\plano\lease.004

EXHIBIT E
Plans and Specifications for Circuit City Pylon Sign

CIRCUIT CITY

14'-0"

6'-6"

40'-0"

35'-6"

5'-0" O.D.

ALUM. SIGN
CABINET PTD
RED

WHITE COPY &
BORDER ON
RED BACKGROUND

INTERNAL LIGHTING
FROM DAYLIGHT
H.O. LAMPS

STEEL SUPPORTS
PTD RED

DOUBLE FACED
PYLON SIGN
PROTOTYPE
91 SQ.FT.
SCALE 1/4" = 1'-0"

## EXHIBIT F
### Exclusive Uses granted to other tenants
### and
### Permitted Encumbrances

## EXHIBIT F

I.   **PERMITTED ENCUMBRANCES**

1.   Easement to The Texas Pipe Line Company, filed 04/24/18, recorded in Volume 217, Page 167, Deed Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996. (As to Tract 1)

2.   Limited or lack of access to road or highway abutting subject property as set forth in instrument filed 01/28/77, recorded in Volume 1035, Page 863, Deed Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996. (As to Tract 1)

3.   Terms and conditions contained in Drainage Easement dated August 28, 1995, filed on August 30, 1995, in Collin County Clerk's File No. 95-0063684, Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996. (As to Tract 2)

4.   Terms and conditions contained in Drainage Easement dated August 28, 1995, filed on August 30, 1995, in Collin County Clerk's File No. 95-0063685, Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996. (As to Tract 2)

5.   Easement to Fairview Farm Development Company, Ltd., filed August 30, 1995 in Collin County Clerk's File No. 95-0063683, Land Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996.  (As to Tract 1)

6.   Ten foot (10) water line easement shown by the plat recorded in Volume 9, Page 59, Map Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S. dated January 29, 1996.  (Affect Tract 1)

7.   Subject to billboard sign as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S. dated January 29, 1996. (Affect Tract 1)   (Affects Tract 1)

8.   20' fire lane and 25' fire lane shown by the plat recorded in Volume 9, Page 59, Map Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S. dated January 29, 1996. (To be abandoned upon replat of the Property) (Affects Tract 1)

CIRCUIT CITY STORES, INC. - PARKER CENTRAL PLAZA

DRR1D207 28740.6

9.  Easement to Texas Power & Light Company, filed 08/22/9, recorded in Volume 739, Page 398, Deed Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996. (To be abandoned upon replat of the Property) (Affects Tract 1)

10. Easement to Texas Power & Light Company, filed 08/31/87, recorded in Volume 2698, Page 257, Land Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996 (To be abandoned upon replat of the Property). (Affects Tract 1)

11. Easement to Texas Power & Light Company, filed 04/21/89, recorded in Volume 3040, Page 474, Land Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996 (To be abandoned upon replat of the Property). (Affects Tract 1)

12. Easement to Texas Power & Light Company and General Telephone Company, filed 07/08/75, recorded in Volume 960, Page 814, Deed Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996. (To be abandoned upon replat of the Property) (Affects Tract 1)

13. Reciprocal Easements with Covenants and Restrictions Affecting Land ("REA") dated August 28, 1995 by and between Clifton R. Haggard, Trustee under the wills of W. O. Haggard, deceased, and Rosa Haggard, deceased, filed on August 30, 1995 in County Clerk's File No. 95-0063682, Deed Records of Collin County, Texas, and as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996. (To be released at Closing). (Affects Tract 1)

14. Lease Agreement by and between Parker Central Plaza, Ltd. and Just for Feet, Inc.

15. Lease Agreement by and between Parker Central Plaza, Ltd. and Ross Stores, Inc.

16. Lease Agreement by and between Parker Central Plaza and Petsmart, Inc.

17. Lease Agreement by and between Reading China & Glass, Inc. d/b/a Reading China & More!

18. Deed of Trust, Mortgage and Security Agreement executed by Parker Central Plaza, Ltd. to Paula McGee, Trustee, securing payment of one note in the principal amount of

CIRCUIT CITY STORES, INC. - PARKER CENTRAL PLAZA

$11,578,727.00, payable to Guaranty Federal Bank, F.S.B. to be filed in Real Property Records of Collin County, Texas.

