# Exhibit A

# LEASE

between

# CIRCUIT CITY STORES, INC.,

as Tenant

and

# GALLERIA PLAZA, LTD.

as Landlord

dated June 7, 1995

Exhibit A

## TABLE OF CONTENTS

1.  Leased Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

2.  Construction of Building and Improvements . . . . . . . . . . . . . . . . . . .  2

3.  Lease Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

4.  Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

5.  Development of Shopping Center by Landlord . . . . . . . . . . . . . . . . .  5

6.  Easements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

7.  Common Areas and Common Area Maintenance . . . . . . . . . . . . . . .  10

8.  Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

9.  Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

10.  Maintenance, Repairs and Replacements . . . . . . . . . . . . . . . . . . . .  17

11.  Payment of Utility Bills . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

12.  Alterations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

13.  Mechanics' Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

14.  Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

15.  Damages by Fire or Other Casualty . . . . . . . . . . . . . . . . . . . . . . .  26

16.  Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

17.  Assignment and Subletting . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

18.  Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

19.  Warranties and Representations . . . . . . . . . . . . . . . . . . . . . . . . .  34

20.  Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

21.  Subordination, Nondisturbance and Attornment . . . . . . . . . . . . . . .  40

22.     Change of Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    41

23.     Tenant's Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

24.     Tenant's Property and Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . .    43

25.     Memorandum of Lease; Commencement Date Agreement . . . . . . . . . . .    43

26.     Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    43

27.     "For Rent" Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44

28.     Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44

29.     Events of Tenant's Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    44

30.     Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45

31.     Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . . . . . . .    47

32.     Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48

33.     Compliance with Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

34.     Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

35.     Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

36.     Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

37.     Effectiveness of Lease; Tenant's Right to Terminate . . . . . . . . . . . . . . . .    52

38.     Right to Terminate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    54

39.     Tenant's Opening . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    54

## EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "A-2" | Alternative Site Plan |
| "A-3" | Alternative Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Nondisturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnity |

<u>LEASE</u>

THIS LEASE is made as of the 7th day of June, 1995, by and between GALLERIA PLAZA, LTD., a Texas limited partnership having an address at 5068 W. Plano Parkway, Suite 215, Plano, Texas 75093 (the "Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 (the "Tenant").

<u>W I T N E S S E T H</u>:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    <u>Leased Property</u>.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" (defined below) to Tenant, all those certain "Premises" consisting of the "Building" and additional "Improvements" (both as defined below), as and when same are constructed or renovated, together with that approximately 55,208 square foot parcel (the "Land"), on which the Improvements are or will be located, as more particularly shown (approximately) outlined in red on Exhibit "A" hereto (the "Site Plan"), together with exclusive rights in the four (4) parking spaces labelled "Customer Pick-Up" in front of the Building and with the easements described in paragraph 6 below, all located in the "Shopping Center", which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located at the intersection of North Dallas Parkway and Alpha Road, lying and being in the City of Dallas, County of Dallas, State of Texas, and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes.  Notwithstanding the foregoing, Landlord shall have the right to substitute the site plan attached as Exhibit "A-2" hereto for the Site Plan attached hereto as Exhibit "A" so that the site plan attached as Exhibit "A-2" shall be deemed to be the "Site Plan" as referenced in

this Lease for all purposes, and the legal description attached as Exhibit "A-3" shall be deemed to be the legal description of the Shopping Center as referenced in this Lease for all purposes. All of the Shopping Center exclusive of the Premises is "Landlord's Premises".

2.    <u>Construction of Building and Improvements</u>.    Commencing immediately upon "delivery of the Land" (as defined in Exhibit "C" hereto), Tenant shall have the right to construct thereon certain improvements, namely a one-story retail building, containing approximately 55,208 square feet of ground-floor space plus mezzanine, with provisions for customer pick-up, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor and other such appurtenances, as more particularly set forth in the construction provisions attached hereto as Exhibit "C" (the "Other Improvements").    The Building and the Other Improvements are sometimes referred to as the "Improvements".    The Improvements shall be constructed in accordance with the plans and specifications to be prepared by Tenant and approved by Landlord as specified in Exhibit "C".    Except as otherwise provided herein, the Improvements shall belong to Landlord upon payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.

3.    <u>Lease Term</u>.    Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, Exhibit "C", which shall be no later than October 1, 1995, and shall end on the "Rent Commencement Date" (as defined in paragraph 4 below).    The main term (the "Main Term") of the Lease shall commence on the Rent Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Rent Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below.    Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period,

as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of any right to renew or extend as aforesaid, if Tenant shall fail to give any such notice within the aforesaid time limit and shall not have given Landlord prior written notice of its intention not to renew or extend as aforesaid, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired) until ten (10) business days after Landlord shall have given Tenant notice of Landlord's election to terminate the Renewal Option, and Tenant may exercise its Renewal Option at any time prior to expiration of said ten (10) business day period, provided that the first date of such Option Period, notwithstanding the exercise date of such Renewal Option, shall be the first date after the expiration of the Main Term or Option Period, as applicable. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the term of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the First Lease Year shall commence on the Rent Commencement Date and shall end on the last day of January following the first anniversary of the Rent Commencement Date.

