(h)   Evidence of Insurance. Subject to Tenant's right to self-insure hereunder, Tenant and Landlord shall cause to be issued to each other appropriate certificates or other evidence of insurance (or self-insurance) evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(i)   Indemnities. Except to the extent of any claims, costs, liability, damage or expense arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that subparagraph (g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring within the Premises or occurring within the Shopping Center resulting from the use thereof by Tenant, its agents or employees.

Except to the extent of any claims, costs, liability, damage or expense arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that subparagraph (g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

15.   Damages by Fire or Other Casualty.

(a)   Less Than Forty Percent (40%). In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of less than forty percent (40%) of the then-total replacement cost of any of the Improvements, Common Areas and/or Additional Areas, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance pro-

ceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements (including substantially equivalent value in equipment, furniture and fixtures owned by Tenant), and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures owned by Landlord), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction and replacement.

(i)    Application of Funds.  All insurance (or self-insurance) proceeds received on account of such damage or destruction, less the cost, if any, of such recovery, shall be applied pursuant to the terms of this Lease to the payment of the cost of such restoration, repair, replacement, rebuilding, or alteration (the "Work"), including expenditures made for temporary repairs or for the protection of property pending the completion of permanent restoration, repair, replacement, rebuilding, or alteration, and, if required by any Mortgagee, shall be held by a mutually agreeable third party escrow agent (which is, for these purposes, the "Escrow Agent"), in an interest bearing account in a federally insured financial institution or institutions such that all funds are deposit insured (or otherwise assured in a manner acceptable to the parties), to be paid out, as provided below, from time to time (but no more often than once monthly), as the Work progresses, upon Tenant's written request in event of work by Tenant, or Landlord's written request in event of work by Landlord, accompanied by a certificate of the architect or

engineer in charge of the Work (the "Certificate"), dated not more than seven (7) days prior to such request, stating that the sum then requested either has been paid by Tenant or Landlord, as applicable, or is justly due to the named contractors, subcontractors, materialmen, engineers, architects, or other persons (whose addresses shall also be stated) who have rendered services or furnished materials for certain portions of the Work, lien waivers, releases, bills and invoices as Landlord or any Mortgagee may reasonably, request, evidence satisfactory to Landlord and any Mortgagee that all construction work is being and will be performed in accordance with all applicable governmental requirements, and evidence that all construction work is being insured in accordance with the terms of this Lease. The Certificate shall give a brief description of such services and materials, shall list the several amounts so paid or owing to each of such persons, shall state the cost of the Work at the date of the requisition, and shall state that no part of such expenditures has been or is being made the basis for any other request for payment. The Certificate shall state also that, except for the amounts listed therein, there is no outstanding indebtedness known to such architect or engineer, after due inquiry, for labor, wages, materials, supplies, or services in connection with the Work which, if unpaid, might become the basis of a vendor's, mechanic's, laborer's, materialman's, or similar lien upon the Work or upon the Premises or any part thereof.

        (ii)   <u>Disbursement</u>. Upon compliance with the foregoing provisions of paragraph 15(a)(i), the Escrow Agent shall pay, out of the escrowed funds, to the persons named in the Certificate the respective amounts stated to be due to them or shall pay to Tenant, in the event of Tenant work, or Landlord, in the event of Landlord work, the amount stated to have been paid by Tenant or Landlord, as applicable; provided, however, that such payments shall not exceed in amount the cost of the relevant Work as stated in the Certificate. If the insurance proceeds or reconstruction funds paid by Tenant or Landlord, as applicable, to the Escrow Agent exceed the amount required to pay the total cost of the Work, the party paying such amount to the Escrow Agent, as applicable, after payment of all costs of the Work, shall be entitled to receive or retain, as applicable, such excess.

