# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re | Chapter 11 |
| CIRCUIT CITY STORES, INC., *et. al.,,* | Case No. 08-35653-KRH |
| *Debtors.* | Jointly Administered |

## REQUEST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE PRIORITY CLAIM BY DALY CITY PARTNERS I, L.P.

Creditor DALY CITY PARTNERS I., L.P. ("Claimant"), by and through its counsel, hereby requests entry of an order pursuant to 11 U.S.C. §365(d)(3) and §503(b)(1)(A) for (i) the allowance of an administrative expense claim for the unpaid rent and related charges from November 11, 2008 through November 30, 2008 ("Stub Rent"); and (ii) allowance of and payment of an administrative expense claim for additional post-petition rent and related charges ("Additional Administrative Claim"). In support of its motion, Claimant respectfully represents:

    1.    Debtors Circuit City Stores, Inc. ("Circuit City") and Circuit City Stores West Coast, Inc. ("West Coast") each filed a voluntary petition under chapter 11 of the Bankruptcy Code on November 10, 2008. The cases of Circuit City and West Coast have been ordered jointly administered. June 30, 2009 has been established as a deadline for filing certain administrative priority claims in these cases. THIS REQUEST APPLIES TO DEBTOR CIRCUIT CITY (3875).

Valerie P. Morrison, Va. Bar No. 24565
Dylan G. Trache, Va. Bar No. 45939
WILEY REIN LLP
7925 Jones Branch Drive, Suite 6200
McLean, Virginia 22102
(703) 905-2800

Julie H. Rome-Banks, Esquire
BINDER & MALTER LLP
2775 Park Avenue
Santa Clara, CA 95050
(408) 295-1700

*Counsel to Daly City Partners I, L.P.*

RECEIVED

JUN 1 9 2009

KURTZMAN CARSON CONSULTANTS

EXHIBIT

A

Factual Background

2.      Claimant is the successor in interest to Crocker Land Company, a California

corporation ("Original Master Landlord") and John Breuner Company, a California corporation

pursuant to a written lease agreement dated March 3, 1970 with a commencement date of

November 11, 1970 (hereinafter the "Master Lease") pursuant to which Crocker Land Company

was the landlord and John Breuner Company was the tenant for the commercial premises known

as 303 Gellert Boulevard, Daly City, California 94015 and also sometimes referred to as 301

Serramonte Plaza, Daly City, California consisting of 120,000 square feet (the "Master

Premises"). The Master Lease had a term of 28 years, with 3 additional five year options to

extend, for a maximum term of 43 years. The first lease year ending date was changed to

October 31, 1971 by agreement of the parties to the Master Lease at that time. A true and correct

copy of the Master Lease together with the letter changing the lease year ending date is attached

as Exhibit "A" to the Declaration of Dennis Wong filed concurrently herewith and is

incorporated herein by reference (the "Wong Declaration").

3.      On July 14, 1989, a sublease (the "Circuit City Sublease") was made between

then property owner Investors First Staged Equity L.P., a California limited partnership (as the

successor in interest to Crocker Land Company) and John Breuner Company, a California

corporation (as tenant) to sublessee Circuit City.  The landlord consented to the Circuit City

Sublease as reflected in the Consent to Sublease and Amendment Of Lease, attached as Exhibit

"B" to the Wong Declaration.  Under the terms of the Circuit City Sublease, annual rent is $2.06

per square foot or $247,200 per year or 20,600 per month.  Annual rent increases by 12% every 4

years.  The initial term of the Circuit City Sublease was 9 years, with three additional 5 year

options to extend (coinciding with the Master Lease term and the options to extend in the Master

Lease).  The Circuit City Sublease also included a requirement for payment of percentage rent

after $10 million of gross annual sales. The Circuit City Sublease is for 41,360 sq. feet including

8,100 sq. feet of new building area to be built by Circuit City (hereinafter the "Subject

Premises") and is sometimes referred to as Circuit City Store #253. Possession of the Subject

Premises was delivered to Circuit City on September 12, 1989 as reflected in the letters attached

as part of Exhibit "B" to the Wong Declaration. The current Base Rent is $35,652.02 per month,

the current operating expenses are $3,234.00 per month and monthly management fees are

$323.00 per month.

    4.    On November 9,1993, Claimant's predecessors in interest, then landlord

Serramonte Plaza L.P., a California limited partnership and tenant John Breuner Company, a

California corporation, entered into a sublease with subtenant Sportmart, Inc., a Delaware

corporation for the remainder of Master Premises leased to John Breuner Company under the

Master Lease of approximately 77,500 sq. feet (the "Sportmart Sublease"). Sportmart

subsequently changed its name to Sports Authority. Under the terms of the Sportmart Sublease,

tenant John Breuner Company can require Sportmart to pay all real estate taxes under the Master

Lease. Sportmart is responsible for its pro-rata share of the Master Premises obligations and

Circuit City is responsible for the balance. Circuit City is obligated to pay its pro-rata share of

the Master Premises Obligation Costs to Sportmart within 30 days after receipt of an invoice. If

Circuit City fails to pay within 90 days of invoice, then Sportmart may invoice John Breuner

Company for such amount with interest from the date payment was due from Circuit City. If

John Breuner Company fails to pay such amount within 30 days from invoice, then Sportmart

may deduct such amount with interest from the next installment(s) of rent due. A true and

correct copy of the Sportmart Sublease and related letter confirming the real property tax

obligations are attached collectively as Exhibit "C" to the Wong Declaration and are

incorporated herein by reference.

5.      Pursuant to an Assumption and Assignment of Circuit City Sublease dated May 1, 1994, assignor Circuit City assigned the Circuit City Sublease to assignee West Coast, Inc., a California corporation (and wholly owned subsidiary of Circuit City). A true and correct copy of that assignment is attached as Exhibit "D" to the Wong Declaration and is incorporated herein by reference. Under the terms of this agreement, Circuit City was <u>not</u> released from its obligations under the Circuit City Sublease. West Coast and Circuit City are therefore jointly and severally liable for all obligations under the Circuit City Sublease.

6.      On November 7, 2006, the third option to extend the Circuit City Sublease was exercised by notice given by Circuit City and West Coast to (a) Master Lessor Daly City Partners I, L.P., and (b) Sublease lessor Daly City Lease Partners I, L.P. The Circuit City Sublease was thereby extended to November 13, 2013. A copy of the letter exercising the third option is attached as Exhibit "E" to the Wong Declaration and is incorporated herein by reference.

7.      As reflected in Exhibit E, as of November 7, 2006, (i) Daly City Lease Partners I, L.P. was the successor in interest to John Breuner Company under the Circuit City Sublease and the Master Lease and (ii) Daly City Partners I, L.P. was the successor in interest to Original Master Landlord. Daly City Partners I, L.P. and Daly City Lease Partners I, L.P. merged and the surviving entity is Daly City Partners I, L.P., Claimant herein. Prism Capital Corporation, a Delaware corporation is the General Partner of Daly City Partners I, L.P. and Dennis Wong is its President.

The Administrative Priority Claims

8.      Circuit City and West Coast each filed voluntary petitions under chapter 11 on November 10, 2008 (the "Petition Date"). The Circuit City Sublease was rejected by notice dated March 4, 2009 stating that the effective date of rejection was March 11, 2009 (the "Rejection Date"). As of the Petition Date, the monthly base rent under the Circuit City

Sublease was $35,652.02.  In addition, Circuit City and West Coast were also obligated to pay as

Additional Rent each month under the Lease a monthly CAM estimate of $3,234.00 and a

monthly management fee estimate of $323.00 which amounts are reconciled on an annual basis.

      9.    A twenty day preliminary notice of intent to lien was served on Claimant on

November 12, 2008 by Gordon Painting Co. Inc. in an effort to recover the sum of $28,021.00

due to labor and materials furnished in the improvement of the Subject Premises.  Circuit City

had apparently contracted with Gordon Painting Co. to provide such services and then failed to

pay the contractor upon completion of the work.  Gordon Painting Co. thereafter recorded a

Mechanic's Lien on November 24, 2008 in San Mateo County where the Subject Property is

located.  The Mechanic's Lien created a cloud on title and further was a breach of the Circuit

City Sublease agreement by Circuit City and West Coast.  A copy of the Preliminary Lien Notice

is attached as Exhibit "F" to the Wong Declaration and is incorporated herein by reference.  A

copy of the recorded Mechanics' Lien is attached as Exhibit "G" to the Wong Declaration and is

incorporated herein by reference.  Claimant was able to reach an agreement and paid Gordon

Painting Co. $17,438.00 on February 12, 2009 to obtain the release of the mechanics' lien.  True

and correct copies of the documents evidencing the agreement and settlement payment to

Gordon Painting Co. to obtain a release of the Mechanic's Lien are attached collectively as

Exhibit "H" to the Wong Declaration and are incorporated by reference.  This amount is entitled

to administrative priority and is included as part of Claimant's Additional Administrative Claim

herein.

      10.    On November 14, 2008, Sports Authority issued an invoice to Circuit City

demanding payment of Circuit City and West Coast's pro-rata share of the real property taxes

that were coming due on the Subject Property in the amount of $54,954.44.  A true and correct

copy of that invoice is attached as Exhibit "I" to the Wong Declaration.  Circuit City and West

Coast failed to pay this property tax obligation under the terms of the Circuit City Sublease.    As

a result, Sports Authority pursuant to the terms of its sublease is entitled to and has by letter

dated January 19, 2009  demanded and issued an invoice to Claimant to pay Circuit City and

West Coast's share of the property tax bill of $54,954.44, a true and correct copy of which is

attached collectively as Exhibit "J" to the Wong Declaration and incorporated herein by

reference.  Sports Authority thereafter charged interest to Claimant in the amount of $2,198.18

for a total balance of $57,152.92.  Claimant must therefore either pay those taxes and interest

which are the obligation of Circuit City and West Coast, or alternatively, Sports Authority may

elect to reduce its rental payments to Claimant by an equal amount.  Under either circumstance,

Claimant has been further damaged in the amount of $57,159.92 for the tax year (or $156.60 per

day).  These taxes are for the period of July 1, 2008 through June 30, 2009. The administrative

portion of the real property taxes runs from the Petition Date to the Rejection Date and is

calculated as 122 days @ $156.60 per day or $19,105.20.  Of this amount, partial payment of

$4,123.88 was received by Claimant, leaving a balance due of $14,981.32 as part of Claimant's

Additional Administrative Claim herein.  The difference of $38,054.72 ($57,159.92 less

administrative portion of $19,105.20) is included as part of Claimant's general unsecured claim

in this case.

