FRISCO, TX

# LEASE

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**SPC NEC121, LTD.,**

as Landlord

dated July 31, 2000

FRISCO VILLAGE SHOPPING CENTER

253080_9[ (00051/38(11975)]

## TABLE OF CONTENTS

| Paragraph | | Page |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Lease Term | 2 |
| 4. | Base Rent | 3 |
| 5. | Development of Shopping Center by Landlord | 5 |
| 6. | Easements | 6 |
| 7. | Common Areas and Common Area Maintenance | 8 |
| 8. | Signs and Communications Equipment | 13 |
| 9. | Taxes | 14 |
| 10. | Maintenance, Repairs and Replacements | 16 |
| 11. | Utility Service Provider: Payment of Utility Bills | 18 |
| 12. | Alterations | 18 |
| 13. | Mechanics' Liens | 19 |
| 14. | Insurance | 19 |
| 15. | Damages by Fire or Other Casualty | 24 |
| 16. | Condemnation | 27 |
| 17. | Assignment and Subletting | 30 |
| 18. | Use | 31 |
| 19. | Warranties, Representations and Covenants | 33 |
| 20. | Estoppel Certificates | 42 |

| Paragraph | | Page |
|---|---|---|
| 21. | Subordination, Non-Disturbance and Attornment | 42 |
| 22. | Change of Landlord | 44 |
| 23. | Tenant's Financing | 45 |
| 24. | Tenant's Property and Waiver of Landlord's Lien | 46 |
| 25. | Memorandum of Lease; Commencement Date Agreement | 46 |
| 26. | Expiration of Term and Holding Over | 46 |
| 27. | Force Majeure | 47 |
| 28. | Events of Tenant's Default | 47 |
| 29. | Landlord's Remedies | 48 |
| 30. | Events of Landlord's Default; Tenant's Remedies | 52 |
| 31. | Waiver | 55 |
| 32. | Compliance with Applicable Laws | 56 |
| 33. | Notices | 56 |
| 34. | Brokers | 57 |
| 35. | Miscellaneous | 57 |
| 36. | Tenant's Right to Terminate | 59 |
| 37. | Confidentiality | 61 |
| 38. | "For Rent" Signs | 62 |
| 39. | Limitation of Liability | 63 |

## EXHIBITS

"A"     Site Plan
"A-1"   Shopping Center Legal Description
"B"     Index of Definitions
"C"     Construction Provisions
"C-1"   Design and Construction Specifications
"D"     Removable Trade Fixtures
"E"     Sign Plans
"F"     Permitted Encumbrances
"G"     Subordination, Non-Disturbance and Attornment Agreement
"H"     Memorandum of Lease
"I"     Commencement Date Agreement
"J"     Indemnification Agreement

FRISCO, TX

## LEASE

This LEASE is made as of the 31st day of July, 2000, by and between **SPC NEC121, LTD.**, a Texas limited partnership, having an address of 5950 Berkshire Lane, Suite 1275, Dallas, Texas 75225 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H:

The parties hereto agree as follows:

1. <u>Leased Property</u>. Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that approximately 33,551 square foot parcel (the "Land"), outlined in red on <u>Exhibit "A"</u> (the "Site Plan"), together with (a) exclusive rights in the three (3) automobile loading stalls labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, (b) the exclusive rights in the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and (c) the non-exclusive rights in easements described in paragraph 6 below; all located in the Frisco Village Shopping Center (herein referred to as the "Shopping Center"), located at NEC Preston and Highway 21, in the City of Frisco (the "City"), County of Collin, State of Texas (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto. All of the Shopping Center exclusive of the Premises is the "Landlord's Premises". Landlord hereby grants to Tenant all of those certain rights, in common with others, granted by Landlord for the benefit of Tenant under that certain Declaration of Easements, Covenants and Restrictions (the "REA") dated July 31, 2000, and executed by Landlord to be recorded against record title of the Shopping Center and certain other real property identified as "Outparcels" on the Site Plan (hereinafter individually referred to as an "Outparcel" and collectively referred to as "Outparcels"). Landlord agrees that it will not consent to any modification of the REA or the Corner REA (hereinafter defined) during the term of this Lease which violates the terms of this Lease, will enforce the terms of the REA and Corner REA for Tenant's benefit and will not exercise any approval rights granted Landlord under the REA or the Corner REA in conflict with the terms hereof.

