and shown on <u>Exhibit "F"</u>, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in <u>Exhibit "F"</u>.

(c) Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

(d) Nothing contained in this Lease shall be construed to require Tenant to open and/or operate the Premises continuously either for the use first stated or for any other use provided, however, if Tenant ceases or fails to operate a business in the Premises (exclusive of any temporary operations designed solely to avoid Landlord's rights under this paragraph) for more than three hundred sixty (360) consecutive days during the Term (exclusive of that period of time reasonably required for Tenant to diligently pursue and complete any repairs or restoration to the Improvements arising from a casualty, condemnation, or remodeling in accordance with the terms of this Lease), Landlord shall have the right upon thirty (30) days advance written notice to Tenant, to terminate this Lease provided Landlord shall pay to Tenant, upon the effective date of Lease termination, a sum equal to the amount of Tenant's Unamortized Costs. Notwithstanding anything in the preceding sentence to the contrary, Landlord's thirty (30) day notice of termination shall not be effective if, during such thirty (30) day period, Tenant notifies Landlord that Tenant is negotiating with a prospective assignee or subtenant ("Prospect") for the Premises and Tenant enters into an assignment or sublease within ninety (90) days after Landlord's notice. If Tenant does not so notify Landlord that it is negotiating with a Prospect, or if Tenant does not enter into an assignment or sublease within ninety (90) days after Landlord's notice, then this Lease shall terminate at the expiration of Landlord's such ninety (90) day period. Upon such termination, Landlord and Tenant shall be relieved of and from all further liability or obligation (except for any sums which are due hereunder accruing prior to the date of termination) to the other under and pursuant to this Lease thereafter accruing. Tenant, within thirty (30) days following written request from Landlord from time to time, shall furnish Landlord with a detailed itemization of the then Unamortized Costs. Notwithstanding anything contained herein to the contrary, Landlord's obligation to reimburse Tenant for its Unamortized Costs shall survive the expiration or termination of this Lease.

19. <u>Warranties, Representations and Covenants</u>.

(a) Landlord represents, warrants and covenants to Tenant that:

(i) <u>Quiet and Peaceful Enjoyment</u>. Landlord covenants that Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises, subject to the terms of this Lease.

(ii) <u>Title</u>. Landlord represents and warrants to Tenant that upon delivery of the Land, Landlord will own fee simple title to the Shopping Center. Landlord's fee simple interest in the Shopping Center shall be free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances" and applicable laws and regulations, or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on <u>Exhibit "F"</u>, shall restrict Tenant's right to sell the Products. Landlord specifically covenants and warrants that Landlord has not created and is not aware that any third party (other than applicable governmental authorities), including, but not limited to, any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products (incidental to the sale thereto), or the right to consent to any feature of the Improvements or Tenant's signage. This representation, warranty and covenant is a material inducement to the Tenant's execution of this Lease.

(iii) <u>Certificate of Authority</u>. Landlord represents, warrants, and covenants that (a) as of the date of this Lease Landlord is a duly constituted limited partnership organized under the laws of the State of Texas, (b) the individual acting as signatory under this Lease is duly authorized and empowered to do so for and on behalf of the limited partnership and to bind Landlord hereto, and (c) Landlord has furnished Tenant prior hereto with evidence of (a) the existence of Landlord, and (b) the authority of the general partner thereof to bind Landlord as contemplated herein.

(iv) <u>No Litigation</u>. To Landlord's actual knowledge, there are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

(v) <u>Hazardous or Toxic Materials</u>. To Landlord's actual knowledge, Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no written notice and has no actual knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced, or knowingly permitted to be introduced, by Tenant, its agents, employees or contractors), all costs of removal incurred by, all liability imposed upon, or actual damages (but not consequential damages) suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and actual damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, penalties, fines, costs, losses, reasonable attorneys' fees and expenses (through all levels of proceedings), reasonable consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi) <u>Tenant's Exclusive Use</u>. So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases and described on <u>Exhibit "F"</u>. Notwithstanding anything contained herein to the contrary, the Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding

