

**LEASE AGREEMENT**

by and between

**MARKET HEIGHTS, LTD.**

as Landlord

and

**CIRCUIT CITY STORES, INC.**

as Tenant

Market Heights Shopping Center

\056-Killeen (Harker Heights, TX)\Lease Ver 9.DOC

Table of Contents

Page

ARTICLE I    FUNDAMENTAL LEASE PROVISIONS ..................................................... 1
    Section 1.01    Definitions: ............................................................................................... 1

ARTICLE II    LEASE OF PREMISES - TERM OF LEASE ................................................. 4
    Section 2.01    Demise ..................................................................................................... 4
    Section 2.02    Extension Periods .................................................................................... 4
    Section 2.03    Commencement Date and Landlord Reimbursement ........................ 5
    Section 2.04    Possession Date ....................................................................................... 6
    Section 2.05    Expected Possession Date ...................................................................... 6
    Section 2.06    Possession Date During Slack Period Delivery ................................... 7
    Section 2.07    Delayed Possession ................................................................................ 7
    Section 2.08    Early Entry .............................................................................................. 7
    Section 2.09    Measurement .......................................................................................... 8
    Section 2.10    Commencement Date Agreement ......................................................... 8
    Section 2.11    Tenant's Permits Contingency .............................................................. 8

ARTICLE III    INITIAL CONSTRUCTION ............................................................................. 8
    Section 3.01    Landlord's and Tenant's Work ............................................................. 8

ARTICLE IV    RENT .................................................................................................................. 9
    Section 4.01    Annual Minimum Rent ......................................................................... 9
    Section 4.02    Additional Rent ...................................................................................... 9
    Section 4.03    Rent; Method of Payment .................................................................... 9

ARTICLE V    COMMON AREA MAINTENANCE AND COST ........................................ 9
    Section 5.01    Maintenance ............................................................................................ 9
    Section 5.02    Construction Clean-up and Post-Possession Work ......................... 10
    Section 5.03    CAM Costs ............................................................................................ 10
    Section 5.04    Tenant's Share of CAM Costs ............................................................ 11
    Section 5.05    Payment of CAM Costs ...................................................................... 12
    Section 5.06    CAM Costs Increases ........................................................................... 12

ARTICLE VI    TAXES ............................................................................................................. 12
    Section 6.01    Taxes ...................................................................................................... 12
    Section 6.02    Payment of Taxes ................................................................................. 13
    Section 6.03    Exclusions from Taxes ........................................................................ 13
    Section 6.04    Right to Contest .................................................................................... 14

ARTICLE VII    UTILITIES ....................................................................................................... 14

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| Section 7.01 | Utilities | 14 |
| Section 7.02 | Interruption | 14 |
| **ARTICLE VIII** | **USE OF PREMISES** | **14** |
| Section 8.01 | Permitted Use | 14 |
| Section 8.02 | Conduct of Operations | 15 |
| Section 8.03 | Leasing Restrictions | 15 |
| Section 8.04 | Tenant's Exclusive | 16 |
| Section 8.05 | Key Tenants | 18 |
| **ARTICLE IX** | **REPAIRS** | **18** |
| Section 9.01 | Landlord Obligations | 18 |
| Section 9.02 | Tenant's Obligations | 19 |
| Section 9.03 | Hazardous Materials | 19 |
| Section 9.04 | Surrender of the Premises | 21 |
| **ARTICLE X** | **REQUIREMENTS OF LAW** | **21** |
| Section 10.01 | Landlord's Obligations | 21 |
| Section 10.02 | Tenant's Obligations | 22 |
| Section 10.03 | Right to Contest | 22 |
| **ARTICLE XI** | **INSURANCE** | **22** |
| Section 11.01 | Landlord's Insurance | 22 |
| Section 11.02 | Tenant's Insurance | 23 |
| Section 11.03 | Insurance Requirements Generally | 23 |
| Section 11.04 | Landlord's Insurance Cost | 24 |
| Section 11.05 | Indemnity | 24 |
| Section 11.06 | Mutual Waiver of Subrogation | 25 |
| Section 11.07 | Affiliate | 25 |
| **ARTICLE XII** | **DAMAGE OR DESTRUCTION** | **25** |
| Section 12.01 | Landlord's Obligation to Rebuild | 25 |
| Section 12.02 | Tenant's Obligation to Rebuild | 26 |
| Section 12.03 | Termination | 26 |
| **ARTICLE XIII** | **CONDEMNATION** | **27** |
| Section 13.01 | Taking | 27 |
| Section 13.02 | Restoration and Rent Adjustment | 28 |

