SECTION 8.02 Conduct of Operations.

(a) Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open for business to the public in the Premises as a fully stocked and staffed Circuit City electronics store for at least one (1) day, not later than three hundred sixty-five (365) days after the Delivery Date. Other than as expressly set forth in the preceding sentence, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.

(b) Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use, after initially opening in accordance with Section 8.02(a) above. In the event that Tenant ceases its business operations at the Premises for a period of two hundred ten (210) consecutive days, such cessation shall not be deemed to be an event of default hereunder, nor shall such cessation relieve Tenant of any of its liabilities or obligations under and pursuant to this Lease. Upon this determination to cease operation, Tenant shall notify Landlord in writing of such decision ("Tenant's Notice"), which Tenant's Notice shall contain the amount of Tenant's Unamortized Costs (hereinafter defined), whereupon Landlord shall have the option of recapturing the Premises by terminating this Lease. Such option shall be exercisable by Landlord from and after the date of Tenant's Notice, provided that prior to exercise by Landlord of its option herein granted, Tenant has not (i) effected an assignment or subletting which obligates the transferee to open for business within one hundred eighty (180) days after such assignment or sublease or (ii) recommenced operations in the Premises. Landlord shall exercise such option by delivering notice to Tenant that it intends to terminate this Lease (the "Landlord's Notice"), in which event this Lease shall terminate entirely on the date contained in Tenant's Notice unless the aforementioned assignment, subletting or recommencement has occurred. If Landlord fails to timely exercise said option to terminate, and Tenant (or any assignee or sublessee) thereafter reopens, Landlord shall once again have such right if the occupant of the Premises once again ceases operating for the one hundred eighty (180) day period described above. Upon such termination, Tenant and Landlord shall be relieved of and from any and all further liability or obligation to the other under and pursuant to this Lease, except that Landlord shall pay to Tenant the amount of the Unamortized Costs. Notwithstanding anything contained herein to the contrary, Landlord's obligation to reimburse Tenant for its Unamortized Costs shall survive the expiration or termination of Lease. For purposes of this paragraph, "cessation" of operation at the Premises shall not mean or include any period during which Tenant is not operating within the Premises due to a casualty event, condemnation, reconstruction, alterations, modifications, maintenance or repair, or preparing the Premises for occupation by an assignee or subtenant.

SECTION 8.03 Leasing Restrictions. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State. In that regard, subject to the rights of CNMK Texas Properties, Ltd. and/or its successors or assigns and sublessees ("Cinemark") under its existing lease at the Shopping Center, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center for any of the Prohibited Uses. In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building in Phase I having a front door within three hundred (300) feet of the front entrance of the

SECTION 8.04 Tenant's Exclusive.

(a) Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Shopping Center, or on any land owned or controlled by Landlord or any of its Affiliates within a one (1) mile radius of the Shopping Center during the Term ("Affiliated Land") for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products (except for furniture and appliances, which shall be permitted without restriction in the Shopping Center). The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a). "Incidental Sale" shall mean sales of the Products (except for furniture and appliances, which shall be permitted without restriction in the Shopping Center) in the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area. The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises. The foregoing exception for Incidental Sales shall be increased for Lack's Furniture only, to be the lesser of three thousand five hundred (3,500) square feet or ten percent (10%) of its display area. The foregoing restrictions shall not apply to any Affiliated Land upon which a retail project exists at the time such property is acquired by Landlord or any entity in which Landlord owns a legal or beneficial interest or any entity which owns a legal or beneficial interest in Landlord.

(b) The Exclusive Use Protection shall also not apply to (A) a full-line supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's or Target), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), and (ii) contain at least 54,000 square feet of Floor Area; or (B) Office Max, Office Depot, Staples, Comp USA, Home Depot, Lowe's or Cinemark; or (C) one (1) cellular or wireless retailer other than Verizon or its successors or assigns, if located in Building L, K, Q, V or M as shown on the Site Plan and not larger than 3,500 square feet in size; (D) one (1) video game store; or (E) the sales, service or repair of automotive parts necessary to drive the vehicle, i.e., not accessories such as those sold by Circuit City.

