disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above.

SECTION 18.04 <u>Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord</u>. If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Premises) and Landlord does not cure such default within five (5) days after notice thereof by Tenant, then Tenant shall have the right, but not the obligation, to:

(a) perform, at Landlord's sole cost and expense, all or any part of Landlord's Work. If and to the extent that Tenant exercises its right under this Section 18.03(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work. Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of Landlord's Work which Tenant completes within ten (10) days after receipt of request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of Landlord's Work performed. If Landlord does not timely reimburse Tenant as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full;

(b) seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease, the actual costs of which litigation shall be borne by Landlord including, without limitation, reasonable attorneys' fees and court's costs; and/or

(c) seek legal remedies available to Tenant, the actual costs of which shall be borne by Landlord, including, without limitation, reasonable attorneys' fees and court costs.

SECTION 18.05 <u>Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement</u>.

(a) If Landlord fails to pay the Landlord Reimbursement in full on or before its due date, then Landlord shall be in default under this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the first day after the Landlord Reimbursement Deadline until the date of payment of the Landlord Reimbursement. However, if Landlord has not tendered payment of the Landlord Reimbursement and interest by that date which is one (1) year from Substantial Completion (the "<u>Substantial Completion Anniversary</u>"), then (i) such date shall become the Commencement Date; (ii) Annual Minimum Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term; and (iii) this Lease shall be converted

35

to a ground lease, with ownership of the Building remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Section 11.02. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

(b)    At any time following the Substantial Completion Anniversary and upon thirty (30) days prior notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Landlord Reimbursement, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Financing Transfer") Tenant's interest in the Building and this Lease. Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Financing Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Financing Transfer. Notwithstanding such Financing Transfer, Tenant shall continue to pay the ground rentals described in Section 18.05(a) during the remainder of the Term.

SECTION 18.06 Waiver; Non-Exclusive Remedies. The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease. Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 19.01 Subordination. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement (the "SNDA") in substantially the form attached as Exhibit J hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the

Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto. "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02 Existing Mortgages and Ground Leases. If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a SNDA substantially in the form attached as Exhibit J, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee). Should Landlord fail to so deliver such instrument(s) within thirty (30) days of the date as provided above, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03 Transfer of Interest. Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer. Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04 Tenant Estoppel Certificates. Tenant agrees, within thirty (30) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c)

37

certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.05 <u>Landlord Estoppel Certificates</u>. Landlord agrees, within thirty (30) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.06 <u>Payments</u>. If Landlord shall request Tenant to execute more than one (1) SNDA, recognition agreement or more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant Seven Hundred Fifty Dollars ($750.00) for each subsequent request for a SNDA, recognition agreement or an estoppel certificate within such twelve (12) month period. If Tenant shall request Landlord to execute more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Landlord's obligations under Section 19.05, Tenant shall pay to Landlord One Thousand Dollars ($1,000) for each subsequent request for an estoppel certificate within such twelve (12) month period.

## ARTICLE XX

## LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01 <u>Quiet Enjoyment</u>. Landlord covenants and agrees that Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever.

SECTION 20.02 <u>Representations, Warranties and Covenants</u>. In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a) As of the Effective Date and as of the Possession Date, Landlord owns the fee simple title to the Shopping Center free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on <u>Exhibit K</u>; that the Shopping Center, as of the Effective Date (and as of the Possession Date), is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees (including, without limitation, those matters described on

Exhibit K) which would, in any way, prevent or inhibit the use of the Premises for the uses thereof by Tenant as contemplated by this Lease, or prevent or restrict the use of the Common Areas or limit ingress and egress to and from Westbank Expressway and Manhattan Blvd, the public thoroughfares shown on the Site Plan, by Tenant, its agents, employees or invitees.

(b)    Landlord shall, on or before the Possession Date, have caused the Delivery of the Land to occur and substantially completed Landlord's Work in accordance with this Lease.

(c)    The Shopping Center shall, at the time of commencement of construction by Landlord, be properly zoned for the operation and maintenance of a store similar to other stores operated by Tenant and for its contemplated use, and that all necessary governmental consents, permits and approvals allowing for the Premises to be occupied for such use shall have been obtained by Landlord.

