

EXHIBIT

A

Hayward, CA

## LEASE

This LEASE is made as of the 3rd day of May, April, 2004, by and between **BATAVIA HOLDINGS, L.L.C.**, a Washington limited liability company, having an address at 1809 Seventh Avenue, Suite 1002, Seattle, WA 98101 ("Landlord"), and **CIRCUIT CITY STORES WEST COAST, INC.**, a California corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

## WITNESSETH:

The parties hereto agree as follows:

1.    <u>Leased Property</u>.  Subject to the provisions set forth in Section 35 below, Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are constructed or renovated on that approximately 33,862 square foot parcel (the "Land"), outlined on Exhibit "A" (the "Site Plan"), together with the exclusive rights in the three (3) automobile loading stalls labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, the exclusive rights in six (6) parking spaces for "Car Stereo Parking" in a mutually agreed upon location, and with the non-exclusive easements described in paragraph 6 below; all located in the shopping center (herein referred to as the "Shopping Center"), located at 2840 Whipple Road, in the City of Hayward (the "City"), County of Alameda (the "County"), State of California (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-2" attached hereto.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  Landlord agrees that it will not consent to, approve or establish any rules and regulations applicable to Tenant without Tenant's prior written consent, which consent shall not be unreasonably withheld.  Tenant acknowledges that Landlord, without Tenant's consent, may establish rules and regulations for other occupants in the Shopping Center so long as such rules and regulations are not applicable to Tenant.  Tenant acknowledges that if Landlord is unable to negotiate a reciprocal driveway easement with the adjacent owner, the Shopping Center will be as depicted on Exhibit "A-1" ("Alternative Site Plan").  Landlord will notify Tenant on or before April 30, 2004 of its election to utilize the Site Plan or the

Alternative Site Plan. If Landlord elects to use the Alternative Site Plan, then from and after the date Landlord delivers written notice of its election to Tenant, all references in the Lease to Site Plan shall be deemed to refer to the Alternative Site Plan.

2.    Construction of Building and Improvements. Commencing following "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C") and incorporated herein by reference for all purposes), Tenant shall commence to construct within the Shopping Center a one-story retail building, containing approximately 33,862 square feet of ground-floor gross leasable area, including at Tenant's election, a non-sales area mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions and approved by Landlord as specified in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant and approved by Landlord as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Improvements and the Land are referred to herein as the "Premises".

3.    Lease Term. Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for three (3)

2

consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above; provided, however, that in the event Landlord provides Tenant with such written notice of termination and Tenant fails to exercise its Renewal Option within such ten (10) business day period (or is deemed to have not exercised such renewal option as provided below), then the Main Term of the Lease shall automatically be extended by the amount of days necessary to cause the expiration date of the Lease to occur on the date which is one hundred eighty (180) days following the expiration of such ten (10) business day period. Tenant acknowledges and agrees that if Tenant fails to exercise its Renewal Option within such ten (10) business day period, then such failure shall be deemed to be Tenant's election not to exercise such Renewal Option.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    <u>Base Rent</u>. During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner

3

specified hereunder, commencing (subject to paragraph 3 of the Construction Provisions) on the earlier of (i) Tenant's opening for business to the public or (ii) 210 days following Landlord's Delivery of the Land to Tenant as provided in, and in accordance with, the Construction Provisions (the "Commencement Date").

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, in lawful money of the United States, without offset or deduction (except as expressly permitted in this Lease), to the address given for Landlord in paragraph 32, or such other address as Landlord may designate from time to time, pursuant to the following schedule:

(a) <u>First Five (5) Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Eight Hundred Forty-Six Thousand Five Hundred Fifty and No/100 Dollars ($846,550.00), payable in equal monthly installments of Seventy Thousand Five Hundred Forty-Five and 83/100 Dollars ($70,545.83).

(b) <u>Adjustment in Base Rent</u>. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 33,862 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as shown on the last set of approved Plans and Specifications), but in no event more than 33,962 square feet or less than 33,762 square feet, multiplied by Twenty-Five and No/100 Dollars ($25.00). In determining the ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(c) <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth (6th) and every succeeding fifth (5th) Lease Year, such that the Base

4

Rent shall equal the product of the actual ground-floor leasable area of the Building (subject to the limitations for re-measurement set forth in paragraph 4(b) above) multiplied by:

| | | |
|---|---|---|
| (i) | Years 6 – 10: | $26.00 |
| (ii) | Years 11 – Main Term expiration date: | $27.00 |
| (iii) | First Option: | $29.70 |
| (iv) | Second Option: | $32.67 |
| (v) | Third Option: | $35.94 |

5.    <u>Development of Shopping Center by Landlord</u>.    Landlord covenants to construct, develop and operate a first-class shopping center consistent with the standards of other first class shopping centers of comparable size in the Hayward area.    The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan, <u>Exhibit "C"</u> (Construction Provisions) and <u>Exhibit "C-1"</u> (Standard Design and Construction Specifications).    The parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) 4.5 spaces per 1,000 square feet of gross leasable area in the Shopping Center or (ii) that required by applicable zoning requirements.    All parking shall be at ground level.    Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction (excluding therefrom any consequential or punitive damages).    Landlord's construction shall not interfere with the conduct of Tenant's business.

6.    <u>Easements</u>.    Landlord also grants to Tenant those nonexclusive easements which shall run as covenants with Landlord's Premises and the Premises during the Term, over Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

(a)    Construction Easements.    During the Construction Term, and subject to the alterations provisions set forth this Lease, any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in constructing the Improvements (such Staging Area may be used during the Construction Term only), (ii) subject to Landlord's approval of the Plans and Specifications as provided in the Construction Provisions, an easement to permit the Building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon Landlord's Premises, (iii) subject to Landlord's approval of the Plans and Specifications as provided in the Construction Provisions, an easement for such additional underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord (or Landlord's tenants, permittees and invitees) of the Common Areas, for the benefit of the Premises.  For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, following approval from Landlord, not to be unreasonably withheld, delayed or conditioned, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.  In exercising the rights in this paragraph 6, Tenant shall not unreasonably interfere with Landlord's Work, and Landlord's tenants' and invitees' work and operations in the Shopping Center, and such rights shall be exercised in compliance with all applicable laws, rules and regulations.  The location of any staging area for subsequent construction or alterations shall be as mutually approved in good faith by Landlord and Tenant.

(b)    Common Area Easements.    Landlord does hereby additionally grant to Tenant a non-exclusive easement in common with Landlord and Landlord's

tenants, permitees and invitees (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefore unless required by law. It is specifically agreed that with respect to the automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements with Landlord's approval, which approval Landlord shall not unreasonably withhold so long as such relocation does not violate any provisions in Landlord's other leases, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such automobile loading stalls shall be used exclusively by Tenant's customers, invitees and patrons. Subject to compliance with all applicable laws, rules and regulations, and upon prior written notice to Landlord, Tenant shall also have the right to use that portion of the Common Areas identified on the Site Plan as (x) the "Permissible Promotional Area" for seasonal and promotional sales and demonstrations and other events customary to Tenant's business operations; provided that Tenant shall not conduct any such promotions or demonstrations more than four (4) times per calendar year, and for not more than one (1) week each time, during any twelve (12) month period and (y) the "Customer Pick Up" for Tenant's customers, invitees and patrons exclusive use in accordance with the provisions of this Lease. In addition, subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned, Tenant shall have the right to install up to two (2) cart corrals within the parking area in the area shown on the Site Plan (or other mutually agreeable location), and Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals; provided, however, that it shall be reasonable for Landlord to withhold its consent if Landlord cannot procure the consent of another tenant within the Shopping Center whose consent would be necessary if the location of the cart corral(s) would fall within a portion of the Common Area over which such other tenant has consent rights.

