LOCATION:  NORWALK, CONNECTICUT

**LEASE**

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**444 CONNECTICUT AVENUE LLC,**

as Landlord

dated January 12, 1998

**444 CONNECTICUT AVENUE SHOPPING CENTER**

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Lease Term | 3 |
| 4. | Base Rent | 4 |
| 5. | Development of Shopping Center by Landlord | 7 |
| 6. | Easements | 8 |
| 7. | Common Areas and Common Area Maintenance | 10 |
| 8. | Signs and Communications Equipment | 14 |
| 9. | Taxes | 15 |
| 10. | Maintenance, Repairs and Replacements | 18 |
| 11. | Payment of Utility Bills | 20 |
| 12. | Alterations | 20 |
| 13. | Mechanics' Liens | 21 |
| 14. | Insurance | 21 |
| 15. | Damages by Fire or Other Casualty | 26 |
| 16. | Condemnation | 29 |
| 17. | Assignment and Subletting | 32 |
| 18. | Use | 33 |
| 19. | Warranties and Representations | 34 |
| 20. | Estoppel Certificates | 44 |
| 21. | Subordination, Non-Disturbance and Attornment | 44 |

H:\RIEKR\LSE\42078_13\54-62 (5720)

22.    Change of Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    45

23.    Tenant's Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    46

24.    Tenant's Property and Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . .    46

25.    Memorandum of Lease; Commencement Date Agreement . . . . . . . . . . . . . .    46

26.    Expiration of Term and Holding Over . . . . . . . . . . . . . . . . . . . . . . . .    47

27.    "For Rent" Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48

28.    Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    48

29.    Events of Tenant's Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    49

30.    Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    50

31.    Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . . . . . . . .    53

32.    Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    54

33.    Compliance with Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . .    54

34.    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    55

35.    Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    56

36.    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    56

37.    Effectiveness of Lease; Tenant's Right to Terminate . . . . . . . . . . . . . . . . .    58

38.    Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    60

H:\RIEKR\LSE\42078_13\54-62 (5720)

<u>EXHIBITS</u>

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |
| "K" | OEA |

H:\RIEKR\LSE\42078_13\54-62 (5720)

NORWALK, CONNECTICUT

### LEASE

THIS LEASE is made as of the 12th day of January, 1998, by and between **444 CONNECTICUT AVENUE LLC,** a Connecticut limited liability company, having an address at 145 Main Street, Norwalk, Connecticut 06851 ("Landlord"), and **CIRCUIT CITY STORES, INC.,** a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

### W I T N E S S E T H:

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" (as defined below) to Tenant, all those certain "Premises" consisting of the "Building" and "Other Improvements" (both as defined in paragraph 2), as and when same are constructed and that approximately 33,560 square foot parcel (the "Land"), on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on Exhibit "A" hereto (the "Site Plan"), together with exclusive rights in the six (6) parking spaces labelled "Customer Pick-Up" adjacent to the Building as shown on the Site Plan, the exclusive rights in the eleven (11) parking spaces labelled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and with the easements described in paragraph 6 below, all located in the "Shopping Center" (herein so called), which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located at a portion of 444 Connecticut Avenue, lying and being in the City of Norwalk (the "City"), County of Fairfield, State of Connecticut (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes.  Landlord shall have no obligation to enforce Tenant's exclusive use of the "Customer Pick-Up" and "Car Stereo Parking" areas.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  The description of the Premises may be

H:\RJEKR\LSE\42078_13\54-62 (5720)

adjusted in accordance with Tenant's final bid set of Plans and Specifications as described in Exhibit "C" attached hereto. Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Operation and Easement Agreement to be executed by Landlord, Tenant and The Sports Authority, Inc. and recorded against the Shopping Center, a copy of which is attached hereto as Exhibit "K" and incorporated herein by reference (the "OEA"). The form of OEA shall not be modified without the prior written approval of Tenant. Landlord agrees that it will not amend the OEA in any way that would adversely affect the rights and obligations of Tenant so long as this Lease is in effect, without Tenant's prior written approval.

2.    Construction of Building and Improvements.  Commencing immediately upon "delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall construct within the Shopping Center, and at the location shown on the Site Plan, a one-story retail building, containing approximately 33,560 square feet of ground-floor gross leasable area ("GLA") plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions.  The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements".  The Improvements shall be constructed in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions, in a good and workmanlike manner, by contractor chosen from the list of contractors attached to the Construction Provisions, lien-free in accordance with paragraph 13 below. Tenant's construction shall not interfere with Landlord's other construction activities at or upon other portions of Landlord's Premises (exclusive of the Premises). Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. Tenant shall obtain from its general contractor with which it shall contract to construct the Improvements, guarantees and warranties to the effect that the Improvements will be free from defects in materials and workmanship, will conform to plans and specifications and legal requirements and shall be in a form commonly obtained by Tenant, which warranties conform

2                                     HARRI:KRM:5034207$_13\54-62 (5720)

to industry standards in the Norwalk, Connecticut area and all such guarantees and warranties shall be assigned to Landlord immediately following receipt of the Tenant Improvement Allowance by Tenant, to the extent Landlord has maintenance or any other obligations therefor.

3.    Lease Term.  Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below).  The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, provided Tenant shall have validly exercised each Renewal Option preceding the Renewal Option being currently exercised, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below.   Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the two hundred seventy (270) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the Term (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given

3

hereunder.  Notwithstanding anything contained herein to the contrary Landlord shall have the right not sooner than one (1) year prior to the expiration of the Main Term or the then current Option Period, as applicable to give Tenant written notice (which written notice shall specifically reference this Lease paragraph and shall recite therein, the deemed waiver by Tenant if it fails to respond to such notice) to confirm in writing Tenant's right to renew this Lease pursuant to the provisions of this paragraph 3.  If, after receipt of such written notice from Landlord, Tenant fails to exercise its Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, or, if later, within thirty (30) days following the receipt of Landlord's notice, Tenant shall be deemed to have waived its right and option to further renew the Term of this Lease, and this Lease shall thereupon terminate on its then scheduled expiration date.  Tenant's occupancy of the Premises during each such Option Period shall be upon the same terms, covenants, and conditions as those herein contained insofar as then in force and applicable to such Option Period; except that (i) the Base Rent during such Option Period shall be determined as provided in paragraph 4, (ii) the terms of this Lease relating to the performance by Landlord of Landlord's Work in accordance with Exhibit "C" shall not be applicable to such Option Period; and (iii) Tenant shall have no further right to extend the term of this Lease beyond the fourth Option Period.

The Construction Term, Main Term and Option Periods are, collectively, the "Term".  The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.      Base Rent.  During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses, except that Tenant shall be responsible for the payment of all utility charges incurred in connection with Tenant's construction of the Improvements.  Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 4 of the Construction Provisions) on the date on which Landlord makes

payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.  Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

(i)    First Five Years.  During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of EIGHT HUNDRED EIGHTEEN THOUSAND EIGHT HUNDRED SIXTY-FOUR AND NO/100 DOLLARS ($818,864.00), payable in equal monthly installments of  SIXTY EIGHT THOUSAND TWO HUNDRED THIRTY-EIGHT AND 66/100 DOLLARS ($68,238.66).

