(b)    <u>Construction</u>.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    <u>Waiver of Jury Trial</u>.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)    <u>Relationship of Landlord-Tenant</u>.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)    <u>Entire Agreement; Merger</u>.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)    <u>Attorneys' Fees</u>.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)    <u>Partial Invalidity</u>.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

57

(h)   Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)   Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)   Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)   Successors and Assigns.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)   Counterparts.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)   Trademarks and Trade Names.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.   Effectiveness of Lease; Tenant's Right to Terminate.  Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)   Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees in a form satisfactory to Tenant simultaneously with the execution hereof.

(b)   Landlord's delivery of the Land by the date and in the condition specified in the Construction Provisions.

H:\RIEKR\LSE\42078_13\54-62 (5720)

(c)    Landlord's representations, warranties and covenants, including, but not limited to, those set forth in paragraph 19 herein, being true and accurate as of the date of delivery of the Land (as defined in the Construction Provisions).

(d)    Tenant's obtaining satisfactory assurance that Landlord has acquired record title to the Shopping Center and if Landlord fails to obtain record title to the Shopping Center prior to the date of delivery of the Land, then Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural, engineering, construction and any other costs incurred by Tenant to the date of termination.

(e)    Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center on or before delivery of the Land.

(f)    Tenant's obtaining satisfactory assurances that all the Approvals (as defined and within the time period set forth in paragraph 1(b) of Exhibit "C") have been obtained prior to the date of execution hereof and all necessary reciprocal use and easement agreements, including the OEA, shall be completed and obtained in accordance with paragraph 2 hereof.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, within the respective time periods specified above, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion by delivering to Landlord a written notice within ten (10) business after the expiration of the respective time periods set forth above signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions and in the event Landlord fails to satisfy such requirement to Tenant's satisfaction within thirty (30) days thereafter this Lease shall terminate.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the

H:\RIEKR\LSE\42078_13\54-62 (5720)

indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

The delivery of this executed lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 37.  It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord, without delay, execute and return same to Tenant in accordance with any instructions delivered by Tenant or its legal counsel.  In the event Landlord fails to immediately execute and return the Lease, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

38.    Confidentiality.  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.  This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction.  It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance, but this covenant of confidentiality shall be breached if Landlord, or any of Landlord's developers, bankers, accountants, agents, lenders, lawyers or other similar parties, discloses the content of, or delivers a copy of this Lease to, any third party without the express written consent of all parties to this Lease.  Any breach of this confidentiality agreement shall constitute an Event of Default under the terms and provisions of this Lease.

H:\RJEKR\LSE\42078_13\54-62 (5720)

WITNESS the following signatures and seals:

### LANDLORD

**444 CONNECTICUT AVENUE LLC,**
a Connecticut limited liability company

WITNESS:

_Antoinette Helland_
Printed Name: _Antoinette Helland_

_[signature]_
Printed Name: _John L. Born II_

By: _[signature]_

Name: Stanley M. Seligson

Title: Managing Member

H:\RIEKR\LSE\42078_13\54-62 (5720)

<u>TENANT</u>

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

WITNESS:

*Linda J. Renaud*
Printed Name: *Linda J. Renaud*

By: *Benjamin B. Cummings Jr.*

      Benjamin B. Cummings, Jr.,
      Vice President

*Patricia J. Morris*
Printed Name: *PATRICIA J. MORRIS*

LEASE/NORWALK, CT

## EXHIBIT "A-1"

### SHOPPING CENTER LEGAL DESCRIPTION

Metes and Bounds Description (Parcel A)

ALL THAT CERTAIN PIECE OR PARCEL OF LAND DESIGNATED AS PARCEL A 3.226 +- ACRES DEPICTED ON MAP ENTITLED "SUBDIVISION, PREPARED FOR, 444 CONNECTICUT AVENUE, LLC, NORWALK, CONNECTICUT" DATED JANUARY 10, 1997, BEING FURTHER BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY HIGHWAY LINE OF CONNECTICUT AVENUE (U.S. ROUTE 1); SAID POINT BEING THE SOUTHEASTERLY PROPERTY CORNER OF LAND OF CONNECTICUT LIGHT & POWER COMPANY AND THE SOUTHWESTERLY PROPERTY CORNER OF LAND HEREIN DESCRIBED;

THENCE RUNNING NORTHERLY ALONG LAND OF CONNECTICUT LIGHT & POWER COMPANY, THE FOLLOWING COURSES AND DISTANCES:
    N  3° - 22' - 08" W        337.52", AND
    N 30° - 40' - 48" W        54.82" TO PROPERTY DESIGNATED AS PARCEL C ON THE ABOVE REFERENCED MAP

THENCE RUNNING NORTHERLY, EASTERLY, AND NORTHERLY AGAIN ALONG SAID PARCEL C THE FOLLOWING COURSES AND DISTANCES:
    N  8° - 59' - 20" E        90.20',
    N 52° - 08' - 15" E        101.02', AND
    N 37° - 04' - 51" W        93.53' TO PROPERTY DESIGNATED AS PARCEL B ON THE ABOVE REFERENCED MAP; SAID POINT BEING MARKED BY AN IRON PIN;

THENCE RUNNING EASTERLY ALONG SAID PARCEL B THE FOLLOWING COURSE AND DISTANCE:
    N 52° - 55' - 09" E        103.53' TO A POINT MARKED BY AN IRON PIN;

THENCE RUNNING SOUTHERLY ALONG SAID PARCEL B THE FOLLOWING COURSES AND DISTANCES:
    S 37° - 04' - 51" E        288.93',
    S 08° - 19' - 54" W        13.04',
    S 36° - 10' - 03" E        190.69' TO A POINT MARKED BY A RAILROAD SPIKE SET IN BITUMINOUS PAVEMENT ON THE NORTHERLY HIGHWAY LINE OF CONNECTICUT AVENUE (U.S. ROUTE 1);

THENCE RUNNING WESTERLY ALONG THE NORTHERLY HIGHWAY LINE OF
CONNECTICUT AVENUE (U.S. ROUTE 1) THE FOLLOWING COURSES AND
DISTANCES:

| | |
|---|---|
| S 53° - 43' - 00" W | 9.87', |
| S 52° - 08' - 15" W | 402.17', AND |
| S 54° - 56' - 45" W | 38.64' TO THE POINT AND PLACE OF BEGINNING |

