**EXHIBIT B**

(Agreement)

PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of May 15, 2009, is made by and between CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Seller"), and 99¢ Only Stores, a California corporation ("Purchaser").

RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court. As contemplated by Section 9.2 of this Agreement, Seller will prepare and file the Sale Motion seeking approval of this Agreement.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

1.  PURCHASE AND SALE

    1.1  Purchase and Sale.  Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to the property located at 12530 Day Street, Moreno Valley, California, comprising approximately 3.53 acres, and being more particularly described on Exhibit A attached hereto and made a part hereof, together with (i) all the rights and appurtenances pertaining to such land, (ii) all buildings (including a building containing approximately 33,970 square feet), structures, and other improvements on said land, (iii) electrical, mechanical, air conditioning and other fixtures attached thereto, (iv) to the extent assignable, plans, specifications, permits, reports, development rights, and title insurance pertaining to such land, and (v) all other personal property situated on such land or in such buildings on the Closing Date (herein collectively called the "Property"); provided, however, the Property shall not include any lifts or racking located in the buildings, if any (the "Excluded FF&E"), which shall be excluded from the sale. Seller shall remove the Excluded FF&E prior to Closing and repair all material damage caused thereby, failing which such Excluded FF&E shall be deemed abandoned and become the property of Purchaser. For purposes of this Agreement, the "Effective Date" shall mean and refer to the date on which this Agreement is signed by both Purchaser and Seller, as indicated on the signature page hereto.

2.  PURCHASE PRICE

    2.1  Purchase Price.    The purchase price (the "Purchase Price") for the Property shall be TWO MILLION TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS

1

CCSWCI: Moreno Valley, CA Sale [5/15/2009]

($2,250,000.00). The Purchase Price, less the Deposit, shall be paid into the Escrow Agent's escrow account in cash by Purchaser by wire transfer in accordance with wire transfer instructions to be provided by the Escrow Agent, as adjusted by prorations and payment of expenses as herein provided.

3.   DEPOSIT

3.1   Deposit.   Within two (2) business days after the Effective Date, Purchaser shall deliver to Stewart Title of California (the "Escrow Agent" and "Title Company"), 16830 Ventura Boulevard, Suite M, Encino, California 91436, Attention: Andrea Mendoza Telephone: (818) 906-5300, Fax: (818) 906-5310, Email: AMendoza@stewart.com, by wire transfer or cashier's check payable to Escrow Agent, an amount equal to NINETY-NINE THOUSAND NINE HUNDRED NINETY NINE AND 99/100 DOLLARS ($99,999.99) (which amount, together with the funds delivered pursuant to the next sentence of this Section 3.1 and all interest accrued thereon, is herein called the "Deposit") to be held by the Escrow Agent in an interest bearing money market account in a federally insured financial institution in the Los Angeles, California metropolitan area (or in such other interest-bearing account or investment as the parties hereto shall mutually direct) (the "Escrow Account"). Within two (2) business days after expiration of the Due Diligence Period (unless Purchaser elects or is deemed to have elected to terminate this Agreement pursuant to Section 4.2 or Section 4.3 hereof), Purchaser shall deliver to Escrow Agent, by wire transfer or cashier's check payable to Escrow Agent, an amount equal to an additional ONE HUNDRED TWENTY-FIVE THOUSAND AND 01/100 DOLLARS ($125,000.01), which amount shall be deemed part of the Deposit and shall be held in the Escrow Account, bringing the total Deposit to TWO HUNDRED TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($225,000.00). The Deposit shall be held in the Escrow Account.

