Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

           - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                         :    Chapter 11
                               :
CIRCUIT CITY STORES, INC.,     :    Case No. 08-35653 (KRH)
et al.,                        :
                               :
          Debtors.             :    Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS
105, 363, 365 AND 503 AND BANKRUPTCY RULES 2002, 6004
AND 6006 (A) AUTHORIZING SELLER TO ENTER INTO AGREEMENT
FOR SALE OF CERTAIN REAL PROPERTY IN SAN JOSE,
CALIFORNIA SUBJECT TO HIGHER OR OTHERWISE BETTER BIDS,
(B) APPROVING TERMINATION FEE IN CONNECTION THEREWITH,
(C) APPROVING SALE OF REAL PROPERTY FREE AND CLEAR OF
ALL INTERESTS, (D) APPROVING ASSUMPTION, ASSIGNMENT AMD
SALE OF CERTAIN UNEXPIRED LEASE OF NON-RESIDENTIAL REAL
PROPERTY FREE AND CLEAR OF ALL INTERESTS AND
(E) GRANTING RELATED RELIEF**

Circuit City Stores West Coast, Inc. (the

"Seller," and collectively with the debtors and debtors

in possession in the above-captioned jointly

administered cases, the "Debtors")[1] hereby moves (the

"Motion"), pursuant to sections 105, 363, 365 and 503 of

title 11 of the United States Code (the "Bankruptcy

Code") and Rules 2002, 6004 and 6006 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

for entry of an order (A) authorizing the Seller to

enter into an agreement with the Purchaser (as defined

herein) for the sale (the "Sale") of certain of the

Seller's real property located at 4070-4080 Stevens

Creek Boulevard in San Jose, California (the "Property"),

a copy of which is attached as Exhibit A to the Sale

---

[1] The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
Inc. (0875), Ventoux International, Inc. (1838), Circuit City
Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
Distribution Company of Virginia, Inc. (2821), Circuit City
Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
Sky Venture Corp. (0311), PRAHS, Inc.(n/a), XSStuff, LLC (9263),
Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
for Circuit City Stores West Coast, Inc. is 9250 Sheridan
Boulevard, Westminster, Colorado 80031.  For all other Debtors,
the address was 9950 Mayland Drive, Richmond, Virginia 23233 and
currently is 4951 Lake Brook Drive, Glen Allen, VA 23060.

Order (the "Agreement"),[2] subject to higher or otherwise

better proposals, (B) approving the Termination Fee (as

defined below) in connection therewith, (C) approving

the Sale free and clear of all Liens (as defined below),

(D) approving the assumption, assignment and sale (the

"Assignment") of the Lease (as defined below) associated

with the Property free and clear of all Liens and

(E) granting related relief.  In support of the Motion,

the Seller respectfully represents as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider

this Motion under 28 U.S.C. §§ 157 and 1334.  This is a

core proceeding under 28 U.S.C. § 157(b).  Venue of

these cases and this Motion in this District is proper

under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief

requested herein are Bankruptcy Code sections 105, 363,

365 and 503 and Bankruptcy Rules 2002, 6004 and 6006.

---

[2]    Capitalized terms used but not otherwise defined herein have the
meanings ascribed to them in the Agreement.

**BACKGROUND**

**A.    The Bankruptcy Cases.**

3.      On November 10, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.      On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").  To date, no trustee or examiner has been appointed in these chapter 11 cases.

6.      On January 16, 2009, the Court authorized the Debtors, among other things, to conduct going out of business sales at the Debtors' remaining 567 stores pursuant to an agency agreement (the "Agency Agreement") between the Debtors and a joint venture, as agent (the "Agent").  On January 17, 2009, the Agent commenced going out of business sales pursuant to the Agency Agreement at the Debtors remaining stores.  As of

4

on or about March 8, 2009, the going out of business

sales concluded.

**RELIEF REQUESTED**

7.    By this Motion, the Seller seeks an

order (A) authorizing the Seller to enter into the

Agreement in connection the Sale of the Property,

subject to higher or otherwise better proposals,

(B) approving the Termination Fee in connection

therewith, (C) approving the of the Sale of the Property

free and clear of all Liens, (D) approving the

Assignment of the Lease free and clear of all Liens and

(E) granting related relief (the "Sale Order").

**BASIS FOR RELIEF**

8.    As more fully set forth below, after a

comprehensive review, the Seller believes that the Sale

of the Property and the Assignment of the Lease

represent its best opportunity under the circumstances

to maximize the value of the Property and the Lease.

Therefore, the Sale of the Property and Assignment of

the Lease are in the best interests of its estate and

stakeholders.

**A.    The Property and the Lease.**

9.    The Seller owns the Property, comprising
approximately 5.17 acres in San Jose, California.  In
addition to operating a retail store on the Property,
the Seller leases certain portions of the Property to
Don Sherwood Golf Shop, Inc. ("Tenant") pursuant to a
lease dated January 26, 1998 (as modified and amended,
the "Lease," a copy of which is attached as Exhibit A to
the Agreement).  Accordingly, the Sale of the Property
would be subject to the Lease, which would be assigned
to any purchaser of the Property.

**B.    Events Leading To The Sale.**

10.   In light of the failure to obtain any
feasible going concern bids and the decision to
liquidate the Debtors' inventory through going-out-of-
business sales, as described above, the Seller has been
left with various assets -- including the Property --
for which it has no remaining use.  In contrast, the
sale of such assets, including the Sale of the Property,
would result in significant proceeds for the Seller's
estate and creditors.

11.   Since at or about the time the going-out-of-business sales were commenced, the Seller, along with its real estate advisor, DJM Realty, LLC ("DJM"), has been marketing the Property.  As a result of these marketing efforts, the Seller received various proposals to purchase the Property.  Upon reviewing these proposals, the Seller determined that the proposal submitted by the Purchaser was considerably higher or otherwise better than the alternate proposals received. Thus, the Seller elected to proceed with the Sale of the Property to the Purchaser.

**C.   The Agreement.**

12.   On July 20, 2009, the Seller entered into the Agreement[3] by and between the Seller and Mathew Zaheri (the "Purchaser").

13.   Pursuant to the Agreement, the Seller has agreed to sell the Property to the Purchaser for $8.25 million (the "Purchase Price"), subject to higher or otherwise better proposals.

---

[3]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

14.   The significant terms of the Agreement

are as follows:[4]

(a)  <u>General Terms</u>.  The Purchaser would
acquire the Property, consisting solely of the Seller's
right, title and interest in and to the property located
at 4070-4080 Stevens Creek Boulevard, San Jose,
California, comprising approximately 5.17 acres,
together with (i) all rights and appurtenances
pertaining to such land, (ii) all buildings, structures
and other improvements on said land and all entitlements,
permits, approvals, warranties, guaranties, plans and
personal property (if any) with respect to or located on
the land, (iii) electrical, mechanical, air conditioning
and other fixtures and equipments attached thereto and
(iv) Seller's interest as landlord in the Lease. The
Property will not include any lifts or racking located
in any of the buildings or any personal property,
inventory, equipment or trade fixtures of the Tenant
under the Lease.  Seller would assign the Lease to
Purchaser.

(b)  <u>Sale and Assignment</u>.  The Property would
be sold free and clear of all liens, charges, pledges,
security interests, conditional sale agreements or other
title retention agreements, leases, mortgages, security
interests, options, or other encumbrances (including the
filing of, or agreement to give, any financing statement
under the Uniform Commercial Code of any jurisdiction)
and any monetary amounts which are secured by any lien
(collectively, the "Liens"), except for (i) the Lease,
(ii) liens for real property taxes that are not yet due
and payable, (iii) zoning ordinances, building codes and
other land use laws and applicable governmental
regulations, (iv) all covenants, agreements, conditions,
easements, restrictions and rights, whether of record or
otherwise and (v) any and all matters that would be

---

[4]   In the event of any discrepancy between the Agreement and this
      summary of the Agreement, the provisions of the Agreement are
      controlling.

shown by a physical inspection of the Property (collectively, the "Permitted Encumbrances").

(c) <u>Bankruptcy Court Approval</u>.  The Sale of the Property would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures (as defined below).

(d) <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.

(e) <u>Purchase Price</u>.  The Purchase Price to be paid by the Purchaser for the Property would be $8.25 million.

(f) <u>Deposit Escrow</u>.  In accordance with the Agreement, the Purchaser has placed $500,000 into an escrow account with Fidelity Title.  Upon closing of the Sale (the "Closing"), or if the Agreement is terminated prior to Closing because of the Purchaser's breach of the Agreement (on the terms as provided in the Agreement), the Seller would be entitled to the funds in the escrow account (the "Deposit").

(g) <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Seller would provide certain standard representations and warranties relating to the Sale of the Property and the Purchaser would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Purchaser survive indefinitely following the Closing or the termination of the Agreement.  The representations and warranties of the Seller shall expire and be extinguished at the Closing.

(h) <u>Termination</u>.  The Agreement could be terminated prior to Closing in the following circumstances:  (i) by Purchaser, if an action is initiated to take any material portion of the Property by eminent domain proceedings, (ii) by Purchaser, in the event of damage to the Property exceeding $200,000 occurring during the period after the date of the Agreement and prior to Closing, if Seller does not

repair such damage, (iii) by Purchaser, in the event
that Seller shall fail to consummate the transactions
contemplated by the Agreement, (iv) by Seller, in the
event that Purchaser shall fail to comply with the
Agreement and (v) by Seller, in order to permit Seller
to accept a higher or otherwise better offer for the
Property pursuant to the Bidding Procedures.

**D.   Termination Fee.**

15.   The Purchaser has expended, and likely
will continue to expend, considerable time, money, and
energy pursuing the Sale and has engaged in arm's length
and good faith negotiations regarding a possible sale of
the Property.   The Agreement is the culmination of these
efforts.

16.   In recognition of this expenditure of
time, energy, and resources, the Seller has agreed to
reimburse the Purchaser for its reasonable out-of-pocket
third-party due diligence expenditures actually incurred
in connection with the Agreement, in an amount not to
exceed of $37,500.00 (the "Termination Fee").
Specifically, the Agreement provides for, and the Seller
respectfully requests that the Sale Order approve, the
Termination Fee payable by the Seller to the Purchaser
in the amount of $37,500.00 if, and only if
(i) Purchaser is not in breach of or default under the

Agreement and (ii) the Agreement is not conditioned on
conducting any further, or completing, due diligence and
(iii) the Seller consummates the Sale of the Property
with a higher or otherwise better bidder following the
Auction (as defined herein) and approval by the
Bankruptcy Court.

17.  The Seller believes that the proposed
Termination Fee is fair and reasonable in view of
(a) the analysis, due diligence investigation, and
negotiation undertaken by the Purchaser in connection
with the Sale and (b) the fact that the Purchaser's
efforts would maximize the value of the Property for the
benefit of all stakeholders, whether as a result of
consummating the Sale pursuant to the Agreement or by
generating a higher or otherwise better offer.

18.  The Purchaser is unwilling to keep open
its offer to purchase the Property under the terms of
the Agreement unless this Court authorizes payment of
the Termination Fee.  Thus, absent entry of the Sale
Order with approval of the Termination Fee, the Seller
may lose the opportunity to obtain what it believes to
be the highest or otherwise best offer for the Property.

And, as described below, the Agreement is subject to higher or otherwise better proposals.  Approving the Termination Fee will thus commit the Purchaser to purchase the Property under the Agreement, and the Agreement would serve to start any additional bidding for the Property at a fair and reasonable purchase price.

19.  Payment of the Termination Fee will not diminish the Seller's estate.  The Seller would not be required to pay the Termination Fee unless it does so to accept an alternative proposal, which would result in even greater value to the Seller's estate and its stakeholders.  This is particularly true given the Initial Minimum Overbid requirement (as defined below), which ensures that other proposals represent higher or otherwise better offers for the Property taking into account payment of the Termination Fee.  The Seller thus requests that this Court authorize payment of the Termination Fee pursuant to the terms and conditions of the Agreement.

