Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

            - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
                          RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                          :    Chapter 11
                                :
CIRCUIT CITY STORES, INC.,      :    Case No. 08-35653 (KRH)
et al.,                         :
                                :
              Debtors.          :    Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS
105, 363 AND 503 AND BANKRUPTCY RULES 2002 AND 6004
(A) AUTHORIZING SELLER TO ENTER INTO AGREEMENT FOR SALE
OF CERTAIN REAL PROPERTY IN ATLANTA, GEORGIA SUBJECT TO
HIGHER OR OTHERWISE BETTER BIDS, (B) APPROVING EXPENSE
REIMBURSEMENT IN CONNECTION THEREWITH, (C) APPROVING
SALE OF REAL PROPERTY FREE AND CLEAR OF ALL INTERESTS
AND (D) GRANTING RELATED RELIEF**

        Circuit City Stores, Inc. (the "Seller," and

collectively with the debtors and debtors in possession

in the above-captioned jointly administered cases, the

"Debtors")[1] hereby move (the "Motion"), pursuant to

sections 105, 363 and 503 of title 11 of the United

States Code (the "Bankruptcy Code") and Rules 2002 and

6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for entry of an order (the "Sale

Order") (A) authorizing the Seller to enter into the

Agreement (as defined herein),[2] a copy of which is

attached as Exhibit A to the Sale Order, with the

Purchaser (as defined herein) for the sale (the "Sale")

of certain of the Seller's real property located at 1325

West Corporate Court, Lithia Springs, Georgia (the

"Property"), subject to higher or otherwise better

---

[1]   The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
Inc. (0875), Ventoux International, Inc. (1838), Circuit City
Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
Distribution Company of Virginia, Inc. (2821), Circuit City
Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
Sky Venture Corp. (0311), PRAHS, Inc.(n/a), XSStuff, LLC (9263),
Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
for Circuit City Stores West Coast, Inc. is 9250 Sheridan
Boulevard, Westminster, Colorado 80031.  For all other Debtors,
the address was 9950 Mayland Drive, Richmond, Virginia 23233 and
currently is 4951 Lake Brook Drive, Glen Allen, VA 23060.

[2]   Capitalized terms used but not otherwise defined herein have the
meanings ascribed to them in the Agreement.

proposals, (B) approving the Expense Reimbursement (as defined below) in connection therewith, (C) approving the Sale free and clear of all Liens (as defined below) and (D) granting related relief.  In support of the Motion, the Seller respectfully represents as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are Bankruptcy Code sections 105, 363 and 503 and Bankruptcy Rules 2002 and 6004.

### BACKGROUND

**A.     The Bankruptcy Cases.**

3.     On November 10, 2008 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

4.     The Debtors continue as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

5.     On November 12, 2008, the Office of the
United States Trustee for the Eastern District of
Virginia appointed a statutory committee of unsecured
creditors (the "Creditors' Committee").  To date, no
trustee or examiner has been appointed in these chapter
11 cases.

6.     On January 16, 2009, the Court
authorized the Debtors, among other things, to conduct
going out of business sales at the Debtors' remaining
567 stores pursuant to an agency agreement (the "Agency
Agreement") between the Debtors and a joint venture, as
agent (the "Agent").  On January 17, 2009, the Agent
commenced going out of business sales pursuant to the
Agency Agreement at the Debtors' remaining stores.  The
going out of business sales concluded on or about March
8, 2009.

## RELIEF REQUESTED

7.     By this Motion, the Seller seeks entry
of the Sale Order (A) authorizing the Seller to enter
into the Agreement in connection the Sale of the
Property, subject to higher or otherwise better
proposals, (B) approving the Expense Reimbursement in

connection therewith, (C) approving the Sale of the
Property free and clear of all Liens, and (D) granting
related relief.

**BASIS FOR RELIEF**

8.   As more fully set forth below, after a
comprehensive review, the Seller believes that the Sale
of the Property represents its best opportunity under
the circumstances to maximize the value of the Property.
Therefore, the Sale of the Property is in the best
interests of its estate and stakeholders.

**A.   The Property.**

9.   The Seller owns the Property, the site of
a 65,000 square foot industrial building built in 2001.
Prior to commencing the going out of business sales,
Seller used the Property as a call and service center.

**B.   Events Leading To The Sale.**

10.  In light of the failure to obtain any
going concern bids and the decision to liquidate the
Debtors' inventory through going out of business sales,
the Seller has been left with various assets --
including the Property -- for which it has no remaining
use.  However, the sale of such assets, including the

Sale of the Property, could result in recovery of significant proceeds for the Seller's estate and creditors.

11. Since around the time of commencement of the going out of business sales, the Seller, along with its real estate advisor, DJM Realty, LLC ("DJM"), has been marketing the Property. As a result of these marketing efforts, the Seller received various proposals to purchase the Property. Upon reviewing these proposals, the Seller determined that the proposal submitted by the Purchaser (as defined below) was materially higher or otherwise better than the alternate proposals received. Thus, the Seller elected to proceed with the Sale of the Property to the Purchaser.

**C.    The Agreement.**

12. On August 5, 2009, the Seller entered into the Agreement[3] by and between the Seller and Axion Holdings, LLC (the "Purchaser").

---

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

13.    Pursuant to the Agreement, the Seller has agreed to sell the Property to the Purchaser for $1.5 million (the "Purchase Price"), subject to higher or otherwise better proposals.

14.    The significant terms of the Agreement are as follows:[4]

(a)    <u>General Terms</u>.  The Purchaser would acquire the Property, consisting solely of the Seller's right, title and interest in and to the Property, together with all the rights and appurtenances pertaining thereto and all personal property, equipment, supplies and fixtures contained thereon and therein and used in connection with the operation of such property.

(b)    <u>Sale</u>.  The Property would be sold free and clear of all liens (including the liens of the Seller's post-petition lenders and liens for past-due real property taxes), claims and encumbrances (collectively, the "Liens"), except for (i) liens for real property taxes and assessments that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, of record and (iv) any and all matters that would be shown by a current survey of the Property (collectively, the "Permitted Encumbrances").

(c)    <u>Bankruptcy Court Approval</u>.  The Sale of the Property would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures (as defined below).

---

[4]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of the Agreement are controlling.

(d)  <u>Purchase Price</u>.  The Purchase Price to be paid by the Purchaser for the Property would be $1.5 million.

(e)  <u>Deposit</u>.  In accordance with the Agreement, the Purchaser will deliver to Chicago Title Insurance Company the amount of $250,000 (the "Deposit"). If the Sale is consummated under the Agreement, the Deposit shall be applied to the Purchase Price.  If the Agreement is terminated prior to Closing of the Sale because of the Purchaser's breach of the Agreement (on the terms as provided in the Agreement), the Seller would be entitled to retain the Deposit as the Seller's sole recourse.

(f)  <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.

(g)  <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Seller would provide certain standard representations and warranties relating to the Sale of the Property and the Purchaser would provide representations and warranties generally standard in a transaction of this type.  The representations and warranties of the Seller would expire and be extinguished at the Closing.  The representations and warranties of the Purchaser would survive indefinitely following the Closing or the termination of the Agreement.

(h)  <u>Closing</u>.  The closing of the Sale of the Property (the "Closing") shall occur on the date which is five (5) days after the later of (i) the expiration of the due diligence period or (ii) the date of entry by the Court of the Sale Order.

(i)  <u>Termination</u>.  The Agreement could be terminated prior to Closing in the following circumstances:  (i) by the Purchaser, if an action is initiated to take any material portion of the Property by eminent domain proceedings, (ii) by the Purchaser, in the event that the Seller shall fail to consummate the transactions contemplated by the Agreement, (iii) by the

Seller, in the event that the Purchaser shall fail to
consummate the transactions contemplated by the
Agreement, (iv) by the Seller, in order to permit the
Seller to accept a higher or better offer for the
Property pursuant to the Bidding Procedures.

**D.    Expense Reimbursement.**

15.    The Seller has agreed to reimburse the

Purchaser for its actual, reasonable, verifiable and

documented third-party out-of-pocket costs and expenses

in an amount not greater than $25,000 (the "Expense

Reimbursement") if, and only if (i) the Purchaser is not

in breach of or default under the Agreement and (ii) the

Seller consummates the Sale of the Property with a

higher or otherwise better bidder following the Auction

(as defined herein) and upon approval by the Bankruptcy

Court.

16.    The Purchaser has expended, and likely

will continue to expend, considerable time, money, and

energy pursuing the Sale and has engaged in arm's length

and good faith negotiations regarding a possible sale of

the Property.  The Agreement is the culmination of these

efforts.

17.    In recognition of this expenditure of

time, energy, and resources, the Seller has agreed to

the Expense Reimbursement.  Specifically, the Agreement
provides for, and the Seller respectfully requests that
the Sale Order approve, the Expense Reimbursement
payable by the Seller to the Purchaser in an amount not
to exceed $25,000 if the Seller terminates the Agreement
to close an alternate transaction, so long as the
Purchaser is not in breach of the Agreement.

