Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and Debtors
in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - - x
In re:                          :   Chapter 11
                                :
CIRCUIT CITY STORES, INC.,      :   Case No. 08-35653 (KRH)
et al.,                         :
                                :   Jointly Administered
                  Debtors.      :   **Obj. Deadline: August 20, 2009 at**
- - - - - - - - - - - - - - - x     **5:00 p.m. (ET)**

### NOTICE OF PROPOSED SETTLEMENT

PLEASE TAKE NOTICE that, on July 23, 2009, the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") entered the Order Pursuant To 11 U.S.C. §§ 105 and 363, and Fed. R. Bankr. P. 2002, 9006, and 9019 Authorizing the Establishment of Procedures to Settle Certain Pre-Petition and Post-Petition Claims and Causes of Action Without Further Court Approval (D.I. 4401, the "Order").[1]  A copy of the Order (without exhibits) is annexed as Exhibit 1.

---

[1]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Destruction Order.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Order, the above-captioned debtors and debtors in possession (collectively, the "Debtors")[2] are authorized to negotiate and enter into stipulation and settlement agreements with third parties, subject to the procedures set forth in the Order and outlined herein.

PLEASE TAKE FURTHER NOTICE that, at this time, the Debtors have entered into a stipulation and settlement agreement (the "Settlement") with Netezza, a copy of which is annexed as <u>Exhibit 2</u>.

### SUMMARY OF SETTLEMENT TERMS[3]

PLEASE TAKE FURTHER NOTICE that, in accordance with paragraph 10(b) of the Order, the material terms of the Settlement are as follows:

(i) The Proposed Settlement is a Tier I Settlement.

(ii) The Settlement is between the Debtors and Netezza Corporation.

---

[2]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Circuit City Stores, Inc. (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875), Ventoux International, Inc. (1838), Circuit City Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia, Inc. (2821), Circuit City Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Venture Corp. (0311), PRAHS, Inc.(n/a), XSStuff, LLC (9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC (3360), and Circuit City Stores PR, LLC (5512).  The address for Circuit City Stores West Coast, Inc. is 9250 Sheridan Boulevard, Westminster, Colorado 80031.  For all other Debtors, the address was 9950 Mayland Drive, Richmond, Virginia 23233 and currently is 4951 Lake Brook Drive, Glen Allen, VA 23060.

[3]   **This section of the notice constitutes a summary of the material terms of the Settlement and is being provided for convenience only and should not be relied upon in any way.  All parties are strongly encouraged to review the Settlement in its entirety.  In the event there is a conflict between the notice and the Settlement, the Settlement shall control in all respects.**

(iii) The Debtors and Netezza are parties to an agreement (the "Hardware Agreement") by which the Debtors purchased from Netezza certain hardware equipment (the "Purchased Hardware") and specified maintenance and support services (the "Maintenance Services").  In light of the Debtors' liquidation, the Debtors have no further need or use for the Purchased Hardware or the Maintenance Services and seek to reject the Hardware Agreement effective as of July 1, 2009.  Though the Debtors' liquidation agent marketed the Purchased Hardware, such efforts were unsuccessful in locating a third-party purchaser.  Accordingly, the Settlement provides that Netezza will remove the Purchased Hardware from the storage facility where it is located at Netezza's sole cost and expense by August 24, 2009.

(iv) The sole continuing obligation under the Hardware Agreement is the provision of the Maintenance Services by Netezza to the Debtors and the payment of maintenance fees (the "Maintenance Fees") by the Debtors to Netezza. The Debtors have pre-paid the Maintenance Fees for the Maintenance Services through and including September 30, 2010.  Accordingly, under the Settlement, Netezza will remit payment to the Debtors in the amount of $341,274.61 on account of the pre-paid Maintenance Fees by no later than August 31, 2009.

(v) As part of the Settlement, the Debtors have agreed to waive any and all causes of action they may have against Netezza arising under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549 and 550 (the "Avoidance Actions"). The Debtors have conducted an analysis of potentially avoidable transfers.  Although the Debtors made certain transfers to Netezza within the 90-day period prior to the Petition Date, all or a portion of such transfers is being refunded as part of the Settlement.  To the extent that a portion of such transfers are

not being refunded, the Debtors believe the
transfers may be subject to one or more valid
defenses.

### TIME AND PLACE FOR FILING OBJECTIONS TO THE PROPOSED SETTLEMENT OR REQUESTING ADDITIONAL INFORMATION OR TIME TO CONSIDER THE SETTLEMENT

PLEASE TAKE FURTHER NOTICE that, in accordance
with paragraph 10(c) of the Order, any Notice Party may
object (each an "Objection") to or request additional time
or information (each a "Request") to evaluate the
Settlement.

PLEASE TAKE FURTHER NOTICE that all Objections
and Requests must be in writing and received by counsel to
the Debtors and counsel to the Official Committee of
Unsecured Creditors (see information below) by no later
**August 20, 2009 at 5:00 p.m. (ET)** (the "Objection
Deadline").  Each Objection or Request must be served on (i)
the attorneys for the Debtors, (a) Skadden, Arps, Slate,
Meagher & Flom, LLP, One Rodney Square, P.O. Box 636,
Wilmington, DE  19899, Attn: Gregg M. Galardi
(gregg.galardi@skadden.com) and Ian S. Fredericks
(ian.fredericks@skadden.com) and (b) McGuireWoods LLP, One
James Center, 901 E. Cary Street, Richmond, VA  23219, Attn:
Douglas M. Foley (dfoley@mcguirewoods.com) and Daniel F.
Blanks (dblanks@mcguirewoods.com), and (ii)(a) Pachulski
Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 11th
Floor, Los Angeles, California 90067-4100, Attn: Jeff
Pomerantz (jpomerantz@pszjlaw.com) and (b) 780 Third Avenue,
36th Floor, New York, NY 10017-2024, Attn: Robert Feinstein
(rfeinstein@pszjlaw.com).

PLEASE TAKE FURTHER NOTICE that if you object to
the Settlement and you do not want the Debtors to proceed
with Settlement or you want the Court to consider your
views concerning such Settlement, you or you attorney must
also:

file in writing with the Court, Clerk of Court,
United States Bankruptcy Court, 701 East Broad
Street, Suite 4000, Richmond, Virginia 23219, or
electronically (www.vaeb.uscourts.gov), a written

Objection pursuant to Local Bankruptcy Rule 9013-1(H). If you mail your Objection to the Court for filing, you must mail it early enough so the Court will **receive it on or before August 20, 2009 at 5:00 p.m. (ET)**

**Any Objection to a Settlement must be submitted by the method described in the foregoing sentence.  Objections will be deemed filed only when actually received at the address listed above.**

PLEASE TAKE FURTHER NOTICE that, pursuant to paragraph 10(d) of the Order, if a Notice Party submits a Request, only such Notice Party shall have the later of (i) an additional five (5) days to object to the Settlement or (ii) in the case of a Request for additional information, three (3) days after receipt by the Notice Party of the additional information requested.  Each Notice Party may only make one Request for additional time per Settlement Agreement, unless otherwise agreed to by the Debtors in their sole discretion.

PLEASE TAKE FURTHER NOTICE that, pursuant to paragraph 10(c) of the Order, if no Objection or Request is filed and served upon counsel for the Debtors and counsel for the Committee of Unsecured Creditors or counsel to the Debtors and counsel for the Committee of Unsecured Creditors do not receive a Request prior to the expiration of the Objection Deadline (as may be extended by Requests, if any, the **Debtors shall be authorized to enter into and consummate the Settlement without further order of the Court or any other action by the Debtors**.


Dated: August 13, 2009    SKADDEN, ARPS, SLATE, MEAGHER &
      Richmond, Virginia  FLOM, LLP
                                    Gregg M. Galardi, Esq.
                                    Ian S. Fredericks, Esq.
                                    P.O. Box 636
                                    Wilmington, Delaware 19899-0636
                                    (302) 651-3000

                                          - and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Chris L. Dickerson, Esq.
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

                                        - and –

MCGUIREWOODS LLP

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and Debtors
in Possession

6

**EXHIBIT 1**

**(Order w/out Exhibit(s))**

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

                    – and –

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

- - - - - - - - - - - - - - x
                                :
In re:                          :   Chapter 11
                                :
CIRCUIT CITY STORES, INC.,      :   1Case No. 08-35653 (KRH)
et al.,                         :
                                :
              Debtors.          :   Jointly Administered
- - - - - - - - - - - - - - x

**ORDER UNDER 11 U.S.C. §§ 105 AND 363, AND FED. R. BANKR.
P. 2002, 9006, AND 9019 AUTHORIZING THE ESTABLISHMENT OF
PROCEDURES TO SETTLE CERTAIN PRE-PETITION AND POST-
PETITION CLAIMS AND CAUSES OF ACTION WITHOUT FURTHER COURT
APPROVAL**

Upon the motion (the "Motion")[1] of the Debtors

for entry of an order, pursuant to sections 105 and 363

---

[1]   Each capitalized term not otherwise defined herein shall have the
      meaning ascribed to it in the Motion.

of title 11 of the United States Code (the "Bankruptcy
Code") and Rules 2002, 9006 and 9019 of the Federal
Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),
for entry of an order authorizing the establishment of
procedures to settle certain pre-petition and post-
petition claims and causes of action without further
court approval; and the Court having reviewed the
Motion; and upon the record herein; and after due
deliberation thereon; and good and sufficient cause
appearing therefor, it is hereby:

**FOUND, DETERMINED, AND CONCLUDED that:**

1.    Based on the affidavits of service filed,
due, proper and adequate notice of the Motion has been
given in accordance with the Case Management Order and
that no other or further notice is necessary;

2.    The Notice Procedures are fair,
reasonable, and appropriate.

3.    The Settlement Procedures are fair
reasonable, and appropriate.

4.    The Notice and Settlement Procedures were
proposed in good faith.

5.    Pursuant to Bankruptcy Rule 9006, cause exists to shorten the applicable notice period in Bankruptcy Rule 2002(a)(3) with respect to each Settlement.

