# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>**CIRCUIT CITY STORES, INC., et al.**<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No.  08-35653**<br><br>**CALIFORNIA SELF-INSURERS' SECURITY FUND'S APPENDIX OF NON-VIRGINIA AUTHORITIES IN SUPPORT OF ITS OPPOSITION TO DEBTORS' TWENTY-SEVEN OMNIBUS OBJECTION TO CERTAIN CLAIMS**<br><br>**Jointly Administered** |

California Self-Insurers' Security Fund (the "Fund") hereby submits this Appendix of non-Virginia authorities in support of its opposition to debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") Twenty-Seventh Omnibus Objection to Claims (Disallowance of Certain Tax Claims for No Tax Liability) (the "Objection").

# APPENDIX OF NON-VIRGINIA AUTHORITIES

**Tab**

CASES

City of New York v. Feiring,
    313 U.S. 283 (1941) .............................................................................. A

County Sanitation District No. 2 v. Lorber Industries of California, Inc. (Lorber Industries of
    California, Inc.),
    675 F.2d 1062 (9th Cir. 1982) ............................................................. B

In re George,
    361 F.3d 1157 (9th Cir. 2004) ............................................................. C

Industrial Commission v. Camilli (In re Camilli),
    94 F. 3d 1330 (9th Cir. 1996) ............................................................. D

New Jersey v. Anderson,
    203 U.S. 483 (1906) ............................................................................ E

United States v. New York,
    315 U.S. 510 (1942) ............................................................................ F

STATUTES

8 Cal. Code of Regs., § 15210 .............................................................. G

California Labor Code ...........................................................................

§ 3201 .................................................................................................. H
§ 3600 .................................................................................................. I
§ 3700 .................................................................................................. J
§ 3701.5 ............................................................................................... K
§ 3740 .................................................................................................. L
§ 3742 .................................................................................................. M
§ 3743 .................................................................................................. N
§ 3744 .................................................................................................. O

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**OTHER AUTHORITIES**

Cal. Const., Article XIV, § 4 ........................................................................................ P

NIXON PEABODY LLP

By /s/ Louis E. Dolan, Jr.

    Louis E. Dolan, Jr. (VSB# 34437)
    Diana V. Vilmenay (VSB# 75536)
    401 9th Street NW
    Suite 900
    Washington, DC 20004-2128
    Telephone: (202) 585-8818
    Facsimile: (866) 947-3670
    Email:    ldolan@nixonpeabody.com
    Email:    dvilmenay@nixonpeabody.com

    - and -

    Louis J. Cisz, III (pro hac vice admission pending)
    Gina M. Fornario (pro hac vice admission pending)
    One Embarcadero Center
    18th Floor
    San Francisco, CA 94111-3600
    Telephone: (415) 984-8200
    Facsimile: (415) 984-8300
    Email:    lcisz@nixonpeabody.com
    Email:    gfornario@nixonpeabody.com

    Attorneys for Creditor
    CALIFORNIA SELF-INSURERS' SECURITY
    FUND

# TAB A

**LexisNexis**

LEXSEE 313 U.S. 283

**CITY OF NEW YORK v. FEIRING, TRUSTEE IN BANKRUPTCY**

No. 863

**SUPREME COURT OF THE UNITED STATES**

*313 U.S. 283; 61 S. Ct. 1028; 85 L. Ed. 1333; 1941 U.S. LEXIS 1187*

**May 7, 1941, Argued**
**May 26, 1941, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

CERTIORARI, post, p. 552, to review the affirmance of an order of the District Court refusing priority of payment to a tax claim asserted by the City of New York under § 64 of the Bankruptcy Act.

**DISPOSITION:** *118 F.2d 329*, reversed.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]

COURTS, §880

Federal courts -- following state laws -- bankruptcy -- priority of state taxes. --

Headnote:[1]

Whether an obligation is a "tax" entitled to priority in bankruptcy is a Federal question to be determined on the basis of the terms and purposes of the Bankruptcy Act, and is not to be controlled or varied by the particular characterization of the obligation under local law.

[***LEdHN2]

BANKRUPTCY, §190

priorities -- taxes -- what are "taxes." --

Headnote:[2]

The priority given by 64 of the Bankruptcy Act to "taxes" extends to those pecuniary burdens laid upon individuals or their property regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it.

[***LEdHN3]

BANKRUPTCY, §190

priorities -- taxes -- seller's liability for sales tax. --

Headnote:[3]

An obligation imposed by law on a seller to collect from the buyer the amount of a municipal sales tax is a "tax" entitled to priority on the seller's bankruptcy, where, under the terms of the law as construed by the state courts, both the seller and buyer are liable in the alternative for the tax, and it may be enforced against the seller regardless of his ability to collect it from the buyer, although provision is made whereby the seller may ordinarily shift the tax to the buyer.

[***LEdHN4] [4]

*New York v. Goldstein, 299 US 522, 81 L ed 384, 57 S Ct 321*, explained.

**SYLLABUS**

1. The question whether an obligation to a State is a tax entitled to priority under § 64 of the Bankruptcy Act

is a federal question. P. 285.

2. The Bankruptcy Act is of nationwide application and § 64 thereof is not to be construed or varied by the particular characterization by local law of the state's demand. P. 285.

Provisions of the state law creating the obligation and decisions of the state courts interpreting them are resorted to not to learn whether they have denominated the obligation a "tax" but to ascertain whether its incidents are such as to constitute a tax within the meaning of § 64.

3. The tax imposed by the New York City Sales Tax Law is a tax on the seller within the meaning of § 64 of the Bankruptcy Act, as well as on the buyer, since both are made liable for payment *in invitum* and subject to distraint of their property for its collection. P. 287.

It is not any the less a tax laid on the seller because the statute places a like burden in the alternative on the purchaser or because it affords to the seller facilities of which he did not avail himself to pass the tax on to the buyer.

**COUNSEL:** Mr. Paxton Blair, with whom Messrs. William J. Chanler, Sol Charles Levine, and Morris L. Heath were on the brief, for petitioner.

Mr. Benjamin Siegel for respondent.

**JUDGES:** Hughes, Stone, Roberts, Black, Reed, Frankfurter, Douglas, Murphy

**OPINION BY:** STONE

**OPINION**

[*284]  [**1028]  [***1335]  MR. JUSTICE STONE delivered the opinion of the Court.

The question is whether the obligation imposed upon sellers by a New York City sales tax (No. 20, Local Laws of New York City, 1934, as amended, No. 24, Local Laws of New York City, 1934), to pay a tax laid upon receipts from sales of personal property and collectible alternatively from the buyer or the seller is a "tax" entitled to priority of payment in bankruptcy under § 64 of the Bankruptcy Act.

[**1029]  Petitioner, New York City, filed its claim against the estate of the bankrupt for taxes on sales of tangible property by the bankrupt during the five years following January 10, 1934. In the proceeding before the referee it appeared that the bankrupt had failed to collect most of the taxes from its buyers as required by the applicable law, and that the sole issue was with respect to the right of the City to priority of payment of the City's claim over those of general creditors. The District Court set aside the referee's order allowing the priority and the Court of Appeals for the Second Circuit affirmed, *118 F.2d 329*, holding that the sum claimed was not a tax, but that the "bankrupt was liable to the city as a tax collector who owes as a debt the amount of taxes collected or to be collected." We granted certiorari April 14, 1941, because of the suggested failure of the court below to follow our decision in *New York City v. Goldstein, 299 U.S. 522*, reversing *In re Lazaroff, 84 F.2d 982*, and of the asserted conflict in principle of the decision below with that of the Court of Appeals for the Tenth Circuit in *Barbee v. Oklahoma Tax Commission, 103 F.2d 114*.

[*285]  [***LEdHR1] [1]Section 64 of the Bankruptcy Act, as amended June 22, 1938, 52 Stat. 840, 874, awards priority of payment, in bankruptcy, to "taxes legally due and owing by the bankrupt to the United States or any State or any subdivision thereof . . ." Whether the present obligation is a "tax" entitled to priority within the meaning of the statute is a federal question. *New Jersey v. Anderson, 203 U.S. 483, 491*; cf. *Burnet v. Harmel, 287 U.S. 103, 110*; *Palmer v. Bender, 287 U.S. 551, 555*; cf. *United States v. Pelzer, 312 U.S. 399*. Intended to be nation-wide in its application, nothing in the language of § 64 or its legislative history suggests that its incidence is to be controlled or varied by the particular characterization by local law or the state's demand. Hence we look to the terms and purposes of the Bankruptcy Act as establishing the criteria upon the basis of which the priority is to be allowed.

[***LEdHR2] [2]As was pointed out in *New Jersey v. Anderson, supra, 491*,the priority commanded by § 64 extends to those pecuniary burdens laid upon individuals or their property, regardless of their consent, for [***1336] the purpose of defraying the expenses of government or of undertakings authorized by it. The particular demand for which the City now claims priority of payment as a tax is created and defined by state enactment. We turn to its provisions and to the decisions

of the state courts in interpreting them, not to learn whether they have denominated the obligation a "tax" but to ascertain whether its incidents are such as to constitute a tax within the meaning of § 64. Cf. *Morgan v. Commissioner,* 309 U.S. 78, 80, 81 and cases cited; *United States v. Pelzer, supra; Ryerson v. United States,* 312 U.S. 405.

[***LEdHR3] [3]The present exaction is that which was considered, and its constitutionality sustained, in *McGoldrick v. Berwind-White Co.,* 309 U.S. 33.The discussion of it there will be supplemented here only so far as is needful for the [*286] disposition of the issue now before us. It was enacted by the municipal assembly of New York City as an emergency revenue measure to defray the expense of unemployment relief, pursuant to authority conferred by the state legislature. Ch. 815, New York Laws 1933; Ch. 873, New York Laws 1934. Originally No. 24 of New York Local Laws, 1934, it has since been annually renewed with minor amendments not now material. Section 2 lays a tax upon receipts from retail sales in New York City of tangible personal property, and requires the seller, with exceptions not now material, to charge the buyer with the amount of the tax, separately from the sales price and to collect the tax from him. Penalties are imposed by § 15 for the seller's willful failure to comply with these requirements. Section 2 also commands that the tax "shall be paid by the purchaser to the vendor, for [**1030] and on account of the City of New York." Section 5 requires the seller to file with the City Comptroller a "return of his receipts and of the taxes payable thereon" for prescribed periods. Section 6 requires the seller, at the time of filing a return to pay to the Comptroller the taxes upon all receipts required to be included in his return and also provides that "all taxes for the period for which a return is required to be filed shall be due from the vendor and payable to the Comptroller on the date limited for the filing of the return for such period, without regard to whether a return is filed or whether the return which is filed correctly shows the amount of receipts and the taxes due thereon." But if the seller fails to collect the tax § 2 also makes it the duty of the purchaser to file a return with the Comptroller and commands that "such tax shall be payable by the purchaser directly to the Comptroller."

By § 8, whenever either the seller or purchaser "shall fail to collect or pay over any tax and/or to pay any tax" imposed by the law, the City is authorized to bring an [*287] action for its recovery or, as an alternative

remedy, the Comptroller is authorized to issue a warrant directed to the sheriff of the county, commanding him to levy upon and sell the real and personal property of the seller or the purchaser and apply the proceeds to the payment of the tax. In construing these provisions the New York Court of Appeals has held that while the Comptroller may proceed under § 2 to collect the tax from the purchaser if he has not paid it to the seller, see *Matter of Kesbec, Inc.* v. *McGoldrick,* 278 N. Y. 293; 16 N. E. 2d 288, the duty to pay the tax is also laid upon the seller whether he has in fact collected it and regardless of his ability to collect it from the buyer. *Matter of Atlas Television Co.,* 273 N. Y. 51; 6 N. E. 2d 94; *Matter of Brown Printing Co.,* 285 N. Y. 47; 32 N. E. 2d 787.

The statute thus contains provisions which in its normal operation are [***1337] calculated to enable the seller to shift the tax burden to the purchaser, see *Matter of Kesbec, Inc.* v. *McGoldrick, supra,* 297; *Matter of Merchants Refrigerating Corp.* v. *Taylor,* 275 N. Y. 113, 124; 9 N. E. 2d 799; cf. *McGoldrick v. Berwind-White Co., supra,* 43, 44. But it is plain that both the vendor and the vendee are made liable for payment of the tax *in invitum* without regard to those provisions by which the seller may shift the incidence of the tax to the buyer and the tax may be summarily collected by distraint of the property of either the seller or the buyer. A pecuniary burden so laid upon the bankrupt seller for the support of government, and without his consent, thus has all the characteristics of a tax entitled to priority of payment in bankruptcy within the meaning of § 64 of the Bankruptcy Act. *New Jersey v. Anderson, supra.* Cf. *United States v. Updike,* 281 U.S. 489, 494. It is not any the less a tax laid on the seller because the statute places a like burden in the alternative on the purchaser or because it affords to the seller facilities of which he did not avail himself to pass [*288] the tax on to the buyer. While an action in debt may be resorted to for the recovery of a tax, it is evident that in this case the bankrupt is liable to the state only because it owes a tax. *Price v. United States,* 269 U.S. 492, 500; *Milwaukee County v. White Co.,* 296 U.S. 268, 271.

[***LEdHR4] [4]In *New York City v. Goldstein, supra,* we reversed *per curiam,* citing *Matter of Atlas Television Co., supra,* a decision of the Court of Appeals for the Second Circuit that a claim of the City for payment of tax by the seller was not entitled to priority under § 64 of the Bankruptcy Act. The court below attributed our reversal to the circumstances that at that time, though not now, §

313 U.S. 283, *288; 61 S. Ct. 1028, **1030;
85 L. Ed. 1333, ***LEdHR4; 1941 U.S. LEXIS 1187

64 allowed priority to debts entitled to priority under state law, and to the decision of the state court in the *Atlas* case, that upon a general assignment for the benefit of creditors made under state law a claim against the seller for the sales tax was entitled to priority. But in placing this interpretation upon our decision in the *Goldstein* case the court below overlooked the fact that the Court of Appeals ruled in the *Atlas* case that an ordinary debt due the state is not entitled to priority by state law, and it sustained the priority in that case only on the ground that the demand was for a tax, the unqualified duty to pay which was placed by the statute on [**1031] the seller.

This interpretation of the state statute was reaffirmed by that court in the *Matter of Brown Printing Co., supra.* For reasons already given, the duty imposed upon the seller by the taxing act thus construed is also a tax within the meaning of § 64 of the Bankruptcy Act.

*Reversed.*

MR. JUSTICE ROBERTS thinks the judgment should be affirmed for the reasons stated by the Circuit Court of Appeals.

# TAB B



LEXSEE 675 F.2D 1062

In re LORBER INDUSTRIES OF CALIFORNIA, INC., a California corporation,
Debtor. COUNTY SANITATION DISTRICT NO. 2 OF LOS ANGELES COUNTY,
Claimant-Appellee, v. LORBER INDUSTRIES OF CALIFORNIA, INC.,
Debtor-Appellant.

No. 79-3610

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

675 F.2d 1062; 1982 U.S. App. LEXIS 19737

July 7, 1981, Argued and Submitted
April 28, 1982, FILED

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Central District of California. D.C. No. CV 78-2530 WJF. The Honorable Warren J. Ferguson, Presiding.

**DISPOSITION:** REVERSED.

**COUNSEL:** Brief of Appellant/Petitioner by: Bennett L. Silverman, SULMEYER, KUPETZ, BAUMANN & ROTHMAN, Los Angeles, CA.

Argument for Appellant/Petitioner by: Iriving Sulmeyer, SULMEYER, KUPETZ, BAUMANN & ROTHMAN, Los Angeles, CA.

Brief of Appellee/Respondent by: Daniel V. Hyde, KNAPP, STEVENS, GROSSMAN & MARSH, Los Angeles, CA.

Argument for Appellee/Respondent by: SAME.

**JUDGES:** Before: GOODWIN, HUG and FARRIS, Circuit Judges.

**OPINION BY:** HUG

**OPINION**

[*1063] *OPINION*

HUG, Circuit Judge:

This action was filed under Chapter XI of the Bankruptcy Act [1] by Lorber Industries, Inc. In the arrangement proceedings before the bankruptcy court, the local sewer district filed a claim for sewer use fees it had assessed to the debtor. It was claimed the user fees constituted taxes and were therefore entitled to priority status. We hold that such fees do not constitute taxes, and that the bankruptcy court correctly classified the sewer district as a general unsecured creditor.

1    These bankruptcy proceedings took place under former Chapter XI of the Bankruptcy Act of July 1, 1898, c. 541, §§ 301-99, 30 Stat. 544 (formerly codified at *11 U.S.C. §§ 701-99*), *repealed*, Act of Nov. 6, 1978, Pub.L. No. 95-598, § 401(a), 92 Stat. 2549. Section 403(a) of the latter Act provides: "A case commenced under the [former] Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act [Pub. L. 95-5981] had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted."

All citations to the Act in this opinion refer to the former Act.

