Gregg M. Galardi, Esq.               Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.              Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &      MCGUIREWOODS LLP
FLOM, LLP                            One James Center
One Rodney Square                    901 E. Cary Street
PO Box 636                           Richmond, Virginia 23219
Wilmington, Delaware 19899-0636      (804) 775-1000
(302) 651-3000

            - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :   Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :   Case No. 08-35653 (KRH)
et al.,                       :
                              :
            Debtors.          :   Jointly Administered
- - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363, 365 AND
503 AND BANKRUPTCY RULES 2002, 6004 AND 6006 AUTHORIZING
AND APPROVING THE SALE BY SELLER OF CERTAIN REAL
PROPERTY LOCATED IN SAN JOSE, CALIFORNIA AND THE
ASSUMPTION, ASSIGNMENT AND SALE BY SELLER OF CERTAIN
UNEXPIRED LEASE OF NON-RESIDENTIAL REAL PROPERTY FREE
AND CLEAR OF LIENS AND INTERESTS**

Upon the amended motion (the "Motion")[1] of Circuit

---

[1]  Capitalized terms not otherwise defined herein shall have the
     meanings ascribed to such terms in the Motion.

City Stores West Coast, Inc. (together with Circuit City
Stores, Inc., the "Seller," and collectively with the
debtors and debtors in possession in the above-captioned
jointly administered cases, the "Debtors") for orders
pursuant to Bankruptcy Code sections 105, 363, 365 and
503 and Bankruptcy Rules 2002, 6004 and 6006
(A) authorizing the Seller to enter into an agreement
with the Purchaser for Sale of the Property, subject to
higher or otherwise better proposals, (B) approving the
Termination Fee in connection therewith, (C) approving
the Sale and of the Property free and clear of all Liens;
(D) approving Assignment of the Golf Store Lease and the
Prime Lease (each as defined in the Agreement and
together referred to as the "Leases") associated with
the Property free and clear of all Liens and
(E) granting related relief; and upon the record of the
auction held on August 12, 2009 (the "Auction") and the
hearing held on August 27, 2009 (the "Sale Hearing");
and after due deliberation thereon, and sufficient cause
appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

A.      The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.      Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C.      The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363, 365 and 503 and Bankruptcy Rules 2002, 6004 and 6006.

D.      The notice of the Motion and the Sale Hearing given by the Seller constitutes due and sufficient notice thereof.

E.      The Bidding Procedures are reasonable and appropriate and represent the best method for

---

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

maximizing the realizable value of the Property and the
Leases.

F.      A reasonable opportunity to object or
be heard regarding the relief in this Order has been
afforded to all interested persons and entities,
including Don Sherwood Golf Shop, Inc. ("Tenant").

G.      The Seller and its professionals
marketed the Property and the Leases and conducted a
sale process as set forth in and in accordance with the
Motion.  Based upon the record of these proceedings, all
creditors and other parties in interest and all
prospective purchasers have been afforded a reasonable
and fair opportunity to bid for the Property and the
Leases.

H.      The Seller has demonstrated good,
sufficient, and sound business purpose and justification
for the Sale and Assignment because, among other things,
the Seller and its advisors diligently and in good faith
analyzed all other available options in connection with
the disposition of the Property and Leases and
determined that (a) the terms and conditions set forth
in the Agreement, (b) the transfer to the Purchaser of

the Property and Leases pursuant thereto and (c) the
purchase price agreed to by the Purchaser, $11,150,000,
is fair and reasonable and constitutes the highest or
otherwise best value obtainable for the Property and the
Leases.

I.    The Seller has full power and authority
to execute the agreement submitted by Smythe European,
Inc. (the "Purchaser"), a copy of which is annexed
hereto as Exhibit A (the "Agreement") and all other
applicable documents contemplated thereby.  The transfer
and conveyance of the Property by the Seller have been
duly and validly authorized by all necessary action of
the Seller.  The Seller has all of the power and
authority necessary to consummate the transactions
contemplated by the Agreement and has taken all action
necessary to authorize and approve the Agreement and to
consummate the transactions contemplated thereby.  No
consents or approvals, other than those expressly
provided for in the Agreement, are required for the
Seller to consummate such transactions.

J.    The Agreement and the sale of the
Property and assignment of the Leases were negotiated

and have been and are undertaken by the Seller and the

Purchaser at arms' length without collusion or fraud,

and in good faith within the meaning of Sections 363(m)

of the Bankruptcy Code.  As a result of the foregoing,

the Seller and the Purchaser are entitled to the

protections of Section 363(m) of the Bankruptcy Code.

K.    Neither the Seller nor the Purchaser

engaged in any conduct that would cause or permit the

Agreement or the consummation of the Sale or Assignment

to be avoided, or costs or damages to be imposed, under

Section 363(n) of the Bankruptcy Code.

L.    The consideration provided by the

Purchaser for the Property and the Leases is the highest

and best offer received by the Seller, and the

consideration constitutes (a) reasonably equivalent

value under the Bankruptcy Code and Uniform Fraudulent

Transfer Act, (b) fair consideration under the Uniform

Fraudulent Conveyance Act, and (c) reasonably equivalent

value, fair consideration and fair value under any other

applicable laws of the United States, any state,

territory or possession, or the District of Columbia,

for the Property and the Leases.

M.   The Sale and Assignment must be approved
and consummated promptly to obtain the value provided
under the terms of the Agreement.

N.   The transfer of the Property and the
Leases to the Purchaser is a legal, valid, and effective
transfer of the Property, and shall vest the Purchaser
with all right, title, and interest of the Seller to the
Property and the Leases free and clear of any lien
(including tax liens and any statutory or common law
liens, possessory or otherwise), charge, pledge,
security interest, conditional sale agreement or other
title retention agreement, lease, mortgage, security
interest, option or other encumbrance (including the
filing of, or agreement to give, any financing statement
under the Uniform Commercial Code of any jurisdiction)
and any monetary amounts which are secured by any lien
(collectively, the "Liens"), except for those items
defined in the Agreement (and which are referred to
hereinafter) as the "Permitted Encumbrances".

O.   If the Sale of the Property and
Assignment of the Leases by the Seller were not free and
clear of any Liens, except for the Permitted

Encumbrances, as set forth in the Agreement and this
Sale Order, or if the Purchaser would, or in the future
could, be liable for any of the Liens, the Purchaser
would not have entered into the Agreement and would not
consummate the Sale and Assignment contemplated by the
Agreement, thus adversely affecting the Seller, its
estate, and its stakeholders.

      P.   The Seller may sell its interest in the
Property and the Leases free and clear of all Liens
(except the Permitted Encumbrances) because, in each
case, one or more of the standards set forth in
Bankruptcy Code sections 363(f)(1)-(5) has been
satisfied.  All holders of Liens who did not object or
withdrew their objections to the Sale and Assignment are
deemed to have consented to the Sale and Assignment
pursuant to 11 U.S.C. § 363(f)(2) and all holders of
Liens are adequately protected by having their Liens, if
any, attach to the cash proceeds of the Sale and
Assignment ultimately attributable to the property
against or in which they claim an interest with the same
priority, validity, force, and effect as they attached

to such property immediately before the closing of the Sale and Assignment.

Q.    Pursuant to sections 365(b)(1)(C), 365(f)(2)(B) and, if applicable, 365(b)(3), the Seller and the Purchaser have demonstrated adequate assurance of future performance by the Purchaser under the Leases.

R.    Other than the Cure Obligations (as defined herein), there is no cure obligation due and owing on the Leases under section 365 of the Bankruptcy Code.

S.    Other than the Cure Obligation, there are no outstanding defaults of the Debtors and their estates under the Leases.

T.    Upon the assignment to the Purchaser, the Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any further liability thereunder, including for any breach of the Leases.

U.    Based on the foregoing findings of fact and conclusions of law,[3]

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED as set forth herein.

2.    Any and all objections to the Motion not waived, withdrawn, settled, adjourned or otherwise resolved herein are hereby overruled on the merits and denied with prejudice.

**A.    Approval Of The Agreement.**

3.    Pursuant to Bankruptcy Code section 363(b), the Agreement and all of the terms and conditions thereof are hereby approved.

