Gregg M. Galardi, Esq.          Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.         Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &  MCGUIREWOODS LLP
FLOM, LLP                        One James Center
One Rodney Square                901 E. Cary Street
PO Box 636                       Richmond, Virginia 23219
Wilmington, Delaware 19899-0636  (804) 775-1000
(302) 651-3000

            - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

            IN THE UNITED STATES BANKRUPTCY COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                     RICHMOND DIVISION

- - - - - - - - - - - - - - x
                            :
In re:                      :    Chapter 11
                            :
CIRCUIT CITY STORES, INC.,  :    Case No. 08-35653 (KRH)
et al.,                     :
                            :
                            :
            Debtors.        :    Jointly Administered
- - - - - - - - - - - - - - x

    **DEBTORS' MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS
     105 AND 365 AND BANKRUPTCY RULE 9019, FOR ORDER
    APPROVING STIPULATIONS BY AND AMONG THE DEBTORS AND
    (I) FEDERAL WARRANTY SERVICE CORPORATION AND CERTAIN
      AFFILIATES; (II) GENERAL ELECTRIC COMPANY; AND
      (III) SERVICE PLAN, INC., AND CERTAIN AFFILIATES**

            Circuit City Stores, Inc. ("Circuit City") and

its subsidiary debtors and debtors in possession in the

above-captioned jointly administered cases (collectively

with Circuit City, the "Debtors")[1] hereby move (the

"Motion"), pursuant to sections 105 and 365 of title 11

of the United States Code (the "Bankruptcy Code") and Rule

9019 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for entry of an order (the "Order")

approving three stipulations (collectively, the

"Stipulations")[2] between the Debtors and (I) Federal

Warranty Service Corporation, Sureway, Inc., American

Bankers Insurance Company Of Florida, and United Service

Protection, Inc. (collectively, "Assurant"),

(II) General Electric Company ("GE"), and (III) Service

Plan, Inc. and its affiliates, including but not limited

---

[1]    The Debtors and the last four digits of their respective taxpayer
      identification numbers are as follows: Circuit City Stores, Inc.
      (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
      Inc. (0875), Ventoux International, Inc. (1838), Circuit City
      Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
      Distribution Company of Virginia, Inc. (2821), Circuit City
      Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
      Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
      Sky Venture Corp. (0311), PRAHS, Inc.(n/a), XSStuff, LLC (9263),
      Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
      LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
      for Circuit City Stores West Coast, Inc. is 9250 Sheridan
      Boulevard, Westminster, Colorado 80031.  For all other Debtors,
      the address was 9950 Mayland Drive, Richmond, Virginia 23233 and
      currently is 4951 Lake Brook Drive, Glen Allen, VA 23060.

[2]    Unless otherwise indicated, capitalized terms not defined herein
      shall have the meanings ascribed to them in the Stipulations.

to Virginia Surety Company, Inc., National Product Care
Company, Service Saver, Inc., Service Saver of Florida,
Inc. and TWG Innovative Solutions, Inc. (collectively,
"SPI" and together with Assurant and GE, the "Settlement
Parties").  In support of the Motion, the Debtors
respectfully represent:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider
this Motion under 28 U.S.C. §§ 157 and 1334.  This is a
core proceeding under 28 U.S.C. § 157(b).  Venue of
these cases and this Motion in this district is proper
under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory and legal predicates for
the relief requested herein are Bankruptcy Code sections
105 and 365 and Bankruptcy Rule 9019.

### BACKGROUND

3.    On November 10, 2008 (the "Petition
Date"), the Debtors filed voluntary petitions in this
Court for relief under chapter 11 of the Bankruptcy Code.

4.    The Debtors continue as debtors in
possession pursuant to Bankruptcy Code sections 1107 and
1108.

5.   On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").  To date, no trustee or examiner has been appointed in these chapter 11 cases.

6.   On January 16, 2009, the Court authorized the Debtors, among other things, to conduct going out of business sales (the "GOB Sales") at the Debtors' remaining 567 stores pursuant to an agency agreement (the "Agency Agreement") between the Debtors and a joint venture, as agent (the "Agent").  On January 17, 2009, the Agent commenced the GOB Sales pursuant to the Agency Agreement at the Debtors' remaining stores.  The GOB Sales were concluded on or about March 8, 2009.

