Gregg M. Galardi, Esq.          Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.         Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &  MCGUIREWOODS LLP
FLOM, LLP                       One James Center
One Rodney Square               901 E. Cary Street
PO Box 636                      Richmond, Virginia 23219
Wilmington, Delaware 19899-0636  (804) 775-1000
(302) 651-3000

                - and –

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :  Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :  Case No. 08-35653 (KRH)
et al.,                       :
                              :
             Debtors.         :  Jointly Administered
- - - - - - - - - - - - - - x

**ORDER (I) APPROVING SALE OF MISCELLANEOUS INTELLECTUAL PROPERTY ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; AND (II) GRANTING RELATED RELIEF**

Upon consideration of the Motion for Orders

Pursuant to Bankruptcy Code Sections 105 and 363 and

Bankruptcy Rule 2002 and 6004 (I)(A) approving Bidding

Procedures for the Sales of the Intellectual Property

Assets, (B) authorizing the Sellers to enter into Stalk-

ing Horse Agreements in connection therewith,
(C) approving the payment of Termination Fees in connec-
tion therewith, (D) approving the Notice Procedures and
(E) scheduling Auction and Hearing dates; (II) approving
the Sales of the Intellectual Property Assets free and
clear of all Interests; and (III) granting related re-
lief (the "Motion"); and the Court having entered the
Order (I) Approving Procedures In Connection With Sales
Of Miscellaneous Intellectual Property Assets,
(II) Authorizing Sellers To Enter Into Stalking Horse
Agreements In Connection Therewith, (III) Approving The
Payment Of Termination Fees In Connection Therewith,
(IV) Setting Auction And Hearing Dates And (V) Granting
Related Relief (the "Bidding Procedures Order"),[1] which
authorized the Debtors to conduct the Sales of the In-
tellectual Property Assets; and the Sellers having held
Auctions on August 18, 2009; and the Court having held a
hearing on the Motion on July 16, 2009 and August 27,
2009; and all parties in interest having been heard, or
having had the opportunity to be heard, regarding the

---

[1]   Capitalized terms not otherwise defined herein shall have the
      meanings ascribed to such terms in the Bidding Procedures Order.

Agreement (as defined below), by and among the Sellers
and the Purchaser (as defined below) and the transac-
tions contemplated thereby (the "Transactions"); and af-
ter due deliberation thereon, and good cause appearing
therefore it is hereby

**FOUND AND DETERMINED THAT:**[2]

A.    The Court has jurisdiction to hear and
determine the Motion and to grant the relief requested
in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and
1334(b).

B.    Venue of these cases and the Motion in
this district is proper under 28 U.S.C. §§ 1408 and
1409.  This is a core proceeding within the meaning of
28 U.S.C. § 157(b)(2).

C.    The statutory predicates for the relief
requested in the Motion are Bankruptcy Code sections 105
and 363 and Bankruptcy Rules 2002 and 6004.

---

[2]    The findings and conclusions set forth herein constitute the
Court's findings of fact and conclusions of law pursuant to Bank-
ruptcy Rule 7052.  To the extent any of the following findings of
fact are determined to be conclusions of law, they are adopted,
and shall be construed and deemed, conclusions of law.  To the
extent any of the following conclusions of law are determined to
be findings of fact, they are adopted, and shall be construed and
deemed, as findings of fact.  All statements by the Court at the
hearing shall constitute additional findings of fact and conclu-
sions law, as applicable.

D.   Notice of the Motion and entry of this Order has been provided to (A)(i) all entities known to have expressed an interest in a transaction with respect to the Intellectual Property Assets or similar assets during the past three (3) months, (ii) all entities known to have asserted any Lien upon the Intellectual Property Assets, (iii) all federal, state, and local regulatory or taxing authorities or recording offices, which have a reasonably known interest in the relief requested by the Motion, (iv) the Attorney Generals for all fifty (50) States; (v) the CPO, and (vi) all parties entitled to notice under the Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (D.I. 130; the "Case Management Order") and (B) other parties through publication of the Sale Notice, all in accordance with and as provided by the Bidding Procedures Order.

E.   Based upon the affidavits of service filed with the Court: (a) notice of the Motion and the Sale Hearing was adequate and sufficient under the cir-

4

cumstances of these chapter 11 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code and the Bankruptcy Rules; and (b) a reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein was afforded to all interested persons and entities.

F.    The Purchased Assets (as defined herein) are property of the Sellers' estates and title thereto is vested in the Sellers' estates.

G.    The Sellers and their professionals marketed the Intellectual Property Assets and conducted the sale process as set forth in and in accordance with the Motion and the Bidding Procedures Order.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Intellectual Property Assets.

H.    The Bidding Procedures approved by this Court and by which the sale process was conducted were substantively and procedurally fair to all parties.

5

I.    After the Auction held on August 18, 2009, the Debtors determined that the highest and best bid was that of Micro Electronics, Inc. (the "Purchaser"), a copy of which is attached hereto as <u>Exhibit A</u>, (the "Agreement").  The Agreement is to purchase certain of the Intellectual Property Assets, as set forth in section 1.02(a) of the Agreement (the "Purchased Assets").

J.    Subject to the entry of this Order, each Seller (i) has full power and authority to execute the Agreement and all other documents contemplated thereby, and the sale of the Purchased Assets by the Sellers has been duly and validly authorized by all necessary company action of each of the Sellers, (ii) has all of the power and authority necessary to consummate the Transactions, (iii) has taken all company action necessary to authorize and approve the Agreement and the consummation by the Sellers of the Transactions.  No consents or approvals, other than those expressly provided for in the Agreement or this Order, are required for the Sellers to close the Sale and consummate the Transactions.

K.    The Agreement and the Transactions were negotiated and have been and are undertaken by the Sellers and the Purchaser at arms' length without collusion or fraud, and in good faith within the meaning of Sections 363(m) of the Bankruptcy Code.  As a result of the foregoing, the Sellers and the Purchaser are entitled to the protections of Section 363(m) of the Bankruptcy Code.

L.    The total consideration provided by the Purchaser for the Purchased Assets is the highest and best offer received by the Sellers, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act, and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia.

M.    The Purchaser would not have entered into the Agreement and would not consummate the Transactions, thus adversely affecting the Sellers, their estates and creditors, if the sale of the Purchased Assets to the

7

Purchaser was not free and clear of all Interests (as
defined herein), or if the Purchaser would, or in the
future could, be liable for any of such Interest.  A
sale of the Purchased Assets other than one free and
clear of all Interests would adversely impact the Sell-
ers' estates, and would yield substantially less value
for the Sellers' estates, with less certainty than the
Sale.  Therefore, the Sale contemplated by the Agreement
is in the best interests of the Sellers, their estates
and creditors, and all other parties in interest.

     N.   The Sellers may sell the Purchased Assets
free and clear of all Interests, because, with respect
to each creditor asserting a Interest, one or more of
the standards set forth in Bankruptcy Code § 363(f)(1)-
(5) has been satisfied.  Those holders of Interest who
did not object or who withdrew their objections to the
Sale or the Motion are deemed to have consented to the
Motion and Sale pursuant to Bankruptcy Code § 363(f)(2).
Those holders of Interests who did object fall within
one or more of the other subsections of Bankruptcy Code
Section 363(f).

O.    Neither the Sellers nor Purchaser engaged in any conduct that would cause or permit the Agreement or the consummation of the Transactions to be avoided, or costs or damages to be imposed, under Section 363(n) of the Bankruptcy Code.

P.    The Purchaser is not holding itself out to the public as a continuation of the Sellers and is not an "insider" or "affiliate" of any of the Debtors.

Q.    Entry into the Agreement and consummation of the Transactions constitute the exercise by the Sellers of sound business judgment and such acts are in the best interests of the Sellers, their estates and creditors, and all parties in interest.  The Court finds that the Sellers have articulated good and sufficient business reasons justifying the Sale of the Purchased Assets to Purchaser.  Such business reasons include, but are not limited to, the following: (i) the Agreement constitutes the highest and best offer for the Purchased Assets; (ii) the Agreement and the closing thereon (the "Closing") will present the best opportunity to realize the value of the Purchased Assets and avoid decline and devaluation of the Purchased Assets; (iii) there is sub-

stantial risk of deterioration of the value of the Pur-
chased Assets if the Sale is not consummated promptly;
and (iv) the Agreement and the Closing thereon will pro-
vide a greater recovery for the Sellers' creditors than
would be provided by any other presently available al-
ternative.

R.    Time is of the essence in consummating
the Sale.  In order to maximize the value of the Sell-
ers' assets, it is essential that the sale of the Intel-
lectual Property and Internet Assets occur within the
time constraints set forth in the Agreement.  Accord-
ingly, there is cause to lift the stay contemplated by
Bankruptcy Rules 6004.

S.    The Sale contemplated by the Agreement is
in the best interests of the Sellers and their estates,
creditors, interest holders and all other parties in in-
terest herein; and it is therefore

**ORDERED, ADJUDGED AND DECREED THAT:**

1.    The relief requested in the Motion is
GRANTED to the extent set forth herein.

2.    Pursuant to Bankruptcy Code sections 105
and 363, the Agreement and the Sale of the Purchased As-

sets to Purchaser are hereby approved and authorized in all respects.

3.    Pursuant to Bankruptcy Code sections 363(b) and 363(f), upon the consummation of the Agreement, the Sellers' right, title, and interest in the Purchased Assets shall be transferred to the Purchaser free and clear of all interests, including liens, claims, and encumbrances ("Interests"), with all such Interests to attach to the cash proceeds of the Sale in the order of their priority, with the same validity, force, and effect which they had as against the Purchased Assets immediately before such transfer, subject to any claims and defenses the Sellers may possess with respect thereto.

4.    Except as may be expressly provided in the Agreement, Purchaser is not assuming nor shall it or any affiliate of Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Sellers in any way whatsoever relating to or arising from the Sellers' ownership or use of the Purchased Assets prior to the consummation of the Transaction contemplated by the Agree-

ment, or any liabilities calculable by reference to the
Sellers or the Purchased Assets, or relating to continu-
ing or other conditions existing on or prior to the
Closing..

5.    Purchaser shall be bound by and shall
comply with the Privacy Protections For Former Circuit
City Customers, attached to this Order as Exhibit B.

