UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                      .      Case No. 08-35653(KRH)
                            .
                            .
                            .
CIRCUIT CITY STORES         .      701 East Broad Street
INC.,                       .      Richmond, VA 23219
                            .
                            .
          Debtor.           .      August 27, 2009
. . . . . . . . . . . . ..         11:08 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:             McGuireWoods LLP
                            By:  DOUGLAS FOLEY, ESQ.
                                 SARAH B. BOEHM, ESQ.
                            9000 World Trade Center
                            101 W. Main St.
                            Norfolk, VA  23510

                            Skadden Arps Slate Meagher & Flom LLP
                            By:  GREGG M. GALARDI, ESQ.
                                 IAN S. FREDERICKS, ESQ.
                            One Rodney Sq.
                            Wilmington, DE 19899
For the Creditors           Pachulski Stang Ziehl & Jones
Committee:                  By:  JEFF N. POMERANTZ, ESQ.
                            10100 Santa Monica Boulevard
                            11th Floor
                            Los Angeles, CA  90067


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

2

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Greystone Data Systems: | Nixon Peabody, LLP<br>By:  CHRISTOPHER M. DESIDERIO, ESQ.<br>437 Madison Avenue<br>New York, NY  10022 |
| For TomTom: | Nixon Peabody, LLD<br>By:  DENNIS J. DREBSKY, ESQ.<br>     CHRISTOPHER M. DESIDERIO, ESQ.<br>437 Madison Avenue<br>New York, NY  10022 |
| For Pratt Center, LLC,<br>Valley Corners, LLC,<br>Mansfield SEQ287, WLTD,<br>No. Plainfield VF, LLC,<br>Marlton VF, LLC: | Sands Anderson<br>By:  LISA TAYLOR HUDSON, ESQ.<br>801 East Main Street<br>Suite 1800<br>Richmond, VA  23219 |
| For Schimenti<br>Construction: | LeClairRyan<br>By:  TARA ELGIE, ESQ.<br>225 Reinekers Lane<br>Suite 700<br>Alexandria, VA 22314 |
| | Thelen, LLP<br>By:  PATRICK M. BIRNEY, ESQ.<br>     PETER E. STRNISTE, ESQ.<br>185 Asylum Street<br>Cityplace II, 10th Floor<br>Hartford, CT  06103 |
| For Verizon Wireless: | Blank Rome, LLP<br>By:  REGINA STANGO KELBON, ESQ.<br>One Logan Square<br>130 North 18th Street<br>Philadelphia, PA  19103 |
| For Madison Waldorf,<br>LLC: | Bean, Kinney & Korman, P.C.<br>By:  MITCHELL B. WEITZMAN, ESQ.<br>2300 Wilson Boulevard<br>Suite 700<br>Arlington, VA  22201 |
| For James Stacia: | CowanGates<br>By:  FRANK F. RENNIE, IV, ESQ.<br>1930 Huguenot Road<br>P.O. Box 35655<br>Richmond, VA  23235 |

APPEARANCES (CONT'D):

For Savitri Cohen:          Christian & Barton, LLP
                            By:  MICHAEL MUELLER, ESQ.
                            909 East Main Street
                            Suite 1200
                            Richmond, VA  23219

For ESI:                    Seyfarth Shaw
                            By:  RHETT E. PETCHER, ESQ.
                            975 F Street, N.W.
                            Washington, D.C.  20004

For Graphic                 Bean, Kinney & Korman, PC
Communications and          By:  THOMAS W. REPCZYNSKI, ESQ.
Loren Stocker:              2300 Wilson Blvd., Suite 700
                            Arlington, VA  22201

For U.S. Signs, Inc.:       Hutson Law Office, PA
                            By:  RICHARD M. HUTSON, II, ESQ.
                            300 West Morgan Street, Suite 1500
                            P.O. Drawer 2252-A
                            Durham, NC  27702

For Schimenti Const. Co.:   LeClairRyan
                            By:  CHRISTOPHER L. PERKINS, ESQ.
                            Riverfront Plaza, East Tower
                            Eighth Floor
                            951 East Byrd Street
                            Richmond, VA    23219

For Golfsmith:              Akin, Gump, Strauss, Hauer
                              and Feld, LLP
                            By:  ASHLEY R. BEANE, ESQ.
                            1700 Pacific Avenue
                            Suite 4100
                            Dallas, TX  75201-4675

For Lowe's #24:             Hunton & Williams, LLP
                            By:  JASON W. HARBOUR, ESQ.
                            951 East Byrd Street
                            Richmond, VA  23219

For Micro Electronics:      Wharton, Aldhizer & Weaver, PLC
                            By:  WHITNEY J. LEVIN, ESQ.
                            125 S. Augusta Street
                            Suite 2000
                            Staunton, VA  24401


**J&J COURT TRANSCRIBERS, INC.**

4

**APPEARANCES (CONT'D):**

Consumer Privacy
Ombudsman:                By:  LUCY THOMPSON, ESQ.


For National A-1, Inc.    Hirschler, Fleischer
                          By:  THOMAS J. DILLON, III, ESQ.
                          The Edgeworth Building
                          2100 East Cary Street
                          Richmond, VA  23223

For Mr. Ivester:          Andrews Kurth, LLP
                          By:  MONICA S. BLACKER, ESQ.
                          1717 Main Street, Suite 3700
                          Dallas, TX  75201


For Ashley Isaac:         ASHLEY ISAAC, pro se

For Premier Contracting:
                          By:  WILLIAM GRAY, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

5

## I N D E X

**PAGE**

**WITNESSES**

NONE

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| 1 through 3 | Transcripts of Auctions | 19 | 19 |
| 4 | Transcript of Intellectual Property Auction | 29 | 29 |

**J&J COURT TRANSCRIBERS, INC.**

1           THE CLERK:  Please be seated and come to order.  In

2  the matter of Circuit City Stores, Incorporated, hearing on

3  items one through 60, as set out on debtors' agenda.

4           MR. FOLEY:  Good morning, Your Honor.  Doug Foley, of

5  McGuireWoods, on behalf of the debtors.

6           THE COURT:  Good morning, Mr. Foley.

7           MR. FOLEY:  With me today from my firm is Sarah

8  Boehm, recently back from maternity leave.

9           THE COURT:  Wonderful.

10          MR. FOLEY:  As well as Gregg Galardi and Ian

11  Fredericks, from Skadden Arps.  Your Honor, here today from the

12  company is Jim Marcum, CEO, as well as Michelle Mosier, the

13  principle financial officer.  Deborah Miller is assistant

14  general counsel.

15          We also have some professionals that you may hear

16  some proffers from today:  Jim Avallone from DJM Asset

17  Management, and Gabe Fried from Streambank, dealing with the

18  miscellaneous intellectual property asset sale motion, Your

19  Honor.

20          THE COURT:  All right.  Very good.

21          MR. FOLEY:  Your Honor, the matters on the agenda, a

22  lot of them have been resolved or we're requesting to be

23  adjourned.  There are a few matters that we do need to -- the

24  Court to address today.  But just going through the order on

25  the agenda, Your Honor, the first six items have been resolved.

**J&J COURT TRANSCRIBERS, INC.**

7

1  Items numbers one, two, three and four, these are

2  administrative claim request motions by Bond Circuit, Roman

3  numeral IV, Delaware Business Trust, Myrtle Beach Farms

4  Company, Market Heights and Team Retail Westbank, those have

5  all resolved and can be removed from the docket.

6          THE COURT:  Very good.

7          MR. FOLEY:  Your Honor, item number five is a motion

8  by the United States for approval of recoupment, and we have

9  submitted a -- actually, an order that's actually already been

10 entered at Docket No. 4402.

11         THE COURT:  Okay.

12         MR. FOLEY:  So that can be removed from the docket.

13         THE COURT:  All right.

14         MR. FOLEY:  Your Honor, item number six, this is a

15 motion for relief from stay by Premier Contracting.  Mr. Gray

16 is here.  We have submitted an order, consent order on that.

17 So that should be pending in your chambers.

18         THE COURT:  You wish to be heard, Mr. Gray?

19         MR. GRAY:  Thank you, Your Honor.  Just quickly for

20 the record, William Gray, for Premier Contracting, and we have

21 reached an agreement and submitted the order.

22         THE COURT:  All right.  Thank you, sir.

23         MR. GRAY:  Thank you.

24         MR. FOLEY:  Your Honor, items number seven and eight,

25 these are requests for payment of 503(b)(9) claims by Motorola

**J&J COURT TRANSCRIBERS, INC.**

8

1  and General Instrument.  They have agreed to adjourn their

2  motions until the October 15th omnibus hearing date that Your

3  Honor recently has given to us at 2:00 p.m.

4           THE COURT:  All right.  Very good.

5           MR. FOLEY:  Your Honor, item number nine, if we could

6  drop that down on the docket, Mr. Fredericks will deal with

7  that with respect to the matters that he's addressing, and

8  explain what we expect and hope to have on the September 16th

9  hearing date with respect to that matter at 1:00 p.m.

10          THE COURT:  Okay.

11          MR. FOLEY:  Your Honor, items number 10 is the

12  DIRECTV motion for relief from the automatic stay to exercise

13  setoff rights.  They have agreed as part of our continuing

14  reconciliation process with them, to adjourn their motion till

15  the October 15th omnibus hearing date at 2:00 p.m.

16          THE COURT:  All right.

17          MR. FOLEY:  Your Honor, similarly, Sony Pictures Home

18  Entertainment's request for 503(b)(9) claim, we are continuing

19  to reconcile their claim and trying to resolve it.  They have

20  agreed to adjourn their motion until the October 15th hearing

21  date, as well.

22          THE COURT:  All right.

23          MR. FOLEY:  Your Honor, item number 12, this is the

24  motion by Vertis for approval to -- for permission to file a

25  late proof of claim.  They have agreed only to adjourn their

**J&J COURT TRANSCRIBERS, INC.**

1 | motion until the September 22nd hearing date.

2 |        THE COURT:  All right.

3 |        MR. FOLEY:  Your Honor, the next item on -- item

4 | number 13, this is the Sennheisser Electric Corporation motion

5 | to -- for permission to file a late 503(b)(9) claim.  We have

6 | spoken with them and several of the other claimants that are

7 | similarly situated, and they have agreed to actually adjourn

8 | their motion until what we believe will be the confirmation

9 | hearing in this case, November 23rd, Your Honor, so that we

10 | don't have to deal with any issues prematurely with respect to

11 | these issues.

12 |        THE COURT:  All right.

13 |        MR. FOLEY:  Item number 14, Your Honor, SouthPeak,

14 | their motion for an administrative expense claim, they've also

15 | agreed to adjourn until the October 15th hearing date.  Item

16 | number 15, Your Honor, Newport News, this is their motion for

17 | payment of a tax claim.  We believe we have resolved it.  They

18 | have agreed to adjourn the matter until the October 15th

19 | hearing date.

20 |        THE COURT:  All right.

21 |        MR. FOLEY:  Item number 16, this is the motion by

22 | Site A, LLC.  They have also agreed to adjourn their motion

23 | until the October 15th hearing date.  Item number 17, Your

24 | Honor, Towne Square, this is, again, a motion for filing a --

25 | permission to file a late claim.  They've agreed to adjourn

10

1  their motion until October 15th.

2         Your Honor, item number 18, this is Schimenti

3  Construction's motion for a 2004 examination.  We have been

4  working with them informally and providing documentation to

5  them with respect to the construction of the two stores that

6  they were involved in.

7         We've actually produced electronically a substantial

8  amount of documentation that they need time to review.  So they

9  have agreed to adjourn their motion for a 2004 until October

10 15th, Your Honor.  Item number 19, this is the motion by Slam

11 Brands, for a request for payment of administrative claim.

12        They have agreed to adjourn their motion until

13 October 15th at 2:00 p.m.  Similarly, Your Honor, item number

14 20, this is the AmREIT's motion for an administrative expense

15 claim that they've agreed to adjourn until October 15th.  Item

16 number 21, Your Honor, this is Waste Management's motion for a

17 late -- permission to file a late proof of claim.  They have so

18 far only agreed to adjourn until September 22nd hearing date,

19 Your Honor.

20        Item number 22, this is the motion by Columbus

21 Dispatch for a payment of administrative claim.  They have

22 agreed to adjourn till the October 15th hearing date.  Item

23 number 23, Your Honor, this is the debtors' motion under 365 to

24 reject a domain name licensing agreement effective as of August

25 12th, and setting aside a right of first refusal.

**J&J COURT TRANSCRIBERS, INC.**

1              This is related to the matters on the docket today

2    under item number 25 on miscellaneous intellectual property

3    assets.  They have agreed to withdraw the objection to that.

4    Pending on what happens with respect to the sale, this motion

5    may be moot, but they have agreed to adjourn it until the

6    September 22nd hearing date.

7              THE COURT:  All right.

8              MR. FOLEY:  Your Honor, one additional item that is

9    currently shown on the docket as going forward today is item

10   number 31.  This is our lease disposition procedures motion.

11   There was one remaining, unresolved objection by 444

12   Connecticut Avenue.

13             They have agreed, Your Honor, to adjourn -- to

14   adjourn that issue until September 22nd.  So item number 31,

15   Your Honor, can be moved to the adjourned matters.

16             THE COURT:  And that's -- when did you say we're

17   going to hear that?

18             MR. FOLEY:  September 22nd.

19             THE COURT:  All right.

20             MR. FOLEY:  Your Honor, before I turn the podium over

21   temporarily to Mr. Fredericks to deal with items 24, 25, 26,

22   27, 28 and 33, there is a matter that's on, a procedure matter,

23   item number 29.  This is our motion, Your Honor, with respect

24   to scheduling the disclosure statement hearing on the joint

25   plan proposed by both the debtors and the committee of

1 liquidation and having the disclosure statement hearing heard

2 on September 22nd.

3         We appreciate Your Honor granting an expedited

4 hearing request to have the motion heard today, which is item

5 number 30, which is now moot.  But under item number 29, Your

6 Honor, with respect to the time periods for which people would

7 have notice of the objection deadline to the disclosure

8 statement, as well as of the hearing date, the combination of

9 Rule 2002 and Local Bankruptcy Rule 3016-1(b), we wanted to

10 make it absolutely clear that what we were trying to do was get

11 people more time to object to the disclosure statement, rather

12 than less, and we noticed it without seeking permission to

13 alter the local rule.

14         The pending motion simply asks that the Court allow

15 objections to the disclosure statement be filed three business

16 days prior to the disclosure statement hearing, rather than

17 five, which is what the local rule says.  And so we would ask

18 the Court to grant that.

19         Mr. Galardi has promised me that we will resolve

20 every single disclosure statement objection prior to the

21 hearing, so you won't have to read anything, anyway.  So --

22         THE COURT:  Well, with that representation the motion

23 will be granted.

24         (Laughter)

25         MR. FOLEY:  Thank you, Your Honor.  Mr. Fredericks

**J&J COURT TRANSCRIBERS, INC.**

13

1  will address items 24 through 28 and 33.

2        MR. FREDERICKS:  Good morning, Your Honor.  Ian

3  Fredericks, with Skadden, Arps, Slate, Meagher and Flom, on

4  behalf of the debtors.  Before I get to the uncontested

5  matters, I just wanted to go back to matter number nine, which

6  is the federal warranty motion related to the debtors' warranty

7  programs.

8        THE COURT:  Right.

9        MR. FREDERICKS:  First, I appreciate Your Honor

10 giving us the September 16th hearing date for a -- to approve

11 settlements we've been working on with these -- with all of our

12 warranty providers.  What we've done is because the issues with

13 our warranty providers have all -- all overlap considerably,

14 and in addition, there is a third party General Electric, who

15 used to be a warranty provider, who also may or may not have

16 certain rights, we've worked out three separate settlement

17 agreements, and then certain of those parties have also worked

18 out interim agreements between themselves.

19        We have reached final documentation on all of the

20 settlements that we are currently exchanging signature pages.

21 The problem is, certain principals of some of the nondebtors

22 are traveling and we just haven't received those signature

23 pages.  We were hopeful to be able to file a motion to approve

24 all of those settlements today so it would be heard on regular

25 notice for the 16th.

**J&J COURT TRANSCRIBERS, INC.**

14

1          It's unlikely we will receive all the signature pages

2    until tomorrow, and some of the parties want to review the

3    motion prior to it being filed.  So it's possible it gets filed

4    tomorrow or it may slip till Monday.  Just wanted to give the

5    Court that -- those pieces of information.

6          Also, we have kept the committee apprised of these

7    since early on in the negotiations.  I believe they're fully --

8    they've seen substantially final forms of the agreements.  So

9    they are in the loop, as well.

10         THE COURT:  All right.  Very good.

11         MR. FREDERICKS:  Okay.  Turning to matter number 24,

12   what I'd propose to do if it's acceptable to Your Honor is,

13   there are four motions seeking to sell individual parcels of

14   real estate.  They're matter 24, 26, 27 and 33.  Three of them

15   were listed on the agenda as uncontested.  That was 24, 26 and

16   27.

