David J. Cacciotti
9812 Fernleigh Dr.
Richmond, VA 23235
Claimant

-v-

SKADDEN, ARPS, SLATE, MEAGHER          MCGUIRE, WOODS LLP
& FLOM, LLP                            One James Center
One Rodney Square                      901 E. Cary Street
PO Box 636                             Richmond, VA 23219
Wilminton, DE 19899-0636               Attn: Dion W. Hayes
Attn: Gregg M. Galardi                 Attn: Douglas M. Foley
Attn: Ian S. Fredericks

              - and -

SKADDEN, ARPS, SLATE MEAGHER
& FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
Attn: Chris L. Dickerson


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


- - - - - - - - - - - - - -
In re:                            Chapter 11
CIRCUIT CITY STORES, INC.         Case # 08-35653
Debtor
- - - - - - - - - - - - - -


The Debtor and the last four digits of their taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875)

### Objection to Debtors' Thirtieth Omnibus Objection to Claims
### (Disallowance of Certain Claims for Wages and Compensation)


I David J. Cacciotti due hereby object to the court's
findings to disallow the payment to the employees of
Circuit City for any pay hereby described as earn hourly
wages, Paid Time Off, (Vacation, Holiday, Sick Pay) and
Commission.

### BACKROUND AND EVIDENCE

November 7, 2008, Circuit City Corp Office notified me of
the notice of reduction of work force.

My position at that time was Technician Direct
Representative (Non-Contract, Full-Time hourly Employee) in
the Firedog Division. My job was to assist Circuit City
television repair technicians in locating and ordering
parts needed to repair the customer's units throughout the
United States.

At the time of the lay off, Circuit City provided a letter
stating my employment with Circuit City will end on January
9, 2009 or a date within 14 days thereafter which may be
provided to me by Circuit City. This is to be permanent
with no bumping rights for other positions with Circuit
City. *See Exhibit 1.*

The letter stated that payments were under the Worker
Adjustment and Retraining Notification ACT ("WARN") (29
U.S.C. Sections 2101 et seq.)

They also provided a FAQ packet titled, **"What happens to my
benefits when my employment ends and Frequently asked
questions."** *See Exhibit 1.*

On page 2 question 6 it asked: **As a part-time or full-time
hourly Associate, will I be paid for unused accrued PTO?**

Answer: ***Yes, You will be paid for unused accrued PTO upon
your termination of employment in your final paycheck.***
Exhibit 3: is a copy of my last Paycheck. This check does
not show any of the remaining 93 hrs of PTO was paid to me.

On Page 24 of the **U.S. Department of Labor WARN ACT
Handbook for Employers Guide to Advance Notice of Closing
and Layoffs.** *See Exhibit 2.*

In this section designated **Frequently Asked Questions (FAQ)
About WARN Act.** Under heading of the Employees Access to
Accrued Vacation Time; the question asked: **"Can I decide
not to give employees paid vacation in a closing or layoff
situation?"**
The answer provided stated the following:

*"Vacation pay may be considered wages or a fringe benefit
in some situations. If an employee has "earned" the
vacation pay, that is, if he/she has a legal right to it by
contract or otherwise, then an employer must pay it as part
of WARN damages. These obligations are generally governed
by contract and sometimes by the Employee Retirement and
Income Security Act. Call 1-800-998-7542 or visit
www.dol.gov/ebsa for more information."*

In this case, the earned vacation pay is also known as,
PTO (Paid Time Off) hours. These hours can be used for
vacation, sick days or other time off request.

In the filing of December 5, 2008, *See Exhibit 3*. Page 10-
11 section 17: The Debtor agreed that they should continue
to pay to the WARN employees the wages, salaries and
benefits during the 60 day WARN Period.

Page 34 Section H Item # 64: The Debtor maintains that such
payments are essential to stabilize their workforce and
improve overall Employee morale in this critical period in
the Debtors' restructuring efforts. This amount is
approximately $8 to $10 million, which amount has been
included in their DIP Budget. *See Exhibit 3*

Page 34-35 Section H sub section 1, Titled **"PAID TIME OFF"**
numbers 65-66: Clearly outlines what Paid Time Off is for
the employees along with the eligibility of gaining the
Paid Time Off etc. *See Exhibit 4*.

Page 35 Section H number 67: Clearly, states prior to the
Petition Date, any unused, accrued Paid Time Off was paid
to Employees upon Termination. *See Exhibit 5.*
Please *See Exhibit 6.* Copy of my last paycheck from Circuit
City. As you will see in the lower right corner, Section
titled PTO Plan, the current earned Vacation hours total is
93.65 hrs.

Page 35 Section H number 68: Clearly states that Circuit
City has approximately 713,000 hours of Paid Time Off
outstanding, with approximate value of $9.2 million. *See
Exhibit 7.*

In that Motion, The Debtors seek entry of an order
authorizing but not directing them to allow Hourly
Employees to use accrued and unused Paid Time Off and to
continue to accrue Paid Time Off in the ordinary course of
business. As stated in Section H, sub section 64: Circuit
City had budget said payment in their DIP Budget.

Circuit City received a motion of approval from the United States Bankruptcy Court to continue to pay the employees wages along with benefit pay for the remaining 60 days. See page 2 of the Judge's ruling. *See Exhibit 8.*

On December 19, 2008, Circuit City sent a claim form to file a claim with the United States Bankruptcy. As of December 24, 2008. *See Exhibit 9.*

Pursuant to 11 U.S.C. Section 507 Priorities, the following expenses and claims have priority in the following order:

*Section 507 (3)(A) states, Wages, Salaries or Commission, including vacation, severance and sick leave pay earned by an individual;*

Therefore, with the evidence provided before the court, I ask the U.S. Bankruptcy court to reverse its decision and order Circuit City to pay the wages that are owed.

