**Omar Tawil**
**7 Merrill Hill, Ladera Ranch, California 92694**
**(714) 904-5557**

September 10, 2009

The United States Trustee
United States Bankruptcy Court
701 East Broad Street Suite 4304
Richmond, Virginia 23219
Attn: Robert B. Vanarsdale



Re: Objection to Claim Status Under Plan of Liquidation

The purpose of this letter is to object to the current status of my claims under the plan of
liquidation for claim numbers _____.

It is my position that I am eligible for the special retention cash incentives based on the
language in the contracts. Specifically, "If you remain continuously employed in a full-
time active position with the Company through and including the date on which a
'Change of Control' of the Company occurs, then any portion of your award that has not
yet vested will vest as of such Change of Control date. For this purpose 'Change of
Control' has the meaning set forth in the Circuit City Stores, Inc. 2003 Stock Incentive
Plan, as amended and restated, effective December 14, 2006, and that definition is
incorporated by reference into, and made part of, this award letter. Generally, a Change
of Control will be deemed to occur upon any of the following events: (i) the acquisition
by any person or entity of 35% or more of either the Company's outstanding shares the
combined voting power of the then outstanding securities of the Company entitled to vote
generally in the election of directors (but excluding certain acquisitions involving the
Company or an affiliate, or by any benefit plan sponsored by the Company); (ii) the
incumbent members of the Board of Directors of the Company (including any future
directors whose election is approved by a majority of the incumbent members) cease to
constitute a majority of the Board of Directors; **(iii) the consummation of a**
**reorganization, merger or consolidation of the Company or sale or other disposition**
**of all or substantially all of the assets of the Company (with certain exceptions, as**
**described in the 2003 Stock Incentive Plan); or (iv) the consummation of a plan of**
**complete liquidation, dissolution, or sale of substantially all of the assets of the**
**Company.**"

These were agreements that I relied upon in participating of the wind down operations
between November 10, 2009 and March 2009. These contractual awards, I believe
vested at the time of announcement of liquidation, by Jim Marcum CEO, on November
16, 2008. (announcement communication enclosed).

**RECEIVED**
ˈSEP 1 8 2009



These awards were never disavowed after the November 10 petition date. I believe that I was reasonable in relying on these awards in continuing to provide services to the corporation.

Lastly, I believe that these claims should be classified as Administrative Claims to the Circuit City Estate not General Unsecured Claims.

Thank you for your time and consideration regarding the above.

Respectfully submitted,

Omar Tawil
Enclosures



SUBJECT: Message from Jim Marcum - January 16, 2009

Dear Circuit City Associates,

I am writing to follow up on today's very unfortunate news. I apologize for not sending this to you sooner, but I wanted to be able to provide you with as much information as possible. I also want you to know that this written communication is <u>not</u> a replacement for the personal communication you should receive from your direct manager. It is meant to ensure that all associates have the opportunity to receive the same information at the same time and directly from me.

Today, Circuit City Stores, Inc. announced that, despite everyone's best efforts, we will have to liquidate all of Circuit City's assets. This will mean that all of our stores will be conducting going-out-of-business sales, which should be completed within the next 90 days. Along with that process, our store support center and other facilities will ultimately close.

As you know, we were in continuous negotiations regarding a going concern transaction. Regrettably, this is the only possible path for our company as we were unable to reach an agreement with our creditors and lenders to structure a going-concern transaction in the limited timeframe available to us.

We will continue to communicate the specifics regarding the "wind down" process as we work through them. In the meantime, here's what we understand to be the probable future of the business -- the liquidation process will begin as early as tomorrow. Representatives from the inventory liquidators while begin to immediately contact stores and work with field management.

I know that you have questions about the status of your jobs and your benefits. We will be working hard to provide you with answers to these questions throughout the day.

I realize how disappointed we all are, but we owe it to each other to keep our heads high, maintain integrity, and respect our great Circuit City brand to the end. Let's honor our company and one another by closing Circuit City with dignity. Thank you for your support and commitment, especially through this most challenging time that we have shared over the past few months. Today's announcement is not an outcome of your work. You can be proud of your tremendous effort to deliver a different result.


Thank you,

Jim

10009204,Tawil,Omar A
N/A, 1/1/2008, Cash



January 3, 2008

Omar A Tawil
7 Merrill Hill
Ladera Ranch, CA  92694

Dear Omar A:

Congratulations!  The Compensation and Personnel Committee of the Board of Directors (the "Committee") has awarded you a special cash retention award (the "Award") subject to the terms of this Award letter.  The purpose of this Award is to reward, motivate and retain management personnel who are key to the Company's turnaround efforts and long term success.  To accept this Award, please sign the enclosed copy of this letter, and return it as indicated in item 6 below.

Subject to the requirements and limitations set forth in this Award letter, your Award, Award Date, and Vesting Dates are as follows:

Total Cash Retention Award:  $40,000

Award Date:  January 1, 2008

| Vesting Dates | Vesting % |
|---|---|
| January 1, 2009 | 50% |
| January 1, 2010 | 50% |

For purposes of this Award letter, "Company" means Circuit City Stores, Inc. or a parent or subsidiary of Circuit City Stores, Inc. within the meaning of section 424(e) and (f) of the Internal Revenue Code of 1986, as amended.

Your right to receive the portion of your Award corresponding to the above Vesting Dates is contingent on (i) your agreeing to the terms of this Award by signing and returning the enclosed copy of this letter, and (ii) your remaining continuously employed on a full-time active basis with the Company through and including the corresponding Vesting Date.  If you satisfy these requirements, the portion of your Award that becomes vested will be paid to you in a single lump sum cash payment within 75 days following the Vesting Date.  Your right to this Award is not contingent on corporate or individual performance.

Forfeiture.  If prior to becoming fully vested in your Award, (i) your employment with the Company terminates for any reason other than your death or permanent disability, or (ii) your employment status with the Company changes to part-time, or (iii) you retire from the Company, then the unvested portion of your Award will be forfeited as of the date of your termination, change in status, or retirement, as the case may be.

If your employment with the Company terminates on or before a Vesting Date because you die or become permanently disabled, then the portion of your Award scheduled to vest on such Vesting Date will vest as of the date of your death or termination for disability (assuming you otherwise meet the requirements under this Award letter), and any portion of your Award that would have vested on a subsequent Vesting Date will be forfeited. For example, if your employment terminates under these circumstances on or before January 1, 2009, the portion of your Award scheduled to vest on that date will vest, and any portion that would have vested on a subsequent Vesting Date will be forfeited.

The Committee will determine whether a permanent disability exists for purposes of the foregoing, and such determination will be conclusive and binding.

Other terms relevant to this Award letter are set forth below.

1. **Modification**. The Committee may unilaterally modify the terms of this Award letter after the Award Date provided that your consent is obtained with respect to any modification that would be detrimental to your rights hereunder, except that your consent will not be required to the extent any such modification is to comply with applicable law.

