```
                    UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF VIRGINIA


IN RE:                      .    Case No. 08-35653(KRH)
                            .
                            .
                            .
CIRCUIT CITY STORES         .    701 East Broad Street
INC.,                       .    Richmond, VA 23219
                            .
                            .
         Debtor.            .    September 16, 2009
. . . . . . . . . . . . . . .    11:08 a.m.


                        TRANSCRIPT OF HEARING
                BEFORE HONORABLE KEVIN R. HUENNEKENS
                UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:

For the Debtor:          Skadden Arps Slate Meagher & Flom LLP
                         By: IAN S. FREDERICKS, ESQ.
                         One Rodney Sq.
                         Wilmington, DE 19899

For Micro Electronics:   Wharton, Aldhizer & Weaver, PLC
                         By:  WHITNEY J. LEVIN, ESQ.
                         125 S. Augusta Street
                         Suite 2000
                         Staunton, VA  24401




Proceedings recorded by electronic sound recording, transcript
              produced by transcription service
```
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

2

**APPEARANCES (CONT'D):**

For Creditors Committee:      Tavenner & Beran
                              BY:  LYNN TAVENNER, ESQ.
                              20 North Eighth Street
                              Second Floor
                              Richmond, VA 23219

For Assurant:                 Hunton & Williams
                              BY:  J.R. Smith, Esq.
                              Riverfront Plaza, East Tower
                              951 East Byrd Street
                              Richmond, VA 23219


**TELEPHONIC APPEARANCES:**

For Assurant:                 BY:  RAUL CUERVO, ESQ.

**J&J COURT TRANSCRIBERS, INC.**

1        THE CLERK: All rise. The Court is now in session.
2   Please be seated and come to order. In the matter of Circuit
3   City Stores, Inc. hearing on Items 1 through 3 as set out on
4   debtor's agenda.
5        THE COURT: Good morning, Mr. Fredericks. I
6   apologize that we didn't get started promptly at one o'clock,
7   but we ran over on the nine o'clock docket from this morning.
8        MR. FREDERICKS: No problem, Your Honor. Thank you
9   very much for fitting us in this afternoon. This is a special
10  afternoon. And good afternoon, as well.
11       We have three matters on the agenda. The first
12  matter will be resolved as soon as the third is approved, which
13  the first matter being Federal Warranty a/k/a Assurant's motion
14  to compel that was filed way back in February that has been
15  continued since then.
16       The second matter is the motion to shorten. There
17  have been no objections to that and we request that Your Honor
18  enter an order approving that motion.
19       THE COURT: Any party wish to be heard on the
20  debtor's motion to shorten time? All right, that motion will
21  be granted.
22       MR. FREDERICKS: Thank you, Your Honor. The third
23  matter on the agenda is a two-part motion. It's in one part
24  it's a motion to approve three settlement agreements. And then
25  as a second basis for relief one of the settlement agreements

1  is an -- will be assumed in accordance with the settlement
2  agreement on kind of a limited and modified basis.
3           But before I get there, Your Honor, I just kindly
4  would like to give you a little bit of background with respect
5  to how we came to this motion and what it resolves.  Basically
6  the debtors in connection with their consumer electronics
7  business had a warranty business whereby they sold consumer
8  warranties.  They were basically -- once a warranty was sold
9  there were kind of three elements of that warranty.
10          One of them was the underlying party that would be
11 the obligor or the insurer of the obligations.  The second was
12 the party of the claims administrator.  And the third was kind
13 of a servicer of the warranty business.  The person who would
14 actually do the work associated with fixing the products and
15 things like that.
16          In all cases -- the debtors had basically two
17 relationships here.  One of them was with a company referred to
18 as the AON Group SPI or the Warranty Group.  That's all kind of
19 interchangeable.  You know one entity.  I'll probably refer to
20 them as the Warranty Group.  They were kind of the debtor in
21 the 90s and in the early 2000s.  They were the company that
22 insured the debtors, what we called -- what the debtors called
23 brown goods which are kind of the traditional consumer
24 electronic stuff, TVs, stereos, things like that.
25          They also in the early 2000s entered into a

1  relationship with GE Assurant to do computer warranties and
2  computer related products.  In all of these circumstances, AON
3  or Assurant GE served as the obligor.  Circuit City would serve
4  as the kind of claims administrator and then Circuit City or
5  another party would serve as the servicer, depending on timing,
6  you know, that would vary.

