UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                        .      Case No. 08-35653(KRH)
                              .
CIRCUIT CITY STORES,          .
INC.                          .      701 East Broad Street
                              .      Richmond, VA  23219
                              .
        Debtor.               .      September 22, 2009
. . . . . . . . . . . . ..            11:01 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            McGuire Woods LLP
                           BY:  DOUGLAS M. FOLEY, ESQ.
                           BY:  SARAH BOEHM, ESQ.
                           World Trade Center
                           101 West Main Street, Suite 9000
                           Norfolk, Virginia  23510-1655

                           Skadden Arps Slate Meagher & Flom LLP
                           BY: IAN S. FREDERICKS, ESQ.
                           BY: CHRIS DICKERSON, ESQ.
                           One Rodney Square
                           Wilmington, DE  19899

                           BY:  DEBORAH MILLER, ESQ.
                           Director & Assistant General Counsel
                           Circuit City Stores, Inc.
                           9950 Mayland Drive
                           Richmond, VA  23233

For Micro Electronics:     Wharton, Aldhizer & Weaver, PLC
                           BY: WHITNEY J. LEVIN, ESQ.
                           125 S. Augusta Street, Suite 2000
                           Staunton, VA  24401


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

**APPEARANCES (CONT'D):**

| | |
|---|---|
| For Creditors<br>Committee: | Pachulski, Stang, Ziehl & Jones<br>BY:  JEFFREY N. POMERANTZ, ESQ.<br>10100 Santa Monica Boulevard<br>11th Floor<br>Los Angeles, CA  90067-4100 |
| For Unocal Enterprises: | Wallace Pledger, PLLC<br>BY:  ERICK F. SEAMSTER, ESQ.<br>7100 Forest Avenue, Suite 302<br>Richmond, VA  23226 |
| For HP: | Durrette Bradshaw, LLP<br>BY:  ELIZABETH GUNN, ESQ.<br>Main Street Center, 20th Floor<br>600 East Main Street<br>Richmond, VA  23219 |

3

1           MR. FOLEY:  Good morning, Your Honor, Doug Foley with

2   McGuire, Woods on behalf of the debtors.

3           THE COURT:  Good morning, Mr. Foley.

4           MR. FOLEY:  With me at counsel table is Chris

5   Dickerson from the law firm of Skadden, Arps, Jeff Pomerantz

6   who's counsel for the Committee, Ian Fredericks from Skadden,

7   Arps and Sarah Boehm from my firm, as well.  Your Honor, with

8   -- here from the Company today, Your Honor, is Michelle Mosier

9   whose the principal financial officer, Jim Markum the CEO and

10  Deborah Miller the General Counsel.  Your Honor, we also have

11  filed an amended agenda today to reflect some of the updates

12  since yesterday.  We've been working to try to resolve some of

13  the disclosure statement objections.  If we could go through

14  the other items first on the agenda, Your Honor?

15          THE COURT:  You may.

16          MR. FOLEY:  Then we can proceed with the disclosure

17  statement issues.  Your Honor, item number one on the agenda is

18  a matter that was on at the last hearing.  Your Honor, this has

19  been withdrawn without prejudice.  It's essentially moot as a

20  result of Your Honor's ruling at the last hearing with respect

21  to the sale of the remaining electoral property.

22          THE COURT:  All right.  Very good.

23          MR. FOLEY:  Your Honor, item number two, again, this

24  is our long-standing motion with respect to establishing sell

25  down procedures and trading and equity and security claims.

**J&J COURT TRANSCRIBERS, INC.**

4

1  We've been in consultation with the Committee with respect to

2  the need to turn this interim order into a final order, but for

3  purposes of today we've asked that and agreed that the matter

4  should be adjourned until the confirmation hearing of --

5  hopefully will be the confirmation hearing of November 23rd.

6          THE COURT:  November 23?

7          MR. FOLEY:  Your Honor, item number three, this is

8  the lease disposition procedures motion.  There is one item

9  left that's unresolved and that's the objection of 444

10  Connecticut Avenue.  The issue there relates to attorneys fees

11  which may be precedential with respect to some claims in the

12  case.  Other claims in the case, we've asked that they've --

13  they've agreed to adjourn the matter until the October 7th

14  omnibus hearing date at 2 p.m.

15          THE COURT:  October 7th?

16          MR. FOLEY:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. FOLEY:  Item number four, Your Honor, this is

19  Sony Picture Home Entertainment motion for allowance and

20  payment of 5039 claim.  They have agreed to adjourn their

21  motion until the October 15th omnibus hearing date at 2 p.m.

22          THE COURT:  All right.  Very good.

23          MR. FOLEY:  Your Honor, items number five, six, eight

24  and nine are all motions by parties seeking permission to file

25  a right proof of claim of some priority or type.  They have

1  respectively agreed to adjourn their motions until the

2  confirmation hearing and item number five is the motion by Mr.

3  Chalifoux.  Number six is Vertis.  Number eight is Waste

4  Management.  Number nine is Minor Fleet Management Corporation.

5  All those, Your Honor, the movants have agreed to adjourn until

6  November 23rd at 10 a.m.

7            THE COURT:  Okay.

8            MR. FOLEY:  Your Honor --

9            THE COURT:  That'll be adjourned.

10           MR. FOLEY:  -- item number seven is application by

11 Infogame Corporation for allowance and payment of

12 administrative expense priority claim.  We have been in

13 negotiations with them and we believe we are very close to a

14 resolution of that motion in its entirety.  They have agreed as

15 a result of those negotiations to adjourn their matter until

16 October 7th at 2 p.m.

17           THE COURT:  All right.

18           MR. FOLEY:  Your Honor, to go back to the motions for

19 late claim, there was a motion that we received that Your Honor

20 may recall from the last hearing by Ms. Ashley Isaac that was

21 mailed to us and we received it yesterday.  She noticed it for

22 today but we just got it yesterday.  I don't even think it's

23 hit the docket yet, but we would ask that that matter, similar

24 to the others be set for hearing on the November 23rd hearing

25 date at 10.

6

1          THE COURT:  I think that's appropriate.

2          MR. FOLEY:  Your Honor, items number 10 is our motion

3 with respect to temporarily allowing certain personal injury

4 tort and wrongful death claims at a zero amount for voting

5 purposes.  I wanted to give the Court a little background with

6 respect to why this motion came about and it is in conjunction

7 with the omnibus objection number 31, which is item number 17.

8          Your Honor, item number 17 is our omnibus objection

9 to certain legal, litigation-type claims.  Some of those

10 claims, Your Honor, appear to be asserting claims that are --

11 may be in the nature of personal injury tort and wrongful death

12 and as Your Honor is aware, 28 U.S.C. 157(b)(2)(B) and (5) talk

13 about the limits of the Court -- certain limitations on the

14 Court -- the Bankruptcy Court's jurisdiction with respect to

15 disposition of personal injury tort and wrongful death claims.

16          Nobody has raised that issue with respect to our

17 ability to object to those claims in this Court and we believe

18 that the precedent in this District is that to the extent

19 parties don't respond to the claim objection that Your Honor

20 could enter a default order with respect to that disposing of

21 the claim because that doesn't constitute a trial for purposes

22 of having to try the case.  It's a pre-trial matter and we

23 believe the case law would allow the Court to enter such an

24 order.

25          However, in order to avoid any complications at this

7

1  hearing and in order to accomplish the purpose for which we

2  were, at least, initially objecting to those claims now for

3  voting purposes, what we did with respect to item number 17 is

4  we had withdrawn our objection as to any claim in omnibus

5  objection number 31 that on its face appeared to be asserting a

6  claim that was in the nature of personal injury tort, wrongful

7  death and what we have done is included it in this motion in

8  item number 10 to temporarily allow them at zero for voting

9  purposes so that when the solicitation packages go out, they

10  would get a ballot that would count for numerosity but not for

11  two-thirds an amount.

12         So, Your Honor, those -- we did -- when we served --

13  and we've -- we served the withdrawal and this motion on those

14  parties on the exact same day in the same package so they

15  should understand what we're -- what we've done.  We have

16  received no responses with respect to item number ten and

17  unless anybody has any questions, we would ask the Court to

18  order the relief that we're requesting in item number 10.

19         THE COURT:  All right, Mr. Foley.  Does any party

20  wish to be heard in connection with the debtor's motion to

21  temporarily allow the certain personal injury and wrongful

22  death claims?

23         ALL COUNSEL:  (No verbal response)

24         THE COURT:  All right.  There being no response and

25  there being no objection, the Court will grant the motion.

**J&J COURT TRANSCRIBERS, INC.**

8

1          MR. FOLEY:   Thank you, Your Honor.  And while I'm

2   here before I turn the podium over to Ms. Boehm to deal with

3   some of the other omnibus objections, we could -- if we could

4   take up item number 17, Your Honor, which is omnibus objection

5   31.  Your Honor, the relief that we're seeking today with

6   respect to omnibus objection number 31 is the Court to enter an

7   order for any body who did not respond to the -- to the claim

8   objection and to adjourn until the November 3rd hearing date.

9   The -- those parties that did file a response so that we

10  continue to try to see if we can't get consensual resolutions

11  with respect to those responses.

12          Again, Your Honor, none of the claims that we're

13  seeking the Court to order today, at least on their face,

14  appear to be asserting a personal injury tort, wrongful death

15  claim.  So, we would ask the Court to grant the relief that

16  we're seeking in item number 17 on the docket.

17          THE COURT:  All right.  Does any party wish to be

18  heard in connection with the debtor's 31st omnibus objection to

19  claims?  Yes, sir?

20          MR. SEAMSTER:  Hi.  Rick Seamster with Wallace

21  Pledger.  We're --

22          THE COURT:  Please come to the podium.

23          MR. SEAMSTER:  Well, Your Honor, local counsel for

24  Unocal Enterprises.

25          THE COURT:  All right.  Come -- if you would identify

**J&J COURT TRANSCRIBERS, INC.**

9

1    yourself on the record, once again, sir for --

2         MR. SEAMSTER:  Sure.  Rick Seamster with the law firm

3    of Wallace Pledger.

4         THE COURT:  All right.

5         MR. SEAMSTER:  We're local counsel for Unocal

6    Enterprises.  National counsel, which is Mr. Thomas Weiss,

7    filed a response a day late on the 31st omnibus objection and

8    there's an affidavit in the response where Mr. Weiss says it

9    was basically a calendaring error and he asked to be heard

10   before the Court on -- on the objection -- on the response to

11   the objection.  So --

12        THE COURT:  All right.

13        MR. SEAMSTER:  -- that's where -- where we stand.

14   We'd like to be able to proceed with that even though it was

15   not timely filed.

16        MR. FOLEY:  We have no problem with that, Your Honor.

17   We'll include this claim in the exhibit that would adjourn the

18   response, even though it was late, until the November 3rd

19   hearing date.

20        THE COURT:  All right.  So, you -- you'll allow the

21   late response?

22        MR. FOLEY:  We'll treat -- we'll treat it as timely

23   filed.

24        THE COURT:  Okay.  So, the response will be treated

25   as timely and then the motion would be the -- that the

10

1  objection would be heard on November 23.

2        MR. SEAMSTER:  November 23?

3        THE COURT:  Do you have any objection to that?

4        MR. FOLEY:   November 3rd, Your Honor.

5        THE COURT:  November --

6        MR. FOLEY:   November 3rd.

7        THE COURT:  November 3rd.

8        MR. FOLEY:   Third.  We have a -- I think we have an

9  omnibus hearing on November 3rd at, I believe, 10 o'clock or 11

10 o'clock.

11       THE COURT:  November 3.

12       MR. FOLEY:   Is that right?  And I believe that on

13 the agenda which was -- well --

14       THE COURT:  It's at 11 o'clock --

15       MR. FOLEY:  It's 11.

16       THE COURT:  -- on the 3rd.

17       MR. FOLEY:  And I believe this claim is actually

18 already listed in the agenda that we've filed this morning as

19 being adjourned --

20       MR. SEAMSTER:  It is.

21       MR. FOLEY:  -- and not ordered.

22       MR. SEAMSTER:  Okay.

23       MR. FOLEY:  So, we did pick that one up.

24       THE COURT:  All right.  Very good.

25       MR. SEAMSTER:  Thank you, Your Honor.

11

1          THE COURT:  All right.  Thank you.  Does any other

2   party wish to be heard in connection with the debtors' omnibus

3   objection 31?

4          ALL COUNSEL:  (No verbal response)

5          THE COURT:  All right.  There being no other

6   objections, the motion will be granted.

7          MR. FOLEY:  Your Honor, item number 13 is a status

8   hearing.  This is on for the second time, carried over from

9   August 18th, I believe.  This is our omnibus objection 24.

10  This was objecting to certain claims that we're asserting real

11  estate tax liability for property that was leased locations.

12  Your Honor, we would -- we'll -- I believe we may have resolved

13  all the responses to this objection.  One of the issues that

14  has arisen is that some of the parties have clarified in their

15  response that they weren't actually asserting a claim for real

16  estate taxes but instead for personal property -- I -- property

17  taxes and to the extent that that's the type of claim that they

18  were asserting, we are withdrawing the objection as to those

19  claims and so -- but for now, we would ask the Court to adjourn

20  for status the omnibus objection number 24 which is item number

21  13 on the docket until October 15th at 2 p.m.

22         THE COURT:  October 15, 2 p.m.  It'll be adjourned to

23  that date.

24         MR. FOLEY:  Your Honor, item number 14 and 15 are,

25  again, carry overs from August 18th.  As Your Honor recalls,

12

1  this -- these two omnibus objections involve what we refer to

2  as PTO, paid time off claims.  This --

3           THE COURT:  I'm familiar with those and I think I've

4  -- you've supplement -- you have provided the Court with a

5  supplemental brief and the Court has got that under advisement

6  at this time.

7           MR. FOLEY:  Okay.  So, that -- we just put it on the

8  docket because we weren't sure if the Court was prepared to

9  make a ruling or adjournment.  Do you want -- would you like us

10 to adjourn it for status to another hearing or just take it off

11 the agenda this morning?

12          THE COURT:  Let -- let's adjourn just so we have it

13 on the calendar to the October 15 hearing date and I am

14 confident that I'll have issued something prior to then.

15          MR. FOLEY:  Okay.  And the only -- the only

16 additional fact that I would make the Court aware of that we

17 became aware of after we filed our supplemental memorandum is

18 Ms. Mosier asked -- Ms. Mosier to see if we could get some

19 detail on one of the questions that the Court asked at the last

20 hearing, which was were employees post-petition allowed to use

21 paid time off -- actually take the time off and they were.  As

22 far as we are aware, she -- I would proffer her testimony that

23 we're not aware of anybody that was denied use of paid time

24 off.  It wasn't paid out in cash and we actually have numbers

25 of the aggregate value of what was used post-petition.  Post-

**J&J COURT TRANSCRIBERS, INC.**

13

1  petition -- and this goes through the liquidation sales, Your

2  Honor, as well, and I'll explain how that worked -- 20,516

3  associates were able to use and did use paid time off post-

4  petition before the liquidation sales were completed and that

5  equates to an aggregate dollar value of $9,484,084.05.

6          Now, the way it worked after the liquidation sales

7  began is if an associated used paid time off under the auspices

8  of the liquidation -- liquidating agent, then the estate had to

9  reimburse the liquidating agent for the cost of that time off

10 and that was done as part of the liquidation sales, but that

11 would be the only factual issue that I would -- that I would

12 add, Your Honor.

13          THE COURT:  Okay.  And your proffering that testimony

14 today?

15          MR. FOLEY:  Yes, Your Honor.

16          THE COURT:  Now, does any party wish to cross examine

17 the proffered witness in connection with that proffered

18 testimony?

19          ALL COUNSEL:   (No verbal response)

20          THE COURT:  All right.  The Court will accept that

21 proffer.

22          MR. FOLEY:  Thank you, Your Honor, and before we get

23 to the disclosure statement, Ms. Beam will address items number

24 16, 18, 19, 20 and 21 and 22 on the docket, Your Honor.

25          MS. BOEHM:  Your Honor, Sarah Boehm from McGuire

14

1  Woods on behalf of the debtors.  Item 16 on the agenda is the

2  debtor's omnibus objection to claims which was the disallowance

3  of certain claims through wages and compensation.  This

4  objection included 270 claims and we received 14 responses

5  today.

6        Mr. Foley dealt with the 31st omnibus objection.  The

7  32nd omnibus objection to claims dealt with the

8  reclassification of certain claims filed by Equity Holders to

9  interests.  This included 53 claims and we've received three

10 responses.

11       The 33rd omnibus objection related to the

12 modification a reclassification of certain claims.  For the

13 vast majority of these, they were claims that were asserted as

14 either admin, secured or priority and we've sought to

15 reclassify them as general unsecured.  That included 85 claims

16 for which non-responses were received.  One of those has

17 already been withdrawn by a claimant.  They now agree with our

18 objection, so we're down to eight responses for that one.

19       The 34th omnibus objection relates to the

20 modification of certain duplicate 503(b)(9) claims.  For the

21 most part, these included claimants who filed a 503(b)(9) claim

22 on the 503(b)(9) claim form and then also filed another proof

23 of claim that included that and so it just seeks to disallow

24 the duplicate portion of that 503(b)(9) claim.  That included

25 41 claimants who had filed duplicate claims and we received

1   nine responses.

2          The 35th omnibus objection to claims is the

3   disallowance of certain amended and duplicate claims.  This

4   included 198 claims for which we received 17 responses.  And

5   the debtor's 36 omnibus objection is the disallowance of

6   certain claims relating to a short-term incentive plan.  This

7   included 217 claims for which we received 18 responses.

8          Your Honor, our procedure was -- with this is the

9   same as it has been with our other claim objections.  Any

10  response that we have received up until the day we submit the

11  order, we include on the adjourned exhibit.  We would ask the

12  Court to either disallow, modify or reclassify the claims for

13  which no response has been received for these omnibus

14  objections and then adjourn the hearing for further status on

15  any response received to November 3rd at 11 a.m.

16         THE COURT:  November 3 for all of those and that

17  would be items number 16, 18,, 19, 20, 21 and 22 on the Court's

18  --

19         MS. BOEHM:  Yes, Your Honor.

20         THE COURT:  All right.  Does any party wish to be

21  heard in connection with any of those matters?  Ms. Gunn?

22         MS. GUNN:  Just briefly, Your Honor.  Elizabeth Gunn

23  appearing on behalf of HP.  HP did not file an objection to the

24  34th omnibus objection to a claims, a response.

