# Exhibit 1 —
# Namken Affidavit

Robert A. Dybing, Esq. (VSB #32712)
THOMPSONMcMULLAN P.C.
100 Shockoe Slip
Richmond, Virginia 23219
Telephone: (804) 649-7545
Facsimile: (804) 780-1813
Email: rdybing@t-mlaw.com

Christopher R. Belmonte, Esq. (CB-2163)
SATTERLEE STEPHENS BURKE
    & BURKE LLP
230 Park Avenue
New York, New York 10169
Telephone: (212) 818-9200
Facsimile: (212) 818-9606
Email: cbelmonte@ssbb.com

Attorneys for International Business
Machines Corporation

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

----------------------------------------------------x
In re:                                       :        Chapter 11
                                             :
CIRCUIT CITY STORES, INC., et al.,           :        Case No. 08-35653 (KRH)
                                             :
                    Debtors.                 :        (Jointly Administered)
----------------------------------------------------x

**AFFIDAVIT OF VICKY NAMKEN IN SUPPORT OF
OBJECTION OF INTERNATIONAL BUSINESS MACHINES
CORP. TO DEBTORS' OBJECTION TO CERTAIN
GENERAL UNSECURED CLAIMS FOR VOTING PURPOSES ONLY**

STATE OF TEXAS           )
                         ) ss.:
COUNTY OF DALLAS         )

VICKY NAMKEN, being duly sworn, deposes and says:

1.      I am a National Bankruptcy/LAR Coordinator- CSO West for

International Business Machines Corporation ("IBM"), and IBM has charged me with the

responsibility for preparing and filing the proofs of claims on behalf of IBM in this

bankruptcy case. As such, I am fully familiar with the facts and circumstances set forth

herein and submit this affidavit in support of IBM's Objection to the Debtors' Objection

to Certain General Unsecured Claims for Voting Purposes Only, dated September 21,

2009 [Docket No. 5022] (the "Voting Objection").

      2.      It is my understanding that, pursuant to the Voting Objection, the

Debtors are seeking to reduce temporarily for voting purposes only IBM's Claim No.

14563 in the amount of $44,966,354 to a claim in the amount of $25,666,364. IBM's

Claim No. 14563 is an amended proof of claim, arising from the rejection of an

agreement between IBM and Circuit City Stores, Inc. ("Circuit City"), and the rejection

damages set forth therein are provided expressly by the contract between the parties.

      3.      Specifically, Circuit City and IBM are parties to that certain

Information Technology Outsourcing Master Services Agreement, dated March 23, 2007,

as amended from time to time, including all associated statements of work and all

associated contract change requests and project change requests (collectively, the "Master

Services Agreement"), pursuant to which IBM agreed to provide certain equipment,

software, and services to Circuit City. A copy of the Master Services Agreement,

without exhibits, is annexed hereto as Exhibit A.

      4.      The Debtors and IBM entered into a Stipulation, Agreement and

Order by and among the Debtors and International Business Machines Corporation for

Rejection of Certain Executory Contracts and Related Relief (the "Stipulation"), made as

of April 30, 2009 [Docket No. 3579]. On or about June 10, 2009, this Bankruptcy Court

783919_1

entered an order approving the Stipulation in its entirety. True copies of the Stipulation, without exhibits, and the corresponding order are annexed hereto as Exhibit B.

5.     The Stipulation provided for the rejection of the Master Services Agreement as of April 30, 2009. Stipulation, ¶ 1. The Stipulation further provided that IBM may file one or more proofs of claim resulting from the rejection of the Master Services Agreement on or prior to June 30, 2009. Stipulation, ¶ 8.

6.     In accordance with the Stipulation, on or about June 19, 2009, IBM filed a general unsecured proof of claim for damages incurred in connection with the rejection of the Master Services Agreement in the amount of $37,860,457 (Claim No. 13551). A true copy of Claim No. 13551 is annexed hereto as Exhibit C.

7.     On or about August 24, 2009, IBM filed an amendment to Claim No. 13551, and pursuant to this amended claim, IBM asserts a general unsecured claim in the amended amount of $44,966,364 in connection with the damages arising from the rejection of the Master Services Agreement (Claim No. 14563). A true copy of Claim No. 14563, containing affiant's relevant contact information, is annexed hereto as Exhibit D.

8.     By the Voting Objection, the Debtors seek to reduce Claim No. 14563 by $19,300,000, which amount corresponds precisely to the amount of "termination fees" authorized by the Master Services Agreement (as set forth in the spreadsheet annexed to IBM's Claim No. 14563). In this regard, the Master Services Agreement (at section 26.01) provides that Circuit City may terminate the agreement for convenience, and, upon the effective date of the termination, pay to IBM a Convenience Termination Fee. Exhibit A, p. 42. Exhibit 1.01 to the Master Services Agreement

(Master List of Defined Terms), annexed hereto as Exhibit E, defines "Termination for Convenience Fee" as meaning, with respect to any termination of the Master Services Agreement pursuant to section 26.01 therein, the applicable amount specified in Exhibit 18.01 (Pricing and Financial Provisions) to the agreement. Exhibit 18.01 provides (at Section 9- Termination Charges) that, if Circuit City terminates the Master Services Agreement for convenience, it will pay IBM (i) the Termination Charges set forth in Attachment 18.01-1 (Pricing Tables) and (ii) IBM's Wind Down Charges. A true copy of Exhibit 18.01 to the Master Services Agreement is annexed hereto as Exhibit F.

9.      Circuit City's termination or rejection of the Master Services Agreement occurred in the first month of the third year of that agreement. According to Exhibit 18.01-1 (Pricing Tables- Termination Fees), annexed hereto as Exhibit G, IBM is entitled to the payment of $19,300,000 in termination charges for any termination in "Month 1" of "Year 3" of the Master Services Agreement. Exhibit G, p. 3. As such, the $19,300,000 included in IBM's Claim No. 14563, the amount by which the Debtors seek to reduce that claim for voting purposes, is provided for contractually under the Master Services Agreement and is properly included in that claim as part of IBM's rejection damages calculations.


VICKY NAMKEN

Sworn to before me this
16th day of October, 2009

Notary Public

PAMELA S. OPIPARE
Notary Public, State of Texas
My Commission Expires
February 25, 2013

783919_1

# Exhibit A to
# Namken Affidavit

# Information Technology Outsourcing

# Master Services Agreement

### between

### Circuit City Stores, Inc.

### and

## International Business Machines Corporation

### March 23, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ I

TABLE OF EXHIBITS .................................................................................................. I

ARTICLE 1 PURPOSE, DEFINITIONS, CONSTRUCTION. ...................................... 1

| | | |
|---|---|---|
| 1.01. | Definitions | 1 |
| 1.02. | Incorporation and References | 1 |
| 1.03. | Headings | 1 |
| 1.04. | Interpretation of Documents | 1 |

ARTICLE 2 TERM. ..................................................................................................... 1

| | | |
|---|---|---|
| 2.01. | Initial Term | 1 |
| 2.02. | Renewal and Extension | 1 |

ARTICLE 3 SERVICES. .............................................................................................. 2

| | | |
|---|---|---|
| 3.01. | Generally | 2 |
| 3.02. | Additional Circuit City Service Recipients. | 2 |
| 3.03. | Non-Exclusive Arrangement. | 2 |
| 3.04. | Acquisition-Related Support. | 2 |
| 3.05. | New Services | 3 |
| 3.06. | Request for Proposal Assistance | 4 |
| 3.07. | Transition | 4 |
| 3.08. | Joint Verification Period | 6 |

ARTICLE 4 ADDITIONAL SERVICE REQUIREMENTS ............................................. 6

| | | |
|---|---|---|
| 4.01. | Provision of Technology | 6 |
| 4.02. | Licenses and Permits | 7 |
| 4.03. | Changes in Regulatory Requirements. | 7 |
| 4.04. | Technical Architecture Standards | 8 |
| 4.05. | Knowledge Sharing | 8 |
| 4.06. | Reports. | 8 |
| 4.07. | Purchasing Agent | 9 |
| 4.08. | Service Compatibility. | 9 |
| 4.09. | Circuit City Authority. | 9 |
| 4.10. | Refresh and Standardization. | 10 |
| 4.11. | Efficiency and Cost Effectiveness | 10 |
| 4.12. | Regulatory Compliance | 10 |
| 4.13. | Gainsharing Proposals | 11 |

ARTICLE 5 AFFECTED EMPLOYEES. ...................................................................... 11

| | | |
|---|---|---|
| 5.01. | Affected Employees. | 11 |
| 5.02. | Transition of Affected Employees. | 12 |
| 5.03. | Continuity Requirements. | 12 |

ARTICLE 6 CIRCUIT CITY RESPONSIBILITIES. ..................................................... 12

| | | |
|---|---|---|
| 6.01. | Circuit City Contract Executive | 12 |
| 6.02. | Circuit City Contract Manager | 12 |
| 6.03. | Circuit City Resources | 12 |
| 6.04. | Use of Circuit City Locations. | 12 |

ARTICLE 7 CONTRACT ADMINISTRATION. ........................................................... 13

| 7.01. | Shared Agreements | 13 |
| 7.02. | Shared Agreement Invoices | 14 |
| 7.03. | Assumed Agreements | 14 |
| 7.04. | Performance under Circuit City Third Party Contracts | 14 |
| 7.05. | Retained Agreements | 15 |
| 7.06. | Extensions | 15 |
| 7.07. | Terminated IBM-CCS Agreements | 15 |
| 7.08. | Managed IBM-CCS Agreements | 15 |

**ARTICLE 8 SERVICE LEVELS.** ........................................................................ **15**

| 8.01. | Service Levels Generally | 15 |
| 8.02. | Root Cause Analysis | 15 |
| 8.03. | Service Level Credits | 16 |
| 8.04. | Service Level Termination Rights | 16 |
| 8.05. | Service Level Maintenance | 16 |

**ARTICLE 9 CUSTOMER SATISFACTION AND MARK TO MARKET.** .................... **16**

| 9.01. | Executive Client Survey | 16 |
| 9.02. | POS Customer Satisfaction Survey. | 17 |
| 9.03. | Customer Satisfaction Generally. | 17 |
| 9.04. | Mark to Market. | 17 |

**ARTICLE 10 SERVICE LOCATIONS.** ................................................................ **18**

| 10.01. | IBM Service Locations Generally | 18 |
| 10.02. | Changes in Circuit City Locations or IBM Service Locations. | 18 |

**ARTICLE 11 SECURITY.** ................................................................................ **18**

| 11.01. | Safety and Security Procedures | 18 |
| 11.02. | Data Security | 19 |
| 11.03. | Security Relating to Competitors | 19 |

**ARTICLE 12 IBM STAFF.** .............................................................................. **19**

| 12.01. | IBM Project Executive. | 19 |
| 12.02. | IBM Delivery Project Executive | 19 |
| 12.03. | Key IBM Positions. | 19 |
| 12.04. | Project Staff | 20 |
| 12.05. | Subcontracts. | 20 |
| 12.06. | Conduct of IBM Personnel. | 21 |
| 12.07. | Non-Competition | 21 |

**ARTICLE 13 MANAGEMENT AND CONTROL.** .................................................. **22**

| 13.01. | Management Committee. | 22 |
| 13.02. | Governance | 22 |
| 13.03. | Policy and Procedures Manual. | 22 |
| 13.04. | Change Control Procedures and Change Management | 23 |

**ARTICLE 14 SOFTWARE AND PROPRIETARY RIGHTS.** .................................... **24**

| 14.01. | Circuit City Software | 24 |
| 14.02. | IBM Software. | 24 |
| 14.03. | IBM New Intellectual Property. | 25 |
| 14.04. | Circuit City New Intellectual Property. | 25 |
| 14.05. | Residual Knowledge | 25 |

**ARTICLE 15 DATA.** ........................................................................................................... 26

15.01.  Ownership of Circuit City Data ................................................................. 26
15.02.  Correction of Errors.................................................................................. 26
15.03.  Access to Data.......................................................................................... 26
15.04.  Return of Data .......................................................................................... 26
15.05.  Record Retention ...................................................................................... 26
15.06.  Certain Privacy Related Matters ............................................................. 26

**ARTICLE 16 CONSENTS.** .................................................................................................. 27

16.01.  Consents Generally. ................................................................................. 27
16.02.  Inability to Obtain Consent. ..................................................................... 27
16.03.  Approval of Communications. .................................................................. 27

**ARTICLE 17 CONTINUED PROVISION OF SERVICES.** ................................................... 27

17.01.  Disaster Recovery..................................................................................... 27
17.02.  Force Majeure............................................................................................ 28
17.03.  Force Majeure Event Exclusions ............................................................ 29
17.04.  Allocation of Resources ........................................................................... 29

**ARTICLE 18 PAYMENTS.** .................................................................................................. 29

18.01.  Pricing and Financial Provisions ............................................................ 29
18.02.  Rights of Set-Off ...................................................................................... 29
18.03.  Proration ................................................................................................... 29
18.04.  Unused Credits ......................................................................................... 29
18.05.  Reductions in Costs .................................................................................. 29
18.06.  Timely Invoices. ........................................................................................ 30

**ARTICLE 19 PAYMENT SCHEDULE AND INVOICES.** .................................................... 30

19.01.  Base Charges and Variable Charges........................................................ 30
19.02.  Consolidated Fee Report .......................................................................... 30
19.03.  Currency and Time of Payment. .............................................................. 30
19.04.  Detailed Invoices....................................................................................... 31

**ARTICLE 20 TAXES.** ......................................................................................................... 31

20.01.  Services Taxes Generally ......................................................................... 31
20.02.  Services Taxes Incurred Due to Certain Relocations.............................. 31
20.03.  Other Taxes ............................................................................................... 31
20.04.  Customs and Other Similar Duties.......................................................... 32
20.05.  Cooperation .............................................................................................. 32
20.06.  Tax Audits or Proceedings....................................................................... 32

**ARTICLE 21 AUDITS.** ........................................................................................................ 33

21.01.  Services Audits. ........................................................................................ 33
21.02.  Charges Audits. ........................................................................................ 34
21.03.  Facilities. ................................................................................................... 35
21.04.  Disclosure Restrictions. ........................................................................... 35
21.05.  Audit Assistance. ..................................................................................... 35

**ARTICLE 22 CONFIDENTIALITY.** ..................................................................................... 35

22.01.  General Obligations. ................................................................................. 35
22.02.  Unauthorized Acts.................................................................................... 36

22.03. Attorney-Client Privilege. ........................................................................... 36

**ARTICLE 23 REPRESENTATIONS AND WARRANTIES.** ....................................... 37

23.01. By Circuit City Stores ............................................................................. 37
23.02. By IBM Corporation. .............................................................................. 38
23.03. **DISCLAIMER OF WARRANTIES** ......................................................... 39

**ARTICLE 24 ADDITIONAL COVENANTS.** ............................................................ 39

24.01. By Circuit City Stores ............................................................................. 39
24.02. By IBM Corporation. .............................................................................. 39

**ARTICLE 25 DISPUTE RESOLUTION.** ................................................................. 40

25.01. Management Committee. ........................................................................ 40
25.02. Executive Committee. ............................................................................ 41
25.03. Fee Dispute Resolution. ......................................................................... 41
25.04. Continuity of Services ............................................................................ 42

**ARTICLE 26 TERMINATION.** ............................................................................... 42

26.01. Termination for Convenience. ................................................................ 42
26.02. Termination for Change in Control of IBM .............................................. 42
26.03. Termination for Cause. .......................................................................... 42
26.04. Other Terminations ............................................................................... 43
26.05. Extension of Termination Effective Date ................................................ 43
26.06. Savings Clause ..................................................................................... 43

**ARTICLE 27 TERMINATION CHARGES.** ............................................................. 43

27.01. No Other Termination Charges .............................................................. 43

**ARTICLE 28 TERMINATION ASSISTANCE.** ........................................................ 43

28.01. Termination Assistance Services. .......................................................... 43
28.02. Exit Rights. ........................................................................................... 44
28.03. Hiring of Project Staff ............................................................................ 45

**ARTICLE 29 INDEMNITIES.** ................................................................................ 45

29.01. Indemnity by Circuit City Stores ............................................................ 45
29.02. Indemnity by IBM .................................................................................. 46
29.03. Additional Indemnities ........................................................................... 47
29.04. Infringement ......................................................................................... 47
29.05. Indemnification Procedures ................................................................... 47
29.06. Exceptions to Infringement Indemnity. ................................................... 48

**ARTICLE 30 DAMAGES.** ..................................................................................... 48

30.01. Damages. ............................................................................................. 48
30.02. Liability Limitations and Exceptions. ...................................................... 48
30.03. Direct Damages. ................................................................................... 49
30.04. Duty to Mitigate. ................................................................................... 49

**ARTICLE 31 INSURANCE.** .................................................................................. 49

31.01. Insurance ............................................................................................. 49
31.02. Insurance Documentation ...................................................................... 49
31.03. Risk of Loss ......................................................................................... 50

**ARTICLE 32 MISCELLANEOUS PROVISIONS.** .................................................................................... 50
32.01. Assignment. ................................................................................................... 50
32.02. Notices .......................................................................................................... 50
32.03. Counterparts ................................................................................................. 50
32.04. Relationship .................................................................................................. 51
32.05. Severability and Modification ....................................................................... 51
32.06. Waivers ......................................................................................................... 51
32.07. Cumulative Remedies ................................................................................... 51
32.08. Entire Agreement ......................................................................................... 52
32.09. Amendments ................................................................................................. 52
32.10. Survival ......................................................................................................... 52
32.11. Third Party Beneficiaries .............................................................................. 52
32.12. Governing Law .............................................................................................. 52
32.13. Sole and Exclusive Venue ........................................................................... 52
32.14. Injunctive Relief ............................................................................................ 52
32.15. Covenant of Further Assurances ................................................................. 53
32.16. Negotiated Terms ......................................................................................... 53
32.17. Conflict of Interest ........................................................................................ 53
32.18. Publicity ......................................................................................................... 53
32.19. Good Faith and Fair Dealing ........................................................................ 53

# TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit 1.01 | Master List of Defined Terms |
| | Attachment 1.01-A – Master List of Technical Acronyms |
| | Attachment 1.01-B – IBM Competitors |
| | Attachment 1.01-C – Circuit City Competitors |
| Exhibit 3.01(1) | Statements of Work |
| | Attachment A-1 – Cross Functional Services |
| | Attachment A-2 – Service Desk Services |
| | Attachment A-3 – Infrastructure Services |
| | Attachment A-4 – Intentionally Omitted |
| | Attachment A-5 – Desktop Support Services |
| | Attachment A-6(A) – Store Support Services |
| | Attachment A-6(B) – Store Engineering & Architecture Support Services |
| | Attachment A-7 – Network Services |
| | Attachment A-8 – Projects |
| Exhibit 3.01(2) | Base Case |
| | Attachment 3.01.1(2) – Base Case Data |
| Exhibit 3.02 | Circuit City Service Recipients |
| Exhibit 3.08 | Transition Plan |
| Exhibit 4.01 | Financial Responsibility Matrix |
| Exhibit 4.04 | Technical Architecture Standards |
| Exhibit 4.05 | IBM Technical Solution Document |
| Exhibit 4.06 | Reports |
| Exhibit 5.01 | Affected Employees |
| Exhibit 5.02 | Human Resources Provisions |
| | Attachment 5.02-A – HR Transition Plan |
| | Attachment 5.02-B – Potential IBM Employee Data Fields |
| | Attachment 5.02-C – Secondment Provisions |
| Exhibit 6 | Circuit City Personnel Projection Matrix |
| Exhibit 7 | Shared Agreements, Assumed Agreements, and Retained Agreements |
| Exhibit 8.01 | Service Level Methodology |
| | Attachment 8-1 – SLA Matrix |
| | Attachment 8-2 – Service Level Descriptions |
| | Attachment 8-3 – Transition Milestones and Deliverable Credits |

*CCS-IBM IT Outsourcing Agreement*                              *Information Technology Outsourcing Master Services Agreement*

|                 |                                           |
|-----------------|-------------------------------------------|
|                 | Attachment 8-4 – Intentionally Omitted    |
|                 | Attachment 8-5 – Severity Levels          |
| Exhibit 9.02    | POS Customer Satisfaction Survey          |
| Exhibit 9.04(1) | Approved Advisors                         |
| Exhibit 9.04(2) | Mark to Market Process                    |
| Exhibit 10      | Service Locations                         |
| Exhibit 11.01   | Circuit City Policies                     |
| Exhibit 12.03   | Key IBM Positions                         |
| Exhibit 12.05   | Approved Subcontractors                   |
| Exhibit 13.02   | Governance Model                          |
| Exhibit 14.01   | Circuit City Software                     |
| Exhibit 14.02   | IBM Software                              |
| Exhibit 17.01   | Circuit City Disaster Recovery Plan       |
| Exhibit 18.01   | Pricing and Financial Provisions          |
|                 | Attachment 18.01-1 – Pricing Tables       |
| Exhibit 19.04   | Form of Invoice                           |

This INFORMATION TECHNOLOGY OUTSOURCING MASTER SERVICES AGREEMENT dated March 23, 2007 is among CIRCUIT CITY STORES, INC., a Virginia corporation, and INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation. For and in consideration of the agreements set forth below, Circuit City Stores and IBM Corporation do agree as follows:

## ARTICLE 1  PURPOSE, DEFINITIONS, CONSTRUCTION.

1.01.   Definitions. Capitalized terms used in this Agreement have the meanings set forth in Exhibit 1.01 (Master List of Defined Terms).

