# Exhibit E to Namken Affidavit

# Information Technology Outsourcing

# Master Services Agreement

### between

## Circuit City Stores, Inc.

### and

## International Business Machines Corporation

## March 23, 2007

# Exhibit 1.01

# Master List of Defined Terms

# MASTER LIST OF DEFINED TERMS

1. "Additional Resource Charges" means the resource charges specified in Exhibit 18.01 (Pricing and Financial Provisions) for the use of Services above the Resource Baselines.

2. "Advisor" means the third party selected by Circuit City Stores to conduct the Mark to Market Process from the list of pre-approved parties set forth in Exhibit 9.04(1) (Approved Advisors).

3. "Affected Employees" shall have the meaning as set forth in Exhibit 5.02 (Human Resource Provisions).

4. "Affected Project Staff Member" means then-current members of the Project Staff, as of the date of either Party's notice to the other Party that there shall be an expiration or termination of the Agreement.

5. "Affiliate" means, as to any entity, any other entity that, directly or indirectly, Controls, is Controlled by or is under common Control with such entity.

6. "Agreement" means the MSA and all the Exhibits.

7. "Ancillary Functions" means any services, functions, processes or responsibilities not specifically described in the Agreement but that are required for the proper performance and provision of the services, functions, processes and responsibilities set forth in any Statement of Work.

8. "Assumed Agreements" means the third party agreements that are assigned, in whole or in part, to IBM and identified as Assigned Agreements in Exhibit 7 (Shared Agreements, Assumed Agreements, and Retained Agreements).

9. "At-Risk Amount" shall have the meaning as set forth in Exhibit 8.01 (Service Level Methodology).

10. "Authorized Users" means users of the Services as Circuit City Service Recipients including Circuit City employees and contingent workers and business partners, vendors, and contractors and their employees

11. "Base Charges" means the fees and other charges for the Designated Services set forth in Exhibit 18.01 (Pricing and Financial Provisions).

12. "BAU Projects" means the Projects included within the Designated Services and the Charges as set forth in Exhibit 3.01(1) Attachment A-8 (Projects).

13. "Business Day(s)" shall mean Circuit City Stores designated business days.

14. "Change" means any change, action, requirement or decision with respect to the provision of the Services or the Software, network, resources, or the Equipment used to provide the Services (including any alteration to the functionality, performance standards or technical environment of the Services or such Equipment, network, resources or Software, operational nature of the Services or manner in which the Services are provided or composition of the Services).

15. "Change Control Procedures" means the written description of the procedures applicable to the review, analysis and approval of any Changes.

16. "Change in Control" means the (a) consolidation or merger of a Party with or into any entity (other than the consolidation or merger of a Party with an Affiliate of such Party in which such Party is the surviving entity), (b) sale, transfer or other disposition of a majority of the assets of a Party or (c) acquisition by any entity, or group of entities

acting in concert, of beneficial ownership of 50% or more (or such lesser percentage that constitutes Control) of the outstanding voting securities.

17. "Change in Control Termination Fee" means with respect to a termination of the Agreement pursuant to Section 26.02 of the Agreement, the applicable amount specified in Exhibit 18.01 (Pricing and Financial Provisions).

18. "Change Management" means the process of planning and implementing modifications, installations, upgrades and enhancements to the Equipment and Software used by IBM to provide the Services.

19. "Chargeable Change" shall mean any Change which is not a Non-Chargeable Change.

20. "Charges" means the Base Charges and the Additional Resource Charges, net of the Reduced Resource Credits, and any other amounts payable by Circuit City to IBM pursuant to the Agreement.

21. "Circuit City" means Circuit City Stores and its Affiliates.

22. "Circuit City Agents" means the agents, subcontractors and representatives of Circuit City, other than IBM and IBM Agents.

23. "Circuit City Auditors" means Circuit City, Circuit City Agents, Circuit City internal and external auditors and legal representatives, and any of Circuit City's regulators; provided that Circuit City shall not designate an IBM Competitor as a Circuit City Auditor.

24. "Circuit City Competitor" means any entity set forth in Attachment 1.01-C, as such list of competitors may be updated by the Parties in accordance with Attachment 1.01-C.

25. "Circuit City Consents" shall mean the Consents related to Circuit City Equipment, Software or agreements.

26. "Circuit City Contract Executive" means an individual appointed by Circuit City Stores, who from the Effective Date, shall serve as the primary Circuit City representative under the Agreement

27. "Circuit City Contract Manager" means an individual appointed by Circuit City Stores, who from the Effective Date, shall manage the day-to-day operation of the Agreement and monitor all IBM deliverables and commitments under the Agreement

28. "Circuit City Data" means all data and information (other than IBM Data) relating to Circuit City, the Circuit City Business or any client, past client or prospective client of Circuit City (a) submitted to IBM or IBM Agents by or on behalf of Circuit City or Circuit City Agents, (b) developed, maintained or otherwise used by IBM or IBM Agents in delivering the Services or (c) received by IBM or IBM Agents through the access afforded them in connection with the provision of the Services.

29. "Circuit City Disaster Recovery Plan" means the document that will define the resources, actions, tasks and data required to manage the process for the restoration of the operations of the Circuit City Systems and the recovery of Circuit City Data upon the occurrence of a disaster.

30. "Circuit City Equipment" means the Equipment that is owned or leased by Circuit City and either used by IBM or IBM Agents in connection with the provision of the Services or supported by IBM or IBM Agents as part of the Services.

31. "Circuit City Indemnified Parties" means Circuit City Stores and its Affiliates, the other Circuit City Service Recipients and their respective officers, directors, employees, agents, successors, and assigns.

32.    "Circuit City Infringement Exceptions" means, with respect to any claim of indirect or contributory infringement, or any claim of patent, trade secret, copyright or other proprietary rights alleged to have occurred because the Circuit City Software or any other resource provided by Circuit City to IBM, any such claim to the extent the infringement is caused by: (a) failure of IBM or any IBM Agent to comply with specific technical designs or instructions provided by Circuit City in any Work Authorization to the extent that such infringement would not have occurred except for the noncompliance by IBM with such Circuit City -provided technical designs or instructions; (b) failure of IBM to give notice to Circuit City that compliance by IBM with technical designs or instructions provided by Circuit City in any Work Authorization will result in infringement; (c) use by IBM of any Circuit City Software or other resources provided by Circuit City under the Agreement in connection or in combination with any Software, Equipment or other resource with which such Circuit City Software or other resource was not used by Circuit City immediately prior to the Effective Date; (d) use by IBM of any Circuit City Software, or other resources provided by Circuit City in the practice of a patented process to the extent that such indemnification claim arises solely from such practice; or (e) an unauthorized modification of any Circuit City Software or other resource made by IBM or any IBM Agents to the extent such indemnification claim arises solely from such modification.

33.    "Circuit City New Intellectual Property" shall mean any enhancements and improvements made in the performance of this Agreement to Circuit City Software and any other new intellectual property created pursuant to this Agreement (including patents, processes and trade secrets) as agreed by the Parties.

34.    "Circuit City Proprietary Software" means the Circuit City Software owned by Circuit City.

35.    "Circuit City Regulatory Requirements" means the Laws that apply to Circuit City in the operation of its business, including its use and receipt of the Services, and any rules or regulations of any self-regulatory organization to which Circuit City is required to submit or voluntary submits.

36.    "Circuit City Resources" means Circuit City Data, Circuit City Equipment and, subject to Section 14.01, Circuit City Software, in each case as is necessary for IBM to perform the Services.

37.    "Circuit City Service Recipients" means (a) Circuit City Stores, (b) Affiliates of Circuit City Stores, (c) any joint venture in which Circuit City Stores is a member, and (d) any third party vendors of Circuit City whose business relationship with Circuit City involves the use of the Services; and (e) any other entity receiving Services under and as set forth in this Agreement.

38.    "Circuit City Share" has the meaning set forth in Section 7.01 of the MSA.

39.    "Circuit City Locations" means the locations to which IBM shall provide the Services under this Agreement and which are listed in Exhibit 10 (Service Locations) as CCS Locations – Remote or CCS Locations - Campus.

40.    "Circuit City Software" means the Software that is Used by Circuit City in connection with the Services.

41.    "Circuit City Stores" or "CCS" means Circuit City Stores, Inc., a Virginia corporation.

42.    "Circuit City Third Party Contract" means any Assigned Agreement, any Shared Agreements and any Retained Agreements.

43.    "Circuit City Third Party Software" means Circuit City Software that is not Circuit City Proprietary Software.

44.     "Comparable Services" means a bundle of outsourced services for a single customer receiving services from a tier-one services provider that are similar (or normalized to be substantially similar) in nature, type, quality (as measured by the Service Levels) and volume to the Services under the Agreement being reviewed during the applicable Mark to Market Process.

45.     "Confidential Information" means all information and documentation of Circuit City or IBM not generally known to the public and maintained by Circuit City or IBM as confidential, whether of a technical, business or other nature that relates to the Agreement or that, although not related to the Agreement, is nevertheless disclosed as a result of the Parties' discussions in that regard, and that should reasonably have been understood by Circuit City or IBM, because of (a) legends or other markings, (b) the circumstances of disclosure or (c) the nature of the information itself, to be proprietary and confidential to the other Party, including (i) with respect to Circuit City, all Circuit City Data and all information of any Circuit City Service Recipient concerning the operations, plans, know-how, trade secrets, business affairs, personnel, vendors and suppliers of such Circuit City Service Recipient, (ii) with respect to Circuit City and IBM, the terms of the Agreement and any information developed by reference to or the use of Circuit City's or IBM's information; provided, however, that except to the extent otherwise provided by Law, the term "Confidential Information" shall not include any information that (A) is or becomes publicly available without breach of the Agreement; (B) can be shown by documentation to have been known to the recipient without confidentiality restrictions at the time of its receipt from the other Party, provided that (1) the recipient has no knowledge that such information is subject to a confidentiality agreement and (2) the information is not of a type or character that a reasonable person would have regarded it as confidential; (C) is rightfully received from a third Party who did not acquire or disclose such information by a wrongful or tortious act, or in breach of a confidentiality restriction; (D) can be shown by documentation to have been independently developed by the recipient without reference to any Confidential Information; or (E) is identified by the disclosing Party as no longer proprietary or confidential.

46.     "Consents" means any consents required from third parties to provide IBM or Circuit City, as applicable, with the right to use or access the Equipment, Software, Shared Agreements, Assigned Agreements or Retained Agreements.

47.     "Consolidated Fee Report" means the detailed report provided to Circuit City Stores by IBM Corporation on a monthly basis describing the Base Charges and Variable Charges incurred by Circuit City.

48.     "Contract Year" means a 12-month period of time starting on the Service Commencement Date and each anniversary of such Service Commencement Date.

49.     "Control" means, with respect to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of voting securities (or other ownership interest), by contract or otherwise.

50.     "Critical Service Levels" shall have the meaning specified in Exhibit 8.01 (Service Level Methodology).

51.     "Critical Transition Milestone" has the meaning set forth in Attachment 8-3 (Transition Milestones & Deliverable Credits) to Exhibit 8.01 (Service Level Methodology).

52.     "Damages Cap" means an amount equal to the total Charges paid to IBM pursuant to the Agreement for performance of the Services for the 12 months prior to the month in which the most recent event giving rise to liability occurred; provided, however, that if the event giving rise to liability occurs during the first 12 months after the Effective Date,

liability will be limited to an amount equal to the total Charges estimated to be payable to IBM pursuant to this Agreement during the first 12 months after the Effective Date (which estimate, in the event of the termination of the Agreement, will be made as if no termination had occurred).

53.    "Deliverable Credits" shall have the meaning set forth in Attachment 8-3 (Transition Milestones & Deliverable Credits) to Exhibit 8.01 (Service Level Methodology).

54.    "Designated Services" means: (a) the services, functions, processes and responsibilities described in this Agreement (including the services, functions, responsibilities and projects described in the SOWs set forth as Exhibit 3.01(1) (Statements of Work)) and any New Statements of Work entered into pursuant to Section 3.05 of the MSA; (b) the IT services, functions, processes and responsibilities being routinely performed prior to the Effective Date by the Affected Employees, which are the Circuit City employees and Circuit City Agents whose services, functions, processes or responsibilities were displaced within Circuit City as a result of this Agreement and which are listed in Exhibit 5.01 (Affected Employees) as Potential IBM Employees, Transition CCS Employees and Retained CCS Leads, even if such service, function or responsibility is not specifically described in this Agreement, to the extent such services, functions, processes or responsibilities are identified during the 12 month period following the Effective Date and are not expressly excluded or identified as retained in this Agreement, and to the extent that such services, functions, processes or responsibilities have not been replaced by IBM's solution, delivery, and tools; (c) the services, functions, processes and responsibilities related to the services, functions, processes and responsibilities set forth in the SOWs and not reflected in Exhibit 3.01(2) (Base Case) or any New Statement of Work, even if such service, function or responsibility is not specifically described in this Agreement; and (d) any Ancillary Functions.

55.    "Disputed Charges Cap" shall have the meaning as set forth in Section 25.03(6) of the MSA.

56.    "Earnback" means the methodology used to determine the potential elimination of a Service-Level Credit as described in Exhibit 8.01 (Service Level Methodology).

57.    "Eastern Time" means the time of day in Richmond, Virginia.

58.    "Effective Date" means March 23, 2007.

59.    "End Date" means the later of (a) the date of expiration or termination of the Agreement and (b) the last day of the Termination Assistance Period applicable to such expiration or termination.

60.    "Equipment" means computers and related equipment, including central processing units and other processors, controllers, modems, communications and telecommunications equipment (voice, data and video), cables, smart cards, encryption keys, storage devices, printers, terminals, other peripherals and input and output devices, and other tangible mechanical and electronic equipment intended for the processing, input, output, storage, manipulation, communication, transmission and retrieval of information and data.

61.    "Escrow Amount Cap" shall have the meaning set forth in Section 25.03(6) of the MSA.

62.    "Executive Client Surveys" shall have the meaning as specified in Section 9.01 of the MSA.

63.    "Executive Committee" means the executive committee to which the Circuit City Contract Executive and IBM Contract Executive appoint representatives that will perform

the functions set out in <u>Exhibit 13.02</u> (Governance Model) and <u>Section 25.02</u> of the MSA.

