# EXHIBIT A – PART 1

**LEASE**

AVONDALE, ARIZONA

ORIGINAL

# LEASE

between

CIRCUIT CITY STORES WEST COAST, INC.,

as Tenant

and

GATEWAY PAVILIONS, L.L.C.,

as Landlord

dated June 5, 2003

GATEWAY PAVILIONS SHOPPING CENTER

TABLE OF CONTENTS

| Paragraph | | Page |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements; Tenant Improvement Allowance | 2 |
| 3. | Lease Term | 3 |
| 4. | Base Rent; Ground Rent | 4 |
| 5. | Development of Shopping Center by Landlord | 5 |
| 6. | Easements | 6 |
| 7. | Common Areas and Common Area Maintenance. | 6 |
| 8. | Signs and Communications Equipment. | 11 |
| 9. | Taxes. | 12 |
| 10. | Maintenance, Repairs and Replacements | 15 |
| 11. | Utility Service Provider: Payment of Utility Bills | 16 |
| 12. | Alterations | 17 |
| 13. | Mechanics' Liens | 17 |
| 14. | Insurance. | 18 |
| 15. | Damages by Fire or Other Casualty. | 22 |
| 16. | Condemnation. | 24 |
| 17. | Assignment and Subletting | 27 |
| 18. | Use. | 28 |
| 19. | Warranties, Representations and Covenants | 29 |
| 20. | Estoppel Certificates | 35 |
| 21. | Subordination, Non-Disturbance and Attornment. | 36 |
| 22. | Tenant's Financing | 38 |
| 23. | Tenant's Property and Waiver of Landlord's Lien | 38 |
| 24. | Memorandum of Lease; Commencement Date Agreement | 38 |
| 25. | Expiration of Term and Holding Over | 39 |
| 26. | Force Majeure | 39 |
| 27. | Events of Tenant's Default | 39 |
| 28. | Landlord's Remedies | 40 |

29. Events of Landlord's Default; Tenant's Remedies. .......... 42
30. Waiver .......... 47
31. Compliance with Applicable Laws .......... 47
32. Notices .......... 48
33. Brokers .......... 49
34. Miscellaneous. .......... 49
35. Tenant's Right to Terminate .......... 52
36. Adjacent Tracts. .......... 53
37. Importance of Each Covenant .......... 54
38. "For Rent" Signs .......... 54
39. Landlord's Liability .......... 54
40. Compliance with Laws .......... 54
41. Guarantee .......... 55
42. Cotenancy Requirement .......... 55
43. Landlord's Right to Recapture Upon Cessation of Operations .......... 56

EXHIBITS

"A" Site Plan

"A-1" Shopping Center Legal Description

"B" Index of Definitions

"C" Construction Provisions

Attachment "1" Construction Schedule

Attachment "2" Site Delivery Work Certification

Attachment "3" Schematic Floor Plan and Elevations

"C-1" Design and Construction Specifications

"D" Intentionally Deleted

"E" Sign Plans

"E-1" Depiction of Tenant's sign panel locations

"F" Tenant Exclusives, Prohibited Uses and Permitted Encumbrances

"G" Subordination, Non-Disturbance and Attornment Agreement

"H" Memorandum of Lease

"I" Commencement Date Agreement

"J" Indemnification Agreement

"K" Guaranty Agreement

**AVONDALE, ARIZONA**

LEASE

This LEASE is made as of the 5th day of June, 2003, by and between **GATEWAY PAVILIONS, L.L.C.**, an Arizona limited liability company, having an address of c/o Mr. Jeff Allen, Kitchell Development, 1707 E. Highland, Phoenix, Arizona 85016 ("Landlord"), and **CIRCUIT CITY STORES WEST COAST, INC.**, a California corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

WITNESSETH:

The parties hereto agree as follows:

