# EXHIBIT A – PART 4

invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part.

      (h)    Consents. Any consent or approval granted by either party shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

      (i)    Holidays. If the day on which rent or any other payment due hereunder falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

      (j)    Applicable Law. This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

      (k)    Successors and Assigns. All rights, obligations and liabilities given to or imposed upon any party shall extend to the permitted successors and assigns of such party.

      (l)    Counterparts. This Lease may be executed in one or more identical counterparts, and as so executed by all parties shall constitute a single instrument for purposes of the effectiveness of this Lease.

      (m)    Trademarks and Trade Names. All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

      (n)    Exhibits. All of the exhibits to this Lease are incorporated by reference for all purposes and are part of this Lease.

      (o)    No Construction Against Either Party. This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

      (p)    Transfer of Landlord's Interest. In the event Landlord sells or transfers all or part of its ownership of the Shopping Center, Landlord shall notify Tenant of such transfer and the purchaser or assignee shall be deemed to have assumed all obligations of Landlord under this Lease. Any such sale or transfer shall operate to release Landlord from any future liability from any of the covenants or conditions herein contained and in such event Tenant agrees to look solely to Landlord's successor in interest for the performance of Landlord's obligations under this Lease.

374052 v10 (00051.00112.000)

(q)    Effective Date. This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

35.    Tenant's Right to Terminate. The parties agree that the following conditions must be met to Tenant's satisfaction (or waived) as set forth herein:

(a)    Tenant's receipt, simultaneously with or prior to the execution of this Lease, of (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) an ALTA survey of the Shopping Center, at Landlord's expense, in form and substance acceptable to Tenant, at a minimum identifying by metes and bounds or platted lot all of the real property within the Shopping Center, each of the parcels owned under every ground lease pertinent to the Shopping Center, and the Land, (iv) all instruments reasonably required by the title company issuing the commitment for leasehold policy of title insurance to issue a policy meeting Tenant's requirements, including, without limitation, an Owner's Affidavit and Indemnity in form acceptable to the title company; and (v) Tenant's approval of all of the foregoing in writing within thirty (30) days after receiving all of said documents, but in any event, prior to the Delivery Date.

(b)    Landlord's delivery of subordination, non-disturbance and attornment agreements executed by any and all existing Mortgagees in a form satisfactory to Tenant simultaneously with the execution of this Lease.

(c)    Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(d)    Prior to the Delivery Date, Tenant's obtaining the required City, County, State and other necessary governmental agency permits and approvals to construct said Improvements on the Premises no later than the Delivery Date. Tenant agrees to apply for such permits promptly as provided, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(e)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

374052 v10 (00051.00112.000)

(f)    Upon execution of this Lease, Landlord's delivery to Tenant of the W-9 form, completed and executed by Landlord, submitted to Landlord by Tenant with the Lease.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant. Notwithstanding the foregoing, upon the sooner of (A) ninety (90) days following Delivery of the Land, or (B) Tenant's commencement of its construction of the Improvements, then any remaining unsatisfied conditions set forth in this paragraph 35 shall cease to be conditions precedent to the effectiveness of this Lease for Tenant's benefit.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) shall survive such termination) upon Tenant's delivery of said notice to Landlord.

The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall be null and void.

36.    Adjacent Tracts. [INTENTIONALLY DELETED]

53                              374052 v10 (00051.00112.000)

37.    <u>Importance of Each Covenant</u>.  Each covenant and agreement on the part of one party hereto is understood and agreed to constitute an essential part of the consideration for each covenant and agreement on the part of the other party.

38.    <u>"For Rent" Signs</u>.  Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the parking lot portion of Tenant's Preferred Area.  During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

39.    <u>Landlord's Liability</u>.  Except for the payment of the Tenant Improvement Allowance as provided in and to the extent required under this Lease and Landlord's fraudulent acts, Tenant shall look solely to Landlord's interest in the Shopping Center, including any rents, profits or revenue derived therefrom for the satisfaction of any judgment or decree requiring the payment of money by Landlord, which rents, profits or revenues are derived after the date of such judgment or decree, based upon any default by Landlord, and no other property or asset of Landlord, or any partner, officer, director, shareholder, mortgagee or agent of Landlord, shall be subject to levy, execution or other enforcement procedure for the satisfaction of such judgment or decree.  This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord under this Lease, which does not involve the payment of money by Landlord.

