# Exhibit A

994538

M 2897h 019

CONSTRUCTION, OPERATING AND RECIPROCAL EASEMENT AGREEMENT

FOR

MOBILE FESTIVAL CENTRE

BY AND AMONG

CIRCUIT CITY STORES, INC.

AND

JAMES D. TATUM, JAMES B. COFER
AND RICHARD N. COOPER
AS TENANTS-IN-COMMON

This Instrument Prepared by:

James M. Edwards
Copeland, Franco, Screws & Gill, P.A.
Post Office Box 347
Montgomery, Alabama 36101



RECORD FEE _____
STATE OF ALA. MOBILE CO.
I CERTIFY THIS INSTRUMENT
WAS FILED ON

## INDEX

| Section | Description | Page No. |
|---------|-------------|----------|
| 1.1 | Definitions | 1 |
| 1.2 | Exhibits | 4 |
| 2.1 | Designing the Shopping Center and Other Developer Building | 5 |
| 2.2 | Preliminary Plans of Developer Buildings | 6 |
| 2.3 | Plans for On-Site Work and Off-Site Work | 6 |
| 2.4 | Final Plans and Specifications | 7 |
| 2.5 | Preliminary Plans of Circuit City | 7 |
| 2.6 | Parking Requirements | 8 |
| 2.7 | Effect of Plan Submission | 8 |
| 2.8 | Preparation of Plans and Document Approval | 8 |
| 3.1 | Cooperation and Construction Standards | 8 |
| 3.2 | On-Site Work and Off-Site Work | 9 |
| 3.3 | Construction of Developer Buildings | 9 |
| 3.4 | Construction by Circuit City | 10 |
| 3.5 | Changes in Buildings | 10 |
| 3.6 | Compliance with Laws and Plot Plan | 11 |
| 4.1 | Leasing Requirements | 11 |
| 5.1 | Opening by Developer | 11 |
| 5.2 | Opening by the Circuit City | 11 |
| 6.1 | Shopping Center Operation | 12 |
| 6.2 | Location of Selling Activities | 12 |
| 6.3 | Signs | 12 |
| 6.4 | Employee Parking | 12 |
| 6.5 | Promotional Services Association | 13 |
| 7.1 | Definitions and Documentation | 13 |
| 7.2 | Construction Easement | 14 |
| 7.3 | Footing and Foundation Easements | 14 |
| 7.4 | Utility Easements | 15 |
| 7.5 | Common Area Easements | 16 |
| 7.6 | Encroachments | 17 |
| 7.7 | Installation Responsibility | 17 |
| 7.8 | Easements to Public Authorities | 17 |
| 7.9 | Self Help Easement | 18 |
| 7.10 | Right to Temporarily Block Easement to Common Area | 18 |
| 7.11 | Termination of Perpetual Easements | 18 |
| 7.12 | Non-Dedication | 18 |
| 8.1 | Building and Utility Maintenance | 19 |
| 8.2 | Maintenance of Common Areas | 20 |
| 9.1 | Condemnation on Developer Site | 21 |
| 9.2 | Condemnation of Circuit City Site | 21 |
| 9.3 | Proceeds | 22 |
| 9.4 | Rebuilding | 22 |
| 9.5 | Use Upon Termination | 22 |
| 10.1 | Casualty Insurance | 22 |
| 10.2 | Liability Insurance | 23 |
| 10.3 | Developer Performance By Others | 23 |
| 10.4 | Indemnities | 23 |

BK 2897 PG 020

| 10.5 | Form of Policies | 23 |
| 10.6 | Builders' Risk | 24 |
| 11.1 | Rebuilding by Developer | 24 |
| 11.2 | Rebuilding by Circuit City | 25 |
| 11.3 | Restoration of Site | 25 |
| 12.1 | Unavoidable Delay | 25 |
| 13.1 | Term | 26 |
| 14.1 | Covenants of Circuit City to Operate | 26 |
| 14.2 | Operating Covenant of Developer | 27 |
| 14.3 | Temporary Cessation of Business | 27 |
| 15.1 | Payment of Taxes and Charges | 27 |
| 15.2 | Contesting Taxes or Charges | 27 |
| 15.3 | Failure to Pay Taxes or Charges | 27 |
| 15.4 | Taxes on Common Areas | 28 |
| 16.1 | Default | 28 |
| 16.2 | Determination of Default | 28 |
| 16.3 | Rights of Self-Help | 29 |
| 16.4 | Remedits Cumulative | 30 |
|  | Article XVII | 30 |
| 18.1 | Transfers by Developer | 32 |
| 18.2 | Transfer by Circuit City | 33 |
| 18.3 | Sale and Leaseback, Mortgages | 33 |
| 18.4 | Recording, Publicity | 35 |
| 18.5 | Covenants Running with the Land | 35 |
| 18.6 | Not Partners | 35 |
| 18.7 | Waiver | 35 |
| 18.8 | Governing Law, Severability | 35 |
| 18.9 | Modifications | 36 |
| 18.10 | Notices | 36 |
| 18.11 | Headings | 36 |
| 18.12 | Counterparts | 36 |
| 18.13 | Remedies Not Exclusive | 36 |
| 18.14 | Successors and Assigns | 36 |
| 18.15 | Estoppel Certificates | 36 |
| 18.16 | Cost and Expense | 37 |
| 18.17 | Exculpation | 37 |
| 18.18 | Agreement for Benefit of Parties | 37 |
| 18.19 | Future Building Areas and Out Parcels | 37 |
| 18.20 | Arbitration | 37 |
| 18.21 | Grand Opening Date | 38 |
| 18.22 | Notice to Mortgagee and Right to Cure | 38 |
| 18.23 | Use | 38 |
| 18.24 | Limitation on Detrimental Characteristics | 38 |
| 18.25 | Out-Parcel Restrictions | 39 |
| 18.26 | Supplemental Agreement Shall Govern | 39 |
| 18.27 | Authorization | 40 |

BK 2897 PG 021

## CONSTRUCTION, OPERATING AND RECIPROCAL EASEMENT AGREEMENT

THIS CONSTRUCTION, OPERATING AND RECIPROCAL EASEMENT AGREEMENT (hereinafter called "Agreement"), made as of the ___ day of March, 1986, by and among:

CIRCUIT CITY STORES, INC., (hereinafter called "Circuit City"), a Virginia corporation having offices at 2040 Thalbro Street, Richmond, Virginia 23230;

JAMES D. TATUM, JAMES B. COFER and RICHARD N. COOPER, (hereinafter jointly called "Developer"), as tenants-in-common, having its principal office at 5455 Troy Highway, Montgomery, Alabama, 36116;

## W I T N E S S E T H:

WHEREAS, Developer is the fee owner of a parcel of land more particularly described in Exhibit A, annexed hereto and hereby made a part hereof, containing approximately 51 acres consisting of the "Developer Site" and "Future Development Parcels"; all as designated as such on the Plot Plan; and

WHEREAS, Developer will construct on the Developer Site the "Developer Building" in the Permissible Building Areas designated on Exhibit B.

WHEREAS, Circuit City is the owner of a parcel of land adjoining the Developer Site, containing approximately 40,069 square feet, upon which it will construct and operate a retail store building for use in selling appliances, electronics and similar products, said parcel being hereinafter referred to as the "Circuit City Site", and being the area so designated on Exhibit B and more particularly described in Exhibit A; and

WHEREAS, it is the mutual desire of the parties hereto that their respective Sites (more particularly described in Exhibit A) shall be developed in accordance with the Plot Plan and that thereafter their respective sites shall be operated as a community shopping center for the mutual benefit of the parties hereto; and

WHEREAS, it is the intention of this Agreement to set forth the rights, obligations, duties and responsibilities of the parties in connection with the development and use of the buildings and operations to be conducted.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereby covenant and agree to and with each other as follows:

## ARTICLE I
## DEFINITIONS AND EXHIBITS

Section 1.1 - Definitions. The following terms, where used in this Agreement, shall have the meanings as set forth below:

(a) Circuit City Building. The term "Circuit City Building" shall mean the building referred to in Section 3.4 hereof.

RP 2897PG 023

(b) <u>Circuit City Site</u>. The term "Circuit City Site" shall mean all that tract or parcel of land shown on the Plot Plan and described and designated as such on Exhibit A and which shall consist solely of the building pad on which the Circuit City Building is to be constructed.

