delays reasonably beyond the control of the party obligated to perform the
applicable term, covenant, condition or agreement under this Agreement and
includes, without limiting the generality of the foregoing, delays due to acts
of God, fires, earthquakes, floods, extreme weather conditions, and undue
precipitation, war, invasion, insurrection, riot, mob violence, civil
commotion, sabotage, malicious mischief, strikes, lock-outs, condemnation,
action of labor unions, impossibility of obtaining materials and other such
events beyond the reasonable control of the party in question, but shall not
include delays attributable to financial difficulties of such party. The
party seeking to be excused hereunder shall give the other party notice within
thirty (30) days of the event upon which the excuse from performance is based.

(b)  No party to this Agreement shall incur any financial or other
liability to the other party to this Agreement arising out of the failure of
said party to meet a particular date or particular dates as set forth therein,
provided the said party hereto has acted in good faith and any such delay
arises from any of the causes enumerated in this Section 12.1, and the said
party has used reasonable diligence to meet said date or dates, it being
understood that "reasonable diligence" shall not require any party to expend
funds for overtime work.

ARTICLE XIII
TERM

Section 13.1 - Term.  Unless otherwise specifically provided in this
Agreement, or unless sooner terminated by subsequent mutual agreement of all
the parties then in interest, this Agreement shall continue and the
obligations hereunder shall remain binding for a period of fifty-five (55)
years from the Opening Date as defined in Section 5.1 (herein referred to as
the "Termination Date").  Upon any termination of this Agreement all rights
and privileges derived from and duties and obligations created or imposed by
the terms of this Agreement shall terminate and thereafter cease to exist and
all easements and burdens in benefitting any part of the Complete Site over or
upon any other part of the Complete Site, shall likewise terminate and
thereafter cease to exist, except that (i) any perpetual easements (including,
but not limited to Sections 7.3, 7.4, 7.5 and 7.6) granted pursuant to this
Agreement shall (subject to Section 7.11) not so terminate; (ii) easements
granted to public utilities companies for a term or terms beyond said
Termination Date shall not so terminate; and (iii) such termination shall not
limit or affect any remedy at law, in equity or under this Agreement of any
party hereto against any other party hereto with respect to any liability and
obligation on the part of such other party arising or to be performed under
this Agreement prior to the Termination Date.

ARTICLE XIV
OPERATING COVENANTS

Section 14.1 - Covenants of Circuit City to Operate.  Circuit City
covenants and agrees with Developer that it will, subject to Article IX and
XI hereof:

(a)  continuously operate or continuously cause to be operated the
Circuit City Building of the dimensions shown on Exhibit B hereof, and under
the name "Circuit City", or in the alternative, under that name which Circuit

26

City may at such time be operating the majority of its stores in the Southeast United States for a period of five (5) years from and after the Opening Date as provided in Section 5.2 of this Agreement;

(b)  subsequent to the five (5) year period set forth in (a) above, Circuit City covenants and agrees with Developer that it shall have no obligation to operate in its Store Building but that, if it elects to operate in its Store Building, it shall operate or permit to operate in its Store Building, under any name(s), no more than four (4) operators, provided such facilities shall be devoted primarily to retail business and shall be compatible, harmonious and in keeping with a community shopping center and this Agreement;

(c)  during the periods that Circuit City is required to operate its Store Building as hereinabove provided, it will cause its Building to be open for business to the public during substantially the same business hours as a majority of Circuit City's other stores in the Southeast United States.

Section 14.2 - Operating Covenant of Developer.  For a period of five (5) years commencing upon the Opening Date as defined in Section 5.1 of this Agreement, and provided Circuit City is being operated in the Shopping Center, Developer shall (subject to the provisions of Articles IX and XI of this Agreement) continuously operate the Shopping Center in a manner consistent with the best standards of a strip-type shopping center practice and shall use its good faith efforts to keep all Floor Area leased.

Section 14.3 - Temporary Cessation of Business.  Any temporary cessation of business by any party not in excess of thirty (30) successive days or occasioned by the making of repairs, alterations, renovations, restorations or rebuilding, so long as such party is using due diligence in making its repairs, alterations and renovations, or interruptions caused by Unavoidable Delay, shall not constitute a breach of such party's covenant to operate as provided in this Article XIV; provided that any other cessation of business shall constitute a breach of this provision upon the giving of thirty (30) days written notice by the other party if such breach is not cured within said thirty (30) day notice period.

ARTICLE XV
REAL ESTATE TAXES AND CHARGES

Section 15.1 - Payment of Taxes and Charges.  Each of the parties shall pay (or cause to be paid) before delinquency, all real estate taxes, assessments, water fees, water tap fees, sewer rates, all charges and/or deposits for any services of utilities (herein collectively called "Taxes and Charges") levied on its Site and the improvements situated thereon.

Section 15.2 - Contesting Taxes or Charges.  Each of the parties may, at its own cost, by appropriate proceedings, contest the validity, applicability and/or the amount of any Taxes or Charges.  Nothing in this Article XV requires a party to pay any Taxes or Charges so long as it contests the validity, applicability or the amount thereof in good faith and so long as it does not allow the affected Site to be in imminent danger of being forfeited to the imposer of such Taxes or Charges as a result of its nonpayment.

Section 15.3 - Failure to Pay Taxes or Charges.  If a party fails to

27

comply with this Article XV, and its Site is in imminent danger of being forfeited to the imposer of such Taxes or Charges as a result of its nonpayment, the other party may pay the Taxes or Charges in question and shall be entitled to prompt reimbursement from the defaulting party for the sums so expended with interest thereon at the lower of eighteen percent (18%) per annum or the highest lawful rate chargeable to such party.

Section 15.4 - Taxes on Common Areas.  In addition, Circuit City shall pay its proportionate share of all Taxes and Charges (including any costs of contesting the same) on the Common Areas on the Developer Site during the term of this Agreement and thereafter so long as Circuit City shall make any use of such Common Area.  Circuit City's share shall be computed by multiplying the total amount of the real estate taxes each year by a fraction, the numerator of which shall be the Floor Area of the Circuit City Building and the denominator of which shall be the total Floor Area of the Circuit City Building and all buildings on the Developer Site (including any Future Building Area but excluding the Floor Area of any tenant that pays the taxes on any portion of the Common Area which is separately assessed for such tenant, to the extent that the tax on such Common Area is comparable to the tax such tenant would have paid on a prorata basis).  Circuit City's proportionate share of the Taxes and Charges shall be paid annually to Developer within thirty (30) days after Circuit City receives a detailed statement setting forth its share of such Taxes and Charges together with copies of the tax bill and evidence that it has been paid.  In computing Circuit City's share, any part of the Common Area that is taxed as a separate parcel and paid by another party shall be excluded from the above computation.

