EXHIBIT "D"

CIRCUIT CITY SIGN

Intentionally Deleted for Recording. The original of Exhibit "D" is attached to counterparts of this Agreement in the possession of the parties hereto.

№ 289776 081

EXHIBIT "E"

## ON-SITE WORK AND OFF-SITE WORK

I. Off-Site Work shall be only that work required outside the boundaries of the Complete Site, and shall include without limitation the following:

(i) those reasonable improvements and engineering in connection therewith as required by the governmental authorities having jurisdiction therefore and related to perimeter roadways and access thereto, all as shown on Exhibit B;

(ii) the bringing of the following facilities to the Complete Site and the installation thereof;

   (A) Water supply with a sufficient rate of flow and pressure to meet the minimum requirements of the governmental authorities having jurisdiction in respect to fire protection and domestic water needs.

   (B) A sanitary sewer system connected to a public sewage facility in each case adequate to handle the sewage from the improvements to be erected on the Complete Site,

   (C) A drainage system adequate to handle and dispose of storm water from the Complete Site.

   (D) Electric and telephones of sufficient capacity to service the improvements to be erected on the Complete Site.

(iii) the foregoing work set forth in (i) and (ii) shall include without limitation, to the extent required by governmental authorities the following:

   (A) Surveys and test borings for Off-Site Work;

   (B) Land for required public street rights-of-way and permanently dedicated buffer;

   (C) Clearing, grading, grubbing and mucking;

   (D) Installation of storm drainage and sanitary sewer systems;

№ 2897 PG 082

- (E) Installation of street curbing and gutters;
- (F) Paving;
- (G) Sidewalks;
- (H) Extension of (including any necessary relocation of) electric, telephone, water, storm drainage sanitary sewer lines;
- (I) Street lighting standards and the wiring thereof;
- (J) Traffic control equipment;
- (K) Landscaping;
- (L) Reasonable architectural, engineering, and contractor's fee, if any;
- (M) Environmental Study Fees and costs, if any;
- (N) Environmental Impact Study Fees and costs, if any;

II. The term On-Site shall mean the installation of all improvements on the Complete Site reasonably related to the preparation of the Complete Site for use as a regional shopping center, excluding all buildings, building retaining walls, backfill of building retaining walls, or appurtenances to, such buildings made by the parties. On-Site Work on the Circuit City Site shall include, without limitation, the underground extension of the necessary facilities referred to in (ii), (A), (B), (C), and (D) under Off-Site Work, to within five (5) feet of the building lines at the point or points designated by Circuit City. On-Site Work shall also include, without limitation, the following:

- (A) Surveys and test borings;
- (B) Clearing, grubbing, grading and mucking;
- (C) Demolition of existing structures and debris removal;
- (D) Mass earth excavation, grading, filling, backfilling, and compacting (including the cost of borrow materials and the cost of disposing of excess materials from the shopping center site, but not to include materials for same, or cost of disposing of excess materials from building construction or compaction of any fill material made necessary by building construction);

RP 2897PG 083

(E) Major rock excavation (excavation for footing, plumbing and other buildings construction excavation of said Circuit City Site shall not be included);

(F) Storm drainage;

(G) Sanitary Sewer;

(H) Curbs and gutters;

(I) Sidewalks and walkways (but not including Circuit City building sidewalks or appurtenances);

(J) Fire loop and domestic water lines;

(K) Electric and telephone distribution;

(L) Parking area paving and striping;

(M) Site landscaping;

(N) Reasonable architectural, engineering and contractor's fees for On-Site Work;

(O) Reasonable supervision.

(P) A building pad for the Circuit City Building graded and compacted to 98% standard proctor. Such building pad shall provide adequate bearing material for the foundation footings of the Circuit City Building. This material shall provide a minimum of 2000 p.s.f. allowable design bearing pressure Foundation strata shall meet all local and state building code requirements.

(Q) The items set forth in Section 2.3 of the Operating Agreement.

EXHIBIT "F"

| Item of Site Work | Completion Date |
|---|---|
| Permanent Storm Drainage | 120 days prior to Opening |
| Permanent Electric Power System | 120 days prior to Opening |
| Permanent Sanitary Sewer | 120 days prior to Opening |
| Permanent Water System | 120 days prior to Opening |
| Permanent Telephone Service | 120 days prior to Opening |
| Parking Lot Pavement Base | 60 days prior to Opening |
| All other on-site and off-site work (including but not limited to, final parking lot paving, lighting, landscaping, striping, traffic controls and irrigation systems) | Opening Date |

N° 2897㎎ 085

the Supplemental Agreement shall govern.

