UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CIRCUIT CITY STORES, INC., et al., | ) | Case No. **08-35653** |
| | ) | |
| Debtors. | ) | Jointly Administered |

**SAFECO INSURANCE COMPANY OF AMERICA'S OBJECTION TO
DEBTOR'S MOTION FOR ENTRY OF ORDER PURSUANT TO BANKRUPTCY
CODE SECTIONS 105(A), 362(D)(1), AND 365(A), AND BANKRUPTCY RULES 4001
AND 6006, AND LOCAL BANKRUPTCY RULE 4001, (I) AUTHORIZING REJECTION
OF SURETY BONDS, (II) MODIFYING THE AUTOMATIC STAY FOR THE LIMITED
PURPOSE OF ALLOWING SAFECO INSURANCE COMPANY OF AMERICA TO
COMMENCE CANCELLATION OF SURETY BONDS, (III) ESTABLISHING SURETY
BOND CLAIM DEADLINE, AND (IV) GRANTING RELATED RELIEF**

Now comes Safeco Insurance Company of America[1] (hereinafter referred to as

"Safeco"), by Troy Savenko, Esquire and Gregory Kaplan, PLC, its attorneys, and files this

Objection to Circuit City Stores, Inc.'s[2] (hereinafter collectively referred to as the "Debtor")

Motion for Entry of Order Pursuant to Bankruptcy Code Sections 105(A), 362(D)(1), and

365(A), and Bankruptcy Rules 4001 and 6006, and Local Bankruptcy Rule 4001, (I) Authorizing

Rejection of Surety Bonds, (II) Modifying the Automatic Stay for the Limited Purpose of

Allowing Safeco Insurance Company of America to Commence Cancellation of Surety Bonds,

(III) Establishing Surety Bond Claim Deadline, and (IV) Granting Related Relief (hereinafter,

the "Motion") [Docket No. 5114], and in support thereof states as follows:

---

[1]     For the purposes of this Objection, Safeco Insurance Company of America shall also include General Insurance Company of America, First National Insurance Company of America, Safeco National Insurance Company, Liberty Mutual Surety, and any of its or their parents, affiliates, subsidiaries and/or successors and assigns, and others as defined in the Agreement of Indemnity attached as Exhibit 1 hereto.

[2]     The movants are Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., InterTAN, Inc., Ventoux International, Inc., Circuit City Purchasing Company, LLC, CC Aviation, LLC, CC Distribution Company of Virginia, Inc., Circuit City Properties, LLC, Kinzer Technology, LLC, Abbott Advertising Agency, Inc., Patapsco Designs, Inc., Sky Venture Corp., PRAHS, Inc., XSStuff, LLC, Mayland MN, LLC, Courchevel, LLC, Orbyx Electronics, LLC and Circuit City Stores PR, LLC.

## PRELIMINARY STATEMENT

In the guise of a simple Motion to cancel outstanding Surety Bonds, the Debtor seeks to: (1) summarily sweep aside, with inadequate, little or no notice, the contractual and statutory rights of third party obligees and claimants in Surety Bonds that are not property of the bankruptcy estate, including the rights of the U. S. Department of Homeland Security, Bureau of Customs and Border Protection ("Customs") and unidentified and unknown third parties to whom no notice can or will be provided; (2) strip, another third party, Safeco, of the collateral it is holding to secure its exposure under the various Surety Bonds it has issued at the Debtor's request and to secure the reimbursement and indemnification that Safeco is entitled to under its indemnity agreement with the Debtor; and (3) control collateral provided to Safeco that is not property of the bankruptcy estate.  This extraordinary relief is sought without citation to any legal authority other than 11 U.S.C. § 105 and is in contravention to the well established and existing case law and Bankruptcy Code provisions.  For the reasons discussed herein, the Motion must be denied because: (1) the Debtor seeks to control the disposition of the proceeds of a Letter of Credit which are not property of the estate; (2) the relief sought by the Debtor is not within the authority of this Court to grant; and (3) the proceeds of the Letter of Credit are protected by 11 U.S.C. § 506 (d) as collateral securing Safeco's claims.  The law, fairness and equity mandate that this Court deny the Debtor's Motion.

## BACKGROUND

In the Motion, the Debtor attempts to consolidate and lump together all open Safeco Surety Bonds into one homogenous group and apply one course of action to all in total disregard for the varying types, nature and purposes of the Surety Bonds at issue and in total disregard for the applicable law, facts and circumstances which surround the various Surety Bonds.  In order to understand the fallacy of the Debtor's misguided approach, it is necessary to discuss in some

detail the nature of suretyship, the nature of the specific Safeco Surety Bonds, and the impact such issues have on the Debtor's Motion.

### A. <u>Suretyship Generally</u>.

Suretyship is an ancient undertaking long recognized and long favored by the law. At its most basic level, a surety is defined as one who contracts to answer for the debt or default of another. The "principal" is the party that is primarily obligated on the undertaking (in this case, the Debtor) and the "surety" is the party that is secondarily obligated (in this case, Safeco). The "obligee" is the party to whom both the principal and the surety are obligated. Suretyship is a form of performance guaranty under which the surety suffers a loss by its performance of the principal's obligations <u>only</u> if the principal fails to perform its obligations and is then unable to exonerate the surety and/or to reimburse the surety for the surety's losses. The surety, in effect, provides its financial strength and credit on behalf of its principal and in favor of the obligee to secure the principal's performance.

Numerous statutes require that surety bonds be issued in a variety of circumstances. Thus, by providing the required bonds, sureties facilitate and stabilize the operation of various industries, including commercial and retail, and effectuate public policy by providing performance protection for the governmental "obligee" and performance protection in the form of payment for the potential "claimants." The surety's bonds are a tripartite agreement, creating obligations among the principal, the obligee and the surety, and to potential claimants as well.

Suretyship is not insurance. In exchange for issuing its bonds, the surety traditionally looks to the principal for exoneration, indemnification and reimbursement for any surety losses arising under the bonds. Indeed, the bonds are issued based upon the underwriting assumption that the surety will be made whole and not incur any losses, and that the principal will protect the

surety by contract and under the law and equity from loss, either before or after the surety incurs the loss.

