IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No.  Case No. 08-35653-KRH |
| | ) | |
| CIRCUIT CITY STORES, INC., et al. | ) | CHAPTER 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

OBJECTION TO CONFIRMATION OF CHAPTER 11 PLAN
BY UNITED STATES CUSTOMS AND BORDER PROTECTION

The United States Customs and Border Protection ("Customs"), an agency of the Department of Homeland Security, by counsel, objects to confirmation of the FIRST AMENDED JOINT PLAN OF LIQUIDATION OF CIRCUIT CITY STORES, INC. AND ITS AFFILIATED DEBTORS filed September 22, 2009.

INTRODUCTION

1.   On or about May 6, 2009, Customs filed a proof of claim for customs duties in the amount of $1,819.11, consisting of a secured claim by virtue of the right of setoff in the amount of $67.15 and unsecured priority claims pursuant to 11 U.S.C. § 507(a)(8)(F) in the amount of $1,751.96.  The proof of claim also listed certain unliquidated entries subject to adjustment.  The proof of claim contained the following statement:

> This claim represents the known liability of the debtor to this agency of the
> United States.  The United States reserves the right to amend this claim to assert
> subsequently discovered liabilities.  This agency holds subject to setoff against
> this claim a debt owed to the debtor of $67.15.  The identification of any sums
> held subject to setoff is without prejudice to any other right under 11 U.S.C. § 553

Robert P. McIntosh
Assistant United States Attorney
1800 Main Street Centre
600 East Main Street
Richmond, Virginia  23219
Tel. No. (804) 819-5400
Counsel for United States

to set off, against this claim, debts owed to debtor by this or any other federal agency.

2.  Since filing the proof of claim, Customs has discovered additional prepetition liabilities in the amount of $38,648.92. Although the governmental bar date passed before Customs could make a final determination of the debt, Customs does not waive any rights it may have to file an amended proof of claim to include this later-discovered liability. However, for purposes of this Objection, Customs asserts that it has a right of set-off against this later-discovered debt by reason of prepetition overpayments of customs duties totaling $10,186.93.

3.  Both the prepetition liability and prepetition overpayment described in paragraph 2, above, resulted from a process described as follows: Generally, the liquidation of claims for customs duties is a multi-step process. A commercial importer, such as the debtor in this case, can make entry of merchandise, submit certain minimal documentation, and receive release of that merchandise immediately upon completion of any required inspection. *See* 19 C.F.R. Parts 141 and 142. Within ten working days after entry, the importer (Circuit City, in this case) must file entry documents with Customs, giving the details of the importation, and provide payment of the duties, fees and other charges the importer estimates are due. *See* 19 C.F.R. § 142.12(b). Customs generally has one year to review the entry for liquidation and assess any additional amounts due, refund excess amounts deposited, or liquidate the entry with no change. *See* 19 U.S.C. § 1504. *See also* 19 C.F.R. Part 159 (regulations on liquidation).

4.  On March 6, and May 8, 2009, Customs liquidated four claims and determined overpayments of customs duties totaling $10,186.93.

5. In addition, Customs officials at the Los Angeles/Long Beach Seaport learned of an additional debt for duties totaling $38,648.92 when debtor reported to Customs Officials at the Los Angeles/Long Beach Seaport on February 5, 2009 that debtor underpaid customs duties with regard to certain coaxial cables (the "coaxial duties"). The coaxial duties were not included in the original proof of claim, the primary reasons for which include the facts that: (1) the Customs office at the Los Angeles/Long Beach Seaport does not prepare proofs of claim in bankruptcy; (2) the debtor's letter dated February 5, 2009 identifying the underpaid customs duties failed to contain any mention of the debtor's bankruptcy; and (3) Customs prepares proofs of claim at a centralized location located in Indianapolis, Indiana. The Customs Office responsible for filing proofs of claim in bankruptcy in Indianapolis did not learned of the coaxial duties liability until the week of November 1, 2009, well after the deadline for filing proofs of claim had passed.[1] Customs asserts that it has a right of set-off of the $38,648.92 amount against the prepetition refund, and also to assert its rights for collection of liabilities against the surety, Safeco Insurance Co., pursuant to an Importer Broker Bond for the benefit of Customs.

