# EXHIBIT A



## MASTER SERVICES AGREEMENT

This **MASTER SERVICES AGREEMENT** (the "MSA" or "Agreement"), dated as of October 1st, 2008 (the "Effective Date"), is made by and between **IPT, LLC** maintaining an office at 10 Columbus Blvd, Hartford, CT (the "Supplier"), and **Circuit City Stores, Inc.**, maintaining its principal office at 9950 Mayland Drive, Richmond VA 23233-1464 ("Circuit City", and together with the Supplier, the "Parties"), consists of this MSA and any fully executed Statements of Work. This MSA contemplates a variety of arrangements under which the Supplier may provide various Services to Circuit City.

A specific project will be defined and agreed to in writing by its own Statement of Work ("SOW") and attached to this MSA. Each SOW together with this MSA forms a separate agreement between the Parties to this Agreement.

## 1.0 PURPOSE OF AGREEMENT

1.1   The purpose of the MSA is to confirm the present mutual intentions of the Parties concerning a proposed arrangement pursuant to which the Supplier will provide certain Services to Circuit City. The Parties also confirm the exchange, receipt and adequacy of consideration hereunder.

## 2.0 AGREEMENT STRUCTURE

2.1   **Structure**.  The structure of the MSA is as follows:

    **(a)**   MSA defines the basic terms and conditions of the contractual relationship between the Supplier and Circuit City.

    **(b)**   Each SOW describes a specific project. Each SOW shall reference the MSA and may include additional terms and conditions for a specific project.

2.2   **Conflicting Terms**.  If there is a conflict of terms between the MSA and any SOW or other document, the terms of the MSA shall prevail, unless the conflicting document expressly states that the document modifies such terms.

2.3   **Amendments**.  Amendments to this MSA or a SOW must be in writing and signed by an authorized representative for each Party.

2.4   **No Commitment**.  This MSA is not a commitment by either Party to execute a SOW.

2.5   **Exclusivity**.   Supplier shall be Circuit City's exclusive facilities maintenance manager and all vendors not hired or contracted directly by Circuit City shall be sourced by and through Supplier.



## 3.0 DEFINITIONS

**3.1**  **Deliverables**.  Deliverables are Supplier Deliverables and Circuit City Deliverables, if any, respectively.

    **(a)**    Supplier Deliverables are any items or work prepared for, or delivered by the Suppler to, Circuit City under a SOW.

    **(b)**    Circuit City Deliverables are any items or work prepared or provided by Circuit City under a SOW.

**3.2.**  **Personnel**.  Consists of the Circuit City's and Supplier's (or either of their Subsidiaries') employees, agents, affiliates, representatives, and authorized subcontractors working under the MSA and any SOW.

**3.3**  **Services**.  Any reasonable effort expended by the Parties or their Personnel to perform the work described in a SOW.

**3.4**  **Subsidiary**.  Means a company owned or controlled by Circuit City or Supplier during the Term of the Agreement.  For the purpose of this Section "controlled" means direct or indirect control of more than fifty percent (50%) of voting stock or decision-making power.

## 4.0 RELATIONSHIP OF THE PARTIES

**4.1**  The Parties to this Agreement are independent of one another.  This Agreement does not create any relationship of franchise, joint venture, association, partnership, or any other form of business organization.  Neither Party shall have any right, power or authority to bind the other or to assume, create, or incur any expenses, liability or obligation, express or implied, on behalf of the other.  Circuit City shall not be responsible for payment of Supplier Personnel's salary, benefits, expenses, insurance, taxes, workers' compensation, unemployment insurance or any other employee benefits, but such responsibility shall be that of the Supplier.  Furthermore, the Supplier shall be fully responsible for withholding any and all Federal, state or local income and employment taxes in connection with Supplier Personnel's compensation.

**4.2**  The Supplier may subcontract its obligations under this MSA or any SOW to a third party.   For any further limitations see also Section 4.8 of this Agreement.

**4.3**  During the term of this Agreement and during any renewal term and for three (3) years thereafter neither Party shall use (except for the purpose of implementing this Agreement) or disclose to any third party (except a Party's subcontractors and independent contractors for the purpose of implementing this Agreement and who are bound by confidentiality obligations at least as restrictive as those contained in this section), without the prior written permission of the disclosing party, any confidential or proprietary information disclosed hereunder (hereinafter



