IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **CIRCUIT CITY STORES, INC.,** *et al.,* | ) | Case No.:    08-35653-KRH |
| | ) | |
| Debtors. | ) | Chapter 11 |

### KELLY BREITENBECHER'S
### REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE

**COMES NOW,** Kelly Breitenbecher ("Ms. Breitenbecher"), by the undersigned counsel,

and pursuant to Debtor's Notice of Deadline For Filing Administrative Expense Requests,

Breitenbecher requests allowance and payment of an administrative expense claim, and states as

follows:

    1.    Amount of Claim:  $1,502,166.00

    2.    Debtor against which claim asserted: **Circuit City Stores, Inc.**

    3.    Legal and factual basis of claim:  See Exhibit 1.  Ms. Breitenbecher was employed by

Circuit City as a Senior Vice President, Operations and Supply Chain, until April 17, 2009.  Her

employment was pursuant to an Employment Agreement dated October 18, 2007, a copy of which

is attached to this claim as Exhibit 2.  Ms. Breitenbecher was also a party to a special cash

retention award dated January 3, 2008, a copy of which is attached this claim as Exhibit 3.

William A. Gray, Esquire – VSB #46911
Peter M. Pearl, Esquire – VSB #22344
C. Thomas Ebel, Esquire – VSB #18637
Sands, Anderson, Marks & Miller, P.C.
801 East Main Street, Suite 1800
Post Office Box 1998
Richmond, Virginia 23218-1998
(804) 648-1636 Telephone
(804) 783-7291 Facsimile
*Counsel for Kelly Breitenbecher*

{W1034179.1 013934-073846 }



COPY

RECEIVED
JUN 29 2009
KURTZMAN CARSON CONSULTANTS

4.    Supporting documentation is attached.

Date:  June 26, 2009

**Respectfully Submitted,**

**KELLY BREITENBECHER**

**By Counsel**

/s/  William A. Gray
William A. Gray, Esquire – VSB #46911
Peter M. Pearl, Esquire – VSB #22344
C. Thomas Ebel, Esquire – VSB #18637
Sands, Anderson, Marks & Miller, P.C.
801 East Main Street, Suite 1800
Post Office Box 1998
Richmond, Virginia 23218-1998
(804) 648-1636 Telephone
(804) 783-7291 Facsimile
*Counsel for Kelly Breitenbecher*


COPY


RECEIVED
JUN 2 9 2009
KURTZMAN CARSON CONSULTANTS

{W1034179.1 013934-073846 }

## EXHIBIT 1

### ATTACHMENT TO ADMINISTRATIVE CLAIM
### OF KELLY BREITENBECHER

1. January 23, 2008 Cash Retention Award      $600,000.00
   (See Attached)

2. Employment Agreement – Change in
   Control Severance Benefits (See Attached)

     a. Subpart 9.3(b):

         i.   2 x Base Salary      580,000.00

         ii.   2 x "Target Annual      290.000.00
            Bonus"[1]

     b. Subpart 9.3(c)[2]      10,166.00

     c. Subpart 9.3(d)[3]      6,000.00

     d. Subpart 9.3(e)[4]      <u>16,000.00</u>

         **TOTAL**      <u>$1,502.166.00</u>

---

[1] Target annual bonus was up to 50% of salary.

[2] Health and related plan benefit x 2.

[3] Value of 6 month outplacement services.

[4] 2x prerequisite outlined in 5.6 – Car allowance ($10,000.00) and legal fees ($6,000.00).

{W1034179.1 013934-073846 }

2007-12-04  14:12          Circuit City          804-527-4181 >> 16039710053          P 2/19



Circuit City Stores, Inc.
9954 Mayland Drive
Richmond, VA 23233

# Circuit City Stores, Inc.
## Employment Agreement for Kelly Breitenbecher

This EMPLOYMENT AGREEMENT ("Agreement") is made, entered into, and is effective as of the 18th day of October, 2007 (the "Effective Date"), by and between Circuit City Stores, Inc. (the "Company") and Kelly Breitenbecher (the "Executive").

WHEREAS, the Company desires to employ the Executive as Senior Vice President of Circuit City Stores, Inc.;

WHEREAS, the Company recognizes the Executive's intimate knowledge and experience in the business of the Company, and desires to secure the employment of the Executive in the role of Senior Vice President of the Company;

WHEREAS, upon execution of this Agreement, any prior employment agreement by and between the Executive and the Company, whether oral or written, will have no force and effect with respect to the terms and conditions of the Executive's employment and will be fully replaced and superseded by the terms of this Agreement; and

WHEREAS, the Executive will develop and/or come in contact with the Company's proprietary and confidential information which is not readily available to the public, and which is of great importance to the Company and is treated by the Company as secret and confidential information.

NOW, THEREFORE, in consideration of the Executive's continued employment and of the mutual covenants and agreements of the parties set forth in this Agreement, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

### Article 1.  Term of Employment

The Company hereby agrees to employ the Executive and the Executive hereby accepts employment as Senior Vice President of the Company, in accordance with the terms and conditions set forth herein, for an initial period of one (1) year, commencing as of the Effective Date of this Agreement as indicated above (the "Initial Term"); subject, however, to earlier termination as expressly provided herein.

The Initial Term shall automatically be renewed for additional periods of one (1) year each at the end of the Initial Term, and then again after each successive year thereafter (collectively, the "Renewal Periods," which, together with the Initial Term, constitute the "Term" of this Agreement). However, either party may terminate this Agreement at the end of the Initial Term, or at the end of any Renewal Period, by giving the other party written notice of intent not to renew, delivered at least forty-five (45) days prior to the end of the Initial Term or any Renewal Period.

Initials



**EXHIBIT**

2

Kelly Breitenbecher
Employment Agreement
Page 2 of 17

## Article 2. Position and Responsibilities

During the Term of this Agreement, the Executive agrees to serve as Senior Vice President of the Company. In her capacity as Senior Vice President, the Executive shall report directly to Executive Vice President - Merchandising, Services & Marketing, and shall have the duties and responsibilities of Senior Vice President of the Company and such other duties and responsibilities not inconsistent with the performance of her duties as Senior Vice President of the Company.

