# EXHIBIT A – PART 3

condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d) The various rights and remedies reserved to Landlord herein, are cumulative, the rights and remedies described in Paragraph 20.(a)-(c) shall survive termination of this Lease and Landlord may pursue any and all such rights and remedies and any other available to Landlord under applicable law or equity, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease); provided, however, that no remedy of termination shall be available to Landlord except as expressly set forth in paragraph 20(b) after the occurrence of an Event of Default. Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Leased Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

21. <u>Notices</u>. All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes (i) three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or (ii) one (1) day after having been

sent by Federal Express or other nationally recognized air courier service, to the Addresses stated below:

   (a) If to Landlord, at the address set forth on the first page of this Lease.

   (b) If to Tenant, at the address set forth on the first page of this Lease, Attention: Corporate Secretary,

With a copy to:  McGuire, Woods, Battle & Boothe, L.L.P.
       One James Center
       Richmond, Virginia 23219
       Attention: Robert L. Burrus, Jr.

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and stating in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall serve a copy of such Notice upon Lender in the manner aforesaid. For the purposes of this Paragraph, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above.

   22.  <u>Memorandum of Lease; Estoppel Certificates</u>. Tenant shall execute, deliver and record, file or register from time to time all such instruments as may be required by any present or future law in order to evidence the respective interests of Landlord and Tenant in any of the Leased Premises, and shall cause a memorandum of this Lease, and any supplement hereto or to such other instrument, if any, as may be appropriate, to be recorded, filed or registered and re-recorded, refiled or re-registered in such manner and in such places as may be required by any present or future law in order to give public notice and protect the validity of this Lease. In the event of any discrepancy between the provisions of said recorded memorandum of this Lease or any other recorded instrument referring to this Lease and the provisions of this Lease, the provisions of this Lease shall prevail. Landlord and Tenant shall, at any time and from time to time, upon not less than twenty days' prior written request by the other (or, in the case of an estoppel certificate requested of either, upon not less than twenty days' prior written request of Lender), execute, acknowledge and deliver to the other a statement in writing, executed by Landlord or Tenant or, if other than an individual, by a President, Vice

33

7763\circuit\ccp8\lease.p8

President or authorized general partner, principal officer or agent certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent payable hereunder has been paid, (iii) that to the knowledge of the party executing such certificate no default by either Landlord or Tenant exists hereunder or specifying each such of which such party may have knowledge; (iv) the remaining Term hereof; and (v) with respect to a certificate signed by Tenant, that to the knowledge of the party executing such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said party's knowledge, specifying and describing the same. It is intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective mortgagee, purchaser, assignee or subtenant of the Leased Premises.

23.  <u>Surrender and Holding Over</u>.  Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord in the same condition in which the Leased Premises were originally received from Landlord at the commencement of this Lease, except as to any repair or Alteration as permitted or required by any provision of this Lease, and except for ordinary wear and tear and damage by fire, casualty or condemnation with which Tenant is not required to repair hereunder. Tenant may remove at Tenant's sole cost and expense from the Leased Premises on or prior to such expiration or earlier termination Tenant's Trade Fixtures and personal property which are owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal. Tenant's Trade Fixtures and personal property not so removed at the end of the Term or within thirty days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier

34

termination. Upon such expiration or earlier termination, no party shall have any further rights or obligations hereunder except as specifically provided herein.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as tenancy from month to month only, at one hundred fifty percent (150%) of the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred fifty percent (150%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 20.

24. <u>No Merger of Title</u>. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (ii) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (x) this Lease or the leasehold estate created by this Lease and (y) the fee estate in or ownership of the Leased Premises including, without limitation, Lender's interest therein, or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

25. <u>Landlord Exculpation</u>. Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in Leased Premises and shall not be enforced against the Landlord individually or personally.

26. <u>Hazardous Substances</u>.

(a) Tenant represents and warrants that it will not on, about, or under the Leased Premises, make, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and

the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 *et seq.* (the "Act"), but the foregoing shall not prevent the use to the extent necessary and customary in normal distribution center operations of any such substances in accordance with applicable laws and regulations and Tenant represents and warrants that it will at all times comply with the Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials. Hazardous Materials as used herein shall include, without limitation, all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.*; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, *et seq.*, any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq.*, any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, *et seq.*, any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes or any modifications thereof or successor statutes thereto; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

    (b)  To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the Initial Term or any extension or renewal Term thereof. Tenant shall and hereby does agree to defend, indemnify and hold Lender and Landlord, their officers, directors, shareholders, partners and employees harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response

36

and remedial costs), and liabilities, including, but not limited to, attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of any applicable federal, state or local environmental law with respect to the Leased Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this Paragraph 26, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) from the Leased Premises or any portion or portions thereof, now or hereafter existing during the Initial Term and any extension or renewal Term, whether or not arising out of or in any manner connected with Tenants' occupancy of the Leased Premises during the Initial Term or any extension or renewal Term.

