Douglas M. Foley (VSB No. 34364)
Bryan A. Fratkin (VSB No. 38933)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In Re:                        :   Chapter 11
                              :
Circuit City Stores, Inc.,    :   Case No. 08-35653 (KRH)
et al.,                       :
              Debtors.    x       Jointly Administered
- - - - - - - - - - - - - - x
Circuit City Stores, Inc.,    :
                              :
              Plaintiff,      :
                              :
        v.                    :   Adv. Pro. No.: _____
                              :
Active Media Services,        :
Inc.,                         :
              Defendant.      :
- - - - - - - - - - - - - - x

**COMPLAINT**

Circuit City Stores, Inc. and its affiliated

debtors and debtors-in-possession in the above-captioned

chapter 11 cases (collectively, "Circuit City" or the

"Debtors"), by and through their undersigned counsel,

for their Complaint, allege upon knowledge as to

themselves and their own actions, and upon information
and belief as to all others, as follows:

## NATURE OF THE ACTION

1.    Circuit City brings this action against
Active Media Services, Inc. ("Active" or "Defendant") to
recover the sum of not less than $19,178,522.73 due and
owing from Active to Circuit City relating to an
advertising brokerage relationship between the parties.
In addition to various breaches of contract by Active,
Circuit City also seeks recovery for unjust enrichment
and for certain preferential transfers and fraudulent
transfers that occurred during the 90-day period prior
to the commencement of Circuit City's bankruptcy
proceedings, as well as turnover of property of Circuit
City's bankruptcy estate.

## THE PARTIES

2.    Plaintiff Circuit City is a corporation
organized under the laws of the Commonwealth of Virginia,
with its principal place of business in Richmond,
Virginia.  Circuit City is a debtor and debtor in
possession in the above-captioned chapter 11 bankruptcy
proceedings, and it was a leading specialty retailer of

consumer electronics and operated large nationwide electronics stores that sold, among other things, televisions, home theatre systems, computers, camcorders, furniture, software, imaging and telecommunications products, and other audio and video electronics.

3.     Upon information and belief, Defendant Active Media Services, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Pearl River, New York.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

5.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A),(E), and (O).

**FACTUAL ALLEGATIONS**

**A.     Circuit City's Bankruptcy Cases.**

7.     On November 10, 2008, Circuit City and certain of its subsidiaries filed voluntary petitions with this Court for relief under chapter 11 of title 11,

United States Code, 11 U.S.C. §§ 101, <u>et</u> <u>seq</u>. (the
"Bankruptcy Code").

8.   On November 12, 2008, the Office of the
United States Trustee for the Eastern District of
Virginia appointed a statutory committee of unsecured
creditors.

9.   To date, no trustee or examiner has been
appointed in these chapter 11 cases.

10.   On November 12, 2008, the Court appointed
Kurtzman Carson Consultants LLC ("KCC") as claims,
noticing and balloting agent for the Debtors in these
chapter 11 cases pursuant to 28 U.S.C. § 156(c).

11.   On December 10, 2008, the Court entered
that certain Order Pursuant to Bankruptcy Code Sections
105 and 502 and Bankruptcy Rules 2002, 3003(c)(3), and
9007 (I) Setting General Bar Date and Procedures for
Filing Proofs of Claim; and (II) Approving Form and
Manner of Notice Thereof (Docket No. 890) (the "Claims
Bar Date Order").

12.   Pursuant to the Claims Bar Date Order,
the deadline for filing all "claims" (as defined in 11
U.S.C. § 105(5)) arising before November 10, 2008

4

against the Debtors by any non-governmental entity was 5:00 p.m. (Pacific) on January 30, 2009 (the "General Bar Date").  The deadline for governmental units to file claims that arose before November 10, 2008 was 5:00 p.m. (Pacific) on May 11, 2009 (the "Governmental Bar Date"). Pursuant to the Claims Bar Date Order, this Court approved the form and manner of the claims bar date notice, which was attached as Exhibit A to the Claims Bar Date Order (the "Claims Bar Date Notice").

13.   On December 17 and 19, 2008, KCC served a copy of the Claims Bar Date Notice on all parties who filed notices of appearance pursuant to Bankruptcy Rule 2002, all of the Debtors' scheduled creditors in these cases, the Debtors' equity holders, and certain other parties (Docket No. 1314).  In addition, the Debtors published the Claims Bar Date Notice in The Wall Street Journal (Docket No. 1395) and The Richmond Times-Dispatch (Docket No. 1394).

