# EXHIBIT A

1

1              UNITED STATES BANKRUPTCY COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5

6     ------------------------------

7                                   )

8                                   )

9     IN RE:                        )

10    CIRCUIT CITY, INC., et al      ) Case No.08-35653-KRH

11                                   )

12                                   )

13                                   )

14    ------------------------------

15

16          Complete transcript of the testimony and

17    other incidents in the above, when heard on November

18    10, 2008, before the Honorable Kevin R. Huennekens,

19    Judge.

20

21

22

23

24

25

2

```
 1   APPEARANCES:

 2   MCGUIREWOODS,LLP
     901 East Cary Street
 3   Richmond, Virginia 23219
     Counsel for debtors
 4   Counsel for debtors
     BY: DION W. HAYES, Esq.
 5
     SKADDEN ARPS SLATE & FLOM, LLP
 6   One Rodney Square
     P.O. Box 636
 7   Wilmington, DE 19899
     Counsel for debtors
 8   By: GREGG M. GALARDI, Esq.

 9   RUSSELL R. JOHNSON, III, Esq.
     2258 Wheatlands Drive
10   Manakin-Sabot, Virginia 23103
     Representing various utilities
11
     JOSEPH ATHANOS, Esq.
12   Counsel for Gordon Brothers and Hilco

13   BRADFORD F. ENGLANDER, Esq.
     7200 Wisconsin Avenue
14   Suite 800
     Bethesda, MD 20814-4842
15   Representing Alliance Corporation Source Interlink
     Media, LLC
16
     ROBERT L. LEHANE, Esq.
17   101 Park Avenue
     New York, NY 10178-0002
18   Representing various landlords

19   BRUCE H. MATSON, Esq.
     951 E Byrd Street
20   Richmond, Virginia 23219
     Representing Bank of America and its agent
21
     ROBERT VAN ARSDALE, Esq.
22   Assistant United States Trustee
     600 East Main Street, Suite 301
23   Richmond, Virginia 23219

24

25
```

3

```
 1    TELEPHONIC APPEARANCES:

 2    DAVID L. POLLACK, Esq.
      1735 Market Street
 3    51st Floor
      Philadelphia, PA 19103-7599
 4
      STEVEN CHURCH
 5    Bloomberg News

 6    MR. GRAFF

 7    DUSTIN P. BRANCH, Esq.
      2029 Century Park East
 8    Suite 2600
      Los Angeles, CA 90067-3012
 9    Representing various landlords

10    DAVID M. HILLMAN, Esq.
      919 Third Avenue
11    New York, New York 10022
      Representing Panasonic Corporation
12
      JOHN MCJUNKIN, Esq. and DANIEL J. CARRIGAN, Esq.
13    1900 K Street NW
      Washington, D.C. 20006-1108
14    Representing Bethesda Softworks, LLC

15    JOHN E. LUCIAN, Esq. and REGINA S. KELBON, Esq.
      130 North 18th Street
16    Philadelphia, PA 19103-6998
      Representing Verizon Wireless
17

18

19

20

21

22

23

24

25
```

```
 1              THE CLERK:  In the matter of Circuit

 2      City Stores, Incorporated, et al, hearings,

 3      first day motions by debtors item 1 through

 4      24.

 5              MR. HAYES:  Good afternoon, Your

 6      Honor.

 7              THE COURT:  Good afternoon,

 8              MR. HAYES:  Dion Hayes with McGuire

 9      Woods on behalf of the debtors.  First of

10      all, Your Honor, we want to thank the Court

11      very much for hearing these matters on an

12      expedited basis.  It is very important to the

13      company that we be able to have an

14      opportunity to speak to Your Honor as soon as

15      we could after the case was filed, and the

16      company is very appreciative.  Your Honor --

17              THE COURT:  You're certainly

18      welcome.

19              MR. HAYES:  Your Honor, if I could,

20      I would like to introduce to the Court

21      certain of the individuals that are in the

22      courtroom today that I think the Court will

23      be seeing more of in the future.  Your Honor,

24      first of all Mr. Reggie Hedgebeth is Circuit

25      City's general counsel.  Seated next to him
```

1          is or on the same row is Bruce Besanko who is

2          the company's chief financial officer.  Jim

3          Marcum the acting chief executive officer,

4          would very much like to be here but he's at

5          headquarters spending time with the company's

6          employees at a very critical time in the

7          company's history.  Your Honor, with me at

8          counsel table from Skadden Arps are Gregg

9          Galardi from Skadden's Wilmington, Delaware

10         office, Ian Fredericks, also from Skadden's

11         Wilmington, Delaware office.  Seated next to

12         Mr. Hedgebeth is Chris Dickerson from

13         Skadden's Chicago office.  Your Honor, I'm

14         going to move for the admission pro hac of

15         Skadden's attorneys who will present the

16         first days.  Before I do that, I want to

17         address the one issue that the clerk's office

18         asked that we address with the Court this

19         morning.  In all of the first day motions we

20         indicated at the end of our proposed orders

21         the required compliance with Rule 9022-1

22         related to orders.  Your Honor, I wanted to

23         be specific as to who we sent notice to of

24         this hearing and the manner in which it was

25         sent.  As the Court is well aware the filings

1          commenced late last night after midnight,

2          concluded in the 3 or 4 o'clock range, and at

3          approximately 4:30 this morning faxed notice

4          of the filing of the first day and notice of

5          the two websites, both the Court's website

6          and the KCC website, who is our claims agent,

7          were sent out to that fax list.  Your Honor,

8          the entities that were on that fax list were

9          the top 50 unsecured creditors, the landlords

10         for the leases that we are proposing to

11         reject, and counsel for the prepetition

12         agent, counsel for Sony, the IRS, the SEC,

13         the secretary of treasury, the attorney

14         generals for all 50 states, the EPA, the

15         Department of Justice Civil Division, the

16         Virginia State Corporation Commission, the

17         Virginia Department of Tax, the county

18         recorder and county taxing authorities for

19         the jurisdictions in which the company would

20         propose to close stores, the governmental

21         units in those jurisdictions where the

22         company operates as well, regional and state

23         and environmental protection authority

24         offices and the state taxing authorities.  We

25         also, Your Honor, had provided draft first

1          day papers on Friday to the U.S. Trustee's

2          Office, had an opportunity to meet this

3          morning with Mr. Van Arsdale and Mr.

4          Whitehurst to talk about first day motions.

5          Your Honor, we believe to all the major

6          constituents in this case they have had as

7          much notice as could reasonably be provided

8          under the circumstances and what we believe

9          to be adequate notice for the hearing on the

10         matters we're going to put before the Court.

11              Your Honor, at this time I would

12         like to move admission pro hac Gregg Galardi,

13         Chris Dickerson, Ian Fredericks with Skadden

14         Arps.  They are admitted in jurisdictions

15         which they practice and we believe well

16         qualified to practice in this Court.

17              THE COURT:  Admissions are approved.

18         Welcome to the court.

19              MR. POLLACK:  Your Honor, the

20         people on the phone are having trouble

21         hearing the speakers in the courtroom.  I

22         don't know if there is anything we can do

23         about that, but we hear you fine.

24              THE COURT:  Very good.  I will see

25         if we can't turn up the volume on the phone.

1          We have just moved into a new

2      courtroom, new courthouse, and we don't have

3      all of the audio systems installed yet.  So

4      we're still trying to get through that, but

5      we will try to accommodate the people on the

6      phone as much as we can.  You may proceed.

7          MR. GALARDI:  Your Honor, again, for

8      the record, Gregg Galardi, with Skadden Arps

9      on behalf of Circuit City.  Your Honor, I

10      don't know what your practice is to

11      proceed -- I know there is a number of out of

12      state counsel -- whether you would like to

13      have those admission introductions before we

14      proceed with these matters or wait until they

15      stand up.

16          THE COURT:  I think we can wait

17      until they stand up because there may be

18      people who want to speak to specific motions

19      and not others.  Do you want the people who

20      are by telephone to identify themselves

21      before we proceed with the hearing?

22          MR. GALARDI:  That would be helpful,

23      Your Honor.

24          THE COURT:  At this point I would

25      like to turn to the people participating by

```
 1              telephonic hearing today and have each of you
 2              identify yourself.
 3                   Mr. Church, would you please
 4              identify yourself.
 5                   MR. CHURCH:  Steven Church of
 6              Bloomberg News.
 7                   THE COURT:  Mr. Pollack, would you
 8              please identify yourself?
 9                   MR. POLLACK:  Good afternoon.  David
10              Pollack, Ballard Spahr and Ingersoll on
11              behalf of certain landlords; also on the
12              phone from our Washington office is Chuck
13              Chotvacs, and I know Mr. Galardi can speak
14              louder than he is.
15                   THE COURT:  Thank you.  Ms. Graff,
16              would you identify yourself?
17                   MR. GRAFF:  Actually, Your Honor,
18              it's Mr. Graff --
19                   THE COURT:  I apologize.
20                   MR. GRAFF:  -- on behalf of
21              (inaudible).
22                   THE COURT:  Mr. Branch, would you
23              identify yourself?
24                   MR. BRANCH:  Good afternoon, Your
25              Honor.  Dustin Branch, Katten Muchin &
```

```
 1            Rosenman, LLP, appearing on behalf of various

 2            landlords.

 3                   THE COURT:  Mr. Hillman, would you

 4            identify yourself?

 5                   MR. HILLMAN:  Yes, Your Honor.

 6            David Hillman of Schulte, Roth and Zable on

 7            behalf of Panasonic Corporation of North

 8            America.

 9                   THE COURT:  All right.  Thank you

10            and Mr. McJunkin, can you identify ourselves?

11                   MR. MCJUNKIN:  John McJunkin,

12            McKenna, Long and Aldridge.  Along with me is

13            Dan Carrigan.  We represent Bethesda

14            Softworks, LLC.

15                   THE COURT:  All right.  Is there

16            anybody on the phone that I have not

17            mentioned?

18                   MR. LUCIAN:  Good morning -- good

19            afternoon, Your Honor, John Lucian and Regina

20            Kelbon from Blank Rome.  We represent Verizon

21            Wireless.

22                   THE COURT:  All right.  Is there

23            anybody else?  All right.  Thank you.

24                   MR. GALARDI:  Thank you, Your Honor,

25            and I will try to speak up and not yell at
```

1           Mr. Pollack.  Your Honor, we are here today

2           with respect to the Circuit City filings, and

3           what I would like to do is give Your Honor an

4           introduction to why we are here, what the

5           corporate structure is, and I have three

6           handouts that we would make available to

7           people if I might approach, Your Honor.

8                THE COURT:  Certainly.

9                MR. GALARDI:  Your Honor, just

10          briefly by way of introduction, Circuit City

11          was founded in 1949 here in Richmond.  It is

12          a public company with operation throughout

13          the United States, Canada and Puerto Rico.

14          What I have handed up to Your Honor is three

15          documents, and as we go through today's

16          hearings I find them -- hopefully they will

17          be useful for a person to understand where we

18          are.  One is a DIP budget and one is also a

19          timetable for where we see this case is

20          going.  The first document is the document

21          that will show the debtors that have actually

22          filed.  You should have a document that has

23          white blocks, sort of gray shade and a darker

24          gray shade.  The white blocks are the

25          debtors, the shaded ones are non-debtors, and

1          then the dark ones are entities that actually

2          filed in Canada today.  We do commence CCAA

3          proceedings.

4               Your Honor, Circuit City Stores is a

5          publicly held company.  It has gotten notice

6          of delisting.  It has -- everyone knows is a

7          leading retailer of consumer electronics and

8          currently operates over 700 stores throughout

9          the United States, and it has a similar

10         number of stores that it operates up in

11         Canada.  Today, as I said, they filed in

12         Canada the CCAA proceeding under InterTan and

13         another one of the companies that is on

14         during this structure is Tormelay (Ph)

15         Corporation filed a CCAA proceeding and

16         actually sought and went over to the judge

17         this morning.  I understand we will hopefully

18         have an order entered there they will

19         approve.  There is some interplay between

20         orders and financing.  We're hopeful that

21         maybe before we finish today they will have

22         an order entered in Canada with respect to

23         the CCAA proceedings.

24               Your Honor, the revenues for year

25         ending February 29, 2008, were approximately

```
 1              12 billion dollars and employed nearly 40,000

 2              people.  Your Honor, unfortunately over the

 3              last two years they have had declining

 4              performance and in the last six months ending

 5              August 31st, as we reported, they have lost

 6              over 400 million dollars.  Simply speaking,

 7              Your Honor, these losses are driven by two

 8              general factors.  First, the decreasing

 9              margins in the company's operations.  They

10              receive less margins on their sales partially

11              because they have chosen before to compete

12              with the internet such as Amazon.com;

13              therefore, in the stores they had lower

14              margins competing with the internet.  The

15              second is simply they've lost foot traffic

16              over the last two to three years resulting

17              both from -- I would say general economic

18              conditions are more pertinent perhaps today

19              than two years ago but also customer

20              dissatisfaction.  After -- back in January of

21              2008 the company received notice from its

22              largest shareholder they want to commence a

23              proxy fight from Wattles Capital.  In May the

24              management agreed to reach an agreement with

25              Wattles regarding the proxy fight and for
```

14

1           three new members for the board to be

2           appointed.  One is Mr. James Marcum, who

3           currently serves as the acting president, and

4           there were two other individuals who were

5           designated to the board who served on the

6           board through last night and are still on the

7           board today.  In addition, Your Honor, during

8           that same period one of the complaints by the

9           shareholders was that the company should be

10          shopping itself and we received an offer from

11          Blockbuster.  The company hired Goldman Sachs

12          to pursue that offer from Blockbuster.

13          Unfortunately a transaction was never

14          completed with Blockbuster.  Goldman Sachs

15          probably three, four or five weeks ago

16          continued in its efforts to try to find TG

17          partners, equity investors or other people to

18          invest in the company.  To date none of those

19          activities have in fact come to fruition.

20          Your Honor, after the proxy contest the

21          company's financial performance continued to

22          deteriorate.  The current CEO at that time

23          stepped down and Mr. Marcum, as I said, took

24          on the position of acting president and

25          chairman.  Since September, although the

15

1     company had already initiated various

2     restructuring efforts, at Mr. Marcum's

3     direction the company has been aggressively

4     pursuing various turnaround efforts.  They

5     have been well publicized in the media to

6     note a few.  First, the company has hired

7     various restructuring professionals to help

8     with the cash flows, to sort of monitor the

9     business and monitor the checkbook and has

10    been searching out alternative forms of

11    financing.  Second, the company began a new

12    advertising campaign and initiatives to

13    improve the customer's experience.  It used

14    to be the company competed with the internet,

15    Amazon, and, as I mentioned, the margins were

16    lower.  So we have one low price now.  We are

17    not going as low as Amazon.  It is very hard

18    to compete with the internet when you have

19    virtually more in the stores.  The company is

20    now one low price, same internet as in the

21    stores, but it is hopefully a higher market

22    product.  They have also taken on great steps

23    to try to give the customers a much better

24    experience to try to get the customers back.

25    Customer satisfaction is perhaps at an all

16

1        time low and they have addressed that.  Those

2        activities were announced and began in the

3        month of -- the end of September and

4        beginning of October.  The company also took,

5        as it announced in September, a look at all

6        of its assets.  In particular the company has

7        had approximately 150 leases which they have

8        not been operating in those stores for some

9        period of time.  On an annual basis they have

10       therefore been paying approximately 40

11       million dollars of an annual rent on lease

12       space that they have no longer been operating

13       stores.  Some of that was mitigated by the

14       fact that there were a couple of peas in

15       those facilities but none of the subleases

16       were greater than the market rent.  They had

17       explored the opportunity to see if they could

18       shop those leases.  Unfortunately they were

19       unable to do so.  One of the motions, Your

20       Honor, is to finally bring in for the payment

21       of that amount and to reject those leases.

22       In addition, Your Honor, they looked at a

23       four-wall analysis, a very strict analysis of

24       what of the stores that they had, at the time

25       about 175 stores.  What are the stores who

1          were best contributors?  What markets were

2          the best contributors on an economic

3          analysis.  They hired FTI, and FTI did a

4          four-wall analysis, the company did an

5          analysis of markets, and as a result of that

6          the company determined it was best to close

7          those stores and close those markets and no

8          longer operate.  Again, one of the topics for

9          the motion, although we started that process

10         prior to the filing, is to seek approval of

11         the agent who is liquidating that inventory

12         and ultimately continue those store closings.

13         That is one of the motions, but that effort

14         was undertaken, begun really in the beginning

15         of October, and we will have testimony today,

16         if Your Honor needs it, with respect to

17         efforts to come to that agency agreement, how

18         we came to that, why it is a fair agreement,

19         what's the benefit of assuming it.  But that

20         was one of the efforts undertaken pre-filing

21         again with the hopes to address our liquidity

22         concerns.

23              Finally, I think, Your Honor, most

24         familiar in people's mind, because it

25         happened only last week, the company took a

1           painful step last Thursday and Friday to have

2           a significant reduction in forces at

3           corporate headquarters.  The number is

4           approximately 700 people in the company, let

5           those people go last Thursday and Friday as

6           was well covered in the press.  Your Honor,

7           during all of this process the company was

8           soliciting offers, and Mr. Besanko can

9           testify as well as the advisors today -- we

10          can proffer or give their testimony.  The

11          company has been looking at talking with its

12          current lenders lead by the agent Bank of

13          America.  The company currently has, and,

14          again, a sign of a different time, a 1.3

15          billion dollar commitment financing from a

16          group of about 17 lenders, very well-known

17          retail lenders led by B of A, there's Wells

18          Fargo, there's GE, and then depending upon

19          whose bank is financing whose bank at any

20          given time, there are other banks within that

21          group.  We started negotiations with them

22          about both out of court financing in-court

23          financing hoping to remain, again, out of

24          court.  The company and its professional

25          advisors also went out and solicited a

1          subdebt.  Your Honor may bring it up later,

2          one of the draft papers mentioned -- there

3          was a subdebt facility.  We will tell the

4          story about why we do not have that facility

5          today.  It is not that they walked away from

6          us.  It is that we walked away from them.  We

7          looked for subordinated debt and again trying

8          to get and solve the liquidity problem.

9          Notwithstanding the above, in light of the

10         quarterly announcement that came out

11         September 29th and the uncertainly in this

12         market created both in the global market as

13         well as the retail market, you can only read

14         the newspapers and see the retailers many

15         times, lenders became quite concerned about

16         the company's financial help.  As a result of

17         this we are in the oddest time of the market

18         for retailers, especially an electronics

19         retailer, as we are building up our inventory

20         right -- we should be building up our

21         inventory.  We are using more and more of our

22         credit facility.  Unfortunately, we would

23         normally get increased trade terms or we

24         would get a higher credit limit from our

25         normal vendors, but given the market that was

1           going on and given the fact that there was

2           press in our quarterly report announcement of

3           400 million dollars lost for six months

4           ending on August 31, what we found happened

5           is after September the company began to

6           deteriorate its liquidity position primarily

7           because, one, vendors were stopping trade

8           terms and demanding cash in advance for

9           shorter terms, and, two, unlike historical

10          limits where we could increase our trade

11          credit with respect to those lenders and

12          therefore build our borrowing base and

13          therefore have more liquidity, we were unable

14          to do so because vendors were no longer

15          willing to go at risk.  Again, the

16          traditional bankruptcy would merely remind

17          that we would only take their money, file on

18          January 1st that we were high and dry for the

19          payrolls, and so they decided not -- at least

20          we understand they decided not to continue to

21          give credit support to the company.  As a

22          result of that and as a result we just

23          couldn't get enough cost as fast as was

24          necessary.  We were required to come into

25          court and seek a filing last night and in

21

1        particular with the support of Bank of

2        America as it did the lending.

3               We have before Your Honor today

4        various first day motions.  What are we

5        trying to establish in this filing?  We read

6        the press this morning, Your Honor, and there

7        are experts that are saying, well, we will

8        take the fate of the lending and things of

9        every other retailer, we are going to

10       liquidate.  Actually, quite simply we are

11       trying to emerge as a going concern and to do

12       it in one of two ways, and we have very

13       limited time as we talk through this process.

14       We are trying to emerge as a going concern

15       and there two ways that reach Chapter 11

16       allows us.  One, a going concern based on a

17       particular sale to all or part of the

18       company.  We can explain.  It's just that

19       continuation in a different form from Goldman

20       Sachs.  And, two, whether or not we can do

21       this is to emerge with a standalone plan

22       hopefully supported by vendors.  As we set

23       forth in the Besanko affidavit, and as Your

24       Honor will hear as we go through the case, is

25       prior to the filing -- again, Mr. Marcum took

1          trips to Korea to try to discuss with vendors

2          whether they would support a vendor plan.

3          And the simple message is, Your Honor, the

4          company believes there is a competitive

5          market out there to Best Buy.  You don't have

6          to compete with the internet.  You provide a

7          valuable service.  And if we get vendor

8          support sufficiently, you can have a second

9          outlet for your goods.  And there are many

10         vendors that would be very much harmed should

11         Circuit City go out of business.  That's one

12         avenue.  And, two, though you have

13         significant interest during the Goldman Sachs

14         days, many of those buyers pointed to the

15         fact that we have a real estate portfolio of

16         150 leases that were debt store leases.  So

17         we had a different footprint.  So the

18         opportunity provided by Section 363, an asset

19         sale in bankruptcy, makes the company more

20         attractive to those bidders.  So, Your Honor,

21         we really do hope we can accomplish a going

22         concern and exit from bankruptcy, and we want

23         to do it in very short time frame.

24                 Your Honor, the second exhibit that

25         I have handed up to Your Honor, again, it is

```
 1              available to people to give you an idea of
 2              the time frame I think to try to set up the
 3              whole case before we go to the first day
 4              motions.  Again, someone would look at our
 5              DIP facility and say, my God, they have to
 6              have a plan of reorganization done by March
 7              and they have to do this, that and the other
 8              thing.
 9                   THE COURT:  That was the first thing
10              that stuck out to me.
11                   MR. GALARDI:  Right, exactly.  And
12              why would anybody borrow so much money on
13              such a short time frame?  Unfortunately, I
14              have done a number of retail cases, Your
15              Honor, and I would like to blame this one on
16              the banks but I really can't.  It is the
17              Bankruptcy Code that actually forces this
18              situation, it seems to me, with the BAPCPA.
19              Your Honor, in a traditional ABL loan what
20              the ABL lenders are obviously concerned about
21              is their primary collateral is the inventory
22              in the stores.  If your primary collateral is
23              the inventory in the stores, you get an
24              appraisal for inventory in the stores, and
25              the appraisal is based on the simple fact if
```

24

1           you have to liquidate, an order of

2           liquidation, how much can you get for that

3           inventory over a certain period of time.

