Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

- and –

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720
(312) 407-0700

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re: | : Chapter 11 |
| CIRCUIT CITY STORES, INC., *et al*., | : Case No. 08-35653 |
| Debtors. | : Jointly Administered |

**APPENDIX TO REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO CERTAIN CLAIMS SUBJECT TO (I) THE DEBTORS' NINETEENTH OMNIBUS OBJECTION TO CLAIMS (RECLASSIFICATION OF CERTAIN MISCLASSIFIED CLAIMS TO GENERAL UNSECURED, NON-PRIORITY CLAIMS) AND (II) THE DEBTORS' THIRTY-THIRD OMNIBUS OBJECTION TO CLAIMS (MODIFICATION AND/OR RECLASSIFICATION OF CERTAIN CLAIMS)**

Dated: January 13, 2010
Richmond, Virginia

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

- and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Chris L. Dickerson, Esq.
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-2700
(312) 407-0700

- and –

MCGUIREWOODS LLP

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and Debtors in Possession

TABLE OF CONTENTS

| Document | Exhibit |
|---|---|
| | |
| Final Order Under Bankruptcy Code Sections 105(a), 362, 503(b), 507(a), 546(c), And 546(h) (I) Granting Administrative Expense Status To Obligations From Postpetition Delivery Of Goods; (II) Authorizing Payment Of Expenses In The Ordinary Course Of Business; (III) Authorizing Debtors To Return Goods; And (IV) Establishing Procedures For Reclamation Demands ("Reclamation Procedures Order") . . . . . . . . . . . . . | A |
| November 10, 2008 Hearing Transcript . . . . . . . . . . | B |
| December 5, 2008 Hearing Transcript. . . . . . . . . . . | C |
| In re US Airways, Inc., 2006 WL. 2992495 (E.D. Va. 2006) . . . . . . . . . . . . | D |
| In re First Magnus Finance Corp., 2008 WL. 5046596 (Bankr. D. Ariz. 2008). . . . . . . . . | E |
| In re Pluma, Inc., 2000 WL. 33673751 (Bankr. M.D.N.C. 2000) . . . . . . . . | F |
| Order Granting Motion To Authorize The Establishment And Implementation Of Exclusive, Global Procedures For The Reconciliation And Treatment Of Reclamation Claims Asserted Against The Debtors (In re US Airways Group, Inc., Case No. 04-13189 (SMS) (Bankr. E.D. Va. Sep. 14, 2004)) . . . . . . . . . . . . . . . . . . . . . . . . | G |
| Order Pursuant To 11 U.S.C. §§ 105, 362, 503 And 546 (I) Providing Administrative Expense Treatment For Certain Holders Of Valid Reclamation Claims And (II) Establishing Procedures For Resolution And Payment Of Reclamation Claims (In re US Airways Group, Inc., Case No. 02-83984 (SMS) (Bankr. E.D. Va. Aug. 12, 2002)). . . | H |
| Order Pursuant to Section 105(a) and 546(c) of the Bankruptcy Code for Approval of Global Reclamation Procedures for Reclamation Claims (In re Fas Mart Convenience Stores, Inc., Case No. 01-60386 (Bankr. E.D. Va. Aug. 14, 2001)). . . . . . . . . . . . . . . . . . . . | I |
| Order Pursuant to Section 105(a) and 546(c) of the Bankruptcy Code for Approval of Global Reclamation Procedures for Reclamation Claims (In re Heilig-Meyers Company, Case Nos. 00-34533 to 00-34358(DOT)). . . . . . | J |

# EXHIBIT A

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Proposed Counsel to the Debtors and Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| CIRCUIT CITY STORES, INC., et al., | : | Case No. 08-35653-KRH |
| Debtors. | : | Jointly Administered |

**FINAL ORDER UNDER BANKRUPTCY CODE SECTIONS 105(a), 362, 503(b), 507(a), 546(c), AND 546(h) (I) GRANTING ADMINISTRATIVE EXPENSE STATUS TO OBLIGATIONS FROM POSTPETITION DELIVERY OF GOODS; (II) AUTHORIZING PAYMENT OF EXPENSES IN THE ORDINARY COURSE OF BUSINESS; (III) AUTHORIZING DEBTORS TO RETURN GOODS; AND (IV) ESTABLISHING PROCEDURES FOR RECLAMATION DEMANDS**

Upon the motion (the "Motion")[1] of the Debtors for an order pursuant to Bankruptcy Code sections 105(a), 362, 503(b), 507(a), 546(c), and 546(h), (i) confirming the grant of administrative expense status

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

0835653081211000000000009



to obligations arising from postpetition delivery of goods; (ii) establishing authority to pay certain expenses in the ordinary course of business; (iii) authorizing the Debtors to return goods to vendors under Bankruptcy Code section 546(h); and (iv) establishing procedures for addressing reclamation demands; and the Court having reviewed the Motion and the Besanko Declaration; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

1.    The Motion is GRANTED, as set forth herein.

2.    The Vendors shall have administrative expense claims with priority under Bankruptcy Code sections 503(b) and 507(a)(2) for those undisputed obligations arising from outstanding orders relating to

shipments of Goods delivered, received, and accepted by
the Debtors after the Petition Date, subject to the
limitations imposed by any order of this Court and the
prior rights of holders of security interests in such
Goods or the proceeds of such Goods under the Debtors'
proposed debtor in possession financing agreements and
prepetition financing agreements, to the extent of such
interests.

3.    The Debtors are authorized, but not
directed, to pay their undisputed obligations arising
from the postpetition shipment or delivery of Goods by
the Vendors under their customary practice in the
ordinary course before the commencement of these chapter
11 cases.

4.    The Debtors are authorized, but not
obligated, under Bankruptcy Code section 546(h), with
the consent of a creditor and subject to the limitations
imposed by any orders of this Court and the prior rights
of holders of security interests in such Goods or the
proceeds of such Goods under the Debtors' proposed
debtor in possession financing agreements and
prepetition financing agreements, to the extent of such

interests, to return to Vendors Goods that were delivered prepetition for an offset of the purchase price of such Goods against the Vendors' prepetition claims; provided, however, that nothing herein shall be construed as a waiver of, or in any way prejudice, any rights the Debtors may have, after notice and a hearing and subject to court approval, to return goods without creditor consent.

5. The procedures for the processing and reconciliation of Reclamation Claims, if any, set forth in the Motion, including the following are hereby approved:

(a) Any person making a Reclamation Demand (the "Reclamation Claimant") must send the Reclamation Demand so it is received by the Debtors no later than the day that is twenty (20) days following the Petition Date or such earlier time as may be required under Bankruptcy Code section 546(c) to the following addressees: Circuit City Stores, Inc., et al., Claims Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, with separate copies to each (i)Circuit City Stores, Inc. 9950 Mayland Drive, Richmond, Virginia 23233, Attn: Reginald D. Hedgebeth, (ii) Circuit City Stores, Inc. 9950 Mayland Drive, Richmond, Virginia 23233, Attn: Daniel W. Ramsey,

(iii) Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois, 60606, Attn: Sarah Baker, Esq., and (iv) McGuireWoods LLP, One James Center, 901 E. Cary Street, Richmond, Virginia 23219, Attn: Sarah B. Boehm, Esq.

(b)   All Reclamation Demands must include the information required by Bankruptcy Code Section 546(c) with respect to the Goods for which the Reclamation Demand is asserted, and the following: (i) a statement by the claimant as to whether they have or will assert an administrative claim pursuant to Bankruptcy Code section 503(b)(9) for the value of goods the claimant provided to the Debtors within the twenty (20) days immediately prior to the Petition Date (a "Section 503(b)(9) Claim") and (ii) to the extent known, the amount of any Section 503(b)(9) Claim.

(c)   On or before the day that is one hundred and twenty (120) days following the Petition Date, the Debtors shall advise each Reclamation Claimant of the allowed amount, if any, of the Reclamation Demand (the "Allowed Reclamation Amount").  Absent receipt of any notice setting forth such an Allowed Reclamation Amount, the Debtors shall be deemed to have rejected the Reclamation Demand.

(d)   In the event that the Debtors and the Reclamation Claimant agree upon the Allowed Reclamation Amount, the Debtors shall be authorized to make payment in such amount or be

required to return the goods sought to be reclaimed, subject to the limitations imposed by any orders of this Court and the prior rights of holders of security interests in such goods.

6. Nothing in this Order or the above procedures is intended to prohibit, hinder, or delay any Reclamation Claimant from asserting or prosecuting any of its rights to seek to reclaim goods provided to the Debtors, or affect, alter, diminish, extinguish, or expand the rights or interests, if any, to recover goods (or proceeds thereof) sought to be reclaimed, subject to the provisions of Bankruptcy Code sections 105, 362, and 546(c), or from filing a claim under Bankruptcy Code section 503(b)(9) consistent with applicable orders of this Court.

7. Nothing in this Order shall impair or expand any entity's right, if any, to withdraw a reclamation claim; provided, however, that all of the Debtors' rights with respect to the withdrawal of any reclamation claim, including (without limitation) the right to contest whether the entity had the right to withdraw such claim, are expressly reserved.

8. The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is hereby waived.

9. This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation or interpretation of this order.

Dated: Richmond, Virginia
December __, 2008
Dec 10 2008

/s/ Kevin Huennekens
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: December 11 2008

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

- and –

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
333 West Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

- and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Proposed Counsel to the Debtors
and Debtors in Possession

**CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Douglas M. Foley

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-------------------------------

)
)
IN RE: )
CIRCUIT CITY, INC., et al ) Case No.08-35653-KRH
)
)
)

-------------------------------

Complete transcript of the testimony and other incidents in the above, when heard on November 10, 2008, before the Honorable Kevin R. Huennekens, Judge.

APPEARANCES:

MCGUIREWOODS,LLP
901 East Cary Street
Richmond, Virginia 23219
Counsel for debtors
Counsel for debtors
BY: DION W. HAYES, Esq.

SKADDEN ARPS SLATE & FLOM, LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
Counsel for debtors
By: GREGG M. GALARDI, Esq.

RUSSELL R. JOHNSON, III, Esq.
2258 Wheatlands Drive
Manakin-Sabot, Virginia 23103
Representing various utilities

JOSEPH ATHANOS, Esq.
Counsel for Gordon Brothers and Hilco

BRADFORD F. ENGLANDER, Esq.
7200 Wisconsin Avenue
Suite 800
Bethesda, MD 20814-4842
Representing Alliance Corporation Source Interlink Media, LLC

ROBERT L. LEHANE, Esq.
101 Park Avenue
New York, NY 10178-0002
Representing various landlords

BRUCE H. MATSON, Esq.
951 E Byrd Street
Richmond, Virginia 23219
Representing Bank of America and its agent

ROBERT VAN ARSDALE, Esq.
Assistant United States Trustee
600 East Main Street, Suite 301
Richmond, Virginia 23219

TELEPHONIC APPEARANCES:

DAVID L. POLLACK, Esq.
1735 Market Street
51st Floor
Philadelphia, PA 19103-7599

STEVEN CHURCH
Bloomberg News

MR. GRAFF

DUSTIN P. BRANCH, Esq.
2029 Century Park East
Suite 2600
Los Angeles, CA 90067-3012
Representing various landlords

DAVID M. HILLMAN, Esq.
919 Third Avenue
New York, New York 10022
Representing Panasonic Corporation

JOHN MCJUNKIN, Esq. and DANIEL J. CARRIGAN, Esq.
1900 K Street NW
Washington, D.C. 20006-1108
Representing Bethesda Softworks, LLC

JOHN E. LUCIAN, Esq. and REGINA S. KELBON, Esq.
130 North 18th Street
Philadelphia, PA 19103-6998
Representing Verizon Wireless

THE CLERK: In the matter of Circuit City Stores, Incorporated, et al, hearings, first day motions by debtors item 1 through 24.

MR. HAYES: Good afternoon, Your Honor.

THE COURT: Good afternoon,

MR. HAYES: Dion Hayes with McGuire Woods on behalf of the debtors. First of all, Your Honor, we want to thank the Court very much for hearing these matters on an expedited basis. It is very important to the company that we be able to have an opportunity to speak to Your Honor as soon as we could after the case was filed, and the company is very appreciative. Your Honor --

THE COURT: You're certainly welcome.

MR. HAYES: Your Honor, if I could, I would like to introduce to the Court certain of the individuals that are in the courtroom today that I think the Court will be seeing more of in the future. Your Honor, first of all Mr. Reggie Hedgebeth is Circuit City's general counsel. Seated next to him

is or on the same row is Bruce Besanko who is the company's chief financial officer. Jim Marcum the acting chief executive officer, would very much like to be here but he's at headquarters spending time with the company's employees at a very critical time in the company's history. Your Honor, with me at counsel table from Skadden Arps are Gregg Galardi from Skadden's Wilmington, Delaware office, Ian Fredericks, also from Skadden's Wilmington, Delaware office. Seated next to Mr. Hedgebeth is Chris Dickerson from Skadden's Chicago office. Your Honor, I'm going to move for the admission pro hac of Skadden's attorneys who will present the first days. Before I do that, I want to address the one issue that the clerk's office asked that we address with the Court this morning. In all of the first day motions we indicated at the end of our proposed orders the required compliance with Rule 9022-1 related to orders. Your Honor, I wanted to be specific as to who we sent notice to of this hearing and the manner in which it was sent. As the Court is well aware the filings

commenced late last night after midnight, concluded in the 3 or 4 o'clock range, and at approximately 4:30 this morning faxed notice of the filing of the first day and notice of the two websites, both the Court's website and the KCC website, who is our claims agent, were sent out to that fax list. Your Honor, the entities that were on that fax list were the top 50 unsecured creditors, the landlords for the leases that we are proposing to reject, and counsel for the prepetition agent, counsel for Sony, the IRS, the SEC, the secretary of treasury, the attorney generals for all 50 states, the EPA, the Department of Justice Civil Division, the Virginia State Corporation Commission, the Virginia Department of Tax, the county recorder and county taxing authorities for the jurisdictions in which the company would propose to close stores, the governmental units in those jurisdictions where the company operates as well, regional and state and environmental protection authority offices and the state taxing authorities. We also, Your Honor, had provided draft first

day papers on Friday to the U.S. Trustee's Office, had an opportunity to meet this morning with Mr. Van Arsdale and Mr. Whitehurst to talk about first day motions. Your Honor, we believe to all the major constituents in this case they have had as much notice as could reasonably be provided under the circumstances and what we believe to be adequate notice for the hearing on the matters we're going to put before the Court.

Your Honor, at this time I would like to move admission pro hac Gregg Galardi, Chris Dickerson, Ian Fredericks with Skadden Arps. They are admitted in jurisdictions which they practice and we believe well qualified to practice in this Court.

THE COURT: Admissions are approved. Welcome to the court.

MR. POLLACK: Your Honor, the people on the phone are having trouble hearing the speakers in the courtroom. I don't know if there is anything we can do about that, but we hear you fine.

THE COURT: Very good. I will see if we can't turn up the volume on the phone.

We have just moved into a new courtroom, new courthouse, and we don't have all of the audio systems installed yet. So we're still trying to get through that, but we will try to accommodate the people on the phone as much as we can. You may proceed.

MR. GALARDI: Your Honor, again, for the record, Gregg Galardi, with Skadden Arps on behalf of Circuit City. Your Honor, I don't know what your practice is to proceed -- I know there is a number of out of state counsel -- whether you would like to have those admission introductions before we proceed with these matters or wait until they stand up.

THE COURT: I think we can wait until they stand up because there may be people who want to speak to specific motions and not others. Do you want the people who are by telephone to identify themselves before we proceed with the hearing?

MR. GALARDI: That would be helpful, Your Honor.

THE COURT: At this point I would like to turn to the people participating by

telephonic hearing today and have each of you identify yourself.

Mr. Church, would you please identify yourself.

MR. CHURCH: Steven Church of Bloomberg News.

THE COURT: Mr. Pollack, would you please identify yourself?

MR. POLLACK: Good afternoon. David Pollack, Ballard Spahr and Ingersoll on behalf of certain landlords; also on the phone from our Washington office is Chuck Chotvacs, and I know Mr. Galardi can speak louder than he is.

THE COURT: Thank you. Ms. Graff, would you identify yourself?

MR. GRAFF: Actually, Your Honor, it's Mr. Graff --

THE COURT: I apologize.

MR. GRAFF: -- on behalf of (inaudible).

THE COURT: Mr. Branch, would you identify yourself?

MR. BRANCH: Good afternoon, Your Honor. Dustin Branch, Katten Muchin &

Rosenman, LLP, appearing on behalf of various landlords.

THE COURT: Mr. Hillman, would you identify yourself?

MR. HILLMAN: Yes, Your Honor. David Hillman of Schulte, Roth and Zable on behalf of Panasonic Corporation of North America.

THE COURT: All right. Thank you and Mr. McJunkin, can you identify ourselves?

MR. MCJUNKIN: John McJunkin, McKenna, Long and Aldridge. Along with me is Dan Carrigan. We represent Bethesda Softworks, LLC.

THE COURT: All right. Is there anybody on the phone that I have not mentioned?

MR. LUCIAN: Good morning -- good afternoon, Your Honor, John Lucian and Regina Kelbon from Blank Rome. We represent Verizon Wireless.

THE COURT: All right. Is there anybody else? All right. Thank you.

MR. GALARDI: Thank you, Your Honor, and I will try to speak up and not yell at

Mr. Pollack. Your Honor, we are here today with respect to the Circuit City filings, and what I would like to do is give Your Honor an introduction to why we are here, what the corporate structure is, and I have three handouts that we would make available to people if I might approach, Your Honor.

THE COURT: Certainly.

MR. GALARDI: Your Honor, just briefly by way of introduction, Circuit City was founded in 1949 here in Richmond. It is a public company with operation throughout the United States, Canada and Puerto Rico. What I have handed up to Your Honor is three documents, and as we go through today's hearings I find them -- hopefully they will be useful for a person to understand where we are. One is a DIP budget and one is also a timetable for where we see this case is going. The first document is the document that will show the debtors that have actually filed. You should have a document that has white blocks, sort of gray shade and a darker gray shade. The white blocks are the debtors, the shaded ones are non-debtors, and

then the dark ones are entities that actually filed in Canada today. We do commence CCAA proceedings.

Your Honor, Circuit City Stores is a publicly held company. It has gotten notice of delisting. It has -- everyone knows is a leading retailer of consumer electronics and currently operates over 700 stores throughout the United States, and it has a similar number of stores that it operates up in Canada. Today, as I said, they filed in Canada the CCAA proceeding under InterTan and another one of the companies that is on during this structure is Tormelay (Ph) Corporation filed a CCAA proceeding and actually sought and went over to the judge this morning. I understand we will hopefully have an order entered there they will approve. There is some interplay between orders and financing. We're hopeful that maybe before we finish today they will have an order entered in Canada with respect to the CCAA proceedings.

Your Honor, the revenues for year ending February 29, 2008, were approximately

12 billion dollars and employed nearly 40,000 people. Your Honor, unfortunately over the last two years they have had declining performance and in the last six months ending August 31st, as we reported, they have lost over 400 million dollars. Simply speaking, Your Honor, these losses are driven by two general factors. First, the decreasing margins in the company's operations. They receive less margins on their sales partially because they have chosen before to compete with the internet such as Amazon.com; therefore, in the stores they had lower margins competing with the internet. The second is simply they've lost foot traffic over the last two to three years resulting both from -- I would say general economic conditions are more pertinent perhaps today than two years ago but also customer dissatisfaction. After -- back in January of 2008 the company received notice from its largest shareholder they want to commence a proxy fight from Wattles Capital. In May the management agreed to reach an agreement with Wattles regarding the proxy fight and for

three new members for the board to be appointed. One is Mr. James Marcum, who currently serves as the acting president, and there were two other individuals who were designated to the board who served on the board through last night and are still on the board today. In addition, Your Honor, during that same period one of the complaints by the shareholders was that the company should be shopping itself and we received an offer from Blockbuster. The company hired Goldman Sachs to pursue that offer from Blockbuster. Unfortunately a transaction was never completed with Blockbuster. Goldman Sachs probably three, four or five weeks ago continued in its efforts to try to find TG partners, equity investors or other people to invest in the company. To date none of those activities have in fact come to fruition. Your Honor, after the proxy contest the company's financial performance continued to deteriorate. The current CEO at that time stepped down and Mr. Marcum, as I said, took on the position of acting president and chairman. Since September, although the

company had already initiated various restructuring efforts, at Mr. Marcum's direction the company has been aggressively pursuing various turnaround efforts. They have been well publicized in the media to note a few. First, the company has hired various restructuring professionals to help with the cash flows, to sort of monitor the business and monitor the checkbook and has been searching out alternative forms of financing. Second, the company began a new advertising campaign and initiatives to improve the customer's experience. It used to be the company competed with the internet, Amazon, and, as I mentioned, the margins were lower. So we have one low price now. We are not going as low as Amazon. It is very hard to compete with the internet when you have virtually more in the stores. The company is now one low price, same internet as in the stores, but it is hopefully a higher market product. They have also taken on great steps to try to give the customers a much better experience to try to get the customers back. Customer satisfaction is perhaps at an all

time low and they have addressed that. Those activities were announced and began in the month of -- the end of September and beginning of October. The company also took, as it announced in September, a look at all of its assets. In particular the company has had approximately 150 leases which they have not been operating in those stores for some period of time. On an annual basis they have therefore been paying approximately 40 million dollars of an annual rent on lease space that they have no longer been operating stores. Some of that was mitigated by the fact that there were a couple of peas in those facilities but none of the subleases were greater than the market rent. They had explored the opportunity to see if they could shop those leases. Unfortunately they were unable to do so. One of the motions, Your Honor, is to finally bring in for the payment of that amount and to reject those leases. In addition, Your Honor, they looked at a four-wall analysis, a very strict analysis of what of the stores that they had, at the time about 175 stores. What are the stores who

were best contributors? What markets were the best contributors on an economic analysis. They hired FTI, and FTI did a four-wall analysis, the company did an analysis of markets, and as a result of that the company determined it was best to close those stores and close those markets and no longer operate. Again, one of the topics for the motion, although we started that process prior to the filing, is to seek approval of the agent who is liquidating that inventory and ultimately continue those store closings. That is one of the motions, but that effort was undertaken, begun really in the beginning of October, and we will have testimony today, if Your Honor needs it, with respect to efforts to come to that agency agreement, how we came to that, why it is a fair agreement, what's the benefit of assuming it. But that was one of the efforts undertaken pre-filing again with the hopes to address our liquidity concerns.

Finally, I think, Your Honor, most familiar in people's mind, because it happened only last week, the company took a

painful step last Thursday and Friday to have a significant reduction in forces at corporate headquarters. The number is approximately 700 people in the company, let those people go last Thursday and Friday as was well covered in the press. Your Honor, during all of this process the company was soliciting offers, and Mr. Besanko can testify as well as the advisors today -- we can proffer or give their testimony. The company has been looking at talking with its current lenders lead by the agent Bank of America. The company currently has, and, again, a sign of a different time, a 1.3 billion dollar commitment financing from a group of about 17 lenders, very well-known retail lenders led by B of A, there's Wells Fargo, there's GE, and then depending upon whose bank is financing whose bank at any given time, there are other banks within that group. We started negotiations with them about both out of court financing in-court financing hoping to remain, again, out of court. The company and its professional advisors also went out and solicited a

subdebt. Your Honor may bring it up later, one of the draft papers mentioned -- there was a subdebt facility. We will tell the story about why we do not have that facility today. It is not that they walked away from us. It is that we walked away from them. We looked for subordinated debt and again trying to get and solve the liquidity problem. Notwithstanding the above, in light of the quarterly announcement that came out September 29th and the uncertainly in this market created both in the global market as well as the retail market, you can only read the newspapers and see the retailers many times, lenders became quite concerned about the company's financial help. As a result of this we are in the oddest time of the market for retailers, especially an electronics retailer, as we are building up our inventory right -- we should be building up our inventory. We are using more and more of our credit facility. Unfortunately, we would normally get increased trade terms or we would get a higher credit limit from our normal vendors, but given the market that was

going on and given the fact that there was press in our quarterly report announcement of 400 million dollars lost for six months ending on August 31, what we found happened is after September the company began to deteriorate its liquidity position primarily because, one, vendors were stopping trade terms and demanding cash in advance for shorter terms, and, two, unlike historical limits where we could increase our trade credit with respect to those lenders and therefore build our borrowing base and therefore have more liquidity, we were unable to do so because vendors were no longer willing to go at risk. Again, the traditional bankruptcy would merely remind that we would only take their money, file on January 1st that we were high and dry for the payrolls, and so they decided not -- at least we understand they decided not to continue to give credit support to the company. As a result of that and as a result we just couldn't get enough cost as fast as was necessary. We were required to come into court and seek a filing last night and in

particular with the support of Bank of America as it did the lending.

We have before Your Honor today various first day motions. What are we trying to establish in this filing? We read the press this morning, Your Honor, and there are experts that are saying, well, we will take the fate of the lending and things of every other retailer, we are going to liquidate. Actually, quite simply we are trying to emerge as a going concern and to do it in one of two ways, and we have very limited time as we talk through this process. We are trying to emerge as a going concern and there two ways that reach Chapter 11 allows us. One, a going concern based on a particular sale to all or part of the company. We can explain. It's just that continuation in a different form from Goldman Sachs. And, two, whether or not we can do this is to emerge with a standalone plan hopefully supported by vendors. As we set forth in the Besanko affidavit, and as Your Honor will hear as we go through the case, is prior to the filing -- again, Mr. Marcum took

trips to Korea to try to discuss with vendors whether they would support a vendor plan. And the simple message is, Your Honor, the company believes there is a competitive market out there to Best Buy. You don't have to compete with the internet. You provide a valuable service. And if we get vendor support sufficiently, you can have a second outlet for your goods. And there are many vendors that would be very much harmed should Circuit City go out of business. That's one avenue. And, two, though you have significant interest during the Goldman Sachs days, many of those buyers pointed to the fact that we have a real estate portfolio of 150 leases that were debt store leases. So we had a different footprint. So the opportunity provided by Section 363, an asset sale in bankruptcy, makes the company more attractive to those bidders. So, Your Honor, we really do hope we can accomplish a going concern and exit from bankruptcy, and we want to do it in very short time frame.

Your Honor, the second exhibit that I have handed up to Your Honor, again, it is

available to people to give you an idea of the time frame I think to try to set up the whole case before we go to the first day motions. Again, someone would look at our DIP facility and say, my God, they have to have a plan of reorganization done by March and they have to do this, that and the other thing.

THE COURT: That was the first thing that stuck out to me.

MR. GALARDI: Right, exactly. And why would anybody borrow so much money on such a short time frame? Unfortunately, I have done a number of retail cases, Your Honor, and I would like to blame this one on the banks but I really can't. It is the Bankruptcy Code that actually forces this situation, it seems to me, with the BAPCPA. Your Honor, in a traditional ABL loan what the ABL lenders are obviously concerned about is their primary collateral is the inventory in the stores. If your primary collateral is the inventory in the stores, you get an appraisal for inventory in the stores, and the appraisal is based on the simple fact if

you have to liquidate, an order of liquidation, how much can you get for that inventory over a certain period of time. That appraisal predicts essentially it will take 9 to 12 weeks to liquidate the inventory in the stores. If you take the timeline, Your Honor, then the bankruptcy code overlay of that is simply the following: as the debtor you have your first 120 days to assume or reject leases. You can get one extension for 90 days, and if you get the 210 days to assume or reject leases, you've got as long as you can get unless you get in this instance another 500 landlords to consent to further extensions. So what you have is if you take 210 days as the longest period, what you find -- and I now have three or four cases of this sort. Well, if you start backwards from 210 days and it takes three months to liquidate the inventory, well, that's seven months minus three months and you have a four month case because no retail debtor is going to start assuming leases until they know where they can exit because the obvious implication is you have now

converted the cure claims. You have to make administrative claims. So the time frame is really not set by, I think, the lenders, although I understand their concern and we would love to have more time. It is the Bankruptcy Code that really sets the 100, 210 days. So what you will see in a timetable that we have proposed is where we see a significant event over the course of this case, Your Honor, is though we have the first 120 days -- you have 120 days, you take three months. We have one month really to get a new order in this case. So we will be filing a motion which is not unheard of anymore but it may not be usual for retail cases to extend the 365(d)4 deadline the first month of this case because if we don't, then the lease reserves kick in. So you will notice the first real deadline here is by December 10th we will have to have an order that will allow us to go through the two to take advantage of the full 210 days. The landlords' counsel in the room have been with me before on these matters, Mr. Pollack and Mr. Hayes. They understand that's what we

will be doing and we will have a negotiation over that, but it is critical to these debtors that they get that extension and so we will have a hearing on that. In addition, Your Honor, the critical deadline is the utilities. A company that has this many leases has thousands and thousands of utilities. The Bankruptcy Code again has made it very difficult on retail companies because you have the choices of either put up and then get back or not put up. So what we've done, and we will talk about this in the first day motions, is we will make an offer but we really need a hearing on that first 30 days to have Your Honor set the adequate assurance of future performance. I know the gentleman who will probably be here from this area, Mr. Russ Jones, will send me my e-mail and tell me I won't accept this, and we understand we will have to deal with that but we normally resolve it. But that's another thing that puts an incredible burden on the retail lender. Again, the lenders now have stipulated this is not an uncommon deadline. They have actually given us in the

area of 40 days or 45 days to get the final order on the debt. So that is a very standard motion.

Again, Your Honor, as we go through the cash flows, the other requirement that you will see is we think we have sufficient liquidity, which was a hotly negotiated issue, to make it through Black Friday back through January, but there is a January 7th requirement that we obtain 75 million dollars in term loan debt, essentially a second lien facility to give us additional liquidity. As I see the case, Your Honor, we have a 60 day period, another 60 day period, and then we can maybe get to Christmas. That's really what we are looking for. So if you think of it this way, go through the Christmas period to January through electronic retailers and then you have to go through Super Bowl. So you have to get liquidity again, buy the goods to get through the Super Bowl, which is February 1st this year, to get us to March. We think that whether we to do this -- and it will be a topic of the motion -- to really get this subfacility with a lender such as

the one we mentioned in the first day papers, or another lender, or even a 363 purchaser, is a very likely possibility and we're hopeful. But, again, to get that kind of facility most people will want to see how did you do during Christmas. And so we thought it would be better not to take the first loan that we talked about because it wouldn't have gotten us to that point, but rather, again, with B of A's cooperation managed to secure a period of January 17th so we have what we think is a good 60 day period to do the sort of things we need. Your Honor, then the dates sort of fall in line because it will need to file a plan disclosure statement by March 1st. That's right within that four month time period I'm talking about. Indeed we think that it is not just that you file on but we will actually have to come into the court and be prepared to confirm a plan somewhere in that March 1st, March 15th period because when we resume the leases the leases will have to be assumed or effective or otherwise we face the next date which is March 15th which is the lease reserve date.

And what that essentially says is if you haven't come up with an exit for this bankruptcy case, then they are going to force us again to protect their collateral as their right to do, to send out informational packages, to liquidating it, to come up with a 363. It's a bridge to somewhere. That's how I see the case, a four month bridge to somewhere. Again, the last day on the calendar is simply Your Honor grants us that extension of the 90 days, then the date would actually run out on June 10th, and that's why three months later we need to get the leases determined.

Your Honor, moving off the calendar -- again, to see this case I think is to see it as two bridges. The first bridge is to give us enough time to solicit interest either from third parties or from the vendor community. The second thing, in July to hopefully come back to this Court with either a vendor supported plan, a vendor supported financing, which we have been starting negotiations with, or a subdebt facility from some other party or a subdebt facility from a

potential purchaser that will allow us to exit in the March time frame. That is the company's hope and goal for these cases.

Your Honor, moving then to the first day papers, I think we will just go in the order. What I have done is I -- hopefully this will be helpful to the Court and people in the courtroom. I handed out a one-page budget which I'm often teased about, but we hand out a one-page budget which will hopefully show the first 13 weeks of the case and will match up to the relief requested. If you think the print is small now it gets even smaller as I get longer in the case and then we will put it on two pages, but most people complain I can read small but I can read you very well. So it is easy for me to read the small print. Your Honor, just to give you a sense of this budget, we start on the week one and we said here -- we have said here we have broken it down essentially to mere operating expenses or cash flows which is an item two. The first item is a significant one, Your Honor. It is an assumption about how this market is going to

operate and comp store sales. Notice it is a scary number. It is off 35 percent. It is off 30 percent. It is off 25 percent. It is off 20 percent. So we think we have taken a conservative assumption, but no one can predict in this market and what people are saying about retail that even a negative 35, 30, 25 is conservative enough. And with a company this size there can be significant variation. But that is the assumption about our performance over this 13 week period. Importantly and not in here, Your Honor, is through the week of January 3rd we assumed absolutely no trade credit, CIA. It is our experience and hope to be able to negotiate trade credit and then beginning on the week, I think, of January 10th very little trade credit comes in because we hopefully will be in the negotiating phase and getting some trade credit.

The next -- in the cash flows then we have what I call the bankruptcy payments, and, Your Honor, those titles should seem familiar to the first day papers as we either -- each tagged to the amount of relief that

we sought in certain of our first day papers by way of any number of arguments, these doctrine of necessity secured claims, whatever, but they are broken down into customer practices, freighter shipping, insurance, mechanic's liens, foreign vendors, and then my favorite, the other one. And we will talk a little bit about the other, my pledge factor.

Your Honor, what I think is striking is the next column. It is a column that says how much is this DIP facility going to cost us, all in when you pay the professionals that negotiated it, when you pay the banks the fees and when you pay the lenders' counsel its fees, we have listed here 34 million dollars. Your Honor, it is actually probably two or three million dollars less, not more. So we're better. We did put in the number. We've done the calculations. It is probably closer to 30 million dollars over all. So as I said to my board, we said -- I want the Court to understand and I want you to understand we're paying 30 million dollars with 50 million dollars of additional

availability over this period of time. Now that's an oversimplification, but I think it is a stark point that Your Honor has to hear. Now we can give you all the other reasons why we're getting covenant relief, we're doing these things and that thing, but at the end of day we are putting in basic economics. You say I want to put 30 million dollars to get 50 to buy the bridge to an exit. We think it is all worth it because our alternatives are not, and, as the experts will testify by proffer or directly, there was no other option but to take this or liquidate, and liquidation was not good for anyone as we have determined.

Your Honor, next to the other budget -- and I point this out because we are not seeking approval of something of this budget, but I do want Your Honor to understand that there are two columns that will talk about -- under the other line there is employee termination cost and employee incentive plans. Your Honor, we are not seeking approval for any employee incentive plan today or any employee severance or other

costs. The employee motion as we go through it -- we stripped it down fairly significantly to pay the basics. We do believe we have one controversial issue that we pointed out in a revised motion that we will take up today. But other than that we think we have determined it. We are not paying severance right now. We're leaving all of that for the discretion committee to be formed. We are therefore only paying those expenses to be necessary and in all of our motions to avoid immediate and irreparable harm.

Then, Your Honor, we can see that the low balance as of today is about 756 million dollars. And that's an estimate. Your Honor, the DIP facility here is -- I don't think is unique anymore in the market, but it is one people can question in the following way: we are seeking -- whether you call it a first day role of the entire facility to convert into post petition debt or as you see it as a new facility taking out the old facility, the fact of the matter is if Your Honor approves that facility today,

the company will lose bankruptcy rights. It will lose its right to cram down, for example, or cram up the secured lenders. It will lose the right to reinstate those debts. It understands that. It is asking to take the full amount of loan, pay the loan down and then start going forward. The ironic part, Your Honor, and I think the media will pick this up but it's worth the finance, although we are reducing our commitment from 1.3 to 1.1 down to 900 eventually, we are actually increasing our availability. That's just the way an ABL loan works. If you don't have enough inventory and goods to get up to that cap, you are never going to borrow the 1.3. We don't have that. We are not going to get up to the 1.1 or the 900 as you see through this model. Nonetheless, what we have gotten to an advantage is we're able to use available collateral again through Bank of America the Canadian assets. So we get a better borrowing rate which gets us to greater liquidity which gets us to 50 million which we believe will get us to that January date. Again, we can also think of it simply

-- if we jettison all the stores we have jettisoned, you don't need a bigger facility to put in as much inventory. Again, that may be an after thought as to how you describe it. The fact of the matter is we don't have the capacity to borrow that. It is not a bad sign that we are losing our commitments or they are being reduced. It is an economic advantage for lenders and it's one of the quid pro quo for getting this many facilities, but I think the message here is we're getting additional availability.

Your Honor, again, at the very bottom of that budget -- I point this out because it becomes a topic of the first day papers -- you will see that we have put in what we call a utility reserve. As the code has changed through 366 there is a, you know, give the money, we come up with what I will say is a somewhat creative way of dealing with it by making an LC landlord and then they can come in and object and we'll resolve, which gets me back to my other budget. Your Honor, we have set the LC reserves as we said in the first day motions

by two weeks. And Your Honor knows as practice, most regulatory agencies say you can ask up to two months. Once you are a new debtor, if you have no credit history or if you have a credit history and it is a bad credit history, they ask for a two-month security deposit. The truth lies somewhere between two weeks and two months. Probably that other line frankly, Your Honor, is our ability to negotiate settlements at something between that two weeks and less than -- less than two months, far less than two months, hopefully at two weeks, and that's how we use the other line. So it is not that we have some slush fund to use. It would be part of the authority that we are seeking Your Honor to approve today.

Your Honor, I think that goes through the budget. Now, again, I will come back to the DIP, but I can move on to the basic first day papers if Your Honor would like to do so. Your Honor, I heard 24 motions. I think I lost count because I have an agenda that's 22. Maybe there is a couple of ad hocs of 24 -- okay. I'm not sure which

ones. So if I miss one, let me know where I am.

THE COURT: On the Court's calendar there were 23, but we have already taken care of one which was the motion for you to appear pro hac.

MR. GALARDI: Well, I'm glad that that one was granted, Your Honor. I think we can move. I didn't have my own appearance on -- I have not yet moved my pro hac vice. Your Honor, the next motion on the agenda is the motion under 105 to set an expedited hearing today. I don't know if Your Honor has approved that.

THE COURT: That is approved.

MR. GALARDI: Thank you. The next matter, Your Honor, is waiting requirements. It is the joint administration motion. Again, Mr. Besanko has set forth in the affidavit, as Your Honor can see from the corporate structure, each of the entities that filed affiliated in either direct or indirect subsidiary or wholly owned subsidiary. Your Honor, it is not subject to consolidation. It is very clear for

procedural purposes. I don't know if Your Honor has questions or need anymore information on that motion.

THE COURT: I have read the papers. I don't have any problems with it. It would be quite normal to proceed with it in this fashion.

Does any party present want to object to the joint administration? All right. That motion will be granted.

MR. GALARDI: Your Honor, the next motion is the motion to approve the application of a claims noticing agent. I don't think Your Honor's Court nor we would want to take on the noticing burden that will be here. We have sought to retain Kurtzman Carson Consultants. They have done many large cases for our firm and many other firms. They are listed in those matters. They do the claims. They do the noticing. They have a website. People can find out the claims. They will do the process of posting our papers, and then ultimately when we come to soliciting acceptance or a rejection of the plan of reorganization they will

hopefully serve as balloting agent for this purpose because they will have the claims and classifications. I don't know if Your Honor has questions about that motion.

THE COURT: Again, I reviewed the papers. I find them to be in order.

Does any party wish to speak in opposition to the motion? That motion will be granted.

