UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                    .      Case No. 08-35653 (KRH)
                          .
                          .
                          .
CIRCUIT CITY STORES,      .      701 East Broad Street
INC.,                     .      Richmond, VA 23219
                          .
                          .
          Debtor.         .      January 14, 2010
. . . . . . . . . . . . ..        2:07 p.m.


                    TRANSCRIPT OF HEARING
         BEFORE HONORABLE KEVIN R. HUENNEKENS
         UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:           McGuire Woods LLP
                          By:  DOUGLAS FOLEY, ESQ.
                          9000 World Trade Center
                          101 W. Main Street
                          Norfolk, VA 23510

                          McGuire Woods, LLP
                          By:  SARAH B. BOEHM, ESQ.
                          901 East Cary Street
                          Richmond, VA 23219

                          Skadden, Arps, Slate, Meagher &
                            Flom, LLP
                          By:  GREGG M. GALARDI, ESQ.
                          P.O. Box 636
                          Wilmington, DE 19899




Proceedings recorded by electronic sound recording, transcript
                produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES: (cont'd)

For Paramount Home          Klee, Tuchin, Bogdanoff & Stern, LLP
Entertainment:              By:  DAVID M. STERN, ESQ.
                            1999 Avenue of the Stars
                            Los Angeles, CA 90067

For Export Development      Hutson & Powell
Canada:                     By:  RICHARD M. HUTSON, II, ESQ.
                            300 West Morgan Street
                            Durham, NC

                            Blakeley & Blakeley, LLP
                            By:  RONALD A. CLIFFORD, III, ESQ.
                            100 Quail Street
                            Newport Beach, CA 92660

For LumiSource:             Williams Mullen
                            By:  ALEXANDER BURNETT, ESQ.
                            1021 East Cary Street
                            Richmond, VA 23218

For Official Committee      Tavenner & Beran
of Unsecured Creditors:     By:  LYNN TAVENNER, ESQ.
                            20 North Eighth Street.
                            Richmond, VA 23219

**TELEPHONIC APPEARANCES**:

For LumiSource:             Querrey & Harrow
                            By:  JOHN M. BROM, ESQ.
                            175 West Jackson Boulevard
                            Chicago, IL 60604

For the Committee:          Pachulski, Stang, Ziehl & Jones
                            By:  JEFFREY N. POMERANTZ, ESQ.
                            10100 Santa Monica Blvd.
                            Los Angeles, CA 90067

## I N D E X

**WITNESS FOR EDV**                                                    **PAGE**

JOANNE KEACH-BARKER

    Cross Examination by Mr. Foley                        100
    Redirect Examination by Mr. Clifford                 106
    Recross Examination by Mr. Foley                     107
    Further Redirect Examination by Mr. Clifford         107
    Further Recross Examination by Mr. Foley             108

**WITNESS FOR THE DEBTOR**

EVAN GERSHBEIN

    Direct Examination by Mr. Foley                      109
    Cross Examination by Mr. Clifford                    111

**J&J COURT TRANSCRIBERS, INC.**

4

1              COURT CLERK:  In the matter of Circuit City Stores,

2  Incorporated, hearings on Items 1 through 65 as set out on

3  debtors' agenda.

4              MR. FOLEY:  Good afternoon, Your Honor, Doug Foley

5  with McGuire Woods on behalf of Circuit City.  Your Honor, with

6  me --

7              THE COURT:  Mr. Foley, do you happen to have an extra

8  copy of your agenda?  I left mine in chambers.

9              MR. FOLEY:  We do.

10             THE COURT:  I've got one right here.  Thank you.

11             MR. FOLEY:  Your Honor, with me today at counsel

12  table is Gregg Galardi we invited from Skadden Arps as well as

13  Sarah Boehm from my firm.  Also in the courtroom today is Jim

14  Markum, CEO, Circuit City as well as Michelle Mosier who's the

15  principle Financial Officer.

16             THE COURT:  All right.  Thank you.

17             MR. FOLEY:  Your Honor, we do have 65 items on the

18  agenda today.  However, many of them will be adjourned to the

19  February 24th omnibus hearing date because there are status

20  hearings on various omnibus objections or claims that we have

21  pending.  But just to go through the agenda in order, Your

22  Honor, there are some matters that Mr. Galardi will be

23  addressing for the Court as well as Ms. Boehm.

24             Items Number 1 and 2, Your Honor, are the Marble Gate

25  administrative claim motions.  Both of those have been resolved

**J&J COURT TRANSCRIBERS, INC.**

1   and have been withdrawn from the docket.

2                  THE COURT:  All right.

3                  MR. FOLEY:  Item Number 3, Your Honor, is our long

4   pending lease and disposition procedures motion.  As Your Honor

5   recalls there was one particular objection that was left which

6   was 444 Connecticut Avenue.  That has now been withdrawn and

7   that motion is now completely resolved and can be removed from

8   the docket.

9                  THE COURT:  Excellent.

10                  MR. FOLEY:  Your Honor, Item Number 4 is a motion by

11   Waste Management with respect to untimely claim.  That matter

12   has been withdrawn and resolved.

13                  THE COURT:  All right.

14                  MR. FOLEY: Your Honor, Items Number 5, Mr. Galardi

15   will be addressing when he takes the podium.  That has to do

16   with the wind down incentive and retention program as it

17   pertains to Mr. Markum.

18                  THE COURT:  Right.

19                  MR. FOLEY:  Your Honor, Item Number 6, that is the

20   Direct TV motion for relief from the automatic stay to exercise

21   setoff rights.  We're still working with them.  We're close to

22   a resolution that will result in significant payments to the

23   estate.  They've requested, and we've conceded to adjourn their

24   motion to the February 24th omnibus hearing date at 2:00 p.m.

25                  THE COURT:  All right.

1              MR. FOLEY:  Your Honor, Schimenti Construction, their

2    motion for 2004 examination, they have made a settlement offer

3    recently -- or settlement demand to us recently that we are in

4    the process of evaluating.  It relates to certain claims that

5    they may bring in the form of an adversary proceeding which

6    actually may moot this 2004 examination motion altogether.  But

7    in any event, until then while we're evaluating their

8    settlement demand they've requested, and we've agreed to

9    adjourn their motion until the February 24th hearing date at

10   2:00 p.m.

11             THE COURT:  Okay.

12             MR. FOLEY:  Your Honor, Item Number 8, this is the --

13   our objection to Panasonic's claim.  We're in discussions with

14   them, we're not certain that we're going to be able to resolve

15   it.  But we will be going forward if we can't resolve it prior

16   to that time on February 11th at 11:00.

17             THE COURT:  Okay.

18             MR. FOLEY:  Your Honor, Item Number --

19             THE COURT:  So that will be heard on the 11th if it's

20   not resolved.

21             MR. FOLEY:  It'll be resolved or heard that day.

22             THE COURT:  Okay.  Very good.

23             MR. FOLEY:  Your Honor, Item Number 9 is the Mad Cow

24   motion for administrative claim.  They -- this has to deal with

25   essentially a reclamation type claim.  They have agreed to

7

1  adjourn their motion until the January 28th hearing date,

2  because they wanted to see what the outcome of today's hearing

3  is, quite frankly, on some of the other matters that Your

4  Honor's going to hear summary judgment on.

5           THE COURT:  All right.

6           MR. FOLEY:  So that one may move to January 28th at

7  eleven.  Your Honor, Ms. Boehm will address the Court on Items

8  Number 10, 11, 15 through 50, and 55 through 61.  So if I could

9  just pass those for now.  Mr. Galardi will be addressing the

10 Court with respect to Items Number 12, 13, 14, and Number 5

11 which I previously mentioned.  Committee counsel will be

12 addressing matters 51 through 54 which are their fee

13 applications.

14          Your Honor, Items Number 62, 63, and 64 --

15          THE COURT:  Let me just catch up with you.

16          MR. FOLEY:  -- these are adversary proceedings that

17 we commenced.  Actually, one of them was commenced by CC

18 Investors 1995/6 with respect to some insurance proceeds.  We

19 have agreed with them.  And we're trying to see if we can

20 resolve the matter to adjourn the pretrial conference until

21 February 24th at 2:00 p.m.

22          Items Number 63 and 64, Your Honor, this is our

23 complaint against Sharp & Creative Labs.  We're working with

24 them and exchanging documents informally to see if we can't

25 resolve the matter and have agreed to adjourn the pretrial

1    conference until February 24th at 2:00.

2         Your Honor, Item Number 65 is EDC's motion for

3    allowance of a late filed 503(b)(9) claim and that will be

4    going forward today as an evidentiary matter and we'll take

5    that up last.

6         THE COURT:  Okay.

7         MR. FOLEY:  Your Honor, At this point Ms. Boehm will

8    address Items Number 10, 11, and 15 through 50 as well as 55

9    through 61.

10         MS. BOEHM:  Good afternoon, Your Honor, Sarah Boehm

11    --

12         THE COURT:  Good afternoon.

13         MS. BOEHM:  -- on behalf of the debtors.  Item 10 on

14    today's agenda is the debtors' 62nd omnibus objection to claims

15    which was the disallowance of certain claims asserted against a

16    domestic company for which the debtors show no liability.  This

17    included six claims for approximately $1.2 million.  We

18    received no responses, and we will submit an order disallowing

19    those claims.

20         THE COURT:  Okay.  The objection will be sustained.

21         MS. BOEHM:  Item Number 11 on the agenda is the

22    debtor's 64th omnibus objection to claims.  This sought the

23    disallowance of certain qualified pension plan and 401(k)

24    claims.  It included 12 claims for approximately $63,000.  We

25    received no responses and would like to submit an order

1  disallowing those claims.

2          THE COURT:  All right.  Those claims will be

3  disallowed as well.

4          MS. BOEHM:  If I could skip, Your Honor, to Item 50

5  on the agenda.  That is the debtors' 63rd omnibus objection to

6  claims which was originally scheduled for initial status

7  conference today.  It sought the disallowance of certain

8  duplicate claims of the Weidler cost settlement.  The Weidler

9  settlement class has requested an extension and we have agreed

10  to extend their deadline to respond until February 17th with

11  the initial status going forward on February 24th while they

12  attempt to confirm that all the claimants included in that

13  objection were in fact part of the class.

14          THE COURT:  All right.

15          MS. BOEHM:  Your Honor, with respect to Items 15

16  through 50 -- or through 49 this is the status conference on

17  the various omnibus objections filed by the debtors.  These,

18  for which any response is still outstanding, are being

19  adjourned for further status to February 24th at two o'clock.

20  I do have a summary chart, Your Honor, to show our progress in

21  resolving these claims.

22          THE COURT:  And all these matters are being adjourned

23  to February 24?

24          MS. BOEHM:  Yes, Your Honor.

25          THE COURT:  Thank you.

1          MS. BOEHM:  Your Honor, just briefly with respect to

2   this chart it includes most of the omnibus objections or all

3   the omnibus objections that were set for initial status today,

4   and shows that as continued and pending we currently have 490

5   claims remaining and we have resolved 119 claims for over $183

6   million.  And we've also -- this chart reflects all the omnibus

7   objections which have been fully resolved which include omnibus

8   objections 1, 11, 12, 13, 14, 17, 18, 25, 26, 38, 40, 45, 46,

9   47, 53, 55, 59, and 61 which are, of course, not on the agenda

10  as they have been fully resolved.

11          THE COURT:  All right.

12          MS. BOEHM:  So, Your Honor, with respect to all those

13  we'll just continue those for further status to February 24th

14  at two o'clock.

15          THE COURT:  Okay.  And again, just for the record

16  those -- the docket numbers on your agenda.

17          MS. BOEHM:  Are Items 15 through 50.

18          THE COURT:  Excellent.  Okay.  Thank you.

19          MS. BOEHM:  And, Your Honor, if we could skip into

20  the fee application section to Item 55.  I will address Items

21  55 through 61 are the fee applications filed on behalf of the

22  debtor.

23          THE COURT:  All right.

24          MS. BOEHM:  And I do have a summary chart as well as

25  the amount sought in those applications.

1           Your Honor, for the majority of the professionals

2    this was their fourth interim application which seeks

3    reimbursement of fees and expenses from August 1, 2009 through

4    October 31, 2009.  For Streambank it was their second interim

5    application for that same time period.  For Kirkland & Ellis

6    this is their final application.  During the fourth interim

7    period they did have a small amount and then their file

8    application seeks file approval of all fees requested which as

9    set forth on the chart fees and expenses total $372,914.83.

10   All the other professionals' fees and expenses as set forth are

11   just interim approval.

12           We have not received any objections by the formal or

13   informal, and we would ask the Court to enter orders approving

14   the debtors' fee applications as set forth therein.

15           THE COURT:  Does any party wish to be heard in

16   connection with the applications of Skadden Arps, McGuire

17   Woods, FTI Consulting, Ernst & Young, TJM Realty, Streambank,

18   or Kirkland & Ellis?  All right, there being no objection the

19   Court has reviewed these applications and I did find them to be

20   in order, and the Court will approve the applications as

21   submitted.  Please submit orders to that effect.

22           MS. BOEHM:  Thank you, Your Honor.  I'll turn it over

23   to Mr. Galardi.

24           MR. GALARDI:  Good afternoon, Your Honor.  For the

25   record Gregg Galardi from Skadden Arps on behalf of the

12

1  debtors.  Happy New Year.

2           Your Honor, the first matter on the agenda that I'm

3  going to handle is an adjournment which is matter Number 5 the

4  incentive plan.  Mr. Markum is in the courtroom today, Your

5  Honor.  As you may recall we had filed an original severance

6  plan which was probably heard eight, nine months ago, but Mr.

7  Markum was adjourned from that with that still pending.  We

8  have been in negotiations with the committee regarding Mr.

9  Markum's payment and satisfaction of those obligations.  At the

10 same time the committee has reserved its rights and as Your

11 Honor may know from reading the plan one of the conditions to

12 the -- one of the statements in the plan is that the committee

13 would support that, Mr. Markum's bonus.

14          We are adjourning it over to the hearing on the 11th

15 because whether it goes forward with confirmation or not we are

16 going to try to go forward with that on February 11th.  We are

17 trying to resolve any committee concerns about that by way of

18 other things that we are working with the committee behinds the

19 scenes and the hope is that we would actually go forward on the

20 11th.  I can't promise you that we will, but that is our

21 intention whether it be on a consensual or non consensual basis

22 is an issue that is still open for discussion although I think

23 we're leading more to it'll be a consensual resolution as

24 opposed an unconsensual resolution.

25          And just for Your Honor's information as of the end

1  of the first pay period of this month and this year Mr. Markum

2  is now going more to a consulting agreement that we will not be

3  paying him his annual salary, but more on an hourly basis that

4  we hope reduces the expense of the estate.  Going forward we're

5  also contemplating hiring a CRO which we're working on.  So all

6  of these things are going on in the background.  So I thought I

7  would just give Your Honor some heads up that that's what we're

8  working on.  That'll help with the confirmation, but it'll also

9  try to resolve all of that by the February 11th hearing.

10         THE COURT:  All right.  Does that also mean that the

11  confirmation hearing is going to slip to the 11th of February?

12         MR. GALARDI:  It means that it'll slip at least that

13  far, Your Honor.  We would file a notice.  I might as well give

14  you a little bit of update on where that stands as parties will

15  ask.  Neither we nor the committee wants to keep adjourning the

16  confirmation hearing.  But at the same time, Your Honor, to

17  give -- I think I may have mentioned it once.  There were two

18  real issues.  One is everybody wants to be absolutely

19  comfortable with the administrative expense and that it paid.

20  And Your Honor has a docket for all of the concerns about

21  setting forth reserves.  I think Your Honor's decisions have

22  helped us with some of those issues and so we'll move that

23  along.  At the same time I think the other side believes that

24  it might not have helped them, the creditors, but nonetheless

25  that's one issue that I think is now getting some clarity so

1   that may help us.

2           More importantly, Your Honor, we have had a

3   successful -- I think I mentioned it to the Court -- a

4   successful sale of the business up in Canada and there was

5   money that comes back from Canada.  The issue is -- how to get

6   that money back in the most effective and efficient tax way.

7   The debtors have filed a, I would call it a revenue ruling

8   although it's probably not called a revenue ruling in Canada

9   with respect to how you get that money back from the United

10  States, because there's a U.S. debtor with a Canadian parent,

11  with a U.S. debtor again.

12          And so to avoid double taxation and to see if we can

13  amalgamate and restructure such that the money is the most

14  effective coming back we are working on that.  As I stand here

15  today we haven't gotten that ruling.  Once we get that ruling

16  then there'll be a period of time by which we have to

17  restructure, you know, amalgamate certain of the corporations.

18  And we have not done that in anticipation.  So that's really

19  what's slowing down the confirmation date so as to maximize the

20  value of the recovery to the estate.

21          And you actually have to accomplish that, at least my

22  understanding is that you have to accomplish that before you go

23  to confirmation and go effective.  So that confirmation date

24  may still slip.  It's not because of claims, it's not because

25  of money, it's a way to maximize the value and not give money

15

1 to the government, essentially, and keep it for creditors.   And

2 we're working with the creditor's committee on that as well.

3         So with that said obviously we're not going forward

4 on the January 28th date.   I would say if I were a betting man

5 I wouldn't think we're going forward on the February 11th date,

6 but I would -- we're probably going to adjourn it over to that

7 February 11th date just to keep it on the docket so we can give

8 Your Honor status conferences at the same time on those

9 matters.   I don't know if either Mr. Pomerantz, Mr. Feinstein

10 or Mr. Pachulski's on the phone and wanted to add anything to

11 that.   But that's where I understand us to be and we're working

12 through those issues.

13         THE COURT:   All right.

14         MR. POMERANTZ:   Your Honor, this is Jeff Pomerantz.

15 I agree with what Mr. Galardi says in terms of the status and

16 our efforts to work together both on the Canadian issues and

17 other issues that will hopefully lead to the consensual

18 confirmation.

19         THE COURT:   All right.   Very good, Mr. Pomerantz.

20 Thank you.

21         MR. GALARDI:   Your Honor, that then turns to matters

22 12, 13, and 14 on the agenda.   And really the focus today is on

23 matter 12.   12 is the debtors' motion for summary judgment with

24 respect to certain reclamation claims.   13 and 14 are the

25 underlying objections to those motions.   Your Honor, I -- if

1   Your Honor pleases I would proceed just with my argument in

2   support of summary judgment and then there may be a few

3   responses and then I could reply if that works.

4            THE COURT:  That works for me.

5            MR. GALARDI:  Your Honor, I guess I said the last

6   time I was here and people probably believed it, if I were from

7   Mars and I came down and read the statute I would start with

8   the statute.  And I'll state with that same statement here with

9   respect to 546(c), because I don't think you need to go to the

10  legislative history.  I don't think you even need to go to the

11  changes.  The issue is if I were coming down and I were to ask

12  if I was a reclamation claimant and were to ask what kind of

13  claims, what kind of rights do I have as a reclamation claimant

14  I would turn to 546 as it's now written.  And 546(c) simply

15  says that you have the right to reclaim your goods.

