(f)    Anything in this Paragraph 13 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 13(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 13. In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender a certified copy of those provisions of the blanket policy that pertain to the Leased Premises, if any, to evidence the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 13.

14.    Damage, Destruction.

(a)    In the event of any casualty loss exceeding $100,000, Tenant shall give Landlord immediate notice thereof. Tenant shall adjust, collect and compromise any and all such claims, with the consent of Lender and Landlord, not to be unreasonably withheld or delayed and Landlord and Lender shall have the right to join with Tenant therein. If the estimated cost of Restoration or repair shall be Five Hundred Thousand ($500,000.00) Dollars or less, all proceeds of any insurance required under Paragraph 13(a) shall be payable to Tenant, provided that Tenant at such time shall have a tangible net worth of not less than Two Hundred Million Dollars ($200,000,000.00) as determined in accordance with generally accepted accounting principles, consistently applied, and in all other events to a Trustee which shall be a federally insured bank or other financial institution, selected by Landlord and Tenant and reasonably satisfactory to Lender (the "Trustee"). If the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee. Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant hereby appoints such Trustee as Tenant's attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease after approval by Tenant of such Trustee, if Trustee is other than Lender, such approval not to be unreasonably withheld or delayed.

(b)    In the event of any casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term shall nevertheless

MWBB 11/6/95

21

continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder. The Net Proceeds of such insurance payment shall be retained by the above-mentioned Trustee and, promptly after such casualty, Tenant shall commence and diligently continue to perform the Restoration to the Leased Premises. Upon payment to the Trustee of such Net Proceeds, the Trustee shall, to the extent available, make the Net Proceeds available to Tenant for restoration, in accordance with the provisions of Paragraph 15. Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace the Improvements in accordance with the provisions of this Lease (including Tenant's making any desired Alterations allowed hereunder) and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof.

(c)     In the event that any damage or destruction shall be subject to the self insurance provisions provided for in Paragraph 13(b), Tenant shall pay to the Trustee the amount of the proceeds that would have been payable had such self insurance program not been in effect (the "Tenant Insurance Payment").

15.     Restoration. The Net Proceeds, Restoration Award and Tenant Insurance Payment (the aggregate of which being herein defined as the "Restoration Fund") shall be disbursed by the Trustee in accordance with the following conditions:

(a)     At the time of any disbursement, no Event of Default shall exist, no default on Tenant's part with respect to the payment of money shall exist (regardless whether such default has ripened into an Event of Default) and no construction, mechanics' or materialmen's liens shall have been filed and remain undischarged and unbonded.

(b)     If the cost of Restoration exceeds $250,000 prior to commencement of the Restoration, the architects, contracts, contractors, plans and specifications for the Restoration shall have been approved by Landlord and Lender, which approval shall not be unreasonably withheld or delayed.

(c)     Each request for disbursement shall be accompanied by a certificate of Tenant, signed by the President, Treasurer or any Vice President of Tenant, describing the work for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work and the certificate to be delivered

MWBB 11/6/95

771DelcrmefwtmbercTVexre.be

SENT BY: XEROX Telecopier 7011:11 ; 7-85 ; 1:21AM ;      2147455380→      5048828;#27

by Tenant upon completion of the work shall, in addition, state that the work has been completed and complies with the applicable requirements of this Lease.

(d)  Disbursements shall be made from time to time in an amount not exceeding the cost of the work completed since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications, (2) waivers of liens, (3) a satisfactory bring down of title insurance, and (4) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed in place and free and clear of mechanics', construction and materialmen's lien claims.

(e)  The Trustee may retain ten percent of the Restoration Fund until the Restoration is fully completed in the reasonable judgment of the Lender.

(f)  The Restoration Fund shall be kept in a separate interest-bearing federally insured account by the Trustee or by Lender.

Prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord, exceeds the amount of the Restoration Fund, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund or, upon Landlord's approval, Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration. Except for the payment to Landlord of the net surplus award, referred to in Paragraph 12(c), any sum in the Restoration Fund which remains in the Restoration Fund upon the completion of Restoration and payment in full of all amounts due with respect thereto, shall be paid to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or the Restoration Award shall be deemed to be disbursed prior to any amount added by Tenant.

16.  Subordination to Financing.

(a)  Subject to the following provisions of this Paragraph 16(a), Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to

MWBB 11/6/95

23

further effectuate or confirm such subordination. So long as no Event of Default shall be outstanding, Tenant's tenancy shall not be disturbed, nor shall this Lease be affected by any default under such Mortgage, and in the event of a foreclosure or other enforcement of any such Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the Term of this Lease and any extensions thereof, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default by Tenant has occurred and is continuing. So long as no Event of Default by Tenant has occurred and is continuing, Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law. Any Mortgage to which this Lease is now or hereafter subordinate shall provide, in effect, that during the time this Lease is in force all insurance proceeds and condemnation awards shall be permitted to be used in accordance with the provisions of this Lease. (i)Notwithstanding an Event of Default, the provisions of this Paragraph 16.(a) shall continue to apply for the benefit of any Qualified Subtenant referred to in Paragraph 17.(c).

(b)    Notwithstanding the provisions of subdivision (a) of this Paragraph 16, the holder of the Mortgage to which this Lease is subject and subordinate, as provided in said subdivision (a), shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to this Lease by recording a unilateral declaration to such effect.

(c)    At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16(a) above, to attorn, from time to time, to any such owner or Lender, upon the then executory terms and conditions of this Lease, for the remainder of the Term originally demised in this Lease and for any renewal term, provided that such owner or Lender, shall then be entitled to possession of the Leased Premises subject to the provisions of this Lease. The provisions of this subdivision (c) shall enure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions. Tenant, any owner and Lender, however, upon demand of the other, hereby agrees to execute, from time

**MWBB 11/6/95**

24

to time, instruments in confirmation of the foregoing provisions of subdivisions (a) and (c), reasonably satisfactory to the requesting party acknowledging such subordination, non-disturbance and attornment as are provided in such subsections and setting forth the terms and conditions of its tenancy.

