Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                          :    Chapter 11
                                :
CIRCUIT CITY STORES, INC.,      :    Case No. 08-35653 (KRH)
et al.,                         :
                                :
              Debtors.          :    Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS
105 AND 363 AND BANKRUPTCY RULES 2002 AND 6004
(A) AUTHORIZING SELLER TO ENTER INTO AGREEMENT FOR SALE
OF CERTAIN REAL PROPERTY IN WHITEHALL, PENNSYLVANIA
SUBJECT TO HIGHER OR OTHERWISE BETTER BIDS,
(B) APPROVING BIDDING PROCEDURES IN CONNECTION THEREWITH,
(C) APPROVING SALE FREE AND CLEAR OF ALL INTERESTS AND
(D) GRANTING RELATED RELIEF**

Circuit City Stores, Inc. (the "Seller," and

collectively with the debtors and debtors in possession

in the above-captioned jointly administered cases, the

"Debtors")[1] hereby move (the "Motion"), pursuant to

sections 105 and 363 of title 11 of the United States

Code (the "Bankruptcy Code") and Rules 2002 and 6004 of

the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for entry of an order (the "Order")

(A) authorizing the Seller to enter into the Agreement

(as defined herein), a copy of which is attached as

Exhibit A to the Sale Order, with the Purchaser (as

defined herein) for the sale (the "Sale") of the

Seller's real property located at Grape Street and

Jordan Boulevard in Whitehall, Pennsylvania (the

"Property"), subject to higher or otherwise better

proposals, (b) approving Bidding Procedures (as defined

herein) in connection therewith (C) approving the Sale

---

[1]   The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc.
(3875), Circuit City Stores West Coast, Inc. (0785), InterTAN,
Inc. (0875), Ventoux International, Inc. (1838), Circuit City
Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
Distribution Company of Virginia, Inc. (2821), Circuit City
Properties, LLC (3353), Kinzer Technology, LLC (2157), Abbott
Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796),
Sky Venture Corp. (0311), PRAHS, INC.(n/a), XSStuff, LLC (9263),
Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
LLC (3360), and Circuit City Stores PR, LLC (5512).  The address
for the Debtors is 4951 Lake Brook Drive, Suite #500, Glen Allen,
VA 23060.

2

free and clear of all Liens (as defined herein) and
(D) granting related relief.  In support of the Motion,
the Seller respectfully represents as follows:

**JURISDICTION AND VENUE**

1.    This Court has jurisdiction to consider
this Motion under 28 U.S.C. §§ 157 and 1334.  This is a
core proceeding under 28 U.S.C. § 157(b).  Venue of
these cases and this Motion in this District is proper
under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief
requested herein are Bankruptcy Code sections 105 and
363 and Bankruptcy Rules 2002 and 6004.

**BACKGROUND**

**A.    The Bankruptcy Cases.**

3.    On November 10, 2008 (the "Petition
Date"), the Debtors filed voluntary petitions in this
Court for relief under chapter 11 of the Bankruptcy Code.

4.    The Debtors continue as debtors in
possession pursuant to Bankruptcy Code sections 1107 and
1108.

5.    On November 12, 2008, the Office of the
United States Trustee for the Eastern District of

Virginia appointed a statutory committee of unsecured
creditors (the "Creditors' Committee").  To date, no
trustee or examiner has been appointed in these chapter
11 cases.

6.   On January 16, 2009, the Court authorized
the Debtors, among other things, to conduct going out of
business sales at the Debtors' remaining 567 stores
pursuant to an agency agreement (the "Agency Agreement")
between the Debtors and a joint venture, as agent (the
"Agent").  On January 17, 2009, the Agent commenced
going-out-of-business sales pursuant to the Agency
Agreement at the Debtors' remaining stores.  The going-
out-of-business sales were concluded on or about March 8,
2009.

7.   On September 29, 2009, the Debtors and
the Creditors Committee filed the First Amended Joint
Plan of Liquidation of Circuit City Stores, Inc. and its
Affiliated Debtors and Debtors In Possession and its
Official Committee of Creditors Holding General
Unsecured Claims (the "Plan").  The associated
disclosure statement (the "Disclosure Statement") was

approved on September 24, 2009.  Confirmation of the
Plan is currently scheduled for March 8, 2010.

8.    Generally, the Plan provides for the
liquidation of the Debtors under chapter 11 of the
Bankruptcy Code.

**RELIEF REQUESTED**

9.    By this Motion, the Seller seeks entry
of the Order (A) authorizing the Seller to enter into
the Agreement in connection the Sale of the Property,
subject to higher or otherwise better proposals,
(B) approving the Bidding Procedures in connection
therewith, (C) approving the Sale free and clear of all
Liens and (D) granting related relief.

**BASIS FOR RELIEF**

10.   As more fully set forth below, after a
comprehensive review, the Seller believes that the Sale
of the Property represents its best opportunity under
the circumstances to maximize the value of the Property.
Therefore, the Sale is in the best interests of its
estate and stakeholders.

**A.     The Property.**

11.   The Seller owns the Property at the intersection of Grape Street and Jordan Boulevard in Whitehall, Pennsylvania.   Prior to the conclusion of the going-out-of-business sales, Seller used the Property as a parking lot adjacent to one of its retail stores that Seller leased from the Purchaser.

**B.     Events Leading To The Sale.**

12.   In light of the failure to obtain any going concern bids and the decision to liquidate the Debtors' inventory, the Seller has been left with various assets -- including the Property -- for which it has no remaining use.   However, the sale of such assets, including the Sale of the Property, could result in recovery of significant proceeds for the Seller's estate and creditors.

13.   Since around the time of commencement of the going-out-of-business sales, the Seller, along with its real estate advisor, DJM Realty, LLC ("DJM"), has been marketing the Property.   As a result of these marketing efforts, the Seller received various proposals to purchase the Property.   Upon reviewing these

proposals, the Seller determined that the proposal submitted by the Purchaser was materially higher or otherwise better than the alternate proposals received. Thus, the Seller elected to proceed with the Sale of the Property to the Purchaser.

**C.    The Agreement.**

14.   On January 28, 2010, the Seller entered into an agreement (the "Agreement")[2] by and between the Seller and Dowel-Allentown, LLC (the "Purchaser").

15.    Pursuant to the Agreement, the Seller has agreed to sell the Property to the Purchaser for $60,000 (the "Purchase Price"), subject to higher or otherwise better proposals.

16.    The significant terms of the Agreement are as follows:[3]

(a)   General Terms.   The Purchaser would acquire the Property, consisting solely of the Seller's right, title and interest in and to the Property, together with all the rights and appurtenances pertaining thereto.

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

[3]   In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of the Agreement are controlling.

(b) <u>Sale</u>.  The Property would be sold free and clear of all liens (including the liens of the Seller's post-petition lenders and liens for past-due real property taxes), claims and encumbrances (collectively, the "Liens"), except for (i) liens for real property taxes and assessments that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, of record and (iv) any and all matters that would be shown by a physical inspection of the Property, but excluding any Mandatory Cure Items (as defined in the Agreement) related to any objections related to Seller's title (collectively, the "Permitted Encumbrances").

(c) <u>Bankruptcy Court Approval</u>.  The Sale of the Property would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures (as defined below).

(d) <u>Purchase Price</u>.  The Purchase Price to be paid by the Purchaser for the Property would be $60,000.

(e) <u>Deposit</u>.  In accordance with the Agreement, the Purchaser has delivered to Tallman, Hudders & Sorrentino, as Agent for First American Title Insurance Company (the "Escrow Agent"), the amount of $6,000 (the "Deposit"). If the Sale is consummated under the Agreement, the Deposit shall be applied to the Purchase Price.  If the Agreement is terminated prior to Closing of the Sale because of the Purchaser's breach of the Agreement (on the terms as provided in the Agreement), Seller would be entitled to retain the Deposit as Seller's sole recourse.

(f) <u>Documentation</u>.  The Sale would be effected pursuant to the Agreement and related documentation.

(g) <u>Representations And Warranties</u>.  Pursuant to the Agreement, the Seller would provide certain standard representations and warranties relating to the Sale of the Property and the Purchaser would provide

8

representations and warranties generally standard in a
transaction of this type.  The representations and
warranties of the Seller would expire and be
extinguished at the Closing.  The representations and
warranties of the Purchaser would survive indefinitely
following the Closing or the termination of the
Agreement.

(h)  <u>Closing</u>.  The closing of the Sale of the
Property (the "Closing") shall occur on (i) the date
which is five (5) business days after the date of entry
by the Court of the Sale Order or (ii) a later date
pursuant to agreement between Seller and Purchaser.

(i)  <u>Termination</u>.  The Agreement could be
terminated prior to Closing in the following
circumstances:  (i) by the Purchaser, if an action is
initiated to take any material portion of the Property
by eminent domain proceedings, (ii) by the Purchaser or
the Seller if the Court shall not enter the Sale Order
by September 30, 2010, in the event that the Seller
shall fail to consummate the transactions contemplated
by the Agreement, or (iii) by the Seller, in order to
permit the Seller to accept a higher or better offer for
the Property pursuant to the Bidding Procedures.

**D.   The Bidding Procedures.**

17.   To ensure that the Seller receives the

highest or otherwise best proposal for the Property, the

Seller will entertain any alternate proposals for the

Sale pursuant to the procedures set forth below (the

"Bidding Procedures").  The Seller accordingly requests

that this Court order that any parties, including those

parties that previously submitted proposals, who wish to

submit an alternate proposal for consideration by the

Debtors be required to do so by March 9, 2010 at 4:00

p.m. (ET) (the "Bid Deadline").  All bids are to be sent

to the following parties:

> (1) Circuit City Stores, Inc., 4951 Lake Brook
Drive, P.O. Box 5695, Glen Allen, VA 23058, Attn:
Michelle Mosier (michelle_mosier@ccswinddown.com);
> (2) Counsel to the Seller, Gregg M. Galardi
and Ian S. Fredericks, Skadden, Arps, Slate, Meagher &
Flom LLP, One Rodney Square, P.O. Box 636, Wilmington,
DE 19801 (gregg.galardi@skadden.com and
ian.fredericks@skadden.com);
> (3) Counsel to the Creditors' Committee, Jeff
Pomerantz, Pachulski Stang Ziehl & Jones LLP, 10100
Santa Monica Blvd., 11th Floor, Los Angeles, California
90067-4100, (jpomerantz@pszjlaw.com); and
> (4) DJM Realty Services, LLC, 445 Broadhollow
Road, Suite 225, Melville, New York 11747, Attn: James
Avallone, Fax: (631) 752-1231 (javallone@djmrealty.com).

