Rodney F. Page, VSB No. 12402
Bryan Cave, LLP
1155 F Street, NW
Washington, DC 20004
(202) 508-6000 (Telephone)
(202) 508-6200(Facsimile)
rfpage@bryancave.com

Counsel for Berkadia Commercial Mortgage, LLC

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **CIRCUIT CITY STORES, INC.,** *et al* | § | **Case No. 08-35653 (KRH)** |
| | § | |
| Debtor. | § | **Jointly Administered** |
| | § | |

**BERKADIA COMMERCIAL MORTGAGE LLC'S MOTION TO COMPEL**
**ASSUMPTION OR REJECTION OF GROUND LEASE**

Bank of America, N.A. (successor-by-merger to LaSalle National Bank National Association), as Trustee for the Registered Holders of Bear Stearns Commercial Mortgage Securities Inc., Commercial Mortgage Pass-Through Certificates, Series 2000-WF1, acting by and through Berkadia Commercial Mortgage LLC, its Special Servicer ("Berkadia"), hereby files its Expedited Motion to Compel Assumption or Rejection of Ground Lease (the "Motion") and in support thereof respectfully represents as follows:

**Jurisdiction**

1.  This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

2. On or about February 28, 1990, Circuit City Stores, Inc. ("the Debtor") as landlord, and CRA Acquisition Corp. ("CRA"), as tenant, entered into that certain Ground Lease and Agreement (the "Ground Lease"). A true and correct copy of the Ground Lease is attached hereto as Exhibit A. The Ground Lease covered property located at 9950 Maryland Drive, Richmond, VA 23233 (the "Premises") and had a main term of twenty (20) years.

3. On or about February 28, 1990, CRA as landlord, and the Debtor as tenant entered into that certain Lease and Agreement (the "Lease"). A true and correct copy of the Lease is attached hereto as Exhibit B. Pursuant to the Lease, CRA leased the Premises back to the Debtor for a primary term of twenty (20) years.

4. On or about March 26, 1990, CRA assigned its interest in the Ground Lease and the Lease to Lexington Corporate Properties Trust (successor by merger to Lexington Corporate Properties, Inc., successor by merger to Corporate Realty Income Trust I) ("LCPT").

5. On or about January 19, 2000, LCPT exercised an option in the Ground Lease to extend the main term to March 1, 2020.

6. On or about January 20, 2000, LCPT assigned its interest in the Ground Lease and Lease to Lexington Richmond L.L.C.

7. On November 10, 2008, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy code.

8. Pursuant to an order from this Court, the Debtor rejected the Lease.

9. On August 25, 2009, Berkadia succeeded to Lexington Richmond L.L.C.'s rights under the Ground Lease. Berkadia is current on its obligations under the Ground Lease.

10.     Berkadia has entered a contract with a potential buyer for the sale of the Ground

Lease.  However, the potential buyer cannot obtain financing while the Ground Lease is still

subject to rejection by the Debtor.

### Relief Requested and Basis Therefor

11.     Through this Motion, Berkadia requests entry of an order compelling the Debtor

to assume or reject the Ground Lease.

12.     Generally speaking the deadlines for assumption or rejection of unexpired leases

are governed by 11 U.S.C. § 365.  However § 365 does not expressly contain a deadline with

respect to the situation before the Court, i.e. where the Debtor is the lessor of non-residential real

property.  Additionally there are no reported opinions dealing with this issue.

13.     One recognized bankruptcy treatise has stated that bankruptcy courts should apply

the rules developed under section 365(d)(2) to leases of non-residential real property under

which the debtor is the lessor.  3 COLLIER ON BANKRUPTCY ¶ 365.04[5] (Alan N. Resnick and

Henry J. Sommer Eds., 15th ed. rev.)

14.     Section 365(d)(2) of the Bankruptcy Code provides the Court with the power to

compel a debtor to assume or reject an unexpired lease within a specified period of time:

> In a case under chapter…11…of this title, the trustee may assume
> or reject an…unexpired lease…of the debtor at any time before the
> confirmation of a plan but the court, on request of any party to
> such…lease, may order the trustee to determine within a specified
> period of time whether to assume or reject such…lease.

11 U.S.C. § 365(d)(2).

15.     "Congress intended this provision to 'prevent the parties in contractual or lease

relationships with the debtor from being left in doubt concerning their status vis-à-vis the

estate.'"  *Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1079 (3rd Cir.

1992)(*citing* S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

16.     Although Chapter 11 provides debtors with a "breathing space" within which to determine whether a particular lease should be assumed or rejected, such breathing space is not without limits. *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002). The limit placed on the time for the debtor's assumption/rejection determination by case law and commentators is "reasonableness." *See e.g. Dallas-Forth Worth Regional Airport Bd. v. Braniff Airways, Inc.*, 26 B.R. 628, 636 (N.D. Tex. 1982.) The determination of what constitutes a reasonable time to assume or reject a particular lease is within the bankruptcy court's discretion and has to be decided in light of the particular facts of each case. *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003).

17.     Among the factors that courts have used to determine what may constitute a "reasonable time" for the purposes of section 365(d)(2) are the following: (a) the nature of the interests at stake; (b) the balance of harm to the parties; (c) the safeguards afforded to the parties; (d) the damage third parties may suffer beyond the compensation available under the Bankruptcy Code; (e) the debtor's failure or ability to satisfy post-petition obligations; (f) the purposes of the chapter 11, (g) the importance of the contract to the debtor's reorganization, and (h) whether the action to be taken is so in derogation of Congress' scheme as to be said to be arbitrary. *Adelphia*, 291 B.R. at 292-294.

18.     The Court must make an equitable determination, based on the balance of harm, in light of the particular circumstances of the parties to the Lease. Berkadia respectfully submits that the balance of hardships in these cases should persuade the Court to compel the assumption or rejection of the Ground Lease as quickly as possible.

19.     The status of the Ground Lease and Berkadia's rights thereunder have been in limbo for fifteen (15) months. In the interim the Debtor has conducted a going out of business sale and made the assumption or rejection decision with respect to hundreds of executory contracts and unexpired leases.

### Notice and Hearing Date

20.     Notice of this Motion has been provided to those parties entitled to notice under this Court's Supplemental Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankprutcy Rules 2002-1 and 013-1 Establishing Certain Notice, Case Management, and Administrative Procedures (Dkt. No. 6208). A hearing has been requested on this motion for March 18, 2010 at 10:00 AM (EDT).

### Waiver of Memorandum of Law

21.     Pursuant to Local Bankruptcy Rule 9003-1(G), and because there are no novel issues of law presented in the Motion and all applicable authority is set forth in the Motion, Berkadia requests that the requirement that all motions be accompanied by a separate memorandum of law be waived.

### Conclusion

WHEREFORE, Berkadia respectfully requests that this Court enter an order (i) compelling the immediate assumption or rejection of the Ground Lease and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  March 4, 2010                    Respectfully Submitted,

                                         BRYAN CAVE LLP

                              By:    //s// Rodney F. Page
                                     Rodney F. Page, VSB 12402
                                     Bryan Cave LLP
                                     1155 F Street, NW
                                     Washington, DC 20004
                                     202-508-6000 – Telephone
                                     202-508-6200– Facsimile
                                     rfpage@bryancave.com

                              Counsel for Berkadia Commercial Mortgage, LLC

# EXHIBIT A

GROUND LEASE AND AGREEMENT

Between

CRA ACQUISITION CORP.,
as Tenant

And

CIRCUIT CITY STORES, INC.,
as Landlord

Dated as of February 28, 1990

(009433-3)

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Ground Lease Term | 2 |
| 3. | Rent and Charges | 3 |
| 4. | Taxes | 9 |
| 5. | Maintenance, Repairs and Replacements | 13 |
| 6. | Payment of Utility Bills | 13 |
| 7. | Alterations | 14 |
| 8. | Granting of Easements | 15 |
| 9. | Mechanics' Liens | 16 |
| 10. | Insurance | 17 |
| 11. | Condemnation and Casualty | 20 |
| 12. | Assignment and Subletting | 22 |
| 13. | Use | 23 |
| 14. | Tenant's Warranty as to Hazardous Substances | 23 |
| 15. | Leasehold Mortgages | 27 |
| 16. | Change of Landlord | 34 |
| 17. | Memorandum of Ground Lease | 35 |
| 18. | Improvements | 36 |
| 19. | Events of Default | 38 |
| 20. | Landlord's Remedies | 40 |
| 21. | Holding Over | 43 |
| 22. | "For Rent" and "For Sale" Signs | 44 |
| 23. | Estoppel Certificates | 44 |
| 24. | Waiver | 45 |
| 25. | Compliance with Applicable Laws | 45 |
| 26. | Non-Recourse as to Landlord | 46 |
| 27. | Notices | 47 |
| 28. | Right of First Refusal and Option to Purchase | 48 |
| 29. | Miscellaneous | 49 |

(009433-3)

## GROUND LEASE

THIS DEED OF GROUND LEASE ("Ground Lease") is made as of the 28th day of February, 1990, by and between CRA ACQUISITION CORP., a Delaware corporation, having an address at 1345 Avenue of the Americas, New York, New York 10105 (the "Tenant"), and CIRCUIT CITY STORES, INC., a Virginia corporation, having an address at 2040 Thalbro Street, Richmond, Virginia 23230 (the "Landlord").

## W I T N E S S E T H:

By deed of even date herewith, Landlord (as grantor) conveyed to Tenant a certain building and other improvements, fixtures and equipment (the "Improvements") located in Henrico County, Virginia, as more particularly described therein.

That for and in consideration of the mutual covenants herein contained and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord that approximately 18.468 acre parcel ("Parcel 1") plus Parcels 2 and 3 (collectively the "Land", which term shall include any improvements which are hereafter constructed on the Land but which are not part of the Improvements or replacements thereof), on which the Improvements are located, as more particularly shown

(009433-3)

on Exhibit "A" hereto.  The Land and the Improvements are collectively referred to as the "Premises".

2.  Ground Lease Term.  The main term (the "Main Term") of the Ground Lease shall commence on February 28, 1990 and shall end on March 1, 2010.

In addition to the Main Term, Tenant shall have five (5) options (each a "Renewal Option") to renew and extend the Ground Lease for four (4) consecutive ten (10) year periods followed by one (1) five-year period (the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least six (6) months prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of any right to renew or extend as aforesaid, if Tenant shall fail to give any such notice within the aforesaid time limit and shall not have given Landlord prior written notice of its intention not to renew or extend as aforesaid, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired) until ten (10) business days after Landlord shall have given Tenant notice of Landlord's election to terminate the Renewal Option, and Tenant may exercise its Renewal Option at any time

-2-

(009433-3)

prior to expiration of said ten (10) business day period. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the term of this Ground Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, as if such notice had been timely given hereunder.

The Main Term and exercised Option Periods are, collectively, the "Term." The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each March during the Term, except that the first Lease Year shall commence on the commencement date of this Lease and shall end on February 28, 1991 and the twentieth (20th) Lease Year shall commence on March 1, 2009 and end on March 1, 2010.

If any Lease Year ends on February 28th in a leap year, the Lease Year shall automatically be extended to February 29th.

3.   Rent and Charges.

(a)  Base Rent.  Tenant agrees to pay base rent ("Base Rent") for the Land in advance on the first day of each calendar month throughout the Term, with appropriate proration for any partial month or Lease Year, to the address given for Landlord at paragraph 27 hereof, unless Landlord shall have given Tenant written notice of a change of address or of the party to whom such rents shall be payable. Base Rent shall be paid pursuant to the following schedule:

-3-

(009433-3)

(i)    <u>First Five Years</u>.  During the first five (5)
Lease Years, Tenant shall pay annual Base Rent
in the amount of Two Hundred One Thousand Sixty-
six and 50/100 Dollars ($201,066.50), payable in
monthly installments of Sixteen Thousand Seven
Hundred Fifty-five and 54/100 Dollars
($16,755.54).

(ii)    <u>Increases in Base Rent During the Main Term and
First and Second Option Periods</u>.  Base Rent
shall increase on the first day of the Sixth and
on the first day of the Eleventh, Twenty-first
and Thirty-first Lease Years so that Base Rent
during the Main Term and the First and Second
Option Periods shall, except as set forth in
(iii) below, be as follows:

| Lease Years | Annual Rent | Monthly Rent |
|---|---|---|
| 1-5 | $201,066.50 | $16,755.54 |
| 6-10 | 219,714.07 | 18,309.51 |
| 11-20 | 252,714.07 | 21,059.05 |

<u>Base Rent During Option Periods</u>.  The Base Rent
during the first Option Period (i.e., Lease
Years 21-30), if exercised, shall be at the rate
per annum equal to the product of the Base Rent
per annum in effect during the first Lease Year
multiplied by a fraction, the numerator of which
is the "Price Index" (as hereinafter defined)
published for the calendar month in which the
first Option Period commences and the
denominator of which is the Price Index
published for the first full calendar month of
the Main Term; provided, however, in no event
shall the Base Rent per annum for the first
Option Period exceed 142.66% of the Base Rent
per annum for the first Lease Year or be less
than the Base Rent per annum in effect on the
last day of the twentieth Lease Year.  If,
pursuant to paragraph 11(c), the Base Rent has
been reduced, the Base Rent per annum in effect
during the first Lease Year shall be deemed to
be the Base Rent that would have applied during
the first Lease Year if the Base Rent adjustment
described in paragraph 11(c) had occurred at the
commencement of the first Lease Year.

-4-

(009433-3)

The Base Rent during the second Option Period (i.e., Lease Years 31-40), if exercised, shall be at the rate per annum equal to the product of the Base Rent per annum in effect on the last day of the first Option Period multiplied by a fraction, the numerator of which is the Price Index figure published for the month in which the second Option Period commences and the denominator of which is the Price Index published for the calendar month in which the first Option Period commences; provided, however, in no event shall the Base Rent per annum for the second Option Period exceed 114.02% of the Base Rent per annum in effect on the last day of the first Option Period or be less than the Base Rent in effect on the last day of the first Option Period.

The term "Price Index" shall be as defined in paragraph 10(b) hereof.

(iii)   Notwithstanding the Base Rent set forth above for Lease Years 21-30 and 31-40, (i) if the Lease [as defined in paragraph 3(d)] is not renewed by the tenant thereunder so as to be in effect during Lease years 21-30, the Base Rent during Lease Years 21-30 shall be at the rate per annum equal to ten percent (10%) of the fair market value of the Land (exclusive of Improvements) determined as set forth in (iv) below; and (ii) if the Lease [as defined in paragraph 3(d)] is not renewed by the tenant thereunder so as to be in effect during Lease Years 31-40 shall be at the rate per annum equal to ten percent (10%) of the fair market value of the Land (exclusive of Improvements) determined as set forth in (iv) below.

(iv)   The Base Rent during the third Option Period (i.e., Lease Years 41-50), if exercised, shall be at the rate per annum equal to ten percent (10%) of the fair market value of the Land (exclusive of the Improvements) determined as set forth below.

The Base Rent during the fourth Option Period (i.e., Lease Years 51-60), if exercised, shall be at the rate per annum equal to ten percent (10%) of the fair market value of the Land (exclusive of the Improvements) determined as set forth below.

(009433-3)

-5-

The Base Rent during the fifth Option Period
(i.e., Lease Years 61-65), if exercised, shall
be at the rate per annum equal to ten percent
(10%) of the fair market value of the Land
(exclusive of the Improvements) determined as
set forth below.

In order to determine the fair market value of
the Land for purposes hereof and if the parties
are otherwise unable to agree upon same,
following exercise by Tenant of its option to
extend and renew for the third Option Period and
for the fourth Option Period and for the fifth
Option Period, and for the first and/or second
Option Periods under the circumstances described
in (iii) above, the parties shall attempt to
agree upon the use of a single appraiser.  Any
appraiser provided for in this paragraph shall
be an independent M.A.I. appraiser experienced
in appraising office buildings in the Richmond,
Virginia metropolitan area.  If, within thirty
(30) days after Tenant's exercise of its option
to extend and renew, the parties have not agreed
upon the use of a single appraiser, then either
party may by written notice to the other select
an appraiser.  The other party shall then select
its appraiser and give notice thereof to the
other party within 30 days after notification by
the other party of its selection of appraisers
or, if it fails to do so, the first appraiser
shall alone determine the fair market rental
value.  The single appraiser or the two
appraisers, as the case may be, shall determine
the fair market value of the Land based upon the
terms and provisions of this Lease.  The
appraiser(s) shall deliver their
determination(s) of fair market value of the
Land to Landlord and Tenant as soon as possible,
and if there are two appraisers whose
determinations differ, the fair market value
shall be the average of the two appraisals.  If
a single appraiser is selected, Landlord and
Tenant shall split the costs of the appraisal,
and if two appraisers are appointed, Landlord
and Tenant shall each pay the costs of the
appraiser selected by it.

(b)  Rent/Additional Rent.  All sums payable by Tenant

to Landlord under this Ground Lease shall constitute rent.  All

-6-

(009433-3)

payments under this Ground Lease other than Base Rent, including,
but not limited to, payments of "Real Estate Taxes" (as defined
below), shall constitute additional rent ("Additional Rent")
hereunder.  Tenant shall pay to Landlord interest at the rate of
15% per annum (or at the maximum rate not prohibited by
applicable law, whichever is less) (the "Default Rate") on all
overdue Base Rent and Additional Rent.

(c) <u>Net Lease; Non Terminability</u>.  This Ground Lease
is a net lease and, except as otherwise expressly provided herein
in paragraphs 11(b), 20(b), paragraph 3(d) and this paragraph
3(c), any present or future law to the contrary notwithstanding,
shall not terminate, nor shall Tenant be entitled to any
abatement, reduction, set-off, counterclaim, defense or deduction
with respect to any Base Rent, Additional Rent or other sum
payable hereunder, nor shall the obligations of Tenant hereunder
be affected, by reason of:  any damage to or destruction of the
Premises; any taking of the Premises or any part thereof by
condemnation or otherwise; any prohibition, limitation,
restriction or prevention of Tenant's use, occupancy or enjoyment
of the Premises, or any interference with such use, occupancy or
enjoyment by any person; any eviction by paramount title or
otherwise; any default by Landlord hereunder or under any other
agreement; the impossibility or illegality of performance by
Landlord, Tenant or both; any action of any governmental
authority; or any other cause whether similar or dissimilar to
the foregoing.  The parties intend that the obligations of Tenant

-7-

(009433-3)

hereunder shall be separate and independent covenants and
agreements and shall continue unaffected unless such obligations
shall have been modified or terminated pursuant to an express
provision of this Ground Lease.  Tenant shall remain obligated
under this Ground Lease in accordance with its terms and shall
not take any action to terminate, rescind or avoid this Ground
Lease, notwithstanding any bankruptcy, insolvency,
reorganization, liquidation, dissolution or other proceeding
affecting Landlord or any assignee of Landlord or any action with
respect to this Ground Lease which may be taken by any trustee,
receiver or liquidator or by any court.  Except as otherwise
expressly provided herein, Tenant waives all rights to terminate
or surrender this Ground Lease, or to any abatement or deferment
of Base Rent, Additional Rent or other sums payable hereunder.
Notwithstanding anything herein to the contrary except as
otherwise provided in paragraph 15 below, in the event of the
termination of the Lease [as defined in paragraph 3(d)], Tenant
shall have the right to terminate this Ground Lease
contemporaneously with the Lease by written notice to Landlord
given at any time on or before thirty (30) days after the notice
of termination of the Lease.  The foregoing shall, except as
otherwise provided in paragraph 15 below, govern the right of
Tenant to terminate this Ground Lease under circumstances which
are not otherwise specifically dealt with herein in paragraphs
11(b) and 20(b).

-8-

(009433-3)

(d)   Notwithstanding paragraphs 3(a) and 3(c) hereof, upon the occurrence of an Event of Default under that certain lease of even date herewith from Tenant (as landlord) to Landlord (as tenant) demising the Premises (the "Lease"), then beginning on the first Base Rent installment due date following such Event of Default and continuing until such Event of Default is cured (if ever) but for no longer than the then current Term of the Lease, the Base Rent under this Ground Lease shall be One Dollar ($1.00) per month.  It is understood that an Event of Default for purposes of this paragraph 3(d) shall not be deemed cured if, as a consequence of the Event of Default, the loan secured by a Permitted Mortgage (as defined in paragraph 15(b) of this Ground Lease) is accelerated and not thereafter reinstated and all of Tenant's expenses incurred in connection with such Event of Default reimbursed by the tenant under the Lease.

4.   Taxes.

(a)   Taxes Contemplated Hereunder.  The term "Real Estate Taxes" shall mean all general and special real estate taxes, special assessments and other ad valorem taxes, rates, levies and assessments payable upon or with respect to the Premises to any governmental agency or authority and all taxes specifically imposed in lieu of any such taxes.  Nothing contained in this Ground Lease shall require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, net income, business or transfer tax of Landlord.

(009433-3)

-9-

(b)  Payment of Real Estate Taxes.  Tenant shall pay the Real Estate Taxes levied against the tax parcel or parcels of which the Premises are a part (the "tax parcel").  Tenant shall pay the Real Estate Taxes before incurring any penalty for late payment and, following expiration or termination of the Lease [as defined in paragraph 3(d)], shall provide Landlord with evidence of payment thereof within 30 days after payment.

(c)  Contest of Real Estate Taxes.  Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes, by appropriate proceedings diligently conducted in good faith, in accordance with the procedure set forth in (d) below, provided that Tenant shall first have notified Landlord of its intent to do so and if payment of the contested amount is not made, first giving such security as Landlord or its lender may reasonably require to assure payment of any contested amount, together with interest and penalties thereon, provided however, that Tenant shall not be required to give security so long as Tenant's net worth exceeds $273,000,000.

(d)  Reduction in Assessed Valuation of Property.  Tenant, at its sole cost and expense, shall have the right to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant at Tenant's expense, execute any and all documents required in connection therewith and, if required by

-10-

(009433-3)

any law, rule or regulation of the taxing authority shall join with Tenant in the prosecution thereof.

(e) <u>Expenses</u>. Upon the termination of the proceedings set forth in (c) or (d) (unless the taxing authority requires that Real Estate Taxes be paid prior to commencement of such proceedings), Tenant shall pay the Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings. In addition, Tenant shall be solely responsible for any costs, fees, interest, penalties and other liabilities incurred in connection with such proceedings. Following expiration or termination of the Lease [as defined in paragraph 3(d)], Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, after deducting therefrom all costs, fees, penalties or interest thereon, which shall be reimbursed to Tenant (if Tenant is the contesting party).

(f) After an Event of Default hereunder, Tenant shall at the request of Landlord [if Landlord is so requested by its lender and if neither Tenant nor any other Person (other than Landlord) is escrowing Real Estate Taxes and Assessments with a Financial Institution] deposit with and pay to Landlord, on the first business day of each month during the continuance of such Event of Default, a sum equivalent to one-twelfth (1/12) of the estimated annual taxes and assessments assessed or levied against the Premises. If, after the first such Event of Default, there

-11-

(009433-3)

shall be another Event of Default hereunder and Landlord's lender
shall require Landlord to impound the estimated annual taxes and
assessments assessed or levied against the Premises. Tenant
shall, for the duration of such Lender's requirement, deposit
with and pay to Landlord, on the first business day of each
month, a sum equivalent to one-twelfth (1/12) of such estimated
annual taxes and assessments. Landlord shall use such deposits
to pay the taxes and assessments when the same become due.
Landlord shall be liable for interest on such deposits at
prevailing bank money market account rates; Landlord shall not
charge Tenant any administrative fee for handling such deposits.
Tenant shall procure and deliver to Landlord, in advance,
statements for such charges. If the total payments made by
Tenant under this paragraph exceed the amount of payments
actually made by Tenant under this paragraph exceed the amount of
payments actually made by Landlord for taxes and assessments,
such excess shall be credited by Landlord or subsequent deposits
to be made by Tenant. If, however, the deposits are insufficient
to pay the taxes and assessments when the same shall be due and
payable, Tenant will pay to Landlord any amount necessary to make
up the deficiency, on or before the date when payment of such
taxes and assessments shall be due. The enforceability of the
covenants relating to taxes and assessments provided for in this
Lease shall not be affected except to the extent that said
obligations have been actually met by compliance with this
paragraph. Landlord shall apply sums or amounts in its hand

-12-

(009433-3)

received pursuant hereto only to the payment of such taxes and assessments. This paragraph 4(f) shall be applicable only after expiration or termination of the Lease [as defined in paragraph 3(d)].

5. **Maintenance, Repairs and Replacements.** Except as provided in the Lease [as defined in paragraph 3(d)], Landlord shall have no responsibility for maintenance, repair or replacements to the Premises or any part thereof. Following expiration or termination of the Lease [as defined in subparagraph 3(d)], Tenant shall maintain or cause to be maintained any improvements on the Land in accordance with applicable governmental requirements. If Tenant shall fail to perform its obligations under this paragraph 5, Landlord may, at its option, effect such maintenance or repairs, provided that Landlord shall have given Tenant thirty (30) days prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required). Tenant shall reimburse Landlord on demand for the reasonable and actual amount so expended, plus interest at the Default Rate from the date of such expenditures until paid.

6. **Payment of Utility Bills.** After expiration or termination of the Lease [as defined in paragraph 3(d)], Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used in connection with the Premises. Tenant shall not

-13-

(009433-3)

be deemed to be in default hereunder as a consequence of breach
of this paragraph 6 unless, as a consequence of the non-payment,
the Land is subject to a lien or Landlord is subject to liability
for the non-payment of such liabilities.

7.    Alterations.    (a)    After expiration or termination
of the Lease [as defined in paragraph 3(d)], Tenant may, at its
sole expense, alter, modify or reconstruct the Improvements.
Tenant shall cause all such alterations to be lien free (in
accordance with paragraph 9) and made and completed at the cost
of the Tenant in compliance with all applicable law.    Without
cost or expense to Landlord, Landlord shall cooperate with Tenant
in the obtaining of any and all licenses, building permits,
certificates of occupancy or other governmental approvals which
may be required in connection with any such alterations, and
Landlord shall execute, acknowledge and deliver any documents
reasonably required in furtherance of such purposes.

(b)    After expiration or termination of the Lease [as
defined in paragraph 3(d)] Tenant shall have the right, at
Tenant's expense, to submit in its own name or in Landlord's
name, if required, applications for such building permits,
zoning, conditional use permits, plans of development and all
such other permits and approvals as shall be related to the use
of the Premises and the construction and operation of
improvements thereon.    Landlord will join in such applications if
requested to do so by Tenant.

-14-

(009433-3)

(c)  Upon expiration or earlier termination of this Ground Lease, Tenant shall provide Landlord a complete set of up-to-date plans and specifications for the Improvements if Tenant has made alterations thereto following expiration or termination of the Lease [as defined in subparagraph 3(d)].

