UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                        . Case No. 08-35653 (KRH)
                              .
                              .
CIRCUIT CITY STORES, INC.,    . 701 East Broad Street
et al.,                       . Richmond, VA 23219
                              .
                              .
                Debtors.      . March 8, 2010
. . . . . . . . . . . . . . . 11:04 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          McGuireWoods, LLP
                          By:  DOUGLAS FOLEY, ESQ.
                          9000 World Trade Center
                          101 W. Main St.
                          Norfolk, VA  23510

For the Debtors:          McGuire Woods, LLP
                          By:  SARAH B. BOEHM, ESQ.
                          One James Center
                          901 East Cary St.
                          Richmond, VA  23219

For the Debtors:          Skadden Arps Slate Meagher
                           & Flom LLP
                          By:  IAN FREDERICKS, ESQ.
                               GREGG M. GALARDI, ESQ.
                          One Rodney Sq.
                          Wilmington, DE 19899

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

**APPEARANCES (Contd'):**

For the Creditors' Committee:    Pachulski Stang Ziehl & Jones
LLP
By:   ROBERT J. FEINSTEIN, ESQ.
780 Third Ave. 36th Floor
New York, NY 10017

For the U.S. Trustee:      Office of the U.S. Trustee
By:   ROBERT B. VAN ARSDALE
701 East Broad Street, St. 4304
Richmond, VA  23219

For Panasonic Corporation:    Hunton & Williams
By:   BENJAMIN C. ACKERLY, ESQ.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219

For Dawn vonBechmann:      NEIL McCULLAGH, ESQ.

For Laura Lambert-Gaffney:    R. CANFIELD, ESQ.

For Kelly Breitenbecher:     WILLIAM GRAY, ESQ.

For David Tolliver:        DAVID TOLLIVER, Pro se Claimant

For Jeff McDonald:         JEFF McDONALD, Pro se Claimant

**TELEPHONIC APPEARANCES:**

For Ryan, Inc.:          Redmon, Peyton & Braswell LLP
By:   ROBERT MARINO, ESQ.
510 King Street, Suite 301
Alexandria, VA  22314

For Ryan, Inc.:          Bell, Nunnally & Martin
By:   BRUCE AKERLY, ESQ.
1400 One McKinney Plaza
3232 McKinney Avenue
Dallas, TX  75204

_ _ _

3

1          DEPUTY CLERK:  All rise.  The United States

2   Bankruptcy Court for the Eastern District of Virginia is now in

3   session.  The Honorable Kevin R. Huennekens presiding.  Please

4   be seated and come to order.

5          COURT CLERK:  In the matter of Circuit City Stores,

6   Incorporated, hearing on Items 1 through 29, as set out on

7   debtors' proposed agenda.

8          MR. FOLEY:  Good morning, Your Honor, Doug Foley with

9   McGuireWoods on behalf of the debtors.

10          THE COURT:  Good morning, Mr. Foley.

11          MR. FOLEY:  With me at counsel table is Gregg Galardi

12   and Ian Fredericks from Skadden Arps.  Also, Sarah Boehm from

13   my firm as well.  Also in the courtroom today, Your Honor, is

14   Jim Marcum, who is the former CEO of Circuit City, a current

15   director of Circuit City Stores, as well as a consultant with

16   the company.

17          Also, in the courtroom today, Your Honor, is Katie

18   Bradshaw, who is the Vice President and Controller of Circuit

19   City.

20          Your Honor, we have many items on the agenda.  Mr.

21   Galardi will be addressing some of the matters, Mr. Fredericks

22   will be addressing some of the matters, as well as Ms. Boehm

23   will be addressing one claim matter.  So, I may go out of

24   order, we want to try to limit how many people have to get up

25   and down.

**J&J COURT TRANSCRIBERS, INC.**

4

1          But, if we could begin with the beginning of the

2    agenda, Your Honor, this is the Southpeak administrative claim

3    motion.  It's related to Item Number 19 on the docket.  This

4    has been resolved by stipulation, so both of those matters can

5    be removed from the agenda.

6          THE COURT:  All right.  So, Numbers 1 and 19 have

7    been resolved.

8          MR. FOLEY:  Yes, Your Honor.  Item Number 2, this was

9    our motion to deem publication notice sufficient for certain

10   purposes.  We've been talking to various parties about how to

11   deal with that going forward, as well as the Committee and

12   we've decided to withdraw this motion without prejudice and

13   we'll deal with these issues as they arise.

14         THE COURT:  All right.  So, Number 2 will be

15   withdrawn.

16         MR. FOLEY:  Item Number 3, Your Honor, this is Sony's

17   motion for a 503(b)(1) claim and 503(b)(9) administrative

18   claim.  We're still waiting for a counter response to them to

19   our latest offer.  They've requested, and we've agreed, to

20   adjourn the matter until the March 25th hearing date at 2:30.

21         THE COURT:  All right.  That'll be adjourned.

22         MR. FOLEY:  Item Number 4, Your Honor, is our motion

23   to reject and cancel certain surety bonds.  There was an

24   objection filed by the government that we're working through as

25   well as with certain issues with respect to the surety

**J&J COURT TRANSCRIBERS, INC.**

5

1   companies.  We're working on a partial consent order that will,

2   hopefully, resolve some of the matters before the March 25th

3   hearing date, but we've asked -- we've asked the Court and the

4   parties have agreed, to adjourn the matter until the March 25

5   hearing date at 2:30.

6           THE COURT:  All right.  It'll be adjourned to March

7   25.

8           MR. FOLEY:  Items Number 5 and 6, Your Honor, these

9   are the motions by Madcow.  One is for an administrative

10  expense claim under 503(b)(1), one is for an administrative

11  expense claim under 503(b)(9).  We're still waiting for some

12  information from them to try to reconcile the underlying

13  amounts of the claims.  And they have requested and we've

14  agreed, to adjourned their matters until March 18th at 10 a.m.

15          THE COURT:  All right.  It'll be adjourned to March

16  18.

17          MR. FOLEY:  Your Honor, Item Number 7 is our motion

18  for approval of a 9019 motion with respect to a small

19  litigation matter that's been pending for some time, that has

20  been finally resolved.  The debtor is a tangential player in

21  the litigation.  We're seeking approval of our entry into

22  mutual releases with respect to just that litigation.  We're

23  not paying any funds.  One of the other parties, Capital

24  Contractors, is paying the funds to the plaintiff and they've

25  requested, the other parties have requested that the settlement

**J&J COURT TRANSCRIBERS, INC.**

6

1   agreement be sealed, which is Item Number 8 on the docket.

2          There have been no objections to either Item Number 7

3   or Item Number 8 and we would ask the Court to approve both

4   motions.

5          THE COURT:  Does any party wish to be heard in

6   connection with the debtors' motion to approve the settlement

7   agreement?

8                    (No audible response)

9          THE COURT:  All right, Mr. Foley.  There being no

10  objection, the Court will approve the settlement agreement and

11  grant the debtors' motion.  And, the Court will also grant the

12  motion to seal the exhibit.

13         MR. FOLEY:  Thank you, Your Honor.  If we could pass

14  over Items Number 9, 10, 11, and 12 for now, Mr. Galardi will

15  be addressing the Court on those matters.

16         Items Number 13 and 14, Your Honor, these are flip

17  sides of the same issue.  This is the motion by Ryan to compel

18  assumption of an executory contract, which is a contingency fee

19  contract for certain professional services and our motion to

20  reject that contract.

21         Your Honor, we've filed papers and wanted to bring

22  one case to the Court's attention that did address the

23  contingency fee contract for an attorney which is the <u>Hall</u>

24  matter, <u>In re Hall</u>, which is at 415 BR 911.

25         Your Honor, we think this is a fairly simple matter

*J&J COURT TRANSCRIBERS, INC.*

1 that we can't be compelled to assume this contract.  We think

2 it's in the debtors' business judgment to reject it.  There's

3 no prejudice to the Ryan party here.  They are allowed to file

4 a proof of claim within 30 days.  As we discussed with the

5 Court at the last hearing, rejection equal breach and they're

6 allowed to file whatever type of claim they want in the next 30

7 days.

8          Of course, we would submit that any claim that they

9 are entitled to is only entitled to general unsecured status,

10 but they may claim something else, but that's not before the

11 Court today.  Before the Court today is only the decision to

12 assume or reject.  So, we would ask the Court to deny matter 13

13 and to grant matter 14.

14          THE COURT:  All right.  Does any party wish to be

15 heard on behalf of Ryan?

16          MR. MARINO:  Your Honor, good morning.  This is

17 Robert Marino.  I am local counsel for Ryan Inc., and with me

18 on the phone also is Bruce W. Akerly, who has been admitted

19 pro hac vice and he will make the presentation for Ryan.  And,

20 I appreciate the Court allowing us to participate by telephonic

21 conference this morning.

22          THE COURT:  All right.  Mr. Akerly, are you on the

23 phone?

24          MR. AKERLY:  Yes, I am, Your Honor.  Thank you, very

25 much.  If I might address the Court on these issues.

**J&J COURT TRANSCRIBERS, INC.**

1           THE COURT:  All right.  Am I pronouncing your name

2  correctly, sir?

3           MR. AKERLY:  It's Akerly, that's correct.

4           THE COURT:  Akerly.  Okay, thank you.

5           MR. AKERLY:  Okay, no problem, Your Honor.

6           I do represent Ryan Inc., and Mr. Marino is my local

7  counsel.  We -- let me give the Court a little bit of

8  background.  I don't think it's as simple an issue as debtors'

9  counsel has portrayed and I think it will require that the

10 Court take some evidence and further hearings on the matter,

11 but, in any event, we were engaged prepetition by the debtor to

12 review the debtors' Hawaii import tax payment records to

13 identify tax refunds and reduction opportunities that might be

14 available to the debtor.  And, Ryan was working under this

15 agreement when the bankruptcy was filed.

16          In fact, Ryan identified approximately $800,000 of in

17 progress tax refunds which would be due to Circuit City.

18 However, Your Honor, that request was denied at the state tax

19 level and in that connection there was an ongoing parallel

20 matter involving Comp USA, that is before the Hawaii Supreme

21 Court which, I believe, has been briefed and is being -- has

22 been or is being argued shortly.  And, it involved the same

23 very complicated tax issues and the State of Hawaii denied the

24 tax refund claim based upon current law which is being appealed

25 before the Hawaii Supreme Court.  So, we've been continuing to

1  monitor that contract post petition and continuing to update

2  the State of Hawaii with respect to our position and other

3  matters.

4          And, in any event, if that appeal is successful, that

5  will result in a reversal of the state's position and a refund

6  of $800,000, of which our engagement says we're entitled to a

7  percentage fee.

8          Now, that agreement is executory, that agreement was

9  ongoing, has been ongoing in the post petition area and we've

10 been monitoring it and reporting to the debtor with respect to

11 the status of the appeal, with respect to the status of the tax

12 issues on the refund request and all of our work product is up

13 before the State of Hawaii and of a benefit to the debtor.

14         Now, what we would like to do is present evidence on

15 the issue of exactly how we believe this would be of benefit to

16 the bankruptcy estate.

17         As you understand, Your Honor, there's no risk here,

18 there's no downside to the bankruptcy estate with respect to

19 this matter.  If the appeal is successful, the estate recovers

20 and we get our contractual fee.  If the appeal is not

21 successful, there's no downside to the estate.  So, in other

22 words, I don't understand the debtors' argument that there's no

23 value here, because there will be value, there's potential

24 value, and there's no cost to the estate.  There's absolutely

25 zero cost to the estate, going forward with this engagement and

1  all of our work product, which is proprietary and owned by my

2  client, which will go away.  If my client is -- if this

3  agreement is not assumed, all of that work product and all of

4  that work cannot be used by the debtor, that's our position,

5  cannot be used by the debtor going forward with the tax appeal,

6  in the event the Supreme Court of Hawaii reverses the very

7  narrow legal issue which is involved in our tax appeal.

8           So, we think the agreement does have value to the

9  estate, and we should be able to put our case on to establish

10 that.

11          And, you know, contingent fee aside, you know, the

12 issue really here is, is there value here and is the debtors'

13 business judgment acceptable to reject this, and we don't think

14 so.  And, so, we would like an opportunity to -- the Court

15 could remand this over for an evidentiary hearing, we'd like an

16 opportunity to present that evidence to the Court, of the value

17 here in order to demonstrate that the debtors' business

18 judgment has not been properly applied.

19          THE COURT:  All right.  Mr. Akerly, let me ask you

20 this question, sir.  What authority can you cite to me that

21 supports your position that you should be entitled to compel

22 the debtor to assume an executory contract?  I was under the

23 impression that that was something that the debtor had the

24 option of doing, to either assume or reject a contract, not

25 something that the other parties to the contract had a right to

1 do.

2        MR. AKERLY:  All right. I don't -- I'll be honest

3 with the Court, I don't have my hands on the case right now,

4 but here's what happened.  When the debtor filed its plan of

5 reorganization, which is a liquidating plan, the plan provides

6 that if the contract is not otherwise assumed it will be deemed

7 rejected.  And, at that point in time, we objected to the plan

8 and filed our motion to compel the debtor to assume.

9        Obviously, we don't want rejection, we want the

10 debtor to assume because we think the contract is a value to

11 the bankruptcy estate.  And, so, I don't have a case -- I just

12 got their response to my objection literally on Friday, and so,

13 I haven't had a chance to, you know, to brief that issue, but

14 I'd like an opportunity to do so if that's an issue that is of

15 importance to the Court.

16        But, in any event, that's how we procedurally got to

17 our motion to assume.  Normally, I would file a motion to

18 compel assumption or rejection, but here we clearly don't want

19 rejection, we want assumption given that the plan provides for

20 rejection.  And, so we were responding to the plan by objecting

21 to the plan and then filing a motion to assume because the plan

22 already provided that the contract was going to be rejected if

23 there was no opposition or objection to the plan.

