Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
One Rodney Square
PO Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

- and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
MCGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                        :    Chapter 11
                              :
CIRCUIT CITY STORES, INC.,    :    Case No. 08-35653 (KRH)
et al.,                       :
                              :
     Debtors.                 :    Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' SUPPLEMENTAL OMNIBUS REPLY IN SUPPORT OF THE FIFTY-SIXTH OMNIBUS OBJECTION TO CLAIMS (DISALLOWANCE OF CERTAIN ALLEGED ADMINISTRATIVE EXPENSES ON ACCOUNT OF EMPLOYEE OBLIGATIONS)**

## INTRODUCTION

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), pursuant to sections 105, 502 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Rules"), submit this supplemental omnibus reply (the "Supplemental Reply") to the Responses of the Respondents and in support of the Debtors' Fifty-Sixth Omnibus Objection (Disallowance of Certain Alleged Administrative Expenses on Account of Employee Obligations) (D.I. 5320, the "Objection").

The Objection was filed on October 21, 2009.  On various dates thereafter, the Respondents filed the Responses.  On March 4, 2010, the Debtors filed their Omnibus Reply in Support of the Fifty-Sixth Omnibus Objection to Claims (Disallowance of Certain Alleged Administrative Expenses on Account of Employee Obligations) (D.I. 6691, the "Reply").[1]  On March 8, 2010,

---

[1]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Objection or the Reply.

the Court held a hearing (the "Hearing") on the Objection,
certain of the Responses and the Reply.  On March 25, 2010,
the Court is scheduled to hold a subsequent hearing with
respect to the remaining Responses.[2]

The Debtors hereby submit this Supplemental Reply
to address certain issue raised at the Hearing and to
clarify the factual background against which the Court is
required to rule on the Objection.

### ARGUMENT

As discussed in the Objection and the Reply, the
Claims are not entitled to administrative expense priority
because, among other reasons, the Claims arose from events
that occurred entirely prior to the Petition Date and did
not arise from a post-petition transaction with the Debtors
as debtors in possession.  Objection at 17-26; Reply at 6-14.
Notwithstanding this fact and the fact that many of the
Respondents were included within the wind down incentive and
retention plan (the "Management Incentive Plan") approved by

---

[2]    In particular, the Court will hear arguments with respect to the
Responses of Bruce H. Besanko (D.I. 5687), Lawrence W. Fay (D.I. 5749),
Daniel W. Ramsey (D.I. 5754) and James H. Wimmer, Jr. (D.I. 5693) on
March 25, 2010.

this Court by order dated March 25, 2009,[3] the Respondents

contend that they are entitled to an allowed administrative

expense because: (i) the pre-petition benefits for which the

Claims are asserted vested upon vesting dates or a change of

control, each of which allegedly occurred post-petition

while the Respondent was an employee of the Debtors; and/or

(ii) the benefits, or a portion thereof, reflect the

"reasonable value" of the services rendered by the

Respondent post-petition and, thus, were earned post-

petition.  Moreover, at least some of the Respondents

contend that they were "induced" by the Debtors to remain in

their employment after the Petition Date by the existences

of these benefits.  Finally, certain of the Respondents

assert that the Pre-Petition Agreements were not executory

contracts.

        As set forth below, the Respondents' arguments

lack a legal foundation as the Claims arose pre-petition

notwithstanding any post-petition vesting date and the

Claims do not reflect reasonable value.  Moreover,

Respondents' contention regarding inducement is inconsistent

---

[3]   Order Under Bankruptcy Code Sections 105, 363(b) and 503(c)(3)
      Approving a Wind Down Incentive and Retention Plan and Authorizing
      Payment of Wind Down Incentive Pay to Plan Participants (D.I. 2757,
      the "Management Incentive Plan Order").

with the indisputable facts.  Finally, the Claims are pre-

petition claims even if the Court accepts Respondents'

assertion that the Pre-Petition Agreements were not

executory.  Consequently, the Court should sustain the

Debtors' Objection.

**I.    THE CLAIMS ARE NOT ENTITLED TO PRIORITY NOTWITHSTANDING WHETHER THE PRE-PETITION AGREEMENTS PROVIDED FOR POST-PETITION PAYMENTS.**

**A.    The Claims Do Not Qualify For Administrative Priority Merely Because The Claims Might Have Vested Post-Petition.**

As discussed in the Objection, the Fourth Circuit

Court of Appeals applies the "conduct test" to determine

when a claim arises.  Objection at 18.  Under the conduct

test, a claim arises when the event or conduct giving rise

to the claim first occurs.  Id.  Here, the Award Programs

were instituted pre-petition, the Awards and severance

payments were granted pre-petition, and the Pre-Petition

Agreements were executed pre-petition.  Thus, under the

conduct test, each of the Claims under the Pre-Petition

Agreements is a pre-petition general unsecured claim.

This is true notwithstanding the fact that the

Pre-Petition Claims provided for post-petition payments.  As

this Court well knows, "[p]riority . . . is not afforded a

claim merely because the right to payment arises post-

petition.  Thus, where there is a pre-petition contract or
lease, and the consideration supporting the claim is
supplied pre-petition, court[s] have determined that those
claims are not entitled to administrative priority, even if
the right to payment arises post-petition." In re Old Carco
LLC, f/k/a Chrysler LLC, 2010 WL 22426, *5 (Bankr. S.D.N.Y.
Jan. 5, 2010) (internal citation omitted).[4]   This principle
has been reiterated by a number of courts, including courts
in this Circuit.  See, e.g., Steward Foods, Inc. v. Broecker
(In re Stewart Foods, Inc.), 64 F.3d 141, 146 (4th Cir. 1995)
("[T]he fact that the payments became due after the
bankruptcy filing does not alter the conclusion that the
payments are pre-petition obligations"); Mason v. Official
Comm. of Unsecured Creditors (In re FBI Distribution Corp.),
330 F.3d 36, 48 (1st Cir. 2003) ("[A] contingent claim,
however, is not entitled to priority simply because the
right to payment arises during the reorganization when the
contingency occurs."); Bachmann v. Commercial Fin. Servs.
Inc. (In re Commercial Fin. Servs. Inc.), 246 F.3d 1291,
1295 (10th Cir. 2001) ("[T]he liability must arise post-

---

[4]   A true and correct copy of In re Old Carco LLC, f/k/a Chrysler LLC,
C2010 WL 22426 (Bankr. S.D.N.Y. Jan. 5, 2010) is attached hereto as
Exhibit A.

petition; it is not enough that the right to payment arose

after the debtor in possession assumed control."); Trustees

of Amalgamated Ins. Fund v. McFarlin's Inc., 789 F.2d 98,

101 (2d Cir. 1986) ("A debt is not entitled to priority

simply because the right to payment arises after the debtor

in possession has begun managing the estate."); In re

Jartran, Inc., 732 F.2d 584, 587-88 (7th Cir. 1984) (denying

administrative priority to claim for costs of advertising

ordered before the petition date but published after the

petition date); In re Dornier Aviation (North America), Inc.,

2002 WL 31999222, *6 (Bankr. E.D. Va. 2002) (finding that a

claim for severance that became payable when the employee

was terminated post-petition was a pre-petition claim where

the employment contract under which the claim arose was

entered into pre-petition).

By the same rationale, courts have found that

claims arising from severance provisions in pre-petition

employment agreements providing for payments upon

involuntary termination are wholly pre-petition claims.  In

In re M Group, Inc., the court looked at a severance

provision in an employment agreement comparable to those at

issue here.  In re M Group, Inc., 268 B.R. 896 (Bankr. D.

Del. 2001).  In particular, similar to the severance

provisions in the Employment Agreements, the M Group court considered a provision that required that a specified payment be made to the employee in the event the employee was terminated without cause. Id. at 900. Moreover, the severance provision was neither tied to length of service nor provided in lieu of notice, as in the present case. Id. Under these circumstances, the M Group court found that the employee "became eligible for severance pay immediately upon signing his employment contract . . . . That is, it is not determinative that payment of the lump sum was contingent upon [his] termination, an event which occurred post-petition. In determining administrative priority, courts look to when the acts giving rise to the liability took place, not when they accrued." Id. at 901 (internal quotation and citation omitted).

Importantly, the M Group court noted, as is true in the present case, that the employee had not signed a contract with the debtors in possession in connection with his post-petition services. Id. at 902. Therefore, the bankruptcy court concluded that "the fact that [the employee] continued to be employed with Debtors postpetition is insufficient to establish a transaction with the debtor in possession for administrative priority purposes." Id.

8

(internal quotation omitted).  As a result, the employee's
claim for severance pay was held to be a pre-petition
unsecured claim.  Id.; see also In re Phones for All, Inc.,
288 F.3d 730, 732 (5th Cir. 2002) (affirming bankruptcy
court's determination that severance payments were earned
pre-petition when the employee entered into the pre-petition
agreement and noting that, under section 503(b)(1), it is
"the claimants' burden to reconfirm or renegotiate post-
petition any severance packages they may have if they
continue to work for the debtor."); Dornier Aviation, 2002
WL 31999222, at *4, 6 (finding that a claim for severance
was not entitled to administrative priority "when the right
to receive it arises, not from a post-petition agreement
with the trustee or debtor in possession but rather under an
agreement with the prepetition debtor that is not assumed by
the trustee or debtor in possession."); In re Uly-Pak, Inc.,
128 B.R. 763, 766-67 (Bankr. S.D. Ill. 1991) (finding that
employee's claim for severance was not entitled to
administrative priority because employee earned his
severance pay pre-petition when he entered into his
employment agreement).

        Similarly, here, the Claims arose in their
entirety under the pre-petition Award Program Agreements and

                              9

Employment Agreements, and no Respondent was a party to a post-petition employment agreement.  Thus, even though, the Claims might have "vested" post-petition when the Respondents were employed through a vesting date or a change of control,[5] that fact does not warrant concluding that the Respondents hold administrative claims when they otherwise do not satisfy the requirements for an administrative expense -- a post-petition transaction that provided the Debtors with an actual and necessary benefit.  See In re Phones for All, Inc., 249 B.R. 426, 430 (Bankr. N.D. Tex. 2000) (finding that, to be entitled to administrative priority, a severance claim that became payable post-petition "must benefit [debtor's] estate and its creditors. . . .  To meet this test, the expense must arise from a transaction with the debtor and the services supplied must enhance the ability of the debtor's business to function as a going concern"), aff'd 288 F.3d 730 (5th Cir. 2002).  As shown in the Objection and the Reply and herein, the Respondents have not, and cannot, establish that there was a post-petition transaction that provided the estates with an actual and necessary benefit.

---

[5]   The Debtors maintain that no "change of control" has yet occurred.

**B.    The Respondents' Received Reasonable Value For Their Post-Petition Employment.**

Some of the Respondents contend that the Claims are entitled to administrative expense treatment, at least in part, because the Claims represent the reasonable value of the Respondents' services post-petition.  Although it is true that a debtor that accepts the benefits of a pre-petition contract must pay reasonable value for such benefits, see NLRB v. Bildisco and Bildisco, 465 U.S. 513, 531 (1984), the Respondents have received such reasonable value for the post-petition services they provided.

Critically, under Section 503(b)(1), any claim that the Respondents' have for the "reasonable value" of their post-petition services cannot exceed the "actual" and "necessary" expense of securing those post-petition services. See 11 U.S.C. § 503(b)(1).  Here, the Claims are not actual and necessary expenses and thus cannot be included in determining the reasonable value of the Respondents' services.

First, "actual" means "existing in fact, real, [or] current."[6]  Here, as discussed below, the Claims did not actually accrue and were not actually earned on each day the

---

[6]   Eugene Ehrlich, et al., OXFORD AMERICAN DICTIONARY 8 (1980).

11

Respondents worked post-petition and, thus, the Claims were not actual expenses of the estates.

Second, "necessary" means "essential in order to achieve something [or] unavoidable, happening or existing by necessity."[7]  The Debtors' honoring of the Awards or payment of severance was, however, not "necessary," "essential" or "required" to induce the Respondents to remain post-petition. Instead, the Debtors paid the Respondents, and the Respondents agreed to stay in exchange for, their Court-approved compensation, comprised of their post-petition wages, salaries and benefits.  Moreover, all of the Respondents received any unpaid pre-petition wages, salary and benefits pursuant to the Wage Order,[8] prior to confirmation of a reorganization plan.  Furthermore, despite being terminated post-petition, all, or nearly all, of the Respondents received payments under the WARN Act for the 60 days following their termination.  And finally, many of the Respondents also received or were eligible to receive bonuses and compensation under the Management Incentive

---

[7]   Eugene Ehrlich, et al., OXFORD AMERICAN DICTIONARY 444 (1980).

[8]   Order Pursuant to Bankruptcy Code Section 105(a), 363, 507(a), 541, 1107(a) and 1108 and Bankruptcy Rules 6003 Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits (D.I. 80, the "Wage Order").

Plan.[9]  Thus, the Claims are not necessary expenses of the

estates.  Indeed, each Respondent has already received those

amounts that were actual and necessary expenses of retaining

such Respondent post-petition.

Moreover, neither the Awards nor the severance

payments under the Employment Agreements were part of the

Respondents' compensation for their post-petition services.

Under the terms of the Pre-Petition Agreements, the Awards

and severance payments did not accrue on a daily basis, as

the Respondents worked.  To the contrary, with respect to

the Awards, the full amounts of the Awards were granted pre-

petition on the date specified in each Award Program,

contingent upon vesting under the terms of such Program.  In

the event that a Respondent terminated his or her employment

for any reason at any point before the vesting date, such

Respondent would have no right to payment of any portion of

his or her Award, notwithstanding the services Respondent

provided until termination.  Similarly, with respect to the

severance payments, such payments were granted pre-petition

---

[9]    The names of those Respondents have not been set forth because their
names were filed provided under seal with respect to the hearing on
the Management Incentive Plan; however, the Debtors will provide the
names to the Court at the hearing, if the Court determines that the
identify of such Respondents is necessary for its ruling.

on the date the Employment Agreement was executed,
contingent upon the Respondent's involuntary termination
without cause or on account of a change in control.  The
amount of time the Respondent remained with the Debtors had
no impact on the amount of the severance payment.

Under similar circumstances, in FBI Distribution
Corp., the court held that severance payments provided by
employment agreement would not be considered in determining
reasonable value of employee's services because, "[u]nlike
severance or vacation benefits geared to length of service -
benefits that clearly constitute a part of an employee's
wages for services rendered - the severance benefits here do
not constitute any part of [employee's] compensation for
services rendered.  Whether she worked two minutes or
thirty-five and one-half months after executing the
Employment Agreement, [employee] was entitled to [her
severance payment] if she were terminated without cause."
FBI Distrib. Corp., 330 F.3d at 46-47.  Thus, "[the
employee's] compensation for services rendered simply did
not include severance pay."  Id.  Likewise, here, because
neither the Awards nor the severance payments were earned by
the Respondents' daily services, it follows that these

amounts should not be considered in determining the reasonable value of Respondents' services.

Consequently, to the extent that the Court determines that an inquiry as to "reasonable value" is required, the fact of the matter is that the Respondents have already received reasonable value for their post-petition services.

## II.    THE RESPONDENTS WERE NOT INDUCED TO REMAIN WITH THE DEBTORS POST-PETITION BY THE PRE-PETITION AWARD PROGRAMS AND EMPLOYMENT AGREEMENTS.

As discussed in the Objection and the Reply, an administrative expense claim must satisfy certain requirements.  Objection at 23; Reply at 12.  In particular, "(1) the claim must arise out of a post-petition transaction between the creditor and the debtor-in-possession (or trustee) and (2) the consideration supporting the claimant's right to payment must be supplied to and beneficial to the debtor-in-possession in the operation of the business." Devan v. Simon DeBartolo Group, L.P. (In re Merry-Go-Round Enters., Inc.), 180 F.3d 149, 157 (4th Cir. 1999) (quoting Stewart Foods, 64 F.3d at 145 n.2).  "This test is, of course, essentially an effort to determine whether the underlying statutory purpose will be furthered by granting priority to the claim in question."  Jartran, 732 F.2d at

15

587.   The statutory purpose of section 503(b)(1) is, in turn, to encourage third parties to provide goods and services to the debtor in possession by granting priority "[w]hen third parties are induced to supply goods or services to the debtor-in-possession. . . ." Id. at 586 (quoting Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976)).

Thus, "[t]o serve the policy of the priority, inducement of the creditor's performance by the debtor-in-possession is crucial to a claim for administrative priority in the context of the furnishing of goods or services to the debtor." Id. (citing Mammoth Mart, 536 F.2d at 954) (emphasis in original); see also Old Carco, 2010 WL 22426, at *5 ("Considering inducement by the debtor-in-possession to be a crucial element comports with the policy reason for allowing the priority, which is to encourage third parties to supply the debtor-in-possession with goods and services with the goal of achieving a reorganization to benefit all creditors."); In re Larsen, 80 B.R. 784, 788 (Bankr. E.D. Va. 1987) (citing Jartran for proposition that the inducement by the debtor in possession is a crucial requirement for an administrative expense).

While the Debtors do not deny that they received a benefit from the Respondents' services post-petition, "benefit to the debtor-in-possession alone, without its having induced the performance, is not sufficient to warrant entitlement to an administrative claim priority, as it would contradict th[e] policy reason for allowing the priority." Old Carco, 2010 WL 22426, at *5.[10]

In particular, with respect to the Claims, all of the inducement – in the form of the Pre-Petition Agreements - was provided pre-petition.  In other words, both the Debtors' and the Respondents' commitments were established pre-petition upon execution of the Pre-Petition Agreements. See In re D.M. Kaye & Sons Transport, Inc., 259 B.R. 114, 120 (Bankr. D.S.C. 2001) (finding that "the key to the allowance of an administrative expense . . . is an inducement to a third party by a debtor-in-possession, followed by consideration from the third party to the debtor-in-possession.  If the commitments of the parties

---

[10] But see Phones for All, 249 B.R. at 430 (finding no benefit to estate where employee was paid his wages in full for his post-petition services and the evidence suggested that the debtor did not induce the employee to continue working post-petition by offering severance pay but rather that the severance was offered as an inducement for the employee to commence employment, such that "the debtor had already received the benefit derived by the severance compensation when [the employee] commenced his employment, which was pre-petition").

arose prepetition, there is no administrative expense
payable from the bankruptcy estate." (citation omitted)).
Under the Pre-Petition Agreements, the Respondents became
eligible for the Awards or the severance payments, as the
case may be, immediately upon signing the Agreements.  See M
Group, 268 B.R. at 901.  After the Petition Date, the
Debtors, now debtors in possession, provided no further
inducement with respect to the Pre-Petition Agreements.

        Indeed, the Debtors specifically stated on the
Petition Date that they were not seeking authorization to
continue the Award Programs.  Employee Practices Motion at
38 ("[T]he Debtors have in place a number of other policies
and programs, including . . . certain additional short-term
and long-term incentive plans . . . .  The Debtors are []
not seeking authorization at this time to continue such
programs in the ordinary course.").  Instead, the Debtors
requested authorization in the Employee Practices Motion to
continue certain other employee practices, including payment
of wages and salaries and certain other performance-based
bonuses, accrual under the Debtors' paid time off policy,
reimbursement of expenses and provision of certain employee
benefits.  See Employee Practices Motion.  Moreover, post-
petition, the Debtors sought and obtained approval of the

18

Management Incentive Plan for certain key employees,
including certain of the Respondents.  <u>See</u> Management
Incentive Plan Order.

Thus, to the extent any inducement was provided to
the Respondents to encourage them to provide services to the
Debtors post-petition, that inducement was provided not by
the Pre-Petition Agreements but by the wages, salaries and
employee benefits approved by the Employee Practices Motion
and, where applicable, bonuses under the post-petition
Management Incentive Plan, all of which have been paid to
the Respondents.

Consequently, because the Debtors did not provide
any post-petition inducement to the Respondents with respect
to the Pre-Petition Agreements, the Claims are not entitled
to administrative expense status.

**III. THE CLAIMS ARE PRE-PETITION CLAIMS REGARDLESS OF
      WHETHER THE PRE-PETITION AGREEMENTS ARE EXECUTORY.**

At the Hearing, certain of the Respondents
challenged the Debtors' assertion that the Pre-Petition
Agreements were executory contracts.  Transcript of March 8,
2010 Hearing[11] at 58.  However, as counsel for the Debtors

---

[11]  A true and correct copy of the Transcript of the March 8, 2010 Hearing
      is attached hereto as <u>Exhibit B</u>.

stated at the Hearing, Transcript at 77-78, 80-82, and as demonstrated below, even if the Court determines that the Pre-Petition Agreements are not executory contracts, the Claims are pre-petition claims.

Whether or not the Pre-Petition Agreements were executory contracts, it is beyond dispute that such Agreements were pre-petition agreements.  On the Petition Date, the Debtors had an obligation under the terms of the Pre-Petition Agreements to pay certain amounts, which obligation was contingent upon the occurrence of certain vesting events.[12]  Under these circumstances, "regardless of the nature of the contract, [where] at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings." Stewart Foods, 64 F.3d at 145. This conclusion accords with, and indeed is dictated by, the Fourth Circuit's conduct test as well.

---

[12]  In addition, for certain of the Award Programs, payment was contingent upon the satisfaction of certain company and individual performance criteria.  The Debtors reserve all rights to object to the Claims on any additional grounds, including, but not limited to, whether the vesting conditions or the performance criteria were satisfied and the enforceability of any obligation under the Pre-Petition Agreements.

