UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                        .    Case No. 08-35653(KRH)
                              .
                              .
CIRCUIT CITY STORES,          .
INC., et al.,                 .    701 East Broad Street
                              .    Richmond, VA 23219
                              .
            Debtors.          .
                              .
                              .    March 18, 2010
. . . . . . . . . . . . . ..        10:05 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:


For the Debtors:          McGuireWoods, LLP
                          By:  DOUGLAS FOLEY, ESQ.
                               DANIEL F. BLANKS, ESQ.
                          9000 World Trade Center
                          101 W. Main St.
                          Norfolk, VA 23510

                          Skadden Arps Slate Meagher & Flom, LLP
                          By:  IAN FREDERICKS, ESQ.
                               GREGG M. GALARDI, ESQ.
                          One Rodney Sq.
                          Wilmington, DE 19899


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311     Fax No. (609) 587-3599**

2

APPEARANCES (cont'd):


For OmniMount:              Sands Anderson Marks & Miller
                           By:  WILLIAM GRAY, ESQ.
                           801 East Main Street
                           Richmond, VA 23219

For Berkadia Commercial
Real Estate, LLC:          By:  WILLIAM OLSON, ESQ.

For U.S. Signs:            Fullerton & Knowles, P.C.
                           By:  RICHARD HUTSON, ESQ.
                           12644 Chapel Road
                           Suite 206
                           Clifton, VA 20124


For Eric Jonas:            ERIC JONAS, Pro se claimant


TELEPHONIC APPEARANCES:

For Sharp Electronics:     Borges & Associates, LLC
                           By:  WANDA BORGES, ESQ.
                           575 Underhill Blvd.
                           Suite 118
                           Syosset, NY 11791-3438


**J&J COURT TRANSCRIBERS, INC.**

3

# I N D E X

|  | | **PAGE** |
|---|---|---|
| **EXHIBITS** | | **ID.** |
| Debtors' Exhibit A | Auction transcript | 18 |

**J&J COURT TRANSCRIBERS, INC.**

1        COURT CLERK:  All rise.  The United States Bankruptcy

2  Court for the Eastern District of Virginia is now in session,

3  the Honorable Kevin R. Huennekens presiding.  Please be seated

4  and come to order.

5        In the matter of Circuit City Stores, Incorporated,

6  hearing on Items 1 through 40 as set out on the debtors'

7  agenda.

8        MR. FOLEY:  Good morning, Your Honor.  Doug Foley of

9  McGuireWoods on behalf of the debtors.  With me at counsel

10  table is Gregg Galardi and Ian Fredericks from Skadden Arps, as

11  well as Dan Blanks from my firm.  Here in court today from the

12  company, Your Honor, is Katie Bradshaw, who's the vice

13  president controller, and Debra Miller, who's the acting

14  general counsel.

15        Your Honor, the agenda today, we have several

16  matters, most of which are claims matters on for status.  The

17  first item on the agenda which is the OmniMount matter, we're

18  pleased to report to the Court, Mr. Gray is here, that we have

19  completely resolved this matter and will be submitting a

20  stipulation today that will remove it from the docket.

21        MR. GRAY:  Good morning, Your Honor.  William Gray

22  from OmniMount.  That's correct.  We have this resolved and

23  hope to have an order entered shortly.

24        THE COURT:  All right.  Thank you.

25        MR. GRAY:  Thank you.

5

1                MR. FOLEY:  Your Honor, Items Number 2 and 3, these

2    are the Madcow motions that we've been carrying forward.  We're

3    trying to get contact information for a business person from

4    Madcow in order to reconcile the amounts of their claims.  We

5    think we're -- once we get that communication hooked up that

6    we'll be able to resolve these completely.  But, for now, Your

7    Honor, we're asking that they be adjourned to the April 6 date

8    at ten.

9                THE COURT:  All right.  They'll be adjourned.

10               MR. FOLEY:  Your Honor, if we could skip just

11   short -- briefly, Items 4 and 5, these are real estate property

12   sale motions that Mr. Fredericks will address the Court on, as

13   well as Numbers 6 and 7 which is the 401K motion and the

14   Berkadia motion which Mr. Galardi will address the Court on.

15               THE COURT:  All right.

16               MR. FOLEY:  Items Number 8 through 36, Your Honor,

17   are our -- are on for status hearing.  These are our omnibus

18   claim objections and we also have the same form of chart that

19   we have handed up to the Court before with respect to the

20   overall status of the claims.  And unfortunately, you still

21   need a magnifying glass to read this somewhat, but the -- in

22   the aggregate, Your Honor, at the bottom subject to these foot

23   notes because some of the omnibus objections were objections to

24   either reclassify or reduce claims rather than to disallow

25   them, it shows --

6

1          THE COURT:  You've handed up three pages for this.

2 It's --

3          MR. FOLEY:  Three copies of the same.

4          THE COURT:  -- three copies of the same page.

5          MR. FOLEY:  Yes, Your Honor.

6          THE COURT:  All right.

7          MR. FOLEY:  That the Court has ordered -- entered

8 orders with respect to 7800 -- approximately 7800 claims and

9 there's -- out of ones that we've objected to and haven't

10 withdrawn, there's 301 remaining.  And we also have resolved

11 since objecting and since there being a response, 164 claims

12 which is set forth in the final column.

13          Your Honor, except for the ones that I'll mention in

14 a minute, most of these claims that are set forth in agenda

15 Items Number 8 through 36 are being continued for status only

16 until the April 15th date.  However, there are several that we

17 have filed specific notices on, so that the parties have notice

18 that we will be going forward on the merits on some of the

19 upcoming dates including next week, March 25th, as well as

20 April 6.  So, if I could just go through that on the record,

21 Your Honor.

22          THE COURT:  You may.

23          MR. FOLEY:  Omnibus Objection Number 5, will be going

24 forward on the merits on April 6 with respect to the Miner

25 Fleet claim, Vector Security, Schimenti Construction and

7

1  U.S. -- I apologize.  Schimenti Construction, U.S. Signs will

2  be on April 29th, not April 6, but Miner Fleet and Vector

3  Security will be on April 6.  Eastern Security which is in our

4  Omnibus Objection Number 6 will be on April 6.

5          THE COURT:  And how do these relate to the numbers on

6  the -- for instance, where do I find Omni 5 as I started at

7  Number 8 on the agenda?

8          MR. FOLEY:  Well, Omni 5, Your Honor, I believe is

9  set forth in Agenda Item Number --

10          UNIDENTIFIED SPEAKER:  -- 26.

11          MR. FOLEY:  -- 26.  Thank you.  Twenty-six.

12          THE COURT:  All right.  I see it.  Thank you.  All

13  right.  And what are we doing with Omni 5?

