UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

```
IN RE:                     .  Case No.  08-35653 (KRH)
                           .
                           .
CIRCUIT CITY STORES, INC., .
et al.,                    .  701 East Broad Street
                           .  Richmond, VA  23219
                           .
                           .
           Debtors.        .  March 25, 2010
. . . . . . . . . . . . . ..  2:39 p.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtors:          McGuireWoods, LLP
                          By:  DOUGLAS FOLEY, ESQ.
                          9000 World Trade Center
                          101 W. Main Street
                          Norfolk, VA  23510

                          McGuireWoods, LLP
                          By:  SARAH B. BOEHM, ESQ.
                          One James Center
                          901 East Cary Street
                          Richmond, VA  23219

                          Skadden Arps Slate Meagher & Flom LLP
                          By:  IAN FREDERICKS, ESQ.
                               GREGG GALARDI, ESQ.
                          One Rodney Square
                          Wilmington, DE  19899

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For Ashley Isaac:              By:  ASHLEY ISAAC, Pro Se Claimant
                               (Telephonic appearance)

For Bruce Besanko,             Christian & Barton, L.L.P.
James H. Wimmer, Jr.           By:  MICHAEL D. MUELLER, ESQ.
and Lawrence W. Fay:           909 East Main Street, Suite 1200
                               Richmond, VA  23219

For Thomas C. Bradley:         By:  THOMAS C. BRADLEY, Pro Se Claimant

For Dawn VonBechmann:          Spotts Fain, P.C.
                               By:  NEIL McCULLAGH, ESQ.
                               411 East Franklin Street
                               Suite 600
                               Richmond, VA  23219

For Robert Gentry,             Hutson Law Office, P.A.
Jack Hernandez,                By:  RICHARD M. HUTSON, II, ESQ.
Jonathan Card and              300 West Morgan Street
Joseph Skaf:                   Suite 1500
                               Durham, NC  27702

For Robert Gentry,             Righetti Law Firm, P.C.
Jack Hernandez,                By:  MICHAEL RIGHETTI, ESQ.
Jonathan Card and              456 Montgomery Street, Suite 1400
Joseph Skaf:                   San Francisco, CA  94104

For the Official              Tavenner & Beran PLC
Committee of Unsecured        By:  PAULA S. BERAN, ESQ.
Creditors:                    20 North Eighth Street, Second Floor
                              Richmond, VA  23219

**J&J COURT TRANSCRIBERS, INC.**

## I N D E X

| **EXHIBITS** | | **ID.** | **EVD.** |
|---|---|---|---|
| Exhibit A | Affidavit of Service | | 10 |
| Exhibit B | Proof of Claim - A. Isaac | | 10 |

**J&J COURT TRANSCRIBERS, INC.**

4

1          COURTROOM DEPUTY:  All rise.  The United States

2    Bankruptcy Court for the Eastern District of Virginia is now in

3    session, the Honorable Kevin R. Huennekens presiding.  Please

4    be seated and come to order.

5          THE CLERK:  In the matter of Circuit City Stores,

6    Incorporated, hearing on Items 1 through 28 as set out on the

7    debtors' agenda.

8          MR. FOLEY:  Good afternoon, Your Honor.  Doug Foley

9    with McGuireWoods, along with Sarah Boehm for Circuit City.

10   With me at counsel table is Greg Galardi and Ian Fredericks

11   from Skadden Arps.  In the courtroom today is Kay Bradshaw, who

12   is the vice president and controller of the company, as well as

13   Deborah Miller, who is the assistant general counsel.

14         Your Honor, we apologize for being late today.  Or

15   normal mode of transportation was caught in some traffic

16   accidents to come pick us up from our office to get here, so we

17   had to scramble to get cabs, so we apologize for being late.

18         THE COURT:  You weren't actually in the accident?

19         MR. FOLEY:  We weren't.  No.  The transportation to

20   come pick us up was.

21         THE COURT:  Was anybody hurt?

22         MR. FOLEY:  No, I don't believe so.

23         THE COURT:  Good.

24         MR. FOLEY:  Your Honor, the agenda here today has 28

25   items on it.  There's several matters going forward on summary

**J&J COURT TRANSCRIBERS, INC.**

1  judgment.  We're pleased to report that several items have

2  settled since we filed the agenda.  The Vertis late claim

3  motion, which is the first one on the agenda, has been

4  resolved, and they have withdrawn that motion.

5          Item Number 2, which is the Miner Fleet late claim

6  motion, we have submitted a consent order that has resolved

7  that matter in its entirety.

8          Item Number 3, which is the OmniMount motion to

9  reconsider a claim disallowance order, that has been settled,

10 as well, by a stipulation that we have filed.  The objection

11 period runs on March 29th, at which point it will become

12 automatically effective and that can come off of the docket, as

13 well.  We don't anticipate any objections.

14          THE COURT:  All right.

15          MR. FOLEY:  Item Number 4 and 5, Your Honor, these

16 are the motions of Motorola and General Instruments for

17 503(b)(9) claims allowance and payment.  We're still working

18 with them with respect to trying to resolve the amount of their

19 claims.  They have agreed to adjourn their motions until April

20 15th at two p.m.  Your Honor, the Sennheiser motion for late

21 claim allowance, that matter we have served -- we're in the

22 process of serving discovery on them in order to get some more

23 factual information from them.  They have requested that their

24 motion be adjourned until the May 20th hearing date at ten

25 a.m., and we hope to, once we get the discovery back, see if we

6

1 can't craft a resolution of that.  This one has both

2 administrative claims and unsecured claims that were both late

3 --

4         THE COURT:  All right.

5         MR. FOLEY:  -- that we need to try to resolve.  Your

6 Honor, Item Number 7 is the Sony administrative claim motion.

7 they have requested, and we have agreed to adjourn their

8 hearing until the April 15th date at two p.m.  The Town Square

9 late claim motion also they've requested -- we're trying to

10 resolve this one.  We have an offer outstanding to them.

11 They've requested that their motion be adjourned to April 15th

12 at two p.m.

13         The Schimenti 2004 motion, Your Honor, we're in

14 negotiations with them regarding potential settlement.  They

15 have a 503(b) -- they believe they have a 503(b)(9) claim.

16 It's an issue of goods versus services.  We've served some

17 discovery on them to try to get that matter more ripe for Court

18 consideration.  In the meantime they're also considering filing

19 a complaint with respect to an alleged trust fund theory.  They

20 have not filed that complaint yet.  That will moot this 2004

21 motion when they do, but for the meantime they have requested

22 and we have agreed to adjourn the matter until April 15th at

23 two p.m.

24         Item Number 10, Your Honor, is the Slam Brands motion

25 for an administrative claim.  They have requested and we have

1  agreed to adjourn their hearing until the April 15th hearing

2  date at two.

3         Item Number 11, Your Honor, this is our motion to

4  cancel certain surety bonds.  We had a draft of a stipulation

5  out to Safeco that we believe will completely resolve this

6  matter.  We're waiting for their approval, as well as the

7  government's -- resolving the government's objection to this

8  motion, as well.  In the meantime we request that that be

9  adjourned until the April 15th hearing date at two.

10         Item Number 12, Your Honor, is the motion by John

11 Raleigh for a late claim.  We're trying to resolve that matter.

12 It results from a contract that was recently rejected which

13 renews the time period for Mr. Raleigh to file a proof of

14 claim.  He believes that he's entitled to some priority piece

15 of that claim.  That's probably the only area that will be in

16 dispute, but in the meantime they have requested -- his counsel

17 has requested to adjourn his motion until April 29th at two.

18         Item Number 13, Your Honor, is Site A's motion for

19 allowance of a late claim.  We are awaiting additional

20 information from them on an informal basis, voluntary basis to

21 establish whatever they believe constitutes excusable neglect.

22 We haven't received that yet.  They have requested that their

23 motion be adjourned until April 15th at two, and we have agreed

24 to that.

25         Item Number 14, Your Honor, is our uncontested motion

**J&J COURT TRANSCRIBERS, INC.**

1  to extend the time periods to remove actions under 28 U.S.C.

2  1452 and Bankruptcy Rule 9027.  The order that we have attached

3  to the motion provides that the period will be extended through

4  the later of August 3rd, 2010, or 30 days after entry of an

5  order granting relief from the automatic stay.  There has been

6  no opposition to the motion, and we would ask that the Court

7  enter an order approving it.

8          THE COURT:  Does any party wish to be heard in

9  connection with the debtors' motion for an order further

10  extending time?  All right.  There being no objection, Mr.

11  Foley, the Court will grant the debtors' motion.

12          MR. FOLEY:  Thank you, Your Honor.  The next item is

13  Ms. Ashley Isaac's motion for allowance of a late claim.  I

14  don't know if she is on the phone, but that -- or how the Court

15  wishes to proceed with that matter.  We did notice a deposition

16  of Ms. Isaac yesterday.  We even agreed to take it by

17  telephone, but she stated that she was not available, so we

18  have not heard whatever testimony or evidence she intends to

19  present over the phone, but we're willing to go forward, Your

20  Honor, on the papers and also obviously have an opportunity to

21  hear what Ms. Isaac has to say that's not in her pleadings.

22  But I don't know if Your Honor wants to drop that down to the

23  end of the docket.  I don't know if Ms. Isaac is on the phone.

24          THE COURT:  All right.  Is Ms. Isaac or anybody on

25  her behalf here in the courtroom?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. ISAAC:  Yes, Your Honor.  I'm appearing

2    telephonically.

3          THE COURT:  Okay.  Is this Ms. Isaac that I'm

4    speaking to?

5          MS. ISAAC:  Yes, Your Honor.  This is Ms. Ashley

6    Isaac.

7          THE COURT:  All right.  Are you prepared to go

8    forward on your motion to allow your late proof of claim?

9          MS. ISAAC:  Yes, Your Honor.

10         THE COURT:  All right.  I will hear you, Ms. Isaac.

11   You may proceed.

12         MS. ISAAC:  Well, Your Honor, during the time that I

13   -- that the company, Circuit City Stores, Incorporated went

14   into bankruptcy I was actually living with my sister and my

15   brother-in-law because my sister was having complications with

16   her pregnancy.  My brother-in-law has epilepsy, so it was a

17   family emergency.  The address for the place where I was living

18   is 1004 Apartment B Eagle View Drive, and it is the address

19   where I was residing.  Now, the address where I assume that the

20   claims -- the bar date deadline was sent to was actually 617

21   76th Street South.  I did not receive that notice because I was

22   living at another address and I was not at the time getting my

23   mail because I was caring for someone else.

24         THE COURT:  All right.  Anything further, Ms. Isaac?

25         MS. ISAAC:  Also, a time off -- the time that I had

1  accumulated I was never paid that amount, so I'm also seeking

2  the amount for the paid time off, as well.  I believe it was in

3  an exhibit in the prior document that I filed with the Court

4  and that should be on the docket, as well.  That should be all,

5  Your Honor.

6          THE COURT:  All right.  Mr. Foley?

7          MR. FOLEY:  Your Honor, first we would ask that the

8  Court accept into Evidence Exhibit A to our opposition to the

9  motion, which is the affidavit of service with respect to the

10 service of a notice of commencement and the notice of deadline

11 for filing proofs of claim by KCC, which is the claims agent in

12 the case.  We would ask that that be admitted into Evidence.

13         THE COURT:  Any objection, Ms. Isaac?

14         MS. ISAAC:  No, Your Honor.

15         THE COURT:  Okay.  It's admitted.

16         MR. FOLEY:  We would also ask, Your Honor, that

17 Exhibit B to our responsive pleading, which is Ms. Isaac's

18 proof of claim, be admitted into Evidence.

19         THE COURT:  All right.  Any objection, Ms. Isaac?

20         MS. ISAAC:  No, Your Honor.

21         THE COURT:  Okay.  That will be admitted as Exhibit

22 B.

23         MR. FOLEY:  Ms. Isaac, just a couple of questions.

24 The address that you mentioned to the Court a few minutes ago,

25 that is not the address that was in your employee records; is

1    that correct?

2         MS. ISAAC:  That is correct.  At the time I did not

3    get a chance to update it, and I was never asked for a most

4    recent address.

5         MR. FOLEY:  Isn't it correct that the address in your

6    employee records is 617 South 76th Street, Birmingham, Alabama,

7    35206?

8         MS. ISAAC:  I believe it is.  Yes.

9         MR. FOLEY:  And you were an employee at the time of

10   the bankruptcy case; is that correct?

11        MS. ISAAC:  Yes.  My hours had been cut, so I wasn't

12   as -- as a current employee, but during that time, yes, I was

13   an employee.

14        MR. FOLEY:  You worked during the end of 1998 and the

15   beginning of -- I mean -- I'm sorry, 2008 and the beginning of

16   2009?  That's correct?

17        MS. ISAAC:  I worked during the end of 2007 to early

18   2009.

19        MR. FOLEY:  Through early 2009.  Okay.  The proof of

20   claim that you filed late, Ms. Isaac, has the address of 617

21   South 76th Street, Birmingham, Alabama; isn't that correct?

22        MS. ISAAC:  Yes.  That is.  I actually had moved back

23   in with my parents and now I am actually residing in the house

24   next to them because my sister moved to Coleman, Alabama after

25   her baby was born.

**J&J COURT TRANSCRIBERS, INC.**

 1            MR. FOLEY:  And you did not file your proof of claim

 2   until six months after the bar date; isn't that correct?

 3            MS. ISAAC:  Yes.  That is.

 4            MR. FOLEY:  Your Honor, I have no further questions.

 5            THE COURT:  Okay.  Do you wish to offer any

 6   additional evidence, Mr. Foley?

 7            MR. FOLEY:  No, Your Honor.  We would simply have

 8   argument, which is basically summarized in our pleadings --

 9            THE COURT:  All right.

10            MR. FOLEY:  -- at this point.

11            THE COURT:  Ms. Isaac, do you wish to make argument

12   at this point?

13            MR. FOLEY:  Yes, Your Honor.  Actually, I believe it

14   was a case, <u>Greyhound Lines, Inc. v. Donna Rogers</u>, which was a

15   similar case where the debtor sent the address to -- to the

16   employee's brother's address instead of her current address,

17   which is very similar to my case.  And I'm just stating that

18   for the record.

19            THE COURT:  All right.  Anything further?

20            MS. ISAAC:  No, Your Honor.

21            THE COURT:  All right.  Mr. Foley?

22            MR. FOLEY:  Your Honor, we would submit that the

23   facts and the evidence clearly provide that the debtors

24   provided notice to the address, the specific address that this

25   employee had in her -- in the employee records.  She was also

1   employed at the time.  She knew about the bankruptcy, being at

2   the company at the time.  She should have had an opportunity to

3   find out about the bar date, and we don't believe that under

4   the legal standard set forth under the Fourth Circuit and the

5   Supreme Court, the Piedner (phonetic) case, the Thompson case,

6   the other cases decided in this District, that the facts

7   presented anywhere come close to establishing a case for

8   excusable neglect for not making the bar date, nor has there

9   been any evidence presented to explain why there was a six-

10   month delay from the bar date to file a proof of claim, so we

11   would ask the Court to deny the motion.

12          THE COURT:  All right.  Ms. Isaac, do you wish to

13   reply?

14          MS. ISAAC:  Yes, Your Honor.  During the time that I

15   was working there I could not file a proof of claim because I

16   didn't know -- I did not know how -- when the bar date the --

17   the deadline for filing a claim was until I actually went to --

18   I filed a civil lawsuit against Circuit City Stores,

19   Incorporated, and that Judge actually related to me that I

20   would have to go through the Bankruptcy Court.  And that was

21   the only way that I realized that I would have to file a proof

22   of claim.  So, the delay was because of the lawsuit, which I

23   believe was filed on May 12th or May 13th of 2009.

