Case 08-35653-KRH    Doc 7155-2    Filed 04/09/10    Entered 04/09/10 10:39:32    Desc
Exhibit(s) Exhibit A contd. - part 1 of 10    Page 1 of 20

EXHIBIT A

# FIRST AMENDMENT TO LEASE AGREEMENT

**THIS FIRST AMENDMENT TO LEASE AGREEMENT** ("First Amendment") is hereby entered into this _____ day of May, 2005, by and between **JP THORNTON LLC**, a Colorado limited liability company ("Landlord"), and **CIRCUIT CITY STORES WEST COAST, INC.**, a California corporation ("Tenant").

## Preliminary Statements:

The following Preliminary Statements are a material part of this First Amendment.

A.  Landlord and Tenant entered into that certain Lease Agreement dated May 28, 2004 (the "Lease"), for that certain premises (the "Premises") located at Larkridge, in Thornton, Colorado (the "Shopping Center"), all as more particularly described in the Lease; and

B.  Landlord and Tenant mutually desire to revise the Lease to reflect certain modifications to the Site Plan and other changed circumstances that have occurred subsequent to the execution of the Lease.

**NOW, THEREFORE,** for valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the Lease is hereby amended as follows:

## Agreements:

1.  <u>Incorporation of Preliminary Statements</u>. The parties hereto acknowledge and agree that the Preliminary Statements set forth above are true and correct and by this reference are incorporated herein.

2.  <u>Exhibit A</u>. All references to "Exhibit A" in the Lease and "Revised Exhibit A" is substituted therefor.

3.  <u>Paragraph 5</u>. The second sentence of Paragraph 5 is hereby deleted and the following is substituted therefor: "The location of buildings and other tenant space therein on Site A will only be within the "Permissible Building Areas" designated on the Site Plan."

4.  <u>Paragraph 15(c)</u>. The references to "'SM-7', 'SM-6', 'SM-5', 'SM-4', 'SM-3', 'Building #10', 'Building #11', 'SM-2', and 'SM-1'" are hereby deleted and "'SM-2', 'SM-3', 'SM-4', 'SM-5', 'SM-6', 'SM-7', 'SM-8' and 'Building #8'" are substituted therefor.

5.  <u>Paragraph 19(D)</u>. <u>Limited Exclusive on Contiguous Land</u> is hereby added as follows:

An Affiliate of Landlord controls an approximately 104-acre tract of land directly to the south of the Shopping Center known as the "Weaver Parcel" whose legal description is attached hereto as Exhibit FA-1. Landlord shall not lease, rent or occupy any portion of the Weaver Parcel to be occupied by any business operating under the trade name of Best Buy, Good Guys/Comp USA, Tweeters, Fry's, Magnolia, Ultimate/Soundtrack Electronics and/or other retailers whose primary business is the sale of Products. The limited exclusive rights granted to Tenant with respect to the Weaver Parcel in the preceding sentence shall be conditioned upon: Tenant not being in default; and Tenant using all of the Premises for the sale, rental or distribution of the Products, other than during any such periods of time during which Tenant's failure to conduct the operations of its business or any other business: (a) is the result of alterations or renovations being performed in and to the Premises or in preparation of an assignment or sublease, (b) is caused by damage or destruction, eminent domain proceedings or actions, or Force Majeure, or (c) is caused by any act or omission of Landlord, or its employees, agents, or contractors. The limited exclusive rights granted to Tenant herein with respect to the Weaver Parcel shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of the entire Premises only.

6.    Paragraph 19(viii)(P). The reference to "Building #10" and "Building #11" is hereby deleted and "Building #8" is substituted therefor.

7.    Exhibit A-1. "Exhibit A-1" is hereby replaced with "Revised Exhibit A-1".

8.    Defined Terms. All capitalized terms in this First Amendment shall have the same meaning as provided in the Lease, unless ordinarily capitalized or otherwise defined herein.

9.    Effect of Amendment. Any provision of the Lease which is inconsistent with this First Amendment is hereby amended and superseded to the extent of such inconsistency. Except as specifically modified by this First Amendment, all of the terms and conditions of the Lease remain in full force and effect. This First Amendment and the Lease shall not be further modified in any manner other than by written modification executed by both Landlord and Tenant.

