receives written notice of the Post-Execution Exclusives promptly after same are executed, (3) Tenant will be subject to the Post-Execution Exclusives only for so long as such exclusive(s) remain in force and effect in the Shopping Center and (4) in no event will any Post-Execution Exclusive prevent Tenant from displaying or selling any of the Products, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

        (c)     Subject to the other provisions of this Lease (including without limitation, (i) satisfaction of the Cotenancy Requirement pursuant to paragraph 39 below, (ii) Delivery of the Shell when and as required pursuant to Exhibit "C", (iii) Landlord's timely delivery of the Shell Delivery Notice, (iv) Substantial Completion of the Site Work by Landlord when and as required under Exhibit "C", and (iv) events of force majeure as set forth in paragraph 26 below), Tenant shall initially open its store for business to the public in all or substantially all of the Premises as a Circuit City store, fully fixturized and stocked with merchandise and inventory, for at least one (1) day on or before the date which is one hundred twenty (120) days following the Delivery Date. Other than as expressly set forth in the first sentence of this subparagraph (c), nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use. In the event Tenant fails to open its store for business to the public if and when required above, the damage to Landlord will be extremely difficult and impracticable to ascertain. In addition, Tenant wishes to limit its liability in event of its breach of this provision, and Landlord has agreed to such a limitation. The parties thus agree that should Tenant fail to open it store for business to the public if and when required above, the sole and exclusive remedy of Landlord shall be for Tenant to pay to Landlord an amount equal to Two Thousand Dollars ($2,000) per day (in addition to rent otherwise due and payable hereunder), until such time as Tenant has opened its store for business to the public, as liquidated damages; all other claims for damages or causes of action are hereby expressly waived by Landlord.

      19.     Warranties, Representations and Covenants.

        (a)     Landlord represents, warrants and covenants to Tenant that:

(i)       Quiet and Peaceful Enjoyment.  Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)      Title.   Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except   those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's right to operate its business in the Premises.  Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage. This representation, warranty and covenant is a material inducement to Tenant's execution of this Lease.

(iii)     Certificate of Authority.  Landlord covenants that it is a duly constituted limited liability company ("LLC") under the laws of the State of Colorado, and that its Manager, who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the LLC.  Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the LLC, and (b) the authority of the Manager to bind the LLC as contemplated herein.

(iv)     No Litigation.     There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

(v)      Hazardous or Toxic Materials.   Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or

34

intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    Tenant's Exclusive Use. So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products (excluding, however, from such exclusive such "other goods related to consumer, office and automotive electronics products as typically merchandised and sold in the majority of Tenant's stores in Colorado," referenced in paragraph 18 above), subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on Exhibit "F". Notwithstanding the foregoing, Tenant hereby agrees that the foregoing restriction shall not apply to (i) the following named tenants and occupants or categories of tenants and occupants selling the following merchandise as their primary use (and their successors and assigns), provided, however, that to the extent Landlord has the right to withhold its approval or consent to a proposed change in use with respect thereto, Landlord shall disapprove or withhold such consent with respect to any such change to a use which would violate the foregoing restriction: book retailers; office products retailers; computer/peripherals retailers; major music retailers; cellular phone

35

retailers; Car Toys; Radio Shack; home improvement stores and department stores in excess of 75,000 square feet; or general merchandise retailers in excess of 80,000 square feet (e.g., Target, Wal-Mart), (ii) a tenant from devoting up to the lesser of 10% or six hundred (600) square feet of the sales area of its premises to the display and sale of the Products as an incidental use to its primary use, or (iii) any occupant(s) of Major 4.

