Gregg M. Galardi, Esq.          Dion W. Hayes (VSB
Ian S. Fredericks, Esq.         No. 34304)
SKADDEN, ARPS, SLATE,           Douglas M. Foley (VSB
MEAGHER & FLOM, LLP             No. 34364)
One Rodney Square               MCGUIREWOODS LLP
PO Box 636                      One James Center
Wilmington, Delaware            901 E. Cary Street
19899-0636                      Richmond, Virginia 23219
(302) 651-3000                  (804) 775-1000

              - and -

Chris L. Dickerson, Esq.
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM, LLP
155 North Wacker Drive
Chicago, Illinois 60606-
1720
(312) 407-0700

Counsel to the Debtors and
Debtors in Possession

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

- - - - - - - - - - - - - - x
In re:                       :   Chapter 11
                             :
CIRCUIT CITY STORES, INC.,   :   Case No. 08-35653 (KRH)
et al.,                      :
                             :
            Debtors.         :   Jointly Administered
- - - - - - - - - - - - - - x

**DEBTORS' RESPONSE TO CREDITORS GENTRY, HERNANDEZ, CARD
AND SKAF'S OMNIBUS MOTION REQUESTING AN ORDER APPLYING
BANKRUPTCY RULE 7023 TO THEIR CLASS PROOFS OF CLAIM
PURSUANT TO BANKRUPTCY RULE 9014(C)**

## TABLE OF CONTENTS

Page

BACKGROUND......................................................1

RESPONSE........................................................7

ARGUMENT........................................................8

I.    THE STANDARD FOR FILING CLASS PROOFS OF CLAIM.............9

II.   THE MOTION IS UNTIMELY..................................11

      A.    The Named Claimants Should Have Filed The
            Motion In Conjunction With The Filing Of The
            Class Claims....................................11

      B.    The Named Claimants Failure To Timely File
            The Motion Causes Undue Prejudice To The
            Debtors.........................................16

III.  ALLOWING THE CLASS CLAIMS AS CLASS PROOFS OF CLAIM
      WOULD BE INFERIOR TO INDIVIDUAL CLAIM ADJUDICATION......20

      A.    The Bankruptcy Claims Process Is Superior To
            The Class Action Process........................21

      B.    The Unnamed Claimants Have Received Adequate
            Notice..........................................23

      C.    Even If Notice To The Unnamed Claimants Were
            Inadequate, The Unnamed Claimants Should Not
            Be Permitted To Proceed On The Class Claims.....32

IV.   ALLOWING THE CLASS CLAIMS AS CLASS PROOFS OF CLAIM
      WOULD UNDULY COMPLICATE AND DELAY THE
      ADMINISTRATION OF THESE CASES..........................35

V.    THE COSTS OF CLASS LITIGATION OUTWEIGH THE
      BENEFITS...............................................38

VI.   THERE IS NO EQUITABLE ESTOPPEL BASIS FOR ALLOWING
      THE CLASS CLAIMS AS CLASS PROOFS OF CLAIM..............41

CONCLUSION.....................................................43

The debtors and debtors in possession in the above-
captioned cases (collectively, the "Debtors")[1], pursuant to
sections 105 and 502 of title 11 of the United States Code
(the "Bankruptcy Code") and Rules 2002, 3007, 7023, 9007 and
9014 of the Federal Rules of Bankruptcy Procedure (the
"Bankruptcy Rules"), submit this response (the "Response") to
Creditors Gentry, Hernandez, Card and Skaf's Omnibus Motion
Requesting An Order Applying Bankruptcy Rule 7023 To Their
Class Proofs of Claim Pursuant to Bankruptcy Rule 9014(c) (the
"Motion").  In support of the Response, the Debtors
respectfully represent as follows:

**BACKGROUND**

**A.    The Chapter 11 Cases.**

On November 10, 2008 (the "Petition Date"), the
Debtors each filed a voluntary petition in the United States
Bankruptcy Court for the Eastern District of Virginia (the
"Court") under chapter 11 of the Bankruptcy Code.

---

[1]  The Debtors and the last four digits of their respective taxpayer
    identification numbers are as follows: Circuit City Stores, Inc. (3875),
    Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875),
    Ventoux International, Inc. (1838), Circuit City Purchasing Company, LLC
    (5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia,
    Inc. (2821), Circuit City Properties, LLC (3353), Kinzer Technology, LLC
    (2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs,
    Inc.(6796), Sky Venture Corp. (0311), PRAHS, INC. (n/a), XSStuff, LLC
    (9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
    LLC (3360), and Circuit City Stores PR, LLC (5512).  The address for the
    Debtors is 4951 Lake Brook Drive, Suite #500, Glen Allen, VA 23060.

The Debtors have continued as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").  To date, no trustee or examiner has been appointed in these chapter 11 cases.

On September 29, 2009, the Debtors and the Creditors' Committee filed the First Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors In Possession and its Official Committee of Creditors Holding General Unsecured Claims (the "Plan"). The associated disclosure statement (the "Disclosure Statement") was approved on September 24, 2009, and the hearing on confirmation of the Plan is currently scheduled for May 11, 2010.  Generally, the Plan provides for the liquidation of the Debtors under chapter 11 of the Bankruptcy Code.

On April 1, 2009, the Court entered the Order Establishing Omnibus Objection Procedures and Approving the Form and Manner of Notice of Omnibus Objections (the "Objection Procedures Motions," D.I. 2881) establishing

procedures (the "Objection Procedures") for the filing of

omnibus objections in the Debtors' chapter 11 cases.

**B.    The General Bar Date.**

On November 12, 2008, the Court appointed Kurtzman

Carson Consultants LLC ("KCC") as claims, noticing and

balloting agent for the Debtors in these chapter 11 cases,

pursuant to 28 U.S.C. § 156(c) (D.I. 108).

On December 10, 2008, the Court entered that certain

Order Pursuant to Bankruptcy Code Sections 105 and 502 and

Bankruptcy Rules 2002, 3003(c)(3), and 9007 (I) Setting

General Bar Date and Procedures for Filing Proofs of Claim;

and (II) Approving Form and Manner of Notice Thereof (the

"Claims Bar Date Order," D.I. 890).

Pursuant to the Claims Bar Date Order, the deadline

for filing all "claims" (as defined in Bankruptcy Code section

105(5)) arising before November 10, 2008 against the Debtors

by any non-governmental entity was 5:00 p.m. (Pacific) on

January 30, 2009 (the "General Bar Date").

On December 19, 2008, KCC served a copy of the

Claims Bar Date Notice (as defined in the Claims Bar Date

Order) on over 370,000 parties, including counsel ("Class

Counsel") to the Named Claimants (as defined herein), the

Debtors' employees for the three years prior to the Petition

3

Date and any parties with pending litigation or employee grievance claims against the Debtors.  (D.I. 1314).  In addition, the Debtors published the Claims Bar Date Notice in The Wall Street Journal (D.I. 1395) and The Richmond Times-Dispatch (D.I. 1394).

**C.   The Pre-Petition Class Action Complaints.**

Robert Gentry ("Gentry"), Jonathan Card ("Card"), Jack Hernandez ("Hernandez") and Joseph Skaf ("Skaf") have filed certain class action complaints against Circuit City Stores, Inc. ("Circuit City") in Los Angeles Superior Court in California, copies of which are attached to the Motion as Exhibits 1, 2, 4 and 5 (collectively, the "Class Action Lawsuits").  Gentry's Class Action Lawsuit was filed on August 29, 2002.  Hernandez's Class Action Lawsuit was filed on April 17, 2008.  Card's Class Action Lawsuit was filed on November 4, 2008 -- six days before the Petition Date.  Skaf's Class Action Lawsuit was filed on December 19, 2008 -- over one month after the Petition Date and in violation of the automatic stay.  As a result of the Debtors' bankruptcy, the Class Action Lawsuits were stayed.  To date, there has been no certification of a class in any of the Class Action Lawsuits.

4

In the Class Action Lawsuits, the Named Claimants,[2] on behalf of themselves and all those similarly situated, seek two forms of relief.  First, the Named Claimants seek damages for conversion, as well as violations of the California Labor Code and Business and Professions Code.  Second, the Named Claimants seek injunctive relief against Circuit City on account of the alleged labor violations.

**D.    The Class Claims.**

On January 13, 2009, Gentry filed claim number 6039 (the "Gentry Class Claim") on behalf of himself and all those similarly situated (the "Gentry Unnamed Claimants").  On January 13, 2009, Card filed claim number 6040 (the "Card Class Claim") on behalf of himself and all those similarly situated (the "Card Unnamed Claimants").  On January 13, 2009, Hernandez filed claim number 6045 (the "Hernandez Class Claim") on behalf of himself and all those similarly situated (the "Hernandez Unnamed Claimants").  On January 30, 2009, Skaf filed claim number 8717 (the "Skaf Class Claim") on behalf of himself, Gustavo Garcia ("Garcia"), Miguel Perez ("Perez") and all those similarly situated (the "Skaf Unnamed Claimants").

---

[2]   Gentry, Card, Hernandez, Skaf, Garcia and Perez are referred to collectively herein as the "Named Claimants".

Each of the Class Claims[3] asserts a claim for the
amounts allegedly due under the respective Class Action
Lawsuit on account of violations of the California labor laws.
Collectively, the Class Claims seek close to $150 million.

On June 22, 2009, the Debtors filed the Debtors'
Nineteenth Omnibus Objection to Claims (Reclassification of
Certain Misclassified Claims to General Unsecured, Non-
priority Claims) (the "Nineteenth Omnibus Objection").  On
August 20, 2009, the Debtors filed the Debtors' Thirty-First
Omnibus Objection to Claims (Disallowance of Certain Legal
Claims) (the "Thirty-First Omnibus Objection" and, together
with the Nineteenth Omnibus Objection, the "Objections").  By
the Objections, the Debtors objected to the Class Claims.

On February 25, 2010, the Debtors filed the
Supplemental Objections[4] in which the Debtors further objected
to the Class Claims and asserted that the Class Claims should
be disallowed to the extent that they sought relief with

---

[3]   The Gentry Class Claim, the Card Class Claim, the Hernandez Class Claim,
      and the Skaf Class Claim are referred to collectively herein as the
      "Class Claims".

[4]   The "Supplemental Objections" are (i) the Debtors' Supplements to the
      Nineteenth Omnibus Objection to Claims (Reclassification of Certain
      Misclassified Claims to General Unsecured, Non-Priority Claims) with
      respect to the Gentry Class Claim (D.I. 6642) and the Hernandez Class
      Claim (D.I. 6661) and (ii) the Debtors' Supplements to the Thirty-First
      Omnibus Objection to Claims (Disallowance of Certain Legal Claims) with
      respect to the Card Class Claim (D.I. 6660) and the Skaf Class Claim
      (D.I. 6646).

6

respect to the Unnamed Claimants[5] and reduced to the amounts asserted solely by the Named Claimants.  The Debtors asserted that the Class Claims should be so reduced because the Named Claimants failed to seek Court authorization to file class proofs of claim as required by Rules 9014 and 7023 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

On March 25, 2010, the Court held a hearing (the "Hearing") with respect to the Supplemental Objections at which the Court found that the Named Claimants were required to file a motion under Bankruptcy Rule 9014 to make Bankruptcy Rule 7023 applicable to the Class Claims.  <u>See</u> Transcript of March 25, 2010 Hearing[6] at 87-89.  The Court authorized the Named Claimants to file such motions, without prejudice to any party's right to object to such motions, including on the grounds that such motions were untimely.  <u>Id.</u> at 89.

On March 31, 2010, the Named Claimants filed the Motion.

## RESPONSE

By the Motion, the Named Claimants request that the Court make Bankruptcy Rule 7023 applicable in their contested

---

[5]   The Gentry Unnamed Claimants, the Card Unnamed Claimants, the Hernandez Unnamed Claimants, and the Skaf Unnamed Claimants are referred to collectively herein as the "Unnamed Claimants".

[6]   A true and correct copy of the Transcript of the March 25, 2010 Hearing is attached hereto as <u>Exhibit A</u>.

matters such that they may be authorized to file the Class
Claims as class proofs of claims.  For the reasons set forth
herein, the Debtors submit that the Named Claimants have
failed to meet the standards for filing class proofs of claim
under Bankruptcy Rules 9014(c) and 7023.  In summary, the
Named Claimants have not satisfied the applicable standard for
the following reasons: (1) the filing of the Motion, and by
extension, class proofs of claim, at this stage of the
Debtors' chapter 11 cases is not timely and would unduly
prejudice the Debtors; (2) class litigation is inferior to the
claims resolution process afforded by a bankruptcy; (3) class
proofs of claim would unduly complicate the administration of
these cases; and (4) the costs of class litigation outweigh
the benefits.

**ARGUMENT**

In the Motion, the Named Claimants assert that they
should be granted authority to file class proofs of claim.  In
so asserting, the Named Claimants argue that, under the law in
other Circuits, their Motion is not untimely, Motion at 1, 2,
6-10, and that they otherwise have satisfied the requirements
for the application of Rule 7023.  Motion at 10-16.

The Debtors disagree.  The Debtors submit that the
Motion, coming more than one year after the General Bar Date,

is long overdue.  The Debtors further assert that, even if the
Court were not to reject the Motion as untimely, the Named
Claimants have failed to meet their burden of establishing
that the claims of the Unnamed Claimants should proceed as
class proofs of claim.

I.    **THE STANDARD FOR FILING CLASS PROOFS OF CLAIM.**

        "Although class proofs of claim may be permitted,
they are not a matter of right."  See In re Computer Learning
Centers, Inc., 344 B.R. 79, 85-86 (Bankr. E.D. Va. 2006); see
also In re American Reserve Corp., 840 F.2d 487, 494 (7th Cir.
1988) (holding Federal Rule of Civil Procedure 23 governing
class actions "may apply throughout a bankruptcy case at the
bankruptcy judge's discretion").  As such, to properly file a
class proof of claim, the claimant must first file a motion
for determination of applicability of Bankruptcy Rule 7023.
See Computer Learning, 344 B.R. at 86 ("The applicability of
Rule 7023 is raised by motion.").

        If would-be class claimants fail to comply with the
required procedures, they are ineligible to file class proofs
of claim.  See Computer Learning, 344 B.R. at 87 ("[W]ithout
[a court order], Rule 7023 is not applicable to the proof of
claim and a class proof of claim is improper."); see also Reid
v. White Motor Corp., 886 F.2d 1462, 1470-71 (6th Cir.

9

1989)(finding that the bankruptcy court did not abuse its
discretion in denying a class proof of claim where the
claimant "failed to timely petition the bankruptcy court to
apply the provisions of Rules 9014 and 7023").

Once a Bankruptcy Rule 7023 motion is filed, the
bankruptcy court has the discretion to deny such a motion.
See Computer Learning, 344 B.R. at 89 (denying the Rule 7023
motion as untimely).  In this jurisdiction, there are four
considerations that are relevant to the inquiry.  These
considerations are: (i) the timeliness of the motion to make
Bankruptcy Rule 7023 applicable to the proof of claim; (ii)
whether class adjudication is superior to adjudication of
individual claims in bankruptcy; (iii) whether a class proof
of claim would unduly complicate or delay the administration
of the bankruptcy case; and (iv) the benefits and costs of
class litigation.  Computer Learning, 344 B.R. at 86, 92
(citing American Reserve, 840 F.2d at 492-94; White Motor
Corp., 886 F.2d at 1463-64).

In considering these factors, courts have recognized
that certain aspects unique to bankruptcy law may make
application of the class action rules unnecessary in that
context.  Computer Learning, 344 B.R. at 86 (citing American
Reserve, 840 F.2d at 492-94).  These aspects include the

10

bankruptcy court's control over the debtor and its property,
the special notice given in bankruptcy proceedings, and the
opportunity to file an individual proof of claim.  Id.
(citations omitted).

**II.  THE MOTION IS UNTIMELY.**

   **A.   The Named Claimants Should Have Filed The Motion In
         Conjunction With The Filing Of The Class Claims.**

        While Bankruptcy Rule 9014 does not provide a
deadline for filing a Bankruptcy Rule 7023 motion, it "should
be filed as soon as practicable and should be denied if it
comes so late as to prejudice any party."  Computer Learning,
344 B.R. at 89 (emphasizing that early application of Rule
7023 "furthers the policy of an orderly and expeditious
administration of the bankruptcy estate").

        Here, the Motion was not filed until March 31, 2010,
more than a year after the General Bar Date and months after
the Debtors first filed objections to the Class Claims.
Nonetheless, the Named Claimants maintain that the Motion is
timely.  Motion at 6-10.  In so asserting, the Named Claimants
rely heavily on case law from the Seventh and Eleventh
Circuits.  Id.  In addition, the Named Claimants assert that
the late filing should be excused because the Debtors filed
no "substantive" objections to the Class Claims until February
25, 2010 and did not explicitly contest the class action

                            11

aspect of the Class Claims until that date.  Id.  These

arguments fail for several reasons.

First, the law in this District, clearly established

in Computer Learning, is that a contested matter exists upon

the filing of a class proof of claim, not upon filing of an

objection.  In reaching this conclusion, the Computer Learning

Court considered at length the Eleventh Circuit's decision in

Certified Class v. The Charter Co. (In re The Charter Co.),

876 F.2d 866 (11th Cir. 1989), on which the Named Claimants

rely.  The Computer Learning Court found that, while Charter

Co. suggested that the filing of an objection creates a

contested matter such that a Rule 7023 motion need not be

filed until after the filing of an objection, "this argument

is generally used as textual support that class proofs of

claim are permissible, not to determine the timeliness of the

filing of the Rule 7023 motion."  Computer Learning, 344 B.R.

at 88.  The Computer Learning Court then proceeded to

expressly reject that position with respect to the timeliness

of a Bankruptcy Rule 7023 motion.

Specifically, the Court stated that, "[i]n fact, the

issue in controversy is whether the proof of claim may be

filed as a class proof of claim in the first instance.  This

is the contested matter.  It is resolved by filing a Rule 7023

motion which itself commences the contested matter.   Logically,
the Rule 7023 motion should be granted before a class proof of
claim is filed. . . .   A Rule 7023 motion filed [after
objection to the class proof of claim] is merely an attempt to
remedy an obvious defect that will otherwise certainly result
in disallowance of the claim."   Id. at 88-89.

        The Seventh Circuit case on which the Named
Claimants rely likewise provides no support for their position.
As the Named Claimants cited, the Seventh Circuit stated that,
"Rule 9014 . . . allows bankruptcy judges to apply Rule 7023 –
and thereby Fed. R. Civ. P. 23, the class action rule – to
'any stage' in contested matters.   Filing a proof of claim is
a 'stage'. . . ."   Motion at 6 (citing American Reserve, 840
F.2d at 488 (emphasis added)).   Thus, the American Reserve
court appears to agree that a contested matter exists upon
filing of a proof of claim.   As such, the filing of a motion
for application of Bankruptcy Rule 7023 would be appropriate
at that time.

        Moreover, Computer Learning makes clear that proofs
of claim may not be filed as class proofs of claim absent a
court order making Bankruptcy Rule 7023 applicable.   Id. at 87.
Accordingly, the Class Claims, while filed before the General
Bar Date, are not yet deemed to be class proofs of claim.

                              13

Thus, by filing the Motion at this time -- more than a year

after the General Bar Date -- the Named Claimants are

essentially seeking authorization to file proofs of claim well

after the time prescribed for doing so.  Where claimants seek

to file late proofs of claim, the claimants must establish

that "the failure to [timely] act was the result of excusable

neglect."  Fed. R. Bankr. P. 9006(b).

    The burden of proving excusable neglect lies with

the claimant seeking to file a late proof of claim. See Export

Development Canada v. Circuit City Stores, Inc., 08-35653 (KRH)

(Bankr. E.D. Va. Feb. 2, 2010); see also Thompson v. E.I.

DuPont de Nemours & Co., Inc., 76 F.3d 530, 534 (4th Cir. 1996)

("'[T]he burden of demonstrating excusability lies with the

party seeking the extension...'" (quoting In re O.P.M. Leasing

Serv., Inc., 769 F.2d 911, 917 (2d. Cir. 1985))).

    Here, the Named Claimants have made no attempt to

demonstrate excusable neglect[7] and, thus, have plainly failed

---

[7]   In Pioneer Inv. Servs. Co. v. Brunswick Ass'n Ltd. P'ship, 507 U.S. 380
(1993), the Supreme Court established a two-part test to determine
whether a claimant's failure to act in accordance with the filing
deadline was due to "excusable neglect." Id. at 395. Under the Pioneer
framework, a court must first determine whether the claimant's failure
to file in a timely manner was the result of neglect. See id. at 394;
see also Huennekens v. Marx (In re Springfield Contracting Corp.), 156
B.R. 761, 765 (Bankr. E.D. Va. 1993) (holding that the Supreme Court had
established a two-part inquiry for determining whether a party's failure
to act was due to "excusable neglect," the first question being whether
the failure to act was due to neglect).

                                                        (cont'd)

to carry their burden.  Consequently, the Named Claimants'
efforts to untimely seek authorization to file the Class
Claims as class proofs of claim should not be permitted and
the Motion should be denied.

Even assuming, _arguendo_, however, that the Named
Claimants were entitled to wait until the Debtors objected to
the Class Claims, the Debtors first filed the Objections in
June and August of 2009, more than seven months before the
filing of the Motion.  The Named Claimants argue, in response,
that these objections were not "substantive" objections which
triggered the requirement to file a Bankruptcy Rule 7023
motion.  Motion at 7.  This argument in unavailing for several
reasons.

First, in order to argue that the Objections were
not substantive objections, the Named Claimants rely on an
email from Debtors' counsel, attached as Exhibit 7 to the
Motion.  However, that email plainly references only the

_____

_(cont'd from previous page)_
    Next, the court must determine whether that neglect was excusable.  In
    _Pioneer_, the Court held that the determination of whether the claimant's
    neglect is excusable is "at bottom an equitable one, taking account of
    all relevant circumstances surrounding the party's omission."  _Id._  In
    keeping with the equitable nature of such a determination, the Supreme
    Court set forth four factors to be considered when contemplating a
    motion to allow a late-filed proof of claim under Rule 9006(b).  _Id._ at
    395.  Those factors include: (1) the danger of prejudice to the debtor;
    (2) the length of the delay and its potential impact on judicial
    proceedings; (3) the reason for the delay, including whether it was
    within the reasonable control of the claimant; and (4) whether the
    claimant acted in good faith.  _Id._

Debtors Forty-Fourth Omnibus Objection, which objected to
certain other claims filed by the Named Claimants as
duplicative.  See Motion, Exhibit 7 ("I've reviewed Debtors'
Forty-Fourth Omnibus Objection to Claims (Disallowance of
Certain Duplicate Claims). . . .  Because this was not a
substantive objection, . . . .").

