## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement"), made effective the _6th_ day of _September_ 2007, by and among **SMART PARTS, INC.,** a Rhode Island corporation (the "Debtor"), and **RBS BUSINESS CAPITAL,** a division of RBS Asset Finance, Inc., a New York corporation (the "Secured Party").

### RECITALS:

WHEREAS, the Debtor has requested the Secured Party to enter into a certain Credit Agreement of even date herewith (as the same may be further amended, modified or supplemented from time to time the "Credit Agreement") pursuant to which the Secured Party will make Revolving Credit Loans and Letters of Credit available to the Debtor from time to time; and

WHEREAS, as an inducement to the Secured Party to enter into the Credit Agreement, and as a condition thereto, the Debtor has agreed to enter into this Agreement to grant the Secured Party the security interests contemplated herein as security for the prompt and full payment and performance of, *inter alia*, the indebtedness and obligations of the Debtor under the Credit Agreement and the other Loan Documents; and

WHEREAS, it is a condition precedent to the Secured Party entering into the Credit Agreement and making the facilities available thereunder to the Debtor that the Debtor grants the Secured Party the security interests contemplated in this Agreement; and

WHEREAS, the Secured Party is not willing to enter into the Credit Agreement unless and until the Debtor enters into this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, and intending to be legally bound hereby, the Debtor and the Secured Party covenant and agree as follows:

**Section 1.**     **Definitions.**

(a)     Capitalized terms used herein shall have the meaning ascribed thereto in the Credit Agreement unless otherwise defined herein.

(b)     All terms defined in the Applicable UCC and used herein shall have the same definitions herein as specified in the Applicable UCC, provided, if a term is defined in Article 9 of the Applicable UCC differently than in another Article of the Applicable UCC, the term has the meaning specified in Article 9 of the Applicable UCC.

(c)     The following words and terms shall have the following meanings (such meanings being equally applicable to both the singular and plural forms of the terms defined):

"Account" shall have the meaning given to the term "account" in the Applicable UCC, and in any event, shall include, without limitation, all accounts, accounts receivable (including health-care-insurance receivables), book debts and other forms of payment obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to the Debtor (whether held in the name of the Debtor or any division thereof or in any applicable trade name or trade style) whether arising out of goods sold or services rendered by the Debtor or from any other transaction, whether or not the same involves the sale of goods or services by the Debtor (including, without limitation, any such obligation that might be characterized

X:\1442\40\Drafts\Security Agt.2

**EXHIBIT**

D

as an account or contract right under the UCC), and all of the Debtor's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by them for goods or services sold or rendered by the Debtor (or by any Person from whom the Debtor acquired such rights), and all of the Debtor's rights to any goods represented by any of the foregoing (including, without limitation, unpaid seller's rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), and chooses in action and causes of action (whether arising in contract, tort or otherwise and whether or not currently in litigation) and all other debts, obligations and liabilities in whatever form owing to the Debtor, documents of title, warehouse receipts, leases, investment accounts, deposit accounts, Cash, contract rights, dividends, distributions, judgments, covenants, licenses, franchises, warranties, indemnities, partnership and joint venture interests, and other rights, including all rights to the payment of moneys due or to become due to the Debtor, under all contracts for the sale of goods or the performance of services or both by the Debtor (whether or not yet earned by performance on the part of the Debtor or in connection with any other transaction), now in existence or hereafter occurring, including, without limitation, the right to receive the proceeds of said purchase orders and contracts, and all collateral security and guarantees of any kind given by any Person with respect to any of the foregoing.

"Account Debtor" means the Person who is obligated on or under an Account owing to the Debtor.

"Applicable UCC" shall mean the Uniform Commercial Code as in effect in the Commonwealth of Pennsylvania on the date of this Agreement and as amended from time to time hereafter, and any new version thereof or new legislation adopted to replace the provisions thereof; provided, however, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the Commonwealth of Pennsylvania, the term "Applicable UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

"Cash" shall mean all money, cash or cash equivalents now owned or hereafter acquired by the Debtor.

"Collections Account" shall have the meaning set forth in Section 5.

"Chattel Paper" shall mean all "chattel paper" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor, or in which the Debtor now have or hereafter acquire any rights, whether tangible or electronic.

"Collections" shall mean all payments to the Debtor from Account Debtors in respect of Accounts.

"Commercial Tort Claims" shall mean all "commercial tort claims" as such term is defined in the Applicable UCC.

"Contracts" shall mean all contracts, undertakings, or other agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which the Debtor may now or hereafter have any right, title or interest, including, without limitation, with respect to an Account and any agreement relating to the terms of payment or the terms of such Account.

"Copyrights" shall mean all of the following now owned or hereafter acquired by the Debtor: (i) all copyrights, registrations and applications therefor, (ii) all renewals and extensions thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect



thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof, (iv) all rights to sue for past, present and future infringements or misappropriations thereof, and (v) all other rights corresponding thereto throughout the world.

"Default" shall have the meaning set forth in Section 7.

"Deposit Account" shall mean a "deposit account" (as such term is defined in the Applicable UCC), and in any event, shall include a demand, time, savings passbook or similar account maintained with a bank.

"Documents" shall mean all "documents" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor or in which the Debtor now have or hereafter acquire any rights.

"Equipment" shall mean all "equipment" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment, including embedded software and peripheral equipment and all engineering, processing and manufacturing equipment, office machinery, furniture, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, and all manuals, drawings, instructions, warranties and rights with respect thereto and any and all additions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto, together with all additions and accessions thereto, and all replacements and substitutes for any of the foregoing.

"Fixtures" shall mean all "fixtures" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor.

"General Intangibles" shall mean all "general intangibles" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all right, title and interest that the Debtor may now or hereafter have in or under any Contract, payment intangibles, in or to any partnerships, joint ventures and similar entities or associations, and rights to distribution of income therefrom, all tax refunds, tax refund claims, customer lists, Copyrights, Trademarks, Trademark licenses, Patents, Patent licenses, rights in intellectual property, permits, Trade Secrets, proprietary or confidential information, inventions (whether patented or patentable or not) and technical information, procedures, designs, knowledge, know-how, Software, computer programs, computer records and discs, computer data, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, now owned or hereafter acquired by the Debtor, and the goodwill and rights of indemnification related thereto and associated therewith.

"Goods" means all "goods" as defined in the Applicable UCC, now owned or hereafter acquired by the Debtor, wherever located, including embedded software to the extent included in "goods" as defined in the Applicable UCC.

"Instruments" shall mean all "instruments" as such term is defined the Applicable UCC, now owned or hereafter acquired by the Debtor or in which the Debtor now have or hereafter acquire any rights (other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper), and, in any event, shall include, without limitation, all promissory notes, certificates of deposit.

"Inventory" shall mean all "inventory" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all inventory, merchandise, Goods and other personal property now owned or hereafter acquired by the



Debtor that are held for sale or lease or are furnished or are to be furnished under a contract of service or that constitute raw materials, work in process or materials used or consumed or to be used or consumed in the Debtor's business, or the processing, packaging, delivery or shipping of the same, and all finished goods.

"Investment Property" shall mean all "investment property" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor and, in any event, shall include, without limitation, all (i) all securities, whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnership interests and mutual fund shares; (ii) all securities entitlements, including the rights to any securities account and the financial assets held by a securities intermediary in such securities account and any free credit balance or other money owing by any securities intermediary with respect to that account; (iii) all securities accounts; and (iv) all commodity contracts and commodity accounts.

"Letter-of-Credit Rights" means "letter-of-credit rights" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor, including rights to payment or performance under a letter of credit, whether or not the Debtor, as beneficiary, have demanded or are entitled to demand payment or performance.

"Lockbox" shall have the meaning set forth in Section 5(b).

"Patents" shall mean all of the following now or hereafter owned by the Debtor: (i) all patents and patent applications, (ii) all inventions and improvements described and claimed therein, (iii) all reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (iv) all income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof, (v) all rights to sue for past, present and future infringements or misappropriations thereof and (vi) all other rights corresponding thereto throughout the world.

"Proceeds" shall mean all "proceeds" as such term is defined in the Applicable UCC and, in any event, shall include, without limitation, (i) any and all proceeds of any insurance, indemnity or warranty payable to the Debtor from time to time with respect to any of the Collateral, (ii) all unearned refund premiums and dividends which may become payable under said policies of insurance and loss payments under such policies, which shall reduce the unearned premiums, (iii) any and all payments (in any form whatsoever) made or due and payable to the Debtor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (iv) any claim of the Debtor against third parties (A) for past, present or future infringement of any Patent or Patent license or (B) for past, present or future infringement or dilution of any Trademark or Trademark license or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark license and (v) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Remittances" shall mean all payments to the Debtor (other than Collections), including, without limitation, cash payments in respect of sales of Inventory, payments in respect of other dispositions of Collateral (other than Inventory sold in the ordinary course of business), insurance proceeds and tax refunds.

