Douglas M. Foley (VSB No. 34364)
Sarah B. Boehm (VSB No. 45201)
McGUIREWOODS LLP
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel to the Debtors and
Debtors in Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

```
- - - - - - - - - - - - - -X
In re:                     :   Chapter 11
                           :
CIRCUIT CITY STORES, INC., :   Case No. 08-35653 (KRH)
et al.,                    :
                           :
            Debtors.       :   Jointly Administered
- - - - - - - - - - - - - -X - - - - - - - - - - -

CIRCUIT CITY STORES, INC., X   Adversary Proceeding
                           :   No:_____
            Plaintiff,     :
                           :
v.                         :
                           :
SCHIMENTI CONSTRUCTION     :
COMPANY, LLC,              :
                           :
            Defendant.     :
- - - - - - - - - - - - - -X
```

**COMPLAINT**

The debtors and debtors in possession in the above-

captioned cases (collectively, the "Debtors"),[1] by and

---

[1]    The Debtors and the last four digits of their respective taxpayer
identification numbers are as follows: Circuit City Stores, Inc. (3875),
Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875),

through their undersigned counsel, for their Complaint

against the above-captioned defendant, Schimenti

Construction Company, LLC (the "Defendant"), and, in support

thereof, allege as follows:

<u>**JURISDICTION AND VENUE**</u>

1.    The Court has jurisdiction over this adversary

proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.    This action is a core proceeding under 28 U.S.C.

§§ 157(b)(2) (A), (B), (F), and (O).

3.    Venue of these cases and this adversary proceeding

in this district is proper under 28 U.S.C. §§ 1408 and 1409.

<u>**BACKGROUND**</u>

4.    On November 10, 2008 (the "Petition Date"), the

Debtors filed voluntary petitions in this Court for relief

under chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code").

---

Ventoux International, Inc. (1838), Circuit City Purchasing Company, LLC
(5170), CC Aviation, LLC (0841), CC Distribution Company of Virginia,
Inc. (2821), Circuit City Proper ties, LLC (3353), Kinzer Technology, LLC
(2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs,
Inc.(6796), Sky Venture Corp. (0311), PRAHS, Inc.(n/a), XSStuff, LLC
(9263), Mayland MN, LLC (6116), Courchevel, LLC (n/a), Orbyx Electronics,
LLC (3360), and Circuit City Stores PR, LLC (5512). The address for
Circuit City Stores West Coast, Inc. is 9250 Sheridan Boulevard,
Westminster, Colorado 80031. For all other Debtors, the address was 9950
Mayland Drive, Richmond, Virginia 23233 and currently is 4951 Lake Brook
Drive, Glen Allen, Virginia 23060.

5.    The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

6.    On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").  To date, no trustee or examiner has been appointed in these chapter 11 cases.

7.    On November 12, 2008, the Court appointed Kurtzman Carson Consultants LLC ("KCC") as claims, noticing and balloting agent for the Debtors in these chapter 11 cases pursuant to 28 U.S.C. § 156(c).

8.    On December 10, 2008, the Court entered that certain Order Pursuant to Bankruptcy Code Sections 105 and 502 and Bankruptcy Rules 2002, 3003(c)(3), and 9007 (I) Setting General Bar Date and Procedures for Filing Proofs of Claim; and (II) Approving Form and Manner of Notice Thereof (Docket No. 890) (the "Claims Bar Date Order").

9.    Pursuant to the Claims Bar Date Order, the deadline for filing all "claims" (as defined in 11 U.S.C. § 105(5)) arising before November 10, 2008 against the Debtors by any non-governmental entity was 5:00 p.m. (Pacific) on January 30, 2009 (the "General Bar Date").  The deadline for

governmental units to file claims that arose before November 10, 2009 was 5:00 p.m. (Pacific) on May 11, 2009 (the "Governmental Bar Date").  Pursuant to the Claims Bar Date Order, this Court approved the form and manner of the claims bar date notice, which was attached as Exhibit A to the Claims Bar Date Order (the "Claims Bar Date Notice").

10.   On December 17 and 19, 2008, KCC served a copy of the Claims Bar Date Notice on all parties who filed notices of appearance pursuant to Bankruptcy Rule 2002, all of the Debtors' scheduled creditors in these cases, the Debtors' equity holders, and certain other parties (Docket No. 1314). In addition, the Debtors published the Claims Bar Date Notice in The Wall Street Journal (Docket No. 1395) and The Richmond Times-Dispatch (Docket No. 1394).

11.   On January 16, 2009, the Court authorized the Debtors, among other things, to conduct going out of business sales at the Debtors' remaining 567 stores pursuant to an agency agreement (the "Agency Agreement") between the Debtors and a joint venture, as agent (the "Agent").  On January 17, 2009, the Agent commenced going out of business sales pursuant to the Agency Agreement at the Debtors remaining stores.  As of March 8, 2009, the going out of

business sales at the Debtors' remaining stores had been completed (the "Liquidation").

12.   On December 19, 2008, the Defendant filed a proof of claim asserting a priority claim pursuant to section 503(b)(9) of the Bankruptcy Code in the amount of $47,682.22 against the Debtor for services provided and goods sold in the twenty (20) days prior to the Petition Date ("Claim No. 966").

13.   On April 30, 2010, the Court entered an order reclassifying Claim No. 966 to a general unsecured non-priority claim (Docket No. 7355).

14.   On January 30, 2009, the Defendant filed a proof of claim asserting an unsecured claim in the amount of $812,861.70 against the Debtors for services provided and goods sold ("Claim No. 8448," and collectively with Claim 966, the "Claims").

<u>**PARTIES**</u>

15.   Prior to the Liquidation, the Debtors were a leading specialty retailer of consumer electronics and operated large nationwide electronics stores that sold, among other things, televisions, home theatre systems, computers, camcorders, furniture, software, imaging and

telecommunications products, and other audio and video electronics.

16.    The Defendant is a limited liability company organized under the laws of New York with its principal place of business in Danbury, Connecticut.

## FACTS

17.    On May 5, 2008, the Debtors and the Defendant entered into that certain Agreement between Owner and Contractor – Stipulated Sum pursuant to which the Defendant was to provide labor, material, equipment and services necessary for the proper management, construction, and completion of the Debtors' store located at 1022 US Route 22, North Plainfield, New Jersey 07060 (the "North Plainfield Contract").  A true and correct copy of the North Plainfield Contract is attached hereto as Exhibit A.

18.    On August 22, 2008, the Debtors and the Defendant entered into an agreement evidenced by that certain Purchase Order pursuant to which the Defendant was to provide labor, material, equipment and services necessary for the renovation of the Debtors' store located at 521 Fifth Avenue, New York, New York 10175 (the "Purchase Order," and collectively with the North Plainfield Contract, the

"Contracts").  A true and correct copy of the Purchase Order is attached hereto as <u>Exhibit B</u>.

19.  On or within ninety (90) days prior to the Petition Date (the "Preference Period"), the Debtors made multiple transfers of interest of the Debtors' property to or for the benefit of the Defendant in an amount not less than $814,180.02, as set forth hereto on <u>Exhibit C</u>.

20.  During the course of this adversary proceeding, the Debtors (through discovery or otherwise) may learn of additional transfers made to Defendant during the Preference Period.  The Debtors intend to avoid and recover all such transfers, whether listed on <u>Exhibit C</u> or not, in an amount not less than $814,180.02 (collectively, the "Transfers").

**COUNT I**

**(RECOVERY OF PREFERENTIAL TRANSFERS**
**PURSUANT TO 11 U.S.C. §§ 547(b) and 550)**

21.  The Debtors hereby incorporate by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully restated here.

22.  The Transfers were made to or for the benefit of Defendant, a creditor of one or more of the Debtors.

23.   The Transfers were made for or on account of an antecedent debt or debts owed by one or more of the Debtors before such Transfers were made.

24.   The Transfers were made during the Preference Period.

25.   The Transfers were made while the Debtors were insolvent.

26.   The Transfers enabled the Defendant to receive greater value than the Defendant would have received if (i) Debtors' cases were cases under chapter 7 of the Bankruptcy Code; (ii) the Transfers had not been made; and (iii) Defendant received payment on account of the debt paid by the Transfers to the extent provided by the provisions of the Bankruptcy Code.

27.   Each of the Transfers constitutes an avoidable preference pursuant to 11 U.S.C. § 547(b).

28.   Defendant is either the initial transferee of the Transfers, the entity for whose benefit the Transfers were made, or an immediate or mediate transferee of the Transfers.

29.   Debtors are entitled to recover not less than $814,180.02, plus costs, expenses, attorneys' fees, and interest at the legal rate pursuant to 11 U.S.C. § 550(a).

## COUNT II

## (DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d))

30.   The Debtors hereby incorporate by reference the allegations set forth in the foregoing paragraphs of this Complaint as if fully restated here.

31.   Section 502(d) of the Bankruptcy Code requires the disallowance of "any claim of any entity . . . that is a transferee of a transfer avoidable under section . . . 547 . . . of this title . . ., unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title."

32.   Pursuant to section 502(d) of the Bankruptcy Code, any claims, including the Claims, held by Defendant against the Debtors' bankruptcy estates must be disallowed unless and until Defendant pays to the Debtors the Transfers in an amount not less than $814,180.02.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors respectfully pray that the Court:

i.      On Count I, enter an Order pursuant to 11 U.S.C. § 550 for avoidance of a preferential transfers pursuant to 11 U.S.C. § 547(b) in an amount not

less than $814,180.02, plus costs, expenses,

attorneys' fees, and interest at the legal rate

pursuant to 11 U.S.C. § 550(a); and

ii.    On Count II, enter an Order pursuant to 11 U.S.C.

§ 502(d) disallowing any claim of Defendant

against the Debtors' bankruptcy estates, including

the Claims, unless and until Defendant pays to the

Debtors the amount of any and all judgments

granted to the Debtors against Defendant in this

adversary proceeding; and

iii.   Grant the Debtors such other and further relief

the Court deems just and appropriate.


Dated: Richmond, Virginia  McGUIREWOODS LLP
       April 30, 2010
                           _/s/ Douglas M. Foley_____
                           Douglas M. Foley (VSB No. 34364)
                           Sarah B. Boehm (VSB No. 45201)
                           One James Center
                           901 E. Cary Street
                           Richmond, Virginia 23219
                           (804) 775-1000

                           Counsel for Debtors and Debtors
                           in Possession


\11110754

# Exhibit A



# Agreement Between
# Owner and Contractor -
# Stipulated Sum
### REV. October 18, 2006
##### (CCSTIPSM)

---

**AGREEMENT #**          made as of the 5th day of May, in the year 2008.

**BETWEEN** the Owner:          Circuit City Stores, Inc.
*(Name and Address)*          9950 Mayland Drive
                              Richmond, Virginia 23233

and the Contractor:          Schimenti Construction Company, LLC
*(Name and Address)*          118 North Bedford Road
                              Mount Kisco, NY  10549

The Project is:          1022 US Route 22
*(Name and Location)*          North Plainfield, NJ  07060

The Architect is:          SBLM
*(Name and Address)*          636 Broadway
                              New York, NY  10012



STIPULATED SUM CONTRACT
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5. 2008

Page 1

The Owner and Contractor agree as set forth below.

# ARTICLE 1
## THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein.  The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral.  An enumeration of the Contract Documents, other than Modifications, appears in Article 7.

# ARTICLE 2
## THE WORK OF THIS CONTRACT

The Contractor shall execute the entire Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others, or as follows:

# ARTICLE 3
## DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

**3.1**     The date of commencement is the date from which the Contract Time is measured, and shall be the date of this Agreement, as first written above, unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.

**START OF CONSTRUCTION - 6/16/2008**

Unless the date of commencement is established by a notice to proceed issued by the Owner, the Contractor shall notify the Owner in writing not less than five days before commencing the Work.

**3.2** The Contractor shall achieve substantial Completion of the entire Work (the "Date of Substantial Completion") not later than

**DATE OF SUBSTANTIAL COMPLETION (TURNOVER) - 9/30/2008**

, subject to adjustments of this Contract Time as provided in the Contract Documents.

# ARTICLE 4
## CONTRACT SUM

**4.1**     The Owner shall pay the Contractor in current funds for the Contractor's performance of the Contract the fixed, stipulated Contract Sum of <u>One Million, Three Hundred Twenty-Four Thousand, Nine Hundred</u> Dollars ($ <u>1,324,900),</u> subject to additions and deductions as provided in the Contract Documents.

**4.2**     The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
See Exhibit G – Letter of Intent

**4.3**     Unit prices, if any, are as follows
See Exhibit D – Bid Breakdown

**4.4**     In the case of additive or deductive Work authorized under Article 12 of the General Conditions of the Contract for Construction, Contractor's markups shall be limited to <u>Seven</u> percent (<u>7</u>%) for profit and overhead, and Subcontractor's markups shall be limited to <u>Fifteen</u> percent (<u>15</u>%) for profit, and overhead in accordance with Article 5 of the General Conditions.

# ARTICLE 5
## PROGRESS PAYMENTS

**5.1**     Based upon Applications for Payment submitted to the Owner by the Contractor, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and in accordance with the General Conditions.

**5.2**     The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**5.3**     Provided an Application for Payment is received by Owner, and such Application for Payment conforms in all respects to the requirements set forth in the General Conditions, Owner shall make payment to Contractor as provided in the General Conditions.

**5.4**     Each Application for Payment shall be based upon the Schedule of Values submitted by the Contractor in accordance with the Contract Documents.  The Schedule of Values shall allocate the entire Contract Sum among the various portions of the Work and be prepared in such form and supported by such data to substantiate its accuracy as the Owner may require.  This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**5.5**     Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

**5.6**     Subject to the provisions of the Contract Documents, the amount of each progress payment shall be computed in accordance with the General Conditions.

## ARTICLE 6
## FINAL PAYMENT

Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when (I) the Contract has been fully performed by the Contractor except for the Contractor's responsibility to correct nonconforming Work as provided in the General Conditions and to satisfy other requirements, if any, which necessarily survive final payment; and (2) Contractor has satisfied all other conditions precedent as set forth in the General Conditions.  Final payment shall not be made any sooner than thirty (30) days after the Date of Final Completion of the Work as specified in the General Conditions.  Contractor shall be solely responsible for assuring full compliance with all local laws, and Contractor agrees to defend and indemnify Owner from and against all actions, claims and demands relating to or arising out of Contractor's performance or failure to perform under this Agreement.


## ARTICLE 7
## ENUMERATION OF CONTRACT DOCUMENTS

**7.1**    The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

**7.1.1**    The Agreement is this executed Agreement Between Owner and Contractor - Stipulated Sum.

**7.1.2**    The General Conditions are the Circuit City Stores, Inc. General Conditions of the Contract for Construction August 30, 2006, Revision., Exhibit A, attached hereto.

**7.1.3**    The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated                            and are as follows:

### SEE EXHIBIT B  DRAWINGS and SPECIFICATIONS


**7.1.4**    The Specifications are those contained in the Project Manual dated as in Subparagraph 7.1.3, and are as follows:

### SEE EXHIBIT B  DRAWINGS and SPECIFICATIONS


**7.1.5**    The Drawings are as follows, and are dated           unless a different date is shown below:

### SEE EXHIBIT B  DRAWINGS and SPECIFICATIONS


**7.1.6**    The addenda, if any, are as follows:

### SEE EXHIBIT G – LETTER OF INTENT

Portions of addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 7.

**7.1.7**   Other documents, if any, forming part of the Contract Documents are as follows:

| | |
|---|---|
| **EXHIBIT B-1** | **EXCLUSIONS and CLARIFICATIONS** |
| **EXHIBIT B-2** | **PRE-BID MEETING MINUTES DATED  4/9/2008** |
| **EXHIBT B-3** | **ADDITIONAL PRICING & CLARIFICATIONS DATED 4/25/2008** |
| **EXHIBIT D** | **BID FORM** |
| **EXHIBIT E** | **INSURANCE** |
| **EXHIBIT F** | **NOTICE TO PROCEED** |
| **EXHIBIT G** | **LETTER OF INTENT** |
| **EXHIBIT H** | **INVITATION TO BID** |

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies of which one is to be delivered to the Contractor, one to the Architect, and the remainder to the Owner.

OWNER                                                CONTRACTOR

CIRCUIT CITY STORES, INC.                        _____

                                                     Schimenti Construction Company, LLC

_____                    _____
(Signature)                                          (Signature)

_____                    _____
THOMAS G. DRAPAC                                     Matthew C. Schimenti
(Printed Name)                                         (Printed Name)

_____                    _____
DIRECTOR of CONSTRUCTION                             Member
(Title)                                              (Title)

STIPULATED SUM CONTRACT
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

Page 5

# EXHIBIT A

# GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION

dated MAY 5, 2008, between

CIRCUIT CITY STORES, INC. ("Owner"),

and Schimenti Construction Company, LLC ("Contractor")

# REV. January 31, 2007



Exhibit A
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

PAGE 1

# TABLE OF CONTENTS

1. WORK TO BE PERFORMED, DOCUMENTS FORMING THE AGREEMENT, AND DEFINITIONS..........2

2. DUTIES OF CONTRACTOR.................................................................................................................4

3. DUTIES OF OWNER .......................................................................................................................7

4. CONTRACT SUM AND COST OF CONSTRUCTION ..........................................................8

5. CHANGES IN THE WORK ............................................................................................................8

6. PAYMENT BY OWNER.................................................................................................................10

7. TIME OF THE WORK ....................................................................................................................12

8. CONTRACTOR'S DEFENSE, INDEMNIFICATION, WARRANTIES AND GUARANTEES......................14

9. INSURANCE. .................................................................................................................................. 17

10. OWNERSHIP OF THE WORK....................................................................................................20

11. ACCOUNTING, INSPECTION AND AUDIT ..........................................................................20

12. DISPUTE RESOLUTION.............................................................................................................21

13. TERMINATION OF AGREEMENT............................................................................................22

14. TEMPORARY CONSTRUCTION FACILITIES ......................................................................23

15. USE OF SITE AND PREMISES ................................................................................................24

16. SUBMITTALS TO OWNER .......................................................................................................25

17. SHOP DRAWINGS .....................................................................................................................26

18. SAMPLES ....................................................................................................................................27

19. RECORD DRAWINGS AND MAINTENANCE INSTRUCTIONS......................................28

20. MATERIALS AND EQUIPMENT .............................................................................................28

21. SUBSTITUTION OF MATERIAL.............................................................................................. 29

22. WORKERS AND WORKMANSHIP .........................................................................................30

23. INSPECTION OF WORK AND TESTING OF MATERIALS ...............................................30

24. CORRECTION OF WORK .........................................................................................................31

25. CUTTING AND PATCHING......................................................................................................32

26. CLEAN-UP ..................................................................................................................................33

27. PROTECTION OF THE WORK. ............................................................................................... 33

28. PROTECTION OF PERSONS AND PROPERTY ..................................................................34

29. FIRE PRECAUTIONS AND PROTECTION............................................................................35

30. ENVIRONMENTAL CONTROL................................................................................................36

31. MISCELLANEOUS ....................................................................................................................36

Exhibit A
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

PAGE 2

## 1.    Work To Be Performed, Documents Forming The Agreement, and Definitions

1.1    Contractor shall provide, perform and/or cause to be provided or performed all of the "Work," set forth in Article 2 of the Agreement.  The "Work" includes the following:

(a)    All of the labor, materials (including associated purchase orders and subcontracts ), equipment and services necessary for the proper management, construction and completion of the Project in accordance with the Contract Documents and the "Construction Documents" (as defined below);

(b)    All work shown on the Drawings;

(c)    All improvements in connection with the Project and all site work for the Project;

(d)    The "Subcontracted Work" and the "General Contractor Work," both as defined below;

(e)    All other items to be performed or provided under the terms hereof by the Contractor or designated herein as included in the Work; and

(f)    All other work necessary or appropriate to construct the Project in accordance with the Contract Documents, excluding only work marked "NIC" on the Drawings and Specifications and the items listed as "Exclusions" on Exhibit B-1 attached to and made a part of the Agreement.

1.2    The terms "Subcontracted Work" and "General Contractor Work" shall have the following meanings:

(a)    "Subcontracted Work" shall mean all Work not performed by Contractor's own personnel.

(b)    "General Contractor Work" shall mean all Work to be performed, supervised or directed by Contractor's own personnel of whatever nature; purchase orders for General Contractor Work; all Work recognized as being the responsibility of the general contractor under the Agreement; the payment and performance by General Contractor of all of its obligations under the Agreement including those set forth in Section 4 hereof; and such other work as shall be necessary for the proper management, layout, direction and supervision of all Subcontracted Work.

1.3    Any written change to this Agreement shall be in writing and signed by Owner and Contractor and, when so signed, shall constitute a "Change Order" binding on the parties hereto, shall be become part of this Agreement and, where inconsistent herewith, shall amend the Agreement.  Changes in the Work and "Change Orders" shall be handled as set forth in Section 5, herein.

1.4    The "Contract Documents" are those documents set forth in Article 1 of the Agreement, and further enumerated in Article 7 of the Agreement.

1.5    The "Architect" is the person or organization licensed to practice architecture and identified in the Agreement, and shall be deemed to include the Architect's duly authorized representatives, including engineers on the Architect's staff and consultants and engineers employed by the Architect.  The Architect shall at all times have access to the Work wherever it is in preparation and progress.  The Contractor shall provide access so the Architect may perform his functions under his agreement with the Owner.  The Architect will review shop drawings, samples and other construction data, and may, as requested by Owner, render decisions regarding the design and other elements specified by or within the Architect's area of expertise.  Nothing contained in the Contract Documents shall create any contractual relationship between the Architect and the Contractor.  The Architect will not be responsible for the acts or omissions of the Contractor, any subcontractors, any of their agents or employees or any other persons performing any

of the Work.  The Architect will not be responsible for construction means, methods, techniques, sequences or procedures, nor for safety precautions, including requirements of OSHA or programs in connection with the Work, and he will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.

1.6    A "subcontractor" is a person or organization who has a direct contract with the Contractor to perform any of the Work on the Project.  A sub-subcontractor is a person or organization who has a direct or indirect contract with a subcontractor to perform any of the Work on the Project.  Where the context so requires or suggests, the term "subcontractor" shall also be deemed to refer to sub-subcontractors.  The terms subcontractor and sub-subcontractor are referred to throughout the Contract Documents as if singular in number and masculine in gender, and mean a subcontractor or sub-subcontractor, as the case may be, and its respective authorized representatives.

1.7    Contractor agrees, with respect to any items or trades treated as an allowance under the "Contract Sum", as hereinafter defined, (i) to work closely with Owner and the Architect to reduce any allowance quotation submitted by Contractor, (ii) to re-bid major trades and subcontracts when requested by Owner, (iii) to suggest to Owner changes which Contractor believes will result in a lower cost for such allowance items and (iv) to provide Owner and its representatives (including the Architect) with full access to all information underlying Contractor's calculation of such allowance.

1.8    In general, Drawings shall show dimensions, positions, materials and kinds of construction. Specifications shall describe quality of materials, workmanship and methods.  Work called for on the Drawings and not mentioned in the Specifications, or vice versa, shall be performed as though fully set forth in both.  Work not particularly detailed, marked or specified shall be the same as similar parts that are detailed, marked or specified.  Should Contractor become aware of an error in the Specifications or Drawings, or in work by others affecting this Work, the Contractor shall at once notify in writing the Owner who will issue instructions as to procedure.  If the Contractor proceeds with the Work based on any such error of which Contractor is aware, of if which in the exercise of reasonable care and diligence should be aware, without instructions from the Owner, the Contractor shall correct, at no cost to Owner, any resulting damage or defects.  This includes Specification typographical errors and Drawing notational errors where the intent is doubtful.  Figured dimensions on scale Drawings and on full-size Drawings shall govern.  In the event of a conflict between the Specifications and the Drawings, regarding material, quality, size, shape or dimension, the Specifications shall govern.

1.8.1    Contractor shall visit the site, familiarize himself with the local conditions under which the Work is to be performed and correlate his observations with the requirements of the Contract Documents.

1.8.2    The Contract Documents are complementary and what is required by any one shall be as binding as if required by all. The intention of the Contract Documents is to include all labor, materials, equipment and other items as provided herein necessary for the proper execution and completion of the Project.  It is intended that Work not covered under any heading, section, branch, class or trade of the Specifications shall be supplied if it is required elsewhere in the Contract Documents or is reasonably inferable as being necessary to produce the intended results. Words which have well-known technical or trade meanings are used herein in accordance with such recognized meanings.

1.9    As used herein, the terms "days" shall mean calendar days.

## 2.    **Contractor Duties**

2.1    The relationship of Contractor with Owner shall be that of an independent contractor.  However, Contractor recognizes the relationship of trust and confidence established by the Agreement and agrees to furnish its best skill and judgment and to cooperate with Owner, the Architect and such other consultants as may be engaged by Owner in pursuing the best interests of Owner.  Contractor agrees to furnish efficient business

administration and supervision in connection with the Project and to maintain at all times an adequate supply of workmen and materials and to use its best efforts to perform the Work in the best workmanlike manner and in the most expeditious and economical manner, consistent at all times with the best interest of Owner.  Contractor shall meet with Owner and Owner's agents, at such time, and from time to time, as Owner requests to review the Work and the progress schedule, and for such other purposes as Owner desires.

2.2    Commencing with the execution of the Agreement, Contractor shall furnish Owner with information concerning costs, availability of materials and equipment, methods of construction and other pertinent information which Contractor may possess or obtain and which may be of value to Owner in completing the Project. Contractor shall report to the Owner and Architect, in writing, any inconsistencies, errors and omissions in the Construction Documents which Contractor may observe or which may come to its attention, and Contractor shall require its subcontractors to report to Contractor or the Owner and Architect, in writing, any such inconsistencies, errors and omissions which they may observe or which may come to their attention.

2.3    Contractor shall provide for the benefit of the Project a competent and skilled field organization containing at all times a sufficient number of personnel to perform the Work and to supervise such performance, including a project manager, project engineers, superintendents and assistants, foremen, engineers and detailers, timekeepers and clerks, cost accountants, material checkers, watchmen, skilled and common laborers and such other workmen and supervisory personnel as the Work may require. Both the number of persons from time to time employed in connection with the Project by Contractor, and the persons so employed, shall be subject to the approval of Owner, which approval shall not be unreasonably withheld.  Contractor shall supervise all of the Work, including all Subcontracted Work, and shall prepare all schedules, estimates and reports as reasonably required by Owner.

(a)    Contractor agrees to appoint a "Project Manager" for the Work, which Project Manager shall be responsible for the administration of this Agreement so long as he shall remain in the employ of Contractor or can be retained by Contractor.

