UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

IN RE:                      .      Case No. 08-35653(KRH)
                            .
                            .
                            .
CIRCUIT CITY STORES         .      701 East Broad Street
INC.,                       .      Richmond, VA 23219
                            .
                            .
          Debtor.           .      April 29, 2010
. . . . . . . . . . . . ..          2:03 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          McGuireWoods LLP
                         By:  DOUGLAS FOLEY, ESQ.
                              SARAH B. BOEHM, ESQ.
                         One James Center
                         901 E. Cary Street
                         Richmond, VA  23219

                         Skadden Arps Slate Meagher & Flom, LLP
                         By:  IAN S. FREDERICKS, ESQ.
                              GREGG M. GALARDI, ESQ.
                         One Rodney Square
                         Wilmington, DE  19899

For U.S. Signs:          Fullerton & Knowles, P.C.
                         By:  RICHARD I. HUTSON, ESQ.
                         12642 Chapel Road
                         Clifton, VA  20124


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

**APPEARANCES (Cont'd):**

| | |
|---|---|
| For Inland: | Christian & Barton, LLP<br>By:  MICHAEL D. MUELLER, ESQ.<br>909 East Main Street<br>Suite 1200<br>Richmond, VA  23219 |
| For Ryan, Inc.: | Redmon, Peyton and Braswell, LLP<br>By:  ROBERT MARINO, ESQ.<br>510 King Street<br>Alexandria, VA  22314 |
| | Cantey Hanger<br>By:  BRUCE AKERLY, ESQ.<br>1999 Bryan Street<br>Suite 3330<br>Dallas, TX  75201 |
| For the Official<br>Committee of Unsecured<br>Creditors: | Tavenner & Beran, PLC<br>By:  PAULA BERAN, ESQ.<br>20 North Eighth Street<br>Second Floor<br>Richmond, VA  23219 |
| | Pachulski, Stang, Ziehl & Jones<br>By:  ROBERT FEINSTEIN, ESQ.<br>780 Third Avenue<br>36th Floor<br>New York, NY  10017 |

- - -

1              COURTROOM DEPUTY:  In the matter of Circuit City

2    Stores, Incorporated.  Hearing on Items one through 22 as set

3    out on debtors' agenda.

4              MR. FOLEY:  Good afternoon, Your Honor.  Doug Foley

5    with McGuireWoods on behalf of Circuit City, the debtor.

6              THE COURT:  Good afternoon.

7              MR. FOLEY:  With me from my firm today is Sarah

8    Boehme as well as at counsel table is Gregg Galardi and Ian

9    Fredericks from Skadden Arps.  Here from the company today is

10   Katie Bradshaw, who's the vice president and controller, as

11   well as Deborah Miller who is the acting general counsel.

12             Your Honor, we only have 22 matters on the agenda

13   today, and I believe only one of them is contested.  As Your

14   Honor is probably aware, we did file earlier today a motion to

15   establish cross-border protocol with the Canadian proceedings

16   as well as we would like to give the Court -- that's not on the

17   agenda yet -- we would like to have an opportunity to address

18   the Court on that, as well as an update with respect to plan

19   confirmation.  And if we could defer from the agenda for a

20   moment and have Mr. Galardi address those two issues to the

21   Court, then we can come back to the agenda if that pleases the

22   Court.

23             THE COURT:  That will be fine, thank you.

24             MR. FOLEY:  Thank you.

25             MR. GALARDI:  Thank you, Your Honor.  For the record,

4

1  Gregg Galardi.  Your Honor, I think in order to understand the

2  protocol, what I'd like to do is start with the status of the

3  confirmation hearing, where we stand, and that will put it in

4  context as to why I'm here to beg to try to get the protocol

5  entered today on a certain notice that was lacking, lacking

6  with respect to general creditors.

7          Your Honor, first of all, the current status for the

8  confirmation hearing would be May 11th.  We are going to seek

9  to adjourn that or to adjourn it over to June 8th.  Again, on

10 that month basis.  That is the unfortunate news, but let me

11 give Your Honor some idea of some progress that we've made and

12 what is the holdup, which is still the holdup, but I think it's

13 -- we'll fill in the Court a little bit as to what we're trying

14 to do, and I think Mr. Feinstein's on the phone and can also

15 explain any perspective he has on this.

16         First, Your Honor, we continue to make progress on

17 the claims' matter.  Your Honor knows we've been here a number

18 of time making progress on claims.  And as I advised Your

19 Honor, I think in one or so hearings, the cash on hand that the

20 debtors have on hand today we believe is adequate to cover our

21 reserve for disputed claims with respect to administrative

22 claims, secured claims that are not otherwise secured by

23 setoffs, and even the priority tax claims.  So we don't think

24 there's going to be any issue going effective reserving those.

25         In addition, Your Honor, what's not even reflected in

5

1   those numbers is, Your Honor may know that there was an appeal

2   from Your Honor's 502(d), 503(b)(9) order, we have had a few

3   status conferences with Judge Payne, there were five people who

4   took those appeals.  Three of those have been resolved, are

5   being resolved.  There are still two pending appeals, and Judge

6   Payne entered an order that will have leave to appeal.  We had

7   another status conference today and we will be going forward

8   with that appeal if we don't resolve the last two objections.

9   But I'd even say we're going to get close to even resolving

10  those underlying claims.  So that's progress.

11          In addition, last week we were here in Richmond to

12  meet with Samsung, one of the largest creditors on 503(b)(9)

13  and others, and I'm proud to say that we have reached a

14  tentative settlement with Samsung regarding its claims,

15  503(b)(9) claims, 502(d) claims and all of the offsets.  And

16  that was significant, so even the numbers that I reported to

17  the Court before regarding reserves, we are still making

18  significant progress on that.

19          In addition, Your Honor, with respect to those two

20  appellants that we hadn't resolved, this morning we filed what

21  I'll call non-opposition papers with respect to their 3020

22  motions to establish reserves under the plan for those claims,

23  and that will avoid a confirmation objection.  And after

24  conversing and having some negotiations with the Committee, we

25  have agreed with the Committee and we think it's wise to avoid

**J&J COURT TRANSCRIBERS, INC.**

1 a lot of issues, to establish reserves under what will be a

2 modified plan for all the disputed claims, in general for all

3 of those claims.  So the 3020 motions will essentially be

4 mooted or no longer contested.  We took the first step today,

5 as I said, one, because Judge Payne would have liked to have

6 seen it and we wanted to make sure he understood that we

7 weren't saying we were going to do it, but we'd actually do it.

8 So we've established reserves.

9          So with all that good news, the question then comes

10 as well, why aren't we going forward with confirmation on May

11 11th?  As I've explained to Your Honor before, one of the

12 issues has always been that we have the Canadian proceedings,

13 and in Canada there was a successful sale of the business in

14 Canada.  In the Canadian proceedings, there is a monitor in

15 there as separate counsel for the debtors, and in that context,

16 the monitor has been going through their claims' process and

17 resolving claims, because the United States' debtors' interest

18 in Canada really is nothing other than a stockholder, and so

19 there won't be a distribution up to the United States until we

20 can get the cash in a stock by way of the stock ownership.

21 That's also complicated by the fact that the immediate parent

22 of the Canadian entity that has cash is a U.S. debtor.  But

23 then the immediate parent of that U.S. debtor is a Canadian

24 entity, and then we go back to a U.S. entity.

25          So to try to make it both a tax -- to make it a tax

1  efficient transfer to the United States, and therefore not pay

2  a lot of taxes on money which could be anywhere between 90 and

3  $105 million, we have been, along with the Committee's tax

4  advisor in Canada, Galings (phonetic), going through and

5  working through what would be a tax efficient mechanism for

6  bringing that money back to the United States.

7       We had contemplated in that process, and that gets

8  tied to whether at the end of the day you had a liquidating

9  trust, which is the effect -- which would happen on the

10 effective date of a plan, or you needed a corporate entity.  We

11 had made a request for a ruling which contemplated what we

12 called an amalgamation of all these entities underneath Circuit

13 City Stores Inc., right before the effective date of the plan,

14 so we've been holding up going effective on the plan until you

15 did that, because there was a tax ruling that was dependent

16 upon that.

17       We have still been proceeding down that line,

18 however, as we've made progress with the claims, the need to

19 get the cash up as fast as we wanted to is not as great as it

20 once was to be able to fund the trust.  But as we have gone

21 through that process, there was two other issues about how much

22 money that would come up from Canada that had to be resolved.

23 One was, what are the general claims in Canada, and I'm pleased

24 to report those are primarily resolved, and they're not going

25 to be a big hold back.

**J&J COURT TRANSCRIBERS, INC.**

1          There was one other issue.  The Canadian entity had a

2     subsidiary in France that did not get dissolved and has created

3     an issue as to whether there is a liability for an entity that

4     has not been operating, I think, as late as 2002, whether there

5     would be a tax liability there.  We have been looking into

6     that, and of course, a monitor, before making a distribution to

7     a shareholder and a U.S. debtor wants to make sure he either

8     has an adequate reserve or takes account of that claim.

9          We have been working on that issue and I'm not

10    pleased to say, but an issue has come up about how much that

11    liability has, which has sort of delayed some of the Canada

12    process.

13         Now, so that then put us, I guess it was probably

14    last week or ten days ago in the process to go back and say,

15    okay, can we go effective on this plan without having to do

16    that amalgamation I talked about beforehand or do we need to

17    wait to do the -- wait to that issue.  We are now exploring

18    that and we're hopeful, and the Committee's been involved in

19    this, that you could actually go effective before you need to

20    do the amalgamation and only need to take one step.

