UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


| | | |
|---|---|---|
| IN RE: | . | Case No. 08-35653(KRH) |
| | . | |
| | . | |
| | . | |
| CIRCUIT CITY STORES | . | 701 East Broad Street |
| INC., | . | Richmond, VA 23219 |
| | . | |
| | . | |
| Debtor. | . | June 24, 2010 |
| . . . . . . . . . . . . .. | | 10:02 a.m. |


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          McGuire Woods, LLP
                         By:  DOUGLAS FOLEY, ESQ.
                         9000 World Trade Center
                         101 W. Main Street
                         Norfolk, VA  23510

                         McGuire Woods, LLP
                         By:  SARAH BECKETT BOEHM, ESQ.
                         One James Center
                         901 E. Cary Street
                         Richmond, VA  23219

                         Skadden Arps Slate Meagher & Flom, LLP
                         By:  IAN S. FREDERICKS, ESQ.
                              GREGG M. GALARDI, ESQ.
                         One Rodney Square
                         Wilmington, DE  19899


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311   Fax No. (609) 587-3599

2

**APPEARANCES (Cont'd):**

```
For the Official          Pachulski, Stang, Ziehl & Jones
Committee of Unsecured    By:  ROBERT FEINSTEIN, ESQ.
Creditors:                780 Third Avenue
                          36th Floor
                          New York, NY  10017
```

3

1          THE CLERK:  In the matter of Circuit City Stores,

2   Incorporated.  Hearing on Items one through 42 as set out on

3   debtors' agenda.

4          MR. FOLEY:  Good afternoon, Your Honor.  Doug Foley

5   with McGuireWoods on behalf of the debtors.  With me at counsel

6   table is Gregg Galardi and Ian Fredericks from Skadden Arps as

7   well as Sarah Boehm from my firm.  From the company here today,

8   Your Honor, is Katie Bradshaw, who's the vice president and

9   controller.

10          Your Honor, there's 42 items on the agenda today.

11   Obviously the big question that the Court wants to address,

12   obviously, is where we are with the plan and mediation motion,

13   and Mr. Galardi will address that briefly shortly.  But just to

14   go through the other items on the agenda before we get to

15   those.

16          Your Honor, Item Number one is Towne Square's motion

17   for a late filed proof of claim.  We are working with them to

18   try to resolve that.  We think we should be able to reach a

19   resolution by the July 22nd omnibus hearing dates.  They have

20   requested and we have agreed to continue their motion until the

21   July 22nd date at ten.

22          THE COURT:  All right.

23          MR. FOLEY:  Your Honor, Items Number two and three,

24   these are Madcow's motion for administrative claim and for a

25   503(b)(9) claim.  We are still exchanging documents with the

**J&J COURT TRANSCRIBERS, INC.**

4

1 business people with respect to a resolution of that claim.

2 They have requested and we have agreed to adjourn their two

3 motions until the July 22nd hearing date at ten.

4          THE COURT:  All right.

5          MR. FOLEY:  Your Honor, Item Number 4 is a motion for

6 a late claim by Site A.  This was filed by Kaufman and Canoles'

7 counsel.  And we are negotiating with then a resolution of that

8 claim.  There are some issues relating to informal perfect

9 claim arguments.  We are hopeful to try to reach a resolution

10 of that motion before the July 22nd hearing date.  They have

11 requested and we've agreed to adjourn that matter until the

12 July 22nd hearing date at ten.

13          THE COURT:  All right.

14          MR. FOLEY:  Your Honor, Item Number 5 is our

15 objection to the New York State Department of Tax and Finance's

16 claims, and we have resolved that matter and it can be removed

17 from the docket.

18          THE COURT:  All right.

19          MR. FOLEY:  I'm sorry.  We're still documenting it,

20 but let's carry it over to the July 22nd hearing date, and we

21 will file that stipulation and settlement prior to that date.

22          THE COURT:  Your agenda suggested you wanted to

23 adjourn it to July 12, but you want to go to July 22?

24          MR. FOLEY:  The other claims' matters we're pushing

25 until July 22nd, Your Honor, so we might as well put them all

**J&J COURT TRANSCRIBERS, INC.**

5

1  on the same day.

2              THE COURT:  That's fine with me.

3              MR. FOLEY:  Thank, Your Honor.   Your Honor, Items

4  Number 6 through 29, Ms. Boehm will address to the Court, but

5  if we can skip for now to Item Number 30, which is the Ryan

6  matter, and 31.  This is the complaint by Ryan with respect to

7  the executory contract that we've rejected.  We have filed a

8  motion to dismiss.  Opposing counsel has requested more time to

9  respond to that.  We have agreed that as long as they filed

10 their response by June 30th that we were agreeable to continue

11 the pretrial conference as well as the hearing on a motion to

12 dismiss the complaint to the July 12th hearing date, Your

13 Honor.

14             THE COURT:  All right.

15             MR. FOLEY:  Your Honor, Item Number 32, this is the

16 Schimenti complaint.  We have also filed a motion to dismiss

17 with respect to that.  With respect to that matter, counsel,

18 opposing counsel has requested that they have more time to

19 respond to our motion to dismiss and we have agreed to allow

20 them until the end of July, I think July 2nd, which is a

21 Friday, to file their response to the motion to dismiss, and we

22 would agree to continue the hearing until the July 12th hearing

23 date, Your Honor.

24             THE COURT:  Do you anticipate that hearing actually

25 be conducted then on the 12th?

**J&J COURT TRANSCRIBERS, INC.**

6

1          MR. FOLEY:  Yes, Your Honor.

2          THE COURT:  All right, thank you.

3          MR. FOLEY:  With respect to Item Number 33, this is

4   the Avenues in Leather complaint and the pretrial conference.

5   We have exchanged offers last night, I believe, with respect to

6   them, to completely resolve this matter.  So we'd ask that the

7   pretrial conference be adjourned until the July 12th hearing

8   date.

9          THE COURT:  All right.

10         MR. FOLEY:  Your Honor, Item Number 34, this is our

11  complaint against Signature, which is the only defendant left

12  in the case.  Mr. Epps represents Signature.  His client is

13  supposed to be getting us documentation that we need in order

14  to evaluate a possible complete resolution.  So we've asked

15  that that pretrial conference be continued to the July 12th

16  hearing date.

17         THE COURT:  All right.

18         MR. FOLEY:  Your Honor, if we could pass over --

19  actually, Your Honor, the remaining items, Item Number 35 will

20  be addressed by Mr. Fredericks and Mr. Galardi will address

21  Items Number 36 through 42, but Ms. Boehm will address the

22  claims' matters which are Items 6 through 29.

23         THE COURT:  All right, thank you.

24         MS. BOEHM:  Good morning, Your Honor.

25         THE COURT:  Good morning.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BOEHM:   Item 6 is the debtor's fifth omnibus

2     objection.   There's only one remaining claim in this and that

3     is with respect to Graphic Communications, Inc., which is

4     scheduled for a status hearing today.   We have been passing

5     around a stipulated facts that we intend to file as well as

6     additional briefing on both the issue of the definition of

7     goods and received.   And we will file a notice of hearing

8     scheduling this matter to go forward on the merits on July 22nd

9     at ten a.m.

10          THE COURT:   All right.   So we'll actually hear it on

11     that day?

12          MS. BOEHM:   Yes, sir.

13          THE COURT:   All right, very good.

14          MS. BOEHM:   Item 7 is the debtor's sixth omnibus

15     objection.   This objection has been fully resolved.

16          THE COURT:   Okay.

17          MS. BOEHM:   Item Number 8 is the debtor's seventh

18     omnibus objection to certain late claims.   This was scheduled

19     to go forward as a status hearing for all the claimants that

20     are remaining in Omni 7 which are Michael and Barbara Lay,

21     Renukaben Naik and Dino Bazdar.   We're in the process of

22     contacting all of these claimants to schedules these matters

23     for hearings on the merit.   We anticipate that some of them may

24     go forward on July 22nd, and if that day doesn't work then

25     we'll find a mutually agreeable date and file separate  notices

**J&J COURT TRANSCRIBERS, INC.**

8

1   of hearing for all of those.