19.   Financing Statement executed to Parker Central Plaza, Ltd. ("Debtor") to Guaranty Federal Bank, F.S.B. ("Secured Party") to be filed in Real Property Records of Collin County, Texas.

20.   Assignment of Leases and Rents executed by Parker Central Plaza, Ltd. ("Assignor") to Guaranty Federal Bank, F.S.B. ("Assignee") to be filed in Real Property Records of Collin County, Texas.

21.   Subject to encroachment of masonry building (i) onto Texas Power & Light Easement recorded in Volume 739, Page 398, Deed Records, Collin County, Texas; (ii) onto Texas Power & Light and General Telephone Electric Easements recorded in Volume 960, Page 814, Deed Records, Collin County, Texas; (iii) and onto 20' wide fire lane per plat recorded in Volume 9, Page 59, Map Records, Collin County, Texas, all as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996.  (Affects Tract 1)

22.   Subject to encroachment of power poles and power lines across boundary line of subject property, as shown on survey prepared by Needham Wright Laskey Engineers, Inc., certified by Robert M. Needham, R.P.L.S., dated January 29, 1996.  (Affects Tract 1)

23.   Subject to any easements, building lines and setback lines to be created by Preliminary Plat of Lot 1, Block A, Phase 1 and Phase 2 of Parker Central Plaza Addition to be filed in Collin County Plat Records, Collin County, Texas. (Affects Tract 1)

CIRCUIT CITY STORES, INC. - PARKER CENTRAL PLAZA

DRR1D207 28740.6

## EXHIBIT F

## II.    OTHER TENANT LEASES - EXCLUSIVE USES

### ROSS STORES, INC.

Landlord has agreed not to permit any other tenant to use its premises for the sale of off-price family oriented wearing apparel, Landlord shall not permit any other tenant or occupant of Landlord's parcel to sell as its primary use off-price family oriented wearing apparel.

### PETSMART, INC.

Landlord has agreed that as long as its premises are used by PETsMART, Inc. or any permitted subtenant or assignee for the retail sale of pets (including but not limited to fish, birds, reptiles, dogs, cats and other small mammals), pet grooming, veterinary and other pet services, pet food, pet accessories and other pet products, and uses incidental thereto, all other tenants of the Shopping Center shall be prohibited from engaging in such business except only for limited incidental uses.

### TANDY CORPORATION d/b/a Computer City

Landlord has agreed that, except only for Circuit City Stores, Inc. (and only so long as Circuit City Stores, Inc. is open and operating for business in the Shopping Center), no other tenant or occupant in the Shopping Center shall be entitled to use its premises for the sale, lease, service and supply of computers, computer software, computer tools, computer peripherals, and components thereof; provided that such exclusive use does not prohibit Landlord from leasing within the Shopping Center space to other tenants who use not more than 2,000 square feet of their floor area for the sale of computer hardware and not more than 400 square feet of floor area for the sale of computer software.

### READING CHINA & GLASS, INC., d/b/a Reading China & More!

Landlord has agreed that no other tenant shall have the right to use more than 2,500 square feet of its premises for the retail sale of china, dinnerware, stoneware, glassware, cookware, housewares, kitchenware, kitchen electrical appliances, crystal, flatware, household accessories and furnishings, giftware, wicker furniture, kitchen and dining linen, gourmet food, coffee and espresso bar service and other kitchen or dining tabletop merchandise.

### JUST FOR FEET, INC.

Landlord has agreed not to lease any space in the Shopping Center who uses its premises primarily for the retail sale of athletic footwear.

## EXHIBIT F

## III.   PROHIBITED USES

Notwithstanding any provision to the contrary contained in the Lease, all of the following uses of the Premises shall be prohibited:

1. Subject to the terms of the Lease, any use which emits an obnoxious odor, noise, or sound which can be heard or smelled outside of any building in the Shopping Center, except for odors typical to restaurant operations and music within a reasonable proximity to a restaurant operation;

2. Any operation primarily used as a warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

3. Any "second hand" store, "surplus" store, "thrift" store or liquidation outlet;

4. Any mobile home park trailer court, labor camp, junkyard, or stockyard (except that this provisions hall not prohibit the temporary use of construction trailers during periods of construction, reconstruction, or maintenance);