4.     Rent.     Tenant agrees to pay base rent ("Base Rent") for the Premises, commencing (subject to the provisions of Exhibit "C") on the earlier to occur of the date on which (i) Tenant opens for business to the public, or (ii) Landlord makes payment of the Tenant Improvement Allowance, as set forth in Exhibit "C" (the "Rent Commencement Date"); provided, however, if Tenant opens for business prior to the date which the Landlord makes payment of the Tenant Improvement Allowance, Tenant may, commencing with the payment of Base Rent next following the date of payment of the Tenant Improvement Allowance by Landlord, withhold and retain an amount of the Base Rent equal to "Tenant's Cost of Funds". Tenant's Cost of Funds shall be equal to the interest accrual on the unpaid Tenant Improvement Allowance commencing with the first payment of Base Rent hereunder, until the date of receipt

of the Tenant Improvement Allowance by Tenant, using a per annum interest figure equal to the interest rate accruing on Landlord's construction loan.  Tenant's Cost of Funds reduction from Base Rent hereunder shall not exceed thirty percent (30%) for any monthly payment of Base Rent; however, any amount of Tenant's Cost of Funds not withheld due to such limitation shall be withheld from the next successive payment(s) of Base Rent until repaid in full.  In the event Landlord fails to pay the Tenant Improvement Allowance within thirty (30) days following the date Tenant achieves Substantial Completion of the Building and Landlord receives the Construction Documents (as defined in Exhibit "C"), the provisions of Exhibit "C" shall govern Tenant's obligation to pay Base Rent hereunder.

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial month or Lease Year, to the address given for Landlord at paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable.  Unless adjusted as provided in (b) below or in paragraph 3 of Exhibit "C", Base Rent shall be paid pursuant to the following schedule:

(a)    First Five Years.  During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of One Million Forty-Eight Thousand Nine Hundred Fifty-Two and 00/100 Dollars ($1,048,952.00), payable in monthly installments of Eighty-Seven Thousand Four-Hundred Twelve and 67/100 Dollars ($87,412.67).

(b)    Reduction/Increase in Base Rent.  Notwithstanding the provisions of (a) above, in the event that the ground floor gross leasable area of the Building when constructed is either greater than or less than 55,208 square feet excluding loading docks, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground floor gross leasable area of the Building (as shown in the Plans and Specifications), multiplied by $19.00. Tenant agrees that the Building shall be constructed in accordance with the Plans and Specifications to within a tolerance of ± 200 square feet unless otherwise approved by Landlord. In determining the aforesaid gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below.  If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year.

In the event of any adjustment to the Base Rent as a result of the ground floor gross leasable area of the Building being greater or less than 55,208 square feet, then the Tenant Improvement Allowance shall also be adjusted proportionately.

(c)    Increases in Base Rent.   Annual Base Rent shall increase (i) on the first day of the sixth, eleventh and sixteenth Lease Year of the Main Term, in an amount equal to the lesser of ten percent (10%) of the initial Base Rent or the increase in the "CPI-U" (as defined below) during the immediately preceding five (5) year period ending on October 31 of the fifth, tenth or fifteenth Lease Year, as applicable and (ii) on the first day of each Option Period, in an amount equal to the lesser of ten percent (10%) of the Base Rent for the immediately preceding Lease Year, or the increase in the CPI-U during the immediately preceding five (5) year period ending on October 31 of the immediately preceding Lease Year. As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers for the Dallas, Texas Standard Metropolitan Statistical Area (1982-84 = 100). If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the aforesaid Bureau of Labor Statistics or a successor or other similar index most nearly equivalent to the CPI-U. Notwithstanding anything herein to the contrary, in no event shall the Base Rent be decreased pursuant to this paragraph 4(c).

(d)    Interest on Past Due Installments.  All past due installments of Base Rent and other amounts payable by Tenant to Landlord hereunder shall bear interest at the Default Rate until paid.