        (b)   <u>Forty Percent (40%) or More</u>. In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of forty percent (40%) or more of

the then-total reconstruction cost of any of said areas, or in the event of any uninsured casualty, Landlord and Tenant each shall have the option of terminating this Lease. Either party shall notify the other of its exercise of such option within sixty (60) days following the occurrence of such casualty and Tenant shall thereupon make available to Landlord the greater of (i) all insurance proceeds actually received by Tenant (or payable by Tenant under this Lease in the event Tenant self-insures) or (ii) the actual cost of repairing and restoring the damaged Improvements to their previous condition, as estimated by an established and reputable shopping center contractor or architect reasonably acceptable to Landlord and Tenant. In the event neither Landlord nor Tenant elects to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and the payment of insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall use its best efforts to assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    Last Two (2) Years of Main Term or Option Period. Notwithstanding anything in this paragraph 15 to the contrary, if any such casualty loss occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's

option, and Landlord shall receive the greater of (i) all insurance proceeds actually received by Tenant (or payable by Tenant under this Lease in the event Tenant self-insures) or (ii) the actual cost of repairing and restoring the damaged Improvements to their previous condition, as estimated by an established and reputable shopping center contractor or architect reasonably acceptable to Landlord and Tenant.

16.   Condemnation.

(a)   Definition of Taking and Substantial Taking.   For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power and any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Building as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below 4.2 per 1000 square feet of gross leasable area in the Shopping Center (but in no event less than the zoning and development ordinance applicable to Shopping Center), and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within ninety (90) days (with respect to Tenant's Preferred Area) or one hundred eighty (180) days (with respect to the remaining Common Area) after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is materially and adversely impeded.

(b)   Rights Upon Taking or Substantial Taking.   In the event of a Taking of Substantially All of the Premises, Tenant may, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, have the right to terminate this Lease. All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor

Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    Rights Upon Less Than Substantial Taking. In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and justly in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Building and the Premises so that the portions of the Building and the Premises not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Premises and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration. If required by a Mortgagee, such awards shall be escrowed and disbursed in accordance with the procedure set forth in paragraph 15(a) above. If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option.

(d)    Rights Upon Temporary Taking. In the event of a Taking of the Premises or any portion thereof, for temporary use, without the taking of the fee simple title thereto, this Lease shall remain in full force and effect, and the Taking shall not relieve Tenant from its duty and obligation fully and completely to keep, observe, perform, satisfy and comply with each and every agreement, term, covenant, condition, requirement, provision and restriction of this Lease. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking allocable to Tenant's leasehold interest in the Premises for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of six (6) months may, at Tenant's option, be deemed a permanent Taking and shall be governed by (b) or (c) above, as applicable.

(e)    Taking of the Pylon Sign(s). In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which

Tenant has installed identification panels, Landlord shall provide a substitute site therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and rebuild any such signage so taken at its sole cost.

(f)    Tenant's Right Upon Condemnation.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

17.    Assignment and Subletting.    Provided Tenant is not in monetary default hereunder (subsequent to the expiration of any applicable right to cure) and subject to any exclusive use rights previously granted by Landlord and approved by Tenant in writing (which exclusive use rights Tenant shall not violate in the exercise of any rights under this paragraph 17 or any of the restrictions on Tenant's use as set forth in paragraph 18 below), Tenant shall have the right to sublet, assign, transfer and reassign (a "transfer") all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term upon delivery to Landlord of written notice of such transfer and an assumption agreement executed by an assignee, sublessee or other transferee.  Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder provided that Tenant shall not be liable for any obligation arising in connection with any agreement, modification, amendment or change to the Lease which is not approved by Tenant in writing and any such agreement, modification, amendment or change to the Lease shall not be binding upon Tenant and shall be deemed to be of no force or effect with respect to Tenant's liability hereunder.  Notwithstanding the foregoing, Tenant shall not be permitted to subdivide the Premises into more than three (3) separate areas. Tenant may also grant licenses and/or concessions without the consent of Landlord, provided such licenses and/or concessions comply with the terms of this Lease.  Transfers to subsidiaries, affiliates, or related parties, and transfers involving beneficial ownership interests in the Tenant, shall not be deemed a transfer hereunder and same may be effected without Landlord's knowledge or consent.