      11.     Circuit City and West Coast are obligated to pay an estimated amount of CAM

and Management Fees each month as Additional Rent under the Circuit City Sublease, which

amounts are reconciled on an annual basis.  For the 2008 calendar year, Circuit City and West

Coast received an invoice and supporting calculations for said reconciliation reflecting a balance

due of $4,287.18 for CAM and $433.52 for management fees for a total due of $4,720.70, true

and correct copies of which are attached collectively as Exhibit "K" to the Wong Declaration and

are incorporated herein by reference.  The portion from the Petition Date to December 31, 2008

is calculated as 52 days @ $12.93 per day or $672.54 and is included in Claimant's Additional Administrative Claim herein. The difference of $4,048.16 ($4,720.70 less administrative portion of $672.54) is included as part of Claimant's general unsecured claim in this case.

12.    Claimant is entitled to an administrative priority claim pursuant to 11 U.S.C. §§365(d)(3), 503(b) and 507(a)(2) for the following amounts of post-petition base rent, additional rent and related charges under the Circuit City Sublease which became due and owing after the Petition Date but prior to the effective date of rejection of the Circuit City Sublease. The amount of the Stub Rent claim which is entitled to administrative priority is calculated as follows:

| Date | Description | Amount |
|------|-------------|--------|
| 11-10-08 to 11-30-08 | November base rent pro-rated ($35,652.02 x 21/30) | $24,956.41 |
| 11-10-08 to 11-30-08 | November CAM pro-rated ($3,234.00 x 21/30) | $2,263.80 |
| 11-10-08 to 11-30-08 | November management fee pro-rated ($323.00 x 21/30) | $226.10 |
|  | Stub Rent Claim | $27,446.31 |

Claimant holds an Additional Administrative Claim, which is also entitled to priority pursuant to 11 U.S.C. §§365(d)(3), 503(b) and 507(a)(2) for the following additional charges arising under the Circuit City Sublease, which are calculated as follows:

| Description | Amount |
|---|---|
| Amount paid on mechanic's lien (see paragraph 9 above) | $17,438.00 |
| Pro-rated real property taxes (see paragraph 10 above) | $14,981.32 |
| Pro-rated 2008 CAM and management fee reconciliation (see paragraph 11 above) | $672.54 |
| Total Additional Administrative Claim | $33,091.86 |

13.    Claimant holds no security deposit.

14.    To the extent any of the amounts claimed herein are determined to not be entitled to administrative priority, then Claimant reserves the right to further amend its Proof of Claim to reclassify such invoices as part of Claimant's unsecured, non-priority claims.

15.    Allowable administrative expenses under 11 U.S.C. §503(b)(1)(A) include the actual and necessary costs and expenses of preserving the Bankruptcy Estate.  Claimant believes that the Debtor's continued utilization of the Subject Premises post-petition preserved assets of this Estate.  See, Devan v. Simon DeBartolo Group, L.P. (In re Merry-Go-Round Enterprises. Inc.), 180 F. 3d 149, 157 (4th Cir. 1999).  Accordingly, Claimant is entitled to an allowable administrative expense claim pursuant to 11 U.S.C. §503(b), which is entitled to priority under 11 U.S.C. §507(a)(2).

16.    Because this motion presents no novel issues of law and the authorities relied upon are set forth herein, Claimant respectfully contends that no separate brief is necessary pursuant to Local Rule 9013-1(G).

Wherefore, Claimant prays that this Court enter an order substantially in the form attached hereto: (a) allowing Claimant an administrative claim pursuant to 11 U.S.C. §503(b)(1)(A)in the amount of $27,446.31 for Stub Rent, which claim is entitled to

administrative priority pursuant to 11 U.S.C. §507(a)(2) against Circuit City and ordering

payment of the same at such time as the Debtors are ordered to pay similar claims in these cases;

(b) allowing Claimant an Additional Administrative Claim pursuant to 11 U.S.C. §503(b)(1)(A)

in the amount of $33,091.86, which claim is entitled to administrative priority pursuant to 11

U.S.C. §507(a)(2) against Circuit City and ordering payment of said amount immediately; and,

(c) for such other and further relief as the Court deems just and proper.

Dated: June 18, 2009                          DALY CITY PARTNERS I, L.P.

Valerie P. Morrison, Va. Bar No. 24565
Dylan G. Trache, Va. Bar No. 45939
WILEY REIN LLP
7925 Jones Branch Drive, Suite 6200
McLean, VA  22102
Telephone: 703-905-2826
Facsimile: 703-905-2820
Email: vmorrison@wileyrein.com
           dtrache@wileyrein.com

and

Julie H. Rome-Banks, Esq.
BINDER & MALTER LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: 408-295-1700
Facsimile: 408-295-1531
email: julie@bindermalter.com

Attorneys for Daly City Partners I, L.P.

## CERTIFICATE OF SERVICE

I hereby certify that on this _10th_ day of June 2009, a copy of the foregoing Motion was sent by electronic mail or by first class mail, postage prepaid, to the Core Group service list and the 2002 List in compliance with the Order establishing Notice, Case Management and Administrative Procedures.

Valerie P. Morrison

13009601.2

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **CIRCUIT CITY STORES, INC.,** *et. al.,,* | **Case No. 08-35653-KRH** |
| *Debtors.* | **Jointly Administered** |

**DECLARATION OF DENNIS WONG IN SUPPORT OF**
**REQUEST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE**
**PRIORITY CLAIM BY DALY CITY PARTNERS I, L.P.**

I, Dennis J. Wong, hereby declare:

1.    I am the President of Prism Capital Corporation, a Delaware corporation. Prism Capital Corporation is the General Partner of Daly City Partners I, L.P., Claimant herein ("Claimant"). I am also the Manager of SPI Holdings, LLC ("SPI"), the duly authorized property manager on behalf of Claimant. I am authorized to make this Declaration in support of the MOTION TO APPROVE ALLOWANCE AND PAYMENT OF ADMINISTRATIVE PRIORITY CLAIM BY DALY CITY PARTNERS I, L.P. ("Motion").

2.    I have personal knowledge of the matters contained in this Declaration except as to those matters alleged upon information and belief and as to those matters I believe them to be true. If called upon as a witness, I could and would competently testify as follows.

3.    In my capacity as the Manager of a SPI, I have access to, and I am familiar with, the books and records kept by SPI on behalf of Claimant. These books and records have been generated, recorded and compiled in the ordinary course of business of SPI. Further, these documents were prepared at the time, or near the time, that the information was received or the events and transactions actually took place. It is the standard operating procedure of SPI to preserve these documents in a place of safekeeping on its business premises. I have personal

RECEIVED
JUN 1 9 2009
KURTZMAN CARSON CONSULTANTS

1

access to these books and records and their continued safekeeping is maintained under my

direction and supervision.

4.      Pursuant to the Motion, Claimant, by and through its counsel, hereby requests

entry of an order pursuant to 11 U.S.C. §365(d)(3) and §503(b)(1)(A) for (i) the allowance of an

administrative expense claim for the unpaid rent and related charges from November 11, 2008

through November 30, 2008 ("Stub Rent"); and (ii) allowance of and payment of an

administrative expense claim for additional post-petition rent and related charges ("Additional

Administrative Claim").

5.      Debtors Circuit City Stores, Inc. ("Circuit City") and Circuit City Stores West

Coast, Inc. ("West Coast") each filed a voluntary petition under chapter 11 of the Bankruptcy

Code on November 10, 2008.  The case of Circuit City and West Coast have been ordered jointly

administered.  June 30, 2009 has been established as a deadline for filing certain administrative

priority claims in these cases.  THIS MOTION APPLIES TO DEBTOR CIRCUIT CITY.

Factual Background

6.      Claimant is the successor in interest to Crocker Land Company, a California

corporation ("Original Master Landlord") and John Breuner Company, a California corporation

pursuant to a written lease agreement dated March 3, 1970 with a commencement date of

November 11, 1970 (hereinafter the "Master Lease") pursuant to which Crocker Land Company

was the landlord and John Breuner Company was the tenant for the commercial premises known

as 303 Gellert Boulevard, Daly City, California 94015 and also sometimes referred to as 301

Serramonte Plaza, Daly City, California consisting of 120,000 square feet (the "Master

Premises").  The Master Lease had a term of 28 years, with 3 additional five year options to

extend, for a maximum term of 43 years. The first lease year ending date was changed to

October 31, 1971 by agreement of the parties to the Master Lease at that time. A true and correct

copy of the Master Lease together with the letter changing the lease year ending date is attached hereto as Exhibit "A" and is incorporated herein by reference (the "Marcogliese Declaration").

7.    On July 14, 1989, a sublease (the "Circuit City Sublease") was made between then property owner Investors First Staged Equity L.P., a California limited partnership (as the successor in interest to Crocker Land Company) and John Breuner Company, a California corporation (as tenant) to sublessee Circuit City. The landlord consented to the Circuit City Sublease as reflected in the Consent to Sublease and Amendment Of Lease, attached as Exhibit "B" to the Marcogliese Declaration.   Under the terms of the Circuit City Sublease, annual rent is $2.06 per square foot or $247,200 per year or $20,600 per month. Annual rent then increases by 12% every 4 years. The initial term of the Circuit City Sublease was 9 years, with three additional 5 year options to extend (coinciding with the Master Lease term and the options to extend in the Master Lease). The Circuit City Sublease also included a requirement for payment of percentage rent after $10 million of gross annual sales. Circuit City Sublease is for 41,360 sq. feet including 8,100 of new building area to be built by Circuit City (hereinafter the "Subject Premises") and is sometimes referred to as Circuit City Store #253. Possession of the Subject Premises was delivered to Circuit City on September 12, 1989 as reflected in the letters attached hereto as part of Exhibit "B". The current Base Rent is $35,652.02 per month, the current operating expenses are $3,234.00 per month and monthly management fees are $323.00 per month.

8.    On November 9,1993, Claimant's predecessors in interest, then landlord Serramonte Plaza L.P., a California limited partnership and tenant John Breuner Company, a California corporation, entered into a sublease with subtenant Sportmart, Inc., a Delaware corporation for the remainder of Master Premises leased to John Breuner Company under the Master Lease of approximately 77,500 sq. feet (the "Sportmart Sublease"). Sportmart

3

subsequently changed its name to Sports Authority. Under the terms of the Sportmart Sublease,

tenant John Breuner Company can require Sportmart to pay all real estate taxes under the Master

Lease. Sportmart is responsible for its pro-rata share of the Master Premises obligations and

Circuit City is responsible for the balance.  Circuit City is obligated to pay its pro-rata share of

the Master Premises Obligation Costs to Sportmart within 30 days after receipt of an invoice.  If

Circuit City fails to pay within 90 days of invoice, then Sportmart may invoice John Breuner

Company for such amount with interest from the date payment was due from Circuit City.  If

John Breuner Company fails to pay such amount within 30 days from invoice, then Sportmart

may deduct such amount with interest from the next installment(s) of rent due.  A true and

correct copy of the Sportmart Sublease and related letter confirming the real property tax

obligations are attached hereto collectively as Exhibit "C" and are incorporated herein by

reference.