253080_9[ (00051/38(11975)]

2. <u>Construction of Building and Improvements</u>. Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as <u>Exhibit "C"</u> and incorporated herein by reference for all purposes), and subject to Tenant's compliance with all applicable laws, rules, regulations, and ordinances, Tenant shall have the right to construct on the Land within the Shopping Center a one-story retail building, containing approximately 33,551 square feet of ground-floor gross leasable area plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Improvements and the Land are referred to herein as the "Premises".

3. <u>Lease Term</u>. Subject to paragraph 36, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for five (5) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give

Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until the (10th) business day after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above. Notwithstanding the foregoing, Landlord shall have the right at any time within the last one hundred eighty (180) days of the Main Term or any then-current Option Period, as applicable, to make a written request of Tenant (which written notice shall specifically reference this Lease paragraph and shall recite therein the consequences of such notice delivered hereunder, including, but not limited to, the deemed waiver by Tenant if it fails to respond to such notice) to elect in writing either to renew this Lease or to waive such right, and Tenant shall respond within thirty (30) days after receipt of Landlord's written request notifying Landlord in writing of either Tenant's exercise of its option to renew, or Tenant's waiver of its option to renew. If Tenant fails to respond within such thirty (30) day period, Tenant shall conclusively be deemed to have waived its right and option to further renew the Term of this Lease, and this Lease shall thereupon terminate on its then scheduled expiration date.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.      Base Rent. During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to paragraph 3 of the Construction Provisions) on the date on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

Tenant shall pay Base Rent in equal monthly installments, in advance, without prior demand or notice, and without deduction or offset, except as otherwise specifically set forth herein, on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 33 hereof, unless Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable (the "Landlord Change Notice"). The Landlord Change Notice shall be deemed conclusive evidence of Landlord's changes set forth therein and Tenant shall incur no liability from its reliance on the information contained therein. Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, to the address given for Landlord in paragraph 33, pursuant to the following schedule:

(i) <u>First Five Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Sixty-Nine Thousand Seven Hundred Fourteen and No/100 Dollars ($469,714.00), payable in equal monthly installments of Thirty-Nine Thousand One Hundred Forty-Three and No/100 Dollars ($39,143.00).

(ii) <u>Adjustment in Base Rent</u>. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 33,551 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as shown on the as-built survey in the Plans and Specifications), multiplied by $14.00. In determining the ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, and monthly Base Rent for any partial calendar month shall be the product of the applicable monthly Base Rent times the number of days in such partial month divided by total number of days in such month.

(iii) <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the initial Base Rent by the lesser of five percent (5%), or two (2) times the percentage increase in the "CPI-U" (as defined below) during the

five (5) year period ending on October 31 of the fifth (or, as applicable, any succeeding fifth) Lease Year. As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average. If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar governmental agency, which index is most nearly equivalent to the CPI-U.

All Base Rent, insurance costs, "Real Estate Taxes" (as defined in paragraph 9(a) below), "CAM Charges" (as defined in paragraph 7(b) below), and utility costs payable by Tenant to Landlord under this Lease shall collectively be referred to as "Rent." All Rent shall be paid by Tenant to Landlord as set forth in this Lease, without prior demand or notice and without deduction or offset, except as otherwise specifically set forth in this Lease.

5.  Development of Shopping Center by Landlord. Landlord covenants to construct, develop and operate a first-class shopping center. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" outlined on the Site Plan, Exhibit "C" (Construction Provisions) and Exhibit "C-1" (Standard Design and Construction Specifications). The parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements. All parking shall be at ground level. Landlord and Tenant shall each construct or cause their respective improvements to be constructed in a good and workmanlike manner, free of mechanics and materialmen's liens, in accordance with paragraph 13 below, and Landlord and Tenant each hereby agree to indemnify, defend and hold each other party harmless from any loss or actual damages suffered by the other as a result of the acts of such party, its employees, agents or contractor's in connection with their respective construction activities. Upon delivery of the Land, Landlord shall not permit construction traffic over the Premises, and Landlord shall use good faith efforts to refrain from interfering with the conduct of Tenant's business. Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which

overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6. <u>Easements</u>. Landlord also grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a) <u>Construction Easements</u>. During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises, (ii) an exclusive easement for an initial construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in constructing the Improvements, (iii) an easement to permit the Building to abut adjacent buildings, and the foundations, footings, not to bear structurally upon Landlord's Premises and no other building may bear structurally on the Premises, and (iv) a non-exclusive easement for such additional underground, public or private utility easements in the Common Areas as Tenant reasonably deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to promptly and diligently install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose and without unreasonable interference to the other occupants of the Shopping Center, subject to the prompt and diligent restoration of the Common Areas by Tenant following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.