sentence. As used herein, "Incidental Sale" shall mean the lesser of (i) four hundred (400) square feet, or (ii) ten percent (10%) of such occupant's or tenant's display area. In addition, (A) any party that has entered into an agreement with Tenant and such agreement applies to this Shopping Center and is in effect at such time when the tenancy at the Shopping Center is created may, at Landlord's option, become a future tenant of the Shopping Center without violating this paragraph 19(a)(vi). Further, the exclusive granted Tenant herein shall not apply to, bind or restrict the operation of a national video rental store as they are currently operated, such as "Blockbuster", "Video Warehouse" or "Hollywood Video", or a national book store such as "Barnes and Noble" or "Borders", or a national toy store, such as "Toys R Us" or "Noodle Kidoodle," or a not more than one (1) national cellular telephone store, such as "AT&T" or "Sprint", or a grocery store.

(vii) <u>Zoning and Subdivision</u>. The Premises, the Land and the Shopping Center are presently subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises, the Land and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii) <u>Prohibited Activities</u>. Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in Tenant Preferred Area or elsewhere in the Shopping Center for use as:

(A) a facility for the sale of paraphernalia for use with illicit drugs;
(B) a facility for any use which is illegal or dangerous, is inconsistent with an integrated, community-oriented retail and commercial shopping center;
(C) a skating rink;
(D) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) that are closer than 350' from Tenant's front door and to the extent the same exceed 10,000 s.f. in the aggregate within the Shopping Center or other nonretail uses except for offices and storage facilities incidental to a primary retail operation
(E) any business or use which emits an obnoxious odor, fume, dust, vapor, noise or sound which can be heard or smelled outside of any building in the Development or constitutes a public or private nuisance, or which creates a fire, explosive or other hazard; provided, however, (i) normal and customary odors from restaurants or other similar food operations shall not be deemed to be obnoxious odor, (ii) outdoor calling systems used by restaurants or other similar food operations shall not be deemed to be an obnoxious noise or sound, and (iii) the use of any radio, television or loudspeaker, amplifier or other sound

system used by restaurants or other similar food operations on its outside deck or patio shall not be deemed to be an obnoxious noise or sound so long as the same do not constitute a nuisance or unreasonably disturb or endanger other tenant or occupants of the Development or unreasonably interfere with their use of their respective premises;

(F)  any warehouse operation (except, as to warehouse use only, as incidental to the operation of a use permitted under the Declaration), including, without limitation, mini-warehouses or other self-storage facilities, and any assembling, manufacturing, refining, smelting, agricultural or mining operation; provided, however, the foregoing shall not prohibit retail "water shops" (with or without on-site distilling operations);

(G)  any mobile home park, trailer court, labor camp, junkyard or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction, reconstruction or maintenance); provided, however, that at least one (1) day prior to the opening by the first (1st) tenant of the Shopping Center to open for business to the public, any construction trailer must be parked at the rear of the Shopping Center buildings or at such other remote area of the Shopping Center designated by Landlord and shall not be allowed within the main parking area of the Shopping Center from and after such date;

(H)  any dumping, disposing, incineration or reduction of garbage (exclusive of screened garbage compactors located near the rear of any building) except as may be allowed by applicable codes and zoning ordinances;

(I)  any laundry or dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to on-site service oriented to drop-off, pick-up and delivery by the ultimate consumer, including nominal supporting facilities, as the same may be found in first-class retail shopping districts in the Dallas metropolitan area;

(J)  any veterinary hospital or animal raising facilities with overnight boarding facilities, provided, however, the foregoing shall not prohibit pet shops;

(K)  any mortuary or funeral home or similar;

(L)  any store that conducts "fire sales", bankruptcy sales, auctions or similar sales;

(M)  any pool hall, bingo hall, dance hall, discotheque, massage parlor, bowling alley or tattoo parlor; provided, however, the foregoing shall not prohibit a restaurant that features entertainment components (including, without limitation, bowling lanes, pool tables and similar) such as "Dave & Buster's;

(N)  any gun range, flea market or other operation selling used goods, or car wash;

(O)  any abortion clinic or comparable facility; provided, however, the foregoing shall not prohibit medical office uses (including, without limitation, obstetrical or gynecological practices);

(P)  any adult bookstore, adult video store or other sexually oriented business, provided, however, the foregoing shall not prohibit a retail bookstore (such as Barnes & Noble, Border's, Bookstop or similar)or video store (such as Blockbuster, Hollywood Video or similar) that carries very limited quantities of adult material but not as such store's primary line of merchandise;