Table of Contents
(continued)

Page

| | | |
|---|---|---|
| Section 13.03 | Award | 28 |
| ARTICLE XIV | ALTERATIONS AND MECHANICS' LIENS | 28 |
| Section 14.01 | Tenant's Alteration Rights | 28 |
| Section 14.02 | Mechanics' Liens | 29 |
| ARTICLE XV | SIGNS | 30 |
| Section 15.01 | Tenant's Signs | 30 |
| Section 15.02 | Pylon Signs | 30 |
| Section 15.03 | Replacement | 31 |
| ARTICLE XVI | TENANT'S PROPERTY | 31 |
| Section 16.01 | Tenant's Property | 31 |
| ARTICLE XVII | ASSIGNMENT AND SUBLETTING | 31 |
| Section 17.01 | Assignment and Subletting Rights | 31 |
| Section 17.02 | Collateral Assignment | 32 |
| Section 17.03 | Cure Rights of Original Tenant | 32 |
| Section 17.04 | Recognition Agreement | 32 |
| ARTICLE XVIII | DEFAULT | 32 |
| Section 18.01 | Tenant's Default | 32 |
| Section 18.02 | Additional Landlord Remedies Due to Construction Delays by Tenant | 34 |
| Section 18.03 | Landlord's Default | 34 |
| Section 18.04 | Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord | 35 |
| Section 18.05 | Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement | 36 |
| Section 18.06 | Waiver; Non-Exclusive Remedies | 37 |
| ARTICLE XIX | SUBORDINATION, TRANSFER OF INTEREST | 37 |
| Section 19.01 | Subordination | 37 |
| Section 19.02 | Existing Mortgages and Ground Leases | 38 |
| Section 19.03 | Transfer of Interest | 38 |
| Section 19.04 | Tenant Estoppel Certificates | 38 |
| Section 19.05 | Landlord Estoppel Certificates | 38 |
| Section 19.06 | Payments | 39 |

Table of Contents
(continued)

| | | Page |
|---|---|---|
| ARTICLE XX | LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS | 39 |
| Section 20.01 | Quiet Enjoyment | 39 |
| Section 20.02 | Representations, Warranties and Covenants | 39 |
| Section 20.03 | Site Covenants | 40 |
| Section 20.04 | OEA | 41 |
| ARTICLE XXI | HOLDING OVER | 43 |
| Section 21.01 | Holding Over | 43 |
| ARTICLE XXII | NOTICE | 43 |
| Section 22.01 | Where and How Given | 43 |
| Section 22.02 | When Given | 44 |
| ARTICLE XXIII | MISCELLANEOUS | 44 |
| Section 23.01 | Rent Proration | 44 |
| Section 23.02 | Construction | 44 |
| Section 23.03 | Section Headings | 44 |
| Section 23.04 | Partial Invalidity | 44 |
| Section 23.05 | Waiver | 45 |
| Section 23.06 | Governing Law | 45 |
| Section 23.07 | Successors and Assigns | 45 |
| Section 23.08 | No Broker | 45 |
| Section 23.09 | Memorandum of Lease | 45 |
| Section 23.10 | Entire Agreement | 45 |
| Section 23.11 | Relationship of Parties | 45 |
| Section 23.12 | Force Majeure | 46 |
| Section 23.13 | Limitation of Landlord's Liability | 46 |
| Section 23.14 | Limitation of Tenant's Liability | 46 |
| Section 23.15 | Consents | 46 |
| Section 23.16 | Intentionally Omitted | 46 |
| Section 23.17 | Attorneys' Fees | 46 |
| Section 23.18 | Survival of Obligations | 47 |
| Section 23.19 | Joint and Several Liability | 47 |
| Section 23.20 | Definition of Hereunder, Herein, etc. | 47 |