(c) Upon any violation of the Exclusive Use Protection that continues for ninety (90) days following notice from Tenant to Landlord, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. If such breach continues for more than one hundred eighty (180) days and the violating retailer occupies 10,000 square feet of Floor Area or more within the Shopping Center, then Tenant shall have the right to terminate this Lease at any time thereafter, in which event the applicable provisions of Section 8.04(e) shall control.

(d) However, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04 (d) shall be tolled

provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation. If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or if the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists. In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Tenant's expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(d) for twenty-four (24) consecutive months and the party violating the Exclusive Use Protection leases or occupies 10,000 square feet of Floor Area or more, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(e).

(e)    If Tenant shall have paid Alternative Rent pursuant to Sections 8.04(c) or (d) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease (subject to the 10,000 square foot limitation on such right set forth therein), or (ii) if the party violating the Exclusive Use Protection occupies less than 10,000 square feet of Floor Area, resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period (i.e. if the party violating the Exclusive Use Protection occupies more than 10,000 square feet of Floor Area, Tenant may continue paying Alternative Rent). Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period. If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above. If Tenant elects to terminate this Lease pursuant to Sections 8.04(c) or (d), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises (the "Unamortized Costs"), but not including any costs paid for by Landlord or reimbursed to Tenant by Landlord, and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

(f)    Landlord represents and warrants that there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises except those set forth on Exhibit H or in the OEA, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such exclusive or other use restriction.

SECTION 8.05 Key Tenants. As of the Possession Date, Landlord shall have entered into leases and/or contracts of sale with the Key Tenants. If, from and after the satisfaction of the Opening Requirement, fewer than all of the Key Tenants are open for regular business or the Minimum Ongoing Cotenancy Requirement is not met for a period of two hundred seventy (270) days other than due to renovation or reconstruction following casualty, condemnation or an assignment or sublease (not to exceed 180 days), then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as all of the Key Tenants are open for regular business and the Minimum Ongoing Cotenancy Requirement is met. If such Key Tenant(s) ceases operations for a period of twenty-four (24) consecutive months or more, or if the Minimum Ongoing Cotenancy Requirement is not met for a period of twenty-four (24) consecutive months or more, then Tenant shall have the right to terminate this Lease upon thirty (30) days notice to Landlord, such notice to be given at any time prior to the date the condition giving rise to such termination right has been satisfied. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (a) for those obligations which expressly survive the expiration or other termination of this Lease, and (b) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Tenant does not terminate this Lease within thirty (30) days after the expiration of such twenty-four (24) month period, then commencing on the day following the end of such thirty (30) day period, Tenant shall resume paying full Annual Minimum Rent. However, Tenant shall again be entitled to exercise its rights under this Section 8.06 each time another Key Tenant ceases operations. It is hereby understood and acknowledged by Landlord that a Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant or Regional Tenant of comparable size and quality of merchandise. "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least fifty (50) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least twenty-five (25) retail stores in first-class shopping centers in any of the following states under a single trade name: Louisiana, Oklahoma, New Mexico, Texas, Colorado, and Arkansas.

## ARTICLE IX

## REPAIRS

SECTION 9.01 Landlord Obligations. Except to the extent arising from a construction defect discovered during the first Lease Year covered by Tenant's 1-year general contractor's warranty for the Premises, which shall be Tenant's obligation to correct and which warranty Tenant shall not assign to Landlord, Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the

Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors. Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII. Landlord shall perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises. Landlord shall give Tenant at least forty-eight (48) hours prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances). If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02 Tenant's Obligations.

(a)    Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises (including painting, window glass, doors and frames, and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems located in and serving exclusively the Premises), and (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors. Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02. Tenant agrees to maintain a maintenance contract with respect to the HVAC system during the Term. In the event Tenant fails to comply with the terms of this paragraph following expiration of the applicable notice and cure periods, and such failure continues for ten (10) days following a second notice from Landlord advising Tenant of Landlord's intent to self-help, Landlord may cure such default and Tenant shall pay to Landlord the reasonable and actual substantiated costs of Landlord in so doing.