(d)    As of the Effective Date there is no Affiliated Land in existence and as of the Possession Date there will not be any Affiliated Land in existence (or, if there shall be Affiliated Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Affiliated Land).

SECTION 20.03 Site Covenants. In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)    Landlord shall not construct (or permit to be constructed) any buildings or other improvements in the area identified on the Site Plan as the "No-Build Area" (the "No-Build Area").

(b)    Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)    The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan.

(d)    Landlord shall not erect (or permit to be erected) any building or other structures (except pylon and monument signs, but including, without limitation, kiosks) in any outparcel except as and where shown on the Site Plan, and all outparcel buildings and signage (excluding the pylon sign on Manhattan Boulevard) constructed in the Shopping Center shall (i) not be exceed a height of twenty-two (22) feet above the finished floor of the Premises (inclusive of all roof top mechanicals, all projections and all architectural treatments and embellishments), (ii) not exceed the Floor Area shown on the Site Plan, (iii) satisfy all parking requirements (without variance) using the parking spaces located within each such outparcel, and (iv) be used solely for retail purposes.

(e) Landlord shall not use (or permit the use of) all or any portion of the Common Areas for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c).

(f) Landlord shall not make (and shall not permit there to be made) any changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's sole discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion. Any other changes to the Common Areas may be made without Tenant's consent.

(g) Following Tenant's opening for business at the Premises, (a) Landlord shall control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Shopping Center during the months of October, November, December and January, except to the extent permitted under Section 5.01, except for emergencies and restoration following casualty damage or condemnation.

(h) Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i) No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

(j) Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

ARTICLE XXI

HOLDING OVER

SECTION 21.01 <u>Holding Over</u>. If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party. During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease or the entering into a new lease for premises within the

Shopping Center, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifteen percent (115%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease.

## ARTICLE XXII

### NOTICE

SECTION 22.01 <u>Where and How Given</u>. All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the party. The Notice Address of each party is:

| | |
|---|---|
| a) Landlord: | Team Retail Westbank, Ltd.<br>9362 Hollow Way Road<br>Dallas, Texas 75220<br>Attention: Worth R. Williams |
| with a copy to: | Munsch Hardt Kopf & Harr, P.C.<br>3800 Lincoln Plaza<br>500 N. Akard Street<br>Dallas, Texas 75201<br>Attn: Michael A. Krywucki |
| b) Tenant: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| with a copy to: | CIRCUIT CITY STORES, INC.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: General Counsel |
| with a copy to: | Kostas & Birne, LLP<br>530 One Turtle Creek Village<br>3878 Oak Lawn Avenue<br>Dallas, Texas 75219<br>Attention: Pamela G. Kostas |

C:\Documents and Settings\kgarner\Local Settings\Temporary Internet Files\OLK114\CC Lease Version 11 response V3.DOC
Dallas 1251043_3 7680.4

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02 When Given. Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable. However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

## ARTICLE XXIII

## MISCELLANEOUS

SECTION 23.01 Rent Proration. If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date. This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02 Construction. In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03 Section Headings. The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04 Partial Invalidity. If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05 Waiver. The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

SECTION 23.06 Governing Law. This Lease shall be governed and construed in accordance with the laws of the State.

SECTION 23.07 <u>Successors and Assigns</u>. This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assigns of Landlord and the successors and assigns of Tenant.

SECTION 23.08 <u>No Broker</u>. Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Broker identified in Section 1.01(D), and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker. Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09 <u>Memorandum of Lease</u>. Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as <u>Exhibit L</u>, setting forth such provisions hereof as may be required by State law. If so requested by Tenant, Landlord shall execute such Memorandum of Lease simultaneously with the execution of this Lease. Recording costs shall be borne by the party requesting recordation of same; however, any transfer taxes or other fees charged by any local or state governmental authorities in connection with such recordation shall be paid by Landlord. The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease. In the event Landlord or any Affiliate of Landlord acquires any additional real property adjacent or contiguous to the Shopping Center, such additional real property shall immediately and automatically be subject to the terms and conditions of this Lease. Landlord shall provide Tenant written notice of the same within a reasonable time thereafter. Moreover, the Landlord and Tenant agree to promptly amend the Lease, the Memorandum of Lease, and the SNDA to reflect that the definition of Shopping Center will include this additional real property and file the amendments to the Memorandum of Lease and SNDA of record.