Tenant agrees to use reasonable efforts to periodically remove its shopping carts from the Common Area.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a first-class manner, consistent with other first-class shopping centers of comparable size in the Hayward, California area, including cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)    CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating, repairing, insuring (to the extent permitted hereunder), maintaining and replacing (to the extent permitted hereunder) the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) which shall not exceed seven and one-half percent (7-1/2%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

8

(i)    real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(ii)    any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(iii)    maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect, or condition, to any interior mall space or to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas;

(iv)    repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(v)    amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(vi)    amounts received from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(vii)    premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(viii)    repairs or replacements of a capital nature (whether or not capitalized) [provided that if Landlord incurs a capital expenditure which is intended to and actually does reduce CAM Charges and is not incurred as a result of the negligence or willful misconduct of Landlord, such costs may be amortized in accordance with generally accepted accounting principles over the useful life of the item so amortized];

(ix)    improvements, repairs or replacements (other than patching, striping, seal coating and similar minor periodic maintenance) to the parking lot or other paved areas during the first seven (7) "CAM Years" (as defined below);

9

(x)     reserves for anticipated future expenses;

(xi)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(xii)   Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(xiii)  amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions), except for the removal of specific tangible items left at the Shopping Center by third parties, the removal which would traditionally be considered a normal expense, such as the removal of abandoned automobile tires and batteries;

(xiv)   any new improvements to the Shopping Center or Common Areas, including but not limited to renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center;

(xv)    amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own premises; or

(xvi)   other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards.  CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)     Tenant Payments.  Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord in equal monthly installments, Tenant's Pro Rata Share of estimated CAM Charges, which are estimated initially to be $4.50 per square foot of ground-floor gross leasable area (subject to the limitations for re-measurement set forth in paragraph 4(b) above) in the Building per annum.  Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period, including the first Lease Year, is a "CAM Year"), and shall be paid by

Tenant in equal monthly installments, on the first day of each month during such CAM Year. CAM Charges shall be considered additional rent for all purposes of this Lease. CAM Charges for "controllable expenses" shall not exceed by more than four percent (4%) each year on a cumulative basis. "Controllable expenses" shall exclude amounts paid by Landlord for Real Estate Taxes, insurance premiums, utility charges, trash removal and other extraordinary non-recurring expenses. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall be made within thirty (30) days; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building (subject to the limitations for re-measurement set forth in paragraph 4(b) above) and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 38,000 square feet; the remainder of CAM Charges shall

11

be borne by Landlord and/or other tenants. Notwithstanding the foregoing, during the first two CAM Years, the denominator of the fraction by which Tenant's Pro Rata Share is determined shall be based on the actual number of occupied square feet of gross leasable area within the Shopping Center.

       (d)   Examination of Landlord's Records. Tenant, at its sole cost and expense (except as provided below), shall have the right, but not more often than once as to any CAM Year and no later than three (3) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within thirty (30) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of four percent (4%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.

      8.   Signs and Communications Equipment.

       (a)   Pylon Sign. Subject to governmental approval, Tenant shall have the right to construct and install, for Tenant's exclusive use and at Tenant's sole cost and expense, a pylon sign structure (with electrical wired box installed) for the purpose of identifying Tenant's store in a location mutually approved by Landlord and Tenant. In connection therewith, Tenant shall submit to Landlord plans and specifications for such pylon sign (including color, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof, for Landlord's written approval, which shall not be unreasonably withheld, delayed or conditioned. Tenant, at Tenant's sole cost and expense, shall maintain such pylon sign in a first-class manner, consistent with other such signs in first-class shopping centers of comparable size in the Hayward, California area.

       (b)   Monument and Building Signs. Provided Landlord obtains the requisite government approvals (and Landlord covenants to use its commercially reasonable efforts to obtain such approvals), Landlord, at its sole cost and expense, no later than the date set forth on Attachment "1" to the Construction Provisions, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a multi-tenant monument sign structure (the "Monument Sign") (with electrical wired box

installed) having sufficient space thereon in the top tenant position for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense. Landlord shall submit to Tenant plans and specifications for the Monument Sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed. Tenant hereby acknowledges and agrees that the proposed Monument Sign shown on Exhibit "E-1" attached hereto is hereby approved by Tenant. Any modifications to the proposed Monument Sign shown on Exhibit "E-1" shall be subject to Tenant's approval, which approval shall not be unreasonably withheld or delayed. In the event that the proposed Monument Sign contains multiple sign panels, Landlord acknowledges that Tenant's sign panel shall be in the top tenant position, and that Tenant shall have the right to approve the size and position of all other tenant sign panels, which approval shall not be unreasonably withheld or delayed. Tenant acknowledges and agrees that the size and position of other tenant sign panels shown on Exhibit "E-1" are hereby approved by Tenant and as long as the size of such sign panels are not changed, Tenant shall have no further approval rights thereover. Notwithstanding anything to the contrary herein, the cost of maintaining the Monument Sign shall be included in CAM Charges. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans; provided that such change is made at no cost or expense to Landlord.

(c)    Communications Equipment. Tenant may, for its own use, or for the use of its successors, subtenants or assigns, install, maintain and/or replace any satellite dishes, antennas, cellular and PCS towers and poles on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same is approved by Landlord in accordance with the Construction Provisions and does not

adversely and materially affect the roof or the structural elements thereof. Tenant further agrees to use commercially reasonable efforts to ensure that such equipment does not unreasonably interfere with Landlord's or Landlord's tenants' operations in the Shopping Center.

    (d)   <u>Existing Billboard Sign</u>. Tenant acknowledges the existence of a billboard sign within the Shopping Center in the location shown on the Site Plan (the "Billboard") currently leased to Clear Channel Communications. Landlord represents and warrants to Tenant that Landlord has no control over the content of the signage on the Billboard.

    9.   <u>Taxes</u>.

    (a)   <u>Taxes Contemplated Hereunder</u>. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes, provided, however, that Tenant shall not be liable for increases in taxes or assessments that result from "changes in ownership" (as defined in Article XII of the Constitution of the State of California) of all or any portion of the Premises except for (i) two (2) such increases during the Main Term and, if applicable, (ii) one (1) such increase during each five (5) year period during the Option Periods. The foregoing limitation shall not include any transfers made by Landlord to an affiliate of Landlord which do not constitute a "change in ownership" within two (2) years following the date of this Lease. In addition, the foregoing limitation shall not absolve Tenant from paying any increased assessments that are levied for reasons other than a "change in ownership", e.g., regular annual tax increases. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease.

    (b)   <u>Payment of Real Estate Taxes</u>. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real

Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of twelve percent (12%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder, subject to the Offset Limitation (defined in paragraph 29(b) below).

(c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10) business days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any

15

instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof; provided that Landlord shall not be obligated to incur any costs in connection therewith.

(d)    Payment Following Appeal.    Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.