(ii)    Reduction in Base Rent.  Notwithstanding the Base Rent provisions, in the event that the GLA of the Building when constructed does not equal 33,560 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual GLA of the Building (as shown in the Plans and Specifications) and the Base Rent specified in sub-paragraph (i) above, reduced by the product of the difference between 33,560 and the actual GLA of the Building (as shown in the Plans and Specifications approved by Landlord) multiplied by $6.25.  In determining the aforesaid GLA, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below.  If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    Increases in Base Rent During Main Term.  Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the initial Base Rent charged hereunder by the lesser of ten percent (10%) or two (2) times the percentage increase in the "CPI-U" (as defined below) during the five (5) year period ending on October 31 of the fifth (or, as applicable, any succeeding fifth) Lease Year.  As used herein, the CPI-U

shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average (1982 - 1984 = 100). If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U.

(iv)    Base Rent During Option Periods.  Upon the commencement of each Option Period, annual Base Rent during such each Option Period shall be adjusted to be an amount equal to ninety percent (90%) of the "Fair Market Rental" rate on the date of the commencement of each respective Option Period, but in no event shall Annual Base Rent be less than the Annual Base Rent for the Lease Year immediately preceding such Option Period.  For purposes of this provision, the term "Fair Market Rental" shall be the market rate for Base Rent for premises comparable to the Premises within the Norwalk, Connecticut (the "Market Area") based upon similar transactions completed within the Market Area within the past six (6) months with tenants of equivalent size and credit worthiness.

For thirty (30) days following Landlord's receipt of Tenant's notice exercising any Renewal Option, in accordance with the provisions hereof, Landlord and Tenant shall endeavor to mutually agree upon the Fair Market Rental of the Premises for the applicable Option Period. If the parties do not agree within said thirty (30) day period, then either party hereto (the "initiating party") may give the other written notice of its intent to seek an appraisal and shall in such notice appoint a disinterested person of recognized competence (MAI designation required) in the field of real estate appraisal within the Market Area.  Within fifteen (15) days thereafter, the other party shall by written notice to the initiating party appoint a second disinterested person of recognized competence (MAI designation required) in the field of real estate appraisal within the Market Area.  The appraisers thus appointed shall appoint a third disinterested person of recognized competence (MAI designation required) in the field of real estate appraisal within the Market Area, and the three (3) appraisers shall, as promptly as possible, determine the Fair Market Rental, but in no event later than thirty (30) days after the appointment of the third appraiser.  The determination of the majority of appraisers shall be conclusive upon the parties.  Each party shall pay the fees and expenses of the appraiser appointed by such party and of the witnesses called on its behalf and of its counsel, and one-half

6

of the fees and expenses of the third appraiser. In the event the two (2) appraisers selected by Landlord and Tenant cannot agree upon the selection of the third appraiser, or if any selected appraiser shall at any time be unable or unwilling to serve, and Landlord and Tenant cannot agree on a replacement, then Landlord and/or Tenant shall make an application to the Superior Court for Fairfield County, Connecticut (at Stamford/Norwalk) to name the third or a substitute appraiser.  Upon the determination of the Fair Market Rental pursuant to the foregoing provisions, Landlord and Tenant upon demand of either of them, shall execute and deliver to each other an instrument setting forth the amount of the Base Rent for each Lease Year of the applicable Option Period.

All costs, charges and expenses which Tenant assumes, agrees or is obligated to pay to Landlord pursuant to this Lease, other than Base Rent, shall be deemed "additional rent", and, in the event of nonpayment, Landlord shall have all the rights and remedies with respect thereto as herein provided for in case of nonpayment of Base Rent. Tenant covenants to pay the Base Rent and "additional rent" when due. Tenant covenants to pay the Base Rent, additional rent and adjustment of rent as in this Lease provided, when due, Base Rent and additional rent, which are past due shall bear interest at the Default Rate (hereinafter defined), commencing on the date that Landlord shall give written notice of such default to Tenant, until paid.  The foregoing shall be in addition to any other right or remedy which may be available to Landlord in the event of default by Tenant.

5.    Development of Shopping Center by Landlord.  Landlord covenants to construct and develop a first-class shopping center, in accordance with the standards generally applicable in the Market Area. The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the number of parking spaces shown on the Site Plan. All such parking shall be at ground level. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord shall not permit construction traffic over the Premises, and Landlord's construction shall not interfere with the conduct of

Tenant's business.  Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.    Easements.  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    Construction Easements.  During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises.  In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") of approximately 15,000 square feet as shown on the Site Plan.

(b)    Footing and Foundation Easements.    Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls, as shown on the Plans and Specifications approved by Landlord in accordance with the Construction Provisions; (ii) for roof projections, as shown on the Plans and Specifications approved by Landlord in accordance with the  provisions of this Lease; and (iii) for encroachments, during the Construction Term only, which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above.

(c)    Utility Easements.  During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord agrees to obtain such underground, public or private utility easements as Tenant deems necessary, and as required in order to comply with the requirements of the Construction

H:\RIEKR\LSE\42078_13\54-62 (5720)

Provisions, without unreasonably interfering with the use by Landlord of the Common Areas or other portions of Landlord's Premises, for the benefit of the Premises. For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord; and provided that detailed plans and specifications for any such utility installation shall first be submitted to Landlord, for Landlord's written approval, which shall not be unreasonably withheld, conditioned, or delayed.

(d)    Common Area Easement. During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the "Site Covenants" contained in subparagraph 19(a)(ix), without payment of any fee or other charge therefor. It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements mutually agreeable to Landlord and Tenant and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such parking spaces shall be used exclusively by Tenant's customers, invitees and patrons, but Landlord shall have no obligation to enforce Tenant's exclusive rights in any such spaces. In addition, Tenant shall have the right to use such Common Areas as shown on the Site Plan for promotional sales customary to Tenant's business operations, provided Tenant shall not conduct such sales more frequently than four (4) times per Lease Year for no longer than seven (7) days in duration, occupying no more than twenty (20) parking spaces as shown on the Site Plan and Tenant agrees to be responsible for any physical damage to the Common Areas resulting from said use.

H:\RJEKR\LSE\42078_13\54-62 (5720)

(e)    Non-Dedication.  None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

7.    Common Areas and Common Area Maintenance.

(a)    Definition of Common Areas.  The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, exterior stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s), amounts expended for required wetlands maintenance and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants, if any) and intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts, if any), their subtenants, licensees, and business invitees.  Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner consistent with comparable shopping centers as currently operated in the Market Area, including cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".  Landlord shall have no obligation to provide security systems or security personnel for the Premises.