## EXHIBIT "B"

### INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|------|-------------------------|
| Approvals | Ex. "C", para. 1(b) |
| Assessment(s) | Ex. "C", para. 1(a) |
| Base Rent | 4(a) |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year | 7(c) |
| Certificate | 15(a)(i) |
| City | 1 |
| Commencement Date | 4 |
| Common Area Easement | 6(d) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Concept Plans | Ex. "C", para. 2(b) |
| Construction Term | 3 |
| CPI-U | 4(a)(iii) |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Escrow Agent | 15(a)(i) |
| Event of Default (Landlord) | 31 |
| Event of Default (Tenant) | 29 |
| Final Plans | Ex. "C", para. 1(b)(c) |
| Foreclosure | 21(a) |
| Ground Lessor | 21(a) |
| Ground Rent | Ex. "C". para. 4(b) |

H:\RIEKR\LSE\42078_13\54-62 (5720)

| Term | Paragraph where defined |
|------|------------------------|
| Hazardous Substances | Ex. "C", para. 1(a) |
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord's Premises | 1 |
| Landlord Work | Ex. "C", para. 1(d) |
| Lease Year | 3 |
| Main Term | 3 |
| Market Area | 4(iv) |
| Modified Proctor | Ex. "C", para. 2(a) |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| OEA | 1 |
| Option Periods | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 23 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 1 |
| Real Estate Taxes | 9(a) |
| Remediation Plan | 19(a)(v) |
| Remediation Work | 19(a)(v) |
| Renewal Option | 3 |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Work | Ex. "C", para. 1(b) |

2 - Ex. "B"

| Term | Paragraph where defined |
|------|------------------------|
| Site Plan | 1 |
| Soils Report | Ex. "C", para 1(b) |
| Staging Area | 6(a) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(e) |
| Substantially All of the Premises | 16(a) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Term | 3 |
| Transfer | Ex. "C", para. 3 |
| Work | 15(a)(i) |
| Worth at the time of the award | 30(b) |

NORWALK, CONNECTICUT

## EXHIBIT "C"

CONSTRUCTION PROVISIONS


THESE **CONSTRUCTION PROVISIONS** (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.    Landlord's Delivery of the Land; Other Landlord Work. All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)    Hazardous Substances. Except as disclosed by the Reports, Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances") and cause the Hazardous Substances to be remediated in accordance with paragraph 19(a)(v) of the Lease. Landlord hereby grants Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct such soil and environmental tests as its deems necessary.

Landlord has caused the preparer of the Reports (as defined in paragraph 19(a)(v)) to provide a certification to Tenant substantially in the form attached hereto as Attachment "1". At Tenant's election and cost, Tenant may obtain an environmental assessment of the Premises.

(b)    Site Work. Landlord, at its sole cost and expense, shall: (i) verify its proposed development of the Shopping Center and compliance of its civil engineering plans with Landlord's geotechnical evaluation of the Land, dated June 9, 1997, as further updated by letters dated November 4, 1997, November 21, 1997 and December 21, 1997, and prepared by Heller & Johnson (the "Soils Report"); (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements (other than those specified in Exhibit "F"), improvements and tenancies; (iii) complete grading of the

1 - Ex "C"                    H:\RIEKR\LSE\42078_13\54-62 (5720)

Land and the Common Areas in accordance with the "Standards for Grading Work" attached
hereto as Attachment "3", and with the Final Plans (hereinafter defined); (iv) completion of
Tenant's building pad stripped of all organic materials and debris and cut to an elevation of ten
(10) inches below designated finished floor elevation within one tenth (1/10) of one foot (1')
tolerance; (v) obtain approvals for all curbcuts indicated on the Final Plans and all on and off-
site permits required for any work to be performed by Landlord necessary to develop the
Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit;
(vi) complete (A) all curbcuts on Connecticut Avenue for Tenant's Preferred Area, (B) the
15,000 square feet of Staging Area (as shown on the Site Plan) outside of but adjacent to the
building pad area to either be paved or stone to provide for all weather use, and (C) an all-
weather construction access road to the Land and the Building as shown on the Site Plan, no less
than twenty (20) feet in width, connecting the existing dedicated roadway adjacent to the
Shopping Center with the Land, all in accordance with the Final Plans; (vii) obtain, not later
than November 30, 1997, (the "Approval Date"), all final non-appealable approvals from
governmental authorities having jurisdiction over the Shopping Center (collectively the
"Approvals") necessary (a) to subdivide the premises of which the Land forms a part, (b) to
obtain site plan approval (together with all related approvals required to obtain such site plan
approval) of the Improvements shown on the Site Plan, (c) permitting Tenant's construction of
the Premises (subject to issuance of Tenant's building permit, which shall be Tenant's
responsibility), and (d) such other approvals required in connection with the development of the
Shopping Center (exclusive of Tenant's building permit); and (viii) construct any and all walls
required by the City for sound barriers.  Landlord represents that it has obtained all approvals,
including, without limitation, the Approvals, necessary to perform the Site Work, and required
as a prerequisite to Tenant's obtaining its building permit.

All of the work described in (i) through (vii) above is, collectively, the "Site Work".
No changes shall be made to any of the Site Work, including, but not limited to, any plans and
specifications therefor, without Tenant's prior written consent.  The Site Work shall be
performed in accordance with the construction schedule attached hereto as Attachment "4"
(sometimes referred to herein as the "Construction Schedule").  Landlord specifically covenants
and agrees that any problems or delays it encounters in grading the Premises in satisfaction of

the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like (other than those sub-surface conditions not previously identified and located by soils engineers retained by either Landlord or Tenant) shall, subject to the provisions of Attachment "3", be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas and any damage caused to such road, or to any other portions of the Shopping Center by Tenant, or Tenant's agents, representatives or contractors in connection with any construction, testing or other related activities shall be Tenant's obligation. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to provide temporary utilities to within five (5) feet of the building pad at Tenant's designated points of entry as set forth in the Plans and Specifications, as contemplated in paragraph 1(c) below, and temporary telephone service to the Premises and the Staging Area, in accordance with the dates established therefor in this Lease, including Attachment "4", to the end that promptly upon completion of such requirements (collectively "delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence the installation of a pile foundation and construction of the Improvements. Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary Approvals or to pay necessary fees for its construction and development of the Shopping Center. Landlord agrees that delivery of the Land shall not be deemed to have occurred until all such aforesaid Approvals shall have been obtained and all such fees, including, but not limited to, impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the

3 - Ex "C"

issuance of Tenant's building permit.  Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work.  Upon the delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached hereto as <u>Attachment "5"</u>, and Landlord shall cause its soils engineer's written certification of pad preparation to be delivered in accordance with <u>Attachment "3"</u> hereto.

Should the Site Work require minor adjustments in order to be in accordance with <u>Attachment "3"</u>, the Soils Report or the Final Plans, Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand and No/100 Dollars ($5,000.00).