3.2   Application of Deposit.   If the sale of the Property is consummated under this Agreement, the Deposit shall be paid to Seller and applied to the payment of the Purchase Price. If Purchaser terminates this Agreement in accordance with Section 4.2, Section 4.3, Section 7.1, Section 7.2, or Section 8.1 hereof, or if Purchaser or Seller terminates this Agreement in accordance with Section 9.4, the Deposit shall be returned promptly to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the "Survival Obligations"). If Seller terminates this Agreement in accordance with Section 8.2 or Section 10.11, the Deposit shall be retained by Seller as liquidated damages pursuant to Section 8.2 and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations. Purchaser agrees to deliver to Seller copies of all Reports (as defined in Section 4.4 hereof) at the time Purchaser's notice to terminate this Agreement is given, provided that Purchaser shall not have any obligation to deliver (i) any survey prepared for Purchaser unless Seller reimburses Purchaser for the cost thereof, (ii) any Reports if this Agreement is terminated due to Seller's breach or default, (iii) any Report if the written contract which Purchaser entered into with the consultant who prepared such Report specifically forbids dissemination thereof to others, and/or (iv) any items which constitute attorney's work product,

2

CCSWCI: Moreno Valley, CA Sale [5/15/2009]

market or financial studies, or other proprietary or privileged matters. Notwithstanding anything to the contrary in this Agreement, Purchaser makes no representations or warranties of any kind whatsoever to Seller as to the accuracy or completeness of the Reports delivered to Seller, and Purchaser shall not have any liability or responsibility to Seller with respect to the accuracy or completeness of any such Reports. The obligations to deliver the Reports shall survive the termination of this Agreement. All interest earned on the Deposit shall be reported to the Internal Revenue Service as income of Purchaser and Purchaser shall promptly execute all forms reasonably requested by the Escrow Agent regarding such interest.

4.    ITEMS DELIVERED TO PURCHASER

    4.1    Items Delivered.    Seller has delivered or will deliver to Purchaser, within three (3) business days following opening of escrow with the Escrow Agent, certain information with respect to the Property, which may include, without limitation, title reports, environmental and engineering reports and real property surveys, but only to the extent Seller has reasonable access to and possession of such information. In addition, Seller will authorize Purchaser, at no cost to Seller, to seek information regarding permits and approvals from applicable governmental agencies as Purchaser may request in connection with Purchaser's intended use of the Property and to discuss the possibility of obtaining permits and approvals from the applicable governmental agencies, provided that the entire cost and liability associated therewith shall be at Purchaser's sole cost, and so long as Purchaser does not tender any applications and/or seek any written approvals prior to Closing. The provisions of this Section 4.1 shall survive the Closing or any termination hereof.

    4.2    Title Examination.    Purchaser shall have the right to have Seller's title to the Property examined by Title Company and shall give written notice to Seller within thirty (30) days from and after the Effective Date (the "Due Diligence Period") of any objection thereto; provided, however, Seller shall have no obligation to satisfy any such objections, except that Seller shall remove, on or before the Closing, all monetary liens affecting the Property other than non-delinquent real property taxes and non-delinquent assessments. Purchaser must elect, on or before the expiration of the Due Diligence Period, one of the following: (i) to waive any such objections that Seller has not agreed to satisfy at or prior to the Closing and to close the transaction in accordance with the terms of this Agreement; or (ii) to terminate this Agreement, in which event Escrow Agent shall promptly refund the Deposit to Purchaser as Purchaser's sole and exclusive remedy and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations; provided, further, if Purchaser does not send a written notice of waiver of title objections prior to the expiration of the Due Diligence Period (which notice may, notwithstanding anything to the contrary in this Agreement, be delivered by facsimile and such notice shall be deemed delivered upon confirmed receipt of facsimile transmission by Seller's counsel, provided that Purchaser shall also send a copy of such notice by one of the other delivery methods set forth below in Section 10.1), then Purchaser shall be deemed to have elected to terminate this Agreement, in which event Escrow Agent shall promptly refund the Deposit to Purchaser as Purchaser's sole and exclusive remedy and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations.