**E.    The Bidding Procedures.**

20.  To ensure the Seller receives the highest or otherwise best proposal for the Property, the

Seller will entertain alternate proposals for the Sale
of the Property.   The Seller accordingly requests that
this Court order that any parties, including those
parties that previously submitted proposals, who wish to
submit an alternate proposal for consideration by the
Debtors be required to do so by August 13, 2009 at 5:00
p.m. (ET) (the "Bid Deadline").

        21.   If the Seller receives any Qualified
Bids (as defined herein), the Seller would hold an
auction (the "Auction") on August 20, 2009 at
10:00 a.m. (PT) by telephone or in person at the offices
of Skadden, Arps, Slate, Meagher & Flom, LLP located at
Four Embarcadero Center, Suite 3800 in San Francisco,
California.   The Seller will advise the Purchaser and
all other parties that submitted a Qualified Bid (as
defined below) of the Auction.

        22.   At the conclusion of any Auction, the
Seller, in consultation with its advisors (and
representatives of the Creditors' Committee), would
determine the highest or otherwise best bid (the
"Successful Bid").

23.   Following the Auction, if any, the
Seller intends to proceed with a hearing to approve the
Sale of the Property on August 27, 2009 at 11:00 a.m.
(ET) (the "Sale Hearing").

24.   If no Qualified Bids other than the bid
of the Purchaser are received, the Seller would proceed
with the Sale to the Purchaser following entry of the
Sale Order.   If the Seller receives additional Qualified
Bids, then at the Sale Hearing, the Seller would seek
approval of the Successful Bid, as well as the second
highest or best Qualified Bid (the "Alternate Bid," and
such bidder, the "Alternate Bidder").   A bid would not
be deemed accepted by the Seller unless and until
approved by the Court.

25.   Following approval of the Sale to the
Successful Bidder, if the Successful Bidder fails to
consummate the sale for specified reasons, then the
Alternate Bid would be deemed to be the Successful Bid
and the Seller would be permitted to effectuate a sale
to the Alternate Bidder without further order of the
Court.

26.   To ensure that only bidders with a serious interest in the purchase of the Property participate in the bidding process, the Seller would only consider the "Qualified Bids" of "Qualified Bidders."  To be considered a "Qualified Bid" and a "Qualified Bidder" for purposes of the Auction, the person or entity submitting the bid would be required to submit an offer by the Bid Deadline that includes:

(a)   an executed copy of the Agreement marked to show those amendments and modifications to the Agreement that the Qualified Bidder proposes (such modified Agreement, a "Marked Agreement"), including modifications to the Purchase Price, which price must be at least $8,400,000.00 (the "Initial Minimum Overbid");

(b)   the potential bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder;

(c)   a statement that the bid shall not be conditioned on the outcome of unperformed due diligence by the bidder or any financing contingency;

(d)   a good faith deposit (the "Good Faith Deposit") equal to at least $500,000.00 in cash;

(e)   an acknowledgement that the bidder's offer is irrevocable until two (2) business days after the closing of the Sale of the Property and Assignment of the Lease; and

15

(f)   an acknowledgement that, in the event the
bidder is the Alternate Bidder, the
bidder will proceed with the purchase of
the Property pursuant to the terms the
Marked Agreement.

27.  The Seller reserves the right to
(i) determine in its reasonable discretion (after
consultation with representatives of the Creditors'
Committee) which offer is the highest or otherwise best
offer; (ii) reject at any time prior to the closing of a
Sale and Assignment, without liability, any offer that
the Seller in its reasonable discretion (after
consultation with representatives of the Creditors'
Committee) deems to be (x) inadequate or insufficient,
(y) not in conformity with the requirements of the
bidding procedures or applicable law or (z) contrary to
the best interests of the Seller and its estate; (iii)
re-open the Auction, (iv) withdraw the Property from the
Auction, (v) waive the requirements of any of the
bidding procedures with respect to a potential or
Qualified Bidder if the Seller determines in its
business judgment (after consultation with
representatives of the Creditors' Committee) it is in
the best interests of its estate and creditors, and (vi)

re-open any Auction at any time prior to entry of the

Sale Order.

28.   Objections to the Sale, if any, shall be

filed and served no later than 4:00 p.m. (ET) on August

20, 2009.

### APPLICABLE AUTHORITY

**I.   APPROVAL OF THE TRANSACTIONS FOR THE SALE OF THE
PROPERTY IS WARRANTED UNDER BANKRUPTCY CODE SECTION
363(b)(1).**

29.   As set forth above, Bankruptcy Code

section 363(b)(1) authorizes a  trustee to "use, sell,

or lease" property of the estate with the Court's

approval.  11 U.S.C. § 363(b)(1).  Assets of the Debtors

may be sold outside of the ordinary course of business,

pursuant to Bankruptcy Code section 363(b)(1), if a

sound business purpose exists for doing so.  In re WBQ

P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)(citing

Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th

Cir. 1986)); see also In re W.A. Mallory Co., Inc., 214

B.R. 834, 836 (Bankr. E.D. Va. 1997).

30.   To satisfy the "sound business purpose

test," the debtor must demonstrate that (1) a sound

business reason or emergency justifies a pre-

confirmation sale; (2) the sale was proposed in good
faith; (3) the purchase price is fair and reasonable;
and (4) adequate and reasonable notice of the sale has
been provided.  In re WBQ P'ship, 189 B.R. at 102.

31.  Based upon the results of their analysis,
the Seller's management and advisors have concluded that
the Sale of the Property pursuant to the Agreement or a
higher or otherwise better offer would maximize the
value of the Property for the Seller's estate.
Maximizing asset value is a sound business purpose that
warrants authorizing the proposed Sale.

32.  The Sale of the Property will be subject
to competing bids, thereby enhancing the Seller's
ability to receive the highest or otherwise best value
for the Property.  Consequently, the fairness and
reasonableness of the consideration to be received by
the Seller will ultimately be demonstrated by a "market
check" through the auction process, which is the best
means for establishing whether a fair and reasonable
price is being paid.

33.  Moreover, the Seller proposes to provide
adequate notice of the Auction and the Sale Hearing as

set forth below.  In light of the circumstances, such
notice is reasonably calculated to provide timely and
adequate notice to the Seller's major creditor
constituencies, those parties most interested in these
cases, those parties potentially interested in bidding
on the Property and others whose interests are
potentially implicated by the proposed Sale and
Assignment.

**II.   THE SALE PROCESS IS REASONABLE AND APPROPRIATE.**

34.   Bankruptcy Code section 363(b)(1)
provides that "[t]he trustee, after notice and a hearing,
may use, sell, or lease, other than in the ordinary
course of business, property of the estate."  11 U.S.C.
§ 363(b)(1).  Moreover, Bankruptcy Code section 105(a)
provides that "[t]he Court may issue any order, process,
or judgment that is necessary or appropriate to carry
out the provisions of this title."  11 U.S.C. § 105(a).

35.   The disposition of the Property and Lease
pursuant to the terms reflected in the Agreement
resulted from the bids submitted for the Property,
pursuant to a marketing process led by DJM.  Conducting
a marketing process through a third party broker

represents an accepted method of selling property.
Similar marketing processes have been approved in other
chapter 11 cases.  See, e.g., Ready v. Rice, 2006 WL
4550188 at *3 (D. Md. 2006); see also In re Reading
Broadcasting, Inc., 386 B.R. 562, 571-72 (Bankr. E.D. Pa.
2008); In re King-Wilson, 1998 WK 737887 at *4-5 (N.D.
Cal. 1998).

        36.   In addition, bid procedures similar those
Bid Procedures outlined above have been approved by this
Court in this case.  See Order Approving (I) Approving
Bidding Procedures and (II) Setting Auction and Sale
Hearing Dates in Connection With the Sale of Certain
Real Property Located in Phoenix, Arizona, (D.I. 2401).

        37.   Finally, the other interested parties are
provided with an opportunity to submit a higher or
otherwise better proposal and, if necessary, the Seller
will conduct an auction.

        38.   In light of the foregoing, the Seller
submits that the Sale process is reasonable and
appropriate.

20

**III. THE TERMINATION FEE REQUESTED HEREIN IS REASONABLE
     AND SHOULD BE APPROVED.**

    39.   In connection with Sale of the Property,
the Court should authorize the Seller to pay the
Termination Fee.

    40.   Agreements to provide termination fees
and other bidding incentives are designed to compensate
a potential acquirer who serves as a catalyst that may
attract higher and better offers, and have been approved
in bankruptcy to encourage bidding.  See In re Ryan, 261
B.R. 867, 870 (Bankr. E.D. Va. 2001).  Termination fees
can be advantageous to both buyers and sellers because
they encourage bidding to ensure that sellers receive
the highest or otherwise best offer while compensating
the buyer for the risk of being outbid.  See id.

    41.   Termination fee fees are allowed as an
administrative expense claim against the estate if they
satisfy the standard of section 503(b)(1).  In re Tropea,
352 B.R. 766, 768 (Bankr. N.D.W.Va. 2006).  Thus, the
fee must reflect the actual and necessary cost of
preserving the estate.  See 11 U.S.C. § 503(b)(1).  See
also In re Tropea, 352 B.R. at 768.  In Calpine Corp. v.

21

O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy,
Inc.), 181 F.3d 527 (3d Cir. 1999), the United States
Court of Appeals for the Third Circuit explained how the
section 503(b)(1) standard applied to termination fees.
The Third Circuit Court of Appeals held that even though
bidding incentives are measured against a business
judgment standard in non-bankruptcy transactions, the
administrative expense provisions of Bankruptcy Code
section 503(b) govern in the bankruptcy context.
Accordingly, to be approved, bidding incentives must
provide some postpetition benefit to the debtor's estate.
See id. at 533; see also In re Lamb, 2002 WL 31508913
(Bankr. D. Md. 2002) (implicitly adopting the
administrative expense standard set forth in O'Brien).

        42.  The O'Brien Court identified at least two
instances in which bidding incentives may provide
benefit to the estate.  First, benefit may be found if
"assurance of a break-up fee promoted more competitive
bidding, such as by inducing a bid that otherwise would
not have been made and without which bidding would have
been limited."  Id. at 537.  Second, when the
availability of bidding incentives induce a bidder to

22

research the value of the debtor and submit a bid that
serves as a minimum or floor bid on which other bidders
can rely, "the bidder may have provided a benefit to the
estate by increasing the likelihood that the price at
which the debtor is sold will reflect its true worth."
Id.

43.   Here, the Seller seeks authority to pay
the Termination Fee in the event that the Purchaser is
not ultimately the Successful Bidder.  The proposed
Termination Fee is appropriate under Bankruptcy Code
section 503 as it is fair and reasonable in amount,
particularly in view of the efforts that will have to be
expended by the Purchaser.  Moreover, the Agreement,
including the Termination Fee provided for therein, will
enable the Seller to secure an adequate floor for an
auction and, thus, insist that competing bids be
materially higher or otherwise better than the purchase
price pursuant to the Agreement (as incorporated in the
Initial Minimum Overbid requirement), a clear benefit to
the Seller's estate.

44.   In sum, the Seller's ability to offer the
Termination Fee enables it to ensure the Sale of the

Property to a contractually-committed bidder at a price

that they believe to be fair while, at the same time,

providing them with the potential of even greater

benefit to the estates.