18.  The Seller believes that the proposed
Expense Reimbursement is fair and reasonable in view of
(a) the analysis, due diligence investigation, and
negotiation that has been undertaken by the Purchaser in
connection with the Sale and (b) the fact that the
Purchaser's efforts would maximize the value of the
Property for the benefit of all stakeholders, whether as
a result of consummating the Sale pursuant to the
Agreement or by generating a higher or otherwise better
offer.

19.  The Purchaser is unwilling to keep open
its offer to purchase the Property under the terms of
the Agreement unless this Court authorizes payment of
the Expense Reimbursement.  Thus, absent entry of the
Sale Order with approval of the Expense Reimbursement,

the Seller may lose the opportunity to obtain what it believes to be the highest or otherwise best offer for the Property.  And, as described below, the Agreement is subject to higher or otherwise better proposals. Approving the Expense Reimbursement will thus commit the Purchaser to purchase the Property under the Agreement, and the Agreement would serve to start any additional bidding for the Property at a fair and reasonable purchase price.

20.  Payment of the Expense Reimbursement will not diminish the Seller's estate.  The Seller would not expect to pay the Expense Reimbursement unless it does so to accept an alternate proposal, which would result in even greater value to the Seller's estate and its stakeholders.  This is particularly true given the Initial Minimum Overbid requirement (as defined below), which ensures that other proposals represent higher or otherwise better offers for the Property taking into account payment of the Expense Reimbursement.  The Seller thus requests that this Court authorize payment of the Expense Reimbursement pursuant to the terms and conditions of the Agreement.

**E.    The Bidding Procedures.**

21.    To ensure that the Seller receives the highest or otherwise best proposal for the Property, the Seller will entertain alternate proposals for the Sale of the Property pursuant to the procedures set forth below (the "Bidding Procedures").  The Seller accordingly requests that this Court order that any parties, including those parties that previously submitted proposals, who wish to submit an alternate proposal for consideration by the Debtors be required to do so by August 20, 2009 at 4:00 p.m. (ET) (the "Bid Deadline").  All bids are to be sent to the following parties:

(1) Circuit City Stores, Inc., 4951 Lake Brook Drive, Glen Allen, VA 23060, Attn: Jim Marcum (Jim_Marcum@ccswinddown.com);

(2) Counsel to the Seller, Gregg M. Galardi and Ian S. Fredericks, Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, DE 19801 (gregg.galardi@skadden.com and ian.fredericks@skadden.com);

(3) Counsel to the Creditors' Committee, Jeff Pomerantz, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067-4100, (jpomerantz@pszjlaw.com); and

(4) DJM Realty Services, LLC, 445 Broadhollow Road, Suite 225, Melville, New York 11747, Attn: James Avallone, Fax: (631) 752-1231 (javallone@djmrealty.com).

22.   If the Seller receives any Qualified
Bids (as defined herein), the Seller would hold an
auction (the "Auction") on August 24, 2009 at 10:00 a.m.
(ET) at the offices of Skadden, Arps, Slate, Meagher &
Flom LLP, 1440 New York Avenue, N.W., Washington, D.C.,
or telephonically  The Seller will advise the Purchaser
and all other parties that submitted a Qualified Bid of
the Auction.

23.   At the conclusion of any Auction, the
Seller, in consultation with its advisors (and
representatives of the Creditors' Committee), would
determine which bid constitutes the highest or otherwise
best bid (the "Successful Bid").

24.   Following the Auction, if any, the
Seller intends to proceed with a hearing to approve the
Sale of the Property on August 27, 2009 at 11:00 a.m.
(ET) (the "Sale Hearing").

25.   If no Qualified Bids other than the bid
of the Purchaser are received, the Seller would proceed
with the Sale to the Purchaser following entry of the
Sale Order.  If the Seller receives additional Qualified
Bids, then at the Sale Hearing, the Seller would seek

approval of the Successful Bid, as well as the second
highest or best Qualified Bid (the "Alternate Bid," and
such bidder, the "Alternate Bidder").  A bid would not
be deemed accepted by the Seller unless and until
approved by the Court.

26.   Following approval of the Sale to the
Successful Bidder, if the Successful Bidder fails to
consummate the sale for specified reasons, then the
Alternate Bid would be deemed to be the Successful Bid
and the Seller would be permitted to effectuate a sale
to the Alternate Bidder without further order of the
Court.

27.   To ensure that only bidders with a
serious interest in the purchase of the Property
participate in the bidding process, the Seller would
only consider the "Qualified Bids" of "Qualified
Bidders."  To be considered a "Qualified Bid" and a
"Qualified Bidder" for purposes of the Auction, the
person or entity submitting the bid would be required to
submit an offer by the Bid Deadline that includes:

> (a)   an executed copy of the Agreement marked
> to show those amendments and
> modifications to the Agreement that the

Qualified Bidder proposes (such modified Agreement, a "Marked Agreement"), including modifications to the Purchase Price, which price must be at least $1,550,000.00 (the "Initial Minimum Overbid");

(b)   the potential bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder;

(c)   a statement that the bid shall not be conditioned on the outcome of unperformed due diligence by the bidder or any financing contingency;

(d)   a good faith deposit (the "Good Faith Deposit") equal to $250,000 plus ten (10) percent of the amount the bid exceeds the Purchase Price in cash;

(e)   an acknowledgement that the bidder's offer is irrevocable until two (2) business days after the Closing of the Sale of the Property; and

(f)   an acknowledgement that, in the event the bidder is the Alternate Bidder, the bidder will proceed with the purchase of the Property pursuant to the terms the Marked Agreement.

28.   The Seller reserves the right to (i) determine in its reasonable discretion (after consultation with representatives of the Creditors' Committee) which offer is the highest or otherwise best offer for the Property; (ii) reject at any time prior to the Closing of a Sale, without liability, any offer that

the Seller in its reasonable discretion (after
consultation with representatives of the Creditors'
Committee) deems to be (x) inadequate or insufficient,
(y) not in conformity with the requirements of the
Bidding Procedures or applicable law or (z) contrary to
the best interests of the Seller and its estate; (iii)
re-open the Auction, (iv) withdraw the Property from the
Auction, (v) waive the requirements of any of the
Bidding Procedures with respect to a potential or
Qualified Bidder if the Seller determines, in its
business judgment (after consultation with
representatives of the Creditors' Committee), it is in
the best interests of its estate and creditors, and (vi)
establish bid increments at the Auction, after
consultation with the Creditors' Committee.  The
Purchaser has agreed to all of the terms of the Bidding
Procedures, including (without limitation) the terms (e)
and (f) of the Qualified Bid requirements.

29.  Objections to the Sale, if any, must be
filed and served no later than 4:00 p.m. (ET) on August
20, 2009.

## APPLICABLE AUTHORITY

**I.   APPROVAL OF THE SALE OF THE PROPERTY IS WARRANTED UNDER BANKRUPTCY CODE SECTION 363(b)(1).**

30.   As set forth above, Bankruptcy Code section 363(b)(1) authorizes a trustee to "use, sell, or lease" property of the estate with the Court's approval. 11 U.S.C. § 363(b)(1).  Assets of the Debtors may be sold outside of the ordinary course of business, pursuant to Bankruptcy Code section 363(b)(1), if a sound business purpose exists for doing so.  In re WBQ P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)(citing Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986)); see also In re W.A. Mallory Co., Inc., 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).

31.   To satisfy the "sound business purpose test," the debtor must demonstrate that (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale was proposed in good faith; (3) the purchase price is fair and reasonable; and (4) adequate and reasonable notice of the sale has been provided.  In re WBQ P'ship, 189 B.R. at 102.

32.   Based upon the results of their analysis, the Seller's management and advisors have concluded that the Sale of the Property pursuant to the Agreement or a higher or otherwise better offer would maximize the value of the Property for the Seller's estate. Maximizing asset value is a sound business purpose that warrants authorizing the proposed Sale.

33.   The Sale of the Property will be subject to competing bids, thereby enhancing the Seller's ability to receive the highest or otherwise best value for the Property.   Consequently, the fairness and reasonableness of the consideration to be received by the Seller will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

34.   Moreover, the Seller proposes to provide adequate notice of the Auction and the Sale Hearing as set forth below.   In light of the circumstances, such notice is reasonably calculated to provide timely and adequate notice to the Seller's major creditor constituencies, those parties most interested in these

cases, those parties potentially interested in bidding on the Property and others whose interests are potentially implicated by the proposed Sale.

## II.   THE SALE PROCESS IS REASONABLE AND APPROPRIATE.

35.   Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Moreover, Bankruptcy Code section 105(a) provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

36.   The disposition of the Property pursuant to the terms reflected in the Agreement resulted from the bids submitted for the Property, pursuant to a marketing process led by DJM.  Conducting a marketing process through a third party broker represents an accepted method of selling property.  Similar marketing processes have been approved previously in this case and in other chapter 11 cases.  See, e.g., In re Circuit City Stores, Inc., Case No. 08-35653 (KRH)(Bankr. E.D. Va. Mar. 20, 2009) (D.I. 2710); Ready v. Rice, 2006 WL

4550188 at *3 (D. Md. 2006); see also In re Reading

Broadcasting, Inc., 386 B.R. 562, 571-72 (Bankr. E.D. Pa.