6.    Upon the expiration of the applicable Notice Period without an objection or upon resolution of any filed objection after the applicable Notice Period, each Settlement that complies with the Notice and Settlement Procedures shall be deemed (i) fair and reasonable and (ii) to have satisfied the standards under Bankruptcy Code sections 105 and 363 and Bankruptcy Rule 9019.

7.    The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**ORDERED, ADJUDGED, AND DECREED that:**

8.    The Motion is GRANTED.

9.    The Debtors are authorized, but not directed, to compromise and settle Disputed Claims and Cause of Action and Receivable Claims in accordance with the Settlement Procedures.

3

10.    The Debtors shall provide key parties in interest with notice of each proposed Settlement.    The Notice Procedures are as follows:

(a)    The Debtors shall give written notice, by email or facsimile, if available, or overnight courier if email or facsimile are not available, of each proposed Settlement (the "Settlement Notice") to (i) the United States Trustee, (ii) counsel for the Committee of Unsecured Creditors, (iii) any party to the Settlement, and (iv) the Core Group and 2002 List (collectively, the "Notice Parties").

(b)    The Settlement Notice (or the Settlement Agreement) shall specify (i) the identity of the other party to the Settlement, (ii) a summary of the dispute with such other party, including a statement of the Debtors' reasonable estimate of the Settlement Claim amount and the basis for the controversy, (iii) an explanation of why the Settlement of such Settlement Claim is favorable to the Debtors, their estates, and their creditors, and (iv) a copy of the proposed settlement agreement ("Settlement Agreement").

(c)    The Notice Parties may object to or request additional time to evaluate the proposed Settlement in writing by no later than 5:00 p.m. (ET) (i) five (5) days for both Tier I Disputed Claims and Tier I Cause of Action and Receivable Claims or (ii) ten (10) days for both Tier II Disputed Claims and Tier II Cause of Action and Receivable Claims (each an individual "Notice Period") and serve such objection or request on counsel to the Debtors and counsel for the Creditors' Committee on or before the

expiration of the applicable Notice.  If the
Debtors are compromising more than one
Disputed Claim and/or Cause of Action and
Receivable Claim, the Tier II Notice Period
shall apply to such Settlement.  If no
objection or written request is filed and
served upon counsel for the Debtors and
counsel for the Creditors' Committee or
counsel to the Debtors does not receive a
written request for additional information
and/or additional time prior to the
expiration of the applicable Notice Period,
the Debtors shall be authorized to enter
into and consummate the Settlement Agreement
without further order of the Court or any
other action by the Debtors.

(d)    If a Notice Party provides a written
request to counsel for the Debtors for
additional information or time to evaluate
the proposed Settlement, only such Notice
Party shall have the later of (i) an
additional five (5) days to object to the
proposed Settlement or (ii) in the case of a
request for additional information, three
days after receipt by the Notice Party of
the additional information requested.  Each
Notice Party may only make one request for
additional time per Settlement Agreement,
unless otherwise agreed to by the Debtors in
their sole discretion.

(e)    If a Notice Party objects to the
proposed Settlement within the defined
Notice Period for that particular Tier of
Disputed Claim or Cause of Action and
Receivable Claim, (or the additional period
in the case of a Notice Party that has
timely requested additional time or
information to evaluate the proposed
Settlement) (the "Objection Deadline") and
the Debtors and such objecting Notice Party
are unable to reach a consensual resolution,

5

the Debtors will not take any further action
to consummate the proposed settlement
without first obtaining Court approval for
that specific Settlement.  The Debtors are
authorized to schedule the Settlement for a
hearing at the next scheduled omnibus
hearing following the Objection Deadline (or
any subsequent hearing) without filing a
separate motion or other pleading.

(f)    If the Objection Deadline has passed
and no objection has been filed with the
Court or request for additional time or
information has been received by the
Debtors, the Debtors are authorized, but not
directed, to file a "Certificate of No
Objection" with the Court; provided,
further, that each such Certificate shall
set forth a statement that no objection was
filed or received (or if any objection was
filed or received, such objection has been
resolved) and no request for additional time
or information was received or, if such
request was received, the additional period
of review has expired.

(g)    An objection will be considered
properly filed and served only if it is
filed with the Court, and actually received
by the following parties on or before the
Objection Deadline: (i) Clerk of the
Bankruptcy Court, United States Bankruptcy
Court, 701 East Broad Street – Room 4000,
Richmond, VA  23219, (ii) the attorneys for
the Debtors, (a) Skadden, Arps, Slate,
Meagher & Flom, LLP, One Rodney Square, P.O.
Box 636, Wilmington, DE  19899, Attn: Gregg
M. Galardi (gregg.galardi@skadden.com) and
Ian S. Fredericks
(ian.fredericks@skadden.com) and (b)
McGuireWoods LLP, One James Center, 901 E.
Cary Street, Richmond, VA  23219, Attn:
Douglas M. Foley (dfoley@mcguirewoods.com)

and Daniel F. Blanks
(dblanks@mcguirewoods.com), and (iii)(a)
Pachulski Stang Ziehl & Jones LLP, 10100
Santa Monica Blvd., 11th Floor, Los Angeles,
California 90067-4100, Attn: Jeff Pomerantz
(jpomerantz@pszjlaw.com) and (b) 780 Third
Avenue, 36th Floor, New York, NY 10017-2024,
Attn: Robert Feinstein
(rfeinstein@pszjlaw.com).

(h)    All time periods set forth in the
Notice Procedures shall be calculated in
accordance with Bankruptcy Rule 9006.

11.   Subject to the Notice Procedures, the
Debtors are authorized to compromise and settle Disputed
Claims as follows:

(a)   Tier I With respect to Disputed
Claims, the Debtors, in their sole
discretion, may negotiate, execute and
consummate written Settlement Agreements
with the Claimants that will be binding on
the Debtors and their estates without
further action by this Court.  The Debtors
may, in full settlement of such Disputed
Claims, grant any Claimant an allowed claim
of an agreed upon priority or administrative
expense claim, as applicable, in an amount
not to exceed $500,000.

(b)   Tier II With respect to Disputed
Claims, the Debtors, in their sole
discretion, may negotiate, execute and
consummate written Settlement Agreements
with the Claimants that will be binding on
the Debtors and their estates without
further action by this Court.  The Debtors
may, in full settlement of such Disputed
Claims, grant any Claimant an allowed claim
(priority or non-priority, as the case may

7

be) or administrative expense claim, as
applicable, in an amount greater than
$500,000.

12.  Subject to the Notice Procedures, the
Debtors are authorized to compromise and settle Cause of
Action and Receivable Claims as follows:

(a)  Tier I With respect to pre- and post-
petition Cause of Action and Receivable
Claims, the Debtors, in their sole
discretion, may negotiate, execute and
consummate written Settlement Agreements
with third parties that will be binding on
the Debtors and their estates without
further action by this Court.  The Debtors
may, in full settlement of such Cause of
Action and Receivable Claims, compromise or
settle a Cause of Action and Receivable
Claim resulting in a cash payment to the
Debtors' estates of a value (i) equal to or
greater than seventy-five percent (75%) of
the Debtors' original reasonable estimate of
the Cause of Action and Receivable Claim
amount and (ii) equal to or less than
$1,000,000.

(b)  Tier II With respect to pre- and
post-petition Cause of Action and Receivable
Claims, the Debtors, in their sole
discretion, may negotiate, execute and
consummate written Settlement Agreements
with third parties that will be binding on
the Debtors and their estates without
further action by this Court.  The Debtors
may, in full settlement of such Cause of
Action and Receivable Claims, compromise or
settle a Cause of Action and Receivable
Claim resulting in a cash payment to the
Debtors' estates of a value equal to (i)
more than $1,000,000 or (ii) less than

8

> seventy-five percent (75%) of the Debtors'
> original reasonable estimate of the Cause of
> Action and Receivable Claim amount.