[**2] I

*FACTS*

A. *The District*

County Sanitation District No. 2 of Los Angeles County (the "District") was formed [*1064] under the authority of *California Health and Safety Code §§ 4700-4858* (West 1970 & Supp. 1981). Its primary functions are to construct, operate, and maintain trunk sewer lines and treatment facilities that collect, treat, and dispose of domestic and industrial wastewater. The District is empowered to condemn or purchase property, and it may finance acquisition and construction by issuing bonds. Section 4746. Current expenses of maintenance and operation may be financed by issuance of negotiable promissory notes. Section 4746.1. It is also granted the power to levy and collect real property taxes to meet bond obligations, pay promissory notes, and defray operating expenses. Section 4747. The District is empowered to adopt specified ordinances and to enforce them through imposition of fines or imprisonment. Section 4766. These ordinances may provide for the collection of rentals, fees, and service charges. In addition to the misdemeanor penalties, charges assessed can be enforced through levy of a lien against the property for which the charge is imposed. [**3] *Section 5473.5.*

Prior to 1972 the District was financed through ad valorem property taxes. Each user of the system thus contributed to the District's expenses on the basis of the assessed valuation of the user's property. In addition, the District received federal grants available under section 201(g) of the Water Pollution Prevention and Control Act (the "Clean Water Act"), *33 U.S.C. § 1281(g).*

In 1972 the Clean Water Act was amended to condition the award of grants upon conformance with specified revenue collection procedures. *See 33 U.S.C. § 1284(b)(1), as amended by Clean Water Act Amendments of 1980, Pub.L No. 96-483, 94 Stat. 2360.* The amendments required that grant applicants adopt an assessment scheme in which each nonresidential user of the system was required to pay charges proportionate to its use of the system. This requirement was imposed to reduce the inequity of requiring low volume dischargers to subsidize those industries which produce high volumes of wastewater. It was also assumed that a system of charges based on use would encourage more efficient

management of waste and more conservative use of the [**4] system. S. Rep. No. 95-370, 95th Cong., 1st Sess., *reprinted in* [1977] U.S. Code Cong. & Ad. News, 4326, 4352.

In response to these amendments, the District adopted Sections 409 and 410 of its *Wastewater Ordinance, An Ordinance Regulating Sewer Construction, Sewer Use and Industrial Wastewater Discharges* (April 1, 1972; as amended July 1, 1975) (the "Ordinance"). Under these sections nonresidential users of the system are assessed a surcharge. The charge is determined by an engineer's estimate, and takes into account the contribution to flow, chemical oxygen demand, and suspended solids. The user is given a credit against these charges in the amount of the user's ad valorem taxes; the balance is due to the District as a user fee.

B. *The Debtor*

Lorber Industries of California, Inc. ("Lorber") is a producer of polyester fabric. Its plant is located in Carson, California, within the area served by the District. In the process of knitting, printing and dyeing the fabric it produces, Lorber discharges unusually high quantities of wastewater into the sewer system operated by the District. This waste contains high levels of chemicals and suspended solids. Based on the [**5] volume discharged and on the chemical and solid content of the wastewater, charges were assessed against Lorber by the District totaling $ 52,653.25. This assessment covered fiscal years 1974-75, 1975-76, and 1976-77.

C. *Proceedings Below*

On October 19, 1976, Lorber filed a petition for relief from bankruptcy under Chapter XI of the Bankruptcy Act (the "Act"), *11 U.S.C. § 722.* On June 7, 1977, the District filed a Proof of Priority Claim for the outstanding charges. The basis of the claim was that the fees due the District constituted taxes legally due and owing to the subdivision of a state, and that they were therefore entitled to priority under [*1065] § 64(a)(4) of the Act, *11 U.S.C. § 104(a)(4).* [2] Lorber filed objections to the claim of priority, contending that the charges constituted a general unsecured claim.

2  *11 U.S.C. § 104(a)* provides in part:

(a) The debts to have priority, in

advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be . . . (4) taxes which became legally due and owing by the bankrupt to the United States or to any State or any subdivision thereof which are not released by a discharge in bankruptcy: *Provided, however,* That no priority over general unsecured claims shall pertain to taxes not included in the foregoing priority: *And provided further,* That no order shall be made for the payment of a tax assessed against any property of the bankrupt in excess of the value of the interest of the bankrupt estate therein as determined by the court. . . .

[**6] The bankruptcy judge issued a written opinion sustaining Lorber's objections to the priority claim. The opinion relied upon numerous state court cases holding that water rents, sewer charges, and related fees are not taxes. It contrasted involuntary assessments imposed to lessen the burden of general taxation with contractual obligations resulting from use of a public utility system. It held that this debt was of the second type, for Lorber was legally free not to use the system, and its voluntary use thus constituted an implied contractual debt. The bankruptcy judge allowed the District's claim as a general unsecured claim.

The District appealed to the district court. That court remanded the case to the bankruptcy court, with instructions to hold hearings and prepare detailed findings of fact identifying the alternate methods of wastewater treatment and disposal available to Lorber. After holding evidentiary hearings, the bankruptcy judge determined that four alternative disposal methods existed, but that Lorber was precluded from using all of these, based on practical and economic considerations. He concluded that "Lorber chose the only practical alternative available to it when [**7] it applied for and obtained permits from the District to discharge wastewater into the District's facilities." [3]

    3    The bankruptcy court identified four

alternatives:

    (a) Percolation to the soil via a system of perforated subsurface concrete pipe.

    (b) Evaporation of the waste using large ponds for evaporation purposes.

    (c) Construction of a biological secondary treatment facility with tertiary treatment with ethylene filtration and absorption by activated carbon.

    (d) Using tank trucks to haul the wastewater to sanitary landfills.

The bankruptcy judge found that all four alternatives were prohibitively expensive. The first two were also found to be infeasible from an engineering and practical standpoint. The third alternative would require state and federal permits; the judge found it "unlikely" that Lorber could acquire these. The fourth alternative was not a reasonable option because the number of landfills is limited, and those that exist are not capable of absorbing the volume and quality of wastewater Lorber produces.

[**8] The district court reversed the decision of the bankruptcy court, and held that the surcharge was a tax. The decision reasoned that the charge was not contractual because the Ordinance enables the District to assess anyone who uses the District's services, whether or not the user acquires necessary permits. It determined that Lorber's use of the system was involuntary, because no practical alternatives were available. The district court also recognized that, as a public agency, the District was dependent upon its ability to collect funds such as these to continue provision of essential services. Lorber appeals the district court judgment.

II

*DISCUSSION*

This court has jurisdiction to review arrangement proceedings under section 316 of the Act, 11 U.S.C. §

716. The facts in this case are not in dispute. As with other types of bankruptcy proceedings, we are free to examine the legal conclusions of the lower courts. 11 U.S.C. § 47; *In re Amex-Protein Development Corporation, 504 F.2d 1056, 1058 (9th Cir. 1974).*

The [**9] broad purpose of the Act is to bring about an equitable distribution of the [*1066] debtor's estate. *Kothe v. R. C. Taylor Trust, 280 U.S. 224, 227, 50 S. Ct. 142, 74 L. Ed. 382 (1930).* The priority provisions of section 64(a) run counter to that purpose, creating a special status for specified claims. If one claimant is granted a priority under section 64(a), that status must be justified by clear statutory authorization. *United States v. Embassy Restaurant, Inc., 359 U.S. 29, 31, 79 S. Ct. 554, 3 L. Ed. 2d 601 (1959); Nathanson v. NLRB, 344 U.S. 25, 29, 73 S. Ct. 80, 97 L. Ed. 23 (1952).* In order to be classified as taxes entitled to priority under the Act, the charges in question must therefore satisfy two requirements. First, they must be "taxes," as defined by federal law. *New York v. Feiring, 313 U.S. 283, 285, 61 S. Ct. 1028, 85 L. Ed. 1333 (1941); New Jersey v. Anderson, 203 U.S. 483, 491, 27 S. Ct. 137, 51 L. Ed. 284 (1906).* [**10] Second, their classification as priority claims must be consistent with the terms and purposes of section 64(a) and the other provisions of the Act. *New York v. Feiring, 313 U.S. at 285.*

### A. Characteristics of User Fees Imposed

In general, these charges can be classified as a tax only if they constitute "a pecuniary burden laid upon individuals or property for the purpose of supporting the Government" or to support "some special purpose authorized by it." *New Jersey v. Anderson, 203 U.S. at 492.* Taxes are not equivalent to debts, which are voluntary obligations based on express or implied contracts. Taxes are levied without the consent or voluntary action of the taxpayer. *Id. See also National Cable Television Association v. United States, 415 U.S. 336, 340-41, 94 S. Ct. 1146, 39 L. Ed. 2d 370 (1974).*

This court considered the distinction between taxes and non-tax charges in *Dungan v. Department of Agriculture, State of California, 332 F.2d 793 (9th Cir. 1964), aff'g In re Farmers Frozen Food Company, 221 F. Supp. 385 (N.D. Cal. 1963).* [**11] We approved the analysis developed by the district court in that case:

The elements which characterize an exaction of a "tax" within the meaning of

said Section 64, sub. a(4) are as follows:

(a) An involuntary pecuniary burden, regardless of name, laid upon individuals or property;

(b) Imposed by, or under authority of the legislature;

(c) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it;

(d) Under the police or taxing power of the state.

*221 F. Supp. at 387* (footnotes omitted). That court defined an "involuntary pecuniary burden" as a non-contractual obligation imposed by state statute upon taxpayers who had not consented to its imposition. *Id.*

In the instant case, both the bankruptcy court and the district court applied the analysis used in *In re Farmers.* Although they concurred as to the incidents of the charges, these courts placed different interpretations upon the "involuntary pecuniary burden" requirement, so that the application of the test to the [**12] charges' characteristics yielded opposite results. We agree with the conclusion of the bankruptcy judge that "involuntary burden" must be read in a manner consistent with the requirements imposed in *New Jersey v. Anderson.* In determining if Lorber's use of the system was voluntary, and if it therefore consented to imposition of the fees, we are not free to consider the practical and economic factors which constrained Lorber to make the choices it did. The focus is not upon Lorber's motivation, but on the inherent characteristics of the charges.

The difficulty of classifying these charges is a product of the duality of the District's revenue system.

Both residential and industrial users are assessed ad valorem taxes, based on the value of real property within the District. The parties agree that the revenue collected on an ad valorem basis constitutes taxation. The surcharge for excess industrial use is assessed under the same state statutory authority as the ad [*1067] valorem taxes. Those statutes allow the District to finance its operation in either manner. It is also empowered to collect and enforce charges in the same manner as general taxes. The calculation of the surcharge [**13] takes into account the amount paid in ad valorem taxes, so that the service charge obligation is functionally related to the tax obligation.

These similarities between the charges and taxes assessed by the District, and the contrasting conclusions reached by the two lower courts in their well-reasoned opinions, clearly indicate that the classification of these charges is a close question. On balance, however, we conclude that because of the characteristics of the charges, they are better classified as non-tax fees than as taxes.

The Ordinance allows the District to assess surcharges only when District services are used by industrial customers and only in an amount proportionate to their use. The imposition of these charges thus was triggered by Lorber's decision to discharge into the system large amounts of industrial wastewater. Because the assessment resulted from Lorber's acts, it falls within the non-tax fee classification defined by the Supreme Court in *National Cable Television Association v. United States*, 415 U.S. 336, 340-41, 94 S. Ct. 1146, 39 L. Ed. 2d 370 (1974):

> Taxation is a legislative function, and Congress, which is the sole organ for [**14] levying taxes, may act arbitrarily and disregard the benefits bestowed by the Government on a taxpayer and go solely on ability to pay, based on property or income. A fee, however, is incident to a voluntary act, *e.g.*, a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing those services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant, not shared by other members of society.

These charges are fees for services provided to the industrial users of the system. The specific services, processing and disposal of excess wastewater, are provided to industrial users, rather than to the general local population. Amounts specifically charged for those services are by nature a debt obligation, based on a contractual agreement, the application for and issuance of a permit. The source of the obligation is not the authorizing legislation, but Lorber's decisions to acquire a permit and to engage in a high level of system use. We therefore hold that the incidents of these charges do not allow their classification as taxes under federal law. [**15] [4]

> [4]   The District argues that it has statutory authority to impose charges on users of the system who fail to acquire a permit prior to use, so that the source of the charge is statutory rather than contractual. That situation is not presented by this case, for Lorber did obtain a permit. However, it would appear that imposition of charges on non-permit users would not transform the charges into taxes. The non-permit user who discharges into the system also incurs a debt obligation, based on an implied contract. The source of the obligation is not the statute authorizing imposition of charges, but the non-permit user's voluntary act of using the system.

## B. Relation of Fees to Terms and Purposes *of the Act*

The conclusion that these charges are not entitled to priority is entirely consistent with the terms and purposes of the Act. We find no clear indication in section 64(a) that user fees such as these are to be granted priority status.

Recognition of tax debts as priority claims was first provided [**16] in the 1867 version of the Act. The statute then granted second priority to "all taxes and assessments under the laws" of the United States. Bankruptcy Act of 1867, § 28. The 1898 Act included as taxes entitled to priority "all taxes legally due and owing by the bankrupt to the United States, State, county, district or municipality. . . ." Bankruptcy Act of 1898, § 64. That expansion of the priority category, however, was followed by an increase in the types and levels of taxation imposed by the federal, state and local governments. As accelerating taxation absorbed greater percentages of [*1068] the bankrupt's estate, Congress recognized that

broad priority classifications hampered the goal of equitable distribution of the estate and penalized general creditors. S. Rep. No. 1158, 89th Cong., 2d Sess., *reprinted in* [1966] U.S. Code Cong. & Ad. News 2468, 2469. As a result, the trend of amendments to section 64(a) has been to erode the preferred status of taxes. [5] *See* Plumb, *The Tax Recommendations of the Commission on the Bankruptcy Laws -- Priority & Dischargability of Tax Claims*, 59 Cornell L.Rev. 991 (1974); Marsh, *Triumph or Tragedy? The* [**17] *Bankruptcy Act Amendments of 1966*, 42 Wash. L.Rev. 681 (1967). In view of this trend, it would be inappropriate for this court to expand priority status without a clear congressional mandate.

[5]     The revised Bankruptcy Act of 1978 is consistent with this trend. Section 507, 92 Stat. 2583, grants priority status to certain enumerated tax claims. The structure of this statute suggests a clear intent to limit taxes entitled to priority. The legislative history states that "the kinds of taxes entitled to priority under [the revised Act] closely follows the categories granted priority under the Bankruptcy Act. . . ." H.R.Rep. No. 595, 95th Cong., 2d Sess., *reprinted in* [1978] U.S. Code Cong. & Ad. News, 5787, 6151.

Our conclusion is further supported by the difference in protections accorded federal government and state government claims under the Act. Debts due to the United States are granted unique priority status under *11 U.S.C. § 104(a) (5) and 31 U.S.C. § 191.* [**18] Thus a

fee imposed by the federal government which could not be classified as a tax would still be eligible for priority status. However, the Act provides no priority protection for non-tax debts due to states and their subdivisions. [6] The District's demand for protection of its non-tax debt is thus contrary to the structure of section 64.

[6]     Priority coverage of non-tax debts owed to state governments was provided by an amendment to the Act in 1926. That coverage was repealed in 1938. *See* 3A *Collier on Bankruptcy*, P 64.501 (14th ed.).

We agree with the concern expressed by the district court that bankruptcy proceedings should not be allowed to impede local government agencies in the collection of essential funds. However, the District had a remedy under the Act that would have fully protected its interests. The state statutes under which the District operates provide that unpaid user fees constitute a lien against the user's real property. *Cal. Health & Safety Code §§ 5473.5 and 5473.11.* Had the [**19] District perfected such a lien, it would have been entitled to claim the protections of section 60 of the Act, *11 U.S.C. § 96*, as a secured creditor.

We hold that the user fees assessed to Lorber by the District are not taxes and do not constitute claims entitled to priority under § 64(a) of the Act. The judgment of the district court is REVERSED.

# TAB C



LEXSEE 361 F.3D 1157

**In re: OWEN GEORGE; In re: DEBORAH GEORGE, Debtors, OWEN GEORGE; DEBORAH GEORGE, Plaintiffs-Appellants, v. UNINSURED EMPLOYERS FUND; STEPHEN J. SMITH, Director of Industrial Relations; DEPARTMENT OF INDUSTRIAL RELATIONS; STATE OF CALIFORNIA, Defendants-Appellees.**

No. 01-16293

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*361 F.3d 1157; 2004 U.S. App. LEXIS 5122; Bankr. L. Rep. (CCH) P80,067; 42 Bankr. Ct. Dec. 245; 69 Cal. Comp. Cas 239*

**October 9, 2002, Argued and Submitted, San Francisco, California
March 18, 2004, Filed**

**PRIOR HISTORY:**    [**1] Appeal from the United States District Court for the Eastern District of California. D.C. No. CV-00-02754-WBS. William B. Shubb, District Judge, Presiding.

**DISPOSITION:**    Reversed.

**COUNSEL:** Michael E. Hansen, Sacramento, California, for the appellants.

John A. Siqueiros, Department of Industrial Relations, Office of the Director-Legal Unit, Los Angeles, California, for the appellees.