4.    Pursuant to Bankruptcy Code section 363(b), the Seller is authorized to perform its obligations under the Agreement and comply with the terms thereof and consummate the Sale and Assignment in accordance with and subject to the terms and conditions of the Agreement.

---

[3]    Statements made by the Court from the bench at the hearing on the Motion shall constitute additional conclusions of law and findings of fact as appropriate.

5.    The Seller is authorized, but not
directed, to execute and deliver, and empowered to
perform under, consummate, and implement, the Agreement,
together with all additional instruments and documents
as may be reasonably necessary or desirable to implement
the Agreement, and to take all further actions as may be
requested by the Purchaser for the purpose of assigning,
transferring, granting, conveying, and conferring to the
Purchaser or reducing to possession the Property and the
Leases as contemplated by the Agreement.

6.    This Sale Order and the Agreement shall
be binding in all respects upon the Seller, all
stakeholders (whether known or unknown) of the Seller,
all affiliates and subsidiaries of the Seller, and any
subsequent trustees appointed in the Seller's chapter 11
case or upon a conversion to chapter 7 under the
Bankruptcy Code.  To the extent that any provision of
this Sale Order is inconsistent with the terms of the
Agreement, this Sale Order shall govern.

7.    The Agreement and any related agreements,
documents, or other instruments may be modified, amended,
or supplemented by the parties thereto, in a writing

signed by such parties, and in accordance with the terms
thereof, without further order of the Court; <u>provided</u>
that any such modification, amendment, or supplement is
disclosed to the Creditors' Committee and does not have
a material adverse effect on the Seller's estate, in the
good faith business judgment of the Seller.

**B.   Sale And Transfer Of The Property.**

8.   Pursuant to Bankruptcy Code sections
363(b) and 363(f), upon the consummation of the
Agreement, the Seller's right, title, and interest in
the Property shall be transferred to the Purchaser free
and clear of all Liens except the Permitted Encumbrances,
with all such Liens to attach to the cash proceeds of
the Sale in the order of their priority, with the same
validity, force, and effect which they had as against
the Property immediately before such transfer, subject
to any claims and defenses the Seller may possess with
respect thereto.

9.   If any person or entity which has filed
financing statements, mortgages, mechanic's liens, <u>lis</u>
<u>pendens</u>, or other documents or agreements evidencing
Liens on or against the Property shall not have

delivered to the Seller prior to the Closing of the Sale,
in proper form for filing and executed by the
appropriate parties, termination statements, instruments
of satisfaction, releases of all Liens that the person
or entity has with respect to the Property, or otherwise,
then (a) the Seller is hereby authorized to execute and
file such statements, instruments, releases, and other
documents on behalf of the person or entity with respect
to the Property and (b) the Purchaser is hereby
authorized to file, register, or otherwise record a
certified copy of this Sale Order, which, once filed,
registered, or otherwise recorded, shall constitute
conclusive evidence of the release of all Liens on or
against the Property of any kind or nature whatsoever
except for the Permitted Encumbrances.

10. This Sale Order (a) shall be effective as
a determination that, upon the Closing of the Sale, all
Liens of any kind or nature whatsoever existing as to
the Seller or the Property prior to the Closing of the
Sale, except for the Permitted Encumbrances, have been
unconditionally released, discharged, and terminated
(other than any surviving obligations), and that the

conveyances described herein have been effected and

(b) shall be binding upon and shall govern the acts of

all entities including, without limitation, all filing

agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state, and

local officials, and all other persons and entities who

may be required by operation of law, the duties of their

office, or contract, to accept, file, register, or

otherwise record or release any documents or instruments,

or who may be required to report or insure any title or

state of title in or to any of the Property.

11.  All persons and entities, including, but

not limited to, all debt security holders, equity

security holders, governmental, tax, and regulatory

authorities, lenders, trade stakeholders, and other

stakeholders, holding Liens of any kind or nature

whatsoever against or in the Seller or the Property,

except the Permitted Encumbrances (whether legal or

equitable, secured or unsecured, matured or unmatured,

contingent or non-contingent, senior or subordinated)

arising under or out of, in connection with, or in any

way relating to the Property prior to the Closing of the

Sale, or the transfer of the Property to the Purchaser,

hereby are forever barred, estopped, and permanently

enjoined from asserting against the Purchaser, its

successors or assigns, its property, or the Property,

such persons' or entities' Liens.  Nothing in this Sale

Order or the Agreement releases or nullifies any

liability to a governmental agency under any

environmental laws and regulations that any entity would

be subject to as owner or operator of any Property after

the date of entry of this Sale Order.  Nothing in this

Sale Order or the Agreement bars, estops, or enjoins any

governmental agency from asserting or enforcing, outside

the Court, any liability described in the preceding

sentence.  Notwithstanding the above, nothing herein

shall be construed to permit a governmental agency to

obtain penalties from the Purchaser for days of

violation of environmental laws and regulations prior to

Closing.

**C.    Assumption, Assignment and Sale of the Leases.**

12.    Under section 365 of the Bankruptcy Code, the Seller is authorized to assume the Leases and to assign the Leases to the Purchaser, which assignment shall take place on and be effective as of Closing.

13.    Under Bankruptcy Code section 363, the Seller is authorized to sell the Leases to the Purchaser.

14.    The Debtors are authorized to execute the assignment agreements, in substantially the form attached as exhibits to the Agreement (the "Assignment Agreement").

15.    Upon Closing, subject to the provisions of this Order, the Purchaser shall succeed to the entirety of Seller's rights and obligations in the Leases due, accruing, arising or attributable to the time period occurring on or after Closing and shall have the rights of the landlord and tenant under the Prime Lease and the landlord under the Golf Store Lease.

16.    Upon Closing, neither the Purchaser, the Debtors, nor the Debtors' estates shall have liability for cure claims of, from, or related to the Leases for any defaults or monetary obligations thereunder;

<u>provided</u>, <u>however</u>, that the Seller shall be obligated
for the following: (i) the Seller shall reimburse the
Tenant $150.00 on account of actual out-of-pocket
expenses associated with trash removed as of the date of
this Order; (ii) the Seller shall reimburse the Tenant
for actual out-of-pocket costs associated with
additional trash removal resulting from third party
dumping until Closing so long as (a) the Tenant
continues to utilize Waste Management's services and (b)
future costs do not deviate materially from prior costs;
(iii) the Seller shall reimburse the Tenant for actual
out-of-pocket costs associated with repairing the
parking lot lighting so long as (a) the Tenant provides
the Seller with a good faith reasonable estimate of
costs associated with such repair prior to commencing
such repair, (b) the Seller, in its reasonable
discretion, approves the estimate, and (c) in the event
the costs are likely to materially deviate from the
estimate, the Tenant advises the Seller and obtains
Seller's consent, which shall not be unreasonably
withheld, before such additional costs are incurred; and
(iv) the Seller shall reimburse the Tenant for actual

out-of-pocket costs associated with reasonable

landscaping until Closing so long as (a) the Tenant

provides the Seller with a good faith reasonable

estimate of costs associated with such work prior to

commencing such work, (b) the Seller, in its reasonable

discretion, approves the estimate, and (c) in the event

the costs are likely to materially deviate from the

estimate, the Tenant advises the Seller and obtains

Seller's consent, which shall not be unreasonably

withheld, before such additional costs are incurred

((i)-(iv), collectively, the "Cure Obligations");

provided, further, that all payments to The Tenant under

this paragraph shall be made within 10 business days

after receipt by Seller of an invoice, unless Seller

advises the Tenant of a dispute prior to expiration of

such period, in which case payment, if any, shall be

made at a time mutually agreed to among the parties or

by further order of this Court; provided, further, for

purposes of this paragraph "materially" shall mean an

amount greater than 10%.

17.  Upon the entry of this Sale Order,

(i) all defaults under the Leases through Closing shall

be deemed cured, (ii) no other amounts will be owed by

Debtors or their estates with respect to the Leases,

(iii) no amounts will be owed by the Purchaser with

respect to the Leases for obligations relating or

attributable to the period prior to Closing, (iv) any

and all persons or entities shall be forever barred and

estopped from asserting a claim against the Debtors or

their estates that any additional amounts are due or

defaults exist under the Leases, and (v) any and all

persons or entities shall be forever barred and estopped

from asserting a claim against the Debtors, their

estates, and the Purchaser that any additional amounts

are due or defaults exist under the Leases that arose or

accrued, relate to or are attributable to the period

prior to Closing.