## RELIEF REQUESTED

7.   By this Motion, the Debtors request that the Court approve the Stipulations under Bankruptcy Code section 105 and 365, as well as Bankruptcy Rule 9019.

4

**BASIS FOR RELIEF**

**A.    The Debtors' Warranty Business.**

8.    As this Court is well aware, the Debtors were formerly in the business of selling consumer electronics and related products.  As part of their consumer electronics business, the Debtors' also sold long-term service contracts -- warranties -- (each, a "Service Contract") for products purchased through their stores, as well as those purchased online.

9.    Each Service Contract was sold pursuant to agreements with various third parties.  Generally, and as more specifically discussed below, the Debtors acted as the claims administrator and performed various product repair and replacement services, and third parties acted as underwriters to insure the obligations associated with the Service Contracts.

10.    In their role as claims administrator, the Debtors received and processed claims and performed repairs or provided replacement products, or subcontracted with additional third parties, including GE, to provide repairs.  For each claim, the Debtors

submitted it to the third party insurers (such as the

Settlement Parties) for reimbursement.

**B.    The Debtors' Relationship With SPI.**

11.  On December 1, 1992, Circuit City and SPI

entered into three agreements pursuant to which Circuit

City generally agreed to sell certain Service Contracts,

act as third party claim administrator, and perform

various product repair and replacement services, and SPI

agreed to act as the underlying obligor.

12.  Under the Agreement Regarding Repair

Service Agreements (the "SPI Master Agreement"), Circuit

City sold thousands of Service Agreements to its

customers at fixed prices (the "Sale Price").  Upon

receipt of the Sale Price, Circuit City remitted a

percentage of the Sale Price to SPI for purposes of

satisfying claims, which amounts were segregated (the

"Claim Fund"), and retained the remainder of the Sale

Price as a commission.  Pursuant to the Master Agreement,

SPI was the ultimate obligor under each Service Contract

sold.

13.  To meet its obligations under the Service

Agreements, SPI engaged Circuit City, under the

Authorized Repair Center Agreement (the "Repair Center
Agreement"), to perform certain product repair and
replacement services.  Under the Repair Center Agreement,
SPI agreed that all claims for service performed by
Circuit City would be paid by SPI on a monthly basis and
that SPI would reimburse Circuit City for the actual
cost of the parts and labor.  After claims were
submitted, but before they were paid, claims were
subject to a review and approval process by SPI.

14.  Finally, under a separate agreement (the
"Contingent Commission Agreement" and collectively with
the SPI Master Agreement, the Repair Center Agreement
and any related agreements, the "SPI Agreements"), SPI
and Circuit City agreed to a process by which amounts
held in the Claim Fund could be released on an annual
basis, as well as at the expiration of all Service
Contracts issued under the SPI Master Agreement.
Pursuant to the Contingent Commission Agreement, based
on the amount paid for claims during a given year and
actuarial studies, Circuit City was entitled to annual
"commissions", which were typically paid in February of
each year.

15.  In or about November 2006, Circuit City and GE entered into a letter agreement (the "GE Letter Agreement") whereby the parties agreed that GE would satisfy certain claims by performing repair services Circuit City was obligated to perform under the Repair Center Agreement with SPI.  The parties further agreed that GE would submit such claims in the appropriate format to Circuit City, as the claim administrator, for processing.  Once processed, Circuit City agreed to submit the GE claims to SPI for payment (the "GE Claims").  Upon receiving payment, Circuit City further agreed to reimburse GE for all valid GE Claims.

16.  Also, in late 2006, Circuit City ceased selling Service Contracts under the SPI Master Agreement, but continued to serve as claim administrator and provide repair and replacement services.  Additionally, GE continued to provide repair services under the GE Letter Agreement.  Thus, prior to and following the Petition Date, Circuit City continued to submit claims, including GE Claims, for reimbursement to SPI.  However, since the Petition Date, SPI has not remitted any payments to Circuit City on account of such claims.

Additionally, the most recent distribution from the Claim Fund was due February 2009, but was not paid.

17.   In April 2009, the Debtors sent SPI a demand for immediate payment of approximately $21,000,000, which included amounts on account of certain GE Claims, that Circuit City asserted were immediately due and payable.  Additionally, Circuit City reserved its right to collect future amounts that would come due and payable over the next two years.