6.    The Transactions were undertaken by the
Purchaser in good faith and the Purchaser is a good
faith purchaser of the Purchased Assets as that term is
used in Bankruptcy Code section 363(m).  The Purchaser
is entitled to all of the protections afforded by Sec-
tion 363(m) of the Bankruptcy Code.

7.    Pursuant to sections 105 and 363 of the
Bankruptcy Code, the Sellers and the Purchaser are each
hereby authorized to take any and all actions necessary
or appropriate to: (i) consummate the Sale of the Pur-
chased Assets to Purchaser and the Closing of the Sale
in accordance with the Motion, the Agreement and this
Order; and (ii) perform, consummate, implement and close
fully the Agreement together with all additional instru-

ments and documents that may be reasonably necessary or
desirable to implement the Agreement.

      8.   This Order is and shall be binding upon
and govern the acts of all entities, including, all fil-
ing agents, filing officers, title agents, title compa-
nies, recorders of mortgages, recorders of deeds, regis-
trars of deeds, administrative agencies or units, gov-
ernmental departments or units, secretaries of state,
federal, state and local officials and all other persons
and entities who may be required by operation of law,
the duties of their office, or contract, to accept,
file, register or otherwise record or release any docu-
ments or instruments, or who may be required to report
or insure any title or state of title in or to the Pur-
chased Assets conveyed to Purchaser.  All such entities
described above in this paragraph are authorized and
specifically directed to strike all recorded Interests
against the Purchased Assets from their records, offi-
cial and otherwise.

      9.   Each and every federal, state and govern-
mental agency or department, and any other person or en-
tity, is hereby directed to accept any and all documents

13

and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

10.   If the Purchaser fails to close on the purchase of the Property in accordance with the terms of the Agreement due to no fault of and Seller is not in default of its obligations under such Agreement, then Seller's counsel shall file with the Court and serve upon the Purchaser,  the Alternate Bidder and their counsel, a notice of such default, which shall include a copy of the Alternate Bidder's agreement upon which the Seller will then close, in which case (i) Seller shall be deemed authorized to close on the sale of the Property and assignment of the Leases with the Alternate Bidder on five (5) days' advance written notice to the Alternate Bidder, and (ii) the Alternate Bidder shall be afforded all of the protections originally afforded to the Purchaser under this Sale Order and the findings herein as to adequacy and fairness of consideration paid and good faith shall be deemed to apply to the Alternate Bidder, its Alternate Bid, and its purchase and sale agreement with the Seller, without the necessity of further order of this Court.

14

11.   This Order shall be effective immediately
upon entry, and any stay of orders provided for in Bank-
ruptcy Rule 6004(h) and any other provision of the Bank-
ruptcy Code or Bankruptcy Rules is expressly lifted.

12.   To the extent permitted by section 525 of
the Bankruptcy Code, no governmental unit may revoke or
suspend any right, license, trademark or other permis-
sion relating to the use of the Purchased Assets sold,
transferred or conveyed to Purchaser on account of the
filing or pendency of these Chapter 11 cases or the con-
summation of the Sale.

13.   The Purchaser or its assigns are hereby
prohibited from (1) communicating with persons (the
"Warranty Customer") to whom a warranty contract was is-
sued under any warranty issuance agreement entered into
prior to the September 30, 2009 (the "Warranty Con-
tract") with respect to, relating to, or arising out of,
any issue related to such Warranty Contract, except if
the inquiry or contact is initiated by such Warranty
Customer in which case the Purchaser or its assign shall
direct them to the present obligor or administrator for
such Warranty Contract, (2) soliciting any Warranty Cus-

15

tomer to cancel an existing Warranty Contract, or (3)

soliciting any Warranty Customer to renew or replace an

existing Warranty Contract.

14.  This Court retains jurisdiction to hear

and determine all matters arising from or related to im-

plementation or interpretation of this Order or the

Agreement.

Dated:  Richmond, Virginia
     Aug 31 2009                  , 2009


                    /s/ Kevin Huennekens
                    UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

**Entered on Docket: 9/1/09**

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and –

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)


                    16

MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors
and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

  Pursuant to Local Bankruptcy Rule 9022-1(C), I
hereby certify that the foregoing proposed order has
been endorsed by or served upon all necessary parties.

        /s/ Douglas M. Foley
        Douglas M. Foley

17

## EXHIBIT A

**(Agreement)**

**ASSET PURCHASE AGREEMENT**

**Dated as of August 18, 2009**

**among**

**MICRO ELECTRONICS, INC.,**

**as Buyer,**

**and**

**CIRCUIT CITY STORES WEST COAST, INC.**

**and**

**CIRCUIT CITY STORES, INC.,**

**and**

**COURCHEVEL, LLC**

**as Sellers**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE        1

**SECTION 1.01.**        Purchase and Sale of Acquired Assets.........................................1
**SECTION 1.02.**        Assets and Liabilities ...........................................................2
**SECTION 1.03.**        Purchase Price. ....................................................................2
**SECTION 1.04.**        Transfer Taxes. ....................................................................2

ARTICLE II CLOSING; CERTAIN DELIVERIES        3

**SECTION 2.01.**        Closing. ...............................................................................3
**SECTION 2.02.**        Certain Deliveries of the Sellers. ..........................................3
**SECTION 2.03.**        Certain Deliveries of Buyer. .................................................3

ARTICLE III REPRESENTATIONS AND WARRANTIES RELATING TO THE COMPANY
AND THE SELLERS        4

**SECTION 3.01.**        Organization; Authority; Execution and Delivery; Enforceability .............4
**SECTION 3.02.**        No Conflicts; Consents. ........................................................5
**SECTION 3.03.**        Title to Assets. ....................................................................5
**SECTION 3.04.**        Financial Advisors. ..............................................................5
**SECTION 3.05.**        AS IS. ..................................................................................5
**SECTION 3.06.**        The Marks. ...........................................................................6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER        6

**SECTION 4.01.**        Organization, Standing and Power. ......................................6
**SECTION 4.02.**        Authority; Execution and Delivery; Enforceability ..................6
**SECTION 4.03.**        No Conflicts; Consents .........................................................7
**SECTION 4.04.**        Financing..............................................................................7
**SECTION 4.05.**        No Brokers. ..........................................................................7
**SECTION 4.06.**        Litigation..............................................................................7

ARTICLE V COVENANTS        7

**SECTION 5.01.**        Covenants Relating to Acquired Assets..................................7
**SECTION 5.02.**        Reasonable Best Efforts.........................................................8
**SECTION 5.03.**        Supplemental Disclosure. .....................................................9
**SECTION 5.04.**        Further Assurances................................................................9
**SECTION 5.05.**        Sale Order and Sale Hearing .................................................9
**SECTION 5.06.**        Reserved...............................................................................10
**SECTION 5.07.**        Access to Information. ..........................................................10

i

ARTICLE VI CONDITIONS PRECEDENT                                          10

**SECTION 6.01.**     Conditions to Each Party's Obligation. .....................................................10
**SECTION 6.02.**     Conditions to Obligations of Buyer. ..........................................................10
**SECTION 6.03.**     Conditions to Obligation of the Sellers......................................................11

ARTICLE VII TERMINATION, AMENDMENT AND WAIVER                           12

**SECTION 7.01.**     Termination..................................................................................................12
**SECTION 7.02.**     Effect of Termination...................................................................................13
**SECTION 7.03.**     Amendments and Waivers. ..........................................................................13

ARTICLE VIII GENERAL PROVISIONS                                          14

**SECTION 8.01.**     Expenses. .....................................................................................................14
**SECTION 8.02.**     No Survival of Representations and Warranties.........................................14
**SECTION 8.03.**     Assignment. .................................................................................................14
**SECTION 8.04.**     No Third Party Beneficiaries. ......................................................................14
**SECTION 8.05.**     Remedies.......................................................................................................14
**SECTION 8.06.**     Notices..........................................................................................................14
**SECTION 8.07.**     Interpretation; Exhibits and Schedules; Certain Definitions ....................15
**SECTION 8.08.**     Counterparts..................................................................................................17
**SECTION 8.09.**     Entire Agreement..........................................................................................17
**SECTION 8.10.**     Severability...................................................................................................18
**SECTION 8.11.**     Exclusive Jurisdiction. .................................................................................18
**SECTION 8.12.**     Governing Law. ............................................................................................18
**SECTION 8.13.**     Waiver of Jury Trial.....................................................................................18
**SECTION 8.14.**     Bankruptcy Court Approval.........................................................................18

ii

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT**, dated as of August 18, 2009 (this "Agreement"), is by and among Micro Electronics, Inc., a Delaware corporation ("Buyer"), Circuit City Stores West Coast, Inc. ("CCWC"), Circuit City Stores, Inc. (the "Company"), and Courchevel, LLC ("Courchevel", and together with CCWC and the Company, the "Sellers").

**WHEREAS**, each of CCWC and the Company are debtors which have commenced cases under chapter 11 of the Bankruptcy Code by filing voluntary petitions with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court") (collectively, the "Cases");

**WHEREAS**, each of the Sellers wishes to sell, or cause to be sold, to Buyer, and Buyer wishes to purchase from the Sellers, all of the Acquired Assets pursuant to, inter alia, Section 363 of the Bankruptcy Code, the applicable Federal Rules of Bankruptcy Procedure, and all other Applicable Laws;

**WHEREAS**, on July 6, 2009, the Sellers filed a motion seeking, among other things, approval of bid procedures by which the Sellers would market and solicit bids for the Acquired Assets and the sale of the Acquired Assets pursuant to Bankruptcy Code section 363;

**WHEREAS**, on July 16, 2009, the Bankruptcy Court entered an order approving the Bid Procedures; and

**WHEREAS**, the sale of the Acquired Assets is subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ACQUIRED ASSETS; PURCHASE PRICE

**SECTION 1.01.**    Purchase and Sale of Acquired Assets.  Subject to the terms and conditions of this Agreement, at and as of the Closing, (a) the Sellers shall (and the Company shall cause the Sellers and the Sellers' Affiliates to) sell, assign, convey, transfer and deliver to Buyer all of seller's rights, title, and interests in and to the Acquired Assets, free and clear of all Liens other than Assumed Liens, and free and clear of all Liabilities; and (b) in exchange therefor, Buyer shall pay an amount equal to the Purchase Price in accordance with Section 1.03, and shall accept, assume and agree to pay, perform or otherwise discharge, in accordance with the respective terms and subject to the respective conditions thereof, the Assumed Liens.