17         Thirty-three had a limited objection from the tenant

18   at the property.  We have resolved that objection with changes

19   to the order, which I can go through.  But if it's acceptable

20   to Your Honor, I'd go through all four of those motions

21   together in successive order.

22         THE COURT:  I think that makes good sense.

23         MR. FREDERICKS:  Okay.  In addition -- thank you,

24   Your Honor.  In addition to that, I'd propose to use one kind

25   of general proffer for all four motions, and then as I get to

1  each motion address any specific issues, if that's acceptable

2  to Your Honor, as well.

3         THE COURT:  That's acceptable, as well.

4         MR. FREDERICKS:  Okay.  The four motions are the

5  motion to sell the Moreno Valley, California, property.  The

6  Virgil Place property, located in Los Angeles, California, the

7  debtors' property in San Jose, California, as well as the

8  debtors' property in Lithia Springs, Georgia.

9         The two witnesses that I would propose to proffer are

10 Mr. Jim Marcum, the chief executive officer of the debtors, as

11 well as Mr. Jim Avallone, a principal with DJM Realty, the

12 debtors' real estate advisors.  Both persons are present in the

13 courtroom and available to testify.

14        If called as a witness -- as witnesses, Mr. Avallone

15 would testify that the DJM marketed these -- marketed these

16 assets since the debtors announced their liquidation.  In

17 addition, they marketed the assets in accordance with the

18 procedures set forth in the motion.

19        The bid procedures were similar to bid procedures

20 approved by this Court previously, and the debtor and Mr.

21 Avallone and Mr. Marcum believe those procedures are fair and

22 reasonable.  In each case, the debtors negotiated a stalking

23 horse agreement with the bidder that they believed at the time

24 presented the highest or otherwise best proposal to -- to begin

25 the auction process.

**J&J COURT TRANSCRIBERS, INC.**

1          The debtors and each purchaser negotiated -- the

2    debtors and each of the stalking horse bidders, as well as in

3    some instances the successful bidder, negotiated at arm's-

4    length and in good faith.  There was no collusion among the

5    bidders.

6          Each of the ultimate purchasers, as well as the

7    stalking horse bidders, were not insiders of the debtors.  The

8    consideration ultimately presented by each of the purchasers is

9    the highest or otherwise best consideration received by the

10   debtors after consultation with the creditors' committee.

11         The purchasers -- each of the purchasers would not

12   have entered into the transactions with the debtors had the

13   assets not been sold free and clear of any interests, with the

14   exception of the permitted encumbrances, as defined in each

15   agreement.

16         The debtors have determined they have no further use

17   for the property and, thus, propose to sell it.  The debtors

18   also believe that each of the sales is in the best interests of

19   their estates and creditors and should be approved.  With

20   respect to three of the transactions, all the transactions

21   except the Virgil Place property located in Los Angeles, at the

22   time the debtors entered into the stalking horse agreements

23   they had negotiated expense reimbursements with each of the

24   purchasers.

25         Those expense reimbursements ranged from 25,000 to

**J&J COURT TRANSCRIBERS, INC.**

17

1  37,500.  Mr. Marcum would testify that -- as well as Mr.

2  Avallone -- that absent the debtor agreeing to those expense

3  reimbursements, those bidders would not have placed the initial

4  bids they placed that were subject to higher or better offers.

5          With that, that would close the general proffer and I

6  will, with Your Honor's -- with Your Honor's agreement I would

7  proceed with matter number 24, the sale of the Moreno Valley

8  property.

9          THE COURT:  You may.

10          MR. FREDERICKS:  Okay.  With respect to this

11  property, the debtors received only one bid.  That was the

12  stalking horse bidder, 99¢ Only Stores.  The purchase price in

13  the agreement was $2,250,000.  There was no auction, as there

14  was no other -- there were no other bids received.

15          In addition, there was an expense reimbursement

16  agreed to here of actual out-of-pocket expenses of up to

17  $35,000.  This expense reimbursement would only have been

18  payable in the event the purchaser was not in default and the

19  debtors closed the transaction with a higher or otherwise

20  better bidder.

21          With respect to the San Jose -- or excuse me -- with

22  respect to the Virgil Place property, which is matter number

23  26, there were ultimately four bids received, one of which was

24  the stalking horse bidder.  Unfortunately, only three of the

25  bidders elected to proceed with the auction.

**J&J COURT TRANSCRIBERS, INC.**

1        The stalking horse bidder advised the debtors prior

2   to the sale of the auction that they would not be

3   participating.  There was no expense reimbursement with respect

4   to this property.  At the auction the -- ultimately -- sorry.

5   The auction began at $350,000.  Ultimately, the sale price was

6   $585,000.

7        The successful bidder was Children's Hospital of Los

8   Angeles, and the next highest bidder was Evergreen Realty, at

9   $580,000.  The next property in order is the Lithia Springs --

10  the Lithia Springs, Georgia, property.  There were two bids.

11  One of them was the stalking horse bidder.

12       The second -- that was Axiom Holdings.  The second

13  bidder was All American Containers.  The -- ultimately, the --

14  the highest or otherwise best bid at the auction was $2,200,000

15  by Axiom Holdings, and the next highest or otherwise best bid

16  was $2,175,000 by All American Containers.

17       With respect to the San Jose property there were two

18  bids.  And that's matter number 33, Your Honor.  There were two

19  bids.  One was the stalking horse bidder and one was the -- a

20  company by the name of Smythe European, Inc.  The purchase

21  price I believe started at $8,250,000.

22       There was a $37,500 expense reimbursement in that

23  agreement.  At the conclusion of the auction the highest or

24  otherwise best bid was $11,150,000, which was submitted by

25  Smythe European, Inc., and the next highest or otherwise best

**J&J COURT TRANSCRIBERS, INC.**

19

1  bid was I believe $11,100,000, presented by the stalking horse

2  bidder.

3          THE COURT:  And there is a expense reimbursement,

4  then, going back to the stalking horse bidder?

5          MR. FREDERICKS:  Yes.  Upon submission of the actual

6  -- or the actual out-of-pocket expenses or reasonable out-of-

7  pocket expenses, yes, there would be an expense reimbursement

8  going back to the -- that bidder.  The -- at each of the

9  auctions the debtor had a court reporter present.

10         I have here copies of the transcripts of each of the

11  auctions, which I'd post -- well, I guess that would close the

12  debtors' proffer of Mr. Marcum and Mr. Avallone.

13         THE COURT:  All right.  Does any party wish to

14  examine the proffered witnesses?  All right.  The proffer's

15  accepted.

16         MR. FREDERICKS:  Thank you, Your Honor.  In addition

17  to that, Your Honor, the debtors, as I mentioned, had a court

18  reporter present at each auction.  The court reporter -- I have

19  here transcripts of each of the auctions, which I'd propose to

20  move into evidence as Exhibits 1 through 3.

21         THE COURT:  All right.

22         MR. FREDERICKS:  Thank you.  For clarity purposes,

23  Exhibit 1 is the san -- the auction for the San Jose property.

24  Exhibit 2 is the transcript for the Virgil Place property in

25  Los Angeles, and Exhibit 3 is the auction transcript for the

1 Lithia Springs, Georgia, property.  As there was no auction for

2 Merino Valley, there's no transcript.

3        There are a few additional items that I would like to

4 go over with respect to these sales, Your Honor.  First, with

5 respect to the sale of the Virgil Place property, there is a

6 disclosure that was put on the record at the auction with

7 respect to Skadden Arps, as well as a disclosure I'd like to

8 make in the courtroom today.

9        Skadden Arps does represent the Children's Hospital

10 of Los Angeles in matters unrelated to this.  We provided no

11 advice or representation with respect to Children's Hospital in

12 this matter, however.  Additionally, as I mentioned, there was

13 one limited objection filed by Golfsmith, the tenant at the San

14 Jose property.

15        I'm happy to report this objection has been resolved.

16 The debtors have agreed to cure the outstanding defaults, which

17 amount to -- there's a $150 of trash removal -- well, let's

18 take a step back for a second.  Since the debtors shut down the

19 store, third parties have in many instances decided to use the

20 debtors' premises as a place to dump various large amounts of

21 garbage.

22        In addition to that, landscaping has not been

23 maintained as well as the debtors would have liked, and

24 there -- the parking lot lights have also malfunctioned.  So

25 we've -- for those three matters the debtor have agreed to

1  reimburse Golfsmith for one -- already the actual out-of-pocket

2  expenses they incurred with respect to the trash removal.

3          Going forward through the closing, any additional

4  trash, Golfsmith's going to arrange for its removal and the

5  debtors' going to agree to reimburse them for that, as well, as

6  long as those costs are reasonable.  With respect to the

7  parking lot lights the debtors are also going to -- Golfsmith

8  is going to locate somebody to fix the lights, provide an

9  estimate of which the debtors can approve, and then those --

10 the debtors will also agree to pay those expenses.

11         Finally, the -- similarly, the landscaping will be

12 maintained by Golfsmith and the debtors will have an

13 opportunity to review those costs before they're incurred, and

14 likewise, pay those.  In addition to that, the parking lot

15 needs certain repairs.

16         The debtors have -- the debtors don't believe there's

17 a default under the lease and I don't believe that Goldsmith

18 has asserted there's a default.  However, Golfsmith requested

19 language in the order to be certain that their rights to seek

20 from the new buyer repairs of the parking lot in accordance

21 with the leases isn't disturbed by the order.  So we've added

22 language there, as well.

23         The last matter is at the time the auction started

24 the debtors were under the assumption that a prime lease, which

25 was originally in place between the debtors and the landlord

22

1  before the debtors purchased the property, was no longer in

2  effect.  There is some discrepancy as to whether or not that's

3  the case.

4        So in addition to assuming and assigning the

5  sublease, the debtors and the purchaser have agreed to assume

6  and assign the prime lease.  So that is also an additional

7  change to the order.  With that, I believe that would be

8  everything with respect to those sales and the debtors would

9  request that each of them be approved.

10        THE COURT:  All right.  Thank you.  Does any party

11  wish to be heard in connection with any of these four items?

12        MS. BEANE:  Your Honor, my name is Ashley Beane.  I'm

13  from Akin, Gump, Strauss, Hauer and Feld, on behalf of

14  Golfsmith, the tenant under this lease, and we would just like

15  to say that we have agreed to all the terms in the order and

16  what Mr. Fredericks just mentioned is all consistent with our

17  agreement.

18        THE COURT:  All right.  Thank you, Ms. Beane.

19        MS. BEANE:  Thank you.

20        THE COURT:  Does any other party wish to be heard in

21  connection with any of these four matters?

22        MR. HARBOUR:  I would.

23        THE COURT:  Yes, sir.

24        MR. HARBOUR:  Good morning, Your Honor.  For the

25  record, Jason Harbour, of Hunton and Williams.  We represent

**J&J COURT TRANSCRIBERS, INC.**

1  Lowe's with respect to matter number 24, the Moreno sale.

2  We've agreed to our objection.  We've resolved the objection,

3  but I just wanted to make it clear to the Court that counsel

4  will be submitting a copy of that order to us before they

5  submit it to chambers, just so we can confirm the order does in

6  fact resolve the objection the way we've previously discussed.

7          THE COURT:  Very good.  Thank you, sir.

8          MR. HARBOUR:  And Your Honor, if I may, may I be

9  excused?

10          THE COURT:  You may be excused.

11          MR. HARBOUR:  Thank you, Your Honor.

12          MR. FREDERICKS:  That's correct, Your Honor.  I

13  apologize for not addressing that earlier.

14          THE COURT:  All right.  Does any other party wish to

15  be heard in connection with any of these four matters?  All

16  right.  We'll -- with that clarification with regard to item

17  number 24, the Court will approve the sales and ask if you'd

18  please submit an order to that effect.

19          MR. FREDERICKS:  Thank you, Your Honor.  I believe

20  the next matter on your agenda is matter number 25.  This is

21  the debtor sale of the remaining and miscellaneous intellectual

22  property.  Present in the courtroom today are, as I mentioned

23  before, Mr. Marcum, as well as Mr. Fried, who is a principal

24  with Streambank, the debtors' intellectual property advisor.

25  I'd propose to proceed by proffer with respect to this matter,

**J&J COURT TRANSCRIBERS, INC.**

1 as well.

2           THE COURT:  You may proceed.

3           MR. FREDERICKS:  Okay.  If called to testify, Mr.

4 Fried would testify that Streambank marketed the assets since

5 the -- since the sale of the debtors' primary intellectual

6 property.  They marketed the assets in accordance with the bid

7 procedures approved by this Court in July.

8           The debtors are -- Mr. Marcum and Mr. Fried would

9 also testify that they received approximately 14 bids for the

10 various assets subject to the motion.  Ultimately, these bids

11 fell into four categories.  It was the Firedog intellectual

12 property, the 800.com web address, the Alpine Data, which as

13 Your Honor may recall, was sold once to Systematics in

14 connection with the earlier intellectual property sale.

15           And this data is the -- it contains personally

16 identifiable consumer information from various years the

17 debtors conducted business.  The last asset is a trading

18 circuit .com web address, as well as related customer

19 information and related intellectual property.

20           Ultimately at the conclusion of the auction the

21 highest or otherwise best bidder for the Firedog intellectual

22 property was a company by the name of F1RSTMARK, and that bid

23 was for $250,000 and included approximately 2 million of the

24 Firedog customers who were contained in the Alpine Data, as

25 well as the Firedog intellectual property.

**J&J COURT TRANSCRIBERS, INC.**

1          At the conclusion of the auction with respect to the

2  Alpine Data, the highest or otherwise best bidder was Micro

3  Electronics, Inc.  They have agreed to purchase the Alpine Data

4  on an exclusive basis, other than the prior sale to Systemax,

5  but with this sale the debtors would no longer be marketing or

6  selling the Alpine Data.  They also carved out the 2 million

7  names that were the subject of the Firedog sale.

8          Lastly, the debtors received the highest or otherwise

9  best bid received for the Trading Circuit assets was also Micro

10 Electronics.  I believe it was in the amount of $41,000, and

11 following -- let's see.  With respect to each purchaser, the --

12 Mr. Marcum would testify, as well as Mr. Fried, that the

13 debtors and each purchaser negotiated in good faith, at arm's-

14 length and without collusion.

15         None of the purchasers are insiders.  The

16 consideration provided by each purchasers is the highest or

17 otherwise best bid.  At the conclusion of the auction the

18 debtors have no further use for the assets and the sale of the

19 assets is in the best interests of the debtors' estates and

20 their creditors.  With that, that would conclude the proffer

21 for both Mr. Marcum and Mr. Fried.

22         THE COURT:  Well, who's buying the domain name,

23 800.com?

24         MR. FREDERICKS:  My apologies.  That's a gentleman by

25 the name of Mr. Steven Ivester.  It's an individual.


**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  All right.  Does any party wish to

2     examine the proffered witnesses?  All right.  The proffer is

3     accepted.

4          MR. FREDERICKS:  Thank you, Your Honor.  Following

5     the initial property auction both the -- both F1RSTMARK and

6     Micro Electronics worked with the CPO and other interested

7     parties concerning protection of personal, identifiable

8     information.

9          I'm happy to report that they have I believe -- both

10    parties have satisfied the CPO's concerns and what we are going

11    to do is attach as an exhibit to each order some privacy -- or

12    some language that the CPO and each party has agreed to with

13    respect to handling customer data.

14         In addition to that, I believe there is -- there's

15    one party in court today who I believe would like to address

16    the Court with respect to the 800.com asset, but other -- so

17    I'll set that one aside for a second, but otherwise, the

18    debtors would request that the Court approve the sale of the

19    Firedog intellectual property, the sale of the Alpine Data and

20    the sale of the Trading Circuit data.

21         THE COURT:  All right.  Does any party wish to be

22    heard in connection with the Firedog, the Alpine Data or the

23    Trading Circuit?  Yes, ma'am.

24         MS. LEVIN:  For the record, my name's Whitney Levin

25    and I'm --

**J&J COURT TRANSCRIBERS, INC.**

1          MS. THOMPSON:  Your Honor, this is Lucy Thompson on

2  the phone --

3          THE COURT:  Excuse me.  What -- on the phone, if you

4  -- we have a party in the courtroom first.

5          MS. THOMPSON:  Thank you.

6          THE COURT:  And then we'll address those on the

7  phone.

8          MS. THOMPSON:  Thank you.

9          MS. LEVIN:  For the record, my name is Whitney Levin

10  and I'm from Wharton, Aldhizer and Weaver, and I represent

11  Micro Electronics, and I just represent that we have reviewed

12  the order and we are in agreement with it.

13          THE COURT:  All right.  Thank you.

14          MS. LEVIN:  Thank you.

15          THE COURT:  Does any other party in the courtroom

16  wish to be heard?  All right.  Now, I'm going to turn to the

17  folks that are on the phone.  Does any party on the phone wish

18  to be heard?