_____          September 9, 2009

David J. Cacciotti
9812 Fernleigh Dr.
Richmond, VA 23235
(804) 560-1148 (H)
(804) 218-0489 (C)

Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233-1464
T 804.486-4000

TO:         Affected Employees of the Circuit City Stores, Inc. Support Center

FROM:       Steve Saunders
            Director of Associate Relations

DATE:       November 7, 2008

RE:         Reduction in Force

We are providing this notice to inform you that Circuit City Stores, Inc. ("Circuit City") has made the difficult decision to reduce the workforce at its Store Support Center located at 9954 Mayland Drive, Richmond, VA 23233-1464. It is anticipated that your employment with Circuit City will terminate on January 9, 2009 or a date within 14 days thereafter which may be provided to you by Circuit City (your "Termination Date"). This employment loss is expected to be permanent and you will not have bumping rights for other positions with Circuit City (i.e., you will not have the right to displace employees with less seniority).

Your manager will discuss your work schedule with you for the period commencing on the date of this notice through your Termination Date. During this time, your services during regular working hours will be required as business dictates. To the extent possible, Circuit City will relieve you of your duties so that you may search for future employment. We expect you to notify your manager if you commence employment with a new employer prior to your Termination Date.

Your health coverage under Circuit City's group health plan will terminate on the last day of the month in which your employment ends. However, you can elect to receive COBRA continuation coverage for yourself and qualifying dependents under Circuit City's group health plan in accordance with the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). Such continuation coverage shall be at your own expense, and shall in all respects be subject to the requirements, conditions and limitations of COBRA and of the health plan of Circuit City, which may be amended from time to time. COBRA election information will also be provided to you under separate cover.

As of the date of this notice, Circuit City has determined that it will not provide severance pay in connection with this layoff. If the company determines otherwise, you will be contacted. You will continue to be bound by the terms and provisions of the Circuit City Code of Business Conduct.

We are providing this letter to you to satisfy any legal obligation to provide notice pursuant to the Worker Adjustment and Retraining Notification Act ("WARN") (29 U.S.C. Sections 2101 et seq.).

If you have any questions or concerns, please feel free to contact me at 1-800-765-5298. On behalf of Circuit City, we regret that this action is necessary.

Steve Saunders



# WHAT HAPPENS TO MY BENEFITS WHEN MY EMPLOYMENT ENDS
## AND
## FREQUENTLY ASKED QUESTIONS

The following information explains what will happen to your benefits when your employment with Circuit City ends. If you need additional information, please contact the Associate Service Center at 1-800-288-6353. You will get the personalized information you need.

Additionally, so that we can contact you with important benefits information, *it is vital that we have your current home address.* If the address printed on your paycheck is *incorrect*, please email the *correct* address to *circuitcity.hrservices@hewitt.com* or fax it to 1-281-298-0845.

Please carefully review the information provided for all of the Plans in which you are currently enrolled.

## BENEFITS

1.  **When will my medical, dental, and vision benefits stop?**

    Your medical, dental, and/or vision coverage ends the last day of the month in which your employment with Circuit City ends. Deductions will be taken from your final paycheck for your last month of coverage.

2.  **If I have medical, dental and/or vision coverage on my Separation Date, can I continue this coverage?**

    Yes. You will be eligible to continue your medical, dental and/or vision coverage under a federal act known as *COBRA (Consolidated Omnibus Reconciliation Act of 1986)*. Please see the enclosed handout in this packet marked "COBRA". Shortly after your termination, detailed information (including cost and length of coverage) regarding the continuation of your medical, dental and/or vision benefits will be mailed to your home address.

    **In the event you have already scheduled a doctor's appointment prior to the COBRA packet reaching you: (1) you may keep the appointment and pay "out of pocket" for any expenses and then be reimbursed upon receipt of your COBRA election confirmation and payment; or (2) you may reschedule your appointment, until after your COBRA election confirmation and payment is received.  For details contact the Associate Service Center at 1-800-288-6353.**

3.  **What if I don't want to continue coverage after my Separation Date?**

    If you do not wish to continue coverage under COBRA, then you do not have to do anything.  However, please keep in mind the following: If you become covered later by another plan and you have experienced more than a 63-day period with no health or dental coverage, a pre-existing condition exclusion period may be applied in accordance with the federal Health Insurance Portability and Accountability Act (HIPAA).

4.  **Will I be able to keep my Life Insurance/Supplemental Life after my Separation Date?**

    Your life insurance may be continued after separation with our life insurance carrier, Aetna.  The appropriate paperwork must be received by Aetna within 31 days of the date your coverage ends.  If you wish to continue your life insurance, please contact the Associate Service Center immediately at 1-800-288-6353.  Further information is available on Aetna's website at http://www.aetna.com/group/circuitcity/.

*October 2008*

5. **Will I be able to continue my Long Term Disability coverage?**

Long Term Disability coverage ends on your Separation Date. Conversion to an individual policy is not available.

6. **As a part-time or full-time hourly Associate, will I be paid for unused, accrued PTO?**

Yes. You will be paid for unused, accrued PTO upon your termination of employment in your final paycheck.

7. **How will my eligibility to receive benefits under the Retirement Plan be affected?**

All service through your Separation Date will count toward vesting for benefits. To be eligible to receive benefits from the Retirement Plan, you must have 5 years of vesting service. You receive a year of vesting service for each Plan Year (March 1 through the end of February) during which you worked 1,000 or more hours. If you are eligible for Early Retirement (age 55 and 10 years of vesting service or 62 and 7 years of vesting service), you can elect to start your benefits right away. If you are eligible for Normal Retirement (age 65 and 5 years of vesting service), your benefits will begin as of the first day of the month after your Separation Date.