2. **Change of Control**. If you remain continuously employed on a full-time active basis with the Company through and including the date on which a Change of Control of the Company occurs, then notwithstanding any provision herein to the contrary, any restrictions hereunder on your outstanding Award shall lapse as of such date. For this purpose, "Change of Control" has the meaning set forth in the Circuit City Stores, Inc. 2003 Stock Incentive Plan, as amended and restated, effective December 14, 2006, and that definition is incorporated by reference into, and made a part of, this Award letter. Generally, a Change of Control will be deemed to occur upon any of the following events: (i) the acquisition by any person or entity of 35% or more of either the Company's outstanding shares or the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (but excluding certain acquisitions involving the Company or an affiliate, or by any benefit plan sponsored by the Company); (ii) the incumbent members of the Board of Directors of the Company (including any future directors whose election is approved by a majority of the incumbent members) cease to constitute a majority of the Board of Directors; (iii) the consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (with certain exceptions, as described in the 2003 Stock Incentive Plan); or (iv) the consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

3. **Withholding Taxes**. On the Vesting Date, you will have taxable income equal to the amount of your vested Award, and the Company will withhold the amount of taxes required to be withheld or paid.

4. **Interpretation**. The interpretation and construction of any provision or term of this Award letter by the Committee will be final and conclusive. The terms of this Award letter and all actions taken hereunder will be governed by the laws of the

- 2 -

Commonwealth of Virginia, without regard to the conflict of law provisions of any jurisdiction.

5. **Miscellaneous**.

a. This Award letter is the entire agreement between you and the Company concerning the Award granted hereunder. If you are a party to an Employment Agreement with the Company, you agree that in the case of a conflict between the Employment Agreement and this Award letter, the terms of this Award letter will control.

b. Nothing in this Award letter confers any right to continued employment with the Company, or affects the Company's right to terminate an associate's employment at any time, with or without notice, and with or without cause.

c. The Company has no obligation to contribute any assets to a trust or other entity or otherwise to segregate any assets, or maintain separate accounts for the purpose of satisfying the Award obligation hereunder.

6. **Acceptance of this Award**. In order for your Award to become effective, you must accept it by signing and faxing a copy of this entire letter as soon as possible, but in no event later than February 1, 2008 to **757-299-8412**.

Your signature will also constitute your agreement to the terms and conditions contained in this letter.

Sincerely,

Eric A. Jonas, Jr.
Senior Vice President
Human Resources

ACCEPTED:

_____
Associate Signature

Omar Tawil
Printed Name

1/14/08
Date

10009204 , Tawil , Omar A.
N/A, 9/29/2008, CASH



October 9, 2008

Omar A. Tawil
7 Merrill Hill
Ladera Ranch, CA  92694

Dear Omar A.:

Congratulations!  The Compensation and Personnel Committee of the Board of Directors (the "Committee") has awarded you a long-term cash incentive award (the "Award") subject to the terms of this Award letter.  The purpose of this Award is to reward, motivate and retain associates who are key to our turnaround efforts and long term success of Circuit City Stores, Inc. (the "Company").  To accept this Award, please sign this letter, and fax it as instructed in Section 6 below.

Subject to the requirements and limitations set forth in this Award letter, your Target Cash Incentive Award, Maximum Cash Incentive Award, and Award Date are as follows:

Target Cash Incentive Award:               $40,000

Maximum Cash Incentive Award:          $80,000

Award Date:                               September 29, 2008

This Award is based on performance of the Company over time and the amount that you can earn at each Vest Date under the Award is subject to meeting the Performance Conditions as outlined below. For purposes of the Performance Conditions, the following definitions apply:

Minimum Availability:  maintaining excess availability under all of the Company's existing or future credit facilities in effect as of February 28, 2009, as such existing or future credit facilities may be amended, modified, superseded or supplemented, through February 28, 2009; and

Closing Stock Price:  closing stock price as reported by the exchange or market on which the Company's common stock generally has the greatest trading volume.

The schedule of Vest Dates, the corresponding target amounts and Performance Conditions for each date are as follows:

1st Vest Date:                     July 1, 2009
Targeted Amount Vesting:          $13,333
Performance Condition:             Minimum Availability

2nd Vest Date:                January 1, 2010
Targeted Amount Vesting:     $13,333
Performance Condition:       Total shareholder return based on the following stock prices:

| Closing Stock Price on Dec. 31, 2009 | % Payout of Targeted Amount Vesting |
| --- | --- |
| less than $3.00 | 0% |
| $3.00–$3.99 | 75% |
| $4.00–$4.99 | 100% |
| $5.00–$5.99 | 125% |
| $6.00–$6.99 | 175% |
| $7.00–$7.99 | 200% |
| $8.00–$8.99 | 225% |
| $9.00 or greater | 250% |

3rd Vest Date:                July 1, 2010
Targeted Amount Vesting:     $13,333
Performance Condition:       Total shareholder return based on the following stock prices:

| Closing Stock Price on Vest Date | % Payout of Targeted Amount Vesting |
| --- | --- |
| less than $4.00 | 0% |
| $4.00–$4.99 | 75% |
| $5.00–$5.99 | 100% |
| $6.00–$6.99 | 125% |
| $7.00–$7.99 | 175% |
| $8.00–$8.99 | 200% |
| $9.00–$9.99 | 225% |
| $10.00 or greater | 250% |

If on the specified Vest Date no amount is earned or an amount less than the Targeted Amount is earned, the unearned portion of the Targeted Cash Incentive Amount for that Vest Date will roll-forward to the next Vest Date and may be earned if the minimum Performance Condition for the next Vest Date is achieved.  Any amounts that are rolled forward to the next Vest Date are not eligible for more than a Target (100%) payout.

For purposes of the vesting and forfeiture requirements that follow, your employment with the "Company" includes your employment with Circuit City Stores, Inc. or with a parent or subsidiary of Circuit City Stores, Inc. within the meaning of section 424(e) and (f) of the Internal Revenue Code of 1986, as amended.

Your right to receive the portion of your Award corresponding to each of the above Vest Dates is contingent on (i) your agreeing to the terms of this Award by signing and faxing this letter, and (ii) your remaining continuously employed on a full-time active basis with the Company through and including the corresponding Vest Date.  If you satisfy these

requirements, the portion of your Award that becomes vested will be paid to you in a single lump sum cash payment within 75 days following the Vest Date. In the event that you are on a leave of absence on the Vest Date, the portion of your Award that would have vested on that date will not vest until you return to active full-time employment with the Company and will then be paid within 75 days after your return.

Forfeiture. If prior to becoming fully vested in your Award, (i) your employment with the Company terminates for any reason other than your death or permanent disability, or (ii) your employment status with the Company changes to part-time, or (iii) you retire from the Company, then the unvested portion of your Award will be forfeited as of the date of your termination, change in status, or retirement, as the case may be

If your employment with the Company terminates on or before a Vest Date because of death or permanent disability, then the portion of your Target Cash Incentive Award that is scheduled to vest on a future Vest Date will vest as of the date of your death or termination for disability (assuming you otherwise meet the requirements under this Award letter), and will be paid out in a lump sum cash payment within 75 days after your death or disability.