7          At certain times GE in its similar or in a separate
8  capacity served as a subcontractor to Circuit City and serviced
9  some of the claims under the AON or the warranty agreement.
10 Beginning in the early 2000s Circuit City transitioned its
11 warranty business away from Assurant or away from the Warranty
12 Group and to Assurant in full, and with that they stopped
13 selling brown goods warranties under the Warranty Group
14 agreement and started selling them under a new agreement with
15 GE Assurant.

16         Basically those relationships continued.  Circuit
17 City continued to serve as the claims administrator and
18 servicer on the Warranty Groups up until the -- Warranty Group
19 agreements up until the petition date and continued to sell new
20 warranties up until and after the petition date on the Assurant
21 agreements.

22         With the liquidation, obviously they needed to wind
23 down these affairs.  From Circuit City's perspective there were
24 two main things that they viewed that were owed to them.  One
25 was unpaid amounts due for claims that have been serviced by

1  the company, by the obligor and then what was sometimes called
2  a commission or -- sometimes it is referred to basically as a
3  commission of what will ultimately come out of the pot of money
4  that is set aside to pay claims.  Circuit City believed in both
5  instances the amounts they would get back from the Warranty
6  Group and the amounts from Assurant would be significant.
7       Once all the claims had been processed, obviously
8  both parties disagreed and in some instances thought it would
9  actually be a negative number in the end.  So that's kind of
10 the framework where settlement discussions started.  The
11 settlement started early with Assurant.  They were -- there
12 were various impediments including the intellectual property
13 sale early on.  We had to reach a resolution with Assurant
14 there to protect their rights to the warranties under the
15 settlement.  And then ultimately we had to bring in GE and the
16 Warranty Group because -- to make sure that all the claims were
17 resolved and the debtor's estates could just move on from their
18 warranty business.
19      Ultimately we reached three settlements.  The
20 Warranty Group settlement is very straightforward.  The
21 Warranty Group is basically paying the debtor's estates
22 $23,250,000.  There is a mutual release going both ways for
23 essentially claims related to the agreements whether known or
24 unknown.  It's a fairly standard release.
25      The GE agreement is also fairly straightforward.

1  Essentially GE reached a separate agreement with Assurant to
2  resolve any issues they had.  We are not, you know, aware of
3  what that settlement was.  But in conjunction with that, GE was
4  willing to release its claims against the estate, which were
5  filed in the amount north of $29 million.  They were originally
6  filed as secured claims.  They were under objection so we
7  reclassified them unsecured.  They've waived those claims in
8  full.  There is a similar mutual release for things related to
9  this relationship.
10        Then there is the agreement with Assurant.  This
11 agreement has multiple parts.  There is -- under the agreement
12 there is a what I'll call, kind of a lump payment to Circuit
13 City in the amount of $46 million, but it's subject to certain
14 offsets.
15        One of those offsets includes the amount that we
16 agreed to pay Assurant to resolve the GE related issues which
17 is about, I believe it is $4.25 million.  And the other offsets
18 are amounts that the debtors owed Assurant for various things
19 occurring post-petition including warranty sales.  It results
20 in a net payment at this time of approximately $34.1 million.
21 And then an escrow of $3.5 million.
22        The escrow is set up to address the issues related to
23 the IP sale.  Essentially Assurant wanted to ensure that if the
24 people who bought the IP breached their obligations under the
25 agreement, Assurant had some type of recourse against the