25         THE COURT:  Okay.  Just so that we have it straight.

**J&J COURT TRANSCRIBERS, INC.**

16

 1  The 34th --

 2          MS. GUNN:  It's number 20.

 3          THE COURT:  -- is number 20?

 4          MS. GUNN:  On the --

 5          THE COURT:  Okay.

 6          MS. GUNN:  -- on the agenda.  However, primary

 7  counsel for HP and counsel for the debtor have exchanged e-

 8  mails and have agreed to amend the exhibit to their order which

 9  will be submitted to reflect on a different amount of HP's

10  claim in the amount of $33,065,626.36.  As long as the exhibit

11  to that order reflects that number, then HP would have no

12  further issue with that, but just wanted to clarify on the

13  record that there are -- was an agreement to amend the exhibit

14  to that order.

15          THE COURT:  All right.

16          MS. GUNN:  Thank you.

17          THE COURT:  Ms. Gunn, is that -- I mean -- is that

18  consistent with the debtor's view?

19          MS. BOEHM:  Your Honor, I personally have not handled

20  that response but whomever she has the e-mail from, I'll follow

21  up with him and we'll make sure the order is appropriate and

22  signed off --

23          THE COURT:  Okay.

24          MS. BOEHM:  -- by Ms. Gunn prior to submitting.

25          THE COURT:  Well -- the relief will -- that we'll be

17

1  granting today will accept that claimant.

2          MS. BOEHM:  Yes.

3          THE COURT:  All right.  Does any other party wish to

4  be heard?

5          ALL COUNSEL:  (No verbal response)

6          THE COURT:  All right.  Ms. Boehm, the Court will

7  grant the debtor's motions then with regard to those docket

8  entries and the parties that have filed responses including HP

9  will be adjourned to the November 3rd omnibus hearing date.

10         MS. BOEHM:  Well, Your Honor, if I understand Ms.

11 Gunn correctly, to the extent HP's number is just modified, it

12 doesn't need to be adjourned.  It can just be ordered --

13         THE COURT:  Well, then --

14         MS. BOEHM:  -- with a modified --

15         THE COURT:  -- then it can be resolved.  Right.  Most

16 definitely.  To the extent that there's any issue, I'll hear

17 the issue if it needs to be heard at that time.

18         MS. BOEHM:  Thank you, Your Honor.

19         THE COURT:  All right.

20         MR. FOLEY:  Thank you, Your Honor.  That leaves, I

21 think, the only items on the agenda are items number 11, a

22 disclosure statement and items number 12 which are the

23 solicitation procedures motion and Mr. Dickerson and Mr.

24 Pomerantz will address those issues with the Court.

25         THE COURT:  All right.  Very good, Mr. Foley.  Thank

1  you.

2          MR. DICKERSON:  Good morning, Your Honor.  Chris

3  Dickerson from Skadden Arps representing the debtors.  Your

4  Honor, as Mr. Foley indicated, I'm happy to report that the

5  debtors, as well as the Creditors Committee and I think you'll

6  note that Mr. Pomerantz is now sitting on this side of the

7  courtroom today.

8          THE COURT:  I notice that everybody's abandoned this

9  area.

10          MR. DICKERSON:  Well, I actually view that as a good

11  thing, Your Honor.

12                        (Laughter)

13          MR. DICKERSON:  I need all the -- we need all the

14  help we can get over here, but with a -- on a more sober point

15  to that issue is that I'm happy to report that the plan and the

16  disclosure statement that have been submitted and filed with

17  the Court and we're seeking approval of today is done on a co-

18  proponent basis with the Creditor's Committee.  We spent a

19  great number of -- a great amount of time with the Committee

20  discussing the terms of the plan, the procedures involved, the

21  disclosure statement and all the ancillary documents and dates

22  and so forth that are included and before Your Honor this

23  morning.

24          I think generally the parties would agree that while

25  we're not where we hoped to be when this case was filed last

1  November, we do think that in light of the circumstances that

2  occurred, we have made substantial progress with getting these

3  cases adjudicated, dealt with and out of Chapter 11 and, in

4  fact, I'll note that we're hopeful that we will be having Your

5  Honor confirm a plan shortly after the one-year anniversary of

6  the petition date which I think, as Your Honor is aware and

7  others are aware, is a fairly rapid pace so -- for a Chapter 11

8  case of any type, especially one of a $12 million company with

9  as many complicated issues that it has.

10      And so, we're pleased that we're able to keep

11  progress going and to allow hopefully claimants to be receiving

12  distributions as soon as possible and that is our ultimate

13  goal, is to insure that the appropriate amounts are disbursed

14  to the people who are entitled to receive them.

15      I won't go into any detailed description of the plan

16  unless Your Honor has specific questions, other than to say

17  that the plan is a liquidating plan and as such, is one I'm

18  sure that most people are familiar with the form of that and in

19  essence it's taking the assets including any cause of action

20  claims issues and so-forth, transferring those to a liquidating

21  trust, a liquidating trustee being appointed to administer

22  those assets.

23      In this instance, there's also a liquidating trust

24  oversight board, seven member board, six of which who are

25  members -- currently members of the Creditor's Committee.  So,

1  we'll have a very great amount of experience with the case and

2  understanding of the issues in the case who will then work with

3  the liquidating trust as fiduciaries to the beneficiaries of

4  the trust, all the claimants and liquidate the remaining assets

5  of which, we're pleased to say, a large amount has been

6  liquidated to date and I think at last estimate there was

7  approximately $280 million worth of liquidity in the debtor's

8  bank accounts so we're well on our way to having liquidated a

9  large number, if you compare that to the numbers that are

10  included in the disclosure statement as the expected

11  recoveries.

12        And we -- we're hopeful that those recoveries that

13  are in the disclosure statement are on the conservative side

14  and the work that will be done by the debtors, the Committee,

15  prior to confirmation, as well as the liquidating trustee after

16  confirmation will result in recoveries in the range that's

17  included in the disclosure statement or it -- or even exceeded.

18  That's obviously the hope.

19        And I -- I'll also point out that I think its

20  obvious, but unsecured creditors will be receiving provided

21  that things go as we expect them, we'll be receiving a recovery

22  in this case.  Obviously it's not a hundred cents and the

23  fervent hope had been at one point that we would be able to pay

24  more than what's provided in the -- in the disclosure

25  statement, but we do believe that's a meaningful recover to

21

1  those claimants and we're interested in trying to get the --

2  those recoveries in as soon as possible.

3       Your Honor, we're technically here to approve the

4  motion that was filed to approve the disclosure statement, the

5  notice of the disclosure statement hearing, a hearing date to

6  consider confirmation, the procedures for filing objections to

7  the plan, approval of the voting agent and deadlines that are

8  related to solicitation and confirmation, procedures with

9  respect to certain claims and then solicitation procedures for

10 confirmation of the plan.

11      Those -- that's -- there's a lot of stuff involved in

12 that motion and I'd like to highlight a few things, but unless

13 the Court would like me to go into more detail about each of

14 those items, I'll just try to remind what's being approved and

15 then I'll describe some changes that have been made to the

16 plan, the disclosure statement and the order approving the

17 motion and then I think we -- we still do have a few objections

18 that have not been resolved, although I'm happy to report that

19 we've discussed, I think, with almost every party that filed an

20 objection except for maybe one or two that we couldn't reach.

21      Their objections, in an effort to try to resolve them

22 and I think we've at least done a little bit of the work or

23 laid the groundwork for having a meaningful discussion with

24 Your Honor so that you can make a ruling on those objections.

25      THE COURT: All right. Very good. And the Court had

22

1  previously reviewed the motion that you filed, as well as the

2  disclosure statement.  I have to say the -- the disclosure

3  statement was filed to the first amended plan.  The Court has

4  hurriedly looked through that, and -- but I think that the way

5  that you propose to proceed is appropriate.

6         MR. DICKERSON:  Thank you, Your Honor, and I'm happy

7  to report that the changes to both the disclosure statement and

8  the plan itself are fairly minimal.  There -- there's one

9  that's -- and I guess more than one that I would say are

10 substantive and important, but I will address those to clarify

11 what's going on and then there's also -- we had filed a revised

12 version of the solicitation procedures order last week.

13 There's been one additional change which I'll also -- also

14 address.

15        THE COURT:  All right.  Thank you.

16        MR. DICKERSON:  Your Honor, the foremost task before

17 the Court today is to approve the disclosure statement as

18 providing adequate disclosure in accordance with Section

19 11:25(a)(1) of the Bankruptcy Code.  I think that in short we

20 have, in fact, the co-proponents have provided adequate

21 information in order to -- for Your Honor to make that ruling.

22 I think some of the objectors may have some issues with respect

23 to whether additional information or changes should be made and

24 we will address those when we get the objections.

25        So, I'm not going to request that you find that the

**J&J COURT TRANSCRIBERS, INC.**

23

1  disclosure statement is adequate now.  We'll save that to the

2  end when we've resolved everything else.

3          Moving on, then, Your Honor, I think the first thing

4  that we would like to do and I believe Your Honor's already

5  held open the spot, is to set the con -- to approve the

6  confirmation hearing for November 23rd.  As well, we would like

7  -- as was attached with the solicitation procedures motion to

8  approve the form of the notice that will be sent to creditors

9  letting them know when that hearing will occur, as well as the

10 objection deadline and other relevant information that they may

11 need with respect to filing an objection or taking any actions

12 that they deem appropriate with respect to confirmation.

13         The -- in more -- and, in fact, Your Honor, the

14 confirmation notice, as you may be aware, includes specific

15 procedures that we're asking Your Honor to approve with respect

16 to objections that provide the form of the objection, the

17 deadline by which it needs to be filed and who it needs to be

18 served with -- served upon.

19         Next, Your Honor, we would request that Kurtzman

20 Carson Consulting the current claims and noticing agent be

21 approved as the voting agent to tabulate ballots and to provide

22 a result of the solicitation so that an affidavit can be

23 entered stating whether or not we've met the statutory

24 requirements for the plan to be confirmed.

25         Your Honor, in the solicitation motion and I won't go

**J&J COURT TRANSCRIBERS, INC.**

24

 1 through each of them, but there are a number of other deadlines

 2 that are requested that Your Honor approve, including the

 3 voting deadline, the exhibit filing deadline, the date by which

 4 we will mail the packages, the voting record date and the

 5 deadline to publish confirmation -- I'm sorry -- the published

 6 notice of the confirmation hearing and then most importantly,

 7 and one that I did want to point out is the deadline for the

 8 debtors to object to claims for voting purposes.

 9      Your Honor, I think its important that in conjunction

10 with the Committee as plan proponents that has been our fervent

11 effort to try to allow as many people to vote on the plan as

12 possible and I think part of the discussion that Mr. Foley had

13 with you earlier, with respect to allow -- temporary allowance

14 for people to at least be allowed to vote for numerosity as

15 opposed to amount, that demonstrates that effort.

16      What we've done, Your Honor and what the plan and

17 solicitation procedures provide and the disclosure statement

18 provides is that disputed, unliquidated and contingent claims

19 at the start are not entitled to vote, but we've provided a

20 process pursuant to the rules to allow 3018 motions to be filed

21 and to the extent that someone receives a notice of a non-

22 voting status and in addition to ballots, if -- if the -- for

23 whatever reason, the debtors and the plan proponents -- excuse

24 me -- have determined that a creditor is not entitled to vote,

25 they won't receive the same package.  They'll receive a notice

25

1  that says we don't believe that you're entitled to vote.  If

2  that creditor believes they should be entitled to vote, then

3  obviously, they are free to file a 3018 motion.

4          I'd like to point out though, in addition, Your

5  Honor, is we hope we don't get to that point.  We really don't

6  want to spend a great deal of the Court's time arguing 3018

7  motions and we've included language that says, if you think

8  you're entitled to vote, please contact us, because we're

9  willing to work with you and work to -- towards a resolution

10 that allows them to vote.  In worse case, for numerosity

11 reasons, if not for some agreed upon amount.

12         So, I -- we're taking steps -- affirmative steps to

13 try to ensure that as many people can vote on this plan so that

14 the -- the due process of this -- of this overall solicitation

15 procedures is done in the best and best manner.

16         I guess, Your Honor, do -- I presume that you've had

17 a chance to review the dates.  Do any of them present any issue

18 or a problem for the Court with respect to how we've separated

19 them out?  We believe we've given adequate time for various

20 events to occur.

21         THE COURT:  As far as the Court is concerned, the

22 dates are acceptable.  I'm not aware that any party has filed

23 an objection to any of the dates that you have proposed.  Is

24 there any issue with regard to those dates?

25         MR. DICKERSON:  I'm not aware of any.  The only thing

26

1  that I thing that I think that may -- we may touch on we would

2  discuss a couple of the objections.  I think that there are

3  some objectors who are concerned with knowing when -- whether

4  the -- the dates that we've set in the plan for disputing or

5  objecting to administrative claims whether those dates are

6  appropriate, but with respect to the solicitation procedures

7  dates, I'm not aware of any objection to those.

8          THE COURT:  And that's what I was referring to, the

9  solicitation dates.  I'm aware of the other concerns in the

10  plan but those would be more confirmation type of issues.

11          MR. DICKERSON:  Thank you.  Your Honor, then I just

12  want to point out one other change to the ballots.  We've -- we

13  submitted forms of the ballots and we're again asking the Court

14  to approve those.  I think as Your Honor is aware, there are

15  two classes that are entitled to vote, Class Three and Class

16  Four.  Class Three is convenience classes is the way its

17  described and it allows claimants with claims between 500 and

18  1,000 -- $999 to opt into that -- to get a different

19  distribution than if they went through the process.  It allows

20  them to get them soon -- sooner and it gives them some

21  certainty as to the amount they're going to get.

22          The one change that we did make is -- in -- with

23  respect to Class Four, there will be two forms of ballots

24  because I think as Your Honor is also aware the creditors who

25  have claims less than $500 are deemed to be de minimus and

1  therefore, don't need -- are not entitled to a distribution.

2  Again, we wanted to allow those parties to vote and so, they

3  will be given a ballot.  Obviously, they'll be voting on

4  whether or not to receive a -- they won't receive a

5  distribution.

6         The changes is that for claimants -- for creditors

7  who have claims in excess of a thousand dollars, they can opt

8  into the Class Three.  It would be inappropriate, the

9  proponents believe, to allow those with less than $500 in

10  claims to also be able to opt into Class Three because that

11  would -- that would obviate the de minimus -- restriction on de

12  minimus payments.

13         And so, the only difference between those ballots --

14  those two Class Four ballots would be to remove the ability of

15  someone with a claim less than $500 to opt into Class Three.

16  So, that's one change from the form of the ballots that we

17  submitted to Your Honor.

18         As I indicated, Your Honor, we also -- we will be

19  sending out packages, hopefully, on the 30th -- by the 30th and

20  hopefully sooner, that will be made up depending on what class

21  a claim falls into.  Those entitled to vote will, obviously,

22  receive ballots.  They also receive a CD-Rom that has the plan

23  and disclosure statement.  It won't be a hard copy; trying to

24  save a few trees there, but to the extent that a claimant

25  doesn't have the ability to read the CD-Rom, it also provides a

28

website, the claims and noticing agent website where they can

go on line and receive one and further, if that doesn't work,

it also has a phone number and an address where they can

contact someone who will then send them a written version of

the plan, if they so desire.

Similarly, those who are either un-impaired and

therefore not entitled to vote or receiving no distribution and

therefore not entitled to vote, will be receiving notices of

non-voting status.  They also will not receive the CD-Rom, but

website, the claims and noticing agent website where they can

go on line and receive one and further, if that doesn't work,

it also has a phone number and an address where they can

contact someone who will then send them a written version of

the plan, if they so desire.

Similarly, those who are either un-impaired and

therefore not entitled to vote or receiving no distribution and

therefore not entitled to vote, will be receiving notices of

non-voting status.  They also will not receive the CD-Rom, but

they will receive the same information to the extent that they

would like to have the plan and disclosure statement.  They can

either go to the web -- the KCC website or they can request it

via mail or phone call and have it transmitted to them at the

debtor's expense.

Your Honor, I think at that point then I've kind of

laid out what I deemed to be the high points of the relief

1  we're requesting.  I think before we get to the objections, I'd

2  like to point out a couple of changes that were made to the

3  solicitations procedures order, the first of which was made in

4  the version that was filed last week, last Friday I believe and

5  that dealt with paragraph 17 and 18 and 27 subparagraph or

6  roman numeral five.

7          These additions, Your Honor, just clarify that -- and

8  I guess I should have mentioned this at the beginning is that

9  the plan is premised on substantive consolidation of the

10 debtor's assets.  So, we're taking the nine debtors' estates,

11 combining them one -- into one and distributing them.  I know

12 that'll be a -- something that we may be discussing with some

13 of the objectors but that is our premise.  We wanted to clarify

14 in the order that if someone believed that they had or has

15 filed a claim against more than one debtor, they only get to

16 vote once.

17          If they have, for example, a guaranty claim and a

18 claim in chief against one -- two different debtors, then the

19 -- their ballots -- even if they filed two ballots, we would

20 only count that once for voting purposes.  So, we wanted to

21 clarify that.  Also, for claims distribution purposes, as well,

22 that's what the plan is premised on but we wanted to make sure

23 that that was clear in the order.

24          The only other change, Your Honor, would be to -- and

25 I don't believe you've seen this one -- it would be to remove

**J&J COURT TRANSCRIBERS, INC.**

30

1  paragraph B on page two, which was a finding that was in

2  addition to the finding already included in the order which, in

3  essence, was a belt and suspenders type language that said,

4  that nothing had come to Your Honor's attention that would

5  suggest that we haven't disclosed things that we should have,

6  nor that we've not disclosed things but the SEC had raised some

7  concern with that.  In reviewing it we determined that it

8  really was implicit in the Court's overall finding that the

9  disclosure statement was adequate and in order to resolve that

10 concern, we just agreed to take that paragraph out.

11          THE COURT:  All right.  Very good.

12          MR. DICKERSON:  Okay, Your Honor, then I think -- we

13 have filed and I know that some of this -- the most recent

14 filing was this morning, we filed a revised version of the plan

15 of disclosure statement and we also filed a chart listing the

16 objections and our proposed response for the resolution of

17 those.  I think rather than -- the easiest way to proceed would

18 be to just move to the objections and then -- because the

19 majority of the changes, or at least the substantive, non-

20 material -- or material changes, related to changes that we've

21 made in light of the -- in light of those objections.