1.02.   Incorporation and References. In this MSA and the Exhibits to this MSA:

    (1)    the Exhibits to this MSA shall be incorporated into and deemed part of this MSA and all references to this MSA shall include the Exhibits to this MSA;

    (2)    references to an Exhibit, Article or Section shall be to such Exhibit to, Article or Section of this MSA, unless otherwise provided;

    (3)    references to an Exhibit to this MSA shall include the Appendices and attachments to such Exhibit;

    (4)    references to any Law means references to such Law in amended, supplemented or replaced form;

    (5)    the defined terms include the plural as well as the singular and the derivatives of such terms; and

    (6)    references to and mentions of the word "including" (and its grammatical variations) or the phrase "e.g." means "including, without limitation."

1.03.   Headings. The Article and Section headings, Table of Contents and Table of Exhibits are for reference and convenience only and shall not be considered in the interpretation of this Agreement.

1.04.   Interpretation of Documents. Except as otherwise expressly set forth in this MSA, in the event of a conflict between the Articles and Sections of this MSA and any Exhibit to this MSA, the Articles and Sections of this MSA shall prevail.

## ARTICLE 2  TERM.

2.01.   Initial Term. The initial term of this Agreement shall commence on the Effective Date and continue until 23:59 Eastern Time on the Expiration Date, or such earlier date upon which this Agreement may be terminated pursuant to Article 26.

2.02.   Renewal and Extension. Unless this Agreement is terminated earlier pursuant to Article 26, 12 months prior to the Expiration Date, IBM Corporation will propose terms and conditions to Circuit City Stores for renewing this Agreement. Circuit City Stores shall notify IBM Corporation at least 180 days prior to the Expiration Date as to whether Circuit City Stores desires to renew this Agreement. If Circuit City Stores notifies IBM Corporation that it does not desire to renew this Agreement, this Agreement shall expire on the Expiration Date. If Circuit

City Stores provides IBM Corporation with notice that it desires to renew this Agreement and Circuit City Stores and IBM Corporation have not agreed upon the ter ms and conditions applicable to the renewal of this Agreement 90 days prior to the Expiration Date or end of the first Extension Period, then at the election of Circuit City Stores the term of this Agreement shall extend for a period of up to 6 months from the Expiration Date or end of the first Extension Period, at the charges, terms and conditions in effect as of the Expiration Date or end of the first Extension Period. Circuit City Stores has the right to exercise the foregoing extension option 4 times for aggregate extensions of up to 24 months. If, during the fourth Extension Period, the Parties do not reach agreement on the terms and conditions applicable to the renewal of this Agreement, this Agreement shall expire at the end of such Extension P eriod.

## ARTICLE 3 SERVICES.

3.01. <u>Generally</u>. Commencing as of the Service Commencement Date and conti nuing throughout the Term, IBM shall coordinate and be responsible for providing to the Circuit City Service Recipients the Services, in each case as such Services may be supplemented, enhanced, modified or replaced in accordance with this Agreement.

3.02. <u>Additional Circuit City Service Recipients</u>. <u>Exhibit 3.02</u> (Circuit City Service Recipients) sets forth, as of the Effective Date, the Ci rcuit City Service Recipients to which IB M will provide Services. Circuit City Stores reserves and has the right to designate from time to time, upon not less than 10 Business Days notice to IBM Corporation, additional Circuit City Service Recipients in accordance with the Change Contr ol Procedures. Within 5 Business Days after providing IBM Corporation with such notice, the Parties will meet and discuss a implementation plan and timeline for IBM to begin providing Services to the new Circuit City Service Recipient. Subject to Circuit City Stores' rights and obligations under <u>Article 18</u> and <u>Article 19</u>, Circuit City Stores agrees that it will be financially responsible for all Services rendered to any Circuit City Service Recipient.

3.03. <u>Non-Exclusive Arrangement</u>. Nothing in this Agreement is intended to create an exclusive arrangement between Circuit City Stores and IBM Corporation with respect to the Services. Circuit City may, at any time upon notice to IB M Corporation, perform for itself or engage any thir d party to provide all, or any portion, of the Services, in which event IB M shall cooperate with such third party in accordance with <u>Section 4.08</u>; provided that any such self-performance or engagement of a third party by Circuit City shall not relieve Circuit City of its obligation to pay the M inimum Annual Revenue C ommitment for the applicable period, as set forth and further described in <u>Exhibit 18.01</u> (Pricing and Financial Provisions). Nothing in this Agreement shall limit Circuit City's right to contract with other technol ogy or other suppliers to jointly pursue the Circuit City's business opportunities.

3.04. <u>Acquisition-Related Support</u>.

(1)    As requested by Circuit City Stores with respect to an acquisition, IB M will provide acquisition support (including assessments, transition planning and migration support) and subsequently, if requested by Circuit City Stores, provide the Services as they apply to the acqui red entity or assets at the then-current terms and conditions.

(2)    As requested by Circuit City Stores, IBM will provide Project Staff to manage the in-scope technology, processes, and functions needed to support an acquisition,

including at the locations of the acquired entity or assets at the then current terms and conditions.

(3)     From time to time, Circuit City may divest some or all interests in its business units or Affiliates. In such an event, IBM will continue to provide the Services to such divested unit or Affiliate as a Circuit City Service Recipient under this Agreement for up to 12 months, or any longer period as agreed by the Parties, at Circuit City Stores' request pursuant to the then-current terms and conditions. In addition, during such period, IBM will provide transition support Services to Circuit City and the entity acquiring such unit or Affiliate similar to those described in Section 3.04(1) above with respect to acquisitions. Circuit City Stores shall remain responsible for the payment and other contractual obligations in connection with the Services provided to such divested units or Affiliates.

(4)     IBM shall provide a transition plan for each acquisition and divestiture, which plan shall provide a framework for addressing Services and Service Level issues.

(5)     IBM's expenses associated with acquisition and divestiture support, start-up and transition efforts in connection with any acquisition and divestiture shall be separately chargeable to Circuit City only to the extent that such efforts constitute a Chargeable Change; provided, however, that in lieu of paying any acquisition support, start-up or transition costs that would otherwise be separately chargeable, Circuit City may, in its discretion, reprioritize existing resources and, if appropriate, provide Service Level relief as requested and identified specifically by IBM.

3.05.   New Services.

(1)     Circuit City Stores may from time to time during the Term, but is not obligated to, request that IBM perform a New Service. Upon receipt of such a request from Circuit City Stores for a New Service, the IBM and Circuit City shall meet to discuss, elaborate on and understand Circuit City's requirements, schedule, and other details pertaining to Circuit City's request. IBM shall within 15 days of receipt of Circuit City's firm requirements (or such longer period as required and agreed upon for complex proposals), provide Circuit City Stores with a written proposal for such New Service, which shall include: (a) a description of the services, functions and responsibilities IBM anticipates performing in connection with such New Service and the proposed New Service Levels; (b) a description of the services, functions and responsibilities IBM proposed to be retained by Circuit City in connection with such New Services; (c) a schedule for commencing and completing such New Service and any associated transition or implementation plan; (d) IBM's prospective Charges for such New Service, including a detailed breakdown of such Charges, and any other financial responsibilities of the Parties; (e) when appropriate, a description of any new Software or Equipment to be provided by IBM in connection with such New Service; (f) when appropriate, the Software and Equipment and run-time requirements necessary to develop and operate any new Software; (g) when appropriate, a description of the human resources necessary to provide the New Service; (h) when appropriate, and subject to the rights and obligations under Articles 14 and Article 16, a list of any existing Software or Equipment included in or to be used in connection with such New Service; (i) when appropriate,

acceptance test criteria and procedures for any new Software or any products, packages or services; and (j) such other information requested by Circuit City Stores.

(2)     Circuit City shall not be under any obligation to accept any proposal presented by IBM with respect to any New Service.

(3)     IBM shall not, and shall not be obligated to, begin performing any New Service, and Circuit City shall not be obligated to pay for any New Service, until Circuit City Stores has provided IBM with authorization to perform the New Service in a Work Authorization and the Parties have executed a New Statement of Work with respect to such New Service.

(4)     Notwithstanding any request made to IBM by Circuit City Stores, Circuit City has the right to contract with a third party to perform any New Service, including systems operations and related services to augment or supplement the Services or to interface with the Software or the Equipment used to provide the Services. Upon Circuit City's request, IBM shall assist Circuit City in identifying qualified third party suppliers to provide New Services. In the event Circuit City contracts with a third party to perform a New Service, IBM shall cooperate in good faith with Circuit City and any such third party as provided in Section 4.08.

3.06.   Request for Proposal Assistance. IBM shall provide Circuit City with then available information related to the Services that Circuit City reasonably requests during the Term to enable Circuit City to draft a request for proposals relating to the Services and to provide due diligence information for recipients of such requests. IBM acknowledges that it may not be a recipient of such a request for proposals.

3.07.   Transition.

(1)     During the Transition Period, IBM shall perform the Transition Services and provide the deliverables described in the Transition Plan attached hereto as Exhibit 3.08 (Transition Plan) and in Attachment 8-3 (Transition Milestones and Deliverable Credits). If any services, functions or responsibilities not specifically described in the Transition Plan are required for the proper performance of the Transition Services in accordance with this Agreement, they shall be deemed to be included within the scope of the Transition Services, as if such services, functions or responsibilities were specifically described in the Transition Plan, unless and to the extent such services, functions or responsibilities meet the definition of New Services. During the Transition Period, Circuit City will perform those tasks which are designated to be Circuit City's responsibility in the Transition Plan; provided that, Circuit City shall not be obligated to perform any tasks during the Transition Period that are not set forth in such Transition Plan, other than those that are an inherent, necessary or customary part of the tasks that are designated to be Circuit City's responsibility in the Transition Plan. Unless otherwise agreed, Circuit City shall not incur any Charges or expenses payable to IBM in connection with the Transition Services, other than those Charges and expenses specified in Exhibit 18.01 (Pricing and Financial Provisions) and those incurred by Circuit City in connection with its performance of tasks designated as Circuit City's responsibility as set forth herein.

(2)     The Transition Plan identifies, among other things: (a) the transition activities to be performed by IBM and the significant components of each such activity, (b) all deliverables to be completed by IBM, (c) the Transition Milestones, (d) a process and set of standards acceptable to Circuit City to which IBM shall adhere in the performance of the Transition Services and that will enable Circuit City to determine whether IBM has successfully completed the transition and the activities and deliverables associated with each Transition Milestone, (e) the contingency or risk mitigation strategies to be employed by IBM in the event of disruption or delay, (f) any transition responsibilities to be performed or transition resources to be provided by Circuit City or any Circuit City Service Recipient, and (g) a detailed work plan identifying the specific transition activities to be performed by IBM on a weekly basis during the Transition Period. The Transition Plan also shall identify any related documents contemplated by this Agreement and/or required to effectuate the transition to be executed by the Parties.

(3)     IBM shall perform the Transition Services in accordance with the timetable in the Transition Plan and the Transition Milestones. IBM shall perform the Transition Services in a manner that will not (a) materially disrupt or have an unnecessary adverse impact on the business or operations of Circuit City or the Circuit City Service Recipients, (b) materially degrade the Services then being received by Circuit City or the Circuit City Service Recipients, or (c) materially disrupt or interfere with the ability of Circuit City or the Circuit City Service Recipients to obtain the full benefit of the Services, except as may be otherwise provided in the Transition Plan. Prior to undertaking any transition activity, IBM shall discuss with Circuit City all known Circuit City-specific material risks and shall not proceed with such activity until Circuit City is reasonably satisfied with the plans with regard to such risks (provided that, neither IBM's disclosure of any such risks to Circuit City, nor Circuit City's acquiescence in IBM's plans, shall operate or be construed as limiting IBM's responsibilities under this Agreement). IBM shall identify and resolve, with Circuit City's reasonable assistance, any problems that may impede or delay the timely completion of each task in the Transition Plan that is IBM's responsibility and shall use all commercially reasonable efforts to assist Circuit City with the resolution of any problems that may impede or delay the timely completion of each task in the Transition Plan that is Circuit City's responsibility.

(4)     IBM shall meet at least weekly with Circuit City to report on its progress in performing its responsibilities and meeting the timetable set forth in the Transition Plan. IBM also shall provide written reports to Circuit City at least weekly regarding such matters, and shall provide oral reports more frequently if reasonably requested by Circuit City. Promptly upon receiving any information indicating that IBM may not perform its responsibilities or meet the timetable set forth in the Transition Plan, IBM shall notify Circuit City in writing of material delays and shall identify for Circuit City's consideration and approval specific measures to remediate such delay and mitigate the risks associated therewith.

(5)     If IBM fails to meet a Transition Milestone, IBM shall be subject to the imposition of the Deliverable Credits specified in Attachment 8-3 (Transition Milestones and Deliverable Credits) for such Transition Milestone.

(6)     Notwithstanding the foregoing, Cir cuit City may terminate this Agreement for cause if (a) IBM fails to comply with its obligations with respect to the provision of Transition Services and such failure causes or will cause a material disruption to or otherwise has or will have a material adverse impact on the operations or businesses of Circuit City or any Circuit City Service Recipient and IBM fails to cure such breach within 30 days after its receipt of notice or (b) IBM materially breaches its obligations with respect to the provision of Transition Services and fails to cure such breach within 30 days after its receipt of notice. If IBM fails to meet Transition Milestone #12 as set forth i n Attachment 8-3 (Critical Milestones and Deliverable Credits) to Exhibit 8.01 (Service Level Methodology), the chief executive officer of IBM Corporation shall meet with the chief executive offi cer of Circuit City Stores at an agreed upon place and tim e. At such meeting, the chief executive officer of IBM Corporation shall explain to Circuit City Stores the reason for and a plan to remedy such failure. In all such events, subject to Article 30, Circuit City may seek to recover the damages suffered by Circuit City and the Circuit City Service Recipients in connection with s uch a termination, provided that, if such termination is based on IBM's failure to meet a Transition Milestone, IBM shall be entitled to set off against any damages otherwise payable in connection ther ewith, any Deliverable Credits IBM has paid for the failure to meet such Transition Milestone.

3.08.   Joint Verification Period.  During the Joint Verification Period, IBM will, with assistance from Circuit City, conduct a limited review of the C ircuit City third party contracts related to the Services that IBM shall not have had an opportunity to review prior to the Effective Date. Such review shall be limited to the verification of information that is reflected in, or omitted from, this Agreement with regard to such third party agreements. Within 10 days after the end of the Joint Verification Period, IBM will submit a detailed audit report of its findings to Circuit City Stores. If there exists any material inaccuracies in this Agreement that are related to (1) the financial assumptions in the base case regarding such contracts, (2) any terms of such contracts being insufficient to support the Service Levels (3) the number, type of and terms and conditions of the licenses or the maintenance provisions required for the delivery of the Services, or (4) Circuit City's failure to comply with the terms of such contracts, then IBM Corporation and Circuit City Stores agree to amend this Agreement to provide for an appropriate adjustment to the Charges, Resource Baselines and other terms of this Agreement directly affected thereby. Any disagreement regarding any such matter shall be resolved in accordance with Article 25.

## ARTICLE 4 ADDITIONAL SERVICE REQUIREMENTS.

4.01.   Provision of Technology.  In providing the Services to Circuit City, IBM shall (1) jointly with Circuit City, identify opportunities to implement new technology advantageous to Circuit City and, upon Circuit City Stores' approval, implement such new technology, (2) maintain a level of currency, knowledge and te chnology that allows Circuit City to take advantage of technological advances relating to the Services, (3) maintain a level of technology c urrency with respect to the Services competitive with other tier-one information technology ser vice providers (with respect to subsections (2) and (3) herein, subject to any specific requirements that may be set forth·in Exhibit 3.01(1) (Statements of Work), Exhibit 14.01 (Circuit City Software), Exhibit 14.02 (IBM Software), or Exhibit 4.01 (Financial Responsibility Matrix), or otherwise expressly set forth in this Agreement, as applicable), (4) offer to Circuit City an opportunity to evaluate the Improved Technology, as well as any reductions in cost as set forth in Section 18.05, in connection with the Services and, if Circuit City Stores elects to conduct such evaluation, assist Circuit City in the assessment of the Improved Technology and (5) meet with

Circuit City at least once during every 180-day period during the Term, or as requested by Circuit City Stores, in accordance with the procedures agreed upon by the Circuit City Contract Executive and IBM Project Executive, to inform Circuit City of any new processes, methodologies, technology or technology trends and directions identified by IBM and Circuit City in accordance with the Agreement.  IBM will maintain Equipment and Software to the extent that, pursuant to Exhibit 4.01 (Financial Responsibility Matrix) and subject to Section 4.10(2), IBM has maintenance responsibility for such Equipment and Software so that they operate in accordance with their specifications, including maintaining Equipment in good operating condition, subject to normal wear and tear; undertaking repairs and preventive maintenance on Equipment in accordance with the applicable Equipment manufacturer's recommendations; and performing Software maintenance in accordance with the applicable Software vendor's documentation and recommendations.

4.02.   Licenses and Permits.

(1)     IBM shall obtain and maintain all Governmental Approvals relating to IBM Regulatory Requirements.

(2)     Circuit City shall obtain and maintain all Governmental Approvals relating to Circuit City Regulatory Requirements.

(3)     Upon a Party's request, the other Party shall cooperate with and assist the requesting Party in obtaining any Governmental Approvals, to the extent reasonably possible.

4.03.   Changes in Regulatory Requirements.

(1)     In the event IBM is required to change the manner in which it provides the Services in order to meet the requirements of a change in IBM Regulatory Requirements, IBM shall implement such change at no additional cost to Circuit City.

(2)     In the event IBM is required to change the manner in which it provides the Services in order to meet (a) a Circuit City Regulatory Requirements or (b) Circuit City's internal and external audit and compliance requirements, which may be more stringent than regulatory requirements, including compliance with the Sarbanes-Oxley Act of 2002, IBM shall implement such change in accordance with the provisions of Section 4.03(3).

(3)     If (a) a change described in Section 4.03(2) does not constitute a Change, (b) is a Non-Chargeable Change or (c) Circuit City agrees to a reprioritization of the Services or a temporary waiver of the Service Levels, as required, then IBM shall implement such required changes at no additional cost to Circuit City, provided in the case of (c) such reprioritization is sufficient to allow IBM to implement such changes without incurring additional costs.  If such change cannot be so implemented, IBM shall work with Circuit City to develop a proposal, including an estimate of additional Charges to Circuit City, if any, to implement such change. IBM agrees that it will not implement such change other than in accordance with the Change Control Procedures.

(4)     While neither Party is obligated to monitor, interpret, or offer advice to the other Party regarding Regulatory Requirements of the other Party, each Party shall promptly notify the other Party of any changes in Regulatory Requirements of which it becomes aware that may relate to IBM's performance, or Circuit City's intended use, of the Services.

(5)     If any change in Circuit City Regulatory Requirements could result in a Charge increase or could impair IBM's performance of the Services, IBM shall promptly propose to Circuit City at least two Change options to modify the Services in response to such change in Circuit City Regulatory Requirements. If any change in Circuit City Regulatory Requirements results in substantial Charge increase or substantially impairs IBM's performance of any material or critical portion of the Services that Circuit City would not have incurred such increase or impairment if Circuit City were performing the Services itself, and such change results in an increase in Circuit City Store's monthly Base Charges by 5% of an affected Services Tower, then Circuit City Stores may terminate the affected Service Tower upon payment of IBM's Wind Down Expenses by providing IBM with 90 days' written notice (or such shorter period as required by Law) within six months of such change in Circuit City Regulatory Requirements. In the event that Circuit City identifies a lower cost option to modify the Services using only IBM resources and expressly excluding performance by a third party to comply with such change in Circuit City Regulatory Requirements, IBM shall implement such Change pursuant to the Change Control Procedures.