64.    "<u>Expiration Date</u>" means the date 7 years after the Service Commencement Date.

65.    "<u>Extension Period</u>" means any of four extension periods to the Term, each of which shall be 6 months, as contemplated by <u>Section 2.02</u> of the MSA.

66.    "<u>Force Majeure Event</u>" means fire, flood, elements of nature, acts of God, acts of war, terrorism or civil unrest, strikes or labor actions that pose a reasonable fear of harm, as set forth in <u>Section 17.03(3)</u>, or any other similar cause beyond the reasonable control of the applicable Party.

67.    "<u>Gainsharing Proposals</u>" means opportunities and recommendations not otherwise contemplated by this Agreement for activities that are not part of the Services and that would enable Circuit City to gain efficiencies in its business operations without adversely affecting Service Levels or the Services.

68.    "<u>Governmental Approval</u>" means any license, consent, permit, approval or authorization of any person or entity, or any notice to any person or entity, the granting of which is required by Law, including Circuit City's Regulatory Requirements, for (a) the consummation of the transactions or the performance or receipt of the Services or any other obligation, in each case as contemplated by this Agreement, or (b) the conduct of IBM's business or Circuit City's business.

69.    "<u>Governmental Authority</u>" means any international, national, state, provincial, municipal, local, territorial, or other governmental department, regulatory authority, judicial or administrative body.

70.    "<u>Gross Negligence</u>" shall mean any act, or failure to act, demonstrating recklessness or reckless disregard for (1) the risk of harm created by such act (or failure to act) or (2) the rights of others.

71.    "<u>IBM</u>" means IBM Corporation and its Affiliates.

72.    "<u>IBM Agents</u>" means the agents, subcontractors and representatives of IBM.

73.    "<u>IBM Competitor</u>" means any entity set forth in <u>Attachment 1.01-B</u>.

74.    "IBM Consents" shall mean the Consents related to IBM Equipment, Software or agreements.

75.    "<u>IBM Project Executive</u>" means an individual who, from the Effective Date, shall serve as the primary IBM representative under the Agreement.

76.    "<u>IBM Delivery Project Executive</u> " means an individual who from the Effective Date shall manage the day-to-day operation of the Agreement and monitor all IBM deliverables and commitments under the Agreement.

77.    "<u>IBM Controls</u>" means controls and procedures for the facilities under IBM's control (which do not include Circuit City Sites) and from which the Services are provided that are in accordance with industry standards for services of the type provided to Circuit City.

78.    "<u>IBM Corporation</u>" means International Business Machines Corporation, a New York corporation.

79.    "<u>IBM Data</u>" means (a) financial/accounting information (including costs, expenditures, billings collections, revenues and finances) of IBM, its affiliates or subcontractors; (b) any data or information regarding IBM's performance of the Services created, generated, collected or processed by IBM to measure the productivity and efficiency of

Case 08-35653-KRH    Doc 5348-3    Filed 10/26/09    Entered 10/26/09 09:24:31    Desc
Exhibit(s) Exhibit 1    part 3    Page 9 of 53
*CCS-IBM IT Outsourcing Agreement*

*Exhibit 1.01 Master List of Defined Terms*

the Services and/or to improve the processes and procedures used by IBM, its Affiliates or subcontractors in the performance of the Services to the extent not required to be provided to Circuit City under this Agreement as part of the Service Levels or Reports; (c) human resources and personnel information of IBM, its Affiliates or subcontractors; and (d) information with respect to third party contracts or licenses of IBM, its affiliates or subcontractors and used in the performance of the Services.

80.   "IBM Disaster Recovery Plan" means a disaster recovery plan maintained by IBM in the normal course of business for protection of the Facilities and Equipment at the IBM Service Locations.

81.   "IBM Equipment" means that Equipment leased or owned by IBM and IBM Agents that is used by IBM and IBM Agents to provide the Services.

82.   "IBM Indemnified Parties" means IBM and its Affiliates, officers, directors, employees, agents, successors, and assigns.

83.   "IBM Infringement Exceptions" means, with respect to any claim of indirect or contributory infringement, or any claim of patent, trade secret, copyright or other proprietary rights alleged to have occurred because of the Use by any Circuit City Service Recipient or any Circuit City Agent of any IBM Software, New Intellectual Property or any other resources provided by IBM pursuant to the Agreement or based on the performance of the Services by IBM, any such claim to the extent the infringement is caused by (a) compliance by IBM with specific technical designs or instructions provided by Circuit City in any Work Authorization, but only to the extent that such infringement arises from compliance by IBM with such Circuit City-provided technical designs or instructions, and Circuit City requires IBM to comply with such Circuit City-provided technical designs or instructions, notwithstanding notice to Circuit City from IBM that compliance with such Circuit City-provided technical designs or instructions will result in infringement; (b) use by Circuit City of any resources provided by IBM under the Agreement in connection or in combination with Equipment or Software (i) not constituting Circuit City Equipment used by Circuit City in compliance with the Circuit City technical standards set forth in Exhibit 4.04 (Technical Architecture Standards) and (ii) not supplied by IBM; or (c) modification by Circuit City, any Circuit City Service Recipient or any Circuit City Agent of any IBM Software, New Intellectual Property or other resource provided by IBM in a manner expressly prohibited by the Agreement or the Related Documentation, but only to the extent that such indemnification claim arises from such modification.

84.   "IBM New Intellectual Property" shall mean any new intellectual property created pursuant to this Agreement (including patents, processes and trade secrets), including enhancements and improvements made in the performance of this Agreement to IBM Software, except for any Circuit City New Intellectual Property.

85.   "IBM Proprietary Software" means the IBM Software designated as such in Exhibit 14.02 (IBM Software) as of the Effective Date and any other IBM Software that is owned, acquired or developed by or on behalf of IBM and used in connection with the Services.

86.   "IBM Regulatory Requirements" mean the Laws that are applicable to IBM in its capacity as a provider of the Services and as an employer of the Project Staff.

87.   "IBM Service Locations" means the locations from which IBM provides the Services which are set forth in Exhibit 10 (Service Locations), as updated by the Parties from time to time in accordance with Section 10.01.

88.   "IBM Share" has the meaning set forth in Section 7.01 of the MSA.

89. "IBM Software" means (a) the Software, other than the Circuit City Software, that will be Used, after the Effective Date, by IBM to perform the Services as set forth in Exhibit 14.02 (IBM Software), and (b) any Software acquired by IBM after the Effective Date with the intention of Using such Software for purposes of performing the Services.

90. "IBM Technical Solution Document" means the technical solution document set forth in Exhibit 4.05 (IBM Technical Solution Document) as may be amended by IBM from time to time.

91. "IBM Third Party Software" means the IBM Software designated as such in Exhibit 14.02 (IBM Software) as of the Effective Date and any other IBM Software that is not IBM Proprietary Software.

92. "Improved Technology" means leading edge information technology developments, including new developments in Software and Equipment, that could reasonably be expected to have an impact on the Circuit City Business, to the extent known and made available by IBM to Circuit City.

93. "Indemnified Party" means a Party entitled to indemnification under the provisions of the Agreement.

94. "Indemnifying Party" means a Party that is obligated to provide indemnification under the provisions of the Agreement.

95. "Initial Term" means the initial term of the Agreement as set forth in Section 2.01 of the MSA.

96. "Invoicing Party" means the Party submitting an invoice that is subject to Section 18.06 of the MSA.

97. "Joint Verification Period" means the 6 month period after the Services Commencement Date.

98. "Katz Patents" shall have the meaning set forth in Section 23.02 of the MSA.

99. "Key IBM Positions" means those positions on the Project Staff that have been designated by the Parties as key positions as set forth in Exhibit 12.03 (Key IBM Positions).

100. "Late Fee" has the meaning set forth in Section 19.03 of the MSA.

101. "Law" means any declaration, decree, directive, legislative enactment, order, ordinance, regulation, rule or other binding requirement of or by any Governmental Authority.

102. "Losses" means any and all damages, fines, penalties, deficiencies, losses, liabilities (including settlements and judgments) and expenses (including, to the extent permitted under applicable Law, interest, court costs, reasonable fees and expenses of attorneys, accountants and other experts or other reasonable fees and expenses of litigation and alternative dispute resolution or other proceedings or of any claim, default or assessment), in each case to the extent awarded or payable to a third party in accordance with the terms of this Agreement.

103. "Managed IBM-CCS Agreements" shall mean the following contracts between IBM and Circuit City: (a) the Statement of Work between IBM Global Services and Circuit City Stores, Inc. entitled "Middleware AMS Support," dated June 15, 2006, as amended from time to time by the Parties; (b) the Statement of Work between IBM Global Services and Circuit City Stores, Inc. entitled "rPOS Application Management Services (AMS), Transition, Migration and Steady State," dated September 22, 2005, as expressly amended from time to time by the Parties; and (c) the IBM Task Order for MST Legacy

Support Services between IBM Global Services and Circuit City Stores, dated October 1, 2005, as expressly amended from time to time by the Parties.

104.    "Management Committee" means the management committee to which the Circuit City Contract Executive and IBM Contract Executive appoint representatives that will perform the functions set out in Exhibit 13.02 (Governance Model) and Sections 13.01 and 25.01 of the MSA.

105.    "Mark to Market" means the process set forth in Section 9.04 of the MSA.

106.    "Mark to Market Average Price" means the average price for Comparable Services, on the basis of the Mark to Market Results.

107.    "Mark to Market Process" means the administration, measurement and comparison processes set forth in Exhibit 9.04(2) (Mark to Market Process) and other non-conflicting processes utilized by the Advisor and agreed upon by the Parties.

108.    "Mark to Market Proposal" has the meaning set forth in Section 9.04 of the MSA.

109.    "Mark to Market Review Period" shall mean the period of time agreed upon by the Parties for conducting the Mark to Market Process. The period of time shall vary based upon the nature and extent of the Services.

110.    "Mark to Market Report" shall mean the findings, analysis, recommendations, and all supporting and backup data provided by the Advisor to IBM and Circuit City.

111.    "Mark to Market Results" means a range of prices for Comparable Services, as determined by the Advisor in accordance with the Mark to Market Process.

112.    "Mark To Market Variability Deadband" has the meaning set forth in Section 9.04 of the MSA.

113.    "MSA" means the Information Technology Outsourcing Master Services Agreement (excluding the Exhibits and Attachments expressly incorporated therein) among Circuit City Stores and IBM Corporation, dated March 23, 2007.

114.    "New Service Levels" means additional Service Levels added by Circuit City after the Service Commencement Date as anticipated in Exhibit 8.01 (Service Level Methodology).

115.    "New Service" means any service that is outside the scope of the Designated Services and the Termination Assistance Services; provided, however, that to the extent that any New Service would constitute increased utilization of Resource Units, such New Service will be treated as part of the Services, and the Charges for such additional services will be calculated according to Exhibit 18.01 (Pricing and Financial Provisions).

116.    "New Statement of Work" means, with respect to any New Service, a statement of work, substantially in the form of the SOWs set forth in Exhibit 3.01(1) (Statements of Work), setting forth the services, functions, processes and responsibilities to be undertaken by IBM in respect of the New Services and setting forth any related services, functions, processes and responsibilities to be retained by Circuit City.

117.    "Non-Chargeable Change" shall mean any Change that (a) can be provided using the Project Staff (at an assumed level at least as high as that reflected in the Personnel Projection Matrix for the Baselines as of the Service Commencement Date) without affecting applicable Service Levels, or with the approval of Circuit City Stores, can be provided by a reprioritization of the Project Staff or relief to the Service Levels, (b) is designated as entirely IBM's obligation to perform under this Agreement, or (c) is otherwise mutually determined by the Parties to be non-chargeable.

118.    "Non-Leveraged" means a subcontract between IBM and a vendor, solely for IBM's performance of the Services under this Agreement (and excluding any subcontracts pursuant to IBM's master or umbrella agreements for support of multiple customers) which: (a) with respect to IBM Equipment, is dedicated to the Services and does not support other IBM clients and (b) with respect to IBM Proprietary Software, is used exclusively for Circuit City; (c) with respect to IBM Third Party Software, is licensed under a separate license specifically for Circuit City, or (d) with respect to any other subcontract, is performed under a separate subcontract specifically for Circuit City.

119.    "Party" means with respect to the MSA, either Circuit City Stores or IBM Corporation, as the case may be.

120.    "Payable Date" has the meaning set forth in Section 19.03 of the MSA.

121.    "Paying Party" means the Party that receives an invoice that is subject to Section 18.06 of the MSA.

122.    "Person" means any individual, corporation, company (including any limited liability company), association, partnership, joint venture, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

123.    "Policy and Procedures Manual" or "Procedures Manual" means the policy and procedures manual, the content of which is described in Exhibit 13.02 (Governance Model), that sets forth the process by which the Parties shall work together and the Services shall be performed.

124.    "POS Customer Satisfaction Surveys" means the point-of-service customer satisfaction surveys conducted and completed by IBM Corporation, in real-time with a representative sampling of Authorized Users.

125.    "Potentially Affected Employees" means the employees identified as Potentially Affected Employees in Exhibit 5.01 (Affected Employees).

126.    "Privacy Laws" means all applicable Laws that relate to privacy.

127.    "Privileged Work Product" shall have the meaning set forth in Section 22.03 of the MSA.

128.    "Project Staff" means the personnel of IBM and IBM Agents who provide the Services from time to time.

129.    "Projects" means discrete work activities that the Parties agree to perform as either a BAU Project or, in accordance with the Change Control Procedures, New Projects which are work activities in addition to the obligations set forth in the SOW.

130.    "Protected Period" has the meaning set forth in Exhibit 5.02 (Human Resources Provisions).

131.    "Reduced Resource Credits" means the credits specified in Exhibit 18.01 (Pricing and Financial Provisions) for the use of Services below the Resource Baselines.

132.    "Regulatory Requirements" means the IBM Regulatory Requirements and the Circuit City Regulatory Requirements.

133.    "Related Documentation" means, with respect to Software and tools, all materials, documentation, specifications, technical manuals, user manuals, flow diagrams, file descriptions and other written information that describes the function and use of such Software or tools.

134.    "Reports" means the graphical performance, utilization and status reports provided to Circuit City Stores by IBM Corporation in a form acceptable to Circuit City Stores.