1. Leased Property. Landlord leases to Tenant the "Premises" (as defined in paragraph 2), consisting of an approximately 32,876 square foot parcel of land (the "Land") and when constructed, the Building (as hereinafter defined) and Other Improvements (as hereinafter defined) outlined on Exhibit "A" (the "Site Plan"), together with exclusive rights in the automobile loading spaces labeled "Customer Pick-Up" adjacent to the Premises and rights to utilize not more than six (6) parking spaces within the area labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and with the easements described in paragraph 6 below (Tenant shall be permitted to mark such spaces as exclusive to Tenant, provided however, Landlord shall have no obligation to enforce such right and shall have no liability to Tenant in the event that Tenant is prohibited from exclusively using such spaces by the REA (as hereinafter defined) or a lease entered into prior to the date of this Lease); all located in that portion of the Gateway Pavilions Shopping Center owned by Landlord, specifically excluding the "Harkins Block" (as defined in the REA) and the "Costco Block" (as defined in the REA) (herein referred to as the "Shopping Center"), located at the northwest corner of 99th Avenue and McDowell Road, in the City of Avondale (the "City"), County of Maricopa, State of Arizona (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto. All of the Shopping Center exclusive of the Premises is "Landlord's Premises". Landlord grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Construction, Operation and Reciprocal Easement Agreement dated November 2, 2001 and executed by Landlord, Harkins Phoenix Cinemas, L.L.C., an Arizona limited liability company, and Costco Wholesale

Corporation, a Washington corporation, re-recorded against record title to the Shopping Center on February 14, 2002 in Instrument No. 2002-0157426, Official Records of Maricopa County Recorder (the "REA"). Landlord agrees that it will not consent to, approve, or otherwise agree to any modification of the REA at any time during the term of this Lease as to matters which would (i) affect visibility of or access to the Building or affect Tenant's Preferred Area without Tenant's prior written approval (which may be withheld in Tenant's sole discretion), or (ii) otherwise conflict with this Lease without Tenant's prior written approval (which may be withheld in Tenant's reasonable discretion), will enforce the terms of the REA consistent with the terms of this Lease, and will exercise all approval rights granted Landlord under the REA in favor of enforcement of the terms hereof, so long as withholding such consent, approval or agreement will not constitute a default by Landlord under the REA. Landlord agrees that Tenant shall not be bound by any amendments to or modifications of any rules or regulations applicable to the Shopping Center after the date hereof to the extent such amendments or modifications adversely affect the rights expressly granted to Tenant hereunder.

2. Construction of Building and Improvements; Tenant Improvement Allowance. Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing approximately 32,876 square feet of ground-floor gross leasable area plus mezzanine, with provisions for car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other improvements (collectively, the "Other Improvements"), all as set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined below. The Improvements and the Land are referred to herein as the "Premises".

Upon Substantial Completion (as defined in the Construction Provisions) and Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease,

(ii) an indemnity in the form of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's policy of title insurance with respect to mechanics' liens arising out of Tenant's construction, (iii) evidence of the square footage of the Building as shown on an as-built survey certified and reasonably acceptable to Tenant and Landlord, and (iv) if requested by Landlord, confirmation from Tenant that Landlord holds title to the Improvements (in form reasonably acceptable to Landlord and Tenant), Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to $70.00 per square foot of gross leasable area of the Building (which shall be conclusively determined by the amount of gross leasable area shown in Tenant's as-built survey mentioned in clause (iii) above), payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (i), (ii), (iii) and (iv) above, provided, however, notwithstanding the foregoing, in no event will the gross leasable area of the Building be less than 32,500 square feet for purposes of calculating the Tenant Improvement Allowance.

If the Base Rent is increased or decreased pursuant to paragraph 4(b) of the Lease, the Tenant Improvement Allowance shall likewise be proportionately increased or decreased.

3. Lease Term. The construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in the condition specified in the Construction Provisions and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each period referred to as an "Option Period") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period. If Tenant fails to give Landlord written notice of Tenant's election to exercise the Renewal Option as provided in the preceding sentence, and if, during such one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of

Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4. Base Rent; Ground Rent. During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and manner specified hereunder, commencing on the date on which Landlord makes payment of the Tenant Improvement Allowance (the "Commencement Date"). "Ground Rent," in lieu of Base Rent, shall be due under certain circumstances, as described in subparagraph 28(f) below, and when due, shall be payable in the same manner as Base Rent. Notwithstanding the foregoing, until Landlord has completed, executed and delivered to Tenant a W-9 form (the form of which will be delivered to Landlord by Tenant together with this Lease for execution), no Base Rent, Ground Rent or other sums shall be due Landlord by Tenant hereunder.