40.    <u>Compliance with Laws</u>.  All rights and occupancy of Tenant herein shall be subject to all governmental laws, ordinances and regulations of any public authority having jurisdiction thereover, and Tenant shall comply with the same, including without limitation compliance with the Americans With Disabilities Act, and shall comply with the requirements of any fire insurance underwriters or other similar body now or hereafter constituted relating to or affecting the condition, use or occupancy of the Premises.  Tenant shall use the Premises and comply with any recorded covenants, conditions, and restrictions affecting the Premises in the Shopping Center as of the commencement of the Lease or which are recorded during the Term,

54

374052 v10 (00051.00112.000)

provided that Tenant shall not be bound by any amendments to such documents made by Landlord after the date of this Lease to the extent the same materially and adversely affect the rights and obligations of Tenant expressly set forth in this Lease.

41.   Guarantee. Tenant will deliver to Landlord, concurrently with Tenant's execution and delivery of this Lease, a guaranty agreement in the form attached as Exhibit "K" hereto duly executed by Circuit City Stores, Inc., a Virginia corporation (the "Guarantor") (such guaranty agreement being referred to as the "Guaranty"). Tenant covenants and agrees to maintain such Guaranty in full force and effect at all times during the Term.   If the Guarantor becomes insolvent or otherwise unable to perform under the Guaranty, or if any other event of default occurs under the Guaranty, Tenant will give Landlord prompt notice thereof. Tenant will take such actions as Landlord may request to obtain a cure of any Guaranty default and/or to replace such Guaranty with additional comparable security reasonably satisfactory to Landlord sufficient to provide Landlord with credit enhancement for this Lease at least equivalent in value to that provided when the Lease was entered into by the parties.

42.   Cotenancy Requirement.   Landlord represents and warrants to Tenant that Borders, Bed Bath & Beyond and SportsMart have entered into leases or other occupancy agreements with Landlord for terms of at least ten (10) years each for operation of their typical national or regional store on or before the date hereof. Additionally, it is a material inducement for Tenant to enter into this Lease at least two (2) "major tenants" (other than Tenant) be open, occupied and operating for retail purposes in the Shopping Center at all times from and after Tenant's opening for business. For purposes of the foregoing sentence, the term "major tenants" means a national or regional retail tenant occupying at least 20,000 square feet of gross leasable area in the Shopping Center. If less than two (2) major tenants (other than Tenant) are open and operating at any time during the term of this Lease, for a period of six (6) consecutive months or more at any time during the term of this Lease, then from and after the end of such six (6) month period, Base Rent (or Ground Rent, as applicable) shall be reduced by fifty percent (50%) during such time.  If, within one (1) year after the commencement of such reduction in Base Rent, at least two (2) major tenants are not open and operating in the Shopping Center as required above, Tenant must either, by delivery of written notice to Landlord within ten (10) days following the end of such one (1) year period, (i) terminate this Lease upon thirty (30) days written notice to Landlord, whereupon Landlord shall pay to Tenant on the date of termination set forth in

374052 v10 (00051.00112.000)

Tenant's notice the amount of Tenant's Unamortized Costs, or (ii) commence the payment of full Base Rent.