(c) <u>Common Area</u>. The term "Common Area" shall refer to and include all portions of the Shopping Center Site which will be, upon completion of construction of the various facilities therefor and upon the improvement thereof (as hereinafter provided), available for the general use, convenience and benefit of the parties hereto and their respective Permittees excepting however, from the foregoing definition the portions of the Circuit City Site and Developer Site, respectively, occupied at any time and from time to time by the Circuit City Building and the Developer Building (as those terms are hereinafter defined).

The Common Area shall include, without limiting the generality of the foregoing: (i) the Parking Area, parking decks (if any), curbs, traffic aisles, directional signs and devices, and light standards; (ii) access, ingress and egress areas and exits (iii) interior public corridors, arcades and balconies; (iv) the common utility facilities; (v) the perimeter sidewalks; (vi) landscaping (excluding landscaping between buildings and sidewalks); (vii) restrooms, escalators, elevators, stairways auditoriums and other public facilities within the Common Area; and (viii) all other land within the Shopping Center on which no improvements are constructed; all as shown on the Plot Plan.

(d) <u>Complete Site</u>. The term "Complete Site" shall refer to and include that property more particularly described in <u>Exhibit A</u> attached hereto and made a part hereof, including the Circuit City Site, the Developer Site, Out Parcels and Future Building Area.

(e) <u>Condemnation or Condemned</u>. The term "Condemnation" or "Condemned" means the taking or appropriation of any portion of the Shopping Center Site pursuant to an exercise of the power of eminent domain or any conveyance in lieu of condemnation or under threat thereof to a grantee having the power of condemnation.

(f) <u>Developer Building</u>. The term "Developer Building" shall mean the buildings referred to in Section 2.2(a) hereof which shall include all buildings on the Developer Site.

(g) <u>Developer Site</u>. The term "Developer Site" shall mean all that portion of the Shopping Center Site owned by Developer all as shown on the Plot Plan and described and labeled as such in <u>Exhibit A</u>.

(h) <u>Floor Area</u>. The term "Floor Area" shall mean, with respect to each building or structure, the number of square feet of floor space on all levels or stories (including mezzanines not used for storage purposes, basements, outdoor garden sales areas, and kiosks, if any) lying within the exterior faces of exterior walls (except party walls as to which the center line, not the exterior faces, shall be used), excluding, however, (i) rooms or penthouses, or portions thereof, used exclusively for mechanical or electrical equipment or for telephone or computer equipment utilized in the operation of

2

the building, (ii) open truck loading areas or docks and delivery corridors used by more than one occupant, (iii) paved or concrete aprons (whether or not covered by canopies) and gasoline pump islands, if any, located at any automotive service station, (iv) decked or mezzanine storage areas above floor level, and (v) public service corridors which may be required by safety fire codes or similar public regulations or laws.

(i) <u>Future Building Area</u>. The term "Future Building Area" shall mean all those tracts or parcels of land shown and designated as such on the Plot Plan and more particularly described on <u>Exhibit A</u>.

(j) <u>Off-Site Work</u>. The term "Off-Site Work" shall refer to that work more particularly described in Section 2.3 hereof.

(k) <u>On-Site Work</u>. The term "On-Site Work" shall refer to that work more particularly described in Section 2.3 hereof.

(l) <u>Opening Date</u>. The term "Opening Date" shall mean that date set forth in Section 5.1 hereof.

(m) <u>Out Parcels</u>. The term "Out Parcels" shall mean all those tracts or parcels of land owned by Developer as shown and designated as such on the Plot Plan, and as more particularly described on <u>Exhibit A</u>.

(n) <u>Parking Area</u>. The term "Parking Area" shall mean:

(i) all roads (including any circumferential roads within the Shopping Center Site), ramps, walkways, curbs, traffic lanes, traffic and directional signals, vehicular parking spaces, paved areas, lighting, striping, and spaces between vehicular parking spaces;

(ii) in addition to the areas specified in (i) above, any other Common Area which shall be similarly improved, but in each case only to the curb line around the adjacent buildings, excluding, however, (A) areas occupied or intended to be occupied by improvements containing Floor Area (but as to areas intended so to be occupied, this exception shall be applicable only after such area ceases to be usable as Parking Area in anticipation of such occupancy), (B) sidewalks adjacent to buildings and (C) any area utilized as a truck dock, truck loading area or service court;

all as more specifically shown on the Plot Plan.

(o) <u>Permissible Building Lines and Permissible Building Area</u>. The term "Permissible Building Lines" shall mean those indicated lines on the Plot Plan which delineate areas within which the respective buildings of the parties may be built, which areas are each referred to as a "Permissible Building Area."

(p) <u>Permittee or Permittees</u>. Any party, tenant or occupant, and any officer, director, partner, employee, agent, contractor, customer, visitor, patient, client, invitee, licensee, subtenant or concessionaire of any party, tenant or occupant.

3

(q)  Plot Plan.  The term "Plot Plan" shall mean the Plot Plan attached hereto as Exhibit B.

(r)  Project Architect.  The term the "Project Architect" shall mean representatives of Architects Plus.

(s)  Promotional Services Association, Advertising, Promotion Service, Promotional Fund or Merchants Association.  The term "Promotional Services Association," "Advertising and Promotion Service," "Promotional Fund or Merchants Association" shall mean the fund or organization formed pursuant to the provisions of Section 6.5 hereof and the successors of such fund or organization.

(t)  Shopping Center.  That portion of the Complete Site consisting of the Developer Buildings, the Common Area situated on the Shopping Center Site, the Circuit City Building.

(u)  Shopping Center Site.  A portion of the Complete Site containing approximately  52.27   acres of land more particularly described on Exhibit A hereto and shown on Exhibit B hereto (being all of the Complete Site except Out Parcels).

(v)  Site.  The term "Site" shall mean the Developer Site, the Circuit City Site, the Future Building Area, and the Out Parcels, or any of them.

(w)  Supplemental Agreement.  The term "Supplemental Agreement" shall mean that separate contract of even date herewith executed by the parties hereto, which is intended to supplement the terms of this Agreement.

(x)  Termination Date.  The term "Termination Date" is defined in Section 13.1 hereof.

(y)  Unavoidable Delay.  The term "Unavoidable Delay" is defined in Section 12.1 hereof.

Section 1.2 - Exhibits.

(z)  Exhibit A.

1.  Legal Description of the Complete Site.
2.  Legal Description of the Developer Site.
3.  Legal Description of the Circuit City Site.
4.  Legal Description of the Out Parcels.
5.  Legal Description of the Future Building Areas.
6.  Legal Description of the Shopping Center Site.

(aa)    Exhibit B.

The Plot Plan consisting of __one__ sheet dated March 14, 1986, entitled "Site Plan _____" prepared by Architecture +

(bb)    Exhibit C.
A survey showing the Complete Site, the Developer Site, the Circuit City Site, Shopping Center Site, and Out Parcels dated March 3, 1986 _____, entitled _____, prepared by Rester and Coleman Engineers.

(cc)    Exhibit D.
Circuit City Sign.

(dd)    Exhibit E.
Itemization of Off-Site Work and On-Site Work.

(ee)    Exhibit F.
Timetable of Construction Work.

ARTICLE II
DESIGNING THE SHOPPING CENTER

Section 2.1 - Designing the Shopping Center and Other Developer Building.

(a)  To the extent herein provided, Developer has planned, as depicted on the Plot Plan, and shall develop a community shopping center, on the Developer Site in accordance with the elevations, design studies and preliminary plans and specifications referred to in Section 2.2. Developer shall also cause to be performed the On-Site Work and the Off-Site Work in accordance with plans and specifications prepared by it as provided for in Section 2.2 and 2.3.  Developer represents it has engaged the Project Architect for the preparation of the elevations, design studies, plans and specifications for the On-Site Work, Off-Site Work and Developer Building.

(b)  The exterior materials and design of all buildings on the Developer Site shall be harmonious as to color, type of exterior material used and aesthetic appearance and shall provide for first class design, structure, workmanship and materials.  The parties have exchanged building designs and plans for exterior materials and agree that these designs and plans depict buildings that comply with the first sentence of this Section 2.1(b).  Each party's preliminary and final plans shall conform with the designs and plans heretofore exchanged and to all requirements as to Floor Area, maximum and minimum limitations as provided in this Agreement, and shall otherwise conform to all the provisions hereof.

Section 2.2 - Preliminary Plans of Developer Buildings.