### ARTICLE XVI
### DEFAULT

Section 16.1 - Default.  Unless otherwise provided in this Agreement, no party shall be deemed to be in default under this Agreement, until such party shall have been given written notice describing the nature of such default, and within thirty (30) days after the receipt of such notice, shall have failed to cure, or if such default is not susceptible to cure within said thirty (30) days, to commence to cure such default and thereafter to proceed diligently to complete the curing of such default as soon as possible, utilizing all reasonable means to effectuate and expedite the curing of such default.

A copy of any such notice of default shall also be given to any holder of a first mortgage on the Site of the defaulting party, pursuant to Section 17.22.  Said mortgagee shall have the right, but not the obligation, to cure the default within the manner and at the times set forth in Section 17.22.

Section 16.2 - Determination of Default.  If the Defaulting Party (as defined in Section 16.3) shall contend that it is not in default, and if the matter is not resolved by the parties to the dispute within thirty (30) days, the matter shall be submitted to arbitration pursuant to Section 17.21 hereof for determination pending which the Defaulting Party need not make any payment provided for in this Article.  If the contention of the Defaulting Party be sustained, it need make no payment to the other (but if it be sustained thereby only in part, then there shall likewise be determined what portion, if any, of the amount expended by the other party is payable by the Defaulting

Party, with interest, as hereinafter provided, to the other party). If either party institutes legal action against the other, the prevailing party shall be reimbursed by the other for all reasonable attorney's fees and expenses.

        Section 16.3 - Rights of Self-Help. Except as to Taxes and Charges being contested as provided in Section 15.2 hereof, and except as to the respective covenants of Developer and Circuit City set forth in Article XIV hereof, if any party (hereinafter the "Defaulting Party") shall fail to perform any of the provisions, covenants and conditions of this Agreement (including the making of payments to others which the Defaulting Party has agreed herein to make) as to Taxes and Charges provided in Section 15.1 hereof and as to maintenance, operation or use of the Common Area or if, in respect of any provision, covenant or condition in this Agreement as to the foregoing which requires the diligent pursuance of a course of conduct or a course of work, the Defaulting Party shall fail to pursue the same diligently, then and in any such event, the party hereto other than the Defaulting Party, shall have the right, subject to Section 16.1 hereof, to proceed to make such payment or take such action as shall be necessary to cure such default, all in the name of and for the account of the Defaulting Party. In such case, the Defaulting Party shall, on demand, reimburse the party paying such sum or taking such action for the monies actually expended by it, and its reasonably out of pocket expenses, including attorney's fees, in so doing, together with interest computed from the date of demand to date of payment in accordance with Section 15.3 hereof. If the party other than the Defaulting Party shall in good faith deem that an emergency is occurring or has occurred, so that the default requires immediate curing, then no notice shall be required and any non-defaulting party may act promptly without giving notice and take such action as is necessary to cure the alleged failure. Any party performing any action pursuant to the preceding sentence shall interfere to the minimum extent possible in light of the matter at hand with the Defaulting Party's business and with reasonable promptness, shall give notice to the Defaulting Party of the doing of such work and the claimed failure; such notice, notwithstanding any other provisions of this Agreement, need not be in writing if the giving of a written notice would not be reasonably possible under the circumstances, so long as given to an officer or responsible official of the Defaulting Party. Written confirmation of the action shall be given as soon as reasonably possible. The party so acting shall prosecute any work performed by it diligently to completion in a workmanlike manner.

        If and to the extent any party shall have obligations to another party with respect to an easement granted by this Agreement and which shall survive the termination date as to any party, rights granted by this Article XVI shall survive with respect to such easement for the duration of such easement. Any amount determined to be due under this Article XVI from a defaulting party to another party shall, ipso facto, without further act of parties, be deemed to constitute a lien or encumbrance (hereinafter, a Section 16.3 Lien) against the Site (including real and personal property) of the Defaulting Party, subordinate to (i) all existing liens and encumbrances (including any leases) then thereon, and the interest in such Site which may be owned by a transferee in a sale and leaseback or its successor at such time, and (ii) any mortgage of such Site then held by an institutional lender, provided that the holders of such liens or encumbrances, or such mortgagee, or such transferee or their successors, as the case may be, were not in possession or control of the Site covered by the Section 16.3 Lien at the time the obligation to perform,

29

non-performance of which resulted in such Section 16.3 Lien, arose. The Defaulting Party shall, at the request of the other party, execute such instruments as are necessary to properly record the existence of any such Section 16.3 Lien, or in default thereof, any other party is hereby irrevocably appointed (as a power coupled with an interest) to execute the same on behalf of the Defaulting Party. Upon the satisfaction of such obligation, the party recording the Section 16.3 Lien shall forthwith procure its removal form the record or record an appropriate instrument of satisfaction thereof.

Section 16.4 - Remedies Cumulative. Any remedies of any party to this Agreement herein specifically provided for are cumulative and shall be deemed additional to arbitration, as provided in Article 17 and Section 18.21, and any and all other remedies to which any of them may be entitled in law or equity, and shall include the right to restrain by injunction, any violation or threatened violation by any party of any of the terms, covenants or conditions of this Agreement and by decree to compel performance of any such terms, covenants or conditions, it being agreed that the remedy at law for any breach of any such term, covenant or condition (except those, if any, requiring the payment of a liquidated sum), is not adequate. Nothing herein shall derogate the provisions of this Agreement where certain provisions as to the exclusivity of remedy are expressly set forth.