Section 18.27 - Authorization. Upon execution of this Agreement Circuit City will deliver to Developer, a certified copy of the corporate resolution(s) authorizing the execution of this Agreement and all supplementary agreements.

IN WITNESS WHEREOF, the parties hereto have caused these presents to be signed by their respective duly authorized officers or representatives, and their corporate seals, where applicable, to be affixed hereto, as of the day, month and year first above stated.

(DEVELOPER)

MOBILE FESTIVAL ASSOCIATES, TIC

_____
James D. Tatum, Tenant-In-Common

_____
James B. Cofer, Tenant-In-Common

_____
Richard N. Cooper, Tenant-In-Common

(CIRCUIT CITY)

ATTEST:                              CIRCUIT CITY STORES, INC.
                                     a Virginia corporation

By: B.B. Cumming, Jr.                By: Donald L. Chasen
Its: Ass't Secretary                 Its: ASS'T. VICE PRESIDENT

Congressional Mortgage Corp. of Georgia, as Mortgagee of the Developer Site, hereby joins in the execution of this Construction, Operating and Reciprocal Easement Agreement solely for the purpose of acknowledging its consent hereto; to further acknowledge that, its mortgage dated June 6, 1985 and recorded in the Office of the Judge of Probate of Mobile County, Alabama in Real Property Book 2771 at page 137, is hereby subordinated to this Agreement.

ATTEST:                              CONGRESSIONAL MORTGAGE CORP. OF GEORGIA

By: Robert Thomas                    By: Richard B. Means
Its: Vice President                  Its: President

STATE OF ALABAMA        )

COUNTY OF MONTGOMERY    )

    I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that James D. Tatum, Tenant-In-Common, whose names is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of this instrument, executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal this the _20_ day of March, 1986.

                                          _James M. Edwards_
                                          Notary Public

My Commission Expires:

_10-27-87_

  (SEAL)


STATE OF ALABAMA        )

COUNTY OF MONTGOMERY    )

    I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that James B. Cofer, Tenant-In-Common, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of this instrument, executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal this the _20_ day of March, 1986.

                                          _James M. Edwards_
                                          Notary Public

My Commission Expires:

_10-27-87_

  (SEAL)

STATE OF ALABAMA                )

COUNTY OF MONTGOMERY             )

    I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Richard N. Cooper, Tenant-In-Common, whose name is signed to the foregoing instrument, and who is known to me, acknowledged before me on this day that, being informed of the contents of this instrument, executed the same voluntarily on the day the same bears date.

    Given under my hand and official seal this the _20_ day of March, 1986.

                                    _James M Edwards_
                                    Notary Public

My Commission Expires:

_12-27-?1_

    (SEAL)


STATE OF VIRGINIA                )

COUNTY OF _Henrico_              )

    I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that _Donald A. Chasen_ and _Benjamin B. Cummings, Jr._, whose names as _Asst. Vice President_ and _Asst. Secretary_ of Circuit City Stores, Inc., a Virginia corporation, are signed to the foregoing instrument, and who are known to me, acknowledged before me on this day that, being informed of the contents of this instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this the _21st_ day of March, 1986.

                                    _Barbara B. Corson_
                                  Notary Public

My Commission Expires:

_8-15-89_

    (SEAL)

STATE OF GEORGIA        )

COUNTY OF _FULTON_     )

    I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that ___RICHARD B. MEANS___ and ___ROBERT W. THOMAS___, whose names as ___PRESIDENT___ and ___VICE-PRESIDENT___ of Congressional Mortgage Corp. of Georgia, are signed to the foregoing instrument, and who are known to me, acknowledged before me on this day that, being informed of the contents of this instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this the _22_ day of March, 1986.

                                        _James H K_____
                                          Notary Public

**My Commission Expires:**
Notary Public, Georgia, State at Large
My Commission Expires October 17, 1990

    (SEAL)

STATE OF ALABAMA

COUNTY OF MOBILE

## CIRCUIT CITY
## SUPPLEMENTAL AGREEMENT

THIS SUPPLEMENTAL AGREEMENT, made as of this 25 day of March, 1986, by and between MOBILE FESTIVAL ASSOCIATES, TIC (composed of James D. Tatum, James B. Cofer and Richard N. Cooper, as tenants-in-common), (hereinafter called "Developer") and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter called "Circuit City");

### W I T N E S S E T H:

WHEREAS, the parties hereto have concurrently herewith executed an agreement entitled Construction, Operating and Reciprocal Easement Agreement (hereinafter referred to as the "Operating Agreement") providing for, inter alia, the construction and operation of a community shopping center known as Mobile Festival Centre; and

WHEREAS, the parties hereto wish to supplement the Operating Agreement and further to define certain obligations of Developer and Circuit City as set out in said Operating Agreement;

NOW, THEREFORE, in consideration of the foregoing mutual covenants, the parties hereto agree as follows:

1. **TERMS OF OPERATING AGREEMENT.** The terms defined in the Operating Agreement shall have the same meaning in this Supplemental Agreement.