In this case, on July 9, 1992, the Debtor and Safeco entered into a General Agreement of Indemnity ("Indemnity Agreement"). See Exhibit 1. The express and stated purpose of the Indemnity Agreement was to obligate the Debtor to indemnify Safeco from all loss and expense in connection with any bonds. Id. The Indemnity Agreement provides:

> INDEMNITY TO SURETY: The Undersigned Corporation agrees to pay to Surety upon demand all loss and expense, including reasonable attorney's fees incurred by surety by reason of having executed any Bond.

Exhibit 1.

The Indemnity Agreement further provides:

> The Undersigned Corporation will on request of Surety procure the discharge of Surety from any Bond and all liability by reason thereof. If such discharge is unattainable, the Undersigned Corporation will, if requested by Surety, either deposit collateral with Surety, acceptable to Surety, sufficient to cover all exposure under such Bonds or make provisions acceptable to Surety for the funding of the bonded obligations.

Id. at ¶4.

Indemnity Agreements and provisions like those referenced above are common between principals and sureties and serve to induce the execution of bonds, and such provisions are uniformly sustained and upheld by the Courts. Fidelity & Deposit Co. of Md. v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160, 1163 (4th Cir. 1983); Cincinnati Ins. Co. v. American Glass Industries, 2008 WL 4642228, 4 (E.D. Va. 2008).[3]

---

[3]     See also Com'l Ins. Co. of Newark v. Pacific-Peru Const., 558 F.2d 948, 953 (9th Cir. 1977); Transamerica Insurance Company v. Bloomfield, 401 F.2d 357, 362-63 (6th Cir. 1968); Engbrock v. Federal Insurance Company, 370 F.2d 784, 786 (5th Cir. 1967); American Surety Co. of New York v. Inmon, 187 F.2d 784, 786 (5th Cir. 1951); United States Fidelity & Guaranty Co. v. Jones, 87 F.2d 346, 348 (5th Cir. 1937); Carroll v. National Surety Co., 58 App. D.C. 3, 24 F.2d 268, 270-71 (D.C. Cir. 1928); National Surety Corporation v. Peoples Milling Co., 57 F. Supp. 281, 282-83 (W.D. Ky. 1944); Martin v. Lyons, 98 Idaho 102, 558 P.2d 1063, 1066 (1977); Central Surety &

B.      **The Letter of Credit**.

Pursuant to the requirements of the Indemnity Agreement, Safeco demanded that the Debtor provide security for the bonded obligations.  On July 14, 2008, at the application of Debtor, the Bank of America, N.A. ("Bank of America") issued an Irrevocable Standby Letter of Credit (No. 64038907) in the amount of $2,700,000.00 (the "Letter of Credit").  See Exhibit 2. The Letter of Credit had an expiration date of July 11, 2009, with automatic renewal for successive one year periods subject to notification of non-renewal.  Id.  On October 3, 2008, in exchange for consideration, by Amendment Number 1, the Letter of Credit was increased by the Bank of America by the amount of $2,700,000.00, with the aggregate amount of the Letter of Credit becoming $5,400,000.00.  See Exhibit 3.  On November 5, 2008, in exchange for consideration, by Amendment Number 2, the Letter of Credit was increased by the Bank of America by the amount of $300,000.00, with the aggregate amount of the Letter of Credit becoming $5,700,000.00.  See Exhibit 4.  Under the terms of Amendments Number 1 and 2, "all other terms and conditions remain unchanged" from the terms in the original Letter of Credit dated July 14, 2008.

The Letter of Credit provided that "[w]e warrant to you that all your drafts under this Irrevocable Letter of Credit will be duly honored upon presentation of your draft on us . . . on or before the expiration date . . ."  Id.  The Letter of Credit further provided that "[e]xcept as stated herein, this Irrevocable Letter of Credit is not subject to any condition or qualification and is our individual obligation which is in no way contingent upon reimbursement."  Id. (emphasis

---

Insurance Corporation v. Martin, 224 S.W.2d 773, 779 (Tex. Civ. App. 1949); Massachusetts Bonding & Insurance Co. v. Gautieri, 69 R.I. 70, 30 A.2d 848, 850 (1943).

added).[4]  Safeco only needed to provide a sight draft to Bank of America to draw down on the

Letter of Credit without the necessity or requirement of meeting any conditions or satisfying any

terms.  On April 23, 2009, with the Debtor's knowledge, Safeco presented a sight draft to Bank

of America and drew down on the Letter of Credit in the amount of $1,000,000.00.

Subsequently, Safeco received notice that the Bank of America did not intend to renew the Letter

of Credit and that the Letter of Credit would expire on July 11, 2009.  Accordingly, in order to

preserve its collateral, Safeco presented a second sight draft to Bank of America in the amount of

$4,700,000.00 to draw down the entire remaining amount of the Letter of Credit.

### C.  **The Surety Bonds.**

As the Court is aware, the Debtor operated retail electronic stores throughout the United

States and Puerto Rico.  To facilitate the Debtor's nationwide operations, the Debtor was

required to provide various surety bonds for different aspects of its business.  Induced by and in

reliance upon the Indemnity Agreement, Safeco, as surety, issued numerous bonds over many

years for the Debtor, as principal.  Indeed, at the time of filing of this bankruptcy proceeding,

Safeco had outstanding a total of at least 101 surety bonds (the "Surety Bonds").  See Exhibit B

to the Motion.  The total amount of potential liability of Safeco under all of the Surety Bonds

was in excess of $9,637,123.27.  In the Motion, the Debtor presents a simplistic attempt to treat

all the Surety Bonds as if they were a single uniform obligation.  In fact, the Surety Bonds have

different terms and conditions, different potential claimants, and obligate Safeco for a variety of

different risks and exposures in varying amounts.  Not only do the terms of the Surety Bonds

define Safeco's risk of loss, but frequently statutes, codes, regulations, case law and other

contracts and agreements, either described or not described in the Surety Bonds, may affect

---

[4]        The Letter of Credit stated no other conditions.  The Letter of Credit was subject to the Uniform Customs
and Practice for Documentary Credits (July 1, 2007 Revision), International Chamber of Commerce, Publication
No. 600, however such provisions did not limit or condition Safeco's ability to draw down on the Letter of Credit.