ARGUMENT

6. Based on Customs' allowed proof of claim, its later discovered prepetition claim, and the prepetition overpayments set forth above, Customs objects to the following provisions of the debtor's plan as impermissibly: (1) affecting the treatment of its claim as an "insured claim" under Article III.H; (2) depriving Customs' right of set-off pursuant to Article X.D; and (3)

---

[1] Moreover, had the debtor complied with the regulations and submitted a proper prior disclosure, it would have "ma[de] a tender of [the] actual loss of duties, taxes and fees or actual loss of revenue," see 19 C.F.R. § 162.74(a)(1), and the debt for duties totaling $38,648.92 would not now constitute a claim by Customs.

enjoining Customs from exercising its rights of collection against third persons under Article X.G.

The treatment of Customs' Claim as an "Insured Claim."

7. Section 1.100 of the Plan defines a "*Priority Tax Claim*" as "a Claim of a Governmental Unit of the kind specified in Bankruptcy Code Sections 502(i) or 507(a)(8)." The customs duties owed to Customs clearly fall within the Plan's definition of Priority Tax Claims as the duties are entitled to priority under Section 507(a)(8)(F). Section 3.A.2 of the Plan provides for the following treatment of priority tax claims in pertinent part:

> Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Distribution Date, a Holder of an Allowed Priority Tax Claim shall be entitled to receive, to be paid out of the Liquidating Trust, in full and final satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, (i) regular installment Cash payments, occurring not less frequently than quarterly over a period not exceeding five (5) years after the Petition Date, in an aggregate principal amount equal to the unpaid portion of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the Case Interest Rate from the Effective Date through the date of payment thereof . . . ; provided however, that the Liquidating Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date of the Plan without premium or penalty. . . . .

The Plan, as written, appears to qualify the obligation to fully pay the customs duties as a Priority Tax Claim because of Customs' status as a beneficiary of a surety bond.

8. To the extent the Plan seeks to do so, Customs objects to its claim being treated as an Insured Claim. Section 1.75 of the Plan defines an "*Insured Claim*" as "any Claim or portion of a Claim that is insured under the Debtors' insurance policies, but only to the extent of such coverage." Section III.H of the Plan provides:

> Distributions under the Plan to each Holder of an Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which

–4–

such Insured Claim is classified; <u>provided</u> <u>however</u>, that the maximum amount of any Distribution under the Plan on account of an Allowed Insured Claim shall be limited to an amount equal to: (a) the applicable deductible or self-insured retention under the relevant insurance policy minus (b) any reimbursement obligations of the Debtors to the insurance carrier for sums expended by the insurance carrier on account of such Claim (including defense costs); <u>provided further</u>, <u>however</u>, that, to the extent that a Claimholder has an Allowed Insured Claim, the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors, such Claimholder shall have an Allowed General Unsecured Claim in the Amount by which such Allowed Insured Claim exceeds the coverage available from the relevant Debtors' insurance policies. Nothing in this section shall constitute a waiver of any Cause of Action the Debtors may hold against any Person, including the Debtors' insurance carriers, or is intended to, shall, or shall be deemed to preclude any Holder of an Allowed Insured Claim from seeking and/or obtaining a distribution or other recovery from any insurer of the Debtors in addition to any Distribution such Holder may receive under the Plan; <u>provided</u> <u>further</u>, <u>however</u>, that the Debtors do not waive, and expressly reserve their rights to assert that an insurance coverage is property of the Estates to which they are entitled.

The Plan shall not expand the scope of, or alter in any other way, the obligations of the Debtors' insurers under their policies, and the Debtors' insurers shall retain any and all defenses to coverage that such insurers may have. The Plan shall not operate as a waiver of any other Claims the Debtors' insurers have asserted or may assert in any Proof of Claim or the debtors' rights and defenses with respect to such Proofs of Claim.

9. Sections 1.75 and III.H of the Plan are objectionable for three reasons. First, under Section 1129(a)(9)(C), Debtors are required to fully pay the value of Customs' priority tax claim, plus interest, through regular installment payments. The Plan should provide that Debtors shall be required to pay the entire amount of Customs' priority claim, but shall receive credit for payments made by the surety.