"Confidential Information"), except as may be required by a court of law or government action. Confidential Information includes, but is not limited to, all information, whether written or oral, and in any form, including without limitation, information relating to the terms of this Agreement, research, development, products, methods of manufacture, trade secrets, business plans, customers, vendors, finances, personnel data, third party proprietary or confidential information (including the confidential information of a Party's subcontractor), and other material or information declared in writing as proprietary by the disclosing party, or which a reasonably prudent person would consider to be confidential and proprietary to the disclosing party and relating to the current or anticipated business which is disclosed directly or indirectly to the receiving party. Neither Party shall be liable to the other for Confidential Information which: (i) is already lawfully known to the receiving party at the time of disclosure; (ii) is in or subsequently enters the public domain (or is or becomes publicly available) without any violation of this Agreement by the receiving party; (iii) the receiving party obtains from a third party source not under a known obligation of confidentiality to the disclosing party; or (iv) which is independently developed or acquired without use or reference to the Confidential Information, as evidenced by appropriate documentation or other competent evidence. Each Party shall use all reasonable efforts to obligate its Personnel to comply with this confidentiality provision. Nothing herein shall be construed as granting or conferring any right by license or otherwise to the receiving party in/to any Confidential Information disclosed hereunder except as specifically set forth herein. Upon the earlier of a Party's request or any termination of this Agreement, the receiving party shall return to the disclosing party the Confidential Information and all copies thereof of the disclosing party; provided, however, that each party may retain an archival copy for their records (which copy shall remain subject to non-disclosure). Should the Supplier engage an approved subcontractor to perform any of its obligations under the terms of this MSA or any SOW hereunder, the Supplier shall obtain a Confidentiality Agreement from the subcontractor containing terms to protect Circuit City's Confidential Information similar to those stated herein. Notwithstanding the above, any such Confidentiality Agreement executed by a subcontractor shall not relieve the Supplier from its confidentiality obligations set forth in this Section 4.3.

**4.4**    Neither Party relies on any promises, inducements, or representations made by the other or expectations of any future business dealings except as expressly provided in this MSA or any associated SOW.

**4.5**    The Supplier shall:

    **(a)**    Perform Services and provide its Deliverables in a manner that satisfies the service levels defined in Appendix A and in accordance with the schedule in a given SOW or as otherwise agreed to in writing by the Parties. Circuit City has the right to evaluate a Deliverable in accordance with the time frame specified in the SOW prior to accepting it to verify that such Deliverable meets the requirements and specifications set forth in such SOW.



(b)    Comply with reasonable rules and regulations of Circuit City when its Personnel are on Circuit City's premises.

(c)    Have appropriate agreements with its Personnel and third parties who perform obligations under the MSA and any SOW.

4.6    The Supplier shall maintain the following insurance with an insurance carrier authorized to do business in the United States and having a rating of "A-" or better by A.M. Best Company and a Financial Size Category of at least Class VIII:  (a) a policy of commercial general liability insurance, covering liability arising from premises, operations, independent contractors, products – completed operations, personal injury, advertising injury and liability assumed under an insured contract, with limits of not less than $1,000,000 each occurrence and at least $10,000,000 in aggregate liability; (b) commercial auto liability insurance to include all owned, non-owned and hired vehicles, with limits of liability not less than $1,000,000 each accident; (c) workers compensation insurance to the extent required by law and employer's liability insurance, with limits of at least $1,000,000 each accident/disease; and (d) professional liability insurance with limits of at least $1,000,000 per occurrence.  All policies except for (c) and (d) above shall name Circuit City Stores, Inc. as an "Additional Insured".  All certificates will provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to under this Agreement.  A certificate of insurance meeting the above requirements will be delivered to Circuit City (i) upon execution of this Agreement, (ii) upon renewal of the insurance policy and annually thereafter, and (iii) upon reasonable request.

4.7    To the extent necessary to perform the Services, Circuit City will provide the Supplier with the workspace, facilities and supplies reasonably required to perform the Services.  Circuit City shall have no liability for any claims, losses, damages, injuries, costs, expenses or any other liabilities of any kind or character whatsoever arising out of, resulting from or in any way connected with providing the Supplier with workspace, facilities and supplies in connection with the Services, except to the extent caused by the negligent or willful acts or omissions of Circuit City.

4.8    a.  Selection and assignment of subcontractors or Supplier personnel to perform the services under this MSA or any SOW is the sole responsibility of Supplier.  Circuit City will not mandate the use or exclusion of any contractor for any service performed under this MSA except as outlined in Paragraph b. below, and Supplier is under no obligation to identify the subcontractors used, nor the terms, rates, or other specifics of its subcontractor agreements.

b.  Supplier will maintain and provide to Circuit City a list of any subcontractors authorized to perform work on Circuit City property.  Circuit City may remove contractors from this list for cause by informing Supplier, along with the reason for exclusion.  Supplier will not assign any services under this MSA to subcontractors so removed from this list.  Should a subcontractor be actively engaged in providing services under this MSA at the time of removal from this list, Supplier will make all commercially reasonable efforts to immediately remove the contractor from performing the services and replace them with an alternate subcontractor.

c.  Subcontractor personnel determined to be objectionable to Circuit City will be removed immediately



from performing work at Circuit City stores upon notification to Supplier.