## Article 3. Standard of Care

During the term of this Agreement, the Executive agrees to devote substantially her full-time attention and energies to the Company's business. The Executive covenants, warrants, and represents that she shall:

(a)     Devote her full and best efforts and talents full time to the performance of her employment obligations and duties for the Company;

(b)     Exercise the highest degree of loyalty and the highest standards of conduct in the performance of her duties;

(c)     Comply with all rules, regulations, and policies established or issued by the Company; and

(d)     Refrain from taking advantage, for herself or others, of any corporate opportunities of the Company.

## Article 4. Other Employment

The Executive shall not, during the term hereof, be interested directly or indirectly, in any manner, as partner, officer, director, investor, stockholder, advisor, employee, or in any other capacity, in any other business similar to Company's business for the Executive's personal advantage or benefit or that of others. Any other employment or position which might reasonably be deemed contrary to the best interests of the Company is prohibited. During the term of employment hereunder, the Executive agrees to obtain the Company's written consent prior to entering into any other occupation, even if dissimilar to that of the Company. Such consent may be granted or withheld, in the Company's absolute discretion. Nothing herein contained shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent the Executive from investing in real estate for her own benefit (so long as such investment (a) is not related to or in support of any entity engaged in a business similar to that of the Company or (b) does not detract from the Executive's performance of her duties and obligations hereunder).

Initials

Kelly Breitenbecher
Employment Agreement
Page 3 of 17

## Article 5. Compensation and Benefits

As remuneration for all services to be rendered by the Executive during her employment, and as consideration for complying with the covenants herein, the Company shall pay and provide to the Executive the following:

**5.1.    Base Salary.** During the Term of this Agreement, the Company shall pay the Executive a Base Salary in an amount which shall be established and approved by the Compensation and Personnel Committee of the Board of Directors; provided, however, that such Base Salary shall be established at a rate of not less than $ 290,000.00 gross per year. This Base Salary shall be subject to all appropriate federal and state withholding taxes and payable in accordance with the normal payroll practices of the Company. The Base Salary shall be reviewed at least annually following the Effective Date of this Agreement, while the Term of this Agreement is in force, to ascertain whether, in the judgment of the Compensation and Personnel Committee, such Base Salary should be changed. If changed, the Base Salary as stated above shall, likewise, be changed for all purposes of this Agreement.

**5.2    Annual Bonus.** In addition to her Base Salary, the Executive shall be entitled to participate in the Company's short-term incentive program, as such program may exist from time to time during the Term of this Agreement.

Under the Company's short-term incentive plan, the Executive has the opportunity to earn an annual bonus with respect to any fiscal year of the Company ("Annual Bonus"). The Annual Bonus, if earned, with respect to any fiscal year, will generally be in an amount that is not less than Fifty Percent (50%) of the Executive's Base Salary for the fiscal year with respect to which the Annual Bonus is being paid (the "Minimum Bonus Rate").

The award and amount of any Annual Bonus shall be determined under the Company's short-term incentive plan, at the sole discretion of the Company's Compensation and Personnel Committee. If the Minimum Bonus Rate is changed, it shall, likewise, be changed for all purposes of this Agreement.

**5.3.    Long-Term Incentives.** During the Term of this Agreement, the Executive shall be eligible to participate in the Company's long-term incentive plan, to the extent that the Board of Directors of the Company or the Compensation and Personnel Committee, in their discretion, determines is appropriate.

**5.4.    Retirement Benefits.** During the Term of this Agreement, the Company shall provide to the Executive the opportunity for participation in all Company retirement, insurance, fringe benefit, and executive compensation plans and programs, subject to the eligibility and participation requirements of such plans.

**5.5.    Employee Benefits.** During the Term of this Agreement, the Company shall provide the Executive all benefits, subject to the eligibility requirements and other provisions of such arrangements. Such benefits may include group term life insurance, comprehensive health and major medical insurance, dental and life insurance, and short-term and long-term disability.

Initials

Kelly Breitenbecher
Employment Agreement
Page 4 of 17

     **5.6.** **Perquisites.** During the Term of this Agreement, the Company shall provide to the Executive, at the Company's cost, all perquisites, to the extent that the Board of Directors of the Company or the Compensation and Personnel Committee, in their discretion, determines is appropriate.

     **5.7.** **Right to Change Plans.** By reason of Articles 5.5 and 5.6 herein, the Company shall not be obligated to institute, maintain, or refrain from changing, amending, or discontinuing any benefit plan or perquisite.

## Article 6. Expenses

     During the Term of this Agreement, the Company shall pay or reimburse the Executive for all ordinary and necessary expenses, in a reasonable amount, which the Executive incurs in performing her duties under this Agreement including, but not limited to, travel, entertainment, professional dues and subscriptions, and all dues, fees, and expenses associated with membership in various professional, business, and civic associations and societies in which the Company finds that the Executive's participation is in the best interests of the Company. The payment of reimbursement of expenses shall be subject to such rules concerning documentation of expenses and the type or magnitude of such expenses as the Compensation and Personnel Committee of the Board of Directors may establish from time to time.

## Article 7. Employment Termination

     **7.1.** **Termination Due to Retirement or Death.** In the event the Executive's employment ends by reason of Retirement (defined as voluntary "Normal Retirement" under the then established definitions and rules of the Company's tax-qualified retirement plan) or the Executive's death during the term of this Agreement, the Executive's benefits shall be determined in accordance with the Company's retirement, survivor's benefits, insurance, and/or other applicable programs of the Company then in effect. In addition, in the case of the Executive's death, all stock grants will become immediately vested and may be exercised by the Executive's personal representatives, distributees, legatees, or estate at any time before the expiration date of the grant.

     The Effective Date of Termination due to Retirement or death shall be (a) ninety (90) days following the date the Executive provides the Company with written notice that the Executive is ending employment by reason of Retirement or (b) on the Executive's date of death, as the case may be. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive or, if applicable, the Executive's estate; (a) any Base Salary or Annual Bonus that was accrued but not yet paid as of the Effective Date of Termination; and (b) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

     **7.2.** **Termination Due to Disability.** The Company shall have the right to terminate the Executive's employment for disability. For the purposes of this Agreement, disability shall mean any physical or mental illness or injury that causes the Executive to be unable to substantially perform the Executive's normal duties; provided however that the Executive shall not be considered disabled until: (i) the Executive has been so disabled for 180 days during any period of twelve (12) consecutive months; (ii) the Executive's attending physician shall have furnished to the Company certification that the return of the Executive to her normal duties is impossible or improbable; or (iii) the Executive is determined to be totally disabled by the disability insurer then insuring the Executive, if any.