(c) The Tenant represents and warrants that it will not install any underground storage tank without specific, prior written approval from the Landlord, which may be withheld in its sole discretion. The Tenant will not store combustible or flammable materials on the Leased Premises in violation of the Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials.

27. Entry by Landlord. Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than 48 hours except in the case of emergency) to enter the Leased Premises at all reasonable business hours, (and at all other times in the event of an emergency), for (i) the purpose of inspecting the same or for the purpose of doing any work under Paragraph 9, and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), and (ii) the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within twelve (12) months prior to the expiration of the term of this Lease for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

28. Statements. Tenant named herein shall submit to Lender and Landlord (i) within 45 days of the end of each of the first three fiscal quarters of each fiscal year of Tenant, quarterly balance sheets, income and cash flow statements for Tenant named herein, certified

37

by a senior financial officer of Tenant; (ii) within 90 days of the end of each fiscal year, annual balance sheets, income and cash flow statements for Tenant named herein, certified by an independent public accountant. Quarterly 10Qs as filed with the Securities and Exchange Commission shall satisfy the requirements contained in (i) herein. Copies of the 10Ks filed with the Securities and Exchange Commission will satisfy the requirement contained in (ii) herein. The obligations of Tenant named herein shall continue whether or not this Lease shall have been assigned.

29. <u>No Usury</u>. The intention of the parties being to conform strictly to the usury laws now in force in the State, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

30. <u>Broker</u>. Landlord and Tenant represent and warrant to each other that neither party negotiated with any broker in connection with this Lease and that this Lease was negotiated directly by Landlord and Tenant. Each party hereby agrees to indemnify the other against all claims, damages, costs and expenses incurred by the indemnified party as a result of the breach of the foregoing representation or warranty by the indemnifying party.

31. <u>Waiver of Landlord's Lien</u>. Landlord hereby waives any right to distrain Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is created or otherwise. Landlord agrees, at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant. Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that Trade Fixtures are Tenant's property and not part of Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

32. <u>No Waiver</u>. No delay or failure by either party to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.

33. **Separability**. If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

34. **Indemnification**. Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from any of the Leased Premises or Adjoining Property or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of any of or otherwise relating to, the Leased Premises or Adjoining Property, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon (collectively, "Losses"), whether or not Landlord has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said Loss. In case any action or proceeding is brought against Landlord or Lender by reason of any such Loss, Tenant covenants upon notice from Landlord or Lender to defend Landlord or Lender in such action, with the expenses of such defense paid by Tenant, and Landlord or Lender will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant. The obligations of Tenant under this Paragraph 34 shall survive any termination of this Lease with respect to Losses identified in reasonable detail, by the Claim Deadline, as defined below, of the intent to make a claim upon Tenant under such indemnity. The "Claim Deadline" shall be:

(a) to the extent of any indemnification obligation arising as a result of the claim by a third party against Landlord or Lender, or the claim of a third party against the Leased Premises, the date that is 30 days after the later of (i) the expiration of the period during which such third party claim may be brought under the applicable statute of limitations or (ii) the date which is two (2) years after the expiration or earlier termination of this Lease;

(b) with respect to any indemnification obligation of Tenant not described in subparagraph (a) above, the day that is two years after the expiration or earlier termination of this Lease.

35. <u>Tenant to Comply With Reciprocal Easement Agreement</u>. Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any reciprocal easement agreement or any other agreement or document of record now affecting the Leased Premises, herein referred to collectively as "REA", and that Tenant shall comply with all of the terms and conditions of the REA during the term of this Lease. Tenant shall be deemed the "Owner" of the Leased Premises for purposes of the REA. Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Lender against any claim, loss or damage suffered by Landlord or Lender by reason of Tenant's failure to perform any obligations or pay any expenses as required under any REA or comply with the terms and conditions of any REA as hereinabove provided during the term of this Lease.

36. <u>Headings</u>. The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

37. <u>Modifications</u>. This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought. Each of Tenant and Landlord agrees that it will not modify this Lease without the written consent of Lender within any period during which there is a Lender hereunder.