14.   On January 13, 2009, Active filed a proof of claim asserting an unsecured claim in the amount of $2,129,242.12 against the Debtors for "media and travel services" ("Claim No. 3895").

15.   On January 16, 2009, this Court
authorized the Debtors, among other things, to conduct
going out of business sales at the Debtors' remaining
567 stores pursuant to an agency agreement (the "Agency
Agreement") between the Debtors and a joint venture as
agent (the "Agent").   On January 17, 2009, the Agent
commenced going out of business sales pursuant to the
Agency Agreement at the Debtors remaining stores.   The
going out of business sales concluded on or about March
8, 2009.

**B.    The Advertising Agreement Between Active and
       Circuit City.**

16.   On December 30, 2003, Circuit City and
Active entered into an agreement (as amended, the
"Advertising Agreement") pursuant to which Active would
purchase cable and network television advertising on
behalf of Circuit City.   A true and correct copy of the
Advertising Agreement is annexed hereto as <u>Exhibit A</u>[1] and
is incorporated herein by reference.

---

[1]   The Advertising Agreement contains certain confidential and/or
      proprietary information.   Accordingly, the Debtors will file a
      motion to seal the Advertising Agreement.

17.    Pursuant to the Advertising Agreement, the "purpose of this [Advertising Agreement] is to set forth the terms of a transaction for the sale by [Circuit City] to [Active], and Active's purchase from [Circuit City], of certain of [Circuit City's] merchandise, as well as the purchase by Active on behalf of [Circuit City] of certain media, goods and/or services."  Advertising Agreement at p.1, Recitals.

18.    Under the Advertising Agreement, Circuit City agreed to sell to Active certain consumer and electronics merchandise identified in a schedule to the Advertising Agreement.  Advertising Agreement ¶ 1.

19.    In exchange for the merchandise, Active agreed to provide Circuit City with certain advertising brokerage services.  Advertising Agreement at p. 1, Recitals; id. ¶ 3.

20.    In connection with these transactions, Active issued to Circuit City a certain amount of trade credits (the "Trade Credits"), purportedly based on the value of the merchandise sold to Active.  Advertising Agreement ¶ 2.

21.  Circuit City could then redeem the Trade
Credits to pay for a portion of the advertising services
it purchased from Active pursuant to the Advertising
Agreement (the "Trade Credit Requirement").  Advertising
Agreement ¶ 4.

22.  Circuit City was required to pay for the
remaining portion of the advertising services with cash
(the "Cash Payment Requirement").  Advertising Agreement
¶ 4.

23.  Under the initial terms of the
Advertising Agreement, payment by Circuit City to Active
on account of advertising services relating to "spot
television media for the first quarter of calendar 2004"
was to be in the form of a sixty-five percent (65%) Cash
Payment Requirement and a thirty-five percent (35%)
Trade Credit Requirement.  Advertising Agreement ¶ 4.

24.  Thereafter, the Cash Payment Requirement
portion and Trade Credit Requirement portion due from
Circuit City on account of Active's invoices would be
determined solely by Active based on Circuit City's
advertising demands.  Advertising Agreement ¶ 4.

25.  With respect to the Trade Credits, the Advertising Agreement provided that the "Trade Credit shall be utilized solely in accordance with the terms and conditions of this [Advertising Agreement] in connection with the purchase by [Circuit City] of media, goods and/or services and shall not be redeemable for cash."  Advertising Agreement ¶ 2.

**C.   The Addenda to the Advertising Agreement.**

26.  Addendum 2.  On October 9 2007, Circuit City and Active entered into Addendum 2 to the Advertising Agreement ("Addendum 2").

27.  Pursuant to Addendum 2, Circuit City sold to Active additional merchandise identified on a schedule to Addendum 2.  Addendum 2 ¶ 1.

28.  In connection with the sale of additional merchandise to Active under Addendum 2, Active issued additional Trade Credits to Circuit City.  Addendum 2 ¶ 2(i).

29.  Addendum 3.  On March 18, 2008, Circuit City and Active entered into Addendum 3 to the Advertising Agreement ("Addendum 3").

30.   Pursuant to Addendum 3, Circuit City assigned to Active its rights of use to certain previously booked hotel reservations at the Mandalay Bay Resort & Casino.  Addendum 3 ¶ 1.

31.   In connection with the assignment of Circuit City's rights to Active under Addendum 3, Active issued additional Trade Credits to Circuit City. Addendum 3 ¶ 2(A).

32.   Addendum 4.  On August 26, 2008, Circuit City and Active entered into Addendum 4 to the Advertising Agreement ("Addendum 4").  A true and correct copy of Addendum 4 is annexed hereto as Exhibit B and is incorporated herein by reference.