4           That appraisal predicts essentially it will

5           take 9 to 12 weeks to liquidate the inventory

6           in the stores.  If you take the timeline,

7           Your Honor, then the bankruptcy code overlay

8           of that is simply the following: as the

9           debtor you have your first 120 days to assume

10          or reject leases.  You can get one extension

11          for 90 days, and if you get the 210 days to

12          assume or reject leases, you've got as long

13          as you can get unless you get in this

14          instance another 500 landlords to consent to

15          further extensions.  So what you have is if

16          you take 210 days as the longest period, what

17          you find -- and I now have three or four

18          cases of this sort.  Well, if you start

19          backwards from 210 days and it takes three

20          months to liquidate the inventory, well,

21          that's seven months minus three months and

22          you have a four month case because no retail

23          debtor is going to start assuming leases

24          until they know where they can exit because

25          the obvious implication is you have now

1          converted the cure claims.  You have to make

2          administrative claims.  So the time frame is

3          really not set by, I think, the lenders,

4          although I understand their concern and we

5          would love to have more time.  It is the

6          Bankruptcy Code that really sets the 100, 210

7          days.  So what you will see in a timetable

8          that we have proposed is where we see a

9          significant event over the course of this

10         case, Your Honor, is though we have the first

11         120 days -- you have 120 days, you take three

12         months.  We have one month really to get a

13         new order in this case.  So we will be filing

14         a motion which is not unheard of anymore but

15         it may not be usual for retail cases to

16         extend the 365(d)4 deadline the first month

17         of this case because if we don't, then the

18         lease reserves kick in.  So you will notice

19         the first real deadline here is by December

20         10th we will have to have an order that will

21         allow us to go through the two to take

22         advantage of the full 210 days.  The

23         landlords' counsel in the room have been with

24         me before on these matters, Mr. Pollack and

25         Mr. Hayes.  They understand that's what we

```
 1          will be doing and we will have a negotiation
 2          over that, but it is critical to these
 3          debtors that they get that extension and so
 4          we will have a hearing on that.  In addition,
 5          Your Honor, the critical deadline is the
 6          utilities.  A company that has this many
 7          leases has thousands and thousands of
 8          utilities.  The Bankruptcy Code again has
 9          made it very difficult on retail companies
10          because you have the choices of either put up
11          and then get back or not put up.  So what
12          we've done, and we will talk about this in
13          the first day motions, is we will make an
14          offer but we really need a hearing on that
15          first 30 days to have Your Honor set the
16          adequate assurance of future performance.  I
17          know the gentleman who will probably be here
18          from this area, Mr. Russ Jones, will send me
19          my e-mail and tell me I won't accept this,
20          and we understand we will have to deal with
21          that but we normally resolve it.  But that's
22          another thing that puts an incredible burden
23          on the retail lender.  Again, the lenders now
24          have stipulated this is not an uncommon
25          deadline.  They have actually given us in the
```

1        area of 40 days or 45 days to get the final
2        order on the debt.  So that is a very
3        standard motion.
4             Again, Your Honor, as we go through
5        the cash flows, the other requirement that
6        you will see is we think we have sufficient
7        liquidity, which was a hotly negotiated
8        issue, to make it through Black Friday back
9        through January, but there is a January 7th
10       requirement that we obtain 75 million dollars
11       in term loan debt, essentially a second lien
12       facility to give us additional liquidity.  As
13       I see the case, Your Honor, we have a 60 day
14       period, another 60 day period, and then we
15       can maybe get to Christmas.  That's really
16       what we are looking for.  So if you think of
17       it this way, go through the Christmas period
18       to January through electronic retailers and
19       then you have to go through Super Bowl.  So
20       you have to get liquidity again, buy the
21       goods to get through the Super Bowl, which is
22       February 1st this year, to get us to March.
23       We think that whether we to do this -- and it
24       will be a topic of the motion -- to really
25       get this subfacility with a lender such as

1        the one we mentioned in the first day papers,

2        or another lender, or even a 363 purchaser,

3        is a very likely possibility and we're

4        hopeful.  But, again, to get that kind of

5        facility most people will want to see how did

6        you do during Christmas.  And so we thought

7        it would be better not to take the first loan

8        that we talked about because it wouldn't have

9        gotten us to that point, but rather, again,

10       with B of A's cooperation managed to secure a

11       period of January 17th so we have what we

12       think is a good 60 day period to do the sort

13       of things we need.  Your Honor, then the

14       dates sort of fall in line because it will

15       need to file a plan disclosure statement by

16       March 1st.  That's right within that four

17       month time period I'm talking about.  Indeed

18       we think that it is not just that you file on

19       but we will actually have to come into the

20       court and be prepared to confirm a plan

21       somewhere in that March 1st, March 15th

22       period because when we resume the leases the

23       leases will have to be assumed or effective

24       or otherwise we face the next date which is

25       March 15th which is the lease reserve date.

1                    And what that essentially says is if you

2                    haven't come up with an exit for this

3                    bankruptcy case, then they are going to force

4                    us again to protect their collateral as their

5                    right to do, to send out informational

6                    packages, to liquidating it, to come up with

7                    a 363.  It's a bridge to somewhere.  That's

8                    how I see the case, a four month bridge to

9                    somewhere.  Again, the last day on the

10                   calendar is simply Your Honor grants us that

11                   extension of the 90 days, then the date would

12                   actually run out on June 10th, and that's why

13                   three months later we need to get the leases

14                   determined.

15                        Your Honor, moving off the calendar

16                   -- again, to see this case I think is to see

17                   it as two bridges.  The first bridge is to

18                   give us enough time to solicit interest

19                   either from third parties or from the vendor

20                   community.  The second thing, in July to

21                   hopefully come back to this Court with either

22                   a vendor supported plan, a vendor supported

23                   financing, which we have been starting

24                   negotiations with, or a subdebt facility from

25                   some other party or a subdebt facility from a

1          potential purchaser that will allow us to

2          exit in the March time frame.  That is the

3          company's hope and goal for these cases.

4                 Your Honor, moving then to the first

5          day papers, I think we will just go in the

6          order.  What I have done is I -- hopefully

7          this will be helpful to the Court and people

8          in the courtroom.  I handed out a one-page

9          budget which I'm often teased about, but we

10         hand out a one-page budget which will

11         hopefully show the first 13 weeks of the case

12         and will match up to the relief requested.

13         If you think the print is small now it gets

14         even smaller as I get longer in the case and

15         then we will put it on two pages, but most

16         people complain I can read small but I can

17         read you very well.  So it is easy for me to

18         read the small print.  Your Honor, just to

19         give you a sense of this budget, we start on

20         the week one and we said here -- we have said

21         here we have broken it down essentially to

22         mere operating expenses or cash flows which

23         is an item two.  The first item is a

24         significant one, Your Honor.  It is an

25         assumption about how this market is going to

1        operate and comp store sales.  Notice it is a

2        scary number.  It is off 35 percent.  It is

3        off 30 percent.  It is off 25 percent.  It is

4        off 20 percent.  So we think we have taken a

5        conservative assumption, but no one can

6        predict in this market and what people are

7        saying about retail that even a negative 35,

8        30, 25 is conservative enough.  And with a

9        company this size there can be significant

10       variation.  But that is the assumption about

11       our performance over this 13 week period.

12       Importantly and not in here, Your Honor, is

13       through the week of January 3rd we assumed

14       absolutely no trade credit, CIA.  It is our

15       experience and hope to be able to negotiate

16       trade credit and then beginning on the week,

17       I think, of January 10th very little trade

18       credit comes in because we hopefully will be

19       in the negotiating phase and getting some

20       trade credit.

21            The next -- in the cash flows then

22       we have what I call the bankruptcy payments,

23       and, Your Honor, those titles should seem

24       familiar to the first day papers as we either

25       -- each tagged to the amount of relief that

1           we sought in certain of our first day papers

2           by way of any number of arguments, these

3           doctrine of necessity secured claims,

4           whatever, but they are broken down into

5           customer practices, freighter shipping,

6           insurance, mechanic's liens, foreign vendors,

7           and then my favorite, the other one.  And we

8           will talk a little bit about the other, my

9           pledge factor.

10          Your Honor, what I think is striking

11          is the next column.  It is a column that says

12          how much is this DIP facility going to cost

13          us, all in when you pay the professionals

14          that negotiated it, when you pay the banks

15          the fees and when you pay the lenders'

16          counsel its fees, we have listed here 34

17          million dollars.  Your Honor, it is actually

18          probably two or three million dollars less,

19          not more.  So we're better.  We did put in

20          the number.  We've done the calculations.  It

21          is probably closer to 30 million dollars over

22          all.  So as I said to my board, we said -- I

23          want the Court to understand and I want you

24          to understand we're paying 30 million dollars

25          with 50 million dollars of additional

1          availability over this period of time.  Now

2          that's an oversimplification, but I think it

3          is a stark point that Your Honor has to hear.

4          Now we can give you all the other reasons why

5          we're getting covenant relief, we're doing

6          these things and that thing, but at the end

7          of day we are putting in basic economics.

8          You say I want to put 30 million dollars to

9          get 50 to buy the bridge to an exit.  We

10         think it is all worth it because our

11         alternatives are not, and, as the experts

12         will testify by proffer or directly, there

13         was no other option but to take this or

14         liquidate, and liquidation was not good for

15         anyone as we have determined.

16              Your Honor, next to the other budget

17         -- and I point this out because we are not

18         seeking approval of something of this budget,

19         but I do want Your Honor to understand that

20         there are two columns that will talk about --

21         under the other line there is employee

22         termination cost and employee incentive

23         plans.  Your Honor, we are not seeking

24         approval for any employee incentive plan

25         today or any employee severance or other

1           costs.  The employee motion as we go through

2           it -- we stripped it down fairly

3           significantly to pay the basics.  We do

4           believe we have one controversial issue that

5           we pointed out in a revised motion that we

6           will take up today.  But other than that we

7           think we have determined it.  We are not

8           paying severance right now.  We're leaving

9           all of that for the discretion committee to

10          be formed.  We are therefore only paying

11          those expenses to be necessary and in all of

12          our motions to avoid immediate and

13          irreparable harm.

14                Then, Your Honor, we can see that

15          the low balance as of today is about 756

16          million dollars.  And that's an estimate.

17          Your Honor, the DIP facility here is -- I

18          don't think is unique anymore in the market,

19          but it is one people can question in the

20          following way:  we are seeking -- whether you

21          call it a first day role of the entire

22          facility to convert into post petition debt

23          or as you see it as a new facility taking out

24          the old facility, the fact of the matter is

25          if Your Honor approves that facility today,

1          the company will lose bankruptcy rights.  It

2          will lose its right to cram down, for

3          example, or cram up the secured lenders.  It

4          will lose the right to reinstate those debts.

5          It understands that.  It is asking to take

6          the full amount of loan, pay the loan down

7          and then start going forward.  The ironic

8          part, Your Honor, and I think the media will

9          pick this up but it's worth the finance,

10         although we are reducing our commitment from

11         1.3 to 1.1 down to 900 eventually, we are

12         actually increasing our availability.  That's

13         just the way an ABL loan works.  If you don't

14         have enough inventory and goods to get up to

15         that cap, you are never going to borrow the

16         1.3.  We don't have that.  We are not going

17         to get up to the 1.1 or the 900 as you see

18         through this model.  Nonetheless, what we

19         have gotten to an advantage is we're able to

20         use available collateral again through Bank

21         of America the Canadian assets.  So we get a

22         better borrowing rate which gets us to

23         greater liquidity which gets us to 50 million

24         which we believe will get us to that January

25         date.  Again, we can also think of it simply

1          -- if we jettison all the stores we have

2          jettisoned, you don't need a bigger facility

3          to put in as much inventory.  Again, that may

4          be an after thought as to how you describe

5          it.  The fact of the matter is we don't have

6          the capacity to borrow that.  It is not a bad

7          sign that we are losing our commitments or

8          they are being reduced.  It is an economic

9          advantage for lenders and it's one of the

10         quid pro quo for getting this many

11         facilities, but I think the message here is

12         we're getting additional availability.

13              Your Honor, again, at the very

14         bottom of that budget -- I point this out

15         because it becomes a topic of the first day

16         papers -- you will see that we have put in

17         what we call a utility reserve.  As the code

18         has changed through 366 there is a, you know,

19         give the money, we come up with what I will

20         say is a somewhat creative way of dealing

21         with it by making an LC landlord and then

22         they can come in and object and we'll

23         resolve, which gets me back to my other

24         budget.  Your Honor, we have set the LC

25         reserves as we said in the first day motions

1           by two weeks.  And Your Honor knows as

2           practice, most regulatory agencies say you

3           can ask up to two months.  Once you are a new

4           debtor, if you have no credit history or if

5           you have a credit history and it is a bad

6           credit history, they ask for a two-month

7           security deposit.  The truth lies somewhere

8           between two weeks and two months.  Probably

9           that other line frankly, Your Honor, is our

10          ability to negotiate settlements at something

11          between that two weeks and less than -- less

12          than two months, far less than two months,

13          hopefully at two weeks, and that's how we use

14          the other line.  So it is not that we have

15          some slush fund to use.  It would be part of

16          the authority that we are seeking Your Honor

17          to approve today.

18                Your Honor, I think that goes

19          through the budget.  Now, again, I will come

20          back to the DIP, but I can move on to the

21          basic first day papers if Your Honor would

22          like to do so.  Your Honor, I heard 24

23          motions.  I think I lost count because I have

24          an agenda that's 22.  Maybe there is a couple

25          of ad hocs of 24 -- okay.  I'm not sure which

1          ones.  So if I miss one, let me know where I

2          am.

3                    THE COURT:  On the Court's calendar

4          there were 23, but we have already taken care

5          of one which was the motion for you to appear

6          pro hac.

7                    MR. GALARDI:  Well, I'm glad that

8          that one was granted, Your Honor.  I think we

9          can move.  I didn't have my own appearance

10         on -- I have not yet moved my pro hac vice.

11         Your Honor, the next motion on the agenda is

12         the motion under 105 to set an expedited

13         hearing today.  I don't know if Your Honor

14         has approved that.

15                   THE COURT:  That is approved.

16                   MR. GALARDI:  Thank you.  The next

17         matter, Your Honor, is waiting requirements.

18         It is the joint administration motion.

19         Again, Mr. Besanko has set forth in the

20         affidavit, as Your Honor can see from the

21         corporate structure, each of the entities

22         that filed affiliated in either direct or

23         indirect subsidiary or wholly owned

24         subsidiary.  Your Honor, it is not subject to

25         consolidation.  It is very clear for

1           procedural purposes.  I don't know if Your

2           Honor has questions or need anymore

3           information on that motion.

4                THE COURT:  I have read the papers.

5           I don't have any problems with it.  It would

6           be quite normal to proceed with it in this

7           fashion.

8                Does any party present want to

9           object to the joint administration?  All

10          right.  That motion will be granted.

11               MR. GALARDI:  Your Honor, the next

12          motion is the motion to approve the

13          application of a claims noticing agent.  I

14          don't think Your Honor's Court nor we would

15          want to take on the noticing burden that will

16          be here.  We have sought to retain Kurtzman

17          Carson Consultants.  They have done many

18          large cases for our firm and many other

19          firms.  They are listed in those matters.

20          They do the claims.  They do the noticing.

21          They have a website.  People can find out the

22          claims.  They will do the process of posting

23          our papers, and then ultimately when we come

24          to soliciting acceptance or a rejection of

25          the plan of reorganization they will

1          hopefully serve as balloting agent for this

2          purpose because they will have the claims and

3          classifications.  I don't know if Your Honor

4          has questions about that motion.

5                    THE COURT:  Again, I reviewed the

6          papers.  I find them to be in order.

7                    Does any party wish to speak in

8          opposition to the motion?  That motion will

9          be granted.

10                    MR. GALARDI:  Your Honor, I'm now on

11         number five, I believe, on my agenda.  It is

12         the motion for the debtors to set various

13         notice of case management and administrative

14         procedures.  Your Honor, it is what I

15         understand to be a fairly standard motion in

16         this jurisdiction.  I think the only thing

17         that would need to be filled in, and maybe we

18         can come back to this at a certain point, is

19         dates for omnibus hearings would be set.  I

20         gave in part the calendar to sort of talk

21         through that.  I don't know if Your Honor's

22         preference is whether to try to set those now

23         or wait and come back to that at the end of

24         the hearing.  I think there is nothing else

25         that's controversial in that motion.  Unless

1        Your Honor has questions, I would ask to be
2        granted.
3              THE COURT:  Any parties want to
4        speak in opposition of the motion?  It will
5        be granted.
6              Why don't we come back at the end of
7        the hearing and set the dates because of some
8        of the other motions we'll need to take into
9        consideration when we set those dates.
10             MR. GALARDI:  Thank you, Your Honor.
11       Your Honor, the next motion is the debtor's
12       motion.  Again, these are administrative
13       motions whereby they want to prepare a list
14       of creditors and we will submit a formatting
15       or mailing matrix, file a consolidated list.
16       As the debtors we filed the 50 largest
17       creditors.  Again, KCC is in their matrix and
18       sending the notices.  I think it is fairly
19       standard.  We prepared the top list, and we
20       will be filing schedules and statements
21       against, again, with our aggressive schedules
22       with plans and disclosure statement and then
23       we set bar dates.  We will be doing that as
24       fast as we possibly can.  We ask Your Honor
25       to grant our motion number six.

```
 1                    THE COURT:  That motion will be
 2          granted.
 3                    MR. GALARDI:  Your Honor, moving
 4          down to number seven -- and I will now say
 5          I'm into what I'll call the business
 6          operation motions.  Again, I think I sort of
 7          see these as going from administrative down
 8          to business operations, from fundamental to a
 9          little bit more controversial depending upon
10          what jurisdiction you're in.  Your Honor, the
11          next motion is motion number seven.  It
12          really seeks four forms of relief.  One is to
13          authorize the company to continue using its
14          existing bank accounts; two, is to use
15          existing business forms, although it is hard
16          to say in this internet age how much you
17          actually have to check in the non-debtor
18          possession but I'm sure we have some.  So I
19          think we sought to continue to use the stock.
20          More importantly and the most important is it
21          is actually required by the DIP which is to
22          continue our cash management system in that
23          payment, the checks and balance.  We have a
24          very complicated graph of disbursements.  But
25          essentially, Your Honor, all the money comes
```

```
 1              in and goes out to Bank of America and it's
 2              re-lent all in the same day and goes out to
 3              the disbursement accounts.  We have a number
 4              of separate disbursement accounts which will
 5              pay down the loan we borrowed again for the
 6              most part under this facility.  Again, it is
 7              automated, electronic.  The company, for
 8              example, can tell me one day or two days
 9              later, well, how are the sales going in those
10              GOB stores.  At the store's closing they can
11              tell me the sales are up 200 percent.  It
12              would be very difficult for Mr. Besanko
13              himself to try and change that.  In addition,
14              Your Honor, we have an intercompany that we
15              would like to be able to pay some money out
16              of the debtors estate and the banks have
17              agreed to this to a Hong Kong facility
18              intercompany.  That is a servicing agent.  It
19              helps us to get contracts with our foreign
20              vendors abroad that don't have -- that are
21              not in this jurisdiction for doing business.
22              It is a small amount of money.  It is
23              essentially to payroll for those people
24              working there.  Again, the banks have
25              consented to that.  It is money that goes out
```

1          of the system.  We would ask Your Honor -- if

2          Your Honor has questions about it, I don't

3          think I can to tell you every bank account or

4          every disbursement account, Your Honor, but I

5          can tell you Mr. Besanko has control over

6          those funds, understands where the funds

7          flow.  If we were in the treasury department,

8          we would have to face substantial

9          difficulties if we were actually to try to

10         belie closing accounts, opening accounts and

11         different accounts.  It would also be a

12         default under our DIP document and they are

13         comfortable in our system.  I don't know if

14         Your Honor has any questions about that.

15               THE COURT:  Any party wish to speak

16         in opposition to this motion?

17               The Court did have one question with

18         regards to the order that you sent us.

19         Apparently what I would see as a

20         typographical error as it appears on Page 6

21         at the bottom, paragraph nine is not finished

22         in the form order that was submitted to the

23         Court.

24               MR. GALARDI:  I think we submitted a

25         revised one for exactly that reason.  We

1           noticed that this morning.  What we can do is

2           get you a copy of a new order and obviously

3           Your Honor can review it, and if it meets

4           Your Honor's approval we can submit that.

5                THE COURT:  Thank you.  With that

6           change, that's approved.

7                MR. GALARDI:  Your Honor, the next

8           motion is a motion for interim and final

9           orders of waiving of the investment and

10          deposit requirements.  Again, the Bankruptcy

11          Code under Section 345 makes sure that we put

12          our investments in safe investments.  We --

13          ordinarily because we think that the banks

14          are safe and generally in this instance

15          because it is a very much revolving line,

16          it's actually -- as I was talking with the

17          U.S. Trustee -- don't believe it is really

18          our money.  It goes down and we borrow it.

19          So it's really in their possession.

20          Nonetheless, as the U.S. Trustee pointed out,

21          Bank of America, Wachovia, I believe, were

22          already collateralized companies.  So to the

23          extent we're going to get any relief on the

24          interim relief we will -- we do in turn have

25          to let the U.S. Trustee know about the bank

1          accounts.  It is without prejudice for them

2          to get comfortable that either they need

3          these collateralization agreements or they

4          don't, but I think on an interim basis they

5          are content, and we'd ask for Your Honor to

6          waive them on an interim basis and come back

7          on a final hearing if someone should, in

8          fact, object to our continuing to be free

9          from the burden of 345.

10              THE COURT:  Anybody wish to be heard

11         on this motion?  Okay.  That will be granted

12         on an interim basis.  That would be one of

13         the hearings, I assume, you will need to set

14         as part of an ongoing series?

15              MR. GALARDI:  Yes, Your Honor.  As

16         we now get into that, that's a perfect

17         introduction to the next set of motions.