MR. GALARDI: Your Honor, I'm now on number five, I believe, on my agenda. It is the motion for the debtors to set various notice of case management and administrative procedures. Your Honor, it is what I understand to be a fairly standard motion in this jurisdiction. I think the only thing that would need to be filled in, and maybe we can come back to this at a certain point, is dates for omnibus hearings would be set. I gave in part the calendar to sort of talk through that. I don't know if Your Honor's preference is whether to try to set those now or wait and come back to that at the end of the hearing. I think there is nothing else that's controversial in that motion. Unless

Your Honor has questions, I would ask to be granted.

THE COURT: Any parties want to speak in opposition of the motion? It will be granted.

Why don't we come back at the end of the hearing and set the dates because of some of the other motions we'll need to take into consideration when we set those dates.

MR. GALARDI: Thank you, Your Honor. Your Honor, the next motion is the debtor's motion. Again, these are administrative motions whereby they want to prepare a list of creditors and we will submit a formatting or mailing matrix, file a consolidated list. As the debtors we filed the 50 largest creditors. Again, KCC is in their matrix and sending the notices. I think it is fairly standard. We prepared the top list, and we will be filing schedules and statements against, again, with our aggressive schedules with plans and disclosure statement and then we set bar dates. We will be doing that as fast as we possibly can. We ask Your Honor to grant our motion number six.

THE COURT: That motion will be granted.

MR. GALARDI: Your Honor, moving down to number seven -- and I will now say I'm into what I'll call the business operation motions. Again, I think I sort of see these as going from administrative down to business operations, from fundamental to a little bit more controversial depending upon what jurisdiction you're in. Your Honor, the next motion is motion number seven. It really seeks four forms of relief. One is to authorize the company to continue using its existing bank accounts; two, is to use existing business forms, although it is hard to say in this internet age how much you actually have to check in the non-debtor possession but I'm sure we have some. So I think we sought to continue to use the stock. More importantly and the most important is it is actually required by the DIP which is to continue our cash management system in that payment, the checks and balance. We have a very complicated graph of disbursements. But essentially, Your Honor, all the money comes

in and goes out to Bank of America and it's re-lent all in the same day and goes out to the disbursement accounts. We have a number of separate disbursement accounts which will pay down the loan we borrowed again for the most part under this facility. Again, it is automated, electronic. The company, for example, can tell me one day or two days later, well, how are the sales going in those GOB stores. At the store's closing they can tell me the sales are up 200 percent. It would be very difficult for Mr. Besanko himself to try and change that. In addition, Your Honor, we have an intercompany that we would like to be able to pay some money out of the debtors estate and the banks have agreed to this to a Hong Kong facility intercompany. That is a servicing agent. It helps us to get contracts with our foreign vendors abroad that don't have -- that are not in this jurisdiction for doing business. It is a small amount of money. It is essentially to payroll for those people working there. Again, the banks have consented to that. It is money that goes out

of the system. We would ask Your Honor -- if Your Honor has questions about it, I don't think I can to tell you every bank account or every disbursement account, Your Honor, but I can tell you Mr. Besanko has control over those funds, understands where the funds flow. If we were in the treasury department, we would have to face substantial difficulties if we were actually to try to belie closing accounts, opening accounts and different accounts. It would also be a default under our DIP document and they are comfortable in our system. I don't know if Your Honor has any questions about that.

THE COURT: Any party wish to speak in opposition to this motion?

The Court did have one question with regards to the order that you sent us. Apparently what I would see as a typographical error as it appears on Page 6 at the bottom, paragraph nine is not finished in the form order that was submitted to the Court.

MR. GALARDI: I think we submitted a revised one for exactly that reason. We

noticed that this morning. What we can do is get you a copy of a new order and obviously Your Honor can review it, and if it meets Your Honor's approval we can submit that.

THE COURT: Thank you. With that change, that's approved.

MR. GALARDI: Your Honor, the next motion is a motion for interim and final orders of waiving of the investment and deposit requirements. Again, the Bankruptcy Code under Section 345 makes sure that we put our investments in safe investments. We -- ordinarily because we think that the banks are safe and generally in this instance because it is a very much revolving line, it's actually -- as I was talking with the U.S. Trustee -- don't believe it is really our money. It goes down and we borrow it. So it's really in their possession. Nonetheless, as the U.S. Trustee pointed out, Bank of America, Wachovia, I believe, were already collateralized companies. So to the extent we're going to get any relief on the interim relief we will -- we do in turn have to let the U.S. Trustee know about the bank

accounts. It is without prejudice for them to get comfortable that either they need these collateralization agreements or they don't, but I think on an interim basis they are content, and we'd ask for Your Honor to waive them on an interim basis and come back on a final hearing if someone should, in fact, object to our continuing to be free from the burden of 345.

THE COURT: Anybody wish to be heard on this motion? Okay. That will be granted on an interim basis. That would be one of the hearings, I assume, you will need to set as part of an ongoing series?

MR. GALARDI: Yes, Your Honor. As we now get into that, that's a perfect introduction to the next set of motions. Again, it is my understanding and generally my practice, Your Honor, that notwithstanding the fact that I haven't styled the rest of these first day motions where I have what I will call the bankruptcy payments, that notice being what it is is not absolutely perfect on one day. So -- and we have tried to reach out to people we think would be on

the committee. My understanding is there would be pretty much interim relief and we would probably talk with the U.S. Trustee again in the spirit of irreparable damage or harm notwithstanding the fact we are getting relief. What I would suggest with respect to relief -- and we will talk about each one. There is only one thing when it comes to the employee one that I would like that to be interim. Otherwise with respect to the motions, my understanding is it would be interim, it would change the orders out, it will send what I call a negative notice deadline. If you object, we'll come back to the first omnibus hearing. And if you don't object, it automatically goes final.

THE COURT: That would be the Court's preference.

MR. GALARDI: Okay. That will work because our budget, again, Your Honor, assumes the number of payments. Obviously we are not going to push all the money out because I know Your Honor has read this -- we are authorized but not directed to make all of these payments. So just because it is on

the budget we have a disbursement covenant. We want to make sure we satisfy that. There is not one's entitlement to any of this money. We will be negotiating as best we can, but I think it is a good way to have us come back to the Court again and put more fine print on it where we stood actually if someone wants to object to where the committee comes and says I don't think you should be making these payments which will not prejudice their right on a subsequent hearing. So with that said we can make the orders all have the kind of language that I said, the negative notice, and we'll talk about a date for objection and at the hearing if there is an objection we will come back. I think that makes the U.S. Trustee more comfortable, and I assume it makes the Court more comfortable.

THE COURT: It does.

MR. GALARDI: Your Honor, with respect to the employee motion, I think that a few things that want to -- one, I think it is a fairly standard motion with maybe two caveats. First, with respect to the

employees we seek to pay wages, salary and the ordinary health benefits. Your Honor, there is no one in this group that -- and our last payroll, I believe, went out -- it was either October 29th or 30th, and so, Your Honor, we are actually coming up on -- the next payroll would be next Wednesday. This Wednesday we will fund. There are no employees to our extent if you take the strict wage and salaries that are over the 10,950. So we are asking the approval of that. With respect to -- now if Your Honor takes also benefits, we have asked for a number of things which we think would be a hardship if Your Honor does not approve. In particular we have employees that are relocating. So we have asked for relocation expenses. We have asked for business expenses. If they didn't get in their Imex bill on time, it is a hardship to burden them with that. We are asking Your Honor to be able to reimburse them. We are asking Your Honor to reimburse -- we have the position -- their health cost, those, Your Honor, are fairly straight forward relief that we have

obtained in many courts. Let me say the hardships that we have put the employees on -- we have terminated with respect to retirees programs. We are not making payments to retirees given the financial budget that we have. It is just an unfortunate fact between paying retirees additional benefits versus having money to run the operation, which I have described as a 60 and not 120 day case. We've decided to terminate certain of those funds. In addition, Your Honor, we are seeking again for employment moral issues to continue the 401(k) match for the time being, the company's share of the 401(k) match. What we have stopped, Your Honor, and what we are going to encourage employees to make a decision about, we have a supplemental 401(k) program. The company has a match to that supplemental 401(k) program and the employees have to opt for tax benefits at the beginning of the year to continue to make those so they get tax benefits. Unfortunately, Your Honor, that's a funded plan that's in a Rabbi trust. I'm not sure if Your Honor understands that

that's subject to the claim of general creditors. So at the very least the company decided we will terminate -- we can do this fix -- terminate our contribution to that supplemental 401(k) as soon as possible, meaning today. With respect to the employees, unfortunately -- and we've tried to figure out how to stop them from making those contributions. We have decided to let them have that election to do that. However, that could have tax implications if they do so. So they will have to pick between paying money into a trust that will be subject to the claims of unsecured creditors or taking the tax implications. We tried to explain that to people but that was the best we can do under the plan, and so we have asked for authority and the board approved last night to give them that option. But what we also did, Your Honor, is we're not allowing them to make an election for 2009. That, we could do. So that will stop in 2009. It is just an unfortunate fact that you can't stop for the employees the contribution, but we will try to get them and tell them to advise their

tax advisor. That was one thing we terminated. We also terminated, Your Honor -- and this we can do -- is we terminated the company's stock purchase plan which the employees can do as a regular payroll. So instead -- and they elected to do this -- and, again, Your Honor, we are in a public company. So we can't simply say, before we filed, stop this, we have information. So we have done that because we don't -- unless the employee wants to go out in the market and buy the stock we think it is time to terminate that and not any longer have that. We have information that they don't have it and we don't want to have them deduct for payroll for future stock purchases. So we have terminated that. Your Honor, there is a list of programs that we have also changed. It is histrionically the case that the company has got -- the employees got paid time off, and if they left and they had paid time off, they would get that payment. We have changed the program such that if you leave the company you do not get a cash payment for the paid time off.

Again, it is an unfortunate fact, but given our liquidity situation we have decided to do that. That said, those people will still be able in the ordinary course of business to use their paid time off as if we had not filed Chapter 11. So if they have vacation time, and subject to the needs of the company, and they can take that time off, they can use it and be paid for that paid time off in the ordinary course. And the difference between paid time off and vacation is it just covers -- whether you have a family day or vacation day or sick day we don't ask the reason. We give you a certain amount of paid time off. Employees are still allowed to do that. Again, you just can't take the next month off. Obviously it is subject to the needs of the company. Your Honor, we have a severance plan which we have made no determination, but obviously, Your Honor, under the circumstances it would be difficult for us to get approval ultimately on a severance plan, but, again, I have put money in the budget to talk about what we are going to do. It is a committee issue, not a

today issue. So we have essentially punted a number of what I will call the other benefits for another date to come back without -- we reserve all rights to come back to the Court to ask for that.

That then brings us to probably the most unfortunate, controversial part of that motion. As I mentioned in my opening statement, Your Honor, on Thursday and Friday we terminated nearly 700 employees at the corporate level. Since it is a one location, Your Honor, we gave them a 60 days Warn Act notice. The Warn Act says you have to give notice and essentially your termination is effective 60 days before or you would have to pay the person back wages if you didn't get the notice. Again, we gave the notice saying you would be terminated 60 days hence. Notwithstanding that fact, Your Honor, there are two cases which we cited in our amended motion that have taken under BAPCPA the case that says -- well, under BAPCPA you're going to have to still show administrative expenses under 503(b)1, and clearly we have laid off these employees. We have no intention at the

present time to recall them just to work. It is a head count reduction. So I can't stand before Your Honor and say we are going to get a post petition benefit from those people in particular. The payroll that that accounts for is roughly 1.1 or 1.2 million dollars a week. Your Honor, based upon just general -- the mood at the company, the employee moral, the need in the community, the company determined after seeing that it had in fact this option, that we would still like to pay the payroll to those people for the next eight weeks. That said, Your Honor, as I described to the U.S. Trustee in that -- and one of the reasons that we think it is interim relief is we understand that there could be -- we're not going to be -- we will be supporting the employees to get them their wages. We don't have a severance plan as I mentioned. We sort of suspended it. At the very least, Your Honor, in thinking about it what we have decided to do is ask Your Honor to have the relief to continue next week the payroll. It would be one thing to send them home Thursday and Friday telling them you

have a paycheck coming and, oh, by the way, we filed on Monday morning and now you have no paycheck. I think that would be devastating to the community and devastating to the morale of the company. And after talking -- and again Mr. Besanko can testify to this -- we have asked for authority to continue the payroll. That payroll number is in our payroll numbers in the DIP budget. It is in every form of DIP budget that -- we haven't highlighted it as a separate line item but up in the operating expenses the payroll is there for the benefit of those people who have always been there. We happened to find a case that came out two and a half weeks ago that says we didn't have to do this, and, again, we have been working very hard with the employees to make sure this is a smooth landing. Indeed they were very encouraged, notwithstanding being laid off, and frankly very positive about the company and the steps the company took. So we just couldn't see a good reason other than saving money, but it is a significant amount of money, other than to pay them. So with

that we would ask Your Honor, again, on this one part of the relief, that Your Honor approve that we continue to pay the payroll, but, again, it could be visited by the committee two, three weeks from now and if the committee wants to object to it, we will defend it and they will be the person objecting to so we can do the payroll.

THE COURT: That would be retroactive relief. That would be continuing it out through the Warn Act period?

MR. GALARDI: Correct, Your Honor. Again, our view would be, you know, see it as a two week notice sort of provision. That's the worst it would be if they got cut off. Again, the company feels strongly that we should have the eight weeks and it should be a moral issue. Again, to put it in further context we have the store closings. We are giving people warn notice there. They just happened -- they got the notice prebankruptcy but they are still working post bankruptcy. So they are going to get the 60 days in any event because the case doesn't really apply. They have provided a benefit and the

termination does not. So there will be disparate treatment of our employees. So just because we could not have them not operate the store, it all seems unfair to us do that. So, again, the company felt very strongly, and Mr. Besanko is in the courtroom, could talk about the employee moral in those matters, but we have sought that relief. Again, at the very least we would like to come back on an interim basis and let the committee look at it. We didn't think it was fair to ask for the full relief but the company's intention is to pursue the entire eight weeks.

THE COURT: All right. Very good. Does any party wish to speak in opposition to this motion? All right. The motion will be granted and the Court will -- with the proviso that the terminated 700 employees -- that would be on an interim basis to give the community an opportunity to come in and object if they wish to do so.

MR. GALARDI: Your Honor, what I think we will do is we will do an employee order and make it specific. I think we call

them the warned employees in our motion. So we will say interim relief with respect to the Warn Act and you will have X period of time to object to that and we will come back and set a hearing. I don't want the rest of the employees stuff to be seen. Again, they have --

THE COURT: I understand exactly what you are saying. That will be -- that's not interim relief. That is -- it will be approved today.

MR. GALARDI: Thank you, Your Honor. Your Honor, the next matter is a fairly standard motion to pay prepetition sales use and trust fund taxes. Again, there are disputes as to whether these are priority claims, whether secured claims, whether they are even property of the estate. The U.S. Trustee's Office wants us to pay our taxes. Most people want us to pay our taxes. We don't want to incur any interest or other payments on it. Again, a lot of it is not even property of the estate. We seek the relief, Your Honor. It is basically up in our standard operating expenses. It is more

of an accident of timing than it is that we have not paid these things at any given time. It would be hard to decipher what is pre and post, and we would ask Your Honor to approve our continuation of plain sales, use and trust fund taxes. Again, there are often personal liabilities associated with failure to pay them. If you don't pay them, there is also an administrative issue at the end of the case if you've left them out for such a long period of time. We rather not face those issues. They are secured. They are priority. So we would ask Your Honor to approve the sales use and pay trust fund taxes.

THE COURT: That motion will be granted.

MR. GALARDI: Your Honor, we now get to my procedural motion that is with respect to Section 366. Your Honor, as I described at the outset the company obviously has 700 and some stores. We are seeking relief with respect to the utilities. Under Section 366 as amended the process is essentially that the debtors have to make a proposal within a

certain period of time. I believe it is 20 days. Then what a utility can do is say is, no, I don't like that proposal, and then you have to give the utility -- if you haven't resolved that issue on the 30th day, you have to give the utility what it requests. To take account of that and not have all the money go out the door and have to pull it back and have all of those fights, what we have to devise is a motion which has been approved in number of jurisdiction whereby we set up first day and we say here's what we are prepared to give the utilities. We are prepared to give the utilities the right to a blocked account at the Bank of America that is a separate, segregated fund of 5 million dollars. We give them a form very much styled in a letter of credit form that says we say you're in default. We draw the amount. Bank of America, just like an LC, has to not inquire whatsoever. Whether there's a default or there is not, it pays it. We then, like a wrongful draw on an LC, we would go back and say now that was wrong but then our dispute is with the utility if

they make that wrongful draw. We think that amount of fund, two weeks for all of the utilities at 5 million dollars, is significant. So we think we have given them adequate protection. It is the other security element of 366. Notwithstanding that, Your Honor, they don't have to accept it and that's what 366 says. So what we try to do is to say, okay, if you don't have to accept it, we need you to come in and tell us what form of your security we would like. We set a deadline to do so and we ask Your Honor to have a hearing before that 30th day so that we can resolve it. Again, money doesn't go out the door only to come back in because, Your Honor, if that's two weeks and you really need two months, you are talking 20 million dollars and that puts this case into no availability in the first weeks. Also, Your Honor, we have 155 stores and we have to pay utilities to all of them and we have to be out of them by the end of December. We've paid them in advance for all of those months and then we have to come back. So we'd like to deal with that one on one. We don't think

that this prejudices the utilities because they still have all of the state law rights and they can still ask for two months, and, Your Honor, it sounds like we'll have thousands and thousands of utilities here on the 29th. Generally speaking we have resolved all of these with respect to stipulations. We seek the authority to do that. And as I said, Your Honor, in all candor we have an other line which where we do exactly that and we can negotiate. We want to keep it to two weeks. We may in certain instances do more. We may in certain instances try to do less if we find out, but we don't need to give utility deposits or if we could use old security deposits in the close of stores. So we would like to have the authority to implement that procedure without prejudice to the utility companies coming in and acting on their rights. I can give you what they will say in response to this. They will say never got a receipt. And we'll have those arguments but we generally have resolved it, and I think it is generally a procedural motion to get us

through 29 days from now.

THE COURT: Does any party wish to speak in opposition to this motion? Mr. Johnson.

MR. JOHNSON: Your Honor, Russell Johnson here on behalf of Virginia Power and several Virginia entities, Duke Energy, several energies, Progress Energy, Consolidated Energy Company of New York, and several northeast utility companies. Our -- I don't disagree that the debtors need procedures here. It is a big case and a lot of utilities. Essentially a few arguments. One a legal argument and one procedural. With respect to the motion to the procedural objection I have, Your Honor, is that I think there should be an objection deadline. This procedural -- we make a request, they get to look at it and decide whether or not it is okay, and then three days before the hearing they'll let us know whether or not it is okay and then there will be a hearing. I just don't think that is really what's proper. I think we should be able to object to this motion to procedures that are set forth and

still be heard before the 30th day. I think if we're going to have a hearing before the 30th day I think that's fine. I don't have a problem with them seeking these procedures but I think my client should have the right to object to them. There is nothing in this. This is a final order that basically says these are the procedures, you have filed them, and for some unfortunate utilities that don't get this notice or get it too late they will be forever barred from seeking adequate assurance. I think that's improper as well. I'm only representing my client that are actually here. So, Your Honor, I would request that there be some deadline, maybe 10 days before the hearing date, that we can object to these procedures. I haven't had a chance to read through the whole thing. I tried to digest as quickly as I can to get a lot of the notice of this hearing this morning. So that's the first issue.

The legal issue, Your Honor, is essentially the debtors are here under Section 363(c)3. They are under the provision that says they can modify the

adequate assurance of the utilities as deemed satisfactory under (c)2. That's fine. That's what they are here for. If you go back to (c)2, my client -- we don't want a segregated deposit fund. That's not what we would choose as the form of adequate assurance. My clients would want a cash deposit as the form. So we don't think that the debtors have the ability to modify the form. My clients would be asking for cash deposit, and all the 366(c)3 allows them to modify is the amount. It says very specifically in there that they can modify the amount of the (c)2 deposit. It does not allow them to modify the form. So my clients would be fine accepting a two week or 15 day, whatever it is that they are proposing, cash deposit to tide this over until the matter is heard, whatever the 29th or 30th day is whenever the Court can schedule a final hearing. We don't want this segregated account which may or may not be there at some day in the future. They even put it in their motion whether or not they are going to be able to fund this thing. So we want the

actual cash to tide us over because that is the type of adequate assurance we would request.

THE COURT: Let me see if I understand. We are still dealing with 366(b) thought, right? All 366(c) is doing is defining some of the terms for purposes of figuring out what's adequate assurance payment under 366(b).

MR. JOHNSON: No. A chapter 11 case like this it is really all 366(c).

THE COURT: I understand the procedures in 366(c). Didn't we have the same liquidity in the Rowe case.

MR. JOHNSON: Well, Rowe was a cash deposit.

THE COURT: I understand. What you are objecting to is that it shouldn't be a draw for the most part on the letter of credit.

MR. JOHNSON: It would be better if there's a letter of credit than a segregated bank account.

THE COURT: That's the way it is set up for block account so the reserve is there

under the --

MR. JOHNSON: Well, they still have financing. If they lose financing, the segregated account presumably would be gone as well. There is nothing said about that, but I have to assume -- if they lost financing or have a reduction in financing, what will happen to that segregated account? That has not been made clear in the motion. That's why we would prefer to have cash until this matter is heard on the 29th or 30th, whatever day the Court schedules for this.

THE COURT: All right. And tell me, as I'm a little bit unsure about your first objection to the procedures, what is it procedurally that you want to object to? You don't like the fact that they are making the offer and you have to then have a counteroffer or do you want to object to them being able to establish a procedure on first day motion?

MR. JOHNSON: The objection would be to the entire motion which would be, one, that a segregated account can't be the proper form of adequate assurance. It's got to be

cash. That would be the first thing we would like to object to, which we all have the opportunity. This is the final order on the first day of the case that they are proposing that then sets -- requests the utilities have to send these requests to all of these various folks that have all of these things in it. We would send requests for charts and account information with things like that anyway. I think this goes over the top of all the stuff they are asking in there, but then they can get a period of time where they have to look at it. Because we have five days before this determination, five business days prior, and then three business days prior they have to respond to us letting us know whether or not they agree with our adequate assurance requests and then the matter gets heard. That seems like a pretty crazy timetable. We would like to have an objection out there and have this Court hear our objection on all of these procedures and not have to wait and give them some request and if we don't give them the request by the proper time and deemed to have waived it. I

just don't think that we should have to fit into that whole thing and comply with their procedures which aren't even set forth in the statute. The statute doesn't provide for these procedures. The statute says we make a request or they can, you know, make a request but -- and they can move to modify. That's all the statute provides. And I don't have a problem, as I said, with this matter being heard before the 30th day, but I certainly want it to be heard before the 30th day with a final hearing on what their Section 366(c)3 motion seeking to modify our request would be. I think this throws the whole thing out. If we make a request, we're -- what pleading do we have before the Court? We don't have any pleading before the Court at all. We have a request that we sent to them and then we will be back before this Court if we don't agree on the request that we sent. We have no pleas, we have nothing before the Court at all under these procedures. The final order is being entered, we get to send some request, and then there is a hearing.

THE COURT: All right. Thank you.

MR. GALARDI: Your Honor, two responses. First, I have no problem if everyone of Mr. Johnson's clients are carved out from this motion, and the reason I have no problem is that I don't need a procedure for them because the Bankruptcy Code -- all we're trying to do is actually jump the gun for the Bankruptcy Code because you start with (b), and what (b) says is that a utility can terminate service or discontinue if within 20 days after the day of order of relief we don't furnish adequate assurance of payment in the form of a deposit or other security. We're not 20 days now. I don't need this procedure. I'm trying to jump the gun to give people something. So if every one of his clients wants to step out of this procedure, I will write an order today that Mr. Johnson's clients don't have to comply. He doesn't want that. He wants his money now. The problem with that is the code doesn't say he gets his money now. What it says is if after 20 days I make an offer of form of security -- and we're basically saying we're making an offer and here it is

two weeks. 6(i) in (c)1(a) says other forms of security that's mutually agreeable. We know Mr. Johnson. I know him from good cases. He's not going to find it acceptable. So what does the Bankruptcy Code say? Well, in that instance you either get to an agreement, now we're in (c)2, in 30 days or they can terminate. Fine. Then what we do is after the 30 days is a (c)3 when we come back. What we're trying to get here is before the 30 days so we can't terminate. So I have two solutions. One, let's just carve him out. A procedural objection is therefore relevant. He wants to take an appeal on this kind of order. He's always wanted to do that. So let's carve him out, he's not applicable, and he can make an offer individually and he can accept it or not. And as long as we agree, and I think he stood up here and said 29 days is fine, let's just schedule a hearing on his request for day 29 and he's carved that out of the motion and that objection is resolved.

THE COURT: Mr. Johnson, does that resolve your objection?

MR. JOHNSON: Yes. I love the extra commentary, Judge. But, yes. So carve us out here on the 29th day of whatever schedule you have is fine.

THE COURT: To make sure you stay, we're going to schedule those dates at the conclusion of this hearing.

MR. JOHNSON: I'm here for another client as well.

MR. GALARDI: Can I just ask that he put the name of his clients on the record.

MR. JOHNSON: Yes. Progress Energy in Florida, Progress Energy in Carolina, Dominion Virginia Power, Dominion East Ohio, Dominion North Carolina Power, Dominion Peoples, Dominion Hope, the Consolidated Edison Company of New York, Yankee Gas Services Company, Public Services of New Hampshire, Connecticut Light and Power, Western Massachusetts Electric, Duke Energy Carolinas, Duke Energy Kentucky, Duke Energy Indiana and Duke Energy Ohio. I think that's all.

THE COURT: Thank you, sir.

MR. GALARDI: And with respect to

that, Your Honor, at the same time I think our order provides that once he's carved out then we can reduce the 5 million dollars by two weeks for each of those utilities so the five million will come down and there will be no reserve for any of those clients.

THE COURT: That's how I understand it to work as well. The motion with that adjustment will be approved.

MR. GALARDI: Thank you, Your Honor. Your Honor, the next matter -- and I'm glad he's in Virginia and we can do that the first day instead of coming back for a hearing. Number 12, Your Honor, is the next motion up. It is debtors' motion for an order authorizing the continuation of certain customer practices. Your Honor, most of the obligations that we have are not cash obligations. There's the gift cards. There's the warranties. So there is no number in our budget for that, but obviously we could technically under the Bankruptcy Code say today, sorry you have your gift card and you can't collect. You come buy goods with it. You're not going to get a refund.

You're not going to get a warranty. Obviously we're trying to reorganize. Maybe if we were liquidating the first day, that would be the smartest relief. In order to make -- as I said in the introduction, to get customers back in the store, to have the foot traffic, to get the margins, we simply have to honor those things. The only cash number other than honoring those kinds of things, which are warranties which are often provided by third parties, is the one we have -- we have a weekly refund that we occasionally have. And so we're on budget for customer practices. You will see a 1.1 million dollar number each week. I can't say that that's a hundred percent accurate of the refund we took up a model what it is during this period. We would like to be able to refund people's money if they are not happy with Circuit City goods. We think it is critical to the business to have customer satisfaction as I have said in the introduction. As Mr. Besanko will testify, one of the issues we have is a very low customer satisfaction, and our job now is to bring the customers back in

foot traffic. We think it is critical to the operation of the business. I don't know if you'd like to hear testimony from Mr. Besanko on this or any of the other people I have available, but we would ask Your Honor to approve the customer practices.

THE COURT: Any party wish to speak in opposition of this motion? All right. This motion will be approved.

MR. GALARDI: Thank you. Your Honor, I am now up to item number 13 on the agenda, which again is the prepetition relief. It's prepetition shipping and delivery charges. Obviously with goods going across the country through all sorts of shippers and vendors, many goods will be caught up currently in transit. We may owe a certain amount of shippers amounts of money. Sometimes we get letters from those shippers that we are not going to deliver those goods. We are going to essentially get a warehouse lien or other lien on those goods if you don't pay us either the prepetition amount or some amount. We are not going to deliver those goods. What this motion says is we

estimate there could be as much as 10 million dollars in transit or prepetition amounts that we might not receive goods. We believe that we would only pay these goods -- and this again is in our discretion -- only if those shippers are owed less than the value of goods we can sell at retail. So we have said that we could owe as much as 10 million dollars of prepetition freight. We would ask Your Honor to approve that we could make such payments. Although we can sue people on state violations and all sorts of things, it's probably more expensive and more time assuming and too devastating to stand up on those bankruptcy rights. So we would ask Your Honor to approve our ability to pay in our discretion up to 10 million dollars to prepetition freight to secure this.

THE COURT: Any party wish to speak in opposition to this motion? It will be granted.

MR. GALARDI: Your Honor, the next matter on my agenda is item number 14. Again, in the normal course of business the company has various contractors building

parts of the stores, modifying parts of the stores, modifying the heating and the HVAC systems in the stores. Your Honor, as things became tight we began to not pay people as often or frequently as they may like. We had filed approximately about 1 million dollars worth of already mechanic's liens that we know of, plus when we looked at our system there's probably as much as 5 or 6 million dollars of potential secret liens, mechanic's liens, contractors' liens that could be filed. So we have sought here again authority to be able to relieve ourselves of those liens in the amount of $6,500,000. Again, as we sit here today we've got notice of 1 million dollars. We're not going to pay people if they don't file their liens. We are not going to pay those people if they are not valid, not perfected, but, again, if we do have valid protected liens, rather than litigate they are secured claims. We don't need to have the interest charges. We ask Your Honor to allow us to pay those even though they are prepetition claims but they would be secured by state law liens or

otherwise and we would have to pay them by the end of the day and we would ask Your Honor to approve the authority to up 6.5 million dollars. Again, all of these are interim relief. We can come back if we have an opposition to it. It is only what we would have to pay in the meantime and it is close to 6.5 million dollars.

THE COURT: Does any party wish to speak in opposition to this motion? It's granted.

MR. GALARDI: Your Honor, the next matter on the agenda is a motion to pay various foreign vendors. Your Honor, we clearly have a lot of foreign names in various pool. We have the Samsungs, the Sonys, the LGs. That's not who we are seeking to pay through these motions. Instead, we are seeking to pay those people who are foreign vendors that are not subject to the jurisdiction of the Court and enforcement of the automatic stay and whose goods we actually need. And with respect that, Your Honor, again, we do have such vendors. We are asking the authority to pay

up to 6.5 million dollars to those vendors. At the present time we don't know exactly how much is exactly being demanded. What we are doing again is we don't have a critical vendor motion here today and this is our way of dealing with what we think are essentially critical foreign vendors that we can't incur stay violations, we can't get the goods, and in the discretion of the management think that we need to get those goods. A lot of these vendors often have documents and we have fees remaining to pay cash at this point to receive those goods, and, again, going into Black Friday to the extent that we can get these goods in we think it is essential to our reorganization efforts, and so under the Bankruptcy Code although they are prepetition they are not secure. We would ask Your Honor to pay foreign vendors up to the same, 6.5 million dollars.

THE COURT: Anyone wishes to speak in opposition to this motion? It will be granted.

MR. GALARDI: Your Honor, the next on the agenda is number 16 which is our

motion to continue our insurance policies and all insurance policies, including DNO insurance policies. Your Honor, with respect to the insurance we think that we are up to date and all premiums are paid for the prepetition period. I don't know of insurance companies that actually ever bill in arrears. In fact, they usually front load it in the period. Nonetheless, to give them comfort that we have the money to pay we want the authority. As to insurance in general we believe it is ordinary course type of payment. We probably don't need authority but it is always good to grant this sort of authority. Your Honor, to be candid, we have the DNO policy. That's fortunate or unfortunate would be -- we are in negotiations with them December 1st terminating obviously. Keeping the board and having people available to us is critical. I have had a lot of experiences. I expect insurance companies under the circumstances will probably raise our premiums but we wanted to come into court to let you know that we are in fact negotiating it. We do a

big number of this budget of 9 million dollars. We are hoping that we can do much less than that, Your Honor, but to keep our board, to keep the management and everyone operating and to feel comfortable with their responsibilities and not to be concerned, we do think it is an ordinary course. We will try to keep the number as low as possible. As I have explained to the board at times, you know, once you're in bankruptcy Your Honor determines the outside of the ordinary course and whether it is appropriate. It is really the tail period and what's going to happen here, and to keep the people who have been most familiar with the company and management we think it is essential to approve our being able to negotiate in good faith the lowest possible premium to secure the insurance the company has historically had.

THE COURT: I agree. I think it is ordinary course. I will certainly grant this motion.

MR. GALARDI: Thank you. Your Honor, the next one is, again, somewhat of a

procedural motion that we use. It gives us some help with respect to vendors. It is a motion seeking four forms of relief. The first form of relief is just confirm that if somebody has goods in transit and they deliver them post petition they will be paid for those goods post petition. It is a benefit to the estate. It is a 503(b)1, but in many times in my experience that people call -- if I deliver these goods today am I going to get paid for them? It is almost a comfort order for the average person. Here's the order. See the title. The Judge says we can pay this. We've already gotten calls today from vendors saying, how do I know you're going to pay me tomorrow? How do I know you have the authority to pay me tomorrow? This order solves that problem and we think it is an abundance of caution relief. The second part of this is to say we pay in the ordinary course. The third is if we get goods that we want to return -- and again it has to be something we want to return. There are buckets I believe in the facility that says you can't just return

anything. But if it is really stuff that's better to return, we want authority to return. And finally we established essentially a notice procedure for people to file reclamation claims. It is not really procedure in the sense of paying and reconciling it. It is just confirming that you have to give us the demand under the Bankruptcy Code in 20 days. We reserve all of our rights. You reserve all of your rights. It does not preclude people from coming in. If they want to get TRO and injunction in an adversary proceeding, it doesn't preclude them from doing it. We are reserving all of our rights for defenses, but it is a way that we can set procedures for them to file it and then start to gather these claims.

Why is it important to the debtors at this time really leads into the next motion is that we need to -- actually it is another motion, 503(b)9. There's an interplay as Your Honor knows from BAPCPA between reclamation claims and 503(b)9 claims. 503(b)9 claims are not really

perfect reclamation claims. They're within the 20 days as opposed to the 45 days. Those are all constituting the administrative claims and secure claims that we have to address. Given the time frame in which we are trying to run this case we think it is very advantageous to have bar dates immediately with respect to periods so we can start to gather the information to formulate a plan and what we would have to do to exit. We would ask Your Honor to approve it. I know there is a gentleman in the courtroom that has a warehouse, and what we have agreed is that -- and this will go to the other motion. We are not going to return his goods in that sense. He keeps his lien to the extent he has a lien and we've discussed the relief and this is not trying to change any of his rights whether he has a warehouse lien or another property in that. I don't know if there is anybody else that concern about this motion.

THE COURT: Does anybody wish to speak to this motion?

MR. ENGLANDER: Yes, Your Honor.

Good afternoon. Brad Englander. I represent Alliance Entertainment Corporation Source Interlink Media, LLC. My clients basically supply CDs, DVDs to the debtor and all their stores and other related merchandise. Some of what my clients do is sell products. Some of it is warehouse products and provide for fulfillment services. I don't think we have an opposition to the motion itself. I think we have very little opportunity to review the form of the order. I understand from Mr. Galardi's comments that there is an opportunity still to object to these orders being entered on an interim basis and that there is not an attempt here to deprive us in connection with the return provision, in particular substantive rights that are available under applicable documents not bankruptcy law or bankruptcy code. So we don't oppose the entry of the order if in fact it is still subject to some sort of an objection period and we can work with the debtor to develop some language that gets us a comfort level.

THE COURT: That was certainly my

understanding being entered on an interim basis until such time we can get any objections resolved, and it's also my understanding or at least my interpretation what was being asked for is really to confirm basically what is in the bankruptcy code and really not anything -- any additional substantive rights?

MR. ENGLANDER: I think mostly that's correct, and I think that's what the intent is. We have concerns whether some language in particular dealing with return rights might leave out protections the Bankruptcy Code provides us, but I think we will be able to work through that.

THE COURT: Very good. Thank you.

MR. GALARDI: And, Your Honor, I can affirm I think it is the Bankruptcy Code. The only language I've ever had objected to is sometimes people had goods returned to them objected and they actually have to accept the goods, and our language may be a little ambiguous on that point. But, again, we can make that in terms of we can resolve it, and we are not trying to do anything but

to get an order to shippers to deliver goods.

THE COURT: Very good. On that basis the Court will approve the motion.

MR. CARRIGAN: Your Honor, this Daniel Carrigan from McKenna, Long and Aldridge on behalf of the Bethesda Office, LLC, one of the debtors vendors. I apologize to the Court and counsel. I was unable to hear a good bit of what Mr. Englander and the other gentleman had to say. I suspect we will come out in the same place, but if I may, Your Honor, may I outline some of the things we think need to be addressed in connection with this motion.

THE COURT: You may.

MR. CARRIGAN: Thank you, Your Honor. The paragraph two of the proposed order indicates that the vendors shall have administrative expense claims with the appropriate priority. However, paragraph three says -- and I'm not sure whether this is contrary to counsel for the debtor had to say -- but they are authorized but not obligated to pay the undisputed obligation arising from post petition shipment for

delivery of goods, and that would be something that on a final basis would have to be addressed. Secondly, in connection with the provisions for the reclamation claims and the 503(b)9 claims the paragraph -- I think proposed paragraph 5(d) indicates that in the event the debtors and the reclamation creditors agree upon and allow reclamation amounts, the debtors would be authorized to make payments or be required to return the goods sought to be reclaimed. If this is too far down the line, the notion of an actual return of goods is going to be -- or goods the vendor wants to get back is going to be somewhat illusionary. So if there is a relatively short time between -- and the time there's a hearing perhaps on an interim basis, it would work, but we would ask it is not a license for the debtor to do whatever it wants with products in the interim that would be outside applicable law.

THE COURT: All right. Very good. The Court was going to approve the order on an interim basis so that these types of objections could be made. And I suppose we

would do that within the next 30 days.

MR. GALARDI: Your Honor, I was thinking that all of the ones that are on interim would be the first time which is hopefully in the next 30 days. So I have no objection to that.

THE COURT: Were you able to hear that?

MR. CARRIGAN: No, Your Honor, I was not.

THE COURT: We will set that -- we will approve the motion on an interim basis reserving your objections as you have outlined them, and we have that hearing at the next omnibus hearing date which would be within the next 30 days. We will set those dates at the end of this hearing.

MR. CARRIGAN: We understand. Thank you, Your Honor.

THE COURT: Thank you.