16            And I'm going to ignore the language of subject to

17  the prior liens.  And in order to reclaim your goods you have

18  to make a written demand.  So the first question I'd ask myself

19  is okay, if I can reclaim those good so let me try to do that.

20  But do I get an administrative claim, and do I get a secured

21  claim?  And there's nothing in this code that says you get

22  either of those anymore.  Now, you may go to a bankruptcy

23  historian, if I came from Mars, and ask what it used to be and

24  that may have been a secured claim and an administrative claim.

25  But the code as it stands today does not provide that.

1            It just simply doesn't and congress -- now we can

2    talk about what congressional intent was, but I would start

3    from this and I ask you -- I would say well, the Court's first

4    question to determine here leaving aside whether there was

5    secured debt or anything else here is could the Court, does

6    this Court have jurisdiction to even grant the reclamation

7    claimant an administrative claim on account of its reclamation

8    claim, or a secured claim on account of its reclamation claim?

9    And there is nothing in this code that says you can do that on

10   account of the goods it delivered prepetition.  And so I think

11   you end the inquiry.

12           Now, let's take a little bit more sophisticated step

13   on that.  That's with respect to reclamation claims per se.

14   Now, can you grant an administrative claim?  Yes, you can.  You

15   can grant an administrative claim for those claims that are

16   properly 503(b)(9) claims, but I don't call those reclamation

17   claims anymore.  What the code says is if those same

18   reclamation claims were sold to the debtors in the 20 days

19   prior to the bankruptcy then in fact you could give them

20   administrative status.  But it doesn't say anything about the

21   reclamation claims.  It says the duty and the right of the

22   creditor is to reclaim those goods subject to, you know,

23   preexisting liens.

24           So if there were no debt on this company, if there

25   were no secured debt on this company a creditor could come in

1  and make a reclamation claim, you could reclaim the goods.

2  That's it.  Now, we're going to talk about the procedures in a

3  minute because I understand their argument.  But that's it.

4  You do that.  Now what do you have to do to that?  Well, you

5  have to lift the stay, reclaim the goods, identify the goods

6  and take them back.  Fine.  You don't get an administrative

7  claim.  You don't get a secured claim, you get your goods back.

8        So the first thing is there is nothing in this

9  Court's authority with respect to their reclamation claim that

10 would give you the right to grant an administrative claim.

11 There is however, -- let's assume the creditor did in fact do

12 that.  What other authority can there be in this code that

13 doesn't say in 546 anymore, and I'll point out 546 as Your

14 Honor knows is a limitation on avoidance actions.  It's not the

15 granting of a claim as courts have pointed out.  But can they

16 make another argument?  Well, sure they can.  But it seems to

17 me that there's two sections that they could go look to.

18       One is can they get an administrative claim under

19 503(b)(1)?  Okay.  Well, if there were a post petition

20 transaction to or for the benefit of the debtor then yes.  But

21 none of them have argued a post petition transaction to or for

22 the benefit of the debtor.  And when we get to the proposed

23 order I will address why one of the provisions of the order

24 says you can pay these goods.  But it's not a 503(b)(1) claim.

25 There's nothing that says there's a post petition transaction

1   for the benefit of the state.

2           Indeed it can't be a post petition transaction

3   because their notion of reclamation is that the goods came into

4   the estate 45 days before the petition date.  So there's one

5   other place that you could go.  You could say well, I could get

6   relief under 105.  But 105 can't fill in and provide that you

7   can get a secured claim or administrative claim for your

8   prepetition delivery of goods.  So, Your Honor, I don't think

9   this Court has authority to grant them under the statute as now

10  written an administrative claim or a reclamation claim.

11          THE COURT:  Nobody's raised it, but why couldn't it

12  be under Section 507(b) that they didn't get adequate

13  protection of their interest at the time?

14          MR. GALARDI:  Well, there's two reasons.  And Your

15  Honor actually -- somebody did raise it and they raised it in

16  the very first motion and we responded to it.  And they settled

17  on that one.  Your Honor, if I might hand up what's number

18  docket 656 which is the debtor's reply.

19          Your Honor, here's why somebody can't get adequate

20  protection.  LumiSource, one of the creditors, when we filed

21  the original procedures raised exactly that argument.  Hey, I

22  get adequate protection.  If you're not giving me back my

23  business get adequate protection.  Two problems.  They're not a

24  secured creditor.  If they're not a secured creditor the case

25  law is you don't get adequate protection.  So that's why they

can't make the claim under the section that you're referring

to.  You don't get adequate protection.

        And indeed, Your Honor, in our reply which is docket

656 which was filed and heard by December 5th, okay, so this

will go to the argument that Paramount wants to make that

somehow we misled the Court and misled creditors.  We

specifically said you cannot, you are not entitled to adequate

protection.  Why?  Paragraph 12.  You can't get it because

unsecured creditors are not.  We've taken the position you're

an unsecured creditor and courts have consistently held that

unsecured creditors are not entitled to adequate protections.

They've also held, as we were arguing, Courts have also held

the reclamation claimants are unsecured creditors citing

exactly these cases.  <u>Pester</u>, then we cited <u>McClouth</u> and we

cited <u>Dairy Mart</u>.

        So Your Honor, that's why I don't think Your Honor

had the authority and we made it clear from the very first day,

indeed we made it clear from the second day hearing on December

5th, they're not secured creditors.  So I think you can't get

that statutory authority.

        So Your Honor, what do they have?  This is sort of

the metaphysical question.  Well, I think they have what it

says they have quite clearly.  The right to take back the goods

subject to certain limitations.  There are three limitations

broadly speaking, Your Honor.  The first is they have to move

1  to lift the stay.  So let me, Your Honor, hand up another

2  motion just to make it clear what our position was.  Your

3  Honor, this is docket 14.  So it's one of the first day

4  motions.  And I would ask Your Honor to turn to Page 11 of that

5  motion.  And we'll go back to the transcripts in a minute.

6  What did we say?  Well, Page -- actually 10 to 11.

7        "Notwithstanding the foregoing nothing in this motion

8  in the above procedures is intended to prohibit, hinder or

9  delay any reclamation claimant from asserting or prosecuting

10  any of its rights to seek to reclaim the goods provided to the

11  debtor subject to the provisions of 105, 362 and 546(c)."

12        Next paragraph -- next sentence.  "In addition, the

13  debtors do not wait and expressly reserve their right to assert

14  any and all defenses to the reclamation demand.  The debtors

15  submit that the reclamation claimants are not entitled to

16  administrative expense treatment in respect of any asserted

17  reclamation claim, but instead of general, nonpriority,

18  unsecured claims subject to the debtors' right to object to

19  unsecureds on any grounds that governing law provides provided

20  that the prepetition liens of the debtors' prepetition lenders

21  that attach to the debtors' inventory are valid enforceable."

22        This is was filed on the first day of the case.  It

23  was litigated on the first day and the final hearing.  So I

24  come back to the question I asked myself, what do they have?

25  Well, Your Honor, here's what they have.  They have the right

1  to take back the goods subject to limitations.  What are those

2  limitations?  One, they got to move to lift the stay.  Not one

3  of them tried to do so.

4       Two, subject to debtors' defenses.  Debtors' defenses

5  come in two forms.  One, all your normal state law reclamation

6  defenses and then --

7                    (Telephone Interference)

8       THE COURT:  I apologize, Mr. Galardi.  Whoever is on

9  the phone would you please set your phone to mute.  Thank you.

10  That didn't work.

11       MR. GALARDI:  I think they put us on hold and we're

12  hearing the Beatles.

13       THE COURT:  We're getting feedback into the

14  courtroom.  Please set your phones to mute.

15       UNIDENTIFIED SPEAKER:  Hello.

16       THE COURT:  Thank you.  All right, Mr. Galardi, I

17  apologize.

18       MR. GALARDI:  So again, Your Honor, what do they

19  have?  One, they can take back the goods subject to

20  limitations.  What are the limitations?  They have to lift the

21  stay.  Two, they have to have -- they're subject to debtor

22  defenses.  We specifically put people on notice that we were --

23  do not waive and expressly reserve to assert any and all

24  defenses.  And what else?  One of those defenses are, you know,

25  that the claims were not properly identified, blah, blah, blah.

1   And then the other defense is the one that is now expressed in

2   the code again from Mars subject to the prior lien defense.

3   And we said here, again, subject to the debtors' rights to

4   object unsecured claims and provided that the prepetition liens

5   of the debtors, prepetition lenders that attached to the

6   inventory are valid and enforceable.  If they weren't valid and

7   enforceable you don't have the prior lien defense.

8        So, Your Honor, going back to question number one in

9   all of these claims they have been filed as either

10  administrative or unsecured, our view is they can't be, period,

11  end of story, no further questions asked.  They should be

12  reclassified as unsecured claims.  So what then becomes of the

13  order?  Did we dupe them?  Did we mislead them?  Did we do

14  anything to make them think that somehow we changed that?  Your

15  Honor, first of all I think the paragraph right there answers

16  the question quite clearly.  Second, Your Honor, I would go to

17  the final order itself which is Exhibit A, but it's also docket

18  897.  I could hand it up to Your Honor if it makes it easier

19  for you.

20       THE COURT:  I know I've got it here someplace, but

21  I'll just take your copy.

22       MR. GALARDI:  It's probably easier.  So what did we

23  do with our reclamation procedures?  Well, we really did as I

24  described, and we'll go to the transcript in a minute, not very

25  much at all.  Paragraph 5 of the order says the following.

1  "Here are the procedures for reconciling -- processing and

2  reconciling reclamation claims."  First, they had to proceed

3  within 20 days.  Okay, that's what the bankruptcy code says.

4  And we just gave them an address to send it to.  That's all A

5  is.

6      B, "The reclamation demands must include the

7  information required by 546(c)," we didn't put any extra in

8  there.  Then we added this, "And the following, two things.  A

9  statement as to whether the claimant will assert an

10  administrative claim under 503(b)(9), and to the extent known

11  the amount."  That's not an addition to reclamation as I

12  explained in both the motion.  The whole process was to try to

13  gather the information so we could assess what might be

14  503(b)(9), what may be reclamation.

15      Next, Your Honor, C.  "On or before a day that is 120

16  days following the petition date the debtors," -- which turns

17  out to be March 10th, I believe -- "the debtors shall advise

18  the reclamation claimant of the allowed amount, if any, and

19  then absent receipt of that the debtors shall have deemed to

20  reject it."  Now, why the 120 days?  Two reasons.  One, it

21  takes a little bit of time.  Two, 546(h) gives you 120 days to

22  decide whether to return goods.  It corresponds exactly to that

23  546(h) period.

24      D.  "In the event that the debtors and the

25  reclamation claimant agree upon the allowed reclamation

1  amount," that is, let's assume we agreed there was some

2  reclamation claim, "the debtor shall be authorized to make

3  payment in such amount, or be required to return the goods,"

4  again, "subject to the limitations imposed by any orders of

5  this Court and the prior holders of security interest."

6          Your Honor, that language is carefully drafted.  It

7  does not say we give it back or you get an administrative claim

8  like the old orders does.  It says we give it back or we pay

9  you.  Well, why is that?  You're entitled to it back if you

10 have one.  If you don't have one I'm going to have to enter

11 into a post petition transaction.  I'm going to have to pay you

12 for the goods.  Then it's a typical I got to pay for goods that

13 I got, because it's not my property, right.  Reclaiming

14 creditors can take back.  It's a recision remedy.  So it

15 doesn't say you get an administrative claim.  It doesn't say

16 you get a secured claim.  It says you get them back or the

17 debtors' going to have to pay it.  And that was an

18 accommodation to instead of taking back the goods and

19 repurchasing them go ahead and pay for them.  It doesn't say

20 it's an administrative claim under 546 or 503(b).  The Court

21 authorized us to pay it.

22         Your Honor, if that's not enough we had two hearings.

23 Mr. Carrigan who's not in the courtroom today, but Your Honor

24 may recall, Mr. Carrigan came to court both of those days.  And

25 on both of those days objected to the procedures.  And on both

1  of those days my response was pretty much the same.  But the

2  response in the second on –- on the second hearing is even more

3  telling as to the fact that these creditors were not due.

4           He raised exactly the statement and said I've read

5  the reply -- and I think this is around Page 46 to 47.  He

6  says, The debtors our response is more global and that the

7  debtor has now taken the position that reclamation creditors

8  have a general unsecured claim for goods and so forth.  This is

9  all back to the value that was argued throughout the northeast

10 and I am, you know, and he goes on.  He says then, and I said

11 what our procedures are essentially the right to go and

12 exercise your reclamation rights.  Go ahead.  If you remember I

13 said okay, get carved out.  Okay, bring a lawsuit.  Okay, lift

14 the stay.  Okay, get a TRO.  I'm not stopping you from that.

15 And if you look at the final order the paragraph right after

16 what I just read nothing in this order or the above procedures

17 is intended to prohibit, hinder, or delay any reclamation

18 claimant from asserting or prosecuting.  We kept putting in or

19 prosecuting letting them know they had to do this.  And any of

20 its rights to seek to reclaim goods provided for the debtors or

21 affect, alter, diminish, extinguish or expand the rights or

22 interests, if any, to recover the goods sought to be reclaimed,

23 again, subject to the provisions of 105, 362 and 546(c).  We

24 had exactly this dispute, and Your Honor ruled these are

25 procedures, I don't understand that I'm making a substantive

1 decision, we'll serve that for another day.  If you want to be

2 carved out be carved out don't be carved out.  So I don't know

3 how we could have made notice to anybody any clearer that all

4 we were doing was gathering information, all rights were

5 reserved, and they could have pursued whatever rights they

6 wanted.

7          So, Your Honor, again, I come back to one, they can't

8 have a secured claim.  Two, they don't have an administrative

9 claim.  Three, there is nothing we did to mislead them as the

10 Georgetown court might have said, but the other court such as

11 <u>Dana</u> and, I believe the <u>Canfield</u> court both said the procedures

12 didn't mislead people.  There's no judicial estoppel here.

13 We're not taking an inconsistent position.  We've all along

14 said pursue at your own risk.  And what would they have

15 happened?  Well, they would have pursued and they would have

16 lost because the exact same argument that we make today would

17 have been made, one, as it was made to Judge Sontchi in the TRO

18 context of the Advanced Marketing case, and two, we would have

19 made the same argument today that we're making now, there are

20 no goods.  The secured creditor has a first lien.  But you

21 can't get a secured claim, you can't get an administrative

22 claim.  Now let's go to the particular facts.  Again, nothing

23 is disputed as to these facts.

24          Your Honor, we then raise, again, and I think, and I

25 hate to take the stronger position, but I think it's the

1  correct position whether or not there was a lien here.  I think

2  these creditors are still at this point no longer have rights

3  to get an administrative claim or a secured claim.  The fact of

4  the matter is if we had no secured debt they had to do

5  something.  They had to do something more and nothing we did

6  precluded them from doing something more.  They had to reclaim

7  the goods.  That's what we said, that's what we allowed them to

8  do, they didn't do it.

9       But now let's take the extra hurdle that we have in

10 this case.  They don't dispute it.  The debt at the prepetition

11 date was greater than any particular reclamation claim in this

12 case.  Your Honor has a legal precedent in front of you, <u>Dana</u>,

13 we would urge you to follow that.  That is not an inconsistent

14 precedent with other courts that have said if there is a prior

15 lien then the fact of the matter is if the reclamation claim

16 does not exceed the value of that lien the reclamation claim is

17 rendered valueless.  Period.

18      There's no factual dispute there.  They haven't

19 raised it.  They said they need discovery about well, after you

20 sold all this stuff what was left or were there goods?  Or

21 after you paid off that first lien what was left?  Now we can

22 get into the factual issues and you can take judicial notice of

23 the record that indeed, you know, the first lien position was

24 turned -- was rolled up.  But then the second lien was not paid

25 off until May months after they even had the notice of

1  rejection.  But we don't have to get there.  The fact of the

2  matter is the first lien on the day that we filed was greater

3  than any reclamation claim that either was raised at that point

4  or subsequent to that point.  Dana says end of story.  You

5  don't have to deny a reclamation claim.  The reclamation claim

6  is simply valueless.

7          But let's assume that's not the case.  Let's even

8  give them one more step, okay.  It's not valueless.  I'm

9  entitled to the proceeds.  Again, legal problem.  Reclamation

10  isn't in rem remedy.  The courts that say you can go to

11  proceeds are incorrect.  In rem means you take the goods.  I

12  don't have to worry about the tracing.  Even if you worried

13  about the tracing they couldn't trace, by the way.  But leave

14  that aside.  I mean, they were here when we did the DIP motion.

15  They were here when we got cash management approved that was a

16  consolidated cash management system.  Not once did they object.

17          They were here when we gave liens to the good faith

18  purchaser in the inventory sale almost a year today when on

19  January 16th I had to step before this Court and say we were

20  going to liquidation, and we had a new lien.  And we gave it to

21  Hill Co.  And Hill Co. got all of those goods and if they

22  didn't sell them they became their property free and clear of

23  all claims.  They didn't object any single time to any of these

24  things though their pending reclamation claims were pending and

25  not resolved.  And they were not precluded.  It's not like the

1  old days where we gave an order that said you are enjoined from

2  pursuing, you're enjoined from filing an adversary proceeding.

3  Indeed, I offered.  And I know Your Honor remembers.  I said

4  bring it on, bring an adversary complaint, bring your TRO.

5  Because we would have taken this dispute up at any time.

6          So, Your Honor, I think one, you can't give them a

7  secured claim, two, you can't give them an administrative claim

8  on its face on the statute alone.  Three, their claim is

9  valueless in any event because of the facts and circumstances,

10  the prior lien defense.  And even if there were some value

11  after you paid off the first lien, even if that were the case

12  they didn't act at the time to get their goods even if somehow

13  some circumstance there were goods left at the end of a

14  liquidation sale and now it's just proceeds and that's not

15  consistent with the UCC law either.

16          It doesn't go to proceeds.  It goes to the goods.

17  They didn't exercise their rights and nothing precluded them

18  from doing so.  So we think, you know, one, congress actually

19  did, whether you want a good intention, deleted the remedy.

20  Two, broadened the rights, actually, said creditors you can

21  take it back if you have the rights.  But doesn't allow this

22  Court to give a secured claim or an administrative claim.  And

23  under the circumstances any such claim was rendered valueless.

24  I wonder if Your Honor has any questions.

25          THE COURT:  No, thank you, Mr. Galardi.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GALARDI:  Thank you.