(d)     Tenant agrees that, if requested by Landlord, Tenant shall, promptly after demand and without charge, enter into (i) a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Lender, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of subparagraph (a), and (ii) an agreement with Lender whereby Tenant shall agree for the benefit of Lender that Tenant will not, without in each case the prior written consent of Lender, (a) amend, modify, cancel or surrender the term of this Lease except as expressly permitted by the provisions of this Lease, or enter into any agreement with Landlord so to do, or (b) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

17.     Assignment, Subleasing.

(a)     The Leased Premises may be sublet in whole or in part without the consent of Landlord.  Except as expressly permitted below, Tenant shall not assign its interest in this Lease without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.  The net worth, credit and financial responsibility of the proposed assignee shall not be considered by Landlord in determining whether to grant or withhold its consent to the proposed assignment.  The assignment of this Lease by Tenant named herein to any purchaser of all or substantially all of the Circuit City Stores in the State shall not require the prior written consent of Landlord.  Assignment of this Lease by Tenant to a parent, subsidiary or affiliate of Tenant shall not require the consent of Landlord.  An "affiliate" of Tenant shall mean any corporation, partnership or other business entity which controls or is controlled by, or is under common control with Tenant.  The word "control" (including "controlled by," "under common control with" and "controlling") as used with respect to any corporation, partnership or other business entity, shall mean the possession of the power to direct

or cause the direction of the management and policies of such corporation, partnership or other business entity, whether through the ownership of voting securities or contract.

(b)    Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease.  No assignment or sublease made as permitted by this Paragraph 17 or otherwise, shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made.  Tenant agrees that in the case of an assignment, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Landlord (i) a duplicate original of such assignment in recordable form and (ii) an agreement executed and acknowledged by the assignee in recordable form wherein the assignee shall agree to assume and agree to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such assignment, and, in the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord a duplicate original of such sublease.

(c)    Landlord recognizes that there may currently be constructed or Tenant may intend to construct certain leasable space (the "Spec Space") at the Leased Premises other than the portion of the Leased Premises currently operated as a Circuit City Store, which Spec Space is or shall be either a separate building or connected to the other Improvements but separated therefrom by a demising wall, for the specific purpose of generating sublease income to the Tenant.  Any such additional Spec Space shall be constructed at Tenant's sole cost and expense, and such construction shall be deemed an Alteration under this Lease and shall be performed in accordance with the terms of this Lease, however, Landlord agrees that Paragraph 11(vi) shall not apply to the construction of the Spec Space.  Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into a nondisturbance and attornment agreement with any Qualified Subtenant, as defined below, of the Spec Space (a "Shop Tenant") or any Qualified Subtenant of the entire portion (the "Anchor Space") of the Leased Premises currently operated by Circuit City as a Circuit City retail store (an "Anchor Tenant") upon the terms described below, pursuant to which Landlord shall agree, for so long

as such Qualified Subtenant is not in default under its Qualified Sublease, as defined below, that the Qualified Sublease shall not be terminated as a result of any termination of this Lease and such Qualified Subtenant's use and occupancy of the premises demised pursuant to the Qualified Sublease shall not be disturbed by Landlord, and pursuant to which such Qualified Subtenant shall agree to attorn to Landlord or its successor as landlord under the Qualified Sublease upon any termination of this Lease. Said agreement shall further provide that nothing therein contained shall impose any obligation on the Landlord, the then owner or the Lender to (a) return or apply any security deposited under such sublease, unless such security shall be transferred and turned over to the Landlord, such then owner or Lender or its successors, (b) expend any sums to make any installations or alterations provided to be made by the sublessor under said sublease or reimburse the subtenant under said sublease for any installations or alterations made by it, (c) be liable for any act or omission of any prior sublessor except that the foregoing shall not prevent any subtenant's exercising any right of termination (and, with respect to any Shop Tenant, any right of substitute cure and resulting offsets against rent) as the result of any continuing default of the prior sublessor relating to its repair, maintenance or service obligations under the Qualified Sublease, (d) be subject to any offsets or defense which such subtenant might have against any prior sublessor, (e) be bound by any rent or additional rent which such subtenant might have paid for more than the current rent (which shall not be paid more than one month in advance) to any prior sublessor, or (f) be bound by any amendment or modification of the sublease made without the prior written consent of Landlord, the terms of which amendment or modification if included in the original sublease would have prevented such sublease from meeting the criteria for a Qualified Sublease. Any subtenant under a Qualified Sublease, as defined below, is a "Qualified Subtenant." With respect to any Spec Space, a "Qualified Sublease" shall be any sublease of the Spec Space, or any portion thereof that (w) requires the tenant thereunder to pay at least its pro rata share (based on the portion of the gross leasable area at the Leased Premises demised under the Qualified Sublease) of Taxes assessed against the Leased Premises and common area facility and maintenance costs and operating expenses incurred with respect to the Leased Premises (which payment amounts may be included in the rent such Qualified Subtenant is required to pay), (x) exculpates the Landlord, its successor and assigns (including any mortgagee of Landlord

SENT BY: XEROX Telecopier 7017;11-7-95 ; 1:24AM ;        214746538Ø→        5040038;#32

or purchaser at sale pursuant to foreclosure under any mortgage granted by Landlord) from all personal liability whatsoever under the Qualified Sublease regardless of whether Landlord or such successor or assign becomes the landlord under the Qualified Sublease, and (y) requires such Qualified Subtenant to maintain the nonstructural components of the premises demised under the Qualified Sublease in accordance with the maintenance standards set forth in this Lease, and (z) requires the Qualified Subtenant to maintain insurance coverage in accordance with the standards set forth in paragraph 13 (or reimburse the sublessor for maintaining such coverage). With respect to the Anchor Space, a "Qualified Sublease" shall be any "bond" or "absolute net" sublease (that is, a sublease that requires the uninterrupted payment of rent without offset or diminution and that places no obligations upon the sublessor thereunder other than those of the type placed upon Landlord hereunder) of the entire Anchor Space expiring no later than the last day of the second renewal period hereunder pursuant to which the subtenant thereunder had, at the time such sublease was entered into, a Standard & Poor's investment grade rating of at least BBB- or a Moody's investment grade rating of at least Baa3 (or equivalent rating of any other generally recognized rating organization) and was not on credit watch and pursuant to which the subtenant thereunder is required to fulfill all of the obligations of Tenant hereunder with respect to the anchor space, including, without limitation, payment of rent at a rate equal to or greater than the rate at which Tenant is required to pay Rent hereunder.