18.   If the Seller receives any Qualified

Bids (as defined herein), the Seller would hold an

auction (the "Auction") on March 16, 2010 at 10:00 a.m.

(ET) telephonically or at the offices of Skadden, Arps,

Slate, Meagher & Flom LLP, One Rodney Square, Wilmington,

Delaware.  The Seller will advise the Purchaser and all

other parties that submitted a Qualified Bid of the

Auction.

19.   At the conclusion of any Auction, the

Seller, in consultation with its advisors (and

representatives of the Creditors' Committee), would

determine which bid constitutes the highest or otherwise best bid (the "Successful Bid").

20.   Following the Auction, if any, the Seller intends to proceed with a hearing to approve the Sale of the Property on March 18, 2010 at 10:00 a.m. (ET) (the "Sale Hearing").

21.   If no Qualified Bids other than the bid of the Purchaser are received, the Seller would proceed with the Sale to the Purchaser following entry of the Sale Order.  If the Seller receives additional Qualified Bids, then at the Sale Hearing, the Seller would seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid," and such bidder, the "Alternate Bidder").  A bid would not be deemed accepted by the Seller unless and until approved by the Court.

22.   Following approval of the Sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid would be deemed to be the Successful Bid and the Seller would be permitted to effectuate a sale

to the Alternate Bidder without further order of the
Court.

23.    To ensure that only bidders with a
serious interest in the purchase of the Property
participate in the bidding process, the Seller would
only consider the "Qualified Bids" of "Qualified
Bidders."  To be considered a "Qualified Bid" and a
"Qualified Bidder" for purposes of the Auction, the
person or entity submitting the bid would be required to
submit an offer by the Bid Deadline that includes:

> (a)  an executed copy of the Agreement marked
>      to show those amendments and
>      modifications to the Agreement that the
>      Qualified Bidder proposes (such modified
>      Agreement, a "Marked Agreement"),
>      including modifications to the Purchase
>      Price, which price must be at least
>      $65,000 (the "Initial Minimum Overbid");
>
> (b)  the potential bidder and the officer(s)
>      or authorized agent(s) who will appear on
>      behalf of such bidder;
>
> (c)  a statement that the bid shall not be
>      conditioned on the outcome of unperformed
>      due diligence by the bidder or any
>      financing contingency;
>
> (d)  a good faith deposit (the "Good Faith
>      Deposit") equal to $6,000 plus ten (10)
>      percent of the amount the bid exceeds the
>      Purchase Price;

       (e)   an acknowledgement that the bidder's offer is irrevocable until two (2) business days after the Closing of the Sale of the Property; and

       (f)   an acknowledgement that, in the event the bidder is the Alternate Bidder, the bidder will proceed with the purchase of the Property pursuant to the terms the Marked Agreement.

24.   The Seller reserves the right to (i) determine in its reasonable discretion (after consultation with representatives of the Creditors' Committee) which offer is the highest or otherwise best offer for the Property; (ii) reject at any time prior to the Closing of a Sale, without liability, any offer that the Seller in its reasonable discretion (after consultation with representatives of the Creditors' Committee) deems to be (x) inadequate or insufficient, (y) not in conformity with the requirements of the Bidding Procedures or applicable law or (z) contrary to the best interests of the Seller and its estate; (iii) re-open the Auction, (iv) withdraw the Property from the Auction, (v) waive the requirements of any of the Bidding Procedures with respect to a potential or Qualified Bidder if the Seller determines, in its

business judgment (after consultation with

representatives of the Creditors' Committee), it is in

the best interests of its estate and creditors, and

(vi) establish bid increments at the Auction, after

consultation with the Creditors' Committee.  The

Purchaser has agreed to all of the terms of the Bidding

Procedures, including (without limitation) the terms

(e) and (f) of the Qualified Bid requirements.

26. [sic 25.]   Objections to the Sale, if any, must be

filed and served no later than 4:00 p.m. (ET) on March

11, 2010.

## APPLICABLE AUTHORITY

## I.   APPROVAL OF THE SALE OF THE PROPERTY IS WARRANTED UNDER BANKRUPTCY CODE SECTION 363(b)(1).

26.   As set forth above, Bankruptcy Code

section 363(b)(1) authorizes a trustee to "use, sell, or

lease" property of the estate with the Court's approval.

11 U.S.C. § 363(b)(1).  Assets of the Debtors may be

sold outside of the ordinary course of business,

pursuant to Bankruptcy Code section 363(b)(1), if a

sound business purpose exists for doing so.  In re WBQ

P'ship, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)(citing

Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th
Cir. 1986)); see also In re W.A. Mallory Co., Inc., 214
B.R. 834, 836 (Bankr. E.D. Va. 1997).

27.   To satisfy the "sound business purpose
test," the debtor must demonstrate that (1) a sound
business reason or emergency justifies a pre-
confirmation sale; (2) the sale was proposed in good
faith; (3) the purchase price is fair and reasonable;
and (4) adequate and reasonable notice of the sale has
been provided.  In re WBQ P'ship, 189 B.R. at 102.

28.   Based upon the results of their analysis,
the Seller's management and advisors have concluded that
the Sale of the Property pursuant to the Agreement or a
higher or otherwise better offer would maximize the
value of the Property for the Seller's estate.
Maximizing asset value is a sound business purpose that
warrants authorizing the proposed Sale.

29.   The Sale of the Property will be subject
to competing bids, thereby enhancing the Seller's
ability to receive the highest or otherwise best value
for the Property.  Consequently, the fairness and
reasonableness of the consideration to be received by

15

the Seller will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

30.   Moreover, the Seller proposes to provide adequate notice of the Auction and the Sale Hearing as set forth below.  In light of the circumstances, such notice is reasonably calculated to provide timely and adequate notice to the Seller's major creditor constituencies, those parties most interested in these cases, those parties potentially interested in bidding on the Property and others whose interests are potentially implicated by the proposed Sale.

## II.   THE SALE PROCESS IS REASONABLE AND APPROPRIATE.

31.   Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Moreover, Bankruptcy Code section 105(a) provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

32.   The disposition of the Property pursuant
to the terms reflected in the Agreement resulted from
the bids submitted for the Property, pursuant to a
marketing process led by DJM.   Conducting a marketing
process through a third party broker represents an
accepted method of selling property.   Similar marketing
processes have been approved previously in this case and
in other chapter 11 cases.   See, e.g., In re Circuit
City Stores, Inc., Case No. 08-35653 (KRH)(Bankr. E.D.
Va. Mar. 20, 2009) (D.I. 2710); Ready v. Rice, 2006 WL
4550188 at *3 (D. Md. 2006); see also In re Reading
Broadcasting, Inc., 386 B.R. 562, 571-72 (Bankr. E.D. Pa.
2008); In re King-Wilson, 1998 WK 737887 at *4-5 (N.D.
Cal. 1998).

33.   In addition, bid procedures similar to
the Bid Procedures outlined above have been approved by
this Court in this case.   See, e.g., In re Circuit City
Stores, Inc., Case No. 08-35653 (KRH)(Bankr. E.D. Va.
Sept. 1, 2009) (D.I. 4733).

34.   Finally, other interested parties have
been and will be provided with an opportunity to submit
higher or otherwise better proposals and, if necessary,

the Seller will conduct an auction.  In light of the

foregoing, the Seller submits that the sale process is

reasonable and appropriate.

**III. THE PURCHASER OR SUCCESSFUL BIDDER SHOULD BE
AFFORDED THE PROTECTIONS OF SECTION 363(m) OF THE
BANKRUPTCY CODE AND THE TRANSACTIONS CONTEMPLATED
BY THE AGREEMENT SHOULD CARRY THE PROTECTIONS OF
SECTION 363(n) OF THE BANKRUPTCY CODE.**

35.  Section 363(m) of the Bankruptcy Code

provides:

> The reversal or modification on appeal of
> an authorization under subsection (b) or
> (c) of this section of a sale or lease of
> property does not affect the validity of
> a sale or lease under such authorization
> to an entity that purchased or leased
> such property in good faith, whether or
> not such entity knew of the pendency of
> the appeal, unless such authorization and
> such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not

define "good faith," the Fourth Circuit Court of Appeals

has "adopt[ed] the traditional equitable definition that

has been adopted by various courts of appeal: 'one who

purchases the assets for value, in good faith, and

without notice of adverse claims.'"  Willemain v. Kivitz,

764 F.2d 1019, 1023 (4th Cir. 1985)(citations omitted).

18

36.   Section 363(n) of the Bankruptcy Code further provides, in relevant part, that:

> The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount.

37.   Throughout the negotiations, the Purchaser has at all times acted in good faith. Moreover, to the extent that the Property is sold to a Successful Bidder, it will be because of a well-planned competitive process and negotiations at arm's length to be conducted at an auction.  Additionally, the Seller submits, and will present evidence at the Sale Hearing, that the Agreement reflects a negotiated, arm's length transaction.  As a result of the foregoing, the Seller requests that the Court make a finding that the total consideration to be paid by the Purchaser or the Successful Bidder constitutes reasonably equivalent value and fair consideration under any applicable law.

38.   The Seller, therefore, requests that this Court make a finding that the Purchaser or the Successful Bidder, as the case may be, has purchased the Property in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Further, the Seller requests that this Court make a finding that the Agreement or any purchase agreement reached as a result of the Bidding Procedures necessarily will comprise an arm's length, negotiated transaction entitled to the protections of section 363(m) of the Bankruptcy Code. Because the Purchaser's or Successful Bidder's bid is not the product of fraud or collusion between the Purchaser or Successful Bidder and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, the Seller furthers request that this Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

**IV.   THE SALE OF THE PROPERTY FREE AND CLEAR OF ALL INTERESTS SHOULD BE AUTHORIZED UNDER BANKRUPTCY CODE SECTION 363(f).**

39.   To facilitate a sale of the Property, the Seller requests authorization to sell the Property free

and clear of any and all Liens that may be asserted

against such Property, except the Permitted Encumbrances.