8.  Granting of Easements.  (a)  If no Event of Default shall have happened and be continuing, Landlord shall, from time to time after expiration or termination of the Lease [as defined in paragraph 3(d)]:  (i) grant easements and other rights in the nature of easements; (ii) release existing easements or other rights in the nature of easements; (iii) dedicate or transfer its interest in unimproved portions of the Land for road, highway or other public purposes; (iv) execute petitions to have the Land annexed to any municipal corporation or utility district; and (v) execute and deliver to any person any instrument appropriate to confirm or effect such grants, releases, dedications and transfers; provided that Tenant delivers to Landlord:

(w)  a copy of such proposal grant, release, dedication, amendment, transfer or petition;

(x)  Tenant's certificate stating:  (I) the consideration, if any, being paid for such grant, release, dedication, transfer, petition or amendment; and (II) that such grant, release, dedication, transfer, petition or amendment does not materially impair the use of the Land or materially reduce its value or adversely affect the priority of the lien created by any Permitted Mortgage, as defined in paragraph 15(b) vis a vis any other lien or existing encumbrance (other than the encumbrance that is the subject of this paragraph 8) on the Premises;

-15-

(009433-3)

(y)   an amount equal to the consideration so paid or payable; and

(z)   a duly authorized and binding undertaking of Tenant that it will remain obligated under this Ground Lease to the same extent as if such grant, release, dedication, transfer, petition or amendment had not been made, and so long as this Ground Lease is in effect that Tenant will perform or cause to be performed all financial and non-financial obligations of Landlord under such instrument and, after expiration or termination of this Ground Lease that Tenant will pay all financial obligations of Landlord under such instrument.

(b)   Tenant shall join or consent to (as required) any easement, right, dedication or other matter required by the tenant under the Lease [as defined in paragraph 3(d)] pursuant to paragraph 8 of such Lease.  Notwithstanding clause (g) of paragraph 8(a) of such Lease, any consideration payable where the easement, right, dedication or other matter encumbers the Land shall be paid to the Landlord under this Ground Lease.

9.   **Mechanics Liens.**  Tenant covenants that it will not permit any lien to be filed against Landlord's interest in the Land on account of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises for or on behalf of Tenant or any party claiming by, through, or under Tenant [other than the tenant under the Lease as defined in paragraph 3(d)], nor shall Tenant permit any judgement, lien or attachment against Tenant to lie against Landlord's interest in the Land. Should any such lien be filed against the Premises, Tenant shall, within thirty (30) days after receipt of written notice of such

-16-

(009433-3)

lien, cause said lien to be removed by substitution of collateral, posting a bond therefor or such other method as may be reasonably acceptable to Landlord.  Landlord may enter the Premises at any time to post notices of non-responsibility.

    10.  <u>Insurance</u>.

    (a)  <u>Property Damage</u>.  Tenant shall keep or cause to be kept in full force and effect all property damage coverage insurance required by any Permitted Mortgage as defined in paragraph 15(b).

    (b)  <u>Liability Insurance</u>.  Following expiration or termination of the Lease, Tenant shall keep in full force, in a form reasonably acceptable to Landlord, a commercial general liability policy of insurance against liability for deaths, bodily injury and property damage occurring on, in or about the Premises and adjoining streets and sidewalks, which shall name Landlord and, if requested, any mortgagee as additional insureds. The limits of such commercial general liability policy shall be not less than $5,000,000 combined single limit for bodily injury and property damage, with a deductible not in excess of the deductible permitted under paragraph 10(b) of the Lease [as defined in paragraph 3(d)] so long as the Lease is in effect or, if the Lease has expired or otherwise been terminated, then $250,000 (increased by a percentage thereof equal to the percentage increase in the Price Index between the commencement of this Ground Lease and the date of calculation).  The term "Price Index" shall mean the Revised Consumer Price Index for

                                      -17-

(009433-3)

Urban Wage Earners and Clerical Workers - All Items, 1982-84 =
100, U.S. City Average, presently published by the United States
Department of Labor, Bureau of Labor Statistics, Washington, D.C.
In the event the Price Index shall hereafter be converted to a
different standard reference base or otherwise revised, the
determination of the percentage change shall be made by the use
of such conversion factor, formula or table for converting the
Price Index as may be published by a nationally recognized
publication of similar statistical information.  In the event the
Price Index shall cease to be published, then for such purpose
there shall be substituted for the Price Index such other index
published by a governmental agency or by a nationally recognized
publication of statistical information as the parties may agree.
If the parties are unable to agree upon such other index, the
matter shall be determined by arbitration.

(c) <u>Workers' Compensation Insurance</u>.  To the extent
applicable following expiration or termination of the Lease [as
defined in paragraph 3(d)], Tenant shall maintain workers
compensation insurance in statutory limits.

(d) <u>Policy Provisions</u>.  Any insurance coverage
enumerated above may be effected by a blanket policy or policies
of insurance.

(e) <u>Waiver of Subrogation</u>.  Landlord and Tenant each
hereby waives any and all rights of recovery against the other
for any loss or damage to the Premises, for loss of income on
account of fire or other casualty, or for injury sustained on the

-18-

(009433-3)

Premises; and the aforesaid policies of insurance shall contain appropriate provisions recognizing this release and waiving all rights of subrogation by the respective insurance carriers. The foregoing release shall only apply to loss or damage which is either (i) covered or required to be covered by insurance maintained by or for the benefit of the releasing party or (ii) capable of coverage by so-called "all risk" casualty insurance; provided the release provided in clause (ii) shall not release Landlord of any self-insurance liability under the Lease.

(f) Evidence of Insurance. To the extent foregoing insurance is not required to be carried by the tenant under the Lease [as defined in paragraph 3(d)] Tenant shall cause to be issued to Landlord appropriate certificates of insurance evidencing compliance with the applicable covenants of this paragraph 10. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days unconditional notice of such expiration, cancellation or material change shall have been given to the certificate holder (and any mortgagee, if applicable).

(g) Indemnity. Before the expiration or termination of the Lease [as defined in paragraph 3(d)], Tenant hereby indemnifies Landlord against all claims, costs, liability, damage or expense, including attorneys' fees, caused by Tenant's negligence. After expiration or termination of the Lease [as defined in paragraph 3(d)], Tenant hereby indemnifies Landlord

-19-

(009433-3)

against all claims, costs, liability, damage or expense,
including attorneys' fees, for any death, damage or injury to
persons or property occurring on, in or about the Premises or
adjoining streets and sidewalks, except such as may have been
caused by Landlord's negligent acts.

11.  Condemnation and Casualty.  (a)  Tenant hereby
irrevocably assigns to Landlord any award or compensation to
which Tenant may become entitled by reason of its leasehold
interest in the Land (but not the Improvements) created by this
Lease if the use, occupancy or title to the Land or any part
thereof is taken, requisitioned or sold in, by or on account of
any actual or threatened eminent domain proceeding or other
action by any person having the power of eminent domain.
Landlord is hereby authorized and empowered to appear in any such
proceeding or action, in the name and on behalf of Tenant, if
necessary, to negotiate, prosecute and adjust any claim for any
award or compensation payment on account of any such damage,
taking, requisition or sale, and to collect any such award or
compensation.

(b)  If an occurrence of the character referred to in
clause (i) or (ii) of paragraph 11(a) of the Lease [as defined in
paragraph 3(d)] shall result in the tenant under the Lease
terminating the Lease pursuant to its right to do so thereunder,
the Tenant may not later than thirty (30) days after receipt of
notice of intention to terminate the Lease deliver to Landlord
(A) notice of its intention to terminate this Ground Lease on the

-20-

(009433-3)

Termination Date" established pursuant to the Lease. If, after
the expiration or termination of the Lease [as defined in
paragraph 3(d)], there shall be a taking by way of condemnation
of the Land such that the residue after the taking is, in
Tenant's reasonable opinion, insufficient for Tenant's use, then
Tenant may terminate this Ground Lease, with the approval of the
Lending Institution under a Permitted Mortgage, by written notice
to Landlord given within ninety (90) days after the date of the
taking.  This Ground Lease shall terminate on the Termination
Date except with respect to obligations and liabilities of Tenant
hereunder, actual or contingent, which have arisen on or prior to
the Termination Date, upon payment by Tenant of all Base Rent,
Additional Rent and other sums then due and payable hereunder to
and including the Termination Date.  If there has been a casualty
or damage to the Improvements and this Ground Lease is terminated
or expires, then Tenant shall, prior to termination or
expiration, remove all rubble and debris from the Land except to
the extent the removal is the obligation of Landlord in its
capacity as tenant under the last sentence of paragraph 5 of the
Lease [as defined in paragraph 3(d)].

        (c)  If, after an occurrence of the character referred
to in clause (i) or (ii) of paragraph 11(a) of the Lease [as
defined in paragraph 3(d)], Tenant does not give notice of its
intention to terminate this Ground Lease, then this Ground Lease
shall continue in full effect but if a taking (or deed in lieu
thereof) of the Land has occurred the Base Rent shall be adjusted

(009433-3)

-21-

from and after the date Tenant is required to yield possession to
the condemning authority in the same ratio that the square
footage of the Land before the taking (or sale in lieu thereof)
bears to the square footage of the Land after the taking (or sale
in lieu thereof); however, the foregoing adjustment shall be
applicable only until there is an adjustment in Base Rent based
on the fair market value of the Land and not thereafter.  In the
event of any temporary requisition, this Ground Lease shall
remain in full effect for the remainder of the term hereof and
Tenant shall be entitled to receive the entire award or
compensation payable during the remainder of the term hereof by
reason of such requisition.

    12.  **Assignment and Subletting.**  Tenant shall have the
right to sublet, assign, transfer and reassign all or any part of
the Land and any of Tenant's rights and obligations under this
Ground Lease during the term, so long as Tenant remains liable
for all of Tenant's obligations arising hereunder as a primary
obligor and not as a surety.  Landlord may recover from Tenant,
and Tenant shall pay to Landlord upon demand, such reasonable and
actual expenses as Landlord may incur (including without
limitation attorney's fees) as a result of any Event of Default
by Tenant hereunder caused by any assignee or subtenant [other
than Landlord in its capacity as tenant under the Lease as
defined in paragraph 3(d)].

    Any assignment of this Ground Lease shall be executed
by the assignor and the assignee.  Each assignee shall, for the

-22-

(009433-3)

benefit of Landlord, agree to assume, be bound by, and perform all terms, covenants, and conditions of this Ground Lease to be kept and performed by Tenant. Any sublease shall be executed by the sublessor and sublessee, shall limit the term of the sublease to the Main Term of this Lease and any exercised Option Periods and shall acknowledge that the sublease will terminate upon any termination of this Ground Lease. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

13. **Use.** Tenant shall initially lease the Premises to Landlord pursuant to the Lease [as defined in paragraph 3(d)] to use and operate the Premises as Landlord's headquarters office building. Tenant shall have the right to use the Land for any lawful use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) in a manner that constitutes a common law nuisance, or (iii) in violation of any Permitted Mortgage (as hereinafter defined) or any applicable provisions of the "Permitted Exceptions" contained in Exhibit "B".

14. **Tenant's Warranty as to Hazardous Substances.** (a) Tenant will not introduce, discharge, dump, spill or store within the Premises any "Hazardous Substances" (as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1986, 42 U.S.C. §§9601 et seq., as amended) or "Hazardous Wastes" as defined in the Resource Conservation Recovery Act of 1976, 42 U.S.C. §6901 et seq., as amended, or "Hazardous

-23-

(009433-3)

Materials" as defined in the Virginia Hazardous Materials
Emergency Response Act, Va. Code Ann. §44-146.34 in violation of
law; and Tenant indemnifies and agrees to hold Landlord harmless
from and against all costs, liability and damages as a result of
such violation. Acts of Landlord in its capacity as tenant under
the Lease shall not be attributed to Tenant hereunder and shall
not be covered by this paragraph 14. This warranty and indemnity
shall survive the termination of this Ground Lease. As used in
subparagraphs (b) and (d), the team "Hazardous Substances" shall
include the "Hazardous Substances, Hazardous Wastes and Hazardous
Materials" referred to in this subparagraph (a).

(b)   Following any discharge, disposal, dumping,
dispersion or release of Hazardous Substances prohibited by
Paragraph 14(a) hereof ("Pollution Hazard"), Tenant shall
immediately upon discovery thereof (i) notify Landlord of such
Pollution Hazard, (ii) obtain from an independent, reputable
environmental consultant reasonably acceptable to Landlord and
Tenant, and deliver to Landlord, a detailed estimate of the cost
of remedying such Pollution Hazard, and (iii) begin appropriate
remedial action and diligently pursue such remedial action to
completion, all at Tenant's sole cost and expense.

(c)   In the event of a Pollution Hazard remediation of
which is likely, in Landlord's reasonable estimation, to cost
more than $1,000,000 (increased by a percentage thereof equal to
the percentage increase in the Price Index between the
commencement of this Ground Lease and the date of calculation),

-24-

(009433-3)

Tenant shall provide Landlord, immediately upon Landlord's request, with adequate financial assurances that Tenant will meet its obligations under paragraph 14(b) above, provided, however, that Tenant shall not be required to provide adequate financial assurances so long as Tenant or a subtenant legally responsible directly to Landlord for such remediation has a reported net worth as of the end of Tenant's (or such subtenant's) most recent quarterly reporting period of not less than $273,000,000. The financial assurances required under this paragraph 14(c) shall take the form of a bond or dedicated bank account or letter of credit in form and substance satisfactory to Landlord or an insured trust account in a FDIC member bank, in each case in an amount equal to Landlord's reasonable estimate of the anticipated cost of the remedial action required under paragraph 14(b) hereof and shall be provided within thirty (30) days of Landlord's written request.

(d)   Following the expiration or termination of the Lease [as defined in paragraph 3(d)], Tenant, promptly upon the written request of Landlord from time to time, but not more than once in any calendar year unless an Event of Default has occurred and is continuing, shall permit such persons as Landlord may designate ("Site Reviewers") on the Premises for the purpose of determining whether there exists on the Premises any environmental condition which will result in any liability, cost or expense to Landlord or any other owner or occupier of the Premises relating to Hazardous Substances; provided, however,

-25-

(009433-3)

that any such Site Reviewer in performing any Site Assessment
shall not unreasonably interfere with the operations of Tenant on
the Premises.  Landlord agrees to indemnify and hold harmless
Tenant from all loss, cost or liability (including reasonable
attorneys' fees, it being understood that Landlord shall have the
right but not the obligation to control the defense of any action
against Tenant for which Landlord is liable under this sentence)
arising out of the acts of such Site Reviewers with respect to
the Premises.  Such Site Assessments may include both above and
below the ground testing for environmental damage or the presence
of Hazardous Substances on the Premises and such other tests on
the Premises as may be reasonably necessary to conduct the Site
Assessments in the opinion of the Site Reviewers.  Tenant shall
supply to the Site Reviewers such historical and operational
information regarding the Premises as may be reasonably requested
by the Site Reviewers to facilitate the Site Assessments and
shall make available for meetings with the Site Reviewers at the
Premises appropriate personnel having knowledge of such matters.
The cost of performing and reporting all Assessments shall be
paid by Landlord unless a Pollution Hazard has occurred (or if an
Event of Default has occurred and is continuing), in which event
such cost will be paid by Tenant within thirty (30) days after
demand by Landlord with interest to accrue at the Default Rate
from and after the due date.

-26-

(009433-3)

15. <u>Leasehold Mortgages</u>.

(a)  Provided no Event of Default has occurred and subject to the provisions hereof, Tenant shall have the right, at any time and from time to time, during the Term of this Ground Lease, to encumber Tenant's leasehold interest in the Land. While Tenant's right to encumber its leasehold interest is otherwise unlimited except as provided in paragraphs 15(a) and 15(b) hereof, only a "Permitted Mortgage" [as defined in paragraph 15(b)] shall be entitled to the benefits conferred by paragraph 15(c) hereof.  If Tenant shall obtain a commitment for any mortgage of Tenant's interest (and not just a Permitted Mortgage), Tenant shall give Landlord prompt notice thereof and of the closing date therefor.

(b)  A "Permitted Mortgage" shall be a deed of trust given by Tenant constituting a first lien upon Tenant's interest in the Premises, securing a Lending Institution and which otherwise meets the requirements of this paragraph 15.  For the purposes of this Ground Lease, the term "Lending Institution" shall mean any insurance company, bank or trust company, savings and loan association, real estate investment trust, pension, profit or retirement fund or trust, industrial revenue bond authority, or any other institution which regularly makes loans on real estate.  The maturity date of any loan secured by any mortgage of Tenant's interest (and not just a Permitted Mortgage) shall not be later than the then expiration date of the Term, and in the event of the sooner termination of this Ground Lease,

-27-

(009433-3)

Tenant shall, as a covenant surviving the expiration or termination hereof, cause to be released from the Premises the lien of the mortgage unless an Event of Default by Landlord in its capacity as tenant under the Lease has resulted in an uncured default under such mortgage. Any mortgage of Tenant's interest (and not just a Permitted Mortgage) (i) shall be subject and subordinate to the Lease and the rights of the tenant thereunder and (ii) shall be subject to this Ground Lease and the rights of Landlord hereunder and (iii) shall agree to release its lien from (or subordinate in the case of easements) the easements, rights and dedications contemplated by paragraph 8 of the Lease [as defined in paragraph 3(d)].

(c)  If Tenant shall mortgage its interest in the Premises, or any part or parts thereof, with a Permitted Mortgage and if the holder(s) of such Permitted Mortgage shall, within thirty (30) days of execution send to Landlord a true copy thereof, together with written notice specifying the name and address of the beneficiary of the Permitted Mortgage and the pertinent recording data with respect to such Permitted Mortgage, Landlord agrees that so long as any such Permitted Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder(s) to Landlord, the following provisions shall apply:

(i)  There shall be no cancellation, surrender or material modification of this Ground Lease without the prior consent in writing of the Lending Institution and any purported

-28-

(009433-3)

cancellation, surrender or material modification shall be null
and void and of no effect; however, the foregoing shall not apply
to Landlord's rights under paragraph 20;

(ii)  Landlord shall, upon serving Tenant with any
notice of default, simultaneously serve a copy of such notice
upon the holder(s) of the note(s) secured by such Permitted
Mortgage.  The Lending Institution shall thereupon have 10 days
in the case of default described in paragraph 19(a) and 60 days
in the case of default described in paragraph 19(b), after
service of such notice upon it, to remedy or cause to be remedied
the defaults complained of, and Landlord shall accept such
performance by or at the instigation of such Lending Institution
as if the same had been done by Tenant;

(iii)  Anything herein contained notwithstanding,
while such Permitted Mortgage remains unsatisfied of record, or
until written notice of satisfaction is given by the holder(s) to
Landlord, if any default shall occur which, pursuant to any
provision of this Ground Lease, entitles Landlord to terminate
this Ground Lease, and if before the expiration of thirty (30)
days from the date of service of notice of termination upon such
Lending Institution, such Lending Institution shall have notified
Landlord of its desire to nullify such notice and shall have paid
to Landlord all rent and other payments herein provided for and
then in default and shall have complied or shall commence the
work of complying with all of the other requirements of this
Ground Lease, other than defaults under paragraphs 19(c) - 19(f),

-29-

(009433-3)

if any are then in default, and shall prosecute the same to completion with reasonable diligence, then in such event Landlord shall not be entitled to terminate this Ground Lease and any notice of termination theretofore given shall be void and of no effect;

(iv)  Landlord agrees that the name of the Lending Institution may be added to the "Loss Payable Endorsement" of any and all casualty insurance policies required to be carried by Tenant hereunder on condition that the insurance proceeds are to be applied in the manner specified in this Ground Lease and in the Lease and that the Permitted Mortgage or collateral document shall so provide.

(v)  Landlord agrees that in the event of termination of this Ground Lease by reason of any default by Tenant other than for nonpayment of rent and other payments herein provided for, that Landlord will enter into a new ground lease of the Land with the Lending Institution or its nominee, for the remainder of the Term, effective as of the date of such termination, at the rent and upon the terms, provisions, covenants and agreements as herein contained and subject to the Lease [as defined in paragraph 3(d)] and to the same conditions of title as this Ground Lease is subject on the date of the termination hereof, and to the rights, if any, of any parties then in possession of any part of the Premises, provided:

-30-

(009433-3)

The Lending Institution or nominee shall make written request upon Landlord for such new ground lease within thirty (30) days after the date of such termination;

The Lending Institution or nominee shall pay to Landlord at the time of the execution and delivery of the new ground lease, any and all sums which would, at the time of the execution and delivery thereof, be due pursuant to this Ground Lease but for such termination, in which case the amount payable by the Tenant under the terminated Ground Lease pursuant to paragraph 20(b) thereof would be zero, and in addition thereto, any expenses, including reasonable attorneys' fees, to which Landlord shall have been subjected by reason of such default;

The Lending Institution or its nominee shall perform and observe all covenants and shall further remedy any other conditions which Tenant under the terminated Ground Lease was obligated to perform under the terms of this Ground Lease; provided however, that the Lending Institution shall not be responsible for remedying conditions which are curable only by Tenant [such as, for example, paragraphs 19(c) through (f) of this Ground Lease];

Landlord shall not warrant possession of the Premises as against Tenant to the tenant under the new ground lease;

The new ground lease shall be expressly made subject to the rights of the tenant under the Lease [as defined in paragraph 3(d)]; and

-31-

(009433-3)

The tenant under such new ground lease shall have the
same right, title and interest, vis a vis Landlord, in and
to the Improvements as Tenant under the terminated Ground
Lease had immediately prior to such termination.

Any new ground lease made pursuant to paragraph 15(c) hereof
shall have the same priority as this Ground Lease and shall be
prior to any mortgage or any lien, charge or encumbrance of the
fee of the Land created by Landlord, for a term of years equal to
the balance of the Term of this Ground Lease, as the same may be
extended pursuant to the provisions of this Ground Lease. Any
mortgage or deed of trust upon Landlord's interest in the Land
and any action by such mortgagee or trustee or beneficiary of
such deed of trust by way of foreclosure, exercise of power of
sale or deed in lieu thereof shall be subject to this Ground
Lease and to the new ground lease to be given pursuant to
paragraph 15(c) hereof and any mortgagee or holder of such
mortgage or beneficiary and trustee of any such deed of trust
must recognize this Ground Lease and all rights of Tenant and the
Lending Institution under any Permitted Mortgage hereunder,
including, without limitation, their rights with respect to
insurance proceeds and condemnation awards. This provision shall
be self-operative and require no further action by the holder of
any mortgage of Landlord's interest in the Land, but upon request
by the Tenant or Mortgagee, Landlord agrees to use its best
efforts to obtain from such holder an instrument duly executed

-32-

(009433-3)

and acknowledged confirming the priority of such new ground lease.

(vi)   Nothing herein contained shall require the Lending Institution or nominee to cure any default of Tenant under this Ground Lease nor shall any such Lending Institution be personally liable therefor.

(vii)   The proceeds from any insurance policies or arising from a condemnation are to be held by any Lending Institution and distributed pursuant to the provisions of this Ground Lease and the Lease [as defined in paragraph 3(d)];

(viii)   The Lending Institution shall be given notice of any arbitration proceedings by the parties hereto, and shall have the right to intervene therein and be made party to such proceedings, and the parties hereto do hereby consent to such intervention.  In the event that the Lending Institution shall not elect to intervene or become party to such proceedings, the Lending Institution shall receive notice of, and a copy of any award or decision made in said arbitration proceedings; and

(ix)   Landlord shall, upon request, execute, acknowledge and deliver to each Lending Institution, an agreement prepared at the sole cost and expense of Tenant, between Landlord, Tenant and the Lending Institution, agreeing to all of the provisions of this paragraph.  The term "mortgage" or "Permitted Mortgage", whenever used herein, shall include whatever security instruments are used in the locale of the Premises, such as, without limitation, deeds of trust and

-33-

(009433-3)

assignments of rents and/or leases, as well as financing statements, security agreements and other documentation required by the Uniform Commercial Code.

(x)   Landlord may mortgage its fee interest in the Land and its interest in this Ground Lease, however, any such mortgage shall be subject to this Ground Lease and the rights of Tenant and the rights (including the right to a new lease) of the Lending Institution under a Permitted Mortgage hereunder.

If Landlord receives more than one written request in accordance with the provisions of this paragraph 15(c), Landlord shall only be required to deliver the new ground lease to the Lending Institution whose Permitted Mortgage is prior in lien to any and all other Permitted Mortgages, and the written request, and its rights hereunder, of any mortgagee whose leasehold mortgage is subordinate in lien shall be null and void and of no force or effect.

16.  Change of Landlord.  In the event the Landlord's interest in the Land passes to a successor ("Successor") by sale, lease, foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Ground Lease for the balance of the Term with the same force and effect as if the Successor were the Landlord under the Ground Lease, and the Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant, but without the execution of any further instrument on the part of either of the parties hereto

-34-

(009433-3)

immediately upon the Successor's succeeding to the interest of
Landlord under this Ground Lease; provided, however, that in
order for the foregoing to be effective against Tenant, such
Successor must be bound to Tenant in respect of all of Landlord's
duties and obligations hereunder, such binding effect on the
Successor to be effective and self-operative without the
execution of any further instrument on the part of either of the
parties hereto (except notice as required above), immediately
upon the Successor's succeeding to the interest, duties and
obligations of Landlord under this Ground Lease.  Such
Successor's liability hereunder shall be limited to its interest
in the Land and the rents, issues and profits therefrom subject
to paragraph 26, and Tenant shall have no claim against other
assets of such Successor.  In the event that Landlord's interest
in the Land passes to a Successor and such Successor is bound
unto Tenant as set forth above, Landlord shall be released from
all obligations to Tenant hereunder arising after the date
Landlord's interest so passes.

    17.  Memorandum of Ground Lease Agreement.  Landlord
agrees, at Tenant's request and Landlord's sole expense, to
execute a Memorandum of Lease in recordable form, substantially
similar to that attached hereto as Exhibit "C" setting forth such
provisions hereof as may be required by Virginia law or desired
by Landlord.  Recording costs for such document shall be borne by
Landlord; however, if a Mortgagee exercises its right to obtain a

(009433-3)

-35-

new ground lease under paragraph 15, costs incident to the
recordation of any memorandum shall not be borne by Landlord.