24        THE COURT:  And, I understand that, but on January

25 28th, the debtor filed a motion to reject this executory

**J&J COURT TRANSCRIBERS, INC.**

1   contract along with many other executory contracts.  And, I

2   understand you're saying that you don't think that they can

3   meet the standard for the Court to approve that, in the

4   exercise of their business judgment.  But, are you saying that

5   in light of that objection, you have the right to force them to

6   assume an executory contract?

7           MR. AKERLY:  No, Your Honor.  I think probably more

8   what I'm saying is, I'm requesting that the debtor be compelled

9   to assume, rather than reject.  So, in other words, the only

10  reason my motion was a motion to assume, compel assumption was

11  because the debtor was already rejecting.  So, rather than --

12  the debtor has already expressed its intention to reject in its

13  plan and file a motion to reject after we filed our motion to

14  assume.  And, so, that's the reason I filed the motion to

15  assume.

16          Obviously, what were asking the Court to do is to

17  deny the rejection.  I agree, I think it's the debtors'

18  business judgment that has to be examined here as to whether

19  the debtor should be entitled to reject the contract.  If the

20  debtor doesn't reject the contract, the contract lives and

21  should be assumed.  In a sense, I'm agreeing with the Court,

22  but, in any event, I'd like to brief the issue if possible.

23          THE COURT:  All right.  And, then -- and I've read

24  you motion to compel and I've also reviewed the response that

25  you filed to the debtors' motion.

1          MR. AKERLY:  Yes.

2          THE COURT:  And, so, I've seen your papers.  Isn't

3 your issue really one of what are your lease rejection damages?

4 In other words, what you want to do is to preserve the

5 contingency fee that you've got in your contract going forward?

6          MR. AKERLY:  Well, if there is rejection, there will

7 be a rejection damages issue, but, really our argument is, is

8 that the damages are the full measure of what -- and the

9 benefit of the contract, which is 33 percent of the ultimate

10 recovery.  The problem here is the recovery may not come until

11 an uncertain time in the future.  And the concern here is that

12 if we're forced to -- if the remedy is, what are your rejection

13 damages at the time we file a rejection damages claims, then

14 you won't have a refund in play.  What we're arguing is, is

15 that the contract should be assumed, the idea being that when

16 there is ultimately a refund we get the full benefit of our

17 contract, and our bargain and that is a percentage of the

18 ultimate refund.  If there is no refund, our damages are zero,

19 our amount that we recover are zero.  However, if we file a

20 rejection damages claim, that will be objected to by the debtor

21 and then the Court will be pressed to determine what is our

22 claim and are we going to be treated pari passu with other

23 unsecured creditors, in that we're only going to share in a

24 percentage of the ultimate -- in other words, you say 33

25 percent of and then we only get a percentage of recovery in the

14

1  same class of unsecured creditors.

2          What we're arguing is, we should be treated, this

3  contract should be treated as the contract going forward and we

4  get our complete recovery off of the refund.  So, that's the

5  problem with the rejection damages, it's not a rejection

6  damages issue, we don't think we should have -- we don't think

7  the contract should be rejected.

8          THE COURT:  I think I understand your position.  Does

9  your client have an attorney's lien that it can invoke with

10  regard to the contingent nature of its contract?

11          MR. AKERLY:  No, it's not an attorneys -- there's no

12  attorneys fee issue here, Your Honor.  This is an accounting

13  firm who is analyzing tax refund and reduction opportunities.

14  It's not an attorneys fee -- it's a contract to analyze taxes

15  paid, to determine whether or not there were overpayments and

16  opportunities for refunds and we get a 33 and 1/3 percent,

17  Ryan, my client, gets 33 1/3 percent of whatever refunds are

18  ultimately awarded to Circuit City.

19          THE COURT:  Okay.  I understand.  Mr. Foley, do you

20  wish to respond?

21          MR. FOLEY:  Your Honor, the issue in Hawaii is

22  complicated and there's a lot of -- it's been going on for a

23  long time and the estate has made no decision how it wants to

24  deal with this claim.  In fact, we're in discussions with Ryan

25  as to whether or not they want to buy it.  And, there's

**J&J COURT TRANSCRIBERS, INC.**

1  negotiations back and forth with respect to that.

2         But, essentially, here, this is a professional trying

3  to force us to retain them on a post petition basis when all

4  the work was done prepetition.  We have our own records with

5  respect to this.  This is -- the claim issue is not before the

6  Court today.  They have 30 days from the date of entry of order

7  of rejection to file a claim and whatever priority they think

8  they're entitled to and we'll evaluate that claim, if and when

9  it ever matures into a ripe claim.

10        This is simply an executory contract that by their

11 motion, forced us to deal with this early, rather than do it

12 as a default rejection under the plan.  So, we think that the

13 Court can and should enter an order approving the rejection as

14 it did with the other contracts in the motion and deny their

15 motion to compel.  They can file a claim and we'll deal with

16 the claim issue down the road.

17        THE COURT:  All right.  Thank you, Mr. Foley.

18 Anything further, Mr. Akerly?

19        MR. AKERLY:  No, Your Honor, thank you.

20        THE COURT:  All right, thank you. The Court has

21 before it the motion of Ryan & Company to compel the debtor to

22 assume executory contracts and the debtors' eighth omnibus

23 objection for an order pursuant to Section 365 to authorize

24 rejection of certain executory contracts, including the Ryan &

25 Company contract.

1          The Court finds no authority to compel the debtor to

2 assume the contract.  The Court finds that the debtor is

3 exercising its business judgment in making a decision to reject

4 the executory contract.  Obviously, the issue of contract

5 rejection damages is not before the Court at this time.  The

6 Court makes no ruling with regard to that, but the Court will

7 authorize the debtor to reject the contract.  And, Mr. Foley, I

8 ask you to submit an order to that effect.

9          MR. FOLEY:  Thank you, Your Honor, we will do so.

10          With respect to Items Number 15 --

11          MR. AKERLY:  May I be excused, Your Honor?

12          THE COURT:  Yes, Mr. Akerly, you may be excused.  And

13 Mr. Marino, you may as well.  Thank you.

14          MR. AKERLY:  Thank you.

15          MR. MARINO:  Thank you, Your Honor, appreciate it.

16          MR. FOLEY:  Your Honor, with respect to Items Number

17 15, 16, 17 and 18, these are all confirmation related issues,

18 including our motion to establish sell down and claims trading

19 procedures with respect to possible preservation of any NOL

20 issue.  The first amended plan of liquidation, the plan or

21 motion for 3020(a) deposit, the Samsung motion for a 3020(a)

22 deposit.

23          Your Honor, the current date for the hearing on the

24 plan is April 6 at ten.  We would ask that Items 15, 16, 17 and

25 18 all be adjourned to the April 6 date at ten.

1          THE COURT:  All right.  All of those matter will be

2  adjourned till April 6.

3          MR. FOLEY:  Thank you, Your Honor.  Item Number 19,

4  this is the Southpeak matter that's been resolved, consistent

5  with Item Number 1.

6          Item Number 20 is the Bethesda Softworks claim

7  objection that we wanted to go forward on, on the merits, on

8  March 18th, Your Honor.  We're very close to a global

9  settlement, we believe, with Bethesda Softworks and we're going

10 to try to get that accomplished before March 18th.

11         Item Number 21 --

12         THE COURT:  So, Number 20 is going to be adjourned to

13 March 18?

14         MR. FOLEY:  March 18, at ten.

15         THE COURT:  All right.

16         MR. FOLEY:  Your Honor, Item Number 21 is our 20th

17 omnibus objection.   We have it on for a status hearing as to

18 the Audiovox claims as well as Item Number 22, which is our

19 50th omnibus objection, which also includes Audiovox and this

20 is a status hearing with respect to that.

21         They have both a 503(b)(9) claim and a duplicative

22 general unsecured claim covering the same invoices, Your Honor.

23 We're working through -- we were having difficulty getting

24 information from them, but once we scheduled this, for a

25 specific status hearing, we were able to get some information

**J&J COURT TRANSCRIBERS, INC.**

1 flowing from them and we believe we may be able to achieve a

2 global settlement.  This is a relatively large 502(b)(9) claim,

3 a couple million dollars and I believe we've reconciled it to

4 within 100,000.  And, so, we think we're going to try to be

5 able to get a resolution completed before the March 25th

6 hearing date at 2:30.  So, we would adjourn the specific status

7 hearing with respect to Audiovox under Items Number 21 and 22

8 to the March 25th date at 2:30.

9         THE COURT:  All right.  The status conference will be

10 adjourned until the 25th.  Now, those will be status

11 conferences.

12         MR. FOLEY:  Those will still be status because we're

13 confident that we are close enough to a resolution that we

14 don't need to go forward on those dates on the merits if we

15 haven't achieved it.

16         THE COURT:  That's fine.

17         MR. FOLEY:  Item Number 23, Your Honor, Mr. Galardi

18 will address shortly, if we could pass that over.

19         THE COURT:  You may.

20         MR. FOLEY:  Item Number 24, Ms. Boehm will address

21 the Court on that one.

22         MS. BOEHM:  Good morning, Your Honor, Sarah Boehm for

23 the debtors.

24         THE COURT:   Good morning.

25         MS. BOEHM:  Item 24 is a notice of hearing on the

1 merits of the debtors' 65th omnibus objection with respect to

2 the reclassification of certain claims filed by equity holders.

3 We had the hearing on the 65 at the last hearing, that we did

4 have one response to omnibus 65, which we had scheduled to go

5 forward on the merits.  This was with respect to the response

6 of Louis & Dolores Luchack, Claim Number 13259.

7         They filed this claim as an administrative expense

8 and assert that it's with respect to 1,000 shares of Circuit

9 City stock.  We would ask the Court to reclassify this from a

10 claim to an interest.

11         THE COURT:  All right.  Does any party wish to be

12 heard on behalf of Mr. and Mrs. Luchack?

13                 (No audible response)

14         THE COURT:  All right.  The Court has reviewed this

15 claim and the Court is satisfied that it is an interest in

16 stock of the debtor and is appropriately -- should be

17 reclassified as an interest.  So, the Court will grant the

18 debtors' motion.

19         MS. BOEHM:  Thank you, Your Honor.

20         THE COURT:  Please submit an order to that effect.

21         MR. FOLEY:  Your Honor, if we could pass over Items

22 Number 25 -- I'm sorry.

23         MR. FREDERICKS:  Good morning, Your Honor, Ian

24 Fredericks of Skadden Arps on behalf of the debtors.  I'm going

25 to just -- we should be able to move fairly quickly through

1  matters 25, 26 and 27.

2           Twenty-five relates to the debtors' fifth omnibus

3  objection where we sought to reclassify certain claims that

4  were allegedly filed as goods claims where we thought they were

5  non-goods claims.  Following Your Honor's ruling on goods, we

6  provided this claimant, Mr. Magnusson with a copy of the

7  Court's opinion.  We also provided him with an additional bases

8  to the objection.

9           As you'll note from the claim, many of the invoices

10  were outside of 20 days, so even if they were goods claims,

11  they were outside of 20 days.  We also advised Mr. Magnusson of

12  various hearing dates to schedule this matter going forward, to

13  which there was no response.  And, ultimately, we noticed it

14  for this hearing and we request that Your Honor sustain the

15  objection, reclassify this claim to non-goods on the basis that

16  he -- Mr. Magnusson's company provided services to the debtor

17  in the form of repair work at the debtors' various locations, I

18  believe, in the New York area.

19           THE COURT:  All right.  The claim was actually filed

20  by Magnus Magnusson Inc., right?

21           MR. FREDERICKS:  Correct, I'm sorry.

22           THE COURT:  Does any party wish to be heard in

23  connection with matter?

24                (No audible response)

25           THE COURT:  All right.  The Court has reviewed it and

**J&J COURT TRANSCRIBERS, INC.**

1 consistent with the Court's previous ruling regarding the

2 definition of goods in 503(b)(9), the Court finds that this was

3 a rendition of services and not goods, and so does not fall

4 within the administrative priority and the Court will grant

5 your motion and disallowance of 503(b)(9) claim.

6         MR. FREDERICKS:  Thank you, Your Honor.  I believe

7 that the motion seeks to just reclassify it to a general

8 unsecured claim, as it was timely filed before the bar date.

9 So, if it's acceptable to Your Honor, we'd submit an order to

10 that effect.

11         THE COURT:  And, you may.

12         MR. FREDERICKS:  Thank you, Your Honor.  The next

13 matter relates to the debtors' 33rd omnibus objection.  This

14 was an objection to reclassify certain claims to general

15 unsecured claims.

16         We're going forward with respect to one respondent,

17 Ms. Cyndi Ann Haines.  We attempted to reach her multiple times

18 to try to resolve this consensually in light of the Court's

19 opinion on paid time off claims, last September.  The debtors

20 only sought to -- rather than reclassify to a general unsecured

21 claim, the debtors sought to reclassify this to a 507(a)(4)

22 priority claim.  Multiple attempts to reach the claimant, even

23 providing her with a copy of a proposed form of order were

24 unsuccessful.

25         The debtors would seek to go forward and rather than

22

1  reclassify this to unsecured, reclassify it to a 507(a)(4)

2  priority claim.

3       THE COURT:  Does any party wish to be heard in

4  connection with the debtors' motion?

5                 (No audible response)

6       THE COURT:  All right.  Mr. Fredericks, consistent

7  with the Court's prior ruling, the Court will grant your motion

8  to reclassify this as a 507(a)(7) (sic) claim.

9       MR. FREDERICKS:  Thank you, Your Honor.  The last

10 matter, matter Number 27 relates, again, to the debtors' 33rd

11 omnibus objection.  This was a secured claim filed by Amore

12 Construction.  It relates to a mechanics lien for a location in

13 Florida that the debtor leased.

14      The lease was rejected by order of this Court and,

15 thus, there is no security by which to secure the lien.  We've

16 contacted Amore Construction and their counsel -- I'm sorry, we

17 contacted Amore Construction's counsel and we're advised that

18 they would not appear at the hearing to oppose the relief that

19 we were requesting by this notice, and we would seek to have

20 this Court reclassify this claim to a general unsecured claim.