Indeed, it is well established that the breach of a pre-petition agreement gives rise to a pre-petition unsecured claim.  See, e.g., FBI Distrib. Corp., 330 F.3d at 43 (holding that claim arising from prepetition nonexecutory retention agreement, was a prepetition claim); In re Waste Systems Int'l, Inc., 280 B.R. 824, 827 (Bankr. D. Del. 2002) ("Since the Consulting Agreement is a pre-petition non-executory contract, any claims arising from it are general unsecured claims.").

Thus, even if this Court determines that the Pre-Petition Agreements were not executory contracts, those Agreements were executed pre-petition and any breach thereof results in a pre-petition general unsecured claim.[13]

Accordingly, the Debtors request that the Court reclassify the Claims in their entirety to pre-petition general unsecured claims and disallow such Claims as late-filed and duplicative.

---

[13]  As discussed in the Reply, if the Pre-Petition Agreements were executory contracts, such contracts have been or will be rejected and, thus, any claim thereunder is a pre-petition rejection damages claim. Reply at 17-19.

## CONCLUSION

For the reasons set forth in the Objection, the Reply and herein, the Debtors respectfully request that this Court disallow the Claims.

Dated: Richmond, Virginia
       March 18, 2010

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Chris L. Dickerson, Esq.
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

- and -

MCGUIREWOODS LLP

/s/ Douglas M. Foley      .
Dion W. Hayes (VSB No. 34304)
Douglas M. Foley (VSB No. 34364)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and Debtors in Possession

# Exhibit A

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161
**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.
In re OLD CARCO LLC, f/k/a Chrysler LLC, et al.,
Debtors.
**No. 09 B 50002(AJG).**

Jan. 5, 2010.

**Background:** Automobile dealer whose dealership agreement with debtor had been terminated asserted administrative expense claim.

**Holdings:** The Bankruptcy Court, Arthur J. Gonzalez, J., held that:
(1) automobile dealer which, by terminating its dealer agreement with automobile manufacturer prepetition, relieved manufacturer of any obligation for rejection damages had the contract instead been rejected in manufacturer's Chapter 11 case, and which, by continuing to sell motor vehicles included in its inventory after dealer agreement was terminated, thereby reduced its claims against debtor-manufacturer for fulfillment of its contractual repurchase obligations, was not entitled to administrative expense claim based on these alleged benefits to estate;
(2) debtor did not "induce" any postpetition performance on part of dealer, as required to support administrative expense claim; and
(3) dealer was not entitled to administrative expense priority, even in absence of showing of any actual benefit to the estate, under so-called *Reading* exception to administrative expense requirements.

So ordered.

West Headnotes

**[1] Bankruptcy 51 ☞2872**

51 Bankruptcy
    51VII Claims

51VII(C) Administrative Claims
    51k2872 k. Reorganization Cases. Most Cited Cases

**Bankruptcy 51 ☞2951**

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2951 k. In General. Most Cited Cases
Expenses incurred by debtor-in-possession during its reorganization effort are afforded a first-level priority as administrative expenses, on theory that operation of business by debtor-in-possession benefits prepetition creditors, such that any claims which result from that operation are entitled to payment prior to payment to creditors for whose benefit the continued operation of business was allowed. 11 U.S.C.A. §§ 503(b)(1)(A), 507(a)(1).

**[2] Bankruptcy 51 ☞2872**

51 Bankruptcy
    51VII Claims
        51VII(C) Administrative Claims
            51k2872 k. Reorganization Cases. Most Cited Cases

**Bankruptcy 51 ☞2951**

51 Bankruptcy
    51VII Claims
        51VII(F) Priorities
            51k2951 k. In General. Most Cited Cases
Administrative expenses are afforded first-level priority to facilitate debtor's reorganization effort by encouraging third parties, who might otherwise be reluctant to deal with debtor-in-possession, to transact such business. 11 U.S.C.A. §§ 503(b), 507(a)(1).

**[3] Bankruptcy 51 ☞2951**

51 Bankruptcy
    51VII Claims

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161

**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

51VII(F) Priorities

    51k2951 k. In General. Most Cited Cases

Statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed in light of the bankruptcy goal of providing equal distribution of debtor's assets to all creditors. 11 U.S.C.A. §§ 503(b), 507(a)(1).

**[4] Bankruptcy 51 ⚷2872**

51 Bankruptcy

    51VII Claims

        51VII(C) Administrative Claims

            51k2872 k. Reorganization Cases. Most Cited Cases

Ordinarily, claim will be accorded administrative expense status (1) only if it arises out of transaction between creditor and bankruptcy trustee or debtor-in-possession; and (2) only to extent that consideration supporting claimant's right to payment was both supplied to and beneficial to debtor-in-possession in operation of its business. 11 U.S.C.A. §§ 503(b), 507(a)(1).

**[5] Bankruptcy 51 ⚷2873**

51 Bankruptcy

    51VII Claims

        51VII(C) Administrative Claims

            51k2873 k. Time of Accrual; Prepetition Claims. Most Cited Cases

To support administrative expense claim, the services performed by claimant must have been induced by debtor-in-possession, not the prepetition debtor. 11 U.S.C.A. §§ 503(b), 507(a)(1).

**[6] Bankruptcy 51 ⚷2872**

51 Bankruptcy

    51VII Claims

        51VII(C) Administrative Claims

            51k2872 k. Reorganization Cases. Most Cited Cases

Benefit to debtor-in-possession alone, without its having induced claimant's performance, is not sufficient to warrant entitlement to administrative expense priority, as this would contradict the policy reason for allowing this priority, i.e., to encourage third parties to supply debtor-in-possession with goods and services with goal of achieving a reorganization to benefit all creditors. 11 U.S.C.A. §§ 503(b), 507(a)(1).

**[7] Bankruptcy 51 ⚷2873**

51 Bankruptcy

    51VII Claims

        51VII(C) Administrative Claims

            51k2873 k. Time of Accrual; Prepetition Claims. Most Cited Cases

**Bankruptcy 51 ⚷3101**

51 Bankruptcy

    51IX Administration

        51IX(C) Debtor's Contracts and Leases

            51k3101 k. In General. Most Cited Cases

When debtor-in-possession elects to continue to receive benefits from other party to executory contract pending decision to assume or reject contract, debtor-in-possession is obligated to pay for reasonable value of those services, and claims of third parties who have been induced to supply goods or services to debtor-in-possession pursuant to contract that has not been rejected are afforded administrative priority to extent that consideration supporting the claim was supplied during reorganization. 11 U.S.C.A. §§ 503(b), 507(a)(1).

**[8] Bankruptcy 51 ⚷2926**

51 Bankruptcy

    51VII Claims

        51VII(E) Determination

            51k2925 Evidence

                51k2926 k. Presumptions and Burden of Proof. Most Cited Cases

Claimant has burden of establishing its entitlement to administrative expense priority. 11 U.S.C.A. §§ 503(b), 507(a)(1).

**[9] Bankruptcy 51 ⚷2873**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161
(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))

51 Bankruptcy
 51VII Claims
  51VII(C) Administrative Claims
   51k2873 k. Time of Accrual; Prepetition Claims. Most Cited Cases

Mere fact that right to payment arises postpetition does not mean that party possessing that right is entitled to priority as administrative expense claimant. 11 U.S.C.A. §§ 503(b), 507(a)(1).

[10] Bankruptcy 51 ⟿2873

51 Bankruptcy
 51VII Claims
  51VII(C) Administrative Claims
   51k2873 k. Time of Accrual; Prepetition Claims. Most Cited Cases

Claim is not payable on priority basis as administrative expense, even though right to payment arises postpetition, when there was prepetition contract or lease between debtor and claimant, and the consideration supporting the claim was supplied prepetition. 11 U.S.C.A. §§ 503(b), 507(a)(1).

[11] Bankruptcy 51 ⟿2872

51 Bankruptcy
 51VII Claims
  51VII(C) Administrative Claims
   51k2872 k. Reorganization Cases. Most Cited Cases

Automobile dealer which, by terminating its dealer agreement with automobile manufacturer prepetition, relieved manufacturer of any obligation for rejection damages had the contract instead been rejected in manufacturer's Chapter 11 case, and which, by continuing to sell motor vehicles included in its inventory after dealer agreement was terminated, thereby reduced its claims against debtor-manufacturer for fulfillment of its contractual repurchase obligations, was not entitled to administrative expense claim based on these alleged benefits to the estate; dealer had obligation to continue to sell inventory to mitigate its damages against estate, and dealer itself benefited from any such sales, as it received payment in amount of sales price of

vehicles, nor was any meaningful benefit conferred on estate as result of elimination of obligation to reject contract. 11 U.S.C.A. §§ 503(b), 507(a)(1).

[12] Bankruptcy 51 ⟿2873

51 Bankruptcy
 51VII Claims
  51VII(C) Administrative Claims
   51k2873 k. Time of Accrual; Prepetition Claims. Most Cited Cases

When bankrupt automobile manufacturer required its dealer, following termination of prepetition dealer agreement between parties, to provide detail regarding the inventory subject to debtor's repurchase obligation, it was merely referencing the fact that any claim for damages under contract would normally need to be substantiated with relevant details, and did not "induce" any postpetition performance on part of dealer, as required to support administrative expense claim. 11 U.S.C.A. §§ 503(b), 507(a)(1).

[13] Bankruptcy 51 ⟿2872

51 Bankruptcy
 51VII Claims
  51VII(C) Administrative Claims
   51k2872 k. Reorganization Cases. Most Cited Cases

Dealer's claims against Chapter 11 debtor/car manufacturer, stemming from termination of dealer agreement between parties prepetition and debtor's alleged obligation to repurchase vehicles included in dealer's inventory, was not entitled to administrative expense priority even in absence of showing of any actual benefit to the estate under so-called *Reading* exception to requirements generally applicable to any creditor seeking to assert administrative expense claim, where state automobile dealership laws on which dealer relied in asserting a *Reading*-type administrative expense claim were concerned primarily with commercial and economic regulation, as opposed to protecting health and safety of general public, there was no allegation of any imminent and identifiable hazard, and not re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161

**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

quiring debtors to abide by these laws did not give them unfair advantage over competing businesses, since debtors' Chapter 11 cases were liquidating Chapter 11 cases. 11 U.S.C.A. §§ 503(b), 507(a)(1); 28 U.S.C.A. § 959(b).

Hughes, Watters, Askanase, L.L.P. by Wayne Kitchens, Esq., Heather McIntyre, Esq., Houston, TX, for Ramirez Chrysler Jeep Dodge, Inc.

Jones Day, by Corinne Ball, Esq., New York, NY, and Jeffrey B. Ellman, Esq., Atlanta, GA, for the Debtors.

OPINION DENYING MOTION OF RAMIREZ CHRYSLER JEEP DODGE, INC. FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES PURSUANT TO 11 U.S.C. §§ 503(b)(1) AND 507(a)(2)

ARTHUR J. GONZALEZ, Bankruptcy Judge.

**\*1** Before the Court is a motion seeking administrative expense priority for damages sustained by an automobile dealer as a result of the voluntary termination by the dealer of its sales and service agreements with the automobile manufacturer.

The Court concludes that any claim for damages sustained by the dealer stems from the applicable pre-petition executory contracts. Therefore, any such claim is a pre-petition general unsecured claim not entitled to administrative expense priority.

*FACTS*

On April 30, 2009, Old Carco LLC f/k/a Chrysler LLC and 24 of its domestic direct and indirect subsidiaries, including Old Carco Motors LLC f/k/a Chrysler Motors LLC ("Chrysler Motors") [FN1] (collectively, the "Debtors") filed for protection under title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are being jointly administered for procedural purposes, pursuant to Rule 1015(a) of the Federal Rules of Bankruptcy Procedure. On May 5, 2009, an Official

Committee of Unsecured Creditors (the "Creditors' Committee") was formed.

On June 1, 2009, an order was entered, pursuant to section 363 of the Bankruptcy Code, granting the Debtors' motion to approve the sale of substantially all of the Debtors' operating assets. Thereafter, on June 9, 2009, an order was entered authorizing the Debtors, pursuant to sections 105 and 365 of the Bankruptcy Code, to reject executory contracts and unexpired leases, including 789 sales and service agreements with domestic car dealerships. The sales and servicing agreements at issue in the instant matter were not included among the 789 rejected agreements. On June 10, 2009, the sale of the Debtors' assets closed.

Prior to the filing by the Debtors for bankruptcy protection, Ramirez Chrysler Jeep Dodge, Inc. (the "Dealer") operated as a dealer for each of the Debtors' three separate lines of automobiles. In 2002, the Dealer entered into separate sales and servicing agreements (the "Dealer Agreements") [FN2] with Chrysler Motors for each of those lines of automobiles. Paragraph 28(a) of each of the separate Dealer Agreements provided that the Dealer could "terminate this Agreement on not less than 30 days written notice." Each Dealer Agreement also provided that, for certain delineated reasons, Chrysler Motors could terminate the Dealer Agreement on 60 days' notice. Although Chrysler Motor's right to terminate was limited to certain situations, the Dealer's right to terminate was not restricted, other than with respect to the requirement that it provide at least 30 days' notice. The Dealer Agreements also provided that within ninety days of any effective termination under paragraph 28 of the applicable Dealer Agreement, Chrysler Motors would buy, and the dealer would sell, among other things, vehicle inventory and automobile parts, signs, tools, and equipment (the "Repurchase Obligations").

On March 31, 2009, the Dealer sent a Notice of Termination of Dealer Sales and Service Agreement by Ramirez Chrysler Jeep Dodge, Inc. (the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161
**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

"Termination Notice"). In the Termination Notice, the Dealer expressly referenced its claim based upon Chrysler Motor's Repurchase Obligations.

**\*2** In response to the Termination Notice, Chrysler Motors sent a letter, dated May 4, 2009, to the Dealer acknowledging the termination and stating that such termination was "effective April 30, 2009." In the letter, Chrysler Motors also acknowledged that the termination imposed certain Repurchase Obligations upon it. In addition, Chrysler Motors sought certain details concerning the vehicles subject to the Repurchase Obligations. The Dealer replied by sending an e-mail, dated May 15, 2009, with a chart attached providing information concerning the vehicles. FN3

On August 27, 2009, the Dealer filed a motion in these bankruptcy cases seeking administrative expense priority, pursuant to sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, for its claim for $1,310,060 allegedly arising from the Repurchase Obligations. The Debtors oppose the Dealer's motion. A hearing on this matter was held before the Court on October 22, 2009.

*Parties' Contentions*

The Dealer argues that it is entitled to an administrative expense priority for its claim arising from the termination of the Dealer Agreements and the resulting Repurchase Obligations imposed on Chrysler Motors by the Dealer Agreements. Initially, the Dealer asserted that the claim was entitled to priority under traditional administrative expense priority standards, arguing that the Dealer bestowed a benefit upon the estates. First, the Dealer alleged that it conferred a benefit upon the estates by voluntarily terminating the Dealer Agreements and sparing the estates the cost of having to reject the Dealer Agreements in the Debtors' administration of those estates. In addition, the Dealer argued that the estates received a separate benefit because the Dealer worked diligently to continue to sell inventory to reduce the Debtors' Repurchase Obliga-

tions. The Dealer also argued that the vehicles were property of the Debtors' estates, which estates were benefitted when the Dealer preserved such property.

Subsequently, the Dealer asserted that its claim is entitled to administrative priority pursuant to either (i) 28 U.S.C. § 959(b), which requires a trustee or debtor-in-possession to manage or operate its business in compliance with state law, or (ii) a line of cases that accord administrative priority to certain obligations incident to the operation of a debtor's business. In support of this argument the Dealer argues that because the state in which the dealership is located has enacted a comprehensive regulatory scheme (the "Dealer Law") pursuant to its police powers, which scheme was intended to address the disparity in bargaining power between automobile manufacturers and dealers, and because 28 U.S.C. § 959(b) requires a debtor to operate its business in accordance with the requirements of state law, the Debtors were required to operate their business in accordance with the Dealer Law. In addition, the Dealer cites a line of cases that hold that actual and necessary costs warranting administrative priority include costs ordinarily incident to the operation of a business. The Dealer asserts that it is ordinarily incident to an automobile manufacturer's business to comply with state dealer laws.

**\*3** The Debtors argue that the origin of the Repurchase Obligation claim is the parties' entry into the Dealer Agreements in 2002. The Debtors assert that the terms of the Dealer Agreements provided for the Repurchase Obligations to occur upon the subsequent termination of such agreements. The Debtors contend that when a debtor-in-possession has post-petition termination obligations under a prepetition contract or lease, such obligations are generally found to be pre-petition obligations even if the right to payment arises post-petition. As such, the Debtors assert that the claim is a pre-petition claim, which is accorded general unsecured status.

The Debtors further argue that even if the Repurchase Obligations were deemed to have arisen upon

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161
**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

termination, that termination occurred pre-petition. According to the Debtors, even if the termination date itself is relevant, such date occurred either on March 30, 2009, when the Dealer sent the Termination Notice, or on April 29, 2009, when the 30 day period after the notice lapsed, or at the latest, April 30, 2009, the date that Chrysler Motors-in its May 4, 2009 letter-acknowledged as the termination date. Inasmuch as the Debtors filed for bankruptcy in the afternoon of April 30, 2009, the Debtors assert that all of those periods occurred pre-petition.

In addition, the Debtors assert that the inventory at issue is not property of the estates as evidenced by the repurchase requirements contained in the Dealer Agreements. The Debtors assert that if the Debtors owned the property, there would not be a requirement for them to "repurchase" such property. Moreover, the Debtors observe that if the property were the Debtors' property as asserted by the Dealer, the Dealer's exercise of control over such property would have violated the automatic stay imposed by section 362 of the Bankruptcy Code. The Debtors also assert that, in the context of their having rejected 789 contracts, any incremental cost associated with addressing the rejection of these few additional leases would have been nominal.

The Debtors contend that the claim does not warrant administrative priority status under either (i) the traditional criteria for administrative priority, (ii) application of 28 U.S.C. § 959(b), or (iii) any case law exceptions to the traditional administrative expense priority standard that allow administrative priority.

The Debtors maintain that 28 U.S.C. § 959(b) only applies to an ongoing business, as does the line of cases concerned with costs ordinarily incident to the operation of a business. The Debtors assert that from the start of these bankruptcy cases, it was clear that the Debtors were ceasing business operations in anticipation of selling their operating assets. The Debtors note that from the commencement of the cases, the Debtors' intent was to liquidate the assets and make a distribution to creditors.

At or prior to the commencement of the cases, the Debtors idled most operations pending the sale of the Debtors' assets to the purchaser. The Debtors ceased all manufacturing operations and only held the business enterprise intact until a sale of the assets could be concluded.

**\*4** In addition, the Debtors argue that the Dealer's claim only seeks to effectuate its private economic interests and rights under the Dealer Law, not any interest the state may have in protecting public health and safety, and especially not any interest in avoiding an imminent threat to public health and safety.

*DISCUSSION*

*Administrative Expense Priority*

*Traditional Criteria*

[1] Section 503(b)(1)(A) of the Bankruptcy Code provides a priority for "the actual, necessary costs and expenses of preserving the estate ... for services rendered after the commencement of the case." Pursuant to section 507(a)(1) of the Bankruptcy Code, these expenses for administering the estate are afforded a first priority. Thus, expenses incurred by the debtor-in-possession during the reorganization effort are afforded a first priority. *See In re Jartran, 732 F.2d 584, 586 (7th Cir.1984)*

This priority is based upon the premise that the operation of the business by a debtor-in-possession benefits pre-petition creditors; therefore, any claims that result from that operation are entitled to payment prior to payment to "creditors for whose benefit the continued operation of the business was allowed." *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir.1976)*. Although *Mammoth Mart* was decided under the former Bankruptcy Act, its analysis remains applicable under the Bankruptcy Code. *See*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161

**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

*In re Drexel Burnham Lambert Group Inc.,* 134 B.R. 482, 489 (Bankr.S.D.N.Y.1991).

[2] Administrative expenses are afforded this priority to facilitate the reorganization effort by encouraging third parties, who might otherwise be reluctant to deal with a debtor-in-possession, to transact such business. *See Amalgamated Ins. Fund v. McFarlin's Inc.,* 789 F.2d 98, 101 (2d Cir.1986) (citing *Mammoth Mart,* 536 F.2d at 954). Absent this incentive, third parties would refrain from dealing with the debtor-in-possession, thereby inhibiting the reorganization effort and harming pre-petition creditors. *Id.*

[3] Nevertheless, in light of the bankruptcy goal of providing equal distribution of a debtor's assets to all creditors, "statutory priorities, such as those resulting from administrative expense treatment, are narrowly construed." *Ames,* 306 B.R. at 54 (citing *Amalgamated Ins. Fund,* 789 F.2d at 101). Strictly construing the terms "actual" and "necessary" minimizes administrative expense claims, thereby preserving the estate for the benefit of all creditors. *See Drexel,* 134 B.R. at 488. If claims not intended to have priority were afforded such, the value of the priority for those creditors Congress intended to prefer would be diluted. *See Mammoth Mart,* 536 F.2d at 953. It is important to note that any dispute between a provider of goods or services and the solvent recipient for such goods or services based upon an ordinary contract becomes, once the recipient becomes a debtor in bankruptcy, a contest among the debtor's creditors to share in the distribution of the debtor's assets. *See General American Transportation Corp. v. Martin ( In re Mid Region Petroleum, Inc.),* 1 F.3d 1130, 1133 (10th Cir.1993). Any priority given to one creditor is effected to the detriment of other creditors. *See In re Patient Education Media, Inc.,* 221 B.R. 97, 101 (Bankr.S.D.N.Y.1998).

**\*5** [4] Ordinarily, an expense will be accorded administrative status

1) if it arises out of a transaction between the cred-

itor and the bankrupt's trustee or debtor-in-possession; and

2) only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business.