14          MR. FOLEY:  Omni 5, Your Honor, this one includes

15  several claims that are left which are on Exhibit A on Page 1

16  and 2.  We're going forward on the merits with respect to the

17  Miner Fleet Management Group claim, the Vector Security claim

18  on April 6 and we've filed specific notices with respect to

19  that for those parties and they're aware of it.  Schimenti

20  Construction and U.S. Signs will be on April 29th.

21          THE COURT:  All right.  Thank you.

22          MR. FOLEY:  And Omnibus Objection Number 6 is Eastern

23  Security, Your Honor.  This is Agenda Item Number 27.

24          THE COURT:  All right.

25          MR. FOLEY:  That one will be going forward on April

**J&J COURT TRANSCRIBERS, INC.**

1   6, as well.

2            THE COURT:  All right.

3            MR. FOLEY:  Your Honor, there are several individuals

4   listed in the Exhibit A to the agenda, the first one being on

5   Page 5 which is Jack Hernandez which is in Omnibus Objection

6   Number 19.  Your Honor is probably aware, there are several

7   purported class representatives on class action litigation

8   claims.  We have those set up for summary judgment hearing next

9   week on March 25th.

10            THE COURT:  All right.

11            MR. FOLEY:  And, so those will be going forward on

12   the 25th.  There will be several of those.  Item number --

13   Omnibus Objection Number 19, with respect to the Laurel

14   Plumbing claim and the Union Construction Group claim will be

15   going forward on April 6.  Omnibus Objection Number 19 which is

16   Robert Gentry which is another purported class representative

17   on a class action litigation, again, March 25th at 2:30.

18            Then we have in our Omnibus Objection Number 27, Your

19   Honor, this is objection to various taxing authorities and

20   county tax claims.

21            THE COURT:  All right.  And that -- this now is

22   Agenda Item Number 30?

23            MR. FOLEY:  Yes, Your Honor.

24            THE COURT:  Okay.

25            MR. FOLEY:  Harris County taxes, Los Angeles,

**J&J COURT TRANSCRIBERS, INC.**

 1  California, Monterey, California, and San Bernadino, California

 2  claims will be going forward on their merits on April 6.

 3          THE COURT:  All right.

 4          MR. FOLEY:  Omnibus Objection Number 31, the

 5  objection to Jonathan Card, who is, again, a purported class

 6  representative in some class action litigation, that one's

 7  going forward on March 25th at 2:30.  Omnibus Objection Number

 8  31, Joseph Scaf, again, he's a purported class representative.

 9  This one's going forward next week, March 25th at 2:30.

10  Similarly, Franklin Wilson, which is in Omnibus Objection

11  Number 31 who is also purported class rep will be going forward

12  on March 25th at 2:30.

13          THE COURT:  All right.

14          MR. FOLEY:  Omnibus Objection Number 57 which is on

15  Page 23 of Exhibit A to the agenda and is Item Number 34 on the

16  agenda, Snell Acoustics, San Disk Corporation, THQ, Inc., Kelly

17  Breitenbecher, James Wimmer and another claim of Snell

18  Acoustics which is in Omnibus Objection 58 are all going

19  forward on the merits on April 6, Your Honor, at ten.

20          THE COURT:  Okay.

21          MR. FOLEY:  And other than that, Your Honor, the

22  balance of the claims are being continued for status hearing

23  until the April 15th hearing date.

24          Your Honor, Item Number -- Agenda Item Number 40 if

25  we could skip to that, that's our adversary proceeding

1  involving Sharp Electronics.  I believe counsel may be on the

2  phone with respect to that matter, but we're prepared for the

3  Court to enter it's standard form scheduling order with respect

4  to that.  It's essentially a preference action, as well as

5  claims for a collection of accounts receivable.  And, so we

6  would need the Court's calendar to set some trial dates and

7  back up on discovery schedules.

8          THE COURT:  All right.  Very good.  Yes, sir.  You

9  wish to be heard on that.

10         UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

11         MS. BORGES:  This is Wanda Borges, Borges and

12 Associates, LLC.  I am counsel for Sharp Electronics, Corp.,

13 and Brian Stark and I have been in at least weekly, several

14 times weekly communication.  We're trying to work out various

15 aspects of the case.  We were hoping to do so informally as

16 possible before entering into formal discovery, but at Mr.

17 Stark's suggestion, he -- or rather email, he informed me that

18 Your Honor would prefer to have a formal scheduling order in

19 place even if we do continue informal discussion.

20         So, with that understanding that this is Your Honor's

21 direction, we're ready to go ahead with the scheduling order.

22 But, we would request that any trial date for this matter not

23 be set really until early in 2011.  There are massive documents

24 on this, both with respect to the accounts receivable portion

25 of their complaint, their claims reconciliation that has been

1  going back and forth and to that, it looks like we're getting

2  close to a number that we might be able to agree on.  On the

3  preference side, we had sent to Circuit City our preference

4  analysis about -- I'm going to say about two weeks ago and it

5  is a, again, a massive preference analysis.  As of the day

6  before yesterday, Mr. Stark informed me that Circuit City is

7  still working through our preference analysis and numbers.

8         So, I think this is not something that's going to be

9  easy to get down to the bottom of, but will take a lot of time

10 and effort going back and forth with numbers and that's why I

11 would request a lengthy period of time and a date for trial not

12 before the early part of 2011.

13        THE COURT:  All right.  Ms. Borges, how do I spell

14 your name?

15        MS. BORGES:  B-o-r-g-e-s.

16        THE COURT:  All right.  Thank you.  And this is -- I

17 don't know if you're familiar with the Eastern District of

18 Virginia, but it's referred to as the rocket docket in that I

19 can't accommodate your request for setting this out into the

20 early part of next year.  I was looking at either a September

21 or October trial date.

22        MS. BORGES:  Well, clearly then I would ask the

23 latest date in October.

24        THE COURT:  And that would be consistent with how we

25 schedule things in this district.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BORGES:  Clearly then, Your Honor, I would

2    request the latest possible date in October.

3          MR. FOLEY:  We're fine with an October date, Your

4    Honor.

5          THE COURT:  All right.  And how long is it going to

6    take to try this matter, Mr. Foley?

7          MR. FOLEY:  I would think it would be safe to plan

8    for two days, Your Honor.

9          THE COURT:  Two days, all right.  I can give you the

10   25th and the 26th of October.

11         MR. FOLEY:  That's fine, Your Honor.

12         THE COURT:  Ms. Borges, is that fine with you?

13         MS. BORGES:  I am checking my calendar now, Your

14   Honor.  Yes, Your Honor.  That is fine.

15         THE COURT:  All right.  So, the Court has reserved

16   those two days.  The Court will enter its standard pretrial

17   order with regard to scheduling of discovery and Rule 26

18   exchange of information and expert witnesses and the like.

19   Counsel may change the times set forth in the order by

20   agreement, but the trial date will not be changed.