24          THE COURT:  All right.  Thank you.  All right.  The

25   Court is prepared to rule.  The Court has before it the motion

1  of Ashley Isaac to allow the existing late proof of claim as

2  valid.   The Court has heard the arguments and the evidence

3  that's been presented.   The Court finds that the debtor

4  received a notice of the bar date at the address that was

5  contained in the records of Circuit City, that that is also the

6  address that is listed on the debtors' own proof of claim that

7  was filed in this case, and that the fact that the claimant did

8  not provide for whatever forwarding information to the post

9  office does not constitute excusable neglect for not receiving

10 the mailing that would otherwise have been made to her, and

11 that in addition she was an employee of the corporation at the

12 time of the commencement of the case, had actual knowledge of

13 the commencement of the case, and that even further the

14 publication notice that the debtor provided would have been

15 sufficient notice in this case, that the claim was filed after

16 the bar date, and that the debtor has failed -- or the

17 claimant, rather, has failed to establish excusable neglect

18 under the precedent set forth by the Fourth Circuit Court of

19 Appeals in this Circuit, and so the Court is going to deny Ms.

20 Isaac's motion to allow the existing proof of claim, and the

21 claim will be expunged.   Any questions regarding the Court's

22 ruling?   All right.   Mr. Foley, please submit an order to that

23 effect.

24             MR. FOLEY:   We will, Your Honor.   Thank you.

25             THE COURT:   Ms. Isaac, for your benefit an order will

1   be submitted denying your proof of claim.  Once the order is

2   submitted you will have 14 days from the date of that order to

3   appeal this Court's ruling if you so desire.

4              MS. ISAAC:  Yes, Your Honor.  Thank you.

5              THE COURT:  You're welcome.

6              MR. FOLEY:  Your Honor, if we could drop down to the

7   end of the docket, the two adversary proceedings?  One is Item

8   Number 27, CC-Investors, as well as Item 28, which is the

9   Creative Labs complaint.  We are still negotiating with the

10  insurance carrier with respect to -- with CC-Investors, and we

11  would ask that that pretrial conference be adjourned to the

12  April 15th hearing at two.

13             THE COURT:  All right.  The pretrial conference will

14  be adjourned to the April date.

15             MR. FOLEY:  The pretrial conference with respect to

16  the Creative Labs complaint, Your Honor, this is a company

17  based in Singapore.  They are still retaining the U.S. counsel.

18  We have exchanged documents informally, and we may be entering

19  the offer and counteroffer stage.  However, we only want to

20  brief -- John met with respect to this matter, to the -- the

21  pretrial conference to the April 6th hearing date at ten, Your

22  Honor.

23             THE COURT:  April 6th at ten o'clock?

24             MR. FOLEY:  Yes, Your Honor.

25             THE COURT:  All right.  And that's by agreement of

1  counsel?

2          MR. FOLEY:  It is.

3          THE COURT:  All right.  It will be adjourned.

4          MR. FOLEY:  Your Honor, the matters on the -- the

5  rest of the matters on the agenda, Items Number 16 through 20

6  will be addressed by Ms. Boehm.  Mr. Galardi will address Items

7  21, 23, 24, 25 and 26.  These are the summary judgment matters

8  with respect to the class action claimants as well as the

9  matters with respect to the employees' claims, and Mr.

10  Fredericks will address Item Number 27, which is Mr. Wilson's

11  claim.

12          THE COURT:  All right.  Very good.

13          MS. BOEHM:  Good afternoon, Your Honor.

14          THE COURT:  Good afternoon.

15          MS. BOEHM:  Sarah Boehm from McGuireWoods on behalf

16  of the debtors.  Agenda Item Number 16 is the debtors' sixty-

17  sixth omnibus objection, which seeks a reclassification of

18  certain claims that were filed by equity holders to interests.

19  This included 14 claims.  We received no responses and would

20  like to submit an order granting the relief requested in the

21  objection.

22          THE COURT:  The claims -- the objection will be

23  sustained.  Submit an order.

24          MS. BOEHM:  Item 17 is the sixty-seventh omnibus

25  objection to claims.  This objection seeks a disallowance of

1 certain amended claims and certain duplicate claims.  The

2 objection included 26 amended claims.  We did receive two

3 responses to those.  And it also included 33 duplicative claims

4 which we received no responses to.  With respect to the two

5 responses that were received, one from Columbus dispatch and

6 one from Chase Bank, we will go forward on the merits with

7 respect to those claims at the April 15th hearing at two p.m.

8 And with respect to any non-responding claimant we would like

9 to submit an order granting the relief sought in the objection.

10          THE COURT:  All right.  The -- it will be sustained

11 as to the non-responding claimants and then we'll hear the

12 other matter -- what date did you say that was going to be?

13          MS. BOEHM:  April 15th at two.

14          THE COURT:  On April 15th.  All right.

15          MS. BOEHM:  Item 18 on the agenda is the debtors'

16 sixty-eighth omnibus objection to claims.  This seeks a

17 disallowance of certain late claims.  It included 13 general

18 unsecured claims, seven government claims, three admin claims,

19 and one 503(b)(9) claim.  We received no responses to this

20 objection, and would request the entry of an order granting the

21 relief sought in the objection.

22          THE COURT:  That will be granted.

23          MS. BOEHM:  Item 19 on the agenda is the sixty-ninth

24 omnibus objection to claims.  This sought the disallowance of

25 certain administrative claims.  It included nine claims.  We

1  did receive one response from Ms. Davis.  We have resolved that

2  matter with Mr. Mueller and he has signed off on the form of

3  order to be submitted, and we would ask that that revised form

4  of order be submitted with respect to Ms. Davis, as well as the

5  other non-responding claimants disallowing all nine of the

6  claims.

7        THE COURT:  All right.  Mr. Mueller, do you wish to

8  be heard on this?

9        MR. MUELLER:  No, sir, Your Honor.

10        THE COURT:  Okay.

11        MR. MUELLER:  Ms. Boehm's representations are

12  accurate.

13        THE COURT:  All right.  That relief will be granted.

14        MS. BOEHM:  Item 20 is the debtors' thirty-ninth

15  omnibus objection to claims.  This was to go forward as a

16  status conference with respect to the one remaining claimant,

17  which was Madcow Group -- Madcow International Group, Limited.

18  We did submit an order yesterday, I believe, that resolves our

19  objection, and upon entry of that order that matter will be

20  resolved.

21        THE COURT:  All right.  Very good.

22        MS. BOEHM:  That's all I have, Your Honor.

23        THE COURT:  All right.

24        MS. BOEHM:  Thank you.

25        MR. GALARDI:  Good afternoon, Your Honor.  For the

1   record, Gregg Galardi on behalf of the debtors.  Your Honor,

2   with respect to Number 21, it's the debtors' fifty-sixth

3   omnibus objection to claims.  These were the employee claims

4   that Your Honor had heard argument with respect to certain of

5   the claimants at the last hearing.  Your Honor, we did, in

6   fact, file a supplement to address a couple of the points

7   raised.  Other than the papers and our arguments I think it

8   would probably be better to let the other claimants go first,

9   and then we can respond to anything that Your Honor may have

10  questions with.

11          THE COURT:  All right.  And this matter was carried

12  over because we had a number of the claimants who weren't able

13  to be present at the last hearing?

14          MR. GALARDI:  Correct.  Not able to attend, and you

15  wanted to give them the opportunity to raise any additional

16  arguments.

17          THE COURT:  All right.  Very good.  Do any of those

18  parties wish to be heard?  Mr. Mueller?

19          MR. MUELLER:  Good afternoon, Your Honor.  Mike

20  Mueller on behalf of the claimants:  James Wimmer, Lawrence

21  Fay, Daniel Ramsey and Mr. Bruce Besanko.  Your Honor, I want

22  to thank the Court and debtors' counsel for their indulgence in

23  continuing this matter over to today's date.  I was out of town

24  on March 8th so I appreciate your indulgence and debtors'

25  counsel's courtesies in continuing this for me.  Your Honor, as

**J&J COURT TRANSCRIBERS, INC.**

1   I stated, I'm appearing on behalf of four claimants, Mr.

2   Wimmer, Mr. Fay, Mr. Ramsey, and Mr. Besanko with respect to

3   the debtors' fifty-sixth omnibus objections to claims.   In

4   these claims I'm only asserting entitlement to portions of the

5   claims related to what they define as awards, short term or

6   long term incentive awards, what I will refer to as retention

7   bonuses with respect to these individuals.   Admittedly before I

8   was engaged some of these individuals asserted severance

9   benefits claims in these -- that are being objected to, and

10  Your Honor, I think the objections to the severance benefits

11  are well taken for reasons that I'm going to try and

12  distinguish the retention bonus awards for.

13          Your Honor, with that background the debtors in their

14  papers, both in their original objection and in their

15  supplemental response that they've filed relied extensively on

16  Dornier Air, Judge Mitchell's decision in Dornier Air, which I

17  know is a severance benefits case, and that's important because

18  in that case Judge Mitchell said that at the time of the entry

19  into the pre-petition agreement the employee earns severance

20  benefits immediately, whether they are there for five more

21  minutes or five years.   And the retention awards, those awards

22  are not earned at that time.   The debtors' semantics in their

23  response indicate that they are earned at that time, but the

24  fact of the matter is the employees had to remain employed

25  through specific target dates in order to receive those awards.

**J&J COURT TRANSCRIBERS, INC.**

1  So, if they had quit five minutes later, unlike the severance

2  awards they would not have received the benefits of those.

3       THE COURT:  What if the severance benefit was set up

4  so that you received more severance the longer you were

5  employed by the debtor?

6       MR. MUELLER:  Well, Judge, that's a very good

7  question because the severance cases that do allow proration of

8  severance benefits, and I don't have their names in front of

9  me, they do allow those prorations where it was based on

10  service over length of time, or length of time of service.

11  It's the cases where the severance benefits are a lump sum or a

12  defined sum regardless of the length of service, that the

13  Courts have rejected those as an administrative claim.  So,

14  they're even within the severance benefit arena the Courts do

15  make distinctions depending on the length of service.

16       Relying on <u>Dornier</u>, the debtors make much of two

17  facts.  The first is that the agreements were not entered into

18  with the debtor post-petition, or they're not agreements

19  entered into with the debtors-in-possession.  The second is

20  that there has to be actual and necessary benefits to the

21  estate.

22       With respect to the first, Your Honor, I would submit

23  that that's a red herring to the extent technically -- as a

24  technical matter there wasn't a new employment agreement

25  entered into post-petition by these employees.  However, it's

1  no different than the debtors do not enter into a new lease

2  agreement with the debtor -- with their landlords post-petition

3  but they're still responsible for the post-petition portion of

4  their lease obligations as an administrative claim to the

5  extent they accept the benefits of those lease agreements.

6          THE COURT:  Isn't that because Congress has put in a

7  specific provision in Section 365(c)(4) that says they have to?

8          MR. MUELLER:  Yes, Your Honor, but Congress has also

9  said that -- and Judge Mitchell acknowledges in <u>Dornier Air</u>, he

10 states, "Of course if the debtor-in-possession elects to

11 continue to receive benefits from the other party to the

12 executory contract pending the decision to assume or reject the

13 contract, the debtor-in-possession is obligated to pay for the

14 reasonable value of those services."  And he says that in the

15 context of this severance benefit case, <u>Dornier Air</u>.  And --

16         THE COURT:  I've got it right here in front of me.

17 I'm --

18         MR. MUELLER:  I'm quite certain Your Honor is more

19 familiar with it than I am.  And so, the only real question is

20 what are the reasonable value of these employees' services and

21 how do you determine the reasonable value of those services?

22 The debtors would have you believe that the reasonable value of

23 the services are the wages that they were paid during that

24 period of employment.  And there is some -- I can understand

25 that as a starting basis, but it was the debtors themselves,

**J&J COURT TRANSCRIBERS, INC.**

1  not the debtors-in-possession, but the debtors themselves that

2  said you all are worth something in addition to that to us, and

3  in fact we would like you to stick around for a period of time,

4  one, two, three years, and that is worth something to us, and

5  if you do that we will pay you X.

6          THE COURT:  Well, let me ask you this.  Is this

7  something that the parties contractually agree to?  Or is it

8  something that the Court has to find what is the reasonable

9  value of the services that were provided by the employees?  For

10  instance, let's assume that there was some sort of a million

11  dollar bonus that was going to be paid to somebody.  Would the

12  Court be bound to accept that?

13          MR. MUELLER:  No, sir, Your Honor.  I believe it's a

14  determination for the Court to make.  The parties can agree,

15  and if the debtors choose to assume that obligation --

16  answering your --

17          THE COURT:  I would still have to approve that if

18  they chose to assume it.

19          MR. MUELLER:  You would, Your Honor.  If you decided

20  it was unreasonable or that it wasn't a necessary or actual

21  benefit to the estate, if Your Honor approved that and the

22  parties agreed, then that would be allowable in that amount.

23  Here we have a situation where the debtors are saying we did

24  not assume those agreements, those retention awards, and by the

25  way, all of this could have been avoided had the debtors just

1  made it clear from the get go that they were going to reject

2  these awards, and we wouldn't be here arguing about this.  But

3  they didn't.  By their silence these employees -- and they're

4  not bankruptcy lawyers, they're lay people -- I can tell you at

5  least with respect to my claimants, right or wrong, they

6  understood that in addition to their compensation, their

7  regular wages, that they were going to get these retention

8  awards had they stayed through a specific date.  Now, they even

9  thought that they would get all of it because it vested post-

10 petition.  I've disabused them of that notion and said at our

11 best case we're entitled to the pro rata, the post-petition

12 amount because, again, these are pre-petition agreements, which

13 if rejected the portion that is not post-petition is part of

14 their unsecured rejection damages claim.

15          But, Your Honor, to further answer --

16          THE COURT:  But what makes it into an administrative

17 claim?  That's where I guess I'm having a little bit of

18 difficulty.

19          MR. MUELLER:  Your Honor, if I understand your

20 question correctly, it's because they provided services to the

21 debtor post-petition and they were beneficial to the estate.

22 Under 503(b)(1) they have to be actual, necessary and

23 beneficial to the estate.  We believe they are beneficial.  If

24 all these employees had left and -- there would be no benefit

25 to the estate.  It would have harmed the debtor.  And, in fact,

1 debtors' counsel, when he argued for the wage motion in the

2 first day orders, acknowledged that we need these employees to

3 stay here.  On December 8th, when he came back in and argued --

4 when debtors' counsel -- I don't mean to single one out,

5 debtors' petition, when they came back in on, I believe it was

6 December 8th, 2008 and were urging the Court to,

7 notwithstanding the law, permit the severance benefits, if you

8 will, the two-week severance -- the 60 days, I think it was,

9 not two weeks, but severance benefits for the employees, some

10 of -- many of whom were discharged pre-petition, they said it

11 was important for the debtors, the debtors' businesses,

12 employee morale, the debtors' reputation in the community, so

13 the debtors acknowledge that these employees are valuable and

14 important, and play a role.  Whether or not the -- again, going

15 back to the reasonableness question that you asked two

16 questions ago, the debtors state in their supplemental response

17 that it is a fact that the reasonableness is the -- what's

18 reasonable is their wages.  Just because they state it as a

19 fact doesn't make it so.  I believe it's Your Honor's decision

20 to determine what's reasonable, and I think evidence of what is

21 reasonable is the debtors' own placing the value by giving

22 these employees the retention awards, saying you're worth X to

23 us to stay here through January 1st, or January 1st, 2009.