10.    Representations and Warranties. Landlord and Tenant represent and warrant to each other respectively that they have the requisite power and authority to enter into this First Amendment; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect this First Amendment; that the signatories executing this First Amendment on behalf of Landlord and Tenant have been duly authorized and empowered to execute this First Amendment on behalf of Landlord and Tenant, respectively; that this First Amendment and the Lease taken together constitute the entire understanding by and between the parties thereto, and

2

that there are no oral agreements or understandings between the parties hereto other than as specifically set forth in said documents; and that this First Amendment is valid and shall be binding upon and enforceable against and shall inure to the benefit of Landlord and Tenant and their respective successors and assigns.

IN WITNESS WHEREOF, Landlord and Tenant have caused this First Amendment to be executed on the day and year first above written.

LANDLORD:

**JP THORNTON LLC,**
a Colorado limited liability company

By:   **JORDON PERLMUTTER & CO.,**
      a Colorado corporation, Manager

      By: _____
          Jay Perlmutter
          Vice President

TENANT:

**CIRCUIT CITY STORES WEST COAST, INC.,**
a California corporation

By: _____

Its: _____

GUARANTOR:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

By: _____

Its: _____

## EXHIBIT FA-1

## LEGAL DESCRIPTION OF WEAVER TRACT

Tract C, Larkridge Subdivision Filing No. 1, a subdivision located in part of the east one-half of section 3 and the northwest one-quarter of section 2, township one south, range 68 west of the 6th principal meridian, County of Adams, State of Colorado, according to the official map thereof recorded October 27, 2004 in the Office of the Clerk and Recorder of Adams County, Colorado under reception number 20041027001078770.

LOCATION: THORNTON, CO

**LEASE**

Between

**CIRCUIT CITY STORES WEST COAST, INC.,**

as Tenant

and

**JP THORNTON LLC,**

as Landlord

dated May 2̲5̲, 2004

LARKRIDGE SHOPPING CENTER

## TABLE OF CONTENTS

Page

1. Leased Property .................................................................................................... 1
2. Construction Of Building And Improvements.................................................... 2
3. Lease Term............................................................................................................. 3
4. Base Rent ............................................................................................................... 4
5. Development Of Shopping Center By Landlord ................................................ 6
6. Easements .............................................................................................................. 7
7. Common Areas And Common Area Maintenance ............................................ 8
8. Signs And Communications Equipment............................................................ 12
9. Taxes..................................................................................................................... 14
10. Maintenance, Repairs And Replacements ........................................................ 16
11. Utility Service Provider: Payment Of Utility Bills .......................................... 18
12. Alterations............................................................................................................ 18
13. Mechanics' Liens ................................................................................................. 19
14. Insurance.............................................................................................................. 20
15. Damages By Fire Or Other Casualty ................................................................ 25
16. Condemnation ..................................................................................................... 27
17. Assignment And Subletting ................................................................................ 30
18. Use ........................................................................................................................ 32
19. Warranties, Representations And Covenants................................................... 33
20. Estoppel Certificates ........................................................................................... 41
21. Subordination, Non-Disturbance And Attornment ......................................... 43
22. Tenant's Financing.............................................................................................. 44
23. Tenant's Property And Waiver Of Landlord's Lien ....................................... 44
24. Memorandum Of Lease; Commencement Date Agreement........................... 45
25. Expiration Of Term And Holding Over............................................................ 45
26. Force Majeure ..................................................................................................... 45
27. Events Of Tenant's Default ................................................................................ 46

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 28. | Landlord's Remedies | 47 |
| 29. | Events Of Landlord's Default; Tenant's Remedies | 49 |
| 30. | Waiver | 53 |
| 31. | Compliance With Applicable Laws | 53 |
| 32. | Notices | 54 |
| 33. | Brokers | 54 |
| 34. | Miscellaneous | 55 |
| 35. | Effectiveness Of Lease; Tenant's Right To Terminate | 57 |
| 36. | Confidentiality | 60 |
| 37. | Intentionally Deleted | 60 |
| 38. | "For Rent" Signs | 61 |
| 39. | Cotenancy Requirement | 61 |
| 40. | Lease Guaranty | 62 |
| 41. | Right of Entry | 62 |

## EXHIBITS

"A"    Site Plan

"A-1"  Shopping Center Legal Description

"B"    Index of Definitions

"C"    Construction Provisions

"C-1"  Standard Design and Construction Specifications

"D"    Removable Trade Fixtures

"E"    Sign Plans and Criteria

"F"    Permitted Encumbrances

"G"    Subordination, Non-Disturbance and Attornment Agreement

"H"    Memorandum of Lease

"I"    Commencement Date Agreement

"J"    Indemnification Agreement

"K"    Lease Guaranty

Thornton, CO

## LEASE

This LEASE is made as of the 28th day of May, 2004, by and between **JP THORNTON LLC**, a Colorado limited liability company, having an address at 1601 Blake Street, Suite 600, Denver, Colorado 80202-1329 ("Landlord"), and **CIRCUIT CITY STORES WEST COAST, INC.**, a California corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