(vii)    Zoning and Subdivision.  The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    Prohibited Activities.  Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in Site A of the Shopping Center for use as:

(A)    a bar, pub, nightclub, music hall or disco which requires a tavern license under Colorado law to operate;

(B)    a bowling alley;

(C)    a billiard or bingo parlor;

(D)    a flea market;

(E)    a massage parlor;

(F)    a funeral home;

(G)    a facility for the sale of paraphernalia for use with illicit drugs;

(H)    an adult book store or adult theater or similar facility primarily selling or displaying pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)    an off-track betting parlor;

(J)    a carnival, amusement park or circus;

(K)    a body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K)), an auto parts store so long as there are no service or repair facilities (unless located more than seven hundred fifty (750) feet from the Premises), a gas station

36

(unless located more than seven hundred fifty (750) feet from the Premises, or unless appurtenant to Sears or Costco, or located on Pad 9); or any other automotive use (unless located more than seven hundred fifty (750) feet from the Premises, or unless appurtenant to Sears and/or Costco, if part of such retailer(s) typical operations);

        (L)    a facility for the sale of new or used automobiles, trailers or mobile homes (the parties specifically acknowledging that a home improvement store may sell self-propelled lawn mowers and the like);

        (M)    a facility for any use which is illegal or dangerous, or constitutes a nuisance;

        (N)    a skating rink;

        (O)    an arcade, pinball or computer gameroom (provided that retail facilities in Site A of the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations; provided, however, that a movie theater (which may be located in "Major 1" designated on the Site Plan) and entertainment-oriented facilities (e.g., Dave & Buster's) may be located within the "Entertainment Zone" designated on the Site Plan, and are excluded from the foregoing restriction;

        (P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses (except for offices and storage facilities incidental to a primary retail operation) within the In-Line Stores; provided, however, that the foregoing service oriented and nonretail uses shall be permissible within the buildings located within the buildings designated as "Building #10" and "Building #11" so long as such uses do not exceed, in the aggregate, 30,000 square feet of gross leasable area;

        (Q)    a banquet hall, auditorium or other place of public assembly;

        (R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind; provided, however, that a movie theater may be located within the "Entertainment Zone" designated on the Site Plan;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores, but excluding antique stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods;

(U)    a house of worship;

(V)    a mortuary or cemetery;

(W)    an industrial business;

(X)    a residential facility;

(Y)    a warehouse (unless incidental to a retail use); or

(Z)    a gymnasium, sport or health club or spa located within six hundred (600) feet of the front entrance to the Building.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building which is located within (a) three hundred (300) feet of the front entrance to the Building to the north or (b) two hundred (200) feet of the front entrance to the Building to the south (provided, however, that cafes and other casual food facilities incidental to a primary retail operation shall not be subject to the foregoing restriction). In addition, no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center (unless required by court order).

(ix)    Site Covenants.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

(A)    Building Height and Location.    No building immediately adjacent to the Premises shall exceed forty (40) feet in height above finished grade (including architectural features), nor shall any building within the In-Line Stores exceed forty (40) feet in height above finished grade (excluding architectural features), nor shall the Building immediately adjacent to the Premises be positioned so as to project beyond the portion of the front wall of the Premises except as otherwise shown on the Site Plan. No outparcels, barriers,

38

buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located on an outparcel in Site A of the Shopping Center shall exceed one story, twenty-six (26) feet in height (excluding architectural features of up to four (4) feet in height), nor shall it exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas. Except as set forth herein, no development shall occur within Site A of the Shopping Center except as shown on the Site Plan.

(B)     Construction and Alterations. Following the end of the initial build-out of the entire Shopping Center, no exterior construction and no construction staging in the Common Area shall be permitted within the "No-Construction Zone" shown on the Site Plan during the months of October, November and December without Tenant's prior written consent, except for emergency repairs and repairs or replacements that are necessary to prevent a breach or default under this Lease, a lease with any other occupant of the Shopping Center or Landlord's financing, provided that Landlord shall take all commercially reasonable steps to avoid all construction activity within Tenant's Preferred Area and otherwise to minimize interference with customers and the operations of all occupants of the Shopping Center, including Tenant. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary. With regard to any such construction, Landlord shall be solely responsible for any governmentally imposed impact fees, hookup, connection, installation or tap-in fees and other similar construction-related charges. Landlord shall make no changes (other than immaterial or de minimis changes, e.g., maintaining and/or replacing landscaping, lighting, signage and the like) in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, truck access routes, sidewalks or parking

39

spaces or reduction of the parking ratio specified herein) without Tenant's express written consent, which consent may be withheld in Tenant's sole and absolute discretion, and (b) Landlord shall make no changes outside of Tenant's Preferred Area which could have a material and adverse effect on (1) access to and from the Premises, (2) the parking and drive aisles serving the Premises, or (3) the visibility of the Premises, without Tenant's prior written consent, which consent shall not be unreasonably withheld or delayed.