     In addition, regardless of whether any of the
Objections were "substantive", the Objection Procedures
plainly state that, "[e]ach Claim subject to an Omnibus
Objection and the Response thereto shall constitute a separate
contested matter as contemplated by Bankruptcy Rule 9014."
See Objection Procedures Order, Exhibit 1 at 3.  Thus, the
Debtors' Objections to the Class Claims constituted contested
matters regardless of whether the Objection was "substantive"
or merely procedural in nature.  Consequently, even if Named
Claimants had no obligation to file a Bankruptcy Rule 7023
motion until the Debtors filed an objection -- a conclusion
that flies in the face of this Court's holding in Computer
Learning -- the Named Claimants' failure to file a Rule 7023
motion for more than seven months was not excusable.

     B.   The Named Claimants Failure To Timely File The
          Motion Causes Undue Prejudice To The Debtors.

     The Debtors and their creditors would be materially
prejudiced by permitting the filing and prosecution of the

16

Class Claims as class proofs of claim this late into the
administration of their chapter 11 cases.

First, the Class Claims assert claims in an amount
of almost $150 million, which were only recently reclassified
from priority to general unsecured claims. The ultimate
allowance or disallowance of such claims will thus have a
material impact on the ultimate recovery that unsecured
creditors receive in these bankruptcy cases, as the Debtors
have estimated that the total allowed amount of general
unsecured claims will be between 1.8 and 2 billion, which
estimate does not assume allowance of the full amount of the
Class Claims.  Moreover, this is especially prejudicial
because, as discussed further below, permitting the
prosecution of the Class Claims is tantamount to a de facto
extension of the General Bar Date for certain creditors
without requiring a showing of excusable neglect.

Second, permitting class counsel to prosecute the
Class Claims would plainly impact the timing of distributions
to all unsecured creditors significantly. In particular, the
Plan provides for pro rata distributions to unsecured
creditors on various distribution dates.  If the Named
Claimants are permitted to proceed on the Class Claims as
class proofs of claim, the Liquidating Trustee will have no

17

choice but to withhold or reserve the pro rata amount

attributable to the Class Claims until the allowed amount, if

any, of such Class Claims is finally resolved.   Given the

discovery requested by Class Counsel regarding class

certification and the fact intensive nature and potential

breadth of the underlying litigation, distributions would thus

likely be delayed for a substantial period of time, even

assuming no appeals.   Consequently, regardless of whether or

not the Class Claims are ultimately allowed, the Debtors'

estates and creditors would be harmed by permitting the Class

Claims to be prosecuted at this late date.   See Computer

Learning, 344 B.R. at 90 (noting that the trustee was

prejudiced by the delay in filing the Rule 7023 motion because

payments to creditors would be delayed indefinitely by the

permission of a class proof of claim).

    In response, the Named Claimants attempt to argue

that any prejudice is of the Debtors' own making.   Motion at

10.   In particular, the Named Claimants assert that Debtors

delayed in filing their Objections to the Class Claims and did

not clarify that they were objections to the class status of

the Class Claims.   These assertions are without factual

support and, more importantly, do not warrant granting the

Named Claimants the relief they request.

18

As this Court is aware, since the General Bar Date,
the Debtors have filed more than seventy omnibus objections to
the thousands of claims filed in their chapter 11 cases.  The
suggestion that Debtors have been dilatory in objecting to the
Class Claims is plainly at odds with the Debtors' significant
efforts and progress in the claims resolution progress.

In addition, in Gentry's Class Action Lawsuit, the
only Class Action Lawsuit in which there have been any
material proceedings, the parties litigated up to the
California Supreme Court the issue of the enforceability of a
class action arbitration waiver signed by Gentry.  Motion at
15.  As such, Gentry, and Class Counsel, were plainly on
notice that the Debtors contested the class status sought by
the Named Claimants.  More importantly, however, as set forth
above and in the Supplemental Objections, the filing of a
Bankruptcy Rule 7023 motion is a mandatory prerequisite to
filing a class proof of claim, regardless of whether the
debtor challenges the class status of the Claim.  See Computer
Learning, 344 B.R. at 87 ("[A] class proof of claim is not
permissible without an order making Rule 7023
applicable. . . .").

Furthermore, Named Claimants' emphasis on Debtors'
failure to respond to the Class Action Lawsuits is likewise

19

unavailing.  Other than Gentry's Class Action Lawsuit,

discussed above, each of the other Class Action Lawsuits was

filed very soon before, or indeed, after the Petition Date.

In fact, Skaf's Class Action Lawsuit, filed on December 19,

2008, more than a month after the Petition Date, is void by

operation of the automatic stay.  See, e.g., In re Robb, 399

B.R. 171, 174, n.1 (Bankr. N.D.W.Va. 2008) (actions taken in

violation of the automatic stay are void).  As such, the

Debtors had no obligation to take any actions in the Class

Action Lawsuits.

Accordingly, because the Named Claimants' Motion was

not timely filed and would materially prejudice the Debtors,

their estates and creditors, the Motion should be denied and

the Class Claims should be disallowed as class proofs of claim.

## III. ALLOWING THE CLASS CLAIMS AS CLASS PROOFS OF CLAIM WOULD BE INFERIOR TO INDIVIDUAL CLAIM ADJUDICATION.

In addition to timeliness, a bankruptcy court's

analysis regarding whether to apply Bankruptcy Rule 7023 and

allow the filing of a class proof of claim looks to whether a

class action is superior to other available methods for the

fair and efficient adjudication of the controversy.  See

Computer Learning, 344 B.R. at 91 (quoting Civil Rule[8]

---

[8]  The Federal Rules of Civil Procedure are referred to herein as the "Civil Rules."

20

23(b)(3)).  In particular, the Court looks to whether the

class claim process will assist or interfere with the

administration of the case.  <u>See</u> Transcript of March 25, 2010

Hearing at 88.  As demonstrated below, even assuming, <u>arguendo</u>,

that the Motion was timely, the Court should exercise its

discretion and deny the request to prosecute the Class Claims

as class proofs of claim.

> **A.   The Bankruptcy Claims Process Is Superior To The**
> **Class Action Process.**

While the analysis under Bankruptcy Rule 7023 may be

similar in some respects to the analysis under Civil Rule 23,

the bankruptcy court should consider and weigh the factors

differently within the context of a bankruptcy case because

the class process may be inferior to the bankruptcy claims

process.  <u>See</u> <u>In re Musicland Holding Corp.</u>, 362 B.R. 644, 651

(Bankr. S.D.N.Y. 2007) (quoting <u>In re Ephedra Prods. Liab.</u>

<u>Litig.</u>, 329 B.R. 1, 5 (S.D.N.Y. 2005)) ("[B]ankruptcy

significantly changes the balance of factors to be considered

in determining whether to allow a class action and . . . class

certification may be less desirable in bankruptcy than in

ordinary civil litigation." (internal quotations and citations

omitted)).  As one court aptly noted, "superiority of the

class action vanishes when the 'other available method' is

bankruptcy, which consolidates all claims in one forum and

allows claimants to file proofs of claim without counsel and
at virtually no cost." See Ephedra, 329 B.R. at 9.

 Indeed, as this Court has recognized, bankruptcy
already provides the same, if not more, procedural advantages
than class adjudication.  See Computer Learning, 344 B.R. at
92 (explaining that "[a] bankruptcy case presents many of the
same mechanisms to process large numbers of claims as a class
action").  Specifically, bankruptcy provides (i) established
mechanisms for notice, (ii) established mechanisms managing
large numbers of claimants, (iii) proceedings centralized in a
single court with nationwide service of process, and
(iv) protection against a race to judgment since all of the
debtor's assets are under the control of the bankruptcy court.
Id.; see also Musicland Holding Corp., 362 B.R. at 650-51, n.
8 (noting that bankruptcy provides more advantages than a
class action and emphasizing the ease of participating in
distributions from the bankruptcy estate).

 Here, nearly 15,000 claims were filed against the
Debtors.  While the Class Claims do not identify the number of
potential class members, even a few hundred or a thousand more
claims likely would not negatively impact the claims
resolution process.  See, e.g., Computer Learning, 344 B.R. at
94 (finding that the claimant's Rule 7023 motion would still

22

have been denied if it was timely because the trustee could
have easily reviewed 100 additional claims in a case where
over 2,000 claims were filed).

In addition, the General Bar Date is long-past and
the Debtors' claims resolution process is well underway.  Any
claims filed by the Named and Unnamed Claimants have been or
will be addressed through that process.  Any claims not filed
by the Named and Unnamed Claimants are barred by the passage
of the General Bar Date.  Thus, at this point in the Debtors'
bankruptcy cases, the claims process is far superior to the
class action process.

**B.    The Unnamed Claimants Have Received Adequate Notice.**

The Named Claimants also argue that the Class Claims
must proceed as class proofs of claim because the Debtors did
not provide actual notice to certain of the Unnamed Claimants.
Motion at 12-14.  The Debtors contend, however, that they
provided adequate notice of the General Bar Date, including
adequate notice to any Unnamed Claimants that Class Counsel
seeks to represent.  Specifically, the Debtors have provided
actual notice to their known creditors and publication notice
to their unknown creditors as due process requires and, thus,
have afforded all creditors the reasonable opportunity to
timely file proofs of claim.

23

In particular, in order to satisfy the requirements of due process, the Supreme Court has held that notice must be reasonably calculated to apprise interested persons of the pending action.  Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  Moreover, in determining whether notice was sufficient, courts should consider the practicalities and peculiarities of each individual case.  Id. at 314-15.

With this principle in mind, courts have determined that whether due process in the bar date notice context has been satisfied depends on whether the creditor was known or unknown to the debtors.  See In re J.A. Jones, Inc., 492 F.3d 242, 249 (4th Cir. 2007) ("The type of notice that is reasonable or adequate for purposes of . . . due process . . . depends on whether a particular creditor is known or unknown to the debtor."); Chemetron Corp. v. Jones, 72 F.3d 341, 346 (3d Cir. 1995) ("For notice purposes, bankruptcy law divides claimants into two types, 'known' and 'unknown.'"); In re Envirodyne Indus., Inc., 214 B.R. 338, 348 (N.D. Ill. 1997).

Known creditors include those claimants "whose identities are actually known to the debtor, as well as claimants whose identities are 'reasonably ascertainable' to the debtor".  J.A. Jones, 492 F.3d at 250 (citations

24

omitted)(emphasis added).  Known creditors must receive actual
notice by mail of the claims bar date.  Id. at 249.

        Unknown creditors, on the other hand, are those
whose identities or claims are conjectural or "'whose
interests or whereabouts could not with due diligence be
ascertained'" by the debtor.  J.A. Jones, 492 F.3d at 250
(quoting Mullane, 339 U.S. at 317).  Unknown creditors need
only receive constructive notice of the claims bar date.  See
J.A. Jones, 492 F.3d at 249-50. ("[W]here a creditor is
unknown to the debtor, constructive notice . . . is generally
sufficient to pass constitutional muster.");  Chemetron Corp.,
72 F.3d at 346 (same).  Indeed, with respect to unknown
creditors, publication notice generally will suffice to inform
unknown creditors of an impending claims bar date.  See J.A.
Jones, 492 F.3d at 249-50.  In fact, as stated by the Fourth
Circuit, "in the case of persons missing or unknown,
employment of an indirect and even a probably futile means of
notification is all that the situation permits and creates no
constitutional bar to a final decree foreclosing their
rights."  J.A. Jones, 492 F.3d at 250 n.6 (quoting Mullane,
339 U.S. at 317).

        The Unnamed Claimants are unknown creditors and the
publication notice given was sufficient to satisfy due process.

25

In particular, the identity of the Unnamed Claimants was not
known or reasonably ascertainable by the Debtors at the time
they provided notice of the General Bar Date.  The Unnamed
Claimants had not joined in any pending litigation; nor had
they commenced any litigation on their own or advised the
Debtors in writing of their intention to do so.  See Matter of
Chicago, Rock Island & Pacific R.R. Co., 90 B.R. 329, 331 (N.D.
Ill. 1987) (finding that, "in the absence of any indication
that a particular claim would ensue," employee was an unknown
creditor and was not entitled to actual notice).  Moreover,
although all possible Unnamed Claimants were once employees of
the Debtors, not all employees held contingent claims that
would have been covered by the allegations in the complaints
that form the basis for the Class Claims.

Additionally, this Court cannot lose sight of the
fact that any potential claims held by the Unnamed Claimants
were contingent and conjectural in nature.  They were
potential litigation claims arising out of circumstances that
occurred many years prior to the commencement of the
bankruptcy cases, which the Unnamed Claimants had not asserted
and had they the Debtors would have vigorously disputed.  Thus,
the Unnamed Claimants were unknown creditors for whom
publication notice was sufficient.

26

This same conclusion is also supported by the fact
that the Debtors were entitled to treat the Unnamed Claimants
as having abandoned any contingent litigation claims they once
held.  Specifically, the Debtors were not required to give
actual notice of the General Bar Date to creditors if the
Debtors reasonably believed those creditors had abandoned
their claims.  See Matter of Chicago, Rock Island & Pacific
R.R. Co., 788 F.2d 1280, 1283 (7th Cir. 1986)("[A] trustee has
no duty to give notice to creditors who he reasonably believes
have abandoned their claims . . . ."); Charter Crude Oil
Company v. Petroleos Mexicano (In re Charter Company), 125 B.R.
650, 655 (M.D. Fla. 1991) (same).  As set forth above, the
Debtors served actual notice on the Named Claimants and any
persons that were employed within the three years prior to the
Petition Date.  The Debtors also provided notice to any party
to any pending litigation with the Debtors, including any
litigation regarding their employment that was unresolved on
the Petition Date.  Thus, to the extent that an Unnamed
Claimant did not receive actual notice of the General Bar Date,
that employee had not commenced any unresolved litigation.
Moreover, with respect to many potential Unnamed Claimants,
any such claims would be time-barred by the statute of
limitations.  Therefore, under these circumstances, the

Debtors were entitled to provide any such Unnamed Claimants with constructive notice because the Debtors could reasonably believe that such Unnamed Claimants had abandoned any potential claims they might have asserted against the Debtors' estates.

Additionally, when courts consider the type of notice required under the circumstances of a particular case, they must harmonize the fundamental requirements of due process with the underlying purposes of the Bankruptcy Code, which in this context means "the prompt and effectual administration and settlement of the debtor's estate." Chemetron Corp., 72 F.3d at 346 (citing Katchen v. Landy, 382 U.S. 323, 328 (1966)); see also Envirodyne Indus., 214 B.R. at 347 ("The state has an interest in bringing bankruptcy cases to a final settlement, enabling the debtor to have a fresh start and protecting the interests of other creditors, and the individual has a right to due process of law prior to being deprived of a property right.").

In addition to the above, the court must also consider the interests of all the debtor's creditors and other parties in interest when determining what form of notice is appropriate in a particular case. Indeed, as the Fourth Circuit has stated:

28

> In bankruptcy, the court has an obligation not only
> to the potential claimants, but also to existing
> claimants and the petitioner's stockholders. The
> court must balance the needs of notification of
> potential claimants with the interest of existing
> creditors and claimants. A bankrupt estate's
> resources are always limited and the bankruptcy
> court must use discretion in balancing these
> interests when deciding how much to spend on
> notification.

Vancouver Women's Health Collective Soc. v. A.H. Robins Co.,
Inc., 820 F.2d 1359, 1364 (4th Cir. 1987).

In balancing these competing interests, courts have

held that publication notice is appropriate where, as here,

the sheer volume of potential claimants in relation to the

size of their claims makes it excessively costly for the

debtors to serve the claimants with actual notice of the

claims bar date.  See Fogel v. Zell, 221 F.3d 955, 963 (7th

Cir. 2000) ("Notice by publication may thus be entirely

appropriate when potential claimants are numerous, unknown, or

have small claims (whether nominally or . . . realistically) –

all circumstances that singly or in combination may make the

cost of ascertaining the claimants' names and addresses and

mailing each one a notice of the bar date and processing the

responses consume a disproportionate share of the assets of

the debtor's estate."); Matter of GAC Corp., 681 F.2d 1295,

1300 (11th Cir. 1982) (reasoning that publication notice is

appropriate when it would have been extremely burdensome and

29

costly to serve certain individual claimants within a larger

class of creditors with actual notice of the bar date).

        That is the case here.  Prior to the Petition Date,

the Debtors employed approximately 40,000 employees.  If the

Debtors had served the publication notice on all of their

former employees going back as far as 1998 (the beginning of

the class period for the Gentry Class Action), this would

likely have entailed serving notice on tens of thousands of

additional persons.

        More importantly, perhaps, such service would have

been costly and could only have been targeted to the Unnamed

Claimants through the Debtors' undertaking of extraordinary

steps, which steps are simply not required by due process.  In

particular, the Debtors' employee records prior to 2005 are

not readily accessible.  Even assuming that the Debtors could

have obtained all of the employee records dating back to 1998,

to give actual notice to the Unnamed Claimants who might be

part of the classes the Named Claimants seek to represent, the

Debtors would have had to review the employee records to

determine each employee's employment location, payroll and

benefit history and whether they might hold a claim.  Plainly,

under the circumstances, such efforts and their associated

costs were not reasonable and, thus, were unnecessary to

                                30

satisfy due process.  Alternatively, the Debtors could have
simply identified all persons that were employed by the
Debtors in or after 1998 and provided them each with actual
notice.  Such notice, however, would have been extremely
costly and in many instances futile given the likelihood that
many of the employees had likely moved from the addresses in
their employment records.

In summary, to provide actual notice to the Unnamed
Claimants, the Debtors would have been faced with a choice
between taking extraordinary measures to identify the Unnamed
Claimants or incurring the significant additional costs of
serving all former employees for a decade prior to the
Petition Date when under severe financial constraints.

Accordingly, the Debtors' decision to only provide
actual notice to employees that worked within the last three
years or had asserted employment grievances or commenced
litigation was reasonable under the circumstances.  Indeed, to
do anything more would have been unduly burdensome, very
expensive, impractical and likely ineffective given the size
of any potential, conjectural claims that employees not
employed within the three years prior to the Petition Date
might have asserted.  Consequently, notwithstanding the Named
Claimants' contention to the contrary, publication notice to

31

the Unnamed Claimants that did not receive actual notice was
proper and adequate and fully complied with due process. See
Export Development Canada v. Circuit City Stores, Inc., 08-
35653 (KRH) (Bankr. E.D. Va. Feb. 2, 2010)(finding that the
Debtors' notice procedures for informing potential 503(b)(9)
claimants satisfied the "reasonably calculated" standard of
due process); In re Snug Enters., Inc., 169 B.R. 31, 33 (Bankr.
E.D. Va. 1994)(finding that "[d]ue process requires notice
that is reasonably calculated, under the circumstances, to
apprise an interested party of the pendency of an action").
Thus, to hold otherwise, would be to allow an end run around
the General Bar Date to the detriment of creditors filing
timely claims, without a showing of excusable neglect.

   C.   **Even If Notice To The Unnamed Claimants Were
        Inadequate, The Unnamed Claimants Should Not Be
        Permitted To Proceed On The Class Claims.**

        Finally, even if the Court determines that notice as
to the Unnamed Claimants was inadequate, such that the claims
of such creditors would not be barred by the passage of the
General Bar Date, it does not follow that permitting the Named
Claimants to proceed on the Class Claims as class proofs of
claim is the only, or, indeed, the best alternative. In fact,
there are less costly and better approaches to addressing any

32

infirmities -- of which the Debtors believe there are none --
with respect to the Debtors' notice.

First, the Court could simply do nothing.  The
Unnamed Claimants that did not receive actual notice, but who
were entitled to receive such notice are no different than any
other persons that might not have received proper notice of
the General Bar Date.  Their claims are not discharged and
they are not barred from asserting those claims in the future.
See City of New York v. New York, N.H. & H.R. Co., 344 U.S.
293, 296-97 (1953) (holding that a claim survives confirmation
when the holder received notice insufficient to satisfy due
process); Spring Valley Farms, Inc. v. Crow (In re Spring
Valley Farms, Inc.), 863 F.2d 832, 835 (11th Cir. 1989)
(holding that Bankruptcy Code section 1141 does not discharge
debt of creditor who was known to debtor and failed to receive
statutory notice of claims bar date); Snug Enters., Inc., 169
B.R. at 33 (finding that creditor's claims were not discharged
where creditor did not receive sufficient notice).
Consequently, prosecution of the Class Claims as class proofs
of claim is not necessary to protect such Unnamed Claimants
rights.

Instead, the bankruptcy process permits creditors to
file proofs of claim after the bar date and demonstrate that

33

their failure to do so earlier was the result of excusable

neglect —- the failure to receive proper notice.  See Fed. R.

Bankr. P. 9006(b); Pioneer, 507 U.S. 380 (explicating

"excusable neglect" standard for filing late proofs of claim).

Alternatively, just as this Court had the authority

to approve the Debtors' proposed notice of the General Bar

Date, it has the authority to direct the Debtors to conduct

further investigation into the identities of persons that

might be included among the Unnamed Claimants and direct the

Debtors to provide supplemental notice to inform such persons

of their right to file proofs of claim.  See Fed. Rule Bankr.

P. 2002.  Nor is there any reason that a class action or a

class proof of claim is needed to provide such notice.  See

Computer Learning, 344 B.R. at 93 (finding that "any notice

that could have been given in a class action could have been

given in this case.  Thus, the class action in this case is

not superior to this bankruptcy case for the fair and

efficient adjudication of the controversy.").  Therefore,

should the Court determine that it is necessary, the Debtors

could provide supplemental notice to persons that might be

Unnamed Claimants and do so with less delay and expense than

would otherwise be incurred if the Motion is granted and the

Class Claims are pursued as class proofs of claim.

Accordingly, even if the Court determines that
Unnamed Claimants that were not otherwise provided with actual
notice were entitled to receive actual notice, the Court
should nonetheless deny the Motion.  Allowing the Named
Claimants to pursue class proofs of claim is inferior to the
individual claims adjudication process, which provides a
mechanism to address any failure to provide adequate notice
and permits the Court to direct the Debtors to provide
"corrective" notice.