"Secured Obligations" shall mean all of the Obligations, and to the extent not included in the Obligations, the following:

        (i)    all obligations, liabilities, indemnities and Indebtedness of the Debtor under the Credit Agreement, the Revolving Credit Note, this Agreement and the



other Collateral Documents, the Hedging Contracts, all L/C-Related Documents and all other Loan Documents, including, without limitation, all obligations, liabilities, indemnities and Indebtedness with respect to principal, interest, fees, Reimbursable Costs and Expenses, Hedging Obligations, L/C Obligations and other reimbursement obligations with respect to Letters of Credit, and all other fees, costs, charges and expenses due from the Debtor to the Secured Party,

(ii)    all other obligations, liabilities and Indebtedness of the Debtor to the Secured Party or its Affiliates, of every kind, nature and description, direct or indirect, secured or unsecured, joint and several, absolute or contingent, due or to become due, now existing or hereafter arising, regardless of how they arise or were acquired or by what agreement or instrument, including, without limitation, all obligations, liabilities, indemnities and Indebtedness from time to time owing to the Secured Party or any of its Affiliates by the Debtor in respect of any Banking Services Obligations, operating or deposit account, or other banking product from time to time made available to the Debtor by the Secured Party or its Affiliates,

(iii)    all fees, costs and expenses (including reasonable counsel fees) of the Secured Party incurred in perfecting, protecting and enforcing the Secured Party's rights (A) under the Credit Agreement, this Agreement, the Revolving Credit Note, the other Collateral Documents and all other Loan Documents, and (B) in and to the Collateral, and

(iv)    all amounts that would become due from the Debtor to the Secured Party but for the operation of the automatic stay provisions of §362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a).

"Software" means all "software" as such term is defined in the Applicable UCC, now owned or hereafter acquired by the Debtor, other than software embedded in any category of Goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Supporting Obligations" means all "supporting obligations" as such term is defined in the Applicable UCC, including letters of credit and guaranties issued in support of Accounts, Chattel Paper, Documents, General Intangibles, Instruments, or Investment Property.

"Trademarks" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) all trademarks (including service marks and trade names, whether registered or at common law), registrations and applications therefor, and the entire product lines and goodwill of the Debtor's business connected therewith and symbolized thereby, (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable or both with respect thereto, including, without limitation, damages and payments for past or future infringements or misappropriations thereof, (iv) all rights to sue for past, present and future infringements or misappropriations thereof and (v) all other rights corresponding thereto throughout the world.

"Trade Secrets" shall mean all of the following, now owned or hereafter acquired by the Debtor: (i) trade secrets, (ii) income, royalties, damages and payments now and hereafter due and/or payable to the Debtor with respect to trade secrets, including, without limitation, damages and payments for past or future infringements or misappropriations thereof, (iii) rights to sue for past, present and future infringements or misappropriations of trade secrets, and (iv) all other rights corresponding to trade secrets throughout the world.



**Section 2.** _Security Interest; Authorization to File Financing Statements_. (a) To secure the payment and performance in full of all of the Secured Obligations, the Debtor hereby pledges, assigns and grants to the Secured Party a security interest in all of the following properties, wherever located, whether now owned or hereafter acquired or arising, and whether owned or consigned by or to, or leased from or to, the Debtor, and all attachments, components, parts, equipment and accessories installed thereon or affixed thereto, together with all replacements, additions, accessions, substitutions, repairs, guaranties and securities therefor, and all documents, records, ledger sheets and files of the Debtor relating thereto, and all of the Debtor's right, title and interest therein, thereto and thereunder (collectively, the "Collateral"):

    (i)     All Accounts, Chattel Paper, Documents, Instruments and Contracts;

    (ii)    All Inventory, Equipment, Fixtures and other Goods;

    (iii)   All Letter of Credit Rights and Supporting Obligations;

    (iv)   All General Intangibles, Trademarks, Patents, Copyrights and Trade Secrets;

    (v)    All Cash, Deposit Accounts and Investment Property; and

    (vi)   All Proceeds and products of the items described above in clauses (i) through (v) of this Section 2(a).

(b)    The Debtor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral as (A) all assets of the Debtor or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Applicable UCC, or (B) as being of an equal or lesser scope or with greater detail, and (ii) contain any other information required by part 5 of Article 9 of the Applicable UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether the debtor is an organization, the type of organization and any organization identification number issued to the Debtor and, in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates. The Debtor agrees to furnish any such information to the Secured Party promptly upon request. The Debtor also ratifies any like initial financing statements or amendments thereto if filed prior to the date hereof and ratify their authorization for the Secured Party to have filed in any Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.

(c)    Notwithstanding any other provision of this Agreement to the contrary, the Debtor shall remain liable under each Contract, Instrument, Chattel Paper or other agreement comprised in the Collateral (collectively, "Debtor Agreements") to observe and perform all of the conditions to be performed and observed thereunder. The Secured Party shall have no obligation or liability under any Debtor Agreements by reason of or arising out of this Agreement or the granting of the lien and security interest thereon or the receipt of any payment relating to any Debtor Agreements pursuant hereto except to the extent resulting directly and primarily from the gross negligence or willful misconduct of the Secured Party. The Secured Party shall not be required or obligated in any manner to perform or fulfill any of the obligations of the Debtor under or pursuant to any Debtor Agreements, or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it or the sufficiency of any performance by any party under any Debtor Agreements, or to present or file any claims, or take any action to collect or enforce any performance or the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.



(d)    The provisions of this Agreement supplement the provisions of any other Collateral Document which secures the payment or performance of any of the Secured Obligations, including, without limitation, any real estate mortgage, deed of trust or intellectual property security agreement or assignment granted by the Debtor to the Secured Party. Nothing contained in any such Collateral Document shall derogate from any of the rights or remedies of the Secured Party hereunder.

**Section 3.**    **_Representations and Warranties_**.    The Debtor represents and warrants to the Secured Party as follows:

(a)    The Debtor is (or to the extent that this Agreement states that the Collateral is to be acquired after the date hereof, will be at the time of such acquisition) the sole owner of the Collateral. There are no Liens on the Collateral or any portion thereof, except Permitted Liens, and no financing statement, mortgage or deed of trust covering the Collateral or any portion thereof exists or is on file in any public office except those in favor of the Secured Party and those relating to Permitted Liens.

(b)    The Debtor has delivered, or concurrently herewith will deliver, to the Secured Party a certificate signed by the Debtor and entitled "Perfection Certificate" (each a "Perfection Certificate" and collectively the "Perfection Certificates"). The Debtor represents and warrants to the Secured Party that all information contained in the Perfection Certificate signed by it is true and correct, and the Debtor hereby acknowledges and agrees that the Secured Party and its legal counsel may fully rely upon the information contained therein as representations and warranties of the Debtor, the falsity of which may constitute a Default.

(c)    Except as otherwise disclosed in the Perfection Certificate, the Debtor has exclusive possession and control of all of the Collateral, and the Debtor has not and will not allow any contractor, processor or supplier to have possession or control of any Inventory, Equipment or other Goods of the Debtor without prior written notice to the Secured Party and compliance with the provisions of Section 6.15(b) of the Credit Agreement.

(d)    This Agreement creates a valid security interest in the Collateral, and the filing of the financing statements in the jurisdictions listed in the Perfection Certificates perfects those security interests in such Collateral which can be perfected by the filing of financing statements subject only to Permitted Liens.

(e)    Neither the execution and delivery of this Agreement by the Debtor, the consummation of the transactions herein contemplated nor the fulfillment of the terms hereof will (i) result in a breach of any of the terms or provisions of, or constitute a default under, or constitute an event which, with notice or lapse of time or both, will result in a breach of or constitute a default under, any agreement, indenture, mortgage, deed of trust, equipment lease, instrument or other document to which the Debtor is a party, or (ii) violate any Law, except to the extent that any such breach, default, event or violation would not reasonably be expected to have a Material Adverse Effect.

(f)    None of the Collateral constitutes, or is the proceeds of, "farm products" as defined in §9-102(a)(34) of the Applicable UCC. Except as otherwise disclosed in the Perfection Certificates, none of the Collateral is covered by a certificate of title. None of the Account Debtors or other persons obligated on any of the Collateral is a governmental authority subject to the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral. The Debtor does not hold any Commercial Tort Claims except as indicated on the Perfection Certificates.

(g)    With respect to the Debtor's Accounts: (i) all such Accounts represent bona fide sales of Inventory, or leasing of Equipment or rendering of services to Account Debtors in the ordinary course of business and are not evidenced by a judgment, Instrument or Chattel Paper; (ii) there are no material setoffs, claims or disputes existing or asserted with respect thereto and the Debtor has not made



any agreement with any Account Debtor for any material extension of time for the payment thereof, any compromise or settlement for materially less than the full amount thereof, any release of any Account Debtor from material liability therefor, or any material deduction therefrom except a discount or allowance allowed by the Debtor in the ordinary course of its business for prompt payment; (iii) to the Debtor's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce materially the amount payable thereunder; (iv) the Debtor has not received any notice of proceedings or actions which are threatened or pending against any Account Debtor which could reasonably be expected to result in any material adverse change in such Account Debtor's financial condition; (v) the Debtor has no knowledge that any Account Debtor is unable generally to pay its debts as they become due; (vi) the amounts shown on all invoices, statements and Borrowing Base Reports with respect to Accounts thereto are actually and absolutely owing to the Debtor as indicated thereon and are not in any way contingent; and (vii) to the Debtor's knowledge, all Account Debtors have the capacity to contract.