(b)    Notwithstanding the foregoing, Contractor agrees that, at the written request of Owner, the Project Manager and any successor(s) thereto shall be replaced by Contractor and another person acceptable to Owner shall be immediately engaged by Contractor as Project Manager.  The Owner shall have the same right as it relates to the project superintendent, project engineer, and other supervisory project personnel.

2.4    Contractor shall provide and maintain a sufficient number of temporary buildings for the operation of its field organization and each of its subcontractors, Owner and the Architect, as well as for storage of all materials and housing of machinery, tools and equipment.  Contractor shall provide such other temporary construction and facilities as may be required for the Work.  Contractor further agrees to utilize staging areas, if designated by Owner.

2.5    Contractor at all times shall provide adequate and sufficient machinery, equipment, tools and supplies as may be required for the Work.

2.6    Contractor shall negotiate and award subcontracts and purchase orders subject to the terms of the Contract Documents. Owner shall have full access and rights to all information concerning the negotiation of all Subcontracted Work, purchase orders and all awards thereof in excess of Five Thousand Dollars ($5,000.00).

(a)    All purchases shall be made utilizing standard written purchase order forms.  Each purchase order shall set forth in detail the pertinent data as to its terms and conditions consistent with the Agreement.

Exhibit A                                                                                               PAGE 5
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

(b)    If requested by Owner, Owner shall be furnished with two (2) executed copies of all purchase orders and subcontract awards in excess of $5,000.

(c)    Whenever reasonably requested by Owner in advance of the award of any subcontracts or purchase orders, Contractor shall establish unit prices ("Unit Prices") as part of the subcontracts or purchase orders.  Such Unit Prices shall be established for additions as well as deletions.

2.7    Contractor shall have full and complete authority and responsibility for the performance of all Subcontracted Work, and for each of its subcontractors and material suppliers.  Contractor shall be fully responsible to Owner for the acts and omissions of each of its subcontractors and material suppliers, and of persons employed either directly or indirectly by them, and for the acts and omissions of Contractor's own employees, which responsibility shall be unaffected by any bankruptcy proceedings affecting any of them or any other inability to perform their obligations.  Contractor agrees that no portion of the Contract Documents, nor any contract entered into between Contractor and any of its subcontractors or material suppliers, shall create any direct contractual relationship between any of such subcontractors or material suppliers and Owner.

2.8    Contractor shall purchase all materials and services required for construction of the Project and as otherwise required to perform fully all of the Work.

2.9    Contractor shall cooperate with Owner's fixture contractor(s) in the coordination of the installation of store fixtures without additional compensation.

2.10    Contractor shall cooperate with Owner and Architect at all times in order to obtain all necessary permits, authorizations, bonds and licenses required by any governmental authority having jurisdiction over all or any part of the Work.

2.11    All Work performed for the Contractor by a subcontractor shall be pursuant to an appropriate agreement between the Contractor and the subcontractor (and where appropriate between subcontractors and sub-subcontractors), which agreements shall be subject to Owner's review and approval, and which shall contain provisions that:

(a)    Preserve and protect the rights of the Owner in accordance with the Contract Documents;

(b)    Make such subcontract subject to the terms of the Agreement and the other Contract Documents and require that such Work be performed in accordance with the requirements of the Contract Documents;

(c)    Require submission to the Contractor of applications for payment under each subcontract to which the Contractor is a part, in reasonable time to enable the Contractor to apply for payment in accordance with the Agreement;

(d)    Require that all claims for additional costs, extensions of time, damages for delays or otherwise with respect to Subcontracted Work shall be submitted to the Contractor (via any subcontractor or sub-subcontractor where appropriate) in sufficient time so that the Contractor may comply in the manner provided in the Contract Documents for similar claims by the Contractor upon the Owner;

(e)    Waive all rights the Contractor and subcontractor may have against one another or the Owner for damages caused by fire or other perils covered by the property insurance described in the Agreement, except such rights as they may have to the proceeds of such insurance held by the Owner as trustee; and

Exhibit A
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

PAGE 6

(f)      Obligate each subcontractor specifically to consent to the provisions of this Paragraph 2.11. The Contractor shall make available to each proposed subcontractor, prior to the execution of the subcontract, copies of the Contract Documents to which the subcontractor will be bound by this Paragraph 2.11, and identify to the subcontractor any terms and conditions of the proposed subcontract which may materially vary from the terms and conditions of the Contract Documents.  Each subcontractor shall similarly make copies of the Contract Documents available to his sub-subcontractors.

2.12      Contractor's Design Responsibilities shall include, but not be limited to the following:

2.12.1      Structural design of all temporary construction, equipment and appliances used in the performance of the Work and not a permanent part thereof, including, but not necessarily limited to, hoisting equipment, cribbing, shoring and the temporary bracing of structural steel, is the sole responsibility of the Contractor.  All such items shall conform with the requirements of governing codes and all rules, regulations and orders of all authorities having jurisdiction.

2.12.2      Contractor shall not impose loading upon any part of the Work under construction or upon existing construction upon or adjacent to the site of the Work, in excess of safe limits, or loading which will damage the structural, architectural, mechanical, electrical or other components.  All damage which occurs as a result of overloading shall be repaired or the damaged Work replaced at Contractor's sole expense, all as directed by the Owner.

2.13      Coordination by Contractor shall include, but not be limited to the following:

2.13.1      Contractor and each subcontractor shall be responsible for examining all Drawings, all sections of Specifications and all items of addenda and all modifications to inform themselves of requirements for their part of the Work.  Owner assumes no responsibility for omission of an indication of an item or part of Work from a location on one Drawing which is indicated on any other Drawing.  Specifications are divided into sections for convenience of Contractor.  Items or parts of Work specified shall constitute the responsibility of Contractor regardless of where they are located in Specifications.

2.13.2      Contractor shall supervise all measurements taken in the field necessary to insure timely fabrication, delivery, and proper fitting together of the entire Work.

2.14      Contractor recognizes and agrees that certain items to be incorporated into the Work may be purchased and supplied by Owner (hereinafter "FBO Items").  Contractor shall be responsible for coordinating the delivery and receipt of all FBO Items for the Project to be incorporated into the Work.  Contractor shall offload, handle, store and as appropriate, incorporate all FBO Items into the Work in accordance with the Contract Documents.  In the event particular FBO Items are to be installed, hooked up or commissioned by others, Contractor shall prepare the necessary locations and adjoining elements of the Work to accept such items, and shall coordinate Contractor's activities so as to facilitate installation or incorporation of such FBO Items by Owner's other contractor or supplier.

## 3.0    Owner Duties

3.1      The Owner shall provide surveys showing the boundaries of the property, easements and location of underground utilities.

3.2      The Owner shall obtain and pay for all necessary easements.

3.3     Decisions and approvals required of the Owner shall be rendered with reasonable promptness, so as not to delay the Work.

3.4     The Owner shall provide the Contractor with soil and subsurface reports relating to the Project, to the extent such exist, and Contractor timely requests such information.  Owner shall have no responsibility for the information contained therein or the accuracy thereof.  All soil, geotechnical and related subsurface information is intended for Owner's benefit, and Contractor is not entitled to rely upon such information.  In the event Contractor desires or requires soil, geotechnical or subsurface information, Contractor shall obtain such information at Contractor's sole expense.

3.5     The Owner shall pay all property taxes and property assessments levied against any portion of the Project.

3.6     The Owner shall appoint a Construction Manager as its full-time representative on the Project with whom the Contractor may consult and whose instructions and decisions shall be binding.  No Change Order, Field Order or bulletin shall be valid or effective unless authorized on behalf of the Owner by the following appointed individuals within the limits shown:

Robert Lerch Construction Manager              Maximum $5,000 - Cumulative monthly
Thomas G. Drapac – Director Of Construction    Maximum $25,000.00 – Cumulative Monthly
John B. Mulleady - Vice President – Construction   Amounts in excess of $25,000.00

3.7     The Owner shall make all payments due Contractor in accordance with the Agreement.

3.8     The Owner's agreement with the Architect may provide for the Architect's obligation to:

        (a)     Produce Construction Documents which comply with all applicable codes and regulations.

        (b)     Review all shop drawings, samples and other submissions of Contractor and its subcontractors for conformance with the design requirements of the Project and for compliance with Construction Documents.  Architect shall not be responsible for checking exact dimensions of shop drawings.

        (c)     Interpret, as requested by Owner, the Construction Documents and coordinate the design and engineering of all systems and subsystems to assure that the architectural, structural and mechanical elements and components will be complete and compatible.

3.9     Owner retains the right to award separate contracts relating to portions of the Project as Owner, in its sole discretion, deems appropriate.  Contractor agrees to sequence and coordinate the Work with such separate contracts at no additional cost to Owner.

3.9.1     Contractor shall afford other contractors reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their portions of the Work, and shall properly connect and coordinate his Work with theirs.

3.9.2     If any part of Contractor's Work depends for proper execution or results upon the Work of any other separate contractor, Contractor shall inspect and promptly report to the Owner any apparent discrepancies or defects in such Work that render it impossible for such proper execution and results.  Failure of Contractor to so inspect and

report shall constitute an acceptance of the other contractor's Work as fit and proper to receive his Work, except as to defects which may develop in the other separate contractor's work after the execution of the Contractor's Work.

3.9.3    Should Contractor cause damage to the work or property of any separate contractor on the Project, the Contractor shall, upon due notice, settle and resolve such dispute with such other contractor  If such separate contractor sues the Owner or initiates a dispute proceeding on account of any damage alleged to have been so sustained, Owner shall notify Contractor who shall defend such proceedings at Contractor's sole expense; and if any judgment or award against Owner arises from such proceedings, Contractor shall pay or satisfy it and shall reimburse Owner for all attorneys' fees and dispute resolution costs which Owner has incurred.

3.10  In accordance with Section 12.6 herein, the Owner may, at its election, decide all claims, disputes and other matters in question between the Contractor and the Owner relating to the performance of the Work or the interpretation of the Contract Documents.  Such decision will be rendered in writing within a reasonable time.  The Owner may refer any such claim or dispute to the Architect.  The Owner's decision, or the Architect's, if referred by or from the Owner's Vice President - Construction, shall be final and binding on the parties.

## 4.0    Contract Sum and Cost of Construction

4.1    Notwithstanding anything to the contrary contained in the Contract Documents, Contractor shall fully, timely and completely perform the Work in accordance with the Contract Documents for the Contract Sum.  The Contract Sum may be increased or decreased only as provided in the Agreement.  Contractor shall be entitled to no other compensation for construction of the Work and Contractor's sole remuneration shall be the amount of the Contract Sum.  Notwithstanding anything to the contrary contained in the Contract Documents, the Owner may withhold up to 150% of any payment to the Contractor under the Contract Documents in addition to retained amounts if and for so long as the Contractor fails to perform any of its obligations under the Contract Documents or otherwise is in default under any of the Contract Documents; provided, however, that any such holdback shall be limited to any amount sufficient in the reasonable opinion of the Owner to cure any such default or failure of performance by the Contractor.  In the case of a contract containing a Guaranteed Maximum Price, all cost savings accrue to the Owner.

## 5.    Changes in the Work

5.1    "Change Order" shall mean (i) any written amendment or modification to the Agreement or the other Contract Documents signed by both Owner and Contractor and (ii) any change in the Work ordered by Owner pursuant to Paragraph 5.3 or requested by Contractor and agreed to by Owner pursuant to such provision.

5.2    "Field Order" shall mean a written instruction by the Owner instructing the Contractor to perform certain activities and to incorporate such labor, services, materials and equipment into the Work in accordance with Paragraphs 5.3 and 5.4 below.  Field Orders may be issued by the Owner prior to agreement on adjustment, if any, in the Contract Sum or Contract Time.

5.3    Owner reserves the right to order in writing alterations, additions to or deletions from the Work from the Contract Documents at any time prior to completion and acceptance of the Work by Owner.  Contractor shall comply with any and all such Field Orders, or as appropriate, Change Orders.  Contractor may request or propose changes in the Work; provided, however, Owner shall be under no obligation to agree to or accept any such requested or proposed change.  Contractor shall not make any change or deviation from the Construction Documents without Owner's prior written approval, and Contractor at all times shall be fully liable to Owner for any unauthorized changes in or deviations from the Construction Documents.  Except where expressly provided in the Agreement, no Change Order shall be made, nor shall any adjustment in the Contract Sum or Contract Time

be recognized hereunder, unless Contractor shall have received a written Change Order or Field Order executed by Owner prior to making any such change.

5.4      In the event it is undetermined or it is disputed whether an order by Owner with respect to the Work constitutes a change in the Work, and thus, whether a Change Order is appropriate, Owner reserves the right to issue a Field Order concerning such labor, services, materials and equipment, and Contractor shall, without delay, fully and completely take, or cause to be taken, all such actions necessary to incorporate such labor, services, materials, and equipment into the Project.  Contractor's compliance with a  Field Order is without prejudice to Contractor's rights, provided that Contractor complies with all requirements of the Contract.  In the event Contractor believes a Field Order, or some part thereof, constitutes a change in the Work, Contractor shall timely and completely follow the procedures associated with Change Orders set forth herein.  In no event shall Contractor delay or stop the Work or cause any adverse impact to the Contract Schedule as a result of questions or disputes relating to the appropriateness or necessity for a Change Order.

5.5      Whenever the necessity for a change arises, and when so ordered by Owner in writing, Contractor shall take all steps necessary to halt any Work in the area of the change that might be affected by the change. Changes in the Work shall be performed fully and completely and in accordance with the Drawings and Specifications, except for the deviations specifically called for by the Change Order.  Materials utilized in the changed Work shall be as specified in the Contract Documents insofar as the Contract Documents do not conflict with the conditions set forth in the Change Order.

5.6      Whenever a Field Order directing work is received by Contractor, or Contractor requests a change, Contractor shall prepare and submit to Owner a full and completely detailed estimate of the cost of the Work for such direction or change and, as applicable, an estimate of the additional time required by Contractor within which to perform which would extend the Date of Substantial Completion and/or of the reduction in costs and time due to the omission of Work which was to have been performed for the Contract Sum.  Estimates of costs for added Work shall be based upon the cost to Contractor for such Work at market values current at the time the directed or changed Work is requested, unless otherwise covered by Unit Prices.  Estimates of the amount to be deducted from the Contract Sum due to the omission of Work shall be based upon the cost of the Work to Contractor for the labor, materials and equipment which would have been used on such Work, using the same values thereof at the time the Contract Sum was established, unless otherwise covered by Unit Prices.  Contractor shall include no more than Seven percent (7.0%) of the cost of such Work as full compensation for Contractor's field overhead, general conditions, main office overhead and profit.  The same percentage used for Contractor's field overhead, general conditions, main office overhead and profit shall apply to both additive and deductive change orders.

5.7      The estimates to be provided by Contractor shall contain the following information:

(a)      For any portion of the directed or changed Work which shall be performed by a subcontractor, Contractor shall furnish Owner with a detailed estimate of the costs to the subcontractor for labor, materials and equipment to be used, and any other applicable costs charged by such subcontractor, including a markup by the subcontractor not to exceed fifteen percent (15%) on all direct labor and materials purchased.  Subcontractor will be allowed five (5% ) markup on all sub-subcontracted work only to cover the subcontractor's supervision, general conditions, general overhead and profit, unless otherwise approved in writing by Owner prior to award of the subcontract.

(b)      Sub-subcontractors' charges shall be limited to the terms of the preceding paragraph. A sub-subcontractor's markup on a lower tier sub-subcontractor's total charges shall not exceed five percent (5%) of the cost of such charges, unless approved in writing by Owner prior to award of the subcontract and shall specifically not include any other additional markup for overhead and profit.

5.8     Except as otherwise provided below, Contractor's quotations, supported by detailed estimates, shall be submitted within ten (10) days after the Field Order directing the work or the change is received by Contractor, or Contractor requests a change. Contractor's quotation shall include the period of time allowed for approval by Owner, which shall be not less than ten (10) days. Any change which the Contractor feels will require additional time extension to achieve the dates set forth in Paragraph 7.2 shall be handled pursuant to Paragraph 7.5 herein as it relates to the requested time extension.

5.9     Changes in the Work required as a result of imminent peril to persons or property, discovery of errors in the Construction Documents requiring immediate clarification in order to avoid a serious work stoppage, changes of a kind where the extent of the Work involved cannot be determined until completed, and unexpected or unforeseen site conditions or changes under any other circumstance when deemed necessary by Owner may be authorized by Owner upon written notice thereof to Contractor or, in the case of imminent peril to persons or property, orally, where it is obvious that the change must be ordered immediately. Contractor shall commence performance of any such change immediately upon receiving such authorization. After commencing any such change, Contractor shall submit a detailed estimate within the same time and in the same manner set forth above for ordinary changes. Contractor also shall submit time and materials records for such Work until an agreement is reached upon the appropriate adjustment to the Contract Sum.

5.10     In the event that Owner and Contractor fail to agree on any adjustment in the Contract Sum for any change in the Work pursuant to a Change Order or a clarification of the Construction Documents which Contractor claims is a Change Order, Contractor, upon issuance of a Field Order from Owner, shall immediately proceed to perform the Work which is the subject of the Field Order or a Change Order dispute or discussion. Contractor shall create and maintain for each day's work a daily work sheet containing a detailed summary of the actual costs of the labor, materials and equipment used in the Work which is the subject of the Field Directive, in a form to be approved by Owner. Contractor similarly shall indicate all savings in labor, materials and equipment, as well as supervisory personnel, in connection with that portion of the Work which is the subject of the Field Order. Where Contractor performs Work subject to a Field Order at locations away from the job site, in lieu of such daily work sheet, Contractor shall furnish a detailed statement of labor, material and equipment used on such Work. In addition, upon completion of such Field Order Work, Contractor shall furnish Owner with a detailed time and materials statement of the cost of the Work as a result of such Field Order.

5.11     All of the information to be provided by Contractor pursuant to this Section 5 shall be provided in such detail that quantity, unit of work, labor, material, equipment and incidentals required to perform the Work are clearly identified and itemized either in assembly or unit prices, or as further the Owner may reasonably require. All statements and work sheets to be provided by Contractor with respect to changes in the Work shall be signed by Contractor, who shall certify, warrant and represent that to the best of Contractor's knowledge the information is true and correct, but such certification shall not preclude subsequent adjustment based upon a later audit.

5.12     For any additive changes in the Work, Contractor shall be entitled only to such adjustment in time by which the Date of Substantial Completion (as defined herein) is delayed due to performance of the added Work. Each estimate for an addition to the work submitted by Contractor shall state the amount of additional time that Contractor considers that the Date of Substantial Completion will be delayed as a result of the requested change. Failure to request additional time when submitting such estimates shall constitute a waiver by Contractor of any right to claim subsequently any adjustment in the time for the Date of Substantial Completion based upon such changed Work. In each instance the request for additional time shall include appropriate credit for time saved as a result of changes in or deletions to the Work. Appropriate changes in time for deductive changes to the Work shall be handled in the same manner. Contractor nonetheless shall have the right to request a Change Order extending the Date of Substantial Completion when the cumulative effect of several Change Orders, by the nature

of the Work described therein, reasonably causes the time of performance to exceed the aggregate of the time extensions already allowed in the same Change Orders.  It is the Contractor's obligation to demonstrate to the Owner how any requested time extension has adversely impacted the Project's Critical Path Schedule.  Only time extensions which have been demonstrated to adversely impact the Project's Critical Path Schedule shall constitute a valid time extension for extending the Date of Substantial Completion.

5.13     The cost or credit to the Owner resulting from a change in the Work shall be determined in one or more of the following ways:

(a)     By mutual acceptance of a sum properly itemized and supported by sufficient substantiating data to permit evaluation;

(b)     By unit prices stated in the Contract Documents or subsequently agreed upon;

(c)     By cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or

(d)     If none of the methods set forth above in 5.13(a), 5.13(b) or 5.13(c) is agreed upon, the Contractor, provided he receives a Field Order, shall promptly proceed with the Work involved.  The cost of such Work shall then be determined by the Owner on the basis of the reasonable expenditures and savings of those performing the Work attributable to the change, including, in the case of an increase in the Contract Sum, a reasonable allowance for overhead and profit not to exceed the amounts set forth in Paragraphs 5.6 and 5.8 above, as appropriate.  In such case, and also under 5.13(c) above, the Contractor shall keep and present, in such form as the Owner may prescribe, an itemized accounting together with appropriate supporting data for inclusion in a Change Order.  All indirect costs whether incurred on or off the Project Site shall be included in the Contractor's overhead.  Such indirect costs include, without limitation, insurance, taxes, bonds, salaries of Contractor's personnel unless the Work is performed with Contractor's own forces, local travel, and expenses of Contractor's principal and branch offices.

5.14     In the event Owner and Contractor are unable to reach agreement on issues relating to or concerning Field Orders, Change Orders, request for a Change Order, or any other aspect of the Work, such dispute and issues shall be decided in accordance with the provisions of Paragraph 12 herein.

## 6.     Payment By Owner

6.1     Owner shall pay the Contract Sum in the manner and at the times hereinafter specified in the agreement.  All applications for payments must be submitted on Owner's payment forms and be accompanied by waivers of claims and liens from Contractor and all "major" subcontractors and material suppliers for the portion of Work certified to be in place for which payment has been made.  "Major" subcontractors and material suppliers will be regarded as those whose contract sum exceeds Ten Thousand Dollars ($10,000.00) for their respective portion of the Work.

6.2     On or about the 25th of the month the Contractor shall deliver to the Owner for its approval, , an itemized written statement on forms approved by Owner showing (i) the actual cost and the amount which is due and payable with respect thereto for Work completed and the projection of the work to be completed to the end of the month (in place and incorporated into the Work) and materials stored at the Project site or at Owner approved off-site storage areas, as itemized per Contractor's schedule thereof, during said month less all applicable retentions therefrom, (ii) the percentage of the Work completed during such month and the total percentage of the Work completed through such month, and (iii) an updated progress CPM schedule for the Work.

6.3     On or about the twenty-fifth (25th) calendar day of each month, Owner shall remit to Contractor with respect to the preceding month that portion of the Contract Sum that the Owner approved in its "Certificate of Payment" and excluding from such amount: (i) a retention equal to ten percent (10%) of the approved amount of such Work (including the General Contractor Work, the Subcontracted Work) as defined herein, (ii) any amount in excess of the cost of the Work performed by Contractor during such month, (iii) any portion of the cost of the Work for such month to the extent it exceeds the cost of the Work attributable to the percentage of the Work completed during such month, and as applicable, (iv) any additional amounts Owner is entitled to withhold pursuant to the terms of the Agreement.

6.4     Contractor shall at all times make available to Owner records and invoices of all disbursements made by Contractor for materials, labor, payments to subcontractors and other expenses incurred by Contractor.  To the extent any discounts, rebates or other credits are due Owner on account of Owner's prepayments or otherwise, all such discounts, rebates and other credits shall appear in said statements as credits due to the Owner.

6.5     Owner may withhold payment to Contractor to the extent necessary to protect Owner upon the occurrence of any one or more of the following events:

  (a)     any failure of Contractor to comply fully with any requirement of the Contract Documents, including any failure of Contractor to make any payment to any subcontractor or material supplier without cause;

  (b)     any failure of Contractor to substantiate that previous payments made by Owner have been applied as provided by this Section 6, regardless of whether Contractor has a legitimate dispute with a subcontractor or material supplier;

  (c)     the filing, delivery or recordation of any claim, lien, stop notice or similar matter against Owner, Contractor, any subcontractor, sub-subcontractor, materials supplier or the Project, or the existence of any allegation or dispute concerning payment or performance between any of such parties, notwithstanding any failure of any of them to file, deliver or record any notice or similar required by law; provided, however, the amount which Owner may withhold pursuant to this subparagraph (c) shall be limited to payments to Contractor for General Contractor Work and payments with respect to the Work performed by the claimant involved, subject to the further limitation that the amount so withheld shall not exceed the greater of (i) the amount(s) claimed or in controversy or (ii) the face amount(s) of any and all bonds posted by the Owner to release any mechanics' or similar liens filed against the Project or any part of the Owner's property, plus twenty-five percent of such face amount(s) as reasonable attorneys' fees to defend any actions on such bonds; and provided further that if Contractor provides a bond for the benefit of Owner pursuant to Paragraph 8.5 hereof with respect to the amount claimed or in controversy, the Owner will not withhold payments with respect thereto; or

  (d)     any damage caused to any other contractor or subcontractor by reason of the negligent acts of Contractor, or persons or entities for whom Contractor is responsible.

## 7.     Contract Time and Schedule

7.1     Contractor shall commence the Work promptly after receipt of a Letter of Intent/Notice to Proceed in the form set forth in Exhibit F attached hereto issued by Owner and shall prosecute the Work diligently to completion.  The Work (including the relevant portions thereof referred to below) shall be completed on the date(s) agreed upon by Owner and Contractor as set forth below.  The "Date of Substantial Completion" of the

Exhibit A
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

PAGE 13

Work is the date when (i) the Work is sufficiently completed, in accordance with the Construction Documents, as modified by any Change Orders, so that the Owner can fully occupy the Project for the use for which it was intended, (ii) if the Project is located in a state which provides for the filing of a notice of completion or similar notice, a valid notice of completion or similar notice may be recorded, and (iii) the local governmental authority having jurisdiction over the Project has issued its final certificate of occupancy for all of the Work. The "Date of Final Completion" of the Work is the date when any and all corrective Work ordered by the Owner, after a semi-final inspection, has been consummated to the Owner's satisfaction. The "Certificate of Final Completion" shall be a document issued by the Owner after the Date of Final Completion and after final inspection has been made and shall not be unreasonably withheld. Notwithstanding the above, Owner may allow minor corrective Work to be completed after the Certificate of Final Completion is issued. Issuance of the Certificate of Final Completion fixes the Date of Final Completion and must be issued prior to final payment by the Owner, with exceptions contained in this Agreement.