21         So it isn't that we are not ready to go effective.

22    The votes are in, we have the money, it's really to benefit the

23    estate to bring back the most money, what is the best way to do

24    this effectively and efficiently, and the Committee and we have

25    been working together.

**J&J COURT TRANSCRIBERS, INC.**

1          So with all of that, why we're here today on that

2     protocol motion is, one of the things, and I had mentioned this

3     to Your Honor earlier is, we believe at some point there will

4     be need for a joint hearing.  Whether that joint hearing is on

5     how we amalgamate all of these entities, Canadian and U.S. and

6     the tax steps, or even how we take just one step, for example,

7     that InterTan Inc., we think will be dismissed under all

8     scenarios, the liabilities assumed by InterTan Canada, we think

9     Your Honor will want to feel comfortable that that's an

10    appropriate step as well as Judge Morawetz in Canada will want

11    to know that.  And we'll put on evidence as to why there are no

12    liabilities, it's not going to increase anybody's liabilities,

13    it's not going to harm anybody.  That step will be consistent

14    regardless of whether we do the big amalgamation or we do it in

15    piecemeal.

16         So what we did was talk to the Canadian counsel about

17    a protocol.  And I will say, honestly, unbeknownst to us on

18    Monday, I guess, the Canadian counsel went and got it approved

19    by Judge Morawetz.  We had thought we were going to coordinate

20    a little bit better, but we frankly didn't get that.  We then

21    gave it to the Committee, we gave it to the U.S. Trustee, and

22    we filed a motion today for approval from Your Honor for that

23    protocol.  We see it as, it has already been approved by Judge

24    Morawetz, not that that should bind Your Honor to feel

25    compelled to enter an order today, but we do think it is purely

**J&J COURT TRANSCRIBERS, INC.**

1  procedural in nature.  It has the consent and support I should

2  say, of the Creditors' Committee.  The U.S. Trustee has

3  reviewed and to the extent we gave him time to review, which

4  was really only this morning, he said that he didn't have any

5  objections to it.

6          So I sort of throw myself on your mercy as to whether

7  one, Your Honor would be prepared to approve the protocol, and

8  then without further notice to other parties.  Or it would be

9  better to ask Your Honor to approve the protocol subject to

10  what I'll call a ten-day negative notice on all creditors if

11  that were necessary.  Again, we do believe that relief is

12  purely procedural.  The rush is, if we get through all the

13  rulings and the permutations that I discussed, we would love to

14  be back here on May 11th regarding, or whatever day Your Honor

15  and Judge Morawetz could have a joint hearing, on whatever the

16  corporate procedural step we take next with as the predecessor

17  to confirmation.  That step would have to be before

18  confirmation and it will at least be a motion to dismiss

19  InterTan and let it, because Canada doesn't have the merger

20  law.  We can't just simply merge InterTan Inc., into Intertan

21  Canada.  So the way we've seen it is, InterTan Canada will

22  assume the liabilities of InterTan Inc., which we believe will

23  not be material because we've done that work.  And then we'd be

24  seeking to dismiss InterTan Inc., out of the bankruptcy case

25  and then dissolve it.  And that's one step that's common to all

1  of the scenarios that we looked at.  And that would be where we

2  see a protocol being necessary with respect to that hearing.

3  　　　　　I would note, again, there was conversation with

4  myself and the Committee this morning that we may need future

5  hearings with respect to protocol, and this may actually need

6  to be amended at some subsequent time, so we're really seeing

7  the protocol is only this very small period of time for that

8  particular hearing.  Nothing more.  We don't think it affects

9  the rights of creditors, nor do we think that it's necessary to

10  have a broader notice, so I leave it to Your Honor's comfort

11  with respect to that notice.

12  　　　　　Again, the Committee has reviewed it, it has been of

13  a form that has been approved, I think in this district, by

14  another Judge, as well as in other districts.  So we think it's

15  fairly standard and it's more just to lay the foundation for

16  whatever the next step is, and hopefully that's May 11th, May

17  20th, and it gets us that little step closer to confirmation,

18  which we're still hopeful will be June 8th.  I don't know if

19  Mr. Feinstein, who's on the line, wants to add anything.

20  　　　　　THE COURT:  Mr. Feinstein, do you wish to weigh in on

21  this?

22  　　　　　MR. FEINSTEIN:  Very briefly, Your Honor.  First,

23  thank you for hearing me by phone.  We're trying where we can

24  to conserve expense.  I won't belabor the point about the

25  history of how we got here except to say that the Canadian and

1  now the French issue are complex.  They're gaiting items for us

2  to get to confirmation on a basis that would be tax efficient,

3  and we're talking about a material amount of money that could

4  be lost if the matter isn't resolved in the best way possible.

5  And we've been working very hard to try to peel back the layers

6  of complexity and get to the root of the issues and to get them

7  resolved.  We are hopeful, I think even confident at this point

8  that we can get to plan confirmation come the new adjourn date

9  in June.  And in the runup to that, it's quite likely that we

10  would need to employ the protocol to get Canadian issues

11  resolved, and it's an evolving discussion, but I think once

12  everybody who's involved, which includes the Committee, the

13  U.S. debtor, the Canadian debtor, the monitor and the CRA are

14  all on the same page, we would want to move expeditiously.  So

15  we very much support entry of the protocol.

16          As Mr. Galardi mentioned, we might want to amend it

17  at some point to the extent that we can't resolve all the

18  pieces of the Canadian and French puzzle pre-effective date.

19  This will fall to the lap of the liquidating trustee.  The

20  amendment would be to add him to the process, but that's for

21  another day.

22          For today though, we reviewed the protocol that was

23  entered in Canada, we very much support prompt entry of the

24  protocol in the U.S. and that's all I have to add.  Thank you.

25          THE COURT:  Thank you very much.  Does any other

1  party wish to be heard?

2                    (No audible response)

3          THE COURT:  All right.  Mr. Galardi, I had just a

4  couple of questions, and it's really for my lack of experience

5  with the protocol that perhaps you could just explain to me how

6  it works.  The first had to do with Paragraph 15, which is the

7  recognition of the stay proceedings.  And my question is, what

8  does that mean?

9          MR. GALARDI:  That's in the Canadian proceedings,

10  correct, Your Honor?

11          THE COURT:  Yes.  It says the U.S. Court hereby

12  recognizes the validity of the stay of proceedings and actions

13  against the Canadian debtors and their property under the CCAA

14  and the CCAA initial order.  Does that mean that a party would

15  have, if there was a -- a party would have the right to come

16  into this court and ask me to enforce the stay that the

17  Canadian Court has issued?

18          MR. GALARDI:  I think that's correct, Your Honor, or

19  visa versa.  And generally --

20          THE COURT:  I see that it works both ways in the

21  proceeding paragraph.

22          MR. GALARDI:  -- right.  And my understanding is,

23  one, the stay is discretionary, it's not the same as the

24  statutory under our law where you file a case that stays there.

25          THE COURT:  It's more like the old act.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GALARDI:  The Canadians have to go in on a

2    regular basis to have to extend the stay, and I think they do

3    so recently.  So I think this is that we too and the United

4    States will recognize that there is a stay.  We're not going to

5    try to overreach.  Again, it's to protect their assets in their

6    dominion, which include what we're talking about here, the cash

7    that is currently sitting in the Canadian entities.  And I just

8    think it's a protection there.  I don't think Your Honor has

9    the jurisdiction to lift that stay, but that you wouldn't take

10   any steps, obviously, in violation of that stay, and that's my

11   understanding of that paragraph.

12          THE COURT:  But that I would be able to enforce that

13   stay.

14          MR. GALARDI:  That is correct.

15          THE COURT:   Okay.

16          MR. GALARDI:  And that you would stop creditors here

17   from going up there to do that as well.

18          THE COURT:  And as a matter of comity it would

19   probably be the law in any event.

20          MR. GALARDI:  Correct.

21          THE COURT:  All right, very good.  The second

22   question I had, and this was just more for clarification, I'm

23   familiar with the ABI guidelines, but from an academic

24   standpoint.  I've never been involved with them, but I've read

25   them and am familiar with them from that standpoint.  And the

1  guidelines indicate -- well, let me just tell you the

2  questions.  Paragraph 11(a) -- and this is to harmonize, you

3  know, the proceedings and such -- it says that the U.S. Court

4  and the Canadian Court may communicate with one another with or

5  without counsel present with respect to any procedural or

6  substantive matter relating to any of the steps required to

7  implement the equity distribution.  And that's pretty clear, I

8  understand what that means.  But the guidelines, the ABI

9  guidelines suggest that if that is going to happen, Guideline

10  7(b) requires that the communications be recorded and then so

11  that they could be later transcribed.  Does that mean that if

12  there's any telephone conversation or something of that between

13  the two Courts that we're going to have to record these and

14  make sure we have a transcript available?

15       MR. GALARDI:  One, I've never had any Judges do that

16  in their conversations.

17       THE COURT:  I've never done that, that's why I'm

18  asking.

19       MR. GALARDI:  And two, I didn't understand it that

20  way.  I thought it was if there were going to be proceedings

21  jointly between the parties with other parties present, that

22  you want it on the record, you had that right.  That's not at

23  all what we intended here.  I've often had Judges take all the

24  argument, go back, and indeed, with Judge Morawetz and Judge

25  Gross, then confer.  I never expected those to be recorded so

1 that you could have a record of them, that was never my

2 understanding.

3      THE COURT:  That was my concern.  Because that would

4 be sort of how I would contemplate it happening so that we're

5 not both expounding at the same time, perhaps differently.