2           THE COURT:  Okay.

3           MS. BOEHM:  Item Number 9 is the debtor's eighth

4   omnibus objection to late claims.  All of these claims are

5   being adjourned to July 22nd at ten a.m.

6           THE COURT:  All right.

7           MS. BOEHM:  Item Number 10 is the debtor's ninth

8   omnibus objection to claims.  This is scheduled to go forward

9   as a status hearing with respect to CNA Consulting, Belkin

10  International Inc., Adam Drake and Lyle Alonso Epps.  Again, we

11  are contacting these parties to schedule these for hearings on

12  the merit and we will be filing separate notices of hearing for

13  those.  With respect to the claim of SimpleTech, which is the

14  only other remaining claim in that omni just being adjourned

15  until July 22nd at ten a.m.

16          THE COURT:  Okay.

17          MS. BOEHM:  Item Number 11 is the debtor's 19th

18  omnibus objection.  All of the remaining claims in Omni 19 are

19  being adjourned to July 22nd at ten a.m.

20          THE COURT:  Okay.

21          MS. BOEHM:  Item Number 12 is the debtor's 20th

22  omnibus objection.  There's only one remaining claim in Omni 20

23  and that is Audiovox, and that is being adjourned until July

24  22nd at ten a.m.

25          THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

9

1           MS. BOEHM:   Item 13 is the 22nd omnibus objection.

2   All of those claims are being adjourned to July 22nd at ten

3   a.m.

4           THE COURT:   All right.

5           MS. BOEHM:   Item  14 is the 23rd omnibus objection.

6   All of those claims are being adjourned to July 22nd at ten

7   a.m.

8           THE COURT:   All right.

9           MS. BOEHM:   Item 15 is the 24th omnibus objection.

10  This dealt with real estate claims.  All of those have been

11  resolved and that can be removed from the docket.

12          THE COURT:   All right.

13          MS. BOEHM:   Item 16, 17, 18, 19 and 20, all of those

14  claims are being adjourned to July 22nd at ten a.m.

15          THE COURT:   All right.

16          MS. BOEHM:   Item 21 is the debtor's 41st omnibus

17  objection.  This had one remaining claim and that was

18  Microsoft.  A stipulation has been filed.  Today is the

19  objection deadline.  Assuming no objections are received today,

20  that omnibus objection will be fully resolved.

21          THE COURT:   All right.

22          MS. BOEHM:   Item Number 22 is the 43rd omnibus

23  objection to late claims.  This was noticed for a status

24  hearing to go forward with respect to the Tennessee Department

25  of Treasury and Rusty Santangelo.  Again, we are contacting

1  these parties and anticipate filing notices of hearing to go

2  forward on the merits.

3            THE COURT:  Okay.  And when will that be conducted?

4            MS. BOEHM:  Possibly July 22nd, and if that date is

5  not good for these parties, then we'll --

6            THE COURT:  But you're going to notice it up

7  separately?

8            MS. BOEHM:  Yes.

9            THE COURT:  Okay.

10            MS. BOEHM:  Item 23 is the 44th omnibus objection.

11  This has one remaining claim that's being adjourned to July

12  22nd at ten a.m.

13            THE COURT:  Okay.

14            MS. BOEHM:  Item 24 is the 48th omnibus objection.

15  This had a few remaining claims.  Stipulations had been filed

16  for all the remaining claims in this omnibus objection.  Today

17  is the deadline for the stipulation withe Averatec.  If no

18  objections are received, then this Omni 48 will be fully

19  resolved.

20            THE COURT:  All right.

21            MS. BOEHM:  Item 25 is the 49th omnibus objection.

22  All of those claims are being adjourned to July 22nd at ten

23  a.m.

24            THE COURT:  Okay.

25            MS. BOEHM:  Item 26 is the 50th omnibus objection.

1  All of those claims are being adjourned to July 22nd at ten

2  a.m.

3           THE COURT:  All right.

4           MS. BOEHM:  Item 27 is the 54th omnibus objection to

5  late claims.  This includes one remaining claim by a late

6  claimant, Greg Nagy, which is scheduled for a status hearing

7  today.  Again, this will be filed a separate notice of hearing

8  to go forward on the merits.

9           THE COURT:  All right.

10          MS. BOEHM:  And Items 28 and 29, the 60th and 70th

11  omnibus objection, the remaining claims are being adjourned to

12  July 22nd at ten a.m.

13          THE COURT:  All right.

14          MS. BOEHM:  Thank you.

15          THE COURT:  Thank you.

16          MR. FREDERICKS:  Good morning, Your Honor.

17          THE COURT:  Good morning.

18          MR. FREDERICKS:  Ian Fredericks of Skadden Arps on

19  behalf of the debtors.  We're here on Matter Number 35, which

20  is the debtor's motion to abandon certain real property located

21  in Marion, Illinois.  Your Honor, Ms. Bradshaw, the vice

22  president and controller of the company is in the court and if

23  it's acceptable to Your Honor, I'd proceed by proffer.

24          THE COURT:  As long as there's no objection, you may

25  proffer.  We'll see if anybody wants to cross examine her.

**J&J COURT TRANSCRIBERS, INC.**

12

1              MR. FREDERICKS:  Thank you, Your Honor.  If called to

2    testify, Ms. Bradshaw would state that the debtors own a parcel

3    of real estate located in Marion, Illinois.  That is

4    essentially just a dirt parcel of real estate.  It was

5    originally purchased after the debtors had leased a

6    distribution center in Marion, Illinois.  It was purchased

7    because at the time trucks were lining up for the DC and

8    obstructing roadways, so they approached the City of Marion and

9    purchased this dirt parcel so that the trucks could wait there

10   instead of waiting in the streets to be loaded and unloaded at

11   the distribution center.

12             Since the going out of business sales, the debtors

13   have had no use for the real estate.  The debtor's real estate

14   broker, DJM Realty, has actively tried to market the real

15   estate.  In particular, they've approached the owner of the

16   distribution center who has expressed no interest in purchasing

17   the parcel and has advised, and the debtors have learned that

18   in fact that owner is in -- the owner of the DC is having

19   financial difficulties since Circuit City vacated.

20             They also approached the City of Marion, who they

21   purchased it from.  The City of Marion similarly is having

22   financial difficulties and has no interest in the real estate.

23             The debtors -- DJM has also attempted to market it to

24   other parties and has received no bids and no interest.  The

25   debtors are concerned that there will be continued tax

1  obligations.  There are likely insurance obligations and there

2  is a risk of injury on the property because there is nobody

3  actively monitoring it and it essentially just is a parcel of

4  dirt.  With that said, Ms. Bradshaw would say that in the

5  debtor's -- or she would testify that in the debtor's business

6  judgment they believe that this asset is burdensome and of no

7  value to the state and it should be abandoned.  That would

8  conclude Ms. Bradshaw's testimony.

9        THE COURT:  All right.  Does any party wish to cross

10  examine the proffered witness?

11                    (No response)

12        THE COURT:  All right, the proffer will be accepted.

13        MR. FREDERICKS:  Thank you, Your Honor.  With that,

14  the debtors believe that they've satisfied Section 554 in that

15  the property is burdensome and of little or no value to the

16  estate and request an order abandoning the property.

17        THE COURT:  Does any party wish to be heard in

18  connection with the debtor's motion for an order authorizing

19  the abandonment of this property?

20                    (No Response)

21        THE COURT:  All right.  Mr. Fredericks, this may be a

22  metaphysical question, but what happens to it once the debtor

23  abandons the property?  Where does it go?

24        MR. GALARDI:  It goes back to the prepetition debtor,

25  Your Honor, for somebody to actually foreclose or forebear or

1  the State to take it over by way of their state powers.

2  Unfortunately that's the answer.

3        THE COURT:   All right.   The Court's going to grant

4  the motion.   I think that it does make sense to relieve the

5  debtor's estate of the burden of further tax liability or any

6  insurance obligation or anything else, regardless of where we

7  might think it ultimately is at this point.   We'll leave that

8  to somebody else to worry about.