5. Any dumping, disposing, incineration, or reduction of garbage (exclusive of garbage compactors and collection containers located near the rear of any building);

6. Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation;

7. Any central laundry or dry cleaning plant; provided, however, this prohibition shall not be applicable to on-site service oriented to pickup and delivery by the ultimate consumer, including nominal supporting facilities, as the same may be found in retail shopping districts in the metropolitan area where the Shopping Center is located;

8. Any automobile, truck, trailer or recreational vehicle sales, leasing, display or repair (except that the temporary, incidental display of vehicles shall be permitted where such vehicle is displayed inside the premises of the party desiring to make such display);

9. Any bowling alley;

10. Any skating rink;

11. Any lodging rooms, living quarters, or sleeping apartments;

12. Any mortuary or funeral home;

13.  Any establishment selling or exhibiting pornographic materials or having topless or nude entertainment or servers, including, but not limited to, massage parlors, adult book stores and adult theaters;

14.  Any bar, pub, liquor store, nightclub, tavern, restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds thirty percent (30%) of the gross revenues of such business (the sale of beer and wine in a grocery store is permitted);

15.  Any theater;

16.  Any flea market, amusement or video arcade, electronic game room, pool or billiard or bingo hall or parlor, discotheque, dance hall, carnival or other business using loud speakers within the Common Area (except that Tenant may have no more than two video game machines on its premises  which are provided as an incidental convenience for Tenant's customers provided that the same are not visible from the exterior of Tenant's premises);

17.  Any training or educational facility, including, but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an occupant incidental to the conduct of its business at the Shopping Center;

18.  Any gasoline or fuel facility, selling to the public, with or without an attached convenience store;

19.  Any laundromat;

20.  Any tent, sidewalk or other sales or promotions outside of any building which affects the minimum number of parking spaces required by applicable city ordinances as of the date of such sale or promotion in the Shopping Center;

21.  The sale of toys in more than 5,000 square feet of floor area;

22.  Any health spa, fitness center or workout facility in excess of 3,000 square feet of floor area;

23.  Any office use, including any office which provides services directly to consumers such as, and by way of illustration only, financial institutions, real estate, stock brokerages, title company and escrow offices, travel and insurance agencies, and medical, dental and legal clients, doctor or dentist offices, beauty or barber shop, accounting offices, shoe repair shops, small appliance repair shops, except that an incidental office area within a retail establishment shall be permitted;

24.  Any church;

25.   Any "off track betting" operation;

26.   Any store which sells drug paraphernalia;

27.   Any store including a restaurant or vitamin store, which specializes in the sale of "health food", "health oriented" food or "low-fat" food;

28.   Any store whose primary business is the sale of ice cream or frozen yogurt;

29.   Any store whose primary business directly competes with a retail grocery, gourmet or specialty food store;

30.   Any store whose business is inconsistent with the customary character of first class retail shopping center (such as without limitation, a "sex", "head" or "pawn" shop);

31.   Any restaurant;

32.   A facility for the sale of paraphernalia fur use with illicit drugs;

33.   A carnival, amusement park or circus;

34.   A gas station, car wash or auto repair or body shop (the parties specifically acknowledge that Tenant's car stereo installation facility is not included in this prohibition);

35.   A banquet hall, auditorium or other place of public assembly;

36.   A gymnasium, sport or health club or spa within 500 feet from the front entrance to the Circuit City Building;

37.   Any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

38.   Any warehouse operation; and

39.   Any use which is illegal under laws of applicable government authorities with jurisdiction over the Shopping Center and the Premises.