5.    Development of Shopping Center by Landlord.  Landlord covenants to construct and develop a first-class shopping center.  The location of buildings and other tenant space therein will be within the "Permissible Building Areas" designated on Exhibit "A" as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than 4.2 spaces per 1,000 square feet of gross leasable area in the Shopping Center. Notwithstanding the foregoing, Landlord covenants that it shall comply with all applicable development, zoning and parking requirements in effect from time to time promulgated by governmental entities. All such parking shall be at ground level. Landlord shall construct or cause all improvements constituting the Shopping Center to be constructed in a good

- 5 -

and workmanlike manner, lien-free, in accordance with paragraph 13 below, and shall indemnify, defend and hold Tenant harmless for any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord shall not permit construction traffic over the Premises and Landlord shall refrain from interfering with the conduct of Tenant's business. Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.   Easements.  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)   Construction Easements.  During the Construction Term, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route providing access to and from public roadways nearest to the Land over the Common Areas (as defined in paragraph 7 below) for the purpose of construction access to the Premises.  In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") of approximately 5000 square feet, in a portion of the Common Areas to the rear of the Shopping Center (if commercially feasible to so locate Tenant's Staging Area) at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in storing its construction equipment, construction vehicles, construction workers' vehicles, trailers, materials, sheds and other items to be used by Tenant in the course of its construction, for which items Tenant shall be solely responsible.  During any period of renovation, remodeling or any reconstruction of the Premises subsequent to the Construction Term, Landlord agrees to reasonably accommodate Tenant's needs for the nonexclusive easements for the purpose of construction access and the exclusive easement for the Staging Area as described above.  The use of such easements by Tenant shall not result in damage or injury to the buildings or other

improvements of Landlord, and shall not unreasonably interfere with the business or construction operations conducted by Landlord or other tenants in the Shopping Center, and said easements shall be subject to such other reasonable conditions as Landlord shall require from time to time. Tenant will indemnify, defend and hold Landlord harmless from such damage or injury to the buildings, roads, utilities, landscaping or other improvements of Landlord, from unreasonable interference with the business or construction operations conducted by Landlord on Landlord's Premises or other tenants in the Shopping Center, and from any and all claims, liability, costs or expenses in connection with death or personal injury or otherwise resulting from Tenant's use of these easements . After the initial construction of the Improvements, these easements shall automatically terminate; provided, however, Landlord agrees to grant Tenant equivalent construction easements in connection with any required, approved or permitted reconstruction, alteration or repairs as provided herein. Tenant acknowledges that other tenants in the Shopping Center are scheduled to be open for business during Tenant's construction period, and Tenant shall not unreasonably interfere with such other tenants' business operations, their customer's access and their safety in the Common Areas.

(b)     Footing and Foundation Easements.   Subject to Tenant's obligations to construct the Building in accordance with the Plans and Specifications, Landlord grants to Tenant, and Tenant grants to Landlord, nonexclusive easements and rights in Landlord's Premises (not including any area beyond five (5) feet from the perimeter of the Land or any areas leased to third party tenants) and the Premises, as appropriate, (i) for the construction and maintenance of foundations, footings, supports and demising walls reasonably necessary in connection with the construction of the other's improvements on the Premises or Landlord's Premises, as appropriate, provided same does not materially adversely affect existing construction on Landlord's Premises or the Premises; and provided same does not affect the separate insurance rating of the other party's building; (ii) to allow their respective buildings to abut and connect (but not to bear structurally upon each other unless and except as otherwise provided herein); and (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets.  No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made.  The grantee shall repair, at its sole

expense, any damage to any building of the grantor caused in making or maintaining said attachment and shall indemnify, defend and hold the grantor harmless from any and all claims, liability, costs and expenses, whether in connection with death, personal injury, or property damage, which result or arise out of the making or maintenance of such attachment. The parties will cooperate and cause their respective contractors to cooperate with each other in the coordination of construction schedules so as to facilitate construction on the Premises and Landlord's Premises and the connection of other buildings in the Shopping Center. The Building shall not be used by Landlord for load-bearing purposes, nor shall the Landlord's buildings be used by Tenant for load-bearing purposes. The easements set forth in this subparagraph 6(b) shall apply only to initial construction and any reconstruction provided in this Lease.

(c)    Encroachments. While it is the intention of the parties to confine their improvements to the limits of the Premises and Landlord's Premises (not including areas leased to third party tenants), as applicable, they acknowledge that this result is not always achieved in a shopping center developed by multiple parties. Accordingly, each party grants to the other a non-exclusive easement, not to exceed twelve inches (12") in width (unless the grantor thereof approves in advance a greater width) for the maintenance of canopies, decorative fascia, roofs and other overhangs, awnings, utility vaults, staircases, signs, lights, pillars and other like projections and encroachments over and across Landlord's Premises or the Premises, as applicable, to the extent that such projections and encroachments shall exist after completion of all construction or reconstruction (if any part is damaged or destroyed and then rebuilt), provided that such use shall not unreasonably interfere with any other tenants in the Shopping Center.