Any assignment or subletting of this Lease shall be executed by the assignor or sublessor and the assignee or sublessee. Each assignee or sublessee shall, for the benefit of Landlord, agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant after the date of such subletting or assignment. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord. Landlord shall be entitled to receive an amount equal to one-half of the net amounts received by Tenant in connection with such assignment or sublease in excess of the Base Rent. Such net amounts shall be determined by subtracting the amounts incurred by Tenant for all reasonable costs, fees, charges and expenses, including but not limited to commissions and finish-out costs, incurred by Tenant in the execution of the assignment or sublease and payment of all other amounts due hereunder from the gross amounts to be paid to Tenant under any assignment or sublease.

18.    Use. Tenant shall initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products. Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants as shown on Exhibit "F", or (iv) in violation of any applicable provision of the "Permitted Encumbrances" contained in Exhibit "F". Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

C:\CIRCUIT\GALLERIA\LEASE.R12

- 33 -

19.    <u>Warranties and Representations</u>.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    <u>Quiet and Peaceful Enjoyment</u>.  Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants and represents that, so long as Tenant is not in default hereunder beyond any applicable cure period, it shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    <u>Title</u>. With respect to the property described on <u>Exhibit "A-3"</u>, Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, declarations, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's initial use of the Premises for the sale of items specifically referred to in paragraph 18 hereof or would restrict in any respect the right of Tenant, its employees, customers, and invitees to use the Common Areas in accordance with the terms of this Lease.  Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on <u>Exhibit "F"</u>, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises.  Landlord specifically covenants and warrants that no third party, except for the approval of Landlord's initial purchase money mortgagee of the Shopping Center which approval must be obtained on or before August 1, 1995, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage.  This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii)    <u>Certificate of Authority</u>. Landlord is a duly constituted limited partnership organized under the laws of the State of Texas; that it has the authority to enter into this Lease and perform Landlord's obligations hereunder; and that the party executing this Lease on Landlord's behalf has the lawful right and authority to do so.

(iv)    <u>No Litigation</u>. There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center

which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    <u>Hazardous or Toxic Materials</u>.    Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in Exhibit "C") on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any such Hazardous Substances are discovered at the Shopping Center which are required to be removed from the Shopping Center under applicable laws, rules, regulations and orders (unless introduced by Tenant, its agents or employees), all costs of removal incurred by Tenant, and all liability imposed upon, or damages suffered by Tenant, because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to hold Tenant harmless from and against all such costs, liability and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage, actions, administrative proceedings, judgments, compensatory and punitive damages, penalties, fines, costs, losses, attorneys, fees (through all levels of proceedings), consultants, or experts, fees and all costs incurred in enforcing this indemnity.  This representation, warranty and indemnity shall survive the termination of this Lease.

(vi)    <u>Tenant's Exclusive Use</u>.  So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to use more than 500 square feet of its premises for the sale of the Products, rental of consumer, office and automotive electronics equipment, computer hardware and appliances, or repair of the Products.

(vii)    <u>Zoning and Subdivision</u>.  The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit: (i) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (ii) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    <u>Prohibited Activities</u>.  Neither Landlord nor Tenant shall operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for use

as (A) a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to or derived from food service, (B) a bowling alley, (C) a billiard or bingo parlor, (D) a flea market, (E) a massage parlor, (F) a funeral home, (G) a facility for the sale of paraphernalia for use with illicit drugs, (H) a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located), (I) an off-track betting parlor, (J) a carnival, amusement park or circus, (K) a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility) is not included in this prohibition (K)), (L) a facility for the sale of new or used motor vehicles, trailers or mobile homes, (M) any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center, (N) a skating rink (O) an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate or display for sale no more than four (4) such electronic games incidentally to their primary operations), (P) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses which are located within three hundred (300) feet from the front entrance to the Building except for offices and storage facilities incidental to a primary retail operation, (Q) a banquet hall, auditorium or other place of public assembly, (R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers) within five hundred (500) feet from the front entrance to the Building, (S) a theater of any kind within five hundred (500) feet from the front entrance to the Building, or (T) a gymnasium, sport or health club or spa within five hundred (500) feet from the front entrance to the Building. Nothing in this paragraph shall be deemed to prohibit Landlord from operating or leasing within any building in the Shopping Center a children's recreational facility such as Discovery Zone or Leaps and Bounds, provided such facility is not located within three hundred (300) feet from the front entrance of the Building. Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building on Landlord's Premises which immediately abuts "Tenant's Preferred Area" (as shown on Exhibit "A") or which is located within three hundred (300) feet