   9.  Pursuant to an Assumption and Assignment of Circuit City Sublease dated May 1,

1994, assignor Circuit City Stores, Inc., a Virginia corporation, assigned the Circuit City

Sublease to assignee Circuit City Stores West Coast, Inc., a California corporation (wholly

owned subsidiary of assignor).  A true and correct copy of that assignment is attached hereto as

Exhibit "D" and is incorporated herein by reference.  Under the terms of this agreement, Circuit

City was not released from its obligations under the Circuit City Sublease.  West Coast and

Circuit City are therefore jointly and severally liable for all obligations under the Circuit City

Sublease.

   10.  On November 7, 2006, the third option to extend the Circuit City Sublease was

exercised by notice given by Circuit City and West Coast to (a) Master Lessor Daly City Partners

I, L.P., and (b) Sublease lessor Daly City Lease Partners I, L.P.  The Circuit City Sublease was

thereby extended to November 13, 2013.  A copy of the letter exercising the third option is attached hereto as Exhibit "E" and is incorporated herein by reference.

11.    As reflected in Exhibit E, as of November 7, 2006, (i) Daly City Lease Partners I, L.P. was the successor in interest to John Breuner Company under the Circuit City Sublease and the Master Lease and (ii) Daly City Partners I, L.P. was the successor in interest to Original Master Landlord.  Daly City Partners I, L.P.  and Daly City Lease Partners I, L.P. merged and the surviving entity is Daly City Partners I, L.P., Claimant herein. Prism Capital Corporation, a Delaware corporation is the General Partner of Daly City Partners I, L.P. and Dennis Wong its President.

The Administrative Priority Claims

12.    Circuit City and West Coast each filed voluntary petitions under chapter 11 on November 10, 2008 (the "Petition Date").  The Circuit City Sublease was rejected by notice dated March 4, 2009 stating that the effective date of rejection was March 11, 2009 (the "Rejection Date").  As of the Petition Date, the monthly base rent under the Circuit City Sublease was $35,652.02.  In addition, Circuit City and West Coast were also obligated to pay as Additional Rent each month under the Lease a monthly CAM estimate of $3,234.00 and a monthly management fee estimate of $323.00 which amounts are reconciled on an annual basis.

13.    A twenty day preliminary notice of intent to lien was served on Claimant on November 12, 2008 by Gordon Painting Co. Inc. in an effort to recover the sum of $28,021.00 due to labor and materials furnished in the improvement of the Subject Premises.  Circuit City had apparently contracted with Gordon Painting Co. to provide such services and then failed to pay the contractor upon completion of the work.  Gordon Painting Co. thereafter recorded a Mechanic's Lien on November 24, 2008 in San Mateo County where the Subject Property is located.  The Mechanic's Lien created a cloud on title and further was a breach of the Circuit

5

City Sublease agreement by Circuit City and West Coast.  A copy of the Preliminary Lien Notice is attached hereto as Exhibit "F" and is incorporated herein by reference.  A copy of the recorded Mechanics' Lien is attached hereto as Exhibit "G" and is incorporated herein by reference. Claimant was able to reach an agreement and paid Gordon Painting Co. $17,438.00 on February 12, 2009 to obtain the release of the mechanics' lien.  True and correct copies of the documents evidencing the agreement and settlement payment to Gordon Painting Co. to obtain a release of the Mechanic's Lien are attached hereto collectively as Exhibit "H" and are incorporated by reference.  This amount is entitled to administrative priority and is included as part of Claimant's Additional Administrative Claim herein.

14.     On November 14, 2008, Sports Authority issued an invoice to Circuit City demanding payment of Circuit City and West Coast's pro-rata share of the real property taxes that were coming due on the Subject Property in the amount of $54,954.44.  A true and correct copy of that invoice is attached hereto as Exhibit "I".  Circuit City and West Coast failed to pay this property tax obligation under the terms of the Circuit City Sublease.   As a result, Sports Authority pursuant to the terms of its sublease is entitled to and has by letter dated January 19, 2009 demanded and issued an invoice to Claimant to pay Circuit City and West Coast's share of the property tax bill of $54,954.44, a true and correct copy of which is attached hereto collectively as Exhibit "J" and incorporated herein by reference.  Sports Authority thereafter charged interest to Claimant in the amount of $2,198.18 for a total balance of $57,152.92. Claimant must therefore either pay those taxes and interest which are the obligation of Circuit City and West Coast, or alternatively, Sports Authority may elect to reduce its rental payments to Claimant by an equal amount.  Under either circumstance, Claimant has been further damaged in the amount of $57,159.92 for the tax year (or $156.60 per day).  These taxes are for the period of July 1, 2008 through June 30, 2009.  The administrative portion of the real property taxes runs

from the Petition Date to the Rejection Date and is calculated as 122 days @ $156.60 per day or

$19,105.20. Of this amount, partial payment of $4,123.88 was received by Claimant, leaving a

balance due of $14,981.32 as part of Claimant's Additional Administrative Claim herein. The

difference of $38,054.72 ($57,159.92 less administrative portion of $19,105.20) is included as

part of Claimant's general unsecured claim in this case.

15.    Circuit City and West Coast are obligated to pay an estimated amount of CAM

and Management Fees each month as Additional Rent under the Circuit City Sublease, which

amounts are reconciled on an annual basis. For the 2008 calendar year, Circuit City and West

Coast received an invoice and supporting calculations for said reconciliation reflecting a balance

due of $4,287.18 for CAMS and $433.52 for management fees for a total due of $4,720.70, true

and correct copies of which are attached hereto collectively as Exhibit "K" and are incorporated

herein by reference.  The portion from the Petition Date to December 31, 2008 is calculated as

52 days @ $12.93 per day or $672.54 and is included in Claimant's Additional Administrative

Claim herein. The difference of $4,048.16 ($4,720.70 less administrative portion of $672.54) is

included as part of Claimant's general unsecured claim in this case.

16.    The following amounts of post-petition base rent, additional rent and related

charges under the Circuit City Sublease became due and owing after the Petition Date but prior

to the effective date of rejection of the Circuit City Sublease. The amount of the Stub Rent claim

which is entitled to administrative priority is calculated as follows:

| Date | Description | Amount |
|------|-------------|--------|
| 11-10-08 to 11-30-08 | November base rent pro-rated ($35,652.02 x 21/30) | $24,956.41 |
| 11-10-08 to 11-30-08 | November CAM pro-rated ($3,234.00 x 21/30) | $2,263.80 |
| 11-10-08 to 11-30-08 | November management fee pro-rated ($323.00 x 21/30) | $226.10 |
|  | Stub Rent Claim | $27,446.31 |

Claimant holds an Additional Administrative Claim for the following additional charges arising under the Sublease, which are calculated as follows:

| Description | Amount |
|-------------|--------|
| Amount paid on mechanic's lien (see paragraph 13 above) | $17,438.00 |
| Pro-rated real property taxes (see paragraph 14 above) | $14,981.32 |
| Pro-rated 2008 CAM and management fee reconciliation (see paragraph 15 above) | $672.54 |
| Total Additional Administrative Claim | $33,091.86 |

17.    Claimant holds no security deposit.

18.    To the extent any of the amounts claimed herein are determined to not be entitled to administrative priority, then Claimant reserves the right to further amend its Proof of Claim to reclassify such invoices as part of Claimant's unsecured, non-priority claims.

Dated: June 17, 2009

_____
Dennis Wong, Declarant

Valerie P. Morrison, Esq.
WILEY REIN LLP
7925 Jones Branch Drive, Suite 6200
McLean, VA  22102
Telephone: 703-905-2826
Facsimile: 703-905-2820
Email: vmorrison@wileyrein.com

Julie H. Rome-Banks, Esq.
BINDER & MALTER LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: 408-295-1700
Facsimile: 408-295-1531
email: julie@bindermalter.com

Attorneys for Daly City Partners I, L.P.


13009596.2

LEASE

JOHN BREUNER COMPANY

and

CROCKER LAND COMPANY

**EXHIBIT**

_A_

# LEASE INDEX

## CROCKER LAND COMPANY

| Subject | Page | Section |
|---------|------|---------|
| Parties | 1 | 1 |
| Premises | 1 | 2 |
| Term | 1 | 3 |
| Rent | 3 | 4 |
| Holding Over | 3 | 5 |
| Purposes | 3 | 6 |
| Waste:  Alterations | 3 | 7 |
| Abandonment | 4 | 8 |
| Uses Prohibited | 4 | 9 |
| Free from Liens | 4 | 10 |
| Conformity with Government Regulations | 5 | 11 |
| Indemnification of Lessor | 5 | 12 |
| Utilities | 6 | 13 |
| Entry by Lessor | 6 | 14 |
| Assignment | 6 | 15 |
| Subletting | 7 | 16 |
| Insolvency or Bankruptcy | 7 | 17 |
| Default | 8 | 18 |
| Auction Prohibited | 10 | 19 |
| Surrender of Lease | 10 | 20 |
| Receivership | 10 | 21 |
| Waiver | 10 | 22 |
| Unlawful Detainer | 11 | 23 |
| Attorney's Fees | 11 | 24 |
| Repairs and Maintenance | 11 | 25 |
| Destruction of Premises | 12 | 26 |
| Construction | 13 | 27 |
| Commencement of Term | 13-A | 28 |
| Taxes | 13-A | 29 |
| Insurance | 15 | 30 |
| General Planning Standards | 15 | 31 |
| Additional Construction and Additional Building Space | 18 | 32 |
| Validity under Rule Against Perpetuities | 19 | 33 |
| Successors | 19 | 34 |
| Time | 19 | 35 |
| Captions | 19 | 36 |
| Notices | 20 | 37 |

<u>LEASE</u>

PARTIES:

    1.  This Lease, made in duplicate at San Francisco, California, the _3rd_ day of _March_, 19_70_, by and between CROCKER LAND COMPANY, a California corporation, hereafter called Lessor, and JOHN BREUNER COMPANY, a California corporation, hereafter called Lessee.

<u>W I T N E S S E T H</u>

PREMISES:

    2.  In consideration of the rent reserved and of the covenants to be performed by Lessee, Lessor hereby leases to Lessee and Lessee hereby hires from Lessor the premises situated in the City of Daly City, County of San Mateo, State of California, as described in Exhibit A attached hereto.

TERM:

    3.  (a)  The term of this lease shall be for a period of twenty eight (28) years, commencing as in Section 28 herein provided, unless sooner terminated under the terms and conditions of this lease.