(b) <u>Common Area Easements</u>. Landlord does hereby additionally grant to Tenant, subject to such reasonable rules and regulations as Landlord may impose (which rules shall be uniformly enforced) and shall not be inconsistent with the terms of this Lease, a non-exclusive easement (the "Common Area Easement") to use the Common Areas for their intended purposes and

to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation, except as set forth herein to the contrary) of parking in designated parking areas and pedestrian, service and vehicular access, ingress and egress on the drive lanes and drive aisles existing from time to time in the Common Areas to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor and the right to maintain its face panel on the common monument sign in accordance with paragraph 8 hereof. It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements at a location which is mutually agreeable to Landlord and Tenant, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such parking spaces shall be used exclusively by Tenant's customers, invitees and patrons, and Tenant shall be entitled to post signs limiting such parking spaces as such; provided, however, that Landlord shall not be responsible for, or have any liability to Tenant in connection with, the monitoring, "policing," or enforcing of Tenant's right to reserve such parking spaces for exclusive use by Tenant's customers, invitees, and patrons, such being the sole responsibility of Tenant. Subject to all applicable governmental regulations, Tenant shall also have the right to use such Common Areas immediately in front of and adjacent to Tenant's Improvements and within Tenant's Preferred Area for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations, provided Tenant shall not unreasonably interfere with pedestrian traffic and shall not conduct such sales promotions more frequently than four (4) times per Lease Year for no longer than seven (7) days in duration, and for Tenant's "Customer Pick Up" used exclusively for Tenant's customers, invitees and patrons.

    (c) <u>Utility Easements</u>. During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems reasonably necessary, without unreasonably interfering with the use by Landlord of the Common Areas or any other part of the Shopping Center, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to

enter upon and use the Common Areas to install the utility systems, but only to such extent and so long as is reasonably necessary to accomplish such purpose, subject to the prompt and diligent restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord without unreasonable interference to the other occupants of the Shopping Center.

(e) <u>Non-Dedication</u>. None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7. <u>Common Areas and Common Area Maintenance</u>.

(a) <u>Definition of Common Areas</u>. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, directional and traffic sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's monument sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance". Landlord shall be solely responsible for maintaining and repairing those portions of the Common Areas which require additional maintenance or repairs arising out of the cross-parking by the Outparcels, including without limitation, removal of excessive trash and/or debris and such additional costs shall not be included in CAM Charges (hereinafter defined).

8

(b) <u>CAM Charges</u>. For the purpose of this paragraph 7, (i) the cost of Common Area Maintenance (the "CAM Charges") shall include Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas, and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center) (a) necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect or condition, to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas, or (b) resulting from the construction activities of Landlord or any tenant or occupant in the Shopping Center, including, without limitation, cleaning or repairing damage to any portion of the Common Areas caused by or attributable to any such construction activities;

(4) repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5) repairs or replacements to any portion of the Shopping Center necessitated by any governmental entity, except the same shall not be excluded from CAM Charges if such governmentally-required repairs or replacements are solely and directly attributable to Tenant's use at the time that Landlord and Tenant receive notice of the need for the same, and such

9

repairs and replacements are not generally required for other tenants or occupants of the Shopping Center to which extent Tenant shall be responsible for all costs and expenses for such repairs or replacements. Notwithstanding the foregoing, Tenant's obligation to reimburse Landlord for any costs pursuant to this paragraph 7(b)(5) above shall at all times be subject to the limitations of paragraph 7(b)(9) below;

    (6)    amounts paid to entities related to Landlord in excess of the cost of such services from any qualified competitive source in the same market area as the Shopping Center;

    (7)    amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

    (8)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

    (9)    repairs or replacements of a capital nature (whether or not capitalized), unless the costs are amortized over the entire useful life of such repairs or replacements, provided that such repairs or replacements are not the direct result of initial defects in materials or workmanship;