(Q)  any gas station or automobile service station within the Shopping Center;

(R) any garage for the repair of boats, motorcycles, trailers, trucks or cars or paint and body shops for trucks or cars (which prohibition shall not include (y) the installation of motor vehicle audio, stereo and telephone systems provided the service areas for such installations are located in the rear of the Shopping Center buildings or (z) the operation of any "Pep Boys" type operation or similar in any outparcel;

(S) any pawn shop, flea market, second hand, surplus store or junkyard;

(T) any lot for the selling or leasing of trucks, automobiles, motorcycles, trailers or boats;

(U) any bar, lounge, tavern, night club or other business that regularly derives more than fifty percent (50%) of its revenues from, or more than fifty percent (50%) of its gross leasable area for the sale of alcoholic beverages, unless in connection with and as part of a full-service restaurant;

(V) any theater provided, however, that such restriction does not prohibit the use of televisions or satellite broadcasts in connection with a retail facility or in a facility primarily used as a restaurant as permitted under this Declaration;

(W) carnival, amusement park or circus, or any amusement arcade, virtual reality, laser tag, gameroom, or similar place of recreation or amusement or any sports or entertainment facility (including, without limitation, a karate or other martial arts facility, gymnasium, health club or physical fitness facility) (provided, however, that retail facilities may operate no more than four (4) electronic games incidental to their primary operations, and the foregoing shall not prohibit a restaurant that features entertainment components (including, without limitation, bowling lanes, pool tables and similar) such as "Dave & Buster's or similar);

(X) a banquet hall, meeting hall, auditorium, library or reading room, or other place of public assembly (provided that book readings and signings shall be permissible), a church, temple, synagogue or other place of worship;

(Y) a training or educational facility (including, without limitation, a trade school, beauty school, barber college, reading room, school, class sessions, or other facility catering primarily to students or trainees rather than retail customers but excepting incidental customer training in the use of computer hardware or software sold by an occupant pursuant to a use permitted by such occupant's lease or occupancy agreement and pursuant to this Declaration;

(Z) any living quarters, apartments, hotel, motel, extended-stay family or other lodging rooms; or

(AA) an off-track betting establishment (except incidental sales of state lottery tickets).

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within the in-line space of the Shopping Center or bookstore within any building on Landlord's Premises which restaurant or bookstore is located within two hundred (200)

feet of Tenant's front entrance to the Building). In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

(ix) <u>Site Covenants</u>. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A) <u>Building Height and Location</u>. No building immediately adjacent to the Premises shall have its parapet height in excess of Tenant's parapet height (nor shall its architectural features exceed 37' in height), nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area. Landlord shall use commercially reasonable efforts to enforce the terms of the REA so that (i) no building located on an Outparcel shall exceed one story, twenty-five (25) feet in height (inclusive of architectural features), except for the Outparcel located on Lot 7 as shown on the Site Plan which may not exceed twenty-eight (28) feet in height (inclusive of architectural features), and (ii) no buildings on the Outparcels shall exceed the size necessary for such Outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas. No construction of any buildings outside of the "Permissible Building Area" shown on the Site Plan shall occur within the Shopping Center except as otherwise shown on the Site Plan.

(B) <u>Construction and Alterations</u>. Following the end of the first Lease Year, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December, except for interior alterations not affecting the operations of Tenant and except for emergency repairs. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of Tenant and shall require erection of safety barriers as necessary. With regard to any construction on

38

253080_9[ (00051/38(11975)]

Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap in fees and other similar construction-related charges. Landlord shall make no material changes in the Common Areas (including, without limitation, changes in the location of entrances, curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5, or any changes which would adversely affect, in Tenant's reasonable discretion, the visibility of the Premises from other portions of the Shopping Center or the surrounding areas) without Tenant's express prior written consent, not to be unreasonably withheld or delayed, except that with respect to any such changes to Tenant's Preferred Area, Tenant may withhold its consent in its sole and absolute discretion. Notwithstanding the foregoing, changes which are required in order to comply with applicable laws and regulations shall not require the Tenant's prior consent.