Table of Contents
(continued)

Page

| | | |
|---|---|---:|
| Section 23.21 | Tenant's Trade Name | 47 |
| Section 23.22 | Counterparts | 47 |
| Section 23.23 | Entry by Landlord | 47 |

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Site Plan |
| EXHIBIT B | Legal Description of the Shopping Center |
| EXHIBIT C | Site Design Requirements |
| EXHIBIT C-1 | Possession Date Notice |
| EXHIBIT D | W-9 Form |
| EXHIBIT E | Commencement Date and Expiration Date Agreement |
| EXHIBIT F | Prohibited Uses |
| EXHIBIT G | Existing Leases |
| EXHIBIT H | Existing Exclusives |
| EXHIBIT I | Recognition Agreement |
| EXHIBIT J | Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT K | Permitted Exceptions |
| EXHIBIT L | Memorandum of Lease |
| EXHIBIT M | Indemnity Agreement |
| EXHIBIT N | Pylon Sign Rendering |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease"), dated as of the ___ day of _____, 2007 ("Effective Date"), by and between **MARKET HEIGHTS, LTD.**, a Texas limited partnership ("Landlord") with an office at 301 S. Congress, Austin, Texas 78701, and **CIRCUIT CITY STORES, INC.**, a Virginia corporation ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

### W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01 Definitions:

A. **Additional Charges**:

   1. Initial CAM Costs: Two and No/100 Dollars ($2.00) per square foot of Floor Area (as defined below), which includes the initial insurance cost of Twenty-Five Cents ($0.25) per square foot of Floor Area (the "Initial Insurance Cost").

   2. Initial Taxes: Two and 50/100 Dollars ($ 2.50) per square foot of Floor Area.

B. **Alternative Rent**: An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

C. **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of fifth (5th) Lease Year (as defined in Section 1.01(J)) | $14.00 | $284,634.00 | $23,719.50 |
| Lease Year 6 through end of Lease Year 10 | $14.70 | $298,865.70 | $24,905.48 |
| 1st Extension Period (as defined in Section 1.01(F)): | $15.44 | $313,910.64 | $26,159.22 |

H:\44050056-Killeen (Harker Heights, TX)\Lease Ver 9.DOC

|  |  |  |  |
|---|---|---|---|
| 2nd Extension Period: | $16.98 | $345,220.38 | $28,768.37 |
| 3rd Extension Period: | $18.68 | $379,783.08 | $31,648.59 |
| 4th Extension Period: | $20.54 | $417,598.74 | $34,799.90 |

D. **Broker:** Western Retail Advisors, LLC/United Commercial Realty.

E. **Delivery Dates:**  1. Anticipated Possession Date: January 15, 2008.

        2. Outside Possession Date: March 15, 2008.

F. **Extension Periods:** Four (4) periods of five (5) years each.

G. **Floor Area:** The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable, and, with respect to exterior areas, excluding all exterior areas leased to or exclusively used by one (1) or more tenants unless such area is included in such tenant's rentable area (other than loading dock areas, trash compactor areas, and trash container areas and maintained by such tenants at their own cost). All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H. **Initial Lease Term:** Ten (10) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I. **Key Tenants:** Target, Barnes & Noble, and Cinemark or replacement National or Regional Tenants.

J. **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K. **Minimum Ongoing Cotenancy Requirement:** All Key Tenants open for business during normal business hours.