(b)    If any HVAC units must be repaired or replaced during the last three (3) years of the Term, then in light of the fact that the same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last three (3) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the useful life of said equipment, determined in accordance with GAAP. The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

SECTION 9.03 Hazardous Materials.

(a)    Landlord represents and warrants that, as of the Effective Date (and as of the Possession Date), there are (and will be) no Hazardous Materials present in the Shopping Center in violation of Environmental Regulations except as otherwise disclosed in any

environmental report delivered by Landlord to Tenant prior to the Effective Date, and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present or become known to be present at the Shopping Center during the Term shall be without cost and expense to Tenant (and not included in CAM Costs), other than Hazardous Materials introduced by Tenant, its agents, invitees or employees. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

  (b) Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

  (c) Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents or employees, or (ii) a breach by Landlord, its agents or employees of any Environmental Regulation to which Landlord is subject.

  (d) Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which was brought into the Premises by Tenant, its agents, contractors, licensees, sublessees, vendors or employees, or (ii) a breach by Tenant, its agents, contractors, licensees, sublessees, vendors or employees of any Environmental Regulation to which Tenant is subject.

(e) With respect to Hazardous Materials which are or become present at the Shopping Center in violation of Environmental Regulations as the result of any cause whatsoever (other than Hazardous Materials which were brought into the Premises by Tenant, its agents, contractors, licensees, sublessees, vendors or employees), Landlord shall, at no cost to Tenant (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform or cause to be performed all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations. Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations. If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this Section 9.03. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would reasonably be expected to be a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04  Surrender of the Premises. At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01  Landlord's Obligations. As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping

Center including, without limitation, the Premises, except as specifically provided in Section 10.02. Notwithstanding the foregoing, the costs of complying with new laws or changes in laws with respect to the Common Area occurring following the Commencement Date may be included in CAM Costs to the extent otherwise permitted by this Lease.

SECTION 10.02 Tenant's Obligations. Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of Tenant's specific manner of use of the Premises (as opposed to retailers in general), is occasioned by alterations to the Premises made by Tenant or relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises.

SECTION 10.03 Right to Contest. The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01 Landlord's Insurance.

(a) Landlord shall maintain or cause to be maintained in full force and effect from and after the Effective Date and throughout the Term:

(i) Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Three Million Dollars ($3,000,000) for bodily injury, death and property damage liability; and

(ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Shopping Center, (exclusive of excavation, footings and foundations) including, without limitation, the Common Areas.

(b) Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI. All policies required to be maintained by Landlord pursuant to this Section 11.01 shall provide that any proceeds thereof shall be deposited with the Mortgagee, or if none, to Landlord, in either event to be held in trust by such party and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

(c) Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01. However, in no event shall any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Twenty-Five Thousand Dollars ($25,000), or other commercially reasonable amount without Tenant's consent.

SECTION 11.02 Tenant's Insurance.

(a) Tenant shall maintain in full force and effect throughout the Term:

(i) Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Three Million Dollars ($3,000,000) for bodily injury, death and property damage liability; and

(ii) Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "additional insured-lessor".

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured, as its interest may appear, on the insurance policies described in Section 11.02(a).

(b) Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(c) All insurance required to be maintained under this Section 11.02 may be provided under a commercially reasonable plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Million Dollars ($100,000,000) determined in accordance with GAAP. To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03 Insurance Requirements Generally.

(a) All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall

provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)     The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04  Landlord's Insurance Cost.

(a)     The insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be included as part of CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included in CAM Costs for the purposes of determining Tenant's Share of any insurance premium included in CAM Costs.

(b)     If the rates for any insurance Landlord is required to carry are increased as a result of the specific use or other activity of an occupant of the Shopping Center (but not the occupants generally), then the amount of such increase shall be excluded from CAM Costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously been included in CAM Costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)     The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05  Indemnity.

(a)     Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)     Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Common Areas, or (ii) occasioned wholly or in part by any act or

omission of Landlord, its agents, contractors, employees or servants, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06 <u>Mutual Waiver of Subrogation</u>.