SECTION 23.10 <u>Entire Agreement</u>. This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect. This Lease shall not be amended or modified in any way except by a writing executed by both parties. All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11 <u>Relationship of Parties</u>. The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

SECTION 23.12 <u>Force Majeure</u>. If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "<u>Force Majeure</u>"), then performance of such act shall be excused for the period of the delay, and the

period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary. The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

SECTION 23.13 Limitation of Landlord's Liability. Except with respect to (a) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this Lease to be applied to the repair or restoration of the Premises or the Shopping Center, (b) Landlord's failure to pay the Landlord Reimbursement in accordance with this Lease, and (c) any monies owed by Landlord to Tenant in connection with Landlord's default in performing Landlord's Work, Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

SECTION 23.14 Limitation of Tenant's Liability. Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

SECTION 23.15 Consents. Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 23.16 Costs. Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless otherwise expressly provided to the contrary in this Lease.

SECTION 23.17 Attorneys' Fees. In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 23.18  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid.  All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.19  Joint and Several Liability.  If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 23.20  Definition of Hereunder, Herein, etc..  Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.21  Tenant's Trade Name.  Landlord shall not make use of Tenant's trade name (i.e., "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion.  Notwithstanding the foregoing, Landlord may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.22  Counterparts.  This instrument may be executed in several counterparts, each of which shall be deemed an original.  The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

[Signature page follows]

45

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

**TEAM RETAIL WESTBANK, LTD.**, a Texas limited partnership

By: GP Team Retail Westbank, LLC, a Texas limited liability company, its general partner

Date: 7/2/07

By: _____
Name: Worth R. Williams
Title: Manager

TENANT:

CIRCUIT CITY STORES, INC., a Virginia corporation

Date: 7/5/07

By: _____
John B. Mulleady
Vice President, Real Estate and Construction

_____ Approved for Signature:

_____ Responsible Atty.
_____ RE Manager

Tenant's counsel:

Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas 75219

WEST BANK LA

# EXHIBIT A

## Site Plan

Premises – crosshatched, with Floor Area and frontage thereof (Section 1.01P)
All buildings within the Shopping Center and Floor Area thereof (Section 1.01S)
Customer Pick-Up Areas (Section 2.01(c))
Car Stereo Parking Areas (Section 2.01(c))
Trash Compactor Area (Section 2.01(c))
Web Order Pick-Up Parking Spaces (Section 2.01(c))
Transformer Pad Area (Section 2.01(c))
Tenant's Preferred Area (Section 2.01(c))
Staging Area (Section 3.01)
Construction Drive (Section 5.02(b))
Primary Restoration Area (Section 12.01(a))
Pylon Sign(s) (Section 15.02)
Public Thoroughfares (Section 20.02(a))
No Build Area (Section 20.03(a))
Parking Spaces In Tenant's Preferred Area (Section 20.03(c))
Landlord's permitted outparcel build-out area (Section 22.03(d))
No-Change Area (Section 20.03(f))
Tenant's Trailer (Section E of Exhibit C)
Speculative retail area [Section 2.04(i)]



EXHIBIT B

Legal Description of the Shopping Center

FEE PARCELS

TRACT A

A CERTAIN TRACT OR PARCEL OF LAND, together with all the buildings and improvements thereon, situated in Jefferson Parish, Louisiana, in that part thereof sometimes referred to as the Hunt Foods and Wesson Oil Snowdrift Company Property, on the west bank of the Mississippi River, above the City of Gretna, and being designated as Tract "A" according to boundary survey by Meurer, Sarafini & Meurer, Thomas L. Bernard, Registered Land Surveyor, dated March 12, 1979, a copy of which is attached to Ordinance No. 13828, recorded as Entry No. 870022 of the records of Jefferson Parish, Louisiana, and also according to a plat of survey by Gilbert, Kelly & Couturie, Inc., James H. Couturie, Registered Land Surveyor, dated August 5, 1993, a print of which is attached to an Act of Sale by Don Carter's All-Star Lanes-New Orleans, A Louisiana Partnership in Commendam to Fazzio Rainbow Lanes Westbank, Inc., bearing various dates in August, 1993, and registered at COB 2878, folio 669, Entry No. 93-46340 on the records of Jefferson Parish, Louisiana, as follows:

Commencing at the Southwest corner of Parcel J-IA, which is the northeast corner of the intersection of Manhattan Boulevard and Westbank Expressway, thence South 29° 23 minutes, 49 seconds East, a distance of 720.00 feet to a point, thence North 60° 36 minutes 11 seconds East, a distance of 320.00 feet (title), 319.66 feet (actual) to the point of beginning. Thence North 36° 07 minutes 49 seconds West (title), North 36° 13 minutes 40 seconds West (actual) a distance of 245.94 feet (title), 245.27 (actual) to a point; thence North 60° 36 minutes 11 seconds East, a distance of 235.89 feet to a point; thence South 29° 23 minutes 49 seconds East, a distance of 8.00 feet to a point; thence North 60° 36 minutes 11 seconds East, a distance of 211.50 feet to a point; thence South 29° 23 minutes 49 seconds East, a distance of 12.00 feet to a point; thence North 60° 36 minutes 11 seconds East, a distance of 42 feet to a point; thence South 29° 23 minutes 49 seconds East, a distance of 60.00 feet to a point; thence North 60° 36 minutes, 11 seconds East, a distance of 61.11 feet to a point; thence South 30° 55 minutes 31 seconds East, a distance of 443.87 feet to a point; thence South 53° 52 minutes 11 seconds West (title), South 53° 55 minutes 49 seconds West (actual), a distance of 497.00 feet (title), 496.06 feet (actual), to a point; thence North 36° 07 minutes 49 seconds West (title), North 36° 13 minutes 40 seconds West (actual), a distance of 264.68 feet to a point; thence North 36° 7 minutes 49 seconds West (title), 36° 13 minutes 40 seconds West (actual) a further distance of 75.52 feet (title), 75.53 (actual) to the point of beginning, hereinafter called "Tract A."

TRACT E

A CERTAIN TRACT OR PARCEL OF LAND, together with all the buildings and improvements thereon, situated in Jefferson Parish, Louisiana, in that part thereof sometimes referred to as the Hunt Foods and Wesson Oil Snowdrift Company Property, on the west bank of the Mississippi River, above the City of Gretna, and being designated as Tract "E" according to boundary survey by Meurer, Sarafini & Meurer, Thomas L. Bernard, Registered Land Surveyor,

B-1

dated March 12, 1979, a copy of which is attached to ordinance No. 13828, recorded as Entry No. 870022 of the records of Jefferson Parish, Louisiana, and also according to a plat of survey by Gilbert, Kelly & Couturie, Inc., James H. Couturie, Registered Land Surveyor, dated August 5, 1993, a print of which is attached to an Act of Sale by Don Carter's All-Star Lanes - New Orleans, A Louisiana Partnership in Commendam to Fazzio Rainbow Lanes Westbank, Inc., bearing various dates in August, 1993, and registered at COB 2878, folio 669, Entry No. 93-46340 on the records of Jefferson Parish, Louisiana, as follows:

Commencing at the Southwest corner of Parcel J-IA, which is the northeast corner of the intersection of Manhattan Boulevard and Westbank Expressway, thence South 29° 23 minutes 49 seconds East, a distance of 720.00 feet to the point of beginning. Run thence North 60° 36 minutes 11 seconds East, a distance of 320.00 feet (title), 319.66 feet (actual) to a point; thence South 36° 07 minutes 49 seconds East (title), 36° 13 minutes 40 seconds East (actual), a distance of 75.52 feet (title), 75.53 feet (actual) to a point; thence South 60° 36 minutes 11 seconds West (actual and title), a distance of 328.75 feet (title), 328.60 (actual) to a point; thence North 29° 23 minutes 49 seconds West, a distance of 75.00 feet to the point of beginning; hereinafter called "Tract E."