10.    Maintenance, Repairs and Replacements.    Except (i) for costs covered by Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant (if any), (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building in a first-class manner, consistent with other first class retail buildings of comparable size in the Hayward, California area, and the HVAC system in compliance with all applicable laws. Notwithstanding the foregoing, Tenant shall have no obligation to install or construct alterations or incur expenditures pursuant to this paragraph during the last four (4) years of the Lease Term; provided however that that during the last four (4) years of the Lease Term, if Tenant elects to make any such replacement of a capital nature in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized on a straight-line basis in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations (with an amortization period not to exceed ten (10) years), over the remainder of the Term, then Tenant shall be reimbursed by Landlord by that amount of the cost associated with such

repairs, construction or alteration for the period beyond the remainder of the Term, so long as any replacements of a capital nature are first approved by Landlord, who has the right to require Tenant to repair said item rather than replace it, if repair is reasonably possible. If Tenant does not elect to make any such capital replacement as provided above, Tenant shall not be entitled to terminate the Lease in the event of any casualty or loss of use of the Premises as a direct result of the failure of Tenant to make any such replacement. Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof (excluding roof membrane, which shall be maintained by Tenant), roof structure, flooring system, floor slab, foundation, load bearing walls and exterior structural walls, except to the extent the repairs are required due to Tenant's faulty construction or Tenant's negligence or willful misconduct, in which event such repairs shall be made by Tenant (except to the extent covered by insurance maintained by Landlord under this Lease). In addition, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, as well as sidewalks and landscaping, and include the cost of same as part of CAM Charges to the extent permissible pursuant to paragraph 7 above. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    <u>Utility Service Provider; Payment of Utility Bills.</u>    Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Tenant shall be responsible to pay for all customary utility hook-up fees and meter fees in connection with the Building.

Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center, which charges shall be included as part of CAM Charges to the extent permissible pursuant to paragraph 7 above.

12.    Alterations. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire.    With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall otherwise have the right, at its sole cost, to otherwise alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the then-existing architecture of the Shopping Center. Landlord may, at the time it is granting such consent, condition its consent with respect to any alterations (other than exterior finish alterations) for which such consent is required hereunder and which are particular or unique to Tenant's specific use of the Premises, upon Tenant's agreement to remove such alterations at the end of the Term and to restore the Premises to their condition prior to such alterations.    Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work.    Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within twenty (20) days following Tenant's delivery of such plans and specifications to Landlord, and which failure continues for ten (10) days after delivery by Tenant to Landlord of a second notice (which notice shall state in capital letters that "FAILURE TO RESPOND WITHIN THE TIME FRAME SET FORTH SHALL BE DEEMED APPROVAL").    Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.    All alterations made by Tenant shall be in compliance with all applicable laws, rules and

18

regulations, shall not adversely affect the structural integrity of the Building, shall be conducted in a lien-free manner and shall not unreasonably interfere with the operations in the Shopping Center. Any staging area required for such alterations shall be subject to Landlord's reasonable approval. Tenant shall be obligated to comply with all government mandated modifications required to be made to the Common Areas (e.g., ADA requirements) if such modifications are required solely as a result of Tenant procuring a building permit in connection with alterations performed by Tenant with respect to the Premises.

13.   <u>Mechanics' Liens</u>.  Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.   <u>Insurance</u>.

(a)   <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction. During the Main Term and all Option Periods, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially

19

reasonable deductible, for which Tenant shall be fully responsible. The policy shall provide coverage, if available at commercially reasonable rates and generally carried by Tenant for a majority of its other locations, for damage due to earthquake (provided, however, that if Tenant does not carry earthquake coverage, damage due to earthquake shall nevertheless be deemed to be an insured casualty for all purposes of this Lease (i.e., Tenant shall be deemed to have self-insured for earthquake loss). Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b)    <u>Liability Insurance</u>.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible. At the end of the tenth (10th) Lease Year and at the commencement of each Option Term, this minimum coverage amount may, upon written notice from Landlord to Tenant, be increased to an amount that is consistent with coverages required by other landlords of similar tenants in the market area.

(c)    <u>Workers' Compensation Insurance</u>.  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    Self-Insurance.    Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant or Guarantor has a tangible reported net worth, as of the end of its most recent quarterly reporting period, of not less than One Hundred Million Dollars ($100,000,000); provided that such amount shall be subject to increases corresponding to the percentage increases in the Base Rent pursuant to paragraph 4(c) above at the intervals set forth therein.

(e)    Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.    During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant and Tenant's guarantor as additional insureds to the fullest extent of their insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such

deductible amount exceed an amount which a prudent Landlord with a similar net worth as Landlord would maintain for Common Area liability coverage. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)     Workers' Compensation – Statutory Limits; Employers Liability – $500,000;

2)     Automobile Liability for all vehicles with limits of $2,000,000; and

3)     Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)     <u>Policy Provisions</u>. All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this

22

paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14. All insurance to be maintained by Tenant shall, except for workers' compensation and employer's liability insurance, be primary.

(g)    Waiver of Right of Recovery and Subrogation. To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)    Evidence of Insurance. Subject to Tenant's right to self-insure hereunder, (i) upon commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

(i)    Indemnities. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death,

damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof, including, without limitation, the construction performed by Tenant as provided in this Lease.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees, including, without limitation, the construction performed by Landlord as provided in this Lease.

15.    <u>Damages by Fire or Other Casualty</u>.

(a)    <u>Insured Casualty</u>.  In the event of a fire or other casualty, causing destruction or damage to the Premises for which insurance protection (or self-insurance) is required to be maintained under this Lease or is maintained (an "Insured Casualty"), the provisions of this paragraph 15(a) shall control.  In the event that substantial completion of the restoration of the Improvements cannot reasonably be expected to occur within three hundred sixty (360) days from the date of the Insured Casualty, Tenant shall have the right upon thirty (30) days written notice to Landlord (which notice shall be delivered to Landlord within thirty (30) days following the date Landlord and Tenant meet as provided below), to terminate this Lease, and Landlord shall receive the proceeds of any insurance (together with any applicable deductible, the amount of which deductible shall be paid by Tenant to Landlord) which are paid by the insurance carrier issuing the policy of insurance required to be maintained pursuant to paragraph 14(a) above, or, in the event Tenant self-insures for an Insured Casualty, the amount necessary for reconstruction of the Improvements.  Landlord and Tenant shall meet and confer in good faith to estimate the time required to complete the restoration of the Improvements within forty-five (45) days following the date of the Insured Casualty.  If this Lease is not terminated as provided for above, then within a reasonable time after such casualty (subject to force majeure, applicable building codes, the procurement of building permits, which Tenant shall diligently pursue, and the receipt of insurance proceeds (unless self-insured), which Tenant shall diligently pursue), Tenant shall diligently complete reconstruction of the Premises to that condition existing immediately prior to such casualty.  Notwithstanding the foregoing, in conjunction with the restoration of the Premises, Tenant may make such alterations as may be permitted under paragraph 12 hereof, subject to the provisions of paragraph 12.

(b)    <u>Uninsured Casualty</u>.  In the event of destruction or damage to the Premises for which insurance protection (or self-insurance) is not required to be maintained under this Lease (and in fact is not maintained) (an "Uninsured Casualty"), which (i) will have, in Tenant's reasonable estimation, a repair or reconstruction cost of twenty percent (20%) of the replacement cost therefor or more, or (ii) substantial completion of the restoration of the Improvements cannot reasonably be expected to

occur within three hundred sixty (360) days from the date of such Uninsured Casualty (and Landlord and Tenant shall meet and confer in good faith to estimate the time required to complete the restoration of the Improvements within forty-five (45) days following the date of the Uninsured Casualty), Tenant shall have the right, at its option, to notify Landlord of the actual cost estimate of such repair or restoration, and Tenant's election to terminate this Lease. Tenant shall notify Landlord of its exercise of such option as soon as possible following such conference with Landlord. Notwithstanding the foregoing, in the event that Tenant elects to terminate this Lease as a result of such an Uninsured Casualty to the Improvements on the grounds that Tenant reasonably estimates that the cost will be in excess of twenty percent (20%) of the replacement cost thereof to repair or reconstruct (but which may take less than three hundred sixty (360) days from the date of such Uninsured Casualty to reconstruct), Landlord shall have the right, within thirty (30) days of receipt of Tenant's notice of termination, to provide Tenant with written notice of its intention to pay the cost of repairing or reconstructing the Premises in excess of such twenty percent (20%) threshold, in which event, subject to Landlord in fact paying such excess, this Lease shall remain in full force and effect; provided, however, that the foregoing twenty percent (20%) threshold shall be in effect only during the Main Term and shall thereafter decrease to fifteen percent (15%) during each and every Option Period. In the event Tenant elects not to terminate this Lease as set forth above, then, subject to force majeure, Tenant shall diligently commence and pursue to completion the reconstruction of the Premises to their condition existing immediately prior to such damage, regardless of the amount of damage to same, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, subject to the provisions of paragraph 12.