(b)    CAM Charges.  For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total

10

the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes, utilities serving the Common Areas).  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)     real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)     any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)     maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect or condition, to any interior mall space or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4)     *repairs or replacements (other than normal patching and filling of parking areas and driveway)* necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or, during the first seven (7) Lease Years, made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)     amounts paid to entities related to Landlord in excess of the . cost of such services from any competitive source;

(6)     amounts reimbursable from insurance proceeds (excluding deductibles actually paid), under warranty or by Tenant, *any other tenant in the Shopping Center* or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)     premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below and subject to increases as set forth in paragraph 14;

11                    H:\RIEKR\LSE\42078_13\54-62 (5720)

(8)    repairs or replacements of a capital nature (whether or not capitalized);

(9)    improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10)    reserves for anticipated future expenses;

(11)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12)    Landlord's personnel (to the extent the cost of the services provided by such personnel are in excess of the cost from any competitive source), overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions); or

(14)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the City, and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    <u>Tenant Payments</u>.    Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord a fee (which Landlord estimates to be $1.25 (inclusive of wetlands maintenance) per square foot of GLA in the Building per annum but CAM Charges shall be based on actual costs), payable in equal monthly installments, as its share of CAM Charges.    Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year.    In no event shall such CAM Charges exceed by more than three percent (3%) those in effect during the preceding CAM Year; provided, nevertheless, that such annual limitation on increases in CAM Charges shall not be applicable to utility costs, insurance premiums and weather-related expenses

12                         H:\RJEKR\LSE\42078_13\54-62 (5720)

such as snow and ice removal. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within sixty (60) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of GLA in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges after the first CAM Year shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the GLA in the Building and the denominator of which is the number of GLA (including the area of any outside sales area exclusive to a single occupant) in the Shopping Center. In determining the GLA of any building in the Shopping Center (including the Building), measurement shall be made from the outside of any exterior walls. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 76,399. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)    Examination of Landlord's Records. Tenant shall have the right, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such

examination or audit.   Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

(e)    Interruption of Services.  Landlord shall have the right, if by reason of an accident, emergency, mechanical breakdown, or when otherwise required by any law, order or regulation of any federal, state, county or municipal authority, or for any other cause beyond the reasonable control of Landlord, to interrupt, curtail or delay Common Area maintenance required to be furnished by Landlord pursuant to this Lease.  Landlord shall use due diligence to complete all required repairs or other necessary work as quickly as possible so that Tenant's inconvenience resulting therefrom may be for as short a period of time as circumstances will permit.  Notwithstanding the foregoing, to the extent legally permissible and subject to force majeure, Tenant shall have the right to proceed with such repairs or work in the event Landlord fails to do so within twenty (20) days after notice from Tenant (except no notice shall be required in the event of an emergency) and Landlord shall promptly reimburse Tenant for all actual and reasonable costs incurred in making such repairs.

8.    Signs and Communications Equipment.

(a)    Signs.  Landlord, at its sole cost and expense, no later than the date set forth on Attachment "4" to the Construction Provisions, shall construct and install upon the Common Areas at the location so shown on the Site Plan, a pylon sign structure (with electrical wired box installed) having sufficient space thereon in the second tenant position for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense.  Landlord shall submit to Tenant plans and specifications for such pylon sign (including colors, design, dimensions, type of lighting and position of tenant panels) prior to construction and installation thereof for Tenant's written approval, which shall not be unreasonably withheld or delayed.  Such pylon sign, inclusive of Tenant's "face panels", shall be designed, located and installed in compliance with, and subject to, all applicable laws and regulations.  Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves subject to compliance with all legal requirements upon its execution of this Lease.  Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and

all of its signs with signage consistent with Tenant's then-current prototypical sign plans. In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, and subject further to all applicable laws and regulations.

(b)    <u>Communications Equipment</u>. Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof. Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    <u>Taxes</u>.

(a)    <u>Taxes Contemplated Hereunder</u>. The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease; provided, however, that, if at any time during the Term hereof, as the same may be renewed or extended, the methods of taxation prevailing at the execution of this Lease shall be altered so that in lieu of or as a substitute for the whole or any part of the taxes levied, assessed or imposed on real estate, there shall be levied, assessed or imposed (i) a tax on the rents received from such real estate, or (ii) a license fee measured by the rents received by Landlord from the Shopping Center or any portion thereof, or (iii) a tax or license fee imposed upon Landlord which is otherwise measured by or based in whole or in part upon the Shopping Center or any portion thereof, then the same shall be included in the

computation of Real Estate Taxes hereunder, computed as if the amount of such tax or fee so payable were that due if the Shopping Center were the only property of Landlord subject thereto.

(b)    Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain pri- marily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, provided Tenant promptly pays Tenant's Pro Rata Share of Real Estate Taxes, if Landlord shall fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder. In addition to the foregoing, Tenant shall pay one hundred (100%) percent of any Real Estate Taxes attributable solely to the Improvements constructed by Tenant or any alterations, renovations or additions thereto.

(c)    Contest of Real Estate Taxes and/or Assessed Valuation of Property. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or

otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.  In connection with any such action or proceeding, Tenant shall have the right, if permitted by law, to pay under protest any Real Estate Taxes and such payment shall be without prejudice to Tenant's rights under this Lease.  If the payment of any such Real Estate Taxes would legally operate as a bar to such contest, Tenant may, during such contest, postpone or defer payment of such Real Estate Taxes, but only if (a) the Premises or the Shopping Center would not, as a result thereof, be in danger of being foreclosed, and (b) Tenant shall have deposited with Landlord a sum equal to all Real Estate Taxes so contested and unpaid, together with all interest and penalties that are reasonably anticipated to accrue during such contest or a comparable bond.

(d)    Separate Tax Parcel.  Notwithstanding the provisions of paragraph 8(b), if the Premises are or become separately assessed, Tenant shall pay, directly to the taxing authority, as Tenant's Pro Rata Share of Real Estate Taxes, such Real Estate Taxes as are set forth in said separate assessment, and Tenant shall be relieved of any liability to reimburse Landlord for Real Estate Taxes with respect to the remainder of the Shopping Center.  Tenant shall pay such Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, or become due or be imposed by operation of law for the nonpayment or late payment thereof, provided Tenant has received the bills therefor.  Tenant is hereby authorized by Landlord to request, from any taxing authority having jurisdiction over the Premises, that any and all Real Estate Tax bills be sent directly to Tenant.  Tenant shall furnish to Landlord upon written request reasonable evidence of the payment of such Real Estate Taxes, including receipted tax bills from the appropriate taxing authority, when and if available.

H:\RJEKR\LSE\42078_13\54-62 (5720)

(e)    Payment Following Appeal.  Upon the termination of the proceedings set forth in subparagraph (c) above, Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings.  Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement to the extent provided by law, from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment.