(c)    <u>Paving, Lighting, Utilities, Landscaping and Drainage</u>.  Landlord shall deliver to Tenant full and complete civil engineering plans ("Final Plans"), on or before the date set forth in <u>Attachment "4"</u> which shall be substantially in accordance with the plans shown on <u>Attachment "11."</u>  Landlord, at its sole cost and expense, and in accordance with <u>Attachment "4"</u>, shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the "Utilities Specifications" attached hereto as <u>Attachment "6"</u>; (ii) the construction and installation within five (5) feet of the front of the Building, of permanent telephone service and permanent utilities, including, but not limited to, gas, electric, telephone, domestic water and fire water (in size sufficient to satisfy local fire codes), each at Tenant's required entry points shown in the Final Plans at depths adequate for Tenant's tie-in without additional cost above that contemplated by the "Plans and Specifications" (as defined in paragraph 2(b) below); (iii) the construction and installation of the storm water drainage system at Tenant's required location shown on the Final Plans; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the "Paving Specifications" attached hereto as <u>Attachment "7"</u>; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" attached hereto as <u>Attachment "8"</u>; and (vii) Landlord's installation of the pylon sign identifying the Shopping

H:\RIEKR\LSE\42078_13\54-62 (5720)

Center as described in paragraph 8 of the Lease, all no later than the dates established therefor in Attachment "4."

(d)    Landlord Work. All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. Tenant agrees that Landlord's affiliate, Olympia Construction ("Olympia"), shall be permitted to perform the Landlord Work. In addition, provided Olympia meets all of Tenant's contractor bid requirements prior to the letting of bids for the Tenant's construction bid, Olympia shall be permitted to bid on the Tenant's construction. All Landlord Work shall be completed in accordance with these Construction Provisions and all attachments hereto. In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete. Tenant may exercise the rights set forth in this paragraph 1(d) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that portion of the Landlord Work from Landlord. In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work. Landlord agrees to reimburse Tenant for any and all actual and reasonable costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed. In the event that Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to add the

costs of such Landlord Work to the Tenant Improvement Allowance set forth in paragraph 4 below.

    2.    <u>Tenant Improvements</u>.

        (a)    <u>Building Construction</u>.  Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including, but not limited to, those required by <u>Attachment "3"</u>) of delivery of the Land in the form of <u>Attachment "5"</u>.  Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided Tenant does not elect its self help remedies set forth in this Lease.  Upon completion of any such previously unmet requirements, Tenant shall promptly commence and pursue to completion with due diligence the construction of the Improvements.  The construction work on the Improvements shall be performed by a contractor, licensed in the State, chosen by Tenant from the list of contractors set forth on <u>Attachment "10"</u>, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the "Plans and Specifications" (defined below).  Provided that the Land is delivered on or before the date set forth on <u>Attachment "4"</u>, Tenant covenants and agrees to use reasonable efforts and due diligence to achieve "Substantial Completion" (as defined below) on or before the date which is two hundred forty (240) days thereafter, subject to the provisions of paragraph 4 of this Lease.

        (b)    <u>Plans and Specifications</u>.  Tenant, not later than January 30, 1998, shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural and engineering drawings and specifications and building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Concept Plans" (which are hereby approved by Landlord) attached hereto as <u>Attachment "9"</u>, and provided that in no event shall Landlord require Tenant to alter its Building elevations, standard entrance tower, customer pickup area or use of Alucobond and red trim on the front exterior of the Building, unless such alteration is required to bring the Plans and Specifications into compliance with applicable requirements of law and regulation.  Landlord agrees that it will approve the Plans and Specifications, so long as they are (i) materially consistent with the Concept Plans, (ii) they comply with all requirements of laws and regulations applicable to the Improvements,

6 - Ex "C"

including, without limitation, building code requirements and the provisions of the Americans with Disabilities Act of 1990 (42 U.S.C. 121010 et seq.), and (iii) they are consistent with all requirements applicable to Landlord's Work hereunder, within ten (10) business days after receipt thereof. If the Plans and Specifications are not disapproved by Landlord within fifteen (15) business days of delivery thereof to Landlord, they will be deemed approved and shall immediately thereafter, but not later than two (2) business days next following the date upon which the Approvals shall be granted, be submitted to the Building Department of the City, and to all other necessary governmental agencies and officials, for review and approval. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Any changes which Landlord desires to make to the Plans and Specifications (which are different than a Building based on the Concept Plans utilizing Tenant's prototypical elevations and building materials) shall be at Landlord's sole cost and expense, and Tenant shall not be required to increase the Base Rent payable hereunder, or accept a reduction in the Tenant Improvement Allowance, as a result of such changes; provided that the Plans and Specifications shall in all cases comply with all applicable requirements of laws and regulations and all changes to the Plans and Specifications necessary to bring them into compliance with such requirements shall be done at Tenant's sole cost and expense.

(c)    Permits. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications. Landlord agrees, at no cost to Landlord (other than as set forth herein), to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)    Landlord Inspections. During the course of construction of the Improvements, Landlord may, at its own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

7 - Ex "C"

(e)    <u>Substantial Completion</u>.  *Substantial completion of the Improvements* ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.  The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications previously approved by Landlord.

3.    <u>Costs</u>.  Upon Substantial Completion and Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of <u>Exhibit "J"</u> attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, and (iii) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), and (iv) an estoppel in a form reasonably acceptable to Tenant; provided however, if required by a Mortgagee in connection *with Landlord's financing which is the source for the Tenant Improvement Allowance, Tenant* will execute a Subordination, Non-Disturbance and Attornment Agreement in the form attached hereto as <u>Exhibit "G"</u> (subject to such reasonable changes as may be mutually acceptable to Tenant and such Mortgagee and such changes as are typically found in subordination, non-disturbance and attornment agreements entered into by Tenant with institutional lenders). Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to $62.50 per square foot of gross leasable area of the Building (which shall be conclusively determined by the amount of gross leasable area shown in Tenant's final construction drawings), together with the Landlord's Share of Excess Costs (as defined in <u>Attachment "3"</u>) and any other costs incurred by Tenant in performing any Landlord Work, payable by wire transfer of funds by *Landlord to Tenant's account no later than thirty (30) days after Substantial Completion (the* Tenant Improvement Allowance and Landlord's Share of Excess Costs are herein collectively referred to as the "Tenant Improvement Allowance").  If the Base Rent is increased or decreased pursuant to paragraph 4[a](ii) of the Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased.  If Landlord fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt of items (i), (ii), (iii) and (iv) above, Landlord shall be in default hereunder, no Base Rent or CAM Charges

shall be due or owing to Landlord until the same is paid to Tenant, and interest shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Tenant Improvement Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent equal to One Hundred Seventy-Five Thousand and No/100 Dollars ($175,000.00) per annum during the first year following the Substantial Completion Anniversary, One Hundred Twenty-Five Thousand and No/100 Dollars ($125,000.00) per annum during the second year following the Substantial Completion Anniversary, and Seventy-Five Thousand and No/100 Dollars ($75,000.00) per annum thereafter during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of the Lease.  Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.  Notwithstanding the foregoing, at any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Transfer") Tenant's interest in the Building, the Improvements and the Lease.  Such right shall be in addition to the rights of Tenant set forth in paragraph 21 of the Lease.  Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Transfer.  Notwithstanding such Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