3

CCSWCI: Moreno Valley, CA Sale [5/15/2009]

     4.3    <u>Property Inspection</u>. Purchaser shall have through the last day of the Due Diligence Period to determine whether, in Purchaser's sole and absolute discretion, the Property is acceptable to Purchaser. Notwithstanding anything to the contrary in this Agreement, Purchaser may terminate this Agreement by giving notice of termination to Seller on or before the last day of the Due Diligence Period if Purchaser determines that the Property is not acceptable for any reason, in which event Escrow Agent shall promptly return the Deposit to Purchaser and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations. If Purchaser does not give a notice waiving its due diligence contingency pursuant to Section 4.2 and this Section 4.3 at or prior to 5 p.m. (Pacific Time) on the last day of the Due Diligence Period, then Purchaser shall be deemed to have elected to terminate this Agreement, in which event Escrow Agent shall promptly refund the Deposit to Purchaser as Purchaser's sole and exclusive remedy and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations. Notwithstanding anything to the contrary in this Agreement, Purchaser may deliver its due diligence contingency waiver notice by facsimile and such notice shall be deemed delivered upon confirmed receipt of facsimile transmission by Seller's counsel (provided that Purchaser shall also send a copy of such notice by one of the other delivery methods set forth below in Section 10.1).

     On and subject to the conditions set out in this Section 4.3, Purchaser shall have reasonable access to the Property during the Due Diligence Period for the purpose of conducting surveys, architectural, engineering, geotechnical, and environmental inspections and tests and any other inspections, studies, or tests reasonably required by Purchaser, all at Purchaser's sole expense. If any inspection or test disturbs the Property, Purchaser will (at its sole expense) restore the Property as soon as reasonably possible to the same condition as existed prior to any such inspection or test. Notwithstanding anything to the contrary in this Agreement, Purchaser will not do, or cause or direct to be done, any subsurface testing or boring, or any testing of subsurface water, or any coring, boring or other intrusive testing, without first obtaining Seller's prior written consent which Seller may give or withhold in its absolute discretion; provided, however, all other inspections of or entry upon the Property by Purchaser shall occur only with the consent of Seller, which consent shall not be withheld unreasonably. Purchaser hereby indemnifies Seller, and agrees to defend, protect and hold Seller harmless, from and against any and all claims, losses, damages and liabilities that may be asserted against or incurred by Seller for or in connection with any injuries or damage to any persons or property, which directly or indirectly are caused by or result from any entry, inspection, testing or other action done or caused or directed to be done by Purchaser or its representatives or contractors; provided, however, in no event shall the foregoing indemnity, defense, protection and hold harmless obligations apply to any claim, loss, damage, liability, injury or damage arising or resulting from any of the following: (a) acts or omissions of Seller or its agents, employees or contractors; and/or (b) the mere discovery of matters, facts or conditions related to or affecting the Property during Purchaser's investigation of the Property, including, but not limited to, any diminution in value in the Property arising therefrom, latent defects in the Property, and/or the release or spread of any Hazardous Materials which are discovered (but not deposited) on or under the Property by Purchaser. Purchaser agrees to maintain (or to cause all parties entering the Property at Purchaser's instance to maintain) adequate and appropriate insurance to cover risks of the type

4

described herein and, upon Seller's request, to deliver to Seller evidence establishing to Seller's reasonable satisfaction that adequate and appropriate insurance to cover risks of the types described herein is being maintained and to add or cause Seller to be added as an additional insured on all such policies. Seller agrees that the following insurance maintained by Purchaser or parties entering the Property at Purchaser's instance shall constitute "adequate and appropriate insurance" for purposes of this Agreement: (i) a comprehensive general liability and property damage policy in an amount of not less than Three Million Dollars ($3,000,000), with a deductible (or self-insured retention) in an amount reasonably acceptable to Seller, covering the activities of Purchaser and its agents and consultants on the Property and naming Seller as an additional insured thereunder, and (ii) workers' compensation in accordance with the provisions of California law. This Section 4.3 shall survive the Closing or the termination of this Agreement, as applicable.