      45.   Thus, the Termination should be approved.

**IV.   THE PURCHASER OR SUCCESSFUL BIDDER SHOULD BE
AFFORDED THE PROTECTIONS OF SECTION 363(m) OF THE
BANKRUPTCY CODE AND THE TRANSACTIONS CONTEMPLATED
BY THE AGREEMENT SHOULD CARRY THE PROTECTIONS OF
SECTION 363(m) OF THE BANKRUPTCY CODE.**

      46.   Section 363(m) of the Bankruptcy Code

provides:

> The reversal or modification on appeal of
> an authorization under subsection (b) or
> (c) of this section of a sale or lease of
> leases does not affect the validity of a
> sale or lease under such authorization to
> an entity that purchased or leased such
> property in good faith, whether or not
> such entity knew of the pendency of the
> appeal, unless such authorization and
> such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not

define "good faith," the Fourth Circuit Court of Appeals

has "adopt[ed] the traditional equitable definition that

has been adopted by various courts of appeal: 'one who

purchases the assets for value, in good faith, and

without notice of adverse claims.'"  <u>Willemain v. Kivitz</u>,

764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

      47.  Section 363(n) of the Bankruptcy Code

further provides, in relevant part, that:

> The trustee may avoid a sale under this
> section if the sale price was controlled
> by an agreement among potential bidders
> at such sale, or may recover from a party
> to such agreement any amount by which the
> value of the property sold exceeds the
> price at which such sale was consummated,
> and may recover any costs, attorneys'
> fees, or expenses incurred in avoiding
> such sale or recovering such amount.

      48.  The Seller submits that the Agreement

reflects negotiated, arm's length transaction.

Throughout the negotiations, the Purchaser has at all

times acted in good faith.  Moreover, to the extent that

the assets are sold to a Successful Bidder, it will be

because of a well-planned competitive process and

negotiations at arm's length to be conducted at an

auction.  As a result of the foregoing, the Seller

requests that the Court make a finding that the Purchase

Price to be paid by the Purchaser or the Successful

Bidder constitutes reasonably equivalent value and fair

consideration under any applicable law.

49.   The Seller, therefore, requests that this
Court make a finding that the Purchaser or the
Successful Bidder, as the case may be, has purchased the
Property in good faith within the meaning of section
363(m) of the Bankruptcy Code.  Further, the Seller
requests that this Court make a finding that the
Agreement or any purchase agreement reached as a result
of the bidding procedures necessarily will comprise an
arm's length, negotiated transaction entitled to the
protections of section 363(m) of the Bankruptcy Code.
Because the Seller has shown that the Purchaser's or
Successful Bidder's bid is not the product of fraud or
collusion between the Purchaser or Successful Bidder and
other bidders or the trustee, or an attempt to take
grossly unfair advantage of other bidders, the Seller
furthers request that this Court make a finding that the
transactions contemplated by the Agreement are not
avoidable under section 363(n) of the Bankruptcy Code.

**V.    THE SALE OF THE PROPERTY AND ASSIGNMENT THE LEASE
FREE AND CLEAR OF ANY INTEREST SHOULD BE AUTHORIZED
UNDER BANKRUPTCY CODE SECTION 363(f).**

50.   To facilitate a sale of the Property, the
Seller requests authorization to sell the Property and

the Lease free and clear of any and all Liens that may

be asserted against such property.

51.   Under section 363(f) of the Bankruptcy

Code, a debtor in possession may sell property free and

clear of any interest in such property if, among other

things:

> (1) applicable nonbankruptcy law permits sale
> of such property free and clear of such
> interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at
> which such property is sold is greater than
> the aggregate value of all liens on such
> property;
>
> (4) such interest is in bona fide   dispute;
> or
>
> (5) such entity could be compelled, in a legal
> or equitable proceeding, to accept a money
> satisfaction of such interest.

11 U.S.C. § 363(f).

52.   Section 363(f) permits the sale of estate

property free and clear of interests if any one of the

five conditions above is met.   See, e.g., In re Laines,

352 B.R. 410, 414-15 (Bankr. E.D. Va. 2005).

53.   Courts have held that the authority of a

debtor to sell assets free and clear of interests is

broad and should be read expansively.  See In re TWA,
Inc., 322 F.3d 283, 289 (3d Cir. 2003); see also United
Mine Workers of Am. 1992 Benefit Plan v. Leckie
Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99
F.3d 573, 582 (4th Cir. 1996) (holding that the phrase
"any interest in property" includes more than just in
rem interests); In re P.K.R. Convalescent Centers, Inc.,
189 B.R. 90, 94 (Bankr. E.D. Va. 1995)("As the plain
meaning of the statute demonstrates, § 363 covers more
situations than just sales involving liens.").  Moreover,
courts have noted that the purpose of the "free and
clear" language is to allow the debtor to obtain a
maximum recovery on its assets in the marketplace.  See
In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr.
D. Del. Mar. 27, 2001).

        54.  Accordingly, this Court should authorize
the Seller to sell the Property and the Lease free and
clear of any and all Liens that may be asserted by any
parties, with any such Liens attaching to the net
proceeds of the sale of the Property and the Lease in
the same order and priority and subject to the same

defenses as they exist against the Property and the

Lease.

## VII. APPROVAL OF ASSUMPTION AND ASSIGNMENT OF THE LEASE IS WARRANTED UNDER BANKRUPTCY CODE SECTION 365.

55.  Under section 365(a) of the Bankruptcy

Code a debtor, "subject to the court's approval, may

assume or reject any executory contract or unexpired

lease of the debtor."  11 U.S.C. § 365(a).  Section

365(b)(1) of the Bankruptcy Code, in turn, codifies the

requirements for assuming an unexpired lease or

executory contract of a debtor.  It provides:

> If there has been a default in an
> executory contract or unexpired lease of
> the debtor, the trustee may not assume
> such contract or lease unless, at the
> time of the assumption of such contract
> or lease, the trustee –
>
> (A)      cures, or provides
> adequate assurance that the trustee will
> promptly cure, such default;
>
> (B)      compensates, or provides
> adequate assurance that the trustee will
> promptly compensate, a party other than
> the debtor to such contract or lease, for
> any actual pecuniary loss to such party
> resulting from such default; and

> (C)        provides adequate
> assurance of future performance under
> such contract or lease.

11 U.S.C. § 365(b)(1).

56.  Section 365(f)(2) of the Bankruptcy Code

provides that:

> The trustee may assign an executory contract
> or unexpired lease of the debtor only if –
>
> (A)        the trustee assumes such
> contract or lease in accordance with the
> provisions of this section; and
>
> (B)        adequate assurance of future
> performance by the assignee of such
> contract or lease is provided, whether or
> not there has been a default in such
> contract or lease.

11 U.S.C. § 365(f)(2).

57.  First, the Seller does not believe it is

in default under the Lease.  However, to the extent that

any defaults exist under the Lease that are to be

assumed and assigned in connection with the Sale, the

Debtors (or the Successful Bidder) would cure any such

default.

58.  Second, Courts give the phrase "adequate

assurance of future performance" a "practical, pragmatic

construction."  EBG Midtown S. Corp. v. Mcharen/Hart

Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139
B.R. 585, 592 (S.D.N.Y. 1992), aff'd, 993 F.2d 300 (2d
Cir. 1993) (presence of adequate assurance should be
"determined under the facts of each particular case").
Adequate assurance does not require a debtor to provide
a guarantee of future performance; assurance is deemed
adequate as long as performance is more probable than
not.  See Cinicola v. Scharffenberger, 248 F.3d 110, 120
n. 10 (3d Cir. 2001) ("Although no single solution will
satisfy every case, the required assurance will fall
considerably short of an absolute guarantee of
performance." (quotations and citations omitted)); In re
Weirton Steel Corp., 2007 WL 2021896 at *5 (Bankr. N.D.
W. Va. July 6, 2007) ("Assurance is adequate if
performance is likely; that is more probable than not.").

      59.  Adequate assurance is generally
associated with assurance that the assignee, as tenant,
will perform payment obligations under the lease being
assigned.  Here however, the Purchaser will be assigned
the obligations of the Seller as lessor, which are far
more limited than those of assignee as tenant.  There
will be little practical change under the Lease as far

as the Tenant is concerned.  Consequently, the financial

wherewithal and diligence required to negotiate and

enter into the Agreement for the Sale of the Property

and the Assignment of the Lease and that the Purchaser

shall guarantee full and complete performance of all

obligations under the Lease on and after the date of the

Sale satisfy the standard set by the Bankruptcy Code.

**VIII.  WAIVER OF THE TEN-DAY STAY PROVIDED BY BANKRUPTCY
RULE 6004 AND 6006 SHOULD BE WAIVED FOR ANY ORDER
APPROVING THE SALE OF THE PROPERTY.**

60.  Bankruptcy Rule 6004(h) provides that:

"[a]n order authorizing the use, sale, or lease of

property of the estate is stayed until the expiration of

10 days after entry of the order, unless the court

orders otherwise."  Fed. R. Bankr. P. 6004(h); see also

6006.

61.  The Seller requests that the Court waive

the ten-day stay of Bankruptcy Rules 6004 and 6006 with

respect to the Sale of the Property and Assignment of

the Lease following the entry of the Sale Order.  By

waiving such requirements, the Seller and the Purchaser

or the Successful Bidder, as applicable, will be able to

immediately close the Sale, which will result in

immediate proceeds to the Seller's estate.

62.   Accordingly, the stay under Bankruptcy

Rule 6004(h) AND 6006 should be waived.

### NOTICE

63.   Notice of this Motion has been provided

to those parties entitled to notice under the Order

Pursuant to Bankruptcy Code Sections 102 and 105,

Bankruptcy Rules 2002 and 9007, and Local Bankruptcy

Rules 2002-1 and 9013-1 Establishing Certain Notice,

Case Management, and Administrative Procedures (D.I. 130;

the "Case Management Order"), as well as (a) all

entities known to have expressed an interest in a

transaction regarding the Property during the past three

(3) months; and (b) all entities reasonably known to

have a Lien on the Property; (c) all federal, state, and

local regulatory or taxing authorities or recording

offices that have a reasonably known interest in the

relief requested by the Motion; and (d) Tenant under the

Lease.   The Seller submits that, under the circumstances,

no other or further notice need be given.

## WAIVER OF MEMORANDUM OF LAW

64.   Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, the Seller requests that the requirement that all motions be accompanied by a separate memorandum of law be waived.

## NO PRIOR REQUEST

65.   No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Seller respectfully request
that the Court (i) enter an Order, substantially in the
form annexed hereto, granting the relief requested
herein, and (ii) such other and further relief as may be
just and proper.

Dated: July 28, 2009
        Richmond, Virginia     SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM, LLP
                               Gregg M. Galardi, Esq.
                               Ian S. Fredericks, Esq.
                               P.O. Box 636
                               Wilmington, Delaware 19899-
                               0636 (302) 651-3000

                                    - and -

                               SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM, LLP
                               Chris L. Dickerson, Esq.
                               155 North Wacker Drive
                               Chicago, Illinois 60606
                               (312) 407-0700

                                    - and -

                               MCGUIREWOODS LLP

                               _/s/ Douglas M. Foley_____
                               Dion W. Hayes (VSB No. 34304)
                               Douglas Foley (VSB No. 34364)
                               One James Center
                               901 E. Cary Street
                               Richmond, Virginia 23219
                               (804) 775-1000

                               Counsel for Debtors and
                               Debtors in Possession

Gregg M. Galardi, Esq.          Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.         Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &  MCGUIREWOODS LLP
FLOM, LLP                        One James Center
One Rodney Square                901 E. Cary Street
PO Box 636                       Richmond, Virginia 23219
Wilmington, Delaware 19899-0636  (804) 775-1000
(302) 651-3000

            - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

        IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
                  RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :   Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :   Case No. 08-35653 (KRH)
et al.,                       :
                              :
            Debtors.          :   Jointly Administered
- - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363, 365 AND 503 AND BANKRUPTCY RULES 2002, 6004 AND 6006 AUTHORIZING AND APPROVING THE SALE BY SELLER OF CERTAIN REAL PROPERTY LOCATED IN SAN JOSE, CALIFORNIA AND THE ASSUMPTION, ASSIGNMENT AND SALE BY SELLER OF CERTAIN UNEXPIRED LEASE OF NON-RESIDENTIAL REAL PROPERTY FREE AND CLEAR OF LIENS AND INTERESTS**

Upon the motion (the "Motion")[1] of Circuit City

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

Stores West Coast, Inc. (the "Seller," and collectively
with the debtors and debtors in possession in the above-
captioned jointly administered cases, the "Debtors") for
orders pursuant to Bankruptcy Code sections 105, 363,
365 and 503 and Bankruptcy Rules 2002, 6004 and 6006
(A) authorizing the Seller to enter into an agreement
with the Purchaser for Sale of the Property, subject to
higher or otherwise better proposals, (B) approving the
Termination Fee in connection therewith, (C) approving
the Sale and of the Property free and clear of all Liens;
(D) approving Assignment of the Lease associated with
the Property free and clear of all Liens and
(E) granting related relief; and upon the record of the
hearing held on August 27, 2009 (the "Sale Hearing");
and after due deliberation thereon, and sufficient cause
appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

A.      The Court has jurisdiction to hear and
determine the Motion and to grant the relief requested

---

[2]   Findings of fact shall be construed as conclusions of law and
conclusions of law shall be construed as findings of fact when
appropriate.  See Fed. R. Bankr. P. 7052.

in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and
1334(b).