2008); In re King-Wilson, 1998 WK 737887 at *4-5 (N.D.

Cal. 1998).

37.   In addition, bid procedures similar those

Bid Procedures outlined above have been approved by this

Court in this case.  See, e.g., In re Circuit City

Stores, Inc., Case No. 08-35653 (KRH)(Bankr. E.D. Va.

Mar. 3, 2009) (D.I. 2401).

38.   Finally, other interested parties have

been and will be provided with an opportunity to submit

higher or otherwise better proposals and, if necessary,

the Seller will conduct an auction.

39.   In light of the foregoing, the Seller

submits that the sale process is reasonable and

appropriate.

**III. THE EXPENSE REIMBURSEMENT REQUESTED HEREIN IS
     REASONABLE AND SHOULD BE APPROVED.**

40.   In connection with Sale of the Property,

the Court should authorize the Seller to pay the Expense

Reimbursement.

41.   Agreements to provide Expense
Reimbursements and other bidding incentives are designed
to compensate a potential acquirer who serves as a
catalyst that may attract higher and better offers, and
have been approved in bankruptcy to encourage bidding.
See In re Ryan, 261 B.R. 867, 870 (Bankr. E.D. Va. 2001).
Expense Reimbursements can be advantageous to both
buyers and sellers because they encourage bidding to
ensure that sellers receive the highest or otherwise
best offer while compensating the buyer for the risk of
being outbid.   See id.

42.   Expense Reimbursements are allowed as an
administrative expense claim against the estate if they
satisfy the standard of section 503(b)(1).   In re Tropea,
352 B.R. 766, 768 (Bankr. N.D.W.Va. 2006).   Thus, the
fee must reflect the actual and necessary cost of
preserving the estate.   See 11 U.S.C. § 503(b)(1).   See
also In re Tropea, 352 B.R. at 768.   In Calpine Corp. v.
O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy,
Inc.), 181 F.3d 527 (3d Cir. 1999), the United States
Court of Appeals for the Third Circuit explained how the
section 503(b)(1) standard applied to Expense

Reimbursements.  The Third Circuit Court of Appeals held
that even though bidding incentives are measured against
a business judgment standard in non-bankruptcy
transactions, the administrative expense provisions of
Bankruptcy Code section 503(b) govern in the bankruptcy
context.  Accordingly, to be approved, bidding
incentives must provide some post-petition benefit to
the debtor's estate.  See id. at 533; see also In re
Lamb, 2002 WL 31508913 (Bankr. D. Md. 2002) (implicitly
adopting the administrative expense standard set forth
in O'Brien).

        43.  The O'Brien Court identified at least two
instances in which bidding incentives may provide
benefit to the estate.  First, benefit may be found if
"assurance of a break-up fee promoted more competitive
bidding, such as by inducing a bid that otherwise would
not have been made and without which bidding would have
been limited."  Id. at 537.  Second, when the
availability of bidding incentives induce a bidder to
research the value of the debtor and submit a bid that
serves as a minimum or floor bid on which other bidders
can rely, "the bidder may have provided a benefit to the

22

estate by increasing the likelihood that the price at which the [asset] is sold will reflect its true worth."
Id.

44.   Here, the Seller seeks authority to pay the Expense Reimbursement in the event that the Purchaser is not ultimately the Successful Bidder.  The proposed Expense Reimbursement is appropriate under Bankruptcy Code section 503 as it is fair and reasonable in amount, particularly in view of the efforts that will have to be expended by the Purchaser.  Moreover, the Agreement, including the Expense Reimbursement provided for therein, will enable the Seller to secure an adequate floor for an auction and, thus, insist that competing bids be materially higher or otherwise better than the Purchase Price pursuant to the Agreement (as incorporated in the Initial Minimum Overbid requirement), a clear benefit to the Seller's estate.

45.   In sum, the Seller's ability to offer the Expense Reimbursement enables it to ensure the Sale of the Property to a contractually-committed bidder at a price that they believe to be fair while, at the same

time, providing them with the potential of even greater

benefit to the estates.

46.   Thus, the Expense Reimbursement should be

approved.

**IV.  THE PURCHASER OR SUCCESSFUL BIDDER SHOULD BE
     AFFORDED THE PROTECTIONS OF SECTION 363(m) OF THE
     BANKRUPTCY CODE AND THE TRANSACTIONS CONTEMPLATED
     BY THE AGREEMENT SHOULD CARRY THE PROTECTIONS OF
     SECTION 363(m) OF THE BANKRUPTCY CODE.**

47.   Section 363(m) of the Bankruptcy Code

provides:

> The reversal or modification on appeal of
> an authorization under subsection (b) or
> (c) of this section of a sale or lease of
> property does not affect the validity of
> a sale or lease under such authorization
> to an entity that purchased or leased
> such property in good faith, whether or
> not such entity knew of the pendency of
> the appeal, unless such authorization and
> such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not

define "good faith," the Fourth Circuit Court of Appeals

has "adopt[ed] the traditional equitable definition that

has been adopted by various courts of appeal: 'one who

purchases the assets for value, in good faith, and

without notice of adverse claims.'"   Willemain v. Kivitz,

764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

48.   Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

49.   Throughout the negotiations, the Purchaser has at all times acted in good faith. Moreover, to the extent that the Property is sold to a Successful Bidder, it will be because of a well-planned competitive process and negotiations at arm's length to be conducted at an auction. Additionally, the Seller submits, and will present evidence at the Sale Hearing, that the Agreement reflects a negotiated, arm's length transaction. As a result of the foregoing, the Seller requests that the Court make a finding that the total consideration to be paid by the Purchaser or the Successful Bidder constitutes reasonably equivalent value and fair consideration under any applicable law.

50.   The Seller, therefore, requests that this
Court make a finding that the Purchaser or the
Successful Bidder, as the case may be, has purchased the
Property in good faith within the meaning of section
363(m) of the Bankruptcy Code.  Further, the Seller
requests that this Court make a finding that the
Agreement or any purchase agreement reached as a result
of the Bidding Procedures necessarily will comprise an
arm's length, negotiated transaction entitled to the
protections of section 363(m) of the Bankruptcy Code.
Because the Purchaser's or Successful Bidder's bid is
not the product of fraud or collusion between the
Purchaser or Successful Bidder and other bidders or the
trustee, or an attempt to take grossly unfair advantage
of other bidders, the Seller furthers request that this
Court make a finding that the transactions contemplated
by the Agreement are not avoidable under section 363(n)
of the Bankruptcy Code.

**V.   THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL
INTERESTS SHOULD BE AUTHORIZED UNDER BANKRUPTCY
CODE SECTION 363(f).**

51.   To facilitate a sale of the Property, the
Seller requests authorization to sell the Property free

and clear of any and all Liens that may be asserted

against such Property, except the Permitted Encumbrances.

52.  Under section 363(f) of the Bankruptcy

Code, a debtor in possession may sell property free and

clear of any interest in such property if, among other

things:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

53.  Section 363(f) permits the sale of estate

property free and clear of interests if any one of the

five conditions above is met.  See, e.g., In re Laines,

352 B.R. 410, 414-15 (Bankr. E.D. Va. 2005).

54.  Courts have held that the authority of a

debtor to sell assets free and clear of interests is

broad and should be read expansively.  See In re TWA,
Inc., 322 F.3d 283, 289 (3d Cir. 2003); see also United
Mine Workers of Am. 1992 Benefit Plan v. Leckie
Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99
F.3d 573, 582 (4th Cir. 1996) (holding that the phrase
"any interest in property" includes more than just in
rem interests); In re P.K.R. Convalescent Centers, Inc.,
189 B.R. 90, 94 (Bankr. E.D. Va. 1995)("As the plain
meaning of the statute demonstrates, § 363 covers more
situations than just sales involving liens.").  Moreover,
courts have noted that the purpose of the "free and
clear" language is to allow the debtor to obtain a
maximum recovery on its assets in the marketplace.  See
In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr.
D. Del. Mar. 27, 2001).

        55.  Accordingly, this Court should authorize
the Seller to sell the Property free and clear of any
and all Liens, except the Permitted Encumbrances, that
may be asserted by any parties, with any such Liens
attaching to the net proceeds of the sale of the
Property in the same order and priority and subject to
the same defenses as they exist against the Property.

**VI.   WAIVER OF THE TEN-DAY STAY PROVIDED BY BANKRUPTCY RULE 6004 SHOULD BE WAIVED FOR ANY ORDER APPROVING THE SALE OF THE PROPERTY.**

56.   Bankruptcy Rule 6004(h) provides that: "[a]n order authorizing the use, sale, or lease of property of the estate is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).

57.   The Seller requests that the Court waive the ten-day stay of Bankruptcy Rule 6004 with respect to the Sale of the Property following the entry of the Sale Order.  By waiving such requirements, the Seller and the Purchaser or the Successful Bidder, as applicable, will be able to immediately close the Sale, which will result in immediate proceeds to the Seller's estate.