13.  To memorialize the Settlements, the Debtors are authorized in their sole discretion, but not directed, to enter into Settlement Agreements substantially in the form of Exhibit A attached hereto; provided, further, that the material terms of each Settlement Agreement may vary depending upon the specific facts and circumstances of each Settlement and nothing herein or therein shall be construed as impairing the Debtors' ability to tailor the form of the Settlement Agreement to each specific Settlement.

14.  The Debtors are authorized, but not directed, to resolve all of the Disputed Claims and Cause of Action and Receivable Claims of a single party in a single Settlement Agreement.

15.  The Debtors shall provide written notice to Kurtzman Carson Consultants LLC ("KCC"), the Debtors' authorized claims and noticing agent, with respect to any proof of claim settled pursuant to these Settlement Procedures; provided, further, that, if applicable, KCC

is authorized and directed to amend the claims register accordingly without further order of the Court.

16.   Following entry of this Order, unless otherwise agreed to between the Debtors and the Creditors' Committee, the Debtors' advisors shall provide weekly updates concerning ongoing settlement discussions to the Creditors' Committee's advisors. These updates shall include, without limitation, non-privileged information mutually agreed to among the parties' advisors.   Once the Debtors reach an agreement in principle with a third party, the Debtors shall share the material terms of the Settlement with the Creditors' Committee's advisors.   All information shared with the Creditors' Committee's advisors shall be deemed shared subject to the existing confidentiality agreement with the Debtors.

17.   Assuming no objection has been filed by the applicable Objection Deadline, immediately after the expiration of the Notice Period (or, in the case of a filed objection that has been resolved, upon filing of a Certificate of No Objection) the Settlement Agreement

10

shall be deemed to be a final order of this Court for all purposes, including for purposes of any appeal.

18. In the event there is an inconsistency between the Motion and this Order, this Order shall control.

19. The requirement under Local Rule 9013-1(G) of the Local Rules for the United States Bankruptcy Court for the Eastern District of Virginia to file a memorandum of law in connection with the Motion is hereby waived.

20.   This Court retains jurisdiction to hear and determine all matters arising from or related to the Motion, this Order or any Settlement.

Dated:  Richmond, Virginia
Aug 7 2009_____, 2009

/s/ Kevin R. Huennekens
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:                    Entered on docket: August 10 2009

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

      - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

      - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors
and Debtors in Possession

12

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Douglas M. Foley
Douglas M. Foley

13

**EXHIBIT 2**

**(Settlement)**

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

          - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
                           :
In re:                     :    Chapter 11
                           :
CIRCUIT CITY STORES, INC., :    Case No. 08-35653 (KRH)
et al.,                    :
                           :
            Debtors.       :    Jointly Administered
- - - - - - - - - - - - - - x

**SETTLEMENT AGREEMENT AND STIPULATION BY AND AMONG THE
DEBTORS AND NETEZZA CORPORATION REGARDING REJECTION OF
EXECUTORY CONTRACT AND RELATED RELIEF**

This stipulation and agreement (the

"Stipulation") is made this 13th day of August, 2009 by

and between the debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors")[1] and

Netezza Corporation ("Netezza").  The Debtors and

Netezza are collectively referred to herein as the

"Parties".

### GENERAL BACKGROUND

WHEREAS, on November 10, 2008 (the "Petition

Date"), the Debtors each filed a voluntary petition in

the United States Bankruptcy Court for the Eastern Dis-

trict of Virginia (the "Court") under chapter 11 of

title 11 of the United States Code (the "Bankruptcy

Code"); and

WHEREAS, the Debtors have continued as debtors

in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code; and

WHEREAS, on November 12, 2008, the Office of

the United States Trustee for the Eastern District of

---

[1]  The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
Inc. (0875), Ventoux International, Inc. (1838), Circuit City
Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC Dis-
tribution Company of Virginia, Inc. (2821), Circuit City Proper-
ties, LLC (3353), Kinzer Technology, LLC (2157), Abbott Advertis-
ing Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Ven-
ture Corp. (0311), Prahs, Inc.(n/a), XSStuff, LLC (9263), Mayland
MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics, LLC
(3360), and Circuit City Stores PR, LLC (5512).  The address for
Circuit City Stores West Coast, Inc. is 9250 Sheridan Boulevard,
Westminster, Colorado 80031.  For all other Debtors, the address
was 9950 Mayland Drive, Richmond, Virginia 23233 and currently is
4951 Lake Brook Drive, Glen Allen, VA 23060.

Virginia appointed a statutory committee of unsecured
creditors (the "Creditors' Committee").

WHEREAS, to date, no trustee or examiner has
been appointed in these chapter 11 cases.

WHEREAS, on January 16, 2009, the Court autho-
rized the Debtors, among other things, to conduct going
out of business sales at the Debtors' remaining 567
stores pursuant to an agency agreement (the "Agency
Agreement") between the Debtors and a joint venture, as
agent (the "Agent").  On January 17, 2009, the Agent
commenced going out of business sales pursuant to the
Agency Agreement at the Debtors remaining stores.  As of
on or about March 8, 2009, the going out of business
sales concluded.

WHEREAS the Debtors are authorized under the
Court's Order Under 11 U.S.C. §§ 105 and 363, and Fed. R.
Bankr. P. 2002, 9006, and 9019 Authorizing the Estab-
lishment of Procedures to Settle Certain Pre-Petition
and Post-Petition Claims and Causes of Action Without
Further Court Approval, dated August 7, 2009 (Docket No.

4401, the "Settlement Procedures Order")[2] to enter into
this Stipulation, subject to the Notice Procedures.

## SETTLEMENT BACKGROUND

WHEREAS, Circuit City and Netezza  are parties
to that certain agreement, including any amendments or
modifications thereto and any and all schedules,
supplements, addenda or similar attachments thereto
(collectively, the "Agreement").  The Agreement is
attached hereto as Exhibit 1.

WHEREAS, pursuant to the Agreement, Circuit
City purchased from Netezza certain hardware equipment,
including a 10050D Netezza Performance Server, a 10100D
Netezza Performance Server and a 10200P Netezza
Performance Server (collectively, the "Purchased
Hardware") and purchased from Netezza specified
maintenance and support services (the "Maintenance
Services").

WHEREAS, in light of the Debtors' liquidation,
the Debtors have no further need or use for the
Purchased Hardware or the Maintenance Services.

---

[2]  All capitalized terms not otherwise defined herein shall have the
     meaning ascribed to such terms in the Settlement Procedures Order.

WHEREAS, the Licensed Hardware is located at a certain IBM facility in Southbury, Connecticut (the "Hardware Storage Facility").

WHEREAS, the sole continuing obligation under the Agreement are the provision of Maintenance Services by Netezza to the Debtors and the payment of maintenance fees (the "Maintenance Fees") to Netezza by the Debtors. The Debtors paid the Maintenance Fees for three years of Maintenance Services to Netezza in advance. Currently, the Debtors have pre-paid the Maintenance Fees for Maintenance Services through and including September 30, 2010.

WHEREAS, the Debtors and Netezza have reached an agreement concerning rejection of the Agreement and a refund of certain of the Maintenance Fees.

NOW, THEREFORE, subject to and in accordance with the Settlement Procedures Order, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties hereby STIPULATE AND AGREE AND IT IS HEREBY ORDERED that:

1.      The Agreement shall be deemed rejected as of July 1, 2009 (the "Rejection Date").

2.      Netezza shall remove the Purchased

Hardware from the Hardware Storage Facility by August 24,

2009 at Netezza's sole cost and expense.  Except with

respect to obligations under this Stipulation, upon

removal of the Purchased Hardware, Netezza has and will

have no obligation or liability whatsoever to the

Debtors for the Purchased Hardware.

3.      By no later than August 31, 2009,

Netezza shall remit payment to the Debtors in the amount

of $341,274.61 on account of pre-paid Maintenance Fees.

4.      Other than obligations under this

Stipulation, the Debtors are not aware of any

outstanding amounts owed by Netezza to the Debtors.

5.      The Debtors and their estates hereby

waive and release any and all causes of action they may

have against Netezza arising under Bankruptcy Code

sections 502(d), 544, 545, 547, 548, 549 and 550 (the

"Avoidance Actions").  Netezza hereby waives and

releases any and all claims it may have under Bankruptcy

Code section 502(g).

6.      Neither this Stipulation, nor any state-

ment made or action taken in connection with the negoti-

ation of this Stipulation, shall be offered or received

in evidence or in any way referred to in any legal ac-
tion or administrative proceeding among or between the
parties hereto, other than as may be necessary (a) to
obtain approval of and to enforce this Stipulation or (b)
to seek damages or injunctive relief in connection the-
rewith.