**JUDGES:** Before: Bobby R. Baldock, * Andrew J. Kleinfeld, and Johnnie B. Rawlinson, Circuit Judges.

*    The Honorable Bobby R. Baldock, Senior United States Court of Appeals Judge for the Tenth Circuit, sitting by designation.

**OPINION BY:** ANDREW J. KLEINFELD

**OPINION**

[*1159] KLEINFELD, Circuit Judge:

This is a bankruptcy case. The issue is whether the claim of the California Uninsured Employers Fund ("the Trust Fund") [1] against an employer who failed to purchase workers' compensation insurance is an "excise tax."

1    After this litigation began, the California state legislature renamed the Uninsured Employers Fund the Uninsured Employers Benefits Trust Fund. 2003 Cal. Stat. 228. *See Cal. Lab. Code § 62.5(c)(2)* (All references to the Uninsured Employers Fund shall mean the Uninsured Employers Benefits Trust Fund.").

[**2] **Facts**

Owen and Deborah George petitioned for bankruptcy under Chapter 7 on October 20, 1998, and obtained a discharge from debt on January 4, 1999. A year later, on February 7, 2000, they were found liable on a debt for $ 116,000. The debt arose because they had failed to cover an employee injury by purchasing workers' compensation insurance or meeting state requirements for self insurance, as required by law. [2]

2    *See Cal. Lab. Code § 3716(b).*

The Trust Fund filed a lien against the Georges' real property. The Georges filed a complaint in their bankruptcy case to establish that the debt had been discharged and to avoid the lien. The Bankruptcy Court held that the Trust Fund's claim was not an "excise tax,"

361 F.3d 1157, *1159; 2004 U.S. App. LEXIS 5122, **2;
Bankr. L. Rep. (CCH) P80,067; 42 Bankr. Ct. Dec. 245

so the debt was discharged and the lien was void. The Trust Fund appealed, and the District Court reversed. The Georges appeal.

## Analysis

Among the exceptions to discharge in *11 U.S.C. § 523* are taxes of the kind and for the periods [**3] specified in *subsection (a)(8) of 11 U.S.C. § 507*, the priorities section. Such taxes include "(E) an excise tax on-- . . . (ii) . . . a transaction occurring during the three years immediately preceding the date of the filing of the petition." [3] The sole issue raised on appeal is whether the Trust Fund's claim is this type of excise tax.

> 3  *11 U.S.C. § 507(a)(8)(E)(ii).*

The amount at issue is called by California law a "liquidated claim for damages," [4] not an "excise tax." California law [*1160] provides that if an employer fails to pay or secure payment of a workers' compensation award, the injured worker may obtain payment from the Trust Fund, which is "a special trust fund account in the State Treasury." [5] The issue in this case is not whether the injured employee gets paid. He already has been, out of the Trust Fund. The practical issue is whether the people of California have a continuing claim for reimbursement of what they paid the injured worker, that survives [**4] bankruptcy, against the Georges for failure to secure workers' compensation insurance, or whether the Georges get a fresh start.

> 4  *Cal. Lab. Code § 3717(a).*
> 5  *Id. § 62.5(c)(1).*

A final award that is "the subject of a demand on the [Trust] Fund . . . shall constitute a liquidated claim for damages against an employer." [6] The terminology the state uses to define the money does not control the federal-bankruptcy-law question of whether the debt is charged by bankruptcy. [7] In *United States v. Reorganized CF&I Fabricators of Utah, Inc.,* [8] the Supreme Court held that even a federal statutory denotation of the amount as a "tax" did not make it a tax for bankruptcy discharge purposes. Federal courts apply a "functional examination" to the exaction, regardless of how it is labeled, to determine whether it is a tax, a penalty, a debt, or something else. [9] "[A] tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government, [**5] " [10] as distinguished from a penalty, which is "an exaction imposed by statute

as punishment for an unlawful act." [11] Even though the money in *Reorganized CF&I Fabricators* would go to the United States Treasury and was termed a "tax" in the federal statute imposing the obligation, it was not a "tax," and thus not an "excise tax," because it was in substance a 100% penalty on pension plan funding deficiencies. *Reorganized CF&I Fabricators* does not really give us an answer for this case, because the amount the Georges owe the Trust Fund is not so obviously penal.

> 6  *Id. § 3717(a).*
> 7  *City of New York v. Feiring, 313 U.S. 283, 285, 85 L. Ed. 1333, 61 S. Ct. 1028 (1941).*
> 8  *United States v. Reorganized CF&I Fabricators of Utah, Inc., 518 U.S. 213, 135 L. Ed. 2d 506, 116 S. Ct. 2106 (1996).*
> 9  *Id. at 224.*
> 10  *Id.* (quoting *New Jersey v. Anderson, 203 U.S. 483, 492, 51 L. Ed. 284, 27 S. Ct. 137 (1906).*
> 11  *Id.* (quoting *United States v. La Franca, 282 U.S. 568, 572, 75 L. Ed. 551, 51 S. Ct. 278 (1931).*

[**6] In *In re Lorber Industries of California, Inc.,* [12] we held that charges imposed by a county for use of its sewer system to dispose of hazardous wastes were not an excise tax. We applied this tax definition: (1) An involuntary pecuniary burden (2) imposed by the state legislature (3) for a public purpose (4) under the state's police or taxing power. [13] Our point in so refining the definition of a tax was to distinguish taxes from debts for voluntarily assumed obligations, and thereby to limit nondischargeable priority obligations under the "excise tax" provision to those "justified by clear statutory authorization." [14] We noted in *Lorber* that "the trend of amendments to *section 64(a)* has been to erode the preferred status of taxes," because "as accelerating taxation absorbed greater percentages of the bankrupt's estate, Congress recognized that broad priority classifications hampered the [*1161] goal of equitable distribution of the estate and penalized general creditors." [15] Voluntariness was the issue, and we limited involuntariness to "inherent characteristics of the charges," not the "motivation" of the payer or the "practical and economic factors which constrained" [**7] the payer. [16] The amount at issue was not the ad valorem tax based on the value of the payer's real estate, but rather the additional fee for excess industrial use "triggered by Lorber's decision to discharge into the

Case 08-35653-KRH    Doc 4581-1    Filed 08/20/09    Entered 08/20/09 15:22:24    Desc
Appendix    Page 19 of 68
361 F.3d 1157, *1161; 2004 U.S. App. LEXIS 5122, **7;
Bankr. L. Rep. (CCH) P80,067; 42 Bankr. Ct. Dec. 245

Page 3

system large amounts of industrial wastewater." [17] This was a fee for services to industrial users rather than for services to the general population, which the payer subjected itself to by applying for a permit. It was therefore dischargeable and non-priority under the bankruptcy code. [18]

12    *In re Lorber Indus. of Cal., Inc.*, 675 F.2d 1062 (9th Cir. 1982).
13    *Id. at 1066.*
14    *Id.*
15    *Id. at 1067-68.*
16    *Id. at 1066.*
17    *Id. at 1067.*
18    *Id. at 1067-68.*

If *Reorganized CF&I Fabricators* and *Lorber* were all we had, the trend would suggest that the Georges' obligation could not be a tax. The amount is not imposed on all employers, just those who do not buy workers' compensation [**8] insurance or do not properly self insure, and the amount is not for the general support of government, but rather for reimbursement of the expense the government bears in paying the employer's workers' compensation obligation. *Reorganized CF&I Fabricators* classified, as not a tax for bankruptcy purposes, what was otherwise a "tax" for federal tax purposes. And *Lorber*, emphasizing the inequity to general creditors of an overly broad reading of "tax" and the trend of Congressional restriction of the tax priority, classified, as not a tax, the extra amount paid by heavy industrial users of the county's sewer district services.

But in our decision most directly on point, *In re Camilli*, [19] we changed directions. There we held, reversing the Bankruptcy Appellate Panel, that a claim by the Arizona fund similar in purpose to the Trust Fund is an "excise tax" for bankruptcy purposes. Both this case and *Camilli* involve a state claim against a bankrupt employer, who failed to secure workers' compensation insurance, for reimbursement of the amount paid an injured worker. *Camilli* distinguished our prior decision in *Lorber* on the ground that "at [**9] the time [Camilli's] obligation to repay the fund] arose," it was "the product of legislative fiat" and "was wholly beyond [her] control." [20] Also, securing worker's compensation insurance or an approved alternative was not voluntary in Arizona, but rather was "a legal duty." [21]

19    *In re Camilli*, 94 F.3d 1330 (9th Cir. 1996).
20    *Id. at 1333.*

21    *Id.*

The Sixth Circuit had gone the other way in another unsecured workers' compensation case, *In re Suburban Motor Freight*. [22] The bankrupt had not paid its premiums under the state workers' compensation scheme, so it was, like the bankrupts in *Camilli* and in this case, an illegally uninsured employer. The Sixth Circuit nevertheless held that the state fund's reimbursement claim for payments made to an injured worker was not an "excise tax" for bankruptcy purposes. [23] *Suburban Motor Freight* refined the *Lorber* test, because its "public purpose" definition of a tax was too broad, [**10] and required in addition "(1) that the pecuniary [*1162] obligation be universally applicable to similarly situated entities; and (2) that according priority treatment to the government claim not disadvantage private creditors with like claims." [24] The employer's liability arose from its failure to secure workers' compensation coverage, not from its status as an employer, so the "universally applicable" requirement of a tax did not apply. [25] Also, the liability was not a tax for the "independent reason" that bonding companies that had paid part of the employer's obligation would be unfairly disadvantaged by priority for the government's similar claim. [26]

22    *In re Suburban Motor Freight*, 36 F.3d 484 (6th Cir. 1994).
23    *Id. at 487-88.*
24    *Id. at 488.*
25    *Id. at 489.*
26    *Id.*

In *Camilli* we could have simply disagreed with the Sixth Circuit decision in *Suburban Motor Freight*, but we did not. Instead, we held that we did not [**11] have to decide whether its additional criteria for a tax applied, because the workers' compensation schemes in Ohio and Arizona were different from each other. We noted that Arizona had not created a state-government-monopoly insurance scheme, whereas Ohio had. We also determined that, nevertheless, no private entity competes with the [Arizona fund] to pay 'insurance' claims for which no insurance has been bought," and thus, there are no private creditors with claims similar [to the Arizona fund's claims]." [27]

27    *Camilli*, 94 F.3d at 1334.

We as a panel are required to follow *Camilli*, so there is no point in our evaluating whether it was correctly

Case 08-35653-KRH   Doc 4581-1   Filed 08/20/09   Entered 08/20/09 15:22:24   Desc
Appendix   Page 20 of 68

361 F.3d 1157, *1162; 2004 U.S. App. LEXIS 5122, **11;
Bankr. L. Rep. (CCH) P80,067; 42 Bankr. Ct. Dec. 245

Page 4

decided. The only question is whether *Camilli* is distinguishable from this case. Arguments made by counsel for the Georges persuade us that it is. *Camilli* distinguished *Lorber* because of some unique, non-universal characteristics of the Arizona workers' compensation system. For example, Arizona statutes designate [**12] payments made to injured employees as judgment[s] against the employer" [28] that "have the same priority against the assets of the employer as claims for taxes." [29] *Camilli* notes that in Arizona no similar creditors could be disadvantaged by priority and nondischargeability. [30] In California, injured employee payment reimbursement is pursued against the employer as a "liquidated claim for damages." [31] The California designation suggests that the appropriate comparison is to other claimants holding an entitlement to liquidated damages, some of whom could be non-governmental entities. The state law designation is not, as we have already explained above, controlling; it does, however, demonstrate the relative importance each state places on being reimbursed.

28  *Ariz. Rev. Stat. § 23-907(E).*
29  *Id. § 23-933.*
30  *Camilli, 94 F.3d at 1334.*
31  *Cal. Lab. Code § 3717(a).*

Moreover, if a creditor similarly [**13] situated to the government can be hypothesized under the relevant statute, then by the reasoning of *Camilli*, the government claim is not a tax. Under the California scheme, another employer could have a competing claim against the uninsured employer if the worker had suffered a cumulative injury. [32] In California, unlike in Arizona, the Trust Fund is not the sole source for compensation for a cumulatively-injured employee of an uninsured employer because another employer may also be liable. Under California law, another employer could be a competing creditor if two employers were liable to a worker, but [*1163] only one employer paid the worker. That employer's claim would be subrogated to the injured worker's claim against the uninsured employer, and would be subordinated if we were to treat the Trust Fund's "liquidated claim for damages" as an excise tax. [33] Under Arizona law, by contrast, only the last employer in whose employment the injured worker was injuriously exposed has liability. [34]

32  *Id. § 5500.5.*
33  *Id. § 3717(a).*

34  *Ariz. Rev. Stat. § 23-901.02*

[**14] Congress said that "excise taxes" are nondischargeable for the three years preceding filing for bankruptcy, not that all government claims of any kind are nondischargeable. [35] The government can have many claims that are not in the nature of taxes. For example, if someone crashes his plane into Mt. McKinley and dies, the Department of the Interior sends his estate a bill for littering the mountain. [36] That is analogous to a private landowner's claim for trespass, not to a tax. Likewise, if a person is injured in an accident that is someone else's fault, and obtains treatment in a veterans' hospital, the government is subrogated to the injured individual's rights against the tortfeasor. [37] The claim is not in the nature of a tax but rather in the nature of any public or private subrogated party's right to recovery against a tortfeasor.

35  *11 U.S.C. § 507(a)(8)(E).*
36  *See* 43 C.F.R. §§ 2881.3, 2920.1-2, 9239.1-2.
37  *See* 38 C.F.R. §§ 2.6(e)(4)(iii), 17.47(g).

[**15] The continuing refinements of the definition of "tax" in *Lorber*, *Suburban Motor Freight*, and *Camilli* reveal the difficulty of distinguishing, with exclusively ahistorical tools, taxes from non-tax government claims. We do not question the definitions of "tax" in *Lorber* and *Camilli*, but those definitions alone are not sufficient to distinguish an "excise tax" for purposes of *11 U.S.C. § 507(a)(8)(E)* from other government exactions. The word "excise" derives from the Latin *ex*, for "out," and *caedere*, meaning "to cut," and was in previous centuries used somewhat as we presently use "circumcise." [38] In the context of taxes, the term "excise taxes" has traditionally been used in the United States to refer to taxes on "the sale of a specified commodity" measured by value or quantity, such as alcohol, tobacco, or motor fuel, as opposed to taxes on income. [39] This sense is preserved in the bankruptcy statute by the phrasing "an excise tax on-- . . . (ii) . . . a [40] *transaction* occurring during the three years immediately preceding the date of the filing of the petition." [40]

38  5 Oxford English Dictionary 505 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989).

[**16]

39  Langdon Day, Marvin A. Chirelstein, Elisabeth A. Owens & Stanley S. Surrey, *Taxation in the United States* § 4/2.1 (1963).

40  *11 U.S.C. § 507(a)(8)(E)* (emphasis added).

361 F.3d 1157, *1163; 2004 U.S. App. LEXIS 5122, **16;
Bankr. L. Rep. (CCH) P80,067; 42 Bankr. Ct. Dec. 245

The Trust Fund claim against the Georges was not an exaction "on a transaction" the Georges made. Their only relevant transaction was hiring the employee who got injured, but hiring does not occasion a Trust Fund claim in California, and neither does an employee injury. What occasions such a claim is the *failure* to make the transaction of purchasing workers' compensation insurance (or applying for self-insured status). It is hard to squeeze the absence of a transaction, which triggers California Trust Fund liability, into the bankruptcy statute requirement of "a transaction occurring during" the three years preceding bankruptcy. [41] We conclude that the Trust Fund's claim is [*1164] not an "excise tax" for purposes of federal bankruptcy law.

41 *Id.*

[**17] **REVERSED**.

# TAB D



LEXSEE 94 F. 3D 1330

**In re: KAREN LEE CAMILLI, Debtor. INDUSTRIAL COMMISSION OF ARIZONA, Appellant, v. KAREN LEE CAMILLI, Appellee.**

No. 95-15928

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*94 F.3d 1330; 1996 U.S. App. LEXIS 23233; 36 Collier Bankr. Cas. 2d (MB) 833; 29 Bankr. Ct. Dec. 902; 61 Cal. Comp. Cas 1048; 148 A.L.R. Fed. 771; 96 Cal. Daily Op. Service 6643*

**June 10, 1996, Argued, Submitted, San Francisco, California
September 5, 1996, Filed**

**SUBSEQUENT HISTORY:** [**1] Certiorari Denied February 18, 1997, Reported at: *1997 U.S. LEXIS 767.*

**PRIOR HISTORY:** [**1] Appeal from the Ninth Circuit Bankruptcy Appellate Panel. BAP No. AZ-93-02437-JmR. Russell, Meyers, and Jones, Judges, Presiding.

**DISPOSITION:** REVERSED and REMANDED.

**COUNSEL:** Lawrence D. Hirsch, Hirsch Law Office, Phoenix, Arizona, for the appellant.

Russell A. Brown, Brown & Sunkin, Chandler, Arizona, for the appellee.