18.   The Purchaser takes the Leases "as is."

19.   Pursuant to section 365(f) of the

Bankruptcy Code, notwithstanding any provision to the

contrary in the Leases, or in applicable nonbankruptcy

law, that prohibits, restricts, or conditions the

assignment of the Leases, the Seller may assign the

Leases to the Purchaser.

20.  Upon Closing, subject to the provisions of this Sale Order, the Purchaser shall assume all obligations under the Leases attributable to, or arising or accruing during, the time period occurring on or after Closing or related to the period subsequent to Closing.

21.  Upon the Assignment authorized herein, and under section 365(k) of the Bankruptcy Code, the Debtors and their estates shall have no further liability under the Leases.

22.  Upon the Assignment to the Purchaser, the Leases shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order.

23.  To the extent that any of the Debtors acts as a guarantor of the Leases (a "Debtor-Guarantor"), the Debtor-Guarantor(s) shall have no obligations with respect to the Leases after the Closing.

24.  Pursuant to Bankruptcy Code section 363(f), the sale and corresponding assumption and assignment of the Leases authorized hereunder shall be free and clear of all Liens, with all such Liens

attaching only to the amount paid under the Agreement

for the Leases and the related premises on which such

Liens had been attached previously, in the same order

and priority, and with the same validity and

enforceability, as same may have had prior to the sale,

assumption and assignment of the Leases, subject to any

and all available defenses.

      25.   Any mechanic's lien filed against the

Seller with respect to the premises associated with the

Leases is hereby released, discharged, and terminated,

and the Purchaser is hereby authorized to file, register,

or otherwise record a certified copy of this Sale Order

and each and every federal, state, and local

governmental agency or department is hereby directed to

accept a certified copy of this Sale Order as conclusive

evidence of the release, discharge, and termination of

any mechanic's lien filed against the Seller with

respect to the premises associated with the Leases and

shall remove such mechanic's lien from record.   Any

interest released, discharged and/or terminated under

this paragraph shall attach solely to the amount paid

under the Agreement for the Leases and the related

premises on which such interest had previously attached, subject to any and all available defenses.

26.   Except for the Seller with respect to their rights under the Agreement and this Sale Order, all parties to the Leases, and to any other agreements relating to the Leases, other than the Agreement, are forever barred from raising or asserting against the Purchaser any default or breach under, or any claim or pecuniary loss arising under or related to the Leases or such other agreements, arising, accruing or incurred prior to Closing.

27.   Except for the Seller with respect to its rights under the Agreement and this Order, all parties to the Leases, and to any other agreements relating to the Leases, other than the Agreement, are forever barred from raising or asserting against the Debtors or their estates any default or breach under, or any claim or pecuniary loss, arising under or related to, the Leases or such other agreements.

28.   Any obligations arising under the Leases which arise, accrue, are incurred or relate to periods on or subsequent to Closing, including but not limited

to any tax, utility, common area charges or insurance
payments, shall be the obligation of the Purchaser, and
no party (including the Purchaser) shall have a claim
against the Debtors or their estates for such
obligations.

29.   The Tenant and any governmental agency
shall accept and honor the assignment of the Leases to
the Purchaser in accordance with the Agreement and this
Sale Order.

30.   The Tenant shall cooperate and
expeditiously execute and deliver, upon the reasonable
requests of the Purchaser, and shall not charge the
Purchaser for, any instruments, applications, consents,
or other documents which may be required by any public
or quasi-public authority or other party or entity, for
the purpose of obtaining any permits, approvals or other
necessary documents required for the alteration,
installation of signage, opening and operating of the
premises associated with the Leases.

31.   Pursuant to the terms specified in the
Agreement, the Seller shall request an executed estoppel
certificate from the Tenant; _provided_ _however_, the

Seller shall have no obligation to deliver an estoppel

certificate, nor shall receipt of the same be a

condition to Closing.

32.   For the avoidance of doubt, nothing

herein, in the Agreement, or in any related documents

shall be construed as impairing, limiting, or waiving

the Tenant's right under the Golf Store Lease to obtain

repair of the parking lot in accordance with the terms

of the Golf Store Lease.

**D.   Additional Provisions**

33.   The consideration provided by the

Purchaser for the Property and the Leases under the

Agreement is hereby deemed to constitute reasonably

equivalent value and fair consideration under the

Bankruptcy Code, the Uniform Fraudulent Conveyance Act,

the Uniform Fraudulent Transfer Act, and under the laws

of the United States, and any state, territory, or

possession thereof, or the District of Columbia.

34.   The consideration provided by the

Purchaser for the Property and the Leases under the

Agreement is fair and reasonable and the Sale and

Assignment may not be avoided under section 363(n) of
the Bankruptcy Code.

35.  Upon the Closing, this Sale Order shall
be construed as and shall constitute for any and all
purposes a full and complete general assignment,
conveyance, and transfer of all the Property or a bill
of sale transferring good and marketable title in to the
Purchaser pursuant to the terms of the Agreement.

36.  The transactions contemplated by the
Agreement are undertaken by the Seller and the Purchaser
at arm's-length, without collusion and in good faith, as
that term is used in section 363(m) of the Bankruptcy
Code, and accordingly, the reversal or modification on
appeal of the authorization provided herein to
consummate the sale of the Property and assignment of
the Leases shall not affect the validity of the Sale and
Assignment to the Purchaser, unless such authorization
is duly stayed pending such appeal.  The Purchaser is a
purchaser in good faith, within the meaning of section
363(m) of the Bankruptcy Code, of the Property and the
Leases, and is, and shall be, entitled to all of the

protections afforded by such section and in accordance
therewith.

37.   The failure specifically to include or to
reference any particular provision of the Agreement in
this Sale Order shall not diminish or impair the
effectiveness of such provision, it being the intent of
the Court that the Agreement be authorized and approved
in its entirety.

38.   If the Purchaser fails to close on the
purchase of the Property in accordance with the terms of
the Agreement due to no fault of and Seller is not in
default of its obligations under such Agreement, then
Seller's counsel shall file with the Court and serve
upon the Purchaser, the Alternate Bidder and their
counsel, a notice of such default, which shall include a
copy of the Alternate Bidder's agreement upon which the
Seller will then close, in which case (i) Seller shall
be deemed authorized to close on the sale of the
Property and assignment of the Leases with the Alternate
Bidder on ten (10) days' advance written notice to the
Alternate Bidder, and (ii) the Alternate Bidder shall be
afforded all of the protections originally afforded to

the Purchaser under this Sale Order and the findings
herein as to adequacy and fairness of consideration paid
and good faith shall be deemed to apply to the Alternate
Bidder, its Alternate Bid, and its purchase and sale
agreement with the Seller, without the necessity of
further order of this Court.

39.   All deposits submitted to the Seller for
the Property and the Leases shall be returned to the
bidder that submitted it no later than (i) two business
days after the closing of the sale with the Purchaser
(or the Alternate Bidder, as the case may be) except in
the case of a bidder who closed on the sale of the
Property or who was required to close in accordance with
the terms of this Sale Order but failed to do so in
breach of its contractual obligations through no fault
of the Seller.

40.   The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

41.   This Court retains exclusive jurisdiction
to interpret, construe, enforce, and implement the terms
and provisions of this Sale Order, the Agreement, all

amendments thereto, any waivers and consents thereunder,
and of each of the agreements executed in connection
therewith in all respects, including, but not limited to,
retaining jurisdiction to (a) compel delivery of the
Property and the Leases to the Purchaser, (b) compel
delivery of the purchase price or performance of other
obligations owed to the Seller pursuant to the Agreement,
(c) resolve any disputes arising under or related to the
Agreement, the Alternate Bid, and any deposit delivered
to Seller by a bidder for the Property and the Leases,
(d) interpret, implement, and enforce the provisions of
this Sale Order, and (e) protect the Purchaser against
any Lien against the Seller or the Property or the
Leases of any kind or nature whatsoever, except for
Permitted Encumbrances, which Liens, valid and timely
perfected, shall attach to the proceeds of the Sale.

      42.  This Order shall be effective and
enforceable immediately upon entry and shall not be
stayed pursuant to Rules 6004(h) and 6006.