18.   In response, SPI asserted various defenses and substantial offsets on account of alleged breaches of the relevant agreements by Circuit City. Additionally, SPI contended that, as a result of the Debtors' liquidation, it was unlikely that the Claim Fund would be sufficient to satisfy potential claims.

19.   Thereafter, the parties engaged in extensive negotiations to resolve their disputes.  As a result of such negotiations, the Debtors and SPI entered into a Stipulation, a copy of which is attached to the proposed order as Exhibit A.  As more fully described below, the Stipulation provides for payment to Circuit City of $23,250,000.00.

**C.    The Debtors Relationship With GE And Assurant.**

20.   In 2000, Circuit City began to sell
Service Contracts for personal computers.   These Service
Contracts were sold as part of a relationship with GE
and, later, Assurant.   Moreover, in December 2006,
Circuit City transitioned its Service Contract business
with SPI to GE and Assurant.   As a result, all of
Circuit City's entire Service Contract business since
December 2006 was with GE and Assurant.

21.   Over the course of their relationship,
Circuit City, Assurant, and GE entered into various
agreements, including, without limitation, an agreement
for the sale of personal computer service contracts (the
"PC Program Agreement"), the Consumer Electronics
Program Agreement dated December 1, 2006 (as amended,
the "Brown Goods Program Agreement") and the Consumer
Electronics Program Services Agreement, dated December 1,
2006 (as amended, the "Brown Goods Services Agreement"
and together with the Brown Goods Program Agreement, and
the "Brown Goods Agreements") (collectively with any
related agreements, the "Assurant Agreements").   On or
about September 26, 2008, GE assigned, sold or otherwise

10

transferred all of its rights, title and interest in and under the Assurant Agreements to Assurant.

22.   Under the Assurant Agreements, Circuit City marketed and sold Service Contracts and administered and performed repair and replacement services for certain Service Contracts.  Specifically, under the Brown Goods Program Agreement, Circuit City sold Service Contracts to consumers for other consumer electronics equipment.  In addition, under the Brown Goods Services Agreement, Circuit City administered claims and performed product repair and replacement services.

23.   Similarly, under the PC Program Agreement, Circuit City sold Service Contracts to consumers for personal computers, peripherals and related products. While the PC Program Agreement did not contemplate that Circuit City would perform repair and/or replacement services under the associated Service Contracts, Circuit City has performed such services during the course of the parties' relationship.

24.   Under the Assurant Agreements, GE and Assurant served as the obligor for Service Contracts

issued thereunder and Assurant continues to serve as the
obligor for Service Contracts in all States, except
allegedly in the State of Massachusetts.

25.   For each Service Contract sold under the
PC Program Agreement and the Brown Goods Program
Agreement, Circuit City retained a portion of the
proceeds as commission and remitted a portion of the
proceeds to Assurant.  In turn, Assurant retained a
portion of such proceeds as compensation and reserved a
large portion thereof (the "Reserve") for payment of the
costs associated with future consumer claims under the
Service Contracts.  Funds held in the Reserve were
invested.

26.   In addition to Circuit City's commission,
on an annual basis, Circuit City could receive two
additional payments from the Reserve, assuming claims
during the year did not result in an under-funded
Reserve.  First, Circuit could receive investment income
generated from the Reserve (based on the 2-year Treasury
Bill rate).  Second, Circuit City could receive a
distribution from excess funds held in the Reserve.

12

27.  Finally, after all costs associated with all claims were paid, Circuit City was entitled to one-hundred (100) percent of any remaining funds in the Reserve associated with the Brown Goods Agreements and fifty (50) percent of remaining funds in the Reserve associated with the PC Program Agreement (the "Underwriting Profit").

28.  As of March 31, 2009, Circuit asserted that approximately $18,000,000 was immediately due and payable under the Assurant Agreements.  Additionally, once all Service Contracts had expired and all claims were administered, the Debtors asserted that they would be entitled to millions of dollars on account of the Underwriting Profit.

29.  In response, Assurant contended that the Debtors owed Assurant approximately $17,800,000 on account of post-petition Service Contract sales and unpaid GE Claims.  Additionally, Assurant contended no Underwriting Profit would ever come due and payable under the Assurant Agreements.