**SECTION 1.02.**    Assets and Liabilities.

(a)    Acquired Assets.    For purposes of this Agreement, "Acquired Assets" means all rights and interests of the Sellers described in clauses (i) through (ii) below. For the avoidance of doubt, if any Acquired Asset is not sold, assigned, conveyed, transferred or delivered to Buyer or its designees on the Closing Date, such Acquired Asset shall be sold, assigned, conveyed, transferred or delivered as promptly as possible in accordance with the procedures for assumption and assignment set forth in the Sale Order.

(i)    The trademarks and service marks and domain names set forth on Schedule 1.02(a)(i) and all goodwill associated with such trademarks, service marks, and domain names (the "Marks");

(ii)    Subject to the terms of this Agreement and pursuant and subject to Bankruptcy Court approval, the Trading Circuit Data, provided, however, that neither Buyer or its assigns may, and the Buyer and its assigns shall not, use the Alpine Data to (1) communicate with persons who were customers of Circuit City (each a "Warranty Customer") and to whom a warranty contract was issued for any product sold by Circuit City under any agreement between Circuit City and any third party pursuant to which warranty contracts were issued prior to March 31, 2009 (each a "Warranty Contract") with respect to or in connection with any issue related to such Warranty Contract, except if the inquiry or contact is initiated by such Warranty Customer in which case the Buyer or its assigns shall direct the Warranty Customer to the present obligor or administrator for such Warranty Contract, (2) solicit any Warranty Customer to cancel an existing Warranty Contract, or (3) solicit any Warranty Customer to renew or replace any existing Warranty Contract.

(b)    Excluded Assets.    Notwithstanding anything to the contrary in this Agreement and for the avoidance of doubt, Seller is not selling, conveying, assigning, transferring or delivering to Buyer any assets or rights other than those conveyed to Buyer pursuant to the terms of Section 1.02(a) (all other assets and rights, the "Excluded Assets").

(c)    Excluded Liabilities.    Notwithstanding anything contained in this Agreement to the contrary, Buyer is not assuming any Liabilities related to the Acquired Assets. All Liabilities related to the Acquired Assets shall be Excluded Liabilities and shall be retained by and remain the Liabilities of the Sellers.

**SECTION 1.03.**    Purchase Price.    The purchase price for the Acquired Assets shall be an amount in cash equal to forty thousand dollars ($40,000) (the "Purchase Price").

**SECTION 1.04.**    Transfer Taxes.    Notwithstanding any other provision herein, all Transfer Taxes attributable to the Sellers' sale of the Acquired Assets, as well as the cost of the filing of all necessary tax returns and other documentation with respect to all such Transfer Taxes, shall be borne and paid equally by the Sellers, on the one hand, and Buyer, on the other, when due, and the Sellers and Buyer shall file all necessary tax returns and other documentation required to be filed by them with respect to all such Transfer Taxes, and, if required by applicable law, Buyer and the Sellers will, and will cause their Affiliates to, file or join in the

2

execution of any such tax returns and other documentation; provided that the parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes.

## ARTICLE II

## CLOSING; CERTAIN DELIVERIES

**SECTION 2.01.**    Closing.  Unless this Agreement shall have been terminated and the Transactions shall have been abandoned pursuant to Article VII hereof, the closing of the Transactions (the "Closing") shall take place at the Delaware offices of Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, Wilmington, Delaware, at 10:00 a.m. on the second Business Day following the satisfaction (or, to the extent permitted, the waiver) of each of the conditions set forth in Article VI (other than those conditions which, by their nature, can be fulfilled only at the Closing, but subject to the fulfillment or waiver of such conditions) or at such other place or at such other time as shall be agreed upon by Buyer and the Company.  The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

**SECTION 2.02.**    Certain Deliveries of the Sellers.  At the Closing, the Sellers shall, at Sellers' expense, deliver the following to Buyer:

(a)    An executed Bill of Sale, Assignment and Assumption Agreement in form and substance set forth in Exhibit A hereto;

(b)    A certified copy of the Sale Order;

(c)    The officer's certificates required to be delivered pursuant to Section 6.02(c) hereof;

(d)    A certified copy of all required directors' resolutions;

(e)    Pursuant and subject to Bankruptcy Court Approval, the Trading Circuit Data in a standard electronic format usable for direct marketing purposes; and

(f)    Such other documents of assumption and adequate assurances as may be required by the Sale Order that the Buyer shall have identified not later than five (5) Business Days prior to the Closing Date.

**SECTION 2.03.**    Certain Deliveries of Buyer.  At the Closing, Buyer shall, at Buyer's expense, deliver to the Sellers:

(a)    By wire transfer of immediately available funds to the account(s) designated by the Company, the Purchase Price;

(b)    An executed Bill of Sale, Assignment and Assumption Agreement in form and substance set forth in Exhibit A hereto;

(c)     The officer's certificate required to be delivered pursuant to Section 6.03(c) hereof;

(d)     Such other documents of assumption and adequate assurance as may be required by the Sale Order; and

(e)     Such other documents as Sellers may reasonably require.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## RELATING TO THE COMPANY AND THE SELLERS

Sellers have delivered to Buyer and attached hereto certain Disclosure Schedules prepared by Sellers with numbered sections corresponding to the relevant sections in this Article III (the "Seller Disclosure Schedules"), and any exception or qualification set forth in the Seller Disclosure Schedules with respect to a particular representation or warranty contained in this Article III shall be deemed to be an exception or qualification with respect to such section of this Article III and all other representations or warranties contained in this Article III only to the extent any description of fact regarding the event, item or matter is disclosed in such a way as to make it reasonably apparent from the face of such disclosure without further inquiry that such exception or qualification is applicable to such other Section of this Article III.

The Sellers hereby represent and warrant to Buyer, jointly and severally, as of the date of this Agreement and (unless the representation and warranty specifies that it is made as of the date of this Agreement) as of the Closing Date as follows:

**SECTION 3.01.**     Organization; Authority; Execution and Delivery; Enforceability.

(a)     Each Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation.

(b)     The Sellers have full power and authority to execute and deliver (or cause to execute and deliver) this Agreement and each other document, instrument and certificate contemplated by this Agreement (the "Seller Documents") and, subject to the entry of the Sale Order, to consummate (or cause to consummate) the Transactions and transactions contemplated by the Seller Documents.  The execution and delivery by the Sellers of this Agreement and Seller Documents and the consummation by the Sellers of the Transactions and transactions contemplated by the Seller Documents have been duly authorized by all necessary corporate action.  The Sellers have duly executed and delivered this Agreement and, assuming this Agreement constitutes a valid and binding obligation of the other parties hereto, this Agreement and the Seller Documents will, subject to the entry of the Sale Order, constitute a valid and binding obligation of each of the Sellers enforceable against it in accordance with its terms.

(c)     Any consent, authorization or approval required for the commencement of the Cases, the execution and delivery of this Agreement and the Seller Documents and the consummation of the Transactions and the transactions contemplated by the Seller Documents has been obtained.

4

SECTION 3.02.        No Conflicts; Consents.  Subject to obtaining Bankruptcy Court approval pursuant to the Sale Order, and assuming that Buyer acquires the Acquired Assets upon the consummation of the Transactions, the execution and delivery by the Sellers of this Agreement does not, and the consummation of the Transactions and compliance by the Sellers with the terms hereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Lien upon any of the properties or assets of the Sellers or any of their Affiliates under, any provision of (i) the certificate of incorporation or by-laws of the Company or the comparable governing instruments of any of the Sellers, (ii) subject to obtaining the third party consents set forth on Section 3.02 of the Seller Disclosure Schedules to the extent required, any Contract to which the Company or any of the Sellers is a party or by which any of their respective properties or assets is bound or (iii) any judgment, order or decree ("Judgment") or statute, law, ordinance, rule or regulation ("Applicable Law") applicable to the Sellers or their respective properties or assets, other than, in the case of clause (iii) above, any such items that, individually or in the aggregate, would not reasonably be expected to have a Seller Material Adverse Effect.  No consent of, or registration, declaration or filing with, any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign (a "Governmental Entity") is required to be obtained or made by or with respect to Sellers or any of their Affiliates in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, other than (i) the Sale Order, (ii) such filings as may be required by the Bankruptcy Court in connection with the Cases, and (iii) such other items as are required solely by reason of the participation of Buyer (as opposed to any third party) in the Transactions.

SECTION 3.03.        Title to Assets.  The Company or one of the Sellers has good and valid title to or leasehold interest in the Acquired Assets in each case free and clear of Liens, except Liens listed in Section 3.03 of the Seller Disclosure Schedules ("Assumed Liens"). Assuming receipt of the Sale Order and obtaining the consents listed in Section 3.02 of the Seller Disclosure Schedules, upon Closing, Buyer will be vested with good and valid title to or leasehold interest in the Acquired Assets free and clear of all Liens, except for the Assumed Liens, to the fullest extent permissible under Sections 363 and 365 of the Bankruptcy Code.

SECTION 3.04.        Financial Advisors.  Except as set forth on in Section 3.04 of the Seller Disclosure Schedules, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

SECTION 3.05.        AS IS.        EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN, ALL OF THE ACQUIRED ASSETS ARE BEING SOLD AND TRANSFERRED TO BUYER ON AN "AS IS" AND "WHERE IS" BASIS AND ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR USE, ARE EXCLUDED FROM THE SALE AND TRANSFER OF THE ACQUIRED ASSETS.        SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES OF ANY NATURE WITH RESPECT TO THE ACQUIRED ASSETS OTHER THAN AS EXPRESSLY PROVIDED FOR HEREIN.

5

**SECTION 3.06.**        <u>The Marks</u>.  Except as set forth on <u>Section 3.06</u> of the Seller Disclosure Schedules:

(a)        To the Sellers' knowledge, as of December 31, 2008 no third party was infringing upon, misappropriating, or otherwise violating the Marks.

(b)        To the Seller's knowledge, as of December 31, 2008 Seller's use of the Marks did not conflict with, infringe upon or violate any trademark or service mark right of any Person.

(c)        The execution, delivery and performance of this Agreement and the Seller Documents, and the consummation of the transaction contemplated hereby and thereby, will not, to the Sellers' knowledge, constitute a material breach of any Contract involving any Acquired Assets, nor cause the forfeiture or termination of any Acquired Assets, except as would not reasonably be expected to result in a Seller Material Adverse Effect.