19          MS. THOMPSON:  This is Lucy Thompson.  I'm the

20  consumer privacy ombudsman.  Your Honor, I worked with the

21  debtors, the purchasers and a representative of the National

22  Association of Attorneys General on analyzing the requirements

23  of the Bankruptcy Code for this sale, and we were working late

24  into the night.

25          So I filed my report this morning for Your Honor's

**J&J COURT TRANSCRIBERS, INC.**

1  consideration.  There's certain findings that Your Honor needs

2  to make and the analytical framework for those is on page 8 of

3  my report.  The recommendations are set forth on page 20 and

4  21, and I would just like to say in a few sentences that I

5  recommend that Your Honor find that F1RSTMARK is a qualified

6  buyer.

7           And I would like to say that the agreements that

8  we've been able to reach with both companies are very helpful

9  to the consumers.  They've worked very hard on trying to make

10 sure that the protections are in place, and those are the

11 documents that will be attached to the final sale order.

12          The F1RSTMARK sale is fairly straightforward.

13 They're buying data, the Firedog data that has the consumer --

14 or the Circuit City privacy policy applied.  They've agreed to

15 comply with the policy.  It prohibits the sale or lease of

16 consumer data to third parties for marketing purposes, and

17 F1RSTMARK will agree to that provision.

18          With records to Micro Center, they are buying the

19 Alpine Data, which is consumer data collected and restored.

20 There was no privacy policy that applied to that data, but the

21 Micro Center representatives have agreed to extend privacy

22 protections to the 33 million Circuit City customers that are

23 in that database.

24          And they are planning on apply the Micro Center

25 privacy policy to those consumers, and they've done all this on

29

1  a voluntary basis.  They also plan to rent the list to certain

2  select marketing partners, and they've agreed to come up with a

3  opt out and notice process so that those customers will be

4  notified that they can opt out of having their information

5  rented.

6          And if an individual so chooses, Micro Center will

7  remove the name of anybody who opts out from their rental list.

8  So those are the protections that we were able to craft for

9  Your Honor's consideration, and under the circumstances it

10 seems a reasonable balance between the circumstances of the

11 bankruptcy sale and the needs of the consumers.  And I'm happy

12 to answer any questions, if Your Honor has any.

13         THE COURT:  All right.  Thank you very much for that

14 report, Ms. Thompson.  Does any other party wish to be heard in

15 connection with these three matters?

16         MR. FREDERICKS:  Your Honor, there are -- and this is

17 Ian Fredericks, for the record, of the debtors again.  Before I

18 guess we close the record on those I'd like to move into

19 evidence the transcript from the intellectual property auction,

20 as well.

21         THE COURT:  All right.  It'll be received as your

22 Exhibit No. 4.

23         MR. FREDERICKS:  Thank you, Your Honor.  And I also

24 believe that Mr. Galardi -- yeah -- with respect to the 800.com

25 asset, we want to keep the record partially open for that.

**J&J COURT TRANSCRIBERS, INC.**

1  There are some -- possibly some additional testimony that Mr.

2  Galardi would want to proffer, as well.

3          THE COURT:  All right.  So with -- does any party

4  with to be heard -- any other party wish to be heard in

5  connection with the fire sale -- the Firedog, the Alpine Data

6  or Trading Circuit?  All right.  Those sales will be approved.

7          MR. FREDERICKS:  Thank you, Your Honor.  Mr. Galardi,

8  I believe, wants to address the Court, as well.  Thank you.

9          MR. GALARDI:  Thank you, Your Honor.  Just briefly,

10 Your Honor, the reason we're doing it a little bit disjointed

11 is the only outstanding concern is with respect to the 800.com.

12 So I thought I would set the stage for that and provide some

13 more specific testimony with respect to Mr. Fried and Mr.

14 Marcum on that topic, which Your Honor may find important for

15 the ultimate objection.

16         Your Honor may recall, pursuant to the procedures

17 that Your Honor approved, we had the right to remain and keep

18 the auction technically open, although we conducted it probably

19 some 10 to more days ago, up until the time that the Court

20 actually signs the order approving the particular bid.

21         We did get to an auction in New York with respect to

22 the 800.com.  There were four bids, but the only bid that

23 actually became a "qualified bidder," the high bid, is the one

24 that you've already heard testimony with respect to.  What I

25 thought I'd do is supplement the record with the testimony of

1  Mr. Marcum and Mr. Fried to set up the issue that I think

2  you're going to hear next.

3       At the auction, Your Honor, it became a concern of

4  Mr. Ivester that in fact, why go forward with the auction at

5  all if it should turn out that some bidder could come in within

6  the period subsequent to I think it was last Monday, a week ago

7  Monday and today.

8       Therefore, there was a request that we state on the

9  record of the auction, as represented by the transcript, that

10 we would not do that, so that the auction would in sense be

11 closed, notwithstanding our bid procedures, which Your Honor

12 approved, to provide certainty to make sure we would get the

13 highest and best bid on that date.

14      If called as witnesses most -- both Mr. Marcum and

15 Mr. Fried would testify that in fact that was a request of Mr.

16 Ivester, that it was a request that he in fact, to go forward

17 with the bid and to give his highest and best bid at that time

18 in accordance with the procedures, that we would actually do

19 that and close the auction.

20      And with respect to the record, Your Honor, you will

21 see on the end of that transcript that Mr. Fredericks did get

22 in -- get in fact on the transcript and say that we would not

23 be seeking higher or other bids or entertain higher or other

24 bids.

25      That puts us in the very awkward position today that

**J&J COURT TRANSCRIBERS, INC.**

32

1  we do have a bidder has now submitted yesterday, and we took a

2  deposit to come to the Court today, a higher bid of almost

3  nearly double the amount that is, in fact, we are requesting

4  the Court to approve.

5        In doing so, and mister -- I believe Mr. Pomerantz is

6  on the record -- we -- we went out and, one, solicited the

7  committee's position, as well as to check what we have done.

8  Mr. Fried would testify and as the record demonstrates by the

9  notice, we did in fact comply with Your Honor's requirements

10 with respect to notice and notice procedures.

11       We readily admit that this particular bidder was not

12 specifically solicited for this asset, and probably didn't,

13 according to them, see it in certain of the public notices.

14 That said, Your Honor, we don't believe that there was any

15 impropriety in the process by which we solicited bidders.

16       We don't believe that there was technically any

17 deficiency in the notice provisions with respect to that.  So

18 it is at least the debtors' position, and I believe agreed to

19 with the committee, that Your Honor, in light of what we said

20 on that record that we would in fact not solicit other bids and

21 that we would stand by our word, that we would come to the

22 Court with whatever the bid that was highest and best on that

23 auction date, notwithstanding some 10 to 12 days between, that

24 we would still be seeking for this Court to approve as the

25 highest and best bid at the auction, and notwithstanding that

1    it could double the amount to 200 -- from 250 to 500,000, that

2    we would still ask Your Honor to approve, in the absence of

3    impropriety or failure to meet due process or notice or

4    whatever, that we would still be asking this Court to approve

5    the bid that we have put forth to Your Honor, the bid of Mr.

6    Ivester.

7         I don't know if Mr. Pomerantz wants to add to that,

8    but that -- I wanted Your Honor to have specific information

9    with respect to that.

10         THE COURT:  Thank you, Mr. Galardi.  Mr. Pomerantz,

11    do you wish to address the Court on that issue?

12         MR. POMERANTZ:  Yes, briefly, Your Honor.  Mr.

13    Galardi is accurate.  Mr. Galardi shared with us the

14    information that he disclosed to the Court today, and that

15    based on -- on notions of fairness and in light of the specific

16    representations that were made to the bidder at the auction, we

17    support the Court approval of the $250,000 offer of the highest

18    and best offer, notwithstanding the late submitted offer that

19    was made apparently today.

20         THE COURT:  All right.  Thank you, sir.  Does any

21    other party in the courtroom wish to be heard?

22         MR. DILLON:  Yes, sir.  Good morning, Judge

23    Huennekens.  Tom Dillon, with Hirschler, Fleischer.  It's a

24    pleasure to appear before you today, and I appreciate your

25    entertaining my comments.  In fact, much of what has been

34

1  proffered earlier we agree with.  Some of the subjective

2  comments about fairness we might disagree with.

3          THE COURT:  Do you wish to examine any of the

4  proffered witnesses?

5          MR. DILLON:  We don't, Your Honor.  We believe that

6  the proffer is correct.  We're familiar with the marketing

7  agent, Streambank, that was involved and really are not here to

8  quibble with the -- the specifics of the noticing provisions,

9  other than just to observe that in fact -- and I can -- I'd

10 like to proceed by proffer, if the Court would entertain that,

11 rather than put on my client for testimony, but certainly,

12 that's available, depending on how the Court would like to

13 proceed.

14         THE COURT:  Your client's in the courtroom?

15         MR. DILLON:  He is, Your Honor.

16         THE COURT:  You may proceed by proffer, and if any

17 party wishes to cross-examine, then I'll give them that

18 opportunity.

19         MR. DILLON:  Thank you, Your Honor.  Yesterday, I was

20 contacted by the client, which is National A-1, Inc., which is

21 a national domain name holding company, and I was contacted by

22 Mr. Hertigan, Gary Hertigan, who is in charge of the domain

23 name acquisitions.

24         Mr. Hertigan has been involved with the company for

25 three years and his primary duties with the company is to seek

**J&J COURT TRANSCRIBERS, INC.**

35

1 out, purchase and/or make good use of URLs and domain names

2 based on the Internet.  In speaking with Mr. Hertigan, he first

3 found out about the sale through a blog, which was aimed at

4 domain name and URL owners, which was sent out on Wednesday the

5 26th of August, 2009.

6        That article was the first notice that Mr. Hertigan

7 or National A-1, Inc., had had of the sale or of the

8 opportunity.  In the blog that alerted Mr. Hertigan and the

9 company to the opportunity the writer of the blog indicates

10 that, and I'll quote, "A source tells domain name wire that

11 most of the bidders were apparently end users, which is not

12 surprising given that the information about the auction was not

13 reported in domain name media."

14        And so I don't think there's any question that we

15 have with the earlier proffers, that all the notices that this

16 Court did approve with the Wall Street Journal, Richmond Times

17 Dispatch and others were followed.  But what -- what hadn't

18 been done and what could have been done was to -- because a big

19 portion of the items to be auctioned off were URLs and domain

20 names that there could have been some additional noticing in

21 the domain name media.

22        And there is a media now that addresses and reaches

23 out to domain name holders.  And of course, this is a new media

24 that isn't as old as the Wall Street Journal or the Richmond

25 Times Dispatch.  And of course, the Court could probably take

**J&J COURT TRANSCRIBERS, INC.**

1 | judicial notice of the fact that people are now getting their

2 | information differently than the way our fathers might have

3 | obtained that information.

4 | At any rate, I would proffer Mr. Hertigan's testimony

5 | that he would testify that there was no notice in the domain

6 | name media that he was familiar with.  Moreover, the client,

7 | National A-1, Inc., hereby makes its offer of $500,000, which

8 | is 100 percent higher than our understanding of the highest bid

9 | at the auction.

10 | Neither Mr. Hertigan or I were present at the

11 | auction.  I can only report what I understand, but my

12 | understanding is it was correct that there was only one outcry

13 | bid made after several bidders did qualify through submitting

14 | written bids, which is a pretty customary practice.

15 | I cannot address, now could Mr. Hertigan address, the

16 | agreements that were made on the record by the debtor at the

17 | end of the auction, other than to observe that as a market

18 | basis that the domain name 800.com was grossly undersold, based

19 | on the market.

20 | And so therefore, it wouldn't be surprising that

21 | someone purchasing it at such a low value would be concerned

22 | that someone would hear about it and come in, just as we have

23 | today, and make a higher offer, just because the property had

24 | been sold.

25 | Very similar to a house being sold for a dollar at a

**J&J COURT TRANSCRIBERS, INC.**

37

1  foreclosure auction, the person paying a dollar at that auction

2  has got a lot more to worry about, someone coming in and

3  stealing from him than if you pay $100,000 for that same

4  property.  The focus of the marketing didn't in fact reach my

5  client, for whatever reason.

6          My client did retain my firm yesterday, the same day

7  that he found out about it, wired $500,000 to Skadden Arps'

8  trust account, authorizes me to submit the bid for $500,000,

9  and while a bit risky, agrees to sign whatever asset purchase

10 agreement that may be in place and agrees to close today with

11 the Court's blessing.

12         So what we have before the Court is an essentially

13 $250,000 more than what had been obtained during the auction

14 process.  I do agree with debtors' counsel when they observe

15 that the bidding procedures, which were published and made part

16 of the notice, did state that they did have the right to reopen

17 at any time, and that that was blessed by this court.

18         And so unless the agreement not to reopen it that was

19 made on the record at the auction was also blessed by the

20 Court, that wouldn't be the same sort of peer agreement, that

21 in order for them to undo what was part of the bidding

22 procedures and to amend them, our position would be that they

23 would come in and have to ask this Court for the right to amend

24 those, before they would in fact be amended and be in a

25 position to give those type of assurances to the person that

1  was bidding at the time.

2       Mr. Hertigan would also testify, Your Honor, that --

3  that in the course of the URL sales and market value that the

4  value of the 800.com is worth at least $500,000, and in all

5  fairness and open and honesty [sic] worth more.

6       So with that, Your Honor, what we would ask is for --

7  for the debtor to follow the bidding procedures which were

8  published and were authorized by this Court, to reopen the

9  auction process, allow our bid of $500,000 for the 800.com

10 domain, and to allow us to close today because the money has

11 been paid.  It's in escrow with debtors' counsel and we're

12 prepared to sign the asset purchase agreement right away.

13      THE COURT:  All right.  Thank you, Mr. Dillon.

14      MR. DILLON:  Thank you, Judge.  Appreciate it.

15      THE COURT:  Does any other party wish to be heard?

16      MR. REPCZYNSKI:  Hello, Your Honor.  Tom Repczynski,

17 on behalf of Mr. Loren Stocker, doing business as Vanity

18 International.  As the Court is aware, based on the

19 representation made earlier, Mr. Stocker had agreed, after

20 having filed his limited objection, he had agreed to continue

21 that with the expectation, at least -- and this all comes as

22 news to me as I sit here today -- but with the expectation at

23 least that the sale was expected to be approved, and that the

24 objection would thereby be mooted, since Mr. Stocker had

25 authorized me to represent to the Court that his objection and

39

1  his right of last refusal bound up in his contract with Circuit

2  City were all willing to go by the wayside with the approval of

3  the sale, as had been -- as had been hammered down, if you

4  will, with the debtors' agreement at that sale.

5          So whatever the Court decides to do today with regard

6  to this new information, I would suggest that it would be

7  inappropriate to accept this bid now at this time and sell this

8  asset based on this bid and allow closing to go forward today.

9  I think we would certainly accept and agree with the debtors'

10 position that the sale was in fact conducted, that notice in

11 fact was proper and that the debtor decided at that time, with

12 the discretion given to it by this Court, to exercise its right

13 to close the sale, as it did, and agree contractually, if you

14 will, with the purchaser at that time to sell it for the price

15 given.  So --

16         THE COURT:  Tell me how Mr. Stocker is harmed if I

17 allow the bid that's before me today to go forward?

18         MR. REPCZYNSKI:  Mr. Stocker, Your Honor, has 800.net

19 among the assets that he controls.  Mr. Stocker is harmed

20 depending on who -- in whose hands 800.com falls.  He has

21 certain rights -- as the Court is aware, based on

22 representations in the contract he has certain rights that he

23 believes aren't subject to being terminated by the debtor, and

24 believes that the sale to this purchaser is enough to protect

25 him and that he can separately work out whatever deal he can

40

1  with this individual.

2         Subject to a reseller making this purchase and not

3  knowing in whose hands 800.com might ultimately fall, his

4  business is directly impacted.  So his willingness to pay a

5  certain amount of money and exercise that right of last refusal

6  was completely contingent upon who the potential purchaser

7  might be.

8         Under this scenario he has no way of knowing who the

9  ultimate owner of that asset's going to be, whereas, with the

10 proposed sale or the agreed to sale, he has the ability to

11 negotiate directly and deal directly with that purchaser and

12 thereby confirm for his own position what the value -- can be

13 maintained on his 800.net.  So --

14        THE COURT:  So he would be, you would suggest,

15 perhaps willing to exercise that -- that right, and actually

16 pay more than the 500,000, as Mr. Dillon suggested it might be

17 worth?

18        MR. REPCZYNSKI:  I can only suggest that he ought to

19 be given --

20        THE COURT:  He's given the opportunity.

21        MR. REPCZYNSKI:  -- given the opportunity.  And keep

22 in mind that the right to exercise that he has actually

23 includes a 15 percent discount and a 10-day consideration

24 period, based on any other offer that comes in.  So again, none

25 of that would allow this Court, or at least this purchaser, to

**J&J COURT TRANSCRIBERS, INC.**

1 confirm this deal at this time with this dollar amount, where

2 the Court has agreed with Mr. Stocker and the debtors had

3 agreed to continue those matters over to another date, in the

4 event the sale is not approved as it had been proffered.