If you are not eligible to retire but are vested, the Associate Service Center will mail specific information about your benefits to your home address. This letter will be sent about one year after your employment ends. If you are eligible to start your benefits and want additional information, call the Associate Service Center at 800-288-6353 or email circuitcity.hrservices@hewitt.com

8. **When can I expect to get my pension payment?**

Retirement Plan (Pension) benefits are generally payable on a monthly basis, beginning on your Early or Normal retirement Date. If you are eligible for *Early Retirement* (age 55 or older with at least 10 years of vesting service) or *Normal Retirement* (age 65 or older with at least 5 years of vesting service), please notify the Associate Service Center at 1-800-288-6353 *at least 90 days before the date you wish to retire.*

If the present value of your retirement benefit payable at age 65 is less than $1,000, you will be paid in a lump sum payment. You may elect to rollover a lump sum payment to an IRA or another Qualified Retirement Plan if that plan allows rollovers. You will receive a letter notifying you of your options within nine months of the close of the plan year.

9. **What happens to my Stock Purchase Plan account?**

Participation in the Stock Purchase Plan ends on your Separation Date. You own the stock you have accumulated in this plan. You may contact Computershare at 1-877-377-7456 for more information about selling your stock, requesting a certificate, or leaving your account open.

10. **How will my participation in the 401(k) Plan be affected?**

If you are participating in the 401(k) Plan, your active participation in the Plan will cease as of your Separation Date. If the current value of your account is under $1,000, it will be distributed approximately 100 days after your Separation Date; if it is over $1,000, you may request to receive a distribution. *Please call Wachovia Bank, recordkeeper for the Plan, at* 1-800-377-9188 or the Associate Service Center at 800-288-6353 for additional information about distributions from the 401(k) plan. In either event you will receive a letter describing your options, along with some important rollover and tax information from Wachovia Bank, NA (the Plan Administrator) within forty-five days of your Separation Date.

11. **Will my pension and the 401(k) automatically vest?**

These plans do not automatically vest when you cease employment with the Company. Vesting will be determined according to the rules of each Plan and you will be notified if you have a vested benefit due.

12. **What happens to my Health Care Spending Account and/or Dependent Care Spending Account (FSA plans)?**

Participation in the FSA plans ends on your Separation Date. You will have 90 days from the date of separation to submit any expenses for reimbursement that were incurred while you were employed. After this 90-day period, any remaining balance in your account will be forfeited according to IRS regulations.

13. **Can I continue my membership with Truliant Federal Credit Union?**

Yes. You may remain a member of the Credit Union as long as you maintain a minimum $5.00 savings balance.

14. **What about my other Benefit programs?**

Participation in all other benefit programs ends on your Separation Date. Such programs include, but are not limited to, the Associate Discount and Short Term Disability.

*Services through the Work-Life Balance Program are available to separated Associates for a limited time. If you are currently receiving services through the Work-Life Balance Program or wish to use the program to assist during your time of transition, please call the Associate Service Center at 800-288-6353 for the correct phone number and access code.*

15. **Who should I contact if my supervisor/manager is unable to answer questions I may have regarding my separation package?**

You should contact Human Resources Administration at 1-800-765-5298.

16. **Who should I contact to answer questions I may have regarding my benefits?**

You should contact the Associate Service Center at 1-800-288-6353.

17. **Will I be able to continue participating in the Associate discount program?**

No, you must be an active Circuit City associate to participate so this benefit ends when you are separated.


*The preceding information summarizes how benefits are handled upon an Associate's separation of employment. If this information conflicts with a Plan's documents and/or contracts, the Plan documents and/or contracts will prevail. If you have any questions, please call the Associate Service Center at 1-800-288-6353.*


## COMPENSATION

18. **How will my final paycheck be handled?**

Depending on your state, your final paycheck will be either hand delivered, direct deposited or deposited to your Circuit City Visa Paycard on your last day of employment or mailed to the company's most current record of home address. If you move, please notify us of your change of address as your W2 cannot be forwarded. If you have any questions about your final check, please call the Associate Service Center at 1-800-288-6353.

19. **Will my final paycheck be taxed differently?**

No. Your final paycheck will be taxed according to your W-4 currently on file. All mandatory federal and/or state withholdings will be deducted accordingly.


20. **When will I be eligible to apply for Unemployment Compensation?**

Please contact your State Employment Commission with questions regarding general eligibility/filing requirements and information related to your specific situation.

The following responses represent the U.S. Department of Labor's best reading of the WARN Act and regulations. Employers should be aware that the U.S. Federal Court solely enforces the Act and these answers are not binding on the courts.

OTHER LAWS AND CONTRACTS

The provisions of WARN do not supersede any laws or collective bargaining agreements that provide for additional notice or additional rights and remedies. If another law or agreement provides for a longer notice period, WARN notice runs concurrently with that additional notice period. Collective bargaining agreements may be used to clarify or amplify the terms and conditions of WARN but may not reduce WARN rights. For example, if a collective bargaining agreement provides for an employer to issue written notice to the union 75 days in advance of anticipated layoffs, the provision will satisfy the WARN requirement for 60-day advance notice. On the other hand, if a collective bargaining agreement provides a 45-day notice period, the WARN requirement for 60 days' notice supersedes that provision.

CAN AN EMPLOYER BE ORDERED NOT TO CLOSE OR LAY OFF?

No. Employers cannot be required by the WARN Act to refrain from closing a plant, relocating operations, or implementing layoffs. An employer can only be required to give a 60-day advance notice or provide back pay and benefits to the affected employees for each day that the employer failed to give notice, up to the required 60 days. The law at section 5(b) specifically states, "a Federal court shall not have authority to enjoin a plant closing or mass layoff." There is no injunctive relief available under the Act.

No.  An employer does not need to provide notice to strikers or to workers who are part of the bargaining unit(s) and are involved in the labor negotiations that led to a lockout when the strike or lockout is equivalent to a plant closing or mass layoff.  Non-striking employees who experience an employment loss as a direct or indirect result of a strike and workers who are not part of the bargaining unit(s) that are involved in the labor negotiations that led to a lockout are still entitled to advance notice.

The Act specifically states that WARN does not affect employers' or employees' rights and responsibilities under the National Labor Relations Act.  An employer does not need to give notice when permanently replacing a person who is an "economic striker."