The Committee will determine whether a permanent disability exists for purposes of the foregoing, and such determination will be conclusive and binding.

Other terms relevant to this Award letter are set forth below.

1. **Modification**. The Committee may unilaterally modify the terms of this Award letter after the Award Date provided that your consent is obtained with respect to any modification that would be detrimental to your rights hereunder, except that your consent will not be required to the extent any such modification is to comply with applicable law.

2. **Change of Control**. If you remain continuously employed on a full-time active basis with the Company through and including the date on which a Change of Control of the Company occurs, then any unvested portion of your outstanding Target Cash Incentive Award will vest as of such date and will be paid to you in a lump sum cash payment within 75 days thereafter. For this purpose, "Change of Control" has the meaning set forth in the Circuit City Stores, Inc. 2003 Stock Incentive Plan, as amended and restated, effective December 14, 2006, and that definition is incorporated by reference, and made a part of this Award letter.

The following provides a brief summary of the definition of Change of Control under the 2003 Stock Plan. This is intended only as a summary, and any determination of whether a Change of Control has actually occurred will be subject to the full definition set forth in the 2003 Stock Plan. In general, a Change of Control will occur upon any of the following events: (i) a third party acquires 35% of the Company's outstanding stock; (ii) the incumbent members of the Company's Board of Directors cease to be a majority of the Board (for this purpose, "incumbent members" includes directors whose election was approved by a majority of the Board); (iii) a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company; or (iv) the consummation of a plan of complete liquidation or dissolution of the Company.



# Your Total Direct Compensation

**About You:**

| Name | Omar A Tawil |
|---|---|
| **Employee ID** | 10009204 |
| **Department** | Western Region |
| **Statement Date** | January 1, 2008 |

**About Your Compensation:**

| | Compensation as of 1/1/2008 |
|---|---|
| **Job Title** | District Mgr |
| | |
| **Base Pay** | $146,775 |
| **Annual Incentive Target Percentage (%)** | |
| **Annual Incentive Target Dollars ($)** | $29,000 |
| **Target Annual Total Cash Comp** | $175,775 |
| **Target Long-Term Incentive (LTI) Award\*** | $ 40,000 |
| **Target Total Direct Compensation** | $215,775 |
| | |
| **One-time Retention Award\*** | $ 40,000 |

**\* Note:** Details regarding the 1/1/2008 LTI grant and cash retention award are in the award letters
contained in this package.



10009204, Tawil, Omar A
N/A, 1/1/2008, PSU



January 3, 2008

Omar A Tawil
7 Merrill Hill
Ladera Ranch, CA 92694

Dear Omar A:

Circuit City Stores, Inc. (the "Company") would like to support our director-level associates through a "phantom stock" award program that provides an incentive to work for the Company's long-term success.  A phantom stock award generally consists of units, each with a value equivalent to one share of a company's stock, which is paid out at the end of a specified time period.

I am pleased to inform you that, effective January 1, 2008, you have been awarded the following phantom stock units, each with a value equal to one share of Circuit City Common Stock, which will be payable in cash upon vesting:

Number of Units: 9,525

Your award is subject to the conditions set forth in this letter and to your signing and returning the enclosed copy of this letter as instructed further below.

This long-term incentive is a three-year program, with vesting at the end of each of the first, second, and third years.  If you remain continuously employed by the Company in a full-time active position from January 1, 2008 through and including:

- January 1, 2009, you will be 33.3% vested in your award and entitled to an initial cash payment equal to 33.3% of the total units awarded hereunder multiplied by the closing share price of Circuit City Common Stock on December 31, 2008;

- January 1, 2010, you will be 66.6% vested in your award and entitled to a second cash payment equal to 33.3% of the total units awarded hereunder multiplied by the closing share price of Circuit City Common Stock on December 31, 2009;

- January 1, 2011, you will be 100% vested in your award and entitled to a third cash payment equal to 33.4% of the total units awarded hereunder multiplied by the closing share price of Circuit City Common Stock on December 31, 2010.

Units that vest will be paid out in cash following the end of the corresponding vesting period.  The vesting of all or part of a phantom stock award is a taxable event.  Accordingly, upon distribution of each payment, the Company will withhold applicable federal, state, and local taxes from this payment.

If your active employment with the Company is terminated <u>for any reason</u> on or before a vesting date, or if you move to a part-time position on or before the vesting date, then the portion of your award that has not yet vested will be forfeited immediately upon the termination of your employment or upon your change to part-time status.

In the event of a stock split or combination of shares, or other such change in the Company's capital stock, without the receipt of consideration by the Company, the number of phantom stock units awarded hereunder will be adjusted accordingly.

If you remain continuously employed in a full-time active position with the Company through and including the date on which a "Change of Control" of the Company occurs, then any portion of your award that has not yet vested will vest as of such Change of Control date. For this purpose, "Change of Control" has the meaning set forth in the Circuit City Stores, Inc. 2003 Stock Incentive Plan, as amended and restated, effective December 14, 2006, and that definition is incorporated by reference into, and made a part of, this Award letter. Generally, a Change of Control will be deemed to occur upon any of the following events: (i) the acquisition by any person or entity of 35% or more of either the Company's outstanding shares or the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (but excluding certain acquisitions involving the Company or an affiliate, or by any benefit plan sponsored by the Company); (ii) the incumbent members of the Board of Directors of the Company (including any future directors whose election is approved by a majority of the incumbent members) cease to constitute a majority of the Board of Directors; (iii) the consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (with certain exceptions, as described in the 2003 Stock Incentive Plan); or (iv) the consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

Nothing in this letter confers any right to continued employment with the Company or affects the Company's right to terminate your employment at any time, with or without notice, and with or without cause.

You may not sell, give away or otherwise transfer any of your units. Additionally, phantom stock units are not actual shares of stock and do not confer on you any rights as a shareholder of the Company. Consequently, you will not have the right to vote or receive dividends on the units.

In order for your award to become effective, you must accept it by signing and faxing a copy of this entire letter as soon as possible, but in no event later than February 1, 2008, to **757-299-8412**. Your signature will also constitute your agreement to the terms and conditions contained in this letter.

With this award, we express our confidence in your ability to help shape a Circuit City that will benefit our associates, our customers, and our shareholders for years to come.

Sincerely,

Eric A. Jonas, Jr.
Senior Vice President
*Human Resources*

ACCEPTED:

Associate Signature

Omar Tawil

Printed Name

1/14/07

Date



Circuit City Stores, inc.
9954 Mayland Drive
Richmond, VA 23233-1464
T 804.527.4000

## Circuit City Stores, Inc.
## Employment Agreement for Omar Tawil

This EMPLOYMENT AGREEMENT is made, entered into, and is effective as of the 13th day of August, 2003 (the "Effective Date"), by and between Circuit City Stores, Inc. (the "Company") and Omar Tawil (the "Executive").