1  amount they were settling here.  So it called for a one-year
2  escrow.  Basically in order for Assurant to be entitled to that
3  money, they have to commence a lawsuit related to those IP sale
4  issues before the expiration of the year period.  If they do,
5  then the escrow will be released kind of once that litigation
6  is resolved.  If no litigation is commenced, the money comes
7  back to the debtor's estates.
8        In addition to that, Assurant has agreed to waive a
9  claim that's north of $25 million which was filed as an
10 unsecured claim and Assurant will maintain a $6 million
11 unsecured claim that was largely related to the computer
12 warranty business.
13       There is also a mutual release in this agreement as
14 well related to the various agreements in the relationship, the
15 warranty relationship.  The debtor's kept the committee
16 apprised kind of throughout this process including all the way
17 back to at the time of the IP sale.  The committee has been,
18 you know, kind of fully aware of the negotiations which have
19 taken some time and I believe their counsel will tell you that
20 they support the approval of the settlement agreement.
21       If Your Honor has any questions related to the
22 settlement agreements, I am happy to answer them at this time.
23 I would like to before we move forward with approval do a brief
24 proffer of Mr. Markham who is acting CEO of the debtors for
25 some of the factual findings in the order.  But if Your Honor

1  has any questions about the settlement agreements or the
2  relationships, I'm happy to address them now or later.
3          THE COURT: Under the SPI agreement, the $23,250,000
4  that is being paid to the debtor?
5          MR. FREDERICKS: Yes.
6          THE COURT: Okay. And then under the Assurant
7  agreement, the total amount was $46 million but the way that it
8  breaks down, we've got $34.1 million is being paid to the
9  debtor and then the $3.5 million is being escrowed which
10 ultimately might be paid to the debtor depending on whether or
11 not there are claims that Assurant needs to make back against
12 GE.
13         MR. FREDERICKS: Correct.
14         THE COURT: All right.
15         MR. FREDERICKS: No, that Assurant needs to make back
16 against the people who -- the 3.5 million is related to the IP
17 sale. If the people, if you recall during the IP sale, we
18 reached an agreement where those parties who bought the
19 intellectual property would not solicit warranty renewals or
20 ask people to terminate their warranties and buy new
21 warranties.
22         THE COURT: Right, right, right.
23         MR. FREDERICKS: Assurant wanted to protect those
24 future business dealings with the people who owned the
25 warranties. If those parties breached those covenants and also

1  the provision in the order that restricts them from doing those
2  things, then Assurant would commence litigation and could
3  recover this $3.5 million back from us.
4           THE COURT:  Okay, then there was another 4.2 million.
5           MR. FREDERICKS:  That's coming off of the 46.
6           THE COURT:  Off of the 46.
7           MR. FREDERICKS:  So when you get to the 34, it's net
8  of the 4.25 million that we're paying Assurant to resolve GE
9  related issues.
10          THE COURT:  And in connection with that, GE is
11 waiving its $29 million claim?
12          MR. FREDERICKS:  Correct.
13          THE COURT:  Got it.  Okay, I think I understand
14 completely.  You can proffer the testimony.
15          MR. FREDERICKS:  Okay.  Mr. Jim Markham is the acting
16 CEO of Circuit City.  If called to testify -- he is present in
17 the courtroom -- if called to testify, Mr. Markham would
18 testify to the facts set forth in the motion including the
19 description of the debtor's warranty, the descriptions of the
20 settlement agreement, as well as the satisfaction of the TMT
21 Trailer Corp. standards.
22          In particular, Mr. Markham would testify that
23 although the debtors believe they would likely be successful in
24 litigation, they recognize there are risks.  They believe that
25 litigation would be costly.  It would likely involve