22          THE COURT:  All right.

23          MR. DICKERSON:  Your Honor, did -- do you have a copy

24 of the chart?

25          THE COURT:  I do.

**J&J COURT TRANSCRIBERS, INC.**

31

1          MR. DICKERSON:  Okay.  Your Honor, 13 objections were

2  filed or we received 13 objections.  I think that there was one

3  with respect to Douglas County that we received it.  I don't

4  believe it was docketed but we treated it as an objection in

5  the chart and so we will be responding to it.  So, there's 13

6  of those objections and as I indicated earlier, we had reached

7  out to the objectors that we could in an effort to resolve them

8  and some of them have been resolved.

9          The chart, Your Honor, is laid in docket order

10  number, so unless you would like me to do something other than

11  that, I'll begin to go that way.  I think it probably makes

12  sense to get rid of the ones that we've resolved and then we'll

13  leave the ones that are still open for the end.

14          THE COURT:  That will be fine.

15          MR. DICKERSON:  Thank you, Your Honor.  The first

16  objection was docket number 4799 from the Los Angeles County

17  Sheriff's Department.  As indicated, we think that that was

18  just a miscommunication or a misunderstanding upon the filing

19  -- by the filing party.  It's a request for additional

20  information --

21          THE COURT:  I couldn't figure out what it was.

22          MR. DICKERSON:  It -- we weren't sure either, but

23  since it was filed, we think that we've provided adequate

24  information in the disclosure statement to resolve any issue

25  that they may have had and to the extent that they have further

**J&J COURT TRANSCRIBERS, INC.**

32

1  issues, they're free to raise those at confirmation, but we're

2  -- we think that that one should be overruled.

3           THE COURT:   All right.

4           MR. DICKERSON:   The next objection, Your Honor, was

5  --

6           THE COURT:  No, no.  Do we want to take these up?

7  Should I ask at this point if any party --

8           MR. DICKERSON:  Oh, sure.

9           THE COURT:  -- wants to be heard in connection with

10 that?  All right.  Does any party wish to be heard in

11 connection with the response to the Los Angeles County

12 Sheriff's Department to Disclosure Statement?

13          ALL COUNSEL:  (No verbal response)

14          THE COURT:  All right.  That response and to the

15 extent it is an objection it's overruled.

16          MR. DICKERSON:  Thank you, Your Honor.  The next

17 objection is docket number 4801 from Roto Rooter Plumbing and

18 Drain Service and again, the -- we're -- I think this happens

19 quite frequently is when you send notices to all creditors they

20 -- they take the opportunity to file things so that they're --

21 they think that they need to re-emphasize their interests and

22 while they don't understand the process, they take an

23 opportunity to respond and so I think that's what happened here

24 and, in fact, we've talked to Roto Rooter.  Really it was a --

25 they filed an invoice for services.  They agree that -- and

33

1  they've agreed to withdraw that objection.  I don't believe

2  anyone's here but we -- they've allowed us to represent that

3  that objection has been resolved --

4           THE COURT:  Okay.

5           MR. DICKERSON:  -- given our conversation.

6           THE COURT:  The Court will not that that has been

7  resolved and will be removed from the docket.

8           MR. DICKERSON:  Your Honor, the next objection is

9  docket number 4834 file by Vincent E. Rhynes and as indicated

10 the -- this really appears to be a claims objection issue in

11 that Mr. Rhynes asserts that his claim should not be

12 reclassified as an equity interest.  Obviously, that

13 reclassification is not coming through the disclosure statement

14 and it doesn't touch on the adequacy of the disclosure

15 statement.  It's a claims objection and we point out that to

16 the extent that Mr. Rhynes believes that he's improperly

17 classified and, therefore, that raises an issue for

18 confirmation.  He's free to do that and then we also point out

19 that the plan and the disclosure statement provide that all

20 equity interests are being -- will receive no distribution on

21 account of those interests.

22          And so, I don't believe we're able to reach Mr.

23 Rhynes to try to resolve that issue with him but again, we

24 would request that that objection be overruled.

25          THE COURT:  Does any party wish to be heard in

34

1  connection with the objection filed by Vincent Rhynes?

2          ALL COUNSEL:  (No verbal response)

3          THE COURT:  All right.  The Court has reviewed that

4  objection, as well, and is satisfied that it is a claims

5  objection and the objection will be overruled or -- yes.

6          MR. DICKERSON:   Thank you, Your Honor.  Your Honor,

7  next is number -- or docket number 4827 from Antor Media Corp.

8  As indicated in the chart Antor has a patent infringement case

9  that was pending against the debtors at the time of the filing

10 and is currently stayed.  Again, the -- this really doesn't

11 appear to be any -- there doesn't appear to be any issue with

12 respect to the adequacy of the disclosure statement other than

13 we've agreed with Antor and they've agreed that this will

14 resolve their objection that we would note that, in fact, they

15 have brought this case, that it's pending and that they reserve

16 their rights in essence and the debtors reserve their rights,

17 the estates reserve their rights with respect to any future

18 litigation on those issues and so we've added the paragraph

19 that you see in the right hand column in the revised disclosure

20 statement.

21         THE COURT:  All right.  Does any party wish to be

22 heard in connection with the Antor Media Corporation response?

23         ALL COUNSEL:  (No verbal response)

24         THE COURT:  All right.  That -- the Court will note

25 that that's been resolved.

**J&J COURT TRANSCRIBERS, INC.**

35

1         MR. DICKERSON:  Your Honor, the next in docket order

2   number is Longacre but with your indulgence I'd like to pass

3   that one to the end.  That's one that's still open.  The next

4   one I'd like to address, Your Honor, are docket numbers 4948

5   and 4968 filed by Michael Cullen and this is one, again, that's

6   not uncommon in Chapter 11 cases.  Mr. Cullen, for some reason,

7   mistakenly believes that he is a debtor and that we're taking

8   actions against him.  We have tried to contact him and to

9   explain that.  We were unsuccessful, but, again, we do not

10  believe that that objection relates in any way to the

11  inadequacy to the disclosure statement or the other relief

12  requested in the solicitation procedures motion and would

13  request that it be overruled.

14        THE COURT:  All right.  Does anyone wish to respond

15  in connection with the response of Michael Cullen?

16        ALL COUNSEL:  (No verbal response)

17        THE COURT:  All right.  The Court has reviewed that

18  and I agree with counsel's comments about the

19  mischaracterization of that response and that it will be to the

20  extent it is an objection, it's overruled.

21        MR. DICKERSON:  Thank you, Your Honor.  Next is

22  docket numbers 4977 and 4999, the objection filed by Direct TV.

23  Direct TV's objection in essence was that they wanted to ensure

24  that nothing in the disclosure statement or plan would impair

25  their set-off rights.  I think as Mr. Pomerantz would agree, we

**J&J COURT TRANSCRIBERS, INC.**

36

1   have taken pains to ensure that the disclosure statement and

2   plan -- and the plan more importantly, do not impair anyone's

3   set-off rights and, in fact, this was a subject of discussion

4   with the Committee as we proposed the -- as we proposed the

5   plan or we drafted the plan and we've ensured that there will

6   be a period upon which the debtors have to bring a set-off

7   action as within any other claims objection.

8          And then, after that period is passed, the only

9   follow on ability for the debtors or the liquidating trustee to

10  use set-off against a claimant would be if set-off is raised by

11  the other party and hadn't been raised before.  And so, we're

12  basically preserving the claimant's abilities to set-off and

13  limiting the debtors ability -- the estate's ability to use

14  those in a defensive manner while trying to preserve them to

15  the extent that it was unaware that -- that someone was going

16  to be bringing a claim and asserting set-off so that we can

17  preserve those rights.

18         We've inserted some language specifically about

19  Direct TV so that they would be -- they would withdraw their

20  objection and again, we spoke with them and they have indicated

21  that we could represent to Your Honor that the inclusion of the

22  language that's included in the column that will resolve their

23  objection.

24         THE COURT:  All right.  Very good.  That'll be

25  resolved.

**J&J COURT TRANSCRIBERS, INC.**

37

1          MR. DICKERSON:  Next, Your Honor, is Schimenti

2   Construction Company, docket number 4980 and 5004.  As Your

3   Honor may be aware, Schimenti has alleged that they have

4   certain rights to funds held by the debtors that they -- they

5   assert are being held in trust, retainage and so forth and they

6   wanted to ensure that nothing in the plan would prohibit them

7   from -- to the extent that they were successful from recovering

8   those assets that were held in trust and weren't assets to the

9   estate.  As, I'm sure Your Honor would expect, the plan

10  proponents agree that to the extent that Schimenti is

11  successful and having this court or another court or competent

12  jurisdiction determine that those amounts, in fact, were not

13  property of the estate and were held in trust for Schimenti,

14  then nothing in the plan or the disclosure statement effects

15  their ability to bring that.

16          We've added again, some language that describes their

17  claim and then further language that says that they will be

18  entitled to bring an adversary proceeding with respect to this

19  issue.  I think as Your Honor may be aware, they had filed a

20  2004 motion but not yet have filed an adversary claim.  We

21  agree that -- that in light of that pending 2004 motion and it

22  going forward that their claim is preserved with respect to the

23  adversary complaint and that they're free to bring that

24  complaint in accordance with applicable law and with -- in

25  light of those additions to the disclosure statement, again, we

38

1  spoke with Schimenti and they've agreed that that would resolve

2  their objection.

3          THE COURT:  All right.  Very good.  The Court will

4  mark that one as resolved, as well.

5          MR. DICKERSON:  Your Honor, the next is Generation H

6  One LP which had joined in the Longacre so I'll just pass that

7  one for now and we'll move to the remainder.  I believe the

8  next is 4983 and Henrico County, Virginia is the objector.

9  Your Honor may be aware that -- and Henrico County has filed

10 claims with respect to some secured amounts -- property -- that

11 relate, I believe, to property taxes and it's both the secured

12 claim and a priority tax claim.

13         We and entered into a stipulation with them with

14 respect to those amounts.  We have also objected to those -- to

15 certain of those claims.  That process is pending, as we go

16 through the claims objection process, but in the stipulation we

17 had agreed to escrow the funds -- the top end of the funds

18 which is approximately -- a little over approximately $3

19 million and we have, in fact, done that.  I do have to -- I did

20 want to let the Court know that we hadn't done that until --

21 and Henrico County reminded us that we needed to do that, but

22 when they did remind us, we had -- we have done that and so the

23 -- those funds are in a segregated account.

24         As I indicated, it's about $3 million.  We have over

25 $280 million in the other accounts that the debtor controls.

39

1  So, there was never any question that those were protected but

2  we have complied with the stipulation and have escrowed those

3  funds and will continue to escrow those funds pending the

4  resolution of the claims objection.

5       I'm not sure if -- if that completely resolves the

6  County's objections, but I believe it does, but I know that

7  they're represented in Court today and --

8       THE COURT:  All right.  Ms. South, do you wish to be

9  heard?

10      MS. SOUTH:  Thank you, Your Honor.  Rhysa South for

11 Henrico County, Virginia.  Yes, Your Honor, our primary concern

12 was that the plan didn't indicate that those funds had been

13 escrowed.  I understand that that's been taken care of now and

14 with the other changes that had been made on the amended claims

15 admitted today, that resolves the County's objections.

16      THE COURT:  All right.  Thank you, ma'am.

17      MS. SOUTH:  Thank you.

18      THE COURT:  All right.  So, that -- docket number 89

19 -- 4983 will be resolved.

20      MR. DICKERSON:  Thank you, Your Honor.  Next is

21 Bethesda, but again, that one joins in Longacre and with that I

22 would like to pass that one.  I think we just have a couple

23 little others that we can dispose of.  Your Honor, next was an

24 informal inquiry that we got -- that we received from the --

25 actually this is the one that we received in writing but it --

40

1   we don't believe that it has been docketed.  I -- we do think

2   it was filed so --

3          THE COURT:  I don't believe I'm familiar with this

4   one.

5          MR. DICKERSON:  In any event, Your Honor, we've

6   treated it as an objection and I'll be happy to describe it.

7   I'm not sure they're represented in court today, but I -- I

8   think we can resolve the objection.  They, again, assert that

9   they have a miscellaneous secured claim and provide that the

10  plan does not describe what happens in the event that there

11  isn't sufficient funds to actually do what the plan says it

12  would do which is unimpair them and pay them in full and --

13         THE COURT:  Is this a secured tax claim?  Is that

14  what it says?

15         MR. DICKERSON:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. DICKERSON:  And -- and so, what they would like

18  is for us to set out in the plan and disclosure statement what

19  happens if, in fact, that class is unimpaired.  The plan

20  proponents believe that's inappropriate, that that's really a

21  -- it might be a confirmation objection but probably is an

22  objection or the subject of some other pleading at the point

23  when that were to happen.  It would be, obviously, very

24  difficult for us to put into the disclosure statement and plan

25  procedures for every potential outcome in these cases.

**J&J COURT TRANSCRIBERS, INC.**

41

1          We believe that the plan provides for the appropriate

2   dealing with miscellaneous secured claims, that there are

3   sufficient and will be sufficient funds to pay them in full

4   and, therefore, unimpair them and so it is not necessary at

5   this point to describe what would happen if we failed to meet

6   one of the fundamental premises that the plan is -- has been

7   founded upon.

8          And so, we believe that the disclosure -- in the

9   disclosure statement about the treatment of miscellaneous

10  secured claims and the treatment in the plan itself are

11  appropriate and that the -- the disclosure's therefore

12  adequate.

13         THE COURT:  All right.  Very good.  Does any party

14  wish to be heard on the informal objection by the Treasurer of

15  Douglas County, Colorado?

16         ALL COUNSEL:  (No verbal response)

17         THE COURT:  All right.  That objection will be

18  overruled.

19         MR. DICKERSON:  Thank you, Your Honor.  The last one

20  before we get to the Longacre related objections is from --

21  again, I believe this -- this shows that it was not docketed

22  but I actually think it -- there may have been a letter

23  docketed this morning and so that it hasn't caught up and

24  unfortunately don't know the docket number, but it's from Mr.

25  Peter Gresens, who I believe is in Court today and he -- the

42

1    essence of his objection is that he'd like to know whether or

2    not the debtors intend to object to employees claims under the

3    debtor's retention plans and whether such claims are

4    administrative.

5          Your Honor, I -- similarly to the previous statement

6    is that we believe that the plan and the disclosure statement

7    in particular are -- give a significant enough or a adequate

8    enough description of how we are treating claims of various

9    classes, but it would be inappropriate for us to, in essence,

10   provide legal strategy to creditors or other counter parties

11   with respect to what we intend to object to and why and what

12   the result would be.

13         The onus and the bar dates that are in effect and the

14   objection deadlines there with respect to the claims process

15   are there so that that process may be done outside of really

16   the disclosure statement and plan and we would assert that that

17   is the appropriate place for those types of issues to be -- to

18   be dealt with.

19         I will say though that if Mr. Gresens has questions

20   about his claims, he's free to contact the debtors and we're

21   happy to discuss them with him.  Obviously the onus is now upon

22   the debtors to object to those claims and if we do intend to

23   reclassify them to take affirmative steps to do so.  So, unless

24   we do that, Mr. Gresens will have the claims that he -- that

25   he's asserted through the proof of claim process.

43

1          THE COURT:  Okay.  So, as I understand this, this is

2   a claim that has been filed to which no objection has been made

3   and the question or -- that has been raised in the objection is

4   whether or not an objection might be forthcoming in the future.

5          MR. DICKERSON:  That -- that's right, Your Honor, and

6   just to be clear, I'm not sure -- and again, he's here -- if

7   he's actually filed a claim or if it's one of those claims to

8   which we had scheduled and, therefore, no proof of claim is

9   required, but I think Mr. Gresens is looking for more

10  information about the ultimate resolution of his claim and what

11  type of claim he will have.

12         THE COURT:  All right.  Very good.  Mr. Gresens, do

13  you wish to be heard on your objection?

14         MR. GRESENS:  Your Honor -- I think, Your Honor, I

15  just wanted to clarify --

16         THE COURT:  Okay.  Why don't you come to the podium

17  then, sir?

18         MR. GRESENS:  -- because --

19         THE COURT:  Before you begin, what I want you to do

20  is state your name for the record, please?

21         MR. GRESENS:  Okay.  Peter M. Gresens and I'm a

22  former manager within Circuit City.

23         THE COURT:  Okay.  Thank you, sir.

24         MR. GRESENS:  A group of employees have contacted me

25  just regarding the retention agreements that were put in place

**J&J COURT TRANSCRIBERS, INC.**

44

1  sometime ago and just getting those on the record as part of

2  the administrative claims.  We actually file -- did file

3  administrative claims back in June with the Court --

4          THE COURT:  Okay.  Are you --

5          MR. GRESENS:  -- so that they would be of record.

6          THE COURT:  -- an attorney?

7          MR. GRESENS:  I am not.

8          THE COURT:  Okay.  So you can represent yourself but

9  you can't represent the group.  So --

10          MR. GRESENS:  I -- I just wanted to --

11          THE COURT:  -- just do it from the stand point --

12          MR. GRESENS:  -- bring the issue up because I know

13  people --

14          THE COURT:  Thank you.  That's fine.

15          MR. GRESENS:  I'm sorry.  I have no idea what I'm --

16  excuse me.  Excuse me.

17          UNIDENTIFIED MALE SPEAKER:  You're doing fine.  Doing

18  fine.

19          THE COURT:  You're actually doing very well.  So,

20  that --

21          MR. GRESENS:  Oh, thank you.  So, anyway, I looked at

22  the plan and I said -- I -- I don't understand how these are

23  going to be resolved and before we go to voting in November on

24  the ultimate plan, I wanted to figure out what -- what's going

25  to happen with these and that's why I brought it up today and I

45

1 didn't know whether this was the appropriate point or not but I

2 said -- I actually tried to contact a number of attorneys in

3 Richmond and it's a challenge right now because everyone has a

4 conflict and so we're looking for other counsel now to help us

5 with this but I wanted to make sure we didn't lose out on

6 anything by not responding.  So --

7          THE COURT:  Okay.  Thank you very much.  All right.

8          MR. GRESENS:  Okay.  Thank you very much.

9          THE COURT:  All right.  The -- I don't think that

10 there's an issue here from a disclosure statement standpoint.