4.04.   Technical Architecture Standards. IBM and Circuit City shall comply with the information management technical architecture and products standards set forth in Exhibit 4.04 (Technical Architecture Standards), as the same may be modified by Circuit City Stores, upon notice to IBM Corporation, from time to time. IBM's costs associated with any work efforts required to comply with any change by Circuit City in such standards after the Effective Date shall be separately chargeable to Circuit City only to the extent that such efforts constitute a Chargeable Change and such Chargeable Change shall be implemented through the Change Control Procedure; provided, however, that in lieu of paying any such costs that would otherwise be separately chargeable, Circuit City may, in its discretion, reprioritize existing resources and, if appropriate, provide Service Level relief as requested and identified specifically by IBM. Circuit City Stores shall also have the right to approve or reject any and all proposed decisions regarding infrastructure design, technical platform, architecture, and standards and will have the right and authority to cause IBM at any time to change any or all of the foregoing; provided that, to the extent that any exercise of such right or authority by Circuit City Stores constitutes or results in a Change, such exercise shall be subject to the Change Control Procedures.

4.05.   Knowledge Sharing. At least once each calendar year, and upon notice from Circuit City, IBM shall (1) provide an update on the current environment used to provide the Services and (2) meet with representatives of Circuit City in order to explain any changes reflected in that update.

4.06.   Reports.

(1)     IBM shall provide to Circuit City, in a form acceptable to IBM and Circuit City Stores, the Reports.

(2)     Without limiting the foregoing, IBM will promptly provide information and other support as requested by Circuit City to assist Circuit City in developing its quarterly, semi-annual, annual and longer term financial objectives, budgets, forecasts and performance goals, to the extent such information and support can be provided with IBM's then-existing resources and tools.

4.07.   Purchasing Agent.  Subject to the provisions of the applicable reseller agreements under which IBM operates, and in accordance with the Change Control Procedures, if requested by Circuit City, IBM will (a) act as a purchasing agent for Circuit City to procure Equipment, Software, and services not within the scope of the Services and (b) will make available to Circuit City the benefit of any such Equipment, Software and service volume purchasing discounts and convey to Circuit City any other benefits offered to IBM by such third party suppliers.

4.08.   Service Compatibility.

(1)     IBM shall provide that all Resources shall be successfully integrated and interfaced, and shall be compatible, with Third Party Resources.  IBM shall provide that none of the Resources are adversely affected in a material way by, or adversely affected in a material way, the Third-Party Resources, whether as to functionality, speed, service levels, interconnectivity, reliability, availability, performance, response times, or similar measures.  To the extent that any interfaces must be developed or modified in order for the Resources to integrate successfully, and be compatible, with the Third Party Resources, IBM shall develop or modify such interfaces as part of the Services.

(2)     In addition, at all times during the Term, IBM shall cooperate with third party service providers of Circuit City to coordinate IBM's provision of the Services with Third Party Resources.  Such cooperation and access shall include: (a) interfacing and cooperating in good faith with such third party; (b) meeting with Circuit City and such third party to facilitate the orderly and efficient provision of services to Circuit City; (c) optimizing the interfaces between the Resources and any services and systems provided by such third party; (d) provided that such third party has executed a commercially reasonable non-disclosure agreement protecting the confidential information of IBM, providing information relating to the Services as may be required by such third party to provide services to Circuit City.  As reasonably requested by Circuit City Stores, IBM will provide point of contact, participate in meetings, coordinate activities and provide assistance in a timely manner.

4.09.   Circuit City Authority.  Circuit City Stores shall retain the exclusive right and authority to set Circuit City's business strategy, define marketing strategies, define offers, and determine, alter, and define any or all of Circuit City's requirements or business processes.  Circuit City Stores shall retain exclusive authority, discretion, and rights of approval for strategic and operational planning; service design and delivery for Circuit City's business; business strategy; program planning and development; brand and image development; product development; offer design; client interaction strategy; technology architecture definition; and legacy technology build and run.  IBM shall actively participate in any of the foregoing activities as Circuit City Stores requests.

4.10. Refresh and Standardization.

   (1)   IBM shall be responsible for refresh of IBM Software, IBM Equipment, Circuit City Equipment and Circuit City Software in accordance with Exhibit 3.01(1) (Statements of Work) and Exhibit 4.01 (Financial Responsibility Matrix).

   (2)   Circuit City Stores will have the flexibility to waive refresh of Circuit City Equipment or Circuit City Software, or any Equipment refreshed pursuant to the Hardware Services Charge methodology in Exhibit 18.01 (Pricing and Financial Provisions), subject to an assessment of any impact on IBM's expenses and appropriate relief from applicable Service Levels, if any.

4.11. Efficiency and Cost Effectiveness. IBM will use commercially reasonable efforts to use efficiently the resources or services necessary to provide the Services, and to perform the Services in the most cost efficient manner consistent with the required level of quality and performance required under this Agreement.

4.12. Regulatory Compliance.

   (1)   In connection with the performance of the Designated Services, IBM shall:

        (a)   comply with all IBM Regulatory Requirements;

        (b)   perform the Services in accordance with this Agreement, including those obligations that are necessary for Circuit City and the Circuit City Service Recipients to comply with Circuit City Regulatory Requirements, including the United States Export Administration Act, the United States Internal Revenue Code, the Sarbanes-Oxley Act of 2002, and, in each case, the rules and regulations promulgated thereunder; and

        (c)   reasonably assist Circuit City, at Circuit City's request, in Circuit City's performance of any obligation that is necessary for Circuit City and the Circuit City Service Recipients to comply with Circuit City Regulatory Requirements, including the United States Export Administration Act, the United States Internal Revenue Code, the Sarbanes-Oxley Act of 2002, and, in each case, the rules and regulations promulgated thereunder.

   (2)   Without limiting the generality of the foregoing, IBM agrees that, in its performance of the Services and in each case to the extent applicable to IBM as a provider of information technology services, IBM will:

        (a)   comply with all applicable wage and hour Laws, including minimum wage, overtime, and maximum hours and utilize fair employment practices as defined in applicable Laws;

        (b)   not discriminate in hiring and employment practices on grounds of race, religion, national origin, political affiliation, age, sex, or disability;

        (c)   comply with all applicable environmental Laws;

(d)    not directly or indirectly, make, offer or agree to make or offer on behalf of Circuit City, any loan, gift, donation or other payment, directly or indirectly, whether in cash or in kind, for the benefit of or at the direction of any candidate, committee, political party, political function or government or government subdivision, or any individual elected, appointed or otherwise designated as an employee or officer thereof, for the purposes of influencing any act or decision of such entity or individual or inducing such entity or individual to do or omit to do anything in order to obtain or retain business or other benefits in violation of the United States Foreign Corrupt Practices Act or any other Laws relating to the making or receipt of gifts, gratuities or bribes;

(e)    comply with all Privacy Laws;

(f)    comply with the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated thereunder; and

(g)    comply with the terms of the SOW that implement Circuit City's requirements regarding the Payment Card Industry (PCI) Security Standards Council's PCI Data Security Standard Version 1.1 and other regulations related to payment transactions.

(3)    To the extent that IBM has an obligation to enable any Circuit City Service Recipient to comply with, or to assist any Circuit City Service Recipient in its compliance with, any Circuit City Regulatory Requirement or other Law, the scope of such assistance will be either (a) set forth in the Statement of Work or (b) otherwise specified by Circuit City to IBM Corporation in writing.

4.13.   Gainsharing Proposals.  IBM shall propose, on a periodic basis, Gainsharing Proposals for Circuit City Stores' review and approval.  The Gainsharing Proposals shall enable Circuit City to take advantage of (1) developments in the information services support and human resources, (2) improvements made available to other IBM customers, and (3) other developments that would enable Circuit City to achieve the foregoing objectives.  In preparing the Gainsharing Proposals, IBM shall actively review the Circuit City information technology, information systems support, human resources, and marketplace trends and developments to identify opportunities for improvement.  As part of such Gainsharing Proposals, Circuit City Stores or IBM Corporation may recommend that the Parties jointly finance, in amounts and in relative proportions to be agreed, a project relating to a change to the Services not contemplated in this Agreement.  In the event that any Gainsharing Proposal consisting of such project is implemented, the Parties will share in any net cost savings realized through their implementation in a ratio equal to the relative amounts contributed by each Party in respect of such Gainsharing Proposal. Gainsharing Proposals shall be implemented in accordance with the Change Control Procedures.

## ARTICLE 5 AFFECTED EMPLOYEES.

5.01.   Affected Employees.  Exhibit 5.01 (Affected Employees) sets forth (a) the name, position and principal work location of each of the Affected Employees in the employ of Circuit City as of the Effective Date and (b) the position, principal work location and reason for vacancy of each of the positions formerly occupied by Circuit City employees identified to IBM

Corporation prior to the Effective Date as Potentially Affected Employees who are no longer in the employ of Circuit City as of the Effective Date.

   5.02.   Transition of Affected Employees.  With respect to each Affected Employee, IBM Corporation will effect the transition of the Affected Employees to IBM Corporation in accordance with the terms and conditions set forth in Exhibit 5.02 (Human Resources Provisions).

   5.03.   Continuity Requirements.  Without limiting Section 12.03, IBM shall not, except as set forth in Section 4.0(1) of Exhibit 5.02 (Human Resources Provisions), terminate, replace or reassign to another account any other Affected Employees during the applicable Protected Period.

## ARTICLE 6 CIRCUIT CITY RESPONSIBILITIES.

   6.01.   Circuit City Contract Executive.  Circuit City Stores shall appoint the Circuit City Contract Executive.  The Circuit City Contract Executive shall (1) have overall responsibility for managing and coordinating the performance of Circuit City's obligations under this Agreement and (2) be authorized to act for and on behalf of, and bind, Circuit City with respect to all matters relating to this Agreement.  Notwithstanding the foregoing, the Circuit City Contract Executive may, upon notice to IBM Corporation, delegate such of his or her responsibilities to other Circuit City employees, as the Circuit City Contract Executive deems appropriate.

   6.02.   Circuit City Contract Manager.  Circuit City Stores shall appoint the Circuit City Contract Manager.

   6.03.   Circuit City Resources.  Commencing on the Service Commencement Date and continuing for so long as IBM and IBM Agents reasonably require the same for the performance of the Services, Circuit City shall provide to IBM and IBM Agents, subject to Section 6.04 (in each case, as agreed by the Parties and subject to Circuit City's standard office policies), such space in and access to Circuit City Locations and other facilities, reasonably required in connection with the performance of the Services, together with office furnishings, telephone equipment and services, janitorial services, utilities and office-related equipment, supplies and duplicating services comparable to that provided to Circuit City employees located at such Circuit City Locations or other facilities to the extent reasonably required in connection with the performance of the Services.  Such space and access shall include office space at Circuit City's corporate headquarters in Richmond, Virginia for individuals in Key IBM Positions (in each case, as agreed by the Parties and subject to Circuit City's standard office policies).

   6.04.   Use of Circuit City Locations.

      (1)   IBM and IBM Agents shall use the Circuit City Locations and the Circuit City Equipment for the sole and exclusive purpose of providing the Services.  IBM's use of the Circuit City Locations does not constitute a leasehold interest in favor of IBM.  IBM will permit Circuit City and Circuit City Agents to enter into those portions of the Circuit City Locations occupied by the Project Staff.

      (2)   IBM and IBM Agents shall use the Circuit City Locations in a reasonably efficient manner.  To the extent that IBM or any IBM Agents operates the space in a manner that unnecessarily increases the costs incurred by Circuit City, Circuit City Stores shall provide IBM Corporation with notice of such inefficiency and, if

IBM fails to remedy such inefficiency within 30 days after such notice, Circuit City
Stores shall have the right to set-off such excess costs in accordance with
Section 18.02.

(3)     IBM and IBM Agents shall keep the Circuit City Locations in good order, not
commit or permit waste or damage to such facilities, not use such facilities for
any unlawful purpose or act and comply with all of Circuit City's standard policies
and procedures as in effect from time to time, of which IBM Corporation has been
made aware, including procedures for the physical security and safety of the
Circuit City Locations.

(4)     With the approval of Circuit City Stores, IBM may make improvements to Circuit
City Locationss at its own expense. Improvements to Circuit City Locations,
whether owned or leased, will become the property of Circuit City or its lessors.

(5)     When the Circuit City Locations are no longer required for the performance of the
Services, IBM shall return such locations to Circuit City in the same condition as
when IBM or any IBM Agents began using such locations, ordinary wear and tear
excepted.

(6)     With respect to the Circuit City Locations utilized by IBM or any IBM Agents to
provide Services, Circuit City will manage and maintain at historical levels the
building and property electrical systems; water, sewer, lights, heating, ventilation
and air conditioning systems; physical security services; general
custodial/landscape services (including monitoring and maintaining the
uninterruptible power supply system; and air handlers and water chillers). Circuit
City will retain the costs of applicable leases and related leasehold improvements
with respect to the Circuit City Locations. The Circuit City Locations will be made
available to IBM on an "as is, where is" basis.

(7)     IBM agrees to keep Circuit City, all of the real and personal property of Circuit
City, and the Services, free and clear of all mechanics or materialmens liens or
lien claims due to an act or omission of IBM or any IBM Agent. Should any such
lien or lien claim be asserted for any reason, Circuit City may at its sole discretion
(a) pay the amount of such lien or lien claim; (b) deduct such amounts from
Charges due to IBM in accordance with Section 18.02; or (c) require IBM to
obtain a properly executed release of lien satisfactory to Circuit City.

(8)     Neither IBM nor any IBM Agent may provide or market services to a third party
from a Circuit City Location without the consent of Circuit City Stores.

## ARTICLE 7  CONTRACT ADMINISTRATION.

7.01.   Shared Agreements. IBM Corporation shall (1) administer and maintain the Shared
Agreements for the purpose of providing the Services and (2) except with respect to the terms
of the Shared Agreements applicable to any responsibility or obligation retained by Circuit City
Stores in respect of the Shared Agreements, comply with the terms of the Shared Agreements
and (3) be financially responsible for the payment of the charges that are assumed by IBM, as
set forth in Exhibit 7 (Shared Agreements, Assumed Agreements, and Retained Agreements)
("IBM Share"). Circuit City shall comply with the terms of the Shared Agreements and shall be
financially responsible for the payment of the charges that are retained by Circuit City, as set

forth in Exhibit 7 (Shared Agreements, Assumed Agreements, and Retained Agreements) ("Circuit City Share"). IBM Corporation's administration and maintenance of the Shared Agreements shall not restrict or interfere in any manner with Circuit City Stores' performance of any responsibility or obligation retained by Circuit City Stores. IBM Corporation shall provide Circuit City Stores with reasonable notice of any renewal, termination or cancellation dates and Charges with respect to the Shared Agreements. IBM Corporation shall not modify, terminate, extend or grant any consent or waiver under any Shared Agreement without the consent of Circuit City Stores.

7.02.   Shared Agreement Invoices. IBM Corporation shall (1) receive all Shared Agreement Invoices, (2) review and request that the vendor correct any errors in the Shared Agreement Invoices in a timely manner and (3) submit the Circuit City Share of all Shared Agreement Invoices to Circuit City Stores within a reasonable period of time following the date of IBM Corporation's receipt of a Shared Agreement Invoice. IBM shall request that the vendor provide IBM with the Shared Agreement Invoice in order that Circuit City Stores may pay the Circuit City Share of such Shared Agreement Invoice with a discount for early payment, if applicable, or by the due date. Circuit City Stores shall pay the Circuit City Share of such Shared Agreement Invoices received and approved by IBM Corporation. Circuit City Stores shall only be responsible for payment of the Circuit City Share of such Shared Agreement Invoices and shall not be responsible to IBM for any management, administration or maintenance fees of IBM in connection with the Shared Agreement Invoices or the IBM Share. Circuit City Stores shall be responsible for any late fees in respect of the Circuit City Share of such Shared Agreement Invoices, provided that IBM Corporation submitted the applicable Shared Agreement Invoices to Circuit City Stores for payment in accordance with the first sentence of this Section 7.02. If IBM fails to submit the Circuit City Share of a Shared Agreement Invoice to Circuit City Stores for payment in accordance with this Section 7.02, IBM shall be responsible for any discount not received or any late fees or other penalties in respect of such Shared Agreement Invoice.

7.03.   Assumed Agreements. As of the Service Commencement Date, IBM shall be financially responsible for payment of the charges set forth in the Assumed Agreements, subject to adjustment as set forth in Section 3.08 (Joint Verification Period). During the Joint Verification Period, IBM will, with Circuit City's assistance, review the Assumed Agreements and decide whether IBM will continue to reimburse Circuit City for the charges incurred by IBM under the Assumed Agreements, IBM will accept assignment of such Assumed Agreements, or IBM will terminate such Assumed Agreements at IBM's expense; provided that Circuit City shall have the right to approve any such IBM decision that would have the effect of increasing any costs to Circuit City. Upon IBM's request, Circuit City Stores shall (1) assign to IBM Corporation, and IBM Corporation shall assume, in each case pursuant to a customary assignment and assumption agreement acceptable in form and substance to the Parties, all liability and responsibility with respect to certain Assumed Agreements set forth in Exhibit 7 (Shared Agreements, Assumed Agreements, and Retained Agreements); and /or (2) terminate certain Assumed Agreements set forth in Exhibit 7 (Shared Agreements, Assumed Agreements, and Retained Agreements), subject to IBM's reimbursement to Circuit City of any termination charges or other amounts payable to the applicable third party vendor pursuant to the terms set forth therein.

7.04.   Performance under Circuit City Third Party Contracts. Each Party shall promptly notify the other Party of any material breach of, or misuse or fraud in connection with, any Shared Agreements of which the notifying Party becomes aware and shall cooperate with the other Party to cure, prevent or stay any such breach, misuse or fraud.

7.05.    Retained Agreements.  Throughout the Term, Circuit City shall be financially and administratively responsible for all Retained Agreements set forth in Exhibit 7 (Shared Agreements, Assumed Agreements, and Retained Agreements).  Circuit City shall retain all liability and responsibility with respect to the Retained Agreements.

7.06.    Extensions.  To the extent any of the Shared Agreements or Assumed Agreements shall expire within 6 months after the Effective Date, Circuit City shall, at the request of IBM Corporation, extend such Agreement on a month to month basis until IBM shall have had a reasonable opportunity to enter into its own contract with such vendor or replacement vendor replacing such terminated agreement.  IBM shall be financially responsible for such extension in the same manner as IBM is financially responsible for the applicable agreement as set forth in this Article 7.

7.07.    Terminated IBM-CCS Agreements.

As of the Service Commencement Date, the Terminated IBM-CCS Agreements (Phase 1) shall be terminated in full and shall be of no further force and effect.  Neither Circuit City nor IBM shall have any rights, obligations or liabilities (including any obligation to pay any termination fees) under such Terminated IBM-CCS Agreements (Phase 1), accruing as of or following the Service Commencement Date, provided that IBM and Circuit City shall continue to have all other rights, obligations and liabilities that shall have accrued prior to the Services Commencement Date.

As of the first month following the month in which the ODCS Environment is relocated to IBM's Data Center in Southbury, and the first month following the month in which the eBHS Environment is either relocated to IBM's Data Center in Southbury or consolidated with IBM's other Tivoli Servers, the ODCS Contract and eBHS Contract, respectively, shall be terminated, in full and shall be of no further force and effect.  Neither Circuit City nor IBM shall have any rights, obligations or liabilities (including any obligation to pay any termination fees) under such Terminated IBM-CCS Agreements (Phase 2), accruing as of or following such termination date, provided that IBM and Circuit City shall continue to have all other rights, obligations and liabilities that shall have accrued prior to such termination date.

7.08.    Managed IBM-CCS Agreements.  As of the Service Commencement Date, the Parties shall oversee the governance of the Managed IBM-CCS Agreements, as set forth in Exhibit 13.02 (Governance Model).

## ARTICLE 8  SERVICE LEVELS.

8.01.    Service Levels Generally.  From and after the applicable Service Level Effective Date, IBM shall perform the Designated Services in accordance with the applicable Service Levels as set forth in Exhibit 8.01 (Service Level Methodology).  All Services without expressly defined Service Levels must be performed at service levels that equal or exceed the level of service being provided by Circuit City within the 12 month-period prior to the Effective Date.