135.  "Resource Unit" means a billable resource, as set forth in Exhibit 18.01 (Pricing and Financial Provisions).

136.  "Resources" means all Services, Equipment, networks, Software, and other resources approved by Circuit City and provided by IBM in connection with the performance of the Services to the extent the SOW expressly contemplates that it is IBM's responsibility that the Services integrate with, interface with, or be compatible with the identified Third-Party Resources ("Integrated Resources").

137.  "Retained Agreements" means the agreements set forth in Exhibit 7 (Shared Agreements, Assigned Agreements, and Retained Agreements) as Retained Agreements.

138.  "Service Commencement Date" means the date IBM assumes responsibility for providing the Services, as set forth in the Transition Plan.

139.  "Service Level Credit" shall have the meaning as set forth in Exhibit 8.01 (Service Level Methodology).

140.  "Service Level Effective Date" means the date identified on Exhibit 8.01 (Service Level Methodology) on which IBM is required to comply with the applicable Service Level.

141.  "Service Levels" means the Service Levels set forth in Exhibit 8.01 (Service Level Methodology), as may be modified in accordance with Exhibit 8.01 (Service Level Methodology), and any New Service Levels.

142.  "Services" means (a) the Designated Services, (b) the Transition Services, (c) any New Services and (d) during a Termination Assistance Period, the Termination Assistance Services.

143.  "Services Taxes" means any applicable withholding tax or sales, use, gross receipts, excise, service, business, value-added or other similar taxes attributable to periods on or after the Effective Date, as applicable, based upon IBM's provision of the Services.

144.  "Services Tower" means the following Infrastructure Services, Network Services, Desktop Support & Workplace Productivity, Store Services, and Service Desk Services.

145.  "Shared Agreements" means the third party agreements that are identified as Shared Agreements in Exhibit 7 (Shared Agreements, Assigned Agreements, and Retained Agreements).

146.  "Shared Agreement Invoices" means the invoices submitted by third parties in connection with the Shared Agreements.

147.  "Software" means the source code and object code versions of any applications programs, operating system software, tools, computer software languages, utilities, other computer programs and Related Documentation, in whatever form or media, including the tangible media upon which such programs, software, languages, and Related Documentation are recorded or printed, together with all corrections, improvements, updates and releases thereof.

148.  "SOW" means any of the Statements of Work set forth in Exhibit 3.01(1) (Statements of Work) and any New Statement of Work entered into pursuant to Section 3.05 of the MSA.

149.  "Successor" means Circuit City Stores or its designee, as the case may be.

150.  "Term" means the Initial Term and the Extension Period, if any.

151.  "Terminated IBM-CCS Agreements (Phase 1)" shall mean the following:  (a) The Statement of Work for Desktop, Print and Lotus Notes Managed Services between

Circuit City Stores and IBM Global Services, dated June 30, 2005, as expressly amended by the Parties on or before the Effective Date of the Agreement; (b) IBM Global Services Statement of Work for Single Point of Contact Help Desk Steady State Services between Circuit City Stores and IBM Global Services, dated December 30, 2004, as expressly amended by the Parties on or before the Effective Date of the Agreement; and (c) the Statement of Work for Store of Tomorrow (SoT) Total Store Support between Circuit City Stores and IBM Global Services dated April 12, 2005, as expressly amended by the Parties on or before March 23, 2007 ("ToSS Contract").

152.   "Terminated IBM-CCS Agreements (Phase 2)" shall mean the following: (a) The e-business Hosting Statement of Work for System Management between IBM Corporation and Circuit City Stores, dated December 1, 2005, as expressly amended by the Parties on or before the Effective Date; and (b) The Flexible Demand Option-Shared Services - Standard Statement of Work for Store of Tomorrow (SoT)/ Enterprise Data Warehouse (EDW) between Circuit City Stores. and IBM Global Services, dated January 14, 2005, as expressly amended by the Parties on or before the Effective Date.

153.   "Termination Assistance Period" means with respect to the Agreement, a period of time designated by Circuit City by notice to IBM, commencing (a) 6 months prior to the expiration or termination of the Agreement or (b) upon any notice of expiration or termination of the Agreement, in each case, continuing for up to 18 months after such expiration or termination of the Agreement, during which IBM shall provide the Termination Assistance Services in accordance with Article 28 of the MSA.

154.   "Termination Assistance Services" means (a) the provision.of a detailed plan, in a form and format acceptable to Circuit City Stores, describing (i) the wind-down and transfer of the terminated Services to Circuit City or another service provider designated by Circuit City Stores and (ii) any Changes that may be necessary to implement such wind-down and transfer, (b) the Services that are being terminated (and any mutually agreed upon replacements thereof or substitutions therefore), to the extent Circuit City Stores requests such Services during the Termination Assistance Period, (c) IBM's cooperation with Circuit City or another service provider designated by Circuit City Stores in the transfer of the terminated Services to Circuit City or such other service provider in order to facilitate the transfer of the terminated Services to Circuit City or such other service provider and (d) subject to the Change Control Procedures, any New Services requested by Circuit City reasonably related to the Services that can be performed with the existing Project Staff and resources and that are reasonably necessary to facilitate the termination and transition of the services, including any New Services to facilitate the transfer of the terminated Services to Circuit City or another service provider designated by Circuit City Stores.

155.   "Termination for Convenience Fee" means with respect to any termination of the Agreement pursuant to Section 26.01 of the Agreement, the applicable amount specified in Exhibit 18.01 (Pricing and Financial Provisions).

156.   "Third Party Resources" means the services, systems, items, and other resources that are being provided or recommended to, or approved for use by Circuit City by any third party service provider and that are identified by IBM as a component of an Integrated Resource.

157.   "Transition Milestone" means the date by which each major activity or deliverable set forth in the Transition Plan is to be completed.

158.   "Transition Period" means the period described in Exhibit 3.08 (Transition Plan) from the Effective Date until the Transition Milestones and other tasks set forth in the Transition Plan have been completed.

159.   "Transition Plan" means the plan set forth in Exhibit 3.08 (Transition Plan).

160.   "Transition Services" means the responsibilities, tasks and functions of IBM described in the Transition Plan.

161.   "Use" means the right to use, operate, load, execute, store, transmit, display, copy, maintain, modify, enhance, make and have made.

162.   "Variable Charges" means the Additional Resource Charges and the Reduced Resource Credits.

163.   "Viruses" means any and all forms of harmful surreptitious code or other contaminants, including commands, instructions, devices, techniques, bugs, or web bugs.

164.   "Work Authorization" means a document in which Circuit City Stores approves the performance of any service request, or other work requiring Circuit City Stores approval to be performed in connection with any Services.

165.   "Willful Misconduct" means (a) the intentional performance of an act (i) with knowledge and the intent that the performance of that act could result in injury or damages or (ii) in such a manner as to imply reckless disregard of the probable consequences or (b) the intentional omission of an act (i) with knowledge and the intent that such omission could result in damage or injury or (ii) in a manner that constitutes reckless disregard of the probable consequences.

# Exhibit F to Namken Affidavit

# Information Technology Outsourcing Agreement

## between

## Circuit City Stores, Inc.

## and

## International Business Machines Corporation

# Exhibit 18.01

# Pricing and Financial Provisions

\

# Table of Contents

1. **Introduction**.............................................................................................................. 1
2. **Charges, Credits and Payments** ......................................................................... 1
   2.1 *Charges*............................................................................................................... 1
   2.2 *Credits* ............................................................................................................... 2
   2.3 *Payments* ......................................................................................................... 3
   2.4 *Hourly Services* ............................................................................................... 3
   2.5 *Change & New Services* ................................................................................. 6
   2.6 *Projects*.............................................................................................................. 6
3. **Economic Change Adjustment** ............................................................................ 6
4. **Resource Units and Measurement Methodology** ............................................. 9
   4.1 *Generally* ........................................................................................................... 9
   4.2 *Infrastructure Services Resource Units* ....................................................... 9
   4.3 *Network Support Services Resource Units*.................................................. 12
   4.4 *Desktop Support Services – Resource Units*.............................................. 18
   4.5 *Store Support Services – Resource Units* ................................................... 21
   4.6 *Store Engineering & Architecture Support Services*.................................. 22
   4.7 *Service Desk Resources*............................................................................... 22
5. **Hardware Services Charge**.................................................................................. 23
6. **Baseline Normalization** ....................................................................................... 25
7. **Additional or Reduced Resources**..................................................................... 25
   7.1 *Effective Date*.................................................................................................. 25
   7.2 *Infrastructure Services, Service Desk Services and Desktop Services* ... 26
   7.3 *Network Services* ........................................................................................... 27
8. **Minimum Annual Revenue Commitment**............................................................ 28
9. **Termination Charges** ........................................................................................... 29
10. **Financial Assumptions**....................................................................................... 30

# PRICING AND FINANCIAL PROVISIONS

## 1. Introduction

a.  This Exhibit describes the methodology for calculating the Services charges. The Base Charges, ARCs, Hourly Services Charges, Transition Charges, Economic Change Adjustment, and any other charge provisions set forth in this Agreement are intended in the aggregate to compensate IBM for the resources used to provide the Services. In addition, this Exhibit describes the measures of resource utilization and the tracking of such usage.

b.  Attached to this Exhibit is <u>Attachment 18.01-1</u> (Pricing Tables) which lists the Base Charges, Monthly Service Charge, Baselines, ARC Rates, RRC Rates, Transition Charges, Termination Charge and other applicable rates.

## 2. Charges, Credits and Payments

### 2.1 Charges

a.  Circuit City is financially responsible for all costs and expenses associated with its responsibilities in this Agreement. All periodic charges will be computed on a calendar month basis and will be prorated for any partial month, unless this Agreement expressly states otherwise.

b.  Base Charges

IBM will invoice Circuit City each month of the Term for the MSC as of the Service Commencement Date (the <u>Base Charges Invoice</u>). The first Base Charge Invoice shall be provided at least 15 days prior to the Services Commencement Date.

c.  Variable Charges

IBM will invoice Circuit City each month of the Term for the ARCs, less the RRCs, which shall be applicable for each month of the Term as of the Service Commencement Date (with the exception of the Resource Units set forth in <u>Section 7.1(b)</u> below which shall not be invoiced until the earlier of (i) the completion of the wall-to-wall inventory and (ii) the date which is six (6) months after the Services Commencement Date) (the <u>Variable Charges Invoice</u>). The first Variable Charges Invoice shall be provided to Circuit City following the month of the Services Commencement Date.

d.  Transition Charge

The charges for IBM's performance of the Transition Services, as set forth in the Transition Plan, are set forth in <u>Attachment 18.01-1</u> (Pricing Tables) (the <u>Transition Charge</u>). IBM will invoice Circuit City for the monthly prorated amount of the Transition Charge as set forth in <u>Attachment 18.01-1</u> (Pricing Tables). The first Transition Charge invoice shall be provided as of the Effective Date.

e.  Economic Change Adjustment

IBM will invoice Circuit City for the Economic Change Adjustment in accordance with <u>Section 3</u> of this Exhibit.

f.   Termination Charges and Wind Down Charges

The Termination Charges and Wind Down Charges are described and set forth in <u>Section 9</u> below.

g.   Other Charges

1.   IBM will invoice Circuit City for New Services, taxes, and any other charges expressly agreed upon in this Agreement, as amended from time to time.

2.   For clarity, with respect to the Managed IBM-CCS Agreements, and with respect to the Shared Agreements and Retained Agreements set forth in <u>Exhibit 7</u> (Shared Agreements, Assumed Agreements, and Retained Agreements), Circuit City will pay the charges or fees as set forth in, and pursuant to the terms and conditions of, such agreements, not pursuant to the terms and conditions of this Agreement.

## 2.2 Credits

a.   Reduced Resource Credits

IBM will provide Circuit City with a credit for any RRCs against either the Variable Charges Invoice or the Base Charges Invoice.

b.   Contract Prepayments and Refunds·

1.   Prepayments

(a) During the Joint Verification Period, the Parties will ascertain whether Circuit City has prepaid any charges to the vendors for (i) the Assumed Agreements, and (ii) for the Shared Agreements with respect to the portion for which IBM is financially responsible, that are attributable to periods during the Term on or after the Service Commencement Date.  If so, IBM shall be financially responsible to credit Circuit City the amount of such prepayments (spread over the period for which the Charges apply), subject to off-setting such amounts by other deviations discovered during the Joint Verification Period with respect to the terms and pricing of the Assumed Agreements and Shared Agreements. The Parties will reconcile any such prepayments during the Joint Verification Period as set forth in <u>Section 3.08</u> (Joint Verification Period) of the MSA.

(b) With respect to any Software, Equipment or third party contracts transferred to Circuit City as set forth in <u>Section 28.02</u> (Exit Rights) of the MSA, if IBM has prepaid any charges that are attributable to periods after the expiration or termination of this Agreement, Circuit City will pay such prepaid amounts to IBM as invoiced to Circuit City at the time of such transfer during the Termination Assistance Period as set forth in the MSA.

2.   Refunds

(a) During the Joint Verification Period, the Parties will ascertain whether:

(i)   IBM has received any refund, credit, or other rebate for (i) the Assumed Agreements, or (ii) for the Shared Agreements with respect to the portion for which IBM is

financially responsible, that are attributable to periods during the Term prior to the Service Commencement Date. If so, IBM shall be financially responsible to refund to Circuit City the amount of such refund, credit or other rebate; and

(ii) Circuit City has received any refund, credit, or other rebate for (i) the Assumed Agreements, or (ii) for the Shared Agreements with respect to the portion for which IBM is financially responsible, that are attributable to periods during the Term following the Services Commencement Date. If so, Circuit City shall be financially responsible to refund to IBM the amount of such refund, credit or other rebate.

(b) The Parties will reconcile the amount of any such refund, credit, or other rebates during the Joint Verification Period as set forth in <u>Section 3.08</u> (Joint Verification Period) of the MSA.

c.  Other Credits

1.  With respect to the December 13, 2006 letter agreement between IBM and Circuit City (via Rob Hafker and Mark Oldani) under which IBM is hosting for Circuit City virtual store floor space in the Second Life web site ("<u>Second Life Letter Agreement</u>"), IBM will provide Circuit City with a monthly credit of up to $2,000 per month (with an annual cap of up to $24,000 per Contract Year) for charges incurred by Circuit City under such Second Life Letter Agreement, to the extent Circuit City continues to obtain virtual store space of the same size as of the Effective Date of this Agreement and to the extent this Agreement has not been terminated.