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 2 above relating to the Tenant Improvement Allowance (it being intended by Landlord and Tenant that the same square footage be used for purposes of determining the Base Rent and Tenant Improvement Allowance), Base Rent shall be paid in equal monthly installments, in advance and without offset, notice or demand, except as set forth herein, on the first day of each calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(a) First Ten Years. During the first ten (10) Lease Years, Tenant shall pay annual Base Rent in the amount of Four Hundred Twenty-Seven Thousand Three Hundred

Eighty-Eight and No/100 Dollars ($427,388.00), payable in equal monthly installments of Thirty-Five Thousand Six Hundred Fifteen and 67/100 Dollars ($35,615.67).

(b) Adjustment in Base Rent. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 32,876 square feet, annual Base Rent during the first ten (10) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building (as evidenced by the square footage set forth on the as-built survey described in paragraph 2 above), multiplied by $13.00; provided, however, that notwithstanding the foregoing, in no event will the ground-floor leasable area of the Building be less than 32,500 square feet for purposes of calculating annual Base Rent. In determining the ground-floor gross leasable area, measurements shall be made in accordance with paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(c) Increases in Base Rent. Annual Base Rent shall increase on the first day of the eleventh, and every succeeding fifth Lease Year, over the then-current Base Rent by a sum equal to the number of gross leasable square feet in the Building multiplied by Fifty Cents ($.50).

5. Development of Shopping Center by Landlord. Landlord covenants to construct, develop and operate a first-class shopping center. The location of buildings and other tenant space will only be within the "Envelope Areas" as set forth in the REA. The parking ratio for the Shopping Center shall be in accordance with the standards set forth in REA (but in no event shall the parking ratio be less than 5 spaces per 1,000 s.f. of the Premises in Tenant's Preferred Area) (the "Parking Ratio"). All parking shall be at ground level. Landlord shall construct all improvements in a good and workmanlike manner, lien-free. Landlord shall use commercially reasonable efforts not to interfere with the conduct of Tenant's business during such construction. If Landlord fails to maintain the above required Parking Ratio, and if such failure has not been remedied within thirty (30) days following written notice from Tenant to Landlord, Tenant shall, in addition to any other legal or equitable remedy, including specific performance, have the right to pay Base Rent in lieu of that provided for herein at the rate of one-half (1/2) of the fixed minimum rent, together with one-half (1/2) of all other charges otherwise payable under this Lease, until such time as the above-specified Parking Ratio is maintained.

6. Easements. Landlord also grants to Tenant the nonexclusive benefit of the construction, staging and Common Area easements set forth in the REA, including, but not limited to:

(a) Construction Easements. During the Construction Term, any period of renovation or reconstruction thereafter, an exclusive easement for a construction staging area (the "Staging Area") in such portion of the Common Areas as shown on the Site Plan for Tenant's use in constructing the Improvements.

(b) Common Area Easements. Landlord grants to Tenant an easement (the "Common Area Easement") to use the Common Areas as set forth in the REA. Tenant shall have the right to install up to four (4) cart corrals within Tenant's Preferred Area in the locations shown on the Site Plan (or other mutually agreeable location), and Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals. Tenant agrees to use reasonable efforts to periodically remove its shopping carts from the Common Areas. Landlord shall not be deemed in violation of the provisions of paragraph 5 to the extent Tenant's installation of cart corrals reduces the number of parking spaces below the Parking Ratio. Tenant shall also have the right to use that portion Common Areas designated in the REA as a "Major's Temporary Outdoor Sales Area" for "sidewalk sales", seasonal and promotional sales and demonstrations and other sales customary to Tenant's business operations exclusively for Tenant's customers, invitees and patrons so long as such sales and demonstrations are in conformance with the provision of the REA; provided, however, that in no event may Tenant use the "Major's Temporary Outdoor Sales Area" more than twice per year (with each period being no longer than four (4) days) and during such use there shall be no structures in such area and there shall be no material interference with the use of the balance of the Common Areas.

7. Common Areas and Common Area Maintenance.

(a) Definition of Common Areas. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved for the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of

the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall operate, maintain, repair and replace the Common Areas in a manner consistent with that of other similar first-class shopping centers (in age, size and type of construction) within the greater Phoenix metropolitan area (the "Area"), including, without limitation, sweeping and cleaning, maintenance of Landlord's pylon and other sign structure(s), including traffic directional signs, markers and lines and informational signs, snow removal and ice treatment, removal of Common Area trash, debris and garbage, lighting (including lighting of signage and Common Areas), repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping and sprinkler systems, storm drains, sewers and other utility lines and facilities not dedicated to the public or owned by a private utility company, which are necessary for the operation of the Shopping Center, customary and reasonable security services (provided that Landlord shall have no liability to Tenant for failure to provide security services), and maintaining all insurance required under this Lease to be maintained by Landlord, all such work to be referred to collectively as "Common Area Maintenance".