43.     Landlord's Right to Recapture Upon Cessation of Operations.  In the event that Tenant ceases its business operations at the Premises, such cessation shall not be deemed to be an event of default hereunder, nor shall such cessation relieve Tenant of any of its liabilities or obligations under and pursuant to this Lease.  Upon its determination to cease operation, Tenant shall notify Landlord in writing of such decision ("Tenant's Notice"), whereupon Landlord shall have the option of recapturing the Premises by terminating this Lease.  Such option shall be exercisable by Landlord from and after the date which is two hundred seventy (270) days following the date of Tenant's Notice (Tenant's Notice being deemed given on the date of Tenant's cessation of business operations in the event Tenant does not give same within fifteen (15) days following Tenant's cessation of business operations) until the date Tenant re-opens  (or notifies Landlord of its intention to reopen) in the Premises for business, provided that prior to exercise by Landlord of its option herein granted, Tenant has not effected an assignment or subletting pursuant to paragraph 17 or recommenced operations in the Premises.  If Tenant has effected an assignment or subletting pursuant to paragraph 17, then such assignee or subtenant shall re-open in the Premises within three hundred sixty-five (365) days after the date of such assignment or subletting.  If such assignee or sublessee does not re-open on or before such 365-day period, then Landlord, at any time thereafter and prior to the Premises being opened for business, deliver the Landlord's Notice (hereinafter defined).  Landlord shall exercise such option by delivering notice to Tenant that it intends to terminate this Lease (the "Landlord's Notice"), in which event this Lease shall terminate entirely on the date contained in Landlord's Notice (which shall not be less than thirty (30) days or more than sixty (60) days after the date of Landlord's Notice) unless the aforementioned assignment, subletting or recommencement has occurred.  If Landlord does not exercise said option to terminate, and Tenant (or any assignee or sublessee) thereafter reopens, Landlord shall once again have such right if the occupant of the Premises once again ceases operating for the two hundred seventy (270) day period described above.  Upon such termination, Tenant and Landlord shall be relieved of and from any and all further liability or obligation to the other under and pursuant to this Lease, and further, Landlord shall pay to Tenant the value of its unamortized improvements made to the Premises (not to exceed $300,000.00, excluding the amount of the Tenant Improvement Allowance), which

374052 v10 (00051.00112.000)

amount shall include the unamortized amount of the Tenant Improvement Allowance only if Landlord has not paid such amount pursuant to this Lease. Notwithstanding anything contained herein to the contrary, Landlord's obligation to reimburse Tenant for its unamortized improvements shall survive the expiration or termination of this Lease. For purposes of this paragraph, "cessation" of operation at the Premises shall not mean or include any period during which Tenant is not operating within the Premises due to a casualty event, condemnation, reconstruction, alterations, modifications, maintenance or repair, or preparing the Premises for occupation by an assignee or subtenant.

WITNESS the following signatures and seals:

LANDLORD:

GATEWAY PAVILIONS, L.L.C.,
an Arizona limited liability company

By:     KDC-GP Partners L.L.C.,
        an Arizona limited liability company,
        Manager and Member

        By:     Kitchell Development Company,
                an Arizona corporation,
                Managing Member

                By:     _____
                        Name: JEFFREY W. ALLEN
                        Title: VICE PRESIDENT

Landlord's counsel:

Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016
Attn: Alexander L. Broadfoot, Esq.

57

374052 v10 (00051.00112.000)

TENANT:

CIRCUIT CITY STORES WEST COAST, INC.,
a California corporation

By: _____
Thomas C. Nolan, Assistant Vice President

Tenant's counsel:

Kane, Russell, Coleman & Logan, P.C.
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Attn: Robert J. Riek, Esq.

Approved for Signature:

_____ Responsible Atty.
_____ Reviewing Atty.
_____ RE Manager

**LEASE/AVONDALE, AZ**



Pylon Si

Premises (outlined in red) – 33,876 square feet
Tenant's Preferred Area
Pylon Sign (99th Avenue)
Truck Well(s)/Trash Compactor
Rebuild Area

Car Stereo Parking
Customer Pick-Up Spaces
Shopping Center
In-Line Space
Cart Corrals

EXHIBIT "A-1"

LEGAL DESCRIPTION

Lots 2, 4, 5, 6, 7, 8, 9, 10 and 11 as shown on that certain Final Plat of Gateway Pavilions, recorded April 28, 2003, as Instrument No. 2003-0530603 in Book 633, beginning at Page 9 of the Official Records of Maricopa County, Arizona;