(a)  Within fifteen (15) days following the date of this Agreement,
Developer shall complete and deliver to Circuit City, for information purposes
only, Developer's preliminary plans and specifications, including exterior
elevations and design studies, all of which are consistent with the Plot Plan
for:  (i) all buildings (said buildings and any addition thereto or
replacement thereof are in this Agreement referred to as the "Developer
Building") on the Developer Site (the Developer Building shall be located
completely within that portion of the Developer Site being within the area
designated "Permissible Building Area" on the Plot Plan, and contain a total
Floor Area of not less than 465,000 square feet, and shall conform to this
Agreement).  Such preliminary plans and specifications shall show, among other
things, the location of all such buildings and improvements, the dimensions,
elevations and maximum initial and future heights of all such buildings and
improvements, the architectural design concept, the provisions for future
horizontal and vertical expansion and the exterior treatment of the buildings
on Developer Site.

(b)  If physically possible at the time of initial construction
Developer Buildings will share common foundations with the Circuit City
Building along common building lines.  Developer will engineer and construct
common foundations based on Circuit City's loading requirements and anchor
bolt spacing to be furnished to Developer upon request.  The cost will be
shared on a pro rata basis of Developer's total loading versus Circuit City's
total loading on the common foundation.  Circuit City shall reimburse
Developer for its share of such cost within thirty (30) days after Developer
certifies the costs thereof to Circuit City in writing.

(c)  If a Circuit City's exterior wall along the common building line
is higher than the Developer Buildings, Developer will provide a base flashing
and counterflashing into a reglet in Circuit City's wall furnished and
installed by Circuit City at such height as is specified by Developer.  If
Developer Buildings are higher than Circuit City's building wall along the
common building line, Circuit City will furnish and install base flashing and
counterflashing into the reglet provided by Developer at such height and
location as are specified by Circuit City.  All details of connection of
Developer Buildings, and Circuit City's Building will be worked out and
approved by Developer and Circuit City before construction commences.

Section 2.3 - Plans for On-Site Work and Off-Site Work.  Within thirty
(30) days following the date of this Agreement, Developer shall prepare and
submit to Circuit City in the manner set forth in Section 2.2 above,
preliminary plans and specifications (hereinafter in this Section 2.3
collectively referred to as "preliminary plans and specifications") for all
On-Site Work and Off-Site Work, in accordance with present reasonable
standards of a community shopping center operation, including, but not limited
to:

(a)  Parking Areas on the Developer Site paved to the extent, in the
areas, and of the character shown on the Plot Plan, and of the capacity
referred to in Section 2.11 hereof, showing the lighting plan, drainage and
the markings and directional signs for such parking areas;

6

(b)  driveways with exits and entrances, truck and delivery passages, truckways, truck loading areas (but not docks), access and egress roads, retaining walls (but not building foundation walls or combination retaining-building foundation walls), walkways and all curbs (but not walkways adjoining the Circuit City Building), exterior landscaped and planted areas (but not lanscaped and planted areas between sidewalks and the Circuit City Building), and utility and other service buildings on the Developer Site (including, but without limitation, those shown on the Plot Plan) necessary for the proper operation of the buildings on the Developer and Circuit City Sites in accordance with present building code requirements; and

(c)  all other facilities and improvements on the Developer Site necessary for the operation of the Shopping Center on the said Sites in accordance with building code requirements; including, without limitation, fire hydrants, water mains and taps on each Site adequately sized to deliver a water supply for sprinkler protection, which shall in any event include affording water supply for the sprinkler protection of retail locations, storm sewers and sanitary sewers, and power lines, telephone lines and gas lines, if available, with all utility lines, mains and facilities to be brought to within five feet (5') of the Circuit City Building at locations to be approved by Circuit City with respect to its Building; and

(d)  that On-Site Work and Off-Site Work more particularly described on Exhibit E annexed hereto and made a part hereof.

### Section 2.4 - Final Plans and Specifications.

As used herein, the phrase, "final plans and specifications" shall mean definitive architectural and engineering plans and specifications, including all necessary working drawings and specifications, providing for first-class structure, workmanship and materials, in detail sufficient to permit construction in full of the facilities and improvements referred to in Sections 2.2, 2.3 and 2.5 hereof.  The parties agree their respective final plans and specifications shall be substantially in accordance with the plans and specifications delivered to the other party pursuant to Sections 2.2, 2.3 and 2.5, respectively.

### Section 2.5 - Preliminary Plans of Circuit City.

(a)  Circuit City shall, subject to the provisions of this Agreement, design and construct, at its expense, a one-level retail store building (including storage and mezzanine) no higher in elevation than 37.5 feet within its respective Permissible Building Area in accordance with the terms and provisions of this Agreement.  The Circuit City Building shall be located within the area designated on the Plot Plan as its Permissible Building Area, and Circuit City shall abut the Developer Building as indicated on the Plot Plan.

(b)  Circuit City must comply with all code requirements within its store space, including without limitation the requirement to provide exits and fire corridors.

(c)  By February 15, 1986, Circuit City will complete and deliver to Developer its preliminary plans showing (i) the exterior materials and treatment of its building, together with architectural elevations and exterior design studies therefor; (ii) the location of all exterior walls of its

7

building and adjacent sidewalks; (iii) the location of truck roadways, truck standing and loading areas, and any service courts; (iv) foundation location and requirements within ten (10) feet of the Developer's and Circuit City's common building lines; (v) the location of and plans, sections and elevations of, all areas and points of interface between its Building and the Developer Buildings; and (vi) the location and size of its cooling and air conditioning installations (if not located within the building or on the roof of a building) and the location of all utility "stub-outs". Circuit City's preliminary plans will be compatible harmonious and in keeping with the general design of Developer Buildings as portrayed by Developer's preliminary plans and will conform to the terms of this Agreement.

(d)  Circuit City shall cause its architects and employees to consult with Developer and the Project Architect during the preparation of Circuit City's preliminary plans, submitted pursuant to this Section 2.5, and Developer shall cause the Project Architect and Developer's employees to consult with Circuit City's architects and employees during the preparation of Circuit City's preliminary plans to the end that the requirements of Circuit City relative to the matters referred to in this Section 2.5 shall be supplied to the Project Architect and Developer in a timely manner with sufficient detail to enable Developer to cause such items to be designed and installed within the requirements of this Agreement.

Section 2.6 - Parking Requirements.  Developer shall provide on its Site parking areas having a minimum capacity of no less than five (5.0) car spaces, of the minimum dimensions as shown on the Plot Plan, for each 1,000 square feet of Floor Area located on the Developer Site plus not less than one hundred eighty (180) car spaces in addition thereto. On its opening date and at all times thereafter, subject to Article IX hereof, Developer shall, maintain on its Site at least said ratio of parking spaces to Floor Area, plus said additional car spaces.

Section 2.7 - Effect of Plan Submission.  Notwithstanding anything herein stated to the contrary, the party submitting any plans shall be solely responsible for the design, supervision and inspection of the work to be performed pursuant to the final plans and specifications and nothing shall be deemed to relieve the party submitting such plans from such responsibility or to constitute a waiver or estoppel by any party of any claim arising out of the failure to meet such responsibility.

Section 2.8 - Preparation of Plans and Document Approval.  The documents required by this Article shall be prepared by an architect or engineer licensed to practice in the State of Alabama, and shall be delivered in duplicate to the party entitled to receive such documents. All documents submitted under this Article II shall be sent to the representatives of the parties hereto as set forth in Section 2.2 hereof, unless the parties are otherwise advised by written notice as provided in Section 18.10 hereof.

### ARTICLE III
### CONSTRUCTION OF SHOPPING CENTER

Section 3.1 - Cooperation and Construction Standards.

8

(a)  Recognizing that construction of improvements by any one party may or will be reasonably expected to affect the performance of the construction of improvements by all other parties, each party agrees to cause its architect, contractors and others engaged in such work or construction to cooperate with the other parties to the extent reasonably possible and to schedule and execute such work and construction in such manner and at such times as will minimize the interruption thereof, or obstruction to, the respective work and construction of the parties.  Until completion of the improvements of the parties hereto, each party shall, through representatives, attend all meetings called by the Developer for coordination purposes and each shall inform all others in advance of any work which shall affect the Site of another or the work thereon.  Developer shall give Circuit City reasonable notice of all construction meetings.