ARTICLE XVII
DEVELOPER'S RIGHT TO REPURCHASE CIRCUIT CITY SITE

(a) The parties agree that the happening of any of the following events shall give Developer the rights hereinafter set forth in this Article XVII:

(i) failure to operate a retail business in the Circuit City Building in accordance with this Agreement for one hundred eighty (180) days or more during any twelve month period (except as may be occassioned by the making of repairs, alterations, renovations or restorations); or

(ii) operating or permitting the operation of any activity in violation of Sections 18.23 and 18.24 of this Agreement.

(b) Upon the occurrence of an event under subparagraph (i) above, Developer may, without prejudice to any of its other rights and remedies at law or in equity, cause Circuit City to convey all its right, title and interest in the Circuit City Site, the Circuit City Building and the easement rights appurtenant thereto (jointly referred to herein as the "Circuit City Site and Improvements"), to Developer for the Purchase Price and on financial terms set forth herein.

(c) Upon the occurrence of an event under subparagraph (ii) above, Developer may, without prejudice to any of its other rights and remedies at law or in equity, terminate this Agreement and may, at its further option, cause Circuit City to convey all its right, title and interest in the Circuit City Site and Improvements to Developer for the Purchase Price and on the financial term set forth herein; provided however, Developer shall have no such rights without first giving Circuit City written notice and thirty (30)

days to cure.  If Developer elects to terminate this Agreement without purchasing the Circuit City Site and Improvements such termination shall be subject to Article XIII of this Agreement.

(d) For the purposes of this Article XVII, the Purchase Price shall be the fair market value of the Circuit City Site and Improvements as determined herein; provided however, in no event shall the Purchase Price be less than the balance of any first mortgage on Circuit City Site and Improvements. Within 15 days after Developer has given notice of conditional exercise of its right and option to purchase the Circuit City Site and Improvements as provided above, Developer and Circuit City shall each select and designate a qualified appraiser to determine the fair market value of the Circuit City Site and Improvements as of the date of the aforesaid conditional notice, and shall notify the other of such choice and designation. The two (2) appraisers so chosen and designated shall choose a third appraiser as soon as possible and, in any event within 30 days following their selection.  The three (3) appraisers so chosen shall independently appraise the Circuit City Site and Improvements, completing same and rendering their reports to each other and to Developer and Circuit City within 30 days following their respective appointments.  Upon said appraisals being completed and reports rendered as aforesaid, the appraisers shall confer in an effort to reach agreement.  The fair market value of the Circuit City Site and Improvements as thus determined and agreed to in a final appraisal report signed by all or a majority of the appraisers shall be binding upon the parties hereto.  Each party will pay for the services of the appraiser chosen by it, and the charges of the third appraiser will be borne equally except that if Developer elects not to purchase the Circuit City Site and Improvements based on the fair market value as determined herein, Developer shall pay the cost of all of the appraisers. Said final appraisal report shall be dated and shall be sent to Developer and Circuit City by certified or registered mail, return receipt requested. Should either party fail or refuse to designate an appraiser within 15 days following Developer's conditional notice of exercise, then and in such event the fair market value of the Circuit City Site and Improvements will be determined by the appraiser timely designated by the other party. Notwithstanding the foregoing, Developer may deduct from the Purchase Price the amount of any indebtedness or obligation (i) owing from Circuit City to Developer; (ii) for which Circuit City is primarily, contingently or otherwise liable (including liability as a guarantor) and for which Developer is or may be primarily, contingently or otherwise liable; or (iii) for which Circuit City is liable and which Developer pays or will pay in order to conveniently operate the Circuit City Site and Improvements.

(e) In the event Developer exercises its option under this Article XVII, Circuit City shall not, without the prior written consent of Developer, remove any fixtures, equipment or leasehold improvements from the Circuit City Building.  Notwithstanding the foregoing Circuit City may remove its trade fixtures and movable equipment, provided Circuit City repairs any damage caused by such removal.

(f) In the event that Developer elects to purchase the Circuit City Site and Improvements as herein provided, Circuit City shall convey to Developer by statutory warranty deed, good and marketable fee simple title to the Circuit City Site and Improvements, which title shall be insurable by a title insurance company approved by Developer (the "Title Company"), at its

31

Exhibit(3)    Page 7 of 22

standard rates in ALTA Standard Owner's Policy Form (1970 Form B), or in the Standard Owner's Policy Form then available for issue in the event the ALTA Standard Owner's Policy Form (1970 Form B) is no longer issued, without exception for any item other than those permitted title exceptions existing at the time of the conveyance of the Circuit City Site and Improvements by Developer to Circuit City, together with the Operating Agreement and easements benefiting the Complete Site.

The Closing and consummation of the the purchase of the Circuit City Site shall occur no later than 45 days after Developer notifies Circuit City of Developer's intention to purchase the Circuit City Site, at such time selected by Developer and at the office of the title company in Mobile County, Alabama, or such other place as Developer and Circuit City may agree upon.

ARTICLE XVIII
MISCELLANEOUS

<u>Section 18.1 - Transfers by Developer</u>.

Subject to Section 18.20 it is agreed by the parties hereto that:

(a)  Until Developer has substantially completed the construction of Developer Buildings, On-Site Work and Off-Site Work and this Agreement has been recorded, Developer shall not have the right to sell, assign, or otherwise transfer its interest in this Agreement, or the right to sell, alienate, encumber or otherwise dispose of any portion of the Developer Site except in the manner, for the purposes and to the extent authorized by this Agreement, and except in connection with a mortgage, mortgage foreclosure, or deed in lieu of foreclosure.  Any such sale, transfer or assignment of the Developer Site or this Agreement may be made if made subject to the following conditions:

(i)  If the transfer is of the entire fee of the Developer Site only as part of a sale leaseback or lease - subleaseback and Developer remains in possession as lessee or sublessee, or to a responsible Developer, but in any case the transfer shall be expressly made subject and subordinate to this Agreement, the Supplemental Agreement; or

(ii)  If the transfer is of an undivided interest therein, only if the persons included within the term "Developer" on the date of execution of this Agreement retain at least a fifty percent (50%) undivided interest therein or C. F. Halstead Contractors/Developers, Inc. retain control over or responsibility for the development, construction and opening of the Developer Building; and such transferee expressly assumes the obligations of Developer under this Agreement and the Supplemental Agreement.