2. **EXTERIOR MATERIAL AND APPEARANCE.** The exterior materials and appearance of the Circuit City Building shall conform to Exhibit A attached hereto and made a part hereof and the exterior materials and appearance of the Developer Buildings shall conform to Exhibit B attached hereto and made a part hereof. The parties agree not to make any material change in the exterior appearance or materials of their respective Buildings without the consent of the other, which consent shall not be unreasonably withheld or delayed.

3. **OFF-SITE/ON-SITE WORK AND CIRCUIT CITY PAD.** Developer agrees to design and construct the Off-Site Work and the On-Site Work for the Complete Site, all of which is more particularly set forth on Exhibit "C", incorporated herein by reference and made a part hereof the same as if typed herein. Further, Developer shall prepare the Circuit City pad capable of supporting the Circuit City Building as described in Circuit City's preliminary plans and specifications, without the need for Circuit City to use pylons or special footings which would substantially increase the costs for the foundation of the Circuit City Building. Circuit City agrees to pay to Developer the lesser of: (i) $300,000 or (ii) its prorata share of all of the costs of such Off-Site/On-Site Work and the preparation of the Circuit City Pad which costs shall include, but shall not be limited to, architect and engineering fees and expenses, surcharging and backfilling the Complete Site, the cost of installing utilities, landscaping, grading, paving, striping, lighting and curbing and other costs incurred with respect to such work. Circuit City's

A4 to A4

prorata share shall be determined by multiplying such costs by a fraction the numerator of which shall be the Floor Area of the Circuit City Building and the denominator of which shall be the Floor Area of the Circuit City Building and the Developer Buildings (including any Future Building Areas).

Circuit City's share of such costs, as determined above, shall be paid in monthly installments within thirty (30) days of the date Developer notifies Circuit City in writing certifying the percentage and amount of the work completed together with a copy of all invoices and a certificate of the Project Architect stating that all such work has been completed in accordance with the plans and specifications therefor. Circuit City shall pay the amount so billed by Developer less a ten percent (10%) retainage. Within thirty (30) days of the date Developer sends the final notice of completion of such work, together with a certificate of the Project Architect stating that the On/Off Site/On-Site Work and the Circuit City Pad have been completed in accordance with the plans and specifications therefor, Circuit City shall pay the amount remaining due plus all retainage.

4. **DEVELOPER'S PYLON SIGN.** (a) Developer shall construct a Shopping Center pylon sign at the location shown on the Plot Plan attached to the Operating Agreement and Circuit City shall pay its prorata share of the cost of such pylon. Such cost shall include but shall not be limited to all architectural fees and expenses and all other expenses of constructing and erecting such pylon. Circuit City's prorata share shall be determined by multiplying such costs by a fraction the numerator of which is the square footage of the face of the Circuit City sign panel and the denominator of which is the square footage of the face of all sign panels on the pylon. Circuit City shall be entitled to maintain a sign panel on said pylon equal in size to other major tenants in the Shopping Center and of the design attached hereto as Exhibit D and by this reference made a part hereof.

(b) Developer shall also place a pylon sign along Montlimar Drive in the location shown on the Plot Plan attached to the Operating Agreement. Developer covenants that (i) such pylon sign shall be subject to mutually agreeable placement and shall not unreasonably interfere with the visibility of the Circuit City Building and (ii) Developer shall not relocate such pylon sign or locate any additional pylon sign along Montlimar Drive without the approval of Circuit City, which approval shall not be unreasonably withheld or delayed.

5. **COMMON AREA MAINTENANCE AND CONTRIBUTION.** Commencing with the opening of the Circuit City Building for business to the public and for the term of the Operating Agreement, Developer agrees that it will perform all the maintenance, as that term is defined in Section 8.4 of the Operating Agreement, of the parking spaces, walkways, roadways, outdoor service areas and all other common facilities and improvements on the Developer Site for which Circuit City agrees to pay to Developer its pro-rata share of Developer's Expense as hereinafter defined incurred in the performance of said maintenance in the proportion that the Floor Area of the Circuit City Building bears to the total Floor Area of the Floor Area of the Circuit City Building and the Developer Buildings.