Safeco's risk of loss. The Debtor has utterly failed to mention or analyze the impact of the varying nature of Safeco's obligations under the Surety Bonds in its Motion. Accordingly, in order to fully address this Motion, a brief discussion of the Surety Bonds, including the ability of the Debtor and Safeco to cancel any particular Surety Bond, the possible claimants under the Surety Bonds, the applicable statutes of limitations for bringing claims against Safeco under the Surety Bonds, and the continuing Safeco risk of loss under the Surety Bonds is necessary.

### D.    The Types of Surety Bonds.

There are many kinds of Surety Bonds described on Exhibit B to the Motion. A majority of the 101 Surety Bonds (56 Surety Bonds) are listed as "utility bonds" ("Utility Bonds"), which are Surety Bonds that provide financial protection to those entities who supply electric, gas, water and other such services to the Debtor (both pre-petition and post-petition). Utility Bonds generally have one obligee, and that obligee should be the only entity that may have a claim against the Utility Bond. Utility Bonds are also generally cancelable pursuant to the terms of the Utility Bond, frequently requiring 30 to 60 days notice to the obligee before the cancellation is effective. Safeco may be obligated to pay any claimant on the Utility Bond for up to the penal sum of the Utility Bond for any valid claims arising up to and including the Cancellation Effective Date of the Utility Bond. Cancellation of the Utility Bond does not extinguish liability for accrued charges and services incurred prior to the Cancellation Effective Date.

Most of the remaining Surety Bonds are license bonds that allow the Debtor to operate its business and/or perform work required by its business. Many of these Surety Bonds are described as a "license to do business" Surety Bond in the description, but these Surety Bonds also include such Surety Bonds as "Home Warranty Bonds", "Permit Bonds", "Contractors Bonds", and other obligations. There are also Surety Bonds to ensure the Debtor's payment of taxes, road charges (Maine, Massachusetts, New York and Pennsylvania, for example), and

others.    Finally, there is one Importer Bond to the U. S. Customs Service, Department of Homeland Security ("Customs") in the face penal sum of $1,000,000 which raises many issues with respect to the relief that the Debtor requests in its Motion as set forth below.

Many of these remaining Surety Bonds are cancelable, either according to the terms of the Surety Bond or pursuant to statute or regulations.    However, not all of the Surety Bonds can be cancelled, and Safeco will remain liable under those Surety Bonds until the later of the expiration of any such Surety Bond and the expiration of the applicable statute of limitations with respect to those Surety Bonds.    Even for those Surety Bonds that can be cancelled, federal (in the case of the Importer Bond) or state law determines when the statute of limitations will run on any claim against the Safeco Surety Bonds.    For example, the statute of limitations for the Importer Bond is six years.    See 28 U.S.C. § 2415.

> ### a.    The Claimants under the Surety Bonds.

With respect to the Utility Bonds, it is quite clear that the only claimant that has a right to make a claim against the Utility Bond should be the named obligee under the Utility Bond who has provided the service to the Debtor and remains unpaid.    Presently, Safeco has paid or may be obligated to pay up to $1,000,000 as a result of current claims against Safeco's Surety Bonds, and the bulk of the claims have been against the Utility Bonds.    Safeco continues to receive claims from obligees who have both pre-petition and post-petition claims against the Utility Bonds (either because they failed to make a claim against the Utility Blocked Account established by the Debtor or opted out of the Utility Blocked Account).    Regardless of a Utility Bond obligee's rights against the Utility Blocked Account, Safeco still faces claims against its Utility Bonds.    Those claims can be made for a period of time governed by the applicable statute of limitations for any claims against a surety bond that arise on or before the Cancellation Effective Date of the relevant Utility Bond.

The Debtor's Motion proposes the establishment of a Surety Bond Claim Deadline which will limit claims against the Safeco Surety Bonds after a specific date (60 days after the Cancellation Effective Date). Because there can normally only be one claimant, the obligee, under a Utility Bond, providing such an obligee with notice of the Surety Bond Claim Deadline may reach the only affected party. Nevertheless, the failure to confirm that notice of the Surety Bond Claim Deadline has been served on any particular obligee under a Utility Bond raises the risk that Safeco may face a claim against the Utility Bond by such an obligee. Safeco may then have the burden (and expense) to prove in any subsequent litigation: (a) that the Utility Bond obligee received notice of the Surety Bond Claim Deadline (and that such a Surety Bond Claim Deadline would be effective and binding upon the Utility Bond obligee); and (b) that Safeco has a defense to the obligee's claim due to the fact that Safeco was prejudiced with respect to the obligee's claim because of the obligee's failure to file its claim by the Surety Bond Claim Deadline, thereby resulting in Safeco's "required" release of a portion of the Safeco Letter of Credit proceeds equal to the penal sum of the Utility Bond as the Debtor requests pursuant to the Motion and in accordance with the Debtor's requested court order.

While many of the license and permit type bonds may name a particular state or local government entity as the obligee, either pursuant to the terms of the Surety Bond or state or local statute, code or regulation, or case law interpreting those statutes, codes or regulations, the claimants under the Surety Bond may be expanded to include those third party entities and individuals who are harmed by the Debtor's failure to perform or do what was required for which the Surety Bond was issued. Those third parties may have the ability to make a claim under such a Surety Bond. Therefore, while such a Surety Bond may be cancelled, the ability to determine who can make a claim under the Surety Bond is totally unclear and unknown. There is no effective way that this Court can give notice to all of the potential third party claimants under

some of the Safeco Surety Bonds that might release Safeco from further liability to those unknown and unnoticed claimants under those Surety Bonds.

Furthermore, without such effective notice (or even with such notice because the requested relief is outside the authority of the Court as discussed below), Safeco, pursuant to the requested Debtor relief, may be ordered to return to the Debtor a portion of the Safeco Letter of Credit proceeds despite the fact that all potential claimants, whether they are obligees under the Surety Bonds or third party claimants under the Surety Bonds, may not have received notice of the Surety Bond Claim Deadline and may still have a cause of action against Safeco pursuant to the applicable statute of limitations for damages under the relevant Surety Bond. The Debtor's Motion completely fails to address this issue.