10. Second, Section III.H provides "to the extent that a Claimholder has an Allowed Insured Claim, the amount of which exceeds the total coverage available from the relevant insurance policies of the Debtors, such Claimholder shall have an Allowed General Unsecured Claim . . ." for the deficiency. If the Court determines that Customs' claims must be treated as

Insured Claims and in the unlikely event the proceeds of the surety bond are not sufficient to pay such claims, then the deficiency owed to Customs must be classified as a priority claim under Section 507(a)(8)(F).

11.     Third, Debtors purport to reserve the right to argue that the insurance policies are property of the estate. However, a surety bond is not property of the estate. *In re McLean Trucking Co.*, 74 B.R. 820, 826 (Bankr. W.D.N.C. 1987); *O'Malley Lumber Co. v. Lockard (In re Lockard)*, 884 F.2d 1171, 1178 (9th Cir. 1989); *In re Hallmark Builders, Inc.*, 205 B.R. 974, 976 (Bankr. M.D. Fla. 1997). *See also Willis v. Celotex Corp.*, 978 F.2d 146, 148-49 (4th Cir. 1992)(holding that supersedeas bond was not property of the estate, but imposing an injunction based upon the unusual nature of the particular reorganization case and noting the lower court expressly mentioned that it would reexamine the stay once a judgment creditor succeeded upon appeal). For the foregoing reasons, Customs objects to the plan.

<u>The Plan Fails to Provide for the Right of Set-Off</u>.

12.     Article X.D of the Plan provides in pertinent part:

> Except as otherwise provide in the Plan, including, but not limited to, as set forth in Article VI.H.2, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons who have held, hold or may hold Claims against or Interests in the Debtors *are permanently enjoined from taking any of the following actions against* the Estate(s), the Liquidating Trust, the Liquidating Trustee, or any of their property on account of any such Claim or Interests: . . . (D) *asserting a setoff*, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtors, except as set forth in Article VI.H.2 of the Plan . . . ; provided, however, that nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of this Plan or the Confirmation Order.

(emphasis added).

13.    Customs objects to Article X.D to the extent it fails to preserve the setoff rights of the United States.

14.    Bankruptcy Code Section 553(a) explicitly provides that the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."  The Supreme Court has recognized both that § 553(a) preserves the right of setoff, *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995), and that "§ 553(a)'s general rule [is] that the Bankruptcy Code does not affect the right of setoff. . . ." *Strumpf*, 516 U.S. at 20. The United States possesses a common law right of setoff:

> <u>The right to setoff is "inherent in the United States Government," and exists independent of any statutory grant of authority to the executive branch</u>. The scope of this common law right is broad.  Historically, it has been exercised against anyone who has a 'claim' against the government, including unpaid government contractors . . . .

*United States v. Tafoya*, 803 F.2d 140 (5th Cir. 1986)(emphasis added and citations omitted).[2]

*See also Cherry Cotton Mills v. United States*, 327 U.S. 536 (1945)(establishing test to determine when the "mutuality" that is necessary for setoff is present between different federal agencies, departments and instrumentalities). Courts have applied the plain language of Section 553(a).  A number of courts have looked to the plain language of § 553(a) to hold that a discharge does not bar a creditor from exercising the right of offset. *In re Conti*, 50 B.R. 142, 149 (Bankr. E.D. Va. 1985); *In re Luongo*, 259 F.3d 323, 333 (5th Cir. 2001)("It is impossible for us to ignore the clear

---

[2] Although the *Tafoya* Court held that the Government had an "inherent right to setoff," it disallowed setoff because of the rule that "current pay" could not be setoff in the absence of specific statutory authorization.

statement of § 553 . . . ."); *In re De Laurentiis Entertainment Group, Inc.*, 963 F.2d 1269, 1276 (9th Cir. 1992)(Relying, in part, on the "language and structure of section 553," the Court held that a right of offset survived confirmation of a Chapter 11 Plan.); *In re Davidovich*, 901 F.2d 1533, 1539 (10th Cir. 1990)(discharge no bar to exercise of right to offset, even where creditor did not file a claim). Similarly, courts have held that plan confirmation does not affect the right of offset. *United States v. Munson*, 248 B.R. 343, 46 (C.D. Ill. 2000)(Chapter 13); *In re Ronnie Dowdy, Inc.*, 314 B.R. 182, 187-88 (Bankr. E.D. Ark. 2004)(Chapter 11); *In re Black*, 280 B.R. 680, 686 (Bankr. N.D. Ala. 2001)(Chapter 11). *Contra In re Lykes Bros. Steamship Co., Inc.*, 217 B.R. 304, 310 (Bankr. M.D. Fla. 1997) *and United States v. Reynolds*, 764 F.2d 1004 (4th Cir. 1985)(IRS violated automatic stay by freezing a tax refund where confirmed Chapter 13 plan provided for the payment of the IRS's claim). For the foregoing reasons, Customs objects to Article X.D as enjoining Customs from asserting its right of set-off.