## 5.0 OWNERSHIP RIGHTS

**5.1** **Ownership of Intellectual Property**. Each Party shall continue to be the sole owner of, without limitation, all its current patents, copyrights, trade secrets, trade marks, system design, tools, modules, functionalities, features, database schema or tables, functions, stored procedures, processes or templates and other intellectual property rights ("Intellectual Property") unless otherwise set forth in this MSA or any related SOW. The Party that owns such Intellectual Property included in a Deliverable shall continue to be free to use such property in other projects and works, without restriction and without any obligation to the other Party (provided that no Confidential Information of the other Party is contained therein), except as may be otherwise specifically agreed to by the Parties in a SOW. A Party shall have no rights of ownership in the Intellectual Property of the other Party and its subcontractors, and shall only have the right to use such property as specifically provided for in this MSA or an applicable SOW; provided, however, that to the extent Intellectual Property is contained in or required to implement a Supplier Deliverable, the Supplier grants Circuit City a worldwide, perpetual, non-revocable and free license to use such Intellectual Property. Except as otherwise specified herein or may be otherwise specified in a SOW, this MSA does not grant either Party rights to use the other Party's trademarks, trade names or service marks

**5.2** **Work Product**. Unless and except as otherwise agreed to in a SOW, all materials and documents (including, but not limited to, reports, summaries and information compilations) written, assembled or produced by Supplier (or, where applicable, consultants working under an SOW) and all products, ideas, concepts, techniques, work product, inventions, processes, or works of authorship developed or created by Supplier (or, where applicable, consultants working under an SOW) during the course of providing Services to Circuit City hereunder ("**Work Product**") and all copyrights, patents, trade secrets, trade marks or other intellectual property rights associated with Work Product shall belong exclusively to Circuit City. Circuit City will have no obligation of nondisclosure or nonuse or otherwise with respect to Work Product or to any other information disclosed to Circuit City hereunder. Supplier automatically assigns (and where applicable will cause all individual consultants to assign) at the time of creation of the Work Product and without any requirement of further consideration, any right title or interest Supplier (or, where applicable, consultants working under an SOW) may have in such Work Product, including any copyrights, patent rights or other intellectual property rights pertaining thereto. Upon request of Circuit City, Supplier shall take (and where applicable shall cause individual consultants to take) such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.

Furthermore, and notwithstanding anything to contrary in the Agreement, to the extent that the Services are deemed in any way to fall within the definition of "work made for hire", as such



term is defined in 17 U.S.C. §101, such Services shall be considered "work made for hire", the copyright of which shall be owned solely, completely and exclusively by Circuit City or shall be deemed to be fully, completely and exclusively assigned to Circuit City, as the case may be.

## 6.0   REPRESENTATIONS AND WARRANTIES

**6.1**   The Supplier represents, warrants, and covenants that (i) it will comply with all applicable federal, state and local laws, rules and regulations in carrying out its obligations set forth hereunder and in any SOW hereto; (ii) it has the power and authority to execute and deliver this MSA and any associated SOW, and to perform its obligations there under; (iii) the execution, delivery and performance of this MSA has been duly and validly authorized and approved; and (iv) its Intellectual Property and Pre-Existing Property do not infringe on or dilute the intellectual property of any third party.

**6.2**   The Supplier warrants that it will perform Services using reasonable care and skill and in a professional and workmanlike manner.

**6.3**   Additional representations and warranties of the Parties may be set forth in a SOW.

## 7.0   INDEMNIFICATION AND LIMITATION OF LIABILITY

**7.1**   **Indemnity**.

    **(a)**   The Supplier agrees, at its sole expense, to indemnify, defend and hold harmless Circuit City, its affiliates and Subsidiaries, and all their respective officers, directors, agents and employees (collectively, the "Circuit City Indemnified Parties"), from and against any and all actions, suits, proceedings, judgments, settlements, losses, claims, damages, costs or liabilities, including reasonable attorneys' fees and costs of suit (collectively, "Claims") which the Circuit City Indemnified Parties may incur as a result of Supplier's or Supplier Personnel's acts or omissions in the performance of Services under this Agreement.