*Initials*

The Effective Date of Termination due to Disability shall be specified, in a written notice, by the Executive's immediate manager, and such written notice shall be delivered to the Executive, but shall be no less than thirty (30) calendar days after the delivery of such written notice to the Executive. Upon the Effective Date of Termination, the Company shall be obligated to pay the Executive (or, if applicable, the Executive's estate): (a) any salary that was accrued but not yet paid as of the Effective Date of Termination; (b) the unpaid Annual Bonus, if any, with respect to the fiscal year preceding the Effective Date of Termination (such Annual Bonus, if any, to be determined in the manner it would have been determined and payable at the time it would have been payable under Article 5.2 had there been no termination of the Employment Period); and (c) all other rights and benefits that the Executive is vested in, pursuant to other plans and programs of the Company.

It is expressly understood that the Disability of the Executive for a period of one hundred eighty (180) calendar days or less in the aggregate during any period of twelve (12) consecutive months, in the absence of any reasonable expectation that her Disability will exist for more than such a period of time, shall not constitute a failure by her to perform her duties hereunder and shall not be deemed a breach or default, and the Executive shall receive full compensation for any such period of Disability or for any other temporary illness or incapacity during the term of this Agreement.

If the employment of the Executive terminates because of Disability, all of the Executive's outstanding stock grants, excluding restricted stock grants issued under a performance based plan, will become immediately vested, effective as of the date of the Executive's Disability. Then, the Executive, the Executive's personal representatives, distributees, or legatees may exercise the Executive's grants at any time before the expiration date of the grant.

7.3.    **Voluntary Termination by the Executive.**  The Executive may terminate her employment and this Agreement at any time by giving the Company at least forty-five (45) days written notice. The Company reserves the right to require the Executive not to work during the notice period but shall pay the Executive her full Base Salary, at the rate then in effect as provided in Article 5.1 herein, through the notice period plus all other benefits to which the Executive has a vested right on the last day of employment (for purposes of this paragraph, the Executive shall not be paid any Annual Bonus with respect to the fiscal year in which voluntary termination under this Article 7.3 occurs). The Company thereafter shall have no further obligations under this Agreement.

7.4    **Involuntary Termination by the Company Without Cause.**  The Company may terminate the Executive's employment, at any time, for any reason other than death, Disability, Retirement, or for "Cause", by providing the Executive with at least forty-five (45) days written notice; provided, however, that for purposes of this Article 7.4 (a), no variation, alteration, modification, cancellation, change or amendment made to this Agreement pursuant to Article 12.3 or 12.4 shall be deemed an involuntary termination without Cause.

(a)    Upon the Effective Date of Termination specified by the Company for termination by the Company without cause, the Company shall pay to the Executive, an amount equal to one (1) year of the Executive's Base Salary and a pro rata share of the Executive's target Annual Bonus established for the fiscal year in which the Executive's Effective Date of Termination occurs according to the Company's regularly scheduled payroll practices. If, however, the Company determines that such payments are subject to Treasury Regulation Service 1.409A-3(g)(2), payment shall begin on the first day of the month following the

 Initials

Kelly Breitenbecher
Employment Agreement
Page 6 of 17

six (6) month anniversary of the Executive's Effective Date of Termination, with 6/12 of the total payment made on such date and 1/12 of the payment made on the first day of each month in the six (6) month period thereafter.

(b)     In addition, the Company shall continue, at the same cost to the Executive as existed as of the Effective Date of Termination, all health and welfare benefit plan participation, as permitted by law, for one (1) full year following the Executive's termination of employment; provided, however, that the applicable COBRA "period of coverage" under any plan subject to Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code"), or Sections 601 through 609 of the Employee Retirement Income Security Act of 1974 (ERISA) shall begin as of the Effective Date of Termination.

(c)     The Company shall also provide the Executive with six (6) months of outplacement services.

(d)     Any unvested stock options or any outstanding restricted stock, excluding performance-based restricted stock grants, as of the Effective Date of Termination, that would become vested (that is, exercisable in the case of stock options or transferable and non-forfeitable in the case of restricted stock) if the Executive remained an employee through the Initial Term or the then current Renewal Period of this Agreement will become vested as of the date of the Effective Date of Termination.  The Executive must satisfy the tax withholding requirements.

The Company thereafter shall have no further obligations under this Agreement.

7.5.     **Termination For Cause.**  Nothing in this Agreement shall be construed to prevent the Company from terminating the Executive's employment under this Agreement, without notice or liability for doing so, for "Cause."

For purposes of this Agreement, "Cause" means:

(a)     The Executive's material breach of this Agreement, which breach is not cured within ten (10) days of receipt by the Executive of written notice from the Company specifying the breach;

(b)     The Executive's gross negligence in the performance of her material duties hereunder, intentional nonperformance or intentional misperformance of such duties, misconduct or refusal to abide by or comply with the directives of the Board, her superior officers, or the Company's policies and procedures, which actions continue for a period of ten (10) days after receipt by the Executive of written notice of the need to cure or cease;

(c)     Conviction of a felony or any crime involving moral turpitude;

(d)     The Executive engaging in illegal conduct, dishonesty or fraud with respect to the business or affairs of the Company that in the reasonable judgment of the Company materially and adversely affects the operations or reputation of the Company;

 Initials

(e)   Failure of the Executive to disclose to the Executive's manager a conflict of interest, of
which the Executive knew or, with reasonable diligence, would have known, in
connection with any transaction entered into on behalf of the Company;

(f)   Failure of the Executive to agree to a modification of this Agreement, pursuant to
paragraph 12.3 below, when the purpose of the modification is to comply with applicable
federal, state and/or local laws or regulations, or when such modification is designed to
further define the restrictions of Article 8 or otherwise enhance the enforcement of
Article 8 without increasing the scope of the Article 8 restrictions; or

(g)   The Executive engages in any act or omission which the Company believes could injure
or bring discredit upon the reputation and/or goodwill of the Company and/or its
respective officers, directors or shareholders.

In the event this Agreement is terminated for Cause, the Company shall pay the Executive her
Base Salary through the Effective Date of Termination for cause and the Executive shall immediately
thereafter forfeit all rights and benefits (other than vested benefits) she would otherwise have been
entitled to receive under this Agreement.  The Company thereafter shall have no further obligations under
this Agreement.