38. <u>Successors, Assigns</u>. The covenants of this Lease shall run with the Land and bind Tenant, the heirs, distributees, personal representatives, successors and permitted assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns. In the event there is more than one Tenant, the obligation of each shall be joint and several. The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of

Landlord are concerned, shall be limited to mean and include only the owner or owners of the Leased Premises or holder of the Mortgage in possession at the time in question of the Leased Premises and in the event of any transfer or transfers of the title of the Leased Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all personal liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed.

39. **Counterparts.** This Lease may be executed in several counterparts, which together shall be deemed one and the same instrument.

40. **Governing Law.** This Lease shall be governed by and construed according to the laws of the State.

41. **Reimbursement for Acquisition and Development of Additional Land.**

(a) For purposes of this paragraph 41, each of the terms set forth below shall have the meaning following such term:

(i) "Additional Indebtedness" means evidence of indebtedness issued by Landlord for the purpose of financing Reimbursable Expenses of Tenant and the reasonable costs and expenses incurred in connection with (A) the issuance of such Additional Indebtedness, (which may be issued, pursuant to subparagraph (c) below, to the Entitled Offerees, pursuant to subparagraph (e) below to Third Party Noteholders, or, pursuant to subparagraph (f) below, in connection with the Pari Passu Financing), (B) the acquisition of the Additional Land, and (C) performing any Landlord obligations under this paragraph 41. All Additional Indebtedness must be nonrecourse to Landlord (being secured only by a lien on the Leased Premises and an assignment of this Lease), except that the provisions exculpating Landlord from personal liability may include customary exceptions for Landlord's fraud. The terms (other than interest rates) of the Additional Indebtedness shall be no less favorable to Landlord than the terms of Landlord's Mortgage entered into approximately as of the date hereof, except that the documents evidencing or creating such indebtedness may include provisions then required by law or customarily required by the NAIC or other regulatory body in similar net lease financings provided by institutional investors. The terms of the Additional

41

Financing must be such that the ratio of (W) the sum of each Incremental Offer Price (calculated in accordance with subparagraph (a)(v) below) thereunder, added to the Offer Price in respect of the same month, to (X) the fair market value (as unencumbered by the Lease), as of the date of payment of the Reimbursable Expenses to Tenant, of the Leased Premises and the Additional Land and the Qualifying Additions, is no greater than the ratio of (Y) such Offer Price to (Z) the amount of $18,000,000.

      (ii) "Additional Land" means the land described on **Exhibit "D"** attached hereto, upon which Tenant currently holds an option.

      (iii) "Current Offer Price" means the Offer Price for the month in which the Reimbursable Expenses are paid (or, as the context may dictate, are requested to be paid) to Tenant.

      (iv) "Entitled Offerees" means the holders of notes issued pursuant to any existing Mortgage, or other institutional investors.

      (v) "Incremental Offer Price" means any of the amounts that would be reflected on a monthly schedule of principal amortization for the Additional Indebtedness as the outstanding principal thereof during the month listed opposite such amount.

      (vi) "Landlord's Commitment" shall have the meaning ascribed thereto in subparagraph (c) below.

      (vii) "Lease Supplement" shall mean a supplement to this Lease, which shall: (A) add the description of the Additional Land to the description of the Leased Premises; (B) increase the Basic Rent payments required to be made hereunder during the Term of this Lease (as the same may have been extended) by an amount which shall be sufficient to make each payment, when due, of principal of, and interest on, the Additional Indebtedness and to pay a trustee's fee of not more than one percent (1%) of each such payment of principal and interest, (C) increase each of the Offer Prices listed on **Exhibit "C"** by the amount of the Incremental Offer Price in respect of the month during which such Offer Price would be applicable hereunder.

(viii) "Offer Price" means any of the purchase prices set forth on Exhibit "C" attached hereto.

(ix) "Pari Passu Financing" means Additional Indebtedness to fund the reimbursement of the Reimbursable Expenses, which financing must:

(a) require equal monthly payments of principal and interest,

(b) be fully self-amortizing over its term,

(c) have a term which is equal to the length of the remaining initial term of the Lease (that is, excluding all renewal periods),

(d) require that the lender thereunder serve upon Lender under any existing Mortgage a duplicate of any notice of default served upon Landlord under the Pari Passu Financing, and

(e) provide that no notice regarding the occurrence of any default under the Pari Passu Financing shall be deemed validly given unless and until such duplicate notice upon Lender is served.

(x) "Priority Adjustment Documents" means all documents and instruments, including an intercreditor agreement, necessary to alter of record the priority status of Landlord's existing Mortgage to render the indebtedness secured thereby secured pari passu with the indebtedness secured by the Pari Passu Financing (that is, such that the indebtedness secured by Landlord's existing Mortgage and the indebtedness secured by the Pari Passu Financing are secured ratably in proportion to the respective aggregate outstanding amounts thereof by liens of equal priority encumbering the Leased Premises, including the Additional Land and the Improvements thereon) and to provide for other necessary rights and obligations between such mortgagees.