33.   Pursuant to Addendum 4, Circuit City sold to Active additional merchandise identified on a schedule to Addendum 4 with a total value of $20,007,642 (the "Merchandise").  Addendum 4 ¶ 1(i).

34.   In connection with the sale of additional Merchandise to Active under Addendum 4, Active issued additional Trade Credits to Circuit City in the amount of $20,000,000.  Addendum 4 ¶ 2(i).

35.   The quantity and value of Merchandise
sold to Active under Addendum 4 was revised pursuant to
an amendment to Addendum 4 dated September 23, 2008
("Amendment 4").   A true and correct copy of Amendment 4
is annexed hereto as Exhibit C and is incorporated
herein by reference.

36.   The revised schedule of Merchandise
included in Amendment 4 identified Merchandise to be
sold to Active with a total value of $19,266,482.
Amendment 4 ¶ 1, Schedule A.

37.   The amount of additional Trade Credits
issued by Active to Circuit City under Addendum 4 was
also reduced to $19,200,000 pursuant to Amendment 4.
Amendment 4 ¶ 1.

38.   Pursuant to the initial Advertising
Agreement, transfer of title of the goods sold by
Circuit City to Active occurred upon delivery of the
merchandise to Active's warehouses.   Advertising
Agreement ¶1(C).

39.   However, in connection with Addendum 4
entered into by the parties on August 26, 2008, within
the 90-day period prior to the commencement of the

bankruptcy proceedings, the transfer of title provision
was amended to provide that "[t]ransfer of title to the
[Merchandise] from [Circuit City] to Active shall occur
simultaneously with the execution of this Addendum 4 by
both parties."  Addendum 4 ¶ 1(ii).

**D.    The December 2008 Estimated Advertising
       Overpayments.**

40.   Pursuant to the Advertising Agreement, on
November 20, 2008, Circuit City initiated a wire payment
to Active in the amount of $2,906,877.05 on account of
estimated December 2008 advertising expenses.

41.   On November 24, 2008, Circuit City
initiated another wire payment to Active in the amount
of $2,142,096.00 on account of estimated December 2008
advertising expenses.

42.   The actual invoices associated with the
December 2008 advertising expenses are identified as
122008AT74, 122008NC42, 122008NT16, 122008N17,
122008NC40, 122008NC41, and 1222008NT18.

43.   The actual expenses associated with the
December 2008 advertising was less than the estimated

amounts wired to Active on November 20 and November 24, 2008.

44.   This resulted in an overpayment to Active in the amount $246,556.70 (the "December 2008 Overpayment").

45.   Circuit City has made verbal and written demands upon Active for payment of the December 2008 Overpayment, but Active has refused to make such payments.

**E.    The Cancelled January 2009 Advertising.**

46.   Pursuant to the Advertising Agreement, on December 19, 2008, Circuit City initiated a wire payment to Active in the amount of $1,725,599 on account of estimated January 2009 advertising expenses.

47.   On December 30, 2008, Circuit City issued an additional payment by check to Active in the amount of $67,881.70 on account of estimated January 2009 advertising expenses.

48.   Subsequent to these payments for estimated January 2009 advertising expenses, the January 2009 advertising was cancelled in its entirety.

49.   This resulted in Active invalidly holding property of Circuit City and its bankruptcy estate in the amount of $1,793,480.70 (the "Cancelled Advertising Amount").

50.   Circuit City has made verbal and written demands upon Active for payment of the Cancelled Advertising Amount, but Active has refused to make such payments.

**F.    The Transfers of Circuit City's Property to Active.**

51.   Pursuant to the Advertising Agreement, Addendum 4 and Amendment 4, Circuit City transferred to Active all of the Merchandise identified on Schedule A to Amendment 4 during the period from September 10, 2008 through October 20, 2008.

52.   Schedule A to Amendment 4 identifies this Merchandise as having a value of $19,266,482.  Amendment 4, Schedule A.

53.   Thus, during the 90-day period prior to the commencement of Circuit City's bankruptcy proceedings, Circuit City made transfers and/or payments of its property to Active.

54.   Such transfers and/or payments were made
by Circuit City to or for the benefit of Active.

55.   These transfers and/or payments were made
to satisfy Circuit City's pre-existing debts to Active
pursuant to the Advertising Agreement, including
Addendum 4 and Amendment 4.

56.   Upon information and belief, Circuit City
was insolvent during the 90-day period prior to the
commencement of Circuit City's bankruptcy proceedings.