18         Again, it is my understanding and generally

19         my practice, Your Honor, that notwithstanding

20         the fact that I haven't styled the rest of

21         these first day motions where I have what I

22         will call the bankruptcy payments, that

23         notice being what it is is not absolutely

24         perfect on one day.  So -- and we have tried

25         to reach out to people we think would be on

1          the committee.  My understanding is there

2          would be pretty much interim relief and we

3          would probably talk with the U.S. Trustee

4          again in the spirit of irreparable damage or

5          harm notwithstanding the fact we are getting

6          relief.  What I would suggest with respect to

7          relief -- and we will talk about each one.

8          There is only one thing when it comes to the

9          employee one that I would like that to be

10         interim.  Otherwise with respect to the

11         motions, my understanding is it would be

12         interim, it would change the orders out, it

13         will send what I call a negative notice

14         deadline.  If you object, we'll come back to

15         the first omnibus hearing.  And if you don't

16         object, it automatically goes final.

17              THE COURT:  That would be the

18         Court's preference.

19              MR. GALARDI:  Okay.  That will work

20         because our budget, again, Your Honor,

21         assumes the number of payments.  Obviously we

22         are not going to push all the money out

23         because I know Your Honor has read this -- we

24         are authorized but not directed to make all

25         of these payments.  So just because it is on

1           the budget we have a disbursement covenant.

2           We want to make sure we satisfy that.  There

3           is not one's entitlement to any of this

4           money.  We will be negotiating as best we

5           can, but I think it is a good way to have us

6           come back to the Court again and put more

7           fine print on it where we stood actually if

8           someone wants to object to where the

9           committee comes and says I don't think you

10          should be making these payments which will

11          not prejudice their right on a subsequent

12          hearing.  So with that said we can make the

13          orders all have the kind of language that I

14          said, the negative notice, and we'll talk

15          about a date for objection and at the hearing

16          if there is an objection we will come back.

17          I think that makes the U.S. Trustee more

18          comfortable, and I assume it makes the Court

19          more comfortable.

20                  THE COURT:  It does.

21                  MR. GALARDI:  Your Honor, with

22          respect to the employee motion, I think that

23          a few things that want to -- one, I think it

24          is a fairly standard motion with maybe two

25          caveats.  First, with respect to the

1          employees we seek to pay wages, salary and

2          the ordinary health benefits.  Your Honor,

3          there is no one in this group that -- and our

4          last payroll, I believe, went out -- it was

5          either October 29th or 30th, and so, Your

6          Honor, we are actually coming up on -- the

7          next payroll would be next Wednesday.  This

8          Wednesday we will fund.  There are no

9          employees to our extent if you take the

10         strict wage and salaries that are over the

11         10,950.  So we are asking the approval of

12         that.  With respect to -- now if Your Honor

13         takes also benefits, we have asked for a

14         number of things which we think would be a

15         hardship if Your Honor does not approve.  In

16         particular we have employees that are

17         relocating.  So we have asked for relocation

18         expenses.  We have asked for business

19         expenses.  If they didn't get in their Imex

20         bill on time, it is a hardship to burden them

21         with that.  We are asking Your Honor to be

22         able to reimburse them.  We are asking Your

23         Honor to reimburse -- we have the position --

24         their health cost, those, Your Honor, are

25         fairly straight forward relief that we have

1          obtained in many courts.  Let me say the

2          hardships that we have put the employees on

3          -- we have terminated with respect to

4          retirees programs.  We are not making

5          payments to retirees given the financial

6          budget that we have.  It is just an

7          unfortunate fact between paying retirees

8          additional benefits versus having money to

9          run the operation, which I have described as

10         a 60 and not 120 day case.  We've decided to

11         terminate certain of those funds.  In

12         addition, Your Honor, we are seeking again

13         for employment moral issues to continue the

14         401(k) match for the time being, the

15         company's share of the 401(k) match.  What we

16         have stopped, Your Honor, and what we are

17         going to encourage employees to make a

18         decision about, we have a supplemental 401(k)

19         program.  The company has a match to that

20         supplemental 401(k) program and the employees

21         have to opt for tax benefits at the beginning

22         of the year to continue to make those so they

23         get tax benefits.  Unfortunately, Your Honor,

24         that's a funded plan that's in a Rabbi trust.

25         I'm not sure if Your Honor understands that

1           that's subject to the claim of general

2           creditors.  So at the very least the company

3           decided we will terminate -- we can do this

4           fix -- terminate our contribution to that

5           supplemental 401(k) as soon as possible,

6           meaning today.  With respect to the

7           employees, unfortunately -- and we've tried

8           to figure out how to stop them from making

9           those contributions.  We have decided to let

10          them have that election to do that.  However,

11          that could have tax implications if they do

12          so.  So they will have to pick between paying

13          money into a trust that will be subject to

14          the claims of unsecured creditors or taking

15          the tax implications.  We tried to explain

16          that to people but that was the best we can

17          do under the plan, and so we have asked for

18          authority and the board approved last night

19          to give them that option.  But what we also

20          did, Your Honor, is we're not allowing them

21          to make an election for 2009.  That, we could

22          do.  So that will stop in 2009.  It is just

23          an unfortunate fact that you can't stop for

24          the employees the contribution, but we will

25          try to get them and tell them to advise their

1          tax advisor.  That was one thing we

2          terminated.  We also terminated, Your

3          Honor -- and this we can do -- is we

4          terminated the company's stock purchase plan

5          which the employees can do as a regular

6          payroll.  So instead -- and they elected to

7          do this -- and, again, Your Honor, we are in

8          a public company.  So we can't simply say,

9          before we filed, stop this, we have

10         information.  So we have done that because we

11         don't -- unless the employee wants to go out

12         in the market and buy the stock we think it

13         is time to terminate that and not any longer

14         have that.  We have information that they

15         don't have it and we don't want to have them

16         deduct for payroll for future stock

17         purchases.  So we have terminated that.  Your

18         Honor, there is a list of programs that we

19         have also changed.  It is histrionically the

20         case that the company has got -- the

21         employees got paid time off, and if they left

22         and they had paid time off, they would get

23         that payment.  We have changed the program

24         such that if you leave the company you do not

25         get a cash payment for the paid time off.

1               Again, it is an unfortunate fact, but given

2               our liquidity situation we have decided to do

3               that.  That said, those people will still be

4               able in the ordinary course of business to

5               use their paid time off as if we had not

6               filed Chapter 11.  So if they have vacation

7               time, and subject to the needs of the

8               company, and they can take that time off,

9               they can use it and be paid for that paid

10              time off in the ordinary course.  And the

11              difference between paid time off and vacation

12              is it just covers -- whether you have a

13              family day or vacation day or sick day we

14              don't ask the reason.  We give you a certain

15              amount of paid time off.  Employees are still

16              allowed to do that.  Again, you just can't

17              take the next month off.  Obviously it is

18              subject to the needs of the company.  Your

19              Honor, we have a severance plan which we have

20              made no determination, but obviously, Your

21              Honor, under the circumstances it would be

22              difficult for us to get approval ultimately

23              on a severance plan, but, again, I have put

24              money in the budget to talk about what we are

25              going to do.  It is a committee issue, not a

1           today issue.  So we have essentially punted a

2           number of what I will call the other benefits

3           for another date to come back without -- we

4           reserve all rights to come back to the Court

5           to ask for that.

6                     That then brings us to probably the

7           most unfortunate, controversial part of that

8           motion.  As I mentioned in my opening

9           statement, Your Honor, on Thursday and Friday

10          we terminated nearly 700 employees at the

11          corporate level.  Since it is a one location,

12          Your Honor, we gave them a 60 days Warn Act

13          notice.  The Warn Act says you have to give

14          notice and essentially your termination is

15          effective 60 days before or you would have to

16          pay the person back wages if you didn't get

17          the notice.  Again, we gave the notice saying

18          you would be terminated 60 days hence.

19          Notwithstanding that fact, Your Honor, there

20          are two cases which we cited in our amended

21          motion that have taken under BAPCPA the case

22          that says -- well, under BAPCPA you're going

23          to have to still show administrative expenses

24          under 503(b)1, and clearly we have laid off

25          these employees.  We have no intention at the

1        present time to recall them just to work.  It

2        is a head count reduction.  So I can't stand

3        before Your Honor and say we are going to get

4        a post petition benefit from those people in

5        particular.  The payroll that that accounts

6        for is roughly 1.1 or 1.2 million dollars a

7        week.  Your Honor, based upon just general

8        -- the mood at the company, the employee

9        moral, the need in the community, the company

10       determined after seeing that it had in fact

11       this option, that we would still like to pay

12       the payroll to those people for the next

13       eight weeks.  That said, Your Honor, as I

14       described to the U.S. Trustee in that -- and

15       one of the reasons that we think it is

16       interim relief is we understand that there

17       could be -- we're not going to be -- we will

18       be supporting the employees to get them their

19       wages.  We don't have a severance plan as I

20       mentioned.  We sort of suspended it.  At the

21       very least, Your Honor, in thinking about it

22       what we have decided to do is ask Your Honor

23       to have the relief to continue next week the

24       payroll.  It would be one thing to send them

25       home Thursday and Friday telling them you

1          have a paycheck coming and, oh, by the way,

2          we filed on Monday morning and now you have

3          no paycheck.  I think that would be

4          devastating to the community and devastating

5          to the morale of the company.  And after

6          talking -- and again Mr. Besanko can testify

7          to this -- we have asked for authority to

8          continue the payroll.  That payroll number is

9          in our payroll numbers in the DIP budget.  It

10         is in every form of DIP budget that -- we

11         haven't highlighted it as a separate line

12         item but up in the operating expenses the

13         payroll is there for the benefit of those

14         people who have always been there.  We

15         happened to find a case that came out two and

16         a half weeks ago that says we didn't have to

17         do this, and, again, we have been working

18         very hard with the employees to make sure

19         this is a smooth landing.  Indeed they were

20         very encouraged, notwithstanding being laid

21         off, and frankly very positive about the

22         company and the steps the company took.  So

23         we just couldn't see a good reason other than

24         saving money, but it is a significant amount

25         of money, other than to pay them.  So with

1           that we would ask Your Honor, again, on this

2           one part of the relief, that Your Honor

3           approve that we continue to pay the payroll,

4           but, again, it could be visited by the

5           committee two, three weeks from now and if

6           the committee wants to object to it, we will

7           defend it and they will be the person

8           objecting to so we can do the payroll.

9                    THE COURT:  That would be

10          retroactive relief.  That would be continuing

11          it out through the Warn Act period?

12                   MR. GALARDI:  Correct, Your Honor.

13          Again, our view would be, you know, see it as

14          a two week notice sort of provision.  That's

15          the worst it would be if they got cut off.

16          Again, the company feels strongly that we

17          should have the eight weeks and it should be

18          a moral issue.  Again, to put it in further

19          context we have the store closings.  We are

20          giving people warn notice there.  They just

21          happened -- they got the notice prebankruptcy

22          but they are still working post bankruptcy.

23          So they are going to get the 60 days in any

24          event because the case doesn't really apply.

25          They have provided a benefit and the

1           termination does not.  So there will be

2           disparate treatment of our employees.  So

3           just because we could not have them not

4           operate the store, it all seems unfair to us

5           do that.  So, again, the company felt very

6           strongly, and Mr. Besanko is in the

7           courtroom, could talk about the employee

8           moral in those matters, but we have sought

9           that relief.  Again, at the very least we

10          would like to come back on an interim basis

11          and let the committee look at it.  We didn't

12          think it was fair to ask for the full relief

13          but the company's intention is to pursue the

14          entire eight weeks.

15                  THE COURT:  All right.  Very good.

16          Does any party wish to speak in opposition to

17          this motion?  All right.  The motion will be

18          granted and the Court will -- with the

19          proviso that the terminated 700 employees --

20          that would be on an interim basis to give the

21          community an opportunity to come in and

22          object if they wish to do so.

23                  MR. GALARDI:  Your Honor, what I

24          think we will do is we will do an employee

25          order and make it specific.  I think we call

1           them the warned employees in our motion.  So

2           we will say interim relief with respect to

3           the Warn Act and you will have X period of

4           time to object to that and we will come back

5           and set a hearing.  I don't want the rest of

6           the employees stuff to be seen.  Again, they

7           have --

8                THE COURT:  I understand exactly

9           what you are saying.  That will be -- that's

10          not interim relief.  That is -- it will be

11          approved today.

12               MR. GALARDI:  Thank you, Your Honor.

13          Your Honor, the next matter is a fairly

14          standard motion to pay prepetition sales use

15          and trust fund taxes.  Again, there are

16          disputes as to whether these are priority

17          claims, whether secured claims, whether they

18          are even property of the estate.  The U.S.

19          Trustee's Office wants us to pay our taxes.

20          Most people want us to pay our taxes.  We

21          don't want to incur any interest or other

22          payments on it.  Again, a lot of it is not

23          even property of the estate.  We seek the

24          relief, Your Honor.  It is basically up in

25          our standard operating expenses.  It is more

```
1              of an accident of timing than it is that we
2              have not paid these things at any given time.
3              It would be hard to decipher what is pre and
4              post, and we would ask Your Honor to approve
5              our continuation of plain sales, use and
6              trust fund taxes.  Again, there are often
7              personal liabilities associated with failure
8              to pay them.  If you don't pay them, there is
9              also an administrative issue at the end of
10             the case if you've left them out for such a
11             long period of time.  We rather not face
12             those issues.  They are secured.  They are
13             priority.  So we would ask Your Honor to
14             approve the sales use and pay trust fund
15             taxes.
16                  THE COURT:  That motion will be
17             granted.
18                  MR. GALARDI:  Your Honor, we now get
19             to my procedural motion that is with respect
20             to Section 366.  Your Honor, as I described
21             at the outset the company obviously has 700
22             and some stores.  We are seeking relief with
23             respect to the utilities.  Under Section 366
24             as amended the process is essentially that
25             the debtors have to make a proposal within a
```

1        certain period of time.  I believe it is 20

2        days.  Then what a utility can do is say is,

3        no, I don't like that proposal, and then you

4        have to give the utility -- if you haven't

5        resolved that issue on the 30th day, you have

6        to give the utility what it requests.  To

7        take account of that and not have all the

8        money go out the door and have to pull it

9        back and have all of those fights, what we

10       have to devise is a motion which has been

11       approved in number of jurisdiction whereby we

12       set up first day and we say here's what we

13       are prepared to give the utilities.  We are

14       prepared to give the utilities the right to a

15       blocked account at the Bank of America that

16       is a separate, segregated fund of 5 million

17       dollars.  We give them a form very much

18       styled in a letter of credit form that says

19       we say you're in default.  We draw the

20       amount.  Bank of America, just like an LC,

21       has to not inquire whatsoever.  Whether

22       there's a default or there is not, it pays

23       it.  We then, like a wrongful draw on an LC,

24       we would go back and say now that was wrong

25       but then our dispute is with the utility if

1        they make that wrongful draw.  We think that

2        amount of fund, two weeks for all of the

3        utilities at 5 million dollars, is

4        significant.  So we think we have given them

5        adequate protection.  It is the other

6        security element of 366.  Notwithstanding

7        that, Your Honor, they don't have to accept

8        it and that's what 366 says.  So what we try

9        to do is to say, okay, if you don't have to

10       accept it, we need you to come in and tell us

11       what form of your security we would like.  We

12       set a deadline to do so and we ask Your Honor

13       to have a hearing before that 30th day so

14       that we can resolve it.  Again, money doesn't

15       go out the door only to come back in because,

16       Your Honor, if that's two weeks and you

17       really need two months, you are talking 20

18       million dollars and that puts this case into

19       no availability in the first weeks.  Also,

20       Your Honor, we have 155 stores and we have to

21       pay utilities to all of them and we have to

22       be out of them by the end of December.  We've

23       paid them in advance for all of those months

24       and then we have to come back.  So we'd like

25       to deal with that one on one.  We don't think

1      that this prejudices the utilities because

2      they still have all of the state law rights

3      and they can still ask for two months, and,

4      Your Honor, it sounds like we'll have

5      thousands and thousands of utilities here on

6      the 29th.  Generally speaking we have

7      resolved all of these with respect to

8      stipulations.  We seek the authority to do

9      that.  And as I said, Your Honor, in all

10     candor we have an other line which where we

11     do exactly that and we can negotiate.  We

12     want to keep it to two weeks.  We may in

13     certain instances do more.  We may in certain

14     instances try to do less if we find out, but

15     we don't need to give utility deposits or if

16     we could use old security deposits in the

17     close of stores.  So we would like to have

18     the authority to implement that procedure

19     without prejudice to the utility companies

20     coming in and acting on their rights.  I can

21     give you what they will say in response to

22     this.  They will say never got a receipt.

23     And we'll have those arguments but we

24     generally have resolved it, and I think it is

25     generally a procedural motion to get us

1          through 29 days from now.

2                    THE COURT:  Does any party wish to

3          speak in opposition to this motion?  Mr.

4          Johnson.

5                    MR. JOHNSON:  Your Honor, Russell

6          Johnson here on behalf of Virginia Power and

7          several Virginia entities, Duke Energy,

8          several energies, Progress Energy,

9          Consolidated Energy Company of New York, and

10         several northeast utility companies.  Our --

11         I don't disagree that the debtors need

12         procedures here.  It is a big case and a lot

13         of utilities.  Essentially a few arguments.

14         One a legal argument and one procedural.

15         With respect to the motion to the procedural

16         objection I have, Your Honor, is that I think

17         there should be an objection deadline.  This

18         procedural -- we make a request, they get to

19         look at it and decide whether or not it is

20         okay, and then three days before the hearing

21         they'll let us know whether or not it is okay

22         and then there will be a hearing.  I just

23         don't think that is really what's proper.  I

24         think we should be able to object to this

25         motion to procedures that are set forth and

1          still be heard before the 30th day.  I think

2          if we're going to have a hearing before the

3          30th day I think that's fine.  I don't have a

4          problem with them seeking these procedures

5          but I think my client should have the right

6          to object to them.  There is nothing in this.

7          This is a final order that basically says

8          these are the procedures, you have filed

9          them, and for some unfortunate utilities that

10         don't get this notice or get it too late they

11         will be forever barred from seeking adequate

12         assurance.  I think that's improper as well.

13         I'm only representing my client that are

14         actually here.  So, Your Honor, I would

15         request that there be some deadline, maybe 10

16         days before the hearing date, that we can

17         object to these procedures.  I haven't had a

18         chance to read through the whole thing.  I

19         tried to digest as quickly as I can to get a

20         lot of the notice of this hearing this

21         morning.  So that's the first issue.

22                  The legal issue, Your Honor, is

23         essentially the debtors are here under

24         Section 363(c)3.  They are under the

25         provision that says they can modify the

1          adequate assurance of the utilities as deemed

2          satisfactory under (c)2.  That's fine.

3          That's what they are here for.  If you go

4          back to (c)2, my client -- we don't want a

5          segregated deposit fund.  That's not what we

6          would choose as the form of adequate

7          assurance.  My clients would want a cash

8          deposit as the form.  So we don't think that

9          the debtors have the ability to modify the

10         form.  My clients would be asking for cash

11         deposit, and all the 366(c)3 allows them to

12         modify is the amount.  It says very

13         specifically in there that they can modify

14         the amount of the (c)2 deposit.  It does not

15         allow them to modify the form.  So my clients

16         would be fine accepting a two week or 15 day,

17         whatever it is that they are proposing, cash

18         deposit to tide this over until the matter is

19         heard, whatever the 29th or 30th day is

20         whenever the Court can schedule a final

21         hearing.  We don't want this segregated

22         account which may or may not be there at some

23         day in the future.  They even put it in their

24         motion whether or not they are going to be

25         able to fund this thing.  So we want the

1          actual cash to tide us over because that is

2          the type of adequate assurance we would

3          request.

4               THE COURT:  Let me see if I

5          understand.  We are still dealing with 366(b)

6          thought, right?  All 366(c) is doing is

7          defining some of the terms for purposes of

8          figuring out what's adequate assurance

9          payment under 366(b).

10               MR. JOHNSON:  No.  A chapter 11 case

11          like this it is really all 366(c).

12               THE COURT:  I understand the

13          procedures in 366(c).  Didn't we have the

14          same liquidity in the Rowe case.

15               MR. JOHNSON:  Well, Rowe was a cash

16          deposit.

17               THE COURT:  I understand.  What you

18          are objecting to is that it shouldn't be a

19          draw for the most part on the letter of

20          credit.

21               MR. JOHNSON:  It would be better if

22          there's a letter of credit than a segregated

23          bank account.

24               THE COURT:  That's the way it is set

25          up for block account so the reserve is there

1           under the --

2                    MR. JOHNSON:  Well, they still have

3           financing.  If they lose financing, the

4           segregated account presumably would be gone

5           as well.  There is nothing said about that,

6           but I have to assume -- if they lost

7           financing or have a reduction in financing,

8           what will happen to that segregated account?

9           That has not been made clear in the motion.

10          That's why we would prefer to have cash until

11          this matter is heard on the 29th or 30th,

12          whatever day the Court schedules for this.

13                   THE COURT:  All right.  And tell me,

14          as I'm a little bit unsure about your first

15          objection to the procedures, what is it

16          procedurally that you want to object to?  You

17          don't like the fact that they are making the

18          offer and you have to then have a

19          counteroffer or do you want to object to them

20          being able to establish a procedure on first

21          day motion?

22                   MR. JOHNSON:  The objection would be

23          to the entire motion which would be, one,

24          that a segregated account can't be the proper

25          form of adequate assurance.  It's got to be

 1          cash.  That would be the first thing we would

 2          like to object to, which we all have the

 3          opportunity.  This is the final order on the

 4          first day of the case that they are proposing

 5          that then sets -- requests the utilities have

 6          to send these requests to all of these

 7          various folks that have all of these things

 8          in it.  We would send requests for charts and

 9          account information with things like that

10          anyway.  I think this goes over the top of

11          all the stuff they are asking in there, but

12          then they can get a period of time where they

13          have to look at it.  Because we have five

14          days before this determination, five business

15          days prior, and then three business days

16          prior they have to respond to us letting us

17          know whether or not they agree with our

18          adequate assurance requests and then the

19          matter gets heard.  That seems like a pretty

20          crazy timetable.  We would like to have an

21          objection out there and have this Court hear

22          our objection on all of these procedures and

23          not have to wait and give them some request

24          and if we don't give them the request by the

25          proper time and deemed to have waived it.  I

1           just don't think that we should have to fit

2           into that whole thing and comply with their

3           procedures which aren't even set forth in the

4           statute.  The statute doesn't provide for

5           these procedures.  The statute says we make a

6           request or they can, you know, make a request

7           but -- and they can move to modify.  That's

8           all the statute provides.  And I don't have a

9           problem, as I said, with this matter being

10          heard before the 30th day, but I certainly

11          want it to be heard before the 30th day with

12          a final hearing on what their Section 366(c)3

13          motion seeking to modify our request would

14          be.  I think this throws the whole thing out.