MR. GALARDI: Your Honor, I would ask now to move out because they are related and I looked down and I guess my agenda got changed. If we can move to item 21, which is really the motion to procedures with respect

to 503(b)9 claims. I think it is fairly straightforward, Your Honor, and it is a procedure that we have adopted. As Your Honor is aware, the BAPCPA changed the Bankruptcy Code to provide the claims for goods delivered to the debtor in the 20 days prior to the bankruptcy that a person may seek to file an administrative claim under 503(b)9. Your Honor, again, it is a very significant change to the Bankruptcy Code because it sets up administrative expenses that would have to be paid to exit bankruptcy because a 503(b)9 claim is a 507(a)2 claim which then has to be paid under 1129(a)9. I like giving all of those numbers. Your Honor, it is important to us to set a bar date for that and to give out a proof of claim form so we do not let those linger. In addition, because of the language the cases unfold, especially with a retail debtor, you have the overlay of 526 and I have to be litigating whether 502(d) is applicable, whether you can then use a preference defense to various circuits. These are all initiatives. And it is just helpful to get a

bar date set for all of these so we can sort of say, well, if you didn't get your reclamation, congress changed that. I understand what the gentleman said, but congress changed it. Their only right right now, unlike the old code, is to take back the goods as secure credit. It is no longer about administrative claims they used to get. This gives us administrative claims. If you fail to do certain things, gives you proper demand but it is in a 20 day window. For those reasons, Your Honor, we would like to establish the bar date set for in that motion for people filing 503(b)9 claims. We don't think it's a hardship that -- they can probably calculate what they believed they delivered in the last 20 days and file a proof of claim. I think we have given 30 days as we've requested. We will give notice out to people, including a form of order to our vendors and ask that they file a proof of claim within 30 days of the entry of the order for 503(b)9. I know the official proof of claim form says you don't have to file administrative claims for post petition

claims but it still constitutes that you can use administrative claims for prepetition period. I don't know if that was intentional or just an action that happened to work for us. So we basically take that form and give them a proof of claim form that says 503(b)9. It is actually 30 days to a date of service of the bar date. That's what we ask for, Your Honor. And we think that will help coordinate in all the work we have to do in the first 60 days in this case to understand what kind of financing we need to make a hurdle in that 60 days to 120 days I mentioned early on.

THE COURT: Any parties wish to speak in opposition of this motion? All right. That will be approved.

MR. GALARDI: And that was item 21, Your Honor,

MR. CARRIGAN: Your Honor, excuse me. I'm sorry. This is Dan Carrigan again. I hate to be the left wing in this discussion. May I be heard on this, please?

THE COURT: Yes, you may. This son setting a bar date on reclamation claims.

MR. GALARDI: On 503(b)9.

THE COURT: 503(b)9 claims. I'm sorry. Thank you.

MR. CARRIGAN: Yes, Your Honor. There are probably a fair number of reclamation creditors who are out there who from past experience in the courts in Delaware and New York and Florida that we found that the negotiation of the terms of the parties -- while we have no objection to setting one and getting it under way, and we're not trying to be obstructionists and be a problem, I think my client and we would like to be helpful in this. I think counsel for the debtor referred to it as lets get a vendor before we're planning all of this and we would as well as soon as possible. But perhaps the way to do this would be to give people an opportunity -- set the bar date but give opportunities to folks, reclamation creditors in particular, and then perhaps even an ad hoc group or official committee to come in and ask for modification or changes without prejudice at this stage instead of being stuck with what I'm hearing is most

people have not had the opportunity to review.

THE COURT: I don't know if I understand your objection. Are you saying that you don't think there should be a bar date or do you say that the bar date being suggested here is an unreasonable bar date?

MR. CARRIGAN: No, Your Honor. We agree that there ought to be a bar date. We don't have an objection to setting one out in the future, but as to the terms how the reclamation claims are established or not established, burden of proof and all that sort of thing, those sorts of things are also addressed in the bar date order, and that all we are suggesting is those terms, not the bar date itself, but the terms ought to be open for some review and discussion before they're fixed at the only way to get a reclamation claim established. I'm sorry, 503(b)9 established. So there could be a short period during which this would be sent out, and if you have problems with the form and if nobody objects or nobody responds, then there is no need for a hearing and it can go

forward on the basis of here. If people do object, if people do respond, then perhaps have a final hearing on the terms of the 503(b)9 process.

THE COURT: So what you're saying is you don't have any objection to establishing the bar date but that you want the approval of the order on an interim basis with regards to the claims procedures set forth in paragraph eight of the proposed order?

MR. CARRIGAN: Yes, Your Honor.

THE COURT: Okay. Do you wish to speak to that?

MR. GALARDI: I do, Your Honor. There are two problems with it. First, I don't think we change any burden. I think 503 has the burden. It is an administrative claim. I believe they have to show a -- you know, they have to carry their burden to satisfy this. I also don't see this as changing any burden to requesting. And what we are really requesting is to facilitate this, and I think what is quite consistent is proof of delivery within the 20 day period in which they have to do to file a claim. We

just made it very clear. The only thing we're doing is we're asking that we make it clear in the 20 days. I think that each individual vendor -- and very much like any other bar date, Your Honor, if they don't put in all of this information, we have to do an insufficient documentation they should not have a right. You still have a claims process. You still have a resolution. So we don't think we have done what he's objecting to. The second thing is, if we don't put something in here for these kinds of procedures for what's necessary to file a proper claim, we can't sent the notice to set the 30 days because people won't tell us the information. So it is pretty much a useless process. They can put in one piece of paper that says I assert a claim for 10 million dollars. So that doesn't do us any good because. The whole purpose -- like any other administrative claim they have to carry their burden and show there was a delivery, where it was delivered, to whom it was delivered and what value was delivered, and that it was delivered in the ordinary course. And if you

go through our procedures, that's exactly what it asks. It says they must identify the particular invoices very much like a reclamation demand. They have to say what claims that they have reclaimed. So if they have filed both a reclamation claim in 20 days and 503(b)9, that's different implications for a state. One could be administrative. One, they have to show they had goods on hand on the date. 503(b)9 -- you just don't have to be on hand. We could have sold those today and it doesn't matter. So that's all you need to know. Which one do you want to assert here? The next section says must include certification that the goods were sold in the ordinary course of business. That's what the statute says and it has to be ordinary course of business. So it tells us it has to be ordinary course of business. It is not different than the proof of claim form that filed under proof of perjury. So we think all we've done is broken out what would be required to carry the burden in this first instance. And I think if we take those procedures out, I

don't think it gets in another. That being said, if somebody doesn't satisfy this, I'm sure Your Honor for excusable neglect or any other OGA standard can say, okay, they didn't put in a piece of paper but that's not enough to disallow their claim, and that's claims projection profits. We are really trying to get notice and as much information as we think is legitimate in 30 days.

THE COURT: Well, as I understand the objection that's stated as far as the terms are concerned it's not disagreeing that they shouldn't be in the order but just on an interim basis so they might have an opportunity to study them and see if some of these procedures are objectionable given the fact they have only had notice of this offense in this case for, you know, not even 10 hours and not had a chance to look at it. And so if there is something in here that would be for some reason burdensome or something, they would have an opportunity to come back and say perhaps they should get some other form of relief.

MR. GALARDI: And, Your Honor, I

have no problem with that on an individual basis. For example, this gentleman comes in -- and even if it is after the 30 day bar date, if someone comes in and says I didn't satisfy this particular and the debtor is now raising an objection past that, my understanding is that they can always come back and say these procedures don't bind me. Just because I didn't attach invoice five doesn't mean I don't have a 503(b)9 claim. I'm not saying these procedures to be all and end all. Now, they don't have an invoice at the end of the day. So I don't think it is precluding them. If we put the procedures in, I guess my only question is let's assume we go forward, let's assume the procedures go out, and let's assume 30 days from now someone says I want to change the procedures. Well, I have just mailed notice to a large number of creditors. What does that do? I have do another notice. No. I think what it does is if you comply, fine. If you don't comply, Your Honor has the equitable power to say, look, I remember the dialogue on the record. I remember somebody complained about

it. I'm not going to live by the letter of procedures. This is not supposed to be a technical hurdle. This is supposed to be to get the debtor information.

THE COURT: All right. Counsel on the phone, do you have anything further that you wish to say?

MR. CARRIGAN: Just two observations, Your Honor. One is establishing excusable neglect and what have you. It's a different exercise than establishing that there is a special problem with the -- and I'm not saying this is a special problem. Please understand that. It is just that if you're going to have -- I don't know how many 503(b)9 claims they are anticipating, but apparently it is a big enough number that they would anticipate a sort of one size fits all approach to them, and given that situation and also the situation that in 503(b)9 it actually says after notice of a hearing there shall be allowed administrative expenses for including and in this case the value of the goods and so forth. They are also asking for a

certification in here that the goods were delivered in the ordinary course of the debtors' business. That is an easy basis for objection as to how would you know what the debtors' -- ordinary course of the debtors' business with respect to that particular vendor who is filing. So I think it is not a question of a wholesale changes in this thing. It may be -- if any. But at least it is an opportunity for people who have just or just seeing this for the first time to say in my experience this has all always led to something maybe that's not even foreseeable in its current form on the first day. And in virtually every other case, Fleming, Ameriserv and others where we have this kind of order that has taken place after a sum-up to study the procedures and have an opportunity to suggest changes to the debtor and if not to the debtor to the Court.

THE COURT: All right. Thank you. The Court has had the opportunity to study this order, and I have looked at the claims procedures that are set forth in the order. They appear to be very reasonable to me. And

I understand the debtor's concern about getting notice out and having to make sure that that notice gets out within the time frame. So the Court is going to overrule your objection to the motion, and I'm going to grant the debtor's motion as it is in its entirety.

MR. GALARDI: Your Honor, again, you can hold me to this, we are not trying to hold -- change the burden.

THE COURT: I understand. I think in saying that I think the Court can deal with the kinds of issues that counsel has raised in objection on a case by case basis as they come up. So one size doesn't fit all. The Court can certainly deal with those kinds of exceptions on a case by case basis.

MR. CARRIGAN: Thank you, Your Honor.

MR. GALARDI: Thank you, Your Honor. Your Honor, now we are on 18 which Your Honor is the, I guess, guard to pay all of this relief that we have now asked for and Your Honor has granted. We need approval of our debtor and possession financing. Your Honor,

with respect to this, again, I will defer to Your Honor as to the witnesses. First of Mr. Besanko is, in fact, in the courtroom today. He submitted an affidavit. I have two other people that if called as witnesses could also testify with respect to the findings with respect to there is no other financing. The names are Mr. Robert Duffy of FTI Consulting and Mr. Bernard Fountain of Rothschild . Your Honor, just very briefly, again, I think in stark -- to give Your Honor -- if Your Honor doesn't mind, I will proffer in general the testimony as to those three.

THE COURT: That will be fine with me. I will let anybody who wishes to cross-examine anybody, put them on as witnesses if someone wants to cross-examine, but otherwise I'm willing to accept the proffer and I have read the affidavit.

MR. GALARDI: Your Honor, thank you. With respect to this, and I will tell it more as a history and any of the three gentlemen could be called as a witness, could testify, that debtors in prepetition were in agreement with the lenders lead by the agency Bank of

America with respect to the 1.3 billion dollar commitment, that as debtors proceeded to have liquidity issues they began negotiations with the current bank group regarding potential financing options. In addition, that the debtors explored through their restructuring personnel and themselves alternative types of financing, whether it be on an unsecured basis, a junior basis as well as a priming basis. Your Honor, what the debtors have found is there is no other DIP financing and for very good reasons. As I mentioned at the outset and as the witnesses would testify, first of all, and as Your Honor is well aware, the market currently for getting financing has been an incredibly difficult market. Second, retail lending and ABL lending is an incredibly difficult market, and as we went through this and as the witnesses will testify we happen to have three or four major retail lenders in the group already. So in order to obtain a different type of financing we would have to go to a different type of lender. We have, for example, Bank of America, Wells Fargo and

GE. And if Your Honor reads the papers and sees the other debtors in possession of the retail world, it's one of those three that is engaging in all of the lending. So we pursued our lending with respect to other potential lenders. Rothschild is out soliciting alternative lenders. As I mentioned in my presentation and as Mr. Besanko will testify we did secure or have commitment or a proposal to secure second lien financing with a potential bank group or potential lender group -- they are not banks -- for second lien financing. We have gotten all the way to a commitment letter that had covenants with respect to which we are still open but wanted a 4 million dollar sort of downstroke to keep the commitment to get to the December 3rd date and we didn't know what the covenants were. We just couldn't get comfortable that the covenants would be the same as the ones that are in the current banking facilities that we are seeking approval for, and indeed we were concerned the covenants would be even stricter and therefore potentially cause us to default.

In addition, Your Honor, in looking for that facility we went back and went through an analysis with the company, and Mr. Besanko, if called as a witness, would testify that he considered and the board considered and the advisors considered other forms of financing and other restructuring alternatives. The company considered just simply saying it is a Chapter 11 liquidation, let's simply go out and do all the store closings. Fortunately or unfortunately, there are too many retailers currently right now in that process. So you even get people to bid -- for example, on our 155, all we kept hearing was there was not enough capacity in the market to have that sort of thing nor did we think it was wise. The board has determined that there is a hope for this company to either restructure itself -- the gentleman on the phone has already said he would support a vendor plan. And we have -- and as Mr. Rothschild would testify and as Mr. Fountain would testify Rothschild was retained to pursue strategic alternatives with respect to the 366 sales. As we stand here today we

have significant interest from a number of buyers, and some of those buyers are including possibly providing subordinated financing. None of those buyers were prepared on this term to give us their first lien facility. No one is prepared to prime the Bank of America, and the debtors are simply not prepared to go into a priming fight on the first day because of the kind of instability that will lead to business. Nor was anybody in a secured loan facility willing to step outside and do their own facility. They are right now doing all the retail cases together and they are particularly willing to take a greater commitment to provide the financing separately so one group could stay with the same bank group. There was no lender prepared to do a subfacility in that group that would have provided the liquidity that we needed on the time we needed with the covenants that we needed. And then the company considered the use of cash collateral. Your Honor, based upon a review, and it makes sense in this instance, if you

look at the inventory value, we are currently getting -- I think it is about 75.5 percent on cost of inventory based on the appraisal. Currently the company has approximately 1.2 or maybe even more, 1.3 billion dollars of inventory. So we believe that the lenders are over secured at this particular point in time -- and if called to testify -- based alone on the inventory, and there are other additional assets. Your Honor, we could have tried to do a priming fight for that reason, but there would have been fights, fees, and, as I said, re-instability of the business. Nonetheless we pulled out our bankruptcy code and tried to determine whether the use of cash collateral can satisfy us here or nonessential cash collateral. As we explored the cash lateral option originally, the cost of such a cash collateral, especially in this market is, one, the company was doubtful it could simply live off cash collateral by itself. Though we don't get a lot of availability the 20 million dollars is enough to make a cushion as Your Honor sees in the motion, and it get us through a time. As we

go into essential cash collateral it was our belief that and the company's belief that you would get just as restrictive covenants as you see the packages that you're getting today with respect to the covenant packages. Even in cash collateral you get a restrictive covenant package and it is not free. It's very expensive and maybe as close. As Mr. Daunton (Ph) would testify and Mr. Duffy would testify, it is not clear that the cost of a consensual cash collateral be all that much less than what Your Honor sees here. We also considered let's try to avoid the fees altogether and let's think about nonconsensual cash collateral arrangements. Frankly, we threw that at the bank group and that is what basically got us to the facility that we have. There was an earlier date by which we would had to have a subfacility. We got that to the January 17th date. At the date that we threw that in the bank's way we had four covenants. We got down to two covenants. Again, Your Honor, to start a case with a nonconsensual use of cash collateral, one, we are not sure we can live

with cash collateral by itself, two, you don't have an LC facility with cash collateral, and, three, you start a case telling your vendors we are going to live all cash collateral. It doesn't send a good message to the vendor community, and Your Honor may know the Wall Street Journal has always said the reason we are here we couldn't get a DIP facility. That's not true. We could get it. We just had to get the best one we could under the market.

With respect to facility itself, Your Honor, we did have a discussion with the U.S. Trustee a little it bit about disclosing the fee letters. We have opposed and filed a motion under seal to not disclose fee letters. That being said, we have disclosed, as I said in a gross term, and we can use gross in many ways, we have used gross in the terms of the fees and advisory fees with respect to this. The number that I have given you, the 30 million on that page, is really 27. Those are all fees, all expenses for all the parties. We don't think it was -- we filed the motion under seal. It is for

pricing for Bank of America and other lenders. We decided it was not appropriate to give the specifics of those fee letters, but for disclosure to the Court those numbers do include all of the fees and the price tag for the facility. Your Honor, again with respect to what we are obtaining for this, we are obtaining, I think, in just basic -- obviously when you go into bankruptcy you have a default. If you have a default, you cannot get a commitment to lend and lenders do not have to lend to you. We are getting our commitment to lend and to continue the commitments subject to the borrowing base. The commitments are being reduced, but as I mentioned earlier, and Mr. Besanko will testify, we don't have sufficient collateral to get up to the cap. We don't expect to have sufficient collateral to get up to that cap. So we don't think we are getting up to anything in this term, at least with respect to the short term commitment.

THE COURT: Why do you have the cap so high if you don't expect to get there? Because you have an unused commitment fee,

too.

MR. GALARDI: There is a commitment fee. Well, there's two things. One, people like to see big numbers, and it is important to say I have a commitment. And if we had gone to 1.3 to 900, we would have more questions that I would have to answer right now. Two, if we are successful, if we get vendor terms, if we get credit terms, and we get the goods in, we can then borrow more. We just can't be sure. At this point on this model with these conservative estimates it was simply the fact. So to pay for a fee to have the luxury of having a facility, indeed as Mr. Besanko will testify, when we first got the 1.3, we never thought we would get there. What we got concerned about is in October and given trade terms, what we thought was we would actually end up getting there. So the good news is we didn't get there, and the bad news is we didn't get there because we didn't get enough goods in to be able to borrow as much as we would like to. So, again, you like to have a nice facility so you can tell the lenders in press

releases that we have a bank group that's giving us 1.3 billion dollars. We have a bank group that's giving us 1.1 billion dollars. So we have reduced the commitments, but, again, we think we are living within the commitments. And it was a significant point to the bank group to reduce the commitments. So although we get very close to the commitment of 1.1 and eventually the 900 comes in the December period, it was important in part of the deal that the bank group wanted was they would reduce the commitment. They are financial incentives for banks to not have outstanding commitments in the same amount. So it was a prid pro quo in one of the terms. In addition, as I mentioned, the prid pro quo was that this facility rolled on the first day or be taken out on the first day. Again, Your Honor, Kirkland and Ellis, whose application will be put forth, has done most of the debtor work. Kirkland and Ellis has reviewed the security package to the perfection of liens, believes they are properly perfected liens, and as Your Honor knows, that binds the debtor but

it doesn't bind the committee to go and review that. So we were comfortable with what -- two things, one, that they were properly perfected and, two, that they are fully secure. So consequently -- and given that that was another term, that it is not a take it or leave it. I don't say that. We had back and forth negotiations on slow rolls, fast rolls. The problem with the slow roll going into the interim hearing is it's hard to figure out what's actually rolled and what's not rolled. So in this sense it is almost as if a new facility is being created post prepetition with a different collateral package. So we agreed to the role of the facility on the first day to turn it into a post petition. Again, as I mentioned before and as being advised by the board and the advisors, we agreed that we would be giving up certain bankruptcy types of leverage that we can have. Again, as the advisors would testify to, if you're going in Bank of America, GE and Wells, you have to come out if you are going to come out with Bank of America, GE or Wells. So they have

litigation essentially between, you know, exit financing as well. So in this context we thought that, you know, we are not going to have a fight at the end of the case as to whether I can reinstate the debtor, whether I can cram up the secured lenders. We're going to need a friendly face at the end of this if we can exit. In addition, Your Honor, even in a 366 sale we understand enough about the retail market that there is very good likelihood if somebody wants to acquire this they are going to go to GE, Bank of America or Wells. So, again, it was to take an issue off the table. I understand why the banks did it and these were results of negotiations. Your Honor, we started these negotiations with respect to DIP financing, including a subordinated financing probably over a month ago, one, to keep out of bankruptcy and another. It has been remarkable actually given the market. The back and forth, give or take, the negotiations as I have already mentioned, including the last seven or eight days when people thought we would be filing a week ago,

there was a bank group set with a -- asserted default deadlines and a void date facility by December 3rd with four different covenants that we were very concerned about meeting and paying as I like to say 30 million dollars for 50 million dollars availability for four weeks just wasn't palpable to the company. We then pulled out the card of the nonconsensual cash lateral. We had back and forth negotiations with Bank of America whose agent was helpful. We had back and forth negotiations with GE and Wells Fargo. We couldn't find another financial, but it gave us the opportunity to say no to the subordinated facility and essentially in the company's mind buy us 60 days to come to the next bridge as I like to say. Again, nobody can guarantee these projections. No one can guarantee that we make these projection but we think they are reasonable under the circumstances given the uncertain market. It provides us sufficient availability. It has limited covenant testing. We are testing on December 13th. We have a minimum availability that we have to maintain. We

have some covenants and essentially a block that we can't go below 50 million dollars, and I think it's the end of December or end of January. There are step-downs as I have mentioned, financial covenants, or rather we go from a no covenant deal to what I will call a covenant deal, but they are not that aggressive covenants. There are certain clean-down provisions. As we've said they'd have to go from 50 million dollars from January 4th through January 10th. We have a facility that we need to have a subordinated facility. If called to testify both Mr. Daunton, Mr. Besanko and Mr. Duffy would say that the negotiations with Bank of America over these facilities is characterized by arm strength, good faith negotiations. Mr. Besanko would testify the absence of such a facility, we have not -- we have basically been on freeze for the last seven days, that we are beginning to go into irreparable harm because we would be unable without a facility to secure goods that we need to get to Black Friday. This is a critical time in the business, and absent that we have had trucks

turned around as late as yesterday with respect to this, and we need this money immediately, that our business will suffer irreparable harm, that we have some availability but very limited cash. Without this facility we will have greater uncertainty in our workforce. We will be unable to meet our payrolls as we have been concerned for the last week, that we would be unable to obtain goods in the short term and not pay our rent and all of the expenses. So absent relief in this facility and absent payment of this facility the company will suffer immediate and irreparable harm. In addition, the advisors and Mr. Besanko will testify the company was unable to secure unsecured financing, financing on a subordinated facility and indeed any other alternative DIP financing.

Your Honor, also I just wanted to be clear with respect to the motion, and I know there are a couple of people in the courtroom, the facility is essentially one priming only itself and the prepetition debt that it has. Your Honor, there is an

indemnity and there is a prepetition lien, and that essentially stays in case somebody wants to undue the facility at a certain point and say go back to the prepetition position. Your Honor, it is carved out for two -- I don't know how we end up saying it, but there is no nonconsensual priming of any good valid first liens. So the gentleman who may have a warehouse lien, if it is a good, valid perfected lien, there is no priming of those liens. We are not asking for a nonconsensual prime. To the extent that we're permitted prior liens in the bankruptcy document we are not priming those liens. We're still permitting prior liens. What happens is the bank group's collateral package now expands and by expanding that package it is not priming. It is taking a second with respect to anything that has previous liens. In addition, Your Honor, there are landlords here. They are not taking a first lien except to the extent perhaps the leases permit them to take so or the mortgages. They are confined to their state law rights. With respect to that they

are not trying to prime them. They are not taking a lien on the leases themselves unless they are permitted to do so and they are taking a lien on the proceeds of such leases. I think that is one of the concerns I had heard from the lenders' counsel. Excuse me one second. I'm sorry. Just to clarify, they are not taking any liens on any leases. It's just the proceeds. I think the language says that, Your Honor. Your Honor, I don't know if anyone wants to cross-examine Mr. Duffy, Mr. Daunton and Mr. Besanko. I don't know if Your Honor has questions that I can answer. Each one, in particular Mr. Besanko, we have looked through the factual findings that Your Honor has called upon that there are stipulations. Mr. Besanko has read that. The debtor finds that they are true and correct to the best of his knowledge. To the extent they are not we just conclude that there are some that are legal in nature. And so we would ask Your Honor to approve the financials, but I can subject any of those gentlemen to cross-examination.

THE COURT: Does any party wish to

 be heard on the motion or cross-examine any of the proffered witnesses?

MR. POLLACK: David Pollack.

THE COURT: Mr. Pollack, hold off just a minute. I have another counsel at the podium and I will come back to you.

MR. LEHANE: Good morning, Your Honor. Robert LeHane, Kelley Drye and Warren on behalf of landlords with approximately 80 locations, Developers, Diversified, General Growth and Morning Garden Realty. I believe my comments will be similar to Mr. Pollack's. If not, I'm sure he will follow up. I had a brief conversation with counsel for the lender and counsel for the debtor before the hearing. One of the concerns the landlords had in addition to the question of the direct lien on the leases was lenders access to store premises and collateral access in the event of default under the DIP facility, and the parties have agreed that the lenders rights in the event of default will be limited to whatever rights they have under state law, whatever relief Your Honor is willing to grant them on a motion on notice

and adequate time for landlords to respond or whenever rights landlords gives them on consent. I just wanted to put that on the record, Your Honor. Thank you very much.

THE COURT: Thank you very much. Any other party? I will come back to you, Mr. Pollack. I haven't forgotten you but I have other people that will speak first.

MR. MATSON: Good afternoon, Your Honor. Bruce Matson here on behalf of Bank of America and its agent. I wanted to confirm the bank group is in agreement with the representations regarding the lease issues.

THE COURT: That were just recited?

MR. MATSON: Yes, sir.

THE COURT: Thank you, Mr. Matson. Any other party?

All right. Mr. Pollack.

MR. POLLACK: Fortunately, Mr. LeHane has already covered my points, Your Honor. Thank you.

THE COURT: He warned me as much. All right. Very good.

MR. HILLMAN: Your Honor, David

Hillman, as a housekeeping matter I would ask the Court's indulgence to be heard even though I haven't yet filed a pro hac vice application nor have I affiliated with a local firm.

THE COURT: You may be heard.

MR. HILLMAN: We represent Panasonic Corporation of North America, and Circuit City is currently in possession of products that have been delivered to Circuit City by Panasonic. These goods were delivered under a consignment agreement, and under the terms of the agreement Panasonic, not Circuit City, has title to the goods. The goods -- excuse me. The different consignment agreement that was terminated prior to the bankruptcy case. So Panasonic is planning on filing an adversary proceeding for the turnover of the goods that belong to it as well as a TRO and a preliminary injunction from preventing Circuit City from selling those goods. I haven't had a chance to read every clause in the DIP motion, in the DIP order in the DIP credit agreement but wanted to -- I point out inconsistency and to make sure that the DIP

credit agreement and the DIP lenders or that the debtor wasn't granting liens on property that it does not have title to.

THE COURT: All right. I certainly don't know how it could.

MR. GALARDI: Your Honor, that's our understanding. We can affirm that whatever this order says, if we don't own the property and it is true, a consignment, it is not our property, we are not granting liens on it.

THE COURT: Did you hear that representation, Mr. Hillman, from counsel for the debtor?

MR. HILLMAN: Unfortunately I could not, Your Honor.

THE COURT: All right. He confirmed what the Court had said that the debtor was -- nothing in the order or in the bank financing is providing any kind of lien on any property that the debtor does not own.

MR. HILLMAN: Thank you. I would just ask for the debtor's counsel perhaps to include that reference in his final interim order that's submitted to the Court.

MR. GALARDI: We have no problem

with that, Your Honor. Again, we will put in a sentence that says if it's not our property, we are not granting liens notwithstanding anything in the order. We will be anxious to get the order entered.

MR. HILLMAN: Thank you, Your Honor.

MR. LUCIAN: Your Honor, John Lucian and Regina Kelbon. We have similar concerns. If I may defer to Ms. Kelbon. I'm a Virginia attorney. We will be pro hac her into the case, Your Honor.

THE COURT: All right. Ms. Kelbon.

MS. KELBON: Thank you, Your Honor. I would like to thank you for allowing us to participate telephonically. I do appreciate that courtesy.

THE COURT: You're welcome.

MS. KELBON: I must say I'm having a very hard time hearing Mr. Galardi who has been very faint in and out.

THE COURT: That's not Mr. Galardi's fault. That's the -- the equipment that we have set up is not fully functional yet. We've just moved into a new courthouse and so that's the reason, but we're trying to make

do as best we can.

MS. KELBON: Thank you, Your Honor. Your Honor, if Your Honor would indulge me just for one moment to sort of explain the relationships with the parties. We represent Cellco, a partnership doing business as Verizon Wireless, and Verizon Wireless is a party to a direct sales agreement with Circuit City. The relationship between the parties is that Verizon Wireless operates a kiosk in the Circuit City stores which is in effect a separate Verizon Wireless store within a Circuit City store. Verizon Wireless has a presence and is substantially in all of the stores. There is a handful of them that Verizon Wireless does not operate in. Pursuant to the agreement, Your Honor, Verizon Wireless establishes and operates merchandising and demonstration displays and offers, sells and markets Verizon Wireless services. The relationship provides Verizon Wireless with complete control over the sale and marketing of its inventory and services. Verizon Wireless controls the kiosks and they are solely responsible for hiring, training,

managing and terminating the employees who work at kiosks. In effect, the kiosks are manned by Verizon Wireless employees. Verizon Wireless also establishes the pricing, the fees for its equipment and services, and Circuit City has no authority to sell Verizon Wireless equipment either in its stores or on its website. So all the Verizon Wireless inventory is separate and apart from Circuit City and is located in locked storage cages. As Verizon sells its inventory it pays commissions monthly to Circuit City and it also has various charge back rights under this agreement for any services that are disconnected within a certain limited period of time. So I would just like to have confirmation in the order if Mr. Galardi would be so accommodating to confirm that -- make sure that nothing in this priming is impacting or affecting any of the charge back rights that also -- recoupment rights that Verizon Wireless has as well as it's clear that it's Verizon Wireless inventory so there can be no liens granted on Verizon Wireless property if

either in the DIP or through the Hilco motion, which I'm not sure which one is up. It is very hard to hear, but it is sounds like the DIP order that you are referring to right now.

THE COURT: It is the DIP order that we are referring to right now, and I believe Mr. Galardi has already made mention that he doesn't intend to take a lien on any property the debtor does not own. I will have him confirm that now. He's at the podium.

MR. GALARDI: Your Honor, we confirm again that we are not taking or granting any liens on any property that is not property of the estate. I would also note, Your Honor, that Verizon has a contract with the company and nothing we are doing is changing the rights of Verizon or any company and to reserve all of our rights and they have all of their rights under the contract. But to the extent they keep it in a locked area and it is not our property, we are not granting any liens in the DIP facility with respect to Verizon property.

THE COURT: Ms. Kelbon, were you

able to hear that exchange?

MS. KELBON: Not really, Your Honor. I'm sorry.

THE COURT: Again, it was represented to the Court that the debtor is not taking any interest in any property that's not property of -- is not granting any liens of any not property that's not property of the debtor and to the extent Verizon maintains its own inventory in locked places they are not taking or granting any liens on Verizon property, that they are subject -- that there is a contract between Verizon and the debtor and that, you know, controls this and they're reserving all of their rights under the contract.

MS. KELBON: That's fine, Your Honor, if we can include something like that in the order as well as that we are rightful and charge backs are protected as well.

THE COURT: That would be governed by the contract.

MS. KELBON: That is correct, Your Honor. I don't want anything in the priming order to be deemed to be impacted on our

rights or --

THE COURT: I think we can put a sentence in the order that says it is not impacting your usual rights under the contract.

MS. KELBON: Thank you, Your Honor.

MR. CARRIGAN: Your Honor, David Carrigan. Again, I apologize for interrupting if there's anyone else that needs to be heard.

THE COURT: I don't know but there is nobody else at the podium right at the moment. You may proceed.

MR. CARRIGAN: Thank you, Your Honor. Ours is a two party creed. One, is this one of the motions that will be brought on for the final hearing on the next omnibus hearing date?

THE COURT: Most certainly this will be entered -- well, the Court's understanding is this will be an interim order because we don't have a committee here that is able to look at any of this and then we'll enter another final.

MR. GALARDI: It is a financing

order. So you can't get a final order for 15 days anyway. Whether it is the omnibus date or we talk about a separate date for final hearing on DIPs, but this is an interim order, Your Honor.

THE COURT: Right.

MR. CARRIGAN: The reason I asked, Your Honor, is that the interim period is defined as -- I think it is defined as the commencement of the case through December 29, 2008. I'm not sure whether that was intended to be that whole period or just until the next hearing, whether it is the final hearing or it proves to be a jury final hearing or whatever. The second inquiry was much along the lines of prior counsel was that with respect to, for example, in this case our interest has been in the 503(b)9 rights and also in the reclamation rights. It is not -- the entry of the order providing for the financing is not intended to affect those rights as at least subject to the final hearing if we understand it correctly.

MR. GALARDI: I'm actually not sure what the gentleman is asking for with respect

to 503(b)9 and with respect to reclamation.

MR. CARRIGAN: The inquiry reports in most of these cases is the effect of both prepetition liens and also upon any liens granted post petition upon reclamation rights and that's the inquiry. All we are saying is that whatever it was on the filing date is whatever it is when it is up and finally approved.

MR. GALARDI: We agree. Your Honor, again, I think many people are used to cases where the lender has all assets and there is nothing for reclamation claims. So what the gentleman is -- whatever the world was as of the petition date, whether there was anything that their reclamation claims could get a lien for under the secured, we are preserving that. We are not trying to change what the world was on the petition date. Now that I understand the question I know where he's concerned about.

THE COURT: All right.

MR. CARRIGAN: Thank you. Your Honor, that's what we understood and thank you.

THE COURT: Okay. You are welcome.

MR. GALARDI: And, Your Honor, Mr. Berman did point out that period, that day, the interim period, but we are seeking an interim period before December 29th and so the order will underline itself. Hopefully we'll have a final order entered and that would be a final hearing when Your Honor schedules that.

THE COURT: Very good. Does anybody else wish to be heard in connection with the DIP financing order? All right. It does not appear to be anybody. At this point the Court will accept now your proffer as you have set forth, and with the clarifications that you've made on the record the Court will approve on an interim basis the DIP financing.

MR. GALARDI: Your Honor, what we would like to do is -- fortunately we don't need to borrow today. What we would like to do is give Your Honor revisions to the order. We would like it to be entered today so first thing -- we actually can't borrow until Wednesday. We can close on the order and

start borrowing as early as Wednesday morning. As I mentioned there is payroll.

MR. LUCIAN: Your Honor, John Lucian. We are having difficulty hearing Mr. Galardi's comment.

THE COURT: He's asking the order be entered today if at all possible because of their needs to be able to draw on the financing. And the Court will certainly accommodate that as soon as you can get that to me.

MR. GALARDI: Thank you, Your Honor.

MS. KELBON: Your Honor, we would appreciate if you could circulate it to counsel because we have concerns about it so we can quickly look at it.

THE COURT: Well, it is being entered on an interim basis and the need for the company to be able to get this done and get it done within the time, because tomorrow is a holiday, is going to be pressing. So I'm not going to require that counsel circulate it among everybody, submit it to the Court. If for some reason it's something we need to take up that we didn't get in on

an interim basis, we will certainly take care of it when we have the next hearing when everyone has had a chance to review it.

MR. GALARDI: Thank you, Your Honor. I think it is clear we are not putting any liens on any property that is not property of the estate.

THE COURT: If there's anything I heard today is that if you try to do that, then there will certainly be protection afforded.

MR. GALARDI: I appreciate it.

MR. LUCIAN: John Lucian. We did not catch Mr. Galardi's last statement, but I assume it was along the lines they will not be taking any property that belongs to the debtor.

THE COURT: Correct. We have nailed that.

MR. LUCIAN: Thank you, Your Honor.

MR. GALARDI: I will try to speak up for the people. The next matter is item 19 on the agenda, Your Honor, and I will say that the next three matters are put after the financing because I will say they are not the

ordinary necessarily first day. Maybe the last one is. Your Honor, the next motion is motion for the debtors to assume the agency agreement that was entered into between Hilco Merchant Resources and Gordon Brothers and to continue to conduct the store closing sales pursuant to that agency agreement and various guidelines. Your Honor, prebankruptcy -- and again, with respect to this Mr. Besanko could testify but also Mr. Duffy because FTI and myself were very much involved in the negotiations of the agreement, prior to the bankruptcy, after we made an announcement on September 29th, I believe, in the SEC, the company was evaluating its leases, its four-wall analysis, FTI conducted that analysis, and it came to a determination that there we're at least 155 store leases that we should try to vacate and sell the inventory because it didn't fit our final business model. Whether they were less profitable stores or in markets that were no longer performing well, we proceeded with that. In the beginning of August or the middle of August we then solicited -- and as many of

the people in the courtroom know there are essentially six liquidators that you normally approach with respect to liquidating your inventory and conducting store closing sales. We entered into confidentiality agreements with all six. And all six confidentiality agreements, much to the consternation of each one of them, precluded them from forming a joint venture without our consent. We were, again, hoping to get a lively auction and we got a lot of push back from all of them, and at the end of the day, after much back and forth, all pretty much said they weren't going to bid unless we let them joint venture. We then said we would allow them to joint venture and to submit bids, and indeed the two that actually joint ventured, the Gordon Brothers and Hilco, we were trying to keep apart because we brought them as the two most likely to be able to put competing bids and we were unable to do that, and the other four formed their own joint venture. Your Honor, we were soliciting what was often called an equity bid, a bid where you would take -- because we wanted to get a big pop of

liquidity early on with respect to the early part of November when we most needed it. An equity bid is essentially what we were asking for with a sort of 80 percent down, buy the inventory, liquidate the inventory in stores, and at the back end you collect your 20 percent book, whatever upside. Because of the market and because of the uncertainty of the market and uncertainty of the Christmas period and also the cost of funds of each of the liquidators themselves have to borrow to pay that 80 percent we got what I would call very disappointing bids with respect to an equity bid. We rejected all of those bids and then went back to the liquidators and asked them to provide us now with a fee deal. A fee deal, as Your Honor probably knows, they act as our agent and give you a straight stake. The concern about that is with all the business in the world who knows how it is that they will be motivated, for how long they are going to be motivated and you're paying the fee and as the sales wind down you might not be getting your money. So we go again, very disappointing proposals with

respect to the fee deal. We then said we will try one more time. I guess this is now the method, the de jure of the liquidators, and we got what we call a hybrid bid, which is really the bid we have before us. It essentially says that they will liquidate the inventory but they will not have to put cash up front, so we've got the cost of capital out of it, and instead that they will give us a guarantee that we would get a minimum recovery of -- in this case 72 cents on the cost value of the inventory. As I mentioned before, that is still below our appraised value, and in this market we have got auctions to go very much higher than the value, but in the market currently and in retail in particular the bids are not coming in even at the appraisal level, plus as we heard over and over again, as we tried to push this high as possible, from the liquidators this is after all the inventory in stores which are closing. There are concerns about that. There are concerns about the holiday season. We then negotiated an agency agreement with Hilco and Gordon

Brothers over two or three days, again, an agency agreement that contemplated remaining out of bankruptcy. Again, if we could have solved our liquidity problems, that would have been our preference. We negotiated a collateral package for them to secure their fee. The problem in a bankruptcy is we can come in and ask Your Honor to give them an administrative claim for their fees. There were two concerns. One, how do we get assurance that we will get our fee because you can always reject a contract? And how can we make sure that, you know, we are subject to auction? Well, we auctioned their contract. We went to the auction, and eventually the other joint venture just said we are not prepared to outbid. We gave them 24 or 12 hours to bid after going back and forth. They decided not to bid. So we were comfortable with the price. The security issue, again with Bank of America's consent, we granted them a second lien on all inventory on all stores. Again, Your Honor, thinking that if we ever got to the subordinated debt these may be the sales that

would be done by that point and we would work around it. And Hilco and Gordon Brothers agreed to take that second lien, but more importantly after negotiations they also agreed that upon the assumption of that agreement they will no longer have a second lien, again freeing our inventory from the second lien so we can begin our vendor negotiations and our second lien financing. We also agreed to seek on a first day as fast as possible the assumption of that agreement. It is obviously not our preference to start a store closing sale beforehand and ask Your Honor to approve the procedures. We did in the agency agreement and I will note -- make sure that they agreed to comply with state laws and store closing laws. The biggest issue is leases and the lease clauses. We then proceeded to negotiate with them the deal, and one critical fact that they were willing to do is as we knew that the sale would be approaching we insisted, and they have provided, people to come in and help as we announced the store closing for SEC purposes to make sure that we didn't have

sufficient shrink or TVs were there. TVs were in stores. Gordon Brothers and Hilco agreed to meet with us to get people in the stores to make sure to avoid as much shrink as possible. They provided an incentive bonus to the people that are in fact in this store to sell the inventory. Again, it is a very hard decision to tell people that you are going to be laying off people and store closings in this market. And they again agreed to backstop with a letter of credit attestable to our bank group to 72 cents on a dollar. Again, it is an urgency of our agreement as set forth if we get the first 72 cents they get the next three and a half percent and then there is a 50/50 sharing of the proceeds. So we do well on the sales. The preliminary results are we are in fact doing very well with the sales, then there is an upside for both the company and Gordon Brothers. So we sort of met the equity idea of get us some upside. We sort of guaranteed an amount but we are getting a fee. It doesn't give us the liquidity profit that we wanted, but nonetheless these sales are

expected to go in the five or six week period of time and therefore be done by December. It was also very important for us to begin these sales so that we could, if we need to, do the lease negotiations and possibly reject 155 stores by the end of December and therefore incur with little rent with respect to the stores during the bankruptcy period. The reason we put it on for first day, Your Honor, as I mentioned, one of the significant provisions that were negotiated was the security package. From our perspective the sooner that we could assume this agreement the better because we could, one, relieve ourselves of the lien. With respect to the other relief that we seek here, Your Honor, we think it is fairly standard with respect to store closing procedures, and, again, I know there are landlords here. We have preserved the rights of AGs to come in and complain. We have preserved the rights of landlords to come in and complain with respect to the procedures. One of the choices -- and, again, these things are all too common. The landlords know Gordon

Brothers, know Hilco. There is much consternation about banners and how big the banners are, whether you can put them by the windows or not. They seem to always get resolved. We know Karen Caudry (Ph) who does represent a lot of the AGs. We think we have in the proposed formal order all of those protections that are required for landlords and for the AGs to police this process. It is a very short process. And obviously Gordon Brothers and Hilco face some risks. If we tail out the assumption, it is very easy to come in and say, well, don't assume it now when all the work is done. In addition, Your Honor, we have provided them with a 1 million dollar up-front deposit, most of the costs to do these things, to buy the signage, and we have worked with them. We gave them that. There is not a lot of money that we know of that was paid on last Friday that we know of that was outstanding. It's not as if this is a large cure here. As I said, we conducted a prebankruptcy auction. We have been told by the other four liquidators that this is the highest and best

price we can get into this market. As more retailers come on the market, who knows what you can get in this market. As we get closer to Christmas, Christmas and Black Friday, one of the things we heard from most liquidators is it's better to do this sooner as opposed to waiting for Black Friday because we get ahead of Black Friday sales, and so far the results have been that. We would therefore ask, Your Honor, to approve both the assumption of the agency agreement as well as the store closure procedures. There is counsel here for Hilco and Gordon Brothers. They do have a witness if Your Honor wanted to have that testimony. I think, again, we have Mr. Duffy who can testify, Mr. Besanko as to the process. It is a business judgment matter to assume a contract, to conduct the store closings, whether they are inside the ordinary course or outside the ordinary course. We think we have taken as many steps in the agreement to comply with the state law which is a big concern. We have been very sensitive to advertisement in those matters, plus we have taken enough of the AG's

language for their rights to come back and complain and have a process, but we really don't think we are prejudicing either the landlords rights and their contract rights with the leases or the AG's right to complain and generally Hilco and the Gordon Brothers are quite good along with us to resolve those objections to come back before the Court. So we would ask Your Honor to approve the assumption and the agreement and the procedures.