2          MR. STERN:  Good afternoon, Your Honor, David Stern

3  appearing on behalf of Paramount Home Entertainment and I know

4  that there are other folks in comparable position, but they've

5  sort of yielded the floor to me at the moment.  I'm well aware

6  that this Court in particular reviews the papers very carefully

7  and I'm not going to restate what's in the papers.  What I'm

8  going to try to do is address what was in the reply that was

9  filed yesterday and in the oral argument that Mr. Galardi just

10 made.

11         I'm going to address why it is that we are entitled

12 to a remedy whether that be an administrative claim or one that

13 is in rem to the proceeds.  Why an in rem claim does not

14 exclude the possibility of a lien on proceeds or a right to

15 proceeds.  Why and how the prior lien defense works or doesn't

16 work, and why in action or alleged in action does not change

17 our rights.

18         Let me start out -- when I go through this I'm going

19 to point to the debtors' reply.  I'm going to try to go through

20 the statute and work with that statute, and, Your Honor,

21 conceding that we are dealing with a new statute and that

22 although we have discussed pre-amendment cases and some post

23 amendment cases as well that to some extent we are dealing with

24 cases that decided a prior statute in different jurisdictions.

25 And I think Your Honor has the luxury, such as it is, to begin

1   from first principles and actually to go to the statute.  Maybe

2   not as if you just came from Mars, but nonetheless in a fresh

3   fashion.

4         I'm going to go to the issue of why summary judgment

5   is not appropriate using traditional Rule 56 analysis.  And

6   then I'm not going to dodge this case at all.  If somebody has

7   any questions on it I will point out a couple of cases that I

8   do think are illuminating, but I'm not going to depart from my

9   basic view that notwithstanding the fact that Mr. Galardi and

10  his office has filed, I don't know, about 70 pages and we filed

11  about 30 you really starting from first principles.

12        And in terms of first principles the reply makes an

13  interesting point.  And Mr. Galardi echoed that.  And that is

14  that the legislative history, I think their language in the

15  reply brief is the legislative history sheds no light on the

16  issue presented to the Court.  I concur.  I don't think it

17  really does.  I don't think you can go -- I think you can look

18  at the statute.  I think you can look at the purpose of the

19  statute.  I certainly think you can look at the commentary.  I

20  don't think you have to take leave of your senses or make

21  believe that you've, you know, you really are from another

22  planet.  But I don't think the legislative history is

23  particularly illuminating and I don't -- I'm not going to spend

24  time on it.  I will spend time on the language, but I'm not

25  going to spend time on the legislative history.

1          What is interesting in the reply, and I think it

2   serves as a launching point for what will be my argument today

3   is a statement that is found at Page 9.  And I'm just going to

4   read it because I really do think it helps.  "In particular the

5   debtors interpret the BAP CPA amendments to have eliminated the

6   court's ability to <u>deny</u> a reclamation claimant's right to take

7   back goods.  In so doing congress eliminated a bar to trade

8   creditors enforcing their state law reclamation rights.

9   Consequently even assuming that BAP CPA amendments -- that BAP

10  CPA amendments rendered Section 546 ambiguous the debtors'

11  interpretation reflects a broadening of trade creditor's rights

12  to reclaim goods as permitted by state law."

13         I view that interpretation, that frame work as highly

14  significant.  What that says is fundamentally, and if you read

15  546 which I know we all have ad nauseam, is that all that --

16  546 tells us very plainly all that a reclaiming creditor need

17  do is make a demand.  Under old 546 there may have been a

18  requirement that the debtor -- that a reclaiming claimant do

19  something more than make a demand because there was this

20  546(c)(2) that gave a court the ability if you make a

21  reclamation demand for the court to deny it and give you

22  something else.

23         The debtors' position, and it is consistent with the

24  express language of the statute, is when you make a reclamation

25  demand it is fundamentally you have your rights.  Now I think

1  that's significant because it doesn't say you have to go do

2  anything beyond that.  We make a demand upon the debtor.  We

3  say we want -- we are asserting our reclamation rights.  And

4  again, we did it within the context of the reclamation

5  procedures order which I'll get to in a moment.  We are

6  asserting our rights.  What does that mean?  What is

7  reclamation?

8        As Mr. Galardi correctly stated what it fundamentally

9  does is it takes the goods that were delivered during the

10  reclamation period almost out of property of the estate because

11  the fiction that goes into a reclamation demand, which after

12  all the UCC merely codified, goes back a long way.  The fiction

13  that goes into it is that debtors have received the goods as a

14  result of its fraud or misrepresentation.  Every good -- good

15  is always accepted upon the implied representation that you're

16  going to pay for it.  If you're insolvent and can't pay for it

17  that's an implied misrepresentation giving the vendor the right

18  to come in and take back its goods.  It really -- it really is

19  its goods.

20        I'm not going to -- I don't have to overly dramatize

21  the notion of whether or not this is or isn't property of the

22  estate.  But what it does say, and 546 makes it clear, this

23  property is now subject to a reclamation demand and the debtor

24  does not have strong arm abilities under 544(a)(1).  That is

25  clear.  No more strong arm ability to say no, you're interest

1   is not perfected as to me.  Not 544(a)(1), 544(a).  So

2   fundamentally when I make that demand and say give me back my

3   goods what is the debtors' appropriate response?  You know, I

4   guess the debtors' appropriate response can be go sue me.  But

5   the, you know, the appropriate response, the real response that

6   is contemplated here is when do you want them and where do you

7   want me to give them to you?  You know, come on over and pick

8   them up.  Because all you have to do is give a demand.  And if

9   their interpretation is that there is no longer a right to deny

10  reclamation, that's what they say, then all the -- the only

11  response is okay, fine, come and get them.  Now, --

12          THE COURT:  What happens under state law?  Let's

13  assume -- take the bankruptcy gloss off of this and we're just

14  under state law, no bankruptcy, goods have been delivered to a

15  company and the seller's concerned about the solvency and makes

16  a reclamation demand at that point.  Now, if the debtor -- it's

17  not a debtor, but the customer says no what happens then

18  without the bankruptcy?

19          MR. STERN:  I understand.  Well, first of all, you

20  know, you put in a predicate that the customer says no.  The

21  customer probably should say yes.  I mean, that's the lawful

22  thing.

23          THE COURT:  I never had a customer say yes.

24          MR. STERN:  No, they're not.  I wouldn't expect

25  anyone to.  Or, you know, if -- let's put it this way, if the

1  customer said yes we don't get the call.

2            THE COURT:  Right.

3            MR. STERN:  So the customer says no.  Depending on

4  the state you're in it's either an action for replevin or an

5  action for claim and delivery, and you go into an appropriate

6  court of general jurisdiction and you ask the Court to both

7  give mandatory and prohibitory injunctive relief.  Thou shalt

8  not interfere with my reclamation and you shall assemble the

9  goods and allow me to come pick them up.

10           THE COURT:  Now, what happens if the debtor in the

11 meantime has used the goods?

12           MR. STERN:  If the debtor between the demand for

13 reclamation I think the debtor at that time has -- well, first

14 of all, obviously, outside of bankruptcy you're not worried

15 about the relative priorities.  But the debtor still owes the

16 money.  I would say that that becomes, you know, if you have to

17 classify that claim, if there's still an obligation, but it

18 actually amounts, I think, to a conversion because if -- it's

19 no different than if I as the secured creditor, if I as, you

20 know, I've given my watch to the jewelry store to be fixed and

21 I say, you know, I want to come back and get my watch.  I

22 understand you're selling watches that you're, you know, for

23 repair to people and I want to get my watch out of your lousy

24 jewelry store.  If I get there in time I get my watch back.  If

25 I don't get there in time the jeweler has converted that watch.

37

1              THE COURT:  I don't necessarily disagree with that,

2    but you still only have an unsecured claim, don't you?

3              MR. STERN:  That's correct.  But let's look at when

4    the unsecured claim arises, because now we do have to get into

5    bankruptcy court.  Now I go and, you know, I call -- I find out

6    that the jeweler who's going t be repairing my watch just filed

7    bankruptcy yesterday.  And I call up and I say I'd like to get

8    my watch back.  And he says I got it here.  And I say well, you

9    know, I'd like to pick it up.  He says, you know, I hope you

10   don't mind, but can you pick it up a few days from now?  We're

11   right in the middle of a whole bunch of stuff.  Or he says come

12   on down.  And by the time I get there he says you're out of

13   luck.  I sold it.

14              I think I've got two rights.  Number one, I do have a

15   post petition conversion of my goods.  If you go back to 1968

16   there's a case called <u>Reading v. Brown</u>, <u>Reading Company v.

17   Brown</u>.  It's a U.S. Supreme Court decision.  And what it talks

18   about is when the estate commits a tort.  And the reason that

19   case came up is because you don't have a benefit to the estate

20   in that context.  What if an estate, what if a trustee

21   operating a business commits a tort?  That's an administrative

22   claim.  So I think in our example, the jeweler, which is kind

23   of, you know, a neat example and we'll move to the actual facts

24   in a minute, I think you've got two things.

25              One is you've got a conversion.  And secondly if he's

38

1 still holding on to the money I think you have a right to that

2 money, because I think that I would believe that the conversion

3 of my property by that jeweler would not entitle him to say you

4 know, I got the money.  Great price.  You know, you never knew

5 your watch was worth so much, but you can't have it.  You have

6 a general unsecured claim because you delivered that watch to

7 me prepetition.  Cannot be the correct.

8        So let's move a little closer to the facts at hand.

9 We now deliver what the discovery responses indicate is roughly

10 $14 million worth of goods.  I think about 11 million are

11 actually within the 45 day period.  We issue a reclamation

12 demand.  What should the debtor do?  And I think it's important

13 to ask what should the debtor do because obviously the debtor

14 can say go sue me.  But what the debtor should do, what the

15 code says it ought to do is respond to that reclamation demand

16 as a lawful demand and treat that demand as an entitlement to

17 the property being returned because it has received those goods

18 prepetition as a result of a fraud.  I'll use those terms in

19 quotes because we all realize that's a legal fiction.  And

20 therefore it has no entitlement to those goods.  It ought to be

21 returning them.

22        Now, what the debtor gets into now are various issues

23 of prior lien defense and the rights.  But I think the key

24 issue here is that once the demand is made, and if we did just

25 come from Mars there would be a demand.  There would be no

39

1  requirement that you do anything more than a demand.  Once

2  we've made the demand we've established our rights to those

3  goods.  Now the reclamation procedures order I think came up

4  with, to my mind, a rational approach to that which is file an

5  appropriate notice, give the debtor some time to figure out

6  what's going on, and let this process be worked out in a manner

7  which is rational and does not lead to a free for all on day

8  one.

9       Now, we didn't have a free for all on day one here.

10  But I'm assuming that, you know, let's assume that Mr.

11  Galardi's argument is believed and Your Honor buys it, issues

12  an opinion, it's published and it goes up.  In the next case no

13  one is going to be foolish enough not to come in there and

14  demand -- and you will have, you know, literally hundreds

15  potentially of relief from stay motions and various other

16  motions seeking to segregate those proceeds, seeking to obtain

17  orders and procedures that are a lot more complex than those

18  that are in this case.

19       I'm going to get in a moment to what I think is a

20  rational way to deal with the statute and how the statute

21  actually does work.  But I think that at least from an initial

22  standpoint we can actually come to a very, very rational

23  conclusion using settled concepts.  And again, all I would say

24  is the moment that they got that reclamation demand there was

25  some onus upon them to do something right.  And I think, and

1  I'll get into this, the payoff of the prepetition loans creates

2  some real problems for them with respect to that.  But I'm

3  getting a little bit ahead of myself on that one.

4          In terms of what does the statute actually say and

5  what does it mean, and again, I think on this one I really do

6  believe we're starting with some first principles here.  The

7  statute uses the terms subject to twice.  It basically states

8  that the estate's rights are subject to the reclamation

9  vendors, reclaiming vendors and the reclaiming vendors are

10 subject to, I believe it says the prior rights of a secured

11 creditor.  I don't have the statute right in front of me, I can

12 grab it, and probably should.  so forgetting the initial clause

13 subject to the prior rights of a holder of a security interest

14 the rights and powers of the trustee under a lot of sections

15 including most particularly 544(a) are subject to the right of

16 a seller of goods that have sold goods to the debtor.

17         There are a couple terms in there that I think are

18 significant.  Subject to.  Subject to is something we deal with

19 all the time.  It sets up a series of priorities.  If I buy a

20 piece of property subject to a deed of trust I may own the

21 piece of property but I -- the preexisting lender on that

22 particular piece of property is still ahead of me.  I can't --

23 I don't -- buying that piece of property oust the prior lender.

24 Similarly when you talk about the trustee's rights being

25 subject to the reclaiming vendor's rights you're not saying

1  that the trustee has no rights.  What you're saying is they are

2  subject to the reclaiming vendors.  In both cases subject to,

3  and this is contrary to Judge Lifland's decision in <u>Dana</u>.

4  Subject to doesn't mean you wipe something out.  It usually

5  means subject to for want of a better term.  We use that all

6  the time.  We use it particularly when we talk about rights of

7  secured creditors.  The second is subject to the first.  The

8  third is subject to the second.

9       Now, I really do have to glom onto another notion

10  which is the prior rights.  Prior rights is interesting because

11  what it -- it doesn't say subject to rights.  It says prior.

12  Prior it a temporal type of term.  And that is that the prior

13  rights would appear to indicate that on the petition date there

14  are preexisting rights of a secured creditor.  And that was

15  clearly the case here.  But the way in which the DIP financing

16  was structured, and I know why that happened because I've

17  represented DIP financers and I've represented debtors.  The

18  existing liens were not simply role, they weren't assigned.

19  They were extinguished and paid off and replaced with DIP

20  financing.

21       And there is a very credible argument that as a

22  result of that the reclaiming vendors were in first place and

23  the DIP was in second place.  Or at least the 546 limitation on

24  the reclaiming vendors does not -- is not -- does not apply

25  here and that at worse what you have is if indeed the DIP is

1  enforceable according to its terms you've got a situation where

2  the DIP is in first and when it's paid off the reclaiming

3  vendors have the rights that are in second position because

4  they have been primed, if you will, by the DIP.

5          Now, I want to go from Mars and the straight

6  interpretation of the statute to what this means on a practical

7  level.  I think you get three possible results.  And let's, you

8  know, roll the clock back to the petition date.  Reclaiming

9  vendors can repossess the goods and the bankruptcy court is

10 powerless to stop them.  Again, going back to Page 9 of the

11 reply brief.  There's nothing in there that says, you know, the

12 bankruptcy court can deny the rights of reclamation.  They are

13 powerless to stop them.  Any reclaiming vendor undoubtedly

14 takes back his, her, its goods subject to the prior rights of a

15 holder of a security interest.  It gets back the goods, but

16 they are still encumbered when it gets back those goods.

17 That's option 1.

18         Option 2, the estate liquidates assets until the

19 prior secured creditor is paid.  And then you stop the music

20 and the repress, suppress, quiescent, whatever rights of the

21 reclaiming vendor then emerge.  And there are a lot of cases

22 that talked about that notion.  That's also consistent with the

23 notion of subject to.

24         The third option is the estate liquidates the assets

25 completely and the prior secured lender or the DIP lender,

43

1  whomever gets paid first.  The next proceeds are used to pay

2  the reclaiming vendors and the balance goes to the estate for

3  distribution to unsecured creditors.  Again, writing on a clean

4  slate I think the third option is the most sensible one.  And

5  it is one that is absolutely permitted by the language of the

6  statute.  It's also contemplated, I think, by the reclamation

7  procedures order and this whole notion of having an allowed

8  reclamation amount.  The business that's best equipped to

9  liquidate these assets does so.  Circuit City sells the assets

10 or it gives it to a liquidator like Hill Co.

11        Thereafter the assets are sold and when it's all over

12 you try to figure out the rights of the various parties and you

13 have a subject to.  You have -- the reclaiming vendors are

14 subject to the secured claim.  The trustee is subject to the

15 rights of the reclaiming vendors.  In effect a waterfall.  The

16 advantage of such an approach is that you don't get into very

17 expensive, very time consuming tracing, and you also don't have

18 a situation where if you're going to have that on day one I'm

19 going to be in here in the next case saying I want to make sure

20 that every item of Paramount inventory, every DVD, every CD is

21 traced.  I want a daily report on what's happening because I

22 want to know precisely when the prior creditor is paid off in

23 full because then I've got reclamation rights.

24        And again, that's consistent with the notion of

25 subject to as opposed to you're wiped out in the event that

1  there is a prior lien.  And I gave this --

2          THE COURT:  Well, what's wrong with that?  Because I

3  mean you're making that sound like that's a terrible situation.

4  But let's say that that did happen and you came in here along

5  with a lot of other folks saying wait a second, those are my

6  widgets and, you know, I want them back and I have a right of

7  reclamation.  And the debtor get up and says we need the

8  widgets.  You know, we have to have them, you know, and don't

9  give them back.  Wouldn't the debtor be able to give the

10 reclaiming creditor at that point a lien on the assets to

11 protect its interest at that point in time?

12         MR. STERN:  The debtor could do a lot of different

13 things.  The debtor could indeed give a lien at that point.

14 The debtor could do a tracing.  But, you know, the interesting

15 question is in the absence of my coming in here and seeking an

16 order of this Court to reclaim those goods --

17         THE COURT:  Is it automatic?

18         MR. STERN:  -- is it automatic?  I mean, in other

19 words, I've made the demand.  I've got a lawfully operating

20 debtor with, you know, a lot of competent professionals.  Why

21 not simply track this stuff?  And there are cases out there

22 that say, you know, the owner should be on the debtor to track

23 the reclamation demand because you've legitimately and honestly

24 made it.  And I think, you know, I want to just answer one

25 other question which is why does a prior lien defense not make

1 a whole lot of sense?  And I put this in my papers, but I'd

2 like to reemphasize it and then make the exception from the

3 rule which is theoretically speaking the prior lien defense

4 would do the following.  Let us assume for the moment that

5 Circuit City owed a billion dollars -- excuse me, had a billion

6 dollars worth of goods, one million dollars from 1,000

7 different vendors, exactly the same amount.  If it owed 1.5

8 million to its bank even though it had a billion dollars worth

9 of goods the prior lien defense would hold that since $1.5

10 million is more than a thousand dollars the $1.5 million lien

11 knocks out all of the reclamation claims and those folks are in

12 the same category as the nonreclamation claims as general

13 unsecured creditors.

14        That's not a crazy system, but it is not the system

15 we have been given in which reclamation rights are given a

16 priority by congress, you know.  I mean, I'm not here to defend

17 congress' choice, merely to implement it.

18        THE COURT:  Well, did congress give a priority in

19 546(c) or did it just preserve the state law remedy?