(d)     Tenant hereby irrevocably and unconditionally assigns to Landlord all rents and other sums of money (the "Sublease Rents") payable under any sublease of any of the Leased Premises. Tenant shall have a revocable license to collect and enjoy the Sublease Rents and to retain and use the Sublease Rents. Such license may be revoked by Landlord, without notice to Tenant, upon the occurrence of an Event of Default under this Lease. Unless and until such license is so revoked, Tenant agrees to apply the proceeds of the Sublease Rents to the payment of Rent under this Lease and to operation and maintenance charges relating to the Leased Premises which are due and payable at the time of collection of such proceeds of the Sublease Rents before using such proceeds for any other purpose. Landlord agrees to re-assign to Tenant all of Landlord's right, title and interest in and to the Sublease Rents upon any acquisition of the Leased Premises by Tenant, including pursuant to paragraph 12 hereof.

MWBB 11/6/95

28

18.   Permitted Contests.  Notwithstanding any provision of this Lease to the contrary, after prior written notice to Landlord, Tenant shall not be required to (i) pay any Tax, (ii) comply with any Legal Requirement, or (iii) discharge or remove any lien, so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (v) the collection of, or other realization upon, the Tax or lien so contested, (w) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same and to pay any damages caused by the violation of any such Legal Requirement, (x) any interference with the use or occupancy of any of the Leased Premises, (y) any interference with the payment of any Basic Rent or any Additional Rent, and (z) the cancellation of any fire or other insurance policy.  In no event shall Tenant pursue any contest with respect to any Tax, Legal Requirement, or lien referred to above in such manner that exposes Landlord to any criminal or material civil liability, penalty or sanction for which Tenant has not made provisions acceptable to Landlord and Lender in its sole discretion.  While any such proceedings are pending and being prosecuted as required hereunder and the required security is held by Lender or Landlord, in that order, Lender or Landlord, as the case may be, shall not have the right to pay, remove or cause to be discharged the Tax, Legal requirement or lien thereby being contested unless any one or more of the conditions in subdivisions (v) through (z) shall not be prevented during the pendency of the contest.  Upon reasonable notice to Tenant, Landlord and Lender shall be entitled to intervene in any such contest, at Tenant's expense, if such intervention is reasonably deemed necessary by either such party's counsel.  Tenant further agrees to keep Landlord and Lender informed as to the status of any such contest and to provide Landlord and Lender information reasonably requested with respect thereto.  Tenant further agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as all of the conditions of the first sentence of this Paragraph 18 are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations.  Tenant shall promptly pay any and all judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination

MWBB 11/6/95
7765PalmaldNetmberd7licum.ne

29

of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof, before any action may be taken with respect to the foreclosure or other enforcement of any such judgments or decrees.

19.   Default.  The occurrence of any one or more of the following events shall constitute an Event of Default under this Lease:

(a)   Tenant's failure to make any payment of Basic Rent when due which continues unremedied for a period of five (5) days after notice thereof from Landlord or Lender.

(b)   Tenant's failure to make payment of Additional Rent or other sum herein required to be paid by Tenant and such default shall continue for a period of fifteen (15) days after notice by Landlord or Lender to Tenant.

(c)   Tenant's failure to duly perform and observe, or Tenant's violation or breach of, any other provision hereof if such failure shall continue for a period of thirty (30) days after notice thereof from Landlord or Lender or if such failure cannot be cured within such period of thirty (30) days, such period shall be extended for such longer time as reasonably necessary provided that Tenant has commenced to cure such default within said initial period of thirty (30) days and is actively, diligently and in good faith proceeding with continuity to remedy such failure.

(d)   The original Tenant named herein shall (i) voluntarily be adjudicated a bankrupt or insolvent, or (ii) consent to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (iii) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (iv) make a general assignment for the benefit of creditors.

(e)   A court shall enter an order, judgment or decree appointing, with the consent of Tenant, a receiver or trustee for it or for any of the Leased Premises or approving a petition filed against Tenant which seeks relief under the bankruptcy or other similar laws of

the United States, any state or any jurisdiction, and such order, judgment or decree shall remain in force, undischarged or unstayed, sixty days after it is entered.

        (f)    The original Tenant named herein shall in any insolvency proceedings be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution.

        (g)    The estate or interest of Tenant in any of the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within sixty (60) days after such levy or attachment.

        (h)    The occurrence of an "Event of Default" under any Cross-Defaulted Lease that arises from a failure by Tenant to make payment of Basic Rent or Additional Rent or other sum required to be paid by Tenant to Landlord or from the failure of Tenant to maintain any insurance required to be maintained under such Cross-Defaulted Lease.

        (i)    The occurrence of an event of default, or any act, omission or condition which, with notice, lapse of time or both would constitute an event of default, under the Lot Lease, except to the extent the same is directly caused by the actions of Landlord.

        20.    <u>Landlord's Remedies</u>. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

        (a)    Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Leased Premises, in which event Landlord shall have the right to collect Basic Rent, Additional Rent and other charges when due. In the alternative, Landlord shall have the right to peaceably re-enter the Leased Premises on the terms set forth in subparagraph (b) below, but without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Leased Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations

SENT BY: XEROX Telecopier 7011;11-7-95 ; 1:27AM ;          214/4559380→          504/6888;#36

of the Leased Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Leased Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Leased Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b)    Landlord (with the written concurrence of Lender) may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant the worth at the time of the award of all of the following:

(i)    Any obligation which has accrued prior to the date of termination.

(ii)    The amount by which the unpaid Basic Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

(iii)    The amount by which the unpaid Rent for the balance of the Term (excluding any option periods or portions thereof) after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided.