40.   Under section 363(f) of the Bankruptcy

Code, a debtor in possession may sell property free and

clear of any interest in such property if, among other

things:

> (1) applicable nonbankruptcy law permits sale
> of such property free and clear of such
> interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at
> which such property is sold is greater than
> the aggregate value of all liens on such
> property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal
> or equitable proceeding, to accept a money
> satisfaction of such interest.

11 U.S.C. § 363(f).

41.   Section 363(f) permits the sale of estate

property free and clear of interests if any one of the

five conditions above is met.  See, e.g., In re Laines,

352 B.R. 410, 414-15 (Bankr. E.D. Va. 2005).

42.   Courts have held that the authority of a

debtor to sell assets free and clear of interests is

broad and should be read expansively.  See In re TWA, Inc., 322 F.3d 283, 289 (3d Cir. 2003); see also United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.), 99 F.3d 573, 582 (4th Cir. 1996) (holding that the phrase "any interest in property" includes more than just in rem interests); In re P.K.R. Convalescent Centers, Inc., 189 B.R. 90, 94 (Bankr. E.D. Va. 1995)("As the plain meaning of the statute demonstrates, § 363 covers more situations than just sales involving liens.").  Moreover, courts have noted that the purpose of the "free and clear" language is to allow the debtor to obtain a maximum recovery on its assets in the marketplace.  See In re TWA, Inc., 2001 Bankr. LEXIS 723, at *8-*10 (Bankr. D. Del. Mar. 27, 2001).

43.  Accordingly, this Court should authorize the Seller to sell the Property free and clear of any and all Liens, except the Permitted Encumbrances, that may be asserted by any parties, with any such Liens attaching to the net proceeds of the sale of the Property in the same order and priority and subject to the same defenses as they exist against the Property.

22

V.      **THE TEN-DAY STAY PROVIDED BY BANKRUPTCY RULE 6004
        SHOULD BE WAIVED FOR ANY ORDER APPROVING THE SALE
        OF THE PROPERTY.**

44.   Bankruptcy Rule 6004(h) provides that:
"[a]n order authorizing the use, sale, or lease of
property of the estate is stayed until the expiration of
10 days after entry of the order, unless the court
orders otherwise."  Fed. R. Bankr. P. 6004(h).

45.   The Seller requests that the Court waive
the ten-day stay of Bankruptcy Rule 6004 with respect to
the Sale of the Property following the entry of the Sale
Order.  By waiving such requirements, the Seller and the
Purchaser or the Successful Bidder, as applicable, will
be able to immediately close the Sale.  This will result
in immediate proceeds to the Seller's estate.  Moreover,
the Agreement requires closing of the Sale to take place
within five (5) days of entry of the Sale Order.
Accordingly, the stay under Bankruptcy Rule 6004(h)
should be waived.

## NOTICE

46.   Notice of this Motion has been provided
to those parties entitled to notice under the
Supplemental Order Pursuant to Bankruptcy Code Sections

23

102 and 105, Bankruptcy Rules 2002 and 9007, and Local
Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain
Notice, Case Management and Administrative Procedures
(D.I. 6208; the "Case Management Order"), as well as
(a) all entities known to have expressed an interest in
a transaction regarding the Property during the past
three (3) months; (b) all entities reasonably known to
have a Lien on the Property; and (c) all federal, state,
and local regulatory or taxing authorities or recording
offices that have a reasonably known interest in the
relief requested by the Motion.  The Seller submits that,
under the circumstances, no other or further notice need
be given.

### WAIVER OF MEMORANDUM OF LAW

47.   Pursuant to Local Bankruptcy Rule 9013-
1(G), and because there are no novel issues of law
presented in the Motion and all applicable authority is
set forth in the Motion, the Seller requests that the
requirement that all motions be accompanied by a
separate memorandum of law be waived.

**NO PRIOR REQUEST**

48.   No previous request for the relief sought

herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Seller respectfully request that the Court (i) enter an Sale Order, substantially in the form annexed hereto, granting the relief requested herein, and (ii) such other and further relief as may be just and proper.

Dated: February 18, 2010
       Richmond, Virginia    SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                             Gregg M. Galardi, Esq.
                             Ian S. Fredericks, Esq.
                             P.O. Box 636
                             Wilmington, Delaware 19899-
                             0636 (302) 651-3000

                                      - and -

                             SKADDEN, ARPS, SLATE, MEAGHER
                             & FLOM, LLP
                             Chris L. Dickerson, Esq.
                             155 North Wacker Drive
                             Chicago, Illinois 60606
                             (312) 407-0700

                                      - and -

                             MCGUIREWOODS LLP

                             /s/ Douglas M. Foley _____
                             Dion W. Hayes (VSB No. 34304)
                             Douglas M. Foley (VSB
                             No. 34364)
                             One James Center
                             901 E. Cary Street
                             Richmond, Virginia 23219
                             (804) 775-1000

                             Counsel for Debtors and
                             Debtors in Possession

Gregg M. Galardi, Esq.              Dion W. Hayes (VSB No. 34304)
Ian S. Fredericks, Esq.            Douglas M. Foley (VSB No. 34364)
SKADDEN, ARPS, SLATE, MEAGHER &    MCGUIREWOODS LLP
FLOM, LLP                          One James Center
One Rodney Square                  901 E. Cary Street
PO Box 636                         Richmond, Virginia 23219
Wilmington, Delaware 19899-0636    (804) 775-1000
(302) 651-3000

              - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                          :    Chapter 11
                                :
CIRCUIT CITY STORES, INC.,      :    Case No. 08-35653 (KRH)
et al.,                         :
                                :
            Debtors.            :    Jointly Administered
- - - - - - - - - - - - - - x

**ORDER UNDER BANKRUPTCY CODE SECTIONS 105 AND 363 AND
BANKRUPTCY RULES 2002 AND 6004 AUTHORIZING AND APPROVING
THE SALE BY SELLER OF CERTAIN REAL PROPERTY LOCATED IN
WHITEHALL, PENNSYLVANIA FREE AND CLEAR OF LIENS AND
INTERESTS**

Upon the motion (the "Motion")[1] of Circuit City

Stores, Inc. (the "Seller," and collectively with the

---

[1]  Capitalized terms not otherwise defined herein shall have the
     meanings ascribed to such terms in the Motion.

debtors and debtors in possession in the above-captioned
jointly administered cases, the "Debtors") for entry of
an order pursuant to sections 105 and 363 of title 11 of
the United States Code (the "Bankruptcy Code") and Rules
2002 and 6004 of the Federal Rules of Bankruptcy
Procedure (the "Bankruptcy Rules"), (A) authorizing the
Seller to enter into the Agreement with Dowel-Allentown,
LLC (the "Purchaser") for the sale (the "Sale") of the
Seller's real property located at Grape Street and
Jordan Boulevard in Whitehall, Pennsylvania (the
"Property"), subject to higher or otherwise better
proposals, (B) approving the Bidding Procedures in
connection therewith, (C) approving the Sale free and
clear of all Liens and (D) granting related relief; and
upon the record of the auction conducted on March 16,
2010 (the "Auction") and the hearing held on March 18,
2010 (the "Sale Hearing"); and after due deliberation
thereon, and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

A.    The Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b).

B.    Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

C.    The statutory predicates for the relief requested in the Motion are Bankruptcy Code sections 105 and 363 and Bankruptcy Rules 2002 and 6004.

D.    The notice of the Motion, the Auction, and the Sale Hearing given by the Seller constitutes due and sufficient notice thereof.

E.    The Bidding Procedures are reasonable and appropriate and represent the best method for maximizing the realizable value of the Property.

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

F.    A reasonable opportunity to object or be heard regarding the relief in this Order has been afforded to all interested persons and entities.

G.    The Seller and its professionals marketed the Property and conducted a sale process as set forth in and in accordance with the Motion and the Bidding Procedures.  Based upon the record of these proceedings, all creditors and other parties in interest and all prospective purchasers have been afforded a reasonable and fair opportunity to bid on the Property.

H.    The Seller has demonstrated good, sufficient, and sound business purpose and justification for the Sale because, among other things, the Seller and its advisors diligently and in good faith analyzed all other available options in connection with the disposition of the Property and determined that (a) the terms and conditions set forth in the Agreement, (b) the transfer to the Purchaser of the Property pursuant thereto and (c) the purchase price (the "Purchase Price") agreed to by the Purchaser, $60,000, is fair and reasonable and constitutes the highest or otherwise best value obtainable for the Property.

I.     The Seller has full power and authority
to execute the agreement submitted by the Purchaser, a
copy of which is annexed hereto as <u>Exhibit A</u> (the
"Agreement") and all other applicable documents
contemplated thereby.  The transfer and conveyance of
the Property by the Seller have been duly and validly
authorized by all necessary action of the Seller.  The
Seller has all of the power and authority necessary to
consummate the transactions contemplated by the
Agreement and has taken all action necessary to
authorize and approve the Agreement and to consummate
the transactions contemplated thereby.  No consents or
approvals, other than those expressly provided for in
the Agreement, are required for the Seller to consummate
such transactions.

J.    The Agreement and the Sale of the
Property were negotiated and have been and are
undertaken by the Seller and the Purchaser at arms'
length without collusion or fraud, and in good faith
within the meaning of Sections 363(m) of the Bankruptcy
Code.  As a result of the foregoing, the Seller and the

Purchaser are entitled to the protections of Section
363(m) of the Bankruptcy Code.

K.    Neither the Seller nor the Purchaser
engaged in any conduct that would cause or permit the
Agreement or the consummation of the Sale to be avoided,
or costs or damages to be imposed, under Section 363(n)
of the Bankruptcy Code.