18.   Improvements.   Until the expiration or sooner
termination of this Ground Lease, title to the Improvements shall
remain in Tenant and Tenant shall be entitled to deduct all
depreciation for the Improvements on Tenant's income tax returns.
Tenant hereby grants, releases, transfers, sets over and assigns
and conveys to Landlord all of its right, title, and interest in
and to the Improvements effective upon the expiration or sooner
termination of this Ground Lease.   Upon the expiration or sooner
termination of this Ground Lease, Tenant shall surrender the Land
together with such Improvements, if any, as are then thereon to
Landlord, free of any Permitted Mortgage, but subject to the
rights of a Lending Institution to obtain a new ground lease and
title to the Improvements under paragraph 15(c), or other lien
created by Tenant, and shall upon request execute in recordable
form a release and quitclaim to Landlord of all of Tenant's
right, title and interest in and to any such Improvements.
Tenant covenants and agrees that it will execute such further
assurances of title and conveyance as may be requested by
Landlord upon expiration or termination in order to fully vest
fee simple title to the Improvements in Landlord or the holder of
a Permitted Mortgage which has obtained a new ground lease
pursuant to paragraph 15(c) in accordance with the requirements
of local law then applicable and in such manner as to permit
Landlord to obtain an owner's title insurance policy in the

-36-

(009433-3)

standard ALTA form then in use insuring Landlord's fee simple
ownership in the Land and Improvements without any exception
arising out of or by reason of the existence of this Ground Lease
or the deed of the Improvements from Landlord to Tenant and at a
premium charge not in excess of the premium charge normally made
by title insurance companies for such owner's title insurance
policy. Without limiting the generality of the foregoing, should
Landlord so request upon the termination of this Ground Lease,
Tenant shall execute a deed in the standard form then in use in
commercial land transactions in the Commonwealth of Virginia and
fully sufficient to convey the Improvements to Landlord. Tenant
hereby appoints Landlord its agent and attorney-in-fact (which
agency shall be deemed a power coupled with an interest and
irrevocable) with full power and authority for it and on its
behalf upon the expiration or termination of this Ground Lease to
execute, acknowledge and deliver to Landlord, its successors and
assigns including the holder of a Permitted Mortgage which has
obtained a new ground lease pursuant to paragraph 15(c), upon the
terms of this Ground Lease, a deed in the standard form then in
use in commercial land transactions in the Commonwealth of
Virginia conveying its entire title to such Improvements. Tenant
covenants and agrees that, should Landlord exercise its right as
agent and attorney-in-fact hereunder as aforesaid and execute,
deliver and record the deed heretofore described, the deed shall
have the same force and effect as to all third parties as a deed
fully executed, acknowledged and delivered by Tenant itself.

-37-

(009433-3)

Tenant's obligations hereunder shall survive the expiration or
earlier termination of the Ground Lease. Tenant will observe and
perform at its own cost and expense all the covenants, terms and
conditions imposed by the Lease [as defined in paragraph 3(d)]
upon the landlord under the Lease, to the end that so long as the
Ground Lease is in effect Landlord shall not have any
responsibility for compliance with the landlord's obligations
under the provisions of the Lease and shall be indemnified by
Tenant against all liability therefor.

    19.  Events of Default.  Any of the following
occurrences, conditions or acts by Tenant shall constitute an
"Event of Default" under this Ground Lease:

    (a)  Following expiration or termination of the Lease
[as defined in paragraph 3(d)], Tenant's failure to make any
payment of rent required by this Ground Lease (including without
limitation Base Rent or Additional Rent) when due and failure to
cure within five (5) business days after receipt of written
notice of default; provided, however, that if Landlord shall give
notice of 3 such Events of Default in any consecutive 18-month
period, any additional such default beyond three (3) within such
18 months shall not be cured until Tenant pays Landlord an
administrative fee equal to 4% of the delinquent payment. The
foregoing shall not apply to an Event of Default which is also an
"Event of Default" by Landlord in its capacity as tenant under
the Lease.

-38-

(009433-3)

(b)  Tenant's failure to observe or perform any other provision of this Ground Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) days, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same and diligently prosecutes such cure. The foregoing shall not apply to an Event of Default which is also an "Event of Default" by Landlord in its capacity as tenant under the Lease.

(c)  any representation or warranty made by Tenant herein or by certificate delivered pursuant hereto proves to be incorrect in any material respect when made;

(d)  Tenant shall (A) seek or consent to the appointment of a receiver or trustee for itself or for the Premises, (B) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (C) make a general assignment for the benefit of creditors;

(e)  a court shall enter an order, judgment or decree appointing a receiver or trustee for it or for the Premises or approving a petition filed against Tenant which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree

-39-

(009433-3)

shall remain in force, undischarged or unstayed, 120 days after it is entered; or

(f)  Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution, it being understood that a merger of Tenant with or into another entity shall not be within the contemplation of this paragraph (f).

20.  Landlord's Remedies.  After the occurrence of an Event of Default, subject to the rights of the holder of a Permitted Mortgage set forth in paragraph 15(c) above, Landlord shall have the right to exercise the following remedies:

(a)  Continue Ground Lease.  Landlord may, at its option, continue this Ground Lease in full force and effect, without terminating Tenant's right to possession of the Premises, if any, in which event Landlord shall have the right to collect Base Rent and Additional Rent when due, including any due for any Option Period for which a Renewal Option has been exercised.  In the alternative, Landlord shall have the right to re-enter the Premises on the terms set forth in subparagraph (b) below, without such re-entry's being deemed a termination of the Ground Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Ground Lease but subject to the Lease [as defined in paragraph 3(d)] if the same remains in effect, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of

-40-

(009433-3)

Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such relettings shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys fees, any reasonable and actual real estate commissions paid, [provided however that expenses of reletting shall not be applicable so long as the Lease is in effect] and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.  If a sufficient sum to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages, then Tenant shall pay Landlord any deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise.  Nothing herein, however, shall be construed to require Landlord to re-enter and relet in any event, except as provided by Virginia law.  Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Ground Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder.  Landlord's re-entry and reletting of the Premises without termination of this Ground Lease shall not preclude Landlord from subsequently terminating this Ground Lease as set forth below.

(b)  Terminate Ground Lease.  Landlord may terminate this Ground Lease by written notice to Tenant specifying a date

-41-

(009433-3)

therefor, which shall be no sooner than ten (10) days following
receipt of such notice by Tenant, and this Ground Lease shall
then terminate on the date so specified as if such date had been
originally fixed as the expiration date of the Term.  In the
event of such termination, Landlord shall be entitled to recover
from Tenant all of the following:

    (i)    The "worth at the time of award"
(defined below) of any obligation
which has accrued prior to the date of
termination;

    (ii)    The worth at the time of the award of
the amount by which the unpaid Base
Rent and Additional Rent which would
have accrued after termination until
the time of award exceeds the amount
of any sums which Landlord has (or
Tenant proves that Landlord could
have) received in mitigation; and

    (iii)    The worth at the time of award of the
amount by which Base Rent and
Additional Rent for the balance of the
Term (including only any exercised
Renewal Options) after the date of the
award exceeds the amount of any sums
which Landlord will (or Tenant proves
that Landlord could) receive in
mitigation.

As used in clauses (i) and (ii) of this subparagraph
20(b) the term "worth at the time of the award" shall be computed
by allowing interest at the rate of eight percent (8%) per annum
on the amount of the obligations set forth therein from the date
the obligation accrues until the date of payment and, as used in
clause (iii), the term "worth at the time of the award" shall be
computed by discounting such amount at the rate of eight percent
(8%) per annum.  In the event this Ground Lease shall be

-42-

(009433-3)

terminated as provided above, by summary proceedings or otherwise, Landlord, its agent, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, either by summary dispossess proceedings or by other suitable action or proceeding at law without liability for damages therefor.

(c) <u>Reimbursement of Landlord's Costs in Exercising Remedies</u>.  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation reasonable attorneys' fees).

(d) <u>Remedies Are Cumulative</u>.  Except after termination of this Ground Lease by Landlord, the various rights and remedies reserved to Landlord herein, including those not specifically described by law in force and effect at the time of the execution hereof, are cumulative, and Landlord may pursue any and all such rights and remedies, whether at the same time or otherwise.

21.  <u>Holding Over</u>.  Tenant agrees that at the expiration of this Ground Lease, in addition to conveying title to Landlord as provided in paragraph 18, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or Additional Rent by Landlord shall operate as a renewal or extension of this Ground Lease without the written consent of Landlord and Tenant.  Should

-43-

(009433-3)

Tenant hold over without the consent of Landlord, this Ground
Lease shall continue in force from month to month, subject to all
of the provisions hereof and at two times the monthly Base Rent
Tenant had been paying during the preceding Lease Year.

22.  "For Rent" and "For Sale" Signs.  Tenant hereby
permits Landlord during the last ninety (90) days of the Main
Term or of any Option Period, as the case may be (provided that
no applicable Renewal Option has been exercised or deemed
exercised), to place "For Rent" or "For Sale" signs, not
exceeding four (4) feet by four (4) feet in size, on the
Premises.  Tenant will also allow Landlord or its agents,
accompanied by a representative of Tenant designed by Tenant, to
show the Premises, exterior and interior, to prospective tenants,
purchasers, or mortgagees during reasonable business hours by
prior appointment, provided same does not interfere with the
conduct of Tenant's business.

23.  Estoppel Certificates.  Without charge, at any
time and from time to time hereafter, within ten (10) days after
receipt of written request by either party, the other party shall
certify, by written and duly executed instrument, to each other
and any present or proposed mortgagee, purchaser, sublessee or
assignee ("Person") specified in such request:  (a) as to whether
this Ground Lease has been supplemented or amended, and, if so,
the substance and manner of such supplement or amendment; (b) as
to the validity, force and effect of this Ground Lease, in
accordance with its tenor as then constituted, to the best

-44-

(009433-3)

knowledge of the party so certifying; (c) as to the existence of any known default thereunder; (d) as to the existence of any offsets, counterclaims, or defenses thereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

24. <u>Waiver</u>. If Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Ground Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present and future, of this Ground Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

25. <u>Compliance with Applicable Laws</u>. During the Term, to the extent that the Premises are affected thereby, Tenant shall comply with all lawful requirements of governmental authorities with jurisdiction over the Improvements respecting Tenant's use and occupancy of the Improvements. If Tenant, after expiration or termination of the Lease [as defined in paragraph 3(d)] and after notice from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any

-45-

(009433-3)

such requirement, fails to perform same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent, after thirty (30) days' prior written notice to Tenant (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) and Tenant's failure to cure or commence to cure during such thirty (30) days and diligently prosecute the cure to completion.

26. <u>Non Recourse as to Landlord</u>.  Anything contained herein to the contrary notwithstanding, except as permitted in paragraph 29(1) any claim based on or in respect of any liability of Landlord under this Ground Lease shall be enforced only against the Land and not against any other assets, properties or funds of (a) Landlord, or any shareholder, trustee, advisor, director, officer, general partner, limited partner, employee or agent of Landlord, or their officer, director, or shareholder (or any legal representative, heir, estate, successor or assign of any thereof) and (b) any predecessor or successor entity, either directly or through Landlord or otherwise, except that (i) any claim in respect of Landlord for fraud or intentional misapplication of funds under this Ground Lease may be enforced against the assets, properties or funds of Landlord but not against the assets, properties or funds of any of the other persons described in (a) and (b) above, (ii) nothing herein shall preclude an action for specific performance or an injunction, and

-46-

(009433-3)

(iii) nothing in this Ground Lease [including subparagraph 3(c)] shall prevent attachment of rents, issues and profits in the hands of Landlord (but not by offset by Tenant), prior to their distribution to shareholders.

27.  Notices.  Any notice permitted or required to be given pursuant to this Ground Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service addressed to the parties as follows:

If to Landlord:         CIRCUIT CITY STORES, INC.
                        2040 Thalbro Street
                        Richmond, Virginia 23230
                        Attention:  Corporate Secretary

with a copy to:         CIRCUIT CITY STORES, INC.
                        1508 Willow Lawn Drive
                        Richmond, Virginia 23230
                        Attention:  Vice President of
                                    Real Estate

If to Tenant:           CRA ACQUISITION CORP.
                        1345 Avenue of the Americas
                        New York, New York 10150
                        Attention:  Antony Monk

with a copy to:         CSAPLAR & BOK
                        655 Montgomery Street
                        San Francisco, California 94111
                        Attention:  Lewis A. Burleigh

or to such other addresses as any party hereto shall from time to time give notice thereof to any other party.

(009433-3)                          -47-

28. <u>Right of First Refusal and Option to Purchase.</u>

(a)  In the event that Landlord from time to time
offers to sell or receives any offer to purchase its interest in
the Land or any portion thereof and desires to accept the same,
before accepting such offer, Landlord shall give to Tenant in
writing the right of first refusal to purchase the same at the
same price and upon the same terms as are contained in the offer.
If Tenant shall not have exercised its right of first refusal by
notice to Landlord given within twenty four (24) days after the
receipt by Tenant of Landlord's notice, Landlord shall be free to
sell the same according to the price and terms of such offer.
Any such sale shall nonetheless be subject to the terms of this
Ground Lease, including this paragraph 28 and the right of first
refusal set forth herein as to subsequent offers.  If Tenant
gives notice of acceptance, settlement shall occur thereafter
upon the terms of such bona fide offer.

(b)  If not sooner terminated pursuant to the
provisions hereof, Tenant's right of first refusal and the option
to purchase shall terminate twenty-one (21) years after the death
of the last survivor of the descendants of Franklin D. Roosevelt
living on the date of this Lease.

(c)  Tenant's right of first refusal shall not apply
to:  (i) a sale of the Land to an assignee of the tenant's
interest in the Lease, or (ii) a conveyance of the Land to a
parent, subsidiary or affiliate of Landlord, or (iii) any
mortgage (including a deed of trust) of the Land or to the

-48-

(009433-3)

foreclosure of any mortgage or deed in lieu thereof, or (iv) any merger of Landlord with any other entity, or (v) any conveyance contemplated by paragraph 8 hereof or paragraph 8 of the Lease [as defined in paragraph 3(d)].

(d)  In the event of the occurrence of an Event of Default under paragraph 19 of the Lease [as defined in paragraph 3(d)], Tenant shall have the option to purchase the Land at its fair market value excluding the Improvements.  Such option shall be exercised by written notice to Landlord given within 30 days after occurrence of the Event of Default but before the Event of Default has been cured.  The fair market value shall be determined by appraisal as set forth in clause (iii) of paragraph 3(a) except that either party may commence the appraisal process following Tenant's exercise of its option to purchase.  Closing shall occur within 30 days after receipt of the appraisal(s) and the purchase price shall be paid in wired federal funds at closing.  Conveyance of the Land shall be by special warranty deed, subject to Permitted Encumbrances, the lien of any mortgage created by Tenant, matters contemplated by paragraph 8 hereof or paragraph 8 of the Lease [as defined in paragraph 3(d)], and matters to which Tenant may have consented or which do not otherwise materially adversely affect marketability of title.

29.  Miscellaneous.  (a)  Headings and Gender.  Any paragraph headings, titles or captions contained in this Ground Lease are for convenience only and shall not be deemed a part of this Ground Lease and shall not in any way limit or amplify the

-49-

(009433-3)

terms and provisions of this Ground Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)  Construction.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)  Waiver of Jury Trial.  In the event of any court action arising out of this Ground Lease, each party hereby expressly waives its right to trial by jury.

(d)  Relationship of Landlord and Tenant.  Nothing contained in this Ground Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant other than the landlord-tenant relationship.

(e)  Entire Agreement; Integration.  This Ground Lease, including all exhibits hereto (which are hereby incorporated herein by reference), covers, in full, each and every final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Ground Lease, and all preliminary negotiations and agreements of whatsoever kind or nature are merged herein.  This Ground Lease cannot be changed or modified in any manner other than a written amendment or modification executed by Landlord and Tenant.

-50-

(009433-3)

(f)  **Attorney's Fees**.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Ground Lease, to commence or defend any action or proceeding in any way connected with this Ground Lease or to seek a judicial declaration of rights under this Ground Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)  **Partial Invalidity**.  If any provision of this Ground Lease or the application thereof to any person or circumstances shall be deemed invalid or unenforceable, the remainder of this Ground Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the extent permitted by law.

(h)  **Consents**.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)  **Holidays**.  If the day on which rent is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)  **Applicable Law**.  This Ground Lease shall be construed in accordance with the laws of the Commonwealth of

(009433-3)

-51-

Virginia, and the parties agree that jurisdiction shall lie therein.

(k) <u>Successors and Assigns</u>. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party. The obligation of Tenant hereunder shall be binding upon any person or entity into which Tenant is merged with which Tenant is consolidated or to whom substantially all assets of Tenant are sold.

(l) <u>Payment Under Protest</u>. It is agreed that if at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under this Ground Lease, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said party to institute suit for the recovery of such sum, and if it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

(m) <u>Force Majeure</u>. Performance by Landlord or Tenant of their obligations hereunder shall be extended by the period of delay caused by force majeure. Force majeure is hereby deemed to include war, natural catastrophe, strikes, walkouts or other labor disturbance, order of any government, court or regulatory

-52-

(009433-3)

body having jurisdiction, shortages, blockage, embargo, riot, civil disorder, or any such similar cause beyond the reasonable control of the party who is obligated to render performance. Financial inability to perform shall not constitute force majeure and obligations to pay money are not subject to force majeure.

(n) Non-Merger. Until this Ground Lease expires or is earlier terminated, so long as a Permitted Mortgage is outstanding, the ownership by the same person of the fee and leasehold interests in the Land shall not cause this Ground Lease to be merged into the fee interest. If this Ground Lease is terminated and the Lending Institution under a Permitted Mortgage does not exercise its right to obtain a new ground lease, as contemplated by paragraph 15(c), this paragraph shall not prevent a merger of estates.

(o) Inspection. Landlord shall have the right, in addition to its rights under paragraph 14, to enter the Premises at all reasonable times and inspect the same, all in a manner that will not unreasonably interfere with the conduct of Tenant's business.

(p) Exculpation of Trustees. Neither Corporate Realty Advisors, Inc., a Delaware corporation ("Advisor"), nor the trustees, officers, directors, shareholders or employees of Advisor or of Corporate Realty Income Trust I shall have any personal liability for the payment and performance by Tenant hereunder.

-53-

(009433-3)

WITNESS the following signatures and seals:

TENANT:

CRA ACQUISITION CORP.,
a Delaware corporation

By: _K. E. Mach_

Its: _PRESIDENT_

LANDLORD:

CIRCUIT CITY STORES, INC., a
Virginia Corporation

ATTEST:

By: _Benjamin B Cumming Jr._

Its: _Asst Secretary_

Its: _ASS'T V.P. - REAL ESTATE_

(SEAL)

WAA5001.LAG

-54-

(009433-3)

EXHIBIT A

Description of the Land

PHASE ONE - PARCEL 1:

SITUATED, lying, and being in the Three Chopt District of Henrico County, Virginia, and being more particularly described as follows:

COMMENCING on a point in the south line of Broad Street Road, said point being the intersection of the south line of Broad Street Road extended, and the west line of Deep Rock Road extended, thence along the west line of Deep Rock Road a distance of 1034.69 feet to a point, said point marking the northwest corner of Parcel 2 and lying in the west line of Deep Rock Road; THENCE South 45°58'00" West for a distance of 510.00 feet with the west line of said Parcel 2 to a point in the north line of Parcel 1, said point being the point of BEGINNING for Parcel 1; THENCE South 50°20'07" East for a distance of 59.95 feet to a point; THENCE along a curve to the left having a radius of 50.00 feet and an arc length of 23.36 feet, being subtended by a chord of South 63°43'12" East for a distance of 23.15 feet to a point; THENCE along a curve to the right having a radius of 393.49 feet and an arc length of 278.64 feet, being subtended by a chord of South 25°42'44" East for a distance of 272.86 feet to a point; THENCE South 84°34'27" West for a distance of 49.00 feet to a point; THENCE South 04°33'53" West for a distance of 119.53 feet to a point; THENCE South 75°26'41" East for a distance of 49.00 feet to a point; THENCE along a curve to the right having a radius of 393.49 feet and an arc length of 64.75 feet, being subtended by a chord of South 19°16'10" West for a distance of 64.68 feet to a point; THENCE South 23°59'00" West for a distance of 609.50 feet to a point; THENCE North 67°37'44" West for a distance of 591.24 feet to a point; THENCE North 21°52'52" West for a distance of 561.48 feet to a point; THENCE North 51°29'00" East for a distance of 373.81 feet to a point; THENCE North 45°33'30" East for a distance of 310.02 feet to a point; THENCE North 39°58'30" East for a distance of 85.69 feet to a point; THENCE South 52°53'21" East for a distance of 353.36 feet to a point being the point of BEGINNING.

SAID property contains 18.467 acres more or less.

FUTURE DEEP ROCK ROAD EXTENSION - PARCEL 2:

SITUATED, lying, and being in the Three Chopt District of Henrico County, Virginia, and being more particularly described as follows:

BEGINNING on a point in the north line of Parcel 1, said point being the point of beginning of Parcel 1 and being the southwest corner of the property herein described. THENCE North 45°58'00" East for a distance of 510.00 feet to a point lying in the west line of Deep Rock Road; THENCE along a curve to the left having a radius of 50.00 feet and an arc length of 64.35 feet, being subtended by a chord of South 44°02'00" East for a distance of 60.00 feet to a point on the south end of Deep Rock Road; THENCE South 45°58'00" West for a distance of 364.86 feet to a point; THENCE along a curve to the left having a radius of 955.54 feet and an arc length of 11.99 feet, being subtended by a chord of South 45°36'26" West for a distance of 11.99 feet to a point; THENCE along a curve to the left having a radius of 40.00 feet and an arc length of 40.88 feet, being subtended by a chord of South 15°58'01" West for a distance of 39.13 feet to a point; THENCE along a curve to the right having a radius of 50.00 feet and an arc length of 124.77 feet, being subtended by a chord of

EXHIBIT A
Continued

South 58°10'31" West for a distance of 94.83 feet to a point; THENCE North 50°20'07" West for a distance of 59.95 feet to the point of BEGINNING.

SAID property contains 0.768 acres more or less.

FUTURE MAYLAND DRIVE EXTENSION - PARCEL 3:

SITUATED, lying, and being in the Three Chopt District of Henrico County, Virginia, and being more particularly described as follows:

COMMENCING on a point in the north line of Parcel 1, said point being the Southwest corner of Parcel 2 also, the point of beginning for Parcel 2, and being the point of beginning for Parcel 1, THENCE South 50°20'7" East for a distance of 59.95 feet to a point; THENCE along a curve to the left having a radius of 50.00 feet and an arc length of 23.36 feet, being subtended by a chord of South 63°43'12" East for a distance of 23.15 feet to a point; THENCE along a curve to the right having a radius of 393.49 feet and an arc length of 278.64 feet, being subtended by a chord of South 25°42'44" East for a distance of 272.86 feet to a point; thence South 84°34'27" West for a distance of 15.00 feet to a point, said point being the point and place of BEGINNING for Parcel 3; THENCE along a curve to the left having a radius of 25.00 feet and an arc length of 34.91 feet, being subtended by a chord of South 45°25'59" East for a distance of 32.14 feet to a point; THENCE South 85°26'26" East for a distance of 30.20 feet to a point; THENCE along a curve to the right having a radius of 1123.00 feet and an arc length of 36.78 feet, being subtended by a chord of South 84°30'08" East for a distance of 36.78 feet to a point; THENCE along a curve to the right having a radius of 246.87 feet and an arc length of 50.39 feet, being subtended by a chord of South 77°42'58" East for a distance of 50.31 feet to a point; THENCE along a curve to the left having a radius of 165.24 feet and an arc length of 53.49 feet, being subtended by a chord of South 81°08'33" East for a distance of 53.26 feet to a point; THENCE South 00°25'00" East for a distance of 55.00 feet to a point; THENCE South 15°15'05" West for a distance of 5.20 feet to a point on the south line of Mayland Drive; THENCE along a curve to the left having a radius of 192.07 feet and an arc length of 45.21 feet, being subtended by a chord of South 82°25'15" West for a distance of 45.11 feet to a point; THENCE along a curve to the right having a radius of 149.13 feet and an arc length of 41.96 feet, being subtended by a chord of South 83°44'17" West for a distance of 41.82 feet to a point; THENCE along a curve to the right having a radius of 1211.78 feet and an arc length of 58.38 feet, being subtended by a chord of North 86°49'14" West for a distance of 58.37 feet to a point; THENCE North 85°26'26" West for a distance of 30.21 feet to a point; THENCE along a curve to the left having a radius of 25.00 feet and an arc length of 34.91 feet, being subtended by a chord of South 54°33'27" West for a distance of 32.14 feet to a point; THENCE North 75°26'41 West for a distance of 34.00 feet to a point; THENCE North 04°33'53" East for a distance of 119.53 feet to a point; THENCE North 84°34'27" East for a distance of 34.00 feet to the point of BEGINNING.

Said property contains 0.473 acres more or less.

## EXHIBIT B

### Permitted Exceptions

1.  Taxes subsequent to those for the year 1989, not yet due and payable.

2.  Possible supplemental assessment and taxes for improvements constructed on the premises.

3.  Restrictions, easements, conditions, assessments, etc. appearing as follows:  Imposed by instrument recorded in Deed Book 1840, page 1952, Deed Book 1850, page 1329, amended in Deed Book 2122, page 1701, Deed Book 2126, page 1158, Deed Book 2126, page 1166, amended in Deed Book 2126, page 1170, and amended in Deed Book 2136, page 642.

4.  Plat of subdivision of Deep Run Business Center dated August 24, 1981, recorded in Plat Book 73, page 89 and 90 shows various drainage, utility, traffic control and slope easements.

5.  Easement granted County of Henrico, dated March 14, 1975, recorded in Deed Book 1636, page 870, grants 16' permanent easement as shown on plat of survey dated September 10, 1987, revised October 16, 1987, and March 30, 1988, made by Foster & Miller, P.C.

6.  Agreement with County of Henrico, Virginia, recorded in Deed Book 1839, page 1067, for establishment of a water system and operation thereof.

7.  Agreement with County of Henrico, Virginia, recorded in Deed Book 1839, page 1182, for establishment of a sewer system and operation thereof.

8.  Easement granted County of Henrico, dated February 11, 1980, recorded in Deed Book 1800, page 168, grants permanent easement 15' in width for utilities as shown on plat attached thereto and also shown on plat of survey dated September 10, 1987, revised October 16, 1987, and March 30, 1988, made by Foster & Miller, P.C., Certified Surveyors.

9.  Reservation by the Innsbrook Corporation in Deed Book 2126, page 1170, for an easement and right-of-way 10' in width drainage and traffic control as shown on plat of survey made by Foster and Miller, dated September 10, 1987, revised March 30, 1988.

10. Deed of Easement to the County of Henrico, dated March 21, 1980, recorded in Deed Book 1806, page 1560, for a 16' sanitary sewer easement.

11. Restriction against hotel development contained in Deed Book 2129, page 1059, Henrico County, Virginia.

12. Terms and Conditions of the Declaration of Easements and Restrictions, dated February 28, 1990, recorded February 28, 1990, Clerk's Office of the Circuit Court of Henrico County, Virginia.

13. Terms and Conditions of the Lease by and between Circuit City Stores, Inc., a Virginia corporation, and CRA Acquisition Corp., a Delaware corporation, dated February 28, 1990, a Memorandum of which is recorded February 28, 1990, in the Clerk's Office of the Circuit Court of Henrico County, Virginia.

14. Terms and Conditions of the Ground Lease from Circuit City Stores, Inc., a Virginia corporation, to CRA Acquisition Corp., a Delaware corporation, dated February 28, 1990, a Memorandum of which is recorded February 28, 1990, in the Clerk's Office of the Circuit Court of Henrico County, Virginia.