21      THE COURT:  Does any party wish to be heard in

22 connection with the debtors' motion?

23                 (No audible response)

24      THE COURT:  All right.  That motion will be granted

25 it be reclassified as a general unsecured claim.

1           MR. FREDERICKS:  Thank you, Your Honor.  That

2  concludes the matters that I'll be doing.

3           MR. FOLEY:  Your Honor, before Mr. Galardi addresses

4  Items Number 9, 10, 11, 12 and 23, there's two adversary

5  proceedings at the end of the docket, Sharp and Creative Labs.

6           We're still exchanging documents with Sharp, Your

7  Honor, but I think we'll be in a position by the March 18th

8  hearing date at ten, to ask the Court to enter your standard

9  form pretrial order, under a pretrial conference.  But, for

10  now, we'd ask that the Court adjourn the pretrial conference on

11  Sharp, which is Item Number 28, until March 18th at ten.

12           THE COURT:  All right.  The pretrial conference will

13  be continued till the 18th of March.

14           MR. FOLEY:  Item Number 29, Your Honor, this is

15  Creative Labs.  They're in Singapore and they're trying to

16  retain counsel in the United States and they're also trying to

17  provide us some additional information.  They have requested --

18  they haven't filed an answer yet, they've requested a little

19  bit more time for the pretrial conference.  We've agreed to

20  adjourn the matter until the March 25th hearing date at 2:30,

21  but, again, Your Honor, we intend to ask the Court to enter you

22  standard pretrial order at that time so that we can get on with

23  the litigation.

24           THE COURT:  All right, very good.  This matter will

25  be adjourned until the 25th of March.

1          MR. FOLEY:  Thank you, Your Honor.

2          MR. GALARDI:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GALARDI:  For the record, Gregg Galardi on behalf

5   of the debtors.  Your Honor, before move into 9, 10, 11 and 12

6   which I'm going to do as a group, I just wanted to mention

7   something about matter two.  We have had conversations with

8   numerous states Attorney Generals.  That's the publication

9   notice on the rebate motion.

10         THE COURT:  Right.

11         MR. GALARDI:  And although it's noted on the docket,

12  I just wanted to be clear with Your Honor, we're withdrawing

13  that without prejudice.  The state AG's had raised concerns

14  about giving notice to even the people that we sent publication

15  notice in the first place, you know, they were concerned about

16  that.  So, we've withdrawn it, but after discussions with the

17  Committee, we decided to not proceed on that motion for this

18  order, but then, if and when various people with rebates may

19  come back and say they had claims or not, would address it then

20  and make exactly the same arguments that we've made in the

21  papers, but, instead of doing a global publication notice, we

22  would reserve all of our rights to do that on a one off base

23  since it was cost effective to do it that way.  They may have

24  arguments that they're not on the schedules, they may have

25  arguments that they didn't have notice.  We'll have arguments

1  that they're not creditors, or not known creditors, but we

2  thought it was just more efficient to do it that way and the

3  Committee agreed.  So, I just wanted to make it clear that we

4  have had discussions and that's why we are in the position of

5  withdrawing that motion.

6         THE COURT:  All right.  And, I shouldn't throw those

7  papers away?

8         MR. GALARDI:  You shouldn't throw those papers away

9  because they will be the template if we actually have to

10 address those later on.

11        THE COURT:  All right, very good.

12        MR. GALARDI:  Your Honor, next matters on the agenda

13 are 9, which is a motion to shorten the hearing on our seeking

14 to retain Crowe and Mr. Siegel, who I believe may be on the

15 phone, as a CRO in this case; 10 is the actual motion to retain

16 Mr. Siegel and his firm Crowe as the CRO in this case; and 11

17 is Mr. Marcum's bonus.

18        I would like to do these both all together and Mr.

19 Marcum's bonus because this has been the subject of

20 negotiations among the parties and I think the timing of Mr.

21 Marcum's bonus and the timing for the motion to shorten, and

22 Mr. Siegel coming in as the CRO are all sort of a package that

23 we're working with the Committee.

24        As Your Honor -- just to give some background here,

25 as Your Honor may know, when we negotiated the joint plan with

1    the Committee, one of the aspects of the joint plan is that

2    there would be a liquidating trust established upon

3    confirmation and there would be a liquidating trustee, and that

4    was probably back in October or November and we had identified

5    Mr. Siegel as the potential liquidating trustee.

6            Because of the issues that Your Honor is aware of

7    with respect to Canadian funds coming back and the NOLs coming

8    back, and making sure we have all of our ducks in a row, we

9    didn't go forward with confirmation though we have an approved

10   disclosure statement and we have voted on -- and the creditors

11   have voted on that.

12           At the same time, we started negotiating with the

13   Committee about, one, Mr. Marcum's departure, eventually, from

14   the company and as we readily admitted, as Mr. Marcum admitted

15   and I advised the Court, as of, I believe January 16th, Mr.

16   Marcum resigned as the CEO going on a part time basis to give

17   consulting services to the debtors, but, again, it was

18   unnecessary for him to remain in a full employment situation

19   and then Ms. Michelle Moser sort of stepped up as our operating

20   person.

21           During this entire time, we were negotiating, again,

22   with the Committee and Mr. Siegel about whether he would be

23   retained as the CRO and, indeed, the Committee had asked that

24   he become CRO, you know, almost the instant -- that January or

25   even in December.  There were concerns and disagreements

1 between the parties.

2        What then ultimately happened and now why we go to

3 shorten notice, partly -- this is a long story to get to

4 shorten notice and why we couldn't have done this earlier, Ms.

5 Michelle Moser, who we'll note by her absence in the courtroom

6 today, was offered a position with another firm, to go and to

7 become the CFO.  That happened rather abruptly, I guess, in

8 February of this month (sic) and then she had decided, after

9 back and forth, that we would not continue to retain her at her

10 rate and she would move on.  So, as that happened, we then had

11 a much greater need for a CRO or somebody, to come into the

12 company.  Ms. Katie Bradshaw is in the courtroom and perfectly

13 capable of doing that, but then there's this transition period

14 and with the plan and having an experienced person who's done

15 liquidations as well, we thought it was wise to accelerate, or

16 actually resolve our differences with the Committee regarding

17 both Mr. Marcum's bonus, Mr. Marcum's consulting agreement --

18 Ms. Moser's consulting agreement and having a CRO come in and

19 then work closer to try to get to the transition.

20        And, then we added that Mr. Van Arsdale also

21 expressed concerns with respect to having Ms. Moser leaving now

22 that Mr. Marcum is only part time, and Ms. Bradshaw is in

23 there, but somebody else of experience also with liquidating

24 cases should come in.

25        We had consulted with the U.S. Trustee and said we

1  were reaching an agreement with the Crowe firm and Mr. Siegel

2  to start as early as today, if the U.S. Trustee would consider

3  our putting it in on shorten notice because of the fact that

4  Ms. Moser's last day was Friday and because Mr. Marcum, as we

5  have disclosed, has now taken on a new CEO position, plus since

6  he started on January 16th, by the two month count in his

7  consulting agreement, March 16th, he will be restricted to

8  certain number of hours if Your Honor approves that consulting

9  agreement.  It was imperative that we put on shorten notice the

10 retention of the Crowe firm as CRO.

11         So, we had asked Mr. Van Arsdale whether he had an

12 objection, the Committee, obviously, wanted it, the debtors,

13 obviously, wanted it, so that's a long way of asking Your Honor

14 to approve, first the motion to shorten to hear today, to hear

15 the Crowe engagement on that shorten notice we apologize,

16 again, but it was a combination of events and facts that, I

17 believe, justify putting it on shorten notice and not waiting

18 to our next hearing, which would be March 16th.  And, the U.S.

19 Trustee, we understood, had no objection.  Obviously, the

20 Committee and we had wanted to go forward and we've not known

21 of any other persons to object to the shorten notice, so we'd

22 ask Your Honor to hear that motion on shorten notice.

23         THE COURT:  Does any party wish to be heard on the

24 debtors' motion for an order shortening the notice period?

25                 (No audible response)

1            THE COURT:  All right, Mr. Galardi, the Court is

2    satisfied with your explanation and that motion is granted.

3            MR. GALARDI:  So, Your Honor, now we move to Items 10

4    and 11 and I would like to do that together, partially because

5    that is the way in which we sort of negotiated with the

6    Committee as almost a package deal here on the circumstances.

7            I'm going to put forth the facts as set forth and,

8    Your Honor, in the courtroom today is Mr. Mark Weinston

9    (phonetic) who did, in fact, testify at FTI at the first round

10   of the employment incentive program.

11           As Your Honor is aware, as part of the plan, the

12   Committee agreed not to object.  We've had our differences of

13   opinion, so there was a potential of objection, we've adjourned

14   it.  I'm pleased to say that we've resolved it.  We've also

15   talked to the U.S. Trustee.  So, Mr. Weinston would testify to

16   the following facts and we can also take them from the record.

17           First, Your Honor will recall that Your Honor

18   previously entered an order that had consensual milestones that

19   were negotiated with the Committee with respect to all other

20   employees, other that Mr. Marcum and we carved Mr. Marcum out

21   for consideration on another day, hoping to resolve the

22   objections to Mr. Marcum.

23           Pursuant to those consensual milestones, Mr. Marcum

24   believed that he had earned a bonus in excess of $375,000,

25   based primarily on those milestones and having served a longer

                    J&J COURT TRANSCRIBERS, INC.

1  period of time.  The Committee had expressed concerns and

2  objections that merely because it took a longer length of time

3  and that Mr. Marcum would, in fact, have gotten his salary

4  during that period of time, that the maximum bonus that Mr.

5  Marcum could have earned under those milestones was $375,000.

6          As part of our negotiations with the Committee, the

7  Committee agreed to object if we put forth a motion that would

8  seek the $375,000 maximum as part of our, also, agreement with

9  respect to having the CRO come in and all of those

10 circumstances.

11         We then advised the U.S. Trustee that we had reached

12 that settlement in a conversation, I believe it was the middle

13 of last week with respect to Mr. Marcum and Mr. Siegel coming

14 in as the CRO.  Mr. Van Arsdale asked me, could we put on

15 evidence under those milestones with respect to the 375 and I

16 explained, as I've explained to the Court, that Mr. Marcum

17 believed that it was 375, that if FTI was called to testify,

18 Mr. Weinston, after reviewing -- excuse me, after reviewing the

19 milestones, FTI would testify that in no event would Mr.

20 Marcum, under those -- and there is some ambiguity in some of

21 those milestones, in no event would Mr. Marcum have earned less

22 than $342,000 based on those milestones.

23         We then talked to Mr. Van Arsdale about a compromise

24 with respect to the 375, we agreed with the Committee and the

25 342 and Mr. Van Arsdale said he would not object.  And, again,

1 he can speak for himself, if we agree to a round number of

2 $350,000, which is the amount that we actually seek today.  We

3 believe that the evidence can justify at least 342, if not

4 greater amounts with that length of time issue that is out

5 there.

6          We had also agreed with the Committee, previously,

7 and we would stand by this agreement, that the payments which

8 would be different than any other executive that received

9 payments, would actually be split into two tranches.  That 50

10 percent of what was earned would be paid upon the order, if

11 Your Honor approves it, becoming final and that the other half

12 of the payment, which now would be $175,000, would be paid on

13 the effective date of the plan.  And, indeed, so as to not have

14 any issues that that payment actually gets made, we are making

15 it a condition to the effectiveness, that the second tranche

16 owed to Mr. Marcum under the deal, is a condition to the

17 effectiveness of the plan so that we don't have that delayed

18 out, anticipating potential other issues.

19          In addition, Your Honor, we had, and the Committee

20 has approved and we've gone back and forth about the forms of

21 this, they also approved that Mr. Marcum would be retained on a

22 consulting agreement, the terms of which have been put forth

23 before Your Honor.  That Mr. Marcum would be paid $700 an hour.

24 That for the first two months, I'd like to say unlimited, but

25 it is limited by his annual salary on a monthly basis, and Mr.

1  Marcum will submit an invoice for the Committee review today

2  that is far less than that, for the first two months.  And, as

3  I said, that would be done by March 16th and then after that,

4  he is limited to ten hours a month of consulting, unless the

5  Committee consents to a greater time, and with Mr. Siegel

6  coming in, that gives us this window, again, to the motion to

7  shorten from the 8th to the 16th. to get as much as information

8  as possible during the next eight days, and then after that

9  there will be a limit to the amount that you would ask for Mr.

10 Marcum's services which, again, gives us the motion to shorten.

11         Those would be the terms of the consulting agreement.

12 We do anticipate coming back to the Court with a consulting

13 agreement with respect to Ms. Moser.  We would ask Your Honor

14 to approve that incentive payment with respect to Mr. Marcum in

15 the amount of 350, to be paid on those terms.

16         In addition, Your Honor, with respect to the Crowe

17 firm and Mr. Siegel, we have introduced an engagement agreement

18 with Mr. Siegel that does provide that they would come in and

19 perform what we call standard CRO services.  Your Honor should

20 be aware, and Mr. Marcum could testify, that Mr. Siegel was

21 interviewed by the Board, was discussed with the Board, and

22 that Mr. Siegel has represented to us that notwithstanding his

23 being recommended by the Committee, that he understands the

24 fiduciary obligations, that he will be serving as an officer of

25 the company with respect to the Board.  We've gone back and

33

1   forth with respect to the terms in the indemnity.  We think

2   it's consistent with the other professionals that have been

3   retained in this case.  If Your Honor will look, it's two times

4   the amount of services.  That was all discussed with the

5   Committee, it's been given to Mr. Van Arsdale.

6        We understand that the Crowe firm is, you know, very

7   well qualified to be representing the debtors here.  We are

8   comfortable with Mr. Siegel and the Crowe firm coming in.  He

9   will be working with Ms. Katie Bradshaw with respect to that,

10  and we think it's in the best interest of the estate and in

11  agreement with the Committee and it is a step further to

12  resolving differences between the Committee and the debtor,

13  towards the plan.