*Amalgamated Ins. Fund,* 789 F.2 at 101; *see also Mammoth Mart,* 536 F.2d at 954.

[5][6] The services performed by the claimant must have been "induced" by the debtor-in-possession, not the pre-petition debtor. *See Jartran, Inc.,* 732 F.2d at 587 (citing *Mammoth Mart,* 536 F.2d at 587). Considering inducement by the debtor-in-possession to be a crucial element comports with the policy reason for allowing the priority, which is to encourage third parties to supply the debtor-in-possession with goods and services with the goal of achieving a reorganization to benefit all creditors. *See Jartran Inc.,* 732 F.2d at 588, 590. Thus, benefit to the debtor-in-possession alone, without its having induced the performance, is not sufficient to warrant entitlement to an administrative claim priority, as it would contradict this policy reason for allowing the priority. *See Jartran, Inc.,* 732 F.2d at 590.

[7][8] Where a "debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." *Patient Education Media,* 221 B.R. at 101 (quoting *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984)); *see also In re Continental Airlines, Inc.,* 146 B.R. 520, 526 (Bankr.D.De.1992). Therefore, the claims of third parties who are induced to supply goods or services to a debtor-in-possession pursuant to a contract that has not been rejected are afforded administrative priority to the extent that the consideration supporting the claim was supplied during the reorganization. *See Jartran, Inc.,* 732 F.2d at 588. The claimant has the burden of estab-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161
**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

lishing entitlement to the priority. *See Drexel,* 134 B.R. at 489.

[9][10]  Priority, however, is not afforded a claim merely because the right to payment arises post-petition. *See Amalgamated Ins. Fund,* 789 B.R. at 101. Thus, where there is a pre-petition contract or lease, and the consideration supporting the claim is supplied pre-petition, court have determined that those claims are not entitled to administrative priority, even if the right to payment arises post-petition. *See Amalgamated Ins. Fund,* 789 B.R. at 101-104 (holding that a required lump sum payment, imposed as liability to withdraw from a multi-employer pension fund, is not entitled to administrative priority even where the payment was due post-petition because the consideration supporting the withdrawal liability is the past (pre-petition) labor of the covered employee).

### The Reading Line of Cases

**\*6** An exception to the requirement that there be an actual benefit to the estate before a claim can be accorded administrative priority has developed in the context of torts committed by the trustee or debtor-in-possession during the course of a chapter 11 proceeding. *See In re Puerto Rican Food Corp.,* 41 B.R. 565, 572-73 (Bankr.E.D.N.Y.1984) (citing *Reading Co. v. Brown,* 391 U.S. 471, 482, 88 S.Ct. 1759, 1765, 20 L.Ed.2d 751 (1968)) (other citations omitted).

In *Reading,* which concerned an arrangement under Chapter XI of the Bankruptcy Act, the Supreme Court reasoned that if a party were injured by negligence in the operation of an "insolvent business thrust upon it by operation of law," it was "fairer" to compensate the injured party upon whom the arrangement had been imposed before compensating those for whose benefit the arrangement was being effected. *See Reading,* 391 U.S. at 478-79, 88 S.Ct. at 1763-64. Thus, the Supreme Court held that a tort arising during the arrangement is treated as an "actual and necessary expense[ ]" of the estate. *Id.*

at 482, 88 S.Ct. at 1765. The concept has since been applied in chapter 11 reorganization cases under the Bankruptcy Code. *See Puerto Rico Food Corp.,* 41 B.R. at 572-73 (citing cases). The justification is that it is "more natural and just" to compensate those who were injured by the operation of the business during the reorganization effort ahead of those for whose benefit the business was allowed to continue to operate. *Reading,* 391 U.S. at 482, 88 S.Ct. at 1765. Thus, "costs ordinarily incident to operation of a business" can be afforded administrative priority. *Reading Co.,* 391 U.S. at 483, 88 S.Ct. at 1766.

In *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.),* 755 F.2d 200, 202-03 (1st Cir.1985), the fairness rationale of *Reading* was extended to a debtor-in-possession's intentional act that violated the law, where the estate's actions injured innocent parties. In *Charlesbank Laundry,* a temporary injunction was issued that enjoined the operation of a laundry in violation of a zoning ordinance, which operation would create a public nuisance. *Id.* at 201. The *Charlesbank Laundry* court granted administrative expense priority to a compensatory civil fine that was levied because of the debtor-in-possession's violation of the temporary injunction. *Id.* at 202-03. The *Charlesbank Laundry* court noted that

[i]f fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, the *a fortiori,* an intentional act which violates the laws and damages others should be so treated.

*Id.* at 203.

In addition, courts have accorded administrative priority to certain claims to further the goal of environmental protection. *See Alabama Surface Mining. Comm. v. C. Michael Stilson (In re N .P. Mining Co., Inc.)* 963 F.2d 1449, 1457-59 (11th Cir.1992) (discussing cases). In that regard, a trustee's effort "to marshall and distribute" estate assets is subject to the governmental interest in public

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161
**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

health and safety. *Id.* at 1457 (citing *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 501-02, 106 S.Ct. 755, 759-60, 88 L.Ed.2d 859 (1986)). Thus, administrative priority has been accorded for the post-petition costs incurred for prompt cleanup of health hazards. *Id.* (citing *Lancaster v. Tennessee ( In re Wall Tube & Metal Prods. Co.),* 831 F.2d 118, 123 (6th Cir.1987)). Allowing an administrative priority for a state's clean-up costs associated with an ongoing health hazard was deemed necessary to ensure that the bankruptcy estate complied with state law and "to protect the health and safety of a potentially endangered public." *Id.* at 1457-58 (citing *Wall Tube,* 831 F.2d at 124).

### 28 U.S.C. § 959(b)

**\*7** There is a federal policy concern with ensuring compliance by trustees with state law, and 28 U.S.C. § 959(b) provides, in relevant part, that

[A] trustee ... appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee ... according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor would be bound to do if in possession thereof.

The *N.P. Mining* case concerned the strip-mining business, which is highly regulated due to environmental concerns that affect public health and safety. The *N.P. Mining* court noted that because an entity operating a business similar to that of the debtor's outside of bankruptcy would be required to pay fines for failure to abate violations of environmental laws, "the policy of section 959(b) that state law govern the actions of a trustee mandates that [such] fines be paid" by an entity operating under bankruptcy protection. *See N.P. Mining,* 963 F.2d at 1458. Thus, "[w]hen a trustee or debtor-in-possession operates a bankruptcy estate, compliance with state law should be considered an admin-

istrative expense." *Id.* The policy is enforced to preclude affording a bankruptcy estate "an unfair advantage over non-bankrupt competitors." *Id.*

Several courts have concluded that 28 U.S.C. § 959(b) does not apply when a business is not operating and its assets are being liquidated. *See N.P. Mining,* 963 F.2d at 1460 (citing cases). Indeed, the plain language of section 959(b) provides that a trustee or debtor-in-possession *"shall manage and operate the property* " in compliance with state law. Moreover, the focus of section 959(b) is preventing an unfair advantage for businesses under the protection of bankruptcy as against their non-bankrupt competitors. *Id.* at 1458. Thus, the *N.P. Mining* court concluded that once a trustee or debtor-in-possession ceases business operations, section 959(b) does not apply. *Id.* at 1460. Moreover, the *N.P. Mining* court also concluded that once business operations ceased, the language employed in *Reading* no longer applied. *Id.* Thus, once a trustee is not "operating" the estate,

neither the policy of 28 U.S.C. § 959(b) that a trustee "manage and operate a property" in compliance with state law nor the language of *Reading* that "costs incident to operation of a business" is implicated.

*Id.*

In *N.P. Mining,* while the trustee had ceased all mining operations, the trustee continued to administer a coal-brokering contract. *Id.* Nevertheless, the *N.P. Mining* court concluded that although the trustee's administration was not entirely inactive, the continuance of the coalbrokering contract was an effort to protect an estate asset for future distribution to creditors. *Id.* The court viewed it as merely a way to maintain the status quo. *Id.* at 1461. The *N.P. Mining* court quoted Judge Learned Hand's interpretation of 28 U.S.C. § 125, the predecessor section to 28 U.S.C. § 959, to the effect that

**\*8** [m]erely to hold matters in the status quo; to mark time, as it were; to do only what is neces-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161

**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

sary to hold the assets intact; such activities are not a continuance of the business.

*Id.* at 1460 (quoting *Vass v. Conron Bros. Co.,* 59 F.2d 969, 971 (2d Cir.1932)). Similarly, costs "incurred when a trustee is merely maintaining an estate for later distribution of assets cannot be considered 'costs ordinarily incident to the *operation* of a business.' " *Id.* at 1460-1461.

*Applying Law to the Dealer's Claim*

[11] The Dealer's claim arises out of the terms of the pre-petition Dealer Agreements. The claim does not arise from a transaction between the Dealer and the Debtors. Further, the Dealer did not provide any benefit to the Debtors' estates. The Debtors correctly assert that the Dealer had an obligation to continue to sell inventory to mitigate damages against the estates and, in addition, that the Dealer itself benefitted from any such sales. Whatever benefit the Debtors' estates received in terms of a reduction of the Repurchase Obligations, the Dealer was fully compensated as it received payment in that amount. Moreover, the Dealer was preserving its own property, not the Debtors' property; otherwise, the Debtors would not have had an obligation to "repurchase" such property. Indeed, paragraph 29(a) of each Dealer Agreement provides that Chrysler Motors' Repurchase Obligations applied to vehicles that were "purchased" by the Dealer from Chrysler Motors and "that are on the effective date of termination the property of ... Dealer." FN4 In addition, if the property at issue were the Debtors' property, the Dealer would have been subject to the section 362 automatic stay. Nor was any meaningful benefit conferred upon the estates as a result of the elimination of the obligation to reject the contract.

The traditional standard for administrative claim priority as set forth in *Mammoth Mart* is not met because the claim did not arise out of a transaction between the Dealer and the Debtors; nor was a benefit conferred upon the estates in the operation of

their businesses.

[12] The Dealer argues that the Debtors did induce performance by the Dealer because the Debtors required the Dealer to respond to their inquiry and provide detail concerning the inventory subject to the Repurchase Obligations. The Debtors' request for such detail, however, merely reflected the basic fact that a claim for damages under a contract would normally need to be substantiated with relevant details. No inducement of the type contemplated in *Mammoth Mart* was implicated.

The Debtors did not receive any benefit from the Dealer "pending a decision to assume or reject the contract." In fact, by sending the Termination Notice, the Dealer set into motion its contractual right to terminate the contract. As the Debtors note, once the Dealer sent the Termination Notice, all that remained for the termination to be effective was the passage of time. There were no meaningful obligations to perform.

**\*9** The Court recognizes that the Dealer has a claim against the Debtors based upon the Repurchase Obligations contained in Dealer Agreements and relevant state law. However, because that claim arises out of the pre-petition contracts, and because no cognizable benefit was conferred on the Debtors' estates in connection therewith, any such claim is a pre-petition general unsecured claim.

[13] The Court agrees with the premise that had the Debtors continued in business, they may have been subject to a continuing obligation under state law to perform the Repurchase Obligations. The Court concludes, however, that the facts presented do not implicate either the *Reading* line of cases or 28 U.S.C. § 959(b). As set forth in the cases cited in *In re Old Carco, LLC,* Slip Op. No. 09-50002 at *13-15, 21 (January 5, 2010), --- B.R. ---- (Bankr.S.D.N .Y.2010), the reasoning of the *Reading* line of cases has been applied in the context of a debtor's negligence, a debtor's intentional misconduct, or injury to an innocent third party with no prior relationship to the debtor. There is no allega-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161

**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

tion that the Debtors were negligent or that they committed an intentional tort. Further, in the instant case, the Dealer was not an unrelated third party adversely affected by the Debtors' actions. Instead, it had a pre-petition contractual relationship with the Debtors and its claim stems from the breach of the very contracts that engendered that relationship. Although the due date for payment of the Repurchase Obligations may occur post-petition, the obligations stem from a pre-petition relationship. The *Reading* exception does not include a right to payment emanating from a pre-petition contract with a debtor. The Court reiterates that the Dealer is allowed a claim against the Debtors' estates for any entitlement it may have to payment of the Reimbursement Obligations. That claim, however, is a general unsecured claim, similar to that of other claimants who have claims against the Debtors arising from the breach of a pre-petition contract.

Following *Reading,* courts have accorded administrative priority to certain claims to further the goal of environmental protection. *See N.P. Mining,* 963 F.2d at 1457-59 (discussing cases). In that regard, a trustee's effort "to marshall and distribute" estate assets is subject to the governmental interest in public health and safety. *Id. at* 1457 (citing *Midlantic Nat'l Bank v. New Jersey Dept. of Environmental Protection,* 474 U.S. 494, 501-02, 106 S.Ct. 755, 759-60, 88 L.Ed.2d 859 (1986)). Thus, administrative priority has been accorded for the post-petition costs incurred for prompt cleanup of health hazards. *Id.* (citing *Lancaster v. Tennessee ( In re Wall Tube & Metal Prods. Co.),* 831 F.2d 118, 123 (6th Cir.1987)). Allowing an administrative priority for a state's clean-up costs associated with an ongoing health hazard was deemed necessary to ensure that the bankruptcy estate complied with state law and "to protect the health and safety of a potentially endangered public." *Id.* at 1457-58 (citing *Wall Tube,* 831 F.2d at 124).

**\*10** In the Opinion approving the rejection of the sales and servicing agreements entered into between Chrysler Motors and other dealers, this

Court concluded that state laws governing the relationship between automobile manufacturers and dealers constitute primarily commercial and economic regulation as applied to the dealers and are not intended to protect the health and safety of the general public. *See Old Carco,* 406 B.R. at 204. As such, here the Dealer is attempting to advance its private interests and rights under the Dealer Law, as opposed to an effort to advance a state's interest in protecting the health and safety of the general public. Therefore, the analysis of the cases that extended the *Reading* rationale to situations involving environmental hazards is not applicable. The Dealer Law afford the Dealer certain rights by virtue of the pre-petition contracts that the Dealer entered into with the Debtors. The claim is not independent of those contracts and stem from the breaches of those pre-petition contracts. The Dealer is merely advancing its own economic interests similar to those interests of any other creditor who has a claim based upon a breach of a pre-petition contract.

Moreover, even if the general purpose of the Dealer Law includes some concern for public health and safety, in the present case, there is no allegation of an imminent and identifiable hazard. In *Old Carco,* 406 B.R. at 191, this Court declined to apply a heightened standard for the rejection of dealer agreements in the absence of an imminent identifiable harm. In its analysis, the Court cited to *Midlantic,* in which the Supreme Court noted that although a trustee was precluded from abandoning property, pursuant to Bankruptcy Code section 554, if such abandonment violated a state law designed to protect public health and safety, any such exception to the abandonment power was to be construed narrowly and only applied where the law at issue was "reasonably calculated to protect the public health or safety from imminent and identifiable harm." *Old Carco,* 406 B.R. at 204 (citing, *Midlantic,* at 474 U.S. at 507 fn. 9, 106 S.Ct. 755, 88 L.Ed.2d 859). Similarly, an imminent and identifiable hazard would be a prerequisite to affording administrative expense priority to a claim based upon a breach of a related obligation The Bankruptcy

© 2010 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161
**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

Code expressly provides that claims based upon breaches of pre-petition contracts are pre-petition claims, which are not entitled to administrative priority. The rationale of the *Reading* line of cases does not justify affording the Dealer's claim administrative priority.

As this Court held in *In re Old Carco, LLC,* Slip Op. No. 09-50002 at *15-17 (January 5, 2010) --- B.R. ---- (Bankr.S.D.N.Y.2010), the analysis of the *Reading* line of cases and 28 U.S.C. § 959(b) apply in the context of a debtor's ongoing business operations. Here, however, the Debtors ceased production and operations as an automobile manufacturer upon filing of the petitions. The Debtors directed their efforts to maintaining the status quo until the conclusion of a sale of substantially all of the assets to a purchaser, which occurred within several weeks of the filing.

**\*11** Further, the justification for requiring a trustee or debtor-in-possession to comply with costs incident to and incurred in the operation of a business is to preclude the estate's business from obtaining an unfair advantage over a competing business. Here, as set forth in the Affidavit, dated April 30, 2009 (the "Kolka Affidavit") of Ronald E. Kolka, in support of First Day Pleadings, the Debtors ceased manufacturing operations upon the filing of their petitions and were in liquidation from the first day of the case. *See* Kolka Affidavit ¶ 89. Therefore, the unfair advantage rationale does not apply. As the *N.P. Mining* court concluded, these circumstances implicate "neither the policy of 28 U.S.C. § 959(b) that a trustee 'manage and operate a property' in compliance with state law nor the language of *Reading* that 'costs incident to operation of a business' [are entitled to administrative priority]." *N.P. Mining,* 963 F.2d at 1460. The Dealer's claim stems from the pre-petition Dealer Agreements. The claim is not entitled to administrative expense priority.

*CONCLUSION*

Any claim that the Dealer has against the Debtors' estates based upon the Repurchase Obligations arises out of the pre-petition Dealer Agreements. Inasmuch as any such claim arises out of the pre-petition contracts, and because no benefit was conferred on the Debtors' estates, that claim is a pre-petition general unsecured claim that is, therefore, not entitled to administrative expense priority.

The rationale of the *Reading* line of cases does not justify affording this claim administrative priority. Further, the circumstances herein do not implicate the policy of 28 U.S.C. § 959(b) concerning a trustee managing and operating a business in compliance with state law because the Debtors were not conducting an ongoing business. Nor is the language of the *Reading* line of cases concerning "costs incident to operation of a business" implicated.

The Debtors are to submit a proposed order, consistent with this Opinion.

> FN1. On May 19, 2009, an additional affiliate of Chrysler LLC filed a petition for relief under title 11 of the Bankruptcy Code.

> FN2. The Dealer Agreements incorporated certain terms and conditions contained in the Chrysler Corporation Sales and Service Agreement Additional Terms and Conditions.

> FN3. At the time of the May 15, 2009 e-mail, the amount of vehicle inventory for which the Dealer was asserting a claim was $1,879,963. Since that date, the Dealer has sold various portions of the automobile inventory to other dealers. At the time it filed its motion on August 27, 2009, the Dealer alleged that the vehicle inventory claim had been reduced to $810,060. In addition, as of August 27, 2009, the Dealer asserts that its claim for the Repurchase Obligations related to automobile parts, signs, tools, and equipment is approxim-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161

**(Cite as: 2010 WL 22426 (Bkrtcy.S.D.N.Y.))**

ately $500,000, resulting in a total alleged claim of approximately $1,310,060.

FN4. Paragraphs 29(b) and 29(c) of the Dealer Agreements concerning the Repurchase Obligation for parts and accessories, respectively, have similar references. In addition, paragraph 29(d) references signs "belonging to Dealer," and paragraph 29(e) references tools "purchased by Dealer."

Bkrtcy.S.D.N.Y.,2010.
In re Old Carco LLC
--- B.R. ----, 2010 WL 22426 (Bkrtcy.S.D.N.Y.), 52 Bankr.Ct.Dec. 161

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# Exhibit B

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                          . Case No. 08-35653 (KRH)
                                .
                                .
CIRCUIT CITY STORES, INC.,      . 701 East Broad Street
et al.,                         . Richmond, VA 23219
                                .
                                .
                    Debtors.    . March 8, 2010
. . . . . . . . . . . . . . . . 11:04 a.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:            McGuireWoods, LLP
                            By:  DOUGLAS FOLEY, ESQ.
                            9000 World Trade Center
                            101 W. Main St.
                            Norfolk, VA  23510


For the Debtors:            McGuire Woods, LLP
                            By:  SARAH B. BOEHM, ESQ.
                            One James Center
                            901 East Cary St.
                            Richmond, VA  23219


For the Debtors:            Skadden Arps Slate Meagher
                             & Flom LLP
                            By:  IAN FREDERICKS, ESQ.
                                 GREGG M. GALARDI, ESQ.
                            One Rodney Sq.
                            Wilmington, DE 19899




Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

2

**APPEARANCES (Contd'):**

For the Creditors' Committee:    Pachulski Stang Ziehl & Jones LLP
By:  ROBERT J. FEINSTEIN, ESQ.
780 Third Ave. 36th Floor
New York, NY 10017

For the U.S. Trustee:    Office of the U.S. Trustee
By:  ROBERT B. VAN ARSDALE
701 East Broad Street, St. 4304
Richmond, VA  23219

For Panasonic Corporation:    Hunton & Williams
By:  BENJAMIN C. ACKERLY, ESQ.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219

For Dawn vonBechmann:    NEIL McCULLAGH, ESQ.

For Laura Lambert-Gaffney:    R. CANFIELD, ESQ.

For Kelly Breitenbecher:    WILLIAM GRAY, ESQ.

For David Tolliver:    DAVID TOLLIVER, Pro se Claimant

For Jeff McDonald:    JEFF McDONALD, Pro se Claimant

**TELEPHONIC APPEARANCES:**

For Ryan, Inc.:    Redmon, Peyton & Braswell LLP
By:  ROBERT MARINO, ESQ.
510 King Street, Suite 301
Alexandria, VA  22314

For Ryan, Inc.:    Bell, Nunnally & Martin
By:  BRUCE AKERLY, ESQ.
1400 One McKinney Plaza
3232 McKinney Avenue
Dallas, TX  75204

_ _ _

1       DEPUTY CLERK:  All rise.  The United States

2  Bankruptcy Court for the Eastern District of Virginia is now in

3  session.  The Honorable Kevin R. Huennekens presiding.  Please

4  be seated and come to order.