21         MR. FOLEY:  Thank Your Honor.

22         MS. BORGES:  Thank Your Honor.

23         MR. FOLEY:  Your Honor, Mr. Blanks and Ian Fredericks

24   will address the status of the matters that we had on going

25   forward on the merits today which are Agenda Items Number 37,

1  38 and 39.  And as I mentioned earlier, Mr. Fredericks will

2  address the sale motions under four and five and Mr. Galardi

3  will address the 401K motion and Berkadia motion which is six

4  and seven.

5          THE COURT:  All right.

6          MR. BLANKS:  Good morning, Your Honor.  Dan Blanks on

7  -- with McGuireWoods on behalf of the debtors.  To take this

8  slightly out of order as Mr. Foley just mentioned, I'll address

9  the issues with respect to Mitsubishi and with respect to

10  Audiovox which are included in Omnis -- I'm sorry, with respect

11  to the Agenda Items 37 through 39.  Mr. Fredericks will address

12  Bethesda Softworks.

13          THE COURT:  All right.

14          MR. BLANKS:  Your Honor, yesterday we submitted a

15  consensual order resolving all of the procedural issues with

16  respect to Mitsubishi.  Mitsubishi has signed off on that

17  procedural order.  We continue in discussions with Mitsubishi

18  with respect to the substantive issues and the resolution of

19  their claims, as well as the substantive issues with respect to

20  a possible collection action with respect to accounts

21  receivable and a possible preference action.

22          With respect to Audiovox, this has been up for status

23  before.  It's, again, up for status for today.  We continue in

24  discussions on the substantive reconciliation and settlement

25  with respect to their claims and possible accounts receivable,

1 as well.  And, so we'd ask that both of these matters -- I'm

2 sorry, with respect to Audiovox, we'd request that this matter

3 be adjourned over to April 15th.  With Mitsubishi, that

4 resolves all of the issues with their claims at this time,

5 procedural issues.  And, so that would not need to be continued

6 because all of the omnibus objections that they had pending

7 have been reconciled including their entirety.

8           THE COURT:  All right.  Very good.  The Court will

9 accommodate that.

10          MR. BLANKS:  Your Honor, one point, the received

11 issue with respect to Mitsubishi, they are still included in

12 Omnibus 20.  That particular issue is not the procedural issue.

13 That's a substantive issue, so that would also be adjourned

14 over to April 15th.

15          THE COURT:  All right.  That -- we didn't resolve

16 that at the last hearing?

17          MR. BLANKS:  That has not been resolved.

18          THE COURT:  All right.  Very good.  Thank you.

19          MR. FREDERICKS:  Just to clarify, Your Honor, I think

20 your question was did you resolve the received issue?  Yes.

21 The -- what the parties have been --

22          THE COURT:  I hope I had.  I just --

23          MR. FREDERICKS:  The parties are taking your opinion

24 and then working with Mitsubishi to figure out exactly whether

25 or not the goods that were on dispute on Omni 20 that the

1   debtors alleged were outside of the 20 days, are actually

2   outside of the 20 days given the opinion.  So, that's what the

3   parties --

4            THE COURT:  Given the factual circumstance.

5            MR. FREDERICKS:  Exactly.

6            THE COURT:  Got it.  Okay.  I understand.

7            MR. FREDERICKS:  Correct.

8            THE COURT:  Thank you.

9            MR. FREDERICKS:  You're welcome, Your Honor.  For the

10  record, Ian Fredericks ob Skadden Arps.  With respect to

11  Bethesda Software Products, this is the debtors' fourth omnibus

12  objection.  We're very close to a global settlement with

13  Bethesda, but we had advised them that, for purposes of

14  cleaning up the claims register and the omnibus objections,

15  these were simply duplicative claims.  We advised them that we

16  would be going forward.  They advised us that they didn't have

17  any further objection to having these duplicate claims

18  disallowed.

19           So, while we still working with them on a settlement,

20  we'd request that the Court disallow these duplicative claims.

21           THE COURT:  All right.  And this is matter Number 4

22  and the agenda?

23           MR. FREDERICKS:  It's not -- no, I'm sorry, it's not

24  matter Number 4.  It's the fourth omnibus objection.  I believe

25  it's matter 37.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Thirty-seven, all right.  Yes, I see it.

2   All right.  So, the duplicate claims will be disallowed.

3          MR. FREDERICKS:  Correct, Your Honor.  And they would

4   have one surviving claim which we're close to having a global

5   resolution about.

6          THE COURT:  All right.  All right.  Thank you.

7          MR. FREDERICKS:  Thank you, Your Honor.  Going -- and

8   I apologize for going so out of order for Your Honor today, but

9   with respect to matter Number 4 which is one of the debtors'

10  two sale motions on for today.

11         THE COURT:  Right.

12         MR. FREDERICKS:  That's the debtors' sale of property

13  located in White Hall, Pennsylvania.  In the courtroom today, I

14  have Ms. Katie Bradshaw who's the current VP, vice president

15  and controller of Circuit City.  And if it's okay with Your

16  Honor, I'd proffer her testimony concerning the sale?

17         THE COURT:  You may.

18         MR. FREDERICKS:  If called to testify, Ms. Bradshaw

19  would state that this was a 1.67 acre parcel of land located in

20  White Hall, Pennsylvania.  It was primarily a parking lot

21  adjacent to one of Circuit City's stores that was leased.  It

22  is, for all intent and purposes, only accessible by way through

23  the main parking lot going in.  (Indiscernible) marketed this

24  property since the liquidation was commenced in January and for

25  over a year, there was very little interest in the park -- in

**J&J COURT TRANSCRIBERS, INC.**

1  the property given its location and accessibility.

2          Ultimately, the debtors received a bid from the

3  landlord of the store that they used to lease, Dow Allentown

4  (phonetic), LLC, and that bid was in the amount of $60,000.

5  The debtors accepted that as a stalking horse bid and filed a

6  motion to -- filed a motion for approval of that sale subject

7  to higher or better bids.

8          After the motion was filed and before the bid

9  deadline, the debtors received one competing bid.  It was from

10 a owner of property adjacent to the parking lot on the other

11 side who submitted a bit for $65,000 which was the minimum

12 overbid.  The debtors determined that this was a qualified bid

13 and conducted an auction.  That party's name was H&L Holdings.

14         The debtors are happy to report they had a very

15 competitive auction.  There appears to have been some type of a

16 dynamic between these two owners of real property located

17 adjacent to the parking lot.  Ultimately, the final price was

18 $910,000.  It was submitted by H&L Holdings.  That's some 15

19 times the stalking horse bid.  The debtors determined that that

20 was the highest or otherwise best bid at the auction and have

21 accepted it subject to this Court's approval.