24 Some of them had a second anniversary date of January 1, 2010,

25 and so forth.  So, the debtors at that time thought that their

1 value was in that -- was something above and beyond what their

2 base compensation was, and so, my contention to Your Honor is

3 that those retention awards are further evidence of their value

4 and it's reasonable and beneficial to the estate.

5      The -- let me look at my notes, Your Honor.  Your

6 questioning has got me -- which are all -- I hope I've answered

7 your questions, but I want to look back in my notes and make

8 sure I've covered my points.

9      Again, Your Honor, I'm not here to argue that because

10 it vested on a post-petition date that all of it should be an

11 admin claim.  I think the Court should prorate it.  There are

12 two decisions that adopted this approach.  One is the <u>Hechinger</u>

13 decision, which I'm sure Your Honor is familiar with, in the

14 Third Circuit.  It's at 298 F.3d 219.  There's also the <u>Lason,</u>

15 <u>Inc.</u> case from the District of Delaware in 2003, Judge Mary

16 Walrath, found at 309 B.R. 441.

17      One of the things, Your Honor, that Judge Mitchell

18 was concerned about in the <u>Dornier Air</u> case was inequity of a

19 result.  And if I can just find the one part from his decision?

20 He was concerned about inequitable results if he allowed the

21 severance benefits for employees who remained with the debtor

22 for a day post-petition versus the severance benefits that

23 would be disallowed in their entirety if they were discharged

24 immediately prior to the petition, and -- Your Honor, if you'll

25 bear with me one second.  I've got so much highlighting on this

1  decision I can't --

2                          (Pause)

3          MR. MUELLER:  I'm not finding it, but the point I

4  want to make, Your Honor, is that by prorating it we are

5  avoiding that result that the Judge was concerned with.

6          THE COURT:  Tell me what you mean -- how would I

7  calculate the claim, then?

8          MR. MUELLER:  Well, for an employee, most of the --

9  there are two different retention awards that are generally at

10 issue here.  They varied in amounts depending on the seniority

11 of the employee.  The one was January 8th, I believe, backdated

12 to January 1, and the other was September 8th.  And the

13 anniversary date was January 1, 2009.  None of these folks were

14 here on January 1, 2010 at issue, even though there was some

15 benefits that would have accrued had they been.  You count the

16 number of days, you divide it by that -- in that -- in these

17 cases they were entitled to 50 percent, for example, of the

18 retention award.  So, you divide that by 365 days, you count

19 the number of days from November 10th, which I didn't do, but

20 there's 20 days to November 30th, plus 31 in December.  That's

21 51 days.  You multiply that by the retention award.  And that,

22 in fact, is how they did it in Hechinger and Lason.  But you're

23 avoiding the result that Judge Mitchell -- that I couldn't find

24 the portion in the opinion and was concerned about, which is he

25 said that the part of his rationale was that it would be

inequitable to award this employee who was employed by the

debtor for 60 days post-petition all of his severance, which

was six months of his employment, because he was employed by

the debtor 60 days, whereas an employee who was discharged the

day before the petition would get nothing.  And I can see where

that would be an inequitable result.  By prorating, Your Honor,

you are only compensating the individuals for that post-

petition amount.  There wouldn't be those inequities.  To the

extent they were there post-petition for ten days they get

compensated ten days.  If they were there for 60 days they

would get compensated for 60 days post-petition.  So, you're

avoiding that inequitable result that Judge Mitchell was

concerned about.

One of the things that the debtors addressed in their

supplemental response was this inducement argument.  And I do

not want to suggest in any way that the debtors engaged in some

duplicitous behavior and falsely induced these employees by

these retention bonuses.  I don't think it was intentional, but

that's what happened.  The employees understood that they were

going to get, rightly or wrongly, these bonuses, and they stuck

around in part because they were counting on that compensation.

They could have, as I indicated earlier, sent a statement loud

and clear to everyone saying you come to work, we want you to

come to work, you're going to get your regular benefits, but

you're not going to get your retention awards because we're

1  going to reject them.  In their supplemental response they

2  indicate we've put everyone on notice because we filed our

3  first day motion which indicated that we were going to pay

4  normal wages and benefits, and at this time we're not seeking

5  to have the Court approve the retention award programs that

6  were in place, leaving open the possibility that it may later

7  be approved.  But more importantly, that motion was not served

8  on the rank and file employees.  What does get served on the

9  rank and file employees is a motion to reject any of their

10 agreements.  They weren't.  Mr. Wimmer, you may recall very

11 early in the case, I was in here on behalf of Mr. Wimmer, he

12 was an employee with the debtor for 40 years.  The debtors'

13 rejection motion sought to reject his employment agreement and

14 the letter agreement, a separate letter agreement that was

15 given to him, I believe on November 8th, two days before they

16 were going to move him to a different position, which he

17 rejected that position.  But they sought to reject that letter

18 agreement, which was never actually entered into by the debtor

19 or Mr. Wimmer, the pre-petition debtor.  They were careful

20 enough to reject that, but they didn't reject his retention

21 awards, which were these letter agreements dated September of

22 2008 and January of 2008.  And they sent a loud and clear

23 message saying, by the way, we're going to also reject those.

24 Then those parties would have been on notice that that was not

25 part of their compensation.  So, in essence, by their silence

1  these employees were operating under the impression that they

2  would also receive these benefits.  And again, as Judge

3  Mitchell says in <u>Dornier Air</u>, the debtor is obligated to pay

4  for the reasonable compensation pending a decision to assume or

5  reject.  The debtors chose not to assume or reject, so pending

6  that decision, they could have -- they could have done it right

7  out of the gate and then there would be no question, we

8  wouldn't be here arguing, I wouldn't have a leg to stand on,

9  Your Honor.  But because they left it open at their own peril,

10  these debtors should be -- or, pardon me -- these employees

11  should be entitled to their pro rata retention bonuses, post-

12  petition retention bonuses.

13          THE COURT:  Okay.  A couple of questions for you.

14          MR. MUELLER:  Yes, sir, Your Honor.

15          THE COURT:  The Bankruptcy Code fixes the time within

16  which a debtor can assume or reject a contract.  You know, in

17  some cases that's accelerated, for instance, with leases and

18  such.  But for these kinds of claims Congress has said that

19  that time for the debtor to assume or reject is on the -- as of

20  the effective date of the plan.

21          MR. MUELLER:  Yes, sir.

22          THE COURT:  Why isn't the debtor entitled to do that

23  in this situation?

24          MR. MUELLER:  The debtor is entitled to do that, but

25  as Judge Mitchell says, if they choose to wait until the plan

1   confirmation to have that be the effective date of the

2   rejection of these contracts, and I'm aware of this plan.  To

3   the extent they haven't previously rejected contracts, rejects

4   all executory contracts, to the extent they chose to wait until

5   that time, again, the Code says that the counter party to the

6   contract, the non-debtor counter party is entitled to the

7   reasonable value of their services pending that time period.

8   So, they're completely entitled to do that, but there is some

9   quid pro quo by choosing to wait until that time to do so, and

10  that is to compensate the counter parties.

11          THE COURT:  And so, what you're saying is that I have

12  to look at these side agreements as part of, really, the wages

13  in calculating the amount of the reasonable value that these

14  claimants should receive for the services they provided?

15          MR. MUELLER:  Your Honor, I don't presume to tell you

16  you have to look at anything.  What I am suggesting is that the

17  Court should consider that as additional or some evidence of

18  value.  And in fact, it's the debtors that chose that value.

19  They are the ones, the pre-petition debtors are the ones that

20  set that price.  They're the ones that said in January it is

21  worth it to us to have you here for another three years, for

22  example, one of the retention awards.  If you stay here for one

23  more year you're going to get 50 percent of this amount.  If

24  you stay here for a second year you'll get an additional 33

25  percent.  If you stay here a third year you'll get 17 percent.

**J&J COURT TRANSCRIBERS, INC.**

And that actually raises a very good argument that I haven't

addressed, which is this concept that was discussed at the

March 8th hearing that none of it accrued until -- until the

vesting date, and therefore the argument -- the statement was

it's all or nothing.  And, Your Honor, it does have value over

time.  By evidence of -- by the agreements themselves, if

you're there for one year you get 50.  If you're there for two

years you get 50 plus 33, or 83 percent.  If you're there for

three years you get the entire 100 percent.  By its terms it

has value over time, to be contrasted with the severance

agreement that isn't linked to time -- as your very first

question to me, the severance agreement that says when you sign

here if you are terminated involuntarily you get six months of

severance if you are terminated tomorrow.  That is not how

these work.  These are over time.  And by their very nature it

says it is worth X to us to have you here for one year.  Well,

if two months of that are post-petition, then it should be that

two months, that prorated post-petition is that value.

THE COURT:  I have two more questions.

MR. MUELLER:  Yes, sir.

THE COURT:  One is, with regard to KERPs and such

that we normally approve, or used to, anyway, prior to BAPCPA,

that was something that the Court had to review and approve so

that the Court would be aware of what was going to be offered

in certain circumstances to employees.  How would the Court

1  ever be aware of whether these types of agreements were out

2  there, whether they were going to be ultimately paid, and such?

3  Isn't that something that the Court has to review, and

4  supervise, and approve separately?

5          MR. MUELLER:  Absolutely, Your Honor.  And in fact,

6  that's why we're here.  We're here on a motion to allow these

7  administrative claims.  And, Your Honor, because they didn't

8  come through the KERP process under I think it's 503(c) now,

9  you're, after the fact, determining are these -- what is a

10  reasonable value for these wages?

11          In addition, Judge Mitchell in <u>Dornier Air</u> talked

12  about one of his considerations is that this severance

13  agreement was not something that the debtor could enter into

14  post-petition as an ordinary course of business transaction

15  without seeking Court authority.

16          THE COURT:  That's where I was going --

17          MR. MUELLER:  Yes, sir.

18          THE COURT:  -- inartfully.

19          MR. MUELLER:  Your Honor, they do enter into, and

20  large companies like this do enter into retention bonuses on a

21  regular basis.  And during the non-bankruptcy period it would

22  be in their business judgment, and they can enter into these in

23  the ordinary course of business.  If the Court -- if Your Honor

24  decides that this is not such the case because of the exigent

25  circumstances of a bankruptcy, that's why we're here before you

1  saying it's Your Honor's decision as to what's reasonable.

2         THE COURT:  All right.  My last question is I'd like

3  you to address the last paragraph of <u>Dornier</u> where Judge

4  Mitchell says, well, wait a second, what this really should be

5  is a claim under -- a priority claim under 507(a)(3) for the

6  accrual that you're talking about, which would have taken place

7  in the 180 days prior to the filing of the bankruptcy.

8         MR. MUELLER:  Your Honor, I have <u>Dornier Air</u> right in

9  front of me.  Can I just briefly look at it?

10         THE COURT:  Most certainly.

11         MR. MUELLER:  I know the issue you're speaking of.

12         THE COURT:  It's on Page 7.

13                    (Pause)

14         MR. MUELLER:  I'm looking at a Lexis printout, so

15  it's -- all right.  Yes.  "Nevertheless, some brief comment is

16  appropriate since Mr. Nealy's employment ..."

17         THE COURT:  Yes.

18         MR. MUELLER:  Okay.  Well, Your Honor, again, that's

19  -- he is referring to the severance pay issue, which is

20  severance pay is a benefit.  And, by the way, he says that the

21  language -- the litigants in <u>Dornier Air</u> say severance is not

22  in the language of 507(a)(3) or (a)(4), and he says we can

23  dispense with that right away because it says including, so

24  it's not limited to wages, benefits.  But he is addressing this

25  because, again, this severance pay, all of it was earned -- the

1  immediate -- when he signed the contract.  Judge Mitchell says

2  that it was all earned the moment he signed the contract.  His

3  right to the payment was contingent upon his termination, which

4  may occur post-petition, but it was earned the moment he signed

5  the contract, so you look at, then -- that's pre-petition, so

6  you look at the 180-day period to determine what part of it is

7  priority.

8           THE COURT:  All right.  Anything further?

9           MR. MUELLER:  No, sir, Your Honor.  Thank you for

10  your time.

11           THE COURT:  Thank you, Mr. Mueller.  Mr. -- or, is

12  there anybody else -- I'm sorry -- any other party that wishes

13  --

14           MR. BRADLEY:  Yes.  My name is Tom Bradley.

15           THE COURT:  Mr. Bradley, you may come up to the

16  podium.  Would you please state your full name for the record?

17           MR. BRADLEY:  My name is Thomas Christopher Bradley.

18           THE COURT:  Are you a claimant?

19           MR. BRADLEY:  Yes.

20           THE COURT:  All right.  And you're representing

21  yourself in these proceedings?

22           MR. BRADLEY:  Yes, Your Honor.

23           THE COURT:  All right.  I will hear you.  Go ahead.

24           MR. BRADLEY:  Thank you very much.  Thank you for

25  giving me the opportunity to speak today.  I don't have any

1   legal defense to this, but I wanted to speak for a moment just

2   based on what it's like to be an employee in this particular

3   situation.  And when the first incentive was offered to us back

4   in January of '08, you know, one of the things that we had to

5   look at yourself -- you know, look in the mirror and say, you

6   know, the company wasn't doing very well at the time, and to

7   commit to staying with the company, you know, myself and the

8   people that work with me felt that, you know, this is the

9   company saying to us, you know, we need you here to survive and

10  get through this, and we're going to reward you for sticking

11  around and being part of this, so much so that in August of '08

12  I moved my family from Delaware to Richmond, Virginia to come

13  to the corporate office to help, you know, support the Firedog

14  effort.  And I ended up staying on as part of the liquidation

15  committee to the very last day, on March 21st.  And, you know,

16  through that whole time, for the most part, you know, it was my

17  understanding that, you know, if we continued to honor this

18  obligation that we would have an opportunity at this because

19  obviously -- you know, I was unemployed for three months when

20  Circuit closed, and I was -- up until maybe a few months ago it

21  took me that long to find a job that would be close to the

22  salary I was at at that company.  But, you know, we really

23  viewed it as -- the one we got in January of '08, that, you

24  know, 50 percent of it would have came to term in January of

25  '09, you know, myself and a lot of other people, we worked

through that whole year and did that, and worked very hard.
You know, we had a lot of layoffs in the company, so, you know,
we took on greater responsibility with the thought that, you
know, we wanted to save this thing.  I've been with Circuit
City since 2004.  I started off as a store director and ended
up being national operations manager for Firedog, so I had a
lot of passion for the company, and I desperately wanted it to
succeed, enough to move my family two, three months before we
actually filed bankruptcy as a company.

At no point when we were first offered these
incentives was it ever stated that, you know, hey, if we
actually file bankruptcy this -- you will not receive this
benefit.  You know, once again, we were under the impression if
we could -- we could battle through this -- you know?  And once
again, from a legal standpoint on the document there was a
change in control, and somebody who is not, you know, a lawyer
in depth in the legal system, you think of change of control,
whether it's new ownership, or, you know, whatever would
happen, that we still thought that the money wasn't at risk.