WITNESSETH:

The parties hereto agree as follows:

1. <u>Leased Property</u>. Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), commencing on the date (the "Delivery Date") of Landlord's "Delivery of the Shell" (as defined in the Construction Provisions attached hereto as <u>Exhibit "C"</u> and incorporated herein by reference for all purposes) to Tenant, as and when the building shell has been constructed on that approximately 33,862 square foot parcel (the "Land"), outlined on <u>Exhibit "A"</u> (the "Site Plan"), together with exclusive rights in the three (3) automobile loading stalls labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, the exclusive rights in the three (3) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and with the easements described in paragraph 6 below; all located in the Larkridge Shopping Center (herein referred to as the "Shopping Center"), located at the intersection of Colorado State Highway No. 7 and 164th Avenue, in the City of Thornton (the "City"), County of Adams, State of Colorado (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto. All of the Shopping Center exclusive of the Premises is "Landlord's Premises". Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Reciprocal Easement Agreement between Landlord and Home Depot (or a comparable replacement tenant or occupant reasonably acceptable to Tenant with a tangible net worth of not less than One Hundred Million Dollars ($100,000,000) occupying at least 100,000 square feet of gross leasable area), to be recorded against record title of the Shopping Center (the "REA"). Landlord covenants

and agrees that the REA shall not materially and adversely affect Tenant's rights or obligations under this Lease. Landlord agrees that it will not consent to, approve, or otherwise agree to any modification of the REA at any time during the term of this Lease which is materially inconsistent with the terms of this Lease, and to use its commercially reasonable efforts to exercise all approval rights granted Landlord under the REA in favor of enforcement of the terms hereof. Landlord further agrees that it will not consent to, approve or establish any rules and regulations applicable to the Shopping Center, as permitted under the REA, without Tenant's prior consent, which will not be unreasonably withheld, conditioned or delayed. Notwithstanding anything to the contrary set forth in this Lease, in the event of any material inconsistency between the terms of this Lease and the terms of the REA, as between Landlord and Tenant, the terms of this Lease shall control.

2. <u>Construction of Improvements</u>. Commencing immediately upon the Delivery Date, Tenant shall have the right to construct improvements to the one-story retail building shell (the "Shell") to be constructed by Landlord within the area more particularly shown on the Site Plan, containing approximately 33,862 square feet of ground-floor gross leasable area, including at Tenant's election, a non-sales area mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. That portion of the Building and the Other Improvements to be constructed by Tenant, i.e., excluding the Shell, are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion with due diligence in accordance with the "Tenant Fit-Out Plans" to be prepared by Tenant as specified in the Construction Provisions. Landlord shall provide Tenant with not less than ninety (90) days' prior written notice of the anticipated Delivery Date (the "Shell Delivery Notice"). Following receipt of the Shell Delivery Notice, Tenant shall have reasonable access rights to the Premises, so long as Tenant does not interfere with Landlord's construction of the Shell. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon

full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Building, the Other Improvements and the Land are referred to herein as the "Premises".

3. Lease Term. Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the Delivery Date and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the fifteenth (15th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above; provided, however, that in the event Landlord provides Tenant with such written notice of termination and Tenant fails to exercise its Renewal Option within such ten (10) business day period, then, at Landlord's option, the Main Term of the Lease shall automatically be extended by the amount of days necessary to cause the expiration date of the Lease to occur on the date which is one hundred eighty (180) days following the expiration of such ten (10) business day period.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12)

3

consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4. **Base Rent.** During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to paragraph 3 of the Construction Provisions) on the earlier of (i) the date upon which Tenant opens the Premises to the general public or (ii) the date on which Tenant is required to open the Premises to the general public as set forth in paragraph 18(c) below (the "Commencement Date"); provided, however, that if the Commencement Date occurs prior to the date on which Tenant has received from Landlord the Tenant Improvement Allowance as set forth in the Construction Provisions, Tenant shall commence payment of Ground Rent. For purposes of this Lease, "Ground Rent" shall equal the Base Rent pursuant to this Lease less the TIA Component (defined below).