(C)    Prohibited Uses in Common Area.    Landlord covenants that it shall not, without Tenant's express written consent (which consent shall not be unreasonably withheld as to items (1), (2) and (3) below), permit the following uses or activities to occur in the Common Areas within Site A of the Shopping Center: (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8 or the REA (other than for a theater tenant in the Entertainment Zone or for Home Depot (or comparable replacement tenant as provided in paragraph 39 below)), the "for rent" signs described in paragraph 38 and traffic control signs; (2) the periodic (i.e., from time to time only) display or sale of merchandise by tenants on the sidewalks immediately adjacent to their premises, so long as there is no unreasonable interference with pedestrian access; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee parking" areas, the location of which shall be agreed upon by Landlord, Tenant and such other occupants.

40

(D)    Easements.  Landlord shall not subdivide, parcel or otherwise divide Site A of the Shopping Center or create any easements in the Common Areas that materially and adversely affect Tenant without Tenant's prior written consent.

(x)    Interference with Tenant's Reception/Transmission. Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.  Landlord shall cooperate with Tenant to eliminate any such interference if any such installation interferes with Tenant's reception or transmission.   Tenant shall cooperate with Landlord to eliminate any such interference with Tenant's reception or transmission (e.g., by moving or adjusting its transmission equipment to try to eliminate any such interference).

(xi)    Notices Affecting the Premises.  Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises.

(xii)    Constructive Trust.  Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    Tenant's Authority.    Tenant is a duly constituted corporation organized under the laws of the state of California; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    Tenant's Warranty as to Hazardous or Toxic Materials.  As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping

41

Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect (with the exception of those set forth in paragraphs 19(a)(v) and (b)(ii), which are governed as set forth therein), or in the event that either Landlord or Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, (i) Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder (excluding, however, special or consequential damages), and (ii) Tenant shall defend, indemnify and hold Landlord harmless from any of such loss, costs, liability or damage (excluding, however, special or consequential damages) incurred as a result of Tenant's breach hereunder.

20.    Estoppel Certificates.

(a)    Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

(b)    In the event Tenant subleases all or substantially all of the Premises for a term of at least five (5) years to a person or entity which has (or to a person or entity whose obligations under such sublease are guaranteed by a person or entity which has), as of the effective date of such sublease, a net worth of at least Twenty Million ($20,000,000.00) Dollars (with the instrument of sublease in such a case being hereinafter referred to as a "Qualified Sublease", and with the subtenant in such a case hereinafter referred to as the "Qualified Subtenant") then, notwithstanding any other provisions of this Lease:

(i)    Upon Tenant's request, Landlord agrees that it shall execute a Non-Disturbance Agreement (hereinafter, an "NDA") among Landlord, Tenant and the Qualified Subtenant pursuant to which Landlord agrees (1) when giving notice to Tenant in respect of any default, to also give a copy of such notice to the Qualified Subtenant, and no notice of default shall be effective until a copy thereof is so given to the Qualified Subtenant, and (2) in the event this Lease is terminated because of such Tenant default, the Qualified Subtenant shall have the option, exercisable by the giving of notice by the Qualified Subtenant to Landlord within ten (10) days after receipt by the Qualified Subtenant of notice from Landlord that the Lease has been terminated, to cure any such default [but only if such default is of a monetary nature or is otherwise reasonably susceptible of cure by the Qualified Subtenant, and, if such is not the case, the Qualified Subtenant shall have no obligation to cure such default as a condition to the exercise by the Qualified Subtenant of any of the Qualified Subtenant's rights set forth in this subsection 20(b)], and become tenant under a new lease for the remainder of the term of the Qualified Sublease (including any Option Periods) upon all of the same terms and conditions as then remain under this Lease (and the Rent payable by the Qualified Subtenant under the terms of such direct lease shall be equal to the greater of (A) the Base Rent and Additional Rent then payable under this Lease, prorated on the basis of the ratio which the gross leasable floor area of the subleased premises bears to the gross leasable floor area of the Premises, or (B) the fixed rent and additional rent then payable under the sublease);

(ii)    From and after the effective date of the Qualified Sublease, all non-disturbance agreements obtained by Landlord in accordance with the provisions

43

of paragraph 21(b) below shall afford the Qualified Subtenant the same rights and protections as are afforded to Tenant thereunder; and

(iii)   Tenant will indemnify, defend and hold Landlord harmless from and against the brokerage commissions, finder's fees or any other similar charges that may arise in connection with such Qualified Sublease. This clause shall survive the expiration or earlier termination of the Lease.