IV.   **ALLOWING THE CLASS CLAIMS AS CLASS PROOFS OF CLAIM WOULD
      UNDULY COMPLICATE AND DELAY THE ADMINISTRATION OF THESE
      CASES.**

Allowing the Class Claims to proceed as class proofs
of claim would unduly complicate and delay the administration
of the case.  As set forth above, all of the Unnamed Claimants
received adequate notice of the General Bar Date and should
not now be allowed to circumvent that bar date.

Bar dates are important to the orderly
administration of any bankruptcy proceeding for both debtors
and creditors.  See Computer Learning, 344 B.R. at 89 (noting
that the bar date "is important to the orderly administration
of a case and prevents delays in distributing funds to
creditors"); In re Protected Vehicles, Inc., 397 B.R. 339, 346
(Bankr. D.S.C. 2008) (noting that a bar date is "necessary to

35

provide finality in determining the identity of claimants and

the liability faced by the bankruptcy estate").  "The

requirement of a Bar Date in Chapter 11 enables the

debtor . . . to establish the universe of claims with which it

must deal and the amount of those claims."  In re A.H. Robins

Co., 129 B.R. 457, 459 (Bankr. E.D. Va. 1991).  Given the

importance of bar dates, where claimants seek to file proofs

of claim after the court-prescribed bar date, the claimants

must establish that "the failure to [timely] act was the

result of excusable neglect."  Fed. R. Bankr. P. 9006(b).

         Even when a class proof of claim is properly

requested and approved by the bankruptcy court, restricting

the class to members who have, individually, timely filed

their own proofs of claim preserves the orderly administration

of a case provided by bar dates.  See In re Protected Vehicles,

Inc., 397 B.R. at 347 (finding that opening a class to include

all employees regardless of whether a proof of claim was

timely filed would "render proof of claim deadlines in

bankruptcy cases meaningless"); In re Adam Aircraft Indus.,

Inc., 2009 WL 21000929 at *9 (Bankr. D. Colo. 2009) (denying a

class proof of claim and stating that, "In the case at bar,

the employees have already been afforded one bite at the

claims apple, and Scoggin has not demonstrated a reason why they should receive a second.").

As set forth above, the Unnamed Claimants received sufficient notice to satisfy due process and to timely file their individual claims, if any.  At this stage of the proceedings, it would be highly prejudicial to allow additional claimants, unknown in number, to now assert claims against the Debtors' estates without any indication of excusable neglect.  See In re Bally Total Fitness of Greater New York, Inc., 402 B.R. 616, 622 (Bankr. S.D.N.Y. 2009) (denying class proof of claim because, in part, "the de facto expansion of the [b]ar [d]ate for notified class members who failed to file individual claims in a timely manner will violate due process and prejudice the rights of timely filers"); In re W.R. Grace & Co., 389 B.R. 373, 380 (Bankr. D. Del. 2008) (noting that allowing a class proof of claim would allow an "end run around the bar date. In that respect, class certification would adversely affect the bankruptcy proceedings by permitting those who missed the bar date and who received at least publication notice to interpose claims into this case, without establishing the excusable neglect standard expressed in Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership").

37

By filing class proofs of claim without timely seeking permission, the Named Claimants are attempting to do just that -- namely, to circumvent the General Bar Date, aimed at facilitating the orderly administration of these cases, and bootstrap potential claimants who have not filed timely proofs of claim into an alleged class action. Any Unnamed Claimants who have yet to file an individual claim should not be allowed to do so through the certification of a class proof of claim. To hold otherwise would unduly complicate and delay the administrative of the Debtors' cases.

## V.   THE COSTS OF CLASS LITIGATION OUTWEIGH THE BENEFITS.

While class action lawsuits are often lauded for their ability to permit many people with small claims to seek redress where cost might otherwise be prohibitive as compared to the potential recovery, such concerns are not persuasive when bankruptcy is the alternative method of adjudication. Ephedra, 329 B.R. at 9 ("[S]uperiority of the class action vanishes when the 'other available method' is bankruptcy . . . ."). This is true because the bankruptcy "consolidates all claims in one forum and allows claimants to file proofs of claim without counsel and at virtually no cost." Id.

38

Moreover, the timely and efficient administration of the Debtors' cases would also be complicated by the nature of the Class Action Lawsuits, which would involve time-consuming, protracted litigation, likely delaying distribution of the Debtors' assets to creditors.  In addition to the time and expense of litigation, the Debtors would first be required fully investigate the identity of the potential members of the classes and to provide special notice to such potential class members.  This process would be made more time consuming and costly by the fact that many of the relevant records are held in storage facilities and are not readily accessible.  See Ephedra, 329 B.R. at 5 (stating that "the potential interference with timely distribution in itself presents sufficient grounds to expunge the class claims" based on the protracted litigation that would result, including pre-certification discovery, notice to class members, discovery on the merits, and a trial).  Moreover, such protracted litigation reduces the assets available to creditors from the Debtors' estates.  See id. at 10 ("The Court has discretion under Rule 9014 to find that the likely total benefit to the class members would not justify the cost to the estate of defending a class action under Rule 23."); Bally Total Fitness, 402 B.R. at 621 (finding that class certification adds layers

of procedural and factual complexity to a case, which can
"siphon the Debtors' resources").

Furthermore, as the Computer Learning Court noted,
the risk of inconsistent adjudications is not a concern in
bankruptcy, where all proceedings are centralized in a single
court.  Computer Learning, 344 B.R. at 91.  In addition,
proceeding by a class action lawsuit would not provide a
deterrent to the Debtors.  Although the Class Action Lawsuits
seek injunctive relief against the Debtors, there is no
injunctive relief available because the Debtors have ceased
their business operations and have liquidated their assets.
See Ephedra, 329 B.R. at 9 ("Under the Bankruptcy Code,
general deterrence is not promoted at the expense of creditors.
Whatever weight deterrence may have in a true reorganization,
it has none in a liquidating plan like the one here.");
Computer Learning, 344 B.R. at 91-92 (discussing the
proposition that the injunctive relief often sought in class
action lawsuits is insignificant in the case of a chapter 7
debtor who will cease business operations).  Here, in the
context of a liquidation, any alleged labor law violations
cannot be remedied for future employees, and no other long-
term benefit would be gained by adjudication of claims through
a class action lawsuit.

Finally, the Named Claimants assert that the Class Action Lawsuits were "heavily litigated", and that this provides a basis for allowing the Class Claims as class proofs of claim.  Motion at 15-16.  However, to the contrary, litigation has occurred only in Gentry's Class Action Lawsuit. Moreover, in that lawsuit, only one discrete issue -- enforceability of class action arbitration waivers -- has been litigated.  The other three Class Action Lawsuits were filed soon before or, indeed, _after_ the Petition Date, and thus were stayed before any progress could be made.  Moreover, no class has been certified in any of the Class Action Lawsuits.  As such, the status and progress of these lawsuits provides no basis for allowing the Class Claims as class proofs of claim.

**VI.   THERE IS NO EQUITABLE ESTOPPEL BASIS FOR ALLOWING THE CLASS CLAIMS AS CLASS PROOFS OF CLAIM.**

The Named Claimants further argue that the Debtors are equitably estopped from objecting the Class Claims because they have taken inconsistent positions.  Motion at 16.  To the contrary, the Debtors have not taken inconsistent positions and there is absolutely no basis for equitable estoppel.

In support of their argument, the Named Claimants assert that the "Debtor flat-out admitted that its own objections were not 'substantive' objections."  Motion at 16. However, as discussed above, the Debtors did no such thing --

41

the only objection which the Debtors stated was non-substantive was the Debtors' Forty-Fourth Omnibus Objection which is not at issue here.  Importantly, however, the Named Claimants were required to file a Bankruptcy Rule 7023 motion regardless of whether the Debtors filed a substantive objection, or indeed any objection at all.

Next, the Named Claimants state that the Debtors did not agree to pursue discovery in either state court or Bankruptcy Court.  Id.  However, at no point did the Debtors, nor could the Debtors, preclude the Named Claimants from seeking to pursue such discovery by their own motion. Moreover, as this Court stated at the Hearing, discovery is not necessary for the filing of a Bankruptcy Rule 7023 motion and the inability to conduct discovery does not relieve the Named Claimants from their obligation to file such a motion. See Transcript of March 25, 2010 Hearing at 88.

Accordingly, for the reasons stated above, the Class Claims should be disallowed as class proofs of claim and the individual claims of the Named Claimants should remain, subject to the Debtors' rights to object to such claims on any grounds governing law permits.

## CONCLUSION

For the foregoing reasons, the Motion should be
denied and the Class Claims should be disallowed as class
proofs of claim.

Dated: April 12, 2010         SKADDEN, ARPS, SLATE, MEAGHER &
       Richmond, Virginia       FLOM, LLP
                              Gregg M. Galardi, Esq.
                              Ian S. Fredericks, Esq.
                              P.O. Box 636
                              Wilmington, Delaware 19899-0636
                              (302) 651-3000

                                    - and -

                              SKADDEN, ARPS, SLATE, MEAGHER &
                                FLOM, LLP
                              Chris L. Dickerson, Esq.
                              155 North Wacker Drive
                              Chicago, Illinois 60606
                              (312) 407-0700

                                    - and -

                              MCGUIREWOODS LLP

                              /s/ Douglas M. Foley_____
                              Dion W. Hayes (VSB No. 34304)
                              Douglas M. Foley (VSB No. 34364)
                              One James Center
                              901 E. Cary Street
                              Richmond, Virginia 23219
                              (804) 775-1000

                              Counsel for Debtors and Debtors
                              in Possession

**EXHIBIT A**

**(Transcript of March 25, 2010 Hearing)**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                        .  Case No.  08-35653 (KRH)
                              .
                              .
CIRCUIT CITY STORES, INC., .
et al.,                       .  701 East Broad Street
                              .  Richmond, VA  23219
                              .
                              .
           Debtors.           .  March 25, 2010
. . . . . . . . . . . . . . .. 2:39 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          McGuireWoods, LLP
                          By:  DOUGLAS FOLEY, ESQ.
                          9000 World Trade Center
                          101 W. Main Street
                          Norfolk, VA  23510

                          McGuireWoods, LLP
                          By:  SARAH B. BOEHM, ESQ.
                          One James Center
                          901 East Cary Street
                          Richmond, VA  23219

                          Skadden Arps Slate Meagher & Flom LLP
                          By:  IAN FREDERICKS, ESQ.
                               GREGG GALARDI, ESQ.
                          One Rodney Square
                          Wilmington, DE  19899


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

For Ashley Isaac:          By:  ASHLEY ISAAC, Pro Se Claimant
                           (Telephonic appearance)

For Bruce Besanko,         Christian & Barton, L.L.P.
James H. Wimmer, Jr.       By:  MICHAEL D. MUELLER, ESQ.
and Lawrence W. Fay:       909 East Main Street, Suite 1200
                           Richmond, VA  23219

For Thomas C. Bradley:     By:  THOMAS C. BRADLEY, Pro Se Claimant

For Dawn VonBechmann:      Spotts Fain, P.C.
                           By:  NEIL McCULLAGH, ESQ.
                           411 East Franklin Street
                           Suite 600
                           Richmond, VA  23219

For Robert Gentry,         Hutson Law Office, P.A.
Jack Hernandez,            By:  RICHARD M. HUTSON, II, ESQ.
Jonathan Card and          300 West Morgan Street
Joseph Skaf:               Suite 1500
                           Durham, NC  27702

For Robert Gentry,         Righetti Law Firm, P.C.
Jack Hernandez,            By:  MICHAEL RIGHETTI, ESQ.
Jonathan Card and          456 Montgomery Street, Suite 1400
Joseph Skaf:               San Francisco, CA  94104

For the Official           Tavenner & Beran PLC
Committee of Unsecured     By:  PAULA S. BERAN, ESQ.
Creditors:                 20 North Eighth Street, Second Floor
                           Richmond, VA  23219

3

# I N D E X

| **EXHIBITS** | **ID.** | **EVD.** |
|---|---|---|
| Exhibit A   Affidavit of Service | | 10 |
| Exhibit B   Proof of Claim - A. Isaac | | 10 |

**J&J COURT TRANSCRIBERS, INC.**

4

1          COURTROOM DEPUTY:  All rise.  The United States

2    Bankruptcy Court for the Eastern District of Virginia is now in

3    session, the Honorable Kevin R. Huennekens presiding.  Please

4    be seated and come to order.

5          THE CLERK:  In the matter of Circuit City Stores,

6    Incorporated, hearing on Items 1 through 28 as set out on the

7    debtors' agenda.

8          MR. FOLEY:  Good afternoon, Your Honor.  Doug Foley

9    with McGuireWoods, along with Sarah Boehm for Circuit City.

10   With me at counsel table is Greg Galardi and Ian Fredericks

11   from Skadden Arps.  In the courtroom today is Kay Bradshaw, who

12   is the vice president and controller of the company, as well as

13   Deborah Miller, who is the assistant general counsel.

14         Your Honor, we apologize for being late today.  Or

15   normal mode of transportation was caught in some traffic

16   accidents to come pick us up from our office to get here, so we

17   had to scramble to get cabs, so we apologize for being late.

18         THE COURT:  You weren't actually in the accident?

19         MR. FOLEY:  We weren't.  No.  The transportation to

20   come pick us up was.

21         THE COURT:  Was anybody hurt?

22         MR. FOLEY:  No, I don't believe so.

23         THE COURT:  Good.

24         MR. FOLEY:  Your Honor, the agenda here today has 28

25   items on it.  There's several matters going forward on summary

**J&J COURT TRANSCRIBERS, INC.**

1    judgment.  We're pleased to report that several items have

2    settled since we filed the agenda.  The Vertis late claim

3    motion, which is the first one on the agenda, has been

4    resolved, and they have withdrawn that motion.

5              Item Number 2, which is the Miner Fleet late claim

6    motion, we have submitted a consent order that has resolved

7    that matter in its entirety.

8              Item Number 3, which is the OmniMount motion to

9    reconsider a claim disallowance order, that has been settled,

10   as well, by a stipulation that we have filed.  The objection

11   period runs on March 29th, at which point it will become

12   automatically effective and that can come off of the docket, as

13   well.  We don't anticipate any objections.

14             THE COURT:  All right.

15             MR. FOLEY:  Item Number 4 and 5, Your Honor, these

16   are the motions of Motorola and General Instruments for

17   503(b)(9) claims allowance and payment.  We're still working

18   with them with respect to trying to resolve the amount of their

19   claims.  They have agreed to adjourn their motions until April

20   15th at two p.m.  Your Honor, the Sennheiser motion for late

21   claim allowance, that matter we have served -- we're in the

22   process of serving discovery on them in order to get some more

23   factual information from them.  They have requested that their

24   motion be adjourned until the May 20th hearing date at ten

25   a.m., and we hope to, once we get the discovery back, see if we

6

1    can't craft a resolution of that.  This one has both

2    administrative claims and unsecured claims that were both late

3    --

4              THE COURT:  All right.

5              MR. FOLEY:  -- that we need to try to resolve.  Your

6    Honor, Item Number 7 is the Sony administrative claim motion.

7    they have requested, and we have agreed to adjourn their

8    hearing until the April 15th date at two p.m.  The Town Square

9    late claim motion also they've requested -- we're trying to

10   resolve this one.  We have an offer outstanding to them.

11   They've requested that their motion be adjourned to April 15th

12   at two p.m.

13             The Schimenti 2004 motion, Your Honor, we're in

14   negotiations with them regarding potential settlement.  They

15   have a 503(b) -- they believe they have a 503(b)(9) claim.

16   It's an issue of goods versus services.  We've served some

17   discovery on them to try to get that matter more ripe for Court

18   consideration.  In the meantime they're also considering filing

19   a complaint with respect to an alleged trust fund theory.  They

20   have not filed that complaint yet.  That will moot this 2004

21   motion when they do, but for the meantime they have requested

22   and we have agreed to adjourn the matter until April 15th at

23   two p.m.

24             Item Number 10, Your Honor, is the Slam Brands motion

25   for an administrative claim.  They have requested and we have

7

1 agreed to adjourn their hearing until the April 15th hearing

2 date at two.

3         Item Number 11, Your Honor, this is our motion to

4 cancel certain surety bonds.  We had a draft of a stipulation

5 out to Safeco that we believe will completely resolve this

6 matter.  We're waiting for their approval, as well as the

7 government's -- resolving the government's objection to this

8 motion, as well.  In the meantime we request that that be

9 adjourned until the April 15th hearing date at two.

10         Item Number 12, Your Honor, is the motion by John

11 Raleigh for a late claim.  We're trying to resolve that matter.

12 It results from a contract that was recently rejected which

13 renews the time period for Mr. Raleigh to file a proof of

14 claim.  He believes that he's entitled to some priority piece

15 of that claim.  That's probably the only area that will be in

16 dispute, but in the meantime they have requested -- his counsel

17 has requested to adjourn his motion until April 29th at two.

18         Item Number 13, Your Honor, is Site A's motion for

19 allowance of a late claim.  We are awaiting additional

20 information from them on an informal basis, voluntary basis to

21 establish whatever they believe constitutes excusable neglect.

22 We haven't received that yet.  They have requested that their

23 motion be adjourned until April 15th at two, and we have agreed

24 to that.

25         Item Number 14, Your Honor, is our uncontested motion

8

1  to extend the time periods to remove actions under 28 U.S.C.

2  1452 and Bankruptcy Rule 9027.  The order that we have attached

3  to the motion provides that the period will be extended through

4  the later of August 3rd, 2010, or 30 days after entry of an

5  order granting relief from the automatic stay.  There has been

6  no opposition to the motion, and we would ask that the Court

7  enter an order approving it.

8         THE COURT:  Does any party wish to be heard in

9  connection with the debtors' motion for an order further

10  extending time?  All right.  There being no objection, Mr.

11  Foley, the Court will grant the debtors' motion.

12         MR. FOLEY:  Thank you, Your Honor.  The next item is

13  Ms. Ashley Isaac's motion for allowance of a late claim.  I

14  don't know if she is on the phone, but that -- or how the Court

15  wishes to proceed with that matter.  We did notice a deposition

16  of Ms. Isaac yesterday.  We even agreed to take it by

17  telephone, but she stated that she was not available, so we

18  have not heard whatever testimony or evidence she intends to

19  present over the phone, but we're willing to go forward, Your

20  Honor, on the papers and also obviously have an opportunity to

21  hear what Ms. Isaac has to say that's not in her pleadings.

22  But I don't know if Your Honor wants to drop that down to the

23  end of the docket.  I don't know if Ms. Isaac is on the phone.

24         THE COURT:  All right.  Is Ms. Isaac or anybody on

25  her behalf here in the courtroom?

**J&J COURT TRANSCRIBERS, INC.**

1            MS. ISAAC:  Yes, Your Honor.  I'm appearing

2  telephonically.

3            THE COURT:  Okay.  Is this Ms. Isaac that I'm

4  speaking to?

5            MS. ISAAC:  Yes, Your Honor.  This is Ms. Ashley

6  Isaac.

7            THE COURT:  All right.  Are you prepared to go

8  forward on your motion to allow your late proof of claim?

9            MS. ISAAC:  Yes, Your Honor.

10            THE COURT:  All right.  I will hear you, Ms. Isaac.

11  You may proceed.

12            MS. ISAAC:  Well, Your Honor, during the time that I

13  -- that the company, Circuit City Stores, Incorporated went

14  into bankruptcy I was actually living with my sister and my

15  brother-in-law because my sister was having complications with

16  her pregnancy.  My brother-in-law has epilepsy, so it was a

17  family emergency.  The address for the place where I was living

18  is 1004 Apartment B Eagle View Drive, and it is the address

19  where I was residing.  Now, the address where I assume that the

20  claims -- the bar date deadline was sent to was actually 617

21  76th Street South.  I did not receive that notice because I was

22  living at another address and I was not at the time getting my

23  mail because I was caring for someone else.

24            THE COURT:  All right.  Anything further, Ms. Isaac?

25            MS. ISAAC:  Also, a time off -- the time that I had

                    **J&J COURT TRANSCRIBERS, INC.**

10

1 accumulated I was never paid that amount, so I'm also seeking

2 the amount for the paid time off, as well.  I believe it was in

3 an exhibit in the prior document that I filed with the Court

4 and that should be on the docket, as well.  That should be all,

5 Your Honor.

6          THE COURT:  All right.  Mr. Foley?

7          MR. FOLEY:  Your Honor, first we would ask that the

8 Court accept into Evidence Exhibit A to our opposition to the

9 motion, which is the affidavit of service with respect to the

10 service of a notice of commencement and the notice of deadline

11 for filing proofs of claim by KCC, which is the claims agent in

12 the case.  We would ask that that be admitted into Evidence.

13          THE COURT:  Any objection, Ms. Isaac?

14          MS. ISAAC:  No, Your Honor.

15          THE COURT:  Okay.  It's admitted.

16          MR. FOLEY:  We would also ask, Your Honor, that

17 Exhibit B to our responsive pleading, which is Ms. Isaac's

18 proof of claim, be admitted into Evidence.

19          THE COURT:  All right.  Any objection, Ms. Isaac?

20          MS. ISAAC:  No, Your Honor.

21          THE COURT:  Okay.  That will be admitted as Exhibit

22 B.

23          MR. FOLEY:  Ms. Isaac, just a couple of questions.

24 The address that you mentioned to the Court a few minutes ago,

25 that is not the address that was in your employee records; is

11

1   that correct?

2          MS. ISAAC:  That is correct.  At the time I did not

3   get a chance to update it, and I was never asked for a most

4   recent address.

5          MR. FOLEY:  Isn't it correct that the address in your

6   employee records is 617 South 76th Street, Birmingham, Alabama,

7   35206?

8          MS. ISAAC:  I believe it is.  Yes.

9          MR. FOLEY:  And you were an employee at the time of

10  the bankruptcy case; is that correct?

11         MS. ISAAC:  Yes.  My hours had been cut, so I wasn't

12  as -- as a current employee, but during that time, yes, I was

13  an employee.

14         MR. FOLEY:  You worked during the end of 1998 and the

15  beginning of -- I mean -- I'm sorry, 2008 and the beginning of

16  2009?  That's correct?

17         MS. ISAAC:  I worked during the end of 2007 to early

18  2009.