(h)    With respect to the Debtor's Inventory: (i) all such Inventory is located at one of the Debtor's locations set forth on the Perfection Certificates, and no Inventory shall at any time hereafter be stored at any other location without the Secured Party's prior written consent, except as permitted under the Credit Agreement, and if the Secured Party gives such consent, the Debtor will concurrently therewith obtain, to the extent required by the Credit Agreement, a Collateral Access Agreement for each such location, (ii) the Debtor has good and merchantable title to all such Inventory, and such Inventory is not subject to any Lien or security interest or document whatsoever except Permitted Liens, (iv) such Inventory is Eligible Inventory of good and merchantable quality, free from any defects, (v) such Inventory is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreements with any third parties which would require any consent of any third party upon sale or disposition of that Inventory or the payment of any monies to any third party upon such sale or other disposition, and (vi) the completion of manufacture, sale or other disposition of such Inventory by the Secured Party following a Default shall not require the consent of any Person and shall not constitute a breach or default under any contract or agreement to which the Debtor is a party or to which such property is subject.

**Section 4.    _Covenants of the Debtor_.** The Debtor covenants and agrees to perform each of the following covenants except to the extent specifically provided for otherwise in the Credit Agreement:

(a)    Further to insure the attachment, perfection and priority of, and the ability of the Secured Party to enforce, the Secured Party's security interest in the Collateral, the Debtor agrees, at the Debtor's sole cost and expense, to take the following actions:

(i)    Promissory Notes and Tangible Chattel Paper.  If the Debtor shall at any time hold or acquire any promissory notes or tangible chattel paper arising or resulting from or related to the Collateral, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, the Debtor shall forthwith endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify, and regardless of the form of such endorsement, the Debtor hereby waives presentment, demand, notice of dishonor, protest and notice of protest and all other notices with respect thereto.  After the occurrence and during the continuance of a Default, upon notice from the Secured Party all payments made under any such promissory notes or tangible chattel paper shall be deposited into the Collateral Account.

(ii)    Deposit Accounts.  For each Deposit Account that the Debtor at any time opens or maintains, the Debtor shall, at the Secured Party's request and option, pursuant to an agreement in form and substance reasonably satisfactory to the Secured Party, either (A) cause the depositary bank to agree to comply at any time with instructions from the Secured Party to such depositary bank directing the disposition of



funds from time to time credited to such deposit account, without further consent of the Debtor, or (B) arrange for the Secured Party to become the customer of the depositary bank with respect to the deposit account, with the Debtor being permitted, only with the consent of the Secured Party, to exercise rights to withdraw funds from such deposit account. The Secured Party agrees with the Debtor that the Secured Party shall not give any such instructions or withhold any withdrawal rights from the Debtor, unless a Default has occurred and is continuing, or, after giving effect to any withdrawal not otherwise permitted by the Loan Documents, a Default would occur. The provisions of this paragraph shall not apply to (x) those accounts referred to in Section 5 and any other Deposit Account for which the Debtor, the depositary bank and the Secured Party have entered into a cash collateral agreement specially negotiated among the Debtor, the depositary bank and the Secured Party for the specific purpose set forth therein, (y) Deposit Accounts for which the Secured Party is the depositary and (z) Deposit Accounts specially and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of the Debtor's salaried employees.

        (iii)   <u>Collateral in the Possession of a Bailee</u>. If any Inventory is at any time in the possession of a bailee, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, the Debtor shall promptly use its reasonable efforts to obtain an acknowledgement from the bailee, in form and substance reasonably satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and shall act upon the instructions of the Secured Party, without the further consent of the Debtor.

        (iv)   <u>Electronic Chattel Paper and Transferable Records</u>. If the Debtor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in §16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, in each case arising or resulting from or related to the Collateral, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, the Debtor shall take such action as the Secured Party may reasonably request to vest in the Secured Party control, under §9-105 of the Applicable UCC, of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, §16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The Secured Party agrees with the Debtor that the Secured Party will arrange, pursuant to procedures satisfactory to the Secured Party and so long as such procedures will not result in the Secured Party's loss of control, for the Debtor to make alterations to the electronic chattel paper or transferable record permitted under §9-105 of the Applicable UCC or, as the case may be, Section 201 of the federal Electronic Signatures in Global and National Commerce Act or §16 of the Uniform Electronic Transactions Act for a party in control to make without loss of control, unless a Default has occurred and is continuing or would occur after taking into account any action by the Debtor with respect to such electronic chattel paper or transferable record. After the occurrence and during the continuance of a Default, upon notice from the Secured Party, all payments made under or in respect of any such electronic chattel paper or transferable record shall be deposited into the Collateral Account.

        (v)   <u>Letter-of-Credit Rights</u>. If the Debtor is at any time a beneficiary under a letter of credit now or hereafter issued in favor of the Debtor arising or resulting from or related to the Collateral, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, the Debtor shall, pursuant to



an agreement in form and substance reasonably satisfactory to the Secured Party, either (A) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Secured Party of the proceeds of any drawing under the letter of credit or (B) arrange for the Secured Party to become the transferee beneficiary of the letter of credit, with the Debtor agreeing, in each case, that after the occurrence and during the continuance of a Default, upon notice from the Secured Party, the proceeds of any drawing under the letter of credit shall be deposited into the Collateral Account.

(vi)    <u>Commercial Tort Claims</u>. If the Debtor shall at any time hold or acquire a commercial tort claim arising or resulting from or related to the Collateral, the Debtor shall promptly notify the Secured Party in a writing signed by the Debtor of the brief details thereof and, at the Secured Party's request and option, grant to the Secured Party in writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Secured Party. After the occurrence and during the continuance of a Default, upon notice from the Secured Party, all proceeds of any such commercial tort claim will be deposited into the Collateral Account.

(vii)    <u>Investment Property</u>. If the Debtor shall at any time hold or acquire any certificated securities, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, the Debtor shall forthwith endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify. If any securities now or hereafter acquired by the Debtor are uncertificated and are issued to the Debtor or its nominee directly by the issuer thereof, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to the Secured Party, either (A) cause the issuer to agree to comply with instructions from the Secured Party as to such securities, without further consent of the Debtor or such nominee, or (B) arrange for the Secured Party to become the registered owner of the securities. If any securities, whether certificated or uncertificated, or other investment property now or hereafter acquired by the Debtor are held by the Debtor or its nominee through a securities intermediary or commodity intermediary, the Debtor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, pursuant to an agreement in form and substance satisfactory to the Secured Party, either (x) cause such securities intermediary or (as the case may be) commodity intermediary to agree to comply with entitlement orders or other instructions from the Secured Party to such securities intermediary as to such securities or other investment property, or (as the case may be) to apply any value distributed on account of any commodity contract as directed by the Secured Party to such commodity intermediary, in each case without further consent of the Debtor or such nominee, or (y) in the case of financial assets or other investment property held through a securities intermediary, arrange for the Secured Party to become the entitlement holder with respect to such investment property, with the Debtor being permitted, only with the consent of the Secured Party, to exercise rights to withdraw or otherwise deal with such investment property. The provisions of this paragraph shall not apply to any financial assets credited to a securities account for which the Secured Party is the securities intermediary. After the occurrence and during the continuance of a Default, upon notice from the Secured Party, all dividends or other cash or property distributions in respect of any certificated or uncertificated securities shall be deposited into the Collections Account.

(b)    The Debtor further agrees to take any other action reasonably requested by the Secured Party to insure the attachment, perfection and first priority of, and the ability of the Secured Party



to enforce, the Secured Party's security interest in any and all of the Collateral including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the Applicable UCC, to the extent, if any, that the Debtor's signature thereon is required therefor, (ii) causing the Secured Party's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Secured Party to enforce, the Secured Party's security interest in such Collateral, (iv) obtaining governmental and other third party consents and approvals, including without limitation any consent of any licensor, lessor or other person obligated on Collateral, (v) obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Secured Party, (vi) taking all actions required by any earlier versions of the Uniform Commercial Code or by other law, as applicable in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction, and (vii) taking any other actions which are necessary or, in the reasonable judgment of the Secured Party, desirable to perfect or continue the perfection and priority of the Secured Party's security interests in the Collateral, to protect the Collateral against the rights, claims or interests of any Person other than the Secured Party or to effect the purposes of this Agreement, and the Debtor will pay all reasonable costs and expenses incurred in connection with any of the foregoing.