7.2     Ten (10) days following Owner's notice to proceed, Contractor shall provide to Owner the Critical Path Schedule, showing timely completion of the Work as required by the Agreement. Upon receipt of the initial Critical Path Schedule, Owner may accept same as submitted or reject and note deficiencies. If the schedule is rejected, the deficiencies noted shall be corrected and a new schedule shall be submitted within ten (10) days. In any case, the complete Critical Path Schedule must be approved by Owner prior to any payments being made. The Critical Path Schedule shall be in the form of a network using Critical Path Methodology (CPM), clearly showing construction activities, dependencies and durations. The critical path activities shall be highlighted and float time for non-critical activities shall be listed. Longer duration activities shall be broken into sub-activities when the Work can be completed in phases (i.e., south half, north half, etc.). Contractor will be allowed flexibility in schedule logic and content; however, the following activities must be included in all cases: (a) award of contract; (b) pad delivery and move on; (c) pour foundations; (d) underground utilities; (e) pour slabs (phase); (f) exterior walls (phase); (g) columns; (h) floor and roof structure (phase); (i) roof decking; (j) roofing (drying); (k) HVAC duct work; (l) fire sprinkler piping; (m) interior stud walls (phase); (n) drywall; (o) lathe and plaster (phase); (p) painting (phase); (q) delivery of long lead materials; (r) contract dates; and (s) anticipated weather delays. In the event Contractor falls behind the Critical Path Schedule, or otherwise fails to progress properly towards timely completion of the Work, Owner shall have the right to require Contractor, without cost or expense to Owner or change in the Contract Sum, to take all steps necessary to improve progress, including, without limitation, overtime work and additional days, and to submit for Owner's approval a revised Critical Path Schedule showing the manner in which the originally scheduled progress will be restored and the Work timely completed as required by the Agreement. Contractor shall keep the Critical Path Schedule current to reflect changes caused by delays permitted hereunder. A Critical Path Schedule showing the latest schedule and actual status of the Work shall, in any case, be submitted on a monthly basis with the pay request.

7.3     Should Contractor, in the opinion of Owner, fail, refuse or neglect to supply a sufficient number of workmen, adequate equipment, or to deliver materials with such promptness as to prevent any delay in the progress of any portion of the Work resulting in Contractor's (or any of its subcontractors' or suppliers') failure to prosecute the Work to completion in a timely manner, then, in addition to any and all other rights and remedies of Owner, Owner shall have the right upon five (5) days' prior written notice, to direct Contractor to furnish additional labor,including overtime, and to expedite delivery of materials which shall be sufficient to accelerate and complete the Work, and the Contract Sum shall not be increased on account of such direction by Owner. Nothing contained herein shall be deemed to preclude Contractor's right, following completion of the Work, to contest by appropriate proceedings any determination by Owner that additional workmen or expedited deliveries were appropriate. Should Contractor neglect or refuse to comply with such directive, Owner shall have the right (but not the obligation) to obtain and pay for such goods and services directly, and the Contract Sum shall be reduced in a like amount, and, in addition thereto, Owner may exercise any other right or remedy granted by this Agreement (including termination hereof for cause) or granted by law. The payment thereof by Owner pursuant to the foregoing shall not be deemed to cure or waive Contractor's default.

7.4     If Contractor is delayed at any time in the progress of the Work by (a) any act or omission of Owner, the Architect or any separate contractor or consultant employed by Owner (but not resulting from or based on any default by Contractor or any of its subcontractors, or any failure by Contractor or its subcontractors to comply with the Contract Documents); (b) labor disputes (provided same are not occasioned by Contractor's failure to pay its employees or subcontractors); (c) fire, extraordinarily severe inclement weather, earthquake, extraordinarily unusual delay in transportation, inability to obtain necessary materials, equipment or labor or by any act or lack of action by governmental authority through no fault of Contractor; or (d) any cause beyond the reasonable control of Contractor and its subcontractors, then the dates set forth in Paragraph 7.2 may be extended for a period equal to the time by which the completion of the Work or the relevant portions thereof is delayed by reason of such causes, provided in each instance that the Critical Path Schedule is affected and a timely and proper claim is made as set forth in Paragraph 7.5 below.  For purposes hereof, "extraordinarily severe inclement weather" shall mean weather patterns that may not reasonably be anticipated during the period of construction of the Work, and which at a minimum, exceed the thirty (30) year return interval for such events according to the National Oceanographic and Atmospheric Administration (NOAA) for the Project area.

7.5     All claims for extensions of time shall be made in writing to Owner not more than ten (10)  days after the occurrence of the cause for delay of which Contractor is aware, or in the exercise of reasonable care should have been aware, by which Contractor seeks to extend the dates set forth in Paragraph 7.2 pursuant to Paragraph 7.4 above.  Failure to request such extensions of any such dates by Contractor in accordance with the foregoing shall constitute a waiver of any right to claim subsequently any adjustment in any such dates based upon any of such causes.  It will be the Contractor's obligation to demonstrate to the Owner how any requested time extension has adversely impacted the Project's Critical Path Schedule.  Only time extensions which have been demonstrated to impact the Project's Critical Path Schedule shall constitute a valid time extension for extending such date.

7.6     In the event that Owner desires to accelerate Contractor's performance of the Work (for reasons other than those set forth in Paragraph 7.3 above) with greater speed than contemplated by Paragraph 7.2, Contractor shall, upon written notice thereof from Owner, employ overtime labor and expedite delivery of materials as directed by Owner.  Such notice shall be deemed a Change Order and the Contract Sum shall be adjusted on account of such Change Order as provided elsewhere herein.

7.7     Notwithstanding the fact that a dispute, controversy or question shall have arisen relating to (i) the interpretation of any provision of the Agreement, (ii) the performance of any Work, (iii) payments which Owner claims it is entitled to withhold pursuant to Paragraphs 4.1 or 6.5 hereof or (iv) otherwise, the Contractor agrees that it will not directly or indirectly stop or delay any Work required to be performed or stop or delay the delivery of any materials required to be furnished hereunder, pending the outcome of such dispute or controversy.

7.8     Owner shall have the right to occupy portions of the Project as and when completed, but prior to Date of Final Completion, only if Owner accepts such portions as substantially complete (subject to punch list corrections) and Owner agrees to the commencement of warranties and guarantees as to such occupied portions.

## 8.   <u>Contractor's Defense, Indemnification, Warranties and Guarantees</u>

8.1     Contractor agrees to indemnify and hold harmless Owner and, in cases where Owner is a tenant of the real property on which the Project is being constructed, Owner's landlord, their subsidiaries and affiliated companies and their respective officers, directors, agents, representatives, consultants and employees, from and against any and all loss, liability, claim, damage, demand, cost and expense of every kind and nature whatsoever (including reasonable attorneys' fees) arising out of or resulting from the performance of the Work, or caused by any act or omission on the part of Contractor, any of its subcontractors, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether such act is caused in part by a party indemnified hereunder.  Contractor shall have no obligation to indemnify or hold harmless Owner or

Owner's landlord, their subsidiaries and affiliated companies and their respective officers, directors, agents, representatives, consultants and employees from losses, liabilities, claims, damages, demands, costs and expenses caused by the proven sole negligence of such entity.

8.2     Contractor agrees that if any legal action or other proceeding of any nature is brought against Owner, Owner's landlord where applicable, or Contractor, or any of their respective officers, directors, agents, representatives, consultants or employees, the Architect, or any of them (whether or not any other party defendant shall be joined in the action), because of any of the foregoing matters against which Contractor agrees to indemnify Owner or Owner's landlord, Contractor shall at its own cost and expense, settle or defend such action, paying all costs, expenses and attorneys' fees involved therein. Notwithstanding the foregoing, in any action of the nature described above in which Owner or Owner's landlord is named as a party, Contractor agrees that its selection of legal counsel supplied in connection with any such action shall be subject to Owner's prior written approval, and Owner shall have the right to participate in the defense of any such action at no cost to Owner.  The obligations of Contractor under this paragraph shall not extend to the liability of the Architect, its agents, consultants or employees, arising out of (i) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, Drawings or Specifications, or (ii) the giving of or the failure to give directions or instructions by the Architect, its agents or employees, provided that the giving or failure to give any such directions or instructions is the primary cause of the injury or damage, unless Contractor in exercise of reasonable care should have known, as appropriate, that the giving of such instruction was improper or that such direction or instruction should have been given.

8.3     Contractor shall defend all suits and claims for infringement of any patent, copyright, trademark or other intellectual property rights and shall hold the Owner and Owner's landlord free and harmless from and against any and all loss, liability, claim, damage, demand, cost and expense on account thereof, except that Owner, or Owner's landlord where applicable, shall be responsible for all such loss, liability, claim, damage, demand, cost and expense when a particular design, process or product of a particular manufacturer is specified by Owner.  If Contractor has reason to believe that the design, process or product specified by Owner is an infringement of a patent, Contractor shall be responsible for such loss unless Contractor promptly provides such information in writing to the Architect and Owner.

8.4     Owner, or Owner's landlord where applicable, shall have no obligation to pay or reimburse Contractor with respect to any of the costs and expenses incurred by Contractor in accordance with paragraphs 8.1 through 8.3 above.  In the event any such loss, liability, claim, damage, demand, cost or expense is asserted against or incurred by Owner or Owner's landlord or their agents, representatives, consultants, or employees, or the Architect in connection with the foregoing, Owner, in addition to all other rights and remedies it may have with respect thereto, may withhold and offset from any payment then or thereafter due to Contractor under the terms of this Agreement an amount sufficient in Owner's judgment to protect and indemnify against any such matter.

8.5     In addition to Contractor's warranty and any guarantees or warranties of Contractor set forth herein or in any other Contract Documents, all of the Work, including all of the materials and equipment incorporated therein, is guaranteed by Contractor against failure due to defects in workmanship, materials and improper installation for a period of one (1) year following the date on which the completed Work is accepted by the Owner or the Date of Substantial Completion, whichever is earlier, unless in each case a longer period of time is specifically provided for in the Contract Documents or is implied by law ("Contractor's Guarantee").  If, within such one year period, any of the Work is found to be not in accordance with the requirements of the Contract Documents, the Contractor shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Contractor a written acceptance of such condition.  This period of one year shall be extended with respect to portions of Work first performed after the Date of Substantial Completion by the period of time between the Date of Substantial Completion and the actual performance of the Work.  This

obligation shall survive acceptance of the Work under the Contract and termination of the Contract.  The Owner shall give such notice after discovery of the condition.

8.5.1     Any Work performed following the issuance of the Certificate of Final Completion and the replacement of any Work, including any of the materials and equipment incorporated therein, pursuant to the foregoing guarantee of Contractor, also shall be unconditionally guaranteed in accordance with the foregoing for a period of one (1) year after completion of replacement, as the case may require, of each such item of Work.

8.5.2     Nothing contained in Paragraphs 8.5 and 8.5.1 shall be construed to establish a period of limitation with respect to other obligations which the Contractor might have under the Contract Documents. Establishment of the time period of one year as described in Paragraphs 8.5 and 8.5.1 relates only to the specific obligation of the Contractor to correct the Work, and has no relationship to the time within which the obligation to comply with the Contract Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Contractor's liability with respect to the Contractor's obligations other than specifically to correct the Work.

8.5.3     Contractor shall cause all guarantees and warranties from subcontractors, materialmen and equipment suppliers to be made directly to Owner as well as Contractor and Contractor shall furnish Owner with written evidence of such guarantees and warranties.  All of such guarantees and warranties (including Contractor's warranties and guarantees under the Contract Documents) shall include the cost of all labor, materials and other costs required to replace defective, unsound or improper Work and materials, including damage to adjacent equipment or materials and the replacement or refinishing of same.  As part of the Work, Contractor promptly shall enforce all of said guarantees and warranties for Owner's benefit if Owner shall request Contractor so to do. Neither payment hereunder, including the final payment to Contractor, nor Owner's use and occupancy of the Project or any part thereof, shall release Contractor from liability to Owner for workmanship, materials and equipment incorporated into the Work which are found to be defective, unsound or improper or otherwise covered by any such guarantees or warranties.

8.6     Contractor warrants to Owner and Architect that the Work will be free from defects not inherent in the quality required or permitted and that the Work will conform with the requirements of the Contract Documents.  Work not conforming to these requirements, including substitutions not properly approved or authorized, may be considered defective.  Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by Contractor, improper or insufficient maintenance, improper operation or normal wear and tear under normal usage.

8.7     The Contractor's warranties (including Contractor's Guarantee) shall cover all Work in the Contract Documents, whether or not any portion or trade has been assigned or sublet.  In the event any portion of the Work is performed by assignees or subcontractors, their written warranty to Owner covering their respective portions of the Work for the periods required shall be collected by Contractor, who shall deliver them, together with his own warranty, to Owner.  Assignees' and subcontractors' warranties shall expressly provide that the same may be enforced directly by Owner, if he so elects, and shall run concurrently with the Contractor's warranties.  All such warranties shall be secured by the Contractor's performance bond when such bond is required.  No warranties by subcontractors shall in any way relieve Contractor of his warranty obligations or obligate Owner to proceed under any subcontractor warranty in lieu of or before proceeding against Contractor's warranties.

8.8     Where any material, process or method of operation or application procedure is required which, in the opinion of Contractor, would render the finished Work unsuitable for the required warranty, then before any Work is started, such matter shall be objected to in writing to the Owner stating reasons therefore and recommending a substitute so that the Work, when completed, will be suitable for the required warranty.  In the event the Contractor's

recommendation is approved, the Work shall be installed in accordance therewith and at no change in the Contract Document price unless otherwise authorized.

8.9      Defective materials, equipment and workmanship occurring within any warranty period may be repaired where such repair produces results in conformity to Contract Documents requirements relating to appearance, performance and reliability.  Where the nature of the defective materials, equipment and workmanship is such that acceptable results cannot be obtained by repair, such defective items shall be removed and replaced with new materials, equipment and workmanship complying with Contract Documents.  All remedial Work shall be subject to Owner's approval.

8.10      Payment and performance bonds shall be provided by Contractor at the request of Owner.  It is expressly understood that the cost of the bond is to only include the direct cost, to the Contractor, from the bonding company; those items not to be included in bond cost are mark-up and/or general administrative expenses of the contractor's home office.

8.11      Contractor shall not have, and hereby waives, any right to file any mechanic's lien, or claim of any sort or kind, against the premises of Owner or any part thereof, unless Contractor shall have given Owner ten (10)  days' prior written notice of Contractor's intention to file such lien or claim and a statement of the basis of such lien or claim.  Contractor agrees that providing such notice shall be a condition precedent to its rights to file any such lien or claim.  Contractor shall not permit or suffer any mechanic's or other similar lien filed by any subcontractor, material vendor, laborer or materialman to remain upon the premises of Owner and shall satisfy and have discharged any lien so filed within fifteen (15) days of its filing or such earlier period as may be necessary to avoid enforcement thereof.  Contractor shall have the right to bond off or provide other satisfactory security against any unreasonable and improper lien which Contractor desires to contest.  Contractor agrees to indemnify and hold Owner, and Owner's landlord where applicable, free and harmless from and against any and all loss, liability, claim, damage, cost and expense from any lien on the Project which is placed on or remains on the Project in connection with the Work, or any stop notice or similar action on the part of any subcontractor, material vendor, laborer or materialman, and Contractor shall at its sole cost and expense save and defend Owner, and Owner's landlord where applicable, from any and all cost and expense in connection therewith.  In the event Contractor should neglect or refuse to cause any such mechanic's or other similar lien promptly to be discharged or bonded off as required above, Owner, after giving Contractor seven (7)  days' written notice of its intention so to do, shall have the right, but not the obligation, to bond off such lien and such payment incurred by Owner shall be credited to the account of the Owner.  Owner shall be entitled to offset one hundred percent of the amounts so bonded, plus twenty-five percent of such amounts as reasonable attorneys' fees, against payments thereafter becoming due to Contractor hereunder.  Owner may exercise any other right or remedy granted by the Agreement (including termination hereof for cause) or granted by law.  The bonding off of any lien by Owner pursuant to the foregoing shall not be deemed to cure or waive Contractor's default.

8.12      Should Contractor neglect or refuse to pay promptly when due any legitimate or undisputed expense incurred by it pursuant to the Agreement, Owner, after giving Contractor seven (7) calendar day's written notice of its intention so to do, shall have the right but not the obligation, to pay such expense directly and such payments shall be credited to the account of the Owner.  Owner shall be entitled to offset the amounts so paid against payments thereafter becoming due to Contractor hereunder.  Owner may exercise any other right or remedy granted by the Agreement (including termination hereof for cause) or granted by law.  The payment of any expense by Owner pursuant to the foregoing shall not be deemed to cure or waive Contractor's default. Owner will not make any such payment, however, without prior consultation with Contractor or an explanation of Contractor's reason for refusing to pay promptly such expense as and when due.

9.    **Insurance**

9.1    Prior to the commencement of any Work or the performance of any service hereunder by Contractor or any of its subcontractors, Contractor shall procure the following insurance coverage and maintain such insurance in full force and effect until all of the Work is completed and accepted for final payment, unless otherwise specified herein.  All such insurance shall be for the benefit and protection of Owner and Contractor and shall name Owner, its subsidiaries and affiliated companies, and their respective officers, directors, Owner's landlord and any party who owns a fee interest in and to the real property to be improved by the Project, or any construction lender for such project, as an additional insured.  All insurance companies, the form of all policies and the provisions thereof shall be subject to Owner's prior approval. The insurance to be procured and maintained by Contractor as hereinabove provided shall consist of the following:

(a)    Statutory worker's compensation and occupational disease insurance and employer's liability insurance, as required by the Worker's Compensation Act of the state in which the Project is located, and employer's liability insurance with minimum limits of not less than $500,000.

(b)    Commercial General Liability Insurance, such policy to include the following provisions:

(i)    Coverage and Limits of Liability:

General Aggregate Limit (other than products/completed operations)................................................................ $4,000,000
Products Completed Operations Aggregate Limit .... $4,000,000
Personal & Advertising Injury Limit......................... $4,000,000
Each Occurrence Limit.............................................. $3,000,000
Fire Damage Limit (any one fire)................................. $100,000
Medical Expense Limit (any one person)......................... $5,000

(ii)    Designated Construction Projects General Aggregate Limit

(iii)    Products-Completed Operations Insurance to remain in force for a minimum of two years after completion of the job, or the length of the guarantee, whichever is greater.

(iv)    Contractual Liability:

(1)    Specifically insuring the liability assumed under the Contract Documents entered into between the Contractor and Circuit City Stores, Inc.

(2)    With respect to the contractual obligation of Contractor to provide liability insurance to Circuit City Stores, Inc., this policy shall apply to any loss or claim before any contribution by the insurance of Circuit City Stores, Inc.

(v)    XCU Coverage (delete exclusions if present)

(vi)    Waiver of Subrogation in favor of Owner

(vii)    Coverage to be written on an occurrence basis policy form.

(viii)    Primary Insurance - This policy is to be primary coverage, and any other insurance in force for the Owner shall act as excess coverage only and not contribute in the payment of any claim made hereunder to the extent of the limits of liability afforded hereunder.

(ix)    Notice of Occurrence - The failure to give timely notice to the insurance company of any occurrence giving rise to a claim hereunder shall not be construed as late notice unless an executive officer of the named insured had actual knowledge of the occurrence and then failed to notify the insurance company in accordance with the policy conditions.

(x)    Cancellation - In the event of cancellation, material change or non-renewal, sixty (60) days advance written notice by certified mail will be sent to Owner and Contractor.

(xi)    The insurance shall not contain any exclusions other than exclusions forming a part of the standard liability insurance policy as currently in use by the Insurance Services Office, except that all exclusions otherwise contained therein that are in conflict with the conditions and coverage as required by this Agreement shall be void; provided, however, in no event shall such insurance prohibit cross-liability of other insured parties covered by such insurers (severability of interest).

(c)    Commercial Automobile Liability - Including all owned, non-owned and hired vehicles, with limits of liability not less than $1,000,000 combined single limit (CSL).

(d)    Umbrella Excess Liability with limits of not less than $1,000,000 providing coverage over primary insurance coverage, written on a following form basis.

(e)    Such other insurance and coverage as Owner may reasonably request.

(f)    Certificates of Insurance applicable to this section, shall be provided as follows on AIA Document G705 or Accord Form 25-S, Accord Form 27, as applicable, and shall specifically set forth evidence of all coverage required by this Paragraph 9.1 and shall reference job site by location and address.

(i)    Certificate or signed binder to be issued and addressed to:

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Construction Department

(ii)    Certificate must provide sixty (60) days notice of any material change or cancellation.  Any wording limiting notice to "best efforts, endeavor to advise, not responsible to notify, etc." WILL RESULT IN CERTIFICATE BEING REJECTED.

(g)    In the event that Contractor fails to procure or maintain any of the insurance required pursuant to this Section, Owner, at its election, but without any obligation to do so, may obtain such insurance for the benefit of Owner and Contractor and may either reduce the Contract Sum in a like amount or deduct the cost thereof from any payment then or thereafter due to Contractor.

9.2     Contractor shall obtain builder's risk and physical damage insurance naming Owner as an additional insured and Loss Payee, for the following items on standard "All Risk" or, "Cause of Loss – Special Form", forms, subject to the standard terms, conditions, and exclusions therein set forth, in an amount not less than One Hundred Percent (100%) of the completed value thereof, subject to standard exclusions and deductible limitations satisfactory to Owner (not to exceed $10,000), but any net loss incurred by Contractor as a result of such standard exclusions or deductible limitations shall be reimbursed by Owner.  Such insurance shall include coverage at least with respect to the following:

      (a)     The structures upon and in which the Work shall be performed (to the extent that it includes the premises hereinabove described).

      (b)     All insurable items of the Work and materials once such materials are incorporated into the Work, are located upon the premises of the Project or are located at off-site storage areas approved by Owner.

      (c)     Owner, Contractor, and all subcontractors waive all rights each against the others for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this Paragraph 9.2, except such rights as they may have to the proceeds of such insurance.  Similar waivers will be included in all subordinate contracts of Owner, Contractor and subcontractors where legally required for validity.

      (d)     Such insurance shall contain a loss payable endorsement in favor of the Owner or its order, as their interests may appear.

      (e)     Valuation - Shall be the replacement cost at time of loss with new material of like kind and quality.

      (f)     Subrogation - In all cases of loss, all rights of subrogation by the insurance company for loss caused by Owner, Contractor or any subcontractor are waived.

      (g)     Cancellation - In the event of cancellation, material change or non-renewal, sixty (60) days advance written notice by certified mail will be sent to the Owner and contractor.

      (h)     Transit coverage applicable to Work and Materials transported to and from any off-site storage area.

9.3     All sums insured under Contractor's property insurance shall be made payable jointly to Contractor and Owner as insureds, subject to the requirements of any applicable mortgagee clause.  The Contractor shall pay the subcontractors their proportionate shares of insurance proceeds to which the Contractor is entitled hereunder.

9.4     Prior to obtaining the insurance required by Paragraph 9.2, Contractor shall inform Owner in writing of the cost to Contractor of obtaining such insurance.  At Owner's option, Owner shall thereafter have the right to obtain such insurance on Contractor's behalf and the Contract Sum shall be reduced by the insurance costs so avoided by Contractor.

## 10.    Ownership of the Work

10.1    Subject to Contractor's obligations to obtain insurance as aforesaid, ownership of all and each part of the Work as and when completed and incorporated in the Work, and to each and all of the materials as and when affixed to the Project and incorporated therein, shall be in the Owner.  Ownership of all materials and equipment delivered to the Project site or approved off-site storage areas, but not affixed to the Project and incorporated therein, shall become the property of Owner at such time that such materials are paid for by Owner, and under no circumstances shall material which has been delivered to the Project site or storage areas be removed without Owner's prior written approval.

10.2    The Contractor hereby agrees to hold Owner and Owner's landlord harmless from any claims or damage of any type including consequential damages on account of loss of use, to any personal property belonging to the Contractor, its subcontractors, suppliers, employees or representatives regardless of whether Contractor is deemed responsible in whole or in part for such damage and whether caused in whole or in part by Contractor's negligence.

## 11.    Accounting, Inspection and Audit

11.1    Contractor shall check all materials, equipment, labor and services of any type involved with or incorporated into the Work and shall keep full, detailed and accurate records and accounts thereof, showing the actual net costs to Contractor of all items of labor, materials, supplies, services and other expenditures of whatever nature for which payment or reimbursement is authorized or required under the terms of the Agreement, as may be necessary for proper financial management under the Agreement, and the system of accounting shall be satisfactory to Owner or to an auditor appointed by Owner.  Contractor shall retain and preserve all such records for a period satisfactory to Owner (but not less than three (3) years) after final payment hereunder.  Owner and its representatives, employees and agents shall be afforded complete access at all reasonable times to all of the Contractor's books, records, correspondence, instructions, drawings, receipts, vouchers, accounts, memoranda and all other materials with respect to the cost of the Work for any Change Order or disputed sum hereunder.  The foregoing obligations shall survive any expiration or termination of the Agreement and the completion of the Work contemplated hereby.

11.2    Contractor's records, including but not limited to accounting records (hard copy, as well as computer readable data), written policies and procedures, subcontract files (including proposals of successful and unsuccessful bidders, bid recaps, etc.), original estimates, estimating work sheets, correspondence, Change Order files (including documentation covering negotiated settlements), back charge logs and supporting documentation, general ledger entries detailing cash and trade discounts earned, insurance rebates and dividends, and any other supporting evidence deemed necessary by the Owner to substantiate charges related to the Agreement (all foregoing hereinafter referred to as "records") shall be open to inspection and subject to audit and reproduction by Owner's agents or its authorized representative to adequately permit evaluation and verification of costs of the Work, and any invoices, Change Orders, payments or claims submitted by the Contractor or any of his payees pursuant to the execution of the Contract Documents.

11.3    Such audits may require inspection and copying from time to time and at reasonable times and places of any and all information, materials and data of every kind and character, including without limitation, records, books, papers, documents, subscriptions, recordings, agreements, purchase orders, leases, contracts, commitments, arrangements, notes, daily diaries, superintendent reports, drawings, receipts, vouchers and memoranda, and any and all other agreements, sources of information and matters that may in Owner's judgment have any bearing on or pertain to any matters, rights, duties or obligations under or covered by any Contract Document.  Such records subject to audit shall also include, but not be limited to, those records necessary to

evaluate and verify direct and indirect costs (including overhead allocations), as they may apply to costs associated with the Agreement.

11.4     Contractor shall require all subcontractors, sub-subcontractors, insurance agents and material suppliers to comply with the provisions of this Section by insertion of the requirements hereof in a written contract agreement between Contractor and such party.  Contractor will cooperate fully and will cause all of its officers, directors, agents, representatives and successors and all of its subcontractors (including those entering into lump sum subcontracts) to cooperate fully in furnishing or in making available to Owner from time to time whenever requested in an expeditious manner any and all such information, materials and data.

11.5     Owner's agent or its authorized representative shall have access to the Contractor's facilities, shall have access to all necessary records and shall be provided adequate and appropriate work space in order to conduct audits in compliance with this Article.

11.6     If an audit inspection or examination in accordance with this Article discloses overcharges of any nature by the Contractor to the Owner in excess of one percent (1%) of the total contract billings, the actual cost of the Owner's audit shall be reimbursed to the Owner by the Contractor.  Any adjustments or payments which must be made as a result of any such audit or inspection of the Contractor's invoices or records shall be made within a reasonable amount of time (not to exceed ninety (90) days) from presentation of Owner's findings to Contractor.