6      MR. GALARDI:  Exactly.  And that's my understanding.

7 And it's just like your deliberations with your clerks, but

8 this is an other judge to come to a joint ruling.  That was

9 never anything, and I actually don't understand the ABI part of

10 it, and that's probably why our part says you can go do that

11 and not have to record in essence, and that would be my

12 implication.

13      THE COURT:  Okay.  And you do say that in another

14 place where there's any inconsistency that the protocol you've

15 established controls.

16      MR. GALARDI:  Right.  And I think that's what that

17 paragraph's origin has been, and that's always been my

18 experience with joint proceedings.

19      THE COURT:  All right, very good.  Those were the

20 only two questions I had.  I'm fully in favor of implementing a

21 procedural protocol in this case.  I think that the

22 efficiencies that will be gained are tremendous and I'm all in

23 favor of doing that.  And so the Court -- and I've been through

24 this, I have to admit, hurriedly, so but I did have an

25 opportunity to go through the motion and see what you were --

1  and review the protocol, so I'm comfortable with that.

2           And I'm also comfortable that it is purely

3  procedural, and so I'm not concerned with regard to the notice

4  issue.  And I understand why you just filed this given the

5  proceedings in the Canadian court on Monday, that makes sense.

6  So I am inclined to approve the protocol and grant your motion.

7           MR. GALARDI:  Thank you, Your Honor.

8           THE COURT:  And so I will ask you to submit an order

9  to that effect.  I don't think we need to give ten days

10 negative notice or anything along those lines.

11          MR. GALARDI:  I appreciate it. It will be on the

12 docket, and if anybody raises concerns, we'll obviously address

13 those concerns, Your Honor.  And again, we gave it to Mr.

14 VanArsdale shortly before the hearing, maybe a few hours.  If

15 he has concerns we will address them.  I will also just add for

16 comfort levels, I know Judge Morawetz has had this a little bit

17 longer than Your Honor and also has had a similar protocol in a

18 couple cases that I've been involved in in Delaware, so I know

19 he's probably reviewed it well and is familiar with the

20 protocol and I take comfort from that as well with the monitor

21 having reviewed it.

22          THE COURT:  Well, as long as he's comfortable with

23 it, that's --

24          MR. GALARDI:  I didn't say that far, but I appreciate

25 it.

1          THE COURT:  That's good.  One of the things that

2    occurs to me as more of a practical matter than anything else,

3    and that is just coordinating how we conduct this joint

4    hearing.  Obviously I need to get our IT personnel in touch

5    with yours as well as the Canadian Court's and such.  I've been

6    in touch with the head of our IT department here, his name is

7    Carl Mosca, and you can get his contact information from the

8    courtroom deputy when we're done, or my law clerk, either one,

9    when we're done here today.  And he in fact will be looking for

10   your phone call, because I've alerted him to the fact that this

11   was going to be happening.  I know he's already been in touch

12   with the Delaware Court to see how they do things there and

13   that sort of thing.  So he's told me that it's all possible,

14   which is a good thing.

15          MR. GALARDI:  That's a positive.

16          THE COURT:  But it does need coordination.  So, you

17   know, and so the sooner we get those people talking to each

18   other probably the better.

19          MR. GALARDI:  Okay.  Either, again, I won't

20   understand it anyway, so either I will make a call or Mr. Foley

21   or somebody from his office will try to coordinate this and

22   we'll make sure that whenever we're going to ask for the

23   hearing, they'll be prepared.  The other practical issue is,

24   the way we've left it with our Canadian counsel is we have

25   given Judge Morawetz your contact information so that once we

                    **J&J COURT TRANSCRIBERS, INC.**

1  all come to an agreement that now is the time to have a

2  hearing, again, you have set omnibus dates, I don't think they

3  have.  Whether those dates work with his schedule or not we'll

4  work that.  But we'll try to coordinate that, and I'm sure he

5  will give Your Honor a call to see what days work and times

6  work for you for that purpose.

7          THE COURT:  Most certainly then.  And that makes good

8  sense.  You say you're going to try to shoot for right around

9  the May 11th timetable?

10         MR. GALARDI:  Well, again, depending upon the outcome

11 of the next step with the CRA and that, our ideal time would be

12 May 11th.  I only use that because you have a fixed date.  If

13 there's an earlier date or we can do it and give people

14 comfortable, adequate notice for what we're doing, but that

15 would be the ideal thing.  Again, the real deadline as I

16 usually do in these cases, is working backwards.  What we

17 really are shooting for is that June 8th confirmation date, and

18 we know this hearing should be before that, because it's the

19 first step in the dismissal before we go.  So somewhere anytime

20 in that period we'll try to coordinate and then we'll again

21 coordinate through Mr. Foley and your office and Judge

22 Morawetz's office as to what's mutually convenient for Your two

23 Honors.

24         THE COURT:  All right, very good.

25         MR. GALARDI:  Thank you, Your Honor.  If I may be

**J&J COURT TRANSCRIBERS, INC.**

1  excused for the day?

2           THE COURT:  You may.  Thank you.

3           MR. GALARDI:  Thank you.

4           MR. FOLEY:  Thank you, Your Honor.  Doug Foley on

5  behalf of the debtors.  I'm just going back to the agenda, Your

6  Honor.  There are 22 items on the agenda.  There's only one

7  matter that is contested that will be going forward.  That's

8  Item Number 5, which is the Ryan motion for reconsideration.

9  But before we get to that, Your Honor, if we could go through

10 the other items.  The Item Number 1 is the motion by John

11 Raleigh.  I'm pleased to report to the Court that we've

12 completely resolved the motion and the underlying claim and

13 will be filing a stipulation with respect to that shortly.

14          With respect to Item Number 2, Your Honor, this is

15 the Schimenti 2004 motion.  I believe this motion is now moot,

16 but I'm waiting for confirmation from Mr. Perkins with respect

17 to that.  So until I get confirmation of that, we'd ask that

18 matter be adjourned to the May 11th date at ten.

19          THE COURT:  All right.

20          MR. FOLEY:  With respect to Items Number 3 and 4,

21 Your Honor, these are the Madcow motions.  One for the

22 administrative claim under 503(b)(1) and the motion under

23 503(b)(9).  We had business contacts coordinating with them to

24 reconcile the amounts of these claims and they've requested

25 that both of their motions be adjourned until the May 20th

1  hearing date at ten.

2          THE COURT:  All right.

3          MR. FOLEY:  Your Honor, Item Number 6 on the agenda

4  is the 23rd omnibus objection with respect to the Vonage

5  Marketing claim, that has been resolved and can be removed from

6  the docket.

7          Item Number 7 on the agenda, Your Honor, is notice of

8  hearing on the 57th omnibus objection -- and I'm just checking

9  my notes on that one -- this is Snell Acoustics, we have

10 resolved everything with Snell Acoustics, Your Honor, and that

11 can be removed from the docket.

12         Item Number 8, again, is the 58th omnibus objection,

13 which also covered the Snell Acoustics claim.  Again, that's

14 been resolved and can be removed from the docket.

15         Item Number 9, Your Honor, is the 34th omnibus

16 objection to claims and that matter has been resolved with

17 respect to some of the matters, but Audiovox we're still

18 working on, and they've requested and the rest of the

19 unresolved matters we're adjourning for status until the May

20 20th hearing date at ten.

21         Item Number 10 on the agenda, Your Honor, is the 50th

22 omnibus objection to claims.  This also includes the Audiovox

23 claim and similarly these are being adjourned for status until

24 the May 20th hearing date at ten.

25         Item Number 11, Your Honor, is the Archos' motion for

**J&J COURT TRANSCRIBERS, INC.**

1 reconsideration with respect to the order on the 48th omnibus

2 objection to claim.  They have requested, we're working with

3 them to try to resolve the matter.  An adjournment until the

4 May 11th hearing date at ten.

5        I'll just skip over Items 12 through 19, Your Honor.

6 Mr. Fredericks and Ms. Boehme will be addressing those.

7        Item Number 20, Your Honor, this is the adversary

8 proceeding complaint against LG.  We're working to try to

9 resolve all their claims.  As Your Honor is aware, they're one

10 of the appellants with respect to the 502(t) ruling.  We prefer

11 to adjourn the pretrial conference and not enter a scheduling

12 order at this time, but rather adjourn the pretrial conference

13 until June 8th at ten, Your Honor.

14        With respect to Item Number 21, this is our adversary

15 proceeding complaint against United States Debt Recovery as

16 well as Signature.  This one, Your Honor, we're not prepared to

17 request the Court to enter a pretrial scheduling order at this

18 point because Signature has defaulted.  We had filed a motion

19 asking Your Honor to enter a default judgment against

20 Signature.  That has been set for hearing on May 11th.  And we

21 have also resolved the underlying issues with U.S. Debt

22 Recovery.  That was one of the appellants that we resolved. So

23 there may not be a need for the Court to enter an initial

24 pretrial conference, but at this point it probably makes sense

25 depending on how Your Honor rules on the default motion to

23

1  adjourn the request for a pretrial conference until May 11th at

2  ten.

3            THE COURT:  All right.  It will be adjourned to the

4  11th.

5            MR. FOLEY:  Your Honor, Item Number 22, this is our

6  complaint against PNY Technologies.  Again, we're trying to

7  resolve the matter with them as well, similar to LG and would

8  request that that initial pretrial conference be adjourned

9  until the June 8th hearing date at ten.

10           THE COURT:  All right, June 8th.

11           MR. FOLEY:  And Mr. Fredericks will address Items 12

12 through 14, which is our fifth omnibus objection to claims that

13 involves the goods, services issue.