9        MR. FREDERICKS:   And with that, Your Honor, what we

10  will do is we will serve Marion with a copy of the order and

11  possibly have DJM, to the extent they have a contact there, and

12  I assume they do, to give them a copy of the order and let them

13  know that this Court has, you know, abandoned it so the State

14  can take whatever action it wants to if it wants to take any.

15        THE COURT:   All right.

16        MR. FREDERICKS:   Or I'm sorry, the City.   Excuse me.

17        THE COURT:   All right, very good.

18        MR. FREDERICKS:   Thank you, Your Honor.   With that

19  I'll turn the remainder over to Mr. Galardi.

20        MR. GALARDI:   Your Honor, at this time I'll let Your

21  Honor -- the next matter on the agenda is the debtor's motion,

22  which is supported by the Committee to pay administrative

23  claims.   The two matters after that are retention motions and

24  then there's all the confirmation matters.   The separate items,

25  they can sort of be said tangentially or in connection with the

1 confirmation matters.  So I don't know if Your Honor wants me

2 to address where we stand on that matter before going to these

3 or whether we should just go in the order of the agenda.

4          THE COURT:  No, I want to know what's going on with

5 regard to the confirmation issue.

6          MR. GALARDI:  Surely.  Your Honor, again, I think --

7 and Mr. Feinstein is here today.  The parties continue to work

8 hard, indeed worked until last night sending e-mails and even

9 this morning.  I think where we have done is we've run out of

10 time given Your Honor's statement that even if we were looking

11 for an adjournment we probably wouldn't get one and maybe a

12 mediator sets a deadline for us to resolve.  I'd say we are

13 still very close.  We had calls last night, but we're not

14 there, and maybe the issues are just fundamental.  Maybe a

15 mediator can resolve them, maybe a mediator can't, but we, I

16 think, from the debtor's perspective, suggest that a mediator

17 be appointed as soon as possible, that the mediation be

18 commenced as soon as possible to see if we can resolve those

19 issues, and if the mediator can't bridge that gap that we were

20 unable to do so, then we may be in a dual plan process.

21          I'm not going to go through the issues unless Your

22 Honor really wants to hear the issues.  I'm assuming that those

23 will be for the mediator.

24          THE COURT:  I assume they'd be for the mediator as

25 well.  I'm obviously disappointed that you weren't able to

1  resolve them, but I do think it's time to, you know, get this

2  case moving and the form of a mediator would be in the best

3  interest.  I would like to hear from the Committee, make sure

4  that there's -- their position on the matter.

5          MR.  FEINSTEIN:  Your Honor, before addressing the

6  plan issue which is obviously quite important, Matter Number

7  36, which was the debtor's motion to pay administrative

8  expenses, we don't view as tied to the plan or anything else.

9  That was a motion that was made that's uncontested today that

10 the Committee does support.

11         THE COURT:  We'll address that in just a few minutes.

12         MR. FEINSTEIN:  Okay.  I just don't -- I don't want

13 to lose sight of that.

14         MR. GALARDI:  No.  And actually, I had mentioned that

15 one, Your Honor, as one that I would do either independent or

16 not.  It's not tied and we intend to prosecute it.

17         MR. FEINSTEIN:  Thank you.  With regard to the plan

18 matter, Your Honor, the Committee wants to see mediation happen

19 immediately.  It can't happen soon enough.  We have tried.

20 We've passed proposals back and forth.  Mr. Galardi's correct,

21 we've been at this into the wee hours last night.  We didn't

22 get there despite great efforts on our part and I believe the

23 debtor's too.  We just have differences.  We don't want to see

24 this process delayed any more than it has been so we would like

25 to see mediation happen as early as the middle of July.

**J&J COURT TRANSCRIBERS, INC.**

1    We don't want to get bogged down in extensive

2  briefing and the like.  While they're complicated issues, we

3  think a mediator will be able to grasp them if we have a couple

4  of day session with him, and if the mediation fails then we do

5  intend to proceed with our own plan.

6    THE COURT:  All right, very good, thank you.  All

7  right, the Court then is going to order  mediation of these

8  issues.  The Court -- I've spoken to Judge Santoro who sits in

9  this district.  He's in Norfolk and obviously doesn't -- we'll

10  move the mediation to that city.  You can coordinate with him

11  and he'll be generally flexible as far as, you know, where you

12  want to do it, but he has consented to conduct the mediation.

13  He's an experienced practitioner before he went on the bench

14  and I think will be very familiar with the issues that you're

15  going to present to him.  And he's enjoyed some successes in

16  mediating past controversies.  So I will ask him as soon as

17  we're done here today I will phone him and let him know that

18  the parties will be getting in touch with him and I would ask

19  you to do that.

20    What I intend to do is enter the order that was

21  submitted to me.  I think that there was a 30-day date in there

22  to come back with a scheduling a status conference.  So I'll

23  make sure the date is, it will be one of our omnibus dates is

24  what I would suggest you do.

25    And my thinking was July 22nd as far as the date to

**J&J COURT TRANSCRIBERS, INC.**

1  report back on status to me as far as where we are on the

2  mediation.  Any questions in any of those regards?

3           MR. FEINSTEIN:  Yes, Your Honor.  From the

4  Committee's perspective, we'd like it clear that we want to

5  have principles at the mediation, meaning directors of the

6  company, members of the Committee --

7           THE COURT:  That is a very good point.  I do require

8  that.  I want decision makers at the mediation.  Judge Santoro

9  will insist upon that.  And generally I'm going to defer to him

10 as far as how he wants to conduct the mediation and such.  But

11 yes, the principle's going to need to be available and they

12 need to have decision making authority.

13          MR. FEINSTEIN:  Again, we'll take up scheduling with

14 Judge Santoro, but we're hoping to have mediation in mid-July

15 so that when we come back to Your Honor on the 22nd it's

16 because we will have already had mediation sessions.

17          THE COURT:  I understand.

18          MR. FEINSTEIN:  Thank you.

19          MR. GALARDI:  And we don't disagree with either the

20 calender of the 22nd or hoping to have had those mediation days

21 before then, Your Honor.

22          THE COURT:  All right.

23          MR. GALARDI:  And we don't disagree with having

24 principles there either, Your Honor.

25          THE COURT:  All right.  And obviously if there's any

1  problem that comes up with the mediation, you can, you know,

2  contact me and I'll be happy to get involved to the extent I

3  think it's appropriate.

4        MR. GALARDI:  Your Honor, then moving on to Matter

5  36, as I had said before --

6        THE COURT:  That takes care of all of the plan

7  confirmation items, so --

8        MR. GALARDI:  Yes, Your Honor.

9        THE COURT:  -- that's through 39.

10       MR. GALARDI:  They'll either be correspondingly

11 adjourned or there will be an order entered on the mediation.

12 So I think we will -- that takes care of the entire pages on my

13 agenda at least from Page 34 to the end.

14       THE COURT:  All right, very good.

15       MR. GALARDI:  Your Honor, then returning to on my

16 agenda, Matter 36, which is on Page 32 of my agenda.  As Your

17 Honor is aware, we had a settlement with the various taxing

18 authorities.  The Committee had expressed reservations

19 regarding that on the basis of fairness that if you're going to

20 pay some administrative claims you should pay all of them.  We

21 had a disagreement about that, but given where we were with the

22 plan process, given the delays that could have occurred, we

23 believe that, and given the success that we've had on claims

24 and bringing in of money, we believed that it was appropriate

25 to file this motion and agree not to withdraw it, to pay

1  administrative claims that have been allowed.

2         Ms. Bradshaw is again in the courtroom today and if

3  called as a witness, would testify that they have over $400

4  million of cash on hand, that there are 25 allowed

5  administrative claims to date with approximate allowed amount

6  of $25 million, that based upon the analysis of the claims to

7  date and the pending claims, that this estate is

8  administratively solvent, that we have sufficient cash to be

9  able to pay all administrative claims.  Indeed, we think -- as

10 I've given Your Honor details before, pay all administrative

11 claims, secured claims and priority claims in full on the

12 effective date of any plan.  This motion is really confined to

13 the administrative claims right now.  We may come back to you

14 with paying more of these things as we go forward depending

15 upon the timing of the plan.