Page 7

CIRCUIT CITY STORES, INC. - PARKER CENTRAL PLAZA

DRR1D207 28740.6

**EXHIBIT G**
**Subordination and Attornment Agreement**

## SUBORDINATION, NONDISTURBANCE AND
## ATTORNMENT AGREEMENT

THIS AGREEMENT made this ____ day of _____, 1996, between GUARANTY FEDERAL BANK, F.S.B. (hereinafter called "Mortgagee") and CIRCUIT CITY STORES, INC. hereinafter called "Tenant"),

## W I T N E S S E T H   T H A T:

WHEREAS, Mortgagee is now or will be the owner and holder of a Deed of Trust and Security Agreement (hereinafter called the "Deed of Trust") dated _____, 1996, covering the real property described in Exhibit A and the buildings and improvements thereon (hereinafter collectively called the "Mortgaged Premises") securing the payment of a promissory note in the stated principal amount of $11,578,727.00 payable to the order of Mortgagee;

WHEREAS, Tenant is the tenant under the lease attached hereto as Exhibit B (hereinafter called the "Lease") dated _____, made by _____, a _____, as landlord (said landlord and its successors and assigns occupying the position of landlord under the Lease hereinafter called "Landlord"), covering certain property (hereinafter called the "Demised Premises") consisting of all or a part of the Mortgaged Premises; and

WHEREAS, Tenant and Mortgagee desire to confirm their understanding with respect to the Lease and the Deed of Trust;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Mortgagee and Tenant hereby agree and covenant as follows:

1.    Subordination. The Lease now is, and shall at all times and for all purposes continue to be, subject and subordinate, in each and every respect, to the lien of the Deed of Trust, it being understood and agreed that the foregoing subordination shall apply to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust, provided that any and all such increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations shall nevertheless be subject to the terms of this Agreement.

2.    Non-Disturbance. So long as (i) Tenant is not in default (beyond any period given Tenant to cure such default) in the payment of rent or additional rent or in the performance of any of the other material terms, covenants or conditions of the Lease on Tenant's part to be performed, (ii) the Lease is in full force and effect according to its original terms, or with such amendments or modifications as Lender shall have approved,

and (iii) Tenant attorns to Mortgagee or a purchaser of the Mortgaged Premises as provided in Paragraph 3, then (a) Tenant's possession, occupancy, use and quiet enjoyment of the Demised Premises under the Lease, or any extensions or renewals thereof or acquisition of additional space which may be effected in accordance with any option therefor in the Lease, shall not be terminated, disturbed, diminished or interfered with by Mortgagee in the exercise of any of its rights under the Deed of Trust, and (b) Mortgagee will not join Tenant as a party defendant in any action or proceeding for the purpose of terminating Tenant's interest and estate under the Lease because of any default under the Deed of Trust. The Mortgagee shall be bound and abide by the terms of the Lease upon succeeding to the interest of the Landlord under the Lease, including but not limited to those provisions controlling the treatment of casualty and condemnation proceeds.

3.    <u>Attornment</u>.  If Mortgagee shall become the owner of the Mortgaged Premises or the Mortgaged Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Mortgaged Premises shall be conveyed by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct Lease between the then owner of the Mortgaged Premises, who shall succeed to the rights and duties of Landlord, and Tenant, and Tenant shall attorn to Mortgagee or such purchaser, as the case may be, upon any such occurrence and shall recognize Mortgagee or such purchaser, as the case may be, as the Landlord under the Lease. Such attornment shall be effective and self-operative without the execution of any further instrument on the part of any of the parties hereto. Tenant agrees, however, to execute and deliver at any time and from time to time, upon the reasonable request of Landlord or of any holder(s) of any of the indebtedness or other obligations secured by the Deed of Trust or any such purchaser, any instrument or certificate which is necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment. Tenant hereby waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder as a result of any such foreclosure or deed in lieu of foreclosure.

4.    <u>Obligations and Remedies</u>.  If Mortgagee shall become the owner of the Mortgaged Premises or the Mortgaged Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Mortgaged Premises shall be conveyed by deed in lieu of foreclosure, Mortgagee or such purchaser, as the case may be, shall have the same remedies in the event of any default by Tenant (beyond any period given Tenant to cure such default) that Landlord had or would have had if Mortgagee or such purchaser had not succeeded to the interest of Landlord. Upon attornment by Tenant as provided herein, Mortgagee or such purchaser shall be bound to Tenant under all the terms, covenants and conditions of the Lease and Tenant shall have the same remedies against Mortgagee or such purchaser for the breach of an agreement contained in the Lease that Tenant might have had under the Lease against Landlord if Mortgagee or such purchaser had not succeeded to the interest of Landlord;

provided, however, that Mortgagee or such purchaser shall not be liable or bound to Tenant:

        (a)    for any act or omission of any prior landlord (including Landlord); or

        (b)    for any offsets or defenses which Tenant might have against any prior landlord (including Landlord) unless Mortgagee was provided notice of the default creating the right of offset or such defense and was given the same opportunity to cure such default as provided Landlord under the Lease; or

        (c)    for or by any rent or additional rent which Tenant might have paid for more than the current month to any prior landlord (including Landlord); or

        (d)    for any security deposit, rental deposit or similar deposit given by Tenant to a prior landlord (including Landlord) unless such deposit is actually paid over to Mortgagee or such purchaser by the prior landlord; or

        (e)    for any moving, relocation or refurbishment allowance; or

        (f)    by any notice given by Tenant to a prior landlord (including Landlord) unless a copy thereof was also then given to Mortgagee.

Except as set out above, the person or entity to whom Tenant attorns shall be liable to Tenant under the Lease only for matters arising during such person's or entity's period of ownership.

    5.    <u>No Abridgment</u>.  Nothing herein contained is intended, nor shall it be construed, to abridge or adversely affect any right or remedy of Landlord or Tenant under the Lease in the event of any default by either Landlord or Tenant (beyond any period given Landlord or Tenant to cure such default) in the performance of any of the terms, covenants or conditions of the Lease.

    6.    <u>Notices of Default to Mortgagee</u>.  Tenant agrees to give Mortgagee a copy of any default notice sent by Landlord under the Lease to Tenant or by Tenant to Landlord.

    7.    <u>Representations by Tenant</u>.  Tenant represents and warrants to Mortgagee that the lease attached hereto as <u>Exhibit B</u> is a true, correct and complete copy of the Lease; Tenant has validly executed the Lease; the Lease is valid, binding and enforceable and is in full force and effect in accordance with its terms; the Lease has not been amended except as stated herein; no rent under the Lease has been paid more than thirty (30) days in advance of its due date; Tenant is unaware of any defaults existing under the Lease; and Tenant, as of this date, has no existing charge, lien, counterclaim or

claim of offset under the Lease, or otherwise, against the rents or other charges due or to become due under the Lease.

8.   Rent Payment.  If Mortgagee shall become the owner of the Mortgaged Premises or the Mortgaged Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Mortgaged Premises shall be conveyed by deed in lieu of foreclosure, Tenant agrees to pay all rents directly to Mortgagee or such purchaser, as the case may be, in accordance with the Lease immediately upon notice of Mortgagee or such purchaser, as the case may be, succeeding to Landlord's interest under the Lease. Tenant further agrees to pay all rents directly to Mortgagee immediately upon notice that Mortgagee is exercising its rights to such rents under the Deed of Trust or any other loan documents (including but not limited to any Assignment of Leases and Rents) following a default by Landlord or other applicable party.  Landlord consents to such payment directly to Mortgagee upon receipt by Tenant of such notice.

9.   Notice of Deed of Trust.  To the extent that the Lease shall entitle Tenant to notice of any mortgage or security agreement, this Agreement shall constitute such notice to the Tenant with respect to the Deed of Trust and to any and all other mortgages and security agreements which may hereafter be subject to the terms of this Agreement.

10.   Landlord Defaults.  Tenant agrees with Mortgagee that effective as of the date of this Agreement, Tenant shall not take any steps to terminate the Lease for any default by Landlord or any succeeding owner of the Mortgaged Premises until after giving Mortgagee a copy of any notice of default required to be provided to Landlord under the Lease and allowing Mortgagee the opportunity to cure such default within the time period allowed Landlord to cure under the Lease.

11.   Notice.  Any notice or communication required or permitted hereunder shall be given in writing, sent by (a) personal delivery, or (b) expedited delivery service with proof of delivery, or (c) United States mail, postage prepaid, registered or certified mail, or (d) confirmed telegram, telex or telecopy, addressed as follows:

To Mortgagee:                Guaranty Federal Bank, F.S.B.
                             8333 Douglas Avenue
                             Dallas, Texas  75225
                             Attention:  Commercial Real Estate Lending
                             Division

To Tenant:                   _____
                             _____
                             _____

33544 00056 REALEST 74187

4