(d)    Utility Easements. During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in Exhibit "C"), Landlord agrees to use reasonable efforts to obtain such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord or any other tenants in the Shopping Center of the Common Areas;    provided, however, Landlord shall be reimbursed for any actual and necessary costs incurred in obtaining such easements, including, but not limited to, reasonable attorneys' fees. For the purpose of exercising the rights granted in this subparagraph 6(d), Tenant and/or the utility provider shall have the right to enter upon

and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas upon such installation and any other reasonable conditions and requirements imposed by Landlord; provided, however, Tenant shall indemnify, defend and hold Landlord harmless from any damages, loss or liability which result from Tenant's acts or omissions in connection with the installation of such utility services.

To the extent possible, no such work shall be performed on weekends or during holiday seasons.

(e)    <u>Common Area Easement</u>.  During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor.  Landlord shall have no right to take any action regarding the Common Areas which would violate the Site Covenants, but shall have the right to temporarily block off access to the Common Areas, but no more often than Landlord and its attorneys reasonably deem to be legally necessary in order to avoid the implication of dedicating the same for public use or of creating prescriptive rights therein as a matter of law, such barriers to be temporarily erected for such purpose, if possible, at a time or upon a day when the Shopping Center is not open for business, and then for only the minimum time required to accomplish such purpose.  Tenant shall exercise reasonable efforts to cause its employees to park in the parking area at the side of the Shopping Center or in other areas reasonably designated by Landlord, provided that such area is adequately lighted and  does not present a security risk to Tenant's employees.

(f)    <u>Non-Dedication</u>.  None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would

- 9 -

cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

(g)    Termination of Easements.    All of the easements described in this paragraph 6 or elsewhere in this Lease shall (unless terminated earlier as set forth herein) automatically terminate upon the expiration of the Term or earlier termination of this Lease. Although no release agreement shall be necessary to terminate such easements, Tenant agrees to execute a release agreement terminating the easements described in this Lease promptly upon request by Landlord.    Tenant agrees to be bound by the reasonably imposed rules and regulations for the Shopping Center proposed by the Landlord, provided that the Tenant shall have the reasonable right to approve the form of such rules and regulations prior to enactment, which approval shall not be unreasonably withheld, and such rules and regulations must be uniformly enforced among all tenants in the Shopping Center and shall not conflict with any of the terms, provisions and conditions contained in this Lease.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas.    The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel occupants which contribute toward "CAM Charges" (as defined below) and are not responsible for separate maintenance of such outparcels), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing, replacing, insuring, equipping, controlling, and lighting the Common Areas, as reasonably necessary, in a first-class manner, including cleaning, maintenance of Landlord's pylon sign structure(s), the roof and roof structure of all buildings, snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, nonstructural maintenance of exterior walls

contained within the Shopping Center and replanting and replacing landscaping, all such work to be collectively "Common Area Maintenance".

(b)    CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) all of Landlord's reasonable and proper direct costs and expenses of operating, maintaining, insuring (including both the Common Areas and other areas of Shopping Center required to be insured by Landlord under paragraph 14 hereof), equipping, controlling and lighting (including without limitation, painting and cleaning of exterior walls and other surfaces) the Common Areas, including normal roof maintenance (but excluding Capital Costs (as hereinafter defined)) and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount equal to six percent (6%) of the total of such costs (specifically excluding from such total, the amounts paid by Landlord and Tenant for non-CAM Charges such as insurance, capital expenditures, Real Estate Taxes, and utilities not serving the Common Areas).  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:  (1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels; (2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center; (3) routine maintenance, repairs or replacements to the interior of any buildings (excluding exterior walls thereof) or utility systems not servicing the Common Areas; (4) repairs or replacements necessitated by the negligence or the wrongful action of Landlord (including failure to construct any portion thereof in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Rent Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions; (5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source; (6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7; (7) premiums for Common Area liability insurance or other insurance required to be maintained by Landlord under this Lease in excess of the premium limits established in paragraph 14(e) below; (8) Capital Costs (as hereinafter defined); (9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10)

"CAM Years" (as defined below); (10) reserves for anticipated future expenses; or (11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner (so long as Tenant has paid Tenant's Pro Rata Share (as defined below) of CAM Charges relating to such bills to Landlord in a timely manner). CAM Charges shall be in an amount reasonably consistent with the costs incurred by other landlords of first class power centers in the north Dallas, Texas market. Capital Costs shall be defined as (i) costs expended by the Landlord in the operation, maintenance, repair, replacement and reconstruction of the Shopping Center which must be amortized or capitalized, rather than expensed or deducted, for federal income tax purposes, notwithstanding any "one-time" or pro rata right to expense, amortize or allocate an otherwise capital expenditure.