from the front entrance to the Building.  In addition, no auction, fire or going-out-of business sale shall be conducted in the Shopping Center.

(ix)    <u>Site Covenants</u>.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)    <u>Building Height and Location</u>.   No building adjacent to the Premises shall exceed thirty-five (35) feet in height above finished grade, nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located in the Shopping Center except as shown on the Site Plan, without Tenant's prior consent, which consent shall not be unreasonably withheld.  No building shall be constructed within the Shopping Center except as shown on the Site Plan within the building footprints shown and described on Exhibit "A" and made a part hereof for all purposes.

(B)    <u>Construction and Alterations</u>.  Following the end of the First Lease Year, no construction shall be permitted in the Shopping Center during the months of October, November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs.   In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction.   With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges, except as same relate to Tenant's Building.   Except as permitted in paragraph 7(e), Landlord shall make no changes in the Common Areas (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's consent, which Tenant may, in its sole discretion, withhold, nor any changes in the Common Areas located within the Shopping Center without Tenant's consent, provided that the Tenant

shall not unreasonably withhold its consent to such change in the Common Areas outside of the Tenant's Preferred Area.

(C)    Prohibited Uses in Common Areas. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 27 and traffic control signs except tenants' identification signs along walkways and the billboard signage which is currently located near the southwest corner of the Shopping Center (as described in Exhibit "A-1"); (2) display or sale of merchandise (except for sales of merchandise on the sidewalks located directly in front of the buildings in the Shopping Center), provided that no outdoor sales area shall unreasonably interfere with Tenant's or Tenant's customers' use of the Premises or any portion of the Common Areas; (3) operation of loudspeakers or other sound electronically amplified within Tenant's Preferred Area; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein, except for any variance which is necessary to permit the Landlord to maintain the parking ratios described herein.

(x)    Interference with Tenant's Reception/Transmission. Landlord shall not install or permit to be installed by Landlord, and shall reasonably attempt to prohibit any other tenant or other person anywhere in the Shopping Center from installing, any radio transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi)    Notices Affecting the Premises. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center, received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use of the Premises, Shopping Center or any such neighboring property.

(xii)    Constructive Trust.    Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    Tenant's Authority.    Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    Tenant's Warranty as to Hazardous or Toxic Materials.    As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store or permit to be deposited within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above.    This warranty and indemnity shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord (or such additional time as may be reasonably necessary if Landlord cannot reasonably cure its default within such thirty (30) day-period), obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such default. Landlord shall be entitled to a corresponding remedy for breach of Tenant's warranty regarding Hazardous Substances.

20.    Estoppel Certificates.    Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any present or proposed mortgagee, purchaser, sublessee or assignee, any other individual, partnership, corporation, trust, unincorporated association or joint venture, government or any department or agency thereof, or any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, in accordance with its tenor as then constituted, to the best knowledge of the party so certifying; (c) as to the existence of any default thereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses thereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested.  Any such certificate may be relied upon by the party requesting it and any person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Nondisturbance and Attornment.