    (b)  So long as Lessee is not in default under the terms and provisions of this lease to be observed or performed by Lessee, then Lessee shall have an option to extend this lease for three successive additional periods of five (5) years each on the same terms and conditions contained herein, so far as applicable, provided, however, that Lessee shall not be entitled to any further extension of the lease beyond said three extensions.  To exercise

such option the Lessee shall give the Lessor written notice of its intention to extend the lease at least twelve (12) months prior to the termination of the then current term hereunder.

(c)  Within sixty (60) days of the date hereof, Lessee may, at its option and, upon written notice to Lessor, terminate this lease with the respective obligations of the parties hereto thereupon ceasing; provided, however, that said termination may occur only if Lessee can demonstrate that, after receiving bids on the costs of (i) Architects fees and travel expenses, (ii) the Fire Protection Sprinkler System, and (iii) the Net Allowable General Contractor's Bid for the new building to be constructed on the premises, the lowest total amount for the cost of all three items exceeds $1,566,800.

(d)  At any time prior to the signing of a contract between Lessee and a general contractor for the construction of the new building on the premises, Lessor may at its option and, upon written notice to Lessee, terminate this lease with the respective obligations of the parties hereto thereupon ceasing; provided, however, that said termination may occur only if Lessee intends to sign a contract for which the total bids for (i) Architects fees and travel expenses, (ii) the Fire Protection Sprinkler System and (iii) the Net Allowable General Contractor's Bid, exceeds $1,746,800. Should Lessee so intend, then Lessee must provide written notice to Lessor, and, further, Lessee shall delay the signing of a contract for ten (10) days beyond the date of Lessor's receipt of said written notice of intent.

-2-

RENT:

4. The Lessee shall pay to the Lessor at its office in the City and County of San Francisco as rent in lawful money of the United States of America the sum determined by the formula set forth in Exhibit B hereto attached and by this reference incorporated herein per month in advance on the first day of each calendar month during the term hereof; provided, that if the date of commencement is not the first day of the calendar month, the rent for the calendar month in which the lessee commences shall be paid on the commencement date and the rent for such month and for the calendar month in which the lease ends shall be equitably prorated.

HOLDING OVER:

5. Any holding over after the expiration of said term, with the consent of Lessor, shall be construed to be a tenancy from month to month, at the same monthly rental then in effect, and shall otherwise be on the terms and conditions herein specified, so far as applicable.

PURPOSES:

6. The Lessee shall use the premises solely for an office, retail store and warehouse facility and for no other purposes without the prior written consent of Lessor.

WASTE:  ALTERATIONS:

7. Lessee shall not commit, or suffer to be committed, any waste upon the premises or any nuisance thereon.  Lessee shall not make or suffer to be made any alterations in, additions to, or expansions of the building (except non-structural alterations not

-3-

exceeding $20,000 in cost), or any changes in the basic landscaping
or parking and loading areas of the premises without the prior
written consent of Lessor.

ABANDONMENT:

8.   Lessee shall not vacate or abandon the premises at any
time during the term; and if Lessee shall abandon, vacate or
surrender the premises, or be dispossessed by process of law or
otherwise, any personal property belonging to Lessee and left on
the premises, except any property that may be mortgaged to Lessor,
shall, at the option of Lessor, be deemed abandoned.

USES PROHIBITED:

9.   Lessee shall not use the premises for any purpose or purposes
other than those for which the premises are leased;  and no use shall
be made of the premises, nor acts done, which will increase premiums
paid by Lessor, if any, for insurance upon, or in connection with,
the premises, or cause a cancellation of any insurance policy covering
the improvements on the premises or any portion thereof.  Lessee shall,
at Lessee's sole cost and expense, conform with any and all require-
ments of any insurer of the premises necessary for the maintenance of
reasonable fire, extended coverage, public liability and other
insurance covering the premises.  Nothing contained in this section
shall impose on Lessor the obligation to procure or maintain insurance
coverage on the premises.

FREE FROM LIENS:

10.   Lessee shall keep the demised premises free from any liens
arising out of any work performed, materials furnished, or obliga-
tions incurred by Lessee.

CONFORMITY WITH GOVERNMENT REGULATIONS:

11.  Lessee shall, at Lessee's sole cost and expense, conform
with all ordinances, laws, statutes, and requirements of Municipal,
State and Federal authorities now in force, or which may hereafter
be in force, pertaining to the premises, and shall faithfully
observe in the use of the premises, all Municipal, State and Fed-
eral ordinances, laws, statutes, and requirements now in force or
which may hereafter be in force.  The judgment of any court of com-
petent jurisdiction, or the admission of Lessee in any action or
proceeding against Lessee, whether Lessor be a part thereto or not,
that Lessee has violated any such ordinance, law, statute, or re-
quirement in the use of the premises, shall be conclusive of that
fact as between Lessor and Lessee.

INDEMNIFICATION OF LESSOR:

12.  Lessee hereby waives all claims against Lessor and agrees
to hold Lessor harmless from all liability and expense (including
but not limited to attorney's fees and cost of suit) that shall or
may arise during the lease term or during Lessee's occupancy because
of the presence on, or use of the premises, by any person, or be-
cause of Lessee's failure to keep the premises in good condition and
repair.  The waiver and indemnity just referred to shall include,
but not be limited to (i) damage to personal property in or about
the premises, and (ii) injury or death of any person in or about the
premises.  Lessee, at Lessee's cost and expense, shall secure and
maintain by insurance policies, in amounts of not less than $100,000
for property damage, $500,000 for injury and/or death to any one
person and $1,000,000 for injury and/or death to any number of per-
sons in any one occurrence, and with provisions and insurers

satisfactory to Lessor, coverage of the foregoing indemnity; Lessor shall be an additional named insured in said policies and shall be entitled to duplicate policies and certificates of insurance and to ten (10) days' advance written notice of the cancellation of any insurance coverage.

UTILITIES:

13.  Lessee shall pay for all water, gas, heat, light and power, and for sewage, telephone and all other utilities supplied to the premises.

ENTRY BY LESSOR:

14.  Lessee shall permit Lessor and its agents to enter the premises at all reasonable times for the purposes of inspecting the same; posting notices of non-liability for alterations, additions, or repairs; or placing upon the premises any usual or ordinary "For Sale", "For Lease" or like signs, without abatement of rent and without any liability to Lessee for loss of occupation or quiet enjoyment of the premises thereby occasioned.  Nothing contained in this section shall alter any obligation imposed on Lessee under this lease to repair and maintain the premises.

ASSIGNMENT:

15.  Lessee shall not assign this lease or any interest herein (nor shall it be assigned by operation of law) without obtaining the prior written consent of Lessor (which consent Lessor agrees not unreasonably to withhold).  No such assignment shall release Lessee from Lessee's obligation to pay rental hereunder unless Lessor

-6-

consents to such release in writing.  A consent to one assignment
shall not be deemed a consent to a subsequent assignment.

SUBLETTING:

16.  Lessee shall not sublet nor grant to any person, firm or
corporation the right to occupy the premises or any portion there-
of without obtaining the prior written consent of Lessor (which
consent Lessor agrees not unreasonably to withhold), provided
that, Lessee may without Lessor's prior written consent grant
rights in the premises to concessionaire operations not to exceed
ten percent (10%) of the retail selling area of the premises.  A
consent to one subletting shall not be deemed a consent to a sub-
sequent subletting.

INSOLVENCY OR BANKRUPTCY:

17.  In the event that Lessee shall file a voluntary petition
in bankruptcy or that proceedings in bankruptcy shall be instituted
against Lessee and Lessee is thereafter adjudicated bankrupt pur-
suant to such proceedings brought under the provisions of any
Federal Reorganization Act, or similar law of any State, or that a
receiver (except a receiver mentioned in Section 21 hereof) of
Lessee"s assets shall be appointed, and such appointment is not
vacated within sixty (60) days, or in the event that Lessee exe-
cutes an assignment for the benefit of its creditors, Lessor shall
have the right to terminate this lease forthwith.  Such termination
shall, in such instance, be deemed to occur upon the happening of
any of said events, and from thence forth Lessee shall have no

-7-

rights in or to the demised premises or to any of the privileges
herein conferred.

DEFAULT:

18.   In the event of any breach of this lease by Lessee which
Lessee fails to cure within a reasonable time after receipt of
notice thereof from Lessor (except for nonpayment of rent, which
shall be paid within five days after such notice), then Lessor, in
addition to other rights and remedies Lessor may have, shall have
the right of re-entry and may remove all persons and
property from the premises; and such property so removed may be
stored in a public warehouse or elsewhere at the cost of, and for
the account of Lessee.  Should Lessor elect to re-enter, as herein
provided, or should Lessor take possession pursuant to legal pro-
ceedings or pursuant to any notice provided for by law, Lessor may
either terminate this lease or Lessor may, from time to time,
without terminating this lease, re-let the premises or any part
thereof for such term (which may be for a term extending beyond
the term of this lease) and at such rental and upon such other
terms and conditions as Lessor, in Lessor's sole discretion, may
deem advisable, with the right to make alterations and repairs to
the premises.  Upon each re-letting Lessee shall be immediately
liable to pay to Lessor, in addition to any indebtedness other than
rent due hereunder the cost and expenses of such re-letting and of
such alterations and repairs, incurred by Lessor, and the amount, if
any, by which the rent reserved in this lease for the period of such
re-letting (up to but not beyond the term of this lease) exceeds the
amount agreed to be paid as rent for the demised premises for such

period on such re-letting; however, at the option of Lessor rents received by Lessor from such re-letting shall be applied; first, to the payment of any indebtedness, other than rent due hereunder from Lessee to Lessor; second, to the payment of any costs and expenses of such re-letting and of such alterations and repair; third, to the payment of rent due and unpaid hereunder and the residue, if any, shall be held by Lessor and applied in payment of future rent as the same may become due and payable hereunder. If Lessee has been credited with any rent to be received by such re-letting, and such rent shall not be promptly paid to Lessor by the new tenant, or if such rentals received from such re-letting during any month be less than that to be paid during that month by Lessee hereunder, Lessee shall pay any such deficiency to Lessor. Such deficiency shall be calculated and paid monthly.  No such re-entry to take possession of said premises by Lessor shall be construed as an election on Lessor's part to terminate this lease unless a written notice of such intention be given to Lessee or unless the termination thereof be decreed by a court of competent jurisdiction.  Lessee hereby waives all claim for damages that may be caused by Lessor's re-entering and taking possession of the premises or removing and storing property, as herein provided, and will save Lessor harmless from loss, costs or damages occasioned Lessor thereby, and no such re-entry shall be considered or construed to be forcible entry as the same is defined in the Code of Civil procedure of the State of California.  Notwithstanding any such re-letting without termination, Lessor may at any time thereafter elect to terminate this lease for such previous breach.  Should

Lessor at any time terminate this lease for any breach, in addition to any other remedy Lessor may have, Lessor may recover from Lessee all damages Lessor may incur by reason of such breach, including the cost of recovering the premises, and including the worth at the time of such termination of the excess, if any, of the amount of rent and charges equivalent to rent reserved in this lease for the remainder of the stated term over the then reasonable rental value of the premises for the remainder of the stated term, all of which amounts shall be immediately due and payable from Lessee to Lessor.