    (10)    improvements, repairs or replacements (other than patching, restriping and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

    (11)    reserves for anticipated future expenses;

    (12)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

    (13)    Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

    (14)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

    (15)    any new improvements to the Shopping Center or Common Areas, including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center:

253080_9[ (00051/38(11975)]

(16) amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own premises; or

(17) other maintenance expenses not considered normal and customary under generally accepted accounting principles. Landlord shall use good faith efforts to insure that CAM Charges are obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c) Tenant Payments. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord $1.25 per square foot of ground-floor gross leasable area in the Building per annum, payable in equal monthly installments, as its estimated share of CAM Charges. Commencing in the second Lease Year, and continuing throughout the remainder of the Term, the amount of annual CAM Charges and Real Estate Taxes which Tenant shall be obligated to pay under this Lease shall be the product of Landlord's actual CAM Charges and Real Estate Taxes incurred in connection with Landlord's operation of the Common Areas of the Shopping Center, determined as follows. The annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period, including the first Lease Year, is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. Commencing with the third CAM Year, and in each succeeding CAM Year, Tenant's Pro Rata Share of CAM Charges shall not increase by more than three percent (3%) above those charged to Tenant in the immediately preceding CAM Year; provided, however, that amounts paid by Landlord for insurance required to be carried by Landlord pursuant to this Lease, capital expenditures, Real Estate Taxes and utilities serving the Common Areas in any CAM Year shall be excluded from CAM Charges for purposes of calculating the foregoing limitation on increases in CAM Charges and such amounts shall not be subject to such limitation in any CAM Year. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within sixty (60) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any

necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any permanent outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any permanent outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 220,000 square feet. The remainder of CAM Charges shall be borne by Landlord and/or other tenants. During the Construction Term, Tenant shall pay for all utilities utilized by Tenant in connection with its construction activities.

(d) <u>Examination of Landlord's Records</u>. Tenant shall have the right, from time to time, following not less than five (5) business days' prior written notice and during Landlord's normal business hours, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine at Landlord's offices and make copies, at Tenant's expense, of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, and Landlord agrees with the results of Tenant's examination results, or if Landlord fails to respond within thirty (30) days following receipt of such examination results, then Landlord shall be deemed to have accepted the results of Tenant's examination and Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges and Tenant shall pay to Landlord within such 10-day period any

underpayment of Tenant's Pro Rata Share of CAM Charges. If any overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable out-of-pocket cost of such examination or audit. If Landlord reasonably disagrees with the results of Tenant's examination, then Landlord shall notify Tenant specifying in detail its disagreement ("Landlord's Notice") and Landlord and Tenant shall endeavor, in good faith, to resolve such disagreement within thirty (30) days after Tenant's receipt of Landlord's Notice. If Landlord and Tenant cannot resolve such disagreement within such thirty (30) day period, then either party shall have the right to submit the same to arbitration in Dallas, Texas, in accordance with the procedural rules then existing of the American Arbitration Association or any successor thereto. The decision of the arbitrator or arbitrators shall be final, conclusive and binding upon the parties, and a judgment may be obtained thereon in any court having jurisdiction. Landlord and Tenant each shall pay one-half (½) of the costs and expenses of the arbitration, and each shall separately pay for its own attorneys' fees and expenses.

8. <u>Signs and Communications Equipment</u>.

    (a) <u>Signs</u>. Landlord, at its sole cost and expense, no later than the date set forth on <u>Attachment "1"</u> to the Construction Provisions, shall construct and install upon the Common Areas at the locations so shown on the Site Plan, two (2) monument sign structures (with electrical wired box installed) (hereinafter individually referred to as a "Monument Sign" and collectively referred to as the "Monument Signs") having sufficient space thereon for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense of <u>Exhibit "E"</u>. Tenant's face panels shall be located (i) in the position on Monument Sign No. 1 shown on <u>Exhibit "E"</u>, which Monument Sign is located along Preston Road as shown on the Site Plan, and (ii) in the position on Monument Sign No. 2 shown on <u>Exhibit "E"</u>, which Monument Sign located on Stone Crest Road as shown on the Site Plan. Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to all applicable governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans.

13

253080_9[ (00051/38(11975)]