(C) <u>Prohibited Uses in Common Area</u>. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the monument sign described in paragraph 8, the "for rent" signs described in paragraph 38 and traffic control signs; (2) display or sale of merchandise (except that sidewalk sales shall be permitted subject to the same limitations placed on Tenant in paragraph 6 of the Lease); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center may be

designated "employee parking" areas by Landlord, the location of which shall be agreed upon by Landlord and Tenant, and Landlord shall use all available commercially reasonable efforts to prevent its employees and those of other tenants or occupants of the Shopping Center from parking within Tenant's Preferred Area as set forth on the Site Plan.

(D) <u>Easements</u>. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center without burdening such subdivided parcels with the terms of this Lease, or create any easements in the Tenant's Preferred Areas which interfere with Tenant's use of the Premises or Common Areas or are underneath the Improvements, without Tenant's prior written consent, such consent not to be unreasonably withheld or delayed.

(x) <u>Interference with Tenant's Reception/Transmission</u>. Landlord shall not install and Landlord shall use reasonable efforts not to permit to be installed by any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi) <u>Notices Affecting the Premises</u>. Landlord shall promptly forward to Tenant any written notice or other written communication affecting the Premises received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises.

(b) Tenant represents, warrants and covenants to Landlord that:

(i) <u>Tenant's Authority</u>. Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii) <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store, or knowingly permit any employee, contractor or agent of Tenant to

introduce, discharge, dump, spill or store, within the Premises, the Land or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(iii)    Prohibited Activities. Tenant shall not operate or permit to be operated the Premises for those activities set forth in paragraph 19(a)(viii).

(iv)    Notices Affecting the Premises. Tenant shall promptly forward to Landlord any notice or other communication affecting the Premises received by Tenant from any owner of property adjoining, adjacent or nearby to the Premises, the Land, or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises.

(v)    No Litigation. To the best of Tenant's knowledge, there are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Tenant which preclude or interfere with Tenant's entering into this Lease and performing its obligations hereunder.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises, the Land, or the Shopping Center, which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance (subject to the limitations set forth in paragraph 29(b) hereof) to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default.

(d)    In addition to such other remedies as may be accorded Tenant at law, in equity (including, but not limited to, an injunction or writ of specific performance) or under the terms of

this Lease, (i) in the event that any of the representations, warranties and covenants set forth in this paragraph 19(a)(i)-(vii) are untrue or incorrect, unless caused by the acts of Tenant, or (ii) in the event that Tenant suffers any actual, out-of-pocket loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties by Landlord, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    Estoppel Certificates. Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; (f) as to the dates to which rent and any other sums due hereunder have been paid; and (g) as to any other matters which may reasonably be so requested. In addition, without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder within the time period stated for Tenant's performance (but not longer), including, but not limited to, the direct payment of rentals to Landlord. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Non-Disturbance and Attornment.

(a)    Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a non-disturbance and attornment agreement in the form of Exhibit "G"

42

253080_9[ (00051/38(11975)]

hereto attached (subject to changes as are customarily made in similar agreements with institutional lenders and Tenant), executed by the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" executed by Mortgagee and with regard to all renewals, modifications, replacements and extensions of Mortgages. Upon Tenant's receipt of such non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage.

In the event of a foreclosure of any Mortgage, Tenant shall attorn to the Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which states the following (provided Tenant is not in uncured default beyond the expiration of any applicable grace periods): (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising and accruing from and after the date of such Foreclosure, including, but not limited to, an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure (unless required under applicable law), and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Shopping Center available for restoration of the Improvements in accordance with the terms hereof.

Upon Tenant's receipt and execution of said non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage. Landlord shall cause any present or future Mortgagee whose Mortgage is prior to this Lease to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Shopping Center. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof. After the delivery by Landlord of the non-disturbance and attornment agreement issued by the Mortgagee

providing the Tenant Improvement Allowance, Landlord agrees to pay Tenant's reasonable attorney's fees incurred in negotiating any additional non-disturbance and attornment agreements, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such services (provided Landlord shall only be obligated to pay Tenant's fees to the extent Landlord makes such request more frequently than once every five (5) years), the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document.