L. **Minimum Initial Cotenancy Requirement:** Target and Bed Bath & Beyond (or comparable National Tenant in lieu of Bed Bath & Beyond) are open for business during normal business hours.

M. **Minimum Parking Ratios:** Four (4) full-size parking spaces for each one thousand (1,000) square feet of Floor Area in the Shopping Center, with each parking space being at least nine (9) feet in width and eighteen (18) feet in length and for full-sized automobiles.

N. **Opening Requirement:** Target and Bed Bath & Beyond (or comparable National Tenant in lieu of Bed Bath & Beyond) are open for business.

O. **Permitted Use:** The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01. The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; furniture and appliances (including, without limitation, household appliances such as, by way of example only, ovens, refrigerators, freezers, dishwashers, washers, dryers, microwave ovens, toasters and blenders), and technological evolutions of the foregoing.

P. **Premises:** The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 20,331 square feet of Floor Area, including 138 feet of frontage, as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan"), in the shopping center to be known as Market Heights, anticipated to contain approximately 678,548 square feet of Floor Area and located at the northeast corner of US Hwy 190 and FM 2410 in Harker Heights, Texas (the "State"), as more particularly described in Exhibit B (the "Shopping Center"). Notwithstanding anything contained herein to the contrary, Tract S on the Site Plan (Bank of America tract) shall only be bound by Tenant's Exclusive Use Protection and Tract C on the Site Plan (Target tract) shall not be bound by the terms of this Lease, both such tracts not being owned by Landlord. Cinemark (defined below) shall also not be bound by the Exclusive Use Protection and Prohibited Uses, to the extent not enforceable under the terms of Cinemark's lease within the Shopping Center as of the Effective Date.

Q. **Slack Delivery Period:** Not Applicable.

R. **Slack Season:** Not Applicable.

S. **Tenant's Share:** A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center, excluding any Floor Area in the Shopping Center for which the tenants or occupants thereof are responsible for the applicable portion of Common Area maintenance or Taxes (defined below). In no event shall the denominator of the fraction by which Tenant's Share is determined be less than 463,705.

T. **Term:** The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised, subject to earlier termination as herein provided.

## ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01 <u>Demise</u>.

(a) Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises more fully described herein.

(b) Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants of the Shopping Center and their respective employees, invitees, agents, customers, concessionaires and licensees, to use all Shopping Center sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "<u>Common Areas</u>") now or hereafter made available or maintained by Landlord in the Shopping Center. Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents. Landlord shall provide Tenant with at least thirty (30) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(c) Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "<u>Other Improvements</u>"), all in the locations shown on the Site Plan. Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas in the locations shown on the Site Plan. Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces in the locations shown on the Site Plan. In addition, subject to the terms of the OEA, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Promotional Area" as shown on the Site Plan ("<u>Tenant's Promotional Area</u>"), for up to seven (7) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to seven 7 days in duration is referred to as a "<u>Tenant Promotion</u>"). Subject to the OEA, Tenant may have up to four (4) Tenant Promotions during any Lease Year. Landlord shall obtain the approval of Target with respect to the foregoing promotions, the Site Plan, Tenant's plans and specifications, the location of the Staging Area, the Elevations attached hereto as Attachment 4 of the Site Design Requirements (the "<u>Elevations</u>"), the location of Tenant's Promotional Area, and Tenant's signage within sixty (60) days following execution of this Lease, and deliver written evidence thereof to Tenant (the "<u>Target Approval Letter</u>"). If the Target Approval is not received, Tenant may terminate this Lease.

SECTION 2.02 <u>Extension Periods</u>. Provided Tenant is not then in default of any terms or provisions this Lease, after the lapse of all applicable grace periods, Tenant shall have the

option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving notice to Landlord (a) at least one hundred eighty (180) days prior to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above (which notice Landlord may give Tenant no earlier than two hundred (200) days prior to expiration of the then-current Term). Accordingly, if Tenant does not exercise its renewal option, the Term shall nonetheless be extended for the number of days necessary to give effect to the foregoing proviso.