(a)     Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party. If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)     Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07 <u>Affiliate</u>. "<u>Affiliate</u>" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be. As used in the definition of Affiliate, "<u>control</u>" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

## ARTICLE XII

## DAMAGE OR DESTRUCTION

SECTION 12.01 <u>Landlord's Obligation to Rebuild</u>. If all or any part of Phase I (excluding the Premises) or Phase II (both being areas designated as such on the Site Plan) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore Phase I and Phase II, other than the Premises, to its condition immediately prior to such damage or destruction. Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.02 <u>Tenant's Obligation to Rebuild</u>. If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01). Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03 <u>Termination</u>.

(a) Tenant shall have the right to terminate this Lease:

(i) if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last two (2) years of the Term, and the restoration period is reasonably estimated by Tenant to be in excess of ninety (90) days, or

(ii) if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b).

Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty.

(b) If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration within one hundred twenty (120) days as to Common Areas and two hundred forty (240) days as to the remainder of Phase I after such damage or destruction, then Tenant shall have the option, upon thirty (30) days notice to Landlord unless during such time period Landlord cures such failure, to elect (y) to complete the repair and restoration to the Common Area and (1) to receive reimbursement therefor in full from Landlord on demand and/or (2) to offset the cost and expense thereof against the payment of Rent and, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration, or (z) to terminate this Lease effective as of the date of such damage or destruction. The time periods referenced in this Section 12.03(b) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(c) If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in

full from Tenant on demand. The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(d)   In the event of casualty damage to fifty percent (50%) or more of the Shopping Center which would take in excess of two hundred forty (240) days to repair or reconstruct, following which Landlord determines to not rebuild the Shopping Center and to terminate all then-existing leases and occupancy agreements with respect to the Shopping Center, Landlord may, upon one hundred eighty (180) days notice to Tenant given no later than ninety (90) days following the casualty event, terminate this Lease, provided the Shopping Center is not redeveloped for any retail purpose for a period of at least ten (10) years following such termination. As a condition to such termination, Landlord shall enter into a recordable instrument satisfactory to Tenant, evidencing such use restriction, and Landlord shall pay the cost of recordation of same in the real estate records of Bell County, Texas.

(e)   If this Lease is terminated, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) only in the case where Tenant terminates this Lease, Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier, or (2) if self-insured, an amount equal to the reconstruction costs of the Premises or, if the Premises are not being reconstructed, an amount equal to the actual value of the Premises (not to exceed, however, an amount equal to the reconstruction costs of the Premises), to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii).

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01 Taking.

(a)   In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a "Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of the Common Areas in Phase I, or (z) more than two (2) of the parking spaces in either Tenant's Preferred Area or more than five (5) of the parking spaces in Phase I, (ii) materially and adversely affects ingress or egress to the Premises or Phase I, or (iii) materially prohibits or inhibits Tenant's use of the Premises, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)   In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas in Phase I but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of ninety (90) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02  Restoration and Rent Adjustment. In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore Phase I as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03  Award. In the event of any Taking, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord for its fee interest in the Premises. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01  Tenant's Alteration Rights.

(a)  Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without obtaining any approvals required under the OEA and the prior approval of Landlord; provided, however, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation in a majority of Tenant's stores in Texas shall not require Landlord's consent. The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)  Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings; provided that: (i) such alterations will not adversely affect the structural components of the Building, any utility connections or Building systems or any portion of the Shopping Center other than the Premises, (ii) such alterations will not materially reduce the value of the improvements to the Premises, and (iii) Tenant complies with all laws in connection therewith.

(c)  Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord, (ii) repairs any damage to the roof caused by the making of the roof penetrations, and (iii) erects and maintains such equipment in accordance with Laws. Tenant shall install the satellite antenna and equipment in accordance with sound construction practices and shall screen same from view from the Common Areas. Tenant shall indemnify, defend and hold Landlord harmless from and against any and all damage to the Premises arising from or out of the installation of the satellite antenna or equipment.