### TRACTS T-B-1 AND T-B-2

TWO CERTAIN LOTS OF GROUND together with all the buildings and improvements thereon, situated in the PARISH OF JEFFERSON, STATE OF LOUISIANA, in that part thereof known as HUNT FOODS AND WESSON SNOWDRIFT COMPANY PROPERTY on the Westbank of the Mississippi River above the City of Gretna, in that area bounded by the West Bank Expressway, Manhattan Boulevard, Tract "E" and Mary Poppins Drive, being a resubdivision of original Tract T-B, and according to a Resubdivision Survey made by R. P. Fontcuberta, Jr., Land Surveyor, dated May 21, 1981 and approved by Ordinance No. 14825 of the Jefferson Parish Council on July 22, 1981, registered in COB 1009, folio 301, a print of which is annexed to and made part of an act before Michael M. Dorsey, Notary Public, dated July 27, 1981, said lots are designated as "T-B-1" and "T-B-2" and measure as follows:

LOT "T-B-1" commences at the intersection of the Southerly Right of Way Line of the West Bank Expressway and the Easterly Right of Way Line of Manhattan Boulevard; thence, S 29°23'49" E, a distance of 510.00 feet to the point of beginning; thence, N 60° 36' 11" E, a distance of 173.38 feet to a point; thence, N 29° 23' 49" W, a distance of 64.84 feet to a point; thence, N 60° 36' 11" E, E, a distance of 114.00 feet to a point thence, S 36° 07' 49" E, a distance of 277.33 feet to a point; thence, S 60° 36' 11" W, a distance of 157.00 feet to a point; thence, N 29° 23' 49" W, a distance of 85.00 feet to a point thence, S 60°36' 11" W, a distance of 163.00 feet to a point; thence, N 29° 23' 49" W, a distance of 125.00 feet to the Point of Beginning.

LOT "T-B-2" commences at the intersection of the Southerly Right of Way Line of the West Bank Expressway and the Easterly Right of Way Line of Manhattan Boulevard; thence, S 29° 23' 49" E, a distance of 635.00 feet to the point of beginning; thence, N 60° 36' 11" E, a distance of 163.00 feet to a point; thence, S 29° 23'49" E, a distance of 85.00 feet to a point, thence, S 60° 36' 11" W, a distance of 163.00 feet to a point: thence, N 29° 23' 49" W, a distance of 85.00 feet to the Point of Beginning.

Improvements thereon bear Municipal Nos. 903 and 921 Manhattan Boulevard.

B-2

All in accordance with the survey by Dading, Marques & Associates, Inc., Land Surveyor, dated July 25, 1995, which shows said lots to have the same designations, locations and measurements as hereinabove set forth, a print of which is annexed to act passed before Marilyn C. Maloney, Notary Public, dated July 31, 1995.

## RECIPROCAL RIGHTS PARCELS

Those certain mutual reciprocal servitudes of passage and parking created under that certain Mutual Reciprocal Servitude of Passage and Parking and Restrictive Covenants by Ashy-Brown-Pettit and Ashly-Brown-Pettit-Wilson dated April 24, 1974, recorded under Entry No. Entry No. 638290 in COB 812, folio 582 on April 24, 1974 (cross servitude); as amended and re-stated by Amended and Re-Stated Mutual Reciprocal Servitude of Passage and Parking and Restrictive Covenants by Ashy-Brown-Pettit-Wilson, Don Carter's All Star Lanes-New Orleans and H.J. Wilson Co, Inc. dated April 24, 1979, recorded under Entry No. 881209 in COB 960, folio 563 on July 5, 1979; as further amended and re-stated by Act of Amendment to Amended and Re-Stated Mutual Reciprocal Servitude of Passage and Parking and Restrictive Covenants by Ashy-Brown-Pettit-Wilson and Don Carter's All Star Lanes - New Orleans dated June 13, 1980, recorded under Entry No. 926270 in COB 983, folio 487 on June 13, 1980; and as further amended and re-stated by Amended and Re-Stated Mutual Reciprocal Servitude of Passage and Parking and Restrictive Covenants by Ashy-Brown-Pettit-Wilson, Don Carter's All-Star Lanes - New Orleans and H. J. Wilson Co., Inc. dated January 16, 1981, recorded under Entry No. 957426 in COB 999, folio 1 on February 23, 1981, affecting Tract A, Tract E, T-B-1 and Tract T-B-2, and the property more fully described as follows:

## TRACT W-2

A CERTAIN TRACT OR PARCEL OF LAND, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in Jefferson Parish, Louisiana, in that part thereof sometimes referred to as the Hunt Foods and Wesson Oil Snowdrift Company Property, on the west bank of the Mississippi River, above the City of Gretna, and being designated as Tract "W-2" according to a survey and resubdivision prepared by John E. Walker, Civil Engineer dated at New Orleans, January 18, 1974, a copy of which is attached to an ordinance of Jefferson Parish, recorded as Entry No. 631721, of the records of the Parish of Jefferson, State of Louisiana, as follows:

> Commencing at the intersection of the South right-of-way line of Mary Poppins Drive and the east right-of-way line of the Westbank Expressway, as shown on the above described plat, thence South 30° 53 minutes 18 seconds East a distance of 153.58 feet to the point of beginning; thence continue South 30° 53 minutes 18 seconds East a distance of 502.55 feet along the South right-of-way line of Mary Poppins Drive to a point and corner; thence South 60° 36 minutes 11 seconds West a distance of 61.11 feet to a point and corner, thence North 29° 23 minutes 49 seconds West a distance of 60 feet to a point and corner; thence South 60° 36 minutes 11 seconds West a distance of 42.00 feet to a point and corner, thence North 29° 23 minutes 49 seconds West a distance of 20.00 feet to a point and corner; thence South 60° 36 minutes 36 seconds

West a distance of 207.50 feet to a point and corner, thence North 29° 23 minutes 49 seconds West a distance of 220.93 feet to a point and corner; thence South 60° 36 minutes 11 seconds West a distance of 208.54 feet to a point and corner; thence North 29° 23 minutes 49 seconds West a distance of 125.00 feet to a point and corner; thence South 52° 48 minutes 42 seconds West a distance of 150.00 feet to a point and corner; thence North 29° 23 minutes 49 seconds West a distance of 175.00 feet to the east right-of-way line of Westbank Expressway; thence along the east right-of-way line of Westbank Expressway North 52° 48 minutes 42 seconds East a distance of 203.83 feet to the beginning of a curve; thence along the arc of a curve to the right having a radius of 7,489.44 feet, a distance of 267.10 feet to a point and corner; thence South 29° 23 minutes 49 seconds East a distance of 127.33 feet to a point; thence along the arc of a curve to the left having a radius of ten feet, a distance of 15.71 feet to a point; thence North 60° 36 minutes 11 seconds East a distance of 177.52 feet to the point of beginning; hereinafter called "Tract W-2."

## TRACT T-A

A CERTAIN TRACT OR PARCEL OF LAND, together with all the buildings and improvements thereon, situated in Jefferson Parish, Louisiana, in that part thereof sometimes referred to as the Hunt Foods and Wesson Oil Snowdrift Company Property, on the west bank of the Mississippi River, above the City of Gretna, and being designated as Tract "T-A" according to a map on file and of record in the office of the Clerk of Court and Recorder for Jefferson Parish, Louisiana, being more particularly described as follows:

Commencing at the Southwest corner of Parcel J-IA, which is the northeast corner of the intersection of Manhattan Boulevard and Westbank Expressway, thence South 29° 23 minutes 49 seconds East, a distance of 175.00 feet to the point of beginning; thence South 29° 23 minutes 49 seconds East, a distance of 50.00 feet to a point and corner; thence North 60°36 minutes 11 seconds East, a distance of 173.38 feet to a point and corner; thence South 29° 23 minutes 49 seconds East, a distance of 175.00 feet to a point and corner; thence South 29° 23 minutes 49 seconds East, a distance of 45.16 feet to a point; thence North 60° 36 minutes 11 seconds East, a distance of 114.00 feet to a point and corner; thence South 36° 07 minutes 49 seconds East, a distance of 31.39 feet to a point and corner; thence North 60° 36 minutes 11 seconds East a distance of 235.89 feet to a point and corner; thence North 29° 23 minutes 49 seconds West, a distance of 220.93 feet to a point and corner; thence South 60° 36 minutes 11 seconds West, a distance of 208.54 feet to a point and corner; thence North 29° 23 minutes 49 seconds West, a distance of 125.00 feet to a point and corner; thence South 52° 48 minutes 42 seconds West, a distance of 325.00 feet to the point of beginning.