      (c)      <u>Reconstruction of Common Areas and Stores</u>. Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and reconstruct (or cause to be reconstructed) not less than ninety percent (90%) of the gross leasable area (excluding the Premises) identified on the Site Plan to the condition existing immediately prior to the casualty, regardless of the amount of damage to same.

(d)    Last Two (2) Years of Main Term or Option Period. Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive (i) the proceeds of any insurance (together with any applicable deductible) which are paid by the insurance carrier issuing the policy of insurance required to be maintained pursuant to paragraph 14(a) above, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above.

(e)    Waiver.  Except as provided above, Tenant hereby waives the provisions of Section 1932(2) and 1933(4) of the California Civil Code.

16.    Condemnation.

(a)    Definition of Taking and Substantial Taking.  For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of (x) 4.5 spaces per 1,000 square

27

feet of gross leasable area in the Shopping Center or (y) that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is impeded.

(b)     Tenant's Rights Upon Taking or Substantial Taking.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)     Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)     Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that

all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)     <u>Rights Upon Temporary Taking</u>.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)     <u>Taking of the Sign(s)</u>.  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide within ninety (90) days a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

(g)     <u>Tenant's Right Upon Condemnation</u>.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

(h)    <u>Waiver</u>. Except as provided above, Tenant hereby waives the right to terminate this Lease pursuant to the provisions of Section 1265.130 of the California Code of Civil Procedure.

17.    <u>Assignment and Subletting</u>. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent. In the event of such a Transfer, Tenant and Guarantor shall remain liable for all of Tenant's obligations to Landlord arising hereunder so long as this Lease is not changed, modified or amended in any respect by Landlord and any transferee without the consent of Tenant, which consent may be withheld in Tenant's sole and absolute discretion (i.e., Tenant shall be released from liability hereunder only with respect to any such changes, modifications or amendments to which Tenant has not consented in writing). Each assignee or sublessee, for the benefit of Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant. Within a reasonable period of time after execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not give rise to Landlord's right to recapture set forth below.

Notwithstanding anything hereinabove to the contrary, if Tenant gives notice to Landlord that Tenant desires to assign this Lease or to sublet all or any part of the Premises to an unaffiliated third party (or parties) for all or substantially all of the then remaining Term of this Lease, then Landlord may elect to cancel this Lease as to that portion of the Premises which is the subject of such assignment or sublease. For purposes of the foregoing, the granting of licenses or concessions by Tenant or the creation of departments by Tenant (as described below) shall not be deemed to be an assignment or sublease. In order to exercise its election to cancel, Landlord shall provide a written notice to Tenant, which notice shall be given no later than thirty (30) days after Landlord's receipt of Tenant's request for Landlord's consent to such assignment or subletting. In the event of any such election to cancel by Landlord, Tenant may elect to either (a) nullify such cancellation by giving notice to Landlord within thirty (30) days

30

after Tenant's receipt of Landlord's notice of cancellation that Tenant withdraws its request for Landlord's consent to such assignment or subletting; or (b) require that such cancellation be effective as to all of the Premises. If Landlord's election to cancel is not vitiated by Tenant, then such cancellation shall be effective on the proposed effective date of the assignment or sublease by Tenant; provided that if such cancellation follows an election by Tenant under clause (b) in the preceding sentence, Landlord may elect to withdraw its election to cancel this Lease by providing written notice of such election to Tenant within five (5) business days of Landlord's receipt of written notice from Tenant of Tenant's requirement that the cancellation be effective as to all of the Premises and, in such event, this Lease shall not be cancelled and Landlord shall be deemed to have consented to such assignment or subletting. In the event of any such cancellation of this Lease, Landlord shall reimburse Tenant for the unamortized cost of the Improvements, including without limitation any alterations or additions thereto (or portion thereof as to which such cancellation is effective), in excess of the Tenant Improvement Allowance paid by Landlord attributable thereto, amortized on a straight-line basis in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations (with an amortization period not to exceed ten (10) years). Upon written request from Landlord (but not more than twice in any calendar year), Tenant shall provide Landlord with the then current unamortized cost of the Improvements as described in the immediately preceding sentence.

18.    Use.

(a)    Tenant may initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)    Thereafter, Tenant shall also have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

(c)    Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use; provided, however, that notwithstanding anything contained herein to the contrary, in the event that Tenant has opened for business but has thereafter ceased operations at the Premises for a period of twelve (12) consecutive months, subject to force majeure or permitted alterations or reconstruction following casualty or condemnation (which alterations or reconstruction Tenant shall diligently and in good faith commence and pursue to completion), then Landlord may elect to terminate this Lease on ninety (90) days prior written notice.  Such election to terminate shall, however, be of no force and effect if Tenant resumes operations at the Premises prior to the end of the twelve (12) month period aforesaid.  In the event such election to terminate is effective, then Landlord shall pay to Tenant on or before the termination date the unamortized costs and expenses of the Improvements paid for by Tenant, including without limitation the costs of alterations and additions thereto, paid for by Tenant and not reimbursed by Landlord, either through the Tenant Improvement Allowance or otherwise, amortized on a straight-line basis in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations (with an amortization period not to exceed ten (10) years).  Upon written request from Landlord (but not more than twice in any calendar year), Tenant shall provide Landlord with the then current unamortized cost of the Improvements as described in the immediately preceding sentence.

19.    Warranties, Representations and Covenants.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    Quiet and Peaceful Enjoyment.  Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises, free from any claims and/or

interference by those claiming by, through or under Landlord, subject to the provisions of this Lease.

(ii)    Title.    Landlord's fee simple interest in the Shopping Center, upon Landlord's acquisition thereof, will be free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances" and/or any loan obtained by Landlord in connection with its acquisition of the Shopping Center (subject to paragraph 21 below), or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party (except for applicable governmental authorities as provided in paragraph 35 below), including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage. This representation, warranty and covenant is a material inducement to Tenant's execution of this Lease.

(iii)    Certificate of Authority.    Landlord covenants that it is a duly constituted limited liability company ("LLC") under the laws of the State of Washington, and that its Managing Member, who is acting as its signatory in this Lease, is duly authorized and empowered to act for and on behalf of the LLC. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the LLC, and (b) the authority of the Managing Member to bind the LLC as contemplated herein.

(iv)    No Litigation.    There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or (to Landlord's actual knowledge) pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

33

(v)    <u>Hazardous or Toxic Materials</u>.  Except as disclosed in the environmental reports identified on <u>Exhibit "F"</u>, Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center.  If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory damages, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    <u>Tenant's Exclusive Use</u>.  So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products. Notwithstanding the foregoing, Tenant hereby agrees that the foregoing restriction shall not restrict a tenant from devoting up to the lesser of (a) ten percent (10%) or (b) 250 square feet, of the sales area of its premises, to the display and sale of the Products as an incidental use to its primary use.