10.    Maintenance, Repairs and Replacements.  Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant in accordance with the terms of this Lease, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, during the Term of this Lease as the same may be renewed from time to time, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including, but not limited to, repairs and/or replacements to plate glass, plumbing, heating, electrical and air conditioning systems which serve only the Premises.  During the last four (4) years of the Term of the Lease (without consideration to the exercise of any additional Renewal Options) Tenant shall be obligated to so install or construct alterations or incur expenditures pursuant to this paragraph; provided, however, that if Tenant is required to expend any sum in satisfaction of its obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), then Tenant shall so notify Landlord and Landlord shall either (A) direct Tenant that Landlord elects not to cause Tenant to make such capital expenditure, and Tenant shall thereby be relieved of any liability for such replacement obligation unless such capital expenditure involves a Building system critical to Tenant's operations, in which event Landlord shall be deemed to have elected (B) immediately following, or (B) direct Tenant to make such capital expenditure in which event Tenant shall be reimbursed by Landlord at the end of the Term by that amount of the cost associated with such repairs, construction or alteration amortized over its useful life as set forth in the Internal Revenue Code, but in no event more

18

than seven (7) years. Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including the roof, roof structure, flooring system, floor slab, foundation, load bearing walls and exterior structural walls of the Building, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease. Landlord shall not be responsible for design defects proved by Landlord to be caused by Tenant or its architects, contractors, subcontractors or agents, which shall be the responsibility of Tenant. In addition to Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party

19

who is required to maintain same under the Lease. Tenant shall obtain a one (1) year general contractor's warranty to the effect that the Improvements will be free from defects in materials and workmanship and a ten (10) year roof warranty in connection with the construction of the Building, which general contractor's warranty shall be assigned to Landlord upon payment of the Tenant Improvement Allowance, as set forth in the Construction Provisions.

11.    <u>Payment of Utility Bills</u>.    Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12.    <u>Alterations</u>.

(a)    During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current stores, and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall have the right, at its sole cost, to alter, modify or reconstruct the exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any structural alteration or modification shall be deemed reasonable only if same is (i) materially inconsistent with the then-existing architecture of the Shopping Center, or (ii) affects the structural integrity of the Building. In the event any of Tenant's alterations shall have a material adverse effect on the structural integrity of the Premises, Landlord shall be relieved of its maintenance obligation hereunder for the portion of the Building affected which shall be and remain Tenant's responsibility thereafter. Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance with all applicable law. All such construction shall be performed in a manner that minimizes noise, dust and disruption to other tenants of the Shopping Center and their patrons. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not

received by Tenant within twenty (20) days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

        (b)    Prior to the commencement of any alterations or modifications pursuant to this paragraph 12, Tenant shall furnish to Landlord:

        (i)    copies of all governmental permits and authorizations which may be required in connection with such work;

        (ii)    a certificate evidencing that Tenant or Tenant's contractors have procured comprehensive general liability and workmen's compensation insurance covering all persons employed in connection with the work who might assert claims for death or bodily injury against Landlord, Tenant or the Building in accordance with the requirement set forth in paragraph 14 below; and

        (iii)    a complete set of construction drawings in sufficient detail to fully disclose all work proposed to be done by Tenant.

    13.    <u>Mechanics' Liens</u>. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of, respectively, Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises or the Shopping Center. Should any lien of any nature, including, but not limited to, the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

21

14.    Insurance.

(a)    <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value (at the time of the loss) of all such construction.  During the Main Term and all Option Periods, Tenant shall keep in full force and effect against loss or damage by fire and perils covered under a standard "all-risk" or "special form" an insurance policy covering loss or damage to the Premises in the amount of one hundred percent (100%) of the replacement value (at the time of the loss) of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than the Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord shall have the right to reasonably increase the amount of the insurance to be maintained by Landlord and Tenant from time to time consistent with coverages required to be carried by comparable tenants located in similar shopping centers in the City.  Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear.  Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate.  Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

(b)    <u>Liability Insurance</u>.  During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear.    The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

22                              H:\RJEKR\LSE\42078_13\54-62 (5720)

(c)    <u>Workers' Compensation Insurance</u>.    To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    <u>Self-Insurance</u>. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided (a) Tenant remains liable under the term of this Lease; and (b) has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Fifty Million Dollars ($150,000,000), as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision). In the event Tenant elects to self-insure, Tenant shall maintain appropriate loss reserves which are actuarially derived in accordance with accepted standards of the insurance industry or otherwise funded. In the event Tenant shall fail to fulfill the requirements of this paragraph 14(d), then Tenant shall immediately lose the right to self-insure and shall be required to provide the insurance specified in sub-paragraphs (a), (b) and (if applicable), (c) of this paragraph 14, and shall, within thirty (30) business days after notice from Landlord so requiring such insurance coverage, provide evidence to Landlord of such coverage, provided, nevertheless, that Tenant's self-insurance shall continue in full force and effect until such insurance is issued.    At Landlord's request, Tenant shall execute and deliver to Landlord and to Landlord's mortgage lender a certificate confirming Tenant's self-insurance undertaking as set forth herein.

(e)    <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction</u>.  During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a

portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, investor or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such lender, investor or stakeholder have insurable interests. The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the City, as the same may from time to time be increased. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage but in no event shall such deductible amount exceed $5,000 for Common Area liability coverage. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)     Workers' Compensation - Statutory Limits;
Employers Liability - $500,000;

2)     Automotive Liability for all vehicles with limits of $3,000,000; and

3) Commercial General Liability to include premises operations and products/completed operations coverage with limits of $3,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)    Policy Provisions.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII and licensed in the State. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14. Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance. An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)    Waiver of Right of Recovery and Subrogation.   To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate

provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)     Evidence of Insurance.  Subject to Tenant's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon delivery of the Land (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14; provided, nevertheless, that unless and until such evidence of Tenant's liability insurance coverage is received by Landlord, neither Tenant nor any agent, employee, contractor, consultant or other representative of Tenant shall be permitted to have access to the Shopping Center for any purpose.  Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

(i)     Indemnities.  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto),  Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

15.     Damages by Fire or Other Casualty.

(a)     Less Than Two Hundred Ten (210) Days to Repair.  In the event of a fire, earthquake or other casualty required to be insured hereunder, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which in the opinion of the

Architect (as hereinafter defined), shall take less than two hundred ten (210) days after receipt of any required governmental permits to repair, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof.  Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof.  In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, restored or replaced, by the party with repair and restoration obligations within two hundred ten (210) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    <u>More Than Two Hundred Ten (210) Days to Repair</u>.  In the event of a fire, earthquake or other casualty required to be insured hereunder, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which in the opinion of the Architect shall take longer than two hundred ten (210) days after the receipt of any governmental permits to repair, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty and shall thereupon make available to Landlord all insurance proceeds or reconstruction costs as set forth in subparagraph (a) above.  Notwithstanding the

H:\RIEKR\LSE\42078_13\54-62 (5720)

foregoing, if Landlord shall complete all repairs to the Common Areas and Additional Areas within thirty (30) days after the date that insurer of the Common Areas and Additional Areas concludes its investigation of the damage, but in no event more than sixty (60) days after the date of the damage, then Tenant shall not have the right to terminate this Lease, but Tenant shall restore the damage to the Premises as hereinafter set forth. In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred ten (210) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall reconstruct all Common Areas and Additional Areas and Tenant shall reconstruct the Building and Other Improvements in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    Last Two (2) Years of Main Term or Option Period. Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) Lease Years of the Main Term or any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the proceeds of any insurance (together with any applicable deductible) which are paid (or to the extent Tenant self-insures may be payable) with regard to such destruc-

H:\RIEKR\LSE\42078_13\54-62 (5720)

tion or damage or, in the event Tenant self-insures, the amount necessary for reconstruction of the Improvements.