9 - Ex "C"

4.    Construction Delays.

(a)    Delays by Landlord.  In the event, Landlord fails to complete delivery of the Land to Tenant by March 15, 1998, Tenant may exercise its remedies of self-help and offset (including, without limitation, offset of all costs of delay, including overtime costs incurred, and costs incurred in performing such Landlord's Work).  Notwithstanding the foregoing, in the event of delays caused by force majeure, Landlord shall have until April 15, 1998 to complete delivery of the Land.  In the event, for any reason whatsoever, Landlord shall fail to complete delivery of the Land to Tenant by April 15, 1998, then Tenant may either (i) exercise its remedies of self-help and offset (including, without limitation, offset of all costs of delay, including overtime costs incurred, and costs incurred in performing such Landlord's Work), (ii) accept such late delivery of the Land, in which event Tenant shall be entitled to two (2) days of free rent (to be applied in consecutive days commencing on the Commencement Date) for every one (1) day of delay past April 15, 1998 that the Landlord Work constituting delivery of the Land fails to be completed, or (iii) terminate this Lease at any time prior to such delivery or completion, but Tenant's damages recoverable from Landlord as a result of such termination shall be a sum equal to the actual out-of-pocket and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of payment to Tenant of damages due, said sum not to exceed One Hundred Thousand and No/100 Dollars $100,000.00.

In the event, subject to force majeure, Landlord shall fail to accomplish delivery of the Land by the date which is fifteen (15) days following the date Landlord should have delivered the Land, or to complete any element of the Landlord Work by the completion date established therefor in Attachment "4", Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant

H:\RJEKR\LSE\42078_13\54-62 (5720)

with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

In addition to any other rights and remedies set forth herein, if Landlord fails to timely deliver the Land as of the forty-fifth (45th) day after April 1, 1998 or any element of the Site Work as of the forty-fifth (45th) day after the intended date of delivery, and regardless of force majeure, Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Base Rent, Real Estate Taxes or CAM Charges. In such event, Landlord shall deliver the Land and complete the Site Work on the date required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural and legal fees not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00), as compensation to Tenant for the loss of store revenues due to Landlord's delays hereunder.

(b)      Delays by Tenant.      If, subject to force majeure, Tenant shall fail to commence its construction following delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of Ground Rent (as hereinafter defined) on the date which is two hundred forty (240) days following delivery of the Land.

If, regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment of Ground Rent on the date which is two hundred forty (240) days following delivery of the Land, and reimburse Landlord for its fixed and ascertainable costs incurred as a result thereof. Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's

unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

For purposes hereof, Ground Rent for the first three (3) months shall be calculated on the basis of an annual Ground Rent in the amount of Five Hundred Sixty Seven Thousand Three Hundred Twenty-Four and No/100 Dollars ($567,324.00) per annum and commencing on the fourth (4th) month and continuing thereafter, Ground Rent shall be calculated on the basis of an annual Ground Rent in the amount of Six Hundred Eight Thousand Twenty-Five and No/100 Dollars ($608,025.00) per annum.

(c)    Miscellaneous. Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies. All sums owing to Tenant under paragraph 1 hereof and/or subparagraph (a) above shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder. All sums owing to Landlord under subparagraph (b) above shall, to the extent applicable and except for Base Rent and CAM Charges, be deducted from the Tenant Improvement Allowance.

Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth in this Exhibit "C" and the Lease.

5.    Attachments.

"1"    Environmental Certification

"2"    Intentionally Deleted

H:\RJEKR\LSE\42078_13\54-62 (5720)

"3"    Standards for Grading Work

"4"    Construction Schedule

"5"    Site Work Certification

"6"    Utilities Specifications

"7"    Paving Specifications

"8"    Shopping Center Lighting Specifications

"9"    Concept Plans

"10"    Bid List

"11"    Approval Drawings

# Stearns & Wheler, LLC
## ENVIRONMENTAL ENGINEERS & SCIENTISTS

March 21, 1997

Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, VA 23233

Attn: Michael Tussey

Re:     444 Connecticut Avenue
        Job No.: 6010.35

This letter is written with respect to paragraph 1 (a) of Exhibit "C", which are the Construction Provisions to your lease with 444 Connecticut Avenue, LLC, dated _____, 1997 (the "Lease").

We have been retained by 444 Connecticut Avenue, LLC to provide an environmental site assessment report concerning any potential environmental hazards present on or about the shopping center property which is the subject of the Lease. We understand that the provision of a report in form and substance satisfactory to Circuit City is a condition of the Lease.

Please be advised that Circuit city can rely on our environmental assessment reports entitled Phase I Environmental Site Assessment and Phase II Site Investigation dated November 1996 and Phase III Environmental Site Investigation dated March 1997, subject to the limitations and qualifications contained therein (the "Report"). A description of our professional liability insurance coverages, including the name of the carriers and the amount of the coverages, is provided under separate cover.

Sincerely,

Stearns & Wheler, LLC

By: _____

Gary A. Dufel, P.E.
Executive Vice President

19 Old Kings Highway South
Darien, Connecticut 06820
(203) 655-7979   Fax (203) 656-0751

New York • Connecticut • Maryland • Massachusetts

1 - Ex "C"
Attachment "1"

# CERTIFICATE OF INSURANCE

DATE (MM/DD/YY)
3/21/97

| | |
|---|---|
| Young Agency, Inc.<br>Ridgewater Place<br>500 Plum Street, Suite 200<br>Syracuse, NY 13204-1480<br>315-474-3374 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

**COMPANIES AFFORDING COVERAGE**

**INSURED**
Stearns & Wheler LLC
One Remington Park Drive
Cazenovia, NY  13035

COMPANY A  American Alliance Insurance

COMPANY B  Agricultural Insurance Co.

COMPANY C  Reliance Insurance Co.