    4.4    Reports. All information provided by Seller to Purchaser or obtained by Purchaser relating to the Property in the course of Purchaser's due diligence investigation, whether before or after the Effective Date (collectively, the "Reports"), shall be treated as confidential information and shall not be disclosed to any third parties except for Purchaser's attorneys, engineers, lenders, real estate broker, prospective tenants and other business associates who need to know the information in furtherance of this transaction, and then only if they agree to maintain the information in strict confidence as provided herein. Purchaser shall be liable to Seller for any unauthorized disclosure of the confidential information by or through Purchaser and for all damage or injury to any person or property resulting from, relating to or arising out of Purchaser's due diligence investigation, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and agrees to defend, protect and hold harmless Seller and its agents, employees, officers, directors, representatives and affiliates from any liability resulting therefrom; provided, however, in no event shall the foregoing indemnity, defense, protection and hold harmless obligations apply to any claim, loss, damage, liability, injury or damage arising or resulting from any of the following: (a) acts or omissions of Seller or its agents, employees or contractors; and/or (b) the mere discovery of matters, facts or conditions related to or affecting the Property during Purchaser's investigation of the Property, including, but not limited to, any diminution in value in the Property arising therefrom, latent defects in the Property, and/or the release or spread of any Hazardous Materials which are discovered (but not deposited) on or under the Property by Purchaser. This Section 4.4 shall survive the Closing or the termination of this Agreement, as applicable.

    4.5    Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller that (a) Purchaser is a corporation, duly organized and in good standing under the State of California, is authorized to do business in the State of California, and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all of its duties and obligations hereunder, and Purchaser has obtained all necessary authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement; (b) neither the execution nor the delivery of this Agreement, nor the

5

consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms. Purchaser's representations and warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.5 shall survive the Closing or termination of this Agreement.

4.6   Seller's Representations and Warranties.   Seller represents and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the State of California; (b) Seller has the corporate power and authority to enter into, execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order (as defined hereinafter) in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; and (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's postpetition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances. The representations and warranties contained in this Section 4.6 shall expire and be extinguished at the Closing.

4.7   Further Assurances.   Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement, provided that there is no material increase in the parties' respective obligations hereunder nor material impairment or delay in the parties' respective rights hereunder.

5.   DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY

5.1   Disclaimer.   PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE WARRANTY OF TITLE AS SET OUT IN THE DEED OR IMPLIED IN THE DEED PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1113, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES

WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS (AS DEFINED BELOW) OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY WITHOUT WAIVER OF SELLER'S EXPRESS REPRESENTATIONS OR WARRANTIES SET OUT IN THE DEED OR IMPLIED IN THE DEED PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1113 OR, WITHOUT WAIVER OF SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT WITH RESPECT TO THE TRANSACTION CONTEMPLATED HEREIN, THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND

7

BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, MAINTENANCE AND MANAGEMENT OF THE PROPERTY; PROVIDED, HOWEVER, PURCHASER SHALL NOT BE REQUIRED TO INDEMNIFY OR DEFEND SELLER FROM OR AGAINST ANY DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (I) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF MATTERS OR EVENTS ARISING PRIOR TO THE CLOSING EXCEPT TO THE EXTENT CAUSED BY THE ACTS OR OMISSIONS OF PURCHASER OR ITS EMPLOYEES, CONTRACTORS, OR AGENTS, OR (II) ATTRIBUTABLE TO THE ACTS OR OMISSIONS OF SELLER OR ITS EMPLOYEES, CONTRACTORS OR AGENTS. THE PROVISIONS OF THIS ARTICLE 5 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

5.2    Hazardous Materials. "Hazardous Materials" shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("CERCLA"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.) ("RCRA"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements (as hereinafter defined) or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

5.3    Environmental Requirements.    "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of

8

the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

    5.4    Purchaser's Independent Investigations.    For all purposes of this Article 5, Purchaser acknowledges and agrees that Purchaser is entitled to access the Property during the Due Diligence Period, to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property.