B.     Venue of these cases and the Motion in
this district is proper under 28 U.S.C. §§ 1408 and 1409.
This is a core proceeding within the meaning of 28 U.S.C.
§ 157(b)(2).

C.     The statutory predicates for the relief
requested in the Motion are Bankruptcy Code sections 105,
363, 365 and 503 and Bankruptcy Rules 2002, 6004 and
6006.

D.     The notice of the Motion and the Sale
Hearing given by the Seller constitutes due and
sufficient notice thereof.

E.     The Bidding Procedures are reasonable
and appropriate and represent the best method for
maximizing the realizable value of the Property and the
Leases.

F.     A reasonable opportunity to object or
be heard regarding the relief in this Order has been
afforded to all interested persons and entities,
including Don Sherwood's Golf, Inc. ("Tenant").

G.      The Seller and its professionals
marketed the Property and the Lease and conducted a sale
process as set forth in and in accordance with the
Motion.  Based upon the record of these proceedings, all
creditors and other parties in interest and all
prospective purchasers have been afforded a reasonable
and fair opportunity to bid for the Property and the
Lease.

H.      The Seller has demonstrated good,
sufficient, and sound business purpose and justification
for the Sale and Assignment because, among other things,
the Seller and its advisors diligently and in good faith
analyzed all other available options in connection with
the disposition of the Property and Lease and determined
that (a) the terms and conditions set forth in the
Agreement, (b) the transfer to the Purchaser of the
Property and Lease pursuant thereto and (c) the purchase
price agreed to by the Purchaser, $8.25 million is fair
and reasonable and constitutes the highest or otherwise
best value obtainable for the Property and the Lease.

I.      The Seller has full power and authority
to execute the agreement submitted by the Purchaser, a

copy of which is annexed hereto as <u>Exhibit A</u> (the

"Agreement") and all other applicable documents

contemplated thereby.  The transfer and conveyance of

the Property by the Seller have been duly and validly

authorized by all necessary action of the Seller.  The

Seller has all of the power and authority necessary to

consummate the transactions contemplated by the

Agreement and has taken all action necessary to

authorize and approve the Agreement and to consummate

the transactions contemplated thereby.  No consents or

approvals, other than those expressly provided for in

the Agreement, are required for the Seller to consummate

such transactions.

J.   The Agreement and the sale of the

Property and assignment of the Lease were negotiated and

has been and is undertaken by the Seller and the

Purchaser at arms' length without collusion or fraud,

and in good faith within the meaning of Sections 363(m)

of the Bankruptcy Code.  As a result of the foregoing,

the Seller and the Purchaser are entitled to the

protections of Section 363(m) of the Bankruptcy Code.

K.   Neither the Seller nor the Purchaser
engaged in any conduct that would cause or permit the
Agreement or the consummation of the Sale or Assignment
to be avoided, or costs or damages to be imposed, under
Section 363(n) of the Bankruptcy Code.

L.   The consideration provided by the
Purchaser for the Property and the Lease is the highest
and best offer received by the Seller, and the
consideration constitutes (a) reasonably equivalent
value under the Bankruptcy Code and Uniform Fraudulent
Transfer Act, (b) fair consideration under the Uniform
Fraudulent Conveyance Act, and (c) reasonably equivalent
value, fair consideration and fair value under any other
applicable laws of the United States, any state,
territory or possession, or the District of Columbia,
for the Property and the Lease.

M.   The Sale and Assignment must be approved
and consummated promptly to obtain the value provided
under the terms of the Agreement.

N.   The transfer of the Property and the
Lease to the Purchaser is a legal, valid, and effective
transfer of the Property, and shall vest the Purchaser

with all right, title, and interest of the Seller to the
Property and the Lease free and clear of any lien
(including tax liens and any statutory or common law
liens, possessory or otherwise), charge, pledge,
security interest, conditional sale agreement or other
title retention agreement, lease, mortgage, security
interest, option or other encumbrance (including the
filing of, or agreement to give, any financing statement
under the Uniform Commercial Code of any jurisdiction)
and any monetary amounts which are secured by any lien
(collectively, the "Liens"), except for those items
defined in the Agreement (and which are referred to
hereinafter) as the "Permitted Encumbrances".

O.    If the Sale of the Property and
Assignment of the Lease by the Seller were not free and
clear of any Liens, except for the Permitted
Encumbrances, as set forth in the Agreement and this
Sale Order, or if the Purchaser would, or in the future
could, be liable for any of the Liens, the Purchaser
would not have entered into the Agreement and would not
consummate the Sale and Assignment contemplated by the

Agreement, thus adversely affecting the Seller, its

estate, and its stakeholders.

P.    The Seller may sell its interest in the

Property and the Lease free and clear of all Liens

(except the Permitted Encumbrances) because, in each

case, one or more of the standards set forth in

Bankruptcy Code sections 363(f)(1)-(5) has been

satisfied.  All holders of Liens who did not object or

withdrew their objections to the Sale and Assignment are

deemed to have consented to the Sale and Assignment

pursuant to 11 U.S.C. § 363(f)(2) and all holders of

Liens are adequately protected by having their Liens, if

any, attach to the cash proceeds of the Sale and

Assignment ultimately attributable to the property

against or in which they claim an interest with the same

priority, validity, force, and effect as they attached

to such property immediately before the closing of the

Sale and Assignment.

Q.    Pursuant to sections 365(b)(1)(C),

365(f)(2)(B) and, if applicable, 365(b)(3), the Seller

and the Purchaser have demonstrated adequate assurance

of future performance by the Purchaser under the Leases.

R.    There is no cure obligation due and owing on the Lease under section 365 of the Bankruptcy Code.

S.    There are no outstanding defaults of the Debtors and their estates under the Lease.

T.    Upon the assignment to the Purchaser, the Lease shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any further liability thereunder, including for any breach of the Leases.

U.    Based on the foregoing findings of fact and conclusions of law,[3]

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED as set forth herein.

2.    Any and all objections to the Motion not waived, withdrawn, settled, adjourned or otherwise resolved herein are hereby overruled on the merits and denied with prejudice.

---

[3]    Statements made by the Court from the bench at the hearing on the Motion shall constitute additional conclusions of law and findings of fact as appropriate.

**A.    Approval Of The Agreement.**

3.    Pursuant to Bankruptcy Code section
363(b), the Agreement and all of the terms and
conditions thereof are hereby approved.

4.    Pursuant to Bankruptcy Code section
363(b), the Seller is authorized to perform its
obligations under the Agreement and comply with the
terms thereof and consummate the Sale and Assignment in
accordance with and subject to the terms and conditions
of the Agreement.

5.    The Seller is authorized, but not
directed, to execute and deliver, and empowered to
perform under, consummate, and implement, the Agreement,
together with all additional instruments and documents
as may be reasonably necessary or desirable to implement
the Agreement, and to take all further actions as may be
requested by the Purchaser for the purpose of assigning,
transferring, granting, conveying, and conferring to the
Purchaser or reducing to possession the Property and the
Lease as contemplated by the Agreement.

6.    This Sale Order and the Agreement shall
be binding in all respects upon the Seller, all

stakeholders (whether known or unknown) of the Seller,

all affiliates and subsidiaries of the Seller, and any

subsequent trustees appointed in the Seller's chapter 11

case or upon a conversion to chapter 7 under the

Bankruptcy Code.  To the extent that any provision of

this Sale Order is inconsistent with the terms of the

Agreement, this Sale Order shall govern.

7.   The Agreement and any related agreements,

documents, or other instruments may be modified, amended,

or supplemented by the parties thereto, in a writing

signed by such parties, and in accordance with the terms

thereof, without further order of the Court; <u>provided</u>

that any such modification, amendment, or supplement is

disclosed to the Creditors' Committee and does not have

a material adverse effect on the Seller's estate, in the

good faith business judgment of the Seller.

**B.   Sale And Transfer Of The Property.**

8.   Pursuant to Bankruptcy Code sections

363(b) and 363(f), upon the consummation of the

Agreement, the Seller's right, title, and interest in

the Property shall be transferred to the Successful

Bidder free and clear of all Liens except the Permitted

Encumbrances, with all such Liens to attach to the cash

proceeds of the Sale in the order of their priority,

with the same validity, force, and effect which they had

as against the Property immediately before such transfer,

subject to any claims and defenses the Seller may

possess with respect thereto.

9.   If any person or entity which has filed

financing statements, mortgages, mechanic's liens, lis

pendens, or other documents or agreements evidencing

Liens on or against the Property shall not have

delivered to the Seller prior to the Closing of the Sale,

in proper form for filing and executed by the

appropriate parties, termination statements, instruments

of satisfaction, releases of all Liens that the person

or entity has with respect to the Property, or otherwise,

then (a) the Seller is hereby authorized to execute and

file such statements, instruments, releases, and other

documents on behalf of the person or entity with respect

to the Property and (b) the Purchaser is hereby

authorized to file, register, or otherwise record a

certified copy of this Sale Order, which, once filed,

registered, or otherwise recorded, shall constitute

conclusive evidence of the release of all Liens on or

against the Property of any kind or nature whatsoever

except for the Permitted Encumbrances.

10.   This Sale Order (a) shall be effective as

a determination that, upon the Closing of the Sale, all

Liens of any kind or nature whatsoever existing as to

the Seller or the Property prior to the Closing of the

Sale, except for the Permitted Encumbrances, have been

unconditionally released, discharged, and terminated

(other than any surviving obligations), and that the

conveyances described herein have been effected and

(b) shall be binding upon and shall govern the acts of

all entities including, without limitation, all filing

agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state, and

local officials, and all other persons and entities who

may be required by operation of law, the duties of their

office, or contract, to accept, file, register, or

otherwise record or release any documents or instruments,

or who may be required to report or insure any title or
state of title in or to any of the Property.

11.  All persons and entities, including, but
not limited to, all debt security holders, equity
security holders, governmental, tax, and regulatory
authorities, lenders, trade stakeholders, and other
stakeholders, holding Liens of any kind or nature
whatsoever against or in the Seller or the Property,
except the Permitted Encumbrances (whether legal or
equitable, secured or unsecured, matured or unmatured,
contingent or non-contingent, senior or subordinated)
arising under or out of, in connection with, or in any
way relating to the Property prior to the Closing of the
Sale, or the transfer of the Property to the Purchaser,
hereby are forever barred, estopped, and permanently
enjoined from asserting against the Purchaser, its
successors or assigns, its property, or the Property,
such persons' or entities' Liens.  Nothing in this Sale
Order or the Agreement releases or nullifies any
liability to a governmental agency under any
environmental laws and regulations that any entity would
be subject to as owner or operator of any Property after

the date of entry of this Sale Order.  Nothing in this

Sale Order or the Agreement bars, estops, or enjoins any

governmental agency from asserting or enforcing, outside

the Court, any liability described in the preceding

sentence.  Notwithstanding the above, nothing herein

shall be construed to permit a governmental agency to

obtain penalties from the Purchaser for days of

violation of environmental laws and regulations prior to

Closing.