58.   Accordingly, the stay under Bankruptcy Rule 6004(h) should be waived.

**NOTICE**

59.   Notice of this Motion has been provided to those parties entitled to notice under the Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice,

29

Case Management, and Administrative Procedures (D.I. 130;

the "Case Management Order"), as well as (a) all

entities known to have expressed an interest in a

transaction regarding the Property during the past three

(3) months; and (b) all entities reasonably known to

have a Lien on the Property; and (c) all federal, state,

and local regulatory or taxing authorities or recording

offices that have a reasonably known interest in the

relief requested by the Motion.  The Seller submits that,

under the circumstances, no other or further notice need

be given.

### WAIVER OF MEMORANDUM OF LAW

60.  Pursuant to Local Bankruptcy Rule 9013-

1(G), and because there are no novel issues of law

presented in the Motion and all applicable authority is

set forth in the Motion, the Seller requests that the

requirement that all motions be accompanied by a

separate memorandum of law be waived.

### NO PRIOR REQUEST

61.  No previous request for the relief sought

herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Seller respectfully request that the Court (i) enter an Sale Order, substantially in the form annexed hereto, granting the relief requested herein, and (ii) such other and further relief as may be just and proper.

Dated: August 7, 2009
       Richmond, Virginia   SKADDEN, ARPS, SLATE, MEAGHER &
                                 FLOM, LLP
                                 Gregg M. Galardi, Esq.
                                 Ian S. Fredericks, Esq.
                                 P.O. Box 636
                                 Wilmington, Delaware 19899-0636
                                 (302) 651-3000

                                         - and -

                                 SKADDEN, ARPS, SLATE, MEAGHER &
                                 FLOM, LLP
                                 Chris L. Dickerson, Esq.
                                 155 North Wacker Drive
                                 Chicago, Illinois 60606
                                 (312) 407-0700

                                         - and -

                                 MCGUIREWOODS LLP

                               /s/ Douglas M. Foley _____
                               Dion W. Hayes (VSB No. 34304)
                               Douglas M. Foley (VSB No. 34364)
                               One James Center
                               901 E. Cary Street
                               Richmond, Virginia 23219
                               (804) 775-1000

                               Counsel for Debtors and Debtors
                               in Possession

Gregg M. Galardi, Esq.          Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.         Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &  MCGUIREWOODS LLP
FLOM, LLP                       One James Center
One Rodney Square               901 E. Cary Street
PO Box 636                      Richmond, Virginia 23219
Wilmington, Delaware 19899-0636 (804) 775-1000
(302) 651-3000

              - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :   Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :   Case No. 08-35653 (KRH)
<u>et al</u>.,                :
                              :
            Debtors.          :   Jointly Administered
- - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363 AND 503
AND BANKRUPTCY RULES 2002 AND 6004 AUTHORIZING AND
APPROVING THE SALE BY SELLER OF CERTAIN REAL PROPERTY
LOCATED IN ATLANTA, GEORGIA FREE AND CLEAR OF LIENS AND
INTERESTS**

Upon the motion (the "Motion")[1] of Circuit City

Stores, Inc. (the "Seller," and collectively with the

---

[1]  Capitalized terms not otherwise defined herein shall have the
     meanings ascribed to such terms in the Motion.

debtors and debtors in possession in the above-captioned

jointly administered cases, the "Debtors") for entry of

an order pursuant to sections 105, 363 and 503 of title

11 of the United States Code (the "Bankruptcy Code") and

Rules 2002 and 6004 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), (A) authorizing the

Seller to enter into the Agreement with Axion Holdings,

LLC (the "Purchaser") for the sale (the "Sale") of

certain of the Seller's real property located at 1325

West Corporate Court, Lithia Springs, Georgia (the

"Property"), subject to higher or otherwise better

proposals, (B) approving the Expense Reimbursement in

connection therewith, (C) approving the Sale free and

clear of all Liens and (D) granting related relief; and

upon the record of the auction conducted on August 24,

2009 (the "Auction") and the hearing held on August 27,

2009 (the "Sale Hearing"); and after due deliberation

thereon, and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

A.    The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.    Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C.    The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363 and 503 and Bankruptcy Rules 2002 and 6004.

D.    The notice of the Motion, the Auction, and the Sale Hearing given by the Seller constitutes due and sufficient notice thereof.

E.    The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Property.

---

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

F.    A reasonable opportunity to object or be heard regarding the relief in this Order has been afforded to all interested persons and entities.

G.    The Seller and its professionals marketed the Property and conducted a sale process as set forth in and in accordance with the Motion and the Bidding Procedures.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid on the Property.

H.    The Seller has demonstrated good, sufficient, and sound business purpose and justification for the Sale because, among other things, the Seller and its advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Property and determined that (a) the terms and conditions set forth in the Agreement, (b) the transfer to the Purchaser of the Property pursuant thereto and (c) the Purchase Price agreed to by the Purchaser is fair and reasonable and constitutes the highest or otherwise best value obtainable for the Property.

I.    The Seller has full power and authority to execute the agreement submitted by the Purchaser, a copy of which is annexed hereto as <u>Exhibit A</u> (the "Agreement") and all other applicable documents contemplated thereby.  The transfer and conveyance of the Property by the Seller have been duly and validly authorized by all necessary action of the Seller.  The Seller has all of the power and authority necessary to consummate the transactions contemplated by the Agreement and has taken all action necessary to authorize and approve the Agreement and to consummate the transactions contemplated thereby.  No consents or approvals, other than those expressly provided for in the Agreement, are required for the Seller to consummate such transactions.

J.    The Agreement and the Sale of the Property were negotiated and have been and are undertaken by the Seller and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Sections 363(m) of the Bankruptcy Code.  As a result of the foregoing, the Seller and the

Purchaser are entitled to the protections of Section 363(m) of the Bankruptcy Code.

K.    Neither the Seller nor the Purchaser engaged in any conduct that would cause or permit the Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code.

L.    The Purchase Price provided by the Purchaser for the Property is the highest and best offer received by the Seller, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Property.

M.    The Sale must be approved and consummated promptly to obtain the value provided under the terms of the Agreement.

N.   The transfer of the Property to the
Purchaser is a legal, valid, and effective transfer of
the Property, and shall vest the Purchaser with all
right, title, and interest of the Seller to the Property
free and clear of all liens (including the liens of the
Seller's post-petition lenders and liens for past-due
real property taxes), claims and encumbrances
(collectively, the "Liens"), except for those items
defined in the Agreement (and which are referred to
hereinafter) as the "Permitted Encumbrances".

O.   If the Sale of the Property by the Seller
were not free and clear of any Liens, except for the
Permitted Encumbrances, as set forth in the Agreement
and this Sale Order, or if the Purchaser would, or in
the future could, be liable for any of the Liens, the
Purchaser would not have entered into the Agreement and
would not consummate the Sale contemplated by the
Agreement, thus adversely affecting the Seller, its
estate, and its stakeholders.

P.   The Seller may sell its interest in the
Property free and clear of all Liens (except the
Permitted Encumbrances) because, in each case, one or

more of the standards set forth in Bankruptcy Code
sections 363(f)(1)-(5) has been satisfied.  All holders
of Liens, if any, who did not object or withdrew their
objections to the Sale are deemed to have consented to
the Sale pursuant to 11 U.S.C. § 363(f)(2) and all
holders of Liens are adequately protected by having
their Liens, if any, attach to the cash proceeds of the
Sale ultimately attributable to the property against or
in which they claim an interest with the same priority,
validity, force, and effect as they attached to such
property immediately before the Closing of the Sale.

Q.   Based on the foregoing findings of fact
and conclusions of law,[3]

**ORDERED, ADJUDGED AND DECREED THAT:**

1.   The Motion is GRANTED.

2.   Any and all objections to the Motion not
waived, withdrawn, settled, adjourned or otherwise
resolved herein are hereby overruled on the merits and
denied with prejudice.

---

[3]   Statements made by the Court from the bench at the hearing on the
Motion shall constitute additional conclusions of law and
findings of fact as appropriate.

**A.    Approval Of The Agreement.**

3.    Pursuant to Bankruptcy Code section
363(b), the Agreement and all of the terms and
conditions thereof are hereby approved.

4.    Pursuant to Bankruptcy Code section
363(b), the Seller is authorized and approved to perform
its obligations under the Agreement and comply with the
terms thereof and consummate the Sale in accordance with
and subject to the terms and conditions of the Agreement.

5.    The Seller is authorized, but not
directed, to execute and deliver, and empowered to
perform under, consummate, and implement all additional
instruments and documents as may be reasonably necessary
or desirable to implement the Agreement, and to take all
further actions as may be requested by the Purchaser for
the purpose of assigning, transferring, granting,
conveying, and conferring to the Purchaser or reducing
to possession the Property as contemplated by the
Agreement.