     7.   Each of the parties hereto shall execute
and deliver any and all additional papers, documents and
other assurances, and shall do any and all acts and
things reasonably necessary or appropriate in conjunc-
tion with the performance of their respective obliga-
tions hereunder.

     8.   No provision of this Stipulation is in-
tended to confer any rights, benefits, remedies, obliga-
tions or liabilities hereunder upon any person other
than the parties hereto and their respective successors.

     9.    This Stipulation shall be governed by
and construed in accordance with the laws of the
Commonwealth of Virginia without regard to choice of law
provisions.  The Bankruptcy Court shall retain exclusive
jurisdiction to hear and determine all matters relating
to or arising from this Stipulation; _provided_, _however_,
that, except for disputes related to this Stipulation,

nothing herein shall be deemed consent by Netezza to the personal jurisdiction of this Court in any other matter or dispute in the Debtors' chapter 11 cases.

10.    This Stipulation contains the entire agreement and understanding between the Debtors and Netezza with respect to the subject matter hereof, and supersedes and replaces all prior negotiations or proposed agreements, written or oral.

11.    This Stipulation may be executed in counterparts, each of which shall be deemed to be an original, but all of which, together will constitute one and the same agreement.  This Stipulation may be executed by facsimile or electronic signature which shall have the same force and effect as an original signature.

12.    This Stipulation is effective upon the later of (i) execution by both parties and (ii) the expiration of the applicable Notice Period.

13.    This Stipulation shall not be modified, altered, amended or vacated without the written consent of all parties hereto or order of the Bankruptcy Court.

IN WITNESS WHEREOF, the Parties have set their

hands in agreement as of the date written above.

**CIRCUIT CITY STORES, INC.**

By:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636 (302) 651-
3000

            - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Chris L. Dickerson, Esq.
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

            - and -

MCGUIREWOODS LLP

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for the Debtors and Debtors in
Possession

**NETEZZA CORPORATION**

By:

Corey C. DuFresne, Esq.
26 Forest Street
Marlborough, MA 01752
(508) 382-8200

Vice President and General Counsel
for Netezza

**EXHIBIT 1**

**(Agreement)**

Contract ID:  1913

Hardware appliance purchase, support and training.

Netezza Corporation

General Terms and Conditions



## ContractFile

**Circuit City Stores, Inc.**
**Robin Pasini**
**Procurement - DR3,2**
**9954 Mayland Drive**
**Robin_Pasini@circuitcity.com**

| Vendor | Title |
|---|---|
| Netezza Corporation | General Terms and Conditions |

**Please Copy:**     Robin Pasini

Justin Schauer

Jeanette Amoroso


John Schlegelmilch

Rob Bennett

Glynn Evans

Bill McCorey

Phil Dunn

Phil Schoonover

**Vendor Contact:**     Bart Diminno

Director Retail and CPG Sales

,

(W) 914-793-5752

(C) 917-270-0490

bdeminno@netezza.com

**Contract Information:**

| | |
|---|---|
| Contract Type: | Purchase Agreement |
| Contract Start Date: | 8/15/2007 |
| Contract End Date: | None |
| Contract Value: | $2,713,200.00 |
| Description: | Hardware appliance purchase, support and training. |

**Proprietary and Confidential - Not to be disclosed outside of Circuit City Stores, Inc.**



**MASTER CUSTOMER AGREEMENT**
Agreement No. 20070813001

## GENERAL TERMS AND CONDITIONS

This Agreement is made and entered into as of 8/15/07 ("Effective Date") by and between Netezza Corporation ("**Netezza**"), a Delaware corporation having a principal place of business at 200 Crossing Boulevard, Framingham, Massachusetts 01702, and Circuit City Stores, Inc. ("**Customer**"), a Virginia corporation having a principal place of business at 9950 Mayland Dr. Richmond Virginia 23233.

### 1.    Definitions

"Affiliate" means, with respect to an entity (the "Entity"), any legal entity (such as a corporation, partnership, or limited liability company) that controls or is controlled by or under common control with the Entity. For the purposes of this definition, the term "control" means (i) beneficial ownership of at least fifty percent (50%) of the voting securities of a corporation or other business organization with voting securities, or (ii) a fifty percent (50%) or greater interest in the net assets or profits of a partnership or other business organization without voting securities.

"Agreement" means this Master Customer Agreement, together with any attached Schedules.

"Documentation" means the installation and operating instructions, user manuals, help files, 'README' files, and all technical information and materials, in written or electronic form, provided by Netezza to Customer and intended for use in connection with Products.

"Hardware" means the computer hardware components of a Netezza Performance Server system, as delivered by Netezza, including but not limited to host computer(s), memory, hard disk drives, network devices, and other components, as well as replacement and spare parts.

"Installed Site" means a facility where Products are installed.

"Intellectual Property Rights" means patent, trademark, copyright, trade secret, and any other intellectual and intangible property rights, including but not limited to all registrations and applications for such rights, and all continuations, continuations in part, divisional applications, and renewals of any of the foregoing.

"Products" means Hardware, Software, and Documentation.

"Purchase Order" means a purchase order for Products and/or Services submitted to Netezza by Customer.

"Services" means services offered by Netezza or its authorized service providers in connection with Products, including but not limited to maintenance and support services.

"Software" means any computer software or firmware (i) installed on or embedded in Hardware, or (ii) otherwise provided by Netezza for use with Products, including but not limited to any applicable updates, patches, or new releases that Netezza or its licensors may provide from time to time.

"Training Services" means training and educational Services provided by Netezza or its authorized service providers in connection with the Products.

"Training Services Materials" means course manuals provided as part of training Services.

### 2.    Orders, Delivery, and Payment

2.1    Orders.    Customer may place orders by issuing Purchase Orders. All Purchase Orders are subject to acceptance by Netezza, which acceptance will not be unreasonably withheld, conditioned, or delayed. The terms and conditions of this Agreement shall supersede any and all terms and conditions attached to a Purchase Order.

2.2    Delivery.    Netezza shall make a commercially reasonable effort to fulfill Purchase Orders promptly. Delivery of Products and Services to Customer shall be subject to the right and ability of Netezza to make such sales and obtain required licenses and permits, under all applicable laws and regulations. Products shall be shipped by Netezza or its agent to a facility designated by Customer, freight prepaid and insured.

2.3    Invoices.    Netezza shall invoice Customer for Products upon shipment and for Services as agreed by the parties, except that support fees will be invoiced annually in advance.

2.4    Shipping Charges.    Customer will pay all shipping charges reasonably incurred in the delivery of Products ordered by Customer.

2.5    Taxes and Other Assessments.    All payments, fees, and other charges payable by Customer to Netezza under this Agreement are exclusive of all federal, state, and local taxes, levies, tariffs, duties, value-added taxes, export and import fees, withholding, and all other taxes or government assessments (collectively, "Taxes").



Customer will bear and be responsible for the payment of all Taxes incurred in the purchase and/or shipment of Products and Services ordered by Customer (except taxes based on Netezza's net income), or will provide Netezza with a tax exemption certificate acceptable to the applicable taxing authorities. Amounts paid by Customer to Netezza shall be grossed-up for any non-refundable withholding tax imposed by a foreign governmental entity on amounts payable hereunder. Customer will provide Netezza with such evidence as Netezza may reasonably request to establish that all Taxes have been paid.

**2.6** Terms of Payment. All payments made to Netezza shall be in U.S. Dollars. Payment for Products and Services shall be due forty-five (45) days from receipt of invoice unless otherwise agreed in writing by the parties. No part of any amount payable to Netezza hereunder may be reduced due to any counterclaim, set-off, adjustment, or other right which Customer might have against Netezza, any other party, or otherwise.

**2.7** Additional Terms. Any additional terms shall be set forth on the attached Schedule A.

**3.    Support and Training**

**3.1** Support. Netezza will provide support for Products as set forth on the attached Schedule B, provided that Customer pays support fees when due as set forth above. Support for each Product will commence on delivery. Netezza will continue to provide support for Products for at least five (5) years from the date of purchase, provided that (i) Customer continues to pay support fees to Netezza as they become due, and (ii) Customer installs a new Software release, available at no additional cost to Customer, at least once per year.

**3.2** Training. Upon Customer making its first purchase of Products, Netezza will provide to Customer at no additional cost, Training Services according to the terms set forth on Schedule C. For Training Services provided at no additional charge, Customer shall order Training Services by submitting to Netezza a signed Training Services order form referencing this Agreement ("Training Services Order Form"). For all other Training Services, Customer shall order Training Services by submitting to Netezza a signed Training Services Order Form and a Purchase Order or Quote/Order Form each referencing this Agreement.

**4.    Permitted Use and Restrictions**

**4.1** Permitted Use. Unless specifically identified as a development system at the time of purchase, Products may be used for either live production or development use. Products shall be used by

Customer solely for its internal business purposes, and shall be accessed and used only by Customer's authorized employees, contractors, and customers (if applicable). Any Product provided as a development system shall be used solely for internal development purposes and shall not be used in a live production environment. Notwithstanding the foregoing, a development system may be used for temporary disaster recovery purposes, provided that Customer promptly transfers operations back to an authorized live production system.