**JUDGES:** Before: Procter Hug, Jr., Chief Judge, Mary M. Schroeder and Michael Daly Hawkins, Circuit Judges. Opinion by Judge Schroeder.

**OPINION BY:** SCHROEDER

**OPINION**

[*1330] OPINION

SCHROEDER, Circuit Judge:

The United States Bankruptcy Code establishes a priority for nondischargeable obligations owed by a debtor to a state that are in the nature of an "excise tax." 11 U.S.C. § 507(a)(8)(E). The statute in relevant part provides:

> (a) The following expenses and claims have priority in the following order:
>
> . . .
>
> (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for -
>
> . . .
>
> (E) an excise tax on - [*1331]
>
> (ii) . . . a transaction occurring during the three years immediately preceding the date of the filing of the petition . . . .

*11 U.S.C. § 507(a)(8)(E)(ii).*

This case concerns a statutorily-imposed obligation [**2] of the debtor, Karen Camilli, to the Industrial Commission of Arizona (ICA) for workers' compensation benefits the Commission had to pay to one of Camilli's employees who was injured on the job. The ICA's obligation arose because Camilli had failed to obtain workers' compensation insurance in violation of state law. The sole issue is whether Camilli's debt to the ICA is

94 F.3d 1330, *1331; 1996 U.S. App. LEXIS 23233, **2;
36 Collier Bankr. Cas. 2d (MB) 833; 29 Bankr. Ct. Dec. 902

a "tax" within the meaning of the Bankruptcy Code, and therefore nondischargeable.

A divided Bankruptcy Appellate Panel ("BAP") held that the obligation was not a "tax" but was instead a "fee" that was to be treated as any other dischargeable, unsecured debt. *In re Camilli, 182 Bankr. 247 (9th Cir. BAP 1995).* The BAP majority decision reversed the decision of the Bankruptcy Court that had held the obligation nondischargeable as a tax.

The federal bankruptcy statutes do not define "tax," but the Supreme Court has made it clear that labels imposed by state law are not controlling. Rather, the Supreme Court has stated that taxes are "pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." [**3] *New York v. Feiring, 313 U.S. 283, 285, 85 L. Ed. 1333, 61 S. Ct. 1028 (1941).*

The leading case in this circuit is *In re Lorber Industries of California, 675 F.2d 1062 (9th Cir. 1982),* which refined that general principle by holding that to qualify as a tax, a debt must be (1) an involuntary pecuniary burden; (2) imposed by the state legislature; (3) for a public purpose; (4) under the police or taxing power. *Id., 675 F.2d at 1066.* We dealt in *Lorber* with charges imposed for the individual use of a city's sewer system to dispose of hazardous waste materials. The sewer system, with its concomitant charges, was one of the options available to entities wishing to dispose of waste materials lawfully, and users received a permit to use the sewer services in return for paying the charges. We characterized the obligation in *Lorber* as more akin to a contractual obligation, voluntarily incurred by the debtor, than to an "involuntary pecuniary burden" characteristic of a tax. *Id., 675 F.2d at 1067, n. 4.*

In this case the debtor violated state law by failing to obtain workers' compensation insurance for her employees. Under Arizona law, such violation could not operate to deprive an employee of workers' [**4] compensation benefits. Thus, when one of Camilli's employees was injured at work, Arizona law required the statutorily-established Special Fund to pay the benefits and obtain a judgment lien on behalf of the ICA against the employer for recoupment. *A.R.S. §§ 23-907, 23-1065.*

In deciding whether such an obligation is a nondischargeable tax, or whether it is more in the nature

of a contractual debt like the fee assessment in *Lorber,* a key consideration for the BAP was whether the obligation was voluntarily undertaken. The BAP majority concluded that the obligation was a voluntary one akin to acceptance of a contractual fee obligation, because in its view, Camilli made a "voluntary" decision to violate state law when she failed to insure her employees. Because we conclude that an obligation imposed by statute as a result of a violation of state law cannot, under the principles enunciated in *Lorber* and nearly universally accepted, constitute a contractual debt, we conclude that the BAP erred in reversing the Bankruptcy Court.

The BAP also rested its decision on the additional assumption that the Special Fund, which was owed reimbursement as a result of its own statutory obligation [**5] to pay benefits for defaulting employers, was in a position materially similar to private insurance carriers who may be owed unpaid premiums by employers in bankruptcy proceedings. The BAP majority decided that giving the obligation owed to the ICA a nondischargeable priority would discriminate against similarly situated private creditors. *See In Re Suburban Motor Freight, Inc., 36 F.3d 484 (6th Cir. 1994) (Suburban II).* We conclude, however, that private carriers who are owed [*1332] premiums established in insurance contracts are not similarly situated to the ICA's Special Fund because the Fund carries a unique burden imposed by the legislature in the exercise of its police power to protect employees injured on the job.

In order to provide a full understanding of the reasons for our decision, we first explain in some detail the operation of the Arizona workers' compensation system, and we then survey the legal authority dealing with similar issues concerning what is a "tax" under the Federal Bankruptcy Code.

## THE ARIZONA WORKERS' COMPENSATION SYSTEM

Fulfilling a mandate in the Arizona Constitution, *Ariz. Const. Art. 18, § 8,* the state legislature enacted a comprehensive workers' [**6] compensation scheme, codified at *A.R.S. § 23-901 et seq.* Employers must insure their workers against job-related injury or they risk civil and criminal sanctions. *A.R.S. § 23-907.*

Employers may buy workers' compensation insurance from the state or from authorized private providers or, by proving to the ICA their ability to pay

Case 08-35653-KRH    Doc 4581-1    Filed 08/20/09    Entered 08/20/09 15:22:24    Desc
Appendix    Page 25 of 68
Page 3

94 F.3d 1330, *1332; 1996 U.S. App. LEXIS 23233, **6;
36 Collier Bankr. Cas. 2d (MB) 833; 29 Bankr. Ct. Dec. 902

timely compensation directly to their injured employees and by posting a substantial bond, they may self-insure. *A.R.S. § 23-961.* An employee's agreement to waive workers' compensation is generally void. *A.R.S. § 23-1025.*

Employees may trade workers' compensation coverage for the right to sue the employer. This election is made by affirmatively rejecting the provisions of the Workers' Compensation Law in writing. *Ariz. Const. Art. 18 § 8; A.R.S. § 23-906.* Employees who do not formally reject the Law's protections are conclusively presumed to have accepted them and to have disclaimed the right to sue for injuries resulting from negligence. *A.R.S. § 23-906.*

To ensure compensation for injured workers whose employers have failed to insure them, but who elect not to sue, the legislature established a Special Fund. *A.R.S. § 23-1065.* [1] The Special Fund, [**7] maintained by tax revenues, is administered by the ICA. *A.R.S. § 23-1065.* Payments to an injured employee from the Special Fund "act as a judgment against the employer." *A.R.S. § 23-907.* And "judgments obtained in any action prosecuted by the [ICA] . . . under the authority of [the Workers' Compensation Law] . . . have the same priority against the assets of the employer as claims for taxes." *A.R.S. § 23-933.*

> 1    The Special Fund is different and separate from the State Compensation Fund, from which benefits are paid to injured workers whose employers have elected to purchase insurance from the state.

The Special Fund is maintained in part by a tax on all unemployment insurance premiums paid in Arizona, whether to the state or to a private insurer. *A.R.S. § 23-1065.* In addition, employers who qualify to self-insure pay into the Fund according to a formula. *Id.* Also helping maintain the Special Fund are sums the ICA recoups in actions like this one.

### PROCEDURAL HISTORY

Karen Camilli failed to insure [**8] employees of her now-defunct janitorial business, "Final Touch." After one of Camilli's staff, Barbara Kennedy, was injured at work in November 1989, Kennedy filed a claim for compensation with the ICA. The ICA paid Kennedy and obtained a judgment against Camilli pursuant to *A.R.S.*

section 23-907.

When Camilli filed for bankruptcy in 1991, the ICA filed an objection to her Chapter 13 Plan, and sought priority status for its judgment against her. After Camilli's Chapter 13 petition was dismissed and a subsequent Chapter 7 petition filed, she filed a complaint to determine the dischargeability of her debt to the ICA pursuant to *11 U.S.C. § 523(a)(1).* The ICA filed a timely answer, and the bankruptcy court ruled that the principal amount paid out of the Special Fund was an "excise tax" within the meaning of *11 U.S.C. § 507(a)(8)(E),* and therefore not dischargeable in bankruptcy.

Camilli appealed, and the BAP reversed, holding that the debt was not a tax, which is in the nature of an assessment, because this [*1333] debt resulted from "Camilli's voluntary decision not to provide insurance." *In re Camilli, 182 Bankr. at 251.* According to the BAP, the ICA's claim stemmed from its "implied [**9] voluntary contract with Camilli for subrogation of monies paid to [her] employees." *Id.* To grant priority to the ICA's claim, the BAP concluded, would be unfair to the private insurers who compete with the state to provide insurance, but who must "suffer along with the rest of the unsecured creditors" in bankruptcy. *Id.* The ICA timely appealed. We have jurisdiction under *28 U.S.C. §§ 158(c)(2)* and *158(d).*

### LEGAL ANALYSIS

Under this circuit's leading decision in *In re Lorber Industries of California, Inc., 675 F.2d 1062 (9th Cir. 1982),* an obligation owed to the state qualifies for priority as a "tax" under federal bankruptcy law only if it meets four separate requirements, three of which are not seriously disputed in this case. There is little or no question that the obligation was first, imposed by or under the authority of the legislature; second, for a public purpose; and third, imposed under the police power of the state in order to protect injured employees. The *Lorber* element about which the judges below disagreed in this case was whether the debt is an "involuntary" burden. In *Lorber,* the debtor owed the local sewer district charges for the debtor's use [**10] of the sewer system to discharge industrial waste. In holding that the obligation was contractual in nature rather than "involuntary," we stressed in *Lorber* that the obligation itself was not created by the statute authorizing imposition of the fees. *Id. at 1067.* Rather, the obligation was created by the debtor's voluntary act of using the system. *See id. at*

94 F.3d 1330, *1333; 1996 U.S. App. LEXIS 23233, **10;
36 Collier Bankr. Cas. 2d (MB) 833; 29 Bankr. Ct. Dec. 902

*1067, n. 4.*

Here, Camilli contends that her obligation is materially similar to that in *Lorber,* and the BAP majority agreed, holding that it was Camilli's "voluntary" decision not to purchase insurance that gave rise to this obligation. This holding is not, however, an accurate description of the legal effect of Camilli's failure to procure workers' compensation insurance in Arizona, even if that failure could be considered to be a "voluntary" act. The source of Camilli's obligation to repay the workers' compensation benefits in this case was not her failure to obtain insurance, but the statutorily-created obligation to reimburse the Special Fund once the Fund paid benefits to an uninsured employee. By contrast, in *Lorber* the event that triggered the charges was the voluntary use by the debtor of the sewer [**11] system. The obligation to repay the Fund in this case is thus the product of legislative fiat; at the time it arose, and the lien was established, it was wholly beyond the control of the debtor.

Moreover, we conclude that the failure of an employer to comply with the Arizona's Workers' Compensation Law should not be considered a "voluntary" act giving rise only to an implied contractual obligation like the obligation to pay sewer charges in *Lorber.* The legal duty to provide workers' compensation insurance for employees in Arizona is part of a complex system designed not merely to offset state expenditures, but to provide universal availability of workers' compensation benefits to employees in the state. We therefore hold that Camilli's obligation to the Special Fund meets the *Lorber* elements for qualifying as a "tax" under federal bankruptcy law.

Because we held in *Lorber* that the sewer user charges were not entitled to priority as a tax, we did not have occasion to consider whether the elements we discussed in that case would, in all circumstances, be sufficient to qualify an obligation as a tax. We did not decide whether they were merely necessary elements that, even [**12] if satisfied, might not be sufficient to qualify an obligation for priority. That issue has been addressed in subsequent decisions of the Sixth Circuit, handed down in the workers' compensation context, which we find instructive. *In re Suburban Motor Freight, Inc., 36 F.3d 484 (6th Cir. 1994)* (Suburban II); *In re Suburban Motor Freight, Inc., 998 F.2d 338 (6th Cir. 1993)* (Suburban I). The Sixth Circuit in these decisions

concluded that the *Lorber* elements, if considered both necessary and sufficient to qualify an obligation as a "tax," would result in too many priorities of debts to the government over like claims of private creditors. The Sixth Circuit held that government [*1334] entities should not be treated more favorably than private creditors with similar claims. *See Suburban II at 488; Suburban I at 342.*

In *Suburban I,* the Sixth Circuit considered the obligation of the debtor to pay premiums to the Ohio Bureau of Workers' Compensation. Under the Ohio workers' compensation scheme, unlike the Arizona workers' compensation scheme, all employers were required to pay premiums to the State Bureau of Workers' Compensation, and private insurance companies were [**13] not permitted to offer workers' compensation insurance. Central to the court's holding that the premium obligation was a "tax" was the fact that employers could have no similar obligations to a private carrier. Taking the view that the "public purpose" element enunciated in *Lorber,* standing alone, reached too broadly, the court refined *Lorber's* "public purpose" criterion to require (1) that the pecuniary obligation be universally applicable to similarly situated entities; and (2) that according priority treatment to a government claim not disadvantage private creditors with like claims. *See Suburban I, 998 F.2d at 342.* Because the premium obligation to the state was, in Ohio, a universal obligation for all employers except self-insurers, and because according priority treatment to those claims did not disadvantage any private creditors with similar claims, *Suburban I* held that the premium obligations were a tax.

In *Suburban II,* however, the same court was faced with the Bureau's claim, not for premiums, but for reimbursement of payments made to workers' compensation claimants. The payments had been necessitated by Suburban's failure to pay premiums when it was [**14] a participant in the state insurance fund, and its failure to pay claims which arose when it was a self-insured employer. The Sixth Circuit decided that such claims for reimbursement did *not* qualify as a "tax" within the meaning of the Bankruptcy Code.

*Suburban II* dealt first with the state's claim for reimbursement of compensation payments it made when the debtor was a fund participant but had defaulted on its premium obligations. The court reasoned that, once it had held in *Suburban I* that the premium obligations

94 F.3d 1330, *1334; 1996 U.S. App. LEXIS 23233, **14;
36 Collier Bankr. Cas. 2d (MB) 833; 29 Bankr. Ct. Dec. 902

themselves were entitled to priority as a tax, the court would not accord priority to the Bureau's claim for reimbursement as well. The Sixth Circuit concluded that allowing priority in bankruptcy for both premiums and claims payments would overcompensate the state without benefitting the general public.

*Suburban II* also dealt with claims for reimbursement brought about by Suburban's default on obligations to employees during the period when it was a declared self-insurer under the Ohio law. Again, relying on the specific provisions of Ohio law, the court noted that Ohio law required self-insurers to post a bond, and that sureties had contributed, along [**15] with the state's surplus fund, to compensate Suburban's injured employees when Suburban defaulted. To allow priority status to the state fund, the court concluded, would be unfair to private sureties.

The ICA's claims in this case are materially different from the Bureau's in *Suburban II*. First, the Arizona's workers' compensation scheme is not a state monopoly, so that premium obligations to the state would not be accorded tax priority as a universal obligation of all insured employers. Second, the ICA's Special Fund differs from Ohio's in that the ICA carries its statutorily-imposed burden alone. No private entity competes with the ICA to pay "insurance" claims for which no insurance has been bought. Thus, there are no private creditors with claims similar to the ICA's in bankruptcy proceedings.

Accordingly, the Sixth Circuit's decisions in *Suburban I* and *Suburban II* are fully consistent with our holding that the exclusive and universal obligation under Arizona law of the Special Fund to provide compensation to employees of uninsured employers is a "tax" entitled to

priority under the Bankruptcy Code. Because the obligation in this case meets the four additional requirements [**16] set forth by the Sixth Circuit in *Suburban I,* as well as the criteria of *Lorber,* there is no need to decide whether the *Suburban I* requirements must be met in all cases.

Cases in other jurisdictions are also consistent with our decision today. The cases out [*1335] of states like Ohio, where workers' compensation insurance by the state is mandatory, and the state insurance system monopolistic, generally hold that premium obligations to the state scheme have priority "tax" status. *See, e.g., New Neighborhoods v. W. Va. Workers' Compensation Fund, 886 F.2d 714 (4th Cir. 1989); In re Pan American Paper Mills, Inc., 618 F.2d 159, 162 (1st Cir. 1980); In re E.A. Nord Co., Inc., 75 Bankr. 634 (Bankr. W.D. Wash. 1987); In re Int'l Automated Mach., Inc., 9 Bankr. 575 (Bankr. N.D. Ohio 1981).* Similarly, courts have given tax priority to mandatory "contributions" to state workers' or unemployment compensation funds. *See, e.g., Matter of Pierce, 935 F.2d 709, 711 (5th Cir. 1991); In re William Akers, Jr. Co., 121 F.2d 846 (3rd Cir. 1941); In re Nail, 163 Bankr. 105 (Bankr. E.D. Mich. 1994); In re Chateaugay Corp., 153 Bankr. 632 (Bankr. S.D.N.Y. 1993);* [**17] *In re Continental Minerals Corp., 132 Bankr. 757, 759 (Bankr. D. Nev. 1991); In re Ndosi, 116 Bankr. 687, 689 n.1 (Bankr. D. Minn. 1990).*

For the foregoing reasons the decision of the Bankruptcy Appellate Panel is REVERSED and the matter is remanded with instructions to affirm the decision of the Bankruptcy Court.