Dated:  Richmond, Virginia
        _____, 2009

                    _____
                    UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

    Pursuant to Local Bankruptcy Rule 9022-1(C), I
hereby certify that the foregoing proposed order has
been endorsed by or served upon all necessary parties.

                            /s/ Douglas M. Foley

**Exhibit A**

**(Agreement)**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of August 26, 2009, is made by and between CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Seller"), and SMYTHE EUROPEAN, INC., a California corporation ("Purchaser").

### RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

1.    PURCHASE AND SALE

1.1    Purchase and Sale. Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to the property located at 4070 – 4080 Stevens Creek Boulevard, San Jose, California, comprising approximately 5.17 acres, and being more particularly described on Exhibit A attached hereto and made a part hereof, together with (i) all the rights and appurtenances pertaining to such land, (ii) all buildings (including a building containing approximately 69,800 square feet), structures, and other improvements on said land, and all entitlements, permits, approvals, warranties, guaranties, plans, and personal property (if any) with respect to or located on the land, (iii) electrical, mechanical, air conditioning and other fixtures and equipment attached thereto and (iv) Seller's interest as landlord under that certain lease between Seller and Don Sherwood Golf Shop dated January 26, 1998, as amended on June 20, 2006 ("Golf Store Lease") (herein collectively called the "Property"); provided, however, the Property shall not include any lifts or racking located in the buildings, if any (the "Excluded FF&E").

2.    PURCHASE PRICE

2.1    Purchase Price. The purchase price (the "Purchase Price") for the Property shall be ELEVEN MILLION ONE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($11,150,000.00). The Purchase Price, less the Deposit, shall be paid into the Escrow Agent's escrow account in cash by Purchaser by wire transfer in accordance with wire transfer instructions to be provided by Fidelity Title (the "Escrow Agent"), 1301 Dove Street, Suite 310, Newport Beach, CA 92660, Attention: Natalie Priestley, Phone: (949) 622-4911, Fax: (949) 477-

1

6835, Email: Natalie.priestley@fnf.com, as adjusted by prorations and payment of expenses as herein provided.

3.    DEPOSIT

3.1    Deposit.  Concurrently with the execution of this Agreement, Purchaser shall deliver to Seller by wire transfer to Circuit City Stores' Account #4426864923 at Bank of America, in accordance with wire transfer instructions provided by counsel for Seller, an amount equal to FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($500,000.00) (which amount, together with all interest accrued thereon, is herein called the "Deposit").  The Deposit shall be held in an interest-bearing savings account in a federally insured financial institution in the Los Angeles, California metropolitan area, or in such other interest-bearing account or investment as the parties hereto shall direct (the "Escrow Account").

3.2    Application of Deposit.  If the sale of the Property is consummated under this Agreement, the Deposit shall be retained by Seller and applied to the payment of the Purchase Price.  If Purchaser terminates this Agreement in accordance with Section 7.1, Section 7.2, or Section 8.1 hereof, or if Purchaser or Seller terminates this Agreement in accordance with Section 9.4, the Deposit and all accrued interest shall be returned promptly to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the "Survival Obligations").  If Seller terminates this Agreement in accordance with Section 8.2, the Deposit and all accrued interest shall be retained by Seller and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations.  Purchaser agrees to deliver (without any representations or warranties whatsoever and subject to any rights of the preparers thereof) to Seller copies of all Reports (as defined in Section 4.4 hereof) excluding any appraisals, market studies or other proprietary information, at the time the notice to terminate this Agreement is given.  The obligations to deliver the Reports shall survive the termination of this Agreement.  All interest earned on the Deposit shall be reported to the Internal Revenue Service as income of Purchaser and Purchaser shall promptly execute all forms reasonably requested by the Escrow Agent or Seller regarding such interest.

4.    ITEMS DELIVERED TO PURCHASER

4.1    Items Delivered.  Seller has delivered or will deliver to Purchaser, within ten (10) days following opening of escrow with the Escrow Agent, all pertinent property documentation and information with respect to the Property, but only to the extent Seller has reasonable access to and possession of such information (the "Due Diligence Material"), which may include, without limitation, the following materials:

(i)    Copies of the Golf Store Lease, licenses, options to purchase, occupancy agreements or reciprocal easement agreements with respect to the Property;

(ii)    Copies of all contracts to which Seller is a party pertaining to the Property including governmental submittals, agreements and matters of record;

2

(iii)    Copies of all notices of violations of any statutes, rules or regulations of any governmental agencies concerning the Property;

(iv)    Copies of all architectural plans and documents, technical studies, soils reports and engineering documentation concerning the Property;

(v)    Copies of all environmental assessments concerning the Property; and

(vi)    Copies of all surveys, tax bills and other documents reasonably requested by Purchaser affecting the Property.

4.2    <u>Title Examination</u>.  Purchaser acknowledges receipt of a copy of a Preliminary Title Report ("PTR") issued by Fidelity National Title Insurance Company ("Title Company") covering the Property together with copies of all documents of record referenced therein.  This Agreement is not to be conditioned on the outcome of unperformed due diligence by Purchaser, including without limitation a title examination of the Property.  Purchaser hereby waives irrevocably any and all title objections and shall be obligated to close the transaction in accordance with the terms of this Agreement.

4.3    <u>Inspection of Property; Tenant Estoppel Certificate</u>.

(i)    Purchaser acknowledges that Seller has made Seller's books, records and financial information regarding the Property available for inspection by Purchaser or its representatives during normal business hours.  Purchaser approves the condition of the Property.

(iii)    Promptly following the execution of this Agreement, Seller shall request an executed estoppel certificate from the tenant under the Golf Store Lease, in substantially the form of Exhibit B attached hereto (the "Estoppel Certificate").  Seller shall use commercially reasonable efforts to obtain the Estoppel Certificate prior to Closing.  Notwithstanding the foregoing, Seller shall have no obligation to deliver an Estoppel Certificate, nor shall receipt of same be a condition to the Closing hereunder.

4.4    <u>Reports</u>.  All non-public information provided by Seller to Purchaser or obtained by Purchaser relating to the Property in the course of Purchaser's investigation of the Property, whether before or after the date of this Agreement (collectively, the "Reports"), shall be treated as confidential information and shall not be disclosed prior to the Closing to any third parties, except as required by law and except for Purchaser's attorneys, engineers, prospective lenders, real estate broker, consultants, investors, prospective tenants and other business associates who need to know the information in furtherance of this transaction, and then only if they agree to maintain the information in strict confidence as provided herein.  Purchaser shall be liable to Seller for any unauthorized disclosure of the confidential information by or through Purchaser resulting from, relating to or arising out of any due diligence investigation, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and agrees to defend, protect and hold harmless Seller and its agents, employees, officers, directors, representatives and affiliates from any liability resulting therefrom. This Section 4.4 shall survive the Closing or the termination of this Agreement, as applicable.

3

4.5    Purchaser's Representations and Warranties. Purchaser represents and warrants to Seller that (a) Purchaser is a corporation duly organized and validly existing under the laws of the State of California; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms.  Purchaser's representations and warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.5 shall survive the Closing or termination of this Agreement.

4.6    Seller's Representations and Warranties.  Seller represents and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the State of California; (b) Seller has the corporate power and authority to enter into, execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order (as defined hereinafter) in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's postpetition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances; (e) to Seller's actual knowledge, the copies of the Golf Store Lease and of the Prime Lease provided to Purchaser are each true, correct and complete, there are no defaults under the Golf Store Lease except as set forth in that certain Limited Objection of Golfsmith International, L.P. to the Debtors' Motion to Sell Certain Real Property Located in San Jose, California (Docket No. 4580), and there are no other leases or rights of possession; (f) Seller shall continue to operate the Property in accordance with its past practices and shall not take any action that would change title to, or the condition of, the Property; provided, however, taking into account that Seller is no longer operating a retail store open to the public at the Property; and (g) to Seller's actual knowledge, Seller has not assigned, transferred or conveyed its interest, if any, in the Prime Lease to any person since the date it acquired its interest(s) in the Prime Lease.  The phrase "actual knowledge" means the actual knowledge of Deborah Miller as of the date of this Agreement and the Closing Date without any duty to inquire or investigate (reference to Deborah Miller shall impose no liability on her, but rather is made only to limit the scope of Seller's obligations and liabilities hereunder).  Seller's representations and warranties contained herein must be true and correct in all material respects on the Closing Date as a condition to Purchaser's obligation to purchase the Property as contemplated under this Agreement. The Seller's representations and warranties contained in this Section 4.6 shall expire and be extinguished at the Closing.