30.  As of the Petition Date, both Assurant and GE also asserted that the Debtors were obligated to

13

each party for various amounts under the Assurant
Agreements.  In particular, GE filed secured claims in
excess of $29,000,000 (the "Filed Claims").  Assurant
likewise filed various claims.

31.  Over the past several months, Assurant
and the Debtors have engaged in significant negotiations
concerning the parties' disputes.  As the parties were
in the process of finalizing a settlement, the parties
determined that it was necessary to resolve issues with
GE prior to reaching a final resolution.  Thus, over the
past month, the Debtors and GE, and GE and Assurant have
engaged in negotiations and likewise resolved their
disputes.  As a result of such negotiations, the Debtors
and Assurant entered into a Stipulation, a copy of which
is attached to the proposed order as <u>Exhibit B</u> (the
"Assurant Stipulation"), and the Debtors and GE entered
into a Stipulation, a copy of which is attached to the
proposed order as <u>Exhibit C</u> (the "GE Stipulation").

32.  Generally, the Assurant Stipulation
provides for payment of $46,000,000 to the Debtors, less
a settlement amount of $4,109,104 and an additional
$4,250,000 on account of GE Claims, and the GE

14

Stipulation provides that GE will agrees to waive all

claims, including the Filed Claims.

**THE STIPULATIONS[3]**

**A.     The SPI Stipulation.**

33.   Pursuant to the SPI Stipulation, the

parties agreed as follows:

(a)   <u>Settlement Payment</u>.  SPI shall make a one-time
cash payment to the Debtors in the amount of
Twenty Three Million Two Hundred Fifty
Thousand dollars ($23,250,000) (the "Payment").

(b)   <u>Release by the Debtors</u>.  The Debtors and all
persons or entities that might be able to
assert claims on behalf of or through the
Debtors or their estates, either directly or
indirectly, release and forever discharge SPI
from any and all past, present and future
claims, demands, damages, obligations,
liabilities, losses, costs, expenses, fees and
causes of action of every nature, character
and description, whether contingent or fixed,
whether matured or unmatured, whether known or
unknown, for anything and everything from the
beginning of time based on, related to, in
connection with, or resulting from any facts,
events, circumstances, acts, or failures to
act related to the SPI Agreements, the Debtors
or these chapter 11 cases.

(c)   <u>Release by SPI</u>.  SPI and all persons or
entities that might be able to assert claims

---

[3]   This section of the Motion is intended as a summary of the
Stipulations and is qualified in all respects by the terms of the
Stipulations.  To the extent that any description of the
Stipulations contained herein conflicts with the terms of the
Stipulations, the Stipulations shall control in all respects.

on behalf of or through the Debtors or their estates, either directly or indirectly, release and forever discharge the Debtors and their estates from any and all past, present and future claims, demands, damages, obligations, liabilities, losses, costs, expenses, fees and causes of action of every nature, character and description, whether contingent or fixed, whether matured or unmatured, whether known or unknown, for anything and everything from the beginning of time based on, related to, in connection with, or resulting from any facts, events, circumstances, acts, or failures to act related to the SPI Agreements, the Debtors or these chapter 11 cases.

**B.     The Assurant Stipulation.**

34.    Pursuant to the Assurant Stipulation, the parties agreed as follows:

(a)    Rejection of Certain Agreements and Allowed Claim.  The Brown Goods Services Agreement, PC Program Agreement and GE Letter Agreement shall be deemed rejected by the Debtors. Assurant shall be granted an allowed general unsecured claim of $6,000,000, which shall be deemed full and final resolution of all amounts owed by the Debtors to Assurant in the Debtors' bankruptcy cases or otherwise in any way related to the Brown Goods Services Agreement and the PC Program Agreement.

(b)    Assumption of Brown Goods Program Agreement, Payment of Profit Sharing Amounts and Termination of Brown Goods Program Agreement. The Brown Goods Program Agreement shall be deemed assumed by the Debtors without objection from Assurant.  In connection with this assumption:

(i)  Assurant shall pay to the Debtors
$46,000,000 to account for the
Debtors share of profits under the
Brown Goods Program Agreement less
(1) a settlement amount $4,109,104
for post-petition amounts due
and payable from the Debtors to
Assurant, (2) $4,250,000 in full
and final resolution of all
amounts advanced or incurred by
Assurant under the GE Letter
Agreement in adjusting and paying
claims formerly administered by
the Debtors, and (3) $3,500,000 to
be deposited in a custodial trust
account (the "Escrow Account"),
for a net initial lump-sum profit
sharing payment of $34,140,896.