(d)        <u>Section 3.06</u> of the Seller Disclosure Schedules sets forth a complete and accurate list of any Contract pursuant to which any third party is authorized to use any of the Acquired Assets (the "<u>Seller Licenses</u>").  Each of the Seller Licenses are valid and enforceable against the Sellers, and, to the knowledge of the Sellers, the other party or parties thereto, in accordance with its terms.

<u>**ARTICLE IV**</u>

<u>**REPRESENTATIONS AND WARRANTIES OF BUYER**</u>

Buyer represents and warrants to the Sellers that, except as set forth in the Buyer Disclosure Schedules, as of the date of this Agreement and as of the Closing Date as follows:

**SECTION 4.01.**        <u>Organization, Standing and Power</u>.  Buyer is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation.

**SECTION 4.02.**        <u>Authority; Execution and Delivery; Enforceability</u>.

(a)        Buyer has full power and authority to execute this Agreement and, subject to the entry of the Sale Order, to consummate the Transactions.  The execution and delivery by Buyer of this Agreement and the consummation by Buyer of the Transactions have been duly authorized by all necessary corporate action. Buyer has duly executed and delivered this Agreement, and assuming this Agreement constitutes valid and binding obligations of the other parties hereto this Agreement will, subject to the entry of the Sale Order, constitute a valid and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally and (ii) general equitable principles.

(b)        To Buyer's knowledge, no state takeover statute or similar statute or regulation applies or purports to apply to Buyer with respect to this Agreement or any the Transactions.

**SECTION 4.03.**     No Conflicts; Consents.

(a)     The execution and delivery by Buyer of this Agreement do not, and the consummation of the Transactions and compliance by Buyer with the terms hereof will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Lien upon any of the properties or assets of Buyer or any of its Affiliates under, any provision of (i) organizational documents of Buyer or any of its Affiliates, (ii) any Contract to which Buyer or any of its Affiliates is a party or by which any of their respective properties or assets is bound or (iii) subject to the filings and other matters referred to in Section 4.03(b), any Judgment or Applicable Law applicable to Buyer or any of its Affiliates or their respective properties or assets, other than, in the case of clauses (ii) and (iii) above, any such items that, individually or in the aggregate, have not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

(b)     No consent of, or registration, declaration or filing with any Governmental Entity is required to be obtained or made by or with respect to Buyer or any of its Affiliates in connection with the execution, delivery and performance of this Agreement or the consummation of the Transactions, other than (i) such filings as may be required by the Bankruptcy Court in connection with the Cases, and (ii) such other items those that may be required solely by reason of the participation of the Company (as opposed to any other third party) in the Transactions.

**SECTION 4.04.**     Financing.  Buyer will have funds on hand as of the Closing Date which will be sufficient to pay the Purchase Price.

**SECTION 4.05.**     No Brokers.  No broker, investment banker or other Person is entitled to any broker's, finder's or other similar fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Buyer.

**SECTION 4.06.**     Litigation.  There are not any (a) outstanding Judgments against or affecting Buyer, (b) Proceedings pending or threatened against or affecting Buyer, or (c) investigations by any Governmental Entity that are pending or threatened against or affecting Buyer that, in each case, individually or in the aggregate, would reasonably be expected to have a Buyer Material Adverse Effect.

## ARTICLE V

## COVENANTS

**SECTION 5.01.**     Covenants Relating to Acquired Assets.

(a)     Except for matters set forth in Section 5.01 of the Seller Disclosure Schedules or otherwise expressly permitted by the terms of this Agreement, from the date of this Agreement to the Closing, taking into account that the Sellers are involved in a bankruptcy proceeding, the Sellers shall not, and shall cause their Affiliates not to, without the prior written consent of Buyer, which consent shall not be unreasonably withheld, delayed or conditioned:

7

(i)       directly or indirectly (through any merger, consolidation, reorganization, issuance of securities or rights, license, lease, encumbrance or otherwise), sell, assign, convey, transfer, license, lease or otherwise dispose of any Acquired Assets; or

(ii)      authorize any of, or commit or agree to take, whether in writing or otherwise, to do any of, the foregoing actions, or request the Bankruptcy Court to approve or authorize the Sellers to take or omit to take any action which would breach the Sellers' covenants under or any other provisions of this Agreement, or consent to any such approval or authorization.

(b)      Advise of Changes.    The Sellers shall use all reasonable efforts to promptly advise the Buyer orally (to be followed promptly by written confirmation) of the occurrence of any matter or event that is material to the Acquired Assets.

**SECTION 5.02.**      Reasonable Best Efforts.    Upon the terms and subject to the conditions herein provided, Buyer, on the one hand, and each of the Sellers, on the other hand, shall (and each Seller shall cause its Affiliates to) use its respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other parties hereto in doing, all things necessary, proper or advisable under Applicable Laws and regulations to ensure that the conditions set forth in this Agreement are satisfied and to consummate and make effective, in the most expeditious manner practicable, the Transactions, including, without limitation, the following:

(a)      Buyer, on the one hand, and each of the Sellers, on the other hand, shall (and each Seller shall cause its Affiliates to) use its reasonable best efforts (including, in the case of the Sellers, moving the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code) to obtain, at its own expense, any and all approvals, authorizations, consents and other actions by Governmental Entities, administrative agencies, courts and other Persons necessary or appropriate (above and beyond the entry of the Sale Order) for such party to consummate the Transactions.  Without limiting the generality of the foregoing, each Seller shall (and shall cause its Affiliates to) use its reasonable best efforts, considering the operation, force and effect of the Sale Order in authorizing such transfers, to obtain, at its own expense, any approvals, authorizations, consents and other actions by all parties necessary for the Sellers to transfer to Buyer, as applicable, and Buyer to receive, all assets which are Acquired Assets.

(b)      Each of the Sellers shall take all actions, including appropriate service and notice of pleadings, in form and substance reasonably satisfactory to Buyer, needed to obtain a Sale Order that authorizes, orders and effects a sale of all of the Acquired Assets free and clear of all Excluded Liabilities and Liens other than Assumed Liens and the other orders contemplated herein.

(c)      Each Seller shall cooperate fully, following entry of the Sale Order approving the sale of the Acquired Assets to Buyer or its designee, in the arrangements for the transfer of the Acquired Assets from the Sellers to Buyer in an orderly fashion, free and clear of and from any and all Excluded Liabilities and Liens other than Assumed Liens and otherwise in accordance with the terms, provisions and conditions of this Agreement and all other

8

agreements, documents and instruments executed and/or delivered in connection herewith, including to the extent reasonably practical, entering into any ancillary insolvency, restructuring or similar proceedings in any relevant non-U.S. jurisdiction.

(d)    Without limiting the generality of the foregoing, the parties hereto shall furnish to each other such necessary information and reasonable assistance, as each may request in connection with each Seller's preparation and filing of applications, motion papers and filings needed to obtain Bankruptcy Court approval of the Transactions, and shall execute any additional instruments necessary to consummate the Transactions, whether before or after the Closing.

(e)    Subject to Applicable Law and the instructions of any Governmental Entity, the Sellers and Buyer each shall keep the other apprised of the status of matters relating to completion of the Transactions, including promptly furnishing the other with copies of notices or other communications received by Buyer or the Sellers, from any third party and/or any Governmental Entity with respect to such Transactions.

(f)    Not fewer than five (5) days prior to Closing or such earlier date as prescribed by Applicable Law, Sellers shall obtain all approvals and certificates (including tax clearance certificates and all applicable bulk sale filings) required by any Governmental Entity and shall deliver all notices required by any Governmental Entity in connection with the sale of the Acquired Assets except to the extent that any such approval certificate is not required by entry of the Sale Order.

(g)    Buyer shall comply with all of the obligations concerning the handling of Trading Circuit Data set forth in the final Sale Order.

**SECTION 5.03.**    <u>Supplemental Disclosure</u>.  Each party shall promptly notify the other parties of, and furnish such other parties with any information such other parties may reasonably request with respect to, the occurrence to such party's actual knowledge of any event or condition or the existence of such party's actual knowledge of any fact that would reasonably be expected to cause any of the conditions set forth in Article VI to not be satisfied.

**SECTION 5.04.**    <u>Further Assurances</u>.  From time to time, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Transactions, including, without limitation, providing the assistance necessary or desirable to transfer the domain names conveyed to Buyer pursuant to this Agreement.

**SECTION 5.05.**    <u>Sale Order and Sale Hearing</u>.

(a)    The Sellers shall use their reasonable best efforts to schedule a hearing to consider the Sale Order (the "<u>Sale Hearing</u>") as soon as possible so as to obtain the entry by the Bankruptcy Court of the Sale Order no later than September 1, 2009.

(b)    Buyer and the Sellers shall cooperate with obtaining entry of an order, in the form attached hereto as <u>Exhibit B</u> authorizing and approving the Agreement and the sale of

the Acquired Assets (the "Sale Order"), and the Sellers shall deliver to Buyer prior to filing, and as early in advance as is practicable to permit adequate and reasonable time for Buyer and its counsel to review and comment, copies of all proposed pleadings, motions, notices, statements schedules, applications, reports and other papers to be filed by the Sellers in connection with such motions and relief requested therein.

**SECTION 5.06.** Reserved.

**SECTION 5.07.** Access to Information. From the date hereof until the Closing Date, Sellers shall afford to Buyer and its authorized personnel and representatives reasonable access during normal business hours to make such reasonable examination of Sellers' books and records to the extent they relate to the Acquired Assets. Any such examination shall be conducted at times reasonably acceptable to Sellers and upon reasonable prior notice to Sellers. Notwithstanding anything herein to the contrary, no examination shall be permitted to the extent that it would require Sellers or any Affiliate to disclose information subject to attorney-client privilege or conflict with any confidentiality obligations to which Sellers or any Affiliates are bound, from which Sellers will use commercially reasonable efforts to be released.

## ARTICLE VI

## CONDITIONS PRECEDENT

**SECTION 6.01.** Conditions to Each Party's Obligation. The respective obligations of each party to effect the Transactions is subject to the satisfaction or waiver on or prior to the Closing of the following conditions:

(a) Governmental Approvals. All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity necessary for the consummation of the Transactions shall have been obtained or filed or shall have occurred, as applicable.

(b) No Injunctions or Restraints. No Applicable Law or injunction enacted, entered, promulgated, enforced or issued by any Governmental Entity or other legal restraint or prohibition preventing the consummation of the Transactions shall be in effect.