5       So again, we agree with the position that it would be

6 proper to approve the sale, based on the debtors' commitment.

7 But in any event, if that weren't the case we don't believe the

8 Court -- that it would be appropriate at this time for the

9 Court to approve the alternative purchaser today.

10      THE COURT:  All right.  Thank you very much.

11      MR. REPCZYNSKI:  Thank you, Your Honor.

12      MR. PERKINS:  Good morning, Your Honor.  Chris

13 Perkins, of LeClairRyan.  Judge, I'm joined with -- by Monica

14 Blacker of the law firm of Andrews Kurth, from Dallas, Texas.

15 Ms. Blacker represents Mr. Ivester, the winning bidder of the

16 800 domain name.

17      Ms. Blacker was not anticipated to be here today

18 until the events unfolded yesterday with this new bid.  She

19 consequently flew here last night, contacted my office this

20 morning about admitting her pro hac vice.  She's provided me

21 with forms, pleadings which I will file this afternoon, but I

22 orally move for her admission pro hac so she could be heard

23 today.

24      THE COURT:  All right.  That motion is granted.  Ms.

25 Blacker, welcome to the Court.

**J&J COURT TRANSCRIBERS, INC.**

42

1          MS. BLACKER:  Thank you, Your Honor.  I'm sorry for

2    the last minute.  We learned about the -- you know -- next

3    potential bid at sometime after 4:00 p.m. yesterday.  So I am

4    here to encourage the Court to go forward with the bid

5    procedures that were approved by this Court, which included a

6    closing of the auction at Skadden Arps' office over a week ago.

7          And while I understand that notice wasn't given to

8    potentially this domain website group, there was notice

9    approved by this Court.  And I find it hard to believe that

10   really anybody who was in this business would not be aware of

11   Circuit City's attempts to sell all of its assets, and it seems

12   a little disingenuous that they would have just found out

13   yesterday.

14          I mean, every time you pop up Yahoo, MSN, CNN,

15   there's a discussion about the -- Circuit City closing its

16   business and selling off its assets.  It's been going on for

17   months.  So this last minute ditch effort is harmful to my

18   client, who has spent four months dealing with this and working

19   this offer, and was under the impression that this process was

20   closed.

21          And it is patently unfair at this point to put them

22   back into the bidding arena, and we would ask that the Court

23   enforce the bid procedures and approve the auction as closed.

24   And I would like to address a couple of the issues that were

25   brought on by the additional purchasers -- of the alternative

43

1  purchaser's counsel.

2        First of all, there's really no evidence as to what

3  the value of the domain name is, other than that the auction

4  was conducted and closed, and that the winning purchase price

5  was 250,000.  I have no idea whether Mr. Hertigan is -- has any

6  -- really, any ability to give us what the proper value is, as

7  -- of this -- his business.  There's no evidence, really, to

8  support that.

9        THE COURT:  There's evidence that somebody thinks

10  it's worth 500,000, right?

11        MS. BLACKER:  That he thinks it's worth 500,000.

12        THE COURT:  Well, he's willing to pay that amount for

13  it.

14        MS. BLACKER:  True, Your Honor.

15        THE COURT:  Okay.

16        MS. BLACKER:  Bottom line is we conducted an auction.

17  It was over eight days ago.  It seems completely against all

18  the fairness of the -- of this Court in that they -- we went

19  through that process.  We followed what the Court wanted, what

20  the Court ordered, and I understand that the debtor had the

21  right to leave the auction open.

22        They closed it.  They also had the right under the

23  auction -- the bidding procedures to modify their bidding

24  procedures, which they did by closing the auction, and we would

25  ask that the Court order the sale to my client.

**J&J COURT TRANSCRIBERS, INC.**

44

1            THE COURT:  All right.  Thank you, Ms. Blacker.

2    Before you get up, Mr. Galardi, is there anybody else in the

3    courtroom that wants to be heard on this matter?  All right,

4    Mr. Galardi.

5            MR. GALARDI:  This is a classic win/win for me, Your

6    Honor.  I either lose the argument and make money or I win the

7    argument and I lose money.  Your Honor, first, I just want to

8    point out a couple facts.  The reservation of rights in the bid

9    procedures did in fact after consultation with the committee

10   allow us to do what we did, and we did it.  We did it with our

11   eyes open.

12           Second, Your Honor, as the party reminded me that got

13   up here, Stocker, there is a right of last refusal, which we

14   rejected that -- we've rejected that agreement.  We don't think

15   it's binding, but that's a party that has an economic interest.

16   We don't think at the 250 they're not going to bid and use the

17   right of last refusal.

18           We find it hard to believe that 500 they'll do so.  I

19   understand the argument.  Your Honor, and again, I think it

20   just comes down to, we conduct a lot of auctions.  When we've

21   done so, it comes down to the integrity of what we're going to

22   do with respect to when we say we're going to do something, and

23   I think that's where the committee and we are.

24           We don't think there's an impropriety.  Yes, it's

25   unfortunate that in this day and age some people don't get

**J&J COURT TRANSCRIBERS, INC.**

45

1 notice, but I don't think there's a due process right to that

2 notice.  It's not a due process concern.  It may be that we're

3 selling ourself short, and I think in this instance it has

4 happened.

5          In other instances you can get a bidder, and they've

6 done the best job possible to put the 500 before us.  They said

7 they're prepared to close.  They've said they have the money.

8 So it really comes down to, I think the debtors and the

9 committee believe that we made that agreement with our eyes

10 open, Monday of last week, and that we've asked the Court to

11 live with that agreement and leave it to the Court, should it

12 think we did the incorrect thing in hindsight and whether this

13 auction should be reopened.

14          THE COURT:  All right.  Thank you, Mr. Galardi.  All

15 right.  The Court has looked at the transcript that's been

16 marked as Debtors' Exhibit No. 4 and considered the argument of

17 counsel.  The Court believes that the integrity of the process

18 is paramount, and otherwise, we're never going to have any kind

19 of way of conducting sales in the future.

20          And so the Court is going to approve the Ivester bid

21 at the auction, approve the procedures that counsel did.  I

22 realize that that means that there's $250,000 less that this

23 estate is going to receive, but I think in the long term that

24 that's the way that we'll promote getting the best bids and

25 auctions generally going forward.

**J&J COURT TRANSCRIBERS, INC.**

46

1            So Mr. Dillon, I thank you and your client for coming

2   in today, but I just think that the integrity of the process

3   needs to be preserved.  So it'll be approved and I'd ask you to

4   submit an order to that effect.

5            MR. DILLON:  And the money's in the Streambank

6   account, so we won't be looking to Skadden Arps to return it,

7   Your Honor.

8            THE COURT:  Oh, okay.

9            MS. BLACKER:  Circuit City's --

10           MR. DILLON:  Circuit City's account.  I know it's not

11  ours.

12           MR. GALARDI:  Thank you very much, Your Honor.

13           MS. BLACKER:  Thank you, Your Honor.  May I be

14  excused?

15           THE COURT:  Yes, Ms. Blacker, you may be excused.

16           MS. BLACKER:  Thank you for --

17           THE COURT:  Thanks for coming in today.

18           MS. BLACKER:  -- indulging me today.

19           MR. DILLON:  Your Honor, may we be excused?

20           THE COURT:  Mr. Dillon, you may be excused, as well.

21           MR. DILLON:  Thank you, Judge.

22           MR. FREDERICKS:  With that, Your Honor, I will turn

23  to matter number 28, which is the debtors' motion to terminate

24  the utility blocked account that was set up in connection with

25  the first day.  Just by way of background, Your Honor -- Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor originally set up or approved a utility blocked account

2  that operated much like the letter of credit.

3        In February when we announced the liquidations as --

4  announced the -- or in January when we announced the

5  liquidations and then got lease procedures approved, we set up

6  a -- we revised that account to basically be a $500,000 account

7  that would never replenish.

8        And so the debtors deposited $500,000 in a separate

9  account for which utilities made demands.  Since that -- since

10  the store closing sales ended and the leases were rejected in

11  March of 2000 -- or in mid-March of this year, there have been

12  various utility requests made on that account, but ultimately,

13  the debtors took every effort to close their remaining

14  utilities associated with their leased premises.

15        There are a few remaining utilities associated with

16  the few remaining pieces of real property that remain, for

17  which the debtors will work with those utilities to set up

18  separate adequate assurance to the extent those utilities

19  request it.

20        Basically, this motion seeks to terminate the account

21  effective 30 days from now, or excuse me, effective September

22  30th.  It would allow parties to submit a utility request to

23  draw on the account for post-petition services.  Any utility

24  request that comes in after September 30th would be barred.

25        We provided notice of a motion to all of the

**J&J COURT TRANSCRIBERS, INC.**

48

1  utilities.  In addition to that we will provide notice of the

2  order to all utilities.  We have already received some requests

3  on this amended form.  And with that, Your Honor, there were no

4  objections, the debtors would request that Your Honor approve

5  the relief requested.

6          THE COURT:  Does any party wish to be heard on the

7  debtors motion for an order terminating the utility blocked

8  account?  Okay.  There being no objection, that motion will be

9  granted.

10         MR. FREDERICKS:  Thank you, Your Honor.  Just so --

11  as Your Honor noticed, 31, I believe, has been adjourned.

12  Thirty-two and -- I'm sorry -- 31 has been adjourned and 33 we

13  dealt with earlier.  Mr. Foley will address the remaining two

14  contested matters.  Thank you, Your Honor.

15         THE COURT:  All right.  Thank you.

16         MR. FOLEY:  Your Honor, item number 32 is a motion by

17  Export Development Canada.  It's their motion.  They -- I think

18  they want to address the Court and we'll respond accordingly.

19         THE COURT:  All right.  Very good.

20         MR. HUTSON:  Good morning, Your Honor.

21         THE COURT:  Good morning.

22         MR. HUTSON:  Richard Hutson, on behalf of Export

23  Development of Canada.  Your Honor, we filed a motion to allow

24  a late filed administrative claim.  The debtors have -- had

25  responded previously that they needed discovery in order to

**J&J COURT TRANSCRIBERS, INC.**

1  respond to our claim.

2        We're just here today to request that the Court enter

3  a scheduling order with a date certain for a hearing on this

4  matter and allow for the debtors to have sufficient time for

5  the discovery that they request.  The debtors have filed an

6  objection.

7        We've at this point received no -- no correspondence

8  regarding to whether they contest the allegations, and at this

9  point we -- when they previously objected we had no idea when

10 the confirmation hearing was going to be, and at this point we

11 do know, I believe, that scheduling this matter for sometime

12 prior to the confirmation hearing would be a right that our

13 client would like to request at this point

14        THE COURT:  All right.  Very good.

15        MR. HUTSON:  Thank you.

16        MR. FOLEY:  Your Honor, I think last time the matter

17 was before the Court was before Ms. Boehm was out on maternity

18 leave.  Now that she's back -- this is backup, but nothing has

19 changed, other than we're closer to a confirmation hearing

20 date.  We would ask the Court, because there's been no change

21 in factual circumstance or certainly no change in prejudice to

22 the movant, that the Court set this matter for a status hearing

23 at the confirmation hearing, which is scheduled -- will be

24 scheduled for, we hope, for November 23rd.

25        Your Honor, if you recall, this is -- this is a

**J&J COURT TRANSCRIBERS, INC.**

50

1 motion by a credit insurer who provided credit insurance to a

2 company called Tech Craft with respect to some goods that they

3 allegedly delivered to the debtors that would allegedly qualify

4 for 503(b)(9) status, had a timely filed 503(b)(9) proof of

5 claim been filed.

6       There are certain allegations in a declaration that's

7 attached from a paralegal about conversations and emails with

8 Ms. Boehm of my firm, as well as some issues as to whether or

9 not they saw what was posted on the KCC website as to the bar

10 date, which was posted on November 13th.

11       They've said they didn't see it.  As Your Honor

12 knows, the excusable neglect standard is a fact intensive

13 inquiry.  It's a difficult standard for movants to meet and

14 there's really, at this point, no need to go forward because

15 there's no law to support a position in our view that a

16 503(b)(9) creditor is entitled to immediate payment of an

17 administrative claim.

18       And there -- the 503(b)(9) statute simply provides

19 for a priority of a claim.  It doesn't provide for allowing

20 immediate payment.  That's obviously in the Court's discretion.

21       THE COURT:  Well, it'd be paid when all

22 administrative claims are paid on the effective date of the

23 plan.

24       MR. FOLEY:  Exactly.  So there's no distribution

25 looming that they need to get their claim resolved or their

**J&J COURT TRANSCRIBERS, INC.**

51

1  late motion resolved in front of, so that they can get a

2  distribution.  There's really no point or time or prejudice to

3  anybody to incur the cost and expense that would be necessary

4  in order to fully investigate the facts relating to this --

5  these allegations, and then have a hearing on it.

6      So we would simply ask the Court -- again, all the

7  other parties that are similarly situated have been continuing

8  their request for late claim motions from time to time.  One

9  has already agreed to go to a confirmation hearing for a status

10  conference and we can deal with these post-confirmation before

11  we go effective.

12      THE COURT:  Well, can they all be dealt with sort of

13  in the same fashion?  In other words, we have one hearing, or

14  are they all going to be fact specific to each other and we're

15  going to have to have separate hearings on all of them?

16      MR. FOLEY:  Well, our intention was to take a look at

17  all of these before we get to the confirmation hearing and to

18  see if there's some commonality of issues that can be dealt

19  with so that Your Honor could potentially make a ruling, either

20  in a test case, as to what standard you're going to apply with

21  respect to excusable neglect, Thompson, Pioneer Standards, so

22  that we can then frame resolutions of these.

23      And obviously, we will be working with the committee,

24  because depending on whether it's a late 503(b)(9) claim

25  entitled to 100 cent dollars versus a general unsecured claim

**J&J COURT TRANSCRIBERS, INC.**

1 that would not be 100 cent dollars, the economics may dictate,

2 you know, the position that we want to take.

3       We don't want to unnecessarily spend estate dollars

4 litigating things if there's not a benefit to those creditors

5 who did follow the rules and did timely file proofs of claim.

6       THE COURT:  All right.  Thank you, Mr. Foley.  Mr.

7 Hutson can -- tell me why you're prejudiced and why this can't

8 be set over for a status conference at the confirmation

9 hearing, and we can deal with all these similar type of claims

10 at one time?

11       MR. HUTSON:  Your Honor, if -- we have no objection.

12 If they're willing to look at this matter and do -- conduct the

13 discovery that they necessarily need prior to confirmation

14 hearing we don't object.  The -- our only objection was, we

15 haven't gotten anything from them.

16       We haven't gotten any way that they plan to challenge

17 the veracity of the allegations that we've made.  We haven't

18 gotten so much -- and these matters have been unilaterally

19 adjourned by the debtors previously without any, you know,

20 communication to us.

21       So we would at least like for them to take a look at

22 the facts.  If it is that there's some issue there that needs

23 to be resolved, we certainly don't want to object to the fact

24 that, and we certainly understand, that these types of

25 merchants are fact intensive and, you know, I argued previously

53

1  to the Court, we certainly take the position that we don't

2  believe ours would be that fact intensive.

3        And when you recall the facts of our case, we're

4  talking about one email that was sent to debtors' counsel

5  requesting the bar date.  We've accepted the fact that we

6  missed the deadline to file.  We've already accepted that.  The

7  only issue is whether the debtors contributed to it.

8        Now, I believe that can be dealt with very simply.

9  It's either debtors' counsel sent the email or she didn't, but

10 in either case, you know, we just want there to be some type of

11 order entered or something showing that they've at least -- you

12 know -- are going to conduct the discovery necessary to resolve

13 this issue; and that's simply what we're looking for.

14       If the confirmation hearing, at that time they're

15 willing to, you know, at least set a hearing date to hear this

16 matter on that day, then we have no objection to that.

17       THE COURT:  Okay.  Thank you.

18       MR. HUTSON:  Thank you.

19       THE COURT:  All right.  The Court is going to set

20 this matter over for status conference at the confirmation

21 hearing, and at that date we'll address scheduling -- a

22 scheduling order that will set this as well as other, similarly

23 situated claimants so that we can get those matters resolved.

24       MR. FOLEY:  Thank you, Your Honor.  The next item on

25 the agenda that's under the contested list is item number 34.

**J&J COURT TRANSCRIBERS, INC.**

54

1  This is Ms. Ashley Isaac's motion for relief from the automatic

2  stay, and I believe she is on the phone, Your Honor.

3            THE COURT:  Okay.

4            MS. ISAAC:  I'm here, Your Honor.

5            THE COURT:  All right, Ms. Isaacs [sic].  I've

6  entered an order yesterday granting you authority to

7  participate by telephone.  So you may proceed on your motion.

8            MS. ISAAC:  Yes, Your Honor.  Thank you.  Well, Your

9  Honor, I would like to -- to file in court a motion for leave

10  to refile a late claim as in the case of <u>Greyhound Lines, Inc.,</u>

11  <u>v. Donna Rogers, et al.</u>  Ms. Rogers was allowed to file a proof

12  of claim because she had never received a bar date notice from

13  the debtor of that case.  Ms. Isaac also never received --

14            THE COURT:  Excuse me, ma'am.  Are we here -- I

15  thought we were here on your amended motion for relief from the

16  automatic stay.