You need to decide whether WARN applies to a particular employment action about 65-70 days before that action is to occur.  If WARN does apply, this gives you the lead time to do what is necessary to give timely notice.  You also need to rely on the facts as you know them at the time you have to make your decision.  Assuming too much can lead to a significant risk.  An example of a question often asked is, "If I close a plant with 53 workers but offer five of them early retirement and they take it, am I liable under WARN?"  The legal answer to that question is that there is no liability since only 48 workers will suffer an employment loss, but the practical answer about whether or not to give notice may depend on what you know 65-70 days in advance.  If you are absolutely sure that five workers will take the early retirement offer, then there is no requirement that you give notice.  If you are not sure that the five workers will take the offer, then you run the risk of liability.  If you choose not to give notice and all

five accept the offer, there is no requirement that you give notice.  However, if two workers do not accept the offer and you have not given notice, you may be liable to 50 workers for pay and benefits.  For that reason, it is recommended that employers err on the side of caution and give notice in situations that pose these kinds of risks.

The period to be used for calculating whether a worker has worked an average of fewer than 20 hours per week is the shorter of the actual time the worker has been employed or the most recent 90 days.

To determine the average number of hours worked in a week, see the following example:

| WEEK NUMBER | EXAMPLE 1 HOURS WORKED | EXAMPLE 2 HOURS WORKED |
|:---:|:---:|:---:|
| 1 | 15 | 24 |
| 2 | 20 | 25 |
| 3 | 11 | 17 |
| 4 | 10 | 20 |
| 5 | 20 | 15 |
| 6 | 20 | 19 |
| 7 | 22 | 24 |
| 8 | 16 | 18 |
| 9 | 15 | 17 |
| 10 | 12 | 15 |
| 11 | 24 | 26 |
| 12 | 18 | 23 |
| 13 | 20 | 22 |
| 90 Days Worked | 223 Hours | 265 Hours |

The calculation to determine whether an employee may be eligible for
WARN notice:

TOTAL HOURS WORKED / 13 WEEKS
= AVERAGE HOURS WORKED PER WEEK

**Example 1**
223 TOTAL HOURS WORKED / 13 WEEKS
= 17.2 HOURS AVERAGE HOURS WORKED PER WEEK

*The worker in Example 1 is a part-time worker because the average
hours worked per week was less than 20 hours.*

**Example 2**
265 TOTAL HOURS WORKED / 13 WEEKS
= 20.4 HOURS AVERAGE HOURS WORKED PER WEEK

The worker in Example 2 is a full-time worker because the average
hours worked per week was over 20 hours.

*If a plant closing or mass layoff occurs, part-time workers are also entitled to
receive a WARN notice.*

Both.  In determining whether the 33% threshold for a mass layoff involving
fewer than 500 workers has been reached, you divide the total number of full-
time workers laid off by the total number of full-time workers.  The term "full-
time workers" means workers at the single site, excluding part-time workers.

EMPLOY...

There is no set "rule of thumb." However, one would look at the circumstances of the individual case. Consideration should be given to the following factors: geographic accessibility of the place of work, quality of the roads, commonly available transportation, and the usual travel time. In addition, collective bargaining agreements may have to be taken into consideration if they are applicable. Travel time is measured from an employee's home, *not the former work site.*

No. The Preamble to the WARN regulations provides that "where it is not possible at the time notice is required to be given to determine who may reasonably be expected to experience an employment loss, it may be advisable for *an employer to give notice to other workers who may lose their jobs as a result of the seniority system,* both to forewarn them and to avoid liability. However, it is not appropriate for an employer to provide blanket notice to workers."

*Where there is no union, the employer must attempt to identify the individuals who will finally lose their jobs as a result of the bumping system.* If the employer cannot reasonably identify these workers, it must give notice to the incumbent workers in the jobs being eliminated.

When providing notice to a union representative, it is not necessary for the employer to identify bumpees. The employer must, however, identify the positions affected by the closing or mass layoff.

Generally, when employees are given adequate notice of a layoff, workers' compensation claims do not increase. One major company found that when it gave notice and had planned on receiving more claims (and in fact set aside significant funds to cover these expected costs), they actually spent none of that money. As with concerns of sabotage, providing notice shows goodwill on the part of the employer, and employees are more likely to feel that they have been treated fairly despite the situation in which they find themselves.

Employers have occasionally expressed concern that providing workers with advance notice of layoffs and closings may result in an incident of sabotage by an affected worker. Experience of the state Rapid Response specialists, however, indicates that the opposite is generally true. Providing advance notice, along with early intervention services that boost morale, limit bitterness and apathy, and enable workers to plan their future before they lose their jobs, minimizes the occurrence of sabotage. This action of goodwill on the part of the employer also helps to maintain productivity, lower unemployment insurance costs, and present a more positive image of the company to the communities affected by the layoff or closing.

Yes. The buyer is responsible for providing notice for any covered plant clos-
ing or mass layoff that occurs after the sale. The practical problem is that the
buyer is not the employer at the time notice must be given. If the seller does
not cooperate, the buyer may not know the names and addresses of everyone
who will be affected so that it can give individual notice. However, written
notice is still required.

This situation is considered a voluntary departure, unless the offer consti-
tutes a **constructive discharge** (see glossary), which could include situations
where significant changes are made in employee's wages, benefits, working
conditions or job description.

The seller. In the case of the sale of part or all of a business, the seller is
responsible for providing affected employees with notice of any plant closing
or mass layoff that takes place up to and including the effective date (time) of
the sale, and the buyer is responsible for providing notice of any plant clos-
ing or mass layoff that takes place thereafter.

The buyer is liable for the full 60 days. If the seller is made aware of any def-
inite plans on the part of the buyer to carry out a plant closing or mass layoff

within 60 days of purchase, the seller may give notice to affected employees as an agent of the buyer, if so empowered. If the seller does not give notice, the buyer is nevertheless responsible to give notice. If the seller gives notice as the buyer's agent, the responsibility for notice still remains with the buyer.

If a drastic change in wages or working conditions causes a person to believe he or she was being fired or would be unable to continue working for that employer, this could constitute a constructive discharge. The test is usually a matter of state law and the test is often a strict one.