WHEREAS, the Company desires to employ the Executive as District Manager of Circuit City Stores, Inc.; and

WHEREAS, the Company recognizes the Executive's intimate knowledge and experience in the business of the Company, and desires to secure the employment of the Executive in the role of District Manager of the Company.

WHEREAS, the Executive will develop and/or come in contact with the Company's proprietary and confidential information which is not readily available to the public, and which is of great importance to the Company and is treated by the Company as secret and confidential information.

WHEREAS, the Company desires to modify certain terms of Executive's employment agreement.

WHEREAS, as consideration for such modified agreement, the Company shall grant to Employee a "Restricted Stock Award" under the 2003 Stock Incentive Plan, subject to the terms set forth in a separate letter agreement to be executed by the Company and Executive.

NOW, THEREFORE, in consideration of the Executive's continued employment and of the mutual covenants and agreements of the parties set forth in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

### Article 1. Term of Employment

The Company hereby agrees to employ the Executive and the Executive hereby accepts employment as District Manager of the Company, in accordance with the terms and conditions set forth herein, for an initial period of one (1) year, commencing as of the Effective Date of this Agreement as indicated above (the "Initial Term"); subject, however, to earlier termination as expressly provided herein.

The Initial Term shall automatically be renewed for additional periods of one (1) year each at the end of the Initial Term, and then again after each successive year thereafter (collectively, the "Renewal Periods," which, together with the Initial Term, constitute the "Term" of this Agreement). However, either party may terminate this Agreement at the end of the Initial

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 2 of 16

Term, or at the end of any Renewal Period, by giving the other party written notice of intent not to renew, delivered at least thirty (30) days prior to the end of the Initial Term or any Renewal Period. For purposes of this Agreement, an "Employment Year" shall mean any twelve (12) month period during the Term of this Agreement beginning on the Effective Date or on any anniversary thereof.

## Article 2.  Position and Responsibilities

During the Term of this Agreement, the Executive agrees to serve as District Manager of the Company. In his/her capacity as District Manager of the Company, the Executive shall report directly to the Executive's immediate manager and shall have the duties and responsibilities of District Manager of the Company and such other duties and responsibilities not inconsistent with the performance of his/her duties as District Manager of the Company.

## Article 3.  Standard of Care

During the term of this Agreement, the Executive agrees to devote substantially his/her full-time attention and energies to the Company's business. The Executive covenants, warrants, and represents that he/she shall:

(a)    Devote his/her full and best efforts and talents full time to the performance of his/her employment obligations and duties for the Company;

(b)    Exercise the highest degree of loyalty and the highest standards of conduct in the performance of his/her duties;

(c)    Comply with all rules, regulations, and policies established or issued by the Company; and

(d)    Refrain from taking advantage, for himself/herself or others, of any corporate opportunities of the Company.

## Article 4.  Other Employment.

The Executive shall not, during the term hereof, be interested directly or indirectly, in any manner, as partner, officer, director, investor, stockholder, advisor, employee, or in any other capacity, in any other business similar to Company's business for the Executive's personal advantage or benefit or that of others. Any other employment or position which might reasonably be deemed contrary to the best interests of the Company is prohibited. During the term of employment hereunder, the Executive agrees to obtain the Company's written consent prior to entering into any other occupation, even if dissimilar to that of the Company. Such consent may be granted or withheld, in the Company's absolute discretion. Nothing herein contained shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 3 of 16

herein contained be deemed to prevent the Executive from investing in real estate for his/her own benefit (so long as such investment (a) is not related to or in support of any entity engaged in a business similar to that of the Company or (b) does not detract from the Executive's performance of his/her duties and obligations hereunder).

## Article 5.  Compensation and Benefits

As remuneration for all services to be rendered by the Executive during the Employment Period, and as consideration for complying with the covenants herein, the Company shall pay and provide to the Executive the following:

**5.1. Base Salary.**  During the Term of this Agreement, the Company shall pay the Executive a Base Salary in an amount which shall be established and approved by the Compensation Committee of the Board of Directors; provided, however, that the Company shall not be obligated to maintain, increase or refrain from reducing or amending such Base Salary so long as such changes are similarly applicable to comparably situated employees. This Base Salary shall be subject to all appropriate federal and state withholding taxes and payable in accordance with the normal payroll practices of the Company. The Base Salary shall be reviewed at least annually following the Effective Date of this Agreement, while the Term of this Agreement is in force, to ascertain whether, in the judgment of the Compensation Committee, such Base Salary should be changed. If changed, the Base Salary as stated above shall, likewise, be changed for all purposes of this Agreement.

**5.2. Long-Term Incentives.**  During the Term of this Agreement, the Executive shall be eligible to participate in the Company's long-term incentive plan, to the extent that the Board of Directors of the Company or the Compensation Committee, in their discretion, determines is appropriate. The Board of Directors will make its determination consistent with the methodology used by the Company for compensating its comparably situated employees.

**5.3. Retirement Benefits.**  During the Term of this Agreement, the Company shall provide to the Executive the opportunity for participation in all Company pension, insurance, fringe benefit, and executive compensation plans and programs, subject to the eligibility and participation requirements of such plans.

**5.4. Employee Benefits.**  During the Term of this Agreement, the Company shall provide the Executive all benefits, as commensurate with the position of District Manager of the Company, but at a minimum not less than those provided by the Company to other comparably situated employees subject to the eligibility requirements and other provisions of such arrangements. Such benefits may include group term life insurance, comprehensive health and major medical insurance, dental and life insurance, and short-term and long-term disability.

**5.5. Right to Change Plans.**  By reason of Article 5.4 herein, the Company shall not be obligated to institute, maintain, or refrain from changing, amending, or discontinuing any benefit plan, so long as such changes are similarly applicable to comparably situated employees.

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 4 of 16

### Article 6.  Expenses

During the Term of this Agreement, the Company shall pay or reimburse the Executive for all ordinary and necessary expenses, in a reasonable amount, which the Executive incurs in performing his/her duties under this Agreement including, but not limited to, travel, entertainment, professional dues and subscriptions, and all dues, fees, and expenses associated with membership in various professional, business, and civic associations and societies in which the Company finds that the Executive's participation is in the best interests of the Company.  The payment of reimbursement of expenses shall be subject to such rules concerning documentation of expenses and the type or magnitude of such expenses as the Compensation Committee of the Board of Directors may establish from time to time.

### Article 7.  Employment Termination

**7.1.  Termination Due to Retirement or Death.**  In the event the Executive's employment ends by reason of Retirement (defined as voluntary "Normal Retirement" under the then established definitions and rules of the Company's tax-qualified retirement plan) or the Executive's death during the term of this Agreement, the Executive's benefits shall be determined in accordance with the Company's retirement, survivor's benefits, insurance, and/or other applicable programs of the Company then in effect.  In addition, all stock grants, except performance-based grants in the case of Retirement, will become immediately vested and may be exercised by the Executive, the Executive's personal representatives, distributees, legatees, or estate at any time before the expiration date of the grant.