1  significant fact and expert testimony concerning future claims
2  against the assets set aside to pay warranty claims.
3         Mr. Markham would also testify that it would likely
4  involve, you know, complex commercial transactions with
5  multiple parties including those before the Court today on this
6  settlement agreement.  And ultimately Mr. Markham would testify
7  that he believes the settlement is a fair and reasonable, is a
8  sound exercise of the debtors -- or is an exercise of the
9  debtor's sound business judgment and is in the best interest of
10 the debtors, their estates and all other parties in interest.
11        That would conclude Mr. Markham's proffer.
12        THE COURT:  Does any party wish to cross examine Mr.
13 Markham in connection with the proffered testimony?  All right.
14 The proffer is accepted.
15        MR. FREDERICKS:  Thank you, Your Honor.  With that,
16 unless -- the one additional matter is the Assurant agreement
17 is not really titled a settlement agreement.  It is titled a
18 modification to an assumption and ultimately termination of the
19 brown goods agreement.  It was structured -- essentially what
20 the debtors are doing is assuming the brown goods agreement as
21 modified by the terms in this settlement agreement.  And then
22 ultimately after the payments take place the agreement will be
23 terminated.  So there is in addition to the other relief
24 related to the settlements, there is relief requesting that the
25 agreement be assumed.

1      THE COURT: All right.

2      MR. FREDERICKS: With that I respectfully request
3 that Your Honor approve the settlement agreements and approve
4 assumption of the brown goods agreement as modified.

5      THE COURT: Very good. Does any party wish to be
6 heard in connection with the debtor's motions?

7      MR. CUERVO: Your Honor, this is Raul Cuervo for the
8 Assurant Companies.

9      THE COURT: Mr. Cuervo, if we could wait, there are a
10 number of people in the courtroom that are going to address and
11 then I will come back to the people on the phone if that's okay
12 with you.

13      MR. CUERVO: Thank you, Your Honor.

14      THE COURT: All right. Ma'am, you may approach.

15      MS. LEVIN: Good afternoon, Your Honor. For the
16 record, Whitney Levin from Wharton, Aldhizer & Weaver and I
17 represent GE. I just want to represent to the Court that I
18 have reviewed the motion and the order and am in agreement with
19 it.

20      THE COURT: All right. Thank you, ma'am.

21      MS. LEVIN: Thank you.

22      THE COURT: All right. Does any other party in the
23 courtroom wish to respond to the debtor's motions? All right,
24 Ms. Tavenner.

25      MS. TAVENNER: Just briefly, Your Honor. Lynn

**J&J COURT TRANSCRIBERS, INC.**

1  Tavenner appearing on behalf of the Official Committee of
2  Unsecured Creditors.  I did want to advise Your Honor that Mr.
3  Jeff Palmer, that's my co-counsel, is on the phone as well.  We
4  wanted to alert the Court to the fact that counsel's comments
5  are indeed correct, that the committee has been apprised of the
6  negotiations throughout the process and believes that the
7  ultimate resolutions that are before the Court today are in the
8  best interest of the debtor's estate.
9           THE COURT:  All right.  Thank you.  Mr. Smith.
10          MR. SMITH:  Good afternoon, Your Honor.  J.R. Smith
11 from Hunton & Williams on behalf of Assurant.  Appearing on the
12 phone, telephonically, is Raul Cuervo from Jordan Burt and I
13 would defer to him.  But I would also point out for the record,
14 and I believe this is clear in the papers, that Assurant's
15 unsecured claim in the amount of $6 million will be deemed
16 allowed.
17          THE COURT:  All right.  I've got that note.  Yes,
18 very good.  Mr. Cuervo, do you wish to respond now at this
19 time?
20          MR. CUERVO:  Yes, Your Honor.  I just want to clarify
21 something that I think I may have misheard.  But the $3.5
22 million that is going to be placed in the custodial account
23 comes from the 34 million, 34.1 million, and I just wanted to
24 clarify that.  But other than that, I may have misheard that,
25 and I just want to concur with the comments made in the court.