11 I think this is more of a claims objection type of issue and

12 you know I certainly would encourage you, Mr. Gresens, to

13 contact counsel and get representation for your group going

14 forward as you may very well need that, but as far as the

15 disclosure statement is concerned, I think that the information

16 contained is adequate from this standpoint and this is just a

17 different issue.  So, the objection will be overruled.

18          MR. DICKERSON:  Thank you, Your Honor.  Your Honor, I

19 think that brings us back to the Longacre objection and the

20 joinders thereto.  I will note that a couple of the joinders

21 had raised a couple of additional items, so, I thought I would

22 deal first with the Longacre objection and the similarities

23 with respect to the -- that issue and then we'll deal with the

24 other one off issues that the other objectors had.

25          THE COURT:  All right.  And I have reviewed these

**J&J COURT TRANSCRIBERS, INC.**

46

1  objections, as well as your responses.

2        MR. DICKERSON:  Okay.  Thank you, Your Honor.  In

3  essence, I believe and, obviously, Longacre will have a -- I

4  believe is in the courtroom will have an opportunity to speak

5  that the -- that, in fact, Longacre raised an issue -- a real

6  issue and pointed out that the plan as drafted appeared to not

7  provide for the payment of allowed administrative claims on the

8  effective date which is required by the Code by Section

9  11:25(a)(6), I believe.

10       Your Honor, I think part of that believe was a little

11 bit of difficulty parsing through the language of the -- of the

12 plan and the disclosure statement as is typical with these.

13 There's a lot of defined terms and cross referencing that you

14 have to do, so, let me --

15       THE COURT:  And when you went to the definition, you

16 had to go through a whole new article.

17       MR. DICKERSON:  That's right, Your Honor.  That's

18 very -- it can be very convoluted and I'm -- I'd love to find a

19 better way to do it, but unfortunately we haven't gotten there

20 yet.

21       In any event, the plan an disclosure statement

22 currently provides or at the -- prior to this hearing provided

23 that a lot of administrative claims would be paid on the

24 earlier of the first distribution date, capital "D", capital

25 "D", following allowance, or no later than 90 days after

**J&J COURT TRANSCRIBERS, INC.**

47

1  allowance and when you looked at the definition of distribution

2  date, you learned that initial distribution date was included

3  in that definition.

4        So, if someone has an allowed administrative claim as

5  we sit here today, the plan is confirmed on November 23rd.  Ten

6  days later, if we're so lucky, the plan goes effective.  The

7  initial distribution date is five days after the effective date

8  which allows the debtors -- or excuse me -- allows the

9  liquidating trustee to set up the accounts and have the money

10 moved over, will then be paid.  If that was all the language

11 that was there and what Longacre and the other objectors, I

12 think, raise, is a valid point, is that there was a proviso at

13 the end of the section that held because of the legitimate

14 concerned raised by the Committee that if the liquidating

15 trustee determined, as he was preparing to make a distribution

16 on those allowed claims, that there wasn't enough money to

17 ultimately play -- pay all allowed admin claims, that he

18 wouldn't make a distribution and that's for the very real

19 concern is that you don't want to have to pay out to some

20 people and then have to go back and ask for disgorgement if the

21 -- the unexpected happened and there wasn't enough to pay all

22 the allowed admin claims.

23       Your Honor, the debtors are highly confident and I

24 think that -- that is premised by the fact that we're here with

25 a plan that -- that's not a very real or likely possibility

**J&J COURT TRANSCRIBERS, INC.**

48

1  that we wouldn't be able to pay all allowed admin claims.  As I

2  said, we have $280 million in cash.  Currently, we're about to

3  receive the proceeds of the sale of the Canadian subsidiary

4  which is another significant chunk and we also believe that we

5  have very good objections to a number of claims that will then

6  reduce the overall claims pool.

7       Not a -- not unexpectedly, the Committee while

8  they've been involved in the case hasn't had access to all

9  information that the debtor's have.  We're continuing to work

10 with them to try to get them that information and in order to

11 kind of meet the time frame, this little bit of accelerated

12 time frame, is they'd ask that we include that language so that

13 if the unexpected happened that -- that we didn't find

14 ourselves in front of Your Honor seeking to have admin claims

15 disgorged.

16      The problem with that, obviously, is pointed out by

17 the objectors is that 11:25(a)(6) doesn't say that you can do

18 that.  It says that you have to pay allowed admin claims on the

19 effective date.  The way that I believe that most Chapter 11

20 estates deal with this issue is if there not yet there, then

21 they'll take a little more time before they actually file the

22 plan and seek to have it confirmed and go forward.

23      What we've done and what we've -- how we've modified

24 the plan and modified the disclosure statement as provided is

25 to -- is to not slow down the process.  I guess one of our

**J&J COURT TRANSCRIBERS, INC.**

1  options would have been to adjourn the hearing today and wait

2  until the Committee was fully in the same place we were and in

3  agreement that there's very, very risk that we would ever be

4  unable to pay a lot of admin claims, but we wouldn't -- didn't

5  want to do that because we do, as I know that -- that the

6  Committee does, we do want to get the process going as quickly

7  as possible so that people can get the distributions that

8  they're entitled.

9      And so, what we did is remove that proviso, deleted

10  it in its entirety and -- and we have added a condition to the

11  confirmation of the plan and you'll note -- this is on Page 3

12  of the chart in the right-hand column -- that provides that in

13  order for confirmation to occur the Creditor's Committee shall

14  have determined in its reasonable judgement that the

15  liquidating trust will have sufficient available cash to pay or

16  reserve for as the case may be the face amount of all

17  administrative claims that the Creditor's Committee believes

18  will ultimately become allowed.

19      And so, really what this does, Your Honor, is it

20  moves -- it allows the Committee to continue to work during the

21  solicitation procedures -- or the solicitation process --

22  solicitation period in order to get to the place where the

23  debtors are today and that's that -- convince themselves that

24  there's no chance that we won't be able -- not that there's no

25  chance but there's very, very little chance that we would be in

50

1  a situation in which there wasn't sufficient funds to pay

2  allowed admin claims.

3        With that, Your Honor, we -- we believe that that

4  should result in a resolution of both Longacre's and the other

5  objectors who joined in that portion of Longacre's claim.  I

6  note that I believe the -- that kind of related to that,

7  Longacre had objected that because we couldn't prove that all

8  admin claims would be paid in full that their impaired and

9  therefore the plan was inappropriate.  The response to that,

10 Your Honor, is that's a confirmation objection, not -- not to

11 use that old canard inappropriately, but I think that it's

12 inappropriate at a disclosure statement hearing or with respect

13 to the disclosure statement to require an estate to prove that

14 they will -- when all things are said and done pay every last

15 admin claim.  There are safeguards built into the process that

16 to the extent that -- that we ever get in that unfortunate

17 situation that will allow recourse for -- for people that find

18 themselves there but it would be impossible for people to

19 confirm plans if that was the -- if that was the standard by

20 which they had to operate.

21        And so, we believe that in the debtor's business

22 judgment and I believe that ultimately in the -- our co-

23 proponent's judgment, we will be able to meet the standard

24 which is that as fiduciaries for the creditors and other

25 parties in interest, that it's appropriate to move forward and

**J&J COURT TRANSCRIBERS, INC.**

51

1  that it is much more likely than not that all allowed admin

2  claims that will be paid in full.

3          THE COURT:  What is the page of the disclosure

4  statement that you've made that change to?

5          MR. DICKERSON:  Well, it will be -- actually, it will

6  be included in the plan in -- on Page 30 in Section 8(a)(5) and

7  then I believe it has a -- it's also obviously be put in the

8  similar section of the disclosure statement as a condition to

9  the --

10          THE COURT:  Well, I've got the plan.  We can go

11  there.

12          MR. DICKERSON:  Okay.

13          THE COURT:  What page of the plan?

14          MR. DICKERSON:  I believe it's Page 30, Your Honor

15  and Section -- Article 8(a)(5).  Yeah.

16          UNIDENTIFIED MALE SPEAKER:  It's on Page 13 of the

17  plan.

18          MR. DICKERSON:  No, no.  It's the addition.

19          UNIDENTIFIED MALE SPEAKER:  Oh, okay.

20          MR. DICKERSON:  I'm looking at the black line, Your

21  Honor.  It's on Page 29 of the black line and it's the -- the

22  new number five as a condition to confirmation.

23          THE COURT:  Okay.  I don't have the black line plan

24  here, but I have the original plan and your adding that

25  paragraph right after Paragraph 4?

52

1          MR. DICKERSON:  That's correct, Your Honor.

2          THE COURT:  Okay.

3          MR. DICKERSON:  If -- would you like me to provide

4  you with the black line?

5          THE COURT:  That would be wonderful if you have an

6  extra copy.

7          MR. DICKERSON:  Yes, Your Honor.  Can you get me

8  another one?

9          THE COURT:  Thank you.

10          MR. DICKERSON:  And then, similarly, Your Honor, on

11  -- the language is struck on Page 13 of the black line in

12  Article 3(a)(1), the notwithstanding language has been removed.

13          THE COURT:  All right.  So, is it envisioned then

14  that this will have to have been resolved at the confirmation

15  hearing or is this something that would occur even after the

16  confirmation hearing that the Creditor's Committee would make

17  this determination?

18          MR. DICKERSON:  It would have to be before

19  confirmation occurs, Your Honor.  That --

20          THE COURT:  That's what I -- okay.

21          MR. DICKERSON:  There is no latitude for post --

22          THE COURT:  It's a condition to confirmation.

23          MR. DICKERSON:  -- condition to confirmation --

24          THE COURT:  That's how I understood it.

25          MR. DICKERSON:  -- there is no post confirmation or

**J&J COURT TRANSCRIBERS, INC.**

1  post effective day latitude.  Once we've confirmed and gone

2  effective, then if you've got allowed admin claims, then you're

3  getting paid at the next distribution date.  It might be the

4  initial one or 90 days, whichever's earlier.

5          THE COURT:  All right.  Very good.

6          MR. DICKERSON:  Your Honor, I think probably it would

7  make sense to allow Longacre now, to respond if they'd like,

8  unless you have other questions?

9          THE COURT:  Okay.  I think Mr. Pomerantz would like

10 to --

11         MR. DICKERSON:  Oh, I'm sorry.  Mr. Pomerantz would

12 like to -- to help me.

13                        (Laughter)

14         MR. POMERANTZ:  Good morning, Your Honor.  Jeffrey

15 Pomerantz from Pachulski, Stang, Ziehl & Jones representing the

16 Creditor's Committee.  The Committee is hopeful based upon the

17 information that the debtor and their advisors who provided to

18 date that the estate is administratively solvent and it will be

19 able to make not only distributions to administrative and

20 priority creditors, but also meaningful distribution to

21 unsecured creditors.

22         However, we believe -- and for that reason, we

23 believed it was important to start the plan confirmation

24 process as soon as possible.  Time is money and the quicker we

25 can get to confirmation, the quicker we can hopefully make

**J&J COURT TRANSCRIBERS, INC.**

54

1 distributions, the lower the burden rate could be and hopefully

2 that will enure to the advantage of all creditors.

3         However, at the time we were filing the plan

4 disclosure statement, we wanted to have safeguards in the plan

5 in the event that there wasn't sufficient money to make

6 administrative payments on the effect of it to allow the claims

7 and for that reason we put in the language, that was the

8 notwithstanding language, that has drawn objection by several

9 creditors.

10         As a result of the objections and the discussions

11 with the debtor, we believed we could address both the

12 objecting parties concerns that a plan not go -- not be

13 confirmed unless administrative creditors were assured that

14 there would be payment on allowed claims and at the same time

15 give the Committee flexibility and in essence delay the

16 ultimate determination for several weeks.

17         As Your Honor's aware, there are now 47 sets of

18 objections that have been filed.  There is different assets

19 that are supposed to come in before confirmation and the debtor

20 has pledged that over the next few weeks to provide additional

21 information to the Committee and their advisors to enable the

22 Committee, hopefully, to get as comfortable with the debtor as

23 the debtor is with respect to administrative and solvency.

24         We expect to do that over the next several weeks and

25 to the extent we are comfortable that the estate is

1  administratively solvent, we will then acknowledge to the Court

2  that that condition has been satisfied and intend to proceed as

3  confirmation.

4         If for some reason we do not believe -- we are not

5  comfortable at that point, ultimately, we may be looking at an

6  -- a continuance of the confirmation hearing.  But again, we

7  are hopeful that the debtor will get us to the point where they

8  are and so as not to delay the process, we thought that this

9  fix both addressed the concerns of the objecting parties and

10 gave the Committee the flexibility that needed to address the

11 issue in several weeks when we will all be a lot smarter based

12 upon information as it develops.

13        THE COURT:  Isn't the resolution of this outstanding

14 issue a feasibility issue, as far as plan confirmation is

15 concerned?

16        MR. POMERANTZ:  Yes, in sense it is a confirmation

17 issue.  I think largely I think it's a fair point raised by the

18 objectors that it was unclear in the document whether and when

19 allowed administrative claims will be paid I think by

20 eliminating the notwithstanding language.  I think we addressed

21 the disclosure issue but, in essence, Your Honor is right.  The

22 Committee will have to make the determination and it,

23 ultimately Your Honor, will have to make a determination of

24 whether there was sufficient money to pay administrative claims

25 at that point and we are in essence delaying the issue until

56

1  confirmation but addressing the disclosure issue at the same

2  time.

3          THE COURT:  Very good.  Thank you.

4          MR. POMERANTZ:  Thank you, Your Honor.

5          THE COURT:  All right.  Does any other party wish to

6  be heard in connection with the Longacre objection?

7          MR. FOSTER:  Yes, Your Honor.  Good afternoon, Your

8  Honor.  Matt Foster from Pepper Hamilton on behalf of Longacre

9  Opportunity Fund.  Your Honor, before we get into the actual

10 objection itself, we previously filed a motion for pro hac vice

11 admission for Jim Kerrigan who is prepared today to do the

12 argument.  I don't know if the Court has actually ruled on

13 that.  If not, I'd ask that the Court grant him pro hac vice

14 admission to be able to argue the objection today.

15         THE COURT:  Okay.  And I don't know whether I -- I've

16 ruled yet either, so I apologize, but yes, the motion will be

17 granted for purposes today.

18         MR. FOSTER:  Thank you, Your Honor.

19         THE COURT:  Okay.  Mr. Kerrigan, welcome to the

20 Court.

21         MR. KERRIGAN:  Thank you, Your Honor.  For the

22 record, James Kerrigan of Pepper Hamilton in Wilmington,

23 Delaware appearing on behalf of Longacre Opportunity Fund, LP

24 and I appreciate the Court's permission for me to speak here

25 today.

57

1          Prior to the hearing today on the train, counsel for

2    the debtors and the Committee very graciously reached out to me

3    and advised me of the modifications they had made to the

4    disclosure statement and plan, particularly now distributions

5    on account of allowed administrative claims are to be made

6    within a short window of the effective date to permit the

7    documents to be signed up and to permit the liquidating trust

8    to be funded and also that the official Committee of Unsecured

9    Creditors will make a determination as a prerequisite to

10   confirmation that they believe that the trust assets will be

11   sufficient to pay allowed administrative claims in full and I

12   appreciate them reaching out for me -- reaching out to me for

13   the -- on those points and I think it does go to several of the

14   bases of Longacre's objection, but I think it's worth noting,

15   Your Honor, that even as modified when we get to the

16   confirmation hearing and even when we get to the effective

17   date, the amount of this estate's administrative claims,

18   liability will still be an estimate.

19          I note that additional condition to confirmation

20   still says -- still says that the Committee believes that the

21   allowed amount -- there will be sufficient funds to take care

22   of administrative claims liability and, you know, it's worth

23   noting, Your Honor, that it'll be an estimate as of the

24   confirmation hearing on both sides of the equation.

25          THE COURT:  Well, actually it says, "The Committee

**J&J COURT TRANSCRIBERS, INC.**

58

1 will have determined in its reasonable judgment . . ." so it's

2 not just a belief.

3          MR. KERRIGAN:  But it still will be an -- an

4 estimate.  It won't be -- the Committee will have determined

5 that the estates now have sufficient funds to pay the face --

6 facial amount of administrative claims and I believe the last

7 clause of that sentence and I'm sorry I don't have it in front

8 of me that the Committee believes will ultimately be allowed.

9          THE COURT:  You're exactly right.  It says, "The

10 Committee believes it will ultimately become allowed."

11          MR. KERRIGAN:  So, the effect of that, Your Honor, is

12 that there's still a significant degree of uncertainty and then

13 in -- in listening to the Court I understand the Court's

14 concern -- look, 11:29 and 9 objections are confirmation

15 objections.  They're not adequate assurance objections.  It is

16 a legal matter believed the Fourth Circuit has held that it's a

17 -- it's proper for a Bankruptcy Court to at least consider the

18 confirmability of a plan of reorganization in a Chapter 11 case

19 at the disclosure statement hearing.

20          THE COURT:  Where has the Fourth Circuit said that?

21          MR. KERRIGAN:  Oh, forgive me, Your Honor.  It was

22 the -- it was this court, the Bankruptcy Court in the <u>Peck</u> case

23 wherein the Court held -- and I'm sorry I don't have the Judge

24 --

25          THE COURT:  It was Judge Shelley.

**J&J COURT TRANSCRIBERS, INC.**

59

1        MR. KERRIGAN:  "If a Court can determine from the

2   reading of the plan that it does not comply with Section 11:29

3   that it is incumbent upon the Court to decline approval of the

4   disclosure statement."  And as a practical matter, I think that

5   makes sense, Your Honor, for -- for the reasons --

6        THE COURT:  Well, the facts in <u>Peck</u>, though, I mean,

7   let's - in fairness and put that case in perspective.  I mean,

8   what happened there was you have a plan that had gone to

9   confirmation and it got before Judge Shelley and Judge Shelley

10  said he would not confirm the plan because equity was going to

11  be retaining an interest and it violated the absolute priority

12  rule and so he -- he refused to confirm the plan and then

13  parties came back -- the debtors came back and submitted,

14  basically exactly the same plan the second time and Judge

15  Shelley, you know, and that was the context in which he wrote

16  the <u>Peck</u> decision.  He said, you know, why are we going to go

17  through a whole solicitation process again when this is exactly

18  the same plan that I've already ruled on that, you know, that

19  it's not unconfirmable.

20        So, it's a little bit different issue than what we've

21  got here.