8.02.    Root Cause Analysis.  In the event of IBM's failure to provide the Services in accordance with the applicable Service Levels, IBM shall (1) perform a root-cause analysis to identify the cause of such failure, (2) provide Circuit City Stores with a report detailing the cause of, and procedure for correcting, such failure, (3) to the extent such failure was caused by IBM or any IBM Agent, implement such procedure and (4) to the extent such failure was caused by IBM or IBM Agents, provide Circuit City Stores with assurance satisfactory to Circuit City Stores

that such failure shall have been appropriately addressed following the completion of the implementation of the procedure.

8.03.   Service Level Credits.   In the event of a failure to provide the Services in accordance with the Service Levels, IBM shall incur the Service Level Credits identified in and accor ding to Exhibit 8.01 (Service Level Methodology). The Service Level Credits shall not limit Circuit City's right to recover, in accordance with this Agreement, other Losses incurred by Circuit City as a result of such failure, but shall be an offset against any dam ages Circuit City is otherwise entitled to recover.

8.04.   Service Level Termination Rights.   If (a) IBM fails to meet the same Critical Service Level 3 times in any rolling 6-month period during the Term, (b) the Service Level Credits exceed an amount equal to 40% of the At- Risk Amount with respect to any rolling 6-month period during the Term, or (c) IBM fails to resolve a Critical Service Level Severity Level 1 Problem for a Gold Service (as set forth in Exhibit 8.01 (Service Level Methodology)) within 48 hours following the time and date of the Problem Ticket creation at the Service Desk); then Circuit City Stores may, by giving 90 days notice to IB M (within six months following the last event triggering this Section 8.04) terminate the affected port ion of this Agreement as of the termination date specified in the notice, subject to payment of the applicable Wind Down Charges. Nothing in this Section 8.04 shall be deem ed to limit or obviate any other right of Circuit City Stores to terminate this Agreement.

8.05.   Service Level Maintenance.   In order for IBM to provide Circuit City with assurance that Services will continue to be performed in accordance with the Service Levels notwithstanding changes in the financial condition of IBM, IBM shall (1) provide Circuit City with an oppor tunity to participate in periodic roundtable updates from an appropriate IBM representative as to the financial condition of IBM and (2) in the event of any material deterioration in the financial condition of IBM and in IBM's provision of the Services, cooperate with Circuit City to develop a plan to continue to perform such Services in accordance with the Service Levels.

## ARTICLE 9 CUSTOMER SATISFACTION AND MARK TO MARKET.

9.01.   Executive Client Survey.

(1)　　Prior. to the end of the first quarter of each calendar year during the Term, IBM shall conduct and complete an executive client survey, which shall survey consist of an interview of the Circuit City Contract Manager and a Circuit City designee for each functional area of the Services (conducted in three sessions) (the "Executive Client Survey"). The Executive Client Survey will be conducted by an independent third party in a 'blind survey,' without the participation or involvement of the IBM Project Executive, and will include the following components: an overall rating, services performance dimensions, responsiveness, support, overall skills, meeting commitments, and value.

(2)　　If the Executive Client Survey reflects any areas in which the rating received was less than "Satisfactory", IBM Corporation shall work together with Circuit City Stores to understand the nature and cause for the rating and to develop an action plan to address the concerns. Upon approval of the action plan by Circuit City Stores, IBM shall promptly implement such plan.

9.02.   POS Customer Satisfaction Survey.  Prior to the end of the first quarter of each calendar year during the Term following the completion of the Transition Period, IBM Corporation shall report on the results of the POS Customer Satisfaction Surveys.  The timing, content, scope and method of the survey shall incorporate the content, scope and procedures set forth in Exhibit 9.02 (POS Customer Satisfaction Survey), with such modifications as may be approved by Circuit City Stores.

9.03.   Customer Satisfaction Generally.

(1)   IBM shall be responsible for all costs and expenses associated with the surveys contemplated in Section 9.01 and Section 9.02.

(2)   IBM Corporation agrees that (1) increased customer satisfaction, as measured by the Executive Client Surveys and the POS Customer Satisfaction Surveys, shall be a key performance factor in determining the incentive compensation of the Key IBM Personnel and such other Project Staff as appropriate and (2) customer satisfaction, as measured by the POS Customer Satisfaction Surveys, shall be measured as Service Levels pursuant to Section 8.01.

9.04.   Mark to Market.

(1)   At the option of Circuit City Stores, at any time after the start of the 4th Contract Year, Circuit City Stores may retain an Advisor to conduct a Mark To Market with respect to the Services in the aggregate; provided that the Mark To Market may be conducted only once during the Term.  The Advisor will be selected by Circuit City Stores.

(2)   The Advisor shall be retained by Circuit City Stores and the fees and expenses charged by the Advisor shall be paid by Circuit City on a non-contingent fee basis.  The Parties will cooperate fully with each other and with the Advisor, and will provide all relevant information relating to the provision of the Services requested by the Advisor.

(3)   The Advisor shall determine, utilizing the Mark to Market Process, the Mark to Market Results.

(4)   If the Mark to Market Results reveal that the Charges to Circuit City in the aggregate are less than 4% higher than the Mark to Market Average Price (the "Mark To Market Variability Deadband"), there shall be no adjustment to the Charges.  If the Mark To Market Results reveal that the Charges to Circuit City in the aggregate are higher than the Mark to Market Variability Deadband, then IBM shall, within 90 days after the receipt of the Mark to Market Results, submit a proposal to Circuit City Stores for reducing the Charges to be at least within the Mark To Market Variability Deadband, in the aggregate ("Mark to Market Proposal").  The Parties shall review the proposal in accordance with the Governance Model set forth as Exhibit 13.02 (Governance Model).  Should the Parties be unable to reach agreement regarding IBM's Mark to Market Proposal, then the matter shall be resolved in accordance with Article 25.  In the event that IBM refuses to adjust the Charges to be, in the aggregate, within the Mark to Market Variability Deadband, then Circuit City may elect to terminate this Agreement, effective no later than 180 days following the end of the 15 day time

period set forth in Section 25.02 for review by the Executive Committee, and Circuit City shall pay IBM the applicable Wind Down Charges. Any adjustments based upon the Mark to Market analysis shall be effective 90 days after Circuit City's receipt of IBM's Mark to Market Proposal, provided the Parties reach agreement on such adjustment within 180 days following such receipt.

(5)     For clarity, except to the extent agreed upon by the Parties, there shall be no upward adjustment to any Charges as a result of a Mark To Market, nor will adjusted Charges be applied retroactively to past invoices or Services, without agreement of the Parties.

## ARTICLE 10   SERVICE LOCATIONS.

10.01. IBM Service Locations Generally. The Services shall be provided to the Circuit City Locations, and from IBM Service Locations. From time to time during the Term, IBM may, in accordance with the Change Control Procedures, propose to provide the Services from locations in addition to the IBM Service Locations as of the Effective Date, and upon Circuit City's approval of such IBM-proposed locations, not to be unreasonably withheld, such IBM-proposed locations shall be deemed to be IBM Service Locations.

10.02. Changes in Circuit City Locations or IBM Service Locations.

(1)     Any incremental expenses incurred by Circuit City as a result of a relocation to, or use of, any location other than a Circuit City Locations or an IBM Service Location initiated by IBM shall, at Circuit City's sole discretion, be paid by IBM or reimbursed to Circuit City by IBM.

(2)     IBM's expenses associated with start-up and transition efforts in connection with any relocation of a Circuit City Locations or of an IBM Service Location that is initiated by Circuit City shall be separately chargeable to Circuit City only to the extent that such efforts constitute a Chargeable Change; provided, however, that in lieu of paying any start-up and transition costs that would otherwise be separately chargeable, Circuit City Stores may, in its discretion, reprioritize existing resources, if appropriate, and provide Service Level relief as requested and identified specifically by IBM.

## ARTICLE 11   SECURITY.

11.01. Safety and Security Procedures. IBM shall maintain and enforce at the IBM Service Locations safety and security procedures in accordance with: (1) the procedures in effect at such IBM Service Location and (2) any higher standard otherwise agreed upon by the Parties. IBM shall maintain and enforce at the Circuit City Locations safety and security procedures in accordance with: (1) the procedures applicable to the Circuit City Locations provided to IBM in writing prior to the Effective Date, as, subject to the Change Control Procedures, may be reasonably amended by Circuit City from time to time during the Term and (2) any higher standard otherwise agreed upon by the Parties. The Parties shall meet from time to time during the Term to review safety and security procedures. IBM shall comply with the safety and security procedures that are applicable to the Circuit City Locations as provided to IBM in writing as of the Effective Date and as amended by Circuit City and implemented in accordance with the Change Control Procedures. Circuit City shall make such safety and security procedures available to IBM from time to time, or upon IBM's reasonable request.

11.02. <u>Data Security</u>. IBM shall establish and maintain safeguards against the unauthorized access, destruction, loss or alteration of Circuit City Data in the possession of IBM or IBM Agents that are no less rigorous than the most rigorous practices of Circuit City as of the Effective Date as made known to IBM. Circuit City has the right to establish backup security for Circuit City Data and to keep backup files for such data in its possession if it so chooses. The Project Staff, IBM and IBM Agents will not attempt to access or allow access to Circuit City Data that is not required for the performance of the Services by such personnel. IBM will promptly notify Circuit City of any breach or potential breach of security relating to Circuit City Data and investigate and reasonably cooperate in remediating the effects of such breach or potential breach. In the event that such breach or potential breach shall have resulted from IBM's failure to comply with this Agreement, IBM shall remediate the cause of such breach or potential breach to prevent a recurrence and reasonably cooperate with Circuit City in remediating the effects thereof.

11.03. <u>Security Relating to Competitors</u>. If (1) IBM provides the Services from an IBM Service Location that is shared with a third party or third parties that is or are a Circuit City Competitor or (2) any part of the business of any such third party is now or in the future a Circuit City Competitor, then, prior to providing any of the Services from such IBM Service Location, IBM shall restrict access in any such shared environment to Circuit City's Confidential Information so that IBM's employees or IBM Agents providing services primarily to such third parties or competitive business from such locations do not have access to Circuit City's Confidential Information.

## ARTICLE 12  IBM STAFF.

12.01. <u>IBM Project Executive</u>. IBM Corporation shall appoint the IBM Project Executive. IBM Corporation's appointment of an IBM Project Executive shall be subject to Circuit City Stores' approval. The IBM Project Executive shall (1) have overall responsibility for managing and coordinating the performance of IBM's obligations under this Agreement and (2) be authorized to act for and on behalf of, and bind, IBM with respect to all matters relating to this Agreement.

12.02. <u>IBM Delivery Project Executive</u>. IBM Corporation shall appoint the IBM Delivery Project Executive.

12.03. <u>Key IBM Positions</u>.

(1)     Each individual in a Key IBM Position shall be dedicated to the Circuit City account on a full-time basis;

(2)     Before assigning an individual to a Key IBM Position, whether as an initial assignment or as a replacement, IBM shall (a) notify Circuit City Stores of the proposed assignment, (b) introduce the individual to appropriate representatives of Circuit City Stores, (c) provide Circuit City Stores with a résumé and any other information regarding the individual that may be requested by Circuit City Stores and (d) obtain the approval of Circuit City Stores for such assignment. IBM shall only assign an individual to a Key IBM Position who is approved by Circuit City Stores; and

(3)     IBM Corporation shall not reassign or replace the IBM Project Executive, IBM Delivery Project Executive or any other individual in a Key IBM Position for the period set forth in <u>Exhibit 12.03</u>, unless (a) Circuit City Stores consents to such

reassignment or replacement, or (b) such individual (i) voluntarily resigns from IBM, (ii) is terminated from employment by IBM for misconduct, other cause, or non-performance, (iii) is unable to work due to a disability, or (iv) has a legitimate personal, family or health reason to request a reassignment.

12.04. <u>Project Staff</u>. IBM will use adequate numbers of qualified individuals with suitable training, education, experience, and skill to perform the Services. All Project Staff must comply with IBM's Business Conduct Guidelines and Substance Abuse and Testing policies during to assignment to the Circuit City account. At the end of every 3 month period after the Service Commencement Date, or as requested by Circuit City, but not more than once every 30 days, IBM shall provide Circuit City Stores with a list of all IBM personnel dedicated full-time to the Project Staff, all IBM personnel who are at Circuit City Locations, and all IBM personnel who have passwords or ID's to access Circuit City systems. IBM shall maintain backup procedures and conduct the replacement procedures for the individuals in the Key IBM Positions in such a manner so as to assure an orderly succession for any members of the individuals who are replaced. Upon Circuit City's request, IBM shall make such procedures available to Circuit City. IBM shall notify Circuit City as soon as possible after dismissing or reassigning any member of the Project Staff whose normal work location is at a Circuit City Site.

12.05. <u>Subcontracts</u>.

(1) <u>Exhibit 12.05</u> (Approved Subcontractors) identifies the subcontractors and suppliers that IBM asserts may be part of the delivery of Services and who are approved by Circuit City Stores for use by IBM as of the Effective Date. Other than the Approved Subcontractors, IBM will not subcontract or delegate any of its obligations under this Agreement without the prior approval of Circuit City Stores; provided that such approval shall be required only with respect to (a) each Non-Leveraged subcontract under which the charges are more than $1,000,000 annually, (b) for any subcontractor that has physical or virtual access to the Circuit City Locations pursuant to such subcontract or (c) for any subcontractor that will routinely perform work on Circuit City Locations.

(2) Circuit City Stores may withdraw its approval of a subcontractor if the subcontractor's performance or failure to perform results, or could reasonably be expected to result, in a material breach of IBM's obligations under this Agreement, provided Circuit City gives IBM reasonable notice under the circumstances and reasonable assistance to IBM to enable IBM to obtain such services from another subcontractor without disrupting IBM's ability to satisfy its obligations under the Agreement. IBM will be responsible for making any and all payments to subcontractors.

(3) Prior to entering into a Non-Leveraged subcontract with a third party, IBM will give Circuit City Stores notice specifying the identity, qualifications and scope for the proposed subcontractor.

(4) IBM's Non-Leveraged subcontracts will include provisions equivalent to those in this Agreement with respect to facilities, intellectual property rights, audit rights, confidentiality, and any other material terms and conditions which in IBM's discretion may affect or relate to the subcontractors' provision of Services.

(5)     All subcontractors will be required to adhere to the standards, policies and
procedures in effect from time to time of Circuit City and IBM.  IBM shall not
disclose Confidential Information of Circuit City to a subcontractor until such
subcontractor has executed an appropriate nondisclosure agreement with IBM
Corporation.

(6)     Any agreement entered into between IBM and its Non-Leveraged subcontractors
where the subcontractor services will be provided to Circuit City will specifically
provide that Circuit City Stores may take an assignment of the contract from IBM
Corporation.

(7)     No subcontracting shall release IBM from its responsibility for its obligations
under this Agreement.

12.06.  Conduct of IBM Personnel.

(1)     While at the Circuit City Locations, IBM and IBM Agents shall (a) comply with the
requests, standard policies, rules and regulations of Circuit-City regarding safety
and health, personal and professional conduct (including wearing of an
identification badge and personal protective equipment, adhering to regulations
and general safety practices and procedures and attending necessary training for
such policies, rules, regulations, practices and procedures) generally applicable
to the Circuit City Locations and (b) otherwise conduct themselves in a
businesslike manner.  IBM shall cause the members of the Project Staff to
maintain and enforce the confidentiality provisions of this Agreement, both during
and after their assignment to the Circuit City account.  IBM will maintain
information control procedures related to the Circuit City Confidential Information,
including appropriate procedures on communication, document exchange, and
file access between Project Staff and other IBM employees.

(2)     In the event that Circuit City determines that a particular member of the Project
Staff is not conducting himself or herself in accordance with Section 12.06(1) or
is otherwise inadequately performing his or her functions, Circuit City may notify
IBM of such conduct or inadequate performance.  Upon receipt of such notice,
IBM shall promptly investigate the matter and, upon confirmation that a violation
has occurred or inadequate performance persists, may (a) remove the applicable
person from the Project Staff, provide Circuit City with prompt notice of such
removal and replace the applicable person with a similarly qualified individual or
(b) take other appropriate disciplinary action to prevent recurrence of such
violation or provide additional training or support to improve performance.  In the
event there are repeat violations of Section 12.06(1) by a particular member of
the Project Staff, IBM shall promptly remove the individual from the Project Staff.

(3)     Circuit City will have the right at any time, to immediately, with or without cause
and at no cost or expense to Circuit City, to require IBM to remove any of its
Project Staff performing Services principally at a Circuit City Location from the
Circuit City Location.

12.07.  Non-Competition.  IBM Corporation shall not assign any individual in a Key IBM
Position to the account of a Circuit City Competitor without the consent of Circuit City Stores
(1) while such individual in a Key IBM Position is assigned to the Circuit City account and (2) for

a period of 18 months following the date that such individual in a Key IBM Position is removed from, or ceases to provide services in connection with, the Circuit City account.

## ARTICLE 13  MANAGEMENT AND CONTROL.

13.01.  Management Committee.  Within 30 days after the Effective Date, the Circuit City Contract Executive and IBM Project Executive shall each appoint representatives to serve on the Management Committee.  The Management Committee shall be authorized and responsible for (1) day-to-day management of this Agreement in accordance with Exhibit 13.02 (Governance Model) and (2) monitoring and resolving disagreements regarding the provision of the Services, the Service Levels and performance under this Agreement and, to the extent not so resolved, referring such disputes to the Executive Committee for resolution in accordance with Section 25.02.  A Party may change any of its representatives on the Management Committee upon notice to the other Party.

13.02.  Governance.  The Parties shall interact with each other in accordance with, and IBM shall comply with the terms of, the Governance Model set forth as Exhibit 13.02 (Governance Model).

13.03.  Policy and Procedures Manual.

    (1)    During the Transition Period, the Parties will work together collaboratively to create a Policy and Procedures Manual that reflects the combined best practices of Circuit City and IBM, as appropriate for the Circuit City environment and Services.  The following are general guidelines for the exchange of drafts, but the Parties will likely exchange iterative drafts throughout the Transition Period. Within 60 days after the Services Commencement Date, IBM Corporation shall deliver to Circuit City Stores a draft of the Policy and Procedures Manual.  Within 15 days of receiving the draft Policy and Procedures Manual, Circuit City Stores will provide comments and revisions to such draft Policy and Procedures Manual to IBM.  Within 45 days after receiving Circuit City Stores' comments and revisions, IBM will deliver to Circuit City Stores, in the form and scope agreed upon by Circuit City Stores, the final form of the Policy and Procedures Manual in hard copy.  IBM Corporation shall have the obligation to update and maintain the Policy and Procedures Manual with the assistance of Circuit City Stores as reasonably requested by IBM.

    (2)    IBM shall not revise or amend the Policy and Procedures Manual without the approval of Circuit City Stores.  The Policy and Procedures Manual shall be maintained in electronic format and accessible electronically by all Project Staff, the Circuit City Contract Executive, the Circuit City Contract Manager and such other persons as the Circuit City Contract Executive may designate.

    (3)    The Policy and Procedures Manual will clearly outline the operational responsibilities of both Parties as well as the schedules required for the delivery of the Services.  IBM Corporation will keep the Policy and Procedures Manual up to date and provide updates periodically and, in any event, not less frequently than annually.

    (4)    IBM shall at all times perform the Services in compliance with the Policy and Procedures Manual; provided that, until such time as the initial Policy and

Procedures Manual has been approved by Circuit City Stores in accordance with Section 13.03(1), IBM shall perform the Services in compliance with the standard operating procedures of Circuit City as in effect as of the Effective Date, as modified by mutual agreement of the Parties.

(5)    In the event of a conflict between this Agreement and the Policy and Procedures Manual, this Agreement will prevail.

13.04.  Change Control Procedures and Change Management.  IBM Corporation shall develop, deliver to Circuit City Stores for its review and approval in accordance with the schedule set forth in Exhibit 3.08 (Transition Plan), and maintain a current version of the Change Control Procedures.  The Change Control Procedures shall form part of the Policy and Procedures Manual and shall provide, at a minimum, that (except as set forth in the Change Management process):

(1)    IBM shall prepare a Change impact analysis with respect to each Change that describes the potential impact, if any, of such Change on, among other things, the Charges, other costs to Circuit City of receiving the Services, IBM's expenses to deliver the Services, the Service Levels and other performance obligations of IBM under this Agreement, and the allocation of costs, responsibilities or risks between IBM and Circuit City under this Agreement;

(2)    IBM Corporation and Circuit City Stores shall each prepare a legal analysis that describes the provisions of this Agreement, if any, that would be affected by such Change;

(3)    No Change will be implemented without approval from the Circuit City Contract Executive and the IBM Project Executive.  No Charge shall be payable by Circuit City with respect to any Non-Chargeable Change; and

(4)    With respect to all Changes, IBM Corporation shall (a) other than those Changes made on a temporary basis to maintain the continuity of the Services, schedule Changes so as not to unreasonably interrupt the operation of the Circuit City business, (b) prepare and deliver to Circuit City Stores each month a rolling schedule for ongoing and planned Changes for the next three month period and (c) monitor the status of Changes against the applicable schedule. With respect to any Change made on a temporary basis to maintain the continuity of the Services, IBM Corporation shall document and provide to Circuit City Stores notification of the Change no later than the next business day after the change is made.