2.  In addition, IBM will provide Circuit City up to a $500,000 development credit which Circuit City may apply to any future agreed upon Circuit City Second Life innovation and development projects which are implemented on or before March 1, 2008.

3.  For each month as of and between October 2007 and January 2008, IBM will credit Circuit City for the aggregate dollar amount of the direct salaries and direct benefits as agreed paid by Circuit City during such period for up to twenty (20) of the Affected Employees then supporting the POS legacy Applications help desk and who are assigned to the help desk job code. Except for this credit, Circuit City shall be responsible for the salary, direct benefits, and all other compensation for such Affected Employees.

4.  IBM will pay any amounts due and owing to Circuit City pursuant to this Agreement by providing Circuit City with a credit against IBM's invoice to Circuit City under this Agreement or, if no invoices are due, by paying such amount to Circuit City.

## 2.3 Payments

Circuit City will pay IBM's invoices as set forth in Article 19 of the MSA. Circuit City will pay each invoice by wire funds transfer or other electronic means acceptable to IBM to an account specified by IBM. Payment will be made in US Dollars.

## 2.4 Hourly Services

a.  If Circuit City requests IBM to:

1.  perform New Projects;

2.  provide additional resources to the extent such resources are a Chargeable Change; or

3. provide additional services on a time and material basis;

(Hourly Services), such services will be provided by IBM as set forth in this Section.

b. The following are some of the representative skills categories IBM may provide as Hourly Services:

1. Analyst, Network: Performs some on-site and remote technical support assistance on advanced products, subsystems and/or systems. Possesses knowledge of multiple complex work stations, personal computers, basic servers, printers, sub-systems, and/or point of sale devices and their attachments, including LAN and WAN connectivity, hubs and routers.

2. Data Security Analyst: Perform multiple roles within the Security Function and works with all levels of management. These roles include Business Management and Operations providing services in support of the delivery of Security policies and processes and utilizes knowledge of Security programs to assist CCS managers. Also works on a daily basis with line management and interrelated groups in support of business objectives and Security strategies. Provides subject matter expertise in specific areas of Security Services such as Physical Security, Information Protections, Incident Management, Emergency Planning, Finance, Strategy, Business Controls, and Business Management.

3. Database Admin: Assesses future information requirements in order to develop long-range, comprehensive database plans. Develops policies and procedures designed to ensure the integrity of the database environment. Develops and maintains routines to facilitate database use. Keeps informed on latest developments in the database management field. Plans and coordinates migration to new data management system software levels. Assures that appropriate database management software is available and effectively used. Determines, implements, and enhances standards on database security. Promotes and recommends appropriate database software for new application systems. Educates applications programmers about database concepts and efficient access techniques, and assists them in analysis and problem resolutions pertaining to database. Performs database performance monitoring and implements efficiency improvements. Designs or supervises the designing of the procedures necessary to save and recover databases from hardware and software failures. Supervises the design and maintenance of database structures. May supervise or train staff. Performs related work as appropriate.

4. Engineer, Network: Performs design, configuration, testing and technical support for all common internetworking devices (e.g. ethernet switches, routers, load balancers). Possesses a thorough working knowledge of complex enterprise network topologies and LAN/WAN technologies.

5. Engineer, Systems: System engineering (design, diagramming, technical writing, requirements analysis & documentation), Critical thinking (diagnostics, troubleshooting, education/training, analysis, process/procedures), System diagramming (networking, servers), Client/Server installation & configuration (Windows, HPUX, AS400, Solaris, Linux), Core Server installation/configuration, Security Systems (routing/software interfaces, firewalls), Directory Services, Documentation (cradle to grave). Provide technical leadership to IT and the enterprise with regard to client/server, web-based and server oriented systems and operational requirements and how future and current requirements may impact the enterprise and can be exploited for the benefit of the Company.

6. Operator, Computer: Performs one of the following activities: Operates operating systems in a complex to highly complex production environment. May be involved in systems and

applications problem determination and resolution. May be required to document timelines and causal analyses. Requires regular supervision, receives general instructions and typically works according to well defined and established procedures.

7. Project Manager: Responsible for large projects or significant segment of large complex IT infrastructure projects. Leads team on large projects or significant segment of large complex IT infrastructure projects. Translates customer requirements into formal agreements and plans to culminate in customer acceptance of results, or have acceptance in the targeted market, while meeting business objectives. Knowledge of the business units mission and processes, such as customer relationship management. Responsible for performance, cost, scope, schedule, quality, and appropriate business measurements for their project/segment of the project, according to their project charter. Has professional knowledge of market segment / industry / technology / discipline trends. Recognized for business acumen by the customer set supported.

8. Specialist, Production Control: Performs multiple operations in which tasks are complex and typically involve the resolution of unusual or difficult problems. A high level of independent judgment and proficiency is required. Assumes additional similar responsibilities as appropriate.

9. Systems Admin: Performs one or more of the following activities: Operates and manages several operating systems and sub-systems of very complex nature. Spends significant time providing technical direction and assistance to other technical personnel and is accountable for results. Demonstrates significant creative, innovative problem solving expertise, resulting in significant contribution to the efforts of the department. Determines source of operating system anomalies and provides resolution alternatives to technical support groups. Offers technical assistance to management and needs no assistance in recognizing degraded functionality of operating systems and sub-systems. Develops new processes. Assumes additional similar responsibilities as appropriate.

10. Systems Analyst: Establishes, uses and supports integration and communications among middleware applications, databases and technology platforms. Uses and administers approved technology practices, standards and procedures. Manages an inventory of technology related assets, hardware, system software and middleware, databases, licenses, products. Elicits and clearly defines and documents Circuit City's needs and associated requirements. Analyzes a variety of work processes and associated document and information flow. Analyzes and documents logical relationships among the data, process or events. Defines and implements specific technical foundation (system software, middleware, data bases, and hardware) for an application Delivers new or enhanced middleware utilizing a variety of formal methodologies and disciplines. May guide and advise less experienced business systems analysts.

c. Hourly Services Charges

1. When IBM performs Hourly Services, Circuit City will pay IBM for IBM's actual hours expended in performing such Services at the agreed hourly rates (Hourly Rates), plus IBM's expenses incurred in providing such Hourly Services (Hourly Services Expenses) (collectively Hourly Services Charges).

2. Hourly Services Expenses will include:

(a) materials charges (such as products, parts, shipping costs, applicable taxes);

(b) travel time from and to point of dispatch to the extent mutually agreed;

(c) actual travel and living expenses to the extent mutually agreed and provided IBM gives Circuit City advance notice if such expenses will apply and to the extent consistent with IBM's travel reimbursement policies (or as otherwise agreed by the Parties).

3. The Parties will agree upon a process for regular, ongoing discussions regarding the nature and quantity of Hourly Services Circuit City will require for its business needs, and provide IBM with sufficient advance notice of such plans and requirements.

4. Hourly Rates

(a) IBM will charge Circuit City for the actual number of hours expended by IBM, rounded up to a full hour, plus overtime or premium rates, multiplied by the applicable Hourly Service Rates. The Hourly Rates are specified in <u>Attachment 18.01-1</u> (Pricing Tables). IBM will provide Circuit City with advance notice if overtime, other skill categories, or other premium rates apply for any Hourly Services (for example, for holidays, because of scarce skills in the industry, or because of Circuit City's requirement for an unusually high quantity of Hourly Services or of certain skills).

(b) In the event that Circuit City provides IBM with 60 days prior notice of its commitment to a quantity of any skill category to work on a Project or other Hourly Services for (i) a minimum commitment of six consecutive months full time, IBM will apply the applicable Hourly Rate, less five percent (5%); and, in addition, (ii) for all Hourly Services paid for by Circuit City that are in excess of 50,000 hours in any Contract Year, IBM will apply the applicable Hourly Services Rate (as discounted as set forth in (b) (i), if applicable), less one and one half percent (1 ½%).

5. IBM will invoice Circuit City for Hourly Services Charges monthly, upon completion of the Hourly Services, or as otherwise set forth in this Exhibit or a Project Plan.

## 2.5 Change & New Services

If Circuit City requests a Chargeable Change, or a New Service that requires one time or start-up expenses, IBM will quote to Circuit City the charges for performing such Chargeable Change or one time / start up expenses. If Circuit City agrees to have IBM perform such Chargeable Change or New Service, IBM and Circuit City will prepare and sign a written amendment to this Agreement for implementation of such Chargeable Change or New Service.

## 2.6 Projects

If Circuit City requests IBM to perform a New Project (or a BAU Project for which a Project Plan is reasonably required and requested by Circuit City), IBM and Circuit City will develop a detailed plan (at no charge to the extent such plan can reasonably be prepared using the skills of the Project Staff) describing the project (the <u>Project Plan</u>). The Project Plan will state IBM's charges for such Project, such as Hourly Services Charges, a fixed price, or an adjustment to the charges set forth in this Agreement.

## 3. Economic Change Adjustment

a. IBM will calculate and apply an adjustment to the Charges based upon economic changes (an <u>Economic Change Adjustment</u> or <u>ECA</u>) as described below beginning as of March 2008. The ECA will be payable on a prospective basis (for example, the actual inflation for December 2007

will determine the ECA for March 2008 through February 2009) on the Charges, including the Base Charges, Hourly Services, and ARCs, less the RRCs, payable by Circuit City. The ECA will be determined as soon as practicable after the end of each calendar year using the formula below (the ECA Factor).

b. IBM will invoice Circuit City for the ECA, if any, beginning in March 2008 and monthly thereafter.

c. Circuit City and IBM agree to use the December unadjusted Consumer Price Index, as published in the Summary Data from the Consumer Price Index News Release by the Bureau of Labor Statistics, U.S. Department of Labor, For All Urban Consumers (Price Index), for purposes of determining actual inflation. In the event such Price Index is no longer published or its content and format is substantially changed, Circuit City and IBM will substitute another comparable index published at least annually by a mutually agreeable source. If the Bureau of Labor Statistics merely redefines the base year for the Price Index from 1982-84 to another year, Circuit City and IBM will continue to use the Price Index, but will convert the Base Year Index to the new base year by using an appropriate conversion formula.

d. Actual Inflation

IBM will calculate the ECA by comparing the change in the year-to-year Price Index with the Price Index for December 2006 (the "Base Year Index"). For each 12 month period as of and following March 2008, the actual Price Index for the December before the year for which the ECA is being calculated (the "Actual Inflation") will be compared to the Base Year Index. For example, the December 2007 Price Index will be used to determine the ECA for the period of March 2008 through February 2009. If Actual Inflation is equal to or less than the Base Year Index, then no ECA is due. If, however, the Actual Inflation is greater than the Base Year Index, then IBM will apply the ECA to the Charges due IBM, minus the RRCs, for the year for which IBM is calculating the ECA.

e. Inflation Sensitivity

The following percentage reflects the inflationary impact on IBM's delivery of the Services in the following Service Towers (Inflation Sensitivity):

1. The Inflation Sensitivity for Infrastructure Services, Service Desk Services, Store Engineering & Architecture Services, and Desktop Services shall be 95%;

2. Inflation Sensitivity for Network Services shall be 25%;

3. Inflation Sensitivity for the Store Support Services and Hardware Services Charges shall be 0%.

f. ECA Factor

The ECA is equal to the ECA Factor times the sum of the Charges less the RRCs due IBM for each month of the 12 month period as of and following March 2008 during which Actual Inflation is greater than the Base Year Index. Calculate the ECA Factor as follows:

| ECA Factor |
| --- |
|  |

| ECA Factor | | |
|---|---|---|
| ECA Factor | = | [{(Actual Inflation - Base Year Index) / Base Year Index} x Inflation Sensitivity] |
| Actual Inflation | = | The Price Index for the December before March of the year for which the ECA is being calculated. |
| Base Year Index | = | The Price Index for the December 2006. |
| Inflation Sensitivity | = | The portion of the charges that are inflation sensitive. |

g. ECA Calculation

1. The example below calculates the ECA based on the following assumptions:

   (a) A Service Commencement Date in 2007;

   (b) a Base Year Index of the Price Index for December 2006;

   (c) ECA calculation begins in March 2008;

   (d) Inflation Sensitivity of 75 percent; and

   (e) the following Actual Inflation examples:

| ECA Calculation Example Actual Inflation Examples | | | | | | |
|---|---|---|---|---|---|---|
| Base Year Index 2006 = 201.80 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Actual Inflation | 207.90 | 214.10 | 220.50 | 227.10 | 233.90 | 238.10 |

2. According to this example:

   (a) there will be an ECA for calendar years 2008 through 2013 because the Actual Inflation for the year preceding each year is greater than the Base Year Index.

   (b) To determine the ECA moneys due, using this example, in addition to the other charges for March 2009, assume:

   (i) the monthly prorated portion of the Base Charges for March is $10,000,000,

   (ii) there are CPU ARCs of $80,000 due for that month, and

   (iii) there are DASD RRCs of $30,000 due Circuit City for that same month.

   (c) the calculation will be as follows:

| ECA Calculation Example |
|---|

| ECA Calculation Example | | |
|---|---|---|
| ECA | = | {(Base Charges + ARCs – RRCs) x ECA Factor} |
| ECA | = | [{($10,000,000 + $80,000 – $30,000) x (214.10 – 201.80) / 201.80} x 0.75] |
| ECA | = | $10,050,000 x {(12.30 / 201.80) x 0.75} |
| ECA | = | $10,050,000 x (0.0609514 x 0.75) |
| ECA | = | $10,050,000 x 0.0457136 |
| ECA | = | $459,421.46 |

(d) The ECA for each month of each year in which the ECA is due is calculated as above substituting the appropriate monthly moneys and the ECA Factor based upon the actual information

## 4. Resource Units and Measurement Methodology

### 4.1 Generally

a. As of the Services Commencement Date and each month thereafter, IBM will measure, track and report on Circuit City's usage of Resource Units in the categories set forth in this Section using the processes and procedures in the Procedures Manual.

b. The quantity of Resource Units for each category of resources provided to Circuit City under this Agreement is specified in Attachment 18.01-1 (Pricing Tables) as a "Resource Unit Baseline."