(b) CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable direct costs and expenses of operating and maintaining the Common Areas, including the performance of Common Area Maintenance, and (ii) Landlord's overhead expenses for administering same, or in lieu thereof a management fee, neither of which shall exceed seven percent (7%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for capital expenditures and Real Estate Taxes). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), (i) necessitated by the negligent or wrongful act of Landlord or (ii) made to correct any construction defect or condition with respect to any buildings (including the roof and exterior walls) or to any utility systems not part of the Common Areas;

(4) repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Common Areas in accordance with the plans and specifications therefore) or any other tenant, or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease and for a period of two (2) years thereafter (unless such defect is the result of Landlord's failure to construct any portion of the Common Areas in accordance with the plans and specifications therefore) or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive third party source;

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8) repairs or replacements of a capital nature (whether or not capitalized) unless the costs are amortized over the entire useful life of such repairs or replacements; provided that such repairs or replacements are not the direct result of initial defects in materials or workmanship;.

(9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance and parking lot resealing every three (3) years) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses;

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12) Landlord's personnel, overhead, home office or administrative expenses, except as set forth in subparagraph (b)(ii) above (provided that the foregoing shall not restrict the inclusion in CAM Charges of reasonable and actual costs of Landlord's personnel to the extent engaged directly in the maintenance of the Common Areas (such as building engineers));

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(14) any new improvements to the Shopping Center or Common Areas; including, but not limited to, renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center (but excluding repairs or replacements of existing landscaping unless covered by an existing warranty);

(15) amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains the Premises;

(16) holiday or other decorations; or

(17) other maintenance expenses not considered normal and customary under generally accepted accounting principles. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the Area (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the beginning of each CAM Year.

(c) Tenant's Estimated Payments. During each calendar year ("CAM Year"), Tenant shall make estimated payments of its Pro Rata Share (as hereinafter defined) of the CAM Charges incurred by Landlord. Tenant's estimated payments of its Pro Rata Share of CAM Charges shall be paid by Tenant in equal monthly installments on the first day of each month during a CAM Year. Commencing on the Commencement Date and continuing until the expiration of the first CAM Year, Tenant shall pay to Landlord Two and No/100 Dollars ($2.00) per square foot of ground-floor gross leasable area in the Building as Tenant's estimated Pro Rata Share of CAM Charges. Commencing after the end of the second full calendar year after the Commencement Date, Tenant's estimated payments of its Pro Rata Share (and its actual Pro Rata Share) of CAM Charges in any CAM year shall not exceed by more than five percent (5%) of those in effect during the preceding CAM Year (exclusive of Real Estate Taxes, insurance and

utilities). For any period within the Term which is less than a full CAM Year, Tenant's Pro Rata Share of CAM Charges shall be appropriately pro rated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center; provided, however, if Landlord is delayed in delivering such statement to Tenant, such delay does not constitute Landlord's waiver of Landlord's rights under this paragraph. Any necessary adjustment with respect to amounts owed by either party based upon the actual amount of CAM Charges paid by Landlord for such preceding CAM Year shall be made (with Tenant paying to Landlord the amount of any deficiency, or Landlord paying to Tenant the amount of any overpayment, as the case may be, within thirty (30) days following the date of Landlord's statement of actual CAM Charges); and the monthly payments to be made by Tenant for the next year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant.

Tenant's pro rata share of CAM Charges (herein referred to as "Pro Rata Share") shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the greater of (i) 225,000 square feet, or (ii) the actual number of ground-floor gross leasable square feet (including the area of any outside sales areas exclusive to a single occupant for which Landlord is receiving rent) constructed from time to time in the Shopping Center (excluding any portion thereof that is separately maintained and that does not contribute to CAM Charges, Landlord hereby reserving the right to cause portions of the Shopping Center to be maintained separately from the remainder of the Shopping Center). In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is

determined be less than 225,000 square feet. The remainder of CAM Charges shall be borne by Landlord and/or other tenants of the Shopping Center.