**TOGETHER WITH**, those certain rights and non-exclusive easements granted to or inuring to the benefit of Landlord under that certain Construction, Operation and Reciprocal Easement Agreement made and entered into by and among Landlord, Harkins Phoenix Cinemas, L.L.C., an Arizona limited liability company, and Costco Wholesale Corporation, a Washington corporation, recorded November 5, 2001, as Instrument No. 01-1034470 and re-recorded to correct page discrepancies on February 14, 2002, as Instrument No. 02-157426 in the Official Records of Maricopa County, Arizona, in, over, upon, across, under and through the land described therein.

## EXHIBIT "B"

## INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|---|---|
| Additional Areas | 14(e) |
| Adjacent Tract | 37 |
| Area | 7(a) |
| Base Rent | 4 |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year(s) | 7(c) |
| Circuit City Specifications | Ex. "C", para. 1(a) |
| City | 1 |
| Civil Plans | Ex. "C", para. 1(a) |
| Commencement Date | 4 |
| Common Area Easement | 6(b) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| Cotenancy Requirement | 38 |
| Date of Taking | 16(a) |
| Default Rate | 9(b) |
| Delivery Date | 29(c) |
| Delivery of the Land | Ex. "C", para. 1(a) |
| Effective Date | 34(q) |
| Envelope Areas | Ex. "A" |
| Event of Default (Landlord) | 29 |
| Event of Default (Tenant) | 27 |
| Hazardous Substances | 19(a)(v) |
| Improvements | 2 |
| In-Line Space | 15 |
| Land | 1 |

374052 v10 (00051.00112.000)

| Term | Paragraph where defined |
|------|-------------------------|
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1 |
| Landlord's Premises | 1 |
| Lawful Requirements | 31 |
| Lease Year | 3 |
| Main Term | 3 |
| Measuring Period | 42 |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Offer | 36 |
| Option Period(s) | 3 |
| Other Improvements | 2 |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 22 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 2 |
| Pro Rata Share | 7(c) |
| Products | 18(a) |
| REA | 1 |
| Real Estate Taxes | 9(a) |
| Reduction Amount | 42 |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Delivery Work | Ex. "C", para. 1(a) |
| Staging Area | 6(a) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(d) |

374052 v10 (00051.00112.000)

| Term | Paragraph where defined |
|------|------------------------|
| Substantial Completion Anniversary | 29(e) |
| Substantially All of the Premises | 16(a) |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | 2 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Soils Report | Ex. "C", para. 1(a) |
| Term | 3 |
| Transfer | 17 |

374052 v10 (00051.00112.000)

AVONDALE, ARIZONA

EXHIBIT "C"

CONSTRUCTION PROVISIONS

These CONSTRUCTION PROVISIONS are made a part of the Lease between Landlord and Tenant and are attached as Exhibit "C".

1.      Landlord's Delivery of the Land; Other Landlord Work. All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)      Site Delivery Work. Landlord acknowledges receipt of, and covenants to comply with Tenant's pad and common area improvements specifications set forth in the Circuit City Specifications attached hereto as Exhibit "C-1" (the "Circuit City Specifications") in the completion of the Landlord Work. Landlord, at its sole cost and expense, shall: (i) verify that its proposed development of the Shopping Center and its civil engineering plans comply with Landlord's geotechnical report, dated April 27, 2001, and prepared by Western Technologies, Inc. for Proposed Power Center 99th Avenue and McDowell Road, Avondale, Arizona (the "Landlord's Soils Report") and that Tenant's building pad area complies with Tenant's geotechnical evaluation of the Land dated January 28, 2003 and prepared by Mactech Engineering & Consulting of Georgia, Inc. (the "Tenant's Soils Report") and with the Circuit City Specifications; (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to Delivery of the Land to Tenant) obstructions, foundations, footings, rock, utilities, easements, improvements and tenancies; (iii) complete grading of the Land and the Common Areas in accordance with Tenant's Soils Report and the "Circuit City Specifications", and with Landlord's final civil engineering plans which have been approved by Tenant (the "Civil Plans") described on Attachment "4" hereto; (iv) complete Tenant's building pad strictly in accordance with Tenant's Soils Report and the Circuit City Specifications; and (v) obtain approvals for all curbcuts for ingress and egress to the Common Areas indicated on the Civil Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all curbcuts for