(b)  Approval of any matters pertaining to construction of improvements within the Shopping Center or any part thereof, under either the provisions of this Agreement or the requirement of a governmental authority shall be made by a representative of each party as follows:

FOR THE DEVELOPER:                James D. Tatum and James B. Cofer
                                  5455 Troy Highway
                                  P. O. Drawer O
                                  Montgomery, Alabama 36116

FOR CIRCUIT CITY:                 Donald L. Chasen
                                  Circuit City Stores, Inc.
                                  2040 Thalbro Street
                                  Richmond, Virginia 23230
                                  cc: Ryan Glass

subject to the right of each party to designate a different representative by notice given pursuant to Section 18.10.  Such approvals shall not be unreasonably denied, withheld or delayed by any party in any case.

Section 3.2 – On-Site Work and Off-Site Work.  Developer will commence and proceed diligently with all clearing and grading, paving and construction of the On-Site Work and all Off-Site Work referred to in Section 2.3 hereof.  Construction of said work shall proceed in accordance with a construction schedule and timetable prepared by Developer and approved in advance by Circuit City, which schedule and timetable shall provide for the construction of all such improvements in a coordinated manner so as to permit, and not unreasonably interfere with, the construction of Circuit City Building.  Such timetable shall be signed by the parties hereto in the form of Exhibit F attached hereto and be treated as an Addendum to this Agreement.  All of such work shall be done in accordance with the final plans and specifications.

Section 3.3 – Construction of Developer Buildings.  Developer will commence and will proceed diligently to complete the Developer Buildings, and all improvements on the Developer Site referred to in Section 2.2 hereof.  Developer shall substantially complete construction of the Developer Buildings and the On-Site Work and Off-Site Work provided for under Section 3.2 not later than forty-five (45) days prior to the date Circuit City is required to open the Circuit City Building pursuant to Section 5.2, (or such other dates as may be specified in the construction schedule and timetable referred to in

9

Section 3.2 hereof for completion of the portions of such construction). Said construction shall be deemed substantially completed on the date when completed in accordance with the terms of this Agreement, with the exception of minor items of work which can be completed within the thirty (30) day period next following.

Section 3.4 - Construction by Circuit City. On or before April 1, 1986, provided that all matters to be done or performed then or prior thereto by Developer pursuant to the construction schedule and timetable referred to in Section 3.2 hereof necessary to permit the start of construction by Circuit City on its Site shall have been duly done and performed, Circuit City will commence construction and will use due diligence to substantially complete the construction of a fully sprinkled one-level retail store building no higher in elevation than 37.5 feet (said building and any addition thereto or any replacement thereof are in this Agreement called the "Circuit City Building") on the Circuit City Site by October 1, 1986, or such later date as may be provided in Section 5.2 hereof. Said Building shall be within the lines of the area designated "Permissible Building Area" on the Plot Plan; shall conform to this Agreement; and shall contain, as of its opening date as specified in Section 5.2 hereof, not less than thirty-nine thousand (39,000) square feet and not more than thirty-nine thousand nine hundred ninety nine (39,999) square feet of Floor Area. Any delay on the part of Developer in completing its work by the date set forth in Sections 3.2 and 3.3 hereof, which completed work is necessary prior to Circuit City's commencement or completion of construction of the Circuit City Building, shall extend the commencement of construction date of the Circuit City Building as set forth in this Section 3.4 by the period of said delay and shall likewise extend Circuit City's completion date of the Circuit City Building as set forth in this Section 3.4 by the period of said delay and shall extend Circuit City's opening date as specified in Section 5.2 hereof by the period of said delay.

Developer may designate: (i) a portion of the Common Area which Circuit City shall fence off and use during construction as a staging and storage area; (ii) a route for all trucks bringing construction material to the construction site; and (iii) a portion of the Common Area to be used for parking by construction workers. Circuit City shall require its contractor to use the staging and storage areas, truck routes and construction worker parking areas so designated.

Section 3.5 - Changes in Buildings.

(a) Subject to Section 3.5(b) hereof, the Developer Buildings or Circuit City Building may at any time be altered (but not expanded except as hereinafter provided) provided that (i) the aforesaid buildings' exterior appearance shall remain architecturally compatible, harmonious and in keeping with each of such buildings; (ii) the building shall continue to conform to and comply with the respective requirements of Sections 2.2, 2.4, 2.5, 2.6, 3.3 and 3.4 hereof (except that the time period for initial submission of preliminary plans and specifications shall not apply); and (iii) the Developer shall continue to comply with Section 2.6 hereof.

(b) During the term of this Agreement, no party shall demolish its Building except, in the case of damage or destruction or condemnation of the building, for the purpose of replacing it within twelve (12) months with

10

another building conforming to the requirements of Sections 2.2, 2.4, 2.5, and 3.4 hereof as to Developer and Circuit City, respectively (except that the time period for initial submission of preliminary plans and specifications shall not apply).

Section 3.6 - Compliance with Laws and Plot Plan. All buildings and other improvements referred to in this Agreement shall comply with the building and zoning laws of the municipal or other governmental subdivisions wherein the Complete Site is situated and with all applicable laws, ordinances, orders, rules, regulations and requirements of all federal, county, state, municipal and other governmental authorities and the appropriate departments, commissions, boards and officers thereof, including environmental protection agencies, and shall be in accordance with the reasonable orders, rules and regulations of the National Board of Fire Underwriters or any other body now or hereafter constituted performing similar functions. All buildings and other improvements shall comply with and be constructed in conformity with the Plot Plan and this Agreement. The location of all building and facilities on the Developer Site and Circuit City Site shall be controlled by the Plot Plan and no buildings or other facilities may be erected on the Developer Site or Circuit City Site except within the Permissible Building Lines shown on the Plot Plan, nor may any additional building or facility be built except in an area designated for Future Building Area or Out Parcels on the Plot Plan, unless all of the parties agree on a modification of the Plot Plan or unless such facility is expressly provided for in this Agreement.

## ARTICLE IV
## LEASING

Section 4.1 - Leasing Requirements. Developer has undertaken and will continue to use good faith efforts to negotiate with prospective tenants for space within the Developer Buildings. The parties hereto agree that it is in their mutual best interest and important to the maximum utilization of their adjoining properties that the Shopping Center Site be developed and maintained as an integrated community shopping center which will contain a combination of merchants which represent a sound and balanced diversification of merchandise and/or services.

## ARTICLE V
## OPENING FOR BUSINESS

Section 5.1 - Opening by Developer. Developer shall use due diligence to open the Developer Buildings for business on or before (hereinafter in this Agreement referred to as the "Opening Date") October 1, 1986.

Section 5.2 - Opening by the Circuit City. Provided Developer has performed its obligations under Sections 3.2, 3.3 and 5.1 hereof and the Supplemental Agreement, and provided further that Wal-Mart Stores, Inc. and Safeway Stores, Incorporated have opened, Circuit City agrees to (i) use due diligence and good faith efforts to open for business in the Circuit City Building on or before October 1, 1986, and (ii) in any event Circuit City shall open not later than December 1, 1986.

11

## Section 6.1 - Shopping Center Operation.

(a) Each party hereto will operate its respective Buildings and conduct its business in accordance with reasonable standards as they may exist from time to time, for a first-class community shopping center operation. In furtherance of such standards, no party may without the prior consent of the other party, at any time permit any occupant to: (i) conduct or permit any auction, fire, bankruptcy, or going out of business sale within their respective sites (but this provision shall not restrict the absolute freedom of such occupant to determine its own selling prices nor shall it preclude the conduct of periodic seasonal, promotional or clearance sales); or (ii) use, or permit to be used, the Common Area, or sidewalks adjacent to such occupant's space, or any other premises outside such space, for the sale or display of any merchandise or for any other business, occupation or undertaking (except for activities sponsored by any Promotional Services Association).

(b) The parties hereto shall not (i) use, or permit to be used, any advertising medium that might constitute a nuisance, such as loudspeakers, sound amplifiers, phonographs or radios or television broadcasts in a manner which can be heard outside of the premises of the occupant employing such medium; (ii) use or permit the use of any portion of their respective Buildings for any activity of a type which is not generally considered appropriate for a first-class community shopping center conducted in accordance with good and generally accepted standards of operation; (iii) burn or permit to be burned, trash or store or permit to be stored any trash or garbage in any area other than inside the occupants' own premises or within appropriate enclosed receptacles; or (iv) park or permit the parking of trucks and delivery vehicles so as to unreasonably interfere with, or suffer or permit any use thereon to interfere with, the use of any driveways, walks, roadways, highways, streets, or parking areas or other Common Areas. All delivery vehicles should use only those areas designated for delivery on the Plot Plan.