(b)  After Developer has substantially completed the construction of the Developer Buildings, the On-Site/Off Site Work, this Agreement has been recorded and until the Termination Date of this Agreement, the following, as applicable, shall be conditions to the right to make any such sale (including the transfer or assignment of any ground lease to the Developer Site), alienation, assignment or other transfer of this Agreement or all or any

32

portion of the Developer Site: (i) the interest of the transferor under this Agreement shall be transferred as part thereof, but the entire such transfer shall be expressly made subject and subordinate to this Agreement and (ii) said transferee shall expressly assume and covenant with the Circuit City, or its successors in title, to perform and be bound by, all the terms, covenants and conditions in this Agreement and all supplements and amendments thereto to be performed or kept on the part of Developer. From and after the date of any such transfer Developer shall be relieved of all liability and obligations on its part thereafter arising or to be performed or kept by it under this Agreement and all such supplements and amendments.

Section 18.2 - Transfer by Circuit City. During the period ending five (5) years after Circuit City opens its Building for business to the public, Circuit City may not sale, lease or otherwise transfer its Building without Developer's consent, which consent may not be unreasonably withheld. From and after the period ending five (5) years after Circuit City opens its building for business to the public, Circuit City may, without Developers consent, sell, lease or otherwise transfer its interest in this Agreement together with the Circuit City Site and Building, and from and after the date of such transfer it shall be relieved of all liability and obligations thereafter arising or to be performed or kept by it under this Agreement and the Supplemental Agreement, provided the transferee shall expressly assume and covenant with Developer or its successors in title, in an agreement duly executed in recordable form, to perform and be bound by, all the terms, covenants, restrictions, limitations and conditions in this Agreement to be performed or observed by Circuit City.

Notwithstanding anything in this Section 18.2 to the contrary Circuit City may, without Developer's consent, transfer the Circuit City Site together with its interest in this Agreement and the Supplemental Agreement pursuant to any transfer, assignment or sublease to any parent, subsidiary or affiliated corporation, to any corporation or entity purchasing all or substantially all of the stock or assets of Circuit City or to any corporation, person or entity purchasing all or substantially all of Circuit City's stores in Alabama.

Section 18.3 - Sale and Leaseback, Mortgages.

(a) Anything in this Agreement to the contrary notwithstanding, if any party shall assign its interest in this Agreement in connection with a sale and leaseback or lease and subleaseback, and it or an affiliated corporation (which affiliated corporation shall have a net worth equal to or greater than the assignor corporation) which affiliated corporation shall have fully guaranteed, if such be the case, the assignor's obligations hereunder or shall have become a party hereto, shall simultaneously become vested with a leasehold estate or similar possessory interest in its Site by virtue of a lease made by the assignee, or lessee, as the case may be; or if, in order to secure an indebtedness, any party shall convey its Site by way of a deed to secure debt, deed of trust, or mortgage and retain a possessory interest in its Site, then in no such event shall the assignee of this Agreement under any such sale and leaseback or lease and subleaseback or any subsequent owner of its Site, or the trustee, beneficiary or mortgagee under any such deed to secure debt, deed of trust, or mortgage, be deemed to have assumed or be bound by any of such party's obligations hereunder for so long as such party (or if a corporation which shall have fully guaranteed its obligations hereunder or

33

shall have become a party hereto) shall retain such possessory interest, and all obligations shall continue to remain those of such party alone, so long as such party retains such possessory interest, and performance by such party or such a corporation of any act required to be performed under this Agreement by it or fulfillment of any condition of this Agreement by such party or such a corporation shall be deemed the performance of such act or the fulfillment of such condition by such assignee, lessee, subsequent owner, trustee, beneficiary or mortgagee, as the case may be, and shall be acceptable to the other parties with the same force and effect as if performed or fulfilled by such assignee, lessee, trustee, subsequent owner, beneficiary or mortgagee.

(b) Anything in Section 18.2 hereof or elsewhere in this Agreement to the contrary notwithstanding, if any such mortgage on the Circuit City Site is foreclosed or a deed delivered in lieu of foreclosure, or if Circuit City, having entered into a sale and leaseback or a lease and subleaseback transaction involving its Site, shall be deprived of possession of such Site by reason of its failure to comply with the terms of such leaseback or subleaseback, anyone who has acquired, or shall thereafter acquire, title to such Site or a leasehold estate therein shall hold the same free of any requirement of this Agreement that a retail business be operated on such Site, but Circuit City shall not, in such a case, be deemed released from liability for damages resulting from the breach of its obligations under Sections 14.1, and provided, however, such Site may only be used for a retail business for so long as Circuit City is obligated to operate a retail business hereunder. Notwithstanding anything hereinstated to the contrary, Article XVII(a)(i) shall not apply to any mortgagee of the Circuit City Site who may be in possession of such Site but the same shall apply to any subsequent purchaser, either at foreclosure or from such mortgagee.

(c) Anything in this Agreement to the contrary notwithstanding, if a mortgage on the Developer Site is foreclosed or a deed delivered in lieu of foreclosure, any first mortgagee of the said Site acquiring title as a result thereof shall not be obligated to undertake or perform any of the initial development or construction obligations of any kind or nature imposed upon Developer or to pay any money damages for any defaults occurring prior to the date such mortgagee acquired title; provided however, such mortgagee shall be required to complete the Common Areas around and serving the Circuit City Site including the Circuit City Preferred Area, the access to Montlimar adjacent to the Circuit City Site and completion of the utilities serving the Circuit City Site. Any such mortgagee shall be bound by, and shall have the benefit of all and any provisions in this Agreement creating easements of any kind, including but not limited to easements for access, footings and foundations, structures, parking, Common Areas, lighting and utilities.

(d) Except as above provided, any party acquiring title of a Site through a foreclosure of a first mortgage or a deed in lieu of foreclosure shall not be relieved of a party's duties, obligations and responsibilities, including, but not limited to the maintenance obligations set forth in Article VIII hereof, except such successor shall have no obligation to pay money damages for defaults as may be provided for in this Agreement or supplements thereto, which occurred prior to acquisition of title. Each party shall give copies of any notices of default under this Agreement to any holder of a first mortgage on the defaulting party's property or to any lessor of such defaulting party's property in a sale/leaseback of which the party giving such

34

notice shall have been notified, and such holder or lessor shall be permitted to cure any such defaults within the time permitted in Section 18.22.