Such payment shall be made on the first day of each month (the monthly payments to be estimated with an adjustment at the end of each calendar year as hereinafter set forth), commencing with the first day of the month

2

A4 to A4

following the date Circuit City opens the Circuit City Building for retail business pursuant to Section 5.2 of the Operating Agreement (such date being herein after referred to as "Opening Date") and continuing thereafter for the period Developer is so obligated and so long as Developer is satisfying its maintenance obligations as set forth under the Operating Agreement and this Agreement; provided that Circuit City shall not be deemed in default so long as Developer receives such payment by the 15th of each month.

Prior to the Opening Date and January 1 of each calendar year thereafter during which Developer is obligated to maintain the common facilities and improvements Developer shall provide Circuit City with an estimate of the Developer's Expense and Circuit City's share hereof; thereafter, Circuit City's share of such estimated Developer's Expense shall be paid in equal monthly installments, due and payable on the first day of each month; provided that Circuit City shall not be deemed in default so long as Developer receives such payment by the 15th of each month.

By March 15, 1987 and by March 15 of each calendar year following a calendar year during which Developer is obligated to maintain the common facilities and improvements Developer shall furnish to Circuit City a statement of Circuit City's share of actual Developer's Expense for the previous calendar year. A lump sum payment will be made from Circuit City to Developer, or, as the case may be, from Developer to Circuit City, within thirty (30) days after the delivery of such statement equal to the difference between Circuit City's share of actual Developer's Expense and Circuit City's share of the estimated Developer's Expense actually paid for the previous calendar year. Developer shall maintain records evidencing the Developer's Expenses for a period of three (3) years from the close of each year. Circuit City shall have the right to audit said records during normal business hours and in the event an inaccuracy is disclosed, an adjustment shall be made. In the event the required adjustment arises from an overstatement of Developer's Expense in excess of three (3) percent, Developer shall reimburse Circuit City for Circuit City's reasonable expense incurred in establishing the inaccuracy.

As used herein the term "Developer's Expense" shall mean all reasonable and proper costs and expenses of operating and maintaining the Common Areas (including compensation of on-site managers and on-site administrative personnel) in a manner consistent with a first class shopping center and in an amount consistent with that incurred for the maintenance of similar shopping centers; provided, however, there shall be excluded from the calculation of "Developer's Expense" the following items: real estate taxes, fees or dues for merchants or other tenant associations, cost of repairs, maintenance or replacements of or to any buildings, utility systems or truck docks and ramps or customer pick-up areas of any other tenant or occupant of the Shopping Center, repairs or replacements necessitated by the negligence or wrongful action of Developer that were made to correct any condition in existence prior to the date hereof, amounts paid to entities related to Developer in excess of the cost of such services from any competitive source, amounts reimbursable from insurance proceeds or by any tenant in the shopping center other than pursuant to a common area expense provision similar to this paragraph, repairs or replacements of a capital nature unless the costs of same are amortized over the useful life of such repairs or replacements, trash and rubbish collection and disposal from other tenants of the shopping center, depreciation, amortization other than as set

3

forth above, interest, or overhead or profit to the extent such overhead or profit exceeds, in the aggregate, 5% of the balance of Developer's Expense.

If Circuit City is not satisfied as to the correctness of such statement as submitted by Developer, then Circuit City may, at its sole expense, upon prior written notice to Developer, have the same audited. Said audit shall be made at reasonable times during business hours and in a manner which shall not interfere unreasonably with the conduct of Developer's business or operation of the Shopping Center. At the conclusion of such audit, if the results differ from Developer's statement of Circuit City's share of Developer's Expense for such year, any and all conflicts or inconsistencies shall be resolved by the parties. Developer and Circuit City each agree to pay promptly any discrepancy as conclusively determined.

In the event Developer fails to perform any of the maintenance required hereunder and such failure continues for a period of thirty (30) days after written notice from Circuit City, Circuit City may, but shall not be so required, cure such default and offset the cost thereof against Circuit City's contribution required by this Section 5.

6. **CIRCUIT CITY TRUCK RAMP, LOADING DOCK AND CUSTOMER PICK-UP AREA.** The parties recognize that all or a portion of the truck ramp, loading dock and/or customer pick-up area serving the Circuit City Building may be located within the Common Areas on the Developer Site. However, notwithstanding anything herein or in the Operating Agreement to the contrary, Circuit City agrees, at its sole cost and expense, to maintain and repair the truck ramp, loading dock and customer pick-up area serving the Circuit City Building and Developer shall have no responsibility or liability with respect thereto.