### b. **The Importer Bond.**

As part of its retail business operations, the Debtor sold goods and merchandise that it imported from foreign countries. During the importation process, certain duties, taxes and other charges are imposed by Customs against the imported goods and merchandise. In order to ensure that the Debtor pays the duties, taxes and other charges, Customs required that the Debtor, and its surety, provide an Importer Bond. 19 U.S.C. § 1499.

The Secretary of the Treasury is authorized to require by regulation such an Importer Bond as he or she deems necessary for Customs' protection, including the collection of revenue. 19 U.S.C. § 1623. The Code of Federal Regulations, 19 C.F.R. §113.0 et seq., sets forth the general provisions with respect to any such Importer Bonds. When an entity such as the Debtor wants to secure multiple transactions relating to the importation or entry of goods and merchandise into the United States, Customs requires a continuous bond. 19 C.F.R. § 113.12(b).

In order to meet the Customs' continuous bond requirement, the Debtor and Safeco executed the Importer Bond dated June 9, 2005 (Safeco Surety Bond #6327553 and Customs

Bond #9905E4843) in the penal sum of $1,000,000.  A copy of the Importer Bond is attached hereto as Exhibit 5.[5]  The Importer Bond provides that the Customs Regulations are incorporated by reference into the Importer Bond and that the Debtor and Safeco are bound by the Customs Regulations.  Id.  The Importer Bond covers and secures any duties, taxes and other charges imposed or estimated to be due at the time of the importation and release from Customs of the imported goods and merchandise.  Id.  Furthermore, the Importer Bond secures the payment of any additional duties, taxes and other charges subsequently found due, legally fixed and imposed on any imported goods and merchandise.  19 C.F.R. § 113.62(a).

As a continuous bond, the Importer Bond has an effective date of June 9, 2005 pursuant to 19 C.F.R. § 113.26(c), and the penal sum of the Importer Bond of $1,000,000 per year is renewable for one year periods.  The Importer Bond provides:

> This bond remains in force for one year beginning with the effective date and for each succeeding annual period, or until terminated.  This bond constitutes a separate bond for each period in the amounts listed below for liabilities that accrue in each period.  The intention to terminate this bond must be conveyed within the period and manner prescribed in the Customs Regulations.

Exhibit 5.

As a result, the Importer Bond is a continuous bond in the penal sum of $1,000,000 for the period of June 9, 2005 through June 8, 2006; June 9, 2006 through June 8, 2007; June 9, 2007 through June 8, 2008; June 9, 2008 through June 8, 2009; and June 9, 2009 through June 8, 2010.  Therefore, for the period of June 9, 2005 through June 8, 2006, the Importer Bond constitutes a separate continuous Importer Bond in the penal amount of $1,000,000 covering any claims that Customs may have against the Importer Bond during that period.  In summary, for

---

[5]    Debtor and Safeco wrote an Importer Bond prior to June 9, 2005 in the penal sum of $200,000, but Customs subsequently required an increase in the penal sum to $1,000,000 due to the increased duties, taxes and other charges resulting from Circuit City's increase in the amount of the imported goods and merchandise.

the period of June 9, 2005 through October, 2009, notwithstanding the fact that the Debtor has

ceased its business operations, Safeco's potential liability to Customs under the Importer Bond is

for five years, or a total risk and exposure of $5,000,000 (not including the continuous penal

sums of the Safeco Importer Bonds issued prior to the current Importer Bond on June 9, 2005).[6]

Pursuant to 19 C.F.R. § 113.27(b), a surety may, with or without the consent of the

principal,[7] terminate its obligations under a continuous bond by providing reasonable written

notice to Customs. The written notice must state the date upon which the termination shall be

effective, and must be mailed both to Customs and the principal by certified mail, with a return

receipt requested. The Importer Bond provides that the "intention to terminate this bond must be

conveyed within the time period and manner prescribed in the Customs Regulations." In the

event of Safeco's termination of the Importer Bond:

> 1.      Safeco remains liable on the terminated Importer Bond for obligations incurred prior to the termination (19 C.F.R. § 113.3); and
> 2.      Upon the termination of the Importer Bond, no new Customs transactions may be charged against the Importer Bond (19 C.F.R. § 113.27(c)).

## ARGUMENT

As required by the Indemnity Agreement, the Debtor posted collateral in the amount of

$5,700,000.00 in the form of the Letter of Credit. However, the amount of the collateral does not

fully cover Safeco's potential exposure under the Surety Bonds issued for the Debtor, which

exposure totals $9,637,123.27, and this amount does not include unpaid premiums, attorneys'

fees, costs and expense incurred by reason of Safeco's having issued the Surety Bonds for which

---

[6]      See American Motorists Ins. Co. v. Pennsylvania Beads Corp., 983 F. Supp. 437, 440 (S.D.N.Y. 1997); U.S. v. Washington International Insurance Co., 177 F. Supp.2d 1313, 1315 n. 1 (Ct. Int'l Trade 2001) recognizing the stacking liability of importer bonds.

[7]      The Motion requests relief from the automatic stay in order for the Debtor and Safeco to take action to cancel the Importer Bond pursuant to 19 C.F.R. § 113.27(b).

the Debtor is liable pursuant to the Indemnity Agreement.  The Debtor proposes to create a

Surety Bond Claim Deadline after which, according to the Debtor, no claims will be permitted

against the Surety Bonds.   Pursuant to the Debtor's Motion, once the Surety Bond Claim

Deadline expires and any claims are paid, Safeco will be required to turnover to the Debtor the

Letter of Credit proceeds in the amount of the face amounts of the penal sums of the relevant

Surety Bonds.  The Debtor's only support for this requested relief is 11 U.S.C. §105 (a).  As will

be discussed in greater detail herein, the Court does not have the authority to affect the rights of

one set of third parties to make claims against another third party, Safeco, under the Surety

Bonds.   Moreover, if the Court forces Safeco to relinquish its collateral, Safeco will not be

protected from claims made against the Surety Bonds from claimants who did not receive notice

of the Court's Order or claimants who did or will never receive notice of the Court's Order but

who then challenge the authority of the Court to issue such an Order.  In essence, the Debtor

seeks to strip Safeco of its collateral and expose Safeco to the risk of future claims based upon

the hope that the Debtor's requested relief is justified, without providing any legal analysis to the

Court to support its Motion.   This Court must not permit such action.