The Plan Impermissibly Enjoins Collection Against Non-Debtors.

15. Customs objects to the limitation of liability provisions contained in Article X.G of the Plan to the extent they purport to relieve Persons, including the surety, of liability related to the customs duties. The bankruptcy code explicitly states that discharge of a debt does not affect the liability of non-debtor third parties. 11 U.S.C. § 524(e). Section 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e).

Notwithstanding the seemingly clear language of Section 524(e), the Fourth Circuit Court of Appeals in Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989)

concluded that in certain limited, unusual circumstances third party releases may be effective in a Chapter 11 plan of reorganization. *Id.* at 702. Notably, this case–unlike A.H. Robins–does not involve a Chapter 11 plan of reorganization or any of the exceptional circumstances on which the Debtors could obtain the relief they seek. See A.H. Robins Co., 880 F.2d at 701-02; Cf. Credit Alliance Corp. v. Williams, 851 F.2d 119, 121 (4th Cir. 1988) ("Nothing in § 362 suggests that Congress intended that provision to strip from the creditors of a bankrupt debtor the protection they sought and received when they required a third party to guaranty the debt. Congress knew how to extend the automatic stay to non-bankrupt parties when it intended to do so."). Rather, Section 524(e) should be applied according to its terms, and no discharge provided for the non-debtor surety. See, e.g., In re Zale Corp., 62 F.3d 746 (5th Cir. 1995); In re Lowenschuss, 67 F.3d 1394, 1401-02 (9th Cir. 1995); In re Western Real Estate Fund, Inc., 922 F.2d 592, 601 (10th Cir. 1990).

An injunction against and release of a non-consenting creditor's claim against a nondebtor "is only appropriate in 'unusual circumstances.'" Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 658 (6th Cir. 2002). Cf. In re A.H. Robins, 880 F.2d at 702 (discussing factual circumstances justifying injunction barring suits against third parties). It is essential that the facts and circumstances leading to the grant of an injunction and release in favor of a non-debtor be grounded in principles of fairness. Gilman v. Continental Airlines (In re Continental Airlines), 203 F.3d 203, 217 (3rd Cir. 2000). A review of the A.H. Robins decision and the cases that follow it show that the unusual circumstances needed to grant a third party injunction and release as part of a Chapter 11 plan do not exist in the present case.

The debtor in *A.H. Robins* manufactured and sold almost five million Dalkon Shield Intrauterine Devices. A.H. Robins Co., Inc., 88 B.R. 742, 743 (E.D. Va. 1988), *aff'd* 880 F.2d 694 (4th Cir. 1989).[3] Numerous lawsuits were filed against Robins forcing it to file bankruptcy. At the time of filing, Robins faced almost 6,000 lawsuits and catastrophic tort liability. Its insurer, Aetna Casualty and Surety Company ("Aetna"), paid out approximately $530 million in settlements relating to Dalkon Shield litigation. Id. Robins and Aetna entered into a settlement pursuant to which Aetna paid $75 million into a trust established for the benefit of tort claimants and provided three insurance policies totaling $350 million. A.H. Robins Co., 88 B.R. at 759. Claimants were required to seek recovery on their claims from certain funds set up to administer tort claims. Even late claimants were allowed to participate in a potential recovery.