    **(b)** Circuit City shall be given the opportunity to participate in the defense of any such Claims; however, it shall not have any right to control the defense, consent to judgment, or agree to settle any such Claims; except with the written consent of the Supplier. The Supplier shall reasonably appraise Circuit City of all significant developments relating to the defense of the Claims.   Additionally, Circuit City shall cooperate fully in the investigation and defense of any such Claims, at Supplier's expense.

    **(c)** Circuit City hereby agrees to indemnify, defend and save harmless IPT, our affiliates,



service providers, and each of our and their respective officers, directors and employees (all hereinafter referred to as the "*IPT Indemnified Parties*") from and against any and all losses that arise out of or result from injuries or death to persons, or damage to or loss of property of any Person including us or our affiliates, in any way arising out of or occasioned by, caused by or on account of your negligence or misconduct or that of Circuit City or your respective contractors or subcontractors, except if caused by the negligence or misconduct of any IPT Indemnified Party.

**7.2**    **Limitation of Liability**. Except for the express representations and warranties set forth herein, IPT makes no (and hereby expressly disclaim any) representation or warranty, express or implied, with respect to the nature, quantity or quality of any of its services, vendor services, or any other matter. IN PARTICULAR, BUT NOT BY WAY OF LIMITATION, NO IMPLIED WARRANTY OF MERCHANTABILITY, CONDITION, QUALITY, DURABILITY, DESIGN OR FITNESS, SUITABILITY FOR A PARTICULAR PURPOSE, CONFORMITY WITH MODELS, SAMPLES, PICTURES OR DRAWINGS IS MADE BY IPT IN ANY RESPECT WHATSOEVER, AND ALL SUCH WARRANTIES ARE EXPRESSLY DISCLAIMED. IPT HAS NOT MADE ANY OTHER REPRESENTATION, WARRANTY OR COVENANT OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ITS SERVICES.    EXCEPT WITH RESPECT TO INDEMNIFICATION OBLIGATIONS, NEITHER PARTY HERETO SHALL BE LIABLE TO THE OTHER FOR ANY LOST PROFITS, PUNITIVE, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, WHETHER BASED ON BREACH OF CONTRACT, TORT, OR OTHERWISE, AND WHETHER OR NOT THE PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN NO EVENT WILL CIRCUIT CITY'S LIABILITY EXCEED THE FEES PAID TO THE SUPPLIER UNDER THIS AGREEMENT DURING THE PREVIOUS TWELVE (12) MONTHS.

## 8.0  TERM AND TERMINATION

**8.1**    This Agreement shall become effective on the Effective Date and shall remain in effect until it is terminated by either Party upon providing no less than sixty (60)  days' prior written notice of such termination (except that the date of termination cannot be prior to the expiration date of any SOW hereunder), unless otherwise terminated in accordance with the termination provisions more specifically set forth herein.  However, the Parties agree that for the first six months after the Effective Date, neither party may terminate this Agreement for convenience. The effective date of termination shall be deemed the "Termination Date".

**8.2**    A SOW shall specify the effective date(s) of the particular Services described therein.  A SOW shall continue until completed in accordance with its terms, unless terminated in accordance with the termination provisions of this MSA or as more specifically set forth in a SOW.  If any SOW remains in effect for a period of time beyond the Termination Date of this MSA, this MSA shall



be automatically extended through the last day that the SOW remains in effect.

8.3    The Supplier shall have the right to terminate this Agreement or any or all SOW(s) without penalty if Circuit City is in breach of any material term of the Agreement and/or any SOW provided, however, that the Supplier shall first give Circuit City thirty (30) days written notice of said alleged breach and an opportunity to correct the same during said thirty (30) day period of time.  Circuit City's failure to pay any undisputed invoices in a timely fashion will constitute a material breach of this MSA, and upon written notice will result in Supplier suspending services until such breach is cured.

8.4    Circuit City may immediately terminate this Agreement and all SOWs without penalty upon written notice to the Supplier in the event that (a) the Supplier becomes insolvent, enters into receivership, is the subject of a voluntary or involuntary bankruptcy proceeding, or makes an assignment for the benefit of creditors; or (b) a substantial part of the Supplier's property is or becomes subject to any levy, seizure, assignment or sale for or by any creditor or governmental agency.

8.5    The Supplier may immediately terminate this Agreement and all SOWs without penalty upon written notice to Circuit City in the event that (a) Circuit City becomes insolvent, enters into receivership, is the subject of a voluntary or involuntary bankruptcy proceeding, or makes an assignment for the benefit of creditors; or (b) a substantial part of Circuit City's property is or becomes subject to any levy, seizure, assignment or sale for or by any creditor or governmental agency.