7.6.   **Termination for Good Reason.**  At any time during the term of this Agreement, the
Executive may terminate this Agreement for Good Reason (as defined below) by giving the Company
forty-five (45) days written notice, which notice sets forth in detail the facts and circumstances claimed to
provide a basis for such termination.  However, the Company shall, at its option, have thirty (30) days
from receipt of such written notice to cure any event or circumstance that could constitute Good Reason.

If the Company chooses not to cure, the Effective Date of Termination for Good Reason shall
occur upon the expiration of the forty-five (45) days prior notice period that is specified by the Executive
in the written notice, and the Company shall pay and provide to the Executive the benefits set forth in this
Article 7.6.

Subject to the last paragraph of this Article 7.6, and for purposes of this Agreement, Good Reason
shall mean, without the Executive's express written consent, the occurrence of any one (1) or more of the
following:

(a)   Failing to maintain the Executive's participation in the Company's annual bonus and
long-term incentive plan in a manner determined by the Board of Directors of the
Company or the Compensation and Personnel Committee;

(b)   Failing to maintain the Executive's benefits under, or relative level of participation in, the
Company's employee benefit or retirement plans, perquisites, policies, practices, or
arrangements in which the Executive participates as of the Effective Date of this
Agreement;

(c)   Reducing the Executive's Base Salary which reduction is not made pursuant to an
agreement between the Executive and the Company;

 Initials

Kelly Breitenbecher
Employment Agreement
Page 8 of 17

(d)    Terminating the Executive's employment otherwise than as expressly permitted by this Agreement; or

(e)    Failing to comply with and satisfy Article 10.1 by requiring any successor to the Company to assume and agree to perform the Company's obligations hereunder.

Upon the Effective Date of Termination, the Executive shall be entitled to receive the same payments and benefits as she is entitled to receive following an involuntary termination of her employment by the Company without Cause, as specified in Article 7.4 herein. Said payment shall commence within forty-five (45) calendar days following the Effective Date of Termination.

The Executive's right to terminate employment for Good Reason shall not be affected by the Executive's incapacity due to physical or mental illness. Additionally, Company reorganizations and/or changes in reporting structures do not constitute a sufficient basis for invoking this Article 7.6.

## Article 8. Noncompetition and Confidentiality

### 8.1.    Noncompetition.

(a)    During the Executive's employment and for a period of one (1) year following the last day of the Executive's employment, the Executive shall not directly or indirectly compete with the Company by engaging, in a competitive capacity, in any business that is engaged in the same or similar business of the Company, specifically including, but not limited to, Best Buy Co., Inc.; Dell, Inc; eBay; Wal-Mart Stores; Amazon.com, and any of the related or affiliated entities for each of the above companies. A business will not be considered to be in competition with the Company for purposes of this paragraph 8.1(a) or paragraph 8.1(b) below if:

(i)    The business or the operating unit of the business in which the Executive is employed or with which the Executive is associated (collectively the "Business Unit") is not engaged in the retail sales of consumer electronics;

(ii)    If sales of the Business Unit's products or services in the retail sales and service of consumer electronics constitute less than ten percent (10%) of such Business Unit's sales; or

(iii)    If the sales of the Business Unit in the retail sales and service of consumer electronics do constitute more than ten percent (10%) of the sales of the Business Unit, but the Business Unit solely operates outside of North America.

Notwithstanding the foregoing, nothing herein shall be deemed to prevent or limit the right of the Executive to invest in the capital stock or other securities of any corporation whose stock or securities are regularly traded on any public exchange, nor shall anything herein contained be deemed to prevent Employee from investing in real estate for her own benefit (as long as such investment is not related to or in support of any entity engaged in the same or similar business as the Company in competition with the

*Initials*

Kelly Breitenbecher
Employment Agreement
Page 9 of 17

Company in one or more Metropolitan Statistical Areas ("MSAs") in which the Company
is doing business during the Executive's employment).

(b)   During the Executive's employment and for a period of one (1) year following the last
day of the Executive's employment, the Executive shall not directly or indirectly compete
with the Company by engaging, in a competitive capacity, in any business engaged in the
same or similar business of the Company in one or more MSAs where, on the last day of
the Executive's employment, the Company is engaged in real estate site selection or has
taken further steps toward the commencement of operations in the future, of which the
Executive is aware.

(c)   The Executive agrees that competition, as set forth in Article 8.1(a) above, shall include,
but not be limited to, engaging in competitive activity, as an individual, as a partner, as a
joint venturer with any other person or entity, or as an employee, agent, or representative
of any other person or entity.

(d)   It is the specific intent of the parties that the Executive shall be restricted from competing
directly or indirectly with any segment of the Company's business in which the Executive
engaged prior to the last day of her employment and from any segment of the Company's
business about which the Executive acquired proprietary or confidential information
during the course of her employment.

(e)   If any provision of this Article 8.1 relating to the time period, geographic area or scope of
restricted activities shall be declared by a court of competent jurisdiction to exceed the
maximum time period, geographic area or scope of activities, as applicable, that such
court deems reasonable and enforceable, said time period, geographic area or scope of
activities shall be deemed to be, and thereafter shall become, the maximum time period,
scope of activities or largest geographic area that such court deems reasonable and
enforceable and this Agreement shall automatically be considered to have been amended
and revised to reflect such determination.

(f)   The Executive and the Company have examined in detail this Covenant Not to Compete
and agree that the restraint imposed upon the Executive is reasonable in light of the
legitimate interests of the Company, and it is not unduly harsh upon the Executive's
ability to earn a livelihood.

8.2.   **Non-Solicitation of Employees.** The Executive agrees that during the Executive's
employment with the Company and for a period of one (1) year following the last day of the Executive's
employment, the Executive shall not, directly or indirectly, solicit or induce, or attempt to solicit or
induce, any employee of the Company to leave the Company for any reason whatsoever or hire any
individual employed by the Company. For purposes of this Article 8.2, employee shall mean any
individual employed by the Company on the last day of the Executive's employment or within the three-
month period prior to the last day of the Executive's employment.