(xi) "Qualifying Addition" means an additional structure, improvement or fixture constructed on or installed at the Leased Premises and the Additional Land that conforms to the character and quality of the Improvements as then existing.

(xii)  "Reimbursable Expenses" shall mean an amount up to the amount incurred or to be incurred by Tenant in the purchase of the Additional Land, and construction or installation of the Qualifying Addition. Notwithstanding the foregoing, the amount of the Reimbursable Expenses shall be deemed to be the lower of the actual amount thereof as set forth in Tenant's Request or the amount that, when added to the Current Offer Price, bears the same relation to the then fair market value (without regard to any value attributable to Landlord's interest in this Lease or the rents payable hereunder) of the Leased Premises, including the Additional Land and the Qualifying Addition, as the Current Offer Price bears to the amount of $18,000,000.00.

(xiii)  "Reimbursement Conditions" shall mean the following:

(A)  The Qualifying Addition shall have been completed substantially in accordance with the Reimbursement Plans, as the same shall have been amended with the consent of Landlord and Lender, which consent shall not be unreasonably withheld;

(B)  Tenant shall have delivered to Landlord and Lender an appraisal, prepared at Tenant's sole cost and expense by an appraiser reasonably acceptable to Landlord and Lender, reflecting that the addition of the Additional Land to the Leased Premises and the completion of the Qualifying Addition has increased the fair market value (without regard to any value attributable to Landlord's interest in this Lease or the rents payable hereunder) of the Leased Premises by an amount at least equal to the amount of the Reimbursable Expenses;

(C)  Tenant shall have caused the Additional Land to be conveyed to Landlord and shall have authorized, executed and delivered to Landlord a Lease Supplement;

(D)  Landlord and Lender shall have received from Tenant such other certificates, opinions of counsel, environmental reports, surveys of the Leased Premises (including the Additional Land), title insurance policies, and consents to the assignment of this Lease (as supplemented) in such form as Landlord or Lender may reasonably request; and

44

(E) Any conditions imposed by Lender in respect of the Additional Indebtedness shall have been satisfied.

(xiv) "Reimbursement Plans" shall have the meaning ascribed thereto in subparagraph (b) below.

(xv) "Rejection Notice" shall have the meaning ascribed thereto in subparagraph (c) below.

(xvi) "Tenant's Request" shall have the meaning ascribed thereto in subparagraph (b) below.

(b) At any time before June 1, 1998, Tenant may, in connection with Tenant's contemplated completion of a Qualifying Addition, or Tenant's completion thereof, make a written request to Landlord (a "Tenant's Request") that Landlord pay to Tenant an amount equal to the Reimbursable Expenses. Tenant shall have the right to make a Tenant's Request if (i) the completion of the Qualifying Addition that is the subject thereof has been completed within 120 days of, or is scheduled to be completed within 120 days of the date of such Tenant's Request; (ii) the amount of the Reimbursable Expenses is, or is reasonably estimated by Tenant to be when completed, $5,000,000 or more; and (iii) the value and use of the Leased Premises shall not be impaired by such Qualifying Addition; (iv) the Tenant's Request is accompanied by architect's drawings and specifications (the "Reimbursement Plans") relating to the Qualifying Addition and Tenant's certification as to (A) the amount and character of the Reimbursable Expenses, (B) the description of the Qualifying Addition, (C) the fact that the Qualifying Addition was constructed in accordance with the requirements of this Lease, and (D) the commencement and completion dates for construction (or Tenant's best estimate thereof). Tenant shall make a Tenant's Request within 120 days of the completion of a Qualifying Addition.

(c) Upon receipt of a Tenant's Request and related Reimbursement Plans, Landlord shall request that Lender (and any other Entitled Offerees identified by Landlord) issue commitments to purchase Additional Indebtedness to be issued by Landlord in

connection with the reimbursement of Tenant's Reimbursable Expenses upon then market terms for similar financings. If Landlord is able to obtain commitments from the Entitled Offerees within 60 days of the date of Tenant's Request, Landlord shall acknowledge in writing (a "Landlord's Commitment") its obligation, subject to and upon the satisfaction of the Reimbursement Conditions, to reimburse Tenant for the Reimbursable Expenses. If Landlord is unable to obtain such commitment within such 60-day period, Landlord shall so advise Tenant in writing (a "Rejection Notice"), promptly after the expiration of such 60-day period.