57.   The transfers and/or payments enabled
Active to receive more than Active would have received if
(i) Circuit City's chapter 11 case were instead a case
under chapter 7 of the Bankruptcy Code, (ii) the
transfers and/or payments had not been made, and (iii)
Active received payment of such debt to the extent
provided by the Bankruptcy Code.

**G.   Inadequate Value Received By Circuit City In
Exchange For Merchandise.**

58.   Pursuant to the Advertising Agreement,
Addendum 4 and Amendment 4, Circuit City transferred to
Active all of the Merchandise identified on Schedule A
to Amendment 4 during the period from September 10, 2008
through October 20, 2008.

59.   Schedule A to Amendment 4 identifies this Merchandise as having a value of $19,266,482.  Amendment 4, Schedule A.

60.   Pursuant to the Advertising Agreement, Addendum 4 and Amendment 4, Active issued to Circuit City Trade Credits in an amount of $19,200,000 upon receipt of the Merchandise valued at $19,266,482. Amendment 4 ¶ 1 and Schedule A.

61.   Under the terms of the Advertising Agreement, however, the Trade Credits have no cash value and can be "utilized solely in accordance with the terms and conditions of this [Advertising Agreement] in connection with the purchase by [Circuit City] of media, goods and/or services."  Advertising Agreement ¶ 2.

62.   From the time of execution of Addendum 4 on August 26, 2008 through December 31, 2008, Circuit City purchased approximately $30,100,000 in media advertising from Active.

63.   Pursuant to the Advertising Agreement, Active established Cash Payment Requirements of approximately $17,400,000 in connection with the $30,100,000 of media advertising.

64.   This allowed Circuit City to utilize
Trade Credits of only $12,743,935.32 in connection with
the $30,100,000 of purchased media advertising.

65.   As of the date of filing of this
Complaint, Circuit City holds approximately
$6,522,546.68 of unused Trade Credits.

66.   These Trade Credits are of no value to
Circuit City or its bankruptcy estate.

67.   In exchange for $19,266,482 of
Merchandise, Circuit City received, at most,
$12,743,935.32 worth of valuable services from Active.

68.   Active received approximately
$6,522,546.68 of Merchandise from Circuit City in
exchange for less than a reasonably equivalent value.

69.   The Trade Credits issued to Circuit City
do not represent reasonably equivalent value for the
Merchandise transferred to Active.

70.   Circuit City received less than a
reasonably equivalent value in exchange for the transfer
of Merchandise to Active.

71.   Upon information and belief, Circuit City
was insolvent at the time of the transfers of

Merchandise or became insolvent as a result of the
transfers.

72.   At the times of, and subsequent to, each
of the transfers, Circuit City had at least one creditor
with an allowable unsecured claim that remained
unsatisfied as of the commencement of Circuit City's
bankruptcy proceedings.   These creditors include, but are
not limited to, Hewlett-Packard Company; ADI Division of
Honeywell International; American Future Technology; and
Hauppauge Computer Works Inc.

**H.    The Trade Agreement.**

73.   On June 12, 2006, Circuit City and Active
entered into a cooperative advertising agreement (the
"Trade Agreement"), a true and correct copy of which is
annexed hereto as Exhibit D and is incorporated herein
by reference.

74.   Pursuant to the Trade Agreement, Active
agreed to establish for the benefit of Circuit City a
facility in the amount of $3,600,000 (the "Lease
Mitigation Facility").   Trade Agreement ¶ 1.

75.   As consideration for the Lease Mitigation
Facility, Circuit City committed to purchase advertising
services from Active in an aggregate net amount of

$30,000,000 over a three-year period from June 1, 2006

through May 31, 2009 (the "Media Commitment").  Trade

Agreement ¶¶ 1, 2.1.1.

76.  Schedule A to the Trade Agreement, which

sets forth "operational rules" relating to the Lease

Mitigation Facility, provides, in relevant part, that

"[u]pon no less than ten (10) business days' prior

written notice from [Circuit City], Active will make

available to [Circuit City] cash in an amount up to

$3,600,000 (less any prior amount paid or utilized by

[Circuit City]) for purposes of funding a lease

termination or any other business purpose."  Trade

Agreement, Schedule A at ¶ 1.

77.  Schedule A to the Trade Agreement also

provides that "[t]he funds available under the Lease

Mitigation Facility belong solely to [Circuit City] upon

execution of the [Trade Agreement] and may be used by

[Circuit City] for any purpose."  Trade Agreement,

Schedule A at ¶ 6.