15          If we make a request, we're -- what pleading

16          do we have before the Court?  We don't have

17          any pleading before the Court at all.  We

18          have a request that we sent to them and then

19          we will be back before this Court if we don't

20          agree on the request that we sent.  We have

21          no pleas, we have nothing before the Court at

22          all under these procedures.  The final order

23          is being entered, we get to send some

24          request, and then there is a hearing.

25                  THE COURT:  All right.  Thank you.

```
 1                    MR. GALARDI:  Your Honor, two

 2           responses.  First, I have no problem if

 3           everyone of Mr. Johnson's clients are carved

 4           out from this motion, and the reason I have

 5           no problem is that I don't need a procedure

 6           for them because the Bankruptcy Code -- all

 7           we're trying to do is actually jump the gun

 8           for the Bankruptcy Code because you start

 9           with (b), and what (b) says is that a utility

10           can terminate service or discontinue if

11           within 20 days after the day of order of

12           relief we don't furnish adequate assurance of

13           payment in the form of a deposit or other

14           security.  We're not 20 days now.  I don't

15           need this procedure.  I'm trying to jump the

16           gun to give people something.  So if every

17           one of his clients wants to step out of this

18           procedure, I will write an order today that

19           Mr. Johnson's clients don't have to comply.

20           He doesn't want that.  He wants his money

21           now.  The problem with that is the code

22           doesn't say he gets his money now.  What it

23           says is if after 20 days I make an offer of

24           form of security -- and we're basically

25           saying we're making an offer and here it is
```

1      two weeks.  6(i) in (c)1(a) says other forms

2      of security that's mutually agreeable.  We

3      know Mr. Johnson.  I know him from good

4      cases.  He's not going to find it acceptable.

5      So what does the Bankruptcy Code say?  Well,

6      in that instance you either get to an

7      agreement, now we're in (c)2, in 30 days or

8      they can terminate.  Fine.  Then what we do

9      is after the 30 days is a (c)3 when we come

10     back.  What we're trying to get here is

11     before the 30 days so we can't terminate.  So

12     I have two solutions.  One, let's just carve

13     him out.  A procedural objection is therefore

14     relevant.  He wants to take an appeal on this

15     kind of order.  He's always wanted to do

16     that.  So let's carve him out, he's not

17     applicable, and he can make an offer

18     individually and he can accept it or not.

19     And as long as we agree, and I think he stood

20     up here and said 29 days is fine, let's just

21     schedule a hearing on his request for day 29

22     and he's carved that out of the motion and

23     that objection is resolved.

24             THE COURT:  Mr. Johnson, does that

25     resolve your objection?

1           MR. JOHNSON:  Yes.  I love the extra

2      commentary, Judge.  But, yes.  So carve us

3      out here on the 29th day of whatever schedule

4      you have is fine.

5           THE COURT:  To make sure you stay,

6      we're going to schedule those dates at the

7      conclusion of this hearing.

8           MR. JOHNSON:  I'm here for another

9      client as well.

10          MR. GALARDI:  Can I just ask that he

11     put the name of his clients on the record.

12          MR. JOHNSON:  Yes.  Progress Energy

13     in Florida, Progress Energy in Carolina,

14     Dominion Virginia Power, Dominion East Ohio,

15     Dominion North Carolina Power, Dominion

16     Peoples, Dominion Hope, the Consolidated

17     Edison Company of New York, Yankee Gas

18     Services Company, Public Services of New

19     Hampshire, Connecticut Light and Power,

20     Western Massachusetts Electric, Duke Energy

21     Carolinas, Duke Energy Kentucky, Duke Energy

22     Indiana and Duke Energy Ohio.  I think that's

23     all.

24          THE COURT:  Thank you, sir.

25          MR. GALARDI:  And with respect to

1          that, Your Honor, at the same time I think

2          our order provides that once he's carved out

3          then we can reduce the 5 million dollars by

4          two weeks for each of those utilities so the

5          five million will come down and there will be

6          no reserve for any of those clients.

7                    THE COURT:  That's how I understand

8          it to work as well.  The motion with that

9          adjustment will be approved.

10                   MR. GALARDI:  Thank you, Your Honor.

11         Your Honor, the next matter -- and I'm glad

12         he's in Virginia and we can do that the first

13         day instead of coming back for a hearing.

14         Number 12, Your Honor, is the next motion up.

15         It is debtors' motion for an order

16         authorizing the continuation of certain

17         customer practices.  Your Honor, most of the

18         obligations that we have are not cash

19         obligations.  There's the gift cards.

20         There's the warranties.  So there is no

21         number in our budget for that, but obviously

22         we could technically under the Bankruptcy

23         Code say today, sorry you have your gift card

24         and you can't collect.  You come buy goods

25         with it.  You're not going to get a refund.

1        You're not going to get a warranty.

2        Obviously we're trying to reorganize.  Maybe

3        if we were liquidating the first day, that

4        would be the smartest relief.  In order to

5        make -- as I said in the introduction, to get

6        customers back in the store, to have the foot

7        traffic, to get the margins, we simply have

8        to honor those things.  The only cash number

9        other than honoring those kinds of things,

10       which are warranties which are often provided

11       by third parties, is the one we have -- we

12       have a weekly refund that we occasionally

13       have.  And so we're on budget for customer

14       practices.  You will see a 1.1 million dollar

15       number each week.  I can't say that that's a

16       hundred percent accurate of the refund we

17       took up a model what it is during this

18       period.  We would like to be able to refund

19       people's money if they are not happy with

20       Circuit City goods.  We think it is critical

21       to the business to have customer satisfaction

22       as I have said in the introduction.  As Mr.

23       Besanko will testify, one of the issues we

24       have is a very low customer satisfaction, and

25       our job now is to bring the customers back in

 1          foot traffic.  We think it is critical to the

 2          operation of the business.  I don't know if

 3          you'd like to hear testimony from Mr. Besanko

 4          on this or any of the other people I have

 5          available, but we would ask Your Honor to

 6          approve the customer practices.

 7               THE COURT:  Any party wish to speak

 8          in opposition of this motion?  All right.

 9          This motion will be approved.

10               MR. GALARDI:  Thank you.  Your

11          Honor, I am now up to item number 13 on the

12          agenda, which again is the prepetition

13          relief.  It's prepetition shipping and

14          delivery charges.  Obviously with goods going

15          across the country through all sorts of

16          shippers and vendors, many goods will be

17          caught up currently in transit.  We may owe a

18          certain amount of shippers amounts of money.

19          Sometimes we get letters from those shippers

20          that we are not going to deliver those goods.

21          We are going to essentially get a warehouse

22          lien or other lien on those goods if you

23          don't pay us either the prepetition amount or

24          some amount.  We are not going to deliver

25          those goods.  What this motion says is we

1          estimate there could be as much as 10 million

2          dollars in transit or prepetition amounts

3          that we might not receive goods.  We believe

4          that we would only pay these goods -- and

5          this again is in our discretion -- only if

6          those shippers are owed less than the value

7          of goods we can sell at retail.  So we have

8          said that we could owe as much as 10 million

9          dollars of prepetition freight.  We would ask

10         Your Honor to approve that we could make such

11         payments.  Although we can sue people on

12         state violations and all sorts of things,

13         it's probably more expensive and more time

14         assuming and too devastating to stand up on

15         those bankruptcy rights.  So we would ask

16         Your Honor to approve our ability to pay in

17         our discretion up to 10 million dollars to

18         prepetition freight to secure this.

19              THE COURT:  Any party wish to speak

20         in opposition to this motion?  It will be

21         granted.

22              MR. GALARDI:  Your Honor, the next

23         matter on my agenda is item number 14.

24         Again, in the normal course of business the

25         company has various contractors building

1         parts of the stores, modifying parts of the

2         stores, modifying the heating and the HVAC

3         systems in the stores.  Your Honor, as things

4         became tight we began to not pay people as

5         often or frequently as they may like.  We had

6         filed approximately about 1 million dollars

7         worth of already mechanic's liens that we

8         know of, plus when we looked at our system

9         there's probably as much as 5 or 6 million

10        dollars of potential secret liens, mechanic's

11        liens, contractors' liens that could be

12        filed.  So we have sought here again

13        authority to be able to relieve ourselves of

14        those liens in the amount of $6,500,000.

15        Again, as we sit here today we've got notice

16        of 1 million dollars.  We're not going to pay

17        people if they don't file their liens.  We

18        are not going to pay those people if they are

19        not valid, not perfected, but, again, if we

20        do have valid protected liens, rather than

21        litigate they are secured claims.  We don't

22        need to have the interest charges.  We ask

23        Your Honor to allow us to pay those even

24        though they are prepetition claims but they

25        would be secured by state law liens or

1           otherwise and we would have to pay them by

2           the end of the day and we would ask Your

3           Honor to approve the authority to up 6.5

4           million dollars.  Again, all of these are

5           interim relief.  We can come back if we have

6           an opposition to it.  It is only what we

7           would have to pay in the meantime and it is

8           close to 6.5 million dollars.

9                   THE COURT:  Does any party wish to

10          speak in opposition to this motion?  It's

11          granted.

12                  MR. GALARDI:  Your Honor, the next

13          matter on the agenda is a motion to pay

14          various foreign vendors.  Your Honor, we

15          clearly have a lot of foreign names in

16          various pool.  We have the Samsungs, the

17          Sonys, the LGs.  That's not who we are

18          seeking to pay through these motions.

19          Instead, we are seeking to pay those people

20          who are foreign vendors that are not subject

21          to the jurisdiction of the Court and

22          enforcement of the automatic stay and whose

23          goods we actually need.  And with respect

24          that, Your Honor, again, we do have such

25          vendors.  We are asking the authority to pay

1          up to 6.5 million dollars to those vendors.

2          At the present time we don't know exactly how

3          much is exactly being demanded.  What we are

4          doing again is we don't have a critical

5          vendor motion here today and this is our way

6          of dealing with what we think are essentially

7          critical foreign vendors that we can't incur

8          stay violations, we can't get the goods, and

9          in the discretion of the management think

10         that we need to get those goods.  A lot of

11         these vendors often have documents and we

12         have fees remaining to pay cash at this point

13         to receive those goods, and, again, going

14         into Black Friday to the extent that we can

15         get these goods in we think it is essential

16         to our reorganization efforts, and so under

17         the Bankruptcy Code although they are

18         prepetition they are not secure.  We would

19         ask Your Honor to pay foreign vendors up to

20         the same, 6.5 million dollars.

21              THE COURT:  Anyone wishes to speak

22         in opposition to this motion?  It will be

23         granted.

24              MR. GALARDI:  Your Honor, the next

25         on the agenda is number 16 which is our

1          motion to continue our insurance policies and

2          all insurance policies, including DNO

3          insurance policies.  Your Honor, with respect

4          to the insurance we think that we are up to

5          date and all premiums are paid for the

6          prepetition period.  I don't know of

7          insurance companies that actually ever bill

8          in arrears.  In fact, they usually front load

9          it in the period.  Nonetheless, to give them

10         comfort that we have the money to pay we want

11         the authority.  As to insurance in general we

12         believe it is ordinary course type of

13         payment.  We probably don't need authority

14         but it is always good to grant this sort of

15         authority.  Your Honor, to be candid, we have

16         the DNO policy.  That's fortunate or

17         unfortunate would be -- we are in

18         negotiations with them December 1st

19         terminating obviously.  Keeping the board and

20         having people available to us is critical.  I

21         have had a lot of experiences.  I expect

22         insurance companies under the circumstances

23         will probably raise our premiums but we

24         wanted to come into court to let you know

25         that we are in fact negotiating it.  We do a

1          big number of this budget of 9 million

2          dollars.  We are hoping that we can do much

3          less than that, Your Honor, but to keep our

4          board, to keep the management and everyone

5          operating and to feel comfortable with their

6          responsibilities and not to be concerned, we

7          do think it is an ordinary course.  We will

8          try to keep the number as low as possible.

9          As I have explained to the board at times,

10         you know, once you're in bankruptcy Your

11         Honor determines the outside of the ordinary

12         course and whether it is appropriate.  It is

13         really the tail period and what's going to

14         happen here, and to keep the people who have

15         been most familiar with the company and

16         management we think it is essential to

17         approve our being able to negotiate in good

18         faith the lowest possible premium to secure

19         the insurance the company has historically

20         had.

21              THE COURT:  I agree.  I think it is

22         ordinary course.  I will certainly grant this

23         motion.

24              MR. GALARDI:  Thank you.  Your

25         Honor, the next one is, again, somewhat of a

1          procedural motion that we use.  It gives us

2          some help with respect to vendors.  It is a

3          motion seeking four forms of relief.  The

4          first form of relief is just confirm that if

5          somebody has goods in transit and they

6          deliver them post petition they will be paid

7          for those goods post petition.  It is a

8          benefit to the estate.  It is a 503(b)1, but

9          in many times in my experience that people

10         call -- if I deliver these goods today am I

11         going to get paid for them?  It is almost a

12         comfort order for the average person.  Here's

13         the order.  See the title.  The Judge says we

14         can pay this.  We've already gotten calls

15         today from vendors saying, how do I know

16         you're going to pay me tomorrow?  How do I

17         know you have the authority to pay me

18         tomorrow?  This order solves that problem and

19         we think it is an abundance of caution

20         relief.  The second part of this is to say we

21         pay in the ordinary course.  The third is if

22         we get goods that we want to return -- and

23         again it has to be something we want to

24         return.  There are buckets I believe in the

25         facility that says you can't just return

1           anything.  But if it is really stuff that's

2           better to return, we want authority to

3           return.  And finally we established

4           essentially a notice procedure for people to

5           file reclamation claims.  It is not really

6           procedure in the sense of paying and

7           reconciling it.  It is just confirming that

8           you have to give us the demand under the

9           Bankruptcy Code in 20 days.  We reserve all

10          of our rights.  You reserve all of your

11          rights.  It does not preclude people from

12          coming in.  If they want to get TRO and

13          injunction in an adversary proceeding, it

14          doesn't preclude them from doing it.  We are

15          reserving all of our rights for defenses, but

16          it is a way that we can set procedures for

17          them to file it and then start to gather

18          these claims.

19               Why is it important to the debtors

20          at this time really leads into the next

21          motion is that we need to -- actually it is

22          another motion, 503(b)9.  There's an

23          interplay as Your Honor knows from BAPCPA

24          between reclamation claims and 503(b)9

25          claims.  503(b)9 claims are not really

1           perfect reclamation claims.  They're within

2           the 20 days as opposed to the 45 days.  Those

3           are all constituting the administrative

4           claims and secure claims that we have to

5           address.  Given the time frame in which we

6           are trying to run this case we think it is

7           very advantageous to have bar dates

8           immediately with respect to periods so we can

9           start to gather the information to formulate

10          a plan and what we would have to do to exit.

11          We would ask Your Honor to approve it.  I

12          know there is a gentleman in the courtroom

13          that has a warehouse, and what we have agreed

14          is that -- and this will go to the other

15          motion.  We are not going to return his goods

16          in that sense.  He keeps his lien to the

17          extent he has a lien and we've discussed the

18          relief and this is not trying to change any

19          of his rights whether he has a warehouse lien

20          or another property in that.  I don't know if

21          there is anybody else that concern about this

22          motion.

23                  THE COURT:  Does anybody wish to

24          speak to this motion?

25                  MR. ENGLANDER:  Yes, Your Honor.

1          Good afternoon.  Brad Englander.  I represent

2          Alliance Entertainment Corporation Source

3          Interlink Media, LLC.  My clients basically

4          supply CDs, DVDs to the debtor and all their

5          stores and other related merchandise.  Some

6          of what my clients do is sell products.  Some

7          of it is warehouse products and provide for

8          fulfillment services.  I don't think we have

9          an opposition to the motion itself.  I think

10         we have very little opportunity to review the

11         form of the order.  I understand from Mr.

12         Galardi's comments that there is an

13         opportunity still to object to these orders

14         being entered on an interim basis and that

15         there is not an attempt here to deprive us in

16         connection with the return provision, in

17         particular substantive rights that are

18         available under applicable documents not

19         bankruptcy law or bankruptcy code.  So we

20         don't oppose the entry of the order if in

21         fact it is still subject to some sort of an

22         objection period and we can work with the

23         debtor to develop some language that gets us

24         a comfort level.

25              THE COURT:  That was certainly my

1          understanding being entered on an interim

2          basis until such time we can get any

3          objections resolved, and it's also my

4          understanding or at least my interpretation

5          what was being asked for is really to confirm

6          basically what is in the bankruptcy code and

7          really not anything -- any additional

8          substantive rights?

9                    MR. ENGLANDER:  I think mostly

10         that's correct, and I think that's what the

11         intent is.  We have concerns whether some

12         language in particular dealing with return

13         rights might leave out protections the

14         Bankruptcy Code provides us, but I think we

15         will be able to work through that.

16                   THE COURT:  Very good.  Thank you.

17                   MR. GALARDI:  And, Your Honor, I can

18         affirm I think it is the Bankruptcy Code.

19         The only language I've ever had objected to

20         is sometimes people had goods returned to

21         them objected and they actually have to

22         accept the goods, and our language may be a

23         little ambiguous on that point.  But, again,

24         we can make that in terms of we can resolve

25         it, and we are not trying to do anything but

1           to get an order to shippers to deliver goods.

2                   THE COURT:  Very good.  On that

3           basis the Court will approve the motion.

4                   MR. CARRIGAN:  Your Honor, this

5           Daniel Carrigan from McKenna, Long and

6           Aldridge on behalf of the Bethesda Office,

7           LLC, one of the debtors vendors.  I apologize

8           to the Court and counsel.  I was unable to

9           hear a good bit of what Mr. Englander and the

10          other gentleman had to say.  I suspect we

11          will come out in the same place, but if I

12          may, Your Honor, may I outline some of the

13          things we think need to be addressed in

14          connection with this motion.

15                  THE COURT:  You may.

16                  MR. CARRIGAN:  Thank you, Your

17          Honor.  The paragraph two of the proposed

18          order indicates that the vendors shall have

19          administrative expense claims with the

20          appropriate priority.  However, paragraph

21          three says -- and I'm not sure whether this

22          is contrary to counsel for the debtor had to

23          say -- but they are authorized but not

24          obligated to pay the undisputed obligation

25          arising from post petition shipment for

1          delivery of goods, and that would be

2          something that on a final basis would have to

3          be addressed.  Secondly, in connection with

4          the provisions for the reclamation claims and

5          the 503(b)9 claims the paragraph -- I think

6          proposed paragraph 5(d) indicates that in the

7          event the debtors and the reclamation

8          creditors agree upon and allow reclamation

9          amounts, the debtors would be authorized to

10         make payments or be required to return the

11         goods sought to be reclaimed.  If this is too

12         far down the line, the notion of an actual

13         return of goods is going to be -- or goods

14         the vendor wants to get back is going to be

15         somewhat illusionary.  So if there is a

16         relatively short time between -- and the time

17         there's a hearing perhaps on an interim

18         basis, it would work, but we would ask it is

19         not a license for the debtor to do whatever

20         it wants with products in the interim that

21         would be outside applicable law.

22              THE COURT:  All right.  Very good.

23         The Court was going to approve the order on

24         an interim basis so that these types of

25         objections could be made.  And I suppose we

```
1                 would do that within the next 30 days.

2                         MR. GALARDI:  Your Honor, I was

3                 thinking that all of the ones that are on

4                 interim would be the first time which is

5                 hopefully in the next 30 days.  So I have no

6                 objection to that.

7                         THE COURT:  Were you able to hear

8                 that?

9                         MR. CARRIGAN:  No, Your Honor, I was

10                not.

11                        THE COURT:  We will set that -- we

12                will approve the motion on an interim basis

13                reserving your objections as you have

14                outlined them, and we have that hearing at

15                the next omnibus hearing date which would be

16                within the next 30 days.  We will set those

17                dates at the end of this hearing.

18                        MR. CARRIGAN:  We understand.  Thank

19                you, Your Honor.

20                        THE COURT:  Thank you.

21                        MR. GALARDI:  Your Honor, I would

22                ask now to move out because they are related

23                and I looked down and I guess my agenda got

24                changed.  If we can move to item 21, which is

25                really the motion to procedures with respect
```

1           to 503(b)9 claims.  I think it is fairly

2           straightforward, Your Honor, and it is a

3           procedure that we have adopted.  As Your

4           Honor is aware, the BAPCPA changed the

5           Bankruptcy Code to provide the claims for

6           goods delivered to the debtor in the 20 days

7           prior to the bankruptcy that a person may

8           seek to file an administrative claim under

9           503(b)9.  Your Honor, again, it is a very

10          significant change to the Bankruptcy Code

11          because it sets up administrative expenses

12          that would have to be paid to exit bankruptcy

13          because a 503(b)9 claim is a 507(a)2 claim

14          which then has to be paid under 1129(a)9.  I

15          like giving all of those numbers.  Your

16          Honor, it is important to us to set a bar

17          date for that and to give out a proof of

18          claim form so we do not let those linger.  In

19          addition, because of the language the cases

20          unfold, especially with a retail debtor, you

21          have the overlay of 526 and I have to be

22          litigating whether 502(d) is applicable,

23          whether you can then use a preference defense

24          to various circuits.  These are all

25          initiatives.  And it is just helpful to get a

1           bar date set for all of these so we can sort

2           of say, well, if you didn't get your

3           reclamation, congress changed that.  I

4           understand what the gentleman said, but

5           congress changed it.  Their only right right

6           now, unlike the old code, is to take back the

7           goods as secure credit.  It is no longer

8           about administrative claims they used to get.