THE COURT: Very good. Does any party wish to speak to this motion?

MR. POLLACK: Yes, Your Honor. I'll let you deal with anyone first in the courtroom.

THE COURT: Okay. Let's take care of the courtroom first and then I will come back to the folks on the phone.

MR. LEHANE: Good afternoon, Your Honor. Robert LeHane, Kelley, Drye and Warren on behalf of landlords representing approximately 80 locations. I respect the comments of counsel for the debtor and had a brief conversation with him before the

hearing to the effect that landlords would have the rights to come back and ask Your Honor for relief if the proposed GOB guidelines were not sufficient. However, I have had an opportunity now to go through the motion and proposed order and, Your Honor, this is not an interim order not with respect to GOB guidelines.

THE COURT: Well, we will make it one and you can have an opportunity to come back, and if there is a problem with the GOB issues you can address those and the Court can take them up.

MR. LEHANE: Thank you, Your Honor. I would suggest in the following motion on the calendar, the rejection motion has, I think, precisely the language that would do the trick. It would allow landlords X number of days. We believe 10 is probably appropriate to come in and file an objection. We have worked with Hilco and Gordon Brothers on any number of occasions, but it would be very unusual to make this a final order. With that addition to these -- I also would like to point out, though, that there appears

to be two different sets of guidelines attached to the motion. There is a set of guidelines attached to the agency agreement and there is a different set of guidelines attached as an exhibit to the order.

THE COURT: The Court reviewed the one that was attached to the order.

MR. GALARDI: Your Honor, again, let me address that. To the agency agreement, because we entered into an agency agreement prior to the bankruptcy --

THE COURT: It is exactly what I thought.

MR. GALARDI: -- there were provisions then to take advantage of the anti-assignment provisions of the Bankruptcy Code. We actually sought approval of different procedures. The one that Your Honor reviewed, the ones attached to the order are the ones that we are seeking approval. Quite honestly, as Mr. LeHane knows, they are more friendly to the sorts of sales and anti-assignment clauses which we couldn't do in the leases prior to the bankruptcy.

MR. LEHANE: Thank you, Mr. Galardi. One other point, though, in connection with any GOB sale order such as this which would render lease provisions unenforceable, again, those are entitled to adequate protection. We believe that that adequate protection under these circumstances would include payment of the rent that accrued from the filing date through the end of the sales. We don't believe that's in the order. We would ask that be included in the order. It does look like the agency agreement provides that the liquidator would cover the occupancy expenses.

MR. GALARDI: Your Honor, I happen to disagree that landlords are entitled to adequate protection, and I'm sure Mr. Pollack will say the same thing as Mr. LeHane on this topic. Your Honor, we have a provision that we do get reimbursed for the actual cost. If we don't pay those costs or if we have to pay those costs, I understand we are in an accrual state, but my understanding is that even though it is an accrual state it is a 503(b) claim and it's paid at the end of the

case, not necessarily at the time of this period. So we believe that the landlords are protected. I understand that Mr. LeHane was going to do this. He knows I will probably take a certain view with respect to the accrual state versus billings state. Leaving that aside, I think the simple answer is I don't believe -- I think it could be raised again in 10 days. The 10 days is before the end of the month if they want to make an argument with respect to what we call the subrent, let them raise an objection. It will me give an opportunity to either resolve or do that. Nothing prejudices their right in the motion to go make such a request. Mr. Pollack can make a request, and they both know me well enough to know we generally resolve these types of objections.

THE COURT: Very good.

MR. POLLACK: Thank you, Your Honor. I will work with counsel for the debtor after the hearing to submit an order that's consistent.

THE COURT: So we have a 10 day period which you can file objections. It

will be an interim order in the meantime and you can raise both of the issues that you have raised.

MR. POLLACK: Thank you very much, Your Honor.

THE COURT: All right.

MR. VAN ARSDALE: Robert Van Arsdale for U.S. Trustee, Your Honor. We would simply like -- I'm not certain that the 10 days that we are just discussing would apply to everybody. We have not yet appointed a committee in this case. I think the committee would like to be able to look at this order before it gets to be a final state.

THE COURT: Are you concerned that the committee wouldn't be formed to be able to look at it within the 10 day period?

MR. VAN ARSDALE: Your Honor, I anticipate we will have a committee hopefully by this Friday. I know the solicitation went out today and we need to factor through that and they will need some time to actually view it. The hope being that part of the people in the committee may know of some other way

that this -- these liquidations sales could take place that would benefit the entire estate.

THE COURT: I guess we've got two competing interests as with the landlords if they have an interest in the GOB provisions not being adequate in such they would want to get in more quickly, whereas the committee would need more time to look at it. So we need to have some sort of balance there.

MR. VAN ARSDALE: Yes, sir.

THE COURT: I think we can do 15 days.

MR. VAN ARSDALE: That would be adequate for the committee.

THE COURT: Okay.

MR. GALARDI: Your Honor, if I may address the plan, I'm not quite sure -- look, I have set interim orders for committees on many cases. I'm not quite sure -- and I will let Mr. Athanos talk to this, but I don't know what it is to have an interim approval of an assumption. With respect to the procedures of running the store closing --

THE COURT: I was more concerned

about GOB.

MR. GALARDI: Right. But, again, it is hard to go back and say we are going to unassume the contract. So with respect to the procedures and objections to procedures themselves and how we are conducting them, I have no problem with the committee. If it is with respect to the assumption of the contract, then I would have a problem because we have to assume and go forward over the next two to three weeks in any event. With respect to the committee, I'm assuming we will be completely aligned that we want the most money into this estate. I have no problem with their coming up with comments about, well, the store closing procedures should be even better and make us more money. That I certainly will endorse.

THE COURT: Well, I think there are two issues as I understand that we are doing it on an interim basis, and it has to do with raising the GOB terms and also the issue of adequate protection. We are preserving those two issues. I agree with you completely. You know, you can't unassume a contract. If

you are assuming it, you are assuming it. So I understand that. That's part of it. And so for clarity I want everyone to know where the Court is coming from.

MR. VAN ARSDALE: Your Honor, I was only speaking to the GOB part of this particular order.

THE COURT: All right. Very good. We have some other people that want to speak to this.

MR. ATHANOS: Good afternoon. Joe Athanos on behalf Hilco and Gordon Brothers. I think we are all on the same page here. The assumption in the existing agreement -- what the existing agreement says is Gordon Brothers and Hilco will comply with all laws and Gordon Brothers and Hilco will comply with all leases. That's the best you can do outside of bankruptcy, and we understand that. I have a witness here today who will testify that it is 3 million bucks to the estate if we can do better which you can in the bankruptcy. You can get out of GOB laws, do the supremacy clause, and you can get out of the terms of leases, instead of paying the

bank, theaters, and having side walkers and that stuff adding value to the sale, and here we think it is worth 2 or 3 million dollars to the debtor's estate. We think there is a huge benefit there, and we think that ought to be approved. But we understand people need the opportunity to object, and we will work with landlords' counsel, which every single person who is here today on behalf of landlords we have worked with a thousand times and it's very unlikely we will be back in court with respect to any of them. We've worked a very long time. And, in addition, with the AGs, the same issues. We expect to have issues but we will work them out. If we don't, we will come back to the Court and that's fine but not on the original agreement which is going to be assumed and that's it, it is final, but on the new GOB procedures that we are getting by virtue of the case being made.

THE COURT: That's what I understand the new GOB, the ones that were attached to the order, not to the original agreement that I will be approving on an interim basis

today.

MR. ATHANOS: That's fine, Judge.

THE COURT: I'm now turning to counsel on the phone to give them an opportunity.

Mr. Pollack, is there anything else you want to raise?

MR. POLLACK: Well, Your Honor, since Mr. LeHane knows most of my arguments and Mr. Galardi usually reads my mind, there isn't much else. I think Mr. Athanos really hit the nail on the head and that is the issue, the main issue I had was that the GOB contract that they were asking to assume was a prepetition one which didn't have the right to do certain things which now they are going to have in bankruptcy, but having worked with him and Mr. Klotz from Gordon and Mr. Capp (Ph) from Hilco, again, I don't see there is a problem we will have to come back to the Court for. We would just like that opportunity in case something unusual happens.

THE COURT: Very good. Thank you.

Any other counsel on the phone wish

to be heard on this matter?

MR. HILLMAN: Yes, Your Honor. David Hillman, counsel for Panasonic Corporation of North America. As I had advised the Court during the discussion over the DIP financing motion Panasonic owns the goods that are in Circuit City's possession. It is my understanding that some of those consigned goods are -- may be in some of the stores that are closing, the 154 stores. The consignment agreement was terminated prebankruptcy. We gave notice to Circuit City, to Hilco and to Gordon Brothers that we did not consent to any sale or disposition of our products at any of these GOB sales. It is not clear to me whether or not that request is being honored, and as I had mentioned we're filing hopefully today, if not tomorrow, the complaint that -- a motion for a TRO and preliminary injunction. So my objection to the motion is I have no problem with approval if the Court approves the motion. My problem lies within selling Panasonic's product at any of those sales.

THE COURT: Okay. But which is

going to be subject to a separate complaint and TRO which you are going to bring before the Court, and I assume then we'll resolve those issues at that time.

MR. GALARDI: Your Honor, we are not in any way prejudicing their rights to bring a complaint, to seek a TRO or to address those issues in the proper form with a complaint, a TRO, and now I understand I may be here a couple days doing so.

THE COURT: So, Mr. Hillman, nothing in this order prejudices your right to proceed forward, and the Court will resolve the issues that you raise in the context of the TRO which I will anticipate receiving shortly.

MR. HILLMAN: Thank you, Your Honor.

THE COURT: Any other?

MS. KELBON: Regina Kelbon for Verizon Wireless, Your Honor. Again, I incorporate my comments that I raised in the DIP. Obviously it's Verizon's inventory, can't be sold by Circuit City, have no authority to sell our large inventory that's specially secured in marked cages. I do not

believe that is the intention since Verizon was informed of Hilco's presence at the property and we believe our stuff is not included. We would just like confirmation of that that there was no intention of that as part of this Hilco agreement. The agreement is not attached of record so we can't review it to know what the actual contract says. We could not find it on our docket.

THE COURT: I assume you've got control over your inventory if it is in a locked location?

MS. KELBON: Yes, Your Honor, we do.

MR. GALARDI: Mr. Athanos has just confirmed they are not selling any of Verizon's equipment and that's my understanding, and Verizon is free to contact Hilco and remove it if that's what they need to do.

MS. KELBON: We are in touch with the Circuit City management and they are discussing the exit dates of the various locations that the Circuit City is closing. So we just reserve all of our rights under our contract, and I'm sure hopefully this

will be worked out amicably.

THE COURT: Yes. So noted. If you have any problem at all, you can come back to the Court and get relief?

MS. KELBON: Thank you, Your Honor.

THE COURT: All right. I don't think any other party --

MR. BRANCH: Dustin Branch, representing various landlords. I quickly wanted to put an objection on the record. My issue has been pretty much laid out by Mr. LeHane and Mr. Pollack and I've dealt with Gordon Brothers and Mr. Galardi on numerous occasions. But at this point I couldn't really hear too well as far as the timing to bring objections on going out of business sales. Whether it is 10 or 15 days, I just couldn't hear for sure.

THE COURT: We are going to address that right now.

MR. BRANCH: Thank you, Your Honor.

THE COURT: All right. So first the Court will accept the proffer of the testimony of the proffered witnesses in connection with this motion. The Court will

approve the assumption of the agreement and then with regard to the GOB provisions and the question of adequate protection of landlords the Court will approve that on an interim basis going forward, and it's been suggested that 10 days notice and then the U.S. Trustee raised a question about 15 for the committee. I'm not really sure that it is a committee issue on either of these two issues that we're reserving. But, Mr. Galardi, I would like your input on the timing and so I would solicit that at this point.

MR. GALARDI: Your Honor, again, I have no objection to the landlords having 10 days. I have no objection to the committee having 15 days if they have an objection. What I expect of them is to join me in opposition to any landlord objection should they arise. I think there is no problem with the time frame.

THE COURT: All right. So it will be 10 days for the landlords, 15 days for the committee. All right. With that then it is approved.

MR. GALARDI: Thank you, Your Honor. Your Honor, moving now to item number 20 on the list of motions, this is the debtor's motion. As I described early on in the case, Your Honor, there has been leases that the debtors have vacated the premises. Some are simply barred and some are currently subleased to third parties. We filed a motion last night to reject all of those leases. The carrying costs, as I mentioned as, and Mr. Besanko would testify, is roughly 40 million dollars a year. It is critical, especially in this accrual state to get out of those leases as fast as possible because each day we remain in those premises arguably we are accruing post petition administrative expenses. Your Honor, following sort of the Delaware precedent that I actually represented the landlords on, the way in which we have tried to proceed to do this is to give the unequivocal notice that we would be out of the premises, that we don't reserve any rights to go back to the premises. So it is an unequivocal objection. Unfortunately, Your Honor, we don't have a committee here

because if there was a committee I would have them agree with us to that.

And finally to return the keys to the premises. Your Honor, we have not returned the keys today but we will return them as soon as Your Honor blesses it, because if Your Honor didn't bless the rejection there was no reason to return the keys. We have made arrangements to return the keys tomorrow so that we would reject. So we are actually seeking rejected as of the petition date so we could avoid post petition administrative expenses with respect to the estate. Your Honor, again, this is a business judgment decision. It is actually evidenced by the fact that we have -- as Mr. Besanko will testify, we have not been operating these premises for quite some time. Mr. Besanko will further testify that the sublease rent that we received is less than the rent that was paid. It is a drain on the estate. In addition, Mr. Besanko would testify that at prior times we invited people in to see if they could take the lease portfolio, find the market portfolio. We

have been unable to do so. Indeed, as Mr. Rothschild will be able to testify or FTI would be able to testify, one of the problems with the prebankruptcy liquidation sales profit is we have these leases and eventually you have to do something with those. We believe it is the business judgment of the debtors to reject effective immediately. Mr. LeHane will get up, and we don't have a problem with this, but if we don't return the keys within a certain period of time and if we keep occupation of the premises, it's without prejudice of the landlords rights to come back and say, hey, you said you were doing this. You didn't do it. You took the value of the property. We want an administrative claim. We have no objection to that, but I didn't want to see that we had to have the keys today. We would like to get the keys out tonight, and hopefully we can make the FedEX deadline, but no later than Wednesday. If we can have in the order that we return the keys no later than Wednesday, the rejection could be effective as of the petition date.

THE COURT: Very good. Does any party wishes to speak to this motion?

MR. POLLACK: Yes, Your Honor. David Pollack on the phone. I don't know if there's anyone in the courthouse.

THE COURT: Yes. We'll go to the podium first.

MR. LEHANE: Thank you, Your Honor. Robert LeHane. Thank you, Mr. Galardi, for attempting to read my mind. We certainly appreciate that this is set up as an interim motion. There is an objection deadline for landlords to object as Mr. Galardi stated, but we don't know whether or not possession of the premises has actually been turned over to the landlords, and we would prefer that the effective date of the rejection of these leases be the later of today or the date that the premises are actually delivered to the landlords by surrender and turnover of the keys. We believe that will avoid a necessity for a multitude of objections whereby maybe landlords get the keys Thursday, Friday or even Wednesday. They have been in the premises post petition. We believe that

those landlords are set up with an administrative claim for that time. Thank you, Your Honor.

THE COURT: Thank you. All right. I will go to counsel on the phone.

MR. POLLACK: Thank you, Your Honor. David Pollack again. Your Honor, I don't have any problem with the date of rejection. I have verified that our premises are vacated and we only have, I believe, one on the list. However, the motion goes further than just rejecting the leases and wants to or ask the Court to approve rejection of guarantees as well. In most cases I have been in guarantees have been held to be non-executory and therefore not capable of rejection under Section 365, and so with regard to guarantees we would ask that that issue not be granted on an interim order because I don't know how you undo a rejection of the guarantee but be held to the final hearing on this and that the interim apply only to the other relief sought by the debtors.

THE COURT: All right. Thank you.

MR. GALARDI: Your Honor, addressing

first Mr. LeHane's point, again, I think we can set a hard date of Wednesday and then we can have disputes. I think we can get all of the keys back. It is just the hearing to give those notice to get it out today and hopefully it's going to be done. So if we can get them back on Wednesday, I would ask the date to be retroactive to the petition date.

With respect to Mr. Pollock's issue on the guarantee, I actually agree with Mr. Pollack that it is not in fact an executory contract, but we do it out of an abundance of caution because if it's not an executory contribution, it's prepetition and prepetition breach. It really is much ado about nothing. If it is prepetition contract, we breach it, and if it's an executory contract, we reject it. I don't know what we're reserving it for. So we have no problem saying we would reject it to the extent it is an executory contract and change the language to reflect that, but I don't want to be bound by a guarantee that I believe is -- even if it's not executory, it

is a contract I can breach.

THE COURT: Very good. Apparently, Mr. Pollack, you win on that. You have a prepetition claim instead of an executory contract. But in any event the Court is going to approve this motion and --

MS. KELBON: Your Honor.

THE COURT: Yes.

MS. KELBON: Excuse me, Your Honor. Regina Kelbon. Your Honor, with respect to this motion, the motion recites that Circuit City is not occupying these premises. I have not had the opportunity to confirm that with the DIP list that is attached to the motion with Verizon Wireless. I'm assuming Circuit City is not in the premises and Verizon Wireless kiosks are not in the premises but I would like to reserve my rights with that just in case there is any disagreement with that because I'm assuming we are out of those premises as well.

THE COURT: I'm assuming so, too, since you have all of your inventory locked and secured.

MS. KELBON: That is correct, Your

Honor. That's why we think that, but since I cannot on this short notice confirm on a store by store basis which was attached to the list, I will have to go with the debtor's representation that they are not occupying the premises to reserve my rights and my contract.

THE COURT: Right. If you need relief, if you find out there is something different, you can always come back to the Court and request appropriate relief. So it will be without prejudice to that.

MR. GALARDI: And, Your Honor, I would only add that if they are in the premises -- and most are sublessee and we're rejecting all subleases. So it doesn't mean we have to stay there for their sake. They can get their property out. And now they are on notice. Get it out.

THE COURT: Exactly. So the Court is going to approve the rejection of these contracts. The Court is going to approve the rejection as of the petition date with the proviso that the keys be returned to the landlords by Wednesday. If that does not

occur, then the Court will entertain any landlord motion for relief as may be appropriate at that point. It is also my understanding that the landlords -- even if they don't have the keys, they have the premises now and can re-enter their property.

MR. GALARDI: That is correct, Your Honor. Again, the key issue has become a big one. Sometimes you can't find the keys. The landlords have the key. It is a symbolic gesture more than anything else. I want to reserve. I mean, we will try to get everyone their keys on Wednesday. If not, they reserve their rights to seek an administrative claim and say, hi, you didn't give the keys back. I reserve the right saying you have had the occupancy.

THE COURT: I understand the issue. That's why I put the additional comments on record, but from the Court's standpoint the landlords have possession immediately and they can enter this evening if they want if they want to get a locksmith and go in themselves. And the keys are going to be returned. And if we have an issue about

whether or not you're holding the keys that you actually do have or somehow using the space, then I will take that up at a different time.

MR. LEHANE: Thank you, Your Honor. We actually agree with Mr. Galardi's comment. There is just a date that would need to be filled. It's the landlord objection deadline. I would propose the same 10 days that was put in the GOB motion.

MR. GALARDI: We agreed to that and the committee 15.

THE COURT: Okay. Ten days for the landlords, committee 15.

MR. GALARDI: Those are both weekdays. So I think it works out, the 20th and 25th.

THE COURT: I would hope so.

MR. GALARDI: Thinking about it, I believe they are.

THE COURT: Okay.

MR. GALARDI: Your Honor, that then brings us to the last motion on the agenda, and, again, Your Honor, all of our relief has been structured to try to reorganize this

company. As Your Honor may know we are a public company. For better or worse we have been operating losses as a result of not having great performance over the number of years. That may be a very significant asset for this company. Accordingly, what has now become somewhat common with public companies is to seek relief to limit the trading in the equity security so as to not have a change in control, you know, inadvertent change in control. What we have sought -- and, again, this is clearly an interim order with the committee to come back to it -- is to seek an order from this Court establishing procedures eliminating trading and security during this interim period obviously subject to people's rights to come in and to object to that and the committee's right to object. It is to preserve what may be a very significant asset either for a potential purchaser or for a standalone plan, namely the NOLs that we have at the current time. Again, Mr. Besanko is in the courtroom and could testify as to the size of the NOLs, our ability to use NOLs. Obviously if there is a different outcome,

 these procedures could be vacated at that time, but right now, hoping to reorganize or to sell and to have that as an asset, we would like to do everything possible to preserve that. These procedures I understand have been granted in cases in this jurisdiction. I know they have been granted in cases in other jurisdictions, and we would ask Your Honor to grant the relief to limit the trading and notices set forth in there with respect to our equity security.

THE COURT: Any party wish to be heard on this motion? Okay. The Court has reviewed the motion and I find it entirely in order and will approve it on an interim basis.

And, Mr. Galardi, I had one other motion we had to take up, which is a motion to file under seal. Are you going to speak to that?

MR. GALARDI: Your Honor, I think I sort of addressed it, but I probably didn't get an order for it. Those are two fee letters that we discussed earlier, and I had had a dialogue with the U.S. Trustee as to

whether those should be disclosed. We would ask Your Honor to keep those under seal, as I mentioned, under record. The total amount of the fees with respect to the facility are in the DIP budget. Our DIP budget is actually higher than that. We would say because of pricing issues and other issue what GE or Wells or Bank of America gets is really a confidential business matter. We would ask Your Honor to enter the order, again, allowing us to file those fee letters under seal. We have given it to the U.S. Trustee's Office. We have given it to the Court. If there is someone who has an actual real interest, we understand they can come to the Court and ask for that. We are not trying to say in all circumstances, but indeed we think we need to file as record and disclose confidential business information of those companies and we ask Your Honor to enter that order.

THE COURT: Very good. Office of the U.S. Trustee wish to be heard on this issue?

MR. VAN ARSDALE: Your Honor, we did

have a conversation prior to court, and the resolution of it was as represented to the Court, and I think that that suits fine. And it still leaves it open if someone really wants to know this to come to the Court and ask that it be unsealed.

THE COURT: Very good.

MR. GALARDI: And clearly, Your Honor, we will give it to the committee. We know the committee will have to get the fee letters and we will give it to the committee. We are not going to make them come and get a motion. It is standard before we have to go to a final hearing.

THE COURT: Very good. All right. The Court is going to approve the motion to file the fee letters under seal subject to further order of the Court. All right. At this point I think we have taken up all the motions that you have filed and we probably need now to do scheduling.

MR. GALARDI: Right, the six omnibus hearings and how Your Honor would like to proceed with the next hearings. I guess one of the first questions for Your Honor is on

preference. If we go back to my sort of significant dates, December 10th is a big date for us, one, with respect to trying to get a motion to extend the time to assume or reject leases and, two, with respect to the 366 deadline. That would be one of the dates. I don't know if Your Honor's practice is to have the hearing on a final DIP at the same, the first omnibus or whether you wanted a separate hearing on that. Anything in that pre-December 10th date as a first omnibus will work well for us.

THE COURT: Do you think you will need any date in November or are you looking at the first part of December?

MR. GALARDI: Well, I know I'm going to get a TRO on it. So I'm looking -- Your Honor, I think if we did it in early December as opposed to -- because Thanksgiving will sort of put everybody in. We have given some 10 days. So 10 days from today and 15 days from today is the 20th and 25th. That Friday or Thursday. Your Honor, unless -- I don't think so. I think probably the very first week of December would be a good day that

will allow us to give notice.

THE COURT: How about Friday, the 5th of December?

MR. GALARDI: That sounds like a good day. That will give us 15 to 20 days notice for the DIP. Can we put the DIP --

THE COURT: Put everything on that date.

MR. GALARDI: Okay. Your Honor, again as to practice, how does Your Honor like to handle applications to employ professionals? Does that go on the first omnibus date? How would you like to do that? I don't want to overload the calendar but I know we will have those filed shortly. How would Your Honor like to proceed?

THE COURT: Let's put them for the same date.

MR. GALARDI: Okay. Thank you.

THE COURT: And do you want to do an afternoon hour or do you prefer to do that in the morning? What is best?

MR. GALARDI: Your Honor, since that may be a long day, I sort of ask that we maybe get the whole day.

THE COURT: You can have the whole day.

MR. GALARDI: Starting -- if we are having the whole day, I think many of us will travel in the night before. But even if we started at 10:00 -- knowing my flights from the northeast, we will land at 9:00. If we start at 10:00, that still allow people to come in in the morning from various locations. So starting at 10:00 I think people will have the flexibility to come in that morning.

THE COURT: That's fine. We will start at 10:00 and you have the day.

MR. GALARDI: Thank you. Working off of that, Your Honor, again if possible to get two days in a month, I would say some period 14 days or longer after that December 5th hearing.

THE COURT: We can do the 19th. We can do the 22nd. I can do the afternoon of the 23rd.

MR. GALARDI: I think my wife doesn't want me here on the 23rd. How about the 22nd? So that gives us a little more

than two weeks if that works.

THE COURT: Again, I have that entire day. What kind of hour?

MR. GALARDI: Why don't we start in the morning on that day, Your Honor, and, again, we will try to balance the calendar. If we think we need a full day, we can contact. But can we do a morning hearing.

THE COURT: Yes. We will set it at 10:00.

MR. GALARDI: Thank you. Now the new year brings with it the deadline. So something close to the 17th, Your Honor, would be good assuming that lawyers leave everything to the last minute. So sometime around December 11th -- I mean, January 11th to the 16th I think will be a helpful hearing because we do have the loan commitment and try to get there. So I don't know what Your Honor's availability is.

THE COURT: That week is tight, but I can do the 16th. I can give you all day on the 16th or I can do the 12th.

MR. GALARDI: Your Honor, since life is what it is, let's do the January 16th so I

can meet that deadline but give myself the full time to that deadline.

THE COURT: All right. We will set that at 10:00 as well.

MR. GALARDI: Thank you. Just because there might be other matters, Your Honor, if you have anything the last week of December I think as a precaution.

THE COURT: We're going to go back to December?

MR. GALARDI: I'm sorry, the last week of January. My apologies.

THE COURT: Thursday the 29th.

MR. GALARDI: That would be fine.

THE COURT: I will set that at 10:00.

MR. GALARDI: Okay. Your Honor, any time in the first two -- second or third week. It looks like the week of the 9th or the week of the 16th of February. Maybe the week of the 9th and then something towards the end of February before my March deadline.

THE COURT: The 13th.

MR. GALARDI: That would be good. 10:00?

THE COURT: 10:00.

MR. GALARDI: And though we have a March deadline to file a disclosure statement and plan maybe something that first week of -- how many do I have now? One, two, three, four, five. I'm going to ask for one more, maybe the first week of March, Your Honor.

THE COURT: March 3rd at 10:00.

MR. GALARDI: Make that six. Thank you.

THE COURT: Yes. That is six.

MR. GALARDI: We would just fill in that, the case management order and file with those dates, correct?

THE COURT: That will be fine. And then depending on where we are at that point we can always set other dates beyond that.

MR. GALARDI: Yes, thank you. Your Honor, that concludes the matters again from Circuit City and myself. I truly appreciate your doing this on such a short notice and accommodating us and granting relief that I hope sets the company on good footing going forward. Thank you.

THE COURT: I certainly wish you

luck with the case.

MR. GALARDI: Thank you.

THE COURT: We're done.

CERTIFICATE OF COURT REPORTER

I, CALVIN ADDISON, a Notary Public for the State of Virginia at Large, hereby certify that I was the Court Reporter in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, on November 10, 2008, at the time of the hearing.

I further certify that the foregoing transcript is a true and accurate record of the testimony and other incidents herein.

Given under my hand this 25th day of November, 2008.

/s/ Calvin Addison

# EXHIBIT C

UNITED STATES BANKRUPTCY COURT

For the Eastern District of Virginia

Richmond Division

December 5th, 2008

Ch. 11 Circuit City Stores, Inc.

08-35653-KRH

Transcript of testimony and other incidents in the above, when heard on December 5th, 2008, before the Honorable KEVIN R. HUENNEKENS, Judge.

CRANE-SNEAD & ASSOCIATES, INC.
4914 Fitzhugh Avenue
Richmond, Virginia 23230
Tel. No. (804) 355-4335

0835653081212000000000010

APPEARANCES:

MR. DOUG FOLEY
McGuire Woods, LLP
901 East Cary Street
Richmond, Virginia 23219
Counsel for debtors

MR. GREGG GALARDI
Skadden, Arps, Slate, Flom, LLP
One Rodney Square
PO Box 636
Wilmington, DE 19899
Counsel for debtors

MR. BRADFORD ENGLANDER
7200 Wisconsin Ave.
Suite 800
Bethesda, MD 20814
Counsel for Alliance Corp. Source Interlink Media, LLC

MR. BRUCE MATSON
951 Byrd St.
Richmond, Virginia 23219
Counsel for Bank of America

ROBERT VAN ARSDALE
Assistant United States Trustee
600 East Main Street Suite 301
Richmond, Virginia 23219

MR. DUSTIN BRANCH
2029 Century Park East
Suite 2600
Los Angeles CA, 90067
Counsel for various landlords

MR. DAVID HILLMAN
919 Third Ave.
New York, New York 10022
Counsel for Panasonic Corp.

MR. JOHN MCJUNKIN and DAVID CARRIGAN
1900 K. Street NW
Washington, DC 20006
Counsel for Bethesda Softworks, LLC

TELEPHONIC APPEARANCE:

MR. SEAN LEUSIN
Counsel for VIWY Limited Partnership

THE CLERK: In the matter of Circuit City Stores, Inc., case number 08-35653, hearing on items one through 33 as the matters for today's docket.

MR. FOLEY: Good morning, Your Honor, Doug Foley on behalf of the debtors.

First I want to thank the Court for the opportunity for the last hour to try to work out some additional resolutions that are on the agenda, and I believe we have done that.

Today with me at Counsel's table is Gregg Galardi from the law firm of Skadden, Arps, Slate, Meagher & Flom. And here from the company today, Your Honor, on the front row is Mr. Jim Marcum, Chief Executive Officer, as well as Bruce Besanko, the Chief Financial Officer for the company, Reggie Hedgepeth, who is the General Counselor for the company. Also we have Chris Crowe, who is Director of Real Estate, who is with the company as well, Your Honor.

THE COURT: All right.

MR. FOLEY: Your Honor, we did file an amended agena last night. If Your Honor doesn't have a copy, I would --

THE COURT: I do have a copy

and I reviewed it.

MR. FOLEY: All right. We would essentially like to file that agenda, Your Honor, with a couple of exceptions, some settlements, resolutions.

Just to go through starting with item number one, this is a motion to file schedules and statements. Our anticipation is to file next week and give notice to parties by December 19th. So although we ask for the end of the month we anticipate filing this next week. And the motion has not been opposed and we would ask permission to submit an order.

THE COURT: That will be granted.

MR. FOLEY: Thank you, Your Honor.

With respect to items number two, three and four, and seven, these are special employments applications.

The first one for our firm is for Counsel for debtors. And also with respect to item number three, application for Kirkland & Ellis to employ as special financing counsel; and also application, number seven, none of those applications have been opposed.

We also have, Your Honor, an employment

application for Ernst & Young as tax consultants. We would ask the Court -- there has been no objections with respect to those applications and we would ask the Court for permission for those applications.

THE COURT: Does any party wish to be heard in connection with the proposed applications?

All right. They will be granted.

MR. FOLEY: Thank you, Your Honor.

With respect to the application of Rothschild as Investment Banker and Financial Advisor, as the agenda reflects, Your Honor, the Committee had until yesterday afternoon to object, we have been working through their issues. And I believe we have agreed on a resolution of their issues. We would like the US Trustee's endorsement on these orders to submit those orders as well.

THE COURT: All right.

MR. FEINSTEIN: Good morning, Your Honor. I'm Robert Feinstein, Counsel for the Creditor's Committee. We have been working delinquently with Debtor's professionals including directly with Rothschild on modified terms essentially changing, in many cases reducing the

proposed structure. It's consistent as part of a whole, Your Honor, but which you will see reflected in a number of pleadings we filed.

We are trying to do our best, Your Honor. And you will see a number of positions the Committee is taking. We are trying to reduce the administrative burden to make sure that any dollars that doesn't need to go out the door don't go out the door today. It's somewhat controversial, I guess, but in many cases these are sale tax payments, and employee payments, and so forth. We are obviously in a challenging time and with that in mind, on a number of the applications, including these two professional applications the Committee is the way it is. The specific terms of Rothschild and FDI that we agreed to would be reflected in terms of the order that we are working on. And we would submit those on consent of the Committee and debtors, Your Honor.

THE COURT: Very good.

Does any other party wish to be heard?

All right. Then with the consent of the Committee and the approval of the Office of the US Trustee the Court will approve those applications.

MR. FOLEY: Thank you, Your Honor.

Item number eight on the agenda is a motion to file certain documents under seal. And if I could just pass over that one for a moment because the underline motion is contested so it was not reflected to deal with those together.

Item number nine, Your Honor is the motion to establish compensation procedures, and that motion also is not opposed. But there is one amendment to the procedures and we have spoken with the Office of the US Trustee today before the hearing. And we are going to make an amendment to that one with their endorsement and submit that to Your Honor.

THE COURT: Does any party wish to be heard in connection with that motion?

All right. The Court will approve that as amended with the endorsement of the Office of the US Trustee.

MR. FOLEY: Thank you, Your Honor.

With items number ten on the docket, Your Honor, this is a matter involving our motion to procedures, we have resolved one of the objections. We have not resolved the other objection but we are working through that. And for the procedure order we ask that this be adjourn to the December 22nd

docket.

THE COURT: That will be adjourn.

MR. FEINSTEIN: Thank you, Your Honor.

And with item number eleven, that motion, Your Honor, and there had been significant objections to that. We are also working with the Committee with respect to that to work through that as well. And we ask that every thing related to matter eleven be adjourn to December 22nd.

MR. GALARDI: We have been working with the Committee and we understand that they have objections to that. We met with them yesterday and we also have been working very hard with them. We are currently putting it over to December 22nd. We may actually come back on January 16th. I think that is another date we have. I just want to give Your Honor notice of that because we may just simply file a notice say it's further adjourned. Some people in the courtroom know that we may not be done December 22nd. Again, as Mr. Feinstein said we have made a lot of progress with negotiations between ourselves, the Committee, so for now we would like to put it off to December 22nd.

THE COURT: All right. That will

be adjourn to December 22nd.

MR. DUNCAN: Your Honor, if we could be heard on that please?

THE COURT: Yes.

MR. McJuskin: Your Honor, John McJuskin on behalf of Bethesda Softworks, LLC.

THE COURT: Bethesda Softworks?

MR. McJUSKIN: Yes, Softworks, LLC.

In connection with this matter I would like to raise the motion, my partner who has been working on this matter. If he could be heard?

THE COURT: Yes.

MR. CARRIGAN: Good morning, Your Honor, Daniel Carrigan.

THE COURT: Carrigan?

MR. CARRIGAN: Yes, Your Honor.

Your Honor, our particular observation on this, what is on the agenda, number 12 on page 9, our response to another motion is listed as an objection to this motion. And I noticed in the Debtor's response, filed the response that our response listed was not addressed. All we are saying is that we believe this should come up at the time the reclamation motion is going to be addressed.

Thank you, Your Honor.

THE COURT: If we address that today it will certainly be taken up at that time.

MR. CARRIGAN: Thank you, Your Honor.

MR. FOLEY: One matter we would like to take out of order Your Honor relates to the motion, the 9019 motion of Panasonic, which is item number 31 on the agenda. The Committee filed an objection to that settlement. Late last night I believe a settlement had been worked out with respect to that. And counsel to the Committee are here towards that settlement.