20        MR. STERN:  You know there's a lot of -- there are

21 two lines of authority here.  I think the answer is it did not

22 give an administrative claim.  I'll give Mr. Galardi that.  It

23 did not say thou shalt have an administrative claim.  There are

24 two lines of authority.  I think they actually lead to the same

25 place.  The one is that it preserved the rights under state

1  law.  The other is that it created in effect a federal right of

2  reclamation.  But does that really matter considering that 49

3  of our 50 states have adopted the UCC fundamentally?  And at

4  least Article II of the UCC fundamentally in existing form 2702

5  tells you what it is.  I don't think we get to a different

6  result here depending on whether or not you view the underlying

7  reclamation right now as being federal or state.  But, you

8  know, I think -- and I really don't think it matters.  I think

9  the presumption here as we stand here today is that whichever

10  rule applied the Paramount claim would meet it under 2702 of

11  the various states in which it did business.  If it doesn't

12  that's a completely different problem one we would have to deal

13  with down the line.  So I think I can't honestly answer the

14  question as to saying it's one or the other, but I'm not sure

15  it matters.

16       Now, the real problem as I said with taking the

17  approach that your failure to run in on day one notwithstanding

18  you're doing everything that the statute says you should do is

19  that that works for one case.  But what happens in this case

20  ultimately gets reported.  It ultimately gets resolved at some

21  higher level.  And, you know, I for one, if I lose this one

22  will never be dumb enough not to come in on the very first day

23  screaming and yelling.  And, you know, I'm sure that's going to

24  be true of a lot of people.  I don't think that's a very good

25  result.

1          Now, in terms of other issues, and I think we ought

2     to at least touch on them, you know, why is summary judgment

3     not appropriate here?  I made this point, you know, in passing

4     and didn't emphasize it in the brief but I did note it.  The

5     debtor-in-possession financing is not a prior -- does not

6     represent prior rights of a holder of a security interest.

7     <u>Farmore</u> thought that was pretty significant.  And that case

8     ultimately was affirmed by the Sixth Circuit, I think.

9          The prior rights here in this case were the

10    prepetition lenders.  I don't really like that result.  I don't

11    like that result because I think that it departs from what I'd

12    like to have as a commonsense way of dealing with this problem.

13    But I'll win anyway I can.  That's my job as a lawyer.  But,

14    you know, strictly speaking on an objective basis I'm not

15    enamored of that.

16         In terms of what our rights are we have asked both

17    informally and ultimately through formal discovery what was the

18    status of our inventory at various times vis-á-vis the loan to

19    the DIP lenders.  Because unless you take the view that subject

20    to wipes out everybody, if you -- in the example I just gave

21    you if you have $1.5 million worth of liens and one billion

22    dollars worth of good subject to reclamation what you would do

23    is you sell.  And at the point where you have paid off the $1.5

24    million prepetition secured debt secured by the inventory at

25    that point the reclamation rights are there again.  And there's

48

 1  no reason why in my hypothetical example or in any other there

 2  should be a complete wipe out of all billion dollars of

 3  reclamation claims because there's $1.5 million in prepetition

 4  indebtedness.

 5           Other issues, much is made of inaction.  I would

 6  argue that inaction was asked for and invited by the

 7  reclamation procedures order.  You know, let me make it clear I

 8  don't think Mr. Galardi tried to mislead anybody.  I don't

 9  think the Court assisted in misleading anybody.  But the simple

10  fact is that the reclamation procedures order much like the

11  orders in other cases was designed to provide comfort to

12  reclaiming vendors.  It didn't stop them from coming in,

13  absolutely.  But the question is if they're going to point to

14  our inaction because there's some kind of estoppel by our

15  failure to act what prejudice did they suffer?  What exactly is

16  the prejudice that they suffered?  Again, this isn't an inquiry

17  I particularly want to get into.  I don't think it's a very

18  tidy way of dealing with it, but it's clearly a question that

19  is raised by that defense.

20           THE COURT:  But if you were misled I want to know how

21  because that would be something that the Court would be very

22  concerned about.

23           MS. STERN:  We were not misled in an active sense.

24  No one tried to mislead us.  Mr. Galardi did not try to mislead

25  us.  No one did.  But what we will say is that you get a

1  reclamation procedures order that says the following, file your

2  reclamation demand, we have 120 days in which to examine it and

3  then we'll tell you what your reclamation amount is.  And then

4  we have a liquidation sale that ends on day 118.  And then on

5  day 120 they say you don't have anything.  We don't -- your

6  only right is to reclaim the goods.  The goods have been sold.

7  There was a prior lien anyway.  Thank you for letting us know

8  what your reclamation demand is.  You all get a big goose egg.

9       I don't know how many reclamation demand amounts were

10 acknowledged by the debtor.  But when you come to a court and

11 ask for that, and again, you know, you parse through the

12 language and you say ah, I see where he was going.  That dog

13 gets one bite.  The next time around you're in there and you're

14 the rabid one because you have to be.  If you're not there

15 demanding a tracing, if you're not demanding segregation, if

16 you're not trying to even marshal for want of a better term you

17 are not serving your client well.

18       So again, unless we adopt the extreme positions, and

19 I do underline extreme positions that the debtor has prior

20 liens wipe out all reclamation rights.  That's number one.

21 Reclamation is purely in rem.  There's no right to proceeds

22 whatsoever.  And if you don't sue on day one you lose.  There

23 are contested issues of fact that need to be explored.  Let me

24 just go briefly into the in rem right.  Because, again, going

25 back what we talked about here was that on day one or in our

1  case I think it was day 2 we give a reclamation demand.

2       Now they go -- let's assume that, you know, they --

3  they now on day 3 they pay off the prior liens.  They have our

4  reclamation demand and they have $11 million worth of our

5  goods.  They don't call us up and say do you want them back?

6  They're silent.  But they do have a reclamation procedures

7  order out there that says here's how we're going to deal with

8  it.  And they now go and sell all these goods whether it's, you

9  know, my watch that I gave to the jeweler or the various DVDs

10 and other things that Paramount supplied.

11      The notion that the in rem right doesn't follow into

12 the proceeds really doesn't make much sense in the context in

13 which we're talking about.  What we're talking about is there's

14 a right to rescind.  I have a right to my goods back.  You

15 haven't honored that right and instead you have sold those.

16 And your answer is -- the debtors' answer is now that I've sold

17 it even though if I still had the goods I would be required to

18 give you $11 million.  The fact that I now have $11 million

19 sitting here in my bank means I don't have to give them back to

20 you, everyone shares.  I don't see that as being consistent

21 with 546(c) which clearly gives some benefit to reclaiming

22 vendors.  And again, --

23      THE COURT:  This goes back to our earlier discussion

24 though doesn't it about what is -- is this a state law remedy

25 or was it something that congress created?  And if it's a state

1  law remedy don't we have to go back to state law and say okay

2  what would be the remedy here if exactly the same thing had

3  happened outside of a bankruptcy context?  Would you have a

4  lien or right to trace the specific proceeds to the detriment

5  of other creditors?

6       MR. STERN:  You know, I think the interesting -- I'm

7  not sure the answer to that question.  I think the answer

8  should be that your rights to those goods are superior to the

9  rights of other creditors.  So your rights to the proceeds

10 ought to be similarly superior.  You would have a tracing

11 issue.  You would have the question of commingle funds, you

12 would have questions of constructive trust and the like.  Those

13 are issues that ordinarily don't happen with respect to post

14 petition actions.

15      I mean, I've litigated the question of whether

16 there's a constructive trust, and, you know, you have a whole

17 series of cases going back to the <u>Omegas</u> decision in the Sixth

18 Circuit that talks about, you know, if you have a judgment,

19 don't you have a judgment?  Can you trace the proceeds?

20 Ordinarily in bankruptcy you wouldn't ask those kinds of

21 questions.  You wouldn't expect to have to get a judgment.  You

22 wouldn't expect to have to demand that the proceeds be

23 segregated.  And by being commingled with other proceeds that

24 you somehow would lose your right to them.  So in that sense

25 you're not entirely going back to state law.

1   But, yeah, my position would absolutely be that you

2   have an in rem right and that right would go to the proceeds

3   just as much as if my property as to which I had a lien, and

4   reclamation rights are a lot like a lien.  If my right in which

5   -- property in which I had a lien is sold the proceeds will

6   generate -- the lien will attach to the proceeds the same way

7   it did to the original property.  I don't want to have to over

8   emphasize it.

9   I'm not saying that reclamation is a lien.  I'm

10  saying that it is lien like and therefore I think that the

11  answer is the same and you can get there a lot of different

12  paths.  You can get there via the Reading v. Brown path.  This

13  is a conversion or a tort and therefore it belongs.  And you

14  can also get there simply by saying that you're in, you know,

15  you have an in rem right and it is recognized in Section 546(c)

16  and it ought to be recognized when you get down to the

17  distribution process.

18  The bottom line is I well understand that most

19  commentators, most courts and most lawyers looking at 546(c),

20  looking at a lot of the amendments that were made in 2005 were

21  not happy with that.  But I kind of feel like we're all lawyers

22  for a client who made a decision and we're not happy with it,

23  but we do have to implement it.  And I think that that means

24  that we have to give some flesh and bones to 546(c).  And I

25  think the rational way to do it, and I realize it creates

1  issues in this case, but the rational way to do it is to say

2  you've got a basket of goods.

3       First you pay off the prior liens and maybe you do

4  have to pay off the DIP lien because you have a valid DIP order

5  and you deal with that.  Then you pay the reclaiming creditors,

6  then if there's -- whatever is left over goes to the general

7  unsecureds.  That's consistent with 546(c).  That's consistent

8  with the scheme.  The second approach would be okay let's see

9  what, you know, which goods actually paid off the prior lien or

10  the DIP lien and, you know, how do we parcel out what was left,

11  because we know there was more?

12       We know that in this particular case all the

13  inventory was not needed to pay off either the prior lien or

14  the DIP lien.  What do we do with the excess?  How do we deal

15  with that?  And I think there are two ways to do it.  One is

16  the more specific approach and the more fact intensive and

17  legal fee intensive approach.  One is the more equitable

18  approach.  The third approach is what the debtors are asking

19  for is we just sort of ignore 546(c).  It has gone away by

20  virtue of the in rem aspects of it and it just gets parceled

21  out among the general unsecureds.

22       THE COURT:  Well, before you leave the podium --

23       MR. STERN:  Sure.

24       THE COURT:  -- I'd like to address the first point

25  that Mr. Galardi raised.  And that is the statutory predicate

54

1  to do what it is you're asking me to do.  Because obviously the

2  language  has been removed from 546(c) that used to be there

3  that provided for an administrative claim or a lien.  Other

4  than Section 105 where do I turn in the code to -- that would

5  allow me to give you the relief that you're asking for?

6        MR. STERN:  I think it's important to emphasize the

7  difference between a remedy and an administrative claim.  I

8  think what we're asking for is an in rem right.  I mean, what

9  I'm saying is we have a right to reclamation.  That is an in

10 rem right to get back our goods.  All we are saying is that

11 those goods have been turned into cash.  We now have an in rem

12 right in that cash which is the proceeds of our goods.  We may

13 in shorthand call it a reclamation claim.  It's actually a

14 reclamation remedy which is in rem and which is to the proceeds

15 and therefore I don't think you have to look outside 546.  I

16 don't think you have to go to 105.  I'm not --

17        THE COURT:  I understand that.  Thank you.

18        MR. STERN:  Okay.

19        THE COURT:  That helps a lot.  Wait a second, one

20 last question.  Do I have to be able to trace it in order to

21 give you the relief or are you just allowed to because it was

22 sold and it's there, you know, under the second scenario as you

23 were describing it to say well, you know, then you should have

24 rights in those proceeds generally?

25        MR. STERN:  I think you could take other approach.  I

1  think you could simply say that as a result of the actions of

2  the debtor it is now impossible and practical or whatever to

3  trace exactly what the proceeds are and therefore we're simply

4  going to set up a priority scheme.  And in effect say that

5  we're going to imagine that the first proceeds that were used

6  to pay off the liens were the -- everything other than the

7  reclaimed goods and thereafter the reclaimed goods.  Or you

8  could go as I said to the more expensive approach.

9          I don't think that's -- from a policy standpoint I

10  don't think that's sensible and I don't think you're required

11  to do that.  As I said I think you're proceeding from first

12  principals.  There are enough cases out there that support the

13  notion that you can either look at it in gross and make an

14  appropriate decision or you can say, you know, Paramount,

15  Cisco, LumiSource, whoever it is, you know, we're going to go

16  and we're going to go with the experts.  We're going to spend a

17  heck of a lot of money figuring this out.  I don't think you

18  have to go there, but I think that it's either door 1 or door

19  2.  I don't think that door 3 which is what Mr. Galardi is

20  suggesting is permissible consistent with the statute and

21  consistent with policies.

22          THE COURT:  All right.

23          MR. STERN:  Thank you.

24          THE COURT:  Mr. Stern, thank you.

25          MR. STERN:  Thank you very much.

1          THE COURT:  All right.  Do any of the other

2    reclamation creditors wish to be heard?  Then Mr. Galardi, I'll

3    get back to you.

4          MR. BURNETT:  Good afternoon, Your Honor, Alex

5    Burnett on behalf of LumiSource.  I'm serving as local counsel

6    for LumiSource.  John Brom of the firm Querrey & Harrow in

7    Chicago, Illinois lead counsel on the case.  He's on the phone

8    this afternoon and has been admitted in the case pro hac.  We

9    have filed a motion earlier to allow him to appear and be heard

10   by telephone, but I understand the Court may not have had an

11   opportunity to address that motion.  We'd request at this time

12   that he be authorized and given a chance to give some brief

13   oral arguments on behalf of LumiSource.

14         THE COURT:  Well if it was filed this week I probably

15   haven't, because we've been sort of nonstop in court this week.

16         MR. BURNETT:  I understand, Your Honor.

17         THE COURT:  All right.  But, yes, I will grant that

18   motion and allow him to participate by phone.

19         MR. BURNETT:  Thank you very much.

20         MR. BROM:  Thank you, Your Honor, counsel, good

21   afternoon, everyone.  Your Honor, the only thing that I wanted

22   to add so as not to belabor the arguments any longer was that

23   in the --

24         THE COURT:  Mr. Brom, before you continue any further

25   what I'd like you to do is state your appearance on the record

57

1  just so that when the transcript of this proceeding comes we'll

2  know who you are.

3        MR. BROM:  Sure.  John Brom, B-r-o-m, on behalf of

4  LumiSource.

5        THE COURT:  Thank you, sir.

6        MR. BROM:  And just briefly, Your Honor, I just

7  wanted to bring more attention to the issue of the in rem

8  proceeding and the proceeds.  In the order, the reclamations

9  procedure order at Paragraph 6 it specifically lists in there

10  that we can move to recover the goods or proceeds thereof.  And

11  I think that that language covers or eliminates debtors'

12  arguments that we have no right to the proceeds.

13        THE COURT:  I'm looking at the order right now.  All

14  right, I see the provision to which you're referring, Mr. Brom.

15        MR. BROM:  That's all I had to add at this time.

16        THE COURT:  All right, thank you.

17        MR. BROM:  Thank you.

18        THE COURT:  All right.  Does any other reclamation

19  creditor wish to be heard?  All right, Mr. Galardi, I'll turn

20  back to you then for a reply.

21        MR. GALARDI:  Sure, Your Honor.  Why don't I take,

22  since it's freshest in my mind, the last comment first.

23        THE COURT:  All right.

24        MR. GALARDI:  As Your Honor will probably go back and

25  read the transcript, and you probably have, we didn't want to

58

1  have any substantive disputes with respect to the procedures.

2  And there's a simple reason why or the proceeds there are of.

3  We did not limit people to make exactly the arguments that have

4  been made here today, go ahead after the proceeds.  That

5  doesn't mean we've conceded by any stretch of the imagination

6  that you're entitled to the proceeds and that this is not an in

7  rem proceeding.

8        What this simply said is nothing in this order is

9  intended to prohibit, hinder, delay any reclamation claimant

10 from asserting or prosecuting any of its rights to reclaim the

11 goods provided the debtors or alter, affect, diminish,

12 extinguish, expand the rights.  Not expand the rights or

13 interest, if any, to recover goods (or proceeds thereof).

14 There was no other way to not have the substantive dispute

15 right there.  If we had just put goods everyone would have been

16 here and said we've affected their substantive rights.  So we

17 don't think that this actually addresses anything other than to

18 say all of the rights are preserved for exactly the argument

19 today.  Can they go after proceeds?  So let me turn to that one

20 next.

21       Your Honor, first of all I think you've started with

22 the right first question.  Did Congress intend there to be a

23 federal reclamation right?  If you answer that question no then

24 you got to go to state law.  I think there may be one case that

25 sort of thought about that, but every other case that I've seen

59

1  says there is no federal right.  This is a preservation of

2  state law rights, period, end of story.

3          THE COURT:  And I agree with that.  I think that

4  that's exactly what was going on.

5          MR. GALARDI:  Okay.  So if that's the case then the

6  question is can under state law you go after proceeds?  And the

7  answer is no.  That's the fact.  It's an in rem remedy, it goes

8  after the goods.  But more importantly, and I'll just point out

9  the language in the statute it says, and again, let's -- we'll

10  take up the subject to language.  But C says except as this,

11  blah, blah, blah, "The rights and powers of the trustee are

12  subject to the right of the seller of the goods, the goods in

13  the ordinary course to reclaim such goods."  It doesn't say to

14  reclaim such goods or the proceeds thereof.

15          And we're all too familiar with other statutes in

16  this section that talk about proceeds.  Congress never said you

17  can reclaim proceeds, and it doesn't even make sense to talk

18  about the work reclaiming proceeds.  You reclaim the things

19  that you gave over.  You don't reclaim the proceeds of things

20  you gave over.  You can make a claim for that, you can trace

21  it.  You do it with cash collateral all the time.  But you

22  don't reclaim proceeds.  That's not what state law does, that's

23  not what the statute says you have the right to do.

24          THE COURT:  Okay.  But that is really going to depend

25  on what state law says.  Because if state law says you get the

60

1  goods or the proceeds then that would be still under 546(c).

2          MR. GALARDI:  I'm not convinced that that's the case

3  even, Your Honor.  Let's assume I had a state law, and I don't

4  think the state law would do it, but let's assume the state law

5  said you can reclaim goods and proceeds.  I could easily make

6  the argument well, congress acknowledged that, but said okay,

7  I'm only limiting you to the goods.  Right there, using express

8  language.  I'm not so sure that if state law -- you find a

9  particular state law that says goods and proceeds that this

10 doesn't trump that state law, because the congress didn't put

11 in, "or proceeds."  So I don't want to go quickly to your

12 conclusion, but I'm also pretty sure that state law doesn't say

13 you get the proceeds.  And you definitely have to trace.  But

14 that's usually secured debt.

15         THE COURT:  Well, I'm familiar with Virginia law, but

16 I can't necessarily say that I'm familiar with the law of the

17 other states although I'm --

18         MR. GALARDI:  Pretty confident the UCC is the same.

19         THE COURT:  -- assuming that it's pretty consistent.

20         MR. GALARDI:  Right.  And again, I could argue that

21 congress, you know, look, I don't think congress thought about

22 this, you know, legislative history being what it is.  But the

23 fact of the matter is they clearly knew how to use the word

24 proceeds.  The word reclaim means what it means, take back the

25 thing you gave.  Not the thing or the proceeds thereof.