As used in this Paragraph the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of nine percent (9%) for past due obligations, and a discount rate to net present value of nine percent (9%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation. In the event this Lease shall

**MWBB 11/6/95**
7763hdcx4RelawbezZUama.at

32

be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Leased Premises and remove all persons and property therefrom, by summary dispossession proceedings.

(c)    Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Leased Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in performing the defaulted obligations of Tenant hereunder and in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)    The various rights and remedies reserved to Landlord herein, are cumulative, the rights and remedies described in paragraph 20(a)-(d) shall survive the termination of this Lease, and Landlord may pursue any and all such rights and remedies and all other rights and remedies available to Landlord under applicable laws of the State.

21.    Notices.    All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes on the earlier of (i) three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or (ii) one (1) day after

MWBB 11/6/95

having been sent by Federal Express or other nationally recognized air courier service, to the Addresses stated below, or (iii) on the date actually received by the recipient, whether sent by personal delivery, mail, air carrier, facsimile or otherwise:

        (a)     If to Landlord, at the address set forth on the first page of this Lease.

With a copy to:        Lorne O. Liechty, Esq.
                          Liechty, McGinnis & Kolitz
                          12750 Merit Drive, Suite 1150
                          Dallas, Texas  75251

        (b)     If to Tenant, at the address set forth on the first page of this Lease, Attention: Corporate Secretary.

With a copy to:        McGuire, Woods, Battle & Boothe, L.L.P.
                          One James Center
                          Richmond, Virginia 23219
                          Attention:  Robert L. Burrus, Jr.

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and stating in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall serve a copy of such Notice upon Lender in the manner aforesaid.  For the purposes of this Paragraph, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above.

        22.     <u>Memorandum of Lease: Estoppel Certificates.</u>   Tenant shall execute, deliver and record, file or register from time to time all such instruments as may be required by any present or future law in order to evidence the respective interests of Landlord and Tenant in any of the Leased Premises, and shall cause a memorandum of this Lease, and any supplement hereto or to such other instrument, if any, as may be appropriate, to be recorded, filed or registered and re-recorded, refiled or re-registered in such manner and in such places as may be required by any present or future law in order to give public notice and protect the validity of this Lease.  In the event of any discrepancy between the provisions of said recorded memorandum of this Lease or any other recorded instrument referring to this Lease and the

provisions of this Lease, the provisions of this Lease shall prevail. Landlord and Tenant shall, at any time and from time to time, upon not less than twenty days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, executed by Landlord or Tenant or, if other than an individual, by a President, Vice President or authorized general partner, principal officer or agent certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent payable hereunder has been paid, (iii) that to the knowledge of the party executing such certificate no default by either Landlord or Tenant exists hereunder or specifying each such of which such party may have knowledge; (iv) the remaining Term hereof; and (v) with respect to a certificate signed by Tenant, that to the knowledge of the party executing such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said party's knowledge, specifying and describing the same. It is intended that any such statements may be relied upon by Lender (and shall be addressed to Lender upon request), the recipient of such statements or their assignees or by any prospective purchaser, assignee or subtenant of the Leased Premises.

23.    <u>Surrender and Holding Over</u>. Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord in the same condition in which the Leased Premises were originally received from Landlord at the commencement of this Lease, except as to any repair or Alteration as permitted or required by any provision of this Lease, and except for ordinary wear and tear and damage by fire, casualty or condemnation that Tenant is not required to repair hereunder. Tenant may remove from the Leased Premises on or prior to such expiration or earlier termination Tenant's Trade Fixtures and personal property which are owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal. Tenant's Trade Fixtures and personal property not so removed at the end of the Term or within thirty days after the earlier termination of the Term for any reason

SENT BY: XEROX Telecopier 7011;11- 7-95 ; 1:29AM ;    →2174455380←    +094:8588#80

whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination. Upon such expiration on earlier termination, no party shall have any further rights or obligations except as specifically provided herein.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as tenancy at sufferance or at will only, at one hundred fifty percent (150%) of the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease except that no renewal options or extensions shall apply. Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred fifty percent (150%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 20.

24.    No Merger of Title. There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (ii) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (x) this Lease or the leasehold estate created by this Lease and (y) the fee estate in or ownership of the Leased Premises including, without limitation, Lender's interest therein, or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

25.    Landlord Exculpation. Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in the Leased Premises and shall not be enforced against the Landlord individually or personally.

MWBB 11/6/95

36

26.    Hazardous Substances.

(a)    Tenant represents and warrants that it will not on, about, or under the Leased Premises, make, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 *et seq.*, but the foregoing shall not prevent the use to the extent necessary and customary in normal retail operations of any such substances in accordance with applicable laws and regulations and Tenant represents and warrants that it will at all times comply with the Comprehensive Environmental Response, Compensation and Liability Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials or other laws pertaining to health, safety or the environment (including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act and the laws, statutes and regulations specified later in this paragraph, collectively, the "Acts"). Hazardous Materials as used herein shall include, without limitation, all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Acts; solid waste under the Resource Conservation and Recovery Act of 1976, as amended; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.*; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, *et seq.*, any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq.*, any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, *et seq.*, any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

(b)    To the extent required by the Acts and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous

**MWBB 11/6/95**

substances (as defined in the Acts) and Hazardous Materials (as defined above) whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the Initial Term or any extension or renewal Term thereof. Tenant shall and hereby does agree to defend, indemnify and hold Lender and Landlord, their officers, directors, shareholders, partners and employees harmless for, from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of the Acts or any other applicable federal, state or local environmental health or safety law, rule or regulation on, from or with respect to the Leased Premises, whether before or after the date of this Lease; (ii) the "release" or "threatened release" of or failure to remove, as required by this Paragraph 26, "hazardous substances" (as defined in the Acts) and Hazardous Materials (as defined above) onto or from the Leased Premises or any portion or portions thereof, now or hereafter existing during the Initial Term and any extension or renewal Term whether or not arising out of or in any manner connected with Tenants' occupancy of the Leased Premises during the Initial Term or any extension or renewal Term. This indemnification shall survive the expiration or earlier termination of this Lease until the Claim Deadline as described in paragraph 34.