L.    The Purchase Price provided by the
Purchaser for the Property is the highest and best offer
received by the Seller, and the Purchase Price
constitutes (a) reasonably equivalent value under the
Bankruptcy Code and Uniform Fraudulent Transfer Act,
(b) fair consideration under the Uniform Fraudulent
Conveyance Act, and (c) reasonably equivalent value,
fair consideration and fair value under any other
applicable laws of the United States, any state,
territory or possession, or the District of Columbia,
for the Property.

M.    The Sale must be approved and consummated
promptly to obtain the value provided under the terms of
the Agreement.

N.    The transfer of the Property to the Purchaser is a legal, valid, and effective transfer of the Property, and shall vest the Purchaser with all right, title, and interest of the Seller to the Property free and clear of all liens (including the liens of the Seller's post-petition lenders and liens for past-due real property taxes), claims and encumbrances (collectively, the "Liens"), except for those items defined in the Agreement (and which are referred to hereinafter) as the "Permitted Encumbrances".

O.    If the Sale of the Property by the Seller were not free and clear of any Liens, except for the Permitted Encumbrances, as set forth in the Agreement and this Sale Order, or if the Purchaser would, or in the future could, be liable for any of the Liens, the Purchaser would not have entered into the Agreement and would not consummate the Sale contemplated by the Agreement, thus adversely affecting the Seller, its estate, and its stakeholders.

P.    The Seller may sell its interest in the Property free and clear of all Liens (except the Permitted Encumbrances) because, in each case, one or

more of the standards set forth in Bankruptcy Code

sections 363(f)(1)-(5) has been satisfied.  All holders

of Liens, if any, who did not object or withdrew their

objections to the Sale are deemed to have consented to

the Sale pursuant to 11 U.S.C. § 363(f)(2) and all

holders of Liens are adequately protected by having

their Liens, if any, attach to the cash proceeds of the

Sale ultimately attributable to the property against or

in which they claim an interest with the same priority,

validity, force, and effect as they attached to such

property immediately before the closing (the "Closing")

of the Sale.

Q.   Based on the foregoing findings of fact

and conclusions of law,[3] it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

1.   The Motion is GRANTED.

2.   Any and all objections to the Motion not

waived, withdrawn, settled, adjourned or otherwise

---

[3]   Statements made by the Court from the bench at the hearing on the
Motion shall constitute additional conclusions of law and
findings of fact as appropriate.

resolved herein are hereby overruled on the merits and denied with prejudice.

**A.    Approval Of The Agreement.**

3.    Pursuant to Bankruptcy Code section 363(b), the Agreement and all of the terms and conditions thereof are hereby approved.

4.    Pursuant to Bankruptcy Code section 363(b), the Seller is authorized and approved to perform its obligations under the Agreement and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the Agreement.

5.    The Seller is authorized, but not directed, to execute and deliver, and empowered to perform under, consummate, and implement all additional instruments and documents as may be reasonably necessary or desirable to implement the Agreement, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to possession the Property as contemplated by the Agreement.

6.    This Sale Order and the Agreement shall
be binding in all respects upon the Seller, all
stakeholders (whether known or unknown) of the Seller,
all affiliates and subsidiaries of the Seller, and any
subsequent trustees appointed in the Seller's chapter 11
case or upon a conversion to chapter 7 under the
Bankruptcy Code.  To the extent that any provision of
this Sale Order is inconsistent with the terms of the
Agreement, this Sale Order shall govern.

7.    The Agreement and any related agreements,
documents, or other instruments may be modified, amended,
or supplemented by the parties thereto, in a writing
signed by such parties, and in accordance with the terms
thereof, without further order of the Court; <u>provided</u>
that any such modification, amendment, or supplement is
disclosed to the Creditors' Committee and does not have
a material adverse effect on the Seller's estate, in the
good faith business judgment of the Seller.

**B.    Sale And Transfer Of The Property.**

8.    Pursuant to Bankruptcy Code sections
363(b) and 363(f), upon the consummation of the
Agreement, the Seller's right, title, and interest in

the Property shall be transferred to the Purchaser free

and clear of all Liens except the Permitted Encumbrances,

with all such Liens to attach to the cash proceeds of

the Sale in the order of their priority, with the same

validity, force, and effect which they had as against

the Property immediately before such transfer, subject

to any claims and defenses the Seller may possess with

respect thereto.

        9.    If any person or entity which has filed

financing statements, mortgages, mechanic's liens, lis

pendens, or other documents or agreements evidencing

Liens on or against the Property shall not have

delivered to the Seller prior to the Closing of the Sale,

in proper form for filing and executed by the

appropriate parties, termination statements, instruments

of satisfaction, releases of all Liens that the person

or entity has with respect to the Property, or otherwise,

then (a) the Seller is hereby authorized to execute and

file such statements, instruments, releases, and other

documents on behalf of the person or entity with respect

to the Property and (b) the Purchaser is hereby

authorized to file, register, or otherwise record a

11

certified copy of this Sale Order, which, once filed,

registered, or otherwise recorded, shall constitute

conclusive evidence of the release of all Liens on or

against the Property of any kind or nature whatsoever

except for the Permitted Encumbrances.

        10.   This Sale Order (a) shall be effective as

a determination that, upon the Closing of the Sale, all

Liens of any kind or nature whatsoever existing as to

the Seller or the Property prior to the Closing of the

Sale, except for the Permitted Encumbrances, have been

unconditionally released, discharged, and terminated

(other than any surviving obligations), and that the

conveyances described herein have been effected and (b)

shall be binding upon and shall govern the acts of all

entities including, without limitation, all filing

agents, filing officers, title agents, title companies,

recorders of mortgages, recorders of deeds, registrars

of deeds, administrative agencies, governmental

departments, secretaries of state, federal, state, and

local officials, and all other persons and entities who

may be required by operation of law, the duties of their

office, or contract, to accept, file, register, or

otherwise record or release any documents or instruments,
or who may be required to report or insure any title or
state of title in or to any of the Property.

11.  All persons and entities, including, but
not limited to, all debt security holders, equity
security holders, governmental, tax, and regulatory
authorities, lenders, trade stakeholders, and other
stakeholders, holding Liens of any kind or nature
whatsoever against or in the Seller or the Property,
except the Permitted Encumbrances (whether legal or
equitable, secured or unsecured, matured or unmatured,
contingent or non-contingent, senior or subordinated)
arising under or out of, in connection with, or in any
way relating to the Property prior to the Closing of the
Sale, or the transfer of the Property to the Purchaser,
hereby are forever barred, estopped, and permanently
enjoined from asserting against the Purchaser, its
successors or assigns, its property, or the Property,
such persons' or entities' Liens.  Nothing in this Sale
Order or the Agreement releases or nullifies any
liability to a governmental agency under any
environmental laws and regulations that any entity would

13

be subject to as owner or operator of the Property after

the date of entry of this Sale Order.  Nothing in this

Sale Order or the Agreement bars, estops, or enjoins any

governmental agency from asserting or enforcing, outside

the Court, any liability described in the preceding

sentence.  Notwithstanding the above, nothing herein

shall be construed to permit a governmental agency to

obtain penalties from the Purchaser for days of

violation of environmental laws and regulations prior to

the Closing of the Sale.

**C.    Additional Provisions**

         12.   The Purchase Price provided by the

Purchaser for the Property under the Agreement is hereby

deemed to constitute reasonably equivalent value and

fair consideration under the Bankruptcy Code, the

Uniform Fraudulent Conveyance Act, the Uniform

Fraudulent Transfer Act, and under the laws of the

United States, and any state, territory, or possession

thereof, or the District of Columbia.

         13.   The Purchase Price provided by the

Purchaser for the Property under the Agreement is fair

and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

14.   Upon the Closing, this Sale Order shall be construed as and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Property or a bill of sale transferring good and marketable title in the Property to the Purchaser pursuant to the terms of the Agreement.

15.   The transactions contemplated by the Agreement are undertaken by the Seller and the Purchaser at arm's length, without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of the Property shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.  The Purchaser is a purchaser in good faith, within the meaning of section 363(m) of the Bankruptcy Code, of the Property and is, and shall be, entitled to all of the

15

protections afforded by such section and in accordance therewith.

16.   The failure specifically to include or to reference any particular provision of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety.

17.   The Closing of the Sale shall occur upon the later of (i) five (5) business days of entry of this Order or (ii) a date on which the Purchaser and Seller have agreed.

18.   If the Purchaser fails to close on the purchase of the Property in accordance with the terms of the Agreement due to no fault of the Seller and Seller is not in default of its obligations under such Agreement, then Seller's counsel shall file with the Court and serve upon the Purchaser, [   ] (the "Alternate Bidder") and their counsel, a notice of such default, which shall include a copy of the Alternate Bidder's agreement upon which the Seller will then close, in which case (i) Seller shall be deemed authorized to

close on the Sale of the Property with the Alternate

Bidder on ten (10) days' advance written notice to the

Alternate Bidder, and (ii) the Alternate Bidder shall be

afforded all of the protections originally afforded to

the Purchaser under this Sale Order and the findings

herein as to adequacy and fairness of consideration paid

and good faith shall be deemed to apply to the Alternate

Bidder, its Alternate Bid, and its purchase and sale

agreement with the Seller, without the necessity of

further order of this Court.

19.   All deposits submitted to the Seller for

the Property, if any, shall be returned to the bidders

that submitted such deposits no later than five (5)

business days after the Closing of the Sale with the

Purchaser (or the Alternate Bidder, as the case may be),

except in the case of a bidder who closed on the Sale of

the Property or who was required to close in accordance

with the terms of this Sale Order but failed to do so in

breach of its contractual obligations through no fault

of the Seller.

20.   This Order shall be effective and
enforceable immediately upon entry and shall not be
stayed pursuant to Bankruptcy Rules 6004(h).

21.   The requirement under Local Bankruptcy
Rule 9013-1(G) to file a memorandum of law in connection
with the Motion is hereby waived.