15. Deed of Easement dated February 28, 1990 from Circuit City Stores, Inc., a Virginia corporation, to Broad Street Mini-Storage Associates, Deep Run Business Partners, Deep Run Business Center Phase II Partnership, Samrock, Deep Rock Associates, Cox Road Associates, FOCO Associates and United Control Company, Inc.

16. Deed of Easement dated February 26, 1990 from Circuit City Stores, Inc. to the City of Richmond granting a gas line easement.

17. Right of Way Agreement dated September 8, 1989 from Circuit City Stores, Inc. to Virginia Electric and Power Company, recorded in Deed Book 2219 at page 1525.

18. Deed of Easement dated February 23, 1990 from Circuit City Stores, Inc. to the County of Henrico granting a water line easement.

CC1-06.EXB

EXHIBIT "C"

MEMORANDUM OF GROUND LEASE

THIS MEMORANDUM OF GROUND LEASE is dated as of February ___,
1990, between CIRCUIT CITY STORES, INC., a Virginia corporation
having an address at 2040 Thalbro Street, Richmond, Virginia
23230 ("Landlord"), and CRA ACQUISITION CORP., a Delaware
corporation having an address at 1345 Avenue of the Americas, New
York, New York 10105 ("Tenant"), and recites:

RECITALS:

A.    Landlord and Tenant are parties to a certain Deed of
Ground Lease of even date herewith (the "Ground Lease").

B.    Landlord and Tenant desire and intend to place third
parties on notice of the terms of the Ground Lease.

GROUND LEASE:

1.    Leased Property.  Landlord demises and
leases to Tenant and Tenant leases and takes from
Landlord that approximately 18.468 acre parcel ("Parcel
1") plus Parcels 2 and 3 (collectively the "Land",
which term shall include any improvements which are
hereafter constructed on the Land but which are not
part of the Improvements or replacements thereof), on
which the Improvements are located, as more
particularly shown on Exhibit "A" hereto.  The Land and
the Improvements are collectively referred to as the
"Premises".

2.    Ground Lease Term.  The main term (the "Main
Term") of the Ground Lease shall commence on February
28, 1990 and shall end on March 1, 2010.

In addition to the Main Term, Tenant shall
have five (5) options (each a "Renewal Option") to
renew and extend the Ground Lease for four (4)
consecutive ten (10) year periods followed by one five-
year period (the "Option Periods") immediately
following the Main Term, at the rent specified below.
Tenant shall give Landlord written notice of its

election to exercise any Renewal Option at lest six (6) months prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of any right to renew or extend as aforesaid, if Tenant shall fail to give any such notice within the aforesaid time limit and shall not have given Landlord prior written notice of its intention not to renew or extend as aforesaid, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired) until ten (10) business days after Landlord shall have given Tenant notice of Landlord's election to terminate the Renewal Option, and Tenant may exercise its Renewal Option at any time prior to expiration of said ten (10) business day period.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the term of this Ground Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, as if such notice had been timely given hereunder.

The Main Term and exercised Option Periods are, collectively, the "Term."  The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each March during the Term, except that the first Lease Year shall commence on the commencement date of this Lease and shall end on February 28, 1991 and the twentieth (20th) Lease Year shall commence on March 1, 2009 and end on March 1, 2010.

If any Lease Year ends on February 28th in a leap year, the Lease Year shall automatically be extended to February 29th.

12.  Assignment and Subletting.  Tenant shall have the right to sublet, assign, transfer and reassign all or any part of the Land and any of Tenant's rights and obligations under this Ground Lease during the term, so long as Tenant remains liable for all of Tenant's obligations arising hereunder as a primary obligor and not as a surety.  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur (including without limitation attorneys' fees) as a result of any Event of Default by Tenant hereunder caused by any assignee or subtenant [other than

2

Landlord in its capacity as tenant under the Lease as defined in paragraph 3(d)].[1]

Any assignment of this Ground Lease shall be executed by the assignor and the assignee. Each assignee shall, for the benefit of Landlord, agree to assume, be bound by, and perform all terms, covenants, and conditions of this Ground Lease to be kept and performed by Tenant. Any sublease shall be executed by the sublessor and sublessee, shall limit the term of the sublease to the Main Term of this Lease and any exercised Option Periods and shall acknowledge that the sublease will terminate upon any termination of this Ground Lease. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

15.   Leasehold Mortgages.

(a)   Provided no Event of Default has occurred and subject to the provisions hereof, Tenant shall have the right, at any time and from time to time, during the Term of this Ground Lease, to encumber Tenant's leasehold interest in the Land. While Tenant's right to encumber its leasehold interest is otherwise unlimited except as provided in paragraphs 15(a) and 15(b) hereof, only a "Permitted Mortgage" [as defined in paragraph 15(b)] shall be entitled to the benefits conferred by paragraph 15(c) hereof. If Tenant shall obtain a commitment for any mortgage of Tenant's interest (and not just a Permitted Mortgage), Tenant shall give Landlord prompt notice thereof and of the closing date therefor.

(b)   A "Permitted Mortgage" shall be a deed of trust given by Tenant constituting a first lien upon Tenant's interest in the Premises, securing a Lending Institution and which otherwise meets the requirements of this paragraph 15. For the purposes of this Ground Lease, the term "Lending Institution" shall mean any insurance company, bank or trust company, savings and loan association, real estate investment trust, pension, profit or retirement fund or trust, industrial revenue bond authority, or any other institution which regularly makes loans on real estate. The maturity date of any loan secured by any mortgage of Tenant's

---

[1]The "Lease as defined in paragraph 3(d)" refers to that certain Lease of even date herewith between Landlord (as tenant) and Tenant (as landlord), a memorandum of which is recorded contemporaneously herewith.

interest (and not just a Permitted Mortgage) shall not
be later than the then expiration date of the Term, and
in the event of the sooner termination of this Ground
Lease, Tenant shall, as a covenant surviving the
expiration or termination hereof, cause to be released
from the Premises the lien of the mortgage unless an
Event of Default by Landlord in its capacity as tenant
under the Lease has resulted in an uncured default
under such mortgage. Any mortgage of Tenant's interest
(and not just a Permitted Mortgage) (i) shall be
subject and subordinate to the Lease and the rights of
the tenant thereunder and (ii) shall be subject to this
Ground Lease and the rights of Landlord hereunder and
(iii) shall agree to release its lien from (or
subordinate in the case of easements) the easements,
rights and dedications contemplated by paragraph 8 of
the Lease [as defined in paragraph 3(d)].

(c)   If Tenant shall mortgage its interest
in the Premises, or any part or parts thereof, with a
Permitted Mortgage and if the holder(s) of such
Permitted Mortgage shall, within thirty (30) days of
execution send to Landlord a true copy thereof,
together with written notice specifying the name and
address of the beneficiary of the Permitted Mortgage
and the pertinent recording data with respect to such
Permitted Mortgage, Landlord agrees that so long as any
such Permitted Mortgage shall remain unsatisfied of
record or until written notice of satisfaction is given
by the holder(s) to Landlord, the following provisions
shall apply:

(i)   There shall be no cancellation,
surrender or material modification of this Ground Lease
without the prior consent in writing of the Lending
Institution and any purported cancellation, surrender
or material modification shall be null and void and of
no effect; however, the foregoing shall not apply to
Landlord's rights under paragraph 20;

(ii)   Landlord shall, upon serving
Tenant with any notice of default, simultaneously serve
a copy of such notice upon the holder(s) of the note(s)
secured by such Permitted Mortgage.  The Lending
Institution shall thereupon have 10 days in the case of
default described in paragraph 19(a) and 60 days in the
case of default described in paragraph 19(b), after
service of such notice upon it, to remedy or cause to
be remedied the defaults complained of, and Landlord
shall accept such performance by or at the instigation
of such Lending Institution as if the same had been
done by Tenant;

4

(iii)  Anything herein contained notwithstanding, while such Permitted Mortgage remains unsatisfied of record, or until written notice of satisfaction is given by the holder(s) to Landlord, if any default shall occur which, pursuant to any provision of this Ground Lease, entitles Landlord to terminate this Ground Lease, and if before the expiration of thirty (30) days from the date of service of notice of termination upon such Lending Institution, such Lending Institution shall have notified Landlord of its desire to nullify such notice and shall have paid to Landlord all rent and other payments herein provided for and then in default and shall have complied or shall commence the work of complying with all of the other requirements of this Ground Lease, other than defaults under paragraphs 19(c) - 19(f), if any are then in default, and shall prosecute the same to completion with reasonable diligence, then in such event Landlord shall not be entitled to terminate this Ground Lease and any notice of termination theretofore given shall be void and of no effect;

(iv)  Landlord agrees that the name of the Lending Institution may be added to the "Loss Payable Endorsement" of any and all casualty insurance policies required to be carried by Tenant hereunder on condition that the insurance proceeds are to be applied in the manner specified in this Ground Lease and in the Lease and that the Permitted Mortgage or collateral document shall so provide.

(v)  Landlord agrees that in the event of termination of this Ground Lease by reason of any default by Tenant other than for nonpayment of rent and other payments herein provided for, that Landlord will enter into a new ground lease of the Land with the Lending Institution or its nominee, for the remainder of the Term, effective as of the date of such termination, at the rent and upon the terms, provisions, covenants and agreements as herein contained and subject to the Lease [as defined in paragraph 3(d)] and to the same conditions of title as this Ground Lease is subject on the date of the termination hereof, and to the rights, if any, of any parties then in possession of any part of the Premises, provided:

The Lending Institution or nominee shall make written request upon Landlord for such new ground lease within thirty (30) days after the date of such termination;

5

The Lending Institution or nominee shall pay to Landlord at the time of the execution and delivery of the new ground lease, any and all sums which would, at the time of the execution and delivery thereof, be due pursuant to this Ground Lease but for such termination [in which case the amount payable by the Tenant under the terminated Ground Lease pursuant to paragraph 20(b) thereof would be zero], and in addition thereto, any expenses, including reasonable attorneys' fees, to which Landlord shall have been subjected by reason of such default;

The Lending Institution or its nominee shall perform and observe all covenants and shall further remedy any other conditions which Tenant under the terminated Ground Lease was obligated to perform under the terms of this Ground Lease; provided however, that the Lending Institution shall not be responsible for remedying conditions which are curable only by Tenant [such as, for example, paragraphs 19(c) through (f) of this Ground Lease];

Landlord shall not warrant possession of the Premises as against Tenant to the tenant under the new ground lease;

The new ground lease shall be expressly made subject to the rights of the tenant under the Lease [as defined in paragraph 3(d)]'; and '

The tenant under such new ground lease shall have the same right, title and interest, vis a vis Landlord, in and to the Improvements as Tenant under the terminated Ground Lease had immediately prior to such termination.

Any new ground lease made pursuant to paragraph 15(c) hereof shall have the same priority as this Ground Lease and shall be prior to any mortgage or any lien, charge or encumbrance of the fee of the Land created by Landlord, for a term of years equal to the balance of the Term of this Ground Lease, as the same may be extended pursuant to the provisions of this Ground Lease. Any mortgage or deed of trust upon Landlord's interest in the Land and any action by such mortgagee or trustee or beneficiary of such deed of trust by way of foreclosure, exercise of power of sale or deed in lieu thereof shall be subject to this Ground Lease and to the new ground lease to be given pursuant to

6

paragraph 15(c) hereof and any mortgagee or holder of such mortgage or beneficiary and trustee of any such deed of trust must recognize this Ground Lease and all rights of Tenant and the Lending Institution under any Permitted Mortgage hereunder, including, without limitation, their rights with respect to insurance proceeds and condemnation awards. This provision shall be self-operative and require no further action by the holder of any mortgage of Landlord's interest in the Land, but upon request by the Tenant or Mortgagee, Landlord agrees to use its best efforts to obtain from such holder an instrument duly executed and acknowledged confirming the priority of such new ground lease.

(vi) Nothing herein contained shall require the Lending Institution or nominee to cure any default of Tenant under this Ground Lease nor shall any such Lending Institution be personally liable therefor.

(vii) The proceeds from any insurance policies or arising from a condemnation are to be held by any Lending Institution and distributed pursuant to the provisions of this Ground Lease and the Lease [as defined in paragraph 3(d)];

(viii) The Lending Institution shall be given notice of any arbitration proceedings by the parties hereto, and shall have the right to intervene therein and be made party to such proceedings, and the parties hereto do hereby consent to such intervention. In the event that the Lending Institution shall not elect to intervene or become party to such proceedings, the Lending Institution shall receive notice of, and a copy of any award or decision made in said arbitration proceedings; and

(ix) Landlord shall, upon request, execute, acknowledge and deliver to each Lending Institution, an agreement prepared at the sole cost and expense of Tenant, between Landlord, Tenant and the Lending Institution, agreeing to all of the provisions of this paragraph. The term "mortgage" or "Permitted Mortgage", whenever used herein, shall include whatever security instruments are used in the locale of the Premises, such as, without limitation, deeds of trust and assignments of rents and/or leases, as well as financing statements, security agreements and other documentation required by the Uniform Commercial Code.

(x) Landlord may mortgage its fee interest in the Land and its interest in this Ground

7

Lease, however, any such mortgage shall be subject to
this Ground Lease and the rights of Tenant and the
rights (including the right to a new lease) of the
Lending Institution under a Permitted Mortgage
hereunder.

If Landlord receives more than one written
request in accordance with the provisions of this
paragraph 15 (c), Landlord shall only be required to
deliver the new ground lease to the Lending Institution
whose Permitted Mortgage is prior in lien to any and
all other Permitted Mortgages, and the written request,
and its rights hereunder, of any mortgagee whose
leasehold mortgage is subordinate in lien shall be null
and void and of no force or effect.

18.  Improvements.  Until the expiration or sooner
termination of this Ground Lease, title to the Improvements
shall remain in Tenant and Tenant shall be entitled to
deduct all depreciation for the Improvements on Tenant's
income tax returns.  Tenant hereby grants, releases,
transfers, sets over and assigns and conveys to Landlord all
of its right, title, and interest in and to the Improvements
effective upon the expiration or sooner termination of this
Ground Lease.  Upon the expiration or sooner termination of
this Ground Lease, Tenant shall surrender the Land together
with such Improvements, if any, as are then thereon to
Landlord, free of any Permitted Mortgage, but subject to the
rights of a Lending Institution to obtain a new ground lease
and title to the Improvements under paragraph 15 (c), or
other lien created by Tenant, and shall upon request execute
in recordable form a release and quitclaim to Landlord of
all of Tenant's right, title and interest in and to any such
Improvements.  Tenant covenants and agrees that it will
execute such further assurances of title and conveyance as
may be requested by Landlord upon expiration or termination
in order to fully vest fee simple title to the Improvements
in Landlord or the holder of a Permitted Mortgage which has
obtained a new ground lease pursuant to paragraph 15(c) in
accordance with the requirements of local law then
applicable and in such manner as to permit Landlord to
obtain an owner's title insurance policy in the standard
ALTA form then in use insuring Landlord's fee simple
ownership in the Land and Improvements without any exception
arising out of or by reason of the existence of this Ground
Lease or the deed of the Improvements from Landlord to
Tenant and at a premium charge not in excess of the premium
charge normally made by title insurance companies for such
owner's title insurance policy.  Without limiting the
generality of the foregoing, should Landlord so request upon
the termination of this Ground Lease, Tenant shall execute a
deed in the standard form then in use in commercial land

8

transactions in the Commonwealth of Virginia and fully
sufficient to convey the Improvements to Landlord.  Tenant
hereby appoints Landlord its agent and attorney-in-fact
(which agency shall be deemed a power coupled with an
interest and irrevocable) with full power and authority for
it and on its behalf upon the expiration or termination of
this Ground Lease to execute, acknowledge and deliver to
Landlord, its successors and assigns including the holder of
a Permitted Mortgage which has obtained a new ground lease
pursuant to paragraph 15(c), upon the terms of this Ground
Lease, a deed in the standard form then in use in commercial
land transactions in the Commonwealth of Virginia conveying
its entire title to such Improvements.  Tenant covenants and
agrees that, should Landlord exercise its right as agent and
attorney-in-fact hereunder as aforesaid and execute, deliver
and record the deed heretofore described, the deed shall
have the same force and effect as to all third parties as a
deed fully executed, acknowledged and delivered by Tenant
itself.  Tenant's obligations hereunder shall survive the
expiration or earlier termination of the Ground Lease. ·
Tenant will observe and perform at its own cost and expense
all the covenants, terms and conditions·imposed by the Lease
[as defined in paragraph 3(d)]¹ upon the landlord under the
Lease, to the end that so long as the Ground Lease is in
effect Landlord shall not have any responsibility for
compliance with the landlord's obligations under the
provisions of the Lease and shall be indemnified by Tenant
against all liability therefor.

      28.  <u>Right of First Refusal and Option to Purchase.</u>

        (a)  In the event that Landlord from ·time to
time offers to sell or receives any offer to purchase
its interest in the Land or any portion thereof and
desires to accept the same, before accepting such
offer, Landlord shall give to Tenant in writing the
right of first refusal to purchase the same at the same
price and upon the same terms as are contained in the
offer.  If Tenant shall not have exercised its right of
first refusal by notice to Landlord given within
twenty four (24) days after the receipt by Tenant of
Landlord's notice, Landlord shall be free to sell the
same according to the price and terms of such offer.
Any such sale shall nonetheless be subject to the terms
of this Ground Lease, including this paragraph 28 and
the right of first refusal set forth herein as to
subsequent offers.  If Tenant gives notice of
acceptance, settlement shall occur thereafter upon the
terms of such bona fide offer.

        (b)  If not sooner terminated pursuant to
the provisions hereof, Tenant's right of first refusal

9

and the option to purchase shall terminate twenty-one (21) years after the death of the last survivor of the descendants of Franklin D. Roosevelt living on the date of this Lease.

(c)  Tenant's right of first refusal shall not apply to:  (i) a sale of the Land to an assignee of the tenant's interest in the Lease, or (ii) a conveyance of the Land to a parent, subsidiary or affiliate of Landlord, or (iii) any mortgage (including a deed of trust) of the Land or to the foreclosure of any mortgage or deed in lieu thereof, or (iv) any merger of Landlord with any other entity, or (v) any conveyance contemplated by paragraph 8 hereof or paragraph 8 of the Lease [as defined in paragraph 3(d)].

(d)  In the event of the occurrence of an Event of Default under paragraph 19 of the Lease [as defined in paragraph 3(d)], Tenant shall have the option to purchase the Land at its fair market value excluding the Improvements.  Such option shall be exercised by written notice to Landlord given within 30 days after occurrence of the Event of Default but before the Event of Default has been cured.  The fair market value shall be determined by appraisal as set forth in clause (iii) of paragraph 3(a) except that either party may commence the appraisal process following Tenant's exercise of its option to purchase. Closing shall occur within 30 days after receipt of the appraisal(s) and the purchase price shall be paid in wired federal funds at closing.  Conveyance of the Land shall be by special warranty deed, subject to Permitted Encumbrances, the lien of any mortgage created by Tenant, matters contemplated by paragraph 8 hereof or paragraph 8 of the Lease [as defined in paragraph 3(d)], and matters to which Tenant may have consented or which do not otherwise materially adversely affect marketability of title.

29(n)  <u>Non-Merger</u>.  Until this Ground Lease expires or is earlier terminated, so long as a Permitted Mortgage is outstanding, the ownership by the same person of the fee and leasehold interests in the Land shall not cause this Ground Lease to be merged into the fee interest.  If this Ground Lease is terminated and the Lending Institution under a Permitted Mortgage does not exercise its right to obtain a new ground lease, as contemplated by paragraph 15(c), this paragraph shall not prevent a merger of estates.

10

29(p)  <u>Exculpation of Trustees</u>.  Neither Corporate Realty Advisors, Inc., a Delaware corporation ("Advisor"), nor the trustees, officers, directors, shareholders or employees of Advisor or of Corporate Realty Income Trust I shall have any personal liability for the payment and performance by Tenant hereunder.

The remaining terms and provisions of the Ground Lease are incorporated herein.by reference to the same extent as if set forth herein in full.

|  | LANDLORD: | CIRCUIT CITY STORES, INC., a Virginia corporation |
|---|---|---|

ATTEST:

By_____
Its:
(SEAL)

By_____
Its:

|  | TENANT: | CRA ACQUISITION CORP., a Delaware corporation |
|---|---|---|

By_____
Its:

11

STATE OF VIRGINIA:

CITY/COUNTY OF _____:

    The foregoing instrument was acknowledged before me this _____ day of February, 1990, by _____ as _____ of CIRCUIT CITY STORES, INC., a Virginia corporation, on behalf of the corporation.

    My commission expires:

                                                                 _____
                                                               Notary Public

STATE OF _____:

CITY/COUNTY OF _____:

    The foregoing instrument was acknowledged before me this _____ day of February, 1990, by _____ as _____ of CRA ACQUISITION CORP., a Delaware corporation, on behalf of the corporation.

    My commission expires:

[Notarial Seal]

                                                                Notary Public

CC1-03.EXC
02/08/90

29(p)  **Exculpation of Trustees**.  Neither Corporate Realty Advisors, Inc., a Delaware corporation ("Advisor"), nor the trustees, officers, directors, shareholders or employees of Advisor or of Corporate Realty Income Trust I shall have any personal liability for the payment and performance by Tenant hereunder.

The remaining terms and provisions of the Ground Lease are incorporated herein by reference to the same extent as if set forth herein in full.

LANDLORD:        CIRCUIT CITY STORES, INC., a Virginia corporation

ATTEST:

By_____       By_____
Its:                            Its:
(SEAL)

TENANT:          CRA ACQUISITION CORP., a Delaware corporation

By_____
Its:

11

5604                    BOOK 2230 PAGE 1852
MEMORANDUM OF GROUND LEASE

THIS MEMORANDUM OF GROUND LEASE is dated as of February 28,
1990, between CIRCUIT CITY STORES, INC., a Virginia corporation
having an address at 2040 Thalbro Street, Richmond, Virginia
23230 ("Landlord"), and CRA ACQUISITION CORP., a Delaware
corporation having an address at 1345 Avenue of the Americas, New
York, New York 10105 ("Tenant"), and recites:

RECITALS:

A.    Landlord and Tenant are parties to a certain Deed of
Ground Lease of even date herewith (the "Ground Lease").

B.    Landlord and Tenant desire and intend to place third
parties on notice of the terms of the Ground Lease.

GROUND LEASE:

1.    Leased Property.  Landlord demises and
leases to Tenant and Tenant leases and takes from
Landlord that approximately 18.468 acre parcel ("Parcel
1") plus Parcels 2 and 3 (collectively the "Land",
which term shall include any improvements which are
hereafter constructed on the Land but which are not
part of the Improvements or replacements thereof), on
which the Improvements are located, as more
particularly shown on Exhibit "A" hereto.  The Land and
the Improvements are collectively referred to as the
"Premises".

2.    Ground Lease Term.  The main term (the "Main
Term") of the Ground Lease shall commence on February
28, 1990 and shall end on March 1, 2010.

In addition to the Main Term, Tenant shall
have five (5) options (each a "Renewal Option") to
renew and extend the Ground Lease for four (4)
consecutive ten (10) year periods followed by one five-
year period (the "Option Periods") immediately
following the Main Term, at the rent specified below.
Tenant shall give Landlord written notice of its

BOOK 2230 PAGE 1853

election to exercise any Renewal Option at lest six (6) months prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however; that in order to avoid any forfeiture or inadvertent lapse of any right to renew or extend as aforesaid, if Tenant shall fail to give any such notice within the aforesaid time limit and shall not have given Landlord prior written notice of its intention not to renew or extend as aforesaid, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired) until ten (10) business days after Landlord shall have given Tenant notice of Landlord's election to terminate the Renewal Option, and Tenant may exercise its Renewal Option at any time prior to expiration of said ten (10) business day period.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the term of this Ground Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, as if such notice had been timely given hereunder.

The Main Term and exercised Option Periods are, collectively, the "Term."  The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each March during the Term, except that the first Lease Year shall commence on the commencement date of this Lease and shall end on February 28, 1991 and the twentieth (20th) Lease Year shall commence on March 1, 2009 and end on March 1, 2010.

If any Lease Year ends on February 28th in a leap year, the Lease Year shall automatically be extended to February 29th.

12.  Assignment and Subletting.  Tenant shall have the right to sublet, assign, transfer and reassign all or any part of the Land and any of Tenant's rights and obligations under this Ground Lease during the term, so long as Tenant remains liable for all of Tenant's obligations arising hereunder as a primary obligor and not as a surety.  Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur (including without limitation attorneys' fees) as a result of any Event of Default by Tenant hereunder caused by any assignee or subtenant (other than

2

BOOK 2230 PAGE 1854

Landlord in its capacity as tenant under the Lease as defined in paragraph 3(d)].[1]

Any assignment of this Ground Lease shall be executed by the assignor and the assignee. Each assignee shall, for the benefit of Landlord, agree to assume, be bound by, and perform all terms, covenants, and conditions of this Ground Lease to be kept and performed by Tenant. Any sublease shall be executed by the sublessor and sublessee, shall limit the term of the sublease to the Main Term of this Lease and any exercised Option Periods and shall acknowledge that the sublease will terminate upon any termination of this Ground Lease. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

### 15. Leasehold Mortgages.

(a) Provided no Event of Default has occurred and subject to the provisions hereof, Tenant shall have the right, at any time and from time to time, during the Term of this Ground Lease, to encumber Tenant's leasehold interest in the Land. While Tenant's right to encumber its leasehold interest is otherwise unlimited except as provided in paragraphs 15(a) and 15(b) hereof, only a "Permitted Mortgage" (as defined in paragraph 15(b)] shall be entitled to the benefits conferred by paragraph 15(c) hereof. If Tenant shall obtain a commitment for any mortgage of Tenant's interest (and not just a Permitted Mortgage), Tenant shall give Landlord prompt notice thereof and of the closing date therefor.

(b) A "Permitted Mortgage" shall be a deed of trust given by Tenant constituting a first lien upon Tenant's interest in the Premises, securing a Lending Institution and which otherwise meets the requirements of this paragraph 15. For the purposes of this Ground Lease, the term "Lending Institution" shall mean any insurance company, bank or trust company, savings and loan association, real estate investment trust, pension, profit or retirement fund or trust, industrial revenue bond authority, or any other institution which regularly makes loans on real estate. The maturity date of any loan secured by any mortgage of Tenant's

---

[1] The "Lease as defined in paragraph 3(d)" refers to that certain Lease of even date herewith between Landlord (as tenant) and Tenant (as landlord), a memorandum of which is recorded contemporaneously herewith.