14       It is anticipated that if we go forward with the

15  joint plan and we do believe we'll be going forward, that Mr.

16  Siegel then would become the liquidating trustee.  We don't

17  think that disqualifies him in any sense, but we wanted to make

18  that an open disclosure.  We have discussed that with Mr. Van

19  Arsdale.

20       And, with that, Your Honor, we don't believe that

21  there are any objections to either the incentive plan payments

22  to Mr. Marcum in the amount of 350,000 in two tranches, the

23  consulting agreement to be entered into, effective as of the

24  January 16th date with Mr. Marcum and the CRO engagement

25  agreement with the Crowe firm and Mr. Siegel, assuming

34

1   immediate responsibilities with respect to the CRO, Your Honor,

2   and we'd ask for, to the extent -- I didn't look at the rule,

3   that there be no stay of this order, that he actually becomes,

4   as soon as the order is entered, indeed, as soon as Your Honor

5   says it, that he can get up and running.  I think he

6   anticipates coming in and being -- taking the CRO

7   responsibilities effective immediately today.

8           THE COURT:  Is there a stay for that kind of an

9   order?

10          MR. GALARDI:  I don't know, I didn't look at the rule

11  before I opened my mouth.  I'm not sure if there is, Your

12  Honor.

13          THE COURT:  But, if there is, then you would like --

14          MR. GALARDI:  If there is, I would ask for -- I have

15  to go back to the rule, I don't remember.  I don't think --

16  it's a 363 retention, that's the only reason I'm concerned.

17          THE COURT:  Okay.

18          MR. GALARDI:  There is no stay for 363?  It's a 363,

19  that's the only reason -- Your Honor, we'll look at it, but I

20  would ask Your Honor, under the circumstances, to the extent

21  that there's any stay, that we become immediately effective and

22  that he be able to -- I sometimes raise issue without thinking

23  of it -- that we go forward immediately with his retention and

24  that he can start the services and be retained.  But, it is a

25  363 and that's the only reason I wanted to make sure.

1          THE COURT:  All right.

2          MR. GALARDI:  Thank you, Your Honor.

3          THE COURT:  All right. Does any party wish to cross

4  examine the proffered witnesses?

5                  (No audible response)

6          THE COURT:  All right.  The proffers will be

7  accepted.  Does any party wish to be heard in connection with

8  the debtors' motion?

9          MR. SIEGEL:  Good morning, Your Honor, Alfred Siegel,

10 the proposed CRO.  And, thank you for the telephonic

11 conference.

12         THE COURT:  You're welcome, Mr. Siegel.

13         MR. FEINSTEIN;  Good morning, Your Honor, Robert

14 Feinstein, Pachulski, Stang, Ziehl and Jones, counsel for the

15 Committee.  I'll be brief, Your Honor.

16         Mr. Galardi fairly laid out the history of these

17 matters, the terms and I can confirm that these were protracted

18 negotiations over every detail of the Crowe Horwath engagement

19 letter, Mr. Marcum's consulting agreement, the terms of the

20 payment of his bonus.  The Committee does support immediate

21 relief for all the reasons Mr. Galardi noted, and we ask that

22 the motions be approved.

23         THE COURT:  All right, thank you.  Does any other

24 party wish to be heard?  Mr. Van Arsdale?

25         MR. VAN ARSDALE:  Robert Van Arsdale for the U.S.

1  Trustee, Your Honor.  We also agree that this is what is

2  appropriate at this time and to the extent any other rules

3  would apply, that would keep this from happening, we would ask

4  for the Court to overrule those, too.

5          THE COURT:  All right.

6          MR. VAN ARSDALE:  Thank you.

7          THE COURT:  Thank you.  Mr. Galardi?

8          MR. GALARDI:  Your Honor, just -- you know, my mind

9  wanders, 363 does have 6004, which does have the (h) provision

10  which is a 14 day stay.  And since we are retaining the CRO

11  under 363, there is a stay, so I would ask for a waiver of that

12  stay.

13          THE COURT:  All right, thank you.  Does any other

14  party wish to be heard in connection with either of these two

15  matters?

16              (No audible response)

17          THE COURT:  All right.  With regard to the debtors'

18  motion for an order under Section 363, authorizing the debtors

19  to retain Mr. Siegel, the Court will grant that motion and the

20  Court will grant that motion immediately, and waive any time

21  requirement set forth in the rule.

22          With regard to the debtors' motion authorizing the

23  debtor to pay the wind down incentive to Mr. Marcum, that is

24  also approved, based on the representations made to the Court

25  by Mr. Galardi this morning.  And, the Court would ask you to

1  submit orders to those effects.

2        MR. GALARDI:  Thank you, Your Honor.  Your Honor, the

3  next item that I'm handling is the matter Number 12, which is

4  the debtors' objection to the claim of Panasonic Corporation.

5        Your Honor, with respect to that motion, we are

6  actually going forward, I believe, on a very narrow legal issue

7  and only legal issue today.

8        Let me give Your Honor what I believe are the

9  uncontested facts.  One, there is a consignment agreement that

10  was attached and we have provided that to you.  Two, Panasonic

11  does not contest, and I don't mean to put the rabbit in the hat

12  by saying these words, but I'm going to say them the way that I

13  ordinarily understand them.

14        Panasonic does not dispute that goods were delivered

15  to the debtors, that we are speaking about, prior to the 20

16  days before the case.  Whether that's receipt, that's the legal

17  issue we're going to talk but there is no dispute that they

18  were actually delivered and in our physical possession 20 days

19  before.

20        Your Honor, I also don't think that there is any

21  dispute that upon the delivery of those goods, under the

22  agreement, and I think it's Section 4 and Section 5 of the

23  consignment agreement, that Circuit City had various reporting

24  obligations and that there was a certain risk of loss under

25  Section 5 of that agreement, that Circuit City, in fact, had

1 that risk of loss.

2          In addition, Your Honor, I don't think there is any

3 dispute, and I think this is maybe Section 1 or 2 of the

4 agreement, that title to those goods does not pass to Circuit

5 City until Circuit City sells it to the customer and what the

6 document actually says in the agreement is that title passes,

7 essentially, simultaneous, but the instant before, in some

8 sense to Circuit City and then Circuit City passes the title to

9 the ultimate customer.  There's also no dispute that that

10 happened within the 20-day period.

11          So, Your Honor, the question that we raise for the

12 Court and what we've done is objected to their argument that

13 it's a 503(b)(9) claim.  Our argument is that Your Honor should

14 read receipt, so it's goods received within the 20 days.  We

15 believe that under a consignment agreement or any other

16 agreement, given the uncontested fact that the debtors came

17 into physical possession of those goods, outside the 20 days,

18 that, therefore, regardless of when the sale transaction, when

19 the ownership or title passed, that it is goods received with

20 the 20 days, this doesn't satisfy the first prong of the

21 503(b)(9) test because these goods were received, under

22 503(b)(9) before the 20 days.

23          And, Your Honor, we would rely one, I think on your

24 own opinion that, you know, receive means physical possession

25 under the UCC; two, if you look at the consignment agreement

1   itself, I'll just point out a few sections of that agreement.

2   So, again, I think it's ordinary parlance, but Section 4B, the

3   second sentence says, "Upon receipt of the consigned products,

4   Circuit City will issue an inbound confirmation report

5   detailing the quantity of goods received at the applicable

6   distribution center, or other location."   I am reading 4B,

7   second sentence.  I'm just pointing to a few of these.

8          Then I'll go to 5, which is the responsibility for

9   the consigned products, and it says, "All risk of loss and

10  damage in connection with the consigned products, shall be

11  transferred to Circuit City."  I'll go to 3, confirmation of

12  receipt by its own expense.  Confirmation of receipt by Circuit

13  City in accordance with 4B.

14         In addition, Your Honor, you will see down in the

15  separate account, that Circuit City shall maintain -- second

16  sentence -- detailed records of the consigned products received

17  on consignment and the disposition thereof, their hold on

18  consignment until sold and in 6, again, you'll see the word

19  then the sale notion.

20         Your Honor, we think that the normal parlance, that

21  the way in which 503(b) has to be interpreted, is received

22  means actual physical possession.  There is no factual dispute.

23  It is not a title transfer statute, 503(b)(9), it is a receipt

24  and then sell.  So, Your Honor, we would argue that receipt

25  means actual physical possession, not the date that the title

1  transferred.  Panasonic raises the other issue, they say it's

2  when the title transferred, and when the sale is, and, Your

3  Honor, it's a legal issue that, again, like we've presented

4  before, is fairly novel.  We don't see any opinions on that

5  matter.  We have cited the one gasoline case.  Again, that's

6  probably not the perfect case for either party to rely on, but

7  I think it goes better for the debtors in the sense that in

8  that case, the gasoline was received, whether it was

9  consignment or not, a consignment was the issue, it was

10 received outside the period and the Court said even if I did

11 reconsider, I wouldn't give you a 503(b)(9), it's certainly not

12 binding on this court.

13       So, Your Honor, we would argue that the Panasonic

14 503(b)(9) claim that we've objected to, should be disallowed

15 and the goods were not received within the 20 days.

16       THE COURT:  The Court previously, in looking at the

17 interpretation of the word goods, did look at the definition of

18 goods in the UCC.  Here, we're interpreting the word received

19 and, of course, that word is not defined in the UCC, the word

20 there is receipt.  What distinction, if any, do you think the

21 Court should make of that?

22       MR. GALARDI:  It's going to be very easy for me to

23 say, I don't think you make a distinction at all, Your Honor.

24 And, even if you weren't to rely on the UCC, okay, so the first

25 thing is, I think receipt/received, it's used throughout the

1   UCC.  Interestingly, it's not defined in the consignment

2   section, it is in the goods and the reclamation statute.  So,

3   you can use it as one source, but if you simply go to the

4   dictionary, received means, I actually got delivery, I actually

5   got possession.  And, if you look at the document, so even if

6   you just wiped clean any UCC interpretation and just used the

7   dictionary interpretation, I think you can still rely that it's

8   physical possession.  And, it doesn't say, and you don't have

9   to -- you can receive goods in all sorts of way without title.

10  I don't think the ordinary parlance means, if you receive

11  something from A that you, therefore, got title for it, and

12  what Panasonic is trying to argue is that you look at title,

13  which is not the ordinary sense of receipt, whether you use a

14  dictionary definition, or you use the UCC definition, and we

15  would rely on both.

16          THE COURT:  All right, thank you.

17          MR. GALARDI:  Thank you.

18          THE COURT:  Does any party wish to be heard in

19  connection with the debtors' objection?

20          MR. ACKERLY:  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. ACKERLY:  My name is Ben Ackerly and I'm here on

23  behalf of Panasonic.  I am a pinch hitter as they say in

24  baseball.

25          Your Honor, I think Mr. Galardi has correctly stated

42

1    what the issue is.  I think the consignment agreement speaks

2    for itself.  I understand that has been filed under seal with

3    the Court and I think for purposes of any decision the Court

4    has to make on this issue, the Court has to take into

5    consideration the consignment agreement and what the

6    consignment agreement says.

7         I think Mr. Galardi is also correct that this appears

8    to be an issue of first impression.  We can't find any cases

9    that involve a consignment agreement as it applies to

10   503(b)(9).  This Court, of course, has addressed goods, but has

11   not addressed received or receipt in the context of 503(b)(9).

12        So, I think, essentially, the issue before the Court

13   is, what does received mean, in the context of 503(b)(9), when

14   the good are delivered to the debtor pursuant to an assignment

15   agreement, outside the 20 days, before the petition date, but

16   pursuant to the consignment agreement sold to the debtor in the

17   ordinary course at the debtor sells the goods to the ultimate

18   consumer.

19        I think to adopt the argument that has been made by

20   the debtor here would mean a ruling, essentially, that never

21   can consigned goods be protected by 503(b)(9) unless you have

22   the unusual circumstance where they are actually delivered

23   within the 20-day period and sold within the 20-day period.

24        Now, let me just take you on a little bit of a short

25   walk through the UCC here, because we believe that there is a

43

1    justification for the Court to find that under these facts,

2    503(b)(9) does apply to Panasonic.

3            As the Court has previously found, goods are defined

4    in the UCC.  They are defined both in Article 2, dealing with

5    sales, and in Article 9, dealing with consignments.  Receipt is

6    defined in Article 2, but not Article 9.  And, as the Court

7    pointed out, received is not defined in the UCC, so far as I'm

8    aware.

9            Consignment is defined in Article 9, but not Article

10   2.  And, it's defined as a transaction, regardless of its form,

11   in which a person delivers goods to a merchant for the purpose

12   of sale.  I think the Court is probably aware that where the

13   UCC was amended, they took consignments out of Article 2, and

14   put consignments into Article 9.

15           So, merchandise that is transferred under a

16   consignment, is not a sale, and the consignee holds the

17   merchandise as bailee for the consignor.  So, in essence, you

18   have a delivery in trust.  And, so, Circuit City, until it

19   sells the goods, holds those goods in trust.  In effect, Your

20   Honor, it receives the goods as an agent, not as a buyer.

21           Merchandise transferred under a consignment is not

22   received in the Article 2 sense, because there's no sale, and

23   the sale does not take place until the ultimate sale to the

24   customer.  It's a bailment.  And, if you look at the

25   consignment agreement, you'll see that Panasonic pays the

1 property taxes on the goods that are subject to the bailment.

2       So, the goods in this case are received by Circuit

3 City when they are sold by Circuit City to a customer, in which

4 you look at Article 9 and not Article 2.  Prior to that, they

5 are not received by Circuit City and they have not been sold to

6 Circuit City.

7       Now, if you think about 503(b)(9), and what was

8 Congress trying to do in 503(b)(9), there appear to be four

9 critical words in 503(b)(9).  The first is receipt; the second

10 is goods; the third is sale, and the fourth is ordinary course.