5       COURT CLERK:  In the matter of Circuit City Stores,

6  Incorporated, hearing on Items 1 through 29, as set out on

7  debtors' proposed agenda.

8       MR. FOLEY:  Good morning, Your Honor, Doug Foley with

9  McGuireWoods on behalf of the debtors.

10      THE COURT:  Good morning, Mr. Foley.

11      MR. FOLEY:  With me at counsel table is Gregg Galardi

12  and Ian Fredericks from Skadden Arps.  Also, Sarah Boehm from

13  my firm as well.  Also in the courtroom today, Your Honor, is

14  Jim Marcum, who is the former CEO of Circuit City, a current

15  director of Circuit City Stores, as well as a consultant with

16  the company.

17      Also, in the courtroom today, Your Honor, is Katie

18  Bradshaw, who is the Vice President and Controller of Circuit

19  City.

20      Your Honor, we have many items on the agenda.  Mr.

21  Galardi will be addressing some of the matters, Mr. Fredericks

22  will be addressing some of the matters, as well as Ms. Boehm

23  will be addressing one claim matter.  So, I may go out of

24  order, we want to try to limit how many people have to get up

25  and down.

**J&J COURT TRANSCRIBERS, INC.**

4

1           But, if we could begin with the beginning of the

2   agenda, Your Honor, this is the Southpeak administrative claim

3   motion.   It's related to Item Number 19 on the docket.   This

4   has been resolved by stipulation, so both of those matters can

5   be removed from the agenda.

6           THE COURT:  All right.  So, Numbers 1 and 19 have

7   been resolved.

8           MR. FOLEY:  Yes, Your Honor.  Item Number 2, this was

9   our motion to deem publication notice sufficient for certain

10  purposes.  We've been talking to various parties about how to

11  deal with that going forward, as well as the Committee and

12  we've decided to withdraw this motion without prejudice and

13  we'll deal with these issues as they arise.

14          THE COURT:  All right.  So, Number 2 will be

15  withdrawn.

16          MR. FOLEY:  Item Number 3, Your Honor, this is Sony's

17  motion for a 503(b)(1) claim and 503(b)(9) administrative

18  claim.  We're still waiting for a counter response to them to

19  our latest offer.  They've requested, and we've agreed, to

20  adjourn the matter until the March 25th hearing date at 2:30.

21          THE COURT:  All right.  That'll be adjourned.

22          MR. FOLEY:  Item Number 4, Your Honor, is our motion

23  to reject and cancel certain surety bonds.  There was an

24  objection filed by the government that we're working through as

25  well as with certain issues with respect to the surety

**J&J COURT TRANSCRIBERS, INC.**

5

1   companies.  We're working on a partial consent order that will,

2   hopefully, resolve some of the matters before the March 25th

3   hearing date, but we've asked -- we've asked the Court and the

4   parties have agreed, to adjourn the matter until the March 25

5   hearing date at 2:30.

6          THE COURT:  All right.  It'll be adjourned to March

7   25.

8          MR. FOLEY:  Items Number 5 and 6, Your Honor, these

9   are the motions by Madcow.  One is for an administrative

10  expense claim under 503(b)(1), one is for an administrative

11  expense claim under 503(b)(9).  We're still waiting for some

12  information from them to try to reconcile the underlying

13  amounts of the claims.  And they have requested and we've

14  agreed, to adjourned their matters until March 18th at 10 a.m.

15         THE COURT:  All right.  It'll be adjourned to March

16  18.

17         MR. FOLEY:  Your Honor, Item Number 7 is our motion

18  for approval of a 9019 motion with respect to a small

19  litigation matter that's been pending for some time, that has

20  been finally resolved.  The debtor is a tangential player in

21  the litigation.  We're seeking approval of our entry into

22  mutual releases with respect to just that litigation.  We're

23  not paying any funds.  One of the other parties, Capital

24  Contractors, is paying the funds to the plaintiff and they've

25  requested, the other parties have requested that the settlement

6

1   agreement be sealed, which is Item Number 8 on the docket.

2        There have been no objections to either Item Number 7

3   or Item Number 8 and we would ask the Court to approve both

4   motions.

5        THE COURT:  Does any party wish to be heard in

6   connection with the debtors' motion to approve the settlement

7   agreement?

8                    (No audible response)

9        THE COURT:  All right, Mr. Foley.  There being no

10  objection, the Court will approve the settlement agreement and

11  grant the debtors' motion.  And, the Court will also grant the

12  motion to seal the exhibit.

13       MR. FOLEY:  Thank you, Your Honor.  If we could pass

14  over Items Number 9, 10, 11, and 12 for now, Mr. Galardi will

15  be addressing the Court on those matters.

16       Items Number 13 and 14, Your Honor, these are flip

17  sides of the same issue.  This is the motion by Ryan to compel

18  assumption of an executory contract, which is a contingency fee

19  contract for certain professional services and our motion to

20  reject that contract.

21       Your Honor, we've filed papers and wanted to bring

22  one case to the Court's attention that did address the

23  contingency fee contract for an attorney which is the <u>Hall</u>

24  matter, <u>In re Hall</u>, which is at 415 BR 911.

25       Your Honor, we think this is a fairly simple matter

7

1 that we can't be compelled to assume this contract.  We think

2 it's in the debtors' business judgment to reject it.  There's

3 no prejudice to the Ryan party here.  They are allowed to file

4 a proof of claim within 30 days.  As we discussed with the

5 Court at the last hearing, rejection equal breach and they're

6 allowed to file whatever type of claim they want in the next 30

7 days.

8          Of course, we would submit that any claim that they

9 are entitled to is only entitled to general unsecured status,

10 but they may claim something else, but that's not before the

11 Court today.  Before the Court today is only the decision to

12 assume or reject.  So, we would ask the Court to deny matter 13

13 and to grant matter 14.

14          THE COURT:  All right.  Does any party wish to be

15 heard on behalf of Ryan?

16          MR. MARINO:  Your Honor, good morning.  This is

17 Robert Marino.  I am local counsel for Ryan Inc., and with me

18 on the phone also is Bruce W. Akerly, who has been admitted

19 pro hac vice and he will make the presentation for Ryan.  And,

20 I appreciate the Court allowing us to participate by telephonic

21 conference this morning.

22          THE COURT:  All right.  Mr. Akerly, are you on the

23 phone?

24          MR. AKERLY:  Yes, I am, Your Honor.  Thank you, very

25 much.  If I might address the Court on these issues.

**J&J COURT TRANSCRIBERS, INC.**

8

1                THE COURT:  All right.  Am I pronouncing your name

2    correctly, sir?

3                MR. AKERLY:  It's Akerly, that's correct.

4                THE COURT:  Akerly.  Okay, thank you.

5                MR. AKERLY:  Okay, no problem, Your Honor.

6           I do represent Ryan Inc., and Mr. Marino is my local

7    counsel.  We -- let me give the Court a little bit of

8    background.  I don't think it's as simple an issue as debtors'

9    counsel has portrayed and I think it will require that the

10   Court take some evidence and further hearings on the matter,

11   but, in any event, we were engaged prepetition by the debtor to

12   review the debtors' Hawaii import tax payment records to

13   identify tax refunds and reduction opportunities that might be

14   available to the debtor.  And, Ryan was working under this

15   agreement when the bankruptcy was filed.

16          In fact, Ryan identified approximately $800,000 of in

17   progress tax refunds which would be due to Circuit City.

18   However, Your Honor, that request was denied at the state tax

19   level and in that connection there was an ongoing parallel

20   matter involving Comp USA, that is before the Hawaii Supreme

21   Court which, I believe, has been briefed and is being -- has

22   been or is being argued shortly.  And, it involved the same

23   very complicated tax issues and the State of Hawaii denied the

24   tax refund claim based upon current law which is being appealed

25   before the Hawaii Supreme Court.  So, we've been continuing to

**J&J COURT TRANSCRIBERS, INC.**

9

1  monitor that contract post petition and continuing to update

2  the State of Hawaii with respect to our position and other

3  matters.

4       And, in any event, if that appeal is successful, that

5  will result in a reversal of the state's position and a refund

6  of $800,000, of which our engagement says we're entitled to a

7  percentage fee.

8       Now, that agreement is executory, that agreement was

9  ongoing, has been ongoing in the post petition area and we've

10 been monitoring it and reporting to the debtor with respect to

11 the status of the appeal, with respect to the status of the tax

12 issues on the refund request and all of our work product is up

13 before the State of Hawaii and of a benefit to the debtor.

14      Now, what we would like to do is present evidence on

15 the issue of exactly how we believe this would be of benefit to

16 the bankruptcy estate.

17      As you understand, Your Honor, there's no risk here,

18 there's no downside to the bankruptcy estate with respect to

19 this matter.  If the appeal is successful, the estate recovers

20 and we get our contractual fee.  If the appeal is not

21 successful, there's no downside to the estate.  So, in other

22 words, I don't understand the debtors' argument that there's no

23 value here, because there will be value, there's potential

24 value, and there's no cost to the estate.  There's absolutely

25 zero cost to the estate, going forward with this engagement and

10

1  all of our work product, which is proprietary and owned by my

2  client, which will go away.  If my client is -- if this

3  agreement is not assumed, all of that work product and all of

4  that work cannot be used by the debtor, that's our position,

5  cannot be used by the debtor going forward with the tax appeal,

6  in the event the Supreme Court of Hawaii reverses the very

7  narrow legal issue which is involved in our tax appeal.

8       So, we think the agreement does have value to the

9  estate, and we should be able to put our case on to establish

10 that.

11      And, you know, contingent fee aside, you know, the

12 issue really here is, is there value here and is the debtors'

13 business judgment acceptable to reject this, and we don't think

14 so.  And, so, we would like an opportunity to -- the Court

15 could remand this over for an evidentiary hearing, we'd like an

16 opportunity to present that evidence to the Court, of the value

17 here in order to demonstrate that the debtors' business

18 judgment has not been properly applied.

19      THE COURT:  All right.  Mr. Akerly, let me ask you

20 this question, sir.  What authority can you cite to me that

21 supports your position that you should be entitled to compel

22 the debtor to assume an executory contract?  I was under the

23 impression that that was something that the debtor had the

24 option of doing, to either assume or reject a contract, not

25 something that the other parties to the contract had a right to

1 do.

2         MR. AKERLY:  All right. I don't -- I'll be honest

3 with the Court, I don't have my hands on the case right now,

4 but here's what happened.  When the debtor filed its plan of

5 reorganization, which is a liquidating plan, the plan provides

6 that if the contract is not otherwise assumed it will be deemed

7 rejected.  And, at that point in time, we objected to the plan

8 and filed our motion to compel the debtor to assume.

9         Obviously, we don't want rejection, we want the

10 debtor to assume because we think the contract is a value to

11 the bankruptcy estate.  And, so, I don't have a case -- I just

12 got their response to my objection literally on Friday, and so,

13 I haven't had a chance to, you know, to brief that issue, but

14 I'd like an opportunity to do so if that's an issue that is of

15 importance to the Court.

16         But, in any event, that's how we procedurally got to

17 our motion to assume.  Normally, I would file a motion to

18 compel assumption or rejection, but here we clearly don't want

19 rejection, we want assumption given that the plan provides for

20 rejection.  And, so we were responding to the plan by objecting

21 to the plan and then filing a motion to assume because the plan

22 already provided that the contract was going to be rejected if

23 there was no opposition or objection to the plan.

24         THE COURT:  And, I understand that, but on January

25 28th, the debtor filed a motion to reject this executory

12

1   contract along with many other executory contracts.  And, I

2   understand you're saying that you don't think that they can

3   meet the standard for the Court to approve that, in the

4   exercise of their business judgment.  But, are you saying that

5   in light of that objection, you have the right to force them to

6   assume an executory contract?

7          MR. AKERLY:  No, Your Honor.  I think probably more

8   what I'm saying is, I'm requesting that the debtor be compelled

9   to assume, rather than reject.  So, in other words, the only

10  reason my motion was a motion to assume, compel assumption was

11  because the debtor was already rejecting.  So, rather than --

12  the debtor has already expressed its intention to reject in its

13  plan and file a motion to reject after we filed our motion to

14  assume.  And, so, that's the reason I filed the motion to

15  assume.

16          Obviously, what were asking the Court to do is to

17  deny the rejection.  I agree, I think it's the debtors'

18  business judgment that has to be examined here as to whether

19  the debtor should be entitled to reject the contract.  If the

20  debtor doesn't reject the contract, the contract lives and

21  should be assumed.  In a sense, I'm agreeing with the Court,

22  but, in any event, I'd like to brief the issue if possible.

23          THE COURT:  All right.  And, then -- and I've read

24  you motion to compel and I've also reviewed the response that

25  you filed to the debtors' motion.

**J&J COURT TRANSCRIBERS, INC.**

1        MR. AKERLY:  Yes.

2        THE COURT:  And, so, I've seen your papers.  Isn't

3   your issue really one of what are your lease rejection damages?

4   In other words, what you want to do is to preserve the

5   contingency fee that you've got in your contract going forward?

6        MR. AKERLY:  Well, if there is rejection, there will

7   be a rejection damages issue, but, really our argument is, is

8   that the damages are the full measure of what -- and the

9   benefit of the contract, which is 33 percent of the ultimate

10  recovery.  The problem here is the recovery may not come until

11  an uncertain time in the future.  And the concern here is that

12  if we're forced to -- if the remedy is, what are your rejection

13  damages at the time we file a rejection damages claims, then

14  you won't have a refund in play.  What we're arguing is, is

15  that the contract should be assumed, the idea being that when

16  there is ultimately a refund we get the full benefit of our

17  contract, and our bargain and that is a percentage of the

18  ultimate refund.  If there is no refund, our damages are zero,

19  our amount that we recover are zero.  However, if we file a

20  rejection damages claim, that will be objected to by the debtor

21  and then the Court will be pressed to determine what is our

22  claim and are we going to be treated pari passu with other

23  unsecured creditors, in that we're only going to share in a

24  percentage of the ultimate -- in other words, you say 33

25  percent of and then we only get a percentage of recovery in the

**J&J COURT TRANSCRIBERS, INC.**

14

1  same class of unsecured creditors.

2           What we're arguing is, we should be treated, this

3  contract should be treated as the contract going forward and we

4  get our complete recovery off of the refund.  So, that's the

5  problem with the rejection damages, it's not a rejection

6  damages issue, we don't think we should have -- we don't think

7  the contract should be rejected.

8           THE COURT:  I think I understand your position.  Does

9  your client have an attorney's lien that it can invoke with

10 regard to the contingent nature of its contract?

11          MR. AKERLY:  No, it's not an attorneys -- there's no

12 attorneys fee issue here, Your Honor.  This is an accounting

13 firm who is analyzing tax refund and reduction opportunities.

14 It's not an attorneys fee -- it's a contract to analyze taxes

15 paid, to determine whether or not there were overpayments and

16 opportunities for refunds and we get a 33 and 1/3 percent,

17 Ryan, my client, gets 33 1/3 percent of whatever refunds are

18 ultimately awarded to Circuit City.

19          THE COURT:   Okay.  I understand.  Mr. Foley, do you

20 wish to respond?

21          MR. FOLEY:  Your Honor, the issue in Hawaii is

22 complicated and there's a lot of -- it's been going on for a

23 long time and the estate has made no decision how it wants to

24 deal with this claim.  In fact, we're in discussions with Ryan

25 as to whether or not they want to buy it.  And, there's

1   negotiations back and forth with respect to that.

2         But, essentially, here, this is a professional trying

3   to force us to retain them on a post petition basis when all

4   the work was done prepetition.  We have our own records with

5   respect to this.  This is -- the claim issue is not before the

6   Court today.  They have 30 days from the date of entry of order

7   of rejection to file a claim and whatever priority they think

8   they're entitled to and we'll evaluate that claim, if and when

9   it ever matures into a ripe claim.

10         This is simply an executory contract that by their

11   motion, forced us to deal with this early, rather than do it

12   as a default rejection under the plan.  So, we think that the

13   Court can and should enter an order approving the rejection as

14   it did with the other contracts in the motion and deny their

15   motion to compel.  They can file a claim and we'll deal with

16   the claim issue down the road.

17         THE COURT:  All right.  Thank you, Mr. Foley.

18   Anything further, Mr. Akerly?

19         MR. AKERLY:  No, Your Honor, thank you.

20         THE COURT:  All right, thank you. The Court has

21   before it the motion of Ryan & Company to compel the debtor to

22   assume executory contracts and the debtors' eighth omnibus

23   objection for an order pursuant to Section 365 to authorize

24   rejection of certain executory contracts, including the Ryan &

25   Company contract.

**J&J COURT TRANSCRIBERS, INC.**

16

1          The Court finds no authority to compel the debtor to

2    assume the contract.  The Court finds that the debtor is

3    exercising its business judgment in making a decision to reject

4    the executory contract.  Obviously, the issue of contract

5    rejection damages is not before the Court at this time.  The

6    Court makes no ruling with regard to that, but the Court will

7    authorize the debtor to reject the contract.  And, Mr. Foley, I

8    ask you to submit an order to that effect.

9          MR. FOLEY:  Thank you, Your Honor, we will do so.

10          With respect to Items Number 15 --

11          MR. AKERLY:  May I be excused, Your Honor?

12          THE COURT:  Yes, Mr. Akerly, you may be excused.  And

13   Mr. Marino, you may as well.  Thank you.

14          MR. AKERLY:  Thank you.

15          MR. MARINO:  Thank you, Your Honor, appreciate it.

16          MR. FOLEY:  Your Honor, with respect to Items Number

17   15, 16, 17 and 18, these are all confirmation related issues,

18   including our motion to establish sell down and claims trading

19   procedures with respect to possible preservation of any NOL

20   issue.  The first amended plan of liquidation, the plan or

21   motion for 3020(a) deposit, the Samsung motion for a 3020(a)

22   deposit.

23          Your Honor, the current date for the hearing on the

24   plan is April 6 at ten.  We would ask that Items 15, 16, 17 and

25   18 all be adjourned to the April 6 date at ten.

1              THE COURT:  All right.  All of those matter will be

2    adjourned till April 6.

3              MR. FOLEY:  Thank you, Your Honor.  Item Number 19,

4    this is the Southpeak matter that's been resolved, consistent

5    with Item Number 1.

6              Item Number 20 is the Bethesda Softworks claim

7    objection that we wanted to go forward on, on the merits, on

8    March 18th, Your Honor.  We're very close to a global

9    settlement, we believe, with Bethesda Softworks and we're going

10   to try to get that accomplished before March 18th.

11             Item Number 21 --

12             THE COURT:  So, Number 20 is going to be adjourned to

13   March 18?

14             MR. FOLEY:  March 18, at ten.

15             THE COURT:  All right.

16             MR. FOLEY:  Your Honor, Item Number 21 is our 20th

17   omnibus objection.   We have it on for a status hearing as to

18   the Audiovox claims as well as Item Number 22, which is our

19   50th omnibus objection, which also includes Audiovox and this

20   is a status hearing with respect to that.

21             They have both a 503(b)(9) claim and a duplicative

22   general unsecured claim covering the same invoices, Your Honor.

23   We're working through -- we were having difficulty getting

24   information from them, but once we scheduled this, for a

25   specific status hearing, we were able to get some information

18

1  flowing from them and we believe we may be able to achieve a

2  global settlement.   This is a relatively large 502(b)(9) claim,

3  a couple million dollars and I believe we've reconciled it to

4  within 100,000.   And, so, we think we're going to try to be

5  able to get a resolution completed before the March 25th

6  hearing date at 2:30.   So, we would adjourn the specific status

7  hearing with respect to Audiovox under Items Number 21 and 22

8  to the March 25th date at 2:30.

9         THE COURT:  All right.   The status conference will be

10 adjourned until the 25th.   Now, those will be status

11 conferences.

12        MR. FOLEY:  Those will still be status because we're

13 confident that we are close enough to a resolution that we

14 don't need to go forward on those dates on the merits if we

15 haven't achieved it.

16        THE COURT:  That's fine.

17        MR. FOLEY:  Item Number 23, Your Honor, Mr. Galardi

18 will address shortly, if we could pass that over.

19        THE COURT:  You may.

20        MR. FOLEY:  Item Number 24, Ms. Boehm will address

21 the Court on that one.

22        MS. BOEHM:  Good morning, Your Honor, Sarah Boehm for

23 the debtors.

24        THE COURT:   Good morning.

25        MS. BOEHM:  Item 24 is a notice of hearing on the

19

1  merits of the debtors' 65th omnibus objection with respect to

2  the reclassification of certain claims filed by equity holders.

3  We had the hearing on the 65 at the last hearing, that we did

4  have one response to omnibus 65, which we had scheduled to go

5  forward on the merits.  This was with respect to the response

6  of Louis & Dolores Luchack, Claim Number 13259.

7          They filed this claim as an administrative expense

8  and assert that it's with respect to 1,000 shares of Circuit

9  City stock.  We would ask the Court to reclassify this from a

10  claim to an interest.

11          THE COURT:  All right.  Does any party wish to be

12  heard on behalf of Mr. and Mrs. Luchack?

13                    (No audible response)

14          THE COURT:  All right.  The Court has reviewed this

15  claim and the Court is satisfied that it is an interest in

16  stock of the debtor and is appropriately -- should be

17  reclassified as an interest.  So, the Court will grant the

18  debtors' motion.

19          MS. BOEHM:  Thank you, Your Honor.

20          THE COURT:  Please submit an order to that effect.

21          MR. FOLEY:  Your Honor, if we could pass over Items

22  Number 25 -- I'm sorry.

23          MR. FREDERICKS:  Good morning, Your Honor, Ian

24  Fredericks of Skadden Arps on behalf of the debtors.  I'm going

25  to just -- we should be able to move fairly quickly through

**J&J COURT TRANSCRIBERS, INC.**

1 matters 25, 26 and 27.