22         Ms. Bradshaw would also testify that the -- both

23 parties to the auction -- both of the counter parties who

24 participated in the auction acted in good faith.  There was no

25 collusion.  She believes there is a sound business

**J&J COURT TRANSCRIBERS, INC.**

1 justification for the sale of the property as the debtors have

2 no further use for it and that the sale to H&L Holdings at

3 $910,000 is the highest or otherwise best bid that they

4 received, is in the best interest to the debtors' estates and

5 their creditors.  And for Your Honor's reference, I do have a

6 copy of the auction transcript which I would mark as Exhibit A.

7         THE COURT:  All right.  All right.  The transcript

8 will be marked as Debtors' Exhibit A.

9         MR. FREDERICKS:  And with that, Your Honor, that

10 would conclude Ms. Bradshaw's proffer.

11         THE COURT:  All right.  Does any party wish to cross

12 examine the proffered witness, Ms. Bradshaw, with regard to the

13 proffered testimony?

14                     (No audible response)

15         THE COURT:  All right.  The proffer is accepted.

16         MR. FREDERICKS:  Thank Your Honor.  Based on that,

17 the debtors would request approval of the sale to H&J Holdings

18 for $910,000 and also request approval of the second highest or

19 otherwise best bid which was 905,000.  The bid valued at

20 $905,000 submitted by the landlord, Dow Allentown, which was a

21 combination of cash and claim waivers.  We'd request approval

22 of both of those bids --

23         THE COURT:  All right.

24         MR. FREDERICKS:  -- at this time.

25         THE COURT:  The Court -- does any party wish to be

**J&J COURT TRANSCRIBERS, INC.**

1 heard in connection with the debtors' motion?

2                    (No audible response)

3           THE COURT:  All right.  There being no objection, the

4 Court is satisfied that the debtor is exercising its sound

5 business judgment and that there's good justification for the

6 sale of the property, that the bid and the backup bid represent

7 the highest -- good value for the sale of the property and that

8 the sale is in the best interest of the estates and the Court

9 will approve the highest bid, as well as the backup bid.

10          MR. FREDERICKS:  Thank Your Honor.  I believe that

11 right now, we're currently working with the highest bidder to

12 finalize the purchase agreement and some title insurance

13 issues.  I believe this is a bid, if I'm not mistaken, that we

14 want to close next week and, so we're going to submit an order

15 as soon as we iron out those last remaining issues.  But, if

16 once that order's submitted, if we could get it entered

17 promptly, that would be very much appreciated.

18          THE COURT:  All right.

19          MR. FREDERICKS:  I apologize.  It has been submitted.

20          THE COURT:  So, the order's in BOPS right now?

21          MR. FREDERICKS:  I believe so, yes.

22          THE COURT:  All right.  Well, the Court certainly

23 will look at that then before the end of the day.

24          MR. FREDERICKS:  Thank Your Honor.  Turning to matter

25 Number 5, this was debtors' motion to sell -- pardon me,

1   property located in Louisville, Kentucky.  Again, if it's

2   acceptable to Your Honor, I proffer the testimony of Ms.

3   Bradshaw, again, with respect to this sale?

4             THE COURT:  You may.

5             MR. FREDERICKS:  If called as a witness, Ms. Bradshaw

6   would testify that this is a 45,000 square foot building

7   located in Louisville, Kentucky.  The debtors have no further

8   use for the building, that the debtors marketed the building

9   since the going out of business sales were conducted or started

10  in January of 2009.

11             Ultimately, the debtors received one bid -- or they

12  received a bid from Jaret Nicholls in the amount of $750,000.

13  Based on that bid, the debtors selected it is as the highest or

14  otherwise best bid to use as a stalking horse.  They filed the

15  motion seeking approval of it subject to higher or better bids.

16  No bids were received by the bid deadline.  The debtors -- I'm

17  sorry, this also includes the assumption and assignment of a

18  lease to Mr. Nicholls, as well.  That lease has little to no

19  value to the estate outside of actually owning the building.

20             The -- given that there were no bids received, the

21  debtors determined to proceed with the sale of the property to

22  Mr. Nicholls for $750,000 and assumption and assignment of the

23  lease.  There have been no objections from the tenant or the

24  lessee to the lease and the debtors have received no other

25  objections to the sale.  There is no further use for the

1  building and the debtors believe it's -- that it's -- sound

2  business reasons exist to approve the sale and the assumption

3  and assignment of the lease and that the sale is in the best

4  interest of the debtors, their estates and creditors.  That

5  would conclude Ms. Bradshaw's proffer.

6      THE COURT:  Does any party wish to cross examine Ms.

7  Bradshaw with regard to the proffered testimony?

8              (No audible response)

9      THE COURT:  All right.  The proffer is accepted.

10     MR. FREDERICKS:  Thank Your Honor.  With that, the

11 debtors would request approval of the sale to Mr. Nicholls.

12     THE COURT:  All right.  The Court finds that the --

13 does any party wish to be heard in connection with this motion?

14              (No audible response)

15     THE COURT:  All right.  There being no objection, the

16 Court finds that the debtor is exercising its business

17 judgment, that the sale is in the best interest of the

18 bankruptcy estate, that the bid represents the highest and best

19 bid received for the property and the Court will approve the

20 sale.

21     MR. FREDERICKS:  Thank Your Honor.  I believe that

22 order has also been BOPS'd.

23     THE COURT:  All right.  And the Court will look at

24 that one, as well.

25     MR. FREDERICKS:  Thank you, very much, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

22

1  With that, I think the only remaining two matters are the

2  contested matters that Mr. Galardi will handle.  Thank Your

3  Honor.

4            THE COURT:  All right.

5            MR. GALARDI:  Good morning, Your Honor.  Gregg

6  Galardi for the record.  I'll turn to Matter 6.  Matter 6 is

7  the debtors' motion for entry of an order directing Wachovia

8  Bank as the custodian of the Circuit City Stores supplemental

9  401K plan to deliver the assets of the plan.

10           Your Honor, as set forth in the motion, this was a

11  top hat plan as -- and it was deferred so no taxes were to be

12  paid by the employees on this plan.  There were assets turned

13  over to Wachovia Bank in connection with that.  It was made

14  clear in the documents which is set forth in the motion that

15  these were subject to the claims of creditors.

16           This is, again, one of those unfortunate

17  circumstances that we have all too often in bankruptcy because

18  there are a number of employees whose deferred compensation was

19  actually put into these plans and they paid no taxes, so

20  they -- Circuit City does not dispute that hey had an actual

21  loss here of compensation they might otherwise have gotten.

22  Unfortunately, to get the benefits of the tax law, those -- the

23  funds in that remain subject to the claims of creditors.

24           On the filing date, Your Honor, we did note that we

25  were going to suspend this because I -- we always though as

 1  adding insult to injury if they continued to put in money, it

 2  was only money that was going to go to the general unsecured

 3  claims.  So, I think we suspended it.