You know, and the gentleman here stated earlier that,
you know, that the company had -- you know, they were basically
telling us that we were valuable to them and they needed us,
and we lost a lot of employees, I know, from Firedog, during
that period because people were afraid that, you know, the
company was in a tailspin, and, you know, it wasn't worth

1  staying for an incentive or anything else.  But there's a lot

2  of us that stuck around for that to try to save the company

3  until the end.  And, you know, and I just wanted to kind of get

4  that point across that, you know, I know there's a lot of

5  legalese around this, but looking at it from an employee

6  standpoint, you know, we took it as you want us to be here,

7  some of us are going to stay here and we're going to try to

8  make this work, and it didn't work, and we ended up being

9  unemployed for it, and, you know, I'm standing here today, yo

10 know, over a year later, trying to explain why I earned at

11 least part of that money.  And so, that's really all I have to

12 say, unless you have any questions for me, Your Honor.

13        THE COURT:  I don't, but I very much appreciate your

14 comments.  Thank you, sir.

15        MR. BRADLEY:  Thank you, sir.

16        THE COURT:  All right.

17        MR. McCULLAGH:  Your Honor, if I could just briefly?

18 Neil McCullagh, here on behalf of Dawn VonBechmann.  I just

19 wanted to -- I was here on March 8, at the last hearing.

20        THE COURT:  I recall.  And your position was these

21 weren't executory contracts.  Have you changed your view at

22 this point?

23        MR. McCULLAGH:  No.  And I didn't -- no, I have not

24 changed my view on that, and I didn't rise to really argue that

25 point any more.  It seems to me the debtor has essentially

**J&J COURT TRANSCRIBERS, INC.**

1   conceded that in their supplemental brief.  I want to address

2   the Court only to adopt and reiterate the arguments that Mr.

3   Mueller made, especially with respect to prorating and also

4   with respect to inducement.  I'm not going to repeat them.

5           THE COURT:  All right.

6           MR. McCULLAGH:  I just thought they were well stated

7   and I wanted to adopt them.  I was here on this on Ms.

8   VonBechmann's behalf, and I wanted the record to note that.

9           THE COURT:  All right.  Thank you very much.

10          MR. McCULLAGH:  Thank you.

11          THE COURT:  Does any other party wish to be heard?

12  Is there anybody on the phone that wishes to be heard?  All

13  right.  Mr. Galardi, I'll hear your response.

14          MR. GALARDI:  Your Honor, again, this is a fairly

15  uncomfortable position because I don't -- the company does not

16  dispute that the debtors -- that these people did provide

17  value, but I'd like to go through the legal arguments because

18  unfortunately I think they take the day here.  First of all,

19  and I'm going to say it, and I don't blame counsel, as a matter

20  of fact Mr. Besanko and Mr. Ramsey cannot come to this

21  courtroom today and tell you that they did not know that the

22  retention agreements were not enforceable because I personally

23  told them that they were not.

24          Leave that aside, we'll move on.  Let's assume that

25  the others did.  With respect to the actual arguments, Your

1  Honor, I think, first of all, it's important to note that

2  Hechinger, and this sort of goes to one of the last points

3  first, Hechinger and Lason are all pre-BAPCPA cases.  With

4  respect to the clients, Mr. Besanko, Mr. Wimmer, Mr. Fay and

5  Mr. Ramsey, each of them were officers and qualify as insiders.

6  Unfortunately for them, BAPCPA, under 503(c), and I think it's

7  been conceded that everything other than, quote, the awards,

8  which are retention programs, cannot, you know, they're not

9  making a claim for that anymore.

10       Well, with respect to the retention programs Congress

11  has spoken.  It says you can't get a retention payment without

12  Court approval, and that's why we objected to them.  So,

13  unfortunately I think as a matter of law and as a matter of

14  statutory interpretation Congress says you can get your wages,

15  you can get your salary, but if it's a retention agreement,

16  let's leave aside whether it's executory or not executory,

17  503(c) says you can't get that if you're an officer, period,

18  end of story, unless the Court approves it.  That requires a

19  separate motion.  That's indeed why we filed a separate motion

20  to get insider payments because we knew you couldn't get that

21  sort of thing.  And, Your Honor, the first day was when we were

22  trying to reorganize.  There's a good reason why you wait until

23  after the case liquidates to file motions to reject if they're

24  even executory at all.

25       THE COURT:  Who were the officers again?

**J&J COURT TRANSCRIBERS, INC.**

1              MR. GALARDI:  Mr. Besanko, Mr. Wimmer, Mr. Fay and

2    Mr. Ramsey, the four that were for today.

3              THE COURT:  Right.

4              MR. GALARDI:  I don't know if the gentleman in the

5    back was an officer or not.  He was a director of some sort.

6    But leave that aside, those four gentlemen were, in fact,

7    officers.  One was an assistant general counsel.  One was the

8    first day affiant, Mr. Besanko, who knew all about this.  Mr.

9    Wimmer, it's already been stated, we rejected his contracts.

10   And as this gentleman concedes the retention part was not part

11   of those contracts, which then goes to another point.  If it's

12   not executory it's a breach.  It's an unfortunate breach, but

13   it's a breach of a pre-petition agreement.  It's a pre-petition

14   claim.  If it's executory we're entitled to reject.

15             Your Honor asked me, under 365(n), I believe, it goes

16   back to a rejection as of the date immediately before the

17   bankruptcy.  That then raised Your Honor's question, okay,

18   well, can it be priority?  And I understand, looking at it from

19   a compassionate standpoint, and unfortunately I can't, you want

20   to give the employees a priority claim, if not an

21   administrative claim.  Unfortunately it was not earned during

22   that 180-day period.  The fact of the matter is these

23   agreements, unlike others, you --

24             THE COURT:  Why wouldn't it be deemed to have been

25   earned?  I mean, if Congress says it's deemed to, you know,

1  have arisen on the day before, why isn't it then deemed to have

2  been earned in the 180 days preceding?  Isn't that what Judge

3  Mitchell is suggesting in Footnote 11?

4        MR. GALARDI:  Well, I think he could suggest that,

5  but I think it's contrary to the way employment agreements work

6  and these particular agreements work because of the following.

7  Your Honor, if you did that, let's take your executive.  Let's

8  take your executive that used to get the golden parachute as

9  part of his agreement with a ten million bonus.  You don't --

10  if it's deemed earned you're going to have to say that was

11  deemed earned in that period because you rejected the

12  agreement.  That's not earned.  That's simply not the common

13  sense notion of earned, and we will have another earned context

14  conversation today.

15        THE COURT:  I know.

16        MR. GALARDI:  But the fact of the matter is, and it's

17  not earned in the sense that each day that they came to -- yes,

18  the argument is if they were here on January 1st there's 50

19  percent down this -- this other percentage.  But it's not on a

20  day-to-day basis.  And as Your Honor pointed out, with respect

21  to leases, and this is an open issue, with respect to leases

22  they said you had to make timely payment.  They didn't say that

23  with respect to these types of executory contracts.  And

24  indeed, Congress said with respect to retention agreements for

25  officers you're not allowed to make these payments.  So, if you

1 | reject it, you either breach it or you reject it.  If Your
2 | Honor is going to say it's an executory contract even though it
3 | was simply the payment of money with respect to the time, if
4 | you just simply look at the retention award, if you're here for
5 | a year you get payment.  One, I could argue that's not an
6 | executory contract at all because all it is is the payment of
7 | money on a date certain, not a rejection.  So, that was earned
8 | the day you sign the agreement.  There's no controversy as to
9 | when the date was that those retention agreements were earned.
10 | When they were signed, and thus earned, that was outside the
11 | 180 days.  If you want to say it's an executory contract you've
12 | got to say it accumulated each and every day during this
13 | period.  It would give you no authority to say from November
14 | 10th to January 8th --

15 |          THE COURT:  Why does it have to accumulate over the
16 | time?  Why can't it just be every day you show up for work it
17 | just -- that severance --

18 |          MR. GALARDI:  Your Honor, because --

19 |          THE COURT:  -- and if it goes on for the next day?

20 |          MR. GALARDI:  I think the answer is, Your Honor, that
21 | if you take that position that a transaction -- essentially
22 | what, in my mind, you're saying is that each day you show up
23 | the debtor took another transaction.  And Your Honor, then,
24 | each day you showed up I could renegotiate your wage for that
25 | day.  Each day.  Why do I have to give you that wage?  Do we

 1  want to get into a 503(b) reason?  Okay.  Well, let's take

 2  certain executives, Mr. Besanko, that the committee might have

 3  said, oh, they're getting paid too much, let's renegotiate each

 4  day and see if he stays or see if he goes.  That's not what

 5  contracts are about.  You pay them the contract rate.  That's

 6  the presumption.  And if they have an extra benefit, that's not

 7  what was actual and necessary to keep them there.  Those

 8  individuals could have taken it.  It's not as if they earned a

 9  pro rata section.  They earned it only on a certain day.  If

10  you take your view, then if I terminated them January 7th, as

11  opposed to January 8th, or I rejected their contract that day,

12  did they earn a part of it even though they weren't there on

13  that eighth?  You're doing equity after the fact.  That's not

14  the way the contract reads.  It's not the way Congress said you

15  should assume or reject.  And it's not the way these people

16  earned each day.  So, you're coming up with an equitable

17  argument for prorating.  I understand the inclination.  But

18  that's --

19          THE COURT:  With a cap.

20          MR. GALARDI:  With a cap at what?

21          THE COURT:  Well, because 507 --

22          MR. GALARDI:  With 40 days post --

23          THE COURT:  -- 507(a)(3) provides a cap on the amount

24  of wages that would be earned in the net period of time.

25          MR. GALARDI:  Right.  And then, let's ask -- okay,

45

1  and again, I don't think this is the way it's going to work.

2          THE COURT:  So, that gets us around the million

3  dollar problem that you raised.

4          MR. GALARDI:  Well, it does, but it also goes to,

5  okay, well, these people also have -- if we're going to have

6  the evidentiary issue how much of the pre-petition wages did

7  they get paid to go through that cap?  How much of the benefits

8  and insurance benefits went through that cap?  And then how

9  much they earned.  So, are we going to have that sort of

10 evidentiary -- that's -- and I would still argue they --

11         THE COURT:  And that's the question I'm asking.

12         MR. GALARDI:  And I -- again, I don't think that's

13 what Congress meant by earned.  I don't think that's how these

14 agreements read, that you earned it in any sense of earned by

15 staying each and every day.  And again, I think that's the

16 critical aspect.  Did they earn it each and every day by

17 staying a percentage of those days and during this period of

18 time?  That's not the concept of earning that I understand, and

19 it's not something that you can give them even a priority

20 claim, it would be my view, under -- at least with respect to

21 the executive officers under 503(3)(c).

22         THE COURT:  Well, I'm concerned about the executive

23 officers, and I'll come back because I think that you make a

24 very, very good point as far as that is concerned.  But the --

25         MR. GALARDI:  Again, Your Honor, to me it's -- unless

**J&J COURT TRANSCRIBERS, INC.**

1  you're going to read a transaction, and I think, again, the

2  ramifications of this is each and every day I'm in bankruptcy

3  and each and every day I do something there is a new

4  transaction each and every day with those individuals.  And are

5  we going to confine it to employees versus people who have

6  post-petition obligations that I still entered into a pre-

7  petition contract?  Again, I think the conduct test under the

8  Fourth Circuit also precludes you from reaching that conclusion

9  because the conduct that gave rise to the obligation is all

10  pre-180 days.  So, I think you're also deviating from when a

11  claim arises.  You're -- and again, that earning --

12          THE COURT:  Well, Congress told us when the claim

13  arises.  If you reject the contract the claim arises

14  immediately preceding the filing --

15          MR. GALARDI:  Well, that's if it's an executory

16  contract.  Okay?  We can have that argument.  Okay?  First

17  you'll have to say the retention is part of that executory

18  contract and then you're going to have to say that that goes

19  there, it's deemed to be a claim that arose.  It's clearly pre-

20  petition.  Then the question is does it fit within the priority

21  507(a)(4)?  Were they wages, salaries or benefits earned?  I

22  don't think this is wages and salary, first of all.

23          THE COURT:  It's -- but it also includes vacations,

24  severance, sick leave.  I mean, it's all stated right there in

25  the statute.  So, Congress --

1          MR. GALARDI:  Okay.  Severance, sick leave, holiday

2    pay, retention bonus.  I know you're going to say including.

3    You're going to have to broaden that including to be retention

4    bonuses, as well.

5          THE COURT:  Okay.  You anticipated the next question.

6          MR. GALARDI:  You're going to keep going as far, and

7    then the question is, okay, what's not there?  Okay.  Are the

8    insurance benefits going to get accrued there?  Congress, I

9    think, said in 503(c), okay, let's leave out non-officers.

10   Right?  The issue still has to come, did they earn it during

11   this post-petition period?  And you're going to distinguish,

12   then, between the people that I reject for contract on January

13   7th, or terminate them January 7th.  They get nothing, right,

14   because if you say it's 507, had to be there on the day to at

15   least qualify as an earn and vest.  It's only people that got

16   after -- so, if somebody leaves on -- I play the game.  If I

17   reject it on January 7th they get nothing if it's an executory

18   contract, but the person that's there on the 8th gets November

19   -- 180 days worth.  But it didn't accumulate.  There's nothing

20   in any of these agreements that allows you to say they earned

21   it, they accumulated it.  This was a fee for services on a day

22   -- every day showing up that they got closer and closer to that

23   goal.  There's nothing in these agreements that say that.

24   That's unlike whether it's <u>Dornier</u> or other severance cases

25   where I have, which makes all the sense in the world.  An

1 employee that, for each day or week that you work, right, you

2 do look at that 180 days, and they do get a priority claim for

3 severance during that period of time, and if they work post-

4 petition and they accumulate every month another week they get

5 an administrative claim.  That, I think, is what <u>Dornier</u> is

6 really talking about.  You look at the way in which the

7 contract, the agreement, the policy is written.  That

8 unfortunately in this circumstance for these employees is not

9 written this way.  It's a make it or break it.  And I think if

10 you reject that contract and it goes back to the petition date

11 it's a pre-petition unsecured claim.  If they want to reserve

12 their right to come in and file it as a priority claim, which

13 by the way these claims would still be untimely.  They've got

14 their unsecured.  We can pursue it there.  You could --

15          THE COURT:  Reclassifying their claims, right?

16          MR. GALARDI:  They've also filed general unsecured

17 claims.  You could --

18          THE COURT:  And administrative claims.  And I'm

19 suggesting that, you know, can these be reclassified to

20 priority claims?

21          MR. GALARDI:  Well, again, my view is no because

22 they're not earned.  If you want to have them prejudice --

23          THE COURT:  I understand that.  I understand --

24 really I do understand that argument, and it's a good argument.

25 I don't know that I agree with it.

**J&J COURT TRANSCRIBERS, INC.**

49

1          MR. GALARDI:  Okay.  And I understand that.  And then

2   the question is, you know, look, I think you're going to --

3   you'll come down to earn and we'll have a fight over whether

4   these are the values of services, and whether these were

5   necessary and actual expenses, and we can have all of that --

6   hold on a second.

7                    (Pause)

8          MR. GALARDI:  I may stand corrected.  Danny was --

9   well -- he was an officer, though?  He was an assistant general

10  counsel.  Hold on one second.  I have one clarification.

11                    (Pause)

12         MR. GALARDI:  Oh.  He was a non-insider, but he was

13  subject to the incentive motion.  I'm sorry, Your Honor.  So,

14  we did, in fact, put him in the non-incentive, not a control

15  person --

16         THE COURT:  All right.

17         MR. GALARDI:  -- side of that.  Mr. Besanko was not

18  subject to the incentive motion because he actually left at the

19  end of January.  And I don't know the other individuals, but

20  they were V.P.s, which was a control.