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(a) **First Five Years.** During the first five (5) Lease Years, annual Base Rent shall equal the product of (A) the number of square feet of gross leasable area of the Store (as measured in accordance with the specifications set forth in Paragraph 7(c) below) and (B) the sum of (1) Nine and 87/00 Dollars ($9.87) per square foot and (2) the Tenant Improvement Allowance per square foot paid to Tenant by Landlord pursuant to the terms of the Construction Provisions, amortized over a 15-year period at a rate of seven percent (7%) (the "TIA Component"). For example, if Landlord paid to Tenant a Tenant Improvement Allowance of $32.64 per square foot of gross leasable area of the

4

Store, and the Store when constructed contained 33,862 square feet of gross leasable area, then the TIA Component would be Three and 52/00 Dollars ($3.52), and annual Base Rent would be Four Hundred Fifty-Three Thousand Four Hundred Twelve and 18/00 Dollars ($453,412.18), payable in equal monthly installments of Thirty-Seven Thousand Seven Hundred Eighty-Four and 35/00 Dollars ($37,784.35) (i.e., 33,862 square feet times $13.39 per square foot, i.e., the sum of $9.87 and $3.52).

(b)   *Adjustment in Base Rent.*   If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.  Annual Base Rent shall adjusted on the first day of the sixth (6th) and every succeeding fifth (5th) Lease Year, such that the Base Rent shall equal the product of the actual ground-floor leasable area of the Building multiplied by:

| | | |
|---|---|---|
| (i) | Years 6 – 10: | The sum of (1) $10.56 and (2) the TIA Component |
| (ii) | Years 11 – Main Term expiration date: | The sum of (1) $11.30 and (2) the TIA Component |
| (iii) | First Option: | $12.43 |
| (iv) | Second Option: | $13.67 |
| (v) | Third Option: | $15.04 |
| (vi) | Fourth Option: | $16.54 |

(c)   *Additional Rent.*   All sums payable by Tenant to landlord under this Lease not otherwise payable as Base Rent shall be deemed Additional Rent.  For the purposes of this Lease, Base Rent and Additional Rent shall sometimes hereinafter be collectively referred to as "Rent."  Except as otherwise specifically provided in this Lease, no abatement, refund, offset, diminution or reduction of Rent shall be claimed by or allowed to Tenant, or any person claiming under Tenant.

5.   *Development of Shopping Center by Landlord.*   Landlord covenants to construct, develop and operate a first-class shopping center.  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas"

5

designated on the Site Plan. Further, prior to the initial construction of the Shopping Center, Landlord reserves the right to realign the "Key Drive Aisle" designated on the Site Plan so long as there is no reduction in the number of parking spaces to the west of the Key Drive Aisle following such realignment. Thereafter, (a) Landlord shall make no changes (other than immaterial or de minimis changes, e.g., maintaining and/or replacing landscaping, lighting, signage and the like) in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, truck access routes, sidewalks or parking spaces or reduction of the parking ratio specified herein) without Tenant's express written consent, which consent may be withheld in Tenant's sole and absolute discretion, and (b) Landlord shall make no changes outside of Tenant's Preferred Area (but within Site A of the Shopping Center) which could have a material and adverse effect on (1) access to and from the Premises, (2) the parking and drive aisles serving the Premises, or (3) the visibility of the Premises, without Tenant's prior written consent, which consent shall not be unreasonably withheld or delayed.

Notwithstanding the foregoing, Landlord shall not be obligated to construct any portions of the Shopping Center outside of the "Phase 1 Site Improvements" designated on the Site Plan; provided that (a) such portions shall be rough graded and either paved or planted with grass seed and (b) in connection with any future construction, Landlord shall use commercially reasonable efforts to minimize any interference with the conduct of Tenant's business, including without limitation access to Tenant's Store or ingress or egress to and from the public roads, and in no event may any portion of Tenant's Preferred Area be used as a staging area.

The parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) five (5) spaces (for full-sized automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements (with up to five percent (5%) of such spaces designated as "compact spaces", so long as such designated spaces are located outside of the Tenant's Preferred Area). All parking shall be at ground level.

Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free and Landlord agrees to indemnify, defend and hold

6

Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord's construction shall not materially and adversely interfere with the conduct of Tenant's business.

6. _Easements_. Landlord also grants to Tenant those nonexclusive leasehold easements which shall run as covenants with Landlord's Premises and the Premises during the Term, over Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

(a) _Construction Easements_. After the Delivery Date, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") of approximately 5,000 square feet, within that portion of the Common Areas designated on the Site Plan as "Tenant's Staging Area", for Tenant's use in constructing the Improvements, (ii) an easement to permit the Building to abut adjacent buildings, and the foundations, footings, common walls and roof projections to bear structurally upon Landlord's Premises, (iii) an easement for all required underground, public or private utility easements for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.