21.   Subordination, Non-Disturbance and Attornment.

(a)   Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Ground Leases (as defined below) and any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a non-disturbance and attornment agreement in the form of Exhibit "G" hereto attached, executed by Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage ("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" (as may be modified in a manner consistent with the then current modifications generally agreed upon by Tenant) executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages. Upon Tenant's receipt and execution of said non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage. Landlord shall cause any present or future Mortgagee or Ground Lessor to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Shopping Center, as set forth in paragraph 35(b) below, or Ground Lease is executed, as applicable. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Shopping Center or any part thereof.

(b)   Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its Qualified Subtenants providing, in part, that, in

44

the event of any termination of this Lease, all of the rights of any such Qualified Subtenant(s) under a Qualified Sublease will be recognized so long as any such Qualified Subtenant is not in default under its Qualified Sublease beyond notice and cure periods, provided that as a pre-condition thereto such Qualified Subtenant agrees that it will executed an NDA with Landlord as set forth in paragraph 20(b) above.

22.    Tenant's Financing. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement (provided that the form and substance thereof are reasonably acceptable to Landlord and/or its lender) and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure).  In addition, Landlord agrees to use commercially reasonable efforts to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 23 below.

23.    Tenant's Property and Waiver of Landlord's Lien.  All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".) Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

24.     Memorandum of Lease; Commencement Date Agreement.  Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as Exhibit "H", setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I", once the Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.     Expiration of Term and Holding Over.  At the expiration or earlier termination of the Lease, Tenant shall surrender the Premises broom-clean and otherwise in the condition required pursuant to the provisions of this Lease.  Should Tenant hold over without the express written consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding year of the Lease.

26.     Force Majeure.  Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) of this Lease.

27.     Events of Tenant's Default.  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    <u>Failure to Pay Rent; Breach</u>.  (i) Tenant's failure to make any payment of Base Rent or Additional Rent required by this Lease (subject to Tenant's right of good faith contest, i.e., to pay under protest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion.  In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.  The 10-day and 30-day notices from Landlord to Tenant referenced herein shall be in addition to, and not in lieu of, any statutory notice for eviction or foreclosure proceedings required under the laws of the State; provided, however, that such notices may expire concurrently (i.e., Landlord shall have the right to serve Tenant with any such statutory notice such that the expiration of the statutory notice period coincides with the expiration of the 10-day or 30-day notice period).

(b)    <u>Bankruptcy</u>.  Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within ninety (90) days after it is begun.

(c)    <u>Abandonment</u>. Tenant's abandonment (but not vacation) of the Premises before the end of the Term, which abandonment is not cured within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion.

47

28.    Landlord's Remedies.    After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)    Continue Lease.    Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and Additional Rent when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, upon such terms and conditions as Landlord may, in its sole but reasonable discretion, deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation reasonable renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If such rentals and other sums received from such reletting during any month will be less than that to be paid during that month by Tenant under the Lease, Tenant shall pay such deficiency to Landlord; if such rentals and such sums shall be more, Tenant shall have no right to, and shall receive no credit for, the excess. Such deficiency shall be calculated and paid monthly. No such re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease unless written notice of such intention be given from Landlord to Tenant or unless the termination thereof be decreed by a court of competent jurisdiction. Landlord shall have the right to bring one or more actions for rent under this Lease from time to time. In the event of any entry or taking possession of the Premises as aforesaid, Landlord shall, subject to paragraph 22 above, have the right, but not the obligation, to remove therefrom all or any part of the personal property located therein and may place the same in storage in a public warehouse at the expense and risk of Tenant and/or the owner or owners thereof.