19         MR. FOLEY:  Through early 2009.  Okay.  The proof of

20  claim that you filed late, Ms. Isaac, has the address of 617

21  South 76th Street, Birmingham, Alabama; isn't that correct?

22         MS. ISAAC:  Yes.  That is.  I actually had moved back

23  in with my parents and now I am actually residing in the house

24  next to them because my sister moved to Coleman, Alabama after

25  her baby was born.

**J&J COURT TRANSCRIBERS, INC.**

12

1          MR. FOLEY:  And you did not file your proof of claim

2    until six months after the bar date; isn't that correct?

3          MS. ISAAC:  Yes.  That is.

4          MR. FOLEY:  Your Honor, I have no further questions.

5          THE COURT:  Okay.  Do you wish to offer any

6    additional evidence, Mr. Foley?

7          MR. FOLEY:  No, Your Honor.  We would simply have

8    argument, which is basically summarized in our pleadings --

9          THE COURT:  All right.

10         MR. FOLEY:  -- at this point.

11         THE COURT:  Ms. Isaac, do you wish to make argument

12   at this point?

13         MR. FOLEY:  Yes, Your Honor.  Actually, I believe it

14   was a case, <u>Greyhound Lines, Inc. v. Donna Rogers</u>, which was a

15   similar case where the debtor sent the address to -- to the

16   employee's brother's address instead of her current address,

17   which is very similar to my case.  And I'm just stating that

18   for the record.

19         THE COURT:  All right.  Anything further?

20         MS. ISAAC:  No, Your Honor.

21         THE COURT:  All right.  Mr. Foley?

22         MR. FOLEY:  Your Honor, we would submit that the

23   facts and the evidence clearly provide that the debtors

24   provided notice to the address, the specific address that this

25   employee had in her -- in the employee records.  She was also

**J&J COURT TRANSCRIBERS, INC.**

13

1   employed at the time.  She knew about the bankruptcy, being at

2   the company at the time.  She should have had an opportunity to

3   find out about the bar date, and we don't believe that under

4   the legal standard set forth under the Fourth Circuit and the

5   Supreme Court, the Piedner (phonetic) case, the Thompson case,

6   the other cases decided in this District, that the facts

7   presented anywhere come close to establishing a case for

8   excusable neglect for not making the bar date, nor has there

9   been any evidence presented to explain why there was a six-

10  month delay from the bar date to file a proof of claim, so we

11  would ask the Court to deny the motion.

12          THE COURT:  All right.  Ms. Isaac, do you wish to

13  reply?

14          MS. ISAAC:  Yes, Your Honor.  During the time that I

15  was working there I could not file a proof of claim because I

16  didn't know -- I did not know how -- when the bar date the --

17  the deadline for filing a claim was until I actually went to --

18  I filed a civil lawsuit against Circuit City Stores,

19  Incorporated, and that Judge actually related to me that I

20  would have to go through the Bankruptcy Court.  And that was

21  the only way that I realized that I would have to file a proof

22  of claim.  So, the delay was because of the lawsuit, which I

23  believe was filed on May 12th or May 13th of 2009.

24          THE COURT:  All right.  Thank you.  All right.  The

25  Court is prepared to rule.  The Court has before it the motion

**J&J COURT TRANSCRIBERS, INC.**

14

1  of Ashley Isaac to allow the existing late proof of claim as

2  valid.   The Court has heard the arguments and the evidence

3  that's been presented.   The Court finds that the debtor

4  received a notice of the bar date at the address that was

5  contained in the records of Circuit City, that that is also the

6  address that is listed on the debtors' own proof of claim that

7  was filed in this case, and that the fact that the claimant did

8  not provide for whatever forwarding information to the post

9  office does not constitute excusable neglect for not receiving

10  the mailing that would otherwise have been made to her, and

11  that in addition she was an employee of the corporation at the

12  time of the commencement of the case, had actual knowledge of

13  the commencement of the case, and that even further the

14  publication notice that the debtor provided would have been

15  sufficient notice in this case, that the claim was filed after

16  the bar date, and that the debtor has failed -- or the

17  claimant, rather, has failed to establish excusable neglect

18  under the precedent set forth by the Fourth Circuit Court of

19  Appeals in this Circuit, and so the Court is going to deny Ms.

20  Isaac's motion to allow the existing proof of claim, and the

21  claim will be expunged.   Any questions regarding the Court's

22  ruling?   All right.   Mr. Foley, please submit an order to that

23  effect.

24          MR. FOLEY:   We will, Your Honor.   Thank you.

25          THE COURT:   Ms. Isaac, for your benefit an order will

15

1  be submitted denying your proof of claim.  Once the order is

2  submitted you will have 14 days from the date of that order to

3  appeal this Court's ruling if you so desire.

4        MS. ISAAC:  Yes, Your Honor.  Thank you.

5        THE COURT:  You're welcome.

6        MR. FOLEY:  Your Honor, if we could drop down to the

7  end of the docket, the two adversary proceedings?  One is Item

8  Number 27, CC-Investors, as well as Item 28, which is the

9  Creative Labs complaint.  We are still negotiating with the

10 insurance carrier with respect to -- with CC-Investors, and we

11 would ask that that pretrial conference be adjourned to the

12 April 15th hearing at two.

13       THE COURT:  All right.  The pretrial conference will

14 be adjourned to the April date.

15       MR. FOLEY:  The pretrial conference with respect to

16 the Creative Labs complaint, Your Honor, this is a company

17 based in Singapore.  They are still retaining the U.S. counsel.

18 We have exchanged documents informally, and we may be entering

19 the offer and counteroffer stage.  However, we only want to

20 brief -- John met with respect to this matter, to the -- the

21 pretrial conference to the April 6th hearing date at ten, Your

22 Honor.

23       THE COURT:  April 6th at ten o'clock?

24       MR. FOLEY:  Yes, Your Honor.

25       THE COURT:  All right.  And that's by agreement of

**J&J COURT TRANSCRIBERS, INC.**

1  counsel?

2          MR. FOLEY:  It is.

3          THE COURT:  All right.  It will be adjourned.

4          MR. FOLEY:  Your Honor, the matters on the -- the

5  rest of the matters on the agenda, Items Number 16 through 20

6  will be addressed by Ms. Boehm.  Mr. Galardi will address Items

7  21, 23, 24, 25 and 26.  These are the summary judgment matters

8  with respect to the class action claimants as well as the

9  matters with respect to the employees' claims, and Mr.

10 Fredericks will address Item Number 27, which is Mr. Wilson's

11 claim.

12         THE COURT:  All right.  Very good.

13         MS. BOEHM:  Good afternoon, Your Honor.

14         THE COURT:  Good afternoon.

15         MS. BOEHM:  Sarah Boehm from McGuireWoods on behalf

16 of the debtors.  Agenda Item Number 16 is the debtors' sixty-

17 sixth omnibus objection, which seeks a reclassification of

18 certain claims that were filed by equity holders to interests.

19 This included 14 claims.  We received no responses and would

20 like to submit an order granting the relief requested in the

21 objection.

22         THE COURT:  The claims -- the objection will be

23 sustained.  Submit an order.

24         MS. BOEHM:  Item 17 is the sixty-seventh omnibus

25 objection to claims.  This objection seeks a disallowance of

17

1   certain amended claims and certain duplicate claims.  The

2   objection included 26 amended claims.  We did receive two

3   responses to those.  And it also included 33 duplicative claims

4   which we received no responses to.  With respect to the two

5   responses that were received, one from Columbus dispatch and

6   one from Chase Bank, we will go forward on the merits with

7   respect to those claims at the April 15th hearing at two p.m.

8   And with respect to any non-responding claimant we would like

9   to submit an order granting the relief sought in the objection.

10          THE COURT:  All right.  The -- it will be sustained

11  as to the non-responding claimants and then we'll hear the

12  other matter -- what date did you say that was going to be?

13          MS. BOEHM:  April 15th at two.

14          THE COURT:  On April 15th.  All right.

15          MS. BOEHM:  Item 18 on the agenda is the debtors'

16  sixty-eighth omnibus objection to claims.  This seeks a

17  disallowance of certain late claims.  It included 13 general

18  unsecured claims, seven government claims, three admin claims,

19  and one 503(b)(9) claim.  We received no responses to this

20  objection, and would request the entry of an order granting the

21  relief sought in the objection.

22          THE COURT:  That will be granted.

23          MS. BOEHM:  Item 19 on the agenda is the sixty-ninth

24  omnibus objection to claims.  This sought the disallowance of

25  certain administrative claims.  It included nine claims.  We

1   did receive one response from Ms. Davis.  We have resolved that

2   matter with Mr. Mueller and he has signed off on the form of

3   order to be submitted, and we would ask that that revised form

4   of order be submitted with respect to Ms. Davis, as well as the

5   other non-responding claimants disallowing all nine of the

6   claims.

7            THE COURT:  All right.  Mr. Mueller, do you wish to

8   be heard on this?

9            MR. MUELLER:  No, sir, Your Honor.

10           THE COURT:  Okay.

11           MR. MUELLER:  Ms. Boehm's representations are

12  accurate.

13           THE COURT:  All right.  That relief will be granted.

14           MS. BOEHM:  Item 20 is the debtors' thirty-ninth

15  omnibus objection to claims.  This was to go forward as a

16  status conference with respect to the one remaining claimant,

17  which was Madcow Group -- Madcow International Group, Limited.

18  We did submit an order yesterday, I believe, that resolves our

19  objection, and upon entry of that order that matter will be

20  resolved.

21           THE COURT:  All right.  Very good.

22           MS. BOEHM:  That's all I have, Your Honor.

23           THE COURT:  All right.

24           MS. BOEHM:  Thank you.

25           MR. GALARDI:  Good afternoon, Your Honor.  For the

**J&J COURT TRANSCRIBERS, INC.**

1 record, Gregg Galardi on behalf of the debtors.  Your Honor,

2 with respect to Number 21, it's the debtors' fifty-sixth

3 omnibus objection to claims.  These were the employee claims

4 that Your Honor had heard argument with respect to certain of

5 the claimants at the last hearing.  Your Honor, we did, in

6 fact, file a supplement to address a couple of the points

7 raised.  Other than the papers and our arguments I think it

8 would probably be better to let the other claimants go first,

9 and then we can respond to anything that Your Honor may have

10 questions with.

11          THE COURT:  All right.  And this matter was carried

12 over because we had a number of the claimants who weren't able

13 to be present at the last hearing?

14          MR. GALARDI:  Correct.  Not able to attend, and you

15 wanted to give them the opportunity to raise any additional

16 arguments.

17          THE COURT:  All right.  Very good.  Do any of those

18 parties wish to be heard?  Mr. Mueller?

19          MR. MUELLER:  Good afternoon, Your Honor.  Mike

20 Mueller on behalf of the claimants:  James Wimmer, Lawrence

21 Fay, Daniel Ramsey and Mr. Bruce Besanko.  Your Honor, I want

22 to thank the Court and debtors' counsel for their indulgence in

23 continuing this matter over to today's date.  I was out of town

24 on March 8th so I appreciate your indulgence and debtors'

25 counsel's courtesies in continuing this for me.  Your Honor, as

**J&J COURT TRANSCRIBERS, INC.**

1  I stated, I'm appearing on behalf of four claimants, Mr.

2  Wimmer, Mr. Fay, Mr. Ramsey, and Mr. Besanko with respect to

3  the debtors' fifty-sixth omnibus objections to claims.  In

4  these claims I'm only asserting entitlement to portions of the

5  claims related to what they define as awards, short term or

6  long term incentive awards, what I will refer to as retention

7  bonuses with respect to these individuals.  Admittedly before I

8  was engaged some of these individuals asserted severance

9  benefits claims in these -- that are being objected to, and

10 Your Honor, I think the objections to the severance benefits

11 are well taken for reasons that I'm going to try and

12 distinguish the retention bonus awards for.

13         Your Honor, with that background the debtors in their

14 papers, both in their original objection and in their

15 supplemental response that they've filed relied extensively on

16 Dornier Air, Judge Mitchell's decision in Dornier Air, which I

17 know is a severance benefits case, and that's important because

18 in that case Judge Mitchell said that at the time of the entry

19 into the pre-petition agreement the employee earns severance

20 benefits immediately, whether they are there for five more

21 minutes or five years.  And the retention awards, those awards

22 are not earned at that time.  The debtors' semantics in their

23 response indicate that they are earned at that time, but the

24 fact of the matter is the employees had to remain employed

25 through specific target dates in order to receive those awards.

1  So, if they had quit five minutes later, unlike the severance

2  awards they would not have received the benefits of those.

3        THE COURT:  What if the severance benefit was set up

4  so that you received more severance the longer you were

5  employed by the debtor?

6        MR. MUELLER:  Well, Judge, that's a very good

7  question because the severance cases that do allow proration of

8  severance benefits, and I don't have their names in front of

9  me, they do allow those prorations where it was based on

10  service over length of time, or length of time of service.

11  It's the cases where the severance benefits are a lump sum or a

12  defined sum regardless of the length of service, that the

13  Courts have rejected those as an administrative claim.  So,

14  they're even within the severance benefit arena the Courts do

15  make distinctions depending on the length of service.

16        Relying on _Dornier_, the debtors make much of two

17  facts.  The first is that the agreements were not entered into

18  with the debtor post-petition, or they're not agreements

19  entered into with the debtors-in-possession.  The second is

20  that there has to be actual and necessary benefits to the

21  estate.

22        With respect to the first, Your Honor, I would submit

23  that that's a red herring to the extent technically -- as a

24  technical matter there wasn't a new employment agreement

25  entered into post-petition by these employees.  However, it's

1  no different than the debtors do not enter into a new lease

2  agreement with the debtor -- with their landlords post-petition

3  but they're still responsible for the post-petition portion of

4  their lease obligations as an administrative claim to the

5  extent they accept the benefits of those lease agreements.

6        THE COURT:  Isn't that because Congress has put in a

7  specific provision in Section 365(c)(4) that says they have to?

8        MR. MUELLER:  Yes, Your Honor, but Congress has also

9  said that -- and Judge Mitchell acknowledges in Dornier Air, he

10 states, "Of course if the debtor-in-possession elects to

11 continue to receive benefits from the other party to the

12 executory contract pending the decision to assume or reject the

13 contract, the debtor-in-possession is obligated to pay for the

14 reasonable value of those services."  And he says that in the

15 context of this severance benefit case, Dornier Air.  And --

16       THE COURT:  I've got it right here in front of me.

17 I'm --

18       MR. MUELLER:  I'm quite certain Your Honor is more

19 familiar with it than I am.  And so, the only real question is

20 what are the reasonable value of these employees' services and

21 how do you determine the reasonable value of those services?

22 The debtors would have you believe that the reasonable value of

23 the services are the wages that they were paid during that

24 period of employment.  And there is some -- I can understand

25 that as a starting basis, but it was the debtors themselves,

**J&J COURT TRANSCRIBERS, INC.**

23

1  not the debtors-in-possession, but the debtors themselves that

2  said you all are worth something in addition to that to us, and

3  in fact we would like you to stick around for a period of time,

4  one, two, three years, and that is worth something to us, and

5  if you do that we will pay you X.

6        THE COURT:  Well, let me ask you this.  Is this

7  something that the parties contractually agree to?  Or is it

8  something that the Court has to find what is the reasonable

9  value of the services that were provided by the employees?  For

10  instance, let's assume that there was some sort of a million

11  dollar bonus that was going to be paid to somebody.  Would the

12  Court be bound to accept that?

13        MR. MUELLER:  No, sir, Your Honor.  I believe it's a

14  determination for the Court to make.  The parties can agree,

15  and if the debtors choose to assume that obligation --

16  answering your --

17        THE COURT:  I would still have to approve that if

18  they chose to assume it.

19        MR. MUELLER:  You would, Your Honor.  If you decided

20  it was unreasonable or that it wasn't a necessary or actual

21  benefit to the estate, if Your Honor approved that and the

22  parties agreed, then that would be allowable in that amount.

23  Here we have a situation where the debtors are saying we did

24  not assume those agreements, those retention awards, and by the

25  way, all of this could have been avoided had the debtors just

**J&J COURT TRANSCRIBERS, INC.**

1  made it clear from the get go that they were going to reject

2  these awards, and we wouldn't be here arguing about this.  But

3  they didn't.  By their silence these employees -- and they're

4  not bankruptcy lawyers, they're lay people -- I can tell you at

5  least with respect to my claimants, right or wrong, they

6  understood that in addition to their compensation, their

7  regular wages, that they were going to get these retention

8  awards had they stayed through a specific date.  Now, they even

9  thought that they would get all of it because it vested post-

10  petition.  I've disabused them of that notion and said at our

11  best case we're entitled to the pro rata, the post-petition

12  amount because, again, these are pre-petition agreements, which

13  if rejected the portion that is not post-petition is part of

14  their unsecured rejection damages claim.

15           But, Your Honor, to further answer --

16           THE COURT:  But what makes it into an administrative

17  claim?  That's where I guess I'm having a little bit of

18  difficulty.

19           MR. MUELLER:  Your Honor, if I understand your

20  question correctly, it's because they provided services to the

21  debtor post-petition and they were beneficial to the estate.

22  Under 503(b)(1) they have to be actual, necessary and

23  beneficial to the estate.  We believe they are beneficial.  If

24  all these employees had left and -- there would be no benefit

25  to the estate.  It would have harmed the debtor.  And, in fact,

**J&J COURT TRANSCRIBERS, INC.**

25

1   debtors' counsel, when he argued for the wage motion in the

2   first day orders, acknowledged that we need these employees to

3   stay here.  On December 8th, when he came back in and argued --

4   when debtors' counsel -- I don't mean to single one out,

5   debtors' petition, when they came back in on, I believe it was

6   December 8th, 2008 and were urging the Court to,

7   notwithstanding the law, permit the severance benefits, if you

8   will, the two-week severance -- the 60 days, I think it was,

9   not two weeks, but severance benefits for the employees, some

10  of -- many of whom were discharged pre-petition, they said it

11  was important for the debtors, the debtors' businesses,

12  employee morale, the debtors' reputation in the community, so

13  the debtors acknowledge that these employees are valuable and

14  important, and play a role.  Whether or not the -- again, going

15  back to the reasonableness question that you asked two

16  questions ago, the debtors state in their supplemental response

17  that it is a fact that the reasonableness is the -- what's

18  reasonable is their wages.  Just because they state it as a

19  fact doesn't make it so.  I believe it's Your Honor's decision

20  to determine what's reasonable, and I think evidence of what is

21  reasonable is the debtors' own placing the value by giving

22  these employees the retention awards, saying you're worth X to

23  us to stay here through January 1st, or January 1st, 2009.

24  Some of them had a second anniversary date of January 1, 2010,

25  and so forth.  So, the debtors at that time thought that their

**J&J COURT TRANSCRIBERS, INC.**

26

1  value was in that -- was something above and beyond what their

2  base compensation was, and so, my contention to Your Honor is

3  that those retention awards are further evidence of their value

4  and it's reasonable and beneficial to the estate.

5       The -- let me look at my notes, Your Honor.  Your

6  questioning has got me -- which are all -- I hope I've answered

7  your questions, but I want to look back in my notes and make

8  sure I've covered my points.

9       Again, Your Honor, I'm not here to argue that because

10 it vested on a post-petition date that all of it should be an

11 admin claim.  I think the Court should prorate it.  There are

12 two decisions that adopted this approach.  One is the Hechinger

13 decision, which I'm sure Your Honor is familiar with, in the

14 Third Circuit.  It's at 298 F.3d 219.  There's also the Lason,

15 Inc. case from the District of Delaware in 2003, Judge Mary

16 Walrath, found at 309 B.R. 441.

17      One of the things, Your Honor, that Judge Mitchell

18 was concerned about in the Dornier Air case was inequity of a

19 result.  And if I can just find the one part from his decision?

20 He was concerned about inequitable results if he allowed the

21 severance benefits for employees who remained with the debtor

22 for a day post-petition versus the severance benefits that

23 would be disallowed in their entirety if they were discharged

24 immediately prior to the petition, and -- Your Honor, if you'll

25 bear with me one second.  I've got so much highlighting on this

27

1  decision I can't --

2                          (Pause)

3          MR. MUELLER:  I'm not finding it, but the point I

4  want to make, Your Honor, is that by prorating it we are

5  avoiding that result that the Judge was concerned with.

6          THE COURT:  Tell me what you mean -- how would I

7  calculate the claim, then?

8          MR. MUELLER:  Well, for an employee, most of the --

9  there are two different retention awards that are generally at

10 issue here.  They varied in amounts depending on the seniority

11 of the employee.  The one was January 8th, I believe, backdated

12 to January 1, and the other was September 8th.  And the

13 anniversary date was January 1, 2009.  None of these folks were

14 here on January 1, 2010 at issue, even though there was some

15 benefits that would have accrued had they been.  You count the

16 number of days, you divide it by that -- in that -- in these

17 cases they were entitled to 50 percent, for example, of the

18 retention award.  So, you divide that by 365 days, you count

19 the number of days from November 10th, which I didn't do, but

20 there's 20 days to November 30th, plus 31 in December.  That's

21 51 days.  You multiply that by the retention award.  And that,

22 in fact, is how they did it in Hechinger and Lason.  But you're

23 avoiding the result that Judge Mitchell -- that I couldn't find

24 the portion in the opinion and was concerned about, which is he

25 said that the part of his rationale was that it would be

28

 1   inequitable to award this employee who was employed by the
 2   debtor for 60 days post-petition all of his severance, which
 3   was six months of his employment, because he was employed by
 4   the debtor 60 days, whereas an employee who was discharged the
 5   day before the petition would get nothing.  And I can see where
 6   that would be an inequitable result.  By prorating, Your Honor,
 7   you are only compensating the individuals for that post-
 8   petition amount.  There wouldn't be those inequities.  To the
 9   extent they were there post-petition for ten days they get
10   compensated ten days.  If they were there for 60 days they
11   would get compensated for 60 days post-petition.  So, you're
12   avoiding that inequitable result that Judge Mitchell was
13   concerned about.
14        One of the things that the debtors addressed in their
15   supplemental response was this inducement argument.  And I do
16   not want to suggest in any way that the debtors engaged in some
17   duplicitous behavior and falsely induced these employees by
18   these retention bonuses.  I don't think it was intentional, but
19   that's what happened.  The employees understood that they were
20   going to get, rightly or wrongly, these bonuses, and they stuck
21   around in part because they were counting on that compensation.
22   They could have, as I indicated earlier, sent a statement loud
23   and clear to everyone saying you come to work, we want you to
24   come to work, you're going to get your regular benefits, but
25   you're not going to get your retention awards because we're

1    going to reject them.  In their supplemental response they

2    indicate we've put everyone on notice because we filed our

3    first day motion which indicated that we were going to pay

4    normal wages and benefits, and at this time we're not seeking

5    to have the Court approve the retention award programs that

6    were in place, leaving open the possibility that it may later

7    be approved.  But more importantly, that motion was not served

8    on the rank and file employees.  What does get served on the

9    rank and file employees is a motion to reject any of their

10   agreements.  They weren't.  Mr. Wimmer, you may recall very

11   early in the case, I was in here on behalf of Mr. Wimmer, he

12   was an employee with the debtor for 40 years.  The debtors'

13   rejection motion sought to reject his employment agreement and

14   the letter agreement, a separate letter agreement that was

15   given to him, I believe on November 8th, two days before they

16   were going to move him to a different position, which he

17   rejected that position.  But they sought to reject that letter

18   agreement, which was never actually entered into by the debtor

19   or Mr. Wimmer, the pre-petition debtor.  They were careful

20   enough to reject that, but they didn't reject his retention

21   awards, which were these letter agreements dated September of

22   2008 and January of 2008.  And they sent a loud and clear

23   message saying, by the way, we're going to also reject those.