(c)     The Debtor will defend the Collateral against all claims and demands of all Persons other than the Secured Party at any time claiming the same or any interest therein.

(d)     Except for Permitted Liens and to the extent otherwise permitted under the Credit Agreement, the Debtor will not in any way hypothecate or create or permit to exist any Lien on or other interest in the Collateral or sell, transfer, assign, exchange or otherwise dispose of the Collateral. If the proceeds of any such sale are notes, instruments or chattel paper, such proceeds shall be promptly delivered to the Secured Party to be held as part of the Collateral. If the Collateral, or any part thereof, is sold, transferred, assigned, exchanged or otherwise disposed of in violation of these provisions, the lien and security interest of the Secured Party shall continue in such Collateral or part thereof notwithstanding such sale, transfer, assignment, exchange or other disposition, and the Debtor will hold the proceeds thereof in a separate account for the Secured Party's benefit and, at the Secured Party's request, transfer such proceeds to the Secured Party in kind.

(e)     The Debtor will not enter into, modify or amend any existing or future contracts or agreements relating to the sale or disposition of the Collateral or any part thereof except those made in the ordinary course of business. Upon request from the Secured Party, the Debtor will provide the Secured Party with copies of all existing and hereafter created contracts and agreements and of all amendments and modifications thereto, and a status report as to its existing contracts.

(f)     No Debtor will grant any extension of the time of payment of any of its Accounts, or compromise or settle the same for less than the full amount thereof, release, in whole or in part, any Person liable for the payment thereof, or allow any credit or discount whatsoever thereon, except extensions, credits, discounts, compromises, settlements or releases (each a "Discount") granted or made in the ordinary course of business and involving (i) an Account having a value of $10,000 or less, (ii) an Account having a value greater than $10,000 but less than or equal to $50,000 provided any such Discount is not in excess of ten percent (10.0%) of the value of the Account, or (iii) an Account having a value greater than $50,000 provided any Discount in excess of $10,000 is made with the prior written consent of the Secured Party, such consent not to be unreasonably withheld.

(g)     Except to the extent otherwise permitted in the Credit Agreement, the Debtor will pay and discharge all taxes, assessments and governmental charges or levies against the Collateral prior to



delinquency thereof and will keep the Collateral free of all unpaid charges whatsoever where the failure to make any of such payments could reasonably be expected to have a Material Adverse Effect.

(h)    The Debtor will (i) keep accurate and correct records of its Inventory, itemizing and describing the kind, type and quantity of Inventory, the Debtor's cost therefor and (where applicable) the current price list for such Inventory, and (ii) upon the Secured Party's request, deliver to the Secured Party records and schedules which show the status, condition and location of all its Inventory and Equipment. The Secured Party shall have the right to review and verify such records, schedules, notices and financial information, and the Debtor will reimburse the Secured Party for all costs incurred thereby.

(i)    The Debtor will cause the Collateral to be kept insured at their own expense under one or more policies with such companies, in such amounts, and against such risks and liabilities as is ordinarily maintained by companies engaged in the same or similar businesses and similarly situated and as are satisfactory to the Secured Party in its reasonable discretion. Such policies shall include loss payable endorsements or such other mortgagee indemnity clauses in favor of the Secured Party as the Secured Party shall direct, and shall name the Secured Party as an additional insured. No such policy shall be subject to reduction or cancellation without thirty (30) days' prior written notice to the Secured Party and an original or certified copy of such policy shall be delivered to the Secured Party. If the Debtor fails to maintain and keep in full force and effect any of such insurance, or fail to pay the premiums when due, the Secured Party may, but shall not be obligated to, do so for the account of the Debtor and add the cost to the Secured Obligations. The Debtor assigns and sets over to the Secured Party all monies which may become payable on account of any insurance on the Collateral and direct the insurers to pay the Secured Party any amount so due. The Secured Party is irrevocably appointed attorney-in-fact of the Debtor to endorse any draft or check which may be payable to the Debtor in order to collect the proceeds of such insurance. The Secured Party agrees that so long as no Default has occurred, if the insurance proceeds are less than or equal to $50,000, the Secured Party will turn over to the Debtor such insurance collected by it on the condition that the Debtor apply such proceeds either (A) to the repair of damaged Collateral, or (B) to the replacement of destroyed Collateral with Collateral of the same or similar type and function and of at least equivalent value (in the sole judgment of the Secured Party), provided such replacement Collateral is made subject to the lien and security interest created by this Agreement and constitutes a perfected first priority lien on and security interest (except Liens permitted pursuant to the Credit Agreement) in such Collateral. If the insurance proceeds are greater than $50,000, the Secured Party may, in its sole and absolute discretion, turn over to the Debtor the proceeds of any such insurance collected by it on the condition that the Debtor apply such proceeds either (A) to the repair of damaged Collateral, or (B) to the replacement of destroyed Collateral with Collateral of the same or similar type and function and of at least equivalent value (in the sole judgment of the Secured Party), provided such replacement Collateral is made subject to the lien and security interest created by this Agreement and constitutes a perfected first priority lien on and security interest (except Liens permitted pursuant to the Credit Agreement) in such Collateral. Any balance of insurance proceeds remaining in the possession of the Secured Party after payment in full of the Secured Obligations shall be paid over to the Debtor.

(j)    If any Accounts arise out of a contract with a governmental authority subject to the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral, the Debtor will promptly notify the Secured Party thereof in writing and execute any instruments and take any steps required by the Secured Party in order that all monies due and to become due under such contracts shall be assigned to the Secured Party and notice thereof given to governmental authority, including, if applicable, the U.S. Government under the Federal Assignment of Claims Act.

(k)    The Debtor will permit the Secured Party during normal business hours and after not less than one (1) Business Day's prior notice to enter into and upon any premises where any of the Collateral or records with respect thereto are located for the purpose of inspecting the same, making



copies of records, observing the use of any part of the Collateral, or otherwise protecting its security interest in the Collateral.

(l)     The Secured Party shall have the right at any time to make any payments and do any other acts the Secured Party may deem necessary to protect its security interest in the Collateral, including, without limitation, the right to pay, purchase, contest or compromise any Lien which is prior to or superior to the liens and security interests granted hereunder, and appear in and defend any action or proceeding purporting to affect its security interest in the Collateral, and in exercising any such powers or authority, the right to pay all reasonable costs and expenses incurred in connection therewith, including reasonable attorneys' fees. The Debtor hereby agrees to reimburse the Secured Party for all such payments made and expenses incurred, which amounts shall be secured under this Agreement, and agrees it shall be bound by any payment made or act taken by the Secured Party hereunder. The Secured Party shall have no obligation to make any of the foregoing payments or perform any of the foregoing acts.

(m)     The Secured Party may at any time after and during the continuance of a Default, at its option, transfer to itself or any nominee any securities constituting Collateral, receive any income thereon and hold such income as additional Collateral or apply it to the Secured Obligations. Whether or not any Secured Obligations are due, the Secured Party may following and during the continuance of a Default, demand, sue for, collect, or make any settlement or compromise which it deems desirable with respect to the Collateral. Regardless of the adequacy of Collateral or any other security for the Secured Obligations, any deposits or other sums at any time credited by or due from the Secured Party to the Debtor may at any time be applied to or set off against any of the Secured Obligations then due and owing.

**Section 5.     Collections Account; Lockbox; Application of Deposits.**     The Debtor covenants and agrees to perform each of the covenants set forth below in this Section 5 except to the extent otherwise specifically consented to in writing by the Secured Party:

(a)     The Debtor will collect its accounts receivable only in the ordinary course of business and will open and maintain a lockbox with the Secured Party (the "Lockbox"). The Debtor shall enter into a lockbox agreement with the Secured Party in form and substance satisfactory to the Secured Party relating to the Lockbox (the "Lockbox Agreement") and will pay to the Secured Party all customary fees in connection with such lockbox arrangement. The Debtor will notify all of its customers and Account Debtors to forward all Collections of every kind due the Debtor to the Lockbox (such notices to be in such form and substance as the Secured Party may require from time to time). All Collections from Account Debtors sent directly to the Lockbox shall be deposited into a non-interest bearing cash collateral account opened, maintained and designated by the Secured Party (the "Cash Collateral Account"). The Debtor will immediately deposit all Remittances in the identical form in which such Remittance was made (except for any necessary endorsements) whether by cash or check into the Cash Collateral Account. Only the Secured Party shall have access to the Lockbox, and the Debtor shall take all actions necessary to grant the Secured Party such sole access. At no time shall the Debtor remove any item from the Lockbox without the Secured Party's prior written consent. The Debtor shall notify all of its customers and Account Debtors to pay all Collections to the Lockbox and all other payees to pay all Remittances to the Lockbox or the Cash Collateral Account. The Debtor shall not instruct any Account Debtors or payees to pay any Collection or Remittance to any other place or address without the Secured Party's prior written consent. If the Debtor neglects or refuses to notify any of its customers or Account Debtors to pay any Collection to the Lockbox, the Secured Party shall be entitled to make such notification. To the extent not inconsistent with the Lockbox Agreement, the Debtor hereby grants to the Secured Party an irrevocable power of attorney, coupled with an interest, to take in the name of each Debtor all action necessary to (A) grant the Secured Party sole access to the Lockbox, (B) contact all Account Debtors of the Debtor to pay any Collections to the Lockbox, and (C) endorse each Collection or Remittance delivered to the Lockbox for deposit to the Cash Collateral Account.