## 12.     <u>Dispute Resolution</u>

12.1     All claims, disputes and other matters in question between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof, may, at the sole option of the Owner, be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then in effect.  This provision shall be specifically enforceable in any court of competent jurisdiction.  Nothing in this Section 12 shall be deemed to require the Owner to subject disputes under the Contract Documents to arbitration.  If the Owner does not opt for arbitration, claims, disputes, and other matters in question between the parties arising out of or relating to this Agreement shall be resolved in accordance with Section 12.2 herein.  Sections 12.1 and 12.2 are subject to the Owner's right to render a final and binding decision pursuant to Section 12.6.

12.2     All claims, disputes and other matters in question between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof or relating thereto which Owner does not elect to subject to arbitration shall be decided a court in litigation, and any civil action in furtherance thereof shall be brought exclusively in either the U.S. District Court for the Eastern District of Virginia, Richmond Division, or the Circuit Court of Henrico County, Virginia.

12.3     As a condition precedent to the institution of any action (lawsuit, arbitration, etc.) hereunder, all disputes shall be submitted to mediation before a professional mediator mutually selected by the parties.  Such mediations shall be conducted at a mutually agreed time and place, shall not be less than one day in length, and the costs and expenses of the mediator shall be split equally between the parties.  Only upon the unsuccessful completion of such mediations shall either party have the right to pursue further resolution of outstanding issues hereunder.

12.4     When the Owner has opted for arbitration, the following will apply:

12.4.1    Arbitration arising out of or relating to this Agreement may include, by consolidation, joinder or any other manner, any other persons substantially involved in a common question of fact or law, whose presence is required if complete relief is to be accorded in the arbitration.  Consolidation shall be decided by an arbitrator in accordance with AAA rules.  The arbitrator(s) shall decide procedural and substantive issues regarding arbitrability and whether conditions precedent have been satisfied.

12.4.2    Notice of demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association Regional Office of Atlanta, Georgia.  The demand shall be made within a reasonable time after the claim, dispute or other matter in question has arisen.  In no event shall the demand for arbitration be made after the date when the applicable statute of limitations would bar institution of a legal or equitable proceeding based on such claim, dispute or other matter in question.

12.4.3    The award rendered by arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court of competent jurisdiction.

12.4.4    The Federal Arbitration Act shall apply and govern disputes submitted to arbitration.

12.4.5    If the amount in controversy is in excess of $250,000, then the matter shall be decided by a panel of three arbitrators selected in accordance with the applicable rules of the AAA.  All other matters shall be decided by a single arbitrator.  If it becomes apparent that the amount in controversy exceeds $250,000 after the selection of a single arbitrator, the AAA shall either add two more arbitrators to the panel or select a new panel of three arbitrators, whichever it deems more appropriate and efficient under the circumstances.

12.5    This Section 12 shall survive the expiration or earlier termination of this Contract. Unless otherwise agreed in writing, Contractor shall carry on the Work and shall maintain the Project Schedule during any and all disputes, including but not limited to mediation, trial, or as applicable, arbitration proceedings, and the Owner shall continue to make payments not in dispute to the Contractor in accordance with this Agreement.

12.6    Claims, disputes and other matters in question between the Contractor and the Owner relating to the performance of the Work or the interpretation of the Contract Documents may be decided by the Owner's Vice President - Construction which decision will be rendered in writing within a reasonable time.  The Owner may refer any such claim or dispute to the Architect.  The Owner's decision, or the Architect's, if referred by or from the Owner's Vice President - Construction, shall be final and binding on the parties.

## 13.    Termination of Agreement

13.1    Owner shall have the right to terminate the Agreement at any time without cause and without liability to Contractor by giving Contractor fifteen (15) days' prior written notice; provided, however, Owner shall reimburse Contractor for that portion of the Contract Sum for which Contractor is obligated to pay prior to the effective date of such termination, less all payments previously made by Owner.  All subcontracts shall contain provisions permitting termination on the same basis as the Agreement.  If the Agreement is terminated after construction has commenced, Owner shall pay to Contractor an amount equal to that which would be payable under Paragraph 13.3 hereof.

13.2    If Contractor persistently or repeatedly refuses or fails to supply sufficient properly skilled workmen or proper materials required for the Work, if Contractor fails to make prompt payment to subcontractors or for

materials or labor, if Contractor persistently or repeatedly disregards laws, ordinances, rules, regulations or orders of any governmental authority having jurisdiction over the Project, or if Contractor otherwise is in violation of a material provision of any of the Contract Documents, then Owner may, without prejudice to any right or remedy, and after giving Contractor and its surety, if any, fifteen (15) days' prior written notice, terminate the Agreement and take possession of the Project and all materials, equipment, tools, construction equipment and machinery thereon owned by Contractor and any materials stored at off site areas and Owner may complete the Work by whatever method Owner may deem expedient.  In any such case, Contractor shall not be entitled to receive any further payment until the Work is completed.  If the unpaid balance of the Contract Sum exceeds the cost to Owner of completing the Work, including compensation for the Architect's additional services, Owner shall reimburse Contractor (to the extent of said difference) for costs incurred but not previously paid to Contractor.  If the cost to Owner of finishing the Work exceeds the unpaid balance of the Contract Sum, Contractor shall pay the difference to Owner.

13.3    If the Work is stopped for a period of ninety (90) days under order of any court or any governmental authority having jurisdiction over the Project, through no fault or act or neglect of Contractor or any of its subcontractors, or any of their agents or employees, or any other person performing any of the Work under a contract with Contractor, or if Owner is guilty of a breach of any material provision of the Agreement and a cure for such breach is not commenced within fifteen (15) days after written notice from Contractor, then in any such event Contractor may, upon seven (7) days' prior written notice to Owner terminate the Agreement and recover from Owner payment for that portion of the Contract Sum payable to the effective date of such termination as defined elsewhere herein.

13.4    Contractor shall use its best efforts to make all contracts, subcontracts, purchase orders and other commitments entered into by Contractor in connection with the performance of the Work hereunder in a form assignable to Owner.  In the event of any termination of the Agreement for any reason, as a condition to any payments to Contractor, Contractor shall, at the request of Owner, assign to Owner any such contracts, subcontracts, purchase orders and commitments as Owner designates, and Contractor shall use its best efforts to obtain consent to the assignment of any such contract, subcontract, purchase order and commitment not otherwise assignable in accordance with its terms and to assist in an orderly transition.  All of the Owner's rights and obligations hereunder may be assigned by Owner to any party who owns a fee interest in and to the real property to be improved by the Project, Owner's landlord or any other party who is a construction lender therefor.

13.5    In the event of any termination of this Agreement, Contractor shall provide Owner with a detailed description of the costs and expenses incurred by Contractor within sixty (60) days after written notice of termination has been provided as herein required.

## 14.    Temporary Construction Facilities

14.1    Contractor shall provide and maintain hoists, bunkers, scaffolds and other temporary construction facilities (including the dual-gate system), excepting only such as are specifically required to be provided by others.  Temporary hoists, bunkers and other temporary construction facilities (including the dual-gate system) shall be located in or about the Project in such a position as is practicable and where it will not interfere with the progress of the Work.

14.2    Contractor shall protect the construction site and surrounding public areas in compliance with the requirements of applicable codes and regulations of public agencies having jurisdiction.  The obtaining and paying for all required permits and inspections in connection therewith shall be the responsibility of the Contractor.  Where so required Contractor shall provide and maintain in working order at all times warning lights and pay all costs in connection therewith.

14.3     Upon completion of the Project, or prior thereto when so authorized or required to maintain job progress, protective fence and canopy and related construction shall be removed by the Contractor and the space occupied thereby restored to its original condition as approved by authorities having jurisdiction.

14.4     Contractor shall provide and maintain, in compliance with local custom and applicable codes and regulations of authorities having jurisdiction, complete temporary toilet facilities.

14.5     Upon completion of the Project, or prior thereto when so authorized, temporary toilet facilities shall be disconnected and all equipment and temporary construction connected therewith removed from the site.

14.6     Contractor shall arrange for connections and pay for water and electric service for power and light, including temporary connections used by subcontractors during the progress of the Work and until final acceptance. Should Contractor fail to settle claims for water, electric power or other material used in the Work, the Owner may reserve from the monies due or to become due to the Contractor a sum sufficient to satisfy such claims, and should any such claim remain unsettled for thirty (30) days after notice thereof has been given the Contractor, the Owner may settle such claim or claims out of the monies reserved and the amount expended for such purposes shall be deducted from monies due or to become due to the Contractor.

14.7     In the event of partial occupancy by the Owner or a tenant with Owner's written permission prior to final acceptance, the payment of charges for water, electricity and fuel for the portion of the Project occupied shall be the responsibility of the Owner or the tenant involved and the account name for the applicable utility service shall be changed accordingly to reflect the responsible party.

14.8     The Contractor shall provide two (2) independent telephones in the construction trailer and a computer with internet connection for the field supervision to communicate via the internet and/or email.. One telephone shall be a cellular telephone. The superintendent shall carry this telephone with him when he is on the job site away from the trailer. The Contractor shall subscribe to the optional features of "call waiting" and "call hold" for both construction telephones.

14.9     Signs furnished by the Owner shall be erected on the site as and where required by the Owner. Contractor shall not place or allow to be placed any signs, billboards or posters on any portion of the site or the Project, except upon written permission from the Owner and then only of a size, material, color and type and at a location approved by the Owner.

14.10     Elevators may be used during the course of construction by Contractor once the elevators are declared operable by the elevator subcontractor, provided that the Contractor shall adequately protect all parts of the equipment, machinery, controls and cabs from damage or harm of any nature; and elevators shall be available to all other separate contractors and subcontractors as may be required by the Owner.

## 15.     Use of Site and Premises

15.1     The working area outside of the building lines for use of storage of materials, for equipment operations and for temporary buildings is the area bounded by the limiting streets and property lines, unless otherwise restricted by the Drawings or Specifications. Such other space, including public sidewalks and roadways as may be permitted for temporary use by the applicable building codes or public authorities at the place of construction, may be used and the cost, if any, shall be borne solely by Contractor. Disturbed public areas shall be put back into their original state at completion of use, as approved and accepted by public authorities having jurisdiction.

15.2     Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not encumber the site with any extraneous materials or equipment.

15.3      The site shall not be encumbered by the storage of materials for extended periods prior to the time when installation of such materials will be required.  No trenches required for utility systems and like operations shall be excavated until material required therefore is ready for installation and completion of such Work in the shortest time possible.

15.4      Contractor shall afford opportunity and facilities for the introduction and storage of material on the site and in the structure by subcontractors.  Workmen, subcontractors or other representatives shall be admitted to the site only for the proper execution of the Work and shall have no tenancy.

15.5      Contractor shall send notices, make all necessary arrangements and perform all services for protection and maintenance of all public utilities during the construction period and until final acceptance of Project by Owner.

15.6      Contractor, at its sole cost and expense, shall obtain and pay for permits and inspections required to use public streets, sidewalks, curbs and paving, including cutting openings therein and shall post guarantees and bonds required and be responsible for repair and correction of damage as required by authorities having jurisdiction.

15.7      Contractor shall give all notices and comply with all laws, ordinances, rules and regulations and valid orders of any public authority bearing on the performance of the Work.  If Contractor observes that any of the Contract Documents are at variance therewith in any respect, he shall promptly notify the Owner in writing, and any necessary changes shall be adjusted by appropriate modification.  If the Contractor performs any Work, knowing it to be contrary to such laws, ordinances, rules and regulations, and without such notice in writing to the Owner, he shall assume full responsibility therefor and shall bear all costs attributable thereto.

15.8      Until acceptance of the Project, or partial or full occupancy by Owner, Contractor, at its sole cost and expense, shall be the building manager and shall be responsible for providing and maintaining temporary doors for security, for locking and unlocking entrances, for protection of all parts from damage or from wetting by rains or flood water, for provision of safety and enforcement of safety regulations, for preventing unauthorized persons from entering the property, for general orderliness, for care of the adjacent properties and public ways abutting the property of Owner and for any temporary assignment of space within the site or premises.

## 16.    **Submittals to Owner**

16.1      Contractor shall submit the following schedules to the Owner for approval no later than ten (10) days after Owner's request for each item.  Contractor shall update each schedule listed below at the end of each month, if necessary to ensure accuracy.

16.1.1      Contemplated progress schedule by trade.

16.1.2      Contemplated payment schedule - indicate contemplated costs on a monthly basis.

16.1.3      Shop drawing and materials sample schedule - list all required shop drawings and samples for each part of the Work with reference to applicable technical section numbers.  Include submission and required return dates.

16.1.4      Guarantees, warranties and bond schedule - list all required guarantees, warranties and bonds, other than warranties and guarantees required by these Contract Documents, including the Contractor's 1-year obligation to restore defects.

16.2    Contractor shall submit schedules for the review and approval of the Owner. If changes affecting the schedules are made in the Project by the Owner as the Work progresses, Contractor shall notify the Owner of the effect within five (5) days of receipt of written authorization to proceed with changes.

16.3    The progress schedule shall be revised from time to time as may be required to reflect changes in job progress or authorized extensions of construction time.

## 17.    <u>Shop Drawings</u>

17.1    Shop drawings and/or plates and brochures, as required, shall be prepared by Contractor and submitted for approval well in advance of the time information will be required in order that the Work will not be delayed; provided, however, in no event shall any shop drawings be submitted more than twenty (20) days after the notice to proceed.  No Work indicated on any one shop drawing shall be started until such drawing has been approved.

17.2    Electronic  drawing compatible with the Architect's CAD system shall be submitted to the Architect for his checking. Required corrections will be noted on the Electronic Drawings and the Electronic Drawing will be returned to the Contractor via email, who shall make the necessary revisions and resubmit the revised Electronic Drawing for final approval.  The Electronic Drawing, after the required corrections have been checked, or if correct when initially submitted and requiring no revisions, will be returned via email with properly approval / revision notation to the Contractor, who shall then make distribution to all parties concerned, including one copy for the Architect and, unless otherwise provided, one copy for the Owner.

17.3    Unless otherwise provided in the various trade sections of the Specifications, shop drawings requiring the interrelation of Work within a trade and shop drawings  which require coordination and checking with shop drawings of another trade shall be submitted together to facilitate proper checking and coordination.  In the event such coordinated submission is not made, the Contractor may be notified and checking of the shop drawings submitted will be delayed by the Architect until the remainder of the related shop drawings are submitted.  Any delay in the Work resulting from Contractor's failure to comply with this requirement shall be the responsibility of Contractor and no extension of completion time will be allowed to compensate for delay in checking and return of the affected shop drawings.

17.4    So far as practicable and in order to facilitate the approval of shop drawings and their prompt return, each shop drawing shall bear a cross reference note referring to the detail number, sheet number or numbers of the Drawings showing the same Work and the Specification section covering the Work shown on the shop drawing.

17.5    Shop drawings shall indicate accurately the job conditions and dimensions and to conform to indications on the Drawings, the requirements of the Specifications and applicable supplementary details and instructions.  They shall indicate the complete methods of connection, jointing, support, anchorage, reinforcement and other features of construction, together with necessary easements and clearances in the work of others, and relation of Work so detailed to finished surfaces of abutting Work.  Materials and finishes of Work so detailed shall be indicated thereon.

17.6    The Architect's checking of shop drawings shall apply in a general sense only and will not relieve Contractor from the responsibility for proper fitting and construction of Work, nor from furnishing material and Work required by the Drawings, Specifications and related documents, which may not be indicated, or which may be indicated differently, on the approved shop drawings.

17.7    Shop drawings and schedules of all trades shall be submitted only by Contractor, who shall indicate by a signed stamp on the drawings or on the email transmitting said documents that he has checked the shop drawings and that the Work shown on them is in accordance with the Contract Documents and has been checked for dimensions and

relationship with work of all other trades involved.  Under no conditions should shop drawings be submitted to the Architect by anyone other than the Contractor.

17.8    The checking of shop drawings and/or schedules by the Architect shall not relieve Contractor of responsibility for deviations or omissions from Drawings or the Specifications, unless he has in writing called the Architect's attention to such deviations and/or omissions at the time of submission of shop drawings, nor shall it relieve him of the responsibility for errors or omissions of any kind in shop drawings or schedules, unless such deviations, changes or omissions are duly approved as such and noted by specific approval on the drawings.  When Contractor does call such deviations or omissions to the attention of the Architect, he shall state in his letter whether such deviations, changes or omissions involve any extra cost.  If this is not mentioned, it will be assumed that no extra cost is involved for making the change, deviation or omission.  Letters fully describing any deviations, changes or omissions, together with the reasons therefor, shall be submitted by Contractor to the Architect, with copy to the Owner, together with the affected drawings.

17.9    Any changes, deviations or omissions which affect the scope of the Work, appearance, or time or price shall be considered a Change Order and shall be subject to approval by Owner in the manner provided for other Change Orders.

17.10    Shop drawings which involve changes in the design concept of the Project, the basic methods of assembly or reduce the quality of the Work may be returned to Contractor without checking unless valid reason for the change is established at the time of submission.

17.11    No portion of the Work requiring a shop drawing, product data or sample submission shall be commenced until the submission has been approved by Architect. All such portions of the Work shall be performed in accordance with approved shop drawings, product data and samples.  All changes made by Architect or Contractor or directions issued by Architect in connection with preparation of shop drawings, product data and samples which involve a change in cost or in time of performance hereunder shall be made and implemented in accordance with the procedures specified for Change Orders.

## 18.    Samples

18.1    Contractor shall prepare and submit for Architect's approval all samples as required by the various trade sections of the Specifications and samples of other materials as may subsequently be requested.  Unless specified otherwise, samples shall be submitted in duplicate.

18.2    Samples shall be submitted in sufficient time to allow the Architect reasonable time for consideration and so as not to delay progress of the Work in the event re-submission should be required.

18.3    Each sample shall be labeled with the following information and shall have a blank space large enough for the approval stamp:

18.3.1    Project name and location.

18.3.2    Name of Contractor.

18.3.3    Name of subcontractor and manufacturer.

18.3.4    Name, finish and composition of the material.

18.3.5    Location and/or intended use of the material.

18.3.6        Reference to Specification section and Drawing sheet number.

18.4    Upon approval, the samples will be stamped or labeled to indicate approval and one of the samples returned to Contractor.  The approved sample retained by the Architect will constitute the standard of quality and appearance of all materials of the type represented by the samples to be installed.  In the event samples are not approved, Contractor will be given the reasons for disapproval and shall re-submit samples until approval is obtained.

18.5      At the option of Owner or Architect, samples will be subject to testing, and in such event such additional samples as may be required, shall be supplied by Contractor at no additional cost.

## 19.     Record Drawings and Maintenance Instructions

19.1       Contractor shall furnish Owner a CD with a complete set of electronic  record drawings for the Work of each trade section where so required by the technical section, and one set of printed record drawings.  Record drawings shall be prepared and submitted to Contractor by each of the subcontractors as required in compliance with the following Paragraphs.

19.2        Each subcontractor shall provide and keep current a complete "as-built" record set of blueline prints, which shall be corrected daily and shall show every change from the original Drawings and Specifications, and shall show the exact "as-built" locations, sizes and kinds of equipment.  Prints for this purpose may be obtained from the Architect at cost.  This set of drawings shall be kept on the job site and shall be used only as a record set.  The foregoing shall not be construed as authorization to Contractor to make changes in the layout without definite authorization in each case.

19.3      At the completion of the Project, Contractor shall deliver to the Architect two (2) copies (or such number is otherwise specified elsewhere in the Contract Documents) of manufacturer's manuals providing for Owner's guidance full details of the suggested care and maintenance of all visible surfaces and equipment included in this Project.

19.4      Contractor shall furnish all literature of each manufacturer relating to equipment, including motors or other manufactured equipment.  He shall also submit cuts, wiring diagrams, instruction sheets and all other information pertaining to same that would be useful to Owner in the operation and maintenance of same, to the extent that this information is reasonably available from manufacturers and/or is not shown on the as-built drawings.

## 20.     Materials and Equipment

20.1      Contractor warrants to Owner that all materials and equipment furnished under the Contract Documents will be new and the best of their respective kinds, unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents.  All Work not so conforming to these standards may be considered defective.  If required by Owner, Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.  The warranty provided in this Section shall be in addition to and not in limitation of any other warranty or remedy required by law or by other portions of the Contract Documents.

20.2       Especially manufactured or fabricated Work made to detail and delivered to the site with the intention of forming a part of the permanent structure, when accepted, shall be considered as the property of Owner, and the value thereof, upon acceptable substantiation, may be included in the periodic requests for payment.  Form lumber and bulk building materials, including brick, aggregate and cement, shall be considered as the property of Contractor until actually incorporated into the Work, and the value thereof shall not be included in the periodic requests for payment.

20.3    Insofar as is practicable, material of one manufacture for each specific purpose shall be used throughout the Project, except where otherwise required, and where the nature of such allows, shall be delivered to the site in original and unbroken cases, cartons or containers with the name or brand of the manufacturer plainly marked thereon.

20.4    Owner reserves the right to purchase material or supplies directly and furnish them to Contractor for installation in compliance with the Contract Documents.    Contractor agrees to accept all FBO materials and incorporate same into the Work as required by Owner.

20.5    Construction materials which do not become a permanent part of the construction and which have previously been used in the Work and are proposed to be re-used, shall be sorted as to class, size and kind and piled and stored in an orderly manner and kept readily accessible.    Such materials may be re-used in the Work, provided they are structurally sound, clean, entirely suitable and approved for the intended use by Owner.    Re-used form lumber for exposed concrete surfaces shall be of such quality so as to produce concrete surfaces of the same appearance and quality as the surfaces produced by the initial use of the forms.

20.6    Where installation of Work is required to be performed in accordance with the product manufacturer's instructions, Contractor shall, unless otherwise provided in the Contract Documents, procure and distribute the necessary copies of such instructions.    Manufacturer's instructions shall be subject to approval and/or modification by the Owner.    Unless otherwise required, Contractor shall obtain and deliver to the Owner two copies of such instructions at least two weeks prior to start of the Work involved.

## 21.    <u>Substitution of Material</u>

21.1    Where materials, equipment or process are specified in a Specification by patent, proprietary name or name of the manufacturer, such Specification shall, unless otherwise specified or restricted, be deemed to be used for the purpose of establishing a standard for that particular item and shall be deemed to be followed by the words "or other as approved by the Architect or Owner." Any bidder, manufacturer or distributor may offer for approval any material, item of equipment or process which he considers to be equal in every respect to that indicated or specified.

21.2    Requests for approval of materials, equipment or processes not named in the Specifications shall be submitted in writing as a part of the submission of proposals.    Requests for approval shall be accompanied by such supplemental technical information and/or samples, where required, as may be necessary for evaluation of the product.

21.3    If, in the opinion of the Owner or Architect, the suggested substitution is equal to the material, equipment or process originally specified, or otherwise fulfills the requirements of the Project, the approval will be confirmed in writing to Owner and Contractor.    Approval of proposed substitutions shall not be deemed to have relieved Contractor of responsibility for the proper execution of the Work nor from warranty and maintenance requirements imposed by the Contract Documents.

21.4    Where no substitutions are proposed or approved in conformity with the provisions of this Article, then no deviation from the materials, equipment or process specified will be allowed, excepting only the following cases and provided in each such case the substitution has been approved by the Owner or Architect:

21.4.1    The manufacture or production of the specified material, process or equipment has been discontinued.

21.4.2    The specified material, process or equipment is not available in sufficient quantity or quantities to complete the Work.    Failure of Contractor to award subcontracts in sufficient time, or failure of Contractor or the subcontractor involved to place orders for materials so as to insure delivery without delaying the Work, will not constitute cause for approval of substitute materials.

21.4.3       Delays beyond the control of Contractor, such as strikes, lock-outs, storms, fires or acts of God, which preclude the procurement and delivery of materials or equipment for purposes of the Project, and for such other reasons as the Owner or Architect may deem to justify the substitution.

## 22.   Workers and Workmanship

22.1       Contractor and its subcontractors shall at all times enforce strict discipline and good order among their employees, and shall not employ on the Work any unfit person or anyone not skilled in the task assigned to him.

22.2       Contractor shall not employ any labor on its own payroll nor allow any subcontractor to employ any labor which may cause dissension with other workers on the premises.

22.3       The workmanship of apprentices and helpers shall not be allowed where that of journeymen and master mechanics is necessary to obtain the required standard of workmanship. Workmen employed shall be competent and skilled in the performance of their particular Work and shall be employed under the prevailing local working conditions and in the status customary in projects of the size and type involved. Workmen or supervisory personnel deemed incompetent or improperly employed, or whose Work on this Project could result in a work stoppage or unacceptable results, then or at any subsequent time during the Project, shall be dismissed forthwith and shall not be re-employed on the Project. The fact that journeymen or master mechanics were employed in the execution of sub-standard Work shall have no effect upon the acceptance or rejection of such Work.

22.4       In the hiring of employees for the performance of Work by Contractor or any subcontractor, neither Contractor nor any subcontractor shall by reason of race, religion or color discriminate against any citizen who is qualified and available to perform the Work to which the employment relates, nor shall Contractor or any subcontractor discriminate in any manner against or intimidate any employee on account of race, religion or color.

22.5       Workmanship shall be the best of its respective kind for each of the various trades and shall be executed in accordance with the Contract Documents and under direct supervision of competent representatives of Contractor and the various subcontractors, and of the manufacturer where so required.

22.6       Contractor and all of his subcontractors are responsible for complying with all aspects of United States Immigration law, including but not limited to the Immigration Reform and Control Act of 1986, and verifying employment eligibility for it's workforce.

## 23.   Inspection of Work and Testing of Materials

23.1       Except as may be modified in the various technical sections of the Specifications, the procedures for inspection of Work and testing of materials under this Section shall apply.

23.2       Materials and products to be incorporated in the Project shall, at Owner's decision, be subject to inspection and testing, both at the site and in the shops or plants of manufacture. Contractor shall give timely notice of the readiness of any Work, products or materials that are required by the Contract Documents or by public authority having jurisdiction to be inspected, tested or approved.

23.3       Access to the Work wherever it is in preparation or progress shall be permitted at all times and Contractor shall provide safe and proper facilities for such access and inspection.

23.4       Work required to be inspected shall be left exposed until inspected and approved. Should such Work be covered without approval, when directed by Owner it shall be uncovered for examination and recovered after approval

at no additional cost to Owner.  Re-examination of questionable concealed Work may be ordered by Owner and/or governmental inspection authorities having jurisdiction.