14           MR. FREDERICKS:  Good morning, Your Honor.

15           THE COURT:  It's actually afternoon.

16           MR. FREDERICKS:  Good afternoon.  Thank you.  I

17 apologize.  Ian Fredericks with Skadden Arps for the record.

18 With respect to Matter Number 12, this was a notice to go

19 forward on certain claims, Minor Fleet Management and Vector

20 Security.  We have reached agreements in principle and I think

21 maybe since this agenda has been filed we've actually finalized

22 the settlement agreements with respect to those two.  So those

23 two are resolved.

24           THE COURT:  All right, excellent.

25           MR. FREDERICKS:  With respect to the next matter,

1    this is both -- it's also, it's either the fifth or the sixth

2    omnibus objection, this one related to U.S. Signs and Schimenti

3    Construction.  We have submitted a proposed form of order

4    sustaining the objection with respect to Schimenti.  With

5    respect to U.S. Signs, we are currently engaging in discovery.

6    We had propounded discovery with respect to the goods issue.

7    They have done likewise.  In addition to that, we also plan to

8    supplement the objection to address the received issue, when

9    the "goods" were received, and we've propounded discovery on

10   that as well, so for the time being, we propose just moving the

11   status hearing over to the May 20 hearing and giving the Court

12   an update at that point about whether or not this matter has

13   been resolved or is going to need to have it set for an

14   evidentiary hearing.

15            THE COURT:  You wish to be heard?

16            MR. HUTSON:  Yes, Your Honor.  Richard Hutson for the

17   record for U.S. Signs.  And Mr. Fredericks is accurate.  We're

18   hoping to resolve this, but we have outstanding discovery, so I

19   think May 20th is a good time to set a status.

20            THE COURT:  All right, very good.  So we'll set that

21   down for May 20.

22            MR. FREDERICKS:  Thank you, Your Honor.  The next

23   matter, Matter Number 15, this was -- I skipped on, I'm sorry.

24   Matter 14, this is a notice with respect to Retail MDS.  This

25   was another goods/non-goods issues.  WE had been advised that

1  Retail MDS would not be appearing at the hearing and what we

2  proceed -- we'd ask the Court to proceed to go forward and rule

3  that this was a non-goods transaction that services

4  predominated and goods were incidental.

5          THE COURT:  All right.  Do I have to have some

6  evidence on that?  Can you proffer some evidence so I can make

7  the ruling?

8          MR. FREDERICKS:  Certainly, Your Honor.  It's

9  actually their burden as the administrative claimant.  But if

10  you'd like us to put on evidence, I'm happy to proffer the

11  testimony of Ms. Bradshaw who is in the courtroom.

12          THE COURT:  You're exactly right.  It is their

13  burden.  I'm sorry.  I was --

14          MR. FREDERICKS:  It's not a problem, Your Honor.  I

15  know it gets confusing about the way we set these things up a

16  little bit.

17          THE COURT:  No, I was just going through and I've got

18  it right here, and it is certainly their burden, and they're

19  not here to go forward on it.  And I've reviewed their response

20  and the documentation that was attached to it, and it appeared

21  to me there was not even a close call, that it was services

22  that were being provided under the -- my prior ruling that none

23  of the goods would be recoverable.  So yes, I will grant your

24  request and that will be denied.

25          MR. FREDERICKS:  Thank you.  We'll submit an order re

**J&J COURT TRANSCRIBERS, INC.**

1  classifying the claim to a general, unsecured claim.

2         THE COURT:  That would be appropriate.  Thank you.

3         MR. FREDERICKS:  Thank you, Your Honor.  I believe

4  there are only -- and this isn't on the agenda -- I believe

5  there are only two claims left after this that will be subject

6  to the fifth and sixth omni -- in addition to U.S. Signs, so

7  three.  U.S. Signs I believe it's Graphic Communications and

8  Performance Printing.  Graphic Communications, we are trying to

9  reach an agreement on stipulated facts, and would then just

10  present briefing to the Court.  Again, that one we are going to

11  supplement and do goods/non-goods and also the received issue.

12  And if we can have stipulated facts to present to the Court,

13  that's where we're trying to get to so that Your Honor doesn't

14  have to have an evidentiary hearing.  We're tentatively

15  thinking that if it works for the Court using June 8th as the

16  hearing for oral argument, if we do need to have evidence,

17  we'll probably use a different hearing given that that may be

18  confirmation.

19         THE COURT:  All right.

20         MR. FREDERICKS:  And then Performance Printing, we

21  are working to try to resolve that claim and hopeful that we

22  can reach a consensual resolution on that one.

23         THE COURT:  All right, very good.

24         MR. FREDERICKS:  For the remainder of the matters, I

25  believe Ms. Boehme will be handling it.  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          MS. BOEHME:  Good afternoon, Your Honor.

3          THE COURT:  Good afternoon.

4          MS. BOEHME:  Sarah Boehme on behalf of the debtors.

5   Item 15 on the agenda is the debtors' 19th omnibus objection.

6   We're here today for a status hearing solely with respect to

7   Arboretum of South Barrington, LLC, Inland U.S. Management,

8   LLC, and Inland Continental Property Management Corporation

9   Marketing, LLC.  We are trying to work through these, they are

10  both landlord claims that were filed as secured that we seek to

11  reclassify to general unsecured.

12          With respect to Arboretum of South Barrington, LLC,

13  we'd like to adjourn the status on that to May 20th for further

14  status.  Since it involves a landlord claim with multiple

15  pieces to it, we're trying to substantively resolve the entire

16  claim rather than handle it piecemeal.  With respect to the

17  three Inland entities, we are prepared to go forward on the

18  merits with that one on May 20th.

19          THE COURT:  All right.

20          MS. BOEHME:  To the extent that it's not resolved

21  prior to that time.

22          THE COURT:  Very good.  Mr. Mueller?

23          MR. MUELLER:  Good afternoon, Your Honor.  Mike

24  Mueller on behalf of Inland.  Ms. Boehme's representations are

25  correct.  We are trying to resolve the claims' objections.  The

28

1  basis for the secured claims is set off rights with respect to

2  reconciliations.  We're trying to work through to see if there

3  are even any reconciliations that need to be made.  So

4  hopefully we'll have it resolved prior to May 20th.

5            THE COURT:  All right, that will be our hope.

6            MR. MUELLER:  Thank you, Your Honor.

7            MS. BOEHME:  Item 16 on the agenda is the debtors'

8  20th omnibus objection.  I'm happy to report that I have

9  submitted an order resolving all but one of these claims.

10 Today we were here to go forward with respect to a status

11 hearing on Averatec/Trigem USA Inc., and Paramount Home

12 Entertainment.  We did resolve the Paramount Home Entertainment

13 objection as part of the order that was submitted.  So today we

14 only need to go forward with a status hearing on

15 Averatec/Trigem USA.

16            THE COURT:  All right.

17            MS. BOEHME:  This claimant also is subject to the

18 48th omnibus objection, which is also set for status.  For this

19 particular objection it's with respect to goods received

20 outside of the 20 days.  We have provided them information

21 documenting that these goods were received at 20 days and

22 they're just having trouble contacting with their client to

23 resolve this piece of it as opposed to the other piece of it

24 with the setoff and other issues raised at omni 48.  But we're

25 hopeful that we will be able to enter an order prior to this.

1  But at this time we will go ahead and adjourn the status

2  hearing with respect to this one to May 20th.

3        THE COURT:  So that will be another status on May

4  20th as opposed to going forward?

5        MS. BOEHME:  Yes.  Yes.

6        THE COURT:  All right.

7        MS. BOEHME:  Item 17 on the agenda is the debtors'

8  37th omnibus objection that deals with a reduction of personal

9  property tax claims.  This is one where the debtors had hired a

10  tax consultant to do a personal property tax evaluation, and

11  nearly every taxing authority responded with questions

12  regarding that evaluation process.  So the debtors have

13  prepared a motion for summary judgment on some threshold legal

14  issues, one of them being abstention and whether or not the

15  Court has authority to rule on personal -- handle these

16  personal property tax matters under Section 505 of the

17  Bankruptcy Code.  We anticipate that the summary judgment

18  motion will be filed today and that all of these will be heard

19  with respect to that legal issue at the May 20th hearing.

20        THE COURT:  If the Court doesn't have the

21  jurisdiction to resolve those, who does?

22        MS. BOEHME:  The individual taxing authorities'

23  jurisdictions.

24        THE COURT:  Okay.

25        MS. BOEHME:  According to the individual taxing

1  authorities who responded.

2           THE COURT:  I think I understand.  All right.

3           MS. BOEHME:  Item 18 on the agenda is the debtors'

4  48th omnibus objection.  This was set for a status hearing with

5  respect to Averatec/Trigem.  Again, we are working with them in

6  connection with the Omnibus 20 objection and we have with

7  respect to Omni 48, propounded discovery and they have done the

8  same.  So we would request that the status hearing on this be

9  set over for May 20th.

10          THE COURT:  Is this a different claim that they have

11 filed that is the subject of your 20th omnibus objection or is

12 this just a different theory for objecting to a similar claim?

13          MS. BOEHME:  This is a different -- Your Honor, Omni

14 48 basically takes into account what we're seeking to do in

15 Omni 20, which is reclassify a portion of their 503(b)(9)

16 claim, and then offset money that's owed to the debtor against

17 their 503(b)(9) claim.

18          THE COURT:  All right.

19          MS. BOEHME:  So we're trying to figure out in Omni 20

20 what their 503(b)(9) claim is and then figure out in Omni 48

21 the amount that we're going to set off against which portion of

22 which claim.