16        Your Honor, we don't believe that there is any

17 prejudice to any of the creditors in the estate.  A number of

18 these claims in administrative status are not just, there's

19 some 503(b)(9) claims that may have waited for confirmation,

20 but there are also administrative claims to vendors who

21 delivered good post-petition, but because of the doubt about

22 administrative solvency back in November/December, and then

23 with certain rulings and the results they're not in doubt, I

24 think the Committee is supportive and we are supportive of in

25 fact paying these amounts now prior to confirmation and

1   comfortable.

2           In addition, Your Honor may recall that we --

3           THE COURT:  Wouldn't you have the authority to pay

4   trade creditors just under Section 363?

5           MR. GALARDI:  Yes, but there was a request from the

6   Committee not to do so until we were in fact in a position to

7   say that we were administratively solvent.  And so we hadn't

8   done so for part of that time, and so we didn't pay those.  Now

9   the 503(b)(9) were different, and indeed, Your Honor, one of

10  the orders we had, and so part of this is to override one of

11  the orders, one of the orders with respect to settlements were

12  503(b)(9) to be not paid until the effective date of the plan.

13  We're now saying, okay, that was an order, but we would like to

14  now pay those as is fair to those administrative creditors.

15          Yes, ordinary administrative expenses we could have

16  paid under the ordinary course for vendors, but they were out

17  of, you know, we were concerned about it and wanted to make

18  sure, because it has other implications in a plan.  And now

19  we're comfortable with that so we think just -- you don't need

20  to give us authority to do that, but we're saying we're going

21  to pay that as if they're allowed claims.

22          Your Honor, and again, Ms. Bradshaw would say that

23  based on her review of the claims and based on we've had a

24  number of administrative bar dates in this case, we are

25  comfortable that there won't be additional administrative

1   claims coming in such that that by making these payments that

2   we are jeopardizing the administrative solvency of these cases,

3   that we have an adequate reserve.  And indeed, Your Honor, one

4   of the conditions to the effectiveness that we'd mentioned with

5   the Committee and whether it's our plan, their plan or some

6   joint plan, we would still anticipate the need to set up

7   reserves for estimated administrative secured and priority

8   claims.  So this again doesn't affect our ability to confirm a

9   plan, go effective or make distributions.  With that, Your

10  Honor, we have not received any objections to this motion.  We

11  would ask for the authority to be both authorized and directed

12  to pay allowed administrative claims.

13         THE COURT:  You said that there are 25 administrative

14  claims have been allowed totaling approximately 25 million.

15  And in your papers, though, you say that there are

16  approximately 1600 administrative claims that have been filed

17  and that that totals 285 million.

18         MR. GALARDI:  Correct.  Those have been filed, but

19  they're not allowed and they're disputed and those are amounts

20  that we may dispute.  We don't think that they're going to be

21  quite as high as that, which is why we are again comfortable

22  paying and releasing the funds.  Because even if they were all

23  allowed, under our plan we were going to reserve for all of

24  these, so even if you took the 450, took the other 265 plus the

25  25, we could reserve, some of those are 503(b)(9) disputes,

**J&J COURT TRANSCRIBERS, INC.**

1   some of those are other claims, so we think even on the most

2   conservative estimate, which is what we've been working out

3   with the Committee, there's plenty of money to pay these

4   administrative claims.

5           So that's why we put that number in there so that the

6   Court feels comfortable that we think it might be a lower

7   number, it's not our estimate of allowed, it's the face amount,

8   and so we can still pay this and still have enough headroom to

9   pay that.  Secured, I think, are about ten million after

10  setoffs and priority are less than or somewhere around that, so

11  we're comfortable that this won't jeopardize any administrative

12  creditor.

13          THE COURT:  Okay.  And are you asking me for

14  authority today to pay the 25 million that have now been

15  allowed or are you also asking me to approve payment of any

16  other administrative claim that may be allowed going forward?

17          MR. GALARDI:  Any other, as they are allowed if we

18  should reach, and I think this will actually help the estate,

19  people will say, you have authority now, you can pay it.  I

20  believe we are asking for authority that as administrative

21  claims get allowed, if we enter into settlements with various

22  creditors with an order that says your administrative claim is

23  allowed, then we would ask authority to continue to pay this

24  going forward, not just this $25 million.

25          THE COURT:  All right.  And then I understood what

1   the benefit to the estate was when we were talking about the

2   tax claims, because they're obviously accruing penalties and

3   interest just as we went through during the post-petition

4   period.  With regard to these claims, that's not necessarily

5   the case.

6          MR. GALARDI:  You're a hundred percent right, Your

7   Honor, and this is partially why we had a dispute with the

8   Committee.

9          THE COURT:  Well, I'm trying to figure out what the

10  benefit to the estate is from paying these claims now as

11  opposed to later.

12         MR. GALARDI:  Financially --

13         THE COURT:  I understand under Chapter 7 there's a

14  provision that says that, you know, claims have to be paid as

15  promptly as possible.  We don't have that in Chapter 11 and

16  normally we would pay it on the effective date.  It just seems

17  to me to be intuitively make more sense that you would, you

18  know, keep this to pay it on the effective date, because that

19  would incentivize all of the creditors in the case to get to

20  plan confirmation and get to the effective date and keep

21  everyone properly engaged.

22         MR. GALARDI:  Your Honor, you've raised exactly the

23  debate as to why this motion wasn't filed sooner and why it

24  might be a compromise of the tax motion.  Economically speaking

25  you are a hundred percent correct that we could arbitrage the

1   interest rate.  This money is in a bank account --

2            THE COURT:  That was the next point I was going to

3   make.

4            MR. GALARDI:  -- this money is in a bank account and

5   we get some very, very, very small interest rate because of

6   this, you know, we have to have it in a safe account.  So it

7   would be --

8            THE COURT:  I understand, but, you know, even, you

9   know, one or two percent on $450 million --

10           MR. GALARDI:  It's not even one or two percent, I

11  think it's like a half of a point

12           UNIDENTIFIED SPEAKER:  Twelve basis points.

13           MR. GALARDI:  Twelve basis points.  That's how light

14  the interest is.  But you're right.  No matter what we do,

15  there is an interest that would be accruing on this 400

16  million, and frankly if you didn't pay the administrative

17  claims, there's no interest accruing under this jurisdiction's

18  law, so I could wait to the effective date, accrue that .012

19  percent interest, make a little money on it, and then wait and

20  pay the administrative claims.  Whether that incentivizes

21  people to get to confirmation or not earlier, clearly the

22  Committee and we have wanted to do that.  The Committee has

23  been very anxious to get to confirmation.  As I've said to you

24  there are issues that we have with taxing and other

25  authorities, and those are broken down on the plan issues.

                   **J&J COURT TRANSCRIBERS, INC.**

26

1  Notwithstanding that, though we would make that .012 percent to

2  avoid any further prejudice because of the disputes, we have

3  determined that that small economic benefit is better to give

4  up and pay these claims now in the rolling course, and I can

5  give you an economic reason is, though you may want to get to

6  confirmation, we think we may make more money by having the

7  authority to pay these claims, not wait to the effective dates,

8  because people will say, especially if we go into a dispute

9  with the Committee, I'll settle now, give me my money now, I

10  don't want to be caught up and wait for the plan confirmation

11  process.  That could be -- I hope the mediation works.  But we

12  thought this may be a way to make those creditors not have to

13  stand aside, maybe get some settlement authority.  But our

14  worst case is, and I can't deny, economically speaking, we are

15  going to lose .012 percent of the money on anything that we let

16  go out the door, this 25 percent, we think that's negligible as

17  part of trying to work through with the Committee the issue.

18  But that has been the big dispute.

19          THE COURT:  Why couldn't you come in on a case by

20  case basis and say, you know, Credit X has agreed to discount

21  their claim by this amount of money if we can pay it prior to

22  the effective date, and then I could approve them that way.

23  Wouldn't that, you know, again, incentivize people to

24  compromise their claims?

25          MR. GALARDI:  Your Honor, I feel like I'm arguing

1  with myself in the dispute with the Committee right now,

2  because you're a hundred percent correct.  I'm not going to say

3  I have an order with one creditor on the Committee, for

4  example, that specifically says they'll be paid on the

5  effective date.  You know, and there was an issue, and I said

6  to that creditor, you know, if the Committee will agree to pay

7  it before the effective date, that's fine, the Committee

8  wouldn't agree, and we happen to agree with that judgment.