(c)     Tenant Payments. Commencing on the Rent Commencement Date, Tenant shall pay to Landlord a fee (which Landlord estimates to be $.60 per square foot of ground floor area in the Building per annum), payable in equal monthly installments, as its share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. During the first two (2) CAM Years, the Tenant shall pay its share of the actual CAM Charges; however, beginning with the third (3rd) CAM Year and continuing for each CAM Year thereafter, CAM Charges shall not exceed by more than seven percent (7%) those in effect during the preceding CAM Year (provided that such limitation on CAM Charges shall not be applicable to taxes, insurance, utility charges and other fixed costs which are not within the control of Landlord). For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground floor gross leasable space in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated based upon the CAM Charges for the prior CAM Year and an estimated

increase, if any, as may be reasonably determined by Landlord.  Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground floor gross leasable space in the Building (excluding exterior truck wells, exterior trash compactor facilities and exterior customer pickup areas) and the denominator of which is the number of square feet of the ground floor gross leasable space (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center.  In determining the ground floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls.  The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein.  Changes in applicable floor areas shall result in corresponding pro rata adjustments, but in no event shall the denominator of the fraction by which Tenant's share of CAM Charges is determined be less than the gross leasable area of the Shopping Center as shown on Exhibit "A", except in the event of a condemnation action not resulting in the termination of this Lease.  The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    Examination of Landlord's Records.  Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year.  Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on at least ten (10) days' prior notice to Landlord.  If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of Tenant's actual share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.  Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.  Tenant shall not intentionally disclose the results of any such audit to any third party, except for any necessary lender, attorney, accountant or similar party.

(e)    <u>Rights Reserved to Landlord</u>.  Notwithstanding any other provisions to the contrary, Landlord expressly reserves the right, at any time and from time to time, to modify or alter the Shopping Center <u>other than</u> the Premises and Tenant's Preferred Area (as herein defined), which Tenant's Preferred Area shall include ingress and egress from and to North Dallas Parkway and Southern Blvd., without the prior written consent of Tenant, provided that (i) the Shopping Center shall at all times be operated as a first-class retail center, and (ii) no modification or alteration will materially and adversely affect Tenant's or its customers' access to, or the use, visibility or operation of the Premises.

8.    <u>Signs</u>.  Landlord, at its sole cost and expense, no later than the date set forth on Attachment "5" to the Construction Provisions, shall construct and install upon the Common Areas at the location so shown on Exhibit "A", a pylon sign structure (with electrical power source available), having sufficient space thereon in the top or first tenant position for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense.  Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed.  Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves.  Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans, provided such replacement signage is compatible with and does not adversely affect the other then existing signage on the pylon used by the other tenants in the Shopping Center. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, and the other restrictions described herein, as aforesaid.

9.    Taxes.

(a)    Taxes Contemplated Hereunder.  The term "Real Estate Taxes" shall mean all general and special real estate taxes, special assessments and other ad valorem taxes, rates, levies and assessments paid upon or with respect to the Shopping Center, including the Premises (or other form of tax specifically levied in lieu of, and not in addition to, one or more forms of Real Estate Taxes), for a calendar year or a portion thereof to any governmental agency or authority and all taxes specifically imposed in lieu of any such taxes.  Nothing contained in this Lease shall require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any income, profits, gross receipts or renewal tax or charge upon the rent payable by Tenant under this Lease.

(b)    Payment of Real Estate Taxes.  Tenant shall pay its share of the Real Estate Taxes levied against the tax parcel or parcels comprising the Shopping Center (the "tax parcel").  Tenant's share shall be calculated by multiplying the total tax assessed, net of any early-payment discounts available at the time Tenant's payment is due, by a fraction, the numerator of which is the number of square feet of ground floor gross leasable area in the Building (excluding truck wells, trash compactor facilities and customer pick-up areas) and the denominator of which is the number of square feet of ground floor gross leasable space (including the area of any outside sales area exclusive to a single occupant but excluding any portion of the Common Areas used by any tenant of the Shopping Center on a temporary basis for promotional purposes) in the Shopping Center.  In determining the ground floor gross leasable area of any building in the Shopping Center (including the Building), the same measurements and criteria set forth in paragraph 7(c) shall be applicable hereto.  Tenant shall pay said share of taxes within fifteen (15) days after Tenant's actual receipt of Landlord's statement therefor (but in no event more than fifteen (15) days before Landlord shall either lose the benefit of any discount given by the taxing authority for early payment or incur any interest charge or penalty for late payment), accompanied by the tax bill on the basis of which such statement is rendered.  Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof (so long as Tenant has paid Tenant's Pro Rata share of such Real Estate Taxes to Landlord in a timely manner).  In the event that Tenant's