(a)    Landlord shall have the right to obtain financing and subject the Property to mortgages, and this Lease shall be subject and subordinate to the lien of any and all Mortgages (as defined below) now or hereafter encumbering the Premises and placed thereon by Landlord and to all renewals, modifications, replacements and extensions of such Mortgages; provided, however, that the subordination herein contained shall not be effective with respect to any Mortgage unless the holder of such Mortgage (the "Mortgagee") shall execute and deliver a subordination, nondisturbance and attornment agreement, in the form attached as Exhibit "G" with such changes thereto as may be reasonably requested by each Mortgagee and approved by Tenant, providing that, in the event the Mortgage shall be foreclosed or the Mortgagee shall accept a deed in lieu thereof (either of which events shall be a "Foreclosure"), so long as Tenant shall not then be in default beyond any cure period provided herein, and so long as Tenant shall attorn to the Mortgagee or purchaser upon Foreclosure, (i) the Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure, its or his successors or assigns, shall

recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under this Lease arising from and after the date of such Foreclosure, (iv) Tenant shall not be named as a party in any action for Foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all net proceeds arising from casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof. Landlord agrees that as a condition to Tenant's subordination of its interest under this Lease, it shall obtain a subordination, nondisturbance and attornment agreement in a form reasonably acceptable to Tenant from all existing Mortgagees simultaneously with the execution of this Lease and from all future Mortgagees within thirty (30) days of the closing of the loan from such Mortgagee to Landlord. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises.

(b)     As a part of such subordination, nondisturbance and attornment agreement which Tenant agrees to execute from time to time during the Term, if requested by any Mortgagee, Tenant shall agree to provide to such Mortgagee (simultaneously with notice to Landlord) notice of Landlord's defaults and the same periods for such Mortgagee to cure such defaults as those provided Landlord herein, together with such agreements as are typically found in subordination, nondisturbance and attornment agreements with institutional lenders as may be satisfactory to Tenant.

22.     Change of Landlord. In the event the Landlord's interest in the Premises passes to a successor ("Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the Landlord under the Lease, and the Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant, but without the execution of any further instrument on the part of either of the parties hereto immediately upon the Successor's succeeding to the interest of Landlord under the Lease; provided, however, that in order for the foregoing to be effective against Tenant, such Successor must be bound to Tenant in respect of all of Landlord's duties and obligations hereunder subject to the limitation on Landlord's liability

in paragraph 31(b), such binding effect on the Successor to be effective and self-operative without the execution of any further instrument on the part of either of the parties hereto (except notice as required above), immediately upon the Successor's succeeding to the interest, duties and obligations of Landlord under this Lease. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all claims, loss or damage suffered by Tenant as a result of Landlord's failure to provide Tenant with notice of such Successor.

23.    <u>Tenant's Financing</u>.  Tenant may, from time to time, provided that Tenant is not then in default hereunder beyond the applicable cure period, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. If Tenant is not then in default hereunder beyond the applicable cure period, Landlord agrees, upon written request by Tenant, to evidence Landlord's consent in writing to such security interest and assignment, and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to use reasonable efforts to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below. Notwithstanding the foregoing, any agreement executed by the Tenant with any lender covering financing for any of the Personalty shall obligate such lender to, upon receipt by such lender of written notice from the Landlord that the Lease has been terminated, (i) remove such Personalty so pledged within thirty (30) days subsequent to the date of such notice, and (ii) exercise reasonable efforts to prevent damage from occurring to the Building during the removal of such Personalty. Such documentation shall also contain a provision to the effect that if the Tenant's lender fails to claim the Personalty within

such thirty (30) day period, then the Personalty shall be deemed abandoned and shall become the Landlord's property to be disposed of as Landlord reasonably determines.

24.   Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant, removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease.  Those improvements that are integrated into the physical structure of the Building shall not be removed and shall become the property of Landlord.  (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".)  Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted.  Landlord expressly waives its statutory or common law landlord's lien and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.   Memorandum of Lease; Commencement Date Agreement.  Landlord agrees, at Tenant's request and Tenant's sole expense, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by Texas law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Rent Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.   Tenant agrees to execute a release of such Memorandum of Lease on the expiration or earlier termination of this Lease.

26.   Holding Over.  Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant.  Should Tenant hold over without the

consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred fifty percent (150%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.    "For Rent" Signs.    Tenant hereby permits Landlord during the last one hundred eighty (180) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding six (6) feet by eight (8) feet in size, on the parking lot of the Shopping Center.  Tenant will also allow Landlord or its agents, accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    Force Majeure.  Except as otherwise specifically contemplated in paragraph 4 of Exhibit "C", in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder (other than the payment of money) by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay; and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of Exhibit "C".