AUCTION PROHIBITED:

19.  Lessee shall not conduct or permit to be conducted any sale by auction on the premises.

SURRENDER OF LEASE:

20.  The voluntary or other surrender of this lease by Lessee, or a mutual cancellation thereof, shall not work a merger, and shall, at the option of Lessor, terminate all or any existing subleases or subtenancies, or may, at the option of Lessor, operate as an assignment to Lessor of any or all such subleases or subtenancies.

RECEIVERSHIP:

21.  Neither the application by Lessor for the appointment of a receiver in an action to take possession of the premises nor the appointment of such a receiver shall be construed as an election on Lessor's part to terminate this lease unless a written notice of such intention is given to Lessee.

WAIVER:

22.  The waiver by either party of any breach of any term, covenant or condition herein contained shall not be deemed to be

-10-

a waiver of such term, covenant or condition on any subsequent
breach of the same or any other term, covenant or condition herein
contained.  The subsequent acceptance of rent hereunder by Lessor
shall not be deemed to be a waiver of any preceding breach by
Lessee of any term, covenant or condition of this lease, other
than the failure of Lessee to pay the particular rental so accepted,
regardless of Lessor's knowledge of such preceding breach at the
time of acceptance of such rent.

UNLAWFUL DETAINER:

    23.  The Lessee covenants and agrees that nothing herein con-
tained and no security or guaranty which may now or hereafter be
furnished the Lessor for the payment of the rent herein reserved,
or for the performance by Lessee of any of the terms, covenants
and conditions of this lease shall in any way be a bar or defense
to any action in unlawful detainer by the Lessor against Lessee,
or for the recovery of the demised premises in any action which
Lessor may at any time commence for or because of the breach of
any term, covenant or condition of this lease.

ATTORNEY'S FEES:

    24.  In the event of litigation between the parties concerning
this lease or any term or condition hereof or any default hereunder,
the prevailing party in such litigation shall be entitled to receive
from the other party a reasonable attorney's fee as fixed by the
court.

REPAIRS AND MAINTENANCE:

    25.  Lessee shall, at Lessee's sole cost, keep and maintain the
premises and appurtenances (including but not limited to landscaping)

in good and sanitary order, condition, appearance and repair, hereby
waiving all right to make repairs at the expense of Lessor as pro-
vided in Section 1942 of the Civil Code of the State of California,
and all rights provided for by Section 1941 of said Civil Code.
By entry hereunder, Lessee accepts the premises as being in good
and sanitary order, condition, appearance and repair and agrees
on the last day of the term, or sooner termination of this lease,
to surrender to Lessor the premises and appurtenances in the same
condition as when received, reasonable use and wear thereof
excepted, and to remove Lessee's signs, if any, from the premises.

DESTRUCTION OF PREMISES:

26.  If the building on the demised premises should be damaged
or destroyed during the term of this lease, this lease shall not
terminate, but Lessee shall forthwith and with all due diligence
repair or rebuild the same to substantially the condition in which
the building was prior to such damage or destruction, provided,
however, that if such damage or destruction should occur during
the last three years of the term (including extension terms) of
this lease, then Lessor may elect to terminate this lease with no
further rights or obligations between the parties hereto.  Such
repairs or rebuilding shall be commenced as soon as is practicable
after the damage or destruction and shall be accomplished with due
diligence.  From the date of the damage until the completion of
the repairs or rebuilding, Lessee shall be entitled to a propor-
tionate abatement of rent based upon the ratio of the non-usable
space in such building resulting from the casualty to the total

space in such building.  The rights of the parties hereto arising
upon damage to, or destruction of, the premises shall be governed
by the provisions of this agreement rather than the provisions of
Sections 1932(2) and 1933(4) of the Civil Code of the State of
California, which sections are hereby expressly waived.

CONSTRUCTION:

27.  Promptly after the execution of this lease, Lessee at
Lessee's sole expense agrees to commence the work necessary in
connection with the construction of a building (called new build-
ing) and landscaping on the demised premises, and to proceed dili-
gently with the construction and completion thereof.  Said work and
construction shall substantially conform to and be in accordance with the
following documents:  (a)  the Site Plan attached hereto as Exhibit
C; (b) those certain Building Plans for Breuner's Wayside Store,
Pleasant Hill, California, prepared by Haver, Nunn and Jensen --
Architects, for Job No. 6824, and including Architecture sheets 1
through 16, Structural sheets S-1 through S-6, Mechanical sheets
M-1 through M-6, Plumbing sheets P-1 through P-4 and Electrical
sheets E-1 through E-10, all of which are dated 2 December 1968
except for Electrical sheet E-1 R which is dated June 5, 1969; and
(c) those certain Specifications for Pleasant Hill Wayside Home
Furnishing Store submitted for Breuner's Investment Company by
Haver, Nunn & Jensen, as Project No. 6824, dated December 2, 1968,
together with Addendum Nos. 1 through 5 thereto, dated 12/6/68,
12/13/68, 12/17/68, 12/31/68 and 1/6/69, respectively, and Change

Orders 1 through 10 thereto and changes specified in letter of
Haver, Nunn & Jensen, Architects, dated February 24, 1970, com-
prising part of Exhibit C.  All the foregoing documents are by
reference incorporated herein and made a part hereof.

COMMENCEMENT OF TERM:

28.  The term hereof shall commence on the date on which
Lessor delivers to Lessee a sum of money equal in amount to the
sum of those items included in paragraphs (a) 2. and (a) 4. of
Exhibit B.  Said delivery of money must be within ten (10) days
after Lessee delivers to Lessor an architect's or engineer's cer-
tificate that the new building has been completed as provided
herein.

TAXES:

29.  In addition to all other payments herein provided to
be made by Lessee and as additional rental hereunder, Lessee
agrees to pay before delinquency all real property taxes
and assessments which have become or may become a



lien upon the demised premises (or are otherwise imposed or assessed on the demised premises) or any portion thereof or upon improvements thereon or improvements added thereto during the term of this lease.   In addition to rental and other charges to be paid by Lessee hereunder, Lessee agrees that if at any time during the term hereof, under the laws of California or any political sub-division thereof, a tax or excise on rents or other tax (except income tax), however described, shall be levied or assessed by California or said political subdivision against Lessor on account of the rental expressly reserved hereunder, Lessee shall reimburse to Lessor, upon demand, any and all such tax or excise on rents or other taxes. If Lessee fails to pay such taxes, in addition to all other remedies Lessor has hereunder, Lessor shall have the right to pay any or all of such taxes and to recover reimbursement therefor from Lessee. Taxes for the year in which this lease commences and for the year in which it terminates shall be equitably prorated.   Should the amount of taxes on real property payable by Lessee as hereinabove pro-vided and applying only to the real property provided by Lessor (as established in Exhibit B, paragraph (a) 1. and (a) 2.),exceed $63,600 annually, then Lessee may request reimbursement from Lessor for said excess; provided, however, that said reimbursement shall only be payable from Lessor from percentage rents already paid to Lessor by Lessee during the prior lease year only, and, further, provided that percentage rents received by Lessor from gross sales (as defined in Exhibit B) of less than $7,000,000 shall be exempt from this reimbursement provision.

30. Lessee shall keep the demised premises insured against loss or damage by fire, with extended coverage, to the extent of 100% of the replacement value of the improvements on said premises (including any improvements made during the term hereof). Lessee shall pay the premium of such insurance from time to time, as and when such premiums shall become due.

The insurance hereunder shall be payable to Lessor and Lessee as their interest may appear, in companies and with provisions satisfactory to Lessor; and Lessor shall be entitled to duplicate policies and to ten (10) days' advance written notice of the cancellation of any insurance coverage. In the event that Lessee shall fail to obtain such insurance or to keep the same in full force and effect, Lessor may procure the same, and Lessee shall upon demand reimburse Lessor for the premiums thereon.

Lessee agrees that if Lessor encumbers or has encumbered tne demised premises to a lender by Deed of Trust, mortgage or other security device, at Lessor's discretion loss shall be made payable to such lender. Lessor agrees that monies, to the extent of insurance proceeds received by either Lessor or such lender under a policy of insurance described by this section, will be disbursed in installments to Lessee or to Lessee's building contractor according to the progress of the work of repairing or rebuilding the demised premises under Section 26. Lessee agrees that in the event Lessor exercises its right under Section 26 hereof to terminate this lease due to damage or destruction to the premises occurring during the last three years of the lease term, the insurance proceeds payable under the policy or policies of insurance covered by this section shall be paid to Lessor.

GENERAL PLANNING STANDARDS:

31. (a) No building or structure of any kind, including but

not limited to walls, fences and signs, shall be erected, altered,
placed, assembled or permitted to remain on the premises unless
and until plans showing the type of use, location, size and
architectural design of all proposed structures, driveways, walks,
loading areas and parking areas have been approved in writing by
the Lessor.

(b)  No loading dock or railroad trackage shall be
permitted on any Gellert Blvd. frontage and all loading spaces
shall be entirely within the property lines of the demised premises.

(c)  No material, supplies, or products (exclusive of
sheltered patio area merchandise display and motor vehicles not
for sale) shall be stored or permitted to remain on the premises
outside a permanent structure without the prior written consent of
Lessor.  Approval of outside storage will be granted only where
storage is screened from view by a masonry wall, or other appro-
priate screen, six (6) feet in height or rising two (2) feet above
the stored material, whichever is higher.

(d)  No billboards, signs, or other advertising devices
of any character shall be erected, pasted, posted, painted, dis-
played, or permitted upon any part of the building exterior or
exterior premises without the prior written approval of Lessor.

(e)  No building shall be painted, repainted, stuccoed
or be surfaced with any material unless and until the Lessor
approves the color and/or material in writing, except the Lessee
may repaint the building in equal or better quality and/or material.

-16-

(f)  All setback areas facing streets between the front
building line and the curb, with the exception of driveways,
sidewalks, automobile parking area and other walkways shall be
used exclusively for the planting and growing of trees, shrubs,
lawns and other ground covering or material as approved by the
Lessor, which approval shall not be unreasonably withheld.  If
landscaping is not properly maintained by the Lessee, Lessor
shall undertake such maintenance as may be necessary, at the
expense of the Lessee.