(b)    Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such (i) subtenant agrees that it will attorn to Landlord and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment, (ii) Tenant shall remain liable for the obligations of such subtenant, and (iii) the terms of the sublease are substantially consistent with the terms of this Lease. After the delivery by Landlord of the first non-disturbance and attornment agreement, Tenant agrees to pay Landlord's reasonable attorney's fees incurred in negotiating any additional non-disturbance and attornment agreements or other documents required in the event Tenant sublets the Premises, including the reasonable equivalent of such fees in the event Landlord elects to utilize in-house legal counsel for the provision of such services (provided Tenant shall only be obligated to pay Landlord's fees to the extent Tenant makes such request more frequently than once every five (5) years), the payment of which fees shall be a condition precedent to the effectiveness of Landlord's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document

22.    Change of Landlord.    Subject to paragraph 21 above, notwithstanding anything contained in this Lease to the contrary, Landlord shall have an absolute, unequivocal right to assign or transfer its interest in this Lease, whether as collateral or absolutely, to any party whatsoever,

whether or not such party is related to Landlord, and in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant but without the execution of any further instrument on the part of either of the parties hereto immediately upon the Successor's succeeding to the interest of Landlord under the Lease; provided, however, that in order for the foregoing to be effective against Tenant, such Successor must assume and be bound to Tenant in respect of all of Landlord's duties and obligations hereunder (arising after the date of such transfer, provided Landlord shall remain liable for all obligations arising prior to the date of such transfer), such binding effect on the Successor to be effective and self-operative without the execution of any further instrument on the part of either of the parties hereto (except notice as required above), immediately upon the Successor's succeeding to the interest, duties and obligations of Landlord under this Lease. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all actual out-of-pocket costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's failure to provide Tenant with notice of such Successor (excluding any special, consequential or punitive damages).

23. <u>Tenant's Financing</u>. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, provided such lender repairs any damage caused to the Premises from such removal, and/or (iii) if Landlord fails to pay the Tenant Improvement Allowance in accordance with the Construction Provisions, a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to

Landlord (which Tenant shall do within a reasonable period of time after obtaining such financing), Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder. In addition, Landlord agrees to use good faith efforts to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24. <u>Tenant's Property and Waiver of Landlord's Lien</u>. All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease, provided Tenant shall pay the Base Rent and all other charges due hereunder during such 30-day period as though it were a holdover tenant. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as <u>Exhibit "D"</u>.) Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any instruments reasonably acceptable to Landlord evidencing such waiver, at any time or times hereafter upon Tenant's request. Nothing contained herein shall be deemed to constitute a waiver by Landlord of any judgment lien.

25. <u>Memorandum of Lease; Commencement Date Agreement</u>. Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as <u>Exhibit "I"</u>, once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26. <u>Expiration of Term and Holding Over</u>. All of the Personalty shall be removable by Tenant any time prior to the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day

period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate. Those improvements that are integrated into the physical structure of the Building, except any of Tenant's Personalty, shall not be removed and shall become the property of Landlord upon the expiration or earlier termination of this Lease. Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises in a broom clean condition. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof, except that the monthly Base Rent during the holdover period shall be one hundred fifteen percent (115%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27.     Force Majeure. Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 29(d) and 30(c) of this Lease. The inability or failure to pay monies shall not be deemed an event of force majeure.

28.     Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)     Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including, without limitation, Base Rent, CAM Charges, Real Estate Taxes or any other Rent) (subject to Tenant's right of good faith contest of Real Estate Taxes as provided above), within ten (10) days after the receipt of written notice from Landlord to Tenant that

same is overdue (in which event, the delinquent amount shall thereafter accrue interest at the Default Rate); or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)     Bankruptcy. (i) Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun, or (ii) Tenant's voluntarily filing a petition in bankruptcy or for reorganization under any existing or future provisions of the Bankruptcy Code, providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts; or (iii) Tenant's voluntary assignment of all of its assets for the benefit of its creditors.

29.     Landlord's Remedies. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)     Continue Lease. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect and Tenant shall pay to Landlord immediately upon demand, the sum of all delinquent Base Rent and other Rent (including accrued interest thereon from the date of delinquency until paid at the Default Rate), together with Base Rent and other Rent when due, including any sums due for any Option Period for which a Renewal Option has been exercised. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to peaceably re-enter the Premises on terms set forth in subparagraph (6) below and to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such

48                                             253080_9[ (00051/38(11975)]