SECTION 2.03 Commencement Date and Landlord Reimbursement. "Commencement Date" shall mean the date on which Landlord makes payment of the Landlord Reimbursement in accordance with this Lease. Tenant's construction of the initial Improvements shall be in accordance with the Site Design Requirements. "Landlord Reimbursement" shall mean the product obtained by multiplying Seventy and No/100 Dollars ($70.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined below). Upon Substantial Completion (as defined in the site design requirements attached hereto as Exhibit C ["Site Design Requirements"]) and Tenant's furnishing to Landlord (a) the certificates of insurance required under Section 11.02, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, (c) a square footage building perimeter survey certified to Tenant and Landlord certifying the Floor Area of the Premises consistent with the definition of Floor Area contained herein (the "Floor Area Certification") and (d) a certificate of substantial completion from Tenant's vice president of construction that the Building have been substantially completed, Landlord shall pay to Tenant the Landlord Reimbursement. The certification by Tenant's architect with respect to the actual Floor Area of the Premises shall be conclusive and binding, unless Landlord disputes such certification in writing within thirty (30) days of Landlord's receipt of written notice thereof. If Landlord and Tenant do not agree on the actual measured area of the Premises, the issue shall be submitted to an independent third party who is qualified to perform the measurement and is acceptable to both Landlord and Tenant, and the determination of such third party shall be binding on both Landlord and Tenant. The fees of such third party shall be shared equally by Landlord and Tenant. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (a), (b), (c) and (d) above. However, if the Commencement Date shall occur prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the date on which the Opening Requirement is met. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant. Upon Substantial Completion and payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes. At Landlord's request, Tenant shall deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord. Upon payment in full to Tenant of the Landlord Reimbursement, Tenant shall assign, on a non-exclusive basis, all warranties and guaranties obtained in connection with construction of the

Building. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale and assignment. However, the conveyance of the Building shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

SECTION 2.04 Possession Date. "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a) Landlord shall deliver the Land to Tenant in the condition specified by those certain plans and specifications for Landlord's Work prepared for Landlord and delivered to Tenant by Larry Cates & Associates dated January 17, 2007 (the "Civil Plans") and the Site Design Requirements, except that the Site Design Requirements shall supersede the Civil Plans to the extent of any conflict;

(b) Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements);

(c) Landlord shall have obtained and delivered to Tenant the Target letter described in Section 2.01(c) within sixty (60) days following execution of this Lease;

(d) Intentionally Omitted;

(e) The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f) Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g) Landlord shall have entered into contracts of sale or leases with each of the Key Tenants for terms of at least ten (10) years each, and

(h) Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below. In no event shall the Possession Date occur prior to the Anticipated Possession Date.

SECTION 2.05 Expected Possession Date.

If Landlord fails to accomplish the Possession Date by the Anticipated Possession Date except due to delays occasioned by Tenant or any person claiming by, through or under Tenant ("Tenant Delay") (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that the

Possession Date is delayed. If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), except as a result of Tenant Delay, and except for minor items not affecting Tenant in any manner, and such failure continues for five (5) days following notice to Landlord, subject to Force Majeure (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to four (4) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06 Possession Date During Slack Delivery Period. Intentionally Omitted.

SECTION 2.07 Delayed Possession. If the Possession Date does not occur before the Outside Possession Date except as a result of Tenant Delay (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Tenant shall have the right to (a) terminate this Lease, or (b) delay opening its store facility for a period of not to exceed nine (9) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date. If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within ten (10) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, reasonable costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000) in the aggregate. If Tenant elects to delay opening its store facility as a result of Landlord's failure to deliver the Premises by the Outside Possession Date, then Landlord shall cause the Possession Date (including, without limitation, the Delivery of the Land) to occur on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all additional documented out of pocket costs (up to One Hundred Thousand Dollars ($100,000) in the aggregate) incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

SECTION 2.08 Early Entry. Subject to Section 11.05, any time prior to the Delivery of the Land, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; provided, however, that such entry may not unreasonably interfere with Landlord's Work or work being performed by any other tenant or occupant of the Shopping Center. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09 <u>Measurement</u>. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.10 <u>Commencement Date Agreement</u>. When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of <u>Exhibit E</u>, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

SECTION 2.11 <u>Tenant's Permits Contingency</u>.