(d)  Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process. If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be. However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(d) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

(e)  Landlord shall not without Tenant's consent make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises. Subject to alterations permitted to made pursuant to the terms of the OEA, Landlord shall neither make nor consent to any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center in the State (exclusive of other National Tenants' or Regional Tenants' entrance features), without the prior consent of Tenant.

SECTION 14.02 <u>Mechanics' Liens</u>. Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant. Similarly, Landlord covenants that Landlord shall

promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed any lien against the Premises or all or any part of the Shopping Center owned by Landlord for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord. If either party shall fail to cause any such lien to be discharged within thirty (30) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand. Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

## ARTICLE XV

### SIGNS

SECTION 15.01  Tenant's Signs. Subject to the OEA and Landlord's consent which consent shall not be unreasonably withheld (except that Landlord's approval shall not be necessary for alterations made to conform Tenant's signage to Tenant's prototypes utilized in the majority of Tenant's stores in Texas) Tenant shall have the exclusive right during the Term to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), temporary banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with Laws. Landlord shall procure the approval of Target for any other foregoing rights not permitted by the OEA, and deliver such written approval to Tenant upon execution of this Lease, but in no event later than the sixtieth (60th) day following the Effective Date. Tenant may erect and maintain in the interior of the Premises any signs it may desire.

SECTION 15.02  Pylon Signs. Landlord shall provide two (2) pylons at the locations shown on the Site Plan. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such pylons (including Tenant's sign panels on all sides of such pylons). Tenant's sign panels shall be procured and installed at Tenant's cost.  A rendering of such pylon(s) showing the dimensions of the pylon/monument(s) and the size and position of all panels to be installed thereon, including Tenant's panel, is attached to this Lease as Exhibit N (Tenant's panels shall be below those of Target and Cinemark). Landlord shall not change or alter the pylons bearing Tenant's sign panel(s) without obtaining Tenant's prior consent, such consent not to be unreasonably withheld, delayed, denied or conditioned.  The cost of maintaining all pylons bearing Tenant's sign panel(s) (but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons) and the cost of any electricity used to illuminate them shall be includable in CAM Costs.

SECTION 15.03 Replacement. Tenant and its subtenants shall be entitled, without Landlord's consent but subject to complying with Laws, to replace all of its signs with signage consistent with Tenant's and/or its subtenant's who are National or Regional Tenants then-current prototypical sign plans used in the majority of its stores in Texas. Any signage which is not consistent with such prototypical sign plans shall be subject to Landlord's approval.

## ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01 Tenant's Property. All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant specific to Tenant's operation and located at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "Tenant's Property") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached. Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property permanently damages any part of the Premises or the Shopping Center, Tenant shall repair such damage.

## ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01 Assignment and Subletting Rights. Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises (a "Transfer"), subject to all of the terms and conditions of this Lease. No transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall be deemed a Transfer and may be effected upon written notice to Landlord. Notwithstanding the foregoing, in the event Tenant desires to assign or sublease all or part of the Premises to an unrelated third party, Tenant shall give Landlord written notice (the "Tenant Notice") of such proposed assignment or sublease which Tenant Notice shall include the amount of the Unamortized Costs and a copy of the proposed assignment of lease document or proposed sublease document, and Landlord shall notify Tenant of its disapproval or approval of such proposed assignment or sublease or election to recapture the Premises or the affected portion thereof within thirty (30) days of Landlord's receipt of said document. If Landlord elects to recapture within such thirty (30) day period, the Lease shall be deemed fully or partially (as applicable) terminated, and Landlord shall recapture the Premises in accordance with this Section 17. Landlord's full or partial (as applicable) termination of this Lease pursuant to this Section 17 shall be effective as of the date that the assignment or subletting would have occurred under the terms of Tenant's proposed assignment or sublease, as set forth in the Tenant Notice. Tenant shall thereafter have no liability under this Lease or with respect to the recaptured portion of the Premises (as applicable). In the event Landlord exercises its option to terminate all or a portion of this Lease as provided in this Section 17, Landlord shall be obligated to pay Tenant its Unamortized Costs of the portion of the Building and Improvements recaptured by Landlord to the date of such termination. No Transfer

shall reduce the liability of Tenant under this Lease and Tenant shall remain liable to the extent that such liability is not increased as a result of any amendment or modification to this Lease between Landlord and any assignee not consented to by Tenant in writing. However, in the event of an assignment by Tenant to an assignee having an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are guaranteed by a guarantor having an Adequate Net Worth, all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate. "Adequate Net Worth" shall mean a tangible net worth determined in accordance with GAAP, as of the effective date of such assignment, of at least One Hundred Fifty Million Dollars ($150,000,000).