## TRACT C-1

A CERTAIN TRACT OR PARCEL OF LAND, together with all the buildings and improvements thereon, situated in Jefferson Parish, Louisiana, in that part thereof sometimes referred to as the Hunt Foods and Wesson Oil Snowdrift Company Property, on the west bank of the Mississippi River, above the City of Gretna, and formerly being designated as Tract "C"

C:\Documents and Settings\kgamer\Local Settings\Temporary Internet Files\OLK114\CC Lease Version 11 response V3.DOC
Dallas 1251043_3 7680.4

according to boundary survey by Meurer, Sarafini & Meurer, Thomas L. Bernard, Registered Land Surveyor, dated March 12, 1979, a copy of which is attached to Ordinance No. 13828, recorded as Entry No. 870022 of the records of Jefferson Parish, Louisiana, as follows:

> Commencing at the Southwest corner of Parcel J-IA, which is the northeast corner of the intersection of Manhattan Boulevard and Westbank Expressway, thence South 29° 23 minutes 49 seconds East, a distance of 945.00 feet to a point of beginning. Run thence North 60° 36 minutes 11 seconds East, a distance of 250.00 feet to a point; thence North 29° 23 minutes 49 seconds West a distance of 150.00 feet to a point; thence North 60° 36 minutes, 11 seconds East a distance of 78.75 feet to a point; thence South 36° 7 minutes 49 seconds East a distance of 264.68 feet to a point; thence South 53° 32 minutes 11 seconds West a distance of 362.41 feet to a point; thence North 29° 23 minutes 49 seconds West a distance of 155.31 feet to a point of beginning, all according to survey by Richard T. Dading, Registered Land Surveyor, dated December 14, 1984, and annexed to Jefferson Parish Ordinance of Resubdivision No. 16339, registered in Jefferson Parish, Louisiana, COB 1202, folio 52, Entry No. 8509986.

## TRACT C-2

A CERTAIN TRACT OR PARCEL OF LAND, together with all the buildings and improvements thereon, situated in Jefferson Parish, Louisiana, in that part thereof sometimes referred to as the Hunt Foods and Wesson Oil Snowdrift Company Property, on the west bank of the Mississippi River, above the City of Gretna, and formerly being designated as Tract "C" according to boundary survey by Meurer, Sarafini & Meurer, Thomas L. Bernard, Registered Land Surveyor, dated March 12, 1979, a copy of which is attached to Ordinance No. 13828, recorded as Entry No. 870022 of the records of Jefferson Parish, Louisiana, as follows:

> Commencing at the Southwest corner of Parcel J-IA, which is the northeast corner of the intersection of Manhattan Boulevard and Westbank Expressway, thence South 29° 23 minutes 49 seconds East, a distance of 795.00 feet to the point of beginning. Run thence North 60° 36 minutes 11 seconds East a distance of 250.00 feet to a point; thence South 29° 23 minutes 49 seconds East a distance of 150.00 feet to a point; thence South 60° 36 minutes 11 seconds East a distance of 250.00 feet to a point; thence North 29° 23 minutes 49 seconds West a distance of 150.00 feet to a point of beginning, all according to survey by Richard T. Dading, Registered Land Surveyor, dated December 14, 1984, and annexed to Jefferson Parish Ordinance of Resubdivision No. 16339, registered in Jefferson Parish, Louisiana, COB 1202, folio 52, Entry No. 8509986.

## TRACT T-B-3

A CERTAIN TRACT OR PARCEL OF LAND, together with all the buildings and improvements thereon, situated in Jefferson Parish, Louisiana, in that part thereof sometimes referred to as the Hunt Foods and Wesson Oil Snowdrift Company Property, on the westbank of the Mississippi River, above the City of Gretna, and formerly being designated as Tract "T-