(vii)    <u>Zoning and Subdivision</u>.  On or before the commencement of construction in accordance with the provisions of Exhibit "C", the Premises and the Shopping Center will be properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the

34

Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)   Prohibited Activities.   Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in Tenant Preferred Area or elsewhere in the Shopping Center for use as, nor shall Tenant use its Premises as:

(A)   a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B)   a bowling alley;

(C)   a billiard or bingo parlor;

(D)   a flea market;

(E)   a massage parlor;

(F)   a funeral home;

(G)   a facility for the sale of paraphernalia for use with illicit drugs;

(H)   a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)   an off-track betting parlor;

(J)   a carnival, amusement park or circus;

(K)   a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)   a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)   a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)   a skating rink;

35

(O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses except for offices and storage facilities incidental to a primary retail operation; provided, however, that the foregoing service oriented and nonretail uses shall be permissible to the extent that such uses may not exceed, in the aggregate, 3,000 square feet of gross leasable area;

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods (provided that the foregoing restriction shall not apply to a first-class store selling quality previously owned merchandise such as "Play it Again Sports"); or

(U)    a gymnasium, sport or health club or spa (provided that the foregoing restriction shall not apply to (i) one (1) day spa occupying not more than 3,000 square feet in "Shops B" shown on the Site Plan, and (ii) Tenant's use of the Premises).

In addition to the foregoing, restaurants or food uses (other than incidental to a primary retail operation) may only be located in the western half of "Shops A" shown on the Site Plan or within "Shops B" shown on the Site Plan (provided that not more than fifty percent (50%) of the gross leasable area within "Shops B" may be used for such

36

uses. Further, a bookstore may only be located within "Shops B" shown on the Site Plan (but not to exceed 3,000 square feet of gross leasable area).

In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

(ix) <u>Site Covenants</u>. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A) <u>Building Height and Location</u>. No building adjacent to the Premises shall exceed twenty-eight (28) feet in height above finished grade (thirty-two (32) feet with architectural treatments), nor shall it be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto. No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within the Shopping Center, and no building located on an outparcel in the Shopping Center shall exceed one story, twenty-two (22) feet in height (twenty-six (26) feet with architectural treatments), nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas. No development shall occur within the Shopping Center except as shown within the Permissible Building Areas designated on the Site Plan or as otherwise shown on the Site Plan.

(B) <u>Construction and Alterations</u>. Following the end of the first Lease Year, no exterior construction and no construction staging shall be permitted in the Shopping Center during the months of October, November and December except for emergency repairs. In the event of any construction within Landlord's Premises, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as reasonably necessary to screen such construction from ground level view. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup,

connection, installation or tap-in fees and other similar construction-related charges. Landlord shall make no changes in the Shopping Center as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold. Landlord shall not make any other changes to the Common Areas which affect Tenant's parking, visibility or access without Tenant's consent, which consent may be granted or withheld in Tenant' sole and absolute discretion. Any other changes to the Common Areas may be made only upon receipt of Tenant's express written consent, which consent shall not be unreasonably withheld.

(C)    Prohibited Uses in Common Area.    Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for rent" signs described in paragraph 37 and traffic control signs and the Billboard; (2) display or sale of merchandise unless approved in advance by Tenant, which approval shall not be unreasonably withheld; provided, however, Tenant shall not withhold its consent to temporary outdoor sales displays by any of the other tenants of the Shopping Center (not more than four (4) times per calendar year, and for not more than one (1) week each time, during any twelve (12) month period) on the sidewalks immediately in front of their premises, so long as there is no material interference with pedestrian access; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking unless required by law; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center; provided, however, that the foregoing restriction shall not apply to an adequately screened and/or disguised antenna (e.g., one disguised to look like a normal shopping center element such as a light pole), so long as Tenant has approved the location within the Shopping Center of such antenna, which approval shall not be unreasonably

38

withheld. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant. Notwithstanding the foregoing, reasonable outdoor seating shall be permitted in the Common Areas near "Shops B" shown on the Site Plan, so long as (i) same are not located on the south side of "Shops B" and (ii) any additional maintenance, insurance, cleaning or other expenses associated therewith are not passed through to Tenant in any manner whatsoever.

(D)    Easements. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas (other than in connection with (i) this Lease and other leases of space within the Shopping Center, (ii) conditions imposed by applicable governmental agencies with respect to design and conditional use approval, (iii) recording a parcel map, (iv) other easements necessary for the development or construction of the Shopping Center as contemplated herein, or (v) easements necessary for reciprocal ingress/egress to public streets, in any case so long as Tenant's Common Area easement rights are not adversely affected) without Tenant's prior written consent (which consent shall not be unreasonably withheld so long as Tenant's Common Area easement rights are not materially adversely affected), except that Landlord shall have the right to subdivide, parcel or otherwise divide the Shopping Center or grant easements for utilities and the like which are typically granted in shopping centers comparable to the Shopping Center, or grant easements for reciprocal ingress/egress which Landlord determines are necessary to provide access to public streets, without Tenant's consent, so long as (x) there is no material impairment to access, ingress or egress to or from, or visibility of,

39

the Premises and (y) Tenant's Common Area easement rights are not materially and adversely affected.

(x) <u>Interference with Tenant's Reception/Transmission</u>. Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi) <u>Notices Affecting the Premises</u>. Landlord shall use good faith efforts to promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii) <u>Constructive Trust</u>. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b) Tenant represents, warrants and covenants to Landlord that:

(i) <u>Tenant's Authority</u>. Tenant is a duly constituted corporation organized under the laws of the state of California; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii) <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances (or allow the same to occur by Tenant's employees, contractors or agents); and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The

40

warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect (with the exception of those set forth in paragraphs 19(a)(v) and (b)(ii), which are governed as set forth therein), or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    Estoppel Certificates.  Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested.  In addition, without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder, including but not limited to the direct payment of rentals to Landlord, within the applicable time period provided to Tenant by this Lease to satisfy any such obligation following receipt from Landlord of notice of Tenant's failure to satisfy such obligation.  Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or

41

delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Non-Disturbance and Attornment.

(a)    Within thirty (30) days after Landlord acquires title to the Land, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" (as may be modified in a manner consistent with the then current modifications generally agreed upon by Tenant) executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages. Such Agreement shall contain, at a minimum, the following: (i) the Lease shall not terminate by reason of a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed so long as Tenant is not in default beyond any notice and applicable cure period, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Shopping Center available for restoration of the Improvements in accordance with the terms hereof. Upon Tenant's receipt and execution of said non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage. Landlord shall cause any present or future Mortgagee or Ground Lessor to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Shopping Center, as set forth in paragraph 35(b) below, or Ground Lease is executed, as applicable. As used in this

42

paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof. After the delivery by Landlord of the first non-disturbance and attornment agreement, Landlord agrees to pay Tenant's reasonable attorneys' fees incurred in negotiating any additional non-disturbance and attornment agreements, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such services, the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document; provided, however, that (x) the foregoing charge shall not be applicable to the first such request, (y) thereafter, such fees shall not exceed Two Thousand Dollars (2004 Dollars) per request, and (z) the foregoing charge shall not be applicable in the event that there have been no modifications to the form attached hereto as Exhibit "G".