(d)    Determination of Architect.    For purposes of determining the period required for any casualty repair hereunder, Landlord and Tenant shall reasonably agree and select an A.I.A. designated architect licensed in the State of Connecticut (the "Architect") for the sole purpose of determining the time required to repair damage caused by a casualty. The cost of such Architect shall be shared equally by Landlord and Tenant. In the event that Landlord and Tenant cannot agree upon the identity of the Architect, then the local A.I.A. representative board shall appoint the Architect who shall be experienced in commercial construction for purposes of determining the period required for such repair, which appointment shall be binding upon Landlord and Tenant.

16.    Condemnation.

(a)    Definition of Taking and Substantial Taking.    For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of five percent (5%) below the number of spaces shown on the Site Plan or that ratio which is required by the zoning ordinance applicable to the Shopping Center (without any variance), and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6(d) above that access to the Premises is impeded.

H:\RJEKR\LSE\42078_13\54-62 (5720)

(b)   <u>Tenant's Rights Upon Taking or Substantial Taking</u>.  In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking.  All compensation awards or awarded or paid for any Taking, whether for the whole or any portion of the Land and Improvements, or with respect to the leasehold interest granted pursuant to this Lease, shall be the sole property of Landlord except for Tenant's moving expenses and Tenant's equipment, improvements and trade fixtures.  Nothing in this paragraph 16(b), however, shall prevent Tenant from receiving any award through a separate proceeding brought by Tenant, provided the same does not diminish Landlord's award (except in the event Landlord has not paid to Tenant the Tenant Improvement Allowance in accordance with the Construction Provisions).

(c)   <u>Tenant's Rights Upon Less Than Substantial Taking</u>.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion of the Improvements condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration.  If the Taking occurs within the last two (2) Lease Years of the Main Term or any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)   <u>Landlord's Obligations Upon Any Taking</u>.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a

30                          H:\RIEKR\LSE\42078_13\54-62 (5720)

complete architectural unit and serve the function originally intended.  In the event of a taking of substantially all of the Shopping Center and the Premises to the extent that Landlord is unable to operate a retail Shopping Center in this location and provided that as a result of such event Landlord is concurrently terminating all other tenant's leases at the Shopping Center, then Landlord shall have the option to terminate this Lease upon not less than thirty (30) days prior written notice to Tenant.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)     Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding 120 days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Other Improvements, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease or related to the Common Areas shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of one hundred twenty (120) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)     Taking of the Pylon Sign(s).  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the

Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

(g)    Tenant's Right Upon Condemnation. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its unamortized leasehold improvements paid for by Tenant (and not reimbursed by Landlord), relocation expenses and any other items to which Tenant is entitled under applicable law.

17.    Assignment and Subletting. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent; provided that all of the following conditions have been satisfied: (i) the use of the Premises by any such transferee shall not (x) violate any applicable law or governmental regulation, or the provisions of paragraph 19(a)(viii); (y) conflict with any rights of exclusive use previously granted by Landlord to any other tenant of the Shopping Center prior to the date of this Lease and as set forth on Exhibit "F"; or (z) require parking in excess of that required for a retail use; (ii) the proposed transferee shall not be entitled to sovereign immunity nor be an agency or department of any governmental or quasi-governmental authority; and (iii) in case of a Transfer of less than the entire Premises, the costs of any required physical separation of the Premises or the systems servicing the Premises shall be performed by Tenant, at Tenant's sole cost, in accordance with plans prepared by Tenant, provided if such physical separation adversely affects the structural integrity of the Building, such plans shall be subject to Landlord's prior approval, which shall not be unreasonably withheld, conditioned or delayed. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder so long as this Lease is not changed, modified or amended in any respect by Landlord and any transferee. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent; provided that Tenant shall remain liable for all of Tenant's obligations hereunder arising.

Notwithstanding anything contained herein to the contrary, Landlord shall have the right, to be exercised within thirty (30) days following receipt of written notice from Tenant (a

32

"Transfer Notice") of a proposed assignment or subletting transaction to recapture the Premises and terminate this Lease. The Transfer Notice shall include information which Tenant has in its possession and which may be disseminated without penalty regarding the proposed assignment or subletting, including, but not limited to, information regarding the proposed assignee or subtenant, financial and operating information regarding such entity, and any other information which Tenant has in its possession and which may be disseminated without penalty and which Landlord reasonably requests in connection with such transaction. In the event that Landlord elects to terminate this Lease within thirty (30) days following receipt of the Transfer Notice, Landlord shall pay to Tenant the value of its unamortized improvements made to the Premises, which amount shall include the unamortized amount of the Tenant Improvement Allowance if Landlord has not paid such amount pursuant to the Construction Provisions, (the "Unamortized Costs") calculated in accordance with generally accepted accounting principles. The Unamortized Costs shall be paid on the effective date of Lease termination, which shall be deemed to occur on the date Tenant vacates the Premises in the condition required by this Lease. Failure of the Landlord to respond to any Transfer Notice shall be deemed to be the election of Landlord to terminate the Lease and pay to Tenant the Unamortized Costs. Tenant shall provide to Landlord reasonable evidence of the amount of the Unamortized Costs.

Each permitted transferee shall assume and be deemed to have assumed this Lease and shall be and remain liable for the payment of the Base Rent, additional rent and other costs and charges payable hereunder, and for the due performance of all the terms, covenants, conditions and agreements herein contained on Tenant's part to be performed for the Term of this Lease. No Transfer shall be binding on Landlord until Tenant shall deliver to Landlord a duplicate original of the instrument evidencing such Transfer which contains a covenant of assumption by the transferee of all of the obligations aforesaid contained in this Lease.