COMPANY D

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| CO LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| A | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE  X OCCUR<br>OWNER'S & CONTRACTOR'S PROT | SPP745284703 | 1/01/97 | 1/01/98 | GENERAL AGGREGATE | $ 1000000 |
| | | | | | PRODUCTS-COMP/OP AGG | $ 1000000 |
| | | | | | PERSONAL & ADV INJURY | $ 1000000 |
| | | | | | EACH OCCURRENCE | $ 1000000 |
| | | | | | FIRE DAMAGE (Any one fire) | $ 300000 |
| | | | | | MED EXP (Any one person) | $ 5000 |
| A | **AUTOMOBILE LIABILITY**<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>X SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | CAP745284903 NY | 1/01/97 | 1/01/98 | COMBINED SINGLE LIMIT | $ 1000000 |
| | | | | | BODILY INJURY (Per person) | $ |
| | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | PROPERTY DAMAGE | $ |
| | **GARAGE LIABILITY**<br>☐ ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | OTHER THAN AUTO ONLY: | |
| | | | | | EACH ACCIDENT | $ |
| | | | | | AGGREGATE | $ |
| | **EXCESS LIABILITY**<br>☐ UMBRELLA FORM<br>☐ OTHER THAN UMBRELLA FORM | | | | EACH OCCURRENCE | $ |
| | | | | | AGGREGATE | $ |
| A | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>THE PROPRIETOR/<br>PARTNERS/EXECUTIVE  ☐ INCL<br>OFFICERS ARE:  ☐ EXCL | WC745284803 NY ,MD | 1/01/96 | 1/01/97 | STATUTORY LIMITS | |
| | | | | | EACH ACCIDENT | $ 500000 |
| | | | | | DISEASE - POLICY LIMIT | $ 500000 |
| | | | | | DISEASE - EACH EMPLOYEE | $ 500000 |
| C | **OTHER**<br>Consultants<br>Environmental<br>Liability | NTF2516412 | 6/01/96 | 6/01/97 | $5,000,000 per loss<br>$5,000,000 Total<br>All Claims | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SPECIAL ITEMS

Re: Job # 5241.

**CERTIFICATE HOLDER**
Stanley M. Seligson Properties
145 Main Street
Norwalk, CT 06851

**CANCELLATION**
SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING COMPANY WILL ENDEAVOR TO MAIL __10__ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE COMPANY, ITS AGENTS OR REPRESENTATIVES.

AUTHORIZED REPRESENTATIVE   *Roy D. Moore*

103654000

Attachment "2"

[INTENTIONALLY DELETED]

Attachment "3"

Standards for Grading Work

1.    The Land and the Shopping Center shall be graded in accordance with the following:

(a)    The Final Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations.  Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b)    The Building will be accessible by grade level parking only.  Steps and stairs are not permitted for normal customer ingress and egress.

(c)    Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%.  All water shall be sheet drained away from Tenant's doors.

(d)    Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%.  Entrances and access drives shall have a maximum slope of 6.0%.

(e)    Surface drainage swales will not be allowed without prior approval of Tenant.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

(f)    The cut and fill on the Shopping Center site should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

(g)    No retaining walls or embankments causing breaks in grade shall be permitted unless specifically as shown on the approved Plans and Specifications.

2.    "Tenant's Pad Area" shall be as indicated on the Site Plan.  The Site Work shall comply with the following additional requirements:

1 - Ex "C"
Attachment "3"                                     H:\RIEKR\LSE\42078_13\54-62 (5720)

(a)    Landlord shall be responsible for preparing Tenant's Pad Area cut to an elevation of ten (10) inches below designed floor elevation within a one tenth (1/10) of one foot (1') tolerance.    Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the modified proctor soil test for water content and compaction levels ("Modified Proctor") on the Land and subject to the following provisions in subparagraph (b).

(b)    On or before the date of delivery of the Land, Landlord shall provide Tenant with:

(i)    An independent soils engineer's written certification that all pad work was completed in accordance with the Soils Report, Final Plans and the Plans and Specifications necessary to allow the installation of Tenant's pile foundation.  This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.  A copy of such certification shall be delivered to Tenant's Vice President-Construction at Tenant's address set forth in paragraph 34.

(ii)    A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot.  This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners.  Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying monuments.

(c)    Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer.  However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas, unless stabilized by rip-rap or placed stones.

(d)    Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by

an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

(e)    All material, including native and fill, within 3 feet of any surface of the building including foundation concrete, shall be nonexpansive with a plasticity index of 12 or less. The material shall also have sufficient cohesion to stand vertically for 3 feet. No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

(f)    The Final Plans shall not be materially changed by Landlord or Tenant without the prior consent of the other party, which consent shall not be unreasonably withheld or delayed.

(g)    All outlots or future building areas shall be rough graded and planted with grass seed.

(h)    Landlord shall be solely responsible for all costs and expenses necessary to prepare and deliver the building pad area in order to construct a standard foundation and slab system to Tenant's specifications (the "Standard Costs"). The term "Standard Costs" shall be determined by the parties from the amount allocated to a standard foundation and slab which shall be obtained from Tenant's approved bid for the Improvements (with a standard foundation). In addition, Landlord shall be solely responsible for the first One Hundred Seventy-Five Thousand and No/100 Dollars ($175,000.00) of the costs and expenses in excess of the amount of the Standard Costs which are necessary to construct a pile foundation and associated structural slab to Tenant's specifications and additional costs and expenses ("Landlord's Share of Excess

3 - Ex "C"

Costs") thereafter shall be shared equally by Landlord and Tenant. By way of example only, the foundation costs shall be allocated as follows:

| | |
|---|---|
| <u>Total Foundation Cost</u> of foundation system (all foundation work inclusive of piles, pile caps, grade beams, etc.) | $450,000.* |
| <u>Standard Cost</u> (per specs to be submitted to Landlord to confirm via local bid pricing) This $150,000. cost is part of TIA) | <u>$150,000.</u> |
| <u>Excess Cost</u> | $300,000. |
| <u>Landlord's share of Excess Costs</u> | <u>$175,000.</u> |
| <u>Excess Costs to be Divided Equally</u> | $125,000. |
| <u>Landlord's Total Share of Foundation Costs</u> $175,000 + 62,500 (50% of $125,000) = | <u>$237,500.</u> |
| <u>Tenant's Total Share of Foundation Costs</u> $150,000 ("Standard Costs") from TIA) + $62,500 (50% of $125,000) = | <u>$212,500.</u> |

---

*Note: This is an example only, final cost subject to design to be mutually agreed upon by Landlord's and Tenant's engineers.