    5.5    General Release.  With regard to the waivers and releases set forth in Article 5, Purchaser agrees as follows:

> PURCHASER HEREBY ACKNOWLEDGES THAT IT HAS READ AND IS FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 ("SECTION 1542"), WHICH IS SET FORTH BELOW:
>
> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."
>
> BY INITIALING BELOW, PURCHASER HEREBY WAIVES THE PROVISIONS OF SECTION 1542 SOLELY IN CONNECTION WITH THE MATTERS WHICH ARE THE SUBJECT OF THE FOREGOING WAIVERS AND RELEASES:
>
> _[initials]_
> Purchaser's Initials

The foregoing waivers and releases by Purchaser shall survive the Closing and shall not be deemed merged into the Deed upon its recordation.

6.    CLOSING

    6.1    Closing.    Unless otherwise agreed by the parties in writing, the closing of the purchase and sale of the Property (the "Closing") shall be conducted by mail or, if necessary, held at the offices of Escrow Agent not later than the date that is ten (10) days following the later to occur of (i) the expiration of the Due Diligence Period, or (ii) entry by the Bankruptcy Court of the Sale Order, unless such later of date is a Monday or Friday, in which event the Closing

9

CCSWCI: Moreno Valley, CA Sale [5/15/2009]

shall occur on the next day on which the Riverside County Recorder's Office is open to the public for business (the date on which the Closing occurs is referred to as the "Closing Date").

6.2    Possession.    Possession of the Property shall be delivered to Purchaser at the Closing, subject to (i) liens for real property taxes that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise (excluding, however, mortgages, deeds of trust, mechanics liens, tax liens, judgment liens, any other liens securing monetary amounts, leases, licenses, any other similar agreements conveying possessory rights (other than easements and similar rights), purchase option rights, rights of first refusal and any other similar rights of purchase, unless approved by Purchaser pursuant to clause (v) below), (iv) any and all matters that would be shown by a physical inspection of the Property, and (v) the matters and exceptions approved or waived by Purchaser pursuant to Section 4.2 above (collectively, the "Permitted Encumbrances"). Prior to the Closing, Seller shall remove the Excluded FF&E from the Property and shall repair any material damage to the Property caused by the removal of the Excluded FF&E, and any Excluded FF&E remaining in the Property after the Closing shall be deemed abandoned and included in the definition of "Property" hereunder and shall become the property of Purchaser. At the Closing, the Title Company shall issue and deliver an ALTA owner's extended coverage policy of title insurance (the "Title Policy"), dated as of the Closing Date, with liability equal to the Purchase Price, showing fee title to the Property vested in Purchaser and subject only to: (x) the matters and exceptions approved or waived by Purchaser pursuant to Section 4.2 above, including, without limitation, any standard exceptions included within the commitment provided by the Title Company; and (y) Permitted Encumbrances.

6.3    Proration.    All utilities with respect to the Property for the month in which the Closing occurs, and real estate taxes and other assessments with respect to the Property for the year in which the Closing occurs, shall be prorated as of the Closing Date as follows:

(a)    All real estate taxes and assessments, both general and special, water charges and sewer rents, whether or not then due or payable, and all other normally proratable items shall be prorated to the Closing Date, based upon the latest assessments or actual invoices available. Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment. Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing.

(b)    Purchaser shall cause all utility meters to be read as of the Closing Date, shall cause the transfer of all utility services for the Property to Purchaser's name as of the Closing Date, and where necessary, shall post deposits with the utility companies; provided, however, Seller shall cooperate reasonably with Purchaser in connection with switching utility services over to Purchaser's name. Seller shall be entitled to a credit of whatever deposits Seller may have with any utility companies if Purchaser receives the benefit of such deposits. If the

10