**C.    Assumption, Assignment and Sale of the Lease.**

12.  Under section 365 of the Bankruptcy Code,

the Seller is authorized to assume the Lease and to

assign the Lease to the Purchaser, which assignment

shall take place on Closing.

13.  Under Bankruptcy Code section 363, the

Seller is authorized to sell the Lease to the Purchaser.

14.  The Debtors are authorized to execute the

assignment agreement, in substantially the form attached

as <u>Exhibit C</u> to the Agreement (the "Assignment

Agreement").

15.  Upon Closing, subject to the provisions

of this Order, the Purchaser shall succeed to the

entirety of Seller's rights and obligations in the Lease
due, accruing, arising or attributable to the time
period occurring on or after Closing and shall have the
rights of the landlord thereunder.

16.   Upon Closing, neither the Purchaser, the
Debtors, nor the Debtors' estates shall have liability
for cure claims of, from, or related to the Lease for
any defaults or monetary obligations thereunder.

17.   Upon the entry of this Sale Order,
(i) all defaults under the Lease through Closing shall
be deemed cured, (ii) no other amounts will be owed by
Debtors or their estates with respect to the Lease,
(iii) no amounts will be owed by the Purchaser with
respect to the Lease for obligations relating or
attributable to the period prior to Closing, (iv) any
and all persons or entities shall be forever barred and
estopped from asserting a claim against the Debtors or
their estates that any additional amounts are due or
defaults exist under the Lease, and (v) any and all
persons or entities shall be forever barred and estopped
from asserting a claim against the Debtors, their
estates, and the Purchaser that any additional amounts

are due or defaults exist under the Lease that arose or
accrued, relate to or are attributable to the period
prior to Closing.

18.   The Purchaser takes the Lease "as is."

19.   Pursuant to section 365(f) of the
Bankruptcy Code, notwithstanding any provision to the
contrary in the Lease, or in applicable nonbankruptcy
law, that prohibits, restricts, or conditions the
assignment of the Lease, the Seller may assign the Lease
to the Purchaser.

20.   Upon Closing, subject to the provisions
of this Sale Order, the Purchaser shall assume all
obligations under the Lease attributable to, or arising
or accruing during, the time period occurring on or
after Closing or related to the period subsequent to
Closing.

21.   Upon the Assignment authorized herein,
and under section 365(k) of the Bankruptcy Code, the
Debtors and their estates shall have no further
liability under the Lease.

22.   Upon the Assignment to the Purchaser, the
Lease shall be deemed valid and binding, in full force

and effect in accordance with their terms, subject to
the provisions of this Sale Order.

23.   To the extent that any of the Debtors
acts as a guarantor of the Lease (a "Debtor-Guarantor"),
the Debtor-Guarantor(s) shall have no obligations with
respect to the Lease after the Closing.

24.   Pursuant to Bankruptcy Code section
363(f), the sale and corresponding assumption and
assignment of the Lease authorized hereunder shall be
free and clear of all Liens, with all such Liens
attaching only to the amount paid under the Agreement
for the Lease and the related premises on which such
Liens had been attached previously, in the same order
and priority, and with the same validity and
enforceability, as same may have had prior to the sale,
assumption and assignment of the Lease, subject to any
and all available defenses.

25.   Any mechanic's lien filed against the
Seller with respect to the premises associated with the
Leases is hereby released, discharged, and terminated,
and the Purchaser is hereby authorized to file, register,
or otherwise record a certified copy of this Sale Order

and each and every federal, state, and local
governmental agency or department is hereby directed to
accept a certified copy of this Sale Order as conclusive
evidence of the release, discharge, and termination of
any mechanic's lien filed against the Seller with
respect to the premises associated with the Leases and
shall remove such mechanic's lien from record.  Any
interest released, discharged and/or terminated under
this paragraph shall attach solely to the amount paid
under the Agreement for the Lease and the related
premises on which such interest had previously attached,
subject to any and all available defenses.

26.  Except for the Seller with respect to
their rights under the Agreement and this Sale Order,
all parties to the Lease, and to any other agreements
relating to the Lease, other than the Agreement, are
forever barred from raising or asserting against the
Purchaser any default or breach under, or any claim or
pecuniary loss arising under or related to the Lease or
such other agreements, arising, accruing or incurred
prior to Closing.

27.   Except for the Seller with respect to its
rights under the Agreement and this Order, all parties
to the Lease, and to any other agreements relating to
the Lease, other than the Agreement, are forever barred
from raising or asserting against the Debtors or their
estates any default or breach under, or any claim or
pecuniary loss, arising under or related to, the Lease
or such other agreements.

28.   Any obligations arising under the Lease
which arise, accrue, are incurred or relate to periods
on or subsequent to Closing, including but not limited
to any tax, utility, common area charges or insurance
payments, shall be the obligation of the Purchaser, and
no party (including the Purchaser) shall have a claim
against the Debtors or their estates for such
obligations.

29.   The Tenant and any governmental agency
shall accept and honor the assignment of the Leases to
the Purchaser in accordance with the Agreement and this
Sale Order.

30.   The Tenant shall cooperate and
expeditiously execute and deliver, upon the reasonable

requests of the Purchaser, and shall not charge the

Purchaser for, any instruments, applications, consents,

or other documents which may be required by any public

or quasi-public authority or other party or entity, for

the purpose of obtaining any permits, approvals or other

necessary documents required for the alteration,

installation of signage, opening and operating of the

premises associated with the Lease.

31.   Pursuant to the terms specified in the

Agreement, the Seller shall request an executed estoppel

certificate from the Tenant; _provided_ _however_, the

Seller shall have no obligation to deliver an estoppel

certificate, nor shall receipt of the same be a

condition to Closing.

**D.   Additional Provisions**

32.   The consideration provided by the

Purchaser for the Property and the Lease under the

Agreement is hereby deemed to constitute reasonably

equivalent value and fair consideration under the

Bankruptcy Code, the Uniform Fraudulent Conveyance Act,

the Uniform Fraudulent Transfer Act, and under the laws

of the United States, and any state, territory, or
possession thereof, or the District of Columbia.

33.  The consideration provided by the
Purchaser for the Property and the Lease under the
Agreement is fair and reasonable and the Sale and
Assignment may not be avoided under section 363(n) of
the Bankruptcy Code.

34.  Upon the Closing, this Sale Order shall
be construed as and shall constitute for any and all
purposes a full and complete general assignment,
conveyance, and transfer of all the Property or a bill
of sale transferring good and marketable title in to the
Purchaser pursuant to the terms of the Agreement.

35.  The transactions contemplated by the
Agreement are undertaken by the Seller and the Purchaser
at arm's-length, without collusion and in good faith, as
that term is used in section 363(m) of the Bankruptcy
Code, and accordingly, the reversal or modification on
appeal of the authorization provided herein to
consummate the sale of the Property and assignment of
the Lease shall not affect the validity of the Sale and
Assignment to the Purchaser, unless such authorization

is duly stayed pending such appeal.  The Purchaser is a
purchaser in good faith, within the meaning of section
363(m) of the Bankruptcy Code, of the Property and the
Lease, and is, and shall be, entitled to all of the
protections afforded by such section and in accordance
therewith.

36.  The failure specifically to include or to
reference any particular provision of the Agreement in
this Sale Order shall not diminish or impair the
effectiveness of such provision, it being the intent of
the Court that the Agreement be authorized and approved
in its entirety.

37.  If the Purchaser fails to close on the
purchase of the Property in accordance with the terms of
the Agreement due to no fault of and Seller is not in
default of its obligations under such Agreement, then
Seller's counsel shall file with the Court and serve
upon the Purchaser, the Alternate Bidder and their
counsel, a notice of such default, which shall include a
copy of the Alternate Bidder's agreement upon which the
Seller will then close, in which case (i) Seller shall
be deemed authorized to close on the sale of the

Property and assignment of the Lease with the Alternate
Bidder on ten (10) days' advance written notice to the
Alternate Bidder, and (ii) the Alternate Bidder shall be
afforded all of the protections originally afforded to
the Purchaser under this Sale Order and the findings
herein as to adequacy and fairness of consideration paid
and good faith shall be deemed to apply to the Alternate
Bidder, its Alternate Bid, and its purchase and sale
agreement with the Seller, without the necessity of
further order of this Court.

38.   All deposits submitted to the Seller for
the Property and the Lease shall be returned to the
bidder that submitted it no later than (i) two business
days after the closing of the sale with the Purchaser
(or the Alternate Bidder, as the case may be) except in
the case of a bidder who closed on the sale of the
Property or who was required to close in accordance with
the terms of this Sale Order but failed to do so in
breach of its contractual obligations through no fault
of the Seller.

39.   The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

40.   This Court retains exclusive jurisdiction
to interpret, construe, enforce, and implement the terms
and provisions of this Sale Order, the Agreement, all
amendments thereto, any waivers and consents thereunder,
and of each of the agreements executed in connection
therewith in all respects, including, but not limited to,
retaining jurisdiction to (a) compel delivery of the
Property and the Lease to the Purchaser, (b) compel
delivery of the purchase price or performance of other
obligations owed to the Seller pursuant to the Agreement,
(c) resolve any disputes arising under or related to the
Agreement, the Alternate Bid, and any deposit delivered
to Seller by a bidder for the Property and the Lease,
(d) interpret, implement, and enforce the provisions of
this Sale Order, and (e) protect the Purchaser against
any Lien against the Seller or the Property or the
Leases of any kind or nature whatsoever, except for
Permitted Encumbrances, which Liens, valid and timely
perfected, shall attach to the proceeds of the Sale.

41.   This Order shall be effective and enforceable immediately upon entry and shall not be stayed pursuant to Rules 6004(h) and 6006.


Dated:   Richmond, Virginia
         August __, 2009


_____
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

      - and –

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

      - and -

/s/ Douglas M. Foley
_____
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Douglas M. Foley

**Exhibit A**

**(Agreement)**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of July 20, 2009, is made by and between CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Seller"), and MATHEW ZAHERI, an individual ("Purchaser").

## RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court. As contemplated by Section 9.2 of this Agreement, Seller will prepare and file the Sale Motion seeking approval of this Agreement.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

I.    PURCHASE AND SALE

1.1    Purchase and Sale.    Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to the property located at 4070 – 4080 Stevens Creek Boulevard, San Jose, California, comprising approximately 5.17 acres, and being more particularly described on Exhibit A attached hereto and made a part hereof, together with (i) all the rights and appurtenances pertaining to such land, (ii) all buildings (including a building containing approximately 69,800 square feet), structures, and other improvements on said land, and all entitlements, permits, approvals, warranties, guaranties, plans, and personal property (if any) with respect to or located on the land, (iii) electrical, mechanical, air conditioning and other fixtures and equipment attached thereto and (iv) Seller's interest as landlord under that certain lease between Seller and Don Sherwood Golf Shop dated January 26, 1998, as amended on June 20, 2006 ("Golf Store Lease") (herein collectively called the "Property"); provided, however, the Property shall not include any lifts or racking located in the buildings, if any (the "Excluded FF&E").

2.    PURCHASE PRICE

2.1    Purchase Price.    The purchase price (the "Purchase Price") for the Property shall be EIGHT MILLION TWO HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($8,250,000.00). The Purchase Price, less the Deposit, shall be paid into the Escrow Agent's escrow account in cash by Purchaser by wire transfer in accordance with wire transfer instructions to be provided by the Escrow Agent, as adjusted by prorations and payment of expenses as herein provided.