6.    This Sale Order and the Agreement shall
be binding in all respects upon the Seller, all
stakeholders (whether known or unknown) of the Seller,

all affiliates and subsidiaries of the Seller, and any
subsequent trustees appointed in the Seller's chapter 11
case or upon a conversion to chapter 7 under the
Bankruptcy Code.  To the extent that any provision of
this Sale Order is inconsistent with the terms of the
Agreement, this Sale Order shall govern.

7.    The Agreement and any related agreements,
documents, or other instruments may be modified, amended,
or supplemented by the parties thereto, in a writing
signed by such parties, and in accordance with the terms
thereof, without further order of the Court; <u>provided</u>
that any such modification, amendment, or supplement is
disclosed to the Creditors' Committee and does not have
a material adverse effect on the Seller's estate, in the
good faith business judgment of the Seller.

**B.    Sale And Transfer Of The Property.**

8.    Pursuant to Bankruptcy Code sections
363(b) and 363(f), upon the consummation of the
Agreement, the Seller's right, title, and interest in
the Property shall be transferred to the Purchaser free
and clear of all Liens except the Permitted Encumbrances,
with all such Liens to attach to the cash proceeds of

10

the Sale in the order of their priority, with the same

validity, force, and effect which they had as against

the Property immediately before such transfer, subject

to any claims and defenses the Seller may possess with

respect thereto.

9.   If any person or entity which has filed

financing statements, mortgages, mechanic's liens, <u>lis</u>

<u>pendens</u>, or other documents or agreements evidencing

Liens on or against the Property shall not have

delivered to the Seller prior to the Closing of the Sale,

in proper form for filing and executed by the

appropriate parties, termination statements, instruments

of satisfaction, releases of all Liens that the person

or entity has with respect to the Property, or otherwise,

then (a) the Seller is hereby authorized to execute and

file such statements, instruments, releases, and other

documents on behalf of the person or entity with respect

to the Property and (b) the Purchaser is hereby

authorized to file, register, or otherwise record a

certified copy of this Sale Order, which, once filed,

registered, or otherwise recorded, shall constitute

conclusive evidence of the release of all Liens on or

against the Property of any kind or nature whatsoever
except for the Permitted Encumbrances.

10.   This Sale Order (a) shall be effective as
a determination that, upon the Closing of the Sale, all
Liens of any kind or nature whatsoever existing as to
the Seller or the Property prior to the Closing of the
Sale, except for the Permitted Encumbrances, have been
unconditionally released, discharged, and terminated
(other than any surviving obligations), and that the
conveyances described herein have been effected and (b)
shall be binding upon and shall govern the acts of all
entities including, without limitation, all filing
agents, filing officers, title agents, title companies,
recorders of mortgages, recorders of deeds, registrars
of deeds, administrative agencies, governmental
departments, secretaries of state, federal, state, and
local officials, and all other persons and entities who
may be required by operation of law, the duties of their
office, or contract, to accept, file, register, or
otherwise record or release any documents or instruments,
or who may be required to report or insure any title or
state of title in or to any of the Property.

11.   All persons and entities, including, but
not limited to, all debt security holders, equity
security holders, governmental, tax, and regulatory
authorities, lenders, trade stakeholders, and other
stakeholders, holding Liens of any kind or nature
whatsoever against or in the Seller or the Property,
except the Permitted Encumbrances (whether legal or
equitable, secured or unsecured, matured or unmatured,
contingent or non-contingent, senior or subordinated)
arising under or out of, in connection with, or in any
way relating to the Property prior to the Closing of the
Sale, or the transfer of the Property to the Purchaser,
hereby are forever barred, estopped, and permanently
enjoined from asserting against the Purchaser, its
successors or assigns, its property, or the Property,
such persons' or entities' Liens.  Nothing in this Sale
Order or the Agreement releases or nullifies any
liability to a governmental agency under any
environmental laws and regulations that any entity would
be subject to as owner or operator of the Property after
the date of entry of this Sale Order.  Nothing in this
Sale Order or the Agreement bars, estops, or enjoins any

13

governmental agency from asserting or enforcing, outside
the Court, any liability described in the preceding
sentence.  Notwithstanding the above, nothing herein
shall be construed to permit a governmental agency to
obtain penalties from the Purchaser for days of
violation of environmental laws and regulations prior to
Closing.

**C.   Additional Provisions**

12.   The Purchase Price provided by the
Purchaser for the Property under the Agreement is hereby
deemed to constitute reasonably equivalent value and
fair consideration under the Bankruptcy Code, the
Uniform Fraudulent Conveyance Act, the Uniform
Fraudulent Transfer Act, and under the laws of the
United States, and any state, territory, or possession
thereof, or the District of Columbia.

13.   The Purchase Price provided by the
Purchaser for the Property under the Agreement is fair
and reasonable and the Sale may not be avoided under
section 363(n) of the Bankruptcy Code.

14.   Upon the Closing, this Sale Order shall
be construed as and shall constitute for any and all

14

purposes a full and complete general assignment,
conveyance, and transfer of the Property or a bill of
sale transferring good and marketable title in the
Property to the Purchaser pursuant to the terms of the
Agreement.

15.   The transactions contemplated by the
Agreement are undertaken by the Seller and the Purchaser
at arm's length, without collusion and in good faith, as
that term is used in section 363(m) of the Bankruptcy
Code, and accordingly, the reversal or modification on
appeal of the authorization provided herein to
consummate the Sale of the Property shall not affect the
validity of the Sale to the Purchaser, unless such
authorization is duly stayed pending such appeal.  The
Purchaser is a purchaser in good faith, within the
meaning of section 363(m) of the Bankruptcy Code, of the
Property and is, and shall be, entitled to all of the
protections afforded by such section and in accordance
therewith.

16.   The failure specifically to include or to
reference any particular provision of the Agreement in
this Sale Order shall not diminish or impair the

15

effectiveness of such provision, it being the intent of

the Court that the Agreement be authorized and approved

in its entirety.

17.  If the Purchaser fails to close on the

purchase of the Property in accordance with the terms of

the Agreement due to no fault of the Seller and Seller

is not in default of its obligations under such

Agreement, then Seller's counsel shall file with the

Court and serve upon the Purchaser, [_____] (the

"Alternate Bidder") and their counsel, a notice of such

default, which shall include a copy of the Alternate

Bidder's agreement upon which the Seller will then close,

in which case (i) Seller shall be deemed authorized to

close on the Sale of the Property with the Alternate

Bidder on ten (10) days' advance written notice to the

Alternate Bidder, and (ii) the Alternate Bidder shall be

afforded all of the protections originally afforded to

the Purchaser under this Sale Order and the findings

herein as to adequacy and fairness of consideration paid

and good faith shall be deemed to apply to the Alternate

Bidder, its Alternate Bid, and its purchase and sale

agreement with the Seller, without the necessity of
further order of this Court.

18.  All deposits submitted to the Seller for
the Property, if any, shall be returned to the bidders
that submitted such deposits no later than two business
days after the Closing of the Sale with the Purchaser
(or the Alternate Bidder, as the case may be), except in
the case of a bidder who closed on the Sale of the
Property or who was required to close in accordance with
the terms of this Sale Order but failed to do so in
breach of its contractual obligations through no fault
of the Seller.

19.  This Order shall be effective and
enforceable immediately upon entry and shall not be
stayed pursuant to Rule 6004(h).

20.  The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

21.  This Court retains exclusive jurisdiction
to interpret, construe, enforce, and implement the terms
and provisions of this Sale Order, the Agreement, all
amendments thereto, any waivers and consents thereunder,

and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Property to the Purchaser, (b) compel delivery of the purchase price or performance of other obligations owed to the Seller pursuant to the Agreement, (c) resolve any disputes arising under or related to the Agreement, the Alternate Bid, and any deposit delivered to Seller by a bidder for the Property, (d) interpret, implement, and enforce the provisions of this Sale Order, and (e) protect the Purchaser against any Lien against the Seller or the Property of any kind or nature whatsoever, except for Permitted Encumbrances, which Liens, valid and timely perfected, shall attach to the proceeds of the Sale.

Dated:  Richmond, Virginia
        _____, 2009


        _____
        UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession


**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

        Pursuant to Local Bankruptcy Rule 9022-1(C), I
hereby certify that the foregoing proposed order has
been endorsed by or served upon all necessary parties.

                        /s/ Douglas M. Foley

**Exhibit A**

**(Agreement)**

EXECUTION VERSION

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of August 5, 2009, is made by and between CIRCUIT CITY STORES, INC., a Virginia corporation ("Seller"), and AXION HOLDINGS, LLC, a Georgia limited liability company ("Purchaser").

## RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court. As contemplated by Section 9.2 of this Agreement, Seller will prepare and file the Sale Motion (as defined below) seeking approval of this Agreement.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

1.    PURCHASE AND SALE

1.1    Purchase and Sale.    Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to that certain improved property commonly known as 1325 West Corporate Court, Lithia Springs, Georgia and being more particularly described on Exhibit A attached hereto and made a part hereof, together with all the rights and appurtenances pertaining to such property (the "Real Property") and all personal property, equipment, supplies, and fixtures contained thereon and therein and used in connection with the operation of such property (the "Personal Property" and collectively with the Real Property, the "Property").