**4.2** Restrictions. Customer shall not: (i) disassemble, decompile, reverse engineer, translate, or otherwise attempt to reconstruct any Products, or attempt to derive or obtain any source code, structure, algorithms, process, technique, technology, know-how, or ideas embodied by, underlying, or contained in Products; (ii) remove any product identification or proprietary rights notices from Products; (iii) sell, sublicense, lease, lend, distribute, transfer, or otherwise provide access to Products to any third party except as expressly permitted by this Agreement; (iv) modify or create derivative works of any Products; or (v) use or copy Products except as expressly provided by this Agreement. Customer shall not permit or facilitate any other person or entity from taking any actions which Customer is prohibited from taking pursuant to this Agreement.

**4.3** Training Services Materials License. In the event that Customer receives Training Services, Netezza grants Customer a non-exclusive, non-transferable (except as set forth herein), non-sublicenseable, perpetual (subject to termination for Customer's material breach of this Section 4.3) right to use Training Services Materials provided with such Training Services in accordance with this Agreement. Customer may copy Training Services Materials as reasonably necessary for backup or archival purposes.

**4.4** Software License. Copies of Software are licensed and not sold. Netezza grants Customer a non-exclusive, non-transferable (except as set forth herein), non-sublicenseable, perpetual (subject to termination for Customer's material breach of Article 4) right to use Software in accordance with this Agreement. Customer may copy Software as reasonably necessary for backup, archival, or disaster recovery purposes.

**4.5** Open Source Software. For any Software that is identified in the applicable Documentation as open source software, Customer may request the machine-readable source code from Netezza and may use the source code subject to the terms and conditions of the applicable open source license.

# NETEZZA

**MASTER CUSTOMER AGREEMENT**
Agreement No. 20070813001

**4.6** Documentation. Netezza agrees to provide Customer with standard Documentation in electronic form, e.g., PDF (Portable Document Format). Subject to all the terms and conditions of this Agreement, Netezza hereby grants Customer a non-exclusive, non-transferable (except as set forth herein), non-sublicensable, perpetual (subject to termination for Customer's material breach of Article 4) right to reproduce the Documentation solely for internal Customer use.    Customer may reproduce the Documentation in hard copy form as well as in electronic form.

**4.7** Audit Rights.  Netezza will have the right to perform technical audits on Products provided to Customer to ensure compliance with the terms of this Agreement.  Each audit will be conducted at the Installed Site, during Customer's normal business hours, in a manner that is not business disruptive, and with at least five (5) business days prior written notice.

## 5.    Intellectual Property

**5.1** Ownership. Except as expressly stated herein, this Agreement does not constitute a grant of license with respect to any Intellectual Property Rights. Netezza retains all its Intellectual Property Rights, whether or not specifically recognized or perfected under the laws of the country where Products are located. Netezza and its licensors retain all right, title, and interest in Software, Training Services Materials and Documentation.

**5.2** Trademarks.   Neither party grants the other party the right to use its trademarks, service marks, or trade names, whether registered or not, in any promotion or publication (including but not limited to the Internet) without prior written consent.

**5.3** Technology Escrow.  Customer shall have the right to be named, at Netezza's expense, as a beneficiary of Netezza's existing multiparty technology escrow account held by a trusted third party and containing source code and hardware designs for Products.

## 6.    Confidentiality

**6.1** Proprietary Information.   As used in this Agreement, the term "Proprietary Information" shall mean any information disclosed by the disclosing party, obtained by the receiving party, or to which the receiving party has access, whether in written, oral, graphic, machine-readable or other form, including but not limited to that which relates to benchmarks, performance data or test results, computer software (including but not limited to source and object code), computer hardware, algorithms, names and expertise of employees and consultants, know-how, formulae, processes, ideas, inventions (whether patentable or not), schematics, processes, data, designs, drawings,

hardware configuration, research, development, and other technical, business, financial, customer, marketing, and product development plans, forecasts, strategies, agreements with third parties, information or data obtained from third parties, and such other information disclosed by the disclosing party which by the nature of the information is of a type that is reasonably considered to be confidential and/or proprietary.    The receiving party recognizes and acknowledges that the disclosing party's Proprietary Information (and the confidential nature thereof) is critical to the disclosing party's business and that the disclosing party would not enter into this Agreement without assurance that its Proprietary Information and its value will be protected as provided in this Article 6 and elsewhere in this Agreement.  The terms of this Agreement shall be considered the Proprietary Information of each party.

**6.2** Use of Proprietary Information.  The receiving party shall use the disclosing party's Proprietary Information only for the purpose of fulfilling the obligations of this Agreement, and the disclosing party's Proprietary Information shall not be used for any other purpose without the prior written consent of the disclosing party. The receiving party shall hold in confidence, and shall not disclose any Proprietary Information of the disclosing party.   The receiving party shall use at least the same degree of care in handling the disclosing party's Proprietary Information as it uses to protect its own Proprietary Information, but no less than a reasonable standard of care.  The receiving party will notify the disclosing party in writing immediately upon becoming aware of the occurrence of any unauthorized use or release of the disclosing party's Proprietary Information.

**6.3** Affiliates, Employees, and Contractors. Notwithstanding the foregoing, the receiving party may disclose the disclosing party's Proprietary Information to any of its Affiliates, directors, advisors, employees,       or     contractors     (collectively, "Representatives") who have a need to know such Proprietary Information in order to fulfill the obligations of this Agreement, provided that under no circumstances may the receiving party disclose Proprietary Information to competitors of the disclosing party. The receiving party agrees, at its sole expense, to take reasonable measures to restrain its Representatives from prohibited or unauthorized disclosure or use of the disclosing party's Proprietary Information, including but not limited to written confidentiality obligations at least as restrictive as those in this Agreement, and the receiving party shall be responsible for any breaches of its obligations under Article 6 by its Representatives.

**6.4** Exceptions.  The obligations of the receiving party specified in this Article 6 shall not apply, and the receiving party shall have no further obligations, with respect to any of the disclosing party's Proprietary



**MASTER CUSTOMER AGREEMENT**

Agreement No. 20070813001

Information to the extent that such Proprietary Information is: (i) generally known to the public at the time of disclosure or becomes generally known through no wrongful act on the part of the receiving party; (ii) in the receiving party's possession at the time of disclosure otherwise than as a result of the receiving party's breach of any legal obligation; (iii) known to the receiving party through disclosure by a source other than the disclosing party that to the knowledge of the receiving party has the legal right to disclose such Proprietary Information; (iv) independently developed by the receiving party without use of, reference to, or reliance upon the disclosing party's Proprietary Information; or (v) required to be disclosed by the receiving party to comply with a court order or applicable laws or governmental regulations, provided that the receiving party gives prompt written notice of such disclosure to the disclosing party to enable it to seek a protective order or other appropriate remedy, and takes commercially reasonable and lawful actions to avoid and/or minimize the extent of such disclosure and to obtain confidential treatment of any such disclosure.

6.5    Publicity. Neither party shall issue any press releases or announcements, or any marketing, advertising, or other promotional materials, related to this Agreement or referencing the other party without the prior written approval of the other party.

6.6    Product Road Map Information. Netezza may disclose information to Customer related to future products, features, or enhancements ("Product Road Map Information"). Netezza's development efforts and plans are subject to change at any time, without notice. Netezza provides no assurances that Netezza will introduce future products, features, or enhancements disclosed to Customer, and Netezza assumes no responsibility to introduce such products, features, or enhancements. Customer acknowledges and agrees that: (i) Customer is not making current purchasing decisions in reliance on any Product Road Map Information; and (ii) if Netezza delays or never introduces future products, features, or enhancements, Customer's current purchasing decisions would not be affected.

7.    **Limitation of Liability**

7.1    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE LIABILITY OF NETEZZA AND ITS AFFILIATES, LICENSORS, AND SUPPLIERS ARISING IN ANY WAY OUT OF PRODUCTS OR SERVICES, THEIR USE OR DISPOSITION, OR OTHERWISE UNDER THIS AGREEMENT, WHETHER BASED UPON WARRANTY, CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, SHALL NOT EXCEED THE AMOUNT ACTUALLY PAID BY CUSTOMER HEREUNDER FOR PRODUCTS AND SERVICES WITHIN THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRIOR TO THE MOST RECENT EVENT GIVING RISE TO THE LIABILITY.