REVERSED and REMANDED.

# TAB E





LEXSEE 203 U.S. 483

**NEW JERSEY v. ANDERSON.**

No. 49.

**SUPREME COURT OF THE UNITED STATES**

*203 U.S. 483; 27 S. Ct. 137; 51 L. Ed. 284; 1906 U.S. LEXIS 1612*

Argued October 19, 1906.
December 10, 1906, Decided

**PRIOR HISTORY:** APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

THIS is an appeal from the judgment of the Circuit Court of Appeals for the Seventh Circuit, affirming the order of the District Court, which affirmed the finding of the referee in bankruptcy, denying to the State of New Jersey a preference for alleged franchise taxes from the estate of a bankrupt, the Cosmopolitan Power Company.

On December 21, 1903, the claim for the State was filed, under the provisions of section 64a of the bankruptcy law. The claim is set forth as follows:

| | |
|---|---:|
| Tax -- 1902 | $5,750 00 |
| Interest to October 15, 1903 | 891 25 |
| Costs on injunction proceedings, because of non-payment of taxes | 26 15 |
| Tax -- 1903 | 2,500 00 |
| Interest to October 15, 1903 | 87 50 |
| | $9,254 90 |

The Cosmopolitan Power Company is a corporation organized under the laws of the State of New Jersey on April 30, 1900, for the purpose of dealing in engines, machines, etc. By its charter it had power to do business in any State or Territory of the United States. While it had its principal office in the State of New Jersey, located under the terms of its certificate of incorporation, it had no property in that State, and conducted its business in the State of Illinois.

The capital stock of the corporation on January 1, 1902, was forty millions of dollars, of which there were ten millions outstanding. On May 13, 1902, its capital stock, pursuant to the laws of New Jersey, was reduced to $2,500,000. The company was adjudicated a bankrupt on April 23, 1903, upon an involuntary petition filed in the District Court for the Northern District of Illinois.

On November 7, 1902, the state board of assessors of New Jersey, the company having failed to make return, levied an assessment for the license or franchise tax in question for the year 1902 in the sum of $5,750.00. On June 1, 1903, there was assessed against the company for

the year beginning January 1, 1903, a similar tax on outstanding capital stock in the sum of $2,500.00, in accordance with the return of the company filed on May 1, 1903.

On February 12, 1904, the State of New Jersey filed its motion before the referee for the payment of said taxes as a preferential debt. The referee disallowed the 1903 tax altogether, and allowed the 1902 tax as a general claim against the estate for the sum of $4,945.08. This reduction was made from the assessment for the year 1902, because the state board had made the assessment upon the basis of $40,000,000 of outstanding capital stock, whereas, in fact, only $10,000,000 was then issued and outstanding, upon which basis the referee made the allowance. The District Court affirmed the order of the referee. Upon appeal to the Circuit Court of Appeals that court modified the judgment of the District Court so as to allow the taxes claimed for the year 1903, as a general debt, and in other respects affirmed the *District Court. 137 Fed. Rep. 858.* The case was then brought here.

**LAWYERS' EDITION HEADNOTES:**

Bankruptcy -- preferences -- franchise tax. --

Headnote:

The claim of the state of New Jersey against the estate of a bankrupt corporation organized under the laws of that state, but doing no business and having no property there, for the "annual license fee or franchise tax" on its outstanding capital stock, imposed under N. J. Gen. Stat. 1895, 251, 252, 257, 258, 260, is for a tax legally due and owing to the state, which, under the bankrupt act of July 1, 1898 (30 Stat. at L. 563, chap. 541, U. S. Comp. Stat. 1901, p. 3447), 64a, must be paid in advance of dividends to creditors.

Bankruptcy -- preferences -- franchise tax. --

Headnote:

The finding of the state board of assessors as to the amount of outstanding capital stock of a corporation, made for the purpose of fixing the amount of the annual license fee or franchise tax imposed by N. J. Gen. Stat. 1895, 251, 252, 257, 258, 260, is not conclusive on the bankruptcy court, in view of the provisions of the bankrupt act of July 1, 1898, 64a, that, in case any

question arises as to the amount or legality of any tax entitled to priority of payment under that section, the same shall be heard and determined by the court.

Bankruptcy -- preferences -- franchise tax. --

Headnote:

The franchise tax assessed under N. J. Gen. Stat. 1895, 251, 252, 257, 258, 260 on the basis of the capital stock of a corporation issued and outstanding on the 1st of January preceding the making of the return, is "legally due and owing" within the meaning of the bankrupt act of July 1, 1898, 64a, providing that taxes must be paid in advance of the payment of dividends to creditors, although such tax may not have been collectible until after the corporation was adjudged a bankrupt.

**SYLLABUS**

The requirement of § 64a of the bankruptcy law of 1898 in regard to preference of taxes is a wide departure from the act of 1867 and prefers taxes due to any State and not only those due to the State in which proceedings are instituted.

It is the province of the courts to enforce, not to make, laws; and if a law works inequality the redress, if any, must be had from Congress, and arguments directed, not to the construction of the act, but as to the justice of a method of distribution of assets under the bankruptcy law, and the hardship resulting therefrom, cannot influence judicial determination.

Generally speaking, a tax is a pecuniary burden laid upon individuals or property to support the Government, and § 64a of the bankruptcy law is very broad and covers all taxes, including yearly license fees imposed by the State on corporations organized under its laws for the privilege of doing business, whether such business is carried on in that or in other States.

A State creating a corporation may fix the terms of its existence and provide that for the continued existence of its franchise it must yearly pay the State certain sums fixed by the amount of its outstanding stock.

While the state court may construe a statute and define its meaning it cannot conclusively determine that which is not a tax to be a tax within the meaning of a Federal statute; that is a Federal question of ultimate

203 U.S. 483, *; 27 S. Ct. 137, **;
51 L. Ed. 284, ***; 1906 U.S. LEXIS 1612

decision in this court.

In this case this court reaches independently the same conclusion as that reached by the state court.

Under the bankruptcy act taxes assessed on returns made prior to the adjudication are legally due and owing and entitled to the preference given by § 64a although not collectible until after the adjudication.

*137 Fed. Rep. 858*, reversed.

**COUNSEL:** Mr. Edward D. Duffield, with whom Mr. Levy Mayer and Mr. Robert H. McCarter were on the brief, for appellant:

The claim of the appellant is a tax within the meaning of the bankruptcy act and is entitled to priority as such. *Tennessee v. Whitworth, 117 U.S. 129, 136; State v. Evening Journal Assn., 47 N.J.L. 36; State Board of Assessors v. Central R.R. Co., 48 N.J.L. 146; Standard Cable Co. v. Attorney General, 46 N.J. Eq. 270; Pipe Line Co. v. Berry, 52 N.J.L. 308, 311; Trenton Savings Fund v. Richards, 52 N.J.L. 156; Honduras Commercial Co. v. State Board of Assessors, 54 N.J.L. 278; Lumberville Bridge Co. v. Assessors, 55 N.J.L. 529; State v. Board of Assessors, 61 N.J.L. 461; Hancock, Comptroller, v. Singer Mfg. Co., 62 N.J.L. 289; Re Mutual Mercantile Agency, 8 Am. Bank. Reps. 435; Myers v. Campbell, 64 N.J.L. 186; Ches. & O. Ry. Co. v. Atlantic Transp. Co., 62 N.J. Eq. 751; Mayor of Newark v. State Board, 51 Atl. Rep. 67; Arimex Cons. Copper Co. v. State Board, 54 Atl. Rep. 244; Hardin v. Morgan, 70 N.J.L. 484; W.U. Tel. Co. v. Massachusetts, 125 U.S. 530; Massachusetts v. W.U. Tel. Co., 141 U.S. 40, 45; Wilmington R.R. Co. v. Reid, 13 Wall. 264; Atlantic & Pacific Tel. Co. v. Philadelphia, 190 U.S. 160; Western Union Tel. Co. v. Missouri, 190 U.S. 412;* 14 Am. & Eng. Ency. of Law, 2d ed., 6; 27 Am. & Eng. Ency. of Law, 2d ed., 578, 932; *I.C.R.R. Co. v. Decatur, 147 U.S. 190, 199; City of Camden v. Allen, 26 N.J.L. 398;* First Nat. Bank v. Aultman, Miller & Co., 12 Am. Bank. Reps. 12; 2 Cook on Corporations, 5th ed., 561. *Re United States Car Co., 60 N.J. Eq. 514; Re Danville Rolling Mill Co., 121 Fed. Rep. 432,* distinguished.

Mr. Horace Kent Tenney, with whom Mr. Frederick D. Silber was on the brief, for appellee, submitted:

The claim is not entitled to any priority. The proper construction of § 64a requires that only such taxes be

paid as priorities as could be collected from property within the jurisdictional limits of the taxing body at the time the petition was filed. Said section does not provide for the payment of taxes due all States, counties, etc., but due the State.

Both the language of the section and the history of the legislation plainly shows that such intention was in the mind of Congress.

The license fee or franchise tax in question is not a tax, according to the decisions of the courts of New Jersey, and other courts. *Re U.S. Car Co., 60 N.J. Eq. 514; Re Ott, 2 A.B.R. 637; Re Danville Rolling Mill Co., 10 A.B.R. 327; Re Aultman, Miller & Co., 12 A.B.R. 12; North Jersey Street Ry. Co. v. Mayor of Jersey City, 63 Atl. Rep. 83;* 1 Cooley on Taxation, 6; *Singer Mfg. Co. v. Heppenheimer, 58 N.J.L. 634; Hancock v. Singer Mfg. Co., 62 N.J.L. 289; Lumberville Bridge Co. v. Assessors, 55 N.J.L. 537; American Smelting & Refining Co. v. People, 82 Pac. Rep. 531.*

The license fee for 1902 never became a valid charge, because the board of assessors had no right under the statute to levy it in November. The statute requiring the levy in June is mandatory and not directory. The court will not give priority to an allowance that never should have been made.

Regardless of any priority, the reduction of the claim for 1902 was proper. The District Court had the right to investigate the legality and amount of the tax for 1902, and to reduce it, under § 64a, and the board of assessors had no power to make the charge on any capital stock not issued and outstanding. *Trenton Heat & Power Co. v. State Board of Assessors, 63 Atl. Rep. 1005; Arimes Copper Co. v. State Board 69 N.J.L. 121;* Peoples Investment Co. v. Assessors, 37 Vroom, 175.

The claim for 1903 should be disallowed, because said claim was not in existence and did not constitute a debt, at the time the bankruptcy petition was filed, and was not then a tax legally due and owing. *Re Aultman, Miller & Co., 12 A.B.R. 12; Emmerman v. Ohio Steel & Iron Co., 13 A.B.R. 40;* and see forms of this court in bankruptcy, Nos. 31 to 36.

**OPINION BY:** DAY

**OPINION**

[*487] [**138] [***286] MR. JUSTICE DAY, after making the foregoing statement, delivered the opinion of the court.

The provisions of the bankrupt law governing the payment of taxes are found in section 64a, act of 1898 (30 Stat. 563, U.S. Comp. Stat. 1901, p. 3447), which reads:

SEC. 64a. The court shall order the trustee to pay all taxes legally due and owing by the bankrupt to the United [*488] States, State, county, district, or municipality in advance of the payment of dividends to creditors, and upon filing the receipts of the proper public officers for such payment he shall be credited with the amount thereof, and in case any question arises as to the amount or legality of any such tax the same shall be heard and determined by the court."

The statute of the State of New Jersey (Gen. Stat. 1895, §§ 251, 252, 257, 258, 260), by its title undertakes to provide for the imposition of state taxes upon certain corporations and for the collection thereof. It requires the corporation to make return to the state board of assessors on or before the first Tuesday in May of each year and to pay an annual license fee or franchise tax of a certain per cent on its capital stock issued and outstanding on January 1 of each year, up to and including $3,000,000; a different per cent on sums in excess of $3,000,000, and not exceeding $5,000,000, and on outstanding capital stock exceeding $5,000,000, [**139] $50 per million or any part thereof. In case the corporation shall fail to make return the state board shall ascertain and fix the amount of the annual license fee, or franchise tax, and shall report to the comptroller on or before the first Monday in June the basis and amount of the tax as returned by each company to, or ascertained by the board, which shall then become due and payable, and it shall be the duty of the state treasurer to receive the same. If the tax remains unpaid on July first after the same becomes due it shall thenceforth bear interest at the rate of one per cent per month. That the tax shall be a debt due from the company to the State, for which it may maintain an action at law for recovery thereof, after the same shall have been in arrears for the period of one month, and the tax shall be a preferred debt in case of insolvency, and in cases of arrears for three months the State may apply for an injunction to restrain the company from exercising its corporate franchise; and that if any corporation shall be delinquent for two years its charter shall be void, unless

further time be given for the payment of taxes.

[*489] It is contended for the appellee that these provisions do not entitle the State to the payment of its claim as a preferred tax within the meaning of the bankrupt act. It is insisted, in the first place, that a proper construction of the act of 1898 does not require the payment of taxes to a State wherein the bankrupt has no property, and the State no means of collecting the tax from property within its jurisdiction. And it is urged that the taxes to be paid are those legally due and owing to the United States, State, county, district or municipality, which does not contemplate payment to any and all States, but only to THE State, which, [***287] it is insisted, should be interpreted with the limitation stated.

It is to be noted that there is a very significant difference in this respect, in the act of 1898, from the provisions of the bankrupt act of 1867, 14 Stat. 530, c. 176, the law in force last before, and do btless in the view of Congress when the present law was drawn. That act, of 1867, gave priority of payment to all debts due to the United States, and all taxes and assessments under the laws thereof, all debts due to the State in which the proceedings in bankruptcy were pending, and all taxes and assessments made under the laws of such State, and provided that nothing contained in the act should interfere with the assessment and collection of taxes by the authority of the United States or any State.

The requirement of the present law is a wide departure from the act of 1867, and specifically obliges the trustee to pay all taxes legally due and owing, without distinction between the United States and the State, county, district or municipality.

An argument is made as to the alleged injustice of this requirement, in that it may take away from the local creditors in the State where the property of the corporation is situated practically all the assets of the corporation in favor of the State where the corporation is organized, but has no business or property. And it is urged that to permit a State under such circumstances to have a preference in the payment of [*490] taxes would give to it an advantage which it could not otherwise obtain for want of charge or lien upon the property. But considerations of this character, however properly addressed to the legislative branch of the government, can have no place in influencing judicial determination. It is the province of the court to enforce, not to make the laws, and if the law works inequality the redress, if any,

must be had from Congress.

The question is, is the claim a tax legally due and owing to the State of New Jersey? We have been cited to many cases in the State of New Jersey, some of which it is alleged maintain the theory of the appellant that this is a tax, and some the contrary view.

Without undertaking to analyze these numerous cases or to harmonize the views expressed by different judges, we think the weight of judicial decision in that State favors the view that this is a tax imposed upon the right of the corporation to continue to be a corporation, with power to exercise its corporate franchises, based upon the amount of its capital stock issued and outstanding.

In *Hancock, Comptroller, v. Singer Manufacturing Co., 62 N.J.L. 289, 335,* it was said:

"The act of 1884 (Pamph. L, p. 232) is entitled 'An act to provide for the imposition of state taxes upon certain corporations and for the collection thereof.'

"In that act this imposition is called a yearly license fee or tax.

"In a supplement passed to the act of 1884 (Pamph. L, 1891, p. 150) it is styled 'a tax.'

"In a further supplement, passed in 1892 (Pamph. L, p. 136), it is called 'an annual license fee or franchise tax.'

"It is wholly immaterial what name may be given to it. The fact that it is called a 'license fee' or 'franchise tax' cannot validate it. It is levied under an act passed 'to authorize the imposition of state taxes,' and it is none the less an interdicted imposition [having reference to the charter [*491] then being considered], and none the less a tax because it is given a new name.

"Although under our adjudications it is [**140] not a tax on property in a sense which brings it within article 4, section 7, paragraph 12, of our state constitution, it is a tax on the capital stock of the corporation. Otherwise the act would be manifestly void for want of a title expressing its object, and the State would be deprived of all its revenue under the act of 1892. The franchise of the company is the right to hold property and exercise its corporate privileges. The Supreme Court of the United States has decided that where a corporation is exempted from taxation, it is not subject to a tax on its franchise.