4.7    Further Assurances.  Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement.

5.    DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER;
ACCEPTANCE OF PROPERTY

    5.1    Disclaimer.    PURCHASER ACKNOWLEDGES AND AGREES THAT
EXCEPT AS EXPRESSLY SET FORTH HEREIN, SELLER HAS NOT MADE, DOES NOT
MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS,
WARRANTIES (OTHER THAN THE WARRANTY OF TITLE AS SET OUT IN THE
GRANT DEED, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR
GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS
OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS
TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR
CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER,
SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C)
THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES
WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE
COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS,
RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL
AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY,
MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF
THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR
MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER,
QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H)
COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER
DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS
MATERIALS (AS DEFINED BELOW) OR (I) ANY OTHER MATTER WITH RESPECT TO
THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS
AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER
ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION,
AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING
THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH
REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR
PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL
BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN.
PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN
GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING
SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY
INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO
ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR
CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR
CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY OR
TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER
ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE
PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY
OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT
INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO
REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS

OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. THE PROVISIONS OF THIS SECTION 5 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

5.2     Hazardous Materials. "Hazardous Materials" shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("CERCLA"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.) ("RCRA"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements (as hereinafter defined) or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

5.3     Environmental Requirements. "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

5.4     Purchaser's Independent Investigations. For all purposes of this Article 5, Purchaser acknowledges and agrees that Purchaser has been provided with adequate and sufficient access to the Property prior to the date of this Agreement, to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as

Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property.

6.      CLOSING

        6.1     Closing. Unless otherwise agreed by the parties in writing, the closing of the purchase and sale of the Property (the "Closing") shall be conducted by mail or, if necessary, held at the offices of Escrow Agent not later than thirty (30) days following entry by the Bankruptcy Court of the Sale Order (the date on which the Closing occurs is referred to as the "Closing Date").

        6.2     Possession and Title Policy. Sole and exclusive possession of the Property shall be delivered to Purchaser at the Closing, subject only to (i) liens for real property taxes that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights of record, including, without limitation, all items shown on the PTR, (iv) any and all matters that would be shown by a physical inspection of the Property, (v) the Golf Shop Lease, and (vi) the Prime Lease (defined herein) (collectively, the "Permitted Encumbrances"). Prior to the Closing, Seller shall remove the Excluded FF&E from the Property and shall repair any material damage to the Property caused by the removal of the Excluded FF&E. At the Closing, Purchaser shall cause the Title Company to issue and deliver an ALTA owner's extended coverage policy of title insurance (the "Title Policy"), together with endorsements reasonably requested by Purchaser, dated as of the Closing Date (as hereinafter defined), with liability equal to the Purchase Price, showing fee title to the Property vested in Purchaser and subject only to: (x) the Permitted Encumbrances; and (y) the standard printed exceptions contained in the form of title policy called for.

        6.3     Proration. All utilities with respect to the Property for the month in which the Closing occurs, all rent under the Golf Shop Lease, and real estate taxes and other assessments with respect to the Property for the year in which the Closing occurs, shall be prorated as of the Closing Date as follows:

                (a)     Purchaser shall receive a credit equal to the amount of the security deposit (if any) held by Seller under the Golf Shop Lease.

                (b)     All real estate taxes and assessments, both general and special, water charges and sewer rents, whether or not then due or payable, and all other normally proratable items shall be prorated to the Closing Date, based upon the latest assessments or actual invoices available. Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment. Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing. All payments received by Purchaser from the tenant under the Golf Shop Lease following the Closing shall first be applied to obligations incurred under the Golf Shop Lease following the Closing; provided, however, that while

7

Purchaser is under no obligation to collect monies owed Seller by the tenant under the Golf Shop Lease attributable to obligations incurred prior to the Closing, Purchaser agrees to deliver to Seller, within thirty (30) days after receipt thereof, all monies collected from the tenant under the Golf Shop Lease after the Closing Date but attributable to periods prior to the Closing Date, and Purchaser agrees to cooperate with Seller in Seller's efforts to collect from such tenant any such pre-closing monetary obligations owed Seller by such tenant.

(c)     Purchaser shall cause all utility meters to be read as of the Closing Date, shall cause the transfer of all utility services for the Property to Purchaser's name as of the Closing Date, and where necessary, shall post deposits with the utility companies; provided, however, Seller shall cooperate reasonably with Purchaser in connection with switching utility services over to Purchaser's name. Seller shall be entitled to a credit of whatever deposits Seller may have with any utility companies if Purchaser receives the benefit of such deposits. If the Closing shall occur before the actual amount of utilities and all other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the apportionment of such utilities and other operating expenses shall be upon the basis of an estimate by Seller of such utilities and other operating expenses for such month. Subsequent to the Closing, when the actual amount of such utilities and other operating expenses with respect to the Property for the month in which the Closing occurs are determined, the parties agree to adjust the proration of such utilities and other operating expenses and, if necessary, to refund or repay such sums as shall be necessary to effect such adjustment.

The agreements of Seller and Purchaser set forth in this Section 6.3 shall survive the Closing.

6.4     Closing Costs.  Seller shall pay all required state, county and municipal transfer or document stamp taxes incident to this transaction. Purchaser shall bear the cost of any audits, inspections, recording fees, and the cost of the Title Policy for the Property (including any endorsements thereto). The parties shall share equally in the cost of any escrow fee. Purchaser and Seller shall each bear their own cost of legal fees. With regard to other costs of Closing, the parties shall bear the costs in accordance with the standard custom in northern California.

6.5     Seller's Obligations at the Closing.  At the Closing (or at such earlier date as provided herein), Seller shall deliver to Escrow Agent the following:

(a)     Grant Deed.  A standard form California grant deed, duly executed by Seller, conveying the Property in fee simple as contemplated by the Sale Order, subject to the Permitted Encumbrances.

(b)     Foreign Person.  An affidavit or certificate duly executed by Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended, and is not subject to withholding under Sections 18805 and 26131 of the California Revenue and Taxation Code.

(c)     Assignment and Assumption of Lease.  An executed counterpart of an assignment and assumption of lease agreement with respect to the Golf Shop Lease, in the form of Exhibit C attached hereto.

8

CCSWCI: San Jose, CA Sale [8/26/2009]

      (d)    Assignment and Assumption of Lease. An executed counterpart of an assignment and assumption of lease agreement with respect to that certain Lease Agreement dated December 31, 1987, between Metropolitan Life Insurance Company, a New York corporation and Seller (the "Prime Lease"), in the form of Exhibit D attached hereto.

      6.6    Purchaser's Obligations at the Closing. At the Closing, Purchaser shall deliver to Escrow Agent the following:

      (a)    Purchase Price and Closing Costs. The Purchase Price (less the amount of the Deposit, which shall be retained by Seller) and any Closing costs which are Purchaser's responsibility hereunder, plus or minus prorations as provided herein, by wire transfer of immediately available funds.

      (b)    Evidence of Authority. Such organizational and authorizing documents of Purchaser as shall be reasonably required by Seller authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

      (c)    Taxpayer I.D. Certificate. A certificate duly executed by Purchaser certifying Purchaser's address and Taxpayer I.D. Number and consenting to Seller's release of this information to any governmental authority.

      (d)    Assignment and Assumption of Lease. An executed counterpart of an assignment and assumption of lease agreement with respect to the Golf Shop Lease, in the form of Exhibit C attached hereto.

      (e)    Assignment and Assumption of Lease. An executed counterpart of an assignment and assumption of lease agreement with respect to the Prime Lease, in the form of Exhibit D attached hereto.