If during the Escrow Term Assurant
believes a violation of the
Prohibition shall have occurred
and Assurant files an action
seeking damages caused by
violation of the Prohibition, the
Custodian shall retain the amounts
held in the Custodial Account
pending a decision of the Court in
the Circuit City Bankruptcy Cases
as to entry of a judgment for
violation of the Prohibition and
distribution of the assets in the
Custodial Account.  The Escrow
Amount will be released upon the
later of (i) one year or (ii) at
the conclusion of any commenced in
accordance with this paragraph.

(ii)  As part of any order approving the
sale or transfer of the right to
use data collected about customers
who had purchased service
contracts under the Brown Goods

Program Agreement and PC Program Agreement, the Debtors shall include language prohibiting the buyer of such data from communicating with these customers or soliciting cancellations, renewals or replacement of existing service contracts (the "Prohibition").  If, within one-year of the effective date of the Assurant Stipulation, Assurant files an action and ultimately obtains a judgment on account of a violation of the Prohibition, it shall be entitled to draw on the Escrow Account to satisfy this judgment.  At the end of the one-year term, the funds in the Escrow Account shall be released to the Debtors.

(iii)   Upon assumption of the Brown Goods Program Agreement as provided in the Assurant Stipulation, except for the terms and conditions set forth in that Stipulation, the Brown Goods Program Agreement shall be deemed to have terminated, and no party to that Agreement shall owe any further performance or have any further liability under the Brown Goods Program Agreement to any other party to that Agreement, including, but not limited to, GE.

(c)   <u>Transfer of Phone Numbers and Data</u>.  The Debtors shall transfer the toll-free numbers relating to the service contract business to Assurant.  The Debtors also grant Assurant the perpetual, royalty-free worldwide exclusive right to use the data collected about customers who had purchased service contracts

under the Brown Goods Program Agreement and PC Program Agreement to communicate with these customers about existing service contracts.

(d)     <u>Final Resolution of SPI Claims</u>.  As set forth in paragraph 33(b)(i) above, the Debtors shall pay to Assurant $4,250,000 in full and final resolution for all amounts advanced or incurred by Assurant in adjusting and paying claims formerly administered by Circuit City under the GE Letter Agreement.

(e)     <u>Release of Claims</u>.  Except for the Settlement Claim, any and all claims filed by Assurant in the Circuit City Bankruptcy Cases shall be deemed withdrawn without further action by the Debtors, Assurant, or any other party or order of the Bankruptcy Court.  Except with respect to claims or causes of action arising from or related to this Brown Goods Termination Agreement, Assurant and Circuit City, on behalf itself and its bankruptcy estate, hereby irrevocably and fully release and discharge one another from and against any and all claims or causes of action arising from, in connection with, relating to, or based in any way on the GE Letter Agreement, the Brown Goods Program Agreement, the Brown Goods Services Agreement, the PC Program Agreement, and any other related agreements (the "Release").  For the avoidance of doubt and notwithstanding anything to the contrary herein, the Settlement Claim shall constitute a valid and allowed general unsecured claim in the Circuit City Bankruptcy Cases, and Assurant shall be obligated to pay the Profit Sharing Amount pursuant to and in accordance with Article III hereof.

C.    **The GE Stipulation.**

35.   Pursuant to the GE Stipulation, the

parties agreed as follows:

(a)   The Filed Claims shall be deemed withdrawn
with prejudice.

(b)   GE, solely with respect to its GE Consumer &
Industrial business component, and the Debtors,
on behalf themselves and on behalf of their
estates, hereby irrevocably and fully release
and discharge one another from and against any
and all claims, including (without limitation)
the Filed Claims, or causes of action,
including, but not limited to, causes of
action under Chapter 5 of the Bankruptcy Code,
including, but not limited to 11 U.S.C. §§547,
548 and 549, arising from, in connection with,
relating to, or based in any way on the AON
Agreements or the Assurant Agreements.

**APPLICABLE AUTHORITY**

I.    **THE STIPULATIONS SHOULD BE APPROVED UNDER
BANKRUPTCY RULE 9019 AND BANKRUPTCY CODE SECTION
105.**

36.   Bankruptcy Rule 9019 provides that the

Court "may approve a compromise or settlement."