(c) Bankruptcy Court Orders. The Bankruptcy Court shall have entered the Sale Order and any other orders necessary to permit and consummate the Transactions, each such other order to be in form and substance reasonably satisfactory to Buyer and all such orders shall be Final Orders; provided, that it shall be a condition only to the obligations of Buyer, and shall not be a condition to the obligations of Sellers, that any order, including the Sale Order, be a Final Order.

**SECTION 6.02.** Conditions to Obligations of Buyer. The obligation of Buyer to effect the Transactions is further subject to the satisfaction (or waiver by Buyer) on or prior to the Closing Date of the following conditions:

(a) Representations and Warranties of the Sellers. The representations and warranties of the Sellers in this Agreement shall be true and correct as of the date hereof and as

10

of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date), without regard to any materiality or "Seller Material Adverse Effect" qualifiers contained in such representations and warranties, in each case except for failures of such representations and warranties to be true and correct that, (i) individually or in the aggregate, have not had and would not reasonably be expected to have a Seller Material Adverse Effect; or (ii) relate solely to liabilities which are Excluded Liabilities or assets which are Excluded Assets.

(b)     Performance of Obligations.   The Sellers shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Sellers at or prior to the Closing.

(c)     Officer's Certificate.   Buyer shall have received a certificate, dated the Closing Date, of an officer of the Company to the effect that the conditions specified in Section 6.02(a) and (b) above have been fulfilled.

(d)     Consents.   All consents listed in Section 3.02 of the Seller Disclosure Schedules shall have been obtained and in full force and effect as of the Closing and without imposing any obligations, financial or otherwise, on Buyer.

(e)     No Seller Material Adverse Effect.   Between the date hereof and the Closing Date, there shall not have been a Seller Material Adverse Effect.

(f)     Documents; Actions.   At the Closing, and contemporaneously with all other actions provided for herein, the appropriate Sellers shall have executed and delivered the documents referenced in Section 2.02.

(g)     Sale Order.   The Sale Order shall be a Final Order or Final Orders entered by the Bankruptcy Court in form attached hereto.

**SECTION 6.03.**     Conditions to Obligation of the Sellers.   The obligations of the Company and the Sellers to effect the Transactions are subject to the satisfaction (or waiver by the Company) on or prior to the Closing Date of the following conditions:

(a)     Representations and Warranties.   The representations and warranties of Buyer in this Agreement shall be true and correct as of the date hereof and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date), without regard to any materiality or "Buyer Material Adverse Effect" qualifiers contained in such representations and warranties, in each case except for failures of such representations and warranties to be true and correct that, individually or in the aggregate, have not had and would not reasonably be expected to have a Buyer Material Adverse Effect.

(b)     Performance of Obligations of Buyer.   Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer by the time of the Closing.

11

(c)     Officer's Certificate.  The Sellers shall have received a certificate, dated the Closing Date, of an officer of Buyer to the effect that the conditions specified in subsections 6.03(a) and (b) above have been fulfilled.

(d)     Documents; Actions.  At the Closing, and contemporaneously with all other actions provided for herein, the Buyer shall have executed, or caused to have been executed, and delivered the documents referenced in Section 2.02.

## ARTICLE VII

## TERMINATION, AMENDMENT AND WAIVER

**SECTION 7.01.**     Termination.

(a)     Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(i)     by mutual written consent of the Sellers and Buyer;

(ii)     upon written notice, by either Buyer or the Sellers, if the Closing shall not have occurred on or before the earlier of (i) consummation of an alternate transaction or (ii) thirty (30) days after the Sale Hearing (the "Drop Dead Date"); provided, however, that, if the Closing shall not have occurred on or before the Drop Dead Date due to a material breach of this Agreement by Buyer or the Sellers, the breaching party may not terminate this Agreement pursuant to this Section 7.01(a);

(iii)     by Sellers, if any condition to the obligations of Seller set forth in Section 6.01 or 6.03 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers in writing;

(iv)     by Buyer, if any of the conditions to the obligations of Buyer set forth in Section 6.01 or 6.02 shall have become incapable of fulfillment other than as a result of a breach of any representation, warranty, covenant or agreement contained in this Agreement by Buyer, and such condition is not waived by Buyer in writing;

(v)     by the Sellers, if Buyer shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (i) would give rise to the failure of a condition set forth in Section 6.01 or 6.03, as applicable, and (ii) cannot be or has not been cured prior to the date that is five (5) days from the date that Buyer is notified by the Company of such breach or failure to perform; provided, however, that the Sellers shall not have a right to terminate this Agreement under this Section 7.01(a)(v) if any Seller is then in material breach of this Agreement;

(vi)     by Buyer, if the Sellers shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, and such breach or failure to perform (i) would

12

give rise to the failure of a condition set forth in Section 6.01 or 6.02, as applicable, and (ii) cannot be or has not been cured prior to the date that is five (5) days from the date that the Seller is notified by Buyer of such breach or failure to perform; provided, however, that Buyer shall not have a right to terminate this Agreement under this Section 7.01(a)(vi) if Buyer is then in material breach of this Agreement;

(vii)    by Buyer, upon written notice to the Sellers, if the Sale Order has not been entered within sixty (60) days after the date of this Agreement, or if after such entry, such Sale Order has not, within eleven (11) days after its entry, become final, non appealable and no longer subject to appeal, reconsideration or stay; provided, however, that Buyer shall not have a right to terminate this Agreement under this Section 7.01(a)(vii) if Buyer is then in material breach of this Agreement; and

(iii)    by either the Sellers or Buyer, if an Applicable Law or injunction which shall have become final and nonappealable is in effect preventing the consummation of the Transactions.

(b)    In the event of termination by the Company or Buyer pursuant to this Section 7.01, written notice thereof shall forthwith be given to the other parties and the Transactions shall be terminated, without further action by any party.  If the Transactions are terminated as provided herein:

(i)    Buyer shall, upon request, return to the Company or destroy all documents and other material received from the Sellers relating to the Transactions, whether so obtained before or after the date hereof; and

(ii)    all confidential information received by Buyer with respect to the Acquired Assets shall be treated in accordance with the Non-Disclosure Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement.

**SECTION 7.02.**    Effect of Termination.  If this Agreement is terminated and the Transactions are abandoned as described in Section 7.01(a), (a) this Agreement shall become null and void and of no further force and effect, except for the provisions of this Article VII; and (b) except as set forth in clause (a) of this Section 7.02, there shall be no liability hereunder on the part of Buyer, the Sellers, or their respective officers, directors, shareholders, managers, members or partners, provided that no termination shall relieve any party of liability for any material breach of any provision of this Agreement occurring prior to such termination.

**SECTION 7.03.**    Amendments and Waivers.  This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto.  By an instrument in writing, Buyer may waive compliance by the Sellers with any term or provision of this Agreement that the Sellers were or are obligated to comply with or perform.  By an instrument in writing, the Sellers may waive compliance by Buyer with any term or provision of this Agreement that Buyer was or is required to comply with or perform.

13

## ARTICLE VIII

## GENERAL PROVISIONS

**SECTION 8.01.**     Expenses.  Except as set forth in this Agreement and whether or not the Transactions are consummated, each party shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the Transactions.

**SECTION 8.02.**     No Survival of Representations and Warranties.  The parties agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the parties shall have any liability to each other after the Closing for any breach thereof.

**SECTION 8.03.**     Assignment.   This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any party without the prior written consent of the other parties hereto; provided, however, that, Buyer may assign its rights and obligations hereunder, in whole or in part, to one or more designees of Buyer, provided that no such assignment shall relieve Buyer of its liabilities and obligations hereunder if such assignee does not perform such obligations and, provided, further, that this Agreement may be assigned to one or more trustees appointed by the Bankruptcy Court to succeed to the rights of the Sellers; provided, however, that any such assignment shall not affect Buyer's rights hereunder.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, and except as otherwise expressly provided herein, no other Person shall have any right, benefit or obligation hereunder.

**SECTION 8.04.**     No Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

**SECTION 8.05.**     Remedies.   Except as otherwise expressly provided in this Agreement, any and all remedies expressly conferred upon a party to this Agreement shall be cumulative with, and not exclusive of, any other remedy contained in this Agreement, at law or in equity and the exercise by a party to this Agreement of any one remedy shall not preclude the exercise by it of any other remedy.  In addition, the parties agree that irreparable damage would occur in the event that the parties fail to perform their obligations in accordance with the terms of this Agreement and each party shall be entitled to specific performance in such event, in addition to any other remedy at law or in equity.

**SECTION 8.06.**     Notices.   All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or sent by overnight courier service and shall be deemed given when so delivered by hand, or after one Business Day in the case of overnight courier service or, if faxed, on the day confirmation of successful facsimile transmission is obtained by the sender thereof, as follows:

14

(a)      if to Buyer,

Micro Electronics, Inc.
4119 Leap Road
Hilliard, OH 43026
Attention: Michael Papai
Tel: 614 850 3302
Fax: 614 850 3001

with a copy to:

Micro Electronics, Inc.
4119 Leap Road
Hilliard, OH 43026
Attention: Nancy Klemstine
Tel:  614 850 3016
Fax: 614 850 3001

(b)      if to the Sellers,

Circuit City Stores, Inc.
9950 Maryland Avenue
Richmond, VA  23233
Attn:  James Marcum
Tel:  (804) 290-4306
Fax:  (804) 486-8248

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square P.O. Box 636
Wilmington DE 19801
Attn:  Gregg M. Galardi, Esq. and Ian S. Fredericks, Esq.
Tel:  (302) 651-3000
Fax:  (302) 651-3001

**SECTION 8.07.**      Interpretation; Exhibits and Schedules; Certain Definitions.

(a)      The headings contained in this Agreement, in any Exhibit or Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein, shall have the meaning as defined in this Agreement.  When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.

15

(b)      For all purposes hereof:

"<u>Affiliate</u>" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"<u>Assumed Liens</u>" means, to the extent they would not be eliminated by the Sale Order, the Liens described in Section 3.03.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of Virginia.

"<u>Business Day</u>" shall mean any day other than a Saturday, Sunday or any other day on which banks in New York, NY are authorized or required by law or executive order to remain closed.