17            MS. ISAAC:  Well, yes, Your Honor, we are.

18            THE COURT:  And what does that have to do with a late

19  -- motion for a late filed claim?

20            MS. ISAAC:  Well, I would also like to -- I was

21  wondering if I could in court file a motion for leave to refile

22  a late claim, and also amend that motion.

23            THE COURT:  Have you filed -- have you filed a motion

24  with the Court for leave to file a late filed claim?

25            MS. ISAAC:  No, sir.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Okay.  That's what you have to do.

2              MS. ISAAC:  No, Your Honor.  I'm sorry.

3              THE COURT:  You can file that motion most certainly,

4    but that's not before us today, okay?  So you can file that

5    motion and then that motion will come up at another time, and

6    then we can be -- you can be heard in connection with that

7    motion, but I can't entertain a motion that's not been filed

8    with the Court.

9              MS. ISAAC:  Yes, Your Honor.  Thank you.

10             THE COURT:  But what I would like you to address is

11   the motion you have filed, which is your amended motion for

12   relief from the automatic stay.

13             MS. ISAAC:  Yes, Your Honor.  Well, I filed that

14   motion for relief seeking only insurance funds because I was an

15   employee with the debtor, and I became subject to harassment,

16   and because of that harassment it prevented me from -- it

17   actually caused my health deterioration.

18             And I did file the motion for relief because right

19   now the debtors have claimed themselves that the evidence is

20   deteriorating and they're -- and they have not been in

21   bankruptcy less than a year, and they're claiming that because

22   of the bankruptcy the evidence that will help my case is

23   actually going to deteriorate.

24             So when the bankruptcy is over my case will be

25   prejudiced and will deny me due process, because my -- the

                    **J&J COURT TRANSCRIBERS, INC.**

56

1 evidence in my favor will have most likely have been

2 terminated.  And I don't wish to cause burden -- undue burden

3 or hardship to the estate of the debtors.

4        I only seek insurance funds.  Whether it's five

5 cents, $5 or $500,000, I do not wish to burden the estate of

6 the debtor.

7        THE COURT:  All right.  So your position is that you

8 have a claim against the debtor that you want to proceed with

9 in another court and that you're willing to limit your claim

10 only to the insurance proceeds that may be available, should

11 you prevail in that action?

12        MS. ISAAC:  Yes, Your Honor.

13        THE COURT:  Okay.  Thank you.  Let me get debtors'

14 counsel to respond.

15        MR. FOLEY:  Your Honor, we -- we did file a response

16 to the amended motion that sort of lays out the history of

17 where Ms. Ashley's [sic] alleged claim stands.  Your Honor, she

18 was noticed and scheduled with a bar date.  She did not file a

19 proof of claim.  Instead, she filed a lawsuit post-petition in

20 violation of the automatic stay, which has subsequently been

21 dismissed.  So there is no pending action to go back to, to

22 adjudicate a claim.  The entire case has been dismissed.

23        THE COURT:  Could the filing that she made, the

24 lawsuit be treated as an informal proof of claim?

25        MR. FOLEY:  I believe it was filed in Mr. Foley--

**J&J COURT TRANSCRIBERS, INC.**

57

1          MS. ISAAC:  Not to interrupt you, but it was May 3rd,

2  but --

3          MR. FOLEY:  It was --

4          THE COURT:  Ms. Ashley [sic], you need to be quiet

5  now, because Mr. Foley's addressing the Court, and you'll get

6  another opportunity to address the Court when he's done, okay?

7          MS. ISAAC:  Oh, yes, Your Honor.  I apologize.

8          THE COURT:  No problem.

9          MR. FOLEY:  Your Honor, it was filed on May 13th,

10  2009.  The bar date was January 31st, 2009.

11          THE COURT:  All right.

12          MR. FOLEY:  So it was filed after the bar date and it

13  was dismissed just a couple weeks ago by the District Court

14  judge in Louisiana, I believe -- in Alabama, Your Honor.

15  That's attached to our proceedings.  She did file a proof of

16  claim --

17          THE COURT:  So you're saying that there isn't

18  anything to --

19          MR. FOLEY:  There's no --

20          THE COURT:  -- list the stay, because there is no

21  case to go back to?

22          MR. FOLEY:  There's no case to go back to and there's

23  no claim.  Right now, she has lodged in July of '09 a late

24  proof of claim.  So I think what -- what I would suggest the

25  Court do is deny the motion for relief from stay without

**J&J COURT TRANSCRIBERS, INC.**

58

1  prejudice until -- unless and until Ms. Isaacs [sic] files a

2  motion to deem timely filed the claim she just filed in July,

3  for whatever reasons she may want to allege, and we'll deal

4  with that similarly with all the other requests for permission

5  to a late claim.

6        THE COURT:  And that's what Ms. Ashley was saying

7  when she first started, that she wanted leave to file a late

8  filed proof of claim, because that's really the issue that we

9  need to address in this matter, is that she needs to file that

10  motion.  And that's the motion we really need to have heard.

11  That's what you're saying?

12        MR. FOLEY:  And I believe this is -- this one's

13  premature, and so I think it -- I think the motion for relief,

14  since the case that she wanted to go back to is now dismissed,

15  can be denied without prejudice.

16        THE COURT:  All right.  Thank you, Mr. Foley.

17        MR. FOLEY:  Thank you, Your Honor.

18        THE COURT:  All right.  Ms. Ashley, do you wish to

19  reply?

20        MS. ISAAC:  No, Your Honor.

21        THE COURT:  Okay.  What Mr. Foley is suggesting is

22  that I deny your motion without prejudice.  What that means is

23  that you can bring it again if you deemed it appropriate.  But

24  because the case has already been dismissed by the Court,

25  there's no case for you to go back to if I granted the relief.

**J&J COURT TRANSCRIBERS, INC.**

59

1          But what you really need to do is file a motion with

2   this Court for leave to file a late-filed proof of claim, and

3   that's the motion we really need to hear.  And then based on

4   whatever the Court decides there, then we can, you know, see

5   how we proceed further.  Do you understand that?

6          MS. ISAAC:  Yes, Your Honor.

7          THE COURT:  Okay.  So that's what the Court's ruling

8   is going to be, is I'm going to deny your motion here today

9   without prejudice.  And then I would encourage you to file that

10  other motion for leave to file your late-filed proof of claim.

11         MS. ISAAC:  Thank you, Your Honor.

12         THE COURT:  You're welcome.

13         MS. ISAAC:  Your Honor, may I be excused?

14         THE COURT:  Yes, ma'am, you may be excused.

15         MS. ISAAC:  Thank you.

16         MR. FOLEY:  Thank you, Your Honor.  The remaining

17  items on the docket, items number 35 through 53, which are

18  previously filed omnibus claim objections on for status, as

19  well as items 54 through 56, which are omnibus objections that

20  are up for the first time today, will be addressed by Ms.

21  Boehm, and items 57 through 59 will be addressed by Mr. Galardi

22  in the context of item number 60, Your Honor.

23         THE COURT:  Very good.  Thank you.  Ms. Boehm,

24  welcome back.

25         MS. BOEHM:  Good afternoon.  Thank you very much.

**J&J COURT TRANSCRIBERS, INC.**

60

1  It's good to be back.

2            THE COURT:  How's the baby?

3            MS. BOEHM:  She's great.

4            THE COURT:  Wonderful.

5            MS. BOEHM:  Thank you.  Items 35 through 53, as Mr.

6  Foley mentioned, are status hearings on omnibus claim

7  objections that have been adjourned from previous omni

8  hearings, and are scheduled today for a continued status

9  hearing.

10            We are continuing to work through those claims for

11  which a response was filed with those claimants, and we would

12  ask the Court to adjourn the status hearing on those omnibus

13  objections to the October 15th hearing date.

14            THE COURT:  All right.  They'll be adjourned to

15  October 15.

16            MS. BOEHM:  Thank you, Your Honor.  That takes us to

17  item 54 on the agenda, which is the initial status conference

18  for the debtors' 27th omnibus objection.  They were very busy

19  while I was gone, Your Honor.  Omnibus objection number 27

20  sought the disallowance of certain tax claims on the basis of

21  no liability.

22            There were 85 claims included in that objection, and

23  to date we have received 10 responses.  For omnibus objection

24  28, which is item 55 on the agenda, we sought the disallowance

25  of certain amended claims.  Those -- that objection included 94

**J&J COURT TRANSCRIBERS, INC.**

61

1  claims, and we received three responses to date.

2          Omni 29, which is agenda item 56, sought the

3  disallowance of certain duplicative claims, which included 53

4  claims, and we have received one response to date.  With

5  respect to all the claims for which we received a response for

6  omni 27, 28 and 29, we would ask the Court to adjourn those

7  hearings over for further status conference to the October 15th

8  hearing date.

9          And with respect to claims for which no response was

10 filed we would ask the Court to order the relief requested in

11 those omnibus objections.  And as I understand the procedure

12 has been, we have submitted one order for each omni and the

13 exhibits reflect which claims are being adjourned and which

14 claims are being disallowed or the relief requested accordingly

15 in those objections.

16         THE COURT:  That's fine.

17         MS. BOEHM:  And we would propose to go forward with

18 that procedure with these, as well.

19         THE COURT:  All right.  Very good.  Does any party

20 wish to be heard in connection with matters 54, 55 or 56?  All

21 right.  The objections will be sustained as to all of the

22 claimants for which no response was filed, and then for the

23 claimants who filed responses, those matters will be carried

24 over to October 15.

25         MS. BOEHM:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

62

1            THE COURT:  You're welcome.

2            MR. GALARDI:  Again, Your Honor, for the record,

3   Gregg Galardi, and good afternoon.

4            THE COURT:  Good afternoon.

5            MR. GALARDI:  I think that brings us to matter 60,

6   and I first want to thank Mr. Foley, who is on the cover of the

7   Virginia Lawyer, on this topic for allowing me to do the

8   argument here.  My understanding --

9            THE COURT:  Since he is the expert.

10           MR. GALARDI:  He is the expert, and we have an

11  autographed copy for Mr. Marcum.  So he'll be signing outside.

12           (Laughter)

13           MR. GALARDI:  Your Honor, the topic is really a

14  threshold issue on 503(b)(9), and Your Honor, I also understand

15  that my -- you helped protect my integrity back at Hershey Park

16  when people were saying my name out so not to go to this topic.

17  So I appreciate that, as well.

18           MR. GALARDI:  The topic is simply, we've raised a

19  number of objections, a number of objections to the definition

20  -- actually, to the scope of the application of 503(b)(9) to

21  various claims that have been filed.  It is a dispute that I

22  know well, having gotten a win in one circuit and a loss in

23  another one with respect to what is the proper determination

24  and definition of goods to be used in Section 503(b)(9).

25           As Your Honor is well aware, having read the statute,

63

1  and this is only one of the definitional applications of

2  503(b)(9) that Your Honor will have to wrestle with I think

3  over the next few weeks, months and maybe even years of this

4  case is to, what is the kind of claim that actually fits within

5  503(b)(9).

6        We have taken the position in this case and I have in

7  other -- in other jurisdictions that the definition of goods is

8  to be interpreted according to the UCC definition of goods.  We

9  have objected, therefore, on a number of claims, Your Honor.

10 And having looked through a number of the objections I think

11 it's important to point out to all the objectors, I don't

12 believe that this necessarily resolves or gets rid of any of

13 those objections right now.

14        What we're really doing is a threshold issue to set

15 the framework to go forward with respect to those types of

16 objections.  Yes, it may be bear significantly on a number of

17 those, but for example, as I read the objections, certain of

18 the states filed their objection as a -- I mean a claim as a

19 503(b)(9).

20        It's clearly a 50 -- (a)(8) or something like that.

21 So we're not going to be disallowing claims based on this.

22 What I think we are doing is taking the important threshold

23 issue in sort of setting up for what the next evidentiary

24 matter will be is whether Your Honor would accept a definition

25 of the UCC and therefore, the predominant purpose test under

64

1  the UCC, which the <u>Goody's</u> court has accepted, or -- and I'll

2  just put the split, because I know the two cases intimately --

3  or whether Your Honor --

4           THE COURT:  Well, didn't Judge Sontchi in the <u>Goody's</u>

5  case say that he -- in a footnote -- he didn't need to reach

6  the predominant factor test, and that -- so he didn't make a

7  determination with regard to that?

8           MR. GALARDI:  Correct.  He only put his toe in the

9  water.  He didn't go all the way, Your Honor.  He did say it

10 would be the UCC.  We believe, then, the question is --

11          THE COURT:  He did, yes.

12          MR. GALARDI:  -- whether or not it's the predominant

13 purpose test, and that raises all sorts of issues between

14 you're interpreting a federal statute, whether you use the UCC.

15 The UCC, though adopted by most states, is a state law, and

16 certain states vary with respect to what actual tests.

17          So we only have to take one step right now, would you

18 rely on the definition of goods in the UCC.  And what that

19 actually means metaphysically is not clear to me, because

20 certain states use the predominant purpose test.  Some states

21 don't use the predominant purpose test.

22          THE COURT:  So which state do I look to, because I've

23 been told by the Fourth Circuit I'm supposed to look at state

24 law in interpreting these matters.

25          MR. GALARDI:  Well, if you're looking at state law,

1 Your Honor, we believe it would be the Virginia law that you

2 should adopt with respect to this.  It is a sale of goods.

3 Again, having had this dispute in Detroit, I can say you could

4 look at each of the states by which the persons would have

5 asserted reclamation under their applicable rates.

6        And so in this instance we could be in 48 states with

7 respect to each 48 vendors and what they could have relied on.

8        THE COURT:  And Puerto Rico.

9        MR. GALARDI:  And Puerto Rico, you're right, Your

10 Honor.  And so I think we were just really getting first to the

11 threshold issue.  Again, do we go to the UCC or not?  Do we go

12 to some other "ordinary course" definition of goods?  What I

13 think is important about the Sontchi opinion is Judge Sontchi

14 interprets the UCC to be "the ordinary course meaning of

15 goods."

16        So therefore, there really is no other meaning,

17 meaning of the word.  And then, for example, if we have vendors

18 in California delivering, then we can use the UCC there for it

19 to go to state law.  Or should we have a federal overlay to

20 this entire use of the definition?

21        I'm not sure that Congress says you have to go to

22 each state on this particular matter.  That's only if you buy

23 that it's a UCC and you believe that this is a reclamation

24 issue.  Your Honor may say, no, I don't think I need to go to

25 state law.

**J&J COURT TRANSCRIBERS, INC.**

1              I think we have to set a federal standard because the

2    federal bankruptcy law applies, and therefore, you can go

3    further to say that I think, you know, the general UCC law does

4    apply a predominant purpose.  So we'll adopt for bankruptcy and

5    for purposes of federal statute a predominant purpose test.

6              There are obviously winners and losers in that

7    analysis, Your Honor, and the debtors can win and lose on any

8    particular case.  For example, if you take a predominant

9    purpose test and it turns out that there are some value of

10   services there, that means you still have to pay the entire

11   claim.

12             It does not mean you get to carve out the services.

13   If you take what I'll call the Plastech view, you carve out

14   services and you carve out the goods.  Again, Your Honor, we

15   think that the better reasoned case -- and again,

16   unfortunately, legislative history here is -- to be candid, is

17   weak at best.

18             Notwithstanding that, if you look at the two -- the

19   place in which this statute came into effect and you look at

20   the changes, it is under, in legislative history, a reclamation

21   section, 1327 I think it is or something like that.

22             Second, it was hand and glove with the changes to the

23   reclamation statute, which changed the priority of the

24   reclamation claims and what you had to do.  And essentially, we

25   read it and we would advocate that the Court read it as a

1 catchall for reclamation claims where people did not actually

2 document their right to reclamation properly.

3         So it's supposed to capture reclamation.  And again,

4 we think that supports the UCC definition, because reclamation

5 is, at its heart, a UCC reclaimed goods.  So what we've tried

6 to argue and what we would advocate to Your Honor is, in the

7 proper framework Congress was looking at the reclamation

8 statute.

9         It changed it as a fallback position, because

10 reclamation claimants, as we know, have a difficulty of

11 documenting what they have.  But it still comes down to the

12 fact that they had to deliver goods within 20 days and the

13 goods should be the same goods that you could "reclaim."

14         And therefore, the definition should follow the UCC

15 definition, if you're going to apply a procedure.  You also

16 note that it's an administrative claim.  So we have the general

17 law that most jurisdictions have, that those are to be

18 construed narrowly.

19         And so our view would be, one, adopt a UCC standard

20 definition of goods, two, Your Honor may not have to go to the

21 predominant purpose.  I think Your Honor could say that the

22 predominant purpose is the appropriate standard to apply.  And

23 then set for hearing evidence where the debtor could dispute

24 with parties whether the predominant purpose of the delivery of

25 goods.