WARN remains applicable to an employer that declares bankruptcy in some circumstances. If an employer declares bankruptcy and then orders a plant closing or mass layoff, it may still be liable under WARN. There are two situations in which WARN may apply in a bankruptcy. The first is when the employer knew about the closing or mass layoff before filing bankruptcy and should have given notice but seeks to use bankruptcy to avoid giving notice. The second is when the employer continues to run the business in bankruptcy, usually as a "debtor in possession." WARN does not, however, apply to a trustee in bankruptcy whose sole function is to wind up the business. The exceptions to the notice requirement, known as the faltering company and unforeseeable business circumstances exceptions, often come up in bankruptcy cases. The bankruptcy proceeding does change the court in which any WARN claim must be filed, from the District Court to the Bankruptcy Court.

WAIVER

Employees cannot be required to waive their rights to advance notice under WARN. WARN requires notice, making no provision for any alternative. However, when you close a facility or have a layoff, you may ask employees to sign a document waiving their rights to make claims against your company. (Waiving the right to make claims against the company means the employee agrees not to sue the company for additional financial compensation or any other benefit because of the employee's job loss, or in some cases, from anything else that may have occurred during the worker's employment.) Requesting that employees voluntarily and knowingly waive any claims under WARN, or other employment-related laws, may involve offering some additional severance pay or extended health benefits. If something of value such as additional pay or benefits is received by the employees for signing the waivers, they may have waived any claims that they have under WARN or other employment-related laws.

Neither the Act nor the regulations recognize the concept of pay in lieu of notice. WARN requires notice, making no provision for any alternative. Failure to give notice does a significant disservice to workers and undermines other services that are part of the purpose of the WARN Act. However, since WARN provides that the maximum employer liability for damages, including back pay and benefits, is for the period of violation up to 60 days, providing your employees with full pay and benefits for the 60-day period effectively precludes any relief.

*Exhibit*

No. If an employee gets another job within the 60-day period, this is viewed as a voluntary termination that makes the employee ineligible to collect damages.

WARN allows "voluntary and unconditional" payments that are not "required by any legal obligation" to be offset against an employer's back pay liability. In many cases, however, severance pay is required by contract, including an employer's personnel policies and handbooks. These payments do not offset WARN damages and thus would not serve as pay in lieu of notice.

Vacation pay may be considered wages or a fringe benefit in some situations. If an employee has "earned" the vacation pay, that is, if he/she has a legal right to it by contract or otherwise, then an employer must pay it as part of WARN damages. These obligations are generally governed by contract and sometimes by the Employee Retirement and Income Security Act. Call 1-800-998-7542 or visit *www.dol.gov/ebsa* for more information.

SINGLE SITE OF ...            ...

For workers whose primary duties require travel from point to point, who are
outstationed, or whose primary duties involve work outside any of the
employer's regular employment sites (for example, railroad workers, bus driv-
ers, or salespersons), the single site of employment to which they are
assigned as their home base, from which their work is assigned, or to which
they report will be the single site in which they are covered for WARN pur-
poses.

WHEN ADVANCE ...    ... ?

From the date of receipt.  Workers must receive notice at least 60 days be-
fore separation.  This does not mean that if one or two notices are not deliv-
ered through no fault of the employer, there is a violation.  It is prudent, how-
ever, to make sure that the workers who were sent notices actually got them.

WHO MUST PAY IF A WARN CASE ...

Employers may be liable for actual attorney fees and costs incurred if a
Federal District Court so rules in the event that the workers prevail in a WARN
lawsuit.

Fourth Circuit, in two recent cases bankruptcy courts

have concluded that notwithstanding the provisions of

the WARN Act, in the event employees are terminated

prior to the commencement of a bankruptcy case, claims

based on the WARN Act are not entitled to administrative

expense priority under section 503(b)(1).  See In re

First Magnus Financial Corporation, 390 B.R. 667, 677

(Bankr. D. Ariz. 2008)(holding that WARN Act claims of 8

employees terminated prior to debtors' filing

liquidating chapter 11 petitions were not entitled to

administrative expense priority under Bankruptcy Code

section 503(b)(1)); Henderson v. Powermate Holding Corp.,

Case No. 08-50559 (KG) (Bankr. D. Del. Oct. 15,

2008)(holding that WARN Act claims of 260 employees

terminated prior to debtors' filing chapter 11 petitions

were not entitled to administrative expense priority

under Bankruptcy Code section 503(b)(1)).

17.    Notwithstanding the above precedent, the

Debtors request authority to pay the WARN Employees the

wages, salaries and benefits that they would be entitled

to earn over the balance of the 60 day WARN Period, even

though it is extremely unlikely that such employees will

be recalled by the Debtors as a result of the

commencement of these Chapter 11 Cases and thus will

provide no further services to the Debtors.  In that

regard, the Debtors believe that, under the

circumstances and given the Debtors' intent to attempt

to successfully reorganize or sell their business as a

going concern such authorization is critical.  In

particular, the Debtors maintain that such payments are

essential to stabilize their workforce and improve

overall Employee morale in this critical period in the

Debtors' restructuring efforts.  The Debtors estimate

that the aggregate cost associated with continuing the

payment of wages, salaries and benefits to the WARN

Employees is approximately $8 to $ 10 million, which

amount has been included in their DIP budget.

**B.    Bonuses.**

18.    In addition to regular compensation, the

Debtors currently offer a number of incentive bonuses to

Employees through various bonus plans.  In particular,

there are approximately 12 separate plans (collectively,

the "Field Bonus Plans") which provide bonuses to

Employees in the Debtors' retail stores.  The Field

11

State Workers' Compensation Programs could result in administrative or legal proceedings against the Debtors and their officers and directors.

63.   Accordingly, by this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to the Workers' Compensation Insurance and the State Workers' Compensation Programs in the ordinary course of business, including amounts that arose prior to the Petition Date.