The Effective Date of Termination due to Retirement or death shall be (a) ninety (90) days following the date the Executive provides the Company with written notice that the Executive is ending employment by reason of Retirement or (b) on the Executive's date of death, as the case may be.  Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive or, if applicable, the Executive's estate; (a) any Base Salary that was accrued but not yet paid as of the Effective Date of Termination; and (b) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

**7.2.  Termination Due to Disability.**  The Company shall have the right to terminate the Executive's employment for disability.  For the purposes of this Agreement, disability shall mean any physical or mental illness or injury that causes the Executive to be unable to substantially perform the Executive's normal duties; provided however that the Executive shall not be considered disabled until:  (i) the Executive has been so disabled for 180 days during any period of twelve (12) consecutive months; (ii) the Executive's attending physician shall have furnished to the Company certification that the return of the Executive to his/her normal duties is impossible or improbable; or (iii) the Executive is determined to be totally disabled by the disability insurer then insuring the Executive, if any.

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 5 of 16

The Effective Date of Termination due to Disability shall be specified, in a written notice, by the Executive's immediate manager, and such written notice shall be delivered to the Executive, but shall be no less than thirty (30) calendar days after the delivery of such written notice to the Executive. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive [or, if applicable, the Executive's estate]: (a) any salary that was accrued but not yet paid as of the Effective Date of Termination; and (b) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

It is expressly understood that the Disability of the Executive for a period of one hundred eighty (180) calendar days or less in the aggregate during any period of twelve (12) consecutive months, in the absence of any reasonable expectation that his/her Disability will exist for more than such a period of time, shall not constitute a failure by him/her to perform his/her duties hereunder and shall not be deemed a breach or default, and the Executive shall receive full compensation for any such period of Disability or for any other temporary illness or incapacity during the term of this Agreement.

If the employment of the Executive terminates because of disability, all of the Executive's outstanding stock grants, including performance based grants, will become immediately vested, effective as of the date of the Executive's disability. Then, the Executive, the Executive's personal representatives, distributees, or legatees may exercise the Executive's grants at any time before the expiration date of the grant.

**7.3. Voluntary Termination by the Executive.** The Executive may terminate his/her employment and this Agreement at any time by giving the Company at least thirty (30) days written notice. The Company reserves the right to require the Executive not to work during the notice period but shall pay the Executive his/her full Base Salary, at the rate then in effect as provided in Article 5.1 herein, through the last day of the Executive's employment plus all other benefits to which the Executive has a vested right on the last day of employment. The Company thereafter shall have no further obligations under this Agreement.

**7.4.     Involuntary Termination by the Company Without Cause.** The Company may terminate the Executive's employment, at any time, for any reason other than Death, Disability, Retirement, or for Cause by providing the Executive with at least thirty (30) days written notice.

(a)     The Company's decision not to renew this Agreement at the Expiration Date of the Initial Term or any Renewal Period shall be deemed an involuntary termination without cause; provided, however, that for purposes of this Article 7.4(a), no variation, alteration, modification, cancellation, change or amendment made to this Agreement pursuant to Article 12.3 or 12.4 at a time other than the Expiration Date of the Initial Term or any Renewal Period, shall be deemed an involuntary termination without Cause.

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 6 of 16

(b)    Upon the Effective Date of Termination specified by the Company for
        termination by the Company without cause, the Company shall pay to the
        Executive, in equal monthly installments over the following six (6) month period
        an amount equal to six (6) months of the Executive's Base Salary established for
        the fiscal year in which the Executive's Effective Date of Termination occurs.

The Company thereafter shall have no further obligations under this Agreement.

   **7.5. Termination For Cause.**  Nothing in this Agreement shall be construed to prevent
the Company from terminating the Executive's employment under this Agreement, without
notice or liability for doing so, for "Cause."

For purposes of this Agreement, "Cause" means:

(a)    The Executive's material breach of this Agreement, which breach is not cured
        within ten (10) days of receipt by the Executive of written notice from the
        Company specifying the breach;

(b)    The Executive's gross negligence in the performance of his/her material duties
        hereunder, intentional nonperformance or intentional misperformance of such
        duties, misconduct or refusal to abide by or comply with the directives of the
        Board, his/her superior officers, or the Company's policies and procedures, which
        actions continue for a period of ten (10) days after receipt by the Executive of
        written notice of the need to cure or cease;

(c)    Conviction of a felony or other crime involving moral turpitude;

(d)    The Executive engaging in illegal conduct, dishonesty or fraud with respect to the
        business or affairs of the Company that in the reasonable judgment of the
        Company materially and adversely affects the operations or reputation of the
        Company;

(e)    Failure of the Executive to disclose to the Executive's manager a conflict of
        interest, of which the Executive knew or, with reasonable diligence, would have
        known, in connection with any transaction entered into on behalf of the Company;
        or

(f)    Failure of the Executive to agree to a modification of this Agreement, pursuant to
        paragraph 12.3 below, when the purpose of the modification is to comply with
        applicable federal, state and/or local laws or regulations, or when such
        modification is designed to further define the restrictions of Article 8 or otherwise
        enhance the enforcement of Article 8 without increasing the scope of the Article 8
        restrictions.

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 7 of 16

In the event this Agreement is terminated for Cause, the Company shall pay the Executive his/her Base Salary through the Effective Date of Termination for cause and the Executive shall immediately thereafter forfeit all rights and benefits (other than vested benefits) he would otherwise have been entitled to receive under this Agreement. The Company thereafter shall have no further obligations under this Agreement.

## Article 8. Noncompetition and Confidentiality

### 8.1. Noncompetition.

(a)    During the Executive's employment and for a period of six (6) months following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business that is engaged in the same or similar business of the Company in one or more Metropolitan Statistical Areas ("MSAs") in which the Company is doing business on the last day of the Executive's employment. A business will not be considered to be in competition with the Company for purposes of this paragraph 8.1(a) or paragraph 8.1(b) below if:

     (i)     The business or the operating unit of the business in which the Executive is employed or with which the Executive is associated (collectively the "Business Unit") is not engaged in the retail sales of consumer electronics;

     (ii)    If sales of the Business Unit's products or services in the retail sales and service of consumer electronics constitute less than ten percent (10%) of such Business Unit's sales; or

     (iii)   If the sales of the Business Unit in the retail sales and service of consumer electronics do constitute more than ten percent (10%) of the sales of the Business Unit, but there is no geographic overlap between such Business Unit's and the Company's business locations.

Notwithstanding the foregoing, nothing herein shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent Employee from investing in real estate for his/her own benefit (as long as such investment is not related to or in support of any entity engaged in the same or similar business as the Company in competition with the Company in one or more MSA's in which the Company is doing business during the Executive's employment).

(b)    During the Executive's employment and for a period of six (6) months following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business engaged in the same or similar business of the Company in one or

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 8 of 16

more MSAs where, on the last day of the Executive's employment, the Company
is engaged in real estate site selection or has taken further steps toward the
commencement of operations in the future, of which the Executive is aware.