**J&J COURT TRANSCRIBERS, INC.**

1  This was clearly an arms length transaction.  It took nine
2  months to get it done and I think it's in everybody's best
3  interest.
4         THE COURT:  All right.  When I was looking at the
5  papers, it looked to me like it said 3.5 million to be
6  deposited in a custodial account, open for an escrow account
7  for a net initial lump sum profit sharing payment of
8  34,140,896.  So I'm looking at Page 17 of the motion.
9         MR. CUERVO: Well, Your Honor, if you look at 3.2 of
10 the agreement, Assurant shall pay to Circuit City 46 million
11 less, and then it has A, B and C, and C includes the 3.5
12 million.  I would ask the debtor to clarify that.
13        THE COURT:  All right.  Very good.
14        MR. FREDERICKS:  Your Honor, if I could have a moment
15 to just look at the settlement agreement.  I believe the way
16 that it is -- if I'm reading from 3.2 of the settlement
17 agreement, I believe it is 46 million is what is defined as the
18 profit sharing amount.
19        THE COURT:  Right.
20        MR. FREDERICKS:  Less a settlement amount of
21 approximately 4.1 million, less 4.25 million which is to GE,
22 less 3.5 million which results in an initial lump sum payment
23 of 34 million.
24        MR. CUERVO: I'm mistaken, Your Honor, I'm sorry.  It
25 is 46 million and those amounts subtracted from 46 million are

1  34 million.
2              THE COURT:  All right.  Good because that's the way I
3  was reading it.
4              MR. CUERVO:  I'm sorry, Your Honor.  I misread it.
5              THE COURT:  All right.  Very good.  All right.
6  Anything further, Mr. Cuervo?
7              MR. CUERVO:  That's all, Your Honor.
8              THE COURT:  All right.  Thank you.  Does any other
9  party on the phone wish to respond to the debtor's motion?  All
10 right.  I believe, Mr. Fredericks, that we've resolved any
11 concerns of any of the parties present, that there are no
12 objections to the debtor's motion.  So, the Court will approve
13 the motions.
14             MR. FREDERICKS:  Thank you very much, Your Honor.
15 There is one additional item related to this.  There is some,
16 and part of asking for this hearing was there is some time
17 sensitivity.  We need to actually have the agreement become
18 final before the end of the month so that funds can move before
19 September 30th.  If it's possible, I believe the order may have
20 already been boxed, but if it is at all possible to have the
21 order docketed today, the debtor's would greatly appreciate
22 that.
23             THE COURT:  All right.  Very good. I will look for
24 that as soon as I get out of the courtroom.  And if it is
25 tendered, then I can certainly get it entered today.  If it is

1  not, then put through the BOPS system and please make sure it
2  gets done as quickly as possible.
3         MR. FREDERICKS:  We will do that.  Thank you, Your
4  Honor.  I know next week is the disclosure statement hearing.
5  I don't know if Your Honor has any questions with respect to
6  that at this time.  Otherwise, we can certainly address all
7  those things on Tuesday.
8         THE COURT:  Well, I have some questions.  I think
9  they are probably best reserved for next Tuesday when we have
10 the hearing because I have another hearing I've got to go into
11 right now and I'm afraid if I start getting into the disclosure
12 statement, it wouldn't be fair to some of the other folks in
13 the courtroom.  I'll look forward to that hearing.
14        Now, also, with the approval of the settlement, that
15 resolves matter number one that was on the docket.
16        MR. FREDERICKS:  That's correct, Your Honor.
17        THE COURT:  Okay, thank you.  Any other matters that
18 we need to take up then in Circuit City this afternoon?
19        MR. FREDERICKS:  I don't believe so.  Thank you very
20 much, Your Honor.
21                        * * * * *
22
23
24
25

1                          CERTIFICATE

2          I, LYNN SCHMITZ, a certified electronic transcriber,

3   certify that the foregoing is a correct transcript, to the best

4   of the transcriber's ability, from the official electronic

5   sound recording of the proceedings in the above-entitled

6   matter.

7

8   /s/ Lynn Schmitz                        September 30, 2009

9   Lynn Schmitz

10  **J&J COURT TRANSCRIBERS, INC.**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**