22        MR. KERRIGAN:  Well, the Court's absolute --

23        THE COURT:  Because I haven't ruled on whether or not

24  its confirmable or not.

25        MR. KERRIGAN:  Oh, the Court's exactly right.  In

60

1  that case, they knew it wasn't confirmable.  Here we don't know

2  if it's confirmable and that really goes to the crux of

3  Longacre's remaining concerns and I would point out as a

4  practical matter that if a disclosure statement's approved,

5  then the debtor might go through the whole entire solicitation

6  process for a plan that might not ultimately be confirmed.

7        So, I think the far better approach, Your Honor,

8  would be to fix this administrative claims liability in advance

9  of the confirmation hearing.  That way, the parties will know,

10  the administrative claimants will know, the Court will know, at

11  least one half of the equation, what is the universe of

12  administrative claims exposure of this estate and can it be

13  taken care of with the assets or the potential assets that are

14  going to be available to the trust and I don't see any

15  practical reason why they can't do that and I know they've been

16  diligent, especially the last few months.  They've been filing

17  objections and been trying to reconcile administrative claims

18  and 503(b)(9) claims and I appreciate that, but I think that

19  would be the -- that would be the better approach so that all

20  the parties in interest are on the same page as of

21  confirmation.

22        Your Honor, that goes to -- that argument, I suppose,

23  goes to allowed administrative claims.  That doesn't say

24  anything with respect to claims such as that owned by my client

25  which are pending administrative claims.  The disclosure

61

1    statement and plan does provide that there will be a objection

2    deadline for administrative claims of four months or -- excuse

3    me -- right, 120 days after the effective date, but that, of

4    course, the debtors are -- or the trust -- excuse me -- is

5    permitted to request an extension of that deadline for good

6    cause.  In my relatively short career, Your Honor, I've never

7    had a liquidating trust that was actually able to object to all

8    of the claims it thought it could within the deadline set forth

9    in the plan.

10           So, my remaining concerns and, again, I appreciate

11   their modifications in response to our objection.  I appreciate

12   their reaching out to me.  My remaining concerns are with

13   respect to timing.  I think that, as it reads now, client --

14   creditors and my client's position do not have any assurances

15   about whether and when they'll be paid nor even whether and

16   when objections to their claims will be made.  Thank you, Your

17   Honor.

18           THE COURT:  All right.  Thank you very much, Mr.

19   Kerrigan.  Does any other party wish to be heard in connection

20   with the Longacre objection?  Mr. Epps?

21           MR. EPPS:  Good afternoon, Your Honor.  A.C. Epps,

22   Jr. on behalf of Generation H One and Two, Limited Partnership

23   and various other objectors.  Your Honor, the debtors and their

24   Committee have also reached out to us and discussed the

25   proposed changes and so forth with regard to the -- our

**J&J COURT TRANSCRIBERS, INC.**

62

 1  objection to the administrative claim issue.

 2          I am here on behalf of our clients to say that while

 3  there remains some uncertainty, we've agreed to withdrawal that

 4  portion of the objection we filed.  The portion that

 5  piggybacked on the Longacre objection --

 6          THE COURT:  All right.

 7          MR. EPPS:  -- and that we are satisfied with the

 8  changes that the debtor's made.

 9          THE COURT:  All right.  You -- and your objection,

10  you also had some that went to the substantive consolidation --

11          MR. EPPS:  That's correct.  By Mr. --

12          THE COURT:  -- and those will appear later.

13          MR. EPPS:  -- but -- like the debtor is going to

14  discuss that in a few minutes, I gather.  Thank you.

15          THE COURT:  Okay.  Very good.

16          MR. EPPS:  But as to this part, we are withdrawing

17  out objection.  Thank you.

18          THE COURT:  Okay.  Thank you, sir.  Yes, sir?

19          MR. KERRIGAN:  Good afternoon, Your Honor.  Daniel

20  Kerrigan, McKenna, Long and Aldridge for Bethesda Softworks,

21  LLC.  We also would like to thank the debtors and the Committee

22  for reaching out to us and we appreciate the effort and I think

23  in the process of doing that, the informational aspects of our

24  objection to our response have been clarified, not necessarily

25  to our satisfaction, but at least we know where -- where things

**J&J COURT TRANSCRIBERS, INC.**

63

1  are coming from and if I could, Your Honor, if Your Honor would

2  look at our response, if the Court has a copy, and I could

3  probably go through and say to the Court well, at least what we

4  understand given the changes that have been made to the

5  disclosure statement and the plan and -- and our conversations

6  which I'm not holding anybody to, anything other than the --

7  that's where they are.

8          THE COURT:  I've got your objection right here in

9  front of me, sir.

10          MR. KERRIGAN:  Thank you, Your Honor.  7(a), this is

11  whether the plan contemplates the Bankruptcy Code 702(d) will

12  be applied to the allowance of both administrative expenses

13  including Bankruptcy Code Section 503(b)(9) administrative

14  expenses, and general unsecured claims and cites to the prior

15  disclosure statement.  If we understand this -- the response

16  here, correctly, from both the chart and our conversations this

17  morning, the answer is yes and it -- at least for a period of

18  90 days or longer, if -- if that time period is extended.

19          This is without any court deciding in this -- in --

20  Your Honor deciding whether or not 702(d) actually does apply

21  or not and --

22          THE COURT:  Well, they're just preserving their

23  rights.  So, they're not saying it does apply.  They're just

24  reserving their right to make the claim that it applies.

25          MR. KERRIGAN:  No, Your Honor, definitionally it says

64

1  that it applies because it defines -- when you work through as

2  Your Honor said the claims -- the definition of claims and this

3  definition and that definition, at the end of the day 502(d) is

4  going to apply to prevent any distributions to allow

5  administrative claims at least through that 90-day period and

6  longer without a decision by the Court.

7         THE COURT:  Well, I'm going to want to hear counsel

8  on that.   That's not the way I read that, but I -- I thought

9  that it was just making a provision that they would preserve

10 their right to make that claim.

11        MR. KERRIGAN:  Definitionally, it says -- it defines

12 claim to include administrative claims, which is -- which is an

13 error in itself and it's an error in particular with respect to

14 Section 502(d).  Your Honor, if I may provide to the Court and

15 this -- its instructive for a number of reasons, a decision of

16 the Second Circuit, not the Fourth Circuit, Your Honor, but the

17 Second Circuit this past Friday.

18        THE COURT:  It's a good Circuit.

19        MR. KERRIGAN:  May I approach, Your Honor?

20        THE COURT:  Yes.

21        MR. KERRIGAN:  This is in the <u>Ames</u> case, Your Honor,

22 and it -- it probably and it probably has not hit the published

23 list yet, but it basically decides that the 502(d) does not

24 apply to Section 503(b)(9) or any other administrative claims

25 to prevent a distribution and -- but in a lot of ways, the

65

1  point is, if you -- if the Court looks at the date of that

2  decision, it took a year from the time that it was argued to

3  the time that it was decided.  Some of that probably was

4  occasion by Justice Sotomayor's leading the Second Circuit

5  because she was a member of the panel initially.

6          But it also, if you look back to the time when the

7  obligations were incurred and the objections were filed, it

8  took six years to get to that result.  Now, if -- if we -- if

9  -- and this ties to another provision of the -- of the plan

10  that we identified in the -- in the disclosure statement, which

11  is (e), whether the plan contemplates that a 503(b)(9)

12  administrative expense will be deemed to be disputed whether or

13  not an objection has been filed.

14          So, definitionally, under the plan as articulated in

15  the disclosure statement, even though no objection to a -- an

16  -- to an administrative expense or a 503(b)(9) administrative

17  expense has been filed, we remain a disputed claim and unless

18  and until the debt -- in this case, either the debtor, I

19  suppose the Committee or post confirmation, the liquidating

20  trust objects.  Now, our point is simply this --

21          THE COURT:  But they got a bar date upon which they

22  have to object.

23          MR. KERRIGAN:  Unless it's extended.

24          THE COURT:  Right.

25          MR. KERRIGAN:  But -- but if they object then, then

66

1  it goes out further and if the time to -- to render a decision

2  or to get a decision or to make a decision with respect to the

3  -- to the 502(d) issue is extended, it goes out even further

4  and -- and all along, the assumption is that it is a disputed

5  claim into the subject of 502(d).  What we want -- the point we

6  want to make is we understand that now, Your Honor, and we

7  understand that is the case and that is a confirmation issue

8  now as to whether or not that's an appropriate provision of the

9  plan, whether it's satisfies as we -- we've articulated in our

10 objection to separate provisions of the 11:29.

11          THE COURT:  The problem -- the disconnect I'm having

12 here is -- is that I had understood that the 502(d) issue that

13 was raised, when I read the disclosure statement and plan

14 initially was just one where the debtor was preserving its

15 right to make that claim.  Rather than having that be resolved

16 in the context of the plan, can you walk me through how you get

17 to that conclusion because that was --

18          MR. KERRIGAN:  I'll try, Your Honor.  I can't

19 guarantee that I can.

20          THE COURT:  Okay.

21          MR. KERRIGAN:  But I think the place you start is the

22 provision.  I think it's the special provision on Section

23 502(d).

24          THE COURT:  And are you looking at the plan now or

25 are you looking at the disclosure statement.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. KERRIGAN:  I will look at whichever the Court

2 prefers.

3          THE COURT:  Well, I've got the -- the plan right

4 here, so why don't we look at the plan.

5          MR. KERRIGAN:  All right, Your Honor.  And if the

6 Court will bear with me, I'll look at the index so I can find

7 it.  I believe it is Article 3, Treatment of Claims in

8 Interest.  In the prior version of the -- of the plan, it was

9 at Page 16.

10          THE COURT:  Okay.  Now, it looks like its on Page 14

11 and 15 of the amended.

12          MR. KERRIGAN:  And it says, "Notwithstanding anything

13 to the contrary in the plan, the liquidating trustee may only

14 use Bankruptcy Code, Section 502(d) as a basis for refusing to

15 make a distribution to a holder of a claim that is subject to a

16 pending Section 502(d) objection until the earlier of 90 days

17 after the effective date or entry of an order establishing some

18 other deadline."

19          Well, but let's look back to the definition of a

20 claim and "A claim has the meaning set forth in the Bankruptcy

21 Code, Section 101.5."  You then go to Section 502(d) and that's

22 where the -- the "claim" where the Code says, that the -- that

23 a claim cannot be allowed, much less paid, cannot be allowed

24 until -- unless and until there has been a repayment of -- let

25 me read it rather than guess at it. "Notwithstanding (a) and

68

1   (b), the Court shall disallow -- shall disallow any claim of

2   any entity for property which is recoverable under the various

3   sections where there is a transferee of an avoidable transfer."

4         So, that -- that -- where we start out and claim, if

5   we understand it from the plan and I've heard no - no dispute,

6   the claim includes administrative expenses under the plan.  The

7   effect of all that is to make 502(d) applicable and useable

8   either in negotiations or litigation, at least for 90 days

9   after the filing and beyond, if that -- if that period is -- is

10  extended and from our perspective, Judge, we know that now and

11  we can live with that -- not that we like it but it -- it

12  clearly is a confirmation objection at this stage.  So, we

13  wanted to highlight it for the Court and we also wanted to

14  highlight it because under the confirmation standards, under

15  11:29 is it -- there's two provisions of the confirmation

16  standards that are implicated and one is 11:29(a)(1) and the

17  other is 11:29(a)(9)(A) and what we want to be clear about,

18  Your Honor, is if the Court approves the plan and if that

19  provision becomes binding is that we have not agreed to that

20  treatment and that's what the plan and the disclosure statement

21  warned, essentially, that if this plan is confirmed that is the

22  way that you treat -- claim is going to be treated and that, in

23  fact, as a practical matter, you've agreed to it and you're

24  stuck with it.  We do not agree to it and we want it clear that

25  we're free to challenge that if we -- and we believe that issue

**J&J COURT TRANSCRIBERS, INC.**

69

1  ought to be resolved, frankly, prior to the -- to the

2  confirmation of the plan and that -- it -- it's our

3  understanding that -- that the plan provisions, the disclosure

4  provisions leave open the possibility that that will occur or

5  that -- or that it will -- they will try to get that decision

6  made.

7      But let's say for example that -- that the debtor

8  files a motion to have a determination as to whether or not

9  502(d) is applicable to administrative expenses or not?  And

10 let's assume that it takes time for the Court to decide that

11 issue because look at what -- what the Second Circuit in <u>Ames</u>

12 did?  Look how long it took to get from the Bankruptcy Court

13 through the District Court to the Court of Appeals and to get a

14 decision.  It took an awful long time.

15     So, we could be standing out there for an awfully

16 long time because if the debtor were -- if the debtor or the

17 Committee or the liquidating trust were to prevail on that

18 issue, we could be waiting, we're stuck with it, that's what's

19 going to happen and we're going to be standing still while all

20 the other administrative expenses that are not subject to

21 502(d) exceptions are being paid.

22     THE COURT:  But there's a provision in the plan that

23 provides for them to reserve for that right?

24     MR. KERRIGAN:  Well, a reserve?  Does that mean a

25 book reserve or does that mean actually dollars?  Does that

**J&J COURT TRANSCRIBERS, INC.**

1  mean parking the money and creating an escrow account?  I think

2  counsel eluded to one of the ways that you deal with these

3  kinds of situations in Chapter 11 plans or with liquidating

4  trusts or what have you.  Well, one of the ways you deal with

5  them is not only kicking the can down the road, in terms of

6  allowing or deciding the claims.  The other way is you escrow

7  the money and if we understand it correctly, everybody seems

8  now to think, notwithstanding what's in the disclosure

9  statement, which says, gee, we really don't know whether it's

10 going to happen or not and you got to be real careful and we're

11 not guaranteeing anything and I don't see the word

12 "disgorgement" in here anywhere, as a matter of fact, but now

13 they're saying is that, you know, we're pretty certain that

14 this is going to work.  Well, fine.

15        Shouldn't they be disclosing to the people who are

16 affected by it, and to the Court?  I mean, if that's the case,

17 we may have a different view of this whole thing.  If it really

18 is going to be that way, I mean, the ultimate protection is,

19 they park the money.  They've got $290 million.  There's more

20 coming in.  Great.  Fabulous.  Park the money.  They estimate

21 that the 503(b)(9) claims are $200 million.  I think if you

22 look at the Appendix C to the -- to the disclosure statement,

23 they have an estimate for administrative claims and they have

24 an estimate for various other sorts of things that if we

25 understand it correctly, you ought to transpose back to the

1 Chapter 11 confirmation system and there would be plenty of

2 money to park it and leave it there.

3         THE COURT:  Okay.

4         MR. KERRIGAN:  But no one's willing to step up and

5 say that at this point and put their money where their mouth is

6 which is to really put the money aside and leave it there and

7 then whatever time it takes to get through it, get through it.

8         Secondly, the modification that is made has been made

9 and we welcome the modifications.  We think it's a step in the

10 right direction and we appreciate the effort, the Committee and

11 everybody else to get there.

12         But we have to recognize one thing, that Committee

13 doesn't represent us.  In fact, they can't represent us and

14 it's the same reason that the Committee that it -- that in the

15 -- in the <u>Fleming</u> case that Judge Walrath appointed a separate

16 committee for folks like us because they don't -- they're

17 obligation is to the Unsecured Creditor's Committee and a lot

18 of their people probably are administrative expense holders and

19 probably are 503(b)(9) holders.  So, on an individual hat, they

20 have an interest on both sides of the equation, but the

21 Unsecured Creditor's Committee, what they're trying to do is

22 maximize the distribution to unsecured creditors.  That's what

23 they're trying to do and -- and that -- they've done it

24 effectively, I suppose, because this looked like it was a --

25 maybe an administrative insolvency at one point.

**J&J COURT TRANSCRIBERS, INC.**

1       So, we don't have a problem with that.  What we're

2   saying is, is that the -- the judgement here is trust the

3   Creditor's Committee even though they don't represent you and

4   at some level we're willing to do that.  We'd trust them a lot

5   more, of course, if the money was actually parked and available

6   and in that regard, if I can return to the objections of the

7   responses, and like I said, I think -- I think the

8   informational aspect of this has been addressed and we

9   appreciate that and now at least we know what we're dealing

10  with.

11      So, the second is, whether the plan proponents

12  contemplate the allowance and payment -- oh, may I just add --

13  add one other thing to this allowed versus disputed aspect,

14  which we'll come to a little bit later, as well.

15      And the irony is, that as of the effective date,

16  unsecured creditors are better off than administrative

17  creditors are in this respect because unsecured creditors whose

18  claims have not been objected to are deemed allowed, whereas

19  administrative creditors whose claims have neither been

20  objected to or not objected to are disputed.

21      So, as of the effective date, the date when we're --

22  when administrative creditors, at least the allowed amounts are

23  to be paid, are disputed and unsecured creditors are allowed.

24  It -- it's somewhat schizophrenic and ironic and it may just be

25  a -- it may just be a result of the complexity of bankruptcy

1 and the -- and the forms and the definitions and all the other

2 things that go into it, but it occurred to me as counsel was

3 making the argument is, at the -- at the effective date, there

4 are (indiscernible 12:34:43) patients that kick in, that the

5 effective date there are releases that kick in, at the

6 effective date the professionals for the debtors and the

7 professionals for the committees sever their relationships with

8 the -- with the debtors and with the process and the one thing

9 it says in the code that has to happen as of the effective

10 date, isn't going to happen and -- but that, again, that's an

11 issue for confirmation and we respectfully suggest it and we

12 appreciate the fact that we've gotten the answers, at least

13 insofar as -- as the questions we asked.

14      Whether the plan proponents contemplate the allowance

15 and payment of any administrative expenses prior to the

16 effective date of the plan, the answer to that is yes.  They

17 certainly do and again, we think now that becomes a

18 confirmation issue because going back to the very beginning of

19 the case and this is outlined in the disclosure statement in

20 the earlier parts they list the accomplishments or the

21 achievements in the Chapter 11 case.

22      Well, many of those achievements under the first day

23 orders and things that came shortly after that were to pay a

24 variety of people whose claims have equal priority to ours or

25 lower priority than ours and there were articulable reasons for

74

1  doing it at the time.  Frankly, they -- there were humane

2  issues to doing it at the time and we didn't oppose those and

3  -- and they shouldn't have been opposed because they were the

4  right thing to do at the time.