IBM Corporation shall develop, deliver to Circuit City Stores, for its review and approval, in accordance with the schedule set forth in Exhibit 3.08 (Transition Plan), and maintain a current version of the Change Management process.  The Change Management process shall form part of the operational procedures in the Policy and Procedures Manual and shall provide, at a minimum, that Circuit City will have the right to set priorities in scheduling work; provided, however, if appropriate to account for the effects of any Circuit City established priority, Circuit City shall provide Service Level relief as requested and identified specifically by IBM.

## ARTICLE 14  SOFTWARE AND PROPRIETARY RIGHTS.

14.01.  Circuit City Software.  Exhibit 14.01 (Circuit City Software) sets forth the Circuit City Software.  Circuit City hereby grants to IBM during the Term and Termination Assistance Period, solely to provide the Services, a non-exclusive, non-transferable, limited right to have access to and (1) Use the Circuit City Proprietary Software, (2) Use, to the extent permissible under the applicable third party agreements, the Circuit City Third Party Software and (3) Use, to the extent permissible under the applicable third party agreements, any Related Documentation in Circuit City's possession on or after the Effective Date.  IBM may, to the extent permissible under the applicable third party agreements, permit IBM Agents to have access to and Use the Circuit City Software solely to provide those Services that such IBM Agents are responsible for providing and as may otherwise be agreed to by the Parties.  IBM and IBM Agents shall not reverse engineer or decompile Circuit City Software except as permitted by Circuit City Stores.  Subject to the confidentiality provisions of the applicable third party agreements, Circuit City Stores shall provide IBM Corporation with such information as may be reasonably required by IBM Corporation to ensure IBM's compliance with the terms of license with respect to Circuit City Third Party Software.

14.02.  IBM Software.

    (1)    Exhibit 14.02 (IBM Software) sets forth the IBM Software.

    (2)    IBM hereby grants to Circuit City, during the Term and the Termination Assistance Period, a non-exclusive, non-transferable, limited license to Use, sublicense, and permit Circuit City Agents to Use, solely in connection with the receipt and use of the Services, (a) the IBM Proprietary Software, any modifications, enhancements and upgrades thereto and any Related Documentation and (b) the IBM Third Party Software, any new releases or versions thereof and any Related Documentation, in each case to the extent necessary for Circuit City to receive and to Use the Services in the manner contemplated in this Agreement.  Circuit City shall have the right to approve the installation of IBM Software and the replacement of any then-current IBM Software prior to IBM's use of such IBM Software to provide the Services in the event that such replacement would affect IBM Software operated or otherwise directly used by any Authorized User, adversely affect IBM's provision or Circuit City's receipt of the Services or increase Circuit City's costs to use the Services. Upon Circuit City's request, IBM shall provide Circuit City with a list of all IBM Software being used to provide the Services as of the date of such request.

    (3)    With respect to any IBM Proprietary Software or IBM Third Party Software that IBM makes commercially available, at the request of Circuit City, IBM shall license such Software to Circuit City on IBM's standard commercial terms for clients of a size and type similar to Circuit City for Use by Circuit City following the expiration or termination of this Agreement.  With respect to any IBM Proprietary Software or IBM Third Party Software that IBM does not make commercially available, but which is necessary for Circuit City's continued receipt of the Services or services replacing the Services, at the request of Circuit City, (a) IBM shall remove or replace such Software with commercially available Software at Circuit City's expense, or (b) in the event such Software is integrated into Circuit City's environment such that removal or replacement of such software cannot be achieved, then IBM Corporation hereby grants to Circuit City Stores,

as of the End Date, a global, irrevocable, fully paid-up, non-exclusive, enterprise-wide license for twelve (12) months following the End Date to have access to and Use, to the extent necessary for Circuit City's continued receipt of the Services or services replacing the Services, such IBM Proprietary Software, IBM Third Party Software and any Related Documentation, in each case as in existence as of the End Date.

(4)    Circuit City shall not reverse engineer, decompile or otherwise attempt to derive source code from IBM Software except as permitted by IBM Corporation.

(5)    IBM Corporation shall provide Circuit City Stores with such information as may be reasonably required by Circuit City Stores to ensure Circuit City's compliance with the terms of license with respect to IBM Third Party Software.

14.03.  <u>IBM New Intellectual Property</u>.  IBM shall have all right, title and interest, including worldwide ownership of copyright and patent, in and to any IBM New Intellectual Property and all copies of IBM New Intellectual Property.  Circuit City hereby irrevocably assigns, transfers and conveys, and shall cause Circuit City Agents to assign, transfer and convey, to IBM without further consideration all of its right, title and interest in and to IBM New Intellectual Property, including all worldwide rights of patent, copyright, trade secret or other proprietary rights in such materials.  Circuit City acknowledges that IBM and the successors and permitted assigns of IBM shall have the right to obtain and hold in their own names any intellectual property rights in and to IBM New Intellectual Property.  Circuit City agrees to execute any documents or take any other actions as may reasonably be necessary, or as IBM may request, to perfect IBM's ownership of any IBM New Intellectual Property.  Subject to <u>Section 14.02(3)</u>, IBM hereby grants to Circuit City a global, perpetual, irrevocable, fully paid-up, non-exclusive, transferable license to Use, and to permit a third party to Use, for Circuit City's benefit, the IBM New Intellectual Property.

14.04.  <u>Circuit City New Intellectual Property</u>.  Circuit City shall have all right, title and interest, including worldwide ownership of copyright and patent, in and to any Circuit City New Intellectual Property and all copies of Circuit City New Intellectual Property.  IBM hereby irrevocably assigns, transfers and conveys, and shall cause IBM Agents to assign, transfer and convey, to Circuit City without further consideration all of its right, title and interest in and to Circuit City New Intellectual Property, including all worldwide rights of patent, copyright, trade secret or other proprietary rights in such materials.  IBM acknowledges that Circuit City and the successors and permitted assigns of Circuit City shall have the right to obtain and hold in their own names any intellectual property rights in and to Circuit City New Intellectual Property.  IBM agrees to execute any documents or take any other actions as may reasonably be necessary, or as Circuit City may request, to perfect Circuit City's ownership of any Circuit City New Intellectual Property.

14.05.  <u>Residual Knowledge</u>.  Nothing contained in this Agreement shall restrict either Party from the use of any ideas, concepts, know-how or techniques which either Party, individually or jointly, develops, receives or discloses under this Agreement that are related to its respective business activities and that remain in an employee's unaided memory, except to the extent such use infringes the copyright or patent rights of the other Party or third parties or breaches its confidentiality or other obligations under this Agreement, or other agreements with the other Party or third parties.  An employee's memory is "unaided" if the employee has not intentionally memorized such information for the purpose of avoiding its obligations hereunder.

## ARTICLE 15  DATA.

15.01.  Ownership of Circuit City Data.  All Circuit City Data is, or shall be, and shall remain the sole and exclusive property of Circuit City and shall be deemed Confidential Information of Circuit City. Without the approval of Circuit City Stores (in its sole discretion), the Circuit City Data shall not be (1) used by IBM or IBM Agents other than in connection with providing the Services, (2) disclosed, sold, assigned, leased or otherwise provided to third parties by IBM or IBM Agents or (3) commercially exploited by or on behalf of IBM or IBM Agents. To the extent permitted by applicable Laws, IBM hereby irrevocably assigns, transfers and conveys, and shall cause IBM Agents to assign, transfer and convey, to Circuit City without further consideration all of its and their right, title and interest in and to the Circuit City Data. Upon request by Circuit City, IBM shall execute and deliver, and shall cause IBM Agents to execute and deliver, any documents that may be necessary or desirable under any Law to preserve, or enable Circuit City to enforce, its rights under this Agreement with respect to the Circuit City Data.

15.02.  Correction of Errors.  IBM shall promptly correct any errors or inaccuracies in the Circuit City Data and the Reports, to the extent caused by IBM or IBM Agents. At Circuit City Stores' request and expense, IBM shall promptly correct any other errors or inaccuracies in the Circuit City Data or the Reports.

15.03.  Access to Data.  IBM shall provide to Circuit City access to the Circuit City Data in IBM's or IBM's Agents possession or control upon request.

15.04.  Return of Data.  Upon request by Circuit City at any time during the Term and upon expiration or termination of this Agreement, IBM shall (1) promptly return to Circuit City, in the format and on the media requested by Circuit City, all or any part of the Circuit City Data or (2) erase or destroy all or any part of the Circuit City Data in IBM's possession, in each case to the extent so requested by Circuit City, subject to, in the case of any such request made during the Term or the Termination Assistance Period, an assessment of any impact on IBM's ability to continue to deliver Services to which such Circuit City Data pertains and IBM's expenses in handling such Circuit City Data and appropriate relief from applicable Service Levels, if any. Any archival tapes containing the Circuit City Data shall be used by IBM and IBM Agents solely for backup purposes.

15.05.  Record Retention.  IBM will comply with Circuit City's record retention policies, including those specifically related to the Sarbanes-Oxley Act of 2002, as set forth in Exhibit 3.01(1) (Statements of Work), and maintain and, upon request, provide access to the Circuit City Data (to the extent maintained in accordance with Circuit City's data retention policies), and records, documents, and other information relating to the Charges, IBM's performance under this Agreement, for the longer of (1) the Term; (2) the period of time required to required to meet Circuit City's audit rights under this Agreement; and (3) the period of time required by Laws, where in the cases of (2) and (3) such extended time period is made known to IBM in advance. Notwithstanding the foregoing, IBM shall not destroy or permit to be destroyed any Circuit City Data or other document or material within its control or the control of any IBM Agent where IBM has been notified by Circuit City that such data or material is related to a litigation matter.

15.06.  Certain Privacy Related Matters.  As the owner and controller of the Circuit City Data, Circuit City hereby directs IBM to process the Circuit City Data in accordance with the terms of this Agreement and hereby consents to IBM and IBM Agents having access to the Circuit City Data for such purpose.

## ARTICLE 16 CONSENTS.

16.01. <u>Consents Generally.</u> IBM shall, with Circuit City's assistance with regard to the Circuit City Consents (including active enforcement of its contract rights under the Circuit City Third Party Contracts), obtain, maintain and comply with the terms of the Consents and shall be responsible for any failure or breach in respect to IBM's foregoing obligations. Circuit City shall cooperate with IBM to obtain any Circuit City Consents.  IBM shall be responsible for obtaining the IBM Consents. The Parties will jointly negotiate with the applicable third party any costs, expenses, fees or charges payable to such third party to obtain or maintain any Circuit City Consent. IBM shall pay and be responsible for the first $100,000 all approved costs, expenses, fees and charges payable to such third party with regard to any Circuit City Consent. Circuit City shall pay and be responsible for any amounts beyond the first $100,000 of approved costs, expenses, fees and charges payable to such third party for such Circuit City Consents.  Both Parties will use commercially reasonable efforts to minimize such costs, expenses, fees and charges.

16.02. <u>Inability to Obtain Consent.</u> If IBM and Circuit City are unable to obtain a Circuit City Consent at a reasonable cost, or prior to or within a reasonable period of time after the Effective Date, the Parties shall, either (1) implement, subject to the prior approval of Circuit City Stores and IBM, alternative approaches as necessary to provide the Services without such Circuit City Consents, (2) obtain any necessary rights and licenses, or (3) amend the requirements of this Agreement and the applicable Statement of Work to remove any impacted Services.  Both Parties will use commercially reasonable efforts to minimize such costs, expenses, fees and charges.

16.03. <u>Approval of Communications.</u> IBM shall obtain the approval of Circuit City Stores of any communications relating to obtaining the Consents to be provided to the applicable third parties under the Circuit City Third Party Contracts.

## ARTICLE 17 CONTINUED PROVISION OF SERVICES.

17.01. <u>Disaster Recovery.</u>

(1)    In accordance with <u>Exhibit 3.01(1)</u> (Statements of Work), if requested by Circuit City, IBM shall work with Circuit City to develop, agree upon and implement a Circuit City Disaster Recovery Plan as a New Service which shall be consistent, and shall operate in conjunction with, the IBM Disaster Recovery Plan.

(2)    In the event of a disaster affecting an IBM Service Location, IBM shall execute the IBM Disaster Recovery Plan; provided, however, that if IBM is unable to implement the IBM Disaster Recovery Plan because of a Force Majeure Event, IBM shall (a) use commercially reasonable efforts to expeditiously obtain alternate data center floor space within seven to ten days, (b) immediately begin to place expedited orders for replacement equipment, (c) use commercially reasonable efforts to obtain telecommunications connectivity to the new data center floor space within seven to ten days after obtaining data center floor space, and (d) upon reinstallation of the required Equipment, load the software and data onto the replacement machines based on the most recent off-site back up tapes. IBM will be financially responsible for replacing equipment residing at IBM's Data Center in accordance with <u>Section 31.03</u>. If necessary to restore the Data Center, IBM will obtain such facility space and equipment from an alternate

provider at IBM's expense. At Circuit City's periodic request, IBM will review with Circuit City the current IBM Disaster Recovery Plan.

(3)     In the event of a disaster affecting an IBM Services Location, IBM shall also execute the Circuit City Disaster Recovery Plan (as agreed and implemented as set forth in (1) above); provided, however, that if IBM is unable to implement the Circuit City Disaster Recovery Plan because of a Force Majeure Event, IBM shall use commercially reasonable efforts to restore the Services as a Non-chargeable Change. If IBM cannot restore the Services to Circuit City within the agreed upon period of time set forth in any Circuit City Disaster Recovery Plan for this Section 17.01(3) provided by IBM, then (a) IBM will identify and make arrangements for a workaround or for Circuit City to contract to receive the Services from an alternate provider at IBM's cost and expense for a period of up to 6 months or (b) Circuit City may choose at its option to terminate the affected Services, by written notice provided to IBM during the pendency of such Force Majeure and unrestored Services, upon payment of IBM's Wind Down Charges.

(4)     In the event of a disaster or other event affecting a Circuit City Location, IBM shall perform any Services relating to the recovery of functionality or data specified in Exhibit 3.01(1) (Statements of Work) and reasonably cooperate with Circuit City to execute the Circuit City Disaster Recovery Plan, to the extent established pursuant to Section 17.01(1) or otherwise.

(5)     In the event of a disaster, IBM shall not increase its Charges or charge Circuit City usage fees in addition to the Base Charges or the Variable Charges, to the extent such usage fees are included within the Circuit City Disaster Recovery Plan provided by IBM.

17.02.  Force Majeure.

(1)     IBM shall not be liable for any Service Level Credits and shall not be in default of its obligations under this Agreement for failure to perform or delay in performance of any obligation (a) if and to the extent such failure or delay is caused, directly or indirectly, by a Force Majeure Event; and (b) provided such failure or delay could not have been prevented by reasonable precautions, including prompt execution of the IBM Disaster Recovery Plan. IBM shall promptly notify Circuit City by telephone or direct contact (to be confirmed by notice in accordance with Section 32.02 within 48 hours) of the inception of any Force Majeure Event affecting IBM and describe the circumstances causing the delay.

(2)     Circuit City shall not be in default of its obligations under this Agreement for failure to perform or delay in its performance of any obligation (other than any obligation solely requiring the payment of money) (a) if and to the extent such failure or delay is caused, directly or indirectly, by a Force Majeure Event; and (b) provided Circuit City is without fault and such failure or delay could not have been prevented by reasonable precautions, including prompt execution of the IBM Disaster Recovery Plan. Circuit City shall promptly notify IBM by telephone or direct contact (to be confirmed by notice in accordance with Section 32.02 within 48 hours) of the inception of any Force Majeure Event affecting Circuit City and describe the circumstances causing the delay.

(3)     The occurrence of a Force Majeure Event does not excuse, limit or otherwise affect IBM's obligation to perform its obligations set forth in <u>Section 17.01</u>.

(4)     A non-performing Party shall use commercially reasonable efforts to continue to perform or to mitigate the impact of its non-performance notwithstanding the occurrence of a Force Majeure Event.

17.03.  <u>Force Majeure Event Exclusions</u>.  Notwithstanding the provisions of <u>Section 17.02</u>, the following shall not constitute a Force Majeure Event:

(1)     The acts of Circuit City Agents, in the case of Circuit City, or IBM Agents, in the case of IBM, in each case unless such failure results from a Force Majeure Event;

(2)     The failures of independent third party providers of services used by IBM in performing the Services to the extent that IBM has expressly designed the Services to accommodate such failures as set forth in <u>Exhibit 3.01(1)</u> (Statements of Work) or <u>Exhibit 4.05</u> (IBM Technical Solution Document); or

(3)     Strikes or labor shortages where such labor actions affect IBM or its Affiliates or subcontractors and do not pose a reasonable fear of physical harm for performing the Services despite such strike or labor shortage.

17.04.  <u>Allocation of Resources</u>.  Whenever a Force Majeure Event or any other disaster occurs, in addition to resources necessary to effect the agreed upon Circuit City Disaster Recovery Plan and IBM Disaster Recovery Plan, IBM will, to the extent reasonably practicable, allocate resources to accelerate recovery from the Force Majeure Event or disaster.  In addition, in no event shall IBM redeploy or reassign any individual in a Key IBM Position to another account in the event of a Force Majeure Event.

## ARTICLE 18 PAYMENTS.

18.01.  <u>Pricing and Financial Provisions</u>.  The pricing and other financial provisions applicable to this Agreement are set forth in <u>Exhibit 18.01</u> (Pricing and Financial Provisions).

18.02.  <u>Rights of Set-Off</u>.  With respect to any undisputed amount that the Parties agree upon in writing (1) should be reimbursed to Circuit City or (2) is otherwise payable or creditable to Circuit City pursuant to this Agreement, Circuit City may deduct the amount owed to Circuit City against the charges otherwise payable or expenses owed to IBM under this Agreement, in both cases subject to <u>Section 25.03(6)</u>.

18.03.  <u>Proration</u>.  All periodic Charges or charges under this Agreement are to be computed on a calendar month basis and shall be prorated on a per diem basis for any partial month.

18.04.  <u>Unused Credits</u>.  Any unused credits against future payments owed to either Party by the other pursuant this Agreement shall be paid to the applicable Party within 30 days of the identification of such unused credit following the earlier of the expiration or termination of this Agreement.

18.05.  <u>Reductions in Costs</u>.  IBM will discuss with Circuit City reductions in the cost of delivery of the Services resulting from extraordinary changes in technology or extraordinary reductions in

the costs of delivering the Services, which could not have been foreseen as of the Effective Date but which occur during the Term and would be generally available to other users of similar technology and services either in-house or through other third party suppliers providing services similar to the Services, when considered in the aggregate based upon the totality of the solution and delivery model.

18.06. Timely Invoices. From and after the Effective Date, the Invoicing Party shall not submit any invoice to the other Paying Party, and the Paying Party will not be obligated to pay, any Charges or other amounts that are not invoiced within 120 days after the end of the month in which such Charges or amounts were entitled to be invoiced unless a request for an extension is approved in writing by Circuit City within such 120 day window. IBM shall manage any voice and data transport services provider used to provide the Services to minimize the amount of time between the date such transport services provider shall invoice the Paying Party and the date on which such transport services provider shall be entitled to invoice the Paying Party and shall pass through to Circuit City the benefit of any time restriction on such transport provider invoicing IBM; provided that in no event shall IBM invoice Circuit City for amounts charged by any transport services provider invoiced more than 180 days after the end of the month in which such Charges or other amounts were entitled to be invoiced (and in the case of any transport services provider other than AT&T, Verizon or Sprint, only to the extent the applicable contract (e.g., IBM's or Circuit City's, respectively) with such transport services provider imposes the same invoicing restriction), unless a request for an extension is approved in writing by Circuit City within such 180 day window.