### 4.2 Infrastructure Services Resource Units

a. Servers System Images

1. A ("System Image" or "Image") shall mean a unique instance of an operating system and all related software operating within such System Image. There are System Images for 3 different types of environments:

    (a) AS400

    (b) Unix/Linux

        (i) Gold

        (ii) Silver

        (iii) Bronze

    (c) Intel

        (i) Gold

        (ii) Silver

        (iii) Bronze

Exhibit 18.01 Pricing and Financial Provisions

2. Resource usage for this category will be measured as the aggregate number of System Images installed, for the applicable environment.   System Images are further classified as receiving Critical Service Levels that are either Gold Service Levels, Silver Service Levels, or Bronze Service Levels, defined and as set forth in Exhibit 8.01 (Service Level Methodology) and its Attachments. The System Images classification of Gold, Silver and Bronze included within the Charges as of the Services Commencement Date are set forth in Attachment 18.01-1 (Pricing Tables).

3. One System Image equals one Resource Unit.

4. The Server System Image Baselines set forth in Attachment 18.01-1 (Pricing Tables) to this Exhibit reflects the quantity of Server System Image Resource Units, for each environment included within the Base Charges.

b. HIDs Devices

1. Resource usage for this category will be measured as the number of Managed Host Intrusion Detection Systems ("HIDS") devices (as recorded in the asset database IBM maintains and measured according to the procedures in the Procedures Manual) during the applicable measurement period.

2. One HIDS equals one Resource Unit.

3. The HIDS Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the agreed quantity of HIDS Resource Units included the Base Charges.

c. Direct Access Storage Devices ("DASD")

1. "DASD" shall mean the utilized terabytes of storage on the following devices: SAN devices, NAS devices, channel attached devices, and EXP units.

2. Resource usage for this category will be the average monthly number of utilized terabytes of disk storage utilized, measured to the nearest thousandth and according to the procedures in the Procedures Manual during the applicable measurement period.

3. One terabyte of utilized disk storage equals one trillion (1,000,000,000,000) bytes.  One terabyte of utilized disk storage equals one Resource Unit.

d. Tape TBs

1. Resource usage for this category will be measured as the aggregate number of physical tape terabytes stored in a tape library.  Such tape terabytes may be stored both within and external to the mechanical tape libraries.

2. One terabytes of Tape equals one trillion (1,000,000,000,000) bytes.  One tape terabytes equals one Resource Unit.

3. The Tape TB Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the quantity of tape terabytes Resource Units included in the Base Charges.

e. Off-Site Tape Storage

1. Resource usage for this category will be measured as the aggregate number of tape reels or cartridges in any off-site tape library (e.g., Iron Mountain) within a given month.

2. One tape reel or cartridge equals one Resource Unit.

3. The Tape Off-Site Storage Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) to this Exhibit reflects the quantity of Tape Off-Site Storage Resource Units included in the Base Charges.

f. Physical Database Instances

   1. Resource usage for this category will be measured as the number database instances of an Informix, or SQL, Sybase, Allbase, Oracle or DB2 running on a Server System Image for which IBM is operationally responsible under this Agreement.

   2. The Database Instances reside in two different environments – those operating on a UNIX System Software and those operating on INTEL System Software.

   3. One Database Instance equals one Resource Unit.

   4. The Database Instance Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Database Instance Resource Units included the Base Charges for each environment (UNIX and Intel).

g. Middleware Instances

   1. Resource usage for this category will be measured as the number Middleware Instances of: Websphere, Weblogic, TIBCO, or MQ, running on a Server System Image for which IBM is operationally responsible under this Agreement.

   2. One Middleware Instance equals one Resource Unit.

   3. The Middleware Instance Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Middleware Instance Resource Units included the Base Charges.

h. CCD Applications Support Baseline

   1. Resource usage for this category will be measured as the number of FTEs performing CCD Applications Integration support as set forth in <u>Section 4.3.1(11)</u> of <u>Attachment A-3</u> (Infrastructure Services) to <u>Exhibit 3.01(1)</u> (Statement of Work).

   2. One Resource Unit is one FTE.

   3. The CCD Applications Support Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of FTEs included the Base Charges.

i. eBHS Environment and ODCS Environments

   Until the relocation of the EBHS Environment to IBM's Data Center in Southbury (the "<u>EBHS Transition</u>"), IBM will provide Circuit City with the EBHS Services pursuant to EBHS Contract. Specifically, the terms of the EBHS Contract shall apply for all purposes during the EBHS Transition, except with respect to the Charges and hosting Baselines (which shall be governed by the MSA and this Exhibit), and with respect to the Service Level Credits and Service Level Credit methodology (which shall be governed by the MSA and <u>Exhibit 8.01</u> (Service Level Methodology) and its Attachments.

Exhibit 18.01 Pricing and Financial Provisions

Until the relocation of the ODCS Environment to IBM's Data Center in Southbury (the "ODCS Transition"), IBM will provide Circuit City with the ODCS Services pursuant to ODCS Contract, as amended by the Parties on the Effective Date of the MSA. Specifically, the terms of the ODCS Contract shall apply for all purposes during the ODCS Transition, except with respect to the Charges and hosting Baselines (which shall be governed by the MSA and this Attachment 18.01-1 (Pricing Tables) and with respect to the Service Level Credits and Service Level Credit methodology (which shall be governed by the MSA and Exhibit 8.01 (Service Level Methodology) and its Attachments).

If IBM fails to relocate the ODCS and EBHS Environments to Southbury within the time period set forth in the Transition Period because of IBM's failure to perform its responsibilities under this Agreement (unless such time period is modified by mutual agreement), IBM will invoice Circuit City the Charges that would have applied had such relocation occurred on the agreed upon timing.

### 4.3 Network Support Services Resource Units

a.   Timing of Network Resource Units

The Resource Units set forth in this Section 5.3 shall apply to IBM's provision of Network Services to Circuit City as of Services Commencement Date for all Network Services, except that the Resource Units set forth in this Section 5.3(a) shall not apply until as of two months following the Services Commencement Date. During the first two months following the Services Commencement Date, Circuit City shall pay for the use of these resources directly to the vendors and pursuant to the terms of the Shared Agreements. Following such two month period, the Parties shall pay the portions of the Shared Agreements for which each Party is financially responsible, as set forth in Exhibit 7 (Shared Agreements, Assumed Agreements, and Retained Agreements)

1.   All data transport connectivity and all Circuits for providing Data Network Services, including but not limited to the following:

(a) MPLS OC3 – Gold Service Level;

(b) MPLS DS3 – Gold Service Level

(c) MPLS MIS T1 –Silver Service Level;

(d) MPLS INCS T1 –Silver Service Level;

(e) MPLS FR ATM T1 –Silver Service Level;

(f)  Point to Point 45000Kbps –Silver Service Level;

(g) All DSL services –Silver Service Level; and

2.   All Voice Usage Minutes.

b.   Data Network Services Resources – Circuits

1.   Resource usage for this category will be the bandwidth capacity of the data communications lines (as defined by access, circuit or port speed of connection) connecting the Data Center to the Data Network locations in Exhibit 10 (Service Locations). Circuits are designated as receiving either Gold Service Levels or Silver Service Levels, as set forth in

Exhibit 8.01(Service Level Methodology). Exhibit 10 (Service Locations) lists the data communications lines with their capacities and addresses of the from and to locations. The Data Network Circuits included within the Base Charges as of the Services Commencement Date are as follows:

(a) WAN OC3 – Gold Service Level

(b) WAN MPLS DS3 – Gold Service Level

(c) WAN - MIS T1 –Silver Service Level

(d) WAN INCS T1 –Silver Service Level

(e) WAN Frame Relay ATM T1 –Silver Service Level

(f) WAN 45000 Kbps –Silver Service Level

(g) WAN DSL –Silver Service Level

2. The Baselines in Attachment 18.01-1 (Pricing Tables) reflect the required bandwidth capacity the Base Charges includes to support Circuit City, and are the basis for determining ARCs and RRCs.

3. To the extent the bandwidth required for such ports is greater or less than the bandwidth included in the Baselines, IBM will add or delete bandwidth capacity in the prescribed increments. Circuit City will define the performance specifications required to support additional Data Network locations, and will be financially responsible for additional capacity for these locations or connection of new locations. IBM will consult with and provide recommendations to Circuit City with respect to port number and speed. IBM will provide Circuit City with a rate card for providing additional bandwidth capacity and speeds.

4. If Circuit City requests, or if necessary to perform the Services according to the Service Levels, IBM will obtain upgrades, replacements or additional line or circuit capacity for the Data Network. All such additions, replacements and upgrades, together with any other changes to the Data Network will be: (i) IBM's financial responsibility, to the extent such changes are required by IBM to meet the Service Levels and are not due to Circuit City's capacity requirements in excess of the Baselines; Circuit City's financial responsibility, to the extent such changes are required by IBM to meet the Service Levels and are due to Circuit City's capacity requirements in excess of the Baselines; and (ii) considered a New Service, to the extent such changes are requested by Circuit City.

5. It is understood that IBM will act as Circuit City's limited agent in dealing with common carriers but will not itself be the subscriber for common carrier services.

c. Internet Bandwidth

1. Resource usage for this category will be the aggregate bandwidth capacity of the data communications lines providing connectivity to the Southbury CT. Data Center as listed in Exhibit 10 (Service Locations), from the Internet for use by Circuit City Direct (CCD). This Internet bandwidth will be designated as receiving either Gold Service Levels as set forth in Exhibit 8.01 (Service Level Methodology).

2. The Data Network Circuits included within the Base Charges as of the Services Commencement Date are as set forth in Attachment 18.01-1.

3. The Baselines in <u>Attachment 18.01-1</u> (Pricing Tables) reflect the required bandwidth capacity the Base Charges includes to support the CCD Internet connectivity, and are the basis for determining ARCs and RRCs. Additional bandwidth required above the Baselines will be measured and charged an ARC on a per MBPS used in excess of the Baselines using a 95 percentile (95%) calculation (i.e., the highest 5% measurements will be disregarded and Circuit City will be charged based on the highest remaining MBPS measured during that month).

d. Router Device Resources – Simple and Complex

1. "Router" means an installed device that determines the next network point to which a data packet should be forwarded enroute toward its destination. Resource usage for this category will be measured as the number of Router Devices installed at the Facilities (as recorded in the asset database IBM maintains and measured according to the procedures in the Procedures Manual) during the applicable measurement period.

2. The following Router Device types have separate Resource Baselines set forth in <u>Attachment 18.01-1</u> (Pricing Tables).

(a) Simple Router. A Simple Router is a Cisco 26XX router or equivalent.

(b) Complex Router. A Complex Router is a Cisco 7XXX router or equivalent.

3. One Router Device equals one Resource Unit.

4. The Router Device Baselines set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Router Device Resource Units included the Base Charges.

e. Wireless Access Points (WAP) Services Resources

1. Resource usage for this category will be measured as the number of Wireless Access Point devices installed at the Facilities (as recorded in the asset database IBM maintains and measured according to the procedures in the Procedures Manual) during the applicable measurement period.

2. One Wireless Access Points device (WAP) equals one Resource Unit.

3. The Wireless Access Points (WAP) Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Wireless Access Points (WAP) Resource Units included the Base Charges.

f. Managed Firewall Resources

1. A Managed Firewall is a single Cisco PIX based device or appliance based device used to control traffic flow from and to a trusted network and a non-trusted network such as the Internet. A managed firewall resource unit provides for on-going labor to support and manage the device. Resource usage for this category will be measured as the number of Managed Firewalls installed at the Facilities (as recorded in the asset database IBM maintains and measured according to the procedures in the Procedures Manual) during the applicable measurement period.

2. One Managed Firewall equals one Resource Unit.

3.  The Managed Firewall Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Managed Firewall Resource Units included the Base Charges.

g.  LAN Device Resources – Simple Switches and Complex Switches

1.  Resource usage for managing the connection of Circuit City's End User devices to the local area network infrastructure ("Active LAN Devices") shall be measured on a per Device basis. An Active LAN Device is one that is installed, programmed, and has a functioning end node (e.g. workstation, printers, servers, Midrange, etc.) attached to it. This Resource Unit includes costs directly associated with the management and support of the local area network infrastructure. On an annual basis as part of the planning process, IBM and Circuit City shall evaluate the available technology, the account technology profile and architecture to evaluate and update the definition of devices. Such new technology profiles and definitions shall only apply for new devices installed subsequent to the profile update and shall not be retroactive to the existing install base. Upon refresh, a device shall be classified consistent with the then current definition.

2.  The following Device types have separate Resource Baselines set forth in <u>Attachment 18.01-1</u> (Pricing Tables).

    (a) Simple Switch.  A Simple Switch is a switch with 48 ports or fewer.

    (b) Complex Switch. A Complex Switch is a switch with greater than 48 ports or layer 3 capability.

3.  One Active LAN Device equals one Resource Unit.

4.  The Active LAN Device Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Active LAN Device Resource Units included the Base Charges.

h.  Network IMAC Event Resources

1.  Install, Move, Add and Change ("IMAC") the sub-components of an IMAC have the following meanings:

    (a) "Install" means the installation and/or removal of Equipment or Software, and includes all associated tasks described in the Network Statement of Work.

    (b) "Move" means the relocation of Equipment and includes all associated tasks described in applicable Network Statement of Work.

    (c) "Add/Change" means the addition, deletion or change of a component of Equipment or Software, and includes all associated tasks described in the applicable Network Statement of Work.

2.  The following Voice and Data Network IMAC Event types have separate Resource Baselines set forth in <u>Attachment 18.01-1</u> (Pricing Tables).

    (a) Soft IMAC.  Soft IMAC means a Software IMAC request received from Circuit City, which IMAC can be performed concurrently with remote element management tools and does not require any physical on-site intervention. A Software patch or error correction upgrade will not be considered as a Soft IMAC.

(b) Hard IMAC. Hard IMAC means an IMAC request received from Circuit City, which requires IBM to dispatch a technician to the Circuit City Location in order to perform such required IMAC. A Hard IMAC shall include a Soft IMAC, if necessary. A Move within a single building or campus that is a Circuit City Location will count as one Hard IMAC unless hardware configuration changes are required at the new location. A Move between Facilities will count as two Hard IMACs.