(d) Examination of Landlord's Records. Tenant shall have the right, once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.

8. Signs and Communications Equipment.

(a) Signs. Landlord, no later than the date set forth on Attachment "1" to the Construction Provisions, shall construct and install upon the Common Areas at the location shown on the Site Plan, two (2) pylon sign structures (with electrical wired box installed). Tenant shall have the right to install its doublesided "face panels" on the pylon structure located on 99th Avenue (the "99th Avenue Pylon Sign Structure") in the position shown on Exhibit "E-1" identifying Tenant's store, which face panels shall be constructed, installed and maintained at Tenant's sole cost and expense. If at any time during the Term, the owner of the Harkins Block should give up such owner's right to utilize a face panel on the pylon sign structure located on McDowell Avenue (the "McDowell Pylon Sign Structure"), then Tenant shall have the right to install its face panel on the McDowell Pylon Sign Structure in the location not utilized by the owner of the Harkins Block. Landlord will be responsible for the initial costs of constructing, installing and maintaining the 99th Avenue Pylon Sign Structure and, if Tenant's sign panel is placed thereon, the McDowell Pylon Sign Structure, and Tenant shall reimburse to Landlord, as a condition to placing its panel on each sign, Tenant's pro rata share (which pro rata share shall be based upon the number of sign panels on the applicable pylon sign structure allocated to Tenant and the total number of sign panels on the applicable sign available for use by tenants in the Shopping Center) of the cost of (i) constructing and installing such pylon sign structure (such pro rata share shall in no event exceed, with respect to each sign structure upon which Tenant places a sign panel, an annual amount equal to the product of $.08 multiplied by the gross leasable area of the Building), and (ii) maintenance of each such pylon sign structure upon which

a sign panel identifying Tenant is located during the Term of this Lease. Attached as a portion of Exhibit "E-1" is an approved depiction of the 99th Avenue Pylon Structure and plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves. Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent, but subject to governmental requirements, to replace all of Tenant's signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans, subject to applicable governmental approvals.

(b) Communications Equipment. Tenant may, at Tenant's cost and expense, install, maintain and/or replace any satellite dishes, antennas, cellular and PCS towers and poles (collectively, "Communications Equipment") on the roof and/or exterior walls or parapet of the Building as Tenant deems reasonably necessary or desirable, provided the Communications Equipment shall not (i) adversely and materially affect the roof or its structural elements, or (ii) void any roof warranty, and provided further the Communications Equipment shall not be visible from view from the Common Areas in front of the Building.

9. Taxes.

(a) Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean all real estate taxes and all other assessments, general and special, ordinary and extraordinary, foreseen as well as unforeseen, of any kind and nature whatsoever, or other tax, however described, which is levied or assessed by the United States of America, or the state in which the Shopping Center is located, or any city, municipality or political subdivision thereof, against Landlord or all or any part of the Shopping Center. Real Estate Taxes shall not include any estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax, transfer, franchise, corporate, capital or other tax or assessment upon Landlord, all of which shall be the obligation of Landlord. Tenant shall pay, together with each installment of Base Rent (or Ground Rent, as the case may be) paid by Tenant, any tax or excise on rents or on any other sum or charge required to be paid by Tenant under this Lease, and gross receipts tax, transaction privilege tax or other tax levied or assessed by any governmental authority against Landlord as a result of Landlord's receipt of such rents or other charges.

(b) Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes

(calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c)), subject to the remaining provisions of this paragraph 9) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement, accompanied by the tax bill on the basis of which such statement is rendered. Real Estate Taxes shall be paid on a semi-annual basis in accordance with applicable laws. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost are added, become due, or are imposed by operation of law for nonpayment or late payment. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment of Real Estate Taxes by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, and if Landlord thereafter fails to pay such Real Estate Taxes after ten (10) days written notice from Tenant, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due and in such event Tenant may deduct the cost, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due. In accordance with subparagraph 9(f) below, Landlord shall have the right, if permitted by law, from time to time, to have the Real Estate Taxes for any portion of the Shopping Center calculated and paid separately from the remainder of the Shopping Center. With respect to any assessment included in said Real Estate Taxes, if Landlord shall, at any time, have elected to pay any such assessment in installments, then the Real Estate Taxes for any tax year shall include only the lowest installments of such assessment as Landlord shall have had the election to have allocable to said tax year, together with any interest thereon accrued by law.