access entrances from adjoining streets to Tenant's Preferred Area, (B) 20,000 square feet of Staging Area to be divided between the paved areas south of Tenant's building pad area and the unpaved area north of Tenant's building pad area (with temporary use of the unpaved area to the west of Tenant's building pad area, if necessary) outside of but adjacent to Tenant's building pad to either be paved or stone or compacted earth to provide for all weather use which may be reduced to 10,000 square feet upon completion of the shell of the Building, and (C) an all-weather construction access road to Tenant's building pad no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to the Shopping Center with the Land, to be maintained by Landlord in good condition throughout the construction of the Common Areas; and (vii) obtain site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vii) above is, collectively, the "Site Delivery Work". No changes shall be made to any of the Site Delivery Work without Tenant's prior written consent. The Site Delivery Work shall be performed in accordance with the Construction Schedule attached hereto as Attachment "1". Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Delivery Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner. Tenant agrees to restore the Staging Area to its original condition following Tenant's use thereof. Additionally, Tenant acknowledges that the driveway located in front of the Building may need to be open for use during the course of Tenant's construction of the Improvements and Tenant shall reasonably cooperate with Landlord in reducing the size or reconfiguring the Staging Area in front of the Building after completion of Tenant's building shell.

Subject to Tenant obtaining all necessary approvals from the City, Tenant shall have the right to temporarily locate a trailer in the Shopping Center during the eight (8) weeks prior to the store opening in a mutually agreeable location, to be used as a Human Resource Hiring Center

for Tenant's store employees.  Landlord shall have no obligation to provide utilities to such trailer.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Delivery Work and to provide temporary utilities and temporary telephone service as described in Exhibit "C-1", to the Staging Area, in accordance with the dates established therefor in the Construction Schedule, to the end that promptly upon completion of such requirements (collectively, "Delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord agrees that Delivery of the Land shall not be deemed to have occurred until all approvals and permits (other than Tenant's building permit) shall have been obtained and all fees, including but not limited to development impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit.  In addition, Landlord shall pay all impact fees assessed with respect to Tenant's construction of the Premises.  Upon Delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Delivery Work have been completed in the form of the Site Delivery Work Certificate attached to Exhibit "C" as Attachment "2".

Should the Site Delivery Work require minor adjustments in order to be in accordance with the Circuit City Specifications or the Civil Plans, Tenant shall use its reasonable effort to contact Landlord and give Landlord a reasonable opportunity to make such adjustments provided Landlord does so without delay to Tenant.  If Landlord fails to make such adjustments promptly, then Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand, in a sum not to exceed Five Thousand Dollars ($5,000.00).

(b)    Paving, Lighting, Utilities, Landscaping and Drainage.  Landlord shall promptly deliver to Tenant full and complete civil engineering plans.  Landlord, at its sole cost and expense, and in accordance with and on the date set forth in Attachment "1", shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the Circuit City Specifications; (ii) the construction and installation within five (5) feet of the

374052 v10 (00051.00112.000)

Building) and permanent utilities, including but not limited to gas, electric, domestic water and fire protection water (in size sufficient to satisfy Tenant's fire consultant, without need for a fire pump) and sanitary sewer as described in the Circuit City Specifications, each at Tenant's required entry points shown in the Civil Plans, at depths adequate for Tenant's tie-in without additional cost above that contemplated by the Plans and Specifications; (iii) the construction and installation of the storm water drainage system at Tenant's required location shown in the Civil Plans; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (Landlord has installed the curbs in front of the Building and Tenant shall be responsible for repairing any damage it causes to such curbing), vehicular access and service roads, and driveways, in accordance with the Civil Plans; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan (Tenant shall provide its landscaping behind the curb in front of the Building); (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" as described in the Circuit City Specifications; and (vii) Landlord's installation of the pylon sign(s) identifying the Shopping Center as described in paragraph 8 of the Lease, all no later than the dates established therefor in the Construction Schedule.