## Section 6.2 - Location of Selling Activities.
There shall be no selling activities outside the Permissible Buildings Areas on the Developer Site and the Circuit City Site except (i) in the areas designated for such on the Plot Plan or (ii) as a part of special events of any Promotional Services Association.

## Section 6.3 - Signs.
All outdoor signs installed or maintained within the Circuit City Site shall conform to Exhibit D attached hereto and by this reference made a part hereof. All other signs shall be subject to the approval of Developer, which approval shall not be unreasonably withheld or delayed. The parties agree that during the term of this Agreement there may not be more free-standing pylon signs erected by Developer than are shown on the Plot Plan and, in the locations indicated on the Plot Plan.

## Section 6.4 - Employee Parking.
The parties will use their good faith reasonable efforts to require their agents, employees, tenants and concessionaires to park their respective vehicles in or on any of the Parking Areas at such locations as may from time to time be designated by Developer as areas for employee parking and approved by Circuit City (which approval shall

12

not be unreasonably withheld or delayed).

Section 6.5 - Promotional Services Association.

(a) Developer may organize, sponsor and support, as hereinafter provided, and, as Developer may determine from time to time, either (i) a Merchants' or Advertising and Promotional Services Association (hereinafter called "Association") or (ii) a Promotion Fund (hereinafter called "Fund") the purpose of which shall be to promote and enhance the commercial activities of the retail business conducted in the Shopping Center.

(b) Circuit City shall join the Association or contribute to the Fund, as the case may be, and maintain such membership or contributions for the period provided for in its Supplemental Agreement.

(c) Circuit City, during the entire period that each is a member of the Association or contributor to the Fund, as the case may be, shall pay monthly dues to the Association or make monthly contributions to the Fund, as the case may be, at the annual rate set forth in its Supplemental Agreement.

## ARTICLE VII
## EASEMENTS

Section 7.1 - Definitions and Documentation. This Article VII sets forth the easements and licenses, and the terms and conditions thereof, which the respective Parties hereby grant to each other, for the respective periods set forth with respect to each such easement or license. As used in this Article,

(a) Wherever a party to this Agreement grants an easement or license, sometimes being referred to as the "grantor" thereof, it is intended that the grant shall bind and include not only such party, but its heirs, successors and assigns as well. Similarly, wherever a party to this Agreement is granted an easement or license, sometimes being referred to as the "grantee" thereof, it is intended that the grant shall benefit and include not only such party, but its heirs, successors and assigns as well.

(b) The word "in", in respect of an easement granted "in" a particular Site means, as the context may require, "in", "to", "on", "over", "through", "upon", "across" and/or "under".

As to the easements herein granted,

(c) The grant of a particular easement by a grantor shall bind and burden its Site, but where only a portion thereof is bound and burdened by the particular easement, only that portion thereof so bound and burdened shall be deemed to be the servient tenement. Similarly, the grant of a particular easement to a grantee shall benefit its Site, but where only a portion thereof is so benefitted, only that portion shall be deemed to be the dominant tenement.

(a) All easements and licenses granted in this Article VII shall exist by virtue of this Agreement, without the necessity of confirmation by any other document; and likewise, upon the extinguishment, expiration or termination of any easement or license, in whole or in part, or its release in respect of all or any portion of any Site pursuant hereto, the same shall be extinguished or released or be deemed to have expired or terminated without the necessity of confirmation by any other document. However, each party hereby will, as to any easement or license, at the request of any other party hereto, upon the submission by the requesting party of an appropriate document in form and substance acceptable to both parties, execute and acknowledge such a document memorializing the existence, or the extinguishment (in whole or in part), or the release in respect of all or any portion of any Site of any easement or license.

Section 7.2 - Construction Easement. For the term of this Agreement, each party, with respect to its Site, hereby grants to the other party hereto, a non-exclusive easement in its Site for the purpose of the development, construction, repairs and reconstruction of such other party's Site. The use of such easement by any party shall not result in damage or injury to the buildings or other improvements of the other party hereof, and shall not unreasonably interfere with the business operation conducted by such other party to this Agreement, and said easements shall be subject to such other reasonable conditions as the grantor shall require from time to time. Each party hereto will indemnify and hold harmless the other party hereto from such damage or injury to the buildings or other improvements of the other party, from unreasonable interference with the business operations conducted by the other party arising herein, and from any and all claims, liability, costs or expense in connection with death or personal injury resulting from the indemnifying party's use of this easement. After the initial construction on each party's Site and opening for business on any party's Site by the owner thereof, no party shall request another to consent to the use of the other's Site for the above stated purpose of this Section 7.2, including access for construction vehicles, if reasonable alternatives are available on its Site.

Section 7.3 - Footing and Foundation Easements. Developer hereby grants to Circuit City, its successors and assigns, and Circuit City hereby grants to Developer, its successors and assigns, such irrevocable easements and rights in perpetuity (subject to Section 7.11) in, its respective Site (i) for ~~the construction and maintenance of~~ foundations, footings, supports and walls reasonably necessary in connection with ~~the construction of~~ its, not to respective improvements on its respective Site, provided same does not affect exceed existing construction on the other's Site; and, provided the same does not twelve inches, affect the separate insurance rating of the other party's building, (ii) to allow their respective buildings to abut and connect (but not bear structurally upon unless and except as herein otherwise provided), (iii) for a roof projection allowing the grantee to tie its building into the adjoining building by flashing and reglets. No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made. The grantee shall repair, at its sole expense, any damage to any building caused in making or maintaining said attachment and shall indemnify and hold the grantor harmless from any and all claims, liability, costs and expenses, whether in connection with death, personal injury, or property damage, which result or arise out of the making or maintenance of such attachment. The

14

parties will cooperate and cause their respective contractors to cooperate with each other in the coordination of construction schedules so as to facilitate the construction of the improvements on their respective Sites and the connection of the Developer Buildings and the Circuit City Building. The Circuit City Building shall not be used by Developer for load-bearing purposes nor shall the Developer Buildings be used by Circuit City for load-bearing purposes. The easements set forth in this Section 7.3 shall apply only to initial construction and any reconstruction as provided for in this Agreement.

Section 7.4 - Utility Easements.

(a)  Each party hereby grants to the other, its respective successors and assigns, for the benefit of each such grantee's Site, such perpetual (subject to Section 7.11) non-exclusive rights and easements across, through and on its Site, other than any "Permissible Building Areas" shown on the Plot Plan, as are reasonably necessary, without interfering with the use by any owner of such grantor's Site as provided in this Agreement, to provide rights-of-way for public or private underground utilities services for the benefit of each grantee's Site, and access to and use of the gas, (if any) water, storm and sanitary sewer systems, and for the drainage of surface and underground storm water. Any such installed utility system may, however, be relocated by the owner of the grantor's Site, subject to the provisions of Section 3.7 hereof, at any time or from time to time at the expense of such owner, provided that such relocation shall not interfere with, or increase the cost of, or diminish grantees' utility services, and such other relocated utility system shall be subject to this easement and may also be used by such grantees.

(b)  Developer may grant to the owners of the Future Building Areas and Out Parcels, for the benefit of Future Building Areas and Out Parcels, the perpetual, non-exclusive right, privilege and easement (i) to tie into utility lines located on the Complete Site at points closest to benefited Future Building Areas or Out Parcels, as the case may be (ii) for the drainage of surface and underground storm water across, through and on its Site. The foregoing easement may be used by the owners or tenants, as the case may be, of Future Building Areas and Out Parcels as authorized or permitted by Developer, its successors and assigns. The grants of said easements are conditioned on (i) there being adequate capacity in the existing utility lines to permit such use without restricting the use by Developer or Circuit City, (ii) if any lines must be run to tap into said utility lines, the same shall be accomplished at the sole cost of the party requesting such tap and only pursuant to plans and specifications therefor approved by each of the parties hereto which approval shall not be unreasonably withheld or delayed.

(c)  This easement shall be for the purpose of installing, using, operating, maintaining, repairing, relocating, replacing or enlarging any such utility.