## Section 18.4 – Recording, Publicity.

(a)  Developer will cause a counterpart of this Agreement to be recorded immediately after the execution thereof, the cost thereof to be shared equally by the parties.

(b)  The parties shall execute a written instrument or instruments in recordable form for the purpose of evidencing the Opening Date and the dates when the Circuit City Building shall have opened for business, and Developer shall cause such instrument or instruments to be filed for record.

(c)  No party will release any publicity, or make any statements for release to the public, relating to the other party hereto or the stores to be operated by such other party without the consent of such party except that Developer may include Circuit City as a proposed occupant of the Shopping Center in publicity releases.

(d)  Within thirty (30) days after the Opening Date the parties shall exchange certificates executed by their respective engineers or other appropriate employee setting forth the Floor Area of each building on their respective Sites. Similar certificates shall be executed on behalf of a party and delivered to the other party whenever the amount of Floor Area on the executing party's Site is increased or decreased.

## Section 18.5 – Covenants Running with the Land.  All the covenants, agreements, conditions and restrictions set forth in this Agreement and any Supplemental Agreement thereto are intended to be and shall be construed as covenants running with the land, binding upon, inuring to the benefit of and enforceable by the parties hereto and the respective owners of the Developer Site and the Circuit City Site.

## Section 18.6 – Not Partners.  Nothing contained in this Agreement shall be construed to make the parties partners or joint venturers or to render any of said parties liable for the debts or obligations of the other, except as in this Agreement expressly provided.

## Section 18.7 – Waiver.  No delay or omission by any of the parties hereto to exercise any right or power accruing upon any noncompliance or failure of performance by any of the other parties under the provisions of this Agreement shall impair any such right or power or be construed to be a waiver thereof.  A waiver by any of the parties hereto of any of the covenants, conditions or agreements hereof to be performed by any of the others shall not be construed to be a waiver of any subsequent breach thereof or of any other covenant, condition or agreement herein contained.

## Section 18.8 – Governing Law, Severability.  This Agreement shall be governed by and construed in accordance with the laws of the State of Alabama. If any provisions, or portion thereof, of this Agreement, or the application thereof to any persons or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provisions, or portion thereof, to any person or circumstances shall not be

35

affected thereby and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Section 18.9 - Modifications. No agreement shall be effective to add to, change, modify, waive or discharge this Agreement, in whole or in part, unless such agreement is in writing and signed by the parties hereto or their successors and assigns herein permitted.

Section 18.10 - Notices. Any notice, request, demand, approval or consent given or required to be given under this Agreement shall be in writing and shall be deemed as having been given upon receipt when mailed by United States certified mail (return receipt requested), postage prepaid, or sent by public or private courier service to the other parties at the addresses stated below or at the last changed address given by the party to be notified as hereinafter specified:

DEVELOPER                          (i)    James D. Tatum
                                          James B. Cofer
                                          5455 Troy Highway
                                          P. O. Drawer 0
                                          Montgomery, Alabama 36105

CIRCUIT CITY                       (ii)   Circuit City Stores, Inc.
                                          2040 Thalbro Street
                                          Richmond, Virginia 23230
                                          ATTN:  Corporate Secretary

Any party may, at any time, change its address for the above purpose by mailing, as aforesaid, a notice stating the change and setting forth the new address.

Section 18.11 - Headings. The article and section headings herein are for convenience and reference only, and in no way define and limit the scope and content of this Agreement or in any way affect its provisions.

Section 18.12 - Counterparts. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all such counterparts shall constitute one and the same instrument.

Section 18.13 - Remedies Not Exclusive. The remedies of the parties provided in this Agreement, are not the sole remedies of a party hereto and shall not be construed to be, by way of limitation, the only remedies available to it, but in addition each party shall be entitled to all remedies available in law or in equity for a breach or default by any other party, including without limitation, specific performance.

Section 18.14 - Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns of the parties hereto.

Section 18.15 - Estoppel Certificates. Each party agrees from time to time within thirty (30) days following receipt of notice from the other party, to execute and deliver to such other party a certificate for the use of the

addressee, whether such addressee is the holder of the mortgage on such party's Site or is a prospective buyer, lessee, or mortgagee of such party, stating (i) that this Agreement and/or Supplemental Agreement is unmodified and in full force and effect, or if modified, that this Agreement and/or Supplemental Agreement is in full force and effect as modified and stating the modifications; (ii) whether or not to the best of its knowledge, any party is in default in any respect under this Agreement and/or Supplemental Agreement, and if in default, specifying such default; (iii) the Opening Date and in the case of Circuit City, the date of the opening of its store.

Section 18.16 - Cost and Expense. Wherever it is provided in this Agreement that a party is to perform certain obligations, those obligations shall be performed by said party without cost and expense to any other party hereto, except where otherwise expressly provided.

Section 18.17 - Exculpation. Notwithstanding anything contained in this Agreement to the contrary, from and after the time when Developer has complied with and met its obligations in regard to: (a) construction of the Developer Building and the On-Site and Off-Site improvements to the Shopping Center Site and (b) opened the building and improvements as required by Section 5.1, Circuit City agrees that it will look solely to the estate and property of Developer in the land and buildings, including without limitation rents and profits therefrom and proceeds of insurance or condemnation, comprising the Developer Site for the collection of any judgment (or other judicial process) requiring the payment of money by Developer in the event of any default by Developer with respect to any of the terms, covenants and conditions of this Agreement to be observed and/or performed by Developer, and no other property or assets of Developer shall be subject to levy, execution or other procedures for the satisfaction of Circuit City's remedies. Nothing herein contained shall act as a limitation on the right of Circuit City to seek and secure injunctive relief for the violation by Developer of any of the terms of this Agreement.

Section 18.18 - Agreement for Benefit of Parties. This Agreement is made for the exclusive benefit of the parties hereto and their heirs, legal representatives, successors and assigns herein permitted and not for any third person. Nothing in this Agreement, expressed or implied, is intended to confer upon any person, other than the parties hereto and their heirs, legal representatives, successors and assigns herein permitted, any rights or remedies under or by reason of this Agreement.