7. **PROMOTIONAL SERVICES ASSOCIATION.** Notwithstanding anything in Article VI of the Operating Agreement to the contrary, commencing with the date of the opening for business of the Circuit City Building, Circuit City agrees to join in the Promotional Services Association (or similar association) formed by the Developer and to remain a member thereof for the period that Circuit City is operating in the Circuit City Building, provided:

    (a) All other tenants or occupants of the Shopping Center are also members.

    (b) The sole purpose of the Promotional Services Association is the promotion and advertising of Mobile Festival Centre to the general public in the trade area of Mobile Festival Centre.

Circuit City agrees to pay to Developer for the Promotional Services Association, an annual sum, in equal monthly installments, equal to the product of the multiplication of the Floor Area of Circuit City's Building times ten cents ($.10). Said sum shall be due and payable on the first day of each month but Circuit City shall not be deemed in default so long as Developer receives such payment by the 15th day of each month.

8. **RESTRICTIONS.** Developer covenants that, so long as Circuit City shall be operating: there shall be no other tenant, with a Floor Area in

4

A4 to A4

excess of 7500 square feet, in the Shopping Center whose business is devoted primarily to the sale of electronics.

9. **LIMITED LIABILITY OF DEVELOPER.** Anything herein stated to the contrary notwithstanding, Circuit City agrees that any and all liability of Developer hereunder shall be subject to and governed by the provisions of Section 18.17 of the Operating Agreement.

10. **DEFAULT.** The parties hereto agree that any default occurring under this Supplemental Agreement and any default occurring under the Operating Agreement shall be deemed to be and constitute a default of the other agreement and any default hereunder shall be subject to and governed by Article XVI of the Operating Agreement. Further, the non-defaulting party shall have all other remedies available to such party at law or in equity.

11. **REQUIREMENT OF REASONABLE CONSENT.** Notwithstanding anythin herein or in the Operating Agreement to the contrary, any provision requiring the consent of either party hereto shall be deemed to require, as between Circuit City and Developer, that (unless expressly stated herein or therein to the contrary) such consent shall not be unreasonably withheld or delayed.

12. **TERMINATION.** This Agreement shall terminate upon the expiration of the Operating Agreement, or upon the sooner termination of the Operating Agreement as provided in the Operating Agreement.

13. **SUPPLEMENTAL AGREEMENT SHALL GOVERN.** To the extent that the provisions of this Supplemental Agreement and the provisions of the Operating Agreement are inconsistent, as between the parties hereto, the provisions of the Supplemental Agreement shall govern.

14. **SUCCESSORS, HEIRS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the respective heirs, legal representatives, successors and assigns with the parties hereto.

(CIRCUIT CITY)

ATTEST:                                    CIRCUIT CITY STORES, INC., a
                                           corporation

By: _B.B. Cumming Jr._                     By: _Ronald L. Chasen_

Its: _Ass't Secretary_                     Its: _ASS'T. VICE PRESIDENT_

(DEVELOPER)

MOBILE FESTIVAL ASSOCIATES, TIC

_James D. Tatum_
James D. Tatum, Tenant-In-Common

_James B. Cofer_
James B. Cofer, Tenant-In-Common

_Richard N. Cooper_
Richard N. Cooper, Tenant-In-Common

5

A4 to A4

STATE OF _Virginia_ )

COUNTY OF _Henrico_ )

I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that _Donald L. Chasen_ and _Benjamin B. Cummings, Jr_, whose names as _Asst. Vice President_ and _Asst. Secretary_ of Circuit City Stores, Inc., a corporation, are signed to the foregoing instrument, and who are known to me, acknowledged before me on this day that, being informed of the contents of this instrument, they, as such officers and with full authority, executed the same voluntarily for and as the act of said corporation.

Given under my hand and official seal this the _21st_ day of _March_, 1986.

_Barbara B Corson_
Notary Public

My Commission Expires:

_8-15-89_

(SEAL)


STATE OF _Alabama_ )

COUNTY OF _Montgomery_ )

I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that James D. Tatum, James B. Cofer and Richard N. Cooper, Tenants-In-Common of Mobile Festival Associates, TIC, are signed to the foregoing instrument, and who are known to me acknowledged before me on this day that, being informed of the contents of this instrument, they, as such Tenants-In-Common and with full authority executed the same voluntarily for and as the act of Mobile Festival Associates, TIC.

Given under my hand and official seal this the _2n_ day of _March_, 1986.

_James M. Edwards_
Notary Public

My Commission Expires:

_12-27-87_

(SEAL)

6

A4 to A4