> **A.   Debtor's Motion Must Be Denied Because the Proceeds of the Letter
> of Credit Are Not Property of the Bankruptcy Estate.**

In the Motion, Debtor seeks return of the proceeds of the Letter of Credit from Safeco;

however, such proceeds are not property of the bankruptcy estate.  It is well settled that the

proceeds from a letter of credit do not constitute property of the estate under 11 U.S.C. § 541.

See Willis v. Celotex Corp., 978 F.2d 146, 148 n. 3  (4th Cir. 1992); Kellogg v. Blue Quail

Energy, Inc. (In re Compton Corp.), 831 F.2d 586, 589 (5th Cir. 1987); In re Oakwood Homes

Corp., 342 B.R. 59 (Bankr. D. Del. 2006); In re Spring Ford Indus., Inc., 338 B.R. 255 (E.D. Pa.

2006); In re Stonebridge Technologies, Inc., 430 F.3d 260 (5th Cir. 2005); In re W.L. Mead, Inc.,

42 B.R. 57 (Bankr. Ohio 1984); In re Leisure Dynamics, Inc., 33 B.R. 171 (Bankr. Minn. 1983);

In re North Shore & Central Illinois Freight Co., 30 B.R. 377 (Bankr. N.D. Ill. 1983); In re M.J.

Sales & Distributing Co., 25 B.R. 608 (Bankr. S.D.N.Y. 1982); In re Zenith Laboratories, Inc.,

104 B.R. 667 (Bankr. D.N.J. 1989).

A letter of credit is defined as "an engagement by an issuer, usually a bank, made at the
request of a customer for a fee, to honor a beneficiary's drafts or other demands for payment
upon satisfaction of the conditions set forth in the letter of credit."   Tudor Dev. Group, Inc. v.
United States Fid. & Guar. Co., 968 F.2d 357, 360 (3rd Cir. 1992).   A letter of credit arises from a
transaction involving three separate contracts.   Demczyk v. Mutual Life Ins. Co. (In re Graham
Square), 126 F.3d 823, 827 (6th Cir. 1997).   The first contract generally arises between a buyer
and seller; here, the Debtor, by offering its indemnity to Safeco under the Indemnity Agreement,
requested Safeco to issue the Surety Bonds to various of the Debtor's creditors/obligees to allow
the Debtor to pursue its business operations and goals.   The second contract arises between the
account party, here the Debtor, and the bank or issuer of the Letter of Credit, Bank of America in
this instance.   Finally, the third contract arises between the issuer, Bank of America, and the
beneficiary of the Letter of Credit, Safeco.   "The relationship between each pair of parties
involved in a letter of credit transaction is entirely independent, although each relationship is
necessary to support a letter of credit, somewhat like the three legs of a tripod."   P.A. Bergner &
Co. v. Bank One, N.A. (In re P.A. Bergner & Co.), 140 F.3d 1111, 1114 (7th Cir. 1998), cert.
denied 525 U.S. 964 (1998).   The independent nature of each of the three contracts involved in a
letter of credit transaction is known as the "independence principle," and this principle seeks to
preserve the viability of letters of credit, whose commercial purpose is to allow the beneficiary to
draw on the money before obtaining a judgment.   Indeed, it has been observed that "[t]he salient
feature of a letter of credit and the principal reason for its use in commercial transactions is the

'independence principle,'" <u>Tudor Dev. Group</u>, 968 F.2d at 360, and strict adherence to this principle "is necessary to protect the integrity of letters of credit as a valuable commercial tool." <u>In re Prime Motor Inns, Inc.</u>, 130 B.R. 610, 613 (S.D. Fla. 1991); <u>In re War Eagle Const. Co., Inc.</u>, 283 B.R. 193 (S.D. W.Va. 2002).

The independence principle insulates the letter of credit from disputes over performance of collateral agreements between the Debtor and the issuer and allows the letter of credit to function as a swift and certain payment mechanism. <u>Demczyk</u>, 126 F.3d at 827. In light of the fact that each of the three relationships is independent, the established rule that a letter of credit and the proceeds therefrom are not property of the debtor's estate has been uniformly recognized by the Courts. <u>In re Compton Corp.</u>, 831 F.2d 586, 589 (5th Cir. 1987).

Under the independence principle, letters of credit and their proceeds are not part of the bankruptcy estate because the issuing bank on the letter of credit distributes <u>its own assets</u> and <u>not</u> the assets of the debtor/customer who caused the letter of credit to be issued. <u>See</u> <u>In re Metro Communications, Inc.</u>, 115 B.R. 849, 854 (Bankr. W.D. Pa. 1990) (<u>emphasis added</u>). Thus, the proceeds of the Letter of Credit in this case, which are in the possession of Safeco, were assets of Bank of America, not the Debtor, and as such were not and are not the Debtor's assets or property then or now. The Fifth Circuit Court of Appeals in <u>Matter of Compton Corp.</u>, 831 F.2d at 589, recognizing the independent character of letters of credit held that "a bankruptcy trustee is not entitled to enjoin a post petition payment of funds under a letter of credit from the issuer to the beneficiary, because such a payment is not a transfer of debtor's property."

Moreover, it has been held that the sole duty of the issuer of a letter of credit is ministerial; namely, the issuer has to determine if the beneficiary has properly complied with the conditions in the letter of credit and once the beneficiary fulfills the requirements of the letter of credit and draws on it, the issuer of the letter of credit cannot direct how the beneficiary uses the

proceeds. See In re Eastern Freight Ways, Inc., 9 B.R. 653, 662 (Bankr. S.D.N.Y. 1981). After

the issuing bank pays the funds to the beneficiary, the letter of credit is a fully executed contract,

and the issuing bank must look to its customer for repayment just as would any other creditor.

Id. at 662; In re Lancaster Steel Co., 284 B.R. 152, 160 (S.D. Fla. 2002).

The case of In re North Shore & Central Illinois Freight Co., 30 B.R. 377 (Bankr. Ill.