The plan of reorganization included an injunction barring suits, including medical malpractice suits, against nondebtor third parties, including Aetna, which potentially were subject to liability as joint tortfeasors. In re A.H. Robins, 880 F.2d at 700-01. Over 94.38% of the claimants voted for the plan in *Robins*. Under the terms of the plan, there were sufficient funds to fully pay all meritorious claims. Id. at 701. Accordingly, the plan contemplated that all persons having claims connected with the Dalkon Shield would be funneled into several specific funds for recovery. A procedure was established to examine the merit of claims. The injunction in *Robins* was necessary because a flood of future lawsuits against non-debtors would significantly affect the bankruptcy reorganization by virtue of the non-debtor's rights to

---

[3] The lower court decisions in the A.H. Robins case are cited to highlight the facts of that bankruptcy case.

indemnity or contribution.  Id.  Given this, the Court found that the injunction was essential to the reorganization.  Id. at 701-02.  In upholding the injunction, the Court reasoned:

> In this situation where the Plan was overwhelmingly approved, where the Plan in conjunction with insurance policies provided as part of a plan of reorganization gives a second chance for even late claimants to recover where, nevertheless, some have chosen not to take part in the settlement in order to retain rights to sue other parties, and where the entire reorganization hinges on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor, we do not construe § 524(e) so that it limits the equitable power of the bankruptcy court to enjoin the questioned suits.  We leave questions concerning cases in which § 524(e) does apply for another day.

Id. at 702.

Quite simply, in this liquidating Chapter 11 case, there are no exceptional circumstances on which an entry of an injunction can be supported.  Pursuant to the express terms of Section 524(e), any provisions in the Debtors' plan that would enjoin CBP from asserting any claims against a non-debtor guarantor cannot be confirmed.  *See also In re McLean Trucking Co.*, 74 B.R. 820 (denying preconfirmation injunction against collecting on a surety bond).  For the foregoing reasons, Customs objects to Article X.G of the Plan.

CONCLUSION

For the foregoing reasons, confirmation of the FIRST AMENDED JOINT PLAN OF LIQUIDATION OF CIRCUIT CITY STORES should be denied.

DATED this __15__ day of November, 2009.

>Respectfully submitted,
>
>NEIL H. MACBRIDE
>UNITED STATES ATTORNEY
>
>
>By: ___/s/Robert P. McIntosh_____
>Robert P. McIntosh
>Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2009, a true and correct copy of the foregoing OBJECTION TO CONFIRMATION OF CHAPTER 11 PLAN BY UNITED STATES CUSTOMS AND BORDER PROTECTION was electronically filed with the Clerk of the Court using the CM/ECF system, which will thereby cause the above to be electronically served on all registered users of the ECF system that have filed notices of appearance in this matter, and mailed, by U.S. Mail, first class, postage prepaid, to the foregoing Motion and Memorandum to the following:

>Daniel F. Blanks, Esq.
>Douglas M. Foley, Esq.
>McGuire Woods LLP
>9000 World Trade Center
>101 W. Main Street
>Norfolk, Virginia 23510
>*Counsel for Debtor*
>
>Dion W. Hayes, Esq.
>Joseph S. Sheerin, Esq.
>Sarah Becket Boehm, Esq.
>McGuire Woods LLP
>One James Center
>901 East Cary Street
>Richmond, Virginia 23219
>*Counsel for Debtor*
>
>Greg M. Galardi, Esq.
>Ian S. Fredericks, Esq.
>Skadden, Arps, Slate, Meagher & Flom, LLP
>One Rodney Square
>P.O. Box 636 Wilmington, Delaware 19899-0636
>*Counsel for Debtor*

Chris L. Dickerson, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
333 West Wacker Drive
Chicago, Illinois 60606

Lynn L. Tavenner, Esq.
Paula S. Beran, Esq.
Tavenner & Beran, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
*Co-counsel for Official Committee of Unsecured Creditors*

Jeffrey N. Pomerantz, Esq.
Brad R. Godshall, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA 90067-4100
*Counsel for Official Committee of Unsecured Creditors*

Robert J. Feinstein, Esq.
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 36th Floor
New York, New York 10017-2024
*Counsel for Official Committee of Unsecured Creditors*

Robert B. Van Arsdale, Esq.
Office of the U. S. Trustee
701 E. Broad St., Suite 4304
Richmond, Virginia 23219
*Counsel for U.S. Trustee*

Bruce H. Besanko
9950 Mayland Drive
Richmond, VA 23233

    /s/Robert P. McIntosh
    Robert P. McIntosh
    Assistant U.S. Attorney