8.6    Circuit City may terminate a SOW hereunder  upon sixty (60) days prior written notice to the Supplier.

8.7    In the event of any termination hereunder, Circuit City's sole responsibility with respect to professional fees and related expenses shall be to pay those undisputed professional fees and related expenses earned or incurred through the Termination Date, unless otherwise stated in a SOW.  In addition, all Supplier Deliverables created up to the point of termination shall promptly be provided to Circuit City.

8.8    This MSA shall be for a period of three (3) years, commencing on the Effective Date and expiring on the third anniversary of the Effective Date, unless sooner terminated as provided herein.

## 9.0  PRICES, PAYMENT, TAXES, AND AUDIT

9.1    The Supplier shall be compensated by Circuit City in connection with the Services provided under this MSA and each SOW for its professional fees and expenses, as described more fully in

each SOW. All payments shall be made in US dollars. The Supplier shall be obligated to pay for any and all travel and related expenses incurred by the Supplier in the provision of Services, unless otherwise specifically agreed to in writing by Circuit City or included in a SOW. Any approved travel and related expenses billed to Circuit City shall be subject to Circuit City's Travel and Expense Policy. The Supplier shall also be responsible for payment of all taxes of any kind and description relating to the Services under any SOW (apart from sales and use taxes, if any, which shall be paid by Circuit City). The Supplier agrees that any payment it receives in full and in accordance with terms specifically set forth in writing under the MSA and any SOW is considered full and complete consideration for Services provided under the MSA and the applicable SOW.

**9.2**    The Supplier shall submit invoices to Circuit City for:

(a) Scheduled Maintenance performed pursuant to SOW #1 on the first of each month; and

(b) Reactive Maintenance performed pursuant to SOW #2 on a weekly basis; and

(c) Project Work performed pursuant to SOW #3 on a weekly basis.

Invoices will list Services, goods and taxes, if applicable, separately. Circuit City will pay the undisputed invoices within fifteen (15) days  receipt of said invoice. Each SOW will define any particular information required for an invoice.

9.3    Circuit City shall be eligible to receive certain rebates from Supplier provided its total annual spend with Supplier, exclusive of any Transactional Fees (as defined in the SOWs) meets the volume milestones described in Appendix B of this MSA ("Safe Harbor Rebates"). The rebate will be paid within thirty (30) days of the close of Circuit City's fiscal year-end, and Circuit may elect to have the rebate paid in cash, or applied as a credit to its account.

(a) If Circuit City has committed a material breach of the MSA or an SOW that has not been cured prior to the payment of the rebate, then it shall forfeit its eligibility for such rebate.

9.4    The Parties agree that Supplier will assume the responsibility of dispatching the general contractors identified in Appendix D attached to this MSA. Circuit City acknowledges that it has a direct contractual relationship with these general contractors ("CC Contractors") that predates this MSA. Supplier will receive ten ($10.00) dollars each time it dispatches a CC Contractor to a Circuit City store ("Transaction Fee"). The parties further agree that Transaction Fees will not be counted toward Circuit City's eligibility for any volume rebates described in Appendix B of this MSA.



## 10.0  GENERAL PROVISIONS

**10.1**  No delay or failure by the Parties hereto in the performance of any obligation of this MSA or any SOW shall be deemed a breach of this MSA or any SOW nor shall it create any liability, if the same shall arise by reason of any cause beyond the reasonable control of the affected Party, including, but not limited to, labor disputes, strikes, wars, riots, insurrection, civil commotion, accident, shortage of materials or equipment, unanticipated government regulations, fire, flood, storm, or any other acts of God, including defects and/or breakdowns of equipment and programming errors not within the reasonable control of the affected Party, provided that the Party so affected shall use its best efforts to avoid or remove such cause of nonperformance and shall continue performance as soon as practicable.  In the event such cause occurs and exceeds thirty (30) calendar days, the Party not so impeded may cancel the applicable SOW upon written notice and without penalty.

**10.2**  Each of the Parties shall render its commercially reasonable cooperation to the other in fulfilling and performing the terms of this MSA and any SOW.  To that end, each shall give to the other, in a timely manner, all consents  and information and execute all documents which may be reasonably required.

**10.3**  This MSA, including all Exhibits, Appendices, and SOW(s), contains the entire agreement of the Parties with respect to the subject matter herein/therein, and all prior discussions, negotiations, letters of intent and understandings regarding such subject matter are merged herein and shall not survive.  All Exhibits, Appendices, and SOW(s), as amended in writing by the Parties, are an integral part of this MSA.  This MSA and any SOW(s) may only be amended or modified in a writing duly signed by both Parties.  Should any term/clause appearing on any Purchase Order / Invoice conflict with the terms as set forth within this MSA, the terms of this MSA shall control. Invoices and purchase orders are used for administrative purposes only.  Any terms and conditions on these documents are replaced by this MSA or an applicable SOW.