8.3.   **Confidentiality.** The Company has advised the Executive and the Executive
acknowledges that it is the policy of the Company to maintain as secret and confidential all Protected
Information (as defined below), and that Protected Information has been and will be developed at

Initials

substantial cost and effort to the Company. The Executive agrees to hold in strict confidence and safeguard any information of or about the Company gained by the Executive in any manner or from any source during the Executive's employment. The Executive shall not, without the prior written consent of the Company, at any time, directly or indirectly, divulge, furnish, use, disclose or make accessible to any person, firm, corporation, association, or other entity (otherwise than as may be required in the regular course of the Executive's employment), either during the Executive's employment with the Company or subsequent to the last day of the Executive's employment, any Protected Information, or cause any such information of the Company to enter the public domain.

The Executive understands and agrees that any information, data and/or trade secrets about Company or its suppliers and/or distributors is the property of the Company and is essential to the protection of the Company's goodwill and to the maintenance of the Company's competitive position and accordingly should be kept secret. For purposes of this Agreement, "Protected Information" means trade secrets, confidential and proprietary business information of or about the Company, and any other information of the Company, including, customer lists (including potential customers), sources of supply, processes, plans, materials, pricing information, internal memoranda, marketing plans, promotional plans, internal policies, research, purchasing, accounting and financial information, computer programs, hardware, software, and products and services which may be developed from time to time by the Company and its agents or employees, including the Executive; provided, however, that information that is in the public domain (other than as a result of a breach of this Agreement), approved for release by the Company or lawfully obtained from third parties who are not bound by a confidentiality agreement with the Company, is not Protected Information.

Nothing contained in this Article is intended to reduce in any way protection available to the Company pursuant to the Uniform Trade Secrets Act as adopted in the Commonwealth of Virginia or any other state or other applicable laws which prohibit the misuse or disclosure of confidential or proprietary information.

8.4.    **Acknowledgement of Covenants.** The parties hereto acknowledge that the Executive's services are of a special, extraordinary, and intellectual character which gives her unique value, and that the business of the Company and its subsidiaries is highly competitive, and that violation of any of the covenants provided in this Article 8 would cause immediate, immeasurable, and irreparable harm, loss, and damage to the Company not adequately compensated by a monetary award. The Executive acknowledges that the time, scope of activities and geographical area restrained by the provisions of this Article 8 are reasonable and do not impose a greater restraint than is necessary to protect the goodwill of the Company's business. The Executive further acknowledges that she and the Company have negotiated and bargained for the terms of this Agreement and that the Executive has received adequate consideration for entering into this Agreement. In the event of any such breach or threatened breach by the Executive of any one or more of such covenants, the Company shall be entitled to such equitable and injunctive relief as may be available to restrain the Executive from violating the provisions hereof. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available at law or in equity for such breach or threatened breach, including the recovery of damages and the immediate termination of the employment of the Executive hereunder for cause.

 Initials

Kelly Breitenbecher
Employment Agreement
Page 11 of 17

## Article 9. Change in Control

**9.1.    Change in Control.** This Article 9 shall not become effective, and the Company shall have no obligation hereunder, if the employment of the Executive with the Company shall terminate prior to a Change in Control (as defined in Article 9.2 below) of the Company.

**9.2.    Definition of Change in Control.** Change in Control of the Company means, and shall be deemed to have occurred, upon the first to occur of any of the following events:

(a)    The acquisition by any individual, entity, or group (a "Person"), including a "person" within the meaning of Section 13(d)(3) or 14(d)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), but excluding an Affiliate (as defined below) of the Company, of beneficial ownership within the meaning of Rule 13d-3 promulgated under the Exchange Act, of thirty-five percent (35%) or more of either: (i) the then outstanding shares of common stock of Circuit City (the "Outstanding Common Stock"); or (ii) the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (the "Outstanding Voting Securities"); excluding, however, the following: (A) any acquisition directly from the Company (excluding an acquisition resulting from the exercise of an option, conversion right, or exchange privilege unless the security being so exercised, converted or exchanged was acquired directly from the Company); (B) any acquisition by the Company; (C) any acquisition by an employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; or (D) any acquisition by any corporation pursuant to a transaction which complies with clauses (i), (ii), and (iii) of subsection (c) of this Article 9.2;

(b)    Individuals who, as of the Effective Date, constitute the Board of Directors (the "Incumbent Board") cease for any reason to constitute at least a majority of such Board; provided that any individual who becomes a director of the Company subsequent to the Effective Date, whose election, or nomination for election by the Company's stockholders, was approved by the vote of at least a majority of the directors then comprising the Incumbent Board shall be deemed a member of the Incumbent Board; and provided further, that any individual who was initially elected as a director of the Company as a result of an actual or threatened election contest, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Exchange Act, or any other actual or threatened solicitation of proxies or consents by or on behalf of any Person other than the Board shall not be deemed a member of the Incumbent Board;

(c)    The consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (a "Corporate Transaction"); excluding, however, a Corporate Transaction pursuant to which: (i) all or substantially all of the individuals or entities who are the beneficial owners, respectively, of the Outstanding Common Stock and the Outstanding Voting Securities immediately prior to such Corporate Transaction will beneficially own, directly or indirectly, more than sixty percent (60%) of, respectively, the outstanding shares of common stock, and the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors, as the case may be, of the corporation resulting

_Initials_

from such Corporate Transaction (including, without limitation, a corporation, which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or indirectly) in substantially the same proportions relative to each other as their ownership, immediately prior to such Corporate Transaction, of the Outstanding Common Stock and the Outstanding Voting Securities, as the case may be; (ii) no Person (other than: the Company; any employee benefit plan (or related trust) sponsored or maintained by the Company or any corporation controlled by the Company; the corporation resulting from such Corporate Transaction; and any Person which beneficially owned, immediately prior to such Corporate Transaction, directly or indirectly, twenty-five percent (25%) or more of the Outstanding Common Stock or the Outstanding Voting Securities, as the case may be) will beneficially own, directly or indirectly, twenty-five percent (25%) or more of, respectively, the outstanding shares of common stock of the corporation resulting from such Corporate Transaction or the combined voting power of the outstanding securities of such corporation entitled to vote generally in the election of directors; and (iii) individuals who were members of the Incumbent Board will constitute at least a majority of the members of the board of directors of the corporation resulting from such Corporate Transaction; or

(d)     The consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

For purposes of this Article 9, "Affiliate" shall mean with reference to a specified Person, any Person that directly or indirectly through one (1) or more intermediaries controls or is controlled by or is under common control with the specified Person. For purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used in respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of such Person, whether through ownership of voting securities or by contract or otherwise.