(d) If Landlord delivers a Landlord's Commitment, each of Landlord and Tenant shall use all reasonable efforts to cause to occur all events within their respective control that are required for the satisfaction of the Reimbursement Conditions, and Landlord shall pay to Tenant the full amount of the Reimbursable Expenses and execute and deliver the Lease Supplement upon the satisfaction of the Reimbursement Conditions.

(e) If Tenant makes a Tenant's Request and Landlord serves a Rejection Notice in response thereto, or Landlord otherwise does not reimburse Tenant for the costs incurred in the construction or installation of such Qualifying Addition, Tenant may arrange for any institutional investor (or Tenant itself) (the "Third Party Noteholders") to purchase Additional Indebtedness in an amount of up to the amount of the Reimbursable Expenses plus the reasonable costs of issuing the Additional Indebtedness, which shall be issued pursuant to and secured by Landlord's existing Mortgage. Upon Tenant's notification to Landlord that Tenant has so arranged, each of Landlord and Tenant shall use all reasonable efforts to cause to occur all events within their respective control that are required for the satisfaction of the Reimbursement Conditions. Upon Tenant's satisfaction of the Reimbursement Conditions (the "Lender", as, but only as, such term is used in the definition of "Reimbursement Conditions", being deemed for purposes of this subparagraph (e) to refer the Third Party Noteholders and Lender, except that as used in subparagraphs (D) and (E) of such definition shall be deemed to refer only to the Third Party Noteholders), Landlord shall issue Additional

Indebtedness to the Third Party Noteholders; Landlord shall pay to Tenant the excess of the gross amount of such Additional Indebtedness issued less Landlord's reasonable costs incurred in connection with such issue; and Landlord shall execute and deliver to Tenant the Lease Supplement.

(f) If Tenant makes a Tenant's Request and Landlord serves a Rejection Notice in response thereto, or Landlord otherwise does not reimburse Tenant for the costs incurred in the construction or installation of such Qualifying Addition, Tenant may arrange for Pari Passu Financing. Upon Tenant's written request, Landlord shall use all reasonable efforts to enforce the provisions in Landlord's current Mortgage that require that Lender negotiate in good faith with the prospective lender under the Pari Passu Financing in order to agree upon the terms of Priority Adjustment Documents mutually agreeable to the lenders under the Pari Passu Financing and the holders of Landlord's Mortgage. Upon such agreement and upon Tenant's satisfaction of the Reimbursement Conditions (the "Lender", as, but only as, such term is used in the definition of "Reimbursement Conditions," being deemed for purposes of this subparagraph (f) to refer to Lender and the mortgagee under the Pari Passu Financing), Landlord shall upon the written request of Tenant,

(i) execute and deliver all notes, mortgages or supplements to mortgages, and other documents, instruments and agreements reasonably required by the lender under the Pari Passu Financing;

(ii) execute and deliver the Lease Supplement; and

(iii) use all reasonable efforts to procure from Lender the execution and delivery of the Priority Adjustment Documents.

(g) Upon Tenant's service of a Tenant's Request and Landlord's service of a Rejection Notice or Landlord's otherwise failing to pay to Tenant the Reimbursable Expenses, Tenant may, at its sole election, convey to Landlord the Additional Land, whereupon Landlord shall execute a supplement to this Lease adding the description of the Additional Land to the description of the Leased Premises (but making no other changes) and shall obtain from

Lender any consent or approval required in respect of such supplement. If Tenant builds a Qualifying Addition and does not become entitled to reimbursement under subparagraphs (b) - (f) above within two years of completion of such Qualifying Addition, Tenant shall convey the Additional Land and the Improvements thereon in accordance with the terms of this subparagraph (g).

(h)  No provision of this paragraph 41 shall require Landlord to make any reimbursement to Tenant except to the extent Landlord receives funds as the result of the issuance of Additional Indebtedness. Tenant shall reimburse to Landlord any costs or expenses incurred by Landlord in performing its obligations under this paragraph 41 if Tenant makes a Tenant's Request but no Additional Indebtedness is issued as a result thereof. If any terms of any Additional Indebtedness would impose additional costs or potential liability upon Landlord in the absence of any amendment to this Lease, Landlord shall advise Tenant thereof, and Tenant shall either withdraw its Tenant's Request (whereupon the parties shall have no further rights or obligations under this paragraph 41 except for Tenant's reimbursement obligation as set forth above and any obligations of Tenant under subparagraph (g) above) or Tenant shall agree to include in the Lease Supplement such changes as are necessary to impose upon Tenant all such additional costs or potential liabilities or make corresponding changes to the Lease in respect of such additional costs and potential liabilities.