78.  Schedule A to the Trade Agreement further

provides that "[Circuit City] may call any or all the

amounts in the Lease Mitigation Facility at any time,

though the pace of funds usage does not impact [Circuit City's] purchasing obligation.  Any amounts remaining in the Lease Mitigation Facility at the end of the Term belong solely to [Circuit City]."  Trade Agreement, Schedule A at ¶ 7.

79.  As of November 2008, Circuit City satisfied its Media Commitment under the Trade Agreement by purchasing $30,000,000 in advertising services from Active during the three-year period contemplated by the Trade Agreement.

80.  At the time Circuit City completed its Media Commitment obligation under the Trade Agreement, Active had previously made Lease Mitigation Facility payments of $2,435,040, leaving a balance of $1,164,960 due and owing to Circuit City (the "Lease Mitigation Facility Balance").

81.  Circuit City has made verbal and written demands upon Active for payment of the Lease Mitigation Facility Balance, but Active has refused to make such payments.

**I.   Preferential Transfers to Active from Circuit City.**

82.   During the 90-day period prior to the
commencement of Circuit City's bankruptcy proceedings
(the "Preference Period"), Circuit City made multiple
transfers of interests of Circuit City's property to or
for the benefit of Active in an amount not less than
$14,112,499.35 as set forth on <u>Exhibit E</u> attached hereto
and incorporated herein by reference.

83.   After taking into account certain
defenses, Circuit City has excluded certain transfers to
which there appear to have been subsequent new value
provided or appear to be substantially contemporaneous
exchanges pursuant to §§ 547(c)(1) and (4) of the
Bankruptcy Code.  <u>Exhibit F</u>, attached hereto and
incorporated by reference, reflects Circuit City's
current knowledge of the recoverable transfers made by
Circuit City to Active during the Preference Period.
During the course of this adversary proceeding, Circuit
City (through discovery or otherwise) may learn of
additional transfers made to Active during the
Preference Period.  Circuit City intends to avoid and
recover all such transfers, whether listed on <u>Exhibit F</u>

or not, in an amount not less than $9,450,978.65
(collectively, the "Transfers").

84.   These Transfers were made to satisfy
Circuit City's pre-existing debts to Active.

85.   Upon information and belief, Circuit City
was insolvent during the 90-day period prior to the
commencement of Circuit City's bankruptcy proceedings.

86.   The Transfers enabled Active to receive
more than Active would have received if (i) Circuit
City's chapter 11 case were instead a case under chapter
7 of the Bankruptcy Code, (ii) the transfers and/or
payments had not been made, and (iii) Active received
payment of such debt to the extent provided by the
Bankruptcy Code.

## COUNT I

### (BREACH OF CONTRACT)

87.   Circuit City repeats and realleges each of
the allegations set forth above and below as if fully set
forth herein.

88.   The Advertising Agreement, Addendum 4 and
Amendment 4 constitute valid and enforceable contracts
between Circuit City and Active.

89.   These agreements evidence Active's obligations to provide certain advertising and related services to Circuit City.

90.   Active has failed to fulfill its legal obligations under the Advertising Agreement, Addendum 4 and Amendment 4.

91.   Active either failed to provide any or all of the advertising services contemplated in the Advertising Agreement, Addendum 4 and Amendment 4.

92.   Despite repeated verbal and written requests by Circuit City, Active has refused to make or remit payments to Circuit City on account of the December 2008 Overpayment and the Cancelled Advertising Amount.

93.   These amounts are valid obligations under the agreements and are presently due, owing and payable by Active.

94.   Active's failure and refusal to remit payment to Circuit City on account of the December 2008 Overpayment and the Cancelled Advertising Amount constitutes a material breach of Active's obligations under the Advertising Agreement, Addendum 4 and Amendment 4.

95.   Circuit City performed its obligations under the Advertising Agreement with respect to the

December 2008 Overpayment and the Cancelled Advertising
Amount.

96.    As a direct and proximate result of
Active's breaches, Circuit City has incurred damages in
an amount not less than $2,040,037.40, plus attorneys'
fees, costs, expenses, and interest.

97.    Specifically, Active's failure and refusal
to make the required payments to Circuit City constitutes
a breach of the contract for which Circuit City is
entitled to a judgment in the amount of not less than
$2,040,037.40, plus attorneys' fees, costs, expenses, and
interest.

## COUNT II

### (BREACH OF CONTRACT)

98.    Circuit City repeats and realleges each of
the allegations set forth above and below as if fully set
forth herein.

99.    The Trade Agreement constitutes a valid
and binding contract between Circuit City and Active.

100.    Pursuant to the Trade Agreement, Active
was obligated to establish for the benefit of Circuit
City the Lease Mitigation Facility.