9           This gives us administrative claims.  If you

10          fail to do certain things, gives you proper

11          demand but it is in a 20 day window.  For

12          those reasons, Your Honor, we would like to

13          establish the bar date set for in that motion

14          for people filing 503(b)9 claims.  We don't

15          think it's a hardship that -- they can

16          probably calculate what they believed they

17          delivered in the last 20 days and file a

18          proof of claim.  I think we have given 30

19          days as we've requested.  We will give notice

20          out to people, including a form of order to

21          our vendors and ask that they file a proof of

22          claim within 30 days of the entry of the

23          order for 503(b)9.  I know the official proof

24          of claim form says you don't have to file

25          administrative claims for post petition

1          claims but it still constitutes that you can

2          use administrative claims for prepetition

3          period.  I don't know if that was intentional

4          or just an action that happened to work for

5          us.  So we basically take that form and give

6          them a proof of claim form that says 503(b)9.

7          It is actually 30 days to a date of service

8          of the bar date.  That's what we ask for,

9          Your Honor.  And we think that will help

10         coordinate in all the work we have to do in

11         the first 60 days in this case to understand

12         what kind of financing we need to make a

13         hurdle in that 60 days to 120 days I

14         mentioned early on.

15              THE COURT:  Any parties wish to

16         speak in opposition of this motion?  All

17         right.  That will be approved.

18              MR. GALARDI:  And that was item 21,

19         Your Honor,

20              MR. CARRIGAN:  Your Honor, excuse

21         me.  I'm sorry.  This is Dan Carrigan again.

22         I hate to be the left wing in this

23         discussion.  May I be heard on this, please?

24              THE COURT:  Yes, you may.  This son

25         setting a bar date on reclamation claims.

1           MR. GALARDI:  On 503(b)9.

2           THE COURT:  503(b)9 claims.  I'm

3      sorry.  Thank you.

4           MR. CARRIGAN:  Yes, Your Honor.

5      There are probably a fair number of

6      reclamation creditors who are out there who

7      from past experience in the courts in

8      Delaware and New York and Florida that we

9      found that the negotiation of the terms of

10     the parties -- while we have no objection to

11     setting one and getting it under way, and

12     we're not trying to be obstructionists and be

13     a problem, I think my client and we would

14     like to be helpful in this.  I think counsel

15     for the debtor referred to it as lets get a

16     vendor before we're planning all of this and

17     we would as well as soon as possible.  But

18     perhaps the way to do this would be to give

19     people an opportunity -- set the bar date but

20     give opportunities to folks, reclamation

21     creditors in particular, and then perhaps

22     even an ad hoc group or official committee to

23     come in and ask for modification or changes

24     without prejudice at this stage instead of

25     being stuck with what I'm hearing is most

1          people have not had the opportunity to

2          review.

3                THE COURT:  I don't know if I

4          understand your objection.  Are you saying

5          that you don't think there should be a bar

6          date or do you say that the bar date being

7          suggested here is an unreasonable bar date?

8                MR. CARRIGAN:  No, Your Honor.  We

9          agree that there ought to be a bar date.  We

10         don't have an objection to setting one out in

11         the future, but as to the terms how the

12         reclamation claims are established or not

13         established, burden of proof and all that

14         sort of thing, those sorts of things are also

15         addressed in the bar date order, and that all

16         we are suggesting is those terms, not the bar

17         date itself, but the terms ought to be open

18         for some review and discussion before they're

19         fixed at the only way to get a reclamation

20         claim established.  I'm sorry, 503(b)9

21         established.  So there could be a short

22         period during which this would be sent out,

23         and if you have problems with the form and if

24         nobody objects or nobody responds, then there

25         is no need for a hearing and it can go

```
 1          forward on the basis of here.  If people do
 2          object, if people do respond, then perhaps
 3          have a final hearing on the terms of the
 4          503(b)9 process.
 5                    THE COURT:  So what you're saying is
 6          you don't have any objection to establishing
 7          the bar date but that you want the approval
 8          of the order on an interim basis with regards
 9          to the claims procedures set forth in
10          paragraph eight of the proposed order?
11                    MR. CARRIGAN:  Yes, Your Honor.
12                    THE COURT:  Okay.  Do you wish to
13          speak to that?
14                    MR. GALARDI:  I do, Your Honor.
15          There are two problems with it.  First, I
16          don't think we change any burden.  I think
17          503 has the burden.  It is an administrative
18          claim.  I believe they have to show a -- you
19          know, they have to carry their burden to
20          satisfy this.  I also don't see this as
21          changing any burden to requesting.  And what
22          we are really requesting is to facilitate
23          this, and I think what is quite consistent is
24          proof of delivery within the 20 day period in
25          which they have to do to file a claim.  We
```

1           just made it very clear.  The only thing

2           we're doing is we're asking that we make it

3           clear in the 20 days.  I think that each

4           individual vendor -- and very much like any

5           other bar date, Your Honor, if they don't put

6           in all of this information, we have to do an

7           insufficient documentation they should not

8           have a right.  You still have a claims

9           process.  You still have a resolution.  So we

10          don't think we have done what he's objecting

11          to.  The second thing is, if we don't put

12          something in here for these kinds of

13          procedures for what's necessary to file a

14          proper claim, we can't sent the notice to set

15          the 30 days because people won't tell us the

16          information.  So it is pretty much a useless

17          process.  They can put in one piece of paper

18          that says I assert a claim for 10 million

19          dollars.  So that doesn't do us any good

20          because.  The whole purpose -- like any other

21          administrative claim they have to carry their

22          burden and show there was a delivery, where

23          it was delivered, to whom it was delivered

24          and what value was delivered, and that it was

25          delivered in the ordinary course.  And if you

1          go through our procedures, that's exactly

2          what it asks.  It says they must identify the

3          particular invoices very much like a

4          reclamation demand.  They have to say what

5          claims that they have reclaimed.  So if they

6          have filed both a reclamation claim in 20

7          days and 503(b)9, that's different

8          implications for a state.  One could be

9          administrative.  One, they have to show they

10         had goods on hand on the date.  503(b)9 --

11         you just don't have to be on hand.  We could

12         have sold those today and it doesn't matter.

13         So that's all you need to know.  Which one do

14         you want to assert here?  The next section

15         says must include certification that the

16         goods were sold in the ordinary course of

17         business.  That's what the statute says and

18         it has to be ordinary course of business.  So

19         it tells us it has to be ordinary course of

20         business.  It is not different than the proof

21         of claim form that filed under proof of

22         perjury.  So we think all we've done is

23         broken out what would be required to carry

24         the burden in this first instance.  And I

25         think if we take those procedures out, I

1           don't think it gets in another.  That being

2           said, if somebody doesn't satisfy this, I'm

3           sure Your Honor for excusable neglect or any

4           other OGA standard can say, okay, they didn't

5           put in a piece of paper but that's not enough

6           to disallow their claim, and that's claims

7           projection profits.  We are really trying to

8           get notice and as much information as we

9           think is legitimate in 30 days.

10              THE COURT:  Well, as I understand

11          the objection that's stated as far as the

12          terms are concerned it's not disagreeing that

13          they shouldn't be in the order but just on an

14          interim basis so they might have an

15          opportunity to study them and see if some of

16          these procedures are objectionable given the

17          fact they have only had notice of this

18          offense in this case for, you know, not even

19          10 hours and not had a chance to look at it.

20          And so if there is something in here that

21          would be for some reason burdensome or

22          something, they would have an opportunity to

23          come back and say perhaps they should get

24          some other form of relief.

25              MR. GALARDI:  And, Your Honor, I

```
 1          have no problem with that on an individual

 2          basis.  For example, this gentleman comes in

 3          -- and even if it is after the 30 day bar

 4          date, if someone comes in and says I didn't

 5          satisfy this particular and the debtor is now

 6          raising an objection past that, my

 7          understanding is that they can always come

 8          back and say these procedures don't bind me.

 9          Just because I didn't attach invoice five

10          doesn't mean I don't have a 503(b)9 claim.

11          I'm not saying these procedures to be all and

12          end all.  Now, they don't have an invoice at

13          the end of the day.  So I don't think it is

14          precluding them.  If we put the procedures

15          in, I guess my only question is let's assume

16          we go forward, let's assume the procedures go

17          out, and let's assume 30 days from now

18          someone says I want to change the procedures.

19          Well, I have just mailed notice to a large

20          number of creditors.  What does that do?  I

21          have do another notice.  No.  I think what it

22          does is if you comply, fine.  If you don't

23          comply, Your Honor has the equitable power to

24          say, look, I remember the dialogue on the

25          record.  I remember somebody complained about
```

1          it.  I'm not going to live by the letter of

2          procedures.  This is not supposed to be a

3          technical hurdle.  This is supposed to be to

4          get the debtor information.

5                    THE COURT:  All right.  Counsel on

6          the phone, do you have anything further that

7          you wish to say?

8                    MR. CARRIGAN:  Just two

9          observations, Your Honor.  One is

10         establishing excusable neglect and what have

11         you.  It's a different exercise than

12         establishing that there is a special problem

13         with the -- and I'm not saying this is a

14         special problem.  Please understand that.  It

15         is just that if you're going to have -- I

16         don't know how many 503(b)9 claims they are

17         anticipating, but apparently it is a big

18         enough number that they would anticipate a

19         sort of one size fits all approach to them,

20         and given that situation and also the

21         situation that in 503(b)9 it actually says

22         after notice of a hearing there shall be

23         allowed administrative expenses for including

24         and in this case the value of the goods and

25         so forth.  They are also asking for a

1           certification in here that the goods were

2           delivered in the ordinary course of the

3           debtors' business.  That is an easy basis for

4           objection as to how would you know what the

5           debtors' -- ordinary course of the debtors'

6           business with respect to that particular

7           vendor who is filing.  So I think it is not a

8           question of a wholesale changes in this

9           thing.  It may be -- if any.  But at least it

10          is an opportunity for people who have just or

11          just seeing this for the first time to say in

12          my experience this has all always led to

13          something maybe that's not even foreseeable

14          in its current form on the first day.  And in

15          virtually every other case, Fleming,

16          Ameriserv and others where we have this kind

17          of order that has taken place after a sum-up

18          to study the procedures and have an

19          opportunity to suggest changes to the debtor

20          and if not to the debtor to the Court.

21                    THE COURT:  All right.  Thank you.

22          The Court has had the opportunity to study

23          this order, and I have looked at the claims

24          procedures that are set forth in the order.

25          They appear to be very reasonable to me.  And

1        I understand the debtor's concern about

2        getting notice out and having to make sure

3        that that notice gets out within the time

4        frame.  So the Court is going to overrule

5        your objection to the motion, and I'm going

6        to grant the debtor's motion as it is in its

7        entirety.

8              MR. GALARDI:  Your Honor, again, you

9        can hold me to this, we are not trying to

10        hold -- change the burden.

11              THE COURT:  I understand.  I think

12        in saying that I think the Court can deal

13        with the kinds of issues that counsel has

14        raised in objection on a case by case basis

15        as they come up.  So one size doesn't fit

16        all.  The Court can certainly deal with those

17        kinds of exceptions on a case by case basis.

18              MR. CARRIGAN:  Thank you, Your

19        Honor.

20              MR. GALARDI:  Thank you, Your Honor.

21        Your Honor, now we are on 18 which Your Honor

22        is the, I guess, guard to pay all of this

23        relief that we have now asked for and Your

24        Honor has granted.  We need approval of our

25        debtor and possession financing.  Your Honor,

1               with respect to this, again, I will defer to

2               Your Honor as to the witnesses.  First of Mr.

3               Besanko is, in fact, in the courtroom today.

4               He submitted an affidavit.  I have two other

5               people that if called as witnesses could also

6               testify with respect to the findings with

7               respect to there is no other financing.  The

8               names are Mr. Robert Duffy of FTI Consulting

9               and Mr. Bernard Fountain of Rothschild . Your

10              Honor, just very briefly, again, I think in

11              stark -- to give Your Honor -- if Your Honor

12              doesn't mind, I will proffer in general the

13              testimony as to those three.

14                   THE COURT:  That will be fine with

15              me.  I will let anybody who wishes to

16              cross-examine anybody, put them on as

17              witnesses if someone wants to cross-examine,

18              but otherwise I'm willing to accept the

19              proffer and I have read the affidavit.

20                   MR. GALARDI:  Your Honor, thank you.

21              With respect to this, and I will tell it more

22              as a history and any of the three gentlemen

23              could be called as a witness, could testify,

24              that debtors in prepetition were in agreement

25              with the lenders lead by the agency Bank of

1          America with respect to the 1.3 billion

2          dollar commitment, that as debtors proceeded

3          to have liquidity issues they began

4          negotiations with the current bank group

5          regarding potential financing options.  In

6          addition, that the debtors explored through

7          their restructuring personnel and themselves

8          alternative types of financing, whether it be

9          on an unsecured basis, a junior basis as well

10         as a priming basis.  Your Honor, what the

11         debtors have found is there is no other DIP

12         financing and for very good reasons.  As I

13         mentioned at the outset and as the witnesses

14         would testify, first of all, and as Your

15         Honor is well aware, the market currently for

16         getting financing has been an incredibly

17         difficult market.  Second, retail lending and

18         ABL lending is an incredibly difficult

19         market, and as we went through this and as

20         the witnesses will testify we happen to have

21         three or four major retail lenders in the

22         group already.  So in order to obtain a

23         different type of financing we would have to

24         go to a different type of lender.  We have,

25         for example, Bank of America, Wells Fargo and

1           GE.  And if Your Honor reads the papers and

2           sees the other debtors in possession of the

3           retail world, it's one of those three that is

4           engaging in all of the lending.  So we

5           pursued our lending with respect to other

6           potential lenders.  Rothschild is out

7           soliciting alternative lenders.  As I

8           mentioned in my presentation and as Mr.

9           Besanko will testify we did secure or have

10          commitment or a proposal to secure second

11          lien financing with a potential bank group or

12          potential lender group -- they are not banks

13          -- for second lien financing.  We have gotten

14          all the way to a commitment letter that had

15          covenants with respect to which we are still

16          open but wanted a 4 million dollar sort of

17          downstroke to keep the commitment to get to

18          the December 3rd date and we didn't know what

19          the covenants were.  We just couldn't get

20          comfortable that the covenants would be the

21          same as the ones that are in the current

22          banking facilities that we are seeking

23          approval for, and indeed we were concerned

24          the covenants would be even stricter and

25          therefore potentially cause us to default.

1           In addition, Your Honor, in looking for that

2           facility we went back and went through an

3           analysis with the company, and Mr. Besanko,

4           if called as a witness, would testify that he

5           considered and the board considered and the

6           advisors considered other forms of financing

7           and other restructuring alternatives.  The

8           company considered just simply saying it is a

9           Chapter 11 liquidation, let's simply go out

10          and do all the store closings.  Fortunately

11          or unfortunately, there are too many

12          retailers currently right now in that

13          process.  So you even get people to bid --

14          for example, on our 155, all we kept hearing

15          was there was not enough capacity in the

16          market to have that sort of thing nor did we

17          think it was wise.  The board has determined

18          that there is a hope for this company to

19          either restructure itself -- the gentleman on

20          the phone has already said he would support a

21          vendor plan.  And we have -- and as Mr.

22          Rothschild would testify and as Mr. Fountain

23          would testify Rothschild was retained to

24          pursue strategic alternatives with respect to

25          the 366 sales.  As we stand here today we

```
 1                have significant interest from a number of
 2                buyers, and some of those buyers are
 3                including possibly providing subordinated
 4                financing.  None of those buyers were
 5                prepared on this term to give us their first
 6                lien facility.  No one is prepared to prime
 7                the Bank of America, and the debtors are
 8                simply not prepared to go into a priming
 9                fight on the first day because of the kind of
10                instability that will lead to business.  Nor
11                was anybody in a secured loan facility
12                willing to step outside and do their own
13                facility.  They are right now doing all the
14                retail cases together and they are
15                particularly willing to take a greater
16                commitment to provide the financing
17                separately so one group could stay with the
18                same bank group.  There was no lender
19                prepared to do a subfacility in that group
20                that would have provided the liquidity that
21                we needed on the time we needed with the
22                covenants that we needed.  And then the
23                company considered the use of cash
24                collateral.  Your Honor, based upon a review,
25                and it makes sense in this instance, if you
```

1        look at the inventory value, we are currently

2        getting -- I think it is about 75.5 percent

3        on cost of inventory based on the appraisal.

4        Currently the company has approximately 1.2

5        or maybe even more, 1.3 billion dollars of

6        inventory.  So we believe that the lenders

7        are over secured at this particular point in

8        time -- and if called to testify -- based

9        alone on the inventory, and there are other

10       additional assets.  Your Honor, we could have

11       tried to do a priming fight for that reason,

12       but there would have been fights, fees, and,

13       as I said, re-instability of the business.

14       Nonetheless we pulled out our bankruptcy code

15       and tried to determine whether the use of

16       cash collateral can satisfy us here or

17       nonessential cash collateral.  As we explored

18       the cash lateral option originally, the cost

19       of such a cash collateral, especially in this

20       market is, one, the company was doubtful it

21       could simply live off cash collateral by

22       itself.  Though we don't get a lot of

23       availability the 20 million dollars is enough

24       to make a cushion as Your Honor sees in the

25       motion, and it get us through a time.  As we

1           go into essential cash collateral it was our

2           belief that and the company's belief that you

3           would get just as restrictive covenants as

4           you see the packages that you're getting

5           today with respect to the covenant packages.

6           Even in cash collateral you get a restrictive

7           covenant package and it is not free.  It's

8           very expensive and maybe as close.  As Mr.

9           Daunton (Ph) would testify and Mr. Duffy

10          would testify, it is not clear that the cost

11          of a consensual cash collateral be all that

12          much less than what Your Honor sees here.  We

13          also considered let's try to avoid the fees

14          altogether and let's think about

15          nonconsensual cash collateral arrangements.

16          Frankly, we threw that at the bank group and

17          that is what basically got us to the facility

18          that we have.  There was an earlier date by

19          which we would had to have a subfacility.  We

20          got that to the January 17th date.  At the

21          date that we threw that in the bank's way we

22          had four covenants.  We got down to two

23          covenants.  Again, Your Honor, to start a

24          case with a nonconsensual use of cash

25          collateral, one, we are not sure we can live

1          with cash collateral by itself, two, you

2          don't have an LC facility with cash

3          collateral, and, three, you start a case

4          telling your vendors we are going to live all

5          cash collateral.  It doesn't send a good

6          message to the vendor community, and Your

7          Honor may know the Wall Street Journal has

8          always said the reason we are here we

9          couldn't get a DIP facility.  That's not

10         true.  We could get it.  We just had to get

11         the best one we could under the market.

12              With respect to facility itself,

13         Your Honor, we did have a discussion with the

14         U.S. Trustee a little it bit about disclosing

15         the fee letters.  We have opposed and filed a

16         motion under seal to not disclose fee

17         letters.  That being said, we have disclosed,

18         as I said in a gross term, and we can use

19         gross in many ways, we have used gross in the

20         terms of the fees and advisory fees with

21         respect to this.  The number that I have

22         given you, the 30 million on that page, is

23         really 27.  Those are all fees, all expenses

24         for all the parties.  We don't think it was

25         -- we filed the motion under seal.  It is for

1          pricing for Bank of America and other

2          lenders.  We decided it was not appropriate

3          to give the specifics of those fee letters,

4          but for disclosure to the Court those numbers

5          do include all of the fees and the price tag

6          for the facility.  Your Honor, again with

7          respect to what we are obtaining for this, we

8          are obtaining, I think, in just basic --

9          obviously when you go into bankruptcy you

10         have a default.  If you have a default, you

11         cannot get a commitment to lend and lenders

12         do not have to lend to you.  We are getting

13         our commitment to lend and to continue the

14         commitments subject to the borrowing base.

15         The commitments are being reduced, but as I

16         mentioned earlier, and Mr. Besanko will

17         testify, we don't have sufficient collateral

18         to get up to the cap.  We don't expect to

19         have sufficient collateral to get up to that

20         cap.  So we don't think we are getting up to

21         anything in this term, at least with respect

22         to the short term commitment.

23              THE COURT:  Why do you have the cap

24         so high if you don't expect to get there?

25         Because you have an unused commitment fee,

1          too.

2                    MR. GALARDI:  There is a commitment

3          fee.  Well, there's two things.  One, people

4          like to see big numbers, and it is important

5          to say I have a commitment.  And if we had

6          gone to 1.3 to 900, we would have more

7          questions that I would have to answer right

8          now.  Two, if we are successful, if we get

9          vendor terms, if we get credit terms, and we

10         get the goods in, we can then borrow more.

11         We just can't be sure.  At this point on this

12         model with these conservative estimates it

13         was simply the fact.  So to pay for a fee to

14         have the luxury of having a facility, indeed

15         as Mr. Besanko will testify, when we first

16         got the 1.3, we never thought we would get

17         there.  What we got concerned about is in

18         October and given trade terms, what we

19         thought was we would actually end up getting

20         there.  So the good news is we didn't get

21         there, and the bad news is we didn't get

22         there because we didn't get enough goods in

23         to be able to borrow as much as we would like

24         to.  So, again, you like to have a nice

25         facility so you can tell the lenders in press

1          releases that we have a bank group that's

2          giving us 1.3 billion dollars.  We have a

3          bank group that's giving us 1.1 billion

4          dollars.  So we have reduced the commitments,

5          but, again, we think we are living within the

6          commitments.  And it was a significant point

7          to the bank group to reduce the commitments.

8          So although we get very close to the

9          commitment of 1.1 and eventually the 900

10         comes in the December period, it was

11         important in part of the deal that the bank

12         group wanted was they would reduce the

13         commitment.  They are financial incentives

14         for banks to not have outstanding commitments

15         in the same amount.  So it was a prid pro quo

16         in one of the terms.  In addition, as I

17         mentioned, the prid pro quo was that this

18         facility rolled on the first day or be taken

19         out on the first day.  Again, Your Honor,

20         Kirkland and Ellis, whose application will be

21         put forth, has done most of the debtor work.