THE COURT: All right.

THE COURT: Please identify yourself each time you come to the podium so we have it on the record.

MR. FEINSTEIN: Certainly.

Robert Feinstein for the Debtor's Committee. Your Honor, the amendment that we made that we reflected in a memorandum form agreement with them and debtor has the attached of a form of a consent order to be submitted. It certainly makes changes.

One is to address the treatment of

Panasonic claims with respect of merchandise that was sold prepetition. The initial motion and agreement there were to be a payment to Panasonic for that amount. And there was an agreement by Panasonic to sale, both of those provisions are out. So all rights are reserved with respect to prepetition cosignment. There is no obligations on Panasonic's part to sale on credit. They will be selling on CIA terms.

But with all other respects the agreement will be respected and the provision in the agreement for the sale of the remaining merchandise that is still in debtor's possession. And the agreement we will submit Your Honor will address all of that.

THE COURT: Thank you.

Does any other party wish to be heard?

MR. SMITH: Good morning, Your Honor, J.R. Smith on behalf of Panasonic. Here with me today is Mr. David Hillman.

THE COURT: Thank you.

MR. HILLMAN: Good morning, Your Honor. I heard what Mr. Feinstein had to say with regard to settlement agreement. That was accurate. However we did take great pains last night and this morning to memorialize the changes to the settlement

agreement and to the order. And to the best of my knowledge there is no dispute or issue with respect to the settlement agreement or the order and we are simply at house keeping phrase for the order to be submitted. So to my knowledge there is no further negotiation and it is just a house keeping matter at this point.

THE COURT: Very good. Thank you.

MR. HILLMAN: Thank you, Your Honor.

MR. FEINSTEIN: That's right, Your Honor. I think I left out one thing, Your Honor, that Mr. Hillman will appreciate me saying. We are in discussions but I don't think it has been formulated or resolved to development program to provide trade support and administrative support for the company.

THE COURT: Very good. Thank you.

MR. MATSON: Good morning, Your Honor. Bruce Matson here on behalf of Bank of America. This happened very recently. We did have an issue in how this would be resolved. We would like to see the final order. We don't anticipate any issues. Mr. Gelardi assured me that we don't have an issue. We would like to look at the order before it gets enters.

MR. FEINSTEIN: Just so Your Honor

has some background, we would have needed amendment if it came down to prepetition status. The banks were waiting to see how the Committee reacted. This happened late last night around 11:00 or so.

THE COURT: Very good. Thank you.

So with the amendments stated on the record the Court will approve that order when it comes in.

MR. FOLEY: Thank you, Your Honor.

Your Honor, the next two items we would like to take up involve a motion Shopping.com, those are items number eight, which is unimposed and item number 26, which was filed yesterday. Mr. Cohen is here for Shopping.com.

THE COURT: Thank you.

MR. CONDYLES: Good morning, Your Honor, Michael Condyles on behalf of Shopping.com. I would like to present to the Court Jeff Cohen. We have submitted a motion, it has not yet been entered. And I would ask that he be permitted to speak before the Court.

THE COURT: He may.

MR. COHEN: Good morning, Your Honor, Jeffrey Cohen on behalf of Shopping.com.

Your Honor. I think this should be

pretty short. In essence, our motion is a request for adequate insurance (inaudible) and acknowledgement from Debtors and the Court that any postpetition service provided and qualify, and a request to the alternative. I'm not going to go through all of this. I think we can narrow it down.

Basically Shopping.com is an online capacity website. It permits the debtors to post advertisements of the sale items on Shopping.com depending on what the debtors pay or intend to pay Shopping.com dictates where their adds would be placed on the site.

The higher priority the logo of Circuit City logo will appear next to the sale the link saying price, it will have a logo. When they click on that logo it will go to Circuit City.com and that occurs a fee within Shopping.com.

In addition to that Shopping.com in working with the debtors work to optimize the relationship. By doing that the debtors will be struck then to negotiate deals with third party vendors on behalf of it.

For example, not many people go directly to Shopping.com. They go to google and they put in a television they would like to see with

various sale prices across the internet. Shopping.com will negotiate with google that when that item is searched on google then Shopping.com will have a higher priority towards the top of the first page. And when you go to Shopping.com on google and you go to Shopping.com Circuit City will be highly listed.

So Shopping.com encourages cost in negotiation with vendors. And then when a consumer clicks on Shopping.com it results in a charge and Shopping.com then gets reimbursed for that.

What we are asking for today is it seems that the debtors have acknowledge at least in part in their objection is that a minimum in order acknowledging postpetition services will characterize that any click by a consumer on Shopping.com that results in the routing of the CircuitCity.com website will qualify as an administrative expense claim.

The debtors do say in their objection that they have no objection to that if we can prove that in addition to a transaction -- Your Honor, I believe if you review paragraph 18 in the debtor's objection and has admitted as a part of the admission by the debtor's clear statement that the

debtors would be severely prejudiced if Shopping.com terminated the agreement.

The debtor's successful reorganization is dependent upon remaining a high level of sales particularly during the holiday season, the internet in particular, and Shopping.com in particular provides crucial avenues by which the debtors may obtain this.

Without Shopping.com services the debtors suspect a decline in sales at their on line stores. So I think at a minimum an acknowledgement of postpetition services would qualify as administrative expense claim and of course we heard the debtor's response. I don't believe that would be a disputed issue.

Shopping.com now request in addition to that is not the long list of items I mentioned in the motion, we are not going to ask Your Honor today to give us that. I do ask Your Honor, because unlike your typical relationship with a vendor or service provider, since Shopping.com is going out and expending cost on behalf of the estates and issue bills on a 30 days basis. So at the end of the month they will issue a bill by the 15th day of the month then its 30 days terms. It often results

in Shopping.com extending resources and sometimes waiting 60 to 90 days of providing 60 to 90 days worth of services before we would know whether payment on that first bill, that first month, will be made on a timely basis.

So Shopping.com's request is a deposit, not to different from a treatment of a utility product, as an internet provider. I think you can draw a parallel between the services of Shopping.come and a utility provider.

Your Honor, considered a utility deposit provide a two week deposit to provide services for 30 days. Shopping.com would make a similar request for a deposit to protect them especially since out of pocket may occur. In addition, Your Honor, that we bill every 30 days with a 30 days notice, go out and pay on behalf of the estate. What I would ask Your Honor to do is to permit Shopping.com to issue a bill every 15 days and maintain a 30 days notice, but this way we are just trying to figure out different avenues of providing Shopping.com with that little bit more of protection and yet maintaining the use of the services for Circuit City through the critical holiday season and in light of electronics through the uptake for this. We want to

make sure they can continue to use the services and be permanently listed.

THE COURT: Thank you.

MR. FOLEY: Your Honor, Doug Foley on behalf of the debtors. We filed our response and we plead out the arguments in the papers that the request for relieve of motion although we appreciate Mr. Cohen backing off some of the request from the motion. But it is still essentially -- they are not seeking 365(B)2 because it is too early for us to do that.

If they want to send us bills more often then they are free to send us bills more often as long as we are not obligated to pay them more often. What they have asked for is no different from any other contract party, the third party -- Shopping.com with extending cost of credit to provide the service, we don't have that in this case. We are sympathetic to their position. We would ask the Court to deny their motion.

THE COURT: What does the contract say about the billing cycle?

MR. FOLEY: It is every 30 days I believe. Thirty days for the bill, thirty days to pay.

THE COURT: Thank you.

Does any other party wish to be heard in connection with this matter?

Mr. Cohen, do you wish to reply?

MR. COHEN: Your Honor, I'll be brief. Just to address the debtor's points, I believe it's performed in the contract. The contract does not require that we go out and pay third parties providers to risk this we do that at the instruction of CircuitCity.com. Their account manager talks to our account manager and request that we go out and make payments -- we are obligated to perform, we will. We are under no obligation to negotiate third party vendors for higher placements on the website. We do that at the request of the company.

THE COURT: With regard to that, what are you asking me to do, isn't that just a matter of business negotiations between you and Circuit City?

MR. COHEN: All I'm asking Your Honor to do is to protect us from posting deposit. If Circuit City wants to pay us in advance and say I am willing to pay you to pay them, that's fine too. But I think it's less burdensome on Circuit City to post a two week deposit

and then be able to run up credit with us on terms as opposed to us delaying the listing by demanding cash in advance.

THE COURT: But isn't that something that you can negotiate directly with Circuit City? That is not something that the Court should impose, is it?

MR. COHEN: Your Honor, I believe we can negotiate directly with them and I advised my client of that. I think in these economic times people are looking for a second degree of comfort. They have seen comfort given to others similarly situated creditors. If you look at utility motion, there are nine included, there is a third party vendor who consolidates the utility bills. That vendor does not qualify as utility but is getting a deposit. I think what my client is looking for is the comfort that may go out of pocket that they have something protecting them, that they will in fact get reimbursed. So if they fail to pay a bill they will have a deposit there. We are a unique party involved. We are critical for their online services.

Your Honor this will impact the debtor's ability to operate on line would be significant. A request for a two week deposit is a $100,000.00 issue in a multi billion dollar case. I think it would be beneficial for the debtor to be willing to post that deposit.

THE COURT: Thank you.

Is there anything further?

MR. COHEN: I appreciate your time.

THE COURT: Thank you.

The Court will grant the motion for filing documents under seal with regard to the motion for adequate insurance of payment. The Court is going to deny that motion. I'm not going to require a two week deposit. And I think the parties are in agreement that post petition transaction are to administrative expense status and will submit an order to that and will grant that.

MR. FOLEY: Thank you.

MR. COHEN: Your Honor, may I be excused?

THE COURT: You may be excused. Thank you.

MR. FOLEY: Your Honor, the next item is number 12.

THE COURT: Thank you.

MR. GALARDI: Good morning, Your Honor, Gregg Galardi on behalf of the debtors.

Your Honor, the next motion is item number 12. We have addressed this on the first day. As I pointed out, Your Honor, on the first day I did point out what I think may be the most controversial, in particular, and as I pointed out, Your Honor, and I will proffer the testimony of Jim Marcum, who is the active CEO and President, and the Committee agrees that we can do this by proffer. They will be free to cross if they so desire.

Mr. Marcum is the acting CEO and President of the company and Vice Chairman of the Board. I thought it was important to express his position of why we continue to support our former employees and our request for continuing what we had called (inaudible). But as I pointed out Your Honor, there are two decisions that have been recently rendered by prepetition obligations probably entired priority and probably not entitled to administrative expenses. As I noted, Your Honor, on the first day we acknowledged that and we still believe for other reasons that these statements are important for Circuit City to make.

Mr. Martin, if called as a witness, would advise Your Honor that there were 700 positions that were, in fact, terminated and given notice of terminations, I think it was the Thursday and Friday before we eventually filed our petition for relief in these cases. And each of those employees were notified that they were being terminated. And I know it received wide press coverage here in the Richmond area as well as nationwide. But there were 580 people that were terminated at that point. We believe, Your Honor, that there was roughly 1.1 million dollars a week to be paid to these terminated employees as we went forward and therefore the 60 day period, I believe that it was and Mr. Marcum would confirm that it would be approximately $8,000,000.00 in payments.

Mr. Marcum would also testified that approximately 4.4 have already been paid to those employees. Your Honor, Mr. Marcum would say that the relief would be in the best interest of the company notwithstanding the fact that claims made be only priority or to some extent unsecured on the following basis.

If he was called as a witness, he would testify that many of the people were given

significant time and effort and in some instances have worked their lives at Circuit City. It was an unfortunate fact that the company had to take but nonetheless the needs of these employees and their wages are still in the best interest and reasonably necessary to the reorganization for these two reasons.

First of all, Your Honor, these people are still in the community and are still loyal customers of Circuit City and it is important for us to continue with the customer loyalty and the goodwill of these employees. So therefore it was important to treat them what we believe is right.

Importantly, Your Honor, and Mr. Marcum would testify that it is also critical for the morale for the still 30 or 33 thousand people still at Circuit City. In deed, Your Honor, there has been many questions that if Your Honor doesn't understand then Mr. Marcum could testify that there had been many meetings with people who are still employed and still concerned about their own wages and benefits. Termination rights, Your Honor, which Mr. Marcum is familiar with having been in this situation before with the fact that contracts go unforceable and there are benefits and other

programs. We don't have a retention program at this company at this point and time.

Your Honor, Mr. Marcum would testify that we have limited availability, but nonetheless, Mr. Marcum would still testify that what he thought was in the best interest and what the company determined to be in the best interest was to treat these employees the way they did because of the need to continue to have the 30 some thousand work force in the company, still believes in the company and still believes in the employees, and that they are instrumental and the company achieving the business plan for these companies. And therefore he still believes it is in the best interest notwithstanding the four million that has gone out the door, and notwithstanding the fact that we are still requesting a four million to go out the door because it would have a spill over affect, not only on the customer base, but the customers in the community, and also a negative impact on those employees that are still in the company. And at this critical time and this critical time of the year that making each payment and with these employees, that although it may not be required under the law, that the four million dollars should

still be paid.

Finally, Your Honor, we would also note that if Mr. Marcum was called to testify that it was somewhat to his nature or accidental nature, that we gave similar notices, as Your Honor knows, with respect to store closing employees, but because they were actually store closing employees, those people are going to be paid essentially the same notice that they fortunately will be able to work out their entire time as store level employees. So it looks like all of those employees would get essentially the equivalent notice, although they were too notified prior to bankruptcy that their job would be terminated. So they continued to work at the store level.

Your Honor, again, Mr. Marcum, would further testify that these payments were in the budget that we presented to the Court, that they were negotiated with the lenders, that the lenders understood the company's position and accommodated the company's position.

So then, again, Your Honor, Mr. Marcum would testify that he believes it is in the best interest of the company and at this time to make the business plan achievable to continue to make these

payments and make the balance of those $4,000,000.00 payments. That would be Mr. Marcum's testimony.

THE COURT: Does any party wish to examine Mr. Marcum with regard to the proffer testimony?

All right. The Court will accept the proffer.

MR. GALARDI: Your Honor, I guess it comes down to some legal argument. Your Honor, the legal argument I think fails us here as the fact that unless Your Honor wants to go against the two opinions that we've seen, there are two clear opinions out there today, which say we gave notice of termination and we are not contesting those facts. We gave notice of termination prior to filing. And those two opinions would say that you terminated there is a prepetition that is priority perhaps, the ten thousand, I think these people got that amount or close to it. So there is another balance that would be an unsecured claim.

Again, if you look strictly at the employees that's probably the law. But as the law defines whether it was necessary for the reorganization, Your Honor, we think this Court has the power to authorize their payments.

And Mr. Marcum's testimony would be that but I can't put intangible when we get $4,000,000.00 in benefits, or $5,000,000.00, the goodwill of these employees, the loyalty of these employees, the dissimilar treatment although for legal grounds that they are not the same as the store level employees to keep these corporate headquarters employees. And then the signal that it sends to the rest of the corporate employees who are being asked during this period, which is a difficult period, to keep their head in the game and to maximize value and to achieve a business plan when it is obvious to them that currently times are bad, the programs they have counted on, the contracts, all of those things as Your Honor knows we cut back significantly, servants payments, those sort of things may not be available even for those employees currently but to send a signal that we are going to do everything for our employees that the Court wants.

THE COURT: Thank you.

MR. FEINSTEIN: Robert Feinstein with the official creditor's committee. Your Honor, the Committee's objection to this motion was not taken likely. We are sympathetic with the employees

and we understand the hardships this might cause them. We appreciate that some of the money has gone to them. So it's not all or nothing at all. But as the representatives of the creditors of this enterprise looking out for all of the constituents, vendors, landlords, the current employees, the 30 some odd thousand employees who would be devastated if Circuit City doesn't survive Ch. 11. We felt it necessary to take the position on this and a number of other motions today. It's difficult. It's difficult to understand the consequences of withholding payments to not just employees, but taxing authorities, the landlords, Panasonic, who wanted to get paid nine million.

Your Honor, eight million here, nine million here, thirteen million here, pretty soon you are talking about no money. And we live in very uncertain times. As Mr. Cohen said it is a very challenging economic environment. And all one needs to do is read in the newspaper every day to see the kind of challenges that Circuit City is facing, that other retailers are facing, that the vendors and the landlords are facing. Everybody has some real hardship here. We are trying to pull together in a certain effort to make sure that Circuit City

remains as a viable enterprise for the thirty some thousand that are still employed and for the benefit of vendors who are looking for a good customer in Circuit City, and for the benefit of the landlord who do not want empty, dark stores.

So this is very difficult and it is unfortunate that some people along the way will feel hardship, but it's a shared hardship Your Honor. This is not a step we took lightly. The Committee is comprised not simply of vendors, but some landlords, and PPVC, and a class action on behalf of employers. And all of them unanimously agreed and support the filing of this objection. It is not something, as I said, we did lightly.

In terms of the legal argument as Mr. Galardi noted, there is the cases that say these are prepetition claims and consistent with the approach we have taken on all matters before Your Honor today. We are trying to conserve --

THE COURT: Well those cases are not binding on this Court --

MR. FEINSTEIN: Your Honor, this is a case of first impression. We are asking Your Honor to follow those cases on the law and as a matter of doctrine of necessity. I will

certainly make the argument, Your Honor, that it is necessity dealing with the other end, that we not send any money unless we certainly have to in order for the greater good to be pursue. So we are asking Your Honor to deny the motion.

THE COURT: If I do deny the motion then certainly the coming into the Court and having to decide the issues and then to litigate those issues and then that is going to distract the company, aren't those things that the Court should take into consideration as well?

MR. FEINSTEIN: There are any number of legal issues that could be raised before Your Honor, company management, this is a discreet issue in one of many. I don't know if it is typically burdensome for the company to have to deal with this issue. If Your Honor follows this it would end up priority unsecured claims so will be treated in the order of the bankruptcy code of their case. I don't know if there is really much more than a discreet legal issue for a lawyer to address and for Your Honor to decide.

THE COURT: Thank you.

Does any other party wish to be heard in

opposition to the motion?

MR. GALARDI: Your Honor, there is the distraction argument. I also note that those cases may technically apply on legal principals, those were liquidated cases, and one of the things we considered and that is why we looked to Mr. Marcum testify by my proffer is that we were actually looking to what affect this would have on the current employees and that is why we are relying to a large extent of the doctrine of necessity.

Your Honor points to another aspect of this. You are absolutely right, there is time and distraction. There is with any prepetition claim but the reason those cases got brought was because as soon as you didn't pay this you have class actions in the first days of the case.

Again, based on all of these things in consideration of making decisions, they made the decision, that is to make sure when you are letting a person go out of this company, this was a major layoff as Your Honor knows. It was 500 people at the corporate headquarters right here. So all of those consideration, although maybe not legally technical and that is what the doctrine

of necessity goes to it is reasonably necessary to affect a reorganization. We are not liquidating right now. We are not hopping to ever liquidate right now. You will see when we get to the landlord matters we are already trying to and I think the Committee is to reorganize. With that as the motivation, I think there is legal authority under 105 even if Your Honor wanted to follow the strict reading of the two other cases to still authorize the relief. There is plenty of relief we have done first day, that is not stricken within the bankruptcy code. The question is the reasonable necessary to reorganization and the company's position is this is reasonably necessary to have this company to have a opportunity to reorganize and we ask that you grant that.

THE COURT: Thank you.

Does any other party wish to be heard?

All right. The Court has read the paper that has been filed and with the testimony that has been offered today in the argument of Counsel. The COurt agrees with the company to exercise its business judgement. I think it would be disruptive. I'm not going to

rule today on whether claims entitled to administrative expense status, that remains an open issue and one that weighs heavily on the Court in making this decision. I think that given the testimony, the proffer testimony, would indicate a large number of people remain in the community and would need the company for its existing employee's morale that the Court will approve the motion and overrule the objection of the Committee. I did not take the Committee's objection lightly. And I think it is a very strong argument. I think in this case that the motion should be granted.

MR. GALARDI: Thank you, Your Honor.

Your Honor, I would ask permission that Mr. Marcum be excused so he may go back to the company?

THE COURT: Yes.

MR. GALARDI: Thank you, Your Honor.

Your Honor, with respect to the next motion on the agenda, I think I will be dealing with the rest of them.

Matter number 13 on the agenda is again one of the first day motions that the Committee has looked seriously too. It is the motion to pay sales, use, trust fund, and other

taxes. There were multiple bases for these payments. Your Honor, we filed an amendment, or an amended motion to seek payments I think an additional $10,000,000.00 payments. What I believe we have agreed to with the Committee and again we are not saying things we don't believe in and the Committee has raised a very valid objection to the payment of sales, use and other taxes. We have been working on many things. We have not been able to provide them with all of the information with respect to these amended taxes. What we have agreed to do is have an agreement, and whether we are going to do it as a separate order or otherwise, where we will not pay these sales, use and other taxes until we give the Committee the information and whether there are Trust Fund, taxes, or other reasons until the Committee agrees that we can pay those.

And should we have a dispute then we will come back on the 22nd with respect to any disputes. We hope not to have any issues with that. But we would like to be able to convince the Committee either that their trust fund, taxes, or some other reason that they should pay because I don't think the Committee wants -- trust fund taxes are not property of the estate. So what we have

agreed to do is give them five days notice of that kind of information and if there is an objection to that in that five days then we would not pay it. If there is no objection then we would be authorized to pay it and that is how we will deal with any money. And I'm not going to just limit it to the supplemental, to the extent if there is any money from the original budget, or with respect to additional money we will apply with that procedure. And I think Mr. Feinstein is okay with that procedure.

THE COURT: All right.

Mr. Feinstein.

MR. FEINSTEIN: Yes, Your Honor, I can confirm that we are okay with that procedure as with a number of these matters we are trying to work out. I do want to just signal that the position we continue to take is that if these are demonstratively trust fund taxes, not just property of the estate, it would be appropriate for the debtor to obtain them. But if it's any other kind of nontrustfund payment of prepetition claim then we are going to oppose it.

THE COURT: Very good. So that will be approved as modified.

I think Mr. Stein wants to --

MR. STEIN: Richard Stein on behalf of the Internal Revenue Services, Your Honor. I am at a little bit at a lost on this one because when I read it, and what has been described here today seems to be a little bit different than at least my reading of it, and it won't be the first time that I'm wrong. But I have a great problem if the company intends on not paying over on the 941 taxes, certainly the trust fund portion as well as the corporate payment of the 941 taxes. So to the extent that it doesn't deal with each time there is a salary payment made to any employee the company pays into the federal government or to the depository account payments. If they are going to continue to do that I have no problem, otherwise I have a great deal of problem with any kind of order that would authorize the nonpayment of taxes.

THE COURT: This order doesn't authorize the nonpayment of taxes. The order that I previously entered authorized the debtor to pay these type of taxes and now with it being modified, it is only that the debtor is going to give five days notice to the committee before they make a payment. And then if the Committee objects to it

then you would have to discuss it with the Committee and if nobody agreed then we can come back and I can make a ruling. But right now I am not authorizing a nonpayment of anything.

MR. STEIN: Thank you. I apologize.

THE COURT: You make a good point.

MR. STEIN: Thank you.

MR. GALARDI: Your Honor, we understood it as just the authorization you gave us is subject to Committee approval on those matters, and the Committee was clear on its position.

Your Honor, that then takes us to matter 14.

THE COURT: For the record, Mr. Galardi, I will approve that with the amended that you described.

MR. GALARDI: And, Your Honor, I think the Committee as we anticipate I think it will probably be more affective in going back and modifying what Your Honor has already entered. We have had a proposed stipulation that we addressed, you will see the Committee has certain concerns before we take certain actions. I would add this one to that order. Hopefully we will be submitting under separate covers Your Honor an order saying

here is how the Committee and the Debtors are going to go forward with any of what I call the bankruptcy prepetition relief. We are working on that order but we just don't have it today.

THE COURT: All right. Very good.

MR. GALARDI: Your Honor, the next one on the agenda is matter number 14, which is the Debtor's motion for utility services procedures.

Your Honor may recall we did this the first day and I guess Mr. Johnson was the one who had raised concern about that. We have since carved out a number of other entries. I believe that this motion is fully resolved although I see right there.

The first change, Your Honor, is we have spoken about a block account after going back and forth many times about block accounts, a separate escrow. Essentially what will happen is the bank will set up a reserve that we do not have access to that funds. It just makes it easier like most reserves. And then if somebody makes the request that reserve will be subject to the availability and we will let the Court know of the availability. That was one of the first clarifications we wanted to make to the order.

And, in addition, you will see the notice of appeal date on the procedure, we are trying to work out stipulations with all of those parties either by way of paying them, I think we have stipulated that this order does not apply to them very much like Mr. Johnson. It doesn't apply to them so we have with respect to that stipulation and there are others that are listed.

In addition, Your Honor, we said in our relief we have negotiated, renegotiated settlements with most if not all of the utilities. I don't think that anyone is still out there that is objecting, I have one adjourn that I know of. We are evaluating the pay in advance or give them a deposit. And then one of things we have talked about, Your Honor, one of the things that will happen in the next hearing or for the final hearing that five million reserve, that two week reserve, will be adjusted accordingly since Mr. Johnson represents every utility I can think of, that reserve will become much smaller. We have resolved his objections.

I think then we have resolved all of the objections to this motion that the order can stand with that one modification to the order

that says instead of a block account it would be a reserve established by the bank. And we would say this is a final order today. I think we have no parties contesting or asking for any other adequate insurance.

The one party is accent energy that ask that this motion with respect to it be adjourn over to December 22nd. So we would essentially carve them out from this, it will not apply to them as a utility, but the same procedure would apply to them if we resolve it or contest it on December 22nd.

THE COURT: Does any other party wish to be heard with respect to the utility motion?

MR. MATSON: Yes, Your Honor.

THE COURT: Mr. Matson.

MR. MATSON: Good morning, Your Honor, Bruce Matson again for Bank of America. I don't think we have any issues at all. We just want to seek final order. There were some protections in the first order related to banks but I don't think it's going to be an issue.

MR. GALARDI: We are working on that language with Mr. Matson.

THE COURT: So then the motion

of Accent Energy will be carried over to the next date.

MR. GALARDI: Yes.

THE COURT: Are you going to be submitting a new order then?

MR. GALARDI: I think we will have to submit an amended, whether we call it final order, final utility order, but it will have the language we need to have.

THE COURT: All right. The Court will look for that.

MR. GALARDI: Thank you, Your Honor.

Your Honor, the next matter on the agenda is matter 15. And, again, it is first day relief. The Committee filed a limited objection. It goes to the stipulation we are working on. It is an explanation of what has been up to date, what has not been up to date, and then the notice provision. I think that resolves the Committee's objection. It wouldn't have to be revision to this order, rather it will be superseded by our stipulation. And there were no other objections.

THE COURT: Very good.

MR. GALARDI: The next matter is 16.

It is the first day motion with respect to contractors and satisfaction of liens. Again, we have agreed the same thing that it will be part of the Committee's stipulation there will be a reporting mechanism, a explanation mechanism, that we are working out language. So this order is final, separate order between the Committee and the Debtors.

THE COURT: All right. That's approved.

MR. GALARDI: Similarly with respect to number 17 on the agenda, that is the motion of the debtor to pay certain foreign vendors and service providers, similar objection by the Committee, similar response. We will add a stipulation of the debtor.

THE COURT: That will be approved.

MR. GALARDI: Your Honor, the next matter on the agenda is the motion for granting administrative expenses and postpetition delivery of goods, the matter of establishing procedures for reclamation.

Your Honor, we received three objections. One was Warner Home Video; the other was Alliance Entertainment and then finally Lumisource filed an objection. I think we have

resolved those with all clarification to language that we can put it in the order to be circulated to counsel. I don't know if there was any other objections. I think they have all been resolved by language we worked out to clarify. We are not trying to prejudice anybody rights. We are not trying to limit their rights.

THE COURT: Does any part wish to be heard in connection with this motion?

MR. ENGLANDER: Good morning, Your Honor, Brad Englander. Our concern, I think the language the debtor propose, I think it needs to go just a step further. I think what the order does is it picks pieces of the language. What the language does is pit picks pieces of 546(H). One of the provisions of this -- I'm sorry. I see now that the language has been added. Thank you.

THE COURT: All right. Very good.

MR. CARRIGAN: Daniel Carrigan, Your Honor, with Bethesda Software, LLC. Your Honor, we filed a response. Our response went beyond the issue that has been addressed under 546(H), although that was part of our response as well. Our response is more global and that the debtor has now taken the position that reclamation

creditors have a general unsecured claim for the goods and so forth. This is all back to the value that has been argued throughout the northeast, New York, Delaware, and else where. And I am not sure if that is what is before the Court today, although I am prepared to address it if the Court would like.

THE COURT: As I understand it nothing is being called along those lines on a subsitive basis based on this motion.

MR. GALARDI: You are absolutely correct, Your Honor. We have not and I want it to be clear that the reclamation claims, that work with the prepetition security interest, and there is no value -- we are not making that argument. We have not made that argument. We have not made a representation or inclination to make such a representation. What our procedures essentially is that you have the right to go and exercise your reclamation rights as a secured creditor, we are not limiting it.

MR. CARRIGAN: With all do respect, Your Honor, that is not the case.

THE COURT: Show me what it is that --

MR. CARRIGAN: If Your Honor would turn to the motion that was filed. The debtors took

the paragraph from the previous page. The debtors submit that the reclamation claims are not entitled to administrative expense with respect to any of reclamation claim, but instead are general nonpriority unsecured claims subject to the debtors rights to object to such unsecured claims on any ground the governing law permits.

THE COURT: That's in the motion.

MR. CARRIGAN: It is in the motion.

However, Your Honor, it is also in the reply that was filed last night. And it's that reclamation creditors are not entitled to adequate protection. However if the Court would turn its attention to the response. I'm sorry I don't have the docket number.

THE COURT: I have it in front of me.

What page is it?

MR. CARRIGAN: It doesn't have a page number, paragraph 13.

THE COURT: All right.

MR. CARRIGAN: Your Honor, the cases that are cited, they are all the same. These are the cases. Obviously the debtor did take in position these claims are not entitled to any treatment other than a general unsecured claim.

THE COURT: You expected them to take that --

MR. CARRIGAN: I would expect that.

THE COURT: But that is not what we are adjudicating in the motion. All we are doing is establishing procedure as I understand it.

MR. CARRIGAN: But the procedures have subsitive affect, Your Honor. As Counsel acknowledged at the original hearing is that the current 546(B) remedy is strictly returned goods, and they are being sold even as we speak. So that when we get 120 days down the road is there going to be anything to reclaim, the good will all be sold thorough.

What we asked for in our motion, what we suggested in our motion, is the kind of motion that has been entered in Winn Dixie. It's been entered in other cases up in New York, that would basically say that if the debtor is going to get a holiday on responding to and dealing with reclamation claims but not have to address them in the iterum, then the catch at the time should not adversely affect the rights, things that happened because the reclamation creditors are not able to get their goods back. That is because the goods are

sold or as the structure of this motion had before that the debtor could return goods after 120 days or at some point without the creditor's consent, which has been changed and is now clarified. There would be nothing to get back except that which the debtor no longer wants, those that are broken, or those that didn't sell. We are in the peak season. The goods are being sold through.

By the time we ever get around to a resolution anything worth having is already going to be sold. So this procedure motion has subsitive impact. The debtor also ask in here, I believe, for clarification that the automatic stay applies here.

Now the citations that are in the records, the parentheticals that we suggested that it is only self help. But the breath of the commentary, or the argument, is that any kind because what they want or what they say they want, they don't want distraction in the company.

This goes back to the fundamental remedy that we have under reclamation. The remedy of the reclamation is that the notice is given and what typically would happen outside bankruptcy would be that the reclamation creditor, reclamation claimant, whatever the designation, would file a

lawsuit to try to obtain reclamation. They would seek a temporary restraining order requiring them to recover the goods.

Now during that process and this is all outline actually in cases that is referenced in this reply. If the Court would refer to (inaudible), that case is based on another case, it is based on an older case called Westwood Bank. What Westwood Bank said is that were eliminating reclamation is foreclosure by the secured creditor and use of that foreclosure sale to pay down a secured debt.

And what the debtor is concerned about and perhaps justifiably we don't even know how many total reclamation claims there are in this case. In Winn Dixie there is plenty. We knew how many there were. There was a process. There was disclosure. There was at least you knew what was going on, what was happening with the reclamation claim. There is no disclosure provided for here.

The order is issued to the subsitive rights also has no governing procedures, or standards, or anything else with respect to when the debtor will or will not honor a reclamation claim. There is a provision that they give or sell with a reclamation -- they can either pay him or give the

goods back. Well who monitors that. Who approves that. How does the reclamation creditors know that they are being treated the same across the board.

We suggested in our response is a one side fits all program. It is also a situation that if the debtor really believes that these claims are valueless under standards, and what those cases do is they take and proxy a foreclosure and use the proceeds to pay down the secured debt. The proxy for that is a quote evaluation, much like under 506, a secured claim or not a secured claim.

So the assumption is that if you go through every single claim, or every single reclamation that the lender's lien is always going to be greater -- pay down the unsecured debt. But is that realistic. Is that practical. Is that what happens in the economy. No, it hardly ever happens today. It only happens like that in liquidation sales.

And that is our concern, Judge. When we get to the end of this process unless there is some kind of stay of affect of these procedures we are not going to know what is happening with those reclamation creditors. That they could pay for whatever reason, and not even have to bring it

to the Court for disclosure.

And, Your Honor, in the other cases that we and counsel for the Committee and also for some of the cases in Delaware at least it was a process where they would have a reclamation report which would identify all of the claims, which would identify those that have essentially reduced various reclamation claims whether it's a notice or what has happened in most of those cases is you get to the end of that whole process, you spent a lot of time and a lot of money evaluate in looking for these things. Now we are going to go through this exercise over the next three or three and a half months and we are going to come to an end and we are going to have evaluate -- what is the point in spending the money, the creditors committee are concerned about, and the vendors are concerned about, that everybody is concerned about, what is the point of that exercise. Yes, there needs to be a process. There is no question about it. And we suggested a process in our response. But our concern is that the process, the so called process is going to affect subsitive rights, and that it could if it's abused, if manipulated where you go outside of the rules, and frankly most of the cases

today it's not unusual. It has turned the rules up side down.

The Mating (phonetically) case years ago was all about the confirmation of the plan and then you pay in the order of priority. Well we have these cases today, these great big cases, is that almost everybody gets paid at the front end including for example, with respect to 503(B)9. Those claims have a second priority after the cost and expenses of administration of Ch. 11 case. Now the Ch. 11 process and administration is being paid on an out going basis. And we did not object to the employee's motion. We do not want the employees to be adversely affected, nor the former employees. So we don't have any objections to that. But frankly they are behind us on the 503(B)9 plan and they are getting paid. And various taxes are behind us and are getting paid. And these foreign vendors are getting paid and they are behind us. And the vendors who products are generating money for the debtors operation right now, or at least some of it, are the ones that are having to stand still and wait for a period of time and may never get the claims backs. The debtor comes back in 120 days and say sorry we don't have that any more, or here is what

we have left, you can have it.

Respectfully, Your Honor, the procedure drives subsitive results. And that is the problem with the motion and the process of the structure right now.

THE COURT: Isn't that what you have as an administrative expense claim?

MR. CARRIGAN: Your Honor, the 503(B)9 is the administrative expense claim, but there is no time to specify to when it paid. But what it does say is that it is senior to most of the other priority claims that are already being paid.

And that is the point how can he justify jumping off the entire train, if you will, of the absolute priority rule that if you don't pay prepetition claim, confirmation, when you get off that rule and it may be a problem with the legislature more so, because you are here on the first day and you are here three weeks later and the answer is that this is the very same situation. The economy is dreadful. You've got hundreds if not thousands of people who depend on this company for their jobs. But let's remember and as pointed out in the declaration, there are hundreds if not thousands of vendors who are dependent upon this

company. A two million or $5,000,000.00 account receivable for these people can be just as dramatic if unpaid -- have just a dramatic affect upon other companies.

So the trickle down affect, if you will, described is very much equitable to the vendors that are out there. And the fact is I don't think there is any dispute. Although, again, the debtors haven't told us how many reclamation -- in Winn Dixie the debtors told us and they estimated the amounts that would come in and the numbers were known at some point at least. And you could say yes, it's a very large number and if the debtor had to pay all of that money right now, the vendors understand that. On the other hand -- it's one thing that they understand it and is working with the debtor, it's a whole different thing to say as time goes by we will work with you, but trust us. And then at the end the goods are all gone.

There has been too many cases, and if I remember the numbers correctly and Counsel can correct me, there are hundreds of millions reclamation claims made, and of course those are not all valid. But that number is going to come down because they are just overstated. But there are

hundreds of millions claims made. In Flemming I can say that when we got to the final numbers that came out of the debtor's reclamation point, it had gone from hundreds of millions down to about a twenty million, and part of that was because the stuff has been sold through. And it wasn't there any more and we couldn't claim it. And because there was no say in the process the argument was that what was a couple hundred of million dollars is now a twenty million claim, and by the way that was valueless because the value of the inventory was not greater than the amount of the secured debt. We are not fighting with the secured creditors here. We are not really trying to fight the debtors. What we are saying is don't limit our rights under the procedures.

THE COURT: All right.

MR. CARRIGAN: Thank you, Your Honor.

MR. GALARDI: Your Honor, I never had a procedure objected to like this, so I would do what I did with the utilities, I would carve him out because these procedures do not apply to him.

MR. CARRIGAN: Your Honor, we did not ask to be carved out. We asked for a fair and equitable procedure. If Counsel wishes to

carve us out then Counsel should give us a fair and equitable procedure. If Counsel does not wish to do that then the Court will really have to rule up or down on it.

THE COURT: You are not bound by the procedures under procedural order then you have all of the rights that you had coming in and nothing has been compromised today and you can proceed by motion or whatever you want this Court to grant you.

MR. CARRIGAN: Your Honor, superficially I would say that is right. But as a practical matter what is going to happen, our client has a three and half million dollar claim. And, again, Your Honor, we didn't ask to be carved out, what we say to the Court is the problem with this order is it's unfair. It has a subsitive impact and --

THE COURT: But if it's not impacting you how --

MR. CARRIGAN: It does impact us, Your Honor.

THE COURT: You are not a part of it.

MR. CARRIGAN: Your Honor, this

would be like if the debtor came to you and said we have a motion that we are going to apply to a whole class of creditors except this one. Now that is obviously discriminatory.

THE COURT: I don't understand. If you want to be excepted from the order then you can, if you want to be a part of the order you can. So it's not discriminatory. You can pick which way you want to go.

MR. CARRIGAN: It's not quite the picking, Your Honor. And, frankly, let's examine what would happen if we were on our own. If we were on our own then we would have the right to go in and file a reclamation claim with this Court. We would then have to go through the preliminary injunction and the process. And then the bank for three million or two million, or whatever is left, they could foreclose upon us and use the money to pay down. While every hundred perhaps, or how many other reclamations are out there are going to be sitting there and hoping that one day the debtor -- we are at a loss if we are all by ourselves in this. I mean that is the answer to this.

The debtors asked for a one side fits all solution. Our response was yes, a one side

fits all make sense, but it needs these kind of modifications. If we are not going to consent the carve out. And we were very careful in our motion to ask for not to be carved out, what we asked for was a fair process. If the fair process is not going to be afforded or what do we view as a fair process, or the Court can decide it is a fair process. And if they do the Court can impose it on us and we certainly will obey the Court's order.