61

1   Congress could have put the proceeds thereof, it didn't.  So I

2   don't see 546 doing that.

3         I have to applaud Mr. Stern for -- it took me a while

4   to figure out this tort conversion <u>Reading</u>, but I think it

5   doesn't work.  It's a great argument, but it converts, to use

6   the word, a prepetition tort into a post petition tort.

7   Reclamation 2702 does have -- its basis is a tort.  It's a

8   prepetition tort.  I misled you to give me goods prepetition I

9   couldn't pay for just because I happened to sell them later?

10  That's a new tort, that's not another tort.  My tort happened

11  already.  My tort was I convinced you to give me goods when I

12  was insolvent.  That's the prepetition tort.  You can't convert

13  it to a post petition claim just because I did something else

14  afterwards.

15        THE COURT:  Well, he's saying that you didn't give

16  them back once he made the demand for you to do so.

17        MR. GALARDI:  Well, and now we're going to talk about

18  state law on that one, too, because the question is, and again,

19  I like you have never had anybody give back my goods.  Indeed,

20  the reason I learned reclamation was I took TRO, I drove the

21  truck up, and I had my client pull the goods.  Because there is

22  no debtor in the world much less nondebtor that actually says

23  oh, yeah, here it is I'll just pile them in all one place and

24  let's just give them to Mr. Stern because we agree.

25        THE COURT:  Whereas Mr. Stern says we don't get those

1  phone calls?

2          MR. GALARDI:  We don't get those phone calls, and I

3  don't believe any client doesn't.  And let's take the

4  nonbankruptcy context.  Suppose I had written to Mr. Stern's,

5  you know, it's not a bankruptcy.  And look, Circuit City did in

6  fact get letters prefiling for reclamation.  You always do.

7  I'll get back to you in 120 days and tell you about my

8  response.  Did I have to do anything more than that?  Not under

9  state law.  There's nothing in the bankruptcy code or state law

10 that says I even have to respond to the reclamation demand.

11 Mr. Stern's creating state law obligation that we don't have.

12 The bankruptcy code doesn't do it.  And the state law doesn't

13 do it.  In fact, we could have said well, you know, we'll just

14 do nothing.  There's no time period here.  One of the reasons

15 that you put these procedures in is to give somebody a horizon,

16 and if they don't like the horizon come on in.

17          Now, I filed a lot of retail cases, and I don't even

18 do reclamation procedures now because I'm, you know, I think

19 simply it is reclamation is let them come in.  And I haven't

20 found the flurry of all the activity.  Indeed, if we did after

21 reading Dana, after reading Canfield there were procedures in

22 both of those cases.  Those cases predated this case.  Had

23 people read those cases and saw our language, "We think you are

24 unsecured prepetition creditors, there are preexisting liens."

25 Why didn't we get the flurry?  Why do we only have eight

1  reclamation claimants still fighting us?  Okay.

2       It's not as if there is this opening Pandora's Box

3  here.  They're not going to come in, they don't have those

4  rights and they recognize that fact.  They filed the claims,

5  they pursued the 503(b)(9) claims.  Now maybe Mr. Stern is

6  going to do something different every case.  I strongly suggest

7  that they do.  But that's exactly what was done in Judge

8  Sontchi's case and what did he do?  You don't get a TRO.  You

9  got a claim for damages.  The claim for damages is a

10 prepetition claim, because it's the tort of I misled you to

11 give me goods, and I'm sorry.  That's it.  So I don't see the

12 slippery slope argument.

13       Now let's talk about the subject to the language I

14 think I've already mentioned.  You reclaim the goods, you don't

15 reclaim the proceeds thereof.  Let's talk about the prior lien

16 defense.  Again, I give Mr. Stern a lot of credit for making up

17 -- and actually at dinner last night we made up the same

18 example where you have a million dollars secure debt, $20

19 million of inventory and everybody's under the million.  And

20 that's the thing I keep scratching my head with, Judge, Judge

21 Lifland's decision.

22       But there's two ways to deal with that.  One is I

23 think the fact of the matter is it's an implied argument of

24 marshaling that the courts have objected.  They're not a

25 secured creditor they have no right to ask the secured lender

1  to marshal the assets.  They don't have to go after particular

2  collateral first.  They can go after any collateral.  Well,

3  then what does that leave the reclamation creditor in the

4  position of doing?  I think the following is the real answer.

5  If after you do the million dollars and you're concerned about

6  that file a reclamation claim and seek an injunction then.

7  Find out what goods are still on hand then.  If that's the case

8  you might have a right of reclamation.  If the liens been paid

9  off and the goods are still there and your time period is still

10 there maybe you have a reclamation right.  That's not our case.

11     And now let's talk about our case.  But I don't think

12 -- I think that's a false dilemma in some sense here because

13 that was not our case.  In our case what we had was we had the

14 prepetition liens.  They exceeded it by a lot more than what

15 the reclamation claims are.  If the reclamation claimants had

16 come in on that day and said look, prior liens your done.

17 Okay.  But now we have a new lien.  Well, the new lien's a good

18 faith purchaser.  There is no priming, there is no first lien.

19 He talks about priming and priming a lien.  They don't have a

20 lien.  It's unencumbered collateral or it's not our property.

21     Your Honor, dealt with many people that first day,

22 consignment vendors ring the bell.  If they had really thought

23 that the prior lien defense was really only with respect to

24 that day they had the right to come in here and make that

25 argument, nothing stopped them.  And then when we liened it up

1  again we had another good faith purchaser.  Under the UCC they

2  can't make that argument.

3       So I think again, his argument is very cleaver, but

4  even if Your Honor didn't want to accept the <u>Dairy Mart</u>, the

5  Judge Sontchi opinion <u>Advanced Marketing</u>, the <u>Dana</u> opinion,

6  even if you didn't want to accept the idea that those are one

7  continuing sale or sale of goods then at best there was an

8  instant in time where there was a payoff and maybe not a lien

9  and you have to argue that it's not a sale.  That you might say

10 yeah, they have a right, but they didn't exercise that right.

11 They didn't get to reclaim their goods.  They didn't object to

12 taking a security interest in what might not be property of the

13 estate.  I still think it's property of the estate because you

14 still had an interest.  So I don't think they win that argument

15 either.

16      Your Honor, also the watch example sort of bothers me

17 for another reason and it goes to the tort.  If you sell the

18 watch to me then you seek to reclaim it.  You sold it to me.

19 Your obligation is to pay the debt.  You don't get a double

20 whammy.  That's a sale.  If I then go sell it it's not like you

21 converted to a conversion.  Your action is for the fact that I

22 never paid you in the first place.  So I think the watch

23 example, it's not like you bring it to the jeweler to have it

24 fixed and he just happens to sell it.  Your remedy is that I

25 didn't pay the sale price.  It's not the conversion action.  So

1  I think the conversion of an action to post petition doesn't

2  work.

3       Your Honor, I don't know if Your Honor has any other

4  questions for me regarding this, but again, I think the statute

5  is clear.  I think you asked the right question to Mr. Stern

6  who I don't think, no disrespect, didn't give you the answer.

7  Where in the statute do you have the authority to grant them

8  the administrative claim or the secured claim.  I don't see it.

9  I don't see a statute.  I don't see a proof of claim.  And so

10 therefore -- and he admits it's not an administrative claim.

11 He does say it's kind of like a secured claim, but it's not a

12 secured claim.

13       I don't think you have to get into the issue of

14 tracing proceeds at all which is an impossible issue at any

15 event.  And I think, Your Honor, the state law if you look at

16 it the debtor could simply whether it's a debtor in bankruptcy

17 or just a debtor to a creditor, say nothing, do nothing.  And

18 the case law is pretty clear that if you say nothing and do

19 nothing and in response the other party does nothing, doesn't

20 exercise their rights they lose those reclamation rights.

21       THE COURT:  I'd like you to address one thing that

22 Mr. Stern raised.  And that is in the administrative procedures

23 order that suggested that the debtor was going to reply, you

24 know, in 120 days but the sale took place on 118th day so when

25 the date for the reply came up all the inventory was gone.  And

1   did that have the potential to mislead the reclamation

2   creditors?

3        MR. GALARDI:  Well, there's two things, Your Honor.

4   Remember, I guess it's almost a year ago today we came in and

5   did that.  At the time we entered the motion which was December

6   5th we were in the process of trying to -- I mean, that's a

7   coincidence.  Did it mislead anybody, no, because we were

8   trying to come up with a restructuring and a reorganization.

9        THE COURT:  I wasn't suggesting that it was all a

10  design.  I was just --

11       MR. GALARDI:  But again, when we said you had nothing

12  at that point in time if your question is could we have said on

13  day one look, there's a preexisting lien defense you're never

14  getting anything in the first place?  Yes.  Probably we could

15  have had we gone through all of that.  Would it have changed

16  anything?  No.  Was it misleading?  No, because there were

17  other things to resolve such as the 503(b)(9) claims which

18  preexisting lien defense doesn't exist.  So I'm not sure how it

19  would have misled people especially when day one you're saying

20  it's an unsecured prepetition claim and we're reserving all our

21  defenses.  And the case law out there has the preexisting lien

22  defense, has the nonfederal claim defense, and has all of the

23  reclamation defenses.

24       I think we might have cited the Seeary (phonetic)

25  article where, you know, and even Mr. Stern admits they put in

68

1  a reclamation claim but they didn't identify well, it's a $17

2  million claim but it's $14 million.  We didn't even get into

3  all of those defenses.  You have to have identifiable specific

4  goods that are on hand that are not sold.  So we didn't even

5  get into it, but we put everybody on notice that that's the

6  case.  So I don't think there's any misleading or even more

7  than a coincidence that on the March 10th date we gave the

8  notice.

9          Moreover, Your Honor, it's not clear that all of

10  those proceeds used, you know, again there was still a

11  preexisting lien at that period.  And just because we closed

12  the sale the debtors still had the proceeds.  The banks were

13  not paid off on that day.  And if they wanted to make a tracing

14  argument then frankly -- or they wanted to make an argument

15  then that would have been the time.  There's five or six times.

16  And I'm not trying to blame anybody for not taking the steps.

17  But there were five or six times that if you wanted to make

18  such a motion and say I want to identify my goods now or now

19  there was every opportunity to do so.  And both at the first

20  day and on December 5th.

21          We were absolutely clear we fully expected people to

22  do it.  And my colleague said you're inviting people to bring

23  these adversary proceedings and complaints.  And I said go

24  ahead, go it.  Because we know we could defeat them.  And so I

25  don't think we mislead anybody in that sense.  And I know

1  you're not suggesting we misled people, but there was nothing

2  out there by either subtle or implication that suggested that

3  we were going to say anything other than probably reject.

4  Again, had we had a different case, had we had a successful

5  case are there ways to argue that if we kept the goods, give

6  credit, do certain things under 105?  Yes.  So those were all

7  preserved.  But I don't think there's misleading.

8          And with respect to the order again I emphasize that

9  the one paragraph that says we give back or pay was not we give

10 back or give you administrative claim.  That, to me, might have

11 been the misleading point.  That's not what we did here.  Thank

12 you.

13         THE COURT:  All right, thank you.  Mr. Stern,

14 anything further?

15         MR. STERN:  Unless Your Honor has any questions of me

16 based on the last comments I would just be repeating myself.

17 I'm happy to answer any questions you might have.

18         THE COURT:  Well, the question that occurs to the

19 Court is why wasn't your remedy to come into the court under

20 Section 363(e) and ask the Court for adequate protection of

21 your reclamation interest at the beginning of the case?

22         MR. STERN:  We weren't a secured creditor.  I'm not

23 sure how we could get adequate protection.

24         THE COURT:  Because you had an interest in the

25 property.  It doesn't say you have to be a secured creditor.

1  It just says any entity that has an interest in property can

2  come in and ask the Court for adequate protection of whatever

3  that interest is and then at that point the Court can give the

4  adequate protection of such interest.  Because again, if you

5  look at 546(c) it does say among all those things that it's

6  subject to that it's subject to Section 363 which gives the

7  debtor the right to use, sell or lease property.  Or am I just

8  making something up that shouldn't be --

9          MR. STERN:  I'm not sure.  That sort of threw me a

10 curve ball.  The answer is I really hadn't thought about 363(e)

11 until you just mentioned it.  I viewed the demand as being all

12 that is required under 546(c) and then that establishes the

13 right to reclaim and the debtors' duty with respect thereto.

14 So, you know, might I raise 363 in the next case if I lose?  Of

15 course.

16         THE COURT:  And in fairness I don't mean to throw

17 curve balls.  That's not advancing the cause of just in any

18 material way at all.  But what I would invite though is if you

19 would like is to look at that and if you want to give me a very

20 brief response within the next week or so I'm going to take

21 this matter under advisement.  In any event I'm not going to

22 rule today.  I would, you know, certainly read whatever you

23 want to give me on that response.

24         MR. STERN:  On the 363(e) question.  I will take you

25 up on that.  I'm not sure I'm going to submit anything.  I'll

1 only submit something if I have something good to say.

2         THE COURT:  I'm not saying you have to submit

3 anything.

4         MR. STERN:  Fair enough.

5         THE COURT:  Okay.

6         MR. STERN:  Thank you.

7         THE COURT:  Very good.  Anything further on that

8 motion then, Mr. Galardi?

9         MR. GALARDI:  No, Your Honor.  Can I just mention

10 363(e) for a second?

11         THE COURT:  Yes, you may.

12         MR. GALARDI:  Because I'm never shy about giving you

13 my views quickly.  Your Honor, listen, if Mr. Stern has

14 something to say.  But I think what it is is digging his own

15 grave, because Your Honor may say this was another remedy that

16 the reclamation claimant should have.  But nobody exercises

17 that right.  So my view is okay, that's very good lawyering,

18 Your Honor, I'm glad you raised it.  I'll be prepared for it

19 next time.  But that just means they lost another right that

20 they didn't exercise.

21         So I don't think it helps their cause, but Mr. Stern

22 is permitted.  But I'm not sure, Your Honor, since no one

23 raised it, and I appreciate it because now I will think about

24 it every time I do this and see how I can defeat that one if I

25 had to.  It doesn't help to resolve in their favor in any sense

72

1  because I would say that's a great argument, Your Honor.  They

2  should have done that.  They didn't do that, and therefore it's

3  a further failure as to why they were not prejudiced because

4  they sat on this right.

5       THE COURT:  Well, what Mr. Stern's going to say

6  though is he's going to start talking about the first day

7  yelling and screaming again with everybody coming in waiving

8  363(e) at the Court.

9       MR. GALARDI:  And you know what, Your Honor, that's

10 probably the best thing for people to do if they think they

11 have the rights.  And then I will go to exactly Judge Sontchi's

12 opinion which says one, you don't have those rights if there's

13 a prior lien.  Had there been no lien, no secured debt that

14 would be a great argument.  They'd either reclaim the goods,

15 and if I'm not going to reclaim the goods under 362, right,

16 because I can't lift the stay then I need adequate protection.

17 The proper motion, at least from my humble opinion is lift the

18 stay, be denied, ask for adequate protection of this sort of

19 your interest.  Not because you're secured, but because you

20 have an interest.  If you read this to say not secured.

21       Now, I'll also make the argument that you have to be

22 secured, but they didn't do any of that.  But that's the

23 appropriate thing for reclamation creditors if there's going to

24 be a right.  And Judge Sontchi will say at this time there is

25 not because there's a prior lien.  Okay, but if you had a take

1  out or a roll on the first day you might say before you grant

2  the new liens you might want to do that.  But nobody did any of

3  that and I think it's an interesting strategy to do.  I think

4  you might have that on the first day.  I'll be prepared for it

5  when I file another motion the next day.

6        But I also think that there's still the remedy is

7  they got to seek 362 relief and it would be denied for all the

8  reasons that Judge Sontchi said he would deny it in the first

9  instance.  And is it a money claim?  What's the real interest

10  to be protected?  Aren't they protected by an unsecured claim

11  because of the prior lien defense?

12        THE COURT:  And I understand if I follow Judge

13  Sontchi's decision that there isn't anything to protect at any

14  point along the way because of the prior lien.

15        MR. GALARDI:  Well, I think it's more Judge Sontchi,

16  but I think he leaves open the issue.  I think Judge Lifland's

17  decision is the one that probably forecloses it because I think

18  Mr. Stern is exactly right about the example.  The example that

19  Mr. Stern gave is if I had one dollar of -- $100 of secured

20  debts, everybody's under $100 it would seem to imply that

21  you've lost that defense, because it's valueless because a

22  secured creditor can go.  That troubles me as well.

23        But my view is okay, once you paid the secured

24  creditor off what's the real remedy?  The real remedy is to

25  come in and now make the reclamation claim.  Not to wait for

1  the proceeds, not to let it all be liquidated, not to go to the

2  end of the case, but to reclaim because then it's only fair to

3  know what goods are left for you to reclaim.  That preserves

4  the state law in rem as opposed to saying well, it's okay to

5  pay off that million, collect 50 other million and now just

6  tell me I get my full claim.  That's not fair to the debtor.

7  It's not fair to the unsecured creditors because, one, the

8  proceeds may not be traceable, but two, it may overstate the

9  reclamation claims if you waited until that period of time.

10 Thank you.

11            THE COURT:  All right.  Thank you.

12            MR. BROM:  Judge, this is John Brom.  May I just add

13 one brief comment?

14            THE COURT:  Mr. Brom, you may.

15            MR. BROM:  Just very briefly.  At the outset of Mr.

16 Galardi's reply he specifically stated what I was under the

17 impression of.  And that's he said the reason why we put that

18 proceeds language in the order was to stop a run -- and I'm

19 paraphrasing here, I tried to get down as much as I could --

20 but was to stop a run on the court to determine the substantive

21 rights of the reclamation claimants.  And given that comment

22 that is exactly what has happened here.  We are taking Mr.

23 Stern's approach of we're going to work through this as the

24 information becomes available to us knowing that the order

25 allows us to go after the proceeds.

1          THE COURT:  All right.  Very good.  Thank you.

2          MR. BROM:  You're welcome.  Thank you.

3          THE COURT:  All right.  Ms. Tavenner, are you going

4    to tell me where we are?

5          MS. TAVENNER:  I'm going to try, Your Honor.

6          THE COURT:  Okay.

7          MS. TAVENNER:  For the record, Lynn Tavenner of the

8    law firm of Tavenner, Beran and co-counsel to the Official

9    Committee of Unsecured Creditors.  I believe we're moving along

10   from reclamation to fee application, Your Honor.