(c)    The Tenant represents and warrants that it will not install any underground storage tank without specific, prior written approval from the Landlord. The Tenant will not store combustible or flammable materials on the Leased Premises in violation of the Acts and any other federal, state or local laws, rules or regulations governing Hazardous Materials.

27.    Entry by Landlord. Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than 48 hours except in the case of emergency) to enter the Leased Premises at all reasonable business hours, and at all other times in the event of an emergency, for (i) the purpose of inspecting the same or for the purpose of doing any work under Paragraph 9, and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work),

and (ii) the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within twelve (12) months prior to the expiration of the Term of this Lease for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

28.   Statements. Tenant named herein shall submit to Lender and Landlord (i) within 45 days of the end of each fiscal quarter, quarterly balance sheets, income and cash flow statements for Tenant named herein; (ii) within 90 days of the end of each fiscal year, annual balance sheets, income and cash flow statements for Tenant named herein. Quarterly 10Qs as filed with the Securities and Exchange Commission shall satisfy the requirements contained in (i) herein. Copies of the 10Ks filed with the Securities and Exchange Commission will satisfy the requirement contained in (ii) herein. The obligations of Tenant named herein shall continue whether or not this Lease shall have been assigned.

29.   No Usury. The intention of the parties being to conform strictly to the usury laws now in force in the State, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

30.   Broker. Landlord and Tenant represent and warrant to each other that neither party negotiated with any broker in connection with this Lease and that this Lease was negotiated directly by Landlord and Tenant. Each party hereby agrees to indemnify the other for all losses, damages, claims and expenses (including without limitation attorneys' fees) incurred by the indemnified party as a result of the actions of the indemnifying party to the extent such actions are in conflict with the foregoing representation and warranty.

31.   Waiver of Landlord's Lien. Landlord hereby waives any right to distrain Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is created or otherwise. Landlord agrees, at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant. Landlord acknowledges and agrees in the

future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that Trade Fixtures are Tenant's property and not part of Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

32.    No Waiver.  No delay or failure by either party to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.

33.    Separability.  If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

34.    Indemnification.  Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender and their respective officers, directors, shareholders, partners, agents, employees and representatives for, from and against any and all liabilities, losses, damages, penalties, costs, expenses (including without limitation reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused, arising from Tenants' breach of its obligations hereunder (including without limitation under paragraph 26 above) or arising from any of the Leased Premises or Adjoining Property or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of any of the Leased Premises or Adjoining Property, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon (collectively, "Losses"), whether or not Landlord or Lender has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said Loss.  In case any action or proceeding is brought against an Indemnified party by reason of any such Loss, Tenant covenants upon notice from Landlord or such indemnified party to defend Landlord and such indemnified party in such action, with the expenses of such defense paid by Tenant, and Landlord will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.  Tenant's

SENT BY: XEROX Telecopier 7011;11- 7-95 ; 1:32AM ;    21474455380→    5046988;#45

indemnification obligations under this paragraph 34 and under any other provision of this Lease shall survive the expiration or earlier termination of this Lease but shall expire and be of no further force and effect unless Landlord or Lender has served written notice upon Tenant, by the Claim Deadline, as defined below, of the intent to make a claim upon Tenant under such indemnity. The "Claim Deadline" shall be:

(a)    to the extent of any indemnification obligation (other than an indemnification obligation arising under paragraph 26 of this Lease) arising as a result of the claim by a third party against Landlord or Lender or any other indemnified party, or the claim of a third party against the Leased Premises, the date that is 30 days after the expiration of the period during which such third party claim may be brought under the applicable statute of limitations or if later, 30 days after an indemnified party is served with notice of suit filed within such statute of limitations period;

(b)    with respect to any indemnification obligation of Tenant other than those described in subparagraph (a) above, the day that is two years after the expiration or earlier termination of this Lease.

35.    Lender as Third Party Beneficiary. Lender shall be deemed a third party beneficiary with respect to all provisions of this Lease that purport to confer benefits upon Lender or impose obligations upon Tenant or Landlord in order to protect the interests of Lender.

36.    Tenant to Comply With Reciprocal Easement Agreement. Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any reciprocal easement agreement, development agreement or any other agreement or document, whether or not of record, now affecting the Leased Premises, herein referred to collectively as "REA", and that Tenant shall comply with all of the terms and conditions of the REA during the term of this Lease. Tenant shall be deemed the "Owner" of the Leased Premises for purposes of the REA. Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Lender for, form and against any claim, loss or damage suffered by Landlord or Lender by reason of Tenant's failure to perform any obligations or pay any expenses as required under any REA or comply with the terms and conditions of any REA

**MWBB 11/6/95**
7MPwirvdMeisdbedNmse.no

41

as hereinabove provided during the term of this Lease. Tenant shall further indemnify and hold harmless Landlord for, from and against all damages, claims, costs and expenses (including without limitation attorneys fees) incurred by Landlord as a result of Tenant's entering into any amendment or supplement or modification of any REA that diminishes in any amount the value of the Leased Premises.

37.    Headings.  The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

38.    Modifications.  This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

39.    Successors, Assigns.  The covenants of this Lease shall run with the Land and bind Tenant, the heirs, distributees, personal representatives, successors and permitted assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns.  In the event there is more than one Tenant, the obligation of each shall be joint and several.

40.    Counterparts.  This Lease may be executed in several counterparts, which together shall be deemed one and the same instrument.

41.    Governing Law.  This Lease shall be governed by and construed according to the laws of the State.

42.    Transfer of Landlord's Interest.  Nothing contained herein shall be deemed to limit Landlord's right to sell, assign or otherwise transfer the Leased Premises and this Lease.  On a transfer or assignment by Landlord of its interest in this Lease (other than a collateral assignment) or all or part of the Leased Premises, Landlord shall thereby be released from any further personal obligations hereunder, and Tenant shall look solely to the interest of Landlord and its successors and assigns in and to the Leased Premises.