22.   This Court retains exclusive jurisdiction
to interpret, construe, enforce, and implement the terms
and provisions of this Sale Order, the Agreement, all
amendments thereto, any waivers and consents thereunder,
and of each of the agreements executed in connection
therewith in all respects, including, but not limited to,
retaining jurisdiction to (a) compel delivery of the
Property to the Purchaser, (b) compel delivery of the
purchase price or performance of other obligations owed
to the Seller pursuant to the Agreement, (c) resolve any
disputes arising under or related to the Agreement, the
Alternate Bid, and any deposit delivered to Seller by a
bidder for the Property, (d) interpret, implement, and
enforce the provisions of this Sale Order, and
(e) protect the Purchaser against any Lien against the
Seller or the Property of any kind or nature whatsoever,

except for Permitted Encumbrances, which Liens, valid

and timely perfected, shall attach to the proceeds of

the Sale.

Dated:  Richmond, Virginia
        _____, 2010


        _____
        UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

        - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

        - and -

/s/ Douglas M. Foley
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and Debtors in Possession

### CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

        Pursuant to Local Bankruptcy Rule 9022-1(C), I
hereby certify that the foregoing proposed order has
been endorsed by or served upon all necessary parties.

                          /s/ Douglas M. Foley

20

**Exhibit A**

**(Agreement)**

## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of January 28, 2010, is made by and between CIRCUIT CITY STORES, INC., a Virginia corporation ("Seller"), and DOWEL-ALLENTOWN, LLC, a Pennsylvania limited liability company ("Purchaser").

## RECITALS

Seller is a debtor in possession in a Chapter 11 bankruptcy case (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). Upon the terms and conditions of this Agreement, Seller desires to sell and convey, and Purchaser desires to purchase and acquire, the Property (as defined below). This Agreement and the purchase and sale of the Property are subject to the approval of the Bankruptcy Court. As contemplated by Section 9.2 of this Agreement, Seller will prepare and file the Sale Motion (as defined below) seeking approval of this Agreement.

In consideration of the mutual covenants and representations herein contained, intending to be legally bound, Seller and Purchaser agree as follows:

1. PURCHASE AND SALE

1.1   Purchase and Sale.   Subject to the terms and conditions of this Agreement, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, all of the Seller's right, title and interest in and to that certain real property located in Whitehall, Pennsylvania and being more particularly described on Exhibit A attached hereto and made a part hereof, together with all the rights and appurtenances pertaining to such land (herein collectively called the "Property").

2. PURCHASE PRICE

2.1   Purchase Price.   The purchase price (the "Purchase Price") for the Property shall be SIXTY THOUSAND AND NO/100 DOLLARS ($60,000.00). At Closing (as defined below), the Purchase Price, less the Deposit (as defined below), shall be paid into the Escrow Agent's (as defined below) escrow account in cash by Purchaser by wire transfer in accordance with wire transfer instructions to be provided by Escrow Agent, as adjusted by prorations and payment of expenses as herein provided.

1

3.    DEPOSIT

   3.1    Deposit.    Concurrently with execution of this Agreement, Purchaser shall deliver to Tallman, Hudders & Sorrentino, the Pennsylvania Office of Norris McLaughlin & Marcus, P.A., as Agent for First American Title Insurance Company ("Escrow Agent"), c/o Jocelyn Hamlin, 1611 Pond Road, Suite 300, Allentown, Pennsylvania 18104, Phone: (610) 391-1800 ext. 2304, Fax: (484) 765-2240, Email: jhamlin@thslaw.com, by wire transfer or cashier's check payable to Escrow Agent, an amount equal to SIX THOUSAND AND NO/100 DOLLARS ($6,000.00) (which amount, together with all interest accrued thereon, is herein called the "Deposit") to be held by Escrow Agent in a non-interest-bearing account in a federally insured financial institution in the Allentown, Pennsylvania metropolitan area, or in such other non-interest-bearing account or investment as the parties hereto shall direct.

   3.2    Application of Deposit.    If the sale of the Property is consummated under this Agreement, at Closing, the Deposit shall be paid to Seller and applied to the payment of the Purchase Price.  If Purchaser terminates this Agreement in accordance with Section 4.2, Section 4.3, Section 6.8, Section 7.1, or Section 8.1 hereof, or if Purchaser or Seller terminates this Agreement in accordance with Section 9.4, the Deposit shall be returned promptly by Escrow Agent to Purchaser, and no party hereto shall have any further obligations under this Agreement except for such obligations that survive termination of this Agreement as expressly set forth in this Agreement (the "Survival Obligations").  If Seller terminates this Agreement in accordance with Section 8.2 or Section 10.11, Escrow Agent shall pay the Deposit to Seller, and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations. Purchaser agrees to deliver to Seller copies of all Reports (as defined in Section 4.4 hereof) at the time the notice to terminate this Agreement is given. The obligation to deliver the Reports shall survive the termination of this Agreement. Purchaser shall not be entitled to the return of the Deposit from Escrow Agent until all Reports have been delivered to Seller.

4.    PREPURCHASE MATTERS

   4.1    Items Delivered.    Seller has previously delivered to Purchaser those items within Seller's possession related to or affecting the Property (if any) to be used by Purchaser in conducting Purchaser's due diligence investigation of the Property during the Due Diligence Period.

   4.2    Title Examination.    Purchaser shall have the right to examine Seller's title to the Property and a survey of the Property and shall give written notice (the "Title Objections Notice") to Seller within three (3) business days from and after the execution

2

and delivery of this Agreement by Seller and Purchaser of any objections thereto; provided, however, Seller shall have no obligation to satisfy any such objections. Seller shall give written notice (the "Seller's Response") within three (3) business days after receipt of the Title Objections Notice of whether it agrees to cure such objections prior to Closing. Failure of Seller to send the Seller's Response in such time shall conclusively be deemed Seller's election not to cure such objections. Purchaser must elect, on or before the expiration of the Due Diligence Period (as hereinafter defined), one of the following: (i) to waive any such objections that Seller has not agreed to satisfy at or prior to the Closing and to close the transaction in accordance with the terms of this Agreement; or (ii) to terminate this Agreement, in which event Escrow Agent shall promptly return the Deposit to Purchaser as Purchaser's sole and exclusive remedy and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations; provided, however, if Seller has agreed to cure or satisfy each such objection specified in the Title Objections Notice (any such items that Seller has agreed to cure, together with any matters first coming of record after November 28, 2009, the date of Purchaser's title commitment for the Property, collectively, the "Mandatory Cure Items"), then no such election shall be required and Purchaser shall be obligated to close the transaction in accordance with the terms of this Agreement and Seller shall be obligated to satisfy each such objection specified in the Title Objections Notice; provided, further, if Purchaser does not send a written notice of objections within the period specified herein, or does not make such an election on or before the expiration of the Due Diligence Period, then Purchaser shall be deemed to have waived irrevocably any and all objections (other than any Mandatory Cure Items) and shall be obligated to close the transaction in accordance with the terms of this Agreement.

4.3    Property Inspection.    Purchaser shall have until the date that is ten (10) business days from and after the execution and delivery of this Agreement by Seller and Purchaser (the "Due Diligence Period") to determine whether, in Purchaser's sole and absolute discretion, the Property is acceptable to Purchaser. Notwithstanding anything to the contrary in this Agreement, Purchaser may terminate this Agreement by giving notice of termination to Seller on or before the last day of the Due Diligence Period if Purchaser determines that the Property is not acceptable for any reason, in which event Escrow Agent shall promptly return the Deposit to Purchaser and the parties shall have no further rights or obligations hereunder, except for the Survival Obligations.  If Purchaser does not give a notice of termination pursuant to this Section 4.3 at or prior to 5 p.m. (local time in Whitehall, Pennsylvania) on the last day of the Due Diligence Period, this Agreement shall continue in full force and effect and Purchaser's right to terminate this Agreement pursuant to this Section 4.3 shall expire and be of no further force or effect.

3

Subject to the conditions set out in this Section 4.3, Purchaser shall have reasonable access to the Property commencing on the date hereof, and continuing until the earlier of Closing or the earlier termination of this Agreement, for the purpose of conducting surveys, geotechnical, and environmental inspections and tests and any other inspections, studies, or tests reasonably required by Purchaser, all at Purchaser's sole expense. I f any inspection or test disturbs the Property, Purchaser will (at its sole expense) restore the Property as soon as reasonably possible to the same condition as existed prior to any such inspection or test. Notwithstanding anything to the contrary in this Agreement, Purchaser will not do, or cause or direct to be done, any subsurface testing or boring, or any testing of subsurface water, or any coring, boring or other intrusive testing, without first obtaining Seller's prior written consent which Seller may give or withhold in its absolute discretion; provided, however, all other inspections of or entry upon the Property by Purchaser shall occur only with the consent of Seller, which consent shall not be withheld unreasonably. Purchaser hereby indemnifies Seller, and agrees to defend, protect and hold Seller harmless, from and against any and all claims, losses, damages and liabilities that may be asserted against or incurred by Seller for or in connection with any injuries or damage to any persons or property, which directly or indirectly are caused by or result from any entry, inspection, testing or other action done or caused or directed to be done by Purchaser or its representatives or contractors. Purchaser agrees to cause all parties entering the Property at Purchaser's instance to maintain adequate and appropriate insurance to cover risks of the type described herein and, upon Seller's request, to deliver to Seller evidence establishing to Seller's reasonable satisfaction that adequate and appropriate insurance to cover risks of the types described herein is being maintained.

4.4    Reports.       All information provided by Seller to Purchaser relating to the Property, whether before or after the date of this Agreement (collectively, the "Reports"), shall be treated as confidential information and shall not be disclosed to any third parties except for Purchaser's attorneys, engineers, lenders, prospective tenants and other business associates who need to know the information in furtherance of this transaction, and then only if they agree to maintain the information in strict confidence as provided herein. Purchaser shall be liable to Seller for any unauthorized disclosure of the confidential information by or through Purchaser and for all damage or injury to any person or property resulting from, relating to or arising out of any due diligence investigation, whether occasioned by the acts of Purchaser or any of its employees, agents, representatives or contractors, and Purchaser shall indemnify and agrees to defend, protect and hold harmless Seller and its agents, employees, officers, directors, representatives and affiliates from any liability resulting therefrom. This Section 4.4 shall survive the Closing or the termination of this Agreement, as applicable.