3

BOOK 2230 PAGE 1855

interest (and not just a Permitted Mortgage) shall not be later than the then expiration date of the Term, and in the event of the sooner termination of this Ground Lease, Tenant shall, as a covenant surviving the expiration or termination hereof, cause to be released from the Premises the lien of the mortgage unless an Event of Default by Landlord in its capacity as tenant under the Lease has resulted in an uncured default under such mortgage. Any mortgage of Tenant's interest (and not just a Permitted Mortgage) (i) shall be subject and subordinate to the Lease and the rights of the tenant thereunder and (ii) shall be subject to this Ground Lease and the rights of Landlord hereunder and (iii) shall agree to release its lien from (or subordinate in the case of easements) the easements, rights and dedications contemplated by paragraph 8 of the Lease [as defined in paragraph 3(d)].

(c)  If Tenant shall mortgage its interest in the Premises, or any part or parts thereof, with a Permitted Mortgage and if the holder(s) of such Permitted Mortgage shall, within thirty (30) days of execution send to Landlord a true copy thereof, together with written notice specifying the name and address of the beneficiary of the Permitted Mortgage and the pertinent recording data with respect to such Permitted Mortgage, Landlord agrees that so long as any such Permitted Mortgage shall remain unsatisfied of record or until written notice of satisfaction is given by the holder(s) to Landlord, the following provisions shall apply:

(i)  There shall be no cancellation, surrender or material modification of this Ground Lease without the prior consent in writing of the Lending Institution and any purported cancellation, surrender or material modification shall be null and void and of no effect; however, the foregoing shall not apply to Landlord's rights under paragraph 20;

(ii)  Landlord shall, upon serving Tenant with any notice of default, simultaneously serve a copy of such notice upon the holder(s) of the note(s) secured by such Permitted Mortgage.  The Lending Institution shall thereupon have 10 days in the case of default described in paragraph 19(a) and 60 days in the case of default described in paragraph 19(b), after service of such notice upon it, to remedy or cause to be remedied the defaults complained of, and Landlord shall accept such performance by or at the instigation of such Lending Institution as if the same had been done by Tenant;

4

BOOK 2230 PAGE 1856

(iii)  Anything herein contained notwithstanding, while such Permitted Mortgage remains unsatisfied of record, or until written notice of satisfaction is given by the holder(s) to Landlord, if any default shall occur which, pursuant to any provision of this Ground Lease, entitles Landlord to terminate this Ground Lease, and if before the expiration of thirty (30) days from the date of service of notice of termination upon such Lending Institution, such Lending Institution shall have notified Landlord of its desire to nullify such notice and shall have paid to Landlord all rent and other payments herein provided for and then in default and shall have complied or shall commence the work of complying with all of the other requirements of this Ground Lease, other than defaults under paragraphs 19(c) - 19(f); if any are then in default, and shall prosecute the same to completion with reasonable diligence, then in such event Landlord shall not be entitled to terminate this Ground Lease and any notice of termination theretofore given shall be void and of no effect;

(iv)  Landlord agrees that the name of the Lending Institution may be added to the "Loss Payable Endorsement" of any and all casualty insurance policies required to be carried by Tenant hereunder on condition that the insurance proceeds are to be applied in the manner specified in this Ground Lease and in the Lease and that the Permitted Mortgage or collateral document shall so provide.

(v)  Landlord agrees that in the event of termination of this Ground Lease by reason of any default by Tenant other than for nonpayment of rent and other payments herein provided for, that Landlord will enter into a new ground lease of the Land with the Lending Institution or its nominee, for the remainder of the Term, effective as of the date of such termination, at the rent and upon the terms, provisions, covenants and agreements as herein contained and subject to the Lease [as defined in paragraph 3(d)] and to the same conditions of title as this Ground Lease is subject on the date of the termination hereof, and to the rights, if any, of any parties then in possession of any part of the Premises, provided:

The Lending Institution or nominee shall make written request upon Landlord for such new ground lease within thirty (30) days after the date of such termination;

5

BOOK 2230 PAGE 1857

The Lending Institution or nominee shall pay to Landlord at the time of the execution and delivery of the new ground lease, any and all sums which would, at the time of the execution and delivery thereof, be due pursuant to this Ground Lease but for such termination (in which case the amount payable by the Tenant under the terminated Ground Lease pursuant to paragraph 20(b) thereof would be zero), and in addition thereto, any expenses, including reasonable attorneys' fees, to which Landlord shall have been subjected by reason of such default;

The Lending Institution or its nominee shall perform and observe all covenants and shall further remedy any other conditions which Tenant under the terminated Ground Lease was obligated to perform under the terms of this Ground Lease; provided however, that the Lending Institution shall not be responsible for remedying conditions which are curable only by Tenant [such as, for example, paragraphs 19(c) through (f) of this Ground Lease];

Landlord shall not warrant possession of the Premises as against Tenant to the tenant under the new ground lease;

The new ground lease shall be expressly made subject to the rights of the tenant under the Lease [as defined in paragraph 3(d)]; and

The tenant under such new ground lease shall have the same right, title and interest, vis a vis Landlord, in and to the Improvements as Tenant under the terminated Ground Lease had immediately prior to such termination.

Any new ground lease made pursuant to paragraph 15(c) hereof shall have the same priority as this Ground Lease and shall be prior to any mortgage or any lien, charge or encumbrance of the fee of the Land created by Landlord, for a term of years equal to the balance of the Term of this Ground Lease, as the same may be extended pursuant to the provisions of this Ground Lease. Any mortgage or deed of trust upon Landlord's interest in the Land and any action by such mortgagee or trustee or beneficiary of such deed of trust by way of foreclosure, exercise of power of sale or deed in lieu thereof shall be subject to this Ground Lease and to the new ground lease to be given pursuant to

6

BOOK 2230 PAGE 1858

paragraph 15(c) hereof and any mortgagee or holder of
such mortgage or beneficiary and trustee of any such
deed of trust must recognize this Ground Lease and all
rights of Tenant and the Lending Institution under any
Permitted Mortgage hereunder, including, without
limitation, their rights with respect to insurance
proceeds and condemnation awards.  This provision shall
be self-operative and require no further action by the
holder of any mortgage of Landlord's interest in the
Land, but upon request by the Tenant or Mortgagee,
Landlord agrees to use its best efforts to obtain from
such holder an instrument duly executed and
acknowledged confirming the priority of such new ground
lease.

(vi)  Nothing herein contained shall
require the Lending Institution or nominee to cure any
default of Tenant under this Ground Lease nor shall any
such Lending Institution be personally liable therefor.

(vii)  The proceeds from any insurance
policies or arising from a condemnation are to be held
by any Lending Institution and distributed pursuant to
the provisions of this Ground Lease and the Lease [as
defined in paragraph 3(d)];

(viii)  The Lending Institution shall
be given notice of any arbitration proceedings by the
parties hereto, and shall have the right to intervene
therein and be made party to such proceedings, and the
parties hereto do hereby consent to such intervention.
In the event that the Lending Institution shall not
elect to intervene or become party to such proceedings,
the Lending Institution shall receive notice of, and a
copy of any award or decision made in said arbitration
proceedings; and

(ix)  Landlord shall, upon request,
execute, acknowledge and deliver to each Lending
Institution, an agreement prepared at the sole cost and
expense of Tenant, between Landlord, Tenant and the
Lending Institution, agreeing to all of the provisions
of this paragraph.  The term "mortgage" or "Permitted
Mortgage", whenever used herein, shall include whatever
security instruments are used in the locale of the
Premises, such as, without limitation, deeds of trust
and assignments of rents and/or leases, as well as
financing statements, security agreements and other
documentation required by the Uniform Commercial Code.

(x)  Landlord may mortgage its fee
interest in the Land and its interest in this Ground

7

BOOK 2230 PAGE 1859

Lease, however, any such mortgage shall be subject to
this Ground Lease and the rights of Tenant and the
rights (including the right to a new lease) of the
Lending Institution under a Permitted Mortgage
hereunder.

If Landlord receives more than one written
request in accordance with the provisions of this
paragraph 15 (c), Landlord shall only be required to
deliver the new ground lease to the Lending Institution
whose Permitted Mortgage is prior in lien to any and
all other Permitted Mortgages, and the written request,
and its rights hereunder, of any mortgagee whose
leasehold mortgage is subordinate in lien shall be null
and void and of no force or effect.

18.  Improvements.  Until the expiration or sooner
termination of this Ground Lease, title to the Improvements
shall remain in Tenant and Tenant shall be entitled to
deduct all depreciation for the Improvements on Tenant's
income tax returns.  Tenant hereby grants, releases,
transfers, sets over and assigns and conveys to Landlord all
of its right, title, and interest in and to the Improvements
effective upon the expiration or sooner termination of this
Ground Lease.  Upon the expiration or sooner termination of
this Ground Lease, Tenant shall surrender the Land together
with such Improvements, if any, as are then thereon to
Landlord, free of any Permitted Mortgage, but subject to the
rights of a Lending Institution to obtain a new ground lease
and title to the Improvements under paragraph 15 (c), or
other lien created by Tenant, and shall upon request execute
in recordable form a release and quitclaim to Landlord of
all of Tenant's right, title and interest in and to any such
Improvements.  Tenant covenants and agrees that it will
execute such further assurances of title and conveyance as
may be requested by Landlord upon expiration or termination
in order to fully vest fee simple title to the Improvements
in Landlord or the holder of a Permitted Mortgage which has
obtained a new ground lease pursuant to paragraph 15(c) in
accordance with the requirements of local law then
applicable and in such manner as to permit Landlord to
obtain an owner's title insurance policy in the standard
ALTA form then in use insuring Landlord's fee simple
ownership in the Land and Improvements without any exception
arising out of or by reason of the existence of this Ground
Lease or the deed of the Improvements from Landlord to
Tenant and at a premium charge not in excess of the premium
charge normally made by title insurance companies for such
owner's title insurance policy.  Without limiting the
generality of the foregoing, should Landlord so request upon
the termination of this Ground Lease, Tenant shall execute a
deed in the standard form then in use in commercial land

8

BOOK 2230 PAGE 1860 

transactions in the Commonwealth of Virginia and fully
sufficient to convey the Improvements to Landlord. Tenant
hereby appoints Landlord its agent and attorney-in-fact
(which agency shall be deemed a power coupled with an
interest and irrevocable) with full power and authority for
it and on its behalf upon the expiration or termination of
this Ground Lease to execute, acknowledge and deliver to
Landlord, its successors and assigns including the holder of
a Permitted Mortgage which has obtained a new ground lease
pursuant to paragraph 15(c), upon the terms of this Ground
Lease, a deed in the standard form then in use in commercial
land transactions in the Commonwealth of Virginia conveying
its entire title to such Improvements. Tenant covenants and
agrees that, should Landlord exercise its right as agent and
attorney-in-fact hereunder as aforesaid and execute, deliver
and record the deed heretofore described, the deed shall
have the same force and effect as to all third parties as a
deed fully executed, acknowledged and delivered by Tenant
itself. Tenant's obligations hereunder shall survive the
expiration or earlier termination of the Ground Lease.
Tenant will observe and perform at its own cost and expense
all the covenants, terms and conditions imposed by the Lease
[as defined in paragraph 3(d)]' upon the landlord under the
Lease, to the end that so long as the Ground Lease is in
effect Landlord shall not have any responsibility for
compliance with the landlord's obligations under the
provisions of the Lease and shall be indemnified by Tenant
against all liability therefor.

28. **Right of First Refusal and Option to Purchase.**

(a) In the event that Landlord from time to
time offers to sell or receives any offer to purchase
its interest in the Land or any portion thereof and
desires to accept the same, before accepting such
offer, Landlord shall give to Tenant in writing the
right of first refusal to purchase the same at the same
price and upon the same terms as are contained in the
offer. If Tenant shall not have exercised its right of
first refusal by notice to Landlord given within
twenty four (24) days after the receipt by Tenant of
Landlord's notice, Landlord shall be free to sell the
same according to the price and terms of such offer.
Any such sale shall nonetheless be subject to the terms
of this Ground Lease, including this paragraph 28 and
the right of first refusal set forth herein as to
subsequent offers. If Tenant gives notice of
acceptance, settlement shall occur thereafter upon the
terms of such bona fide offer.

(b) If not sooner terminated pursuant to
the provisions hereof, Tenant's right of first refusal

9

BOOK 2230 PAGE 1861

and the option to purchase shall terminate twenty-one (21) years after the death of the last survivor of the descendants of Franklin D. Roosevelt living on the date of this Lease.

(c) Tenant's right of first refusal shall not apply to: (i) a sale of the Land to an assignee of the tenant's interest in the Lease, or (ii) a conveyance of the Land to a parent, subsidiary or affiliate of Landlord, or (iii) any mortgage (including a deed of trust) of the Land or to the foreclosure of any mortgage or deed in lieu thereof, or (iv) any merger of Landlord with any other entity, or (v) any conveyance contemplated by paragraph 8 hereof or paragraph 8 of the Lease [as defined in paragraph 3(d)].

(d) In the event of the occurrence of an Event of Default under paragraph 19 of the Lease [as defined in paragraph 3(d)], Tenant shall have the option to purchase the Land at its fair market value excluding the Improvements. Such option shall be exercised by written notice to Landlord given within 30 days after occurrence of the Event of Default but before the Event of Default has been cured. The fair market value shall be determined by appraisal as set forth in clause (iii) of paragraph 3(a) except that either party may commence the appraisal process following Tenant's exercise of its option to purchase. Closing shall occur within 30 days after receipt of the appraisal(s) and the purchase price shall be paid in wired federal funds at closing. Conveyance of the Land shall be by special warranty deed, subject to Permitted Encumbrances, the lien of any mortgage created by Tenant, matters contemplated by paragraph 8 hereof or paragraph 8 of the Lease [as defined in paragraph 3(d)], and matters to which Tenant may have consented or which do not otherwise materially adversely affect marketability of title.

29(n) Non-Merger. Until this Ground Lease expires or is earlier terminated, so long as a Permitted Mortgage is outstanding, the ownership by the same person of the fee and leasehold interests in the Land shall not cause this Ground Lease to be merged into the fee interest. If this Ground Lease is terminated and the Lending Institution under a Permitted Mortgage does not exercise its right to obtain a new ground lease, as contemplated by paragraph 15(c), this paragraph shall not prevent a merger of estates.

10



BOOK 2230 PAGE 1862

29(p)  <u>Exculpation of Trustees</u>.  Neither
Corporate Realty Advisors, Inc., a Delaware corporation
("Advisor"), nor the trustees, officers, directors,
shareholders or employees of Advisor or of Corporate
Realty Income Trust I shall have any personal liability
for the payment and performance by Tenant hereunder.

The remaining terms and provisions of the Ground Lease are
incorporated herein by reference to the same extent as if set
forth herein in full.

LANDLORD:    CIRCUIT CITY STORES, INC.,
             a Virginia corporation

ATTEST:

By                        By
Its:                      Its:  Asst V.P. - REAL ESTATE
(SEAL)

TENANT:      CRA ACQUISITION CORP., a
             Delaware corporation

             By
             Its:  PRESIDENT

11

STATE OF VIRGINIA:                          BOOK 2230 PAGE 1863

CITY/COUNTY OF _Richmond_____:

The foregoing instrument was acknowledged before me this
_13th_ day of February, 1990, by _Benjamin B. Cummings, Jr._ as
_Assistant Vice-President_ of CIRCUIT CITY STORES, INC., a Virginia
corporation, on behalf of the corporation.

My commission expires: _9-11-92_

_Toni B. Hageman_
Notary Public


STATE OF _Virginia_____:

CITY/COUNTY OF _Richmond_____:

The foregoing instrument was acknowledged before me this
_13th_ day of February, 1990, by _A.E. Monk_____ as
_President_____ of CRA ACQUISITION CORP., a Delaware
corporation, on behalf of the corporation.

My commission expires: _9-11-92_

[Notarial Seal]                          _Toni B. Hageman_
                                          Notary Public

CC1-03.EXC
02/08/90

12

EXHIBIT A

Description of the Land    BOOK 2230 PAGE 1864

PHASE ONE - PARCEL 1:

SITUATED, lying, and being in the Three Chopt District of Henrico County,
Virginia, and being more particularly described as follows:

COMMENCING on a point in the south line of Broad Street Road, said point being
the intersection of the south line of Broad Street Road extended, and the west
line of Deep Rock Road extended, thence along the west line of Deep Rock Road
a distance of 1034.69 feet to a point, said point marking the northwest corner
of Parcel 2 and lying in the west line of Deep Rock Road; THENCE South
45°58'00" West for a distance of 510.00 feet with the west line of said Parcel
2 to a point in the north line of Parcel 1, said point being the point of
BEGINNING for Parcel 1; THENCE South 50°20'07" East for a distance of 59.95
feet to a point; THENCE along a curve to the left having a radius of 50.00
feet and an arc length of 23.36 feet, being subtended by a chord of South
63°43'12" East for a distance of 23.15 feet to a point; THENCE along a curve
to the right having a radius of 393.49 feet and an arc length of 278.64 feet,
being subtended by a chord of South 25°42'44" East for a distance of 272.86
feet to a point; THENCE South 84°34'27" West for a distance of 49.00 feet to a
point; THENCE South 64°33'53" West for a distance of 119.53 feet to a point;
THENCE South 75°26'41" East for a distance of 49.00 feet to a point; THENCE
along a curve to the right having a radius of 393.49 feet and an arc length of
64.75 feet, being subtended by a chord of South 19°16'10" West for a distance
of 64.68 feet to a point; THENCE South 23°59'00" West for a distance of 609.50
feet to a point; THENCE North 67°37'44" West for a distance of 591.24 feet to
a point; THENCE North 21°52'52" West for a distance of 561.48 feet to a point;
THENCE North 51°29'00" East for a distance of 373.81 feet to a point; THENCE
North 45°33'30" East for a distance of 310.02 feet to a point; THENCE North
39°58'30" East for a distance of 85.69 feet to a point; THENCE South 52°53'21"
East for a distance of 353.36 feet to a point being the point of BEGINNING.

SAID property contains 18.467 acres more or less.

FUTURE DEEP ROCK ROAD EXTENSION - PARCEL 2:

SITUATED, lying, and being in the Three Chopt District of Henrico County,
Virginia, and being more particularly described as follows:

BEGINNING on a point in the north line of Parcel 1, said point being the point
of beginning of Parcel 1 and being the southwest corner of the property herein
described.  THENCE North 45°58'00" East for a distance of 510.00 feet to a
point lying in the west line of Deep Rock Road; THENCE along a curve to the
left having a radius of 90.00 feet and an arc length of 64.35 feet, being
subtended by a chord of South 44°02'00" East for a distance of 60.00 feet to a
point on the south end of Deep Rock Road; THENCE South 45°58'00" West for a
distance of 364.86 feet to a point; THENCE along a curve to the left having a
radius of 955.54 feet and an arc length of 11.99 feet, being subtended by a
chord of South 45°36'26" West for a distance of 11.99 feet to a point; THENCE
along a curve to the left having a radius of 40.00 feet and an arc length of
40.88 feet, being subtended by a chord of South 15°58'01" West for a distance
of 39.13 feet to a point; THENCE along a curve to the right having a radius of
50.00 feet and an arc length of 124.77 feet, being subtended by a chord of

EXHIBIT A
Continued     BOOK 2230 PAGE 1865

South 58°10'31" West for a distance of 94.83 feet to a point; THENCE North
50°20'07" West for a distance of 59.95 feet to the point of BEGINNING.

SAID property contains 0.768 acres more or less.

FUTURE MAYLAND DRIVE EXTENSION - PARCEL 3:

SITUATED, lying, and being in the Three Chopt District of Henrico County,
Virginia, and being more particularly described as follows:

COMMENCING on a point in the north line of Parcel 1, said point being the
Southwest corner of Parcel 2 also, the point of beginning for Parcel 2, and
being the point of beginning for Parcel 1, THENCE South 50°20'7" East for a
distance of 59.95 feet to a point; THENCE along a curve to the left having a
radius of 50.00 feet and an arc length of 23.36 feet, being subtended by a
chord of South 63°43'12" East for a distance of 23.15 feet to a point; THENCE
along a curve to the right having a radius of 393.49 feet and an arc length of
278.64 feet, being subtended by a chord of South 25°42'44" East for a distance
of 272.86 feet to a point; thence South 84°34'27" West for a distance of 15.00
feet to a point, said point being the point and place of BEGINNING for Parcel
3; THENCE along a curve to the left having a radius of 25.00 feet and an arc
length of 34.91 feet, being subtended by a chord of South 46°25'59" East for a
distance of 32.14 feet to a point; THENCE South 85°26'26" East for a distance
of 30.20 feet to a point; THENCE along a curve to the right having a radius of
1123.00 feet and an arc length of 36.78 feet, being subtended by a chord of
South 84°30'08" East for a distance of 36.78 feet to a point; THENCE along a
curve to the right having a radius of 246.87 feet and an arc length of 50.39
feet, being subtended by a chord of South 77°42'58" East for a distance of
50.31 feet to a point; THENCE along a curve to the left having a radius of
165.24 feet and an arc length of 53.49 feet, being subtended by a chord of
South 81°08'33" East for a distance of 53.26 feet to a point; THENCE South
00°25'00" East for a distance of 55.00 feet to a point; THENCE South 15°15'05"
West for a distance of 5.20 feet to a point on the south line of Mayland
Drive; THENCE along a curve to the left having a radius of 192.07 feet and an
arc length of 45.21 feet, being subtended by a chord of South 82°25'15" West
for a distance of 45.11 feet to a point; THENCE along a curve to the right
having a radius of 149.13 feet and an arc length of 41.96 feet, being
subtended by a chord of South 83°44'17" West for a distance of 41.82 feet to a
point; THENCE along a curve to the right having a radius of 1211.78 feet and
an arc length of 58.38 feet, being subtended by a chord of North 86°49'14"
West for a distance of 58.37 feet to a point; THENCE North 85°26'26" West for
a distance of 30.21 feet to a point; THENCE along a curve to the left having a
radius of 25.00 feet and an arc length of 34.91 feet, being subtended by a
chord of South 54°33'27" West for a distance of 32.14 feet to a point; THENCE
North 75°26'41 West for a distance of 34.00 feet to a point; THENCE North
04°33'53" East for a distance of 119.53 feet to a point; THENCE North
84°34'27" East for a distance of 34.00 feet to the point of BEGINNING.

Said property contains 0.473 acres more or less.

BOOK 2230 PAGE 1866

Plat Retained in
Clerk's Office.
See Plat Book 90 P 41~43

$2,209,522.00

VIRGINIA: IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF THE COUNTY OF HENRICO

This Deed was presented, and with the Certificate annexed admitted to record

on _____FEB 28 1990_____, at __12:43__ o'clock __P__. M.

| | |
|---|---|
| State Tax | 3314.40 |
| County Tax | 1104.80 |
| Grantor's Tax (120) | |
| (220-A) | |
| Transfer Fee | |
| Clerk's Fee | 50.00 |
| Total | $ 4469.20 |

_____ Clerk

Return to: Lawyer's Title







7896

## ASSIGNMENT AND ASSUMPTION
## OF LEASE AND AGREEMENT

BOOK **2234** PAGE **1939**

ASSIGNMENT AND ASSUMPTION OF LEASE AND AGREEMENT, dated as of March 26, 1990 (this Assignment), between CRA ACQUISITION CORP., a Delaware corporation (Assignor) and Antony E. Monk, John R. Cornell, Richard S. Ellwood, Mark J. Sandler, and Stephen J. Treadway and their successors as trustees of CORPORATE REALTY INCOME TRUST I, a Massachusetts business trust (Assignee), having an address at 1345 Avenue of the Americas, New York, New York 10150,.

Assignor entered into a Lease and Agreement, dated as of February 28, 1990 (the Lease) between Assignor, as landlord, and Circuit City Stores, Inc., a Virginia corporation (Circuit City), as tenant, a memorandum of which has been recorded among the Land Records of Henrico County, Virginia, in Book 2230, Page 1872, . Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Lease. Pursuant to the Lease, Assignor leased to Circuit City the Premises described therein consisting of certain improvements on the land described on Schedule A attached hereto (the Land), and Assignor's leasehold interest in the Land created pursuant to the Ground Lease and Agreement, dated as of February 28, 1990, between Assignor, as tenant, and Circuit City, as landlord, a memorandum of which has been recorded among the Land Records in Henrico County, Virginia, in Book 2230, Page 1852.

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Assignor and Assignee agree as follows:

1. **Assignment**. Assignor hereby assigns to Assignee all of Assignor's right, title and interest in, to and under the Lease.

2. **Assumption**. Assignee hereby accepts the foregoing assignment and agrees, effective the date hereof, to perform and be bound by all terms, covenants and conditions of the Lease to be kept and performed by landlord. Neither Corporate Realty Advisors, Inc. (Advisor), a Delaware corporation, nor the trustees, officers, directors, shareholders or employees of Advisor or of Assignee shall have any personal liability for the performance by landlord under the Lease.

IN WITNESS WHEREOF, this Assignment has been duly executed by the parties hereto as of the day and year first above written.

ASSIGNOR

CRA ACQUISITION CORP.,
a Delaware corporation

By: _____
Name: Michael A. Marriott
Title: Vice President

(009433-46) 3/22/90

ASSIGNEE

BOOK **2234** PAGE **1940**

_____ and _____,
and their successor trustees as
Trustees of CORPORATE REALTY INCOME
TRUST I, a Massachusetts business trust

By: _____ A. E. Monk _____
Its Trustee

By: _____
Its Trustee

(009433-46) 3/22/90

STATE OF NEW YORK                )
                                 )            BOOK 2234 PAGE 1941
COUNTY OF NEW YORK               )

    The foregoing instrument was acknowledged before me this _23_ day of
March, 1990, by _Michael A. Marriott_, as _____ of CRA Acquisition
Corp., a Delaware corporation, on behalf of the corporation.

My Commission expires: 6/30/91

[Notarial Seal]

                                             _____
            ELLIN HARLOW                  Notary Public
       Notary Public, State of New York
    No. 4793177 Qualified in Rockland County
      Certificate Filed in New York County
      COMMISSION expires MARCH 30, 19..
              6/30/91

(009433-46) 3/22/90

STATE OF NEW YORK           )
                            )          BOOK 2234 PAGE 1942
COUNTY OF NEW YORK          )

     The foregoing instrument was acknowledged before me this 23 day of March, 1990, by  A.E. Monk  and  S. Treadway , as Trustees of Corporate Realty Income Trust I, a Massachusetts business trust, on behalf of the business trust.