11      What was delivered under Article 9 would be goods,

12 but there was no sale, until the ultimate sale.  And, I don't

13 think there's any dispute that they were delivered and sold in

14 the ordinary course of business.  So, the question comes back

15 to receive, and our position is, Your Honor, that because it

16 was a bailment, there was no receipt in the context in which

17 Article 2 contemplates that there be a receipt, because the

18 goods are, in fact, held in trust for Panasonic, and not by the

19 debtor.

20      So, our argument on that point is that the receipt

21 definition is physical possession of goods, but if you look at

22 the definition of receipt, the definition of receipt says

23 physical possession of goods, if you look at the definition of

24 goods in Article 2, Article 2 definition of goods says, the

25 goods must be identified to a contract of sale.  And, there's

1  no contract of sale here until the goods are sold, because

2  that's when the title transfers.

3        So, Your Honor, it is our position that in the facts

4  of this case, the Court should find that the consignment

5  agreement gives Panasonic a 503(b)(9) claim with respect to

6  goods that were delivered outside the 20-day period, but sold

7  by Panasonic -- sold by Circuit City, within the 20-day period.

8        And, we think if you think about what Congress was

9  trying to do with 503(b)(9), they were trying to protect

10 merchants who sold goods within the 20-day period.  I think

11 receipt had -- I was trying to figure out this morning, why

12 they used the word received in there, why that was so important

13 to them, but let's just concede that receive does have some

14 meaning within the statute, but the real purpose of the statute

15 is to protect a merchant who sold goods to the debtor within

16 the 20-day period and, therefore, the debtor benefitted from

17 that sale.  The estate increased in value.  And, in this case,

18 with a consignment, the estate increased in value when the

19 consigned goods are sold, because the debtor receives the money

20 from it.   Panasonic did not receive the money.

21       So, here, in this situation, you had Circuit City

22 preparing to file Chapter 11 bankruptcy, and during the 20-day

23 period, it bought Panasonic's goods and didn't pay for them.

24 And so we're in the same position as any other seller with

25 respect to the goods.  So I would ask the Court to consider

1 that.

2        THE COURT:  All right.  Mr. Ackerly, two questions.

3 The -- and I think we all agree that if we were writing this

4 provision we would draft it a little bit differently.  I think

5 this is the fourth time I've had to construe this specific

6 section.  But when you say that there are four words that are

7 operable, the words right before sold where it says, in which

8 goods have been sold, you say there's no sale, what do you take

9 away from the past tense there?  Does that mean that those

10 goods had to be sold within the 20 days before the petition

11 date?

12        MR. ACKERLY:  I think what it means -- I think the

13 20-day, I think the sale has to be within the 20-day period if

14 that's the Court's question.

15        THE COURT:  All right.  And so your goods were

16 actually sold within the 20 days before the petition date?

17        MR. ACKERLY:  Right.

18        THE COURT:  All right.  That was my first question.

19 The second question is, if this is an Article 9 transaction,

20 why do you need to have this kind of relief?  Why doesn't your

21 security interest in these goods protect your client?

22        MR. ACKERLY:  Because once the goods are sold by

23 Circuit City, our security interest terminates in those goods.

24        THE COURT:  Well, no, no.  Because under Article 9

25 you have a consignment agreement is treated as a security

1  interest.  As long as it was properly perfected you would have

2  a properly perfected lien on the goods.  Is there a perfection

3  issue here I guess is what I'm asking.

4          MR. ACKERLY:  I'm not aware of a perfection issue,

5  but let me go back and answer your question again.

6          THE COURT:  Yes.

7          MR. ACKERLY:  My understanding is in this case, Bank

8  of America had a blanket lien --

9          THE COURT:  Right.

10         MR. ACKERLY:  -- on everything.  The security -- the

11 consignment security interest is a perfected security interest

12 which protects us against Bank of America's blanket lien.  But

13 the point is, we're talking here, Your Honor about Panasonic

14 product that was delivered to the debtor outside the 20 days,

15 but sold by the debtor within the 20-day period.  So once those

16 goods are sold to customers, our security interest doesn't

17 reach to those customers --

18         THE COURT:  Agreed.

19         MR. ACKERLY:  -- and we can't go claim the goods from

20 the customers.

21         THE COURT:  But you have a security interest in the

22 proceeds.  Why not?  That's what Article 9 says.

23         MR. ACKERLY:  They are obligated to turn the proceeds

24 over to us within five days of the sale.

25         THE COURT:  All right.  And if you have a security

48

1  interest in those proceeds, why aren't you making that

2  argument?  Because that to me is the better argument.

3         MR. ACKERLY:  I would have to go back and examine the

4  consignment agreement carefully and the security interest.  But

5  there's not, there is reference in one of the financing

6  statements, I think, to proceeds, but I think that they're

7  obligated to pay the money over to us within five days.  I'd

8  have to look at that, I'd be glad to address that, Your Honor.

9  But --

10         THE COURT:  All right.

11         MR. ACKERLY:  -- I'm not prepared on that question.

12         THE COURT:  All right.  All right, thank you.  Those

13  were my questions.  Mr. Galardi?

14         MR. GALARDI:  And as Your Honor asked the questions I

15  had already started to draft -- I mean, we do have to say why

16  would a consignment vendor be in this situation in the first

17  place, because of all the questions Your Honor asked.  And the

18  reason that they're moving under 503(b) is there is a

19  perfection issue here with respect to prepetition, because if

20  you think of your normal consignment, if you had sold the

21  goods, the proceeds go into a separate account, that separate

22  account is never commingled, there would have been identifiable

23  proceeds, you'd never have to rely on 503(b)(9).  The problem

24  is, and they have a claim for this, an unsecured claim, those

25  proceeds didn't get put in an identifiable separate account.

1  As Your Honor knows, we turned over our DIP, all the funds were

2  commingled, and as between choosing to fight on the consignment

3  issue with Bank of America and along those lines, they chose to

4  seek a 503(b)(9) claim.

5        The fact of the matter is, if they're just like any

6  unsecured creditor, that's the claim they have, they have a

7  claim for the loss of the proceeds because their security

8  interest could not trace through those proceeds.  So we come

9  back to this statute really goes to the normal sense of

10  received or the UCC sense of received, physical possession,

11  whether Bailey or anybody else, it's physical possession, the

12  goods have to be sold within, we agree it has to be sold within

13  the 20 days, but the statute goes to when were the goods

14  received and the statute says received within the 20 days.

15  They were not received within the 20 days, the sale did occur

16  within the 20 days.

17        THE COURT:  All right.

18        MR. GALARDI:  So, Your Honor, that's why a

19  consignment vendor is really not a consignment vendor even if

20  it is in this sense the way that their document worked.  It was

21  truly the fact that they can't trace, commingle.  This is a

22  fallback position from that argument.  And indeed, the

23  stipulation that we entered into avoided those issues, because

24  the stipulation going forward said, look, we're going to come

25  up with the fiction, as we did with many of our consignment

50

1   vendors regardless of what the past was, we are going to get a

2   court order that says we can live with the fiction as if we

3   were segregating the proceeds so as to not to add insult to

4   injury in the post-petition period.  That's exactly what we did

5   with Panasonic, and paid them on the post-petition basis and

6   paid them as the sales occurred as to when their claim for

7   payment arose.  That's a different issue.

8        So, Your Honor, I think that's really why 503(b)

9   should not be fit to sort of get the consignment vendor in here

10  because they have their rights under Article 9.  It's really

11  when the consignment vendor cannot exercise those rights that

12  you look to 503(b)(9), and when you can't, you should read

13  503(b)(9) like you do for everybody else, goods received within

14  20 days, ultimately sold, then you get that value.

15       And so we would argue that they don't have a

16  503(b)(9) claim, and, Your Honor, if they want to go back to

17  assert a consignment claim and a tracing argument in proceeds,

18  nothing we're doing here stops them from doing that.  I think

19  that's why they just decided not to proceed there.  And we

20  don't think it's a 503(b)(9) claim, without prejudice to any

21  consignment rights or otherwise, you know, attaching to

22  proceeds.

23       THE COURT:  Okay.  One question.  Were any of the

24  Panasonic goods received by the debtor in the 20 days before

25  the petition date?  Because it looks from the papers it sort --

1          MR. GALARDI:  Again, Your Honor, you're doing the

2    sort of periods that I looked at.  One, there are goods that

3    were received prior to the 20 days that were sold within the 20

4    days, that's what we're fighting at.  If there were goods

5    received and sold within that 20-day period, we've paid them

6    the proceeds, we don't think that there's a dispute on whether

7    that could be a 503(b)(9) even if not perfected.

8          THE COURT:  Because you treated that as a consignment

9    claim going forward.

10          MR. GALARDI:  Consignment claim.  But it was both

11   received and paid, so it wasn't worth fighting whether it was a

12   consignment and valid or whether it's a 503(b)(9), it's still

13   an administrative expense claim, so we don't have a problem

14   with that.  If they were received, but not sold until

15   post-petition, we paid them on post-petition, because the

16   contract said we had to pay it and it was consignment on the

17   petition date and we entered into this stipulation saying we'll

18   deal with the fiction, right, we won't segregate, we accounted

19   for the goods in that petition, we said this is what we had.

20   So we had a choice on the petition date.  Give back the goods

21   because the title had not passed or sell them and make money.

22   We agreed to sell, make money and remit proceeds.

23          So we dealt with all of those periods, and that's the

24   consistent, and so it's only this ambiguous pre-20 day receipt

25   sell within the period, we just took the position that either

52

1  it's a valid consignment, go ahead and trace, but if you can't

2  trace, it's certainly not a 503(b)(9) and that's how we --

3  that's why we don't think it's a 503(b)(9) claim at all.

4          THE COURT:  All right, thank you, Mr. Galardi.

5  Anything further, Mr. Ackerly?

6          MR. ACKERLY:  Your Honor, with respect to the

7  perfection of security interest, I wasn't aware that that was

8  going to be an issue today.

9          THE COURT:  And I apologize for bringing up an issue

10  that may be I shouldn't have been raising.

11          MR. ACKERLY:  I mean, if that's critical to the

12  Court's conclusion here, then I think Mr. Galardi and I have to

13  see whether we can stipulate as to what the status was.  All I

14  know is this was a true consignment and we're arguing whether

15  the goods were received under 503(b)(9), not whether there was

16  a perfected security interest in what our rights were in

17  proceeds.  Thank you.

18          THE COURT:  All right, thank you.  All right, the

19  Court has before the debtor's objection to the claim of

20  Panasonic under Section 503(b)(9).  The Court has reviewed the

21  papers filed by the parties in this matter and the Court,

22  consistent with its prior ruling is going to adopt the

23  definition of receipt in the uniform commercial code as its

24  definition for received in Section 503(b)(9).  The Fourth

25  Circuit having a rule previously that where a term is not

1 defined in the Bankruptcy Code, the Court's to look to state

2 law for the interpretation of that phrase.  And so based on

3 that, the Court is going to look to when did the debtor receive

4 physical possession of the goods and as that occurred more than

5 20 days prior to the petition date, the Court is going to

6 sustain the debtor's objection to the 503(b)(9) claim.  That is

7 without prejudice, however, to Panasonic raising whatever

8 consignment claims it may have with regard to any tracing or

9 secured status that it may assert as a result of its

10 consignment agreement.   Any question regarding the Court's

11 ruling?

12          MR. GALARDI:  Your Honor, since this will -- in the

13 past and we can talk about it -- since this is probably going

14 to be another decision that we're going to rely on in the

15 future, does Your Honor want us to put proposed findings of

16 fact and conclusion of law so that we can enter an order that

17 will be sort of -- well, it won't sort of be -- it will be law

18 of the case going forward because there are other people that

19 are waiting for this decision to decide to go forward, or would

20 Your Honor want to write an opinion or want to see our findings

21 of fact and then decide?

22          THE COURT:  Please submit findings of fact,

23 conclusions of law and the Court will make a decision whether

24 it's going to write an opinion based thereon.

25          MR. GALARDI:  Thank you, Your Honor.  We will

54

1  obviously circulate that to counsel to Panasonic for review

2  before we submit it.

3          THE COURT:  All right, thank you.

4          MR. ACKERLY:  Your Honor, the next matter that -- and

5  I think it is actually the last matter on the agenda that is an

6  open matter is Item Number 23.  This the debtor's 56th omnibus

7  objection to claims.  It is to seek to disallow certain alleged

8  administrative expenses on account of employee obligations.

9          Your Honor, as set forth in the motion, there were

10 seven programs, and I think it's important to note that these

11 programs are not sort of a severance or paid time off or what

12 I'll call accrual obligations.  The seven obligations that we

13 were seeking to, that people filed claims are with respect to

14 are, there was a long term incentive program, there was a cash

15 retention and a long term cash award.  There was a short term

16 incentive program, there was a chairman's award program, a

17 phantom stock program, a restricted stock program and various

18 employment agreements.  Importantly, Your Honor, with respect

19 to every one of those programs except the short term incentive

20 program, there was actually a letter agreement with each of the

21 claimants advising them what their rights are and having a

22 contract underlie it or an agreement underlying their

23 entitlement to these.

24          With respect to every one of the seven programs I

25 just listed, they were in effect prior to the bankruptcy.  With

1  respect to each of the agreements, they were in effect prior to

2  the bankruptcy.  And the only different -- and then with

3  respect to the claimants, the claimants say that

4  notwithstanding these being in effect and subject to

5  documentation of the agreement that they are in this and that

6  they would get X awards, each of the claimants assert that they

7  had an administrative claim, either because one, some event

8  happened that vested them in their rights, or two, that there

9  was a change of control transaction that has occurred.

10        Your Honor, we will assume for the sake of argument

11  today that there was a vesting event and that there was a

12  change of control, but we don't think there's been a change of

13  control, maybe it will happen on the plan of liquidation being

14  confirmed, but we don't think there's a change of control.