2          Twenty-five relates to the debtors' fifth omnibus

3 objection where we sought to reclassify certain claims that

4 were allegedly filed as goods claims where we thought they were

5 non-goods claims.  Following Your Honor's ruling on goods, we

6 provided this claimant, Mr. Magnusson with a copy of the

7 Court's opinion.  We also provided him with an additional bases

8 to the objection.

9          As you'll note from the claim, many of the invoices

10 were outside of 20 days, so even if they were goods claims,

11 they were outside of 20 days.  We also advised Mr. Magnusson of

12 various hearing dates to schedule this matter going forward, to

13 which there was no response.  And, ultimately, we noticed it

14 for this hearing and we request that Your Honor sustain the

15 objection, reclassify this claim to non-goods on the basis that

16 he -- Mr. Magnusson's company provided services to the debtor

17 in the form of repair work at the debtors' various locations, I

18 believe, in the New York area.

19          THE COURT:  All right.  The claim was actually filed

20 by Magnus Magnusson Inc., right?

21          MR. FREDERICKS:  Correct, I'm sorry.

22          THE COURT:  Does any party wish to be heard in

23 connection with matter?

24                    (No audible response)

25          THE COURT:  All right.  The Court has reviewed it and

1  consistent with the Court's previous ruling regarding the

2  definition of goods in 503(b)(9), the Court finds that this was

3  a rendition of services and not goods, and so does not fall

4  within the administrative priority and the Court will grant

5  your motion and disallowance of 503(b)(9) claim.

6          MR. FREDERICKS:  Thank you, Your Honor.  I believe

7  that the motion seeks to just reclassify it to a general

8  unsecured claim, as it was timely filed before the bar date.

9  So, if it's acceptable to Your Honor, we'd submit an order to

10  that effect.

11          THE COURT:  And, you may.

12          MR. FREDERICKS:  Thank you, Your Honor.  The next

13  matter relates to the debtors' 33rd omnibus objection.  This

14  was an objection to reclassify certain claims to general

15  unsecured claims.

16          We're going forward with respect to one respondent,

17  Ms. Cyndi Ann Haines.  We attempted to reach her multiple times

18  to try to resolve this consensually in light of the Court's

19  opinion on paid time off claims, last September.  The debtors

20  only sought to -- rather than reclassify to a general unsecured

21  claim, the debtors sought to reclassify this to a 507(a)(4)

22  priority claim.  Multiple attempts to reach the claimant, even

23  providing her with a copy of a proposed form of order were

24  unsuccessful.

25          The debtors would seek to go forward and rather than

22

1  reclassify this to unsecured, reclassify it to a 507(a)(4)

2  priority claim.

3          THE COURT:  Does any party wish to be heard in

4  connection with the debtors' motion?

5                  (No audible response)

6          THE COURT:  All right.  Mr. Fredericks, consistent

7  with the Court's prior ruling, the Court will grant your motion

8  to reclassify this as a 507(a)(7) (sic) claim.

9          MR. FREDERICKS:  Thank you, Your Honor.  The last

10  matter, matter Number 27 relates, again, to the debtors' 33rd

11  omnibus objection.  This was a secured claim filed by Amore

12  Construction.  It relates to a mechanics lien for a location in

13  Florida that the debtor leased.

14          The lease was rejected by order of this Court and,

15  thus, there is no security by which to secure the lien.  We've

16  contacted Amore Construction and their counsel -- I'm sorry, we

17  contacted Amore Construction's counsel and we're advised that

18  they would not appear at the hearing to oppose the relief that

19  we were requesting by this notice, and we would seek to have

20  this Court reclassify this claim to a general unsecured claim.

21          THE COURT:  Does any party wish to be heard in

22  connection with the debtors' motion?

23                  (No audible response)

24          THE COURT:  All right.  That motion will be granted

25  it be reclassified as a general unsecured claim.

1           MR. FREDERICKS:  Thank you, Your Honor.  That

2   concludes the matters that I'll be doing.

3           MR. FOLEY:  Your Honor, before Mr. Galardi addresses

4   Items Number 9, 10, 11, 12 and 23, there's two adversary

5   proceedings at the end of the docket, Sharp and Creative Labs.

6           We're still exchanging documents with Sharp, Your

7   Honor, but I think we'll be in a position by the March 18th

8   hearing date at ten, to ask the Court to enter your standard

9   form pretrial order, under a pretrial conference.  But, for

10  now, we'd ask that the Court adjourn the pretrial conference on

11  Sharp, which is Item Number 28, until March 18th at ten.

12          THE COURT:  All right.  The pretrial conference will

13  be continued till the 18th of March.

14          MR. FOLEY:  Item Number 29, Your Honor, this is

15  Creative Labs.  They're in Singapore and they're trying to

16  retain counsel in the United States and they're also trying to

17  provide us some additional information.  They have requested --

18  they haven't filed an answer yet, they've requested a little

19  bit more time for the pretrial conference.  We've agreed to

20  adjourn the matter until the March 25th hearing date at 2:30,

21  but, again, Your Honor, we intend to ask the Court to enter you

22  standard pretrial order at that time so that we can get on with

23  the litigation.

24          THE COURT:  All right, very good.  This matter will

25  be adjourned until the 25th of March.

1          MR. FOLEY:  Thank you, Your Honor.

2          MR. GALARDI:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. GALARDI:  For the record, Gregg Galardi on behalf

5  of the debtors.  Your Honor, before move into 9, 10, 11 and 12

6  which I'm going to do as a group, I just wanted to mention

7  something about matter two.  We have had conversations with

8  numerous states Attorney Generals.  That's the publication

9  notice on the rebate motion.

10          THE COURT:  Right.

11          MR. GALARDI:  And although it's noted on the docket,

12  I just wanted to be clear with Your Honor, we're withdrawing

13  that without prejudice.  The state AG's had raised concerns

14  about giving notice to even the people that we sent publication

15  notice in the first place, you know, they were concerned about

16  that.  So, we've withdrawn it, but after discussions with the

17  Committee, we decided to not proceed on that motion for this

18  order, but then, if and when various people with rebates may

19  come back and say they had claims or not, would address it then

20  and make exactly the same arguments that we've made in the

21  papers, but, instead of doing a global publication notice, we

22  would reserve all of our rights to do that on a one off base

23  since it was cost effective to do it that way.  They may have

24  arguments that they're not on the schedules, they may have

25  arguments that they didn't have notice.  We'll have arguments

25

1    that they're not creditors, or not known creditors, but we

2    thought it was just more efficient to do it that way and the

3    Committee agreed.  So, I just wanted to make it clear that we

4    have had discussions and that's why we are in the position of

5    withdrawing that motion.

6           THE COURT:  All right.  And, I shouldn't throw those

7    papers away?

8           MR. GALARDI:  You shouldn't throw those papers away

9    because they will be the template if we actually have to

10   address those later on.

11          THE COURT:  All right, very good.

12          MR. GALARDI:  Your Honor, next matters on the agenda

13   are 9, which is a motion to shorten the hearing on our seeking

14   to retain Crowe and Mr. Siegel, who I believe may be on the

15   phone, as a CRO in this case; 10 is the actual motion to retain

16   Mr. Siegel and his firm Crowe as the CRO in this case; and 11

17   is Mr. Marcum's bonus.

18          I would like to do these both all together and Mr.

19   Marcum's bonus because this has been the subject of

20   negotiations among the parties and I think the timing of Mr.

21   Marcum's bonus and the timing for the motion to shorten, and

22   Mr. Siegel coming in as the CRO are all sort of a package that

23   we're working with the Committee.

24          As Your Honor -- just to give some background here,

25   as Your Honor may know, when we negotiated the joint plan with

1 the Committee, one of the aspects of the joint plan is that

2 there would be a liquidating trust established upon

3 confirmation and there would be a liquidating trustee, and that

4 was probably back in October or November and we had identified

5 Mr. Siegel as the potential liquidating trustee.

6        Because of the issues that Your Honor is aware of

7 with respect to Canadian funds coming back and the NOLs coming

8 back, and making sure we have all of our ducks in a row, we

9 didn't go forward with confirmation though we have an approved

10 disclosure statement and we have voted on -- and the creditors

11 have voted on that.

12        At the same time, we started negotiating with the

13 Committee about, one, Mr. Marcum's departure, eventually, from

14 the company and as we readily admitted, as Mr. Marcum admitted

15 and I advised the Court, as of, I believe January 16th, Mr.

16 Marcum resigned as the CEO going on a part time basis to give

17 consulting services to the debtors, but, again, it was

18 unnecessary for him to remain in a full employment situation

19 and then Ms. Michelle Moser sort of stepped up as our operating

20 person.

21        During this entire time, we were negotiating, again,

22 with the Committee and Mr. Siegel about whether he would be

23 retained as the CRO and, indeed, the Committee had asked that

24 he become CRO, you know, almost the instant -- that January or

25 even in December.  There were concerns and disagreements

1  between the parties.

2        What then ultimately happened and now why we go to

3  shorten notice, partly -- this is a long story to get to

4  shorten notice and why we couldn't have done this earlier, Ms.

5  Michelle Moser, who we'll note by her absence in the courtroom

6  today, was offered a position with another firm, to go and to

7  become the CFO.  That happened rather abruptly, I guess, in

8  February of this month (sic) and then she had decided, after

9  back and forth, that we would not continue to retain her at her

10 rate and she would move on.  So, as that happened, we then had

11 a much greater need for a CRO or somebody, to come into the

12 company.  Ms. Katie Bradshaw is in the courtroom and perfectly

13 capable of doing that, but then there's this transition period

14 and with the plan and having an experienced person who's done

15 liquidations as well, we thought it was wise to accelerate, or

16 actually resolve our differences with the Committee regarding

17 both Mr. Marcum's bonus, Mr. Marcum's consulting agreement --

18 Ms. Moser's consulting agreement and having a CRO come in and

19 then work closer to try to get to the transition.

20        And, then we added that Mr. Van Arsdale also

21 expressed concerns with respect to having Ms. Moser leaving now

22 that Mr. Marcum is only part time, and Ms. Bradshaw is in

23 there, but somebody else of experience also with liquidating

24 cases should come in.

25        We had consulted with the U.S. Trustee and said we

1  were reaching an agreement with the Crowe firm and Mr. Siegel

2  to start as early as today, if the U.S. Trustee would consider

3  our putting it in on shorten notice because of the fact that

4  Ms. Moser's last day was Friday and because Mr. Marcum, as we

5  have disclosed, has now taken on a new CEO position, plus since

6  he started on January 16th, by the two month count in his

7  consulting agreement, March 16th, he will be restricted to

8  certain number of hours if Your Honor approves that consulting

9  agreement.  It was imperative that we put on shorten notice the

10 retention of the Crowe firm as CRO.

11       So, we had asked Mr. Van Arsdale whether he had an

12 objection, the Committee, obviously, wanted it, the debtors,

13 obviously, wanted it, so that's a long way of asking Your Honor

14 to approve, first the motion to shorten to hear today, to hear

15 the Crowe engagement on that shorten notice we apologize,

16 again, but it was a combination of events and facts that, I

17 believe, justify putting it on shorten notice and not waiting

18 to our next hearing, which would be March 16th.  And, the U.S.

19 Trustee, we understood, had no objection.  Obviously, the

20 Committee and we had wanted to go forward and we've not known

21 of any other persons to object to the shorten notice, so we'd

22 ask Your Honor to hear that motion on shorten notice.

23       THE COURT:  Does any party wish to be heard on the

24 debtors' motion for an order shortening the notice period?

25                 (No audible response)

29

1          THE COURT:  All right, Mr. Galardi, the Court is

2   satisfied with your explanation and that motion is granted.

3          MR. GALARDI:  So, Your Honor, now we move to Items 10

4   and 11 and I would like to do that together, partially because

5   that is the way in which we sort of negotiated with the

6   Committee as almost a package deal here on the circumstances.

7          I'm going to put forth the facts as set forth and,

8   Your Honor, in the courtroom today is Mr. Mark Weinston

9   (phonetic) who did, in fact, testify at FTI at the first round

10  of the employment incentive program.

11         As Your Honor is aware, as part of the plan, the

12  Committee agreed not to object.  We've had our differences of

13  opinion, so there was a potential of objection, we've adjourned

14  it.  I'm pleased to say that we've resolved it.  We've also

15  talked to the U.S. Trustee.  So, Mr. Weinston would testify to

16  the following facts and we can also take them from the record.

17         First, Your Honor will recall that Your Honor

18  previously entered an order that had consensual milestones that

19  were negotiated with the Committee with respect to all other

20  employees, other that Mr. Marcum and we carved Mr. Marcum out

21  for consideration on another day, hoping to resolve the

22  objections to Mr. Marcum.

23         Pursuant to those consensual milestones, Mr. Marcum

24  believed that he had earned a bonus in excess of $375,000,

25  based primarily on those milestones and having served a longer

1   period of time.  The Committee had expressed concerns and

2   objections that merely because it took a longer length of time

3   and that Mr. Marcum would, in fact, have gotten his salary

4   during that period of time, that the maximum bonus that Mr.

5   Marcum could have earned under those milestones was $375,000.

6           As part of our negotiations with the Committee, the

7   Committee agreed to object if we put forth a motion that would

8   seek the $375,000 maximum as part of our, also, agreement with

9   respect to having the CRO come in and all of those

10  circumstances.

11          We then advised the U.S. Trustee that we had reached

12  that settlement in a conversation, I believe it was the middle

13  of last week with respect to Mr. Marcum and Mr. Siegel coming

14  in as the CRO.  Mr. Van Arsdale asked me, could we put on

15  evidence under those milestones with respect to the 375 and I

16  explained, as I've explained to the Court, that Mr. Marcum

17  believed that it was 375, that if FTI was called to testify,

18  Mr. Weinston, after reviewing -- excuse me, after reviewing the

19  milestones, FTI would testify that in no event would Mr.

20  Marcum, under those -- and there is some ambiguity in some of

21  those milestones, in no event would Mr. Marcum have earned less

22  than $342,000 based on those milestones.

23          We then talked to Mr. Van Arsdale about a compromise

24  with respect to the 375, we agreed with the Committee and the

25  342 and Mr. Van Arsdale said he would not object.  And, again,

31

1  he can speak for himself, if we agree to a round number of

2  $350,000, which is the amount that we actually seek today.  We

3  believe that the evidence can justify at least 342, if not

4  greater amounts with that length of time issue that is out

5  there.

6         We had also agreed with the Committee, previously,

7  and we would stand by this agreement, that the payments which

8  would be different than any other executive that received

9  payments, would actually be split into two tranches.  That 50

10 percent of what was earned would be paid upon the order, if

11 Your Honor approves it, becoming final and that the other half

12 of the payment, which now would be $175,000, would be paid on

13 the effective date of the plan.  And, indeed, so as to not have

14 any issues that that payment actually gets made, we are making

15 it a condition to the effectiveness, that the second tranche

16 owed to Mr. Marcum under the deal, is a condition to the

17 effectiveness of the plan so that we don't have that delayed

18 out, anticipating potential other issues.

19        In addition, Your Honor, we had, and the Committee

20 has approved and we've gone back and forth about the forms of

21 this, they also approved that Mr. Marcum would be retained on a

22 consulting agreement, the terms of which have been put forth

23 before Your Honor.  That Mr. Marcum would be paid $700 an hour.

24 That for the first two months, I'd like to say unlimited, but

25 it is limited by his annual salary on a monthly basis, and Mr.

1  Marcum will submit an invoice for the Committee review today

2  that is far less than that, for the first two months.  And, as

3  I said, that would be done by March 16th and then after that,

4  he is limited to ten hours a month of consulting, unless the

5  Committee consents to a greater time, and with Mr. Siegel

6  coming in, that gives us this window, again, to the motion to

7  shorten from the 8th to the 16th. to get as much as information

8  as possible during the next eight days, and then after that

9  there will be a limit to the amount that you would ask for Mr.

10 Marcum's services which, again, gives us the motion to shorten.

11        Those would be the terms of the consulting agreement.

12 We do anticipate coming back to the Court with a consulting

13 agreement with respect to Ms. Moser.  We would ask Your Honor

14 to approve that incentive payment with respect to Mr. Marcum in

15 the amount of 350, to be paid on those terms.

16        In addition, Your Honor, with respect to the Crowe

17 firm and Mr. Siegel, we have introduced an engagement agreement

18 with Mr. Siegel that does provide that they would come in and

19 perform what we call standard CRO services.  Your Honor should

20 be aware, and Mr. Marcum could testify, that Mr. Siegel was

21 interviewed by the Board, was discussed with the Board, and

22 that Mr. Siegel has represented to us that notwithstanding his

23 being recommended by the Committee, that he understands the

24 fiduciary obligations, that he will be serving as an officer of

25 the company with respect to the Board.  We've gone back and

1 forth with respect to the terms in the indemnity.  We think

2 it's consistent with the other professionals that have been

3 retained in this case.  If Your Honor will look, it's two times

4 the amount of services.  That was all discussed with the

5 Committee, it's been given to Mr. Van Arsdale.

6 　　　　　We understand that the Crowe firm is, you know, very

7 well qualified to be representing the debtors here.  We are

8 comfortable with Mr. Siegel and the Crowe firm coming in.  He

9 will be working with Ms. Katie Bradshaw with respect to that,

10 and we think it's in the best interest of the estate and in

11 agreement with the Committee and it is a step further to

12 resolving differences between the Committee and the debtor,

13 towards the plan.

14 　　　　　It is anticipated that if we go forward with the

15 joint plan and we do believe we'll be going forward, that Mr.

16 Siegel then would become the liquidating trustee.  We don't

17 think that disqualifies him in any sense, but we wanted to make

18 that an open disclosure.  We have discussed that with Mr. Van

19 Arsdale.

20 　　　　　And, with that, Your Honor, we don't believe that

21 there are any objections to either the incentive plan payments

22 to Mr. Marcum in the amount of 350,000 in two tranches, the

23 consulting agreement to be entered into, effective as of the

24 January 16th date with Mr. Marcum and the CRO engagement

25 agreement with the Crowe firm and Mr. Siegel, assuming

34

1  immediate responsibilities with respect to the CRO, Your Honor,

2  and we'd ask for, to the extent -- I didn't look at the rule,

3  that there be no stay of this order, that he actually becomes,

4  as soon as the order is entered, indeed, as soon as Your Honor

5  says it, that he can get up and running.  I think he

6  anticipates coming in and being -- taking the CRO

7  responsibilities effective immediately today.

8          THE COURT:  Is there a stay for that kind of an

9  order?

10         MR. GALARDI:  I don't know, I didn't look at the rule

11 before I opened my mouth.  I'm not sure if there is, Your

12 Honor.

13         THE COURT:  But, if there is, then you would like --

14         MR. GALARDI:  If there is, I would ask for -- I have

15 to go back to the rule, I don't remember.  I don't think --

16 it's a 363 retention, that's the only reason I'm concerned.

17         THE COURT:  Okay.

18         MR. GALARDI:  There is no stay for 363?  It's a 363,

19 that's the only reason -- Your Honor, we'll look at it, but I

20 would ask Your Honor, under the circumstances, to the extent

21 that there's any stay, that we become immediately effective and

22 that he be able to -- I sometimes raise issue without thinking

23 of it -- that we go forward immediately with his retention and

24 that he can start the services and be retained.  But, it is a

25 363 and that's the only reason I wanted to make sure.

35

1          THE COURT:  All right.

2          MR. GALARDI:  Thank you, Your Honor.

3          THE COURT:  All right. Does any party wish to cross

4     examine the proffered witnesses?

5                    (No audible response)

6          THE COURT:  All right.  The proffers will be

7     accepted.  Does any party wish to be heard in connection with

8     the debtors' motion?

9          MR. SIEGEL:  Good morning, Your Honor, Alfred Siegel,

10    the proposed CRO.  And, thank you for the telephonic

11    conference.

12         THE COURT:  You're welcome, Mr. Siegel.

13         MR. FEINSTEIN;  Good morning, Your Honor, Robert

14    Feinstein, Pachulski, Stang, Ziehl and Jones, counsel for the

15    Committee.  I'll be brief, Your Honor.

16         Mr. Galardi fairly laid out the history of these

17    matters, the terms and I can confirm that these were protracted

18    negotiations over every detail of the Crowe Horwath engagement

19    letter, Mr. Marcum's consulting agreement, the terms of the

20    payment of his bonus.  The Committee does support immediate

21    relief for all the reasons Mr. Galardi noted, and we ask that

22    the motions be approved.

23         THE COURT:  All right, thank you.  Does any other

24    party wish to be heard?  Mr. Van Arsdale?

25         MR. VAN ARSDALE:  Robert Van Arsdale for the U.S.

1 Trustee, Your Honor.  We also agree that this is what is

2 appropriate at this time and to the extent any other rules

3 would apply, that would keep this from happening, we would ask

4 for the Court to overrule those, too.

5           THE COURT:  All right.

6           MR. VAN ARSDALE:  Thank you.

7           THE COURT:  Thank you.  Mr. Galardi?

8           MR. GALARDI:  Your Honor, just -- you know, my mind

9 wanders, 363 does have 6004, which does have the (h) provision

10 which is a 14 day stay.  And since we are retaining the CRO

11 under 363, there is a stay, so I would ask for a waiver of that

12 stay.

13           THE COURT:  All right, thank you.  Does any other

14 party wish to be heard in connection with either of these two

15 matters?

16               (No audible response)

17           THE COURT:  All right.  With regard to the debtors'

18 motion for an order under Section 363, authorizing the debtors

19 to retain Mr. Siegel, the Court will grant that motion and the

20 Court will grant that motion immediately, and waive any time

21 requirement set forth in the rule.