 4         We've received one objection.  That is an objection

 5  of Mr. Jonas who I'm familiar with and I know he's in the

 6  courtroom today that may want to speak to the Court.  Your

 7  Honor, I don't think it's really an evidentiary matter in the

 8  sense that there are numbers of cases, we cite them in the

 9  papers, with respect to the claims of creditors.  It is

10  actually a requirement of the federal tax law that they be --

11  remain subject to the claims of creditors and I understand Mr.

12  Jonas is here and wants to address the Court.

13         But, we think as a legal matter and the way and order

14  to get the tax treatment that was beneficial, unfortunately for

15  the employees, those funds do become funds of property of the

16  estate, we've cited that law, and they are subject to be

17  directed back and for the benefit of all unsecured creditors.

18         THE COURT:  All right.  Thank you, Mr. Galardi.  Does

19  any party wish to be heard in connection with the debtors'

20  objection?

21         MR. JONAS:  Yeah, Eric Jonas, former SPFH officer of

22  the City Stores.

23         THE COURT:  All right.

24         MR. JONAS:  Look, I mean, as I said in the letter of

25  objection, you know, when we created the plan, our objective

1 was really to ensure that there was, in fact, protection for

2 all of the funds that were put in.  And I'm here really to make

3 a plea at the very least that, you know, if there's a way that

4 the Court can see to it that at least the funds that -- the

5 earned income that was put in by the participants could, in

6 fact, be returned to them.  And really there isn't very much

7 else to say other than what was said in the letter.

8          THE COURT:  Okay.  Your argument was that under

9 Section 702 of the plan that, when there was a change of

10 control, there was an obligation to fund a grantor trust and

11 that that should trump the provisions of Section 701.

12          MR. JONAS:  Yeah.

13          THE COURT:  If I understood what you said.

14          MR. JONAS:  Yeah, especially since we had done that

15 from -- actually from the very beginning of the implementation

16 of the plan and the plan was such that it was just really

17 allowed -- to allow folks who were above the IRS limit to

18 continue to put away for retirement savings.

19          THE COURT:  Okay.  And I understand that.

20          MR. JONAS:  Yeah.

21          THE COURT:  And I guess what I want you to understand

22 is that the way that the tax code is that, even if there is a

23 grantor trust and it is still subject to the claims of

24 creditors in order to get the tax treatment that is provided

25 for in these types of plans, so that your claim, although you

1  have a claim against Circuit City, it's not against these

2  specific funds, but just a general unsecured claim.  And as Mr.

3  Galardi eluded that that's unfortunate, but that's the way

4  congress set these things up.  All right.

5           MR. JONAS:  Okay.

6           THE COURT:  Thank you.

7           MR. JONAS:  Thank you.

8           THE COURT:  That said, the objection will be

9  overruled and the debtors' motion will be granted.  I trust

10 that Wachovia, as the custodian, has no objection.

11          MR. GALARDI:  I -- we understand they have no

12 objection, Your Honor, with an order that would allow for us to

13 direct it then I think they will have no problem.  They would

14 prefer an order obviously.

15          THE COURT:  Obviously, yes, submit your order.  Thank

16 you.

17          MR. GALARDI:  Your Honor, the next matter is actually

18 a motion that we've responded to.  It's Berkadia's motion to

19 compel the assumption of a ground lease and I turn to podium to

20 counsel.

21          THE COURT:  All right.

22          MR. OLSON:  Good morning, Your Honor.

23          THE COURT:  Good morning.

24          MR. OLSON:  William Olson for Berkadia Commercial

25 Real Estate, LLC.  With me in the courtroom is Tim Sharock

1  (phonetic), who is a VP Senior Asset Manager of real estate

2  solutions for Berkadia.

3       Berkadia's here today on a motion seeking to compel

4  the debtor to make a decision to assume or reject a ground

5  lease.  The ground lease in question relates to property where

6  Circuit City's former headquarters was located.  On that

7  property, there's a 280,000 square foot building which our

8  client, Berkadia, currently owns.

9       The debtors have rejected the lease on the building

10 on February 28th, 2009.  Subsequent to that, the former owner

11 of the building when into default on their loan for the

12 building and subsequent to that, Berkadia foreclosed and

13 obtained their ownership interest in the building.  And just to

14 clarify, Berkadia is the special servicer of the former lender

15 just to make sure we're clear on that point.

16      It's been -- the (indiscernible) continued for 15

17 months and there has not been a decision with respect to the

18 ground lease.  And Berkadia believes that it can show that the

19 debtors have had reasonable time to make a decision with

20 respect to this lease and the Court should issue an order

21 compelling a decision whether to assume of reject this lease.

22      Section 365(d)(2) of the bankruptcy code explicitly

23 grants the debtor in possession in a Chapter 11 bankruptcy

24 discretion to assume or reject an unexpired lease of

25 residential real estate property at any time before a

**J&J COURT TRANSCRIBERS, INC.**

1  confirmation of the plan.  But, also notes that the Court, on

2  request of any party to the lease, may order the debtor in

3  possession to determine within a specified period of time

4  whether to assume or reject the lease.

5          THE COURT:  Of course, that relates to residential

6  real property.

7          MR. OLSON:  That is correct, Your Honor.

8          THE COURT:  And we're not talking about residential

9  real property here.

10          MR. OLSON:  That is correct, Your Honor.

11          THE COURT:  So, how is that section relevant?

12          MR. OLSON:  Berkadia's position is that the same

13  discretion -- the Court has the same discretion with respect to

14  non-residential leases, that this -- although the statute

15  doesn't refer to non-residential leases in that provision, it

16  was not meant to be an exclusion of discretion going forward

17  for the Court in these type of leases.

18          THE COURT:  Well, you know, that interests me

19  because, you know, there is a provision in 365 that addresses

20  this specific situation and that's 365(h).  And that's where,

21  if the debtor were to reject the ground lease, you would still

22  be protected by being able to continue to pay the rent and

23  obviously remain on the premises.

24          So, how are -- well, two questions.  Number one is

25  how are you harmed one way or the other because it seems to me

1 that congress has completely protected your -- the -- your

2 deal, the economics of your deal?  And second, why isn't that

3 the exclusive remedy that congress has provided for lessees in

4 your situation?

5          MR. OLSON:  The harm that Berkadia's suffering is not

6 lack of access to the property and we recognize 365(h) does --

7 if there is a rejection, does allow continued use of the

8 property.  The harm we've -- that Berkadia's suffering is that

9 the lack of a decision is precluding Berkadia to closing a sale

10 of the building that it owns on this property.  That although

11 365(h) does spell out a right to use going forward, the

12 protections of that statute aren't sufficient in the

13 marketplace for a lender to be willing to engage in a

14 transaction with a seller with respect to a building on

15 property that is subject to a ground lease.  And that's, not

16 only financing the property, but also financing improvements

17 that would be needed to bring in a tenant going forward.