21         You asked me, again, on the reclassification, let's

22  be really clear, these -- we're fighting about claims that were

23  filed after the pre-petition bar date that sought 503(b)(1)

24  administrative priority, so if you reclass you can't fix the

25  date that they were filed.  You may say, well, but they also

**J&J COURT TRANSCRIBERS, INC.**

1  filed pre -- because we've asked actually not to reclassify

2  these.  We've asked to deny them because they also have general

3  unsecured claims on file for the same amount.  Now, they -- you

4  may say, well, maybe they can amend those claims and come back

5  and assert priority.  We'd get to the same point.  We'd argue

6  it's an untimely amendment.  But either way you get to the same

7  issue of whether or not they can actually succeed on the claim

8  for priority.  And again, now we're not talking actual and

9  necessary.  We're talking 507(a)(4).  And we're talking earned.

10  And I don't know how else other than to say, look, the statute

11  says what it says, and I can't see any argument that says it

12  was earned during that 180 days.

13          Plus, Your Honor, I guess then how do you distinguish

14  the post-petition period?  Are you going to say from November

15  10th?  Right?  You'd actually have two claims now.  Right?  Oh,

16  by the way you worked post-petition, but because you're now

17  rejected I'm only going to give you a pre-petition.  It's not

18  really actual and necessary but it's earned during the pre-

19  petition period because Congress tells me 365 says I make it

20  the pre-petition date.  There's something incongruous about

21  that.  So, I don't see it.  It's a 503(b)(1), and the question

22  is whether it's actual and necessary.  We also all understand

23  the economic environment.  I'd love to take an evidentiary

24  hearing on why these individuals stayed during that period, and

25  whether these were actually necessary and whether they were

1  banking on this.  This all goes to the inducement.  But I think

2  as a legal argument it wasn't actual, it wasn't necessary.

3  There wasn't a transaction.  No one asked for a post-petition

4  transaction.  The Fourth Circuit has a conduct test.  These are

5  all agreements that were entered into.  We're talking about

6  when a contingent claim arose.  So, I think you have to re-

7  write Fourth Circuit law on conduct test here, as well,

8  notwithstanding that remark in <u>Dornier</u> saying, well, maybe we

9  ought to consider it.  And I think you can consider it when the

10  facts are different and severance is earned by time of service

11  or retention is earned by time of service.  But retention -- it

12  just doesn't make sense.  Maybe it's just me.  Retention means

13  you've got to stay to a date.  Just because I stayed five of

14  the days of the ten that I might have to stay to doesn't mean

15  that I've earned it for those five days.  If this was severance

16  it's a different type of animal.  If this was a bonus, that

17  might be a different type of animal.  Indeed, we drafted a

18  program that said if you stay four or five weeks you got a

19  percentage.  But a retention is a retention, and you knew when

20  you signed your contract you had to be there at that date, and

21  Congress said it's not the kind of thing -- to me, it's just

22  not the kind of thing that you earn in any ordinary sense of

23  the word by continued performance until that date.  And

24  unfortunately it's a pre-petition agreement.  I don't think

25  it's executory, also, and I don't think it's incorporated into

1  the agreements.  But -- that's it.  I don't know if you have

2  any other questions.

3           THE COURT:  I don't.  Thank you very much.  Mr.

4  Mueller, do you wish to reply?

5           MR. MUELLER:  I do, Your Honor, if that would be all

6  right with the Court.  First of all, I think I just heard Mr.

7  Galardi say he doesn't think these agreements are executory,

8  which their pleadings argue ad nauseam that they are executory,

9  they're pre-petition agreements that are being rejected and

10  we're entitled to pre-petition damages.

11           Also, with respect to whether or not the claims are

12  untimely, if these are -- these retention awards are executory

13  contracts that are being rejected on the consummation of the

14  plan, I think under the Code the parties have 30 days to file

15  claims for -- after the rejection order is entered.

16           With respect to his request that they be disallowed

17  because they're duplicative claims, I know for some of my

18  clients they're duplicative claims, but some of these folks

19  have not sent me all their information.  They only engaged me

20  recently.  I don't know that that's the case, so I would like

21  to reserve the right, if the Court determines that these are

22  not appropriately administrative claims, that we can at least

23  assert claims for the damages or the general unsecured claim

24  for those amounts.  The argument would be that they would be

25  timely because it's rising out of this Court's decision.  They

**J&J COURT TRANSCRIBERS, INC.**

1  did file their claims timely for the admin claims, so everyone

2  is on notice of it.

3       With respect to the concept of -- counsel indicated

4  that the parties need to be there on a certain date to earn

5  these, and each of these cases, my understanding is that all of

6  these individuals were there on the first vesting date.  They

7  were not there on the second and third vesting dates.  We're

8  not asking for that, even on a pro -- on a pro rata basis we're

9  not asking for that.  So, that part is not -- with respect to

10 503(c), that has not been raised before.  It's not in their

11 pleadings, I don't believe.  If they are I apologize.  But the

12 --

13      THE COURT:  But if they were officers, and this is

14 very important, I think --

15      MR. MUELLER:  Yes, sir.

16      THE COURT:  If they were officers hasn't Congress

17 said that retention claims cannot be paid except pursuant to

18 503(c)?

19      MR. MUELLER:  Congress said that notwithstanding

20 Sections 503(b) they shall neither be allowed nor paid provided

21 it meets these requirements.  There's nothing that says there

22 that it has to be after notice and hearing.  The Court has to

23 have evidence, but we could come back another day and say,

24 okay, Mr. Besanko's claim is X dollars, which is not more than

25 ten times the general retention awards for everybody else.  A

54

1  lot of the Court's powers -- a lot of the things debtors can do

2  are only after notice and hearing, and that's not the way this

3  is set up.  It says that retention bonuses cannot be paid to

4  insiders unless they meet these requirements.  Well, if that's

5  where we're going with respect to this, then they should be

6  afforded an opportunity, and I won't waste the Court's time.  I

7  would discuss this with debtors' counsel to see if there's even

8  a chance, but they ought to be afforded an opportunity to say

9  we do meet requirements one, two and three -- or, pardon me --

10 I guess it's stated as A, B and C of 503(c)(1).  I appreciate

11 your time, Your Honor.

12         THE COURT:  All right.  Thank you.  Mr. McCullagh, do

13 you wish to be heard?

14         MR. McCULLAGH:  I do, Your Honor.  Again, I didn't

15 plan to come here and make argument today.  I was more

16 interested in just listening.  But I wanted to highlight one of

17 the first things I said when I addressed the Court on December

18 8th, which is the debtor, in its brief filed, I think it was on

19 March 6, just a couple of days, or maybe it was five days

20 before the last hearing, identified certain of the claimants

21 who were subject to the KERP requirements.  My client, Ms.

22 VonBechmann, was not among those, and I think properly so.  She

23 did have the title of vice president.  I think she was vice

24 president of merchandising.  I don't remember her exact title.

25 But she wasn't a control person in the company.  She wasn't

1  identified as someone being subject to KERP.  And I don't have

2  my Code in front of me.  I believe 503(3)(c) refers to

3  insiders, and I know that the Code defines insiders to include

4  officers and directors, but I'd also point out, and I'm going

5  from memory here, but I believe one of the initial motions

6  filed in this case, it might be the employment -- employee

7  practices motion that the debtor filed, distinguished and

8  provided case law that not all officers are insiders, and I

9  believe it carved out in that pleading some of those people, so

10 I don't think we can say just because this person had a title

11 like vice president they're automatically subject to the KERP

12 requirements.  And the debtor did, I think, carve Ms.

13 VonBechmann out from any sort of KERP argument.  And I feel

14 like I needed to highlight that in light of the colloquy that

15 the Court has had with counsel.

16          THE COURT:  All right.  Thank you.

17          MR. MUELLER:  Thank you.

18          THE COURT:  Anything further, Mr. Galardi?

19          MR. GALARDI:  Yes, Your Honor.  I think hopefully

20 some helpful clarifications for all of this.  One is, the last

21 gentleman to speak is absolutely correct.  We did take a

22 position, and that's why Mr. Ramsey sort of confused me.  He

23 has the title, but we took the position he needed control, and

24 I think when we settled with the committee that issue wasn't

25 ruled on by Your Honor, but we have taken the position,

1  although I know there's subsequent case law to the contrary,

2  that just because you had a title doesn't mean you're in

3  control and shouldn't done the insider.  I don't remember if

4  Your Honor ruled or commented on that, but I think we were

5  comfortable with that position.  So, that's why when Mr. Ramsey

6  came up, I know he's an officer title, but I know we took the

7  position not insider for the purpose of the incentive plan.

8  So, that is correct.

9        Your Honor, I think better said, one, we haven't

10  moved to reject anything yet, so -- on these agreements.

11  Better said, I think we think it's irrelevant whether it's

12  executory or not executory because I think you get to the same

13  place except for the issue Your Honor has mentioned.  If it's

14  not executory, the retention separate letter agreement, then

15  you breach it and you have a pre-petition claim.  Where I think

16  it now makes a difference in Your Honor's mind, although we

17  don't think it makes a difference from our perspective is if

18  it's part of the executory contract.  And then you have a

19  couple variations.  If it's part of an executory contract then

20  you raise your issue.  If it's rejected the date before the

21  filing, can it be earned as of that date?  And then we have the

22  other issue, which, again, our position is no, your position

23  may be yes, or wherever your position comes out.

24        THE COURT:  And your motion, just so that we're clear

25  what we're talking about because we've had a lot of discussion

1  going on today, is really an objection to claims under your

2  fifty-sixth omnibus objection to claims as opposed to any kind

3  of a motion to reject the executory contracts?

4         MR. GALARDI:  Correct, Your Honor.  They have all

5  filed these as 503(b)(1) administrative claims.  We have

6  objected to them as 503(b)(1) administrative claims on the

7  grounds that it doesn't satisfy 503(b)(1).  We have not yet

8  moved to reject anything or do that.  Now, in our plan we'll

9  have the basic everything is rejected, but we have not done

10  anything other than say they're not administrative claims.

11         Also, so to be clear, and I know the gentleman hasn't

12  looked, to the extent that they don't have a duplicate

13  unsecured pre-petition claim on file, we have no objection to

14  that being there.  The problem is we're reserving our rights to

15  object it's late.  None of these claims that we objected to

16  were filed prior to the pre-petition unsecured bar date, so we

17  actually objected, you're not administrative.  And why we

18  didn't seek, as we've done many times before, to reclassify, is

19  they weren't filed by the pre-petition bar date.  That may be

20  unfortunate for a claimant.  If Your Honor feels better saying,

21  well, I might not get 503(b), but let's consider it a late

22  claim, that's fine.  We will then probably object as it being a

23  late claim.  I'm not trying to do everything.  I think we did

24  that in our objection.

25         So, I think those were the issues I just wanted to

1  clarify with respect to the objection.

2           THE COURT:  Okay.

3           MR. MUELLER:  Your Honor, can I -- Your Honor, only

4  very briefly, and I very much appreciate your indulgence.  With

5  respect to this issue that Mr. McCullagh and Mr. Galardi are

6  talking about that certain folks may have the title but are not

7  insiders, I would concede most likely that Mr. Besanko, who was

8  the CFO prior to Ms. Michelle Mosier (phonetic) being the CFO,

9  was an insider, I assume, under their definition, although I

10 haven't seen it.  Mr. Fay, I'm not sure what his title was.

11 Mr. Ramsey apparently was an assistant counsel, or associate

12 counsel.  And then, Mr. Wimmer, who I'm most familiar with,

13 while he had been there for 40 years I don't think under

14 anybody's definition he would be an insider.  So, I would

15 reserve the same issues that Mr. McCullagh did, that 503(c)

16 wouldn't apply to them.  It would probably be Mr. Besanko.  And

17 I know Mr. Besanko had an offer from another company, which, if

18 we had a hearing on that, could come into Evidence, which is

19 the first element under 503(b)(1)(A), whether or not it was

20 necessary to keep them there if they had another offer.

21          With respect to the issue about the timing of the

22 admin claims versus the general unsecured claims, that was set

23 up based on the debtors' bar dates.  The first bar date, I

24 believe, was January 30th for general unsecured claims, and

25 then they had a later bar date for administrative claims, I

59

1  believe it was April 30th.  So, by their own procedural posture

2  or orders they got these admin claims after the general

3  unsecured claims.  And, in fact, many of these employees were

4  there past the general bar date.  If you worked until February

5  1 you were past the general bar date, so you're not going to

6  file your claim for your post-petition earnings as they view

7  these to be, whether or not the Court ultimately decides that

8  they are, until -- until that time.  So, I think it would be

9  disingenuous to now -- to then come and say, well, you can't

10 file it as a general unsecured claim now because it's after

11 January 30th, 2008 -- 2009.

12        THE COURT:  Yes.  You'll have some sort of claim.

13 But the question really is in my mind, because we've been going

14 sort of in circles on this, you know, what you're really

15 arguing is that you've got an executory contract and that if

16 they reject the executory contract you're going to have lease

17 rejection damages claims, and it may be an administrative claim

18 if I find that it's part of the value.  And if not, then I've

19 raised, you know, apparently this red herring about whether

20 it's some sort of priority claim under 507.

21        But in any event, that's one type of claim.  But what

22 we have before us today really is an admin claim that you've

23 already filed which would be based on, what, the executory

24 contract or the pre-petition agreement?  I guess I'm a little

25 confused on what I'm doing, because I really do think that

1 these things are executory contracts, and I'm trying to figure

2 out how I've got in the posture that I've got it right now.

3          MR. MUELLER:  Your Honor, I agree with you.  They are

4 executory -- my opinion, which doesn't count for much, because

5 I am not the Judge, but they're executory contracts under the

6 Countryman test because performance was still due by both sides

7 on the petition date.  Both parties still had obligations to

8 perform, which is the --

9          THE COURT:  Well, Mr. Galardi will say that, no, that

10 only your client had -- well, I guess you're right.  If you

11 performed up to a date, you're saying, then it automatically

12 vested as of that January 8th date.

13          MR. MUELLER:  And none of the cases even address

14 whether or not really they're executory contracts because I

15 would submit it's pre-supposed that they are.  But, Judge

16 Mitchell in Dornier Air says you don't really -- the issue

17 doesn't really turn on whether or not they're executory.  It

18 turns on what are the reasonable -- what's reasonable

19 compensation for these services.  But as a technical matter,

20 you're right, we are here because of the manner in which the

21 debtors procedurally postured this, which was we filed

22 administrative claims because we thought we were entitled to

23 these 503(b)(1) claims and they filed an objection to them.  To

24 my knowledge there's over 7,000 docket entries in this case,

25 and I've done my best to keep up with the docket entries, but

1   to my -- to my knowledge there has not been a motion to reject

2   these executory contracts as of yet.

3          THE COURT:  Wasn't there an eighth omnibus objection?

4   Or --

5          MR. GALARDI:  Your Honor, maybe this will actually

6   help both Your Honor's ruling and maybe we have gone around in

7   circles.  One, none of the, quote, employment agreements or the

8   retention agreements, whether you see them as executory or not,

9   there is no motion that has been filed that will reject these

10  to date.

11         THE COURT:  All right.

12         MR. GALARDI:  So --

13         THE COURT:  That's helpful.

14         MR. GALARDI:  That's helpful, because I think, Your

15  Honor, if I -- again, if we take -- again, if you're Your Honor

16  and I'm just a lawyer, but I'll take my shot at it.  If I look

17  at simply the procedural matter --

18                    (Pause)

19         MR. GALARDI:  Okay.  We have rejected the employment

20  agreements.  We have not rejected the retention agreements.