(b) _Common Area Easements_. Landlord does hereby additionally grant to Tenant an easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of

7

any fee or other charge therefor. It is specifically agreed that with respect to the automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, to relocate the same to other areas adjacent to the Improvements, subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such automobile loading stalls shall be used exclusively by Tenant's customers, invitees and patrons. Tenant shall also have the right, subject to Landlord's prior written approval, which approval shall not be unreasonably withheld, delayed or conditioned, to install up to four (4) cart corrals within the parking area located in the Tenant's Preferred Area (or other mutually agreeable location), and Tenant shall be permitted to store its shopping carts outside of the Premises in such cart corrals; provided, however, that it shall be reasonable for Landlord to withhold its consent if Landlord cannot procure the consent of another tenant within the Shopping Center whose consent would be necessary if the location of the cart corral(s) would fall within a portion of the Common Area over which such other tenant has consent rights. Such cart corrals shall be installed and maintained by Tenant at its sole cost and expense. Tenant shall be responsible for keeping the Tenant's Preferred Area reasonably free of carts except in the cart corral. If Tenant fails to properly maintain the cart corrals, Landlord may, after notice and the expiration of the cure period reference in paragraph 29(a)(ii) below, require Tenant to remove such cart corrals.

    7.    <u>Common Areas and Common Area Maintenance.</u>

        (a)    <u>Definition of Common Areas.</u> The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as

8

defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a first-class manner, including cleaning, maintenance of Landlord's pylon and other sign structure(s), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)  CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) which shall not exceed seven percent (7%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(i)  real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(ii)  any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(iii)  maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect, or condition, to any interior mall space or to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas;

(iv)  repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction defect or condition in

9

existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(v) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(vi) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(vii) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(viii) repairs or replacements of a capital nature (whether or not capitalized) unless (A) such expenditure is reasonably necessary to keep the Common Area in the required condition and repair, and (B) the expenditure is amortized over the useful life of the item in accordance with generally acceptable accounting principles;

(ix) replacements of all or a portion of the parking lot or other paved areas more than once every four (4) "CAM Years" (as defined below);

(x) reserves for anticipated future expenses;

(xi) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(xii) Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(xiii) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(xiv) any new improvements to the Shopping Center or Common Areas, including but not limited to renovations to the facade of the Shopping Center and improvements to landscaped areas of the Shopping Center;

(xv) amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own premises; or

(xvi) other maintenance expenses not considered reasonable and customary in the Denver, Colorado metropolitan area shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords

10

of similar shopping centers in the City (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)     Tenant Payments. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord $1.11 per square foot of ground-floor gross leasable area in the Building per annum, payable in equal monthly installments, as its estimated share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period, including the first Lease Year, is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, on the first day of each month during such CAM Year. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated on the basis of a 360-day year. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of ground-floor gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant) within Site A of the Shopping Center. In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the exterior line of any exterior walls. Changes in applicable floor areas shall result in

corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 250,000 square feet. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d) <u>Examination of Landlord's Records</u>. Tenant shall have the right, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year during regular business hours at the office in which Landlord maintains its books and records; provided, however, that (i) Tenant shall deliver a copy of the results of such examination to Landlord within thirty (30) days after completion, (ii) Tenant shall not have the right to employ a contingent fee auditor and (iii) the results of such examination shall be kept confidential, except that Tenant may disclose, to the extent and in the manner that is the custom, such information to its agents, attorneys, auditors and other consultants. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within ten (10) days after written demand for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. If the examination discloses any underpayment by Tenant, Tenant shall pay to Landlord within thirty (30) days the amount of any such underpayment of Tenant's Pro Rata Share of CAM Charges.

8. <u>Signs and Communications Equipment</u>.

(a) <u>Signs</u>. Landlord, at its sole cost and expense, no later than the date set forth on <u>Attachment "1"</u> to the Construction Provisions, shall construct and install upon the Common Areas at the location so shown on the Site Plan (or such other location as mutually agreed upon in writing by Landlord and Tenant), a pylon sign structure (with electrical wired box installed) (the "Site A Pylon Sign") having sufficient space thereon for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense. As soon as practicable following the date hereof, but in no event later than August 1, 2004, Landlord shall submit to Tenant the sign criteria for the Shopping Center, including plans and

12