(b)    Terminate Lease.    Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date

48

so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

> (i)      The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination;

> (ii)     The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation; and

> (iii)    Any other amount necessary to compensate the Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to interest, transaction costs and attorneys' fees.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of eight percent (8%) for past due obligations, and a discount rate to net present value equal to the discount rate of the Federal Reserve Bank situated nearest to the location of the Shopping Center at the time of the award, plus two hundred (200) basis points on anticipated future obligations, on the amount of the obligations payable on the date of such calculation. In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

> (c)      Remedies Are Cumulative. The various rights, remedies, elections and powers reserved to Landlord in this Lease are cumulative, and Landlord may pursue any and all such rights, remedies, elections and powers (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise,

without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

29.    Events of Landlord's Default; Tenant's Remedies.

(a)    Default by Landlord.    Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33 hereof, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, it being agreed that with respect to the dates set forth therein time is of the essence.

(b)    Remedies Upon Landlord's Default.    Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i)

50

above; provided, however, that except in emergency situations (i.e., a situation involving imminent danger to persons or property), in which event only such notice as is reasonable under the circumstances shall be required, prior to exercising any such self-help remedies available under this Lease, at law or in equity, Tenant shall be required to deliver to Landlord a second written notice, and Tenant may not exercise such self-help remedies unless Landlord fails to cure such Event of Default within five (5) business days following delivery by Tenant to Landlord of such second notice. If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein. All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced only by judicial means available under State law, or any other applicable proceedings. The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise. Notwithstanding the foregoing to the contrary, Tenant agrees that its right to offset its costs due hereunder shall be limited (the "Offset Limitation") to twenty-five percent (25%) of the Base Rent and one hundred percent (100%) of the Additional Rent and any and all other amounts and charges due Landlord hereunder, provided that such limitation on offsetting under this Lease shall not apply (1) to the Tenant Improvement Allowance or (2) if Tenant has obtained a judgment against Landlord and Landlord has failed to pay such judgment within ten (10) days thereafter.

(c)    <u>Additional Tenant Remedies Due to Delays by Landlord.</u>  On or before February 1, 2005, Landlord shall notify Tenant in writing, if it will not be able to complete the Site Work and accomplish Delivery of the Shell in the condition specified herein by July 1, 2005 (the "Outside Delivery Date"). If Landlord either (i) notifies Tenant that it will not be able to complete the Site Work and accomplish Delivery of the Shell in the condition specified herein by the Outside Delivery Date, or (ii) has not notified Tenant that it will not be able to complete the Site Work and accomplish

51

Delivery of the Shell in the condition specified herein by the Outside Delivery Date but in fact fails to do so, regardless of force majeure, then in either case, Tenant shall have the right, in its sole and absolute discretion, to elect to either (A) terminate this Lease, upon written notice to Landlord, in which event this Lease shall be automatically terminated and the parties shall have no further rights or obligations hereunder except as specified in this Lease, or (B) agree to permit Landlord to extend (x) the date by which Landlord shall complete the Site Work and accomplish Delivery of the Shell in the condition specified herein to March 21, 2006, the (y) the Outside Delivery Date to July 1, 2006, and (z) the completion dates for each of the elements of the Landlord Work set forth in Attachment "1" of Exhibit "C" attached hereto (the Construction Schedule) by one (1) year.  In the event that Landlord completes the Site Work and accomplishes Delivery of the Shell in the condition specified herein after March 21, 2005 (or March 21, 2006, as the case may be) but on or before the Outside Delivery Date, Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs (if any) incurred as a result thereof in the exercise of all reasonable efforts to open for business by November 1, 2005 (or November 1, 2006, as the case may be); provided Tenant has notified Landlord in writing that it anticipates that such costs will be incurred.  Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay.

In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Shell by the Outside Delivery Date, or to complete any subsequent element of the Landlord Work by the completion date established therefor in Attachment "1" of Exhibit "C" attached hereto (the Construction Schedule), as such dates may be extended as provided in the foregoing paragraph, Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for Delivery of the Shell or, as applicable, any element of the Landlord Work which has not been timely