24   Then those parties would have been on notice that that was not

25   part of their compensation.  So, in essence, by their silence

1  these employees were operating under the impression that they

2  would also receive these benefits.  And again, as Judge

3  Mitchell says in <u>Dornier Air</u>, the debtor is obligated to pay

4  for the reasonable compensation pending a decision to assume or

5  reject.  The debtors chose not to assume or reject, so pending

6  that decision, they could have -- they could have done it right

7  out of the gate and then there would be no question, we

8  wouldn't be here arguing, I wouldn't have a leg to stand on,

9  Your Honor.  But because they left it open at their own peril,

10 these debtors should be -- or, pardon me -- these employees

11 should be entitled to their pro rata retention bonuses, post-

12 petition retention bonuses.

13          THE COURT:  Okay.  A couple of questions for you.

14          MR. MUELLER:  Yes, sir, Your Honor.

15          THE COURT:  The Bankruptcy Code fixes the time within

16 which a debtor can assume or reject a contract.  You know, in

17 some cases that's accelerated, for instance, with leases and

18 such.  But for these kinds of claims Congress has said that

19 that time for the debtor to assume or reject is on the -- as of

20 the effective date of the plan.

21          MR. MUELLER:  Yes, sir.

22          THE COURT:  Why isn't the debtor entitled to do that

23 in this situation?

24          MR. MUELLER:  The debtor is entitled to do that, but

25 as Judge Mitchell says, if they choose to wait until the plan

1  confirmation to have that be the effective date of the

2  rejection of these contracts, and I'm aware of this plan.  To

3  the extent they haven't previously rejected contracts, rejects

4  all executory contracts, to the extent they chose to wait until

5  that time, again, the Code says that the counter party to the

6  contract, the non-debtor counter party is entitled to the

7  reasonable value of their services pending that time period.

8  So, they're completely entitled to do that, but there is some

9  quid pro quo by choosing to wait until that time to do so, and

10 that is to compensate the counter parties.

11         THE COURT:  And so, what you're saying is that I have

12 to look at these side agreements as part of, really, the wages

13 in calculating the amount of the reasonable value that these

14 claimants should receive for the services they provided?

15         MR. MUELLER:  Your Honor, I don't presume to tell you

16 you have to look at anything.  What I am suggesting is that the

17 Court should consider that as additional or some evidence of

18 value.  And in fact, it's the debtors that chose that value.

19 They are the ones, the pre-petition debtors are the ones that

20 set that price.  They're the ones that said in January it is

21 worth it to us to have you here for another three years, for

22 example, one of the retention awards.  If you stay here for one

23 more year you're going to get 50 percent of this amount.  If

24 you stay here for a second year you'll get an additional 33

25 percent.  If you stay here a third year you'll get 17 percent.

1  And that actually raises a very good argument that I haven't

2  addressed, which is this concept that was discussed at the

3  March 8th hearing that none of it accrued until -- until the

4  vesting date, and therefore the argument -- the statement was

5  it's all or nothing.  And, Your Honor, it does have value over

6  time.  By evidence of -- by the agreements themselves, if

7  you're there for one year you get 50.  If you're there for two

8  years you get 50 plus 33, or 83 percent.  If you're there for

9  three years you get the entire 100 percent.  By its terms it

10 has value over time, to be contrasted with the severance

11 agreement that isn't linked to time -- as your very first

12 question to me, the severance agreement that says when you sign

13 here if you are terminated involuntarily you get six months of

14 severance if you are terminated tomorrow.  That is not how

15 these work.  These are over time.  And by their very nature it

16 says it is worth X to us to have you here for one year.  Well,

17 if two months of that are post-petition, then it should be that

18 two months, that prorated post-petition is that value.

19          THE COURT:  I have two more questions.

20          MR. MUELLER:  Yes, sir.

21          THE COURT:  One is, with regard to KERPs and such

22 that we normally approve, or used to, anyway, prior to BAPCPA,

23 that was something that the Court had to review and approve so

24 that the Court would be aware of what was going to be offered

25 in certain circumstances to employees.  How would the Court

33

1  ever be aware of whether these types of agreements were out

2  there, whether they were going to be ultimately paid, and such?

3  Isn't that something that the Court has to review, and

4  supervise, and approve separately?

5          MR. MUELLER:  Absolutely, Your Honor.  And in fact,

6  that's why we're here.  We're here on a motion to allow these

7  administrative claims.  And, Your Honor, because they didn't

8  come through the KERP process under I think it's 503(c) now,

9  you're, after the fact, determining are these -- what is a

10 reasonable value for these wages?

11         In addition, Judge Mitchell in <u>Dornier Air</u> talked

12 about one of his considerations is that this severance

13 agreement was not something that the debtor could enter into

14 post-petition as an ordinary course of business transaction

15 without seeking Court authority.

16         THE COURT:  That's where I was going --

17         MR. MUELLER:  Yes, sir.

18         THE COURT:  -- inartfully.

19         MR. MUELLER:  Your Honor, they do enter into, and

20 large companies like this do enter into retention bonuses on a

21 regular basis.  And during the non-bankruptcy period it would

22 be in their business judgment, and they can enter into these in

23 the ordinary course of business.  If the Court -- if Your Honor

24 decides that this is not such the case because of the exigent

25 circumstances of a bankruptcy, that's why we're here before you

34

1  saying it's Your Honor's decision as to what's reasonable.

2      THE COURT:  All right.  My last question is I'd like

3  you to address the last paragraph of <u>Dornier</u> where Judge

4  Mitchell says, well, wait a second, what this really should be

5  is a claim under -- a priority claim under 507(a)(3) for the

6  accrual that you're talking about, which would have taken place

7  in the 180 days prior to the filing of the bankruptcy.

8      MR. MUELLER:  Your Honor, I have <u>Dornier Air</u> right in

9  front of me.  Can I just briefly look at it?

10      THE COURT:  Most certainly.

11      MR. MUELLER:  I know the issue you're speaking of.

12      THE COURT:  It's on Page 7.

13              (Pause)

14      MR. MUELLER:  I'm looking at a Lexis printout, so

15  it's -- all right.  Yes.  "Nevertheless, some brief comment is

16  appropriate since Mr. Nealy's employment ..."

17      THE COURT:  Yes.

18      MR. MUELLER:  Okay.  Well, Your Honor, again, that's

19  -- he is referring to the severance pay issue, which is

20  severance pay is a benefit.  And, by the way, he says that the

21  language -- the litigants in <u>Dornier Air</u> say severance is not

22  in the language of 507(a)(3) or (a)(4), and he says we can

23  dispense with that right away because it says including, so

24  it's not limited to wages, benefits.  But he is addressing this

25  because, again, this severance pay, all of it was earned -- the

**J&J COURT TRANSCRIBERS, INC.**

35

1  immediate -- when he signed the contract.  Judge Mitchell says

2  that it was all earned the moment he signed the contract.  His

3  right to the payment was contingent upon his termination, which

4  may occur post-petition, but it was earned the moment he signed

5  the contract, so you look at, then -- that's pre-petition, so

6  you look at the 180-day period to determine what part of it is

7  priority.

8            THE COURT:  All right.  Anything further?

9            MR. MUELLER:  No, sir, Your Honor.  Thank you for

10  your time.

11            THE COURT:  Thank you, Mr. Mueller.  Mr. -- or, is

12  there anybody else -- I'm sorry -- any other party that wishes

13  --

14            MR. BRADLEY:  Yes.  My name is Tom Bradley.

15            THE COURT:  Mr. Bradley, you may come up to the

16  podium.  Would you please state your full name for the record?

17            MR. BRADLEY:  My name is Thomas Christopher Bradley.

18            THE COURT:  Are you a claimant?

19            MR. BRADLEY:  Yes.

20            THE COURT:  All right.  And you're representing

21  yourself in these proceedings?

22            MR. BRADLEY:  Yes, Your Honor.

23            THE COURT:  All right.  I will hear you.  Go ahead.

24            MR. BRADLEY:  Thank you very much.  Thank you for

25  giving me the opportunity to speak today.  I don't have any

**J&J COURT TRANSCRIBERS, INC.**

1  legal defense to this, but I wanted to speak for a moment just

2  based on what it's like to be an employee in this particular

3  situation.  And when the first incentive was offered to us back

4  in January of '08, you know, one of the things that we had to

5  look at yourself -- you know, look in the mirror and say, you

6  know, the company wasn't doing very well at the time, and to

7  commit to staying with the company, you know, myself and the

8  people that work with me felt that, you know, this is the

9  company saying to us, you know, we need you here to survive and

10  get through this, and we're going to reward you for sticking

11  around and being part of this, so much so that in August of '08

12  I moved my family from Delaware to Richmond, Virginia to come

13  to the corporate office to help, you know, support the Firedog

14  effort.  And I ended up staying on as part of the liquidation

15  committee to the very last day, on March 21st.  And, you know,

16  through that whole time, for the most part, you know, it was my

17  understanding that, you know, if we continued to honor this

18  obligation that we would have an opportunity at this because

19  obviously -- you know, I was unemployed for three months when

20  Circuit closed, and I was -- up until maybe a few months ago it

21  took me that long to find a job that would be close to the

22  salary I was at at that company.  But, you know, we really

23  viewed it as -- the one we got in January of '08, that, you

24  know, 50 percent of it would have came to term in January of

25  '09, you know, myself and a lot of other people, we worked

1 | through that whole year and did that, and worked very hard.
2 | You know, we had a lot of layoffs in the company, so, you know,
3 | we took on greater responsibility with the thought that, you
4 | know, we wanted to save this thing.  I've been with Circuit
5 | City since 2004.  I started off as a store director and ended
6 | up being national operations manager for Firedog, so I had a
7 | lot of passion for the company, and I desperately wanted it to
8 | succeed, enough to move my family two, three months before we
9 | actually filed bankruptcy as a company.

10 |       At no point when we were first offered these
11 | incentives was it ever stated that, you know, hey, if we
12 | actually file bankruptcy this -- you will not receive this
13 | benefit.  You know, once again, we were under the impression if
14 | we could -- we could battle through this -- you know?  And once
15 | again, from a legal standpoint on the document there was a
16 | change in control, and somebody who is not, you know, a lawyer
17 | in depth in the legal system, you think of change of control,
18 | whether it's new ownership, or, you know, whatever would
19 | happen, that we still thought that the money wasn't at risk.

20 |       You know, and the gentleman here stated earlier that,
21 | you know, that the company had -- you know, they were basically
22 | telling us that we were valuable to them and they needed us,
23 | and we lost a lot of employees, I know, from Firedog, during
24 | that period because people were afraid that, you know, the
25 | company was in a tailspin, and, you know, it wasn't worth

**J&J COURT TRANSCRIBERS, INC.**

38

1   staying for an incentive or anything else.  But there's a lot

2   of us that stuck around for that to try to save the company

3   until the end.  And, you know, and I just wanted to kind of get

4   that point across that, you know, I know there's a lot of

5   legalese around this, but looking at it from an employee

6   standpoint, you know, we took it as you want us to be here,

7   some of us are going to stay here and we're going to try to

8   make this work, and it didn't work, and we ended up being

9   unemployed for it, and, you know, I'm standing here today, yo

10  know, over a year later, trying to explain why I earned at

11  least part of that money.  And so, that's really all I have to

12  say, unless you have any questions for me, Your Honor.

13          THE COURT:  I don't, but I very much appreciate your

14  comments.  Thank you, sir.

15          MR. BRADLEY:  Thank you, sir.

16          THE COURT:  All right.

17          MR. McCULLAGH:  Your Honor, if I could just briefly?

18  Neil McCullagh, here on behalf of Dawn VonBechmann.  I just

19  wanted to -- I was here on March 8, at the last hearing.

20          THE COURT:  I recall.  And your position was these

21  weren't executory contracts.  Have you changed your view at

22  this point?

23          MR. McCULLAGH:  No.  And I didn't -- no, I have not

24  changed my view on that, and I didn't rise to really argue that

25  point any more.  It seems to me the debtor has essentially

**J&J COURT TRANSCRIBERS, INC.**

1 conceded that in their supplemental brief.  I want to address

2 the Court only to adopt and reiterate the arguments that Mr.

3 Mueller made, especially with respect to prorating and also

4 with respect to inducement.  I'm not going to repeat them.

5          THE COURT:  All right.

6          MR. McCULLAGH:  I just thought they were well stated

7 and I wanted to adopt them.  I was here on this on Ms.

8 VonBechmann's behalf, and I wanted the record to note that.

9          THE COURT:  All right.  Thank you very much.

10          MR. McCULLAGH:  Thank you.

11          THE COURT:  Does any other party wish to be heard?

12 Is there anybody on the phone that wishes to be heard?  All

13 right.  Mr. Galardi, I'll hear your response.

14          MR. GALARDI:  Your Honor, again, this is a fairly

15 uncomfortable position because I don't -- the company does not

16 dispute that the debtors -- that these people did provide

17 value, but I'd like to go through the legal arguments because

18 unfortunately I think they take the day here.  First of all,

19 and I'm going to say it, and I don't blame counsel, as a matter

20 of fact Mr. Besanko and Mr. Ramsey cannot come to this

21 courtroom today and tell you that they did not know that the

22 retention agreements were not enforceable because I personally

23 told them that they were not.

24          Leave that aside, we'll move on.  Let's assume that

25 the others did.  With respect to the actual arguments, Your

**J&J COURT TRANSCRIBERS, INC.**

40

1 Honor, I think, first of all, it's important to note that

2 Hechinger, and this sort of goes to one of the last points

3 first, Hechinger and Lason are all pre-BAPCPA cases.  With

4 respect to the clients, Mr. Besanko, Mr. Wimmer, Mr. Fay and

5 Mr. Ramsey, each of them were officers and qualify as insiders.

6 Unfortunately for them, BAPCPA, under 503(c), and I think it's

7 been conceded that everything other than, quote, the awards,

8 which are retention programs, cannot, you know, they're not

9 making a claim for that anymore.

10        Well, with respect to the retention programs Congress

11 has spoken.  It says you can't get a retention payment without

12 Court approval, and that's why we objected to them.  So,

13 unfortunately I think as a matter of law and as a matter of

14 statutory interpretation Congress says you can get your wages,

15 you can get your salary, but if it's a retention agreement,

16 let's leave aside whether it's executory or not executory,

17 503(c) says you can't get that if you're an officer, period,

18 end of story, unless the Court approves it.  That requires a

19 separate motion.  That's indeed why we filed a separate motion

20 to get insider payments because we knew you couldn't get that

21 sort of thing.  And, Your Honor, the first day was when we were

22 trying to reorganize.  There's a good reason why you wait until

23 after the case liquidates to file motions to reject if they're

24 even executory at all.

25        THE COURT:  Who were the officers again?

**J&J COURT TRANSCRIBERS, INC.**

1            MR. GALARDI:  Mr. Besanko, Mr. Wimmer, Mr. Fay and

2   Mr. Ramsey, the four that were for today.

3            THE COURT:  Right.

4            MR. GALARDI:  I don't know if the gentleman in the

5   back was an officer or not.  He was a director of some sort.

6   But leave that aside, those four gentlemen were, in fact,

7   officers.  One was an assistant general counsel.  One was the

8   first day affiant, Mr. Besanko, who knew all about this.  Mr.

9   Wimmer, it's already been stated, we rejected his contracts.

10  And as this gentleman concedes the retention part was not part

11  of those contracts, which then goes to another point.  If it's

12  not executory it's a breach.  It's an unfortunate breach, but

13  it's a breach of a pre-petition agreement.  It's a pre-petition

14  claim.  If it's executory we're entitled to reject.

15           Your Honor asked me, under 365(n), I believe, it goes

16  back to a rejection as of the date immediately before the

17  bankruptcy.  That then raised Your Honor's question, okay,

18  well, can it be priority?  And I understand, looking at it from

19  a compassionate standpoint, and unfortunately I can't, you want

20  to give the employees a priority claim, if not an

21  administrative claim.  Unfortunately it was not earned during

22  that 180-day period.  The fact of the matter is these

23  agreements, unlike others, you --

24           THE COURT:  Why wouldn't it be deemed to have been

25  earned?  I mean, if Congress says it's deemed to, you know,

42

1  have arisen on the day before, why isn't it then deemed to have

2  been earned in the 180 days preceding?  Isn't that what Judge

3  Mitchell is suggesting in Footnote 11?

4        MR. GALARDI:  Well, I think he could suggest that,

5  but I think it's contrary to the way employment agreements work

6  and these particular agreements work because of the following.

7  Your Honor, if you did that, let's take your executive.  Let's

8  take your executive that used to get the golden parachute as

9  part of his agreement with a ten million bonus.  You don't --

10 if it's deemed earned you're going to have to say that was

11 deemed earned in that period because you rejected the

12 agreement.  That's not earned.  That's simply not the common

13 sense notion of earned, and we will have another earned context

14 conversation today.

15        THE COURT:  I know.

16        MR. GALARDI:  But the fact of the matter is, and it's

17 not earned in the sense that each day that they came to -- yes,

18 the argument is if they were here on January 1st there's 50

19 percent down this -- this other percentage.  But it's not on a

20 day-to-day basis.  And as Your Honor pointed out, with respect

21 to leases, and this is an open issue, with respect to leases

22 they said you had to make timely payment.  They didn't say that

23 with respect to these types of executory contracts.  And

24 indeed, Congress said with respect to retention agreements for

25 officers you're not allowed to make these payments.  So, if you

43

1 reject it, you either breach it or you reject it.  If Your

2 Honor is going to say it's an executory contract even though it

3 was simply the payment of money with respect to the time, if

4 you just simply look at the retention award, if you're here for

5 a year you get payment.  One, I could argue that's not an

6 executory contract at all because all it is is the payment of

7 money on a date certain, not a rejection.  So, that was earned

8 the day you sign the agreement.  There's no controversy as to

9 when the date was that those retention agreements were earned.

10 When they were signed, and thus earned, that was outside the

11 180 days.  If you want to say it's an executory contract you've

12 got to say it accumulated each and every day during this

13 period.  It would give you no authority to say from November

14 10th to January 8th --

15        THE COURT:  Why does it have to accumulate over the

16 time?  Why can't it just be every day you show up for work it

17 just -- that severance --

18        MR. GALARDI:  Your Honor, because --

19        THE COURT:  -- and if it goes on for the next day?

20        MR. GALARDI:  I think the answer is, Your Honor, that

21 if you take that position that a transaction -- essentially

22 what, in my mind, you're saying is that each day you show up

23 the debtor took another transaction.  And Your Honor, then,

24 each day you showed up I could renegotiate your wage for that

25 day.  Each day.  Why do I have to give you that wage?  Do we

44

1  want to get into a 503(b) reason?  Okay.  Well, let's take

2  certain executives, Mr. Besanko, that the committee might have

3  said, oh, they're getting paid too much, let's renegotiate each

4  day and see if he stays or see if he goes.  That's not what

5  contracts are about.  You pay them the contract rate.  That's

6  the presumption.  And if they have an extra benefit, that's not

7  what was actual and necessary to keep them there.  Those

8  individuals could have taken it.  It's not as if they earned a

9  pro rata section.  They earned it only on a certain day.  If

10 you take your view, then if I terminated them January 7th, as

11 opposed to January 8th, or I rejected their contract that day,

12 did they earn a part of it even though they weren't there on

13 that eighth?  You're doing equity after the fact.  That's not

14 the way the contract reads.  It's not the way Congress said you

15 should assume or reject.  And it's not the way these people

16 earned each day.  So, you're coming up with an equitable

17 argument for prorating.  I understand the inclination.  But

18 that's --

19         THE COURT:  With a cap.

20         MR. GALARDI:  With a cap at what?

21         THE COURT:  Well, because 507 --

22         MR. GALARDI:  With 40 days post --

23         THE COURT:  -- 507(a)(3) provides a cap on the amount

24 of wages that would be earned in the net period of time.

25         MR. GALARDI:  Right.  And then, let's ask -- okay,

**J&J COURT TRANSCRIBERS, INC.**

45

1  and again, I don't think this is the way it's going to work.

2          THE COURT:  So, that gets us around the million

3  dollar problem that you raised.

4          MR. GALARDI:  Well, it does, but it also goes to,

5  okay, well, these people also have -- if we're going to have

6  the evidentiary issue how much of the pre-petition wages did

7  they get paid to go through that cap?  How much of the benefits

8  and insurance benefits went through that cap?  And then how

9  much they earned.  So, are we going to have that sort of

10 evidentiary -- that's -- and I would still argue they --

11         THE COURT:  And that's the question I'm asking.

12         MR. GALARDI:  And I -- again, I don't think that's

13 what Congress meant by earned.  I don't think that's how these

14 agreements read, that you earned it in any sense of earned by

15 staying each and every day.  And again, I think that's the

16 critical aspect.  Did they earn it each and every day by

17 staying a percentage of those days and during this period of

18 time?  That's not the concept of earning that I understand, and

19 it's not something that you can give them even a priority

20 claim, it would be my view, under -- at least with respect to

21 the executive officers under 503(3)(c).

22         THE COURT:  Well, I'm concerned about the executive

23 officers, and I'll come back because I think that you make a

24 very, very good point as far as that is concerned.  But the --

25         MR. GALARDI:  Again, Your Honor, to me it's -- unless

J&J COURT TRANSCRIBERS, INC.