(b)      If the Debtor receives directly any Collections or Remittances, the Debtor shall receive such Collections and Remittances in trust and as fiduciary for the Secured Party and shall immediately deposit any such Collections or Remittances, in its original form, into the Cash Collateral Account. Pending such deposit, the Debtor agrees that it will not commingle any such Collection or Remittance with any of the Debtor's other funds or property, but will hold it separate and apart therefrom in trust and as fiduciary for the Secured Party until deposit is made into the Cash Collateral Account.

(c)      The Secured Party shall have sole dominion, control and access to the Cash Collateral Account and all Collections and Remittances and other items deposited in the Cash Collateral Account, and such Collections and Remittances and items may be withdrawn only by the Secured Party, it being the intention of the parties hereto that the Debtor shall have no control over or withdrawal rights in respect of, or access to, the Cash Collateral Account. The Debtor hereby grants to the Secured Party a security interest in all funds held in each Lockbox and, to the extent funds in the Blocked Account or the Cash Collateral Account are deemed to be the property of the Debtor, all funds held in the Blocked Account or the Cash Collateral Account, as security for the Secured Obligations. The Cash Collateral Account shall not be subject to any deduction, set-off, banker's lien or any other right in favor of any person or entity other than the Secured Party.

(d)      The Cash Collateral Account will be cleared by the Secured Party daily as to collected funds, and such collected funds will be applied to the principal balance of and accrued interest on the Revolving Credit Loans, at the Secured Party's election. Upon the occurrence of an Event of Default, the Secured Party may apply such collected funds to the Secured Obligations in such order as it may elect.

(e)      For the purpose of calculating interest on the Revolving Credit Loans, all Collections and Remittances shall be credited to the Debtor (conditional upon final collection) one (1) Business Day after the Secured Party receives notice of deposit of the same into the Cash Collateral Account; provided, however, in the event that the Secured Party receives notice of such deposit later than 12:00 noon on any Business Day, such Collections and Remittances deposited shall be credited to the Debtor (conditional upon final collection) three Business Days after such deposit. For the purpose of determining the Revolving Credit Availability under the Credit Agreement, all such Collections and Remittances shall be credited on the Business Day deposited into the Cash Collateral Account. From time to time, the Secured Party may adopt such regulations and procedures as it may deem reasonable and appropriate with respect to the operation of the Cash Collateral Account, the Lockbox and the services to be provided by the Secured Party under this Agreement not inconsistent with the terms of this Agreement.

(f)      All reasonable costs of collection of Accounts, including out-of-pocket expenses, administrative and record-keeping costs, reasonable attorneys' fees, and all service charges and costs related to the establishment and maintenance of the Lockboxes and the Cash Collateral Account, shall be the sole responsibility of the Debtor, whether the same are incurred by the Secured Party or the Debtor, and the Secured Party, in its sole discretion, may charge the same against the Debtor and/or any account maintained by the Debtor with the Secured Party and the same shall be deemed part of the Secured Obligations. The Debtor hereby agrees to indemnify and hold the Secured Party harmless from and against any loss or damage with respect to any Collection or Remittance deposited in the Cash Collateral Account which is dishonored or returned for any reason. If any Collection or Remittance deposited in the Cash Collateral Account is dishonored or returned unpaid for any reason, the Secured Party, in its sole discretion, may charge the amount of such dishonored or returned Collection or Remittance directly against the Debtor and/or any accounts maintained by the Debtor with the Secured Party and such amount shall be deemed part of the Secured Obligations.



**Section 6.** _**Power of Attorney.**_

(a)    The Debtor hereby irrevocably constitutes and appoints the Secured Party and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Debtor or in the Secured Party's own name, to take any and all appropriate action and to execute any and all documents and instruments at any time that may be necessary or useful to accomplish the purposes of this Agreement. Without limiting the generality of the foregoing, the Debtor hereby gives the Secured Party as its attorney-in-fact as aforesaid the power and right, on behalf of the Debtor, without notice to or assent by the Debtor, to do any or all of the following:

(i)    to demand, sue for, collect, or receive in the name of the Debtor or in its own name, any money or property at any time payable or receivable on account of or in exchange for any of the Collateral and, in connection therewith, endorse checks, notes, drafts, acceptances, money orders, documents of title, or any other instruments for the payment of money under the Collateral or any policy of insurance;

(ii)    to pay or discharge taxes, Liens, security interests, or other encumbrances levied or placed on or threatened against the Collateral.

(iii)    to send requests for verification to Account Debtors and other obligors;

(iv)    to notify post office authorities to change the address for delivery of mail of the Debtor to an address designated by the Secured Party and to receive, open and dispose of mail addressed to the Debtor;

(v)    (A) to direct Account Debtors and any other parties liable for any payment relating to or in respect of any of the Collateral to make payment of any and all monies due and to become due thereunder directly to the Secured Party or as the Secured Party may direct; (B) to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral; (C) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against the Debtor, assignments, proxies, stock powers, verifications and notices in connection with an account and other documents relating to the Collateral; (D) to commence and prosecute any suit, action, or proceeding at law or in equity in any court of competent jurisdiction to collect the Collateral or any part thereof and to enforce any other right in respect of any Collateral; (E) to defend any suit, action, or proceeding brought against the Debtor with respect to any Collateral; (F) to settle, compromise or adjust any suit, action, or proceeding described above and, in connection therewith, to give such discharges or releases as the Secured Party may deem appropriate; (G) to exchange any of the Collateral for other property upon any merger, consolidation, reorganization, recapitalization, or other readjustment of the issue thereof and, in connection therewith, deposit any of the Collateral with any committee, depositary, transfer agent, registrar, or other designated agency upon such terms as the Secured Party may determine; (H) to add or release any guarantor, endorser, surety, or other party to any of the Collateral; (I) to renew, extend, or otherwise change the terms and conditions of any of the Collateral; (J) to insure, and to make, settle, compromise, or adjust claims under any insurance policy covering any of the Collateral; and (K) to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral in such manner as is consistent with the Applicable UCC and as fully and completely as though the Secured Party were the absolute owner thereof for all purposes, and to do, at the Secured Party's option and the



Debtor's expense, at any time, or from time to time, all acts and things which the Secured Party deems necessary to protect, preserve, or realize upon the Collateral and the Secured Party's security interest therein in order to effect the intent of this Agreement, all as fully and effectively as the Debtor might do, including, without limitation, the execution, delivery and recording, in connection with any sale or other disposition of any Collateral, of endorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(vi)    To the extent the authorization given in Section 2(b) is not sufficient, to file such financing statements, with or without the Debtor's signature, or a photocopy of this Agreement in substitution for a financing statement, as the Secured Party may deem appropriate and to execute in the Debtor's name such financing statements and amendments thereto and continuation statements which may require the Debtor's signature.

(b)    To the extent permitted by law, the Debtor hereby ratifies all that its attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and is irrevocable.

(c)    The powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Debtor for any act or failure to act, except for the Secured Party's own gross negligence or willful misconduct.

**Section 7.    *Defaults*.** The occurrence of any one or more of the following events or conditions shall constitute a default under this Agreement (a "*Default*"):

(i)    The occurrence of an Event of Default under the Credit Agreement.

(ii)    The failure of the Debtor to pay any amount or perform any obligation or covenant required to be performed by it in accordance with the terms and conditions of this Agreement after the expiration of any applicable grace period.

**Section 8.    *Remedies*.** (a) Upon the occurrence and during the continuance of a Default, the Secured Party may, at its option, without notice to or demand upon the Debtor, do any one or more of the following:

(i)    Declare all of the Secured Obligations immediately due and payable.

(ii)    Exercise any or all of the rights and remedies provided for by the Applicable UCC of the state or states having jurisdiction with respect to all or any portion of the Collateral from time to time, specifically including, without limitation, the right to take possession of the Collateral, and to recover reasonable attorneys' fees and other expenses incurred by the Secured Party in the enforcement of this Agreement or in connection with the Debtor's redemption of the Collateral.

(iii)    Require the Debtor to assemble the Collateral or any part thereof and make it available at one or more places as the Secured Party may designate, and to deliver possession of the Collateral or any part thereof to the Secured Party, who shall have full right to enter upon any or all of the Debtor's premises and property to exercise the Secured Party's rights hereunder.



(iv)    Use, manage, operate and control the Collateral and the Debtor's business and property to preserve the Collateral or its value, including, without limitation, the right to take possession of all of the Debtor's premises and property, to exclude the Debtor and any third parties, whether or not claiming under the Debtor, from such premises and property, to make repairs, replacements, alterations, additions and improvements to the Collateral and to dispose of all or any portion of the Collateral in the ordinary course of the Debtor's businesses.