23.5    If Owner determines that any Work requires special inspection, testing or approval which the preceding paragraphs do not include, he will instruct Contractor to order such special inspection, test or approval and Contractor shall give notice as noted in preceding paragraphs.  If such special inspection or testing reveals a failure of the Work to comply with the requirements of the Contract Documents or with laws, ordinances, rules, regulations or orders of any public authority having jurisdiction, Contractor shall bear all costs thereof, including the Architect's additional services made necessary by such failure and the cost of such testing or inspection; otherwise Owner shall bear such costs and an appropriate Change Order shall be issued.

23.6    Required inspections and tests and the reports shall be made by a qualified testing engineer or laboratory selected or approved by Owner.  Certified copies of test reports shall be furnished as follows:

      23.6.1    One copy to Owner.

      23.6.2    One copy to Architect.

      23.6.3    One copy to consulting engineer.

      23.6.4    One copy to Contractor.

      23.6.5    One copy to the building department under whose jurisdiction the Project is constructed.

      23.6.6    One copy to the supplier of the material tested.

23.7    If Owner or Architect wishes to observe the inspections, tests or approvals required by this Section, they will do so promptly and, where applicable, at the source of supply.

23.8    Neither the observations of the Architect nor inspections, tests or approvals by persons other than Contractor, shall relieve Contractor from his obligations to perform the Work in accordance with the Contract Documents.

23.9    Preliminary inspection and approval of materials during the process of manufacture or at the time of delivery and intermediate inspection and approval of installed Work before covering shall be subject to the Contract Documents relating to final inspection and acceptance of the Work as a whole and to the provisions of the Contractor's warranty.

23.10    Except as otherwise provided herein, the cost of testing and inspection shall be paid by Owner.

## 24.    Correction of Work

241    Contractor shall promptly remove from the premises all Work determined by Owner prior to completion to fail to conform to the Contract Documents, whether or not incorporated into the improvements under construction, and Contractor shall promptly replace and re-execute or cause to be replaced and re-executed all such Work.  Contractor shall not be entitled to reimbursement for the cost of such removal, replacement and re-execution.

24.2    If Contractor does not remove such non-conforming Work within a reasonable time, fixed by written notice from Owner, Owner may remove it and store the material at the expense of Contractor.  If Contractor does not promptly pay the expenses of such removal and storage, Owner may at its election, deduct such expenses from any

Exhibit A
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

PAGE 33

payment due Contractor hereunder or bring such action as Owner may deem appropriate for the recovery of such expenses.

24.3     If Contractor does not replace and re-execute such non-conforming Work or cause it to be replaced and re-executed within a reasonable time, fixed by written notice from Owner, Owner may, without prejudice to any other remedy it may have, cause such Work to be replaced and re-executed at the expense of Contractor.  If Contractor does not promptly pay the expense of such replacement and re-execution, Owner may at its election deduct such expenses from any payment due Contractor hereunder of bring such action as Owner may deem appropriate for the recovery of such expenses.

24.4     Contractor shall not stop the Work or any portion thereunder except as directly affected by removal of such condemned Work.

24.5     If any Work is covered contrary to the request of the Architect or Owner, it must, if required by Owner, be uncovered for his observation and replaced at Contractor's expense.  If any other Work has been covered which the Architect or Owner has not specifically requested to observe prior to being covered, Owner may request to see such Work and it shall be uncovered by Contractor.  If such Work be found in accordance with the Contract Documents, the cost of uncovering and replacement shall, by appropriate Change Order, be charged to Owner.  If such Work be found to be not in accordance with the Contract Documents, Contractor shall pay such costs.

24.6     Neither the issuance of the Certificate of Final Completion nor payment of the final payment shall relieve Contractor of responsibility for faulty or defective materials and workmanship, and he shall remedy all defects due thereto and pay for damage which may appear within any warranty period to other Work resulting therefrom, all in a satisfactory and acceptable manner.  Owner shall give notice of observed defects with reasonable promptness.

24.7     In addition to corrections required because of faulty or defective Work, the related requirements of these General Conditions are extended to include maintenance of a continuing service character, where required under various technical sections of the Specifications.

## 25.    Cutting and Patching

25.1     All trades shall perform and time their Work so as not to require unnecessary cutting.  All Work shall be performed in accordance with information obtained from Drawings and Specifications, detail drawings or instructions from the various trades so as to avoid where possible, the necessity of cutting. Contractor or its subcontractors shall not endanger any Work by cutting, excavating or otherwise altering the Work and shall not cut or alter the Work of any other contractor without the consent of Owner.

25.2     All trades shall promptly install conduits, outlets, piping sleeves, boxes, inserts, anchors and other equipment into walls, floors and other construction to meet requirements of construction progress of all other trades.  All subcontractors and trades shall cooperate freely under the coordinating direction of Contractor to the end that all parts of the Work may proceed advantageously and in complete harmony.  If there is a need for cutting, then it and the resulting corrective patching shall be done at the expense of the trade requiring it.  Any cost caused by defective or ill-timed Work shall be borne by the party responsible therefore, and not by Owner in any event.  No indiscriminate cutting or patching shall be performed until Owner has been consulted for proper directions.  Careless or avoidable cutting will not be tolerated.

25.3     Contractor shall do all cutting, fitting or patching of its Work that may be required to make its several parts fit together properly.  In all cases, care shall be exercised in cutting operations.  Contractor shall perform operations under supervision of competent mechanics skilled in applicable trades and shall cut openings as small as possible to avoid damage.

25.4    Wherever cutting, removal or alteration of existing Work is necessary to form connections with new Work, or otherwise meet the requirements of the Contract Documents, such Work shall be performed as necessary to avoid damaging the Work that is to remain in place, and patching and repairs shall be made in workmanlike manner, using materials, construction, details and finishes matching the existing Work.

## 26.    Clean-Up

26.1    Contractor at all times shall keep the premises free from accumulation of waste materials or rubbish caused by his or his subcontractors' operations.  Materials to be used shall be kept in an orderly manner, neatly stacked or piled.

26.2    Upon completion of the Work of any subcontractor, such subcontractor shall remove his surplus materials and debris from job site.  At the completion of all the Work, Contractor shall remove all waste materials and rubbish from and about the Project, as well as all tools, construction equipment, machinery and surplus materials, and shall clean all glass surfaces and leave the Work "broom-clean" or its equivalent, except as otherwise specified.  Subject to exceptions specified, Contractor and all subcontractors shall use materials and methods for cleaning and polishing as recommended by the applicable manufacturers.  Soaps and cleaners shall be of types not injurious to surfaces on which they are used.  Use of acids is prohibited except as specified.

26.3    All Work shall be left clean and free of dirt, splatterings of paint, plaster, concrete, mortar, fingerprints and foreign matter.  Contractor shall leave the building and premises clean and orderly, ready for the occupancy for which it is intended, and in accordance with, but not limited to, the following, in addition to "broom-cleaning:"

26.3.1    Remove all stains from glass; wash and polish same inside and out.  Do not scratch glass or glazing compound.

26.3.2    Clean fixtures and equipment, floors, wall and ceiling surfaces, doors and other surfaces exposed to view.

26.3.3    Clean and polish metal surfaces, including doors and hardware.

## 27.    Protection of the Work

27.1    Protection of Work shall be continuously maintained by Contractor in such suitable form as will protect the Work as a whole and in part, and adjacent property and improvements from accidents, injury or damages. Contractor shall properly protect the Work with lights, guard rails, temporary covers and barricades; provide excavations with proper enclosures; brace and secure all parts of the Work against storm and accident and provide such additional forms of protection as may be necessary in the prevailing circumstances.

27.2    Should construction, materials or equipment become damaged, destroyed or stolen through negligence on the part of Contractor or any subcontractor or the agents or employees of any of them while the Work remains under Contractor's jurisdiction, Contractor shall repair or replace same to the satisfaction of Owner, without cost to Owner.

27.3    Contractor and all subcontractors shall provide protection for their own materials, tools and equipment employed in the Work including the tools of workmen.  Except where otherwise expressly stipulated, Owner shall not be held to have incurred any liability for loss of or damage to materials, tools and equipment of Contractor or of those persons employed by him, by subcontractors or otherwise.

27.4      Contractor shall be solely responsible for the safety and condition of his and the various subcontractors' materials and implements stored in or about the building and the site.  Should it become necessary during the Project to remove such materials and implements to facilitate and maintain scheduled progress of the Work, Contractor shall remove materials and implements to some new location and such moving shall be done without additional charge. Should Contractor fail, refuse or neglect to commence the Work of removal of materials and implements within two (2) days after notifications or to prosecute the Work of removal with due diligence, Owner may cause the materials or implements to be moved and the cost thereof shall be deducted and paid by Owner out of monies which may be due or may become due to Contractor.

27.5      Contractor shall be responsible for the patching and replacing of all damaged Work.  Patching and replacing of damaged Work shall be done in accordance with the Contract Documents, and the cost shall be an obligation of Contractor. At completion of the Project, damage to the Project shall be satisfactorily repaired or replaced by Contractor at its sole cost and expense.

27.6      Rain, surface or subsurface water and other fluid shall not be allowed to accumulate in excavations or under or about the structures.  Should such conditions develop or be encountered, the water shall be kept constantly controlled and legally disposed of by temporary pumps, piping, ditches, dams or other methods.

27.7      Carts, hand trucks, wheelbarrows and similar wheeled conveyances used on or in any portion of the structure shall be equipped with pneumatic tires, except where otherwise expressly authorized.

## 28.      Protection of Persons and Property

28.1      Contractor shall comply at all times with Federal OSHA and Local OSHA requirements. Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.  Contractor shall designate a responsible member of his organization at the site whose duty shall be the prevention of accidents.  This person shall be the Contractor's superintendent unless otherwise designated in writing by Contractor to Owner.

28.2      Contractor shall comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority including OSHA, having jurisdiction for the safety of persons or property or to protect them from damage, injury or loss.  Contractor shall erect and maintain, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent properties.

28.3      Such protective measures as may be required to adequately protect the public from hazards of construction work and to exclude unauthorized persons from the Work shall be provided and maintained by Contractor.  When regulated by local building code or other authority, such requirements for protection shall be considered as minimum requirements and  Contractor shall be responsible for such protection in excess of minimum requirements as may be required hereby.

28.3.1      Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

28.3.2      All workmen and other employees of Contractor and subcontractors on the Project and all visitors and other persons who may be affected thereby;

28.3.3      All the Work and all materials and equipment to be incorporated therein, whether in storage on or off the site, as long as it is under the care, custody or control of Contractor or any subcontractors or sub-subcontractors; and

28.3.4      Other property at the site or adjacent thereto, including trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

28.4      No part of the Work shall be performed, nor shall any of the material, supplies, articles or equipment be manufactured or fabricated in any plant, factory, building or surroundings, or under working conditions which are unsanitary, hazardous or dangerous to the health and safety of employees engaged therein. Precautions shall be exercised for the protection of all persons and property.

28.5      Should the manufacturer of a specified material or product supply instructions, either by label on the container or by independently issued bulletin or instructions pertaining to the product, which refer to possible health and/or safety hazards in the use of the product, Contractor shall be responsible for the proper use and application of the product in conformity with such instructions, and shall be responsible for all damage or injury resulting from failure to comply with such instructions.

28.6      When the use or storage of explosives or other hazardous materials or equipment is necessary for the execution of the Work, Contractor shall exercise the utmost care and shall conduct such activities under the supervision of properly qualified personnel.

28.7      Internal combustion engines and compressors shall be equipped with mufflers to reduce noise to a minimum and shall not be operated in enclosed areas without adequate ventilation.

28.8      Owner may provide such watchmen's service as he deems necessary to protect his interests during the progress of construction of the Project, but any protection so provided by Owner shall not in any way relieve Contractor of the responsibility for the safety and condition of the Work and material until the completion and acceptance thereof.  Contractor shall employ such watchmen's service as he may deem necessary to properly protect and safeguard the Work and material.  Owner shall not in any way be liable or responsible for damage or loss to the Work or material due to trespass or theft.

28.9      All damage or loss to any property referred to herein and caused in whole or in part by Contractor, any subcontractor, any sub-subcontractor or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, shall be remedied by Contractor at its sole cost and expense.

28.10      In any emergency affecting the safety of persons or property, Contractor shall act to prevent threatened damage, injury or loss.  Any additional compensation or extension of time claimed by Contractor on account of emergency Work shall be determined as provided in the Agreement for Changes in the Work.

## 29.      Fire Precautions and Protection

29.1      Contractor shall take necessary precautions to guard against and eliminate possible fire hazards and to prevent damage to the Work, building materials, equipment, temporary field offices, storage sheds and public and private property.  Contractor shall be responsible for providing, maintaining and enforcing the following conditions and requirements during the entire construction period:

29.1.1      Contractor's superintendent in charge shall inspect the entire Project at least once each week to make certain that the conditions and requirements of the Contract Documents and applicable law are being adhered to.

29.1.2      An adequate number of outlets and supply of fire hose of required size and length to protect the construction area shall be provided by Contractor as soon as water is available or when construction starts.  Installation

shall be in compliance with requirements of applicable codes and/or regulations established by public authorities having jurisdiction.

29.1.3    Contractor shall provide and maintain in working order during construction portable fire extinguishers, the number and locations of which shall be as required by applicable codes or the requirements of public authorities having jurisdiction.    In the absence of such requirements, Contractor shall provide not less than four (4) fire extinguishers conveniently located for proper protection for each 25,000 sq. ft. of floor area.  Fire extinguishers shall be either 2-1/2 gal. capacity water type gas cartridge expelled units or 5 gal. capacity pump type.  Extinguishers shall have the approval of Fire Underwriter's Laboratory and shall be inspected at regular intervals and recharged as necessary.  In areas of flammable liquids, asphalt or electrical hazards, extinguishers of the 15e lb. carbon dioxide type or 20-lb. dry chemical type shall be provided.

29.1.4    No open fires shall be permitted.

29.1.5    Only a reasonable working supply of flammable building material shall be located inside of, or on the roof of, the building(s) of the Project.

29.1.6    Tarpaulins used during the course of construction shall be of a flameproof type and secured in-place against damage or flapping from winds.

29.1.7    Oil-soaked rags, papers and other highly combustible materials shall be removed from the Project at the close of each day's work, and more often where necessary, and placed in metal containers with tight-hinged lids.

29.1.8    Gasoline, benzene or similar combustible materials, as well as flammable or waste materials subject to spontaneous combustion, shall not be poured into sewers, manholes or traps, but shall be safely disposed. Contractor shall make appropriate arrangements for storing these materials outside of the Project.

29.2    When public authorities or codes impose regulations relating to fire prevention and control, such regulations shall be considered as minimum requirements and not requirements in lieu of those set forth above.

## 30.    Environmental Control

30.1    All materials and work procedures used on the Project shall comply with all air pollution, water pollution and other environmental pollution control regulations in effect at the site of the Project.  Contractor shall be responsible for obtaining all necessary approvals and certification as to compliance of material and procedures.

30.2    Throughout the entire construction period, Contractor shall effectively dust-palliate the working area, unpaved roads used in the operations and involved portions of the site.  Such palliation shall include chemical treatment or intermittent watering and sprinkling of such frequency as will satisfactorily allay the dust at all times during construction.

## 31.    Miscellaneous

31.1    All notices and demands of any kind or nature which either party hereto may be required or desires to serve upon the other party hereto under the terms of the Agreement shall be in writing and shall be served upon such other party by personal service or by mailing a copy thereof by certified or registered mail, postage prepaid, with return receipt requested, or sending by overnight express courier, addressed to the party so to be served as follows:

If to Owner:                    Circuit City Stores, Inc.
                                9950 Mayland Drive
                                Richmond, VA 23233
                                Attn: Vice President - Construction


If to Contractor:
                                Schimenti Construction Company, LLC
                                118 North Bedford Road
                                Mount Kisco, NY 10549
                                Attn: Todd Gutrie


In case of service by mail, notice shall be deemed given, unless it is sooner received, at the expiration of the third (3rd) business day after the date of mailing. If by overnight delivery, notice shall be deemed given one (1) business day after sending. If by personal service, notice shall be deemed given when delivered. The addresses to which and the persons to whom notice and demand shall be delivered may be changed from time to time by notice served as hereinabove provided.

    31.2    Neither the rights nor the obligations of Contractor under the Agreement may be assigned or assumed by any other party except to the extent of duties assumed by subcontractors, and in any such case subject to the prior approval of Owner. In no event may Contractor assign any right to monies due or to become due to Contractor hereunder. The Agreement, and all warranties, guarantees and other obligations hereunder, may be assigned by Owner to any mortgagee, any affiliated entity, or any entity which now owns or hereafter may acquire the fee title to or leasehold interest in and to the property to which the Agreement relates.. Except as hereinabove specifically provided, the Agreement shall be binding upon and shall inure the benefit of the respective successors and assigns of the parties hereto.

    31.3    The Agreement and the other Contract Documents, as and when prepared and added hereto, shall constitute the entire agreement between the parties hereto with respect to the subject matter hereof, and supersede all prior agreements and understandings, including all correspondence, between the parties hereto with respect to the subject matter hereof, both oral and written.

    31.4    No provision of the Agreement may be waived, changed or modified, or the termination or discharge thereof agreed to or acknowledged orally, but only by an agreement in writing signed by the party against whom the enforcement of any such waiver, change, modification, termination or discharge is sought.

    31.5    The headings of the several paragraphs hereof are included herein solely for convenience of reference and are not intended to aid in the construction of or to govern the terms and provisions of this Agreement.

    31.6    The Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    31.7    The Contractor hereby agrees to execute any and all documents which may be reasonably requested by a construction or permanent lender, including the assignment of the Contract, in whole or in part, and the Contractor shall be bound thereby.

31.8    Notwithstanding anything in the Contract Documents to the contrary, the Owner shall have, at all reasonable times, the right to enter the Project for the purpose of conducting marketing activities and inspecting the Work.  The Contractor shall provide for such access.

31.9    The Agreement shall be governed and construed in accordance with the laws of the State of Virginia.

Initials:

Owner:

Contractor:

Schimenti Construction Company, LLC

Exhibit A
CIRCUIT CITY STORE #4133
NORTH PLAINFIELD, NJ
SCHIMENTI CONSTRUCTION COMPANY, LLC
MAY 5, 2008

PAGE 40

EXHIBIT~B

# DRAWING INDEX

*CMB*

| DWG. NO. | DWG. TITLE | REV. | DATE |
|---|---|---|---|
| ▣ T1.0 | TITLE SHEET | · | 3/26/08 · |

## STRUCTURAL

| | | | |
|---|---|---|---|
| ▣ S0.1 | GENERAL NOTES | · | 3/20/08 · |
| ▣ S0.2 | TYPICAL DETAILS | · | " · |
| ▣ S1.1 | FOUNDATION PLAN | · | " · |
| ▣ S1.2 | FOUNDATION DETAILS | · | " · |
| ▣ S2.1 | FRAMING PLAN | · | " · |
| ▣ S2.2 | FRAMING DETAILS | · | " · |
| ▣ S2.3 | FRAMING DETAILS | · | " · |

## ARCHITECTURAL

| | | | |
|---|---|---|---|
| ▣ A2.0 | LIFE SAFETY PLAN | · | 3/26/08 · |
| ▣ A2.1 | FLOOR PLAN | · | " · |
| ▣ A2.2 | FIXTURE PLAN (FOR REFERENCE ONLY) | · | 2/11/08 · |
| ▣ A2.3 | ROOF PLAN AND DETAILS | · | 3/26/08 · |
| ▣ A2.4 | ROOM FINISH SCHEDULE | · | " · |
| ▣ A2.5 | DOOR SCHEDULE AND DETAILS | · | " · |
| ▣ A2.6 | STOREFRONT DETAILS | · | " · |
| ▣ A2.7 | INTERIOR WINDOW DETAILS | · | " · |
| ▣ A3.1 | EXTERIOR ELEVATIONS | · | " · |
| ▣ A3.2 | WALL SECTIONS AND DETAILS | · | " · |
| ▣ A3.3 | VESTIBULE SECTION AND DETAILS | · | " · |
| ▣ A4.1 | ENLARGED PLANS AND ELEVATIONS | · | " · |
| ▣ A4.2 | MILLWORK, DETAILS AND SECTIONS | · | " · |
| ▣ A5.1 | INTERIOR ELEVATIONS | · | " · |
| ▣ A5.2 | INTERIOR ELEVATIONS | · | " · |
| ▣ A6.1 | REFLECTED CEILING PLAN | | " |

## MECHANICAL

| | | | |
|---|---|---|---|
| ▣ M1.0 | HVAC ROOF PLAN AND SCHEDULES | · | 3/26/08 · |
| ▣ M2.0 | HVAC FLOOR PLAN AND DETAILS | | " |

## PLUMBING

| | | | |
|---|---|---|---|
| ▣ P1.0 | PLUMBING PLAN | · | 3/26/08 · |
| ▣ P2.0 | PLUMBING SCHEDULES AND DETAILS | | " |

## ELECTRICAL

| | | | |
|---|---|---|---|
| ▣ E1.0 | LIGHTING PLAN AND DETAILS | · | 3/26/08 · |
| ▣ E2.0 | STS PLAN | · | " · |
| ▣ E3.0 | MISCELLANEOUS DETAILS | · | " · |
| ▣ E3.2 | POWER DETAILS | | " |
| ▣ E4.0 | POWER PLAN AND DETAILS | | " |
| ▣ E5.0 | ROUGH-IN PLAN AND DETAILS | | " |
| ▣ E5.1 | LIGHTING DIMENSION PLAN | | " |
| ▣ E6.0 | PANEL SCHEDULES AND RISER DIAGRAM | | " |
| ▣ E6.1 | PANEL ELEVATIONS AND SCHEDULES | | " |
| ▣ E7.0 | ELECTRICAL DETAILS | | " |
| ▣ E8.0 | MWS LIGHTING PLAN AND DETAILS | | " |
| ▣ E8.1 | AMP INNERGY POWER PLAN | · | " |
| ▣ E8.2 | AMP INNERGY POWER DETAILS | · | " |
| ☑ E3.1 | Stick Built STS Room | · | " |

## FIRE ALARM

| | | | |
|---|---|---|---|
| ▣ FA1.0 | FIRE ALARM INITIATING DEVICE LAYOUT | · | 3/7/08 · |
| ▣ FA2.0 | FIRE ALARM NOTOFICATION DEVICE LAYOUT | | " |
| ▣ FA3.0 | FIRE ALARM RISER DIAGRAMS AND NOTES | · | " |
| ▣ FA4.0 | FIRE ALARM CALCULATIONS AND DETAILS | · | " |

EXHIBIT B-1

**Circuit City**
1200 US Highway 22
North Plainfield, NJ



**Schimenti**
Construction Company

## Qualifications & Exclusions

✓1  All work to be done using Union labor.
✓2  Work figured using a 15 week ACTIVE job schedule. Super figured to be on-site thru Grand opening
✓3  All work to be performed during normal business hours.
✓4  Removal of any and all hazardous material is excluded.
✓5  All work figured using plans dated 3/26/08 by SBLM Architects.
✓6  Any work related to concealed conditions at the time of this bid proposal is excluded.
✓7  Price is valid for (30) days from the date of the sumbitted proposal, after which time, pricing
     will be subject to all applicable labor and material increases.
— 8  Any and all engineering fees are excluded. NEED ENG. SHOPS - STEEL STUDS - CANOPY / TOWER. (EXHIBIT B-3)
✓9  Any additional work needed to satisfy the local building officials to obtain the CO is excluded.
✓10 Obtaining and paying for the general building permit is excluded.
✓11 Consequential damages for delays are excluded.
✓12 Tap fees and road openings permits/fees are excluded.
✓13 All communications and CATV wiring are excluded.
✓14 OCP insurance is excluded.
✓15 Payment and performance bonds are excluded.
✓16 We reserve the right to negotiate price, scope and quality of work with each of our subcontractors
     and suppliers, but no such negotiation or resulting modification will change or modify our
     agreement with you with respect to the price, scope, or quality other than to insure the full scope
     of the contract documents, and the highest quality for your project.
✓17 Fire watch is not included.
✓18 Dewatering is not included.
✓19 All Loading Dock equipment is excluded.
— 20 Rock excavation is excluded.
✓21 All plumbing fixtures are figured to be provided by Circuit City.
✓23 All steel structural and misc. is to be supplied by Circuit City.
✓24 All Flooring Except Ceramic Tile is excluded.
✓25 All Fire Alarm work is Excluded
— 26 All Sprinkler work is excluded. — DEMO IS INCLUDED
✓27 Fixture contractor is supplying their own labor.
✓28 We exclude all work to be by Landlord on the plans.
— 29 We exclude all floor prep , it will be done by the Circuit City Flooring contractor. — ALLOWANCE
— 30 All landlord requirements are excluded due to the fact that they would not respond to our e-mails and phone calls .
✓31 Power is assumed to be in the Existing CT cabinet attached top the building .
✓32 The trench drain at the compactor pad is excluded, due to no details or a note stating who's responsibility it is.

— RFI's 1-13 INCLUDED
— TRENCH DRAIN @ COMPACTOR / LOADING DOCK - EXISTING, GC TO PRESERVE
   AND DO THEIR WORK TO SUPPORT & INCLUDE IN FINAL WORK.
— DEMISING WALL @ COL LINE 4 - TYPE 3D WALL - INCLUDED IN BID.
— CONC. SLAB IN WAREHOUSE - INCLUDED
— LL ROOFER - INCLUDED
— HC RAMP @ NEW ENTRANCE - SEE EXHIBIT B-3



**EXHIBIT B-2**
**North Plainfield, NJ, #4133**
April 9, 2008
**PRE-BID MEETING Minutes**

**Attendees:**
- **Patrick Cartolano (Schimenti Construction)**
- **Robert Burke (RIV Construction)**
- **Carmine Caruso (RIV Construction)**
- **Allan Kleinman (B.R Fries Constructors)**
- **Don DeWitt (Site Developer, Jayeff Construction)**

1) Please read the Invitation to Bid e-mail carefully and print its contents for use by all parties in preparing the bid. It contains up-to-the-minute revisions to the bids for this project. The first paragraph "Note" states that information contained in the Invitation supercedes direction to the contrary found in the plans and specifications and can only be countermanded by direction from Circuit City (NOT from the architect).

2) Bidders are to make sure that they are able to access Expesite and successfully make entries on their bid form. In addition to the bid form, Do NOT wait until bid day to start entering information on the bid form. Contact Dave Bennett at 804-527-4000  ext 2410 if you are experiencing difficulty.

3) The general contractor is to use the RFI system during bidding. This is the only way of getting questions answered in a timely fashion for all bidders. Please limit the number of questions to one per RFI unless they are related to the same topic. Check the RFIs regularly and frequently as bid day approaches. RFI's should be submitted to Mahmood Dulu.