23          THE COURT:  All right, I understand.

24          MS. BOEHME:  Item 19 on the agenda is the debtors'

25 70th omnibus objection.  This is on for an initial status.  The

1    objection included 113 claims for approximately 8.1 million.

2    We did receive several responses, most of which were set forth

3    on Exhibit A, although we did receive some informal responses

4    that were not set forth -- excuse me -- on Exhibit A.  At this

5    time we would ask the Court to enter an order granting the

6    disallowance of the claims for any claimant that did not file a

7    response and for any claimant that did file a response we will

8    set those for status on May 20th.

9              THE COURT:  All right, that relief will be granted.

10             MS. BOEHME:  Thank you, Your Honor.  That concludes

11   the claims with the only item being left being the contested

12   item Number 5 with respect to Ryan.

13             THE COURT:  All right.

14             MR. FOLEY:  Your Honor, Doug Foley on behalf of the

15   debtors.  Matter Number 5 is Ryan's motion for reconsideration

16   of Your Honor's ruling on March 8th with respect to their

17   motion to compel us to assume prepetition professional services

18   contract and our motion to reject it.  Your Honor entered an

19   order rejecting it.  They've moved to reconsider that.  We

20   obviously think the Court should deny the motion, it has

21   nothing to do with the claim issue.  We can update the Court on

22   what they have done with respect to the claims.

23             They have filed a couple of claims, administrative

24   claims, alleging administrative priority.  We'll deal with

25   those in the ordinary course.  We'll object to them at some

1  point because it involves prepetition services.  And they've

2  also filed a complaint recently to seek declaratory judgment

3  with respect to the status of their claims as well as some

4  other relief.  But the issue today is simply on the motion to

5  reconsider the 365 issue on assumption or rejection and we

6  don't believe they can meet the standard that's under Your

7  Honor's precedent that was recently affirmed by Judge Payne.

8  But we'll defer to the movants.

9           THE COURT:  All right.

10          MR. MARINO:  Good afternoon, Your Honor.  I'm Robert

11  Marino from the Law Firm of Redmon, Peyton and Braswell serving

12  as local counsel for Ryan Inc., formerly known as Ryan and

13  Company, Inc.  And I have with me today Bruce W. Akerly of the

14  law firm of --

15          THE COURT:  I'm sorry, the last name again?

16          MR. MARINO:  -- Akerly.

17          THE COURT:  Akerly, that's right.  I heard him by

18  phone last time.

19          MR. MARINO:  Yes, that's correct.  And as you heard

20  me by phone last time.  He's with the firm of Cantey Hanger in

21  Dallas, Texas, and he is the lead counsel and he's been

22  previously admitted pro hac vice and I'll let Mr. Akerly

23  address the Court.

24          THE COURT:  Thank you.

25          MR. MARINO:  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1              THE COURT:  Mr. Akerly, welcome to the court.

2              MR. AKERLY:  Thank you very much, Your Honor.  Just

3    for the record, Bruce Akerly on behalf of Ryan Inc., the movant

4    here today.  And I appreciate the Court hearing me this

5    afternoon.

6              Just as an administrative matter, we did designate

7    some exhibits, but I'll let the Court know that there's 14.  I

8    think 13 of them are all pleadings or things that are of

9    record, but I wanted them in kind of a notebook so as I talk a

10   little bit the Court can refer to them.  Number 14 is actually

11   a copy of the actual agreement that's in dispute or at issue

12   with respect to the rejection issue.

13             THE COURT:  All right.

14             MR. AKERLY:  May I approach, Your Honor?

15             THE COURT:  You can hand them to the courtroom

16   security officer.

17             MR. AKERLY:  For the record, Your Honor, I have --

18             THE COURT:  And have these been made available to

19   counsel for the debtor?

20             MR. AKERLY:  Yes, I was just going to say that, Your

21   Honor, thank you.  We have made a set of these available to

22   counsel today and they have them.

23             THE COURT:  All right.

24             MR. AKERLY:  If I may, Your Honor, we are here, as

25   Mr. Foley has correctly stated, to ask the Court to reconsider

1 two orders.  In your notebook these orders are under Exhibits 9

2 and 10.  I guess as an administrative matter, maybe I ought to

3 go ahead and move for admission of these exhibits if that's

4 possible as I refer to them.

5          THE COURT:  Any objections, Mr. Foley?

6          MR. FOLEY:  Your Honor, 13 of the 14 exhibits are

7 pleadings from the Court's docket.  Either orders or our

8 motion.  Exhibit Number 14 is the copy of the contract that we

9 rejected which was attached to our motion.  I don't know that

10 the Court needs evidence at this point.  We would like to make

11 an argument that notwithstanding -- we don't have any

12 objections to the exhibits, they're all exhibits from the

13 Court's docket, but we think for purposes of this hearing on

14 our motion to reconsider, we're not exactly sure that it makes

15 sense to have evidence that all which was available at the

16 hearing that Your Honor held last time.

17          THE COURT:  Okay, well, I'll hear that at the

18 appropriate time, but I'm going to let Mr. Akerly explain to me

19 why I do and let him go.  So they're all admitted.

20          MR. AKERLY:  Thank you very much, Your Honor.  Eight

21 and nine of the exhibits are the two orders that are before you

22 this afternoon.  The first order under eight is the order --

23 I'm sorry, not eight and nine, nine and ten, Your Honor.

24 Exhibit 9 is the order authorizing the rejection of the

25 executory contracts, a contract with Ryan Inc.  That is the

1  contract that is under Tab 14 in your notebook.  Exhibit 10 is

2  the order denying Ryan's motion to compel assumption of that

3  contract. So what you had in front of you back on, I believe,

4  March 8th at the -- well, the hearing in which we appeared by

5  telephone and Mr. Foley appeared here in person was you had two

6  motions in front of you at that time, the debtors' motion to

7  reject the executory contract and Ryan's motion to assume.  The

8  Court then entered separate orders on those and we're asking

9  the Court to reconsider those at this time.

10        We did file before the Court, and it is under Tab 11,

11  Your Honor, our verified motion to reconsider.  And the reason

12  I verified it was I just wanted to avoid the necessity of

13  putting on specific evidence.  Most of the facts are just

14  proofing up the pleadings and Ryan's understanding with respect

15  to the transactions that have transpired and resulted in the

16  issuance of the order.

17        If I may take the Court back just a little bit with

18  respect to what has transpired here and how we sort of got here

19  from there, just real briefly.  Ryan entered into this

20  agreement prepetition, the agreement that's under Tab 14.

21  Ryan, at the time of the bankruptcy, Ryan was continuing to

22  monitor Hawaii import tax payment issues at the state level,

23  but wasn't doing much.  I mean, at the state level there was an

24  appeal -- well, a denial of a tax refund request that had been

25  undertaken by Ryan and at the time the bankruptcy was filed

1  that appeal of that denial had been put on hold.  And so Ryan

2  continued, basically just continued to monitor the process

3  throughout the bankruptcy.

4          On September 29th, the debtor filed its joint, it's

5  first amended joint plan, and in that plan, it's essentially,

6  with respect to executory contracts, it's a default plan which

7  basically says if we haven't assumed your executory contract

8  it's going to be deemed rejected.  Based on that, we filed an

9  objection to confirmation, Your Honor, which is under Tab, I

10 believe it's Tab 4.  No, I'm sorry, Your Honor, it's under Tab

11 6 or 7, Your Honor.  But in any event, we objected there.

12         We also filed a motion to compel the debtor to assume

13 the contract.  And the reason we did this was, normally we

14 would file a motion to compel the debtor to assume or reject.

15         THE COURT:  Right.

16         MR. AKERLY:  Have the debtor make a decision.  The

17 debtor here essentially in the plan was indicating its

18 intentions.  They had informed us that they were going to not

19 assume Ryan's contract, but were going to reject it as part of

20 confirmation process.  And so we thought, well, rather,

21 obviously rather than wait for the confirmation process, we

22 wanted to have, to force the issue, essentially, filed a motion

23 to compel assumption.

24         And then we begin the dialogue with the parties, and

25 both parties talked extensively about how to resolve the issues

between the parties with respect to this contract.  And just to
give the Court a little bit of background, there's an appeal
pending in the State of Hawaii that involves Comp USA.  And
this particular import tax issue, I don't even begin to
understand all of the intricacies of it, but this particular
issue is heading up in the State Court system in Hawaii in
connection with Comp USA.  Comp USA is actually a client of
Ryan's.  That is actually Ryan's appeal that's going up.  And
as part of that process, Ryan had developed, essentially, a
mechanism to, would request at the State of Hawaii level, you
know, refunds with respect to import tax issues and it involves
an interpretation of state law and different import inventories
and analysis.  And that issue is before the State Supreme
Court.

And Ryan then came to Circuit City and informed
Circuit City that they might benefit from this, from what's
happening in the State of Hawaii.  And before they entered into
this engagement, Ryan said to Circuit City essentially is, we
have this strategy, but we need you to enter into the
engagement.  They entered into the engagement and then they
involved the strategy, which essentially is the same strategy
that is going up for the -- so they started down that route and
then Circuit City filed bankruptcy.