9  Okay?  Because if I'm not going to get a bigger discount,

10  that's life.  But --

11          THE COURT:  But you could.  You could go back to that

12  creditor now and say, look it, you know, I could possibly get

13  you, you know, paid immediately if you'll discount it again by

14  a certain amount.  Doesn't that inure to the benefit of the

15  unsecured creditors?  I should be asking somebody else that

16  question.

17          MR. GALARDI:  Well, Your Honor, you're asking exactly

18  the questions as to why I was not -- you know, we said we'd

19  file this motion, we said we would be directed not to withdraw

20  it.  I am comfortable doing it, because again, in the overall

21  scheme of things, to facilitate the relationships and try to

22  move forward, and I do think it will give me some authority

23  going forward to settle, but there are clearly $25 million

24  worth of claims out there that I don't really want to go back

25  and open up the orders.  Now we could do that, that's a lot of

1 | legal fees.  Am I going to save the estate that .012?

2 |            THE COURT:  That's fair.

3 |            MR. GALARDI:  I'm not sure I'm going to do that.  I

4 | also think that by the way, I'll probably antagonize those

5 | people and I might not get it.  And, you know, maybe the money

6 | walks, but I'm all for using leverage as everybody in this

7 | courtroom knows.  This is one circumstance where we said we'd

8 | give up that little leverage to get it done.  And again, it was

9 | in the context of the secured claims, they do accrue interest,

10 | and that's why we were prepared and distinguished them.  That

11 | said, this .012 percent, if it's another three months, let's

12 | say, worst case, it's not that big a deal and it will give me

13 | the leverage going forward.  And I don't think the legal fees

14 | or the expense of going back to those people and say, now will

15 | you cut me this is that significant of a savings.

16 |            Your Honor has hit on all the issues that gave us,

17 | you know, why we wouldn't be doing this.  But I also don't want

18 | to take advantage of the fact, well, I don't confirm so now I

19 | make .012 percent for the next year and be accused that we're

20 | not confirming so that somehow I can arbitrage the interest

21 | because it's in our interest to make some money and drag it out

22 | with administrative creditors and use that over their head for

23 | getting to a plan confirmation matter.  So that was sort of all

24 | our decision making in deciding to file this motion.

25 |            THE COURT:  I was more concerned about keeping the

1  administrative creditors completely engaged in the case and

2  making sure that they're, you know, wanting to go forward to

3  get confirmation so that everybody wants to get to the same

4  thing rather than let confirmation possibly lag because it's no

5  longer as important to them as it might otherwise be.

6          MR. GALARDI:  And, Your Honor, you know, that opens a

7  whole can of worms with the Committee and the administrative

8  claims, because a lot of those have them, as you well know,

9  from the 503(b)(9).  Again, all things considered, again, this

10 is -- you have to approve it, but the debtor's business

11 judgment was, yes there is a cost, yes we are giving the

12 arbitrage on the interest, yes we could go back, but overall,

13 considering where we are, considering the kind of circumstances

14 we're going into, that I have no doubt that these

15 administrative creditors and the 25 million will remain

16 engaged, because many of them, a couple are on the Committee, a

17 couple are very large unsecured creditors, and merely because

18 they got their administrative claim, I do not think that they

19 will become less engaged and let this case languish.  The

20 Committee wants confirmation as soon as possible.  We have an

21 issue.  That's not going to be any detriment to this estate to

22 pay these administrative claims.  It's not like we're going to

23 sit here and not move forward on confirmation.

24          You've heard me say, let's get to mediation.  I

25 happen to agree with the Committee, if we don't get there on

1  the 22nd, we'll probably go on dual plans.  Everybody wants to

2  get done, our board wants to get done.  Hopefully it won't be

3  dual plans, I don't think that this is going to be a detriment

4  and make this case languish.  Thank you.

5          THE COURT:   Thank you.

6          MR. FEINSTEIN:  Robert Feinstein for the Committee.

7  Your Honor, the Committee does in fact support the motion.

8          THE COURT:  And my question is why?

9          MR. FEINSTEIN:  Yes.  The genesis of this motion,

10  Your Honor, was the tax motion.  Was that there was an effort

11  made to bring settlements to the Committee for approval on a

12  one off basis that paid some administrative creditors' claims

13  while others whose claims were allowed were not being paid.

14  And our --

15          THE COURT:   But there we had penalties accruing, we

16  had interest accruing on those claims.

17          MR. FEINSTEIN:  I understand, Your Honor.  Although I

18  think that was kind of a secondary consideration.  I think the

19  basis as it was presented to us, and I don't want to get into

20  any kind of privileged settlement discussions or what have you,

21  but --

22          THE COURT:  And I'm not asking you to.

23          MR. FEINSTEIN:  -- the basis as presented to us was,

24  if we pay these people now we can get a discount.  It had

25  nothing to do with interest or taxes.  That was kind of an

1    afterthought, candidly.  And our view was, if we're going to

2    pay administrative creditors, either pay all the administrative

3    creditors with allowed claims or pay none of them.

4               THE COURT:  But that --

5               MR. FEINSTEIN:  I also need to make it clear, Your

6    Honor, we never told the debtor don't pay vendors for goods

7    delivered post-petition in the ordinary course.

8               THE COURT:  Okay.

9               MR. FEINSTEIN:  That's just not true.  What we're

10   talking about though are reconciled 503(b)(9) claims and tax

11   claims and a variety of administrative claims and our statement

12   to the debtor was either pay all of them or pay none of them

13   pre-effective date.  The debtor came back and said, then we

14   would like to pay then pre-effective date, and on that basis we

15   had no objection.  We did have a problem with doing it

16   selectively, so that was the genesis of the discussion that led

17   to the debtor saying we opt to pay them all, we reviewed that

18   request and we have Protiviti as our financial advisor review

19   the economics of the situation and were comfortable that there

20   is, that the estate is administratively insolvent, that we're

21   not prejudicing anybody by paying certain claims now where they

22   are allowed.

23              And I guess the other point I'd like to add, Your

24   Honor, is that paying them is not going to disincentivize

25   anybody to get to confirmation.  We are highly incentivized to

32

1  get to confirmation.  We're not going to slow down for a minute

2  if these claims are paid.

3           THE COURT:  All right.  I've got a couple of

4  questions.  First of all, with regard to the tax claims, back

5  when, before I came on the bench and I was a Chapter 7 trustee,

6  I would try to pay the tax claims just as promptly as I

7  possibly could, because the penalties and interest, you know,

8  amount to something critical that would eat into the amount

9  that would otherwise be available to unsecured creditors.  And

10  so I saw good reason for that.  Tell me, what is the benefit to

11  the unsecured creditors to approving this motion?

12           MR. FEINSTEIN:  Again, our --

13           THE COURT:  Not to the administrative -- to the

14  people on your committee and the people you represent.

15           MR. FEINSTEIN:  Our concern was one of fairness, Your

16  Honor, that if administrative claims are being paid, that

17  either they, that they not be done selectively.  That if

18  allowed claims are to be paid, then let's pay all allowed

19  claims or pay none of them until the effective date.

20           THE COURT:  But how does that benefit the unsecured

21  creditors?  I just don't -- I'm not getting it.

22           MR. FEINSTEIN:  I can't point you to a tangible

23  economic benefit, Your Honor.  There is --

24           THE COURT:  Okay, so why are you advocating this?

25           MR. FEINSTEIN:  -- but Mr. Galardi does point out

**J&J COURT TRANSCRIBERS, INC.**

1  that there is potential benefit -- excuse me -- in authorizing

2  the debtor to pay, resolve the administrative claims

3  pre-effective date, because it's leverage, because they can get

4  a discount, and that discount will offset the lost interest, it

5  will offset the legal fees of fighting with these people.  So

6  net I think there is an economic benefit.  I can't measure it

7  for you, Your Honor.

8         THE COURT:  But with regard to the 25 million that's

9  already been approved, we're not going back and redoing that.

10  That's just going to go away right now.  So we're not going to

11  get any additional leverage.