payment of its share of Real Estate Taxes is not timely tendered to Landlord, Tenant shall be liable to Landlord for its share of any discount which would have been available to Tenant as aforesaid had Tenant made timely payment thereof or, as applicable, for its share of any penalty which would have been avoided by such timely payment, notwithstanding the fact that Landlord may actually have made timely payment and received the discount or avoided the penalty. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant. Real Estate Taxes shall be prorated as of the Rent Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of Real Estate Taxes and any interest and penalties due thereon and may deduct the cost thereof, plus interest at the lesser of sixteen percent (16%) per annum or the highest rate permitted by Texas law (the "Default Rate"), from the next install-ment(s) of Base Rent and other charges due hereunder.

(c)    Contest of Real Estate Taxes. The Landlord covenants that it shall, upon receipt of written notice from the Tenant, contest the amount of Real Estate Taxes imposed against the Shopping Center as a CAM Charge. Landlord shall be relieved of such covenant in the event other tenants in the Shopping Center occupying more than fifty thousand (50,000) square feet of rentable area in the Shopping Center object in writing to such tax contest after notice thereof. In addition, Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant, within ten (10) days of receipt of such notice, that Landlord intends to contest same.

(d)    Reduction in Assessed Valuation of Property. Tenant, at its sole cost and expense, shall have the right to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes. In any instance where any such action or proceeding is being

undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents reasonably required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

(e)   Expenses.  Upon the termination of the proceedings set forth in (c) or (d) (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay its share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings.  In addition, Tenant shall be solely responsible for any costs, fees, interest, penalties or other liabilities incurred in connection with such proceedings.  Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, after deducting therefrom all costs, fees, penalties or interest thereon, which shall be reimbursed to the contesting party.  In the event the Real Estate Taxes for the Shopping Center are increased as a result of Tenant's actions contesting or requiring that Landlord contest such Real Estate Taxes then Tenant shall be liable to the Landlord for the increase in Real Estate Taxes on the Shopping Center.

10.   Maintenance, Repairs and Replacements.  Except as set forth below or arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), Tenant shall be solely responsible for maintenance of the exterior and interior of the Building, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems, Tenant's storefront, door glass, doors, door closure devices, window and door frames, molding, locks and hardware, and floor covering.  In the event Tenant is required to repair or replace the HVAC system during the last thee (3) years of the Term and the resulting repair or replacement cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of such Term, then Landlord shall reimburse Tenant at the end of the Term (including those Option Periods resulting from Tenants' previous exercise of a Renewal Option, if any) for the amount of such costs associated with the repair or replacement for the period beyond the remainder of the Term.  If as a result of such repairs or replacement of the HVAC Landlord would be required to reimburse Tenant for a portion of the cost thereof, Tenant covenants to consult with Landlord prior to the repairs or replacement and purchase of any such

HVAC system and give to Landlord the option, at Landlord's election, to repair or replace and purchase the HVAC equipment at Landlord's sole cost and expense. Landlord shall be responsible for the obligation to repair, replace and maintain the roof, roof structure, flooring system, floor slab and structural damage, defects or weaknesses in load-bearing and structural walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof. Notwithstanding the foregoing, Landlord shall not be responsible for any repairs or maintenance required as a direct result of Tenant's construction defects or deficiencies relating to the Building or Tenant's failure to comply (with respect to the interior of the Premises) with any applicable laws, rules, or regulations, including the Americans with Disabilities Act of 1990, as amended, and related state and municipal laws regarding Tenant's use of the Premises. In addition, Landlord shall not be responsible for Tenant's failure to comply with any applicable laws, rules, or regulations, including the Americans with Disabilities Act of 1990, as amended, and related state and municipal laws regarding Tenant's use of the Premises, if such compliance is required due to a specific change in the use of the Premises by Tenant. Should either party fail to perform its obligations under this paragraph 10, the other may, at its option, effect such maintenance or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required). The nonperforming party shall reimburse the other on demand for the reasonable and actual amount so expended, plus interest at the Default Rate. All maintenance, repairs or replacements shall be done by Tenant or Landlord in a manner consistent with the then-existing Shopping Center of which the Building is a part. In order for Landlord effectively to perform its maintenance obligations hereunder, upon payment of the Tenant Improvement Allowance, Tenant shall assign to Landlord any and all manufacturers' and contractors' warranties relating to those elements which Landlord is required to maintain, repair and replace (including a ten year roof membrane warranty) and to the extent same may not be assignable, Tenant shall exercise reasonable efforts (without liability for any loss, cost or expense) to enforce, and shall reasonably cooperate with Landlord in the enforcement of, such warranties. Landlord shall have the right to enter the Premises during reasonable business hours upon 24 hours prior written notice (or at any time in case of an emergency) for inspection and to make any repairs or

replacements required of it to be made; provided, however, that Landlord shall notify the store manager or other person in charge at the Premises, and Landlord's employees, agents, and contractors shall identify themselves to such person upon entering the Premises.