29.    Events of Tenant's Default.  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    Failure to Pay Rent; Breach.  (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, it such default cannot with due diligence be wholly cured within such thirty (30) days, Tenant shall have such longer period

as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion, and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)   Bankruptcy.   (i) Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun; or (ii) Tenant's voluntarily filing a petition in bankruptcy or for reorganization under any existing or future provisions of the Bankruptcy Code, providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts; or (iii) Tenant's voluntary assignment for the benefit of its creditors; if, as a result of any of the foregoing occurrences, the covenants to be performed by Tenant under this Lease (including the covenant to pay rent) are not being performed by Tenant or a party claiming through Tenant.

30.   Landlord's Remedies.   After the occurrence of an Event of Default, Landlord shall have the right to exercise the following remedies:

(a)   Continue Lease.   Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any due for any Option Period for which a Renewal Option has been exercised.   In the alternative, Landlord shall have the right to peaceably re-enter and repossess the Premises on the terms set forth in subparagraph (b) below, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof.   Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees, any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.   If a sufficient sum to pay such expenses and sums shall not be realized or secured, in Landlord's

exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Nothing herein, however, shall be construed to require Landlord to re-enter and relet in any event, except as provided by Texas law. The Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b)     Terminate Lease. In the event of an Event of Default by Tenant, Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant (provided that if Tenant cannot reasonably cure such default within such thirty (30) day period, then Tenant shall have such longer time to cure such default hereunder as is reasonably necessary, provided Tenant diligently pursues such cure to completion), and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. Subject to Tenant's offset rights and remedies provided by this Lease, any failure to pay Base Rent or other sums of money hereunder shall be deemed to be an Event of Default as used herein and the time period for curing same shall not exceed the ten (10) day cure period set forth in Section 29(a) of the Lease. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)     The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)     The worth at the time of the award of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this subparagraph 30(b), the term, "worth at the time of the award", shall be computed by allowing interest at the Default Rate on the amount of the obligations set forth therein. In the event this Lease shall be terminated as provided above, by summary proceedings

or otherwise, Landlord, its agents, servants or representatives, may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all personal property therefrom, either by summary dispossess proceedings or by other suitable action or proceeding at law without liability for damages therefor. Landlord shall never be entitled to dispossess the Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

   (c) <u>Reimbursement of Landlord's Costs in Exercising Remedies</u>. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, including reasonable attorney's fees, placing the same in good order and condition and repairing the same for reletting, all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), and any other amount necessary to compensate Landlord for any detriment proximately caused by Tenant's failure to perform its obligations under this Lease.

   (d) <u>Remedies Are Cumulative</u>. The various rights and remedies reserved to Landlord herein, including those not specifically described by law in force and effect at the time of the execution hereof, are cumulative, and Landlord may pursue any and all such rights and remedies, whether at the same time or otherwise.

   31. <u>Events of Landlord's Default; Tenant's Remedies</u>. (a) Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue; or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) days, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion, and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

(b)    Notwithstanding the foregoing, from and after payment of the Tenant Improvement Allowance, the liability of Landlord, its partners, principals or joint venturers, under this Lease shall be limited to Landlord's interest in the Shopping Center, including any rents and profits, insurance proceeds and condemnation awards derived therefrom and further including any consideration received by Landlord, its partners, principals or joint venturers, from the sale or other disposition of all or any part of the Shopping Center. From and after the payment of the Tenant Improvement Allowance, Tenant agrees to look solely to the Shopping Center for satisfaction of any and all claims it may have against Landlord, provided that nothing contained herein shall prevent Tenant from bringing a suit for specific performance or seeking injunctive relief against Landlord in an appropriate case, from attaching rents and profits, sale proceeds, insurance or condemnation awards derived from the Shopping Center, nor limit Tenant's right to any other action or remedy (not involving the personal liability of Landlord, its partners, principals or joint venturers) which may be accorded Tenant by law.