(g)  Lessee shall not cause or make harmful, offensive
or obnoxious sewage wastes, excessive noise, odors, or vibration
that could be deemed objectionable by Lessor to other tenants and
that would conflict with the purposes or restrictions of Lessor's
development and shall not create or maintain a nuisance.

(h)  From time to time, Lessee may have need for more
visitor parking than is provided within the demised premises.
Lessee's total parking requirement during these anticipated peaks
may approach three hundred (300) parking spaces, or approximately
thirty-five (35) parking spaces in excess of those within the
demised premises.  Without assuming any liability, therefore, it
is Lessor's intent to provide for said excess parking with adequate
lighting on adjacent parcels, whether or not said adjacent parcels
may be leased to others.  In like manner Lessee shall, from time
to time, make its parking area within the demised premises hereof
available to others and no parking areas shall be considered ex-
clusive.

(i)  Lessor agrees that it will install and maintain, at its expense, landscaping of the slope areas located at the edges of the premises as designated in Exhibit C attached hereto.

ADDITIONAL CONSTRUCTION AND ADDITIONAL BUILDING SPACE:

32.  If at any time, or from time to time, Lessee should desire to expand or extend the improvements, Lessor will undertake to have such additional construction work done and pay for the same provided, however, the monthly rental hereunder shall be increased in an amount to be negotiated by the parties hereto.  If terms cannot be agreed upon, Lessee may construct the desired improvements at its own expense.

From time to time, Lessee may also occupy additional ware-house building space within a twenty mile radius of the demised premises.  To the extent that this additional building space is in support of the effort of Lessee to increase retail sales occurring from the demised premises, percentage rent payable to Lessor by Lessee shall be reduced in proportion to the amount of said addition-al building space occupied by Lessee, as follows:

For each 1,000 square feet of said additional build-ing space, $130,000 of annual gross sales above $8,000,000 shall be subject to a percentage rent re-duction from one and one-half percent (1-1/2%) to one percent (1%), provided that these $130,000 of gross sales increments shall begin at an annual volume of $8,000,000 and continue upward from $8,000,000, with said $130,000 unit gross sales increments being cumu-

lative, one for each 1,000 square feet of cumulative additional building space.

VALIDITY UNDER RULE AGAINST PERPETUITIES:

33. Anything herein contained to the contrary notwithstanding, and in order to guard against any possible invalidity of this lease under the so-called "Rule Against Perpetuities", the parties hereto expressly agree that in case the term provided for in Section 3 hereof shall not have commenced, for whatever reason, within twenty-one (21) years after the date hereof, this lease shall never take effect and the respective obligations of the parties hereto shall thereupon cease and terminate forthwith.

SUCCESSORS:

34. The covenants and conditions herein contained shall, subject to the provisions hereof concerning assignment, apply to and bind the heirs, successors, executors, administrators and permitted assigns of the parties hereto; and all of the parties hereto shall be jointly and severally liable hereunder.

TIME:

35. Time is of the essence of this lease.

CAPTIONS:

36. The caption headings in this lease are for convenience only and are not a part of this lease and do not in any way limit or amplify the terms and provisions of this lease. The terms Lessor and Lessee shall apply to the parties hereto as may be applicable and without regard to gender or number.

-19-

NOTICES:

37.   All notices hereunder may be given in writing personally or by depositing the same in the United States Mail, postage prepaid, certified and addressed to the following addresses:

> Lessor        CROCKER LAND COMPANY
>               660 MARKET STREET
>               SAN FRANCISCO, CALIFORNIA 94104

> Lessee        JOHN BREUNER COMPANY
>               2201 BROADWAY
>               OAKLAND, CALIFORNIA 94612

or to such other addresses as may be designated from time to time in writing.

EXECUTED in duplicate the day and year first above written.

CROCKER LAND COMPANY

By _____
        Its   VICE PRESIDENT

By _____
        Its   Treas

(CORPORATE SEAL)

JOHN BREUNER COMPANY

By _____
        Its   President

By _____
        Its   Sec'ty

(CORPORATE SEAL)

READ AND APPROVED

EXHIBIT "A"

# EXHIBIT "A"

All that certain real property situate in the City of Daly City, County of San Mateo, State of California, being more particularly described as follows:

BEGINNING at the most southerly extremity of that certain course South 11° 29' 11" East 122.21 feet, which said course forms the most easterly boundary line of Serramonte Boulevard as said boulevard is shown on that certain map entitled, "SERRAMONTE, Unit No. 7, DALY CITY, SAN MATEO COUNTY, CALIFORNIA," recorded January 25, 1967 in Book 66 of Maps, at Pages 8 to 11 inclusive, San Mateo County Records; thence from said point of beginning along the boundary of the lands of Crocker Land Company as described in Parcel 5 of Grant Deed from Suburban Realty Company to Crocker Land Company, dated December 5, 1969 recorded in Volume 5725 of Deeds, at pages 72 and 73 San Mateo County Records, the following courses and distances:   South 11° 29' 11" East 4.80 feet to a point, northeasterly on an arc of a curve to the left, the center of which bears North 11° 29' 11" West 2266.18 feet from the last mentioned point, with a radius of 2266.18 feet, through a central angle of 4° 15' 48", an arc distance of 168.63 feet, North 74° 15' 01" East, tangent to the preceding curve 319.71 feet to a point, southeasterly on an arc of a curve to the right, the center of which bears South 77° 41' 47" West 3848.30 feet from the last mentioned point, with a radius of 3848.30 feet, through a central angle of 7° 13' 52" an arc distance of 485.68 feet; thence leaving said boundary (5725 of Deeds 72 and 73) South 84° 45' 00" West; 703.18 feet; thence North 5° 15' 00" West 150.87 feet; thence North 2° 17' 00" West 51.16 feet; thence along a curve to the left, tangent to the preceding course with a radius of 1009.00 feet, through a central angle of 2° 58' 00." an arc distance of 52.24 feet; thence North 5° 15' 00" West tangent to the preceding curve, 120.94 feet to a point described in the aforementioned deed (5725 of Deed 72 and 73); thence along the boundary of said deed along a curve to the right tangent to the last described course with a radius of 30.00 feet, through a central angle of 89° 30' 59" an arc distance of 46.87 feet; thence North 84° 15' 59" East tangent to the preceding curve, 158.66 feet to the point of beginning, containing 6.858 acres.

INCLUDED HEREWITH A NONEXCLUSIVE access easement described as follows:

A strip of land fifty (50) feet in width lying southerly of parallel and adjacent to the line described above as "South 84° 45' 00" West 703.18 feet" and running from the most westerly point of said line easterly a distance of 228.51 feet and extending there from a strip of land thirty-two (32) feet in width and continuing southerly of parallel and adjacent to said line described as "South 84° 45' 00" West a distance of 474.67 feet."

EXHIBIT "A"


All that certain real property situate in the City of Daly City,
County of San Mateo, State of California, being more particularly
described as follows:

        BEGINNING at the most southerly extremity of that certain
course South 11° 29' 11" East 122.21 feet, which said course forms
the most easterly boundary line of Serramonte Boulevard as said
boulevard is shown on that certain map entitled, "SERRAMONTE,
Unit No. 7, DALY CITY, SAN MATEO COUNTY, CALIFORNIA," recorded
January 25, 1967 in Book 66 of Maps, at Pages 8 to 11 inclusive,
San Mateo County Records; thence from said point of beginning along
the boundary of the lands of Crocker Land Company as described in
Parcel 5 of Grant Deed from Suburban Realty Company to Crocker
Land Company, dated December 5, 1969 recorded in Volume 5725 of
Deeds, at pages 72 and 73 San Mateo County Records, the following
courses and distances:  South 11° 29' 11" East 4.80 feet to a
point, northeasterly on an arc of a curve to the left, the center
of which bears North 11° 29' 11" West 2266.18 feet from the last
mentioned point, with a radius of 2266.18 feet, through a central
angle of 4° 15' 48", an arc distance of 168.63 feet, North 74° 15'
01" East, tangent to the preceding curve 319.71 feet to a point,
southeasterly on an arc of a curve to the right, the center of
which bears South 77° 41' 47" West 3848.30 feet from the last
mentioned point, with a radius of 3848.30 feet, through a central
angle of 7° 13' 52" an arc distance of 485.68 feet; thence leaving
said boundary (5725 of Deeds 72 and 73) South 84° 45' 00" West;
703.18 feet; thence North 5° 15' 00" West 150.87 feet; thence North
2° 17' 00" West 51.16 feet; thence along a curve to the left, tangent
to the preceding course with a radius of 1009.00 feet, through a
central angle of 2° 58' 00" an arc distance of 52.24 feet; thence
North 5° 15' 00" West tangent to the preceding curve, 120.94 feet
to a point described in the aforementioned deed (5725 of Deed
72 and 73); thence along the boundary of said deed along a curve
to the right tangent to the last described course with a radius of
30.00 feet, through a central angle of 89° 30' 59" an arc distance
of 46.87 feet; thence North 84° 15' 59" East tangent to the preceding
curve, 158.66 feet to the point of beginning, containing 6.858 acres.

        INCLUDED HEREWITH A NONEXCLUSIVE access easement described
as follows:

A strip of land fifty (50) feet in width lying southerly of parallel
and adjacent to the line described above as 'South 84° 45' 00" West
703.18 feet' and running from the most westerly point of said line
easterly a distance of 228.51 feet and extending there from a strip
of land thirty-two  (32) feet in width and continuing southerly of
parallel and adjacent to said line described as"South 84° 45' 00"
West a distance of 474.67 feet."

EXHIBIT B

(a)   Fixed Rent

The basic rental amount which is the fixed minimum sum to be
paid monthly by Lessee to Lessor shall be computed by multi-
plying 0.8333% (the annual rate being 10.000%) times the sum
of the following amounts:

(1)   The land value, being the total area within the leased
premises as described in Exhibit A, said value being
$600,000.

(2)   Costs of the building and its appurtenances (the build-
ing and appurtenances are shown and described in Exhibit
C and in those certain other documents incorporated by
reference in Paragraph 27 of the Lease to which this
Exhibit is attached) being the sum of the costs of work
accomplished by (i) the general contractor, and (ii) by
other contractors and suppliers and services, approxi-
mately as follows:

| Item | Approximate Amount |
|---|---|
| General Contractor's Work | $1,265,300 |
| Architect's Fee | 54,000 |
| Architect's Travel | 3,500 |
| Soil Engineering | 2,000 |
| Landscaping | 25,000 |
| Parking Lot Lights | 4,000 |
| Store Lighting Fixtures | 3,000 |
| Wall Coverings | 5,000 |
| Fire Protection Sprinkler System | 144,000 |
| PLan Check | 700 |
| Building Permit | 1,500 |
| Interim Financing | 35,000 |

(3)   One-half the premium cost of a title insurance policy,
A.L.T.A. in form, in the amount of the sum of 1. and 2.
above.