(a) Anything contained in this Lease to the contrary notwithstanding, if the Permit Condition (as defined below) is not satisfied on or before ninety (90) days following the Outside Possession Date (the "<u>Permit Contingency Date</u>"), then Tenant shall have the right (at its option) to terminate this Lease at any time thereafter and prior to the satisfaction of the Permit Condition. Tenant agrees to use diligent and good faith efforts to satisfy the Permit Condition on or before the Possession Date; <u>provided, however,</u> the foregoing shall not be deemed to require Tenant to initiate litigation or agree to any condition imposed upon the issuance of any Tenant's Permits (as defined below) which would materially modify Tenant's prototype. "<u>Permit Condition</u>" shall mean the final and unconditional issuance of Tenant's Permits free and clear of any governmental ban, bar or moratorium and with all appeal periods having expired. "<u>Tenant's Permits</u>" shall mean any and all building permits, approvals, licenses and the like necessary to perform Tenant's Work, provided that Tenant's Permits specifically exclude the Site Development Permit which will be obtained by Landlord for the Shopping Center, at Landlord's cost.

(b) If the Permit Condition has not been satisfied within thirty (30) days after the Permit Contingency Date for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option, upon notice given to Tenant prior to the satisfaction of the Permit Condition, to terminate this Lease, <u>provided, however</u>, Tenant shall have the right to void Landlord's termination notice by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, if Tenant has obtained its permits, whereupon Landlord's termination notice shall be rendered null and void.

(c) If Tenant or Landlord terminates this Lease under this Section 2.11, then there shall be no further liability on the part of Landlord or Tenant, <u>except</u> for those obligations that expressly survive the expiration or other termination of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01 <u>Landlord's and Tenant's Work</u>. Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("<u>Landlord's Work</u>"). Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("<u>Tenant's Work</u>") for which Landlord shall pay to Tenant the Landlord Reimbursement. Landlord and Tenant acknowledge receipt of the Site Design

Requirements and each agrees to comply with the provisions thereof relating to their respective work. In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately 20,000 square feet of the Common Areas in the location identified on the Site Plan as "Staging Area," subject to reduction as set forth in the Site Design Requirements.

## ARTICLE IV

## RENT

SECTION 4.01 Annual Minimum Rent. Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without demand, setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term. However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month. Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent, Ground Rent (as defined in Section 18.02(a)) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement of, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement of, deduction from or setoff against Alternative Rent, Ground Rent or the other ground rent. All Rent not paid when due shall bear interest at the highest rate allowed by law from the date of Tenant's receipt from Landlord of notice that such sum is past due until paid in full.

SECTION 4.02 Additional Rent. The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03 Rent; Method of Payment. The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent. All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

## ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01 Maintenance. Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition. Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the

maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking. Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature. However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to reasonably minimize interference with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs at times other than between October 1 and January 1.

SECTION 5.02 <u>Construction Clean-up and Post-Possession Work</u>. Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition to any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

(a) staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

(b) Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place in that portion of the Shopping Center labeled "Phase I" on the Site Plan ("Phase I") except through the entrance/exit drives designated as the "<u>Construction Drives</u>" on the Site Plan;