SECTION 17.02 Collateral Assignment. In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03 Cure Rights of Original Tenant. If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "Original Tenant"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be thirty (30) days longer than the cure period applicable to Tenant

SECTION 17.04 Recognition Agreement. If Tenant subleases all of the Premises for a term equal to the balance of the Term, upon terms no less favorable to Landlord than those of this Lease, and the subtenant has a net worth of at least $100,000,000 (determined in accordance with GAAP), then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of Exhibit I, in recordable form (the "Recognition Agreement").

## ARTICLE XVIII

## DEFAULT

SECTION 18.01 Tenant's Default.

(a)  If Tenant defaults in the payment of any installment of Rent and such default is not cured within ten (10) days after receipt of notice from Landlord thereof or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete

same with all due diligence, but not to exceed ninety (90) days following notice of such default), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i) terminate this Lease, without any right by Tenant to reinstate its rights by payment of Rent or other performance of the terms and conditions hereof and upon such termination Tenant shall immediately surrender possession of the Premises to Landlord, and Landlord shall immediately become entitled to receive from Tenant, as liquidated, agreed final damages, an amount equal to the difference between the aggregate of all rentals reserved under this Lease for the balance of the Term, and the fair rental value of the Premises for that period (both discounted to present value at an annual interest rate equal to eight percent (8%)), determined as of the date of such termination; or

(ii) with or without terminating this Lease, as Landlord may elect, re-enter and repossess the Premises, or any part thereof, and lease them to any third-party upon commercially reasonable terms and conditions, for a term within or beyond the Term; provided, however, that any such reletting prior to termination shall be for the account of Tenant, and Tenant shall remain liable for (y) Rent, and other sums which would be payable hereunder by Tenant in the absence of such expiration, termination or repossession, less (z) the net proceeds, if any, of any reletting effected for the account of Tenant after deducting from such proceeds all of Landlord's reasonable expenses (which expenses shall be amortized over the term of the new tenant's lease and only the portion thereof allocable to the balance of the Term shall be so deducted by Landlord hereunder) in connection with such reletting (including, without limitation, all repossession costs, reasonable brokerage commissions, reasonable attorneys' fees and expenses, reasonable alteration costs and expenses of preparation for such reletting).

(b) If the Premises are at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate of two percent (2%) per annum in excess of the rate charged to Tenant for short-term borrowings by any bank with which Tenant regularly transacts business (the "Default Rate").

(c) Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set forth in Section 18.01(a)(i) above, (ii) any right to recover consequential, punitive or exemplary damages as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant. Anything contained in this Lease to the contrary notwithstanding, Landlord shall use all

reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default.

SECTION 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant.

(a)   If, subject to force majeure (not to exceed thirty (30) days), Tenant shall fail to achieve Substantial Completion by that date which is two hundred ten (210) days following Delivery of the Land, then Landlord, at its option, upon prior notice to Tenant, may require Tenant to commence payment of Ground Rent (as defined below) on the date which is two hundred eleven (211) days following Delivery of the Land. "Ground Rent" shall mean $142,317.00 annually, shall be payable in lieu of Annual Minimum Rent, and shall be payable in equal monthly installments of 1/12 each and in the same manner as Annual Minimum Rent.

(b)   If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred seventy (270) days following Delivery of the Land, then Landlord shall be entitled to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03  Landlord's Default.

(a)   If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence, but not to exceed ninety (90) days following notice of such default), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

(w)   perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord;

(x)   bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord; and/or

(y)   offset against the Annual Minimum Rent all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's