(b)    Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and a subtenant of all or substantially all of the Premises providing, in part, that, in the event of any termination of this Lease because of Tenant's default hereunder, such subtenant shall have the option, exercisable by the giving of written notice by such subtenant to Landlord within thirty (30) days after receipt by such subtenant of notice from Landlord that the Lease has been terminated, to become tenant under a new lease for the remainder of the term of the sublease (including, but not longer than, Option Periods) upon all of the same terms and conditions as then remain under this Lease (and the rent payable by such subtenant under the terms of such direct lease shall be equal to the greater of (A) the Base Rent and additional rent then payable under this Lease, or (B) the fixed rent and additional rent then payable under the sublease. Upon the subtenant's exercise of such option, Landlord shall prepare and deliver the direct lease to the subtenant. The obligations of the parties under the direct lease shall accrue from the date of the notice to the subtenant that this Lease was

terminated, even though the direct lease will not be executed and delivered until after subtenant exercises the option provided for in this paragraph.

22. Tenant's Financing. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises upon prior written notice to Landlord to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.

23. Tenant's Property and Subordination of Landlord's Lien. All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease; provided that if Tenant elects to remove its personal property following the expiration or earlier termination of this Lease as permitted herein, Tenant shall be required to pay rent for each day beyond such expiration or termination date at a rate equal to one hundred ten percent (110%) of the daily rent in effect immediately prior to such date. A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D". Landlord expressly subordinates its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such subordination, at any time or times hereafter upon Tenant's request.

24. Memorandum of Lease; Commencement Date Agreement. Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached

44

hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as <u>Exhibit "I"</u>, once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.   <u>Expiration of Term and Holding Over</u>.   At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises in a broom clean condition. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

26.   <u>Force Majeure</u>.   Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, extraordinary delays in inspections or issuing approvals by private or public utility providers or permits by governmental agencies inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war, extraordinarily adverse weather conditions, or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) of this Lease.

27.   <u>Events of Tenant's Default</u>. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)   <u>Failure to Pay Rent; Breach</u>.   (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten

45

(10) days after the receipt of written notice from Landlord to Tenant that same is overdue (in which event (1) the delinquent amount shall thereafter accrue interest at the Default Rate; provided, however, that notwithstanding the foregoing, no interest shall be due with respect to any late payment unless Tenant shall have had at least one (1) prior late payment within the immediately preceding 12-month period, and (2) Tenant shall pay to Landlord a late charge of three percent (3%) on any late payment of rent or other sums or charges not paid within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; provided, however, that notwithstanding the foregoing, no late charge shall be due with respect to any late payment unless Tenant shall have had at least two (2) prior late payments within the immediately preceding 12-month period); or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy.    Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.    Landlord's Remedies.    After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)    Continue Lease.    Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and

46

conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.

(b)    Terminate Lease.  Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)    The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation; and

(iii)    The "worth at the time of the award" of the amount by which the unpaid rent and all other charges for the balance of the Term after the time of award exceeds the amount of such sums which Landlord has (or Tenant proves that Landlord could have reasonably) received in mitigation; and

(iv)    Any other amount necessary to compensate the Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of eight percent (8%) for past due obligations, and a discount rate to net present value of ten percent (10%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.  In the event this Lease shall be terminated as provided above, by

47

summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)    Remedies Are Cumulative.    The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(d)    Additional Landlord Remedies Due to Construction Delays by Tenant. If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following Delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of Ground Rent (as defined in Exhibit "C" attached hereto) on the date which is two hundred ten (210) days following Delivery of the Land.

If, subject to force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred ten (210) days following Delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment of Ground Rent on the date which is two hundred ten (210) days following Delivery of the Land, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof. Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime and acceleration charges paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished

48

work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In addition to the foregoing, if, subject to force majeure, Tenant shall fail to construct the Improvements to a point at which the value thereof is not at least One Million Dollars ($1,000,000) by that date which is one hundred fifty (150) days following Delivery of the Land (the "Construction Threshold"), Landlord may suffer adverse tax consequences as a result, the exact amount of which will be extremely difficult and impracticable to ascertain. In addition, Tenant wishes to limit its liability in event of its breach of this provision, and Landlord has agreed to such a limitation. The parties thus agree that should Tenant fail to reach the Construction Threshold as and when required above, the sole and exclusive remedy of Landlord shall be for Tenant to pay to Landlord, and Tenant covenants and agrees to pay to Landlord, as liquidated damages, a supplemental rental amount equal to Five Thousand Dollars ($5,000) per month for twelve (12) months, commencing as of the month in which Tenant is first required to begin paying Base Rent pursuant to paragraph 4 above or Ground Rent pursuant to the immediately preceding paragraph; all other claims for damages or causes of action are hereby expressly waived by Landlord. The obligation of Tenant to pay the foregoing additional rent shall be in addition to Landlord's other remedies specifically delineated in this subparagraph (d).

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then, in addition to Landlord's other remedies specifically delineated in this subparagraph (d), Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

29.    Events of Landlord's Default; Tenant's Remedies.

(a)    Default by Landlord.    Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33 hereof, within ten (10) days after the receipt of written notice from Tenant that same is overdue

(in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within twenty (20) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such twenty (20) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such twenty (20) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, it being agreed that with respect to the dates set forth therein time is of the essence.

(b)    <u>Remedies Upon Landlord's Default</u>.  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance (subject to the Offset Limitation described below), including any and all transaction costs and reasonable attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder (provided, however, that except in emergency situations (i.e., a situation involving imminent danger to persons or property), in which event only such notice as is reasonable under the circumstances shall be required, prior to exercising any such self-help remedies available under this Lease, at law or in equity, Tenant shall be required to deliver to Landlord a second written notice (which notice shall state in capital letters that "FAILURE TO CURE THE EVENT OF DEFAULT MAY RESULT IN TENANT EXERCISING ITS SELF-HELP REMEDIES UNDER THE LEASE", and Tenant may not exercise such self-help remedies unless Landlord fails to cure such Event of Default within five (5) business days following delivery by Tenant to Landlord of such second notice), or (ii) in the case of an Event of Default by Landlord that has or could reasonably

be expected to have a material impact on Tenant's ability to operate its business from the Premises, terminate this Lease and sue for damages, including interest, transaction costs and reasonable attorneys' fees as specified in subsection (i) above, provided that Tenant shall not have the right to terminate this Lease unless Landlord and Landlord's first Mortgagee (if Tenant has received notice of such Mortgagee) have failed to cure such Event of Default following receipt from Tenant of a second written notice (which notice shall state in capital letters that "FAILURE TO CURE THE EVENT OF DEFAULT MAY RESULT IN TENANT'S ELECTION TO TERMINATE THE LEASE"), and Tenant may not exercise such termination right unless Landlord or such first Mortgagee fails to cure such Event of Default within five (5) business days following delivery by Tenant of such second notice). If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner in accordance with the provisions of this Lease, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by judicial means available under State law, or any other applicable proceedings; provided, however, that any such lien shall be subordinate to the lien of Landlord's first Mortgagee. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise. Notwithstanding the foregoing to the contrary, Tenant agrees that its right to offset its costs due hereunder shall be limited (the "Offset Limitation") to fifty percent (50%) of the Base Rent and one hundred percent (100%) of the CAM Charges and any and all other amounts and charges due Landlord hereunder, provided that such limitation on offsetting under this Lease shall not apply (A) to the Tenant Improvement Allowance or (B) if Tenant has obtained a judgment against Landlord and Landlord has failed to pay such judgment within five (5) business days thereafter.