18.    Use.

(a)    Tenant may initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular

H:\RIEKR\LSE\42078_13\54-62 (5720)

telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)     Thereafter, Tenant shall have the right to use the Premises for any lawful retail or entertainment use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted to a tenant or other occupant of the Shopping Center pursuant to a lease executed prior to this Lease and shown on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

(c)     Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

19.     Warranties and Representations.

(a)     Landlord represents, warrants and covenants to Tenant that:

(i)     Quiet and Peaceful Enjoyment.     Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)     Title. Upon Landlord's acquisition of record title, Landlord's fee simple interest in the Shopping Center shall be free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's rights under this Lease, including, but not limited to, the

34                                      H:\RJEKR\LSE\42078_13\54-62 (5720)

right to operate its business in the Premises. Landlord specifically covenants and warrants that, subject to the granting of the Approvals (as referred to in Exhibit "C" hereto), no third party, including, but not limited to, any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage. This representation and warranty is a material inducement to Tenant's execution of this Lease.

(iii)    Certificate of Authority.    Landlord covenants that it is a duly constituted limited liability company under the laws of the State of Connecticut, and that its manager who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the company. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the company, and (b) the authority of the manager to bind the company as contemplated herein.

(iv)    No Litigation.    There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center, subject to the granting of the Approvals (as referred to in Exhibit "C" hereto), which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials.    Except as otherwise disclosed by that certain Phase I and II environmental site assessment, dated November, 1996, prepared by Stearns & Wheler, LLC ("Stearns") and that certain Phase III environmental site assessment, dated March, 1997, prepared by Stearns (collectively, the "Reports") Landlord has not received any notice nor has any actual knowledge that Hazardous Substances have been used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, or that any such condition exists at the Shopping Center except as set forth in the Reports. If any claim is ever made against Tenant by a third party relating to Hazardous Substances present at the Shopping Center, which such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents, contractors or employees) or Landlord's failure to properly remediate any Hazardous

35                    H:\RIEKR\LSE\42078_13\54-62 (5720)

Substances hereafter discovered at the Shopping Center, all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease. Landlord acknowledges that the Reports covering the Premises have disclosed the existence of certain Hazardous Substances currently existing on the Premises. Landlord hereby agrees to perform all work ("Remediation Work") necessary to cause the containment and/or remediation of such Hazardous Substances from the Premises in accordance with all remediation plans ("Remediation Plans"), which shall be subject to the reasonable approval of Tenant and all applicable regulatory bodies. Landlord shall be solely responsible for the commencement of the Remediation Work, the implementation of the Remediation Plan and all governmental, regulatory and other approvals required or related thereto.

Landlord acknowledges that it will perform the Remediation Work in full cooperation with Tenant and Tenant's architects, engineers and contractors (as defined in the Construction Provisions) and Landlord covenants not to unreasonably interfere with any of Tenant's construction or cause any delay in Tenant's construction as a result thereof. Tenant makes no objection to the implementation of the Remediation Plans, or the placement and location of the component systems, including monitoring wells and other similar collection and treatment facilities, as shown on the Remediation Plans. Notwithstanding anything contained herein, Tenant's review of the Remediation Plans and consent to their implementation on the Premises does not constitute Tenant's approval of the technical requirements of the Remediation Plans and Tenant shall not be liable for any construction, design, technical design or other defects of any kind in the Remediation Plans.

H:\RJEKR\LSE\42078_13\54-62 (5720)

Landlord shall, at its sole cost and expense, cause the prompt and diligent construction, installation, implementation, operation and maintenance of the Remediation Plans for the purposes of containing and remediating Hazardous Substances introduced by Landlord, its agents or employees, in accordance with all applicable laws and regulations. No changes shall be made to the any of the Remediation Work to be performed in connection with the remediation plans, without Tenant's prior written consent which shall not be unreasonably withheld. Landlord covenants and agrees to complete (or cause to be completed), at no cost to Tenant, each item of the Remediation Work in accordance with the Remediation Plans and applicable laws. Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for Landlord's failure to properly implement the Remediation Plan and complete the Remediation Work and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.

(vi)     Tenant's Exclusive Use. So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on Exhibit "F". The Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another operator or tenant shall not be deemed a violation of the preceding sentence. As used herein, "Incidental Sale" shall mean ten percent (10%) of such operator's or tenant's display area.

(vii)    Zoning and Subdivision. Subject to the issuance of the Approvals as referred to in the Construction Provisions, the Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

H:\RIEKR\LSE\42078_13\54-62 (5720)

(viii)    Prohibited Activities.  Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center, nor shall Tenant use any portion of the Premises for use as:

(A)    a bar, pub, nightclub, music hall or disco in which less than sixty percent (60%) of its space or revenue is devoted to and derived from food service;

(B)    a bowling alley;

(C)    a billiard or bingo parlor;

(D)    a flea market;

(E)    a massage parlor;

(F)    a funeral home;

(G)    a facility for the sale of paraphernalia for use with illicit drugs;

(H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)    an off-track betting parlor;

(J)    a carnival, amusement park or circus;

(K)    a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer gameroom or any other facility operated solely for entertainment purposes, such as a "laser tag" or "virtual reality" theme operation (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses except for offices and storage facilities incidental to a primary retail operation;

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers; and not including on-site employee training by any occupant at the Shopping Center incidental to the conduct of said occupant's business at the Shopping Center);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores); or

(U)    a gymnasium, sport or health club or spa.

38

(V)    any operation primarily used as a warehouse operation (other than the warehousing of products incidental to an occupant's primary business), and any assembling, manufacturing, distilling, refining, smelting, agricultural, or mining operation;

(W)    any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during period of construction, reconstruction, or maintenance);

(X)    any dumping, disposing, incineration, or reduction of garbage(exclusive of garbage compactors located near the rear of any building);

(Y)    any fire sale, bankruptcy or going-out-of-business sales (unless pursuant to a court order) or auction house operation;

(Z)    any central laundry, dry cleaning plant, or laundromat; provided, however, this prohibition shall not be applicable to on-site service oriented to pickup and delivery by the ultimate consumer, including nominal supporting facilities, as the same may be found in retail shopping districts in the metropolitan area where the shopping Center is located;

(AA)    any living quarters, sleeping apartments, or lodging rooms;

(BB)    any veterinary hospital or animal raising facilities (except that this prohibition shall not prohibit pet shops);

(CC)    a facility for the sale of fireworks;

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant or bookstore within any building on Landlord's Premises which abuts "Tenant's Preferred Area" (as shown on the Site Plan) or which is located within three hundred (300) feet of the front entrance to the Building. In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center.

(ix)    Site Covenants. With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)    Building Height and Location. The Building shall be free-standing with no building adjacent thereto. No outparcels, barriers, buildings, kiosks or other structures (except for the existing Billboard Signs and the pylon signs), either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located on an outparcel (if any is ever hereinafter created) elsewhere in the Shopping Center shall exceed one story, eighteen (18) feet in height, exclusive of architectural features, or twenty-two (22) feet in height, inclusive of architectural features, nor shall it exceed the size necessary for such

H:\RIEKR\LSE\42078_13\54-62 (5720)

outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas. No development shall occur within the Shopping Center except as shown on the Site Plan.