4 - Ex "C"

Attachment "4"

Construction Schedule

| **Landlord's Task** | **Completion Date** |
|---|---|
| 1. Landlord's delivery of full and complete civil engineering plans for the Shopping Center. | Completed |
| 2. Approval Date (including municipal and outside agencies). | Completed |
| 3. Outside Approval Date. | Completed |
| 4. Landlord's date for obtaining permits. | April 4, 1998 |
| 5. Landlord's dates for completion of offsite improvements. | May 30, 1998* |
| 6. Construction of all-weather construction access to the Premises, staging area and curbcuts in Tenant's Preferred Area. | April 4, 1998* |
| 7. Completion of Site Work including approval for all curbcuts. | April 4, 1998* |
| 8. Installation of temporary utilities. | April 4, 1998* |
| 9. Landlord's delivery of the Land to Tenant. | April 4, 1998* |
| 10. Landlord's delivery of pad certification from soils engineer. | April 4, 1998* |
| 11. Construction and installation of permanent utilities including permanent telephone service. | June 1, 1998 |
| 12. Construction and installation of storm water drainage. | June 1, 1998 |
| 13. Construction and installation of paving (including heavy-duty paving) and curbing. | September 1, 1998 |

1 - Ex "C"

14.   Completion of landscaping at Shopping Center.      September 1, 1998

15.   Construction and installation of exterior lighting      September 1, 1998
in the Shopping Center.

16.   Construction and installation of pylon sign(s)      September 1, 1998
identifying the Shopping Center.

*subject to force majeure as set forth in paragraph 4(a) of Exhibit "C"

Attachment "5"

Site Work Certification

To:    Circuit City Stores
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Vice President-Real Estate

Re:    Circuit City Store/Norwalk, Connecticut-Lease Agreement, dated January 12, 1998

Ladies and Gentlemen:

The undersigned, as Landlord under the Lease has caused "delivery of the Land" to occur, and accordingly, completion of the Site Work, all in accordance with the terms of the Lease.  Specifically the undersigned hereby certifies that:  (i) the grading of the Land and Common Areas has occurred in accordance with the Standards for Grading Work, attached as Attachment "3" to the Lease, and Tenant's building pad has been prepared in accordance with the requirements of Exhibit "C" to the Lease; (ii) the Staging Area has been completed; and (iii) an all-weather construction access road to the Land no less than 20 feet width has been prepared and is ready for your use.

All conditions precedent to issuance of your building permit have been satisfied by Landlord, and we certify that all elements of the Site Work and delivery of the Land have been satisfied in accordance with the Lease.

LANDLORD

**444 CONNECTICUT AVENUE LLC,**
a Connecticut limited liability company

By:    _____
Name:  _____
Title:  _____

1 - Ex "C"

Attachment "5"                                      H:\RIEKR\LSE\42078_13\54-62 (5720)

Attachment "6"

Utilities Specifications

Landlord will provide the following temporary utilities to within fifty (50) feet of Connecticut Avenue no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

> water (2" line, with sufficient pressure that pumping is not necessary), electric power (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) and temporary telephone for use by Tenant in its construction of the Improvements.

Landlord will provide the following permanent utilities to within five (5) feet of the front of the Building at Tenant's identified entry points no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

> gas (if available), telephone, permanent electricity (adequate for 800-amp panel, 3-phase, 277/480 volt), storm sewer system (in accordance with Final Plans), sanitary sewer (6" line), domestic water (2" line), fire protection water as currently provided the City (Landlord represents that such will be provided to the Building by an 8" line).

1 - Ex "C"

Attachment "6"

H:\RIEKR\LSE\42078_13\54-62 (5720)

Attachment "7"

Paving Specifications

1.    With respect to parking area and roadway surfacing:

(a)    Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

(b)    All pavement design shall be subject to review and approval by Tenant, and shall conform to the recommendations of an independent soils engineer selected and compensated by Landlord.

(c)    Consideration must be given to heavier use in main drives and service area.

2.    With respect to sidewalks and curbs:

(a)    Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks (excluding those within the curbline around the Building).

(b)    All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by Landlord's architect with respect to the Common Area), over a suitable granular base. Salt finish is not acceptable.

(c)    Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted. Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete. Extruded asphalt or concrete curbing may not be used.

(d)    Curbs at all non-parking areas shall be painted yellow with an exterior flat yellow latex paint, receive a trowel finish and be designated "No Parking" by a contrasting paint color.

1 - Ex "C"

Attachment "7"                                          H:\RIEKR\LSE\42078_13\54-62 (5720)

Attachment "8"

Shopping Center Lighting Specifications

Minimum design standards for lighting of the Shopping Center are as follows:

1.    The Developer shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.    Illumination as measured at pavement shall be:

    a.    5.0 foot candles minimum maintained within 50' of Tenant's entry.

    b.    2.0 foot candles minimum maintained throughout, measured at grade.

3.    Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn).  The security lighting layout and pattern shall be subject to Tenant's approval.

4.    Selection of fixture types shall be subject to Tenant's review and approval prior to design and circuiting.

5.    Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel.  All security lighting shall be placed on photocell switching.

6.    The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

7.    Entry canopy soffit: 4.0 foot candles.  Landlord to provide (2) 1,000 watt spot lights focused on Tenant's entry canopy.



Attachment "9"

PROTOTYPE "A1" ELEVATION

PROTOTYPE "B1" ELEVATION

PROTOTYPE "C1" ELEVATION

PROTOTYPE "C2/3" ELEVATION

PROTOTYPE "D1" ELEVATIONS

## Attachment "10"

### Bid List

Wren Associates, Inc.
491 Amherst St.
Nashua, NH  03063
(603) 883-7868

Vratsinas Construction
216 Louisiana
Little Rock, AR  72203
(501) 376-0017

C. Raimondo & Sons Construction Co.
540 Bergen Blvd.
Fort Lee, NJ  070204
(201) 461-5550

## Attachment "11"

### Approval Drawings

| Prepared By | Sheet No. | Sheet Name | Date |
|---|---|---|---|
| Stearns & Wheler, LLC | 1 | Site Aerial Photo | 3/21/97 |
| Ryan & Faulds, LLC | 2 | Topographic Map & Utility Plan | 1/10/97 |
| Ryan & Faulds, LLC | 3 | Subdivision Plan | 1/10/97 |
| Stearns & Wheler, LLC | 4 | Site Development Plan | 7/03/97 |
| Stearns & Wheler, LLC | 5 | Site Grading and Drainage Plan | 7/03/97 |
| Stearns & Wheler, LLC | 5A | Connecticut Avenue (Rte 1) Improvement without Stop & Shop | 7/03/97 |
| Stearns & Wheler, LLC | 5B | Connecticut Avenue (Rte 1) Improvement with Stop & Shop | 7/03/97 |
| Stearns & Wheler, LLC | 6 | Site Utility Plan | 7/03/97 |
| Stearns & Wheler, LLC | 7 | Site Lighting and Landscaping Plan | 7/03/97 |
| Stearns & Wheler, LLC | 8 | Sediment and Erosion Control Plan | 7/03/97 |
| Stearns & Wheler, LLC | 9 | Miscellaneous Details | 7/03/97 |
| Stearns & Wheler, LLC | 10 | Miscellaneous Details | 7/03/97 |