3.    DEPOSIT

3.1    Deposit.    Within three (3) business days following the execution of this Agreement and the opening of escrow, Purchaser shall deliver to Fidelity Title (the "Escrow Agent"), 1301 Dove Street, Suite 310, Newport Beach, CA 92660, Attention: Natalie Priestley, Phone: (949) 622-4911, Fax: (949) 477-6835, Email: Natalie.priestley@fnf.com, by wire transfer or cashier's check payable to Escrow Agent, an amount equal to FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) (which amount, together with all interest accrued thereon, is herein called the "Deposit"). The Deposit shall be held in an interest-bearing savings account in a federally insured financial institution in the Los Angeles, California metropolitan area, or in such other interest-bearing account or investment as the parties hereto shall direct (the "Escrow Account").

3.2    Application of Deposit.    If the sale of the Property is consummated under this Agreement, the Deposit shall be paid to Seller and applied to the payment of the Purchase Price. If Purchaser terminates this Agreement in accordance with Section 7.1, Section 7.2, or Section 8.1 hereof, or if Purchaser or Seller terminates this Agreement in accordance with Section 9.4, the Deposit and all accrued interest shall be returned promptly to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the "Survival Obligations"). If Seller terminates this Agreement in accordance with Section 8.2, the Deposit and all accrued interest shall be retained by Seller and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations. Purchaser agrees to deliver (without any representations or warranties whatsoever and subject to any rights of the preparers thereof) to Seller copies of all Reports (as defined in Section 4.4 hereof) excluding any appraisals, market studies or other proprietary information, at the time the notice to

terminate this Agreement is given.  The obligations to deliver the Reports shall survive the termination of this Agreement.  All interest earned on the Deposit shall be reported to the Internal Revenue Service as income of Purchaser and Purchaser shall promptly execute all forms reasonably requested by the Escrow Agent regarding such interest.

4.    ITEMS DELIVERED TO PURCHASER

        4.1    Items Delivered.    Seller has delivered or will deliver to Purchaser, within ten (10) days following opening of escrow with the Escrow Agent, all pertinent property documentation and information with respect to the Property, but only to the extent Seller has reasonable access to and possession of such information (the "Due Diligence Material"), which may include, without limitation, the following materials:

                (i)    Copies of the Golf Store Lease, licenses, options to purchase, occupancy agreements or reciprocal easement agreements with respect to the Property;

                (ii)    Copies of all contracts to which Seller is a party pertaining to the Property including governmental submittals, agreements and matters of record;

                (iii)    Copies of all notices of violations of any statutes, rules or regulations of any governmental agencies concerning the Property;

                (iv)    Copies of all architectural plans and documents, technical studies, soils reports and engineering documentation concerning the Property;

                (v)    Copies of all environmental assessments concerning the Property; and

                (vi)    Copies of all surveys, tax bills and other documents reasonably requested by Purchaser affecting the Property.

        4.2    Title Examination.    Purchaser acknowledges receipt of a copy of a Preliminary Title Report ("PTR") issued by Fidelity National Title Insurance Company ("Title Company") covering the Property together with copies of all documents of record referenced therein.  This Agreement is not to be conditioned on the outcome of unperformed due diligence by Purchaser, including without limitation a title examination of the Property.  Purchaser hereby waives irrevocably any and all title objections and shall be obligated to close the transaction in accordance with the terms of this Agreement.

        4.3    Inspection of Property; Tenant Estoppel Certificate.

CCSWCI: San Jose, CA Sale [7/17/2009]                                                    3

(i)    Purchaser acknowledges that Seller has made Seller's books, records and financial information regarding the Property available for inspection by Purchaser or its representatives during normal business hours. Purchaser approves the condition of the Property.

(iii)    Promptly following the execution of this Agreement, Seller shall request an executed estoppel certificate from the tenant under the Golf Store Lease, in substantially the form of Exhibit B attached hereto (the "Estoppel Certificate"). Seller shall use commercially reasonable efforts to obtain the Estoppel Certificate prior to Closing. Notwithstanding the foregoing, Seller shall have no obligation to deliver an Estoppel Certificate, nor shall receipt of same be a condition to the Closing hereunder.

4.4    Reports.    All non-public information provided by Seller to Purchaser or obtained by Purchaser relating to the Property in the course of Purchaser's investigation of the Property, whether before or after the date of this Agreement (collectively, the "Reports"), shall be treated as confidential information and shall not be disclosed prior to the Closing to any third parties, except as required by law and except for Purchaser's attorneys, engineers, prospective lenders, real estate broker, consultants, investors, prospective tenants and other business associates who need to know the information in furtherance of this transaction, and then only if they agree to maintain the information in strict confidence as provided herein. Purchaser shall be liable to Seller for any unauthorized disclosure of the confidential information by or through Purchaser resulting from, relating to or arising out of any due diligence investigation, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and agrees to defend, protect and hold harmless Seller and its agents, employees, officers, directors, representatives and affiliates from any liability resulting therefrom. This Section 4.4 shall survive the Closing or the termination of this Agreement, as applicable.

4.5    Purchaser's Representations and Warranties.    Purchaser represents and warrants to Seller that (a) [intentionally omitted]; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms. Purchaser's representations and

CCSWCI: San Jose, CA Sale [7/17/2009]                                    4

warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.5 shall survive the Closing or termination of this Agreement.

    4.6    <u>Seller's Representations and Warranties</u>.    Seller represents and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the State of California; (b) Seller has the corporate power and authority to enter into, execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order (as defined hereinafter) in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's postpetition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances; (e) to Seller's actual knowledge, the copy of the Golf Store Lease provided to Purchaser is true, correct and complete, there are no defaults under the Lease and there are no other leases or rights of possession; and (f) Seller shall continue to operate the Property in accordance with its past practices and shall not take any action that would change title to, or the condition of, the Property; provided, however, taking into account that Seller is no longer operating a retail store open to the public at the Property.  The phrase "actual knowledge" means the actual knowledge of Deborah Miller as of the date of this Agreement and the Closing Date without any duty to inquire or investigate (reference to Deborah Miller shall impose no liability on her, but rather is made only to limit the scope of Seller's obligations and liabilities hereunder).  Seller's representations and warranties contained herein must be true and correct in all material respects on the Closing Date as a condition to Purchaser's obligation to purchase the Property as contemplated under this Agreement. The Seller's representations and warranties contained in this Section 4.6 shall expire and be extinguished at the Closing.

    4.7    <u>Further Assurances</u>.    Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement.

5.       DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY

5.1   <u>Disclaimer</u>.   PURCHASER ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE WARRANTY OF TITLE AS SET OUT IN THE GRANT DEED, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS (AS DEFINED BELOW) OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY

RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION.  SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS.  IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. THE PROVISIONS OF THIS SECTION 5 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

   5.2 <u>Hazardous Materials</u>. "<u>Hazardous Materials</u>" shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("<u>CERCLA</u>"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.) ("<u>RCRA</u>"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements (as hereinafter defined) or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of

persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

5.3    Environmental Requirements.    "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

5.4    Purchaser's Independent Investigations.    For all purposes of this Article 5, Purchaser acknowledges and agrees that Purchaser has been provided with adequate and sufficient access to the Property prior to the date of this Agreement, to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property.

6.    CLOSING

6.1    Closing.    Unless otherwise agreed by the parties in writing, the closing of the purchase and sale of the Property (the "Closing") shall be conducted by mail or, if necessary, held at the offices of Escrow Agent not later than thirty (30) days following entry by the Bankruptcy Court of the Sale Order (the date on which the Closing occurs is referred to as the "Closing Date").

6.2    Possession and Title Policy.    Sole and exclusive possession of the Property shall be delivered to Purchaser at the Closing, subject only to (i) liens for real property taxes that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights of record, including, without limitation, all items shown on the PTR, (iv) any and all matters that would be shown by a physical inspection of the Property and (v) the Golf Shop Lease (collectively, the "Permitted Encumbrances").    Prior to the Closing, Seller shall remove the Excluded

FF&E from the Property and shall repair any material damage to the Property caused by the removal of the Excluded FF&E. At the Closing, Purchaser shall cause the Title Company to issue and deliver an ALTA owner's extended coverage policy of title insurance (the "Title Policy"), together with endorsements reasonably requested by Purchaser, dated as of the Closing Date (as hereinafter defined), with liability equal to the Purchase Price, showing fee title to the Property vested in Purchaser and subject only to: (x) the Permitted Encumbrances; and (y) the standard printed exceptions contained in the form of title policy called for.

6.3    Proration.    All utilities with respect to the Property for the month in which the Closing occurs, all rent under the Golf Shop Lease, and real estate taxes and other assessments with respect to the Property for the year in which the Closing occurs, shall be prorated as of the Closing Date as follows:

(a)    Purchaser shall receive a credit equal to the amount of the security deposit (if any) held by Seller under the Golf Shop Lease.

(b)    All real estate taxes and assessments, both general and special, water charges and sewer rents, whether or not then due or payable, and all other normally proratable items shall be prorated to the Closing Date, based upon the latest assessments or actual invoices available. Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment. Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing. All payments received by Purchaser from the tenant under the Golf Shop Lease following the Closing shall first be applied to obligations incurred under the Golf Shop Lease following the Closing; provided, however, that while Purchaser is under no obligation to collect monies owed Seller by the tenant under the Golf Shop Lease attributable to obligations incurred prior to the Closing, Purchaser agrees to deliver to Seller, within thirty (30) days after receipt thereof, all monies collected from the tenant under the Golf Shop Lease after the Closing Date but attributable to periods prior to the Closing Date, and Purchaser agrees to cooperate with Seller in Seller's efforts to collect from such tenant any such pre-closing monetary obligations owed Seller by such tenant.

(c)    Purchaser shall cause all utility meters to be read as of the Closing Date, shall cause the transfer of all utility services for the Property to Purchaser's name as of the Closing Date, and where necessary, shall post deposits with the utility companies; provided, however, Seller shall cooperate reasonably with Purchaser in connection with

switching utility services over to Purchaser's name. Seller shall be entitled to a credit of whatever deposits Seller may have with any utility companies if Purchaser receives the benefit of such deposits.  If the Closing shall occur before the actual amount of utilities and all other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the apportionment of such utilities and other operating expenses shall be upon the basis of an estimate by Seller of such utilities and other operating expenses for such month.  Subsequent to the Closing, when the actual amount of such utilities and other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the parties agree to adjust the proration of such utilities and other operating expenses and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.

The agreements of Seller and Purchaser set forth in this Section 6.3 shall survive the Closing.

6.4    <u>Closing Costs</u>.      Seller shall pay all required state, county and municipal transfer or document stamp taxes incident to this transaction.  Purchaser shall bear the cost of any audits, inspections, recording fees, and the cost of the Title Policy for the Property (including any endorsements thereto).  The parties shall share equally in the cost of any escrow fee.  Purchaser and Seller shall each bear their own cost of legal fees.  With regard to other costs of Closing, the parties shall bear the costs in accordance with the standard custom in northern California.

6.5    <u>Seller's Obligations at the Closing</u>.  At the Closing (or at such earlier date as provided herein), Seller shall deliver to Escrow Agent the following:

(a)    <u>Grant Deed</u>.  A standard form California grant deed, duly executed by Seller, conveying the Property in fee simple as contemplated by the Sale Order, subject to the Permitted Encumbrances.

(b)    <u>Foreign Person</u>.      An affidavit or certificate duly executed by Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended, and is not subject to withholding under Sections 18805 and 26131 of the California Revenue and Taxation Code.