2.    PURCHASE PRICE

2.1    Purchase Price.    The purchase price (the "Purchase Price") for the Property shall be ONE-MILLION FIVE-HUNDRED THOUSAND AND NO/100 DOLLARS ($1,500,000.00). At Closing (as defined below), the Purchase Price, less the Deposit (as defined below), shall be paid into the Escrow Agent's (as defined below) escrow account in cash by Purchaser by wire transfer in accordance with wire transfer

1

EXECUTION VERSION

instructions to be provided by Escrow Agent, as adjusted by prorations and payment of expenses as herein provided.

3.    DEPOSIT

3.1    Deposit.    Within three (3) days following the complete execution of this Agreement, Purchaser shall deliver to Midtown Agency, Inc. ("Escrow Agent"), P.O. Box 250, 1430 Cardwell Road, Crozier, Virginia 23039, Attention: Pope Reed, by wire transfer or cashier's check payable to Escrow Agent, an amount equal to TWO-HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($250,000.00) (the "Deposit") to be held by Escrow Agent in a non-interest-bearing account in a federally insured financial institution, or in such other non-interest-bearing account or investment as the parties hereto shall direct.

3.2    Application of Deposit.    If the sale of the Property is consummated under this Agreement, at Closing, the Deposit shall be paid to Seller and applied to the payment of the Purchase Price.  If Purchaser terminates this Agreement in accordance with Section 4.2, Section 4.3, Section 7.1, Section 7.2, or Section 8.1 hereof, or if Purchaser or Seller terminates this Agreement in accordance with Sections 9.4 or 9.6, the Deposit shall be returned promptly by Escrow Agent to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the "Survival Obligations").  If Seller terminates this Agreement in accordance with Section 8.2 or Section 10.11, Escrow Agent shall pay the Deposit to Seller, and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations. Purchaser agrees to deliver to Seller copies of all Reports (as defined in Section 4.4 hereof) at the time the notice to terminate this Agreement is given.  The obligation to deliver the Reports shall survive the termination of this Agreement. Purchaser shall not be entitled to the return of the Deposit from Escrow Agent until all Reports have been delivered to Seller.

4.    PREPURCHASE MATTERS

4.1    Items Delivered.

(a)    Seller has previously delivered to Purchaser those items within Seller's possession related to or affecting the Property (if any) to be used by Purchaser in conducting Purchaser's due diligence investigation of the Property during the Due Diligence Period.

EXECUTION VERSION

(b)     Purchaser has previously delivered or will deliver to Seller within five (5) days following Seller's execution of this Agreement proof of available funds adequate to purchase the Property. In the event that Purchaser fails to deliver such proof within the foregoing specified period, Seller shall have the right to terminate this Agreement, the Deposit shall be returned promptly by Escrow Agent to Purchaser, and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations.

4.2     <u>Title Examination</u>.     Purchaser shall have the right to have Seller's title to the Property examined and shall give written notice to Seller during the period beginning on the date of this Agreement and ending on August 7, 2009 (the "<u>Due Diligence Period</u>") of any objection thereto; provided, however, Seller shall have no obligation to satisfy any such objections. Purchaser must elect, on or before the expiration of the Due Diligence Period, one of the following: (i) to waive any such objections that Seller has not agreed to satisfy at or prior to the Closing and to close the transaction in accordance with the terms of this Agreement; or (ii) to terminate this Agreement, in which event Escrow Agent shall promptly return the Deposit to Purchaser as Purchaser's sole and exclusive remedy; provided, however, if Seller has agreed to cure or satisfy each such objection specified in the written notice, then no such election shall be required and Purchaser shall be obligated to close the transaction in accordance with the terms of this Agreement; provided, further, if Purchaser does not send a written notice of title objections prior to the expiration of the Due Diligence Period or does not make such an election on or before the expiration of the Due Diligence Period, then Purchaser shall be deemed to have waived irrevocably any and all title objections and shall be obligated to close the transaction in accordance with the terms of this Agreement.

4.3     <u>Property Inspection</u>.     Purchaser shall have through the last day of the Due Diligence Period to determine whether, in Purchaser's sole and absolute discretion, the Property is acceptable to Purchaser.  Notwithstanding anything to the contrary in this Agreement, Purchaser may terminate this Agreement by giving notice of termination to Seller on or before the last day of the Due Diligence Period if Purchaser determines that the Property is not acceptable for any reason, in which event Escrow Agent shall promptly return the Deposit to Purchaser and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations.  If Purchaser does not give a notice of termination pursuant to Section 4.2 or this Section 4.3 at or prior to 5 p.m. (local time in Lithia Springs, Georgia) on the last day of the Due Diligence Period, this Agreement shall continue in full force and effect and Purchaser's right to terminate this Agreement pursuant to Section 4.2 and this Section 4.3 shall expire and be of no further force or effect.

EXECUTION VERSION

Subject to the conditions set out in this Section 4.3, Purchaser shall have reasonable access to the Property during the Due Diligence Period for the purpose of conducting surveys, geotechnical, and environmental inspections and tests and any other inspections, studies, or tests reasonably required by Purchaser, all at Purchaser's sole expense.  If any inspection or test disturbs the Property, Purchaser will (at its sole expense) restore the Property as soon as reasonably possible to the same condition as existed prior to any such inspection or test.  Notwithstanding anything to the contrary in this Agreement, Purchaser will not do, or cause or direct to be done, any subsurface testing or boring, or any testing of subsurface water, or any coring, boring or other intrusive testing, without first obtaining Seller's prior written consent which Seller may give or withhold in its absolute discretion; provided, however, all other inspections of or entry upon the Property by Purchaser shall occur only with the consent of Seller, which consent shall not be withheld unreasonably.  Purchaser hereby indemnifies Seller, and agrees to defend, protect and hold Seller harmless, from and against any and all claims, losses, damages and liabilities that may be asserted against or incurred by Seller for or in connection with any injuries or damage to any persons or property, which directly or indirectly are caused by or result from any entry, inspection, testing or other action done or caused or directed to be done by Purchaser or its representatives or contractors.  Purchaser agrees to cause all parties entering the Property at Purchaser's instance to maintain adequate and appropriate insurance to cover risks of the type described herein and, upon Seller's request, to deliver to Seller evidence establishing to Seller's reasonable satisfaction that adequate and appropriate insurance to cover risks of the types described herein is being maintained.

4.4    Reports.        All information provided by Seller to Purchaser or obtained by Purchaser relating to the Property in the course of Purchaser's due diligence investigation, whether before or after the date of this Agreement (collectively, the "Reports"), shall be treated as confidential information and shall not be disclosed to any third parties except for Purchaser's attorneys, engineers, lenders, prospective tenants and other business associates who need to know the information in furtherance of this transaction, and then only if they agree to maintain the information in strict confidence as provided herein.  Purchaser shall be liable to Seller for any unauthorized disclosure of the confidential information by or through Purchaser and for all damage or injury to any person or property resulting from, relating to or arising out of any due diligence investigation, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and agrees to defend, protect and hold harmless Seller and its agents, employees, officers, directors, representatives and affiliates from any liability resulting therefrom. This Section 4.4 shall survive the Closing or the termination of this Agreement, as applicable.

4

EXECUTION VERSION

4.5    Purchaser's Representations and Warranties.    Purchaser represents and warrants to Seller that (a) Purchaser is a limited liability company, duly organized and in good standing under the laws of the State of Georgia, is authorized to do business in the State of Georgia, and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all of its duties and obligations hereunder, and Purchaser has obtained all necessary authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms.    Purchaser's representations and warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.5 shall survive the Closing or termination of this Agreement.

4.6    Seller's Representations and Warranties.    Seller    represents    and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the Commonwealth of Virginia; (b) Seller has the corporate power and authority to enter into, execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order (as defined below) in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; and (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's postpetition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances. The representations and warranties contained in this Section 4.6 shall expire and be extinguished at the Closing.

4.7    Further Assurances.    Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement.

5

EXECUTION VERSION

5.    DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY

5.1    Disclaimer.    PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE SPECIAL WARRANTY OF TITLE AS SET OUT IN THE DEED, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS (AS DEFINED BELOW) OR (I) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY.  ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE

EXECUTION VERSION

ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, MAINTENANCE AND MANAGEMENT OF THE PROPERTY; PROVIDED, HOWEVER, PURCHASER SHALL NOT BE REQUIRED TO INDEMNIFY SELLER WITH RESPECT TO MATTERS ARISING PRIOR TO THE CLOSING AND ATTRIBUTABLE SOLELY TO SELLER'S CONDUCT. THE PROVISIONS OF THIS SECTION 5 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

    5.2   <u>Hazardous Materials</u>. "<u>Hazardous Materials</u>" shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("<u>CERCLA</u>"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.)

EXECUTION VERSION

("RCRA"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

5.3    Environmental Requirements.    "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

5.4    Purchaser's Independent Investigations.    For all purposes of this Article 5, Purchaser acknowledges and agrees that Purchaser has been provided with adequate and sufficient access to the Property prior to the date of this Agreement, and Purchaser is entitled to access the Property during the Due Diligence Period, to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property.