7.2    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER NETEZZA NOR ITS AFFILIATES, LICENSORS, OR SUPPLIERS WILL BE LIABLE, UNDER ANY CONTRACT, TORT, STRICT LIABILITY, OR OTHER THEORY, FOR ANY SPECIAL, PUNITIVE, MULTIPLE, INCIDENTAL, CONSEQUENTIAL, OR OTHER INDIRECT DAMAGES, OR FOR DAMAGES RELATING TO LOSS OF OR DAMAGE TO DATA, COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES, OR TECHNOLOGY, LOSS OF ANTICIPATED REVENUE OR PROFITS, WORK STOPPAGE, OR IMPAIRMENT OF OTHER ASSETS, WHETHER OR NOT SUCH DAMAGES ARE FORESEEABLE AND WHETHER OR NOT NETEZZA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

7.3    The limitation of liability stated in this Article 7 shall not apply to liability arising under Article 6 (Confidentiality) or Article 9 (Indemnification), or to liability arising from physical damage to property, personal injury, death, gross negligence, or willful misconduct.

8.    **Limited Warranties**

8.1    Product Warranty. For a period of ninety (90) days after delivery to Customer, Netezza warrants that Products will be free from defects in material and workmanship and will, under normal use, conform to the published specifications for the Product. Customer's sole remedy, and Netezza's sole liability, for a failure of a Product to comply with this warranty, shall be: (i) for Netezza to repair or replace the non-conforming Product; or (ii) if repair or replacement is not reasonably practicable, for Customer to return the Product and receive a refund of any payments actually made by Customer to Netezza for such Product. This warranty shall not apply in the event of: (a) use of Products not in accordance with the specifications or Documentation; (b) accident for which Netezza is not responsible; (c) modification of the Product by anyone not approved by Netezza; (d) physical or operating environment not in accordance with the specifications or Documentation; (e) improper maintenance by anyone not approved by Netezza; or (f) failure caused by a product not provided or approved by Netezza. Netezza does not warrant that use of Products will be uninterrupted or error-free.

8.2    Services Warranty. Netezza warrants that it shall perform Services in a professional manner using reasonable care and skill in accordance with industry standards.

8.3    Disclaimer of Warranties. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE



**MASTER CUSTOMER AGREEMENT**

Agreement No. 20070813001

LIMITED WARRANTIES AND REMEDIES FOR BREACH OF WARRANTY IN THIS ARTICLE 8 ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND REMEDIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

## 9.    Indemnification

9.1    <u>Intellectual Property</u>. Netezza shall, at its own expense, defend, indemnify, and hold Customer and Customer's Affiliates, officers, directors, agents, and employees harmless from all damages, liabilities, claims, losses, costs, demands, suits, actions, and reasonable expenses (including but not limited to attorneys' fees and settlement costs) arising out of or related to any third party suits or claims brought against Customer alleging that a Product provided pursuant to this Agreement infringes any Intellectual Property Right of such third party, provided that Netezza is: (i) promptly notified in writing of the claim; (ii) rendered reasonable assistance by Customer as required; and (iii) permitted to direct the defense or settlement negotiations. The foregoing obligation of Netezza does not apply to the extent that a claim of infringement arises from: (a) any Product, or portion or component of such Product (i) which is or was made in whole or in part in accordance with Customer's specifications or instructions and such Customer specifications or instructions are the source of the alleged infringement, (ii) which was modified outside of the specifications or by any party not authorized by Netezza (including Customer), if the alleged infringement relates to such modification, or (iii) which is or was combined or integrated with other products (hardware or software), processes, or materials (including Customer products or other products provided by Customer or any third party) where the alleged infringement relates to such combination, provided that the alleged infringement claim could not be made but for such combination; (b) Customer's continued allegedly infringing activity after being notified in writing by Netezza or after receiving a modification delivered at Netezza's expense that would have avoided the alleged infringement; or (c) a claim based on Intellectual Property Rights owned by Customer or its Affiliates.

9.2    <u>Effect of Infringement</u>. In the event that any Product is held in a suit or proceeding to infringe any Intellectual Property Right of a third party and the use or sale of such Product is enjoined, or Netezza reasonably believes that it is likely to be found to infringe or likely to be enjoined, then Netezza may, in its sole discretion and at its cost and expense: (i) procure for Customer the right to continue using such Product in accordance with this Agreement; (ii) modify such Product so that it becomes non-infringing; or (iii)

replace such Product with a product that is substantially similar in functionality and performance. If neither (i), (ii), nor (iii) is reasonably practicable, then Netezza may, in its sole discretion, remove such Product from this Agreement by repurchasing it. The price of any such repurchase shall be based on the price paid by Customer depreciated on a three (3) year straight-line basis. Netezza shall pay Customer for such repurchased Products within thirty (30) days after Netezza receives those Products.

9.3    <u>Sole Remedy and Exclusive Liability</u>. Sections 9.1 and 9.2 state Customer's sole remedy and Netezza's exclusive liability in the event that a Product infringes on the Intellectual Property Rights of any third party.

9.4    <u>Other Rights</u>. Netezza shall not accept any settlement which imposes liability not covered by this indemnification, or restrictions on Customer, without Customer's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. Netezza will not be responsible for any settlement it does not approve in writing. Customer may participate in the defense of any claim through its own counsel, and at its own expense.

## 10.    Termination

10.1    <u>Termination of Agreement</u>. Customer may terminate this Agreement for convenience upon ninety (90) days advance written notice. Either party may terminate this Agreement for cause upon written notice to the other party: (i) if the other party materially breaches this Agreement, provided that the other party is given written notice of its breach and at least thirty (30) days to cure the breach; (ii) of repeated material breaches of this Agreement by the other party; or (iii) if a party becomes insolvent (generally unable to pay its debts as they become due) or the subject of a bankruptcy, conservatorship, receivership, or similar proceeding, or makes a general assignment for the benefit of its creditors.

10.2    <u>Failure to Terminate</u>. Failure of either party to terminate this Agreement due to a breach on the part of the other party shall not prejudice its rights to terminate for a subsequent breach on the part of the defaulting party.

10.3    <u>Effects of Termination</u>. Termination of this Agreement will not terminate Customer's rights under Article 4, unless Netezza has terminated the Agreement due to a material breach of Article 4 by Customer. Termination is not an exclusive remedy and all other remedies will be available whether or not this Agreement is terminated.



## 11. General Provisions

**11.1 Non-Exclusivity.** This Agreement is non-exclusive. Either party is free to enter into agreements with others and to conduct its business without restriction.

**11.2 Waiver.** No delay or omission by either party in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver given on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion. No waiver shall be effective unless it is in writing and signed by the party giving the waiver.

**11.3 Assignment.** Except as set forth in this Section, neither party shall assign, delegate, or otherwise transfer this Agreement or any of its rights or obligations to a third party without the other party's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed. Either party may assign, without such consent, its rights and obligations under this Agreement to: (i) an Affiliate; or (ii) any entity which acquires all or substantially all of its capital stock or assets related to this Agreement through purchase, merger, consolidation, or otherwise, provided that such entity is not a direct competitor of the other party. Customer may assign, without such consent, its right to purchase Products and Services under this Agreement to a third-party equipment leasing company or financier in connection with an equipment lease arrangement. Any assignment in violation of the foregoing shall be void. The provisions of this Agreement shall be binding and inure to the benefit of the parties, their successors, and permitted assigns.

**11.4 Notices.** All notices and other communications required or permitted under this Agreement shall be in writing and in the English language. Notices shall be effective upon delivery. Notices under this Agreement shall be sufficient only if personally delivered, delivered by a major commercial rapid delivery courier service with tracking capabilities, or mailed by certified or registered mail, return receipt requested, to a party at the address set forth in this Agreement or as amended by notice pursuant to this Section 11.4.

**11.5 Governing Law.** This Agreement and performance hereunder shall be governed by the substantive laws of the Commonwealth of Virginia, without regard to its conflict of law rules.

**11.6 Dispute Resolution.** Prior to initiating any formal claim, suit, or action with respect to any dispute in connection with, arising out of, or relating to this Agreement, the parties shall attempt to resolve the dispute in accordance with the procedures specified in this Section 11.6 and its subsections. Notwithstanding the foregoing, a party may immediately seek a preliminary injunction or other provisional judicial relief if in its sole judgment such action is necessary to prevent irreparable harm to its interests. Despite such action, the parties will continue to participate in good faith in the procedures specified in this Section 11.6. Each party is required to continue to perform its obligations under this Agreement pending final resolution of any dispute, unless to do so would be impossible or impracticable under the circumstances. The requirements of this Section 11.6 shall not be deemed a waiver of any right of termination under this Agreement.

**11.6.1 Negotiation.** The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between executives who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Either party may give the other party written notice of any dispute not resolved in the normal course of business. Within ten (10) business days after delivery of the notice, the receiving party shall submit to the other a written response. The notice and response shall include: (i) a statement of that party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive. Within twenty (20) business days after delivery of the initial notice, the executives of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. The parties may agree to conduct such meetings by telephone or other technical means rather than in person. All negotiations pursuant to this Section are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

**11.6.2 Further Action.** If the dispute has not been resolved by negotiation as provided in Section 11.6.1 within thirty (30) business days after delivery of the initial notice, each party may take whatever action it deems necessary to protect its rights.