*Wilmington Railroad Co. v. Reid, 13 Wall. 264."*

While we take this view of the decisions of the Supreme Court of New Jersey and reach the conclusion that the claim in question is for a tax within the meaning of the law as construed by that court, the bankruptcy act is a Federal statute, the ultimate interpretation of which is in the Federal courts. It is doubtless true, as was said in the opinion of the learned judge speaking for the Circuit Court of Appeals, in this case, that if the highest court of the State should decide that a given statute imposed no tax within the meaning of the law as interpreted by it, a Federal court, in passing upon the bankruptcy act, would not compel the State to accept a preference from the bankrupt's estate upon a different view of the law. Conceding the doctrine that the meaning of a statute is a state question, except where rights, the subject of adjudication by the Federal courts, have accrued before its construction by the state court, or the question of contract within the protection of the Federal Constitution is involved, still a state court, while entitled to great consideration, cannot conclusively decide that to be a tax within the meaning of a Federal law, providing [***288] for the payment of taxes, which is not so in fact. The section (64a) itself declares that in case of disputes as to the amount or legality of any such tax, they [*492] shall be heard and determined by the court. The state court may construe a statute and define its meaning, but whether its construction creates a tax within the meaning of a Federal statute, giving a preference to taxes, is a Federal question, of ultimate decision in this court.

We are of opinion that this claim was for a tax. The language of the act, as we have said, is very broad and includes all taxes. It is not necessary to enter upon a discussion of the different forms which taxes may take. Generally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government. We think this exaction is of that character. It is required to be paid by the corporation after organization in invitum. The amount is fixed by the statute, to be paid on the outstanding capital stock of the corporation each year, and capable of being enforced by action against the will of the taxpayer. As was said by Mr. Justice Field, speaking for the court in *Meriwether v. Garrett, 102 U.S. 472, 513:*

"Taxes are not debts. It was so held by this court in the case of Oregon v. Lane County, reported in 7 Wallace. Debts are obligations for the payment of money

founded upon contract, express or implied. Taxes are imposts levied for the support of the Government, or for some special purpose authorized by it. The consent of the taxpayer is not necessary to their enforcement. They operate in invitum. Nor is their nature affected by the fact that in some States -- and we believe in Tennessee -- an action of debt may be instituted for their recovery. The form of procedure cannot change their character."

It is urged by the appellee, and upon this ground the case was decided in the Circuit Court of Appeals, that this is in no just sense a tax levied by the State, but is the result of a contract by which the corporation was brought into existence, the consideration being the payment of annual sums for the privileges given it by the State, for which no lien is given upon the property, but only a right of action for their recovery. [*493] But this imposition is in no just sense a contract. The amount to be paid, fixed by the statute, is subject to control and change at the will of the State. It is imposed upon all corporations, whether organized before or after the passage of the act. The corporation is not consulted in fixing the amount of the tax, and under the laws of New Jersey the charter of such corporations as this may be amended or repealed. *Hancock v. The Singer Manufacturing Co., 62 N.J.L. 289, 328.*

The form of the collection of taxes is left to the discretion of the taxing power; sometimes a lien is provided, sometimes a summary method of collection is awarded; in other cases, an action for debt is given, and, as in the present case, with the right of prohibition of the exercise of corporate franchises by injunction for failure to pay.

We think then that, as denominated in the statute, this was a tax imposed by the State upon the corporation for the privilege of existence and the continued right to exercise its franchise.

The State which created this corporation had the right to fix the terms of its existence, and to provide, if it saw fit so to do, that for the continued existence of its franchise the corporation should pay certain sums to the State, fixed by the amount of its yearly outstanding capital stock. [**141] *Metropolitan St. Ry. Co. v. New York, 199 U.S. 1, 8, 37* et seq.

Coming to the specific objections to the claim for the year 1902, the claim was presented upon the basis of $40,000,000 of outstanding capital stock, when in fact

there was only $10,000,000 of such stock, the assessment by the state board being upon the former sum and made upon the failure of the corporation to report. But we do not think the finding of the state board is conclusive. The tax is to be assessed upon capital actually outstanding. It may well be doubted whether the board had power to tax any other stock. But be that as it may, section 64a specifically provides that in case any question arises as to the amount or legality of taxes, the same shall be heard and determined by the court, with a view to ascertaining [*494] the amount really due. We do not think it was the intention of Congress to conclude the bankruptcy courts by the findings of boards of this character, and that the claim should have been upon the basis of the capital stock actually outstanding.

The amount claimed for the year 1903, it is insisted, had not accrued at the time of the adjudication in bankruptcy, which was on April 23, 1903, the return being made on May 2, 1903, and the assessment was not made until July 1, 1903; but the annual return required to be made to the board, on or before the first Tuesday in May, is upon the basis of the capital stock issued and outstanding the first of January preceding the making of the return. The bankrupt act requires the payment of all taxes legally due and owing. We think the tax thus assessed upon that basis was legally due and owing, [***289] although not collectible until after the adjudication.

We reach the conclusion that, under the bankruptcy act these taxes, in the amounts hereinbefore indicated, were entitled to preferential payment in favor of the State of New Jersey, and that the Circuit Court of Appeals erred in reaching a contrary conclusion.

Its judgment will be

Reversed and the cause will be remanded to the District Court for further proceedings in conformity with this opinion.

**DISSENT BY: HARLAN**

**DISSENT**

MR. JUSTICE HARLAN (with whom concurred MR. CHIEF JUSTICE FULLER and MR. JUSTICE PECKHAM) dissenting.

The Chief Justice, Mr. Justice Peckham and myself

dissent from the opinion of the court. In our judgment the "taxes" owing by a bankrupt to a State -- which section 64a of the bankruptcy act provides shall be paid in advance of the payment of dividends to creditors -- do not embrace an "annual license fee or franchise tax" (the words of the New Jersey statute), which, strictly, is not a property tax, but only an exaction by the State for the privilege given to a corporation [*495] to do certain business under its charter. We think the bankruptcy act should be so construed. It cannot be otherwise construed without doing gross injustice to those creditors of the bankrupt corporation who have business transactions with it at its place of business. Here the bankrupt corporation did no business in New Jersey. So far as appears, it did not have, nor expect to have, any connection with that State except to become incorporated under its laws. It had its seat of operations and all its tangible property in the State of Illinois. It had no property in New Jersey.

Its scheme was to get a charter from New Jersey and then go to another State for purposes of its business. We do not think that Congress intended that in the distribution of the assets of a bankrupt preference should be given to the claims of a State which have their origin in and are wholly based upon a bargain with the State whereby certain privileges are granted in exchange for certain payments -- privileges which the State may grant or withhold at pleasure. In our opinion the word "taxes" in the bankruptcy act was intended to embrace only burdens or charges imposed in invitum and which were in their nature and in reality "taxes," as distinguished from governmental exactions for privileges granted. The claim of New Jersey, whatever its true amount, should not be given priority, but should be placed upon the same footing with claims of other creditors. This view is consistent with the act of Congress.

# TAB F

# LexisNexis·

LEXSEE 315 U.S. 510

## UNITED STATES v. NEW YORK *

\* Together with No. 251, New York v. United States, also on writ of certiorari,
314 U.S. 592, to the Circuit Court of Appeals for the Second Circuit.

### No. 238

### SUPREME COURT OF THE UNITED STATES

*315 U.S. 510; 62 S. Ct. 712; 86 L. Ed. 998; 1942 U.S. LEXIS 1154; 28 A.F.T.R. (P-H)
995; 1942-1 C.B. 240*

**February 2, 1942, Argued
March 2, 1942, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

*CERTIORARI, 314 U.S. 592,* on cross-petitions, to review a judgment reversing part of an order of the *District Court, 38 F.Supp. 976,* for the distribution of assets of a bankrupt estate.

**DISPOSITION:** *118 F.2d 537,* reversed.

## LAWYERS' EDITION HEADNOTES:

[***LEdHN1]

BANKRUPTCY, §190

priorities -- employer's liability for Social Security Act tax. --

Headnote:[1]

The obligation imposed by 801, 802 of Title VIII of the Social Security Act (*42 USC 1001, 1002*) upon employers to collect the tax imposed upon the income of employees, by deducting the amount of the tax from the wages of employees, and the liability of the employer for the amount of the tax although he has not so deducted it, constitute a "tax" entitled to priority upon the employer's bankruptcy, under 64(a)(4) of the Bankruptcy Act (*11*

*USC 104*), rather than a debt.

[***LEdHN2]

BANKRUPTCY, §190

priorities -- exactions included in term "tax." --

Headnote:[2]

A "tax," for purposes of 64(a)(4) of the Bankruptcy Act (*11 USC 104*) includes any pecuniary burden laid upon individuals or property for the purpose of supporting the government, by whatever name it may be called.

[***LEdHN3]

BANKRUPTCY ACT, §190

priorities -- tax imposed by Social Security Act -- character as penalty. --

Headnote:[3]

The excise tax exacted by 901, Title IX of the Social Security Act (*42 USC 1101*) of employers constitutes in its entirety a tax entitled to priority under 64(a)(4) of the Bankruptcy Act (*11 USC 104*), and is not a penalty or forfeiture within the meaning of 57(j) of the Bankruptcy Act (*11 USC 93(j)*), although the Social Security Act

permits him to credit against the tax the amount of his contributions to the state unemployment fund, such credit not to exceed 90 per cent of the tax.

[***LEdHN4]

BANKRUPTCY, §190

priorities -- Social Security tax -- formula for determining deductible credits. --

Headnote:[4]

Formula adopted by court below for determining amount of the credit deductible under 902 of the Social Security Act against the tax imposed by 901 of the same act (*42 USC 1101*), in the case of a bankrupt who has not made any contribution to the state unemployment fund at the time of adjudication and whose assets are insufficient to meet the total of the claims of equal priority, held, not error, although its effect is to accord the United States a larger sum on its claim under 901 than it would receive if the available assets were sufficient to discharge in full all priority claims.

**SYLLABUS**

1. Under §§ 801 and 802 of Title VIII of the Social Security Act, an employer is required to collect the tax laid on the wage incomes of his employees, but is liable for its payment whether or not he collects it. P. 515.

2. This liability of the employer is a tax, and a claim thereon is entitled to priority as for a tax under § 64 (a) (4) of the Bankruptcy Act. P. 515.

3. A tax for the purposes of § 64 (a) (4) of the Bankruptcy Act includes any pecuniary burden upon individuals or property for the purpose of supporting the Government. P. 515.

4. The provision of *§ 902* of Title IX of the Social Security Act allowing the employer to credit against his tax, under *§ 901*, the amount of his contributions to state unemployment funds up to 90% of the tax, does not make the tax to that extent a penalty, within the meaning of § 57 (j) of the Bankruptcy Act, as applied to an employer who has failed to make such contributions. P. 516.

5. In determining the amounts distributable to the United States on its tax claim and to the State for its unemployment fund, under *§§ 901* and *902* of Title IX of

the Social Security Act, from a bankrupt estate whose assets were insufficient to satisfy these and other claims of priority, *held* that the allowance to be made for the state fund should be credited against the total tax claim of the United States under *§ 901*, rather than against the amount actually available for such claim. P. 520.

**COUNSEL:** Mr. J. Louis Monarch, with whom Solicitor General Fahy, Assistant Attorney General Clark, and Mr. Alvin J. Rockwell were on the brief, for the United States.

Mr. William Gerard Ryan, Assistant Attorney General of the State of New York, with whom Messrs. John J. Bennett, Jr., Attorney General, and Henry Epstein, Solicitor General, were on the brief, for the State of New York.

**JUDGES:** Stone, Roberts, Black, Reed, Frankfurter, Douglas, Murphy, Byrnes, Jackson

**OPINION BY:** BYRNES

**OPINION**

[*511]    [**713]    [***999]    MR. JUSTICE BYRNES delivered the opinion of the Court.

The United States and the State of New York seek review of a judgment of the Circuit Court of Appeals for the Second Circuit reversing in part a District Court order for the distribution of the assets of a bankrupt estate. The Independent Automobile Forwarding Corporation was adjudicated a bankrupt on April 26, 1938. A total of $ 3,053.20 eventually became available for distribution. [*512] This amount was insufficient even to meet those claims of the federal and state governments which were assertedly entitled to priority as taxes under § 64 (a) (4) of the Bankruptcy Act. [1] The federal claims of this character were for amounts due under §§ 801 and 802 of Title VIII and under *§ 901* of Title IX of the Social Security Act, [2] and for certain taxes as to which no question is [***1000] raised in this case. The state claims were for payments due its unemployment insurance fund, and for taxes not in issue here.

1    "Section 64. Debts which have priority. -- a. The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be . . . (4) taxes legally due and

owing by the bankrupt to the United States or any State or any subdivision thereof . . ." *U. S. C., Title 11, § 104.*

2   c. 531, 49 Stat. 636, 639.

"Section 801. Income tax on employees. In addition to other taxes, there shall be levied, collected, and paid upon the income of every individual a tax equal to the following percentages of the wages (as defined in § 811) received by him after December 31, 1936, with respect to unemployment (as defined in § 811) after such date: (1) With respect to employment during the calendar years 1937, 1938, and 1939, the rate shall be 1 per centum." *U. S. C., Title 42, § 1001.*

"Section 802. (a) The tax imposed by § 801 shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages as and when paid. Every employer required so to deduct the tax is hereby made liable for the payment of such tax, and is hereby indemnified against the claims and demands of any person for the amount of any such payment made by such employer." *U. S. C., Title 42, § 1002.*

"Sec. 901. On and after January 1, 1936, every employer (as defined in § 907) shall pay for each calendar year an excise tax, with respect to having individuals in his employ, equal to the following percentages of the total wages (as defined in § 907) payable by him (regardless of the time of payment) with respect to employment (as defined in § 907) during such calendar year: . . . (2) with respect to employment during the calendar year 1937 the rate shall be 2 per centum. . . ." *U. S. C., Title 42, § 1101.*

The state's appeal from the District Court's first order of distribution was discontinued by agreement of the [*513] parties because the Social Security Act had been extensively amended while the appeal was pending. 3 A second order was thereupon entered by the District Court. The State again appealed to the Circuit Court of Appeals. It contended that the share of the assets granted to the federal government was excessive for three reasons: (1) the claim based on § 801 of Title VIII of the Social Security Act was a claim for a debt rather than for taxes and thus was not entitled to priority under § 64 (a)

(4) of the Bankruptcy Act; (2) no more than 10% of the claim based on § 901 of Title IX of the Social Security Act was entitled to allowance because the balance constituted a claim for a penalty rather than a tax and thus fell within the prohibition of [**714] § 57 (j) of the Bankruptcy Act; 4 and (3) the credit against the Title IX claim provided for in § 902 was incorrectly calculated. The Circuit Court of Appeals sustained the state's contention with respect to the Title VIII claim and reversed to that extent the order of the District Court, but rejected the state's arguments with respect to the claim under Title IX.

3   c. 666, 53 Stat. 1360, 1399.  See notes 9 and 10, *infra.*

4   "Section 57 (j). Debts owing to the United States or any State or subdivision thereof as a penalty or forfeiture shall not be allowed, except for the amount of the pecuniary loss sustained by the act, transaction, or proceeding out of which the penalty or forfeiture arose, with reasonable and actual costs occasioned thereby and such interest as may have accrued thereon according to law." *U. S. C., Title 11, § 93 (j).*

[***LEdHR1] [1]*First.*  The claim based on Title VIII. Section 801 bears the heading "Income tax on employees" and provides for a tax "upon the income of every individual" equal to 1 per centum of the wages received by him with respect to employment during 1937. 5 Section 802 (a) provides that this tax "shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages as and when paid." The employer is made [*514] liable for the payment of the tax. By regulation, pursuant to Title VIII, 6 the Treasury Department has explicitly ruled that the tax may be assessed against the employer, regardless of whether he has in fact deducted it from the employee's wages. The Circuit Court of Appeals held that the employer was liable "only as an agent bound to pay whether his duty to collect was performed or not" and that his liability was for a debt rather than for taxes. *118 F.2d 537.*

5   Both the pertinent state and federal claims are for the year 1937.

6   Treasury Regulations 91, Article 505.

As authority for this view, it relied upon its decision of the same date in *City of New York v. Feiring, 118 F.2d 329.* [***1001] The city sales tax involved in that case was laid upon receipts from sales of personal property.

Case 08-35653-KRH   Doc 4581-1   Filed 08/20/09   Entered 08/20/09 15:22:24   Desc
Appendix   Page 40 of 68
315 U.S. 510, *514; 62 S. Ct. 712, **714;
86 L. Ed. 998, ***1001; 1942 U.S. LEXIS 1154

Page 4

The vendor was required to collect the amount of the tax from the vendee separately from the sales price. He was obliged to report periodically concerning his receipts from sales and to turn over to the City Comptroller the taxes due, whether or not he had actually collected them from the purchasers. If the vendor failed to collect the tax, the vendee was required to report the transaction and to pay the tax directly. Thus, the procedure contemplated was that the purchaser should bear the burden of the tax, but that the seller should collect and transmit it to the Comptroller. If the seller did not obtain it from the purchaser, however, the Comptroller was authorized to proceed to collect it from either of them. The Circuit Court of Appeals held that the claim of the City against a bankrupt vendor for the amount of the sales tax outstanding was a claim for a debt and not for taxes, within the meaning of § 64 (a) (4). We reversed this decision and held that the burden imposed upon the seller by the city taxing act had "all the characteristics of a tax entitled to priority" under § 64 (a) (4). 313 U.S. 283.