      6.7    Escrow Agent's Duties Upon Closing. When the Escrow Agent has received all documents and funds required for the Closing and has received written notification from Purchaser and Seller that all conditions to the Closing have been satisfied or waived, and when the Title Company is irrevocably committed to issue the Title Policy, then the Escrow Agent shall:

      (a)    Record the Grant Deed and any other documents which the parties may mutually direct to be recorded in the Official Records of the County of Santa Clara, and shall obtain conformed copies thereof for prompt distribution to Purchaser and Seller;

      (b)    Cause the Title Company to issue to Purchaser the Title Policy;

      (c)    Deliver to Purchaser Seller's certification of non-foreign status and its California Withholding Exemption Certificate with the appropriate federal and state agencies as well as comply with any other federal or state reporting requirements;

(d)     Deliver to Purchaser (i) a conformed copy of the Grant Deed and (ii) the appropriate escrow closing statement; and

(e)     Deliver to Seller (i) the Purchase Price, less Seller's share of the Closing costs and (ii) the appropriate escrow closing statement.

6.8     Commission.  Seller and Purchaser represent that there are no real estate brokers or agents of record in this transaction, other than DJM Realty ("Seller's Broker").  Upon Closing, Seller shall pay Seller's Broker a commission pursuant to a separate written agreement.  Neither Seller nor Purchaser shall be responsible for any other real estate commissions or fees of any kind or nature whatsoever.  Seller and Purchaser each agrees to hold the other harmless against any claim made for brokerage commissions or finders' fees resulting from such parties' actions in this transaction.  The provisions of the preceding sentence shall survive the Closing.

7.     RISK OF LOSS; EXISTING INSURANCE PROCEEDS

7.1     Condemnation.  If, prior to the Closing, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a return of Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event the award of the condemning authority shall be assigned to Purchaser at the Closing, and there shall be no reduction in the Purchase Price.

7.2     Casualty.  Seller assumes all risks and liability for damage to or injury occurring to the Property by fire, storm, accident, or any other casualty or cause until the Closing has been consummated.  If the Property, or any part thereof, suffers any damage in excess of Two Hundred Thousand and No/100 Dollars ($200,000.00) after the date of this Agreement and prior to the Closing from fire or other casualty, which Seller, at its sole option, does not repair, Purchaser may either at or prior to Closing (a) terminate this Agreement and receive a refund of the Deposit and neither party will have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which latter event all of Seller's right title and interest in and to the proceeds of any insurance covering such damage (less an amount equal to any expenses and costs incurred by Seller to repair or restore the Property or to be paid on account of the loss of rents or other income from the Property for the period prior to and including the Closing Date, all of which shall be payable to Seller), to the extent the amount of such insurance does not exceed the Purchase Price, plus Seller's deductible under its insurance policy, shall be assigned to Purchaser at the Closing.  If the Property, or any part thereof, suffers any damage less than Two Hundred Thousand and No/100 Dollars ($200,000.00) after the date of this Agreement and prior to the Closing, Purchaser agrees that it will consummate the Closing and accept the assignment of the proceeds of any insurance covering such damage, plus Seller's deductible under its insurance policy, and there shall be no reduction in the Purchase Price. Seller shall maintain casualty insurance for the Property through the Closing Date and, if Purchaser is entitled to insurance proceeds pursuant to this Section 7.2, Seller shall cooperate with Purchaser in good faith in connection with the prosecution of any such insurance claim.

CCSWCI: San Jose, CA Sale [8/26/2009]

8.    DEFAULT

    8.1    <u>Breach by Seller</u>.    In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy may elect to either (a) seek specific performance of Seller's obligations to sell the Property pursuant to the terms of this Agreement (provided that Purchaser is ready, willing and able to deposit the entire Purchase Price (less the amount of the Deposit) into Escrow), or (b) terminate this Agreement and receive a refund of the Deposit. In no event shall Purchaser be entitled to any remedy other than as set forth in the immediately preceding sentence, and in no event shall Seller be liable to Purchaser for any actual, punitive, speculative or consequential damages; provided, however, that in the event Seller fails to comply with its obligations under this Agreement and Purchaser elects to terminate this Agreement as provided in subsection (b) above, then, in addition to the Deposit being disbursed to Purchaser, Seller shall reimburse Purchaser for its reasonable out-of-pocket third-party due diligence expenses actually incurred in connection with this Purchase Agreement, in an amount not to exceed Thirty-Seven Thousand Five Hundred and No/100 Dollars ($37,500.00).

    8.2    <u>Breach by Purchaser</u>.    If the Closing does not occur solely as a result of Purchaser's failure to comply with its obligations under this Agreement, Seller may terminate this Agreement and thereupon shall be entitled to the Deposit (and Purchaser shall pay all escrow charges) as Seller's full liquidated damages pursuant to applicable state statute (and not as a penalty) as Seller's sole and exclusive remedy and relief hereunder, and shall not be entitled to the remedy of specific performance.    Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and that these sums represent a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach. SAID AMOUNT WILL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY PURCHASER.    THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677.    SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement.

            _____              _____
            Purchaser's initials          Seller's initials

9.    BANKRUPTCY ISSUES

    9.1    <u>Generally</u>. Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

8.    DEFAULT

8.1    Breach by Seller.  In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy may elect to either (a) seek specific performance of Seller's obligations to sell the Property pursuant to the terms of this Agreement (provided that Purchaser is ready, willing and able to deposit the entire Purchase Price (less the amount of the Deposit) into Escrow), or (b) terminate this Agreement and receive a refund of the Deposit.  In no event shall Purchaser be entitled to any remedy other than as set forth in the immediately preceding sentence, and in no event shall Seller be liable to Purchaser for any actual, punitive, speculative or consequential damages; provided, however, that in the event Seller fails to comply with its obligations under this Agreement and Purchaser elects to terminate this Agreement as provided in subsection (b) above, then, in addition to the Deposit being disbursed to Purchaser, Seller shall reimburse Purchaser for its reasonable out-of-pocket third-party due diligence expenses actually incurred in connection with this Purchase Agreement, in an amount not to exceed Thirty-Seven Thousand Five Hundred and No/100 Dollars ($37,500.00).

8.2    Breach by Purchaser.  If the Closing does not occur solely as a result of Purchaser's failure to comply with its obligations under this Agreement, Seller may terminate this Agreement and thereupon shall be entitled to the Deposit (and Purchaser shall pay all escrow charges) as Seller's full liquidated damages pursuant to applicable state statute (and not as a penalty) as Seller's sole and exclusive remedy and relief hereunder, and shall not be entitled to the remedy of specific performance.  Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and that these sums represent a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach.  SAID AMOUNT WILL BE THE FULL, AGREED AND LIQUIDATED DAMAGES FOR THE BREACH OF THIS AGREEMENT BY PURCHASER.  THE PAYMENT OF SUCH AMOUNT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677.  SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 3389. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement.

_____ Purchaser's initials          _____ Seller's initials

9.    BANKRUPTCY ISSUES

9.1    Generally.  Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

CCSWCI: San Jose, CA Sale [8/26/2009]                                    11

9.2     Sale Order. The obligation of Seller to sell and convey the Property to Purchaser, and the obligation of Purchaser to purchase the Property from Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered an order in the Bankruptcy Case (the "Sale Order") (i) approving this Agreement and the sale of the Property to Purchaser, free and clear of liens, claims and encumbrances other than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions contemplated by this Agreement.

9.3     Entry of Sale Order. The closing of the sale of the Property to Purchaser shall take place as provided in Section 6.1 above.  Purchaser shall cooperate with the Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable.

9.4     Termination. Seller shall use good faith efforts to cause the Bankruptcy Court to hold the hearing approving or disapproving the Sale Order as part of the Omnibus Hearing currently scheduled on August 27, 2009.   Notwithstanding any other provision of this Agreement, each of Seller and Purchaser shall have the right to terminate this Agreement if the Bankruptcy Court has not entered the Sale Order on or prior to October 31, 2009 (the "Outside Date").  If this Agreement is terminated by Seller or Purchaser because the Bankruptcy Court will not enter the Sale Order prior to the Outside Date, Seller shall disburse the Deposit, with accrued interest thereon, to Purchaser.  Purchaser shall receive no "break up fee" or other penalty or compensation from Seller in the event Purchaser is not permitted to purchase the Property through the Bankruptcy Court proceedings.