Compromises are tools for expediting the administration

of the case and reducing administrative costs and are

favored in bankruptcy.  See In re Bond, 1994 U.S. App.

Lexis 1282, *9-*14 (4th Cir. 1994)("To minimize

litigation and expedite the administration of a

bankruptcy estate, 'compromises are favored in bankruptcy'."); Fogel v. Zell, 221 F.3d 955, 960 (7th Cir. 2000); In re Martin, 91 F.3d 389, 393 (3d Cir. 1996).  Various courts have endorsed the use of Bankruptcy Rule 9019.  See, e.g., Bartel v. Bar Harbour Airways, Inc., 196 B.R. 268 (S.D.N.Y. 1996).

37.  The standards by which a Court should evaluate a settlement are well established.  In addition to considering the proposed terms of the settlement, the Court should consider the following factors:

    (a)  the probability of success in litigation;

    (b)  the difficulty in collecting any judgment that
         may be obtained;

    (c)  the complexity of the litigation involved, and
         the expense inconvenience and delay
         necessarily attendant to it; and

    (d)  the interest of creditors and stockholders and
         a proper deference to their reasonable views
         of the settlement.

See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-245 (1968); In re Frye, 216 B.R. 166, 174 (E.D. Va. 1997); United States ex. Rel. Rahman v. Oncology Assoc., P.C., 269 B.R. 139, 152 (D. Md. 2001).

38.   The decision to approve a settlement or compromise is within the discretion of the Court and is warranted where the settlement is found to be reasonable and fair in light of the particular circumstances of the case.   See TMT Trailer Ferry, 390 U.S. at 424-25.   The settlement need not be the best that the debtor could have achieved, but need only fall "within the reasonable range of litigation possibilities."   In re Telesphere Communications, Inc., 179 B.R. 544, 553 (Bankr. N.D. Ill. 1994).   In making its determination, a court should not substitute its own judgment for that of the debtor and should defer to the debtor so long as there is a reasonable business justification.   See In re Martin, 91 F.3d at 395; In re Jasmine, Ltd., 258 B.R. 119, 123 (D.N.J. 2000).   The court should exercise its discretion "in light of the general public policy favoring settlements."   In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998); Nellis v. Shugrue, 165 B.R. 115, 23 (S.D.N.Y. 1994) ("[T]he general rule [is] that settlements are favored and, in fact, encouraged by the approval process outlined above.").

39.   Here, approval of the Stipulations is warranted because each factor in <u>TMT Trailer Ferry</u> weighs in favor of approving the Stipulations.  First, although the Debtors believe that they would likely be successful in litigation with Settlement Parties, with all litigation there are risks.  Furthermore, even if the Debtors were ultimately successful in asserting some or all of their arguments, they would likely prevail only after significant complex litigation.

40.   Second, although the Debtors do not have any evidence that there are risks associated with collecting a judgment from any Settlement Party, given the overall economic conditions, risks, however, slight, exist.

41.   Third, litigation with the Settlement Parties would be complex.  In particular, any litigation would involve significant fact discovery concerning the validity of claims administered the Debtors and not paid by the Settlement Parties.  Additionally, such litigation would require expert testimony concerning future claims against the Claim Fund and the Reserve. Moreover, such experts would need to testify to the

value any future commissions under the SPI Agreements
and Underwriting Profit under the Assurant Agreements.
Finally, as evidenced by the negotiations, litigation
would likely involve multiple parties and various
counter and cross claims.

42.   Fourth, and finally, the Debtors believe
that the Stipulations will enable the Debtors to
beneficially reconcile their current disputes with
Settlement Parties without instituting complex
litigation proceedings, thereby avoiding the attendant
costs, delays and uncertainty.  This savings, as well as
the consideration received under the Stipulations, will
directly inure to the benefit of the Debtors' creditors
and other stakeholders.

43.   Based on the foregoing, the Debtors
submit that the proposed Stipulations are beneficial to
their estates and their creditors.  Moreover, the
Stipulation represents a compromise that is fair and
equitable, falls well within the range of reasonableness,
and satisfies the standards for approval under
applicable law.