"<u>Buyer Material Adverse Effect</u>" means the occurrence of a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

"<u>Contract</u>" means all contracts, agreements, leases, licenses, indentures, notes, bonds, mortgages, deeds of trust, loan agreements, credit agreements, pledges, encumbrances, guarantees, reciprocal easement agreements, financing agreements, commitments, conditional sales contracts, collective bargaining agreements, permits, instruments, bids, orders, proposals and other legally binding arrangements, whether written or oral.

"<u>Consumer Privacy Ombudsman</u>" means a "consumer privacy ombudsman" as defined in the Bankruptcy Code.

"<u>Data</u>" means customer data (including, without limitation, customer names, email addresses, mailing addresses, methods of contact and historical sales data with respect to each such customer) in a standard electronic format usable for direct marketing purposes.

"<u>Excluded Liabilities</u>" means Liabilities of the Sellers or any of their Affiliates.

"<u>Final Order</u>" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion or alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (c) as to which no stay is in effect; <u>provided</u>, <u>however</u>, that the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within ten (10) days of the entry of the order at issue.

"<u>including</u>" means including, without limiting the generality of the foregoing.

16

"Liabilities" means, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, matured or unmatured of such Person, whether accrued, vested or otherwise, whether known or unknown, foreseen or unforeseen, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

"Trading Circuit Data" means the Data collected by Sellers via the www.tradingcircuit.com website, but does not mean (i) personally identifiable consumer records on backup tapes and on paper copies of sales tickets; (ii) credit card account numbers and other financial records; (iii) records of individuals whose addresses are outside the United States; and (iv) "cookie" information collected from persons visiting the www.tradingcircuit.com web site.

"Liens" means mortgages, liens, security interests, charges, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind.

"Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"PII" means "personally identifiable information" as defined in the Bankruptcy Code, that is included in the Acquired Assets.

"Proceeding" means any claim, action, suit, proceeding or investigation in or before any Governmental Entity, whether brought, initiated, asserted or maintained by a Governmental Entity or any other Person or entity.

"Sale Notice" means the notice given pursuant to the Bid Procedures Order.

"Seller Material Adverse Effect" means the occurrence of a material adverse effect on the ability of any Seller to perform its obligations under this Agreement.

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, privilege, registration and other such taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties, interest and additions in respect thereof).

**SECTION 8.08.**   Counterparts.   This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other parties.

**SECTION 8.09.**   Entire Agreement.   This Agreement and the Non-Disclosure Agreement, along with the Schedules and Exhibits thereto, contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.  None of the parties shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the Non-

Disclosure Agreement.  In the event of a conflict between the terms of this Agreement and the Sale Order, the terms of the Sale Order shall prevail.

SECTION 8.10.        Severability.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other Persons or circumstances.

SECTION 8.11.        Exclusive Jurisdiction.        The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions.  Any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 8.06 hereof.

SECTION 8.12.        Governing Law.  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the internal laws of the Commonwealth of Virginia applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

SECTION 8.13.        Waiver of Jury Trial.  Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the Transactions.  Each party (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 8.13.

SECTION 8.14.        Bankruptcy Court Approval.  This Agreement shall not be binding on the Sellers until the Sale Order is entered, other than Article V (other than covenants to be performed after the Closing).

[SIGNATURE PAGE FOLLOWS]

18

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

**MICRO ELECTRONICS, INC.**

By: _____
    Name:  Michael P. Papai
    Title:  Vice President of Retail Marketing


**CIRCUIT CITY STORES, INC.**

By: _____
    Name:
    Title:


**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____
    Name:
    Title:


**COURCHEVEL, LLC**

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

**MICRO ELECTRONICS, INC.**

By: _____
Name:  Michael P. Papai
Title:  Vice President of Retail Marketing


**CIRCUIT CITY STORES, INC.**

By: _____
Name: _____
Title: _____


**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____
Name:  Michelle Mosier
Title:  Authorized Signer


**COURCHEVEL, LLC**

By: _____
Name:  Michelle Mosier
Title:  Authorized Signer

## EXHIBIT A

### BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Agreement"), dated as of _____, 2009 (this "Agreement"), is by and among Micro Electronics, Inc, a Delaware corporation ("Buyer"), Circuit City Stores West Coast, Inc. ("CCWC"), Circuit City Stores, Inc. (the "Company", together with CCWC, the "Sellers"). Except as expressly defined herein, capitalized terms used in this Agreement shall have the meaning ascribed to them in the Asset Purchase Agreement, dated as of August 18, 2009 (the "Purchase Agreement"), by and between Buyer and the Sellers.

WHEREAS, Buyer and the Sellers entered into the Purchase Agreement providing for the sale of the Acquired Assets (as defined in the Purchase Agreement) from the Sellers to Buyer;

WHEREAS, the Sellers desire to assign to Buyer, and Buyer desires to obtain and assume from the Sellers, the Acquired Assets; and

WHEREAS, the sale of the Acquired Assets has been approved by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.  <u>Transfer of Assets and Assumption of Liabilities</u>.

(a)   Subject to Section 1(c) below, the Sellers hereby assign, transfer, convey and deliver to Buyer, its successors and assigns, all of the Sellers' respective right, title and interest, as the same exists on the date hereof, in and to the assets set forth below:

(i)   The trademarks and service marks and domain names set forth on Schedule 1.02(a)(i) and all goodwill associated with such trademarks, service marks, and domain names (the "Marks");

(ii)   Subject to the terms of this Agreement and pursuant and subject to Bankruptcy Court approval, the Trading Circuit Data, provided, however, that neither Buyer or its assigns may, and the Buyer and its assigns shall not, use the Alpine Data to (1) communicate with persons who were customers of Circuit City (each a "Warranty Customer") and to whom a warranty contract was issued for any product sold by Circuit City under any agreement between Circuit City and any third party pursuant to which warranty contracts were issued prior to March 31, 2009 (each a "Warranty Contract") with respect to or in connection with any issue related to such Warranty Contract, except if the inquiry or contact is initiated by such Warranty Customer in which case the Buyer or its assigns shall direct the Warranty Customer to the present obligor

or administrator for such Warranty Contract, (2) solicit any Warranty Customer to cancel an existing Warranty Contract, or (3) solicit any Warranty Customer to renew or replace any existing Warranty Contract.

(b)    Buyer hereby accepts the foregoing assignment, transfer, conveyance and delivery.

(c)    Notwithstanding anything to the contrary in this Agreement and for the avoidance of doubt, the Sellers are not selling, conveying, assigning, transferring or delivering to Buyer any assets or rights other than those specifically identified in Section 1(a).

2.    Miscellaneous.

(a)    Counterparts.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other parties.

(b)    Entire Agreement.  This Agreement and the Non-Disclosure Agreement, along with the Schedules and Exhibits thereto, contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter.  None of the parties shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the Non-Disclosure Agreement.

(c)    Severability.  If any provision of this Agreement (or any portion thereof) or the application of any such provision (or any portion thereof) to any person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision hereof (or the remaining portion thereof) or the application of such provision to any other persons or circumstances.

(d)    Exclusive Jurisdiction.  The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder.  Any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 8.06 of the Purchase Agreement.

(e)    Governing Law.  This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and the internal laws of the Commonwealth of Virginia applicable to agreements made and to be performed entirely within such State, without regard to the conflicts of law principles of such State.

(f)    Waiver of Jury Trial.  Each party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement.  Each party (a) certifies that

no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 2(f).

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first written above.

**MICRO ELECTRONICS, INC.**

By: _____
    Name: Michael P. Papai
    Title: Vice President of Retail Marketing

**CIRCUIT CITY STORES, INC.**

By: _____
    Name:
    Title:

**CIRCUIT CITY STORES WEST COAST, INC.**

By: _____
    Name:
    Title:

**COURCHEVEL, LLC**

By: _____
    Name:
    Title:

**EXHIBIT B**

**[SALE ORDER]**

## Schedule 1.02(a)(i)

**TRADING CIRCUIT**

| Jurisdiction | Mark/Image | Application Ser. No. | Filing Date | Registration No. | Registration Date | Status | Record Owner | Class(es) |
|---|---|---|---|---|---|---|---|---|
| Canada | TRADING CIRCUIT | 1220147 | 6/11/2004 | TMA697635 | 10/2/2007 | Registered | Circuit City Stores West Coast, Inc. | 35 |
| United States | TC TRADING CIRCUIT and Design  | 78/413288 | 5/5/2004 | 3202617 | 1/23/2007 | Registered | Circuit City Stores West Coast, Inc. | 35 |
| United States | TRADING CIRCUIT | 78/403082 | 4/16/2004 | 3202611 | 1/23/2007 | Registered | Circuit City Stores West Coast, Inc. | 35 |

**Domain Registrations:**

| Domain Name | Paid Through Date | Status | Renewal Status |
|---|---|---|---|
| tradingcircuit.biz | 2/21/2016 | registered locked | Auto Renewal |
| tradingcircuit.ca | 5/4/2010 | registered locked | Auto Renewal |
| tradingcircuit.com | 2/22/2016 | registered locked | Auto Renewal |
| trading-circuit.com | 2/22/2016 | registered locked | Auto Renewal |

EXHIBIT

**B**

tabbies®

Micro Electronics
dba Micro Center
4119 Leap Rd.
Hilliard, Ohio 43026

August 26, 2009

## PRIVACY PROTECTIONS FOR FORMER CIRCUIT CITY CUSTOMERS
### In conjunction with the purchase of the Customer Information by Micro Electronics, Inc., d/b/a Micro Center:

Micro Center will offer privacy protections to customers of the former Circuit City as follows;

1.  Micro Center is in substantially the same line of business as Circuit City and will be using the data for essentially the same purposes as specified in the Circuit City Privacy Policy.

2.  Micro Center will voluntarily extend privacy protections to the former Circuit City customers by covering them under the Micro Center Privacy Policy published at www.microcenter.com.

3. Micro Center will add additional language to its Privacy Policy that will apply specifically to the customers of the former Circuit City as set forth below.

4.  An Opt Out Process will be undertaken following approval of the sale of the Circuit City consumer information.  The opt-out process will consist of two types of notification to consumers: (1) notification on the Micro Center website and (2) notification to consumers with postal addresses and e-mail addresses as specified below.

5.  Following the closing, Micro Center will post a clear and conspicuous notice on a prominent part of the home page notifying all former Circuit City customers of the change of corporate ownership and of the customers' right to opt-out of the transfer of their personally identifiable information to Micro Center and/or to receive future postal mail or e-mail communications from Micro Center or its partners.  The notice will be posted for a period of one year from the closing.