1     So we have, for example here, a number of examples.

2  One, bringing laminates and cabinets into our buildings.  Okay.

3  Did we hire them to perform services or did we buy the cabinets

4  and the laminate?  Did we buy the signs to have them install

5  them, or did we have the signs because we wanted signs?

6     Did we have concrete and fixtures delivered to the

7  property because we wanted to buy concrete from this person, or

8  they wanted to do -- do renovations on our buildings?  If you

9  don't do that, then we're going to have to, and I think this

10  goes to gamesmanship, and I'm not sure that people will go do

11  this on their invoices, but then they're going to demarcate

12  their invoices as, here's the goods, here's the materials and

13  so now I got to go through everyone of those now and say, okay,

14  I have to pay for the goods; I don't pay for the materials.

15     Now, Judge Shefferly at <u>Plastech</u> said, well, I'm

16  sorry; that's maybe what you're going to have to do.  I happen

17  to disagree with that position because, one, you never know

18  what the value of those goods is because now, you look at the

19  invoice, and would I have bought the goods, would I have bought

20  the concrete from one of the protected people here if I was

21  really interested to buy concrete.

22     Is there embedded costs in that?  That's why I think

23  the UCC's gone to the predominant purpose.  First, make the

24  decision of predominant purpose.  If you can show that the

25  predominant purpose was to do services, then that's the end of

**J&J COURT TRANSCRIBERS, INC.**

1  the matter.

2          If you do show that the predominant purposes is

3  goods, then that's the end of the matter.  We think that that's

4  the -- one, the approach that, to the extent any congressional

5  intent could be deemed here at all -- we would think that that

6  was consistent with the congressional intent.

7          Two, if you just look at the way the statute works

8  with reclamation, it seems the right way to work it.  Three,

9  the definition of the UCC is a common sense definition, and

10  four, the Bankruptcy Code uses the word, "goods and services,"

11  and there has to be a distinction between goods and services.

12          So then we can only get into the nuances of what UCC

13  law apply.  For example, I've had to wrestle with under certain

14  states natural gas is a good.  In certain states it's not a

15  good.  Do we have one federal "UCC definition," or are we going

16  to have state definitions?

17          But until we can say it's the UCC, you don't have the

18  next step of which UCC?  Do I apply federal common law, which

19  we can create, or do I apply state law for each state, because

20  this vendor in this case has a better UCC law than in this

21  case.  Your Honor, it's absolutely --

22          THE COURT:  That doesn't seem a very practical way of

23  proceeding, though.  There's got to be a federal definition for

24  the word.

25          MR. GALARDI:  Your Honor, that would --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  But we look to state law to try to help

2     us get the federal definition.

3          MR. GALARDI:  Your Honor, that's exactly our

4     position.  I think, you know, again, though Judge Sontchi

5     didn't get there, though Judge Shefferly wouldn't get there,

6     I'll guess I'll have -- you have the opportunity to get there,

7     because I think the only workable solution with the federal

8     bankruptcy statute is very much like the ethics rules for

9     lawyers.

10          You look to the state, but you create a model,

11    federal code to interpret the federal statute in these

12    instances, and adopt what you believe is the workable

13    definition that's consistent with the congressional intent.

14    Congressional intent is at best sparse here, but it is in the

15    context of a reclamation statute.

16          It makes sense to use a UCC definition of goods.  And

17    then you look at what the majority opinion of the states are

18    UCC, and the majority is a predominant purpose test.  And if

19    the majority is a prominent purpose test, though you can't say

20    that's what Congress intended -- I don't think Congress

21    intended anything -- that's the most workable definition and it

22    sets up what the evidentiary issues for the parties, was the

23    intent of the predominant purpose of a transaction to have

24    services rendered or to have goods.

25          I can only give you some examples here of if we sent

1  out a stereo to put in parts, to bring back, did I sent it out

2  to be serviced or did I send it to do parts?  And in the

3  Plastech problem that I've had is we send motors out.  They put

4  little pieces in.  They send it back.

5       Now, we got to figure out what the price of those

6  little pieces are.  Now, that's not for Judge Shefferly a

7  reason to say those aren't goods, but I think it's an

8  unworkable federal scheme, and this is a federal statute that

9  has to set a standard across the country.

10      And Your Honor has the opportunity to do that.  I

11  think Judge Sontchi has gotten it right with the UCC, and the

12  only question now is we haven't had to have the issue of

13  predominant purpose.  I think you will have that issue raised.

14  I don't know if Your Honor has any other questions for me.

15      THE COURT:  In applying the predominant purpose test

16  do you look at the cost of the goods versus the cost of the

17  services, and whichever is more on the scale, if that's what

18  you apply, or do you look what the intent of the parties was as

19  far as what the they really wanted, and does that get into

20  subjective analysis?  How do you apply the test?

21      MR. GALARDI:  Your Honor, I think you apply it

22  exactly how the UCC does, and I don't think it's a simply slam-

23  dunk of where the goods are more expensive or not expensive is.

24  And again, it is subjective.  It is an evidentiary matter, but

25  it's testimony that I would anticipate putting on from our

72

1  witnesses saying, why did you contact this person and for what

2  purpose.

3          If they need to use a very expensive piece, but you

4  were doing it because of their expertise, and they're the only

5  one that could do this, then that may be a small -- it may be a

6  very expensive piece, but you contacted them because of the

7  professional services they can put in there.

8          So I don't think you can do a bright line where we

9  have more services and goods in our invoices.  That's -- you

10  know -- that would even make people, if they were really

11  manipulative, to jack up the price of the goods and down-price

12  their services, so in case of a bankruptcy.

13          I think it's really the question is, why did you hire

14  those people.  Why did you ask them to perform x or y or z?

15  Were you going to them as a marketer of goods, or are you going

16  to them as a provider of services?  Again, my dispute, say,

17  with <u>Plastech</u> on the <u>Astroturf</u> case was, we weren't calling

18  them to deliver salt and silicon to do the parks.

19          We were calling them to remove the ice and the snow,

20  and it was a happenstance that they used parts.  I think that's

21  an unworkable standard.  And so through the judge said, well,

22  they did deliver this, but we could have bought, and the

23  testimony quite there was, you could have bought sand and salt

24  and done it yourself.

25          I didn't go to them for that.  I gave them to perform

**J&J COURT TRANSCRIBERS, INC.**

1  a service.  He said, nonetheless, you got salt and sand and

2  chemicals; you're going to pay for that.  That to me is an

3  unworkable standard and that's why I think the predominant

4  purpose and that's why I think the UCC is the appropriate

5  standard.

6          The other aspect of this is, this is what the vendors

7  who sell goods understand to be the standard.  They may not

8  like it, but outside of bankruptcy this is what would govern

9  their right to reclaim this.  They can't reclaim it if it's a

10 service.

11         So consequently, I think it does the least damage to

12 what I'll call the commercial relationships that exist,

13 regardless of the bankruptcy.  So that would be another reason

14 we would advocate the predominant purpose.  And then, yes,

15 you're going to have disputes like you have under the UCC, but

16 they're no different than the disputes you would have under the

17 UCC and it's not a simple, you paid more for goods than

18 services.

19         It's, what were the intentions of the parties and how

20 do you hold yourself out to sale?  What you see in some of

21 these objections is, well, I gave you a bus to transport goods,

22 or, I gave you a security guard.  You know, a security guard is

23 not a good under any commercial sense of the UCC.

24         THE COURT:  No.  It's the adoption of the 13th

25 Amendment.

**J&J COURT TRANSCRIBERS, INC.**

74

1              MR. GALARDI:  Exactly.  So and you're not going to

2    reclaim -- you may call them back, but you're not going to

3    reclaim the security guard.  So that's the kind of manipulation

4    that's going on side -- that side, from the vendor's

5    perspective.  So the -- clearly, why I retained them was to

6    perform a service.

7              Why I asked for somebody to come in -- and I'm not

8    trying to put the rabbit in the hat on any of these people, but

9    why I hired a security service to install -- it's not because

10   they used this little wire and this box.  It's because they

11   could put a whole system together, and I'm asking them to

12   perform a service.

13             Inevitably, they had to put some piece of good in my

14   property.  They're not going to reclaim that under the UCC, and

15   I don't think, therefore, they should get the 503(b)(9) claim

16   under the Bankruptcy Code.  And I think those are why they have

17   to go hand in glove.

18             THE COURT:  All right.  Very good.  So today what

19   you're asking me to do with regard to the objection that you

20   have filed to these claims is -- is basically a motion for a

21   partial summary judgment on what is the standard to be applied

22   as far as goods is concerned and whether or not the predominant

23   purpose test be applied in these cases.

24             MR. GALARDI:  That is exactly right, Your Honor.

25             THE COURT:  And the --

**J&J COURT TRANSCRIBERS, INC.**

1           MR. GALARDI:  And that's not to allow or disallow any

2    claim.  Obviously, there will be a dialogue once you've set the

3    standard.  As to whether the parties want to go forward and

4    meet that standard or not, we hope that it'll resolve and

5    expedite a lot of the issues going forward.

6           THE COURT:  All right.  Very good.  Thank you.

7           MR. GALARDI:  Thank you.

8           THE COURT:  All right.  Does any party in the

9    courtroom wish to be heard in connection with this matter?

10          MR. PERKINS:  Good afternoon, Your Honor.  Chris

11   Perkins, on behalf of Schimenti Construction Company, LLC.

12   Schimenti furnished goods and services in connection with its

13   build-out and remodeling of several of the retail locations.

14          And it filed a 503(b)(9) claim for approximately

15   $47,000, which amount represented solely the goods portion of

16   that contract.  It filed a separate and much larger claim

17   related to the labor involved in that contract.  And I would

18   agree with the Court and the debtors that there are two issues

19   before the Court today:  what is the definition of goods, and

20   then whether the predominant purpose test applies.

21          And I think as to the first issue I'm not sure that

22   there's a whole lot of debate over that, what the definition of

23   goods is.  I've managed to skim through most of the responses,

24   and I don't think a lot of folks -- and of course, they'll

25   speak for themselves -- take issue with the definition of goods

1 being that defined by the UCC under section 2105, relying on

2 the concept of movability.

3       And I certainly on behalf of Schimenti don't oppose

4 that definition and agree with the debtors that that definition

5 should apply for the term goods.  It's as to the second issue

6 and the treatment of the predominant purpose test that I depart

7 ways with the debtor, and for a number of reasons.

8       The debtors are suggesting that this is an all or

9 nothing approach, that the predominant purpose test should

10 apply, which as the Court well knows, looks at the overall

11 transaction and then picks one or the other.  Is it a good or

12 is it a service, and it can only be one under the predominant

13 purpose test.  Winner take all.

14       Schimenti respectfully disagrees with the debtor that

15 that's the proper position to take and suggests --

16       THE COURT:  Well, if I'm looking at the definition of

17 goods under the UCC, don't I have to take that definition with

18 how it's been interpreted by, you know, the various states or

19 the majority of states that have looked at it for purposes --

20 and it does arise in the context of the reclamation statute,

21 and factor that in?

22       MR. PERKINS:  Well, I think reclamation is a

23 different issue, and I'm going to address that in a moment.

24       THE COURT:  Okay.

25       MR. PERKINS:  But as it comes to the predominant

77

1  purpose test, you don't have to look at that for you to

2  determine if it's a good.  Okay.  I think it's a two-step

3  process.  First, is it a good?  Okay.  It's a good.  Now, was

4  it involved in a mixed transaction where there was also

5  services involved?

6        You can adopt the UCC definition of good as a

7  movable, identifiable object before you get to the predominant

8  purpose test.  So for example in Schimenti, it's construction.

9  We provided doors, windows, lumber, things like that.  Those

10  are goods.  I don't think anybody would suggest they're not.

11        Now, we also provided labor to install it.  Then you

12  get to that second step.  Okay.  Do we apply a predominant

13  purpose test or not?  But the predominant purpose test doesn't

14  help you decide whether it's a good or not.  That's what that

15  first concept is all about.  All right.

16        So -- and I'm in agreement with that.  Good is what

17  the UCC says is good.  All right.  Then we get to whether the

18  predominant purpose applies, and I'm submitting to the Court

19  that that -- that it should not apply, and for a number of

20  reasons, but first of all, being that it's an all or nothing

21  approach.

22        I believe that we can apportion the claim as to the

23  goods and the labor, as Schimenti has done and as many of the

24  other creditors that are subject to this omnibus objection have

25  done, and that is goods would get the administrative priority

**J&J COURT TRANSCRIBERS, INC.**

78

1    claim under 503(b)(9) and the labor would fall in under the

2    unsecured in our creditors' pool.

3            Now, the reason I take this position is for a couple

4    reasons.  First of all, there is no authority in the Fourth

5    Circuit or anywhere in the country for the debtors' position

6    that the predominant purpose applies.  As the Court pointed

7    out, Goody's does not take that position, and there are no

8    cases out there that do.

9            The cases cited by the debtor that talk about the

10   predominant purpose test are nonbankruptcy cases, cases

11   involving contract disputes.  For example, the Princess Cruises

12   case in the District Court in Virginia, those are nonbankruptcy

13   cases that deal with contract disputes, and the reason they

14   were talking about the predominant purpose test is because they

15   were trying to decide what law are we going to apply here.

16           I have a contract.  Is it governed by the UCC or is

17   it governed by common law of contracts?  And in order for me,

18   the District Court and Princess Cruises to decide which law to

19   apply, I have to apply the predominant purpose test and decide

20   whether this transaction was a goods transaction or was it a

21   services transaction.

22           So it was in that framework that you looked at the

23   predominant purpose test to help the Court decide what law to

24   apply.  That's not the question here.  This Court isn't trying

25   to figure out which law to apply.  This Court is assessing

**J&J COURT TRANSCRIBERS, INC.**

79

1  whether these claim for goods are entitled to 503(b)(9) status,

2  not do we apply UCC or do we apply contract law.

3        And that's the reason why Judge Shefferly in the

4  <u>Plastech</u> case said predominant purpose is not the right test;

5  we don't look at that here.  We're talking about 503(b)(9).

6  That case is right on point.  I'm sure the Court's had an

7  opportunity to look at it.  If you haven't, I --

8        THE COURT:  I've got it right here.

9        MR. PERKINS:  Okay.  That case is procedurally in the

10 same posture we are now.  The debtor filed an omnibus objection

11 to a number of 503(b)(9) claims where it says, these are

12 misclassified, these aren't goods, and several of the creditors

13 came forward with their responses.  The Court look at the very

14 same issues.

15       And this is what the Court decided, and I think it's

16 pretty instructive to walk through that case briefly.  The

17 Court said goods is the UCC definition of goods.  Second step,

18 do I apply the predominant purpose test?  Court said, no, I'm

19 not going to apply it, and here's why; it's al all or nothing

20 test; if I adopt this test I'm going to reward creditors whose

21 transactions are predominantly goods, but contain some

22 services; give them 503(b)(9) status for their entire claim,

23 even though some of those services no one's even arguing are

24 entitled to anything better than an unsecured priority.

25       Similarly, it's going to penalize folks whose claims

**J&J COURT TRANSCRIBERS, INC.**

80

1   are predominantly services, but there's no question there are

2   bids involved.  So it's an imperfect test, certainly not

3   equitable, and that's what we're all about here in bankruptcy,

4   under a 503(b)(9) analysis, as opposed to the Princess Cruises,

5   where they're just simply trying to look at which law applies.

6          The second reason in Plastech, which I think is

7   instructive, is let's look at the statute.  It's right there in

8   plain English, and 503(b)(9) says that administrative priority

9   is given to the value of any goods received, any goods

10  received.  And it's the word "any" that I believe is very

11  important to the analysis here.

12         They're not just talking about goods, but the statute

13  says the value of any goods received, which would indicate to

14  me that Congress was intending to allow 503(b)(9) status to any

15  goods, regardless of the fact that they might be involved in a

16  transaction that also includes services.

17         And to be true to the meaning of the statute and the

18  plain language of the statute, that's what we have to agree.

19  We don't take predominant purpose and throw out the goods

20  portion, because the statute actually says the value of any

21  goods received.

22         And Your Honor, I might add one more that's no in the

23  Plastech case, but let's think of an example where we decide

24  we're going to apply the predominant purpose test and --

25         THE COURT:  Well, don't I have -- aren't I ignoring,

**J&J COURT TRANSCRIBERS, INC.**

81

1   then, the second part of the statute which talks about -- where

2   it says which goods have been sold fo the debtor?  I mean,

3   isn't that where this predominant factor test comes in, about

4   whether or not we were selling goods to the debtor?

5           And going back to Mr. Galardi's argument, you know,

6   if you were -- were you really selling concrete to the debtor

7   or were you, you know, molding the concrete, you know, into a

8   sidewalk or --

9           MR. PERKINS:  Right.

10          THE COURT:  -- or whatever.

11          MR. PERKINS:  Right.  Well, you're doing both; you're

12  doing both.  You're both selling the product and you're

13  installing it.  If the debtor wanted to, it could have gone and

14  bought the product and then just hired somebody to install it,

15  but it hired somebody to do both.  So I believe you can break

16  it down.