*Exhibit 4*   **H.    Other Forms of Compensation.**

64.   The Debtors offer their Employees other forms of compensation, including paid time off, overtime pay and certain other benefits.  These forms of compensation are usual, customary and necessary if the Debtors are to retain qualified employees to operate their businesses.

*Exhibit 5*   **(1)   Paid Time Off.**

65.   All full-time and part-time Salaried and Hourly Employees are eligible to accrue or receive paid time off (the "Paid Time Off").  This Paid Time Off may

34

be used by Employees for vacation, holidays, sick days,
or personal days.[21]

66.  **Hourly Employees' Paid Time Off Policy.**  All
Hourly Employees with ninety (90) days or more of
service with the Debtors accrue Paid Time Off for each
hour worked.  The rate of accrual varies based on the
length of service.

67.  These accrued hours of Paid Time Off may be
used for any purpose, including sick time, vacation,
holidays or personal business.  Hourly Employees may
carry any remaining accrued Paid Time Off over into the
next fiscal year.  Prior to the Petition Date, any
*Exhibit 5* unused, accrued Paid Time Off was paid to Employees upon
termination of employment.

*Exhibit 7*  68.  As of September 30, 2008, there were
approximately 713,000 hours of Paid Time Off outstanding,
with an approximate value of $9.2 million.[22]  By this
Motion, the Debtors seek entry of an order authorizing,
but not directing, them to allow Hourly Employees to use

---

[21] Employees in the Debtors' Puerto Rico stores accrue separate sick
days and vacation days.

[22] Puerto Rico Employees have accrued approximately $50,000 in sick
and vacation hours.

accrued and unused Paid Time Off and to continue to

accrue Paid Time Off in the ordinary course of business.

However, at this time, the Debtors are not seeking

authorization to continue to pay an Employee for accrued,

unused Paid Time Off upon termination.

*Exhibit 7*        69.   The Debtors anticipate that their Hourly

Employees will utilize the accrued Paid Time Off in the

ordinary course of business without resulting in any

material cash flow requirements beyond the Debtors'

normal payroll obligations.  Use of Employee Paid Time

Off remains subject to ordinary course restrictions.

        70.  **Salaried Employees' Paid Time Off Policy.**

Paid Time Off does not accrue for Salaried Employees and

there is no specified allowance of Paid Time Off

available to Salaried Employees.  Salaried Employees

must request permission to take Paid Time Off from their

supervisors and may take Paid Time Off to the extent

that such permission is granted.  The appropriate amount

of Paid Time Off for each Salaried Employee depends on

certain job-related factors and, in each case, will be

dependent on a supervisor's determination that the Paid

Time Off request does not conflict with immediate

CIRCUIT CITY STORES
PO BOX 563986
CHARLOTTE, NC 28256-3986
1 800-288-6353

DAVID J CACCIOTTI
9812 Fernleigh Dr
Richmond, VA  23235

Business Unit: USRNA
Employee ID: 1033549
Department: 900000 Consumer Parts
Location: Deep Run - CCS Corporate

Pay End Date: 01/15/2009   Advice Date: 01/21/2009

| TAX DATA: | Federal | VA State |
|---|---|---|
| Marital Status | Single | Single |
| Allowances: | 2 | 1 |
| Addl. Pct: | | |
| Addl. Amt: | | |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Regular Hourly | 15.270000 | 48.00 | 732.96 | 112.00 | 1,710.24 |
| Paid Time Off | | | 0.00 | 16.00 | 244.32 |
| Total: | | 48.00 | 732.96 | 128.00 | 1,954.56 |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Fed Withholding | 16.56 | 100.81 |
| Fed MED/EE | 9.01 | 25.92 |
| Fed OASDI/EE | 38.53 | 110.82 |
| VA Withholding | 14.86 | 56.28 |
| Total: | 78.96 | 293.83 |

## BEFORE TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Employee Dental | 13.56 | 20.34 |
| Employee Medical | 97.84 | 146.76 |
| 401K | 73.30 | 195.46 |
| Total | 184.70 | 362.56 |

## AFTER TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Accidental Death/Dismemberment | 2.50 | 3.75 |
| Supplemental Life Insurance | 17.72 | 26.58 |
| Long Term Disability | 9.86 | 14.79 |
| Total: | 30.08 | 45.12 |

## PTO Plan

| Py PTO | |
|---|---|
| Earned | 0.00 |
| Taken | 0.00 |
| Balance | 0.00- |
| Current PTO | |
| Earned | 159.06 |
| Taken | 72.75 |
| Balance | 93.65 |

| IMPUTED INCOME | |
|---|---|
| Current: | 0.00 |
| YTD: | 0.00 |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 732.96 | 548.26 | 78.96 | 214.78 | 439.22 |
| YTD | 1,954.56 | 1,592.00 | 293.83 | 407.68 | 1,253.05 |

MESSAGE  VERIFY YOUR PERSONAL INFO FOR 2007 W2 ACCURACY

▼ FOLD AND TEAR HERE ▼

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER. THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE WHEN CHECKING THE ENDORSEMENT

**circuit CITY®**

CIRCUIT CITY PAYROLL
PO BOX 563986
CHARLOTTE, NC 28256-3986
1-800-288-6353

**Date:**
01/21/2009

**Advice No.**
3246103

VOID

Deposit Amount:  $********439.22

To The
Account(s) Of

DAVID J CACCIOTTI
9812 Fernleigh Dr.
Richmond, VA  23235

### DIRECT DEPOSIT DISTRIBUTION

| Account Type | Account Number | Deposit Amount |
|---|---|---|
| Checking | XXXXXXXXXXXXXXXXX5230 | $439.22 |

**NON-NEGOTIABLE**
THIS IS NOT A CHECK

TOTAL                     439.22

**NON NEGOTIABLE**

Exhibit C

Gregg M. Galardi, Esq.                  Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.                 Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &         MCGUIREWOODS LLP
FLOM, LLP                               One James Center
One Rodney Square                       901 E. Cary Street
PO Box 636                              Richmond, Virginia 23219
Wilmington, Delaware 19899-0636         (804) 775-1000
(302) 651-3000

                - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Proposed Counsel to the Debtors
and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
                             :
In re:                       :   Chapter 11
                             :
CIRCUIT CITY STORES, INC.,   :   Case No. 08- _____ (___)
et al.,                      :
                             :
            Debtors.         :   Jointly Administered
- - - - - - - - - - - - - - x

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363,
507(a), 541, 1107(a) AND 1108 AND BANKRUPTCY RULE 6003
AUTHORIZING DEBTORS TO PAY PREPETITION WAGES,
COMPENSATION, AND EMPLOYEE BENEFITS**

Upon the motion (the "Motion")[1] of the Debtors

for an order, pursuant to Bankruptcy Code sections

---

[1] Capitalized terms not otherwise defined herein shall have the
meanings ascribed to such terms in the Motion.