(c)    The Executive agrees that competition, as set forth in Article 8.1(a) above, shall
include, but not be limited to, engaging in competitive activity, as an individual, as a
partner, as a joint venturer with any other person or entity, or as an employee, agent,
or representative of any other person or entity.

(d)    It is the specific intent of the parties that the Executive shall be restricted from
competing directly or indirectly with any segment of the Company's business in
which the Executive engaged prior to the last day of his/her employment and from
any segment of the Company's business about which the Executive acquired
proprietary or confidential information during the course of his/her employment.

(e)    If any provision of this Article 8.1 relating to the time period, geographic area or
scope of restricted activities shall be declared by a court of competent jurisdiction to
exceed the maximum time period, geographic area or scope of activities, as
applicable, that such court deems reasonable and enforceable, said time period,
geographic area or scope of activities shall be deemed to be, and thereafter shall
become, the maximum time period, scope of activities or largest geographic area that
such court deems reasonable and enforceable and this Agreement shall automatically
be considered to have been amended and revised to reflect such determination.

(f)    The Executive and the Company have examined in detail this Covenant Not to
Compete and agree that the restraint imposed upon the Executive is reasonable in
light of the legitimate interests of the Company, and it is not unduly harsh upon the
Executive's ability to earn a livelihood.

**8.2. Non-Solicitation of Employees.** The Executive agrees that during the Executive's
employment with the Company and for a period of six (6) months following the last day of the
Executive's employment, the Executive shall not, directly or indirectly, solicit or induce, or attempt
to solicit or induce, any employee of the Company to leave the Company for any reason whatsoever
or hire any individual employed by the Company. For purposes of this Article 8.2, employee shall
mean any individual employed by the Company on the last day of the Executive's employment or
within the three (3) month period prior to the last day of the Executive's employment.

**8.3. Confidentiality.** The Company has advised the Executive and the Executive
acknowledges that it is the policy of the Company to maintain as secret and confidential all
Protected Information (as defined below), and that Protected Information has been and will be
developed at substantial cost and effort to the Company. The Executive agrees to hold in strict
confidence and safeguard any information of or about the Company gained by the Executive in
any manner or from any source during the Executive's employment. The Executive shall not,
without the prior written consent of the Company, at any time, directly or indirectly, divulge,

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 9 of 16

furnish, use, disclose or make accessible to any person, firm, corporation, association, or other entity (otherwise than as may be required in the regular course of the Executive's employment), either during the Executive's employment with the Company or subsequent to the last day of the Executive's employment, any Protected Information, or cause any such information of the Company to enter the public domain.

The Executive understands and agrees that any information, data and/or trade secrets about Company or its suppliers and/or distributors is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position and accordingly should be kept secret. For purposes of this Agreement, "Protected Information" means trade secrets, confidential and proprietary business information of or about the Company, and any other information of the Company, including, customer lists (including potential customers), sources of supply, processes, plans, materials, pricing information, internal memoranda, marketing plans, promotional plans, internal policies, research, purchasing, accounting and financial information, computer programs, hardware, software, and products and services which may be developed from time to time by the Company and its agents or employees, including the Executive; provided, however, that information that is in the public domain (other than as a result of a breach of this Agreement), approved for release by the Company or lawfully obtained from third parties who are not bound by a confidentiality agreement with the Company, is not Protected Information.

Nothing contained in this Article is intended to reduce in any way protection available to the Company pursuant to the Uniform Trade Secrets Act as adopted in Virginia or any other state or other applicable laws, which prohibit the misuse or disclosure of confidential or proprietary information.

**8.4. Acknowledgement of Covenants.** The parties hereto acknowledge that the Executive's services are of a special, extraordinary, and intellectual character which gives him/her unique value, and that the business of the Company and its subsidiaries is highly competitive, and that violation of any of the covenants provided in this Article 8 would cause immediate, immeasurable, and irreparable harm, loss, and damage to the Company not adequately compensable by a monetary award. The Executive acknowledges that the time, scope of activities and geographical area restrained by the provisions of this Article 8 are reasonable and do not impose a greater restraint than is necessary to protect the goodwill of the Company's business. The Executive further acknowledges that he/she and the Company have negotiated and bargained for the terms of this Agreement and that the Executive has received adequate consideration for entering into this Agreement. In the event of any such breach or threatened breach by the Executive of any one or more of such covenants, the Company shall be entitled to such equitable and injunctive relief as may be available to restrain the Executive from violating the provisions hereof. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available at law or in equity for such breach or threatened breach, including the recovery of damages and the immediate termination of the employment of the Executive hereunder for cause.

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 10 of 16

## Article 9.  Change in Control

**9.1.  Change in Control.**  This Article 9 shall not become effective, and the Company shall have no obligation hereunder, if the employment of the Executive with the Company shall terminate prior to a Change in Control (as defined in Article 9.2 below) of the Company.

**9.2.  Definition of Change in Control.**  Change in Control of the Company means, and shall be deemed to have occurred, upon the first to occur of any of the following events:

(a)     The acquisition by any individual, entity, or group (a "Person"), including a "person" within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), but excluding an Affiliate (as defined below) of the Company, of beneficial ownership within the meaning of Rule 13d-3 promulgated under the Exchange Act, of fifteen percent (15%) or more of either:  (i) the then outstanding shares of common stock of the Circuit City Group (the "Outstanding Common Stock"); or (ii) the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (the "Outstanding Voting Securities"); excluding, however, the following:  (A) any acquisition directly from the Company (excluding an acquisition resulting from the exercise of an option, conversion right, or exchange privilege unless the security being so exercised, converted or exchanged was acquired directly from the Company); (B) any acquisition by the Company; (C) any acquisition by an employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii), and (iii) of subsection (c) of this Article 9.2;

(b)     Individuals who, as of the Effective Date, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of such Board; provided that any individual who becomes a director of the Company subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by the vote of at least a majority of the directors then comprising the Incumbent Board shall be deemed a member of the Incumbent Board; and provided further, that any individual who was initially elected as a director of the Company as a result of an actual or threatened election contest, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act, or any other actual or threatened solicitation of proxies or consents by or on behalf of any Person other than the Board shall not be deemed a member of the Incumbent Board;

(c)     The consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (a "Corporate Transaction"); excluding, however, a Corporate Transaction

_____ Initials

pursuant to which: (i) all or substantially all of the individuals or entities who are the beneficial owners, respectively, of the Outstanding Common Stock and the Outstanding Voting Securities immediately prior to such Corporate Transaction will beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the outstanding shares of common stock, and the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Corporate Transaction (including, without limitation, a corporation, which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or indirectly) in substantially the same proportions relative to each other as their ownership, immediately prior to such Corporate Transaction, of the Outstanding Common Stock and the Outstanding Voting Securities, as the case may be; (ii) no Person (other than: the Company; any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; the corporation resulting from such Corporate Transaction; and any Person which beneficially owned, immediately prior to such Corporate Transaction, directly or indirectly, twenty-five percent (25%) or more of the Outstanding Common Stock or the Outstanding Voting Securities, as the case may be) will beneficially own, directly or indirectly, twenty-five percent (25%)or more of, respectively, the outstanding shares of common stock of the corporation resulting from such Corporate Transaction or the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors; and (iii) individuals who were members of the Incumbent Board will constitute at least a majority of the members of the board of directors of the corporation resulting from such Corporate Transaction; or