5          It doesn't change the fact that a lot of people in

6  this case and a lot of entities in this case who have

7  administrative claims or lower priority claims have been paid

8  and we have been standing here for the last year having

9  provided the goods which turned into money which paid the --

10 the expenses of getting ready for the bankruptcy and helped pay

11 the banks off, the secured creditors in this case.

12         THE COURT:  Well, the claim that comes immediately to

13 mind would be the rent claims for landlords, which are paid on

14 a timely basis monthly.

15         MR. KERRIGAN:  Correct and the professional fees.

16 The 25 out of 30 million have been paid according to the

17 operating reports.

18         THE COURT:  Well --

19         MR. KERRIGAN:  I don't have a problem with that.

20         THE COURT:  All right.

21         MR. KERRIGAN:  We're not suggesting --

22         THE COURT:  Well, then what --

23         MR. KERRIGAN:  -- there is a problem.

24         THE COURT:  -- what --

25         MR. KERRIGAN:  All we're suggest --

75

1           THE COURT:  That's what I was going to ask.  Is there

2    a problem with that?

3           MR. KERRIGAN:  The only problem is -- comes up and I

4    think counsel eluded to it, is disgorgement.  I mean, the fact

5    is when we get to the end as of the --

6           THE COURT:  Well, that's only if you don't get paid

7    in full.

8           MR. KERRIGAN:  Well, that's right, but if we're going

9    to have a moratorium on payments to administrative expenses,

10   maybe I think -- maybe what we should be thinking about is a

11   moratorium on everybody getting -- not getting paid in the

12   interim, but that's a confirmation issue, Your Honor --

13          THE COURT:  All right.

14          MR. KERRIGAN:  -- not a disclosure issue.  The

15   calendar month and year in which the effective date is expected

16   to occur, well, the answer to this appears to be they don't

17   know.  They can't guess.  They don't have enough information.

18   Well, if they don't have enough information, we certainly don't

19   have enough information and that also goes to the -- to the

20   issue about the Creditor's Committee making a decision with

21   respect to the plan going effective or not and goes to the

22   decision of whether people are comfortable that there's enough

23   money in the pot, so-to-speak, to take care of the

24   administrative claims and -- and the way that arises is, if it

25   -- if they don't know yet, if their not certain yet, if they

1  haven't had access to the information yet, how far further down

2  the chain are we, in terms of the information that's -- that's

3  been available?  How are we expected to make a decision about

4  that and in that regard, Your Honor, and this covers really the

5  -- the Paragraph F of our response, if the Court looks at

6  Appendix C, the liquidation analysis and I don't know if the

7  Court has a copy of the -- the most recent operating report?  I

8  think this was based on the -- on the June 30 -- the month

9  ending June 30 operating report to the extent --

10           THE COURT:  I have the Exhibit C.  I don't have the

11  operating report.

12           MR. KERRIGAN:  Your Honor, I have the one for ending

13  June 30.  May I give it to the --

14           THE COURT:  You may.

15           MR. KERRIGAN:  Thank you, Your Honor.  And it's --

16  it's obviously made of record in the Court.

17           THE COURT:  Thank you.

18           MR. KERRIGAN:  And my figures are going to be off

19  because I'm working from the July 31st but they're in the --

20  plus or minus they're in the ball -- pretty much in the ball

21  park.  Well, according to this, the 503(b)(9) -- this is in --

22  in Subsection D or Section D.  The 503(b)(9) claims are between

23  --

24           THE COURT:  Which page are we looking at?

25           MR. KERRIGAN:  I'm sorry.  The very first page of the

1   Appendix C, the liquidation analysis.

2          THE COURT:  Oh, the -- okay.  I'm there.

3          MR. KERRIGAN:  I'm sorry, Your Honor.  And I -- what

4   I was comparing this to were, what I believe were the balance

5   sheet that's in the operating report and also the -- the

6   section of the operating report that deals with accounts

7   receivable aging.  In the liquidation analysis, it has

8   503(b)(9) claims as being between 170 and 200 million.

9          THE COURT:  I see that.

10          MR. KERRIGAN:  And -- and that's not all that far

11   away, by the way, Your Honor, when the debtors ask for an

12   extension of the (indiscernible 12:39:49) period, the first

13   extension, I believe they estimated that the dollars were in

14   the $210 million, $230 million range.  So, plus or minus it's

15   in the ballpark.

16          So, at that point in February, they had an idea that

17   it was in the $200 million range, at least, and now that's been

18   somewhat confirmed.  It also, up above, in the (a) estimated

19   proceeds from sale of assets, it has 275 million of cash and

20   cash equivalents and if you look at the -- at the operating

21   report and the balance sheet and you -- you add the cash held

22   by Bank of America and the cash and cash equivalents, you get

23   283, so that's -- I think someone used the figure 290, so

24   that's in the ballpark as to what they -- what they have now.

25          But here's where the big difference comes.  Accounts

1 receivable net, in the case of a liquidation, 59,700,000 to 83

2 million.  On the operating report, let's -- let's skip to the

3 -- from the balance sheet over to the AR -- receivables report.

4 There they have total accounts receivable in my version of

5 about 450 -- 455 million, most of which are in the 91 plus

6 category.  All right?  They may be -- the numbers might be

7 slightly different on the prior month and they have a million

8 dollars or $1.1 million of -- of un -- in a amount considered

9 uncollectable and the AR's net for $454 million on the -- as of

10 July 31st in my -- in my version and that's going to drop 82 to

11 87 percent in the event of a liquidation.  You'd expect some

12 drop.  You expect maybe a substantial drop, but almost the --

13 some -- something, you know, in the mid to -- mid-80 percent

14 range.  Now, this is going to liquidation still after the --

15 after the plan if the plan -- significant class --

16          THE COURT:  Well, if they're wrong there, that only

17 improves the recovery, doesn't it?

18          MR. KERRIGAN:  No, Your Honor.  If they're wrong,

19 then there's no -- that that money isn't going to be in the

20 pot.  If they're wrong about -- they say it's 455, but now

21 they're saying in a liquidation scenario, it's 59,7, well that

22 starts to make that -- that cash and cash equivalents look a

23 little skinny especially if you're funding the liquidating

24 trust and you're paying administrative expenses between now and

25 the time the liquidating trust takes over and you're paying the

1  expenses of the liquidating trust ahead of administrative

2  claims in this case.

3        It's not a question that can't be answered.  It

4  simply raises questions about and -- and looking and doing the

5  analysis -- now, I understand that the operating reports are

6  gap and all that, but on the other hand, these folks have been

7  in liquidation for the better part of -- well, since January, I

8  suppose when we were here and they announced that they were

9  laying off virtually all the remaining employees.

10        So, this is -- this number, if it's in the -- if it's

11  in the -- in the balance sheets, that's all we have to go on.

12  Comparing those numbers is really distressing and concerning.

13  Now, if it -- if it's not an accurate number, then fine.  Tell

14  us what it is going to be.  That's all we're really asking.

15  So, on that -- on that score, Your Honor, I don't believe that

16  we have got an answer as to really -- and in fact, the -- the

17  provisions that have been incorporated into the plan and the

18  disclosure statement about the need for the committee to -- as

19  they should in any exercise of their fiduciary duties as

20  they're doing, to take a look at it and make sure that those

21  monies are really going to be there or they think they're

22  really going to be there or they make a determination, whatever

23  it is, what we're saying now is that we don't really know and

24  if they don't know, how can we know?

25        And if -- and if that's part of the exercise, then --

1  of confirming a plan and providing adequate information, then

2  it's -- we should be given some sort of comfort that that's --

3  that's the case and it's possible, if I may suggest, that

4  through communication between the Committee and folks that are

5  in my client's situation, that we can -- we can get that kind

6  of comfort and I hope not to be standing here at confirmation

7  objecting, but I did want the Court to understand what our

8  concern was and why the concern was articulated in something we

9  consider fairly extreme that is objecting to a disclosure

10  statement.

11        With respect to the time periods and whether those

12  are necessary because they don't have enough money or it may

13  not have enough money as of the time, the answer, I believe, in

14  the -- in the chart is that, no, it's to -- it's to give them

15  time to -- in an orderly fashion go through and determine which

16  claims should be allowed and which claims should not be

17  allowed.

18        If I may, Your Honor, as a group, I mean, this is

19  like a lot of other things, when you look at it at the whole,

20  that sounds like a perfectly reasonable explanation.  When you

21  look at it from the context of -- of our client's claim and,

22  perhaps, the Longacre claim and perhaps others, including

23  perhaps the landlords -- the Stub Rent dispute, is it really

24  necessary that there be a -- have been all that -- all this

25  time and more time yet.

1          For example and in -- I'm not holding anybody the --

2  to admitting the -- that we're right and we have the allowed

3  claim based on what's here, but the fact is, is that our folks

4  had a $3.8 million claim on the day of the filing and that our

5  folks filed a reclamation claim with the documentation to back

6  that up in accordance with the -- this Court's order as and

7  when it was -- was required and actually beforehand because we

8  sent the reclamation notice immediately upon hearing of the

9  bankruptcy.

10          We then filed our 503(b)(9) administrative claim in

11  the form that the debtors promulgated and the Court approved

12  and -- and the timing and that was back in, I believe June -- I

13  think the first -- it was either December or January.  I get

14  this and October -- mixed up and since then, we've been the

15  subject of two objections and the two objections have basically

16  been to the -- to the fact that we filed duplicate claims or

17  that we -- and the second one was to the fact that our general

18  unsecured claim, which again, was timely filed and really

19  incorporated all the other stuff that we've provided, was

20  incorporated not only the piece that we thought was unsecured,

21  but the piece that could become unsecured if an objection to

22  our administrative claim was successful.

23          That's a sum total.  Now, we've been through a bunch

24  of other objections and they've -- they've done, what 40-some

25  now, and we haven't shown up again and -- and some of those

82

1  objections have dealt with the -- the sort of substantive

2  issues on 503(b)(9) whether they're goods involved, whether

3  they're services involved, whether they're within the 20-day

4  period.  What's not been covered in those objections?  502(d),

5  no preference claims.  That's what's not been covered.

6         So, that's again why we felt it necessary to ask

7  whether we could be in jeopardy of agreeing to the

8  applicability of 502(d) because as we see it, that's the only

9  impediment of getting us allowed and that would be the

10 impediment to getting us paid five days after the effective

11 date and for a company like ours and this is not in the record,

12 but you could look up our company on the -- our client on the

13 internet, it's public dodged, but we're not a public company.

14 Three point eight million dollars means a whole lot to them in

15 any time, especially if the effective day, for example, was

16 before the end of the year.  If it was say, December 15th and

17 five days after December 15th a nice Christmas present for this

18 company and it's employees would be $3.8 million dollars in

19 cash.

20        That's why it's important to us.  That's why it's in

21 here.  But again, we think now that it's -- it's more of a

22 confirmation issue than a disclosure issue and I think that --

23 that really is the sum of where we are and I -- and I think,

24 unfortunately, through this process of objecting and responding

25 to the -- to the disclosure statement and parsing through all

83

1 this stuff and trying to figure out as the Court apparently

2 did, as well, to try to figure out how the definitions all meld

3 together, we wound up with -- with the information that we were

4 looking for and we're not thrilled with the result but we have

5 the information and we -- we may have to go to the next stage.

6         Hopefully, what will happen over the next couple of

7 weeks may resolve these, as well.  There will be more security

8 that in -- and warm and fuzzy feeling, if you will, that

9 there's going to be enough money there to pay the

10 administrative claims, regardless of the what the number is in

11 the assets.

12         But those are the reasons that we filed and we seek

13 the information and those are the reasons that, unless they're

14 resolved, we're going to wind up objecting to the plan, as

15 well.  Thank you, Your Honor.

16         THE COURT:  Thank you, Mr. Kerrigan.  Does any other

17 party wish to be heard in connection with the Longacre

18 Opportunity Fund objection?  You wish to respond?

19         MR. DICKERSON: Yes, Your Honor, although, I'm -- I

20 had hoped to -- had -- with respect to Bethesda's counsel, I

21 think -- we were trying to get the common issue resolved first,

22 the Longacre and the two -- the joinder and it seems that we've

23 segued off into the 502(d) and some other issues, but -- so, I

24 would like to -- would you like me to go back to the issue we

25 were originally discussing or would you like me to deal with

84

1  the 502(d) issue now or us to deal with the 502(d) issue

2  because I think Mr. Pomerantz will handle that?

3          THE COURT:  Okay.  I think that first --

4          MR. DICKERSON:  Although I --

5          THE COURT:  -- I'd like you to go --

6          MR. DICKERSON:  I'm sorry.  Excuse me for -- go

7  ahead, Your Honor.

8          THE COURT:  I'd like you to go back and address the

9  issue that you had raised and then we can go into the 502(d)

10  issue.

11          MR. DICKERSON:  Thank you, Your Honor.  And I was

12  just going to add, although I do think that Bethesda's

13  counsel's did admit that with respect to disclosure he had no

14  objection.  So, I'm not sure how much time we need to go back

15  and revisit those issues.  Although it probably is worthwhile

16  because, unfortunately, I think that Bethesda's counsel has

17  misinterpreted the language and, in fact, we agree with Your

18  Honor's interpretation of it, but again, we'll be happy to walk

19  through that in just a minute.

20          THE COURT:  Okay.

21          MR. DICKERSON:  Your Honor, with respect to the

22  original issue with -- about paying allowed admin claims as the

23  effective date and I just had a couple points in response to

24  Longacre's counsel.  It seems -- if I'm understanding the

25  position right, is that Longacre's counsel is arguing for a

85

1  situation in which all admin claims would be determined and

2  allowed or determined and then paid on the effective which is

3  an impossibility.

4          Clearly, there will be administrative claims that are

5  being incurred all the way through confirmation and, so, we

6  can't -- we have the catch 22 of how do you have a bar date

7  when the period in which you could have an admin claim hasn't

8  passed and so, we would respectfully submit that that type of a

9  -- that type of a set-up is not one that -- that's permissible

10 because you can't do it.  It's impossible.

11         And the -- what we have done and what we believe is

12 the standard for this Court and for other courts and, in fact,

13 it's the standard adopted by, I believe, this Court and other

14 courts, is that we have provided the time periods in which

15 object -- which admin claims may be filed.  In fact, we've got

16 a second one.  That is 60 days after the effective date so that

17 gives people time after the -- after confirmation has occurred

18 to look back and see if they have any claim that's related to

19 an -- entitled to administrative expense priority and then file

20 that claim and then we've given what we believe is reasonable

21 and actually at the urging of the Committee is shorter than we

22 had --

23              (Recording Skipped Forward)

24         MR. DICKERSON:  -- a period of time within which to

25 object to those claims to the extent that we deem them to be

**J&J COURT TRANSCRIBERS, INC.**

1  improper, another 60 days.  And so, we are committed to all the

2  parties in interest and this Court to have a process that's

3  knowable and is reasonable under the circumstances, to allow

4  allowed claims, allowed admin claims to be paid as soon as

5  possible and practicable.  Now, I think an underlying part of

6  this argument is that the 503(b)(9) claim is they're unhappy

7  that they -- that we have not yet challenged or commenced the

8  adversary proceeding necessary to determine for this Court to

9  determine whether the 503(b)(9) claims are allowed

10  administrative claims.

11       We have a deadline by which we need to have brought

12  those claims.  If we don't do that, then they will have been

13  allowed and so, we again have set up a process that is fair.

14  It may not be as fast as some of the individual claimants

15  clearly would like it to be, but we do believe its fair and

16  reasonable under the circumstances and in light of that and in

17  light of the change that we've made that -- that says to the

18  extent that your -- and we expect and it's our intent to have

19  commenced the 503(b)(9) issue prior to the confirmation

20  hearing.

21       Whether it's finalized by then or not, I don't know,

22  but we're not -- just as we're fiduciaries to all the parties

23  in interest including them, but it -- we can't obviously pay

24  any junior claims until the admin claims are dealt with.  And

25  so, it would be inappropriate and in violation of our fiduciary

87

1  duties now and the liquidating trust fiduciary duties

2  afterwards if it didn't prosecute these in a -- in an orderly

3  and a -- in a speedily fashion and so, that's what we intend to

4  do.

5         So, in light of the changes that we've made to the --

6  to the plan and disclosure statement, we believe that that

7  fully addresses those as appropriate under applicable law with

8  respect to the payment of the admin claims.

9         THE COURT:  All right.  Thank you.

10        MR. POMERANTZ:  Good afternoon, Your Honor.

11        THE COURT:  Good afternoon.

12        MR. POMERANTZ:  Jeffrey Pomerantz again.  Your Honor,

13  there is always uncertainty in the process.  There's

14  uncertainty in what proceeds will be available for -- from

15  liquidation of assets to prosecution of causes of action and

16  there's uncertainty because of the status of the claims

17  process.  That's by definition any Chapter 11 case and if a

18  debtor and a Committee needed to wait until everything would be

19  resolved you would find cases lasting years.

20        THE COURT:  Six years.

21        MR. POMERANTZ:  On the other hand, the Committee has

22  been focused and concerned about the issues that counsel

23  raises.  The issue of to what extent there will be money

24  available to pay administrative creditors because if the

25  administrative creditors can't be paid, then unsecured

1  creditors can't -- won't be paid.

2           Now, the Committee in this case is comprised of a

3  number of trade creditors, many of which have large 503(b)(9)

4  claims.  So, during the process of negotiating the plan with

5  the debtor, we have been extremely mindful of the issues that

6  are facing administrative creditors because, again, several

7  many of the Committee members have such claims.

8           Because of that we put in the provisions that allowed

9  they're not to be distributions until there was sufficient

10 money to pay all and had modified it as we talked about today.

11 We are very concerned about payment of administrative claims

12 prior to confirmation and other than claims in the ordinary

13 course, rent, utilities, professionals and other things that

14 are ongoing, we have told the debtor we don't think is

15 appropriate until the administrative solvency is clarified and

16 demonstrated to the Committee's satisfaction, that

17 administrative claims be paid other than the ordinary course

18 and we believe that the debtor is -- understands our concern

19 and we would not expect there to be any administrative claim

20 payments requested to be paid prior to confirmation.

21          We don't want to go down the disgorgement path.

22 That's not fun for anyone and for that reason we will not want

23 the plan to be confirmed if it can't demonstrate that there is

24 sufficient money to pay.