## ARTICLE 19 PAYMENT SCHEDULE AND INVOICES.

19.01. Base Charges and Variable Charges. On or before the 15th of each calendar month, IBM shall invoice Circuit City Stores for the Base Charges for the Designated Services to be performed during the following month as set forth in Exhibit 18.01 (Pricing and Financial Provisions). As of the 2nd month of the Term, IBM shall invoice Circuit City Stores for the any Additional Resource Charges for the prior month, less any Reduced Resource Credits for the prior month and any other credits required to be credited to Circuit City Stores pursuant to this Agreement. In the event that such Reduced Resource Credits equal the Additional Resource Charges, the amount invoiced for the variable charges for such month shall be zero. Any excess credits other than Reduced Resource Credits shall be credited against subsequent invoices.

19.02. Consolidated Fee Report. Simultaneously with the submission of the invoices by IBM to Circuit City Stores pursuant to Section 19.01, IBM Corporation shall provide Circuit City Stores with the Consolidated Fee Report which shall set forth (1) the Base Charges charged; (2) the Resource Units utilized by each Circuit City Service Recipient; (3) the Variable Charges charged; (4) the Service Level Credits and other credits required to be credited to Circuit City Stores; and (5) such other information relating to the monthly invoices as Circuit City Stores may reasonably request. In the event Circuit City Stores disputes any of the Charges set forth in a Consolidated Fee Report upon resolution of such dispute, in accordance with Article 25 or otherwise, IBM Corporation shall provide Circuit City Stores with a revised Consolidated Fee Report reflecting any changes necessary to reflect the resolution of such dispute.

19.03. Currency and Time of Payment.

(1)     IBM shall invoice, and Circuit City Stores shall pay, the Base Charges and the Variable Charges in US Dollars. The Base Charges and the Variable Charges

shall be due and payable to IBM by Circuit City Stores 45 days (the "Payable Date") after Circuit City receives IBM's invoice. Any other sum due IBM pursuant to this Agreement for which payment is not otherwise specified shall be due and payable by Circuit City Stores 45 days after Circuit City receives an invoice from IBM. If any payments or portions thereof are not received by IBM within five days after the Payable Date, Circuit City will also pay IBM a late fee for each day between and including the sixth day after the Payable Date and the date IBM receives such late payment in full. The late fee will be based on a rate equal to the lesser of: 1 ¼ % of such payments per every thirty days or portion thereof; or the maximum amount permissible by the applicable Law ("Late Fee").

(2)     Circuit City Stores may dispute payment of individual items of invoiced amounts for Base Charges and Variable Charges contained within an invoice only in accordance with the procedures set forth in Section 25.03.

19.04. Detailed Invoices. IBM shall render, in a format acceptable to Circuit City Stores, a single consolidated invoice for the Charges incurred in each month. Each invoice shall be in the form set forth in Exhibit 18.01 (Pricing and Financial Provisions).

## ARTICLE 20 TAXES.

20.01. Services Taxes Generally. Circuit City shall be responsible for any Services Taxes. The Charges do not include any Services Taxes. To the extent that any Services Taxes are required by Law to be separately identified in IBM's billings to Circuit City, IBM shall separately identify the tax and assume any and all responsibility for non-compliance, including tax, interest and penalty assessments.

20.02. Services Taxes Incurred Due to Certain Relocations. Any incremental taxes assessed on the provision of the Services to any Circuit City Location resulting from IBM's relocating or rerouting the delivery of Services for IBM's convenience to, from or through a location other than the IBM Service Location or jurisdiction from which the Services were provided as of the Service Commencement Date shall be paid by IBM.

20.03. Other Taxes.

(1)     Circuit City and IBM shall each bear sole responsibility for all taxes, assessments and other real and personal property-related levies on its owned or leased real property or personal property.

(2)     IBM shall be responsible for all taxes attributable to IBM's payroll and related taxes for any Affected Employees on or after the Effective Date and all taxes due from IBM in connection with IBM's net income.

(3)     Circuit City Stores shall timely pay all excise, sales, use, value-added, registration, stamp, recording, documentary, conveyancing, franchise, property, transfer or similar taxes, arising out of or in connection with the transactions contemplated by Article 28, unless such transactions are undertaken in connection with a termination of this Agreement pursuant to Section 3.07(6) (Termination for Transition Services) or Section 26.03(1) (Termination for Cause). Circuit City Stores shall file all tax returns with respect to such taxes required by applicable Laws.

*Information Technology Outsourcing Master Services Agreement*

(4)      IBM shall endeavor to minimize all taxes chargeable to Circuit City through, for
         example the use of electronic delivery of software where appropriate and other
         generally accepted tax minimization strategies as set forth below in
         Section 20.05. Notwithstanding any other provision of this Article 20, Circuit City
         shall not be obligated to pay any taxes assessed against IBM as a result of any
         failure to endeavor to minimize taxes. In the event that Circuit City identifies an
         alternate method of performing the Services that would have the effect of
         reducing Circuit City's tax liability, the Parties shall review and, at the request of
         Circuit City, implement such alternate method in accordance with the Change
         Control Procedures.

20.04. Customs and Other Similar Duties. Unless otherwise expressly agreed, each Party will
be the importer of record of any items for which it has financial responsibility, as set forth in
Exhibit 4.01 (Financial Responsibility Matrix). Each Party will reasonably cooperate with the
other and will provide to the other, promptly upon request, any end-user certificates, affidavits
regarding reexport or other certificates or documents as are reasonably requested to obtain
authorizations, consents, licenses and/or permits required for any payment or any export or
import of products or services under this Agreement.

20.05. Cooperation. Circuit City and IBM shall cooperate to segregate the Charges into the
following separate payment streams: (1) those for taxable Services; (2) those for nontaxable
Services; and (3) those for which IBM functions merely as a paying agent for Circuit City in
receiving goods, supplies or services (including leasing and licensing arrangements) that
otherwise are nontaxable or have previously been subject to tax. In addition, Circuit City and
IBM shall each reasonably cooperate with the other to more accurately determine a Party's tax
liability and to minimize such liability, to the extent legally permissible. Circuit City and IBM shall
each provide and make available to the other any resale certificates, information regarding out-
of-state sales or use of Equipment, materials or services, and any other exemption certificates
or information requested by a Party.

20.06. Tax Audits or Proceedings. Each Party shall promptly notify the other Party of, and
coordinate with the other Party, the response to and settlement of, any claim for taxes asserted
by applicable taxing authorities for which the other Party is financially responsible hereunder.
With respect to any claim arising out of a form or return signed by a Party to this Agreement,
such Party will have the right to elect to control the response to and settlement of the claim, but
the other Party will have reasonable rights to participate in the responses and settlements that
are appropriate to the extent of its potential responsibility or liability. Each Party also shall have
the right to challenge the imposition of any tax liability for which it is financially responsible
under this Agreement or, if necessary, to direct the other Party to challenge the imposition of
any such tax liability. If either Party requests the other to challenge the imposition of any tax
liability, such other Party shall do so (unless and to the extent it assumes financial responsibility
for the tax liability in question), and, the requesting Party shall reimburse the other for all fines,
penalties, interest, additions to taxes or similar liabilities imposed in connection therewith, plus
the reasonable legal, accounting and other professional fees and expenses it incurs. Each
Party shall be entitled to any tax refunds or rebates obtained with respect to the taxes for which
such Party is financially responsible under this Agreement. IBM reserves the right to settle any
and all claims, without notification to, or approval by, Circuit City, provided however, that in such
event, Circuit City shall not be responsible for such settled taxes.

## ARTICLE 21 AUDITS.

21.01. Services Audits.

(1)     Upon reasonable notice from Circuit City, but in any event not less than 10
        business days in advance, IBM and IBM Agents shall provide the Circuit City
        Auditors with access to and any reasonable as sistance as they may require
        with respect to the applicable portions of the IBM Service Locations, the IBM
        Software, IBM Equipment, the IBM Controls and IBM's books, records and
        supporting documentation to the extent necessary in performing audits or
        inspections of the Services, Service Levels and the business of Circuit City
        relating to the Services. Except as provided in Section 21.04, all financial and
        non-financial transactions resulting from this Agreement shall be documented by
        IBM to the extent required to comply with this Agreement, any IBM Regulatory
        Requirement or Circuit City Regulatory Requirement (to the extent (a) such
        requirement is set forth in this Agreement or (b) Circuit City gives IBM notice of
        such Circuit City Regulatory Requirement) and shall be subject to audit by the
        Circuit City Auditors. While conducting an audit in ac cordance with this
        Section 21.01, the Circuit City Auditors shall act in a manner that complies with
        IBM's commercially reasonable security and confidentiality requirements, that
        does not require IBM to violate its security and/or confidentiality obligations to
        third parties, and that incorporates commercially reasonable efforts to minimize
        interference with IBM's operations.

(2)     IBM Corporation and Circuit City Stores shall promptly meet to review each audit
        report resulting from an audit or inspection under Section 21.01(1) and to agree
        upon an appropriate manner to address any deficiencies or recommendations
        contained therein. If any audit report indicates that IBM or IBM Agents are not in
        compliance with any IBM Regulatory Requirement, IBM shall take, and shall
        cause IBM Agents to take, prompt actions to comply with such requirement. If
        any such audit report indicates that Circuit City or Circuit City Agents are not in
        compliance with any Circuit City Regulatory Requirement, IBM shall assist Circuit
        City to comply with such requirement in accordance with the Change Control
        Procedures. IBM shall bear any cost and expense to im plement any such
        response that is required by any IBM Regulatory Requirement. Circuit City shall
        bear any cost and expense of any suc h response that is required by any Circuit
        City Regulatory Requirement.

(3)     IBM shall, at its cost and expense maintain the IBM Controls. IBM shall:
        (a) update the IBM Controls in accordance with the procedures set forth in the
        Policy and Procedures Manual; (b) cooperate with Circuit City Auditors in
        connection with the testing of IBM Controls and such other disclosure controls
        and procedures for which such cooperation i s reasonably necessary;
        (c) cooperate with C ircuit City and Circuit City Auditors in the design,
        documentation and im plementation of any changes in IB M Controls requested by
        Circuit City Stores to comply with the Circuit City Regulatory Requirements in
        accordance with the Change Contr ol Procedures; and (d) remediate any
        identified weakness or deficiency in the performance of the IBM Controls. The
        implementation of, and any changes to, the IB M Controls shall be subject to the
        approval of Circuit City Stores. In the event that Cir cuit City Stores requests any
        change to any previously-approved IBM Controls, and such change would

increase the cost of IBM to deliver the Services, Circuit City shall be responsible for such additional cost.

(4)     IBM shall engage, at its cost and expense, an external auditor to conduct a Type II SAS 70 audit of the systems related to IBM's provision of information technology data processing services to IBM's clients at the IBM Service Locations supporting Circuit City under this Agreement. IBM will provide Circuit City Stores with a copy of this report as frequently as performed by IBM (but in no event less frequently than every year), as of and following 6 months following completion of Transition.

(5)     In the event Circuit City would like IBM to retain an external auditor to provide a Circuit City-specific audit of agreed upon procedures in IBM's performance of Services, IBM will do so as a New Project ("Agreed Upon Procedures Audit"). At Circuit City's request, IBM and Circuit City can design the agreed upon controls and procedures, the number of data processing sites and machines to be covered, and other relevant scope areas. IBM will then provide Circuit City with the Charges to provide such Agreed Upon Procedures Audit. For clarity, an Agreed Upon Procedures Audit is not a SAS70 Audit.

(6)     IBM's practice is to develop and implement an action plan for exceptions noted in IBM's generic SAS70 Reports, and to provide status against such action plans in subsequent SAS70 reports until such exception is closed.

21.02. Charges Audits.

(1)     Upon reasonable notice from Circuit City Stores, but in any event not less than 10 business days in advance, IBM shall provide Circuit City and Circuit City Agents with access to such financial records and supporting documentation as may be reasonably requested by Circuit City and Circuit City Agents to audit IBM's Charges to determine if such Charges are accurate and in accordance with this Agreement.

(2)     If, as a result of such audit, Circuit City determines that IBM has overcharged Circuit City, and IBM shall not have successfully disputed the amount in question, Circuit City shall notify IBM of the amount of such overcharge and the Parties shall act in accordance with the dispute resolution procedure set forth in Article 25. Upon resolution of any dispute concerning overcharged amounts in accordance with the preceding sentence, IBM shall promptly pay to Circuit City the amount of the overcharge, plus interest at the lesser of the applicable Prime Rate and the maximum amount permitted by Law, calculated from the date of receipt by IBM of the overcharged amount until the date of payment to Circuit City.

(3)     In addition to Circuit City's rights set forth in this Section 21.02, in the event any such audit reveals a confirmed overcharge to Circuit City of 5% or more of IBM's total invoiced charges for the period being audited, IBM shall, at Circuit City Stores' option, issue to Circuit City a credit against the Charges equal to the reasonable cost of the audit incurred to identify such overcharge or reimburse Circuit City for the same costs.

21.03.  Facilities:  IBM shall provide to Circuit City and Circuit City Agents, on IBM's premises (or, if the audit is being performed of an IBM Agent, the IBM Agent's premises if necessary), space, office furnishings (including lockable cabinets), telephone and network connectivity, email and facsimile services, utilities and usual and customary office-related equipment and duplicating services and access to the requested audit data and summaries thereof in electronic or hardcopy form as Circuit City or such Circuit City Agents may reasonably require to perform the audits described in this Article 21 in a timely manner satisfactory to Circuit City.

21.04.  Disclosure Restrictions.  Notwithstanding any other provisions of this Agreement, IBM shall not be required to provide (1) audit reports or information or findings resulting or obtained from audits, investigations or reviews to the extent (a) such audits, investigations or reviews were performed by IBM's outside auditors (other than the SAS-70 Type II reports contemplated in Section 21.01), corporate internal audit staff or business controls functions, (b) such reports, findings or information constitute attorney-client privileged materials, attorney work product or were otherwise undertaken at the direction of counsel or (c) disclosure of such reports, findings or information would violate Privacy Laws or IBM's obligations of confidentiality to third parties, (2) information about IBM set forth in third-party agreements, (3) information about other IBM clients or (4) information about IBM's costs (including costs of Affiliates, agents and subcontractors) of obtaining goods and services or providing the Services (except for Services that have Charges that are calculated using such costs, such as Services provided on a cost-plus or pass-through basis); (5) any information, data, or access to IBM Confidential Information or IBM Service Locations to any entity or person that is an IBM Competitor.

21.05.  Audit Assistance.  Upon Circuit City's request, IBM shall provide, at IBM's cost and expense, audit assistance for audits initiated pursuant to this Article 21.  To the extent the audit assistance requested by Circuit City pursuant to this Section 21.05 exceeds a commercially reasonable level of assistance (taking into consideration the scope and objective of the underlying audit), IBM shall provide such audit assistance in accordance with the Change Control Procedures.

## ARTICLE 22  CONFIDENTIALITY.

22.01.  General Obligations.

(1)      Each Party shall use at least the same degree of care it uses for its own information of a similar nature, but no less than a reasonable degree of care, to avoid any unauthorized disclosure, publication, release, or transfer to Confidential Information of, or obtained from, the other in any form, or unauthorized use of, any person or entity without the disclosing party's consent. Each of Circuit City and IBM shall, however, be permitted to disclose relevant aspects of the other's Confidential Information to its officers, directors, agents, professional advisors, contractors (including the Advisor), subcontractors and employees and to the officers, directors, agents, professional advisors, contractors, subcontractors and employees of its Affiliates, to the extent that such disclosure is not restricted under this Agreement, any Assumed Agreements, any Shared Agreements, any Consents or any Governmental Approvals and only to the extent that such disclosure is reasonably necessary for the performance of its duties and obligations, and exercise of its rights, under this Agreement; provided, however, that the recipient shall not permit disclosure to any such officer, director, agent, professional advisor, contractor or subcontractor or employee until such person has agreed to confidentiality obligations that are no less

restrictive than the obligations of Article 22. The obligations in this Section 22.01 shall not restrict any disclosure pursuant to any Law or in connection with any tax audit.

(2)    IBM shall require that the Project Staff and IBM Agents comply with the confidentiality restrictions of this Agreement.

22.02. Unauthorized Acts. Without limiting either Party's rights in respect of a breach of this Article, each Party shall:

(1)    immediately notify the other Party of any unauthorized possession, use or knowledge, or attempt thereof, of the other Party's Confidential Information by any person or entity that may become known to such Party;

(2)    promptly furnish to the other Party full details of the unauthorized possession, use or knowledge, or attempt thereof, and assist the other Party in investigating or preventing the recurrence of any unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information;

(3)    reasonably cooperate with the other Party in any litigation and investigation against third parties deemed necessary by the other Party to protect its proprietary rights; and

(4)    promptly undertake efforts to prevent a recurrence of any such unauthorized possession, use or knowledge, or attempt thereof, of Confidential Information.

Each Party shall bear the costs it incurs as a result of compliance with this Section 22.02.

22.03. Attorney-Client Privilege.

(1)    IBM recognizes that IBM and IBM's Agents: (1) may obtain access to Circuit City documents, data and databases created by and for Circuit City and associated communications related thereto that are protected by the attorney-client privilege and/or the work product doctrine: (2) may communicate both orally and in writing with Circuit City and/or its attorneys regarding Circuit City documents, data, databases and communications that are subject to the attorney-client privilege and/or the work product doctrine; or (3) may create documents, memoranda, spreadsheets, and other materials, that are protected by Circuit City as attorney-client privileged and/or subject to work product protection (collectively, "Privileged Work Product") and to the extent that Circuit City and/or its attorneys specifies to IBM and/or IBM's Agents that particular documents, data or information constitute Privileged Work Product, or the Parties otherwise agree in accordance with mutually agreed to procedures. IBM shall not reveal Privileged Work Product to third parties unless instructed to do so by a court of competent jurisdiction and IBM shall institute adequate safeguards to prevent the unintentional disclosure of Privileged Work Product to third parties consistent with the safeguards IBM institutes to protect IBM information of a similar nature. The only Project Staff who may have access to Privileged Work Product shall be those for whom such access is necessary for the purpose of providing Services to Circuit City. If legally required to protect the privilege, all Project Staff who will need access to Privileged Work Product shall first sign and deliver to Circuit City

a confidentiality agreement satisfactory to Circuit City. IBM recognizes that Privileged Work Product has been prepared in anticipation of litigation and/or as part of the attorney-client relationship and that IBM is performing the Services in respect of Privileged Work Product as an agent of Circuit City, and that all matter related thereto is protected from disclosure by Rule 26 of the United States Federal Rules of Civil Procedure (or any similar Law in other local jurisdictions). Should IBM ever be notified of any judicial or other proceeding seeking to obtain access to Privileged Work Product, IBM shall (1) immediately notify Circuit City and (2) take such reasonable actions as may be specified by Circuit City to resist providing such access. Circuit City shall have the right and duty to represent IBM in such resistance or to select and compensate counsel to so represent IBM or to reimburse IBM for reasonable attorneys' fees and expenses incurred in resisting such access.

(2)     IBM shall reasonably cooperate, and assist Circuit City, in connection with legal or regulatory proceedings and shall take any actions reasonably requested by Circuit City in connection therewith. IBM shall provide, or at the request of Circuit City retain, all information related to Circuit City Data or Circuit City Confidential Information as reasonably requested by Circuit City or that would assist Circuit City in connection with such legal or regulatory proceedings, including responding to any expedited requests related thereto. If Circuit City reasonably requests, IBM shall participate in meetings to discuss, and provide information, documents, and data related to, Circuit City's litigation response and related activities, including information retention and retrieval policies and responses to discovery requests, subpoenas, investigatory demands, and other requirements for information related to legal and regulatory proceedings.

(3)     The Parties agree that if any Circuit City request pursuant to this Section constitutes a Change, the Parties shall evaluate whether such request constitutes a Chargeable Change.

## ARTICLE 23 REPRESENTATIONS AND WARRANTIES.

23.01. <u>By Circuit City Stores</u>. Circuit City Stores represents and warrants that, as of the Effective Date:

(1)     Circuit City Stores is a corporation, duly organized, validly existing and in good standing under the Laws of Virginia;

(2)     Circuit City Stores has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement;

(3)     The execution, delivery and performance of this Agreement by Circuit City Stores (a) has been duly authorized by Circuit City Stores, (b) shall not violate any applicable Law and (c) shall not conflict with, result in a breach of or constitute a default under any other agreement to which Circuit City Stores is a party or by which Circuit City Stores is bound;

(4)     Circuit City Stores is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the

transaction of business of the char acter transacted by it, except where the failure to be so licensed, authorized or qualified would not have a material adverse effect on Circuit City Stores' ability to fulfill its obligations under this Agreement;

(5)    Circuit City is in compliance with all Laws applicable to it as a corporation and has obtained all applicable permits, certificates, approvals, inspections and licenses required of it in connection with its obligations under this Agreement;

(6)    Circuit City has not disclosed any Confidential Inform ation of IBM in violation of any agreement between the Parties;

(7)    There is no outstanding claim, litigation, proceeding, arbitration, investigation or material controversy or other dispute which Circuit City, without predicting the outcome of such matter, reasonably expects to have a material adverse effect on Circuit City's or IBM's ability to enter into this Agreement or to fulfill its respective obligations under this Agreement; and

(8)    The Circuit City Software does not infringe upon the patent, trade secret, copyright or other proprietary rights of any third party, except for the Circuit City Infringement Exceptions.