3. Resource usage for this category will be measured as the aggregate number Data Network IMAC Events performed by IBM during the applicable measurement period.

4. One Data Network IMAC Event equals one Resource Unit.

i.  Voice Network – Active Ports

1. Resource usage for this category will be measured as the aggregate number of PBX active Ports. PBX Active Ports shall be measured as the total number of ACD ports on PBX cards with active station or trunk connections as of the last day of each month.

2. One PBX/ACD Active Port equals one Resource Unit.

3. The PBX/ACD Active Ports Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the agreed quantity of PBX/ACD Active Ports Resource Units included the Base Charges.

j.  Voice Mailboxes Resources

1. Resource usage for this category will be measured as the total number of Voice Mailboxes supported by IBM as of the last day of each Month.

2. One Voice Mailbox equals one Resource Unit.

3. The Voice Mailbox Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the agreed quantity of Voice Mailbox Resource Units included the Base Charges.

k.  Voice – Remote Access Services (RAS) Users Resources

1. RAS Single User VPN/DIAL. Resource Unit usage for this category shall be measured monthly based on the number of End Users who used the Remote Access Service during the month.

2. One RAS VPN or Dial User equals one Resource Unit.

3. The RAS VPN or Dial User Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the agreed quantity of RAS VPN or Dial User Resource Units included the Base Charges.

l.  Voice Network Adjunct (IVR & ACD) Resources

1. Resource usage for this category will be measured as the aggregate number of Active Ports in each of the following categories:

(a) Adjunct PBX IVR. PBX IVR Active Ports shall be measured as the total number of IVR ports on PBX cards with active station or trunk connections as of the last day of each month; and

Exhibit 18.01 Pricing and Financial Provisions

(b) Adjunct PBX ACD. PBX ACD Active Ports shall be measured as the total number of ACD ports on PBX cards with active station or trunk connections as of the last day of each Month.

2. One Adjunct Active Port equals one Resource Unit.

3. The Adjunct Active Ports Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Adjunct Active Ports Resource Units included the Base Charges.

m. Voice Usage – VoiceNetwork Services Call Minutes Resources

Resource usage for this category will be measured, on a monthly basis, in the number of call minutes related to voice usage on common carrier networks in the following areas.

1. Domestic Outbound interstate, intrastate, interlata, intralata

(a) On Net - On Net: The aggregate number of call minutes per month for an outbound voice call that originates and terminates at a Circuit City Location that uses T-1 access for voice usage.

(b) On Net - Off Net: The aggregate number of call minutes per month for an outbound voice call originating from a Circuit City Location and terminates at a switched Circuit City Location that used common business lines.

(c) Off Net – On Net: The aggregate number of call minutes per month for an outbound voice call originating at a switched Circuit City Location that uses common business lines and terminates at a Circuit City Location that uses T-1 access for voice usage.

(d) Off Net - Off Net: The aggregate number of call minutes per month for an outbound voice call that originates and terminates at a Circuit City Location that uses common business lines.

2. International Outbound

Resource usage in this category will be the aggregate number of minutes related to international usage call minutes and measured in the following categories:

(a) International Dedicated: The aggregate number of minutes per month related to voice usage call minutes that originate in the United States from a Circuit City Location that uses T-1 access for voice usage and terminate at non United States locations.

(b) International Switched: The aggregate number of minutes per month related to voice usage call minutes that originate in the United States from a Circuit City Location that uses common business lines for voice usage and terminate at non United States locations.

3. Domestic Inbound Toll Free 800/888

Resource usage in this category will be the aggregate number of minutes per month related to 800/888 service usage call minutes and measured in the following categories:

(a) Dedicated: The aggregate number of Domestic Inbound call minutes per month related to voice usage call minutes at Circuit City Facilities using T-1 access for 800/888 service voice usage.

(b) Switched: The aggregate number of Domestic Inbound call minutes per month related to voice usage call minutes terminating at Circuit City common business lines for 800/888 service voice usage.

4. International Inbound Toll Free 800/888

Resource usage in this category will be the aggregate number of minutes per month related to 800/888 service voice usage call minutes that terminate in the United States and originate from a non United States location. International Inbound 800/888 service voice usage will be measured in the following categories:

(a) Dedicated: The aggregate number of international inbound call minutes per month related to voice usage call minutes terminating at Circuit City Facilities using T-1 access for 800/888 service voice usage.

(b) Switched: The aggregate number of international inbound call minutes per month related to voice usage call minutes terminating at Circuit City common business lines for 800/888 service voice usage.

5. Calling Card Usage

Resource usage for this category will be measured as the aggregate number of calling card calls and the aggregate number of call minutes per month to access the IBM voice network from any telephone.

6. Cellular Minutes- Resource Usage for this category shall be measured, on a monthly basis, by the number of minutes related to cellular connection usage on common carrier networks.

7. The Voice Network rate tables in Attachment 18.01-1 (Pricing Tables) set forth detailed pricing for Domestic Outbound, International Outbound, Domestic Inbound, and International Inbound calls. The voice rates will apply for the Term. Circuit City will be billed monthly for actual usage using the Voice Network rate tables. IBM will provide Circuit City with a rate card for providing additional Voice Nework minutes.

### 4.4 Desktop Support Services – Resource Units

a. Workstation Resources

1. Resource usage for this category will be measured as the number of accessible Workstations operational at the Facilities (as recorded in the asset database IBM maintains and measured according to the Procedures Manual) during the applicable measurement period.

2. There are 7 classifications of Workstations, each having a separate Baseline and associated ARC Rate and RRC Rate: Campus Desktops, Remote Desktops, Campus Laptops, Remote Laptops, Store Director devices, and e-Learning Workstations.

3. A Workstation will be considered operational:

(a) upon its Install or as IBM discovers or is otherwise notified by Circuit City;

(b) until IBM deinstalls it as an IMAC event or as IBM is otherwise notified that it is a deinstalled unit; or

(c) until it is classified as unserviceable in accordance with the Procedures Manual.

4.  One Workstation equals one RU.

5.  The Workstation Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the agreed quantity of Workstation Resource Units included in the Base Charges.

b.  MacIntosh PC Resources

1.  Resource usage for this category will be measured as the number of accessible MacIntosh PCs operational at the Facilities (as recorded in the asset database IBM maintains and measured according to the Procedures Manual) during the applicable measurement period.

2.  A MAC PC will be considered operational:

(a) upon its Install or as IBM discovers or is otherwise notified by Circuit City;

(b) until IBM deinstalls it as an IMAC event or as IBM is otherwise notified that it is a deinstalled unit; or

(c) until it is classified as unserviceable in accordance with the Procedures Manual.

3.  One MAC PC equals one RU.

4.  The MAC PC Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the agreed quantity of MacIntosh PC Resource Units included in the Base Charges.

c.  Wireless Handheld Resources

1.  "Wireless Handheld Devices" shall mean Blackberrys, and other agreed upon wireless communication devices having similar function.

2.  Resource usage for this category will be measured as the number of accessible Wireless Handheld Devices operational (as recorded in the asset database IBM maintains and measured according to the Procedures Manual) during the applicable measurement period. Wireless Handheld Device usage charges are not included in this Resource Unit.

3.  A Wireless Handheld Device will be considered operational:

(a) upon its Install or as IBM discovers or is otherwise notified by Circuit City;

(b) until IBM deinstalls it as an IMAC event or as IBM is otherwise notified that it is a deinstalled unit; or

(c) until it is classified as unserviceable in accordance with the Procedures Manual.

4.  One Wireless Handheld Device equals one RU.

5.  The Wireless Handheld Device Baseline set forth in Attachment 18.01-1 (Pricing Tables) reflects the agreed quantity of Wireless Handheld Device Resource Units included in the Base Charges.

d.  Network Printer Resources

1. "Network Printer" shall mean a printer that is connected to a network for use by End Users and is operational at the Facilities (as recorded in the asset database IBM maintains and measured according to the Procedures Manual) during the applicable measurement period.

2. Resource usage for this category will be measured as the number of accessible Network Printers operational (as recorded in the asset database IBM maintains and measured according to the Procedures Manual) during the applicable measurement period.

3. A Network Printer will be considered operational:

   (a) upon its Install or as IBM discovers or is otherwise notified by Circuit City;

   (b) until IBM deinstalls it as an IMAC event or as IBM is otherwise notified that it is a deinstalled unit; or

   (c) until it is classified as unserviceable in accordance with the Procedures Manual.

4. One Network Printer equals one RU.

5. The Network Printers Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Network Printer Resource Units included in the Base Charges. Desktop Printers will be supported on a time and material basis.

e. Desktop Install, Move, Add, and Change (IMAC) Services Resources

   1. Resource usage for this category will be measured as the aggregate number of Install, Move, Add, and Change events, as defined in the Desktop Statement of Work, that IBM performs during the applicable measurement period. IMAC's will be differentiated as follows:

      (a) IMACs performed at Campus Locations, as defined in <u>Exhibit 10</u> (Service Locations);

      (b) IMAC's performed at Remote Locations, as defined in <u>Exhibit 10</u> (Service Locations);

      (c) IMAC's performed on eLearning PCs, as defined in <u>Exhibit 10</u> (Service Locations);

   2. IMACs performed on the e-Learning PCs in the Stores. The IMAC Baselines set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflect the agreed quantity of IMACs included in the Base Charges.

   3. IMAC refers only to the above activities and does not include hardware, software or other devices or functions necessary to implement an IMAC, site preparation, packing materials or transportation of the components to, within and between Facilities. Circuit City will be responsible for all of the foregoing.

   4. Any activities associated with restoring asset data base integrity necessitated by problems caused by an IMAC activity performed outside of the IMAC process (for example, unauthorized, undocumented or improperly communicated to IBM) will be considered an additional service separately charged as Hourly Services or as a Project.

f. Email Support Resources

1. Resource usage for this category will be measured as the number of Email User IDs at the Facilities that IBM maintains (as measured according to the process set forth in the Procedures Manual) during the applicable measurement period.

2. There are 2 classifications of Email User IDs: Lotus Notes User IDs and Webmail User IDs, each having a separate Baseline and associated ARC Rate and RRC Rate. Such classifications reflect the support costs.

3. One Email User IDs equals one RU.

4. The Email User IDs Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of CCS Store Resource Units included in the Base Charges.

g. eLearning Image Support Resources

1. Resource usage for this category will be measured as the number of Hours actually performed by IBM in support of eLearning Image Support, during the applicable measurement period.

2. The Baseline (i.e., quantity) for this resource category is based upon the number of Hours agreed to by the Parties as of the Effective Date.

3. One Hour equals one RU.

4. The eLearning Image Support Hours Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of eLearning Image Support Hours Resource Units included in the Base Charges.

h. Disposal

Workstations that are not salable, as determined by IBM, will be scrapped and Circuit City charged a $25 scrapping fee.

### 4.5 Store Support Services – Resource Units

a. Store Support Services – Maintenance ("<u>Store Support RU</u>")

1. "CCS Store" shall mean those stores listed in <u>Exhibit 10</u> (Service Locations).

2. Resource usage for this category will be measured as the number of CCS Stores during the applicable measurement period. In addition, as Circuit City is refreshing the point of sale with the rPOS rollout to have an average of 17 lanes, there will be an additional charge ("<u>Store Support - Additional Hardware</u>") for each such Store that has migrated to rPOS.

3. The Baseline (i.e., quantity) for this resource category will the quantities set forth in <u>Attachment 18.01-1</u> (Pricing Table).

4. One CCS Store equals one Store Support RU. In addition, one CCS with Additional Hardware equals one Store Support – Additional Hardware RU.

5. The CCS Store Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of CCS Store Resource Units included in the Base Charges.

b. Store Support Services – Project Hours ("<u>Store Project Hours RU</u>")

1. Resource usage for this category will be measured as the number of Project Hours (FTE Hours) actually performed by IBM in support of Store Infrastructure Projects in CCS Stores, during the applicable measurement period.

2. The Baseline (i.e., quantity) for this resource category is based upon the number of Project Hours agreed to by the Parties as of the Effective Date.

3. One Project Hour equals one RU.

4. The Project Hours Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Project Hours Resource Units included in the Base Charges.

c. The ARCs for the Store Maintenance RU and the Store Project Hours RU shall be applied independently of each other. In other words, Circuit City may choose in its discretion whether to obtain additional Store Project Hours. ARCs (but not RRCs) shall apply to this Resource Unit.

## 4.6 Store Engineering & Architecture Support Services

1. Resource usage for providing Engineering and Architecture support as set forth in the Store Engineering & Architecture Support Services Statement of Work shall be provided based upon the number of Full Time Equivalents (FTE) providing such Services.

2. One Resource Unit is one FTE.

3. The Project Support – Stores FTE Baseline set forth in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of FTEs.

## 4.7 Service Desk Resources

a. Resource usage for this category will be measured as the number of requests for services or assistance received by the Service Desk electronically, or by telephone (including electronic or voice entry where the End User selects to speak to an agent or process an automated function); but excluding calls to the systems status recording (<u>Calls</u>), during the applicable measurement period.

b. During the Transition Period, Service Desk Calls will be measured using the existing Circuit City Call monitoring system. Following the Transition Period, Service Desk Calls will be measured using the IBM Call monitoring system.

c. One Call equals one RU.

d. The Service Desk Calls Baseline in <u>Attachment 18.01-1</u> (Pricing Tables) reflects the agreed quantity of Service Desk Resource Units included within the Base Charges.

e. In the event that IBM fails to perform its obligations under this Agreement, which results in an increase in Help Desk calls such that CCS is required to pay IBM or its then third party provider, an ARC for additional support, IBM agrees to relieve CCS of its obligation to pay the ARC invoice to the extent resulting from IBM's failure to perform its obligations under this Agreement. For purposes of clarity, this provision shall be limited by and based on the extent to which IBM's failure to perform its obligations under this Agreement has increased the charges to Circuit City above the applicable ARC that would otherwise not have been incurred but for IBM's failure to perform under this Agreement and excludes any increases based on scope or factors not included as IBM's responsibilities under this Agreement or factors that are outside the control of

IBM.