(c)     Landlord Work: All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work". All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants and contractors, who are bondable and all licensed in the State. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers. All Landlord Work shall be completed in accordance with these Construction Provisions and all attachments hereto (including but not limited to the Construction Schedule) and the Civil Plans. In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work. Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under

374052 v10 (00051.00112.000)

the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

2.    <u>Tenant Improvements</u>.

(a)    <u>Building Construction</u>. Upon completion of all of the Site Delivery Work, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by the Standard Specifications) of Delivery of the Land in the form of <u>Attachment "2"</u>. Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided Tenant does not elect its self-help remedies set forth in this Lease. Upon completion of any such previously unmet requirements, Tenant shall within a reasonable time commence and pursue to completion with due diligence the construction of the Improvements and storefront sidewalk. The construction work on the Improvements and storefront sidewalk shall be performed by a duly licensed and bondable contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the Plans and Specifications.

(b)    <u>Plans and Specifications</u>. Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications including building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan and Elevation" (which are hereby approved by Landlord) attached hereto as <u>Attachment "3"</u>. Landlord agrees that it will approve or disapprove the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation and in all events comply with any and all applicable laws, regulations, ordinances and other requirements (including, without limitation, that certain design review package approved by the City) (collectively, "Design Requirements"), within ten (10) business days after receipt thereof. If the Plans and Specifications are not disapproved by Landlord within such 10-day period, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed; provided, any changes made by Tenant to its prototypical store prior to commencement of construction by Tenant shall be

deemed approved by Landlord, provided such changes comply with the Design Requirements. Any changes which Landlord desires to make to the Plans and Specifications which are different than a Building based on the Schematic Floor Plan and Elevation utilizing Tenant's prototypical elevations and building materials or different from the initial plans and specifications submitted by Tenant to Landlord shall be subject to Tenant's approval, which may be withheld in Tenant's sole discretion, and made at Landlord's sole cost and expense, and Tenant shall not be required to increase the Base Rent payable hereunder, or accept a reduction in the Tenant Improvement Allowance, as a result of such changes.

(c)   Permits. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises in accordance with the Plans and Specifications. Notwithstanding the foregoing, Landlord shall pay all costs necessary to satisfy conditions imposed by any governmental entity on Tenant's permit which are not the sole result of or solely related to Tenant's intended construction of the Improvements. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)   Substantial Completion. Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority.

Attachments:

"1"  Construction Schedule

"2"  Site Delivery Work Certification

"3"  Schematic Floor Plan and Elevation

"4"  Civil Plans

Attachment "1"

Construction Schedule

| **Landlord's Task** | **Completion Date** |
|---|---|
| 1. Landlord's delivery of full and complete civil engineering plans for the Shopping Center and architectural scale building elevations for the remainder of the Shopping Center. | Completed |

I.   SITE DELIVERY WORK

| | |
|---|---|
| Landlord's Delivery of the Land to Tenant with pad certification; construction of all-weather construction access road to the Premises, staging area and curbcuts for access to Tenant's Preferred Area from adjoining streets; installation of temporary utilities; and completion of Site Delivery Work. | The date of the Lease |

II.  REMAINDER OF LANDLORD WORK

| | |
|---|---|
| Construction and installation of conduit for permanent utilities in Tenant's required locations as described and in accordance with Exhibit "C-1". | August 1, 2003 |
| Construction and installation of:  paving (including heavy-duty paving), curbing, and exterior parking lot lighting in accordance with the Civil Plans and Exhibit "C-1" and permanent utility service. | September 1, 2003 |
| Construction and installation of:  Common Area landscaping, and pylon sign(s) identifying the Shopping Center. | September 30, 2003 |

374052 v10 (00051.00112.000)