(d)  For the purpose of exercising the rights granted in sub-paragraphs (a), (b) and (c) of this Section 7.4, each grantee, and its respective employees, agents and contractors, shall have the right to enter upon and use the Site of each grantor to such extent and so long as reasonably necessary to accomplish such purpose subject to the following conditions and requirements:

15

(i)  No less than ten (10) days prior written notice shall be given to the grantor that grantee anticipates doing such work, together with notification of the nature and extent of such work, the proposed area of such work, and the anticipated date of start of such work; but if the work involved is emergency repair work, only such advance notice, written or oral, as is reasonably practicable need be given;

(ii)  After such work, the pipes or lines in question shall be underground and not beneath or within five (5) feet of any Floor Area on the grantor's Site, or any ground area shown in _Exhibit B_ hereof as a place where grantor may build Floor Area, but this paragraph (ii) shall not require the moving of any pipes or lines theretofore installed not in violation of this Agreement;

(iii)  After the completion of such work, the grantee shall restore the portion of the Site and improvements of the respective grantor so used to the same or as good condition as existed immediately before the commencement of such work; and

(iv)  Any worked performed under sub paragraph (a), (b) or (c) of this Section 7.4, and the restoration of the grantor's Site after such work is completed shall be done at the sole cost of the grantee undertaking the same and shall be performed in such a manner as not to cause any interruption of or undue interference with the business conducted on the Site of the grantor and the business conducted by Circuit City.  To the extent possible, no such work shall be performed on weekends or during holiday seasons.

Section 7.5 – Common Area Easements.

(a)  Developer hereby grants to Circuit City, its respective successors and assigns, for the benefit of the Circuit City Site, as herein described, the non-exclusive, perpetual right, privilege and easement to use the Common Areas for their intended purpose and to permit its Permittees to use the same, in common with Developer, its heirs, successors and assigns, and Developer's Permittees and all persons claiming by or though them, for among other things parking purposes and for the purposes of access, ingress and egress to, from and between its Site and the Developer Site and the streets and highways abutting and adjacent to the Complete Site, without payment of any fee or other charge being made therefor (except for any contributions by Circuit City to maintenance as may be provided for in the Supplemental Agreement), except for the purpose of preventing or discouraging abuse of parking privileges by others than those hereinbefore and hereinafter specified as being entitled to the use of the same; subject, however, to the provisions of subparagraph (b) of this Section 7.5.  If a fee or other charge is established for the reasons set forth above, said fee or other charge shall be subject to the unanimous consent of the parties hereto.  If any parking fees are required by law, said fees shall be imposed be determined by all parties to this Agreement.

Notwithstanding, anything herein stated to the contrary, upon the

16

expiration or sooner termination of this Agreement, Developer may terminate this easement except as to an area adjacent to the Circuit City Site (indicated on the Plot Plan as the Circuit City Preferred Area) which shall contain that number of automobile parking spaces required by local ordinance with respect to the Circuit City Building and shall provide Circuit City with the non-exclusive access to Montlimar Drive.

(b) Developer reserves the right, from time to time, without obtaining the consent or approval of Circuit City, to make any reasonable and non-material changes, modifications or alterations to those portions of its Site which are subject to the foregoing easements, provided that the accessibility of the respective Sites to pedestrian and vehicular traffic is not unreasonably restricted thereby and the flow of vehicular traffic thereon is not materially affected, and provided further, that the parking ratio is not reduced below the required ratio. Notwithstanding this Section 7.5(b) to the contrary, Developer shall not make any changes in the area marked on the Plot Plan "Circuit City Preferred Area" without Circuit City's written consent, which consent shall not be unreasonably withheld or delayed.

(c) The foregoing easements may be used by the owners, tenants, or occupants as the case may be, of Future Building Areas and the Out Parcels, their respective Permittees the Permittees or their tenants, or occupants, such use to be in common with the grantors thereof, their successors and assigns, and all other persons claiming by or through such grantors.

Section 7.6 - Encroachments. While it is the intention of the parties to confine their improvements to the limits of their respective Sites, it is recognized that this result is not always achieved in a multi-ownership shopping center. Accordingly, each party grants to the others an easement permitting the maintenance of canopies, decorative facia, roofs and other overhangs, awnings, utility vaults, staircases, signs, lights, pillars and other like projections and encroachments over and across the grantor's Site to the extent that such projections and encroachments, not to exceed six feet (6') or such greater amount as may be shown on plans and specifications approved by the grantor, shall exist after completion of all construction or reconstruction (if any part is damaged or destroyed and then rebuilt). It is understood that the provisions of this Section 7.7 shall survive the termination of this Agreement and shall continue thereafter so long as any party's Building stands.

Section 7.7 - Installation Responsibility. Except as otherwise specifically provided in this Agreement, the respective grantee of the easements shall be responsible for the installation, maintenance and repair of all facilities which are the subject of such easements.

Section 7.8 - Easements to Public Authorities. Developer covenants and agrees that it will grant to governmental or public authorities or any public utility company(ies) or authority formed pursuant to law having jurisdiction easements in its respective Site, located all in accordance with the requirements of Section 7.4 hereof and in form which satisfies the requirements of Section 7.4 hereof and otherwise in form acceptable to the Developer, for the installation and/or maintenance and operation of utility facilities reasonably required for any or all Sites. Such easement(s) shall be continuous so long as such authority and company(ies) use the same to

17

provide utility services to any part of the Complete Site.

Section 7.9 - Self Help Easement. So long as this Agreement shall remain in full force and effect, each party grants to the other party hereto and their employees, agents and contractors, easements to enter upon the Site of such party within the Shopping Center for the purpose of performing any obligation which such party is required to perform pursuant to Section 16.3 hereof.

The party performing such Self Help shall indemnify and save the defaulting party harmless from all loss, risk and expense in any way arising out of such party's availing itself of the Self Help provisions of this Section 7.9 and Section 16.3, provided, however, that the defaulting party shall reimburse the party performing the Self Help for the cost of performing the obligation of the defaulting party.

This Self Help easement shall not apply to or encumber any portion of the Future Building Area or Out Parcels unless such portion is annexed into the Shopping Center.

Section 7.10 - Right to Temporarily Block Easement to Common Area. At least once in each calendar year, Developer shall have the right to temporarily block off access to the Common Area within such portion that it owns in order to avoid the possibility of dedicating the same for public use or creating prescriptive rights therein, such barriers to, be temporarily erected, for such purpose, if possible, at a time or upon a day when the Shopping Center is not open for business.

Section 7.11 - Termination of Perpetual Easements. Any perpetual easement provided for in this Agreement shall terminate (as to the abandoned benefited real estate only) if the use of such easement shall have been abandoned and continue to be abandoned for a period of one (1) year after written notice of such abandonment shall have been actually received by the then record owner of the fee of the real estate benefited by such easement (and the then record owner, if any, of a leasehold interest in said real estate) from the then record owner of the fee of the real estate burdened with such easement; provided, however, if the easement is for a nonregular use (for example, an easement to maintain, or repair or replace), it shall not be considered to be abandoned during said one (1) year period, even if not used during that period, if during that period, after receipt of said written notice, the then record owner of the fee or any leasehold interest in the real estate benefited by such easement gives written notice to the then record owner of the fee of the real estate burdened with such easement that it has not been abandoned. The aforesaid notice from the record owner of the real estate burdened with an easement shall not be valid unless it states the address to which notices to that owner may be mailed. Any notice provided in this Section to be given to the record owner of the burdened real estate shall be deemed as having been given upon receipt when mailed by U.S. registered or certified mail (return receipt requested) to said Owner at the last address for such owner determined as provided in Section 18.10 hereof.

Section 7.12 - Non-Dedication. None of the easements granted by the parties in this Article are intended, nor shall any of them be construed, as a dedication of the parties' respective Sites for public use, and the parties

18

will refrain from taking any action which would cause such a dedication and take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by all the parties hereto or their respective successors or assigns.

### ARTICLE VIII
### MAINTENANCE

### Section 8.1 - Building and Utility Maintenance.

(a) Each party shall, during the term of this Agreement, maintain in good order, condition and repair all buildings on its own Site in accordance with first-class community shopping center standards, including, without limitation, repairing the exterior of such buildings as reasonably shall be required.