Section 18.19 - Future Building Areas and Out Parcels. Notwithstanding anything stated in this Agreement to the contrary, the parties hereto agree that Developer may, in whole or in part, sale, lease, sale and leaseback, lease and sub-leaseback, construct, reconstruct and/or expand any improvements made, or to be made, on the Future Building Areas and Out Parcels without the necessity of any approval and without any conditions or restrictions other than the restriction that any such parcels may not be used for any business or activity which is not compatible, out of harmony or not in keeping with a community shopping center practices for so long as the Complete Site is being used in part for a Shopping Center.

Section 18.20 - Arbitration. If at any time during the existence of this Agreement, or after the dissolution or termination thereof, any question,

37

ꟿ 2897ᴾᴳ 059

disagreement or dispute shall arise among the parties to this Agreement and/or Supplemental Agreement, its business or accounts, or to the meaning or interpretation of this Agreement, or the rights, duties, or obligations of the parties hereto, such question, disagreement or dispute shall, if requested by one of the parties, be submitted to, and determined by, arbitration by the American Arbitration Association, in accordance with its rules then in force. In any arbitration, the arbitrator shall have authority to order and decree any relief and to grant any remedy, but for this arbitration clause, could have been granted by a court of competent jurisdiction at law or in equity. In the event of such arbitration, either party will be permitted, upon petition made to the arbitrator, to inspect and copy any records, papers, documents, plans, drawings and accounting ledgers prior to the arbitration hearing and to take depositions and conduct discovery otherwise provided under the Alabama Rules of Civil Procedure.

Section 18.21 - Grand Opening Date.  The parties hereto agree that it is to their mutual advantage to have a Grand Opening Date (as such term is hereinafter defined).

Developer shall establish, after consultation with Circuit City on reasonable notice, an official "Grand Opening Date" for the Shopping Center.

Section 18.22 - Notice to Mortgagee and Right to Cure.

The mortgagee affecting any party's Site shall be entitled to receive notice of any default by such respective party, provided that the one giving such notice shall have been previously notified of the name and address of said mortgagee.

Except as otherwise provided herein, the parties agree that they will not exercise any right of termination provided to them by this Agreement in the event of default of another party or any right of termination or purchase under Article XVII hereof, except after giving notice to the mortgagee of any defaulting party as provided above, and affording such mortgagee or such mortgagee's assigns or successors in interest the right to cure such default. Such mortgagee, its assigns and successors, shall have thirty (30) days in which to cure such default or such longer period of time as reasonably necessary if such default cannot be reasonably cured within such thirty (30) day period.

Section 18.23 - Use.  No party's Site shall be used for any unlawful purpose during the term of this Agreement, and so long as the Shopping Center is being operated as a community shopping center each party's Site shall only be used for retail purposes or such other uses as are not incompatible or inconsistent or out of harmony with the operation of a community shopping center.

Section 18.24 - Limitation on Detrimental Characteristics.  No use or operation will be made, conducted or permitted on any part of the Shopping Center which use or operation is objectionable to a community shopping center. Included among the uses or operations which are prohibited are uses or operations which produce or are accompanied by the following characteristics, which list is not intended to be all inclusive:

38

(i)  Any noise, litter, odor or other activity which may constitute a public or private nuisance;

(ii)  Any unusual firing, explosion or other damaging or dangerous activities;

(iii)  Any assembly, manufacturer, distillation, refining, smelting, industrial, agriculture, drilling or mining operation;

(iv)  Any trailer court, mobilehome park, lot for sale of new or used motor vehicles, labor camp, junk yard, stock yard or animal raising (other than pet shops);

(v)  Any dumping, disposal, incineration or reduction or garbage or refuse other than by the handling or reducing of such waste produced on the premises from authorized uses and handled in a reasonably clean and sanitary manner;

(vi)  Any sale of pornographic material including but not limited to an adult bookstore.

(vii)  Any bowling alley, billiard parlor or pool hall, game parlor, masage parlor, night club or other place of amusement, tavern, dance hall, or any business serving or selling alcoholic beverages (unless the serving and selling of alcoholic beverages is incidental to said business), Skating rink.

(viii)  Any theatre except as shown on the Plot Plan.

(ix)  Any health spa or studio in excess of twelve thousand (12,000) square feet of Floor Area within six hundred (600) feet of the space occupied by Safeway Stores, Incorporated.

(x)  Any restaurant on the Circuit City Site or on the Developer Site between the Circuit City Building and the space occupied by Safeway Stores, Incorporated.

Section 18.25 - Out-Parcel Restrictions.  Developer covenants that so long as Circuit City shall be operating a Circuit City Store:

(a)  Out-Parcels shall be limited in use to restaurants, banks and other uses typical to shopping center out-parcels.

(b)  Out-Parcels 7 and 8 (as so designated on the Plot Plan) must maintain at least that parking ratio required by local code and shall not have the privilege of parking on the Developer Site.

(c)  The height of any building on Out Parcels 4, 5, 6, 7 and 8 (as so designated on the Plot Plan) shall not exceed twenty (20) feet from ground to finished elevation; provided, however, any national tenant or owner of any such Out-Parcel may construct to the height of its standard national architectural scheme.

Section 18.26 - Supplemental Agreement Shall Govern.  To the extent that the provisions of the Supplemental Agreement and the provisions of this Agreement are inconsistent, as between the parties hereto, the provisions of