1983) is illustrative of the unique nature of letters of credit and the proceeds therefrom. In North

Shore, supra, the debtor arranged for a $50,000.00 letter of credit with a bank. Id. at 377. The

beneficiary of the letter of credit was a surety, Protective Insurance Company. Id. The letter of

credit was issued to provide Protective with adequate security against any liability it might incur

while serving as surety for the debtor. Id. Subsequently, the debtor filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code. Id. Thereafter, Protective sought to draw the

$50,000.00 from the bank as permitted under the terms of the letter of credit. Id. at 378. The

debtor then brought an adversary complaint seeking to prevent the bank from disbursing the

funds to Protective and Protective moved to dismiss the debtor's complaint. Id.

The debtor argued that the automatic stay prevented Protective from drawing upon the

letter of credit. Implicit in the debtor's argument was the proposition that the letter of credit was

property of the bankrupt's estate. In analyzing the issue, the North Shore Court recognized the

important function that letters of credit play in the commercial marketplace and that the bank

issuing the letter of credit is the party obligated to the beneficiary, not the debtor. Id. at 378.

Accordingly, the North Shore Court held that the letter of credit was not property of the

bankruptcy estate and the automatic stay did not bar the surety's draw down of the letter of

credit. Id. at 379. See also In re M.J. Sales & Distributing Co., Inc., 25 B.R. 608 (Bankr. N.Y.

1982).

The United States Bankruptcy Court for the Eastern District of Virginia has also recognized that letters of credit and the proceeds therefrom are not property of the bankruptcy estate.  In re Printing Department, Inc., 20 B.R. 677 (Bankr E.D. Va. 1981); In re Valley Vue Joint Venture, 123 B.R. 199 (Bankr E.D. Va. 1991).  In In re Printing Department, Inc., 20 B.R. 677 (Bankr E.D. Va. 1981), the debtor moved for a show cause order based on an alleged violation of the automatic stay to prevent a creditor from drawing down on a letter of credit and to seek recovery of any moneys paid under the letter of credit.  The Printing Department Court observed that a "letter of credit" is "an engagement by a bank or other person made at the request of a customer... that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit . . ." Id. at 679.  Further, the Court noted that under the Virginia Code, the issuer of a letter of credit "must honor a demand for payment which complies with the terms of a letter of credit regardless of compliance with the underlying contract." Id. at 680.  The Printing Department Court concluded that, "the issuer of the letter of credit, therefore, assumes an original primary obligation wholly apart from the underlying contract which exists between the beneficiary and the customer." Id. at 681.  Thus, the Printing Department Court held that when the creditor submitted its draft to the bank, it was not asserting a claim against the debtor or against any of the estate's property; rather, it was enforcing a contract which existed between the creditor and the bank that issued the letter of credit, which was independent of any relationship between debtor and the issuing bank. Id.  The Court stated, "[T]he issuer of a letter of credit 'acts as a principal, not as agent for its customer, and engages its own credit.'" Id.  The Printing Department Court denied the debtor's claimed relief.

Because the proceeds of the Letter of Credit that are now in the hands of Safeco are not property of Debtor's estate, this Court does not have the power to require Safeco to return such proceeds to the Debtor.  The Debtor cites to no contract provision, statute or bankruptcy case law

to support its position that Safeco must return the Letter of Credit proceeds to the Debtor under any circumstances. More importantly, the Debtor has failed to cite to any authority that any proceeds of the Letter of Credit must be returned to the Debtor as opposed to the issuer of the Letter of Credit, Bank of America, or simply be retained by Safeco. The Debtor has identified no facts or information upon which this Court could rely to reach any conclusions regarding the disposition of the proceeds of the Letter of Credit. Accordingly, the Debtor has utterly failed to meet its burden to support its Motion and its requested relief must be denied.

Moreover, in this case, the Debtor is essentially seeking a turnover of the Letter of Credit's proceeds pursuant to 11 U.S.C. § 542 in the disguise of a Motion. However, such a remedy is not applicable to the proceeds of a letter of credit because such proceeds are not property of the estate. Hechinger Inv. Co. of Del., Inc. v. Allfirst Bank (In re Hechinger Inv. Co. of Del., Inc.), 282 B.R. 149, 161 (Bankr. D. Del. 2002). In addition, "[t]urnover under 11 U.S.C. § 542 is a remedy available to debtors to obtain what is acknowledged to be property of the bankruptcy estate. It is not a remedy available to recover claimed debts which remain unliquidated and/or in dispute." Id. at 161-62. Here, the claims are both unliquidated and in dispute. First, as the Debtor's Motion and this Objection demonstrate, the Debtor's claim against the proceeds of the Letter of Credit is unliquidated because the amount of the claims that may exist against the Safeco Surety Bonds is unknown. Second, whether Safeco owes anything at all to the Debtor is disputed as is demonstrated in this Objection. As held in Hechinger, supra. a debtor may not use a turnover action to "circumvent" its contract claims and "recover that to which [it] has not yet established [as] an undisputed, liquidated claim." Hechinger, 282 B.R. at 162. Finally, the Debtor has not established how Safeco will be adequately protected once the Letter of Credit proceeds are released from Safeco's possession from remaining contingent liabilities or other bonded liabilities that are not governed by the Court's order under this Motion

such as Debtor's obligation to Safeco under the Indemnity Agreement to reimburse Safeco for its attorneys' fees, costs and expenses arising from claims made against the Surety Bonds, premiums due for the Surety Bonds, liability to unknown third parties, and liability to the federal government and/or state governments on statutory bonds issued on behalf of Safeco, including the Importer Bond.