**10.4**  This Agreement shall inure to and benefit the Parties hereto and their permitted successors and assigns.  Neither Party may assign this Agreement without the prior written consent of the other Party, which consent shall not be unreasonably withheld.  Notwithstanding the above Circuit City may, without the need for consent from the Supplier transfer or assign this Agreement (a) to an Affiliate (as defined below) of such Party provided that all the persons obligated to fulfill the assigning Party's obligations under the  Agreement after the assignment have substantially equivalent financial capability to that of all other persons obligated to fulfill the assigning Party's obligations under the Agreement before the assignment, or (b) to any person or entity succeeding to all or substantially all of the assets of such Party; provided, however, that any such assignee shall agree to be bound by the terms and conditions hereof.  As used herein, "Affiliate" shall mean with respect to any person, any other person (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person.  For purposes of the foregoing definitions, "control" means the direct or indirect ownership of more than fifty percent (50%) of the outstanding capital stock or other



equity interests having ordinary voting power.

**10.5** This MSA and any SOW shall bind the Parties and their successors and assigns.

**10.6** Any waiver of any provision shall be valid only in the instance for which given and shall not be deemed a continuing waiver nor otherwise construed as a waiver of any other provision.

**10.7** If any provision of this MSA is held invalid or unenforceable as written, such provision shall be construed and enforced to the extent practicable and lawful as if it has been more narrowly drawn so as not to be invalid or unenforceable or otherwise shall be severed from the other provisions of this MSA, and the remaining provisions of this MSA shall remain in effect and be enforceable in accordance with their terms.

**10.8** The confidentiality, ownership of Intellectual Property, Representations and Warranties, and indemnification obligations hereunder, or under any SOW that by their nature are intended to survive termination shall survive termination or expiration of this MSA or any applicable SOW.

**10.9** This MSA and any associated SOW shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without regard to those provisions governing conflicts of law.

**10.10** All correspondence and notices hereunder shall be in writing and will be deemed to be given if delivered via facsimile transmission (and confirmed with an original copy by overnight courier), registered or certified mail (return receipt requested), or mailed personally by overnight courier to the addresses specified below, or at such other address as may hereafter be furnished in writing in a SOW or otherwise to the notifying Party.

To Circuit City:

Circuit City Stores, Inc.
Attn: [BUSINESS OWNER]
9950 Mayland Drive
Richmond, VA 23233-1464
Fax Number: 804-[XXX-XXXX]

With copy to:

Circuit City Stores, Inc.
Attn: Legal Department/Commercial
9950 Mayland Drive
Richmond, VA 23233-1464
Fax Number: 804-418-8248



To Supplier:

IPT, LLC
Attn: Thomas Greenebaum
10 Columbus Blvd.
4th Floor
Hartford, CT 06106
Fax Number: (860) 466-7403

**10.11** Both Parties will maintain auditable records regarding the subject matter of this MSA and any associated SOW to support invoices issued or payments made to the other. The records will be retained and made reasonably available for two (2) years from the date of the related payment or invoice. If a Party reasonably requests, the other Party will make the records available to an independent auditor chosen and compensated by the requesting Party. All requests shall be in writing and will not occur more than once a year. The auditor will sign an agreement to protect the audited Party's Confidential Information. The auditor shall only disclose to the requesting Party any payments due and payable for the period examined.

**10.12** Facsimile signatures are deemed binding under the terms of this Agreement. Captions are inserted only for reference, and in no way define or limit neither the scope nor the intent of any provision of this Agreement. The singular of any term herein shall include the plural, and vice versa, as dictated by context.

**10.13** Neither Party shall, without the prior written consent of the other Party, in connection with this MSA or an applicable SOW, refer to the other Party or attribute any information to the other Party in any external communication for any purpose, including without limitation press releases, web sites, offering memoranda, and conversations with analysts.

**10.14** The Supplier agrees not to actively solicit for employment any employee or representative of Circuit City during the term of a SOW and for a period of one (1) year following the date of termination or completion of a SOW without the prior written consent of Circuit City.



**IN WITNESS WHEREOF,** the said Parties hereto executed this MSA in duplicate, each to have the full force and effect of any original, all as of the Effective Date hereof.