9.3.     **Change-in-Control Severance Benefits.** If at any time during the Term of this Agreement there is a Change in Control of the Company and the Executive's employment is terminated for any reason other than death, Disability, Retirement, Voluntary Termination other than Good Reason or Cause within the one (1) year period following the Change in Control or the Executive voluntarily terminates for any reason in the thirteenth month following a Change in Control of the Company, the Company shall provide to the Executive the following:

(a)     Base Salary and all other benefits due her as if she had remained an employee pursuant to Article 5 through the remainder of the month in which the termination occurs, less applicable withholding taxes and other authorized payroll deductions;

(b)     A lump-sum severance allowance in an amount that is equal to the product of two (2) times both the Executive's Base Salary at the rate in effect immediately prior to the termination and the Executive's target Annual Bonus established for the fiscal year in which the Executive's termination of employment occurs;

_Initials_

Kelly Breitenbecher
Employment Agreement
Page 13 of 17

(c)     Continuation at the same cost to the Executive as existed as of the Effective Date of
Termination of Agreement of all health, welfare, and benefit plan participation for two
(2) full years following employment termination;

(d)     Provision of outplacement services for the Executive for six (6) months;

(e)     A lump-sum payment equal to the two (2) year cost of perquisites outlined in Article 5.6
above; and

(f)     Any unvested stock options or any outstanding restricted stock, excluding
restricted stock grants issued under a performance based plan, that would become vested
(that is, transferable and non-forfeitable) if the Executive remained an employee through
the Initial Term or the then current Renewal Period of this Agreement will become vested
as of the date of the Executive's termination of employment.  The Executive must satisfy
the tax withholding requirements.

9.4.     **Excise Tax Equalization Payment.**  In the event that the Executive becomes entitled to
severance benefits under this Agreement or any other agreement with or plan of the Company (in the
aggregate, the "Total Payments"), if any of the Total Payments will be subject to the tax (the "Excise
Tax") imposed by Section 4999 of the Code or any similar excise tax that may hereafter be imposed), the
Company shall pay to the Executive in cash an additional amount (the "Gross-Up Payment"), such that
the net amount retained by the Executive after deduction of any Excise Tax upon the Total Payments and
any federal, state, and local income tax and Excise Tax upon the Gross-Up Payment provided for by this
Article 9.4 (including FICA and FUTA), shall be equal to the Total Payments.  The Company shall make
such payment to the Executive as soon as practicable following the Effective Date of Termination, but in
no event beyond thirty (30) days from such date.

For purposes of determining the amount of the Gross-Up Payment, the Executive shall be deemed
to pay federal income taxes at the highest marginal rate of federal income taxation in the calendar year in
which the Gross-Up Payment is to be made, and state and local income taxes at the highest marginal rate
of taxation in the state and locality of the Executive's residence on the Effective Date of Termination, net
of the maximum reduction in federal income taxes which could be obtained from deduction of such state
and local taxes.

The Company's Compensation and Personnel Committee shall determine, based upon the advice
of the Company's independent certified public accountants, whether any payments or benefits hereunder
are subject to the Excise Tax.

9.5.     **Subsequent Recalculation.**  In the event the Internal Revenue Service adjusts the
computation of the Company under Article 9.4 herein so that the Executive did not receive the greatest
net benefit, the Company shall reimburse the Executive for the full amount necessary to make the
Executive whole, plus a market rate of interest, as determined by the Compensation and Personnel
Committee.

9.6.     **Limit on Change-in-Control Severance Benefits.**  Notwithstanding anything in this
agreement to the contrary, the value of change-in-control severance benefits payable under this
agreement, determined as set forth below, may not exceed 2.99 times the sum of the Executive's Base

 Initials

Kelly Breitenbecher
Employment Agreement
Page 14 of 17

Salary plus the most recent bonus paid to the Executive (or, if no bonus has been paid to the Executive in the Executive's current position, the Executive's target bonus). This limit shall apply to lump sum severance payments, periodic cash payments, consulting fees (other than fees paid on an hourly or per diem basis for work actually performed), the value of post-termination employee benefit plan and fringe benefit continuation and additional service credit under the Company's defined benefit pension plan. The value of accelerated vesting of stock options and other long-term incentive awards is not subject to the limit, nor is accelerated payment of an amount that would otherwise be due to the Executive at a later date. Excise tax equalization payments, as provided under Article 9.4 will continue to apply in these situations and may cause the total benefits paid to the Executive to exceed the 2.99 limit.

## Article 10.  Assignment

**10.1.    Assignment by Company.** This Agreement may and shall be assigned or transferred to, and shall be binding upon and shall inure to the benefit of, any successor of the Company, and any such successor shall be deemed substituted for all purposes of the "Company" under the terms of this Agreement. As used in this Agreement, the term "successor" shall mean any person, firm, corporation, or business entity which, at any time, whether by merger, purchase, or otherwise, acquires all or substantially all of the assets or the business of the Company. In addition, the obligations of the Executive under Articles 8 and 12 of this Agreement shall continue after the termination of the Executive's employment and shall be binding on the Executive's heirs, executors, legal representatives and assigns.

Failure of the Company to obtain the agreement of any successor to be bound by the terms of this Agreement prior to the effectiveness of any such succession shall be a breach of this Agreement, and shall immediately entitle the Executive to compensation from the Company in the same amount and on the same terms as the Executive would be entitled in the event of a Termination of Employment for Good Reason as provided by Article 7.6. Except as provided herein, the Company may not otherwise assign this Agreement.

**10.2.    Assignment by Executive.** The services to be provided by the Executive to the Company hereunder are personal to the Executive, and the Executive's duties may not be assigned by the Executive; provided, however, that this Agreement shall inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, and administrators, successors, heirs, distributees, devisees, and legatees. If the Executive dies while any amounts payable to the Executive hereunder remain outstanding, all such amounts, unless otherwise provided herein, shall be paid in accordance with the terms of this Agreement to the Executive's devisee, legatee, or other designee or, in the absence of such designee, to the Executive's estate.