101.    Pursuant to the Trade Agreement, Active
was obligated to make payment of the Lease Mitigation
Facility Balance to Circuit City.

102. Despite repeated verbal and written requests by Circuit City, Active has refused to make payments to Circuit City on account of the Lease Mitigation Facility Balance.

103. These amounts are valid obligations under the Trade Agreement and are presently due, owing and payable by Active.

104. Active's failure and refusal to remit payment to Circuit City on account of the Lease Mitigation Facility Balance constitutes a material breach of Active's obligations under the Trade Agreement.

105. Circuit City performed its obligations under the Trade Agreement with respect to the Lease Mitigation Facility.

106. As a direct and proximate result of Active's breaches, Circuit City has incurred damages in an amount not less than $1,164,960, plus attorneys' fees, costs, expenses, and interest.

107. Specifically, Active's failure and refusal to make the required payments to Circuit City constitutes a breach of the contract for which Circuit City is entitled to a judgment in the amount of not less than $1,164,960, plus attorneys' fees, costs, expenses, and interest.

## COUNT III

### (UNJUST ENRICHMENT)

108. Circuit City repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

109. In the alternative to Counts I and II but without waiving any allegation contained therein, Circuit City makes the following allegations in support of Count III.

110. Circuit City conferred a benefit upon Active by transferring cash and Merchandise to Active relating to (i) the December 2008 Overpayment, (ii) the Cancelled Advertising Amount, (iii) the Lease Mitigation Facility, and (iv) the Merchandise transfers.

111. Circuit City reasonably expected to be compensated by Active in an amount not less than $246,556.70 on account of the December 2008 Overpayment.

112. Circuit City reasonably expected to be compensated by Active in an amount not less than $1,793,480.70 on account of the Cancelled Advertising Amount.

113. Circuit City reasonably expected to be compensated by Active in an amount not less than

$1,164,960 on account of the Lease Mitigation Facility
Balance.

114. Circuit City reasonably expected to be
compensated by Active in an amount not less than
$6,522,546.68 on account of the transferred Merchandise
for which Circuit City received no value.

115. Active accepted and continues to retain
the benefit of Circuit City's transfers of cash and
Merchandise.

116. Circuit City has no adequate remedy at law
to recover these amounts.

117. Accordingly, as a result of Active's
unjust enrichment at Circuit City's expense, Circuit City
is entitled to restitution from Active in an amount not
less than $9,727,544.08, plus attorneys' fees, costs,
expenses, and interest.

**COUNT IV**

**(TURNOVER OF PROPERTY OF THE
ESTATE UNDER 11 U.S.C. § 542)**

118. Circuit City repeats and realleges each of
the allegations set forth above and below as if fully set
forth herein.

119. In the alternative to Counts I-III, but
without waiving any allegation contained therein, Circuit

City makes the following allegations in support of Count
IV.

120. Active is in possession, custody and
control over the December 2008 Overpayment, the Cancelled
Advertising Amount and the Lease Mitigation Facility
Balance in an amount not less than $3,204,997.40 plus
attorneys' fees, costs, expenses, and interest.

121. Active is not a custodian for the December
2008 Overpayment, the Cancelled Advertising Amount or the
Lease Mitigation Facility Balance.

122. The December 2008 Overpayment, the
Cancelled Advertising Amount and the Lease Mitigation
Facility Balance constitute valid and existing debts, due
and owing by Active to Circuit City.

123. The December 2008 Overpayment, the
Cancelled Advertising Amount and the Lease Mitigation
Facility Balance are property of Circuit City's
bankruptcy estates under section 541 of the Bankruptcy
Code and constitute debts that are matured, payable on
demand, or payable on order.

124. Accordingly, pursuant to section 542 of
the Bankruptcy Code, Active should be compelled to
immediately turn over and deliver to Circuit City the
December 2008 Overpayment, the Cancelled Advertising
Amount and the Lease Mitigation Facility Balance in an

28

amount not less than $3,204,997.40 plus attorneys' fees,
costs, expenses, and interest.

**COUNT V**

**(AVOIDANCE AND RECOVERY OF FRAUDULENT
TRANSFERS UNDER 11 U.S.C. §§ 548 and 550)**

125. Circuit City repeats and realleges each of
the allegations set forth above and below as if fully set
forth herein.

126. Within the 90-day period prior to the
commencement of Circuit City's bankruptcy proceedings,
Circuit City transferred interests in Merchandise to or
for the benefit of Active.