22         Kirkland and Ellis has reviewed the security

23         package to the perfection of liens, believes

24         they are properly perfected liens, and as

25         Your Honor knows, that binds the debtor but

```
 1              it doesn't bind the committee to go and

 2              review that.  So we were comfortable with

 3              what -- two things, one, that they were

 4              properly perfected and, two, that they are

 5              fully secure.  So consequently -- and given

 6              that that was another term, that it is not a

 7              take it or leave it.  I don't say that.  We

 8              had back and forth negotiations on slow

 9              rolls, fast rolls.  The problem with the slow

10              roll going into the interim hearing is it's

11              hard to figure out what's actually rolled and

12              what's not rolled.  So in this sense it is

13              almost as if a new facility is being created

14              post prepetition with a different collateral

15              package.  So we agreed to the role of the

16              facility on the first day to turn it into a

17              post petition.  Again, as I mentioned before

18              and as being advised by the board and the

19              advisors, we agreed that we would be giving

20              up certain bankruptcy types of leverage that

21              we can have.  Again, as the advisors would

22              testify to, if you're going in Bank of

23              America, GE and Wells, you have to come out

24              if you are going to come out with Bank of

25              America, GE or Wells.  So they have
```

1          litigation essentially between, you know,

2          exit financing as well.  So in this context

3          we thought that, you know, we are not going

4          to have a fight at the end of the case as to

5          whether I can reinstate the debtor, whether I

6          can cram up the secured lenders.  We're going

7          to need a friendly face at the end of this if

8          we can exit.  In addition, Your Honor, even

9          in a 366 sale we understand enough about the

10         retail market that there is very good

11         likelihood if somebody wants to acquire this

12         they are going to go to GE, Bank of America

13         or Wells.  So, again, it was to take an issue

14         off the table.  I understand why the banks

15         did it and these were results of

16         negotiations.  Your Honor, we started these

17         negotiations with respect to DIP financing,

18         including a subordinated financing probably

19         over a month ago, one, to keep out of

20         bankruptcy and another.  It has been

21         remarkable actually given the market.  The

22         back and forth, give or take, the

23         negotiations as I have already mentioned,

24         including the last seven or eight days when

25         people thought we would be filing a week ago,

1          there was a bank group set with a -- asserted

2          default deadlines and a void date facility by

3          December 3rd with four different covenants

4          that we were very concerned about meeting and

5          paying as I like to say 30 million dollars

6          for 50 million dollars availability for four

7          weeks just wasn't palpable to the company.

8          We then pulled out the card of the

9          nonconsensual cash lateral.  We had back and

10         forth negotiations with Bank of America whose

11         agent was helpful.  We had back and forth

12         negotiations with GE and Wells Fargo.  We

13         couldn't find another financial, but it gave

14         us the opportunity to say no to the

15         subordinated facility and essentially in the

16         company's mind buy us 60 days to come to the

17         next bridge as I like to say.  Again, nobody

18         can guarantee these projections.  No one can

19         guarantee that we make these projection but

20         we think they are reasonable under the

21         circumstances given the uncertain market.  It

22         provides us sufficient availability.  It has

23         limited covenant testing.  We are testing on

24         December 13th.  We have a minimum

25         availability that we have to maintain.  We

```
 1              have some covenants and essentially a block

 2              that we can't go below 50 million dollars,

 3              and I think it's the end of December or end

 4              of January.  There are step-downs as I have

 5              mentioned, financial covenants, or rather we

 6              go from a no covenant deal to what I will

 7              call a covenant deal, but they are not that

 8              aggressive covenants.  There are certain

 9              clean-down provisions.  As we've said they'd

10              have to go from 50 million dollars from

11              January 4th through January 10th.  We have a

12              facility that we need to have a subordinated

13              facility.  If called to testify both Mr.

14              Daunton, Mr. Besanko and Mr. Duffy would say

15              that the negotiations with Bank of America

16              over these facilities is characterized by arm

17              strength, good faith negotiations.  Mr.

18              Besanko would testify the absence of such a

19              facility, we have not -- we have basically

20              been on freeze for the last seven days, that

21              we are beginning to go into irreparable harm

22              because we would be unable without a facility

23              to secure goods that we need to get to Black

24              Friday.  This is a critical time in the

25              business, and absent that we have had trucks
```

1           turned around as late as yesterday with

2           respect to this, and we need this money

3           immediately, that our business will suffer

4           irreparable harm, that we have some

5           availability but very limited cash.  Without

6           this facility we will have greater

7           uncertainty in our workforce.  We will be

8           unable to meet our payrolls as we have been

9           concerned for the last week, that we would be

10          unable to obtain goods in the short term and

11          not pay our rent and all of the expenses.  So

12          absent relief in this facility and absent

13          payment of this facility the company will

14          suffer immediate and irreparable harm.  In

15          addition, the advisors and Mr. Besanko will

16          testify the company was unable to secure

17          unsecured financing, financing on a

18          subordinated facility and indeed any other

19          alternative DIP financing.

20              Your Honor, also I just wanted to be

21          clear with respect to the motion, and I know

22          there are a couple of people in the

23          courtroom, the facility is essentially one

24          priming only itself and the prepetition debt

25          that it has.  Your Honor, there is an

1           indemnity and there is a prepetition lien,

2           and that essentially stays in case somebody

3           wants to undue the facility at a certain

4           point and say go back to the prepetition

5           position.  Your Honor, it is carved out for

6           two -- I don't know how we end up saying it,

7           but there is no nonconsensual priming of any

8           good valid first liens.  So the gentleman who

9           may have a warehouse lien, if it is a good,

10          valid perfected lien, there is no priming of

11          those liens.  We are not asking for a

12          nonconsensual prime.  To the extent that

13          we're permitted prior liens in the bankruptcy

14          document we are not priming those liens.

15          We're still permitting prior liens.  What

16          happens is the bank group's collateral

17          package now expands and by expanding that

18          package it is not priming.  It is taking a

19          second with respect to anything that has

20          previous liens.  In addition, Your Honor,

21          there are landlords here.  They are not

22          taking a first lien except to the extent

23          perhaps the leases permit them to take so or

24          the mortgages.  They are confined to their

25          state law rights.  With respect to that they

1          are not trying to prime them.  They are not

2          taking a lien on the leases themselves unless

3          they are permitted to do so and they are

4          taking a lien on the proceeds of such leases.

5          I think that is one of the concerns I had

6          heard from the lenders' counsel.  Excuse me

7          one second.  I'm sorry.  Just to clarify,

8          they are not taking any liens on any leases.

9          It's just the proceeds.  I think the language

10         says that, Your Honor.  Your Honor, I don't

11         know if anyone wants to cross-examine Mr.

12         Duffy, Mr. Daunton and Mr. Besanko.  I don't

13         know if Your Honor has questions that I can

14         answer.  Each one, in particular Mr. Besanko,

15         we have looked through the factual findings

16         that Your Honor has called upon that there

17         are stipulations.  Mr. Besanko has read that.

18         The debtor finds that they are true and

19         correct to the best of his knowledge.  To the

20         extent they are not we just conclude that

21         there are some that are legal in nature.  And

22         so we would ask Your Honor to approve the

23         financials, but I can subject any of those

24         gentlemen to cross-examination.

25                   THE COURT:  Does any party wish to

1          be heard on the motion or cross-examine any

2          of the proffered witnesses?

3               MR. POLLACK:  David Pollack.

4               THE COURT:  Mr. Pollack, hold off

5          just a minute.  I have another counsel at the

6          podium and I will come back to you.

7               MR. LEHANE:  Good morning, Your

8          Honor.  Robert LeHane, Kelley Drye and Warren

9          on behalf of landlords with approximately 80

10         locations, Developers, Diversified, General

11         Growth and Morning Garden Realty.  I believe

12         my comments will be similar to Mr. Pollack's.

13         If not, I'm sure he will follow up.  I had a

14         brief conversation with counsel for the

15         lender and counsel for the debtor before the

16         hearing.  One of the concerns the landlords

17         had in addition to the question of the direct

18         lien on the leases was lenders access to

19         store premises and collateral access in the

20         event of default under the DIP facility, and

21         the parties have agreed that the lenders

22         rights in the event of default will be

23         limited to whatever rights they have under

24         state law, whatever relief Your Honor is

25         willing to grant them on a motion on notice

1           and adequate time for landlords to respond or

2           whenever rights landlords gives them on

3           consent.  I just wanted to put that on the

4           record, Your Honor.  Thank you very much.

5                    THE COURT:  Thank you very much.

6           Any other party?  I will come back to you,

7           Mr. Pollack.  I haven't forgotten you but I

8           have other people that will speak first.

9                    MR. MATSON:  Good afternoon, Your

10          Honor.  Bruce Matson here on behalf of Bank

11          of America and its agent.  I wanted to

12          confirm the bank group is in agreement with

13          the representations regarding the lease

14          issues.

15                   THE COURT:  That were just recited?

16                   MR. MATSON:  Yes, sir.

17                   THE COURT:  Thank you, Mr. Matson.

18          Any other party?

19                   All right.  Mr. Pollack.

20                   MR. POLLACK:  Fortunately, Mr.

21          LeHane has already covered my points, Your

22          Honor.  Thank you.

23                   THE COURT:  He warned me as much.

24          All right.  Very good.

25                   MR. HILLMAN:  Your Honor, David

1          Hillman, as a housekeeping matter I would ask

2          the Court's indulgence to be heard even

3          though I haven't yet filed a pro hac vice

4          application nor have I affiliated with a

5          local firm.

6               THE COURT:  You may be heard.

7               MR. HILLMAN:  We represent Panasonic

8          Corporation of North America, and Circuit

9          City is currently in possession of products

10         that have been delivered to Circuit City by

11         Panasonic.  These goods were delivered under

12         a consignment agreement, and under the terms

13         of the agreement Panasonic, not Circuit City,

14         has title to the goods.  The goods -- excuse

15         me.  The different consignment agreement that

16         was terminated prior to the bankruptcy case.

17         So Panasonic is planning on filing an

18         adversary proceeding for the turnover of the

19         goods that belong to it as well as a TRO and

20         a preliminary injunction from preventing

21         Circuit City from selling those goods.  I

22         haven't had a chance to read every clause in

23         the DIP motion, in the DIP order in the DIP

24         credit agreement but wanted to -- I point out

25         inconsistency and to make sure that the DIP

1          credit agreement and the DIP lenders or that

2          the debtor wasn't granting liens on property

3          that it does not have title to.

4               THE COURT:  All right.  I certainly

5          don't know how it could.

6               MR. GALARDI:  Your Honor, that's our

7          understanding.  We can affirm that whatever

8          this order says, if we don't own the property

9          and it is true, a consignment, it is not our

10         property, we are not granting liens on it.

11              THE COURT:  Did you hear that

12         representation, Mr. Hillman, from counsel for

13         the debtor?

14              MR. HILLMAN:  Unfortunately I could

15         not, Your Honor.

16              THE COURT:  All right.  He confirmed

17         what the Court had said that the debtor was

18         -- nothing in the order or in the bank

19         financing is providing any kind of lien on

20         any property that the debtor does not own.

21              MR. HILLMAN:  Thank you.  I would

22         just ask for the debtor's counsel perhaps to

23         include that reference in his final interim

24         order that's submitted to the Court.

25              MR. GALARDI:  We have no problem

1            with that, Your Honor.  Again, we will put in

2            a sentence that says if it's not our

3            property, we are not granting liens

4            notwithstanding anything in the order.  We

5            will be anxious to get the order entered.

6                    MR. HILLMAN:  Thank you, Your Honor.

7                    MR. LUCIAN:  Your Honor, John Lucian

8            and Regina Kelbon.  We have similar concerns.

9            If I may defer to Ms. Kelbon.  I'm a Virginia

10           attorney.  We will be pro hac her into the

11           case, Your Honor.

12                   THE COURT:  All right.  Ms. Kelbon.

13                   MS. KELBON:  Thank you, Your Honor.

14           I would like to thank you for allowing us to

15           participate telephonically.  I do appreciate

16           that courtesy.

17                   THE COURT:  You're welcome.

18                   MS. KELBON:  I must say I'm having a

19           very hard time hearing Mr. Galardi who has

20           been very faint in and out.

21                   THE COURT:  That's not Mr. Galardi's

22           fault.  That's the -- the equipment that we

23           have set up is not fully functional yet.

24           We've just moved into a new courthouse and so

25           that's the reason, but we're trying to make

1           do as best we can.

2                   MS. KELBON:   Thank you, Your Honor.

3           Your Honor, if Your Honor would indulge me

4           just for one moment to sort of explain the

5           relationships with the parties.  We represent

6           Cellco, a partnership doing business as

7           Verizon Wireless, and Verizon Wireless is a

8           party to a direct sales agreement with

9           Circuit City.  The relationship between the

10          parties is that Verizon Wireless operates a

11          kiosk in the Circuit City stores which is in

12          effect a separate Verizon Wireless store

13          within a Circuit City store.  Verizon

14          Wireless has a presence and is substantially

15          in all of the stores.  There is a handful of

16          them that Verizon Wireless does not operate

17          in.  Pursuant to the agreement, Your Honor,

18          Verizon Wireless establishes and operates

19          merchandising and demonstration displays and

20          offers, sells and markets Verizon Wireless

21          services.  The relationship provides Verizon

22          Wireless with complete control over the sale

23          and marketing of its inventory and services.

24          Verizon Wireless controls the kiosks and they

25          are solely responsible for hiring, training,

1         managing and terminating the employees who

2         work at kiosks.  In effect, the kiosks are

3         manned by Verizon Wireless employees.

4         Verizon Wireless also establishes the

5         pricing, the fees for its equipment and

6         services, and Circuit City has no authority

7         to sell Verizon Wireless equipment either in

8         its stores or on its website.  So all the

9         Verizon Wireless inventory is separate and

10        apart from Circuit City and is located in

11        locked storage cages.  As Verizon sells its

12        inventory it pays commissions monthly to

13        Circuit City and it also has various charge

14        back rights under this agreement for any

15        services that are disconnected within a

16        certain limited period of time.  So I would

17        just like to have confirmation in the order

18        if Mr. Galardi would be so accommodating to

19        confirm that -- make sure that nothing in

20        this priming is impacting or affecting any of

21        the charge back rights that also --

22        recoupment rights that Verizon Wireless has

23        as well as it's clear that it's Verizon

24        Wireless inventory so there can be no liens

25        granted on Verizon Wireless property if

1            either in the DIP or through the Hilco

2            motion, which I'm not sure which one is up.

3            It is very hard to hear, but it is sounds

4            like the DIP order that you are referring to

5            right now.

6                    THE COURT:  It is the DIP order that

7            we are referring to right now, and I believe

8            Mr. Galardi has already made mention that he

9            doesn't intend to take a lien on any property

10           the debtor does not own.  I will have him

11           confirm that now.  He's at the podium.

12                   MR. GALARDI:  Your Honor, we confirm

13           again that we are not taking or granting any

14           liens on any property that is not property of

15           the estate.  I would also note, Your Honor,

16           that Verizon has a contract with the company

17           and nothing we are doing is changing the

18           rights of Verizon or any company and to

19           reserve all of our rights and they have all

20           of their rights under the contract.  But to

21           the extent they keep it in a locked area and

22           it is not our property, we are not granting

23           any liens in the DIP facility with respect to

24           Verizon property.

25                   THE COURT:  Ms. Kelbon, were you

1          able to hear that exchange?

2                    MS. KELBON:  Not really, Your Honor.

3          I'm sorry.

4                    THE COURT:  Again, it was

5          represented to the Court that the debtor is

6          not taking any interest in any property

7          that's not property of -- is not granting any

8          liens of any not property that's not property

9          of the debtor and to the extent Verizon

10         maintains its own inventory in locked places

11         they are not taking or granting any liens on

12         Verizon property, that they are subject --

13         that there is a contract between Verizon and

14         the debtor and that, you know, controls this

15         and they're reserving all of their rights

16         under the contract.

17                    MS. KELBON:  That's fine, Your

18         Honor, if we can include something like that

19         in the order as well as that we are rightful

20         and charge backs are protected as well.

21                    THE COURT:  That would be governed

22         by the contract.

23                    MS. KELBON:  That is correct, Your

24         Honor.  I don't want anything in the priming

25         order to be deemed to be impacted on our

1           rights or --

2                   THE COURT:  I think we can put a

3           sentence in the order that says it is not

4           impacting your usual rights under the

5           contract.

6                   MS. KELBON:  Thank you, Your Honor.

7                   MR. CARRIGAN:  Your Honor, David

8           Carrigan.  Again, I apologize for

9           interrupting if there's anyone else that

10          needs to be heard.

11                  THE COURT:  I don't know but there

12          is nobody else at the podium right at the

13          moment.  You may proceed.

14                  MR. CARRIGAN:  Thank you, Your

15          Honor.  Ours is a two party creed.  One, is

16          this one of the motions that will be brought

17          on for the final hearing on the next omnibus

18          hearing date?

19                  THE COURT:  Most certainly this will

20          be entered -- well, the Court's understanding

21          is this will be an interim order because we

22          don't have a committee here that is able to

23          look at any of this and then we'll enter

24          another final.

25                  MR. GALARDI:  It is a financing

1              order.  So you can't get a final order for 15

2              days anyway.  Whether it is the omnibus date

3              or we talk about a separate date for final

4              hearing on DIPs, but this is an interim

5              order, Your Honor.

6                   THE COURT:  Right.

7                   MR. CARRIGAN:  The reason I asked,

8              Your Honor, is that the interim period is

9              defined as -- I think it is defined as the

10             commencement of the case through December 29,

11             2008.  I'm not sure whether that was intended

12             to be that whole period or just until the

13             next hearing, whether it is the final hearing

14             or it proves to be a jury final hearing or

15             whatever.  The second inquiry was much along

16             the lines of prior counsel was that with

17             respect to, for example, in this case our

18             interest has been in the 503(b)9 rights and

19             also in the reclamation rights.  It is not --

20             the entry of the order providing for the

21             financing is not intended to affect those

22             rights as at least subject to the final

23             hearing if we understand it correctly.

24                   MR. GALARDI:  I'm actually not sure

25             what the gentleman is asking for with respect

1          to 503(b)9 and with respect to reclamation.

2                    MR. CARRIGAN:  The inquiry reports

3          in most of these cases is the effect of both

4          prepetition liens and also upon any liens

5          granted post petition upon reclamation rights

6          and that's the inquiry.  All we are saying is

7          that whatever it was on the filing date is

8          whatever it is when it is up and finally

9          approved.

10                   MR. GALARDI:  We agree.  Your Honor,

11         again, I think many people are used to cases

12         where the lender has all assets and there is

13         nothing for reclamation claims.  So what the

14         gentleman is -- whatever the world was as of

15         the petition date, whether there was anything

16         that their reclamation claims could get a

17         lien for under the secured, we are preserving

18         that.  We are not trying to change what the

19         world was on the petition date.  Now that I

20         understand the question I know where he's

21         concerned about.

22                   THE COURT:  All right.

23                   MR. CARRIGAN:  Thank you.  Your

24         Honor, that's what we understood and thank

25         you.

1           THE COURT:  Okay.  You are welcome.

2           MR. GALARDI:  And, Your Honor, Mr.

3      Berman did point out that period, that day,

4      the interim period, but we are seeking an

5      interim period before December 29th and so

6      the order will underline itself.  Hopefully

7      we'll have a final order entered and that

8      would be a final hearing when Your Honor

9      schedules that.

10          THE COURT:  Very good.  Does anybody

11     else wish to be heard in connection with the

12     DIP financing order?  All right.  It does not

13     appear to be anybody.  At this point the

14     Court will accept now your proffer as you

15     have set forth, and with the clarifications

16     that you've made on the record the Court will

17     approve on an interim basis the DIP

18     financing.

19          MR. GALARDI:  Your Honor, what we

20     would like to do is -- fortunately we don't

21     need to borrow today.  What we would like to

22     do is give Your Honor revisions to the order.

23     We would like it to be entered today so first

24     thing -- we actually can't borrow until

25     Wednesday.  We can close on the order and

1          start borrowing as early as Wednesday

2          morning.  As I mentioned there is payroll.

3                    MR. LUCIAN:  Your Honor, John

4          Lucian.  We are having difficulty hearing Mr.

5          Galardi's comment.

6                    THE COURT:  He's asking the order be

7          entered today if at all possible because of

8          their needs to be able to draw on the

9          financing.  And the Court will certainly

10         accommodate that as soon as you can get that

11         to me.

12                   MR. GALARDI:  Thank you, Your Honor.

13                   MS. KELBON:  Your Honor, we would

14         appreciate if you could circulate it to

15         counsel because we have concerns about it so

16         we can quickly look at it.

17                   THE COURT:  Well, it is being

18         entered on an interim basis and the need for

19         the company to be able to get this done and

20         get it done within the time, because tomorrow

21         is a holiday, is going to be pressing.  So

22         I'm not going to require that counsel

23         circulate it among everybody, submit it to

24         the Court.  If for some reason it's something

25         we need to take up that we didn't get in on

1           an interim basis, we will certainly take care

2           of it when we have the next hearing when

3           everyone has had a chance to review it.

4                        MR. GALARDI:  Thank you, Your Honor.

5           I think it is clear we are not putting any

6           liens on any property that is not property of

7           the estate.

8                        THE COURT:  If there's anything I

9           heard today is that if you try to do that,

10          then there will certainly be protection

11          afforded.

12                       MR. GALARDI:  I appreciate it.

13                       MR. LUCIAN:  John Lucian.  We did

14          not catch Mr. Galardi's last statement, but I

15          assume it was along the lines they will not

16          be taking any property that belongs to the

17          debtor.

18                       THE COURT:  Correct.  We have nailed

19          that.

20                       MR. LUCIAN:  Thank you, Your Honor.

21                       MR. GALARDI:  I will try to speak up

22          for the people.  The next matter is item 19

23          on the agenda, Your Honor, and I will say

24          that the next three matters are put after the

25          financing because I will say they are not the

1          ordinary necessarily first day.  Maybe the

2          last one is.  Your Honor, the next motion is

3          motion for the debtors to assume the agency

4          agreement that was entered into between Hilco

5          Merchant Resources and Gordon Brothers and to

6          continue to conduct the store closing sales

7          pursuant to that agency agreement and various

8          guidelines.  Your Honor, prebankruptcy -- and

9          again, with respect to this Mr. Besanko could

10         testify but also Mr. Duffy because FTI and

11         myself were very much involved in the

12         negotiations of the agreement, prior to the

13         bankruptcy, after we made an announcement on

14         September 29th, I believe, in the SEC, the

15         company was evaluating its leases, its

16         four-wall analysis, FTI conducted that

17         analysis, and it came to a determination that

18         there we're at least 155 store leases that we

19         should try to vacate and sell the inventory

20         because it didn't fit our final business

21         model.  Whether they were less profitable

22         stores or in markets that were no longer

23         performing well, we proceeded with that.  In

24         the beginning of August or the middle of

25         August we then solicited -- and as many of

1          the people in the courtroom know there are

2          essentially six liquidators that you normally

3          approach with respect to liquidating your

4          inventory and conducting store closing sales.