But the carve out is not a realistic -- again, Your Honor, frankly the debtor filed this motion and they asked for relief under 546(H). And it included all of the elements under 546(H) subject to the rights of the secured creditors and subject to a lot of other things but they left out the consent of the affected creditor.

Now what were they going to do when it comes back later. Were they going to say that anybody that didn't object to this motion has consented so they get their goods back when ever they get them back and whatever they are. That's the danger of these things is that this process offers the opportunity for the debtors, and not even having to disclosure to anybody.

And, frankly, Your Honor, no,

we will not consent to being carved out. If the Court carves us out, the Court carves us out. If the Court overrules our objection, the Court overrules our objection.

But our problem is the debtor wanted one size fits all process. It is not only a process it is also a subsitive affect. And we suggested a process that has proven out, it has worked in other cases that would be applicable to all. If the Court chooses to disregard that, or rule that it is inappropriate or unfair, we respect that and we want the Court's judgement.

Thank you.

THE COURT: Mr. Galardi.

MR. GALARDI: Your Honor, with respect to the process, I think, Your Honor, in reading through the brief again, I find the process some what -- the reclamation claims are secured creditors under the modification of the code. They have secured creditors rights that can be asserted and they have the rights in pursuing those. What we found, Your Honor, in dealing with all of those protective orders, and then we are going to first day motions to try to avoid being in Court every few days. I understand at the end of the day you are

selling goods. And why we draft the procedure the way we do and why we are very clear, if they are not comfortable with these procedures, then you are entitled to file a lawsuit, a request for a stay, a temporary injunction, because we do understand. This is just like outside of bankruptcy, every day those goods get sold their reclamation claims may become less. They can protect their rights. This was a mechanism to give us notice so we can have conversation.

But if people are concerned about that then we can carve them out of the motion, or the motion in particular, they are filing an action getting a preliminary injunction and getting their goods. So in that context, our brief is actually helping creditors understand that they have rights now as secured creditors. They can optimize the procedures and know the risk. But if you don't want to be in a procedure, here is what the code says, and by the way

the procedure doesn't preclude you from doing what the code says, or what lawyers do, namely file a complaint. Whether he wants to be in or out, what the consequences of saying if you are not happy then you should come in and protect your rights. The debtor is not going to protect all of those rights. We are going to try to work with the committee and come up with a process. We do support our vendors. But this was to get a notice so we can start talking about that. But it doesn't preclude anybody that is unhappy from coming in and asking for relief. So we ask Your Honor to overrule the objection.

THE COURT: The Court is going to overrule the objection. I will approve the procedures, and if the creditor wants to opt out of the order, he may.

MR. GALARDI: Thank you, Your Honor.

Your Honor, we now come to matter 19, which looks like it may have taken a long time, Your Honor, we very much appreciate you giving us the hour to talk before we came in.

I am very hopeful to say that we have resolved all but one objection. I think we have resolved these objections. I think this goes to number 19, number 20, and I believe there is one other one. I am going to say some things that what I think we have agreed too. I am sure there are plenty of landlord counsels behind us, behind me that may come up. This is also with the effort and the suggestion of the Committee, who has two very large landlords that have many leases.

The first thing we would agree to Your Honor and you can see from our brief that there is a split in authority between a billing date and an accrual date. What we have agreed with every single objecting landlord, we will agree that the accrual method applies. So therefore and we have a number of leases as I explained to the parties, and one reason why you have gotten so many objections to 365 before because of the complicated restructure.

Your Honor, I think I explained in the first day we have what we call the surplus leases

that were already rejected but under rejection motion. We have been going forward the leases that are store closing leases so we are concerned about whether December and how the accrual method works. We have the stores that we have no intention to leave at this particular time. And among those stores some are paid in advance, but unfortunately some are paid in arrears. So there is an objection out there today that somebody would be paid rent on November 30th, but it would go back to November 1st. So we have agreed that regardless of the way your lease works, if you have objected we would apply the accrual method with respect to you.

Any landlord who is not an objecting party we will not agree to that. We will reserve our rights to argue otherwise. We understand that the circuit may have the accrual method, but we will reserve our rights to say otherwise to do whatever we need to do. But we are with respect to any objecting landlord in the room we are agreeing the accrual method applies. It applies not only to those who pay in advance but also -- for example, there is one landlord in here that has a November 30th payment that would go back. They agreed I don't have to go back all the way to November 1st.

I am only going back to November 10th and paying that rent. And to stay consistent with 365(B)3, we are going to actually take up one of the accruals we will pay. That was one of the many points that we did.

Your Honor, the second part of this 365(B), we also agree with the landlords that we needed a 365(B)4 extension for the reasons set forth in the record on the first day. We have agreed with the landlords. I think we have resolved every objection in 365(B)4 motion. But to make clear there are carve outs to that 365(B)4 and again we didn't realize the carve outs when we made them.

In particular, if you were what we call the (inaudible) leases we didn't have the inventory, this motion does not apply to you. You are carved out. So I still have my 120 days with my rights to ask for an additional 90 days. If you were a GOB store because we are liquidating inventory in those stores. We are going at a store closing store, we are not going out of business. If you are in one of those since we liquidate the inventory, again we are not exceeding the 364(B)4 extension. What came to my attention and the banks have agreed too. There were some leases that were

in a construction phrase. Obviously we didn't have inventory, but we didn't know and there extensions, we are not seeking an extension with the inconstruction, again, the lenders are concerned about the liquidation of the inventory.

Your Honor, we agreed that we would again, and I understand this is an issue in this jurisdiction in particular which I have learned this morning, there is an issue of timely obligation in the accrual of stub rent. Landlords are very concerned about the stub rent, and if we don't pay the stub rent right now there will be consequences. We have agreed to at least for this purpose and there are reasons, business reasons, we have been working with the Committee, any of the requests to have immediate payment of stub rent, whether that is in the form of a motion, or in the form of an objection, or in the form of an objection from the 365(B)4, we are saying you don't need to make a motion. If you have already done it, and all such objections are going to be adjourn over to December 22nd. With that said because of the accrual method we will agree that they are administrative claims, and we are really talking about the timing of the payments of those. I guess the concern is here that

if they delay the payment on it we would ask Your Honor to enter an order to protect them from the delay of any payments right now at least.

My understanding is if they receive an order tomorrow and this is today saying immediately pay it they are out of that disgorgement, the dissolution issue, so they were very concerned about that and that is what prompted a number of motions and reactions.

We have agreed that, if Your Honor agrees, to help get us to that December 22nd date to not fight the issue of the timing of that thing is and that hopefully get beyond that and to not fight issue, at least from now until December 22nd, the facts that they have delayed, not delay, we asked for a delay, the fact that we are not paying it now should not subject them to dissolution or disgorgement or anything else and we come back on the December 22nd to discuss the issue.

In addition, Your Honor, as I've told the landlords, with respect to stub rent, Your Honor, we have two types of leases now. We have the leases that the stores are liquidating during -- under the agency agreement although they are not third party beneficiaries of that agreement we have

agreed to pay because we are being paid by the agent, we have agreed to pay that rent. Again if you live by the accrual method you are going to die by the accrual method so that means and they all agreed that if we stay on through mid-December that having pay December 1st rent, we will have rent and we can actually vacate the premises, and we are working on what that means, then we only pay for the two weeks so the landlords are agreeing to that sort of method.

I think and I know I jumped around because I got to go back to the objection motion, but it all goes as one big piece. Those were the major concerns that resolved the 365(B)4. Your Honor, our motion may read incorrectly, so I want to be clear on the record. If we will have to actually assume or actually reject by the earlier of the confirmation date or the 210 date, not that we would file motion on that date to extend that time period. Now with respect to confirmation we would have to make a notice that we are assuming confirmation, but as normal we would not have those go affective until the affective date and they agreed to that. But we can't change and play games with the confirmation and the affective date to say ha, ha, we assumed it

and now are rejecting it. So I think that was another issue that they had that we have resolved.

Your Honor, the other things that we have resolved with respect to some of the properties is, and I will wait until they come up, there were a number of people that objected to the rejection. And the issue comes down to a number of issues. This is where I think there is one outstanding objection. We have two problems and most of it comes from did we give the keys back, did we surrender the premises. We have a witness who would be available to testify of that. What I thought we would do in that case is argue that everybody rights are reserved. If you raised the objection that the affective date of our rejection or we didn't surrender the premises for whatever reason, it was not November 9th, or November 12th, or November 19th, or whatever, as long as you agree that it was by November 30th, so we put a perimeter around that date and all rights are reserved and argued whether there was an affective surrender or not, then we have agreed to that. We are not going to put on evidence today of that. We will try to resolve that. And, again, that would be a stub rent claim, if we were wrong and it was not of the

affective date and we have our position, they have theirs and then we will talk about if it's two days, three days, four days stub rent. But it will be treated like all of the other stub rent claims without the subject of dissolution on those issues. I think that is resolved. I will find out when I leave the podium of that.

Your Honor, then we have our stub rent, the sublease issue. You see a number of objections from landlords where they are the overlord or the sublessee, I believe that we are agreed in accepting in one situation that because we gave notice of the rejection both to the overlord and to the sublessee, will agreed that both have been rejected. Nonetheless, we couldn't do all of this before -- but we still want to do a deal. We are letting them have more time. We will gladly help them. But we will certainly suspend it to December 22nd, if they could work out deals. We have no problems with people working out deals as long as we are clear that there has been a rejection and those people can still fight what the date of the keys were. One landlord still may have an issue on that.

Your Honor, then we have the unfortunate

circumstances for them, perhaps fortunate for us, is that some of the sublessee pay rent for the month of November on the 1st and we didn't pay rent to the landlord. Since we have money prepetition put into our accounts, we told them we were unfortunately unable to pay that money back. So we agreed that if they want to come in and argue that point we can do that with Your Honor. We can't without an order of the Court say by the way you got sublessee you get back the money. That is something that the Court will just have to decide. We would oppose it. Landlords are free to argue that. We are not resolving that today.

But as a compromise on the other side, some landlords did in fact make the December payment. But we didn't pay December rent because we thought they were rejected. What we told the landlords was we are not going to try to make in the postpetition period. That's just an accounting problem. We would if we got it, give the money to the landlords, back to the tenants pending upon the circumstances. That is what they want. Again, there is one landlord that may say we took it and we got the rent. Everybody else has agreed with that provision.

We then got to the fifth procedures, Your Honor, and again, I think we got pretty far on all of these and then I will leave the podium to the landlord counsels. There was a concern about notifications with respect to this procedure adequate insurances, and I'm hoping that we settled these in this environment. But as a precaution what we have agreed to do, and I think there is a December 17th date by which we would have to give notification to the parties as to the bidders of the properties for adequate insurance information. We would by Friday noon post on the website and hopefully send out to the landlords, if there is a bid on their property we would notify them of the potential bidder. And I think the hearing is December 22nd, so the ideal is give them notices back.

We would modify the bid requirements of anyone who wants to bid on them. So if we don't get a bid we are going to give that five days notice of the date of rejection. But the rejection would be affective again this goes to what constitutes surrender, we would give notice, you get five days notice to turn over or shut off the alarm code. And I said we would make reasonably efforts to give them

the alarm code and turn over the keys and to deactivate the system if we are not going to be there.

And with respect to third parties we would try to -- they were concerned about the property. We are aware of perhaps the collateral of the banks. What we would do is try to give notice and we will do the best that we can to all third parties that we believe have property in there. And the same five days notice saying take it or it will be given to the landlords free and clear so they don't have a liability should they get it, should they throw it out, or should they sale it.

We also agreed, Your Honor, that it is really not appropriate until the actual sale of the property, if the period of time that the order may become immediately affective. That would be December 22nd if we are in the position to that.

Finally, Your Honor, I think on December 22nd what we have agreed to is we would only go forward on the uncontested sales of leases, and if there is a contestant matter with respect to the sales of the leases and the parties couldn't agree to go forward on December 22nd, we would come up with some hearing, Your Honor. If we need to do it

before the year end, we would ask for time for that. But at least we will agree temporarily not to try to force if the parties are not prepared to go forward on December 22nd, given that date, it's the 17th and 18th becomes the weekend and then we are back here so we would agree to that.

Let me test my memory and see if there is anything else. Now my understanding, Your Honor, with respect to all of the parties other than I think two parties, one of the sublease and the rejection, one trying to determine by putting off motion to compel could be done on December 22nd. I actually think that resolved all of the objections to the rejection motion, which was number 19. It resolves a lot of objections to 20 as well Your Honor. It resolves all of the objections with respect to the motion listed on 21, which is the extension of the 365(B)4. I think we should probably stop there and let the counsels go. I will go back to this, motion 20, which is the agency is resolved by I believe most -- I see Mr. Branch coming up -- but in addition, Your Honor, we want to make clear in a modified order, as Your Honor is probably familiar the agent has been dealing with landlords on all of those issues. We want to make

clear that the agent could landlords that are enforceable. We want to make sure that the agents have the authority to do so, that those letter agreements could be approved and finally that the sale of the would be free and clear of all those claims and encumbrances. Again, the bank group had agreed to the original motion to do that. If there is an issue with the bank group, that we would in fact make sure that is possible on that aspect.

Your Honor, I may have missed some parts of my script before they all come up and speak.

THE COURT: Let me ask you this question, please. Should we plan a lunch break? Would it make sense to talk a little bit with the landlords to see if there was something not put on the record because it sounds like to me that you made tremendous progress this morning in just one hour. Does it make sense for us to take a break or do you want to push through?

MR. GALARDI: Your Honor, I think we should take a break. I'm not sure that there are many other matters. But it may be worth it to take a break. Let me go through this, 22 is a motion to compel rent. And 23 is the same, 24 is the same, 25

is the same. Your Honor, has already disposed of 26. And 27 is again a motion to compel rents. And 28, Your Honor, is to the supplemental sales use. Your Honor, I believe with one change to number 29, that is also resolved. The landlords have asked for clarification on that as well. It's the later of, they don't have to file a general bar date. It is the date by which it's 30 days after rejection, what ever is the later of those two. So they don't have to put in all of their prepetition damage claims. There is an outstanding objection. We are agreeing with the agency governing 180 days. That takes us to number 30, I believe, that will be a matter we will be hopefully resolving. Number 31, Your Honor, is already handled. And 32 would be addressed and 33. So I do think a break at this point might clean the whole agenda except for maybe a couple objections.

THE COURT: All right. We will go ahead and do that.

How long do you want to take a break?

MR. CURLY: Paul Curly, I want to introduce the Court to Mr. Cunningham. I have an obligation this afternoon and I was going to ask Mr. Cunningham to be able to appear without me being

present.

THE COURT: Certainly. That will be granted.

How long do you want to break for?

MR. GALARDI: Your Honor, if you want to take a lunch break now, it's 1:00. Would 2:00 give everybody enough time. I think a break until 2:00 and we can work the language out and that will give your staff time to have lunch and we can finish this up.

THE COURT: We will stand adjourn until 2:00.

(A lunch recess was taken.)

THE COURT: I see everyone is back.

MR. GALARDI: Your Honor, there is a gentleman here that is not on the agenda, who represents the monitor in Canada. I think we should take that one first before we go back on the docket.

THE COURT: Who in Canada?

MR. GALARDI: As you know we filed a CCWA proceeding.

THE COURT: Yes, sir.

MR. GALARDI: And he would like

to say a few words to the Court.

THE COURT: All right.

MR. GALARDI: Thank you.

MR. SMITH: Good afternoon, Your Honor. Thank you for hearing us. J.R. Smith from Hutton & Williams. With me today is Mr. Ken Coleman. I would ask you if he may be heard today.

THE COURT: Yes, sir.

MR. COLEMAN: Thank you, Your Honor.

I will be very brief. Those proceedings are commenced in Canada that these Ch. 11 cases were commenced. We represent the monitor who was appointed in that proceeding. As Your Honor may be aware the appointment of a monitor is required on the statute. There is a great deal of attention being paid in the Canadian proceedings. Very briefly, I just wanted to outline a couple of points to the Court. One is the monitor's role in the Canadian proceeding. The monitor is an officer of the Court. He is not a party to the proceeding. He is independent, neutral, and intended to assist the company and the creditors to achieve a restructuring.

One of the functions of the monitor is to file periodic reports that is the principal

means of the communication of the Court to appoint the monitor and the principal means of communications between the creditors, constringencies in the proceedings. We have done a fair amount of work representing monitors in the US cases. And some Courts have found it helpful to receive copies of those reports to be filed into the US proceeding. We are happy to do that here if Your Honor thinks that would be of interest or somehow informative. We are happy to proceed on that basis if you think that would be helpful to the court.

Later today, I think in about an hour's time there is a hearing to approve a sale process and that is designed to be a duel process, Your Honor, a stand alone process for sales or in conjunction with a larger transaction made. That process in Canada is on a pretty fast track. Proposals, current proposals are due by the 15th of January. And it is intended or at least proposed in the order that will be submitted today that the monitor have full participation in that process in Canada. That transaction if it goes forward would require approval by the Court and depending on the other aspects of the deal particularly if there are some US elements to it, there may be a need for

coordination and cooperation between this Court and the Canadian Court. It may be useful in that regard for the two courts to have communication. And we would make available to your chambers the contact information if Your Honor would feel that it is appropriate to communicate.

Just very briefly, Your Honor, the other two items up for today in Canada are extension of the stay, proposals to extend that out to January 30th and as well to make certain modifications to the initial order that was granted on the first day.

Your Honor, if you think it would be helpful to this Court we can file those pleadings and those orders along with the reports as you wish, and provide as much or as little information as Your Honor would desire to see. Those are my comments.

Thank you very much.

THE COURT: Thank you very much.

Mr. Galardi, do you think those would be helpful to have the reports or any of those pleadings filed in connection with this case?

MR. GALARDI: Your Honor, I have know objection if you have an interest to do that.

THE COURT: I don't know if we need to have the pleadings filed.

MR. GALARDI: Your Honor, we have been involved with the monitor. We have discussed the process and how it coincides with the process here in the United States. We had a meeting already with the monitor. I think having the monthly reports that they do is a good ideal. If there is some pleading that they thought is really important they could always file it. The reports might be a good ideal to get.

THE COURT: Very good.

MR. COLEMAN: Thank you, Your Honor.

MR. GALARDI: I do believe we have resolved the landlord type motions and all of the issues. I would turn to matter 19. Matter 19 is the motion of us to reject leases and to abandon property. I guess I missed a couple of things that I would like to put on the record with respect to this that I think finalizes it.

There are three objections, Golf Galaxy, Dick's Sporting Goods, and Dollar Tree. We have agreed to adjourn their objections to rejection over to the January 29th date.

THE COURT: Those are Golf Galaxy, Dick's Sporting Goods, and Dollar Tree?

MR. GALARDI: Yes, Your Honor.

There are also agreements between landlords and subtenants that we are going to have side deals where there will be assumptions and assignments as opposed to a challenge of business judgement, where we had at least made it neutral, I believe, with landlords. One would be Cardinal Distribution would be the landlord and GEI is the subtenant doing business as CP Transportation Systems. The second would be OLP6609 Grand LLC with Lazy Boy as the subtenant. And then I have, I think it's Ban CCIWR Business Trust with DHL. So we would seek to have those agreements. Your Honor, with respect to the actual date of rejection as well as you have seen a lot of landlords say we have banished the property especially with types of claims they may have in addition to stub rent, all rents are reserved. We are not trying to say that there is not an administrative claim. We are not saying that there is. We are just reserving all rights for people to make any claims they want out of this including a claim for stub rent and contesting whether we actually are entitled to the date of rejection. If I'm not mistaken that resolves all of the objections.

THE COURT: Thank you.

Does anybody wish to be heard in connection with the motion authorizing rejection of an expired lease?

MR. LESTERMAN: Robbie Lesterman. Your Honor we filed a joinder in the objection of Dick's Sporting Goods.

THE COURT: Right.

MR. LESTERMAN: We filed it last yesterday evening. The objection is docket number 275, I believe. And I just want to make it clear that we just simply join in that objection. We are the primary landlord with respect to that lease and so we have no problem with carrying that objection or joiner over to the 29th.

THE COURT: Thank you.

MR. LESTERMAN: Thank you.

MR. GALARDI: Your Honor, there is one lease that we have not moved to reject, or didn't apparently have it on our sublease rejection, that we agreed with Counsel that we would do.

MR. CUNNINGHAM: For the record, Your Honor, Gary Cunningham appearing on behalf of the landlord in Detroit, the service center for Circuit City in that geographic location. There is a subtenant, apparently a subtenant lease that we

weren't party too. They have not received any notification of what is happening here in this Ch. 11 proceeding. Counsel for the debtor and I have agreed that that needs to be resolved as well. And I believe debtor will take all of the steps necessary in order to get notice in file a motion in order to reject that sublessee.

MR. GALARDI: That's correct, Your Honor.

MR. CUNNINGHAM: And we also agreed, Your Honor, as other landlords have on the proration method being the law of the case here. The only other issue we have is our damage claims and we agreed that we will preserve those as the same as the debtor. And I think that resolves everything.

THE COURT: Very good.

What is the docket number? Did you file an objection?

MR. CUNNINGHAM: We did, Your Honor, docket number 260. I'm not certain what the letters were. The original one was 260.

THE COURT: That's sufficient. Thank you.

MR. CUNNINGHAM: Thank you, Your Honor.

MR. GALARDI: Your Honor, the other

one is there is an objection, I think it's docket number 368, Home Family Trust, we have reached an agreement with Counsel.

I think that resolves all of the objections on number 19. What we intend to do is work on an order and we will circulate an order on Monday morning, circulating to the parties so that they can review it to make sure I've gotten everything.

THE COURT: So do you anticipate there will be one order for every landlord, or are you going to circulate separate orders for each of the landlords who have objected?

MR. GALARDI: Good question. I think what we will do is resolving their objections, Your Honor, because remember this was a motion to reject, they objected to that. So we will circulate it to them. And if they need a separate order then we will do a separate order trying to get on record any agreements, if necessary, if they are comfortable with my representations. They can contact us if they want an order for that.

THE COURT: All right. Very good.

MR. GALARDI: Your Honor, may I have permission that if we don't need to file an order

but we have an agreement by email or other way that that will be sufficient instead of filing an order or stipulation, if landlords are comfortable with that.

THE COURT: That is fine with the Court.

MR. GALARDI: Thank you, Your Honor.

Your Honor, as I move to matter 20, I believe that this is the motion with respect to the Gordon Brothers. Your Honor, I neglected to say -- I mentioned that there was (inaudible) Company that was being sold. Your Honor we amended the agreement with respect to sale. What had happened was we decided to go away from Gordon Brothers and thought we had a better deal and it was our only option to do so. Then once we received the better deal we then circulated that deal and Gordon Brothers made the higher proposal, which is reflected in the letter of agreement. We shared that letter with the creditors committee. I wanted to bring that to the Court's attention so we ask for approval to proceed that way.

In addition, Your Honor, I missed a number of little points, well big points to everyone. First landlords will be authorized to

appear at the auctions whether they bid or not. Second is that landlords will be entitled to credit bid, we have the right to contest whether it's a valid amount. And those credits will include both prepetition and postpetition accrual again with respect to the landlord's bidding.

In addition, the landlords if bidding on their own lease would not have to make a good faith deposit on their own lease. It is their own lease. Obviously if they go on any other lease they get treated like any other bidder.

I may have misspoken that the adequate insurance information be transmitted is actually December 16th. And then I have the obligation by December 19th at noon put on the record where these properties have gone. And I'm loosing my notes on the December 17th date. Secured objection deadline, which I didn't refer too. Apparently there is a shorter period with our modifying this order, that will be modified over the weekend. It's already a deadline, but we are essentially extending the deadline for persons to make objections. It will give the landlords more time to make the calculations and make the objections. And then any amounts if we do sell the properties and we have an

agreement, or to the extent we have an agreement, we would pay up the amount and we are not going to hold the landlords hostage to the full amount being resolved unless there is such a gigantic difference that we can't agree. But I can't imagine that will be the case. We will pay the uncontested amounts at that point and then we can resolve any other additional amounts at a later point. I believe that there resolves all of the objections to number 20. And on this one what we were doing and Counsels to the landlords have been very helpful here, we have modified the order to reflect all of my comments, the additional comments. The ideal would be to circulate this order to the objecting parties. We ask if they don't have their emails on something we already have to give us their emails to circulate that order on Monday morning and then to get all comments around noon or 1:00, and then try to circulate and file that order for Your Honor by the end of the day, Monday. It may split to Tuesday. We will be sure to get these deadlines out there.

THE COURT: All right. Very good.

Does any party wish to be heard with connection of this motion?

MR. FEINSTEIN: Robert Feinstein

with the creditors committee, we just ask even though we didn't object to this that we be included in all of these orders being circulated.

THE COURT: I would assume you would be included or at least that would be my hope.

MR. GALARDI: Yes, sir.

Your Honor, I think on the hearing we have the whole day scheduled for the 22nd.

THE COURT: You do.

MR. GALARDI: What I would suggest is that at least this matter be scheduled for the afternoon. If we have a big enough calender we can deal with other things in the morning. But at least this matter be scheduled for the afternoon if that is acceptable. And maybe we can resolve some objections on some other matters if that is acceptable.

THE COURT: That is acceptable. So we will set this matter down for 1:00.

MR. GALARDI: That will be great, Your Honor. Thank you.

Your Honor, now we turn to matter 21 on the agenda, which is the debtor's motion to extend time under 365(d)4. As I earlier mentioned, Your Honor, we would be extending the time but it

would all be for the 210 days that would have to be done to assume or reject it. Clarification on the record, Your Honor, we put in the order a paragraph that provides that we will satisfy our client's obligation that is required by 365(d)4. And then the way that we worked out a procedure is that landlords, if they believe we have not done so, they will give us five days notice. We will have five days to either fix it or we agree to have to come back to the Court on an expedited basis. I think that resolves all of the objections with respect to -- and the other things I said earlier with respect to the 365(d)4. I think that is the thing that I missed earlier.

THE COURT: All right. Very good.

Does any party wish to be heard in connection with the motion to extend time in which the debtor may assume or reject leases?

MR. EPPS: Good afternoon, Your Honor, H.C. Epps, Jr. on behalf of many of the objecting landlords. I asked Mr. Galardi and he has given me permission to clarify something that he said earlier about the timing. Our group of landlords and another of others have objected to the payments and stub rent for any period of time based

on the language, would have get paid in a timely matter in order to avoid be put into the general administrative expense claims pocket only paid at the end of the case. We had agreed as to the landlords, the payments is considered to be made as of today whether or not it's heard at some other day and that issue will not be raised as to us, the fact that we were not here on a timely basis, that was spoken before lunch but I want to clarify that was what we worried about and we do have an agreement on the issue.

THE COURT: Very good.

MR. EPPS: Thank you.

THE COURT: Thank you.

MR. MCCULLAGH: Good afternoon, Your Honor, Neil McCullagh. I have filed a motion to be here today. I would allow Mr. Wood to address the Court on this.

THE COURT: Mr. Wood.

MR. WOOD: Thank you, Your Honor.

Your Honor, our lease is one of the under construction leases, no inventory, it originally was on the extension list and now it's been taken off and we appreciate that. The debtor, as Counsel said, the current date now will

be March 10th as the drop dead date for assuming or rejecting and we realize that and the debtors has reserved its right to extend that time. We realize that.

But we just want the record to be clear that we are reserving all rights to seek a shorter period, but we will reserve our rights to do so. We have about approximately $736,000.00 contract on the particular lease and under California law they have a time limit in which they can affect that. And some of those time limits are going to be coming due. Certainly they will be coming due before March 10th. Some of them will be coming due this month. We already had one. We actually had two filed and we anticipate a lot more. The parties are working on the termination agreement and I hope that the parties will be able to resolve this, but if not we may be back as soon as December 22nd telling you that if this needs to be compelled -- I didn't want the Court to be surprised by that so we are reserving our rights to do that.

THE COURT: Thank you.

MR. WOOD: Thank you.

MR. CREMSHAW: Good afternoon,

Your Honor, William Cremshaw on behalf of various landlords and particular with regard to objection 607. We have a distribution center in California where our rent is due in and we agreed with the debtor for a payment that was due on November 30th, we have agreed to prorate that from the postpetition period with the understanding that in the event the lease is subsequently rejected we would also be entitled to run it on a prorated basis.

So if they reject it on the 15th of the month then we would get half of the rent for that month even though the rent wasn't due until later. We just wanted to clarify that for the record.

THE COURT: Thank you.

MR. GALARDI: Your Honor, the clarification on the proration are absolutely fine. One of the clarification -- I guess the benefit of being an objector is hearing some of the argument from other counsel. So I will make it clear. if you are an objector even if you didn't ask for your stub rent on any one of those three documents but you are here objecting to any one of those three motions you still have the right and you don't have to file, you can make argument

and get what ever benefit with respect to stub rent on December 22nd.

THE COURT: That is what I understood you to say before we took the break.

MR. GALARDI: And, Your Honor, finally on 365(d) motions to compel, and motions to shorten time we reserve all of our rights as we do otherwise.

MR. LEUSIN: Your Honor, if I may be heard telephonically?

THE COURT: Who is speaking please?

MR. LEUSIN: Your Honor, this is Sean Leusin. I represent VIWY Limited Partnership. We filed an objection and I believe it's docket number 711, with respect to this matter.

Mr. Galardi said earlier that the deal that was set forth on the record related to landlords in the room, and he just said a moment ago landlords that are there, I just want to make sure it covers me telephonically.

MR. GALARDI: Yes, as long as Mr. Leusin stays on the phone. I meant anybody that has filed an objection, Your Honor.

MR. LEUSIN: Thank you.

THE COURT: All right.

MR. GALARDI: Your Honor, I think that is all of the objections to 21 so we will be putting in an order with respect to that.

Your Honor, I haven't identified every counsel with every lease, but I think number 22 has now been continued over to the December 22nd, which is the motion of Burbank Mall Associates to postpetition rent.

MR. (inaudible): I represent Burbank Mall and that is correct, and also with number 23 Crown CCI.

THE COURT: That is going to be carried over to the 22nd.

Now will that be at the 1:00 time; is that correct?

MR. GALARDI: Yes, Your Honor.

If it would make it easier for all landlord counsels to do their matters at 1:00, and then whatever else we can do in the mornings I think would be appropriate.

THE COURT: That is what I thought you said, I just wanted to make sure I understood.

MR. GALARDI: Your Honor, I think that takes care of matter 23 as well.

Now I'm up to matter 24, which

is also a motion to compel rents, to pay administrative rent. Again, I don't know which Counsel represented them but there is an agreement to adjourn.

MR. MICHAEL (inaudible): I represent woodlawn Trustees, also represent docket 25, 502-12 86th Street, and number 27, the Basile Limited Liability Company and we do agree to adjourn on the 22nd.

THE COURT: And that will be at 1:00 also.

MR. GALARDI: Your Honor, that takes care of numbers 24, 25, 27, and number 26 on the docket is already handled. And I think we moved number 27 to the 22nd.

THE COURT: That's correct.

MR. GALARDI: Number 28 is already addressed, which brings us to matter 29, debtors motion a bar date. There are a number of objections filed and I know there are a number of landlord objections, and there are a number of taxing authorities objections. I think the landlord objections are now resolved. We have a language I will make it clearer, that it is the later of the bar dates 30 days after the rejection

or as otherwise provided in any order by the Court.

I don't know if there are other parties in court that have objections to the bar date, notice or order. And I don't know if Your Honor has any other concerns.

THE COURT: Does any party wish to speak to the motion of setting the bar dates?

It appears that you have resolved all of your objections to the Court's finding.

MR. GALARDI: Thank you, Your Honor. We will submit an order reflecting those changes, again with the revisions.

Your Honor, let me turn to matter 30, which is the bidding. Again, I think with all of the representation I have put on the record and of the order, I believe that resolves the matters listed in number 30.

THE COURT: Does any party wish to be heard?

MR. DAVID (inaudible): I really have more of a question on next Monday on the 22nd. I filed in some my motions requesting joining with other landlords. I don't have a subsitive objection as to the information -- would the Court entertain

just one party with other counsel to piggyback in with other Counsel on the same issue and let them argue the issue and abide by the Court's order.

THE COURT: Certainly.

MR. GALARDI: Number 31 is the Panasonic motion, Your Honor. I think Your Honor has already ruled on that matter.

Number 32 is another motion to compel the immediate payment of stub rent.

My understanding is that has already been resolved Your Honor.

MR. WESTERMAN: That's correct.

THE COURT: You need to identify yourself.

MR. WESTERMAN: I'm sorry. Robbie Westerman.

THE COURT: Thank you.

MR. WESTERMAN: It's docket number 471, Your Honor. It was a motion to compel payment of rent. I think it may be number 31 on the revised agenda.

MR. GALARDI: I think it's number 32, Your Honor.

THE COURT: Yes, I have it as number 32.

MR. WESTERMAN: That matter has been resolved.

THE COURT: All right.

MR. WESTERMAN: And we have prior objections as well that has been resolved and that can be taken off as well.

THE COURT: All right.

MR. WESTERMAN: Thank you.

MR. GALARDI: Your Honor, that brings us to the last matter on the agenda, which was demand by Green 521, this is I believe again a stub rent issue. And I believe that it is resolved, actually putting that over to the 22nd.

THE COURT: So we will put that over to 12-22 at 1:00.

MR. GALARDI: That concludes the matters on the agenda, Your Honor. And I appreciate all of the time for being able to talk.

THE COURT: Thank you. I compliment Counsel on being able to resolve all of these complicated issues.

MR. GALARDI: Thank you.

(Hearing concluded.)

CERTIFICATE OF COURT REPORTER

I, Anne M. Nelson, hereby certify that I, having been duly sworn, was the Court Reporter in the United States Bankruptcy Court, Richmond, Virginia, on December 5th, 2008, at the time of the hearing herein.

I further certify that the foregoing transcript is a true and accurate record of the testimony and other incidents of the hearing herein.

Given under my hand this 12th day of December, 2008.

/s/ Ann Marie Nelson
Court Reporer

102

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT D

Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Alexandria Division.
In re U.S. AIRWAYS, INC. et al., Reorganized Debtors.
Philip A. Garland, Appellant,
v.
US Airways, Inc., Appellee.
**No. 1:06CV539.**

Oct. 13, 2006.

Philip A. Garland, Las Vegas, NV, pro se.

Douglas Michael Foley, McGuireWoods LLP, Norfolk, VA, for Appellee.

**MEMORANDUM OPINION**

LEONIE M. BRINKEMA, District Judge.

***1** Before the Court is the appeal of Philip A. Garland ("Garland") of the decision of the United States bankruptcy court granting summary judgment in favor of U.S. Airways, Inc. ("US Airways") on Garland's claim for $17 million, which was based on allegations of racial discrimination, retaliation, and harassment surrounding Garland's employment with and termination by U.S. Airways as a pilot.

The bankruptcy court found that Garland's claims were barred as a matter of bankruptcy law and, in the alternative, barred by *res judicata.* The bankruptcy court further found no evidence supporting Garland's motion for sanctions. These findings were fully supported by the record and will not be disturbed. Accordingly, this Court will affirm the decision of the bankruptcy court.

I. Background and Procedural History

*A. Garland's Litigation Against U.S. Airways in 1986*

US Airways hired Philip Garland as a pilot in 1984.[FN1] In April 1986, Garland filed a lawsuit against U.S. Airways alleging racial discrimination in U.S. Airways's hiring and recruitment practices. *Garland v. U.S. Air,* Inc., 767 F.Supp. 715 (W.D.Pa.1991). Following trial in 1991, the district court found that if not for certain discriminatory recruitment, interviewing, and hiring practices used in the early 1980s, Garland would have been hired in 1982. Accordingly, the court ordered U.S. Airways to assign Garland retroactive seniority to November 13, 1982, and enjoined U.S. Airways from further discriminatory conduct in its hiring and recruitment.

FN1. Garland flew primarily B737 and DC-9 aircraft, and during his employment, he was promoted to 737 Captain, a position he held until October 1999.

*B. Garland's Promotion and Subsequent Termination*

In 1999, Garland voluntarily bid for the opportunity to serve as a captain for a new aircraft type, the B757/767. He was awarded the bid based on his seniority, and completed his training for the B757/767 on October 27, 1999. The completion of this training enabled Garland to receive his Federal Aviation Administration ("FAA") type rating and airline transport ("ATP") license on the B757/767. Garland served as a reserve pilot on the new aircraft type, meaning he did not hold a regularly scheduled line of flying but was contacted for flights according to the needs of U.S. Airways. Garland was required to return for his annual proficiency check ("PC") by the end of October 2000. On October 29, 2000, Garland took and failed the PC. Under the U.S. Airways-Air Line Pilots Association ("ALPA") collective bargaining agreement, Garland was entitled to, and did receive, five hours of training in a flight simulator, followed by an opportunity to retake the PC. Garland failed his second PC on November 14, 2000. Following Garland's second failed PC, the FAA invoked its right under 49 U.S.C. § 44709 (2000) to require Garland to submit to an FAA examination, known as a "44709 check ride," to determine whether Garland should continue to hold his airline transport pilot license.

Under the collective bargaining agreement with ALPA, U.S. Airways was required to provide Garland

with five hours of additional training. However, at Garland's and ALPA's request, U.S. Airways agreed to provide Garland with a full transition training course of 115 hours of additional training, normally given only to pilots with no experience flying the aircraft in question. Despite completing the training, on February 15, 2001, Garland took and failed the 44709 check ride.

***2** After failing the 44709 check ride, Garland voluntarily surrendered his Airline Transport Pilot Certificate for the B757/767 Type Ratings to the FAA, in lieu of the FAA suspending his certification. Once the certificates were surrendered to the FAA, Garland was not lawfully permitted to operate a commercial airline flight and U.S. Airways was not permitted to use Garland as a pilot.[FN2]

FN2. Because he surrendered his certificates, Garland was no longer legally permitted to fly *any* commercial flight, which precluded him from returning to his position as 737 Captain.

Although not required to do so, the FAA agreed to provide Garland with a second 44709 check ride using a different examiner, and U.S. Airways agreed to provide five hours of additional training. On March 7, 2001, Garland failed his second 44709 check ride.[FN3] The FAA would not return Garland's certificates or recommend him for further PCs. Because it could no longer use Garland as a pilot, U.S. Airways permanently terminated his employment in December 2001, after an investigation of the termination decision.

FN3. The record is not clear as to what specifically caused Garland to fail his PCs or his 44709 check rides.

*C. Garland's Post-Termination Litigation*

Garland unsuccessfully litigated his dismissal in the Western District of Pennsylvania, through an arbitration proceeding, and in U.S. Airways's bankruptcy proceedings. After being fired by U.S. Airways, Garland first filed a civil contempt complaint on December 4, 2001 in the district court for the Western District of Pennsylvania, arguing that U.S. Airways's decision to fire him violated the injunction issued by that court in 1991. Although he sought to re-open the 1986 case, he named new defendants, including the two FAA inspectors who had conducted the 44709 check rides, without seeking leave to amend his original complaint.

Garland's termination was simultaneously litigated in an arbitration proceeding brought under the U.S. Airways-ALPA collective bargaining agreement. The arbitration hearing was held before the ALPA System Board of Adjustment ("Board") July 16-17, 2002. At issue in the arbitration was whether U.S. Airways was justified in terminating Garland. At the hearing, Garland was represented by ALPA counsel, who had the opportunity to present evidence, testimony, and arguments and to cross-examine witnesses. Post-hearing briefs and reply briefs were submitted, and the record was completed on October 22, 2002.