11         THE COURT:  All right.

12         MS. TAVENNER:  And that would be Items 51 through 54

13   on the docket.  The first one would be the fourth interim

14   application of Pachulski Stang, Ziehl & Jones along with the

15   application of my firm Tavenner & Beran Protiviti Inc.  All of

16   those, Your Honor, are in the fourth interim applications for

17   the time period August 1 through October 31, Your Honor.  And

18   then we also have another application on the docket for the law

19   firm of Gowling, Lafleur, Henderson, LLP which is the first

20   interim application but it covers the period from November 18,

21   2008 through the October 31 time period.

22         Your Honor, my firm filed one notice with respect to

23   all four of those applications.  That notice was provided on

24   December 14th.  And no responses were received on behalf of any

25   of those applications.  I'm happy to go through the amounts

76

1  requested in each of the applications.  And to the extent that

2  I can answer questions I'm happy to.  I believe that Mr.

3  Pomerantz is still on the phone as well.

4       THE COURT:  All right.  The Court has actually been

5  through each of the applications and I've reviewed them in

6  detail.  Does any party wish to be heard in connection with the

7  committee's motions to approve these applications?  All right.

8  There being no objection the Court as I indicated just a moment

9  ago has reviewed the applications.  I found them to be in order

10  and the Court will approve the applications as submitted and I

11  would ask you to please submit orders to that effect.

12       MS. TAVENNER:  Thank you, Your Honor, we will.

13       THE COURT:  Thank you.

14       MR. FOLEY:  Your Honor, Doug Foley for the debtors.

15  I believe that leaves Item Number 65 which is the last matter.

16  This is the DC motion to allow late filed 503(b)(9) claim.

17       THE COURT:  All right.

18       MR. GALARDI:  Your Honor, may I ask to be excused to

19  catch a flight?

20       THE COURT:  Yes, Mr. Galardi, you may be excused.

21  Thank you.

22       MR. STERN:  I was going to make the same request,

23  Your Honor.  May I go?

24       THE COURT:  Mr. Stern, you may be excused as well.

25  Thank you, sir.

1          MR. STERN:  Thank you.

2          MR. HUTSON:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MR. HUTSON:  Richard Hutson local counsel for Export

5    Development Canada.  Your Honor, I have with me Ronald Clifford

6    from Blakeley & Blakeley in California who is lead counsel for

7    Export Development Canada.  Mr Clifford has been -- this Court

8    has granted our pro hac motion for Mr. Clifford to appear on

9    behalf of Export.  So at this time I'd like Mr. Clifford to

10   address the motion.

11         THE COURT:  Yes, sir.  Thank you.  Mr. Clifford,

12   welcome to the Court.

13         MR. CLIFFORD:  Thank you very much, Your Honor, and I

14   would like to extend my gratitude to the Court for allowing me

15   to appear before Your Honor pro hac vice.  I have a couple

16   slight housekeeping matters.  I will forewarn the Court that I

17   will keep my portion of the motion as short as possible.  That

18   was a lot of 546(c) stuff and so I'll try to keep this much

19   more concise.

20         The first thing I'd like to do is to hand up to Your

21   Honor, debtors' counsel has one as well, we provided -- want to

22   provide your Court very brief binders that list some of the

23   exhibits that we would like to provide to Your Honor to follow

24   along with us in our presentations.

25         The second thing I would like to do is, coupled with

1  Export Development Canada's motion is a declaration of Joanne

2  Keach-Barker.   Joanne Keach-Barker is an employee of Export

3  Development Canada and her declaration thoroughly runs through

4  what that -- what her work details include.   Rather than have

5  her take the stand and run through her entire declaration my --

6  with Your Honor's grace I was going to simply offer her up as

7  proof, make a representation to you that if Joanne Keach-Barker

8  were to take that stand she would run through every item in

9  that declaration and attest to them under oath.   And I also

10  would extend to counsel for the debtor that we will make her

11  available for cross examination during his portion of the

12  presentation if he so wished.

13          THE COURT:   Is she in the courtroom?

14          MR. CLIFFORD:   She is, Your Honor.   She's in the back

15  and she is available for cross examination.

16          THE COURT:   Okay.   Any objection to the Court

17  receiving the declaration?

18          MR. FOLEY:   Not as a proffer, Your Honor.   We have a

19  similar situation on our side.   Just to go through the exhibit

20  books, Your Honor, so that Your Honor has -- that Your Honor

21  has in front of you.   You already have ours.   Ours is the

22  smaller one.

23          THE COURT:   The small one.

24          MR. FOLEY:   Is the small one.   Well, just for the

25  size.   They just have the bigger rings in theirs.   They have

79

1  seven exhibits, Your Honor, and we stipulate to the admission

2  of all the exhibits.  The one issue that we have and I believe

3  Mr. Clifford is in agreement with this, Exhibit Number 1 is a

4  long list of invoices and bills of lading.  We don't think it's

5  necessary for purposes of this hearing which is an excusable

6  neglect hearing, to go through the merits of their underlying

7  alleged claim.  We obviously stipulate that they have asserted

8  a claim for a 503(b)(9) status.

9        The question is whether Your Honor should allow it to

10 be deemed timely?  So as long as these exhibits -- this exhibit

11 is coming in not to actually establish and prove their claim,

12 because we haven't gone through these bills of lading or

13 invoices then we're fine with it coming into evidence just for

14 the limited purpose of them establishing that they are trying

15 to assert a 503(b)(9) claim late, but not actually establishing

16 as part of this hearing.

17        THE COURT:  All right.  Thank you, Mr. Foley.

18        MR. FOLEY:  Otherwise we have no problem with all of

19 their seven exhibits coming into evidence.

20        THE COURT:  All right.

21        MR. CLIFFORD:  Your Honor, that's a fair

22 representation of my understanding of our agreement.  Export

23 Development Canada's purpose of Tab 1 is in case Your Honor

24 views our argument in the motion persuasive and decides to

25 grant it it would be to grant the extension of the late filed

1  proof of claim along with the documents that were attached to

2  that proof of claim.

3       THE COURT:  All right, very good.  So for those

4  purposes then the Court will admit the documents that have been

5  tendered to the Court by Export Development Canada as movant's

6  Exhibits 1 through 7.

7       MR. FOLEY:  Thank you, Your Honor.  With respect to

8  the debtors' exhibit book, Your Honor, we have -- we've labeled

9  them with letters A through F.  Mr. Clifford has agreed to

10  stipulate to their admissibility at this point in time

11  depending on the cross examination of Ms. Keach-Barker.  I only

12  am moving to admit A, B, C and F at this time.

13       THE COURT:  All right.  So any objection to A, B, C

14  and F being admitted?

15       MR. CLIFFORD:  None on behalf of EDC.  The only thing

16  we would like to do is to inform the Court that we want to

17  reserve the right to cross examine Mr. Gershbein, I believe it

18  is.

19       MR. FOLEY:  Yes.  And he's in the courtroom today.

20       THE COURT:  Okay.  Very good.

21       MR. FOLEY:  I think the way to proceed at this point,

22  Your Honor, is since their documentary evidence is in along

23  with the direct examination by proffer by affidavit by Ms.

24  Keach-Barker is for me to cross examine her and then I can put

25  on our evidence and then we can make an evidence.  Because I

1    don't think the facts are largely in dispute, Your Honor.

2            THE COURT:  Is that acceptable?

3            MR. CLIFFORD:  Your Honor, what I wanted to do, and

4    I'm more than happy to follow Your Honor's lead was run through

5    our argument, finish up our argument which is going to be

6    brief, turn it over to any cross exam at that point and be

7    done.  I just -- I wanted to take the opportunity -- the first

8    opportunity to provide Your Honor with our thoughts on the

9    motion.

10           MR. FOLEY:  I'll defer to the Court.  I know time is

11   short.  I just want to --

12           THE COURT:  Okay.  Proceed.

13           MR. CLIFFORD:  Okay.  Your Honor, I think a good

14   place to start here is going to be with a very brief summary of

15   the undisputed facts related to the motion of EDC.  EDC

16   essentially, Your Honor, as the Court is well aware through the

17   motion is requesting that the Court enter an order allowing its

18   late filed 503(b)(9) claim.  EDC, and I'll refer to Export

19   Development Canada from this point on as EDC, provides credit

20   insurance to Canadian companies that export goods and provide

21   services to foreign parties.

22           EDC provided credit insurance to Techcraft

23   Manufacturing.  Techcraft, Your Honor, is a Canadian company,

24   and more specifically Techcraft manufacturing sold goods to the

25   debtor prior to the petition date within the 20 days prior to

1  that petition filing.  The petition filing, of course, Your

2  Honor knows is November 10th, 2008.  As Exhibit 1 shows copies

3  of the invoices that were attached to that proof of claim have

4  been offered and accepted by Your Honor as -- essentially as an

5  attachment to the proof of claim.  We would ask Your Honor to

6  include that entire -- the proof of claim and the entire list

7  of exhibits if Your Honor were to grant this motion.

8         Essentially Techcraft filed an application for

9  payment with EDC when they learned that the debtors filed

10 bankruptcy.  Just so Your Honor knows how it works is EDC

11 provides this credit insurance.  Once the insured Techcraft

12 finds out that someone's filed a bankruptcy the general

13 practice is they file an application for payment on the credit

14 insurance with EDC.  EDC then takes, from that point, a

15 reconciliation period whereby EDC determines whether or not

16 this is a valid claim, determines how much of his claim is in

17 fact to be paid, and then pays the claim.

18        After the claim is paid the entire file reaches

19 Joanne Keach-Barker's desk.  Joanne Keach-Barker is in charge

20 of filing, among other things, filing proofs of claims in cases

21 such as this.  That gives you a brief rundown of kind of what

22 happens as you will see as we go through with some of the

23 timing that period can be quite extensive.  But I think that

24 gives the Court a brief idea of how this works with EDC and its

25 insured, and more specifically how it worked with Techcraft.

1          Techcraft's claim again was -- application for

2    payment was filed on November 27th, 2008 with EDC.  Techcraft's

3    claim was assigned to EDC which is different.  There's a

4    reconciliation period.  Once they assigned the claim to EDC

5    they then paid -- EDC paid the insured that claim.  That was

6    done on November 27th, 2008.  Techcraft's claims --

7          THE COURT:  That's the date the claim was assigned --

8          MR. CLIFFORD:  To EDC.

9          THE COURT:  Got it.  Okay.  All right.

10         MR. CLIFFORD:  Let me step back, Your Honor.  The

11   application for payment was filed with EDC on behalf of

12   Techcraft on November 27th, 2008.  The claim was assigned to

13   EDC on January 16th.  The claim was actually paid by EDC --

14   Techcraft is actually paid by EDC on January 21st.  That's the

15   time line.

16         THE COURT:  All right.  Thank you.

17         MR. CLIFFORD:  The debtors here again, Your Honor, as

18   I think was explained ad nauseam during the first bouts of

19   motions we had here, the debtors filed a 503(b)(9) procedures

20   order like we've seen in these cases.  However, it was done on

21   the petition date.  Your Honor, actually granted that 503(b)(9)

22   claims, bar date, motion through an order entered November

23   12th.  Essentially it was heard with the first day hearings --

24   first day motions.  Eventually through that 503(b)(9) claims

25   bar date order the bar date was fixed as December 19th, 2008.

1            EDC files a proof of claim for its 503(b)(9) claim on

2    January 28th, 2009.  That's 40 days after the 503(b)(9) bar

3    date.  Techcraft, and this is what's important, Techcraft

4    receives the notice of the 503(b)(9) bar date as well as the

5    papers that came along with that from the debtors timely.

6    Techcraft forwarded the notice of 503(b)(9) bar date and all

7    the papers that were sent with it to EDC on December 11th.  I

8    guess what's important there is there was an interrogatory or a

9    request for admission.  I think it was a request for admission

10   that asks was EDC aware of the 503(b)(9) claims bar date on

11   December 11th?  I think we've now reached a point to where

12   we've agreed and admitted that that is such.

13           But I guess the confusion is what does aware mean,

14   and is it, you know, being in a mailbox or being on a claims

15   agent's desk the same as the person in EDC assigned dealing

16   with these claim having it in their hands, the same thing.  I

17   guess that's the issue with aware.  Nonetheless EDC admits and

18   is willing to make a representation on the record that it

19   received, it was in possession of the 503(b)(9) bar date notice

20   on December 11th.

21           I think what comes down -- the entire motion here is

22   going to come down to, and I think what the next ten minutes or

23   however much longer we're going to be here is going to focus on

24   is the date of December 2nd, 2008.  On December 2nd, 2008, and

25   this is just 17 days before that December 19th 503(b)(9) bar

1  date Joanne Keach-Barker, an employee of EDC as we've already

2  recognized on the record who's task was among other things

3  filing proofs of claim in bankruptcy cases sends an email to

4  Sarah Beckett Boehm who is counsel for the debtors.  A copy of

5  that email is in Your Honor's binder as Exhibit 2.

6       And just to give Your Honor some background on that

7  essentially there can be a delay.  And here we had a delay

8  between Techcraft providing the notice or application for

9  payment and the actual payment of that claim by EDC of

10 something like 54 days.  Joanne Keach-Barker doesn't become

11 involved in this process who is the person who actually looks

12 to recover on these proofs of claim and all these bankruptcy

13 cases around the world, doesn't become involved until the

14 actual payment on the claim.  Well, that can sometimes create a

15 problem because as we saw here there's a 55 day window there

16 and we could have a bar date expire.  Which is what we saw

17 here.  A bar date did in fact expire.

18      Joanne Keach-Barker takes the added step to say let

19 me go ahead and get an email over to counsel for the debtor.

20 If there's a bar date that's looming I need to be aware of it

21 and I'll get something filed.  On December 2nd, that's 17 days

22 before the 503(b)(9) bar date -- I'm trying to find my place in

23 my email here -- Joanne Keach-Barker sends Ms. Beckett Boehm

24 and email and she says, "Can you please tell me," -- I'm

25 reading from, I guess it's the last email on the first page.

1  "Can you please tell me when is the bar date for filing proof

2  of claim?  EDC has pending claims against Circuit City and we

3  would like to register these debts in EDC's name.  Thanks for

4  our assistance in this matter.

5       Ms. Boehm replies to that email on the same day and

6  says, "The general bar date for filing proofs of claim has not

7  yet been established."  That's what we'll work through here

8  over the next four or five minutes of my argument.  At that

9  point Joanne Keach-Barker steps off and says I have some time.

10 Unfortunately what that email leaves out is in 17 days there's

11 a 503(b)(9) bar date that's pending.  That's what becomes

12 important.  And I think that's what we'll run through.  But

13 that is the email that I want to hopefully wrap this entire

14 argument around.  This in effect is the largest reason for the

15 delay of EDC filing its proof of claim.

16      Essentially EDC is going to fashion its argument

17 around the doctrine of excusable neglect.  It has been clearly

18 established through case law that this Court may allow the late

19 filing of a claim when the tardiness is due to a result of

20 excusable neglect.  Courts have provided guidance as to the

21 analysis of late filed proofs of claims under it's feasible

22 neglect doctrine.  And two of the more seminal cases, and those

23 are listed in the motion as well as the reply -- both replies

24 of EDC are the Enron Corporation case, and that's 298 B.R. 513.

25 And the Pioneer Services v. Brunswick case.  And that one is at

1 507 U.S. 380.  Again, these are the seminal cases that lay out

2 what we're looking for in excusable neglect standard.

3         It's important to note that above all this is an

4 equitable determination by the Court taking into account the

5 totality of the circumstances.  There have been factors that

6 have been laid out generally well accepted by most courts as

7 being the guidepost when we're looking at analysis -- an

8 analysis of excusable neglect.  And really it comes all down to

9 really -- most courts have agreed that it comes down to four

10 factors.

11        The first is dangerous -- the danger of prejudice to

12 the debtor.  The second is going to be length of delay and the

13 potential impact on judicial proceedings.  The third is going

14 to be the reason for delay.  And the fourth is going to be

15 whether or not the creditor acted in good faith.  I'd like to

16 eliminate that fourth factor.  There's been no opposition filed

17 in any of the three oppositions that have been filed to the

18 motion.  That being whether or not EDC acted in good faith.  We

19 believe that.  I'm here to state to the Court on the record

20 that EDC has acted in good faith.  There's been no factual

21 circumstances put before the Court to show they haven't acted

22 in good faith.

23        So really I think it's a very quick touch on points

24 one, two, and three.  The first one being the danger of

25 prejudice to the debtor.  Enron and Pioneer cases have used the

1  following factors to analyze that prong of the case.  The first

2  one is the size of a claim in relation to the estate.  Your

3  Honor, if we look at this case this is a very large case.  In

4  California we would -- in California and New York we would

5  refer to this case as a mega case.  Roughly, and I'm saying

6  roughly, there's somewhere between two and a half to $3 billion

7  in debt in this case.  My understanding is that professionals

8  alone in the case, Your Honor, has sought some $20 million in

9  fees incurred in administering the case.  EDC's 503(b)(9) claim

10 was filed for just over $550,000.  EDC's claim is dwarfed by

11 the sheer size of the debt in this case.  Counsel's argument,

12 and I'm sure Your Honor hasn't had a chance to read it.  It was

13 just filed on the 11th.  It was a surreply or suropposition

14 that was filed just Monday or Tuesday.

15      THE COURT:  You can assume I've read your papers and

16 all the papers.

17      MR. CLIFFORD:  Perfect.  Oh, thank you, Your Honor.

18 Counsel's argument in that claim would have -- essentially

19 would have an effect -- they state that this would have an

20 effect on junior creditors.  This would greatly affect junior

21 creditors.  I really believe that to be disingenuous.  Any pro

22 rata distribution to junior creditors of $500,000 in a claim

23 pool of this size would be de minimis.  And to say de minimis

24 would be an extremely conservative term.  We're talking $2

25 billion -- I believe $2 billion in unsecured debt.  To spread

1  among that debt $500,000 and to say that that would be -- that

2  that would have some effect on junior creditors is really a

3  joke I believe.

4       The second element we have under danger of prejudice

5  is whether or not a plan has been filed with the knowledge of

6  existence of a claim.  We went through this in the motion, Your

7  Honor, so I won't really spend any time on this.  We filed our

8  proof of claim on January 28th, 2009.  We also filed our

9  motion, this motion, originally on March 18, 2009.  A plan of

10  disclosure statement wasn't filed in this case for months

11  thereafter.  I believe the first was filed in July, it could

12  have been later than that.  But this was filed well before any

13  plan of disclosure statement was filed.

14       And then lastly is the disruptive effect the late

15  filing claim would have on a plan close to completion or upon

16  the economic model upon which the plan is formulated.  Again, I

17  think that goes to the second argument.  One thing I'm not even

18  clear if the debtors actually included EDC's claim and its

19  formulation in liquidating -- and it's liquidation analysis and

20  things of that sort.  But nonetheless the claim is so small

21  when you take a look at the grand scheme of the case the effect

22  -- there can be a genuine argument that there's a real effect

23  here.