43.    Lot Lease; Ground Lease.  The parties hereby agree as follows with respect to the Lot Lease:

**MWBB 11/6/95**
7767\dfreal\fstarsbas2\leases.ag

42

(a)    Landlord shall not modify, amend or supplement the terms of the Lot Lease without the written consent of Tenant, and Landlord shall not exercise any right of renewal or extension under the Lot Lease without the written consent of Tenant.

(b)    Neither Landlord nor Tenant shall do any act that constitutes a violation or breach of the terms of the Ground Lease or the Lot Lease.

(c)    Tenant shall pay when due all rent and other charges required to be paid under the Lot Lease during the Term of this Lease and shall provide Landlord with evidence of such payment; Tenant shall timely perform all other duties and discharge all other obligations of the sublessee under the Lot Lease required to be performed or discharged during the Term of this Lease.  Landlord and Tenant shall deliver to the other copies of all notices or other correspondence received by such party related to the Lot Lease and the Ground Lease under which the Lot Lease constitutes a sublease of the property subject to such sublease and lease, promptly after such party's receipt of the same.

(d)    Landlord hereby grants to Tenant the right to exercise (and to serve any notices required or allowed in order to effect such exercise) any and all renewal options under the Lot Lease; provided, however, that (i) Tenant shall not exercise any such renewal option until the thirtieth (30th) day before the last day such option may be exercised, and (ii) upon any such exercise by Tenant, Tenant shall not thereafter exercise its right to terminate the Term of this Lease under paragraph 3 hereof if such termination would result in the remaining term of the Lot Lease being more than five years longer than the remaining Term of this Lease. Upon Tenant's request, Landlord shall join in any notice or other correspondence reasonably required to effect the exercise of a renewal option under the Lot Lease in accordance with the provisions of this paragraph 43(d).

(e)    By service of notice of its election to do so any time before the expiration or earlier termination of the Term of this Lease, Landlord may, at its election, with the consent of Lender if one then exists, re-assign to Tenant all of the rights of the subtenant under the Lot Lease, upon which re-assignment, Tenant shall re-assume and agree to indemnify Landlord with respect to all of the obligations of the subtenant under the Lot Lease.  Upon

Landlord's election to so re-assign the Lot Lease to Tenant, the parties shall enter into an agreement mutually satisfactory to the parties effecting such re-assignment and re-assumption.

(f)    Tenant further covenants and agrees to indemnify, defend and hold Landlord and Lender harmless for, from and against any claims, losses, damages, liabilities, costs or expenses (including, without limitation, attorneys' fees) suffered or incurred by Landlord or Lender by reason of or in any way related to (i) Tenant's failure to perform any obligations or pay any expenses of the sublessee as required under the Lot Lease or to comply with the terms and conditions of the Lot Lease during the term of this Lease, (ii) Tenant's failure to extend the renewal terms of the Lot Lease throughout the Term of this Lease (including any renewals thereof), (iii) Tenant's consenting to or entering into any amendment or supplement or modification of the Lot Lease or the Ground Lease (as hereinafter defined) without the prior written consent of Landlord, or (iv) the occurrence of any default under the terms of the Lot Lease or the Ground Lease, unless caused by Landlord or its agents, employees, contractors or invitees.

(g)    Notwithstanding anything herein contained to the contrary, neither the Lease nor any of Tenant's obligations hereunder (including, without limitation, the obligation to pay Rent) shall be affected in any manner whatsoever in the event of a default under, cancellation or termination of the Ground Lease or the Lot Lease for any reason whatsoever.

44.    Attorneys' Fees.  In the event either party to this Lease shall be required to commence or defend any action or proceeding against any other party to this Lease by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease, or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings. The identity of the "prevailing party" for purposes of this provision shall be deemed at issue in any such action or proceeding and shall be established by the trier of fact therein.

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

MWBB 11/6/95

44

LANDLORD:

WEC 95B WINSTON-SALEM LIMITED
PARTNERSHIP

By Wolverine Winston-Salem, Inc., a Texas
corporation, its general partner

By: _____

TENANT:

CIRCUIT CITY STORES, INC.

By: _____

MWBB 11/6/95
77CJadron/WewesbstZNams.ae

45

EXHIBIT A

EXHIBIT "A"

Parcel 1

Lying and being in Kinston Township and

BEGINNING at an iron pin located in the northwesterly right-of-way line of South Stratford Road at the point where said right-of-way line intersects with Ramp "C" leading to Interstate 40; running thence with the right-of-way line of South Stratford Road two bearings and distances as follows: (1) South 32 deg. 34 min. 31 sec. West, 20.41 feet to an iron pin (2) on a curve to the left having a radius of 1,465.86 feet and a chord bearing and distance of South 34 deg. 49 min. 09 sec. West, 265.75 feet to an iron pin; thence North 52 deg. 51 min. 09 sec. West, 272.16 feet to an iron pin; thence South 57 deg. 15 min. 34 sec. West, 170.00 feet to an iron pin in the northern margin of Hanes Mall Boulevard; thence along the said margin of Hanes Mall Boulevard North 52 deg. 32 min. 16 sec. West, 50.00 feet to an iron pin; thence two calls along the line of Wal-Mart Properties, Inc. as described in Deed Book 1555, Page 450, Forsyth County Registry, North 57 deg. 19 min. 54 sec. East, 165.00 feet to an iron pin; thence continuing along the line of said Wal-Mart Properties, Inc. North 52 deg. 49 min. 53 sec. West, 111.12 feet to an iron pin; thence continuing along the line of Wal-Mart Properties, Inc. as described in Deed Book 1555, Page 4204, North 41 deg. 51 min. 22 sec. East, 455.06 feet to an iron pin in the margin of Ramp "C" leading to Interstate 40; thence with said right-of-way line of Ramp "C", south 25 deg. 59 min. 51 sec. East, 117.54 feet to a concrete monument; thence continuing with said ramp, South 44 deg. 01 min. 07 sec. East, 164.44 feet to and iron pin; thence South 50 deg. 27 min. 24 sec. East, 44.28 feet to a concrete monument; thence South 08 deg. 10 min. 20 sec. West, 71.00 feet to the POINT AND PLACE OF BEGINNING, containing 5.744 acres more or less, according to survey by Borum, Wade and Associates, P.A., dated October 4, 1995.