4

4.5    Purchaser's Representations and Warranties.    Purchaser represents and warrants to Seller that (a) Purchaser is a limited liability company, duly organized and validly existing under the laws of the Commonwealth of Pennsylvania, is authorized to do business in the Commonwealth of Pennsylvania, and has the power to enter into this Agreement and to execute and deliver this Agreement and to perform all of its duties and obligations hereunder, and Purchaser has obtained all necessary authorizations required in connection with the execution, delivery and performance contemplated by this Agreement and has obtained the consent of all entities and parties necessary to bind Purchaser to this Agreement; (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser, or any partner or related entity or affiliate of Purchaser, is a party or by which Purchaser, any partner or related entity or affiliate of Purchaser, or any of Purchaser's assets is bound; and (c) this Agreement is the legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms. Purchaser's representations and warranties contained herein must be true and correct through the Closing Date, and Purchaser's failure to notify Seller prior to the Closing Date of any inaccuracies shall be a default by Purchaser under this Agreement. The Purchaser's representations and warranties set forth in this Section 4.5 shall survive the Closing or termination of this Agreement.

4.6    Seller's Representations and Warranties.    Seller represents and warrants to Purchaser that (a) Seller is a corporation duly organized and validly existing under the laws of the Commonwealth of Virginia; (b) Seller has the corporate power and authority to enter into, execute and deliver this Agreement and to perform all of its duties and obligations under this Agreement; (c) upon entry of the Sale Order (as defined below) in the Bankruptcy Case, this Agreement will be the legal, valid and binding obligation of Seller and will be enforceable against Seller in accordance with its terms; and (d) at the Closing, Seller shall convey to Purchaser fee simple title to the Property, free and clear of liens (including the liens of Seller's postpetition lenders and liens for past-due real property taxes), claims and encumbrances other than Permitted Encumbrances (as defined below). The representations and warranties contained in this Section 4.6 shall expire and be extinguished at the Closing.

4.7    Further Assurances.    Seller and Purchaser agree to execute and deliver at or prior to Closing any documents or instruments reasonably necessary to carry out the terms of this Agreement.

5.    DISCLAIMER OF REPRESENTATIONS OR WARRANTIES BY SELLER; ACCEPTANCE OF PROPERTY

5

5.1    Disclaimer.    PURCHASER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES (OTHER THAN THE SPECIAL WARRANTY OF TITLE AS SET OUT IN THE DEED, AS DEFINED BELOW), PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, STATUTORY, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (B) THE INCOME TO BE DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, (G) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (AS HEREINAFTER DEFINED), INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS (AS DEFINED BELOW) OR (I) ANY OTHER MATTER WITH RESPECT TO THE CONDITION OR STATUS OF THE PROPERTY. ADDITIONALLY, NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND BY EXECUTION HEREOF PURCHASER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN; AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE

6

PROPERTY OR TO ANY HAZARDOUS MATERIALS ON THE PROPERTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS OR COMPLETENESS OF SUCH INFORMATION. SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS IS" "WHERE IS" CONDITION AND BASIS WITH ALL FAULTS. IT IS UNDERSTOOD AND AGREED THAT THE PURCHASE PRICE REFLECTS THAT THE PROPERTY IS BEING SOLD BY SELLER AND PURCHASED BY PURCHASER SUBJECT TO THE FOREGOING. PURCHASER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE AND HOLD HARMLESS SELLER FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF PURCHASER'S ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, MAINTENANCE AND MANAGEMENT OF THE PROPERTY; PROVIDED, HOWEVER, PURCHASER SHALL NOT BE REQUIRED TO INDEMNIFY SELLER WITH RESPECT TO MATTERS ARISING PRIOR TO THE CLOSING AND NOT ATTRIBUTABLE TO PURCHASER'S CONDUCT. THE PROVISIONS OF THIS ARTICLE 5 SHALL SURVIVE THE CLOSING OR ANY TERMINATION HEREOF.

    5.2    Hazardous Materials. "Hazardous Materials" shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in §101 (14) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) ("CERCLA"), or any regulations promulgated under CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act, as amended (42 U.S.C. §6901 et seq.) ("RCRA"), or regulations promulgated under RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. §2601 et seq.); (iv) gasoline, diesel fuel, or

other petroleum hydrocarbons; (v) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) radon gas; and (viii) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

5.3    Environmental Requirements.    "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

5.4    Purchaser's Independent Investigations.    For all purposes of this Article 5, Purchaser acknowledges and agrees that Purchaser has been provided with adequate and sufficient access to the Property prior to the date of this Agreement, and Purchaser is entitled to access the Property during the Due Diligence Period, to conduct its own inspections, tests, investigations, environmental audits and other reviews of the Property as Purchaser deems necessary or appropriate, and Purchaser is relying on its own such inspections, tests, investigations, environmental audits and other reviews in determining the advisability of acquiring the Property.

6.    CLOSING

6.1    Closing.    Unless otherwise agreed by the parties in writing, the closing of the purchase and sale of the Property (the "Closing") shall be conducted by mail or, if necessary, held at a location to be mutually agreed upon by the parties, on the date which is five (5) business days after the date upon which Purchaser receives from Seller written notice (which written notice may be given by email) of entry by the Bankruptcy Court of the Sale Order, together with an electronic copy thereof, and that

8

any applicable appeal period has expired (the date on which the Closing occurs is referred to as the "Closing Date").

6.2    Possession.    Possession of the Property shall be delivered to Purchaser at the Closing, subject to (i) liens for real property taxes and assessments that are not yet due and payable, (ii) zoning ordinances, building codes and other land use laws and applicable governmental regulations, (iii) all covenants, agreements, conditions, easements, restrictions and rights, whether of record or otherwise, and (iv) any and all matters that would be shown by a physical inspection of the Property, but excluding any Mandatory Cure Items (collectively, the "Permitted Encumbrances").

6.3    Prorations.    All real estate taxes and assessments, both general and special, for the year in which the Closing occurs, whether or not then due or payable, and all other normally proratable items shall be prorated as of the Closing Date, based upon the latest assessments or actual invoices available.    Should any such proration be inaccurate based upon the actual tax bill or assessment when received, either party hereto may demand and shall be entitled to receive on demand, a payment from the other correcting such malapportionment.    Seller shall pay all costs associated with any fees, taxes, impact fees, assessments, delinquent or otherwise, and any other land use charges attributable to a period prior to Closing.

The agreements of Seller and Purchaser set forth in this Section 6.3 shall survive the Closing.

6.4    Closing Costs.    Purchaser shall pay all title examination costs, title insurance premiums, survey costs, environmental and engineering costs, and any and all other due diligence costs.    Purchaser shall also pay any grantee's tax imposed on the Deed (as defined below) pursuant to applicable state law and any other recording fees associated with the recordation of the Deed.    Seller shall pay any grantor's tax imposed on the Deed pursuant to applicable state law. Except as otherwise provided herein, each party shall pay its own attorneys' fees.    The parties shall each pay one-half (1/2) of all transfer and recordation costs and any escrow fee charged by Escrow Agent; and, with regard to other costs of Closing, the parties shall bear the costs of recording and settlement as is the custom in the Commonwealth of Pennsylvania.

6.5    Seller's Obligations at the Closing.    At the Closing, Seller shall deliver to Escrow Agent the following:

(a)    Deed. A special warranty deed, duly executed by Seller, conveying the Property in fee simple as contemplated by the Sale Order, subject to the Permitted Encumbrances.

9

(b)    Foreign Person.    An affidavit or certificate duly executed by Seller certifying that Seller is not a "foreign person," as defined in the federal Foreign Investment in Real Property Tax Act of 1980, and the 1984 Tax Reform Act, as amended.

(c)    Documents Required by Title.    A Privacy Notice and Seller's Affidavit, duly executed on behalf of Seller, in the forms attached hereto as Exhibit B and Exhibit C.

6.6    Purchaser's Obligations at the Closing.    At the Closing, Purchaser shall deliver to Escrow Agent the following:

(a)    Purchase Price.    The Purchase Price (less the amount of the Deposit, which shall be released separately by Escrow Agent to Seller), by wire transfer of immediately available funds.

(b)    Evidence of Authority.    Such organizational and authorizing documents of Purchaser as shall be reasonably required by Seller authorizing Purchaser's acquisition of the Property pursuant to this Agreement and the execution of this Agreement and any documents to be executed by Purchaser at the Closing.

(c)    Taxpayer I.D. Certificate.    A certificate duly executed by Purchaser certifying Purchaser's address and Taxpayer Identification Number and consenting to Seller's release of this information to any governmental authority.

6.7    Commission.    Seller and Purchaser represent that there are no real estate brokers or agents of record in this transaction, other than DJM Realty (the "Broker"), and upon Closing, Seller shall pay Broker a commission pursuant to a separate written agreement.    Neither Seller nor Purchaser shall be responsible for any other real estate commissions or fees of any kind or nature whatsoever.    Seller and Purchaser each agrees to hold the other harmless against any claim made for brokerage commissions or finders' fees resulting from such parties' actions in this transaction.    The provisions of the preceding sentence shall survive the Closing.

6.8    Conditions to Closing.    Each of the following shall be a condition to Purchaser's obligation to proceed to Closing hereunder:

(a)    Title.    Title to the Property shall be in the condition required pursuant to Section 4.2 and Section 6.2 above, and all Mandatory Cure Items shall have been removed or otherwise cured of record.

10

(b)    <u>Bankruptcy Sale Order</u>.    The Bankruptcy Court shall have entered the Sale Order, as described in Section 9.2 below, and any applicable appeal period shall have expired (without appeal).

(c)    <u>Closing Deliverables</u>. Seller shall have delivered all of Seller's closing deliverables, as required under Section 6.5 above.

(d)    <u>Seller's Representations and Warranties</u>.    The representations and warranties of Seller set forth in Section 4.6 above shall be true and correct in all material respects.

In the event of the failure of any of the above conditions, Purchaser shall have the right, at its election, to either (i) waive such failure and proceed to Closing, or (ii) terminate this Agreement, in which event the Deposit shall be returned promptly by Escrow Agent to Purchaser, and no party hereto shall have any further obligations under this Agreement except for the Survival Obligations.