My Commission expires: 6/30/91

[Notarial Seal]

                                        Notary Public

ELLIN MARLOW
Notary Public, State of New York
No. 4793377  Qualified in Rockland County
Certificate Filed in New York County
Commission Expires March 30, 1991
6/30/91

(009433-46) 3/22/90

SCHEDULE A

Description of the Land    BOOK 2234 PAGE 1943

PHASE ONE - PARCEL 1:

SITUATED, lying, and being in the Three Chopt District of Henrico County,
Virginia, and being more particularly described as follows:

COMMENCING on a point in the south line of Broad Street Road, said point being
the intersection of the south line of Broad Street Road extended, and the west
line of Deep Rock Road extended, thence along the west line of Deep Rock Road
a distance of 1034.69 feet to a point, said point marking the northwest corner
of Parcel 2 and lying in the west line of Deep Rock Road; THENCE South
45°58'00" West for a distance of 510.00 feet with the west line of said Parcel
2 to a point in the north line of Parcel 1, said point being the point of
BEGINNING for Parcel 1; THENCE South 50°20'07" East for a distance of 59.95
feet to a point; THENCE along a curve to the left having a radius of 50.00
feet and an arc length of 23.36 feet, being subtended by a chord of South
63°43'12" East for a distance of 23.15 feet to a point; THENCE along a curve
to the right having a radius of 393.49 feet and an arc length of 278.64 feet,
being subtended by a chord of South 25°42'44" East for a distance of 272.86
feet to a point; THENCE South 84°34'27" West for a distance of 49.00 feet to a
point; THENCE South 04°33'53" West for a distance of 119.53 feet to a point;
THENCE South 75°26'41" East for a distance of 49.00 feet to a point; THENCE
along a curve to the right having a radius of 393.49 feet and an arc length of
64.75 feet, being subtended by a chord of South 19°16'10" West for a distance
of 64.68 feet to a point; THENCE South 23°59'00" West for a distance of 609.50
feet to a point; THENCE North 67°37'44" West for a distance of 591.24 feet to
a point; THENCE North 21°52'52" West for a distance of 561.48 feet to a point;
THENCE North 51°29'00" East for a distance of 373.81 feet to a point; THENCE
North 45°33'30" East for a distance of 310.02 feet to a point; THENCE North
39°58'30" East for a distance of 85.69 feet to a point; THENCE South 52°53'21"
East for a distance of 353.36 feet to a point being the point of BEGINNING.

SAID property contains 18.467 acres more or less.

FUTURE DEEP ROCK ROAD EXTENSION - PARCEL 2:

SITUATED, lying, and being in the Three Chopt District of Henrico County,
Virginia, and being more particularly described as follows:

BEGINNING on a point in the north line of Parcel 1, said point being the point
of beginning of Parcel 1 and being the southwest corner of the property herein
described.  THENCE North 45°58'00" East for a distance of 510.00 feet to a
point lying in the west line of Deep Rock Road; THENCE along a curve to the
left having a radius of 50.00 feet and an arc length of 64.35 feet, being
subtended by a chord of South 44°02'00" East for a distance of 60.00 feet to a
point on the south end of Deep Rock Road; THENCE South 45°58'00" West for a
distance of 364.86 feet to a point; THENCE along a curve to the left having a
radius of 955.54 feet and an arc length of 11.99 feet, being subtended by a
chord of South 45°36'26" West for a distance of 11.99 feet to a point; THENCE
along a curve to the left having a radius of 40.00 feet and an arc length of
40.88 feet, being subtended by a chord of South 15°58'01" West for a distance
of 39.13 feet to a point; THENCE along a curve to the right having a radius of
50.00 feet and an arc length of 124.77 feet, being subtended by a chord of

(009433-46) 3/22/90

SCHEDULE A
Continued                    BOOK 2234 PAGE 1944

South 58°10'31" West for a distance of 94.83 feet to a point; THENCE North
50°20'07" West for a distance of 59.95 feet to the point of BEGINNING.

SAID property contains 0.768 acres more or less.

FUTURE MAYLAND DRIVE EXTENSION - PARCEL 3:

SITUATED, lying, and being in the Three Chopt District of Henrico County,
Virginia, and being more particularly described as follows:

COMMENCING on a point in the north line of Parcel 1, said point being the
Southwest corner of Parcel 2 also, the point of beginning for Parcel 2, and
being the point of beginning for Parcel 1, THENCE South 50°20'7" East for a
distance of 59.95 feet to a point; THENCE along a curve to the left having a
radius of 50.00 feet and an arc length of 23.36 feet, being subtended by a
chord of South 63°43'12" East for a distance of 23.15 feet to a point; THENCE
along a curve to the right having a radius of 393.49 feet and an arc length of
278.64 feet, being subtended by a chord of South 25°42'44" East for a distance
of 272.86 feet to a point; thence South 84°34'27" West for a distance of 15.00
feet to a point, said point being the point and place of BEGINNING for Parcel
3; THENCE along a curve to the left having a radius of 25.00 feet and an arc
length of 34.91 feet, being subtended by a chord of South 45°25'59" East for a
distance of 32.14 feet to a point; THENCE South 85°26'26" East for a distance
of 30.20 feet to a point; THENCE along a curve to the right having a radius of
1123.00 feet and an arc length of 36.78 feet, being subtended by a chord of
South 84°30'08" East for a distance of 36.78 feet to a point; THENCE along a
curve to the right having a radius of 246.87 feet and an arc length of 50.39
feet, being subtended by a chord of South 77°42'58" East for a distance of
50.31 feet to a point; THENCE along a curve to the left having a radius of
165.24 feet and an arc length of 53.49 feet, being subtended by a chord of
South 81°08'33" East for a distance of 53.26 feet to a point; THENCE South
00°25'00" East for a distance of 55.00 feet to a point; THENCE South 15°15'05"
West for a distance of 5.20 feet to a point on the south line of Mayland
Drive; THENCE along a curve to the left having a radius of 192.07 feet and an
arc length of 45.21 feet, being subtended by a chord of South 82°25'15" West
for a distance of 45.11 feet to a point; THENCE along a curve to the right
having a radius of 149.13 feet and an arc length of 41.96 feet, being
subtended by a chord of South 83°44'17" West for a distance of 41.82 feet to a
point; THENCE along a curve to the right having a radius of 1211.78 feet and
an arc length of 58.38 feet, being subtended by a chord of North 86°49'14"
West for a distance of 58.37 feet to a point; THENCE North 85°26'26" West for
a distance of 30.21 feet to a point; THENCE along a curve to the left having a
radius of 25.00 feet and an arc length of 34.91 feet, being subtended by a
chord of South 54°33'27" West for a distance of 32.14 feet to a point; THENCE
North 75°26'41 West for a distance of 34.00 feet to a point; THENCE North
04°33'53" East for a distance of 119.53 feet to a point; THENCE North
84°34'27" East for a distance of 34.00 feet to the point of BEGINNING.

Said property contains 0.473 acres more or less.

(009433-46) 3/22/90

BOOK 2234 PAGE 1945

VIRGINIA: IN THE CLERK'S OFFICE OF THE CIRCUIT COURT OF THE COUNTY OF HENRICO

This Deed was presented, and with the Certificate annexed admitted to record

on _____ MAR 27 1990 _____ , at __10;13__ o'clock __A__. M.

State Tax                   _____
County Tax                  _____
Grantor's Tax (120)         _____
         (220-A)            _____
                                                    _Margaret B Baker_
Transfer Fee                _____                 Clerk
Clerk's Fee                 __12.00__
Total               $ __12.00__        Mail to: _Lawyers Title_

STATE OF NEW YORK                    )
                                     ).
COUNTY OF NEW YORK                   )

        The foregoing instrument was acknowledged before me this _23_ day of
March, 1990, by ___A.C. Monk___ and ___S. Treadwy___, as Trustees of
Corporate Realty Income Trust I, a Massachusetts business trust, on behalf of
the business trust.

My Commission expires: 6/30/91

[Notarial Seal]

                                        _____
                                        Notary Public

        ELLIN HARLOW
    Notary Public, State of New York
    No. 4791377  Qualified in Rockland County
    Certificate Filed in New York County
    Commission Expires

        6/30/91

(009433-46) 3/22/90

# EXHIBIT B

LEASE AND AGREEMENT


Between


CRA ACQUISITION CORP.,
a Delaware corporation,
as Landlord


And


CIRCUIT CITY STORES, INC.,
as Tenant


Dated as of February 28, 1990


(D09433-30)

## TABLE OF CONTENTS

1.  Leased Property.................................... 1
2.  Lease Term......................................... 1
3.  Rent and Charges................................... 2
4   Taxes.............................................. 5
5.  Maintenance, Repairs and Replacements.............. 6
6.  Payment of Utility Bills........................... 7
7.  Alterations........................................ 7
8.  Granting of Easements.............................. 8
9.  Mechanics' Liens................................... 9
10. Insurance.......................................... 9
11. Condemnation and Casualty.......................... 11
12. Assignment and Subletting.......................... 13
13. Use................................................ 13
14. Tenant's Warranty as to Hazardous Substances....... 13
15. Priority of Lease.................................. 15
16. Change of Landlord................................. 15
17. Memorandum of Lease Agreement...................... 15
18. Tenant's Property and Waiver of Landlord's Lien.... 15
19. Ground Lease....................................... 16
20. Events of Default.................................. 16
21. Landlord's Remedies................................ 17
22. Holding Over....................................... 19
23. "For Rent" and "For Sale" Signs.................... 19
24. Estoppel Certificates.............................. 19
25. Waiver............................................. 19
26. Compliance with Applicable Laws.................... 19
27. Non-Recourse as to Landlord........................ 20
28. Notices............................................ 20
29. Right of First Offer/Refusal....................... 21
30. Miscellaneous...................................... 21

Exhibit A - Description of Land
Exhibit B - Permitted Exceptions
Exhibit C - Memorandum of Lease
Exhibit D - Tenant's Trade Fixtures

(009433-30)

r.c

## LEASE

This Deed of Lease ("Lease") is made as of the 28th day of February, 1990, by and between CRA Acquisition Corp., a Delaware corporation, having an address at 1345 Avenue of the Americas, New York, New York 10105 (the "Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation, having an address at 2040 Thalbro Street, Richmond, Virginia 23230 (the "Tenant").

### W I T N E S S E T H:

That for and in consideration of the mutual covenants herein contained and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Leased Property.** Landlord demises and leases to Tenant and Tenant leases and takes from Landlord all those certain "Premises" consisting of all of Landlord's estate and interest in the approximately 288,000 square foot office building, together with all fixtures permanently attached thereto or to the Land hereinafter described, and equipment constituting part of such improvements, such as air conditioning, heating and ventilating systems used in connection with such building and other improvements (collectively, "Improvements"), and the Landlord's leasehold interest created pursuant to the Ground Lease (as defined in paragraph 19) in that approximately 18.468-acre parcel (Parcel 1) plus parcels 2 and 3 (collectively, the "Land") including trees, shrubbery and plants, on which the Improvements are located, as more particularly described on Exhibit "A" hereto.

2. **Lease Term.** The main term (the "Main Term") of the Lease shall commence on February 28, 1990 and shall end on February 28, 2010.

In addition to the Main Term, Tenant shall have five (5) options (each a "Renewal Option") to renew and extend the Lease consisting of four (4) consecutive ten (10) year periods followed by one (1) five (5) year period (the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least twelve months prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of any right to renew or extend as aforesaid, if Tenant shall fail to give any such notice within the aforesaid time limit and shall not have given Landlord prior written notice of its intention not to renew or extend as aforesaid, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired) until ten (10) business days after Landlord shall have given Tenant notice of Landlord's election to terminate the Renewal Option, and Tenant may exercise its Renewal Option at any time prior to expiration of said ten (10) business day period. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the term of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, as if such notice had been timely given hereunder.

(005433 3; )

The Main Term and exercised Option Periods are, collectively, the "Term." The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each March during the Term, except that the first Lease Year shall commence on the commencement date of this Lease and shall end on February 28, 1991. If any Lease Year ends on February 28 in a leap year, or if this Lease would otherwise expire on such date, such Lease Year or the Term, as the case may be, shall be automatically extended to February 29.

3.  Rent and Charges.

(a) Base Rent.  Tenant agrees to pay base rent ("Base Rent") for the Premises in advance on the first day of each calendar month throughout the Term, with appropriate proration for any partial month or Lease Year, to the address given for Landlord in paragraph 28 hereof, unless Landlord shall have given Tenant written notice of a change of address or of the party to whom such rents shall be payable. Base Rent shall be paid pursuant to the following schedule:

(i)  First Five Years.  During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Two Million Two Hundred Seventy Five Thousand and No/100 Dollars ($2,275,000), payable in monthly installments of One Hundred Eighty-Nine Thousand Five Hundred Eighty-Three and 33/100 ($189,583.33).

(ii)  Increases in Base Rent During the Main Term.  Base Rent shall increase on the first day of the Sixth and on the first day of the Eleventh Lease Years so that Base Rent during the Main Term shall be as follows:

| Lease Years | Annual Rent | Monthly Rent |
| --- | --- | --- |
| 1-5 | $2,275,000 ( 9.1%) | $189,583.33 |
| 6-10 | $2,478,125 ( 9.9125%) | $206,510.42 |
| 11-20 | $2,859,375(11.4375%) | $238,281.25 |

(iii)  Base Rent During Option Periods.  The Base Rent during the first Option Period (i.e., Lease Years 21-30), if exercised, shall be at the rate per annum equal to the product of the Base Rent per annum in effect during the first Lease Year multiplied by a fraction, the numerator of which is the "Price Index" (as hereinafter defined) published for the calendar month in which the first Option Period commences and the denominator of which is the Price Index published for the first full calendar month of the Main Term; provided, however, in no event shall the Base Rent per annum for the first Option Period exceed 142.66% of the

Base Rent per annum in effect on the last day of the twentieth
Lease Year. If, before the first Option Period, Net Proceeds
have been paid to Landlord pursuant to paragraph 11(c) and as a
result thereof the Base Rent has been reduced, the Base Rent per
annum in effect during the first Lease Year shall be deemed to
be the Base Rent that would have applied during the first Lease
Year if the Base Rent adjustment described in paragraph 11(c)
had occurred at the commencement of the first Lease Year.

The Base Rent during the second Option Period (i.e., Lease Years
31-40), if exercised, shall be at the rate per annum equal to
the product of the Base Rent per annum in effect on the last day
of the first Option Period multiplied by a fraction, the
numerator of which is the Price Index figure published for the
month in which the second Option Period commences and the
denominator of which is the Price Index published for the
calendar month in which the first Option Period commences;
provided, however, in no event shall the Base Rent per annum for
the second Option Period exceed 114.02% of the Base Rent per
annum in effect on the last day of the first Option Period or be
less than the Base Rent in effect on the last day of the first
Option Period.

The term "Price Index" shall mean the Revised Consumer Price
Index for Urban Wage Earners and Clerical Workers - All Items,
1982-84 = 100, U.S. City Average, presently published by the
United States Department of Labor, Bureau of Labor Statistics,
Washington, D.C. In the event the Price Index shall hereafter
be converted to a different standard reference base or otherwise
revised, the determination of the percentage change shall be
made by the use of such conversion factor, formula or table for
converting the Price Index as may be published by a nationally
recognized publication of similar statistical information.
In the event the Price Index shall cease to be published, then
for such purpose there shall be substituted for the Price Index
such other index published by a governmental agency or by a
nationally recognized publication of statistical information as
the parties may agree. If the parties are unable to agree upon
such other index, the matter shall be determined by arbitration.

The Base Rent during the Third Option Period (i.e., Lease Years
41-50), if exercised, shall be at the rate per annum equal to
the fair market rental value of the Premises (exclusive of the
land component of the Premises) determined as set forth below,
but in no event shall the Base Rent in Lease Years 41-50 exceed
114% of the Base Rent in effect on the last day of the Second
Option Period.

3

(009433-30)

The Base Rent during the fourth Option Period (i.e., Lease Years 51-60), if exercised, shall be at the rate per annum equal to the fair market rental value of the Premises (exclusive of the land component of the Premises) determined as set forth below.

The Base Rent for the fifth Option Period (i.e. Lease Years 61-65) if exercised shall be at the rate per annum equal to the fair market rental value of the Premises (exclusive of the land component of the Premises) determined as set forth below.

In order to determine the fair market rental value of the Premises for purposes hereof and if the parties are otherwise unable to agree upon same, following exercise by Tenant of its option to extend and renew for the third, fourth or fifth Option Period, the parties shall attempt to agree upon the use of a single appraiser. Any appraiser provided for in this paragraph shall be an independent M.A.I. appraiser experienced in appraising office buildings in the Richmond, Virginia metropolitan area. If, within thirty (30) days after Tenant's exercise of its option to extend and renew, the parties have not agreed upon the use of a single appraiser, then either party may by written notice to the other select an appraiser. The other party shall then select its appraiser and give notice thereof to the other party within 30 days after notification by the other party of its selection of appraisers or, if it fails to do so, the first appraiser shall alone determine the fair market rental value. The single appraiser or the two appraisers, as the case may be, shall determine the fair market rental value of the Premises based upon the terms and provisions of this Lease and assuming that Landlord will provide no rent abatement, moving allowance, construction allowance or other such economic incentive to a prospective tenant. The appraiser(s) shall deliver their determination(s) of fair market value of the Premises to Landlord and Tenant as soon as possible, and if there are two appraisers whose determinations differ, the fair market rental value shall be the average of the two appraisals. If a single appraiser is selected, Landlord and Tenant shall split the costs of the appraisal, and if two appraisers are appointed, Landlord and Tenant shall each pay the costs of the appraiser selected by it.

(b) Rent/Additional Rent. All sums payable by Tenant to Landlord under this Lease shall constitute rent. All payments under this Lease other than Base Rent, including, but not limited to, payments of "Real Estate Taxes" (as defined below), shall constitute additional rent ("Additional Rent") hereunder. Tenant shall pay to Landlord interest at the rate of 15% per annum (or at the maximum rate not prohibited by applicable law, whichever is less) (the Default Rate) on all overdue Base Rent and Additional Rent.

(c) Net Lease; Non-Terminability. This Lease is a net lease and, except as otherwise expressly provided in paragraphs 11(b), 11(c), 21, 30(1) or 30(n), any present or future law to the contrary notwithstanding, shall not terminate, nor shall Tenant be entitled to any abatement, reduction, set-off,

4

counterclaim (except as provided in paragraph 27), defense or deduction with
respect to any Base Rent, Additional Rent or other sum payable hereunder, nor
shall the obligations of Tenant hereunder be affected, by reason of: any
damage to or destruction of the Premises; any taking of the Premises or any
part thereof by condemnation or otherwise; any prohibition, limitation,
restriction or prevention of Tenant's use, occupancy or enjoyment of the
Premises, or any interference with such use, occupancy or enjoyment by any
person; any eviction by paramount title or otherwise; any default by Landlord
hereunder or under any other agreement; the impossibility or illegality of
performance by Landlord, Tenant or both; any action of any governmental
authority; or any other cause whether similar or dissimilar to the foregoing.
The parties intend that the obligations of Tenant hereunder shall be separate
and independent covenants and agreements and shall continue unaffected unless
such obligations shall have been modified or terminated pursuant to an express
provision of this Lease. Tenant shall remain obligated under this Lease in
accordance with its terms and shall not take any action to terminate, rescind
or avoid this Lease, notwithstanding any bankruptcy, insolvency,
reorganization, liquidation, dissolution or other proceeding affecting
Landlord or any assignee of Landlord or any action with respect to this Lease
which may be taken by any trustee, receiver or liquidator or by any court.
Except as otherwise expressly provided in paragraphs 11, 21, 27, 30(1) and
30(n), Tenant waives all rights to terminate or surrender this Lease, or to
any abatement or deferment of Base Rent, Additional Rent or other sums payable
hereunder.

4. Taxes.

(a) Taxes Contemplated Hereunder. The term "Real Estate Taxes"
shall mean all general and special real estate taxes, special assessments and
other ad valorem taxes, rates, levies and assessments payable upon or with
respect to the Premises to any governmental agency or authority and all taxes
specifically imposed in lieu of any such taxes. Nothing contained in this
Lease shall require Tenant to pay any franchise, corporate, estate,
inheritance, succession, capital levy, net income, business or transfer tax of
Landlord.

(b) Payment of Real Estate Taxes. Tenant shall pay the Real
Estate Taxes levied against the tax parcel or parcels of which the Premises
are a part (the "tax parcel"). Tenant shall pay the Real Estate Taxes before
incurring any penalty for late payment and shall provide Landlord with
evidence of payment thereof within 30 days after payment.

(c) Contest of Real Estate Taxes. Tenant shall have the right, at
Tenant's sole expense, to contest the amount or validity, or otherwise seek an
exemption or abatement, of any Real Estate Taxes, by appropriate proceedings
diligently conducted in good faith, provided that Tenant shall first have
notified Landlord of its intent to do so and, if payment of the contested
amount is not made, first giving such security as Landlord or its lender may
reasonably require to assure payment of any contested amount, together with
interest and penalties thereon, provided however, that Tenant shall not be
required to give security so long as Tenant's net worth exceeds $273,000,000.

5

(009433-30)

(d)  Reduction in Assessed Valuation of Property.  Tenant, at its
sole cost and expense, shall have the right to seek a reduction in the
valuation of the Premises assessed for Real Estate Tax purposes.  In any
instance where any such action or proceeding is being undertaken by Tenant,
Landlord shall cooperate with Tenant at Tenant's expense, execute any and all
documents required in connection therewith and, if required by any law, rule
or regulation of the taxing authority, shall join with Tenant in the
prosecution thereof.

(e)  Expenses.  Upon the termination of the proceedings set forth
in (c) or (d) (unless the taxing authority requires that Real Estate Taxes be
paid prior to commencement of such proceedings), Tenant shall pay the Real
Estate Taxes as finally determined in such proceedings, the payment or partial
payment of which may have been deferred during the prosecution of such
proceedings.  In addition, Tenant shall be solely responsible for any costs,
fees, interest, penalties and other liabilities incurred in connection with
such proceedings.  Tenant shall be entitled to a refund of any overpayment of
Real Estate Taxes relating or allocable to the Premises, after deducting
therefrom all costs, fees, penalties or interest thereon, which shall be
reimbursed to Tenant.

(f)  After an Event of Default hereunder, Tenant shall at the
request of Landlord (if Landlord is so requested by its lender) deposit with
and pay to Landlord, on the first business day of each month during the
continuance of such Event of Default, a sum equivalent to one-twelfth (1/12)
of the estimated annual taxes and assessments assessed or levied against the
Premises.  If, after the first such Event of Default, there shall be another
Event of Default hereunder and Landlord's lender shall require Landlord to
impound the estimated annual taxes and assessments assessed or levied against
the Premises, Tenant shall, for the duration of such Lender's requirement,
deposit with and pay to Landlord, on the first business day of each month, a
sum equivalent to one-twelfth (1/12) of such estimated annual taxes and
assessments.  Landlord shall use such deposits to pay the taxes and
assessments when the same become due.  Landlord shall be liable for interest
on such deposits at prevailing bank money market account rates; Landlord shall
not charge Tenant any administrative fee for handling such deposits.  Tenant
shall procure and deliver to Landlord, in advance, statements for such
charges.  If the total payments made by Tenant under this paragraph exceed the
amount of payments actually made by Landlord for taxes and assessments, such
excess shall be credited by Landlord on subsequent deposits to be made by
Tenant.  If, however, the deposits are insufficient to pay the taxes and
assessments when the same shall be due and payable, Tenant will pay to
Landlord any amount necessary to make up the deficiency, on or before the date
when payment of such taxes and assessments shall be due.  The enforceability
of the covenants relating to taxes and assessments provided for in this Lease
shall not be affected except to the extent that said obligations have been
actually met by compliance with this paragraph.  Landlord shall apply sums or
amounts in its hand received pursuant hereto only to the payment of such taxes
and assessments.

5.  Maintenance, Repairs and Replacements.  Tenant shall be solely
responsible for maintenance of the Improvements in good repair and condition
as a first class office building, including, but not limited to, repairs
and/or replacements to plumbing, heating, electrical and air conditioning
systems.  Tenant shall not commit or permit waste of the Premises or any part
thereof.  Landlord shall have no responsibility for maintenance, repair or
replacements to the Premises or any part thereof, but should Tenant fail to
perform its obligations under this paragraph 5, Landlord may, at its option,
effect such maintenance or repairs, provided that Landlord shall have given
Tenant thirty (30) days' prior written notice, except in the case of

6

emergencies (in which event only such notice as may be reasonable under the circumstances shall be required). Tenant shall reimburse Landlord on demand for the reasonable and actual amount so expended, plus interest at the Default Rate from the date of such expenditures until paid. Tenant shall have no obligations under this paragraph to make repairs or replacements of casualty damage if Tenant terminates this Lease on account of such casualty in accordance with the terms hereof but, upon request of Landlord and upon Landlord's making funds available for this purpose, Tenant shall remove all rubble and debris from the Land.

6.   Payment of Utility Bills. Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used in connection with the Premises. Tenant shall not be deemed to be in default hereunder as a consequence of breach of this paragraph 6 unless, as a consequence of the non-payment, the Premises is subject to a lien or Landlord is subject to liability for such breach.

7.   Alterations. (a)  In the case of a project anticipated to cost less than $1,000,000 (increased by a percentage thereof equal to the percentage increase in the Price Index between the commencement of the Lease and the date of calculation, but in no event shall such figure exceed 4% of the then fair market value of the Premises, determined as encumbered by the Lease) Tenant shall have the right, at its discretion and its sole cost, upon notice to Landlord but without obtaining the prior consent from Landlord, to make alterations or modifications which do not materially adversely change the character of the Improvements as a first class office building, reduce its office space by more than a cumulative 15,000 square feet over the life of this Lease, or cumulatively materially reduce its value from its value at the inception of the Lease. After completion of such project, Tenant shall deliver to Landlord updated plans and specifications reflecting such work.  In the case of a project anticipated to cost more than $1,000,000 (increased by a percentage thereof equal to the percentage increase in the Price Index between the commencement of the Lease and the date of calculation, but in no event shall such figure exceed 4% of the then fair market value of the Premises, determined as encumbered by the Lease) (as adjusted as provided above), or which involves a material demolition of the exterior of a building or structural alteration of the Improvements, which exterior demolition or structural alterations exceed a cumulative cost over the Main Term of $500,000 (increased by a percentage thereof equal to the percentage increase in the Price Index between the commencement of this Lease and the date of calculation) or which otherwise is not within the scope of the preceding sentence, Tenant shall deliver plans and specifications for such project to, and obtain the approval by, Landlord prior to commencement of any such project and shall deliver copies of all building permits to Landlord. Thereupon, with Landlord's consent, which shall not be unreasonably withheld or delayed, Tenant may, at its sole expense, alter, modify or reconstruct the Improvements in substantial accordance with such plans and specifications.  Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 9) and made and completed at the cost of the Tenant in a workmanlike manner and in compliance with all applicable law. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

7

(009433-30)

(b)  Tenant shall have the right, at Tenant's expense, to submit in its own name or in Landlord's name, if required, applications for such building permits, zoning, conditional use permits, plans of development and all such other permits and approvals as shall be related to the use of the Premises and the construction and operation of Improvements thereon.  Landlord will join in such applications if requested to do so by Tenant.

(c)  Upon written request of Landlord in connection with a sale or refinancing of the Premises, Tenant shall provide a complete set of up-to-date plans and specifications for the Improvements, regardless of whether Landlord's consent was required in connection with alterations reflected thereby.