15        What we believe, Your Honor, however, is

16  notwithstanding the vesting, notwithstanding meeting milestones

17  under the employment contracts or anything else, Your Honor,

18  under the Fourth Circuit standard of what a claim is, we

19  believe that since these are prepetition agreements,

20  prepetition programs put into effect by the company prior to

21  the filing, that in most instances, except for that short term

22  incentive, the person's entitlement was the result of a

23  prepetition agreement with that individual.  And because every

24  one of these persons have been paid wages, salaries, et cetera

25  during the post-petition period, and that these were not what

1  I'll call accrual-based awards.  It's not as if each day, which

2  I think distinguishes it from the <u>Hechinger</u>, each day you

3  worked you got more.  It was sort of you had to hit the hurdle

4  of the best to get the whole thing.

5        We believe that each of these claims is a full

6  prepetition, unsecured nonpriority claim and that each of these

7  individuals has also filed a duplicative claim essentially, for

8  prepetition, so not only do we seek to say it's a prepetition

9  claim, we're not seeking just to reclassify it, but to disallow

10  it, because all of these claims were filed after the

11  prepetition bar date.  The good news for the individuals is we

12  don't believe any individual is going to be really prejudiced

13  other than their right to an administrative claim, because they

14  did file prepetition, unsecured claims that are essentially

15  duplicative of this.

16        Your Honor, we believe that the Fourth Circuit

17  conduct test is what governs here.  The facts giving rise to a

18  claim, thought it may have been contingent upon vesting or a

19  change of control occurred all prepetition, and that therefore

20  it is a prepetition, unsecured claim and since they were filed

21  after the bar date should be disallowed as a late filed claim.

22  Thank you.

23        THE COURT:  All right, thank you.  Does any party

24  wish to be heard in connection with the debtor's objection?

25        MR. McCULLAGH:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. McCULLAGH:  Neil McCullagh here on behalf of one

3 of the claimants, Dawn VonBechmann.  Your Honor, if I could

4 just briefly recite the facts relating to Ms. VonBechmann, she

5 was given a cash retention award via a letter dated January 3,

6 2008.  She signed that letter agreement January 15, 2008.  That

7 letter provides that the cash retention award was $125,000.

8 The first half of that, $62,500 would vest on January 1, 2009.

9 The second half in the same amount would vest on January 1,

10 2010.  Ms. VonBechmann was a vice president with the company.

11 She did stay employed with the company through January 1, 2009,

12 the first vesting date, and then she was told on or about

13 January 16th, 2009 that she was being let go in connection with

14 the debtor' decision to liquidate.

15          She filed a timely administrative claim for the

16 $62,500 portion that had vested on January 1.  She did not make

17 any administrative claim under any of the other programs that

18 Mr. Galardi mentioned, although she was a party to some of

19 those.  She does not assert any change in control.  She also

20 has not been identified as the debtor, and I think correctly so

21 as not a key employee who would be subject to the key employee

22 retention plan restrictions and the code the debtor filed, it's

23 a reply to the various claims this past Thursday, I believe it

24 was, and did not identify her as someone who would be subject

25 to the KERP restrictions.

1              Your Honor, I'd like to take the arguments set forth

2    in the debtor's brief a little bit out of turn.  The first one

3    relates to these agreements being executory contracts, which

4    the debtor can reject and therefore render any claims to be

5    prepetition claims.  I don't believe that was an argument

6    originally set forth in the objections, so I've not had an

7    opportunity to research it as much as I would like.  But I do

8    believe that argument is incorrect.  The debtor does not assert

9    in its brief any case factually on point in this scenario.

10   I've done some research on that question over the last couple

11   of days, and I would cite the Court to a decision from the

12   District Court of the Eastern District of Virginia in the <u>U.S.</u>

13   <u>Airways</u> bankruptcy.  The case is <u>B.N.Y. Capital Funding, LLC v.</u>

14   <u>U.S. Airways Inc</u>.  It is 345 B.R. 549, and it's a case that

15   would be familiar to Mr. Foley, because he is listed as counsel

16   for U.S. Airways in that case.  In that case, the District

17   Court found that a letter of intent that the debtor had entered

18   into with B.N.Y. Capital Funding prepetition was not an

19   executory contract and was rather a unilateral option contract.

20   The letter of intent in that case allowed the debtor to require

21   B.N.Y. Funding to provide financing for some purchases of jet

22   airliners.  The Court though found that the debtor had no

23   obligation under that letter of intent and therefore it was not

24   an executory contract under the Countryman definition of

25   executory contract.  The Court stated in this case, U.S.

59

1   Airways had no binding obligations and thus the contract was

2   not executory under the Countryman definition.  I would assert

3   the same thing is true with respect to this cash retention

4   award with Ms. VonBechmann.  Nowhere in that letter agreement,

5   for lack of a better term, does she undertake any new

6   obligation to the debtor.  There's a contingency, she has to

7   remain employed with the company in order to get the bonus that

8   would vest later on, and that's the only contingency she has to

9   meet.  The letter agreement specifically states it is not

10  performance-based, it's a very simple agreement.  Stay employed

11  this long and you get this payment.  But if she declined, if

12  she left employment with the company, they couldn't try to

13  compel her to perform, they couldn't pursue damages, there was

14  nothing there.  It was simply an option that she had that was

15  put in front of her as an incentive to stay.  So I think the

16  executory contract argument fails.

17          Your Honor, I think the crux of the debtor's argument

18  throughout their brief is the conduct test which Mr. Galardi

19  referenced and first arose or first was elaborated on by the

20  Fourth Circuit in the Robins case, of course that was a Dalkon

21  Shield case that was not similar in any way to this scenario

22  we're dealing with today.  I think in none of the cases, maybe

23  save one that the debtors cite, is there any

24  post-petition performance by the person who's seeking a claim.

25  In the Robins case there's the Dalkon Shield inserted

1  prepetition.  There's nothing that happens post-petition.

2         In the <u>Thompson</u> case, Judge Bostetter's opinion that

3  I think is frequently cited in the brief, there is no post-

4  petition performance of any kind by the -- in that case it was

5  the debtor who the Court was deciding had a claim that was

6  prepetition.  But in that case, the debtor, as I understand the

7  opinion, had been on disability and was not performing any

8  service to the police force at any time post-petition.  So

9  there was no post-petition performance of any kind.

10        Likewise, the <u>Stewart Foods</u> Fourth Circuit case that

11  is cited in Circuit City's brief involved no post-petition

12  performance.  In that case the claimant was an executive who

13  had finished his service to the debtor prepetition and simply

14  had a contract with the debtor to provide continued -- whereby

15  the debtor was supposed to continue paying his salary, but he

16  wasn't doing anything for the debtor post-petition.

17        In this case, of course, Ms. VonBechmann provided

18  service post-petition precisely because the debtor was giving

19  her incentive to do that.  That was the point of these

20  agreements was to get people to stay around.

21        THE COURT:  Well, doesn't that necessarily mean it's

22  part of her employment contract?

23        MR. MCCULLAGH:  Your Honor, it was in connection with

24  her employment.  It was not in any way incorporated.  It did

25  not incorporate the --

1                THE COURT:  But you just said one of the reasons that

2        she stuck around, one of the reasons that she performed was

3        because she had the prospect of getting paid.  Isn't that just

4        the classic way that employment contracts work, one person

5        works, the other person pays for the services rendered.

6                MR. MCCULLAGH:  Of course.  But there was a separate

7        -- and I'm not sure I'm fully comprehending the question -- but

8        there was a separate employment contract here and she was

9        performing under that.  This was simply an additional separate

10       incentive to remain during what were clearly difficult times

11       for the debtor.  I'm not sure I've answered your question, but

12       I have cited in the Court's -- or in my application, the

13       Campbell Electronics case.  I understand that's not binding on

14       this Court, it's a Louisiana case.  In relevant part though,

15       the Court there and that also involved a severance payment.

16       Factually similar in that it involved the exact same dollar

17       amounts we have here, $62,500.  It also involved someone who

18       was identified as a vice president with the company.  And the

19       Court said, these sorts of agreements should be enforced,

20       because if they're not, they're not going to be respected by

21       the people who sign them, they're simply not going to have any

22       force.  And that's the only precedent I found that I think was

23       closely on point.

24                I would also point out there's a sort of asymmetry

25       between the debtors in this scenario and people like Ms.

1 VonBechmann, who is not an insider of the company.  She didn't

2 -- she doesn't understand the bankruptcy process.  She didn't

3 have counsel at the time that the debtor filed bankruptcy or

4 even when her employment was terminated.  She didn't contact me

5 until subsequent to that.  The debtor knew this agreement was

6 out there.  They had to know that she was relying on it in part

7 or at least had been incentivized to stay.  They're the ones

8 who could have taken action and filed a motion to reject or

9 something to put her on notice that you're not going to get

10 this money.  Now, maybe they didn't know at the time.  I

11 understand there was negotiations going on at the time, the

12 debtor was trying to survive, it didn't know that yet.  But I

13 think it was the debtor who had the better source of

14 information as to whether this money, whatever be paid.

15          Your Honor, the one case I mentioned that is that the

16 -- both I've cited and Circuit City has cited is Judge

17 Mitchell's opinion in the <u>Dornier Aviation</u> case, which is not a

18 reported opinion, but it's a very well reasoned opinion.

19          THE COURT:  And I'm familiar with that opinion, and

20 in fact I was going to ask you next about that.

21          MR. MCCULLAGH:  Yes.  Judge Mitchell I think there,

22 ultimately that is a case where there is some post-petition

23 performance.  The debtor -- or the employee is not let go until

24 after the petition's been filed and he makes his claim for

25 severance at that time.  And Judge Mitchell, after looking at

63

1  the various precedents on this, decides that's not an

2  administrative claim, but he also, I think, leaves the door

3  open to sometimes it should be if it's reasonable.  I think he

4  says if we were talking about one or two weeks of severance,

5  that's not the sort of thing that the debtor would be required

6  to get advance court approval for, it's ordinary course of

7  business.  But he says in the case of a highly paid executive

8  who's seeking six months of severance, that's a different

9  story.  That is the sort of thing that the debtor would have to

10 get advanced approval for, and that's what we're dealing with

11 here, so I'm not going to allow it.

12         In this case, obviously $62,500 is a lot of money.

13 But in relation to Ms. VonBechmann's compensation, it is only

14 20 percent at best.  Her salary was $275,000.  She also was

15 part of the normal annual bonus program would have paid her

16 another $137,000.  On the salary alone this cash retention

17 award wasn't even 25 percent of her normal pay.  Once the bonus

18 is added into that, that percentage goes down even more.  So

19 it's a lot of money, but I think overall this is not out of the

20 ordinary when you consider her base pay as a way of trying to

21 get her to stay around.

22         Your Honor, the final argument I wanted to make

23 relates to the accrual point in the Hechinger case that Mr.

24 Galardi made.  This is an unusual kind of agreement.  Hechinger

25 didn't deal with the cash retention award and I haven't found

1  another case that did.  If this kind of claim doesn't accrue

2  over time, it doesn't exist at all.  There's no consideration

3  that she was providing to the debtor other than staying

4  employed.  That was it.  At the instant she signed that

5  agreement, she had provided nothing to Circuit City.  It was

6  only if she stayed over time that it was meaningful.  So even

7  though the agreement doesn't provide the $62,000 -- $62,500

8  accrues in pieces on each day, that's the essence of the

9  agreement.  That's what it is.  That's what it's all about.

10 That's why she stayed.  So I think even if the Court declines

11 to find the entire amount to be an administrative claim, I

12 think it's a recognition of the basic essence of the agreement

13 to find that there was a post-petition performance, there was a

14 post-petition benefit.  That's why the debtor asked her to do

15 this, and that's why the debtor set that price.

16         So again, if the Court is not inclined to award the

17 entire amount, I think a prorating from the petition date

18 through at least that first vesting date of January 1 would be

19 appropriate for her.  And that's all I have.

20         THE COURT:  All right, thank you.  Mr. Galardi, do

21 you wish to respond to each one or do you want to wait until

22 everybody's had their turn.

23         MR. GALARDI:  It's Your Honor's preference.  I think

24 the issues are going to be sort of similar so I might as well

25 wait until the last --

1          THE COURT:  And that's the Court's preference.  I

2   just wanted to -- all right, is there any party here on behalf

3   of Mr. Besanko.

4          MR. GALARDI:  Your Honor, I should have clarified

5   this at the start.  Mr. Wimmer, Mr. or Miss, I don't know, I

6   know Mr. Besanko is a mister, but Wimmer, Fay, Ramsey and

7   Besanko are all carved out from today's hearing and are now on

8   for March 25th.  With the understanding that if there are

9   common issues that will be law of the case and they will be,

10  you know, will be applicable to their particular instances, but

11  they didn't want to come today so they wanted to adjourn theirs

12  until the 25th.  So to the extent that they are common issues,

13  they are carved out from the arguments I made today.

14         THE COURT:  Okay.  And that's Mr. Besanko, Fay,

15  Ramsey and Wimmer.

16         THE COURT:  All right.  Thank you.

17         MR. GALARDI:  Thank you.

18         THE COURT:  All right.  Is there a party wish to be

19  heard on behalf of Linda Castle?  All right.  Is there a party

20  that wishes to be heard on behalf of Francis Telegadas.

21         MR. TELEGADAS:  Yes, sir.

22         THE COURT:  All right, sir.  Please come forward.

23         MR. TELEGADAS:  I am Francis Telegadas, Your Honor.

24         THE COURT:  Okay.

25         MR. TELEGADAS:  And I'm representing myself in this.

1 I will reiterate some of the points that Mr. McCullagh made.

2 Just briefly, two days ago I received the reply brief despite

3 three and a half months going since we had to file our response

4 to the objection.  Very short notice, and the debtor knew that

5 this date was coming up.  I would ask that that not be allowed

6 simply because we haven't had time to respond to it, and it

7 brings up new arguments.

8 　　　　THE COURT:  What I will do, if you're not prepared to

9 go forward on that, is to adjourn your hearing on this to the

10 same date as the other four that Mr. Galardi just mentioned to

11 me.  But otherwise if you're not inclined to do that, then I'm

12 going to go forward with what I have.