22           With regard to the debtors' motion authorizing the

23 debtor to pay the wind down incentive to Mr. Marcum, that is

24 also approved, based on the representations made to the Court

25 by Mr. Galardi this morning.  And, the Court would ask you to

1 submit orders to those effects.

2          MR. GALARDI:  Thank you, Your Honor.  Your Honor, the

3 next item that I'm handling is the matter Number 12, which is

4 the debtors' objection to the claim of Panasonic Corporation.

5          Your Honor, with respect to that motion, we are

6 actually going forward, I believe, on a very narrow legal issue

7 and only legal issue today.

8          Let me give Your Honor what I believe are the

9 uncontested facts.  One, there is a consignment agreement that

10 was attached and we have provided that to you.  Two, Panasonic

11 does not contest, and I don't mean to put the rabbit in the hat

12 by saying these words, but I'm going to say them the way that I

13 ordinarily understand them.

14          Panasonic does not dispute that goods were delivered

15 to the debtors, that we are speaking about, prior to the 20

16 days before the case.  Whether that's receipt, that's the legal

17 issue we're going to talk but there is no dispute that they

18 were actually delivered and in our physical possession 20 days

19 before.

20          Your Honor, I also don't think that there is any

21 dispute that upon the delivery of those goods, under the

22 agreement, and I think it's Section 4 and Section 5 of the

23 consignment agreement, that Circuit City had various reporting

24 obligations and that there was a certain risk of loss under

25 Section 5 of that agreement, that Circuit City, in fact, had

1   that risk of loss.

2          In addition, Your Honor, I don't think there is any

3   dispute, and I think this is maybe Section 1 or 2 of the

4   agreement, that title to those goods does not pass to Circuit

5   City until Circuit City sells it to the customer and what the

6   document actually says in the agreement is that title passes,

7   essentially, simultaneous, but the instant before, in some

8   sense to Circuit City and then Circuit City passes the title to

9   the ultimate customer.  There's also no dispute that that

10  happened within the 20-day period.

11         So, Your Honor, the question that we raise for the

12  Court and what we've done is objected to their argument that

13  it's a 503(b)(9) claim.  Our argument is that Your Honor should

14  read receipt, so it's goods received within the 20 days.  We

15  believe that under a consignment agreement or any other

16  agreement, given the uncontested fact that the debtors came

17  into physical possession of those goods, outside the 20 days,

18  that, therefore, regardless of when the sale transaction, when

19  the ownership or title passed, that it is goods received with

20  the 20 days, this doesn't satisfy the first prong of the

21  503(b)(9) test because these goods were received, under

22  503(b)(9) before the 20 days.

23         And, Your Honor, we would rely one, I think on your

24  own opinion that, you know, receive means physical possession

25  under the UCC; two, if you look at the consignment agreement

1  itself, I'll just point out a few sections of that agreement.

2  So, again, I think it's ordinary parlance, but Section 4B, the

3  second sentence says, "Upon receipt of the consigned products,

4  Circuit City will issue an inbound confirmation report

5  detailing the quantity of goods received at the applicable

6  distribution center, or other location."   I am reading 4B,

7  second sentence.  I'm just pointing to a few of these.

8       Then I'll go to 5, which is the responsibility for

9  the consigned products, and it says, "All risk of loss and

10  damage in connection with the consigned products, shall be

11  transferred to Circuit City."  I'll go to 3, confirmation of

12  receipt by its own expense.  Confirmation of receipt by Circuit

13  City in accordance with 4B.

14       In addition, Your Honor, you will see down in the

15  separate account, that Circuit City shall maintain -- second

16  sentence -- detailed records of the consigned products received

17  on consignment and the disposition thereof, their hold on

18  consignment until sold and in 6, again, you'll see the word

19  then the sale notion.

20       Your Honor, we think that the normal parlance, that

21  the way in which 503(b) has to be interpreted, is received

22  means actual physical possession.  There is no factual dispute.

23  It is not a title transfer statute, 503(b)(9), it is a receipt

24  and then sell.  So, Your Honor, we would argue that receipt

25  means actual physical possession, not the date that the title

1  transferred.  Panasonic raises the other issue, they say it's

2  when the title transferred, and when the sale is, and, Your

3  Honor, it's a legal issue that, again, like we've presented

4  before, is fairly novel.  We don't see any opinions on that

5  matter.  We have cited the one gasoline case.  Again, that's

6  probably not the perfect case for either party to rely on, but

7  I think it goes better for the debtors in the sense that in

8  that case, the gasoline was received, whether it was

9  consignment or not, a consignment was the issue, it was

10  received outside the period and the Court said even if I did

11  reconsider, I wouldn't give you a 503(b)(9), it's certainly not

12  binding on this court.

13        So, Your Honor, we would argue that the Panasonic

14  503(b)(9) claim that we've objected to, should be disallowed

15  and the goods were not received within the 20 days.

16        THE COURT:  The Court previously, in looking at the

17  interpretation of the word goods, did look at the definition of

18  goods in the UCC.  Here, we're interpreting the word received

19  and, of course, that word is not defined in the UCC, the word

20  there is receipt.  What distinction, if any, do you think the

21  Court should make of that?

22        MR. GALARDI:  It's going to be very easy for me to

23  say, I don't think you make a distinction at all, Your Honor.

24  And, even if you weren't to rely on the UCC, okay, so the first

25  thing is, I think receipt/received, it's used throughout the

1  UCC.   Interestingly, it's not defined in the consignment

2  section, it is in the goods and the reclamation statute.   So,

3  you can use it as one source, but if you simply go to the

4  dictionary, received means, I actually got delivery, I actually

5  got possession.   And, if you look at the document, so even if

6  you just wiped clean any UCC interpretation and just used the

7  dictionary interpretation, I think you can still rely that it's

8  physical possession.   And, it doesn't say, and you don't have

9  to -- you can receive goods in all sorts of way without title.

10 I don't think the ordinary parlance means, if you receive

11 something from A that you, therefore, got title for it, and

12 what Panasonic is trying to argue is that you look at title,

13 which is not the ordinary sense of receipt, whether you use a

14 dictionary definition, or you use the UCC definition, and we

15 would rely on both.

16          THE COURT:  All right, thank you.

17          MR. GALARDI:  Thank you.

18          THE COURT:  Does any party wish to be heard in

19 connection with the debtors' objection?

20          MR. ACKERLY:  Good morning, Your Honor.

21          THE COURT:  Good morning.

22          MR. ACKERLY:  My name is Ben Ackerly and I'm here on

23 behalf of Panasonic.  I am a pinch hitter as they say in

24 baseball.

25          Your Honor, I think Mr. Galardi has correctly stated

1  what the issue is.  I think the consignment agreement speaks

2  for itself.  I understand that has been filed under seal with

3  the Court and I think for purposes of any decision the Court

4  has to make on this issue, the Court has to take into

5  consideration the consignment agreement and what the

6  consignment agreement says.

7       I think Mr. Galardi is also correct that this appears

8  to be an issue of first impression.  We can't find any cases

9  that involve a consignment agreement as it applies to

10  503(b)(9).  This Court, of course, has addressed goods, but has

11  not addressed received or receipt in the context of 503(b)(9).

12       So, I think, essentially, the issue before the Court

13  is, what does received mean, in the context of 503(b)(9), when

14  the good are delivered to the debtor pursuant to an assignment

15  agreement, outside the 20 days, before the petition date, but

16  pursuant to the consignment agreement sold to the debtor in the

17  ordinary course at the debtor sells the goods to the ultimate

18  consumer.

19       I think to adopt the argument that has been made by

20  the debtor here would mean a ruling, essentially, that never

21  can consigned goods be protected by 503(b)(9) unless you have

22  the unusual circumstance where they are actually delivered

23  within the 20-day period and sold within the 20-day period.

24       Now, let me just take you on a little bit of a short

25  walk through the UCC here, because we believe that there is a

1  justification for the Court to find that under these facts,

2  503(b)(9) does apply to Panasonic.

3       As the Court has previously found, goods are defined

4  in the UCC.  They are defined both in Article 2, dealing with

5  sales, and in Article 9, dealing with consignments.  Receipt is

6  defined in Article 2, but not Article 9.  And, as the Court

7  pointed out, received is not defined in the UCC, so far as I'm

8  aware.

9       Consignment is defined in Article 9, but not Article

10  2.  And, it's defined as a transaction, regardless of its form,

11  in which a person delivers goods to a merchant for the purpose

12  of sale.  I think the Court is probably aware that where the

13  UCC was amended, they took consignments out of Article 2, and

14  put consignments into Article 9.

15       So, merchandise that is transferred under a

16  consignment, is not a sale, and the consignee holds the

17  merchandise as bailee for the consignor.  So, in essence, you

18  have a delivery in trust.  And, so, Circuit City, until it

19  sells the goods, holds those goods in trust.  In effect, Your

20  Honor, it receives the goods as an agent, not as a buyer.

21       Merchandise transferred under a consignment is not

22  received in the Article 2 sense, because there's no sale, and

23  the sale does not take place until the ultimate sale to the

24  customer.  It's a bailment.  And, if you look at the

25  consignment agreement, you'll see that Panasonic pays the

44

1   property taxes on the goods that are subject to the bailment.

2          So, the goods in this case are received by Circuit

3   City when they are sold by Circuit City to a customer, in which

4   you look at Article 9 and not Article 2.  Prior to that, they

5   are not received by Circuit City and they have not been sold to

6   Circuit City.

7          Now, if you think about 503(b)(9), and what was

8   Congress trying to do in 503(b)(9), there appear to be four

9   critical words in 503(b)(9).  The first is receipt; the second

10  is goods; the third is sale, and the fourth is ordinary course.

11         What was delivered under Article 9 would be goods,

12  but there was no sale, until the ultimate sale.  And, I don't

13  think there's any dispute that they were delivered and sold in

14  the ordinary course of business.  So, the question comes back

15  to receive, and our position is, Your Honor, that because it

16  was a bailment, there was no receipt in the context in which

17  Article 2 contemplates that there be a receipt, because the

18  goods are, in fact, held in trust for Panasonic, and not by the

19  debtor.

20         So, our argument on that point is that the receipt

21  definition is physical possession of goods, but if you look at

22  the definition of receipt, the definition of receipt says

23  physical possession of goods, if you look at the definition of

24  goods in Article 2, Article 2 definition of goods says, the

25  goods must be identified to a contract of sale.  And, there's

1  no contract of sale here until the goods are sold, because

2  that's when the title transfers.

3          So, Your Honor, it is our position that in the facts

4  of this case, the Court should find that the consignment

5  agreement gives Panasonic a 503(b)(9) claim with respect to

6  goods that were delivered outside the 20-day period, but sold

7  by Panasonic -- sold by Circuit City, within the 20-day period.

8          And, we think if you think about what Congress was

9  trying to do with 503(b)(9), they were trying to protect

10 merchants who sold goods within the 20-day period.  I think

11 receipt had -- I was trying to figure out this morning, why

12 they used the word received in there, why that was so important

13 to them, but let's just concede that receive does have some

14 meaning within the statute, but the real purpose of the statute

15 is to protect a merchant who sold goods to the debtor within

16 the 20-day period and, therefore, the debtor benefitted from

17 that sale.  The estate increased in value.  And, in this case,

18 with a consignment, the estate increased in value when the

19 consigned goods are sold, because the debtor receives the money

20 from it.   Panasonic did not receive the money.

21          So, here, in this situation, you had Circuit City

22 preparing to file Chapter 11 bankruptcy, and during the 20-day

23 period, it bought Panasonic's goods and didn't pay for them.

24 And so we're in the same position as any other seller with

25 respect to the goods.  So I would ask the Court to consider

1  that.

2           THE COURT:  All right.  Mr. Ackerly, two questions.

3  The -- and I think we all agree that if we were writing this

4  provision we would draft it a little bit differently.  I think

5  this is the fourth time I've had to construe this specific

6  section.  But when you say that there are four words that are

7  operable, the words right before sold where it says, in which

8  goods have been sold, you say there's no sale, what do you take

9  away from the past tense there?  Does that mean that those

10 goods had to be sold within the 20 days before the petition

11 date?

12          MR. ACKERLY:  I think what it means -- I think the

13 20-day, I think the sale has to be within the 20-day period if

14 that's the Court's question.

15          THE COURT:  All right.  And so your goods were

16 actually sold within the 20 days before the petition date?

17          MR. ACKERLY:  Right.

18          THE COURT:  All right.  That was my first question.

19 The second question is, if this is an Article 9 transaction,

20 why do you need to have this kind of relief?  Why doesn't your

21 security interest in these goods protect your client?

22          MR. ACKERLY:  Because once the goods are sold by

23 Circuit City, our security interest terminates in those goods.

24          THE COURT:  Well, no, no.  Because under Article 9

25 you have a consignment agreement is treated as a security

47

interest.  As long as it was properly perfected you would have

a properly perfected lien on the goods.  Is there a perfection

issue here I guess is what I'm asking.

      MR. ACKERLY:  I'm not aware of a perfection issue,

but let me go back and answer your question again.

      THE COURT:  Yes.

      MR. ACKERLY:  My understanding is in this case, Bank

of America had a blanket lien --

      THE COURT:  Right.

      MR. ACKERLY:  -- on everything.  The security -- the

consignment security interest is a perfected security interest

which protects us against Bank of America's blanket lien.  But

the point is, we're talking here, Your Honor about Panasonic

product that was delivered to the debtor outside the 20 days,

but sold by the debtor within the 20-day period.  So once those

goods are sold to customers, our security interest doesn't

reach to those customers --

      THE COURT:  Agreed.

      MR. ACKERLY:  -- and we can't go claim the goods from

the customers.

      THE COURT:  But you have a security interest in the

proceeds.  Why not?   That's what Article 9 says.

      MR. ACKERLY:  They are obligated to turn the proceeds

over to us within five days of the sale.

      THE COURT:  All right.  And if you have a security

1  interest in those proceeds, why aren't you making that

2  argument?  Because that to me is the better argument.

3          MR. ACKERLY:  I would have to go back and examine the

4  consignment agreement carefully and the security interest.  But

5  there's not, there is reference in one of the financing

6  statements, I think, to proceeds, but I think that they're

7  obligated to pay the money over to us within five days.  I'd

8  have to look at that, I'd be glad to address that, Your Honor.

9  But --

10          THE COURT:  All right.

11          MR. ACKERLY:  -- I'm not prepared on that question.

12          THE COURT:  All right.  All right, thank you.  Those

13  were my questions.  Mr. Galardi?

14          MR. GALARDI:  And as Your Honor asked the questions I

15  had already started to draft -- I mean, we do have to say why

16  would a consignment vendor be in this situation in the first

17  place, because of all the questions Your Honor asked.  And the

18  reason that they're moving under 503(b) is there is a

19  perfection issue here with respect to prepetition, because if

20  you think of your normal consignment, if you had sold the

21  goods, the proceeds go into a separate account, that separate

22  account is never commingled, there would have been identifiable

23  proceeds, you'd never have to rely on 503(b)(9).  The problem

24  is, and they have a claim for this, an unsecured claim, those

25  proceeds didn't get put in an identifiable separate account.

1  As Your Honor knows, we turned over our DIP, all the funds were

2  commingled, and as between choosing to fight on the consignment

3  issue with Bank of America and along those lines, they chose to

4  seek a 503(b)(9) claim.

5          The fact of the matter is, if they're just like any

6  unsecured creditor, that's the claim they have, they have a

7  claim for the loss of the proceeds because their security

8  interest could not trace through those proceeds.  So we come

9  back to this statute really goes to the normal sense of

10 received or the UCC sense of received, physical possession,

11 whether Bailey or anybody else, it's physical possession, the

12 goods have to be sold within, we agree it has to be sold within

13 the 20 days, but the statute goes to when were the goods

14 received and the statute says received within the 20 days.

15 They were not received within the 20 days, the sale did occur

16 within the 20 days.

17         THE COURT:  All right.

18         MR. GALARDI:  So, Your Honor, that's why a

19 consignment vendor is really not a consignment vendor even if

20 it is in this sense the way that their document worked.  It was

21 truly the fact that they can't trace, commingle.  This is a

22 fallback position from that argument.  And indeed, the

23 stipulation that we entered into avoided those issues, because

24 the stipulation going forward said, look, we're going to come

25 up with the fiction, as we did with many of our consignment

50

1  vendors regardless of what the past was, we are going to get a

2  court order that says we can live with the fiction as if we

3  were segregating the proceeds so as to not to add insult to

4  injury in the post-petition period.  That's exactly what we did

5  with Panasonic, and paid them on the post-petition basis and

6  paid them as the sales occurred as to when their claim for

7  payment arose.  That's a different issue.

8         So, Your Honor, I think that's really why 503(b)

9  should not be fit to sort of get the consignment vendor in here

10 because they have their rights under Article 9.  It's really

11 when the consignment vendor cannot exercise those rights that

12 you look to 503(b)(9), and when you can't, you should read

13 503(b)(9) like you do for everybody else, goods received within

14 20 days, ultimately sold, then you get that value.

15        And so we would argue that they don't have a

16 503(b)(9) claim, and, Your Honor, if they want to go back to

17 assert a consignment claim and a tracing argument in proceeds,

18 nothing we're doing here stops them from doing that.  I think

19 that's why they just decided not to proceed there.  And we

20 don't think it's a 503(b)(9) claim, without prejudice to any

21 consignment rights or otherwise, you know, attaching to

22 proceeds.

23        THE COURT:  Okay.  One question.  Were any of the

24 Panasonic goods received by the debtor in the 20 days before

25 the petition date?  Because it looks from the papers it sort --

1           MR. GALARDI:  Again, Your Honor, you're doing the

2    sort of periods that I looked at.  One, there are goods that

3    were received prior to the 20 days that were sold within the 20

4    days, that's what we're fighting at.  If there were goods

5    received and sold within that 20-day period, we've paid them

6    the proceeds, we don't think that there's a dispute on whether

7    that could be a 503(b)(9) even if not perfected.

8           THE COURT:  Because you treated that as a consignment

9    claim going forward.

10          MR. GALARDI:  Consignment claim.  But it was both

11   received and paid, so it wasn't worth fighting whether it was a

12   consignment and valid or whether it's a 503(b)(9), it's still

13   an administrative expense claim, so we don't have a problem

14   with that.  If they were received, but not sold until

15   post-petition, we paid them on post-petition, because the

16   contract said we had to pay it and it was consignment on the

17   petition date and we entered into this stipulation saying we'll

18   deal with the fiction, right, we won't segregate, we accounted

19   for the goods in that petition, we said this is what we had.

20   So we had a choice on the petition date.  Give back the goods

21   because the title had not passed or sell them and make money.

22   We agreed to sell, make money and remit proceeds.

23          So we dealt with all of those periods, and that's the

24   consistent, and so it's only this ambiguous pre-20 day receipt

25   sell within the period, we just took the position that either

52

1  it's a valid consignment, go ahead and trace, but if you can't

2  trace, it's certainly not a 503(b)(9) and that's how we --

3  that's why we don't think it's a 503(b)(9) claim at all.

4          THE COURT:  All right, thank you, Mr. Galardi.

5  Anything further, Mr. Ackerly?

6          MR. ACKERLY:  Your Honor, with respect to the

7  perfection of security interest, I wasn't aware that that was

8  going to be an issue today.

9          THE COURT:  And I apologize for bringing up an issue

10 that may be I shouldn't have been raising.

11         MR. ACKERLY:  I mean, if that's critical to the

12 Court's conclusion here, then I think Mr. Galardi and I have to

13 see whether we can stipulate as to what the status was.  All I

14 know is this was a true consignment and we're arguing whether

15 the goods were received under 503(b)(9), not whether there was

16 a perfected security interest in what our rights were in

17 proceeds.  Thank you.

18         THE COURT:  All right, thank you.  All right, the

19 Court has before the debtor's objection to the claim of

20 Panasonic under Section 503(b)(9).  The Court has reviewed the

21 papers filed by the parties in this matter and the Court,

22 consistent with its prior ruling is going to adopt the

23 definition of receipt in the uniform commercial code as its

24 definition for received in Section 503(b)(9).  The Fourth

25 Circuit having a rule previously that where a term is not

53

1  defined in the Bankruptcy Code, the Court's to look to state

2  law for the interpretation of that phrase.  And so based on

3  that, the Court is going to look to when did the debtor receive

4  physical possession of the goods and as that occurred more than

5  20 days prior to the petition date, the Court is going to

6  sustain the debtor's objection to the 503(b)(9) claim.  That is

7  without prejudice, however, to Panasonic raising whatever

8  consignment claims it may have with regard to any tracing or

9  secured status that it may assert as a result of its

10 consignment agreement.   Any question regarding the Court's

11 ruling?

12         MR. GALARDI:  Your Honor, since this will -- in the

13 past and we can talk about it -- since this is probably going

14 to be another decision that we're going to rely on in the

15 future, does Your Honor want us to put proposed findings of

16 fact and conclusion of law so that we can enter an order that

17 will be sort of -- well, it won't sort of be -- it will be law

18 of the case going forward because there are other people that

19 are waiting for this decision to decide to go forward, or would

20 Your Honor want to write an opinion or want to see our findings

21 of fact and then decide?

22         THE COURT:  Please submit findings of fact,

23 conclusions of law and the Court will make a decision whether

24 it's going to write an opinion based thereon.

25         MR. GALARDI:  Thank you, Your Honor.  We will

54

1 obviously circulate that to counsel to Panasonic for review

2 before we submit it.