18          So, the harm that Berkadia's suffering is, at this

19 point where there's been no decision, Berkadia's -- is not in a

20 position to sell the property which is what it's looking to do.

21 And as a result of that, Berkadia's not a property owner.  It's

22 in this situation because of the larger circumstances involved

23 in this case.  Berkadia would not have ended up owning this

24 property if the events that happened to Circuit City hadn't

25 happened, that the course of events led to a default on the

1  loan and Berkadia having to foreclose on its security interest.

2  And Berkadia's trying to -- it is attempting to maximize the

3  value of its collateral at this point and it's being precluded

4  from doing that because of the step -- the unclear status of

5  the leases even thought you can -- even with the protections of

6  365(h) and also incurring costs -- further harm would be the

7  costs that it's incurring in maintaining this property

8  currently with no income.  There is no current tenant.

9  Although they would be amenable to leasing the property,

10 Berkadia is focused on that -- in their estimate of what the

11 best course for them to maximize their value, they have been

12 focusing on attempting to sell the property as quickly as

13 possible.  Although is the tenant came to them, they would be

14 willing to lease the property.

15      To further address your 365(h) point, as well, that

16 provision does provide protection.  But, as I read the language

17 of it, that is not limited to non-residential leases.  It is

18 generally leases of property.  And I guess it -- my view is if

19 you read that provision with 365(d)(2), I'm not sure if you can

20 read 365(h) as making clear that 365(d)(2) doesn't apply to a

21 non-residential lease.

22      THE COURT:  Well, wouldn't congress have said just

23 plain lease as opposed to lease of residential real property?

24 I mean, that's pretty specific in 362(d)(2) -- 365(d)(2).

25      MR. OLSON:  I believe that that it -- that could be

1  one interpretation that congress did intend for the difference,

2  although I'm not -- there does not seem to be a policy reason

3  behind that change.  And my review of the history of the

4  statute is it looks like the change was made around 1998

5  changing that language, that it did at one point say lease.

6           But, it appears to be --

7           THE COURT:  And I agree with you.  This has been the

8  most amended section of the entire code and it's gone through

9  all sorts of different versions in that it used to say that.

10  You're exactly right.

11           MR. OLSON:  And, I guess the other point would be if

12  you look at 365(d)(4) which deals with debtor as lessee, that

13  there is that provision as well providing protection, but it --

14  I think they left open this issue of non-residential leases

15  where the debtor is the lessor.  And I think read in full, it

16  should not be -- a plain language reading shouldn't be applied

17  in this context and Collier and bankruptcy also agrees with

18  that interpretation, that that is what Collier would suggest in

19  this circumstance that you would apply the same standard for a

20  non-residential lease as a residential lease.

21           THE COURT:  All right.  Well, assuming that I weave

22  all of these parts of the statute together and maybe even

23  invoke -- conjure up Section 105 and agree with you that I can

24  do this, tell me why I should do it because don't we -- the

25  debtor, under any circumstances, has to assume or reject all

**J&J COURT TRANSCRIBERS, INC.**

1  lease, including this one, at the time of confirmation of its

2  plan?  And we currently have a plan that's on the table that

3  the creditors have already voted on that is, you know, getting

4  ready for a confirmation hearing which is currently scheduled

5  for next month.  So, what -- why should I do this now as

6  opposed to in April?

7       MR. OLSON:  Berkadia currently has a purchase sale

8  contract in place with a potential buyer for this property.

9  One of the primary contingencies left on that deal going

10 forward is the issue of the ground lease.  And there is a

11 significant possibility that this deal will fall through is

12 there isn't a decision made with respect to the lease.

13      Now --

14      THE COURT:  And why can't you come to some sort of an

15 accommodation with the debtor with regard to the business terms

16 of this transaction?  I mean, it is something where it doesn't

17 make good sense for the estate, but only makes good sense for

18 you or what's going on here?

19      MR. OLSON:  I -- my understanding is I'm not sure why

20 there hasn't been an agreement.  I -- and I think that goes

21 into the -- when looking at the elements of who balancing the

22 harm to the parties if you go through the elements --

23      THE COURT:  That's what I'm trying to do.  I'm trying

24 to figure that out.

25      MR. OLSON:  Yes, I am not -- I'm not clear the debtor

**J&J COURT TRANSCRIBERS, INC.**

1  in there brief, one issue they raise is the base rent, that

2  there's been a -- there was a disagreement on the base rent

3  going forward, that the base rent reset as of March 1, 2010.

4  And that disagreement led to a delay in the debtors' efforts to

5  sell the property the building sits on.

6         My understanding, and we're -- Berkadia's prepared to

7  present testimony on the negotiations about the rent, is that

8  there has been agreement reached on the rent going forward,

9  that it's -- the agreement on the number is $19,229.17 a month.

10 There had been  correspondence between the broker for Berkadia

11 and general counsel of Circuit city on this issue.  My reading

12 of the correspondence and our understanding is -- Berkadia's

13 understanding is there is an agreement there's just paperwork

14 to be finalized.  And that rent had been paid for March and it

15 will be adjusted to the agreed upon amount going forward.  So,

16 that issue's set aside.

17        Beyond that, I don't see another issue.  I think the

18 debtor could make a decision and it wouldn't affect their

19 ability to maximize the value of the their property going

20 forward.  That if they're asked -- and our motion does request

21 immediate decision.  I would request the Court -- I would ask

22 the Court to take into account the quick need on Berkadia's end

23 to sell the property, but would understand that the debtor

24 would need some time to make a decision beyond the time of the

25 Court's order.  But, would ask for an order prior to the

**J&J COURT TRANSCRIBERS, INC.**

1    confirmation of the plan.  Especially -- although we -- the

2    Court does have a date set, they're --

3              THE COURT:  It's moved before.

4              MR. OLSON:  -- it's moved before.  And --

5              THE COURT:  Okay.  And, so what -- how much time do

6    you think that the debtor should have?

7              MR. OLSON:  I would say the end of the month would be

8    a reasonable time.

9              THE COURT:  Okay.

10             MR. OLSON:  And looking at the other factors, I think

11   that one thing to keep in mind is the 15 months, as well, that

12   in the case law on residential leases and contracts, a lot of

13   those cases are -- the motions come three to four months into

14   the bankruptcy.  We are at 15 months and I think that also

15   weighs in favor of an order granting -- order compelling a

16   decision in this circumstance, that such a significant amount

17   of time has passed.

18             THE COURT:  All right.

19             MR. OLSON:  Your Honor, that's the end of my -- I

20   don't have any further issues, argument-wise, but would be

21   prepared to present testimony on the harm issue if necessary.

22             THE COURT:  All right.  Mr. Olson, I'm going to hear

23   from Mr. Galardi and then I will welcome any further comments

24   in response that you might have.