21  So, for example, Mr. Wimmer's contract was rejected --

22         THE COURT:  All right.

23         MR. GALARDI:  What has not been rejected is the

24  underlying retention agreements.  Whether we see them as

25  executory or not, that may be that, but we'll have a catch all

1  in the plan.  To the extent that somebody thinks it's an

2  executory contract and gets the extra 30 days, it's not a Code

3  provision, it's actually our bar date said that, and the plan

4  will say that.  So, if they think that's a rejection, they

5  would have a claim.  So, if I were thinking of what I think is

6  procedurally the narrow issue before Your Honor today, they

7  have filed a 503(b)(1) claim.  We have objected to a 503(b)(1)

8  claim saying it's not -- doesn't qualify as an actual necessary

9  expense to preserve the estate.  Your Honor asked me, well, if

10 you reject these things can they get a priority?  There is no

11 priority claim that I know of that's on file currently.  We

12 have not objected to one if it is on file currently.  And we

13 have not rejected or moved to assume or reject the retention

14 agreements under a plan.  So, in substance I could say if I

15 were the Judge that issue is not really before Your Honor.

16 It's an interesting issue we could save for 30 days post the

17 effective date if people file it.

18         THE COURT:  Which is what Judge Mitchell said.

19         MR. GALARDI:  So -- but there is no such thing, and

20 so they're not really prejudiced either because they may still

21 file that claim and you may have given them an argument for

22 them to raise on that rejection.  The plan will clearly provide

23 that anything that is not expressly assumed is rejected to the

24 extent it's an executory contract, and they will then have

25 another 30 days to decide whether they want to take the

1  position it's executory, make the argument that Your Honor has

2  suggested that it's earned, and fight another day exactly that

3  issue.  Thank you.

4        THE COURT:  All right.  Thank you.  Mr. McCullagh?

5        MR. McCULLAGH:  If I might beg your indulgence one

6  more time.  I feel like I have to rise on these points only

7  because I did file for Ms. VonBechmann general unsecured claims

8  timely prior to the initial bar date, also designating part of

9  her claim as a priority claim.  So, just for the record I have

10 set these issues out there.  I spoke to debtors' counsel, not

11 Mr. Galardi, but before the initial hearing.  My understanding

12 is that even if the administrative claims are disallowed and

13 the resulting -- or are converted to general unsecured claims

14 and those are disallowed as untimely, that will not effect the

15 timely filed proofs of claim that I filed way back in January

16 of 2009.  And I --

17        THE COURT:  I understand.  Thank you.

18        UNIDENTIFIED ATTORNEY:  That's our understanding,

19 Your Honor.

20        THE COURT:  Yes.  And that's consistent with mine,

21 too.  All right.  The Court is prepared to rule.  The Court is

22 going to disallow the administrative claims filed under

23 503(b)(1).  The Court does view these agreements as executory.

24 There may be some priority claim.  The Court does not have that

25 issue before it right now, and I guess I'm sorry to some extent

64

1  that I raised the issue when it wasn't before me since so much

2  turned on that.  But to the extent that any party wants to file

3  that when the contracts are -- these agreements are ultimately

4  rejected, we'll take it up in the appropriate posture at the

5  appropriate time, at that point.  And so, the Court is not

6  going to make any ruling with regard to Section 507(a)(3), or

7  (a)(4), rather.  And -- but with regard to the administrative

8  claims under 503(b)(1), the Court is going to disallow the

9  claims.

10       MR. GALARDI:  Your Honor, I hate to ask this, but

11 I've got to.  Your Honor said you view these as executory.

12 Since the -- is that a ruling on this matter with respect to

13 these retention agreements being executory because, again, I

14 have my view that they may not be.  I have my --

15       THE COURT:  You can argue that at the appropriate

16 time.

17       MR. GALARDI:  Thank you.

18       THE COURT:  I'm not ruling that they're executory.  I

19 said it was my view that they were.

20       MR. GALARDI:  Okay.  I just wanted to make --

21       THE COURT:  The only ruling I am making today is that

22 the administrative claims under 503(b)(1) are denied, and then

23 everything else is preserved, and you know my views.

24       MR. GALARDI:  I know your views, Your Honor -- and I

25 --

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Much like we know the Second Circuit's

2   views in _Chrysler_, and that doesn't matter anymore, either.

3                          (Laughter)

4          MR. GALARDI:  I appreciate that.  I just wanted the

5   clarification so it wasn't rule of the case so that I couldn't

6   argue it in good faith.  Thank you.

7          THE COURT:  Yes.  Thank you.  All right.  I'm afraid

8   now to ask this question.  Any questions regarding the Court's

9   ruling?

10         MR. GALARDI:  Your Honor, I would propose just a very

11  simple order saying that the objection to the 503(b) and all

12  other rights are preserved but with respect to the

13  administrative claims asserted under 503(b)(1), that's it, and

14  that's the very simple order --

15         THE COURT:  The -- those are denied.

16         MR. GALARDI:  -- denied.  Everything else is

17  preserved with all rights.  And if counsel wants to make sure

18  that they've filed it, or make an argument that it has to be

19  reclassified, we'll talk to them, and if we have to come back

20  to the Court we'll do so.

21         THE COURT:  All right.  That would be the Court's

22  preference.  All right.  Thank you.

23         MR. GALARDI:  Your Honor, that now would move to

24  Number 22, Your Honor, which is the debtors' motion to disallow

25  or to reclassify a claim.  There was a $10 million claim filed

1 by Franklin Spencer Wilson.  That was a lawsuit.  That lawsuit

2 was commenced in 2007.  I think it was June 27th, 2007.  The

3 claimant has sought priority administrative treatment for that

4 claim.  Your Honor, both it is outside the period, we believe,

5 and nor is it one of those claims that we believe is entitled

6 to administrative pre-petition priority, or administrative

7 priority, 503(b).  I don't know if the claimant is here.  They

8 did, in fact, file a response.  I'm not going to go into the

9 merits of the response, Your Honor.  I'd ask if that claimant

10 is here, to set forth the grounds for administrative priority,

11 otherwise we would ask Your Honor to sustain the objection.

12          THE COURT:  And this is the claim of Mr. Franklin

13 Wilson?

14          MR. GALARDI:  That's correct.  It's Docket Number

15 6590, and this was Matter 22 on the agenda.

16          THE COURT:  All right.  Is Mr. Wilson either in the

17 courtroom or on the phone?  Is there any counsel appearing on

18 behalf of Mr. Wilson?

19          MR. GALARDI:  I think Mr. Wilson advised us that he

20 was not going to appear, nor counsel, but just wanted to

21 confirm that no one was here for him.

22          THE COURT:  All right.  Well, for the record I have

23 reviewed the debtors' motion and memorandum in support of the

24 summary judgment on the objection to the claim, and I've

25 reviewed Mr. Wilson's correspondence with the Court and his

1 reply, and I think that the position set forth by Mr. Wilson

2 don't go to the merits of the matter, and the debtors' motion

3 for summary judgment will be granted.

4     MR. GALARDI:  Thank you, Your Honor.  That now brings

5 us, and I think they can all be grouped together, I think

6 counsel actually represents it, Matters 23, 24, 25 and 26 on

7 the agenda, Your Honor.  All of these are the debtors'

8 objections and then a request for summary judgment on claims

9 that have been filed, one as class proofs of claim, and two, in

10 a priority amount.  Your Honor, we did receive a response,

11 whether we want to call that a response requesting an

12 adjournment and discovery.  We did not receive a substantive

13 response, I would call, to our summary judgment motion in the

14 time that was permitted to file a response.  Your Honor, I

15 don't know how you'd like to proceed.  I can go forward with my

16 arguments on summary judgment, or I could let counsel discuss

17 the grounds for the adjournment and why we think an adjournment

18 should not be granted and why Your Honor should rule, and the

19 importance to the estate.

20     THE COURT:  All right.  Well, what I would like to do

21 -- I've read all of your papers, but I'd like you very briefly

22 just to put your main points on the record, and then I'm going

23 to let counsel proceed.

24     MR. GALARDI:  Sure.  Your Honor, very briefly, first

25 it is our understanding, and we believe good law, that in order

1  to file a class proof of claim one should get leave of Court

2  prior to doing so, and importantly, to do so prior to the bar

3  date.  I think it is an uncontested fact that these particular

4  class action proofs of claim, they did not seek Court

5  permission prior to the bar date, and therefore on that grounds

6  alone, I don't think that's disputed, that the Court should

7  deny the claim going forward as a class proof of claim, and

8  therefore should consider simply those class plaintiffs that

9  were identified in those claims specifically.

10      Your Honor, with respect to even if they were class

11  proofs of claim, Your Honor, our view is if you look at the

12  allegations of the complaint and the representations of the

13  identified class plaintiffs that could be representative of a

14  class, all of them seek claims of priority essentially for

15  wages, but there was no set of facts for each of those

16  individuals that the wages could qualify for that 180-day

17  period pursuant to 507(a)(4).  There is a statement that if we

18  could take discovery we might find such a person, and we'll

19  talk about that.  But with respect to the actual people that

20  could be representative, and we would say that they are the

21  only class that could be representative, those people could not

22  as a matter of law qualify for a 507(a)(4).

23      With respect to those unidentified people that might

24  have earned wages, and we don't even know if there are any,

25  Your Honor, we go back to argument number one.  We would say

1  it's a significant prejudice.  All of those people received

2  notice of the bar date, the class action.  We did notify

3  employees of their right.  So, there's only two sets of facts

4  that could be true here.  One, they already filed their proofs

5  of claim and their rights are preserved to seek priority.  Or

6  they didn't file proofs of claim, in which case the discovery

7  as to who was in that class but didn't file a proof of claim

8  would prejudice the debtors.  To seek the discovery would

9  prejudice it, and then would bootstrap around the bar date a

10 potential priority claim.

11         Your Honor, with respect to the prejudice, and I

12 think this also goes to the adjournment, I think these are

13 facts that Your Honor can take judicial notice of because they

14 are all claims agent facts.  And I'm speaking prior to any

15 orders that Your Honor may enter today.

16         Your Honor, as we sit here today, and confirmation is

17 looming on April 6th, and we're going to move that a month, but

18 just to give Your Honor an idea of why the debtors feel

19 strongly that this matter should proceed today, and in fact

20 that these claims should be reclassified, as we sit here today

21 we have $442 million of cash on the books.  We have, after

22 objections, and after eliminating most favorably for our sakes

23 without prejudice to anybody, rights of setoff, there are 11

24 million secured claims.  So, that would leave us with $431

25 million of cash if we paid them or reserved for them.  And I'm

1  going to go through this because this is all a matter of the

2  claims record.

3       If you took the $431 million of cash, we have

4  administrative claims filed to date, again, without orders

5  today, of $110 million.  And Your Honor is familiar with the

6  docket enough to know that many people have asked for reserves.

7  So, again, we think we're going to get that number down, but if

8  we had to confirm today and we reserved for all those claims,

9  even the ones that have pending objections, we would now be

10 down to $321 million of cash.

11      Your Honor, in addition we have 200 million of

12 503(b)(9) claims.  And I want to be clear about that.  And this

13 is not with respect to prejudice to anybody's rights, but I

14 want to put in context why we are so motivated to move forward

15 on the priority claims.  The 200 million constitutes claims

16 that are unobjected to, as well as the amounts that Your Honor

17 has temporarily disallowed, so we didn't deduct from that 200.

18 If we took -- temporary disallowed, but as Your Honor knows

19 we've gotten a request for reserves, we're going to deal with

20 that in confirmation but I'm trying to give Your Honor the best

21 cash.  So, if you take that cash out we'd have $121 million

22 left.

23      Your Honor, there is $6 million in professional

24 reserves, so we're down to $115 million of cash.  Your Honor,

25 there was an appeal on the reclamation, but let's just leave --

1  we have $115 million of cash.  So, if I wanted to confirm today

2  and show Your Honor that this was feasible, set up reserves for

3  all of those claims so that people knew they were getting paid,

4  we'd have as much as $115 million of cash.  If Your Honor -- if

5  I have to set a reserve for reclamation claims because Your

6  Honor's opinion has been appealed, we'd have to take 25 more

7  out of that, so somewhere between 90 and $115 million of cash.

8        We do think we have other sources of cash.  We've

9  talked about the Canadian, but I'm talking about what I think

10  I'll get in the next 30 days to confirm.

11        Your Honor, there are $223 million of priority

12  claims.  Though they don't have to be paid on the effective

13  date, you do have to pay them in full.  It will at least go to

14  feasibility.  Your Honor, the four claims that I'm objecting

15  today account for $150 million.  So, obviously if it's 223 I

16  have one big feasibility issue.  I have 90 million of cash,

17  $223 million of claims.  Can't reserve for that amount.  If I'm

18  successful, and I'm not saying I'm successful, but if I deal

19  with 150 of it, I'm down to $73 million, and I'll have cash

20  under all circumstances that I could even reserve, and I know

21  those numbers will come down and say now we can go forward.

22  And our plan requires that we either reserve or pay

23  administrative and priority claims before any distribution can

24  be made to unsecured claims.  So, it is absolutely imperative

25  that we address these issues as soon as possible to get to

1    confirmation.  It's at least a feasibility issue if not a

2    reserve issue.  So, Your Honor, that's why we think it is

3    prejudicial to us to delay and don't think a party should be

4    able to grant themselves an adjournment simply by filing a

5    discovery request without a substantive relief, and without an

6    order from the Court.  Those are my points.

7              THE COURT:  Thank you, Mr. Galardi.  Mr. Hutson?

8              MR. HUTSON:  Good afternoon, Your Honor.  Richard

9    Hutson, for the record, on behalf of the local -- local counsel

10   on behalf of the class creditors, Robert Gentry, Jack

11   Hernandez, Jonathan Card and Joseph Skaf.  Your Honor, Michael

12   Righetti of the Righetti Law Firm has been admitted to this

13   Court via pro hac vice.  I'd like, at this time, to have him

14   address debtors' argument.

15             THE COURT:  Thank you, Mr. Hutson.  Mr. Righetti,

16   welcome to the Court.

17             MR. RIGHETTI:  Thank you, Your Honor.  And thank you

18   for the opportunity to appear before you here in Virginia.  I

19   did spend yesterday cruising around and seeing some sights in

20   Richmond.  I did enjoy that very much, but it is an honor to be

21   here, as well.

22             I'd like to, I think, start out by just notifying the

23   Court a little bit about the big picture here, and I think that

24   the way that this has been briefed it's -- we've tried to show

25   the Court the big picture, but I believe the debtor is looking

J&J COURT TRANSCRIBERS, INC.

1 at this through a very small tube, if you will.  This -- the

2 Gentry case, in particular, having been filed in 2002, has now

3 been litigated for over eight years, and vigorously litigated,

4 yet there's been no answer to the complaint that has been

5 originally filed.  I think it probably sets the record for the

6 most amount of time, money, and attorneys' resources that have

7 been spent on a case without ever having an answer to a

8 complaint.

9       The case went all the way up to the Supreme Court and

10 back down, and is now still sitting in the Second D.C.A. Court

11 of Appeals on Circuit City's attempt to enforce a ban on class

12 actions in California.  The California Supreme Court, I'll

13 note, has deemed that provision illegal.

14       Your Honor, we did not have the opportunity to

15 conduct any discovery into the merits of class certification or

16 the merits of our claims in State Court, and we have not had

17 the opportunity to do that in this Court, obviously, pending

18 the automatic stay on discovery.