46

1   you're going to read a transaction, and I think, again, the

2   ramifications of this is each and every day I'm in bankruptcy

3   and each and every day I do something there is a new

4   transaction each and every day with those individuals.  And are

5   we going to confine it to employees versus people who have

6   post-petition obligations that I still entered into a pre-

7   petition contract?  Again, I think the conduct test under the

8   Fourth Circuit also precludes you from reaching that conclusion

9   because the conduct that gave rise to the obligation is all

10  pre-180 days.  So, I think you're also deviating from when a

11  claim arises.  You're -- and again, that earning --

12          THE COURT:  Well, Congress told us when the claim

13  arises.  If you reject the contract the claim arises

14  immediately preceding the filing --

15          MR. GALARDI:  Well, that's if it's an executory

16  contract.  Okay?  We can have that argument.  Okay?  First

17  you'll have to say the retention is part of that executory

18  contract and then you're going to have to say that that goes

19  there, it's deemed to be a claim that arose.  It's clearly pre-

20  petition.  Then the question is does it fit within the priority

21  507(a)(4)?  Were they wages, salaries or benefits earned?  I

22  don't think this is wages and salary, first of all.

23          THE COURT:  It's -- but it also includes vacations,

24  severance, sick leave.  I mean, it's all stated right there in

25  the statute.  So, Congress --

**J&J COURT TRANSCRIBERS, INC.**

1           MR. GALARDI:  Okay.  Severance, sick leave, holiday

2  pay, retention bonus.  I know you're going to say including.

3  You're going to have to broaden that including to be retention

4  bonuses, as well.

5           THE COURT:  Okay.  You anticipated the next question.

6           MR. GALARDI:  You're going to keep going as far, and

7  then the question is, okay, what's not there?  Okay.  Are the

8  insurance benefits going to get accrued there?  Congress, I

9  think, said in 503(c), okay, let's leave out non-officers.

10  Right?  The issue still has to come, did they earn it during

11  this post-petition period?  And you're going to distinguish,

12  then, between the people that I reject for contract on January

13  7th, or terminate them January 7th.  They get nothing, right,

14  because if you say it's 507, had to be there on the day to at

15  least qualify as an earn and vest.  It's only people that got

16  after -- so, if somebody leaves on -- I play the game.  If I

17  reject it on January 7th they get nothing if it's an executory

18  contract, but the person that's there on the 8th gets November

19  -- 180 days worth.  But it didn't accumulate.  There's nothing

20  in any of these agreements that allows you to say they earned

21  it, they accumulated it.  This was a fee for services on a day

22  -- every day showing up that they got closer and closer to that

23  goal.  There's nothing in these agreements that say that.

24  That's unlike whether it's _Dornier_ or other severance cases

25  where I have, which makes all the sense in the world.  An

1  employee that, for each day or week that you work, right, you

2  do look at that 180 days, and they do get a priority claim for

3  severance during that period of time, and if they work post-

4  petition and they accumulate every month another week they get

5  an administrative claim.  That, I think, is what <u>Dornier</u> is

6  really talking about.  You look at the way in which the

7  contract, the agreement, the policy is written.  That

8  unfortunately in this circumstance for these employees is not

9  written this way.  It's a make it or break it.  And I think if

10  you reject that contract and it goes back to the petition date

11  it's a pre-petition unsecured claim.  If they want to reserve

12  their right to come in and file it as a priority claim, which

13  by the way these claims would still be untimely.  They've got

14  their unsecured.  We can pursue it there.  You could --

15         THE COURT:  Reclassifying their claims, right?

16         MR. GALARDI:  They've also filed general unsecured

17  claims.  You could --

18         THE COURT:  And administrative claims.  And I'm

19  suggesting that, you know, can these be reclassified to

20  priority claims?

21         MR. GALARDI:  Well, again, my view is no because

22  they're not earned.  If you want to have them prejudice --

23         THE COURT:  I understand that.  I understand --

24  really I do understand that argument, and it's a good argument.

25  I don't know that I agree with it.

**J&J COURT TRANSCRIBERS, INC.**

49

1           MR. GALARDI:  Okay.  And I understand that.  And then

2    the question is, you know, look, I think you're going to --

3    you'll come down to earn and we'll have a fight over whether

4    these are the values of services, and whether these were

5    necessary and actual expenses, and we can have all of that --

6    hold on a second.

7                              (Pause)

8           MR. GALARDI:  I may stand corrected.  Danny was --

9    well -- he was an officer, though?  He was an assistant general

10   counsel.  Hold on one second.  I have one clarification.

11                             (Pause)

12          MR. GALARDI:  Oh.  He was a non-insider, but he was

13   subject to the incentive motion.  I'm sorry, Your Honor.  So,

14   we did, in fact, put him in the non-incentive, not a control

15   person --

16          THE COURT:  All right.

17          MR. GALARDI:  -- side of that.  Mr. Besanko was not

18   subject to the incentive motion because he actually left at the

19   end of January.  And I don't know the other individuals, but

20   they were V.P.s, which was a control.

21          You asked me, again, on the reclassification, let's

22   be really clear, these -- we're fighting about claims that were

23   filed after the pre-petition bar date that sought 503(b)(1)

24   administrative priority, so if you reclass you can't fix the

25   date that they were filed.  You may say, well, but they also

1  filed pre -- because we've asked actually not to reclassify

2  these.  We've asked to deny them because they also have general

3  unsecured claims on file for the same amount.  Now, they -- you

4  may say, well, maybe they can amend those claims and come back

5  and assert priority.  We'd get to the same point.  We'd argue

6  it's an untimely amendment.  But either way you get to the same

7  issue of whether or not they can actually succeed on the claim

8  for priority.  And again, now we're not talking actual and

9  necessary.  We're talking 507(a)(4).  And we're talking earned.

10 And I don't know how else other than to say, look, the statute

11 says what it says, and I can't see any argument that says it

12 was earned during that 180 days.

13         Plus, Your Honor, I guess then how do you distinguish

14 the post-petition period?  Are you going to say from November

15 10th?  Right?  You'd actually have two claims now.  Right?  Oh,

16 by the way you worked post-petition, but because you're now

17 rejected I'm only going to give you a pre-petition.  It's not

18 really actual and necessary but it's earned during the pre-

19 petition period because Congress tells me 365 says I make it

20 the pre-petition date.  There's something incongruous about

21 that.  So, I don't see it.  It's a 503(b)(1), and the question

22 is whether it's actual and necessary.  We also all understand

23 the economic environment.  I'd love to take an evidentiary

24 hearing on why these individuals stayed during that period, and

25 whether these were actually necessary and whether they were

51

1  banking on this.  This all goes to the inducement.  But I think

2  as a legal argument it wasn't actual, it wasn't necessary.

3  There wasn't a transaction.  No one asked for a post-petition

4  transaction.  The Fourth Circuit has a conduct test.  These are

5  all agreements that were entered into.  We're talking about

6  when a contingent claim arose.  So, I think you have to re-

7  write Fourth Circuit law on conduct test here, as well,

8  notwithstanding that remark in <u>Dornier</u> saying, well, maybe we

9  ought to consider it.  And I think you can consider it when the

10  facts are different and severance is earned by time of service

11  or retention is earned by time of service.  But retention -- it

12  just doesn't make sense.  Maybe it's just me.  Retention means

13  you've got to stay to a date.  Just because I stayed five of

14  the days of the ten that I might have to stay to doesn't mean

15  that I've earned it for those five days.  If this was severance

16  it's a different type of animal.  If this was a bonus, that

17  might be a different type of animal.  Indeed, we drafted a

18  program that said if you stay four or five weeks you got a

19  percentage.  But a retention is a retention, and you knew when

20  you signed your contract you had to be there at that date, and

21  Congress said it's not the kind of thing -- to me, it's just

22  not the kind of thing that you earn in any ordinary sense of

23  the word by continued performance until that date.  And

24  unfortunately it's a pre-petition agreement.  I don't think

25  it's executory, also, and I don't think it's incorporated into

1 the agreements.  But -- that's it.  I don't know if you have

2 any other questions.

3          THE COURT:  I don't.  Thank you very much.  Mr.

4 Mueller, do you wish to reply?

5          MR. MUELLER:  I do, Your Honor, if that would be all

6 right with the Court.  First of all, I think I just heard Mr.

7 Galardi say he doesn't think these agreements are executory,

8 which their pleadings argue ad nauseam that they are executory,

9 they're pre-petition agreements that are being rejected and

10 we're entitled to pre-petition damages.

11          Also, with respect to whether or not the claims are

12 untimely, if these are -- these retention awards are executory

13 contracts that are being rejected on the consummation of the

14 plan, I think under the Code the parties have 30 days to file

15 claims for -- after the rejection order is entered.

16          With respect to his request that they be disallowed

17 because they're duplicative claims, I know for some of my

18 clients they're duplicative claims, but some of these folks

19 have not sent me all their information.  They only engaged me

20 recently.  I don't know that that's the case, so I would like

21 to reserve the right, if the Court determines that these are

22 not appropriately administrative claims, that we can at least

23 assert claims for the damages or the general unsecured claim

24 for those amounts.  The argument would be that they would be

25 timely because it's rising out of this Court's decision.  They

53

1  did file their claims timely for the admin claims, so everyone

2  is on notice of it.

3         With respect to the concept of -- counsel indicated

4  that the parties need to be there on a certain date to earn

5  these, and each of these cases, my understanding is that all of

6  these individuals were there on the first vesting date.  They

7  were not there on the second and third vesting dates.  We're

8  not asking for that, even on a pro -- on a pro rata basis we're

9  not asking for that.  So, that part is not -- with respect to

10 503(c), that has not been raised before.  It's not in their

11 pleadings, I don't believe.  If they are I apologize.  But the

12 --

13        THE COURT:  But if they were officers, and this is

14 very important, I think --

15        MR. MUELLER:  Yes, sir.

16        THE COURT:  If they were officers hasn't Congress

17 said that retention claims cannot be paid except pursuant to

18 503(c)?

19        MR. MUELLER:  Congress said that notwithstanding

20 Sections 503(b) they shall neither be allowed nor paid provided

21 it meets these requirements.  There's nothing that says there

22 that it has to be after notice and hearing.  The Court has to

23 have evidence, but we could come back another day and say,

24 okay, Mr. Besanko's claim is X dollars, which is not more than

25 ten times the general retention awards for everybody else.  A

**J&J COURT TRANSCRIBERS, INC.**

54

1  lot of the Court's powers -- a lot of the things debtors can do

2  are only after notice and hearing, and that's not the way this

3  is set up.  It says that retention bonuses cannot be paid to

4  insiders unless they meet these requirements.  Well, if that's

5  where we're going with respect to this, then they should be

6  afforded an opportunity, and I won't waste the Court's time.  I

7  would discuss this with debtors' counsel to see if there's even

8  a chance, but they ought to be afforded an opportunity to say

9  we do meet requirements one, two and three -- or, pardon me --

10 I guess it's stated as A, B and C of 503(c)(1).  I appreciate

11 your time, Your Honor.

12         THE COURT:  All right.  Thank you.  Mr. McCullagh, do

13 you wish to be heard?

14         MR. McCULLAGH:  I do, Your Honor.  Again, I didn't

15 plan to come here and make argument today.  I was more

16 interested in just listening.  But I wanted to highlight one of

17 the first things I said when I addressed the Court on December

18 8th, which is the debtor, in its brief filed, I think it was on

19 March 6, just a couple of days, or maybe it was five days

20 before the last hearing, identified certain of the claimants

21 who were subject to the KERP requirements.  My client, Ms.

22 VonBechmann, was not among those, and I think properly so.  She

23 did have the title of vice president.  I think she was vice

24 president of merchandising.  I don't remember her exact title.

25 But she wasn't a control person in the company.  She wasn't

55

1   identified as someone being subject to KERP.  And I don't have

2   my Code in front of me.  I believe 503(3)(c) refers to

3   insiders, and I know that the Code defines insiders to include

4   officers and directors, but I'd also point out, and I'm going

5   from memory here, but I believe one of the initial motions

6   filed in this case, it might be the employment -- employee

7   practices motion that the debtor filed, distinguished and

8   provided case law that not all officers are insiders, and I

9   believe it carved out in that pleading some of those people, so

10   I don't think we can say just because this person had a title

11   like vice president they're automatically subject to the KERP

12   requirements.  And the debtor did, I think, carve Ms.

13   VonBechmann out from any sort of KERP argument.  And I feel

14   like I needed to highlight that in light of the colloquy that

15   the Court has had with counsel.

16         THE COURT:  All right.  Thank you.

17         MR. MUELLER:  Thank you.

18         THE COURT:  Anything further, Mr. Galardi?

19         MR. GALARDI:  Yes, Your Honor.  I think hopefully

20   some helpful clarifications for all of this.  One is, the last

21   gentleman to speak is absolutely correct.  We did take a

22   position, and that's why Mr. Ramsey sort of confused me.  He

23   has the title, but we took the position he needed control, and

24   I think when we settled with the committee that issue wasn't

25   ruled on by Your Honor, but we have taken the position,

56

1  although I know there's subsequent case law to the contrary,

2  that just because you had a title doesn't mean you're in

3  control and shouldn't done the insider.  I don't remember if

4  Your Honor ruled or commented on that, but I think we were

5  comfortable with that position.  So, that's why when Mr. Ramsey

6  came up, I know he's an officer title, but I know we took the

7  position not insider for the purpose of the incentive plan.

8  So, that is correct.

9      Your Honor, I think better said, one, we haven't

10  moved to reject anything yet, so -- on these agreements.

11  Better said, I think we think it's irrelevant whether it's

12  executory or not executory because I think you get to the same

13  place except for the issue Your Honor has mentioned.  If it's

14  not executory, the retention separate letter agreement, then

15  you breach it and you have a pre-petition claim.  Where I think

16  it now makes a difference in Your Honor's mind, although we

17  don't think it makes a difference from our perspective is if

18  it's part of the executory contract.  And then you have a

19  couple variations.  If it's part of an executory contract then

20  you raise your issue.  If it's rejected the date before the

21  filing, can it be earned as of that date?  And then we have the

22  other issue, which, again, our position is no, your position

23  may be yes, or wherever your position comes out.

24      THE COURT:  And your motion, just so that we're clear

25  what we're talking about because we've had a lot of discussion

1    going on today, is really an objection to claims under your

2    fifty-sixth omnibus objection to claims as opposed to any kind

3    of a motion to reject the executory contracts?

4          MR. GALARDI:  Correct, Your Honor.  They have all

5    filed these as 503(b)(1) administrative claims.  We have

6    objected to them as 503(b)(1) administrative claims on the

7    grounds that it doesn't satisfy 503(b)(1).  We have not yet

8    moved to reject anything or do that.  Now, in our plan we'll

9    have the basic everything is rejected, but we have not done

10   anything other than say they're not administrative claims.

11         Also, so to be clear, and I know the gentleman hasn't

12   looked, to the extent that they don't have a duplicate

13   unsecured pre-petition claim on file, we have no objection to

14   that being there.  The problem is we're reserving our rights to

15   object it's late.  None of these claims that we objected to

16   were filed prior to the pre-petition unsecured bar date, so we

17   actually objected, you're not administrative.  And why we

18   didn't seek, as we've done many times before, to reclassify, is

19   they weren't filed by the pre-petition bar date.  That may be

20   unfortunate for a claimant.  If Your Honor feels better saying,

21   well, I might not get 503(b), but let's consider it a late

22   claim, that's fine.  We will then probably object as it being a

23   late claim.  I'm not trying to do everything.  I think we did

24   that in our objection.

25         So, I think those were the issues I just wanted to

58

1   clarify with respect to the objection.

2              THE COURT:  Okay.

3              MR. MUELLER:  Your Honor, can I -- Your Honor, only

4   very briefly, and I very much appreciate your indulgence.  With

5   respect to this issue that Mr. McCullagh and Mr. Galardi are

6   talking about that certain folks may have the title but are not

7   insiders, I would concede most likely that Mr. Besanko, who was

8   the CFO prior to Ms. Michelle Mosier (phonetic) being the CFO,

9   was an insider, I assume, under their definition, although I

10  haven't seen it.  Mr. Fay, I'm not sure what his title was.

11  Mr. Ramsey apparently was an assistant counsel, or associate

12  counsel.  And then, Mr. Wimmer, who I'm most familiar with,

13  while he had been there for 40 years I don't think under

14  anybody's definition he would be an insider.  So, I would

15  reserve the same issues that Mr. McCullagh did, that 503(c)

16  wouldn't apply to them.  It would probably be Mr. Besanko.  And

17  I know Mr. Besanko had an offer from another company, which, if

18  we had a hearing on that, could come into Evidence, which is

19  the first element under 503(b)(1)(A), whether or not it was

20  necessary to keep them there if they had another offer.

21             With respect to the issue about the timing of the

22  admin claims versus the general unsecured claims, that was set

23  up based on the debtors' bar dates.  The first bar date, I

24  believe, was January 30th for general unsecured claims, and

25  then they had a later bar date for administrative claims, I

59

1  believe it was April 30th.  So, by their own procedural posture

2  or orders they got these admin claims after the general

3  unsecured claims.  And, in fact, many of these employees were

4  there past the general bar date.  If you worked until February

5  1 you were past the general bar date, so you're not going to

6  file your claim for your post-petition earnings as they view

7  these to be, whether or not the Court ultimately decides that

8  they are, until -- until that time.  So, I think it would be

9  disingenuous to now -- to then come and say, well, you can't

10  file it as a general unsecured claim now because it's after

11  January 30th, 2008 -- 2009.

12       THE COURT:  Yes.  You'll have some sort of claim.

13  But the question really is in my mind, because we've been going

14  sort of in circles on this, you know, what you're really

15  arguing is that you've got an executory contract and that if

16  they reject the executory contract you're going to have lease

17  rejection damages claims, and it may be an administrative claim

18  if I find that it's part of the value.  And if not, then I've

19  raised, you know, apparently this red herring about whether

20  it's some sort of priority claim under 507.

21       But in any event, that's one type of claim.  But what

22  we have before us today really is an admin claim that you've

23  already filed which would be based on, what, the executory

24  contract or the pre-petition agreement?  I guess I'm a little

25  confused on what I'm doing, because I really do think that

J&J COURT TRANSCRIBERS, INC.

60

1  these things are executory contracts, and I'm trying to figure

2  out how I've got in the posture that I've got it right now.

3       MR. MUELLER:  Your Honor, I agree with you.  They are

4  executory -- my opinion, which doesn't count for much, because

5  I am not the Judge, but they're executory contracts under the

6  Countryman test because performance was still due by both sides

7  on the petition date.  Both parties still had obligations to

8  perform, which is the --

9       THE COURT:  Well, Mr. Galardi will say that, no, that

10  only your client had -- well, I guess you're right.  If you

11  performed up to a date, you're saying, then it automatically

12  vested as of that January 8th date.

13       MR. MUELLER:  And none of the cases even address

14  whether or not really they're executory contracts because I

15  would submit it's pre-supposed that they are.  But, Judge

16  Mitchell in Dornier Air says you don't really -- the issue

17  doesn't really turn on whether or not they're executory.  It

18  turns on what are the reasonable -- what's reasonable

19  compensation for these services.  But as a technical matter,

20  you're right, we are here because of the manner in which the

21  debtors procedurally postured this, which was we filed

22  administrative claims because we thought we were entitled to

23  these 503(b)(1) claims and they filed an objection to them.  To

24  my knowledge there's over 7,000 docket entries in this case,

25  and I've done my best to keep up with the docket entries, but

61

1  to my -- to my knowledge there has not been a motion to reject

2  these executory contracts as of yet.

3          THE COURT:  Wasn't there an eighth omnibus objection?

4  Or --

5          MR. GALARDI:  Your Honor, maybe this will actually

6  help both Your Honor's ruling and maybe we have gone around in

7  circles.  One, none of the, quote, employment agreements or the

8  retention agreements, whether you see them as executory or not,

9  there is no motion that has been filed that will reject these

10 to date.

11         THE COURT:  All right.

12         MR. GALARDI:  So --

13         THE COURT:  That's helpful.

14         MR. GALARDI:  That's helpful, because I think, Your

15 Honor, if I -- again, if we take -- again, if you're Your Honor

16 and I'm just a lawyer, but I'll take my shot at it.  If I look

17 at simply the procedural matter --

18                    (Pause)

19         MR. GALARDI:  Okay.  We have rejected the employment

20 agreements.  We have not rejected the retention agreements.

21 So, for example, Mr. Wimmer's contract was rejected --

22         THE COURT:  All right.

23         MR. GALARDI:  What has not been rejected is the

24 underlying retention agreements.  Whether we see them as

25 executory or not, that may be that, but we'll have a catch all

62

1   in the plan.  To the extent that somebody thinks it's an

2   executory contract and gets the extra 30 days, it's not a Code

3   provision, it's actually our bar date said that, and the plan

4   will say that.  So, if they think that's a rejection, they

5   would have a claim.  So, if I were thinking of what I think is

6   procedurally the narrow issue before Your Honor today, they

7   have filed a 503(b)(1) claim.  We have objected to a 503(b)(1)

8   claim saying it's not -- doesn't qualify as an actual necessary

9   expense to preserve the estate.  Your Honor asked me, well, if

10  you reject these things can they get a priority?  There is no

11  priority claim that I know of that's on file currently.  We

12  have not objected to one if it is on file currently.  And we

13  have not rejected or moved to assume or reject the retention

14  agreements under a plan.  So, in substance I could say if I

15  were the Judge that issue is not really before Your Honor.

16  It's an interesting issue we could save for 30 days post the

17  effective date if people file it.

18         THE COURT:  Which is what Judge Mitchell said.

19         MR. GALARDI:  So -- but there is no such thing, and

20  so they're not really prejudiced either because they may still

21  file that claim and you may have given them an argument for

22  them to raise on that rejection.  The plan will clearly provide

23  that anything that is not expressly assumed is rejected to the

24  extent it's an executory contract, and they will then have

25  another 30 days to decide whether they want to take the

63

1   position it's executory, make the argument that Your Honor has

2   suggested that it's earned, and fight another day exactly that

3   issue.   Thank you.