(v)    Use, in connection with any assembly or disposal of the Collateral, any Trademark, Trade Secret, Copyright, Patent or technical knowledge or process used or utilized by the Debtor, and for the purpose thereof and/or the exercise of the Secured Party's rights under Section 8(a)(iv), the Debtor hereby grants to the Secured Party an irrevocable, nonexclusive license (exercisable without the payment of royalty or other compensation to the Debtor) to use, license or sublicense any Trademark, Trade Secret, Copyright, Patent or technical knowledge or process now owned or hereafter acquired by the Debtor, together with access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for compilation or printout thereof.

(vi)    Enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any other or further remedy which it may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Debtor until full and final payment of any deficiency has been made in cash. The Debtor shall reimburse the Secured Party upon demand for, or the Secured Party may apply any proceeds of the Collateral to, the costs and expenses (including reasonable attorneys' fees, transfer taxes and any other charges) incurred by the Secured Party in connection with any sale, disposition or retention of any Collateral hereunder.

(vii)    Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party shall give to the Debtor at least five (5) Business Days prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made. The Debtor hereby acknowledges that five (5) Business Days prior written notice of such sale or sales shall be reasonable notice. Such notice may be mailed to the Debtor at the address set forth in this Agreement for delivery of notices. Further, in the event of any public sale hereunder, the Secured Party shall exhibit the Collateral for a reasonable period of time not later than the day before such sale is to take place, and, if practicable, shall exhibit the Collateral at the time and place of such sale; provided, however, that the Secured Party shall have no obligation to exhibit any part of the Collateral at or prior to the sale thereof, if, at the time of default, such Collateral is in the Debtor's possession or under its control, and if the Secured Party sends the Debtor a written demand for possession thereof under Section 8(a)(iii) and the Debtor fails to comply with such demand at least three (3) days prior to the date set for sale of such Collateral. In addition, the Debtor waives any and all rights that it may have to a judicial hearing in advance of the enforcement of any of the Secured Party's rights hereunder, including, without limitation, its right following a Default to take immediate possession of the Collateral and to exercise its rights with respect thereto.

(viii)    Proceed by an action or actions at law or in equity to recover the Secured Obligations or to foreclose under this Agreement and sell the Collateral, or any portion thereof, pursuant to a judgment or decree of a court or courts of competent jurisdiction.

17



(ix)    In the event the Secured Party recovers possession of all or any part of the Collateral pursuant to a writ of possession or other judicial process, whether prejudgment or otherwise, the Secured Party may thereafter retain, sell or otherwise dispose of such Collateral in accordance with this Agreement or the Applicable UCC, and following such retention, sale or other disposition, the Secured Party may voluntarily dismiss without prejudice the judicial action in which such writ of possession or other judicial process was issued.  The Debtor hereby consents to the voluntary dismissal by the Secured Party of such judicial action, and the Debtor further consents to the exoneration of any bond that the Secured Party filed in such action.

(b)    To the extent that applicable law imposes duties on the Secured Party to exercise remedies in a commercially reasonable manner, the Debtor acknowledges and agrees that it is not commercially unreasonable for the Secured Party (i) to fail to incur expenses reasonably deemed significant by the Secured Party to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other persons, whether or not in the same business as the Debtor, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, (x) to purchase insurance or credit enhancements to insure the Secured Party against risks of loss, collection or disposition of Collateral or to provide to the Secured Party a guaranteed return from the collection or disposition of Collateral, or (xi) to the extent deemed appropriate by the Secured Party, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Secured Party in the collection or disposition of any of the Collateral.  The Debtor acknowledges that the purpose of this Section 8(b) is to provide non-exhaustive indications of what actions or omissions by the Secured Party would not be commercially unreasonable in the Secured Party's exercise of remedies against the Collateral and that other actions or omissions by the Secured Party shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 8(b).  Without limitation upon the foregoing, nothing contained in this Section 8(b) shall be construed to grant any rights to the Debtor or to impose any duties on the Secured Party that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 8(b).

**Section 9.    _Distribution of Collateral Proceeds_**.  In the event that, following the occurrence and during the continuance of a Default, the Secured Party receives any monies in connection with the enforcement of the liens and security interests granted to the Secured Party in this Agreement or otherwise with respect to the realization upon any of the Collateral, such monies shall be applied as follows:

(i)    First, to the payment of, or (as the case may be) the reimbursement of the Secured Party for or in respect of, all Reimbursable Costs and Expenses and losses which shall have been incurred or sustained by the Secured Party in connection with the collection of such monies by the Secured Party, for the exercise, protection or enforcement by the Secured Party of all or any of the rights, remedies, powers and



privileges of the Secured Party under this Agreement or any of the other Loan Documents or in respect of the Collateral or in support of any provision of adequate indemnity to the Secured Party against any Taxes or liens which by law shall have, or may have, priority over the rights of the Secured Party to such monies;

(ii)     Second, to the payment of all other Secured Obligations in such order or preference as the Secured Party may determine in its sole discretion; provided, however, the Secured Party may in its sole discretion make proper allowance to take into account any Secured Obligations not then due and payable;

(iii)    Third, upon payment and satisfaction in full of, or the making of provisions satisfactory to the Secured Party for payment in full of, all of the Secured Obligations, to the payment of any obligations required to be paid pursuant to the provisions of the Applicable UCC; and

(iii)    Fourth, the excess, if any, shall be returned to the Debtor or to such other Persons as are entitled thereto under applicable Law.

### Section 10.     *Miscellaneous*

(a)     Marshalling.  The Secured Party shall not be required to marshal any present or future collateral security (including but not limited to this Agreement and the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising.  To the extent that they lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Secured Party's rights under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that they lawfully may, the Debtor hereby irrevocably waives the benefits of all such laws.

(b)     Notices.  Any notice or consent required or permitted by this Agreement shall be in writing and shall be delivered in the manner and to the addresses specified in the Credit Agreement for delivery of notice.  All notices shall be deemed effective at the times specified in the Credit Agreement based upon the manner of delivery.

(c)     Headings.  The various headings in this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

(d)     Governing Law.  This Agreement, any claim arising from or relating to this Agreement, or any statement, course of conduct, act, omission, or event occurring in connection herewith (whether for breach of contract, tort or any other theory of liability) shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to its choice of law principles.

(e)     Amendments.  This Agreement or any provision hereof may be changed, waived, or terminated only by a statement in writing signed by the party against which such change, waiver or termination is sought to be enforced.

(f)     No Waiver.  No delay in enforcing or failure to enforce any right under this Agreement shall constitute a waiver by the Secured Party of such right.  No waiver by the Secured Party



of any default hereunder shall be effective unless in writing, nor shall any waiver operate as a waiver of any other default or of the same default on a future occasion.

(g)    TIME OF THE ESSENCE.    TIME IS OF THE ESSENCE IN EACH PROVISION OF THIS AGREEMENT OF WHICH TIME IS AN ELEMENT.

(h)    Binding Agreement. All rights of the Secured Party hereunder shall inure to the benefit of its successors and assigns. The Debtor may not assign any of its interests or obligations under this Agreement without the prior written consent of the Secured Party, which consent may be withheld in the sole discretion of the Secured Party. Any purported assignment inconsistent with this provision shall, at the option of the Secured Party, be null and void.

(i)    Entire Agreement. This Agreement and the other Loan Documents are intended by the parties as a final expression of their agreement and is intended as a complete and exclusive statement of the terms and conditions thereof. Acceptance of or acquiescence in a course of performance rendered under this Agreement shall not be relevant to determine the meaning of this Agreement even though the accepting or acquiescing party had knowledge of the nature of the performance and opportunity for objection.

(j)    Expenses. The Debtor shall pay to the Secured Party on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by the Secured Party in protecting, preserving or enforcing the Secured Party's rights under or in respect of any of the Secured Obligations or any of the Collateral.

(k)    Severability. If any provision of this Agreement should be found to be invalid or unenforceable, all of the other provisions shall nonetheless remain in full force and effect to the maximum extent permitted by law.

(l)    Survival of Provisions.    All representations, warranties and covenants of the Debtor contained herein shall survive the execution and delivery of this Agreement, and terminate only upon full and final payment and performance of the Secured Obligations.

(m)    Set-off.    The Secured Party shall have the right, at any time after the occurrence of a Default, to set off any indebtedness or obligation of the Debtor to the Secured Party against any indebtedness or obligation of the Secured Party to the Debtor, without notice to or demand upon the Debtor and whether or not any such indebtedness or obligations are liquidated or mature at the time of such offset. The Secured Party's right of offset hereunder shall be in addition to and not in limitation of any other rights or remedies which may exist in favor of the Secured Party.