4) Drawings have been submitted for the building permit. Once the permit is ready the successful GC will pick up the permit and Circuit City will reimburse the direct cost of the permit.

5) Material Allowances : No longer used. See FBO listings on Drawing T1.0 and elsewhere. Do not include Allowances in your bid.

6) Alternates – When directed to provide alternates, include your responses in Exhibit B-1 of the Bid Form.

7) Please be aware of the "Task" box on the drawings Title Sheet T1.1. This table lists the GENERAL division of responsibility for the project. Specific details about utilities may significantly differ (ie: electrical should always be bid per sheet E6.0) Do not qualify your bid "Utilities to 5' out" as this is almost always incorrect.

8) **NOTE:** It is the responsibility of the General Contractor to take weather conditions into account when bidding this project. All costs for weather protection and conditions are to be included in the base bid. Please refer to the Contract and General Conditions, Exhibit A, which are included in the project specifications for exceptions.

9)   If the Project is "Pad Ready":  N/A

**\*\*\* OR \*\*\***

10) Project is Full Site:
    i)    All sitework is the responsibility of the General Contractor.
    ii)   Temporary utilities are the responsibility of the GC.
    iii)  Electrical should be bid per E6.0
    iv)  Phone and Cable to be bid per the drawings
    v)   Domestic Water to be bid per the drawings
    vi)  Existing Fire Riser
    vii) Gas Service to be bid per the drawings
    viii) GC responsible to tie into existing Sanitary

11) Circuit City has implemented a Furnished By Owner (FBO) program.  Refer to drawing T1.0 and others for the FBO listings.

12) The GC's superintendent is to remain on-site through Grand Opening.(Add two (2) weeks from project Turnover Date).

13) The Electrician's foreman is to be on site for the day of Grand Opening.

14) The GC is to include final cleaning of all store fixtures, including shelving, countertops and glass.  This is to be completed during the final week of turnover.

15) The General Contractor is to provide 300 sheets of 1/8" single-tempered Masonite hardboard material for use in floor protection.  The GC is responsible for installing the floor protection boards (including providing duct tape), maintaining floor protection at all times, and final removal.  The GC is to include one additional removal and installation of the floor protection boards in their bid.  No lifts or other construction traffic are to be permitted on unprotected finished floors at any time.

16) Include as-built survey:   As soon as the exterior walls are complete provide as-built survey of the building footprint.  Standard calculations are from the middle of each demising wall and from outside wall to outside wall front to back.  If we are an end cap or stand alone building, all walls are measured outside to outside.  The square footage of the vestibule should be included.  Provide drawing (3 copies) showing the footprint, actual dimensions and calculations, stamped and signed (with wet seal) by a registered surveyor or civil engineer.  This drawing must be scanned and uploaded to Expesite, with notification to Sara Snelson, Construction Manager and Tom Drapac.

17) It is the General Contractor's responsibility to coordinate with Circuit City's sign installer to insure that the blocking and surfaces to receive exterior signs are ready by the date shown on the contract in order for them to have the signs installed by the Ready for Fixtures date.  This includes coordinating construction in the areas where the sign installer will have to mobilize their equipment in order to do the install and to have the electrician available to make final connections.  GC must post photographic evidence on Expesite that the blocking has been installed.  Notify Construction Manager, Dana Franson, Tom Drapac.

18) It is the responsibility of the General Contractor to coordinate with gas, power, water, sewer and communication utilities to ensure that all work is completed and that all services, including meters,  are available and operating when needed.  The General Contractor shall notify Circuit City of any Impact Fees, Meter Fees or Utility Connection Fees needed to facilitate timely utility service or may pay these fees directly and submit detailed invoices to Circuit City for reimbursement.

19) Spec Section 02282 - Termite Control.  DO NOT include termite treatment (soil poisoning) in your bid UNLESS required by law.

20) Include two (2) Painters ten (10) hours each for one (1) day to touch up paint following Merchandising and prior to Grand Opening, as scheduled with the Store Director.

21) Include treated 2x4 continuous wood base at all Warehouse drywall partitions.

22) Include usage costs for Temporary Utilities.  Make application for and coordinate installation of Permanent Utilities. Include all permanent utility costs through Turnover Date in your bid. All utilities will be opened by the GC in their own name and will be transferred into CC's name on Turnover.  CC will not pay permanent utility consumption costs incurred prior to Turnover Date.

23) Circuit City will reimburse the General Contractor for the General Building Permit Fee. All other Permit Fees, i.e. Mechanical, Plumbing, Electrical, etc., are to be included in the bid.

24) Do not include any impact fees, meter fees, and connection fees imposed by local or state jurisdictions in your bid.  CC will reimburse these costs.

25) The bidders are to include the cost of Permits for Construction Trailers and "Coming Soon" signs in their bid.

26) Other Instructions:

   a)  Closeouts are to be posted to Expesite (Red Lined As-Builts and Manuals) – No hard copies unless needed by the Landlord for TIA Reimbursement.

   b)  Project is to be bid – Union Labor

   c)  Landlord Contact is Dick Wise(Vornado) at 201-587-1000.

   d)  Provide Weekly Cost for General Conditions in your Qualifications.

   e)  Provide Weekly Cost for Superintendent in your Qualifications.

   f)  Provide a list of any special taxes required in the location.

   g)  GC is responsible to unload all FBO items.

   h)  Landlord's Roofer is to used for GC's work (Conti Roofing).

   i)  Review the Exhibit A items such as Staging area, Trailer location, fencing needed, etc.

   j)  GC responsible for security mesh in framed demise wall separating CCSI and adjacent space.  Wall type to be supplied in RFI

   k)  GC responsible to prep the floor which includes old floor finish removal, mastic removal, grind and bead blast the floor, and fill any voids.

   l)  GC is responsible to demo the existing sprinkler system piping throughout the building back to the Riser.

m) Please note the Construction Duration is being extended by 2 weeks from 92 to 106 days

from Start of Construction to Turnover.  Therefore, please note the following date

changes:

   a.  Start of Construction – 5/5/08

   b.  Available to start of Store Fixtures – 7/28/08

   c.  Ready for Exterior Sign Installation – 7/14/08

   d.  Available for start of Warehouse Racking – 7/21/08

   e.  Ready for Telephone Equipment Room Installation – 7/14/08

   f.  Ready for Novar/Entec Startup – 7/28/08

   g.  Flextray Installation Complete – 7/7/08

   h.  Fixturing Complete/Certificate of Occupancy – 8/14/08

   i.  Ready for Turnover to Merchandising/Punchlist Complete/Substantial Completion

     – 8/19/08

n)

Exhibit B-3



**"Todd Gutrie"**
**<TGutrie@Schimenti.com>**

04/25/2008 03:18 PM

To  <Carl_Brandt@circuitcity.com>

cc  "Patrick Cartolano" <PCartolano@Schimenti.com>

bcc

Subject  CC-North Plainfield, NJ

ADDITIONAL PRICING & CLARIFICATIONS

Carl,

Please adjust our bid as follows:

1. Please ADD $3,900.00 to concrete for the addition of the concrete ramp
2. Please ADD $2,000.00 to Drywall for engineered shop drawings for the front canopy.

Thank you.

Case 08-35653-KRH    Doc 7363    Filed 04/30/10    Entered 04/30/10 17:32:39    Desc Main
Date: 5/5/2008 10:41 AM                Document        Page 64 of 94

EXHIBIT D

CIRCUIT CITY STORES, INC.        4133 -- 1200 US Highway 22, Nor        Schimenti Construction Company, LLC

## SECTION 0300

## BID PROPOSAL FORM

TO:    Circuit City Stores, Inc. herein called "Owner".

1.    Pursuant to and in compliance with the Invitation to bid and the proposed contract documents relating to the costruction of:

**CIRCUIT CITY STORES, INC.** ___4133___      ___1200 US Highway 22, North Plainf___

The undersigned, having become thoroughly familiar with the terms and conditions of the proposed Contract Documents and with local conditions affecting the performance and costs of the work at the place where the work is to be completed, and having fully inspected the site in all particulars, hereby proposes and agrees to fully perform the work within the time stated and in strict accordance with the proposed Contract Documents, including furnishing any and all labor and materials, and do all the work required to construct and complete said work in accordance with the Contract Documents, for the following sum of money:

Base Bid:   For all labor and materials, services, and equipment necessary for the completion of the work shown on the drawings, the written specifications, and:

|  |  |
|---|---|
| Addenda No. _____ | Dated _____ |
| Addenda No. _____ | Dated _____ |
| Addenda No. _____ | Dated _____ |
| Addenda No. _____ | Dated _____ |
| Addenda No. _____ | Dated _____ |

for the sum of:  As stated on the attached Bid Breakdown

2.    Should the undersigned be required to perform work over and above that required by the Contract Documents, or should he be ordered to omit work required by the Contract Documents, he will be paid extra or credit Owner, as the case may be, on the basis of unit prices quoted herein, price quoted being sum total compensation payable or creditable for such items or work.

UNIT PRICING

| DESCRIPTION OF WORK | EXTRA | CREDIT |
|---|---|---|
| Reinforcing Steel in footings, grade beams, retaining walls and foundation walls, in place, per ton | $ 1,500.00 | $ 1,500.00 |
| Concrete Footings, Earth Formed, in place per cy | $ 1,000.00 | $ 1,000.00 |
| Concrete Footings Formed, in place, per cy | $ 1,500.00 | $ 1,500.00 |
| Concrete Foundation Walls, in place, per cy | $ 1,500.00 | $ 1,500.00 |
| Concrete Retaining Walls, in place, per cy | $ 1,500.00 | $ 1,500.00 |
| CMU Foundation Walls, in place, per sf | $ 25.00 | $ 25.00 |

Bid Proposal Form:

Earthwork Unit Price Definitions:  Excavation includes removal processes, loading, hauling, and disposal.  Unsuitable material is existing material (Not hazardous material), found to be incapable of supporting design loading.  Borrow material is defined as material provided from off-site sources.  Borrow material includes purchase of material, transportation, spreading and compaction to specifications.

| | | |
|---|---|---|
| Bulk Rock Excavation, (ripped), per cy | $ _____ | $ _____ |
| Bulk Rock Excavation, (blasted), per cy | $ _____ | $ _____ |
| Trench Rock Excavation (machine), per cy | $ _____ | $ _____ |
| Trench Rock Excavation (blasted), per cy | $ _____ | $ _____ |
| Hand Rock Removal, per cy | $ _____ | $ _____ |
| Bulk Earth Excavation, per cy | $ _____ | $ _____ |
| Unsuitable Material Excavation (More than 100cy), per cy | $ _____ | $ _____ |
| Trench Earth Excavation, per cy | $ _____ | $ _____ |
| Hand Earth Excavation, per cy | $ _____ | $ _____ |
| Borrow Structural Fill Compacted, in place, per cy | $ _____ | $ _____ |
| Mirafi (or Equal) Soil Fabric, in place, per sy | $ _____ | $ _____ |
| Additional Topsoil in Place, per cy | $ _____ | $ _____ |
| _____ | $ _____ | $ _____ |
| _____ | $ _____ | $ _____ |
| _____ | $ _____ | $ _____ |
| _____ | $ _____ | $ _____ |

| | | | |
|---|---|---|---|
| Fire extinguishers (per unit installed cost) to add to or deduct from units or allowance specified by local authorities. (List unit price for each type) | Type A | $   150.00 | $   150.00 |
| | Type B | $   200.00 | $   200.00 |
| | Type C | $   250.00 | $   250.00 |

3.    ADDITIONAL WORK PERFORMED ON A TIME & MATERIAL BASIS

A. ELECTRICAL

| | | |
|---|---|---|
| Foreman hourly rate, including mark-up | $   130.00 | $   130.00 |
| Journeyman hourly rate, including mark-up | $   125.00 | $   125.00 |
| Apprentice hourly rate, including mark-up | $   125.00 | $   125.00 |
| Material Mark-up (Not to exceed 15%) | 15.00% | 15.00% |

B. MECHANICAL (HVAC)

| | | |
|---|---|---|
| Foreman hourly rate, including mark-up | $   150.00 | $   150.00 |
| Journeyman hourly rate, including mark-up | $   140.00 | $   140.00 |
| Apprentice hourly rate, including mark-up | $   140.00 | $   140.00 |
| Material Mark-up (Not to exceed 15%) | 15.00% | 15.00% |

C. MECHANICAL (PLUMBING)

Foreman hourly rate, including mark-up                 $    125.00        $    125.00
Journeyman hourly rate, including mark-up              $    120.00        $    120.00
Apprentice hourly rate, including mark-up              $    120.00        $    120.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

D. <u>FIRE SPRINKLERS</u>
Foreman hourly rate, including mark-up                 $    210.00        $    210.00
Journeyman hourly rate, including mark-up              $    210.00        $    210.00
Apprentice hourly rate, including mark-up              $    210.00        $    210.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

E. <u>CARPENTRY (Drywall Framing)</u>
Foreman hourly rate, including mark-up                 $    130.00        $    130.00
Journeyman hourly rate, including mark-up              $    125.00        $    125.00
Apprentice hourly rate, including mark-up              $    125.00        $    125.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

F. <u>CARPENTRY (Millwork)</u>
Foreman hourly rate, including mark-up                 $    130.00        $    130.00
Journeyman hourly rate, including mark-up              $    125.00        $    125.00
Apprentice hourly rate, including mark-up              $    125.00        $    125.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

G. <u>Carpentry (Forming)</u>
Foreman hourly rate, including mark-up                 $    130.00        $    130.00
Journeyman hourly rate, including mark-up              $    125.00        $    125.00
Apprentice hourly rate, including mark-up              $    125.00        $    125.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

H. <u>PAINTING</u>
Foreman hourly rate, including mark-up                 $    100.00        $    100.00
Journeyman hourly rate, including mark-up              $     85.00        $     85.00
Apprentice hourly rate, including mark-up              $     85.00        $     85.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

I. <u>VINYL WALL COVERING</u>
Foreman hourly rate, including mark-up                 $    100.00        $    100.00
Journeyman hourly rate, including mark-up              $     85.00        $     85.00
Apprentice hourly rate, including mark-up              $     85.00        $     85.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

J. <u>FLOORING</u>
Foreman hourly rate, including mark-up                 $    115.00        $    115.00
Journeyman hourly rate, including mark-up              $    110.00        $    110.00
Apprentice hourly rate, including mark-up              $    110.00        $    110.00
Material Mark-up (Not to exceed 15%)                        15.00%             15.00%

K. ACOUSTICAL CEILING

Bid Proposal Form:                                                      Page 3
                                                                       04/03/2007

| | | |
|---|---|---|
| Foreman hourly rate, including mark-up | $ 130.00 | $ 130.00 |
| Journeyman hourly rate, including mark-up | $ 125.00 | $ 125.00 |
| Apprentice hourly rate, including mark-up | $ 125.00 | $ 125.00 |
| Material Mark-up (Not to exceed 15%) | 15.00% | 15.00% |

L. GENERAL LABOR

| | | |
|---|---|---|
| Labor Foreman hourly rate, including mark-up | $ 85.00 | $ 85.00 |
| Laborer hourly rate, including mark-up | $ 80.00 | $ 80.00 |

M. GENERAL CONTRACTOR

Overhead and profit mark-up on work performed additional to Contract Plans and Specifications, but not to exceed 7%.

(GMAX Proposals - This percentage must match the accepted Fee)

Combined Overhead & Profit (not to exceed 7%):                    7.0%

N. Labor Burden Mark-up on labor only for performed in addition to Contract Drawings and Specifications, by the General Contractor's own forces.  Detailed backup information will be required.

Total Labor Burden Markup-up (breakdown in Exhibit J):    _____

4    I understand that the Owner reserves the  right to reject any and/or all bids, but that this bid shall remain open and not be withdrawn for a period of thirty (30) days from the date prescribed for its opening.  I also understand that the bidders shall not be entitled to any compensation from the owner for expenses involved in bidding the work

5.    I understand that the project construction schedule shall be established so as to provide Owner with beneficial occupancy in order to commence his use according to the following milestone dates.

| | | |
|---|---|---|
| | Letter of Intent/Notice to Proceed issued by: | _____ |
| A. | Start Of Construction: | 5/5/2008 |
| B. | Available for Start of Store Fixturing: | 7/14/2008 |
| C. | Ready For Exterior Sign Installation: | 6/30/2008 |
| D. | Available for Start of Warehouse Racking: | 7/7/2008 |
| E. | Readt for Telephone Equipment Room Installation: | 6/30/2008 |
| F. | Ready for NOVAR/Entec Startup: | 7/14/2008 |
| G. | Flextray Installation Complete: | 6/23/2008 |
| H. | Fixturing Complete - Certificate of Occupancy: | 7/31/2008 |
| I. | Ready for Turnover to Merchandising - Punchlist Complete - Substantial Completion | 8/5/2008 |

6.    If written notice of acceptance of this bid is mailed or delivered to the undersigned within thirty (30) days after the date set for the opening of this bid, or at any other time thereafter before it is withdrawn, the undersigned will execute and deliver the Contract Documents to the Owner in accordance with this bid as accepted, and will also furnish and deliver to the Owner the Performance Bond, Labor and Material Payment Bond, if required, and proof of insurance coverage, all within fifteen (15) days after personal delivery or after deposit in the mails of the notification of acceptance of this bid.

7.    Notice of acceptance, or request for additional information, may be addressed to the undersigned at the address set forth below.

8.    The names of all persons interested in the foregoing bid as principles are:

Matthew C Schimenti

**(IMPORTANT NOTICE**: If Bidder, or other interested person is a corporation, give legal name of corporation, state where incorporated, and names of president, and secretary; If a partnership, give name of firm and names of all individual co-partners composing the firm; if bidder or other interested person is an individual, give first and last name in full).

Licensed in accordance with an act for the registration of Contractors, and with license number:

SIGN HERE:

**NOTE**:  If bidder is a corporation, set forth the legal name of the corporation together with the signature of the officer or officers authorized to sign contracts on behalf of the corporation.   If bidder is a partnership, set forth the name of the firm together with the signature of  the partner or partners authorized to sign contracts on behalf of the partnership.

| | |
|---|---|
| Business Address: | 118 North Bedford Road |
| City, State, Zip: | Mount Kisco, NY  10549 |
| Telephone Number: | 914-244-9100              Fax Number:      914-244-9130 |
| E-Mail Address: | |
| Date Of Proposal: | April 17, 2008 |

| | |
|---|---|
| CONTRACTORS NAME: | Schimenti Construction Company, LLC |
| CONTRACTORS ADDRESS: | 118 North Bedford Road |
| CONTRACTORS CITY, STATE, ZIP: | Mount Kisco, NY  10549 |

END OF SECTION

Date: 5/5/2008 10:41 AM

## ALTERNATES

A.   <u>GENERAL</u>

        Alternate(s) listed below are for the purpose of modifying the requirements and/or Drawings.  All work affected by such alternate(s) shall be performed in strict accordance with the Construction Documents.  The "amount" ADD or DEDUCT, stated below for each alternate shall be the net adjustment to Base Bid should the Owner elect to include it in the Contract.  Owner reserves the right to accept or reject any or all alternates without invalidating the Base Bid.  Contractor agrees to modify his proposal to include, at Owner's option, Alternates, if any, negotiated before execution of the Agreement.

B.   <u>DESCRIPTION OF ALTERNATES</u>

1.          When awarded the Contract, a bond may be required by the Owner.  Contractor shall, within ten calendar days after signing of the Contract, deliver satisfactory payment and performance bonds in a form acceptable to the Owner and in an amount equal to one hundred percent (100%) of the contract sum.  The amount indicated below will be added to the contract amount by establishing an allowance. The contractor will provide the actual invoice to adjust this allowance by change order. Circuit City will pay only the actual direct cost of these bonds. Such bonds, at the Owner's option, may be secured and paid for separately by the Owner.

        a.       The above signed hereby states that the premium cost of such bond, if such bond is secured and paid for the above signed, will be an amount equal to: ___1.5_ % of the contract sum.

        b.       If a bond is required, no work shall commence until such bond is recorded with the county recorders office.
ADD: $ _____  $19,410.00

BONDING COMPANY'S NAME: _____
ADDRESS: _____
CITY, STATE ZIP: _____
PHONE: _____
FAX: _____
CONTACT PERSON: _____

ALLOWANCES - Bidders are advised that mark up for profit and overhead for allowances should be included in their base bid, no adjustment for profit and overhead will be allowed in change orders that net out allowances. See Article 5.3 of General Conditions.

1.          Add to the construction base bid, the following allowances (per the Invitation to Bid):

        There are NO allowances identified for this project.  All items previously sourced via allowances are now covered by the FBO Program.

        These allowances include freight only and do not include state and local sales taxes.  The contractor shall purchase and install the equipment in accordance with Circuit City Store, Inc., instructions.  Contractor shall be compensated by Circuit City for any additional monies used to purchase equipment and the contractor shall reimburse Circuit City for any allowance not used in the purchase of the equipment.  NOTE: These allowances do not include site lighting.

        Profit and overhead will not be considered if the final cost is less than or greater than the allowance.

Date: 5/5/2008 10:41 AM

## INSPECTIONS

1.    Inspections on or about the date of substantial completion to determine the completion of the work and conformance of the work to the drawings and specifications.  Written reports of deficiencies will be incorporated into a consolidated punchlist to be issued by Circuit City.

2.    Inspections will include, but not be limited to:  Roofing, plumbing, HVAC, HVAC controls, and electrical.

3.    Circuit City will pay the cost of the initial inspection and one following-up "back-check" inspection.  The Contractor shall correct deficiencies in a reasonable amount of time and notify Circuit City to schedule a back-check inspection.

4.    If deficiencies are not corrected and in Circuit City's opinion additional back-check inspections are required beyond the first back-check inspection referenced above, the cost of such additional inspections (including travel, testing and preparation of reports) will be deducted from amounts owed to the Contractor.

| | |
|---|---|
| CONTRACTORS NAME: | Schimenti Construction Company, LLC |
| ADDRESS: | 118 North Bedford Road |
| | Mount Kisco, NY  10549 |
| PHONE NO. | 914-244-9100 |
| FAX NO. | 914-244-9104 |
| BID SUBMITTED BY: | Patrick Cartolano |

END OF SECTION

Bid Proposal Form:

Date: 5/5/2008 10:41 AM

SECTION 00450
SUBCONTRACTOR LIST

Project Number:    4133                          Project Name: 1200 US Highway 22, North Plainfie

Contractor: Schimenti Construction Company,

| SUB-CONTRACTOR | NAME |
|---|---|
| Demolition | B&A Demolition |
| Asbestos Removal (If Required) | |
| Grading | |
| Paving | |
| Concrete | Precision Concrete |
| Masonry | Precision Concrete |
| Steel | Kryton Iron |
| Woodwork (Cabinets) | |
| Roofing (EPDM) | Conti |
| Metal Batten Roofing | |
| Automatic Doors | |
| Storefronts, Glass & Glazing | Standard Glass |
| EIFS | European Stucco |
| Studs & Drywall | Avon |
| Ceilings | Avon |
| Flooring: | |
|    Ceramic Tile | Precision Flooring |
|    Resilient | |
|    Solid Vinyl Tile | |
|    Carpet | |
| Painting | PR Painting |
| Plumbing | Competitive Plumbing |
| Sprinkler | |
| HVAC | Nasco |
| Electrical | AJ Maglio |

**END OF SECTION**

Bid Proposal Form:

## Bid Breakdown

Part of Exhibit D

**Bidder:** Todd Gutrie - Schimenti Construction

**Bid Package Name:** 4133 - Construction Contract

**Status:** Submitted

**Submitted Date:** 4/17/2008 3:57 PM EST

**Due:** 4/17/2008 4:00:00 PM EST

**Qualifications and Exceptions:** See Exhibit B-1

| Line Item Number | Total | Total | Total |
|---|---|---|---|
| ⊟DIVISION 1 - GENERAL C | $197,547.00 | $197,547.00 | $197,547.00 |
| 1005 -- General Conditions | $136,500.00 | $136,500.00 | $136,500.00 |
| 1010 -- Overhead & Profit (I | $61,047.00 | $61,047.00 | $61,047.00 |
| ⊟DIVISION 2 -- SITEWORK | $14,500.00 | $14,500.00 | $14,500.00 |
| 2010 -- Site Clearing & Ero: | $0.00 | $0.00 | $0.00 |
| 2020 -- Demolition | $14,500.00 | $14,500.00 | $14,500.00 |
| 2030 -- Excavation & Gradi | $0.00 | $0.00 | $0.00 |
| 2040 -- Site Storm Drainag | $0.00 | $0.00 | $0.00 |
| 2050 -- Site Utilitites | $0.00 | $0.00 | $0.00 |
| 2060 -- Concrete Walks | $0.00 | $0.00 | $0.00 |
| 2070 -- Precast Bollards | $0.00 | $0.00 | $0.00 |
| 2080 -- Site Retaining Walls | $0.00 | $0.00 | $0.00 |
| 2090 -- Curb & Gutter and E | $0.00 | $0.00 | $0.00 |
| 2100 -- Concrete Paving | $0.00 | $0.00 | $0.00 |
| 2110 -- Asphalt Paving & S | $0.00 | $0.00 | $0.00 |
| 2120 -- Exterior Fencing | $0.00 | $0.00 | $0.00 |
| 2130 -- Landscaping & Irrig | $0.00 | $0.00 | $0.00 |
| 2140 -- Site Lighting from 5 | $0.00 | $0.00 | $0.00 |
| 2999 -- Sitework Other | $0.00 | $0.00 | $0.00 |
| ⊟DIVISION 3 -- CONCRETE | $60,000.00 | $60,000.00 | $60,000.00 |
| 3010 -- Concrete Foundatic | $0.00 | $0.00 | $0.00 |
| 3020 -- Concrete Slab | $60,000.00 | $60,000.00 | $60,000.00 |
| 3030 -- Concrete Sidewalks | $0.00 | $0.00 | $0.00 |
| 3060 -- Building Excavatior | $0.00 | $0.00 | $0.00 |
| 3070 -- Tilt Wall Panels | $0.00 | $0.00 | $0.00 |
| 3999 -- Concrete Other | $0.00 | $0.00 | $0.00 |
| ⊟DIVISION 4 -- MASONRY | $52,650.00 | $52,650.00 | $52,650.00 |
| 4050 -- Unit Masonry | $52,650.00 | $52,650.00 | $52,650.00 |
| 4999 -- Masonry - Other | $0.00 | $0.00 | $0.00 |
| ⊟DIVISION 5 -- METALS | $90,000.00 | $90,000.00 | $90,000.00 |
| 5010 -- Structural Metal | $0.00 | $0.00 | $0.00 |
| 5020 -- Misc. & Ornamental | $0.00 | $0.00 | $0.00 |
| 5999 -- Metals - Other | $90,000.00 | $90,000.00 | $90,000.00 |
| ⊟DIVISION 6 -- ROUGH CA | $26,832.00 | $26,832.00 | $26,832.00 |
| 6010 -- Rough Carpentry | $19,500.00 | $19,500.00 | $19,500.00 |
| 6020 -- Finish Carpentry | $0.00 | $0.00 | $0.00 |
| 6030 -- Millwork | $7,332.00 | $7,332.00 | $7,332.00 |
| 6999 -- Carpentry Other | $0.00 | $0.00 | $0.00 |
| ⊟DIVISION 7 -- MOISTURE | $105,500.00 | $105,500.00 | $105,500.00 |
| 7010 -- Waterproofing | $0.00 | $0.00 | $0.00 |
| 7020 -- Building Insulation | $0.00 | $0.00 | $0.00 |
| 7040 -- Sheetmetal Work | $0.00 | $0.00 | $0.00 |
| 7050 -- Roofing & Roof Insi | $105,000.00 | $105,000.00 | $105,000.00 |
| 7055 -- Exterior Metals | $0.00 | $0.00 | $0.00 |
| 7060 -- Roof Accessories | $0.00 | $0.00 | $0.00 |
| 7070 -- Caulking & Sealant: | $500.00 | $500.00 | $500.00 |