Now, Circuit City, after they filed their plan and
after we objected to the plan and then we filed the motion to

1  assume, we engaged in discussions with counsel for Circuit City

2  with respect to whether or not they would entertain an offer by

3  Ryan to purchase the claim.  We proposed a purchase price.

4  They then responded to the purchase price three days before the

5  March 8th, hearing.

6          Now, again, prior to that time, they also moved to

7  reject the contract.  So not only did you have the plan

8  essentially doing a default rejection, but now you had actually

9  a formal motion to reject on the part of the debtor, which was

10 buried within an omnibus motion to reject that had to do with

11 employment contracts.  So you had all these, you know, a host

12 of employment contracts and then you had Ryan's contract, which

13 has nothing to do with employment.  But they did move to

14 reject, and so we responded.  We responded to that motion to

15 reject.  We posed that motion to reject.  They then opposed our

16 motion to assume which brought the two contested matters sort

17 of ready for submission to the Court.  But during that time,

18 the parties continued to dialogue.

19         As I pointed out in my verified motion, Your Honor,

20 it was Ryan's understanding, because this matter had been

21 passed numerous time on the docket, most of the times it had

22 been passed to coincide with confirmation hearings that were --

23 confirmation settings that were before the Court and the

24 continued dialogue between the counsel, that it was Ryan's

25 understanding and believe, and I understand that, you know, the

1  debtor has, the debtor definitely has a different viewpoint.

2        And I'm not representing to the Court that with

3  respect to the hearing on March 8th that the debtor said to us,

4  that's not going to be an evidentiary hearing.  I don't want to

5  misrepresent to the Court, and I know Mr. Foley had had some

6  concerns about, you know, our motion somehow implying that the

7  debtor, the debtors' counsel had somehow said that that March

8  8th hearing wasn't going to be an evidentiary hearing.  Don't

9  misunderstand me.  What I'm saying is, from our perspective,

10 notwithstanding the agenda that went up before the Court, we

11 believed and understood that that hearing was not going to be

12 evidentiary, that it was essentially going to be talking about

13 legal issues, and then if evidence was going to be necessitated

14 that it would be set down for an evidentiary hearing.

15       And to back this up, it's not just my belief or Mr.

16 Marino's belief or understanding, but we then got permission to

17 attend the hearing by telephone, and in our motion to appear by

18 telephone, as I've set out, the actual motion is in the

19 exhibits, but as I set out in my motion to reconsider, in that

20 motion to appear by phone, we state, the parties agree that the

21 issues presented at the March 8th omnibus hearing with respect

22 to Ryan's plan objection, the motion to compel and the motion

23 to reject would be confined to legal argument, with the

24 understanding that if any evidentiary issues that they will be,

25 if there are any evidentiary issues that they will be deferred

1  to another date subject to entry of a scheduling order by the

2  Court.

3        Please understand, that's my understanding of what

4  the parties' understanding was.  Again, I don't want to mislead

5  the Court, but it was very clear to us, okay, that we were

6  going to be able to appear by phone and present this argument

7  by phone, legal argument.  If there was any legal argument we

8  would be making those assertions.  Then if there was a

9  necessity for evidence, we were going to set it down.

10  Otherwise I would never have been, I would never have appeared

11  by phone.  I would have had Mr. Neil Fett, who's here from

12  Ryan, I would have had him here for that hearing, Your Honor.

13        Now, this is really important, because when you look

14  at the flip side, okay, there were two motions before the Court

15  on the eighth, okay?  My motion to assume, and if you remember,

16  Your Honor, we have the transcript here, if you remember, one

17  of the legal issues you raised, Your Honor, was, you know, can

18  a creditor move to compel the assumption, okay, and that's the

19  kind of issue we contemplated would come up is, you know, are

20  these pleadings asserting proper legal rights as between the

21  parties?

22        The other motion, there were two motions, the other

23  motion was there motion to reject.  Now, obviously we have the

24  burden on our motion and the debtor has the motion on their

25  motion.  So when we got to the hearing, and you can look at the

1   transcript, we appeared by phone, and the Court raised those

2   issues, quite fine, that was fine, but the Court took the

3   business judgment conclusions that were made in the omnibus

4   motion to reject as final, essentially, and they were not

5   final, they were contested.  Once we contested the motion to

6   reject, that put the debtor to its burden to put on evidence

7   with respect to business judgment and whether or not this

8   particular contract had no value to the Court -- I'm sorry --

9   no value to the estate, was a burden on the estate.  And at

10  that hearing there was no evidence proffered, there were no

11  witnesses or exhibit lists filed, the motion to reject, the

12  omnibus motion to reject was not followed by a declaration or

13  an affidavit or any verification.  Mr. Foley, as you can see

14  from the transcript, Mr. Foley never offered to put on any

15  evidence to support his motion.

16        And no disrespect to the Court, the Court considered

17  the motion in front of it and made a ruling.  We respectfully

18  believe that the Court did not -- should have considered

19  evidence.  Okay?  The Court could have said to me, Mr. Akerly,

20  you have the burden on your motion to assume.  Okay?  And

21  where's you evidence?  You know, and I would have said, well,

22  Your Honor, I didn't know this was going to be an evidentiary

23  hearing, that's why I'm on the phone.  That was my burden

24  though.  Okay?  But what the Court didn't do was say, okay, Mr.

25  Foley, your motion to reject, it is opposed by Mr. Akerly,

**J&J COURT TRANSCRIBERS, INC.**

1 where's your evidence?  And Mr. Foley in his response to his

2 motion to reconsider says, well, Mr. Akerly could have cross

3 examined.  There were no witnesses, there was no proffer.

4 There was no proffer made.

5       So my point with respect to this aspect of the motion

6 to reconsider is, the Court should, in the interest of

7 fairness, in the interest of justice is hold the debtor to

8 their burden.  To at least demonstrate to the Court that this

9 agreement is lacking in value to the bankruptcy estate, this

10 agreement is a burden to the bankruptcy estate.

11       We likewise would like to put on evidence to show the

12 Court that this agreement has considerable value to bankruptcy.

13 It's a very unique arrangement, very unique contract between

14 the parties, and we would like the opportunity to put the

15 evidence on to show the unique relationship between my client

16 and the debtor.  And not just the debtor, but the debtors'

17 successor is going to benefit from this contract to the tune of

18 --

19       THE COURT:  Let's assume that you're right --

20       MR. AKERLY:  Yes, Your Honor.

21       THE COURT:  -- and that the contract has huge benefit

22 to the estate, all right?  That the debtor says, you know, in

23 exercise of our business judgment, we want to reject it anyway.

24 Aren't they entitled to reject a contract?

25       MR. AKERLY:  I don't think they're entitled to

43

1    absolute, just to say in our business judgment we reject.  They

2    have to have some judgment.  They have to have something that

3    backs that up.

4            THE COURT:  Well, I have to find that their business

5    judgment is reasonable.

6            MR. AKERLY:  There you go.

7            THE COURT:  But it's got to be -- but so long as

8    they've got reason --

9            MR. AKERLY:  Yes.

10           THE COURT:  -- for exercising the business judgment,

11   isn't that the controlling issue?

12           MR. AKERLY:  How I understand the cases, Your Honor,

13   is that if they go forward with a certain amount of evidence on

14   business judgment, the burden then shifts to me to demonstrate

15   that this is a valuable contract to the estate.  That this

16   contract is not a burden and has value.  This particular

17   contract, for example, it is a contingent fee contract, there's

18   no, absolutely no cost to the estate.  If there is a recovery

19   of a tax refund, then we get a fee.  The estate has no, there's

20   no downside, no economic downside to the estate with respect to

21   this contract.

22           Our client has the unique relationship with the State

23   of Hawaii.  Our client has undertaken all of the analysis.  It

24   was our client's strategy from the very beginning with respect

25   to this refund.  In that contract there is a confidentiality

**J&J COURT TRANSCRIBERS, INC.**

1    agreement, and that's the basis for our complaint that we filed

2    for declaratory and injunctive relief is that that strategy,

3    the fruit of that strategy, the whole argument that's being

4    made before the State of Hawaii that was being made by Ryan

5    cannot be used by Circuit City.

6         And my point being is, there being no downside to the

7    estate, what is the problem here in terms of allowing Ryan to

8    continue what it was doing under that contract, get the fruit

9    of its labor, the estate gains six to $800,000.  Without Ryan

10   there, we arguably have a contractual block to their ability to

11   go forward, which means the estate and the creditors, under the

12   liquidating trust, the creditors will lose out on that

13   recovery, because they can't use our strategy, the fruits of

14   our strategy, our work product, all of that under the terms of

15   the agreement.  And that's our point.

16        What we would hope or we wanted was to have the Court

17   set it down for an evidentiary hearing so the Court could hear

18   this, could hear the witnesses, could see, you know, in the

19   scheme of things, this contract actually is absolutely no

20   burden to the estate.  Actually there's an incredible upside.

21   Because if you weigh in the rights that Ryan has under the

22   agreement, you know, in terms of its ability to block the

23   debtor from going forward, then you've got to rule in Ryan's

24   favor.

25        Now, here's what I would suggest, and I was trying to

1 do this before the hearing with Mr. Foley is, since we have th

2 complaint for declaratory injunctive relief, what I would

3 request is if the Court were to grant my motion to reconsider

4 is that the Court then consolidate the motion to assume with

5 the complaint, and let's just -- there really isn't much in the

6 way -- there's really no discovery  that has to be had, we can

7 have an evidentiary hearing, hear everything and the Court can

8 rule in a very prompt manner.

9          THE COURT:  Okay, well, let's assume that -- well,

10 let's break it down.

11          MR. AKERLY:  Yes, Your Honor, I'm sorry.

12          THE COURT:  Because with regard to the motion to

13 require them to assume the contract.

14          MR. AKERLY:  Yes, Your Honor.

15          THE COURT:  Okay, you've conceded that that was your

16 burden, you didn't present the evidence, so that one's gone it

17 seems to me, isn't it?