12         MR. FEINSTEIN:  That's right, Your Honor.  But to go

13  back and open them up, as Mr. Galardi pointed out, would be a

14  lot of legal fees that would more than offset the point, or the

15  12 basis points on the 25 million.  But I think it's

16  legitimate, Your Honor, for the Committee to be concerned about

17  fairness and equity.  And we were presented with one off

18  settlement saying we've reached an agreement with Creditor X.

19  It happened to be a taxing creditor.  But the next request

20  would have been with a 503(b)(9) claimant, and we were

21  uncomfortable allowing the debtor to selectively pay

22  administrative claims while withholding payment to others who

23  were similarly situated.

24         THE COURT:  But from an unsecured creditor's

25  standpoint, paying that tax claim works to that party's

1    benefit.  I understand that.  Because, you know, now you're not

2    accruing interest --

3              MR. FEINSTEIN:  Right.

4              THE COURT:  -- and you're not accruing any further

5    penalties.  And so then there's more money available for

6    unsecured creditors.  And then you say well, yes, but now we

7    want to do it for these other administrative creditors.  I

8    don't see that there's, you know, the same benefit flowing to

9    the unsecured creditors from that because there is no accrual

10   going on.

11             MR. FEINSTEIN:  Well, Mr. Galardi pointed out though

12   that he intends to use the ability to pay as part of his

13   leverage.  To leverage the reduction of administrative claims,

14   whether they're 503(b)(9) or other types of non-tax claims, on

15   the basis that he can promise payment.

16             THE COURT:  But why can't he come in and ask for that

17   on a claim by claim basis and come in and say, okay, I've

18   offered this creditor, you know, an extra ten percent discount

19   if they will, you know, if I can pay them right now.  And, you

20   know, why couldn't I approve that on a case by case basis?

21             MR. FEINSTEIN:  I suppose you could, Your Honor.  But

22   I don't want to gloss over the notion of fairness and equity

23   here.  That the debtor was out there, you know, selectively

24   making decisions about who to prefer, and we thought that was

25   not appropriate.  So we said it's either all or nothing.  And

1    they came back with all and we're fine with that.

2              THE COURT:  All right.  Anything further?

3              MR. GALARDI:  Your Honor, I'm sorry, I'm just not

4    going to sit by.  A couple things.  I have the integrity to

5    forward with the motion on the grounds, and I think I've been

6    candid with this Court.  It is just a complete and utter

7    falsehood, and this is going to begin a series of these, that

8    the Committee says that they did not tell us to pay ordinary

9    course professionals.  I will be prepared to bring in some

10   e-mails where that's ordinary course administrative expenses.

11   They've said that.  That is -- and I'm not going to be called a

12   liar in front of this Court.

13             Your Honor, with respect to this motion, I still will

14   go forward, because I have committed to go forward and do it.

15   I understand, and we've had exactly the arguments you've had.

16   I understand the economic benefit to myself to Mr. Pachulski

17   and Mr. Pomerantz and Mr. Feinstein have exactly those exact

18   arguments that you just had with us.  Do I think I can use it

19   to do better than that 1.2 percent interest going forward?

20   Yes.  Do I think it's unfair to say those people who agreed

21   previously because we drew a line in the sand will not pay

22   until effective date?  No, I don't think it's unfair, but I

23   have no problem paying those people now to move this along as

24   some are Committee members, and the conflict is obvious, as

25   Your Honor points out, between committee members that have

1  administrative claims and unsecured claims.  And that's part of

2  what's driving this.  But we have tried to do this to reach an

3  agreement with the Committee.  We didn't reach it.  But I'm not

4  going back on my word to file this motion and to pursue it.  We

5  still think it's in the best interest of the estate.  We'd

6  still push for it.

7       But again, Your Honor, I acknowledge that

8  economically speaking it is not obvious what the economic

9  benefit for this versus those tax claims are to unsecured

10 creditors.  Thank you.

11      THE COURT:  Thank you.  Does any other party with to

12 be heard?  I'm sorry, Mr. Feinstein?

13      MR. FEINSTEIN:  Your Honor, I can't speak for every

14 e-mail that's emanated from every lawyer from my firm.  I don't

15 know that Your Honor wants to get into dredging up a year's

16 worth of e-mails on the topic, but I do want to address one

17 thing.  Mr. Galardi raised a putative conflict.  There are, I

18 believe, two Committee members who have, who are affected by

19 this, but we have 11 committee members, and the Committee

20 unanimously endorsed this.  Thank you.

21      THE COURT:  All right, thank you.  All right.  The

22 Court, as based on my comments is very troubled by this motion.

23 I don't understand it.  I don't understand what the benefit to

24 the unsecured creditors is with regard to it and I don't

25 understand why the leverage that Mr. Galardi mentions can't be

**J&J COURT TRANSCRIBERS, INC.**

1 | obtained, you know, on a case by case basis as claims are

2 | negotiated.    I'm not going to deny the motion at this point.

3 | I'm going to carry this matter over to the 22nd of July and

4 | give it some further consideration.

5 |          MR. FEINSTEIN:  It's your motion.

6 |          MR. GALARDI:  Your Honor, I think the only two

7 | remaining matters then on the calendar are the Committee's

8 | motion to retain French counsel, the Arsene Taxand firm, and

9 | the Committee's motion to lift the cap on Gowlings.

10 |          With respect to the application to retain the

11 | Arsenault firm, Your Honor, we filed the application on May

12 | 21st.  It's an application to retain special French counsel to

13 | deal with our French tax issues, which are quite substantial.

14 | I don't think it would be helpful of appropriate to the estate,

15 | Your Honor, to go into detail as to the nature of the French

16 | issues, but the Committee needs independent French counsel to

17 | address these issues.  If Your Honor needs more elaboration it

18 | might be appropriate, because I know the press is in the

19 | courtroom, to either seal the record or go into chambers.

20 |          But this is in a sense, a garden variety retention

21 | application where the amount of services to be rendered will be

22 | put forth in a fee application by the firm.  The debtor will

23 | have full opportunity to review the fee application and object

24 | to it if they see it as appropriate.

25 |          The debtor filed a limited objection that in kind of

38

1 a paternalistic way said we'd like to see a budget and a cap on

2 our counsel.  We don't think that's appropriate.  Particularly

3 under the given circumstances where we need independent

4 counsel, we can't rely on the debtor's French counsel to do

5 this.  We don't think that kind of a cap is appropriate.

6 We also think with the upcoming mediation that we will need the

7 benefit of these lawyers.  So we ask that the application be

8 approved on that basis, Your Honor.

9         THE COURT:  All right, thank you.

10        MR. GALARDI:  Your Honor had asked me at the last

11 hearing whether we think the Committee needs French counsel and

12 we don't have a problem with their retaining it to have an

13 independent view.  Our issue has been solely the budget and the

14 fees.  And I do want to put the structure of this before the

15 Court just so you can understand why.  I don't have any problem

16 getting into the French tax issues, because we have a

17 fundamental disagreement about that.  But the French tax

18 issues, just so Your Honor understands, is there is a French

19 subsidiary of InterTAN Canada.  InterTAN Canada is currently a

20 debtor in the CCAA proceedings.  InterTAN Canada is a

21 subsidiary of InterTAN Inc., a U.S. debtor that to my knowledge

22 probably has no creditors at this point, which entity is itself

23 owned as a common shareholder by Ventu (phonetic) Inc., which

24 is a U.S. debtor, which too probably has no creditors that are

25 not already collateralized in full and Tormalae (phonetic)

**J&J COURT TRANSCRIBERS, INC.**

39

 1  which has a preferred, which has the preferred there, which is

 2  again, a CCAA entity.

 3          Ventu is in turn owned by Circuit City Stores Inc.,

 4  which is a debtor, obviously, in this Court, and has creditors.

 5  So Canada, InterTAN Canada has hired French counsel, is dealing

 6  with an issue, Gowlings has been interacting with them.  So we

 7  don't have a -- and what this all comes down to is how much

 8  money is return of capital, is a  return of capital, is a

 9  return of capital is a return of capital that gets distributed

10  to Circuit City Stores Inc., creditors.  Not necessarily all of

11  them, because one of our issues will be how this plan all comes

12  out.