11.    Payment of Utility Bills.    Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for separately metered gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center which are payable by Landlord.

12.    Alterations.    During the Term, Tenant shall have the right, at its discretion and its sole cost, without obtaining the prior consent from Landlord, to make (i) any non-structural alterations or modifications necessary in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire; provided, however, if such alterations (a) would affect any of the electrical system, plumbing system, or HVAC system, or (b) would adversely affect other tenants located in the Shopping Center, or (c) require the construction of any demising walls or other significant structural improvements to the interior of the Premises, then Tenant must obtain Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed.    Tenant shall provide Landlord with ten (10) days prior written notice of any such alterations. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Building or Improvements.    Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same would impair the structural integrity of the Building and, as to exterior alterations or modifications, only if same are materially inconsistent with the then-existing architecture of the Shopping Center.    Notwithstanding the foregoing, Tenant shall not, without Landlord's prior written consent, construct a second story or expand exterior walls beyond their initially constructed location.    Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at the cost of Tenant in a workmanlike manner and in compliance with all applicable law.    Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work.    Without cost or

expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes. Tenant shall reimburse Landlord for any actual and reasonable costs, fees and expenses incurred by Landlord in connection herewith.

In addition, Tenant may, from time to time, install, maintain and/or replace any satellite dish or antennas on the roof or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof, parapet or the structural elements thereof or cause the breach or termination of the warranty given by the roof contractor as described in Exhibit "C". Upon removal by Tenant of any satellite dish or antennas, Tenant shall repair any damage done in connection with such removal. Tenant shall be liable for any damage to person or property caused by it in connection with the installation, maintenance, existence or removal of the satellite dish or antennae, or due to any environmental hazards caused by the presence of such satellite dish for Tenant. Tenant shall be obligated, at Tenant's sole cost, except to the extent any damage thereto is caused by Landlord, to maintain, repair and replace such satellite dish or antennae. Tenant shall exercise reasonable efforts to insure that such satellite dish shall not interfere with the operations of any other tenant in the Shopping Center or any other satellite dish used by another tenant in the Shopping Center. Landlord shall exercise reasonable efforts to ensure that no satellite dish or antennae used by any other tenant in the Shopping Center shall interfere with the business operations of Tenant, or Tenant's satellite dish or antennae. Landlord may request Tenant, at Landlord's sole cost and expense, to relocate the satellite dish or antennae if Landlord is required to do so by law. Landlord shall identify an alternate location on or about the Premises which will comply with such legal requirements and provide Tenant with adequate reception for its satellite dish or antennae. The initial location of the satellite dish or antennae shall be shown in the Plans and Specifications delivered by Tenant to Landlord. Original installation of the satellite dish or antennae shall be performed in conjunction with the original construction of the roof and with the cooperation of the roofing contractor performing such original construction, as shall be all subsequent modifications thereto, the relocation thereof and the like, it being the intention of the parties that

the roof warranty applicable to the Premise shall in no way be adversely affected by the installation of the satellite dish or antennae.

13.   Mechanics' Liens.  Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment lien or mechanics and materialmen's lien or claim of any nature relating to labor or services rendered, as applicable, to be filed against the Premises or the Shopping Center.  Should any judgment lien or mechanics or materialman's lien or claim of any nature relating to labor or services rendered be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within sixty (60) days after receipt of written notice of such lien, cause said lien to be removed by substitution of collateral, posting a bond therefor or such other method as may be permissible pursuant to the Texas Property Code, as amended from time to time, and reasonably acceptable to the other party hereto.  In the event either of Tenant or Landlord fails to cause any of such liens to be removed or avoided as aforesaid, within such sixty (60) day period, then such failure shall be deemed an event of default hereunder by the non-defaulting party, and the non-defaulting party may at its option take such actions it deems reasonably necessary to remove such lien, and all costs incurred in connection with the removal and/or avoidance of such lien (including reasonable attorneys' fees), shall be payable to the non-defaulting party, plus interest at the Default Rate.

14.   Insurance.

(a)   Property Damage.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of "all risk" insurance covering loss or damage to the Improvements for the full replacement value of all such construction.  During the Main Term and all Option Periods, Tenant shall keep in full force and effect, in a form reasonably acceptable to Landlord, a policy of fire and extended coverage insurance covering loss or damage to the Premises in the amount of the full replacement value of the Building thereon, exclusive of excavation, footings and foundations (which initial amount shall be not less than the Tenant Improvement Allowance), with a commercially reasonable

deductible, for which Tenant shall be fully responsible. Landlord and Landlord's "Mortgagees" (as defined in paragraph 21 below), as changed from time to time, shall be named in such policy or policies as additional insureds as their respective interests may appear. Tenant shall furnish to Landlord a duplicate certificate of insurance showing insurance existing in such amount.