Upon the occurrence of an Event of Default, at Tenant's option, in addition to any other remedies which it may have, and without its actions being deemed a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, plus interest at the Default Rate, against the Base Rent, and all CAM Charges and other charges due Landlord hereunder, or (ii) withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until such Event of Default is cured by Landlord, or (iii) sue for damages and in the event such default of Landlord is material, Tenant may terminate this Lease. Notwithstanding the foregoing, if Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in Exhibit "C" in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein.

32.    Waiver. If Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present and future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.   Compliance with Applicable Laws.   During the Term, to the extent that the Premises are affected thereby, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements. If Tenant, after notice from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent, after thirty (30) days' prior written notice to Tenant (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) and Tenant's failure to cure or commence to cure during such thirty (30) days and diligently prosecute the cure to completion. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

34.   Notices.   Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given and received three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:       CIRCUIT CITY STORES, INC.
                    9950 Mayland Drive
                    Richmond, Virginia 23233
                    Attention: Corporate Secretary

|                    |                                                                                                    |
|--------------------|----------------------------------------------------------------------------------------------------|
| with a copy to:    | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| If to Landlord:    | GALLERIA PLAZA, LTD.<br>5068 W. Plano Parkway, Suite 215<br>Plano, Texas 75093<br>Attention: Wayne Nash |
| with a copy to:    | William A. Thau<br>Jenkens & Gilchrist, P.C.<br>1445 Ross Avenue, Suite 3200<br>Dallas, TX 75202 |

or to such other addressees as any party hereto shall from time to time give notice thereof to any other party.

35.  Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease.  Each party shall indemnify, defend and hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party has or purportedly has dealt.

36.  Miscellaneous.

(a)  Headings and Gender.  Any paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)  Construction.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)  Waiver of Jury Trial.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)   Relationship of Landlord-Tenant.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant other than the landlord-tenant relationship.

(e)   Entire Agreement; Merger.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference), covers, in full, each and every final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature are merged herein.  This Lease cannot be changed or modified in any manner other than a written amendment or modification executed by Landlord and Tenant.

(f)   Attorneys' Fees.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)   Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law.

(h)   Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)   Holidays.  If the day on which rent is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)   Applicable Law.  This Lease shall be construed in accordance with the laws of the State of Texas, and the parties agree that jurisdiction shall lie therein.

(k)    Successors and Assigns. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)    Assignment by Landlord. Landlord may assign this Lease to an affiliate or related entity of Landlord upon five (5) days written notice to Tenant, provided Tenant is provided the form of such assignment concurrently with such notice. The Landlord shall not be relieved of any liability hereunder in the event of any such assignment. Landlord and Tenant agree that an assignment of Landlord's interest in this Lease to a Texas limited partnership whose sole general partners are (i) a corporation solely owned by Wayne Nash and related family members (the "Nash Corporation") and (ii) equity investors, shall be considered a permitted assignment to an affiliate or related entity, provided that the Nash Corporation is the managing general partner of such limited partnership and all requirements of this paragraph are satisfied.

(m)    Trademarks and Trade Names. All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification. Likewise, all trademarks, trade names, service marks, signs and all other marks of identification used by Landlord in its business shall at all times remain the exclusive property of Landlord, and Tenant shall have no right, interest in, or title to any of Landlord's trademarks, trade names, service marks, signs or other marks of identification.

37.    Effectiveness of Lease; Tenant's Right to Terminate. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof, of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment; and (iii) Landlord's most current survey of the Shopping Center; all of which shall be approved or disapproved by Tenant in writing within thirty (30) days after receiving all of said documents.

(b)     Landlord's delivery of subordination, nondisturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in the form attached hereto as Exhibit "G" simultaneously with the execution of this Lease or as otherwise set forth in Paragraph 21(a) hereof.

(c)     Subject to force majeure, Landlord's delivery of the Land by the date and in the condition specified in Exhibit "C".