-1-

(4)   Any other costs that may be agreed in writing by both

Lessor and Lessee.

(b)   Percentage Rent

As additional rental, Lessee shall pay Lessor annually

within thirty (30) days after the end of each lease year

a percentage rent equal to the amount by which Lessee's

gross sales, (as hereinafter defined) exceed $5,000,000

annually for each lease year, multiplied by the percent-

age rent rate, the aggregate being computed as follows:

(1)   No percent (0%) of gross sales during such lease

year up to but not in excess of $5,000,000 of such

gross sales; plus

(2)   Five-tenths of one percent (.5%) of gross sales dur-

ing such lease year in excess of $5,000,000 for such

lease year up to but not in excess of $6,000,000 of

such gross sales for such lease year; plus

(3)   Three-quarters of one percent (.75%) of gross sales

during such lease year in excess of $6,000,000 for

such lease year up to but not in excess of $7,000,000.

of such gross sales for such lease year; plus

(4)   One percent (1.00%) of gross sales during such lease

year in excess of $7,000,000 for such lease year up

to but not in excess of $8,000,000 of such gross

sales for such lease year; plus

(5)   One and one-half percent (1.50%) of gross sales dur-

    ing such lease year in excess of $8,000,000 of

    such gross sales.

(c)   <u>Definition of gross sales</u>

The term "gross sales" as used herein shall, subject to the

authorized deductions or exceptions set forth, be construed

to mean:

(1)   The entire amount of the price charged whether wholly

    or partly for cash or on credit, or otherwise, for all

    goods, wares and merchandise sold, leased or licensed,

    in, on, through, or from the premises;

(2)   All charges made by Lessee or by anyone on its behalf

    for the rendition of any service of any kind whatso-

    ever to Lessee's customers on the premises or by reason

    of any business done in, on, through, or from the

    premises;

(3)   The amount of all orders taken on the premises, although

    the merchandise which is the subject of such orders may

    be delivered from a place other than the premises;

(4)   All other sums received or charged by Lessee for goods,

    services or things of value in the course of the conduct

    of its business in, on, about, through or from the

    premises, or in connection with the business done by it

    in the premises, including, but not limited to the

    amount of all orders secured or received in the premises

by telephone, mail, house-to-house, or other can-
vassing by personnel operating from, reporting to, or
under the supervision of any employee, agent, or rep-
resentative located at or operating out of the
premises or which Lessee, in the normal and customary
course of its operations, would credit or attribute
to its business in the premises, or by other means,
whether or not filled elsewhere;

(5)  Gross sales, as hereinabove defined, of all Lessee's
tenants, concessionaires, licensees and other persons
doing business in the premises.

There shall be deducted from gross sales, as hereinabove
defined:

(1)  The total of what are commonly called by the trade
"returns", that is to say, return sales,  consisting
of the repayment of the purchase price or cancellation
charges therefor upon the return of merchandise pre-
viously sold;

(2)  The total of what are commonly called by the trade
"cancellations", that is to say, the entire or partial
cancellation of a transaction before or after delivery
of merchandise, but before any charge is made therefor;

(3)  The total of what are commonly called shop sales, that
is to say, labor and supply charges incurred in fabri-
cating, installing and servicing merchandise sold, where

the amount thereof is added to the selling price
of the merchandise;

(4) The total of what are commonly called by the trade
"refunds and allowances", that is to say, the return
in whole or in part of the purchase price of merchan-
dise sold because of defects therein or otherwise, and
the return in whole or in part of the purchase price of
such merchandise, or the cancellation in whole or in
part of the charge made therefor;

(5) The value of merchandise accepted upon trade-ins, as
such values are determined by Lessee on each transaction,
upon the exercise of its judgment in good faith;

(6) All sums referred to as finance charges received by
Lessee on credit sales of merchandise, services, things
of value, miscellaneous charges, and taxes in excess of
the retail cash sale price of said merchandise and other
charges;

(7) The amount of all sales taxes and excise taxes separ-
ately stated and billed or collected by Lessee from
customers and paid over by Lessee to governmental
authorities;

(8) The amount of all delivery charges, charges for postage
and miscellaneous charges separately stated and billed
or collected by Lessee from customers.

The foregoing deductions shall apply in determining gross
sales of Lessee and of all subtenants, concessionaires, licensees

and other persons doing business in the premises.  No
deduction shall be allowed for uncollected or uncollectible
credit amounts.

There shall be excepted from gross sales, as hereinabove
defined:

(1)  Any amount received by Lessee by way of cash or credit
or any other form of bookkeeping entry which may be
made on the books of account of Lessee for merchandise
transferred from the premises to any other store owned
and operated by Lessee;

(2)  All sums received by Lessee upon deliveries of merchan-
dise to customers pursuant to sales secured by and
credited to any other of said stores referred to in the
preceding clause (1);

(3)  All sums received by Lessee upon return of merchandise
to the supplier thereof.

(d)  <u>Lessee's Records, Accounts, and Statements</u>

Lessee shall keep in its corporate offices true and complete
records and accounts (or microfilm of such records and accounts)
of all sales and business transacted, including daily bank
deposits, and shall give Lessor access, during reasonable hours,
to such records and accounts or microfilm.  Within fifteen (15)
days after the end of each lease year. Lessee shall
furnish a true and accurate statement of all gross sales during
such period.  The statement shall show the refunds, returns and
other allowable items deducted in computing the amount of such

gross sales and shall be certified to be correct by a
principal executive of Lessee.  Within ten (10) days after
the end of each month, Lessee shall also furnish Lessor an
unaudited monthly statement of the gross sales during the
preceding month, which statement shall not be used for the
purposes of computing percentage rent.

Lessee shall keep and preserve for at least fourteen (14)
months after the end of each lease year all sales slips, cash
register tape readings, sales books, bank books or duplicate
deposit slips, or microfilm of all such documents, and other
evidence of gross sales for such year.  Lessor shall have the
right at any time and from time to time to audit all of the
books of account, bank statements, documents, records, returns,
papers, and files of Lessee relating to gross sales, and on
request by Lessor, Lessee shall make all such matters available
for examination at the premises.  If Lessor should have an
audit made for any lease year and the gross sales shown by
Lessee's statement for such year should be found to be under-
stated by more than three percent (3%), Lessee shall immedi-
ately pay to Lessor the cost of such audit as well as the
additional rent payable by Lessee to Lessor; otherwise, the
cost of such audit shall be paid by Lessor.  Lessor's right
to have such an audit made with respect to any lease year
shall expire twelve (12) months after Lessee's statement for
such year, as provided in Section (e) following, shall have
been delivered to Lessor.

(e)   Annual Audit and Adjustment

Within sixty (60) days after the end of each lease year,
Lessee shall cause a statement of the gross sales in, at,
upon, or from the premises for such year to be prepared and
certified by a principal executive of Lessee.  A copy of the
statement so certified shall be delivered to Lessor within the
sixty (60) day period.  If it is determined by audit or other-
wise that any statement previously delivered by Lessee to
Lessor was inaccurate, there shall be such an adjustment that
the correct amount of percentage and fixed rent will have been
paid.  Each party agrees to pay to the other on demand such
amount as may be necessary to effectuate any such adjustment.

(f)   Accounting Information Confidential

Any information obtained by Lessor pursuant to the provisions
of this Exhibit B shall be treated as confidential, except in
any litigation or arbitration proceedings between the parties,
and except further that Lessor may divulge such information to
a prospective buyer or encumbrancer of the premises.

(g)   Covenant of Continuous Operation and Full Merchandising

Lessee shall continuously and uninterruptedly occupy and use

-8-

the entire premises for the purposes specified herein and
shall continuously merchandise one hundred percent (100%) of
the premises during not less than as many days as the majority
of all Breuners Stores retail operations in Northern California
are open for business.  This requirement shall not apply during
times when the premises are untenantable by reason of fire or
other casualty, strikes, lockouts, labor disputes, acts of
God, governmental controls, enemy or hostile governmental action,
civil commotion, and other causes beyond the reasonable control
of Lessee.  Lessee shall, however, continue operation of its
business to the extent reasonably practicable from the stand-
point of good business during any such period when the premises
are untenantable or undergoing reconstruction or repair.  At
all times, Lessee shall carry a full and complete stock of
seasonable merchandise offered for sale at competitive prices
and shall maintain adequate personnel for the efficient service
of its customers.  In general, Lessee shall employ its best
judgment, efforts, and abilities to operate the business con-
ducted by it in the premises in a manner calculated to produce
the maximum profitable and practicable volume of sales and
transactions obtainable.

For the purpose of computing percentage rent, the gross sales
for any time when Lessee does not continuously and uninter-
ruptedly conduct its business as required by this section

-9-

shall be deemed to be the greater of the Gross Sales trans-
acted in the premises:

(1)    During such period or

(2)    During the corresponding period of the preceding last
       year.

# HAVER, NUNN AND JENSEN



### ARCHITECTURE · PLANNING · ENGINEERING
1133 EAST MISSOURI AVENUE · PHOENIX, ARIZONA 85014 · PHONE: 263-9000

RALPH B. HAVER, A.I.A.
JIMMIE R. NUNN, A.I.A.
ROSS L. JENSEN, A.I.A.
JAMES L. SALTER
JAMES E. HARRIS
GEORGE A. COLLAMER
MICHAEL J. KEENAN
WESLEY G. NELSON, A.I.A.
CLARENCE A. SHANKS, A.I.A.
WILLIAM L. STIMMEL, A.I.A.

February 24, 1970

Crocker Land Co.
660 Market Street
San Francisco, California

Re:  Breuner Serramonte Store

Gentlemen:

This is to advise you that the construction plans and specifications
for the Breuner store proposed for the Serramonte Shopping Center
are substantially the same as those used for the Breuner Pleasant
Hill store with the following exceptions:

    a.  Warehouse enlarged 4000 Sq. Ft.

    b.  Studio area redesigned within the building envelope.

    c.  Patio sales area reduced by 250 sq. ft. - wrought iron
        fence added.

    d.  Air Conditioning system redesigned to meet climate
        requirements.

    e.  Minor changes in office sizes.

    f.  Mezzanine enlarged 1500 Sq. Ft.

If further clarification is needed in this matter, please do not
hesitate to ask.