(c) Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

(d) Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03 <u>CAM Costs</u>. "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive costs and expenses actually incurred by Landlord in operating, insuring, repairing and maintaining the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "<u>Administrative Fee</u>") equal to seven percent (7%) of the CAM Costs for the calendar year in question, but excluding from the computation of such Administrative Fee the cost of any replacement or improvement of a capital nature (to the extent otherwise permitted to be included in CAM Costs), the cost of electricity and other utilities, and the cost of insurance

premiums. In no event will CAM Costs include: (a) real estate taxes, (b) any costs associated with maintenance performed by another tenant or occupant of the Shopping Center on portions of the Common Areas separately maintained by such tenant or occupant; (c) any dues or charges for a merchants' or other association of occupants of the Shopping Center; (d) maintenance, repairs or replacements to the Common Areas (i) necessitated by the negligent or wrongful act of Landlord or any tenant or occupant, (ii) made to correct any construction defect within the first two (2) Lease Years, or (iii) relating to any improvements or utility systems not within the Common Areas (e.g. roofs, exterior walls, fire protection systems); (e) repairs or replacements necessitated by any governmental entity or made to correct any condition in existence prior to the Commencement Date, or to correct damage caused by subsidence or adverse or substandard soil conditions, except as provided below; (f) amounts reimbursable from insurance proceeds, under warranty, or by any tenant or occupant of the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this Section 5.03; (g) premiums for insurance for coverage maintained by Landlord with respect to the Shopping Center (except that premiums for Common Areas liability insurance may be included as part of CAM Costs provided the coverage provided by such liability insurance policy is not in excess of the limits established in Section 11.01), any costs resulting from insurance deductibles under any insurance policy maintained by Landlord that are in excess of commercially reasonable amounts comparable to deductibles maintained by other landlords of similar centers, any costs which would have been reimbursed or paid for by insurance proceeds had Landlord maintained the insurance required under Section 11.01, and the amount of any judgment or other charge entered, or costs assessed against, Landlord in excess of the policy limits of the insurance maintained by Landlord with respect to the Shopping Center or required to be maintained by Landlord under Section 11; (h) the cost of any replacements or capital improvements to the Common Areas, except that the cost of (w) any capital improvements undertaken to materially reduce CAM Costs, (x) repaving the parking areas of the Shopping Center and is not incurred (i) prior to the expiration of the tenth (10th) full calendar year of the Term, or (ii) more than once during each ten (10) full calendar years of the Term, (y) any repairs or replacements made to comply with changes in law following the Commencement Date, or (z) any capital improvements performed to promote the safety of tenants of the Shopping Center may be included within CAM Costs so long as such cost is otherwise permitted to be included within CAM Costs and is amortized on a straight-line basis over the useful life thereof under generally accepted accounting principles consistently applied; (i) reserves for anticipated future expenses; (j) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner; (k) Landlord's personnel, overhead, home office or administrative expenses, except for the Administrative Fee and on-site personnel costs (or if off-site, reasonably allocable to the Shopping Center); (l) amounts incurred to remediate any Hazardous Materials (as defined in Section 9.03(a)); (m) any new improvements to the Shopping Center or Common Areas including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center not including replacements and capital improvements permitted in (h) above; (n) holiday or other decorations or other promotional expenses relating to the Shopping Center; or (o) any fees, costs or expenses not related to the operation, maintenance, insurance or repair of the Common Areas.

SECTION 5.04  Tenant's Share of CAM Costs. Tenant shall pay to Landlord Tenant's Share of CAM Costs in each calendar year during the Term. Tenant's Share of CAM Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term.

Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial CAM Costs, and in no event shall the component(s) thereof for Landlord's insurance obligations exceed the Initial Insurance Cost.

SECTION 5.05 Payment of CAM Costs. Tenant's Share of CAM Costs shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs for the preceding calendar year, subject to immediate adjustment when the actual amount of CAM Costs or a change in Tenant's Share thereof is determined. Within one hundred twenty (120) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of CAM Costs and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant). Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due. Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith. Landlord's records of CAM Costs for each year shall be available for inspection by Tenant for a period of two (2) years after Landlord notifies Tenant of Tenant's Share of CAM Costs for the year in question. Tenant's auditor may not be compensated based on a percentage of savings basis. Tenant may, during such two (2) year period, upon ten (10) days' prior notice to Landlord, have an audit made of CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records"). In addition, Landlord agrees to forward copies of reasonable evidence of CAM Costs to Tenant or its representative within ten (10) days of a written specific request therefor. Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith. If any such audit shows that Tenant's Share of CAM Costs have been overstated by more than four percent (4%), then Landlord shall immediately pay to Tenant the reasonable out-of-pocket cost of such audit not to exceed Two Thousand and No/100 Dollars ($2,000.00).