      (c)   Additional Tenant Remedies Due to Construction Delays by Landlord. In the event, subject to force majeure, Landlord shall fail to complete the Site

Work and accomplish Delivery of the Land in the condition specified herein by September 15, 2004 (the "Delivery Date"), as same may be extended as set forth below, Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by February 15, 2005. Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is fifteen (15) days following the Delivery Date, or to complete any subsequent element of the Landlord Work by the completion date established therefor in Attachment "1" of Exhibit "C" attached hereto (the Construction Schedule), Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for Delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its actual costs thereof, including interest on such costs at the Default Rate. Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full, subject to the Offset Limitation.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete Delivery of the Land to Tenant by the date which is ninety (90)

days from the Delivery Date, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00).

(d)    Exercise of Remedies.  Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to Tenant under paragraph 29 hereof shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder, subject to the Offset Limitation.

(e)    Time is of the Essence.  Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth herein.

(f)    Extension of the Delivery Date.  The Delivery Date set forth in subparagraph (c) above shall be subject to extension if Landlord has not procured the conditional use permit (which Landlord agrees to apply for and pursue diligently and in good faith) necessary for the development of the Shopping Center (the "CUP") on or before May 2, 2004 on a day-for-day basis, not to exceed forth-five (45) days. By way of illustration, if Landlord, after the exercise of good faith diligent efforts, procures the CUP on May 10, 2004, then notwithstanding anything in this Lease to the contrary, the "Delivery Date" shall be extended by eight (8) days from September 15, 2004 to September 23, 2004 and all other dates set forth in the Construction Provisions shall be extended accordingly.

30.    Waiver.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from

enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.    Compliance with Applicable Laws.    During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters (collectively, the "Lawful Requirements") respecting Tenant's use and occupancy of the Improvements, and Landlord shall comply with all Lawful Requirements otherwise relating to the Improvements. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent, subject to the Offset Limitation.

32.    Notices.    Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

If to Tenant:                    CIRCUIT CITY STORES WEST COAST, INC.
                                 Deep Run I
                                 9950 Mayland Drive
                                 Richmond, Virginia 23233
                                 Attention:  Corporate Secretary

with a copy to:                  CIRCUIT CITY STORES WEST COAST, INC.
                                 Deep Run I
                                 9950 Mayland Drive
                                 Richmond, Virginia 23233
                                 Attention:  Vice President of Real Estate

If to Landlord:                  Batavia Holdings, L.L.C.
                                 1809 Seventh Avenue, Suite 1002
                                 Seattle, Washington 98101
                                 Attention: Mr. Daniel H. Temkin

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

    33.    Brokers. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for The Equity Group, Millennium Partners and Staubach Retail Services (collectively, "Tenant's Brokers") and Colliers International ("Landlord's Broker" and collectively with Tenant's Brokers, the "Brokers"), each of which shall be paid a commission by Landlord pursuant to their separate written agreement.  Landlord agrees that, if Landlord fails to pay any of such Brokers its commission when due, Tenant may pay same and offset such amount against the amounts then next becoming due from Tenant to Landlord hereunder.  Landlord agrees that Tenant's Brokers are representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Tenant's Brokers of the Tenant's Broker's commission, the Tenant's Brokers owe no fiduciary's, agent's or other duty whatsoever to Landlord.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

    34.    Miscellaneous.

(a)    <u>Headings and Gender</u>.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    <u>Construction</u>.    The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    <u>Waiver of Jury Trial</u>.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)    <u>Relationship of Landlord–Tenant</u>. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)    <u>Entire Agreement; Merger</u>.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)    <u>Attorneys' Fees</u>.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)    <u>Partial Invalidity</u>.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the

remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)   Consents.   Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)   Holidays.   If the day on which rent or any other payment due hereunder is payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j)   Applicable Law.   This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)   Successors and Assigns.   All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)   Counterparts.   This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)   Trademarks and Trade Names.   All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)   Exhibits.   All of the exhibits to this Lease are hereby incorporated herein by reference for all purposes and are part of this Lease.

(o)   No Construction Against Either Party.   This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)   Effective Date.   This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

35.    <u>Effectiveness of Lease; Tenant's Right to Terminate</u>. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Tenant's receipt, simultaneously with or prior to the execution hereof (except for the survey), of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) within thirty (30) days of execution hereof, an ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all Mortgagees and Ground Lessors existing on the date that Landlord acquires title to the Land and the form required by paragraph 21 within thirty (30) days of Landlord's acquisition of title to the Land. Tenant's execution of any such subordination, non-disturbance and attornment agreement shall constitute Tenant's approval of the form of same.

(c)    Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d)    Tenant's obtaining the required City, County, State and other necessary governmental agency permits and approvals to construct the Improvements on the Premises (excluding certificates of occupancy, business licenses and other permits required for occupancy that are not customarily obtained prior to the commencement of construction) and to operate from the Premises for the initial use contemplated by this Lease no later than the Delivery Date (collectively, the "Entitlements"); provided,

however, that Tenant's application for the Entitlements shall be consistent with that certain Conditional Use Permit No. No. PL-2004-0039 issued by the City for the Premises on March 25, 2004 (the "CUP"), the terms and conditions of which have been approved by Landlord and Tenant, as the CUP may from time to time be modified or amended. Tenant agrees to promptly apply for such permits as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals prior to the Delivery Date; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval (other than the conditions to the CUP which have been approved by Tenant) that, in Tenant's sole and absolute discretion, have a material adverse affect on Tenant's proposed improvement and/or use of the Premises for the initial use contemplated in Paragraph 18(a).

(e)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

(f)    Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, planned unit developmental boards and other necessary entities, and all necessary reciprocal use and easement agreements have been obtained prior to the date of execution hereof.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties

shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord. All conditions contained in this paragraph except subparagraphs (a) and (f) unless previously waived or satisfied shall expire as of the date of Tenant's store opening.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt thereof by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

36.    Confidentiality.  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction. This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto. Any breach of this confidentiality agreement shall constitute an automatic Event of Default without notice or cure provided, for which either party may recover damages as their sole remedy and for which neither party can terminate this Lease.

37.    "For Rent" Signs.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot of the Shopping Center. During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a

representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

38.   <u>Landlord's Acquisition of the Shopping Center</u>.

(a)   Landlord represents and warrants to Tenant that, as of the date of this Lease: (i) it has entered into that certain Standard Offer Agreement and Escrow Instructions for Purchase of Real Estate dated as of April 23, 2003 between Landlord and Frank J. Warn, Inc. ("Fee Owner"), as amended (the "Contract") whereby Landlord has the right to purchase the Shopping Center and Fee Owner is obligated to convey fee title to the Shopping Center to Landlord; (ii) the Contract is in full force and effect; and (iii) Landlord has not delivered or received any notice of default, and has no knowledge of any condition or circumstance which with notice or the lapse of time, or both, could become a default, under the Contract.

(b)   Landlord agrees to act diligently and in good faith to facilitate the closing of its acquisition of the Shopping Center on or before July 31, 2004 (the "Acquisition Deadline").