(B)    Construction and Alterations. Following the end of the first Lease Year, no construction shall be permitted in the Shopping Center during the months of October, November and December, except for interior and minor exterior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges. Unless required by municipal authorities, Landlord shall make (i) no changes in the Tenant's Preferred Area without Tenant's express written consent, which Tenant may, in its sole discretion, withhold, or (ii) material changes in the Common Areas (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which shall not be unreasonably withheld or delayed; provided the foregoing shall not be construed to inhibit Landlord's obligations or ability to perform Common Area Maintenance.

(C)    Prohibited Uses in Common Areas. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, the "for

rent" signs described in paragraph 27 and traffic control signs and except for not more than two (2) free-standing billboard signs located upon a portion of the Shopping Center shown on the Site Plan (the "Billboard Signs"); (2) display or sale of merchandise; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant, provided, Landlord shall have no obligation to enforce such employee parking areas.

(D)   Easements.   Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas without Tenant's prior written consent without the benefit of an easement or other agreement which burdens such subdivided parcel or easement with the provisions of this Lease, provided Landlord shall be permitted to subdivide the Sports Authority site as shown on the Site Plan without Tenant's consent, but such Sports Authority site shall at all times be subject to the OEA.

(x)   Interference with Tenant's Reception/Transmission.   Landlord shall not install (and Landlord shall use reasonable efforts to insure that no other tenant or other person anywhere in the Shopping Center shall install), any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi)   Notices Affecting the Premises.   Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or

41                          H:\RIEKR\LSE\42078_13\54-62 (5720)

from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(xii)    <u>Constructive Trust</u>.    Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due. Nothing in the foregoing shall prevent Landlord from commingling its funds.

(xiii)    <u>No Mortgages</u>.    Landlord represents and warrants that as of the date of execution hereof, there shall be no Mortgages (hereinafter defined) existing or recorded against the Premises or the Shopping Center.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    <u>Tenant's Authority</u>.    Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>.    As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant, its agents, contractors or employees will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to defend and hold Landlord harmless from and against all costs, liability and damages as a result thereof, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

If required to remediate any Hazardous Substances as set forth above, Tenant shall, at its sole cost and expense, cause the prompt and diligent construction, installation, implementation, operation and maintenance of a remediation plan (provided same is required by

governmental regulations) for the purposes of containing and remediating Hazardous Substances introduced by Tenant, its agents, contractors or employees, in accordance with all applicable laws and regulations. No changes shall be made to any of the remediation work to be performed in connection with such remediation plan (if required), without Landlord's prior written consent, which shall not be unreasonably withheld. Tenant covenants to complete (or cause to be completed), at no cost to Landlord, each of the items of remediation work in accordance with such remediation plan and applicable laws.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In the event there is a condition at variance with the foregoing representations and warranties of Tenant with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Landlord's Premises for their intended purposes by Landlord or Landlord's tenants, employees, licensees, agents, suppliers, customers or invitees, or if Tenant shall default in the observance or performance of any of the foregoing representations and warranties, then, Landlord may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Tenant, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Landlord's legal remedy and the irreparable harm which would be caused to Landlord by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that the other party (the "Non-Defaulting Party") suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, the Defaulting Party shall defend, indemnify and hold the Non-Defaulting Party harmless from any of such loss, costs,

H:\RIEKR\LSE\42078_13\54-62 (5720)

liability or damage incurred as a result of the Defaulting Party's breach hereunder. Notwithstanding anything contained herein to the contrary, in no event shall either party be liable to the other for special or consequential damages, including, without limitation, lost profits.

20.    Estoppel Certificates.    Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. In addition, without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy the obligations of Tenant hereunder, but without thereby releasing Tenant, including, but not limited to, the direct payment of rentals to Landlord. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Non-Disturbance and Attornment.    Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Mortgages (as defined below) encumbering the Premises and placed thereon by Landlord, a non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" (with such changes as are reasonably satisfactory to Tenant and are typically found in subordination, nondisturbance and attornment agreements with large institutional lenders executed by Tenant) executed by Mortgagee (as applicable) with regard to all future Mortgages

H:\RIEKR\LSE\42078_13\54-62 (5720)

and with regard to all renewals, modifications, replacements and extensions of such Mortgages. Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage.

In the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which states the following (provided Tenant is not in uncured material default beyond the expiration of any applicable grace periods): (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including, but not limited to, an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof.

Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37(b) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises.

22.    <u>Change of Landlord</u>.    Subject to paragraph 21 above with respect to a Foreclosure, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes

H:\RJEKR\LSE\42078_13\54-62 (5720)

to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's failure to provide Tenant with notice of such Successor.

23. Tenant's Financing. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's trade fixtures, other than fixtures which cannot be removed from the Premises without causing damage to the Building (unless Tenant shall repair such damage following such removal) personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) in the event Landlord fails to pay the Tenant Improvement Allowance in accordance with the Construction Provisions, a collateral assignment of Tenant's leasehold interest in the Premises, to the extent of the unpaid Tenant Improvement Allowance, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure). In addition, Landlord agrees to use reasonable efforts to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24. Tenant's Property and Waiver of Landlord's Lien. All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

H:\RIEKR\LSE\42078_13\54-62 (5720)

25.    <u>Memorandum of Lease; Commencement Date Agreement</u>. Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as <u>Exhibit "I"</u>, once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement. Upon the expiration or other termination of this Lease, Tenant shall, upon demand by Landlord and at Landlord's sole expense, execute and deliver to Landlord an instrument in proper form for recording, sufficient to release said Memorandum of Lease. In the event that Tenant shall fail for any reason whatsoever, to execute and deliver such instrument within thirty (30) days after written demand, Tenant shall indemnify and hold Landlord harmless from and against all losses, damages, costs and expenses, including reasonable legal fees, arising in connection therewith unless Tenant is contesting in good faith such expiration or other termination of this Lease.

26.    <u>Expiration of Term and Holding Over</u>. Where furnished by or at the expense of Tenant (except where same is a replacement of an item theretofore furnished and paid for by Landlord or against which Tenant has received a reimbursement), all movable property, furniture, furnishings and trade fixtures, other than those affixed to the realty so that they cannot be removed without damage, shall remain the property of Tenant, and in case of damage by reason of such removal, Tenant shall restore the Premises to good order and condition, reasonable wear and tear excepted. All of the Personalty shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease. In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate or, at

Landlord's option, upon not less than ten (10) days prior written notice, may otherwise dispose of, discard or retain as Landlord's property, all or a portion of such Personalty and all costs and expenses incurred by Landlord in connection therewith shall be Tenant's obligation. Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at 150% of the monthly Base Rent Tenant had been paying during the preceding Lease Year. Such continued occupancy shall be deemed a tenancy at will and shall not be construed as permitting Tenant to hold over.