## EXHIBIT "D"

STORE FIXTURES

ALL STORAGE RACKING

ALL SECURITY SYSTEM ITEMS

TELEPHONES AND PAGING SYSTEMS

COMPUTER SYSTEM

OFFICE FURNITURE AND TRASH RECEPTACLES

BATTERY CHARGER

TRASH COMPACTOR

SIGNS (INTERIOR/EXTERIOR)

ANTENNA SYSTEM

ELECTRONIC SWITCHING

AIR COMPRESSOR (ROADSHOP)

SAFE

CONVEYOR

MEDECO CYLINDER LOCKS (5)

REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES

TACK BOARDS

WATER COOLER

FIRE EXTINGUISHERS

AUDIO ROOM FIXTURES AND SWITCHGEAR

PICTURES

WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS, DOLLIES, ETC.)

TRACK LIGHTS (CANS ONLY, NOT TRACKS)

H:\RIEKR\LSE\42078_13\54-62 (5720)

# EXHIBIT "E"

## SIGN PLANS AND CRITERIA

[See Attached]



10'-0"

ALUM. SIGN
CABINET PTD
MED. BRONZE
#41-312

"444" MED. BRONZE
ON 1/2" THICK
SINTRA OVAL
NON-LIGHTED

444

THE
SPORTS
AUTHORITY

RED PMS 199
ON WHITE FIELD

BLUE PANEL PMS
#285 W/ WHITE COPY

RED PMS 199
ON WHITE FIELD

REVEAL MED. BRONZE

CIRCUIT
CITY

WHITE COPY &
BORDER W/
CARDINAL RED #830-53
BACKGROUND

✳ NOTE:
BOTH SIGNS WILL BE
INT. ILLUM. W/ D.H.O.
LAMPS.
FLEX-FACES FROM 3-M
W/ HEAT TRANSFERRED
GRAPHICS
ALL WIRING & MATERIALS
USED WILL BE U.L.
APPROVED.

ALUM. CAP MED. BRONZE

EIFS LT. TAN

STACKED BLOCK
MED TAN

EIFS DR. TAN

ALL COLORS ON
BASE TO MATCH
BLDG. FINISHES

5'-3"   23"

9"

9"

5'-3"   18"

18"

20'-9"

7'-9"

DOUBLE FACED
PYLON SIGN
SCALE 3/8" = 1'-0"

SERVICE NEON
SIGNS INC

## EXHIBIT "F"

### PERMITTED ENCUMBRANCES

A.  Tenant exclusive uses:

>   The Sports Authority, Inc. A sporting goods business, including, but not limited
>   to, men's, women's and children's athletic sportswear and apparel; athletic
>   footwear (which shall also include, without limitation, in-line roller skates and ice
>   skates); bicycles; fitness equipment, golf and racquet equipment; camping
>   equipment, marine, fishing and hunting gear; water sports equipment; ski
>   equipment and apparel; team sports equipment and apparel; sports related
>   paraphernalia and memorabilia; sports licensed products; sports related books and
>   videos and general recreational merchandise.

B.  Permitted Title Exceptions:

>   6.  Certificate of Variance, dated and recorded November 26, 1990, in Volume 2498
>       at Page 101 of the Norwalk Land Records.

>   7.  Covenant and Agreement contained in a deed from Connecticut Light & Power
>       Company, dated January 21, 1960, and recorded February 1, 1960, in
>       Volume 529 at Page 421 of the Norwalk Land Records.

>   8.  Rights of others in and to any brooks, streams, ponds or ditches located upon or
>       abutting said premises.

>   9.  Declaration of Restrictions, Covenants and Easements entered into by and
>       between Landlord, Tenant and The Sports Authority, Inc.

**Notwithstanding anything contained in this Exhibit "F" to the contrary, nothing
contained herein shall be construed to prohibit the exercise of the rights and privileges
granted to Tenant under the Lease, including, but not limited to, Tenant's exclusive use
rights set forth in paragraph 18 of the Lease.**

H:\RJEKR\LSE\42078_13\54-62 (5720)

## EXHIBIT "G"

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
(Mortgage)

THIS **SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT**, dated the _____ day of _____, 1997, between _____, a _____ ("Mortgagee"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation ("Tenant").

## W I T N E S S E T H :

(a)     Tenant has entered into a certain lease (the "Lease") dated January 12, 1998, with 444 Connecticut Avenue LLC, a Connecticut limited liability company ("Landlord"), covering premises located within that certain property known as Connecticut Avenue Shopping Center, located in the City of Norwalk, Fairfield County, Connecticut, and more particularly described in Schedule "A" hereto; and

(b)     Mortgagee has made a loan to Landlord as evidenced and secured by a Deed of Trust recorded _____, 199____ in the land records of Fairfield County, _____, in Book _____ at page _____ (the "Mortgage"), encumbering the property described in Schedule "A"; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.     The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real  property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.     Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.     In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will recognize this Lease and all of Tenant's rights hereunder, and Mortgagee will not terminate the Lease nor join Tenant in

H:\RIEKR\LSE\42078_13\54-62 (5720)

summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.     Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.     In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

    (a)     liable for any act or omission of any prior lessor (including Landlord); or

    (b)     liable for the return of any security deposits unless delivered to Mortgagee; or

    (c)     bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

    (d)     bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall be subject to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

6.     Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

7.     Notwithstanding anything contained in this Agreement, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall be subject to all of Tenant's remedies properly exercised under the Lease, including, but not limited to, Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including

Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

8.  Mortgagee, Landlord and Tenant, respectively, represent and warrant to each other that each has the requisite power and authority to enter into this Agreement; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Agreement; that the signatories executing this Agreement on behalf of Mortgagee, Landlord and Tenant have been duly authorized and empowered to execute this Agreement on behalf of Mortgagee, Landlord and Tenant, respectively; and that this Agreement is valid and shall be binding upon and enforceable against Mortgagee, Landlord and Tenant and their successors and assigns and shall insure to the benefit of Mortgagee, Landlord and Tenant and their successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

WITNESS:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____

Printed Name:_____

Benjamin B. Cummings, Jr.
Vice President

Printed Name:_____

WITNESS:

COMPANY NAME

By: _____

Printed Name:_____

Name: _____

Title: _____

Printed Name:_____

3 - Ex "G"

STATE OF VIRGINIA         §
                          §
COUNTY OF HENRICO         §

      The foregoing instrument was acknowledged before me this ___ day of _____,
1997, by Benjamin B. Cummings, Jr., Vice President of **CIRCUIT CITY STORES, INC.**, a
Virginia Corporation, who is personally known to me to be the officer who signed the foregoing
instrument and he acknowledged that the execution thereof was his free act and deed for the uses
and purposes therein expressed.