(c)    <u>Assignment and Assumption of Lease</u>.      An      executed counterpart of an assignment and assumption of lease agreement with respect to the Golf Shop Lease, in the form of <u>Exhibit C</u> attached hereto.

6.6    <u>Purchaser's Obligations at the Closing</u>.    At the Closing, Purchaser shall deliver to Escrow Agent the following:

(a)    <u>Purchase Price and Closing Costs</u>.    The Purchase Price (less the amount of the Deposit, which shall be released separately by the Escrow Agent to Seller) and any Closing costs which are Purchaser's responsibility hereunder, plus or minus prorations as provided herein, by wire transfer of immediately available funds.

(b)    <u>Evidence of Authority</u>.    Such organizational and authorizing documents of Purchaser as shall be reasonably required by Seller authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

(c)    <u>Taxpayer I.D. Certificate</u>.    A certificate duly executed by Purchaser certifying Purchaser's address and Taxpayer I.D. Number and consenting to Seller's release of this information to any governmental authority.

(d)    <u>Assignment and Assumption of Lease</u>.    An    executed counterpart of an assignment and assumption of lease agreement with respect to the Golf Shop Lease, in the form of <u>Exhibit C</u> attached hereto.

6.7    <u>Escrow Agent's Duties Upon Closing</u>.    When the Escrow Agent has received all documents and funds required for the Closing and has received written notification from Purchaser and Seller that all conditions to the Closing have been satisfied or waived, and when the Title Company is irrevocably committed to issue the Title Policy, then the Escrow Agent shall:

(a)    Record the Grant Deed and any other documents which the parties may mutually direct to be recorded in the Official Records of the County of Santa Clara, and shall obtain conformed copies thereof for prompt distribution to Purchaser and Seller;

(b)    Cause the Title Company to issue to Purchaser the Title Policy;

(c)    Deliver to Purchaser Seller's certification of non-foreign status and its California Withholding Exemption Certificate with the appropriate federal and state agencies as well as comply with any other federal or state reporting requirements;

(d)    Deliver to Purchaser (i) a conformed copy of the Grant Deed and (ii) the appropriate escrow closing statement; and

(e)    Deliver to Seller (i) the Purchase Price, less Seller's share of the Closing costs and (ii) the appropriate escrow closing statement.

6.8    <u>Commission</u>.  Seller and Purchaser represent that there are no real estate brokers or agents of record in this transaction, other than DJM Realty ("<u>Seller's Broker</u>"). Upon Closing, Seller shall pay Seller's Broker a commission pursuant to a separate written agreement.  Neither Seller nor Purchaser shall be responsible for any other real estate commissions or fees of any kind or nature whatsoever.  Seller and Purchaser each agrees to hold the other harmless against any claim made for brokerage commissions or finders' fees resulting from such parties' actions in this transaction.  The provisions of the preceding sentence shall survive the Closing.

7.    RISK OF LOSS; EXISTING INSURANCE PROCEEDS

7.1    <u>Condemnation</u>.    If, prior to the Closing, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a return of Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event the award of the condemning authority shall be assigned to Purchaser at the Closing, and there shall be no reduction in the Purchase Price.

7.2    <u>Casualty</u>.    Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated.  If the Property, or any part thereof, suffers any damage in excess of Two Hundred Thousand and No/100 Dollars ($200,000.00) after the date of this Agreement and prior to the Closing from fire or other casualty, which Seller, at its sole option, does not repair, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a refund of the Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event all of Seller's right title and interest in and to the proceeds of any insurance covering such damage (less an amount equal to any expenses and costs incurred by Seller to repair or restore the Property or to be paid on account of the loss of rents or other income from the Property for the period prior to and including the Closing Date, all of which shall be payable to Seller), to the extent the amount of such insurance does not exceed the Purchase Price, plus Seller's deductible under its insurance policy, shall be assigned to Purchaser at the Closing. If the Property, or any part thereof, suffers any damage less than Two Hundred Thousand and No/100 Dollars ($200,000.00) after the date of this Agreement and prior to the Closing, Purchaser agrees that it will

consummate the Closing and accept the assignment of the proceeds of any insurance covering such damage, plus Seller's deductible under its insurance policy, and there shall be no reduction in the Purchase Price. Seller shall maintain casualty insurance for the Property through the Closing Date and, if Purchaser is entitled to insurance proceeds pursuant to this Section 7.2, Seller shall cooperate with Purchaser in good faith in connection with the prosecution of any such insurance claim.

8.    DEFAULT

8.1    <u>Breach by Seller</u>.    In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy may elect to either (a) seek specific performance of Seller's obligations to sell the Property pursuant to the terms of this Agreement (provided that Purchaser is ready, willing and able to deposit the entire Purchase Price (less the amount of the Deposit) into Escrow), or (b) terminate this Agreement and receive a refund of the Deposit. In no event shall Purchaser be entitled to any remedy other than as set forth in the immediately preceding sentence, and in no event shall Seller be liable to Purchaser for any actual, punitive, speculative or consequential damages; provided, however, that in the event Seller fails to comply with its obligations under this Agreement and Purchaser elects to terminate this Agreement as provided in subsection (b) above, then, in addition to the Deposit being disbursed to Purchaser, Seller shall reimburse Purchaser for its reasonable out-of-pocket third-party due diligence expenses actually incurred in connection with this Purchase Agreement, in an amount not to exceed Thirty-Seven Thousand Five Hundred and No/100 Dollars ($37,500.00).

8.2    <u>Breach by Purchaser</u>. If the Closing does not occur solely as a result of Purchaser's failure to comply with its obligations under this Agreement, Seller may terminate this Agreement and thereupon shall be entitled to the Deposit (and Purchaser shall pay all escrow charges) as Seller's full liquidated damages pursuant to applicable state statute (and not as a penalty) as Seller's sole and exclusive remedy and relief hereunder, and shall not be entitled to the remedy of specific performance. Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and that these sums represent a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach. SAID AMOUNT WILL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY PURCHASER.    THE PAYMENT OF SUCH AMOUNT AS

LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677. SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement.

_____          _____
Purchaser's initials                          Seller's initials

9.    BANKRUPTCY ISSUES

    9.1    <u>Generally</u>.    Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

    9.2    <u>Filing a Sale Motion</u>. The obligation of Seller to sell and convey the Property to Purchaser, and the obligation of Purchaser to purchase the Property from Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered an order in the Bankruptcy Case (the "Sale Order") (i) approving this Agreement and the sale of the Property to Purchaser, free and clear of liens, claims and encumbrances other than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions contemplated by this Agreement. Promptly following the execution and delivery of this Agreement and the receipt of the deposit by the Escrow Agent, Seller will file with the Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code seeking approval of, among other things, this Agreement and the consummation of the transactions contemplated hereby, bidding procedures, and entry of the Sale Order (the "Sale Motion"). The Sale Motion shall be in form and substance consistent with this Agreement, and Seller shall be responsible for serving and providing notice of the Sale Motion.

    9.3    <u>Entry of Sale Order</u>.    The closing of the sale of the Property to Purchaser shall take place as provided in Section 6.1 above. Purchaser shall cooperate with the Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable.

    9.4    <u>Termination</u>. Purchaser acknowledges that the Seller intends to solicit "higher or otherwise better" offers for the Property, including entertaining other offers

CCSWCI: San Jose, CA Sale [7/17/2009]                                                    14

LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY
WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369,
BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER
PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677.
SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE
SECTION 3389.  Notwithstanding the foregoing, the provisions of this Section 8.2 shall
not limit or affect any of Purchaser's indemnities as provided in any other Section of this
Agreement.

_____                    _____
Purchaser's initials                              Seller's initials

9.    BANKRUPTCY ISSUES

    9.1    Generally.    Notwithstanding any other provision of this Agreement, the
provisions of this Article 9 shall apply to the sale of the Property.

    9.2    Filing a Sale Motion.  The obligation of Seller to sell and convey the
Property to Purchaser, and the obligation of Purchaser to purchase the Property from
Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered
an order in the Bankruptcy Case (the "Sale Order") (i) approving this Agreement and the
sale of the Property to Purchaser, free and clear of liens, claims and encumbrances other
than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions
contemplated by this Agreement.  Promptly following the execution and delivery of this
Agreement and the receipt of the deposit by the Escrow Agent, Seller will file with the
Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code seeking
approval of, among other things, this Agreement and the consummation of the
transactions contemplated hereby, bidding procedures, and entry of the Sale Order (the
"Sale Motion").  The Sale Motion shall be in form and substance consistent with this
Agreement, and Seller shall be responsible for serving and providing notice of the Sale
Motion.

    9.3    Entry of Sale Order.   The closing of the sale of the Property to Purchaser
shall take place as provided in Section 6.1 above.  Purchaser shall cooperate with the
Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as
reasonably practicable.

    9.4    Termination.  Purchaser acknowledges that the Seller intends to solicit
"higher or otherwise better" offers for the Property, including entertaining other offers

CCSWCI: San Jose, CA Sale [7/17/2009]                                        14

from competing bidders. To facilitate this process, Seller agrees to the following procedures for responding to other offers that the Seller may receive for the Property: (a) an initial minimum overbid for the Property of at least EIGHT MILLION FOUR HUNDRED THOUSAND AND NO/100 DOLLARS ($8,400,000.00); (b) each initial overbid must be accompanied by a deposit in an amount equal to the total aggregate Deposit; (c) each competing offer must have terms and conditions that are substantially identical to those set forth in this Agreement; and (d) if an acceptable competing offer is received by Seller, Seller shall conduct an auction to determine the highest or best offer for the Property and Purchaser shall be entitled to participate in the auction. The last day for submission of higher or better offers will be fixed by the Seller or established by order of the Bankruptcy Court. Seller shall use good faith efforts to: (i) seek Bankruptcy Court approval for such auction to be held on or before August 12, 2009, and (ii) cause the Bankruptcy Court to hold the hearing approving or disapproving the Sale Order as part of the Omnibus Hearing currently scheduled on August 27, 2009. Notwithstanding any other provision of this Agreement, (i) Seller shall have the right to terminate this Agreement in order to permit Seller to accept a "higher or otherwise better" offer for the Property in accordance with the terms and conditions of this Section, and (ii) each of Seller and Purchaser shall have the right to terminate this Agreement if the Bankruptcy Court has not entered the Sale Order on or prior to October 31, 2009 (the "Outside Date"). If this Agreement is terminated by Seller as provided in this Section 9.4, or because the Bankruptcy Court will not enter the Sale Order prior to the Outside Date, Escrow Agent shall disburse the Deposit, with accrued interest thereon, to Purchaser. In addition, if, and only if (i) Purchaser is not in breach of or default under this Purchase Agreement, (ii) the Purchaser Agreement is not conditioned on conducting any further, or completing, due diligence and (iii) Seller consummates a sale of the Property with a higher or otherwise better bidder following an auction, Seller shall reimburse Purchaser for its reasonable out-of-pocket third-party due diligence expenses actually incurred in connection with this Purchase Agreement, in an amount not to exceed Thirty-Seven Thousand Five Hundred and No/100 Dollars ($37,500.00). Purchaser shall receive no "break up fee" or other penalty or compensation from Seller in the event Purchaser is not permitted to purchase the Property through the Bankruptcy Court proceedings, other than the reimbursement of out-of-pocket third-party due diligence expenses pursuant to this Section 9.4. Any reimbursement of Purchaser's out-of-pocket third-party due diligence expenses pursuant to this Section 9.4 shall be in lieu of, and not in addition to, any reimbursement of Purchaser's out-of-pocket third-party due diligence expenses pursuant to Section 8.1 herein.

       9.5    Alternate Bidder. In the event the Purchaser is not the highest or otherwise best bidder, but is the next highest or otherwise best bidder, the Purchaser

agrees to keep this proposal open until the closing of a transaction with the highest or otherwise best bidder and close with the Seller at the highest Purchase Price Purchaser submitted at the auction (or if Purchaser does not submit a higher price at the auction, then at the Purchase Price stated in this Agreement) and otherwise pursuant to the terms and conditions of this Agreement and the Sale Order if the Seller does not close with such higher or otherwise better bidder.