6.    CLOSING

6.1    Closing.    Unless otherwise agreed by the parties in writing, the closing of the purchase and sale of the Property (the "Closing") shall be conducted by mail or, if necessary, held at a location to be mutually agreed upon by the parties, on the

EXECUTION VERSION

date which is five (5) business days after the date of entry by the Bankruptcy Court of the Sale Order (the date on which the Closing occurs is referred to as the "Closing Date").

6.2    Possession.    Possession of the Property shall be delivered to Purchaser at the Closing, subject to (i) liens for real property taxes and assessments that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise, and (iv) any and all matters that would be shown by a physical inspection of the Property (collectively, the "Permitted Encumbrances").

6.3    Prorations.    All real estate taxes and assessments, both general and special, for the year in which the Closing occurs, whether or not then due or payable, and all other normally proratable items shall be prorated as of the Closing Date, based upon the latest assessments or actual invoices available.    Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment.    Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing.

The agreements of Seller and Purchaser set forth in this Section 6.3 shall survive the Closing.

6.4    Closing Costs.    Purchaser shall pay all title examination costs, title insurance premiums, survey costs, environmental and engineering costs, and any and all other due diligence costs.    Seller shall pay all transfer taxes imposed on the Deed (as defined below) pursuant to applicable law.    Except as otherwise provided herein, each party shall pay its own attorneys' fees.    The parties shall each pay one-half (1/2) of any escrow fee charged by Escrow Agent; and, with regard to other costs of Closing, the parties shall bear the costs of recording and settlement as is the custom in the State of Georgia.

6.5    Seller's Obligations at the Closing.    At the Closing, Seller shall deliver to Escrow Agent the following:

(a)    Deed.    A limited warranty deed, duly executed by Seller, conveying the Real Property in fee simple as contemplated by the Sale Order, subject to the Permitted Encumbrances.

9

EXECUTION VERSION

(b)      Bill of Sale.   A bill of sale, duly executed by Seller, transferring, conveying and assigning and warranting to Purchaser the Personal Property as contemplated by the Sale Order, subject to the Permitted Encumbrances.

(c)      Foreign Person.      An affidavit or certificate duly executed by Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended.

6.6      Purchaser's Obligations at the Closing.      At the Closing, Purchaser shall deliver to Escrow Agent the following:

(a)      Purchase Price.      The Purchase Price (less the amount of the Deposit, which shall be released separately by Escrow Agent to Seller), by wire transfer of immediately available funds.

(b)      Evidence of Authority.      Such organizational and authorizing documents of Purchaser as shall be reasonably required by Seller authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

(d)      Taxpayer I.D. Certificate.      A certificate duly executed by Purchaser certifying Purchaser's address and Taxpayer Identification Number and consenting to Seller's release of this information to any governmental authority.

6.7      Commission.   Seller and Purchaser represent that there are no real estate brokers or agents of record in this transaction, other than DJM Realty ("Seller's Broker"), and upon Closing, Seller shall pay Seller's Broker a commission pursuant to a separate written agreement.   Neither Seller nor Purchaser shall be responsible for any other real estate commissions or fees of any kind or nature whatsoever.   Seller and Purchaser each agrees to hold the other harmless against any claim made for brokerage commissions or finders' fees resulting from such parties' actions in this transaction.   The provisions of the preceding sentence shall survive the Closing.

7.      RISK OF LOSS

7.1      Condemnation.      If, prior to the Closing, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Agreement, in which case the Deposit shall be returned to Purchaser by Escrow Agent and neither party shall have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which case the award of the condemning authority

10

EXECUTION VERSION

shall be assigned to Purchaser at the Closing, and there shall be no reduction in the Purchase Price.

7.2    Damage to Property. If, prior to Closing, any material portion of the Property is damaged, Purchaser may either at or prior to Closing (a) terminate this Agreement, in which case the Deposit shall be returned to Purchaser by Escrow Agent and neither party shall have any further right or obligation hereunder except for the Survival Obligations, or (b) accept the Property in its then condition and proceed with the Closing with a credit for any deductible (up to the amount of the cost of the required repair), but otherwise without any reduction in the Purchase Price and receive an assignment of all of Seller's right to any insurance proceeds payable by reason of such damage or destruction.  If Purchaser elects to proceed under clause (b) above, Seller shall not compromise, settle or adjust any claims to such proceeds without Purchaser's prior written consent.

7.3    Non-Material Damage or Condemnation.    If, prior to the Closing, any non-material portion of the Property is damaged or subject to a taking, Purchaser shall accept the Property in its then condition (with a credit for any deductible (up to the amount of the cost of the required repair) but otherwise without any reduction in the Purchase Price) and proceed with the Closing, in which case Purchaser shall be entitled to an assignment of all of Seller's rights to any insurance proceeds or any award in connection with such taking, as the case may be.  If any such non-material damage or taking occurs, Seller shall not compromise, settle or adjust any claims to such insurance proceeds or such award, as the case may be, without Purchaser's prior written consent.

7.4    Definition of Material.      For purposes of this Section 7, damage to the Property, or a taking of a portion thereof, shall be deemed to involve a material portion thereof if the reasonably estimated cost of restoration or repair of such damage or the amount of the condemnation award with respect to such taking shall exceed $200,000.00 or affects any access to the Property.

8.    DEFAULT

8.1    Breach by Seller.      In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy, may terminate this Agreement and demand the return of the Deposit from Escrow Agent.  In no event shall Purchaser be entitled to any remedy other than the return of the Deposit. Escrow Agent and Seller shall not be liable to Purchaser for any actual, punitive, speculative or

EXECUTION VERSION

consequential damages.  In no event shall Purchaser be entitled to the remedy of specific performance.

8.2     Breach by Purchaser.  In the event that Purchaser shall fail to consummate the transactions contemplated by this Agreement for any reason, except Seller's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Seller, as its sole and exclusive remedy, may terminate this Agreement and thereupon shall be entitled to payment of the Deposit from Escrow Agent as liquidated damages.  Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and because the parties believe that the Deposit represents a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement.

9.      BANKRUPTCY ISSUES

9.1     Generally.     Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

9.2     Filing a Sale Motion. The  obligation  of  Seller  to  sell  and  convey  the Property to Purchaser, and the obligation of Purchaser to purchase the Property from Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered an order in the Bankruptcy Case (the "Sale Order") (i) approving this Agreement and the sale of the Property to Purchaser, free and clear of liens, claims and encumbrances other than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions contemplated by this Agreement.   Promptly following the expiration of the Due Diligence Period, Seller will file with the Bankruptcy Court a motion pursuant to Section 363 of the Bankruptcy Code seeking approval of, among other things, this Agreement and the consummation of the transactions contemplated hereby, bidding procedures and entry of the Sale Order (the "Sale Motion"). The Sale Motion shall be in form and substance consistent with this Agreement and shall be in a form and substance reasonably satisfactory to Purchaser.  Seller shall be responsible for serving and providing notice of the Sale Motion.

9.3     Entry of Sale Order.   The closing of the sale of the Property to Purchaser shall take place as provided in Section 6.1 above.  Purchaser shall cooperate with the Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable.

12

EXECUTION VERSION

9.4    <u>Termination</u>.  Purchaser acknowledges that the Seller intends to solicit "higher or otherwise better" offers for the Property, including entertaining other offers from competing bidders. To facilitate this process, Seller agrees to the following procedures for responding to other offers that the Seller may receive for the Property: (a) an initial minimum overbid for the Property of at least $1,550,000.00 shall be required; (b) each initial overbid must be accompanied by a deposit in an amount equal to at least $250,000.00 plus ten percent (10%) of the amount such overbid exceeds the Purchase Price; (c) each competing offer must have terms and conditions that are substantially identical to those set forth in this Agreement (except that no competing offer shall provide for any due diligence period or property inspection period); and (d) if an acceptable competing offer is received by Seller, Seller shall conduct an auction to determine the highest or best offer for the Property and Purchaser shall be entitled to participate in the auction. The last day for submission of higher or otherwise better offers will be fixed by Seller or established by order of the Bankruptcy Court. Notwithstanding any other provision of this Agreement, (i) Seller shall have the right to terminate this Agreement in order to permit Seller to accept a "higher or otherwise better" offer for the Property, and (ii) each of Seller and Purchaser shall have the right to terminate this Agreement if the Bankruptcy Court has not entered the Sale Order on or prior to October 30, 2009 (the "<u>Outside Date</u>"). In the event of a termination of this Agreement pursuant to this Section 9, the Deposit shall be returned to Purchaser, Seller, upon Seller's receipt of an invoice from Purchaser, shall reimburse Purchaser for its actual, reasonable, verifiable and documented third-party out-of-pocket costs and expenses (up to the maximum amount of $25,000.00) incurred by Purchaser in connection with Purchaser's review of the Property, including, without limitation, title and survey expenses, third-party report expenses, and reasonable attorney's fees (collectively, the "<u>Due Diligence Expenses</u>"), and neither party shall have any further right or obligation hereunder except for the Survival Obligations.