**11.7 Survival of Obligations.** The following provisions shall survive the termination of this Agreement: Articles 4 (Permitted Use and Restrictions), 5 (Intellectual Property), 6 (Confidentiality), 7 (Limitation of Liability), 8 (Limited Warranties), 9 (Indemnification), and 11 (General Provisions), and Sections 2.4 (Shipping Charges), 2.5 (Taxes and Other Assessments), 2.6 (Terms of Payment), and 10.3 (Effects of Termination).

**11.8 Severability.** In the event any provision of this Agreement is held by a court or other tribunal of competent jurisdiction to be unenforceable as written,



**MASTER CUSTOMER AGREEMENT**

Agreement No. 20070813001

that provision shall be reformed so as to give effect to the intentions of the parties, and the other provisions of this Agreement will remain in full force and effect.

**11.9** Compliance with Laws. Each party shall comply with all applicable laws, rules, and regulations in its performance of this Agreement. In particular, Customer acknowledges that Products are subject to U.S. export controls, and Customer shall not export, re-export, divert, transfer, or disclose, either directly or indirectly, any Product, information, or data, or any portion thereof, to any country outside of the United States or to the nationals of any such country, except as permitted by this Agreement and in strict compliance with relevant U.S. laws and regulations, including but not limited to U.S. export laws and regulations, and shall cooperate fully with Netezza in any official or unofficial audit or inspection that relates to these controls.

**11.10** U.S. Government Use. The Software provided under this Agreement is commercial computer software developed exclusively at private expense. Unless otherwise set forth in this Agreement, use, duplication, and disclosure by civilian agencies of the U.S. Government shall not exceed those minimum rights set forth in FAR 52.227-19(c) or successor regulations. Use, duplication, and disclosure by U.S. Department of Defense agencies is subject solely to the software license terms contained in this Agreement, as stated in DFARS 227.7202 or successor regulations. U.S. Government rights shall apply only to the specific agency and program for which the Software is obtained.

**11.11** Force Majeure. Neither party shall be responsible for any delay or failure in its performance of any obligation hereunder (other than payment obligations) due to causes beyond its reasonable control, provided that the party invoking this Section (i) provides prompt notice to the other party, and (ii) resumes performance promptly when conditions allow it to do so.

**11.12** Non-Solicitation. During the term of this Agreement and for a period of one (1) year thereafter, neither party will directly or indirectly, either alone or in association with others, (i) solicit, or permit any Affiliate of the party to solicit, any employee of the other party or its Affiliates to leave the employ of the other party or any of its Affiliates, or (ii) solicit for employment, hire, or engage as an independent contractor, or permit any Affiliate of the party to solicit for employment, hire, or engage as an independent contractor, any person who was employed by the other party or its Affiliates; provided, that this clause (ii) shall not apply to any individual whose employment with the other party and its Affiliates has been terminated for a period of six (6) months or longer and provided further that this Section 11.12 shall not prohibit general advertisement of

employment opportunities not specifically targeting any employee(s) of the other party or its Affiliates.

**11.13** Entire Agreement. This Agreement sets forth the complete and exclusive agreement between the parties relating to the subject matter contained herein and supersedes all prior oral and written agreements, understandings, and communication about it. Purchase Orders issued by Customer shall be effective solely with respect to specifying the number and kind of Products and/or Services being ordered, and to the extent such Purchase Orders are based on quotes provided by Netezza, the price of such Products or Services. Invoices issued by Netezza shall be effective solely with respect to specifying the charges for Products and Services. All other terms and conditions printed or included on such Purchase Orders, invoices, and other correspondence shall be of no effect or force. Any amendment to this Agreement must be in writing and signed by duly authorized representatives of both parties.

**11.14** Counterparts. This Agreement may be executed by facsimile and/or in counterparts, which together shall be deemed the entire agreement.

**11.15** Headings. The article and section headings in this Agreement are for convenience only and are not to be considered in its interpretation.

**11.16** English Version. This Agreement is drafted in English. In the event that this Agreement is translated into a language other than English, the English version of this Agreement shall control all questions of interpretation with respect thereto.



**MASTER CUSTOMER AGREEMENT**

Agreement No. 20070813001

The undersigned represent and warrant that this Agreement is valid and binding and that they have the authority to execute this Agreement.

**NETEZZA CORPORATION**

By: Authorized Signature

Patrick J. Scannell, Jr.
Print Name

Sr. VP & CFO
Title

9.5.07.
Date Signed

**CUSTOMER**
**CIRCUIT CITY STORES, INC.**

By: Authorized Signature

Phil Schoonover
Print Name

Chairman, President & CEO
Title

9/4/07
Date Signed

Rev. 110606                          Page 8                          CONFIDENTIAL



**MASTER CUSTOMER AGREEMENT**
Agreement No. 20070813001

## SCHEDULE A – ADDITIONAL TERMS

**A.1  Details of the first transaction.**

### NETEZZA

Quote/Order Form

Netezza Corporation
200 Crossing Boulevard
Framingham, MA 01702
USA

| Quote No. | 20070811-BM-1 |
|---|---|
| Issue Date | 13-Aug-2007 |

| Customer | Ship To |
|---|---|
| Circuit City<br>9950 Mayland Drive<br>Richmond, VA<br>23233 | Circuit City<br>9950 Mayland Drive<br>Richmond, VA<br>23233<br>Desired Delivery Date: |

| Qty | Description of Products | List Price | Discount | Net Price | Ext. Price |
|---|---|---|---|---|---|
| 1 | NPS 10200 Production System with<br>10TB User Data Storage Capacity | $1,800,000 | -$630,000 | $1,170,000 | $1,170,000 |
| 1 | NPS 10050 Test/Integration System<br>with 6.25TB User Data Storage | $300,000 | | $300,000 | $300,000 |
| 1 | NPS 10100 Test Integration System<br>with 12.5 TB User Data Storage | $525,000 | | $525,000 | $525,000 |

| Qty | Description of Maintenance Support Services | | | Net Price | Ext. Price |
|---|---|---|---|---|---|
| 3 | Business Critical Maintenance Support<br>for NPS 10200 Production System @        12% | | | | $421,200 |
| 3 | Business Critical Maintenance Support<br>for NPS 10500 Development Systems @        12% | | | | $297,000 |

| Additional Terms |
|---|
| Delivery is subject to execution of a Master Customer Agreement and completion of an order. |
| Customer may purchase an additional 15 TB of User Data Storage Capacity at $21,000 per 1 TB. |
| Applicable freight and sales taxes will be the responsibility of the Customer. |

Prices above are in $USD

This quote expires August 30, 2007.

| | | | | Subtotal | $2,713,200 |
|---|---|---|---|---|---|
| | | Tax Rate | TBD | Taxes | TBD |
| | | | | Freight (est)* | TBD |
| | | | | Order Total | $2,713,200 |

*Actual freight will be determined based on delivery destination. Freight for multiple shipments may be higher than estimate.
Terms and conditions applicable to this order are set forth in  Agreement No. 20070813001.
To place an order, either (a) sign below, or (b) issue PO referencing this Quote, then fax to (508) 665-5710.

_Phil Schoonover_
Authorized Signature

Phil Schoonover
Print Name

Chairman, President & CEO
Title

9/4/07
Date

**A.2  Pricing Discounts.**  Customer shall have a 35% discount off Netezza's List price for all products purchased within the first 24 months of this agreement.

**A.3  User Conference.**  Customer shall receive 3 passes to the 2007 Netezza User Conference



**MASTER CUSTOMER AGREEMENT**
Agreement No. 20070813001

## SCHEDULE B – SUPPORT TERMS AND CONDITIONS

The General Terms and Conditions are incorporated into this Schedule by reference.

**1.   Definitions**

"7x24" means seven days a week, twenty-four hours a day.

"Covered System" means Hardware and Software, which together comprise a Netezza Performance Server system for which Customer has purchased support.

"Critical Problem" means a technical problem that renders a Covered System completely unavailable to users or unable to perform a critical user function.

"Customer Replaceable Unit" means Hardware that requires no formal training or special tools in order to achieve replacement.

"Minor Problem" means a technical problem that does not impair Covered System operation, but is a non-conforming behavior that can be avoided or ignored.

"Moderate Problem" means a technical problem that impairs operation of a Covered System to a lesser degree than a Serious Problem, but does not render the Covered System completely unavailable to users or unable to perform a critical user function.

"Normal Business Hours" means between the hours of 9:00 a.m. and 5:00 p.m. local TAC time, Monday through Friday, excluding locally observed holidays.

"On-site Spares" means replacement parts stored at an Installed Site.

"Serious Problem" means a technical problem that substantially impairs operation of a Covered System, but does not render the Covered System completely unavailable to users or unable to perform a critical user function.

"Service Representative" means a Netezza employee or contractor who is authorized to perform on-site service of a Covered System.

"Service Ready" means a Covered System that is eligible for support under this Schedule.