[*515] We think that our decision in the Feiring case is controlling here. The New York City sales tax involved in that case and the obligation imposed by §§ 801 and 802 of Title VIII of the Social Security Act cannot be distinguished in any material respect. It was observed in the Feiring case that, while the sales tax was intended to rest upon the purchaser "in its normal operation," "both the vendor and the vendee are made liable for payment of the tax in invitum . . . and the tax may be summarily collected by distraint of the property of either the seller or the buyer." 313 U.S. at 287. The burden of the tax provided for by §§ 801 and 802 likewise will normally rest upon the employee, but the Commissioner of Internal Revenue may proceed to collect it from the employer whether or not he has deducted it from the wages of the employee.

[***LEdHR2] [2]Two distinctions between the cases are urged by the State. One is that § 802 (a) of Title VIII provides that the [**715] tax "shall be collected by the employer of the taxpayer" and thus reveals a Congressional intent that only a claim against the employee should be treated as one for a tax. The other asserted distinction is that Title VIII in its entirety is designed to impose two distinct taxes; § 801 imposes an "income tax" upon the employee, while § 804 imposes an "excise tax" upon the employer. [7] But a tax for purposes of § 64 (a) (4) includes any "pecuniary burden laid upon individuals or property for the purpose of

supporting the Government," by whatever name it may [*516] be called. New Jersey v. Anderson, 203 U.S. 483, 492. Although he may not be referred to in §§ 801 and 802 as the taxpayer, and although he may also be subject to the "excise tax" prescribed by § 804, the plain fact is that the employer is liable for the § 801 tax whether or not he has collected it from his employees. We therefore hold that the Title VIII claim of the United States against the estate of this bankrupt employer is entitled to the priority afforded by § 64 (a) (4).

7   "Section 804. Excise tax on employers. In addition to other taxes, every employer shall pay an excise tax, with respect to having individuals in his employ, equal to the following percentages of the wages (as defined in § 811) paid by him after December 31, 1936, with respect to employment (as defined in § 811) after such date: (1) With respect to employment during the calendar years 1937, 1938, and 1939, the rate shall be 1 per centum." U. S. C., Title 42, § 1004.

[***LEdHR3] [3]Second. The claim under Title IX. [***1002] Section 901 imposes upon this employer, in addition to the obligations discussed above, an "excise tax" equal to 2 per centum of the total wages payable by him during 1937. Section 902, however, permits him to credit "against the tax imposed by § 901" the amount of his 1937 contributions to the state unemployment fund, but provides that the total credit "shall not exceed 90 per centum of the tax against which it is credited."

(a) The State contends that § 902 (a) in effect exacts a penalty, equal to 90% of the amount of the tax levied by § 901, from an employer who fails to make the payments to the state unemployment fund required by state law. Since § 57 (j) of the Bankruptcy Act provides that claims by the United States for penalties are not allowable, [8] it argues, only 10% of the tax imposed by § 901 is actually a tax for purposes of § 64 (a) (4) of the Bankruptcy Act. There is no merit to this contention. While the issue here is cast in somewhat different terms, it is similar in outline to that raised by the constitutional objection to the Act which was set to rest in Steward Machine Co. v. Davis, 301 U.S. 548. There it was argued that the 90% credit provisions amounted to coercion of the States which was repugnant to the Tenth Amendment and to the federal system. The Court recognized that the effect of the scheme was to encourage the States to [*517] establish and maintain unemployment insurance funds and thus to

cooperate with the federal government in meeting a common problem. It observed that "every rebate from a tax when conditioned upon conduct is in some measure a temptation" but it concluded that "to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties," and to accept "a philosophical determinism by which choice becomes impossible." *301 U.S. at 589-590.* These considerations are equally pertinent to the suggestion that the 90% rebate arrangement constitutes the imposition of a "penalty" within the meaning of § 57 (j) upon an employer who fails or refuses to contribute to a state fund. The amount of the tax assessable under *§ 901* is definite and fixed, once the single variable, the total of the wages paid during the year, is determined. Although the employer is free to obtain a credit against it by contributing to his state fund, it cannot be said that it is any the less a tax because the employer has failed, either through choice or lack of resources, to make such a contribution. Either the state or the federal government must provide the money to meet the requirements [**716] of relief to the unemployed. By his contributions to the State, an employer has diminished the demand upon the financial resources of the federal government. But by his failure to contribute, the employer has increased this demand and sharpened the necessity for obtaining the revenues required to satisfy it. The effort by the United States to obtain the revenue by denying the credit must be regarded as the levying of a tax and not as the exaction of a penalty. 9

8  See note 4, *supra.*
9  In 1939 Congress undertook to put an end to any doubts on this question by providing in *§ 902 (i)* of the amendments to the Social Security Act that no part of the tax imposed by Title IX should be deemed a penalty or forfeiture within the meaning of § 57 (j) of the Bankruptcy Act. C. 666, 53 Stat. 1360, 1400.

[*518]  [***LEdHR4] [4](b) Finally the State contends that the District Court applied an incorrect formula in determining the amount of the credit deductible under *§ 902. Section 902* provides: "The taxpayer may credit against the tax imposed by *§ 901* of this chapter the amount of contributions, with respect to employment during the taxable year, paid by him (before the date of filing [***1003] his return for the taxable

year) 10 into an unemployment fund under a state law. The total credit allowed to a taxpayer under this section for all contributions paid into unemployment funds with respect to employment during such taxable year shall not exceed 90 per centum of the tax against which it is credited . . ." In the case of a bankrupt who has not made any contribution to the state unemployment fund at the time of adjudication and whose assets are insufficient to meet the total of the claims of equal priority, the calculation of the credit is beset with some difficulty. The amount available for the state's claim for its unemployment insurance fund is contingent upon the sums allowed on the other claims, including that of the federal government under *§ 901.* The amount to be allowed on the claim of the United States is in turn dependent upon the credit deductible from it under the terms of *§ 902.* And this credit under *§ 902* is determined by the sum granted on the state's unemployment insurance fund claim.

10  This condition had not been complied with in the present case. However, the 1939 amendments to the Social Security Act, which resulted in the dismissal of the first appeal by stipulation, provided that the credit should be allowed on payments to the state fund "without regard to the date of payment, if the assets of the taxpayer are, at any time during the fifty-nine-day period following such date of enactment, in the custody or control of a receiver, trustee, or other fiduciary appointed by, or under the control of, a court of competent jurisdiction." *§ 901 (a) (3).* C. 666, 53 Stat. 1360, 1399. This bankrupt estate qualified under this provision.

Because of this mutual dependence, the courts below have accepted and approved an algebraic solution of the [*519] problem. Under this solution, the claim for the tax assessed under *§ 901* is diminished by subtracting from it an amount equal to the sum allowed to the State for its unemployment fund. The formula by which this is accomplished is reducible to a quadratic equation capable of solution by the recognized method.

As against this algebraic solution, the State urges an arithmetical calculation which would afford it a larger share of the assets. In brief, the state's theory is as follows: The amount of each of the several claims of the State and of the United States should be divided by the total of such claims. The percentage of the assets due on

each claim is thus determined. The total of the assets available is then multiplied in turn by these percentages, and the actual sum to be allowed on each claim is found. However, the amount allowed on the federal government's claim under § 901 is then multiplied by 10%. The sum equal to this 10% is thereupon conclusively granted to the United States. But the remaining amount, equal to 90%, is returned to the estate as a second fund to be divided among all the claims in the same manner. The share of this second fund which by this computation would go to the United States on its § 901 claim is again multiplied by 10%, with the balance of 90% returning to [**717] form a third fund. The process is repeated until the still undistributed assets reach a vanishing point.

It will be observed that while the one solution is algebraic and the other arithmetic, there is little to choose between them in terms of complexity. The obvious fact is that neither the Bankruptcy Act nor the Social Security Act affords the courts any meaningful assistance in solving the problem raised by this case. And their legislative history is equally barren.

The State objects to the formula applied below because its effect is to accord the United States a larger sum in dollars and cents on its § 901 claim than it would [*520] receive if the available assets were sufficient to discharge in full all of the priority claims. This is true

because, under [***1004] § 902, the United States would be entitled to no more than 10% of its § 901 claim if the unemployment fund claim of the State was paid in full. We agree that this result is somewhat incongruous. However, the method of computation urged by the State embodies so basic an error that we cannot accept it. *Section 902* permits the credit "against the tax imposed by § 901." Under the state's formula the credit is reckoned in terms of a sum determined by that formula to be *actually available* to the United States on its § 901 claim rather than in terms of the whole amount *actually due* under that section. We think that the words "the tax imposed" must mean "the tax demanded" or "assessed" or "due." It can hardly be thought to mean "the tax paid" or "the amount available for payment of the tax." The formula adopted by the District Court avoids this error by crediting the undetermined sum available to the state unemployment fund against the total tax assessed or claimed under § 901. We therefore hold that the District Court and the Circuit Court of Appeals did not err in adopting and using that formula.

The judgment of the Circuit Court of Appeals is reversed with respect to the claim under Title VIII, but is otherwise affirmed. The case is remanded to permit the reinstatement of the judgment of the District Court.

*Reversed.*

# TAB G



LEXSTAT 8 CCR 15210

BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS
Copyright © 2009 by Barclays Law Publishers
All rights reserved

\* THIS DOCUMENT IS CURRENT THROUGH REGISTER 2009, NO. 31, JULY 31, 2009 \*

TITLE 8.  INDUSTRIAL RELATIONS
DIVISION 1.  DEPARTMENT OF INDUSTRIAL RELATIONS
CHAPTER 8.  OFFICE OF THE DIRECTOR
SUBCHAPTER 2.  ADMINISTRATION OF SELF-INSURANCE PLANS
ARTICLE 3.  SECURITY DEPOSIT REQUIREMENTS

*8 CCR 15210 (2009)*

§ 15210.  Security Deposit

(a) Public self insurers are not required to post or maintain a security deposit with the Director for workers' compensation liabilities.

(b) Individual Private self insurers shall post and maintain a security deposit, in accordance with the provisions of *Labor Code Section 3701* and the requirements of Article 3 of this subchapter 2 and/or in accordance with *Labor Code Section 3701.8* and Article 3.1 of this subchapter 2.

(c) The minimum required security deposit pursuant to *Labor Code Section 3701* for existing, private self insurers shall be equal to:

(1) 135 percent of the individual private self insurer's estimated future liabilities for the payment of compensation for known claims; and

(2) An amount posted in advance for liabilities of the current year, consisting of the average annual estimated future liability over the past five (5) years reported on the Self Insurer's Annual Report; and

(3) an adjustment to reduce the liability reported on individual claims based on documentation of specific excess insurance pursuant to Section 15300(e) of these regulations.

The required deposit may be increased at the Director's discretion as set forth in Article 3 of these regulations. Said future liability may be ascertained from any relevant source.

(d) New individual private self insurers shall initially post a security deposit pursuant to *Labor Code Section 3701* in an amount equal to the greater of the following:

(1) The prior three (3) years' incurred liability; or

(2) The statutory minimum required by *Labor Code Section 3701(b)*; or

(3) A higher amount approved by the Director.

(e) The addition of a new subsidiary or affiliate private self insurer to the holder of an existing individual private Certificate to Self Insure shall initially post a security deposit pursuant to *Labor Code Section 3701* in an amount equal to the greater of the following:

(1) The average one year incurred liability for the new subsidiary or affiliate self insurer based upon the prior three years' incurred liability; or

(2) A higher amount approved by the Director.

(f) Security deposit shall be posted in the form of:

(1) A surety bond executed on State issued bond and rider forms pursuant to Section 15212 of these regulations;

(2) An irrevocable letter of credit issued by a bank or savings institution or other financial institution pursuant to Section 15215 of these regulations;

(3) Approved securities in the form of government issued or corporate issued securities, meeting the requirements of Section 15213 of these regulations;

(4) Cash in trust deposited pursuant to requirements of Section 15214 of these regulations; or

(5) Any combination of one or more of the above four types of security deposit.

(g) Failure of an individual private self insured employer to maintain the required amount of deposit or to post an acceptable form of deposit as set forth in this Article shall be good cause for assessment of civil penalties pursuant to *Labor Code Section 3702.9(a)* by the Manager and/or, in the Director's discretion, revocation of the Certificate to Self Insure.

(h) Failure of an individual private self insured employer to post and maintain the required amount of security deposit for a period of 60 days shall be good cause for the Manager to summarily revoke a Certificate of Consent to Self-Insure. The summary revocation of the Self Insurer's Certificate of Consent will provide for a 15-day notice of termination, without a hearing.

(1) Notwithstanding subsection (h) above, the individual private self insured employer may still request a hearing on the Manager's Revocation Order before the Director as provided in Article 11 of this subchapter 2.

(2) An individual private self insurer requesting a hearing pursuant to subsection (h)(1) shall be required to provide proof of workers' compensation coverage under a policy from an admitted carrier for the period of time without security deposit or proof of compliance with the Manager's request to post security.

AUTHORITY:

Note: Authority cited: *Sections 54, 55, 3701.8 and 3702.10, Labor Code.* Reference: *Sections 59, 3700, 3701, 3701.5, 3701.8, 3702, 3702.3, 3702.6, 3702.10 and 3740-3745, Labor Code.*

HISTORY:

1. Amendment of article heading, section heading and text and adoption of Note filed 12-22-92; operative 1-21-93 (Register 93, No. 2).

2. Change without regulatory effect amending subsection (f)(3) filed 8-27-98 pursuant to *section 100, title 1, California Code of Regulations* (Register 98, No. 35).

8 CCR 15210

3. Change without regulatory effect amending subsections (c)(1) and (c)(3) filed 4-9-2003 pursuant to *section 100, title 1, California Code of Regulations* (Register 2003, No. 15).

4. Amendment of section and Note filed 5-30-2003 as an emergency; operative 5-30-2003 (Register 2003, No. 22). A Certificate of Compliance must be transmitted to OAL by 9-29-2003 or emergency language will be repealed by operation of law on the following day.

5. Certificate of Compliance as to 5-30-2003 order, including amendment of subsection (h)(1), transmitted to OAL 9-29-2003 and filed 11-12-2003 (Register 2003, No. 46).

6. Amendment filed 3-2-2009; operative 3-2-2009 pursuant to *Government Code section 11343.4* (Register 2009, No. 10).

# TAB H

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 1.  General Provisions

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Lab Code § 3201 (2009)

**§ 3201.  Divisions 4 and 5; Purpose**

This division and Division 5 (commencing with Section 6300) are an expression of the police power and are intended to make effective and apply to a complete system of workers' compensation the provisions of Section 4 of Article XIV of the California Constitution.

**HISTORY:**

Enacted 1937. Amended Stats 1984 ch 193 § 95; Stats 1986 ch 248 § 157.

# TAB I

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH \*
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 3.  Conditions of Compensation Liability

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Lab Code § 3600 (2009)

**§ 3600.  Conditions essential**

(a) Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person except as otherwise specifically provided in Sections 3602, 3706, and 4558, shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death, in those cases where the following conditions of compensation concur:

(1) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division.

(2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment.

(3) Where the injury is proximately caused by the employment, either with or without negligence.

(4) Where the injury is not caused by the intoxication, by alcohol or the unlawful use of a controlled substance, of the injured employee. As used in this paragraph, "controlled substance" shall have the same meaning as prescribed in Section 11007 of the Health and Safety Code.

(5) Where the injury is not intentionally self-inflicted.

(6) Where the employee has not willfully and deliberately caused his or her own death.

(7) Where the injury does not arise out of an altercation in which the injured employee is the initial physical aggressor.

(8) Where the injury is not caused by the commission of a felony, or a crime which is punishable as specified in subdivision (b) of Section 17 of the Penal Code, by the injured employee, for which he or she has been convicted.

(9) Where the injury does not arise out of voluntary participation in any off-duty recreational, social, or athletic activity not constituting part of the employee's work-related duties, except where these activities are a reasonable expectancy of, or are expressly or impliedly required by, the employment. The administrative director shall promulgate reasonable rules and regulations requiring employers to post and keep posted in a conspicuous place or places a notice ad-

vising employees of the provisions of this subdivision. Failure of the employer to post the notice shall not constitute an expression of intent to waive the provisions of this subdivision.

(10) Except for psychiatric injuries governed by subdivision (e) of Section 3208.3, where the claim for compensation is filed after notice of termination or layoff, including voluntary layoff, and the claim is for an injury occurring prior to the time of notice of termination or layoff, no compensation shall be paid unless the employee demonstrates by a preponderance of the evidence that one or more of the following conditions apply:

(A) The employer has notice of the injury, as provided under Chapter 2 (commencing with Section 5400), prior to the notice of termination or layoff.

(B) The employee's medical records, existing prior to the notice of termination or layoff, contain evidence of the injury.

(C) The date of injury, as specified in Section 5411, is subsequent to the date of the notice of termination or layoff, but prior to the effective date of the termination or layoff.

(D) The date of injury, as specified in Section 5412, is subsequent to the date of the notice of termination or layoff.