10.     MISCELLANEOUS

10.1     Notices. All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; or (b) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal Express, addressed to such party at the address specified below.  For purposes of this Section 10.1, the addresses of the parties for all notices are as follows:

| | |
|---|---|
| If to Purchaser: | SMYTHE EUROPEAN, INC.<br>c/o AutoNation, Inc.<br>200 S.W. First Avenue, 14th Floor<br>Fort Lauderdale, Florida 33301<br>Attention: Jeff Shupert |
| with a copy to: | AUTONATION, INC.<br>200 S.W. First Avenue, 14th Floor<br>Fort Lauderdale, Florida 33301<br>Attention: Michael Archey, Esq. |
| and a copy to: | BLOODWORTH CARROLL & BANOWSKY, P.C.<br>12221 Merit Drive, Suite 1680 |

Dallas, Texas 75251
Attention: Thomas L. Bloodworth, Esq.

If to Seller:      CIRCUIT CITY STORES WEST COAST, INC.
4951 Lake Brook Drive, 5th Floor
Glen Allen, Virginia 23060-9279
Attention: Vice President of Real Estate

with a copy to:      CIRCUIT CITY STORES WEST COAST, INC.
P.O. Box 5695
Glen Allen, Virginia 23058
Attention: General Counsel

and a copy to:      KENNERLY, LAMISHAW & ROSSI, LLP
707 Wilshire Blvd., Suite 1400
Los Angeles, CA 90017
Attention: Matthew I. Lamishaw, Esq.

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

10.2    Entire Agreement. This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations, promises or inducements made by either party relative to the subject matter hereof, which are not expressly set forth herein.

10.3    Amendment. This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

10.4    Heading. The captions and headings used in this Agreement are for convenience of reference only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

10.5    Time of Essence. Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States, or the State where the Property is located, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

10.6    Governing Law. This Agreement shall be governed by the laws of the State of California and the laws of the United States pertaining to transactions in such State.

10.7    Successors and Assigns: Assignment. This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall be permitted to assign

Purchaser's rights under this Agreement to an affiliate of Purchaser without obtaining any consent of Seller; provided, however, any other assignment may be made only with the prior written consent of Seller, which consent shall not be unreasonably withheld, delayed or conditioned. No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement. This Agreement is solely for the benefit of Seller and Purchaser; there are no third party beneficiaries hereof. Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

10.8    Invalid Provision. If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

10.9    Attorneys' Fees. In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.

10.10    Multiple Counterparts. This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

10.11    No Recordation. Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record in any real property or other public records.

10.12    Merger Provision. Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

10.13    Brokers. Except as contemplated by Section 6.8, no commissions, brokerage fees, finders' fees, or other similar fees shall be due in connection with this Agreement.

10.14    Consent to Jurisdiction of Bankruptcy Court. THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Seller and Purchaser further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in Section 10.1

of this Agreement will be effective service of process for any action, suit or proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above. Each of Seller and Purchaser irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

CCSWCI: San Jose, CA Sale [8/26/2009]

SELLER

CIRCUIT CITY STORES WEST
COAST, INC., a California corporation


By:      _Michelle Mosier_
Name:    _Michelle Mosier_
Title:   _VP & Controller_

PURCHASER

SMYTHE EUROPEAN, INC.,
a California corporation


By:      _____
Name:    _____
Title:   _____

CCSWCI: San Jose, CA Sale [8/26/2009]

16

SELLER

CIRCUIT CITY STORES WEST
COAST, INC., a California corporation


By: _____
Name: _____
Title: _____

PURCHASER

SMYTHE EUROPEAN, INC.,
a California corporation


By: _____
Name: Jeffrey Shupert
Title: Authorized Signatory

The escrow terms and conditions of this Agreement are agreed to and accepted this 26th day of August, 2009.

ESCROW AGENT:

FIDELITY NATIONAL TITLE INSURANCE COMPANY

By: _____
Name: Natalie Priestley
Title: VP

Mailing Address:

1301 Dove Street, Suite 310
Newport Beach, CA 92660
Attention: Natalie Priestley

**Parties are aware that no funds will be deposited into an interest bearing account until a completed W-9 is received into escrow. Depositor will bear loss of interest until W-9 is received by Escrow.**

_____
**Escrow Officer**

CCSWCI: San Jose, CA Sale [8/26/2009]

17

## EXHIBIT A

### LEGAL DESCRIPTION OF THE PROPERTY

All that certain Real Property in the City of San Jose, County of Santa Clara, State of California, described as follows:

Portion of Lots 9 and 2, as shown upon that certain Map entitled, "Map of the Dean Tract", which Map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California, on March 5, 1892 in Book F of Maps, at page 9, and more particularly described as follows:

Beginning at a point in the center line of Stevens Creek Road at the Northeast corner of that certain parcel of land conveyed by John Maridon to Teresa Maridon, by Deed dated April 7, 1921 and recorded April 18, 1922 in Volume 552 of Deeds, at page 54, said point being distant West 12.49 chains from the point of intersection of the center line of Stevens Creek Road with the center line of Saratoga Avenue; thence West and along the center line of Stevens Creek Road, 4.947 chains; thence running South 0 deg. 16' West 11.80 chains to a point on the Southerly line of Lot 9, as shown upon the Map hereinabove mentioned; thence running along the Southerly line of Lots 9 and 2, East 4.947 chains to a stake marked "X" at the Southeast corner of the lands so conveyed to Teresa Maridon; thence running along the Easterly line of said Teresa Maridon's Land, North 0 deg. 16' East 11.80 chains to the point of beginning.

Excepting therefrom a strip of land 75.00 feet in width and more particularly described as follows:

Portion of Lots 2 and 9, as shown upon that certain Map entitled, "Map of the Dean Tract", which map was filed for record in the Office of the Recorder of the County of Santa Clara, State of California on March 5, 1892 in Book F of Maps, at page 9 and more particularly described as follows:

Beginning at a point in the center line of Stevens Creek Road at the Northeast corner of that certain parcel of land conveyed by John Maridon to Teresa Maridon by Deed dated April 7, 1921 and recorded April 18, 1922 in Volume 552 of Deeds, at page 54, said point being distant West 824.34 feet from the point of intersection of the center line of Stevens Creek Road with the center line of Saratoga Avenue, thence South 89 deg. 57' 45" West along the center line of Stevens Creek Road 326.50 feet, thence South 0 deg. 16' West 75.00 feet to the Southwesterly corner of that certain parcel of land conveyed to the County of Santa Clara, recorded on April 10, 1965 in Book 6940 of Official Records, page 594 Santa Clara County Records, thence North 89 deg. 57' 45" East along the Southerly line of the lands conveyed to the County of Santa Clara 326.50 feet to the Southeasterly corner thereof, thence North 0 deg. 16' East 75.00 feet to the point of beginning.

18

<u>EXHIBIT B</u>

ESTOPPEL CERTIFICATE

TENANT: _____

DATE OF LEASE: _____

DATE OF AMENDMENT(S): _____

PREMISES: _____

Attention: _____

        The undersigned hereby certifies to _____ ("Purchaser"), as follows:

        1.    The undersigned is the current tenant (the "<u>Tenant</u>") under the above-referenced lease (the "<u>Lease</u>") covering the above-referenced premises (the "<u>Premises</u>").

        2.    The Lease constitutes the entire agreement between the current landlord under the Lease (the "<u>Landlord</u>") and the Tenant with respect to the Premises. The Lease has not been modified or amended except as set forth above. The lease incorporated that certain Lease Agreement dated December 31, 1987, between Metropolitan Life Insurance Company, a New York corporation and Landlord's predecessor in interest.

        3.    The term of the Lease commenced on _____, _____, and, including any presently exercised option or renewal term, will expire on _____, _____.

        4.    As of the date of this Estoppel Certificate, the Lease is in full force and effect.

        5.    As of the date of this Estoppel Certificate, to the knowledge of the undersigned, there exists no breach or default under the Lease, and, to the knowledge of the undersigned, no state of facts which, with notice, the passage of time, or both, would result in a breach or default under the Lease on the part of either the Tenant or the Landlord, except for

_____.

        6.    Tenant is currently obligated to pay annual rental in monthly installments of $_____ per month and monthly installments of annual rental have been paid through _____, _____. No other rent has been paid in advance and Tenant has no claim or defense against Landlord under the Lease and is asserting no offsets or credits against either the rent or Landlord.