44. Accordingly, for the reasons detailed herein, approval of the Stipulations is warranted under Bankruptcy Rule 9019.

45. Finally, Bankruptcy Code section 105 provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As noted above, approval of the relief requested herein furthers the Debtors' efforts to minimize the risk of litigation and to resolve claims in a manner that benefits the Debtors and is fair and equitable to other parties in interest. Accordingly, approval of the Stipulations is justified under Bankruptcy Code section 105.

**II.   ASSUMPTION OF THE BROWN GOODS PROGRAM AGREEMENT AND REJECTION OF THE OTHER ASSURANT AGREEMENTS SHOULD BE APPROVED.**

46. Bankruptcy Code section 365(a) provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard. See Lubrizol

Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756
F.2d 1043, 1046-47 (4th Cir. 1985), cert. denied sub
nom., Lubrizol Enters., Inc. v. Canfield, 475 U.S. 1057
(1986); In re Extraction Technologies of VA, L.L.C., 296
B.R. 393, 399 (Bankr. E.D. Va. 2001); see also In re HQ
Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del.
2003) (stating that a debtor's decision to reject an
executory contract is governed by the business judgment
standard and can only be overturned if the decision was
the product of bad faith, whim, or caprice).

47.   Once the Debtors articulate a valid
business justification, "[t]he business judgment rule
'is a presumption that in making a business decision the
directors of a corporation acted on an informed basis,
in good faith and in the honest belief that the action
taken was in the best interests of the company.'"
Official Comm. Of Subordinated Bondholders v. Integrated
Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting
Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

48.   The business judgment rule has vitality
in chapter 11 cases and shields a debtor's management
from judicial second-guessing.   See Comm. Of Asbestos-

26

Related Litigants and/or Creditors v. Johns-Manville
Corp., 60 B.R. 612, 615 16 (Bankr. S.D.N.Y. 1986)
("[T]he Code favors the continued operation of a
business by a debtor and a presumption of reasonableness
attaches to a debtor's management decisions.").

49.  Here, the Debtors have satisfied the
"business judgment" standard for rejecting the the Brown
Goods Services Agreement, PC Program Agreement and GE
Letter Agreement, as well as assuming the Brown Goods
Program Agreement.  As discussed above, these decisions
were part of a comprehensive settlement of various
disputes and result in significant value to the Debtors
in their estates.

50.  Accordingly, the Debtors should be
authorized to reject the Brown Goods Services Agreement,
PC Program Agreement and GE Letter Agreement and assume
the Brown Goods Program Agreement.

**NOTICE**

51.  Notice of this Motion has been provided
to those parties entitled to notice under this Court's
Order Pursuant to Bankruptcy Code Sections 102 and 105,
Bankruptcy Rules 2002 and 9007, and Local Bankruptcy

Rules 2002-1 and 9013-1 Establishing Certain Notice,

Case Management, and Administrative Procedures (Docket

No. 130).  The Debtors submit that, under the

circumstances, no other or further notice need be given.

### WAIVER OF MEMORANDUM OF LAW

52.  Pursuant to Local Bankruptcy Rule 9013-

1(G), and because there are no novel issues of law

presented in the Motion and all applicable authority is

set forth in the Motion, the Debtors request that the

requirement that all motions be accompanied by a

separate memorandum of law be waived.

### NO PRIOR REQUEST

53.  No previous request for the relief sought

herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request

that the Court grant the relief requested herein and

such other and further relief as may be just and proper.

Dated: September 1, 2009         SKADDEN, ARPS, SLATE, MEAGHER
       Richmond, Virginia           & FLOM, LLP
                                 Gregg M. Galardi, Esq.
                                 Ian S. Fredericks, Esq.
                                 P.O. Box 636
                                 Wilmington, Delaware 19899-
                                 0636 (302) 651-3000

                                      - and -

                                 SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM, LLP
                                 Chris L. Dickerson, Esq.
                                 155 North Wacker Drive
                                 Chicago, Illinois 60606
                                 (312) 407-0700

                                      - and -

                                 MCGUIREWOODS LLP

                                 /s/ Douglas M. Foley         .
                                 Dion W. Hayes (VSB No. 34304)
                                 Douglas Foley (VSB No. 34364)
                                 One James Center
                                 901 E. Cary Street
                                 Richmond, Virginia 23219
                                 (804) 775-1000

                                 Counsel for Debtors and
                                 Debtors in Possession