6.  Micro Center will advertise to selected customers of the former Circuit City to encourage in-store and/or online purchases by sending promotional mailings to them by U.S. Mail:

> For at least the first three promotional mailings to any customer, Micro Center will include an announcement notifying all former Circuit City customers of the change of corporate ownership and of the customer's right to opt-out of the transfer of their personally identifiable information to Micro Center and/or to receive future postal mail from Micro Center or its partners.

> For those customers with e-mail addresses, with the first promotional e-mail sent to the customers, Micro Center will notify all customers of the change of corporate ownership of the records, and of their right to opt-out of receiving future communications from Micro Center; a straightforward opt-out method will be provided.

7. Notice of any future changes to the Privacy Policy will be posted on Micro Center's website and customers will be provided a facility for opting-out.

8. Micro Center may share customer names, postal mailing address and purchase category information on a limited basis with trusted companies who offer products or services that may be of interest and value to them as a purchaser of consumer electronics and similar types of products.

> A Rental Agreement representing industry best practices will be developed to provide protections to consumers from proliferation of their personally identifiable information. Such protections includes prohibitions against the marketing partner providing

information to any additional parties, limits on the number of times a name can be mailed, and prohibits telemarketing for any reason. Names will only be shipped to reputable service bureaus and never directly to list renters. Companies with which we share information are prohibited from using Customer Personal Information for any purpose other than that agreed upon in the Rental Agreement.

In each Rental Agreement, Micro Center will require the marketing partner, as a condition to such rental agreement, to (1) provide a clear and conspicuous process for consumers to opt-out of receiving future postal mail, and (2) promptly inform Micro Center of any opt-out requests received from customers so that Micro Center can remove the customer from Micro Center's rental list.

The process for unsubscribing from the Micro Center Marketing Partner postal promotions is outlined below.

9. Micro Center will modify our Preference Center on our website to accommodate the specific preferences of the Circuit City customers regarding opting-out of our mailings and those of our marketing partners and other outside companies. This will ensure that customers are given the choice regarding how any personal information collected from them may be used.

10. Micro Center will employ appropriate information security controls (technical, operational and managerial) to protect the personally identifiable customer information, including the use of seed names, list monitoring and the same strong security controls utilized for Micro Center's current customers to make sure that there is no unauthorized use of the customer list.

11. Micro Center agrees to abide by any applicable federal, state or international laws, including laws prohibiting unfair or deceptive practices "UDAP," data breach, privacy, "do-not-call," and "no spam" laws.


## A.  Notice published on microcenter.com website for Circuit City customers

**WELCOME CUSTOMERS OF THE FORMER CIRCUIT CITY!**

On August 28, 2009, Micro Center acquired the POSTAL mailing list of Circuit City Stores. Micro Center is a nationwide retailer and website of 30,000 technology-related items and exciting product offers. We advertise by direct mail, and would greatly value having you as a customer.

This is notice that we are extending our privacy protections to you under the Micro Center Privacy Policy <link>. If you prefer not to be covered under this Privacy Policy, or would like to opt-out of receiving postal mailings or e-mail communication from us or our partners, please visit our Preference Page <link> and let us know.


## B.  Published Privacy Policy additions for Circuit City customers

*[NEW] How is personally identifiable information collected?*

*Customer information is collected during sales transactions primarily for customers in our stores through our in-store checkout process and other in-store contacts such as sweepstakes or contest entry forms. Information is collected through online checkout process and for customers who register at our online Preference Center.*

*Customer information is also collected through Micro Center's acquisition of Circuit City's customer database. We will advertise to selected people in this group to encourage in-store and/or online purchases from us, and will solicit information from these customers when they buy from us, or want to voluntarily sign up for our mailing lists.*

**1. What personally identifiable information is collected?**

[Same as stated in current Privacy Policy attached]

**2. How is the collected information used?**

[Same as stated in current Privacy Policy attached]

**3. How do we use cookies and technology in our website?**

[Same as stated in current Privacy Policy attached]

**4. Who are the third party entities with whom we may share your personally identifiable information?**

**a. Third party service providers:** *[Same as stated in Privacy Policy attached; repeated here for reference]*

[Same as stated in current Privacy Policy attached]

**b. Marketing partners:**

***The following applies to customers with whom we have business relationship.***

To enhance your computing experience with us, we may sponsor on a limited basis relevant offers from a very limited number of reputable marketing partners who provide special services or products that may be of interest and value to you, including financial institutions, warranty service providers and other entities with which we have an ongoing business relationship. We may provide these marketing partners personally identifiable information obtained from you, and this information may be combined with other personally identifiable information, such as demographic information, available from our records and other sources. However, we will NOT provide any of your financial or credit card transaction information or phone numbers to our marketing partners. Also, we will NOT provide your email address to our marketing partners unless you have given your authorization by checking Subscribe" to "Marketing Partners" on the preferences page of this website. We will not otherwise re-sell or distribute your email address to any third party.

[Added] Other Companies:

***The following applies to former Circuit City customers who have not made purchases from Micro Center stores or Micro Center Online.***

*We are respectful of your preferences concerning the amount and source of mail you receive and that it is of interest to you. With this in mind, we may share your name, postal mailing address and purchase category information on a limited basis with trusted companies that we believe would offer products or services you would value as a purchaser of consumer electronics and similar types of products.*

*We never share eMail addresses, telephone numbers or credit card account numbers with any of these third-party companies.  If you would prefer that we not share your address information with outside companies, you may so indicate as noted in the opt out section below.*

**5. How do I opt in/out of Micro Center and Micro Center Online eMails or postal mailings?**

[Same as stated in current Privacy Policy attached]

**6. How do I opt in/out of Micro Center Marketing Partner emails?**

[Same as stated in current Privacy Policy attached]

## 7. How do I unsubscribe from Micro Center Marketing Partner postal promotions?

[Same as stated in current Privacy Policy attached]

***[NEW] How do I unsubscribe from Micro Center sharing my information with other companies?***

*There are various methods for letting us know if you would not like to receive postal mailings from other companies. (**Important Note:** if you decide to unsubscribe from receiving mail promotions from other companies, this means we no longer provide your address to them. You will need to opt out of their specific promotions that you no longer want to receive via their unsubscribe process. Opting out of partner promotions directly will only opt you out of the promotions from them.)*

1. *Go to our preference page where you can unsubscribe to "Sharing Information".*
2. *Write to us and let us know what you would like to receive or not receive. You can send your letter to:*
   ***Communications Department***
   *4119 Leap Road*
   *Hilliard, Ohio 43026*
   ***Note:*** *Please be sure to include your full name, address and phone number and tell us you want us to no longer provide your name and address information to other companies. This will allow us to correctly identify you in our systems and process your request.*
3. *Email us at csrs@microcenterorder.com*
   ***Note:*** *Please be sure to include your full name, address and phone number and tell us you want us to no longer provide your name and address information to other companies. This will allow us to correctly identify you in our systems and process your request.*
4. *Call Customer Support.*

## Remaining Sections 8 – 12 regarding security and disclosures

[Same as stated in current Privacy Policy attached]

## C. Non-published additional protections for Circuit City customers

*We may enhance customer records on our database using only reputable sources in a manner consistent with generally-recognized industry standards and best practices. This enhancement may include data appending such as demographic information, data modeling and scoring of records, and hygiene processes such as National Change of Address (NCOA), de-duplication, etc.*

*This additional customer information is collected to better personalize advertising messages to customers' interests. For companies with which we will share information as described above, we will provide statistics of customer information in aggregate. Names and postal addresses or persons who have certain group characteristics such as demographics will be shared to better target messages to those who would likely value them the most. The enhanced customer information itself is not provided to outside companies.*

*A Rental Agreement representing industry best practices will be developed to provide protections to consumers from proliferation of their personally identifiable information. Such protections includes prohibitions against the marketing partner providing information to any additional parties, limits the number times a name can be mailed, and prohibits telemarketing for any reason. Names will only be shipped to reputable service bureaus and never directly to list renters. Companies with which we share information are prohibited from using Customer Personal Information for any purpose other than that agreed upon in the Rental Agreement.*

S0902518

*Complete reprinting of the privacy policy from our Website (section numbers added):*

# Your privacy is important to us.

This page discloses the privacy policy of Micro Electronics, Inc., Micro Center® and Micro Center Online®. We are concerned about your privacy and the security of your important personal information. We want you to be aware of what kind of information we obtain from you, how we use this information, and how you can control its use. By using this site or making purchases at our stores, you consent to this Privacy Policy. You should also review our Safe Shopping Promise for online purchases.

Micro Electronics, Inc. operates retail stores and web sites under the names of Micro Center® and Micro Center Online®. Micro Electronics, Inc. is the parent company of these companies, and as such, when you provide information to any of these entities, this information may be combined or shared between current or future Micro Electronics, Inc. entities and subsidiaries.

This site is restricted to users from the United States and those not governed by privacy policies of the European Union. Users from the European Union are advised not to disclose personal information on this site.

1. What personally identifiable information is collected?
In order to provide you superior service, communicate marketing promotions which we believe will be of interest to you, and to administer our business, Micro Center® retail stores and Micro Center Online® may gather the following personal information (except where prohibited by law): salutation, name (first/middle/last), billing and shipping addresses, company name (if applicable), email address, phone/fax number (if applicable), payment type (VISA, Check, Cash, etc.), credit card type/number/expiration date. How this information is used and how we protect information collected from online purchases is explained below.

2. How is the collected information used?
Micro Center® retail stores and Micro Center Online® use your personally identifiable information to provide superior service in the following areas: to process, fulfill and track online orders and in-store pickup orders; bill your credit card for purchases; respond to your customer service inquiries or requests; provide requested services such as rebate redemption and warranty coverage; offer information regarding products and services based on your interests or past purchases; hold contests, giveaways, drawings and promotions; administer shopping or reward club accounts; conduct and administer surveys; mail marketing/sales material via email or postal mail; set up commercial accounts; sign up for new credit card promotions; or use it for other general business purposes to further enhance our business relationship with you.

To enhance your Micro Center Online® experience, we may also collect aggregate information as to which pages you visit, search terms used, etc. - in order to measure the effectiveness of our website and identify areas for improvement (product selection, site performance and/or to streamline the purchasing processes).