17          THE COURT:  But isn't -- all I was getting at, isn't

18  it in that context that the predominant purpose test comes into

19  play here, as far as whether or not you're going to do the

20  demarcation that you're talking about and set aside the goods

21  and set aside the services, if you -- to the extent you can

22  possibly do that, and that'd be a very fact intensive thing or

23  whether you're going to look at, okay, what was the overall,

24  you know, intent here?  Was it to sell services or was it to

25  sell these particular goods?

82

1          MR. PERKINS:  I -- yeah.

2          THE COURT:  And then in that context if we're looking

3   at the UCC and what the overall purpose of the statute was, you

4   know, could you have reclaimed your goods?  You know, could you

5   have gone back and gotten your concrete or --

6          MR. PERKINS:  Right.

7          THE COURT:  -- had it already set?  And so there

8   wouldn't have been a reclamation right at all.

9          MR. PERKINS:  Well, I think that's a proper

10  description of what the predominant purpose test is all about

11  and why it -- why it does what it does.  I still maintain, as I

12  said before, that it's not the right case to be applied in this

13  framework.

14          And as it relates to reclamation -- and this was

15  specifically looked at in the Plastech case -- the Court there

16  said, I don't see anywhere, where 503(b)(9) says anything about

17  reclamation.  In fact, the statute says any goods.  It doesn't

18  say only those goods that are reclaimable.

19          It doesn't put any qualification on goods.  It's the

20  -- you'd have to imply that those are reclaimable goods.  And

21  it doesn't say that.  It actually says, any goods.  So for

22  those reasons, the Court there said that that's not

23  appropriate.  It's not a reclamation concept.

24          It smells like it, but it's not, and it's not in the

25  language of the statute.  Had they wanted to put it in there,

**J&J COURT TRANSCRIBERS, INC.**

83

1  they could have, but they didn't.  In fact, they went even

2  further and they put the word "any goods" in there, which

3  indicates that what they meant was any goods, whether they're

4  reclaimable or not, whether they're involved in a combined

5  mixture of services and goods or not.

6       So Your Honor, I think -- well, the Court obviously

7  doesn't have a lot of law to go on.  The _Plastech_ case I think

8  is well-reasoned.  It addresses all of the issues.  As it

9  relates to the efficiency concept and do we have to have a

10 whole lot of fact-intensive inquiries here, in this case we're

11 only talking about -- I think there's only 20 claimants who

12 responded, and many of those were taxes and many of those have

13 changed their position.

14      I would submit that we're down to maybe a handful at

15 this point.  So I don't think the deficiencies really -- really

16 weight in.  And I would urge the Court to adopt the _Plastech_

17 analysis, adopt the definition of goods under the UCC, but

18 reject the predominant purpose test.

19      THE COURT:  When your client sends a bill to the

20 debtor --

21      MR. PERKINS:  Yes, sir.

22      THE COURT:  -- does it break down the services and

23 break down the goods, or do you have to go back and try to

24 reinvent all that after the fact?

25      MR. PERKINS:  I can't say what the ordinary course is

84

1  for my folks.  But in our proof of claim, which is some 140

2  pages long, it is broken down.

3              THE COURT:  I saw that.

4              MR. PERKINS:  Now, whether they went back and did

5  that for the proof of claim or whether they --

6              THE COURT:  That's what I -- that's why I asked that

7  question.

8              MR. PERKINS:  I don't know the answer to that,

9  frankly, Your Honor.

10             THE COURT:  Okay.  Fair enough.  Thank you, Mr.

11 Perkins.

12             MR. PERKINS:  Thank you.

13             MR. REPCZYNSKI:  Good afternoon again, Your Honor.

14             THE COURT:  Good afternoon.

15             MR. REPCZYNSKI:  Thomas Repczynski, appearing in this

16 matter on behalf of Graphic Communications, Inc., one of the

17 respondents to the fifth omnibus objection.  Like my colleague

18 before me, I think it's easy to set up an argument where one

19 doesn't exist.

20             I think I can respectfully stand before the Court and

21 say, we agree the UCC definition of goods applies.  I think

22 that gets us a long way, perhaps, because I don't know where

23 else, you know, we would be looking, although the debtors --

24 you know -- debtors' counsel stands before the Court and says,

25 okay, well, what does that now mean.

**J&J COURT TRANSCRIBERS, INC.**

85

1          To say that the UCC applies obviously brings with it

2   the baggage that was discussed about deciding what state law

3   applies or does the Court somehow adopt a UCC definition and

4   make that federal law, because that's what was intended by the

5   -- by the Congress.  I think --

6          THE COURT:  Well, the other that have looked at it,

7   looked at what they call the ordinary meaning and they've come

8   to the same thing, that it's movable property.  They've looked

9   at <u>Black's Law Dictionary</u> and said, whoops, it means movable

10  property there and they've looked at <u>Webster's</u>, you know.

11         So we can look in a lot of different places and you

12  sort of circle back to the UCC definition.  This is probably as

13  good a definition -- and in looking at all of the papers that

14  was filed, didn't look to me like anybody was really taking

15  issue with, you know, how we were going to define goods as

16  movable property.

17         MR. REPCZYNSKI:  I think that's right, Your Honor,

18  and I know I can say specifically with regard to Graphic

19  Communications' claim, we feel like there's been a little bit

20  of a bait and switch here today, and I don't think there was an

21  expectation that we were going to come in here and simply

22  discuss esoterically.

23         The Court has now sort of framed it and debtor agreed

24  to frame it in the context of a partial summary judgment, but

25  coming in today, we had a claim objection and we had a response

**J&J COURT TRANSCRIBERS, INC.**

1  to that objection, and it was agreed that we're going forward

2  on this, it's not going to be continued.

3         So we came in expecting that there is enough here,

4  with regard at least to my client's claim, we believe, to

5  resolve the objection and find that this is a 503(b)(9).  So I

6  can appreciate somewhat that now we're simply looking at it and

7  say, let's look and decide what are goods; then we'll go back

8  and we'll apply it to each case.

9         But of all the examples that were given by debtors'

10 counsel and the -- it's not a situation there; it's not a

11 situation where -- and we went through the various types of

12 facts, my client produced leaflets, over 10 million Circuit

13 City flyers that we all get in our mail -- or not in the mail

14 necessarily, could be in the newspaper, but the leaflets, over

15 10 million of them, in this case for a specific job.

16        But with that in mind, the ability to say, one, that

17 these pamphlets that were produced, these leaflets that were

18 produced aren't movable or aren't goods, for me really sort of

19 gets us beyond, do we have to even sit here and decide as a

20 threshold matter, or can we simply move and say, well, there

21 are goods; they are movable; we agree; we accept the definition

22 as it's proposed; as between the parties, then, there's no

23 disagreement as to what is or is not a good.

24        We have leaflets.  We have over 10 million of them.

25 And we billed -- and we billed for the production of them.  The

**J&J COURT TRANSCRIBERS, INC.**

87

1  question then becomes, at least with regard to Graphic

2  Communications, where do you draw that line.  If I have a

3  movable good, are we stuck in that same sort of -- the Court

4  used the pouring the concrete examples, because it was

5  Schimenti in front of it.

6          There then became a question of is it reclaimable.

7  And you somehow find that, well, ultimately, I think the Court

8  agrees yes, you could take that concrete back.  It may not --

9  it may --

10         THE COURT:  But would you.

11         MR. REPCZYNSKI:  Would you, right?  And I'd argue in

12 a different context, ultimately, through the Bankruptcy Court

13 in Norfolk all the way through the Fourth Circuit a number of

14 years ago about, did you have a purchase money security

15 interest in something that ultimately got attached, and

16 frankly, it wasn't discussed in a reclamation context, but

17 similarly, could you and would you and did you have those

18 rights.

19         We don't have to look at that for purposes of my

20 client's claim.  So as I thought about that, because clearly,

21 there are goods.  There are leaflets that were reclaimable.  So

22 when the Court was asked to find that test, what makes sense,

23 to have to determine a predominant purpose, I don't the Court

24 has to go there, at least not with regard to Graphic

25 Communications.

**J&J COURT TRANSCRIBERS, INC.**

1          So I presume there are other situations where the

2   Court wouldn't have to go that far, either.  The Court raised

3   the question -- I hear Schimenti's counsel saying it -- you

4   don't have to -- it's not our reclamation issue, can they be

5   reclaimed.

6          But if the Court's inclined to go there, if the

7   debtors' inclined to have us go there, then I believe that the

8   Court should find and can find here today on the facts before

9   it that Graphic Communications is making a 503(b)(9) claim for

10  goods, reclaimable, movable goods, as that is understood.  Now,

11  the Court has before it --

12         THE COURT:  But you've got a different issue, which

13  apparently is not before me today, and that is whether you sold

14  the goods to the debtor, and you know, did the debtor take

15  title to those pamphlets.  Or were they delivered to a

16  newspaper and belonged to the newspaper and the newspaper

17  distributed them.

18         And you know, so -- but that's -- as I understand --

19  that's why I was trying to get some closure around it when I

20  was asking Mr. Galardi what was before me today and what -- and

21  that's why I said I was just going to decide the two issues of

22  goods or predominant purpose test, and not reach that issue,

23  which is whether or not title passed to Circuit City in those

24  pamphlets; in other words, there was a sale of a good.

25         MR. REPCZYNSKI:  I understand the Court's asking.  I

89

1  can only tell you, that's where I mentioned the bait and switch

2  sentiment, because I felt that --

3       THE COURT:  Because you were prepared to address

4  that.

5       MR. REPCZYNSKI:  Well, what I was prepared to say

6  was, debtor did not raise in its objection the issue of the

7  title, the issue of the value that it received.  So our

8  position as we sit here before the Court is, we had a claim

9  objection where value was not questioned as to whether or not

10  Circuit City received value for the goods or nongoods, as they

11  might be.

12       Merely, the only objection raised by Circuit City is,

13  is it a good or not a good, essentially leaving before the

14  Court, I believe, if you find that it's a good, the debtor has

15  not raised a separate objection, then my claim is a good one.

16  They stand before the Court here today -- and I only heard

17  literally for the first time that, oh, no, no, we're simply

18  making this a threshold issue with regard to all these claims

19  and we want the right to come back later and make other

20  determinations.

21       I get it.  I understand why they're doing it, but I

22  certainly appreciated the Court's asking and looked forward to

23  the respond, and was only then surprised to hear that we're

24  just here on what was ultimately determined to be a partial

25  summary judgment.

**J&J COURT TRANSCRIBERS, INC.**

1          My client put forward a response to the objection

2    supported by Mr. Drake's affidavit and the bills that apply

3    there.  and I think to the extent there is any question at all

4    on that -- on the title issue, because again, I don't think you

5    have to go there, but the question, really, for Graphic

6    Communications was, here, remove-ability, not a question.

7          As the Court's -- we sold goods.  Clearly, the

8    invoices there are for, here's your 10 million.  In fact,

9    there's even a reference on the invoices as put forward there

10   that says, title to the paper that -- as used in the production

11   of this does not pass until the paper is delivered and paid

12   for.

13          So there's a question of the title, it being used or

14   implemented, I guess, in the -- in the billing itself.  These

15   flyers were produced.  That's what they were -- that's what

16   they were asked to do.  The Court wants to look to the

17   predominant purpose test, I think we're prepared to say, the

18   predominant purpose test with regard to Graphic Communications,

19   as I thought we were supposed to be prepared to do today, was

20   to produce and get the flyers out there.

21          Circuit City was trying to avoid going into

22   bankruptcy.  It was having sales.  It was trying to make

23   everyone aware of the fact they should come to Circuit City and

24   sell [sic] these products.  We did what we were asked.  So our

25   arguments were based on the only one case that debtor put

**J&J COURT TRANSCRIBERS, INC.**

91

1   forward, the in re <u>Deere</u> case out of the Southern District of

2   Mississippi, a 2007 bankruptcy case, the only one that it can

3   point to in the 503(b)(9) context with regard to calling what

4   Graphic did here advertising services.

5          And so I stand before the Court to say, this was not

6   advertising services as contemplated by that <u>Deere</u> case and the

7   cases that it relied upon.  The only cases that -- well, <u>Deere</u>

8   itself and the cases that it relies upon were YellowBook

9   advertising, where there's a -- the contract for the taking out

10  of an ad in a book and whether or not that itself was deemed to

11  be a service provision or a good.  Under the circumstances --

12         THE COURT:  So you're saying that, if I understand

13  your argument, just so I can be clear on it, that I should

14  apply the predominant purpose test, but your claim would pass

15  the predominant purpose test for the reasons that you've just

16  outlined.

17         MR. REPCZYNSKI:  Close, but --

18         THE COURT:  Okay.

19         MR. REPCZYNSKI:  -- I don't think you need to apply

20  the predominant purpose test, but clearly, if the Court decides

21  to go there with regard to Graphic Communication, our position

22  is we absolutely satisfy it.  And the cases that are cited to

23  the Court -- in fact, I've included for the Court with -- with

24  our pleading -- indicate that the production of a movable item,

25  such as this pamphlet or leaflet or however you want to

**J&J COURT TRANSCRIBERS, INC.**

92

1 determine it as Graphic Communication provided, is wholly

2 different from the notion of advertising services as is the

3 only position the debtor -- debtors have taken with regard to

4 Graphic Communications' claim.

5        So should the Court determine that the predominant

6 purpose test is necessary, we don't think the Court needs to go

7 there.  You have these movable goods for us.  But if the Court

8 goes there, then yes, we do satisfy that test.

9        THE COURT:  All right.  I understand.

10        MR. REPCZYNSKI:  Thank you, Your Honor.

11        THE COURT:  Thank you.  Does any other party in the

12 courtroom wish to be heard?  Mr. Hutson?

13        MR. HUTSON:  Good afternoon, again, Your Honor.

14 Richard Hutson, on behalf of U.S. Signs, Incorporated.  We were

15 a part of the debtors fifth omnibus objection.  We filed a

16 503(b)(9) claim, I believe somewhere in the nature of $108,000.

17 I, like the gentleman before me, came here prepared to argue in

18 response to debtors' objection.

19        We certainly don't have an objection to the use of

20 the UCC definition of goods.  I made that argument in my brief,

21 Your Honor.  And like the gentleman before me, I certainly

22 don't believe that there's a need to adjourn this matter, even

23 further, at least with regards to U.S. Signs.

24        Just to put it in perspective, Your Honor, the signs

25 we're talking about with regard to my client are the signs we

**J&J COURT TRANSCRIBERS, INC.**

93

1 see every day in abandoned Circuit City stores, the Circuit

2 City signs.  I find it hard to believe that the debtors can say

3 that these are not goods within the definition of the UCC.

4         I take no position, really, with regard to whether we

5 apply the predominant purpose test.  I believe that there's no

6 need in our instance to reach that conclusion, the reach the

7 predominant purpose test.  If we look at the UCC it

8 certainly -- certainly, signs, all of the material that's used

9 to create signs are goods and are movable at the time of the

10 contract.

11         The definition of the UCC 2-105, 8.2-105, includes

12 specially manufactured goods.  Certainly, our signs would be

13 included within this definition.  I believe there is no need to

14 reach a predominant purpose test and we can resolve those

15 objections today.

16         I would -- we certainly offered a declaration to that

17 effect.  U.S. Signs is a manufacturer and a creator of signs,

18 and an installer of signs.  Certainly, if you'd like to apply

19 the predominant purpose test, I certainly don't believe that

20 the debtors could use the materials for anything other than to

21 create the signs.

22         You know, if they took it back there would be nothing

23 to do with it.  Certainly, under the manufacture -- specially

24 manufactured goods definition of the UCC 2-201, you know,

25 specially manufactured goods are not suitable for sale to other

**J&J COURT TRANSCRIBERS, INC.**

94

1  -- to others in the ordinary course of a seller's business.

2           Certainly, as we see, those signs are still there.

3  They're not suitable for use by anyone else, but in either

4  case, the predominant focus, you know, for this transaction

5  certainly was to create those signs, and for the sale of those

6  signs to Circuit City.

7           I don't see how they can object to that.  And if

8  there is some -- you know -- they would like to argue with

9  that, I certainly believe we can resolve that today.

10          THE COURT:  Well, if I understand your argument, that

11 you were actually selling the signs and that was the business

12 of which you were doing, if I was to apply the predominant

13 purpose test to your claim you would say that the predominant

14 purpose was to sell the actual signage.

15          MR. HUTSON:  That's correct.

16          THE COURT:  And that the installation of the signs

17 was --

18          MR. HUTSON:  Incidental, Your Honor.

19          THE COURT:  -- antecedent to that, and that you would

20 be able to then, if I adopted that test, recover your entire

21 claim and you wouldn't have to bifurcate it into that for which

22 you --

23          MR. HUTSON:  For services.

24          THE COURT:  -- provided installing services in that

25 which you were providing the goods.