105(a), 363, 507(a)(4), 507(a)(5), 541, 1107(a) and 1108
and Bankruptcy Rule 6003, (a) authorizing, but not
directing, the Debtors, *inter alia*, to pay prepetition
wages, salaries, bonuses, reimbursements, and other
compensation; (b) authorizing, but not directing, the
Debtors to continue the maintenance of all employee
benefit programs in the ordinary course; and
(c) *directing all banks to honor prepetition checks for*
payment of prepetition employee obligations; and the
Court having reviewed the Motion and the Besanko
Declaration; and the Court having determined that the
relief requested in the Motion is in the best interests
of the Debtors, their estates, their creditors, and
other parties in interest; and it appearing that proper
and adequate notice of the Motion has been given and
that no other or further notice is necessary; and upon
the record herein; and after due deliberation thereon;
and good and sufficient cause appearing therefor, it is
hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.    The Motion is GRANTED.

2



Confidential – Internal Use Only: Do Not Distribute

## FAQ Related to "Notice of Deadline for Filing Proofs of Claim"

*The purpose of this FAQ document is to clarify some basic questions you may have about receiving the Notice of Deadline for Filing Proofs of Claim. This document is <u>not</u> intended to provide all of the information you may need in reference to this Notice and does not in any way replace reading the Notice in its entirety.*

*Please read the Notice carefully to determine whether you are required to file a Proof of Claim. <u>You may want to consult an attorney to determine whether a Proof of Claim needs to be filed. The company cannot provide legal advice to you on whether to file a Proof of Claim or assist you with completing your Proof of Claim Form.</u> This FAQ does not in any way constitute legal advice.*

1. **Why did I receive this Notice of Deadline for Filing Proofs of Claim?**

   The mailing of this Notice is a routine part of a Chapter 11 case. The Notice was sent to all known or potential creditors, equity interest holders and other parties of interest. Employees and retirees of the company might be potential creditors. You may receive more than one copy.

   Prior to mailing this notice, Circuit City filed with the Bankruptcy Court schedules of its assets and liabilities, which, among other things, list claim amounts that Circuit City believes it may owe to its creditors. Anyone who has a claim listed in the schedules as disputed, unliquidated or contingent, who disagrees with the amounts listed in the schedules or who believes that he or she holds a claim against Circuit City must file a Proof of Claim before the Bar Date.

   The Notice and Proof of Claim Form provide you with (1) information relating to monies the company may owe you for claims that arose prior to November 10, 2008, when the company filed for bankruptcy, and (2) the information you need to file a Proof of Claim relating to those monies, if necessary.

   Receiving the Notice does not necessarily mean that you have a claim or that you need to file a Proof of Claim.

2. **What is a "Bar Date"?**

   The Bar Date is the date set by the Bankruptcy Court by which a creditor must file a Proof of Claim against the company relating to the period before November 10, 2008. The Bar Date is **January 30, 2009, 5:00 p.m. Pacific Time**. For more information about how to meet this deadline, please follow the instructions in the Notice.

1

Confidential – Internal Use Only: Do Not Distribute

3. **How can I file a Proof of Claim?**

If you believe that you have a claim against Circuit City, the Notice provides you with the instructions and the Proof of Claim Form to complete in order to properly file that claim with the Bankruptcy Court.

If you do not believe that you have a claim against Circuit City, you do not need to do anything. The definition of "claim" is set forth in the notice. If you are not sure whether you have a claim, you may want to contact an attorney.

4. **How can I find out how much Circuit City owes me?**

You should have received a Proof of Claim Form along with the Notice. The Proof of Claim form may include a specific dollar amount or it may say "unknown". If you believe the amount is incorrect or if this amount is listed as "disputed", "contingent" "unliquidated", or "unknown", you should follow the instructions in the Notice relating to filing a Proof of Claim.

There are a few types of claims for which you do not need to file a Proof of Claim. A few examples listed in the Notice include the following:
- A monetary amount (including $0.00) listed on your Proof of Claim Form that is <u>not</u> listed as "contingent," "unliquidated" or "disputed" and that you do not dispute for any reason;
- Claims for which a Proof of Claim has already been properly filed; and
- Claims previously allowed or paid under an order of the Bankruptcy Court.

Claims previously paid or being paid under an order of the Bankruptcy Court include the following:
- Associate wages and base salary that accrued prior to the bankruptcy filing;
- Pre-filing benefits including Medical, Dental, Vision, Health Care Spending Account, Dependent Care Spending Account, Life, Long-term Disability, Short-term Disability and 401(k) match;
- Incentive plans for field associates including Region District Incentive Plan (DMs, ROMs, RfMs, DHRMs), Store Management Incentive Plans, Store Supervisor Incentive Plans, HE Specialist Incentive Plans, Firedog Services Management Incentive Plan, Installation Supervisor Incentive Plans, and Call Center Hourly Incentive Plans;
- Reimbursements for pre-filing business expenses;
- Retirement (Pension) Plan Benefits; and
- Tuition reimbursement for associates properly enrolled as of the filing date and approved on record for the semester that includes November 10.