(d)     The consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

For purposes of this Article 9, "Affiliate" shall mean with reference to a specified Person, any Person that directly or indirectly through one (1) or more intermediaries controls or is controlled by or is under common control with the specified Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used in respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

**9.3. Change-in-Control Severance Benefits.** If at any time during the Term of this Agreement there is a Change in Control of the Company and the Executive's employment is terminated by the Company without cause within the one (1) year period following the Change in Control following a Change in Control of the Company, the Company shall provide to the Executive the following:

Omar Tawil
Employment Agreement
August 13, 2003
Page 12 of 16

    (a)    Base Salary and all other benefits due him/her as if he/she had remained an employee pursuant to Article 5 through the remainder of the month in which the termination occurs, less applicable withholding taxes and other authorized payroll deductions;

    (b)    A lump-sum severance allowance in an amount that is equal to one (1) year of the Executive's Base Salary at the rate in effect immediately prior to the termination;

    (c)    Any unvested stock options or any outstanding restricted stock, excluding restricted stock grants issued under a performance based plan, that would become vested (that is, transferable and non-forfeitable) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as of the date of the Executive's termination of employment. The Executive must satisfy the tax withholding requirements.

    (d)    Continuation at the same cost to the Executive as existed as of the Effective Date of Termination of Agreement of all health, welfare, and benefit plan participation for one (1) full year following employment termination;

    (e)    Provision of outplacement services for a period of three (3) months for the Executive; and

    (f)    A lump-sum payment equal to the one (1) year costs of a Company vehicle.

**9.4. Excise Tax Equalization Payment.** In the event that the Executive becomes entitled to severance benefits under this Agreement or any other agreement with or plan of the Company (in the aggregate, the "Total Payments"), if any of the Total Payments will [be subject to the tax (the "Excise Tax") imposed by Section 4999 of the Code] or any similar excise tax that may hereafter be imposed), the Company shall pay to the Executive in cash an additional amount (the "Gross-Up Payment"), such that the net amount retained by the Executive after deduction of any Excise Tax upon the Total Payments and any federal, state, and local income tax and Excise Tax upon the Gross-Up Payment provided for by this Article 9.4 (including FICA and FUTA), shall be equal to the Total Payments. The Company shall make such payment to the Executive as soon as practicable following the Effective Date of Termination, but in no event beyond thirty (30) days from such date.

For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in which the Gross-Up Payment is to be made, and state and local income taxes at the highest marginal rate of taxation in the state and locality of the Executive's residence on the Effective Date of Termination, net of the maximum reduction in federal income taxes which could be obtained from deduction of such state and local taxes.

Omar Tawil
Employment Agreement
August 13, 2003
Page 13 of 16

The Company's Compensation Committee shall determine, based upon the advice of the Company's independent certified public accountants, whether any payments or benefits hereunder are subject to the Excise Tax.

**9.5. Subsequent Recalculation.** In the event the Internal Revenue Service adjusts the computation of the Company under Article 9.4 herein so that the Executive did not receive the greatest net benefit, the Company shall reimburse the Executive for the full amount necessary to make the Executive whole, plus a market rate of interest, as determined by the Compensation Committee.

## Article 10. Assignment

**10.1. Assignment by Company,** This Agreement may and shall be assigned or transferred to, and shall be binding upon and shall inure to the benefit of, any successor of the Company, and any such successor shall be deemed substituted for all purposes of the "Company" under the terms of this Agreement. As used in this Agreement, the term "successor" shall mean any person, firm, corporation, or business entity which, at any time, whether by merger, purchase, or otherwise, acquires all or substantially all of the assets or the business of the Company. In addition, the obligations of the Executive under Articles 8 and 12 of this Agreement shall continue after the termination of the Executive's employment and shall be binding on the Executive's heirs, executors, legal representatives and assigns.

**10.2. Assignment by Executive.** The services to be provided by the Executive to the Company hereunder are personal to the Executive, and the Executive's duties may not be assigned by the Executive; provided, however, that this Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, and administrators, successors, heirs, distributees, devisees, and legatees. If the Executive dies while any amounts payable to the Executive hereunder remain outstanding, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, in the absence of such designee, to the Executive's estate.

## Article 11. Dispute Resolution and Notice

**11.1. Issue Resolution.** Except for actions initiated by the Company to enjoin a breach by, and/or recover damages from the Executive related to violation of any of the restrictive covenants in Article 8 of this Agreement, which Company may bring in an appropriate court of law or equity, any disagreement between the Executive and the Company concerning anything covered by this Agreement or concerning other terms or conditions of the Executive's employment or the termination of the Executive's employment will be settled by final and binding arbitration pursuant to the Company's Associate Issue Resolution Program. The Dispute Resolution Agreement and the Dispute Resolution Rules and Procedures are incorporated herein by reference as if set forth in full in this Agreement. The decision of the arbitrator will be final and

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 14 of 16

binding on both the Executive and the Company and may be enforced in a court of appropriate jurisdiction.

**11.2. Notice.** Any notices, requests, demands, or other communications provided for by this Agreement shall be sufficient if in writing, and if sent by registered or certified mail to the Executive at the last address he/she has filed in writing with the Company or, in the case of the Company, at its principal offices.

## Article 12. Miscellaneous

**12.1. Entire Agreement.** This Agreement supersedes any prior agreements or understandings, oral or written, between the parties hereto, with respect to the subject matter hereof, and constitutes the entire agreement of the parties with respect thereto. Without limiting the generality of the foregoing sentence, this Agreement completely supersedes any and all prior employment agreements entered into by and between the Company, and the Executive, and all amendments thereto, in their entirety.

**12.2. Return of Materials.** Upon the termination of the Executive's employment with the Company, however such termination is effected, the Executive shall promptly deliver to Company all property, records, materials, documents, and copies of documents concerning the Executive's business and/or its customers (hereinafter collectively "Company Materials") which the Executive has in his/her possession or under his/her control at the time of termination of his/her employment. The Executive further agrees not to take or extract any portion of Company Materials in written, computer, electronic or any other reproducible form without the prior written consent of the Executive's immediate manager.

**12.3. Modification.** This Agreement shall not be varied, altered, modified, canceled, changed, or in any way amended except by mutual agreement of the parties in a written instrument executed by the parties hereto or their legal representatives.

**12.4. Severability.** It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. If any clause or provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, then the remainder of this Agreement shall not be affected thereby, and in lieu of each clause or provision of this Agreement which is illegal, invalid or unenforceable, there shall be added, as a part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and as may be legal, valid, and enforceable.

**12.5. Counterparts.** This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 15 of 16

**12.6. Tax Withholding.** The Company may withhold from any benefits payable under this Agreement all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling.