25          Now, whether the plan -- whether the debtor and the

89

1  plan proponents will have the ability to pay all administrative

2  claims is a confirmation issue.  We have negotiated for the

3  right for the Committee to have, in essence, a veto right.  If

4  it doesn't pass the Committee's satisfaction, we never come

5  before Your Honor.  However, if we pass the Committee's

6  satisfaction, all parties will have the ability to present to

7  Your Honor the arguments of whether we have satisfied the

8  standards for confirmation.  Your Honor will have the ultimate

9  determination.

10         So, counsel has commented several times about the

11  Committee ultimately be the arbor of this decision and he

12  doesn't have the information we don't have or what we have,

13  ultimately Your Honor is the arbor of that decision and in

14  connection with discovery, any objecting party can seek

15  discovery on that particular issue and we again our hopeful

16  that as the time comes that the debtor and the planned

17  performance will be able to demonstrate that there is

18  sufficient money to pay such claims.

19         I want to give the Court a little background on the

20  502(d) issue, because given the make-up of the Committee, it

21  was very important that nothing in the plan address the issue

22  of the use of 502(d) to apply to 503(b)(9) claims.  We're aware

23  of the case law out there, of the disputes among -- surrounding

24  the issue and the initial drafts of the plan we received were

25  not identifying 502(d) as such, could have been read to

**J&J COURT TRANSCRIBERS, INC.**

90

1  ultimately have the plan make the decision.

2        We didn't think that was appropriate.  We knew this

3  would be an issue.  We knew this would be an issue that would

4  have to be brought to the Court's attention and our goal was to

5  have it brought to the Court's attention in a timely manner in

6  which case creditor's can respond on the use of 502(d), the

7  debtor could have its position and Your Honor would ultimately

8  make the decision.

9        We still had to deal with the plan on what is going

10  to happen right after confirmation.  The plan provides that for

11  120 days, all claims, not just administrative claims as counsel

12  misstated, but all claims are not allowed unless they're

13  specifically allowed.  That by definition has to be the case

14  because as we said, administrative claims will be filed up

15  until the confirmation date.  There has to be a period of time.

16        We specifically picked the 90-day period as a date

17  before the end of the 120-day period.  So, this Court, at the

18  latest, 90 days after confirmation will be asked to make a

19  determination of the use of 502(d).  If the Court has not made

20  that determination, 502(d) will not be able to be used to apply

21  to apply to 503(b)(9) claims.  That is what the language says.

22        THE COURT:  And that's the provision in --

23        MR. POMERANTZ:  In F.

24        THE COURT:  -- Paragraph F.

25        MR. POMERANTZ:  Correct.  So, while it is being read

**J&J COURT TRANSCRIBERS, INC.**

91

1  to do the opposite, in fact it was read to protect

2  administrative creditors, put a time limit by which this issue

3  had to be decided.  We are hopeful and we've encouraged the

4  debtor to file the motion prior to confirmation so then that it

5  could be addressed, but we had to have upon confirmation, we

6  had to have some guidance in the plan to the liquidating

7  trustee.  Can he make distributions or not?  And since claims

8  were not going to be deemed allowed for 120 days anyway, we

9  figured use the 90-day period here to get this issue resolved.

10        So, again, it's sort of ironic that the language

11  which we so strongly fought for is now being looked at as a

12  detriment to administrative creditors.  We actually read it in

13  the -- it was intended to be a benefit to administrative

14  creditors to get the issue resolved.

15        So, Your Honor, we think that the plan issues that

16  are on the table are confirmation issues.  Your Honor, will

17  ultimately make -- have to make the determination of whether

18  there's sufficient money to pay admin claims and let this plan

19  go effective.  None of the issues raised really fall to the

20  disclosure statement basis.  We hope, with continuing dialog

21  with the objecting parties that we can get them comfortable on

22  the issues.  We hope the debtor will get us comfortable on the

23  issues and if not, we will all be back here in November to

24  argue the same things, but we believe that based upon the

25  changes that we made, based upon the provisions in the plan how

**J&J COURT TRANSCRIBERS, INC.**

1  they're intended and actually how they read, that Your Honor

2  can find that the disclosure statement contains adequate

3  information and preserve all issue -- other issues to

4  confirmation.

5         THE COURT:  All right.  Thank you.  Does any other

6  party wish to be heard in connection with the 502(d) issue?

7         ALL COUNSEL:  (No verbal response)

8         THE COURT:  All right.  You may proceed.

9         MR. DICKERSON:  Thank you, Your Honor.  Your Honor,

10 because it's been prefaced by Bethesda's counsel, I thought I'd

11 just finish with the rest of their objection and then we'll

12 move back to the one remaining objection, I believe it -- just

13 with respect to consolidation.

14        THE COURT:  Okay.  And that's Item K that's on the

15 response on the agenda.

16        MR. DICKERSON:  I believe so, Your Honor.  Bethesda

17 is K.  That's correct.  On Page 6 of the chart.

18        THE COURT:   Right.

19        MR. DICKERSON:  And some of which I think we've

20 covered but just to be clear and, again, I believe that

21 Bethesda's counsel said with respect to all these issues and he

22 agrees that they're confirmation issues and that disclosure has

23 been appropriate, but just to let the Court know what we've

24 done we've actually added some language with respect to some of

25 these and in an effort to try to address those as well.

93

1           At -- the first is one that was just addressed,

2   whether Bethesda had requested that the disclosure statement

3   state whether the debtor's intend to assert that 502(d) applies

4   to the 503(b)(9) claims.  I think as Mr. Pomerantz indicated

5   and as the debtor's intend to do, we intend to tee-up that

6   issue shortly.  We obviously are aware of the Second Circuit

7   case on that issue and to the extent that we are dilatory in

8   bringing it, then there are dates within the -- in the plan

9   that would prevent us from bringing such a claim.

10          So, that it isn't an opened ended situation and we --

11  we agree and understand the same interpretation of the plan

12  that Mr. Pomerantz indicated is that, in fact, 502(d) only

13  applies if we get Your Honor to say that it applies and on the

14  time frame set forth.

15          The next objection they had -- Bethesda had was with

16  -- that the disclosure statement should state whether debtor's

17  allow or pay any administrative expenses prior to the effective

18  date and if so, to whom.  The disclosure statement, in fact,

19  does have language that indicates that we intend to pay

20  ordinary course administrative claims as they become due.  I

21  don't think that there's any further disclosure.  I think that

22  Your Honor is aware that the Committee is aware of admin claims

23  that are being paid.

24          We have included a proviso that says that all parties

25  reserve their rights to the payment of such ordinary course

**J&J COURT TRANSCRIBERS, INC.**

94

1  administrative expenses and, in addition and one change that's

2  not reflected in the chart, is where repeating that language is

3  that all parties in interest reserve the right to object to not

4  only ordinary course but the payment of any administrative

5  claim.  And so, we think all parties and interested rights are

6  preserved there.

7          The next objection was that the disclosure statement

8  should state the month and year in which the effective date is

9  anticipated to occur.  Your Honor, I wish I would be able to

10  give that precision.  I think I can express and the disclosure

11  statement does express the expectation, if the confirmation

12  hearing occurs on November 23rd and we're allow -- we're

13  successful and Your Honor confirms the plan, we will have a

14  ten-day appeal period with which to wait and hopefully we will

15  go effective shortly thereafter.

16          We can't be any more precise than that.  Obviously,

17  there's a number of variables included and we have inserted

18  language to that effect into the disclosure statement that says

19  when the confirmation hearing is -- is scheduled to occur and

20  the -- once the conditions to go effective have been met, then

21  we will promptly go effective.

22          The next part of the objection was that the

23  disclosure statement should state whether the time periods and

24  procedures associated with the allowance and payment of the

25  Bankruptcy Code Section 503(b)(9) are necessary.  Your Honor, I

1  -- we have inserted, again, propose to insert language that

2  says that Article 3 of the plan provides for the time periods,

3  not just for 503(b)(9) claims, obviously, but with respect to

4  all claims, all administrative claims and sets the bar dates

5  for -- for those claims to be brought and for us to challenge

6  those claims.  With two bar dates, obviously, one has passed,

7  and but there's a second one and then there's a 120 days post

8  effective date period in which the debtors or the liquidating

9  trustee actually could object to those claims filed before the

10 second bar date.

11          The next one was that the disclosure statement should

12 state whether the plan being to the Bankruptcy Code a 503(b)(9)

13 claim is disputed, even if an objection has not been filed.  I

14 think that Bethesda's counsel touched on this a little bit and

15 although I think he was slightly incorrect in his

16 interpretation of the plan, the plan with respect to all

17 claims, administrative claims included, but again, that's --

18 they are not subsumed in the same definition, but both the

19 administrative claims and other claims are disputed unless

20 they're allowed and so, we tried to make that simple and it --

21 and while I stated it simply, as you can imagine, the -- it is

22 a difficult concept because there are any ways that you can

23 dispute a claim by listing it on the schedules, by filing an

24 objection, and there is language in both the plan and

25 disclosure statement that lays out how things are disputed but

96

1   really when it comes down to it, is if it's not allowed if you

2   don't have something that shows that it's allowed, then it is

3   disputed and so, with respect to Bethesda's 503(b)(9) claim,

4   because it has not been allowed, it is disputed.

5         And we are adding language that says exactly that in

6   Section G of the introduction of the disclosure statement, "A

7   claim, including the 503(b)(9) claim, is a disputed claim

8   unless it has been allowed pursuant to the plan."

9         The next is, the disclosure statement should state

10  whether payment is full of -- as -- whether payment in full of

11  administrative claims is dependent on collection of accounts

12  receivable or the collection of proceeds from a cause of

13  action.  That's a very real possibility, Your Honor, and we

14  believe that the disclosure statement provides that.  It does

15  not state contrary to, I think the wishes of some people, but

16  it's kind of an untenable wish, that we have not collected all

17  of and liquidated all of the assets.

18        We expect and we are comfortable that allowed -- that

19  by the time we get to the effective date, allowed

20  administrative claims, there would be more than enough cash on

21  hand to pay those and, again, as we mentioned earlier, we

22  expect and hope that the Committee will be in the same

23  position, otherwise we won't go forward with confirmation.

24        So, with respect to admin claims, how we monetize the

25  assets in order to be able to pay them, that is dependent on

97

1 continuing to liquidate the assets, but when we get to

2 confirmation, as Mr. Pomerantz provided, unless Your Honor is

3 satisfied that we have sufficient assets to have -- to be

4 confirmed then -- and to pay those admin claims, then we won't

5 -- you won't confirm.  So, you will be the ultimate determiner

6 of that issue.

7        I think that is the end of the Bethesda claims or

8 objections and so, unless Your Honor has any questions or if --

9 I'd ask that that one be addressed unless you'd like to wait

10 until you've heard the rest of the one remaining objection?

11        THE COURT:  Well, what I heard Mr. Kerrigan say was

12 that from the informational aspect that he was satisfied with

13 the disclosure statement.  He didn't necessarily like what it

14 said and was reserving his rights to object at confirmation and

15 as far as confirmation issues, but as far as the information

16 was concerned that the information was there and just for the

17 record, yes, I interpret Section F as just preserving the right

18 to claim a 502(d) objection to a 503(b)(9) claim not as

19 establishing that.

20        MR. DICKERSON:  Thank you, Your Honor, and again,

21 that was the intent.

22        THE COURT:  Right.  So, with that understanding,

23 then, the objection to -- that was filed Bethesda Softworks

24 will be overruled.

25        MR. DICKERSON:  Your Honor, and I think that the

**J&J COURT TRANSCRIBERS, INC.**

98

1  Longacre objection also has been argued and can be ruled if you

2  -- if you like unless you would like to reserve that one for

3  the end?

4         THE COURT:  No, I'm satisfied with the Longacre

5  Opportunity Fund that that has been addressed, as well with the

6  stricken language and with the additional language that has

7  been inserted into the disclosure statement and so that

8  objection be resolved, as well.

9         MR. DICKERSON:  Thank you, Your Honor.  I think that

10 -- that leaves us with the remaining objection of Generation H

11 One LP.  That, again, is docket number 49815 and 5003.

12        THE COURT:  Right.

13        MR. DICKERSON:  And that objection is whether or not

14 substantive consolidation is appropriate and whether or not the

15 disclosure statement provides adequate information with respect

16 to substantive consolidation.

17        THE COURT:  And as I understand it, what they were

18 interested in is a little bit of the extensive analysis that

19 you represented that you had done.

20        MR. DICKERSON:  Thank you, Your Honor.  I also had a

21 similar understanding of their concern and I would -- I would

22 point out that, I guess, at the outset is that commencing --

23 and I'm looking at the black line of the disclosure statement

24 on Page 31.  There is one, two, three -- three and a half or so

25 pages of disclosure with respect to substantive consolidation

**J&J COURT TRANSCRIBERS, INC.**

1  and it sets forth the position of the plan proponents, so not

2  just the debtors, but the Committee as well, that substantive

3  consolidation in these cases is appropriate.

4         I guess I should back up a little bit, Your Honor, is

5  that, again, we believe that this is a confirmation objection

6  issue and we agree that everyone's rights are preserved with

7  respect to raising it again at the confirmation hearing.

8         What we attempted to do in the disclosure statement

9  is provide to those people entitled to vote under the plan,

10  which is who we're required to have provided adequate

11  disclosure, information about how we arrived at the decision to

12  substantively consolidate the assets and we believe that in

13  that three and a half pages we go through the details of how we

14  arrived and as you might imagine, Your Honor, the analysis is

15  one that once you begin it and you determine that you have met

16  a basic threshold for even considering substantive

17  consolidation and I guess I would in that category how

18  difficult it is to disentangle the books and records of the

19  debtors and whether or not its clearly on its face going to be

20  a disproportionate -- have a disproportionate effect on certain

21  creditors to -- and to the benefit of certain others.

22         Once you begin to get to at least that threshold then

23  you become -- your confronted with the decision of how much

24  further do you go to try to actually disentangle and it --

25  expend the assets which would -- could otherwise be used for

1 distribution to creditors.

2      The debtors did do those analysis -- analyses and

3 with the Committee's agreement, determined that they had met

4 the burden and they will show at confirmation to the extent

5 necessary, both in our -- in the papers and so-forth, that

6 under the circumstances, substantive consolidation is

7 appropriate.

8      With respect to adding more detail with respect to

9 our analysis, again, we could have made the disclosure

10 statement 1,000 pages long by putting in all the numbers and

11 letting everybody come to their own conclusions.  We are

12 fiduciaries.  The Committee's the fiduciary to its constituency

13 and we did the analysis and came and believe we've met the

14 appropriate standards that are required to be met for

15 substantive consolidation.

16      And we did not include the -- multiple pages of the

17 various debtor's books and records and inter-company

18 receivables and affidavits with respect to whether or not the

19 subsidiaries held themselves out as being independent from

20 Circuit City as a whole and so forth.  We, instead, arrived at

21 what we believe is a thorough description of how we -- the

22 analysis we did and was -- and with anything in the disclosure

23 statement or plan, we encourage anyone who has an issue and

24 would like to discuss with us how we did that analysis and

25 requires more detail to contact us and we will discuss it with

1 them and provide them with the information necessary  for them

2 to ensure that we've met our burden and that we, in fact, it --

3 and whether it's in fact appropriate for Your Honor to confirm

4 the plan as a substantively consolidated plan.

5      And so, we think that the disclosure in the

6 disclosure statement is adequate on that point and would

7 request that Your Honor agree with us and to overrule

8 Generation HP's objection on that point.

9      THE COURT:  All right.  Thank you.  Mr. Epps, do you

10 wish to be heard on your objection?

11      MR. EPPS:  I do, Your Honor.  Good afternoon, again,

12 Your Honor.  A.C. Epps, Jr. on behalf of Generation H One and

13 Two and the other objectors.  Your Honor, I will try to be

14 brief.  I don't want the Court to infer from my brevity that I

15 don't take this very seriously, but I think it can be said

16 quite shortly, but I believe in this very, very deeply.

17      Your Honor, as the Court may know, our firm has

18 represented over a hundred landlords in this case.  There have

19 been all sorts and conditions of landlords.  They have all the

20 various different subsidiaries as their tenants and some have

21 guaranties and some don't have guaranties.

22      The schedule is to tell a story that there is a

23 substantial difference between the subs and the parent in terms

24 of the closeness to solvency.  Schedules are, as you and I both

25 know, just schedules and you try but they often may not tell

1  the real story and I understand that.

2        However, several of the objectors have Circuit City

3  West Coast as their tenant.  Circuit City West Coast has

4  schedules that are much stronger than some of the others.  It

5  is impossible for someone from one of these debtors to tell

6  from what is said in this disclosure statement whether it is in

7  their best interest to vote for the plan.

8        In that regard, I take very strong exception to Mr.

9  Dickerson's assertion that this is really a confirmation issue.

10  This is the quintessential disclosure issue because I haven't

11  -- I have and, indeed, most of my clients have no opinion on

12  the underlying issue of substantive consolidation.  They can't

13  have an opinion.  They don't know anything.  What they're being

14  told if this disclosure statement is approved in its current

15  form is essentially we have spent a lot of money and time

16  agonizing over this and we think it's the right answer, trust

17  us.

18        Well, I don't think that's good enough and the reason

19  I don't think it's good enough is that they have, in fact, done

20  the analysis.  I realize that their postulate axiom assumptions

21  and so-forth that go into this and that they are a Committee

22  and that the debtor's are somewhat worried about putting this

23  out because there are so many assumptions that would go into

24  the issue of whether what the numbers really should be.  It's a

25  little bit like a liquidation analysis although I could see

**J&J COURT TRANSCRIBERS, INC.**

1  that its more complicated.

2      Mr. Dickerson said that he thought it was adequate

3  without having a 1,000 page disclosure statement and without

4  having page after page after page of schedules and I do too,

5  but I certainly think there's a middle ground.  We know because

6  we have been told in the draft of the disclosure statement that

7  numbers have been run that factors have been considered.  Some

8  of the factors indeed are in here, with it numbers are -- have

9  been run, that show that the costs are substantial to not -- to

10  failing to consolidate substantively and that creditors are not

11  very far apart in treatment once all of the issues are unwound,

12  but it isn't here.

13      There is absolutely nothing here that would tell a

14  landlord or a creditor of Circuit City West Coast for example,

15  why this is in his best interest other than, trust me, it's in

16  your best interest.

17      THE COURT:  So, what are you looking for?  Are you

18  looking for a liquidation analysis by debtor?