23.02.  By IBM Corporation.  IBM Corporation represents and warrants that, as of the Effective Date:

(1)    IBM Corporation is a corporation duly incorporated, validly existing and in good standing under the Laws of New York;

(2)    IBM Corporation has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement;

(3)    The execution, delivery and performance of this Agreement by IBM Corporation (a) has been duly authorized by IBM Corporation, (b) shall not violate any applicable Law and (c) shall not conflict with, result in a breach of or constitute a default under any other agreement to which IBM Corporation is a party or is bound;

(4)    IBM Corporation is duly licensed, authorized or qualified to do business and is in good standing in every jurisdiction in which a license, authorization or qualification is required for the ownership or leasing of its assets or the transaction of business of the char acter transacted by it, except where the failure to be so licensed, authorized or qualified would not have a m aterial adverse effect on the ability of IBM Corporation to fulfill its obligations under this Agreement;

(5)    IBM is in compliance with all Laws applicable to it as a corporation and has obtained all applicable permits, certificates, approvals, inspections and licenses required of it in connection with its obligations under this Agreement;

(6)    IBM has not disclosed any Confidential Infor mation of Circuit City in violation of any agreement between the Parties;

(7)     There is no outstanding claim, litigation, proceeding, arbitration, investigation or material controversy or other dispute which IBM, without predicting the outcome of such matter, reasonably expects to have a material adverse effect on IBM's or Circuit City's ability to enter into this Agreement or to fulfill its respective obligations under this Agreement;

(8)     IBM Software does not infringe upon the patent, trade secret, copyright or other proprietary rights of any third party, except for the IBM Infringement Exceptions.

(9)     IBM is the owner of, or is authorized to use or provide, all IBM Software used in connection with the Services; and

(10)    IBM has not violated any applicable Laws or any Circuit City policies of which IBM has been given notice, regarding the offering of unlawful inducements in connection with this Agreement.

IBM and its subsidiaries shall not be liable to Circuit City or indemnify Circuit City for any claims of patent infringement, including contributory infringement or inducement to infringe, of any patents owned or licensable now or hereafter by Ronald A. Katz or Ronald A. Katz Technology Licensing, L.P. or by his or its successors or assigns ("Katz Patents"), provided, however, that the foregoing limitation shall not be applicable to the extent the Services provided by IBM are related to information technology being provided from facilities owned or leased by IBM and IBM is providing substantially all automated call processing and updating all databases associated with the Services.

23.03. **DISCLAIMER OF WARRANTIES. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR ANY WORK AUTHORIZATION, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING ANY MATTER, INCLUDING THE MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, OR RESULTS TO BE DERIVED FROM THE USE, OF ANY INFORMATION TECHNOLOGY SERVICE, SOFTWARE, HARDWARE OR OTHER MATERIALS PROVIDED UNDER THIS AGREEMENT, OR THAT THE OPERATION OF ANY SUCH SERVICE, SOFTWARE, HARDWARE OR OTHER MATERIALS WILL BE UNINTERRUPTED OR ERROR-FREE.**

**ARTICLE 24** ADDITIONAL COVENANTS.

24.01. By Circuit City Stores. Circuit City Stores covenants and agrees with IBM Corporation that during the Term and the Termination Assistance Period:

(1)     Circuit City shall comply with all Laws applicable to Circuit City and relating to the conduct of the Circuit City business to the extent that such conduct relates to the receipt of the Services; and

(2)     The Circuit City Software shall not infringe upon the proprietary rights of any third party except to the extent caused by a Circuit City Infringement Exception.

24.02. By IBM Corporation. IBM Corporation covenants and agrees with Circuit City Stores that during the Term and the Termination Assistance Period:

(1)    None of the Services, IBM New Intellectual Property, IBM Software, IBM Equipment, any enhancements or modifications to the Circuit City Software performed by IBM or IBM Agents or any other resources or items provided to Circuit City by IBM or IBM Agents shall infringe upon the proprietary rights of any third party except to the extent caused by an IBM Infringement Exception;

(2)    As set forth in the Exhibit 4.04 (Technical Architecture Standards), IBM shall maintain a level of technology currency with respect to Virus protection, prevention, elimination and remediation that is consistent with other tier-one information technology service providers and shall implement such technologies and methodologies as necessary throughout the Term and Termination Assistance Period. In connection with the performance of the Designated Services, during the Term and the Termination Assistance Period, IBM shall use commercially reasonable efforts to provide that no Viruses are introduced into any IBM Software, Circuit City Software, IBM Equipment or Circuit City Equipment. If a Virus is found to have been introduced into any such Software or Equipment, IBM promptly shall (a) notify Circuit City in writing of such introduction and, assist Circuit City in reducing the effects of the Virus, and (b) if the Virus causes an interruption of the Services, a loss of operational efficiency or loss of data, assist Circuit City to the same extent to mitigate and restore such losses, in each case using Project Staff;

(3)    During the Term and the Termination Assistance Period, except for license management code (i.e., code embedded in Software by a licensor to protect such Software from being used in contravention of the license agreement), for any Software used in the performance of or supported as part of the Services and any Developed Software, (a) IBM shall not insert into such Software any code that would have the effect of disabling or otherwise shutting down all or any portion of the Services and shall not invoke disabling code at any time without Circuit City's prior consent and (b) if any such insertion or invocation occurs, IBM shall promptly remove or reverse such disabling code, restore any Services disabled or otherwise shut down as a result of such insertion or invocation and mitigate and restore any losses resulting from such disablement or shutting down; and

(4)    During the Term and the Termination Assistance Period, IBM will perform the Services with promptness, diligence and in a workmanlike and professional manner, in accordance with the terms of this Agreement and with the practices and professional standards applicable to tier-one providers.

## ARTICLE 25  DISPUTE RESOLUTION.

25.01.  Management Committee. Any dispute arising under this Agreement (other than dispute governed by Section 25.03) that is not resolved through the issue escalation procedure set forth in Exhibit 13.02 (Governance Model) shall be considered in person or by telephone by the Management Committee at its next regularly scheduled meeting. If, for any reason, including a failure to meet or communicate, the Management Committee has not resolved such dispute to the satisfaction of the Parties within 15 days after the Dispute Date, then the Management Committee shall immediately refer such dispute to the Executive Committee.

25.02. <u>Executive Committee.</u> Any dispute arising under this Agreement (other than dispute governed by <u>Section 25.03</u>) that is not resolved by the Management Committee in accordance with <u>Section 25.01</u> shall be considered in person or by telephone by the Executive Committee within 15 days after referral of such dispute to the Executive Committee by the Management Committee. If, for any reason, including a failure to meet or communicate, the Executive Committee has not resolved such dispute to the satisfaction of the Parties within 15 days after the dispute is referred to the Executive Committee, then either Party may refer such dispute to litigation or, if mutually agreed, alternative dispute resolution.

25.03. <u>Fee Dispute Resolution.</u> Any dispute with regard to Charges arising under this Agreement will be addressed in the order of the escalation set forth below:

    (1)    Circuit City Stores must notify IBM Corporation of the amount of any disputed Charges and the reason for such dispute prior to the time at which the payment of such Charges is due;

    (2)    Circuit City Stores will provide IBM Corporation with sufficient detail regarding the dispute to allow IBM Corporation to conduct an investigation of the details of the disputed sum within 5 days after the date on which the disputed Charges are due;

    (3)    the IBM Delivery Project Executive and the Circuit City Delivery Project Executive will meet within 5 days after the date on which the disputed Charges are due to discuss the dispute and review supporting data with the objective of resolving the dispute before the date on which the payment is due;

    (4)    if the dispute cannot be resolved by the IBM Delivery Project Executive and the Circuit City Delivery Project Executive within 5 days after their meeting, the IBM Project Executive and Circuit City Contract Executive will meet within 5 days after the date on which the dispute was referred to them to discuss the dispute and review supporting data with the objective of resolving the payment dispute;

    (5)    if the dispute cannot be resolved by the IBM Project Executive and the Circuit City Project Executive within 5 days after their meeting, either Party may escalate the dispute to the IBM Industry Vice President and the Circuit City CIO. The Parties will use best efforts to commence all escalations that pertain to Charges disputes within 15 Business Days after the Parties fail to resolve the dispute in accordance with clause (4) above; and

    (6)    notwithstanding any other provisions set forth in this Agreement, Circuit City shall withhold disputed Charges subject to the terms set forth in this <u>Section 25.03(6)</u>. The maximum amount of the Charges that may be withheld by Circuit City at any one time is limited to a maximum of one-twelfth of the Charges paid during the 12-month period preceding the latest dispute ("<u>Disputed Charges Cap</u>"). In the event Circuit City disputes Charges in excess of the Disputed Charges Cap, Circuit City shall pay such excess amount of the Charges into an escrow account held by a nationally recognized financial institution; pursuant to a three party agreement between IBM, Circuit City, and the financial institution; provided that the maximum amount that may be paid into escrow by Circuit City at any one time is limited to a maximum of one-twelfth of the Charges paid during the 12-month period preceding the latest dispute ("<u>Escrow Amount Cap</u>"). Circuit City

shall pay to IBM any Charges in excess of the Disputed Charges Cap and the Escrow Amount Cap; provided that Circuit City shall retain any and all rights to contest its obligation to pay IBM such Charges. Upon resolution of the dispute, the Parties shall allocate the disputed amount, less any fee relating to opening and maintaining the escrow account, plus the interest provided by the financial institution, according to the resolution of the dispute.

25.04. <u>Continuity of Services</u>. IBM acknowledges that the performance of its obligations pursuant to and as required by this Agreement is critical to the business and operations of Circuit City. Accordingly, in the event of a dispute between Circuit City and IBM, (1) IBM shall continue to so perform its obligations under this Agreement in good faith during the resolution of such dispute unless and until this Agreement is terminated in accordance with the provisions of this Agreement; and (2) subject to Circuit City's rights to dispute invoice amounts pursuant to <u>Section 25.03</u>, Circuit City shall continue to perform its payment obligations under this Agreement in good faith during the resolution of such dispute.

## ARTICLE 26 TERMINATION.

26.01. <u>Termination for Convenience.</u> Circuit City Stores may terminate this Agreement for convenience by giving IBM Corporation notice of termination not less than 6 months prior to the termination date specified in such notice and Circuit City Stores shall, upon the effective date of the termination, pay to IBM Corporation the Convenience Termination Fee.

26.02. <u>Termination for Change in Control of IBM</u>. Circuit City Stores may terminate this Agreement if there occurs a Change in Control of IBM Corporation by giving notice to IBM Corporation not more than 6 months after the effective date of such Change in Control of IBM Corporation. If Circuit City Stores terminates this Agreement pursuant this <u>Section 26.02</u>, such termination shall be effective as of the later of (1) the date specified in such notice, which shall be no longer than 90 days after the effective date of the Change of Control, and (2) the effective date of such Change of Control of IBM Corporation and Circuit City Stores shall, upon the effective date of the termination, pay to IBM Corporation the Change in Control Termination Fee.

26.03. <u>Termination for Cause</u>.

(1)    If (a) IBM (i) breaches in any material respect any of its duties or obligations under this Agreement and fails to cure such breach within 30 days after notice; (ii) breaches any material duty or obligation under this Agreement that is not capable of being cured relating to confidentiality, compliance with Laws, data security, or intellectual property rights of Circuit City or a third party; or (iii) commits numerous breaches of its duties or obligations under this Agreement which in the aggregate are material and fails to cure such breaches within 30 days after notice (provided such notice may not be given until such breaches become material in the aggregate) then Circuit City Stores may, by giving notice to IBM Corporation, terminate this Agreement as of the termination date specified in the notice.

(2)    IBM Corporation may terminate this Agreement only if Circuit City fails to comply with <u>Section 25.03(6)</u> and fails to cure such breach within 15 days after a notice of intent to terminate given by IBM Corporation to Circuit City Stores not earlier than 15 days after notice of nonpayment is given by IBM Corporation to Circuit

City Stores. Any such notice of nonpayment must be delivered in accordance with Section 32.02 and shall also be delivered at least two times to the Circuit City Chief Financial Officer.

26.04.  Other Terminations.  In addition to the provisions of this Article, this Agreement may be terminated by Circuit City Stores as provided in Section 3.07(6) (Transition Services), Section 4.03(5), and Section 8.04.

26.05.  Extension of Termination Effective Date.  Circuit City Stores may, upon 90 days' notice to IBM Corporation, extend the effective date of termination one or more times as it elects, at its sole discretion, provided that the total of all such extensions shall not exceed 6 months following the original effective date of termination.  The Charges and Service Levels in effect at the time of the termination will continue to be in effect during any Extension Period.

26.06.  Savings Clause.  Except as set forth in Section 26.03(2), no other failure by Circuit City to perform any of its responsibilities set forth in this Agreement shall be deemed to be grounds for termination by IBM.  IBM's failure to perform any of its obligations under this Agreement shall be excused if and to the extent: (1) such failure results from Circuit City's failure to perform its responsibilities; (2) IBM provides Circuit City with reasonable notice of such nonperformance; and (3) IBM uses commercially reasonable efforts to perform notwithstanding Circuit City's failure to perform.

## ARTICLE 27  TERMINATION CHARGES.

27.01.  No Other Termination Charges.  Except as otherwise specifically set forth in Exhibit 18.01 (Pricing and Financial Provisions), no other fees or charges shall be payable by Circuit City Stores in connection with the termination of this Agreement.

## ARTICLE 28  TERMINATION ASSISTANCE.

28.01.  Termination Assistance Services.

(1)      IBM will provide Termination Assistance Services to the Successor during the Termination Assistance Period.

(2)      IBM shall provide the Termination Assistance Services regardless of the reason for termination or expiration and such Termination Assistance Services will be included in IBM's Charges.  If Circuit City Stores has terminated this Agreement for cause per Section 26.03(1), all associated costs and expenses of the Termination Assistance Services related to wind-down and transition shall be at IBM's sole cost and expense and IBM shall not charge any Charges to Circuit City for such Termination Assistance Services, except as related to the continued provision of Designated Services by IBM for which IBM will continue to charge Circuit City in accordance with Section 19.01.  IBM shall, upon Circuit City's request during a Termination Assistance Period, provide the Termination Assistance Services at IBM's rates then in effect for such services immediately prior to the expiration or termination of this Agreement, except to the extent that resources included in the Base Charges being paid by Circuit City to IBM after such expiration or termination can be used to provide the Termination Assistance Services.  Further, in the event of a termination by IBM pursuant to Section 26.03(2), (a) IBM may require that Circuit City pay monthly in advance

for any Termination Assistance Services and any other Services, and IBM shall not be obligated to provide Termination Assistance Services or any other Services, and shall not be in breach under this Agreement for failing to provide Termination Assistance Services or any other Services, unless Circuit City prepays for such Termination Assistance Services and Services and (b) at least 10 days prior to the beginning of each month, IBM shall provide Circuit City with an invoice setting out a good faith estimate of the charges for the Termination Assistance Services and any other Services for that month and such amounts shall be due and payable by Circuit City prior to the beginning of such month (with a quarterly reconciliation of the amounts actually due).

(3)     All Service Levels and Service Level Credits will be applicable to any Services being performed during the Termination Assistance Period, unless IBM provides notice to Circuit City Stores that performance of the Termination Assistance Services is inconsistent with adherence to the Service Levels. In such instances, the Parties will meet and discuss workarounds and reprioritize Service Levels as needed.

(4)     As part of the Termination Assistance Services, IBM will (a) provide such information as Circuit City may reasonably request relating to the number and function of each member of the Project Staff, and IBM will make such information available to potential Successors; and (b) not make any disproportionate changes (as compared to the amount of Services being provided) to the number of Project Staff assigned to perform functions for Circuit City under this Agreement.

(5)     After the expiration of the Termination Assistance Period, IBM shall (a) answer questions from Circuit City regarding the Services on an "as needed" basis at IBM's then-standard billing rates and (b) deliver to Circuit City any remaining Circuit City-owned reports and documentation relating to the Services still in IBM's possession.

28.02.  Exit Rights. Upon the End Date:

(1)     the rights granted to IBM and IBM Agents in Section 14.01 shall immediately terminate and IBM shall, and shall cause IBM Agents to, (a) deliver to Circuit City, at no cost to Circuit City, a current copy of the Circuit City Software and Related Documentation in IBM's or IBM Agents' possession, in the form in use as of the End Date, and (b) destroy or erase all other copies of the Circuit City Software in IBM's or IBM Agents' possession. IBM shall, upon Circuit City's request, certify to Circuit City that all such copies have been destroyed or erased;

(2)     with respect to any IBM Proprietary Software that IBM makes commercially available, at the request of Circuit City, IBM shall (a) deliver to Circuit City such IBM Proprietary Software and (b) provide Circuit City with maintenance releases and support for such IBM Proprietary Software for up to 3 years after the End Date on IBM's standard commercial terms for clients of a size and type similar to Circuit City for Use by Circuit City following the End Date. With respect to any IBM Proprietary Software that IBM does not make commercially available, at the request of Circuit City, IBM shall comply with the terms set forth in Section 14.02(3);

(3)     with respect to IBM Third Party Software that IBM has licensed, leased or otherwise obtained from third parties and is using to provide the Services as of the End Date, IBM shall (except with respect to open source code): either (a) deliver a copy of such IBM Third Party Software and transfer, assign or sublicense such IBM Third Party Software to Circuit City or its designee at no additional cost (other than ongoing support and maintenance fees contained in such license to the extent approved by Circuit City Stores at the time such IBM Third Party Software was acquired by IBM), or (b) at Circuit City Stores' cost and expense, implement, subject to the prior approval of Circuit City Stores, permanent alternative approaches as necessary to provide Circuit City with a functional equivalent to such IBM Third Party Software;

(4)     IBM shall deliver to Circuit City a copy of all of the applicable IBM New Intellectual Property, in the form in use as of the last day of the applicable Termination Assistance Period;

(5)     upon Circuit City's request, with respect to (a) any Non-Leveraged subcontracts and (b) the Assumed Agreements, IBM shall, and shall cause IBM Agents to, transfer or assign such agreements to Circuit City or its designee, on terms and conditions acceptable to all applicable parties; and

(6)     IBM shall sell or assign leases for the Non-Leveraged IBM Equipment as of the End Date to Circuit City or its designee, free and clear of all liens, security interests or other encumbrances at book value. IBM shall be responsible for and shall pay for all Consents necessary to effectuate such Equipment transfer.

28.03.  Hiring of Project Staff. As of the date of a Party's notice to the other Party that there shall be an expiration or termination of this Agreement, IBM shall (1) not terminate, reassign or otherwise remove from the Project Staff any Affected Project Staff Member unless such termination, reassignment or removal of the applicable member of the Project Staff results directly from reductions in the Services by Circuit City and (2) to the extent not prohibited by applicable Laws, (a) provide Circuit City with the name of each Affected Project Staff Member's position and such Affected Project Staff Member's description of job responsibilities, in accordance with IBM's standard employment policies, (b) provide Circuit City and its designees reasonable access to such Affected Project Staff Members and (c) allow Circuit City and its designees to meet with and extend offers of employment to Affected Project Staff Members, and (d) not interfere with any such effort to hire such Affected Project Staff Members and waive any restrictions that may prevent any Affected Project Staff Member from being hired by Circuit City or its designees pursuant to this Section 28.03.