## 5. Hardware Services Charge

a. The HSC is a methodology to provide the Parties with flexibility in refreshing the Equipment and Software for the Server Services and Network Services, and in obtaining new Equipment and its associated Software above the Baselines set forth in <u>Attachment 18.01-1</u> (Pricing Tables). If and when such variance in the Equipment is required for the provision of the Services (above or below the Resource Unit Baselines in <u>Attachment 18.01-1</u> (Pricing Tables) for Infrastructure Services and Network Services) occurs, IBM will prepare a HSC invoice as set forth in the Change Management process to address the additional requirement or reduced requirement. This HSC invoice will result in a monthly HSC adjustment that Circuit City shall pay or receive credit for based on the actual increased or decreased monthly Capital Expenditures detailed in the HSC proposal.

b. The HSC shall be charged monthly to Circuit City based on the monthly Capital Expenditures (as defined below) made for assets (new or refresh) provided by IBM under this Agreement. The purchase of any assets that are to be included in the monthly Capital Expenditures must be pre-approved by Circuit City. "Capital Expenditures" means, with respect to any month of the Term, the sum of the Equipment Supplier's charges for the asset (including all associated peripheral equipment), applicable sales and use taxes, shipping and handling costs, disposal costs of replaced equipment, and the costs of any other service that is ordinarily provided by an OEM or hardware dealer, including, as applicable, burn-in, equipment and System Software installation, setup, initial configuration and physical connection costs. In addition, the HSC will include all costs associated with the applicable Equipment personal property taxes, Equipment hardware maintenance, Equipment System Software (when not bundled with the "Capital Expenditures"), and a 3% administrative charge above the total invoiced amount.

c. Equipment purchased as part of the Hardware Services Charge shall be owned or leased by the IBM in the IBM's name.

d. The monthly charges for asset acquisitions in a given month (HSC) will equal the following, for the finance term:

$$\text{Monthly HSC} = \left[ \; \left( P * \left[ \frac{\dfrac{i}{12} * \left(1 + \dfrac{i}{12}\right)^n}{\left[ \left(1 + \dfrac{i}{12}\right)^n - 1 \right]} \right] + \left[ \frac{XX\%}{12} * P_{baseline} * .5 \right] \right) + M + S \; \right] * 1.03$$

<u>Where:</u>

- Monthly HSC = the monthly Hardware Service Charge

- P = the total financed Capital Expenditure for such Equipment

- M = the monthly hardware maintenance expenditure for that month

- S = the monthly System Software expenditure for that month (if not bundled with Capital Expenditure)

- n = the finance term

- i = the interest rate benchmark (the international 2 year swap rate, found at http://www.federalreserve.gov/releases/h15/update/) plus the interest rate adders (4.9% for 36 month lease, 5.1% for 48 months, and 5.5% for 60 month)

- XX = the personal property tax at time of purchase; and

- 1.03 = the administrative charge

e. For each month during the Term in which IBM provides Circuit City with a Variable Charges invoice, IBM will compare the total actual monthly HSC (including those occurring from previous months' asset purchases) to the monthly HSC Base Charges set forth in Attachment 18.01-1 (Pricing Tables) to this Exhibit for that month. Should the actual monthly HSC be greater or less than the monthly HSC Base Charges set forth in Attachment 18.01-1 (Pricing Tables), Circuit City shall pay or receive a credit (i.e. Circuit City will be billed at actual amounts), as applicable, for such difference within that Variable Invoice.

f. For an HSC asset which is not refreshed or removed at the end of the finance term following acquisition, Circuit City shall continue to pay IBM for direct personal property taxes. In addition, prior to the end of the finance term, Circuit City and IBM will agree on an appropriate extended (beyond the initial HSC finance term) monthly hardware maintenance and System Software charge. Such personal property tax, hardware maintenance and System Software monthly charge will continue until such asset is refreshed or removed. Subject to the preceding sentence, Circuit City shall have no further monthly HSC for an asset not refreshed or removed at the end of the finance term following acquisition.

g. If a third party supplier ceases to provide hardware maintenance service for an HSC asset or if parts are not generally commercially available for such HSC asset, then Circuit City will have the option to direct IBM to purchase a replacement HSC asset, to refresh such HSC asset, or take no action on the HSC asset. If a purchase or refresh is made, a new monthly HSC charge will be calculated and invoiced, and any former charges for hardware maintenance or parts will cease. If no action on the HSC asset is taken, IBM's Service Levels will be adjusted appropriately to provide relief; and IBM will bill Circuit City actuals for time and material hardware maintenance.

h. If Circuit City requests removal of an HSC asset, prior to finance term end, any remaining monthly HSC for that asset shall continue to the end of the applicable finance term payment period. Alternatively, and at Circuit City's option (and, in any event, upon termination or expiration of the Term), Circuit City may (i) retain the asset and pay IBM an amount equal to the present value of the remaining HSC for that asset, using a discount rate equal to rate of interest included in the HSC calculation, or (ii) request IBM to dispose of such asset and charge Circuit City a one time amount equal to the present value of the remaining HSC for that asset, using a discount rate equal to the rate of interest included in the HSC calculation, less the fair market value of such asset (as shall be determined by an agreed-upon appraisal), plus any disposal charges incurred by IBM for this asset. At Circuit City's requests, IBM's Project Executive will exercise reasonable efforts to redeploy such HSC asset within IBM to eliminate or reduce Circuit City's remaining financial obligation, provided, however, that until and unless IBM

successfully redeploys such HSC asset, Circuit City shall continue to be financially responsible for such HSC asset as set forth herein.

i.    If Circuit City cancels an order for a previously approved HSC asset, Circuit City shall be responsible for any commercially reasonable restocking fees or other charges of the applicable third party vendor resulting from the cancellation request (i.e. freight).  If such products cannot be returned to the applicable third party vendor, IBM shall assist Circuit City with the redeployment of the HSC asset, as appropriate, within Circuit City.  The designated Circuit City representative must approve all requests for the cancellation of approved purchases in writing.

j.    One-time charges are not included in the monthly HSC calculation and will be invoiced separately.

## 6.  Baseline Normalization

IBM may, at its expense, implement technological advancements relative to providing the Services, provided IBM performs the Services according to the Service Levels.  If such technological advancements will have an effect on a Baseline, IBM and Circuit City will agree upon a normalization for the affected Baseline, and the ARC Rate and/or RRC Rate, so that Circuit City receives the same level of performance and the same price performance as Circuit City received under the methodology applicable to such Baseline, ARC Rate or RRC Rate.  IBM will review with Circuit City the conversion methodology (for example, historical data) that IBM used to support such adjustments.

## 7.  Additional or Reduced Resources

### 7.1 Effective Date

a.    After the completion of each month during the Term following the Services Commencement Date (except as set forth in Section 8(a) below), IBM will calculate ARCs and RRCs as set forth in this Exhibit.  Circuit City's increased or decreased resource usage within a Service category may result in either an ARC or RRC, except to the extent otherwise set forth in this Agreement. IBM shall apply RRCs as set forth in this Exhibit to the extent Circuit City's resource usage is above the Minimum Annual Commitment set forth in Section 8.0 below.

b.    IBM will not invoice Circuit City for ARCs and RRCs for the Resource Units set forth in this Section until the earlier of (i) the completion of the wall-to-wall inventory and (ii) the date which is six (6) months after the Services Commencement Date. .  Thereafter , IBM will invoice Circuit City for ARCs and RRCs in the Resource Unit categories below.

1.  Server Images,

2.  DASD,

3.  DBA Instances,

4.  Middleware Instances,

5.  On-site Tape,

6.  Routers,

7. Switches,

8. WAPs.

## 7.2 Infrastructure Services, Service Desk Services and Desktop Services

The following is an illustrative example of the application of ARCs and RRCs to a monthly invoice.

a. IBM will compare the quantity of RUs actually used during the applicable measurement period (the Actual RUs), with the Baseline for that category. There will be no increase of the charges otherwise payable to IBM for such period if the Actual RUs do not exceed the Baseline for such period. There will be no reduction of the charges otherwise payable to IBM for such period if the Actual RUs do not fall below the Baseline for such period.

b. If the Actual RUs exceeds the Baseline for such period, Circuit City will pay IBM an ARC with the current or future charges (or, if no future charges will be due, make payment to IBM) equal to the product of the ARC Rate for the applicable category, as set forth in Attachment 18.01-1 (Pricing Tables), multiplied by the difference between the Actual RUs for that category and the Baseline.  For example, assuming the following, the ARC calculation would be as follows:

1. the Actual RUs for DASD for a month are 75 terabytes,

2. the monthly DASD Baseline is 71 terabytes, and

3. the ARC Rate is $200.00 per terabyte.

| Sample ARC Calculation | | |
|---|---|---|
| ARC | = | (Actual RUs - Baseline) x ARC Rate |
| ARC | = | (75 Terabytes - 71 terabytes)  x $200.00 |
| ARC | = | 4 x $200.00 |
| ARC | = | $800.00 |

4. In this example, the ARC for DASD for the month would be $800.00.

c. RRCs

1. If the Actual RUs are less than the Baseline for that category for such period, IBM will give Circuit City an RRC against current and future charges (or, if no future charges will be due, make payment to Circuit City) equal to the product of the RRC Rate for the applicable category, as set forth in Attachment 18.01-1 (Pricing Tables), multiplied by the difference between the Actual RUs for the category and the Baseline for that category.  For example, assuming the following, the RRC calculation would be as follows:

(a) the Actual RUs for DASD for a month are 65 terabytes

(b) the monthly DASD Baseline is 71 terabytes, and

(c) the RRC Rate is $200.00 per terabyte.

| Sample RRC Calculation |
|---|

| Sample RRC Calculation | | |
|---|---|---|
| RRC | = | (Baseline - Actual RUs) x RRC Rate |
| RRC | = | (71 Terabytes - 65 terabytes)  x $200.00 |
| RRC | = | 6 x $200.00 |
| RRC | = | $1,200.00 |

2. In this example, the RRC for DASD for the month would be $1,200.

## 7.3 Network Services

a. Data Network

1. In the event that Circuit City requests IBM to add additional data communications capacity either for growth at existing Data Network locations beyond the Baselines set forth in this Exhibit or for new Data Network locations beyond those in Exhibit 10 (Service Locations), there will be both a one-time installation charge and an ongoing monthly charge, which charges will be at IBM's prevailing rates at the time of installation, for each increment of data communications capacity. The one-time installation charge will include charges for the managed access circuit configuration, permanent virtual circuits, and router configuration for the type of protocol required for each Service Location on a case by case basis.

2. If additional data communications equipment is required to accommodate the added data communications capacity, IBM will provide such equipment as a New Service.

3. The one-time installation charge for additional data communications capacity is not recoverable in the event the data communications capacity and communications equipment are subsequently discontinued. IBM will adjust the ongoing monthly support charge set forth in Attachment 18.01-1 (Pricing Tables) to reflect the discontinued data communications capacity and communications equipment.

b. Voice Network

1. Resource usage (other than International Inbound) will be billed at an 18 second initial increment and six second increments thereafter. International Inbound will be billed at a 30 second initial increment with six second increments thereafter. Voice usage billing will be rounded to the nearest cent on an individual call basis.

2. A surcharge per call will be charged to Circuit City for all inbound calls originating from a public pay phone.

c. Installation Charges

To the extent any circuits are installed with a waived installation fee if the circuit is installed for an agreed upon period of time, Circuit City shall be obligated to pay for such waived installation fee if Circuit City requests removal of such circuit prior to the agreed upon period of time.

## 8. Minimum Annual Revenue Commitment

To the extent Circuit City's reduction of its usage of Resource Units is because of changes in the operation of the business or its business volume  ("Normal Business Change"), but not because of Circuit City's election to provide such Services  or resources itself or with a third party (including business process outsourcing) ("Insourcing/Resourcing" or "I/R"), or to divest business units then receiving the Services to an unaffiliated third party (a "Divestiture"), IBM shall apply RRCs as set forth in this Exhibit, without regard to a MARC as set forth herein.

Circuit City's spend with IBM under this Agreement for each Contract Year of the Term (the "Minimum Annual Revenue Commitment" or 'MARC") is set forth below. The MARC shall be calculated and applied on a Contract Year basis, but shall be tracked and reported on a quarterly basis.  In the event Circuit City's Base Charges for any Contract Year is below the applicable MARC as of the end of each Contract Year ("MARC Shortfall"), IBM shall invoice, and Circuit City shall pay, the dollar amount of such MARC Shortfall.

The minimum commitment for the ODCS Services during the ODCS Transition Period shall be that which is set forth in the ODCS Contract.

In the event Circuit City has reduced its usage of Resource Units because of Insourcing/Resourcing, the applicable Minimum Annual Revenue Commitment shall be as follows ("I/R MARC"):

1. The I/R MARC for the Network Services Tower shall be seventy-five percent (75%) of the Base Charge for the applicable Contract Year, as set forth in this Agreement as of the Effective Date ("Original Base Charges"), for the Network Services Tower.  For clarity, any commitments or other restrictive terms in any Shared Agreements (except for the minimum revenue commitment in the Circuit City agreement with AT&T) shall continue to apply as set forth therein, without regard to the I/R MARC set forth herein.

2. The I/R MARC for all other Services in the aggregate shall be: (x) in the 1st Contract Year, forty-five percent (45%) of the Original Base Charges for the 1st Contract Year for all Services (except Network Services and ODCS Services).; and (y) in Contract Years 2 through and including 7, forty-five percent (45%) of the Original Base Charges for the 2nd Contract Year for all Services (except Network Services).

To the extent Circuit City's reduced usage of Resource Units is because of a Divestiture,  the MARC ("Divestiture MARC") shall be the same as the I/R MARC set forth above for the twelve (12) months following the effective date of the applicable Divestiture and, thereafter, (x) in all cases be the same as set forth above with respect to Network Services, and (y) with respect all other Services, the Divestiture MARC shall be reduced to be the greater of (i) the remaining aggregate Base Charges for such Services (but no greater than as set forth in subsection (8) (2) (y) above) and (ii) forty percent (40%) of the Original Base Charges for such Services in the 2nd Contract Year.

For clarity,

1. In no event shall a MARC be less than forty percent (40%) of the Original Base Charges for such Services for the 2nd Contract Year;

2. In the event both an I/R MARC and a Divestiture MARC applies in any Contract Year, the lower of the two MARCs shall apply (i.e., Divestiture MARC); and

3. This Section shall not modify Circuit City's obligations as set forth in Section 6 above (HSC), nor its obligations under the Shared Agreements.