(b) Insofar as there are on any party's Site facilities installed thereon to provide utility services or water or sanitary or storm sewers to serve, the Site of any other party, the same shall be kept and maintained in good order, condition and state of repair by the party on whose Site the portion of said facilities or systems requiring such maintenance shall be located (except to the extent that such services or systems may be operated and maintained by public agencies or utilities), and the cost thereof shall be borne by each party serviced thereby in the proportion which the Floor Area serviced thereby on its Site bears to the total Floor Area of all Sites served thereby. To the extent that any Future Building Area or the Out Parcels are served by such utility facilities, the Floor Area of such Areas or Parcels shall be deemed to be included as a part of the total Floor Area on the Developer Site serviced thereby for purposes of the above computation.

(c) In the event any party fails to discharge its obligations under Section 8.1(b), except as it relates to any buildings on the Shopping Center Site (hereinafter called the "Defaulting Party"), within a reasonable time after receiving written notice thereof from Developer (if Circuit City is the Defaulting Party) or Circuit City (if Developer is the Defaulting Party), or such other form of notice as shall be reasonable under the circumstances in case of an emergency, the party giving the notice shall have the right to perform such repairs or maintenance and a license to enter upon the land of the Defaulting Party to do so and charge the Defaulting Party the proportionate share of the cost thereof if the Site of the Defaulting Party is served by such utility which proportionate share shall not exceed Five Thousand and No/100 ($5,000.00) Dollars. Said action may be taken by any such party hereto immediately after the giving of notice whenever such failure causes interference with the operation or use of its Site. At the election of the performing party, any amounts so expended for repairs or maintenance under this self-help provision (i) may be withheld from amounts, if any, otherwise payable to the Defaulting Party under this Agreement or any Supplemental Agreement, without prejudice, however, to the right of the Defaulting Party to contest the right of the other party to make such repairs or perform such maintenance and to withhold such amounts, or (ii) shall be payable on demand by the Defaulting Party to the performing party.

19

Section 8.2 - Maintenance of Common Areas.

Developer shall perform all maintenance (as that term is hereinafter defined) of the Common Area on the Developer Site. Developer will also keep all Parking Areas, malls and walkways, on the Developer Site open and well lighted with a minimum maintained intensity of not less than one (1) foot candle measured at ground level during all period of darkness when the Circuit City Building is open for business and for one-half (1/2) hour before and one (1) hour after such business hours; provided, however, Developer shall not, in any event be required to light the Common Area on its Site after 10:00 p.m. Upon request of Circuit City, Developer shall keep the Common Areas open and lighted after 10:00 p.m. provided that the additional cost of so doing shall be borne by Circuit City (if only Circuit City remains open) or by Circuit City and such other store that may elect to remain open after 10:00 p.m., pro-rata.

As used in this Section, the term "maintenance" shall mean that all Common Areas will be kept at all times in good order, condition and state of repair and replacement in accordance with reasonable standards, from time to time, of first-class community shopping center operation, including, without limitation, the following:

(i) all hard-surfaced portions of the common facilities and improvements shall be swept at intervals sufficient to maintain the same in a reasonably clean condition before the retail stores within the Shopping Center shall open for daily business with the public;

(ii) all sidewalks shall be swept at intervals sufficient to maintain the same in a clean condition;

(iii) all public trash and rubbish containers located in the common facilities for the use of the public shall be emptied daily and cleaned at intervals sufficient to maintain the same in a clean condition;

(iv) all landscaping shall be properly maintained;

(v) all hard-surfaced markings shall be repainted as the same shall become unsightly or indistinct from wear and tear or other cause;

(vi) all sewer catch basins shall be sufficient to maintain all sewer lines in a free flowing condition; and all mechanical equipment which are apart of storm and sanitary sewer facilities shall be kept in proper working order;

(vii) all asphalt paving shall be maintained in a good condition and repair;

(viii) all surface utility facilities servicing the common facilities, including, but not by way of limitation, hose bibs, standpipes, sprinklers and domestic water lines, shall be repaired or replaced, as the occasion may require, upon the occurrence of any defect or malfunctioning;

20

(ix) all common facility amenities, and institutional, directional, traffic and other signs, shall be properly maintained; and

(x) all lamps on lighting standards and lamps shall be replaced when no longer properly functioning.

## ARTICLE IX
## CONDEMNATION

### Section 9.1 - Condemnation on Developer Site.

(a) If as a result of Condemnation: (i) the number of parking spaces on the Developer Site is reduced below four (4) car spaces for each 1000 square feet of Floor Area and Developer shall fail to provide substitute parking within six (6) months thereafter; or (ii) the Developer Building(s) is condemned thereby reducing the existing Floor Area therein below 400,000 square feet or (iii) the right of adequate access between the Developer Site and the public highways is terminated; then and in any such event any party to this Agreement may elect to withdraw from this Agreement, subject to the survival of Sections 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, 7.11 and 9.5 and exclude its Site as of the date of the taking of such property by the condemning authorities, by notice in writing given to the other parties hereto within ninety (90) days of such taking, or within ninety (90) days after the six (6) months provided in (i) above. Developer shall use good faith efforts to provide alternative parking under this Section 9.1(a) but such shall not require Developer to build a parking deck.

(b) If any Condemnation: (i) does not result in a reduction of the number of parking spaces required on the Developer Site below four (4) car spaces for each 1,000 square feet of Floor Area, (ii) does not result in reducing the existing Floor Area of the Developer Building below 400,000 square feet, (iii) does not result in eliminating the right of adequate access between the Developer Site and the public highways, or (iv) the option to exclude described in the preceding paragraph is not exercised, then this Agreement shall continue in full force and effect, but in such event the proceeds of any award received by Developer by reason of such Condemnation shall, be applied toward (A) the repair and reconstruction of any building or other improvements on the Developer Site condemned so as to continue to provide an integrated shopping center, and (B) the repair and reconstruction of the parking areas on the Developer Site, to the extent necessary, to maintain the ratio of car spaces on the Developer Site required by Section 2.7 hereof. Any excess condemnation proceeds shall be payable to Developer, except that any proceeds with respect to the Circuit City Preferred Area shall be equitably divided between Developer and Circuit City.

### Section 9.2 - Condemnation of Circuit City Site.

(a) If as a result of Condemnation: (i) any part of the Circuit City Building, is taken by Condemnation so as, in Circuit City's reasonable judgment, to render that Building unfit or impractical for such use as to which it may then be properly devoted, or (ii) if the right of adequate access between the Circuit City Site and the public highways is terminated, then in any such event Circuit City shall have the option to exclude its Site from the operation and effect of this Agreement and to withdraw from this Agreement as

21

to it, subject to the survival of Sections 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, 7.11 and 9.5 by giving notice to such effect to the other party hereto within ninety (90) days after such taking.

(b) If any Condemnation (i) does not render the Circuit City Building unfit or impractical for use as it may then be properly devoted, and (ii) does not result in terminating adequate access between the Circuit City Site and the public highways, or (iii) the option to exclude described in the preceding paragraph is not exercised, then this Agreement shall continue in full force and effect, but in such event Circuit City shall use the proceeds of any award received by it by reason of such Condemnation to repair and reconstruct its Building.

Section 9.3 - Proceeds. Regardless of whether Condemnation of all or any portion of the parties respective Sites terminate this Agreement, subject to Sections 9.1(b) and 9.2(b) hereof, the fee owner of the Site Condemned shall be solely entitled, as among the parties hereto, to any and all of the award proceeds resulting from the Condemnation of its Site and all other parties hereto who might have had any property interest, tangible or intangible, in said Site hereby waive any and all rights with respect to such award proceeds except that any condemnation proceeds with respect to the Circuit City Preferred Area shall, subject to Section 9.1(b), be equitably divided between Developer and Circuit City. The obligation of any party to repair and reconstruct under this Article IX shall be limited to the extent of the proceeds received by such party by reason of such Condemnation.

Section 9.4 - Rebuilding. Any repairs or reconstruction under this Article IX shall be completed and any building or other improvement shall be ready for occupancy within ten (10) months from the date the Condemnation proceeds are received, subject to Unavoidable Delay.

Section 9.5 - Use Upon Termination. In the event any party excludes its Site from this Agreement by reason of Condemnation as permitted in this Article, the Site of the party so excluded shall not be utilized for any use not compatible with a shopping center or for any use in contravention of Sections 18.23 and 18.24 for the term of this Agreement.