39

COMPLETE SITE

Commencing at the Southeast corner of Downtown West, Unit One, as recorded in Map Book 17, Page 118 of the Probate Court Records, Mobile County, Alabama, run N 00° 22' W along the East boundary of said Downtown West, Unit One, a distance of 115 feet to the point of beginning of the property herein described; thence run S 89° 38' W 255 feet to the P.C. of a curve to the left having a central angle of 90° 00' and a radius of 25 feet; thence run Southwestwardly along the arc of said curve 39.27 feet to the P.T. of said curve; said point being on the East right of way line of Downtowner Boulevard; thence along said East right of way line of Downtowner Boulevard run N 00° 22' W 200 feet to the Northwest corner of Lot 22 of said Downtown West, Unit One; thence along the North boundary of said Lot 22, Downtown West, Unit One run N 89° 38' E 280 feet to a point on the aforementioned East boundary of Downtown West, Unit One; thence along said East boundary of Downtown West, Unit One, run N 00° 22' W 345 feet to a point; thence run S 89° 38' W 280 feet to a point on the aforementioned East right of way line of Downtowner Boulevard; thence along said East right of way line of Downtowner Boulevard run N 00° 22' W 495 feet to the P.C. of a curve to the right having a central angle of 90° 00' and a radius of 25.0 feet; thence continuing along East right of way line of Downtowner Boulevard run Northeastwardly along the arc of said curve 39.27 feet to the P.T. of said curve; said point being on the South right of way line of Downtowner Loop North and the North boundary of Lot 30 of said Downtown West, Unit One; thence along said South right of way line of Downtowner Loop North and said North boundary of Lot 30, Downtown West, Unit One run N 89° 38' E 255 feet to the Northeast corner of said Lot 30, Downtown West, Unit One; thence run N 00° 22' W 5.0 feet to a point; thence run N 89° 38' E 523.81 feet to a point; thence run N 00° 23' W 610 feet to a point on the South right of way line of Airport Boulevard; thence along said South right of way line of Airport Boulevard run N 89° 38' E 740 feet to its intersection with the West right of way line of Montlimar Drive; thence along said West right of way line of Montlimar Drive run S 85° 22' 30" E 28.28 feet to a point; thence continuing along said West right of way line of Montlimar Drive run S 00° 23' E 651.35 feet to the P.C. of a curve to the left having a radius of 1044.9 feet; thence continuing along said West right of way line of Montlimar

$Exhibit\ A$
A-1

Drive run Southeastwardly along the arc of said curve 529.70 feet to the P.T. of said curve; thence continuing along said West right of way line of Montlimar Drive run S 29° 25' 43" E 297.01 feet to the P.C. of a curve to the right having a radius of 1871.5 feet; thence continuing along said West right of way line of Montlimar Drive run Southeastwardly along the arc of said curve 490.86 feet to a point on the centerline of a 100 foot drainage easement; thence along said centerline of 100 foot drainage easement run S 89° 26' 13" W 2020.84 feet to a point on the aforementioned East right of way line of Downtowner Boulevard; said point being on the arc of a 1247.12 foot radius curve concave Westwardly; thence along said East right of way line of Downtowner Boulevard and said arc of curve run Northwardly 50 feet to a point on the North line of said 100 foot drainage easement; thence along said North line of 100 foot drainage easement run N 89° 26' 13" E 97.98 feet to a point; thence run N 89° 38' E 292.05 feet to a point; thence run N 00° 22' W 195 feet to a point; thence run S 89° 38' W 110 feet to the point of beginning. Containing 58.54 Acres. Subject to a 50 foot drainage easement North of and adjacent to the South boundary of the above described property, as per instrument recorded in Real Property book 499, Page 430 of the Probate Court Records, Mobile County, Alabama.

A-1

DEVELOPER SITE

Commencing at the Southeast corner of Downtown West, Unit One, as recorded in Map
Book 17, Page 118 of the Probate Court Records, Mobile County, Alabama, run N 00°
22' W along the East boundary of said Downtown West, Unit One, a distance of 115 feet
to the point of beginning of the property herein described; thence run S 89° 38' W
255 feet to the P.C. of a curve to the left having a central angle of 90° 00' and a radius
of 25 feet; thence run Southwestwardly along the arc of said curve 39.27 feet to the P.T.
of said curve; said point being on the East right of way line of Downtowner Boulevard;
thence along said East right of way line of Downtowner Boulevard run N 00° 22' W 65.0
feet to a point; thence run N 89° 38' E 280.0 feet to a point on the aforementioned East
boundary of Downtown West, Unit One; thence along said East boundary of Downtown
West, Unit One, run N 00° 22' W 480 feet to a point; thence run S 89° 38' W 280 feet to
a point on the aforementioned East right of way line of Downtowner Boulevard; thence
along said East right of way line of Downtowner Boulevard run N 00° 22' W 50 feet to a
point; thence run N 89° 38' E 165 feet to a point; thence run N 00° 22' W 160 feet to a
point; thence run S 89° 38' W 165 feet to a point on the aforementioned East right of way
line of Downtowner Boulevard; thence along said East right of way line of Downtowner
Boulevard run N 00° 22' W 285.0 feet to the P.C. of a curve to the right having a
central angle of 90° 00' and a radius of 25.0 feet; thence continuing along East right of
way line of Downtowner Boulevard run Northeastwardly along the arc of said curve 39.27
feet to the P.T. of said curve; said point being on the South right of way line of
Downtowner Loop North and the North boundary of Lot 30 of said Downtown West, Unit
One; thence along said South right of way line of Downtowner Loop North and said North
boundary of Lot 30, Downtown West, Unit One run N 89° 38' E 255 feet to the Northeast
corner of said Lot 30, Downtown West, Unit One; thence run N 00° 22' W 5.0 feet to a
point; thence run N 89° 38' E 523.81 feet to a point; thence run N 00° 23' W 490 feet
to a point; thence run N 89° 38' E 150.02 feet to a point; thence run N 00° 22' W 120.0
feet to a point on the South right of way line of Airport Boulevard; thence along said
South right of way line of Airport Boulevard run N 89° 33' E 352.54 feet to a point;
thence run S 00° 22' E 170 feet to a point; thence run N 89° 38' E 257.45 feet to a point
on the East right of way line of Montlimar Drive; thence along said West right of way
line of Montlimar Drive run S 00° 23' E 501.35 feet to the P.C. of a curve to the left
having a radius of 1044.9 feet; thence continuing along said West right of way line of