**B.    Debtor's Motion Must Be Denied Because This Court Does Not Have Authority to Establish an Enforceable Surety Bond Claim Deadline and Impose a Bar on any Further Claims.**

The Debtor seeks an order from this Court setting a "Surety Bond Claims Deadline" and providing a release of all Surety Bond claims not asserted prior to the Surety Bond Claims Deadline.  Although Safeco recognizes, and indeed, shares, the Debtor's desire for a mechanism by which to accelerate the identification and evaluation of all Surety Bond Claims, Safeco does not believe this Court has the legal authority to give the Debtor the relief that it seeks. Specifically, the Debtor seeks to have this Court enter an order lifting the stay to allow Safeco to cancel all of the Surety Bonds, establishing a Surety Bond Claims Deadline, and enjoining all Surety Bond claims against Safeco arising after the Surety Bond Claims Deadline has passed. The Motion suffers from certain, material defects, including the following:

1)    the proposed Order offers no mechanism to confirm that the Surety Bond obligees actually receive Safeco's Surety Bond cancellation notice and/or effective notice of the Surety Bond Claims Deadline;

2)    the Motion fails to consider the implications of a factual scenario where parties other than the Surety Bond obligees have a right to assert claims against the Surety Bonds and, thus, the proposed Order offers no mechanism to provide notice of the Surety Bond cancellation or the Surety Bond Claims Deadline to any potential claimants other than the Surety Bond obligees;

3)    the Motion fails to consider that some of the Surety Bonds are issued pursuant to governmental statutes and regulations that may direct how a claim can be asserted, when/if the Surety Bond can be cancelled and what notice must be given of a cancellation, and the period of limitations for filing claims, and the relief sought by the Debtor may directly conflict with such statutes and regulations; and

4)      the Debtor offers no consideration to prospective claimants for relinquishing their Surety Bond claim rights against Safeco.

Without further consideration of these and other important issues and legal authority to support the relief sought by the Debtor, the Motion must fail.

### i. The Motion Overstates the Court's Authority under 11 U.S.C. § 105.

There is no provision in the Bankruptcy Code that gives the Court express authority to enter an order that releases Safeco's liability, as a third party to other third party claimants under the Surety Bonds.  The Debtor cites to no specific provision that authorizes releases of, and injunctions of third party claims against, non-debtor third parties like Safeco.

The Debtor relies on § 105 for support for their proposition that the Court has authority to enter an order setting a Surety Bond Claims Deadline and releasing/enjoining all claims against both the Debtor and Safeco.  Section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

While § 105(a) is intended to supplement the Court's enumerated powers, as many courts have stated, its reach is not unlimited.  As noted by the Third Circuit in United States v. Pepperman, 976 F.2d 123, 131 (3rd Cir. 1992), § 105(a) does not "create substantive rights that would otherwise be unavailable under the Bankruptcy Code." Id. quoting In re Morristown & Erie R.R.Co., 885 F.2d 98, 100 (3d Cir. 1989); see also Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) (noting that the bankruptcy court's equitable powers can only be exercised within the confines of the Bankruptcy Code).  Further, it has been recognized that

"[b]ankruptcy judges have no more power than any others to ignore the plain language of a statute in order to reach a result more in keeping with their notions of equity." In re Kelly, 841 F.2d 908, 913 n.4 (9th Cir. 1988).

The Debtor's have filed a Motion seeking relief other than in the context of a Plan of Reoganization.  Section 524 specifically provides that the bankruptcy discharge of a debtor under a Plan does not relieve non-debtors of their liabilities.[8]  Numerous courts, including the Fifth, Ninth and Tenth Circuits, have concluded that section 524(e) precludes them from authorizing releases and injunctions of claims against non-debtors, finding these to be the equivalent of a non-debtor discharge.  See, e.g., Feld v. Zale Corp. (In re Zale Corp.), 62 F.3d 746 (5th Cir. 1995); Resorts Int'l v. Lowenschuss (In re Lowenschuss), 67 F.3d 1394, 1401-02 (9th Cir. 1995), cert. denied. 517 U.S. 1243 (1996); Landsing Diversified Properties – II v. First Nat'l Bank & Trust Co. of Tulsa (In re Western Real Estate Fund, Inc.), 922 F.2d 592, 601 (10th Cir. 1990), modified by Abel V. West, 932 F.2d 898 (10th Cir. 1991); In re Future Energy Corp., 83 B.R. 470, 486 (Bankr. S. D. Ohio 1988)("The clear weight of decisional authority supports the proposition that Chapter 11 plans which call for the release of nonparties (such as guarantors) from liability upon obligations of the debtor are violative of § 524(e)").

The Fourth Circuit has allowed a release of non-debtor liability in the context of a chapter 11 reorganization plan approval, but only in exceptional circumstances.  In the A.H. Robins bankruptcy case, brought about by liabilities arising from litigation over the  Dalkon shield, the Fourth Circuit approved a reorganization plan that provided releases for the debtor's directors, insurers and their attorneys (some of whom had indemnity rights against the debtor) because it found them to be necessary for a successful reorganization and consideration was given to the

---

[8]     Section 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

claimants for the releases, including consideration given by some of the parties receiving releases. Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694, 701-02 (4th Cir. 1989), cert. denied, 493 U.S. 959 (1989). See also Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2nd Cir. 1992); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 94 (2nd Cir.1988), cert. denied, 488 U.S. 868 (1988). As the Third Circuit observed about the above-noted cases (while rejecting an attempt to provide third party releases in a chapter 11 proposed plan):

> A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties. Substantial debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible.

In re Continental Airlines, 203 F.3d 203, 212-213 (3rd Cir. 2000).

There is no legal authority to support the extraordinary relief requested by the Debtor in its Motion under the facts of this case. There are not mass tort liabilities involved. There is no consideration being given to the prospective Surety Bond claimants for their releases. In fact, security that has been provided to such prospective claimants in the form of the Surety Bonds is being taken away from them. As the Delaware bankruptcy court has noted in refusing to allow broad releases to non-debtor parties, it is "certainly unclear whether, in a more typical financial reorganization such as presented here, non-consensual releases may ever be validated." Genesis Health Ventures, Inc., 266 B.R. 591, 603 (Bankr. D. Del. 2001).

In the case of In re Berwick Black Cattle Co., 394 B.R. 448 (Bankr. C.D. Ill. 2008), the bankruptcy court addressed a blanket third-party release provision in a proposed chapter 11 liquidating plan. In denying confirmation, the bankruptcy court held that the proposed release provisions prevented the court from approving the plan. In rejecting the plan, the court stated:

> [P]rudence demands that third-party releases be viewed with a
> healthy dose of skepticism.  This Court is aware of no authority,
> outside of the mass tort context, that supports the granting in the
> plan of a nonconsensual third-party release of claims other than for
> acts or omissions made in the bankruptcy proceeding, with gross
> negligence and willful misconduct excluded.