CIRCUIT CITY STORES, INC.                    [FULL LEGAL NAME OF SUPPLIER]

By: _____              By: _____

Print Name: _____              Print Name: _____

Title: _____              Title: _____

Date: _____              Date: _____



# Appendix A

## Service Level Specifications

**General Requirement:** Beginning of March 1, 2009 of the Term, Supplier shall meet or exceed the following service performance metrics. If Supplier fails to meet a specification defined below, then some or a portion of the Service Level Compliance Incentive will be forfeited.

**Definition:**

Service Level Compliance Incentive – shall mean a monthly payment from Supplier to Circuit City in the amount up to $50,000.00.

### 1. Call Center- Average Speed to Answer

*Objective*
For all Requests for Services received by the Call Center to be promptly answered by an Agent.

*Definition*
The amount of time that Customer must wait after placing a call to the Call Center to speak with an Agent, as measured from the time that the call is received by the Automatic Call Distribution (ACD) system until the call is answered by an agent.

*Measurement Interval*
Monthly

*Method of Calculation*
This Service Level Specification is calculated and measured by the following formula:

Average Speed to Answer = (total number of calls answered by an Agent within 30 seconds / total number of calls received by the ACD * 100 (expressed as a percentage).

*Minimum Service Level Specification*
70% of calls answered within 30 seconds.

*Weighting*
In a given month, up to twenty (20%) of the Service Level Compliance Incentive for that same month shall be at risk ("At-Risk-Amount") in the event Supplier does not meet or exceed this Minimum Service Level Specification. Supplier shall forfeit twenty-five (25%) of the At-Risk-Amount for every five (5%) percent that Supplier underperforms. Any underperformance score that is less than five (5%) shall be regarded as substantial compliance.



**2.    Service Provider Arrival (Normal Incidents)**

*Objective*
To expeditiously resolve outstanding Requests for Services and to track Service Provider arrival timeliness.

*Definition*
The amount of time between dispatch and arrival, as well as the amount of time required to complete required work, depending on the criticality of the issue.

*Measurement Interval*
Monthly

*Method of Calculation*
This Service Level Specification is calculated and measured by the following formula:

Post Service Provider Arrival (Normal Incidents) = (total number of Requests for Services for Normal Incidents where the Service Provider arrives at the designated Store On-Time / total number of Requests for Services for Normal Incidents) * 100 (expressed as a percentage)

For purposes of this Service Level Specification only, "On-Time" means within three (3) business days of Supplier's receipt of the Request for Service or within timeframe agreed to by applicable Store manager on duty, unless the Store manager on duty determines that the Request for Service can be serviced during upcoming Scheduled Maintenance Services (not to exceed forty-five (45) days from the date of the Request for Service), in which case, by the date of the next Scheduled Maintenance Services.

*Minimum Service Level Specification*
90% within ETA provided.

*Weighting*
In a given month, up to twenty (20%) of the Service Level Compliance Incentive for that same month shall be at risk ("At-Risk-Amount") in the event Supplier does not meet or exceed this Minimum Service Level Specification. Supplier shall forfeit twenty-five (25%) of the At-Risk-Amount for every five (5%) percent that Supplier underperforms. Any underperformance score that is less than five (5%) shall be regarded as substantial compliance.

**3.    Service Provider Arrival (Emergency/Critical Incidents)**

*Objective*
To expeditiously resolve outstanding Requests for Services and to track Service Provider arrival timeliness.

*Definition*
The amount of time between dispatch and arrival, as well as the amount of time required to complete required work, depending on the criticality of the issue.

*Measurement Interval*
Monthly



*Method of Calculation*
This Service Level Specification is calculated and measured by the following formula:

Post Service Provider Arrival (Emergency/Critical Incidents) = (total number of Requests for Services for Emergency/Critical Incidents where the Service Provider arrives at the designated Store On-Time / total number of Requests for Services for Emergency/Critical Incidents) * 100 (expressed as a percentage)

For purposes of this Service Level Specification only, "On-Time" means within four (4) hours of Supplier's receipt of the Request for Service or within the timeframe agreed to by applicable Store manager on duty.

*Minimum Service Level Specification*
90% within ETA provided.

*Weighting*
In a given month, up to twenty (20%) of the Service Level Compliance Incentive for that same month shall be at risk ("At-Risk-Amount") in the event Supplier does not meet or exceed this Minimum Service Level Specification. Supplier shall forfeit tweny-five (25%) of the At-Risk-Amount for every five (5%) percent that Supplier underperforms. Any underperformance score that is less than five (5%) shall be regarded as substantial compliance.

**4.    Budget Management**

*Objective*
To effectively manage costs within agreed upon budget levels for customer.

*Definition*
Managing costs to meet or fall below agreed upon budget between customer and supplier.

*Measurement Interval*
Monthly

*Method of Calculation*
This Service Level Specification is calculated and measured by the following formula:

Costs measured against monthly budget forecast.