## Article 11.  Dispute Resolution and Notice

**11.1.    Issue Resolution.** Except for actions initiated by the Company to enjoin a breach by, and/or recover damages from the Executive related to violation of any of the restrictive covenants in Article 8 of this Agreement, which Company may bring in an appropriate court of law or equity, any disagreement between the Executive and the Company concerning anything covered by this Agreement or concerning other terms or conditions of the Executive's employment or the termination of the Executive's employment will be settled by final and binding arbitration pursuant to the Company's Associate Issue Resolution Program. The Dispute Resolution Agreement and the Dispute Resolution Rules and

 Initials

Kelly Breitenbecher
Employment Agreement
Page 15 of 17

Procedures are incorporated herein by reference as if set forth in full in this Agreement. The decision of the arbitrator will be final and binding on both the Executive and the Company and may be enforced in a court of appropriate jurisdiction.

**11.2.    Notice.** Any notices, requests, demands, or other communications provided for by this Agreement shall be sufficient if in writing, and if sent by registered or certified mail to the Executive at the last address she has filed in writing with the Company or, in the case of the Company, at its principal offices.

## Article 12. Miscellaneous

**12.1.    Entire Agreement.** This Agreement supersedes any prior agreements or understandings, oral or written, between the parties hereto, with respect to the subject matter hereof, and constitutes the entire agreement of the parties with respect thereto. Without limiting the generality of the foregoing sentence, this Agreement completely supersedes any and all prior employment agreements entered into by and between the Company, and the Executive, and all amendments thereto, in their entirety.

**12.2.    Return of Materials.** Upon the termination of the Executive's employment with the Company, however such termination is effected, the Executive shall promptly deliver to Company all property, records, materials, documents, and copies of documents concerning the Executive's business and/or its customers (hereinafter collectively "Company Materials") which the Executive has in her possession or under her control at the time of termination of her employment. The Executive further agrees not to take or extract any portion of Company Materials in written, computer, electronic or any other reproducible form without the prior written consent of the Executive's immediate manager.

**12.3.    Modification.** This Agreement shall not be varied, altered, modified, canceled, changed, or in any way amended except by mutual agreement of the parties in a written instrument executed by the parties hereto or their legal representatives. It is the intention of the parties that this Agreement may be modified to ensure that this Agreement is in compliance with all federal laws and regulations, including but not limited to, Internal Revenue Code Section 409A and regulations thereunder.

**12.4.    Severability.** It is the intention of the parties that the provisions of the restrictive covenants herein shall be enforceable to the fullest extent permissible under the applicable law. If any clause or provision of this Agreement is held to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, then the remainder of this Agreement shall not be affected thereby, and in lieu of each clause or provision of this Agreement which is illegal, invalid or unenforceable, there shall be added, as a part of this Agreement, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and as may be legal, valid, and enforceable.

**12.5.    Counterparts.** This Agreement may be executed in one (1) or more counterparts, each of which shall be deemed to be an original, but all of which together will constitute one and the same Agreement.

**12.6.    Tax Withholding.** The Company may withhold from any benefits payable under this Agreement all federal, state, city, or other taxes as may be required pursuant to any law or governmental regulation or ruling.

 Initials

Kelly Breitenbecher
Employment Agreement
Page 16 of 17

12.7. **Restrictive Covenants of the Essence.** The restrictive covenants of the Executive set forth herein are of the essence of this Agreement; they shall be construed as independent of any other provision in this Agreement; and the existence of any claim or cause of action of the Executive against the Company, whether predicated on this Agreement or not, shall not constitute a defense to the enforcement by the Company of the restrictive covenants contained herein. The Company shall at all times maintain the right to seek enforcement of these provisions whether or not the Company has previously refrained from seeking enforcement of any such provision as to the Executive or any other individual who has signed an agreement with similar provisions.

12.8 **Beneficiaries.** The Executive may designate one (1) or more persons or entities as the primary and/or contingent beneficiaries of any amounts to be received under this Agreement. Such designation must be in the form of a signed writing acceptable to the Executive's immediate manager. The Executive may make or change such designation at any time.

12.9. **Payment Obligation Absolute.** The Company's obligation to make the payments and the arrangement provided for herein shall be absolute and unconditional, and shall not be affected by any circumstances, including, without limitation, any offset, counterclaim, recoupment, defense, or other right which the Company may have against the Executive or anyone else. All amounts payable by the Company hereunder shall be paid without notice or demand. Each and every payment made hereunder by the Company shall be final, and the Company shall not seek to recover all or any part of such payment from the Executive or from whomsoever may be entitled thereto, for any reasons whatsoever.

The Executive shall not be obligated to seek other employment in mitigation of the amounts payable or arrangements made under any provision of this Agreement, and the obtaining of any such other employment shall in no event effect any reduction of the Company's obligations to make the payments and arrangements required to be made under this Agreement; provided, however, that continued health, welfare, and benefit plan participation pursuant to Article 7.4 or Article 9.3 herein shall be discontinued in the event the Executive becomes eligible to receive substantially similar benefits from a successor employer.

12.10. **Contractual Rights to Benefits.** This Agreement establishes and vests in the Executive a contractual right to the benefits to which she is entitled hereunder. However, nothing herein contained shall require or be deemed to require, or prohibit or be deemed to prohibit, the Company to segregate, earmark, or otherwise set aside any funds or other assets, in trust or otherwise, to provide for any payments to be made or required hereunder.

Initials

Kelly Breitenbecher
Employment Agreement
Page 17 of 17

### Article 13.  Governing Law

To the extent not preempted by federal law, the provisions of this Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia, without reference to Virginia's choice of law statutes or decisions.

IN WITNESS WHEREOF, the Executive and the Company have executed this Agreement as of the Effective Date.

**CIRCUIT CITY STORES, INC.**

By: _____
Eric A. Jonas, Jr.
Sr. Vice President, Human Resources

**EXECUTIVE:**

_____
Kelly Breitenbecher
SSN: 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

**ATTEST:**

_____

#3739932 v1

Initials



January 3, 2008

Kelly Breitenbecher
4701 Trail Wynd Ct.
Glen Allen, VA  230590000

Dear Kelly:

Congratulations!  The Compensation and Personnel Committee of the Board of Directors (the "Committee") has awarded you a special cash retention award (the "Award") subject to the terms of this Award letter.  The purpose of this Award is to reward, motivate and retain management personnel who are key to the Company's turnaround efforts and long term success.  To accept this Award, please sign the enclosed copy of this letter, and return it as indicated in item 6 below.