127. Each of the transfers constituted a
transfer of an interest in the property of Circuit City.

128. Circuit City received less than fair
consideration and less than a reasonably equivalent value
in exchange for such transfers of Merchandise worth
approximately $6,522,546.68.

129. These transfers were made for no valuable
consideration.

130. The transfers by Circuit City to Active
were not supported by consideration deemed valuable in
law.

131. Upon information and belief, Circuit City
was insolvent at the time of the transfers of

Merchandise or became insolvent as a result of the transfers.

132. By virtue of the foregoing, each of the transfers was a fraudulent transfer avoidable under 11 U.S.C. § 548, and Circuit City is entitled to recover each of the transfers under 11 U.S.C. § 550.

133. Accordingly, Circuit City is entitled to a judgment in the amount of not less than $6,522,546.68, plus attorneys' fees, costs, expenses, and interest.

**COUNT VI**

**(AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS UNDER
11 U.S.C. §§ 544 AND 550 AND APPLICABLE STATE
LAW INCLUDING VIRGINIA CODE §§ 55-81)**

134. Circuit City repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

135. Within the 90-day period prior to the commencement of Circuit City's bankruptcy proceedings, Circuit City transferred interests in Merchandise to or for the benefit of Active.

136. Each of the transfers constituted a transfer of an interest in the property of Circuit City.

137. Circuit City received less than fair consideration and less than a reasonably equivalent value

in exchange for such transfers of Merchandise worth approximately $6,522,546.68.

138. The transfers were made for no valuable consideration.

139. The transfers by Circuit City to Active were not supported by consideration deemed valuable in law.

140. Prior to, at the time of, and subsequent to each of the transfers, Circuit City had at least one creditor with an allowable unsecured claim which remained unsatisfied as of the commencement of Circuit City's bankruptcy proceedings. These creditors include, but are not limited to, Hewlett-Packard Company; ADI Division of Honeywell International; American Future Technology; and Hauppauge Computer Works Inc.

141. Upon information and belief, Circuit City was insolvent at the time of the transfers of Merchandise or became insolvent as a result of the transfers.

142. By virtue of the foregoing, each of the transfers was a fraudulent transfer avoidable under applicable state law, including Virginia law, and Circuit City is entitled to avoid and recover each of the transfers under 11 U.S.C. §§ 544 and 550.

31

143. Accordingly, Circuit City is entitled to a judgment in the amount of not less than $6,522,546.68, plus attorneys' fees, costs, expenses, and interest.

**COUNT VII**

**(AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS UNDER 11 U.S.C. §§ 547 AND 550)**

144. Circuit City repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

145. The Transfers were made to or for the benefit of Active, a creditor of one or more of the Circuit City debtors.

146. The Transfers were made for or on account of an antecedent debt or debts owed by one or more of the Circuit City debtors before such Transfers were made.

147. The Transfers were made during the Preference Period.

148. The Transfers were made while the Debtors were insolvent.

149. The Transfers enabled Active to receive greater value than Active would have received if (i) Circuit City's cases were cases under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Active received payment on account of the debt

paid by the Transfers to the extent provided by the provisions of the Bankruptcy Code.

150. Each of the Transfers constitutes an avoidable preference pursuant to 11 U.S.C. § 547(b).

151. Active is either the initial transferee of the Transfers, the entity for whose benefit the Transfers were made, or an immediate or mediate transferee of the Transfers.

152. Circuit City is entitled to recover not less than $9,450,978.65 pursuant to 11 U.S.C. § 550(a).

### COUNT VIII

### (AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS UNDER 11 U.S.C. §§ 547 AND 550)

153. Circuit City repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

154. During the 90-day period prior to the commencement of Circuit City's bankruptcy proceedings, Circuit City transferred Merchandise to Active in the amount of $6,522,546.68.

155. Each transfer of Merchandise was a transfer of Circuit City's interest in property.

156. Each transfer of Merchandise was made by Circuit City to or for the benefit of Active.

33

157. Upon information and belief, Circuit City was insolvent during the 90-day period prior to the commencement of Circuit City's bankruptcy proceedings.

158. The transfers of Merchandise occurred for or on account of an antecedent debt owed by Circuit City before such transfers were made.

159. The transfers enabled Active to receive more than Active would have received if (i) Circuit City's chapter 11 case were instead a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) Active received payment of such debt to the extent provided by the Bankruptcy Code.

160. Each of the transfers constitutes an avoidable preferential transfer within the meaning of section 547 of the Bankruptcy Code.

161. Active is either the initial transferee of the transfers, the entity for whose benefit the transfers were made, or an immediate or mediate transferee of the initial transfers.