5          We entered into confidentiality agreements

6          with all six.  And all six confidentiality

7          agreements, much to the consternation of each

8          one of them, precluded them from forming a

9          joint venture without our consent.  We were,

10         again, hoping to get a lively auction and we

11         got a lot of push back from all of them, and

12         at the end of the day, after much back and

13         forth, all pretty much said they weren't

14         going to bid unless we let them joint

15         venture.  We then said we would allow them to

16         joint venture and to submit bids, and indeed

17         the two that actually joint ventured, the

18         Gordon Brothers and Hilco, we were trying to

19         keep apart because we brought them as the two

20         most likely to be able to put competing bids

21         and we were unable to do that, and the other

22         four formed their own joint venture.  Your

23         Honor, we were soliciting what was often

24         called an equity bid, a bid where you would

25         take -- because we wanted to get a big pop of

1            liquidity early on with respect to the early

2            part of November when we most needed it.  An

3            equity bid is essentially what we were asking

4            for with a sort of 80 percent down, buy the

5            inventory, liquidate the inventory in stores,

6            and at the back end you collect your 20

7            percent book, whatever upside.  Because of

8            the market and because of the uncertainty of

9            the market and uncertainty of the Christmas

10           period and also the cost of funds of each of

11           the liquidators themselves have to borrow to

12           pay that 80 percent we got what I would call

13           very disappointing bids with respect to an

14           equity bid.  We rejected all of those bids

15           and then went back to the liquidators and

16           asked them to provide us now with a fee deal.

17           A fee deal, as Your Honor probably knows,

18           they act as our agent and give you a straight

19           stake.  The concern about that is with all

20           the business in the world who knows how it is

21           that they will be motivated, for how long

22           they are going to be motivated and you're

23           paying the fee and as the sales wind down you

24           might not be getting your money.  So we go

25           again, very disappointing proposals with

1          respect to the fee deal.  We then said we

2          will try one more time.  I guess this is now

3          the method, the de jure of the liquidators,

4          and we got what we call a hybrid bid, which

5          is really the bid we have before us.  It

6          essentially says that they will liquidate the

7          inventory but they will not have to put cash

8          up front, so we've got the cost of capital

9          out of it, and instead that they will give us

10          a guarantee that we would get a minimum

11          recovery of -- in this case 72 cents on the

12          cost value of the inventory.  As I mentioned

13          before, that is still below our appraised

14          value, and in this market we have got

15          auctions to go very much higher than the

16          value, but in the market currently and in

17          retail in particular the bids are not coming

18          in even at the appraisal level, plus as we

19          heard over and over again, as we tried to

20          push this high as possible, from the

21          liquidators this is after all the inventory

22          in stores which are closing.  There are

23          concerns about that.  There are concerns

24          about the holiday season.  We then negotiated

25          an agency agreement with Hilco and Gordon

1        Brothers over two or three days, again, an

2        agency agreement that contemplated remaining

3        out of bankruptcy.  Again, if we could have

4        solved our liquidity problems, that would

5        have been our preference.  We negotiated a

6        collateral package for them to secure their

7        fee.  The problem in a bankruptcy is we can

8        come in and ask Your Honor to give them an

9        administrative claim for their fees.  There

10       were two concerns.  One, how do we get

11       assurance that we will get our fee because

12       you can always reject a contract?  And how

13       can we make sure that, you know, we are

14       subject to auction?  Well, we auctioned their

15       contract.  We went to the auction, and

16       eventually the other joint venture just said

17       we are not prepared to outbid.  We gave them

18       24 or 12 hours to bid after going back and

19       forth.  They decided not to bid.  So we were

20       comfortable with the price.  The security

21       issue, again with Bank of America's consent,

22       we granted them a second lien on all

23       inventory on all stores.  Again, Your Honor,

24       thinking that if we ever got to the

25       subordinated debt these may be the sales that

```
 1            would be done by that point and we would work

 2            around it.  And Hilco and Gordon Brothers

 3            agreed to take that second lien, but more

 4            importantly after negotiations they also

 5            agreed that upon the assumption of that

 6            agreement they will no longer have a second

 7            lien, again freeing our inventory from the

 8            second lien so we can begin our vendor

 9            negotiations and our second lien financing.

10            We also agreed to seek on a first day as fast

11            as possible the assumption of that agreement.

12            It is obviously not our preference to start a

13            store closing sale beforehand and ask Your

14            Honor to approve the procedures.  We did in

15            the agency agreement and I will note -- make

16            sure that they agreed to comply with state

17            laws and store closing laws.  The biggest

18            issue is leases and the lease clauses.  We

19            then proceeded to negotiate with them the

20            deal, and one critical fact that they were

21            willing to do is as we knew that the sale

22            would be approaching we insisted, and they

23            have provided, people to come in and help as

24            we announced the store closing for SEC

25            purposes to make sure that we didn't have
```

1          sufficient shrink or TVs were there.  TVs

2          were in stores.  Gordon Brothers and Hilco

3          agreed to meet with us to get people in the

4          stores to make sure to avoid as much shrink

5          as possible.  They provided an incentive

6          bonus to the people that are in fact in this

7          store to sell the inventory.  Again, it is a

8          very hard decision to tell people that you

9          are going to be laying off people and store

10         closings in this market.  And they again

11         agreed to backstop with a letter of credit

12         attestable to our bank group to 72 cents on a

13         dollar.  Again, it is an urgency of our

14         agreement as set forth if we get the first 72

15         cents they get the next three and a half

16         percent and then there is a 50/50 sharing of

17         the proceeds.  So we do well on the sales.

18         The preliminary results are we are in fact

19         doing very well with the sales, then there is

20         an upside for both the company and Gordon

21         Brothers.  So we sort of met the equity idea

22         of get us some upside.  We sort of guaranteed

23         an amount but we are getting a fee.  It

24         doesn't give us the liquidity profit that we

25         wanted, but nonetheless these sales are

1         expected to go in the five or six week period

2         of time and therefore be done by December.

3         It was also very important for us to begin

4         these sales so that we could, if we need to,

5         do the lease negotiations and possibly reject

6         155 stores by the end of December and

7         therefore incur with little rent with respect

8         to the stores during the bankruptcy period.

9         The reason we put it on for first day, Your

10        Honor, as I mentioned, one of the significant

11        provisions that were negotiated was the

12        security package.  From our perspective the

13        sooner that we could assume this agreement

14        the better because we could, one, relieve

15        ourselves of the lien.  With respect to the

16        other relief that we seek here, Your Honor,

17        we think it is fairly standard with respect

18        to store closing procedures, and, again, I

19        know there are landlords here.  We have

20        preserved the rights of AGs to come in and

21        complain.  We have preserved the rights of

22        landlords to come in and complain with

23        respect to the procedures.  One of the

24        choices -- and, again, these things are all

25        too common.  The landlords know Gordon

1         Brothers, know Hilco.  There is much

2         consternation about banners and how big the

3         banners are, whether you can put them by the

4         windows or not.  They seem to always get

5         resolved.  We know Karen Caudry (Ph) who does

6         represent a lot of the AGs.  We think we have

7         in the proposed formal order all of those

8         protections that are required for landlords

9         and for the AGs to police this process.  It

10        is a very short process.  And obviously

11        Gordon Brothers and Hilco face some risks.

12        If we tail out the assumption, it is very

13        easy to come in and say, well, don't assume

14        it now when all the work is done.  In

15        addition, Your Honor, we have provided them

16        with a 1 million dollar up-front deposit,

17        most of the costs to do these things, to buy

18        the signage, and we have worked with them. We

19        gave them that.  There is not a lot of money

20        that we know of that was paid on last Friday

21        that we know of that was outstanding.  It's

22        not as if this is a large cure here.  As I

23        said, we conducted a prebankruptcy auction.

24        We have been told by the other four

25        liquidators that this is the highest and best

1           price we can get into this market.  As more

2           retailers come on the market, who knows what

3           you can get in this market.  As we get closer

4           to Christmas, Christmas and Black Friday, one

5           of the things we heard from most liquidators

6           is it's better to do this sooner as opposed

7           to waiting for Black Friday because we get

8           ahead of Black Friday sales, and so far the

9           results have been that.  We would therefore

10          ask, Your Honor, to approve both the

11          assumption of the agency agreement as well as

12          the store closure procedures.  There is

13          counsel here for Hilco and Gordon Brothers.

14          They do have a witness if Your Honor wanted

15          to have that testimony.  I think, again, we

16          have Mr. Duffy who can testify, Mr. Besanko

17          as to the process.  It is a business judgment

18          matter to assume a contract, to conduct the

19          store closings, whether they are inside the

20          ordinary course or outside the ordinary

21          course.  We think we have taken as many steps

22          in the agreement to comply with the state law

23          which is a big concern.  We have been very

24          sensitive to advertisement in those matters,

25          plus we have taken enough of the AG's

1          language for their rights to come back and

2          complain and have a process, but we really

3          don't think we are prejudicing either the

4          landlords rights and their contract rights

5          with the leases or the AG's right to complain

6          and generally Hilco and the Gordon Brothers

7          are quite good along with us to resolve those

8          objections to come back before the Court.  So

9          we would ask Your Honor to approve the

10         assumption and the agreement and the

11         procedures.

12              THE COURT:  Very good.  Does any

13         party wish to speak to this motion?

14              MR. POLLACK:  Yes, Your Honor.  I'll

15         let you deal with anyone first in the

16         courtroom.

17              THE COURT:  Okay.  Let's take care

18         of the courtroom first and then I will come

19         back to the folks on the phone.

20              MR. LEHANE:  Good afternoon, Your

21         Honor.  Robert LeHane, Kelley, Drye and

22         Warren on behalf of landlords representing

23         approximately 80 locations.  I respect the

24         comments of counsel for the debtor and had a

25         brief conversation with him before the

1            hearing to the effect that landlords would

2            have the rights to come back and ask Your

3            Honor for relief if the proposed GOB

4            guidelines were not sufficient.  However, I

5            have had an opportunity now to go through the

6            motion and proposed order and, Your Honor,

7            this is not an interim order not with respect

8            to GOB guidelines.

9                 THE COURT:  Well, we will make it

10           one and you can have an opportunity to come

11           back, and if there is a problem with the GOB

12           issues you can address those and the Court

13           can take them up.

14                 MR. LEHANE:  Thank you, Your Honor.

15           I would suggest in the following motion on

16           the calendar, the rejection motion has, I

17           think, precisely the language that would do

18           the trick.  It would allow landlords X number

19           of days.  We believe 10 is probably

20           appropriate to come in and file an objection.

21           We have worked with Hilco and Gordon Brothers

22           on any number of occasions, but it would be

23           very unusual to make this a final order.

24           With that addition to these -- I also would

25           like to point out, though, that there appears

1          to be two different sets of guidelines

2          attached to the motion.  There is a set of

3          guidelines attached to the agency agreement

4          and there is a different set of guidelines

5          attached as an exhibit to the order.

6                    THE COURT:  The Court reviewed the

7          one that was attached to the order.

8                    MR. GALARDI:  Your Honor, again, let

9          me address that.  To the agency agreement,

10         because we entered into an agency agreement

11         prior to the bankruptcy --

12                   THE COURT:  It is exactly what I

13         thought.

14                   MR. GALARDI:  -- there were

15         provisions then to take advantage of the

16         anti-assignment provisions of the Bankruptcy

17         Code.  We actually sought approval of

18         different procedures.  The one that Your

19         Honor reviewed, the ones attached to the

20         order are the ones that we are seeking

21         approval.  Quite honestly, as Mr. LeHane

22         knows, they are more friendly to the sorts of

23         sales and anti-assignment clauses which we

24         couldn't do in the leases prior to the

25         bankruptcy.

1           MR. LEHANE:   Thank you, Mr. Galardi.

2        One other point, though, in connection with

3        any GOB sale order such as this which would

4        render lease provisions unenforceable, again,

5        those are entitled to adequate protection.

6        We believe that that adequate protection

7        under these circumstances would include

8        payment of the rent that accrued from the

9        filing date through the end of the sales.  We

10       don't believe that's in the order.  We would

11       ask that be included in the order.  It does

12       look like the agency agreement provides that

13       the liquidator would cover the occupancy

14       expenses.

15          MR. GALARDI:  Your Honor, I happen

16       to disagree that landlords are entitled to

17       adequate protection, and I'm sure Mr. Pollack

18       will say the same thing as Mr. LeHane on this

19       topic.  Your Honor, we have a provision that

20       we do get reimbursed for the actual cost.  If

21       we don't pay those costs or if we have to pay

22       those costs, I understand we are in an

23       accrual state, but my understanding is that

24       even though it is an accrual state it is a

25       503(b) claim and it's paid at the end of the

1          case, not necessarily at the time of this

2          period.  So we believe that the landlords are

3          protected.  I understand that Mr. LeHane was

4          going to do this.  He knows I will probably

5          take a certain view with respect to the

6          accrual state versus billings state.  Leaving

7          that aside, I think the simple answer is I

8          don't believe -- I think it could be raised

9          again in 10 days.  The 10 days is before the

10         end of the month if they want to make an

11         argument with respect to what we call the

12         subrent, let them raise an objection.  It

13         will me give an opportunity to either resolve

14         or do that.  Nothing prejudices their right

15         in the motion to go make such a request.  Mr.

16         Pollack can make a request, and they both

17         know me well enough to know we generally

18         resolve these types of objections.

19              THE COURT:  Very good.

20              MR. POLLACK:  Thank you, Your Honor.

21         I will work with counsel for the debtor after

22         the hearing to submit an order that's

23         consistent.

24              THE COURT:  So we have a 10 day

25         period which you can file objections.  It

 1          will be an interim order in the meantime and

 2          you can raise both of the issues that you

 3          have raised.

 4                  MR. POLLACK:  Thank you very much,

 5          Your Honor.

 6                  THE COURT:  All right.

 7                  MR. VAN ARSDALE:  Robert Van Arsdale

 8          for U.S. Trustee, Your Honor.  We would

 9          simply like -- I'm not certain that the 10

10          days that we are just discussing would apply

11          to everybody.  We have not yet appointed a

12          committee in this case.  I think the

13          committee would like to be able to look at

14          this order before it gets to be a final

15          state.

16                  THE COURT:  Are you concerned that

17          the committee wouldn't be formed to be able

18          to look at it within the 10 day period?

19                  MR. VAN ARSDALE:  Your Honor, I

20          anticipate we will have a committee hopefully

21          by this Friday.  I know the solicitation went

22          out today and we need to factor through that

23          and they will need some time to actually view

24          it.  The hope being that part of the people

25          in the committee may know of some other way

1         that this -- these liquidations sales could

2         take place that would benefit the entire

3         estate.

4              THE COURT:  I guess we've got two

5         competing interests as with the landlords if

6         they have an interest in the GOB provisions

7         not being adequate in such they would want to

8         get in more quickly, whereas the committee

9         would need more time to look at it.  So we

10        need to have some sort of balance there.

11             MR. VAN ARSDALE:  Yes, sir.

12             THE COURT:  I think we can do 15

13        days.

14             MR. VAN ARSDALE:  That would be

15        adequate for the committee.

16             THE COURT:  Okay.

17             MR. GALARDI:  Your Honor, if I may

18        address the plan, I'm not quite sure -- look,

19        I have set interim orders for committees on

20        many cases.  I'm not quite sure -- and I will

21        let Mr. Athanos talk to this, but I don't

22        know what it is to have an interim approval

23        of an assumption.  With respect to the

24        procedures of running the store closing --

25             THE COURT:  I was more concerned

1          about GOB.

2                    MR. GALARDI:   Right.  But, again, it

3          is hard to go back and say we are going to

4          unassume the contract.  So with respect to

5          the procedures and objections to procedures

6          themselves and how we are conducting them, I

7          have no problem with the committee.  If it is

8          with respect to the assumption of the

9          contract, then I would have a problem because

10         we have to assume and go forward over the

11         next two to three weeks in any event.  With

12         respect to the committee, I'm assuming we

13         will be completely aligned that we want the

14         most money into this estate.  I have no

15         problem with their coming up with comments

16         about, well, the store closing procedures

17         should be even better and make us more money.

18         That I certainly will endorse.

19                    THE COURT:   Well, I think there are

20         two issues as I understand that we are doing

21         it on an interim basis, and it has to do with

22         raising the GOB terms and also the issue of

23         adequate protection.  We are preserving those

24         two issues.  I agree with you completely.

25         You know, you can't unassume a contract.  If

1          you are assuming it, you are assuming it.  So

2          I understand that.  That's part of it.  And

3          so for clarity I want everyone to know where

4          the Court is coming from.

5                    MR. VAN ARSDALE:  Your Honor, I was

6          only speaking to the GOB part of this

7          particular order.

8                    THE COURT:  All right.  Very good.

9          We have some other people that want to speak

10         to this.

11                   MR. ATHANOS:  Good afternoon.  Joe

12         Athanos on behalf Hilco and Gordon Brothers.

13         I think we are all on the same page here.

14         The assumption in the existing agreement --

15         what the existing agreement says is Gordon

16         Brothers and Hilco will comply with all laws

17         and Gordon Brothers and Hilco will comply

18         with all leases.  That's the best you can do

19         outside of bankruptcy, and we understand

20         that.  I have a witness here today who will

21         testify that it is 3 million bucks to the

22         estate if we can do better which you can in

23         the bankruptcy.  You can get out of GOB laws,

24         do the supremacy clause, and you can get out

25         of the terms of leases, instead of paying the

1           bank, theaters, and having side walkers and

2           that stuff adding value to the sale, and here

3           we think it is worth 2 or 3 million dollars

4           to the debtor's estate.  We think there is a

5           huge benefit there, and we think that ought

6           to be approved.  But we understand people

7           need the opportunity to object, and we will

8           work with landlords' counsel, which every

9           single person who is here today on behalf of

10          landlords we have worked with a thousand

11          times and it's very unlikely we will be back

12          in court with respect to any of them.  We've

13          worked a very long time.  And, in addition,

14          with the AGs, the same issues.  We expect to

15          have issues but we will work them out.  If we

16          don't, we will come back to the Court and

17          that's fine but not on the original agreement

18          which is going to be assumed and that's it,

19          it is final, but on the new GOB procedures

20          that we are getting by virtue of the case

21          being made.

22               THE COURT:  That's what I understand

23          the new GOB, the ones that were attached to

24          the order, not to the original agreement that

25          I will be approving on an interim basis

1        today.

2                MR. ATHANOS:  That's fine, Judge.

3                THE COURT:  I'm now turning to

4        counsel on the phone to give them an

5        opportunity.

6                Mr. Pollack, is there anything else

7        you want to raise?

8                MR. POLLACK:  Well, Your Honor,

9        since Mr. LeHane knows most of my arguments

10       and Mr. Galardi usually reads my mind, there

11       isn't much else.  I think Mr. Athanos really

12       hit the nail on the head and that is the

13       issue, the main issue I had was that the GOB

14       contract that they were asking to assume was

15       a prepetition one which didn't have the right

16       to do certain things which now they are going

17       to have in bankruptcy, but having worked with

18       him and Mr. Klotz from Gordon and Mr. Capp

19       (Ph) from Hilco, again, I don't see there is

20       a problem we will have to come back to the

21       Court for.  We would just like that

22       opportunity in case something unusual

23       happens.

24               THE COURT:  Very good.  Thank you.

25               Any other counsel on the phone wish

1          to be heard on this matter?

2                    MR. HILLMAN:  Yes, Your Honor.

3          David Hillman, counsel for Panasonic

4          Corporation of North America.  As I had

5          advised the Court during the discussion over

6          the DIP financing motion Panasonic owns the

7          goods that are in Circuit City's possession.

8          It is my understanding that some of those

9          consigned goods are -- may be in some of the

10         stores that are closing, the 154 stores.  The

11         consignment agreement was terminated

12         prebankruptcy.  We gave notice to Circuit

13         City, to Hilco and to Gordon Brothers that we

14         did not consent to any sale or disposition of

15         our products at any of these GOB sales.  It

16         is not clear to me whether or not that

17         request is being honored, and as I had

18         mentioned we're filing hopefully today, if

19         not tomorrow, the complaint that -- a motion

20         for a TRO and preliminary injunction.  So my

21         objection to the motion is I have no problem

22         with approval if the Court approves the

23         motion.  My problem lies within selling

24         Panasonic's product at any of those sales.

25                    THE COURT:  Okay.  But which is

1          going to be subject to a separate complaint

2          and TRO which you are going to bring before

3          the Court, and I assume then we'll resolve

4          those issues at that time.

5                    MR. GALARDI:  Your Honor, we are not

6          in any way prejudicing their rights to bring

7          a complaint, to seek a TRO or to address

8          those issues in the proper form with a

9          complaint, a TRO, and now I understand I may

10         be here a couple days doing so.

11                   THE COURT:  So, Mr. Hillman, nothing

12         in this order prejudices your right to

13         proceed forward, and the Court will resolve

14         the issues that you raise in the context of

15         the TRO which I will anticipate receiving

16         shortly.

17                   MR. HILLMAN:  Thank you, Your Honor.

18                   THE COURT:  Any other?

19                   MS. KELBON:  Regina Kelbon for

20         Verizon Wireless, Your Honor.  Again, I

21         incorporate my comments that I raised in the

22         DIP.  Obviously it's Verizon's inventory,

23         can't be sold by Circuit City, have no

24         authority to sell our large inventory that's

25         specially secured in marked cages.  I do not

1               believe that is the intention since Verizon

2               was informed of Hilco's presence at the

3               property and we believe our stuff is not

4               included.  We would just like confirmation of

5               that that there was no intention of that as

6               part of this Hilco agreement.  The agreement

7               is not attached of record so we can't review

8               it to know what the actual contract says.  We

9               could not find it on our docket.

10                   THE COURT:  I assume you've got

11              control over your inventory if it is in a

12              locked location?

13                   MS. KELBON:  Yes, Your Honor, we do.

14                   MR. GALARDI:  Mr. Athanos has just

15              confirmed they are not selling any of

16              Verizon's equipment and that's my

17              understanding, and Verizon is free to contact

18              Hilco and remove it if that's what they need

19              to do.

20                   MS. KELBON:  We are in touch with

21              the Circuit City management and they are

22              discussing the exit dates of the various

23              locations that the Circuit City is closing.

24              So we just reserve all of our rights under

25              our contract, and I'm sure hopefully this

1          will be worked out amicably.