By an opinion issued on February 7, 2003, the arbitration was concluded when the Board upheld U.S. Airways's termination of Garland as justified. Although it observed that the issue formally presented for arbitration was whether Garland's termination was justified as a contractual matter, the Board addressed Garland's discrimination claims, finding that there was "absolutely no support for such [discrimination and retaliation] allegations about the Company's treatment of the grievant." *US Airways, Inc. v. The Air Line Pilots Association International,* DIS 01-05-03 (unpublished) (2003) (Krinsky, Arb.). As a contractual matter, the Board found the termination justified because Garland no longer held the ATP license required to work as an airline pilot after his certificates were surrendered to the FAA.

***3** While the arbitration was pending, in December 2002, the district court granted the FAA inspectors' motion to dismiss, and dismissed the remainder of Garland's civil contempt complaint *sua sponte* after finding that Garland's termination was already being adjudicated before the U.S. Airways-ALPA System Board, the completion of which "would obviate the need for further litigation" ("the December 2002 order").

In March 2003, Garland filed a motion for reconsideration of the December 2002 order, alleging that U.S. Airways had engaged in fraud to obtain the arbitration award. This motion was denied.

On May 7, 2003, Garland filed in the Western District of Pennsylvania a "Motion for Trial de Novo and

Hearing Date," again under the caption from the 1986 case, requesting that the court vacate the arbitration decision and hear his contempt and civil rights claims "de novo." The court again dismissed the motion on grounds that it was an untimely filed motion for reconsideration of the December 2002 order. Garland appealed this decision and the decision to deny his March reconsideration motion to the United States Court of Appeals for the Third Circuit, which affirmed the district court's decisions in all respects. *Garland v. U.S. Air Inc ., et al.,* No. 03-2557 (3d Cir. Oct. 9, 2003).

In January 2004, Garland filed yet another pleading in the Western District of Pennsylvania again under the 1986 case caption, titled "Motion to Vacate and Set Aside Orders Upon Evidence of Fraud, Fraud Upon the Court, Collusion and Corruption Pursuant to FRCP 60(b); Motion for Contempt; Motion to Add New Claims and Parties and Scheduling Order." In this motion he alleged that both the December 2002 order and the February 2003 arbitration decision were procured by fraud. In July 2004, the district court once again dismissed Garland's motion as an untimely filed motion for reconsideration. Garland filed a second notice of appeal with the Third Circuit.[FN4]

FN4. On October 11, 2005, the Third Circuit issued an Order dismissing Garland's appeal because of U.S. Airways's bankruptcy proceeding. *Garland v. U.S. Air, Inc.,* No. 04-3155 (3d Cir. Oct. 11, 2005).

On February 7, 2005, Garland filed a new Complaint in the Western District of Pennsylvania, which he was permitted to amend for a second time on November 28, 2005. One defendant named in the case, the arbitrator who presided over the arbitration decision, has been dismissed, but otherwise that case is still pending.

*D. US Airways's Chapter 11 Proceedings*

US Airways, together with its parent holding company and several affiliates, filed a chapter 11 petition for reorganization in the bankruptcy court on August 11, 2002 while Garland's district court and arbitration proceedings were in progress. On October 1, 2002, Garland filed a proof of claim (Claim No. 146) in that proceeding, seeking $17 million for alleged racial discrimination, retaliation, and harassment. Garland attached a copy of the complaint he had filed in the Western District of Pennsylvania in December 2001. US Airways objected to Garland's claim. Because of the pending arbitration and the litigation in the district court, Garland's proof of claim was continued every time it came up for hearing. On March 18, 2003, the plan was confirmed, under which allowable secured claims (except for a convenience class of small claims) would be satisfied by stock in the reorganized company, rather than by cash. The confirmation plan also included a discharge injunction of all claims filed as proofs of claim during the proceeding. Garland sought and was granted limited relief from that injunction to adjudicate his claims in the Western District of Pennsylvania.

***4** In September 2004, U.S. Airways filed its second bankruptcy petition. As a result, Garland's second notice of appeal to the Third Circuit was stayed. On February 1, 2005, Garland filed a proof of claim in the second bankruptcy proceeding (Claim No. 3007). This second proof of claim was identical to the proof of claim filed in the first bankruptcy proceeding, and again requested $17 million, although it gave a slightly different date for the alleged discrimination (two days' difference). US Airways objected to this claim. Because U.S. Airways's unresolved objections to claims filed in the first case, including Garland's claim, were transferred to the second bankruptcy proceeding, the bankruptcy court had two identical proofs of claim filed by Garland pending before it.

A reorganization plan in the second case was confirmed on July 28, 2005. A status hearing on Garland's second proof of claim was set for October 20, 2005, and continued to December 15, 2005, when oral argument of the claim was held.

On March 6, 2006, the bankruptcy court issued a Memorandum Opinion granting summary judgment in favor of U.S. Airways. In analyzing Garland's two identical proofs of claim, the bankruptcy court concluded that the first claim (Claim No. 146), filed in the first bankruptcy case, must be disallowed as moot because confirmation of the plan of reorganization in the first bankruptcy case limited any recovery to a distribution of stock, and all rights to stock issued in the first bankruptcy case were cancelled by the confirmed plan in the second bankruptcy case. Garland's claim in the second bankruptcy case (Claim No. 3007),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

was disallowed because it was essentially identical to Claim No. 146, which had arisen before the first bankruptcy petition was filed and, therefore, was discharged in the first bankruptcy case. The court also concluded that even if Garland's claims had not been disallowed as moot and/or discharged, they were barred by *res judicata* because the claims had been fully litigated before the U.S. Airways-ALPA System Board, the Western District of Pennsylvania, and the Third Circuit Court of Appeals, and final judgment had been entered dismissing his discrimination and retaliation claims. Lastly, the bankruptcy court concluded that there was no evidence that U.S. Airways's counsel had acted in an inappropriate manner, thus Garland's motion seeking sanctions against U.S. Airways's counsel was denied.[FN5] Garland timely appealed this decision to this Court.

> FN5. The sanctions motion arose out of confusion over the date on which Garland's proof of claim would be argued. Garland alleged that U.S. Airways's counsel deliberately misinformed him that the matter had been continued to cause his absence and thereby jeopardize his claim.

II. Discussion

*A. Standard of Review*

A bankruptcy court's findings of fact may only be set aside by a district court exercising appellate review if they are clearly erroneous. Fed. R. Bankr.P. 8013. A district court's review of legal conclusions and mixed questions of law and fact, however, is *de novo*. *In re Johnson*, 960 F.2d 396, 399 (4th Cir.1992).

Motions for summary judgment raise mixed questions of law and fact. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c), *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1985). In ruling on a motion for summary judgment, a court should accept the evidence of the nonmovant, and all justifiable inferences must be drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*B. Res Judicata*

***5** Garland's claims are clearly barred by *res judicata*. Under *res judicata*, or claim preclusion, "a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States*, 440 U.S. 147, 153 (1979); *Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir.1991). The doctrine of *res judicata* bars claims when there is (1) a final judgment on the merits in an earlier suit; (2) the cause of action in both the earlier and the later suit are identical; and (3) the parties or their privies in the two suits are identical. *Pension Benefit Guar. Corp. v. Beverley*, 404 F.3d 243, 248 (4th Cir.2005); *Meekins*, 946 F.2d at 1057.

Garland's discrimination claims were fully litigated before the U.S. Airways-ALPA System Board during the arbitration proceeding. In that proceeding, the Board specifically found no evidence to support allegations of discrimination or retaliation surrounding U.S. Airways's decision to terminate Garland. Instead, it found that U.S. Airways had fired Garland because he no longer held FAA pilot certification and therefore could not legally be employed as one.

The Western District of Pennsylvania upheld the Board's conclusions and denied Garland's motion to vacate the arbitration ruling or reconsider its own rulings. The district court also rejected Garland's allegations of fraud in the arbitration process. The Third Circuit's dismissal of Garland's appeals rendered the district court's judgment on the merits of his claim a final judgment. Because the claims Garland unsuccessfully pursued in the arbitration and district court proceedings and those pursued in the bankruptcy court are the same, and the parties are the same, the bankruptcy court's entry of summary judgment in favor of U.S. Airways on the ground of *res judicata* was fully supported by the record, and correct as a matter of law.

*C. Discrimination*

Even if not barred by *res judicata*, Garland's claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (29 U.S.C. ̄ 2000e-3(a)) would fail because they are without merit. Garland alleges that he was subjected to a racially hostile environment and was terminated due to race discrimination and retaliation for filing a racial discrimination lawsuit in 1986.

Garland fails to state a *prima facie* case of race dis-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

crimination or retaliation because it is uncontestable that he was not qualified for the position from which he was fired. To establish a *prima facie* case of discrimination, Garland must show that (1) he is a member of a protected class; (2) he was qualified for his job and his job performance was satisfactory; (3) he was fired; and (4) other employees who are not members of the protected class were retained under apparently similar circumstances. *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124 (4th Cir.2002). Thus, a crucial element of the prima facie case is that the plaintiff must be qualified for the position in question. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

***6** There is no question that Garland was not qualified for his position as a pilot: he could not lawfully fly a commercial airplane after he repeatedly failed proficiency tests and the FAA revoked his required license. US Airways was justified in terminating Garland at that point. Therefore, he fails to establish a *prima facie* case of discrimination.

Garland also failed to allege any facts sufficient to establish a hostile work environment. To state a claim of hostile environment, the hostility must be pervasive or severe enough "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). A plaintiff cannot rely upon casual, isolated, or sporadic incidents to support a claim of hostile work environment. *See Faragher v. City of Boca Raton*, 524 U.S. 755, 788 (1998). Garland has alleged no facts such as harassing statements, conduct, or actions that would constitute racial harassment. He therefore fails to state a claim for hostile work environment.

Garland has also provided no evidence of retaliation. Lacking any direct evidence of retaliation, in analyzing whether Garland has made a sufficient claim for retaliation, the *McDonnell Douglas* burden shifting framework is the appropriate test. Under that framework, Garland must first make a *prima facie* case by showing that (1) he engaged in a protected activity; (2) U.S. Airways took an adverse employment action against him; and (3) a causal connection existed between the protected activity and the asserted adverse action. *Tinsey v. First Union Nat'l Bank*, 155 F.3d 435, 443 (4th Cir.1998). Specifically, if Garland is able to show that his 1986 discrimination lawsuit in 1986 triggered his termination in 2001, a *prima facie* case would be made and the burden would then shift to U.S. Airways to articulate a legitimate, non-retaliatory reason for its action. If U.S. Airways carries this burden, then to overcome summary judgment Garland must present some evidence that the company's proffered explanation is merely a pretext for retaliation.

Garland cannot establish the third element of the *prima facie* case, that is, causation, because the thirteen years between the protected activity (filing the discrimination lawsuit) and the adverse employment action is insufficient as a matter of law to establish causality. *Tinsey*, 155 F.3d at 443. Moreover, even if Garland could establish a *prima facie* case of retaliation, he has not rebutted U.S. Airways's legitimate, non-retaliatory reason for firing him; namely, that he was not legally certified to fly planes. Garland presents no evidence other than his own assertions that this decision was pretextual. In the Fourth Circuit, such declarations do not rebut a non-retaliatory explanation. *Goldberg v. Green and Co.*, 836 F.2d 845, 848 (4th Cir.1988). [FN6]

FN6. Garland has made other claims and noted several issues on appeal that are also without merit. These include a claim for defamation and assertions that his claims are not subject to discharge in bankruptcy because they are for "willful and malicious injury;" that the debtor has admitted it has insurance that would cover his claims; that it was error for the bankruptcy court to dismiss Garland's claim when no discovery had been conducted and no jury trial held; that a judicial lien was created by the 1991 decision in the Western District of Pennsylvania; that U.S. Airways has engaged in a continuing violation of his civil rights and the bankruptcy court abused its discretion by disallowing his claims; and that his claims were adversely affected by the order closing the first bankruptcy and thus the bankruptcy court abused its discretion by later determining that his claims were disallowed. None of these claims are supported by the record in any way.

*D. Motion for Sanctions*

Garland filed a motion for sanctions against counsel

for U.S. Airways because of the miscommunication surrounding the schedule for hearing his claim. The bankruptcy court found that although there may have been some misunderstanding between counsel and Garland as to whether the claim objection *had been* or *was to be* continued, the outcome was the same in either event. Thus, no action was taken on his claim at the October 20 hearing and there was no evidence that counsel acted inappropriately. The bankruptcy court denied Garland's motion for sanctions. This decision will not be disturbed.

III. Conclusion

***7** For the reasons stated above, the decision of the bankruptcy court will be AFFIRMED.

A separate order consistent with this opinion will be entered.

E.D.Va.,2006.
In re US Airways, Inc.
Not Reported in F.Supp.2d, 2006 WL 2992495 (E.D.Va.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT E

Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States Bankruptcy Court,
D. Arizona.
In re: FIRST MAGNUS FINANCIAL CORPORATION, Debtor.
**No. 4:07BK01578-JMM.**

Oct. 16, 2008.

John R. Clemency and Todd A. Burgess, Greenberg Traurig, LLP, Phoenix, AZ, for First Magnus Financial Corporation, Attorneys for Liquidating Trustee.

James P.S. Leshaw, Greenberg Traurig, PA, Miami, FL, for First Magnus Financial Corporation, Attorneys for Liquidating Trustee.

David Wm. Engelman and Bradley D. Pack, Engelman Berger, P.C., Phoenix, AZ, for Dell Marketing, L.P.

Sabrina L. Streusand, Streusand & Landon, LLP, Austin, TX, for Dell Marketing, L.P.

Sean P. O'Brien, Gust Rosenfeld, PLC, Phoenix, AZ, for Official Committee of Unsecured Creditors.

Walter H. Gilbert, Almquist & Gilbert, PC, Scottsdale, AZ, for Cupertino Capital, LLC.

MEMORANDUM DECISION

MARLAR, Bankruptcy J.

***1** Before the court is the motion of Dell Marketing, L.P. ("Dell") for administrative expense priority concerning property sold to the Debtor and delivered within the 45-day period preceding the filing of the chapter 11 bankruptcy case on August 21, 2007 (Dkt.# 3778).

The facts are that the Debtor ordered, and Dell shipped, products to the Debtor as follows:

| | | |
|---|---|---|
| • | Within 20 days prior to petition date (Declaration of Michael Keller) | $94,535.45 |
| • | Within 21 and 45 days prior to petition date (Declaration of Michael Keller) | *79,700.62* |
| | | $174,236.07 |

Dell promptly and timely made a reclamation demand upon the Debtor, through counsel Sabrina Streusand, on September 7, 2007.

The Debtor never returned any of Dell's product, and instead surrendered it to one of its secured creditors, JPMorgan Chase, N.A., which has disposed of said property and credited sums received against its own obligations due from Debtor. The Debtor benefitted from such surrender of products, subject to reclamation, by having the proceeds reduce its obligation to JPMorgan Chase.

Ms. Streusand's letter effectively created an informal proof of claim under the law, although the figures set forth in her letter were later adjusted. *See In re Edelman,* 237 B.R. 146, 154 (9th Cir. BAP1999). The total remained constant. Other filings by Dell also put the Debtor on notice of Dell's claims, both substantively and procedurally. Dell's claims were all timely, and the Debtor's efforts to claim other adequate means of notice were ineffective and legally insufficient to bind Dell to any such deadlines claimed by the Debtor.

In addition, Dell filed a timely proof of claim, which, among other things, mentioned an administrative claim under § 503(b)(9).

*LAW*

A. *Product sold to Debtor within 20 days pre-petition*

Dell is entitled to an administrative expense claim of $94,535.45, pursuant to 11 U.S.C. § 503(b)(9). The Debtor failed to rebut, by affidavit or argument, the *prima facie* case made by Dell in its moving papers. FED. R. BANKR. P. 3001(f). Dell's request for administrative expense status for $94,535.45 will be GRANTED.

B. *Product sold to Debtor between 21 and 45 days pre-petition*

Section 546(c) gives a seller of goods the right to seek reclamation of goods sold to a debtor in the ordinary course of the seller's business and received by the insolvent debtor within 45-days pre-petition. But while Dell had that right, the Debtor did not comply with the demand, and instead turned the goods over to another competing creditor, JPMorgan Chase. Section 546(c) is not a creditor remedy statute, but instead describes limitations on a trustee's (or debtor-in-possession's) *avoiding* powers under § 544 (strongarm), § 545 (statutory liens), § 547 (preferences) and § 549 (post-petition transfers). *See, e.g., In re Dana Corp.*, 367 B.R. 409, 413-14 (Bankr.S.D.N.Y.2007). In other words, a trustee is subject to a seller's reclamation rights, and thus has to return the product if the reclamation is timely asserted by the selling creditor.

***2** But § 546(c) does not address what happens if a creditor's demand for reclamation is ignored, or if the reclamation seller does not promptly seek assistance from the court, and thereby forces the debtor to give back the sold product. The statute does not give such a seller/creditor an administrative claim, except to the extent it qualifies for one under § 503(b)(9). 11 U.S.C. § 546(c)(2). If its product is thereafter lost to a senior secured lender, as in this case, by "selling into" the blanket lien of a perfected senior lienholder, or if the Debtor simply ignores the demand, the creditor may lose its rights, as here.

What then, is the creditor left with? The answer is: Only an unsecured claim (or a claim against the secured lender for conversion), unless it can establish a benefit to the estate to qualify as an administrative expense under § 503(b)(1). *See, e.g., In re Pittsburgh-Canfield Corp.*, 309 B.R. 277, 286 (6th Cir. BAP2004) (reclaiming seller is entitled to a lien or administrative expense to the full extent of the seller's valid reclamation claim under state law); VERNON'S TEX. BUS. & COM.CODE ANN. § 2.702(c) (Thompson Reuters/West 2008) (seller's right to reclaim is subject to rights of a lien creditor).

Here no such benefit has been established by Dell, sufficient to qualify as an administrative expense for the product shipped between 21 and 45 days, pre-petition, and no evidence was presented which would support such a claim. *See In re Abercrombie*, 139 F.3d 755, 757 (9th Cir.1998) (administrative expense claim must arise from postpetition transaction and directly and substantially benefit the estate).

Accordingly, Dell's request for administrative expense status of $79,700.62 will be DENIED. Its claim for this amount is unsecured.

A separate order will be entered.

Bkrtcy.D.Ariz.,2008.
In re First Magnus Financial Corp.
Not Reported in B.R., 2008 WL 5046596 (Bkrtcy.D.Ariz.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT F

Not Reported in B.R., 2000 WL 33673751 (Bkrtcy.M.D.N.C.)
**(Cite as: 2000 WL 33673751 (Bkrtcy.M.D.N.C.))**

Only the Westlaw citation is currently available.

United States Bankruptcy Court, M.D. North Carolina.
In re: PLUMA, INC., Debtor.
**No. 99-11104C-11G.**

July 21, 2000.

MEMORANDUM OPINION

STOCKS, Bankruptcy J.

***1** This case came before the court on June 13, 2000, for hearing upon an objection by the Debtor, Pluma, Inc., to a claim by Premium Wear, Inc., for a secured claim or a priority claim in the amount of $54,203.28 based upon reclamation rights under § 546(c). R. Bradford Leggett appeared on behalf of the Debtor, K. Lane Klotzberger appeared on behalf of Premium Wear, Inc., David M. Grogan appeared on behalf of the Unsecured Creditors' Committee, and Douglas R. Ghidina appeared on behalf of the Bank of America and the Bank Group.

NATURE OF THE CONTROVERSY

The Debtor contends that Premium Wear, Inc. is not entitled to any relief under § 546(c) and therefore is not entitled to either secured or priority status.

FACTS

1. Prior to ceasing operations, Debtor was a vertically integrated manufacturer and distributor of fleece and jersey active wear.

2. In May 1997, Debtor purchased various assets and assumed various liabilities from Stardust Corporation, a Wisconsin corporation, which expanded Debtor's nationwide wholesale distributorship into undecorated sportswear. The purchased assets, which included real and personal property comprising a manufacturing facility in Wisconsin, were operated as a separate division called the Stardust Division. It is undisputed that Stardust was sufficiently integrated with Pluma after the purchase for Pluma to be liable for all of Stardust's debts and obligations arising thereafter.

3. Debtor's Stardust Division purchased shirts in large quantities from Premium Wear, which is located in Minnesota. At the time of Debtor's petition, Stardust owed Premium Wear $159,435.16 as a result of multiple shipments of clothing for which no payment had been made. Of these shipments, four were delivered on May 13, 1999, and had a total contract price of $54,435.16. These four shipments were comprised of a total of 4,440 Munsingwear shirts.

4. Debtor filed a voluntary petition for relief under Chapter 11 on May 14, 1999.

5. Upon learning of Debtor's filing, Premium Wear mailed on May 21, 1999, written demand for reclamation of the 4,400 shirts delivered on May 13th. The letter demanded that Stardust retain the shirts until Premium Wear secured possession thereof. Authority for reclamation cited in the letter was 11 U.S.C. § 546(c), Wis. Stat. § 402.702, and Minn.Stat. § 336.2-702.

6. Premium Wear filed a proof of claim in this case on July 20, 1999, in the amount of $159,435.16. Of that amount, Premium Wear alleged that $54,203.28 should be allowed as a secured claim because of its reclamation rights related to the 4,400 shirts.

7. There is no evidence that Premium Wear had any contact with Stardust or Pluma during the interval between the demand letter on May 21, 1999, and the filing of the proof of claim on July 20, 1999.

8. The Debtor objected to Premium Wear's claim to the extent that the claim was asserted as secured or priority based upon reclamation under § 546(c).

9. Premium Wear filed a response to Debtor's objection on March 2, 2000, followed by a second response on April 27, 2000.

PROCEDURAL POSTURE

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

***2** On June 13, 2000, a hearing was held regarding Premium Wear's claim and the Debtor's objection. At the hearing, the parties agreed that the only documents filed with the Court regarding Premium Wear's claim were Premium Wear's proof of claim, Debtor's objection to the claim and Premium Wear's two responses to Debtor's objection, which included attached documentation. The only evidence offered at the hearing were the attachments to the Premium Wear response and a copy of an affidavit from Michael P. Coaty, counsel for Premium Wear in Wisconsin, regarding the fact that various bankruptcy notices had been sent to Premium Wear's lockbox in Minnesota rather than to him despite his having filed a notice of appearance on September 8, 1999. Debtor objected to paragraph six of the affidavit, and the objection was sustained. The original of this affidavit was filed with the court on June 27, 2000, and has been considered by the court along with Premium Wear's proof of claim and responses.

DISCUSSION

As an initial matter, it was agreed by the parties that none of the shirts remain in the possession of the Debtor. There being no actual shirts remaining in Debtor's possession, Premium Wear conceded that actually reclaiming the shirts is foreclosed. Premium Wear argued, however, that it should nonetheless be granted a priority claim under § 503(b). Premium Wear claims to have fully complied with both Minnesota and Wisconsin state law [FN1] and to have a right to reclamation under state law. In its second Brief in Support of Claim, Premium Wear states that "Section 546(c) of the Bankruptcy Code provides that a party with a state-law right to reclamation may assert that right in bankruptcy, provided that the seller's demand for reclamation was in writing." Premium Wear then refers the Court to § 546(c)(2), which states that when a court denies "reclamation to a seller with such a right of reclamation that has made such a demand," the court must provide the seller with either a priority claim or a lien on property.[FN2] According to Premium Wear, since it has been denied this state-law reclamation right, the court must provide it with a priority claim pursuant to § 546(c)(2).

FN1. Minn.Stat. Ann. § 336.2-702 (West 2000) and Wis. Stat. Ann. § 402.702 (West 2000) respectively, both of which are based on Article 2, Section 702 of the Model Uniform Commercial Code, which addresses reclamation rights and insolvent buyers.

FN2. Section 546 states:

> (c) Except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but-
>
> (1) such seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods-
>
> (A) before 10 days after receipt of such goods by the debtor; or
>
> (B) is such 10-day period expires after the commencement of the case, before 20 days after receipt of such goods by the debtor; and
>
> (2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court-
>
> (A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title; or
>
> (B) secures such claim by a lien.

In opposition to this argument, the Debtor maintains that § 546(c) requires that a right to reclamation exist and that Premium Wear had the burden of proving it had a right to reclamation, which it failed to do. The court finds Debtor's arguments to be correct and decisive in this matter.

It is well settled that § 546(c) provides the sole remedy for a seller seeking to reclaim goods from a debtor in bankruptcy. *See In re Julien Co.*, 44 F.3d 426, 432 (6th Cir.1995); *Rawson Food Serv., Inc.*, 846 F.2d 1343, 1346 (11th Cir.1988); *In re Morken*, 182 B.R. 1007,

1014 (Bankr.D.Minn.1995); *In re Video King of Ill., Inc.*, 100 B.R. 1008, 1013 (Bankr.N.D.Ill.1989). Courts have consistently held that any grant of lien or priority claim under § 546(c)(2) is conditioned upon the claiming party first establishing a right to reclamation under § 546(c). Since § 546(c)(2) provides for a lien or priority claim only when the court has denied a *valid* claim of reclamation under § 546(c), establishing a § 546(c) right to reclamation is a precondition for any lien or priority claim that § 546(c) provides as an alternative remedy. *See* *Morken*, 182 B.R. at 1018;*Video King*, 100 B.R. at 1016. One of the prerequisites for establishing a 546(c) right to reclamation is that the reclaiming party must have a common law or statutory right to reclamation. *See, e.g.,* *Rawson*, 846 F.2d at 1347;*In re McLouth Steel Prods. Corp.*, 213 B.R. 978, 983 (E.D.Mich.1997); *In re Arlco, Inc.*, 239 B.R. 261, 266 (Bankr.S.D.N.Y.1999).

***3** While Premium Wear has stated in its briefs and at the hearing that it has complied with state law and has a state law right of reclamation, these statements are conclusory and not supported by the evidence. The court accepts that Premium Wear did abide by those requirements listed in its briefs, namely that demand was made within ten days of Debtor's receipt of the goods, the goods were sold on credit, and that the Debtor was insolvent at the time of receipt (although no evidence was presented on this latter issue). However, the three requirements listed by Premium Wear do not comprise all of the requirements for proving a state law right to reclamation. Instead, the cases impose four requirements for obtaining treatment under § 546(c) as follows:

(1) the goods must have been sold in the ordinary course of business;

(2) the goods must have been received by the buyer while insolvent;

(3) a written demand for reclamation must have been made within ten days of receipt of the goods by buyer; and

(4) the buyer must have been in possession of the goods at the time the buyer received the demand or the goods not be in the hands of a good faith purchaser or buyer in the ordinary course of business.

*See, e.g.,* *In re Adventist Living Centers, Inc.*, 52 F.3d 159, 162 (7th Cir.1995); *In re Pester Refining Co.*, 964 F.2d 842, 845 (8th Cir.1992); *Video King*, 100 B.R. at 1013. Other courts use slightly different variations on this list, but all still require that the goods be in the possession of the buyer at the time demand is made. *See, e.g.,* *Rawson*, 846 F.2d at 1347;*Vanco Trading, Inc. v. Monheit*, 1999 WL 464531 (D. Conn. June 17, 1999); *McLouth*, 213 B.R. at 983;*Arlco*, 239 B.R. at 266;*In re Victory Markets, Inc.*, 212 B.R. 738, 741 (Bankr.N.D.N.Y.1997). This is because reclamation is an *in rem* right that must be invoked immediately and prior to disposition of the goods. *See* *In re Crofton & Sons, Inc.*, 139 B.R. 567, 569 (M.D.Fla.1992); *Action Indus., Inc. v. Dixie Enters., Inc.*, 22 B.R. 855, 859 (Bankr.S.D.Ohio 1982).

The requirement that the goods still be in the possession of the buyer at the time demand is made is a state law requirement-not an additional requirement of the Bankruptcy Code. *See* *In re Landy Beef Co.*, 30 B.R. 19, 20 n. 4 (Bankr.D.Mass.1983); *In re Flagstaff Food Serv. Corp.*, 14 B.R. 462, 465 (Bankr.S.D.N.Y.1981); 5 *Collier on Bankruptcy* ¶ 546.04[2][a] (Lawrence P. King et al. eds., 15th ed. rev.2000).

The prevailing rule is that the reclaiming party has the burden of proving that the goods were in the possession of the buyer at the time demand was received by the buyer. *See* *Adventist*, 52 F.3d at 163 (" 'The seller in a reclamation case bears the burden of proving that the debtor possessed the goods when it received the reclamation demand. This is a fairly stringent requirement because a seller's evidence must indicate that this critical fact on which its recover depends is true, and not merely that it is possible it is so." ') (quoting *In re Flagstaff Food Serv. Corp.*, 56 B.R. 899, 908 (Bankr.S.D.N.Y.1986)); *Rawson*, 846 F.2d at 1348;*Arlco*, 239 B.R. at 266;*Victory Markets*, 212 B.R. at 741. The burden is to prove by the preponderance of the evidence. *See* *Adventist*, 52 F.3d at 162;*Arlco*, 239 B.R. at 266;*Video King*, 100 B.R. at 1013. There is no presumption that the goods remain in the possession of the debtor just because delivery has been made. *See* *Adventist*, 52 F.3d at 162;*Rawson*, 846 F.2d at 348.

***4** In the present case, Premium Wear failed to provide any evidence that the shirts in question were still in the Debtor's possession at the time written demand was made on May 21, 1999. Premium Wear thus

failed to meet its burden of proving a right to reclaim any goods under § 546(c) of the Code.

A reclaiming party that fails to prove that goods were in the possession of a bankruptcy debtor at the time demand was made fails to prove a state law right to reclamation and therefore fails to meet the most basic prerequisite to § 546(c) remedies. Since Premium Wear has failed to establish that it had a state law right to reclamation, this court's denial of Premium Wear's right to reclamation is not a denial of a *valid* right of reclamation under § 546(c), and § 546(c)(2) therefore is not called into play. *See* *Pester*, 964 F.2d at 847. As a result, Premium Wear's request for a priority claim pursuant to § 546(c)(2) must be denied. Though Premium Wear did not raise the issue, any claim for a lien pursuant to § 546(c)(2)(A) would be denied on the same grounds.[FN3]

FN3. Because a determination as to whether or not the Bank Group had a perfected security interest in the inventory of Stardust does not affect the outcome of the issue at hand, namely whether or not Premium Wear should be allowed a secured or priority claim in the amount of $54,203.28, the court need not address that question.

CONCLUSION

In accordance with the foregoing, an order will be entered contemporaneously herewith denying the claim of Premium Wear, Inc. to the extent that it seeks secured or priority status and allowing a general unsecured claim in the amount of $159,435.16.

Bkrtcy.M.D.N.C.,2000.
In re Pluma, Inc.
Not Reported in B.R., 2000 WL 33673751 (Bkrtcy.M.D.N.C.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT G

Brian P. Leitch, Esq.
Daniel M. Lewis, Esq.
Michael J. Canning, Esq.
ARNOLD & PORTER LLP

370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
(303) 863-1000
- and -
555 Twelfth Street, NW
Washington, DC 20004
(202) 942-5000
- and -
399 Park Avenue
New York, New York 10022
(212) 715-1000

Lawrence E. Rifken, Esq. (VSB No. 29037)
Douglas M. Foley, Esq. (VSB No. 34364)
David I. Swan, Esq.
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22102-4215
(703) 712-5000

*Counsel to the Debtors and Debtors-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 04-13819 |
| | ) | Jointly Administered |
| US AIRWAYS, INC., et al.,[1] | ) | Chapter 11 |
| | ) | Hon. Stephen S. Mitchell |
| Debtors. | ) | |
| | ) | |

**NOTE: THE FORM OF THE ORDER HAS BEEN MODIFIED BY THE COURT.**

**ORDER GRANTING MOTION TO AUTHORIZE THE ESTABLISHMENT AND IMPLEMENTATION OF EXCLUSIVE, GLOBAL PROCEDURES FOR THE RECONCILIATION AND TREATMENT OF RECLAMATION CLAIMS ASSERTED AGAINST THE DEBTORS**

Upon the motion dated September 12, 2004 (the "Motion")[2] wherein the Debtors and debtors-in-possession in the above-captioned cases moved this Court for an order (i)

[1] The Debtors are the following entities: US Airways, Inc., US Airways Group, Inc., PSA Airlines, Inc., Piedmont Airlines, Inc. and Material Services Company, Inc.
[2] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Motion.

establishing and implementing exclusive, global procedures for the reconciliation and treatment of all Reclamation Claims asserted against the Debtors by or on behalf of the Debtors' creditors or other parties and (ii) granting such other and further relief as is just and proper, the Court finds that (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) the relief requested in the Motion is in the best interests of the Debtors, their estates, and their creditors, (iv) proper and adequate notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary, and (v) good and sufficient cause exists for the granting of the relief requested in the Motion after having given due deliberation upon the Motion and all of the proceedings had before the Court in connection with the Motion. Therefore,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Motion is GRANTED.

2. The Debtors should be, and hereby are, authorized, pursuant to sections 105(a), 503(b), 507(a), and 546 of the Bankruptcy Code, Federal Bankruptcy Rule 9019(b), and section 2-702 of the UCC, to reconcile and resolve all Reclamation Claims in accordance with the exclusive Reclamation Procedures set forth below, which are hereby approved and authorized in their entirety:

**RECLAMATION PROCEDURES**

(1) Reclamation Demands

(a) All Sellers seeking to reclaim Goods from the Debtors will be required to submit a written demand to US Airways Group, Inc., 2345 Crystal Drive, Arlington, Virginia 22227 (Attn: Anita Beier, Senior Vice President and Controller) with copies to McGuireWoods LLP, 1750 Tysons Boulevard, Suite 1800, McLean, Virginia 22102-4215 (Attn: Lawrence E. Rifken, Esq.) and FTI Consulting, Inc., 622 Third Avenue, 31st Floor, New York, New York, 10017 (Attn: Scott Rinaldi), so that the demand is received by each of the above addressees (a "Reclamation Demand"):

(i) before 10 days after the receipt of such Goods by the Debtors; or

(ii) if such 10-day period expires after the Petition Date, before 20 days after the receipt of such Goods by the Debtors, unless, the period of time specified in subparagraph (a)(i) above or this subparagraph (a)(ii) expires on a day that is not a business day, in which case such period shall expire on the next business day.

(b) The Reclamation Demand must specifically set forth the Goods for which reclamation is being sought and the basis for the Reclamation Claim, and must be accompanied by the applicable invoice(s) relating to the Goods and documentation establishing the delivery of the Goods to the Debtor(s).

(c) Any Seller who fails to timely submit a Reclamation Demand pursuant to section 546 of the Bankruptcy Code and the requirements set forth above shall be deemed to have forever waived any and all of its rights with respect to any alleged Reclamation Claim, including, but not limited to, its right to any payment on account of any alleged Reclamation Claim.

(2) The Statement of Reclamation

(a) Within forty-five (45) days after the Petition Date or the receipt of a timely and otherwise validly submitted Reclamation Demand, whichever is later, the Debtors will provide the Seller who is the proponent of such Reclamation Demand with a copy of the Reclamation Order and a statement of reclamation (the “Statement of Reclamation” or the “Statement”).

(b) The Statement of Reclamation will set forth the extent, if any, to which and the bases upon which the Debtors believe the underlying Reclamation Claim is not legally valid and the portion, if any, of the Reclamation Claim that the Debtors believe may be legally valid (the “Reconciled Reclamation Claim”). In addition, the Statement shall identify any defenses that the Debtors choose to reserve, including, but not limited to, the defenses set forth in subparagraph 5(a) below (the “Reserved Defenses”), notwithstanding any payment of the Reconciled Reclamation Claim.

(c) Sellers who agree with and wish to assent to the Reconciled Reclamation Claim as set forth in the Statement of Reclamation may indicate such assent on the Statement of Reclamation and return the Statement within sixty (60) days after the date of the Statement of Reclamation (the “Reconciliation Deadline”) to US Airways Group, Inc., 2345 Crystal Drive, Arlington, Virginia 22227 (Attn: Anita Beier, Senior Vice President and Controller), or such other addressee as set forth in such Statement, with copies to McGuireWoods LLP, 1750 Tysons Boulevard, Suite 1800, McLean, Virginia 22102-4215 (Attn: Lawrence E. Rifken, Esq.) and FTI Consulting, Inc., 622 Third Avenue, 31st Floor, New York, New York, 10017 (Attn: Scott Rinaldi).

(d)      Sellers who do not agree with the Reconciled Reclamation Claim as set forth in the Statement of Reclamation and wish to dissent thereto (the "Dissenting Sellers") must indicate such dissent on the Statement of Reclamation and return the Statement by the Reconciliation Deadline to all of the addressees identified above in subparagraph 2(c) of these Reclamation Procedures.  A Statement of Reclamation returned under this subparagraph must be accompanied by:

(i)      a copy of the Reclamation Demand together with any evidence of the date such Reclamation Demand was sent to and received by the Debtors;

(ii)      the identity of the Debtor(s) that ordered the Goods and the identity of the Seller from whom the Goods were ordered;

(iii)      any evidence demonstrating when the Goods were shipped and received;

(iv)      copies of the Debtors' and the Seller's purchase orders and invoices, respectively, together with a description of the Goods shipped; and

(v)      a statement identifying which information on the Debtors' Statement of Reclamation is incorrect, specifying the correct information, and stating any legal basis for the objection.

(e)      Any Seller who (i) returns the Statement of Reclamation by the Reconciliation Deadline and indicates its dissent but fails to materially comply with subparagraph (2)(d) above (as determined by the Debtors in good faith), (ii) returns the Statement of Reclamation by the Reconciliation Deadline but fails to indicate its assent or dissent, or (iii) fails to return the Statement of Reclamation by the Reconciliation Deadline, shall be deemed to have (i) waived its right to object to the proposed treatment and allowed amount of the Reconciled Reclamation Claim, if any, and (ii) assented to the Reconciled Reclamation Claim, if any, unless the Court orders otherwise.

(3)      Fixing of Reclamation Claims

(a)      Each Reclamation Claim of any Seller who (i) returns the Statement of Reclamation by the Reconciliation Deadline and indicates its assent to the Reconciled Reclamation Claim as set forth in the Statement of Reclamation, (ii) returns the Statement of Reclamation by the Reconciliation Deadline and indicates its dissent but fails to materially comply with subparagraph (2)(d) above (as determined by the Debtors in good faith), (iii) returns the Statement of Reclamation by the Reconciliation Deadline but fails to indicate either its assent or dissent, or (iv) fails to return the Statement of Reclamation by the Reconciliation Deadline, will be deemed an Allowed Reclamation Claim in the amount of the Reconciled Reclamation Claim, if any.

(b)     The Debtors are authorized to negotiate with all Dissenting Sellers and to adjust the Reconciled Reclamation Claim either upward or downward to reach an agreement regarding a Dissenting Seller's Reclamation Claim.  The Debtors are also authorized to include any Reserved Defenses as part of any such agreement.  In the event that the Debtors and a Dissenting Seller are able to settle on the amount and/or treatment of the Dissenting Seller's Reclamation Claim, the Reclamation Claim will be deemed an Allowed Reclamation Claim in the settled amount.

(c)     In the event that no consensual resolution of a Dissenting Seller's Reclamation Claim is reached within sixty (60) days after the Reconciliation Deadline (or such later date as the parties may mutually agree), the Debtors shall file a motion for determination of the Dissenting Seller's Reclamation Claim and set such motion for a hearing before the Court at the next regularly scheduled omnibus hearing occurring more than twenty (20) days after the filing of the motion for determination, unless another hearing date is mutually agreed to by the parties or ordered by the Court (the "Determination Hearing"). The Dissenting Seller's Reclamation Claim, if any, shall be deemed an Allowed Reclamation Claim as fixed by the Court in the Determination Hearing or as mutually agreed to by the Debtors and the Dissenting Seller prior to a determination by the Court in the Determination Hearing.