24       The second prong or the second element under that

25  Pioneer -- I'm going to call them the Pioneer factors is really

1    the length of delay.  Again, here the length of delay is 40

2    days, Your Honor.  I went through and I scoured all of the

3    cases on this topic very thoroughly.  I found no case dealing

4    with a late filed proof of claim of a time period that is

5    anywhere near 40 days.  That specifically goes to the analysis

6    of the length of delay.  I've seen a case or two where there

7    was a summary disposition by the Court of denying a claim for

8    it being filed, you know, some five, six, seven, ten days late.

9    But there wasn't -- these were early cases and these weren't

10   any -- there wasn't any real analysis on the length of the

11   delay factor we have here under Pioneer.

12          The only cases that you find there are cases where

13   you have proofs of claim filed six months.  I think I cite one

14   in the motion where the delay was a year, maybe two years.  But

15   for a delay of only 40 days, and I've looked at it all.  I

16   haven't seen a single case applying Pioneer or applying Enron

17   where we have a length that short and the Court -- period.

18   There hasn't been anything filed or decided that I know of of a

19   length that short.

20          We would argue 40 days is really de minimis given the

21   fact that the plan hadn't been filed yet.  Given the fact that

22   this is an enormous case.  Given the fact that the claim is

23   large to our client.  The claim may not be large to the entire

24   case in general, but the claim was large to our client.  You

25   see the sheer number of invoices involved.  Forty day delay in

1  the grand scheme of things we believe is very minimal.

2          And then I think the last excluding the fourth

3  element was really the reason for delay.  And I really think

4  we've brought Your Honor in on our belief as to the reasons for

5  delay.  There's really a number of reasons that led to the

6  delay in EDC filing its 503(b)(9) proof of claim.  First,

7  really the bar date was really set pretty aggressively in this

8  case.  The Court entered an order establishing the bar date two

9  days after the petition date which the bar date was eventually

10 fixed on December 19th, 2008.  That's just 38 or 39 days after

11 the petition date.  Although not unheard of it's -- in my

12 experience I should say -- it's unusual to have a 503(b)(9) bar

13 date itself established that early on in the case and then to

14 have it one, -- let me step back, Your Honor.

15          THE COURT:  Wasn't it normal in retail cases to have

16 a fairly early bar date with regard to 503(b) claims?

17          MR. CLIFFORD:  One, I don't see many 503(b)(9)

18 procedures filed.  Typically I see them filed sometime later on

19 in the case if they are filed.  I've never seen one filed with

20 first day motions.  This is the first.  And my firm's been in

21 them all over the country.  This is the first time I've ever

22 seen that.  I'm not saying that it wasn't warranted.  But it

23 was fast.  And if I do see procedures or things of that sort we

24 usually don't see those procedures for months in the case.

25          Some of the bigger cases in New York right now, the

1  Quebecor case, things of that sort.  We really didn't see a

2  503(b)(9) claims until well after parties started filing

3  motions for allowance of those claims.  Things of that sort.  I

4  think it was six months after the case had been filed, maybe

5  even longer.  But to see one filed on the first day motions was

6  a first for me.  That may be common in this jurisdiction but

7  I've never seen that.  So it was very quick.  Like I say maybe

8  not unheard of, but I think unusual.

9       Secondly, and I think it's important to point Your

10 Honor to the fact that EDC is a very large operation.  EDC is

11 an arm of the Canadian federal government.  It deals with

12 claims from all over the world.  The U.S. being one of the more

13 major portions, but it deals with claims all over.  It does not

14 only this, but also does exit financing as we saw EDC play a

15 part in the Chrysler bankruptcy case.

16      So I think with the increased state of the economy

17 and the increase flow of claims that are coming in one of the

18 factors that led in to this whole delay of 54 days and one

19 reason why it didn't get to Joanne Keach-Barker earlier was

20 really just because the size of the operation there, one.  Two,

21 because it's the federal government, and in the federal

22 government it would take me two weeks to get this piece of

23 paper to you at that bench.  But three, it's really the state

24 of, you know, the economy and the sheer number of bankruptcies

25 that are being filed in not only the U.S., but all over the

1  world.

2           THE COURT:  Is EDC a governmental entity?

3           MR. CLIFFORD:  It's a subsidiary.  Non -- I think

4  it's a -- I don't really remember how to put it, but it's a

5  subsidiary of the Canadian federal government.  They run on the

6  same pay scales and things of that sort.  It's funded and

7  subsidized by the Canadian government.  It isn't -- to my

8  understanding it's a nonprofit organization.  But I don't

9  believe they go by -- I think that's the extent to my knowledge

10  of EDC.

11          THE COURT:  All right.  You don't know whether

12  they're a separate corporation or whether they're a department

13  of the Canadian government.

14          MR. CLIFFORD:  I think it's a separate corporation.

15  I can have Joanne Keach-Barker testify to that.  But my

16  understanding is that they are an arm or a branch of the

17  Canadian federal government.

18          THE COURT:  Okay.

19          MR. CLIFFORD:  Again, so because of all these factors

20  Joanne Keach-Barker takes the time to actually say there's a 54

21  day window, it could be longer, we've got a big claim here.

22  The entire unsecured claim I believe a million one or just

23  under a million two Joanne Keach-Barker takes the time to say

24  you know what, what I need to do is go to the source itself,

25  counsel for the debtor and to see if there's any looming bar

1   dates.  That's exactly what Joanne Keach-Barker did.  So she

2   sends that email that we just looked at.

3           Counsel for the debtor gets back to her without

4   disclosing the 503(b)(9) bar date.  Joanne Keach-Barker at that

5   point relaxes and waits for the claim to come to her desk and

6   that's when the claim is paid, January 21st.  They see things

7   happen.  Seven days later the proof of claim, the 503 (b)(9)

8   proof of claim is filed.  That's really the time line and the

9   reason we have here for the delay.  Counsel for the debtor --

10          THE COURT:  Why isn't your insured obligated to

11  protect your interest prior to the time that the claim was

12  paid?

13          MR. CLIFFORD:  It's a great question.  And they are.

14  Techcraft had the obligation -- until the claim was paid had

15  the obligation to ensure that a proof of claim was filed.  Now

16  what EDC does and EDC can be pretty lenient with some of its

17  insureds.  What EDC has done is taken the position that once

18  the bar date was sent over to it and it was sent over to it on

19  December 11th EDC has taken the position that it's willing to

20  spend the cost and bear the expense of having this late filed

21  proof of claim motion heard in front of this Court.  But the

22  blame there is definitely laid on not only EDC's shoulders, but

23  it would be laid on Techcraft's shoulders as well.

24          THE COURT:  Because you didn't pay the claim until

25  January 21.  And the claim was assigned -- wasn't assigned to

1 you until January 16th which would have been beyond the bar

2 date.  So, you know, it strikes the Court that your claim

3 might, you know, lie against your insured as opposed the debtor

4 in this case.

5          MR. CLIFFORD:  That's a great question.  What EDC is

6 arguing is that EDC would have filed the proof of claim -- and

7 they had before -- would have filed the proof of claim on

8 behalf of the insured had it been aware of the bar date.

9 That's been done before many times and that would have been

10 done here.  As a matter of fact that was the reason for the

11 call -- sorry, for the email.  Had the email came back and they

12 had been aware of the 503(b)(9) bar date that proof of claim

13 would have been filed by EDC or it would have been triggered by

14 EDC to be filed on behalf of the insured while we wait to have

15 that claim officially transferred over through the assignment

16 process.

17          THE COURT:  All right.

18          MR. CLIFFORD:  Counsel for the debtor filed that

19 response on the 11th just this Monday stating that the general

20 claims bar date had been established.  And again, what I really

21 want to focus Your Honor on is the nondisclousre.  There seems

22 to be an argument that there's no duty of counsel for the

23 debtor to disclose that bar date.  But I disagree with that,

24 Your Honor.  There may not be a duty.  And let's table that for

25 aside.  Let's say there is no duty.  It becomes a duty once

1  counsel for the debtor engages in responding to that type of

2  inquiry.

3        So if EDC comes, as they did, comes to counsel for

4  the debtor, sends an email and says when is the bar date?  If

5  the debtor says I'm not going to respond to you, we've sent

6  those out, that's one thing.  If the debtor comes back and says

7  there is no bar date in this case and doesn't go further on to

8  say the 503(b)(9) bar date actually is in 17 days, the debtor

9  -- EDC is worse off for extending that email -- after seeing

10 that email and receiving a response than before they sent the

11 email.  Had she said kick rocks, we're not going to say

12 anything to you Joanne Keach-Barker at that point contacts

13 myself, contacts someone else in her office.  She takes extra

14 steps to determine whether or not there's a bar date.

15       But the moment counsel for the debtor takes the

16 strides to alert a creditor of whether or not there is actually

17 a bar date you're required to go ahead and go full speed.  You

18 have to give me everything that's gone there.  You can't take

19 me halfway and leave me in a worse off position after reading

20 your email than I was before I sent the email in the first

21 place.

22       THE COURT:  Well, on December 2 you weren't even a

23 creditor though.  I mean, what is the duty to respond to

24 emails?

25       MR. CLIFFORD:  But that's just it.  Say there is no

1  duty to respond to emails.  The point is if you do respond to

2  an email EDC would argue to Your Honor you have created a duty.

3  Creditors are now relying on you.  If you send an email to --

4  if Sarah Beckett Boehm says no, we're not going to respond to

5  an email, that's not our duty, that's one argument.  But if she

6  goes forward, sends a reply email that is incomplete now you

7  have created a duty.  Now you've actually put a creditor in

8  position of relying on a statement that you said that's

9  incomplete.  That is a duty.  And that's what -- that's where

10 we say there's a duty if there is no duty in the first place.

11        But if you read the motion, Your Honor, we cite a

12 case the Nutri*Bevco case.  That's 117 B.R. 771.  And that case

13 is, I think, squarely on point.  Although in dicta the Court

14 did hint to the point that there if a creditor specifically

15 asks whether or not a bar date has been set and counsel is

16 responding to that they have a duty to disclose what that bar

17 date is.  That case, it's a little odd because there what you

18 had was someone asking about mailings.  The Court wasn't

19 willing to go that far to extend counsel's duty to go into

20 mailings and things of that sort from the debtor.  But the

21 Court did quite pointedly in its dicta say had that been an

22 inquiry about whether or not a bar date had been set in the

23 case, and counsel had responded to that it's quite clear that

24 that Court -- had those been the facts that Court would have

25 came down on the side of the creditor.  You created a duty at

1    that point.

2              THE COURT:  But the Court in that case decided not to

3    extend the bar date.

4              MR. CLIFFORD:  Right.  It's distinguishable on why it

5    did not.  That was a different issue.  That was regarding

6    mailings.  It wasn't regarding a bar date.  But the Court went

7    on in its dicta to actually address the issue of bar dates.

8              THE COURT:  All right.

9              MR. CLIFFORD:  And lastly, Joanne Keach-Barker after

10   the December 2nd email she takes Sarah Boehm's word and she

11   says there is no bar date looming, not need to be hasty, no

12   need to hurry up and do anything.  She goes to the Kurtzman

13   Carson website, that's the claims agent for the debtor, looking

14   for a bar date.  She's put in her declaration and testified in

15   a deposition which I'm sure she'll be cross examined on.  She

16   says I went on that website I didn't see a bar date.  She does

17   this all the time, been doing it for a lot of years.  Four or

18   five years.  Didn't see a bar date.  So she's done two things.

19   She's asked counsel for the debtor, she's looked on the KCC's

20   website doesn't see a bar date, she takes no action, we have a

21   late filed claim.

22             Is it reasonable that EDC filed the claim late?  I

23   believe it is.  If we look at -- if we go through all the

24   factors -- remember Your Honor is instructed by some of the

25   case law that we cite that we don't just look at one factor and

1 say this is definitive.  We look at the entire balance of

2 what's going on here.  This is a small claim, very small claim.

3 This is a huge case.  The length of delay here is very short.

4 This is a 40 day delay.  We're not talking about six months or

5 a year or two years after the case is in existence.  No.  The

6 bar date's set on the filing date -- excuse me, the motion is

7 filed on the filing date, it's decided two days later.

8 　　　　　We're 40 days late.  It's not unreasonable given the

9 next fact which is we go above and beyond understanding there's

10 limitation in some of the EDC  procedures and then being able

11 to act very quickly.  We go beyond that to now reach out to

12 counsel for the debtor for help in trying to establish whether

13 or not there truly is a bar date.  Counsel for the debtor

14 doesn't fully disclose what the bar date is.  I would submit to

15 Your Honor there's no way EDC should not be allowed to have an

16 admin claim in this case.

17 　　　　　I've read all of the papers that have been filed by

18 counsel for the debtor and none of them are persuasive.  I

19 would point Your Honor to the reply we filed last night.  It

20 addresses all of the cases that the debtor filed in its

21 supplemental opposition.  And I think if Your Honor reads that

22 case you will see that EDC should have their claim allowed, and

23 it's the equitable thing to do.

24 　　　　　THE COURT:  All right.  Thank you.  Mr. Foley.

25 　　　　　MR. FOLEY:  Your Honor, I'd like to just cross

Keach-Barker - Cross/Foley                    100

1  examine Ms. Keach-Barker on the stand.

2          THE COURT:  Ms. Keach-Barker, would you please come

3  forward and be sworn.

4  J O A N N E   K E A C H-B A R K E R, SWORN

5                    CROSS EXAMINATION

6  BY MR. FOLEY:

7  Q    Good afternoon, Ms. Keach-Barker.  Do you mind if I call

8  you Joanne since we did this in the deposition?

9  A    Please do.

10 Q    It's easier to -- thank you.  There's an exhibit book in

11 front of you that's a small exhibit book.  There's six exhibits

12 in it.  If you could turn to Exhibit Number B -- or letter B.

13 Could you identify that document?

14 A    It's a claim payment application.

15 Q    And this is the claim payment application received by EDC

16 from Techcraft the insured on November 27th, is that correct?

17 A    Yes.

18 Q    And it provides in handwriting under the risk category

19 block that Circuit City filed Chapter 11 on November 10th,

20 2008, is that correct?

21 A    Yes.

22 Q    And who within EDC's organization received this document?

23 A    It went to the Claims Unit.

24 Q    Who in particular?

25 A    The claim was assigned to the claims services manager

Keach-Barker - Cross/Foley                    101

1  Bouchon Lanceree (phonetic)

2  Q    Bouchon Lanceree.  And you don't work in the claims

3  department, correct?

4  A    No.

5  Q    In fact, you work in the recovery department, correct?

6  A    Correct.

7  Q    When Bouchon received this document what would she -- what

8  did she do with it?

9  A    She would have commenced processing the claim.

10 Q    Wouldn't she have uploaded onto a system?

11 A    Oh, yes, I'm sorry.

12 Q    A computer system?

13 A    Yes, yes.

14 Q    So that you could access it and see it?

15 A    That's correct.

16 Q    Okay.  And in fact didn't she and the claims manager from

17 the claims department contact you about this document?

18 A    Yes.

19 Q    And what did they ask you to do?

20 A    They wanted to know when the -- if there was a proof of

21 claim deadline coming up.

22 Q    And that's not withstanding the fact that EDC hadn't even

23 paid this claim yet.  They were already getting you involved in

24 the recovery department to make sure that their bankruptcy

25 issues are dealt with, isn't that correct?

Keach-Barker - Cross/Foley                    102

1  A    Yes.

2  Q    Okay.  Turn to Exhibit C in the book.  Can you identify

3  that document?

4  A    Yes.

5  Q    Now, this is an email, is it not from Techcraft to Bouchon

6  Lanceree who's in the claims department transmitting a copy of

7  the 503(b)(9) proof of claim request form, isn't that correct?

8  A    Yes.

9  Q    And didn't Bouchon Lanceree also upload this onto the

10 computer system as well?

11 A    Yes.

12 Q    But nobody in the claims department ever told you about

13 this document, isn't that correct?

14 A    That's correct.

15 Q    And in fact you never went back to the computer system to

16 look and actually see that this document has been uploaded,

17 isn't that correct?

18 A    No.

19 Q    And so therefore the proof of claim bar date passed and

20 you didn't find out about this until sometime in January, isn't

21 that correct?

22 A    Yes, that's correct.

23 Q    Take a look at the larger exhibit book, if you -- look at

24 Exhibit Number 2.  This is the email exchange between you and

25 Ms. Boehm.  The rest of the email exchange that counsel didn't

Keach-Barker - Cross/Foley                103

1   read was your follow on question to Ms. Boehm's answer which

2   is,"Is it too early to file proofs of claim?"  The response,

3   "No, it's not too early to file a claim.  You can go to

4   www.kccllc.net/circuitcity for information."  And you say thank

5   you, isn't that correct?

6   A    Yes.

7   Q    And you went to the website.

8   A    Yes.

9   Q    And what did you look for?

10  A    I would have looked for something that would have led me

11  to the bar date.

12  Q    Did you search?  Did you do a Control F bar date?

13  A    No.

14  Q    You just looked for something that's -- what exactly did

15  you look for?

16  A    I usually go through the docket.  I go through the

17  documents to find the stuff I need.

18  Q    Isn't it correct that on December 2nd, 2008 you had no

19  idea -- well, strike that question.  You're not a lawyer, is

20  that correct?

21  A    That's correct.

22  Q    In your bankruptcy law procedure's training has been

23  informal I believe you said in your deposition transcript?

24  A    Yes.

25  Q    And you handled the entire worldwide portfolio of

**J&J COURT TRANSCRIBERS, INC.**

Keach-Barker - Cross/Foley                    104

1 bankruptcy cases for EDC, isn't that correct?

2 A    That's correct.

3 Q    On December 2nd, 2008 you had no idea what 503(b)(9) of

4 the United States Bankruptcy Code meant or did, isn't that

5 correct?

6 A    That's correct.

7 Q    So if there was a document on the KCC website that said

8 503(b)(9) proof of claim form you would have no idea what that

9 meant.

10 A    That's correct.

11 Q    And you did not call Mr. Clifford or any outside

12 bankruptcy lawyer for advice with respect to what you saw on

13 the KCC website, did you?

14 A    No.  I didn't see the need.

15 Q    Mr. Clifford in his opening statement suggested that there

16 was an obligation on behalf of Techcraft to protect the claim

17 and the interest in order to preserve the insurance.  Do you

18 recall yesterday in your deposition testifying as to whether or

19 not Techcraft complied with their obligations?  In fact, didn't

20 you say that they provided you, you mean EDC, all of the

21 documentation with respect to the bankruptcy case that they

22 needed to do?

23 A    Yes, they did.

24 Q    And the reason the proof of claim did not get filed is not

25 because Techcraft didn't provide the documentation to you, but

Keach-Barker - Cross/Foley                105

1  that the claims department didn't provide the documentation to

2  the recovery department which is your department in order to

3  get the proof of claim filed.