Parcel 2

BEGINNING at an iron pin in the northwesterly margin of South Stratford Road, said iron pin being at the southeastern corner of Parcel described above; thence along the line of South Stratford Road along a curve to the left having a radius of 1,465.86 feet and a chord bearing and distance of south 34 deg. 49 min. 25 sec. West, 84.59 feet to an iron pin thence continuing with said right-of-way line as it turns into Hanes Mall Boulevard, South 77 deg. 29 min. 07 sec. West, 111.91 feet to an iron pin thence continuing with the margin of Hanes Mall Boulevard, North 52 deg. 32 min. 16 sec. West, 204.11 feet to an iron pin thence along the line of Parcel 1 above, North 57 deg. 19 min. 54 sec. East, 170.00 feet to an iron pin thence continuing with Parcel 1 above, South 52 deg. 51 min. 09 sec. East, 272.16 feet to the POINT AND PLACE OF BEGINNING, containing 1.001 acres more or less, according to survey referred to in Parcel 1 above.

MWBB 11/6/95

## EXHIBIT B

1. Basic Rent for the initial term shall be at the annual rate of $536,250.

2. Basic Rent for the first renewal term shall be at the annual rate of $589,875.

3. Basic Rent for the second renewal term shall be at the annual rate of $643,500.

**MWBB 11/6/95**

**Exhibit "C"**
**Rejectable Offer Schedule-Winston/Salem**

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 1 | $5,500,000 |
| 2 | $5,492,432 |
| 3 | $5,484,613 |
| 4 | $5,477,142 |
| 5 | $5,469,419 |
| 6 | $5,461,845 |
| 7 | $5,453,818 |
| 8 | $5,445,538 |
| 9 | $5,436,006 |
| 10 | $5,430,918 |
| 11 | $5,421,970 |
| 12 | $5,413,663 |
| 13 | $5,406,734 |
| 14 | $5,397,529 |
| 15 | $5,388,270 |
| 16 | $5,380,854 |
| 17 | $5,372,563 |
| 18 | $5,364,155 |
| 19 | $5,355,670 |
| 20 | $5,347,127 |
| 21 | $5,338,527 |
| 22 | $5,329,869 |
| 23 | $5,321,153 |
| 24 | $5,312,378 |
| 25 | $5,303,563 |
| 26 | $5,294,545 |
| 27 | $5,285,696 |
| 28 | $5,276,691 |
| 29 | $5,267,606 |
| 30 | $5,258,659 |
| 31 | $5,249,271 |
| 32 | $5,240,010 |
| 33 | $5,230,587 |
| 34 | $5,221,302 |
| 35 | $5,211,653 |
| 36 | $5,202,340 |
| 37 | $5,192,763 |
| 38 | $5,183,121 |
| 39 | $5,173,414 |
| 40 | $5,163,642 |
| 41 | $5,153,804 |
| 42 | $5,143,900 |
| 43 | $5,133,927 |
| 44 | $5,123,889 |
| 45 | $5,113,782 |
| 46 | $5,103,607 |
| 47 | $5,083,364 |
| 48 | $5,083,061 |
| 49 | $5,072,689 |
| 50 | $5,062,217 |
| 51 | $5,051,694 |
| 52 | $5,041,101 |
| 53 | $5,030,435 |
| 54 | $5,019,636 |
| 55 | $5,008,868 |
| 56 | $4,898,006 |
| 57 | $4,987,060 |
| 58 | $4,976,019 |
| 59 | $4,964,915 |
| 60 | $4,953,738 |
| 61 | $4,842,481 |

Exhibit "C"
Rejectable Offer Schedule–Winston/Salem

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 62 | $4,931,759 |
| 63 | $4,918,742 |
| 64 | $4,906,250 |
| 65 | $4,890,696 |
| 66 | $4,885,058 |
| 67 | $4,873,339 |
| 68 | $4,861,541 |
| 69 | $4,949,653 |
| 70 | $4,837,709 |
| 71 | $4,726,688 |
| 72 | $4,813,549 |
| 73 | $4,801,346 |
| 74 | $4,789,095 |
| 75 | $4,776,684 |
| 76 | $4,764,349 |
| 77 | $4,751,715 |
| 78 | $4,739,097 |
| 79 | $4,726,393 |
| 80 | $4,713,604 |
| 81 | $4,700,729 |
| 82 | $4,687,769 |
| 83 | $4,674,716 |
| 84 | $4,661,576 |
| 85 | $4,648,351 |
| 86 | $4,535,035 |
| 87 | $4,621,630 |
| 88 | $4,608,133 |
| 89 | $4,594,546 |
| 90 | $4,580,867 |
| 91 | $4,567,096 |
| 92 | $4,553,231 |
| 93 | $4,539,273 |
| 94 | $4,525,221 |
| 95 | $4,511,074 |
| 96 | $4,496,832 |
| 97 | $4,482,493 |
| 98 | $4,468,058 |
| 99 | $4,453,525 |
| 100 | $4,438,896 |
| 101 | $4,424,165 |
| 102 | $4,409,336 |
| 103 | $4,394,407 |
| 104 | $4,379,377 |
| 105 | $4,364,246 |
| 106 | $4,349,013 |
| 107 | $4,333,677 |
| 108 | $4,318,237 |
| 109 | $4,302,693 |
| 110 | $4,287,044 |
| 111 | $4,271,290 |
| 112 | $4,255,429 |
| 113 | $4,239,462 |
| 114 | $4,223,386 |
| 115 | $4,207,202 |
| 116 | $4,190,909 |
| 117 | $4,174,506 |
| 118 | $4,157,992 |
| 119 | $4,141,366 |
| 120 | $4,124,628 |
| 121 | $4,107,778 |