7.    RISK OF LOSS

7.1    <u>Condemnation</u>.    If, prior to the Closing, action is initiated to take any material portion of the Property by eminent domain proceedings or by deed in lieu thereof, Purchaser may either at or prior to Closing (a) terminate this Agreement, in which case the Deposit shall be returned to Purchaser by Escrow Agent and neither party shall have any further right or obligation hereunder except for the Survival Obligations, or (b) consummate the Closing, in which case the award of the condemning authority shall be assigned to Purchaser at the Closing, and there shall be no reduction in the Purchase Price.

8.    DEFAULT

8.1    <u>Breach by Seller</u>.    In the event that Seller shall fail to consummate the transactions contemplated by this Agreement for any reason, except Purchaser's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Purchaser, as its sole and exclusive remedy, may terminate this Agreement and demand the return of the Deposit from Escrow Agent. In no event shall Purchaser be entitled to any remedy other than the return of the Deposit. Notwithstanding the foregoing, the provisions of this Section 8.1 shall not limit or affect any of Seller's indemnities as provided in any other Section of this Agreement. Escrow Agent and Seller shall not be liable to Purchaser for any actual, punitive, speculative or consequential damages. In no event shall Purchaser be entitled to the remedy of specific performance.

11

8.2    Breach by Purchaser. In the event that Purchaser shall fail to consummate the transactions contemplated by this Agreement for any reason, except Seller's default or a termination of this Agreement by Purchaser or Seller pursuant to a right to do so under the provisions hereof, Seller, as its sole and exclusive remedy, may terminate this Agreement and thereupon shall be entitled to payment of the Deposit from Escrow Agent as liquidated damages. Seller and Purchaser have made this provision for liquidated damages because it would be impossible to estimate more precisely, on the date hereof, the amount of actual damages for such breach, and because the parties believe that the Deposit represents a reasonable pre-estimate of Seller's probable loss in the event of Purchaser's breach. In no event shall Purchaser be liable for any actual, punitive, speculative or consequential damages in connection with this Agreement. In no event shall Seller be entitled to the remedy of specific performance. Notwithstanding the foregoing, the provisions of this Section 8.2 shall not limit or affect any of Purchaser's indemnities as provided in any other Section of this Agreement.

9.    BANKRUPTCY ISSUES

9.1    Generally.    Notwithstanding any other provision of this Agreement, the provisions of this Article 9 shall apply to the sale of the Property.

9.2    Filing a Sale Motion. The obligation of Seller to sell and convey the Property to Purchaser, and the obligation of Purchaser to purchase the Property from Seller, are subject to the condition precedent that the Bankruptcy Court shall have entered an order in the Bankruptcy Case (the "Sale Order") (i) approving this Agreement and the sale of the Property to Purchaser, free and clear of liens, claims and encumbrances other than Permitted Encumbrances, and (ii) authorizing Seller to consummate the transactions contemplated by this Agreement.    Promptly following the expiration of the Due Diligence Period, Seller will file with the Bankruptcy Court a motion pursuant to section 363 of the Bankruptcy Code seeking approval of, among other things, this Agreement and the consummation of the transactions contemplated hereby, bidding procedures, and entry of the Sale Order (the "Sale Motion"). The Sale Motion shall be in form and substance consistent with this Agreement.    Seller shall be responsible for serving and providing notice of the Sale Motion.

9.3    Entry of Sale Order.    The closing of the sale of the Property to Purchaser shall take place as provided in Section 6.1 above.    Purchaser shall cooperate with the Seller in good faith to obtain entry by the Bankruptcy Court of the Sale Order as soon as reasonably practicable and Seller shall diligently pursue entry by the Bankruptcy Court of the Sale Order, and shall provide to Purchaser written notice (which written notice may be given by email) of same promptly upon Seller's becoming aware that the Sale Order has been entered by the Bankruptcy Court.

12

9.4    Termination.  Purchaser acknowledges that the Seller intends to solicit "higher or otherwise better" offers for the Property, including entertaining other offers from competing bidders. To facilitate this process, Seller agrees to the following procedures for responding to other offers that the Seller may receive for the Property: (a) an initial minimum overbid for the Property of at least $65,000.00 shall be required; (b) each initial overbid must be accompanied by a deposit in an amount equal to at least $6,000.00 plus ten percent (10%) of the amount such overbid exceeds the Purchase Price; (c) each competing offer must have terms and conditions that are substantially identical to those set forth in this Agreement (except that no competing offer shall provide for any due diligence period or property inspection period); and (d) if an acceptable competing  offer is received by Seller, Seller shall conduct an auction to determine the highest or best offer for the Property and Purchaser shall be entitled to participate in the auction.  The last day for submission of "higher or otherwise better" offers will be fixed by Seller or established by order of the Bankruptcy Court, and Seller promptly shall advise Purchaser of such date. Seller shall keep Purchaser apprised of any competing bids and give Purchaser reasonable advance notice of the time, date, and location of any auction (including, without limitation, of any changes to the time(s), date(s) and/or location(s) of any such auction), so as to reasonably permit Purchaser to attend and bid at such auction.  Notwithstanding any other provision of this Agreement, (i) Seller shall have the right to terminate this Agreement in order to permit Seller to accept a "higher or otherwise better" offer for the Property, and (ii) each of Seller and Purchaser shall have the right to terminate this Agreement if the Bankruptcy Court has not entered the Sale Order on or prior to September 30, 2010.  In the event of a termination of this Agreement pursuant to this Section 9.4, the Deposit shall be returned to Purchaser by Escrow Agent, and neither party shall have any further right or obligation hereunder except for the Survival Obligations.

10.    MISCELLANEOUS

10.1    Notices.      All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Agreement, shall be in writing and shall be deemed effective either: (a) on the date personally delivered to the address below, as evidenced by written receipt therefore, whether or not actually received by the person to whom addressed; (b) on the third (3rd) business day after being sent, by certified or registered mail, return receipt requested, addressed to the intended recipient at the address specified below; or (c) on the first (1st) business day after being deposited into the custody of a nationally recognized overnight delivery service such as Federal Express, addressed to such party at the address specified below, or (d) upon receipt, if sent by email, addressed to such party at the address specified below.  Further, any notice to Seller shall be deemed effective

upon delivery of such notice to counsel for Seller (Matthew T. Gunlock, Esquire, at McGuireWoods LLP), without the necessity of copies of such notice having been received by the other Seller notice parties. For purposes of this Section 10.1, the addresses of the parties for all notices are as follows:

| | |
|---|---|
| If to Purchaser: | c/o WILKES ARTIS<br>1150 18th Street, N.W.<br>Suite 400<br>Washington, DC 20036<br>Attention: Eric S. Kassoff, Esq.<br>E-mail: ekassoff@wilkesartis.com |
| with a copy to: | VENABLE LLP<br>575 7th Street, N.W.<br>Washington, DC 20004<br>Attention: Robert Gottlieb, Esq.<br>E-mail: rggottlieb@venable.com |
| If to Seller: | MCGUIREWOODS LLP<br>One James Center<br>901 East Cary Street<br>Richmond, Virginia 23219<br>Attention: Matthew T. Gunlock, Esq.<br>E-mail: mgunlock@mcguirewoods.com |
| with a copy to: | CIRCUIT CITY STORES, INC.<br>P.O. Box 5695<br>Glen Allen, Virginia 23058-5695<br>Attention: General Counsel |
| and a copy to: | CIRCUIT CITY STORES, INC.<br>P.O. Box 5695<br>Glen Allen, Virginia 23058-5695<br>Attention: Vice President of Real Estate |

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

14

10.2   Entire Agreement.   This Agreement embodies the entire agreement between the parties relative to the subject matter hereof, and there are no oral or written agreements between the parties, nor any representations, promises or inducements made by either party relative to the subject matter hereof, which are not expressly set forth herein.

10.3   Amendment.   This Agreement may be amended only by a written instrument executed by the party or parties to be bound thereby.

10.4   Headings.   The captions and headings used in this Agreement are for convenience of reference only and do not in any way limit, amplify, or otherwise modify the provisions of this Agreement.

10.5   Time of Essence.   Time is of the essence of this Agreement; however, if the final date of any period which is set out in any provision of this Agreement falls on a Saturday, Sunday or legal holiday under the laws of the United States, or the jurisdiction in which the Property is located, then, in such event, the time of such period shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

10.6   Governing Law.   This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

10.7   Successors and Assigns: Assignment.   This Agreement shall bind and inure to the benefit of Seller and Purchaser and their respective heirs, executors, administrators, personal and legal representatives, successors and permitted assigns. Purchaser shall not be permitted to assign Purchaser's rights under this Agreement without obtaining the prior written consent of Seller. No assignment of Purchaser's rights hereunder shall relieve Purchaser of its liabilities under this Agreement. This Agreement is solely for the benefit of Seller and Purchaser; there are no third party beneficiaries hereof. Any assignment of this Agreement in violation of the foregoing provisions shall be null and void.

10.8   Invalid Provision.   If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and, the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement.

15

10.9   Attorneys' Fees.     In the event it becomes necessary for either party hereto to file suit to enforce this Agreement or any provision contained herein, the party prevailing in such suit shall be entitled to recover, in addition to all other remedies or damages, as provided herein, reasonable attorneys' fees incurred in such suit.

10.10   Multiple Counterparts.     This Agreement may be executed in a number of identical counterparts which, taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature.

10.11   No Recordation.     Seller and Purchaser hereby acknowledge that neither this Agreement nor any memorandum or affidavit thereof shall be recorded of public record in any real property or other public records. Should Purchaser ever record or attempt to record this Agreement, or a memorandum or affidavit thereof, or any other similar document, then, notwithstanding anything herein to the contrary, said recordation or attempt at recordation shall constitute a default by Purchaser hereunder, and, in addition to the other remedies provided for herein, Seller shall have the express right to terminate this Agreement by filing a notice of said termination in the county in which the Property is located or otherwise as may be necessary to give public notice of such termination.

10.12   Merger Provision.     Except as otherwise expressly provided herein, any and all rights of action of Purchaser for any breach by Seller of any representation, warranty or covenant contained in this Agreement shall merge with the Deed and other instruments executed at Closing, shall terminate at Closing and shall not survive Closing.