8.  Granting of Easements.  (a)  If no Event of Default shall have happened and be continuing, Landlord shall, from time to time:  (i) grant easements and other rights in the nature of easements; (ii) release existing easements or other rights in the nature of easements; (iii) dedicate or transfer its interest in unimproved portions of the Land for road, highway or other public purposes; (iv) execute petitions to have the Premises annexed to any municipal corporation or utility district; and (v) execute and deliver to any person any instrument appropriate to confirm or effect such grants, releases, dedications and transfers; provided that Tenant delivers to Landlord:

(w)  a copy of such proposal grant, release, dedication, amendment, transfer or petition;

(x)  Tenant's certificate stating:  (I) the consideration, if any, being paid for such grant, release, dedication, transfer, petition or amendment; and (II) that such grant, release, dedication, transfer, petition or amendment does not materially impair the use of the Premises or materially reduce its value or adversely affect the priority of the lien created by any Permitted Mortgage (as defined in paragraph 15(b) of the Ground Lease) in relation to any other lien or encumbrance on the Premises (other than the encumbrance that is the subject of the certificate);

(y)  an amount equal to the consideration so paid or payable (subject, however, to the provisions of the Ground Lease under which the consideration may be payable to the landlord thereunder; and

(z)  a duly authorized and binding undertaking of Tenant that it will remain obligated under this Lease to the same extent as if such grant, release, dedication, transfer, petition or amendment had not been made, and so long as the Lease is in effect that Tenant will perform all financial and non-financial obligations of Landlord under such instrument and, after expiration or termination of the Lease that Tenant will pay all financial obligations of Landlord under such instrument.

(b)  If Tenant elects to dedicate Parcel 2 and/or Parcel 3 or any portion of the "ring road" on Parcel 1 to the public, Landlord consents thereto and agrees, without incurring any liability, to execute such instruments, if any, as may be required of Landlord to effect such dedication.  Landlord's obligations under this paragraph 8(b) are unconditional.

9.  Mechanics' Liens.  Tenant covenants that it will not permit any lien to be filed against the Premises on account of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises for or on behalf of Tenant or any party claiming by, through, or under Tenant, nor shall Tenant permit any judgment, lien or attachment against Tenant to lie against Landlord's interest in the Premises.  Should any such lien be filed against the Premises, Tenant shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed by substitution of collateral, posting a bond therefor or such other method as may be reasonably acceptable to Landlord.  Landlord may enter the Premises at any time to post notices of non-responsibility.

10.  Insurance.

(a)  Property Damage.  Tenant shall keep in full force and effect, in a form reasonably acceptable to Landlord, a policy of fire and all-risk insurance covering loss or damage to the Premises in the amount of the full replacement cost of the Improvements, exclusive of excavation, footings and foundations (subject to subparagraph (c) below).  Tenant shall be fully responsible for any deductible required under such policy.  In the first Lease Year, the deductible shall not exceed $250,000.  In any succeeding Lease Year, the maximum deductible allowed hereunder shall not exceed 2% of Tenant's tangible net worth as shown on its most recent financial statement.  Landlord and any Mortgagee (as defined in paragraph 15 below), shall be named in such policy or policies as additional insureds as their respective interests may appear.  Tenant shall furnish to Landlord a certificate of insurance and, upon request, a duplicate policy of insurance showing insurance existing in such amount from an insurance carrier licensed to do business in the Commonwealth of Virginia and having a Best's Key Rating (Property and Casualty) of at least A- or better or an insurer at Lloyd's subject to the jurisdiction of and consenting to venue in the courts of the Commonwealth of Virginia or the United States District Courts for Virginia and licensed in or approved by the Commonwealth of Virginia as a surplus lines carrier.

(b)  Liability Insurance.  Tenant shall keep in full force, in a form reasonably acceptable to Landlord, a commercial general liability policy of insurance against liability for deaths, bodily injury and property damage occurring on, in or about the Premises and adjoining streets and sidewalks, which shall name Landlord and, if requested, any Mortgagee as additional insureds.  The limits of such commercial general liability policy shall be not less than $5,000,000 combined single limit for bodily injury and property damage, with a deductible not in excess of $1,000,000 (increased by a percentage thereof equal to the percentage increase in the Price Index between the commencement of this Lease and the date of calculation).

9

(c) _Self-Insurance_. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self insure against the first dollar of liability up to an amount equal to 2% of Tenant's tangible net worth as shown on its most recent financial statement for any of the risks or portions thereof set forth in subparagraph (a) above. Tenant acknowledges that generally accepted accounting principles may require the use of actuarial standards and the maintenance of reserves on its financial books in maintaining a program of self-insurance.

(d) _Workers' Compensation Insurance_. Tenant shall maintain workers' compensation insurance in statutory limits.

(e) _Other Insurance_. Tenant shall maintain such other insurance as is commonly obtained in connection with properties similar to the Premises in the same general geographical area, in such amounts as Landlord and Tenant shall agree.

(f) _Policy Provisions_. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises shall be at least the equivalent of separate policies in the amounts herein required; and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 10. An increased coverage or "umbrella" policy may be provided and utilized to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the Premises shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 10.

(g) _Waiver of Subrogation_. Landlord and Tenant each hereby waives any and all rights of recovery against the other for any loss or damage to the Premises, for loss of income on account of fire or other casualty, or for injury sustained on the Premises; and the aforesaid policies of insurance shall contain appropriate provisions recognizing this release and waiving all rights of subrogation by the respective insurance carriers. The foregoing waiver shall not release Tenant from liability as a self-insurer under paragraph 10(c) or as an indemnitor under paragraph 10(i) (except to the extent such indemnitor's liability is in fact paid by a third party insurer) or for any liability required but not insured against under paragraphs 10(a), (b) or (c).

(h) _Evidence of Insurance_. Tenant shall cause to be issued to Landlord appropriate certificates of insurance (or evidence of maintenance of a self-insurance program) evidencing compliance with the applicable covenants of this paragraph 10. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

10

(009433-30)

(i)  Indemnity.  Tenant hereby indemnifies Landlord against all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on, in or about the Premises or adjoining streets and sidewalks, except such as may have been caused by Landlord's negligent acts.

11.  Condemnation and Casualty.  (a)  Tenant will immediately notify Landlord of any damage, destruction or condemnation of all or any part of the Premises estimated to cost more than $100,000 to repair.  Tenant hereby irrevocably assigns to Landlord any award, compensation or insurance payment to which Tenant may become entitled by reason of its leasehold interest in the Improvements created by this Lease (i) if the Improvements are damaged or destroyed by fire or other casualty or (ii) if the use, occupancy or title to the Improvements or any part thereof is taken, requisitioned or sold in, by or on account of any actual or threatened eminent domain proceeding or other action by any person having the power of eminent domain.  Landlord is hereby authorized and empowered in the name and on behalf of Tenant to appear in any such proceeding or action, to negotiate, prosecute and adjust any claim for any award, compensation or insurance payment on account of any such damage, destruction, taking, requisition or sale, and to collect any such award, compensation or insurance payment.  Tenant shall be entitled to participate in any such proceeding, action, negotiation, prosecution or adjustment.  All amounts payable in connection with any such damage, destruction, taking, requisition or sale of the Improvements, including amounts payable under Tenant's program of self-insurance, shall be applied pursuant to this paragraph 11, and all such amounts (minus the expense of collecting such amount) are herein called the Net Proceeds.  Tenant shall take all appropriate action in connection with each such proceeding, action, negotiation, prosecution and adjustment and shall pay all expenses thereof, including the reasonable cost of Landlord's participation therein.  Pending disbursement thereof, the Net Proceeds shall be invested in a federally insured interest bearing money market account.

(b)  If an occurrence of the character referred to in clause (i) or (ii) of paragraph 11(a) shall affect all or a substantial portion of the Premises and shall render the Premises unsuitable for restoration for continued use and occupancy in Tenant's business, then Tenant shall, not later than 90 days after such occurrence, deliver to Landlord (A) notice of its intention to terminate this Lease on a date (the Termination Date) which occurs not less than 180 days nor more than 270 days after the delivery of such notice and (B) a certificate of Tenant describing the event giving rise to such termination and stating that its board of directors or executive committee has determined that such event has rendered the Premises unsuitable for restoration for continued use and occupancy in Tenant's business and an agreement that Tenant will not occupy the Improvements for office purposes for a period of 24 months after termination of the term hereof (failure to deliver such agreement shall make Tenant liable for any penalty or premiums assessed against Landlord by reason of non-delivery of such agreement under any Permitted Mortgage); however, nothing herein shall prevent Tenant from occupying the Land for any purpose (assuming the Ground Lease has been terminated and no new ground lease given to the holder of a Permitted Mortgage) nor shall any third party be prevented from occupying the Improvements.  This Lease shall terminate on the Termination Date except with

(009433-30)

respect to obligations and liabilities of Tenant hereunder, actual or
contingent, which have arisen on or prior to the Termination Date, upon
payment by Tenant of all Base Rent, Additional Rent and other sums then due
and payable hereunder to and including the Termination Date, and the Net
Proceeds shall belong to Landlord, subject to the rights of a Permitted
Mortgagee. At Landlord's request which can be made only if Landlord
contemporaneously terminates the Ground Lease, Tenant shall pay to Landlord on
the Termination Date an amount equal to the Net Proceeds (or if the amount is
not then known, a reasonable estimate thereof, and Landlord and Tenant agree,
as a covenant surviving termination of this Lease, to adjust such payment,
without consideration of the cost of delay in payment, when the final amount
is known), and upon payment thereof Landlord shall assign to Tenant its right
to receive all Net Proceeds.

      (c)  If, after an occurrence of the character referred to in clause
(i) or (ii) of paragraph 11(a), Tenant does not give notice of its intention
to terminate this Lease, then this Lease shall continue in full effect, and
Tenant shall, as promptly as possible in the exercise of diligence, repair any
damage to the Improvements caused by such event in conformity with the
requirements of paragraph 5 so as to restore the Improvements (as nearly as
practicable) to the condition and market value thereof immediately prior to
such occurrence.  If the estimated cost of repairs exceeds $1,000,000
(increased by a percentage thereof equal to the percentage increase in the
Price Index between the commencement of this Lease and the date of
calculation), the plans and specifications for the restoration shall be
subject to Landlord's prior written approval, which approval shall not be
unreasonably withheld or delayed.  Provided no Event of Default is continuing
hereunder, Tenant shall be entitled to receive the Net Proceeds payable in
connection with such occurrence and interest accrued thereon, but, if the
estimated cost of restoration exceeds $1,000,000 (increased by a percentage
thereof equal to the percentage increase in the Price Index between the
commencement of this Lease and the date of calculation),  only against
certificates of Tenant's architect delivered to Landlord from time to time as
such work or repair progresses, each such certificate describing the work or
repair for which Tenant is requesting payment and the cost incurred by Tenant
in connection therewith and stating (i) the estimated cost to complete the
repairs, and (ii) that Tenant has not theretofore received payment for such
work, and such partial lien waivers and contractor's statements as Landlord
may require.  If an Event of Default shall exist hereunder, the Net Proceeds
shall be paid to Landlord, subject to the rights of the mortgagee under a
Permitted Mortgage, in accordance with paragraph 11(b) and if such Net
Proceeds are not made available to Tenant to the extent of the costs of
reconstruction, Base Rent hereunder shall therefore be reduced as provided in
the next sentence. Any Net Proceeds remaining after final payment has been
made for such work, together with all interest earned thereon, shall be paid
to Tenant and no adjustment shall be made in the Base Rent payable hereunder
or, at Landlord's option, shall be retained by Landlord and, thereafter each
installment of Base Rent payable on and after the first full calendar month or
after the final payment to Tenant for such work shall be reduced by 1/12 of
(1) for the period through the last day of February, 1995, 9.1% of the amount
so retained (2) during the period March 1, 1995 through the last day of
February, 2000, 9.9125% of such amount (3) during the period March 1, 2000

12

through the last day of February, 2010, 11.4375% of such amount, and
(4) during each period thereafter, the product of the annual Base Rent in
effect during such period and a fraction, the numerator of which is the amount
retained by Landlord and the denominator of which is $25,000,000. In the
event of any temporary requisition, this Lease shall remain in full effect for
the remainder of the term hereof and Tenant shall be entitled to receive the
entire Net Proceeds payable during the remainder of the term hereof by reason
of such requisition. If the cost of any repairs required to be made by Tenant
pursuant to this paragraph 11(c) shall exceed the amount of such Net Proceeds
and interest accrued thereon, the deficiency shall be paid by Tenant.

(d) Tenant shall have no obligation to repair casualty or
condemnation damage unless the cost thereof up to the amount of the Net
Proceeds is made available to Tenant as provided herein. If such amount is
insufficient to perform the required repairs, Tenant shall pay any deficiency.

12. **Assignment and Subletting**. Tenant shall have the right to
sublet, assign, transfer and reassign all or any part of the Premises and any
of Tenant's rights and obligations under this Lease during the term, so long
as Tenant remains liable for all of Tenant's obligations arising hereunder as
a primary obligor and not as a surety. Landlord may recover from Tenant, and
Tenant shall pay to Landlord upon demand, such reasonable and actual expenses
as Landlord may incur (including without limitation attorneys' fees) as a
result of any Event of Default by Tenant hereunder caused by any assignee or
subtenant.

Any assignment of this Lease shall be executed by the assignor and
the assignee. Each assignee shall, for the benefit of Landlord, agree to
assume, be bound by, and perform all terms, covenants, and conditions of this
Lease to be kept and performed by Tenant. Any sublease shall be executed by
the sublessor and sublessee, shall limit the term of the sublease to the Main
Term of this Lease and any exercised Option Periods and shall acknowledge that
the sublease will terminate upon any termination of this Lease. After
execution of the assignment or sublease, Tenant will forward a completed copy
thereof to Landlord.

13. **Use**. Tenant shall initially use and operate the Premises as
its headquarters office building. Tenant shall have the right to use the
Premises for any lawful general office building use and related ancillary
uses; provided, however, that the Premises shall not be used (i) for any
illegal purpose, (ii) in a manner that constitutes a common law nuisance, or
(iii) in violation of the Ground Lease or any applicable provisions of the
"Permitted Exceptions" contained in Exhibit "B".

14. **Tenant's Warranty as to Hazardous Substances**. (a) Tenant
will not introduce, discharge, dump, spill or store within the Premises any
"Hazardous Substances" (as defined in the Comprehensive Environmental
Response, Compensation and Liability Act of 1986, 42 U.S.C. §§9601 et seq., as
amended) or "Hazardous Wastes" as defined in the Resource Conservation
Recovery Act of 1976, 42 U.S.C. §6901 et seq., as amended or "Hazardous
Materials" as defined in the Virginia Hazardous Materials Emergency Response
Act, Va. Code §44-146.34 et seq., in violation of law; and Tenant indemnifies

13

(009433-30)

and agrees to hold Landlord harmless from and against all costs, liability and damages as a result of such violation. This warranty and indemnity shall survive the termination of this Lease. As used in subparagraphs (b) and (d), the term "Hazardous Substances" shall include the Hazardous Substances, Hazardous Waste and Hazardous Materials referred to in this subparagraph (a).

(b)  Following any discharge, disposal, dumping, dispersion or release of Hazardous Substances, whether occurring before or after the commencement of this Lease ("Pollution Hazard"), Tenant shall immediately upon discovery thereof (i) notify Landlord of such Pollution Hazard, (ii) obtain from an independent, reputable environmental consultant reasonably acceptable to Landlord and Tenant, and deliver to Landlord, a detailed estimate of the cost of remedying such Pollution Hazard, and (iii) begin appropriate remedial action and diligently pursue such remedial action to completion, all at Tenant's sole cost and expense.

(c)  In the event of a Pollution Hazard remediation of which is likely, in Landlord's reasonable estimation, to cost more than $1,000,000 (increased by a percentage thereof equal to the percentage increase in the Price Index between the commencement of the Lease and the date of calculation), Tenant shall provide Landlord, immediately upon Landlord's request, with adequate financial assurances that Tenant will meet its obligations under paragraph 14(b) above, provided, however, that Tenant shall not be required to provide adequate financial assurances so long as Tenant has a reported net worth as of the end of Tenant's most recent quarterly reporting period of not less than $273,000,000. The financial assurances required under this Paragraph 14(c) shall take the form of a bond, dedicated bank account or letter of credit in form and substance satisfactory to Landlord or an insured trust account in a FDIC member bank, in each case in an amount equal to Landlord's reasonable estimate of the anticipated cost of the remedial action required under paragraph 14(b) hereof and shall be provided within thirty (30) days of Landlord's written request.

(d)  Tenant, promptly upon the written request of Landlord from time to time, but not more than once in any calendar year unless an Event of Default has occurred and is continuing, shall permit such persons as Landlord or the secured party under a Permitted Mortgage may designate ("Site Reviewers") on the Premises for the purpose of determining whether there exists on the Premises any environmental condition which will result in any liability, cost or expense to Landlord or any other owner or occupier of the Premises relating to Hazardous Substances; provided, however, that any such Site Reviewer in performing any Site Assessment shall not unreasonably interfere with the operations of Tenant on the Premises. Landlord agrees to indemnify and hold harmless Tenant from all loss, cost or liability (including reasonable attorney's fees, it being understood that Landlord shall have the right but not the obligation to control the defense of any action against Tenant for which Landlord is liable under this sentence) arising out of acts of such Site Receivers with respect to the Premises. Such Site Assessments may include both above and below the ground testing for environmental damage or the presence of Hazardous Substances on the Premises and such other tests on the Premises as may be reasonably necessary to conduct the Site Assessments in the opinion of the Site Reviewers. Tenant shall supply to the Site Reviewers such historical and operational information

14

regarding the Premises as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments and shall make available for meetings with the Site Reviewers at the Premises appropriate personnel having knowledge of such matters. The cost of performing and reporting all Assessments shall be paid by Landlord unless a Pollution Hazard has occurred (or, if any Event of Default has occurred and is continuing and the secured party under a Permitted Mortgage requests an Assessment) and is continuing, in which events such cost will be paid by Tenant within thirty (30) days after demand by Landlord with interest to accrue at the Default Rate from and after the due date.

15.  Priority of Lease.  This Lease and the rights of Tenant hereunder are intended to be an encumbrance on the Premises ranking ahead of any liens, charge or encumbrance hereafter created or suffered by Landlord (except such liens, charges and encumbrances as Tenant is obligated to pay or discharge pursuant to the terms hereof).

16.  Change of Landlord.  In the event the Landlord's interest in the Premises passes to a successor ("Successor") by sale, assignment of ground lease, foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the Landlord under the Lease, and the Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Successor to Tenant, but without the execution of any further instrument on the part of either of the parties hereto immediately upon the Successor's succeeding to the interest of Landlord under the Lease; provided, however, that in order for the foregoing to be effective against Tenant, such Successor must be bound to Tenant in respect of all of Landlord's duties and obligations hereunder, such binding effect on the Successor to be effective and self-operative without the execution of any further instrument on the part of either of the parties hereto (except notice as required above), immediately upon the Successor's succeeding to the interest, duties and obligations of Landlord under this Lease.  Such Successor's liability hereunder shall be limited to its interest in the Premises, and Tenant shall have no claim against other assets of such Successor.  In the event that Landlord's interest in the Premises and the rent, issues and profits thereof passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes.

17.  Memorandum of Lease Agreement.  Landlord agrees, at Tenant's request and Tenant's sole expense, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "C" setting forth such provisions hereof as may be required by Virginia law or desired by Tenant.  Recording costs for such document shall be borne by Tenant.

18.  Tenant's Property and Waiver of Landlord's Lien.  All Tenant's trade fixtures (a nonexclusive list of which is attached as Exhibit "D") and other personal property shall be and remain the personal property of Tenant, removable by Tenant at any time upon or prior to the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord, provided that Tenant shall not be required to remove personal property if the Ground Lease is terminated by Landlord contemporaneously with

15

(009433-30)

the termination or expiration of this Lease. Those improvements that are permanently integrated into the physical structure of the Improvements shall not be removed and shall become the property of Landlord (subject to the terms of the Ground Lease). Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment and to surrender the Premises broom clean, in good condition as a first class office building, ordinary wear and tear excepted and also excepting casualty and condemnation damage not required to be repaired by Tenant by the terms of this Lease. Landlord and anyone who claims any interest by, through, or under Landlord expressly waives its statutory or common law landlord's lien and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

19. <u>Ground Lease</u>. Tenant will duly and punctually make all payments required to be made by the tenant under the Ground Lease dated as of the date hereof between Tenant, as landlord, and Landlord, as tenant (the Ground Lease), including without limitation, all payments of Base Rent payable thereunder, when and as the same shall become due and payable. The obligation to pay rent under the Ground Lease is in addition to the obligation to pay Base Rent hereunder and shall constitute Additional Rent.

20. <u>Events of Default</u>. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a) Tenant's failure to make any payment of rent required by this Lease (including without limitation Base Rent or Additional Rent) when due and failure to cure within five (5) business days after receipt of written notice of default, provided, however, that if Landlord shall give notice of 3 such Events of Default in any consecutive 18-month period, any additional such default beyond three (3) within such 18 months shall not be cured until Tenant pays Landlord an administrative fee equal to 4% of the delinquent payment;

(b) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; [provided that, if such default cannot with due diligence be wholly cured within such thirty (30) days, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same and diligently prosecutes such cure];

(c) any representation or warranty made by Tenant herein or in any certificate delivered by Tenant at the commencement date of this Lease or by certificate delivered pursuant hereto proves to be incorrect in any material respect when made;

16

(d)  Tenant shall (A) seek or consent to the appointment of a receiver or trustee for itself or for the Premises, (B) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (C) make a general assignment for the benefit of creditors; or

(e)  a court shall enter an order, judgment or decree appointing a receiver or trustee for it or for the Premises or approving a petition filed against Tenant which seeks relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, and such order, judgment or decree shall remain in force, undischarged or unstayed, 120 days after it is entered; or

(f)  Tenant shall be liquidated or dissolved or shall begin proceedings towards its liquidation or dissolution; it being understood that a merger of Tenant with or into another entity shall not be within the contemplation of this paragraph (f.)

21.  Landlord's Remedies.  After the occurrence of an Event of Default, Landlord shall have the right to exercise the following remedies:

(a)  Continue Lease.  Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and Additional Rent when due, including any due for any Option Period for which a Renewal Option has been exercised.  In the alternative, Landlord shall have the right to re-enter the Premises on the terms set forth in subparagraph (b) below, without such re-entry's being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof.  Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees, any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.  If a sufficient sum to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages, then Tenant shall pay Landlord any deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise.  Nothing herein, however, shall be construed to require Landlord to re-enter and relet in any event, except as provided by Virginia law. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder.  Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

17

(009433-30)

(b) **Terminate Lease**. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than ten (10) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i) The "worth at the time of award" (defined below) of any obligation which has accrued prior to the date of termination;

(ii) The worth at the time of the award of the amount by which the unpaid Base Rent and Additional Rent which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation; and

(iii) The worth at the time of award of the amount by which Base Rent and Additional Rent for the balance of the Term (including only any exercised Renewal Options) after the date of the award exceeds the amount of any sums which Landlord will (or Tenant proves that Landlord could) receive in mitigation.

As used in clauses (i) and (ii) of this subparagraph 21(b) the term "worth at the time of the award" shall be computed by allowing interest at the rate of eight percent (8%) per annum on the amount of the obligations set forth therein from the date the obligation accrues to the date it is paid and, as used in clause (iii), the term "worth at the time of the award" shall be computed by discounting such amount at the rate of eight percent (8%) per annum. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agent, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, either by summary dispossess proceedings or by other suitable action or proceeding at law without liability for damages therefor.

(c) **Reimbursement of Landlord's Costs in Exercising Remedies**. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation reasonable attorneys' fees).

18

(009433-30)

(d) <u>Remedies Are Cumulative</u>. Except after termination of this Lease by Landlord, the various rights and remedies reserved to Landlord herein, including those not specifically described by law in force and effect at the time of the execution hereof, are cumulative, and Landlord may pursue any and all such rights and remedies, whether at the same time or otherwise.

22. <u>Holding Over</u>. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or Additional Rent by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at two times the monthly Base Rent Tenant had been paying during the preceding Lease Year.

23. <u>"For Rent" and "For Sale" Signs</u>. Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place "For Rent" or "For Sale" signs, not exceeding four (4) feet by four (4) feet in size, on the Premises. Tenant will also allow Landlord or its agents, accompanied by a representative of Tenant designed by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

24. <u>Estoppel Certificates</u>. Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to each other and any present or proposed mortgagee, purchaser, sublessee or assignee ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, in accordance with its tenor as then constituted, to the best knowledge of the party so certifying; (c) as to the existence of any known default thereunder; (d) as to the existence of any offsets, counterclaims, or defenses thereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

25. <u>Waiver</u>. If Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present and future, of this Lease. Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

19

(009433-30)

26. <u>Compliance with Applicable Laws</u>. During the Term, to the extent that the Premises are affected thereby, Tenant shall comply with all lawful requirements of governmental authorities with jurisdiction over the Improvements respecting Tenant's use and occupancy of the Improvements. If Tenant, after notice from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent, after thirty (30) days' prior written notice to Tenant (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) and Tenant's failure to cure or commence to cure during such thirty (30) days and diligently prosecute the cure to completion.

27. <u>Non-Recourse as to Landlord</u>. Anything contained herein to the contrary notwithstanding, except as provided in paragraph 30(1) any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Premises and not against any other assets, properties or funds of (a) Landlord, or any shareholder, trustee, advisor, director, officer, general partner, limited partner, employee or agent of Landlord, or their officer, director, or shareholder (or any legal representative, heir, estate, successor or assign of any thereof) and (b) any predecessor or successor entity, either directly or through Landlord or otherwise, except that (i) any claim in respect of Landlord for fraud or intentional misapplication of funds under this Lease may be enforced against the assets, properties or funds of Landlord but not against the assets, properties or funds of any of the other persons described in (a) and (b) above, (ii) nothing herein shall preclude an action for specific performance or an injunction and (iii) nothing in this Lease including paragraph 3(c) shall prevent attachment of rents, issues and profits in the hands of Landlord (but not by offset by Tenant), prior to their distribution to beneficiaries and in all events subject to the prior rights of the party secured by a Permitted Mortgage.

28. <u>Notices</u>. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service addressed to the parties as follows:

If to Tenant:           CIRCUIT CITY STORES, INC.
                      2040 Thalbro Street
                      Richmond, Virginia 23230
                      Attention: Corporate Secretary

with a copy to:       CIRCUIT CITY STORES, INC.
                      1508 Willow Lawn Drive
                      Richmond, Virginia 23230
                      Attention: Vice President of
                              Real Estate

(009433-30)

If to Landlord:                    CRA ACQUISITION CORP.
                                   1345 Avenue of the Americas
                                   New York, New York 10150
                                   Attention: Mr. Antony E. Monk

with a copy to:                    CSAPLAR & BOK
                                   655 Montgomery Street
                                   San Francisco, California 94111
                                   Attention: Lewis A. Burleigh, Esq.

or to such other addresses as any party hereto shall from time to time give
notice thereof to any other party.