13 　　　　MR. TELEGADAS:  I'll go forward with that, Your

14 Honor.

15 　　　　THE COURT:  Okay.

16 　　　　MR. TELEGADAS:  I'll go forward then, Your Honor.

17 　　　　THE COURT:  Okay.

18 　　　　MR. TELEGADAS:  I just think it was a way to create a

19 record that we really couldn't respond to, and I didn't

20 appreciate the fact that we got such short notice.

21 　　　　This, I don't understand why several are going on at

22 a later date.  They are common issues, and I would ask the

23 Court to make a ruling on common issues when all parties are

24 heard because there are common issues.

25 　　　　With regard to the three points or the three programs

1  that I'm arguing for, I was involved in a long term incentive

2  program which was rolled out literally a month before the

3  filing of the bankruptcy.  A cash retention program, which like

4  Ms. VonBechmann was rolled out at the beginning of 2008 with

5  two vesting dates 1/1/09 and 1/1/10.  My portion was $20,000

6  for each vesting period.  The bonus program, the short term

7  incentive program was also one that was rolled out as part of

8  an annual package.  It was a routine part of our compensation.

9  And half was based on personal performance.  You had to be

10 there at a certain date and you had to get a minimum rating as

11 far as your performance to get half of that.  And the other

12 half was based on company performance.  And for that my bonus

13 was just over $60,000, the exact amount is listed in my papers.

14 But half of that is -- was one that was really claiming with --

15 that's not tied to the company performance, but was tied to my

16 performance and my being there.

17        The -- like Mr. Galardi said, I did file unsecured

18 claims on all these, because the unsecured date was prior to

19 this date that we had to file, so you know, if these are not

20 allowed, you know, I'll rely on my own secured claims.  I do

21 think these should be allowed as administrative expenses.

22        Let me give a little bit of the facts.  These are --

23 all these programs are part of our overall compensation.  Just

24 like pay.  That's what they were there.  They were tied also to

25 keep people there on a long term basis, not have rollover, not

68

1  have turnover.  And that was very clearly made by the debtor --

2  made clear to the debtor by us.  The -- when the debtor came

3  into court and filed their initial petition, they neither

4  accepted nor rejected.  What was going on back then?  They

5  wanted to get through Christmas.  They wanted people to stay.

6  They wanted people to work and try and make this thing turn

7  around.  And so they didn't.  They sat on the fence.  They knew

8  these programs are out there.  They knew that these programs

9  had vesting dates that came after that, and again, were coming

10 up, and they didn't reject it.  They never rejected it after

11 Christmas.  They could have rejected it on December 31st.  They

12 didn't reject it then.

13        They haven't -- they waited and waited and waited,

14 they wanted people to work, they wanted people to turn this

15 company around.  We were there, we performed work.  And the

16 requirement was on the cash retention, you were physically

17 there, employed by the company 1/1/09.  That's it.  And then

18 the other half was 1/1/10.  But 1/1/09, I was clearly employed.

19 There hasn't been an objection to that, there hasn't been any

20 dispute to that.  I was there through also 2/28/09, which is

21 the date for the bonus, and I was in fact there through April

22 17 when that was my last day I was deemed a critical employee

23 for purposes of part of the wind down.

24        The company doesn't dispute that fact that for the

25 case retention award you had to have a minimum performance

**J&J COURT TRANSCRIBERS, INC.**

1  rating of three.  I performed all the way through 2/28, I was

2  kept on after that.  If I wasn't getting the minimum

3  performance rating of three, then something was wrong if they

4  kept me around.  Also, under the Circuit City program, the way

5  it worked is that if you were less than a three, you were

6  supposed to have notice of that, you were supposed to have

7  midyear reviews to get you on track.  I had my midyear review,

8  I was fine.  So I don't think there's been any dispute that I

9  met that criteria as well.  I was there on 1/1/09, I was there

10  on 2/28/09.  I deserve the full amount of those.  I worked

11  post-petition.  They got benefit from me.  I met all the

12  criteria.

13        Your Honor, I'll be glad to answer any other

14  questions that you have.  Again, the original objection said

15  that there has to be a couple of -- to make it an

16  administrative expense there has to be a couple of criteria.

17  They need a post-petition transaction.  Post-petition

18  transaction was, I was there, I stayed, I tried to turn this

19  place around.  They also need consideration.  The consideration

20  was the work I was doing.  So I don't see why this shouldn't be

21  an administrative expense, and if Your Honor has any questions

22  I'll be glad to answer them.

23        THE COURT:  Thank you very much.  I appreciate it.

24  Is there any party wish to be heard with regard to the response

25  of Lambert-Gaffney?

1              MR. CANFIELD:  Robert Canfield, Your Honor.  I'm here

2    on behalf of both Ms. Lambert-Gaffney and Mr. Geith in this

3    matter.

4              THE COURT:  All right.

5              MR. CANFIELD:  That's G-e-i-t-h.

6              THE COURT:  All right, very good.

7              MR. CANFIELD:  As far as Ms. Lambert-Gaffney, she was

8    there for the whole time and would have been required to earn

9    the $125,000 cash retention award.  Mr. Geith, on the other

10   hand, left some time during the pendency of these proceedings,

11   so he's only entitled to $45,000 under the one program and

12   62,500 on the other.  But when I echo Mr. McCullagh's arguments

13   on the law, I think this objection also puts this Court at the

14   brink of a slippery slope.

15             And the problem that I see is one of these programs

16   was proffered by Circuit City 9/30/2008.  Obviously the

17   bankruptcy was filed roughly six weeks thereafter.  And what we

18   have, you have a number of experienced employees who were

19   encouraged to stay and try to work out -- turn this company

20   around, or on the alternative, at least facilitate in this

21   liquidation.  Not unlike all the lawyers sitting up here in

22   front of the room today.

23             And I think the analogy would be, these folks were

24   standing on the deck of the Titanic, and they said look, you

25   need to help these folks get into the lifeboats, and you hang

1  around, because we're going to bring some more lifeboats for

2  you.  This could be a benefit if you help us do what we need to

3  do.  And where we are today is that any other life boats that

4  showed up are for the captain and the executive, but not for

5  the folks who helped do the work and got the folks in the

6  lifeboat.  And so if this Court denies these claims, you'll see

7  in the future, at least in this area, is when people are faced,

8  do I stay on, do I try to work it out, or should I leave, do I

9  do what's in my own best interest?  They're going to leave like

10  the rats off a ship.

11        So, Judge, I think that your decision here today has

12  a much farther reaching impact than whether or not just this

13  program, because I think you're obviously setting a precedent

14  that's going to be known by people in future cases and they're

15  not going to hang around.  So I would echo Mr. McCullagh's

16  arguments on the law.

17        THE COURT:  Well, let me ask you.  One of the things

18  that Mr. Galardi says is that if you look at the definition of

19  claim, you know, the definition is very, very broad and these

20  were agreements that were entered into prepetition.

21        MR. CANFIELD:  Yes, sir.

22        THE COURT:  All right.  Now, and then I asked Mr.

23  McCullagh, and I wasn't really clear on the answer, you know,

24  but weren't these in the nature of executory contracts, in

25  other words, that they're a part of the employment contract in

1  going forward and from that standpoint I'm looking at Judge

2  Mitchell's analysis in the <u>Dornier</u> case and it is that the

3  proper analysis to do and to answer your question then -- and I

4  realize I'm going on and I'm going to give you a chance in just

5  a second to respond -- but as far as everybody just leaving,

6  isn't the answer that the debtor should or could have assumed

7  these agreements at the front end of the case and for whatever

8  reason it chose not to do that?

9       MR. CANFIELD:  Well, Your Honor, under that analogy

10 or that question, that's how we want to look at it, then I

11 would say that Circuit City misled all their employees who

12 stayed.  Because all these people stayed in 2009 and some in

13 2010 relying upon the fact that they had been told they would

14 be paid these sums if they did that.  And so now to sustain

15 these objections would be, in my view, simply to reward that

16 fraud.

17      THE COURT:  All right.  Thank you.  Does any party

18 wish to be heard on behalf of Scott Mainwaring?  Does any party

19 wish to be heard on behalf of the response filed by Thomas

20 Bradley?  Does any party wish to be heard on behalf of the

21 response filed by Kelly Breitenbecher?

22      MR. GRAY:  Yes, Your Honor.  Good afternoon.  William

23 Gray on behalf of Kelly Breitenbecher.  Briefly on the facts

24 for Ms. Breitenbecher too, I would say she was a senior vice

25 president of Operations and Supply.  She was working there

1  under an employment agreement and a retention agreement.  She

2  was there post-petition for five and a half months until April

3  17th, 2009.  Now I believe my take is just a little bit

4  different.  I do agree with Mr. McCullagh and the other parties

5  here who have made some arguments.  But I come at this a little

6  bit differently, and it might be on what Your Honor was asking

7  to.  I see this if you were to grant the opposition, the

8  objection, in my mind you're establishing the value of Ms.

9  Breitenbecher for her post-petition period as simply the base

10 wages that she earned during that period.  And I don't think

11 that is correct.  She was worth more than that.  To me this is,

12 what is the value of her services post-petition?  What you have

13 before you, Your Honor, is evidence of that value, which are

14 these contracts that we're talking about.  And that shows that

15 she -- the value of her services as agreed by the parties was

16 more than just her base salary.  She did not get anything more

17 than just her base salary in the post-petition period.  The

18 debtor took its time to decide whether they were going to

19 assume or reject.  And as the <u>Bildisco</u> case mentioned, the

20 debtor needs to pay for the services during that decision

21 making time, and it could be what's in the contract.  Dornier

22 even mentioned, I don't say forever that what's in the contract

23 would be what the value of the services are basically as the

24 way I was reading that.  They didn't rule that out.

25             I urge the Court to look at the evidence of the

1  contracts, and then we need to extrapolate that into what was

2  the value of her services.  This gets us, in my mind, to the

3  proration of <u>Hechinger</u> and <u>Lauzon,</u> that you can very easily

4  determine that the severance -- the retention agreement rather,

5  was also part of her wages and salaries et cetera.  Blacks Law

6  Dictionary has a very broad definition of wages and salaries.

7  It's not just base salary.

8        So I'm urging the Court, Your Honor, to adopt the

9  accrual part of <u>Hechinger</u> and <u>Lauzon</u> and you can take part of

10 what these other agreements were.  I would note, I heard from

11 the others that have been up here about their retention

12 agreements.  It was different, apparently, from Ms.

13 Breitenbecher's.  Hers was a three-year agreement vesting at

14 three different points.  The others I heard were talking about

15 two different vestings.  So in my mind, that -- is that --

16 there is a determination made as to the value of the person

17 when they were retained, coming together with this retention

18 agreement.  It's not all the same.  So these people have value

19 to them, they provided that value post-petition, and that's

20 what we're talking about here in these administrative expense

21 claims.

22        THE COURT:  All right.  Thank you, Mr. Gray.

23        MR. GRAY:  Thank you.

24        THE COURT:  Does any party wish to be heard in

25 connection with a response filed by David Tolliver?

1              MR. TOLLIVER:  Hello, Your Honor.  I was a --

2              THE COURT:  You need to identify yourself of the

3    record.

4              MR. TOLLIVER:  I'm sorry.  My name is David Tolliver.

5              THE COURT:  All right, Mr. Tolliver. You may proceed.

6              MR. TOLLIVER:  Yes.  I was a store director with

7    Circuit City and worked there up to, through and including the

8    going out of business sale.  I agree a lot with the previous

9    gentlemen and I've noted the argument in my response to the

10   debtor's objection that, you know, I viewed a lot of the

11   incentive, the cash award program, as a contract, as an

12   executory contract.  And because the debtors never sought to

13   assume or reject the contract, that I was due to be paid the

14   value of services rendered from the contract.  And I view the

15   cash incentive was part of a total compensation package that

16   was given to numerous employees.  Mine was $15,000.  That

17   vested once every three years -- I mean once a year for three

18   years on January 1st.  And because I worked through and

19   including the going out of business sale, then that entire

20   award was due to be payable per the terms that I included on

21   the original reply on my award letter.  So I agree that it is

22   a contract and I believe that the value of services that the

23   debtor's received by me working through this awards the

24   compensation as an administrative claim.

25             THE COURT:  All right, thank you very much.  Does any

1  party wish to be heard in connection with the response of

2  Michael Goode or Goode.   Does any party wish to be heard in

3  connection with the response of Jeff McDonald?

4           MR. McDONALD:  Your Honor, I'm Jeff McDonald.  I

5  received a call from my attorney this morning at ten that said

6  he would not be able to appear on my behalf.  I don't have any

7  unique --

8           THE COURT:  That's wonderful, isn't it?

9           MR. McDONALD:  Yes.

10                         (Laughter)

11          THE COURT:  Would you like to have yours carried over

12  to the 25th of March when the other four are going to be heard

13  or do you want to proceed today?

14          MR. McDONALD:  No, sir.  I don't really have a unique

15  argument that hasn't already been presented, and I'm certainly

16  in an unusual position in that I'm still employed by Circuit

17  City stores.  But I understood from my attorney that I needed

18  to appear here to protect whatever rights I may have in the

19  Court's decisions.

20          THE COURT:  All right, thank you, sir.

21          MR. McDONALD:  Thank you.

22          THE COURT:  Does any party wish to be heard in

23  connection with the response filed by Richard Salon?  All

24  right, Mr. Galardi, I'll hear your arguments in response.

25          MR. GALARDI:  First, Your Honor, let me say this is

1 one of the most difficult things for a corporate counsel to go

2 against people that have done and actually provided benefits to

3 this company.  But notwithstanding that, let me go through each

4 of the arguments as I understand them and why I think as a

5 matter of law that they are still prepetition claims.