3          THE COURT:  All right, thank you.

4          MR. ACKERLY:  Your Honor, the next matter that -- and

5 I think it is actually the last matter on the agenda that is an

6 open matter is Item Number 23.  This the debtor's 56th omnibus

7 objection to claims.  It is to seek to disallow certain alleged

8 administrative expenses on account of employee obligations.

9          Your Honor, as set forth in the motion, there were

10 seven programs, and I think it's important to note that these

11 programs are not sort of a severance or paid time off or what

12 I'll call accrual obligations.  The seven obligations that we

13 were seeking to, that people filed claims are with respect to

14 are, there was a long term incentive program, there was a cash

15 retention and a long term cash award.  There was a short term

16 incentive program, there was a chairman's award program, a

17 phantom stock program, a restricted stock program and various

18 employment agreements.  Importantly, Your Honor, with respect

19 to every one of those programs except the short term incentive

20 program, there was actually a letter agreement with each of the

21 claimants advising them what their rights are and having a

22 contract underlie it or an agreement underlying their

23 entitlement to these.

24          With respect to every one of the seven programs I

25 just listed, they were in effect prior to the bankruptcy.  With

1   respect to each of the agreements, they were in effect prior to

2   the bankruptcy.  And the only different -- and then with

3   respect to the claimants, the claimants say that

4   notwithstanding these being in effect and subject to

5   documentation of the agreement that they are in this and that

6   they would get X awards, each of the claimants assert that they

7   had an administrative claim, either because one, some event

8   happened that vested them in their rights, or two, that there

9   was a change of control transaction that has occurred.

10        Your Honor, we will assume for the sake of argument

11  today that there was a vesting event and that there was a

12  change of control, but we don't think there's been a change of

13  control, maybe it will happen on the plan of liquidation being

14  confirmed, but we don't think there's a change of control.

15        What we believe, Your Honor, however, is

16  notwithstanding the vesting, notwithstanding meeting milestones

17  under the employment contracts or anything else, Your Honor,

18  under the Fourth Circuit standard of what a claim is, we

19  believe that since these are prepetition agreements,

20  prepetition programs put into effect by the company prior to

21  the filing, that in most instances, except for that short term

22  incentive, the person's entitlement was the result of a

23  prepetition agreement with that individual.  And because every

24  one of these persons have been paid wages, salaries, et cetera

25  during the post-petition period, and that these were not what

1  I'll call accrual-based awards.  It's not as if each day, which

2  I think distinguishes it from the Hechinger, each day you

3  worked you got more.  It was sort of you had to hit the hurdle

4  of the best to get the whole thing.

5          We believe that each of these claims is a full

6  prepetition, unsecured nonpriority claim and that each of these

7  individuals has also filed a duplicative claim essentially, for

8  prepetition, so not only do we seek to say it's a prepetition

9  claim, we're not seeking just to reclassify it, but to disallow

10 it, because all of these claims were filed after the

11 prepetition bar date.  The good news for the individuals is we

12 don't believe any individual is going to be really prejudiced

13 other than their right to an administrative claim, because they

14 did file prepetition, unsecured claims that are essentially

15 duplicative of this.

16         Your Honor, we believe that the Fourth Circuit

17 conduct test is what governs here.  The facts giving rise to a

18 claim, thought it may have been contingent upon vesting or a

19 change of control occurred all prepetition, and that therefore

20 it is a prepetition, unsecured claim and since they were filed

21 after the bar date should be disallowed as a late filed claim.

22 Thank you.

23         THE COURT:   All right, thank you.  Does any party

24 wish to be heard in connection with the debtor's objection?

25         MR. McCULLAGH:  Good morning, Your Honor.

1          THE COURT:  Good morning.

2          MR. McCULLAGH:  Neil McCullagh here on behalf of one

3  of the claimants, Dawn VonBechmann.  Your Honor, if I could

4  just briefly recite the facts relating to Ms. VonBechmann, she

5  was given a cash retention award via a letter dated January 3,

6  2008.  She signed that letter agreement January 15, 2008.  That

7  letter provides that the cash retention award was $125,000.

8  The first half of that, $62,500 would vest on January 1, 2009.

9  The second half in the same amount would vest on January 1,

10  2010.  Ms. VonBechmann was a vice president with the company.

11  She did stay employed with the company through January 1, 2009,

12  the first vesting date, and then she was told on or about

13  January 16th, 2009 that she was being let go in connection with

14  the debtor' decision to liquidate.

15          She filed a timely administrative claim for the

16  $62,500 portion that had vested on January 1.  She did not make

17  any administrative claim under any of the other programs that

18  Mr. Galardi mentioned, although she was a party to some of

19  those.  She does not assert any change in control.  She also

20  has not been identified as the debtor, and I think correctly so

21  as not a key employee who would be subject to the key employee

22  retention plan restrictions and the code the debtor filed, it's

23  a reply to the various claims this past Thursday, I believe it

24  was, and did not identify her as someone who would be subject

25  to the KERP restrictions.

1          Your Honor, I'd like to take the arguments set forth

2    in the debtor's brief a little bit out of turn.  The first one

3    relates to these agreements being executory contracts, which

4    the debtor can reject and therefore render any claims to be

5    prepetition claims.  I don't believe that was an argument

6    originally set forth in the objections, so I've not had an

7    opportunity to research it as much as I would like.  But I do

8    believe that argument is incorrect.  The debtor does not assert

9    in its brief any case factually on point in this scenario.

10   I've done some research on that question over the last couple

11   of days, and I would cite the Court to a decision from the

12   District Court of the Eastern District of Virginia in the U.S.

13   Airways bankruptcy.  The case is B.N.Y. Capital Funding, LLC v.

14   U.S. Airways Inc.  It is 345 B.R. 549, and it's a case that

15   would be familiar to Mr. Foley, because he is listed as counsel

16   for U.S. Airways in that case.  In that case, the District

17   Court found that a letter of intent that the debtor had entered

18   into with B.N.Y. Capital Funding prepetition was not an

19   executory contract and was rather a unilateral option contract.

20   The letter of intent in that case allowed the debtor to require

21   B.N.Y. Funding to provide financing for some purchases of jet

22   airliners.  The Court though found that the debtor had no

23   obligation under that letter of intent and therefore it was not

24   an executory contract under the Countryman definition of

25   executory contract.  The Court stated in this case, U.S.

59

1  Airways had no binding obligations and thus the contract was

2  not executory under the Countryman definition.  I would assert

3  the same thing is true with respect to this cash retention

4  award with Ms. VonBechmann.  Nowhere in that letter agreement,

5  for lack of a better term, does she undertake any new

6  obligation to the debtor.  There's a contingency, she has to

7  remain employed with the company in order to get the bonus that

8  would vest later on, and that's the only contingency she has to

9  meet.  The letter agreement specifically states it is not

10 performance-based, it's a very simple agreement.  Stay employed

11 this long and you get this payment.  But if she declined, if

12 she left employment with the company, they couldn't try to

13 compel her to perform, they couldn't pursue damages, there was

14 nothing there.  It was simply an option that she had that was

15 put in front of her as an incentive to stay.  So I think the

16 executory contract argument fails.

17      Your Honor, I think the crux of the debtor's argument

18 throughout their brief is the conduct test which Mr. Galardi

19 referenced and first arose or first was elaborated on by the

20 Fourth Circuit in the Robins case, of course that was a Dalkon

21 Shield case that was not similar in any way to this scenario

22 we're dealing with today.  I think in none of the cases, maybe

23 save one that the debtors cite, is there any

24 post-petition performance by the person who's seeking a claim.

25 In the Robins case there's the Dalkon Shield inserted

60

1  prepetition.  There's nothing that happens post-petition.

2          In the Thompson case, Judge Bostetter's opinion that

3  I think is frequently cited in the brief, there is no post-

4  petition performance of any kind by the -- in that case it was

5  the debtor who the Court was deciding had a claim that was

6  prepetition.  But in that case, the debtor, as I understand the

7  opinion, had been on disability and was not performing any

8  service to the police force at any time post-petition.  So

9  there was no post-petition performance of any kind.

10          Likewise, the Stewart Foods Fourth Circuit case that

11  is cited in Circuit City's brief involved no post-petition

12  performance.  In that case the claimant was an executive who

13  had finished his service to the debtor prepetition and simply

14  had a contract with the debtor to provide continued -- whereby

15  the debtor was supposed to continue paying his salary, but he

16  wasn't doing anything for the debtor post-petition.

17          In this case, of course, Ms. VonBechmann provided

18  service post-petition precisely because the debtor was giving

19  her incentive to do that.  That was the point of these

20  agreements was to get people to stay around.

21          THE COURT:  Well, doesn't that necessarily mean it's

22  part of her employment contract?

23          MR. MCCULLAGH:  Your Honor, it was in connection with

24  her employment.  It was not in any way incorporated.  It did

25  not incorporate the --

1           THE COURT:  But you just said one of the reasons that

2    she stuck around, one of the reasons that she performed was

3    because she had the prospect of getting paid.  Isn't that just

4    the classic way that employment contracts work, one person

5    works, the other person pays for the services rendered.

6           MR. MCCULLAGH:  Of course.  But there was a separate

7    -- and I'm not sure I'm fully comprehending the question -- but

8    there was a separate employment contract here and she was

9    performing under that.  This was simply an additional separate

10   incentive to remain during what were clearly difficult times

11   for the debtor.  I'm not sure I've answered your question, but

12   I have cited in the Court's -- or in my application, the

13   Campbell Electronics case.  I understand that's not binding on

14   this Court, it's a Louisiana case.  In relevant part though,

15   the Court there and that also involved a severance payment.

16   Factually similar in that it involved the exact same dollar

17   amounts we have here, $62,500.  It also involved someone who

18   was identified as a vice president with the company.  And the

19   Court said, these sorts of agreements should be enforced,

20   because if they're not, they're not going to be respected by

21   the people who sign them, they're simply not going to have any

22   force.  And that's the only precedent I found that I think was

23   closely on point.

24           I would also point out there's a sort of asymmetry

25   between the debtors in this scenario and people like Ms.

1  VonBechmann, who is not an insider of the company.  She didn't

2  -- she doesn't understand the bankruptcy process.  She didn't

3  have counsel at the time that the debtor filed bankruptcy or

4  even when her employment was terminated.  She didn't contact me

5  until subsequent to that.  The debtor knew this agreement was

6  out there.  They had to know that she was relying on it in part

7  or at least had been incentivized to stay.  They're the ones

8  who could have taken action and filed a motion to reject or

9  something to put her on notice that you're not going to get

10 this money.  Now, maybe they didn't know at the time.  I

11 understand there was negotiations going on at the time, the

12 debtor was trying to survive, it didn't know that yet.  But I

13 think it was the debtor who had the better source of

14 information as to whether this money, whatever be paid.

15         Your Honor, the one case I mentioned that is that the

16 -- both I've cited and Circuit City has cited is Judge

17 Mitchell's opinion in the <u>Dornier Aviation</u> case, which is not a

18 reported opinion, but it's a very well reasoned opinion.

19         THE COURT:  And I'm familiar with that opinion, and

20 in fact I was going to ask you next about that.

21         MR. MCCULLAGH:  Yes.  Judge Mitchell I think there,

22 ultimately that is a case where there is some post-petition

23 performance.  The debtor -- or the employee is not let go until

24 after the petition's been filed and he makes his claim for

25 severance at that time.  And Judge Mitchell, after looking at

1  the various precedents on this, decides that's not an

2  administrative claim, but he also, I think, leaves the door

3  open to sometimes it should be if it's reasonable.  I think he

4  says if we were talking about one or two weeks of severance,

5  that's not the sort of thing that the debtor would be required

6  to get advance court approval for, it's ordinary course of

7  business.  But he says in the case of a highly paid executive

8  who's seeking six months of severance, that's a different

9  story.  That is the sort of thing that the debtor would have to

10  get advanced approval for, and that's what we're dealing with

11  here, so I'm not going to allow it.

12         In this case, obviously $62,500 is a lot of money.

13  But in relation to Ms. VonBechmann's compensation, it is only

14  20 percent at best.  Her salary was $275,000.  She also was

15  part of the normal annual bonus program would have paid her

16  another $137,000.  On the salary alone this cash retention

17  award wasn't even 25 percent of her normal pay.  Once the bonus

18  is added into that, that percentage goes down even more.  So

19  it's a lot of money, but I think overall this is not out of the

20  ordinary when you consider her base pay as a way of trying to

21  get her to stay around.

22         Your Honor, the final argument I wanted to make

23  relates to the accrual point in the Hechinger case that Mr.

24  Galardi made.  This is an unusual kind of agreement.  Hechinger

25  didn't deal with the cash retention award and I haven't found

1  another case that did.  If this kind of claim doesn't accrue

2  over time, it doesn't exist at all.  There's no consideration

3  that she was providing to the debtor other than staying

4  employed.  That was it.  At the instant she signed that

5  agreement, she had provided nothing to Circuit City.  It was

6  only if she stayed over time that it was meaningful.  So even

7  though the agreement doesn't provide the $62,000 -- $62,500

8  accrues in pieces on each day, that's the essence of the

9  agreement.  That's what it is.  That's what it's all about.

10  That's why she stayed.  So I think even if the Court declines

11  to find the entire amount to be an administrative claim, I

12  think it's a recognition of the basic essence of the agreement

13  to find that there was a post-petition performance, there was a

14  post-petition benefit.  That's why the debtor asked her to do

15  this, and that's why the debtor set that price.

16       So again, if the Court is not inclined to award the

17  entire amount, I think a prorating from the petition date

18  through at least that first vesting date of January 1 would be

19  appropriate for her.  And that's all I have.

20       THE COURT:  All right, thank you.  Mr. Galardi, do

21  you wish to respond to each one or do you want to wait until

22  everybody's had their turn.

23       MR. GALARDI:  It's Your Honor's preference.  I think

24  the issues are going to be sort of similar so I might as well

25  wait until the last --

65

1        THE COURT:  And that's the Court's preference.  I

2   just wanted to -- all right, is there any party here on behalf

3   of Mr. Besanko.

4        MR. GALARDI:  Your Honor, I should have clarified

5   this at the start.  Mr. Wimmer, Mr. or Miss, I don't know, I

6   know Mr. Besanko is a mister, but Wimmer, Fay, Ramsey and

7   Besanko are all carved out from today's hearing and are now on

8   for March 25th.  With the understanding that if there are

9   common issues that will be law of the case and they will be,

10  you know, will be applicable to their particular instances, but

11  they didn't want to come today so they wanted to adjourn theirs

12  until the 25th.  So to the extent that they are common issues,

13  they are carved out from the arguments I made today.

14        THE COURT:  Okay.  And that's Mr. Besanko, Fay,

15  Ramsey and Wimmer.

16        THE COURT:  All right.  Thank you.

17        MR. GALARDI:   Thank you.

18        THE COURT:  All right.  Is there a party wish to be

19  heard on behalf of Linda Castle?  All right.  Is there a party

20  that wishes to be heard on behalf of Francis Telegadas.

21        MR. TELEGADAS:  Yes, sir.

22        THE COURT:  All right, sir.  Please come forward.

23        MR. TELEGADAS:  I am Francis Telegadas, Your Honor.

24        THE COURT:  Okay.

25        MR. TELEGADAS:  And I'm representing myself in this.

**J&J COURT TRANSCRIBERS, INC.**

1  I will reiterate some of the points that Mr. McCullagh made.

2  Just briefly, two days ago I received the reply brief despite

3  three and a half months going since we had to file our response

4  to the objection.  Very short notice, and the debtor knew that

5  this date was coming up.  I would ask that that not be allowed

6  simply because we haven't had time to respond to it, and it

7  brings up new arguments.

8           THE COURT:  What I will do, if you're not prepared to

9  go forward on that, is to adjourn your hearing on this to the

10  same date as the other four that Mr. Galardi just mentioned to

11  me.  But otherwise if you're not inclined to do that, then I'm

12  going to go forward with what I have.

13           MR. TELEGADAS:  I'll go forward with that, Your

14  Honor.

15           THE COURT:  Okay.

16           MR. TELEGADAS:  I'll go forward then, Your Honor.

17           THE COURT:  Okay.

18           MR. TELEGADAS:  I just think it was a way to create a

19  record that we really couldn't respond to, and I didn't

20  appreciate the fact that we got such short notice.

21           This, I don't understand why several are going on at

22  a later date.  They are common issues, and I would ask the

23  Court to make a ruling on common issues when all parties are

24  heard because there are common issues.

25           With regard to the three points or the three programs

67

1  that I'm arguing for, I was involved in a long term incentive

2  program which was rolled out literally a month before the

3  filing of the bankruptcy.  A cash retention program, which like

4  Ms. VonBechmann was rolled out at the beginning of 2008 with

5  two vesting dates 1/1/09 and 1/1/10.  My portion was $20,000

6  for each vesting period.  The bonus program, the short term

7  incentive program was also one that was rolled out as part of

8  an annual package.  It was a routine part of our compensation.

9  And half was based on personal performance.  You had to be

10 there at a certain date and you had to get a minimum rating as

11 far as your performance to get half of that.  And the other

12 half was based on company performance.  And for that my bonus

13 was just over $60,000, the exact amount is listed in my papers.

14 But half of that is -- was one that was really claiming with --

15 that's not tied to the company performance, but was tied to my

16 performance and my being there.

17      The -- like Mr. Galardi said, I did file unsecured

18 claims on all these, because the unsecured date was prior to

19 this date that we had to file, so you know, if these are not

20 allowed, you know, I'll rely on my own secured claims.  I do

21 think these should be allowed as administrative expenses.

22      Let me give a little bit of the facts.  These are --

23 all these programs are part of our overall compensation.  Just

24 like pay.  That's what they were there.  They were tied also to

25 keep people there on a long term basis, not have rollover, not

1 have turnover.  And that was very clearly made by the debtor --

2 made clear to the debtor by us.  The -- when the debtor came

3 into court and filed their initial petition, they neither

4 accepted nor rejected.  What was going on back then?  They

5 wanted to get through Christmas.  They wanted people to stay.

6 They wanted people to work and try and make this thing turn

7 around.  And so they didn't.  They sat on the fence.  They knew

8 these programs are out there.  They knew that these programs

9 had vesting dates that came after that, and again, were coming

10 up, and they didn't reject it.  They never rejected it after

11 Christmas.  They could have rejected it on December 31st.  They

12 didn't reject it then.

13        They haven't -- they waited and waited and waited,

14 they wanted people to work, they wanted people to turn this

15 company around.  We were there, we performed work.  And the

16 requirement was on the cash retention, you were physically

17 there, employed by the company 1/1/09.  That's it.  And then

18 the other half was 1/1/10.  But 1/1/09, I was clearly employed.

19 There hasn't been an objection to that, there hasn't been any

20 dispute to that.  I was there through also 2/28/09, which is

21 the date for the bonus, and I was in fact there through April

22 17 when that was my last day I was deemed a critical employee

23 for purposes of part of the wind down.

24        The company doesn't dispute that fact that for the

25 case retention award you had to have a minimum performance

1  rating of three.  I performed all the way through 2/28, I was

2  kept on after that.  If I wasn't getting the minimum

3  performance rating of three, then something was wrong if they

4  kept me around.  Also, under the Circuit City program, the way

5  it worked is that if you were less than a three, you were

6  supposed to have notice of that, you were supposed to have

7  midyear reviews to get you on track.  I had my midyear review,

8  I was fine.  So I don't think there's been any dispute that I

9  met that criteria as well.  I was there on 1/1/09, I was there

10 on 2/28/09.  I deserve the full amount of those.  I worked

11 post-petition.  They got benefit from me.  I met all the

12 criteria.

13       Your Honor, I'll be glad to answer any other

14 questions that you have.  Again, the original objection said

15 that there has to be a couple of -- to make it an

16 administrative expense there has to be a couple of criteria.

17 They need a post-petition transaction.  Post-petition

18 transaction was, I was there, I stayed, I tried to turn this

19 place around.  They also need consideration.  The consideration

20 was the work I was doing.  So I don't see why this shouldn't be

21 an administrative expense, and if Your Honor has any questions

22 I'll be glad to answer them.

23       THE COURT:  Thank you very much.  I appreciate it.

24 Is there any party wish to be heard with regard to the response

25 of Lambert-Gaffney?

1          MR. CANFIELD:  Robert Canfield, Your Honor.  I'm here

2   on behalf of both Ms. Lambert-Gaffney and Mr. Geith in this

3   matter.

4          THE COURT:  All right.

5          MR. CANFIELD:  That's G-e-i-t-h.

6          THE COURT:  All right, very good.

7          MR. CANFIELD:  As far as Ms. Lambert-Gaffney, she was

8   there for the whole time and would have been required to earn

9   the $125,000 cash retention award.  Mr. Geith, on the other

10  hand, left some time during the pendency of these proceedings,

11  so he's only entitled to $45,000 under the one program and

12  62,500 on the other.  But when I echo Mr. McCullagh's arguments

13  on the law, I think this objection also puts this Court at the

14  brink of a slippery slope.

15         And the problem that I see is one of these programs

16  was proffered by Circuit City 9/30/2008.  Obviously the

17  bankruptcy was filed roughly six weeks thereafter.  And what we

18  have, you have a number of experienced employees who were

19  encouraged to stay and try to work out -- turn this company

20  around, or on the alternative, at least facilitate in this

21  liquidation.  Not unlike all the lawyers sitting up here in

22  front of the room today.

23         And I think the analogy would be, these folks were

24  standing on the deck of the Titanic, and they said look, you

25  need to help these folks get into the lifeboats, and you hang

1    around, because we're going to bring some more lifeboats for

2    you.  This could be a benefit if you help us do what we need to

3    do.  And where we are today is that any other life boats that

4    showed up are for the captain and the executive, but not for

5    the folks who helped do the work and got the folks in the

6    lifeboat.  And so if this Court denies these claims, you'll see

7    in the future, at least in this area, is when people are faced,

8    do I stay on, do I try to work it out, or should I leave, do I

9    do what's in my own best interest?  They're going to leave like

10   the rats off a ship.