25             MR. OLSON:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

34

1              THE COURT:  All right.

2              MR. GALARDI:  Your Honor, just very briefly.  Your

3    Honor hit on the 365(h) issues.  Let's assume that a standard

4    of sort of cause exists.  Let's just address those which we can

5    get into evidence, but, Your Honor, what the gentleman just

6    said I think proves that we need more time for the following

7    reasons, (1) we conducted a sale process in January when they

8    sent a letter saying that the ground rent would fall to a low

9    number, so we had to stop that sale process.  We're about the

10   commence another sale process, but as he, again, just admitted,

11   we don't have the documented amendment with the ground lease

12   and the sale process take a certain amount of time.

13             Consequently, we've not been able to properly market

14   this property and his client may or may not or whoever it is

15   that wants this may very well be a bidder at that auction and

16   as any auction is successful as you heard today with the

17   parking lot, if we can get two bidders, the estate will get

18   more money.  Once we've got the ground rent, we're going to set

19   up a sale process.

20             So, Your Honor, first off we would think that there

21   is no cause and although they may loose money in the long run,

22   that's not a legally cognizable interest that the Court can

23   consider.  The Court's supposed to consider the best interests

24   of the creditors and the debtor before it and our interest is

25   to get the highest and best price for it.  We couldn't do that

1  in the first instance because their letter.  And then we can't

2  of it now until we get the amendment, so that we can properly

3  shop the ground lease to determine who's the highest and best

4  bidder and hopefully we'll get a competitive bidder to his

5  client such that we can have a high auction like we went from

6  65 to nearly a million dollars on the parking lot.

7          So, Your Honor, we would ask, again, not to shorten

8  the time.  Yes, we acknowledge the confirmation has moved and

9  may move again.  And hopefully it will be sooner rather than

10  later, but we would like to get the time so that we can get the

11  documentation done, that we can actually conduct a sale process

12  and if they come back in without prejudice, if we don't start

13  that sale process within the next 30 to 40 days depending upon

14  the amendment, they can come in again and they say, okay,

15  enough is enough.  But, again, most of the parties responsible

16  for not having been able to conclude a sale on this particular

17  property is their client who had sent a letter that there

18  wasn't a ground rent and now is waiting for the documentation.

19          Your Honor, I'd also note that the ground lease

20  actually provides the right of first refusal with respect to

21  this property as well which they've refused to exercise.  So,

22  they do have a remedy that they have been asked to go ahead and

23  make a bid.  They were not prepared to do it and, Your Honor, I

24  would just note that that is Section 28 of the ground lease.

25          And if Your Honor is a rule of perpetuities person,

**J&J COURT TRANSCRIBERS, INC.**

1 I'd ask you to look at (b) which says that they still have that

2 right until 21 years after the death of the last survivor of

3 the descendants of the Franklin Delano Roosevelt living on the

4 date of the lease.  I just thought that was an interesting

5 provision in the lease, but they do have a right of first

6 refusal, Your Honor.

7         THE COURT:  I'm glad you pointed that out.

8         MR. GALARDI:  I -- it is fascinating to me.  I

9 haven't seen that one before, but I'm assuming that it hasn't

10 terminated for that reason.  It's 21 years after.

11         So, we would, again, say, Your Honor, there is really

12 no --

13         THE COURT:  Hasn't their rule against perpetuities

14 had been abolished in Virginia?

15         MR. GALARDI:  I don't know, Your Honor.  But, it

16 would have satisfied it.  We did have that discussion this

17 morning.  So, because it had a date certain, but --

18         THE COURT:  So, if it existed, it would have

19 satisfied.

20         MR. GALARDI:  So, I just thought that was an

21 interesting provision I have not seen and I've read a lot of

22 leases.

23         But, again, Your Honor, we don't think that there is

24 any prejudice even if there was a cause standard.  Again, the

25 debtors do need additional time.  Your Honor, I would deny the

1  motion to compel without prejudice to coming back should we not

2  drag our heels on confirmation go out to start a sale process.

3  But, once the documentation is done which is in their control,

4  we will start a sale process.  They will be apprised of it and

5  they are free to bid at that process if there's an alternative.

6  So, we would ask you to deny the motion.

7          THE COURT:  Then let me ask this question and I

8  understand the intricacies of 362 -- 365(d)(2) and 365(h) and

9  these provisions, but I assume that under Section 365(d)(3)

10 that under this lease, like in any lease, the -- Circuit City,

11 the debtor, has an obligation to timely perform its obligations

12 under the lease and that you are doing that.

13         MR. GALARDI:  Correct, Your Honor.  They haven't

14 alleged otherwise.  Again --

15         THE COURT:  Right.  And I understand that.

16         MR. GALARDI:  -- Ms. Debra Miller is in there and we

17 have been timely performing and making all of the payments that

18 are due and payable and there's no been an allegation to the

19 otherwise.

20         THE COURT:  So, how is the debtor harmed by assuming

21 this lease?

22         MR. GALARDI:  Your Honor, because it's a longer term

23 lease and if we were to reject it and put back the claim, if we

24 don't have a value to sell it, obviously we believe that there

25 is a value.

38

1        THE COURT:  I would assume so.

2        MR. GALARDI:  And, so otherwise we wouldn't be paying

3  even the amounts that we're paying.  So, to assume that now if

4  we -- the only risk is if you don't actually sell it or that if

5  we assume that people charge us less of the proportion, you

6  know.  Part of the problem is you have a building under one

7  lease and a ground lease under, so when you proportion the

8  price for the whole thing, we seem to get short-changed on

9  that.  That's our biggest concern, so we may not recover that.

10        If we can sell them separately, and again, this is

11 just the auction dynamics, it would be better for us to still

12 have the right to assume and assign and let the other -- so, we

13 can get either the higher price there and have a fair

14 proportion by way of the market standard, who wants the

15 building, who wants the lease, or we'll get one of both come in

16 and compete for both buildings.

17        THE COURT:  That makes perfectly good sense.  I

18 understand.

19        MR. GALARDI:  And that's what we've tried to do with

20 the auction process.

21        THE COURT:  All right.  Thank you.

22        MR. GALARDI:  Thank you.

23        THE COURT:  Mr. Olson, you wish to respond?  You

24 don't need to address the rule against perpetuities.

25                    (Laughter)


**J&J COURT TRANSCRIBERS, INC.**

1        MR. OLSON:  Thank you, Your Honor.  I think with

2   respect to the harm issue to the debtor, I believe the issue of

3   the ground lease being the rent being set is something that

4   could be resolved in a limited amount of time.  But, that is

5   not something where, within the time frame, I had suggested in

6   my opening argument that would be something that could be

7   resolved within a matter of days.  And although counsel for the

8   debtor does make an argument for having some -- needing some

9   flexibility, they would still have the ability to sell the

10  property if they were compelled to make a decision on the lease

11  in the short -- shorter term.