19       THE COURT:  Well, why not?  Because, I mean, unlike

20 California this is referred to as the rocket docket, and we do

21 things fairly quickly here.  And why couldn't you have

22 commenced discovery as soon as there was -- I mean, the

23 objection to your claim was filed back in June, if I recall

24 correctly, and so at that point it became a contested matter,

25 right?  And why couldn't you commence your discovery, you know,

1  the day after you got the objection to your claim?  Because now

2  you had your claim and you had an answer.

3        MR. RIGHETTI:  Thank you, Your Honor.  And I'll

4  respond to both of your questions.  We did receive an objection

5  back in June, and through e-mail correspondence with attorneys

6  from debtor, they, in fact, preliminarily agreed to adjourn

7  those objections if we filed a preliminary response to them.

8  They are now saying that they've put us on notice that that was

9  a contested matter.  I have e-mail correspondence, and I would

10 appreciate the opportunity to approach the Court and submit

11 those documents so the Court has them in front of Your Honor,

12 so that you can see that the correspondence, in fact, indicates

13 that they were willing to adjourn those objections if we filed

14 a preliminary response.

15       To say now that that put us on notice that they were

16 contesting the -- that this case is ripe for class

17 certification, or that they were contesting any of the claims

18 in our original complaint I think is a bit of hyperbole, Your

19 Honor, because there's been no indication until we received

20 this motion for summary judgment that they disputed class

21 certification.  And we still actually don't know that they

22 dispute that this case is proper for class certification.

23       THE COURT:  Okay.  Well, let's forget the class

24 certification for a minute, because I wanted to go back to the

25 original thing that -- you said that you didn't know that they

 1  were disputing it, but you filed a claim, okay, and then you

 2  got an objection to your claim.  Okay.  Now, regardless of what

 3  anybody says, by law, under Rule 9014, that becomes a contested

 4  matter.  Right?

 5          MR. RIGHETTI:  Correct, Your Honor.

 6          THE COURT:  And so, as a contested matter then Rule

 7  9014 says certain of the rules are applicable.  And one of

 8  those rules that says that's applicable is Rule 26, and it also

 9  -- Rules 28, 29, 30, all the way up to 33.  We're familiar with

10  all those rules on discovery.  And my question to you simply

11  was when you got the objection why didn't you immediately

12  commence discovery?

13          MR. RIGHETTI:  Your Honor, we -- and Matthew

14  Righetti, in his declaration, testified to this extensively,

15  but he approached the attorneys at Skadden Arps, and counsel

16  for debtor, requesting that discovery be allowed either in

17  State Court or to commence discovery here in this Court, and

18  the response from debtors' counsel was that Your Honor would

19  not be interested in lifting the stay to conduct discovery

20  because this is a liquidating Chapter 11 proceeding --

21          THE COURT:  That was probably correct.

22          MR. RIGHETTI:  Okay.  And so we relied on that

23  representation and also on their representation that they were

24  not willing to stipulate to do discovery, neither in this Court

25  or in State Court, and therefore we were waiting patiently to

1  deal with these claims when they came before the Court.

2          THE COURT:  Now, who says you have to get their

3  stipulation to commence discovery?

4          MR. RIGHETTI:  Your Honor, we did not need to receive

5  -- to get a stipulation, and I suppose at this point it would

6  have been more wise and prudent to bring a motion before the

7  Court, but we relied on their representation.  And what Your

8  Honor believes was correct, that any request to do discovery

9  would have been denied, as this is a liquidating Chapter 11.

10         THE COURT:  No.  I would have denied lifting the stay

11 to pursue it in California.  And the reason for that is I

12 wouldn't have wanted to wait another eight years to get any

13 kind of an answer.  We need to get answers quickly in this

14 Court, and we move fairly quickly.  And so, you know -- and

15 that's why I'm questioning you on the delay that's already

16 occurred.  I mean, if you were in the District Court this case

17 would have already been tried.  You know?  And -- but, you

18 know, we do it a little bit slower in Bankruptcy, I suppose, as

19 we have more moving pieces.  But I'm trying to understand why

20 you didn't commence discovery if you thought you needed to do

21 it.

22         MR. RIGHETTI:  Well, Your Honor, and I believe that

23 the declaration of Matthew Righetti which sets forth by we did

24 not commence discovery right away is the position of the

25 creditors in this matter.  I think it's also important to note

1  that the reply of the debtors did not address any of the

2  comments that Matthew Righetti swore to in his declaration.

3  They seem to be saying, so what?  Yes, we told you that there

4  would be no discovery allowed in this Court, but that's just

5  unfortunate and now you're stuck because you didn't get

6  permission from the Court to file a class proof of claim.  I

7  believe what you're really looking at is a gotcha motion, Your

8  Honor, where we had been communicating, we had been responding

9  to these omnibus procedural objections, but we never actually

10 made a formal request for discovery, relying on the

11 representations of debtor counsel.  And they, obviously having

12 more experience before Your Honor, made the correct assumption

13 that discovery would probably not be advised, as this is a

14 liquidating Chapter 11.  So, that's the reason we didn't

15 conduct --

16        THE COURT:  Notice the distinction, though, that not

17 -- wouldn't be permitted to proceed in California, but you were

18 always entitled to proceed in this Court.

19        MR. RIGHETTI:  Well, we were under the impression

20 there was an automatic stay in this Court on any discovery.

21 And when we requested that the stay --

22        THE COURT:  Where does that come up?  There's not an

23 automatic stay against discovery in this Court.

24        MR. RIGHETTI:  Well, Your Honor, that was the

25 impression that we were under, and that's what we believed they

**J&J COURT TRANSCRIBERS, INC.**

1  informed us of when we asked to do discovery before Your Honor

2  in this Court.  I mean, we've communicated with them that we

3  want to get these claims litigated.  We believe that there are

4  thousands of employees in California who have bona fide claims

5  for back overtime wages, meal and rest break, minimum working

6  standards in California, and with the stroke of a pen, those

7  bona fide claims could be completely wiped out.

8          And, Your Honor, I think -- and another -- a very

9  important point is that --

10         THE COURT:  Okay.  Well, let's -- I understand all

11 that, and I've read all your papers, and I've read the

12 affidavits and such, but let's move to what it is you need to

13 have discovery on.  Okay?

14         MR. RIGHETTI:  Thank you, Your Honor.

15         THE COURT:  Tell me specifically, because I think you

16 said there were four things that you needed discovery on, and I

17 want you to go through and explain to me why you think you need

18 to have an adjournment to have discovery on those four things

19 under Rule 56(f).

20         MR. RIGHETTI:  Thank you, Your Honor.  The affidavit

21 sets forth that we believe this discovery could be completed in

22 90 days, and if -- if the Court would like it to be conducted

23 sooner than that I think it's certainly possible to do it

24 sooner than that, as well, depending on cooperation from debtor

25 counsel and actually responding to the discovery that we

1 propound.  The first thing that's very important, Your Honor,

2 is to get the identities and contact information of the

3 putative class members.  That is important for two reasons.

4 One, the testimony from putative class members is often

5 critical in establishing the Rule 23 requirements for

6 certification.  And the second reason, Your Honor, is that we

7 really need to know, we need discovery on who actually received

8 notice of the bar date in this case.

9        In the motion for summary judgment the debtor submits

10 that it provided publication notice in The Wall Street Journal

11 and the Richmond Times Dispatch.  Your Honor, we're dealing

12 with California employees who worked for Circuit City from 1998

13 up until -- well, the present, although no one is currently

14 working there.  No one, Your Honor, in California, I believe,

15 is reading The Richmond Times Dispatch.  And we're also dealing

16 with low wage workers in California, who may have an interest

17 in reading The Wall Street Journal, but you would typically

18 find that those folks are not reading The Wall Street Journal

19 either.

20        Then, in their reply, although not supported by

21 declaration, they say that they notified putative employees, or

22 they notified former employees from three years preceding the

23 bar date.  They did not say that -- they did not support it

24 with a declaration, and they did not submit that in their

25 motion.  Now, all of a sudden, when they realize that they may

1  not have given proper notice they come back and say, well, we

2  did give notice to employees from three years preceding the bar

3  date.  We don't know that.  No one swore to it in a declaration

4  from debtor counsel.  I believe they referenced a docket number

5  to --

6          THE COURT:  Isn't it a matter of record in this case?

7  I mean, when the claims agent serves a notice the claims agent

8  files a certification with the Court who was served and when it

9  was served, and that's filed under penalty of perjury.

10          MR. RIGHETTI:  Well, Your Honor -- so, if it's, in

11  fact, true that they did notify employees from three years

12  preceding the bar date they did not provide notice for the full

13  statutory period, which is four years preceding the filing of

14  the class action, which would have been, in the <u>Gentry</u> case,

15  1998.  They only provided notice from the bar date, it would

16  have been 2005 to 2008.  You're leaving out eight years of --

17  or, seven years of the statutory period where they're, in fact,

18  conceding that they did not give actual notice by informing

19  former employees.

20          THE COURT:  All right.  Well, you heard Mr. Galardi

21  talking.  What he's concerned about is that you filed a

22  priority claim for $150 million.  All right?  Now, the only way

23  that we can get a priority claim for any of these folks would

24  be if they had been employed at Circuit City during the 180

25  days preceding the filing of the bankruptcy petition.  All

1  right?

2          MR. RIGHETTI:  I understand.

3          THE COURT:  Now, all right, so we're talking about a

4  pretty narrow window there.  And he said that he has sent

5  notice to all of the employees that were employed at Circuit

6  City during that period of time.  And I think you were seated

7  in the courtroom when I earlier made a ruling with regard to

8  one employee who claimed they didn't get the notice, but, you

9  know, because they had moved and didn't have a forwarding

10 address.  So, the employees, you know, I'm satisfied, received

11 notice of this.  So, with that in mind, now, why do you need

12 discovery to find out who these people are?

13         MR. RIGHETTI:  Well, Your Honor, first, to make a

14 7023 motion in this Court you do have to meet some of the Rule

15 23 requirements.  The case In Re Computer Learning Centers,

16 sets that forth, and that's the case that's heavily relied on

17 --

18         THE COURT:  I was involved in that case.

19         MR. RIGHETTI:  -- by the debtor.

20         THE COURT:  I know it well.

21         MR. RIGHETTI:  Okay.  Thank you, Your Honor.  So, I

22 obviously, again, will not tell you exactly what the Court held

23 in that case, as you're more familiar with it than I probably

24 am.  But we don't have any of the evidence necessary to even

25 make that motion to begin with.  That's another reason that we

82

1  certainly need discovery of the putative class members.  We

2  need to know who these people are, what working conditions they

3  worked in, what type of hours they worked, who was entitled to

4  overtime.  I mean, we don't even know, Your Honor, if the

5  debtors disputes that these folks are exempt from California's

6  mandatory minimum wage working conditions.

7          THE COURT:  What difference does it make?

8          MR. RIGHETTI:  Well, Your Honor, because that's

9  exactly the type of thing that if you need to conduct discovery

10  on they have to put issues in dispute that they are, in fact,

11  disputing from your complaint.

12          THE COURT:  But what Mr. Galardi said is that, look,

13  they got a notice.  All right?  And they have either filed a

14  claim in this case, or they haven't.  Okay?  Now, if they've

15  filed a claim, they're protected.  If they haven't filed a

16  claim, they're barred.  Now, why do you need to know what their

17  names and addresses are?

18          MR. RIGHETTI:  Well, Your Honor, if we're only

19  determining whether they are entitled to priority or not

20  priority I think it's less important that we have the names and

21  contact information for the putative class members.  That's not

22  -- that is not the point I think I'm trying to make.

23          THE COURT:  Okay.

24          MR. RIGHETTI:  If, in fact, those individuals did not

25  receive notice, or received notice and either made a claim and

1  are entitled to priority or not, I mean, I can't dispute the

2  facts that are undisputed.  I mean, that's just the way it is.

3  If, in fact, there is not an entitlement to a priority claim,

4  you know, that's just the way it is, and we'll have to proceed

5  as unsecured creditors.  But I don't think it means that you

6  immediately cut out the claims of thousands of potential

7  California employees who did not receive notice of the bar

8  date.  And there are certainly thousands of employees who were

9  employed by Circuit City before three years preceding the bar

10  date who I can guarantee you did not receive notice of the bar

11  date.  I've spoken with a lot of these individuals.

12       THE COURT:  Well, we might be able to cut this short,

13  then, because I want to ask Mr. Galardi a question, because it

14  -- take this out of order.  Mr. Galardi, isn't your motion just

15  a partial summary judgment to disallow the priority claims in

16  this case?

17       MR. GALARDI:  Exactly, Your Honor.  And if they have

18  an unsecured claim and they want to fight that at some other

19  day, that's fine.  My whole prejudice and issue is anybody who

20  could have had a priority claim got notice.  This claim should

21  just be reclassified for whatever amounts, not -- and he can

22  certify it, do whatever, I just don't want a priority claim.

23       THE COURT:  Right.  Okay.  So, we're dealing only in

24  this matter --

25       MR. HUTSON:  I'm sorry, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  That's okay, Mr. Hutson.  Go ahead.

2            MR. HUTSON:  We asked -- we asked to go down to only

3    that particular individual, Your Honor, but I understand that

4    if all I got was the priority portion, and all rights reserved

5    otherwise, that's all I really need to move forward as fast as

6    possible, and we can discuss the other issues.

7            THE COURT:  All right.

8            MR. RIGHETTI:  Your Honor, Mr. Hutson has alerted me

9    that they did file a supplemental memo requesting that all the

10   claims be barred, and I'm not sure if it's something that you

11   were willing to withdraw, then maybe --

12           MR. GALARDI:  Your Honor, two things.  One is

13   obviously we're most interested in the priority.  Two, Your

14   Honor, and I don't know if either Mr. Pomerantz or Mr.

15   Feinstein, or creditors' committee counsel wants to mention it,

16   we think it should be stricken because it's still prejudicial,

17   but that's not our big issue for today.  The big issue for

18   today is clearly our first part of our relief priority.  We

19   don't think you can file a class group of claims for the

20   unsecured portion either.  I understand the gentleman's notice

21   of bar date issue.  I don't think Your Honor can rule on that

22   because I don't think we did go back beyond three years of

23   employees, and I understand that may be an issue we have to

24   deal with, or supplement notice for those employees if there

25   really is a statutory requirement, we can't argue abandon.  But

**J&J COURT TRANSCRIBERS, INC.**

1 with respect to priority, hearing that issue, priority, I think

2 Your Honor can rule on.  I'll defer to the creditors'

3 committee, because they'll have to deal with it on the

4 unsecured portion, but, you know, again, that -- we did ask for

5 that relief.  We could hold in abeyance without prejudice that

6 relief and go to the bar date issue.

7          THE COURT:  Right.  And that would also preserve your

8 argument that they didn't file a 7023 motion asking to proceed

9 as --

10          MR. GALARDI:  Right.  Right.  Our view --

11          THE COURT:  -- for another --

12          MR. GALARDI:  -- Your Honor, is if they filed the

13 motion we'd oppose it or not oppose it, that's itself a

14 contested matter.  They should have done that early on.

15          THE COURT:  I understand that.

16          MR. GALARDI:  Again, preserving all those rights.

17          THE COURT:  Exactly.  All right.  I'm sorry to have

18 intervened.  But what we're dealing with now is only whether or

19 not, as far as this hearing is concerned, whether or not to

20 grant summary judgment in favor of the debtor on the priority

21 portion of the claim that you filed, which is for employees

22 that were employed during the four months preceding the filing

23 of the bankruptcy petition.  All right.  Now, if you're allowed

24 to go forward on your unsecured claim, are you willing to give

25 that up, or do you have an argument that you want me to

1   consider on your priority claim?