4          THE COURT:   All right.   Thank you.   Mr. McCullagh?

5          MR. McCULLAGH:   If I might beg your indulgence one

6   more time.   I feel like I have to rise on these points only

7   because I did file for Ms. VonBechmann general unsecured claims

8   timely prior to the initial bar date, also designating part of

9   her claim as a priority claim.   So, just for the record I have

10  set these issues out there.   I spoke to debtors' counsel, not

11  Mr. Galardi, but before the initial hearing.   My understanding

12  is that even if the administrative claims are disallowed and

13  the resulting -- or are converted to general unsecured claims

14  and those are disallowed as untimely, that will not effect the

15  timely filed proofs of claim that I filed way back in January

16  of 2009.   And I --

17         THE COURT:   I understand.   Thank you.

18         UNIDENTIFIED ATTORNEY:   That's our understanding,

19  Your Honor.

20         THE COURT:   Yes.   And that's consistent with mine,

21  too.   All right.   The Court is prepared to rule.   The Court is

22  going to disallow the administrative claims filed under

23  503(b)(1).   The Court does view these agreements as executory.

24  There may be some priority claim.   The Court does not have that

25  issue before it right now, and I guess I'm sorry to some extent

**J&J COURT TRANSCRIBERS, INC.**

1    that I raised the issue when it wasn't before me since so much

2    turned on that.  But to the extent that any party wants to file

3    that when the contracts are -- these agreements are ultimately

4    rejected, we'll take it up in the appropriate posture at the

5    appropriate time, at that point.  And so, the Court is not

6    going to make any ruling with regard to Section 507(a)(3), or

7    (a)(4), rather.  And -- but with regard to the administrative

8    claims under 503(b)(1), the Court is going to disallow the

9    claims.

10           MR. GALARDI:  Your Honor, I hate to ask this, but

11   I've got to.  Your Honor said you view these as executory.

12   Since the -- is that a ruling on this matter with respect to

13   these retention agreements being executory because, again, I

14   have my view that they may not be.  I have my --

15           THE COURT:  You can argue that at the appropriate

16   time.

17           MR. GALARDI:  Thank you.

18           THE COURT:  I'm not ruling that they're executory.  I

19   said it was my view that they were.

20           MR. GALARDI:  Okay.  I just wanted to make --

21           THE COURT:  The only ruling I am making today is that

22   the administrative claims under 503(b)(1) are denied, and then

23   everything else is preserved, and you know my views.

24           MR. GALARDI:  I know your views, Your Honor -- and I

25   --

**J&J COURT TRANSCRIBERS, INC.**

65

1          THE COURT:  Much like we know the Second Circuit's

2    views in <u>Chrysler</u>, and that doesn't matter anymore, either.

3                         (Laughter)

4          MR. GALARDI:  I appreciate that.  I just wanted the

5    clarification so it wasn't rule of the case so that I couldn't

6    argue it in good faith.  Thank you.

7          THE COURT:  Yes.  Thank you.  All right.  I'm afraid

8    now to ask this question.  Any questions regarding the Court's

9    ruling?

10         MR. GALARDI:  Your Honor, I would propose just a very

11   simple order saying that the objection to the 503(b) and all

12   other rights are preserved but with respect to the

13   administrative claims asserted under 503(b)(1), that's it, and

14   that's the very simple order --

15         THE COURT:  The -- those are denied.

16         MR. GALARDI:  -- denied.  Everything else is

17   preserved with all rights.  And if counsel wants to make sure

18   that they've filed it, or make an argument that it has to be

19   reclassified, we'll talk to them, and if we have to come back

20   to the Court we'll do so.

21         THE COURT:  All right.  That would be the Court's

22   preference.  All right.  Thank you.

23         MR. GALARDI:  Your Honor, that now would move to

24   Number 22, Your Honor, which is the debtors' motion to disallow

25   or to reclassify a claim.  There was a $10 million claim filed

                    **J&J COURT TRANSCRIBERS, INC.**

1 by Franklin Spencer Wilson.  That was a lawsuit.  That lawsuit

2 was commenced in 2007.  I think it was June 27th, 2007.  The

3 claimant has sought priority administrative treatment for that

4 claim.  Your Honor, both it is outside the period, we believe,

5 and nor is it one of those claims that we believe is entitled

6 to administrative pre-petition priority, or administrative

7 priority, 503(b).  I don't know if the claimant is here.  They

8 did, in fact, file a response.  I'm not going to go into the

9 merits of the response, Your Honor.  I'd ask if that claimant

10 is here, to set forth the grounds for administrative priority,

11 otherwise we would ask Your Honor to sustain the objection.

12          THE COURT:  And this is the claim of Mr. Franklin

13 Wilson?

14          MR. GALARDI:  That's correct.  It's Docket Number

15 6590, and this was Matter 22 on the agenda.

16          THE COURT:  All right.  Is Mr. Wilson either in the

17 courtroom or on the phone?  Is there any counsel appearing on

18 behalf of Mr. Wilson?

19          MR. GALARDI:  I think Mr. Wilson advised us that he

20 was not going to appear, nor counsel, but just wanted to

21 confirm that no one was here for him.

22          THE COURT:  All right.  Well, for the record I have

23 reviewed the debtors' motion and memorandum in support of the

24 summary judgment on the objection to the claim, and I've

25 reviewed Mr. Wilson's correspondence with the Court and his

67

1 reply, and I think that the position set forth by Mr. Wilson

2 don't go to the merits of the matter, and the debtors' motion

3 for summary judgment will be granted.

4        MR. GALARDI:  Thank you, Your Honor.  That now brings

5 us, and I think they can all be grouped together, I think

6 counsel actually represents it, Matters 23, 24, 25 and 26 on

7 the agenda, Your Honor.  All of these are the debtors'

8 objections and then a request for summary judgment on claims

9 that have been filed, one as class proofs of claim, and two, in

10 a priority amount.  Your Honor, we did receive a response,

11 whether we want to call that a response requesting an

12 adjournment and discovery.  We did not receive a substantive

13 response, I would call, to our summary judgment motion in the

14 time that was permitted to file a response.  Your Honor, I

15 don't know how you'd like to proceed.  I can go forward with my

16 arguments on summary judgment, or I could let counsel discuss

17 the grounds for the adjournment and why we think an adjournment

18 should not be granted and why Your Honor should rule, and the

19 importance to the estate.

20        THE COURT:  All right.  Well, what I would like to do

21 -- I've read all of your papers, but I'd like you very briefly

22 just to put your main points on the record, and then I'm going

23 to let counsel proceed.

24        MR. GALARDI:  Sure.  Your Honor, very briefly, first

25 it is our understanding, and we believe good law, that in order

**J&J COURT TRANSCRIBERS, INC.**

68

1    to file a class proof of claim one should get leave of Court

2    prior to doing so, and importantly, to do so prior to the bar

3    date.  I think it is an uncontested fact that these particular

4    class action proofs of claim, they did not seek Court

5    permission prior to the bar date, and therefore on that grounds

6    alone, I don't think that's disputed, that the Court should

7    deny the claim going forward as a class proof of claim, and

8    therefore should consider simply those class plaintiffs that

9    were identified in those claims specifically.

10          Your Honor, with respect to even if they were class

11   proofs of claim, Your Honor, our view is if you look at the

12   allegations of the complaint and the representations of the

13   identified class plaintiffs that could be representative of a

14   class, all of them seek claims of priority essentially for

15   wages, but there was no set of facts for each of those

16   individuals that the wages could qualify for that 180-day

17   period pursuant to 507(a)(4).  There is a statement that if we

18   could take discovery we might find such a person, and we'll

19   talk about that.  But with respect to the actual people that

20   could be representative, and we would say that they are the

21   only class that could be representative, those people could not

22   as a matter of law qualify for a 507(a)(4).

23          With respect to those unidentified people that might

24   have earned wages, and we don't even know if there are any,

25   Your Honor, we go back to argument number one.  We would say

**J&J COURT TRANSCRIBERS, INC.**

69

1  it's a significant prejudice.  All of those people received

2  notice of the bar date, the class action.  We did notify

3  employees of their right.  So, there's only two sets of facts

4  that could be true here.  One, they already filed their proofs

5  of claim and their rights are preserved to seek priority.  Or

6  they didn't file proofs of claim, in which case the discovery

7  as to who was in that class but didn't file a proof of claim

8  would prejudice the debtors.  To seek the discovery would

9  prejudice it, and then would bootstrap around the bar date a

10 potential priority claim.

11         Your Honor, with respect to the prejudice, and I

12 think this also goes to the adjournment, I think these are

13 facts that Your Honor can take judicial notice of because they

14 are all claims agent facts.  And I'm speaking prior to any

15 orders that Your Honor may enter today.

16         Your Honor, as we sit here today, and confirmation is

17 looming on April 6th, and we're going to move that a month, but

18 just to give Your Honor an idea of why the debtors feel

19 strongly that this matter should proceed today, and in fact

20 that these claims should be reclassified, as we sit here today

21 we have $442 million of cash on the books.  We have, after

22 objections, and after eliminating most favorably for our sakes

23 without prejudice to anybody, rights of setoff, there are 11

24 million secured claims.  So, that would leave us with $431

25 million of cash if we paid them or reserved for them.  And I'm

**J&J COURT TRANSCRIBERS, INC.**

1  going to go through this because this is all a matter of the

2  claims record.

3        If you took the $431 million of cash, we have

4  administrative claims filed to date, again, without orders

5  today, of $110 million.  And Your Honor is familiar with the

6  docket enough to know that many people have asked for reserves.

7  So, again, we think we're going to get that number down, but if

8  we had to confirm today and we reserved for all those claims,

9  even the ones that have pending objections, we would now be

10  down to $321 million of cash.

11        Your Honor, in addition we have 200 million of

12  503(b)(9) claims.  And I want to be clear about that.  And this

13  is not with respect to prejudice to anybody's rights, but I

14  want to put in context why we are so motivated to move forward

15  on the priority claims.  The 200 million constitutes claims

16  that are unobjected to, as well as the amounts that Your Honor

17  has temporarily disallowed, so we didn't deduct from that 200.

18  If we took -- temporary disallowed, but as Your Honor knows

19  we've gotten a request for reserves, we're going to deal with

20  that in confirmation but I'm trying to give Your Honor the best

21  cash.  So, if you take that cash out we'd have $121 million

22  left.

23        Your Honor, there is $6 million in professional

24  reserves, so we're down to $115 million of cash.  Your Honor,

25  there was an appeal on the reclamation, but let's just leave --

1    we have $115 million of cash.  So, if I wanted to confirm today

2    and show Your Honor that this was feasible, set up reserves for

3    all of those claims so that people knew they were getting paid,

4    we'd have as much as $115 million of cash.  If Your Honor -- if

5    I have to set a reserve for reclamation claims because Your

6    Honor's opinion has been appealed, we'd have to take 25 more

7    out of that, so somewhere between 90 and $115 million of cash.

8              We do think we have other sources of cash.  We've

9    talked about the Canadian, but I'm talking about what I think

10   I'll get in the next 30 days to confirm.

11             Your Honor, there are $223 million of priority

12   claims.  Though they don't have to be paid on the effective

13   date, you do have to pay them in full.  It will at least go to

14   feasibility.  Your Honor, the four claims that I'm objecting

15   today account for $150 million.  So, obviously if it's 223 I

16   have one big feasibility issue.  I have 90 million of cash,

17   $223 million of claims.  Can't reserve for that amount.  If I'm

18   successful, and I'm not saying I'm successful, but if I deal

19   with 150 of it, I'm down to $73 million, and I'll have cash

20   under all circumstances that I could even reserve, and I know

21   those numbers will come down and say now we can go forward.

22   And our plan requires that we either reserve or pay

23   administrative and priority claims before any distribution can

24   be made to unsecured claims.  So, it is absolutely imperative

25   that we address these issues as soon as possible to get to

1  confirmation.  It's at least a feasibility issue if not a

2  reserve issue.  So, Your Honor, that's why we think it is

3  prejudicial to us to delay and don't think a party should be

4  able to grant themselves an adjournment simply by filing a

5  discovery request without a substantive relief, and without an

6  order from the Court.  Those are my points.

7         THE COURT:  Thank you, Mr. Galardi.  Mr. Hutson?

8         MR. HUTSON:  Good afternoon, Your Honor.  Richard

9  Hutson, for the record, on behalf of the local -- local counsel

10 on behalf of the class creditors, Robert Gentry, Jack

11 Hernandez, Jonathan Card and Joseph Skaf.  Your Honor, Michael

12 Righetti of the Righetti Law Firm has been admitted to this

13 Court via pro hac vice.  I'd like, at this time, to have him

14 address debtors' argument.

15        THE COURT:  Thank you, Mr. Hutson.  Mr. Righetti,

16 welcome to the Court.

17        MR. RIGHETTI:  Thank you, Your Honor.  And thank you

18 for the opportunity to appear before you here in Virginia.  I

19 did spend yesterday cruising around and seeing some sights in

20 Richmond.  I did enjoy that very much, but it is an honor to be

21 here, as well.

22        I'd like to, I think, start out by just notifying the

23 Court a little bit about the big picture here, and I think that

24 the way that this has been briefed it's -- we've tried to show

25 the Court the big picture, but I believe the debtor is looking

**J&J COURT TRANSCRIBERS, INC.**

73

1   at this through a very small tube, if you will.  This -- the

2   <u>Gentry</u> case, in particular, having been filed in 2002, has now

3   been litigated for over eight years, and vigorously litigated,

4   yet there's been no answer to the complaint that has been

5   originally filed.  I think it probably sets the record for the

6   most amount of time, money, and attorneys' resources that have

7   been spent on a case without ever having an answer to a

8   complaint.

9        The case went all the way up to the Supreme Court and

10  back down, and is now still sitting in the Second D.C.A. Court

11  of Appeals on Circuit City's attempt to enforce a ban on class

12  actions in California.  The California Supreme Court, I'll

13  note, has deemed that provision illegal.

14       Your Honor, we did not have the opportunity to

15  conduct any discovery into the merits of class certification or

16  the merits of our claims in State Court, and we have not had

17  the opportunity to do that in this Court, obviously, pending

18  the automatic stay on discovery.

19       THE COURT:  Well, why not?  Because, I mean, unlike

20  California this is referred to as the rocket docket, and we do

21  things fairly quickly here.  And why couldn't you have

22  commenced discovery as soon as there was -- I mean, the

23  objection to your claim was filed back in June, if I recall

24  correctly, and so at that point it became a contested matter,

25  right?  And why couldn't you commence your discovery, you know,

**J&J COURT TRANSCRIBERS, INC.**

1  the day after you got the objection to your claim?  Because now

2  you had your claim and you had an answer.

3       MR. RIGHETTI:  Thank you, Your Honor.  And I'll

4  respond to both of your questions.  We did receive an objection

5  back in June, and through e-mail correspondence with attorneys

6  from debtor, they, in fact, preliminarily agreed to adjourn

7  those objections if we filed a preliminary response to them.

8  They are now saying that they've put us on notice that that was

9  a contested matter.  I have e-mail correspondence, and I would

10  appreciate the opportunity to approach the Court and submit

11  those documents so the Court has them in front of Your Honor,

12  so that you can see that the correspondence, in fact, indicates

13  that they were willing to adjourn those objections if we filed

14  a preliminary response.

15       To say now that that put us on notice that they were

16  contesting the -- that this case is ripe for class

17  certification, or that they were contesting any of the claims

18  in our original complaint I think is a bit of hyperbole, Your

19  Honor, because there's been no indication until we received

20  this motion for summary judgment that they disputed class

21  certification.  And we still actually don't know that they

22  dispute that this case is proper for class certification.

23       THE COURT:  Okay.  Well, let's forget the class

24  certification for a minute, because I wanted to go back to the

25  original thing that -- you said that you didn't know that they

1  were disputing it, but you filed a claim, okay, and then you

2  got an objection to your claim.  Okay.  Now, regardless of what

3  anybody says, by law, under Rule 9014, that becomes a contested

4  matter.  Right?

5          MR. RIGHETTI:  Correct, Your Honor.

6          THE COURT:  And so, as a contested matter then Rule

7  9014 says certain of the rules are applicable.  And one of

8  those rules that says that's applicable is Rule 26, and it also

9  -- Rules 28, 29, 30, all the way up to 33.  We're familiar with

10 all those rules on discovery.  And my question to you simply

11 was when you got the objection why didn't you immediately

12 commence discovery?

13         MR. RIGHETTI:  Your Honor, we -- and Matthew

14 Righetti, in his declaration, testified to this extensively,

15 but he approached the attorneys at Skadden Arps, and counsel

16 for debtor, requesting that discovery be allowed either in

17 State Court or to commence discovery here in this Court, and

18 the response from debtors' counsel was that Your Honor would

19 not be interested in lifting the stay to conduct discovery

20 because this is a liquidating Chapter 11 proceeding --

21         THE COURT:  That was probably correct.

22         MR. RIGHETTI:  Okay.  And so we relied on that

23 representation and also on their representation that they were

24 not willing to stipulate to do discovery, neither in this Court

25 or in State Court, and therefore we were waiting patiently to

76

1    deal with these claims when they came before the Court.

2            THE COURT:  Now, who says you have to get their

3    stipulation to commence discovery?

4            MR. RIGHETTI:  Your Honor, we did not need to receive

5    -- to get a stipulation, and I suppose at this point it would

6    have been more wise and prudent to bring a motion before the

7    Court, but we relied on their representation.  And what Your

8    Honor believes was correct, that any request to do discovery

9    would have been denied, as this is a liquidating Chapter 11.

10           THE COURT:  No.  I would have denied lifting the stay

11   to pursue it in California.  And the reason for that is I

12   wouldn't have wanted to wait another eight years to get any

13   kind of an answer.  We need to get answers quickly in this

14   Court, and we move fairly quickly.  And so, you know -- and

15   that's why I'm questioning you on the delay that's already

16   occurred.  I mean, if you were in the District Court this case

17   would have already been tried.  You know?  And -- but, you

18   know, we do it a little bit slower in Bankruptcy, I suppose, as

19   we have more moving pieces.  But I'm trying to understand why

20   you didn't commence discovery if you thought you needed to do

21   it.

22           MR. RIGHETTI:  Well, Your Honor, and I believe that

23   the declaration of Matthew Righetti which sets forth by we did

24   not commence discovery right away is the position of the

25   creditors in this matter.  I think it's also important to note

**J&J COURT TRANSCRIBERS, INC.**

1   that the reply of the debtors did not address any of the

2   comments that Matthew Righetti swore to in his declaration.

3   They seem to be saying, so what?  Yes, we told you that there

4   would be no discovery allowed in this Court, but that's just

5   unfortunate and now you're stuck because you didn't get

6   permission from the Court to file a class proof of claim.  I

7   believe what you're really looking at is a gotcha motion, Your

8   Honor, where we had been communicating, we had been responding

9   to these omnibus procedural objections, but we never actually

10  made a formal request for discovery, relying on the

11  representations of debtor counsel.  And they, obviously having

12  more experience before Your Honor, made the correct assumption

13  that discovery would probably not be advised, as this is a

14  liquidating Chapter 11.  So, that's the reason we didn't

15  conduct --

16          THE COURT:  Notice the distinction, though, that not

17  -- wouldn't be permitted to proceed in California, but you were

18  always entitled to proceed in this Court.

19          MR. RIGHETTI:  Well, we were under the impression

20  there was an automatic stay in this Court on any discovery.

21  And when we requested that the stay --

22          THE COURT:  Where does that come up?  There's not an

23  automatic stay against discovery in this Court.

24          MR. RIGHETTI:  Well, Your Honor, that was the

25  impression that we were under, and that's what we believed they

78

1 informed us of when we asked to do discovery before Your Honor

2 in this Court.  I mean, we've communicated with them that we

3 want to get these claims litigated.  We believe that there are

4 thousands of employees in California who have bona fide claims

5 for back overtime wages, meal and rest break, minimum working

6 standards in California, and with the stroke of a pen, those

7 bona fide claims could be completely wiped out.

8        And, Your Honor, I think -- and another -- a very

9 important point is that --

10       THE COURT:  Okay.  Well, let's -- I understand all

11 that, and I've read all your papers, and I've read the

12 affidavits and such, but let's move to what it is you need to

13 have discovery on.  Okay?

14       MR. RIGHETTI:  Thank you, Your Honor.

15       THE COURT:  Tell me specifically, because I think you

16 said there were four things that you needed discovery on, and I

17 want you to go through and explain to me why you think you need

18 to have an adjournment to have discovery on those four things

19 under Rule 56(f).

20       MR. RIGHETTI:  Thank you, Your Honor.  The affidavit

21 sets forth that we believe this discovery could be completed in

22 90 days, and if -- if the Court would like it to be conducted

23 sooner than that I think it's certainly possible to do it

24 sooner than that, as well, depending on cooperation from debtor

25 counsel and actually responding to the discovery that we

1 propound.  The first thing that's very important, Your Honor,

2 is to get the identities and contact information of the

3 putative class members.  That is important for two reasons.

4 One, the testimony from putative class members is often

5 critical in establishing the Rule 23 requirements for

6 certification.  And the second reason, Your Honor, is that we

7 really need to know, we need discovery on who actually received

8 notice of the bar date in this case.

9          In the motion for summary judgment the debtor submits

10 that it provided publication notice in The Wall Street Journal

11 and the Richmond Times Dispatch.  Your Honor, we're dealing

12 with California employees who worked for Circuit City from 1998

13 up until -- well, the present, although no one is currently

14 working there.  No one, Your Honor, in California, I believe,

15 is reading The Richmond Times Dispatch.  And we're also dealing

16 with low wage workers in California, who may have an interest

17 in reading The Wall Street Journal, but you would typically

18 find that those folks are not reading The Wall Street Journal

19 either.

20          Then, in their reply, although not supported by

21 declaration, they say that they notified putative employees, or

22 they notified former employees from three years preceding the

23 bar date.  They did not say that -- they did not support it

24 with a declaration, and they did not submit that in their

25 motion.  Now, all of a sudden, when they realize that they may

1  not have given proper notice they come back and say, well, we

2  did give notice to employees from three years preceding the bar

3  date.  We don't know that.  No one swore to it in a declaration

4  from debtor counsel.  I believe they referenced a docket number

5  to --

6          THE COURT:  Isn't it a matter of record in this case?

7  I mean, when the claims agent serves a notice the claims agent

8  files a certification with the Court who was served and when it

9  was served, and that's filed under penalty of perjury.