(n)    Authority of the Secured Party. The Secured Party shall have and be entitled to exercise all powers hereunder which are specifically delegated to the Secured Party by the terms hereof, together with such powers as are reasonably incident thereto. The Secured Party may perform any of its duties hereunder or in connection with the Collateral by or through agents or employees and shall be entitled to retain counsel and to act in reliance upon the advice of counsel concerning all such matters. Neither the Secured Party nor any director, officer, employee, attorney or agent of the Secured Party shall be liable to the Debtor for any action taken or omitted to be taken by it or them hereunder, except for its or their own gross negligence, bad faith or criminal or willful misconduct; nor shall the Secured Party be responsible for the validity, effectiveness or sufficiency hereof or of any document or security furnished pursuant hereto. The Secured Party shall be entitled to rely on any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons. The Debtor agrees to indemnify and hold harmless the Secured Party and/or any such other person from and against any and all costs, expenses (including reasonable attorneys' fees), claims or liability incurred by the Secured Party or such other persons hereunder, unless such claim or liability shall



be due to gross negligence, bad faith or criminal or willful misconduct on the part of the Secured Party or such other person.

(o)     <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same agreement. Delivery by telecopier of an executed counterpart of a signature page to this Agreement or any notice, communication, agreement, certificate, document or other instrument in connection with this Agreement and the other Loan Documents shall be effective as delivery of an executed original counterpart thereof.

(p)     <u>Consent to Jurisdiction</u>.   The Debtor consents to the commencement and maintenance of any action or proceeding against it in any state court within the Commonwealth of Pennsylvania or in the United States District Court for the Western District of Pennsylvania, and the Debtor further consents to service of process in any such action by the mailing of copies of such process to the Debtor at the address specified in this Agreement for delivery of notice to the Debtor. The Debtor agrees that the state courts of the Commonwealth of Pennsylvania and the United States District Court for the Western District of Pennsylvania shall have exclusive jurisdiction for any action or proceeding commenced by or through it with respect to this Agreement and hereby waives any claim that Allegheny County, Pennsylvania is an inconvenient forum and that any action or proceeding arising out of or relating to this Agreement and commenced in any state or federal courts sitting in Allegheny County, Pennsylvania lacks proper venue

(q)     <u>Waiver of Jury Trial</u>. THE DEBTOR AND THE SECURED PARTY HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY OTHER DOCUMENT OR INSTRUMENT ATTACHED HERETO, REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE DEBTORS WITH RESPECT TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR INSTRUMENT ATTACHED HERETO, REFERRED TO HEREIN OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND THE DEBTOR AND THE SECURED PARTY HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE DEBTOR AND THE SECURED PARTY HERETO TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

(r)     <u>Termination</u>. This Agreement and the security interests created hereby shall terminate (except for any provisions hereof which survive such termination by their own terms) upon the full, final and irrevocable payment of all of the Secured Obligations and termination of any commitment by the Secured Party to make any further loans or advances to the Debtor or to issue any Letters of Credit. If the Secured Party receives any payment or payments on account of the Secured Obligations which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver, or any other party under the Bankruptcy Code, 11 U.S.C. §101 <u>et seq</u>., as amended, or any other state or federal law, common law or equitable doctrine, then to the extent of any sum not finally retained by the Secured Party, the Debtor's obligations to the Secured Party shall be reinstated and this Agreement, and any security therefor, shall remain in full force and effect (or be reinstated) until payment shall have been made to the Secured Party, notwithstanding termination of this Agreement or the cancellation of any note, instrument or agreement evidencing the Secured Obligations, and such payment shall be due on demand by the Secured Party. If any proceeding seeking such repayment is pending or, in the Secured Party's sole judgment, threatened, this Agreement and any security therefor shall remain in full force and effect notwithstanding that the



Debtor may not be obligated to the Secured Party.  Upon termination of this Agreement and the security interests created hereby, the Secured Party shall execute and deliver to the Debtor such documents as the Debtor may reasonably request to evidence or otherwise effect such termination.

      (s)    <u>Sealed Document</u>.  This Agreement is intended as a document under seal.


**\*\*\*\*\*\*SIGNATURES APPEAR ON THE FOLLOWING PAGE\*\*\*\*\*\***



IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

DEBTORS:

WITNESS/ATTEST:

SMART PARTS, INC.

By:_____
Title:_____

SECURED PARTY:

RBS BUSINESS CAPITAL, a division of RBS Asset Finance, Inc., a New York corporation

By:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Security Agreement to be executed by their duly authorized officers effective as of the day and year first above written.

DEBTORS:

WITNESS/ATTEST:

**SMART PARTS, INC.**

By:_____
Title:_____

SECURED PARTY:

**RBS BUSINESS CAPITAL**, a division of RBS Asset Finance, Inc., a New York corporation

By:_____
Title: _Senior Vice President_

## PERFECTION CERTIFICATE

Reference is made to that certain Security Agreement of even date herewith (the "Security Agreement") between **SMART PARTS, INC.,** a Rhode Island corporation (the "Borrower"), and **RBS BUSINESS CAPITAL,** a division of RBS Asset Finance, Inc., a New York corporation (the "Lender"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Security Agreement.

In connection with the Security Agreement, the Borrower certifies to the Lender as follows:

1.    Names.

(a)    Set forth below is (i) the exact legal name of the Borrower and each direct or indirect subsidiary of the Borrower (the "Subsidiaries") as it appears in their respective certificates of organization or incorporation, (ii) the state of organization or incorporation of the Borrower and each of its Subsidiaries, and (iii) the state organization identification number and the federal employer identification number of the Borrower and each of its Subsidiaries:

| Name | State of Organization/Incorporation | Federal EIN | State Organization No. |
|------|------|------|------|
| Smart Parts, Inc. | Rhode Island | 20-0029072 | 000132464 |

(b)    Set forth below is each other name (including trade names or similar appellations) used by the Borrower, its Subsidiaries or any of their respective divisions or other business units at any time during the past five years:

| Names | Date that name changed |
|------|------|
| Smartparts, Inc. | N/A  (Certificate of Amendment to be filed with Rhode Island Secretary of State to change name to Smartparts, Inc.) |

(c)    Except as set forth in Schedule 1 attached hereto, neither the Borrower nor any of the Subsidiaries has changed its identity or structure in any way within the past five years.  For purposes of this Certificate, changes in identity or structure include mergers, consolidations and acquisitions, as well as any change in form, name, nature or jurisdiction of organization.  If any such change has occurred, Schedule 1 attached hereto includes the information required by paragraphs 1, 2 and 3 of this Certificate as to each acquiree or constituent party to a merger or consolidation.

2.    Current Locations.

(a)    The chief executive offices of the Borrower and the Subsidiaries are located at the following addresses:

| Name/Address | County | State |
|------|------|------|
| Smart Parts, Inc. 102 Prospect Street Providence, Rhode Island 02906 | Providence | Rhode Island |



(b)    The following are all locations where the Borrower or the Subsidiaries (1) maintain any books or records relating to any Accounts, (2) maintain any Inventory or Equipment, or (3) has a place of business, in addition to the addresses listed in part 2(a) above:

| Name/Address  (Including County and State) | Items maintained at Location |
|---|---|
| Smart Parts, Inc.<br>102 Prospect Street<br>Providence, Providence County, Rhode Island 02906 | Business Records |
| Smart Parts, Inc.<br>29-J Commerce Way<br>Totowa, Passaic County, New Jersey 07512 | Inventory & Equipment |
| Smart Parts, Inc.<br>3069 Cai Tian Road,  Suite 2908<br>Galaxy Century, Futian<br>Shenzhen, China | Furniture & Office Equipment |
| Global Logistics, Inc.<br>10685 East 51st Avenue<br>Denver, Colorado 80239 | Inventory |

(c)    The following are the names and addresses of all Persons other than the Borrower or the Subsidiaries which have possession of any Inventory or Equipment owned by the Borrower or the Subsidiaries and the relationship to the Borrower or the Subsidiaries (such as landlord, warehouseman, etc.):

| Name/Address/Relationship | Items maintained at Location |
|---|---|
| HandPack, Inc.<br>65 Commerce Road<br>Carlstadt, New Jersey 07072 | Inventory & Equipment |
| Shenzhen – Not Available in English | Furniture & Office Equipment |
| Global Logistics, Inc.<br>10685 East 51st Avenue<br>Denver, Colorado 80239 | Inventory |

3.    Prior Locations.  Set forth below is all of the business locations, not otherwise listed above, which were maintained by the Borrower or the Subsidiaries at any time during the past five years:

| Name/Address | County | State |
|---|---|---|
| Smart Parts, Inc.<br>180 South Van Brunt<br>Englewood | Bergen | New Jersey |

4.    <u>Unusual Transactions</u>.    All accounts have been originated by the Borrower or its Subsidiaries and all Inventory and Equipment has been acquired by the Borrower or the Subsidiaries in the ordinary course of business.

5.    <u>Intellectual Property</u>.    Attached hereto as <u>Schedule 2</u> is a list of all the patents, patent rights, patent applications, copyrights and copyright applications, trademarks, trademark rights, patent licenses, copyright licenses and trademark licenses now owned or used by the Borrower or the Subsidiaries.