**Bid Breakdown**

Part of Exhibit D

| | | | |
|---|---|---|---|
| 7999 -- Moisture Control - ( | $0.00 | $0.00 | $0.00 |
| DIVISION 8 -- DOORS WII | $42,000.00 | $42,000.00 | $42,000.00 |
| 8010 -- Steel Doors and Fra | $0.00 | $0.00 | $0.00 |
| 8020 -- Wood & Plastic Doc | $0.00 | $0.00 | $0.00 |
| 8030 -- Impact Doors | $0.00 | $0.00 | $0.00 |
| 8040 -- Overhead Doors | $0.00 | $0.00 | $0.00 |
| 8050 -- Entrance & Store Fr | $42,000.00 | $42,000.00 | $42,000.00 |
| 8060 -- Security Gates | $0.00 | $0.00 | $0.00 |
| 8070 -- Finish Hardware | $0.00 | $0.00 | $0.00 |
| 8080 -- Glass & Glazing | $0.00 | $0.00 | $0.00 |
| 8090 -- Fire Doors | $0.00 | $0.00 | $0.00 |
| 8999 -- Doors, Windows & ( | $0.00 | $0.00 | $0.00 |
| DIVISION 9 -- FINISHES | $248,600.00 | $248,600.00 | $248,600.00 |
| 9010 -- Lath, Plaster & EIFS | $49,900.00 | $49,900.00 | $49,900.00 |
| 9020 -- Stud & Drywall | $157,000.00 | $157,000.00 | $157,000.00 |
| 9030 -- Ceramic Tile | $4,200.00 | $4,200.00 | $4,200.00 |
| 9040 -- Acoustical Ceilings | $6,500.00 | $6,500.00 | $6,500.00 |
| 9050 -- Carpet | $0.00 | $0.00 | $0.00 |
| 9060 -- Resilent Flooring | $0.00 | $0.00 | $0.00 |
| 9070 -- Sheet Vinyl Flooring | $0.00 | $0.00 | $0.00 |
| 9080 -- Rubber Flooring | $0.00 | $0.00 | $0.00 |
| 9090 -- Painting/Wall Cover | $31,000.00 | $31,000.00 | $31,000.00 |
| 9100 -- Marlite Panels (FRP | $0.00 | $0.00 | $0.00 |
| 9999 -- Finishes Other | $0.00 | $0.00 | $0.00 |
| DIVISION 10 -- SPECIALT | $7,360.00 | $7,360.00 | $7,360.00 |
| 10010 -- Toilet Partitions | $1,600.00 | $1,600.00 | $1,600.00 |
| 10020 -- Interior Signage | $0.00 | $0.00 | $0.00 |
| 10030 -- Fire Extinguishers | $0.00 | $0.00 | $0.00 |
| 10040 -- Toilet Accessories | $1,300.00 | $1,300.00 | $1,300.00 |
| 10070 -- Rolling Conveyor | $0.00 | $0.00 | $0.00 |
| 10080 -- Lockers | $0.00 | $0.00 | $0.00 |
| 10999 -- Specialties - Other | $4,460.00 | $4,460.00 | $4,460.00 |
| DIVISION 11 -- EQUIPMEI | $0.00 | $0.00 | $0.00 |
| 11010 -- Miscellaneous Equ | $0.00 | $0.00 | $0.00 |
| 11020 -- Loading Dock Equ | $0.00 | $0.00 | $0.00 |
| 11030 -- Elevators/Lifts | $0.00 | $0.00 | $0.00 |
| DIVISION 12 -- FURNISHI | $0.00 | $0.00 | $0.00 |
| 12010 -- Window Treatmen | $0.00 | $0.00 | $0.00 |
| 12020 -- Coat Rack | $0.00 | $0.00 | $0.00 |
| 12030 -- Floor Mats | $0.00 | $0.00 | $0.00 |
| DIVISION 15 -- MECHANI | $134,011.00 | $134,011.00 | $134,011.00 |
| 15010 -- Plumbing | $72,011.00 | $72,011.00 | $72,011.00 |
| 15020 -- Fire Protection | $0.00 | $0.00 | $0.00 |
| 15030 -- HVAC | $62,000.00 | $62,000.00 | $62,000.00 |
| DIVISION 16 -- ELECTRIC | $315,000.00 | $315,000.00 | $315,000.00 |
| 16090 -- Electrical | $315,000.00 | $315,000.00 | $315,000.00 |
| TOTAL: | $1,294,000.00 | $1,294,000.00 | $1,294,000.00 |

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
05/08/2008

| | |
|---|---|
| **PRODUCER** (203)336-6302    FAX (203)368-1940<br>Kesten-Brown Insurance, LLC<br>535 Clinton Ave<br>Bridgeport, CT 06605 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| **INSURED** Schimenti Construction Company, LLC<br>118 North Bedford Road<br>Mount Kisco, NY 10549 | **INSURERS AFFORDING COVERAGE** | **NAIC #** |
|---|---|---|
| | INSURER A: The Phoenix Ins. Co. | 25623 |
| | INSURER B: Travelers P&C of America | 25674 |
| | INSURER C: Everest National Insurance Co. | 10120 |
| | INSURER D: Travelers Casualty & Surety Co. | 19038 |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS MADE [X] OCCUR | DT-CO-9164B087-PHX-07 | 06/29/2007 | 06/29/2008 | EACH OCCURRENCE | $ 1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurence) | $ 300,000 |
| | | | | | | MED EXP (Any one person) | $ 5,000 |
| | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | | | | | | GENERAL AGGREGATE | $ 2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>[ ] POLICY [X] PRO-JECT [ ] LOC | | | | PRODUCTS - COMP/OP AGG | $ 2,000,000 |
| B | | **AUTOMOBILE LIABILITY**<br>[X] ANY AUTO<br>[ ] ALL OWNED AUTOS<br>[ ] SCHEDULED AUTOS<br>[X] HIRED AUTOS<br>[X] NON-OWNED AUTOS | DT-810-9164B087-TIL-07 | 06/29/2007 | 06/29/2008 | COMBINED SINGLE LIMIT (Ea accident) | $ 1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>[ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN    EA ACC | $ |
| | | | | | | AUTO ONLY:    AGG | $ |
| C | | **EXCESS/UMBRELLA LIABILITY**<br>[X] OCCUR [ ] CLAIMS MADE<br>[ ] DEDUCTIBLE<br>[X] RETENTION    $ 10,000 | 71C-4000001-071 | 06/29/2007 | 06/29/2008 | EACH OCCURRENCE | $ 10,000,000 |
| | | | | | | AGGREGATE | $ 10,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| D | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | DTACR-UB-9164B087-07 | 06/29/2007 | 06/29/2008 | [X] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |
| B | | **OTHER**<br>Contractors<br>Leased/Rented<br>Equipment | QT-660-222D4267-TIL-07<br>(FIRST REHAB LIFE INS.<br>NY DBL-93588) | 06/29/2007<br><br>01/01/2008 | 06/29/2008<br><br>01/01/2009 | $100,000 Maximum Limit/Item<br>$1,000 Deductible<br>Statutory | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**
Project: Circuit City Store 1200 US Highway, North Plainfield, NJ 10803
Circuit City Stores, Inc 9950 Mayland Drive Richmond, VA 23233 and Vorando Realty Trust
(landlord) 210 Route 4 East Paramus, NJ 07652 as additional insured insured in regards
to the mentioned General Liability policy as required by written contract.
15 day notice of cancellation applies due to nonpayment of premium

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Circuit City Stores, Inc.<br>Construction Department<br>9950 Mayland Drive<br>Richmond, VA 23233 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL **30** DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>**AUTHORIZED REPRESENTATIVE**<br>Robert Kesten |

**ACORD 25 (2001/08)** ©ACORD CORPORATION 1988

# IMPORTANT

If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

## DISCLAIMER

The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon.

**ACORD 25 (2001/08)**

**ACORD.**

# EVIDENCE OF PROPERTY INSURANCE

DATE (MM/DD/YYYY)
05/09/2008

THIS EVIDENCE OF PROPERTY INSURANCE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE ADDITIONAL INTEREST NAMED BELOW. THIS EVIDENCE OF PROPERTY INSURANCE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

| AGENCY | PHONE (A/C, No, Ext): (203)336-6302 | COMPANY |
|---|---|---|
| Kesten-Brown Insurance, LLC<br>535 Clinton Ave<br>Bridgeport, CT 06605 | | Travelers Insurance Co.<br>CI Remittance Center<br>Hartford, CT 06183-1008 |
| FAX (A/C, No): (203)368-1940 | E-MAIL ADDRESS: | |
| CODE: | SUB CODE: | |
| AGENCY CUSTOMER ID #: 00003051 | | |

| INSURED | LOAN NUMBER | | POLICY NUMBER |
|---|---|---|---|
| Schimenti Construction Company, LLC.<br>118 North Bedford Road<br>Mount Kisco, NY 10549 | | | QT-660-608SC492-TIL-08 |
| | EFFECTIVE DATE<br>05/14/2008 | EXPIRATION DATE<br>09/14/2008 | CONTINUED UNTIL<br>TERMINATED IF CHECKED ☐ |
| | THIS REPLACES PRIOR EVIDENCE DATED: | | |

## PROPERTY INFORMATION

LOCATION/DESCRIPTION
1   1200 US Highway, North Plainfield, NJ 10803
    (Builders Risk for Circuit City)

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED, NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS EVIDENCE OF PROPERTY INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

## COVERAGE INFORMATION

| | COVERAGE / PERILS / FORMS | AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|---|---|
| 1 | Builders Risk Limit | 1,300,000 | 2,500 |
| 1 | Temporary Storage Limit | 50,000 | 2,500 |
| 1 | Transit Limit | 50,000 | 2,500 |

## REMARKS (Including Special Conditions)

Special Conditions: Premium is minimum earned, Fungus, Mold, Bacteria Exclusion, Specifield Collapse Exclusion-BR, Programming Errors Exclusion.

## CANCELLATION

SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL   30   DAYS WRITTEN NOTICE TO THE ADDITIONAL INTEREST NAMED BELOW, BUT FAILURE TO MAIL SUCH NOTICE SHALL IMPOSE NO OBLIGATIO OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.

## ADDITIONAL INTEREST

| NAME AND ADDRESS | | |
|---|---|---|
| Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, VA 23233 | MORTGAGEE ☐   LOSS PAYEE ☐   LOAN # | X ADDITIONAL INSURED |
| | AUTHORIZED REPRESENTATIVE<br>Robert Kesten | |

ACORD 27 (2006/07)

© ACORD CORPORATION 1993-2006. All rights reserved.
The ACORD name and logo are registered marks of ACORD

EXHIBIT F

# *CIRCUIT CITY STORES, INC.*

NOTICE TO PROCEED

| | |
|---|---|
| *PROJECT:* | *CIRCUIT CITY Store #4133* |
| | *North Plainfield, NJ* |
| *CONTRACTOR:* | *Schimenti Construction Company, LLC* |
| *LETTER OF INTENT DATE:* | *May 5, 2008* |
| *CONTRACT AMOUNT:* | *$1,324,900* |

You are hereby notified to commence work on the above referenced contract on or before 6/16/2008 and shall fully complete all of the work in accordance with contract documents, plans and specifications within 107 consecutive calendar days thereafter. Therefore, the completion date for the following schedule is 9/30/2008.

| | | |
|---|---|---|
| a) | Start of Construction | 6/16/2008 |
| b) | Available for Start of Store Fixturing: | 9/8/2008 |
| c) | Ready For Exterior Sign Installation: | 8/25/2008 |
| d) | Available for Start of Warehouse Racking: | 9/1/2008 |
| e) | Ready for Telephone Equipment Room Installation: | 8/25/2008 |
| f) | Ready for NOVAR/Entec Startup: | 9/8/2008 |
| g) | Flextray Installation Complete: | 8/18/2008 |
| h) | Fixtures Complete/Certificate of Occupancy: | 9/25/2008 |
| i) | Ready for Turnover to Merchandising/Punchlist Complete Substantial Completion: | 9/30/2008 |

Dated this 13th day of June, 2008

BY: _____

John B. Mulleady

TITLE:    Vice President of Construction

## ACCEPTANCE OF NOTICE

Receipt of the foregoing Notice to Proceed is hereby acknowledged.

This _____ day of _____, 2008.

BY: _____

TITLE:    Member



Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

EXHIBIT G

May 5, 2008


Mr Todd Gutrie
Schimenti Construction Company, LLC
118 North Bedford Road
Mount Kisco, NY 10549

RE:   **LETTER OF INTENT**
      **Circuit City Store # 4133**
      North Plainfield, NJ

Dear Mr Gutrie:

The purpose of this Letter of Intent is to award your firm a general construction contract for the construction of a Circuit City Store in North Plainfield, NJ.

1.   You are authorized to commence with the awarding of sub-contracts and purchase orders so as not to delay the project in order to meet the construction schedule described within this document.

2.   The Stipulated Sum price per your proposal dated April 14, 2008, is as follows:

Base Bid                                                                    $ 1,294,000
   Alternates
      Re-work front sidewalk and install Handicap Ramp – Add                      3,900
      Provide engineered shop drawings for canopy and tower framing – Add         2,000
      Create Allowance for Flooring Installation – Add                           25,000
   Subtotal Alternates                                                      $    30,900
TOTAL                                                                       $ 1,324,900
The following allowance was included in the Base Bid
      Flooring Installation                                                      25,000
TOTAL ALOWANCE                                                              $ 25,000

3.   It is understood that a formal Stipulated Sum Contract for the performance of the work, similar to the one that was included in the project specification, will be executed. The contract will be sent once this Letter of Intent is signed and returned to our office with all required exhibits.

4.   If, for any reason, the Owner should not execute the formal contract, you will be compensated for all sums due you under this Letter of Intent, which will include your actual direct purchase and fabrication costs up to such time as it shall be determined by the Owner that such formal contract/agreement will not be executed by the Owner.

LETTER OF INTENT
Circuit City Store #4133 North Plainfield, NJ
Page 2

5.    Time is of the essence.  Work under your contract shall be performed to meet the following contractual time frames.  <u>Exact dates</u> to be outlined in Notice to Proceed.

| | | |
|---|---|---|
| a) | Start of Construction: | <u>5/12/2008</u> |
| b) | Available for Start of Store Fixturing: | <u>8/4/2008</u> |
| c) | Ready For Exterior Sign Installation | <u>7/21/2008</u> |
| d) | Available for Start of Warehouse Racking: | <u>7/28/2008</u> |
| e) | Ready for Telephone Equipment Room Installation: | <u>7/21/2008</u> |
| f) | Ready for NOVAR/Entec Startup: | <u>8/4/2008</u> |
| g) | Flextray Installation Complete: | <u>7/14/2008</u> |
| h) | Fixturing Complete/ Certificate of Occupancy | <u>8/21/2008</u> |
| i) | Ready for Turnover to Merchandising/Punchlist Complete/ Substantial Completion: | <u>8/26/2008</u> |

The total duration for the above is 107 calendar days.

6.    Provide Builders Risk Insurance Certificate, as well as evidence of insurance to Circuit City before commencing construction.  Please note requirements of contract Section 9, pertaining to Certificate of Insurance (Attachment A).

7.    The Building Permit is ready to be picked up, you are responsible for picking up the permit and invoicing us for the direct cost of the permit fees.

8.    It is understood that Circuit City will contract a construction testing firm.  It will be your responsibility to see to it that an inspector is on the job when testing is required.

9.    Robert Lerch will serve as Construction Manager for Circuit City.  He will contact you regarding a pre-construction meeting to be attended by all of your major sub-contractors.  Specific construction administration requirements will be discussed at this meeting.

10.    You will need to upload your preliminary Microsoft Project 98 schedule within (10) days of this Letter of Intent to Expesite, Folder E01 – Project Schedule. Notify the Construction Manager when your Schedule is uploaded.

11.    The construction documents include Addendums: N/A.

12.    A list of the drawings is attached, Exhibit "B".

13.    A list of the Clarifications/Qualifications to the bid, if any, is attached, Exhibit "B-1".

14.    The Notice to Proceed will be issued upon notification that the Building Permit has been uploaded to Expesite, Folder C10.1 – Permits. Upload the certificate of insurance and Builders Risk to Expesite Folder E05.3 Certificate of Insurance.    Notify Dave Bennett and the Construction Manager when the Permit and The Certificate of Insurance and Builders Risk has been uploaded to Expesite

LETTER OF INTENT
Circuit City Store # 4133 North Plainfield, NJ
Page 3

15.     A copy of the bid form, Sections 00300, 00400 and 00450 from the specifications, is required to be returned with this Letter of Intent.

16.     General Contractor's Project Manager will be <u>Ray Lamanna</u>          .

17.     **<u>DELETED</u>**

18.     The general contractor fee on change orders is to be <u>7.0%</u> combined main office overhead and profit.

19.     Labor Burden Breakdown form (**Exhibit J**) is enclosed, please complete and return with this Letter of Intent.

20.     A Project Information Sheet is enclosed, please complete and return with this Letter of Intent.

21.     Written documentation is attached regarding the procedure for field orders, change orders and pay requests.

22.     Requests for Information (RFI's), to the Architect, are to be submitted through Expesite. Instructions attached

23.     The General Contractor is required to upload weekly progress photographs to Expesite. Instructions attached..

24.     It is the responsibility of the General Contractor to coordinate with gas, power, water, sewer and communication utilities to ensure that all work is completed and that all services, including meters, are available, installed and operating when needed. The General Contractor shall notify Circuit City of any Impact Fees, Meter Fees or Utility Connection Fees needed to facilitate timely utility service. If it becomes necessary to expedite the process, the General Contractor may be directed to pay these fees and submit detailed invoices to Circuit City for reimbursement.

25.     The general contractor is to provide detailed weekly updates on the status of the buyout of the project and to complete buyout within 2 weeks of this letter of intent.

26.     Circuit City may receive the pad earlier than the date specified in the schedule above. The general contractor acknowledges that they will hold themselves ready to mobilize and begin construction on the dates above or within one week of receiving the notice to proceed if an earlier start is possible.

27.     The general contractor and all of his subcontractors are exclusively responsible for complying with all aspects of United States immigration law, including but not limited to the Immigration Reform and Control Act of 1986, and verifying employment eligibility for its workforce.

28.     **NOTE:** It is expressly understood that the current unit pricing and hourly rates for additional work performed on a time and material basis stated in your bid form are not approved. Detailed backup including union rate cards and subcontractor backup will be required before these items can be agreed upon.

LETTER OF INTENT
Circuit City Store #4133 North Plainfield, NJ
Page 4

29.  A photograph, clearly identifying the site and showing the "Coming Soon" sign, must
     accompany the first pay application for this project in order for the application to be
     processed. Shipping of the "Coming Soon" sign(s) is to be coordinated with Kellee Jackson,
     Circuit City Purchasing, Ph: 804-486-8633, e-mail: Kellee_Jackson@CircuitCity.com.

30.  The exhibits listed below, the receipt of which is acknowledged, are included in this contract.

31.  It is expressly understood that an Excel Spreadsheet will be provided to you electronically and
     is to be completed and forwarded by e-mail to Dave Bennett for approval. Once approved the
     Construction Manger will forward the spreadsheet to Ashley Brown for processing. Please
     contact Carl Brandt (ext. 2412) in order to receive the electronic format for submitting your
     pay requests. This is a mandatory requirement for payments to be made.

Circuit City Stores, Inc. is looking forward to a successful building project with Schimenti Construction
Company, LLC.

Yours truly,

CIRCUIT CITY STORES, INC.

John B. Mulleady
Vice President of Construction

JBM/wdb

cc:  Tom Drapac – Director Of Construction
     Robert Lerch
     Frank Domurat
     Michael Reidy, SBLM

**ACCEPTED:**

**BY:**        Matthew C. Schimenti

**TITLE:**     Member

Attachments:
Exhibit B    List of Drawings Used to Prepare Bid
Exhibit B-1  Clarifications & Qualifications to the Bid
Exhibit B-2  Pre-Bid Meeting Minutes, Dated 4/9/2008
Exhibit B-3  Additional Pricing and Clarifications, Dated 4/25/2008
Exhibit D    Bid Form

Circuit City Stores, Inc.
9950 Mayland Dr.
Richmond, VA 23233


Thursday, March 20, 2008

TO ALL BIDDERS


RE: INVITATION TO BID FOR: North Plainfield, NJ #4133


NOTE:  This letter is a part of the contract documents.  Information contained in this Invitation To Bid supersedes that found in the plans and specifications and can not be changed except by direct communication from this office.  If an addenda or clarification from another party is in conflict with instructions contained herein, contact me at 804/486 - 2410 immediately.

You have been included on our invited bidders list for the above referenced project.  Accordingly, one (1) complete set of plans and specifications (on CD) is scheduled to be sent via overnight delivery to you under separate cover, directly from our architect, SBLM, on or about 3/26/2008.  Please notify me upon receipt to confirm the bid date.

Your bid will be submitted electronically via the Internet through Expesite. If you have not received your Username and Password from Expesite  prior to bid date, please call Dave Bennett at 804/486-2410.

Your bid is to be phoned in to Dave Bennett no later than 2:00 p.m. local project time, on 4/17/2008, at 804/486-2410.  Complete the Bid Form through Expesite, attach the Bid Proposal Form, and SUBMIT your bid no later than 4:00 p.m. local project time, on 4/17/2008.  For your records, be sure to print a copy of the Bid Form and the electronic verification which you will receive upon submission.

All applicable Unit Price blanks on your Bid Proposal Form (Attached to the Bid form) must be completed, attached and submitted at the same time as your Bid.  For items not in your scope of work, leave blank.  Also, provide with your bid a list of the drawings showing sheet numbers, titles and latest revision dates, the specifications, showing title and latest revision date (Bid Proposal Form – Attached to the Bid form).

The building permit process has started and should be available soon.  The successful contractor will be required to pick up the permit and invoice Circuit City Stores, Inc. the direct cost.  Do not include the cost of the permit in you bid unless otherwise directed.  Circuit City's Construction Manager, Robert Lerch, will contact you to schedule a pre-bid meeting.

Circuit City intends to award a construction contract within two (2) weeks after the bids are received. Your bid should reflect a construction schedule as follows:


A - Start of Construction                                                                    5/5/2008


B - Available for Installation of Store Fixturing                              7/14/2008


I - Ready for Turnover to Merchandising/Punchlist Complete – Substantial

Completion                                                                          <u>8/5/2008</u>

The definition of store ready for merchandising is per **Attachment A**.

Included in your proposal should be the cost of providing Circuit City Stores, Inc. with a Construction schedule.  This schedule must be prepared using Microsoft Project.  The schedules are to be submitted to the construction manager twice a month on a diskette and must be in Project 98 or later format.

Requests for Information (RFI's) are to be submitted to the Architect only, Michael Reidy during bidding.

We look forward to receiving your bid.

Yours truly,

CIRCUIT CITY STORES, INC.

Dave Bennett
Construction Contract Specialist

cc: John Mulleady
            Robert Lerch

Enclosures

rev 4/3/07

# Circuit City Store
## ATTACHMENT "A"

Time is of the essence of this Agreement as to all obligations of Contractor hereunder. Contractor recognizes and agrees that Owner may incur substantial financial losses in the event the Work, or the relevant portions thereof, are not completed by the following dates:

| | | |
|---|---|---|
| a) | Start of Construction: | <u>5/5/2008</u> |
| b) | Available To Start of Store Fixtures: | <u>7/14/2008</u> |
| c) | Ready For Exterior Sign Installation: | <u>6/30/2008</u> |
| d) | Available for start of Warehouse Racking: | <u>7/7/2008</u> |
| e) | Ready for Telephone Equipment Room Installation: | <u>6/30/2008</u> |
| f) | Ready for NOVAR/Entec Startup: | <u>7/14/2008</u> |
| g) | Flextray Installation Complete: | <u>6/23/2008</u> |
| h) | Fixturing Complete/ Certificate of Occupancy: | <u>7/31/2008</u> |
| I) | Ready for Turnover to Merchandising/Punchlist Complete | |
| | Substantial Completion: | <u>8/5/2008</u> |

The date of availability for start of store fixturing shall be the day when all of the following have been properly performed:  i) all floor coverings (carpeting, rubber tile, and sheet vinyl) shall be in place, clean and protected; ii) the store shall be enclosed, with all exterior doors in place and lockable (or in lieu thereof, Contractor's expense appropriate security guards or watchmen) and roof hatch or other roof access to the store shall be lockable; iii) gypsum board shall be completed and painted, all required backing shall be in place; and iv) adequate lighting and power for all interior fixture trades shall be installed and completed; v) ceiling shall be complete including acoustic grid, lighting and fire sprinklers trimmed and under pressure; vi) HVAC system shall be operational; vii) wire shall be pulled and trimmed for floor boxes and wall electrical shall be in place; viii) all area shall be clear of debris and broom clean; and ix) concrete floors shall be sealed where specified.  All of the foreing shall be performed in accordance with the requirements of the Contract Documents.   Contractor shall consult with Owner and the Architect to make provision for the proper sequencing, coordination and scheduling of this portion of the Work.

The date the telephone equipment room is ready shall be the date when the requirements for fixturization as set forth in the previous paragraph have been satisfied and continuous permanent power is available to the telephone equipment room.

The date the store is ready for merchandising shall be the date i) the Work is completed to an extend satisfactory to all governmental departments (including fire department) and agencies having jurisdiction over the Project so as to allow Owner to bring employees into the building and ii) all electrical work in the sales floor has been completed.