18          MR. AKERLY:  Well, respectfully, Your Honor, again,

19 we did not believe that the hearing that was taking place on

20 the eighth was an evidentiary hearing.  We believed it was

21 going to be talking about legal issues, you know are these most

22 proper, those kind of -- that's my understanding, that's Ryan's

23 understanding.  I know Mr. Foley, I agree, the agenda doesn't

24 say that, the agenda says going forward, I understand.  But we

25 believe that it wasn't -- my point being that if the Court

1 finds that the motion to assume was actually set down for a

2 final hearing, and, you know, sorry, Mr. Akerly, you shouldn't

3 have appeared by phone, you should have been here with

4 witnesses, then you're right.  Then that motion, I mean, I

5 didn't put on any evidence.

6        THE COURT:  But you didn't say when you were on the

7 phone, wait a second, Judge, I want to put on some evidence

8 here.

9        MR. AKERLY:  No, but what I said was, I said, I

10 believe in the transcript I said that we would like the

11 opportunity to go forward on the motions.  Okay?  Neither party

12 filed any witness list, any exhibit list.  You know, it just

13 didn't occur to us that that's what was going to happen.  We

14 were thinking it was going to be more like a status conference

15 talking about legal issues, talking about are these motions

16 really proper and those kinds of -- that's my understanding.

17 Now, you know, obviously --

18        THE COURT:  The second thing I wanted to ask you is,

19 if I do what you're asking me to do, if this plan gets

20 confirmed on the eighth of June, the plan terms provide for the

21 rejection of the contract, so isn't that going to, you know,

22 moot the whole thing at that point in time?   I mean, in other

23 words, aren't the creditors allowed to vote to say that we want

24 to reject these contracts?

25        MR. AKERLY:  The way the plan is drafted now, that's

**J&J COURT TRANSCRIBERS, INC.**

1  right, anything not assumed is going to be rejected.  We

2  objected to the plan on the very basis that you shouldn't

3  reject Ryan's contract.  So it's out there as an objection to

4  confirmation.  And we've raised the same issues in our

5  objection to confirmation as we're raising in our response to

6  their motion to reject.  My point being is that you can

7  preserve that issue out, you can preserve that -- you can

8  confirm that plan.  This is a liquidating Chapter 11.  You can

9  confirm that plan and reserve the issue on rejection.  If the

10 Court deems the contract rejected, there's no impact.  It's

11 gone.  Yes, we file a rejection damages claim.  They know what

12 our claim's going to be, they can reserve for it, that's fine.

13 If the Court assumes, it's all upside.  There's not monetary

14 impact on the creditors, because everything we do is going to

15 result in a monetary recovery from the State of Hawaii

16 ultimately.

17         Now let me say one other thing, Your Honor, and to

18 make it very clear here about Ryan's role under this contract.

19 If this contract is rejected, all right, either the creditor's

20 liquidating trustee is going to just not do anything, right?

21 Fully aware of it and not do anything, and I don't know if

22 that's a breach of fiduciary duty, but the refund claim's out

23 there.  Okay?  The State of Hawaii would love the debtor to

24 ignore the claim obviously.  But if the liquidating trustee

25 decides to go forward and seek that refund, two things.  One

1  is, we don't think they can use Ryan's work product or Ryan's

2  strategy or the fruit of that strategy.  That's protected by

3  the agreement.  Even on rejection the agreement doesn't go,

4  that aspect of the agreement doesn't go away.

5        Second is, the liquidating trustee is going to have

6  to have to hire somebody to prosecute that tax refund.  There's

7  no indication that anybody would do that on a contingent basis

8  like Ryan's doing.  So that is going to be a burden, that is

9  going to be an economic burden.  You have to pay somebody on an

10  hourly basis to prosecute that, whereas Ryan's contract has no

11  burden at all.  So I think you could reserve it out.

12        THE COURT:  But that goes back to my other question

13  before that, you know, that the debtor in the exercise of its

14  business judgment could say, wait a second, we do want to hire

15  somebody else to do this because maybe they think on an hourly

16  fee basis that it's going to be less than what the contingency

17  contract is.  That's a reasonable business judgment.

18        MR. AKERLY:  Sure.  Then let's hear it.  Let's hear

19  it.  I mean, that's my point.  I have not heard that.  I have

20  not heard -- the only thing I've heard from the debtors' side

21  is, we don't think it's a valuable contract.  And that's what

22  set us down the path of, well, maybe we'll buy it.  Okay?  And

23  that started us down the path of negotiations.  Because all

24  we've heard so far is, we don't think that's a valuable

25  contract.  That's crazy.  I mean, we're the ones who, Ryan is

1 the ones who are prosecuting the Comp USA, but we're on the

2 inside, we know the value of this contract.  We offered to buy

3 it.  The debtor, we couldn't reach an agreement on the price,

4 okay, which anyone on that  basis can assume that that means

5 the debtor does believe it has some value, we couldn't reach an

6 agreement.

7          So the point is, yes, let them come in, that's all

8 we're asking.  Let them come in and say, we think we can hire

9 an accounting firm in Hawaii, you know, fifty bucks an hour, to

10 do this.  Then the Court also has to consider, you know, can

11 they use the fruit of Ryan's work, the product, in light of the

12 agreement?  Are they going to have to start from scratch?  And

13 that's kind of the benefit, the cost benefit analysis the Court

14 needs to hear in order to decide whether or not it's

15 appropriate to reject.  That's the business judgment we want

16 the Court to be able to consider.

17          THE COURT:  All right.  And so the basis for your

18 motion is that under Rule 59(e) which as incorporated by

19 Bankruptcy Rule 9023, that the Court needs to do this to

20 correct a clear error of law and to prevent manifest justice?

21          MR. AKERLY:  Yes, Your Honor.  Miscarriage of

22 justice, that's right.

23          THE COURT:  Okay.  All right.

24          MR. AKERLY:  Thank you.

25          THE COURT:  Let me hear from Mr. Foley.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. FOLEY:  Your Honor, setting aside the offense

2    that I've taken at the pleading and the conversation we had

3    prior to the hearing that counsel was not going to stand here

4    and claim that they were somehow misrepresented by me or

5    somebody at my firm, that seems to be the genesis of the

6    argument, that we weren't prepared last time, we want another

7    chance, we want a do over.  Whatever the argument is, it

8    doesn't meet the standard, we believe, as we've set forth in

9    the pleadings, that Your Honor cites in the <u>Pollack</u> case

10   (phonetic) and Judge Payne in the affirmance of that case that

11   the Fourth Circuit says you have to apply Rule 59 and motions

12   to reconsider for many a judgment to accommodate an intervening

13   change and controlling law to account for new evidence not

14   available at trial or to correct a clear error of law or

15   prevent manifest injustice.  And they appear to be moving under

16   the third prong.

17          But, Your Honor, again, Mr. Akerly confuses several

18   things.  One is he overstates what's going on in Hawaii.  What

19   is pending in Hawaii is, we filed an amended tax return seeking

20   a refund that could be, with interest, up as much as $750,000.

21   Right now it's worth nothing, because it's been denied, and the

22   strategy or whatever they claim that they've come up with in

23   the Comp USA case is all public record.  They filed pleadings

24   with the Hawaiian Appellate Courts, everything is disclosed.

25   There was a window of time in Hawaii before they changed the

1  law between 2002 -- 2001 and 2004 where the State of Hawaii was

2  valuing certain inventory that was on an excised tax basis that

3  was imported form the mainland to the Islands.  And that's what

4  this relates to, how much of an excise tax do you pay based

5  upon a cost basis of the inventory.  What cost basis do you

6  use?  Their theory came from this Comp USA case, which is a

7  legal theory and it's public record.  There is no, for lack of

8  a better word, special sauce that they gave us.  They came in

9  and looked at our screen shots from our financial information

10 and helped us prepare and file amended tax returns.  We have no

11 proprietary information, we have no secret book from Ryan on

12 the secrets of Hawaii, you know, tax refunds.  All this work

13 was done in 2005 and 2006 and 2007, and it's been percolating

14 up and down through the Hawaii courts, and right now all the

15 taxpayers are at zero.

16        And this is a prepetition contract for professional

17 services, nothing has been done post-petition.  We have no idea

18 what we're going to do with this claim.  We may abandon it

19 eventually.  But there's nothing to do.  We said, if you think

20 this claim is so great and you want to prosecute it, make us an

21 offer.  They offered us $25,000 for what could be a $750,000

22 claim.

23        MR. AKERLY:  Your Honor, objection.  Obviously --

24        MR. FOLEY:  You brought up --

25        MR. AKERLY:  -- Federal rules of evidence prohibit

52

1 the disclosure of settlement amounts.  I mentioned the

2 discussions, the settlement discussions, but I deliberately did

3 not get into the --

4        THE COURT:  I think Mr. Akerly is right and the Court

5 will disregard the amount of any settlement.

6        MR. FOLEY:  That's fine, Your Honor.  My point is the

7 value of this claim is what it is.  But the point of the matter

8 is, what's before the Court is a motion to reconsider under 365

9 our business judgment to reject a prepetition professional

10 services contract, because the only alternative of assumption

11 would potentially, we don't know if this claim's ever going to

12 materialize into anything, could potentially elevate a

13 prepetition, general unsecured claim into an administrative

14 claim.  That's what's really driving everything here and why

15 Your Honor doesn't need to amend its ruling is because --

16        THE COURT:  Well, that's what I recall from this

17 prior hearing is that what bothered me about assuming this

18 contract or what was really driving this is that if a

19 professional was going to be employed post-petition, that that

20 was something that had to be approved by this Court on

21 application, that I had not approved any post-petition

22 application for any professional and therefore I didn't think

23 it was a contract that could be assumed.