13          We don't dispute that it is important for the

14  Committee in this U.S. case, because it could affect creditors'

15  distributions, have some counsel to understand the French tax

16  issues, to get information, and if they need to speak French to

17  the French counsel, that's all fine.  The U.S. counsel hasn't

18  retained separate counsel.  My firm has looked at the issue,

19  because we have a French office, and that's not been very

20  expensive to look at the memo from the French counsel.  What we

21  are concerned about is the takeover of an issue, and that it

22  simply be subject to a budget and a cap.  We didn't think that

23  was unreasonable.  Whether that counsel is needed now or for

24  the mediation or not, I don't even want to fight that.  They

25  want it now, we agree to it.  It's just a budget and a cap.

40

1    That's all we've really asked for.  And with the period of time

2    and with the experience of the next one, we slipped over the

3    Gowlings to go to Arsene, it's the least controversial one.  We

4    just think it's time to have a budget and a cap for this

5    particular purpose.  That is our sole objection to the French

6    counsel.

7              THE COURT:  And why kind of cap are you proposing?

8              MR. GALARDI:  I think we said $25,000, Your Honor, in

9    our motion, which was more than our own counsel had spent more

10   than the French counsel.  And again, without prejudice, again,

11   we're just trying to get, without prejudice, to come back and

12   to seek an increase if it's going to cost more.  If that

13   budget's not acceptable and they can give the Court or us or

14   the U.S. Trustee an idea of how much more it would cost, fine,

15   we'll agree.  Just let's please set a budget.

16             Our counsel now just tells us that our own counsel in

17   Canada, $32,000.  So if they'd want to set it at 32, I'd still

18   think it a discount off of what the people primarily doing the

19   memos are.  But whether it's 32,000 or 25,000, all we're asking

20   for is a cap and a budget.

21             THE COURT:  Why can't you, as Mr. Feinstein suggests,

22   object to a fee application if you think that it's an

23   inappropriate expenditure of funds?

24             MR. GALARDI:  Your Honor, we can do that.  Your Honor

25   and I, we've been around the block enough, it's oftentimes --

**J&J COURT TRANSCRIBERS, INC.**

1  it's better to have a cap.  We want to object and get into a

2  reasonableness fight, we can do that, Your Honor.  If caps

3  don't work here and they think that they're traps for the

4  unwary, I understand that argument to reasonableness.  We think

5  we'd like to have a cap so we don't have to be put in that

6  position so we can monitor it and people file their

7  applications timely.  And not to get into the Gowlings one, but

8  they didn't file invoices.  And if they had filed them after

9  the fact, we're in the position of arguing about the

10  reasonableness.

11        Now we don't want to be in that position again.  We

12  think that there's a basis for happing a cap.  Especially with

13  a special counsel for a special purpose.  But, Your Honor,

14  again, if that's a trap for the unwary and you feel better that

15  you approve them, but they must timely submit those invoices,

16  because we don't want to get caught with three or four months

17  behind and all of a sudden have to make a reasonableness

18  objection to a large sum of money.  We just think caps are

19  easier to do.  If that's not manageable, we'll go to the

20  reasonableness objection.

21        The point is, we've got to have regularity and people

22  have to put in their applications on time so that we can make

23  timely objections and not be in a position to say, $325,000,

24  where did that come from.  Thank you.

25        THE COURT:  All right, thank you.  Do you wish to

1  respond?

2         MR. FEINSTEIN;  Thank you, Your Honor.  Again, we

3  reject the notion of a cap.  None of the professionals but for

4  Gowlings was subject to a cap.  Nobody's talking about capping

5  the Pachulski fees or the Skadden fees.  We proposed just doing

6  this the ordinary way, which is retention application, review

7  for reasonableness.  I'm sure that Arsenault will comply with

8  the Court's compensation order and take care of its monthlies.

9         With respect to the proposed cap amount, I do need to

10 point out that the French counsel retained by the Canadian

11 subsidiary, my understanding is, they are historic French

12 counsel and we need to review what they did over the last

13 number of years.  The fact that they're very familiar with the

14 problem may lead to the fact that their bill for this is very

15 low.  But we're bringing in French counsel that needs to look

16 at a fairly complicated situation.  Twenty-five thousand does

17 not address the problem.  So we need to -- it will take us

18 where it takes us.  The work I'm sure they'll do would be

19 necessary and appropriate.  If it's not, everybody has their

20 rights to the fee application.  So we'd ask on that basis that

21 the application be granted.

22         THE COURT:  All right.

23         MR. FEINSTEIN:  Thank you.

24         THE COURT:  Does any other party wish to be heard?

25 Mr. Galardi?

**J&J COURT TRANSCRIBERS, INC.**

43

1              MR. GALARDI:  Again, Your Honor, why I went through

2    the capital structure is -- and this is what we're concerned

3    about.  They should be aware of the French tax issue.  But

4    they're standing in this matter is a standing as a creditor of

5    a stockholder of a stockholder of a stockholder or a

6    stockholder.  It is not necessarily because that's really a

7    Canadian cause of action that maybe a stockholder action that

8    may be stockholder action that may be a stockholder action.  To

9    give a scope to say we're just going to do an exam of

10   everything that happened in the French text, that's exactly why

11   we are concerned.

12             And so if the scope is to review our analysis and see

13   if we can resolve this, which we believe and the monitor

14   believes and my Canadian counsel believes we can resolve this

15   rather rapidly, to do an exam, we think, in all honesty, it's

16   going to be a witch hunt, and we're not prepared to say that's

17   what needs to be done now.  What needs to be done now is to

18   address whether there's a zero liability or a hundred million

19   dollar liability and resolve it, and that's primarily a

20   Canadian InterTAN Canadian French counsel issue.  And that's

21   why we oppose a cap.  You can do it through the scope.

22             I don't want to be standing here saying, well, you're

23   looking at every historical event for everything.  The history

24   is the history.  There may be a cause of action, they may not

25   be.  The real issue right now is, how do we move from here to

1 resolve the French tax issue?  What is the debtor, the Canadian

2 debtor, doing to do that, is this a good strategy and can we

3 resolve it so we don't have to bring causes of action.   That's

4 why we were concerned about the issue.  Thank you.

5 　　　　　THE COURT:  All right, thank you.  All right.  The

6 Court is going to approve the application authorizing the

7 employment of French counsel by the Committee.  And I'm not

8 going to set a cap.  I don't think I should tie the Committee's

9 hands with regard to that.  I think that the best way of

10 resolving our fee issues is by the timely submission, and I

11 think that that is, got to be done of invoices so that they

12 could be monitored, and that in Chapter 11 cases that the

13 parties generally police that by reviewing each other's

14 applications and where it's appropriate having an objection for

15 the Court to resolve.  And I think that that's the best way to

16 handle it.  This way when we get right down to it, it's the

17 creditors' money that is being spent here, and I think that the

18 Committee is entitled to have whatever professionals that it

19 deems is necessary in order to play the very critical role that

20 it does in these cases.

21 　　　　　So the Court's going to grant the application and,

22 Mr. Feinstein, if you would please submit an order to that

23 effect.  Now, I do want them to comply with submitting the

24 invoices and such --

25 　　　　　MR. FEINSTEIN:  Yes.

1          THE COURT:  -- as appropriate, because we have this

2     other issue, which I assume you're about to address --

3          MR. FEINSTEIN:  Yes, Your Honor.

4          THE COURT:  -- where that didn't occur, now we have a

5     very large amount.

6          MR. FEINSTEIN:  Yes.  Based on the Gowlings'

7     experience, Your Honor, we will make sure to remind our

8     colleagues to get their monthlies in on time.  We don't want to

9     see a repeat of that.  Thank you, Your Honor, for that.  Let me

10    turn then to the Gowlings' application.  The Gowlings' motion

11    is one for relief of a cap that was put in in the inception of

12    the case before we knew about the complex Canadian tax issues

13    that really arose, I would say, late last fall.  Gowlings has

14    given a mea culpa and I'll repeat it for them.  It was an

15    unfortunate mistake on their part to let slip the obligation to

16    render their monthlies.  And on their behalf we apologize to

17    the Court.