(b)   Liability Insurance. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than a Three Million and No/100 Dollars ($3,000,000.00) combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)   Workers' Compensation Insurance. Tenant shall maintain workers' compensation insurance in statutory limits.

(d)   Self-Insurance. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than Seventy-Five Million Dollars ($75,000,000), as computed in accordance with generally accepted accounting principles consistently applied. Tenant agrees to provide Landlord with evidence of such net worth upon request (but not more than twice during any calendar year), and if Tenant fails to do so, then Tenant shall not have the right to self-insure, as set forth herein. To the extent Tenant elects to self-insure as provided herein, Tenant agrees to disburse funds in accordance with the terms of this Lease in the same amounts and at such times as would be disbursed pursuant to an insurance policy which would otherwise be required to be maintained by Tenant in the event Tenant had not elected to self-insure against any of the risks or portions thereof set forth in subparagraphs (a), (b) and (c) above, and Tenant shall notify Landlord in writing of such election to self-insure and confirm Tenant's agreement to disburse funds as provided in the Lease. Landlord shall (at Landlord's sole cost and expense without reimbursement from Tenant) have the right, but not the obligation, to purchase insurance that covers the potential loss, damage or liabilities covered by such

self-insurance. If and to the extent that Tenant elects to self-insure under this paragraph, Tenant hereby agrees to indemnify, hold harmless and defend Landlord from and against any and all claims, demands, suits, costs, expenses, liabilities and losses that Landlord may suffer or incur as a result thereof and that Landlord would not have incurred but for Tenant's self-insurance. The foregoing indemnification shall include, without limitation, all reasonable attorney's fees incurred by Landlord and any claims arising out of the negligence of the Landlord, to the extent same would have been covered by the insurance policies required to be maintained by Tenant under this Lease but for Tenant's election to self-insure. Tenant additionally agrees to provide to Landlord, upon reasonable request, such agreements and documents with respect to Tenant's self-insurance as Landlord or any Mortgagee may reasonably require from time to time.

(e)    Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction. During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights, but which do not constitute a portion of the Common Areas (such areas are sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iii) constructed portions of the Shopping Center (excluding furniture, fixtures and equipment within such portions of the Shopping Center, i.e., the building shell finish-out and systems only). Said liability policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The reasonable cost of the premiums for coverages relating to the Shopping Center shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is reasonable or appropriate to cover the risks insured in Landlord's reasonable discretion. In this regard, Landlord agrees to submit bids to at least five (5) insurance carriers selected by Landlord and

two (2) insurance carriers selected by Tenant at Tenant's option, with a Best rating of not less than B + X in order to obtain the most reasonable cost for the insurance coverages permitted under this Lease. Landlord shall use its reasonable efforts to assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)  Workers' Compensation - Statutory Limits;
    Employers Liability - $500,000;

2)  Automotive Liability for all vehicles with limits of $2,000,000; and

3)  Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a party insured to the extent of its insurable interest.

(f)  Policy Provisions. All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than B + X. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Building and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall

comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance. All policies shall provide that no cancellation of insurance shall be effective until at least thirty (30) days written notice to both Landlord and Tenant. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Building and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14. It shall not be necessary for either party to deliver the original of any such blanket or other policy to the other, but the other party shall be furnished with a certificate or duplicate (whichever is requested by the other party) of such policy reasonably acceptable to such other party upon (i) commencement of the Main Term (as to casualty insurance), (ii) upon delivery of the Land (as to liability insurance), (iii) no less than annually thereafter, or (iv) immediately upon the renewal of the policies thereafter or the inception of a new policy.

(g)    Waiver of Right of Recovery and Subrogation.    Landlord and Tenant hereby agree that to the extent that a loss is covered by insurance or is self-insured (with the deductible under any policy being deemed to be self-insured), they hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers. If Tenant elects to self-insure as provided herein (with the deductible of any policy being deemed to self-insure or the failure by Tenant to obtain an insurance policy being deemed to be an election to self-insure), then the release of claims and waivers of subrogation set forth in this subparagraph (g) shall apply for an amount equal to the full liability, loss or damage which may occur and for which Tenant is responsible under this Lease or at law; provided, that such release and waiver shall not be applicable to, and shall not in any way diminish, Tenant's self-insurance obligations or the indemnification agreement of Tenant set forth in paragraph 14(d) above.