(d)     Tenant's obtaining (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning and use regulations allow construction of the Improvements on the Premises; and (ii) the required City, County and State permits and approvals to construct said Improvements on the Premises no later than October 1, 1995. Tenant agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e)     Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of delivery of the Land.

(f)     Prior to delivery of the Land to Tenant, Tenant's obtaining from Landlord copies of soils and Hazardous Substances reports satisfactory to Tenant.

(g)     Tenant's obtaining satisfactory written assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

The existence of the foregoing conditions is solely for the benefit of Tenant, which may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime

prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect (and the parties shall have no further liability except that the indemnification set forth in paragraph 14(i) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord. Notwithstanding the foregoing, however, in the event Tenant has not elected to terminate this Lease within thirty (30) days after the date hereof as a result of the nonsatisfaction of one or more of the above conditions, then this paragraph 37 shall automatically be of no further force or effect and this Lease shall be deemed to be effective, provided that the elimination of such conditions shall not excuse Landlord from the performance of its obligations under this Lease.

38. <u>Right to Terminate</u>. If Landlord has not acquired title to the Shopping Center by August 1, 1995, then Tenant shall have the right to terminate this Lease, provided Tenant exercises such right by delivering written notice to Landlord by August 10, 1995. In the event that Tenant exercises its right to terminate hereunder, then neither party hereto shall have any further liability to the other hereunder. If the Landlord has not acquired title to the Shopping Center by August 1, 1995, or Landlord has not received the approval of Landlord's initial purchase money mortgagee of the Shopping Center with respect to the terms of this Lease by August 1, 1995 (so long as Landlord uses best efforts to obtain such approval), then Landlord shall have the right to terminate this Lease and thereafter neither of Landlord nor Tenant shall have any further liability hereunder, one to the other.

39. <u>Tenant's Opening</u>. Tenant agrees to open its business in the Premises initially as a Circuit City Store ("Tenant's Opening"). Thereafter, Tenant shall not be obligated to operate its business in the Premises, and nothing contained in this Lease shall be construed as a covenant or other agreement of the Tenant to continuously operate, or stay open, in the Premises. Notwithstanding the foregoing, in the event that Tenant intends to cease operations of its business in the Premises, Tenant shall provide Landlord with written notice of such intent. Landlord shall have the option to terminate this Lease within thirty (30) days (time is of the essence) from the delivery of Tenant's notice to Landlord by providing Tenant with written notice of Landlord's termination of the Lease and paying to Tenant the amount of Tenant's

unamortized tenant improvement costs (being costs for fixtures, furnishings and improvements to the Premises) incurred by Tenant with respect to the Premises during the Term, which amounts shall not include any amounts previously reimbursed to Tenant by payment of the Tenant Improvement Allowance to Tenant. In addition to and notwithstanding the foregoing, in the event that the Tenant shall fail to operate its business in the Premises for a consecutive period of one hundred eighty (180) days during any Lease Year, and such failure is not due to force majeure, any damage or casualty, condemnation or remodeling, then the Landlord may terminate this Lease upon written notice to Tenant. In the event a termination of this Lease by Landlord pursuant to the terms of this paragraph 39, neither party hereunder shall have further liability, one to the other and in such event Landlord shall have no obligation to pay Tenant's unamortized costs as described herein); provided, that such termination shall not affect Tenant's indemnification obligation hereunder and Tenant's obligation to pay to Landlord on demand all amounts which have accrued prior to the date thereof or to promptly surrender the Premises to Landlord peaceably in accordance with requirements of this Lease.

WITNESS the following signatures and seals:


LANDLORD:                              GALLERIA PLAZA, LTD.
                                       a Texas limited partnership

                                       By:   Alpha Parkway I, LLC,
                                             a Texas limited liability company,
                                             its general partner


ATTEST (WITNESS):
                                       By:   _____
_Cynthia Beerker_                            Wayne L. Nash
_Philip G. Carpenter, III_                   Manager

TENANT:

ΛTTEST:

Its: _Assistant Secretary_

Its: _____

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____
Benjamin B. Cummings, Jr.
Vice President