Very truly yours,

HAVER, NUNN AND JENSEN, ARCHITECTS


Ralph B. Haver, President

RBH:ne
    cc:  Floyd Southard

# CROCKER ESTATE COMPANY
## 660 MARKET STREET
### SAN FRANCISCO, CALIFORNIA 94104

421-4610

October 9, 1970

John Breuner Company
2201 Broadway
Oakland, California  94612

Attn.:  Mr. Floyd Southard

Gentlemen:

This letter agreement is intended to document our understand-
ing and comply with the lease between Crocker Land Company
and John Breuner Company dated March 3, 1970, regarding:

1. **The Payment of Money by Lessor to Lessee.**  (Paragraph 28)
   On November 11, 1970 Crocker Land Company will deliver to
   John Breuner Company the amount of $1,250,000.  This sum
   is a partial payment of items (a) 2. and (a) 4. of Exhibit B.
   The remainder of the amounts due by Lessor to Lessee will
   be delivered prior to January 31, 1971, after documentation
   for the total amount due has been provided by Lessee.

2. **Commencement of Term.**  (Paragraphs 4 and 28)  The commence-
   ment of the term and the owing of rent shall begin on Novem-
   ber 11, 1970, as provided in the lease.  When the final
   payment mentioned above is accomplished by the Lessor to
   the Lessee, then the rent shall be increased as of that
   date of payment in accordance with the formula in the lease.

The rental payment due for fixed rent for November, 1970 re-
sulting from the land value (Paragraph (a) (1) of Exhibit B)
plus the November 11, 1970 payment indicated above is calcu-
lated as follows:

| | |
|---|---:|
| Land Value<br>Exhibit B - Par. (a) (1) | $   600,000 |
| Initial Payment<br>Exhibit B - Par. (a) (2) | 1,250,000 |
| Title Insurance Cost<br>Exhibit B - Par. (a) (3) | 3,784 |
| | $ 1,853,784 |
| Multiplier | 0.8333% |
| Fixed Rent, each month | $ 15,447.58 |
| November fractional occupancy | 0.6667% |
| Fixed Rent due, November 11, 1970 | $ 10,298.90 |

John Breuner Company
Page two
October 9, 1970


If the above conforms to your understanding, please so indicate on the duplicate original of this letter and return the duplicate original to us.

Very truly yours,

CROCKER ESTATE COMPANY
Successor to Crocker Land Company


E. A. BEHRENS
Vice President

EAB/mf


ACCEPTED this _____22nd___ day of

_____October_____ , 1970

JOHN BREUNER COMPANY

By _____

READ AND APPROVED



*Copy to Day 11-~71*

*nCity*

**Breuners**

HOME FURNISHERS SINCE 1856

October 27, 1971

Mr. E. A. Behrens
Vice President
Crocker Estate Company
660 Market Street
San Francisco, Calif. 94104

Dear Mr. Behrens:

We hereby request that the 'lease year' term used in
Exhibit B of the lease for the Daly City Store be de-
fined as ending each October 31st.

This request is made because it would provide a
cleaner period for accounting and excess rent.  The
period would end October 31st, a normal accounting
period.

If you concur in this request, kindly sign the copy of
this letter and return it to me.

Very truly yours,

G. L. Roessler
Treasurer

GLR:ch

THE ABOVE REQUEST IS
HEREBY GRANTED.

E. A. Behrens, Vice President
FOREMOST-McKESSON PROPERTY COMPANY,
Successor by merger to
CROCKER ESTATE COMPANY

CORPORATE OFFICE: 2201 BROADWAY, OAKLAND, CALIFORNIA 94612 ☐ TELEPHONE 834-2220 ☐ AREA CODE 415
Sacramento ☐ Campbell ☐ Stockton ☐ San Carlos ☐ Vallejo ☐ Richmond ☐ Pleasant Hill ☐ Daly City ☐ Reno

Exhibit A

# CONSENT TO SUBLEASE AND AMENDMENT OF LEASE

THIS AGREEMENT, made and entered into as of the 14th day of July, 1989, by and between INVESTORS FIRST STAGED EQUITY, L.P., a California limited partnership ("LANDLORD"), and THE JOHN BREUNER COMPANY, a California corporation ("TENANT").

## W I T N E S S E T H:

WHEREAS, by lease dated March 3, 1970, (the "Lease"), Crocker Land Company, a California corporation and LANDLORD's predecessor in interest ("Crocker"), leased to Tenant the improved real property commonly known as 301 Serramonte Plaza, Daly City, California 94015, and more particularly described in Exhibit A attached hereto and hereby made a part hereof;

WHEREAS, the parties desire to amend and supplement the Lease in certain respects and to provide for LANDLORD's consent to the sublease of a portion of the demised premises to CIRCUIT CITY STORES, INC., a Virginia corporation ("SUBLESSEE").

NOW, THEREFORE, the consideration and mutual covenants herein contained the parties agree as follows:

1. <u>Term</u>. The parties agree that, for purposes of paragraph 28 of the Lease, the term of the Lease commenced on November 11, 1970.

2. <u>Rent</u>.

a. Effective on the Rent Commencement Date specified in the Sublease, the basic annual rental payable by TENANT under

1



the Lease shall be (i) TWO DOLLARS AND SIX CENTS ($2.06) per square foot of rentable space, which the parties agree is 120,000 square feet, plus (ii) one-half (1/2) of the total consideration (for both the existing building and the new building, as described in the Sublease) received by TENANT from SUBLESSEE in excess of TWO DOLLARS AND SIX CENTS per square foot of existing ground floor space (exclusive of the new building) to be leased by SUBLESSEE less:

(i) All costs paid by TENANT for tenant improvements relating to the subleased premises, including but not limited to demising walls to separate the subleased premises from the remainder of the space demised to TENANT;

(ii) Real estate commissions paid by Tenant in respect of the sublease;

(iii) Legal expenses paid by Tenant in respect of the sublease; and

(iv) Additional rent paid to TENANT by SUBLESSEE applicable to maintenance, insurance of property and common area liability insurance, and taxes already paid or to be paid to LANDLORD by Tenant under the Lease.

b.    The permitted deductions from the total consideration received by TENANT from SUBLESSEE specified in clauses (i), (ii) and (iii) above shall be reduced by the amount of the legal expenses incurred by LANDLORD in respect of the said sublease and the real estate consulting fees of Northwest Asset Management Co., Inc. not to exceed FORTY-ONE THOUSAND THREE HUNDRED SIXTY DOLLARS ($41,360.00), and except as hereinafter set

2



forth, the balance shall be amortized over a period of forty-eight (48) months, commencing on the rent commencement date specified in the Sublease. As to each of the three succeeding five year renewal options under the Sublease, any real estate commission paid by TENANT in respect of the Sublease in accordance with Exhibit "C" attached hereto, will be amortized out of the rent paid under the Sublease over the respective periods of twenty-four (24) months immediately following payment of such real estate commissions.

     c.    Paragraph (b) of Exhibit B to the Lease is hereby amended to read as follows:

> "As additional rental, Lessee shall pay Lessor annually within thirty (30) days after the end of each lease year a percentage rent equal to the amount by which Lessee's gross sales, (as hereinafter defined) exceed $10,000,000 annually for each lease year, multiplied by the percentage rent rate, the aggregate being computed as follows:
>
> (1)   No percent (0%) of gross sales during such lease year up to but not in excess of $10,000,000.00 of gross sales; plus
>
> (2)   One and one-half percent (1-1/2%) of gross sales during such lease year in excess of $10,000,000.00 of gross sales."
>
> Notwithstanding the foregoing, or any definition of gross sales contained in the Lease, it is expressly agreed that TENANT shall pay percentage rent only on sales directly by TENANT, and that SUBLESSEE's sales shall be expressly excluded from any definition of gross sales under the lease."

3



d.   Basic rental shall be paid in equal monthly installments in advance on the first day of each and every month during the Lease term.

3.   <u>Consent to Sublease</u>.   LANDLORD hereby consents to the sublease of a portion of the demised premises, which portion consists of approximately 41,360 square feet (including mezzanine space), as more specifically delineated on the floor plan attached hereto as Exhibit "B", which portion includes approximately 8,100 square feet of new building area (including mezzanine space) to be constructed by SUBLESSEE in accordance with the approval of LANDLORD hereinafter contained in paragraph 7.   LANDLORD acknowledges that it has received a copy of said sublease dated July 14, 1989, and has reviewed the same, and that its consent herein contained is based on such review.   As expressed in the sublease, LANDLORD's consent to the sublease does not constitute a consent to permit SUBLESSEE to continue to occupy the premises demised by the Sublease in the event TENANT does not exercise its option to extend the term of the lease.

4.   <u>Estoppel</u>.   Each party agrees that, as of the date hereof, the other party has performed all of the obligations to be performed by it under the Lease and that no event has occurred which, with the giving of notice, or the passage of time, or both, would constitute a default under the Lease.

5.   <u>Common Area Maintenance</u>.   Notwithstanding any provision of the Lease to the contrary, LANDLORD, at its election, shall have the right to perform and charge TENANT for its proportionate share of the common area maintenance costs of the Serramonte

4



Plaza Center, including, without limitation, the cost of parking lot striping, sweeping and asphalt repair and resurfacing, the cost of landscape maintenance and the cost of repair or replacement of electrolier lights in the common area; provided, however, that the cost of such work shall not exceed that prevailing in other "Class A" strip shopping centers, and provided further that with respect to the calendar year 1990 common area maintenance costs will not exceed TWELVE THOUSAND FORTY-FIVE DOLLARS AND NINETY-TWO CENTS ($12,045.92).  TENANT acknowledges and agrees that Common Area maintenance costs shall include a ten percent (10%) administrative services charge.

6.  <u>Approval of Site Plan and Improvements</u>.  LANDLORD hereby approves the site plan and plans and specifications relating to the improvements to be made to the subleased space previously submitted to LANDLORD; provided, however, that such approval shall not impose any obligations on LANDLORD to ascertain that the improvements comply with applicable laws, rules and regulations.

7.  <u>Right to Cure Defaults</u>.  LANDLORD agrees to give CIRCUIT CITY written notice of any default by TENANT under the Lease and the right to cure default by TENANT under the Lease, capable of being cured by CIRCUIT CITY, within the time and in the manner provided by the Lease.

5



8.    <u>Ratification</u>.    As amended hereby, the Lease is ratified and confirmed in all respects.

IN WITNESS WHEREOF, the undersigned have executed this instrument on the date set forth opposite their respective signatures.

<u>LANDLORD</u>:

Dated:

INVESTORS FIRST STAGED EQUITY, L.P.
a California limited partnership

By:   VMS REALTY SERVICES
      Its duly authorized agent

By: _____

By: _____
W. GARDNER COMBS
Title: _____


<u>TENANT</u>:

Dated:

THE JOHN BREUNER COMPANY,
a California corporation


By: _____

VICE PRESIDENT


156LPBW

6

**<u>Exhibit B to</u>**
**<u>Second Amendment of Lease and Amendment of Sublease;</u>**
**<u>Consent to Sublease and Attornment</u>**
**<u>and Non-Disturbance Agreement</u>**

Copy of Lease and all Amendments