SECTION 5.06 CAM Costs Increases. Notwithstanding anything contained in this Lease to the contrary, for all calendar years subsequent to the second (2nd) full calendar year of the Term, in no event shall Tenant's Share of CAM Costs increase, from any calendar year to the immediately succeeding calendar year, by more than five percent (5%).

ARTICLE VI

TAXES

SECTION 6.01 Taxes. Landlord shall pay prior to delinquency all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and excluding real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "Taxes") levied and assessed against the land, improvements and buildings comprising the Shopping

Center and all charges imposed in lieu of such taxes (including taxes on rents) of the Shopping Center. Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (other than the Premises) of any buildings in the Shopping Center included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of Taxes for the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial Taxes.

SECTION 6.02 <u>Payment of Taxes</u>. Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and payable, whichever is later provided, in the event Tenant's net worth falls below $100,000,000. Tenant's Share of Taxes shall be payable in equal monthly installments on the first (1st) day of each month. Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of Taxes for the preceding calendar year, subject to immediate adjustment when the actual amount of Taxes or a change in Tenant's Share thereof is determined.

SECTION 6.03 <u>Exclusions from Taxes</u>. Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term. Landlord represents to Tenant that, as of the Effective Date and, to the best of Landlord's knowledge, as of the Possession Date, no portion of the Shopping Center is or will be (a) subject to or the beneficiary of an abatement, exemption and/or phase-in of Taxes, (b) subject to any special assessments or similar charges, or (c) included in any special improvement district(s) which would result in higher sales taxes or other similar impositions than would exist in the absence of such district(s). Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes; (iv) assessment for a public improvement arising from the initial construction or expansion of the Shopping Center or the Premises; (v) Taxes resulting directly from an increase in the assessment caused by a sale or ground lease of all or any portion of the Shopping Center to an Affiliate of Landlord; or (vi) fees imposed upon Landlord in connection with Landlord's development of the Shopping Center (including, without limitation, trip generation fees). All Taxes payable by Tenant pursuant to this Article VI shall be determined as if the Shopping Center was the only property owned by Landlord.

SECTION 6.04 <u>Right to Contest</u>. Landlord shall use commercially reasonable efforts to contest the amount or validity of any unreasonable assessed valuation or Taxes. Tenant shall have no right to contest the assessed valuation or Taxes attributable to the Shopping Center. If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01). Landlord may charge tenants as part of CAM Costs the reasonable cost of Landlord's tax contest, up to the total amount of the taxes saved as a result of the contest.

### ARTICLE VII

### UTILITIES

SECTION 7.01 <u>Utilities</u>. Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements. Landlord, as part of Landlord's Work, shall cause all such utilities to the Premises to be separately metered at Landlord's sole cost and expense. Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term and all connection fees related thereto. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed Landlord's actual cost for such utility service. In addition, Tenant shall have the right to install a test meter to verify its utility usage. If such choice does not adversely affect rates for the remainder of the Shopping Center, notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises, including the telecommunication provider. Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02 <u>Interruption</u>. If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within forty-eight (48) consecutive hours after the Landlord has actual knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

### ARTICLE VIII

### USE OF PREMISES

SECTION 8.01 <u>Permitted Use</u>. The Premises may be used and occupied for any Permitted Use. However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in <u>Exhibit F</u>) (which include those in the OEA) or in violation of any of existing exclusives or prohibited uses set forth on <u>Exhibit H</u> (the "Exclusives").