(c)   In the event that Landlord has not acquired fee title to the entire Shopping Center on or prior to the Acquisition Deadline, then either party may, at its election, upon notice to the other party given at any time after said date (and in any event, prior to Landlord's acquisition of fee title as aforesaid), elect to terminate this Lease. Notwithstanding the foregoing, in the event Landlord elects to terminate this Lease as aforesaid and thereafter acquires the Shopping Center within three (3) years following the date on which Landlord's termination notice is received by Tenant, then notwithstanding such termination, Tenant shall have the right to notify Landlord, within thirty (30) days following notification from Landlord of such satisfaction, that Tenant elects to reinstate this Lease, on the same terms and conditions set forth herein (with a corresponding adjustment in the performance schedule), in which event this Lease shall be deemed to be in full force and effect.  Should Tenant terminate this Lease as aforesaid, unless the reason that Landlord has not acquired fee title is due to a default under the Contract by the Fee Owner or due to any other event outside of Landlord's reasonable control,

61

Landlord shall be obligated to promptly reimburse Tenant for the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, provided that such reimbursement by Landlord shall not exceed the aggregate sum of Fifty Thousand and No/00 Dollars ($50,000.00). In the event Tenant elects not to terminate this Lease as aforesaid, Landlord shall Deliver the Land and complete the Site Work on the date set forth in the Schedule of Performance (with a day-for-day extension for every day beyond the Acquisition Deadline until the date on which Landlord has acquired fee title to the Shopping Center), and Landlord shall pay to Tenant on demand an amount equal to all additional or incremental costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

(d)    In the event that Landlord and Tenant have executed a Memorandum of Lease for recording pursuant to Paragraph 24 above prior to Landlord's acquisition of the Shopping Center, Landlord shall cause such Memorandum of Lease to be duly recorded immediately after the deed of conveyance to Landlord, at Landlord's expense. Within five (5) days after the closing of title to the Shopping Center pursuant to the Contract, Landlord shall give notice thereof.

39.    Landlord's Liability. Notwithstanding anything contained in this Lease to the contrary, except for (i) the payment of the Tenant Improvement Allowance, (ii) any failure of title, or (iii) any fraudulent or intentional acts of Landlord hereunder, Landlord shall have no personal liability with respect to any of the provisions of this Lease. If Landlord is in default with respect to its obligations under this Lease, Tenant shall look solely to the interest of Landlord in and to the Premises to which Landlord holds title, and the rents, issues and profits therefrom for satisfaction of Tenant's remedies, if any; so long as Landlord's equity interest in the Premises (calculated as of the time that the then existing financing was placed on the Premises) is not be less than twenty percent (20%) of the value of the Premises; provided further that if Landlord's equity interest in the Shopping Center is less than twenty percent (20%) of the value of the Premises (calculated as of the time that the then existing financing was placed on the Premises), Landlord's liability shall be limited to the interest of Landlord in and to the Premises, and

62

the rents, issues and profits therefrom, and an amount equal to the twenty percent (20%) of the value of the Premises.

40.    _Guarantor_.    Concurrently with the execution of this Lease, Circuit City Stores, Inc., ("Guarantor") shall execute a guaranty in the form attached hereto as Exhibit "K".

WITNESS the following signatures and seals:

LANDLORD

BATAVIA HOLDINGS, L.L.C.,
a Washington limited liability company

By: _____
Name: _Daniel H. Temkin_____
Title:  Managing Member

TENANT

CIRCUIT CITY STORES WEST COAST,
INC.,
a California corporation

By: _____
Thomas C. Nolan,
Vice President

## ASSIGNMENT AND ASSUMPTION OF WARRANTIES AND GUARANTIES

THIS ASSIGNMENT AND ASSUMPTION OF WARRANTIES AND GUARANTIES ("Assignment") is executed by CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Assignor") and HAYWARD PROPERTIES, L.L.C., a Washington limited liability company ("Assignee") with reference to the following facts:

A.      Pursuant to that certain Lease dated as of May 4, 2004 (the "Lease"), Assignor leased from Assignee certain premises located, in the City of Hayward, County of Alameda, State of California (the "Premises"), as described more specifically in Exhibit "A" and "A-1" attached to the Lease.

B.      Assignor has constructed on the Premises the "Building" and the "Other Improvements", which are collectively referred to in the Lease as the "Improvements".

C.      In connection therewith, Assignor has agreed to assign to Assignee, on a non-exclusive basis with Assignor, Assignor's right, title and interest in and to those certain construction warranties and guaranties with respect to the Improvements, as described in Exhibit "A" attached hereto (the "Warranties and Guaranties"), to the fullest extent to which same may be assigned, and Assignee has agreed to assume the Warranties and Guaranties.

THEREFORE, for valuable consideration, Assignor and Assignee agree as follows:

1.      Assignment.  Effective as of the date hereof, Assignor hereby assigns and transfers to Assignee, on a non-exclusive basis with Assignor, Assignor's right, title and interest in and to the Warranties and Guaranties.

2.      Assumption.  Effective as of the date hereof, Assignee hereby assumes, on a non-exclusive basis with Assignor, Assignor's right, title and interest in and to the Warranties and Guaranties.

3.      Counterparts.  This Assignment may be executed in counterparts, each of which shall be deemed an original, and both of which together shall constitute one and the same instrument.

4.      Miscellaneous.  This Assignment shall be binding on the parties and their respective successors and assigns.  The headings to paragraphs of this Assignment are for convenient reference only and shall not be used in interpreting this Assignment.

5.      California Law.  This Assignment shall be governed by and interpreted in accordance with the laws of the State of California.

Dated: _Maria 14 #2_, 2005

LA/930520.1

EXECUTED this *14th* day of *March*_____, 2005.

LANDLORD

HAYWARD PROPERTIES, L.L.C.
a Washington limited liability company

By: _____
Name: _____
Title:  Managing Member


TENANT

CIRCUIT CITY STORES WEST COAST,
INC., a California corporation

By: _____
Name: Gary Mierenfeld
Title: Senior Vice President



173.20'

# CIRCUIT CITY STORE

2480 WHIPPLE ROAD
HAYWARD, CA
33,866 SF

185.41'

211.63'

107.46'

26.28'

66.06'

NOTE: DUE TO FIELD CONDITIONS,
MEASUREMENTS ARE TO THE NEAREST ±0.02

**PACIFIC LAND SERVICES**

2151 SALVIO STREET, SUITE 250, CONCORD, CA 94520
925-680-6406          FAX 925-680-6407
ENGINEERING        ENTITLEMENT        SURVEYING        LANDSCAPE ARCHITECTURE

BUILDING AS-BUILT

CIRCUIT CITY
2480 WHIPPLE RD
HAYWARD, CA

| | |
|---|---|
| JOB NO: | 5082 |
| SCALE: | 1"=40' |
| DATE: | 12-07-04 |
| SHEET: | **1** |

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that Circuit City Stores West Coast, Inc., a California, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does by these presents bargain and sell unto Hayward Properties, L.L.C., a Washington Limited Liability Company (hereinafter referred to as "Landlord"), all of the undersigned's right, title, and interest in and to the improvements (the "Improvements") located on the property described more fully on Exhibit A-1, attached hereto and incorporated herein by this reference. Circuit City Stores West Coast, Inc. does hereby warrant that it is the lawful owner of the Improvements and has the full right and title thereto and the authority to sell and dispose of the same, in that the Improvements are free and clear of all liens, security interests, and encumbrances of every kind.

This sale is made pursuant to a certain lease agreement by and between Hayward Properties, L.L.C., a Washington Limited Liability Company (hereinafter referred to as "Landlord"), and Circuit City Stores, West Coast, Inc. dated May 3, 2004.

IN WITNESS WHEREOF, the undersigned, on behalf of and with authority for Circuit City Stores, Inc., has hereunto set his hand delivered these presents on this ___ day of February 2005.

CIRCUIT CITY STORES WEST COAST, INC.

By: _____
Gary Mierenfeld
Senior Vice-President

Signed, sealed, and delivered in the presence of:

STATE OF VIRGINIA

COUNTY OF HENRICO

The foregoing instrument was acknowledged before me this ___ day of February 2005 by Gary Mierenfeld, on behalf of Circuit City Stores West Coast, Inc., a California corporation in his capacity as Senior Vice- resident of Real Estate of Circuit City Stores West Coast, Inc.

_____
Notary Public, State and County
Shown Above

My Commission Expires: 5/31/07
(SEAL)