27.    "For Rent" Signs. Tenant hereby permits Landlord during the last six (6) months of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place two (2) "For Rent" or "For Sale" signs, not exceeding four (4) feet by eight (8) feet in size on the parking lot of the Shopping Center. During the same period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.    Force Majeure. Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder, other

than Tenant's obligation to pay Base Rent and other charges required hereunder which in no event shall be deferred or excused, by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions. The lack of funds or inability to obtain financing shall not constitute an event of force majeure.

29.    Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including, without limitation, Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)    Bankruptcy.

(i)    If at any time prior to the Commencement Date there shall be filed by or against Tenant in any court pursuant to any statute either of the United States or of any State a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's property, and within one hundred twenty (120) days after Tenant fails to secure a discharge thereof, or if Tenant makes an assignment for the

benefit of creditors, or petitions for or enters into an arrangement or composition with creditors, this Lease shall ipso facto be canceled and terminated, in which event neither Tenant nor any person claiming through or under Tenant or by virtue of any statute or of an order of any court shall be entitled to possession of the Premises and Landlord, in addition to the other rights and remedies set forth herein, may retain as liquidated damages any Base Rent, security deposit or monies received by it from Tenant or others on behalf of Tenant upon the execution hereof.

(ii)     If at the Commencement Date or if at any time during the Term hereby demised there shall be filed against Tenant in any court pursuant to any statute either of the United States or of any State a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Tenant's property, and within one hundred twenty (120) days after Tenant fails to secure a discharge thereof, or if Tenant makes an assignment for the benefit of creditors or petitions for or enters into an arrangement or composition with creditors, or takes advantage of any statute relating to bankruptcy, this Lease, at the option of Landlord, may be canceled and terminated, in which event neither Tenant nor any person claiming through or under Tenant by virtue of any statute or of an order of any court shall be entitled to possession or to remain in possession of the Premises but shall forthwith quit and surrender the Premises, and Landlord, in addition to the other rights and remedies Landlord has by virtue of any other provision in this Lease contained herein may retain as liquidated damages any Base Rent, security deposit or monies received by it from Tenant or others on behalf of Tenant.

30.     Landlord's Remedies.  After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)     Continue Lease.  Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any sums due for any Option Period for which a Renewal Option has been exercised.  In the alternative, Landlord shall have the right to peaceably re-enter the Premises on the terms set forth in subparagraph (b) below, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof.  Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part

50

thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including, without limitation, necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b) <u>Terminate Lease</u>. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i) The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii) The "worth at the time of the award" of the amount by which the unpaid Base Rent which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 30(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate equal to the Default Rate for past due obligations, and a discount rate to net present value equal to the prime rate of Citibank, N.A. plus one percent (1%), but in no event less than eight percent (8%) on anticipated future

51

obligations, on the amount of the obligations payable on the date of such calculation. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)     Landlord's Right to Cure Tenant's Default. Upon the occurrence of an Event of Default, Landlord, without being under any obligation to do so and without thereby waiving such default, upon not less than five (5) business days prior written notice, may remedy such Event of Default for the account and at the expense of Tenant. If Landlord makes any expenditures or incurs any obligations for the payment of money in connection therewith, including, but not limited to, reasonable attorney's fees in instituting, prosecuting or defending any action or proceeding, such sums paid or obligations incurred shall be deemed to be additional rent hereunder and shall be paid to Landlord by Tenant on demand, plus interest at the Default Rate if not reimbursed within ten (10) days after such demand. In exercising its remedies hereunder Landlord agrees to use its reasonable efforts to minimize interference with Tenant's business in the Premises.

(d)     Reimbursement of Landlord's Costs in Exercising Remedies. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including, without limitation, attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(e)     Options/Assignment and Subletting. Upon the occurrence of a monetary Event of Default by Tenant, existing at the time of the exercise of any Renewal Option or assignment or subletting, Tenant shall be prohibited from exercising its right to exercise such Renewal Option, or assignment or subletting, as applicable.

52

(f)    <u>Remedies Are Cumulative</u>.  The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease).  Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(g)    <u>Assurances of Cure</u>.  If, as a matter of law, Landlord has no right upon the occurrence of an Event of Default to terminate this Lease, then, if Tenant, as debtor, or its trustee wishes to assume or assign this Lease, in addition to curing or adequately assuring the curing of all defaults hereunder then existing, Tenant, as debtor, or the trustee or assignee shall also furnish adequate assurances of future performance under this Lease.  Adequate assurances of curing then existing defaults shall mean (i) the posting with Landlord of a sum in cash sufficient to defray the cost of so curing, (ii) payment to Landlord of a security deposit amount equal to three (3) months Base Rent, and (iii) in the case of an assignee, assuring Landlord that the assignee is financially capable of performing the obligations of Tenant under this Lease and that such assignee's use of the Premises will not be detrimental to the other Tenants in the Shopping Center or to Landlord.

31.    <u>Events of Landlord's Default; Tenant's Remedies</u>.  Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due hereunder, including, but not limited to, the payment of the brokerage commissions pursuant to paragraph 35 hereof, hereunder within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within

53

such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default (after the expiration of all applicable cure periods) by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) in the event of an actual or constructive eviction, terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in the Construction Provisions in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by judicial means available under State law, or any other applicable proceedings. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.

32.    Waiver.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

33.    Compliance with Applicable Laws.  During the Term, (a) Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with

jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements, and (b) Landlord shall comply with all such lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Shopping Center, and the board of fire underwriters, relating to those portions of the Premises which are Landlord's responsibility and all portions of the Shopping Center. In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent. In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof, plus interest at the Default Rate from the next installment or installments of Base Rent.

If Tenant receives written notice of any violation of law, ordinance, rule, order or regulation applicable to the Premises it shall give prompt notice thereof to Landlord. If Landlord receives written notice of any violation of law, ordinance, rule, order or regulation applicable to the Premises it shall give prompt notice thereof to Tenant.

34.   _Notices._ Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

| If to Tenant: | CIRCUIT CITY STORES, INC.<br>Deep Run I<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention:  Corporate Secretary |
|---|---|
| with a copy to: | CIRCUIT CITY STORES, INC.<br>Deep Run I<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention:  Vice President of Real Estate |
| If to Landlord: | 444 CONNECTICUT AVENUE LLC<br>145 Main Street<br>Norwalk, CT  06851<br>Attention:  Mr. John Bush |

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35.   Brokers.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Garrick-Aug Associates and The Equity Group, which shall be paid a commission by Landlord pursuant to their separate written agreement. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees and court costs (through all levels of proceedings), resulting from any claims that may be successfully asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

36.   Miscellaneous.

(a)   Headings and Gender.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

56

H:\RJEKR\LSE\42078_13\54-62 (5720)