      WITNESS my hand and official seal this ___ day of _____, 1997.


                      _____
                      Notary Public in and for the State
                      of Virginia

                      My Commission Expires:_____


STATE OF _____         §
                               §
COUNTY OF _____          §

      The foregoing instrument was acknowledged before me this ___ day of _____,
1997, by _____,_____ of _____,
a _____, who is personally known to me to be the officer who signed the
foregoing instrument and he acknowledged that the execution thereof was his free act and deed
for the uses and purposes therein expressed.

      WITNESS my hand and official seal this ___ day of _____, 1997.


                      _____
                      Notary Public in and for the State
                      of _____

                      My Commission Expires:_____


                  H:\RJEKR\LSE\42078_13\54-62 (5720)

## EXHIBIT "H"

Prepared by and return to after recording:

Kane, Russell, Coleman, & Logan, P.C.
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas  75201
Attn: Robert J. Riek

## MEMORANDUM OF LEASE

This **MEMORANDUM OF LEASE** is made this 5th day of January, 1998, between **444 CONNECTICUT AVENUE LLC**, a Connecticut limited liability company (hereinafter referred to as "Landlord"), **and CIRCUIT CITY STORES, INC.**, a Virginia corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated January 12, 1998, whereby Landlord has leased to Tenant a portion of the real property (the "Property"), Norwalk, Fairfield County, Connecticut, the legal description of which Property is set forth on Exhibit "A-1" attached hereto. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.      Term. The term of the Lease is for a period of twenty (20) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for four (4) successive periods of five (5) years each.

II.    Exclusive Use Rights. The Lease provides that Tenant shall, subject to the provisions of the Lease, enjoy the sole and exclusive privilege in the Shopping Center located on the Property to sell or rent consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but

1 - Ex "H"

shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems.

III.   <u>Successors</u>.  The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.   <u>Incorporation of Lease</u>.   All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.   <u>Conflicts with Lease</u>.   This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter modify, expand, diminish or supplement the provisions of the Lease.   In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

**444 CONNECTICUT AVENUE, LLC,**

WITNESS:                                          a Connecticut limited liability company

_____          By:   _____

Printed Name:_____                Name: _____
                                             Title: _____

_____

Printed Name:_____

2 - Ex "H"                                    H:\RIEKR\LSE\42078_13\54-62 (5720)

STATE OF _____        §
                                §
COUNTY OF _____          §

    The foregoing instrument was acknowledged before me this ___ day of January, 1998, by _____, _____ of **444 CONNECTICUT AVENUE, LLC,** a Connecticut limited liability company, who is personally known to me to be the officer who signed the foregoing instrument and he acknowledged that the execution thereof was his free act and deed for the uses and purposes therein expressed.

    WITNESS my hand and official seal this ___ day of January, 1998.


_____
Notary Public in and for the State
of _____

My Commission Expires:_____


3 - Ex "H"

WITNESS:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

Printed Name: _____

By: _____

Benjamin B. Cummings, Jr.,
Vice President

Printed Name: _____

STATE OF VIRGINIA        §
                         §
COUNTY OF HENRICO        §

The foregoing instrument was acknowledged before me this _____ day of January, 1998, by Benjamin B. Cummings, Jr., Vice President of **CIRCUIT CITY STORES, INC.**, a Virginia Corporation, who is personally known to me to be the officer who signed the foregoing instrument and he acknowledged that the execution thereof was his free act and deed for the uses and purposes therein expressed.

WITNESS my hand and official seal this ___ day of January, 1998.

_____

Notary Public in and for the State
of Virginia

My Commission Expires: _____

MEMORANDUM OF LEASE/NORWALK, CT

## EXHIBIT "I"

## COMMENCEMENT DATE AGREEMENT

THIS **COMMENCEMENT DATE AGREEMENT**, made as of this ____ day of
_____, 1998, between **444 CONNECTICUT AVENUE, LLC**, a Connecticut limited
liability company (herein called "Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia
corporation (herein called "Tenant").

## W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in Norwalk, Fairfield
County, Connecticut (herein called the "Premises"); and

WHEREAS, by that certain Lease, dated January 12, 1998 (herein called the "Lease"),
Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded
in the office of the Clerk of Fairfield County, Connecticut, on the ____ day of
_____, 1998, in Book _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has
commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into
an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.      The term of the Lease commenced on, and the Commencement Date (as such term
is defined in the Lease) was, _____, 199___. The term of the Lease shall expire on
January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless
the Lease terminates earlier as provided in the Lease.

2.      The date of commencement of the first "Option Period" (as such term is defined
in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect
thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless
Tenant exercises any option to further extend the term of the Lease or the Lease terminates
earlier as provided in the Lease.

3.      The date of commencement of the second Option Period shall be February 1, ____
if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of

the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

    4.    The date of commencement of the third Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

    5.    The date of commencement of the fourth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

    6.    The date of commencement of the fifth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless the Lease terminates earlier as provided in the Lease.

    IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

WITNESS:

**444 CONNECTICUT AVENUE, LLC,**
a Connecticut limited liability company

_____

Printed Name:_____

By: _____

Name: _____
Title: _____

_____

Printed Name:_____

WITNESS:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

_____

Printed Name:_____

By: _____

Benjamin B. Cummings, Jr.,
Vice President

_____

Printed Name:_____

H:\RJEKR\LSE\42078_13\54-62 (5720)

## EXHIBIT "J"

## INDEMNIFICATION AGREEMENT

This **INDEMNIFICATION AGREEMENT** is made between **444 CONNECTICUT AVENUE, LLC**, a Connecticut limited liability company (hereinafter referred to as "Landlord") and **CIRCUIT CITY STORES, INC.**, a Virginia corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease"), dated January 12, 1998, whereby Landlord has leased to Tenant a portion of the real property located in Norwalk, Fairfield County, Connecticut (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.     Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.     Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

H:\RJEKR\LSE\42078_13\54-62 (5720)

EXECUTED this _____ day of _____, 199___.

**LANDLORD**

**444 CONNECTICUT AVENUE, LLC,**
a Connecticut limited liability company

By:  _____
Name: _____
Title: _____

**TENANT**

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By:  _____
Benjamin B. Cummings, Jr.,
Vice President

## EXHIBIT "K"

## OPERATION AND EASEMENT AGREEMENT

[See Attached]