10.   MISCELLANEOUS

10.1   Notices.      All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; or (b) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal Express, addressed to such party at the address specified below.  For purposes of this Section 10.1, the addresses of the parties for all notices are as follows:

| | |
|---|---|
| If to Purchaser: | Mathew Zaheri<br>4100 Stevens Creek Blvd<br>San Jose, CA  95129 |
| If to Seller: | CIRCUIT CITY STORES WEST COAST, INC.<br>4951 Lake Brook Drive, 5th Floor<br>Glen Allen, Virginia 23060-9279<br>Attention: Vice President of Real Estate |
| with a copy to: | CIRCUIT CITY STORES WEST COAST, INC.<br>P.O. Box 5695<br>Glen Allen, Virginia 23058<br>Attention:  General Counsel |
| and a copy to: | KENNERLY, LAMISHAW & ROSSI, LLP<br>707 Wilshire Blvd., Suite 1400<br>Los Angeles, CA 90017<br>Attention:  Matthew I. Lamishaw, Esq. |

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

10.2    Entire Agreement.    This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations, promises or inducements made by either party relative to the subject matter hereof, which are not expressly set forth herein.

10.3    Amendment.  This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

10.4    Heading.      The captions and headings used in this Agreement are for convenience of reference only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

10.5    Time of Essence.      Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States, or the State where the Property is located, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

10.6    Governing Law.      This Agreement shall be governed by the laws of the State of California and the laws of the United States pertaining to transactions in such State.

10.7    Successors and Assigns: Assignment.      This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall be permitted to assign Purchaser's rights under this Agreement to an affiliate of Purchaser without obtaining any consent of Seller; provided, however, any other assignment may be made only with the prior written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned.  No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement. This Agreement is solely for the benefit of Seller and Purchaser; there are no third party beneficiaries hereof. Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

10.8    Invalid Provision.    If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

10.9    Attorneys' Fees.    In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.

10.10    Multiple Counterparts.    This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

10.11    No Recordation.    Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record in any real property or other public records.

10.12    Merger Provision.    Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

10.13    Brokers.    Except as contemplated by Section 6.8, no commissions, brokerage fees, finders' fees, or other similar fees shall be due in connection with this Agreement.

10.14    Consent to Jurisdiction of Bankruptcy Court.    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND THE PARTIES HEREO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Seller and Purchaser further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in Section 10.1 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.  Each of Seller and Purchaser irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

SELLER

CIRCUIT CITY STORES WEST
COAST, INC.,
a California corporation

By:      _____
Name:   _____
Title:    _____

PURCHASER

_____
MATHEW ZAHERI, an individual

SELLER                              PURCHASER

CIRCUIT CITY STORES WEST
COAST, INC.,
a California corporation

By:     *Michelle Mosier*
Name:   *Michelle Mosier*          MATHEW ZAHERI, an individual
Title:  *VP & Controller*

The escrow terms and conditions of this Agreement are agreed to and accepted this 27th day of July, 2009.

ESCROW AGENT:

FIDELITY NATIONAL TITLE INSURANCE
COMPANY

By: _Natalie Priestley_

Name: _Natalie Priestley_

Title: _V.P, Escrow Officer_

Mailing Address:

1301 Dove Street, Suite 310
Newport Beach, CA 92660
Attention: Natalie Priestley

## EXHIBIT A

### LEGAL DESCRIPTION OF THE PROPERTY

All that certain Real Property in the City of San Jose, County of Santa Clara, State of California, described as follows:

Portion of Lots 9 and 2, as shown upon that certain Map entitled, "Map of the Dean Tract", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, on March 5, 1892 in Book F of Maps, at page 8, and more particularly described as follows:

Beginning at a point in the center line of Stevens Creek Road at the Northeast corner of that certain parcel of land conveyed by John Maridon to Teresa Maridon, by Deed dated April 7, 1921 and recorded April 18, 1922 in Volume 552 of Deeds, at page 54, said point being distant West 12.49 chains from the point of intersection of the center line of Stevens Creek Road with the center line of Saratoga Avenue; thence running South 0 deg. 16' West 11.80 chains to a point on the Southerly line of Lot 9, as shown upon the Map hereinabove mentioned; thence running along the Southerly line of Lots 9 and 2, West 4.947 chains to a stake marked "K" at the Southeast corner of the lands so conveyed to Teresa Maridon; thence running along the Easterly line of said Teresa Maridon's Land, North 0 deg. 16' East 11.80 chains to the point of beginning.

Excepting therefrom a strip of land 75.00 feet in width and more particularly described as follows:

Portion of Lots 2 and 9, as shown upon that certain Map entitled, "Map of the Dean Tract", which map was filed for Record in the Office of the Recorder of the County of Santa Clara, State of California on March 5, 1892 in Book F of Maps, at page 8 and more particularly described as follows:

Beginning at a point in the center line of Stevens Creek Road at the Northeast corner of that certain parcel of land conveyed by John Maridon to Teresa Maridon by Deed dated April 7, 1921 and recorded April 18, 1922 in Volume 552 of Deeds, at page 54, said point being distant West 824.34 feet from the point of intersection of the center line of Stevens Creek Road with the center line of Saratoga Avenue, thence South 89 deg. 57' 45" West along the center line of Stevens Creek Road 326.50 feet, thence South 0 deg. 16' West 75.00 feet to the Southwesterly corner of that certain parcel of land conveyed to the County of Santa Clara, recorded on April 30, 1965 in Book 6940 of Official Records, page 594 Santa Clara County Records, thence North 89 deg. 57' 45" East along the Southerly line of the lands conveyed to the County of Santa Clara 326.80 feet to the Southeasterly corner thereof, thence North 0 deg. 16' East 75.00 feet to the point of beginning.

<u>EXHIBIT B</u>

ESTOPPEL CERTIFICATE

TENANT: _____

DATE OF LEASE: _____

DATE OF AMENDMENT(S): _____

PREMISES: _____

Attention: _____

           The undersigned hereby certifies to _____ ("<u>Purchaser</u>"), as follows:

           1.     The undersigned is the current tenant (the "<u>Tenant</u>") under the above-referenced lease (the "<u>Lease</u>") covering the above-referenced premises (the "<u>Premises</u>").

           2.     The Lease constitutes the entire agreement between the current landlord under the Lease (the "<u>Landlord</u>") and the Tenant with respect to the Premises. The Lease has not been modified or amended except as set forth above.

           3.     The term of the Lease commenced on _____, _____, and, including any presently exercised option or renewal term, will expire on _____, _____.

           4.     As of the date of this Estoppel Certificate, the Lease is in full force and effect.

           5.     As of the date of this Estoppel Certificate, to the knowledge of the undersigned, there exists no breach or default under the Lease, and, to the knowledge of the undersigned, no state of facts which, with notice, the passage of time, or both, would result in a breach or default under the Lease on the part of either the Tenant or the Landlord, except for _____.

6.      Tenant is currently obligated to pay annual rental in monthly installments of $_____ per month and monthly installments of annual rental have been paid through _____, _____.  No other rent has been paid in advance and Tenant has no claim or defense against Landlord under the Lease and is asserting no offsets or credits against either the rent or Landlord.

7.      Tenant has no claim against Landlord for any security or other deposits except $ _____ which was paid pursuant to the Lease.

8.      All obligations of the Landlord under the Lease concerning the construction of the Premises have been performed by Landlord.

9.      Tenant has made no agreement with Landlord or any agent, representative or employee of Landlord concerning free rent, partial rent, rebate of rental payments or any other type of rental or other concession except as expressly set forth in the Lease.

10.      Tenant has no option to extend the Lease term, no right of first refusal with respect to the Premises or the property of which the Premises are a part and no option to expand the Premises and no option to terminate the Lease, except for

_____.

Dated this _____ day of _____, 2009.

"TENANT"

_____

By: _____
Name: _____
Title: _____

EXHIBIT C

ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT (this "Assignment") is made as of _____, 2009 (the "Effective Date") by and between CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Assignor") and _____ ("Assignee").

RECITALS

A.    Assignor, as lessor, and Don Sherwood Golf Shop (the "Tenant") have entered into that certain lease dated January 26, 1998, as amended on June 20, 2006 (collectively, the "Lease") covering certain premises located upon that certain property commonly known as 4070 – 4080 Stevens Creek Boulevard, San Jose, California (the "Real Property").

B.    Concurrently with this Assignment, pursuant to the terms of that certain Purchase and Sale Agreement between Assignor, as Seller, and Assignee, as Purchaser, dated as of _____ _____, 2009 (the "Purchase Agreement"), Assignor has executed and delivered that certain Grant Deed of even date for the conveyance of the Real Property to Assignee.

C.    In connection with said conveyance, Assignor now desires to assign and transfer to Assignee all of Assignor's interest as lessor in the Lease, subject to the rental, terms, covenants, obligations, easements and restrictions set forth therein.

NOW THEREFORE, in consideration of the mutual covenants and conditions hereinbelow set forth, it is agreed:

1.    Assignment.  Assignor hereby assigns and transfers to Assignee, effective as of the Effective Date, all of Assignor's right, title and interest as lessor (excepting therefrom the Reserved Rights) accruing after the Effective Date, in and to the Lease, and any security deposit held by Assignor thereunder (the "Security Deposit"), subject to the rentals, terms, covenants, obligations, easements and restrictions set forth in the Leases. As used herein, the term "Reserved Rights" shall mean all relevant rights and remedies of the Lease (collectively, the "Enforcement Rights") relating to the landlord's right to collect past due monetary obligations of the tenant including the landlord's right to recover the payment of landlord's attorneys' fees as the same relate to the collection of

monetary obligations of the Tenant(s) arising prior to the Effective Date. Nothing contained in this Section 1 shall impair Assignee's assumption of the Enforcement Rights as the same relate to the collection of monetary obligations of the Tenant(s) under the Lease(s) arising after the Effective Date.

2.    Assumption. Assignee hereby accepts, effective as of the Effective Date, the assignment of the Lease (and the Security Deposit, if applicable) and shall be entitled to all rights and benefits accruing to the lessor thereunder and hereby assumes all obligations thereunder and agrees to be bound by the terms of the Lease, from and after the Effective Date.

3.    Tenant Notice. Assignor agrees to deliver to the Tenant notice to inform the Tenant that Assignor has transferred its interest in the Lease (and the Security Deposit, if applicable) to Assignee as of the Effective Date.

4.    Miscellaneous

(a)    Counterparts. This Assignment may be executed in counterparts which taken together shall constitute one and the same instrument.

(b)    Assignment. This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns.

(c)    Headings. Headings used in this Assignment are for reference purposes only, and are not to be considered in interpreting this Assignment.

(d)    Governing Law. This Assignment shall be governed and construed in accordance with the laws of the State of California.

(e)    Entire Agreement. This Assignment and the other agreements entered into in connection with this Assignment embody the entire agreement and understanding between the parties hereto and shall, except with respect to the Purchase Agreement, supersede all prior agreements and understanding between the parties relating to relating to the subject matter hereof.

(f)    Attorneys' Fees. If any action or proceeding is commenced by either party to enforce its rights under this Assignment, the prevailing party in such action or proceeding shall be entitled to recover all reasonable costs and expenses incurred in such action or proceeding, including reasonable attorneys' fees and costs, in addition to any other relief awarded by the court.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

<u>ASSIGNOR</u>

CIRCUIT CITY STORES WEST COAST, INC.,
a California corporation


By: _____
Name: _____
Title: _____


<u>ASSIGNEE</u>


By: _____
Name: _____
Title: _____


By: _____
Name: _____
Title: _____