9.5    <u>Seller's Efforts</u>.    Seller agrees to use its commercially reasonable good faith efforts to (a) seek Bankruptcy Court approval for any auction to be held on or about August 25, 2009, and (b) cause the Bankruptcy Court to hold the hearing approving or disapproving the Sale Order as part of the Omnibus Hearing currently scheduled on August 27, 2009.

9.6    <u>Alternate Bidder</u>.    In the event Purchaser is not the highest or otherwise best bidder, but is the next highest or otherwise best bidder, Purchaser agrees to keep this proposal open until the closing of a transaction with the highest or otherwise best bidder and close with Seller if Seller does not close with such highest or otherwise best bidder; provided, however, if such closing does not occur on or before the Outside Date set forth in Section 9.4, Purchaser shall be entitled to terminate this Agreement. In

the event that Seller closes the transaction with the highest or otherwise best bidder, then this Agreement shall be deemed terminated, the Deposit shall be returned to Purchaser, Seller, upon Seller's receipt of an invoice from Purchaser, shall reimburse Purchaser for the Due Diligence Expenses (up to the maximum amount specified in Section 9.4), and neither party shall have any further right or obligation hereunder except for the Survival Obligations.

10.    MISCELLANEOUS

10.1    <u>Notices</u>.      All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; (b) on the third (3rd) business day after being sent, by certified or registered mail, return receipt requested, addressed to the intended recipient at the address specified below; or (c) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal Express, addressed to such party at the address specified below.  For purposes of this Section 10.1, the addresses of the parties for all notices are as follows:

| | |
|---|---|
| If to Purchaser: | BIKE ALERT – USA<br>1465 Trae Lane<br>Lithia Springs, Georgia 30122<br>Attention: Christakis Vassiliou Boyiantzeas |
| with a copy to: | JAMPOL, SCHLEICHER, JACOBS & PAPADAKIS, LLP<br>11625 Rainwater Drive, Suite 350<br>Alpharetta, Georgia 30009<br>Attention: Michael Jacobs, Esq. |
| If to Seller: | CIRCUIT CITY STORES, INC.<br>P.O. Box 5695<br>Glen Allen, Virginia 23058-5695<br>Attention: Vice President of Real Estate |
| with a copy to: | CIRCUIT CITY STORES, INC.<br>P.O. Box 5695<br>Glen Allen, Virginia 23058-5695<br>Attention:  General Counsel |

EXECUTION VERSION

and a copy to:        MCGUIREWOODS LLP
                      One James Center
                      901 East Cary Street
                      Richmond, Virginia 23219
                      Attention: Matthew T. Gunlock, Esq.

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

10.2    Entire Agreement.    This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations, promises or inducements made by either party relative to the subject matter hereof, which are not expressly set forth herein.

10.3    Amendment. This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

10.4    Heading.      The captions and headings used in this Agreement are for convenience of reference only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

10.5    Time of Essence.      Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States, or the State where the Property is located, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

10.6    Governing Law.      This Agreement shall be governed by the laws of the State of Georgia.

10.7    Successors and Assigns; Assignment.      This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall not be permitted to assign Purchaser's rights under this Agreement without obtaining the prior written consent of Seller.   No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement.   This Agreement is solely for the benefit of Seller and Purchaser; there are no third party

15

beneficiaries hereof. Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

10.8    Invalid Provision.    If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

10.9    Attorneys' Fees.    In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.

10.10    Multiple Counterparts.    This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

10.11    No Recordation.    Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record in any real property or other public records. Should Purchaser ever record or attempt to record this Agreement, or a memorandum or affidavit thereof, or any other similar document (which does not include any item for recordation with respect to the closing of the sale contemplated herein), then, notwithstanding anything herein to the contrary, said recordation or attempt at recordation shall constitute a default by Purchaser hereunder, and, in addition to the other remedies provided for herein, Seller shall have the express right to terminate this Agreement by filing a notice of said termination in the county in which the Property is located or otherwise as may be necessary to give public notice of such termination.

10.12    Merger Provision.    Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

EXECUTION VERSION

10.13  <u>Brokers</u>.    Except as contemplated by Section 6.7, no commissions, brokerage fees, finders' fees, or other similar fees shall be due in connection with this Agreement.

10.14  <u>Consent to Jurisdiction of Bankruptcy Court</u>.    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND THE PARTIES HEREO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Seller and Purchaser further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in Section 10.1 of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.  Each of Seller and Purchaser irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

[SIGNATURE PAGE ATTACHED]

17

EXECUTION VERSION

     IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representatives as of the date set forth above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _Michelle Mosier_____

Name: _Michelle O. Mosier_____

Title: _V.P. and Controller_____

PURCHASER

AXION HOLDINGS, LLC,
a Georgia limited liability company

By: _____

Name: _____

Title: _____

18

EXECUTION VERSION

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representatives as of the date set forth above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
Name: _____
Title: _____

PURCHASER

AXION HOLDINGS, LLC,
a Georgia limited liability company

By: _____
Name: CHRISTAKIS VASSILION BOYIANTZEAS
Title: CEO

18

EXECUTION VERSION

The escrow terms and conditions of this Agreement are agreed to and accepted this __ day of August 2009. Notwithstanding anything contained within this Agreement, except for Escrow Agent's own negligence or willful misconduct, Escrow Agent shall not be liable for any loss or damage resulting from any loss or impairment of funds that have been deposited in escrow while those funds are in the course of collection or while those funds are on deposit in a financial institution if such loss or impairment results from the failure, insolvency, or suspension of a financial institution.

ESCROW AGENT:

Stewart Title & Guaranty Company

By:     _____

Name:   _____

Title:  _____

Mailing Address:

P.O. Box 250

1430 Cardwell Road

Crozier, Virginia 23039

19

EXECUTION VERSION

The escrow terms and conditions of this Agreement are agreed to and accepted this 7th day of August 2009. Notwithstanding anything contained within this Agreement, except for Escrow Agent's own negligence or willful misconduct, Escrow Agent shall not be liable for any loss or damage resulting from any loss or impairment of funds that have been deposited in escrow while those funds are in the course of collection or while those funds are on deposit in a financial institution if such loss or impairment results from the failure, insolvency, or suspension of a financial institution.

ESCROW AGENT:

Midtown Agency, Inc.

By: _____

Name: _Paulson C. Reed_

Title: _President_


Mailing Address:

P.O. Box 250

1430 Cardwell Road

Crozier, Virginia 23039


19

EXHIBIT A

LEGAL DESCRIPTION OF PROPERTY

All that tract or parcel of land lying and being in Land Lot 480 of the 18th District, 2nd Section, Douglas County, Georgia, being more particularly described as follows:

Beginning at the point of intersection of the easterly right of way of Maxhara Road (R/W varies) with the northerly right of way of Skyview Drive (80' R/W and varies); thence easterly a distance of 558.94 feet along the northerly right of way of Skyview Drive (80' R/W and varies) to a point; said point being the true point of beginning, thence north 10 degrees 42 minutes 05 seconds west a distance of 68.74 feet to a point; thence north 27 degrees 45 minutes 18 seconds east a distance of 190.81 feet to a point; thence north 05 degrees 14 minutes 04 seconds west a distance of 257.67 feet to a point; thence north 42 degrees 25 minutes 45 seconds east a distance of 72.08 feet to a point on the southerly right of way of West Corporate Court (80' R/W and varies); thence along said right of way northeasterly along the arc of a curve to the left having a radius of 75.00 feet a distance of 193.21 feet to a point, said arc being subtended by a chord north 45 degrees 59 minutes 05 seconds east a distance of 144.05 feet; thence northeasterly along the arc of a curve to the right having a radius of 25.00 feet a distance of 24.32 feet to a point, said arc being subtended by a chord north 00 degrees 02 minutes 56 seconds east a distance of 23.37 feet; thence north 27 degrees 54 minutes 57 seconds east a distance of 83.89 feet to a point; thence departing the right of way of West Corporate Court south 62 degrees 05 minutes 03 seconds east a distance of 383.90 feet to a point; thence north 29 degrees 36 minutes 50 seconds east a distance of 25.00 feet to a point; thence south 62 degrees 05 minutes 03 seconds east a distance of 216.99 feet to a point; thence south 12 degrees 08 minutes 33 seconds west a distance of 59.58 feet to a point; thence south 12 degrees 08 minutes 01 seconds west a distance of 362.52 feet to a point on the northerly right of way of Skyview Drive (80' R/W and varies); thence along said right of way south 84 degrees 49 minutes 24 seconds west a distance of 522.93 feet to a point; thence southwesterly along the arc of a curve to the left having a radius of 1940.07 feet a distance of 179.62 feet to a point, said arc being subtended by a chord south 82 degrees 12 minutes 18 seconds west a distance of 179.62 feet, said point being the true point of beginning.

Said tract contains 9.0240 acres.

\9707020.8 (EXECUTION VERSION)