"Support Commencement Date" the date on which support begins for a Product.

"Support Year" means a twelve (12) month period beginning on the Support Commencement Date and each succeeding twelve (12) month period beginning on the anniversary of that date.

"TAC" or "Technical Assistance Center" means Netezza's customer support facility.

**2.   Eligibility for Support**

2.1   Service Ready" System.   A Covered System is automatically deemed "Service Ready" upon installation.

2.2   Relocated System.   In the event that Customer relocates a Covered System, Customer shall notify Netezza of such relocation in writing, and support for the relocated system will be subject to a new "Service Ready" determination at Customer's expense based on Netezza's then-current rates.   Any work required to return the Covered System to a "Service Ready" condition will be at Customer's expense.

2.3   Modified System.   Customer shall notify Netezza of any changes to the original configuration of the Covered System that are not performed by a Service Representative or under the instructions of the Netezza TAC.   Any such change may make the Covered System subject to a new "Service Ready" determination, at Netezza's sole discretion, at Customer's expense based on Netezza's then-current rates.   Any work required to return the Covered System to a "Service Ready" condition will be at Customer's expense.

2.4   Restart After Termination.   If Customer has terminated support for a Covered System and subsequently requests support for that system, the system shall be subject to a new "Service Ready" determination at Customer's expense based on Netezza's then-current rates.   Any work required to return the Covered System to a "Service Ready" condition will be at Customer's expense.

**3.   Netezza's Support Responsibilities**

3.1   Support Services.   Netezza shall use commercially reasonable efforts to provide the support services described in this Article 3 in accordance with the terms of this Schedule.   Such services will be performed only in connection with a Covered System at an Installed Site.

3.2   TAC Support for Critical Problems.   Netezza will respond to a support request for a Critical Problem with a Covered System within two (2) hours.   7X24 For Critical Problems, Netezza will



**MASTER CUSTOMER AGREEMENT**

Agreement No. 20070813001

provide TAC support on a continuous basis until the Covered System is restored to service.

**3.3    TAC Support for Serious and Moderate Problems.**    Netezza will respond to a support request for a Serious or Moderate Problem with a Covered System within two (2) hours if reported during Normal Business Hours.  For Serious or Moderate Problems, Netezza will provide TAC support on a priority, but not necessarily continuous, basis until the Covered System's operation is no longer impaired.

**3.4    TAC Support for Minor Problems.**    Netezza will acknowledge receipt of a support request for a Minor Problem with a Covered System on the same business day.  Minor Problems will be addressed during Normal Business Hours only, in a manner and within a time frame as determined by Netezza in its sole discretion.

**3.5    Automated Electronic Mail Messages.**    A Covered System may be configured to automatically send an electronic mail message to user-defined addresses, which may include the TAC, upon the detection of a specified error message.  Because e-mail messages may travel over data communications networks not controlled by Netezza, Netezza cannot guarantee that electronic mail messages will be delivered or received.

**3.6    Telephone Support.**    Netezza will provide Customers in the U.S. and select countries with unlimited, toll-free telephone access to the Netezza TAC. Netezza will provide all other Customers outside the U.S. with unlimited, but not necessarily toll-free, telephone access to the Netezza TAC.

**3.7    On-line Support.**    Netezza will provide 7x24 access via its website to certain electronic support services, which may include problem reporting and tracking, a technical knowledgebase, software updates, patch downloads, and diagnostic tools.

**3.8    On-site Support.**    If Netezza, in its sole discretion, determines that it is necessary to do so, Netezza will provide on-site support at Netezza's cost and expense, including labor, parts, and material necessary to repair a Covered System. Netezza will provide emergency on-site support within four (4) hours to service a host computer or install On-site Spares.  Upon arrival at the site, Netezza will provide support until the Covered System is operational or for as long as reasonable progress is being made.  Work may be temporarily suspended if additional parts or resources are required, but will resume when they become available.

**3.9    On-Site Spares.**    Netezza shall provide On-Site Spares including the most commonly needed replacement parts.  As On-Site Spares are consumed, Netezza will replenish them at no additional cost to Customer.

**3.10    Software Updates, Patches, and New Releases.**    Netezza shall provide, at no additional cost to Customer, all applicable Software updates, patches, and new releases.

**4.    Customer's Support Responsibilities**

**4.1    Primary Contact.**    Customer shall assign and maintain a technically skilled employee or agent who will serve as Customer's primary contact with Netezza.  Customer shall provide Netezza with this individual's name and contact information.  Customer may change its primary contact at any time upon notice to Netezza.

**4.2    Other Contacts.**    Customer may identify a reasonable number of other individuals who are authorized to request support for a Covered System. Customer shall provide Netezza with the names and contact information for these individuals.  Customer may change these contacts at any time upon notice to Netezza.

**4.3    Support Requests.**    For all non-Critical Problems, Customer is strongly encouraged to make all support requests via Netezza's Internet website in order to ensure communication of all essential information, including but not limited to log files. Support requests for Critical Problems may be made via the website or telephone, except that support requests for Critical Problems outside of Normal Business Hours must be made by telephone. For Critical Problems, Customer shall provide Netezza with a dedicated contact person who will be available to assist Netezza for the duration of the Critical Problem.

**4.4    Routine Maintenance.**    Customer shall maintain a Covered System and its components in a manner consistent with all applicable product specifications provided by Netezza or the manufacturer, including but not limited to cleaning, replacing expendable parts, and performing regular operating checks.

**4.5    Remote Access.**    Customer shall provide, at no cost to Netezza, access to and use of suitable telecommunications lines and equipment to establish data communication via a mutually agreed interface between the Netezza TAC and a Covered System.

**4.6    Diagnostics.**    Customer shall execute diagnostic routines when requested by Netezza and shall provide the results to Netezza.

**4.7    Customer Replaceable Units.**    Customer shall replace Customer Replaceable Units under

# NETEZZA

the remote direction and guidance of the Netezza TAC or a Service Representative.

4.8    Backup. Customer shall ensure that all data stored on a Covered System is adequately duplicated, documented, and protected. Netezza is not responsible for Customer's failure to do so, or for the cost of reconstructing data stored on disks, tapes, or other media that are lost or damaged.

4.9    On-site Support.    During on-site support, Customer shall ensure that Service Representatives have access to the Covered System. Customer shall render all reasonable assistance and cooperate fully with Service Representatives.    Additionally, Customer shall ensure the Service Representative's ability to work without interruption or interference.

## 5.    Other Support Terms

5.1    Additional Fees.    Customer may incur additional fees on a time and materials basis for any parts, services, or materials provided by Netezza to remedy problems caused by any of the following: (i) fire, flood, natural disaster, neglect, misuse, abuse, terrorism, war, or other force majeure events or causes; (ii) unauthorized modifications; (iii) use of equipment or software not provided by Netezza, except as authorized by Netezza; or (iv) damage resulting from environmental considerations such as electrical power, heat, cold, or humidity outside the published product specifications.

5.2    Price Changes / Renewal.    Support will renew annually upon written agreement between the parties.    Fees for Support shall be locked for five years at twelve percent (12%) of the net Product price so long as Customer prepays three (3) years Support in advance and commits to additional two (2) years Support to be paid for prior to the start of years four (4) and five (5). Thereafter, annual increases will not exceed the lesser of the CPI or five percent (5%).

5.3    Termination of Support.    Customer may terminate support for a Covered System at any time upon written notice to Netezza.    If Customer terminates support, Customer shall be entitled to a prorated refund of any prepaid support fees.

5.4    Subcontractors. Netezza may, without notice, contract with third party vendors to provide all or a portion of the support services to be provided under this Schedule. Customer acknowledges that Hewlett-Packard is an authorized subcontractor for on-site hardware support.

    CONFIDENTIAL



**MASTER CUSTOMER AGREEMENT**
Agreement No. 20070813001

### SCHEDULE C – TRAINING

Information regarding training Services including a list of Netezza's then-current training courses (including costs) is provided on Netezza's training website, which is located at the following address: http://www.netezza.com/support/education.cfm

Customer may order training Services (including training Services provided at no additional charge) as specified in Section 3 of the Agreement.

<u>Training Services Provided At No Additional Charge</u>

Training services will be provided at no additional charge for up to 12 student days at our Netezza training site.

Customer will receive seventeen (17) Training Credits (as defined below) upon submitting its first Purchase Order or Quote/Order Form (as applicable) to Netezza.

A "Training Credit" is equal to one (1) day of training for one (1) student.

Unused Training Credits expire twelve (12) months from the date of the first Purchase Order or Quote/Order Form (as applicable) submitted to Netezza.

Additional seats at training courses and training provided at customer site may be purchased in accordance with instructions provided on the Training Services Order Form.

Notwithstanding the foregoing, if Customer purchases only a NPS 5200 Product, as its first purchase, Customer will not receive Training Credits.

Customer may select training courses from the courses listed on the Netezza training website referenced above.