For purposes of this paragraph, an employee provided notice pursuant to <u>Sections 44948.5, 44949, 44951, 44955, 44955.6, 72411, 87740, and 87743 of the Education Code</u> shall be considered to have been provided a notice of termination or layoff only upon a district's final decision not to reemploy that person.

A notice of termination or layoff that is not followed within 60 days by that termination or layoff shall not be subject to the provisions of this paragraph, and this paragraph shall not apply until receipt of a later notice of termination or layoff. The issuance of frequent notices of termination or layoff to an employee shall be considered a bad faith personnel action and shall make this paragraph inapplicable to the employee.

(b) Where an employee, or his or her dependents, receives the compensation provided by this division and secures a judgment for, or settlement of, civil damages pursuant to those specific exemptions to the employee's exclusive remedy set forth in subdivision (b) of Section 3602 and Section 4558, the compensation paid under this division shall be credited against the judgment or settlement, and the employer shall be relieved from the obligation to pay further compensation to, or on behalf of, the employee or his or her dependents up to the net amount of the judgment or settlement received by the employee or his or her heirs, or that portion of the judgment as has been satisfied.

**HISTORY:**

Enacted 1937. Amended Stats 1961 ch 2170 § 1; Stats 1978 ch 1303 § 5; Stats 1982 ch 922 § 4; Stats 1986 ch 755 § 1; Stats 1990 ch 939 § 1 (AB 4315). Amended Stats 1993 ch 118 § 2 (AB 119), effective July 16, 1993, ch 1242 § 24 (SB 223).

# TAB J

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH \*
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 4.  Compensation Insurance and Security
Article 1.  Insurance and Security

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Lab Code § 3700 (2009)

**§ 3700.  Securing payment of compensation**

Every employer except the state shall secure the payment of compensation in one or more of the following ways:

(a) By being insured against liability to pay compensation by one or more insurers duly authorized to write compensation insurance in this state.

(b) By securing from the Director of Industrial Relations a certificate of consent to self-insure either as an individual employer, or as one employer in a group of employers, which may be given upon furnishing proof satisfactory to the Director of Industrial Relations of ability to self-insure and to pay any compensation that may become due to his or her employees.

(c) For any county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state, including each member of a pooling arrangement under a joint exercise of powers agreement (but not the state itself), by securing from the Director of Industrial Relations a certificate of consent to self-insure against workers' compensation claims, which certificate may be given upon furnishing proof satisfactory to the director of ability to administer workers' compensation claims properly, and to pay workers' compensation claims that may become due to its employees. On or before March 31, 1979, a political subdivision of the state which, on December 31, 1978, was uninsured for its liability to pay compensation, shall file a properly completed and executed application for a certificate of consent to self-insure against workers' compensation claims. The certificate shall be issued and be subject to the provisions of Section 3702.

For purposes of this section, "state" shall include the superior courts of California.

**HISTORY:**

Enacted 1937. Amended Stats 1945 ch 1431 § 63; Stats 1st Ex Sess 1946 ch 7 § 1; Stats 1978 ch 1379 § 2; Stats 1986 ch 1128 § 1, effective September 25, 1986. Amended Stats 1993 ch 121 § 25 (AB 110), effective July 16, 1993; Stats 2002 ch 905 § 10 (SB 2011).

# TAB K

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 4.  Compensation Insurance and Security
Article 1.  Insurance and Security

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Lab Code § 3701.5 (2009)

**§ 3701.5.  Use of security deposit upon failure to pay compensation; Determination; Procedure; Review**

(a) If the director determines that a private self-insured employer has failed to pay workers' compensation as re-quired by this division, the security deposit shall be utilized to administer and pay the employer's compensation obliga-tions.

(b) If the director determines the security deposit has not been immediately made available for the payment of compensation, the director shall determine the method of payment and claims administration as appropriate, which may include, but is not limited to, payment by a surety that issued the bond, or payment by an issuer of an irrevocable letter of credit, and administration by a surety or by an adjusting agency, or through the Self-Insurers' Security Fund, or any combination thereof.

(c) If the director determines the payment of benefits and claims administration shall be made through the Self-Insurers' Security Fund, the fund shall commence payment of the private self-insured employer's obligations for which it is liable under Section 3743 within 30 days of notification. Payments shall be made to claimants whose entitlement to benefits can be ascertained by the fund, with or without proceedings before the appeals board. Upon the assumption of obligations by the fund pursuant to the director's determination, the fund shall have a right to immediate possession of any posted security and the custodian, surety, or issuer of any irrevocable letter of credit shall turn over the security to the fund together with the interest that has accrued since the date of the self-insured employer's default or insolvency.

(d) The director shall promptly audit an employer upon making a determination under subdivision (a) or (b). The employer, any excess insurer, and any adjusting agency shall provide any relevant information in their possession. If the audit results in a preliminary estimate that liabilities exceed the amount of the security deposit, the director shall direct the custodian of the security deposit to liquidate it and provide all proceeds to the Self-Insurers' Security Fund. If the preliminary estimate is that liabilities are less than the security deposit, the director shall ensure the administration and payment of compensation pursuant to subdivision (b).

(e) The payment of benefits by the Self-Insurers, Security Fund from security deposit proceeds shall release and discharge any custodian of the security deposit, surety, any issuer of a letter of credit, and the self-insured employer, from liability to fulfill obligations to provide those same benefits as compensation, but does not release any person from any liability to the fund for full reimbursement. Payment by a surety constitutes a full release of the surety's liability

under the bond to the extent of that payment, and entitles the surety to full reimbursement by the principal or his or her estate. Full reimbursement includes necessary attorney fees and other costs and expenses, without prior claim or proceedings on the part of the injured employee or other beneficiaries. Any decision or determination made, or any settlement approved, by the director or by the appeals board under subdivision (g) shall conclusively be presumed valid and binding as to any and all known claims arising out of the underlying dispute, unless an appeal is made within the time limit specified in Section 5950.

(f) The director shall advise the Self-Insurers' Security Fund promptly after receipt of information indicating that a private self-insured employer may be unable to meet its compensation obligations. The director shall also advise the Self-Insurers' Security Fund of all determinations and directives made or issued pursuant to this section.

(g) Disputes concerning the posting, renewal, termination, exoneration, or return of all or any portion of the security deposit, or any liability arising out of the posting or failure to post security, or adequacy of the security or reasonableness of administrative costs, including legal fees, and arising between or among a surety, the issuer of an agreement of assumption and guarantee of workers' compensation liabilities, the issuer of a letter of credit, any custodian of the security deposit, a self-insured employer, or the Self-Insurers' Security Fund shall be resolved by the director. An appeal from the director's decision or determination may be taken to the appropriate superior court by petition for writ of mandate. Payment of claims from the security deposit or by the Self-Insurers' Security Fund shall not be stayed pending the resolution of the disputes unless and until the superior court issues a determination staying a payment of claims decision or determination of the director.

**HISTORY:**

Added Stats 1984 ch 252 § 2, effective June 27, 1984. Amended Stats 1986 ch 1128 § 6, effective September 25, 1986; Stats 1989 ch 1258 § 2.

# TAB L

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH \*
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 4.  Compensation Insurance and Security
Article 2.5.  Self-Insurers' Security Fund

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Lab Code § 3740 (2009)

**§ 3740.  Legislative intent**

It is the intent of the Legislature in enacting this article and Article 1 (commencing with Section 3700) to provide for the continuation of workers' compensation benefits delayed due to the failure of a private self-insured employer to meet its compensation obligations when the employers' security deposit is either inadequate or not immediately accessible for the payment of benefits. With respect to the continued liability of a surety for claims that arose under a bond after termination of that bond and to a surety's liability for the cost of administration of claims, it is the intent of the Legislature to clarify existing law. The Legislature finds and declares that the establishment of the Self-Insurers' Security Fund is a necessary component of a complete system of workers' compensation, required by <u>Section 4 of Article XIV of the California Constitution</u>, to have adequate provisions for the comfort, health and safety, and general welfare of any and all workers and their dependents to the extent of relieving the consequences of any industrial injury or death, and full provision for securing the payment of compensation.

**HISTORY:**

Added Stats 1984 ch 252 § 5, effective June 27, 1984. Amended Stats 1986 ch 1128 § 15, effective September 25, 1986.

# TAB M

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 4.  Compensation Insurance and Security
Article 2.5.  Self-Insurers' Security Fund

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Lab Code § 3742 (2009)

**§ 3742.  Establishment of fund as nonprofit mutual benefit corporation; Board of Trustees; Terms; Powers**

   (a) The Self-Insurers' Security Fund shall be established as a Nonprofit Mutual Benefit Corporation pursuant to Part 3 (commencing with Section 7110) of Division 2 of Title 1 of the Corporations Code and this article. If any provision of the Nonprofit Mutual Benefit Corporation Law conflicts with any provision of this article, the provisions of this article shall apply. Each private self-insurer shall participate as a member in the fund as a condition of maintaining its certificate of consent to self-insure.

   (b) The fund shall be governed by a seven member board of trustees. The director shall hold ex officio status, with full powers equal to those of a trustee, except that the director shall not have a vote. The director, or a delegate authorized in writing to act as the director's representative on the board of trustees, shall carry out exclusively the responsibilities set forth in Division 1 (commencing with Section 50) through Division 4 (commencing with Section 3200) and shall not have the obligations of a trustee under the Nonprofit Mutual Benefit Corporation Law. The fund shall adopt bylaws to segregate the director from all matters that may involve fund litigation against the department or fund participation in legal proceedings before the director. Although not voting, the director or a delegate authorized in writing to represent the director, shall be counted toward a quorum of trustees. The remaining six trustees shall be representatives of private self-insurers. The self-insurer trustees shall be elected by the members of the fund, each member having one vote. Three of the trustees initially elected by the members shall serve two-year terms, and three shall serve four-year terms. Thereafter, trustees shall be elected to four-year terms, and shall serve until their successors are elected and assume office pursuant to the bylaws of the fund.

   (c) The fund shall establish bylaws as are necessary to effectuate the purposes of this article and to carry out the responsibilities of the fund, including, but not limited to, any obligations imposed by the director pursuant to Section 3701.8. The fund may carry out its responsibilities directly or by contract, and may purchase services and insurance and borrow funds as it deems necessary for the protection of the members and their employees. The fund may receive confidential information concerning the financial condition of self-insured employers whose liabilities to pay compensation may devolve upon it and shall adopt bylaws to prevent dissemination of that information.

   (d) The director may also require fund members to subscribe to financial instruments or guarantees to be posted with the director in order to satisfy the security requirements set by the director pursuant to Section 3701.8.

**HISTORY:**

Added Stats 1984 ch 252 § 5, effective June 27, 1984. Amended Stats 1986 ch 1128 § 16, effective September 25, 1986. Amended Stats 2002 ch 866 § 8 (AB 486).

# TAB N

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH *
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 4.  Compensation Insurance and Security
Article 2.5.  Self-Insurers' Security Fund

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Lab Code § 3743 (2009)

**§ 3743.  Assumption of obligations of insolvent self-insurer; Limitation on liability; Rights and defenses**

(a) Upon order of the director pursuant to Section 3701.5, the fund shall assume the workers' compensation obligations of an insolvent self-insurer.

(b) Notwithstanding subdivision (a), the fund shall not be liable for the payment of any penalties assessed for any act or omission on the part of any person other than the fund, including, but not limited to, the penalties provided in Section 132a, 3706, 4553, 4554, 4556, 4557, 4558, 4601.5, 5814, or 5814.1.

(c) The fund shall be a party in interest in all proceedings involving compensation claims against an insolvent self-insurer whose compensation obligations have been paid or assumed by the fund. The fund shall have the same rights and defenses as the insolvent self-insurer, including, but not limited to, all of the following:

(1) To appear, defend, and appeal claims.

(2) To receive notice of, investigate, adjust, compromise, settle, and pay claims.

(3) To investigate, handle, and deny claims.

**HISTORY:**

Added Stats 1984 ch 252 § 5, effective June 27, 1984.

# TAB O

LEXSTAT

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH \*
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20, 2009

LABOR CODE
Division 4.  Workers' Compensation and Insurance
Part 1.  Scope and Operation
Chapter 4.  Compensation Insurance and Security
Article 2.5.  Self-Insurers' Security Fund

## GO TO CALIFORNIA CODES ARCHIVE DIRECTORY

Cal Lab Code § 3744 (2009)

### § 3744.  Reimbursement from insolvent self-insurer or security deposit

   (a) The fund shall have the right and obligation to obtain reimbursement from an insolvent self-insurer up to the amount of the self-insurer's workers' compensation obligations paid and assumed by the fund, including reasonable administrative and legal costs. This right includes, but is not limited to, a right to claim for wages and other necessities of life advanced to claimants as subrogee of the claimants in any action to collect against the self-insured as debtor.

   (b) The fund shall have the right and obligation to obtain from the security deposit of an insolvent self-insurer the amount of the self-insurer's compensation obligations, including reasonable administrative and legal costs, paid or assumed by the fund. Reimbursement of administrative costs, including legal costs, shall be subject to approval by a majority vote of the fund's trustees. The fund shall be a party in interest in any action to obtain the security deposit for the payment of compensation obligations of an insolvent self-insurer.

   (c) The fund shall have the right to bring an action against any person to recover compensation paid and liability assumed by the fund, including, but not limited to, any excess insurance carrier of the self-insured employer, and any person whose negligence or breach of any obligation contributed to any underestimation of the self-insured employer's total accrued liability as reported to the director.

   (d) The fund may be a party in interest in any action brought by any other person seeking damages resulting from the failure of an insolvent self-insurer to pay workers' compensation required pursuant to this division.

## HISTORY:

   Added Stats 1984 ch 252 § 5, effective June 27, 1984. Amended Stats 1986 ch 1128 § 17, effective September 25, 1986.

# TAB P



LEXSTAT CAL. CONST. ART. XIV § 4

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2009 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

\* THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED THROUGH \*
CH. 24 OF THE 2009-2010 REG. SESS., CH. 12 OF THE 2009-2010 2d EX. SESS.,
CH. 26 OF THE 2009-10 3d EX. SESS., CH. 24 OF THE 2009-10 4th EX. SESS.,
THE GOVERNOR'S REORG. PLAN #1 OF 2009, EFF. MAY 10, 2009, & PROP. 1F APPROVED, EFF. MAY 20,
2009

CONSTITUTION OF THE STATE OF CALIFORNIA
Article XIV. LABOR RELATIONS

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Const, Art. XIV § 4 (2009)*

### § 4. Workers' compensation

The Legislature is hereby expressly vested with plenary power, unlimited by any provision of this Constitution, to create, and enforce a complete system of workers' compensation, by appropriate legislation, and in that behalf to create and enforce a liability on the part of any or all persons to compensate any or all of their workers for injury or disability, and their dependents for death incurred or sustained by the said workers in the course of their employment, irrespective of the fault of any party. A complete system of workers' compensation includes adequate provisions for the comfort, health and safety and general welfare of any and all workers and those dependent upon them for support to the extent of relieving them from the consequences of any injury or death incurred or sustained by workers in the course of their employment, irrespective of the fault of any party; also full provision for securing safety in places of employment; full provision for such medical, surgical, hospital and other remedial treatment as is requisite to cure and relieve from the effects of such injury; full provision for adequate insurance coverage against liability to pay or furnish compensation; full provision for regulating such insurance coverage in all its aspects, including the establishment and management of a State compensation insurance fund; full provision for otherwise securing the payment of compensation; and full provision for vesting power, authority and jurisdiction in an administrative body with all the requisite governmental functions to determine any dispute or matter arising under such legislation, to the end that the administration of such legislation shall accomplish substantial justice in all cases expeditiously, inexpensively, and without incumbrance of any character; all of which matters are expressly declared to be the social public policy of this State, binding upon all departments of the State government.

The Legislature is vested with plenary powers, to provide for the settlement of any disputes arising under such legislation by arbitration, or by an industrial accident commission, by the courts, or by either, any, or all of these agencies, either separately or in combination, and may fix and control the method and manner of trial of any such dispute, the rules of evidence and the manner of review of decisions rendered by the tribunal or tribunals designated by it; provided, that all decisions of any such tribunal shall be subject to review by the appellate courts of this State. The Legislature may combine in one statute all the provisions for a complete system of workers' compensation, as herein defined.

The Legislature shall have power to provide for the payment of an award to the state in the case of the death, arising out of and in the course of the employment, of an employee without dependents, and such awards may be used for the payment of extra compensation for subsequent injuries beyond the liability of a single employer for awards to employees of the employer.

Nothing contained herein shall be taken or construed to impair or render ineffectual in any measure the creation and existence of the industrial accident commission of this State or the State compensation insurance fund, the creation and existence of which, with all the functions vested in them, are hereby ratified and confirmed.

**HISTORY:**

Adopted June 8, 1976.

**NOTES:**

**Former Sections:**

Former Art XIV § 4, similar to present Const Art X § 7, was adopted November 2, 1954 and repealed June 8, 1976.

**Historical Derivation:**

Former Const Art XX § 21, as adopted October 10, 1911, amended November 5, 1918, November 7, 1972, November 5, 1974.