19

CCSWCI: San Jose, CA Sale [8/26/2009]

7.      Tenant has no claim against Landlord for any security or other deposits except $ _____ which was paid pursuant to the Lease.

8.      All obligations of the Landlord under the Lease concerning the construction of the Premises have been performed by Landlord.

9.      Tenant has made no agreement with Landlord or any agent, representative or employee of Landlord concerning free rent, partial rent, rebate of rental payments or any other type of rental or other concession except as expressly set forth in the Lease.

10.     Tenant has no option to extend the Lease term, no right of first refusal with respect to the Premises or the property of which the Premises are a part and no option to expand    the    Premises    and    no    option    to    terminate    the    Lease,    except    for _____.

Dated this _____ day of _____, 2009.

"TENANT"

_____

By: _____
Name: _____
Title: _____

EXHIBIT C

ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT (this "Assignment") is made as of _____, 2009 (the "Effective Date") by and between CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("Assignor") and _____ ("Assignee").

RECITALS

A.    Assignor, as lessor, and Don Sherwood Golf Shop (the "Tenant") have entered into that certain lease dated January 26, 1998, as amended on June 20, 2006 (the "Lease") covering certain premises located upon that certain property commonly known as 4070 – 4080 Stevens Creek Boulevard, San Jose, California (the "Real Property").

B.    Concurrently with this Assignment, pursuant to the terms of that certain Purchase and Sale Agreement between Assignor, as Seller, and Assignee, as Purchaser, dated as of _____ _____, 2009 (the "Purchase Agreement"), Assignor has executed and delivered that certain Grant Deed of even date for the conveyance of the Real Property to Assignee.

C.    In connection with said conveyance, Assignor now desires to assign and transfer to Assignee all of Assignor's interest as lessor in the Lease, subject to the rental, terms, covenants, obligations, easements and restrictions set forth therein.

NOW THEREFORE, in consideration of the mutual covenants and conditions hereinbelow set forth, it is agreed:

1.    Assignment. Assignor hereby assigns and transfers to Assignee, effective as of the Effective Date, all of Assignor's right, title and interest as lessor (excepting therefrom the Reserved Rights) accruing after the Effective Date, in and to the Lease, and any security deposit held by Assignor thereunder (the "Security Deposit"), subject to the rentals, terms, covenants, obligations, easements and restrictions set forth in the Leases. As used herein, the term "Reserved Rights" shall mean all relevant rights and remedies of the Lease (collectively, the "Enforcement Rights") relating to the landlord's right to collect past due monetary obligations of the tenant including the landlord's right to recover the payment of landlord's attorneys' fees as the same relate to the collection of monetary obligations of the Tenant(s) arising prior to the Effective Date. Nothing contained in this Section 1 shall impair Assignee's assumption of the Enforcement Rights as the same relate to the collection of monetary obligations of the Tenant(s) under the Lease(s) arising after the Effective Date.

21

CCSWCI: San Jose, CA Sale [8/26/2009]

2.    <u>Assumption</u>. Assignee hereby accepts, effective as of the Effective Date, the assignment of the Lease (and the Security Deposit, if applicable) and shall be entitled to all rights and benefits accruing to the lessor thereunder and hereby assumes all obligations thereunder and agrees to be bound by the terms of the Lease, from and after the Effective Date.

3.    <u>Tenant Notice</u>. Assignor agrees to deliver to the Tenant notice to inform the Tenant that Assignor has transferred its interest in the Lease (and the Security Deposit, if applicable) to Assignee as of the Effective Date.

4.    <u>Miscellaneous</u>

(a)    <u>Counterparts</u>. This Assignment may be executed in counterparts which taken together shall constitute one and the same instrument.

(b)    <u>Assignment</u>. This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns.

(c)    <u>Headings</u>. Headings used in this Assignment are for reference purposes only, and are not to be considered in interpreting this Assignment.

(d)    <u>Governing Law</u>. This Assignment shall be governed and construed in accordance with the laws of the State of California.

(e)    <u>Entire Agreement</u>. This Assignment and the other agreements entered into in connection with this Assignment embody the entire agreement and understanding between the parties hereto and shall, except with respect to the Purchase Agreement, supersede all prior agreements and understanding between the parties relating to the subject matter hereof.

(f)    <u>Attorneys' Fees</u>. If any action or proceeding is commenced by either party to enforce its rights under this Assignment, the prevailing party in such action or proceeding shall be entitled to recover all reasonable costs and expenses incurred in such action or proceeding, including reasonable attorneys' fees and costs, in addition to any other relief awarded by the court.

CCSWCI: San Jose, CA Sale [8/26/2009]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

ASSIGNOR

CIRCUIT CITY STORES WEST COAST, INC.,
a California corporation

By: _____
Name: _____
Title: _____

ASSIGNEE

_____

By: _____
Name: _____
Title: _____

23

CCSWCI: San Jose, CA Sale [8/26/2009]

<u>EXHIBIT D</u>

ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF LEASE AGREEMENT (this "<u>Assignment</u>") is made as of _____, 2009 (the "<u>Effective Date</u>") by and between CIRCUIT CITY STORES WEST COAST, INC., a California corporation ("<u>Assignor</u>") and _____ ("<u>Assignee</u>").

RECITALS

A.    Assignor's predecessor in interest, Circuit City Stores, Inc. a Virginia corporation, as lessee, and Metropolitan Life Insurance Company, a New York corporation ("MetLife"), as landlord were parties to that certain Lease Agreement dated December 31, 1987 (the "<u>Lease</u>") covering certain premises located upon that certain property commonly known as 4070 – 4080 Stevens Creek Boulevard, San Jose, California (the "<u>Real Property</u>").

B.    Assignor acquired all of the rights of MetLife under the lease pursuant to an Assignment of Lease dated August 23, 2004 and acquired title to the Real Property by grant deed dated August 23, 2004.

C.    Concurrently with this Assignment, pursuant to the terms of that certain Purchase and Sale Agreement between Assignor, as Seller, and Assignee, as Purchaser, dated as of _____ _____, 2009 (the "Purchase Agreement"), Assignor has executed and delivered that certain Grant Deed of even date for the conveyance of the Real Property to Assignee.

D.    In connection with said conveyance, Assignor now desires to assign and transfer to Assignee all of Assignor's interest as lessor and lessee in the Lease, if any, subject to the rental, terms, covenants, obligations, easements and restrictions set forth therein.

NOW THEREFORE, in consideration of the mutual covenants and conditions hereinbelow set forth, it is agreed:

1.    <u>Assignment</u>. Assignor hereby assigns and transfers to Assignee, effective as of the Effective Date, without recourse, representation or warranty, all of Assignor's right, title and interest in and to the Lease as lessor and lessee thereunder, if any, subject to the rentals, terms, covenants, obligations, easements and restrictions set forth in the Lease.

2.    <u>Assumption</u>. Assignee hereby accepts, effective as of the Effective Date, the assignment of the Lease and shall be entitled to all rights and benefits accruing to the lessor and the lessee thereunder, if any, and hereby assumes all obligations thereunder and agrees to be bound by the terms of the Lease, from and after the Effective Date.

3.      Miscellaneous.

(a)      Counterparts. This Assignment may be executed in counterparts which taken together shall constitute one and the same instrument.

(b)      Assignment. This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective heirs, executors, administrators, successors and assigns.

(c)      Headings. Headings used in this Assignment are for reference purposes only, and are not to be considered in interpreting this Assignment.

(d)      Governing Law. This Assignment shall be governed and construed in accordance with the laws of the State of California.

(e)      Entire Agreement. This Assignment and the other agreements entered into in connection with this Assignment embody the entire agreement and understanding between the parties hereto and shall, except with respect to the Purchase Agreement, supersede all prior agreements and understanding between the parties relating to the subject matter hereof.

(f)      Attorneys' Fees. If any action or proceeding is commenced by either party to enforce its rights under this Assignment, the prevailing party in such action or proceeding shall be entitled to recover all reasonable costs and expenses incurred in such action or proceeding, including reasonable attorneys' fees and costs, in addition to any other relief awarded by the court.

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

ASSIGNOR

CIRCUIT CITY STORES WEST COAST, INC.,
a California corporation

By:      _____
Name:    _____
Title:   _____

ASSIGNEE

_____

By:    _____
Name:  _____
Title:  _____