3. How do we use cookies and technology in our website?
Micro Center Online® sets a cookie on your computer to record certain information during your online visit (session). No personally identifiable information is stored within this cookie. The benefit to you is the ability to save items added to your Shopping Cart and store them on our server for future reference (up to 30 days). These cookies do not gather sensitive information like your name, address, credit card number, etc., if you do not specifically give that information to us voluntarily. If you have given us that information, cookies enable us to recall it (and save you the trouble of entering it all over again) each time you visit our site.

Our web server collects the addresses of the web sites that visitors came from before visiting our site, which browser was used to view our site and search terms entered on our site. Without

making use of any personally identifiable information, we may track the pages visited to help us understand how customers use our site. This helps us make decisions on how to create a better experience for you in the future.

At your option, if you delete our cookies, you will limit our ability to personalize the site for your next visit. However, deleting a cookie will not prevent you from visiting our site and making purchases.

4.  Who are the third party entities with whom we may share your personally identifiable information?

**a. Third party service providers:**
Micro Center® retail stores and Micro Center Online® may provide your name, address and email address to reputable organizations that help us to fulfill services to you on our behalf. For example, we may use such third party service providers to authorize credit card transactions, ship packages, schedule and perform product installations, administer service programs, help us maintain records and analyze sales data, augment and improve the accuracy of our customer database and distribute postal and email communications to you with our offers or important information on our behalf. None of these third party service providers are authorized to use your information for any purpose other than to provide the above stated services for which they contract with us to perform.

**b. Marketing partners:**
Additionally, to enhance your computing experience with us, we may sponsor on a limited basis relevant offers from a very limited number of reputable marketing partners who provide special services or products that may be of interest and value to you, including financial institutions, warranty service providers and other entities with which we have an ongoing business relationship. We may provide these marketing partners personally identifiable information obtained from you, and this information may be combined with other personally identifiable information, such as demographic information, available from our records and other sources. However, we will NOT provide any of your financial or credit card transaction information or phone numbers to our marketing partners. Also, we will NOT provide your email address to our marketing partners unless you have given your authorization by checking Subscribe" to "Marketing Partners" on the preferences page of this website. We will not otherwise re-sell or distribute your email address to any third party.

5.  How do I opt in/out of Micro Center® and Micro Center Online® emails or postal mailings?
There are various methods for letting us know if you would or would not like to receive Micro Center® and Micro Center Online® postal or email promotions. (Please note that if you opt out of our email marketing communications, you may still receive business-related communications such as order and shipping confirmations, product recall information or other administrative communications.)

1.  Go to our website (www.microcenter.com) and click on the Email Newsletters link on the left side of the home page. This will take you to our email options page where you can sign up to receive our various marketing promotions or request to no longer receive specified marketing promotions.
2.  All promotional emails we send you contain a link allowing you to opt out of these specific emails in the future. Click on the relevant link and follow the simple instructions.
3.  Write to us and let us know what you would like to receive or not receive. You can send your letter to:
**Email Communication Department**
4119 Leap Road
Hilliard, Ohio 43026
**Note:** Please be sure to include your full name, address, phone number and email address and tell us specifically which type of marketing communication you wish to receive or stop receiving. This will allow us to correctly identify you in our systems and process your

      request.
4. Email us at csrs@microcenterorder.com
   **Note:** Please be sure to include your full name, address, phone number and email address and tell us specifically which type of marketing communication you wish to receive or stop receiving. This will allow us to correctly identify you in our systems and process your request.
5. Call Customer Support.
6. While visiting our retail stores, request to get on our mailing lists.

If you opted out of receiving our postal or email marketing communications, please allow us a reasonable period of time to honor your request, as some promotions may already be in process. For email subscriptions, please allow up to 10 business days for us to make the requested changes. Removal from our print advertising list may take up to 4 - 5 weeks, depending on the mailing cycle updating process.

Of course, you always have the option to get back on our mailing lists. Simply, go to our website ( www.microcenter.com ) and click on the Email Newsletters link on the left side of the home page.

6.  How do I opt in/out of Micro Center Marketing Partner emails?
To enhance your computing experience with us, we may sponsor on a limited basis, relevant offers from a very limited number of marketing partners. We provide our marketing partners the names and email addresses of those who opted in to receive marketing partner emails on a per campaign basis (the list of opt in names is not provided for unlimited use by our marketing partners).

There are various methods for letting us know if you would or would not like to receive emails from our marketing partners. (Important Note: if you opt in to receive our marketing partner emails and you later decide to opt out, this means we will no longer provide your email address to them from that point forward. You will need to opt out of their specific email promotions that you no longer want to receive via their opt out processes. Opting out of their email promotions directly will only opt you out of the promotions from them.)

1. Go to our website (www.microcenter.com) and click on the Email Newsletters link on the left side of the home page. This will take you to our email options page where you can make the choice to receive or not receive our marketing partner emails. It's a fast and easy process.
2. Write to us and let us know what you would like to receive or not receive. You can send your letter to:
   **Email Communication Department**
   4119 Leap Road
   Hilliard, Ohio 43026
   **Note:** Please be sure to include your full name, address, phone number and email address and tell us specifically which type of marketing communication you wish to get or stop receiving. This will allow us to correctly identify you in our systems and process your request.
3. Email us at csrs@microcenterorder.com
   **Note:** Please be sure to include your full name, address, phone number and email address and tell us specifically which type of marketing communication you wish to stop receiving. This will allow us to correctly identify you in our systems and process your request.
4. Call Customer Support.

We will only share your email address and other personally identifiable information with our marketing partners for emailing purposes if you authorized us by opting in.

Additionally, each email message our partners send you should include similar descriptions of simple opt in and opt out processes to enable you to stop receiving future email and marketing materials from them or their marketing partners. Please be aware that the sites operated by our marketing partners may collect personal information about you and will operate according to their own privacy practices that may differ from our Privacy Policy and our Safe Shopping Promise.

Remember to consult other sites' privacy policies if you are concerned how your information is used by any party other than Micro Electronics, Inc. or Micro Center Online®. Also, you need to consult other sites' privacy policies to find out how to choose not to receive marketing information from companies other than Micro Electronics, Inc. or Micro Center Online® if that is your desire.

7.  How do I unsubscribe from Micro Center Marketing Partner postal promotions?

There are various methods for letting us know if you would not like to receive postal mailings from our marketing partners. (**Important Note:** if you decide to unsubscribe from receiving mail promotions from our marketing partners, this means we no longer provide your address to them. You will need to opt out of their specific promotions that you no longer want to receive via their unsubscribe process. Opting out of partner promotions directly will only opt you out of the promotions from them.)

1.  Go to our preference page where you can unsubscribe to the marketing partners.
2.  Write to us and let us know what you would like to receive or not receive. You can send your letter to:
    **Email Communication Department**
    4119 Leap Road
    Hilliard, Ohio 43026
    **Note:** Please be sure to include your full name, address and phone number and tell us you want us to no longer provide your name and address information to our marketing partners. This will allow us to correctly identify you in our systems and process your request.
3.  Email us at csrs@microcenterorder.com
    **Note:** Please be sure to include your full name, address and phone number and tell us you want us to no longer provide your name and address information to our marketing partners. This will allow us to correctly identify you in our systems and process your request.
4.  Call Customer Support.

8.  How do we protect the security of your Micro Center Online® order information?

Micro Electronics, Inc. and Micro Center Online® are concerned about your privacy and the security of your important personal information. We always use industry standard encryption technologies when transferring and receiving any data that you exchange with our site. We employ the same industry-standard Secure Sockets Layer (SSL) technology that is used by major banks and stock brokerage firms to conduct business via the Internet. This encryption procedure "scrambles" the information you send us and makes online transactions extremely safe.

When we transfer and receive certain types of sensitive information, such as financial information, you will be redirected to a secure server and we will notify you, depending on the type of browser you are using, through a pop-up screen or a yellow "padlock" icon displayed in the lower portion of the browser window. We have appropriate security measures in place in our physical facilities to protect against the loss, misuse, or alteration of information that we have collected from you via this site.

For complete details, please see our Safe Shopping Promise.

9.  How do we handle information related to children?

This site is not intended or designed to attract children under the age of 13. We do not knowingly or intentionally obtain any personally identifiable information from any person we know to be under the age of 13.

10. How can you contact us with questions regarding this Privacy Policy?

If you have questions or concerns about our Privacy Policy, you may contact us by writing to: Micro Center Online at 4119 Leap Road, Hilliard, Ohio 43026 or calling Customer Support. Please remember to include your postal address, email address and phone number with your

correspondence.

11. How am I notified of Privacy Policy changes?
As we continue to grow our businesses and improve our services, we reserve the right to change or modify this Privacy Policy at any time. If there are changes or additions, we will post those changes here or in other formats we deem acceptable, so that you are aware of such changes. If this Privacy Policy changes in such a way that your personally identifiable information may be used or shared in a different manner, you will be given the opportunity to opt-out of having your information used or shared in that new manner. If you are concerned about how your information is used, please check back at this site periodically.

12. Disclosure exceptions:
Notwithstanding the above policies, we reserve the right to disclose your personal information to appropriate third parties if we are required to do so by law or we believe that such action is necessary: to comply with legal process such as a search warrant, subpoena or court order; to protect against misuse or unauthorized use of our website and/or Micro Center Online®; to protect Micro Electronics, Inc.'s rights and property; or during emergencies, such as when we believe someone's physical safety is at risk.

In addition, as we develop our business, we may buy or sell assets or business offerings. Customer information, email addresses, and visitor information are generally among the transferred business assets in these types of transactions. We may also transfer such information in the course of corporate divestitures, mergers, or any dissolution, including, but not limited to, a bankruptcy proceeding.

The effective date of this Privacy Policy is May 28, 2002. It was last updated on September 20, 2007.

# CERTIFICATE OF NOTICE

```
District/off: 0422-7          User: jafarbayj          Page 1 of 1          Date Rcvd: Sep 01, 2009
Case: 08-35653               Form ID: pdforder         Total Noticed: 1

The following entities were noticed by first class mail on Sep 03, 2009.
aty          +Gregg M. Galardi,   Skadden Arps Slate Meagher,   & Flom LLP, One Rodney Sq.,   PO Box 636,
              Wilmington, DE 19899-0636

The following entities were noticed by electronic transmission.
NONE.                                                                         TOTAL: 0

          ***** BYPASSED RECIPIENTS *****
NONE.                                                                         TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.
```

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

**Date: Sep 03, 2009**                **Signature:**   _Joseph Speetjens_