**J&J COURT TRANSCRIBERS, INC.**

95

1          MR. HUTSON:  That's exactly -- that's exactly right,

2    Your Honor.

3          THE COURT:  So you would say I should apply the

4    predominant purpose test?

5          MR. HUTSON:  I believe that -- I don't -- I believe

6    that we don't even need to reach that, particularly with the

7    use of the specially manufactured good portion of the

8    definition.  But if there is a need I do believe we can

9    recover, you know, our entire claim based on that, as well.

10          Certainly, I don't see how the debtors can enter into

11   a transaction for -- to purchase a sign, essentially, and not,

12   you know, purchase the materials used to create that specific

13   sign, as well as the installation services for the specific

14   sign, and you know, keeping in mind, the type of signs that

15   we're talking about here.

16          So with that, Your Honor, I ask that we -- you

17   know -- if the Court's going to adopt the UCC definition, I

18   certainly don't object to that, but I certainly would like to

19   resolve that definition, at least with regard to U.S. Signs.

20          THE COURT:  All right.  Thank you.  Does any other

21   party in the courtroom wish to be heard on this matter?  All

22   right.  I'm going to turn to the phone.  Does any party on the

23   phone wish to be heard on this matter?  All right, Mr. Galardi.

24          MR. GALARDI:  Okay.  I'm going to work backwards,

25   Your Honor, just to show how critical -- actually, I'm going to

96

1  work from the statute first, and then I'll -- I'll take up each

2  of the responses.

3          First, Your Honor, the first question is whether

4  reclamation has anything to do with this at all.  And I state

5  with the reclamation statute, which is 546.  What 546 says in

6  the very last sentence, "If the seller of goods," the same

7  word, "goods," "fails to provide notice in a manner described

8  in one," that is, to perfect its reclamation claim, "the seller

9  still may assert the rights contained in section 503(b)(9)."

10          To me, I don't understand how the work could be any

11  different than 546(c), because it's -- it's basically saying,

12  look, if you can't give the written notice that you were

13  supposed to give under reclamation, you can now move to

14  503(b)(9).

15          The word "goods" is used there, and so it is exactly

16  related to the reclamation statute.  So I wanted to start with

17  that.  Your Honor, then going to -- and Your Honor caught it,

18  and I'm shaking my head -- when you go to 503(b)(9) it's very

19  simple to say, oh, look at any goods, but that's the value of

20  any goods.

21          And the real phrase that's the key phrase is, "goods

22  have been sold."  That's a transactional analysis.  That's

23  exactly what the predominant purpose is looking at.  That's

24  exactly what the UCC looks at.  It doesn't look just simply at

25  the words.

**J&J COURT TRANSCRIBERS, INC.**

1          It says, okay, if you have a doubt about a

2   transaction involving goods -- no one's disputing -- everybody

3   here had some movable stuff -- the question is, is that

4   transaction going to be captured by this phrase, goods have

5   been sold.  That's a transactional analysis.  That's why we're

6   suggesting that you go to the predominant purpose test.

7          Why that test is so important is we can go straight

8   through now, from bottom up on U.S. Signs, U.S. Signs' claim --

9   and I have it as objection P -- U.S. signs agreed to

10  manufacture, supply and install signs.  So it's a lot of stuff

11  that it's doing.

12         And if you look exactly at the invoices, some say,

13  "face cab sign."  Some say, "permit," "engineering," "freight,"

14  "due diligence."  Others say, "installation," "labor,"

15  "assembly," "sign," "contractor standby," "manufacture and

16  install."  We do have to go to what's the predominant purpose.

17         We're not disputing that they made signs, they put

18  signs.  The whole question is, that's a transaction.  We have a

19  contract with them.  Is that contract predominantly to buy the

20  goods, the signs, or was it to manufacture, install, do due

21  diligence, assemble them, put the parts on and then

22  subsequently deliver them.

23         That's exactly the UCC question, the transaction.

24  What was the predominant purpose of the transaction, the

25  contract we entered into with U.S. Signs?  Let's go back up now

98

1  to the advertising.  I can't remember that client's name, but

2  yes, there are leaflets, Your Honor, and leaflets, again, did

3  we hire them to do this kind of advertising or that kind of

4  advertising.

5       But let's assume they pass the goods objection, Your

6  Honor.  Our procedures, which Your Honor approved, and the

7  objection itself said we can then make additional arguments.

8  And I think Your Honor pointed out -- and what we're not here

9  for but I'm prepared to argue and since I've done it a number

10 of times is -- did we -- let's assume he passes it.

11      I still think you have to do with advertising.  He

12 may distinguish all the other cases.  He may say, my

13 advertising is not like anybody else's advertising; the

14 predominant purpose was to get the leaflets, the stuff, the

15 goods, but then he only passes that test.

16      Your Honor knows another test is coming up:  did we

17 receive those.  Did they put them right into the newspaper or

18 did -- was there actual receipt?  The other definition that

19 I've had many fights over is, what's receipt.  If I say go put

20 it in the third parties' car, I don't have actual possession.

21      We got another UCC issue on the horizon, and our

22 objections all reserved exactly those issues, one issue at a

23 time.  The advertising is one.  Is this advertising a good or

24 is it predominant purpose?  We're not saying blanket, just

25 because you, advertiser, give advertising materials, you fail

**J&J COURT TRANSCRIBERS, INC.**

99

1  the test.  We say it raises the issue of the test and now let's

2  get to it.

3        Merely because he has a piece of paper that say it --

4  leaflet -- merely because somebody delivered a good, a movable,

5  is not sufficient to say it's goods within the UCC, for a UCC

6  transaction.  It's not sufficient to say its goods have been

7  sold in 503(b)(9).

8        Our purpose is, you got to look at the transaction.

9  You use the definition and you apply the transactional analysis

10 that the UCC does, and you should use the predominant purpose

11 test.  Finally, I think the parsing of the "any value" language

12 is absolutely correct that it uses "any value," but it's "any

13 value of goods," the goods have been sold.

14       You still have to get that second part in, and

15 indeed, both Judge Shefferly and judge -- I think Judge

16 Sontchi, as I recall, said, look, we're not looking at the

17 value of the goods.  You've seen some of the arguments here,

18 right?  Clearly, somebody's increased the value of the goods by

19 doing certain services, but that's not the focused phrase.

20       The focused phrase is, "goods have been sold."

21 Again, transactional analysis, UCC, it's tagged to 546.  It's a

22 scape -- an escape hatch for people who don't, at least in my

23 view, narrowly interpreted, if you can't meet the reclamation,

24 take them back.

25       You have this option to get a claim; we gave you the

**J&J COURT TRANSCRIBERS, INC.**

1  exception in 502(b)(9) [sic]; now, you got to take the same

2  thing you could have reclaimed under 546, take your escape

3  hatch, make the claim; it's got to be the same kind of goods

4  you could reclaim.

5          And the goods you could reclaim are in a transaction

6  under the UCC that satisfies, in our view, the predominant

7  purpose test.  I don't know if Your Honor has any other

8  questions, but that how -- that's how I would respond to the

9  three objections.

10         THE COURT:  All right.  The question that I have is

11  probably the first question I asked you, and that is, what am I

12  deciding here, so that I know --

13         MR. GALARDI:  I think, Your Honor, what we think that

14  you should be deciding is, one, what is the proper definition

15  of goods.  As Your Honor already alluded, you could go to

16  Webster's and say, that's the one, versus the UCC.  Question

17  number one is UCC.

18         Your Honor could go further and say the UCC, which

19  then says we have the predominant purpose test or not, as you

20  understand it.  Your Honor could take it in little, itty-bitty

21  baby steps, or you can go to the predominant purpose.  We are

22  advocating, so that we can go further, that it is the

23  predominant purpose test, that by adopting the UCC, the federal

24  common law, whatever you want to say, should be the predominant

25  purpose test.

1          That will set the standard by which we will take

2     evidentiary hearings going forward.  We can resolve certain

3     people.  Maybe the leaflet person is a predominant purpose and

4     we'll deal with the delivery and receipt, but we need to have a

5     threshold.  So it's summary judgment, UCC standard definition.

6     I don't know if anybody other than the three gentlemen have

7     agreed to it.

8          And two, by taking that definition -- again, they

9     like to say "goods," and then you look at this -- I think

10    taking the definition is taking the predominant purpose test.

11    I don't think it's a --

12          THE COURT:  I understood that.

13          MR. GALARDI:  -- it's not a -- it's not a piecemeal,

14    though they like to do it that way.  In my view, is by

15    accepting it you're accepting the UCC analysis, and we've

16    advocating the proper UCC analysis is predominant purpose.

17          THE COURT:  All right.  Thank you.

18          MR. GALARDI:  Thank you.

19          THE COURT:  Do any of the three parties that have --

20    wish to reply?

21          MR. PERKINS:  Real briefly, Your Honor.  Just two

22    points to respond to what Mr. Galardi just raised.  He started

23    with the reclamation statute and worked backwards, and he said,

24    there's a part of that reclamation statute that says, if you

25    fail to give the written notice then you can shift over to

1  503(b)(9).

2          Yeah, that's true, and -- but that doesn't mean

3  503(b)(9) is solely for reclamation.  It's a backup position

4  for those who fail to meet the reclamation test.  So --

5          THE COURT:  Well, it certainly shows that there's a

6  nexus.

7          MR. PERKINS:  There's certainly a nexus, but it

8  doesn't answer the question that 503(b)(9) is solely a

9  reclamation issue, and that goods have to be defined as they

10 would be under reclamation.  503(b)(9) --

11         THE COURT:  Do you -- whoa.  Whoa -- do you think

12 that Congress intended a different definition of goods in

13 section 546 than it did in section 503?

14         MR. PERKINS:  I'm just saying that 503(b)(9) is any

15 goods, not solely reclaimable goods.

16         THE COURT:  All right.  I see the distinction you're

17 trying to make.

18         MR. PERKINS:  Yeah, that's -- okay.  And then -- and

19 then as to whether goods have been sold -- and that's a

20 question you asked me earlier -- absolutely, they've been sold

21 in a mixed context.  The price of those goods is part of the

22 invoice, the labor plus the cost of the goods.

23         They're not free when we install whatever item we're

24 installing, and so yes, that also meets -- under my scenario,

25 under my framework, yes, the goods have been sold, because the

1  cost of those goods is included in the overall price.  Those

2  are the only two points I wanted to make.

3           THE COURT:  Thank you, Mr. Perkins.

4           MR. PERKINS:  Thank you, sir.

5           THE COURT:  Does any of the other two wish to be

6  heard?  Mr. Hutson?

7           MR. HUTSON:  Yes, Your Honor.  I apologize, Your

8  Honor.  I had to run out and feed the meter.  So I missed the

9  response to my --

10          THE COURT:  So you don't know what you're responding

11 to.

12          (Laughter)

13          MR. HUTSON:  But I would like to at least --

14          MR. PERKINS:  I disagree with it.

15          MR. HUTSON:  -- to reaffirm my, you know, initial

16 position.  And I -- again, like the gentleman before me, would

17 like to say that these -- you know -- if they're services

18 incident to the goods that are being purchased, you know,

19 they're not free.

20          The -- certainly, the invoices reflect certain

21 things, such as permits and fees that have to be -- and costs

22 associated with that.  But the -- you know -- the overall goal

23 is to develop and manufacture, in my client's case, signs.  So

24 I just urge the Court to take that into consideration.

25          And again, I'd like to state that I believe that we

1  can at least resolve the objection with regard to U.S. Signs

2  here today.

3          THE COURT:  All right.  Thank you.

4          MR. REPCZYNSKI:  Tom Repczynski, for Graphic

5  Communications.  As the Court considers applying the

6  predominant purpose test, the Court is going to find itself

7  seeking out the parties' intent, subjectively or otherwise.  If

8  it's going to be fact specific and fact intensive, that's what

9  the Court is going to be forced into doing.

10         In a situation like Graphic Communications where the

11 intent -- without argument -- was to create pamphlets or these

12 leaflets that go, the question can't then become, was it a

13 question to -- and I presume the same with signs -- can't be a

14 question of whether or not you're going to produce them versus

15 simply -- whether it -- the question can't be whether it's

16 going to be to provide a service or to have a good.

17         At the end of the day, they wanted a pamphlet.  At

18 the end of the day, they wanted a sign.  So to say what their

19 intent was, I think ultimately it's going to be on the Court to

20 look at the transaction, not look at what the subjective

21 testimony's going to be.

22         And for that, I think the Court already has what it

23 needs.  And I note for the Court, the omnibus objection is

24 before the Court.  To say that some sort of testimony about

25 whether or not they intended merely to create a pamphlet or a

**J&J COURT TRANSCRIBERS, INC.**

1  sign versus actually have a sign or have a pamphlet at the end

2  of the day doesn't get the Court anywhere.

3       So I'm not sure the predominant purpose test makes

4  sense on an -- on an individual, case by case basis; certainly

5  not here.

6       THE COURT:  All right.  Thank you.  All right.  The

7  Court is -- although I will issue a written opinion on the

8  matter -- is going to go ahead and rule on the matter so we can

9  go forward.  The Court is going to apply the UCC definition of

10 the -- found in Article 2 of 2-105.1 of goods, that all things

11 movable at the time of the identification to the contract of

12 sale, and I think that's consistent with the ordinary meaning

13 of movable goods, as found in the Plastech case and in the

14 Goody's case, and so the Court is going to apply that.

15      And the majority of courts that have looked at the

16 factor of these mixed type of contracts have applied the

17 predominant purpose test, as Judge Sontchi, while he didn't

18 reach that conclusion, certainly pointed out in his opinion.

19 And the Court is inclined to follow the majority in that

20 regard, and apply the same -- the same tests to these types of

21 cases.

22      And I think that that is certainly contemplated in

23 the language that Congress used, talking about, in 503(b)(9),

24 in which goods have been sold to the debtor in the ordinary

25 course of such debtors' business.  That's how you figure out

**J&J COURT TRANSCRIBERS, INC.**

 1 whether the goods have been sold to the debtor in the ordinary

 2 course, is by providing that test.

 3        And I think that section 503(b)(9) is certainly a

 4 close nexus between it and section 546, and certainly, goods

 5 have to be interpreted the same way.  And that's, again,

 6 another reason why I'll apply the predominant purpose test to

 7 construing these claims.

 8        And that's all the Court is going to rule.  I'm not

 9 ruling on whether or not there was a sale, whether title passed

10 or any of those kinds of issues.  Those are all reserved.  I'm

11 just ruling on the motion for partial summary judgment on those

12 two issues.

13        And as I said, I will issue a written opinion

14 consistent with those conclusions.  Any questions concerning

15 the Court's ruling in that regard?  All right.  Do we have any

16 other matters we need to take up today?

17        MR. FOLEY:  Your Honor, Doug Foley, on behalf of the

18 debtors, Your Honor.  I believe that concludes the items on the

19 agenda for today, Your Honor.  We thank the Court for its time.

20        THE COURT:  All right.  Very good.

21        MR. REPCZYNSKI:  Your Honor, if I may just seek

22 clarification.

23        THE COURT:  Yes.

24        MR. REPCZYNSKI:  In light of the Court's ruling --

25        THE COURT:  You may.

**J&J COURT TRANSCRIBERS, INC.**

1            MR. REPCZYNSKI:  -- as I understand, that the debtors

2    put forward any other matters relating or following up with

3    these particular omnibus objections, the debtor had written

4    that they intended to carry those over or request that the

5    Court carry those over to the October 15th date?

6            MR. GALARDI:  Correct, Your Honor.  None of the

7    orders or any of the objections are overruled.  We're now going

8    to sort through those and walk through the issues.

9            THE COURT:  Right.  So all of the objections are

10   carried over to the 15th.

11           MR. GALARDI:  Yes, Your Honor.

12           THE COURT:  October 15th.

13           MR. GALARDI:  Yes, Your Honor, items number --

14           THE COURT:  And the only thing that we've resolved

15   are those two issues with regard to these claims.

16           MR. GALARDI:  Correct.  Items number 57, 58 and 59 on

17   the agenda are adjourned for the balance of any remaining

18   issues until October 15th, similar with all the other omnibus

19   objections.

20           THE COURT:  All right.  Very good.

21           MR. GALARDI:  Thank you, Your Honor.

22           THE COURT:  That was certainly my understanding.  All

23   right.  Thank you very much.

24           ALL COUNSEL:  Thank you, Your Honor.

25           THE CLERK:  All rise.  Court is now adjourned.

**J&J COURT TRANSCRIBERS, INC.**

1        (Whereupon, at 1:23 p.m., the hearing in the above-

2   entitled matter was adjourned.)

3                        --oOo--

4                       CERTIFICATE

5        I, ELIZABETH REID-GRIGSBY, a certified electronic

6   transcriber, certify that the foregoing is a correct

7   transcript, to the best of the transcriber's ability, from the

8   official electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11   /s/ Elizabeth Reid-Grigsby           September 10, 2009

12   Elizabeth Reid-Grigsby

13   AAERT CET**00145

14   **J&J COURT TRANSCRIBERS, INC.**

15

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**