Confidential – Internal Use Only: Do Not Distribute

5. **What does it mean if my claim says "disputed", "contingent" or "unliquidated"?**
   - *Disputed claim*: A claim that is currently disputed by the company.
   - *Contingent claim*: A claim that may be owed by the company only under certain circumstances, such as a possible future event.
   - *Unliquidated claim*: A claim for which a specific value has not been determined.

6. **What do I do if the information on the Proof of Claim Form and/or in the schedules I was sent does not match the amount I believe I am owed?**

   You can submit a Proof of Claim for the amount you believe you are owed, and you will be notified if/when the company or its representative is ready to reconcile your claim.

7. **Should I file a Proof of Claim if I am a stockholder?**

   You do not need to file a Proof of Claim that reflects solely your ownership and amount of company stock. You will be notified separately if you need to file a "Proof of Interest" to reflect the amount of stock you own.

8. **What happens if I file a Proof of Claim?**

   Filing a Proof of Claim allows a properly submitted claim to be evaluated by the Bankruptcy Court. The company will rely on the schedules and Proofs of Claim submitted to determine the amount and validity of claims held by creditors. This determination will allow the company to, among other things, establish the distribution amounts paid to creditors under a plan of reorganization.

   Please note that filing a Proof of Claim does not guarantee that you will receive the amount of your claim or any amount.

9. **What if I don't file a Proof of Claim or file it after the Bar Date?**

   Proofs of Claim must be filed by the Bar Date unless your claim falls into an excluded category as referenced in the Notice. If you fail to file your Proof of Claim by the Bar Date, you will be forever barred from asserting the claim against the company, from voting on a plan of reorganization, or from participating in any distributions on account of such claim under a plan of reorganization.

10. **What is the status of the company's short-term and long-term incentive programs?**

    Please refer to our "Chapter 11 FAQs for Associates" accessible via a direct link to "Chapter 11 News Archive" from Company Headlines on ccity.com.

3

Confidential – Internal Use Only: Do Not Distribute

### 11. Where do I go if I need more information?

Unfortunately, we cannot answer every question that you may have because this
process is a legal matter about which the company cannot advise you.  If you need
advice on whether to file a Proof of Claim or how to fill out your Proof of Claim
Form, you may want to consult an attorney.

An FAQ about other topics related to filing for protection under Chapter 11 is
accessible via a direct link to "Chapter 11 News Archive" from Company Headlines
on ccity.com.

4

*Exhibit 9*

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA | PROOF OF CLAIM |
|---|---|

**Debtor against which claim is asserted :  (Check only one box below):**

| | | |
|---|---|---|
| Circuit City Stores, Inc. (Case No. 08-35653) | CC Distribution Company of Virginia, Inc. (Case No. 08-35659) | Abbott Advertising, Inc. (Case No. 08-35665) |
| Circuit City Stores West Coast, Inc. (Case No. 08-35654) | Circuit City Stores PR, LLC (Case No. 08-35660) | Mayland MN, LLC (Case No. 08-35666) |
| InterTAN, Inc. (Case No. 08-35655) | Circuit City Properties, LLC (Case No. 08-35661) | Patapsco Designs, Inc. (Case No. 08-35667) |
| Ventoux International, Inc. (Case No. 08-35656) | Orbyx Electronics, LLC (Case No. 08-35662) | Sky Venture Corporation (Case No. 08-35668) |
| Circuit City Purchasing Company, LLC (Case No. 08-35657) | Kinzer Technology, LLC (Case No. 08-35663) | XSStuff, LLC (Case No. 08-35669) |
| CC Aviation, LLC (Case No. 08-35658) | Courcheval, LLC (Case No. 08-35664) | PRAHS, Inc. (Case No. 08-35670) |

NOTE: *This form should not be used to make a claim for administrative expenses arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503(a).*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br><br>**CACCIOTTI, DAVID J** | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:     NameID: **4974516**     PackID: **351379**<br><br>CACCIOTTI, DAVID J<br>9812 FERNLEIGH DR<br>RICHMOND VA 23235<br><br>Telephone number: | **Court Claim Number:** _____<br>*(If known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**     $_____<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:** _____<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:** _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier — 11 U.S.C. § 507(a)(4). |
| **4. Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:**  ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br><br>**Value of Property:** $_____   **Annual Interest Rate** ___%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>if any: $_____   **Basis for perfection:** _____<br><br>**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan — 11 U.S.C. § 507(a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use — 11 U.S.C. § 507(a)(7).<br><br>☐ Taxes or penalties owed to governmental units — 11 U.S.C. § 507(a)(8).<br><br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment* |
| **Date:** | **Signature:** the person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | **FOR COURT USE ONLY** |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

MasterCode: **10041183**



08356530812180741331187922

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT | PROOF OF CLAIM |
|---|---|

| Name of Debtor: Circuit City Stores, Inc. | Case Number: 08-35653 |
|---|---|

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

**Name of Creditor (the person or other entity to whom the debtor owes money or property):**

☐ Check this box to indicate that this claim amends a previously filed claim.

Name and address where notices should be sent:
Circuit City Stores, Inc.
9954 Mayland Dr.
Richmond, Va. 23233

Telephone number: 804-486-4000

**Court Claim Number:** _____
*(If known)*

Filed on: _____

Name and address where payment should be sent (if different from above):
David J. Cacciotti
9812 Fernleigh Dr.
Richmond, Va. 23235

Telephone number: 804-560-1148

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $ 1,022.27 _____

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** _____ WARN Act 29 U.S.C. Sections 2101 et Seq. 11 U.S.C.
Section 507 (A) U.S. Bankruptcy Court Case #08-35653
(See instruction #2 on reverse side.) 12/05/08 Hearing

**3. Last four digits of any number by which creditor identifies debtor:** 3875

    **3a. Debtor may have scheduled account as:** _____
    (See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe:

Value of Property:$_____  Annual Interest Rate___%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____  Basis for perfection: _____

Amount of Secured Claim: $_____  Amount Unsecured: $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

X Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$ 1,022.27

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

Date: 12/23/08

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

FOR COURT USE ONLY

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.