**12.7. Restrictive Covenants of the Essence.** The restrictive covenants of the Executive set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement; and the existence of any claim or cause of action of the Executive against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictive covenants contained herein. The Company shall at all times maintain the right to seek enforcement of these provisions whether or not the Company has previously refrained from seeking enforcement of any such provision as to the Executive or any other individual who has signed an agreement with similar provisions.

**12.8 Beneficiaries.** The Executive may designate one (1) or more persons or entities as the primary and/or contingent beneficiaries of any amounts to be received under this Agreement. Such designation must be in the form of a signed writing acceptable to the Executive's immediate manager. The Executive may make or change such designation at any time.

**12.9. Payment Obligation Absolute.** The Company's obligation to make the payments and the arrangement provided for herein shall be absolute and unconditional, and shall not be affected by any circumstances, including, without limitation, any offset, counterclaim, recoupment, defense, or other right which the Company may have against the Executive or anyone else. All amounts payable by the Company hereunder shall be paid without notice or demand. Each and every payment made hereunder by the Company shall be final, and the Company shall not seek to recover all or any part of such payment from the Executive or from whomsoever may be entitled thereto, for any reasons whatsoever.

The Executive shall not be obligated to seek other employment in mitigation of the amounts payable or arrangements made under any provision of this Agreement, and the obtaining of any such other employment shall in no event effect any reduction of the Company's obligations to make the payments and arrangements required to be made under this Agreement; provided, however, that continued health, welfare, and benefit plan participation pursuant to Article 7.4 or Article 9.3 herein shall be discontinued in the event the Executive becomes eligible to receive substantially similar benefits from a successor employer.

**12.10. Contractual Rights to Benefits.** This Agreement establishes and vests in the Executive a contractual right to the benefits to which he is entitled hereunder. However, nothing herein contained shall require or be deemed to require, or prohibit or be deemed to prohibit, the Company to segregate, earmark, or otherwise set aside any funds or other assets, in trust or otherwise, to provide for any payments to be made or required hereunder.

_____ Initials

Omar Tawil
Employment Agreement
August 13, 2003
Page 16 of 16

## Article 13.  Governing Law

To the extent not preempted by federal, law, the provisions of this Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia, without reference to Virginia's choice of law statutes or decisions.

IN WITNESS WHEREOF, the Executive and the Company have executed this Agreement as of the Effective Date.

**CIRCUIT CITY STORES, INC.**

By: _____
    Jeffrey S. Wells
    Senior Vice President, Human Resources

**EXECUTIVE:**

_____
Omar Tawil    SSN: 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

**ATTEST:**_____

Circuit City Stores, Inc
c/o Kurtzman Carson Consultants LLC
2335 Alaska Ave
El Segundo, Ca 90245

170539

PRF 18614    5020923

TAWIL, OMAR A
7 MERRILL HILL
LADERA RANCH CA 92694-

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:                                                    :            Chapter 11
:
Circuit City Stores, Inc., <u>et al.</u>,                 :            Case No. 08-35653 (KRH)
:
Debtors.       :            (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF HEARING AND OBJECTION DEADLINE REGARDING DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF LIQUIDATION OF CIRCUIT CITY STORES, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION AND ITS OFFICIAL COMMITTEE OF CREDITORS HOLDING GENERAL UNSECURED CLAIMS

PLEASE TAKE NOTICE that on August 24, 2009, Circuit City Stores, Inc. ("Circuit City") and seventeen (17) of its direct and indirect debtor subsidiaries (together with Circuit City, the "Debtors"), and the Official Committee of Creditors Holding General Unsecured Claims (the "Creditors' Committee") in the above-captioned cases, filed the Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession, and its Official Committee of Creditors Holding General Unsecured Claims (as it may be amended, the "Plan"), and the Disclosure Statement with Respect to Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession, and its Official Committee of Creditors Holding General Unsecured Claims (as it may be amended, the "Disclosure Statement"), with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that a hearing (the "Disclosure Statement Hearing") will be held before the Honorable Kevin R. Huennekens, United States Bankruptcy Court for the Eastern District of Virginia, 701 East Broad Street, Room 5000, Richmond, VA 23219, on **September 22, 2009 at 11:00 a.m. (Eastern)**, *or as soon thereafter as counsel can be heard, to consider the entry of an order*, among other things, finding that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of title 11 of the United States Code (as amended, the "Bankruptcy Code") and approving the Disclosure Statement for solicitation purposes. The Disclosure Statement Hearing may be adjourned from time to time, without further notice to creditors or parties in interest, by an announcement in the Bankruptcy Court of such adjournment on the date scheduled for the Disclosure Statement Hearing or in the agenda filed with respect to the scheduled Disclosure Statement Hearing.

**THIS NOTICE IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. VOTES ON THE PLAN MAY NOT BE SOLICITED UNLESS AND UNTIL THE DISCLOSURE STATEMENT IS APPROVED BY ORDER OF THE BANKRUPTCY COURT.**

PLEASE TAKE FURTHER NOTICE THAT the Disclosure Statement and Plan are on file with and may be examined by interested parties at the Office of the Clerk of the Bankruptcy Court, 701 East Broad Street, Richmond, VA 23219, during regular business hours. In addition, a copy of the Disclosure Statement and Plan may be obtained at the Debtors' case information website, <u>www.kccllc.net/circuitcity</u> or upon <u>written</u> request to Kurtzman Carson Consultants LLC, 2335 Alaska

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, IL 60606
(Attn: Chris L. Dickerson and Jessica S. Kumar)

and

McGuireWoods LLP
One James Center
901 E. Cary Street
Richmond, VA 23219
(Attn: Douglas M. Foley and Sarah B. Boehm)

Counsel For The Creditors' Committee

Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA 90067
(Attn: Jeffrey N. Pomerantz and Stanley E. Goldich)

and

Pachulski Stang Ziehl & Jones, LLP
780 Third Avenue, 36th Floor
New York, NY 10017
(Attn: Robert J. Feinstein)

and

Tavenner & Beran, PLC
20 N. Eighth Street, Second Floor
Richmond, VA 23219
(Attn: Lynn L. Tavenner and Paula S. Beran)

The United States Trustee

701 East Broad Street, Suite 4304
Richmond, VA 23219
(Attn: Robert B. Van Arsdale)

**IF ANY OBJECTION TO THE DISCLOSURE STATEMENT IS NOT TIMELY FILED AND SERVED AS PRESCRIBED HEREIN, THE OBJECTING PARTY WILL BE BARRED FROM OBJECTING TO THE ADEQUACY OF THE DISCLOSURE STATEMENT AND WILL NOT BE HEARD AT THE DISCLOSURE STATEMENT HEARING.**

023154_18614 PRODUCT_1_DOMESTIC 1/170539/511617/i


KURTZMAN
CARSON
CONSULTANTS

## MEMORANDUM

Date:    September 18, 2009

To:      Court Clerk

From:    Kurtzman Carson

Re:      Circuit City

Enclosed please find an Objection to Claim Status Under Plan of Liquidation that was sent to our office by mistake, to be filed with the court.