19      MR. EPPS:  I think there should be some summary of

20  what the difference is -- they think the differences would be

21  to creditors between if they were stand-alone and if they're

22  substantively consolidated because if you look at the package

23  as a whole without the expense and headache of administering

24  separate estates, one or two of these subsidiaries are almost

25  solvent and the estimate for the package is somewhere between

104

1  zero and 13 and a half percent.  Now, that's a --

2          THE COURT:  Which are the ones that are solvent?

3          MR. EPPS:  Well, I didn't say they were solvent, but

4  I said they were -- I didn't mean to say they were solvent.  I

5  said, they're almost --

6          THE COURT:  Almost.  Oh, okay.

7          MR. EPPS:  Well, Circuit City West Coast,

8  particularly, but there's been a calculation that that

9  disappears because of various and -- factors raised,

10 calculations, cerebrations, and so-forth, none of which has

11 been shared with us.  I don't think it takes more than a page

12 or two, but I need to have my various landlords be able to

13 decide for themselves whether they should vote for it and so

14 these are quintessential disclosure statement issues, as far as

15 I'm concerned.

16          As I say, I am not anti-substantive consolidation.

17 Indeed, because I have so many landlords on so many sides, I

18 mean, I'd be able to take a position at the, you know, at the

19 final hearing.  This is my position, to try to give people some

20 information so they can make their vote because this is nothing

21 but several different law firms, all good, and several

22 different consultants, are all excellent, have cerebrated and

23 think you should do this and I don't think I'm asking for

24 something that's impossible.  I believe you're talking about

25 two or three summary tables and some paragraphs and that's all,

1  but I -- the debtor and the Committee don't want to do that and

2  I think they should and I think they should and I don't think

3  -- I don't want to stand in front of an express train, and I've

4  been known to -- been accused of doing that for a living and I

5  don't want this to be another express train, but I don't think

6  I'm wrong and I'd ask the Court to consider this and I think it

7  can be done without disrupting their schedule and we can have a

8  confirmation hearing -- a successful confirmation hearing on

9  Thanksgiving week and get it done.  Thank you, Your Honor.

10       THE COURT:  All right.  Thank you, Mr. Epps.  Mr.

11 Dickerson, does the debtor have a -- has it done this analysis

12 of the stand alone versus the substantively consolidated.

13       MR. DICKERSON:  Yes, Your Honor.  Okay.  And we

14 describe --

15       THE COURT:  Okay.  And --

16       MR. DICKERSON:  -- we describe it in the disclosure

17 statement on Page 34 of the blackline.  We also have offered to

18 give Generation One and Two's counsel access to that and we

19 agreed to give that access to him as quickly as he would like

20 to start to have access to it.  We note that the voting

21 deadline is November 10th and we would expect that if we are

22 not -- do not live up to our word with respect to providing

23 that analysis, then he is free to come to this Court and

24 explain that we did not do that and that would be an issue that

25 will taken under consideration when its time for confirmation.

**J&J COURT TRANSCRIBERS, INC.**

1        I'd point out that in -- on Page 34, we described

2  that specifically that West Coast -- the issue that -- that was

3  raised by Generation's counsel is that West Coast, just on its

4  schedules, looks like it could be close to solvency, but when

5  we described it that's, in fact, not the case because those

6  schedules do not take into account the reconciliation of

7  royalty payments for intellectual property, nor does it take

8  into account the administrative costs that the subsidiaries are

9  required to pay back to Circuit City, Inc. for maintaining the

10 overall operations and management of the subsidiaries as a

11 whole.

12        So, we do describe in the disclosure statement that

13 -- that the end result when you net out all of those

14 differences is that on a -- when you compare a consolidated

15 basis to a non-consolidated basis, the recoveries are

16 essentially the same.

17        THE COURT:  And what would -- what would be the

18 debtor's objection to providing the chart that would show what

19 that analysis reveals rather than just provide it in a summary

20 form in the paragraph that you have here?

21        MR. DICKERSON:  To do it correct, Your Honor, it's

22 not a one or two page chart.  It is a significant amount of

23 analysis.  There are nine different debtors.  They are inter-

24 company receivables, royalty payments, so-forth.  It requires

25 understanding how the -- how the corporate structure, the

**J&J COURT TRANSCRIBERS, INC.**

1  capital structure works with respect to the proceeds that are

2  being brought down from Canada and so-forth.  It -- with due

3  respect to Generation's counsel, it is not a one or two-page

4  issue.  It's a very complicated issue and, again, we're happy

5  to work our way through it with -- with him, but we think it

6  inappropriate with respect to trying to get that into the

7  disclosure statement at -- at any -- at any point let alone

8  this point and believe that we've provided adequate disclosure

9  that lets people to determine whether the independent

10 fiduciaries for both the Committee and for all parties in

11 interest have done the analysis and if you have questions we're

12 happy to walk you through it, but it -- it's inappropriate and

13 it will delay the process if we were -- would have to amend the

14 disclosure statement to include a understandable detailed

15 substantive consolidation analysis.

16          THE COURT:  All right.  But this analysis has already

17 been done --

18          MR. DICKERSON:  That's correct, Your Honor.

19          THE COURT:  -- it's just a matter of how would you

20 make it intelligible.  What if you did it in a summary form

21 that just said, all right, stand alone, the creditors of

22 Circuit City West Coast would, you know, receive, you know,

23 between X and Y, you know, substantively consolidated, they

24 receive, you know, what you've got in the plan?  Is that

25 feasible?

108

1          MR. DICKERSON:  Well, Your Honor, I -- I think to the

2  extent that that's all your looking for, we can probably just

3  put language that says that.  The -- under a nine consolidated

4  -- on a nine consolidated basis, the -- we believe that a

5  distribution to creditors of Circuit City West Coast would be X

6  and on a consolidated basis we believe it will be Y.

7          THE COURT:  But -- and I think that's all that Mr.

8  Epps is asking to be included, is that type of a --

9          MR. DICKERSON:  I'm sorry, Your Honor.

10          THE COURT:  I thought that that would be just the

11  type of summary that he wanted --

12          MR. DICKERSON:  That --

13          THE COURT:  -- not necessarily just for West Coast

14  but we could do it for each of the debtors so that creditors of

15  those particular debtors would know, look, is it in my best

16  interest to vote in favor of this plan?  Now, if this analysis

17  has not been done --

18          MR. DICKERSON:  Well, Your Honor, I think the

19  analysis has been done to a level as we describe here that

20  makes it clear that the substantive consolidation and to be

21  exact, if we had to do the analysis to an exact finite end,

22  then it would cost -- it would require more time, but the

23  analysis that we've done so far --

24          THE COURT:  So -- you -- is the analysis that you

25  have right now, if you were to reveal that, it could very well

**J&J COURT TRANSCRIBERS, INC.**

109

1 be misleading because you haven't gone through all of the

2 various steps and you don't want to have something misleading

3 in the disclosure statement --

4 　　　　　MR. DICKERSON:  Absolutely, Your Honor.

5 　　　　　THE COURT:  -- when you know what the answer is, but

6 to get to the ultimate answer is going to take a lot more

7 resources and time and those resources and time are better put

8 to other purposes.

9 　　　　　MR. DICKERSON:  Absolutely, Your Honor.

10 　　　　　THE COURT:  Okay.  I think I understand your

11 position.

12 　　　　　MR. POMERANTZ:  Your Honor, just to add a couple

13 things and I think your last point is where I was going to go.

14 There's a difference between disclosure and meaningful

15 disclosure.  Disclosure for disclosure sake, I don't think

16 helps anyone and just to give Your Honor a little perspective

17 on our participation analysis and what it took us to get

18 comfortable on substantive consolidation.

19 　　　　　THE COURT:  I would be very interested in that.

20 　　　　　MR. POMERANTZ:  The debtor spent several weeks, if

21 not months putting together a conceptual framework to address

22 and consider the issue and I think even in those discussions,

23 the debtor expressed concern or issue on whether they should be

24 substantively consolidated.

25 　　　　　We waited for weeks for the analysis to be done and

**J&J COURT TRANSCRIBERS, INC.**

1  understandably, the debtor did not want to provide us that

2  analysis while it was in mid-stream.  Once we received the

3  analysis, our financial advisors spent probably three days

4  solid, and these are financial advisors who have been working

5  on this case for the last 12 months --

6          THE COURT:  Remind me again, who are the --

7          MR. POMERANTZ:  Protiviti.

8          THE COURT:  Okay.

9          MR. POMERANTZ:   Who are fairly sophisticated not

10 only in bankruptcy work generally, but have a fairly decent

11 understanding and thorough understanding of how this company

12 operated and it took them three days to work through and to

13 understand the debtor's analysis.  They were then good enough

14 to explain it to me in four hours which is not a statement of

15 my ability, but they -- so, the time an effort it took to

16 really understand the process and even when we concluded the

17 process, we recognized that if you move one number here or one

18 number here or one assumption here or one assumption here, it

19 would take -- it could change the analysis dramatically and a

20 lot of the assumptions, there was some work that the debtor did

21 to come to that assumption, but each assumption you could spend

22 days, if not weeks, if not months, trying to validate.

23          So, my concern is in putting out information in some

24 extremely abbreviated form is -- what is really the point?  We

25 make the statements in the disclosure statement that we believe

111

1  it's in the best interest.  There's one -- in essence, one

2  counsel whose objected which we have indicated we're happy to

3  sit down and share that analysis to have him get comfortable at

4  the same place.

5          THE COURT:  Well, it's only -- to the one counsel's

6  who is representing many different parties --

7          MR. POMERANTZ:  No, I -- I understand.

8              (Phone Ringing Interruption)

9          THE COURT:  -- and they are parties that would be

10 uniquely, you know, positioned in this case to have relied on

11 one of these separate entities.

12         MR. POMERANTZ:  No, I -- I understand that, but we

13 are dealing with 15,000 creditors and there are creditors of

14 different estates which are more than the ones he represented

15 but having said that, if it was an issue and concern to a lot

16 of people out there, I'm sure we would have received a much

17 more significant response to the disclosure statement and given

18 our commitment to sit down with Mr. Epps to share with him the

19 analysis, to spend however long he wants to spend to get to the

20 same conclusion we made, subject, of course, to his right to

21 ultimately come in and deal with the issue at confirmation.  We

22 feel that's the best way to deal with the objection and not

23 clutter the disclosure statement with disclosure which at the

24 end of the day, I'm not sure would all be that meaningful.

25         THE COURT:  All right.  Thank you.  Does any other

**J&J COURT TRANSCRIBERS, INC.**

1  party wish to be heard in connection with this matter?  Mr.

2  Epps, you wish to reply?

3          MR. EPPS:  May I respond before Your Honor?

4          THE COURT:  Yes.

5          MR. EPPS:  Thank you.  Your Honor, I have to -- I

6  have to say that the fact that I -- as Mr. Pomerantz seems to

7  imply that I'm the fly on the windshield of this case is a

8  little bit unfortunate.  I happen to believe I'm right in this

9  case and the fact that no one else seems to have found the

10  issue doesn't make me less right.  But beyond that, I do think

11  the -- his argument proved too much.  The more analysis he

12  tells me that they have done, the more it ought to be

13  distillable into something that someone besides the brains of

14  the top of this case can at least look at.

15          THE COURT:  Well, in fairness though to what Mr.

16  Pomerantz is saying and, you know, the 15,000 creditors that

17  are involved in this case, why doesn't it make more sense if

18  your clients are uniquely situation here to be able to deal

19  with this?  The -- to sit down with Protiviti or whoever, the

20  debtor and, you know, from the debtor's side and go through and

21  get the analysis and get comfortable with what it is so that

22  then you can in -- educate your particular clientele, rather

23  than delay the process for everybody and also the time and

24  expense that would go into having to do it that way and also

25  the fact that, you know, because its been represented to be as

113

1  complex as it is, that we may run the risk that if we are, you

2  know, disseminating misinformation as opposed to good

3  information.

4         MR. EPPS:  Well, at the risk of reversing roles, my

5  question back to the Court would be, isn't that another --

6  isn't that disclosure materials that's not approved by this

7  Court if they give me extra materials that are only for my

8  clients?  But beyond that issue -- that's what they're

9  proposing is to give me Part B of a disclosure statement --

10        THE COURT:  Well, see, I wouldn't --

11        MR. EPPS:  -- for my clients --

12        THE COURT:  -- I wouldn't --

13        MR. EPPS:  -- I think.

14        THE COURT:  -- I wouldn't look at it that way.  I

15 would look at it more in the form of, you know, doing informal

16 discovery or even formal discovery with regard to objections

17 that you might want to raise to confirmation and doing it that

18 way because --

19        MR. EPPS:  Well --

20        THE COURT:  -- because, obviously substantive

21 consolidation is a confirmation issue and you have correctly

22 noted that one of the issues is whether or not there would be

23 a, you know, disparate treatment among creditors in these

24 various estates because of the substantive consolidation.

25 They'd be giving up substantive rights and, you know, we're

114

1 familiar with the cases that say that, you know, that that's

2 not appropriate.  We need to, you know, why can't you do it in

3 that context?

4 　　　　　MR. EPPS:  Well, I can do it in whatever context the

5 Court directs, but I -- but I think that, once again, as I was

6 saying that Mr. Pomerantz made and in fact proved too much

7 because when he says if you change a penny here or a dollar

8 here, the numbers go all over the place, well, that -- even

9 that is something that ought to be disclosed, it seems to me in

10 order to decide the issue.  Now, if the Court prefers that we

11 have our own private seance with them and I distribute the

12 materials to our client, I guess that's what we'll need to do,

13 but I do find it unfortunate that all this material exists that

14 it cannot be -- is summarized on a page or two because I'm

15 convinced that it actually could be, but I -- but in any case,

16 Your Honor, if the Court has -- I suppose the Court has no

17 objection to our meeting with them and reaching our own

18 agreement on what materials I can show to my clients, I find

19 that unusual, but I feel protected by the Court in its

20 suggestion in that respect that I'm not getting something that

21 I shouldn't get.

22 　　　　　THE COURT:  Well, you certainly wouldn't be getting

23 something that you shouldn't get, that I think that you should

24 be entitled to get that kind of information.

25 　　　　　MR. EPPS:  I meant in the sense that it hadn't been

**J&J COURT TRANSCRIBERS, INC.**

1  approved as a -- as part of the disclosure process, but that --

2            THE COURT:  I understand.

3            MR. EPPS:  All right.  Thank you, Your Honor.

4            THE COURT:  All right.  Any other party wish to be

5  heard in connection with this matter?

6            ALL COUNSEL:  (No verbal response)

7            THE COURT:  Mr. Dickerson?

8            MR. DICKERSON:  Thank you, Your Honor.  Your Honor,

9  with that, I think that that concludes the discussion of the

10  various objections and I think the only remaining objection is

11  Mr. Epps' client's objection and so I would -- we would -- the

12  co-proponents would request that that objection be overruled.

13            THE COURT:  All right.  Well, the Court is going to

14  overrule the objection but with this caveat and that is that

15  you do engage in informal discovery with Mr. Epps so that he

16  can get the information that he thinks is necessary for

17  purposes of any objection that he might want to file to

18  confirmation based on substantive consolidation and if for some

19  reason the parties can't agree on what information is

20  appropriate or whatever, then I would entertain a motion by Mr.

21  Epps to -- for formal discovery shortening discovery periods

22  and the like so that his clients be protected and I don't think

23  that it's receiving information outside the disclosure

24  statement.  I think it goes to plan confirmation issues.

25            MR. DICKERSON:  Your Honor, we -- we agree to that,

116

1  obviously, and we agree with you and I would further say to any

2  -- any party, prior to filing a confirmation objection of any

3  sort whether it be substantive consolidation or any other

4  issue, please contact either the Committee or the debtors

5  because we would like to try to find a way to resolve that.

6  We're trying to make this a cooperative process and we hope to

7  limit the number of actual objections that you'll need to

8  consider on November 23rd.

9          THE COURT:  Oh, the Court will be very encouraged by

10 that and, you know, I -- I've got to say that given the limited

11 number of objections we had to the disclosure statement, I

12 think speaks strongly to that, that it has -- it appears to the

13 Court to have been a cooperative effort and that, you know,

14 parties are getting information that they want and issues are

15 being resolved in that kind of a manner and, like I said, that

16 is encouraging and so hopefully that -- that will continue and

17 we'll be able to get to confirmation.

18         MR. DICKERSON:  Oh, one -- one item I forgot to

19 mention in all the discussions, Your Honor, is you may have

20 been -- you may have seen in the amended disclosure statement

21 that we described that we have reached a settlement with the

22 PBGC.  We will be filing a motion for -- under Bankruptcy Rule

23 9019 with respect to that settlement.  That will resolve all

24 the claim issues and that the PBGC has within the case and so

25 we're happy to include that as part of this process and you can

117

1  anticipate that that will likely -- hopefully be heard even

2  prior to confirmation so that we can get those issues resolved.

3          THE COURT:  All right.  Well, that's encouraging, as

4  well.  All right.  Is -- are there any other matters that we

5  need to -- now, we've resolved the disclosure statement with

6  the proposed changes that you've set forth in your chart.  The

7  Court is going to approve the disclosure statement, you know,

8  as -- as amended.

9          MR. DICKERSON:  Thank you, Your Honor, and I -- I

10  guess just as a catch-all, I would request that the relief

11  requested in the solicitation procedures motion which includes

12  finding that the -- the disclosure statement is adequate and be

13  approved on the terms that we described here in court and in

14  the pleadings.

15          THE COURT:  And that's item number 12 on the docket

16  and the Court will approve or grant that motion, as well.  Is

17  there any other business then that we need to take up today?

18          MR. DICKERSON:  No, Your Honor.

19          THE COURT:  All right.  Well, good luck with the

20  solicitation and we look forward to seeing you at the

21  confirmation hearing.

22          MR. DICKERSON:  Thank you, Your Honor.

23          THE CLERK:  All rise.  Court is now adjourned.

24                        * * * * *

25

**J&J COURT TRANSCRIBERS, INC.**

118

# **C E R T I F I C A T I O N**

I, JOY K. BRENNAN, the assigned transcriber, do hereby certify the foregoing transcript of proceedings is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate compressed transcript of the proceedings as recorded, to the best of my ability.


/s/ Joy K. Brennan

JOY K. BRENNAN

J&J COURT TRANSCRIBERS, INC.  DATE:    October 13, 2009

**J&J COURT TRANSCRIBERS, INC.**