## ARTICLE 29  INDEMNITIES.

29.01.  Indemnity by Circuit City Stores. Circuit City Stores will indemnify, defend and hold harmless the IBM Indemnified Parties against Losses incurred as a result of any third party claim:

(1)     arising out of or related to Circuit City's failure to perform its obligations (a) prior to the date of assignment under any Assumed Agreement or (b) under any Shared Agreement;

(2)     arising out of or relating to Circuit City's breach of any representation or warranty set forth in clauses (1) through (4) of <u>Section 23.01</u>;

(3)     of infringement of the patent, trade secret, copyright or other proprietary rights, alleged to have occurred because of Systems or other resources provided by Circuit City to IBM except to the extent caused by a Circuit City Infringement Exception;

(4)     against IBM for fines or penalties related to Circuit City's failure to comply with its obligations in <u>Section 24.01(1)</u>;

(5)     against IBM for taxes, assessments, or penalties which are the responsibility of Circuit City pursuant to <u>Article 20</u>;

(6)     with regard to the provision of Services under this Agreement, relating to (a) a violation of Law for the protection of persons or members of a protected class or category of persons by Circuit City Agents, including unlawful discrimination, (b) accrued employee benefits expressly retained by Circuit City, (c) any representations, oral or written, made by Circuit City or Circuit City Agents to its employees, including the Affected Employees, and (d) any other aspect of the Affected Employees' employment relationship with Circuit City or the termination of the employment relationship with Circuit City (including claims for breach of an express or implied contract of employment);

(7)     relating to a breach by Circuit City of its obligations under <u>Article 22</u>.

Circuit City Stores shall indemnify the IBM Indemnified Parties from any Losses incurred in connection with the enforcement of this <u>Section 29.01</u>.

29.02.  <u>Indemnity by IBM</u>. IBM will indemnify, defend and hold harmless the Circuit City Indemnified Parties against Losses incurred as a result of any third party claims:

(1)     arising out of or related to IBM's performance or failure to perform its obligations (a) under any Assumed Agreement on or after the effective date of assignment or assumption or (b) in connection with managing any Shared Agreement;

(2)     arising out of or relating IBM Corporation's breach of any representation or warranty set forth in clause (1) through (4) of <u>Section 23.02</u>;

(3)     subject to <u>Section 23.02</u> as it pertains to Katz Patents, of infringement of the patent, trade secret, copyright or other proprietary rights, alleged to have occurred as a result of any Use in connection with this Agreement of any IBM Software, IBM New Intellectual Property or other resources provided by IBM, or based upon performance of the Services by IBM except to the extent caused by an IBM Infringement Exception;

(4)     against Circuit City for fines or penalties related to IBM's failure to comply with (a) any IBM Regulatory Requirement, or (b) the terms of this Agreement where such failure causes Circuit City to violate a Circuit City Regulatory Requirement of which Circuit City informs IBM in advance is associated with the terms or is otherwise specified in this Agreement; provided that IBM's maximum aggregate

amount of liability for all fines or penalties imposed by a government agency(ies) in connection with (b) shall be equal to the Damages Cap, provided further, however, in any single or series of related events involving data or loss of data that is not encrypted, the maximum amount of liability for fines or penalties imposed by a governmental agency(ies) in connection with such event shall be $5,000,000 in the case of any such liability that could have been avoided had such data been encrypted;

(5)     against Circuit City for taxes, assessments, or penalties which are the responsibility of IBM pursuant to <u>Article 20</u>;

(6)     with regard to the provision of Services under this Agreement, relating to (a) a violation of Law for the protection of persons or members of a protected class or category of persons by IBM or IBM Agents, including unlawful discrimination, (b) accrued employee benefits following their transfer date not expressly retained by Circuit City, (c) any representations, oral or written, made by IBM or IBM Agents to Circuit City's employees, including the Affected Employees, and (d) any other aspect of the Transitioned Employees' employment relationship with IBM or the termination of the employment relationship with IBM (including claims for breach of an express or implied contract of employment); and

(7)     relating to a breach by IBM of its obligations under <u>Article 22</u>.

IBM Corporation shall indemnify the Circuit City Indemnified Parties from Losses incurred in connection with the enforcement of this <u>Section 29.02</u>.

29.03. <u>Additional Indemnities</u>. Each Party shall indemnify, defend, and hold harmless the other, and the other's respective Affiliates, officers, directors, employees, agents, successors, and assigns, against any Losses incurred as a result of any third party claims (a) for the death or bodily injury of any person to the extent caused or contributed to by the negligence of the indemnitor; (b) for the damage, loss or destruction of any real or tangible personal property to the extent caused or contributed to by the negligence of the indemnitor; (c) arising out of or related to the indemnitor's breach of its confidentiality obligations under <u>Article 22</u>.

29.04. <u>Infringement</u>. If any item used by IBM to provide the Services becomes, or in IBM's reasonable opinion is likely to become, the subject of an infringement or misappropriation claim or proceeding, then IBM will promptly notify Circuit City of such claim or proceeding and at IBM's expense take the following actions in the following priority order: (1) secure the right to continue using the item; (2) replace or modify the item to make it non-infringing, provided that any such replacement or modification will not degrade the performance or quality of the affected component of the Services in any material way; or (3) if neither (1) nor (2) is available to IBM at a commercially reasonable rate, remove the item from the Services and equitably adjust the Charges to adequately reflect such removal.

29.05. <u>Indemnification Procedures</u>. If any third party claim is commenced against the Indemnified Party, notice thereof shall be given to the Indemnifying Party as promptly as practicable. If, after such notice, the Indemnifying Party shall acknowledge that this Agreement applies with respect to such claim, then the Indemnifying Party shall be entitled, if it so elects, in a notice promptly delivered to the Indemnified Party to immediately take control of the defense and investigation of such claim and to employ and engage attorneys reasonably acceptable to the Indemnified Party to handle and defend the same, at the Indemnifying Party's sole cost and

expense. The Indemnified Party shall cooperate in all reasonable respects with the Indemnifying Party and its attorneys in the investigation, trial and defense of such claim and any appeal arising therefrom; provided, however, that the Indemnified Party may, at its own cost and expense, participate, through its attorneys or otherwise, in such investigation, trial and defense of such claim and any appeal arising therefrom. No settlement of a claim that involves a remedy other than the payment of money by the Indemnifying Party shall be entered into without the consent of the Indemni fied Party. After notice by the Indemnifying Party to the Indemnified Party of its election to assume full control of the defense of any such claim, the Indemnifying Party shall not be liable to the Inde mnified Party for any legal expenses incurred thereafter by such Indemnified Party in connection with the defense of that claim. If the Indemnifying Party does not assume full control over the defense of a claim subject to such defense as provided in this Section 29.05, the Indemnifying Party may participate in such defense, at its sole cost and expense, and the Indemni fied Party has the right to defend the claim in such manner as it may deem appropriate, at the cost and expense of the Indemni fying Party.

29.06. Exceptions to Infringement Indemnity.

(1) Neither IBM nor Circuit City will be liable to the other for claims of indirect or contributory infringement.

(2) Notwithstanding anything in this Agreement to the contrary, IBM shall not have any liability to any third party, Circuit City nor any Circuit City Indemnified Party with respect to the IBM Infringement Exceptions.

(3) Notwithstanding anything in this Agreement to the contrary, Circuit City shall not have any liability to any third party, IBM nor any IBM Indemnified Party with respect to Circuit City Infringement Exceptions.

## ARTICLE 30 DAMAGES.

30.01. Damages. Subject to the liability limitations set forth below, it is the intent of the Parties that each Party shall be liable to the other P arty for any damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations under this Agreement.

30.02. Liability Limitations and Exceptions.

(1) Except as noted below, neither Party shall be liable to the other for any loss of profits, loss of use, loss of contracts or for any consequential, indirect, incidental, punitive or exemplary damages, regardless of whether liability is based on any breach of contract, tort (including negligence), warranty, statute, or other basis of liability.

(2) Each Party's total liability to the other shall be limited, in the aggregate, to the Damages Cap, provided, however, such Damages Cap shall be increased by an amount equal to six months Charges for damages occasioned by Gross Negligence or Willful Misconduct.

(3) The limitations of liability contained in Section 30.02(1) and Section 30.02(2) shall not apply with respect to (a) claims that are the subject of indemnification under any provision of this Agreement; (b) a Party's nonperformance of its

payment obligations to the other expressly set forth in this Agreement (including, with respect to Circuit City, Circuit City's obligation to make payments to IBM during the Term as required hereby, whether in the form of Charges or for payment or reimbursement of taxes); (c) breaches of <u>Article 22</u>; or (d) breaches of <u>Section 15.01</u> or <u>Section 15.04</u>. Further, the limitation of liability contained in <u>Section 30.02(1)</u> shall only apply with respect to damages occasioned by the Gross Negligence or Willful Misconduct of a Party to the extent such liability exceeds $50,000,000.

30.03. <u>Direct Damages</u>. Direct damages recoverable by Circuit City pursuant to this Agreement shall include actual and reasonable: (1) costs of reloading data or, when applicable, restoring data using generally accepted data restoration techniques; (2) costs of implementing and performing workarounds regarding a Service failure; (3) costs of replacing lost, stolen or damaged goods or materials; (4) costs to procure replacement services from an alternate source as a result of a failure to perform, to the extent in excess of the applicable Charges; and (5) overtime, straight time, and related expenses and allocated overhead (including travel, lodging, wages) as a result of a failure to perform.

30.04. <u>Duty to Mitigate</u>. Each Party has a duty to mitigate the damages that would otherwise be recoverable from the other pursuant to this Agreement by taking appropriate and reasonable actions to reduce or limit the amount of such damages.

## ARTICLE 31  INSURANCE.

31.01. <u>Insurance</u>. During the Term, IBM shall obtain and maintain at its own expense, and require IBM Agents to obtain and maintain at their own or IBM's expense, insurance of the type and in the amounts set forth below:

(1)     Worker's Compensation per government or statutory requirements.

(2)     Employer's liability insurance with minimum limits of $1,000,000.

(3)     Commercial general liability (including contractual liability insurance) with a combined single limit of not less than $5,000,000 per occurrence.

(4)     All Risk Property insurance, including coverage specifically designed for electronic data processing equipment, providing "all risk" or "special cause of loss" coverage on a replacement cost basis, on all Equipment owned or leased by IBM and used to provide the Services.

(5)     Comprehensive automobile liability covering all vehicles that IBM owns, hires or leases in an amount not less than $2,000,000 per occurrence (combined single limit for bodily injury and property damage).

(6)     Umbrella or Excess Liability, in an amount not less than $10,000,000 per occurrence and in the aggregate.

31.02. <u>Insurance Documentation</u>. To the extent third party insurance is obtained or maintained by IBM in respect of the insurance coverage required by <u>Section 31.01</u>, IBM shall, upon Circuit City's request, furnish to Circuit City certificates of insurance or other appropriate documentation evidencing all coverages referenced in this Agreement. Each policy shall

provide that Circuit City shall be named as an additional insured, except workers compensation and employers liability and property insurance, on a primary coverage basis. Such certificates or other documentation shall include a provision whereby 30 days notice must be received by Circuit City Stores prior to coverage cancellation by either IBM or IBM Agents or the applicable insurer. Such cancellation shall not relieve IBM of its continuing obligation to maintain insurance coverage in accordance with this <u>Article 31</u>. In addition, Circuit City and IBM hereby agree to waive subrogation and have their respective insurers waive their rights of subrogation against the other under their respective Workers Compensation, Commercial General Liability, All Risk Property Coverage, Business Automobile Liability and Umbrella or Excess Liability insurance policies.

31.03. <u>Risk of Loss</u>. Each Party shall be responsible for damages to their respective tangible personal or real property (whether owned or leased), and each Party agrees to look only to their own insuring arrangements (if any) with respect to such damages, except to the extent such damages are caused by the other Party.

## ARTICLE 32  MISCELLANEOUS PROVISIONS.

32.01. <u>Assignment</u>.

   (1)    Neither Party may assign this Agreement or any right or obligation hereunder, without the prior consent of the other Party, except that either Party may assign its rights and obligations under this Agreement without the approval of the other Party to (a) an entity which acquires all or substantially all of the assets of such Party; or (b) to any Affiliate or successor in connection with a Change in Control of such Party, in the case of IBM Corporation, subject to the right of Circuit City Stores to terminate this Agreement pursuant to <u>Section 26.02</u>. The assigning Party shall not be relieved of its obligations under this Agreement as a result of any such assignment. The consent of a Party to any assignment of this Agreement shall not constitute such Party's consent to further assignment.

   (2)    This Agreement shall be binding on the Parties and their respective successors and permitted assigns. Any assignment in contravention of this <u>Section 32.01</u> shall be void.

32.02. <u>Notices</u>. Except as otherwise specified in this Agreement, all notices, requests, consents, approvals, agreements, authorizations, acknowledgments, waivers and other communications required or permitted under this Agreement shall be in writing and shall be deemed given when received by the intended recipient by certified mail or comparable registered mail through any postal service, hand delivery or other courier with a reliable system for tracking delivery at the address specified below:

In the case of Circuit City Stores:

     Circuit City Stores, Inc.
     9950 Mayland Drive
     Richmond, VA 23233
     Attention: Chief Information Officer

with a copy to:

> Circuit City Stores, Inc.
> 9950 Mayland Drive
> Richmond, VA 23233
> Attention: Office of the General Counsel – Commercial Legal

In the case of IBM Corporation:

> International Business Machines Corporation
> Attention: Associate General Counsel
> Global Technology Services
> Route 100
> Somers, NY 10589

with a copy to:

> International Business Machines Corporation
> Attention: IBM Project Executive
> 9954 Mayland Drive
> Richmond, Virginia 23233

Either Party may change its address for notification purposes by giving the other Party prior notice of the new address and the date upon which it shall become effective.

32.03. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one single agreement between the Parties.

32.04. <u>Relationship</u>. The Parties intend to create an independent contractor relationship and nothing contained in this Agreement shall be construed to make either Circuit City or IBM partners, joint venturers, principals, agents (except as expressly set forth in <u>Article 7</u>) or employees of the other. No officer, director, employee, Affiliate or IBM Agent retained by IBM to perform work on Circuit City's behalf under this Agreement shall be deemed to be an employee of Circuit City or a Circuit City Agent. Neither Party has any right, power or authority, express or implied, to bind the other.

32.05. <u>Severability and Modification</u>. In the event that any provision of this Agreement conflicts with the Law under which this Agreement is to be construed or if any such provision is held invalid by an arbitrator or a court with jurisdiction over the Parties, such provision will be deemed to be modified to reflect as nearly as possible the original intentions of the Parties in accordance with applicable Laws. The remainder of this Agreement will remain in full force and effect. If any state or federal body of competent jurisdiction determines that any provision of this Agreement violates any applicable Law, both Parties will make reasonable efforts to promptly bring this Agreement into compliance and will endeavor in those efforts to preserve for both Parties the economic benefits as reflected in this Agreement to the maximum extent possible.

32.06. <u>Waivers</u>. No delay or omission by either Party to exercise any right or power it has under this Agreement shall impair or be construed as a waiver of such right or power. A waiver by any Party of any breach or covenant shall not be construed to be a waiver of any succeeding breach or any other covenant. All waivers must be signed by the Party waiving its rights.

32.07. <u>Cumulative Remedies</u>. No right or remedy herein conferred upon or reserved to either Party is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy under this Agreement, or under applicable Law, whether now or hereafter existing.

32.08. <u>Entire Agreement</u>. This MSA and the Exhibits to this MSA represent the entire agreement between the Parties with respect to its subject matter, and there are no other representations, understandings or agreements between the Parties relative to such subject matter.

32.09. <u>Amendments</u>. No amendment to, or change, waiver or discharge of, any provision of this Agreement shall be valid unless in writing and signed by an authorized representative of Circuit City Stores and IBM Corporation. The Parties agree that an electronic signature from an authorized representative of Circuit City Stores and IBM Corporation is valid under this Agreement, provided it complies with the process for such electronic signature set forth in the Procedures Manual.

32.10. <u>Survival</u>. Any provision of this Agreement, including this <u>Section 32.10</u>, that contemplates performance or observance subsequent to any termination or expiration (in whole or in part) will survive any such termination or expiration (in whole or in part, as applicable) and continue in full force and effect.

32.11. <u>Third Party Beneficiaries</u>. Neither Party intends that this Agreement shall benefit, or create any right or cause of action in or on behalf of, any person or entity other than the Parties. IBM Corporation acknowledges and agrees that (1) Circuit City Stores shall be entitled to assert actions and claims against IBM under this Agreement on behalf of any Circuit City Service Recipient or Circuit City Indemnified Party, and (2) Losses suffered by any Circuit City Service Recipient arising out of or relating to IBM's performance or failure to perform under this Agreement shall also be deemed to be Losses of Circuit City Stores. Circuit City Stores acknowledges and agrees that only Circuit City Stores shall be entitled to bring claims under this Agreement on behalf of Circuit City Service Recipients and Circuit City Indemnified Parties. Circuit City shall exercise commercially reasonable efforts to obligate any Circuit City Service Recipient(s) (other than Circuit City Stores) not to file any claims against IBM under this Agreement, and, in the event any such Circuit City Service Recipient and Circuit City Indemnified Party (other than Circuit City Stores) nonetheless files such claims Circuit City agrees to provide reasonable cooperation to IBM to persuade such Circuit City Service Recipient(s) (other than Circuit City Stores) to withdraw such claim.

32.12. <u>Governing Law</u>. This Agreement and the rights and obligations of the Parties under this Agreement shall be governed by and construed in accordance with the Laws of the State of New York; provided, however, that to the extent that the Laws of any other jurisdiction, by their terms, govern the employment relationship between Circuit City or IBM and any Affected Employee, the rights and obligations of the Parties with respect to such matter shall be governed by and construed in accordance with the Laws of such other jurisdiction.

32.13. <u>Sole and Exclusive Venue</u>. Each Party irrevocably agrees that any legal action, suit or proceeding initially brought by IBM in any way arising out of this Agreement must be brought solely and exclusively in the state and federal courts located in the Borough of Manhattan in the City of New York, New York. Each Party irrevocably accepts and submits to the sole and exclusive jurisdiction of the aforesaid courts in personam, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other Party. **EACH**

**PARTY HEREBY WAIVES ANY RIGHT TO DEMAND OR RECEIVE A JURY TRIAL IN ANY SUCH ACTION AND AGREES INSTEAD TO BRING ANY SUCH ACTION BEFORE A JUDGE SITTING AS A TRIER OF BOTH FACT AND LAW.**

32.14. <u>Injunctive Relief</u>. A Party may seek immediate injunctive relief if it makes a good faith determination that a breach is such that the damages to the Party resulting from the breach will be so immediate, so large or severe, and so incapable of adequate redr ess after the fact that a temporary restraining order or other immediate injunctive relief is the only adequate remedy. A Party filing a pleading s eeking immediate injunctive relief, which is not awarded in substantial part, shall pay all reasonable costs and attorneys' fees of the other Party.

32.15. <u>Covenant of Further Assurances</u>. Circuit City Stores and IBM Corporation covenant and agree that, subsequent to the execution and delivery of this Agreement and, without any additional consider ation, each of Circuit City and IBM shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

32.16. <u>Negotiated Terms</u>. The Parties agree that the terms and conditions of this Agreement are the result of negotiations betw een the Parties and that this Agreement shall not be construed in favor of or against any Party by reason of the extent to which any Party or its professional advisors participated in the preparation of this Agreement.

32.17. <u>Conflict of Interest</u>. Neither Party shall, directly or indirectly, pay any salaries, commissions, fees or make any payments or rebates to any em ployee of the other Party or to any designee of such employee, or favor any employee of the other Party or any designee of such employee, with gifts or entertainment of significant cost or value or with services or goods sold at l ess than full market value. Each Party agrees that its obligation under this <u>Section 32.17</u> shall also be binding upon its r espective employees, subcontractors, Affiliates and agents.

32.18. <u>Publicity</u>. No public disclosures by either Party relating to this Agreement, except for internal announcem ents or disclosures required to meet requirements of any applicable Law, shall be made without the pr ior approval of the other P arty.

32.19. <u>Good Faith and Fair Dealing</u>. The performance of all obligations and the e xercise of all rights by each Party, except where explicitly stated otherwise (such as by the use of the term "sole discretion" or words of similar effect), shall be governed by the fundam ental principle of good faith and fair dealing and by a commercially reasonable standard, i ncluding (for clarity) (1) the use of com mercially reasonable efforts in performing obligations , (2) not unreasonably withholding or delaying any consent or approval to be given by a P arty and (3) making only reasonable requests and pr oviding reasonable notice under this Agreement.

*     *     *     *

Circuit City Stores and IBM Corporation have caused this Information Technology Master Services Agreement to be signed and delivered by its duly authorized representative.

**CIRCUIT CITY STORES, INC.**

By: _____

Name: Philip J. Schoonover

Title: President, CEO and Chairman

Date: March 23, 2007

**INTERNATIONAL BUSINESS MACHINES CORPORATION**

By: _____

Name:  Stephen J. Fenn

Title:  Vice President, Retail Industry

Date: March 23, 2007