IBM acknowledges that there may be extraordinary circumstances in which Circuit City will incur a substantial reduction in its requirements for the Services, defined as a reduction for the remainder of the Term in the Baselines as of the Effective Date (the "Original Baselines") or the Original Base Charges, by 25% or more. In such a case, except in the case of Insourcing/Resourcing) , IBM will work together with Circuit City to develop a plan to accommodate such reduction, such as, for example, by modifying the nature and /or manner of performing the Services and/or the Service Levels, reprioritization, one time investments to reduce the on-going costs, further use of global resourcing, or other adjustments to the solution, terms and conditions set forth in this Agreement. Upon the Parties agreement to such plan, IBM and Circuit City shall execute an amendment to this Agreement.

## 9. Termination Charges

a. If Circuit City terminates this Agreement for its convenience, as set forth in <u>Section 26.01</u> (Termination for Convenience) of the Agreement Circuit City will pay IBM the following in accordance with <u>Section 19.01</u> of the Agreement (1) the Termination Charges set forth in <u>Attachment 18.01-1</u> (Pricing Tables); and (2) IBM's Wind Down Charges.

b. If Circuit City terminates this Agreement for a Change of Control of IBM, as set forth in <u>Section 26.02</u> (Termination for Change in Control of IBM), Circuit City will pay IBM the following in accordance with <u>Section 19.01</u> of the Agreement: (1) 90% of the Termination Charges set forth in <u>Attachment 18.01-1</u> (Pricing Tables), and (2) IBM's Wind Down Charges.

c. If Circuit City terminates this Agreement for a change in Regulatory Requirements as set forth in <u>Section 4.03(5)</u> of the Agreement, Circuit City will pay IBM's Wind Down Charges in accordance with <u>Section 19.01</u> of the Agreement.

d. Notwithstanding any other provisions of this Agreement, if Circuit City terminates this Agreement for any reason, in full or in part, Circuit City shall pay IBM the charges set forth in <u>Section 8(d)(2)</u> (Hardware Services Charge) and (3) (Amortized Investments) of this Exhibit.

e. Wind Down Charges shall mean the following:

1. IBM's actual amount of out of pocket costs incurred resulting from IBM having to effect an early termination of third party agreements, licenses and/or leases, Hardware Services Charges and personnel expenses (either severance or relocation as the individual case may be) that are a result of Circuit City's election to terminate the Services, moving and shipping expenses for its dedicated assets on IBM's Service Locations; and disconnect charges for any circuits installed less than 12 months prior to the effective date of termination (or such other period specified in the Circuit City – AT&T Retail Agreement);

2. The payments remaining on any Hardware Services Charge, and existing hardware lease payments for the ODCS Contract and EBHS Contracts, until the end of such finance term; and

3. IBM's transition or start up amounts remaining on IBM's balance sheet as of the effective termination date ("Amortized Investments").

f. Within 30 days of IBM's receipt of Circuit City's notification of its termination of this Agreement for its convenience, IBM will invoice Circuit City for the Termination Charge as set forth in <u>Attachment 18.01-1</u> (Pricing Table). IBM will invoice Circuit City for IBM's Wind Down Charges

promptly upon IBM's calculation of such charges. Circuit City will pay such charges to IBM as specified in the Agreement.

## 10. Financial Assumptions

a.  Price does not include any desktop, laptop, tablet, workstation, or other end user hardware and operating system software installed on such devices.

b.  Solution assumes use of Circuit City's retained assets & facilities, at no charge, until no longer required by IBM for performance of Services under this Agreement.

c.  Circuit city retains financial responsibility for network transport (voice & data) for sixty days (60) after the Services Commencement Date and IBM assumes thereafter.

d.  IBM will provide the Services to Circuit City during the Service Hours. If Circuit City requests IBM perform any of the following and IBM agrees to do so, IBM will provide such Services as Hourly Services, a New Project, or will consider such request a New Service:

1.  Services or support outside of the Service Hours; and

2.  Support for hardware or software not included within the Services.

e.  All Services will be provided in the English language.

f.  If IBM arrives at a Service Location to perform a scheduled or agreed on-site Service, but is unable to perform the Service because of Circuit City's action or inaction, the visit will be counted and/or charged in accordance with this Exhibit.

# Exhibit G to
# Namken Affidavit

## Exhibit 18.01-1 - Pricing Tables
## IX. Termination Fees - Backup

Currency: (USD $ 000s)

### Infrastructure

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|
| If Terminated in Month 1 | 14,200 | 11,300 | 8,500 | 7,500 | 6,100 | 4,400 | 2,400 |
| If Terminated in Month 2 | 13,958 | 11,067 | 8,417 | 7,383 | 5,958 | 4,233 | 2,200 |
| If Terminated in Month 3 | 13,717 | 10,833 | 8,333 | 7,267 | 5,817 | 4,067 | 2,000 |
| If Terminated in Month 4 | 13,475 | 10,600 | 8,250 | 7,150 | 5,675 | 3,900 | 1,800 |
| If Terminated in Month 5 | 13,233 | 10,367 | 8,167 | 7,033 | 5,533 | 3,733 | 1,600 |
| If Terminated in Month 6 | 12,992 | 10,133 | 8,083 | 6,917 | 5,392 | 3,567 | 1,400 |
| If Terminated in Month 7 | 12,750 | 9,900 | 8,000 | 6,800 | 5,250 | 3,400 | 1,200 |
| If Terminated in Month 8 | 12,508 | 9,667 | 7,917 | 6,683 | 5,108 | 3,233 | 1,000 |
| If Terminated in Month 9 | 12,267 | 9,433 | 7,833 | 6,567 | 4,967 | 3,067 | 800 |
| If Terminated in Month 10 | 12,025 | 9,200 | 7,750 | 6,450 | 4,825 | 2,900 | 600 |
| If Terminated in Month 11 | 11,783 | 8,967 | 7,667 | 6,333 | 4,683 | 2,733 | 400 |
| If Terminated in Month 12 | 11,542 | 8,733 | 7,583 | 6,217 | 4,542 | 2,567 | 200 |

### Network Services

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|
| If Terminated in Month 1 | 9,700 | 7,500 | 5,000 | 4,400 | 3,500 | 2,500 | 1,400 |
| If Terminated in Month 2 | 9,517 | 7,292 | 4,950 | 4,325 | 3,417 | 2,408 | 1,283 |
| If Terminated in Month 3 | 9,333 | 7,083 | 4,900 | 4,250 | 3,333 | 2,317 | 1,167 |
| If Terminated in Month 4 | 9,150 | 6,875 | 4,850 | 4,175 | 3,250 | 2,225 | 1,050 |
| If Terminated in Month 5 | 8,967 | 6,667 | 4,800 | 4,100 | 3,167 | 2,133 | 933 |
| If Terminated in Month 6 | 8,783 | 6,458 | 4,750 | 4,025 | 3,083 | 2,042 | 817 |
| If Terminated in Month 7 | 8,600 | 6,250 | 4,700 | 3,950 | 3,000 | 1,950 | 700 |
| If Terminated in Month 8 | 8,417 | 6,042 | 4,650 | 3,875 | 2,917 | 1,858 | 583 |
| If Terminated in Month 9 | 8,233 | 5,833 | 4,600 | 3,800 | 2,833 | 1,767 | 467 |
| If Terminated in Month 10 | 8,050 | 5,625 | 4,550 | 3,725 | 2,750 | 1,675 | 350 |
| If Terminated in Month 11 | 7,867 | 5,417 | 4,500 | 3,650 | 2,667 | 1,583 | 233 |
| If Terminated in Month 12 | 7,683 | 5,208 | 4,450 | 3,575 | 2,563 | 1,492 | 117 |

### Desktop Services

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|
| If Terminated in Month 1 | 900 | 800 | 700 | 600 | 500 | 400 | 200 |
| If Terminated in Month 2 | 892 | 792 | 692 | 592 | 492 | 383 | 183 |

Circuit City and IBM Confidential
Circuit City Stores Wind-Down Charges - v7.2.09.xls

Exhibit 18.01-1 - Pricing Tables
IX. Termination Fees - Backup

Currency: (USD $ 000s)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| If Terminated In Month 3 | 883 | 783 | 683 | 583 | 483 | 367 | 167 |
| If Terminated In Month 4 | 875 | 775 | 675 | 575 | 475 | 350 | 150 |
| If Terminated In Month 5 | 867 | 767 | 667 | 567 | 467 | 333 | 133 |
| If Terminated In Month 6 | 858 | 758 | 658 | 558 | 458 | 317 | 117 |
| If Terminated In Month 7 | 850 | 750 | 650 | 550 | 450 | 300 | 100 |
| If Terminated In Month 8 | 842 | 742 | 642 | 542 | 442 | 283 | 83 |
| If Terminated In Month 9 | 833 | 733 | 633 | 533 | 433 | 267 | 67 |
| If Terminated In Month 10 | 825 | 725 | 625 | 525 | 425 | 250 | 50 |
| If Terminated In Month 11 | 817 | 717 | 617 | 517 | 417 | 233 | 33 |
| If Terminated In Month 12 | 808 | 708 | 608 | 508 | 408 | 217 | 17 |

Circuit City and IBM Confidential
Circuit City Stores Wind-Down Charges - v7.2.09.xls

# Exhibit 18.01-1 - Pricing Tables
## IX. Termination Fees - Backup

Currency: (USD $ 000s)

### Stores

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|
| If Terminated In Month 1 | 5,000 | 4,700 | 4,300 | 3,800 | 3,100 | 2,200 | 1,200 |
| If Terminated In Month 2 | 4,975 | 4,667 | 4,258 | 3,742 | 3,025 | 2,117 | 1,100 |
| If Terminated In Month 3 | 4,950 | 4,633 | 4,217 | 3,683 | 2,950 | 2,033 | 1,000 |
| If Terminated In Month 4 | 4,925 | 4,600 | 4,175 | 3,625 | 2,875 | 1,950 | 900 |
| If Terminated In Month 5 | 4,900 | 4,567 | 4,133 | 3,567 | 2,800 | 1,867 | 800 |
| If Terminated In Month 6 | 4,875 | 4,533 | 4,092 | 3,508 | 2,725 | 1,783 | 700 |
| If Terminated In Month 7 | 4,850 | 4,500 | 4,050 | 3,450 | 2,650 | 1,700 | 600 |
| If Terminated In Month 8 | 4,825 | 4,467 | 4,008 | 3,392 | 2,575 | 1,617 | 500 |
| If Terminated In Month 9 | 4,800 | 4,433 | 3,967 | 3,333 | 2,500 | 1,533 | 400 |
| If Terminated In Month 10 | 4,775 | 4,400 | 3,925 | 3,275 | 2,425 | 1,450 | 300 |
| If Terminated In Month 11 | 4,750 | 4,367 | 3,883 | 3,217 | 2,350 | 1,367 | 200 |
| If Terminated In Month 12 | 4,725 | 4,333 | 3,842 | 3,158 | 2,275 | 1,283 | 100 |

### Service Desk

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|
| If Terminated In Month 1 | 900 | 850 | 800 | 700 | 550 | 400 | 200 |
| If Terminated In Month 2 | 896 | 846 | 792 | 688 | 538 | 383 | 183 |
| If Terminated In Month 3 | 892 | 842 | 783 | 675 | 525 | 367 | 167 |
| If Terminated In Month 4 | 888 | 838 | 775 | 663 | 513 | 350 | 150 |
| If Terminated In Month 5 | 883 | 833 | 767 | 650 | 500 | 333 | 133 |
| If Terminated In Month 6 | 879 | 829 | 758 | 638 | 488 | 317 | 117 |
| If Terminated In Month 7 | 875 | 825 | 750 | 625 | 475 | 300 | 100 |
| If Terminated In Month 8 | 871 | 821 | 742 | 613 | 463 | 283 | 83 |
| If Terminated In Month 9 | 867 | 817 | 733 | 600 | 450 | 267 | 67 |
| If Terminated In Month 10 | 863 | 813 | 725 | 588 | 438 | 250 | 50 |
| If Terminated In Month 11 | 858 | 808 | 717 | 575 | 425 | 233 | 33 |
| If Terminated In Month 12 | 854 | 804 | 708 | 563 | 413 | 217 | 17 |

### Grand Total

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Year 6 | Year 7 |
|---|---|---|---|---|---|---|---|
| If Terminated In Month 1 | 30,700 | 25,150 | 19,300 | 17,000 | 13,750 | 9,900 | 5,400 |
| If Terminated In Month 2 | 30,238 | 24,663 | 19,108 | 16,729 | 13,429 | 9,525 | 4,950 |
| If Terminated In Month 3 | 29,775 | 24,175 | 18,917 | 16,458 | 13,108 | 9,150 | 4,500 |

Circuit City and IBM Confidential
Circuit City Stores Wind-Down Charges - v7.2.09.xls

Exhibit 18.01-1 - Pricing Tables
IX. Termination Fees - Backup

Currency: (USD $ 000s)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| If Terminated In Month 4 | 29,313 | 23,688 | 18,725 | 16,188 | 12,788 | 8,775 | 4,050 |
| If Terminated In Month 5 | 28,850 | 23,200 | 18,533 | 15,917 | 12,467 | 8,400 | 3,600 |
| If Terminated In Month 6 | 28,388 | 22,713 | 18,342 | 15,646 | 12,146 | 8,025 | 3,150 |
| If Terminated In Month 7 | 27,925 | 22,225 | 18,150 | 15,375 | 11,825 | 7,650 | 2,700 |
| If Terminated In Month 8 | 27,463 | 21,738 | 17,958 | 15,104 | 11,504 | 7,275 | 2,250 |
| If Terminated In Month 9 | 27,000 | 21,250 | 17,767 | 14,833 | 11,183 | 6,900 | 1,800 |
| If Terminated In Month 10 | 26,538 | 20,763 | 17,575 | 14,563 | 10,863 | 6,525 | 1,350 |
| If Terminated In Month 11 | 26,076 | 20,275 | 17,383 | 14,292 | 10,542 | 6,150 | 900 |
| If Terminated In Month 12 | 25,613 | 19,788 | 17,192 | 14,021 | 10,221 | 5,775 | 450 |

Circuit City and IBM Confidential
Circuit City Stores Wind-Down Charges - v7.2.09.xls