ARTICLE X
INSURANCE

Section 10.1 - Casualty Insurance. Each party shall at all times during the term of this Agreement, keep all buildings and other improvements on its Site insured, at its expense, against loss or damage by fire, windstorm, hail, explosion, damage from aircraft and vehicles and smoke damage, and such other risks as are from time to time included in "all risk" endorsements available in Mobile County, Alabama, and in an amount not less than the greater of eighty percent (80%) of the actual value or eighty percent (80%) of the actual replacement cost of the building or buildings and improvements on its Site (excluding foundation and excavation costs and cost of underground flues, pipes and drains), provided such policy or policies comply in amount with any insurance warranty contained herein. To the extent available, all insurance required pursuant to this Section 10.1 shall contain an express waiver of any right of subrogation by the insurer against the parties hereto, and each party obtaining such waiver of subrogation shall be obligated to pay any additional premium that may be required for such

22

coverage.

No party shall be liable to any other party or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building or other structure which was or could have been covered by the insurance referred to in the preceding paragraph notwithstanding the fact that such loss or damage might have been occasioned by the negligence of the party requesting such waiver, its agent or employees'. Each party does, for itself and its insurance companies, hereby waive all rights of subrogation.

Notwithstanding anything in this Article stated to the contrary, the insurance required by this Section 10.1 shall not run concurrently with that insurance required in Section 10.6. This insurance required pursuant to this Section 10.1 shall cover all completed buildings and other improvements not covered by the comprehensive Builders Risk Insurance under Section 10.6.

Section 10.2 - Liability Insurance. During the term of this Agreement, each party will, at its expense, maintain comprehensive general public liability insurance (including automobile and contractual liability endorsements) against claims for personal injury or death and property damage occasioned by accident occurring upon, in or about its Site, such insurance in each case to afford protection to the limit, per occurrence, of not less than $3,000,000 with respect to personal injury or death and such insurance against property damage to afford protection to the limit of not less than $500,000 in respect of any instance of property damage. In addition to the foregoing, the insurance coverage required under this Section shall extend to any liability of the parties arising out of the indemnities provided for in Section 10.4 hereof.

Section 10.3 - Developer Performance By Others. Anything in this Article X to the contrary notwithstanding, it is expressly understood and agreed that the obligations of Developer for carrying public liability insurance with respect to the Developer Buildings may be carried in whole or in part by the tenants of Developer as to the particular location of each tenant (but said obligations shall not be satisfied if and to the extent that any such tenants are self-insured), provided that the insurance carried by such tenants shall be in the same amount as hereinbefore provided to be carried by Developer as to the Developer Building and shall be as inclusive as to coverage and shall be in the form required by Section 10.5 hereof.

Section 10.4 - Indemnities. Each party to this Agreement will indemnify and save the other parties to this Agreement harmless from and against any and all claims, actions, damages, liabilities and expense in connection with loss of life, personal injury or damage to property, or any of them, occasioned wholly or in part by any negligent act or omission of such party, its officers, agents, employees, tenants, subtenants, occupants and contractors. The foregoing indemnity shall not apply to claims or liabilities arising from the willful act or negligence of the indemnified party or its agents, or employees, or by reason of causes excluded from standard public liability and property damage insurance policies as the same exist from time to time.

Section 10.5 -Form of Policies. All insurance provided for in this

Article X shall be effected under valid and enforceable policies issued by insurers of recognized responsibility. Any insurance required to be maintained by a party, so long as it shall be the owner or lessee in possession of its Site and as owner or lessee in possession thereof have a net worth (or the entity, if any, guaranteeing its obligations under Articles VIII, IX and X has a net worth), according to its last published report, of at least $75,000,000, may be maintained in whole or in part, by self-insurance. Any insurance required to be maintained by a party may be taken out under a blanket insurance policy or policies and self-insurance covering other premises, property or insureds in addition to the Circuit City Site or Developer Site, as the case may be. The immediately foregoing sentence shall not be construed to permit any of the parties to carry less than the insurance (except for permitted self-insurance) that is otherwise required hereunder. The original of the initial policies or renewal policies, if any, as the case may be, shall be delivered to the primary named insured, and upon request therefor certificates thereof shall be delivered to the other party hereto. Any policy required by this Article X shall provide that such policy shall not be cancelled without at least ten (10) days prior written notice to the parties to this Agreement. In the event a party fails to maintain insurance in accordance with the provisions of this Article IX and if such party fails to correct such default after reasonable notice from one of the other parties hereto, such other party may purchase such insurance for such defaulting party and the defaulting party shall pay the cost thereof.

Section 10.6 - Builders' Risk. The parties hereto agree to cause to be maintained comprehensive Builders' Risk Insurance in completed value form during all the period of time the construction improvements on their respective Sites is in progress and uncompleted. Each party hereto waives any and every claim which arises, or may arise, in its favor against any other party during the period of construction for any and all loss of, or damage to, any of its property located within or upon, or constituting a part of, the Shopping Center. Said mutual waivers shall be in addition to, and not in limitation or derogation of, any other waiver or release regarding any loss of, or damage to, the said property of any party.

## ARTICLE XI
## DAMAGE AND DESTRUCTION

### Section 11.1 - Rebuilding by Developer.

(a) In the event of the destruction or damage of the Developer Buildings or any part thereof within five (5) years after the date hereof and as often as Developer Buildings, during such period, may be destroyed or damaged, by fire or other casualty, Developer shall, to the extent of the insurance proceeds, promptly rebuild and repair or replace the same to as good a condition and to the same general appearance as existed prior to the damage or destruction so that, within twelve (12) months from the date the insurance proceeds are received for such destruction or damage, subject to Unavoidable Delays, there shall be on the Developer Site retail stores containing at least 400,000 square feet of Floor Area and further will so rebuild and repair or replace the Developer Buildings then located upon the Developer Site; provided, however, Developer shall have no such obligation unless "credit tenants" occupying at least one-hundred fifty thousand (150,000) square feet of Floor Area agree to remain in the Shopping Center following such repair and

24

restoration. As used herein the term "credit tenants" shall include Wal-Mart Stores, Inc., Safeway Stores, Incorporated, Ross Stores, Inc., Marshalls, R. G. Brandons, Kenney Shoes and other tenants with substantially similar credit ratings. Developer agrees that Developer Buildings shall be rebuilt in accordance with plans and specifications which provide for first-class structures, workmanship and materials and are otherwise in accordance with Section 2.2 of this Agreement (except that Developer shall not be required to submit plans and specifications).

(b)  Any building which Developer is required to rebuild or repair pursuant to this Agreement shall be rebuilt and ready for occupancy within twelve (12) months from the time when the insurance proceeds for the loss or destruction are received. Work or repair or reconstruction when once commenced by Developer will be carried through continuously to conclusion by it, but Unavoidable Delays, as defined in Section 12.1 hereof, shall not be deemed such an interruption as constitutes Developer in default in the obligation to cause such work to be done continuously or to complete such repair or reconstruction within said ten (10) month period.

Section 11.2 - Rebuilding by Circuit City.  In the event of the destruction or damage of the buildings and improvements on the Circuit City Site, or any part thereof, within five (5) years after the date hereof, and as often as any building or improvements or part thereof on said Site shall, during such period, be destroyed or damaged by fire or other casualty, Circuit City shall, to the extent of the insurance proceeds, promptly rebuild and replace or repair the same to as good a condition and to the same general appearance as existed prior to the damage or destruction to the extent necessary so that within twelve (12) months from the date the insurance proceeds are received for such destruction or damage, subject to Unavoidable Delays, there shall be on said Site a building containing the minimum Floor Area as specified in Section 3.4. Notwithstanding anything herein stated to the contrary, if Circuit City does not rebuild (whether or not required to hereunder), Developer may exercise its rights pursuant to Section 16.4(b).

Section 11.3 - Restoration of Site.  If buildings and improvements on a party's Site are damaged or destroyed at a time when the party is not obligated to rebuild as in this Article XI required and such party elects not to rebuild, then said party shall, at its option, either (a) restore its Site to a neat and orderly condition and maintain its Site in a clean, safe and sightly condition by either paving and striping same so that it is suitable as a parking area for the shopping center or by landscaping the same, or (b) use its building Site for a use which shall be harmonious, compatible and in keeping with the operation of a community shopping center.

ARTICLE XII
UNAVOIDABLE DELAY

Section 12.1 - Unavoidable Delay.

(a)  Notwithstanding anything in this Agreement to the contrary, the time for performance of any term, covenant, condition, or agreement of this Agreement or any Supplemental Agreement, except the obligation to pay any sum of money, shall be extended by any period of Unavoidable Delay, but this Section 12.1 shall not apply to Article XIII hereof. Unavoidable Delay means