Montlimar Drive run Southeastwardly along the arc of said curve 15 feet to a point; thence run N 44° 56' 08" W 21.54 feet to a point; thence run S 89° 38' W 148.2 feet to a point; thence run S 00° 22' E 219.0 feet to a point; thence run S 51° 55' 14" E 18.65 feet to a point; thence run N 76° 31' 32" E 150.8 feet to a point; thence run N 46° 19' 58" E 23.83 feet to a point on the aforementioned West right of way line of Montlimar Drive; said point being on the arc of a 1044.9 foot radius curve concave Northeastwardly; thence along said West right of way line of Montlimar Drive and said arc of curve run Southeastwardly 120.19 feet to a point; thence run N 53° 24' 56" W 23.98 feet to a point; thence run S 89° 38' W 103.61 feet to a point; thence run S 00° 22' E 213.63 feet to a point; thence run N 89° 38' E 205 feet to a point on the afore-mentioned West right of way line of Montlimar Drive; said point being on the arc of a 1044.9 foot radius curve concave Northeastwardly; thence along said West right of way line of Montlimar Drive and said arc of curve run Southeastwardly 13.0 feet to the P.T. of said curve; thence continuing along said West right of way line of Montlimar Drive run S 29° 25' 43" E 297.07 feet to the P.C. of a curve to the right having a radius of 1871.5 feet; thence continuing along said West right of way line of Montlimar Drive run Southeastwardly along the arc of said curve 38.5 feet to a point; thence run N 73° 54' 53" W 14.02 feet to a point; thence run S 60° 34' 17" W 131.43 feet to a point; thence run S 00° 22' E 158.43 feet to a point; thence run S 89° 38' W 20.0 feet to a point; thence run S 00° 22' E 154.15 feet to a point on the North line of a 100 foot drainage easement; thence along said North line of drainage easement run N 89° 26' 13" E 296.51 feet to a point on the aforementioned West right of way line of Montlimar Drive; said point being on the arc of a 1871.5 foot radius curve concave Southwestwardly; thence along said West right of way line of Montlimar Drive and said arc of curve run Southeast-wardly 51.69 feet to the centerline of the aforementioned 100 foot drainage easement; thence along said centerline of 100 foot drainage easement run S 89° 26' 13" W 2020.84 feet to a point on the aforementioned East right of way line of Downtowner Boulevard; said point being on the arc of a 1247.12 foot radius curve concave Westwardly; thence along said East right of way line of Downtowner Boulevard and said arc of curve run Northwardly 50 feet to a point on the North line of said 100 foot drainage easement; thence along said North line of 100 foot drainage easement run N 89° 26' 13" E 97.98 feet to a point; thence run N 89° 38' E 292.05 feet to a point; thence run N 00° 22' W 195

feet to a point; thence run S 85° 38' W 110 feet to the point of beginning.  Containing 52.27 Acres.  Subject to a 50 foot drainage easement *North of and adjacent to the South boundary of the above described property, as per instrument recorded in Real Property Book 499, Page 430 of the Probate Court Records, Mobile County, Alabama.*

LESS AND EXCEPT

CIRCUIT CITY SITE

Commencing at the Southeast corner of Downtown West, Unit One, as recorded in Map Book 17, Page 118 of the Probate Court Records, Mobile County, Alabama, run N 00° 22' W along the East boundary of said Downtown West, Unit One, a distance of 290.0 feet to a point; thence run N 89° 38' E 1119.43 feet to a point; thence run S 00° 22' E 78.64 feet to the point of beginning of the property herein described; thence run N 89° 38' E 106.24 feet to a point; thence run N 44° 38' E 23.33 feet to a point; thence run S 45° 22' E 23.33 feet to a point; thence run N 89° 38' E 77.83 feet to a point; thence run S 00° 22' E 210.0 feet to a point; thence run S 89° 38' W 78.67 feet to a point; thence run N 00° 22' W 41.33 feet to a point; thence run S 89° 38' W 138.0 feet to a point; thence run N 00° 22' W 168.67 feet to the point of beginning.  Containing 40,069 Square Feet.

A-2

## CIRCUIT CITY SITE

Commencing at the Southeast corner of Downtown West, Unit One, as recorded in Map Book 17, Page 118 of the Probate Court Records, Mobile County, Alabama, run N 00° 22' W along the East boundary of said Downtown West, Unit One, a distance of 290.0 feet to a point; thence run N 89° 38' E 1119.93 feet to a point; thence run S 00° 22' E 78.64 feet to the point of beginning of the property herein described; thence run N 89° 38' E 105.29 feet to a point; thence run N 44° 38' E 23.33 feet to a point; thence run S 45° 22' E 23.33 feet to a point; thence run N 89° 38' E 77.93 feet to a point; thence run S 00° 22' E 210.0 feet to a point; thence run S 89° 38' W 78.67 feet to a point; thence run N 00° 22' W 41.33 feet to a point; thence run S 89° 38' W 138.0 feet to a point; thence run N 00° 22' W 168.67 feet to the point of beginning. · Containing 40,069 Square Feet.

OUT PARCEL 1 (MOBILE FESTIVAL CENTRE)

Commencing at the Southeast corner of Downtown West, Unit One, as recorded in Map

Book 17, Page 118 of the Probate Court Records, Mobile County, Alabama, run N 00°

22' W along the East boundary of said Downtown West, Unit One, a distance of 155 feet

to the point of beginning of the property herein described; thence run S 89° 38' W

280.0 feet to a point on the East right of way line of Downtowner Boulevard; thence

along said East right of way line of Downtowner Boulevard run N 00° 22' W 135 feet to

the Northwest corner of Lot 22 of said Downtown West, Unit One; thence along the

North boundary of said Lot 22, Downtown West, Unit One run N 89° 38' E 280 feet to a

point on the aforementioned East boundary of Downtown West, Unit One; thence along

said East boundary of Downtown West, Unit One, run S 00° 22' E 135 feet to the point

of beginning. Containing 37,800 Square Feet.

OUT PARCEL 2 (MOBILE FESTIVAL CENTRE)

Commencing at the Southeast corner of Downtown West, Unit One, as recorded in
Map Book 17, Page 118 of the Probate Court Records, Mobile County, Alabama, run
N 00° 22' W along the East boundary of said Downtown West, Unit One, and a
Northward projection thereof run 635 feet to a point; thence run S 89° 38' W 280.0
feet to a point on the East right of way line of Downtowner Boulevard; thence along
said East right of way line of Downtowner Boulevard run N 00° 22' W 50.0 feet to the
point of beginning of the property herein described; thence continuing N 00° 22' W
along said East right of way line of Downtowner Boulevard run 160.0 feet to a point;
thence run N 89° 38' E 165.0 feet to a point; thence run S 00° 22' E 160.0 feet to a
point; thence run S 89° 38' W 165.0 feet to the point of beginning.  Containing 26,400
Square Feet.