Id. at 460.  The court also noted that the rationale for granting third-party releases is "far less

compelling, if it exists at all, in a liquidation than in a reorganization."  Id. at 461.  See also In re

New Towne Development, LLC, 410 B.R. 225, 232 (Bankr. M.D. La. 2009) ("It would indeed

be anomalous if the Bankruptcy Code prohibited a plan from discharging a liquidating non-

individual debtor that will not remain in business post-confirmation, but allowed that plan

effectively to discharge non-debtor third parties by means of releases and permanent

injunctions.").

        None of the case authority addressing this issue supports the Debtor's requested relief.

This case does not involve mass tort litigation.   The proposed releases are blanket releases

dealing with both pre-petition and post-petition claims and relate to matters outside of the

bankruptcy process.  Further, the Debtor has ceased operations and is liquidating under chapter

11 and cannot assert that the releases are necessary for an effective reorganization.  The fact that

the cases cited in this Objection all address the issue in the context of plan confirmation while

the Debtor has chosen to present the issue in the context of a Motion seeking relief from the

Court does not change the analysis or the conclusions to be reached therefrom.

   **C.    Debtor's Motion Must Be Denied Because Safeco's Claim and Its
           Right to Retain the Collateral Securing Its Claim Is Protected by 11
           U.S.C. §506 (d).**

        Assuming for the purposes of argument only that the Debtor is able to establish some

entitlement to the proceeds of the Letter of Credit, Safeco is nevertheless entitled to retain the

proceeds from the Letter of Credit until Safeco is fully released and discharged from all liability

under the Surety Bonds pursuant to 11 U.S.C. § 506 (d).

Section 506 (d) provides in relevant part:

> To the extent that a lien secures a claim against the debtor that is
> not an allowed secured claim, such lien is void, unless –
> (1)   such claim was disallowed only under section 502(b)(5)[9] or
> 502(e) of this title; or . . .

11 U.S.C. § 506 (d).

The Bankruptcy Code defines "claim" as "(A) right to payment, whether or not such right

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy

for breach of performance if such breach gives rise to a right to payment, whether or not such

right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured,

disputed, undisputed, secured, or unsecured."  11 U.S.C. § 101 (5).  In this case, Safeco's claim

against the Debtor is in part for existing claims and is in part for contingent future claims by

obligees and claimants under the Surety Bonds.

A portion of Safeco's reimbursement claim, at common law and pursuant to the

Indemnity Agreement, is contingent.  11 U.S.C. § 502 (e) provides in relevant part:

> (e)(1) Notwithstanding subsections (a), (b), and (c) of this section
> and paragraph (2) of this subsection, <u>the court shall disallow any
> claim for reimbursement</u> or contribution of an entity that is liable
> with the debtor on or has secured the claim of a creditor, to the
> extent that--
>     (A) such creditor's claim against the estate is disallowed;
>     (B) <u>such claim for reimbursement</u> or contribution <u>is
>     contingent as of the time of allowance or disallowance of
>     such claim for reimbursement</u> or contribution; or
>     (C) such entity asserts a right of subrogation to the rights of
>     such creditor under section 509 of this title.

---

[9]        Section 502(b)(5) is not applicable to this discussion.

11 U.S.C. § 502 (e) (emphasis added).

Notwithstanding any such possible future disallowance which may occur with respect to Safeco's contingent claim for reimbursement, Safeco retains its rights against the Letter of Credit proceeds pursuant to §506 (d). The Bankruptcy Code defines "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101 (37). Pursuant to Virginia law, a security interest attaches in money if the money is in the possession of the secured party. See Grossmann v. Saunders, 237 Va. 113, 122, 376 S.E.2d 66, 71 (Va. 1989); Va. Code § 8.9A-313(a). The proceeds of the Letter of Credit constitutes "money" intended to secure payment of Debtor's performance of its obligations under the Surety Bonds and to reimburse Safeco under the terms of the Indemnity Agreement with the Debtor. Safeco, by virtue of its draws on the Letter of Credit, has in Safeco's possession the proceeds of the Letter of Credit, which are held because of Safeco's potential continuing liability, risk and exposure under the Surety Bonds.

In this instance, a portion of Safeco's claim may eventually be disallowed, if at all, by operation of Section 502 (e)(1)(B). However, Safeco's lien is not invalidated because of Section 506(d) to the extent of Safeco's security, which in this case is the proceeds of the Letter of Credit. As a result, Safeco is entitled to retain possession of the proceeds of the Letter of Credit until its liability has been fully released, discharged and extinguished under the Surety Bonds and Safeco has been fully reimbursed pursuant to the terms of the Indemnity Agreement.

## **CONCLUSION**

For the reasons noted herein, Safeco Insurance Company of America respectfully requests that the Debtor's Motion be denied.

Dated:  October 28, 2009

Respectfully submitted,

/s/ Troy Savenko
Troy Savenko (Va. Bar No. 44516)
Leslie A. Skiba (Va. Bar No. 48783)
GREGORY KAPLAN, PLC
7 East Second Street (23224-4253)
Post Office Box 2470
Richmond, VA   23218-2470
Telephone:     (804) 423-7921
Facsimile:      (804) 230-0024

-and-

Cynthia E. Rodgers-Waire (Admission Pro Hac Vice Pending)
Michael A. Stover (Admission Pro Hac Vice Pending)
WRIGHT, CONSTABLE & SKEEN, LLP
One Charles Center, 16th Floor
100 North Charles Street
Baltimore, Maryland 21201
Telephone:     (410) 659-1300
Facsimile:      (410) 659-1350

*Counsel to Safeco Insurance Company of America*

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2009, a copy of the foregoing was filed and served via the Court's Electronic Case Filing System on the following:(i) the Core Group, which includes the Debtors, co-counsel to the Debtors, the Office of the United States Trustee, co-counsel for any committee, counsel to the agents for the Debtors' prepetition lenders, and counsel to the agents for the Debtors' post-petition lenders; (ii) the 2002 List; and (iii) those additional parties as required by the Case Management Order (all of which are defined in the Case Management Order), which can be found at www.kccllc.net/circuitcity.

/s/ Troy Savenko