*Minimum Service Level Specification*
100% within budget.

*Weighting*

In a given month, up to twenty (20%) of the Service Level Compliance Incentive for that same month shall be at risk ("At-Risk-Amount") in the event Supplier does not meet or exceed this Minimum Service Level Specification. Supplier shall forfeit fifty (50%) percent of the At-Risk-Amount if costs exceed the monthly forecasted budget by 1% to 3%. Supplier shall forfeit all of the At-Risk-Amount if costs exceed the monthly forecasted budget by more than 3%.



Exception: The Parties agree that if during any measured month, there is an event or occurrence contemplated under Section 10.1 of the MSA, then the "Budget Management" Service Level will be suspended until the first succeeding, full month after the event or occurrence has been resolved.

## 5.    Reporting

*Objective*
To provide Customer with timely access to pertinent data and information to enable sound business decisions.

*Definition*
The percentage of reports that are available at the required time.

*Measurement Interval*
Monthly

*Method of Calculation*
This Service Level Specification is calculated and measured by the following formula:

Report Delivery/Availability = (total number of reports delivered On-Time) / total number of reports scheduled to be delivered) * 100 (expressed as a percentage)

For the purposes of this Service Level Specification only, a monthly report is considered "On-Time" if it is either available electronically or received in hardcopy by Customer by the 15th day of the following month. A weekly report is considered "On-Time" if it is either available electronically or received in hardcopy by Customer on the following Wednesday. And, a quarterly report is considered "On-Time" if it is either available electronically or received in hardcopy by Customer by the 15th day of the month immediately following the completion of the calendar quarter.

*Minimum Service Level Specification*
100% delivered by the 15th of each month.

*Weighting*
In a given month, up to twenty (20%) of the Service Level Compliance Incentive for that same month shall be at risk ("At-Risk-Amount") in the event Supplier does not meet or exceed this Minimum Service Level Specification. Supplier shall forfeit all of the At-Risk-Amount if Supplier fails to meet this Service Level Specification.



## Appendix B

## Safe Harbor Rebate Schedule

In accordance with Section 9.3 of the MSA, Circuit City is eligible to receive certain annual percentage rebates from Supplier ("Safe Harbor Rebates").   Circuit City's total spend (exclusive of Transactional Fees, and inclusive of refunds, add-backs, and credit adjustments) with Supplier in any annual year of the Term (January through December) must meet the following milestones, and Circuit City must also be in material compliance with all other terms and conditions of the MSA and SOWs.

| Spend Milestone: | Percentage Rebate: |
|---|---|
| $10 million | 1% |
| $20 million | 2% |
| $30 million | 3% |
| $40 million and above | 5% |

**Calculation**:

Total Spend - shall mean the total amount of money Ciruit City pays to Supplier during any of annual year of Term, less Transactional Fees and associated services,  and inclusive of refunds, add-backs, and credit adjustments.

Percentage Rebate – shall mean the applicable percentage (see above) multiplied by the total annual scheduled maintenance spend plus total annual labor spend within reactive maintenance services.



## Appendix C

### QUOTE AND PROJECT FEE SCHEDULE

IPT will perform any facility maintenance services not normally covered under scheduled and reactive maintenance based on a sliding fee scale (see Table 1). There are primarily two classifications of work that will billed pursuant to this fee schedule: (1) Quoted Services and (2) Project Management Services.

**Quoted Services Fee Schedule:** Quoted Services consist of services where the costs of the services exceeds $5,000 and are repairs to components or equipment at a customer location. IPT will perform such services based on the sliding fee scale explained in Table 1, below. The Quote Fee represents all compensation for obtaining service, managing the process and processing the service invoices. The fee is only applied to the labor costs of the quote. All labor and materials are direct costs from the vendor and may include incurred costs from previous work performed but not billed.

**Project Management Fee Schedule:** Project Management Services which shall consist of services that are neither Scheduled Maintenance Services nor Reactive Maintenance Services, and which usually constitute either (1) an improvement to existing property or (2) replacement of components or equipment that constitute a capital project associated with a customer location. IPT will perform Project Management Services pursuant to the sliding fee scale described in Table 1, below. The Project Services Fee represents all compensation for obtaining service, managing the process and processing the service invoices. In contrast to Quoted Services, this fee is applied to the entire cost of the quote.

Table 1

| Project Cost | Mark Up % |
|---|---|
| Up to $5,000 | 14% |
| $5,000 - $10,000 | 10% |
| $10,000 and above | 7% |
| | |



## Appendix D

Covered Locations

# (CC to Insert)