Subject to the requirements and limitations set forth in this Award letter, your Award, Award Date, and Vesting Dates are as follows:

| Total Cash Retention Award: | $600,000 |
|---|---|
| Award Date: | January 1, 2008 |

| Vesting Dates | Vesting % |
|---|---|
| January 1, 2009 | 50% |
| January 1, 2010 | 33% |
| January 1, 2011 | 17% |

For purposes of this Award letter, "Company" means Circuit City Stores, Inc. or a parent or subsidiary of Circuit City Stores, Inc. within the meaning of section 424(e) and (f) of the Internal Revenue Code of 1986, as amended.

Your right to receive the portion of your Award corresponding to the above Vesting Dates is contingent on (i) your agreeing to the terms of this Award by signing and returning the enclosed copy of this letter, and (ii) your remaining continuously employed on a full-time active basis with the Company through and including the corresponding Vesting Date.  If you satisfy these requirements, the portion of your Award that becomes vested will be paid to you in a single lump sum cash payment within 75 days following the Vesting Date.  Your right to this Award is not contingent on corporate or individual performance.

Forfeiture.  If prior to becoming fully vested in your Award, (i) your employment with the Company terminates for any reason other than your death or permanent disability, or (ii) your employment status with the Company changes to part-time, or (iii) you retire from the Company, then the unvested portion of your Award will be forfeited as of the date of your termination, change in status, or retirement, as the case may be.

- 1 -

**EXHIBIT**

3

If your employment with the Company terminates on or before a Vesting Date because you die or become permanently disabled, then the portion of your Award scheduled to vest on such Vesting Date will vest as of the date of your death or termination for disability (assuming you otherwise meet the requirements under this Award letter), and any portion of your Award that would have vested on a subsequent Vesting Date will be forfeited. For example, if your employment terminates under these circumstances on or before January 1, 2009, the portion of your Award scheduled to vest on that date will vest, and any portion that would have vested on a subsequent Vesting Date will be forfeited.

The Committee will determine whether a permanent disability exists for purposes of the foregoing, and such determination will be conclusive and binding.

Other terms relevant to this Award letter are set forth below.

1. **Modification**. The Committee may unilaterally modify the terms of this Award letter after the Award Date provided that your consent is obtained with respect to any modification that would be detrimental to your rights hereunder, except that your consent will not be required to the extent any such modification is to comply with applicable law.

2. **Change of Control**. If you remain continuously employed on a full-time active basis with the Company through and including the date on which a Change of Control of the Company occurs, then notwithstanding any provision herein to the contrary, any restrictions hereunder on your outstanding Award shall lapse as of such date. For this purpose, "Change of Control" has the meaning set forth in the Circuit City Stores, Inc. 2003 Stock Incentive Plan, as amended and restated, effective December 14, 2006, and that definition is incorporated by reference into, and made a part of, this Award letter. Generally, a Change of Control will be deemed to occur upon any of the following events: (i) the acquisition by any person or entity of 35% or more of either the Company's outstanding shares or the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (but excluding certain acquisitions involving the Company or an affiliate, or by any benefit plan sponsored by the Company); (ii) the incumbent members of the Board of Directors of the Company (including any future directors whose election is approved by a majority of the incumbent members) cease to constitute a majority of the Board of Directors; (iii) the consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (with certain exceptions, as described in the 2003 Stock Incentive Plan); or (iv) the consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

3. **Withholding Taxes**. On the Vesting Date, you will have taxable income equal to the amount of your vested Award, and the Company will withhold the amount of taxes required to be withheld or paid.

4. **Interpretation**. The interpretation and construction of any provision or term of this Award letter by the Committee will be final and conclusive. The terms of this Award letter and all actions taken hereunder will be governed by the laws of the

Commonwealth of Virginia, without regard to the conflict of law provisions of any jurisdiction.

5. **Miscellaneous**.

a. This Award letter is the entire agreement between you and the Company concerning the Award granted hereunder.  If you are a party to an Employment Agreement with the Company, you agree that in the case of a conflict between the Employment Agreement and this Award letter, the terms of this Award letter will control.

b. Nothing in this Award letter confers any right to continued employment with the Company, or affects the Company's right to terminate an associate's employment at any time, with or without notice, and with or without cause.

c. The Company has no obligation to contribute any assets to a trust or other entity or otherwise to segregate any assets, or maintain separate accounts for the purpose of satisfying the Award obligation hereunder.

6. **Acceptance of this Award**.  In order for your Award to become effective, you must accept it by signing and faxing a copy of this entire letter as soon as possible, but in no event later than February 1, 2008 to **757-299-8412**.

Your signature will also constitute your agreement to the terms and conditions contained in this letter.

Sincerely,

Eric A. Jonas, Jr.
Senior Vice President
Human Resources

ACCEPTED:

Associate Signature

Kee Breitenbecher
Printed Name

2 3 2008
Date



# SANDS ANDERSON
# MARKS & MILLER

A PROFESSIONAL CORPORATION

**William A. Gray**
Attorney

Direct: (804) 783-7237
E-mail: BGray@SandsAnderson.com

RICHMOND • BLACKSBURG • FREDERICKSBURG
MCLEAN • RESEARCH TRIANGLE

WWW.SANDSANDERSON.COM

801 East Main Street
Post Office Box 1998
Richmond, Virginia 23218-1998
Main: (804) 648-1636
Fax: (804) 783-7291

June 26, 2009

**VIA: OVERNIGHT MAIL**
Circuit City Stores, Inc., et al.
Claims Processing Department
Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, California 90245

COPY

RE:    Circuit City Chapter 11 Bankruptcy
       Administrative Claim of Kelly Breitenbecher
       Our File/Matter No. 013934/073846

To Whom It May Concern:

Enclosed please find for filing an Administrative Claim on behalf of Kelly Breitenbecher.
Also enclosed is one extra copy of the Claim. Please file stamp the extra copy, and return same
to me in the enclosed self-addressed stamped return envelope.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

William A Gray

RECEIVED
JUN 2 9 2009
KURTZMAN CARSON CONSULTANTS

WAG/gtp

Enclosure:

cc:    Ms. Kelly Breitenbecher

{W1034629.1 013934-073846 }