162. By virtue of the foregoing, Circuit City is entitled to avoid and recover each of the preferential transfers under 11 U.S.C. §§ 547(b) and 550.

163. Accordingly, Circuit City is entitled to a judgment in the amount of not less than $6,522,546.68, plus interest.

## COUNT IX

### (DISALLOWANCE OF CLAIM PURSUANT TO 11 U.S.C. § 502(d))

164. Circuit City repeats and realleges each of the allegations set forth above and below as if fully set forth herein.

165. Section 502(d) of the Bankruptcy Code requires the disallowance of "any claim of any entity from which property is recoverable under section 542 . . . of this title . . ., unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 542 . . . of this title."  11 U.S.C. § 502(d).

166. Pursuant to section 502(d) of the Bankruptcy Code, any claims, including Claim No. 3895, held by Defendant against the Debtors' bankruptcy estates must be disallowed unless and until Defendant pays to the Debtors the amounts set forth above.

### PRAYER FOR RELIEF

WHEREFORE, Circuit City respectfully requests that, on its claims for breach of contract, unjust

35

enrichment, turnover, fraudulent transfer and

preferential transfer, the Court enter judgment granting

the following relief:

A.    Awarding Circuit City damages totaling not
      less that $19,178,522.73; and

B.    Awarding Circuit City reasonable costs and
      expenses incurred in this action,
      including (without limitation) attorneys'
      fees and expert fees; and

C.    Awarding Circuit City pre-judgment and
      post-judgment interest; and

D.    Requiring Active to immediately turn over
      the amounts owed to Circuit City, plus
      interest, costs, expenses, and attorneys'
      fees;

E.    Disallowing any claim of Defendant
      against the Debtors' bankruptcy estates,
      including Claim No. 3895, unless and
      until Defendant pays to the Debtors the
      amount of any and all judgments granted
      to the Debtors against Defendant in this
      adversary proceeding; and

F.    Awarding Circuit City such other relief

as may be just and proper.

Dated: December 11, 2009    MCGUIREWOODS LLP
       Richmond, Virginia

                              /s/ Douglas M. Foley
                              Douglas M. Foley (VSB No. 34364)
                              Bryan A. Fratkin (VSB No. 38933)
                              One James Center
                              901 E. Cary Street
                              Richmond, Virginia 23219
                              (804) 775-1000

                              Counsel for Debtors and Debtors
                              in Possession

\10269333.2

37

## <u>EXHIBIT A</u>

**ADVERTISING AGREEMENT**

**[TO BE FILED UNDER SEAL]**

## EXHIBIT B

**ADDENDUM 4 TO THE ADVERTISING AGREEMENT**

**[TO BE FILED UNDER SEAL]**

<u>**EXHIBIT C**</u>

**AMENDMENT 4 TO ADDENDUM 4 TO THE ADVERTISING AGREEMENT**

**[TO BE FILED UNDER SEAL]**

## EXHIBIT D

**TRADE AGREEMENT**

**[TO BE FILED UNDER SEAL]**

## EXHIBIT E

**TRANSFERS OF PROPERTY**

**Active Media Services Preference Analysis - Payment Detail**
**Exhibit E**

| | | | | |
|---|---|---|---|---|
| ACTIVE MEDIA SERVICES INC | 10/15/2008 | 4568687 | $ | 4,661,520.70 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571976 | $ | 2,636,436.00 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571974 | $ | 13,852.30 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571977 | $ | 458,789.10 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571979 | $ | 340,737.00 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571980 | $ | 424,627.50 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571978 | $ | 1,376,608.75 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571975 | $ | 446,842.00 |
| ACTIVE MEDIA SERVICES INC | 11/6/2008 | | $ | 3,753,086.00 |

**Total Check Amount  $ 14,112,499.35**

## EXHIBIT F

**PREFERENTIAL TRANSFERS**

**Active Media Services Preference Analysis - Payment Detail**
**Exhibit F**

| Vendor Name | Check Date | Check # | Amount |
|---|---|---|---|
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571976 | $ 2,636,436.00 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571974 | $ 13,852.30 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571977 | $ 458,789.10 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571979 | $ 340,737.00 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571980 | $ 424,627.50 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571978 | $ 1,376,608.75 |
| ACTIVE MEDIA SERVICES INC | 10/30/2008 | 4571975 | $ 446,842.00 |
| ACTIVE MEDIA SERVICES INC | 11/6/2008 | | $ 3,753,086.00 |
| | | **Total Check Amount** | **$ 9,450,978.65** |