2                  THE COURT:  Yes.  So noted.  If you

3          have any problem at all, you can come back to

4          the Court and get relief?

5                  MS. KELBON:  Thank you, Your Honor.

6                  THE COURT:  All right.  I don't

7          think any other party --

8                  MR. BRANCH:  Dustin Branch,

9          representing various landlords.  I quickly

10         wanted to put an objection on the record.  My

11         issue has been pretty much laid out by Mr.

12         LeHane and Mr. Pollack and I've dealt with

13         Gordon Brothers and Mr. Galardi on numerous

14         occasions.  But at this point I couldn't

15         really hear too well as far as the timing to

16         bring objections on going out of business

17         sales.  Whether it is 10 or 15 days, I just

18         couldn't hear for sure.

19                 THE COURT:  We are going to address

20         that right now.

21                 MR. BRANCH:  Thank you, Your Honor.

22                 THE COURT:  All right.  So first the

23         Court will accept the proffer of the

24         testimony of the proffered witnesses in

25         connection with this motion.  The Court will

1          approve the assumption of the agreement and

2          then with regard to the GOB provisions and

3          the question of adequate protection of

4          landlords the Court will approve that on an

5          interim basis going forward, and it's been

6          suggested that 10 days notice and then the

7          U.S. Trustee raised a question about 15 for

8          the committee.  I'm not really sure that it

9          is a committee issue on either of these two

10         issues that we're reserving.  But, Mr.

11         Galardi, I would like your input on the

12         timing and so I would solicit that at this

13         point.

14              MR. GALARDI:  Your Honor, again, I

15         have no objection to the landlords having 10

16         days.  I have no objection to the committee

17         having 15 days if they have an objection.

18         What I expect of them is to join me in

19         opposition to any landlord objection should

20         they arise.  I think there is no problem with

21         the time frame.

22              THE COURT:  All right.  So it will

23         be 10 days for the landlords, 15 days for the

24         committee.  All right.  With that then it is

25         approved.

 1                    MR. GALARDI:   Thank you, Your Honor.

 2          Your Honor, moving now to item number 20 on

 3          the list of motions, this is the debtor's

 4          motion.  As I described early on in the case,

 5          Your Honor, there has been leases that the

 6          debtors have vacated the premises.  Some are

 7          simply barred and some are currently

 8          subleased to third parties.  We filed a

 9          motion last night to reject all of those

10          leases.  The carrying costs, as I mentioned

11          as, and Mr. Besanko would testify, is roughly

12          40 million dollars a year.  It is critical,

13          especially in this accrual state to get out

14          of those leases as fast as possible because

15          each day we remain in those premises arguably

16          we are accruing post petition administrative

17          expenses.  Your Honor, following sort of the

18          Delaware precedent that I actually

19          represented the landlords on, the way in

20          which we have tried to proceed to do this is

21          to give the unequivocal notice that we would

22          be out of the premises, that we don't reserve

23          any rights to go back to the premises.  So it

24          is an unequivocal objection.  Unfortunately,

25          Your Honor, we don't have a committee here

1            because if there was a committee I would have

2            them agree with us to that.

3                  And finally to return the keys to

4            the premises.  Your Honor, we have not

5            returned the keys today but we will return

6            them as soon as Your Honor blesses it,

7            because if Your Honor didn't bless the

8            rejection there was no reason to return the

9            keys.  We have made arrangements to return

10           the keys tomorrow so that we would reject.

11           So we are actually seeking rejected as of the

12           petition date so we could avoid post petition

13           administrative expenses with respect to the

14           estate.  Your Honor, again, this is a

15           business judgment decision.  It is actually

16           evidenced by the fact that we have -- as Mr.

17           Besanko will testify, we have not been

18           operating these premises for quite some time.

19           Mr. Besanko will further testify that the

20           sublease rent that we received is less than

21           the rent that was paid.  It is a drain on the

22           estate.  In addition, Mr. Besanko would

23           testify that at prior times we invited people

24           in to see if they could take the lease

25           portfolio, find the market portfolio.  We

```
 1          have been unable to do so.  Indeed, as Mr.

 2          Rothschild will be able to testify or FTI

 3          would be able to testify, one of the problems

 4          with the prebankruptcy liquidation sales

 5          profit is we have these leases and eventually

 6          you have to do something with those.  We

 7          believe it is the business judgment of the

 8          debtors to reject effective immediately.  Mr.

 9          LeHane will get up, and we don't have a

10          problem with this, but if we don't return the

11          keys within a certain period of time and if

12          we keep occupation of the premises, it's

13          without prejudice of the landlords rights to

14          come back and say, hey, you said you were

15          doing this.  You didn't do it.  You took the

16          value of the property.  We want an

17          administrative claim.  We have no objection

18          to that, but I didn't want to see that we had

19          to have the keys today.  We would like to get

20          the keys out tonight, and hopefully we can

21          make the FedEX deadline, but no later than

22          Wednesday.  If we can have in the order that

23          we return the keys no later than Wednesday,

24          the rejection could be effective as of the

25          petition date.
```

1         THE COURT:  Very good.  Does any

2         party wishes to speak to this motion?

3              MR. POLLACK:  Yes, Your Honor.

4         David Pollack on the phone.  I don't know if

5         there's anyone in the courthouse.

6              THE COURT:  Yes.  We'll go to the

7         podium first.

8              MR. LEHANE:  Thank you, Your Honor.

9         Robert LeHane.  Thank you, Mr. Galardi, for

10        attempting to read my mind.  We certainly

11        appreciate that this is set up as an interim

12        motion.  There is an objection deadline for

13        landlords to object as Mr. Galardi stated,

14        but we don't know whether or not possession

15        of the premises has actually been turned over

16        to the landlords, and we would prefer that

17        the effective date of the rejection of these

18        leases be the later of today or the date that

19        the premises are actually delivered to the

20        landlords by surrender and turnover of the

21        keys.  We believe that will avoid a necessity

22        for a multitude of objections whereby maybe

23        landlords get the keys Thursday, Friday or

24        even Wednesday.  They have been in the

25        premises post petition.  We believe that

1           those landlords are set up with an

2           administrative claim for that time.  Thank

3           you, Your Honor.

4                THE COURT:  Thank you.  All right.

5           I will go to counsel on the phone.

6                MR. POLLACK:  Thank you, Your Honor.

7           David Pollack again.  Your Honor, I don't

8           have any problem with the date of rejection.

9           I have verified that our premises are vacated

10          and we only have, I believe, one on the list.

11          However, the motion goes further than just

12          rejecting the leases and wants to or ask the

13          Court to approve rejection of guarantees as

14          well.  In most cases I have been in

15          guarantees have been held to be non-executory

16          and therefore not capable of rejection under

17          Section 365, and so with regard to guarantees

18          we would ask that that issue not be granted

19          on an interim order because I don't know how

20          you undo a rejection of the guarantee but be

21          held to the final hearing on this and that

22          the interim apply only to the other relief

23          sought by the debtors.

24                THE COURT:  All right.  Thank you.

25                MR. GALARDI:  Your Honor, addressing

1        first Mr. LeHane's point, again, I think we

2        can set a hard date of Wednesday and then we

3        can have disputes.  I think we can get all of

4        the keys back.  It is just the hearing to

5        give those notice to get it out today and

6        hopefully it's going to be done.  So if we

7        can get them back on Wednesday, I would ask

8        the date to be retroactive to the petition

9        date.

10                With respect to Mr. Pollock's issue

11        on the guarantee, I actually agree with Mr.

12        Pollack that it is not in fact an executory

13        contract, but we do it out of an abundance of

14        caution because if it's not an executory

15        contribution, it's prepetition and

16        prepetition breach.  It really is much ado

17        about nothing.  If it is prepetition

18        contract, we breach it, and if it's an

19        executory contract, we reject it.  I don't

20        know what we're reserving it for.  So we have

21        no problem saying we would reject it to the

22        extent it is an executory contract and change

23        the language to reflect that, but I don't

24        want to be bound by a guarantee that I

25        believe is -- even if it's not executory, it

1          is a contract I can breach.

2                    THE COURT:  Very good.  Apparently,

3          Mr. Pollack, you win on that.  You have a

4          prepetition claim instead of an executory

5          contract.  But in any event the Court is

6          going to approve this motion and --

7                    MS. KELBON:  Your Honor.

8                    THE COURT:  Yes.

9                    MS. KELBON:  Excuse me, Your Honor.

10         Regina Kelbon.  Your Honor, with respect to

11         this motion, the motion recites that Circuit

12         City is not occupying these premises.  I have

13         not had the opportunity to confirm that with

14         the DIP list that is attached to the motion

15         with Verizon Wireless.  I'm assuming Circuit

16         City is not in the premises and Verizon

17         Wireless kiosks are not in the premises but I

18         would like to reserve my rights with that

19         just in case there is any disagreement with

20         that because I'm assuming we are out of those

21         premises as well.

22                    THE COURT:  I'm assuming so, too,

23         since you have all of your inventory locked

24         and secured.

25                    MS. KELBON:  That is correct, Your

1          Honor.  That's why we think that, but since I
2          cannot on this short notice confirm on a
3          store by store basis which was attached to
4          the list, I will have to go with the debtor's
5          representation that they are not occupying
6          the premises to reserve my rights and my
7          contract.
8                    THE COURT:  Right.  If you need
9          relief, if you find out there is something
10         different, you can always come back to the
11         Court and request appropriate relief.  So it
12         will be without prejudice to that.
13                   MR. GALARDI:  And, Your Honor, I
14         would only add that if they are in the
15         premises -- and most are sublessee and we're
16         rejecting all subleases.  So it doesn't mean
17         we have to stay there for their sake.  They
18         can get their property out.  And now they are
19         on notice.  Get it out.
20                   THE COURT:  Exactly.  So the Court
21         is going to approve the rejection of these
22         contracts.  The Court is going to approve the
23         rejection as of the petition date with the
24         proviso that the keys be returned to the
25         landlords by Wednesday.  If that does not

1              occur, then the Court will entertain any

2              landlord motion for relief as may be

3              appropriate at that point.  It is also my

4              understanding that the landlords -- even if

5              they don't have the keys, they have the

6              premises now and can re-enter their property.

7                   MR. GALARDI:  That is correct, Your

8              Honor.  Again, the key issue has become a big

9              one.  Sometimes you can't find the keys.  The

10             landlords have the key.  It is a symbolic

11             gesture more than anything else.  I want to

12             reserve.  I mean, we will try to get everyone

13             their keys on Wednesday.  If not, they

14             reserve their rights to seek an

15             administrative claim and say, hi, you didn't

16             give the keys back.  I reserve the right

17             saying you have had the occupancy.

18                  THE COURT:  I understand the issue.

19             That's why I put the additional comments on

20             record, but from the Court's standpoint the

21             landlords have possession immediately and

22             they can enter this evening if they want if

23             they want to get a locksmith and go in

24             themselves.  And the keys are going to be

25             returned.  And if we have an issue about

```
 1              whether or not you're holding the keys that

 2              you actually do have or somehow using the

 3              space, then I will take that up at a

 4              different time.

 5                      MR. LEHANE:  Thank you, Your Honor.

 6              We actually agree with Mr. Galardi's comment.

 7              There is just a date that would need to be

 8              filled.  It's the landlord objection

 9              deadline.  I would propose the same 10 days

10              that was put in the GOB motion.

11                      MR. GALARDI:  We agreed to that and

12              the committee 15.

13                      THE COURT:  Okay.  Ten days for the

14              landlords, committee 15.

15                      MR. GALARDI:  Those are both

16              weekdays.  So I think it works out, the 20th

17              and 25th.

18                      THE COURT:  I would hope so.

19                      MR. GALARDI:  Thinking about it, I

20              believe they are.

21                      THE COURT:  Okay.

22                      MR. GALARDI:  Your Honor, that then

23              brings us to the last motion on the agenda,

24              and, again, Your Honor, all of our relief has

25              been structured to try to reorganize this
```

1        company.  As Your Honor may know we are a
2        public company.  For better or worse we have
3        been operating losses as a result of not
4        having great performance over the number of
5        years.  That may be a very significant asset
6        for this company.  Accordingly, what has now
7        become somewhat common with public companies
8        is to seek relief to limit the trading in the
9        equity security so as to not have a change in
10       control, you know, inadvertent change in
11       control.  What we have sought -- and, again,
12       this is clearly an interim order with the
13       committee to come back to it -- is to seek an
14       order from this Court establishing procedures
15       eliminating trading and security during this
16       interim period obviously subject to people's
17       rights to come in and to object to that and
18       the committee's right to object.  It is to
19       preserve what may be a very significant asset
20       either for a potential purchaser or for a
21       standalone plan, namely the NOLs that we have
22       at the current time.  Again, Mr. Besanko is
23       in the courtroom and could testify as to the
24       size of the NOLs, our ability to use NOLs.
25       Obviously if there is a different outcome,

1          these procedures could be vacated at that

2          time, but right now, hoping to reorganize or

3          to sell and to have that as an asset, we

4          would like to do everything possible to

5          preserve that.  These procedures I understand

6          have been granted in cases in this

7          jurisdiction.  I know they have been granted

8          in cases in other jurisdictions, and we would

9          ask Your Honor to grant the relief to limit

10         the trading and notices set forth in there

11         with respect to our equity security.

12              THE COURT:  Any party wish to be

13         heard on this motion?  Okay.  The Court has

14         reviewed the motion and I find it entirely in

15         order and will approve it on an interim

16         basis.

17              And, Mr. Galardi, I had one other

18         motion we had to take up, which is a motion

19         to file under seal.  Are you going to speak

20         to that?

21              MR. GALARDI:  Your Honor, I think I

22         sort of addressed it, but I probably didn't

23         get an order for it.  Those are two fee

24         letters that we discussed earlier, and I had

25         had a dialogue with the U.S. Trustee as to

1          whether those should be disclosed.  We would

2          ask Your Honor to keep those under seal, as I

3          mentioned, under record.  The total amount of

4          the fees with respect to the facility are in

5          the DIP budget.  Our DIP budget is actually

6          higher than that.  We would say because of

7          pricing issues and other issue what GE or

8          Wells or Bank of America gets is really a

9          confidential business matter.  We would ask

10         Your Honor to enter the order, again,

11         allowing us to file those fee letters under

12         seal.  We have given it to the U.S. Trustee's

13         Office.  We have given it to the Court.  If

14         there is someone who has an actual real

15         interest, we understand they can come to the

16         Court and ask for that.  We are not trying to

17         say in all circumstances, but indeed we think

18         we need to file as record and disclose

19         confidential business information of those

20         companies and we ask Your Honor to enter that

21         order.

22              THE COURT:  Very good.  Office of

23         the U.S. Trustee wish to be heard on this

24         issue?

25              MR. VAN ARSDALE:  Your Honor, we did

1         have a conversation prior to court, and the

2         resolution of it was as represented to the

3         Court, and I think that that suits fine.  And

4         it still leaves it open if someone really

5         wants to know this to come to the Court and

6         ask that it be unsealed.

7              THE COURT:  Very good.

8              MR. GALARDI:  And clearly, Your

9         Honor, we will give it to the committee.  We

10        know the committee will have to get the fee

11        letters and we will give it to the committee.

12        We are not going to make them come and get a

13        motion.  It is standard before we have to go

14        to a final hearing.

15             THE COURT:  Very good.  All right.

16        The Court is going to approve the motion to

17        file the fee letters under seal subject to

18        further order of the Court.  All right.  At

19        this point I think we have taken up all the

20        motions that you have filed and we probably

21        need now to do scheduling.

22             MR. GALARDI:  Right, the six omnibus

23        hearings and how Your Honor would like to

24        proceed with the next hearings.  I guess one

25        of the first questions for Your Honor is on

```
 1          preference.  If we go back to my sort of
 2          significant dates, December 10th is a big
 3          date for us, one, with respect to trying to
 4          get a motion to extend the time to assume or
 5          reject leases and, two, with respect to the
 6          366 deadline.  That would be one of the
 7          dates.  I don't know if Your Honor's practice
 8          is to have the hearing on a final DIP at the
 9          same, the first omnibus or whether you wanted
10          a separate hearing on that.  Anything in that
11          pre-December 10th date as a first omnibus
12          will work well for us.
13                  THE COURT:  Do you think you will
14          need any date in November or are you looking
15          at the first part of December?
16                  MR. GALARDI:  Well, I know I'm going
17          to get a TRO on it.  So I'm looking -- Your
18          Honor, I think if we did it in early December
19          as opposed to -- because Thanksgiving will
20          sort of put everybody in.  We have given some
21          10 days.  So 10 days from today and 15 days
22          from today is the 20th and 25th.  That Friday
23          or Thursday.  Your Honor, unless -- I don't
24          think so.  I think probably the very first
25          week of December would be a good day that
```

1           will allow us to give notice.

2                   THE COURT:  How about Friday, the

3           5th of December?

4                   MR. GALARDI:  That sounds like a

5           good day.  That will give us 15 to 20 days

6           notice for the DIP.  Can we put the DIP --

7                   THE COURT:  Put everything on that

8           date.

9                   MR. GALARDI:  Okay.  Your Honor,

10          again as to practice, how does Your Honor

11          like to handle applications to employ

12          professionals?  Does that go on the first

13          omnibus date?  How would you like to do that?

14          I don't want to overload the calendar but I

15          know we will have those filed shortly.  How

16          would Your Honor like to proceed?

17                  THE COURT:  Let's put them for the

18          same date.

19                  MR. GALARDI:  Okay.  Thank you.

20                  THE COURT:  And do you want to do an

21          afternoon hour or do you prefer to do that in

22          the morning?  What is best?

23                  MR. GALARDI:  Your Honor, since that

24          may be a long day, I sort of ask that we

25          maybe get the whole day.

 1            THE COURT:  You can have the whole

 2       day.

 3            MR. GALARDI:  Starting -- if we are

 4       having the whole day, I think many of us will

 5       travel in the night before.  But even if we

 6       started at 10:00 -- knowing my flights from

 7       the northeast, we will land at 9:00.  If we

 8       start at 10:00, that still allow people to

 9       come in in the morning from various

10       locations.  So starting at 10:00 I think

11       people will have the flexibility to come in

12       that morning.

13            THE COURT:  That's fine.  We will

14       start at 10:00 and you have the day.

15            MR. GALARDI:  Thank you.  Working

16       off of that, Your Honor, again if possible to

17       get two days in a month, I would say some

18       period 14 days or longer after that December

19       5th hearing.

20            THE COURT:  We can do the 19th.  We

21       can do the 22nd.  I can do the afternoon of

22       the 23rd.

23            MR. GALARDI:  I think my wife

24       doesn't want me here on the 23rd. How about

25       the 22nd?  So that gives us a little more

1          than two weeks if that works.

2                    THE COURT:  Again, I have that

3          entire day.  What kind of hour?

4                    MR. GALARDI:  Why don't we start in

5          the morning on that day, Your Honor, and,

6          again, we will try to balance the calendar.

7          If we think we need a full day, we can

8          contact.  But can we do a morning hearing.

9                    THE COURT:  Yes.  We will set it at

10         10:00.

11                   MR. GALARDI:  Thank you.  Now the

12         new year brings with it the deadline.  So

13         something close to the 17th, Your Honor,

14         would be good assuming that lawyers leave

15         everything to the last minute.  So sometime

16         around December 11th -- I mean, January 11th

17         to the 16th I think will be a helpful hearing

18         because we do have the loan commitment and

19         try to get there.  So I don't know what Your

20         Honor's availability is.

21                   THE COURT:  That week is tight, but

22         I can do the 16th.  I can give you all day on

23         the 16th or I can do the 12th.

24                   MR. GALARDI:  Your Honor, since life

25         is what it is, let's do the January 16th so I

1          can meet that deadline but give myself the

2          full time to that deadline.

3                    THE COURT:  All right.  We will set

4          that at 10:00 as well.

5                    MR. GALARDI:  Thank you.  Just

6          because there might be other matters, Your

7          Honor, if you have anything the last week of

8          December I think as a precaution.

9                    THE COURT:  We're going to go back

10          to December?

11                    MR. GALARDI:  I'm sorry, the last

12          week of January.  My apologies.

13                    THE COURT:  Thursday the 29th.

14                    MR. GALARDI:  That would be fine.

15                    THE COURT:  I will set that at

16          10:00.

17                    MR. GALARDI:  Okay.  Your Honor, any

18          time in the first two -- second or third

19          week.  It looks like the week of the 9th or

20          the week of the 16th of February.  Maybe the

21          week of the 9th and then something towards

22          the end of February before my March deadline.

23                    THE COURT:  The 13th.

24                    MR. GALARDI:  That would be good.

25          10:00?

182

```
 1              THE COURT:  10:00.

 2              MR. GALARDI:  And though we have a

 3    March deadline to file a disclosure statement

 4    and plan maybe something that first week of

 5    -- how many do I have now?  One, two, three,

 6    four, five.  I'm going to ask for one more,

 7    maybe the first week of March, Your Honor.

 8              THE COURT:  March 3rd at 10:00.

 9              MR. GALARDI:  Make that six.  Thank

10    you.

11              THE COURT:  Yes.  That is six.

12              MR. GALARDI:  We would just fill in

13    that, the case management order and file with

14    those dates, correct?

15              THE COURT:  That will be fine.  And

16    then depending on where we are at that point

17    we can always set other dates beyond that.

18              MR. GALARDI:  Yes, thank you.  Your

19    Honor, that concludes the matters again from

20    Circuit City and myself.  I truly appreciate

21    your doing this on such a short notice and

22    accommodating us and granting relief that I

23    hope sets the company on good footing going

24    forward.  Thank you.

25              THE COURT:  I certainly wish you
```

183

1              luck with the case.

2                        MR. GALARDI:  Thank you.

3                        THE COURT:  We're done.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

184

1

2

3

4              CERTIFICATE OF COURT REPORTER

5

6              I, CALVIN ADDISON, a Notary Public for the

7       State of Virginia at Large, hereby certify that I was

8       the Court Reporter in the United States Bankruptcy

9       Court for the Eastern District of Virginia, Richmond

10      Division, on November 10, 2008, at the time of the

11      hearing.

12              I further certify that the foregoing

13      transcript is a true and accurate record of the

14      testimony and other incidents herein.

15              Given under my hand this 25th day of November,

16      2008.

17

18

19

20                      /s/ Calvin Addison

21

22

23

24

25