(4)     Treatment of Allowed Reclamation Claims

(a)     The Debtors may, but are not obligated to, at any point in time satisfy in full any Reclamation Claim or Allowed Reclamation Claim by making the Goods at issue available for pick-up by the Seller or Dissenting Seller pursuant to section 546(g) of the Bankruptcy Code without any further notice or order of the Court.

(b)     All Allowed Reclamation Claims for which the Debtors choose not to make the Goods available for pick-up in accordance with sub-paragraph 4(a) above shall be paid (i) in full as administrative expense priority claims pursuant to a plan of reorganization confirmed by the Court in the Debtors' bankruptcy cases, (ii) in accordance with the provisions of the Bankruptcy Code in the event of a liquidation of the Debtors, or (iii) in whole or in part and earlier than the time period specified in (i) or (ii) of this subparagraph in the Debtors' business judgment.

(5)     The Debtors' Reserved Defenses

(a)     The Debtors' Reserved Defenses, as referenced in subparagraph (2)(b) above, shall include, but not be limited to, the following:

(i)     a seller has no right to reclaim goods delivered to a debtor that was not insolvent when the goods were delivered;

(ii)     a seller has a right to reclaim only those goods delivered without the seller's knowledge of the buyer's insolvency;

(iii)    a seller has a right to reclaim only those goods for which it made a reclamation demand before 10 days after the buyer's receipt of the goods or, if such 10-day period expires after the commencement of the bankruptcy case(s), before 20 days after such receipt, pursuant to subparagraph 1(a) above;

(iv)    the reclamation demand must be in writing;

(v)    a seller has a right to reclaim only those goods that are specifically identifiable and not commingled with or altered by other goods (i) to create a finished product or a manufacturing process and/or (ii) in the process of providing the Debtors' transportation services;

(vi)    a seller may reclaim goods only to the extent that the goods were in the possession of the debtor at the time the debtor received the reclamation demand;

(vii)    a seller has no right to reclaim goods that have been transferred to a "buyer in the ordinary course" or a "good faith purchaser"; and

(viii)    a seller may reclaim goods only to the extent that the goods are not subject to the superior rights or interests of any secured lender or creditor.

(6)    Exclusivity of Remedy

(a)    The foregoing Reclamation Procedures are the sole and exclusive method for the resolution and payment of all Reclamation Claims asserted against the Debtors.  All Sellers are prohibited from seeking any other means for the resolution of and/or treatment for their Reclamation Claims other than that which is permitted by these Reclamation Procedures.

(b)    All parties are prohibited from commencing adversary proceedings against the Debtors in connection with any Reclamation Claims.  All adversary proceedings in these cases relating to Reclamation Claims, whether currently pending or initiated in the future, except those proceedings initiated by the Debtors in accordance with these Reclamation Procedures, are stayed and the claims asserted therein shall be reconciled and resolved exclusively pursuant to the Reclamation Procedures set forth herein, unless otherwise ordered by the Court.

(7)    Miscellaneous Terms and Conditions

(a)    The Debtors are authorized to reconcile and pay Allowed Reclamation Claims pursuant to the Reclamation Procedures without the need for a further order of this Court.  In the event that an Allowed Reclamation Claim is paid, in whole or in part, earlier than the effective date of a confirmed plan of

reorganization in the Debtors' bankruptcy cases (the "Effective Date"), any such payments shall be subject to any Reserved Defenses.  The Reserved Defenses shall be deemed waived by the Debtors on the earlier of the Effective Date or the date that is one year following the last payment of an Allowed Reclamation Claim, except as may be otherwise provided by the mutual agreement of the parties or by order of the Court.

(b)      The Debtors' payment of an Allowed Reclamation Claim pursuant to the Reclamation Procedures shall constitute a waiver, release, discharge, and satisfaction of any and all rights and claims, including, but not limited to, reclamation rights and/or claims, that the holder of the Allowed Reclamation Claim has ever had, or hereafter can, shall, or may have, against the Debtors arising directly or indirectly from, or in connection with, the Goods constituting the basis for the Allowed Reclamation Claim.

(c)      Neither anything contained in the Reclamation Procedures nor any of the transactions contemplated thereby, including, but not limited to, the Debtors' payment of any Allowed Reclamation Claim, shall create a waiver by the Debtors of any claims that they may have against any vendor relating to any preferential or fraudulent transfers, or other potential claims, counterclaims, or offsets with respect to said vendors.  The Debtors expressly reserve their rights to pursue such claims and any and all other claims that they may seek to advance against any vendor in the future.  The Debtors specifically reserve the right to object on any grounds to any proof of claim filed by or on behalf of any of the Sellers.

(d)      Nothing contained herein shall be deemed an admission as to the solvency or insolvency of the Debtors at any relevant time, and each holder of an Allowed Reclamation Claim, by accepting payment in accordance with the Reclamation Procedures, shall be deemed to warrant that it has not assigned any of its rights to its Reclamation Claim.

3.      Consistent with paragraph 6(b) of the Reclamation Procedures, all parties are hereby prohibited from commencing adversary proceedings against the Debtors in connection with any Reclamation Claims.  All adversary proceedings in these cases relating to Reclamation Claims, whether currently pending or initiated in the future, except those proceedings initiated by the Debtors in accordance with these Reclamation Procedures, are hereby stayed and the claims asserted therein shall be reconciled and resolved exclusively pursuant to the Reclamation Procedures set forth herein, unless otherwise ordered by this Court.

4. The entry of this Order is conditional. Any party in interest may object to the entry of this Order within ten (10) days after the date of entry, except that the United States Trustee and any statutory committee appointed in these cases shall have fifteen (15) days after the date of entry or ***ten (10) days after the appointment of the committee, which is later,*** to object. If any such objection is timely filed, the objection shall be heard at the next regularly-scheduled omnibus hearing date. At the hearing, the Court may vacate this Order, modify it, or make it final. If no timely objection is filed, this Order shall become final at the conclusion of such objection period without further order of this Court. This Order shall remain in effect notwithstanding any objection until further order of this Court. The modification or vacation of this Order shall not impair any action taken pursuant to it prior to its modification or vacation.

Dated: Alexandria, Virginia
___________, 2004

Sep 14, 2004

/s/ Stephen S. Mitchell

UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: Sep 14, 2004 cb

WE ASK FOR THIS:

Brian P. Leitch, Esq.
Daniel M. Lewis, Esq.
Michael J. Canning, Esq.
ARNOLD & PORTER LLP

370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
(303) 863-1000
          - and -
555 Twelfth Street, NW
Washington, DC 20004
(202) 942-5000
          - and -
399 Park Avenue
New York, New York 10022
(212) 715-1000


          - and -


/s/ Lawrence E. Rifken
Lawrence E. Rifken, Esq. (VSB No. 29037)
Douglas M. Foley, Esq. (VSB No. 34364)
David I. Swan, Esq.
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22102-4215
(703) 712-5000

*Counsel to the Debtors and
Debtors-in-Possession*


\\FIN\202726

# EXHIBIT H

John Wm. Butler, Jr.
John K. Lyons
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM (ILLINOIS)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

Lawrence E. Rifken (VSB No. 29037)
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22102-4215
(703) 712-5000

Attorneys for Debtors and Debtors-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 02-83984-SSM |
| US AIRWAYS GROUP, INC., et al., | ) | Jointly Administered |
| | ) | Chapter 11 |
| Debtors. | ) | Hon. Stephen S. Mitchell |
| | ) | |

**ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 503 AND 546**
**(I) PROVIDING ADMINISTRATIVE EXPENSE TREATMENT**
**FOR CERTAIN HOLDERS OF VALID RECLAMATION CLAIMS**
**AND (II) ESTABLISHING PROCEDURES FOR**
**RESOLUTION AND PAYMENT OF RECLAMATION CLAIMS**

Upon the motion dated August 11, 2002 (the "Motion"),[1] wherein US Airways Group, Inc. ("Group") and seven of its subsidiaries and affiliates (the "Affiliate

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Motion.

Debtors"),[2] debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), moved this Court for an order pursuant to sections 105, 362, 503 and 546 of the Bankruptcy Code authorizing the Debtors to establish procedures for the resolution and payment of reclamation claims; the Court finds that (i) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. §§ 157 and 1334; (ii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iii) the relief requested in the Motion is in the best interests of the Debtors, their estates and their creditors; (iv) proper and adequate notice of the Motion and the hearing thereon has been given and that no other or further notice is necessary; and (v) upon the record herein after due deliberation thereon good and sufficient cause exists for the granting of the relief as set forth herein,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1. The Motion is GRANTED.

2. The Debtors be, and hereby are, authorized, pursuant to sections 105, 362, 503 and 546 of the Bankruptcy Code, to resolve Reclamation Claims in accordance with the Reclamation Procedures set forth below:

---

[2] The Debtors are the following entities: US Airways Group, Inc., US Airways, Inc., Allegheny Airlines, Inc., PSA Airlines, Inc., Piedmont Airlines, Inc., MidAtlantic Airways, Inc., US Airways Leasing and Sales, Inc. and Material Services Company, Inc.

RECLAMATION PROCEDURES

(a) Reclamation Demands

(i) All persons (collectively, the "Sellers") seeking to reclaim Goods from the Debtors shall be required to submit a demand (a "Reclamation Demand"):

(1) before 10 days after receipt of such Goods by the Debtors; or

(2) if such 10-day period expires after the Petition Date, before 20 days after receipt of such Goods by the Debtors.

(ii) Such a Reclamation Demand must set forth in specificity the goods for which reclamation is sought and the basis for the Reclamation Claim.

(iii) Any Seller who fails to timely submit a Reclamation Demand pursuant to section 546 of the Bankruptcy Code shall be deemed to have waived its right to payment on any purported Reclamation Claim.

(b) The Statement of Reclamation

(i) Within forty-five (45) days after the Petition Date or receipt of a timely Reclamation Demand, whichever is later, the Debtors shall provide the Seller with a copy of the Reclamation Order and a statement of reclamation (the "Statement of Reclamation" or the "Statement").

(ii) The Statement of Reclamation shall set forth the extent and basis, if any, upon which the Debtors believe the underlying Reclamation Claim is not legally valid (the "Reconciled Reclamation Claim").

(iii) Sellers who are in agreement with the Reconciled Reclamation Claim as contained in the Statement of Reclamation may indicate such assent on the Statement of Reclamation and return the Statement by 60 days after date of Statement of Reclamation (the "Reconciliation Deadline") to the

Debtors' representative as set forth in such statement with copies to Skadden, Arps, Slate, Meagher & Flom (Illinois), 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Attn: John Wm. Butler, Jr., Esq., and John K. Lyons, Esq.) and McGuireWoods LLP, 1750 Tysons Boulevard, Suite 1800, McLean, Virginia 22102-4215 (Attn: Lawrence E. Rifken).

(iv) Sellers who are in disagreement with the Reconciled Reclamation Claim as contained in the Statement of Reclamation (the "Dissenting Sellers") must indicate such dissent on the Statement of Reclamation and return the Statement by the Reconciliation Deadline to the entities and at the addresses identified in subparagraph (iii) of these Procedures, above. A Statement of Reclamation returned under this subparagraph must be accompanied by:

(1) a copy of the Reclamation Demand together with any evidence of the date such Reclamation Demand was sent and received;

(2) the identity of the Debtor that ordered the products and the identity of the Seller from whom the Goods were ordered;

(3) any evidence demonstrating when the Goods were shipped and received;

(4) copies of the respective Debtor's and Seller's purchase orders and invoices, together with a description of the Goods shipped; and

(5) a statement identifying which information on the Debtors' Statement of Reclamation is incorrect, specifying the correct information and stating any legal basis for the objection.

(v) The failure of a Dissenting Seller to materially comply with subparagraph (iv) above shall constitute a waiver of such Dissenting Seller's right to object to the proposed treatment and allowed amount of such Reclamation Claim unless the Court orders otherwise.

(vi) Any Seller who fails to return the Statement of Reclamation by the Reconciliation Deadline or who returns the Statement of Reclamation by the Reconciliation Deadline but fails to indicate assent or dissent shall be deemed to have assented to the Reconciled Reclamation Claim.

(c) Fixing the Reclamation Claim

(i) The Reclamation Claims of (i) all Sellers who return the Statement of Reclamation by the Reconciliation Deadline and indicate their assent to the Reconciled Reclamation Claim as contained in the Statement of Reclamation, (ii) all Sellers who fail to return the Statement of Reclamation by the Reconciliation Deadline and (iii) all Sellers who return the Statement of Reclamation by the Reconciliation Deadline but who fail to indicate either assent or dissent shall be deemed an Allowed Reclamation Claim in the amount of the Reconciled Reclamation Claim.

(ii) The Debtors are authorized to negotiate with all Dissenting Sellers and to adjust the Reconciled Reclamation Claim either upward or downward to reach an agreement regarding the Dissenting Seller's Reclamation Claim. In the event the Debtors and a Dissenting Seller are able to settle on the amount of the Dissenting Seller's Reclamation Claim, the Reclamation Claim shall be deemed an Allowed Reclamation Claim in the settled amount.

(iii) In the event that no consensual resolution of the Dissenting Seller's Reclamation Demand is reached within sixty (60) days of the Reconciliation Deadline, the Debtors shall file a motion for determination of the Dissenting Seller's Reclamation Claim and set such motion for hearing at the next regularly scheduled omnibus hearing occurring more than twenty (20) days after the filing of the motion for determination, unless another hearing date is agreed to by the parties or ordered by the Court (the "Determination Hearing"). The Dissenting Seller's Reclamation Claim, if any, shall be deemed an Allowed Reclamation Claim as fixed by the Court in the Determination Hearing or as agreed to by the Debtors and the Dissenting Seller prior to a determination by the Court in the Determination Hearing.

(d) Treatment of Allowed Reclamation Claims

(i) The Debtors may at any point in these Reclamation Procedures satisfy in full any Reclamation Claim or Allowed Reclamation Claim by making the Goods at issue available for pick-up by the Seller or Dissenting Seller.

(ii) All Allowed Reclamation Claims for which the Debtors choose not to make the Goods available for pick-up will be paid in full in 25% increments over four consecutive fiscal quarters, payments due on the first day of each fiscal quarter and beginning in the first fiscal quarter after the Reclamation Claim is allowed. To the extent that a plan of reorganization is confirmed prior to the completion of such payments, the balance of the payments still owed under this subparagraph shall be paid as an administrative expense pursuant to the terms of such plan.

3. All adversary proceedings, except those proceedings brought by the Debtors in accordance with these procedures (the "Reclamation Procedures"), in these cases relating to Reclamation Claims, whether currently pending or initiated in the future, shall be, and hereby are, stayed, and the claims asserted therein shall be subject to the Reclamation Procedures set forth herein.

4. The entry of this Order is conditional. Any party-in-interest may object to the entry of this Order within 10 days after the date of entry. If any such objection is timely filed, the objection shall be heard at the next regularly-scheduled omnibus hearing date. At the hearing, the Court may vacate this Order, modify or make it final. If no objection is filed within the 10-day period, the order shall become final at the conclusion of the 10-day period without further order of this Court. This Order shall remain in effect notwithstanding any objection until further order of this

Court. The modification or vacation of this Order shall not impair any action taken pursuant to it prior to its modification or vacation.

Dated: Alexandria, Virginia
August 12, 2002

*/s/ Robert G. Mayer*
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

John Wm. Butler, Jr.
John K. Lyons
SKADDEN, ARPS, SLATE, MEAGHER & FLOM (ILLINOIS)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

- and -

By: /s/ Lawrence E. Rifken
Lawrence E. Rifken (VSB No. 29037)
McGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22102-4215
(703) 712-5000

Attorneys for Debtors and Debtors-in-Possession

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| FAS MART CONVENIENCE STORES, INC., et al., | ) | Procedurally Consolidated Case No. Case No. **01-60386** |
| | ) | |
| Debtors. | ) | |

**ORDER PURSUANT TO SECTIONS 105 (a) AND 546(c) OF THE BANKRUPTCY CODE APPROVING GLOBAL PROCEDURES FOR RECONCILIATION OF RECLAMATION CLAIMS**

This matter comes before the Court on the Debtors' Motion Pursuant to Sections 105(a) and 546(c) Of The Bankruptcy Code For Approval Of Global Procedures For Reconciliation Of Reclamation Claims (the "Motion"). The Court having reviewed the Motion and having heard the statements of counsel in support of the relief requested therein at a hearing before the Court (the "Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (c) notice of the Motion (and proposed Order) was sufficient under the circumstances; and the Court being fully advised in the premises and having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; it is hereby

ORDERED as follows:

Bruce H. Matson, Esquire (Va. Bar No. 22874)
Lynn Lewis Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
LeCLAIR RYAN, A Professional Corporation
707 East Main Street, Suite 1100
Richmond, Virginia 23219
(804) 783-2003

Counsel for the Debtors

1.    The Motion is hereby GRANTED.

2.    Capitalized terms not otherwise defined herein shall have the meanings given to

them in the Motion.

3.    The Debtors shall be and hereby are, authorized to implement the Global

Reclamation Procedures, as defined in the Motion, and as further defined and specified as

follows:

    a.    Within 25 days after entry of the order approving the Global Reclamation
Procedures, the Debtors will send to the counsel for the Reclamation Vendors,
and, if none, the Reclamation Vendors a copy of such order and, to the extent that
the Debtors have not reconciled the Reclamation Claim of the Reclamation
Vendor, a letter (the "Document Request") requesting copies of all documents
necessary to complete the reconciliation of such claim, including, without
limitation, invoices, proofs of delivery or other documents.

    b.    The Reclamation Vendor shall submit the requested documentation to the
Debtors so that it is received by the Debtors at the address indicated in the
Document Request within 30 days of the date of the Document Request.  Failure
to respond to a Document Request in a timely fashion shall result in the
disallowance of the Reclamation Claim unless the Debtors have, in writing,
extended such deadline.

    c.    Within 115 days after the entry of the order approving the Global Reclamation
Procedures, the Debtors will send to counsel for each Reclamation Vendor, and, if
none, each Reclamation Vendor from whom they received a Reclamation Claim a
report setting forth for that Reclamation Vendor (the "Reclamation Reports"); (i)
the name of the vendor; (ii) the date of the Reclamation Claim; (iii) the applicable
reclamation period for the Reclamation Vendor; (iv) the goods received by the
Debtors during the applicable reclamation period, by invoice number, amount and
date received to the extent practicable; (v) the goods still in the Debtors'
possession on the date of the receipt of the Reclamation Claims by use of a "shelf
life" analysis or otherwise; and (vi) the Debtors' determination as to the valid
amount of the Reclamation Claim subject to the insolvency or other issues.  The
Debtors will consult with counsel for the Creditors' Committees prior to sending
the Reclamation Reports and provide such counsel copies of the Reclamation
Reports.    The Debtors will file a schedule of the Reclamation Reports with the
Court when the Reclamation Reports are provided to the Reclamation Vendors.

d. If a Reclamation Vendor disagrees with the Debtors' proposed amount of acceptable Reclamation Claim as indicated in the Reclamation Report, it must object within 15 days of the date the Reclamation Report by filing a written objection, specifying the grounds therefor, with the Court and serving the same on: (i) Thomas M. Terry, Fas Mart Convenience Stores, Inc. 1400 Mechanicsville Turnpike Richmond, VA 23111; (ii) Paula S. Beran, Esquire, LeCLAIR RYAN, A Professional Corporation 707 East Main Street, Suite 1100 Richmond, Virginia 23219; (iii) Paul M. Nussbaum, Esquire, WHITEFORD, TAYLOR & PRESTON L.L.P. Seven Saint Paul Street Baltimore, Md 21202-1626; and (iv) Douglas M. Foley, Esquire, MCGUIREWOODS, LLP, One James Center, 901 East Cary Street Richmond, VA 23219.

e. To the extent a Reclamation Vendor desires reasonable information from the Debtors concerning its Reclamation Claim, the Debtors shall provide reasonable information within 20 days from the date of a written request. If necessary and appropriate, a Reclamation Vendor may request that the Debtors conduct an inventory at the Reclamation Vendors expense.

f. If a timely objection is not filed by a Reclamation Vendor and served on each of the aforementioned parties, the amount of the Reclamation Claim of such vendor shall be deemed fixed in the amount set forth in the Reclamation Report as an administrative expense claim payable pursuant to the provisions of the Bankruptcy Code without further notice or hearing.

g. If a timely objection is filed and served, the Reclamation Claim will be resolved (i) consensually through a written stipulation between the Debtors and the objecting vendor, filed with the Court, and served on the general service list[1] (the "General Service List"[2]) or (ii) through a trial as a contested matter.

4. Notwithstanding the Debtors' waiver of their right to assert as a defense to reclamation that a Reclamation Vendor has failed to promptly commence or prosecute an adversary proceeding to enforce its Reclamation Claim, such waiver and the Global Reclamation Procedures shall be, and hereby are without prejudice to any and all other rights, claims and

[1] The general service list is defined in the Administrative Order Establishing Notice, Case Management And Hearing Procedures entered by this Court on March 9, 2001.

[2] Any stipulation filed with the Court shall be served on the General Service List. If no objections to such stipulation is filed within ten (10) days of service then such stipulation shall become effective without further notice or hearing.

defenses that the Debtors may have in respect of Reclamation Claims including, without limitation, issues pertaining to insolvency.

5. Pending the completion of the Global Reclamation Procedures, a stand still (the "Stand-Still") shall be in effect such that Reclamation Vendors are not required, and are stayed from taking steps to establish the validity and amount of their Reclamation Claims, including the commencement and continued prosecution of adversary proceedings, if any, except as provided by the Global Reclamation Procedures.

6. A copy of this entered Order shall be served by the Court via electronic delivery to those individuals/entities on the Court's electronic database for these cases, and if not otherwise served by the Court, by Debtors' counsel via first-class mail, postage prepaid to: (a) the Office of the United States Trustee; (b) counsel for the Official Committee of Unsecured Creditors and each member of the Official Committee of Unsecured Creditors; (c) the Debtors' known secured creditors; (d) any known legal counsel for the Debtors' secured creditors; (e) any party requesting service of pleadings in these cases all as listed on the General Service List attached hereto as Schedule A; and (f) all Reclamation Vendors as listed on Schedule B attached hereto.

Enter: 8 / 14 /2001.

UNITED STATES BANKRUPTCY JUDGE

**NOTICE OF JUDGMENT OR ORDER**
**Entered on Docket AUG 14 2001**

We ask for this:

/s/ Paula S. Beran

Bruce H. Matson, Esquire (Va. Bar No. 22874)
Lynn Lewis Tavenner, Esquire (Va. Bar No. 30083)
Paula S. Beran, Esquire (Va. Bar No. 34679)
LeCLAIR RYAN, A Professional Corporation
707 East Main Street, Suite 1100
Richmond, Virginia 23219
(804) 783-2003

      Counsel for the Debtors


Seen and not objected to:

/s/ Brent C. Strickland

Paul M. Nussbaum, Esquire
Brent C. Strickland, Esquire
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street
Baltimore, MD  21202-1626
(410) 347-8700

and

H. Slayton Dabney, Jr., Esquire (Va. Bar No. 14145)
Douglas M. Foley, Esquire (Va. Bar No. 34364)
McGuire, Woods, Battle & Boothe LLP
World Trade Center
101 West Main Street, Suite 9000
Norfolk, VA 23510-1655
(757) 640-3715

      Counsel for the Official Committee of Unsecured Creditors

**CERTIFICATION**

I hereby certify that the foregoing proposed Order Pursuant to Sections 105(a) and 546(c) Of The Bankruptcy Code For Approval Of Global Procedures For Reconciliation Of Reclamation Claims has been endorsed by or served upon all necessary parties.

/s/ Paula S. Beran
Counsel

SCHEDULE A

McLane Mid Atlantic
c/o Michael P. Falzone, Esquire
Hirschler, Fleischer, Weinberg, et al.
701 East Byrd Street, P. O. Box 500
Richmond VA 23218-0500

Bank of America
c/o Peter G. Zemanian, Esquire
1800 Bank of America Center
One Commercial Place
Norfolk, VA 23510-2197

Frank Bradley
The Beale Company of Virginia
Post Office Box 217
Mechanicsville, Virginia 23111

B. Amon James, Esquire
Acting, Assistant U. S. Trustee
Office of the United States Trustee
11 South 12th Street, Suite 224
Richmond, Virginia 23219

Fas Mart Petroleum
c/o Kevin R. Huennekens, Esq.
Kutak Rock, LLP
1111 East Main Street, Suite 800
Richmond, Virginia 23219

Cynthia Tucker
FMAS
Three American Lane
Greenwich, CT 06831

Franchise Mortgage Acceptance Co.
c/o James M. Nolan, Esquire
Trautman, Sanders, Mays & Valentine
1111 East Main Street
P. O. Box 1122
Richmond, VA 23218

Lehman Brothers
c/o Jeffrey L. Schwartz, Esquire
Hahn & Hessen LLP
350 Fifth Avenue
New York, NY 10118-0075

Clive D. Bull
JP Morgan Chase Securities, Inc.
60 Wall Street
New York, NY 10260-0060

JP Morgan Chase Securities, Inc.
c/o Larren M. Nashelsky, Esq.
Morrison & Foerster
1290 Avenue of the Americas
New York, NY 10104-0050

Motiva Enterprises, LLC
c/o Tyler P. Brown, Esquire
Hunton & William
Riverfront Plaza – East Tower
951 East Byrd Street
Richmond, VA 23219

Motiva Enterprises, LLC
Shari L. Heyen
Gregory C. Ulmer
Baker & Hostetler, LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002

Frank B. Bradley, III, President
The Beale Company of Virginia, Inc.
Post Office Box 217
Mechanicsville, VA 23111

Errol Uhr
Financial Security Assurance
350 Park Avenue
New York, NY 10022

Peter Kern
Lehman Brothers
3 World Financial Center
New York, NY 10022

Raymond Galkowski
Financial Security Assurance
350 Park Avenue
New York, NY 10022

Richard G. King, President
Utz Quality Foods, Inc.
P. O. Box 338
900 High Street
Hanover, PA 17331

Raymond R. Pring, Jr.
Gold Morrison & Laughlin, P.C.
1660 International Drive, Suite 450
McLean, VA 22102-4848

Gail G. Roberts, Esquire
County Attorney's Office
P. O. Box 339
Stafford, VA 22555-0339

Augustus C. Epps, Jr., Esquire
Christian & Barton, LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095

Carl T. Anderson, Esquire
Paul Hastings Janofsky & Walker, LLP
555 South Flower Street
23rd Floor
Los Angeles, CA 90071

William A. Broscious, Esquire
Kepley & Broscious
7201 Glen Forest Drive, Suite 102
Richmond, Virginia 23226

David Hopper, Esquire
Alan Buffenstein, Esquire
McCandlish & Kaine
1111 East Main St., Suite 1500
Richmond, VA 23219

John D. McIntyre
Willcox & Savage, P.C.
1800 Bank of America Center
One Commercial Place
Norfolk, VA 23510-2197

Attn: Legal Department
Marva Maid Dairy
5500 Chestnut Avenue
P. O. Box 5145
Newport News, VA 23605-2118

BP Amoco
c/o James S. Carr, Esquire
Kelley Drye & Warren, LLP
101 Park Avenue
New York, NY 10178

Citgo Petroleum
c/o Peter S. Partee, Esquire
Hunton & Williams
951 East Byrd Street
Richmond, VA 23219-4074

John P. McDonagh
J.P. Morgan Chase & Co.
380 Madison Avenue, 9th Floor
New York, NY 10017-2591

Dominion Virginia Power
c/o Russell R. Johnson, III, Esq.
3734 Byfield Place
Richmond, VA 23233

Marva Maid Dairy
c/o Robert M. Marino, Esq.
Reed Smith LLP
1301 K Street, NW, #1100 – East Tower
Washington, D.C. 20005-3317

SCHEDULE A

McLane Company, Inc.
c/o Gregory G. Hesse
Jenkens & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202-2799

Kim Martin Lewis, Esq.
The Proctor & Gamble Distributing Co.
One Proctor & Gamble Plaza
Attn: Jason P. Muncy (Legal Division)
Cincinnati, OH 45202

Richard W. Stiteler
Eastern Group Credit Advisor
Coca-Cola Enterprises, Inc.
The Mid-Atlantic Coca-Cola Bottling Co.
9770 Patuxent Woods Drive
Columbia, MD 21046

Michael T. Bevilacqua, Manager
Accounts Receivable
Pepsi Bottling Group, LLC
1100 Reynolds Blvd.
Winston-Salem, NC 27105

Linda Merryman
Credit / Account Receivable Manager
Cloverland / Green Spring Dairy
2701 Loch Raven Road
Baltimore, MD 21218

William H. Schwarzchild, III, Esq.
Williams, Mullen Clark & Dobbins
1021 East Cary Street
Richmond, VA 23218-1320

H. Slayton Dabney, Jr., Esquire
Douglas M. Foley, Esquire
McGuire Woods
One James Center
901 East Cary Street
Richmond, Virginia 23219

Paul M. Nussbaum, Esquire
Whiteford, Taylor & Preston, LLP
Seven Saint Paul Street
Baltimore, MD 21202-1626

Robert Marshall, Esquire
Waters McPherson McNeill
300 Lighting Way
Secaucus, NJ 07096

A. Carter Magee, Jr., Esquire
Magee Foster Goldstein & Sayers, P.C.
P. O. Box 404
Roanoke, VA 24011

Ross Buntrock, Esquire
Kelley Drye & Warren, LLP
1200 19th Street, N.W., Suite 500
Washington, DC 20036

Kelly H. Scoffield, Esquire
ExxonMobil Corporation
3225 Gallows Road
Room 3D-0634 – Law Dept.
Fairfax, VA 22037

Douglas M. Foley, Esquire
McGuire Woods
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510

Sheri M. Graves
The Coca-Cola Company
P. O. Box 1734, USA 733
Atlanta, GA 30301

Borden R. Bowen
c/o David K. Spiro, Esquire
823 East Main Street, 15th Floor
Richmond, VA 23218-0561

T. Wayne Biggs, Esquire
Mark R. Dycio, P.C.
10615 Judicial Drive, Suite 101
Fairfax, Virginia 22030

Stephanie W. Frye
C/o Glenda Clausell
Equiva Services LLC
910 Louisiana
One Shell Plaza Room 771
Houston, TX 77002

Stuart Hirshfield, Esquire
Dewey Ballantine
1301 Avenue of the Americas
27th Floor
New York, NY 10019

CACI, Inc. – Federal
dba CACI Marketing Systems
Attn: Marjorie Crossman
1100 N. Glebe Road
Arlington, VA 22201

Waste Management, Inc.
c/o Gregory S. Duncan, Esquire
412 East Jefferson Street
Charlottesville, VA 22902

Atlantic Bank
c/o Mark R. Lewis, Esquire
6400 Arlington Boulevard
Suite 420
Falls Church, Virginia 22042-2336

Citicorp Vendor Finance, Inc.
c/o James S. D. Eisenhower, III
Eisenhower & Laufer, P.C.
10476 Armstrong Street
Fairfax, Virginia 22030

**Schedule B**

# Reclamation Vendors

| Company Name |
|---|
| Citgo Petroleum Corp.<br>PO Box 3758<br>Tulsa, Oklahoma 74102 |
| Coca-Cola Enterprises, Inc.<br>t/a The Mid Atlantic Coca-Cola Bottling Co.<br>9770 Patuxent Woods Dr., Columbia, MD 21046 |
| Frito Lay, Inc.<br>PO Box 660059<br>Dallas Texas 75266-0053 |
| Krispy Kreme Doughnut Corp.<br>PO Box 83<br>Winston Salem, NC 27102 |
| Marva Maid Dairy<br>5500 Chestnut Avenue<br>Newport News, Va. 23605 |
| McClane Company, Inc.<br>4747 McLane Parkway<br>Temple, Texas 76503 |
| Pepsi-Cola Bottling Co. Of Salisbury<br>c/o A. Gillis Allen, II<br>207 Downtown Plaza<br>PO Box 990<br>Salisbury, Maryland 21803 |
| Pepsi-Cola<br>1100 Reynolds Boulevard<br>PO Box 10<br>Winston Salem, NC 27102 |
| Tosco Refining Company<br>1400Park Avenue<br>Lincoln, NJ 07036 |

# EXHIBIT J

McGUIREWOODS LLP
H. Slayton Dabney, Jr., Esq. (VSB No. 14145)
Douglas M. Foley, Esq. (VSB No. 34364)
One James Center
901 East Cary Street
Richmond, VA 23219
(804) 775-1000
- and -
WILLKIE FARR & GALLAGHER
Paul V. Shalhoub, Esq.
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| In re | ) | |
| | ) | Case No. 00-34533 through 00-34358 |
| HEILIG-MEYERS COMPANY, et al., | ) | |
| | ) | |
| Debtors. | ) | Chief Judge Douglas O. Tice, Jr. |
| | ) | |
| | ) | (Chapter 11 cases) (jointly administered) |

**ORDER PURSUANT TO SECTIONS 105 (a) AND 546(c) OF THE BANKRUPTCY CODE FOR APPORVAL OF GLOBAL RECLAMATION PROCEDURES FOR RECLAMATION CLAIMS**

Upon the Motion dated November 16, 2000 (the "Motion") of Debtors, as debtors in possession, for an order, pursuant to sections 105(a) and 546(c) of title 11 of the United States Code, for approval of global reclamation procedures for reclamation claims, all as more fully set forth in the Motion (the "Global Reclamation Procedures"); and it appearing that the Court has jurisdiction over this matter; and it appearing that due notice of the Motion has been provided to the Office of the United States Trustee, the attorneys for the statutory committee of unsecured creditors and equity holders appointed in these chapter 11 cases, all Reclamation Vendors from whom the Debtors have received a Reclamation Claim, as such terms are defined in the Motion,



and those persons requesting notice in these chapter 11 cases pursuant to Rule 2002 of the

Federal Rules of Bankruptcy Procedure, and that no other or further notice need be provided; and

it further appearing that the relief requested in the Motion is in the best interests of the Debtors

and their estates and creditors; and upon all of the proceedings had before the Court; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Debtors shall be, and hereby are, authorized to implement the Global

Reclamation Procedures, as defined in the Motion, and as further defined and specified as

follows :

    1.          Within 25 days after entry of the order approving the Global
Reclamation Procedures, the Debtors will send to the Reclamation Vendors a copy of
such order and, to the extent that the Debtors have not reconciled the Reclamation Claim
of the Reclamation Vendor, a letter (the "Document Request") requesting copies of all
documents necessary to complete the reconciliation of such claim, including, without
limitation, invoices, proofs of delivery or other documents.

    2.          The Reclamation Vendor shall submit the requested
documentation to the Debtors within 60 days of the date of the Document Request.
Failure to respond to a Document Request in a timely fashion shall result in the
disallowance of the Reclamation Claim unless the Debtors have, in writing, extended
such deadline or a motion has been filed prior to such deadline by a Reclamation Vendor.

    3.          Not later than 90 days after expiration of the period described
in paragraph (2) above, the Debtors will send each Reclamation Vendor from whom they
received a Reclamation Claim a report setting forth for that Reclamation Vendor (the
"Reclamation Reports"); (i) the name of the vendor; (ii) the date of the Reclamation
Claim; (iii) the applicable reclamation period for the Reclamation Vendor; and (iv) the
goods received by the Debtors during the applicable reclamation period, by invoice
number or purchase order number, amount and date received to the extent practicable; (v)
the goods actually still in the Debtors' possession on the date of the receipt of the
Reclamation Demand if this can be determined by the Debtors; otherwise, the Debtors
will provide a good faith estimate of the goods actually in the Debtors' possession on the
date of receipt of the Reclamation Demand along with a detailed explanation of the basis
for such estimate; and (vi) the Debtors' determination as to the valid amount of the
Reclamation Claim subject to insolvency or other issues.  The Debtors will consult with
counsel for the Equity and Creditors' Committees prior to sending the Reclamation
Reports and provide such counsel copies of the Reclamation Reports.  The Debtors will
file a schedule of the Reclamation Reports with the Court when the Reclamation Reports
are provided to the Reclamation Vendors.

4. If a Reclamation Vendor disagrees with the Reclamation Claim as indicated in the Reclamation Report, it must object within 45 days of the date it received the Reclamation Report by filing a written objection, specifying the grounds therefor, with the Court and serving the same on (i) Douglas M. Foley, Esq. and Erin McDonald, Esq., McGuireWoods, LLP, One James Center, 901 East Cary Street Richmond, VA 23219 and Paul V. Shalhoub, Esq., Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019-6099, and (ii) Robert Thornhill, Heilig-Meyers Furniture Company, 12560 West Creek Parkway, Richmond, VA 23238; (iii) Michael Stamer, Esq. at Akin, Gump, Strauss, Hauer & Feld, L.L.P., 590 Madison Avenue, 20th Floor, New York, New York 10022; and (iv) Peter S. Partee, Esq., Hunton & Williams, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219

5. If a timely objection is not filed by a Reclamation Vendor and served on each of the aforementioned parties, the amount of the Reclamation Claim of such vendor shall be deemed fixed in the amount set forth in the Reclamation Report as an administrative expense claim payable pursuant to the provisions of the Bankruptcy Code without further notice or hearing. Upon the filing of a timely objection in accordance with the procedures set forth herein, the Stand-Still (as defined below) would be immediately and automatically lifted and Reclamation Vendors would have all rights available to them under the law to establish the validity and amount of their Reclamation Claims, including the commencement of adversary proceedings.

6. If a timely objection is filed and served, the Reclamation Claim will be resolved (i) consensually through a written stipulation between the Debtors and the objecting vendor, filed with the Court, and served on the Limited Service List[1] or (ii) through a trial as a contested matter.

and it is further

ORDERED that notwithstanding the Debtors waiver of their right to assert as a defense to a Reclamation Claim that a Reclamation Vendor has failed to promptly commence or prosecute an adversary proceeding to enforce its Reclamation Claim, such waiver and the Global Reclamation Procedures shall be, and hereby are without prejudice to any and all other rights, claims and defenses that the Debtors may have in respect of a Reclamation Claim including, without limitation, issues pertaining to insolvency, and it is further

---

[1] Any stipulation filed with the Court shall be served on the Limited Service List. If no objections to such stipulation is filed within ten (10) days of service then such stipulation shall become effective without further notice or hearing.

ORDERED that pending completion the Global Reclamation Procedures, a stand-still (the "Stand-Still") shall be in effect such that Reclamation Vendors are not required, and are stayed, from taking steps to establish the validity and amount of their Reclamation Claims, including the commencement and continued prosecution of adversary proceedings, except as provided by the Global Reclamation Procedures.

Dated: January 11th, 2001
Richmond, Virginia

DOUGLAS O. TICE, JR.
CHIEF UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

/s/Douglas M. Foley
McGUIREWOODS LLP
H. Slayton Dabney, Jr., Esq. (VSB No. 14145)
Douglas M. Foley, Esq. (VSB No. 34364)
One James Center
901 East Cary Street
Richmond, VA 23219
(804) 775-1000
- and -
WILLKIE FARR & GALLAGHER
Paul V. Shalhoub, Esq.
787 Seventh Avenue
New York, NY 10019-6099
(212) 728-8000

NOTICE OF JUDGEMENT OR ORDER
Entered on Docket JAN 11 2001

\\FIN\40804.1