4  A    That's correct.

5  Q    So it was basically a breakdown in your internal

6  procedures as to why the proof of claim did not get filed,

7  isn't that correct?

8  A    No.

9  Q    Well, isn't the claims department supposed to provide all

10  of the bankruptcy documents to the person in the recovery

11  department that is in charge of bankruptcy claims which is you?

12  A    Not until after the claim is paid.

13  Q    Well, didn't you testify yesterday that it depends on the

14  size of the claim?  That you get involved early if the size of

15  the claim is big enough?

16  A    Okay, I apologize.  I didn't quite understand the

17  question.  Yes, that's correct.

18  Q    And this one would fall into that category obviously.

19  A    Yes, that's correct.

20  Q    So what Bouchon Lanceree should have done is told you, as

21  she did with the application for payment form which suggested

22  that Circuit City filed bankruptcy, is provided to you what

23  Techcraft provided to her which was the proof of claim form.

24  But she didn't do that, did she?

25  A    No.

Keach-Barker - Redirect/Clifford                106

1  Q    And you don't know why she didn't do that.

2  A    No.

3  Q    It was just oversight on her part.

4  A    Yes.

5  Q    EDC paid 85 percent of Techcraft's claim, isn't that

6  correct?

7  A    Yes.

8  Q    But you're seeking to recover 100 percent of that from the

9  bankruptcy estate, is that correct?

10         MR. CLIFFORD:  Objection, Your Honor, I don't --

11  A    No.

12         MR. CLIFFORD:  -- think this is relevant.

13         THE COURT:  Objection sustained.

14         MR. FOLEY:  I have no more questions of the witness,

15  Your Honor.

16         THE COURT:  All right.  Thank you.

17         MR. CLIFFORD:  May I quickly, Your Honor?

18         THE COURT:  Very quickly, please.

19         MR. CLIFFORD:  Yes, Your Honor.

20                    REDIRECT EXAMINATION

21  BY MR. CLIFFORD:

22  Q    Joanne, you know what a proof of claim is.

23  A    Yes.

24  Q    If you would have saw proof of claim on KCC's website

25  would that have triggered in your mind that a proof of claim

Keach-Barker - Recross/Foley / Further Redirect/Clifford 107

1  bar date was looming?

2  A    Yes.

3  Q    Did you see the words, "Proof of claim," on the website?

4  A    No.

5          MR. CLIFFORD:  Nothing further, Your Honor.

6                    RECROSS EXAMINATION

7  BY MR. FOLEY:

8  Q    Do you recall testifying yesterday that you don't recall

9  what you saw on the website when you looked?

10 A    Yes.

11 Q    You do recall saying that you don't recall what you saw on

12 the website.

13 A    Yes.

14 Q    That's what you said yesterday.

15 A    Yes.

16 Q    Okay.

17         MR. FOLEY:  I have no further questions, Your Honor.

18         THE COURT:  All right, may this witness step down?

19         MR. CLIFFORD:  Your Honor, may I have two moments?  I

20 understand Your Honor wants to get out of here.  I just need

21 two seconds.

22                 FURTHER REDIRECT EXAMINATION

23 BY MR. CLIFFORD:

24 Joanne, yesterday at the deposition when you said you didn't

25 remember what was on KCC's website were you referring to what

Keach-Barker - Further Recross/Foley                    108

1  the scope of information was on KCC's website or were you --

2  strike that, Your Honor.  What were you referring to when you

3  said you didn't remember what was on KCC's website?

4  A    Everything.

5  Q    But isn't it true that you know for certain that there

6  wasn't a proof of claim -- the language proof of claim on KCC's

7  website?

8  A    Not that I saw.

9           MR. CLIFFORD:  Thank you, Your Honor.

10          MR. FOLEY:  Not to beat a dead horse, Your Honor.

11                  FURTHER RECROSS EXAMINATION

12  BY MR. FOLEY:

13  Q    But if you could turn to Exhibit F in the binder, please.

14  And turn to Page 27.  This is your deposition transcript as the

15  designated 30(b)(6) witness for EDC.  And I asked you the

16  question,

17  "Q    Did you go look at the KCC website when Ms. Boehm provided

18  it to you?

19  "A    Yes.

20  "Q    And what did you do when you navigated that website?  What

21  did you look for?

22  "A    The documents that I would need.  And I didn't -- I didn't

23  find anything.

24  "Q    You didn't find anything referring to a claim form or how

25  to file a claim?

Gershbein - Direct/Foley                    109

1  "A    I'm sorry, I don't really recall what I saw on the KCC

2  website, but I certainly didn't see the bar date."

3  Q    Is that your answer?

4  A    Yes.

5  Q    Okay.

6           MR. FOLEY:  I have no further questions, Your Honor.

7           THE COURT:  All right.

8           MR. CLIFFORD:  Nothing further, Your Honor.

9           THE COURT:  May this witness step down?  Okay.

10  Ma'am, thank you for your testimony.  You may step down.

11           MR. FOLEY:  Your Honor, we'd call Evan Gershbein to

12  the stand from KCC.

13           THE COURT:  Please come forward and be sworn.

14  E V A N   G E R S H B E I N, SWORN

15                    DIRECT EXAMINATION

16  BY MR. FOLEY:

17  Q    Mr. Gershbein, could you state your name and occupation

18  for the record.

19  A    Evan Gershbein.  I'm a senior managing consultant at

20  Kurtzman Carson Consultants.

21  Q    And Kurtzman Carson Consultants is the --

22  A    Claims and noticing agent for Circuit City.

23  Q    Could you turn to Exhibit A in the binder that's in front

24  of you?

25  A    Yes.

1 Q     Is that your affidavit with respect to this particular

2 motion?

3 A     It is.

4 Q     How do you know that you instructed that the 503(b)(9) bar

5 date notice was posted on the KCC website?

6 A     The order was entered on November 12th and on November

7 13th I had an email communication with fellow consultant

8 Timothy Woo in our office directing him to add a date to the

9 website and post a link to the notice.  He responded and I

10 reviewed it on that day.

11 Q     Had someone on that day gone to the website that is

12 referenced in Ms. Boehm's email to Ms. Keach-Barker

13 www.kccllc.net/circuitcity what would they have seen?  And I

14 will -- well, why don't you describe what they would have seen.

15 A     The public access website for Circuit City displays on the

16 top is general information about the case.  It lists the

17 various debtors and the case numbers and then a section of

18 important dates including the bankruptcy filing date, the bar

19 dates, the 341 hearing, etcetera.  And then on the bottom it

20 has the court information and the counsel information.  There's

21 also links in various places on the left for different items

22 including the court documents where you would find the bar date

23 order.  And on the top you'll see that there's also links to

24 the specific proof of claims.

25 Q     I've handed you a demonstrative exhibit that I believe is

Gershbein - Cross/Clifford                    111

1   consistent with what you're describing, but is this a screen

2   shot from the website that you are describing that you printed

3   this morning?

4   A    It is.

5   Q    And is this how it would have looked with respect to the

6   matters that have been posted on that day?

7   A    It's obviously been updated since that day, but the

8   pertinent day and the links were the same that day.

9   Q    And in the top middle there's an icon called 503(b)(9)

10  proof of claim form?

11  A    That's right.

12  Q    And then what you refer to in your affidavit as the

13  important dates, deadlines and documents.  There's a reference,

14  there is a fourth item 503(b)(9) administrative claim bar date

15  with two links to the bar date notice on the proof of claim

16  form, is that correct?

17  A    That's correct.

18          MR. FOLEY:  Your Honor, I have no further questions.

19          THE COURT:  Any cross examination of this witness?

20          MR. CLIFFORD:  Very shortly, Your Honor.

21          THE COURT:  All right.

22                  CROSS EXAMINATION

23  BY MR. CLIFFORD:

24  Q    Mr. Gershbein.

25  A    Yes.

Gershbein - Cross/Clifford                112

1 Q    Are you a computer expert?

2 A    I'm pretty sophisticated with computers.  I wouldn't say I

3 was an expert.

4 Q    Did you monitor the website on December 2nd, 2008?

5 A    On that date?  It's very likely.  I look at it frequently.

6 Q    Can you confirm on the record under oath that all links on

7 the website on December 2nd were working properly?

8 A    I don't recall if they were working properly, but they've,

9 you know, I'm usually told if they're not.  So I probably would

10 have known about it if they weren't.

11 Q    But you can't confirm under oath whether or not for

12 certain all the links on the website were working correctly on

13 December 2nd.

14 A    I can't.  I can't be for certain.

15        MR. CLIFFORD:  Thank you, Your Honor.

16        THE COURT:  May this witness step down?

17        MR. FOLEY:  Yes, Your Honor.  I have nothing further.

18        THE COURT:  Thank you, sir.  May he be excused?

19        MR. FOLEY:  Yes, Your Honor.

20        THE COURT:  Okay.  You're excused, sir.

21        MR. FOLEY:  Your Honor, I have no further evidence.

22 I don't know if Mr. Clifford has any further argument.  I'm

23 certainly glad to make a brief argument based upon the evidence

24 in the case law that we've cited in our papers which I know are

25 voluminous and the Court's already read.

113

1          THE COURT:  Well, I've already heard Mr. Clifford's

2   argument.  So why don't you make yours.  I would hope that you

3   could do it a little bit, you know, condensed version.

4          MR. FOLEY:  I'll be brief, Your Honor.  As we cite in

5   the papers this circuit and this district has case law with

6   respect to the standard under excusable neglect starting

7   obviously with the Supreme Court's decision in <u>Pioneer</u>, the

8   Fourth Circuit's opinion in <u>Thompson</u>, this district's opinion

9   in <u>Best Products</u> and other cases talks about whether or not --

10  talks about the movant having the burden of proof obviously to

11  establish the circumstances surrounding the party's failure to

12  take an action and that the reason for the delay is the most

13  important of the factors.  There are other factors, prejudice,

14  length of delay and good faith that Mr. Clifford addressed, but

15  the most important reason is what's the reason for the delay?

16         And it's not an easy standard to meet.  All the case

17  law uniformly say that it's a very difficult standard that bar

18  dates and deadlines especially in bankruptcy cases are

19  important to promote finality.  And we would submit, Your

20  Honor, that the facts here in this case are quintessentially

21  not excusable neglect.  In fact, all the case law including the

22  case law cited by the movant, the very case that Mr. Clifford

23  referred to <u>Nutri*Bevco</u> actually has language in it that would

24  exclude these facts and circumstances from fitting into an

25  excusable neglect conclusion.

1          I read from Page 44.  In our case however, "Movants

2     have shown that their failure to respond timely to the notices

3     they receive resulted either from a breakdown in their

4     procedures for processing notices or from ordinary negligence.

5     Neither of these, however are recognized as factors sufficient

6     to constitute excusable neglect.  Where the litigant's own

7     internal procedures are the cause of a failure to comply with

8     proper legal procedures Courts generally refused to grant

9     relief from the consequence of the lack of compliance."

10          Your Honor, we would submit that the fact that the

11    person at EDC in charge of bankruptcy claims did not appreciate

12    the concept or consequence of what a 503(b)(9) claim even was.

13    She had no reason to ask Ms. Boehm has the 503(b)(9) bar claim

14    been set because she had no idea what that was.  She didn't

15    even know whether they had a 504(b)(9) claim.  She was given

16    the website.  She went to the website.  The testimony is that

17    it was posted.  There's no reason to believe it wasn't properly

18    posted and there's no reason to believe that the screen shot

19    that Your Honor looked at today and heard described by the

20    witness wasn't what Ms. Keach-Barker looked at, but she didn't

21    appreciate what she was looking at, number one.

22          So we don't believe that the email exchange

23    establishes anything.  In fact, if it establishes anything it

24    establishes the old concept that no good deed goes unpunished.

25    And maybe I should instruct all my associates never to respond

1   to a creditor inquiry again because then we wouldn't be here

2   today.  But that said not only did that email exchange not

3   mislead a party who received the website, it actually provided

4   the information that was requested.  They just didn't

5   appreciate what it was.

6           Secondly, Your Honor, on December 11th eight days

7   prior to the expiration of the 503(b)(9) date the insured sends

8   an email to Techcraft.  This is Exhibit C.  "Good day, Madame

9   Lanceree, please find attached some documentation I received

10  for Circuit City along with United States Bankruptcy Court

11  Section 503(b)(9) claim request form.  Should you require any

12  information or assistance in completing the form, please don't

13  hesitate to ask myself or Mary O'Calabrese."

14          This was uploaded on their system.  It was never

15  provided to Ms. Keach-Barker to do anything with.  She never

16  went to their system to look at it to see that it was posted.

17  And when she was deposed yesterday about that I asked her on

18  Page 23 of the transcript which is Exhibit F, ...

19  "Q   So this would have been put into the system just like the

20  application for payment form.

21  "A   Correct.

22  "Q   So you could have gone and viewed that, is that correct?

23  "A   I could have.  Yes.

24  "Q   But you did not until January, is that correct?

25  "A   Correct."

1          And on Page 33 of the transcript, Your Honor, in

2   talking about the previous page of the transcript we were

3   talking about -- well, actually I'll start on Page 32.  I'm

4   sorry, Your Honor, 31.  The bottom of Page 31.

5   "A    Yes.

6   "Q    Why didn't she," referring to Ms. Bouchon, "respond to

7   Techcraft," referring to the email, "and say why don't you go

8   ahead and fill out the 503(b)(9) claim form?

9   "A    I can't speak for Bouchon.  I don't know.

10  "Q    But you're here on behalf of EDC.  Was it just an

11  oversight?

12  "A    I think -- well, I know EDC we relaxed a little bit.  We

13  didn't think the deadline was going to be set so soon so we

14  thought we had time to get the claim paid and then file

15  afterwards and did not have to worry about the policyholder

16  filing the proof of claim and then EDC having to file the

17  notice of transfer."

18          And then I tried to understand that.  Second

19  paragraph of my question.

20  "Q    It's EDC's preference to not have the insured file a claim

21  then have it transferred to EDC.  They would rather get the

22  claim paid assigned to EDC and then EDC files one claim so they

23  don't have to deal with the bankruptcy court transfer, is that

24  what you're say?

25  "A    That is our preference.

1  "Q   And in this case the hope was that the reconciliation

2  period would be completed so that you would not have to tell

3  the insured go ahead and file a claim in case the bar date runs

4  and then we'll deal with the transfer of that later.

5  "A   I don't know what was communicated to the policyholder.

6  "Q   Is there anybody in the claims servicing department or

7  claims management department that you identified that deals

8  with bankruptcy cases?

9  "A   Yes.  Because they, when they process claims for

10  bankruptcy -- for bankruptcy debtors --

11  "Q   But they don't deal with EDC's efforts to recover.

12  "A   That's correct.

13  "Q   That's your area.

14  "A   Yes, yes.

15  "Q   Exclusively.

16  "A   Yes.

17  "Q   And you get involved only depending on early in the

18  process if the claim is big enough.

19  "A   Yes.

20  "Q   And they didn't bring you in the loop on this one early,

21  but they didn't -- they did bring you in the loop on this one

22  early, but they didn't provide you all the documents.

23  "A   That's correct."

24       So to answer Your Honor's question to counsel

25  Techcraft did everything right.  The result of this late claim

1   being filed in January rather than by the bar date is of no

2   reason other than the internal breakdown between the claims

3   department and the recovery department and properly

4   communicating the bankruptcy information so that the bankruptcy

5   claim could have been timely filed by somebody.  And that's not

6   excusable neglect, Your Honor.  All the cases say that internal

7   breakdowns are because they're busy or because one person in

8   this entity deals with all bankruptcy cases worldwide.  That is

9   not excusable neglect, Your Honor.  And Your Honor should deny

10  the motion.

11          THE COURT:  All right, thank you.  Anything further?

12          MR. CLIFFORD:  Your Honor, I need to have a few

13  seconds here.  Your Honor, I like the way counsel for the

14  debtor wants to omit the fact that one of the steering reasons

15  for the delay here was an email that left out one of the most

16  important bar dates set in the case thus far which was a

17  503(b)(9) bar date.  And while I understand the patron saints

18  of McGuire Woods don't want to leave any good deed unpunished I

19  think what has to be communicated from counsel to the debtor to

20  his associates are the point is if you respond to an email

21  respond to an email in full.  Don't respond to an email half.

22  And when you respond to an email half this is what happens.

23  EDC shouldn't be punished because it relied on the one person

24  who any creditor in this case could rely on if there was

25  anybody to rely on and that's counsel for the debtor.

1          THE COURT:  All right.  Thank you.  All right, the

2    Court has before it the question whether to allow the late

3    filed claim under Section -- for a claim under Section

4    503(b)(9) in this case.  And the question comes down to whether

5    the Court should allow the late filed claim on account of

6    excusable neglect.

7          The Court finds that there was neglect in this case.

8    And whether that neglect is excusable under the case law

9    depends on the totality of the circumstances.  And again, in

10   this circuit the inadvertence ignorance of the rules or

11   mistakes in construing the rules do not constitute excusable

12   neglect.  The Court finds in this case that the neglect was the

13   result of a breakdown in the internal procedures of EDC.  I

14   don't think it has anything to do with the email.  I think that

15   the email, if anything, was more informative about stirring

16   toward the website and gave additional information.

17         The Court notes that in the order establishing the

18   bar date in this case the Court was provided procedures for

19   giving notice of the bar date which the Court was -- looked at

20   very carefully given the bar date that was established in the

21   case.  The Court found those procedures to be reasonable in

22   approving them.  And in fact the notice got to the creditor in

23   this case Techcraft, and in fact the notice got to EDC, you

24   know, well in time for EDC to file the bar date.  The fact that

25   it didn't appreciate what it received or didn't act on it when

120

1  it did receive it I think are of no moment.

2         So the Court's going to deny the motion to extend the

3  bar date.  And I would ask Mr. Foley to please submit an order

4  to that effect.  And I would ask that you detail that order

5  with specific findings of fact and conclusions of law

6  consistent with the Court's ruling today.  Any questions

7  regarding the Court's ruling?

8         MR. CLIFFORD:  No, Your Honor.

9         THE COURT:  All right.

10         MR. FOLEY:  No, Your Honor.

11         THE COURT:  All right.  I thank counsel for their

12  very capable presentation.  Do I have any other business to

13  take up today?

14         MR. FOLEY:  No, Your Honor, that concludes the

15  agenda.  Thank you, Your Honor.

16         THE COURT:  All right.  We will then be adjourned.

17                        *  *  *  *  *

18

19

20

21

22

23

24

25

1                        **C E R T I F I C A T I O N**

2                I, KIMBERLY UPSHUR, court approved transcriber,

3      certify that the foregoing is a correct transcript from the

4      official electronic sound recording of the proceedings in the

5      above-entitled matter, and to the best of my ability.

6

7      /s/ Kimberly Upshur          DATE:  January 19, 2010

8      KIMBERLY UPSHUR

9      J&J COURT TRANSCRIBERS, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25