Exhibit "C"
Rejectable Offer Schedule-Winston/Salem

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 122 | $4,090,814 |
| 123 | $4,073,735 |
| 124 | $4,056,561 |
| 125 | $4,039,231 |
| 126 | $4,021,806 |
| 127 | $4,004,260 |
| 128 | $3,986,597 |
| 129 | $3,968,816 |
| 130 | $3,950,913 |
| 131 | $3,932,890 |
| 132 | $3,914,745 |
| 133 | $3,896,479 |
| 134 | $3,878,088 |
| 135 | $3,859,574 |
| 136 | $3,840,935 |
| 137 | $3,822,169 |
| 138 | $3,803,278 |
| 139 | $3,784,258 |
| 140 | $3,765,111 |
| 141 | $3,745,834 |
| 142 | $3,726,427 |
| 143 | $3,706,889 |
| 144 | $3,687,219 |
| 145 | $3,667,416 |
| 146 | $3,647,480 |
| 147 | $3,627,409 |
| 148 | $3,607,203 |
| 149 | $3,586,861 |
| 150 | $3,566,391 |
| 151 | $3,545,783 |
| 152 | $3,525,006 |
| 153 | $3,504,108 |
| 154 | $3,483,070 |
| 155 | $3,461,889 |
| 156 | $3,440,566 |
| 157 | $3,419,089 |
| 158 | $3,397,467 |
| 159 | $3,375,729 |
| 160 | $3,353,824 |
| 161 | $3,331,771 |
| 162 | $3,309,570 |
| 163 | $3,287,218 |
| 164 | $3,264,716 |
| 165 | $3,242,062 |
| 166 | $3,219,255 |
| 167 | $3,196,294 |
| 168 | $3,173,179 |
| 169 | $3,148,907 |
| 170 | $3,126,478 |
| 171 | $3,102,891 |
| 172 | $3,079,145 |
| 173 | $3,055,238 |
| 174 | $3,031,170 |
| 175 | $3,006,940 |
| 176 | $2,982,546 |
| 177 | $2,957,988 |
| 178 | $2,933,264 |
| 179 | $2,908,373 |
| 180 | $2,883,314 |
| 181 | $2,658,086 |

**Exhibit "C"**
**Rejectable Offer Schedule-Winston/Salem**

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 182 | $2,832,687 |
| 183 | $2,807,118 |
| 184 | $2,781,375 |
| 185 | $2,755,459 |
| 186 | $2,729,360 |
| 187 | $2,703,101 |
| 188 | $2,676,657 |
| 189 | $2,650,034 |
| 190 | $2,623,231 |
| 191 | $2,596,246 |
| 192 | $2,569,080 |
| 193 | $2,541,734 |
| 194 | $2,514,200 |
| 195 | $2,486,481 |
| 196 | $2,458,575 |
| 197 | $2,430,480 |
| 198 | $2,402,196 |
| 199 | $2,373,721 |
| 200 | $2,345,053 |
| 201 | $2,316,193 |
| 202 | $2,287,137 |
| 203 | $2,257,885 |
| 204 | $2,228,436 |
| 205 | $2,198,789 |
| 206 | $2,168,940 |
| 207 | $2,138,891 |
| 208 | $2,108,639 |
| 209 | $2,078,183 |
| 210 | $2,047,521 |
| 211 | $2,016,652 |
| 212 | $1,985,574 |
| 213 | $1,954,286 |
| 214 | $1,922,790 |
| 215 | $1,891,079 |
| 216 | $1,859,154 |
| 217 | $1,827,014 |
| 218 | $1,794,657 |
| 219 | $1,762,082 |
| 220 | $1,729,286 |
| 221 | $1,696,270 |
| 222 | $1,663,030 |
| 223 | $1,629,567 |
| 224 | $1,595,877 |
| 225 | $1,561,960 |
| 226 | $1,527,814 |
| 227 | $1,493,438 |
| 228 | $1,458,829 |
| 229 | $1,423,988 |
| 230 | $1,388,910 |
| 231 | $1,353,597 |
| 232 | $1,318,045 |
| 233 | $1,282,252 |
| 234 | $1,246,219 |
| 235 | $1,209,942 |
| 236 | $1,173,420 |
| 237 | $1,136,652 |
| 238 | $1,099,636 |
| 239 | $1,062,370 |
| 240 | $1,024,852 |
| 241 | $987,082 |

Exhibit "C"
Rejectable Offer Schedule-Winston/Salem

| COLUMN "A" MONTHS | COLUMN "B" PRINCIPAL BALANCE |
|---|---|
| 242 | $948,050 |
| 243 | $910,773 |
| 244 | $872,233 |
| 245 | $833,432 |
| 246 | $794,369 |
| 247 | $755,043 |
| 248 | $715,451 |
| 249 | $675,592 |
| 250 | $635,464 |
| 251 | $595,066 |
| 252 | $554,394 |
| 253 | $513,448 |
| 254 | $472,226 |
| 255 | $430,725 |
| 256 | $388,945 |
| 257 | $346,882 |
| 258 | $304,536 |
| 259 | $261,904 |
| 260 | $218,984 |
| 261 | $175,774 |
| 262 | $132,273 |
| 263 | $88,479 |
| 264 | $44,388 |
| 265 | ($0) |

## EXHIBIT D

### List of Properties Subject to Cross Defaulted Leases

**WINSTON-SALEM, NORTH CAROLINA - #830**
1612 S. Stratford Road
Winston-Salem, NC
(Forsyth County)

**KILEEN, TEXAS (MINI) - #1612**
2500 East Central Texas Expwy, Suite C
Kileen, Texas 76543
(Bell County)

**MERCED, CALIFORNIA (FRESNO - MICRO) - #1628**
3275 "R" Street
Merced, California
(Merced County)

**SALISBURY, MARYLAND (MINI) - #3164**
2640 N. Salisbury Boulevard
Salisbury, Maryland 21801
(Wicomico County)

**GATEWAY, OREGON (PORTLAND) - #3315**
1638 N.E. 102nd Avenue
Portland, Oregon 97220
(Multnomah County)

**MWBB 11/6/95**