10.13   Brokers.     Except as contemplated by Section 6.7, no commissions, brokerage fees, finders' fees, or other similar fees shall be due in connection with this Agreement.

10.14   Consent to Jurisdiction of Bankruptcy Court.     THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ALL MATTERS, INCLUDING ANY LEGAL ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS AND THE INTERPRETATION, IMPLEMENTATION AND ENFORCEMENT OF THIS AGREEMENT AND THE PARTIES HERETO IRREVOCABLY SUBMIT AND CONSENT TO SUCH JURISDICTION.

Seller and Purchaser further agree that service of any process, summons, notice or document by U.S. registered mail to any such party's respective address set forth in Section 10.1 of this Agreement will be effective service of process for any action, suit or

16

proceeding with respect to any matters to which it has submitted to jurisdiction as set forth above.  Each of Seller and Purchaser irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in the Bankruptcy Court.

[SIGNATURE PAGE ATTACHED]

17

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representatives as of the date set forth above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _Michelle Mosier_____
Name: _Michelle Mosier_____
Title: _V.P. and Controller_____

PURCHASER

DOWEL-ALLENTOWN, LLC,
a Pennsylvania limited liability company

By: _____
Name: _____
Title: _____

18

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be executed by its duly authorized representatives as of the date set forth above.

SELLER

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: _____
Name: _____
Title: _____

PURCHASER

DOWEL-ALLENTOWN, LLC,
a Pennsylvania limited liability company

By: _____
Name: _____Eric Kassof_____
Title: _____President_____

18

The escrow terms and conditions of this Agreement are agreed to and accepted this 28th day of January 2010.

ESCROW AGENT:

Tallman, Hudders, & Sorrentino, The Pennsylvania Office of Norris McLaughlin & Marcus, P.A., agent for FIRST AMERICAN TITLE INSURANCE COMPANY

By:

Name:

Title:

Jocelyn C. Hamlin,
Paralegal/Title Agent

Mailing Address:

c/o Tallman, Hudders, & Sorrentino
1611 Pond Road
Suite 300
Allentown, Pennsylvania 18104
Attention: Jocelyn Hamlin

19

**EXHIBIT A**

LEGAL DESCRIPTION OF PROPERTY

[FOLLOWS THIS PAGE]

## EXHIBIT A

ALL THAT CERTAIN tract of land located in Whitehall Township, Lehigh County, Pennsylvania, bounded and described as follows, to wit:

COMMENCING at a drill hole in the sidewalk at the intersection of the northerly property line of Grape Street (70 feet wide) with the westerly line of Jordan Boulevard (60 feet wide); thence from the point of commencement along the northerly property line of Grape Street (parallel with and five feet north of the curb line of Grape Street), S 75° 35' 30" W 282.59 feet to a drill hole in the sidewalk; thence along the easterly property line of Howard Johnson Company, N 14° 24' 30" W 350.00 feet to an iron pipe; thence along the northerly property line of Howard Johnson Company and Monroe Kurlansik, S 75° 35' 30" W 147.30 feet to an iron pipe, said iron pipe being the POINT OF BEGINNING; thence from the point of beginning along the northerly property line of Howard Johnson Company and Monroe Kurlansik, S 75° 35' 30" W 177.70 feet to an iron pipe; thence along the easterly property line of State Street Bank and Trust Company of Connecticut, W. Jeffrey Kramer, Boatman's National Bank of St. Louis, and City National Bank of Florida N 14° 24' 30" W 232.26 feet to an iron pipe; thence along the easterly line of State Street Bank and Trust Company of Connecticut, W. Jeffrey Kramer, Boatman's National Bank of St. Louis, and City National Bank of Florida N 10° 57' 40" E 121.36 feet to an iron pipe; thence along the southerly property line of Jefferson Street (50 feet wide) parallel with and 8.5 feet south of the curb line of Jefferson Street and the two following courses and distances: (1) S 79° 02' 20" E 72.19 feet to an iron pipe at a point of curvature; and (2) on a curve to the left having a radius of 670.86 feet an arc length of 65.52 feet (chord bearing and distance N 81° 50' 12" E 65.49 feet) to an iron pipe; thence along the westerly property line of Toys "R" Us – Penn, Inc. S 14° 24' 30" E 285.85 feet to the point of beginning.

BEING a portion of the same premises which Henry T. Newhard, Jr. and Eleanor C. Newhard by Deed dated and recorded 10/19/1984 in Lehigh County, Pennsylvania in Deed Book Vol. 1343 page 1040, conveyed unto Toys "R" Us – Penn., Inc., a Pennsylvania corporation, in fee.

Parcel No F9SE 4-3-2

CHICAGO TITLE INSURANCE COMPANY
WHITEHALL OFFICE
Oct. 17, __
WASHINGTON DC 27005

<u>EXHIBIT B</u>

PRIVACY NOTICE

[FOLLOWS THIS PAGE]

File No. THSFA-248

FIRST AMERICAN TITLE
INSURANCE COMPANY



THE FIRST
AMERICAN
CORPORATION

## PRIVACY POLICY

**We Are Committed to Safeguarding Customer Information**

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our parent company, The First American Corporation, we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its Fair Information Values, a copy of which can be found on our website at www.firstam.com.

**Types of Information**

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

**Use of Information**

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated parties except: (a) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies, and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

Tallman Hudders & Sorrentino, the Pennsylvania office of Norris McLaughlin & Marcus, P.A. is an agent of First American Title Insurance Company and adopts its privacy policy.

We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.

We restrict access to nonpublic personal information about you to those employees who need to know that information to provide the products or services requested by you, or your lender, if any.

We maintain physical, electronic and procedural safeguards that comply with appropriate federal and state regulations.

Receipt of the Privacy Policy is hereby acknowledged:

Date:

Dowel-Allentown, LLC,
a Pennsylvania limited liability company

BY:_____
Name:
Title:

File No. THSFA-248



FIRST AMERICAN TITLE
INSURANCE COMPANY

THE FIRST
AMERICAN
CORPORATION

## PRIVACY POLICY

**We Are Committed to Safeguarding Customer Information**

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our parent company, The First American Corporation, we have adopted this Privacy Policy to govern the use and handling of your personal information.

**Applicability**

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its Fair Information Values, a copy of which can be found on our website at www.firstam.com.

**Types of Information**

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

**Use of Information**

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated parties except: (a) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies, and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

**Former Customers**

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

**Confidentiality and Security**

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's Fair Information Values. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

Tallman Hudders & Sorrentino, the Pennsylvania office of Norris McLaughlin & Marcus, P.A. is an agent of First American Title Insurance Company and adopts its privacy policy.

We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.

We restrict access to nonpublic personal information about you to those employees who need to know that information to provide the products or services requested by you, or your lender, if any.

We maintain physical, electronic and procedural safeguards that comply with appropriate federal and state regulations.

Receipt of the Privacy Policy is hereby acknowledged:

Date:

Circuit City Stores, Inc.,
a Virginia corporation

BY:_____
Name:
Title:

ATTEST:

_____

<u>EXHIBIT C</u>

SELLER'S AFFIDAVIT

## *First American Title Insurance Company*

**COMMITMENT NO.  THSFA-248**

**PREMISES:**    1.25 acres, more or less, Parking lot on Jefferson Street,

Township of Whitehall, Lehigh County, PA

COMMONWEALTH OF PENNSYLVANIA                )
COUNTY OF                                                           ) SS

ON THE ___ DAY OF _____, 2010, before me, the undersigned Officer, personally appeared the undersigned, who being duly sworn according to law and intending to be legally bound, depose(s) and say(s) that the following statements are true and correct to the actual knowledge and belief of the undersigned.

1.      That the Grantor(s)/Mortgagor(s) herein is/are the owner(s) of premises described on <u>Exhibit A</u> being insured hereunder.

2.      That there have been no repairs, additions or improvements made, ordered or contracted to be made on or to the premises on behalf of the undersigned, within six (6) months prior to the date hereof, nor are there any improvements or fixtures attached to the premises which have not been paid for in full; and that there are no outstanding or disputed claims for any such work or items.

3.      That there has been no work done, or notice received that work is to be done, by the Municipality (City, Borough or Township), or at its direction, in connection with the installation of sewer or water or for improvements such as paving or repaving of streets or alleys, or the installation or repair of curbs or sidewalks.

4.      That no notice has been served by any governmental authority for the removal or abatement of any nuisance, for the violation of any zoning regulations or concerning the condemnation of any portion of said premises.

5.      That there has been no violation of any restrictions affecting the premises.

6.      That there are no purchase money obligations being created in this transfer.

7.      That the Grantor(s)/Mortgagor(s) in this transaction is/are in actual possession of the entire premises, and there are no unrecorded leases or agreements affecting the premises or any part

thereof outstanding, other than those that are presently being assigned.

8.  That the Grantor(s)/Lessor(s) has/have not received a notice of claim from any Real Estate Broker claiming a right to a lien in accordance with Act 34 of 1998.

9.  That as to each Grantor/Mortgagor that is a Corporation, Limited Liability Company or Partnership:

    A.  That the Corporation, Limited Liability Company or Partnership has been duly formed according to the laws of its incorporation or formation and is validly existing. The Corporation is a Debtor in a voluntary bankruptcy proceeding pending in the Eastern District of Virginia (Case No. 08-35653 (KRH)) (Bankr. E.D.Va. 2008).

    B.  That all parties signatory to documents in this transaction are duly authorized to execute same on behalf of the Corporation, the Limited Liability Company or the Partnership.

    C.  That no shareholder consent is required by the Corporation, nor member consent required by the Limited Liability Company, nor limited partner consent required by the Partnership.

This affidavit is made for the purpose of inducing First American Title Insurance Company or its duly authorized agent to hold settlement on the above premises, and to issue its title insurance policy, insuring the title thereto and to make disbursement of funds arising out of said transaction.

SWORN TO AND SUBSCRIBED before me,
the day and year aforesaid.

_____
                        Notary Public
My Commission Expires:_____


Circuit City Stores, Inc., a Virginia corporation

BY:_____
Name:
Title

ATTEST:

_____

\10365628.5