29. Right of First Offer/Refusal. (a) In the event Landlord
wishes to sell the Premises, or any part thereof, Landlord shall first notify
Tenant of its intention, and Tenant shall have the right to make the first
offer to purchase same by notice to Landlord given within twenty-four (24)
days (12 days in any case where Tenant has exercised rights under this
paragraph 29(a) within the preceding six months) after receipt by Tenant of
Landlord's notice. If such offer is not accepted by Landlord, Landlord may
seek other offers; however, acceptance of any such offer shall nonetheless be
subject to this Lease including paragraph 29(b) below.

(b) In the event that Landlord from time to time offers to sell or
receives any offer to purchase its interest in the Premises or any portion
thereof and desires to accept the same, before accepting such offer, Landlord
shall give to Tenant in writing the right of first refusal to purchase the
same at the same price and upon the same terms as are contained in the offer.
If Tenant shall not have exercised its right of first refusal by notice to
Landlord given within twenty-four (24) days after the receipt by Tenant of
Landlord's notice, Landlord shall be free to sell the same according to the
price and terms of such offer. Any such sale shall nonetheless be subject to
the terms of this Lease, including this paragraph 29 and the rights of first
offer and refusal set forth herein as to subsequent offers. If Tenant gives
notice of acceptance, settlement shall occur thereafter upon the terms of such
bona fide offer.

(c) Tenant's rights under this paragraph 29 shall not apply to
foreclosure of a Permitted Mortgage or a deed in lieu of foreclosure, but
shall apply to all sales after completion of such foreclosure or delivery of
such deed.

(d) If not sooner terminated pursuant to the provisions hereof,
Tenant's rights of first offer and refusal shall terminate twenty-one (21)
years after the death of the last survivor of the descendents of former
President Franklin D. Roosevelt living on the date of this Lease.

30. Miscellaneous. (a) Headings and Gender. Any paragraph
headings, titles or captions contained in this Lease are for convenience only
and shall not be deemed a part of this Lease and shall not in any way limit or
amplify the terms and provisions of this Lease. The masculine, feminine or
neuter gender and the singular or plural number shall be deemed to include the
others whenever the context so requires or indicates.

21

(009433-30)

(b) <u>Construction</u>. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c) <u>Waiver of Jury Trial</u>. In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d) <u>Relationship of Landlord-Tenant</u>. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant other than the landlord-tenant relationship.

(e) <u>Entire Agreement; Merger</u>. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference), covers, in full, each and every final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature are merged herein. This Lease cannot be changed or modified in any manner other than a written amendment or modification executed by Landlord and Tenant.

(f) <u>Attorneys' Fees</u>. In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g) <u>Partial Invalidity</u>. If any provision of this Lease or the application thereof to any person or circumstances shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the extent permitted by law.

(h) <u>Consents</u>. Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i) <u>Holidays</u>. If the day on which rent is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j) <u>Applicable Law</u>. This Lease shall be construed in accordance with the laws of the Commonwealth of Virginia, and the parties agree that jurisdiction shall lie therein.

22

(009433-30)

(k) Successors and Assigns. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party. The obligation of Tenant hereunder shall be binding upon any person or entity into which Tenant is merged with which Tenant is consolidated or to whom substantially all assets of Tenant are sold.

(l) Payment Under Protest. It is agreed that if at any time a dispute shall arise as to any amount or sum of money to be paid by one party to the other under this Lease, the party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest", and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said party to institute suit for the recovery of such sum, and if it shall be adjudged that there was no legal obligation on the part of said party to pay such sum or any part thereof, said party shall be entitled to recover such sum or so much thereof as it was not legally required to pay under the provisions of this Lease.

(m) Force Majeure. Performance by Landlord or Tenant of their obligations hereunder shall be extended by the period of delay caused by force majeure. Force majeure is hereby deemed to include war, natural catastrophe, strikes, walkouts or other labor disturbance, order of any government, court or regulatory body having jurisdiction, shortages, blockage, embargo, riot, civil disorder, or any such similar cause beyond the reasonable control of the party who is obligated to render performance. Financial inability to perform shall not constitute force majeure and obligations to pay money are not subject to force majeure.

(n) Non-Merger. The ownership by the same person of the interests of Landlord and Tenant hereunder shall not cause a merger of estates unless such person so declares in writing at a time when no assignment of Landlord's interest hereunder is in effect. If the Ground Lease is terminated and the Lending Institution under a Permitted Mortgage does not exercise its right to obtain a new ground lease, as contemplated by the Ground Lease, this paragraph shall not prevent a merger of estates.

(o) Inspection. Landlord shall have the right, in addition to its rights under paragraph 14, to enter the Premises at reasonable times and inspect the same, all in a manner that will not unreasonably interfere with the conduct of Tenant's business.

23

WITNESS the following signatures and seals:

LANDLORD:                          CRA ACQUISITION CORP., a Delaware corporation

                                   By: _____A. E. Monk_____

                                   Name:  A.E monk
                                   Title: Piesioent


TENANT:                            CIRCUIT CITY STORES, INC., a
                                   Virginia Corporation
ATTEST:

_____          By: _Benjamin B. Cummings Jr._
                                        BENJAMIN B. CUMMINGS JR.
Its: _Ast. Secretary_              Its: _ASS'T V.P.- REAL ESTATE_
(SEAL)


(009433-30)                               24

EXHIBIT A

Description of the Land

PHASE ONE - PARCEL 1:

SITUATED, lying, and being in the Three Chopt District of Henrico County, Virginia, and being more particularly described as follows:

COMMENCING on a point in the south line of Broad Street Road, said point being the intersection of the south line of Broad Street Road extended, and the west line of Deep Rock Road extended, thence along the west line of Deep Rock Road a distance of 1034.69 feet to a point, said point marking the northwest corner of Parcel 2 and lying in the west line of Deep Rock Road; THENCE South 45°58'00" West for a distance of 510.00 feet with the west line of said Parcel 2 to a point in the north line of Parcel 1, said point being the point of BEGINNING for Parcel 1; THENCE South 50°20'07" East for a distance of 59.95 feet to a point; THENCE along a curve to the left having a radius of 50.00 feet and an arc length of 23.36 feet, being subtended by a chord of South 63°43'12" East for a distance of 23.15 feet to a point; THENCE along a curve to the right having a radius of 393.49 feet and an arc length of 278.64 feet, being subtended by a chord of South 25°42'44" East for a distance of 272.86 feet to a point; THENCE South 84°34'27" West for a distance of 49.00 feet to a point; THENCE South 04°33'53" West for a distance of 119.53 feet to a point; THENCE South 75°26'41" East for a distance of 49.00 feet to a point; THENCE along a curve to the right having a radius of 393.49 feet and an arc length of 64.75 feet, being subtended by a chord of South 19°16'10" West for a distance of 64.68 feet to a point; THENCE South 23°59'00" West for a distance of 609.50 feet to a point; THENCE North 67°37'44" West for a distance of 591.24 feet to a point; THENCE North 21°52'52" West for a distance of 561.48 feet to a point; THENCE North 51°29'00" East for a distance of 373.81 feet to a point; THENCE North 45°33'30" East for a distance of 310.02 feet to a point; THENCE North 39°58'30" East for a distance of 85.69 feet to a point; THENCE South 52°53'21" East for a distance of 353.36 feet to a point being the point of BEGINNING.

SAID property contains 18.467 acres more or less.

FUTURE DEEP ROCK ROAD EXTENSION - PARCEL 2:

SITUATED, lying, and being in the Three Chopt District of Henrico County, Virginia, and being more particularly described as follows:

BEGINNING on a point in the north line of Parcel 1, said point being the point of beginning of Parcel 1 and being the southwest corner of the property herein described. THENCE North 45°58'00" East for a distance of 510.00 feet to a point lying in the west line of Deep Rock Road: THENCE along a curve to the left having a radius of 50.00 feet and an arc length of 64.35 feet, being subtended by a chord of South 44°02'00" East for a distance of 60.00 feet to a point on the south end of Deep Rock Road; THENCE South 45°58'00" West for a distance of 364.86 feet to a point; THENCE along a curve to the left having a radius of 955.54 feet and an arc length of 11.99 feet, being subtended by a chord of South 45°36'26" West for a distance of 11.99 feet to a point; THENCE along a curve to the left having a radius of 40.00 feet and an arc length of 40.88 feet, being subtended by a chord of South 15°58'01" West for a distance of 39.13 feet to a point; THENCE along a curve to the right having a radius of 50.00 feet and an arc length of 124.77 feet, being subtended by a chord of

EXHIBIT A
Continued

South 58°10'31" West for a distance of 94.83 feet to a point; THENCE North
50°20'07" West for a distance of 59.95 feet to the point of BEGINNING.

SAID property contains 0.768 acres more or less.

FUTURE MAYLAND DRIVE EXTENSION - PARCEL 3:

SITUATED, lying, and being in the Three Chopt District of Henrico County,
Virginia, and being more particularly described as follows:

COMMENCING on a point in the north line of Parcel 1, said point being the
Southwest corner of Parcel 2 also, the point of beginning for Parcel 2, and
being the point of beginning for Parcel 1, THENCE South 50°20'7" East for a
distance of 59.95 feet to a point; THENCE along a curve to the left having a
radius of 50.00 feet and an arc length of 23.36 feet, being subtended by a
chord of South 63°43'12" East for a distance of 23.15 feet to a point; THENCE
along a curve to the right having a radius of 393.49 feet and an arc length of
278.64 feet, being subtended by a chord of South 25°42'44" East for a distance
of 272.86 feet to a point; thence South 84°34'27" West for a distance of 15.00
feet to a point, said point being the point and place of BEGINNING for Parcel
3; THENCE along a curve to the left having a radius of 25.00 feet and an arc
length of 34.91 feet, being subtended by a chord of South 45°25'59" East for a
distance of 32.14 feet to a point; THENCE South 85°26'26" East for a distance
of 30.20 feet to a point; THENCE along a curve to the right having a radius of
1123.00 feet and an arc length of 36.78 feet, being subtended by a chord of
South 84°30'08" East for a distance of 36.78 feet to a point; THENCE along a
curve to the right having a radius of 246.87 feet and an arc length of 50.39
feet, being subtended by a chord of South 77°42'58" East for a distance of
50.31 feet to a point; THENCE along a curve to the left having a radius of
165.24 feet and an arc length of 53.49 feet, being subtended by a chord of
South 81°08'33" East for a distance of 53.26 feet to a point; THENCE South
00°25'00" East for a distance of 55.00 feet to a point; THENCE South 15°15'05"
West for a distance of 5.20 feet to a point on the south line of Mayland
Drive; THENCE along a curve to the left having a radius of 192.07 feet and an
arc length of 45.21 feet, being subtended by a chord of South 82°25'15" West
for a distance of 45.11 feet to a point; THENCE along a curve to the right
having a radius of 149.13 feet and an arc length of 41.96 feet, being
subtended by a chord of South 83°44'17" West for a distance of 41.82 feet to a
point; THENCE along a curve to the right having a radius of 1211.78 feet and
an arc length of 58.38 feet, being subtended by a chord of North 86°49'14"
West for a distance of 58.37 feet to a point; THENCE North 85°26'26" West for
a distance of 30.21 feet to a point; THENCE along a curve to the left having a
radius of 25.00 feet and an arc length of 34.91 feet, being subtended by a
chord of South 54°33'27" West for a distance of 32.14 feet to a point; THENCE
North 75°26'41 West for a distance of 34.00 feet to a point; THENCE North
04°33'53" East for a distance of 119.53 feet to a point; THENCE North
84°34'27" East for a distance of 34.00 feet to the point of BEGINNING.

Said property contains 0.473 acres more or less.

## EXHIBIT B

### Permitted Exceptions

1. Taxes subsequent to those for the year 1989, not yet due and payable.

2. Possible supplemental assessment and taxes for improvements constructed on the premises.

3. Restrictions, easements, conditions, assessments, etc. appearing as follows:  Imposed by instrument recorded in Deed Book 1840, page 1952, Deed Book 1850, page 1329, amended in Deed Book 2122, page 1701, Deed Book 2126, page 1158, Deed Book 2126, page 1166, amended in Deed Book 2126, page 1170, and amended in Deed Book 2136, page 642.

4. Plat of subdivision of Deep Run Business Center dated August 24, 1981, recorded in Plat Book 73, page 89 and 90 shows various drainage, utility, traffic control and slope easements.

5. Easement granted County of Henrico, dated March 14, 1975, recorded in Deed Book 1636, page 870, grants 16' permanent easement as shown on plat of survey dated September 10, 1987, revised October 16, 1987, and March 30, 1988, made by Foster & Miller, P.C.

6. Agreement with County of Henrico, Virginia, recorded in Deed Book 1839, page 1067, for establishment of a water system and operation thereof.

7. Agreement with County of Henrico, Virginia, recorded in Deed Book 1839, page 1182, for establishment of a sewer system and operation thereof.

8. Easement granted County of Henrico, dated February 11, 1980, recorded in Deed Book 1800, page 168, grants permanent easement 15' in width for utilities as shown on plat attached thereto and also shown on plat of survey dated September 10, 1987, revised October 16, 1987, and March 30, 1988, made by Foster & Miller, P.C., Certified Surveyors.

9. Reservation by the Innsbrook Corporation in Deed Book 2126, page 1170, for an easement and right-of-way 10' in width drainage and traffic control as shown on plat of survey made by Foster and Miller, dated September 10, 1987, revised March 30, 1988.

10. Deed of Easement to the County of Henrico, dated March 21, 1980, recorded in Deed Book 1806, page 1560, for a 16' sanitary sewer easement.

11. Restriction against hotel development contained in Deed Book 2129, page 1059, Henrico County, Virginia.

12. Terms and Conditions of the Declaration of Easements and Restrictions, dated February 28, 1990, recorded February 28, 1990, Clerk's Office of the Circuit Court of Henrico County, Virginia.

13. Terms and Conditions of the Lease by and between Circuit City Stores, Inc., a Virginia corporation, and CRA Acquisition Corp., a Delaware corporation, dated February 28, 1990, a Memorandum of which is recorded February 28, 1990, in Clerk's Office of the Circuit Court of Henrico County, Virginia.

14. Terms and Conditions of the Ground Lease from Circuit City Stores, Inc., a Virginia corporation, to CRA Acquisition Corp., a Delaware corporation, dated February 28, 1990, a Memorandum of which is recorded February 28, 1990, in the Clerk's Office of the Circuit Court of Henrico County, Virginia.

15. Deed of Easement dated February 28, 1990 from Circuit City Stores, Inc., a Virginia corporation, to Broad Street Mini-Storage Associates, Deep Run Business Partners, Deep Run Business Center Phase II Partnership, Samrock, Deep Rock Associates, Cox Road Associates, FOCO Associates and United Control Company, Inc.

16. Deed of Easement dated February 26, 1990 from Circuit City Stores, Inc. to the City of Richmond granting a gas line easement.

17. Right of Way Agreement dated September 8, 1989 from Circuit City Stores, Inc. to Virginia Electric and Power Company, recorded in Deed Book 2219 at page 1525.

18. Deed of Easement dated February 23, 1990 from Circuit City Stores, Inc. to the County of Henrico granting a water line easement.

CC1-06.EXB

EXHIBIT "C"

MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE is dated as of February 28, 1990, between CRA ACQUISITION CORP., a Delaware corporation having an address at 1345 Avenue of the Americas, New York, New York 10105 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 2040 Thalbro Street, Richmond, Virginia 23230 ("Tenant"), and recites:

RECITALS:

A.    Landlord and Tenant are parties to a certain Deed of Lease of even date herewith (the "Lease").

B.    Landlord and Tenant desire and intend to place third parties on notice of the terms of the Lease.

LEASE:

1.    Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord all those certain "Premises" consisting of all of Landlord's estate and interest in the approximately 288,000 square foot office building, together with all fixtures permanently attached thereto or to the Land hereinafter described, and equipment constituting part of such improvements, such as air conditioning, heating and ventilating systems used in connection with such building and other improvements (collectively, "Improvements"), and the Landlord's leasehold interest created pursuant to the Ground Lease (as defined in paragraph 19)[1] in that approximately 18.468-acre parcel (Parcel 1) plus Parcels 2 and 3 (collectively, the "Land") including trees, shrubbery and plants, on which the Improvements are located, as more particularly described on Exhibit "A" hereto.

---

[1] The "Ground Lease" refers to that certain Deed of Ground Lease of even date herewith between Landlord (as tenant) and Tenant (as landlord), a memorandum of which is recorded contemporaneously herewith.

2.    Lease Term.  The main term (the "Main Term")
of the Lease shall commence on February 28, 1990 and
shall end on February 28, 2010.

In addition to the Main Term, Tenant shall
have five (5) options (each a "Renewal Option") to
renew and extend the Lease consisting of four (4)
consecutive ten (10) year periods followed by one (1)
five (5) year period (the "Option Periods") immediately
following the Main Term, at the rent specified below.
Tenant shall give Landlord written notice of its
election to exercise any Renewal Option at least twelve
months prior to the expiration of the Main Term or any
then-current Option Period, as applicable; provided,
however, that in order to avoid any forfeiture or
inadvertent lapse of any right to renew or extend as
aforesaid, if Tenant shall fail to give any such notice
within the aforesaid time limit and shall not have
given Landlord prior written notice of its intention
not to renew or extend as aforesaid, then and as often
as the same shall occur, Tenant's right to exercise
such Renewal Option shall nevertheless continue, as
shall its tenancy hereunder (under the same terms and
conditions as theretofore in effect and notwithstanding
that the Main Term or then-current Option Period shall
have expired) until ten (10) business days after
Landlord shall have given Tenant notice of Landlord's
election to terminate the Renewal Option, and Tenant
may exercise its Renewal Option at any time prior to
expiration of said ten (10) business day period.  Upon
the giving of notice of renewal and extension in
accordance with the foregoing provisions, the term of
this Lease shall thereupon be renewed and extended in
accordance with such notice without further act by
Landlord or Tenant, as if such notice had been timely
given hereunder.

The Main Term and exercised Option Periods
are, collectively, the "Term."  The term "Lease Year"
shall mean each successive period of twelve (12)
consecutive calendar months, commencing on the first
day of each March during the Term, except that the
first Lese Year shall commence on the commencement date
of this Lease and shall end on February 28, 1991.  If
any Lease Year ends on February 28, in a leap year, or
if this Lease would otherwise expire on such date, such
Lease Year or the Term, as the case may be, shall be
automatically extended to February 29.

2

8.    **Granting of Easements.**

(a)    If no Event of Default shall have happened and be continuing, Landlord shall, from time to time: (i) grant easements and other rights in the nature of easements; (ii) release existing easements or other rights in the nature of easements; (iii) dedicate or transfer its interest in unimproved portions of the Land for road, highway or other public purposes; (iv) execute petitions to have the Premises annexed to any municipal corporation or utility district; and (v) execute and deliver to any person any instrument appropriate to confirm or effect such grants, releases, dedications and transfers; provided that Tenant delivers to landlord:

(w)    a copy of such proposal, grant, release, dedication, amendment, transfer or petition;

(x)    Tenant's certificate stating: (I) the consideration, if any, being paid for such grant, release, dedication, transfer, petition or amendment; and (II) that such grant, release, dedication, transfer, petition or amendment does not materially impair the use of the Premises or materially reduce its value or adversely affect the priority of the lien created by any Permitted Mortgage (as defined in paragraph 15(b) of the Ground Lease) in relation to any other lien or encumbrance on the Premises (other than the encumbrance that is the subject of the certificate);

(y)    an amount equal to the consideration so paid or payable (subject, however, to the provisions of the Ground Lease under which the consideration may be payable to the Landlord thereunder; and

(z)    a duly authorized and binding undertaking of Tenant that it

3

will remain obligated under this
Lease to the same extent as if
such grant, release, dedication,
transfer, petition or amendment
had not been made, and so long as
the Lease is in effect that
Tenant will perform all financial
and non-financial obligations of
Landlord under such instrument,
and, after expiration or
termination of the Lese that
Tenant will pay all financial
obligations of Landlord under
such instrument.

(b)    If Tenant elects to dedicate Parcel 2
and/or Parcel 3 or any portion of the "ring road" on
Parcel 1 to the public, Landlord consents thereto and
agrees, without incurring any liability, to execute
such instruments, if any, as may be required of
Landlord to effect such dedication. Landlord's
obligations under this paragraph 8(b) are
unconditional.

12.    Assignment and Subletting.    Tenant shall
have the right to sublet, assign, transfer and reassign
all or any part of the Premises and any of Tenant's
rights and obligations under this Lease during the
term, so long as Tenant remains liable for all of
Tenant's obligations arising hereunder as a primary
obligor and not as a surety. Landlord may recover from
Tenant, and Tenant shall pay to Landlord upon demand,
such reasonable and actual expenses as Landlord may
incur (including without limitation attorneys' fees) as
a result of any Event of Default by Tenant hereunder
caused by any assignee or subtenant.

Any assignment of this Lease shall be
executed by the assignor and the assignee. Each
assignee shall, for the benefit of Landlord, agree to
assume, be bound by, and perform all terms, covenants,
and conditions of this Lease to be kept and performed
by Tenant. Any sublease shall be executed by the
sublessor and sublessee, shall limit the term of the
sublease to the Main Term of this Lease and any
exercised Option Periods and shall acknowledge that the
sublease will terminate upon any termination of this
Lease. After execution of the assignment or sublease,
Tenant will forward a completed copy thereof to
Landlord.

4

15.  _Priority of Lease_.  This Lease and the
rights of Tenant hereunder are intended to be an
encumbrance on the Premises ranking ahead of any liens,
charge or encumbrance hereafter created or suffered by
Landlord (except such liens, charges and encumbrances
as Tenant is obligated to pay or discharge pursuant to
the terms hereof).

18.  _Tenant's Property and Waiver of Landlord's
Lien_.  All Tenant's trade fixtures (a nonexclusive list
of which is attached as _Exhibit "D"_) and other personal
property shall be and remain the personal property of
Tenant, removable by Tenant at any time upon or prior
to the expiration or earlier termination of this Lease
and shall be so removed by Tenant at the request of
Landlord, provided that Tenant shall not be required to
remove personal property if the Ground Lease is
terminated by landlord contemporaneously with the
termination or expiration of this Lease.  Those
improvements that are permanently integrated into the
physical structure of the Improvements shall not be
removed and shall become the property of Landlord
(subject to the terms of the Ground Lease).  Tenant
agrees promptly to repair any damage to the Premises
occasioned by the removal of Tenant's trade fixtures,
furnishings and equipment and to surrender the Premises
broom clean, in good condition as a first class office
building, ordinary wear and tear excepted and also
excepting casualty and condemnation damage not required
to be repaired by Tenant by the terms of this Lease.
Landlord and anyone who claims any interest by,
through, or under Landlord expressly waives its
statutory or common law landlord's lien and any and all
rights granted under any present or future laws to levy
or distrain for rent (whether in arrears or in advance)
against the aforesaid property of Tenant on the
Premises and further agrees to execute any reasonable
instruments evidencing such waiver, at any time or
times hereafter upon Tenant's request.

29.  _Right of First Offer/Refusal_.

(a)  In the event Landlord wishes to sell
the Premises, or any part thereof, Landlord shall first
notify Tenant of its intention, and Tenant shall have
the right to make the first offer to purchase same by
notice to Landlord given within twenty-four (24) days
(12 days in any case where Tenant has exercised rights
under this paragraph 29(a) within the preceding six
months) after receipt by Tenant of Landlord's notice.
If such offer is not accepted by Landlord, Landlord may
seek other offers; however, acceptance of any such

5

offer shall nonetheless be subject to this Lease including paragraph 29(b) below.

(b)    In the event that Landlord from time to time offers to sell or receives any offer to purchase its interest in the Premises or any portion thereof and desires to accept the same, before accepting such offer, Landlord shall give to Tenant in writing the right of first refusal to purchase the same at the same price and upon the same terms as are contained in the offer. If Tenant shall not have exercised its right of first refusal by notice to Landlord given within twenty-four (24) days after the receipt by Tenant of Landlord's notice, Landlord shall be free to sell the same according to the price and terms of such offer. Any such sale shall nonetheless be subject to the terms of this Lease, including this paragraph 29 and the rights of first offer and refusal set forth herein as to subsequent offers. If Tenant gives notice of acceptance, settlement shall occur thereafter upon the terms of such bona fide offer.

(c)    Tenant's rights under this subparagraph 7(c) shall not apply to foreclosure of a Permitted Mortgage or a deed in lieu of foreclosure, but shall apply to all sales after completion of such foreclosure or delivery of such deed.

(d)    If not sooner terminated pursuant to the provisions hereof, Tenant's rights of first offer and refusal shall terminate twenty-one (21) years after the death of the last survivor of the descendants of former President Franklin D. Roosevelt living on the date of this Lease.

30(n)    Non-Merger.  The ownership by the same person of the interests of Landlord and Tenant hereunder shall not cause a merger of estates unless such person so declares in writing at a time when no assignment of Landlord's interest hereunder is in effect.  If the Ground Lease is terminated and the Lending Institution under a Permitted Mortgage does not exercise its right to obtain a new ground lease, as contemplated by the Ground Lease, this paragraph shall not prevent a merger of estates.

The remaining terms and provisions of the Lease are incorporated herein by reference to the same extent as if set forth herein in full.

6

WITNESS the following signatures and seals.

|                    | LANDLORD: | CRA ACQUISITION CORP., a<br>Delaware corporation |
|--------------------|-----------|--------------------------------------------------|

By_____
Its:

|                    | TENANT: | CIRCUIT CITY STORES, INC.,<br>a Virginia corporation |
|--------------------|---------|------------------------------------------------------|

[CORPORATE SEAL]
ATTEST:

By_____     By_____
Its:                           Its:

STATE OF VIRGINIA:

CITY/COUNTY OF _____:

The foregoing instrument was acknowledged before me this

_____ day of February, 1990, by _____ as

_____ of CIRCUIT CITY STORES, INC., a Virginia

corporation, on behalf of the corporation.

My commission expires:

_____
Notary Public

7

STATE OF _____:

CITY/COUNTY OF _____:

The foregoing instrument was acknowledged before me this

____ day of _____, 1990, by _____

as _____ of CRA ACQUISITION CORP., a Delaware

corporation, on behalf of the corporation.

My commission expires:

[Notarial Seal]

_____
Notary Public

CC1-04.MOL
02/08/90

8

EXHIBIT "D"

Store Fixtures
All storage racking
All security system items
Telephones and paging systems
Computer system
Office furniture and trash receptacles
Battery charger
Trash compactor
Signs (interior/exterior)
Antenna system
Electronic switching
Air Compressor (roadshop)
Safe
Conveyor
Medeco Cylinder locks (5)
Refrigerator and microwave used by employees
Tack boards
Water cooler
Fire extinguishers
Audio room fixtures and switchgear
Pictures
Warehouse and material handling equipment (movable ladders,
dollies, etc.)
Track lights (cans only, not tracks)

CC1-08.EXD