6 　　　　　Your Honor, and also, everyone has said that they

7 stayed in reliance upon and getting paid these amounts.  That's

8 an evidentiary issue, we don't have witnesses, and we reserve

9 our rights in the event that Your Honor thinks it becomes an

10 evidentiary issues as opposed to a matter of law to actually

11 challenge each and every one of those persons that say they

12 stayed because of these programs.  We've taken this on as a

13 legal argument with respect to when a claim arises.

14 　　　　　Your Honor, let's first start with what I think is

15 one of the general arguments.  Is there an executory contract

16 or not?  And we've heard conflicting things.  If there's no

17 executory contract, I think Your Honor is already aware that if

18 it's a prepetition agreement, it's not executory, we're free to

19 breach, it's a prepetition claim, end of story.

20 　　　　　THE COURT:  I agree with that.

21 　　　　　MR. GALARDI:  So if there's not an executory

22 contract, then we're done.  Second then we go to if there is an

23 executory contract, we are free to reject that contract.

24 Second, Bildisco says you pay value of services.  The fact of

25 the matter is the law is until it's assumed or rejected, it is

1  simply not enforceable against the debtor, and that the relief

2  that should be requested by a claimant -- and again, I

3  understand that these people were not necessarily represented

4  by counsel at this time, but at the same time, their obligation

5  is to come forward and seek to compel assumption or rejection

6  or it stays in abeyance and it's simply not enforceable against

7  us until we make the decision.  And, Your Honor --

8         THE COURT:  But you've got to address the argument

9  that Mr. Gray made which is, what is the best evidence that the

10  Court has as far as the value of the services that the debtor

11  received in these cases, and isn't that from, to be gleaned

12  from the prepetition agreements?

13         MR. GALARDI:  Your Honor, yes, but not with respect

14  to these particular programs?  Right.  These --

15         THE COURT:  Okay, now why?

16         MR. GALARDI:  -- because these particular programs do

17  not say that there is an accrual of daily services.  This is --

18         THE COURT:  Do they have to?

19         MR. GALARDI:  -- I think they do, actually, Your

20  Honor, to say to the value of the services.  For example, take

21  a document that says you have to be on day one, be here.  If I

22  let you go the day before, you didn't get any of those -- you

23  don't get the value of those services.  So that's not your

24  daily value of services.  This is a payment that you get if

25  you're here on a day X, Y or Z, but it's not the value.

1  There's not an accrual.  And this is why I think this is quite

2  different.  So if somebody says if you stay here until, what is

3  it, January 1st, 2009 or January 1st, 2010, that doesn't say

4  what your daily services are.  That says that there is a hurdle

5  as a separate agreement or part of your contract that you would

6  get a bonus consideration.  Not for your daily work, because if

7  I let you go on December 31st, you wouldn't have gotten any of

8  that.  They wouldn't have had an equitable argument, they

9  wouldn't have had a contractual argument for one dollar of

10  those retention payments.

11         So although you've asked the question, is it part of

12  their employment agreement?  I don't think it really is part of

13  -- it's not one, big integrated agreement.  These are separate

14  agreements.  These are separate deals.  There's a contract, and

15  then there's another contract.  And it says if you get here,

16  and I could even argue that it's a gift, but I don't want to go

17  so far as to say it's a gift, because --

18         THE COURT:  We all know it's not a gift.

19         MR. GALARDI:  -- it's not a gift, but the fact of the

20  matter is, you don't accumulate that on a daily payment.  You

21  have to be there on a certain date, and if we've not affirmed

22  or denied whether we're going to honor that program, and indeed

23  in our first day motions we said these are the value of the

24  services, these are the programs we're going to pay you, such

25  as vacation pay time, what the Bankruptcy Code says are

salaries, but we didn't go forward and specifically said we

cannot go forward on these particular programs and benefits

because of the uncertainty of the circumstances.  So they were

held in abeyance.  And these are contracts whether they're

prepetition executory contract that if you had to be here.

Again, I think if they're not executory, which I frankly think

some of these incentive programs aren't, I give you X, you give

me Y, this is a prepetition, we will offer you this if you're

here on a certain day, and we never affirmed that obligation.

Yes, they were here, yes, they vested this, they had a change

of control.  But nonetheless, unfortunately for the employees,

they were prepetition agreements or offers by us that said you

had to be here on a day and we never affirmed and we either

breached them, unfortunately, or we never assumed them, we

never made a motion to approve it.  And I don't think, Your

Honor, and the Committee can speak, this is why you have

employee incentive programs and why under 503(c) you now have

to come in and seek other types of consideration.  Indeed, Mr.

McDonald's here, he's received other consideration to keep

working and doing it, because you don't count on these

particular salaries and it's an unfortunate fact that Your

Honor and I lived through -- and again, this is why I go back

to the justifiable reliance, to say that people in Richmond

stayed here at that economic time because of these payments, I

think there's a factual issue.

1          But the fact of the matter is, we made it clear we

2    were not seeking approval of these documents at that time.  We

3    made it clear in our first day when we said, what are we giving

4    as far as wages, salary and benefits, and when we calculated

5    the priority claim and when we calculated the payments, we made

6    it clear what we believed the value of the services were.  If

7    those days passed, and I'm not blaming the employees, but if

8    they had gotten attorneys on January 1st of 2009 and they had

9    come into this Court on that date and said, pay us these

10   amounts, that's what an administrative claimant does.  We would

11   have opposed it exactly then and there and had to oppose it, or

12   we would have had to go to the Committee and say, should we

13   approve this part of the program?  But there was such

14   uncertainly in this case for business judgment reasons, and I

15   represent the company, for business reasons we could not do

16   that.  We don't think it establishes a reliance.

17         So, Your Honor, one, we think if it's not executory,

18   it's just breach.  I tend to think these are not executory

19   programs.  These are offers whether they were one day before

20   the filing or whether they're 30 days before the filing or

21   whether they're four years before the filing.  It's not wrapped

22   up in the employment contract.  It's the agreement to pay money

23   and money only if you're here on a date.  I think you can

24   breach it.  Unfortunately, that means it's a prepetition claim.

25         If it's an executory contract, we can reject it.  I

1  think to Mr. Gray's argument, it doesn't go to the value of

2  each individual day services.  I don't think there's an accrual

3  like a landlord's type claim.  This is not an accrual method.

4  This is, you get it or you don't get it, and it's not the value

5  of your services each day prepetition and post-petition.

6          Your Honor -- let me think what other argument that

7  people have made -- I think that's the common arguments through

8  all of these threads, Your Honor, and I think, again, you don't

9  need to go to all of the other issues that would arise, but

10  again, you can't without Court approval, have a severance

11  program, pay people bonuses and that under 503(c).

12          You also have the 548 issue.  A lot of these programs

13  were put in in the two years prior to the bankruptcy, and

14  there's an issue of fraudulent conveyance if we ever get

15  through.  But I think this is ultimately simply a matter of

16  these are prepetition programs, the Fourth Circuit is quite

17  clear on the conduct test.  Their claims, as of the date we put

18  these programs into effect, which are not controversial, it's

19  all prepetition, the documents are all prepetition, and

20  therefore I think, unfortunately under the Fourth Circuit, it

21  is a prepetition claim, and I don't think it goes to the

22  measure of those services for those individuals on a daily

23  basis that accrues prepetition or post-petition.  Unfortunately

24  it's an all or nothing.

25          THE COURT:  Let me ask you this.  If I was to agree

1 with you and disallow these claims as administrative claims,

2 would they nevertheless be entitled to payment as a priority

3 claim under Section 507(a)(4)?

4        MR. GALARDI:  Well, again, Your Honor, that will go

5 to whether they accrued during the 180 days prior to the

6 bankruptcy.

7        THE COURT:  But if you reject them the day

8 beforehand, I'm looking at the <u>Dornier</u> case, it would by

9 definition be within the 180 days beforehand.

10        MR. GALARDI:  But there's another issue.  Were they

11 earned on that date?  I'm not sure that they were earned during

12 that date, and the statute that provides for priority, and

13 we'll have a mathematical calculation, we have other issues

14 about --

15        THE COURT:  Does it have to be earned on that date?

16        MR. GALARDI :  Yes, I think it has to be earned

17 within the --

18        THE COURT:  If it was earned on a subsequent date and

19 you reject it and you go back to that day?

20        MR. GALARDI:  Your Honor, to look at the priority

21 statute, and we're going to have this on some of our other

22 claims, the words are that they have to be earned within the

23 180 days.  Because again, and we'll go to, again, to give you

24 an idea of -- and why I say that is we're going to have another

25 argument here and doing precedent with respect to class action

1  settlement people that you entered into a settlement or

2  something on that date.  But it relates to a period five years

3  before.  I think the priority says that it has to be actual

4  wages and benefits earned during that period.  That's not say

5  that if they want to make that argument, again, and we'll leave

6  aside whether they filed it as priority claims and all of that,

7  I think it has to be earned within the 180 days prior to the

8  petition.

9         THE COURT:  I see the language you're referring to.

10         MR. GALARDI:  So I think that's the problem, and I

11  don't think you can just simply say because the Bankruptcy Code

12  says a rejection as of the date immediately prior to the

13  petition date that answers the question as to whether it was

14  earned.  And under my argument about accrual, I don't think

15  some of this will be earned at all during that period of time.

16  So, Your Honor, and I think that again distinguishes, and

17  again, I come from a circuit that the conduct test doesn't

18  work, you have some severance and each day that you -- you

19  know, there's a distinction between the executive contracts

20  versus your standard for every two weeks, you know, every month

21  you work you accrue.  That's an accrual, and I would understand

22  it.  But none of these benefits was a each day you earned and

23  if you terminated your relationship by X or Y date prior to,

24  you would have accrued something.  It's an all or nothing hit

25  or miss on those dates, Your Honor.

1         And so I think that's the problem.  And if it's as I

2    say not an executory contract, then it's a breach.  And if it's

3    an executory contract, it's a rejection that goes back to that

4    date and it's not enforceable, and since it's not an accrual, I

5    don't think it is part of the sorts of things that become the

6    fundamental compensation for the individuals.  It's not added

7    to their wages, salaries and benefits and their worth.  If

8    that's the standard, then we're going to start thinking, well,

9    what's your share of the medical liability insurance, and

10   what's your share of this?  We don't do that sort of thing

11   because we take the wages, salaries as the compensation.

12        And again, I don't want to put the burden on every

13   employee, because this is the circumstances that we always

14   have, but again, when you represent company counsel, it's sort

15   of like when you go in and say something, you tell me about

16   this, but I can't protect you on privilege issues, again, for

17   employees I can't say go file a claim and be aggressive here

18   and do the administrative claim.  We're as honest as we can be

19   with them.  That's why we say  we're not seeking approval of

20   those programs.  But had January 1st come and gone and had they

21   had the options that everyone is saying and had they wanted to,

22   they could have made the motion right then and there, pay me

23   for my benefit that just came.  They didn't.  And it's an

24   unfortunate fact, but the answer could have been very clear at

25   that point that we were in negotiations with the Committee at

1  that point for, you know, employee retention programs and that

2  and we just couldn't do it because of the outcome of this case.

3  So unfortunately the estate had to do what it had to do with

4  respect to individuals.  Pay them their fundamental wages.  We

5  never came up with an incentive program for during that period

6  of time, and then subsequently came to an incentive program to

7  compensate people for what we believed were their losses of

8  these kind of programs.

9              THE COURT:  All right, thank you.

10              MR. GALARDI:  Thank you, Your Honor.

11              THE COURT:  Does the Committee wish to be heard on

12  this issue?

13              MR. FEINSTEIN:  Yes, only briefly, Your Honor.

14  Robert Feinstein, counsel for the Committee.  Mr. Galardi's

15  correct in that there were, there was extensive attention paid

16  to developing an incentive program.  These payments were not

17  included, that was the debtor's business judgment not to

18  include them, so it would seem inappropriate to allow them to

19  become administrative claims by fiat because the claimants come

20  at the end of the case and say, I rendered services, I'd like

21  to be paid.  That's not enough and 503(c) makes it very clear

22  what the requirements are.  I'm not even sure as I stand here

23  whether these types of payments would qualify under 503(c), but

24  the debtor's judgment was not to include them.  Had they

25  included them, we would have had a much different conversation

1  and perhaps a different program, but they were not included.

2  Thank you.

3            THE COURT:  All right, thank you.

4            MR. GALARDI:   Your Honor, I did forget one argument,

5  it's probably just piling on, and it goes to all of this.

6  There is no -- I mean, these individuals provided a benefit

7  post-petition, we don't dispute that.  But again, the other

8  aspect of the administrative claim is, what is the

9  post-petition transaction?  I think it would be stretching it

10 to say each day of employment is a new transaction, just like

11 each day of the rent Your Honor has, we've done the accrual

12 method.  But there is no post-petition transaction, and we do

13 think that is the element that is also missing with respect to

14 the straight 503(b)(1) administrative claim.

15           THE COURT:  All right, thank you.  Do any of the

16 other parties that have spoken previously wish to be heard?

17           Okay, what the Court's going to do is, I'm going to

18 defer ruling on this until March 25th when the other four

19 persons that were not here today will have an opportunity to

20 present their arguments.  I think it would be unfair to them to

21 rule at this point in time without having heard them.  So I'll

22 take it up at that time.

23           MR. GALARDI:  Your Honor, that concludes the matters

24 from our perspective today.

25           THE COURT:  All right.  Is there any other business

88

1  we need to take up today then in the Circuit City matter?  All

2  right, thank you all.

3                         *  *  *  *  *

4                  **C E R T I F I C A T I O N**

5            WE, ELAINE HOWELL and  RITA BERGEN, court approved

6  transcribers, certify that the foregoing is a correct

7  transcript from the official electronic sound recording of the

8  proceedings in the above-entitled matter, and to the best of

9  our ability.

10

11  /s/ Elaine Howell

12  ELAINE HOWELL

13  /s/ Rita Bergen

14  RITA BERGEN

15  J&J COURT TRANSCRIBERS, INC.    DATE:  March 10, 2010

16

17

18

19

20

21

22

23

24

25