11          So, Judge, I think that your decision here today has

12   a much farther reaching impact than whether or not just this

13   program, because I think you're obviously setting a precedent

14   that's going to be known by people in future cases and they're

15   not going to hang around.  So I would echo Mr. McCullagh's

16   arguments on the law.

17          THE COURT:  Well, let me ask you.  One of the things

18   that Mr. Galardi says is that if you look at the definition of

19   claim, you know, the definition is very, very broad and these

20   were agreements that were entered into prepetition.

21          MR. CANFIELD:  Yes, sir.

22          THE COURT:  All right.  Now, and then I asked Mr.

23   McCullagh, and I wasn't really clear on the answer, you know,

24   but weren't these in the nature of executory contracts, in

25   other words, that they're a part of the employment contract in

72

1  going forward and from that standpoint I'm looking at Judge

2  Mitchell's analysis in the <u>Dornier</u> case and it is that the

3  proper analysis to do and to answer your question then -- and I

4  realize I'm going on and I'm going to give you a chance in just

5  a second to respond -- but as far as everybody just leaving,

6  isn't the answer that the debtor should or could have assumed

7  these agreements at the front end of the case and for whatever

8  reason it chose not to do that?

9          MR. CANFIELD:  Well, Your Honor, under that analogy

10 or that question, that's how we want to look at it, then I

11 would say that Circuit City misled all their employees who

12 stayed.  Because all these people stayed in 2009 and some in

13 2010 relying upon the fact that they had been told they would

14 be paid these sums if they did that.  And so now to sustain

15 these objections would be, in my view, simply to reward that

16 fraud.

17         THE COURT:  All right.  Thank you.  Does any party

18 wish to be heard on behalf of Scott Mainwaring?  Does any party

19 wish to be heard on behalf of the response filed by Thomas

20 Bradley?  Does any party wish to be heard on behalf of the

21 response filed by Kelly Breitenbecher?

22         MR. GRAY:  Yes, Your Honor.  Good afternoon.  William

23 Gray on behalf of Kelly Breitenbecher.  Briefly on the facts

24 for Ms. Breitenbecher too, I would say she was a senior vice

25 president of Operations and Supply.  She was working there

1    under an employment agreement and a retention agreement.  She

2    was there post-petition for five and a half months until April

3    17th, 2009.  Now I believe my take is just a little bit

4    different.  I do agree with Mr. McCullagh and the other parties

5    here who have made some arguments.  But I come at this a little

6    bit differently, and it might be on what Your Honor was asking

7    to.  I see this if you were to grant the opposition, the

8    objection, in my mind you're establishing the value of Ms.

9    Breitenbecher for her post-petition period as simply the base

10   wages that she earned during that period.  And I don't think

11   that is correct.  She was worth more than that.  To me this is,

12   what is the value of her services post-petition?  What you have

13   before you, Your Honor, is evidence of that value, which are

14   these contracts that we're talking about.  And that shows that

15   she -- the value of her services as agreed by the parties was

16   more than just her base salary.  She did not get anything more

17   than just her base salary in the post-petition period.  The

18   debtor took its time to decide whether they were going to

19   assume or reject.  And as the <u>Bildisco</u> case mentioned, the

20   debtor needs to pay for the services during that decision

21   making time, and it could be what's in the contract.  Dornier

22   even mentioned, I don't say forever that what's in the contract

23   would be what the value of the services are basically as the

24   way I was reading that.  They didn't rule that out.

25            I urge the Court to look at the evidence of the

1  contracts, and then we need to extrapolate that into what was

2  the value of her services.  This gets us, in my mind, to the

3  proration of Hechinger and Lauzon, that you can very easily

4  determine that the severance -- the retention agreement rather,

5  was also part of her wages and salaries et cetera.  Blacks Law

6  Dictionary has a very broad definition of wages and salaries.

7  It's not just base salary.

8          So I'm urging the Court, Your Honor, to adopt the

9  accrual part of Hechinger and Lauzon and you can take part of

10 what these other agreements were.  I would note, I heard from

11 the others that have been up here about their retention

12 agreements.  It was different, apparently, from Ms.

13 Breitenbecher's.  Hers was a three-year agreement vesting at

14 three different points.  The others I heard were talking about

15 two different vestings.  So in my mind, that -- is that --

16 there is a determination made as to the value of the person

17 when they were retained, coming together with this retention

18 agreement.  It's not all the same.  So these people have value

19 to them, they provided that value post-petition, and that's

20 what we're talking about here in these administrative expense

21 claims.

22          THE COURT:  All right.  Thank you, Mr. Gray.

23          MR. GRAY:  Thank you.

24          THE COURT:  Does any party wish to be heard in

25 connection with a response filed by David Tolliver?

1           MR. TOLLIVER:  Hello, Your Honor.  I was a --

2           THE COURT:  You need to identify yourself of the

3  record.

4           MR. TOLLIVER:  I'm sorry.  My name is David Tolliver.

5           THE COURT:  All right, Mr. Tolliver. You may proceed.

6           MR. TOLLIVER:  Yes.  I was a store director with

7  Circuit City and worked there up to, through and including the

8  going out of business sale.  I agree a lot with the previous

9  gentlemen and I've noted the argument in my response to the

10 debtor's objection that, you know, I viewed a lot of the

11 incentive, the cash award program, as a contract, as an

12 executory contract.  And because the debtors never sought to

13 assume or reject the contract, that I was due to be paid the

14 value of services rendered from the contract.  And I view the

15 cash incentive was part of a total compensation package that

16 was given to numerous employees.  Mine was $15,000.  That

17 vested once every three years -- I mean once a year for three

18 years on January 1st.  And because I worked through and

19 including the going out of business sale, then that entire

20 award was due to be payable per the terms that I included on

21 the original reply on my award letter.  So I agree that it is

22 a contract and I believe that the value of services that the

23 debtor's received by me working through this awards the

24 compensation as an administrative claim.

25           THE COURT:  All right, thank you very much.  Does any

76

1  party wish to be heard in connection with the response of

2  Michael Goode or Goode.   Does any party wish to be heard in

3  connection with the response of Jeff McDonald?

4          MR. McDONALD:  Your Honor, I'm Jeff McDonald.  I

5  received a call from my attorney this morning at ten that said

6  he would not be able to appear on my behalf.  I don't have any

7  unique --

8          THE COURT:  That's wonderful, isn't it?

9          MR. McDONALD:  Yes.

10                        (Laughter)

11         THE COURT:  Would you like to have yours carried over

12 to the 25th of March when the other four are going to be heard

13 or do you want to proceed today?

14         MR. McDONALD:  No, sir.  I don't really have a unique

15 argument that hasn't already been presented, and I'm certainly

16 in an unusual position in that I'm still employed by Circuit

17 City stores.  But I understood from my attorney that I needed

18 to appear here to protect whatever rights I may have in the

19 Court's decisions.

20         THE COURT:  All right, thank you, sir.

21         MR. McDONALD:  Thank you.

22         THE COURT:  Does any party wish to be heard in

23 connection with the response filed by Richard Salon?  All

24 right, Mr. Galardi, I'll hear your arguments in response.

25         MR. GALARDI:  First, Your Honor, let me say this is

1  one of the most difficult things for a corporate counsel to go

2  against people that have done and actually provided benefits to

3  this company.  But notwithstanding that, let me go through each

4  of the arguments as I understand them and why I think as a

5  matter of law that they are still prepetition claims.

6          Your Honor, and also, everyone has said that they

7  stayed in reliance upon and getting paid these amounts.  That's

8  an evidentiary issue, we don't have witnesses, and we reserve

9  our rights in the event that Your Honor thinks it becomes an

10 evidentiary issues as opposed to a matter of law to actually

11 challenge each and every one of those persons that say they

12 stayed because of these programs.  We've taken this on as a

13 legal argument with respect to when a claim arises.

14         Your Honor, let's first start with what I think is

15 one of the general arguments.  Is there an executory contract

16 or not?  And we've heard conflicting things.  If there's no

17 executory contract, I think Your Honor is already aware that if

18 it's a prepetition agreement, it's not executory, we're free to

19 breach, it's a prepetition claim, end of story.

20         THE COURT:  I agree with that.

21         MR. GALARDI:  So if there's not an executory

22 contract, then we're done.  Second then we go to if there is an

23 executory contract, we are free to reject that contract.

24 Second, Bildisco says you pay value of services.  The fact of

25 the matter is the law is until it's assumed or rejected, it is

1  simply not enforceable against the debtor, and that the relief

2  that should be requested by a claimant -- and again, I

3  understand that these people were not necessarily represented

4  by counsel at this time, but at the same time, their obligation

5  is to come forward and seek to compel assumption or rejection

6  or it stays in abeyance and it's simply not enforceable against

7  us until we make the decision.  And, Your Honor --

8          THE COURT:  But you've got to address the argument

9  that Mr. Gray made which is, what is the best evidence that the

10  Court has as far as the value of the services that the debtor

11  received in these cases, and isn't that from, to be gleaned

12  from the prepetition agreements?

13          MR. GALARDI:   Your Honor, yes, but not with respect

14  to these particular programs?  Right.  These --

15          THE COURT:  Okay, now why?

16          MR. GALARDI:  -- because these particular programs do

17  not say that there is an accrual of daily services.  This is --

18          THE COURT:  Do they have to?

19          MR. GALARDI:  -- I think they do, actually, Your

20  Honor, to say to the value of the services.  For example, take

21  a document that says you have to be on day one, be here.  If I

22  let you go the day before, you didn't get any of those -- you

23  don't get the value of those services.  So that's not your

24  daily value of services.  This is a payment that you get if

25  you're here on a day X, Y or Z, but it's not the value.

1   There's not an accrual.  And this is why I think this is quite

2   different.  So if somebody says if you stay here until, what is

3   it, January 1st, 2009 or January 1st, 2010, that doesn't say

4   what your daily services are.  That says that there is a hurdle

5   as a separate agreement or part of your contract that you would

6   get a bonus consideration.  Not for your daily work, because if

7   I let you go on December 31st, you wouldn't have gotten any of

8   that.  They wouldn't have had an equitable argument, they

9   wouldn't have had a contractual argument for one dollar of

10  those retention payments.

11          So although you've asked the question, is it part of

12  their employment agreement?  I don't think it really is part of

13  -- it's not one, big integrated agreement.  These are separate

14  agreements.  These are separate deals.  There's a contract, and

15  then there's another contract.  And it says if you get here,

16  and I could even argue that it's a gift, but I don't want to go

17  so far as to say it's a gift, because --

18          THE COURT:  We all know it's not a gift.

19          MR. GALARDI:  -- it's not a gift, but the fact of the

20  matter is, you don't accumulate that on a daily payment.  You

21  have to be there on a certain date, and if we've not affirmed

22  or denied whether we're going to honor that program, and indeed

23  in our first day motions we said these are the value of the

24  services, these are the programs we're going to pay you, such

25  as vacation pay time, what the Bankruptcy Code says are

1  salaries, but we didn't go forward and specifically said we

2  cannot go forward on these particular programs and benefits

3  because of the uncertainty of the circumstances.  So they were

4  held in abeyance.  And these are contracts whether they're

5  prepetition executory contract that if you had to be here.

6  Again, I think if they're not executory, which I frankly think

7  some of these incentive programs aren't, I give you X, you give

8  me Y, this is a prepetition, we will offer you this if you're

9  here on a certain day, and we never affirmed that obligation.

10  Yes, they were here, yes, they vested this, they had a change

11  of control.  But nonetheless, unfortunately for the employees,

12  they were prepetition agreements or offers by us that said you

13  had to be here on a day and we never affirmed and we either

14  breached them, unfortunately, or we never assumed them, we

15  never made a motion to approve it.  And I don't think, Your

16  Honor, and the Committee can speak, this is why you have

17  employee incentive programs and why under 503(c) you now have

18  to come in and seek other types of consideration.  Indeed, Mr.

19  McDonald's here, he's received other consideration to keep

20  working and doing it, because you don't count on these

21  particular salaries and it's an unfortunate fact that Your

22  Honor and I lived through -- and again, this is why I go back

23  to the justifiable reliance, to say that people in Richmond

24  stayed here at that economic time because of these payments, I

25  think there's a factual issue.

1          But the fact of the matter is, we made it clear we

2    were not seeking approval of these documents at that time.  We

3    made it clear in our first day when we said, what are we giving

4    as far as wages, salary and benefits, and when we calculated

5    the priority claim and when we calculated the payments, we made

6    it clear what we believed the value of the services were.  If

7    those days passed, and I'm not blaming the employees, but if

8    they had gotten attorneys on January 1st of 2009 and they had

9    come into this Court on that date and said, pay us these

10   amounts, that's what an administrative claimant does.  We would

11   have opposed it exactly then and there and had to oppose it, or

12   we would have had to go to the Committee and say, should we

13   approve this part of the program?  But there was such

14   uncertainly in this case for business judgment reasons, and I

15   represent the company, for business reasons we could not do

16   that.  We don't think it establishes a reliance.

17         So, Your Honor, one, we think if it's not executory,

18   it's just breach.  I tend to think these are not executory

19   programs.  These are offers whether they were one day before

20   the filing or whether they're 30 days before the filing or

21   whether they're four years before the filing.  It's not wrapped

22   up in the employment contract.  It's the agreement to pay money

23   and money only if you're here on a date.  I think you can

24   breach it.  Unfortunately, that means it's a prepetition claim.

25         If it's an executory contract, we can reject it.  I

82

1  think to Mr. Gray's argument, it doesn't go to the value of

2  each individual day services.  I don't think there's an accrual

3  like a landlord's type claim.  This is not an accrual method.

4  This is, you get it or you don't get it, and it's not the value

5  of your services each day prepetition and post-petition.

6         Your Honor -- let me think what other argument that

7  people have made -- I think that's the common arguments through

8  all of these threads, Your Honor, and I think, again, you don't

9  need to go to all of the other issues that would arise, but

10  again, you can't without Court approval, have a severance

11  program, pay people bonuses and that under 503(c).

12         You also have the 548 issue.  A lot of these programs

13  were put in in the two years prior to the bankruptcy, and

14  there's an issue of fraudulent conveyance if we ever get

15  through.  But I think this is ultimately simply a matter of

16  these are prepetition programs, the Fourth Circuit is quite

17  clear on the conduct test.  Their claims, as of the date we put

18  these programs into effect, which are not controversial, it's

19  all prepetition, the documents are all prepetition, and

20  therefore I think, unfortunately under the Fourth Circuit, it

21  is a prepetition claim, and I don't think it goes to the

22  measure of those services for those individuals on a daily

23  basis that accrues prepetition or post-petition.  Unfortunately

24  it's an all or nothing.

25         THE COURT:  Let me ask you this.  If I was to agree

83

1  with you and disallow these claims as administrative claims,

2  would they nevertheless be entitled to payment as a priority

3  claim under Section 507(a)(4)?

4          MR. GALARDI:  Well, again, Your Honor, that will go

5  to whether they accrued during the 180 days prior to the

6  bankruptcy.

7          THE COURT:  But if you reject them the day

8  beforehand, I'm looking at the <u>Dornier</u> case, it would by

9  definition be within the 180 days beforehand.

10         MR. GALARDI:  But there's another issue.  Were they

11  earned on that date?  I'm not sure that they were earned during

12  that date, and the statute that provides for priority, and

13  we'll have a mathematical calculation, we have other issues

14  about --

15         THE COURT:  Does it have to be earned on that date?

16         MR. GALARDI :  Yes, I think it has to be earned

17  within the --

18         THE COURT:  If it was earned on a subsequent date and

19  you reject it and you go back to that day?

20         MR. GALARDI:  Your Honor, to look at the priority

21  statute, and we're going to have this on some of our other

22  claims, the words are that they have to be earned within the

23  180 days.  Because again, and we'll go to, again, to give you

24  an idea of -- and why I say that is we're going to have another

25  argument here and doing precedent with respect to class action

84

1   settlement people that you entered into a settlement or

2   something on that date.  But it relates to a period five years

3   before.  I think the priority says that it has to be actual

4   wages and benefits earned during that period.  That's not say

5   that if they want to make that argument, again, and we'll leave

6   aside whether they filed it as priority claims and all of that,

7   I think it has to be earned within the 180 days prior to the

8   petition.

9         THE COURT:  I see the language you're referring to.

10        MR. GALARDI:  So I think that's the problem, and I

11  don't think you can just simply say because the Bankruptcy Code

12  says a rejection as of the date immediately prior to the

13  petition date that answers the question as to whether it was

14  earned.  And under my argument about accrual, I don't think

15  some of this will be earned at all during that period of time.

16  So, Your Honor, and I think that again distinguishes, and

17  again, I come from a circuit that the conduct test doesn't

18  work, you have some severance and each day that you -- you

19  know, there's a distinction between the executive contracts

20  versus your standard for every two weeks, you know, every month

21  you work you accrue.  That's an accrual, and I would understand

22  it.  But none of these benefits was a each day you earned and

23  if you terminated your relationship by X or Y date prior to,

24  you would have accrued something.  It's an all or nothing hit

25  or miss on those dates, Your Honor.

1          And so I think that's the problem.  And if it's as I

2    say not an executory contract, then it's a breach.  And if it's

3    an executory contract, it's a rejection that goes back to that

4    date and it's not enforceable, and since it's not an accrual, I

5    don't think it is part of the sorts of things that become the

6    fundamental compensation for the individuals.  It's not added

7    to their wages, salaries and benefits and their worth.  If

8    that's the standard, then we're going to start thinking, well,

9    what's your share of the medical liability insurance, and

10   what's your share of this?  We don't do that sort of thing

11   because we take the wages, salaries as the compensation.

12         And again, I don't want to put the burden on every

13   employee, because this is the circumstances that we always

14   have, but again, when you represent company counsel, it's sort

15   of like when you go in and say something, you tell me about

16   this, but I can't protect you on privilege issues, again, for

17   employees I can't say go file a claim and be aggressive here

18   and do the administrative claim.  We're as honest as we can be

19   with them.  That's why we say  we're not seeking approval of

20   those programs.  But had January 1st come and gone and had they

21   had the options that everyone is saying and had they wanted to,

22   they could have made the motion right then and there, pay me

23   for my benefit that just came.  They didn't.  And it's an

24   unfortunate fact, but the answer could have been very clear at

25   that point that we were in negotiations with the Committee at

86

1  that point for, you know, employee retention programs and that

2  and we just couldn't do it because of the outcome of this case.

3  So unfortunately the estate had to do what it had to do with

4  respect to individuals.  Pay them their fundamental wages.  We

5  never came up with an incentive program for during that period

6  of time, and then subsequently came to an incentive program to

7  compensate people for what we believed were their losses of

8  these kind of programs.

9              THE COURT:  All right, thank you.

10             MR. GALARDI:  Thank you, Your Honor.

11             THE COURT:  Does the Committee wish to be heard on

12 this issue?

13             MR. FEINSTEIN:  Yes, only briefly, Your Honor.

14 Robert Feinstein, counsel for the Committee.  Mr. Galardi's

15 correct in that there were, there was extensive attention paid

16 to developing an incentive program.  These payments were not

17 included, that was the debtor's business judgment not to

18 include them, so it would seem inappropriate to allow them to

19 become administrative claims by fiat because the claimants come

20 at the end of the case and say, I rendered services, I'd like

21 to be paid.  That's not enough and 503(c) makes it very clear

22 what the requirements are.  I'm not even sure as I stand here

23 whether these types of payments would qualify under 503(c), but

24 the debtor's judgment was not to include them.  Had they

25 included them, we would have had a much different conversation

1  and perhaps a different program, but they were not included.

2  Thank you.

3            THE COURT:  All right, thank you.

4            MR. GALARDI:   Your Honor, I did forget one argument,

5  it's probably just piling on, and it goes to all of this.

6  There is no -- I mean, these individuals provided a benefit

7  post-petition, we don't dispute that.  But again, the other

8  aspect of the administrative claim is, what is the

9  post-petition transaction?  I think it would be stretching it

10 to say each day of employment is a new transaction, just like

11 each day of the rent Your Honor has, we've done the accrual

12 method.  But there is no post-petition transaction, and we do

13 think that is the element that is also missing with respect to

14 the straight 503(b)(1) administrative claim.

15           THE COURT:  All right, thank you.  Do any of the

16 other parties that have spoken previously wish to be heard?

17           Okay, what the Court's going to do is, I'm going to

18 defer ruling on this until March 25th when the other four

19 persons that were not here today will have an opportunity to

20 present their arguments.  I think it would be unfair to them to

21 rule at this point in time without having heard them.  So I'll

22 take it up at that time.

23           MR. GALARDI:  Your Honor, that concludes the matters

24 from our perspective today.

25           THE COURT:  All right.  Is there any other business

88

1  we need to take up today then in the Circuit City matter?  All

2  right, thank you all.

3                          *  *  *  *  *

4                    **C E R T I F I C A T I O N**

5           WE, ELAINE HOWELL and  RITA BERGEN, court approved

6  transcribers, certify that the foregoing is a correct

7  transcript from the official electronic sound recording of the

8  proceedings in the above-entitled matter, and to the best of

9  our ability.

10

11 /s/ Elaine Howell

12 ELAINE HOWELL

13 /s/ Rita Bergen

14 RITA BERGEN

15 J&J COURT TRANSCRIBERS, INC.    DATE:  March 10, 2010

16

17

18

19

20

21

22

23

24

25