12        That -- and also if they were compelled to make a

13  decision in for -- in, if in our view, the most likely scenario

14  they would assume the lease which would allow the sale to go

15  through, they would have a potential buyer, the buyer of the

16  building, as a key bidder that, while Berkadia may not be as a

17  lender in a position to bid on the ground and I'm not in a

18  position to represent going forward exactly what Berkadia would

19  do if it retains its ownership going forward, but it seems that

20  an owner of the building that's looking to own it long-term

21  would be more likely in a position to be interested in bidding

22  on the ground where the building is located.  And that making

23  an order compelling a decision would more likely lead to that

24  result, that they would be an owner that would be looking to

25  own the building going forward long-term.

1           THE COURT:  Well, what if they rejected your lease?

2           MR. OLSON:  That would be a difficult -- on the --

3           THE COURT:  Well, you'd get something you wouldn't

4   want.

5           MR. OLSON:  That would --

6           THE COURT:  You're hoping that I say they have to do

7   one or the other and they're going to do what you perceive to

8   be the rational thing to do.

9           MR. OLSON:  That's right.  And if it -- if they

10  reject the lease, then --

11          THE COURT:  Then you're in the same soup you're in

12  right now.

13          MR. OLSON:  We are, in some ways, the same soup,

14  although we see we can't finance the -- we would have problem

15  financing with a buyer and it would lead to a need to

16  coordinate -- at least me view would be a need to coordinate

17  with Circuit City going forward and I think Your Honor put your

18  finger on it, that the rational thing -- the rational view is

19  they would likely assume the lease because it, I think for all

20  parties involved, would be the best outcome.

21          But, as we recognize, it's -- what we're asking the

22  Court is to compel a decision and Circuit City would retain the

23  discretion to make decision what they want to do with the lease

24  and we can't push either way on that.  But, I think it is

25  reasonable for the Court to consider what the rational outcome

1  would be and, playing that forward, the debtor would still have

2  ample opportunity to maximize its value and, in some ways,

3  there would be a benefit going forward because there's a more

4  likely opportunity for there to be a buyer of the building that

5  would be bidding on the lease or would be exercising -- more

6  likely to exercise the right of first refusal.

7           THE COURT:  All right.  Thank you.

8           MR. OLSON:  Thank you.

9           THE COURT:  All right.  The Court has before it the

10 motion of Berkadia to compel the assumption of rejection of the

11 ground lease.  The Court is not going to rule at this time

12 whether or not it has the discretion to compel the debtor to

13 assume or reject a lease pursuant to 365(d)(2).  The debtor --

14 the Court is going to deny the motion without prejudice for the

15 time being and reserve making that decision if it has to at a

16 future date.

17           It seems to the Court that the economies here -- or

18 the economics of the deal really require the parties to talk to

19 each other and to work something out.  You're obviously joined

20 at the hip with this one and some sort of a joint resolution

21 obviously makes sense.

22           That said, I'm going to carry this over to the April

23 6 date which is when we currently have the confirmation hearing

24 scheduled.  If the parties have not made progress at that point

25 if there's no sale process in process at that time then, Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Olson, you may renew your motion at that time and the Court

2  will, you know, consider it in light of where we are at that

3  point in time, so it doesn't drag out internally.  That's

4  certainly not something that the Court wants to see either, but

5  I do think that there's a resolution that the parties can

6  probably come to here with regard to this matter.

7          Any questions regarding the Court's ruling?

8          UNIDENTIFIED ATTORNEY:  No, Your Honor.

9          THE COURT:  All right.  Is there are any other

10  business we need to take up today?

11          MR. FREDERICKS:  Yes, Your Honor.  Just briefly, we

12  just wanted to advise the Court at the last hearing Your Honor

13  did rule on the received issue.  Last night, we did send

14  proposed findings of fact and conclusions of law to the Court.

15  I wanted to let you know that we did circulate those to

16  Panasonic.  We did receive comments from Panasonic.  We

17  accepted some of those and not others and obviously Your

18  Honor's free to enter whatever ruling Your Honor ultimately

19  reaches.

20          THE COURT:  Well, I appreciate that.

21          MR. FREDERICKS:  Obviously, but --

22          THE COURT:  All right.

23          MR. FREDERICKS:  Thank Your Honor.

24          THE COURT:  And I appreciate you having circulated

25  those to opposing counsel and the Court will look at those

1 probably over the weekend.  Yes, sir?

2          MR. FREDERICKS:  On the fifth omnibus objection with

3 respect to U.S. Signs, there was one point of clarification.

4 We had --

5          THE COURT:  Which number is this, just so I know

6 where I am?

7          UNIDENTIFIED ATTORNEY:  Twenty-six.

8          THE COURT:  Twenty-six, thank you.

9          MR. FREDERICKS:  And they are --

10          THE COURT:  Yes, I see them.

11          MR. FREDERICKS:  -- on Exhibit A, as well.  The

12 matter was set for April 29th hearing.  Mr. Hutson has advised

13 me that his clients aren't available that date.  What we're

14 going to do is we intend to serve some discovery.  Then we want

15 to take some discovery on this matter and we're going to use

16 that hearing as a status conference or discovery conference if

17 we need it.  And then we'll pick a mutually agreeable date to

18 have an evidentiary hearing if we need it.

19          THE COURT:  All right.  So, that won't go over it,

20 but we'll not go on on that date, but we'll set a date at that

21 point in time.

22          MR. FREDERICKS:  Correct.

23          THE COURT:  All right.  That's acceptable to the

24 Court.  Mr. Hutson?

25          MR. HUTSON:  That's correct, Your Honor.  Just for

**J&J COURT TRANSCRIBERS, INC.**

1   the record, Richard Hutson, Fullerton and Knowles for U.S.

2   Signs.   The debtor said it accurately, Your Honor.

3           THE COURT:  All right.  Thank you.

4           MR. FREDERICKS:  And my apologies for the --

5           THE COURT:  All right.

6           MR. FREDERICKS:  -- miscommunication.

7           THE COURT:  All right.  Thank you.

8           MR. FREDERICKS:  Thank Your Honor.  I don't believe

9   there's --

10          THE COURT:  Any other business then that we need to

11  take up today?

12          MR. FREDERICKS:  I don't believe so, Your Honor.

13          THE COURT:  All right.  Thank you.

14          MR. FREDERICKS:  Thank Your Honor.

15          COURT CLERK:  All rise.  Court stands in recess.

16                        * * * * *

17              **C E R T I F I C A T I O N**

18          I, AMY L. RENTNER, court approved transcriber,

19  certify that the foregoing is a correct transcript from the

20  official electronic sound recording of the proceedings in the

21  above-entitled matter, and to the best of my ability.

22

23  /s/ Amy Rentner

24  AMY L. RENTNER

25  J&J COURT TRANSCRIBERS, INC.   DATE:   April 1, 2010


**J&J COURT TRANSCRIBERS, INC.**