2          MR. RIGHETTI:  With all due respect, Your Honor,

3   could I have one moment to confer with my colleague?

4          THE COURT:  Yes.

5                      (Pause)

6          MS. BERAN:  Your Honor, just for the record, Paula

7   Beran on behalf of the Official Committee of Unsecured

8   Creditors, and today I am flying solo.  There is no one from

9   the Pachulski firm on the line.  The creditors' committee does

10  have significant issues and concerns with the priority aspects

11  as articulated by Mr. Galardi and is taking extreme interest in

12  seeing that this is resolved today for the reasons Mr. Galardi

13  articulated.  As it relates to the general unsecured claim and

14  other related issues, the committee would take the position

15  that we reserve all rights as it relates to that, but would

16  like to see the priority issue resolved today.

17         THE COURT:  Thank you.  Mr. Righetti?

18         MR. RIGHETTI:  Thank you, Your Honor.  If the Court

19  is inclined to grant summary judgment on the issue of whether

20  there's a priority on the class proof of claim I still think

21  that we need the discovery if the proof of claim becomes an

22  unsecured non-priority claim.  We still need to have the Court

23  determine whether the unnamed claimants have a valid proof of

24  claim in this Court, and, you know, we'll have to do that by

25  motion, I imagine.  Their position is going to be that we

**J&J COURT TRANSCRIBERS, INC.**

1   should have done that, you know, months ago, but we don't have

2   any of the discovery to make that motion, so we're still going

3   to need the opportunity to present that issue to the Court at a

4   later time.

5           THE COURT:  Okay.  The -- in the <u>Computer Learning</u>

6   case what the Court said there was that it was a two-step

7   process as far as proceeding under Rule 23 in the Bankruptcy

8   Court because Rule 23 is not one of the rules that is

9   incorporated automatically into Rule 9014.  So, what you would

10  need to do is file a motion with the Court to, you know,

11  include Rule 23 relief as part of your contested matter, and

12  then the Court can hear you and Mr. Galardi, or whoever, on

13  that issue.  And then once we resolve that, if we're going to

14  have a class action in the bankruptcy case, and there are a lot

15  of reasons why the Court might or might not want to have a

16  class action in the bankruptcy case, which is why you have to

17  bring these kinds of motions, because they can, you know,

18  interfere with the administration of the case, or they may aid

19  in the administration of the case.  But you have to file that

20  motion first.  And then, the Court makes the determination

21  really on that basis as far as whether it's going to assist the

22  Court in the administration of the case or not.  And then once

23  it makes that determination, then we go forward, if I rule in

24  your favor, with, you know, the class certification, and you

25  get to do that discovery, and all of that.  So, it's a two-part

1  process.  So, we've got sort of the cart before the horse here

2  today.

3          MR. RIGHETTI:  Okay.  Well, does Your Honor deny that

4  the Rule 7023 motion is an evidentiary motion?  I mean, we

5  don't have -- we would never make a motion under 7023 without

6  the evidence, and we won't make a motion now without the

7  evidence.  We'd just simply -- how would we make the motion?

8          THE COURT:  What evidence would you have?

9          MR. RIGHETTI:  Well, certainly, Your Honor, the In Re

10 Computer Learning Center case identifies that a part of the

11 7023 motion involves looking at the RFCP 23 factors.  It

12 discusses that where it discusses the applicability of the 7023

13 motion to the facts of In Re Computer Learning Centers.  I have

14 the case in my file.  I'm sure the Court is familiar with it.

15 But Rule 23 factors are a part of making a 7023 motion, and the

16 Court looks at those factors in ruling on a 7023 motion.  At

17 least --

18          THE COURT:  Only to the extent that -- will it aid

19 the Court in administering the case?  That's what a Bankruptcy

20 Court is going to be concerned about.  Or is it going to

21 interfere with the administration of the bankruptcy estate?

22 That's what the 7023 motion is about.  And that's why you do it

23 on a threshold basis.  And, yes, you can say these are the

24 factors we're going to have to prove for class certifications,

25 but you don't have to put on evidence, or prove any of that at

1 that point in time.  You can make those allegations, say this

2 is what it is, this is what we're going to have to show, this

3 is what we think we can show, and then the Court can decide

4 whether it makes sense from a case administration standpoint to

5 proceed in that fashion.

6          MR. RIGHETTI:  Okay.  Well, so then, Your Honor, will

7 the Court hear a 7023 motion at this time?

8          THE COURT:  Once it's filed I certainly will.

9          MR. RIGHETTI:  Okay.  Well then, Your Honor, we will

10 bring it.

11          THE COURT:  Without any prejudice to anybody else to

12 object that it's untimely, or whatever.  But, you know, I'm not

13 ruling on anything today other than to say that I think that

14 procedurally that's the way I think you need to proceed.

15          MR. RIGHETTI:  Okay.  Your Honor, we appreciate the

16 Court's suggestion, and proceed in that fashion.  If there is,

17 in fact, no discovery that is required to bring that motion,

18 then our request for discovery at this time may not be

19 necessary given in light of the fact that we bring a 7023

20 motion.  But with respect to the unnamed claimants and whether

21 they received notice of the bar date, that is something that I

22 believe we still will request discovery on.  I think that's an

23 important issue with respect to the bona fide claims of these

24 California employees.

25          THE COURT:  Right.  And that's why I'm not going to

1 grant summary judgment on the entire matter today because I

2 can't rule that way, whether -- because I don't know whether

3 they received notice or not.  But if I grant the class action

4 motion that you're going to file, then we'll have to visit that

5 at that point in time.

6       MR. RIGHETTI:  Okay.  Thank you, Your Honor.  I don't

7 have any comments at this point in time.  I may in a minute or

8 two.  Thank you.

9       THE COURT:  All right.  Anything further, Mr.

10 Galardi?

11       MR. GALARDI:  Nothing further from me, Your Honor.

12 What we would like to do is enter an order that says that with

13 respect to the claims that are subject to these, one, that no

14 part of the claim will be entitled to priority, so the

15 objection is sustained on that.  It will be without prejudice

16 for this counsel to bring a motion seeking 7023 relief before

17 this Court, and that the debtors, the committee, and any other

18 party in interest, as is normally the case, reserve all rights

19 to oppose any such motion and any request for discovery in the

20 context of that motion.  That would be the simple order that I

21 would like to enter.  And I don't know if there's any

22 objection, but I think simple is good here, and then we

23 reclassify this to a total unsecured claim, not touching the

24 amounts or anything else at this point in time.

25       THE COURT:  All right.  Any objection to that, Mr.

1  Righetti?

2           MR. RIGHETTI:  No, Your Honor.  No objection.

3           THE COURT:  All right.  Well then, that will be what

4  the Court rules, and I would ask you to submit an order, then,

5  Mr. Galardi, to that effect.

6           MR. GALARDI:  Thank you, Your Honor.  Your Honor,

7  there are --

8                          (Pause)

9           MR. GALARDI:  Your Honor, with respect to just -- I

10 touched on it just so that Your Honor was aware, but there's no

11 other matters on the agenda, but I thought I would let Your

12 Honor know where we stand on confirmation today.

13          THE COURT:  Which is the most important thing that I

14 wanted to discuss.

15          MR. GALARDI:  Which is the most important thing.  I

16 saved it for last.  We are still talking to the committee.  Let

17 me give Your Honor some information.  One, I think especially

18 with this ruling obviously we've made very good progress to be

19 able to satisfy the feasibility.  And as Your Honor knows from

20 at least the disclosure statement hearing, one of the issues

21 was making sure we had all the cash on the effective date and

22 not have to fight as many of the reserve issues.  I'm not

23 saying we're not fighting them, but Your Honor knows our cash

24 position.  So, that was one important point.  And with these

25 rulings, and assuming we don't have to establish reserves for

1 anything more than what I just mentioned, and even remaining,

2 then I think we're going to be able to proceed with

3 confirmation very soon.

4          Now, April 6th is not going to work, so we have

5 asked, and would serve notice that we think May 11th, and I

6 think that's probably going to be a realistic date, but let me

7 give you an update on the other aspect of this.  Not only do we

8 think we now have cash in, but there is still a large amount of

9 cash up in Canada, and the committee and we are working

10 through, and again, Mr. Pomerantz and Mr. Feinstein are not on

11 the call, but we were to have a call today.  We are working

12 through with the monitor up there.  There will need to be some

13 modifications to the plan which we think are not substantial to

14 effectuate what's called an amalgamation.  One of our debtors

15 is sort of in the way of -- it goes Canadian is a parent of one

16 of our debtors, and then that is the parent of a Canadian

17 entity.  And we need to do an amalgamation, which means we have

18 to modify the plan a little bit.

19          THE COURT:  Now, is that the plan here or the plan in

20 Canada?

21          MR. GALARDI:  Well, it's kind of a combination of

22 both because in order to not prejudice the creditors of

23 InterTAN, Inc., which is that one entity, there are, like, six

24 claims, and we filed an objection, and we've been in contact

25 with them.  So as to not prejudice those claimants, and at the

1  same time not overburden the Canadian parent of that company,

2  they're going to -- they don't have a merger statute in Canada,

3  so it's essentially they'll assume the assets and liabilities.

4  We don't think there's a lot of assets or liabilities.  That's

5  why we're going to do that, so we have to take InterTAN out of

6  our plan.

7        Once we do that, the monitor up in Canada has

8  resolved a lot of their claims.  This has all been driven by

9  we're waiting for a Canadian revenue ruling on a tax issue to

10  make sure that the money can go up so we don't have to pay a

11  lot of taxes on that money to make the distribution up to the

12  United States as great as possible.

13        We had a preliminary indication of a ruling.  After

14  conversing with the committee the committee wanted to get a

15  ruling as to the timing of that payment and whether if we're a

16  liquidating trust, i.e., if we go effective on our plan prior

17  to the money coming up, whether that makes a difference, or

18  whether we have to stay a corporate entity.  There's been

19  discussions for the last three weeks on that.  We're getting

20  very close with the Canadian revenue ruling.

21        All that is a way to say we're not ready to get

22  there, but we've made significant progress, and we just don't

23  want to have a tax implication if we go effective before the

24  money comes up, because it's 90 to $120 million, and it could

25  have, I think, a 30 percent tax effect.  No reason to give

1  government money if we don't have to legally.  So, that's where

2  we are there.  So, I'm still hoping that May 11th will work.  I

3  wouldn't be surprised if it slipped a little bit, but we're

4  still going on a month-to-month basis because we are trying to

5  confirm it as soon as possible.

6        The other thing I was going to mention, and I was on

7  the phone with the Canadian colleagues before this, and I think

8  Your Honor has this capacity, Judge Morowitz has been sitting

9  on the Canadian case to date.  It will also require, as I

10  mentioned, the Canadian entity to assume some of the assets and

11  liabilities, and then be comfortable with the distribution of

12  cash up so we've been in contact with the monitor and the

13  reserves.  My understanding is the Canadian colleagues, and

14  they're going to mention this to the committee's counsel up in

15  Canada, would like to advise Justice Morowitz of where we

16  stand, as well, and I think this would be -- perhaps we should

17  have done it at the first day hearings or the final DIP

18  hearings, but after having seen Judge Morowitz I think this

19  will be a good hearing that if we could have a combined hearing

20  and make the evidence both on our side as to why we don't think

21  there are claims and liabilities why we're doing this, Justice

22  Morowitz hearing it at the same time and understanding, with

23  the monitor having the recommendations, it might be a good

24  opportunity to have a joint hearing.  They're going to make the

25  same suggestion, I believe, to Judge Morowitz, as we get

**J&J COURT TRANSCRIBERS, INC.**

1  closer, give essentially the same update that I'm giving to

2  Your Honor as to what we've been doing behind the scenes trying

3  to work all these issues out, and then leave it to Justice

4  Morowitz to either decide whether he wants us to get back to

5  you, or to call you directly about logistics and whether you

6  think that's a good idea for a joint hearing, and work it out

7  between Your Honors or tell us what you would like us to do.

8  And so, as we get closer and file the motions, know the

9  Canadian ruling, know the issues, if there's a hearing that I

10 think would be important for both sides to not go one side

11 first and the other side first, that would be the hearing,

12 since it is a combination on corporate structure, amalgamation

13 and distributions.  And that is a prelude to the effective date

14 actually occurring, so -- that's the update.  I'm hoping May

15 11th works.  I don't think -- my board hopes it works.  I think

16 the committee hopes it works.  But when we get the Canadian

17 revenue ruling, it's still an issue because we're modifying it

18 for those considerations, and that's out of our control to know

19 how long they will take to respond.  We're hopeful it's only a

20 week.  It has never moved quite as quickly as that, so I'm just

21 a realist.  But that's it.  We don't think there are other

22 hurdles to confirmation.  And I think, happily, based upon, you

23 know, all the claims work we've done in the last couple months,

24 we think we're very good on feasibility and cash, as I wanted

25 to describe to Your Honor for today's hearing, which is why it

1 was so critical for us.

2          THE COURT:  All right.  Thank you.  I appreciate

3 that, and that's been very helpful.  With regard to a joint

4 hearing with Judge Morowitz, the Court has no problem with

5 that, and actually thinks that that makes a lot of sense, you

6 know, from both sides, so that, you know, each knows what the

7 other is doing and can do it in tandem together.  My only

8 questions would be the logistics of doing that.  I have to

9 confess I've never done that before, but --

10          MR. GALARDI:  Having been a party and appeared --

11 Justice Morowitz on another case, if you have a t.v. screen and

12 we can hook it up, that's generally how we've done it.  I don't

13 know the logistics.  That's beyond my capacity.  But that's how

14 we've done it, and they both sit there and -- if we can hook

15 that into the Canadian Court -- he has done it before since I

16 know I've done it in Delaware with him.  So, if we just let the

17 techies get together, maybe they'll figure it out.

18          THE COURT:  Okay.  Well, I have a department that

19 does that sort of thing, so we should be able to do that.

20          MR. GALARDI:  Okay.  And we'll convey to Osler

21 (phonetic), who is our Canadian counsel, that we mentioned it,

22 we told them.  Again, we'll leave it to Justice Morowitz to

23 either contact you or tell us, but we'll let him know that you

24 sort of, as we and Osler think, it might make sense for this

25 hearing to be a joint hearing, and we'll work out logistics.

**J&J COURT TRANSCRIBERS, INC.**

1  But Justice Morowitz is a Justice, as well, so I'll let him

2  decide.

3          THE COURT:  Well, agreed.  And if he -- you know,

4  obviously has different views on the subject, then that's fine,

5  as well.  I certainly didn't mean to be preempting that by any

6  means.

7          MR. GALARDI:  No.  I don't think so, but I sense --

8  I've had -- I met him at that function that we were at, and I

9  think he would agree on this, because he's asked the same

10 question as to where we can get both of these to coordinate for

11 the final.  So, I suspect he'll have a similar reaction.

12          THE COURT:  All right.  Very good.

13          MR. GALARDI:  Thank you.

14          THE COURT:  Is there anything further?

15          MR. GALARDI:  That's it for us today, Your Honor.

16          THE COURT:  All right.  Thank you all.

17          COURTROOM DEPUTY:  All rise.  Court is now adjourned.

18                          * * * * *

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

I, TAMMY DeRISI, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of my ability.


<u>/s/ Tammy DeRisi</u>           Date:  March 30, 2010
TAMMY DeRISI
J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**