10          MR. RIGHETTI:  Well, Your Honor -- so, if it's, in

11  fact, true that they did notify employees from three years

12  preceding the bar date they did not provide notice for the full

13  statutory period, which is four years preceding the filing of

14  the class action, which would have been, in the <u>Gentry</u> case,

15  1998.  They only provided notice from the bar date, it would

16  have been 2005 to 2008.  You're leaving out eight years of --

17  or, seven years of the statutory period where they're, in fact,

18  conceding that they did not give actual notice by informing

19  former employees.

20          THE COURT:  All right.  Well, you heard Mr. Galardi

21  talking.  What he's concerned about is that you filed a

22  priority claim for $150 million.  All right?  Now, the only way

23  that we can get a priority claim for any of these folks would

24  be if they had been employed at Circuit City during the 180

25  days preceding the filing of the bankruptcy petition.  All

81

1  right?

2          MR. RIGHETTI:  I understand.

3          THE COURT:  Now, all right, so we're talking about a

4  pretty narrow window there.  And he said that he has sent

5  notice to all of the employees that were employed at Circuit

6  City during that period of time.  And I think you were seated

7  in the courtroom when I earlier made a ruling with regard to

8  one employee who claimed they didn't get the notice, but, you

9  know, because they had moved and didn't have a forwarding

10 address.  So, the employees, you know, I'm satisfied, received

11 notice of this.  So, with that in mind, now, why do you need

12 discovery to find out who these people are?

13         MR. RIGHETTI:  Well, Your Honor, first, to make a

14 7023 motion in this Court you do have to meet some of the Rule

15 23 requirements.  The case In Re Computer Learning Centers,

16 sets that forth, and that's the case that's heavily relied on

17 --

18         THE COURT:  I was involved in that case.

19         MR. RIGHETTI:  -- by the debtor.

20         THE COURT:  I know it well.

21         MR. RIGHETTI:  Okay.  Thank you, Your Honor.  So, I

22 obviously, again, will not tell you exactly what the Court held

23 in that case, as you're more familiar with it than I probably

24 am.  But we don't have any of the evidence necessary to even

25 make that motion to begin with.  That's another reason that we

1  certainly need discovery of the putative class members.  We

2  need to know who these people are, what working conditions they

3  worked in, what type of hours they worked, who was entitled to

4  overtime.  I mean, we don't even know, Your Honor, if the

5  debtors disputes that these folks are exempt from California's

6  mandatory minimum wage working conditions.

7          THE COURT:  What difference does it make?

8          MR. RIGHETTI:  Well, Your Honor, because that's

9  exactly the type of thing that if you need to conduct discovery

10  on they have to put issues in dispute that they are, in fact,

11  disputing from your complaint.

12          THE COURT:  But what Mr. Galardi said is that, look,

13  they got a notice.  All right?  And they have either filed a

14  claim in this case, or they haven't.  Okay?  Now, if they've

15  filed a claim, they're protected.  If they haven't filed a

16  claim, they're barred.  Now, why do you need to know what their

17  names and addresses are?

18          MR. RIGHETTI:  Well, Your Honor, if we're only

19  determining whether they are entitled to priority or not

20  priority I think it's less important that we have the names and

21  contact information for the putative class members.  That's not

22  -- that is not the point I think I'm trying to make.

23          THE COURT:  Okay.

24          MR. RIGHETTI:  If, in fact, those individuals did not

25  receive notice, or received notice and either made a claim and

83

1  are entitled to priority or not, I mean, I can't dispute the

2  facts that are undisputed.  I mean, that's just the way it is.

3  If, in fact, there is not an entitlement to a priority claim,

4  you know, that's just the way it is, and we'll have to proceed

5  as unsecured creditors.  But I don't think it means that you

6  immediately cut out the claims of thousands of potential

7  California employees who did not receive notice of the bar

8  date.  And there are certainly thousands of employees who were

9  employed by Circuit City before three years preceding the bar

10 date who I can guarantee you did not receive notice of the bar

11 date.  I've spoken with a lot of these individuals.

12        THE COURT:  Well, we might be able to cut this short,

13 then, because I want to ask Mr. Galardi a question, because it

14 -- take this out of order.  Mr. Galardi, isn't your motion just

15 a partial summary judgment to disallow the priority claims in

16 this case?

17        MR. GALARDI:  Exactly, Your Honor.  And if they have

18 an unsecured claim and they want to fight that at some other

19 day, that's fine.  My whole prejudice and issue is anybody who

20 could have had a priority claim got notice.  This claim should

21 just be reclassified for whatever amounts, not -- and he can

22 certify it, do whatever, I just don't want a priority claim.

23        THE COURT:  Right.  Okay.  So, we're dealing only in

24 this matter --

25        MR. HUTSON:  I'm sorry, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

84

1          THE COURT:  That's okay, Mr. Hutson.  Go ahead.

2          MR. HUTSON:  We asked -- we asked to go down to only

3  that particular individual, Your Honor, but I understand that

4  if all I got was the priority portion, and all rights reserved

5  otherwise, that's all I really need to move forward as fast as

6  possible, and we can discuss the other issues.

7          THE COURT:  All right.

8          MR. RIGHETTI:  Your Honor, Mr. Hutson has alerted me

9  that they did file a supplemental memo requesting that all the

10  claims be barred, and I'm not sure if it's something that you

11  were willing to withdraw, then maybe --

12          MR. GALARDI:  Your Honor, two things.  One is

13  obviously we're most interested in the priority.  Two, Your

14  Honor, and I don't know if either Mr. Pomerantz or Mr.

15  Feinstein, or creditors' committee counsel wants to mention it,

16  we think it should be stricken because it's still prejudicial,

17  but that's not our big issue for today.  The big issue for

18  today is clearly our first part of our relief priority.  We

19  don't think you can file a class group of claims for the

20  unsecured portion either.  I understand the gentleman's notice

21  of bar date issue.  I don't think Your Honor can rule on that

22  because I don't think we did go back beyond three years of

23  employees, and I understand that may be an issue we have to

24  deal with, or supplement notice for those employees if there

25  really is a statutory requirement, we can't argue abandon.  But

85

1  with respect to priority, hearing that issue, priority, I think

2  Your Honor can rule on.  I'll defer to the creditors'

3  committee, because they'll have to deal with it on the

4  unsecured portion, but, you know, again, that -- we did ask for

5  that relief.  We could hold in abeyance without prejudice that

6  relief and go to the bar date issue.

7        THE COURT:  Right.  And that would also preserve your

8  argument that they didn't file a 7023 motion asking to proceed

9  as --

10       MR. GALARDI:  Right.  Right.  Our view --

11       THE COURT:  -- for another --

12       MR. GALARDI:  -- Your Honor, is if they filed the

13 motion we'd oppose it or not oppose it, that's itself a

14 contested matter.  They should have done that early on.

15       THE COURT:  I understand that.

16       MR. GALARDI:  Again, preserving all those rights.

17       THE COURT:  Exactly.  All right.  I'm sorry to have

18 intervened.  But what we're dealing with now is only whether or

19 not, as far as this hearing is concerned, whether or not to

20 grant summary judgment in favor of the debtor on the priority

21 portion of the claim that you filed, which is for employees

22 that were employed during the four months preceding the filing

23 of the bankruptcy petition.  All right.  Now, if you're allowed

24 to go forward on your unsecured claim, are you willing to give

25 that up, or do you have an argument that you want me to

**J&J COURT TRANSCRIBERS, INC.**

86

1  consider on your priority claim?

2          MR. RIGHETTI:  With all due respect, Your Honor,

3  could I have one moment to confer with my colleague?

4          THE COURT:  Yes.

5                      (Pause)

6          MS. BERAN:  Your Honor, just for the record, Paula

7  Beran on behalf of the Official Committee of Unsecured

8  Creditors, and today I am flying solo.  There is no one from

9  the Pachulski firm on the line.  The creditors' committee does

10 have significant issues and concerns with the priority aspects

11 as articulated by Mr. Galardi and is taking extreme interest in

12 seeing that this is resolved today for the reasons Mr. Galardi

13 articulated.  As it relates to the general unsecured claim and

14 other related issues, the committee would take the position

15 that we reserve all rights as it relates to that, but would

16 like to see the priority issue resolved today.

17         THE COURT:  Thank you.  Mr. Righetti?

18         MR. RIGHETTI:  Thank you, Your Honor.  If the Court

19 is inclined to grant summary judgment on the issue of whether

20 there's a priority on the class proof of claim I still think

21 that we need the discovery if the proof of claim becomes an

22 unsecured non-priority claim.  We still need to have the Court

23 determine whether the unnamed claimants have a valid proof of

24 claim in this Court, and, you know, we'll have to do that by

25 motion, I imagine.  Their position is going to be that we

87

1  should have done that, you know, months ago, but we don't have

2  any of the discovery to make that motion, so we're still going

3  to need the opportunity to present that issue to the Court at a

4  later time.

5        THE COURT:  Okay.  The -- in the <u>Computer Learning</u>

6  case what the Court said there was that it was a two-step

7  process as far as proceeding under Rule 23 in the Bankruptcy

8  Court because Rule 23 is not one of the rules that is

9  incorporated automatically into Rule 9014.  So, what you would

10  need to do is file a motion with the Court to, you know,

11  include Rule 23 relief as part of your contested matter, and

12  then the Court can hear you and Mr. Galardi, or whoever, on

13  that issue.  And then once we resolve that, if we're going to

14  have a class action in the bankruptcy case, and there are a lot

15  of reasons why the Court might or might not want to have a

16  class action in the bankruptcy case, which is why you have to

17  bring these kinds of motions, because they can, you know,

18  interfere with the administration of the case, or they may aid

19  in the administration of the case.  But you have to file that

20  motion first.  And then, the Court makes the determination

21  really on that basis as far as whether it's going to assist the

22  Court in the administration of the case or not.  And then once

23  it makes that determination, then we go forward, if I rule in

24  your favor, with, you know, the class certification, and you

25  get to do that discovery, and all of that.  So, it's a two-part

88

1  process.  So, we've got sort of the cart before the horse here

2  today.

3          MR. RIGHETTI:  Okay.  Well, does Your Honor deny that

4  the Rule 7023 motion is an evidentiary motion?  I mean, we

5  don't have -- we would never make a motion under 7023 without

6  the evidence, and we won't make a motion now without the

7  evidence.  We'd just simply -- how would we make the motion?

8          THE COURT:  What evidence would you have?

9          MR. RIGHETTI:  Well, certainly, Your Honor, the <u>In Re</u>

10 <u>Computer Learning Center</u> case identifies that a part of the

11 7023 motion involves looking at the RFCP 23 factors.  It

12 discusses that where it discusses the applicability of the 7023

13 motion to the facts of <u>In Re Computer Learning Centers</u>.  I have

14 the case in my file.  I'm sure the Court is familiar with it.

15 But Rule 23 factors are a part of making a 7023 motion, and the

16 Court looks at those factors in ruling on a 7023 motion.  At

17 least --

18         THE COURT:  Only to the extent that -- will it aid

19 the Court in administering the case?  That's what a Bankruptcy

20 Court is going to be concerned about.  Or is it going to

21 interfere with the administration of the bankruptcy estate?

22 That's what the 7023 motion is about.  And that's why you do it

23 on a threshold basis.  And, yes, you can say these are the

24 factors we're going to have to prove for class certifications,

25 but you don't have to put on evidence, or prove any of that at

**J&J COURT TRANSCRIBERS, INC.**

89

1   that point in time.  You can make those allegations, say this

2   is what it is, this is what we're going to have to show, this

3   is what we think we can show, and then the Court can decide

4   whether it makes sense from a case administration standpoint to

5   proceed in that fashion.

6          MR. RIGHETTI:  Okay.  Well, so then, Your Honor, will

7   the Court hear a 7023 motion at this time?

8          THE COURT:  Once it's filed I certainly will.

9          MR. RIGHETTI:  Okay.  Well then, Your Honor, we will

10  bring it.

11         THE COURT:  Without any prejudice to anybody else to

12  object that it's untimely, or whatever.  But, you know, I'm not

13  ruling on anything today other than to say that I think that

14  procedurally that's the way I think you need to proceed.

15         MR. RIGHETTI:  Okay.  Your Honor, we appreciate the

16  Court's suggestion, and proceed in that fashion.  If there is,

17  in fact, no discovery that is required to bring that motion,

18  then our request for discovery at this time may not be

19  necessary given in light of the fact that we bring a 7023

20  motion.  But with respect to the unnamed claimants and whether

21  they received notice of the bar date, that is something that I

22  believe we still will request discovery on.  I think that's an

23  important issue with respect to the bona fide claims of these

24  California employees.

25         THE COURT:  Right.  And that's why I'm not going to

1 grant summary judgment on the entire matter today because I

2 can't rule that way, whether -- because I don't know whether

3 they received notice or not.  But if I grant the class action

4 motion that you're going to file, then we'll have to visit that

5 at that point in time.

6         MR. RIGHETTI:  Okay.  Thank you, Your Honor.  I don't

7 have any comments at this point in time.  I may in a minute or

8 two.  Thank you.

9         THE COURT:  All right.  Anything further, Mr.

10 Galardi?

11        MR. GALARDI:  Nothing further from me, Your Honor.

12 What we would like to do is enter an order that says that with

13 respect to the claims that are subject to these, one, that no

14 part of the claim will be entitled to priority, so the

15 objection is sustained on that.  It will be without prejudice

16 for this counsel to bring a motion seeking 7023 relief before

17 this Court, and that the debtors, the committee, and any other

18 party in interest, as is normally the case, reserve all rights

19 to oppose any such motion and any request for discovery in the

20 context of that motion.  That would be the simple order that I

21 would like to enter.  And I don't know if there's any

22 objection, but I think simple is good here, and then we

23 reclassify this to a total unsecured claim, not touching the

24 amounts or anything else at this point in time.

25        THE COURT:  All right.  Any objection to that, Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  Righetti?

2       MR. RIGHETTI:  No, Your Honor.  No objection.

3       THE COURT:  All right.  Well then, that will be what

4  the Court rules, and I would ask you to submit an order, then,

5  Mr. Galardi, to that effect.

6       MR. GALARDI:  Thank you, Your Honor.  Your Honor,

7  there are --

8                    (Pause)

9       MR. GALARDI:  Your Honor, with respect to just -- I

10  touched on it just so that Your Honor was aware, but there's no

11  other matters on the agenda, but I thought I would let Your

12  Honor know where we stand on confirmation today.

13       THE COURT:  Which is the most important thing that I

14  wanted to discuss.

15       MR. GALARDI:  Which is the most important thing.  I

16  saved it for last.  We are still talking to the committee.  Let

17  me give Your Honor some information.  One, I think especially

18  with this ruling obviously we've made very good progress to be

19  able to satisfy the feasibility.  And as Your Honor knows from

20  at least the disclosure statement hearing, one of the issues

21  was making sure we had all the cash on the effective date and

22  not have to fight as many of the reserve issues.  I'm not

23  saying we're not fighting them, but Your Honor knows our cash

24  position.  So, that was one important point.  And with these

25  rulings, and assuming we don't have to establish reserves for

92

1  anything more than what I just mentioned, and even remaining,

2  then I think we're going to be able to proceed with

3  confirmation very soon.

4       Now, April 6th is not going to work, so we have

5  asked, and would serve notice that we think May 11th, and I

6  think that's probably going to be a realistic date, but let me

7  give you an update on the other aspect of this.  Not only do we

8  think we now have cash in, but there is still a large amount of

9  cash up in Canada, and the committee and we are working

10 through, and again, Mr. Pomerantz and Mr. Feinstein are not on

11 the call, but we were to have a call today.  We are working

12 through with the monitor up there.  There will need to be some

13 modifications to the plan which we think are not substantial to

14 effectuate what's called an amalgamation.  One of our debtors

15 is sort of in the way of -- it goes Canadian is a parent of one

16 of our debtors, and then that is the parent of a Canadian

17 entity.  And we need to do an amalgamation, which means we have

18 to modify the plan a little bit.

19      THE COURT:  Now, is that the plan here or the plan in

20 Canada?

21      MR. GALARDI:  Well, it's kind of a combination of

22 both because in order to not prejudice the creditors of

23 InterTAN, Inc., which is that one entity, there are, like, six

24 claims, and we filed an objection, and we've been in contact

25 with them.  So as to not prejudice those claimants, and at the

1  same time not overburden the Canadian parent of that company,

2  they're going to -- they don't have a merger statute in Canada,

3  so it's essentially they'll assume the assets and liabilities.

4  We don't think there's a lot of assets or liabilities.  That's

5  why we're going to do that, so we have to take InterTAN out of

6  our plan.

7          Once we do that, the monitor up in Canada has

8  resolved a lot of their claims.  This has all been driven by

9  we're waiting for a Canadian revenue ruling on a tax issue to

10 make sure that the money can go up so we don't have to pay a

11 lot of taxes on that money to make the distribution up to the

12 United States as great as possible.

13         We had a preliminary indication of a ruling.  After

14 conversing with the committee the committee wanted to get a

15 ruling as to the timing of that payment and whether if we're a

16 liquidating trust, i.e., if we go effective on our plan prior

17 to the money coming up, whether that makes a difference, or

18 whether we have to stay a corporate entity.  There's been

19 discussions for the last three weeks on that.  We're getting

20 very close with the Canadian revenue ruling.

21         All that is a way to say we're not ready to get

22 there, but we've made significant progress, and we just don't

23 want to have a tax implication if we go effective before the

24 money comes up, because it's 90 to $120 million, and it could

25 have, I think, a 30 percent tax effect.  No reason to give

1  government money if we don't have to legally.  So, that's where

2  we are there.  So, I'm still hoping that May 11th will work.  I

3  wouldn't be surprised if it slipped a little bit, but we're

4  still going on a month-to-month basis because we are trying to

5  confirm it as soon as possible.

6         The other thing I was going to mention, and I was on

7  the phone with the Canadian colleagues before this, and I think

8  Your Honor has this capacity, Judge Morowitz has been sitting

9  on the Canadian case to date.  It will also require, as I

10  mentioned, the Canadian entity to assume some of the assets and

11  liabilities, and then be comfortable with the distribution of

12  cash up so we've been in contact with the monitor and the

13  reserves.  My understanding is the Canadian colleagues, and

14  they're going to mention this to the committee's counsel up in

15  Canada, would like to advise Justice Morowitz of where we

16  stand, as well, and I think this would be -- perhaps we should

17  have done it at the first day hearings or the final DIP

18  hearings, but after having seen Judge Morowitz I think this

19  will be a good hearing that if we could have a combined hearing

20  and make the evidence both on our side as to why we don't think

21  there are claims and liabilities why we're doing this, Justice

22  Morowitz hearing it at the same time and understanding, with

23  the monitor having the recommendations, it might be a good

24  opportunity to have a joint hearing.  They're going to make the

25  same suggestion, I believe, to Judge Morowitz, as we get

95

1    closer, give essentially the same update that I'm giving to

2    Your Honor as to what we've been doing behind the scenes trying

3    to work all these issues out, and then leave it to Justice

4    Morowitz to either decide whether he wants us to get back to

5    you, or to call you directly about logistics and whether you

6    think that's a good idea for a joint hearing, and work it out

7    between Your Honors or tell us what you would like us to do.

8    And so, as we get closer and file the motions, know the

9    Canadian ruling, know the issues, if there's a hearing that I

10   think would be important for both sides to not go one side

11   first and the other side first, that would be the hearing,

12   since it is a combination on corporate structure, amalgamation

13   and distributions.  And that is a prelude to the effective date

14   actually occurring, so -- that's the update.  I'm hoping May

15   11th works.  I don't think -- my board hopes it works.  I think

16   the committee hopes it works.  But when we get the Canadian

17   revenue ruling, it's still an issue because we're modifying it

18   for those considerations, and that's out of our control to know

19   how long they will take to respond.  We're hopeful it's only a

20   week.  It has never moved quite as quickly as that, so I'm just

21   a realist.  But that's it.  We don't think there are other

22   hurdles to confirmation.  And I think, happily, based upon, you

23   know, all the claims work we've done in the last couple months,

24   we think we're very good on feasibility and cash, as I wanted

25   to describe to Your Honor for today's hearing, which is why it

**J&J COURT TRANSCRIBERS, INC.**

1  was so critical for us.

2         THE COURT:  All right.  Thank you.  I appreciate

3  that, and that's been very helpful.  With regard to a joint

4  hearing with Judge Morowitz, the Court has no problem with

5  that, and actually thinks that that makes a lot of sense, you

6  know, from both sides, so that, you know, each knows what the

7  other is doing and can do it in tandem together.  My only

8  questions would be the logistics of doing that.  I have to

9  confess I've never done that before, but --

10         MR. GALARDI:  Having been a party and appeared --

11  Justice Morowitz on another case, if you have a t.v. screen and

12  we can hook it up, that's generally how we've done it.  I don't

13  know the logistics.  That's beyond my capacity.  But that's how

14  we've done it, and they both sit there and -- if we can hook

15  that into the Canadian Court -- he has done it before since I

16  know I've done it in Delaware with him.  So, if we just let the

17  techies get together, maybe they'll figure it out.

18         THE COURT:  Okay.  Well, I have a department that

19  does that sort of thing, so we should be able to do that.

20         MR. GALARDI:  Okay.  And we'll convey to Osler

21  (phonetic), who is our Canadian counsel, that we mentioned it,

22  we told them.  Again, we'll leave it to Justice Morowitz to

23  either contact you or tell us, but we'll let him know that you

24  sort of, as we and Osler think, it might make sense for this

25  hearing to be a joint hearing, and we'll work out logistics.

97

1   But Justice Morowitz is a Justice, as well, so I'll let him

2   decide.

3           THE COURT:  Well, agreed.  And if he -- you know,

4   obviously has different views on the subject, then that's fine,

5   as well.  I certainly didn't mean to be preempting that by any

6   means.

7           MR. GALARDI:  No.  I don't think so, but I sense --

8   I've had -- I met him at that function that we were at, and I

9   think he would agree on this, because he's asked the same

10  question as to where we can get both of these to coordinate for

11  the final.  So, I suspect he'll have a similar reaction.

12          THE COURT:  All right.  Very good.

13          MR. GALARDI:  Thank you.

14          THE COURT:  Is there anything further?

15          MR. GALARDI:  That's it for us today, Your Honor.

16          THE COURT:  All right.  Thank you all.

17          COURTROOM DEPUTY:  All rise.  Court is now adjourned.

18                        * * * * *

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

98

# **C E R T I F I C A T I O N**

I, TAMMY DeRISI, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter to the best of my ability.


/s/ Tammy DeRisi               Date:  March 30, 2010
TAMMY DeRISI
J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**