6.    <u>Lien Search Reports</u>.    Attached hereto as <u>Schedule 3</u> are the financing statements or other filings filed against the Undersigned in the Uniform Commercial Code filing office or offices in each jurisdiction identified in Paragraphs 2 or 3 above with respect to the Borrower, and no other financing statement or other filing under the Uniform Commercial Code has been made in the name of the Borrower.

7.    <u>Commercial Tort Claims</u>.    Except to the extent set forth below, the Borrower does not hold any commercial tort claims:

IN WITNESS WHEREOF, the undersigned has executed this Perfection Certificate through its duly authorized officers as of the ___4___ day of August, 2007.

WITNESS/ATTEST:

SMART PARTS, INC.

By:_____
Title:_____

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

RBS BUSINESS CAPITAL, a division
of RBS ASSET FINANCE, INC.,

               Plaintiff,               Case No. GD 09 -

      v.

SMARTPARTS, INC., f/k/a SMART
PARTS, INC; GEOFFREY E. LEWIS;
STEFAN GUELPEN; and WYNIT, INC.,

               Defendants.

## ORDER OF COURT

AND NOW, this _____ day of _____, 2009, upon review and Hearing on Plaintiff

RBS Business Capital, a division of RBS Asset Finance, Inc.'s Motion to Appoint Receiver, it is

hereby ORDERED, ADJUDGED and DECREED that the Motion is GRANTED under the

following terms:

      1.    Mr. Mark Gleason shall be appointed as receiver (hereinafter the "Receiver") for

the property and assets of Smartparts, real, personal and mixed, of whatever kind and

description, and wheresoever situated, including all personal property, business, shares of stock,

rights, assets, and effects of whatsoever nature and kind and wheresoever the same may be

situated, all its plants, machinery, tools, merchandise, bills and accounts receivable, cash on hand

and in bank, and all of its contracts, rights, and choses in action, intangibles, licenses, patents,

trademarks and names, copyrights, corporate franchises, and its income and profits, books of

accounts, records and other books, papers and accounts, deeds, leases, contracts, muniments of

title, and all interests, easements, privileges, rights and assets of every kind (collectively the

"Corporation Assets") for a period commencing on the date of an Order of Court Appointing Receiver and ending upon revocation of such appointment by Order of Court.

2.     The Receiver shall, within ten (10) days from the date of this Order, file with the Prothonotary a Bond for the faithful performance of its duties in the amount of $5,000.00, in satisfaction of the requirements set forth in Pa.R.Civ.P. 1533(d).

3.     The Receiver shall take all necessary action to add RBS and the Receiver as a Named Insured and Agreement on its General Liability and Casualty Policy of Insurance maintained by the Receiver and the Receiver shall furnish to RBS a Certificate of Insurance reflecting RBS Business Capital, A division of RBS Asset Finance, Inc.'s status as a Named Insured and Agreement under its Policy, along with a copy of the Policy itself.  The Receiver shall maintain said Policy for so long as the Receiver continues its duties as a Receiver under the Court's Order.

4.     Smartparts shall cause existing insurance coverage for the Collateral and Corporation Assets, if any, to remain in force until the expiration of the current paid up term under such policy or policies and shall notify the insurance carrier(s) immediately of the appointment of the Receiver and request that the Receiver and RBS be added to the insurance policy or policies as Additional Insureds thereunder.  Upon the expiration of the paid up portion of such policy or policies, the Receiver shall have the responsibility for keeping the Collateral insured and may as an option keep in force the existing insurance coverage(s) or obtain new coverage(s) for the Collateral, each of which such coverage(s) shall name RBS and Receiver as Additional Insured's thereunder.

5.     Nothing in this Order of Court shall in any way limit, alter or impair the rights and interests of RBS in the Collateral.

6.    The Receiver shall be entitled to compensation for its services provided under Court Order as enumerated in the Compensation Schedule attached as Exhibit E to RBS's Motion. The Receiver's compensation shall be payable from the revenues generated by the Collateral.

7.    The Receiver is authorized to conduct investigations of, and analyses concerning, the operation and value of the Corporation Assets. The Receiver shall have all necessary powers to manage the Corporation Assets including, without limitation, the following powers and responsibilities:

a)    To take possession of the Corporation Assets and all personalty related thereto, including without limitation, all related books, records, bank accounts, keys, combinations for locks or other access information, or which relate in any manner to the management or operation of all or any portion of the Corporation Assets;

b)    To direct Defendants (or Smartparts) and their agents, employees or other representatives immediately to turn over and deliver or cause to be delivered to the Receiver or his designee all personalty which relates in any manner to the management or operation of the Corporation Assets including, without limitation, all keys, combinations for locks or other access codes, books, records, accounts, operating statements, reserve accounts and the like pertaining to the operation of the Corporation Assets;

c)    To sell all or any portion of the Corporation Assets and to do all acts and things necessary or advisable in connection with such sale(s);

d) To negotiate all bills, drafts, notes or other instruments in the name of Smartparts;

e) To take such steps with respect to the outstanding accounts payable and the status of operation of the Corporation Assets in order to maintain, preserve, and protect the Corporation Assets including, without limitation, to discern the status of the outstanding accounts payable and to settle any such accounts that the Receiver or its designee deems necessary and the power to demand, collect and receive from all present and future account debtors, all sums now due and unpaid or which hereafter shall become due with respect to or arising out of the Corporation Assets during the pendency of the receivership authorized hereby;

f) To employ such counsel, accountants or other professionals, contractors, building management specialists and support personnel and other persons as may be necessary in order to carry out his duties as Receiver and to preserve, maintain and liquidate the Corporation Assets, to authorize the compensation of such entities from the revenues generated by the Corporation Assets;

g) To commence and prosecute such actions at law or in equity that the Receiver deems necessary to fulfill his duties, to liquidate or preserve the Corporation Assets;

h) To determinate or abrogate any or all agreements, contracts, understandings or commitments entered into by Smartparts with respect to the Corporation Assets, to the extent permitted by applicable law;

    i)  To open new accounts with, or negotiate, compromise or otherwise resolve Smartparts existing obligations to utility companies or other service providers or suppliers of goods and services to Smartparts and to otherwise enter into such agreements, contracts or understandings with such utility companies or other service providers or suppliers as are necessary to maintain, preserve and protect the Corporation Assets;

    j)  To open new bank accounts with respect to the Receiver or his designee's management and liquidation of the Corporation Assets, and;

    k)  To apply to this Court for further directions and for such further powers as may be necessary to enable the Receiver to fulfill his duties.

8.    The Receiver or his designee shall conduct an inspection of the Corporation Assets and shall perform a complete inventory of the Corporation Assets coming under his control or possession pursuant to this Order. Such inspection and inventory shall be conducted with the cooperation of Defendants (or Smartparts) and their agents, employees or other representatives and the Receiver or his designee shall file with the Prothonotary's Office a true and complete inventory of the property and proposed plan of liquidation of the Corporation Assets under oath within sixty (60) days after the date of this Order. The Receiver or his designee shall keep a true and accurate account of any and all receipts and expenditures and shall, so often as the Court directs, file with the Court an Inventory and Account under oath, of any additional property or effects which he has discovered which shall have come into his hands since his appointment, and of the amount remaining in his hands or invested by him, and of the manner in which the same is secured or invested, stating the balance due from or to him at the

time of rendering its last account, the receipts and expenditure since that time. The account shall

include detailed information concerning income, expenses, payables and receivables.

9.       All rents, issues, profits, revenues, income or other payments which are now or

hereafter become due (hereinafter collectively, the "Accounts") with respect to all or any portion

of the Corporation Assets whether pursuant to oral or written agreement shall be remitted by the

account debtors directly to the Receiver.

10.      Smartparts shall use its best efforts to ensure a smooth transition of the

management and operation of the Collateral and Corporation Assets to the Receiver and

Smartparts shall cooperate with the Receiver in effecting such transition.

11.      Smartparts and its agents, employees or other representatives are enjoined from

interfering in any manner with the Receiver's management and operation of the Corporation

Assets and Collateral.

12.      The Receiver shall not be bound by all or any contracts, agreements,

understandings or other commitments Smartparts had, has or may have with third parties,

whether oral or written and the Receiver shall be authorized, by affirmative written ratification

executed by the Receiver, to agree to become bound by any such contracts, agreements,

understandings or other commitments or may agree to enter into new or amended contracts,

agreements, understandings or other commitments.

13.      RBS may terminate this receivership at any time by filing with the Court and

serving upon Smartparts a written notice indicating the effective date of such termination and

RBS, upon written request of Smartparts will file such notice within thirty (30) days of such

request provided RBS has received payment in full of all amounts, including without limitation,

all principal, interest, late charges, attorneys' fees and expenses, or other charges owing to RBS

by Smartparts under the subject loan documents.

BY THE COURT:

_____,J.