END ATTACHMENT "A"

# Exhibit B

# Purchase Order

**Dispatch via Print**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| CCS01-0000474943 | 08/22/2008 | | 1 |
| **Payment Terms** | **Freight Terms** | | **Ship Via** |
| NET 30 | Destination | | Bestway |
| **Buyer** | **Phone** | | **Currency** |
| Hudson,Ashley E | | | USD |
| **Email Address** | | | |
| ashley_brown@circuitcity.com | | | |

## Circuit City Stores
9954 Mayland Drive
Richmond VA 23233
United States

**Vendor:** 0002397252
SCHIMENTI CONSTRUCTION CO LLC
118 N BEDFORD RD
MT KISCO NY 10549
United States

**Ship To:** 09000 - Hudson,Ashley E
9954 Mayland Dr
Richmond VA 23233
United States

**Bill To:** Expense Payables, DR3 6th FL
9954 MAYLAND DRIVE
RICHMOND VA 23233
United States

Tax Exempt? N     Tax Exempt ID:          Replenishment Option: Standard

| Line-Sch Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|
| **Attention:** Hudson,Ashley E | | | | | |
| 1- 1  1005 - GENERAL CONDITIONS | | 1.00 EA | 17,980.00 | 17,980.00 | 08/22/2008 |
| | | Schedule Total | | 17,980.00 | |
| **Attention:** Hudson,Ashley E | | Item Total | | 17,980.00 | |
| 2- 1  1010 - OH & P | | 1.00 EA | 14,874.00 | 14,874.00 | 08/22/2008 |
| | | Schedule Total | | 14,874.00 | |
| **Attention:** Hudson,Ashley E | | Item Total | | 14,874.00 | |
| 3- 1  8010 - STEEL DOORS & FRAME | | 1.00 EA | 1,600.00 | 1,600.00 | 08/22/2008 |
| | | Schedule Total | | 1,600.00 | |
| **Attention:** Hudson,Ashley E | | Item Total | | 1,600.00 | |
| 4- 1  9020 - STUD & DRYWALL | | 1.00 EA | 15,240.00 | 15,240.00 | 08/22/2008 |
| | | Schedule Total | | 15,240.00 | |
| **Attention:** Hudson,Ashley E | | Item Total | | 15,240.00 | |
| 5- 1  9040 - ACOUSTICAL CEILINGS | | 1.00 EA | 2,940.00 | 2,940.00 | 08/22/2008 |
| | | Schedule Total | | 2,940.00 | |
| **Attention:** Hudson,Ashley E | | Item Total | | 2,940.00 | |
| 6- 1  9060 - RESILIENT FLOORING | | 1.00 EA | 7,000.00 | 7,000.00 | 08/22/2008 |
| | | Schedule Total | | 7,000.00 | |
| | | Item Total | | 7,000.00 | |

**Authorized Signature**
Electronically Approved
Reginald D. Hedgebeth, Senior VP

# Purchase Order

**Dispatch via Print**

**Circuit City Stores**
9954 Mayland Drive
Richmond VA 23233
United States

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| CCS01-0000474943 | 08/22/2008 | | 2 |
| **Payment Terms** | **Freight Terms** | | **Ship Via** |
| NET 30 | Destination | | Bestway |
| **Buyer** | **Phone** | | **Currency** |
| Hudson,Ashley E | | | USD |
| **Email Address** | | | |
| ashley_brown@circuitcity.com | | | |

**Vendor:** 0002397252
SCHIMENTI CONSTRUCTION CO LLC
118 N BEDFORD RD
MT KISCO NY 10549
United States

**Ship To:** 09000 - Hudson,Ashley E
9954 Mayland Dr
Richmond VA 23233
United States

**Bill To:** Expense Payables, DR3 6th FL
9954 MAYLAND DRIVE
RICHMOND VA 23233
United States

**Tax Exempt?** N    **Tax Exempt ID:**    **Replenishment Option:** Standard

| Line-Sch | Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|
| **Attention:** | **Hudson,Ashley E** | | | | | |
| 7- 1 | 9090 - PAINTING | | 1.00 EA | 2,800.00 | 2,800.00 | 08/22/2008 |
| | | | Schedule Total | | 2,800.00 | |
| **Attention:** | **Hudson,Ashley E** | | Item Total | | 2,800.00 | |
| 8- 1 | 15020 - FIRE PROTECTION | | 1.00 EA | 2,100.00 | 2,100.00 | 08/22/2008 |
| | | | Schedule Total | | 2,100.00 | |
| **Attention:** | **Hudson,Ashley E** | | Item Total | | 2,100.00 | |
| 9- 1 | 15030 - HVAC | | 1.00 EA | 3,500.00 | 3,500.00 | 08/22/2008 |
| | | | Schedule Total | | 3,500.00 | |
| **Attention:** | **Hudson,Ashley E** | | Item Total | | 3,500.00 | |
| 10- 1 | 16090 - ELECTRICAL | | 1.00 EA | 46,000.00 | 46,000.00 | 08/22/2008 |
| | | | Schedule Total | | 46,000.00 | |
| **Attention:** | **Hudson,Ashley E** | | Item Total | | 46,000.00 | |
| 11- 1 | 6030 - MILLWORK | | 1.00 EA | 3,000.00 | 3,000.00 | 08/22/2008 |
| | | | Schedule Total | | 3,000.00 | |
| **Attention:** | **Hudson,Ashley E** | | Item Total | | 3,000.00 | |
| 12- 1 | MISC. CONSTRUCTION WORK | | 1.00 EA | 11,703.00 | 11,703.00 | 08/22/2008 |
| | | | Schedule Total | | 11,703.00 | |
| | | | Item Total | | 11,703.00 | |

**Authorized Signature**
Electronically Approved
Reginald D. Hedgebeth, Senior VP

# Purchase Order

**Dispatch via Print**

**Circuit City Stores**
9954 Mayland Drive
Richmond VA 23233
United States

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| CCS01-0000474943 | 08/22/2008 | | 3 |
| **Payment Terms** | **Freight Terms** | | **Ship Via** |
| NET 30 | Destination | | Bestway |
| **Buyer** | **Phone** | | **Currency** |
| Hudson,Ashley E | | | USD |
| **Email Address** | | | |
| ashley_brown@circuitcity.com | | | |

**Vendor:** 0002397252
SCHIMENTI CONSTRUCTION CO LLC
118 N BEDFORD RD
MT KISCO NY 10549
United States

**Ship To:** 09000 - Hudson,Ashley E
9954 Mayland Dr
Richmond VA 23233
United States

**Bill To:** Expense Payables, DR3 6th FL
9954 MAYLAND DRIVE
RICHMOND VA 23233
United States

| Tax Exempt? N | Tax Exempt ID: | | Replenishment Option: | Standard | | | |
|---|---|---|---|---|---|---|---|
| Line-Sch  Item/Description | | Mfg ID | | Quantity UOM | PO Price | Extended Amt | Due Date |

**Total PO Amount** | 128,737.00

**Authorized Signature**
Electronically Approved
Reginald D. Hedgebeth, Senior VP

# Purchase Order

**Dispatch via Print**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| CCS01-0000474943 | 08/22/2008 | | 4 |

| Payment Terms | Freight Terms | | Ship Via |
|---|---|---|---|
| NET 30 | Destination | | Bestway |

| Buyer | | Phone | Currency |
|---|---|---|---|
| Hudson,Ashley E | | | USD |

| Email Address |
|---|
| ashley_brown@circuitcity.com |

**Circuit City Stores**
9954 Mayland Drive
Richmond VA 23233
United States

**Vendor:** 0002397252
SCHIMENTI CONSTRUCTION CO LLC
118 N BEDFORD RD
MT KISCO NY 10549
United States

**Ship To:** 09000 - Hudson,Ashley E
9954 Mayland Dr
Richmond VA 23233
United States

**Bill To:** Expense Payables, DR3 6th FL
9954 MAYLAND DRIVE
RICHMOND VA 23233
United States

TERMS AND CONDITIONS

1. Acceptance is expressly limited to the terms and conditions contained in this purchase order ("Order"). By accepting this Order, Seller agrees to comply with the Circuit City Corporate Purchasing Vendor Procedures Manual (the "Vendor Procedures Manual"), a copy of which has been or will be provided to Seller from time to time. In the event that the Buyer and Seller have entered into a separate written agreement ("Procurement Agreement") for the purchase of any goods ("Goods"), services ("Services") (such Services being deemed to include any software, code, materials, documents or other deliverables ("Deliverables") provided as a part of such Services) or the license of any pre-existing software, code, reports, data or other intellectual property or rights therein ("IP") covered by this Order, any conflict between such Procurement Agreement and this Order shall be resolved in the following order of preference: (i) the Procurement Agreement; (ii) this Order; and (iii) the Vendor Procedures Manual. If there is no Procurement Agreement in place, any conflict between the Vendor Procedures Manual and this Order shall be resolved in favor of this Order. Any provisions in Seller's invoices, billing statements, acknowledgement forms or similar documents which are at variance with the provisions of this Order shall be of no force or effect unless specifically agreed to in writing by an authorized representative of Buyer. Seller shall accept or reject this Order by the next business day after receipt from Buyer. In the event that Seller does not accept or reject this Order within such time, Seller shall be deemed to have accepted this Order in all respects and Seller may be subject to a non-compliance charge as described in the Vendor Procedures Manual.

2. All Goods, Services and IP shall be delivered in accordance with any specifications, drawings, samples or other descriptions furnished by Buyer to Seller or as provided by Seller to Buyer.

3. Buyer assumes no liability (including but not limited to any obligation to purchase or obligation to store) with regard to Goods processed or shipped or Services or IP supplied in excess of the amount specified in this Order.

4. All Goods, Services and IP will be subject to Buyers' inspection and acceptance. In addition to other rights provided by law, Buyer reserves the right to refuse or reject non-conforming Goods, Services or IP. In the event Buyer shall have made payments to Seller for Goods so returned or Services or IP so refused or rejected, Seller shall promptly refund such payments to Buyer. Any Goods, Services or IP purchased in error by Buyer may be returned for credit within thirty (30) days and will be accepted by Seller. If the Goods, Services or IP delivered do not meet or exceed reasonable reliability requirements, including, without limitation, out-of-box failures, Seller shall identify the cause and replace the defective Goods, Services or IP with conforming Goods, Services or IP. The existence of any such epidemic failure shall be established from Buyer's service records for the Goods, Services or IP and by showing that the average failure rate for the specified period of the monitored Goods, Services or IP is not in conformance with reasonable reliability requirements. If any Goods, Services or IP fails to meet the warranties set forth herein, or is subject to epidemic failure, as set forth herein, such Goods, Services or IP may be returned to Seller for replacement. The cost of freight and handling to replace the Goods, Services or IP under warranty will be at the expense of Seller. The rights and remedies set forth in this Section shall be in addition to and not in limitation of any other right or obligation Buyer may have under the Procurement Agreement, this Order, the Vendor Procedures Manual or otherwise at law or in equity.

5. In the event Seller fails to deliver the Goods, Services or IP on the required delivery date specified in this Order, Buyer shall have the right, in addition to all other rights and remedies under the Procurement Agreement, this Order, the Vendor Procedures Manual or at law or equity or otherwise, and without any liability or obligation, to: (i) cancel this Order, or (ii) extend such delivery date to a later date, subject, however to the right to cancel as in (i) preceding if delivery is not made or performance is not completed on or before such extended delivery date. Neither the acceptance nor delivery of Goods shipped or Services or IP provided after the date or dates specified herein shall be considered to be a waiver of Buyer's rights to recover damages for late delivery. Without limiting the generality of the foregoing, if Buyer elects to extend such delivery date, Seller shall absorb any differences between the charges to

| Authorized Signature |
|---|
| Electronically Approved |
| Reginald D. Hedgebeth, Senior VP |

# Purchase Order

**Dispatch via Print**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| CCS01-0000474943 | 08/22/2008 | | 5 |

| Payment Terms | Freight Terms | | Ship Via |
|---|---|---|---|
| NET 30 | Destination | | Bestway |
| Buyer | | Phone | Currency |
| Hudson,Ashley E | | | USD |

**Email Address**
ashley_brown@circuitcity.com

**Circuit City Stores**
9954 Mayland Drive
Richmond VA 23233
United States

**Vendor:** 0002397252
SCHIMENTI CONSTRUCTION CO LLC
118 N BEDFORD RD
MT KISCO NY 10549
United States

**Ship To:** 09000 - Hudson,Ashley E
9954 Mayland Dr
Richmond VA 23233
United States

**Bill To:** Expense Payables, DR3 8th FL
9954 MAYLAND DRIVE
RICHMOND VA 23233
United States

ship normal transportation and the charges to ship premium overnight.

6. Seller represents and warrants that neither it nor the Goods purchased nor Services nor IP provided or to be provided hereunder (i) infringe, misappropriate or otherwise violate any patent, trademark, trade secret, copyright or other proprietary right of any third party; (ii) compete unfairly (including, but not limited to passing off, misappropriation or violation of any state or federal statute), (iii) violate any applicable law or statute, or (iv) violate any other rights of third parties. Without limiting the generality of the foregoing, Seller further agrees that it and the Goods, Services and IP shall comply with all applicable laws, ordinances, regulations and codes (including any pertaining to the environment, safety or health), including the identification and procurement of required permits, certificates, licenses, insurance, approvals and inspections in performance of this Agreement. Further, Seller shall comply, and shall ensure that its agents and representatives comply, with all applicable laws and regulations relating to shipping of products for transit into the United States, including, without limitation, any customs laws and regulations. Seller shall be solely responsible for any taxes, duties or other payments due with regard to compliance with such applicable laws. Seller further warrants to Buyer that no Goods, Services or IP furnished by Seller under this Order are defined as a hazardous or toxic substance or material under applicable federal, state or local law, ordinance, rule, regulation or order, and that such Goods, Services and IP present no abnormal hazards to persons or the environment. Seller is responsible for adhering to all Federal and State laws and regulations as applicable regarding the shipment of any hazardous materials, and the Seller shall be responsible for all reasonable costs and/or penalties incurred by Buyer as a result of Seller's failure to comply with this Section.

7. Seller represents and warrants that any Goods, Services and IP provided pursuant to this Order are (a) merchantable, (b) free from material defects in design, material and workmanship, including, without limitation, such defects as could create a hazard to life or property; (c) fit and sufficient for the purpose intended; (d) in conformity with and will perform in accordance with all the other specifications, descriptions, documentation and/or requirements set forth or incorporated herein or provided with the Goods, Services or IP; and (e) in conformity with all applicable federal, state and local laws. Seller further represents and warrants that the Services provided hereunder will be performed in a satisfactory, efficient, competent, professional and workmanlike manner, and in accordance with industry standards.

8. Seller agrees to indemnify, defend and hold harmless Buyer and its affiliates and subsidiaries and their respective directors, officers, employees, agents, principals, representatives, successors and assigns from and against any losses, expenses, damages, claims, fines, penalties, costs and expenses (including reasonable attorneys' fees) that arise, directly or indirectly, out of or result from (a) the use and/or failure of the Goods, Services or IP covered by this Order, including without limitation, liability based upon death or injury to any persons or damage to any property; (b) Seller's non-performance or breach of the terms, representations and warranties contained in this Order; (c) Seller's negligence or willful misconduct in performance of its obligations under this Order; (d) Seller's violation or violation by the Goods, Services or IP of any of the laws of any governmental entity with respect to the Goods, Services or IP covered by this Order; or (e) any and all third party claims that the Seller or the Goods, Services or IP covered by this Order infringe, misappropriate or otherwise violate any patent, trademark, trade secret, copyright or other proprietary right of any third party.

9. In support of Seller's obligations under this Order, Seller shall maintain (a) statutory workers' compensation coverage, including coverage for employer's liability; (b) commercial automobile liability coverage; (c) commercial general liability insurance, including products, completed operations coverage, and covering liability arising from premises, operations, personal injury, advertising injury and liability assumed under an insured contract. The coverage limits required for such insurance shall be at least $2,000,000 for each incident. Products - completed operations coverage shall be maintained for at least three (3) years after delivery of the Goods, Services or IP covered by this Order, or such longer time as may be set forth in a Procurement Agreement. Such policy shall name "Circuit City Stores, Inc., its affiliates, successors and assigns" as additional insured and shall be underwritten by an insurance carrier authorized to do business in the United States and having a rating of "A-" or better by A.M. Best Company and a Financial Size Category rating of at least Class VIII. Prior to delivery of the Goods, Services or IP covered by this Order, and thereafter upon reasonable request, a certificate of insurance evidencing the required coverage shall be provided to Buyer. All certificates shall provide for at least thirty (30) days written notice prior to cancellation of any insurance referred to herein.

**Authorized Signature**
Electronically Approved
Reginald D. Hedgebeth, Senior VP

# Purchase Order

**Circuit City Stores**
9954 Mayland Drive
Richmond VA 23233
United States

**Dispatch via Print**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| CCS01-0000474943 | 08/22/2008 | | 6 |
| Payment Terms | Freight Terms | | Ship Via |
| NET 30 | Destination | | Bestway |
| Buyer | Phone | | Currency |
| Hudson,Ashley E | | | USD |
| Email Address | | | |
| ashley_brown@circuitcity.com | | | |

**Vendor:** 0002397252
SCHIMENTI CONSTRUCTION CO LLC
118 N BEDFORD RD
MT KISCO NY 10549
United States

**Ship To:** 09000 - Hudson,Ashley E
9954 Mayland Dr
Richmond VA 23233
United States

**Bill To:** Expense Payables, DR3 6th FL
9954 MAYLAND DRIVE
RICHMOND VA 23233
United States

10. In addition to the rights set forth in Section 5 above, at its option, Buyer may terminate all or a part of this Order upon written notice to Seller.

11. In the course of performance of this Order, Buyer may share with Seller certain documents and information, including, but not limited to, information pertaining to customers, products, business practices, schedules, services, methods, data, processes, advertising plans, sales, financial information and operating procedures which the Buyer considers to be, and treats as confidential ("Confidential Information"), whether or not specifically identified as such. The Seller shall maintain the Buyer's Confidential Information in confidence, shall protect it with the same degree of care that it uses to protect its own Confidential Information (which shall be not less than reasonable care), shall not disclose it to any third party and shall use it for the sole purpose of performing hereunder or under any Procurement Agreement. At the conclusion of this Order (or at the conclusion of the Procurement Agreement, if later), Seller shall either return the Buyer's Confidential Information in its possession (including all copies) or shall, at the Buyer's direction, destroy the Buyer's Confidential Information (including all copies) and certify its destruction to the Buyer. For purposes of this Section, the term "Confidential Information" shall not include any information which: (a) is in the public domain at the time of disclosure or enters the public domain following disclosure through no fault of the Seller; (b) the Seller can demonstrate was already in its possession prior to disclosure hereunder or is subsequently disclosed to the Seller with no obligation of confidentiality by a third party having the right to disclose it; or (c) is independently developed by the Seller without reference to the Buyer's Confidential Information provided that the Seller can clearly demonstrate such independent development through contemporaneous records showing such development. The Seller may disclose the Buyer's Confidential Information upon the order of any court of competent jurisdiction or as otherwise required by law or legal process, provided that prior to such disclosure, the Seller shall inform the Buyer of such order if permitted by law, in order to provide the Buyer with an opportunity to contest such order or to seek such other protective action as the Buyer may elect. Seller may not issue a press release regarding this Agreement or the relationship of the parties hereunder without the Buyer's prior written approval. In the event of a violation of the terms of this Section, because of the unique nature of the Confidential Information, the Buyer would suffer irreparable harm, and money damages and other remedies at law available in the event of a breach or threatened breach would not be adequate to compensate for the harm caused by the breach or the threatened breach. Accordingly, in addition to any other remedies it may have hereunder or at law or in equity, Buyer shall have the right to obtain injunctive relief for violation of the terms of this Section.

12. If the Buyer of the Goods, Services or IP hereunder is Circuit City Purchasing Company, LLC ("Circuit City Purchasing"), the parties acknowledge and agree that Circuit City Purchasing may resell, transfer, assign or sublicense the Goods, Services or IP to Circuit City Stores, Inc. or to any other affiliate, and that, if they are not parties to a Procurement Agreement covering the purchase or license of the Goods, Services or IP in question, Circuit City Stores, Inc. and any other affiliate will be deemed to be intended and notified third party beneficiaries of the such Procurement Agreement and/or the terms of this Order and the Vendor Procedures Manual. Without limiting the generality of the foregoing, Circuit City Stores, Inc. and its affiliates shall be entitled to any and all rights and protections under any applicable Procurement Agreement, this Order, the Vendor Procedures Manual and applicable law, including, but not limited to all rights and protections under any warranties and indemnification provisions. Furthermore, Seller agrees that the resale, transfer, assignment or sublicense of any of such Goods, Services or IP shall in no way limit or restrict any warranty provided therewith, and all such warranties shall remain in force and effect as if no resale, transfer, assignment or sublicense had been made, and shall benefit Circuit City Purchasing, Circuit City Stores, Inc. or any other affiliate.

13. To the extent that Deliverables are provided as a part of the Services, such Deliverables, including all materials and documents, reports, summaries, and information compilations written, assembled or produced by Seller and all products, ideas, concepts, techniques, work product, inventions, processes or works of authorship developed or created by Seller during the course of providing Services to Buyer hereunder and all copyrights, patents, trade secrets, trademarks or other intellectual property rights associated with the Deliverables shall belong exclusively to Buyer. Buyer will have no obligation of nondisclosure or nonuse or otherwise with respect to the Deliverables or to any other information disclosed to Buyer hereunder. Seller automatically assigns at the time of creation of the Deliverables, and without the requirement of further consideration, any right, title or interest Seller may have in such Deliverables,

**Authorized Signature**
Electronically Approved
Reginald D. Hedgebeth, Senior VP

# Purchase Order



**Dispatch via Print**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| CCS01-0000474943 | 08/22/2008 | | 7 |
| **Payment Terms** | **Freight Terms** | | **Ship Via** |
| NET 30 | Destination | | Bestway |
| **Buyer** | **Phone** | | **Currency** |
| Hudson,Ashley E | | | USD |
| **Email Address** | | | |
| ashley_brown@circuitcity.com | | | |

**Circuit City Stores**
9954 Mayland Drive
Richmond VA 23233
United States

**Vendor:**   0002397252
SCHIMENTI CONSTRUCTION CO LLC
118 N BEDFORD RD
MT KISCO NY 10549
United States

**Ship To:**   09000 - Hudson,Ashley E
9954 Mayland Dr
Richmond VA 23233
United States

**Bill To:**   Expense Payables, DR3 6th FL
9954 MAYLAND DRIVE
RICHMOND VA 23233
United States

including any copyrights, patent rights or other intellectual property rights pertaining thereto.  Upon request of Buyer, Seller shall take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to give full and proper effect to such assignment.  To the extent that Deliverables are deemed in any way to fall within the definition of "work for hire" as such term is defined in 17 U.S.C. Section 101, such Deliverables shall be considered to be "work for hire", the copyright of which shall be owned solely, completely and exclusively by Buyer.

14. With regard to any IP covered by this Order, Seller hereby grants Buyer a non-exclusive right and license to use the IP for the benefit of itself and its affiliates, subject to any limitations set forth in this Order.  To the extent that no limitations are set forth in this Order, such license shall be perpetual, and Buyer and its affiliates shall have unlimited use of such IP, without the obligation to make any future payments.

15. Buyer shall pay Seller only for applicable state and local sales and use tax payments with respect to transactions under this Order unless Buyer advises Seller that an exemption applies with respect to state and local sales and use taxes, as applicable.  Taxes payable by Buyer shall be billed as separate items on Seller's invoices and shall not be included in Seller's prices.  At Buyer's expense and subject to Buyer's direction and control, Buyer shall have the right to have Seller contest any such taxes that Buyer deems improperly levied.

16. The relationship of the parties under this Order shall be and at all times remain one of independent contractors and not principal and agent, employer and employee, franchisor and franchisee, partners or joint venturers.  Neither party shall have the authority to assume or create obligations on behalf of the other party.  Each party shall employ its own personnel and contractors and shall be solely responsible for their acts and be responsible for payment of all unemployment, Social Security, and other payroll taxes, including contributions required by law.

17. Neither party shall be held responsible for any delay or failure in performance of any part of this Order to the extent such delay or failure is caused by fire, flood, strike, civil, governmental or military authority, act of God, or other similar causes beyond its control and without the fault or negligence of the delayed or non-performing party or its subcontractors ("Force Majeure Event").  If either party is unable to perform its obligations under this Order due to a Force Majeure Event, that party is responsible for giving written notice to the other party of its inability to perform and the steps it plans to take to rectify such inability.  The parties shall be obligated to use their best efforts to continue to perform pursuant to the terms of this Order.  In the event Seller is unable to perform within five (5) days of a Force Majeure Event, Buyer shall have the right to cancel this Order.

18. No course of dealing of Buyer nor any delay or omission of Buyer to exercise any right or remedy granted under this Order shall operate as a waiver of any rights of Buyer.  No waiver of any obligation of either party under this Order shall be effective unless it is in writing and signed by both parties.  The failure of either party at any time to enforce any right or remedy available to it under this Order or otherwise with respect to any breach or failure by the other party shall not be construed to be a waiver of such right or remedy with respect to any other breach or failure by the other party.

19. No right of Seller under this contract resulting from the acceptance of this Order, including, without limitation, any account based upon this Order, shall be assignable without the written consent of Buyer.

20. This Order shall be governed by the laws of the Commonwealth of Virginia, excluding its choice of law rules.

21. This Order, together with the Vendor Procedures Manual and the Procurement Agreement, if any, between the parties, shall constitute the entire agreement between the parties with respect to the subject matter of this Order and shall not be modified or rescinded, except by a writing signed by Buyer and Seller.  The provisions of this Order which, by their nature, should survive shall survive the termination or expiration of this Order.

**Authorized Signature**
Electronically Approved
Reginald D. Hedgebeth, Senior VP

# Exhibit C

**Schimenti Construction Preference Analysis -  Payment detail**
**Exhibit C**

| Vendor Name | Check Clear Date | Check Number | Paid Amount |
|---|---|---|---|
| SCHIMENTI CONSTRUCTION CO LLC | 9/18/2008 | 4557540 | $   501,136.38 |
| SCHIMENTI CONSTRUCTION CO LLC | 9/22/2008 | 4559364 | $     19,080.10 |
| SCHIMENTI CONSTRUCTION CO LLC | 10/2/2008 | 4563843 | $   291,323.54 |
| SCHIMENTI CONSTRUCTION CO LLC | 10/14/2008 | 4565065 | $       2,640.00 |

**Total Check Amount** $   814,180.02