24        MR. FOLEY:  And we agree one hundred percent with

25 Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1            THE COURT:  But wasn't that what I said last time?

2            MR. FOLEY:  Yes.  That is one of the -- that's one of

3    the issues you addressed.  I mean, we listed Ryan as an

4    ordinary course professional to the extent there was any work

5    to be done post-petition, but that would have required them to

6    file an affidavit that they were going to do work.  They never

7    file done, because they didn't do any work.  This is all

8    prepetition work.  And it's not in the fiduciary duty or

9    interest of the estate to assume a contract that would elevate

10   a prepetition, general unsecured claim to an administrative

11   claim.  All the work was done.  They're in no different

12   situation than anybody else who didn't get paid for prepetition

13   work that they did.  The fact that they  have a contingency fee

14   contract, the case law is clear.  We cited the <u>Hall</u> case,

15   prepetition contingency fee contracts for professional services

16   can be rejected.  And the question of what their claim might be

17   is not before the Court today.  They have filed two

18   administrative claims and they had filed a complaint to seek

19   declaration of a priority status of their claim.  That can all

20   be dealt with another day.  This is simply a decision on

21   assumption and rejection.  And the Court -- there's no basis

22   for the Court to alter its decision.

23           THE COURT:  Would you address just very briefly, Mr.

24   Akerly's argument that you were required to put on evidence in

25   order to support the business judgment of the debtor that would

1 allow you to reject the contract?

2        MR. FOLEY:  At the previous hearing, Your Honor, I

3 think Mr. Akerly is correct, I did not use the word proffer,

4 but as Your Honor is aware, Ms. Bradshaw comes to every

5 hearing, and we proffered that it was our business judgment not

6 to do that, not to elevate a prepetition, general unsecured

7 claim for prepetition work under prepetition contract and to

8 the post-petition arena, because there was no work to be done,

9 there was no request to retain them, and that the U.S. -- the

10 plan confirmation, the trustee has to weigh in on what to do

11 with this claim.

12        And we're not going to make decisions on retaining

13 professionals when this thing has been languishing for years

14 that could tie the trustee's hands.  And so we made

15 -- we could always hire Ryan again after we confirm the plan we

16 can negotiate another contract, we could hire somebody else, we

17 could end up selling the claim to Ryan or somebody else, but

18 that was the basis -- it's axiomatic in our view that rejecting

19 this contract was really the only responsible thing that the

20 estate could do.

21        And to the extent the Court thinks I should turn that

22 into a proffer, I'm glad to proffer Ms. Bradshaw's testimony in

23 that regard.  If I didn't use the words proffer on March 8th I

24 apologize to the Court.  But again, it was axiomatic in our

25 view that this was the only result, because it's not a contract

1  that could be assumed.

2           THE COURT:  All right, thank you.  Mr. -- I'm sorry,

3  Ms. Beran, you wish to be heard on this?

4           MS. BERAN:  Yes.  For the record, Paula Beran as co-

5  counsel for the Official Committee of Unsecured Creditors.  I

6  believe Mr. Feinstein may also still be on the line in

7  connection with this.  This is something that had been

8  discussed with the Committee and the Committee supported the

9  debtors' position on it, and again today supports the debtors'

10 position and believes that the debtors' request for you to deny

11 the relief requested is the appropriate action.

12          THE COURT:  All right, thank you.

13          MS. BERAN:  Thank you.

14          THE COURT:  All right, I don't see anybody else

15 getting up, so, yes, Mr. Akerly, you can respond.

16          MR. AKERLY:  Really just a minute --

17          THE COURT:  Is this really a dispute, you're just

18 trying to elevate a prepetition claim to administrative status?

19          MR. AKERLY:  No, Your Honor, no.  We have not, we are

20 not making -- let me back up.  I filed, Ryan filed an

21 administrative claim and then a supplement to administrative

22 claim very early in the case as a prophylactic matter.  And

23 Ryan is not making any contention that they have undertaken

24 work, significant work that has been of a resulting benefit to

25 the bankruptcy where you'd have a 503 admin claim.  Don't get

1  me wrong, this is an executory contract.  Okay?  Nobody's

2  claimed that it's not an executory -- it's an executory

3  contract which has value to the bankruptcy estate which needs

4  -- we think needs to be assumed.

5          I'm surprised that counsel for the Creditors'

6  Committee is not actually weighing in on our side here in order

7  to preserve the value of this contract for the bankruptcy

8  estate.  She wasn't at the hearing on the motion to reject and

9  the motion to assume.  She shows up now on the motion to

10  reconsider and I -- my concern is --

11          THE COURT:  How do you know she wasn't there?

12          MR. AKERLY:  Well, I have the transcript, doesn't

13  have her appearance.

14          THE COURT:  She didn't appear at that part of the

15  hearing.

16          MR. AKERLY:  Okay.  I guess she can say, Judge, let

17  you know if she was there or not.  But, Your Honor, she didn't

18  stand up and try to weigh in on it before the Court ruled.  She

19  didn't come before the Court to say, Your Honor, we're weighing

20  in, we've talked about this with the debtor, we're weighing in

21  and we support the debtors' motion to reject.  I understand

22  it's a joint plan.  And that's fine.  I mean, I understand that

23  they're supporting the plan and the plan contemplates

24  rejection.

25          But my concern is, that doesn't make rejection right.

**J&J COURT TRANSCRIBERS, INC.**

1  You need to take evidence on the issue as to whether or not

2  this is satisfactory on the business judgment side.  I think

3  everyone's missing the point here, and that is that Ryan has

4  the unique and valuable skills, and it's their strategy, I know

5  Mr. Foley's saying, well, this is all a matter of public

6  record.  It's a little more complicated than that.  And I have

7  Mr. Fett here who would be testifying on those issues if

8  necessary, but it's much more complicated than that.  Ryan is

9  actually prosecuting that Comp USA appeal.  We have the unique

10  ability to be victorious on that contract.  This contract goes

11  away, all of the fruits of our labor go away under the

12  contract.

13         THE COURT:  Okay.  Just assuming you're correct in

14  all that.  Let's focus on the legal issue.  What is the

15  manifest injustice that I need to prevent or what is the clear

16  error of law that I committed last time when we had the

17  hearing?

18         MR. AKERLY:  Primarily not putting debtor to their

19  burden to put on evidence.  There was no proffer.  The

20  transcript is -- Your Honor, the transcript is under Tab 13.  I

21  have the transcript of the entire proceeding.  First of all,

22  the Court didn't take up that issue that Mr. Foley said you did

23  or you thought you did, that legal issue that we mentioned

24  about, you know, elevating to an administrative claim, that was

25  -- Mr. Foley mentioned some things about it, but the Court was

1 mostly concerned, if you notice, Your Honor, in the transcript,

2 the Court was mostly concerned about how can I, what authority

3 do I have to prosecute a motion to compel assumption?  And

4 that's a good questions.  I've looked high and low and not

5 found a case that says either way.  The code obviously says

6 that it's the debtors' right to assume or reject.  It's an or,

7 and here I've explained, you know, the debtors clearly

8 manifested an intention to reject, so we merely moved to compel

9 assumption knowing that they were already planning to object.

10      But in there, in this particular transcript, Your

11 Honor, there is no attempt on the part of Mr. Foley to say, you

12 know, here's our evidence, here's what we think, here's what's

13 going on here, here's why we think this is of no value to the

14 estate.  And all I'm asking for, Your Honor, is an opportunity

15 to put forth the evidence so that Your Honor can have a good

16 record from which we can establish whether or not this is in

17 fact, rejection is in fact in the best interest of the

18 bankruptcy estate applying the business judgment rule.  Thank

19 you.

20      THE COURT:  All right, thank you, sir.  The Court has

21 before it the verified motion to reconsider the order denying

22 the motion of Ryan Inc., to compel the debtor to assume the

23 executory contract in the order pursuant to Section 365

24 authorizing the rejection of the executory contract with Ryan.

25      The Court has previously ruled that the three grounds

59

1  to reconsider hearing as has the Fourth Circuit has found the

2  three grounds, recognize them in Hutchinson v. Staton to

3  accommodate intervening change of controlling law to account

4  for new evidence not available at trial or to correct a clear

5  error of law and prevent manifest injustice.  The Court does

6  not believe that there is any clear error of law or any

7  manifest injustice that would be prevented by reconsidering the

8  Court's prior ruling.  The Court was confident that the debtor

9  was exercising its business judgment in making the decision to

10 reject the contract, and furthermore, the Court did not believe

11 that this was a contract that was capable of being, you know,

12 simply assumed for because any post-petition work performed by

13 a professional would have to have been approved by the Court

14 through appropriate application.  So the Court's not going --

15 is going to deny the motion to reconsider.  And, Mr. Foley, I'd

16 ask you to please prepare an order to that effect.

17        MR. FOLEY:  We will, Your Honor.  That concludes the

18 remaining matters on the docket.

19        THE COURT:  Okay.  Mr. Akerly, thank you for your

20 fine presentation here today.

21        MR. AKERLY:  Thank you, Your Honor.

22                    * * * * *

23

24

25


**J&J COURT TRANSCRIBERS, INC.**

# **C E R T I F I C A T I O N**

        I, RITA BERGEN, court approved transcriber, certify
that the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter, and to the best of my ability.


/s/ Rita Bergen                    DATE:  May 13, 2010

RITA BERGEN

J&J COURT TRANSCRIBERS, INC.