18         We did supply, at the debtor's request, their monthly

19    fee statements to the debtor some time ago, I think over a

20    month ago.  We've heard no comment from the debtor about

21    whether those time charges are reasonable or not.

22         The motion recites that at its inception the

23    retention application was to hire a firm in Canada really to

24    monitor the Canadian proceedings and to do no more.  That

25    changed last fall in a very dramatic sense in that we started

J&J COURT TRANSCRIBERS, INC.

46

1  really relying fairly heavily on the Canadian tax lawyers, not

2  the Canadian insolvency lawyers to solve our problems, and

3  these are substantial problems, as Mr. Galardi alluded to.   And

4  again, at the risk of -- I don't want to put the tax issues on

5  the record, Your Honor, for a number of obvious reasons, but

6  they are highly complicated, and we find the advice that we're

7  getting from Gowlings on the Canadian revenue issues to be

8  invaluable.   We don't want to penalize our constituents for

9  Gowlings' mishaps in failing to get their monthlies in.

10         Nor do we want to penalize Gowlings unfairly.

11  They've apologized.   They've provided their statements.   Again,

12  if there's an issue about the reasonableness of their fees,

13  everybody has their opportunity in the context of a fee

14  application to review and analyze the -- the miss on the cap,

15  again, Your Honor, there's just no excuse for it for not

16  getting their monthlies in and for alerting people that they

17  were exceeding the cap, but --

18         THE COURT:   They were aware of this cap, weren't

19  they?

20         MR. FEINSTEIN:   I believe that they were, Your Honor.

21  We've talked to lawyers in the firm, and I think it was really

22  an issue of one hand not knowing what the other was going.   A

23  billing partner over here, a service partner over here

24  rendering the service and miscommunication internally.   But

25  again, we don't want to penalize the constituents.   We find

1   their help invaluable right now.  And particularly going into

2   mediation where the lion's share of the issues of the mediation

3   are going to turn on what to do about Canada.  That we don't

4   want to lose their service.  We want them to be fully

5   incentivized going forward.  They will comply, I assure Your

6   Honor and I'll make sure personally that they comply with the

7   application to get their monthly statements out.  Because we

8   don't want to see this mishap again.  It was unfortunate, but

9   given the circumstances, Your Honor, including our need for

10  them going forward, and that they've rendered very valuable

11  services to the Committee already, and to the estate, we think.

12  We would ask that the cap be lifted.  Of course, this is with

13  all rights reserved for the debtor, the U.S. Trustee and any

14  other party in interest to challenge the reasonableness of

15  their fees.  We think it would be an unfortunate event to both

16  penalize Gowlings and the Committee by sustaining the debtor's

17  objection to our motion.  Thank you.

18          THE COURT:  Would that also be with the right to be

19  able to object since they didn't timely submit their monthly

20  statements, that that was somehow prejudicial to being able to

21  object to the reasonableness, so all of that will be reserved

22  as well?

23          MR. FEINSTEIN:  Yes.  Absolutely, Your Honor.  As a

24  factual matter, I think this case has been pending since

25  November of 2008.  I don't recall their ever being any

48

1  objection to any monthly fee application, but to the extent

2  that their monthlies were not rendered timely and there was

3  prejudice to the debtor or any other party, they have, of

4  course, the full reservation to argue that.  Thank you.

5        THE COURT:  All right, thank you.

6        MR. GALARDI:  Your Honor, I think it's a simple legal

7  issue for Your Honor to decide in this instance.  One, it was

8  not the scope of services, two, it may have been a total

9  mistake, three, the fee applications have not been filed.  Yes,

10 they submitted invoices to us, we've taken a  quick look at

11 them, but ultimately they've not been submitted to the Court or

12 whatever the procedures are.  Do we feel prejudiced by that?

13 Frankly we do.  Do we disagree about the service?  Yes.  But

14 again, I'm not trying to penalize anybody here.  The fact of

15 the matter is it's a professional, it's a fee application --

16 it's a fee process.  There was a cap.  We didn't try to do it

17 unaware, they got to the 105.  They were doing it timely

18 through October.  The fact of the matter is they took on some

19 other services not within the scope and it's a nunc pro tunc

20 approval of services with a right to reserve on fees.  If

21 that's what Your Honor decides, I'm not going to argue the cap,

22 I've already lost the cap issues, so we'll move on from that

23 one.

24        But the real question is from Your Honor is this the

25 sort of nunc pro tunc services, expanding services that should

**J&J COURT TRANSCRIBERS, INC.**

49

1  only be dealt with on a reasonableness basis to reserve those

2  fees from the debtor's perspective?

3        THE COURT:  Well, as I understood it, I'm not being

4  asked to approve the fees.   I'm just asking to --

5        MR. GALARDI:  Correct.

6        THE COURT:  -- remove the cap without prejudice to

7  you or anybody else to argue that it is a nunc pro tunc relief,

8  that it is unreasonable, you know, given the fact that you

9  couldn't review it on a monthly basis and all the rest.

10       MR. GALARDI:  Your Honor, I guess the real question

11 in that is by making it a reasonable standard as opposed to

12 saying I will expand the services nunc pro tunc whatever number

13 of months it was before we learned about this, that's really

14 the question, is that prejudice by itself?  Your Honor can

15 decide that issue, Your Honor can issue whatever decision on

16 that matter, if you think it's an appropriate nunc pro tunc

17 relief to go back to that date, we're going to live with it and

18 we'll review the fees for reasonableness.

19       I will say, in their defense, it's not a -- the

20 debtors did not, we never looked back at their application to

21 see whether these services were there.  We understood they were

22 providing tax services.  Our dispute may be about the value of

23 those services.  Our dispute may be that we think it's taken a

24 different course to one of the courses that now we're having

25 fights over.  But again, that can all be erred in a

1 reasonableness, Your Honor.  It comes down to does this Court

2 want to, on a nunc pro tunc basis, expand services for a

3 professional that was aware of the cap, has no excuse, and now

4 comes back and then will put in a fee application for that

5 amount.  That's really, to me it's the legal issue and we

6 brought it to Your Honor's attention.  It's your court and if

7 you want to approve the nunc pro tunc expansion of services,

8 we'll look at that ruling.

9          THE COURT:  All right, thank you.

10          MR. GALARDI:  Thank you.

11          THE COURT:  Does any other party wish to be heard?

12                    (No response)

13          THE COURT:  All right.  The Court is going to remove

14 the cap on the fees, you know, given the Committee's stated

15 need that they need to, the services of Canadian counsel on a

16 going forward basis, and the cap has been exceeded.  The

17 Court's not making any ruling with regard to the reasonableness

18 of any of the fees that have been charged to date or going

19 forward.  The Court's not ruling on the nunc pro tunc.  All of

20 that is reserved for when the appropriate application is filed

21 and the Court will determine at that time.

22          I will state on the record that I have written an

23 opinion in another case, in the <u>Rennie Petroleum</u> case, where I

24 disapproved, you know, any nunc pro tunc retention.  So that is

25 on the record and I think the parties can review that as far as

51

1   what the Court may do, absent some agreement obviously. But the

2   Court's not making that ruling today.   All I'm doing is

3   removing the cap so on a going forward basis, the Committee has

4   the access to this firm.

5          All right, I think -- is that everything that's on

6   the docket?

7          MR. FOLEY:   Yes, Your Honor.   I believe that's

8   everything that's on the agenda today.   We will promptly

9   endeavor to contact Judge Santoro regarding scheduling.

10         THE COURT:   I'm going to phone his chambers just as

11  soon as we're done here and let him know.   I was in contact

12  with him as recently as yesterday, so he's aware of what's

13  going on in the case.   And then he'll be expecting you to

14  contact him.   And then, as I said, you know, you can make those

15  arrangements directly through him as far as how you want to do

16  all of that and the like.

17         MR. FOLEY:   We will do so.   Thank you, Your Honor.

18         THE COURT:   Okay.   Thank you.

19                        *  *  *  *  *

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# **C E R T I F I C A T I O N**

I, RITA BERGEN, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


/s/ Rita Bergen_____        DATE:  June 30, 2010

RITA BERGEN

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**