LAW OFFICES

# WILLIAM R. NUNNO

45 ESSEX STREET
SUITE 201
HACKENSACK, NJ 07601
(201) 342-5022

FAX: (201) 342-0684

WILLIAM R. NUNNO ▲
ALISA NUNNO DI CHIARA ◆
TRACIE NUNNO D'AMICO ◆

◆ Certified by the Supreme Court of New Jersey
as a Civil Trial Attorney
▲ NJ & FL Bars



RICHMOND DIVISION

F I L E D

JUL 1 3 2010

F I L E D

CLERK
U.S. BANKRUPTCY COURT

July 6, 2010

Clerk of the Bankruptcy Court
United States Bankruptcy Court
701 East Broad Street-Room 4000
Richmond, VA  23219

Re:  In re: Circuit City Stores, Inc., et al.
     Case No.: 08-35653 (KRH)

Dear Sir/Madame:

Please be advised that I represent Claimant, James Fouskey, with regard to injuries he sustained in an accident on December 2, 2007, at Circuit City in Wayne, New Jersey.

Kindly accept the following as Claimant's response to Circuit City Stores, Inc., 79th Omnibus Objection to Claims which is venued in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, bearing case no.: 08-35653 (KRH).

On December 2, 2007, Claimant, James Fouskey, was an invitee at Circuit City in Wayne, New Jersey. As he exited the store, he slipped and fell on ice which was covering the exit ramp from the store to the parking area.  This was the only means of egress available to Claimant.  As a result, he fell and struck his left shoulder and sustained a full thickness tear of the supraspinatus tendon.  Claimant underwent open rotator cuff repair with insertion of six screw anchors.  Claimant continues to experience severe pain and limitation of motion as a result of this injury.

At the time of the accident, Circuit City maintained, operated and controlled the premises where Claimant fell.  Circuit knew or should have known of the icy condition of its entrance/exit

ramp which patrons must use to enter or exit the store.  It failed to make a reasonable inspection of the premises in order to determine said condition.  Circuit City did not take proper precautions to avoid Claimant's fall such as salting the ramp, although there was snowfall prior to Claimant's fall. The snow and ice covered ramp was carelessly and negligently maintained, creating an unsafe, hazardous and dangerous condition.

I am enclosing medical records which were forwarded with Claimant's Proof of Claim. Also enclosed is deposition transcript of Claimant taken with regard to the civil lawsuit pending in Bergen County Superior Court, New Jersey.

Please contact me if you need anything further.

Very truly yours,

ALISA NUNNO DI CHIARA

AND:bt
Cc:  James Fouskey
        Gregg M. Galardi, Esq.
        Ian S. Fredericks, Esq.
        Douglas M. Foley, Esq.
        Sarah B. Boehm, Esq.
        Chris L. Dickerson, Esq.

## ENGLEWOOD HOSPITAL and MEDICAL CENTER
### 350 Engle Street
### Englewood, NJ 07631

### REPORT OF OPERATION

| | | | |
|---|---|---|---|
| NAME: | Fouskey, James E | MRN: | 00845281 |
| SURGEON: | Michael Pizzillo, MD | DATE: | 07/14/2008 |
| PT LOCATION: | DIS | ACCOUNT NO: | 000036206183 |

DATE OF PROCEDURE: July 14, 2008

PREOPERATIVE DIAGNOSES:
1.    Chronic left shoulder two-tendon rotator cuff tear.
2.    Left shoulder impingement.

POSTOPERATIVE DIAGNOSES:
1.    Chronic left shoulder two-tendon rotator cuff tear.
2.    Left shoulder impingement.

PROCEDURES PERFORMED:
1.    Open repair left shoulder chronic rotator cuff tear.
2.    Arthroscopic left shoulder subacromial decompression.

SURGEON: Michael Pizzillo, MD

ANESTHESIA: Left interscalene block and general anesthesia.

ESTIMATED BLOOD LOSS: Minimal.

INTRAVENOUS FLUIDS: 600 mL of plasmalyte.

OPERATIVE FINDINGS: Massive, chronic two-tendon rotator cuff tear with retraction.

ORTHOPEDIC DEVICES: Two 5.5 fully threaded Bio-Corkscrew anchors. Four 3.5-mm PushLock suture anchors.

INDICATIONS: A 69-year-old right-hand dominant gentleman, status post a fall. Initial MRI scan revealed a left shoulder supraspinatus rotator cuff tear. Interval MRI scan performed several months later in June 2008 revealed massive two-tendon rotator cuff tear with atrophy and retraction. The patient failed an appropriate course of conservative treatment and indicated for the above procedure.

DETAILS OF PROCEDURE: After being properly identified, the patient was taken to the operating room and placed supine on the operating room table. A left interscalene block was performed by the anesthesia department. Preoperative antibiotics were given intravenously. The patient was secured to the operating room table. General anesthesia was successful performed by the anesthesia department. The operating room table was then conformed into the beach chair position. All bony prominences were well padded. Venodyne boots were applied. The left upper extremity was then prepped and draped in the usual sterile fashion. A

**Carbon Copy For Michael Pizzillo, MD**

NAME: Fouskey, James E     MRN: 00845281

marking pen was used to mark the bony anatomy and the proposed portal sites.

The posterior portal was established, followed by the anterior superior portal just inferior to the biceps tendon. A probe was then placed through the anterior portal probing the anterior superior labrum as well as the biceps anchor. There was no evidence of labral pathology. The patient had no evidence of glenohumeral arthritis. The axillary pouch was inspected. There was no evidence of loose bodies. The undersurface of the rotator cuff was visualized revealing a retracted, massive rotator cuff tear. A 4.5 shaver was then placed into the anterior superior portal debriding the undersurface of the rotator cuff.

The scope was then redirected into the subacromial space and a lateral portal was then established. The ArthroCare wand was then used to remove adherent bursal tissue off the rotator cuff. Areas of concentration were the posterolateral corner of the lateral gutter. Anteriorly, the patient had a large anterior acromial spur.

The coracoacromial ligament was identified, released and resected. A 4.5 shaver was then used to debride the edges of the rotator cuff, which was then re-visualized from the bursal side. A 4.0 acromionizer was placed into the lateral portal, performing an acromioplasty of the anterior inferior surface of the acromion and co-planing the clavicle to a similar level.

A cuff grasper was then placed into the anterior cannula which was redirected in the subacromial space. Grasping the rotator cuff, this was then pulled anteriorly, releasing scar tissue as the entire posterior portion of the humeral head was visualized. Although the rotator cuff was somewhat mobile, I was unable to fully mobilize it to cover the humeral head. The supraspinatus was mobilized on the undersurface of the rotator cuff. The infraspinatus was mobilized posteriorly. The cuff grasper was utilized during this process. Due to the massive nature of the tear, the procedure was then converted to an open procedure.

The instruments were taken out of the subacromial space. The lateral portal was then extended. Full-thickness flaps were developed. The deltoid was split bluntly. The subacromial space was re-identified and retractors were placed deep into the wound. The rotator cuff was then re-visualized in the subacromial space. Previously placed converging stitches were utilized as traction sutures to draw the rotator cuff anterolateral. Two converging stitches were then placed in a split in between the infraspinatus and supraspinatus. The arm was slightly abducted. Next, a series of 5.5 fully threaded Bio-Corkscrew anchors were deployed after the appropriate punch tap system was applied. The sutures were then passed through the rotator cuff with a Mayo needle. Efforts were made to further mobilize the retracted rotator cuff, including an interval slide; the rotator cuff tissue was friable. The cuff was not fully mobilized and 75 percent of the humeral head coverage was achieved. The sutures from the previously placed anchors were then tied. Suture tails from the Bio-Corkscrew anchors and the convergence stitches were secured laterally with a series of PushLock anchors. The suturing and tying were performed from a posterior to anterior direction. The PushLock anchors were placed into the lateral portion of the humerus, securing the rotator cuff just lateral to the articular edge.

Once complete, the wound was irrigated. The deep fascia was closed with 0 Vicryl suture. The subcutaneous tissue was closed with 2-0 Vicryl suture and the skin with staples. Nylon suture was used on the portal sites. The patient was placed into a shoulder immobilizer, extubated, transferred to a stretcher and brought to recovery room in stable condition.

NAME:   Fouskey, James E                 MRN:   00845281

Electronically Signed by
Michael Pizzillo, MD 09/04/2008 07:41

Michael Pizzillo, MD

Dict:   08/29/2008/ 5:29 P
Trans: 08/29/2008  7:21 P

012769809

cc:    Michael Pizzillo, MD

## SPINE & SPORTS REHABILITATION CENTER, L.L.C.
### CATALINA GRIGORESCU, M.D., F.A.A.P.M. & R.
*Board Certified Physical Medicine & Rehabilitation*
205 Robin Road, Suite 118
Paramus, NJ  07652
Telephone: (201) 225-1522
Fax: (201) 225-9731

October 30, 2008

Ms. Alisa Nunno-DiChiara
Attorney at Law
45 Essex Street, Suite 201
Hackensack, NJ  07601

**RE:    James Fouskey**
**DATE OF ACCIDENT:  December 2, 2007**

Dear Ms. Nunno-DiChiara:

The patient is a 70 year old male who was in his regular state of health until December 2, 2007 when he sustained a fall injuring his left shoulder.  The patient states that he was shopping at Circuit City store.  As he was leaving the store, he slipped on black ice, lost balance, fell and landed on his left shoulder.  The patient developed immediate left shoulder pain which by the next day was significantly worse.  On December 3, 2007, Mr. Fouskey presented himself to St. Joseph's Wayne Hospital in Wayne, NJ.  At the hospital, the patient complained of left shoulder pain and tenderness.  According to the hospital notes, the patient underwent X-rays of his left shoulder which ruled out fractures or dislocations and he was released home the same day with prescription for Naprosyn 500 mg. twice a day with food.  Diagnosis upon discharge from St. Joseph's Wayne Hospital was left shoulder contusion and internal derangement.  The patient was instructed to follow up with his primary care physician and orthopedic physician for further evaluation of his shoulder.  The patient was referred to Dr. Robert Greenblum, orthopedics, in Fair Lawn and subsequently, he was referred for MRI testing of his left shoulder.  The MRI testing was performed at Clifton Medical Imaging on December 5, 2007.  The MRI testing revealed a complete tear of the supraspinatus tendon, large amount of fluid and moderate degree of degenerative arthritis.  Mr. Fouskey was followed up by Dr. Robert Greenblum on December 27, 2007 when according to Dr. Greenblum's consult note, the patient's examination revealed mild swelling and persistent tenderness and obvious weakness with external rotation and abduction on the left.  Dr. Greenblum's impression was rotator cuff tear, left shoulder and he discussed at that time with his patient the possibility of arthroscopic repair of the rotator cuff.  At the patient's request, a course of physical therapy was initiated and the patient went for physical therapy approximately two months.  The patient remembers that physical therapy did not help his symptoms in any way, by the opposite, he remembers being in constant, excruciating pain.

**Page 2**

RE:  **James Fouskey**
**DATE OF ACCIDENT:  December 2, 2007**


On July 14, 2008, Mr. Fouskey underwent surgical reconstruction to his left shoulder by Dr. Michael Pizzillo at Englewood Hospital and Medical Center in Englewood, NJ. Preoperative diagnosis was chronic left shoulder 2 tendon rotator cuff tear and left shoulder impingement.  Postoperative diagnosis was the same.  The procedure performed open repair left shoulder chronic rotator cuff tear and arthroscopic left shoulder subacromial decompression.  Indications for surgery, status post fall with initial MRI scan showing supraspinatus rotator cuff tear.  An interval MRI testing performed in June 2008 revealed massive 2 tendon rotator cuff tear and atrophy and retraction.  The patient failed appropriate course of conservative treatment and indication for the above procedure was made.  The patient was placed postoperatively into a shoulder immobilizer and transferred to recovery room.  Postoperative complications included urinary retraction.  The patient was discharged from the hospital with a urinary bag, which subsequently was removed a week later.  Postoperatively, the patient was sent for a second course of physical therapy to Kessler Institute in Clifton.  He underwent approximately 3 weeks of physical therapy.

Postoperatively, the patient continued having pain, predominantly related to movement and diminished range of motion in his left arm.

The patient's complaints today include, but are not limited to, persistent pain, limitation of range of motion, inability to use his left arm for activities of daily living.

**PAST MEDICAL HISTORY:**  Hypertension; diabetes; narcolepsy.

**MEDICATIONS:**  Flomax; Lisinopril; HCT.

**ALLERGIES:**  None.

**SOCIAL HISTORY:**  Right hand dominant, non-smoker.  Denies alcohol abuse.  He has 5 children.  He works part time as a concierge.  The patient reports that he was out of work for approximately one month secondary to injuries related to the fall of December 2, 2007.

**PHYSICAL EXAMINATION:**

Reveals the patient is alert and oriented.  HEIGHT:  6'.  WEIGHT:  235 pounds. Examination is directed to his left shoulder which reveals a postsurgical incision measuring 8 cm. length, which is healed, no signs of infection.  Tenderness to palpation over the anterior and lateral aspect of the shoulder.  Range of motion of the shoulder is limited in flexion to 160 degrees with tightness and pain at end range.  Limited in external rotation to 50 degrees with pain.  Internal rotation is full 90 degrees.  Abduction

**Page 3**

**RE:  James Fouskey**
**DATE OF ACCIDENT:  December 2, 2007**

is also limited to 160 degrees.  Manual muscle testing of the left shoulder graded at 4+/5 compared to 5/5 on the right.

## IMPRESSION:

1.  Left shoulder rotator cuff tear.
2.  Left shoulder open repair of the left rotator cuff tear on July 14, 2008.

## FUNCTIONAL STATUS:

The patient reports that prior to this accident, he was fully independent and able to function without restrictions or limitations to his left shoulder and was pain free. Following his fall on December 2, 2007 and his injury, the patient reports having had significantly limited functional level.  He reports that he cannot lift, carry even lightweight objects with his left arm.  He has pain every time he turns in his sleep on the left shoulder.  He is unable to perform any type of work around the house, unable to cut grass and clean gutters, activities that he had no trouble performing prior to December 2, 2007.  He states that his activities at work are also limited, as a concierge at a building, he is required to receive and therefore lift, push, pull and/or carry UPS parcels that at the present time, he is unable to do.  He is unable to perform any light work around his house, such as changing light bulbs of the ceiling.

## MEDICAL DOCUMENTATION REVIEWED:

Physician notes dated December 3, 2007 from St. Joseph's Wayne Hospital which states that the patient slipped and fell yesterday and injured his left shoulder.  Patient assessment record from St. Joseph's Hospital.  Patient assessment nurse's record from St. Joseph's Hospital.  Emergency Department medical record from St. Joseph's Hospital.  X-ray reports dated December 3, 2007 from St. Joseph's Hospital which notes presence of degenerative changes, but no acute fracture or dislocation noted.  The test was read by Dr. Steinberg.  MRI of the left shoulder performed December 5, 2007 at Clifton Medical Imaging Center which reveals presence of a complete tear of the supraspinatus tendon with retraction, test read by Dr. Michael Kessler.  Operative report dated July 14, 2008 performed at Englewood Hospital and Medical Center in Englewood, NJ by Dr. Michael Pizzillo.  I have also reviewed multiple medical bills which included St. Joseph's Regional Medical Hospital bills which included emergency nurses and diagnostic X-ray with a total charge of $562.00 dated December 3, 2007. Medical bills from Clifton Medical Imaging which included charges of $995.00.  Multiple orthopedic bills which included patient visits and surgical procedure dated July 14, 2008 which totaled to $11,952.00.  Emergency Medical Associates with a total balance of $65.68.  Bills from Allwood Physical Therapy which totaled to $2,168.00.  Englewood

**Page 4**

RE:  **James Fouskey**
DATE OF ACCIDENT:  December 2, 2007

Hospital bills for drugs administered and pathology $671.00 and Englewood Hospital bills for supplies, lab, anesthesiology, emergency room and recovery room which added to $18,861.00. Physical therapy from Kessler Institute totaling $878.00 and $72.00.

## PROGNOSIS:

This patient's prognosis is poor. This patient sustained serious injury to his left shoulder which resulted in a complete rotator cuff tear that did not improve with conservative care and subsequently required surgical reconstruction to his left shoulder on July 14, 2008. Although postoperatively, the patient did feel better in terms of pain, the patient has not become pain free. His range of motion remains limited and he presents persistent weakness to his left shoulder.

## DISCUSSION:

In my opinion, within a reasonable degree of medical probability the patient's condition is directly related to the accident described in this report. The mechanism of injury is entirely consistent with the clinical presentation. There has been severe trauma to his left shoulder as a result of slip and fall accident that this patient sustained. There has been a complete rotator cuff tear that required surgical intervention. The patient underwent open surgery to his left shoulder and postoperatively developed complications which included urinary retention. The patient also underwent a prolonged course of physical therapy pre and postoperatively but he has not recovered completely and has not regained his pre-accident status. In my opinion, within a reasonable degree of medical probability, there has been a permanent weakening of the structures of his left shoulder, therefore, his injuries are permanent in nature. At this point in time, I believe this patient is not a surgical candidate, however, he suffers from long term complications such as residual pain, residual limitations of range of motion, loss of function and weakness to his left shoulder. It is also my opinion that the above medical bills were reasonable and necessary for proper treatment of this patient's significant injury to his left shoulder.

Sincerely,

Catalina Anca Grigorescu, M.D.
Diplomat of American Board of PM&R

CAG/pb

Page 1

1

2                                  SUPERIOR COURT OF NEW JERSEY
                                   LAW DIVISION: BERGEN COUNTY
3                                  DOCKET NUMBER: BER-L-3271-08

JAMES FOUSKEY,                     )
4                                  )
                                   )
        Plaintiff,                 )        DEPOSITION UPON
5                                  )        ORAL EXAMINATION
    vs.                            )             OF
6                                  )        JAMES FOUSKEY
CIRCUIT CITY STORES, INC.,         )
7   WAYNE VF, LLC, VORNADO TRUST,   )
STAR UNIVERSAL, LLC,               )
8   INDUSTRIAPLEX, INC., TOWER      )
CLEANING SERVICES d/b/a US         )
9   MAINTENANCE, JOHN DOES 1-10     )
(fictitious names) and ABC         )
10  CORPS. 1-2 (fictitious names),  )
                                   )
11          Defendants.            )

12

13                 Thursday, March 5, 2009

14          T R A N S C R I P T of the deposition of JAMES

15  FOUSKEY called for Oral Examination in the above entitled

16  action, said deposition being taken pursuant to Rules

17  governing Civil Practice in the Courts of New Jersey, by and

18  before DEBORAH EVENNOU, a Notary and Certified Court

19  Reporter of the State of New Jersey, at the office of

20  WILLIAM R. NUNNO, ESQ., 45 Essex Street, Hackensack, New

21  Jersey, commencing at ten o'clock in the morning.

22

                    JEAN E. DOLAN ASSOCIATES
23                  3 Parlin Drive   Box 289
                    Parlin, New Jersey  08859
24                     (732)  238-7666
                    Fax (732)  613-4666

25                                        COPY

Page 2

```
 1  A P P E A R A N C E S:
 2      WILLIAM R. NUNNO, ESQ.
        BY: ALISA NUNNO DiCHIARA, ESQ.
 3      Attorneys for the Plaintiff, James Fouskey
 4      WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, ESQS.
        BY: DANIEL E. ZEMSKY, ESQ.
 5      Attorneys for the Defendant, Circuit City Stores,
        Inc., Wayne VF, LLC, Vornado Trust
 6
 7      JOHN P. TIERNEY, ESQ.
        Attorney for the Defendant, Industriaplex
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              I N D E X
 2  WITNESS        DIRECT   CROSS   RE-DIRECT  RE-CROSS
    JAMES FOUSKEY
 3
    By Mr. Zemsky   5              27/89
 4  By Mr. Tierney         26              63
    By Ms. Nunno DiChiara   89
 5
 6          INDEX TO EXHIBITS
 7
    EXHIBIT      DESCRIPTION            IDENT.
 8
    Fouskey-1  Photograph                 26
 9
    Fouskey-2  Answers to Interrogatories     55
10
    Fouskey-3  Letter dated 9/24/08 from Ms. Nunno DiChiara  58
11
    Fouskey-4  Five-page Document from Orthopedic Associates 72
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           LITIGATION SUPPORT INDEX
 2  DIRECTION TO WITNESS NOT TO ANSWER
 3  Page-Line
 4  None
 5
 6
 7
 8  REQUEST FOR PRODUCTION OF DOCUMENTS
 9  Page-Line
       45 - 9
10     46 - 13
       80 - 3
11
12
13
14
15  MOTION TO STRIKE
16  Page-Line
17  None
18
    EXHIBIT ANALYSIS
19
    All Exhibits were retained by Counsel.
20
21
22
23
24
25
```

Page 5

```
 1          J A M E S  F O U S K E Y, called as a witness,
 2  having been first duly sworn, testified as follows:
 3  DIRECT EXAMINATION BY MR. ZEMSKY:
 4      Q     Good morning, Mr. Fouskey. My name is
 5  Daniel Zemsky. I represent Vornado Realty Trust and
 6  Wayne VF, LLC. We are here to take your
 7  deposition.
 8          Have you ever been deposed?
 9  A    No.
10      Q     It is very simple --
11  A    No, I never have. I avoid it. I have been a good
12  guy all of my years, no. No, I have never.
13      Q     It is not a problem. Even though it
14  is a very informal setting, we are with a
15  court reporter who is to my right and your left.
16  She is going to be taking down every word that you
17  and I and the other attorneys are saying today.
18          So it is very important that you speak
19  up and you answer me verbally. So I know in normal
20  conversation head gestures and um-hum are usually
21  appropriate. But this is not really a natural setting,
22  so you have to vocalize your response.
23          Do you understand?
24  A    Yes.
25      Q     It is basically a question and answer
```

JEAN E. DOLAN ASSOCIATES, LLC

Page 6

1  session. I am going to be asking a whole bunch of
2  questions. You are going to be answering to the best
3  of your ability. I understand that this accident
4  happened, you know, in 2007. So I know memories fade
5  over time, so if you don't remember something, it is
6  a perfectly good response to say I do not remember.
7        If there is something that is a document
8  that you maybe think that will help refresh your
9  recollection, you can identify the document. And if we
10  don't have it today, then I can always ask for it from
11  your attorney.
12        Do you understand?
13  A    Yes.
14    Q    You have to speak up. It is also important
15  that do you not guess. We are not here to trick you. And
16  I want to know what you know. I don't want you to guess
17  at anything.
18        If you can approximate for me, that is a
19  different story.
20        Do you know the difference between guessing
21  and approximating?
22  A    Well, guessing is just something that you pull out
23  of the air. Approximating is something that you don't
24  know, maybe you might not know the exact day, but you are
25  close to it.

Page 7

1    Q    Okay. That is a fairly good definition.
2  An example is the distance between you and I. I mean
3  you don't really know, but you can probably approximate
4  maybe we are three feet apart from each other. I mean
5  you and I may have a difference of opinion on how far we
6  are.
7  A    Five feet.
8    Q    Five feet. Okay. But you understand what
9  I am saying?
10  A    Yes. Yes.
11    Q    Okay. I have got to ask this, are you on
12  any medications today or anything like that would hinder
13  your testimony today?
14  A    No.
15    Q    Once we begin you cannot confer with
16  your attorney. So if there are any questions that you
17  would like to ask of your attorney now in confidence,
18  this is the time to do it.
19        Do you have any questions of either myself or
20  anybody else in this room before we start?
21  A    No.
22    Q    Okay. So you are ready to begin?
23  A    Yes.
24    Q    We can take breaks. If you want to take
25  a break, that is perfectly fine. Just if we are in mid

Page 8

1  question I would just ask you to answer the question and
2  then we will break. Okay?
3  A    All right.
4    Q    If we do break, you cannot talk about the
5  matter at all.
6  A    All right.
7    Q    Are you ready to begin?
8  A    Okay.
9    Q    Just for the record could you just state your
10  full name?
11  A    James E. Fouskey.
12    Q    How old are you, Mr. Fouskey?
13  A    Seventy.
14    Q    What is your date of birth?
15  A    July 24th, 1938.
16    Q    And your Social Security number?
17  A    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.
18    Q    Where do you presently live?
19  A    40, four, zero, Sylvan, S-y-l-v-a-n Avenue,
20  in Clifton, New Jersey 07011.
21    Q    Do you reside there with anybody?
22  A    My wife.
23    Q    How long have you been married?
24  A    Thirty and a half years or something like that.
25    Q    Do you have children?

Page 9

1  A    Yes.
2    Q    How many?
3  A    Seven.
4    Q    How old is the youngest?
5  A    The youngest is 36.
6    Q    Do any of your children live with you?
7  A    No.
8    Q    How long have you lived at 40 Sylvan Avenue
9  for?
10  A    About twenty-nine years.
11    Q    Is it a single family home?
12  A    Yes.
13    Q    Do you own the home?
14  A    Yes.
15    Q    Could you just give me a brief background of
16  your education?
17  A    I went to -- I graduated. I went to high school
18  and graduated high school. I went to RETS Electronics
19  Technician course that I took for two years.
20    Q    Where did you graduate high school from?
21  A    Central High School.
22    Q    Where is that?
23  A    It no longer exists now. It was in Paterson.
24    Q    What year did you graduate?
25  A    It was 1957. I don't know the exact year.

Page 10

```
1       Q    That is fine. Somewhere in the late '50s?
2   A   Yes.
3       Q    And you said you went to RETS Electronics
4   Tech?
5   A   Yes, on Park Avenue in Nutley.
6       Q    What type of school is that?
7   A   It is an electronics. They teach electronic
8   courses.
9       Q    A vocational school?
10  A   Yes, it was. They -- yeah, you would say vocational
11  school.
12      Q    Do you remember what years you went there?
13  A   It was in 1970 probably 4.
14      Q    And it is a two-year program?
15  A   Yes.
16      Q    Did you graduate with a degree?
17  A   Yes.
18      Q    What did you do between 1957, the late 50s
19  to 1974?
20  A   I worked in the dry cleaners. I had a dry cleaners.
21      Q    So you owned it?
22  A   I owned and I worked in one up until my first wife
23  died.
24      Q    So this is your second marriage?
25  A   Yes.
```

Page 11

```
1       Q    When did you -- I would like to do the
2   math, so thirty and a half years, you would have been
3   married to this wife since -- this is 2008 --
4   A   1978.
5       Q    When were you married to your first wife?
6   A   1958.
7       Q    Do you have any children with your first
8   wife?
9   A   Five.
10      Q    Five. So you have five children with your
11  first wife and two with your second wife?
12  A   Yeah, my second wife I call them my children, but
13  she had them by her first husband. But I don't have
14  stepchildren. These are my kids.
15      Q    So you have five natural children with
16  your first wife and two other children with your second
17  wife?
18  A   Yes. Yes.
19      Q    Now, you said you were in the dry cleaning
20  business. And I believe you have testified that you owned
21  a dry cleaning at one time?
22  A   Yes.
23      Q    Do you remember what the name of that dry
24  cleaning was and when was it?
25  A   Well, I had a couple of them. Fouskey Cleaners,
```

Page 12

```
1   basically that is what it was.
2       Q    Where was that located?
3   A   In Paterson.
4       Q    Do you remember how long that business was
5   opened for?
6   A   That one was opened for a couple of years, two or
7   three years.
8       Q    In the fifties or sixties?
9   A   No, that was in the seventies.
10      Q    Seventies.
11  A   '75 maybe, after my wife had passed, the first one.
12      Q    And so before you owned a dry cleaning
13  business, you worked at other dry cleaning businesses?
14  A   Yes, I first started working at a dry cleaning
15  business in 1954.
16      Q    Then the first time you owned a dry cleaning
17  business was in '75?
18  A   Yes.
19      Q    That was Fouskey Cleaning?
20  A   Yes.
21      Q    After Fouskey Cleaning closed, is that when
22  you went to the RETS Electronic Tech School?
23  A   Yes, I went to RETS Electronics after that.
24      Q    And what did you do after you graduated from
25  RETS?
```

Page 13

```
1   A   For a while I didn't do anything because my wife
2   had passed. So I had five kids. I had an infant baby.
3   I had at that time she died of childbirth, so I had an
4   infant baby and four other kids. So I stopped working for
5   a while and I had a house and so --
6       Q    When you finally got back into the
7   work force, where did you go?
8   A   When I finally went back into the work force I went
9   and I worked for a cleaners in New Milford.
10      Q    Do you remember the name of that cleaners?
11  A   It has been so long, I don't remember the name.
12      Q    That is okay. How long did you work there
13  for, do you remember the dates?
14  A   I worked there for maybe five or six years.
15      Q    When did you start working for the condominium
16  association?
17  A   2004. I think it was 2004.
18      Q    At Admiral --
19  A   Admiral Walk.
20      Q    What was your position in 2004?
21  A   Concierge.
22      Q    Were you working full-time or part-time?
23  A   Part-time.
24      Q    What does part-time consist of?
25  A   Part-time consist of maybe twenty, twenty-five hours,
```

4 (Pages 10 to 13)

Page 14

1  sometimes forty hours. It varies.
2      Q    Would that be every day? Would you work
3  every day?
4  A    No. No, the way I worked was like if someone
5  called out on vacation time, I would work every day to
6  fill in. Other than that, no, I didn't work
7  every day.
8      Q    Normally would you work --
9  A    Normally it was a part-time job.
10     Q    Three days a week?
11  A    Yes, three days a week.
12     Q    And in 2004, what were your duties as a
13  concierge?
14  A    Well, my duties as a concierge is you sit at a
15  desk and you take calls and any emergencies you have
16  to handle them. And you have to give out the mail that
17  is left at the desk, the UPS parcels, you have to hand
18  them out.
19     Q    And you mean by handing them out, you
20  personally go to the resident?
21  A    Yes, you personally take them out of the closet
22  and give them to the resident. You take them from the
23  UPS man when he delivers them. And you put them up in
24  the closet. And then you take them out of the closet
25  when the resident comes and you give it to them.

Page 15

1      Q    You don't go to the resident's home, the
2  resident comes to you?
3  A    Right. Because it is a building and you have
4  110 residents in the building. So when they come in
5  I have a light and they see a light on, then they know
6  they have mail or a package. And they will come to
7  the desk and I will give it to them.
8      Q    Anything else that you would do as a concierge
9  besides what you have just stated?
10  A    No, that is about it.
11     Q    What was your job previous to working at
12  Admiral Walk?
13  A    I basically was in the cleaning business. I had
14  my own little route and whatnot.
15     Q    Were you working full-time before you started
16  working for Admiral Walk?
17  A    Basically you could call it full-time, yeah.
18  Because I worked for myself. So it was like full-time.
19  I actually had, after I closed the store up, I had
20  the equipment. I live in an area that is semi
21  like commercial, so I had the equipment in my
22  garage. And so I used to have a little route and I used
23  to do work there and you could consider it full-time.
24     Q    I am having a hard time understanding.
25  I am sorry. People would drop dry-cleaning at your

Page 16

1  house?
2  A    I would pick it up.
3      Q    You would pick it up?
4  A    Yes, and deliver it.
5      Q    And you did the dry-cleaning in your garage?
6  A    Yes.
7      Q    And you would deliver it back to them?
8  A    Yes.
9      Q    And you were doing this business from 1975
10  until before you --
11  A    Yes. I have always did that, yes.
12     Q    Was that your sole source of income
13  before you did Admiral Walk, was doing this dry cleaning
14  business out of your garage?
15  A    Yeah. I do taxes. I do a lot of things. I work
16  for electronic filed taxes. And I was doing real estate
17  at one time.
18     Q    Did you work for a company when you did
19  electronic filed taxes?
20  A    Well, I am self-employed. I do it now, but
21  I am self-employed. I have my own EFIN number.
22     Q    So you obviously must be pretty business
23  at this time of the year then, I would imagine with the
24  taxes?
25  A    Well, I am busy. I don't take on a big work load.

Page 17

1      Q    So you also on the side, you file taxes for
2  people. And you also said something about real estate?
3  A    Well, I was working with Prime America. I was
4  doing refinancing and whatnot at one time.
5      Q    So like a loan officer?
6  A    Yes.
7      Q    When were you working for Prime America?
8  A    Well, basically Prime America. I could do loans
9  myself, but basically I worked through Prime America.
10     Q    How long were you in that business for?
11  A    I did it for maybe a year or so.
12     Q    Was that a full-time job?
13  A    No.
14     Q    Are you presently still working for Prime
15  America?
16  A    No.
17     Q    Do you do refinancing still?
18  A    No. I am not doing that, no.
19     Q    Any other jobs that you worked prior to
20  2004?
21      I know we have covered dry-cleaning. We
22  covered electronic filing of taxes. We have covered
23  refinancing. Anything else?
24  A    No, that is basically it.
25     Q    And when you joined Admiral Walk Condo in

Page 18

1    2004, were you still doing electronic filing of taxes
2    or are you still doing electronic filing of taxes?
3    A    Yes, I still do that.
4        Q    Were you doing the refinancing?
5    A    When I first started work at Admiral Walk,
6    I was.
7        Q    When did you stop, do you remember?
8    A    Maybe a year or so after.
9        Q    Around 2005?
10   A    Yes.
11       Q    What about your garage dry cleaning business,
12   are you still running that today?
13   A    No. That is finished. I stopped that years
14   ago.
15       Q    Years ago meaning?
16   A    Meaning that was maybe 1997 or something like that,
17   or '98 or something like that.
18       Q    Okay. Let's move to December 2nd, 2007.
19   Do you remember that day?
20   A    Yes.
21       Q    Could you tell me what happened?
22   A    I went to Circuit City. And I went to shop. And
23   then when I came out of the store I slipped down on the ice
24   and fell.
25       Q    Do you remember what time this was, what time

Page 19

1    you first went to Circuit City?
2    A    The approximate time was maybe four or five o'clock.
3        Q    Was it dark outside when you first arrived,
4    I am talking about when you first got there?
5    A    No.
6        Q    So it was light outside still?
7    A    Yeah, it was light.
8        Q    Do you remember what the weather was like
9    that day when you first arrived there?
10   A    It was snow, a little snow, light snow and a little
11   ice.
12       Q    Was it snowing?
13   A    Yeah, it was snowing.
14       Q    It was snowing. It was snowing lightly, I
15   believe you said?
16   A    It was lightly.
17       Q    Do you know how long it was snowing, do you
18   remember when it started that day?
19   A    Not exactly. I don't know exactly what time it
20   started.
21       Q    Do you recall if it was snowing for a few
22   hours? Did it just start snowing? Do you recall any of
23   that?
24   A    Approximately it just had started snowing before
25   I went.

Page 20

1        Q    Do you remember when was the last time it
2    snowed prior to the December 2nd of 2007?
3    A    No.
4        Q    No. Do you recall was it the day before
5    or maybe two weeks earlier, do you remember?
6    A    No.
7        Q    Was there snow on the ground when you arrived
8    at Circuit City?
9    A    A little.
10       Q    A little?
11   A    Yes, a little.
12       Q    A few inches? Less than an inch?
13   A    No. No. Just a little. Just a dusting.
14       Q    A dusting?
15   A    Yes.
16       Q    Do you remember what the temperature was
17   approximately?
18   A    No, I don't. Approximately in order for the snow
19   to stick on the ground it had to be at least maybe 30.
20       Q    So the snow was sticking?
21   A    Yes. Yes.
22       Q    Now, what were you going to Circuit City
23   for?
24   A    Shopping, electronics. I went to get -- I think I
25   went to get some software.

Page 21

1        Q    Had you been to Circuit City before prior to
2    December 2nd, 2007?
3    A    Yes. Sure.
4        Q    How often had you been to the Circuit City?
5    A    Quite a few times.
6        Q    So you had been there a lot?
7    A    Yes.
8        Q    Do you remember the last time that you had
9    been to Circuit City prior to December 2nd, 2007?
10   A    No, I don't know the date. I know the last time
11   I was there is when I went bought a GPS. I think that
12   might have been the last time. I don't know the exact
13   date.
14       Q    I understand that. But it wasn't a few days
15   before December 2nd?
16   A    No, it was before that. More than a few days before.
17       Q    Was it still wintertime when you went there
18   prior?
19   A    No, it might have been the summertime.
20       Q    So it had been a few months then?
21   A    Yes.
22       Q    Had you ever been to that Circuit City in the
23   wintertime though, prior to December 2nd, 2007?
24   A    I had been there in the wintertime already.
25       Q    Now, when you drove into the parking lot was

6 (Pages 18 to 21)

Page 22

1  it crowded?
2  A    Now, you say "crowded", it wasn't --
3        Q    Were there a lot of cars in the
4  parking lot, were there a lot of spaces filled up --
5  well, strike that. Let me reword it.
6        Did you have to park far away?
7  A    No. No.
8        Q    Did you have any trouble driving your car in
9  the parking lot?
10  A    No.
11        Q    So your car wasn't slipping or anything like
12  that?
13  A    No.
14        Q    What about when you got out of your car
15  and you were walking to the Circuit City, did you have
16  any difficulty walking to the Circuit City?
17  A    No difficulty walking to the Circuit City, no.
18        Q    Did you see any snow or ice on the ground
19  when you were walking to the Circuit City?
20  A    There was light snow on the ground when I was walking
21  to the Circuit City.
22        Q    Now, was there light snow on the ground in the
23  parking lot?
24  A    In the parking lot, that is what I am talking
25  about, there was a little light snow in the parking lot.

Page 23

1        Q    What about in the entrance way?
2  A    In the entrance way there was a little light snow.
3        Q    Did you see any ice when you were walking into
4  the store in the entrance way?
5  A    I saw a little ice here and there, yes.
6        Q    Now, I know I am going to have to ask you
7  this, what do you mean by "a little ice here and there"?
8  A    Well, it wasn't enough for me to think it would
9  be unsafe for me to go up there, it wasn't.
10        Q    Was it little patches?
11  A    Yes, there were little patches in the beginning when
12  I went just.
13        Q    Do you remember what you were wearing?
14  A    Shoes.
15        Q    Do you know what type of shoes that you were
16  wearing?
17  A    Regular rubber sole shoes similar to the ones that
18  I have on, like these.
19        Q    Okay. So they're -- I am horrible at shoes.
20        MR. ZEMSKY: You could describe the shoes
21        better than I could describe the shoes.
22        MS. NUNNO DiCHIARA: Just rubber sole
23        lace up walking shoes.
24        MR. TIERNEY: Could I see them as well,
25        please.

Page 24

1  A    They were similar to these. They just had a
2  little more -- the ridges on the bottom were a little
3  more, you know.
4        Q    Do you still have those shoes today?
5  A    Yes.
6        Q    Now, how long were you in the Circuit City
7  for?
8  A    About fifteen minutes, twenty minutes, maybe about
9  twenty minutes.
10        Q    I am sorry. I believe you've testified to
11  this earlier, and I apologize, but did you purchase
12  anything?
13  A    No. No. They didn't have the software that I
14  wanted.
15        Q    Were you carrying anything into the store
16  with you?
17  A    No, I didn't carry anything in.
18        Q    So you had no bag or anything with you?
19  A    Nothing.
20        Q    Did you have a cell phone at that time?
21  A    In my pocket, yeah.
22        Q    Now, when you left the store did the weather
23  conditions change, did they change since you went into the
24  store?
25  A    Yes, it still was lightly snowing and, I guess, it

Page 25

1  was building up a little more.
2        Q    So it was still lightly snowing, but
3  since you were in the store for about twenty minutes
4  the accumulation --
5  A    Yeah, the accumulation, that was a little more.
6        Q    Now, we are talking about the entrance
7  way now, was the accumulation more in the entrance way
8  as well as in the parking lot?
9  A    Yeah, the accumulation was more in the entrance way,
10  yes.
11        Q    Now, I believe you said before you went in
12  you believe it was a light dusting. Correct?
13  A    In the lot it was a light dusting, yes.
14        Q    And what about in the entrance way?
15  A    In the entrance way, basically it was light in the
16  lot and in the entrance way.
17        Q    What about when you came out?
18  A    When I came out there was more of a buildup when
19  I came out.
20        Q    Could you estimate, was it an inch? Less than
21  an inch? More than an inch?
22  A    Well, maybe a little less than an inch.
23        Q    Now, is the entrance covered by a roof?
24  A    No.
25        Q    No.

Page 26

1       MR. ZEMSKY: Let's make it easier. I am going
2   to mark this as Exhibit Fouskey-1.
3   A     There is no roof.
4       Q     Just let her type. There is no question
5   pending.
6   A     Okay.
7           (Whereupon, the document was marked.)
8       Q     Now, Mr. Tierney is going to ask you some
9   questions before I continue.
10  CROSS EXAMINATION BY MR. TIERNEY:
11      Q     Sir, my name is John Tierney. I
12  represent Industriaplex. You've just indicated that
13  there was a little less than an inch?
14  A     Yes.
15      Q     Is that when you came out of the Circuit City?
16  A     Let's see, when I came out.
17      Q     So you were inside the Circuit City for
18  fifteen to twenty minutes, during that time ice and snow
19  accumulated. Is that correct?
20  A     Yes.
21      Q     When you came out there was approximately
22  less than an inch of ice and snow in the entrance way as you
23  came out of the Circuit City?
24  A     It was a little more. When I went in, when I went
25  in Circuit City, it was less than an inch. When I came

Page 27

1   out, it might have been close to an inch. It wasn't
2   a lot of accumulation of snow, it wasn't.
3       Q     Did the ice accumulate from the icy
4   patches that you've described when you went into the
5   store?
6   A     Evidently, yes.
7       Q     So when you went into the store you
8   observed icy patches and when you came out there was
9   a greater accumulation of ice as well?
10  A     It was like black ice. When I came out where
11  I walked at, the ice wasn't that visible as being
12  patches of ice.
13      Q     Was the snow visible?
14  A     Yeah. You could see a little snow, yeah.
15          MR. TIERNEY: Thank you, Dan.
16          MR. ZEMSKY: No problem.
17  RE-DIRECT EXAMINATION BY MR. ZEMSKY:
18      Q     I am going to show you what has been marked
19  as Fouskey-1. Could you identify what is depicted in the
20  picture, please?
21  A     What is depicted is the gentleman that is walking
22  there.
23      Q     Let's slow down. Is that Circuit City?
24  A     Yes.
25      Q     Is that the Circuit City that you went to on

Page 28

1   December 2nd, 2007?
2   A     Yes.
3       Q     Is that a picture of the front of Circuit
4   City?
5   A     Yes.
6       Q     Is that a picture, I guess, of the driveway in
7   front of the Circuit City?
8   A     Yes.
9       Q     And, I guess, when we were talking and we
10  were referring to earlier in the transcript, there is a
11  walkway and, I guess, could you describe --
12  A     He is using the walkway right now.
13      Q     So there is a gentleman in this picture that
14  is walking towards Circuit City?
15  A     Yes.
16      Q     And he is on the walkway in this picture?
17  A     Right. And I fell about right here.
18      Q     Let's mark an X with this red pen on where you
19  fell, if you can do that for me.
20  A     (Witness indicates.)
21      Q     You can make it bigger than that so
22  we can identify it. Okay.
23          MR. TIERNEY: Let the record reflect that he
24  marked Fouskey-1 with a red mark.
25          MR. ZEMSKY: Where he fell.

Page 29

1       Q     Who took this picture, by the way?
2   A     I did.
3       Q     Do you remember when you took that picture?
4   A     The next day.
5       Q     So December 3rd?
6   A     Yes, the conditions were about the same.
7       Q     You read my mind, I was about to ask you
8   that.
9   A     Yes, the conditions were about the same.
10      Q     What was the purpose of taking that
11  picture?
12  A     The reason why I took that picture, so that I
13  could explain -- I could explain and show exactly where
14  I fell at. So that you would have an indication to
15  know and I could show you, just like I am doing now
16  exactly where I fell.
17      Q     Now, I see a car. I am horrible with
18  cars, but it is a SUV?
19  A     Yes.
20      Q     That seems like to be in the front of the
21  entrance. Was that car --
22  A     No.
23      Q     -- there on that day?
24  A     No.
25      Q     Were there any cars parked like that?

Page 30

1   A    No.
2   Q    Were there any icicles that if you recall
3   that were hanging from this, I guess, is this like a --
4   A    No, no icicles. I didn't see any icicles.
5   Q    Is this a roof? I am pointing to below the
6   City sign, is that a roof?
7   A    Well, it is a roof, but it don't cover. It only
8   covers just the front there, but here is open. All of
9   this is open. It is open all the way up to when you
10  get to the door, it is open. All of that is open.
11  Q    Okay.
12  A    This is ramped. That is ramped.
13  Q    It inclines up?
14  A    Yes, it is ramped. And that is the only way,
15  basically that is the way in and out of there.
16  Q    That was going to be my next question, is
17  there any other entrances or exits from Circuit City?
18  A    No.
19  Q    So the only entrance and exit ways are these
20  front doors that are depicted in this picture?
21  A    Right.
22  Q    Okay. I believe you've testified, and I
23  apologize, but you didn't see any icicles hanging from
24  any roofing or any walk or anything?
25  A    No. There were no icicles, no.

Page 31

1   Q    Now, when you were walking, how far out of
2   the door did you get until you fell?
3   A    I came out of the door and I got to this spot
4   right.
5   Q    To the red X. Could you approximate what
6   distance that is from the door?
7   A    From here to -- from here to maybe that wall or a
8   little closer. Yes, from here to the wall.
9       MR. ZEMSKY: So could anybody estimate how many
10      feet that is?
11      MS. NUNNO DiCHIARA: Ten feet.
12      MR. TIERNEY: Eight feet.
13  Q    So eight to ten feet?
14  A    Yes, about that.
15  Q    Do you remember where you were looking,
16  in what direction you were looking when you were walking
17  out the door?
18  A    Usually I look down or I look where I am going,
19  you know.
20  Q    Were you talking on your cell phone?
21  A    No. No.
22  Q    Were you with anybody?
23  A    No, by myself.
24  Q    Were you holding anything when you left the
25  store?

Page 32

1   A    No, I didn't make any purchase.
2   Q    Okay. So you were walking approximately
3   ten feet, then describe exactly what happened?
4       MR. TIERNEY: Just note my objection to the
5       form. I believe he said eight to ten feet.
6       MR. ZEMSKY: What did I say?
7       MR. TIERNEY: Ten feet.
8       MR. ZEMSKY: Eight to ten feet. I apologize.
9   A    When I walked I was cautious. And I didn't really
10  realize that it was as bad as it was. And when I stepped
11  and I was making sure that when I walked through there
12  that when I stepped down I was looking where I was going
13  and whatnot, and I just went and slipped.
14  Q    Why were you being cautious?
15  A    Because it was a light snow. So whenever there
16  is a little snow, you know, the thing is to be
17  cautious because you could fall.
18  Q    Okay.
19  A    You know, so that's it.
20  Q    And you said, stepping down, were you going
21  down a step?
22  A    No, it is --
23  Q    -- a ramp?
24  A    That is a ramp.
25  Q    So you were doing a decline?

Page 33

1   A    Yes.
2   Q    Do you know how steep that decline is?
3   A    It is for to be able to push a wheelchair. It
4   is a decline just like that, not a lot.
5   Q    You have to do it for the record because she
6   can't identify what you are doing with your hands.
7   A    Okay. It is a decline of maybe a couple of inches of
8   a decline, that is all.
9   Q    It is meant for the handicap?
10  A    It is meant for the handicap.
11  Q    Now, did a foot slip out from under you, or
12  how did the whole fall happen?
13  A    Well, when I stepped.
14  Q    What foot, do you remember?
15  A    No, it was black ice there and when I stepped,
16  you know.
17  Q    You dont' remember whether your right foot or
18  your left foot slipped?
19  A    No, I don't remember which foot.
20  Q    That is okay. Do you remember which direction
21  you fell?
22  A    Well, I fell like straight. I twisted myself so
23  that I didn't hit my head on the ground, you know. I didn't
24  want to hit my head on the ground.
25  Q    Did you fall forward or did you fall backward?

Page 34

1  A   I fell backward.
2    Q   What body part hit the ground first, do you
3  recall?
4  A   My shoulder.
5    Q   Your shoulder, referring to your left
6  shoulder?
7  A   Yes, the left shoulder, this shoulder.
8    Q   Did anybody see you fall?
9  A   Five people helped pick me up, yeah. Yeah, people
10  saw me fall.
11    Q   So were they customers or Circuit City
12  employees?
13  A   They were customers. The Circuit City employees
14  didn't even come out there for crying out loud. These
15  were people that were shopping, they helped to get me
16  off of the ground because I couldn't get up. I fell
17  pretty hard, so there was like maybe four people that
18  pulled me up. Because I was still on the ice, so I really
19  couldn't get up.
20    Q   Now, did any of these four or five people say
21  anything to you, do you recall having any conversations with
22  them?
23  A   No, not really.
24    Q   Did you get their names?
25  A   Well, you know, the first thing people ask you,

Page 35

1  are you hurt, you know. I said well, I said my shoulder
2  feels like I -- my side here, I said is hurting a little
3  bit, but that is all. Basically you respond, you know.
4    Q   Did you get any of these individuals'
5  names?
6  A   No. No, because I didn't think that, you know.
7    Q   I am sorry.
8  A   I didn't think that I was really injured at the
9  time that bad. I thought it was something that would go
10  away.
11    Q   Now, how long do you believe that you were on
12  the ground for?
13  A   Maybe five minutes or so.
14    Q   Now, when you were on the ground, did you see
15  the ice?
16  A   After I fell?
17    Q   Yes. When you were lying on the ground?
18  A   When I was lying on the ground, I could see
19  that there was ice on there when I was lying on the
20  ground.
21    Q   Was it a patch of ice or was it the whole
22  walkway full of ice?
23  A   Well, the whole area, yes. It was like black ice
24  and you wouldn't think that it was, you know, ice per say.
25    Q   Was it a color?

Page 36

1  A   No, there was no color on it.
2    Q   So how did you know that it was ice?
3  A   When I stepped down on it, I know it had to be.
4    Q   But you didn't actually physically see it?
5  A   I physically saw it, yes. I physically saw it.
6    Q   Did it feel cold to the touch?
7  A   It was frozen.
8    Q   So the ground was cold when you were on the
9  ground?
10  A   Yes.
11    Q   Did you see how far the ice extended?
12  A   Yeah, it extended from here down the whole walkway.
13    Q   Why don't you make a red line and draw a
14  straight line from where you believe the ice extended and
15  ended.
16  A   All right. It extended down here.
17    Q   So it extended it looks like from what you are
18  saying, it extended to the driveway?
19  A   Yeah.
20    Q   Was it the whole -- now, where on the ramp?
21  It is hard to tell from the X, but were you in the middle of
22  the ramp? The beginning of the ramp?
23  A   No, the beginning of the ramp.
24    Q   You were at the begining of the ramp. So
25  coming from the store, you were at the beginning of the

Page 37

1  ramp going into the parking lot?
2  A   I was at the beginning of the ramp coming from the
3  store.
4    Q   You believe that the ice extended all the
5  way from the beginning of the ramp to the bottom of the
6  ramp?
7  A   The biggest accumulation was here and then there
8  was -- yes, it extended.
9    Q   Okay. Now, when you walked into the store,
10  did you use that ramp?
11  A   Yes.
12    Q   Now, the conditions were different than when
13  you left the store, that ice wasn't there?
14    MR. TIERNEY: Objection to the form.
15  A   No.
16    Q   No, the ice was not there?
17  A   There was a little, but not enough for me to be that
18  concerned.
19    Q   But you didn't have any difficulty negotiating
20  the ramp going into the store?
21  A   No.
22    Q   Now, when you were lying on the ground,
23  I know you said that your left shoulder hurt, did anything
24  else hurt?
25  A   No, just -- well, your body, yeah, this side.

Page 38

1    Q    When you say "this side", you are referring to
2  your left side?
3  A    Yeah, that's all.
4    Q    And then I believe you said four or five
5  people helped you up. Correct?
6  A    Yes.
7    Q    And what did you do thereafter?
8  A    Then I went back into the store.
9    Q    What was the purpose of going back into the
10  store?
11  A    And I sat down, because I was like, you know,
12  after 235 pounds hitting the ground, you know, like I
13  was -- you know, I went in to sit down to get my
14  composure.
15    Q    Was there a seating area in the Circuit City?
16  A    Yes, when you go inside there is a -- they have a
17  bench there inside. And so I went in and sat down. And
18  one of the representatives of Circuit City came out --
19  well, he came over to me and asked me what happened.
20    Q    Was he aware before he came over to you
21  what happened, or was it he just happened to be out there
22  and asked you?
23  A    I guess, he was a little aware of it, because
24  four people were getting me off of the ground and they
25  had the security guy at the door, so he should have been

Page 39

1  aware.
2    Q    Do you think the security guy saw you on the
3  ground?
4  A    I think the security guy saw me on the ground, yes.
5    Q    Did the security guy say anything to you?
6  A    Basically, no.
7    Q    Do you remember what he was wearing the
8  security guy, was he wearing a uniform?
9  A    I think they have a shirt and a pair of pants,
10  yes, a uniform.
11    Q    And did it say anything on the pants or the
12  shirt?
13  A    I know he is security, because when you come out
14  he checks your packages. That is how I know. I have
15  been shopping there before, so when you come out he is
16  at the door to make sure that what you bought, you
17  bought.
18    Q    So he is the guy that makes sure no one
19  shoplifts?
20  A    Yes.
21    Q    Was he wearing a Circuit City --
22  A    I am not sure whether or not.
23    Q    Was he an officer?
24  A    No, he had a shirt on that said Circuit City on
25  it, yes.

Page 40

1    Q    Was it red?
2  A    I am not sure.
3    Q    Okay. Now, you don't know if anybody reported
4  this, your fall down to the --
5  A    I did.
6    Q    You did?
7  A    He asked me, he said would you like to give the
8  information, give your information at the desk here.
9  He called up somebody from Circuit City's insurance
10  company or whoever it was, because they called me back the
11  next day. So he asked me, would you like to give the
12  information, and so I gave the information. And he gave
13  me a phone number.
14    Q    What type of information?
15  A    That I had fell. That I had just fell.
16    Q    Did they make you fill out a form?
17  A    It wasn't a form, no. I just filled out where I
18  lived and my telephone number and whatnot.
19    Q    Was it on a --
20  A    No. It wasn't on a formal piece of paper, no.
21    Q    What was it on?
22  A    Just on a piece of paper.
23    Q    Like a blank piece of paper he gave you and he
24  said write down your information?
25  A    Yes.

Page 41

1    Q    Do you remember who this individual was, did
2  you get his name or her name?
3  A    No.
4    Q    Did you ask for his or her name?
5  A    No.
6    Q    Do you remember if it was a male?
7  A    It was a male. It was a male. So I spoke to
8  someone on the phone that represented Circuit City, their
9  insurance company or somebody.
10    Q    I am talking about on December 2nd, 2007?
11  A    When I fell, no.
12    Q    Was he an older gentleman?
13  A    No, he was a young man, maybe about 35 or 40.
14    Q    Was he white or black?
15  A    White.
16    Q    Did he state his title to you?
17  A    He might have been a manager or an assistant
18  manager.
19    Q    What time was this around? I know you
20  went to the store I believe, and correct me if I'm wrong,
21  you went between four and five. Right?
22  A    Yes.
23    Q    Around four or five o'clock. So this had to
24  be what, twenty to twenty-five minutes later?
25  A    Yes.

Page 42

1    Q    So anywhere between 4:30 and 5:30?
2    A    Yes, maybe 5:30.
3    Q    Do you recall, did you guys have a
4    conversation?
5    A    No, he just asked me did I want to -- he asked me
6    to give my information over the phone.  He called somebody
7    and he asked me to give the information of where I lived
8    and my telephone number and that is all.
9    Q    He didn't ask you about how you fell or
10   anything like that?
11   A    No, he didn't get into details.  But he knows that
12   I fell.  He didn't get into details about it.
13   Q    Did they offer to call you an ambulance or
14   call the police or anything like that?
15   A    No, he might have said how are you, you know.
16   No, I am not sure.  I am not sure whether he offered.
17   He might have, but I am not sure.
18   Q    But nevertheless, an ambulance did not come.
19   Correct?
20   A    No, I didn't call an ambulance.
21   Q    Did the police come?
22   A    No, I didn't call the ambulance and I didn't call the
23   police, because I didn't think that, you know, I was -- I
24   thought I was able to, you know, drive home, which I did.
25   Q    So how long do you believe that you were

Page 43

1    sitting on the bench until you finally left the
2    store?
3    A    I sat on the bench about fifteen to twenty minutes.
4    Q    Then you walked back out to your car?
5    A    Yes, I went back out to the car.
6    Q    And did you have any difficulty at that time
7    walking to your car?
8    A    I don't remember as far as difficulties, because I
9    don't remember.
10   Q    But you made it without falling again, is that
11   fair to say?
12   A    I didn't fall again, no.
13   Q    And then you were able to drive home?
14   A    Yes.
15   Q    How far did you live?  You lived in Clifton.
16   Correct?
17   A    Yes, fifteen minutes.
18   Q    Fifteen minutes.  This is in Wayne.  Right?
19   A    In Wayne.  I live in Clifton.
20   Q    How did you feel that night?
21   A    Sore, my shoulder was hurting.
22   Q    Did you tell anybody what happened when you
23   got home?
24   A    My wife.
25   Q    Did you take anything or do anything to help

Page 44

1    relieve the pain that night?
2    A    No, I am not a take pill guy.  I am not a guy that
3    just swallows pills to make it go away like that, no.
4    Q    Do you first recall when you first sought
5    treatment for your injury?
6    A    You know, it started paining me and so then I went
7    to my primary doctor.
8    Q    Who is your primary doctor?
9    A    Dr. Sharma.  And he then sent me for X-rays.
10   Q    Do you know what type of doctor Dr. Sharma
11   is?
12   A    Yes, he is a regular doctor.
13   Q    He is like a family practitioner?
14   A    Yes.
15   Q    Do you remember when you went to him?
16   A    The next day.
17   Q    So December 3rd?
18   A    Yes.
19   Q    Before we go into that, you said someone
20   from Circuit City called you the following day?
21   A    From the office, yeah, someone called me.  I don't
22   know, did I give the lawyer the information maybe
23   afterwards, that they had called me.
24   Q    It is okay.  Just tell me what you've
25   testified, tell me what happened?

Page 45

1    A    They called me.
2    Q    They called you on December 3rd, 2007?
3    A    Yes, just to confirm that I had an accident there
4    and that is all.
5    Q    Do you remember who called you from Circuit
6    City?
7    A    No, I have it written down at home.
8    Q    Okay.  Well, I will take a look and see if
9    we have it and if we don't I will ask your attorney for
10   it.
11   A    I have it written down.
12   Q    But they identified themselves you
13   believe being from the insurance company, Circuit City's
14   insurance company you said?
15   A    Yes, the people that handle when you have an
16   accident or something there, those are the people that
17   called me.
18   Q    Okay.  What, in fact, did they ask
19   you?
20   A    To confirm that I had fell.  You know, that they
21   knew that I had fell.
22   Q    Did they ask you what your injuries were or
23   how you fell?
24   A    I don't remember.
25   Q    Do you remember how long the conversation was?

Page 46

1  A    Five minutes.
2      Q    Was that the last time that you heard from
3  them or did they call you another time?
4  A    It was another time, I think they might have
5  wrote a letter, but that was weeks later. They might
6  have sent me something.
7      Q    Do you remember what that letter said?
8  A    Just to confirm that I had fell there, and that is
9  all.
10     Q    Do you still have that letter?
11 A    I probably do.
12     Q    Well, I would just ask you to take a look for
13 it and I will ask your attorney for it.
14 A    All right.
15     Q    Was that the only other time that someone from
16 Circuit City contacted you?
17 A    Yes.
18     Q    So there was one telephone call the day
19 after the accident and there was a letter a few weeks
20 after the accident?
21 A    Yes.
22     Q    And that was the last time that you heard from
23 them?
24 A    The last time I heard from them.
25     Q    Let's get back to you saw Dr. Sharma the

Page 47

1  next day on December 3rd, and I believe you have testified
2  he recommended to get an X-ray?
3  A    Yes.
4      Q    Did you, in fact, get that X-ray?
5  A    Yes.
6      Q    Where did you go?
7  A    I went to, I think I went to Wayne General.
8      Q    Did you that day?
9  A    Yes.
10     Q    Do you remember what the X-ray said?
11 A    I went to Wayne -- I am not sure whether I went to
12 Wayne General or on Broadway.
13     Q    But what did they take an X-ray of?
14 A    The shoulder.
15     Q    Do you remember what --
16 A    Well, he took an X-ray of the shoulder and he
17 said that they saw some damage. But he said that you
18 have to take a MRI in order for them to see. Because
19 he says an X-ray is not going to show that much.
20     Q    So they recommended that you get a MRI?
21 A    Yes.
22     Q    Did you, in fact, get a MRI?
23 A    Yes, I did.
24     Q    Do you remember when you got the MRI?
25 A    Maybe a day or two after I had the X-ray.

Page 48

1      Q    Somewhere between December 3rd and December
2  4th and December 5th?
3  A    Yes.
4      Q    Do you remember where you got the MRI?
5  A    I think I got the MRI at Clifton Image.
6      Q    And did you find out the results of the
7  MRI?
8  A    Yes.
9      Q    What was your understanding of what the
10 results were?
11 A    That the rotator cuff was torn.
12     Q    Have you ever torn your rotator cuff
13 before?
14 A    No.
15     Q    Had you ever injured your left shoulder
16 before?
17 A    No.
18     Q    What hand are you dominant with, are you a
19 lefty or a righty?
20 A    I am dominant with the right hand.
21     Q    So after you found out that you had a torn
22 rotator cuff, what did you do?
23 A    Well, I went for physical therapy.
24     Q    Do you remember where?
25 A    In Clifton on Clifton Avenue. I don't remember

Page 49

1  the name exactly.
2      Q    Do you remember how long you went for?
3  A    I went for a couple of months.
4      Q    How many days a week?
5  A    Twice, two, sometimes three times.
6      Q    Did you go for your shoulder only?
7  A    Yes.
8      Q    How did the physical therapy work out for you?
9  A    It wasn't good.
10     Q    So you went for a few weeks -- for a few
11 months? I am sorry.
12 A    It wasn't working.
13     Q    It wasn't working?
14 A    To me it was hurting. It was still hurting.
15     Q    And then what did you do thereafter?
16 A    Then I went to Dr. Pizzillo and he checked and
17 he said it was getting worse, the burs or something that
18 was in there. So I said, well -- you know, he recommended
19 that get it operated on and sewn up.
20     Q    That was the first time you saw Dr. Pizzillo?
21 A    No, I think I saw Dr. Pizzillo before I went for the
22 therapy I saw him.
23     Q    Dr. Pizzillo doesn't work with Dr. Sharma,
24 does he?
25 A    No. He said to try therapy.

13 (Pages 46 to 49)

Page 50

1     Q     Dr. Pizzillo first recommended therapy?
2   A     Yes.
3     Q     And then when it didn't work out, you came
4   back and he said you should go for surgery?
5   A     Yes.
6     Q     And I take it, you did have surgery. Correct?
7   A     I did.
8     Q     Do you remember when you had surgery?
9   A     I don't remember the exact date. It is July
10   something.
11     Q     Was it of 2007?
12   A     Yes.
13     Q     Okay. Was it a one-day procedure?
14   A     Yes.
15     Q     So you were in and out that day?
16   A     Yes.
17     Q     Where did you go to have the procedure done?
18   A     Englewood Hospital. I think it was in the
19   hospital. It might have been -- I don't know if it was
20   in the hospital or in something that was associated with
21   the hospital. Dr. Pizzillo did it.
22     Q     Dr. Pizzillo performed the surgery?
23   A     Yes.
24     Q     What time did you arrive, you arrived in the
25   morning?

Page 51

1   A     I think it was in the morning.
2     Q     Do you remember what time that you left?
3   A     About three hours later.
4     Q     Okay. So it was a three-hour procedure?
5   A     Yes.
6     Q     And what were your instructions after
7   you had the surgery, what did they tell you that you had
8   to do?
9   A     Wait for it to heal, I guess.
10     Q     Did you go back to physical therapy?
11   A     And then go back to physical therapy, yeah.
12   They recommended that I go back to physical therapy.
13     Q     How long after the surgery did you go back to
14   the physical therapy?
15   A     Well, he said wait about two or three weeks.
16     Q     And did you, in fact, go back to physical
17   therapy?
18   A     I went back.
19     Q     Did you go back to the place in Clifton?
20   A     No, I went to another one that was in -- there
21   is another one that was in Clifton that I went to.
22     Q     Do you remember the name of that one?
23   A     On Broad Street.
24     Q     Was it Kessler?
25   A     Yes.

Page 52

1     Q     How long did you go there for?
2   A     I went there for a couple of months.
3     Q     A couple of months. You got the surgery
4   in the summer, did you start physical therapy in the
5   fall?
6   A     Yeah.
7     Q     And how long did you go?
8   A     I went there a couple of months.
9     Q     So into the new year, into 2008?
10   A     I think it was in 2008.
11     Q     And how often did you go?
12   A     I was going twice a week.
13     Q     Twice a week. Now, did it work or was it
14   helping you?
15   A     No. Well, it helped me a little bit. I still
16   feel pain or whatnot, so I stopped going. And not only
17   that, the insurance company, they said they wasn't going
18   to pay no more.
19     Q     So you stopped going because; A, it wasn't
20   helping; B, they weren't going to cover you anymore?
21   A     No.
22     Q     Who is your insurance company?
23   A     Horizon.
24     Q     Horizon. Now, when you left physical therapy,
25   did you continue to do your own type of therapy?

Page 53

1   A     I did therapy at home.
2     Q     What type of therapy?
3   A     Well, I did arm stretching at home that they said
4   and I forgot.
5     Q     How long did you do this routine for?
6   A     I did the routine for like maybe another month or
7   so.
8     Q     Why did you stop?
9   A     Well, I didn't really stop. I still do a little
10   therapy.
11     Q     How often?
12   A     Maybe once or twice a week. You know, they told
13   me some things that I could do.
14     Q     Who is the "they", the physical therapists?
15   A     Yes.
16     Q     Now, I believe you were working, you were
17   working at this time as a concierge. Correct?
18   A     Yes.
19     Q     Did you have to miss any work because of
20   this accident?
21   A     I missed maybe a month or so. Because what I did
22   was, I missed maybe a month.
23     Q     A month of work?
24   A     Yes.
25     Q     Did you miss a month of work right after

Page 54

1  you fell or a month of work after your surgery?
2  A    After the surgery. Because before that what I
3  did was, I had pain and everything, but you know, I am
4  right-handed so I did mostly everything with my right
5  hand.
6      Q    So you sucked it up?
7  A    Yes.
8      Q    Were you on your regular schedule?
9  A    Well, it wasn't the regular schedule because
10 normally I could fill in first shift, second shift.
11 But after the accident, I couldn't do first and
12 second because you have to handle the parcels. So you
13 have got to be able to lift your hand up high to get them
14 off of the top shelf and I couldn't do it. I just stuck
15 to doing the third shift.
16     Q    What is the third shift?
17 A    Twelve to eight, and mostly everything is gone then.
18     Q    Is that the graveyard shift twelve at night to
19 eight in the morning?
20 A    Yes.
21     Q    And you did that about two or three days a
22 week?
23 A    Yes.
24     Q    About twenty to twenty-five hours a week?
25 A    Yes.

Page 55

1      Q    So your hours didn't change, it was just
2  the time that you worked might have changed.
3          Did you sometimes work graveyard hour
4  shifts -- I know I had asked you about twenty
5  different questions -- strike that.
6          Before you fell on the December 2nd, 2007,
7  had you ever worked the graveyard shift before?
8  A    Yeah. Yes. Yes.
9      Q    But you also worked other shifts?
10 A    Other shifts. But basically I confined it to the
11 graveyard shift because I don't have to handle any boxes
12 or anything. Before that, they called me and I could
13 come in and I could do first or second shift. But after
14 that, they like rescheduled me so I could just come in
15 twelve to eight and I wouldn't have to be handling any
16 packages or anything.
17     MR. ZEMSKY: Could we go off the record for one
18 second.
19     (A discussion is held off the record.)
20     MR. ZEMSKY: Back on the record. I am going to
21 mark this as Fouskey-2.
22     (At which time the document was marked.)
23     Q    Mr. Fouskey, do you remember filling out
24 answers to interrogatories at one point with your
25 attorney for this litigation, answering a bunch of

Page 56

1  questions?
2  A    I don't remember.
3      Q    Okay. I am going to show what has been
4  marked Fouskey-2. I would ask you to turn to the last
5  page and tell me if that is your signature, please?
6  A    Sure.
7      Q    That is your signature?
8  A    Yes.
9      Q    Could you just review this document, the whole
10 thing, and let me know if you recall answering those
11 questions. You can turn to the front page and look at
12 everything.
13 A    Oh, yeah, I have no problem with that.
14     Q    So you remember answering them. I don't
15 want to know any conversation that you had with your
16 attorney about answering those, but do you remember
17 looking at these and reviewing them and executing them,
18 meaning the answers to interrogatories that you signed
19 your name to?
20 A    Yeah. Yeah. These are right.
21     Q    So you recognize those?
22 A    Yes.
23     Q    And you did, in fact, answer them?
24 A    Yeah.
25     MR. TIERNEY: Is that a "yes", sir?

Page 57

1      THE WITNESS: Yes. Yes.
2      Q    I am going to turn your attention to Number
3  10.
4  A    Yes.
5      Q    Now, I will also show you the Form A Questions
6  to Interrogatories, which correspond to those answers.
7          Now, we don't have it separate, so I am going
8  to be showing you Form A out of the Rule Book, the 2008 Rule
9  Book. If you turn to Question 10 and you see how it says
10 Question 10 and you went to (a) Admiral Walk, River Road,
11 Edgewater?
12 A    Yes.
13     Q    Now, if I read the question to Number 10, if
14 you could read that question to us out loud.
15 A    If employed at the time of the accident state name
16 and address of employer, position held and nature of work
17 performed, average weekly wages for past year, period of
18 time lost from employment giving dates and amount of wages
19 lost, if any.
20     Q    Now, if you look at (d) you said December 2nd,
21 2007 to August 10, 2008. Now, that was your answer to (d).
22 Right. So if you look at the question, period of
23 time lost from employment, giving the dates.
24     Now, I believe you've testified a few minutes
25 ago that you only lost one month of employment. Is that

Page 58

1  correct?
2  A   Yes.
3  Q   So in your answers to interrogatories you
4  state that you lost work from December 2nd, 2007?
5  A   Okay. This could be explained.
6  Q   Okay.
7  A   In the beginning I gave the lawyer a date, but
8  then afterwards my wife and I, we looked it over.
9  THE WITNESS: And I don't know if I, you know,
10  spoke to you or not.
11  A   That it was really a month that was lost.
12  Q   That is fine.
13  A   That is all.
14  Q   I am going to show you what we will mark as
15  Fouskey-3.
16  A   Yes, so that is, you know --
17  MS. NUNNO DiCHIARA: Wait for the question.
18  Q   Wait for the question. There is not a
19  question. I will give you every opportunity to address it.
20  MS. NUNNO DiCHIARA: Off the record.
21  (A discussion is held off the record.)
22  MR. ZEMSKY: Back on the record.
23  (Whereupon, the document was marked.)
24  Q   Mr. Fouskey, I am going to show
25  you what has been marked Fouskey-3. This was a letter that

Page 59

1  I received from your Counsel. Now, I understand you
2  probably have never seen this document before and that is
3  fine. But let me know if Paragraph 2 is accurate. And you
4  could read it out loud for the record.
5  A   This seems to be accurate.
6  Q   Just read it out loud for the record,
7  Paragraph 2.
8  A   As to the plaintiff's wage loss he was out of
9  work from July 14th to August 10th due to injuries
10  he sustained in this accident. His wage loss is
11  $1240.00. I have attached plaintiff's W-2 forms from
12  2006 and 7. Please accept this amendment to plaintiff's
13  answers to interrogatories.
14  Q   That is fine. You can stop from there.
15  A   Yeah. Yes. So she did change it, because I
16  told her that was wrong.
17  Q   That is fine. That is fine. I just wanted
18  to get the record clear that you only lost work from
19  July 14th, 2007 until August 10th, 2007?
20  A   Right.
21  Q   And the wages that you lost because you didn't
22  go to work were $1240.00?
23  A   Right.
24  Q   So if you don't show up to work, you
25  don't have a sick day or something like that and you

Page 60

1  don't get paid?
2  A   No, I only get paid when I go to work because I am
3  part-time.
4  MR. TIERNEY: Could I just interrupt for a
5  second. Your missed work was on July 14th, 2008 to
6  August 10th, 2008. Correct, sir?
7  THE WITNESS: Yes.
8  MR. TIERNEY: Meaning, it is the summer after
9  your accident of December 2nd, 2007.
10  MR. ZEMSKY: That is a good point.
11  MR. TIERNEY: From the accident, it is seven or
12  eight months after. Correct?
13  THE WITNESS: When I had the operation. I
14  missed it because of the operation. I didn't miss
15  time because --
16  MR. TIERNEY: I am just clarifying the date.
17  THE WITNESS: Yes.
18  MS. NUNNO DiCHIARA: You had said 2007 before
19  mistaking the year.
20  THE WITNESS: I don't know. But it was after
21  the surgery.
22  Q   Okay.
23  A   Before that, no. Like you said, I sucked it up.
24  Q   Just for the record, it does say 2007. So
25  that is really 2008, which would make more sense

Page 61

1  because I know your surgery was in 2008 and this happened
2  December of 2007.
3  So for the record I know the document says
4  2007, but that is a typo. You missed work from July 14th,
5  2008 to August 10th, 2008. Correct?
6  A   (No verbal response.)
7  Q   You have to say yes. Is that a "yes"?
8  A   Yes.
9  Q   So this letter that I received from your
10  attorney has a typo with the year. Correct?
11  A   Okay. Yes.
12  Q   So it is really 2008?
13  A   Yes.
14  Q   And I am sorry, before we went into that
15  you said you don't get paid unless you show up for work.
16  Correct?
17  A   Correct.
18  Q   Did you receive any health insurance
19  or anything like through your employer?
20  A   No, part-time don't get nothing. Part-time don't get
21  health, only full-time help.
22  Q   Does your wife work?
23  A   Yes.
24  Q   Where does she work?
25  A   She is a schoolteacher in Paterson.

16 (Pages 58 to 61)

Page 62

1    Q    Are you under her plan?
2    A    Insurance-wise, yes.
3    Q    And she is the one that has Horizon?
4    A    Yes.
5    Q    Now, when you missed that month of work,
6    did you go on disability?
7    A    No.
8    Q    Are you on Social Security?
9    A    Yes.
10    Q    How much do you receive a month from Social
11    Security?
12    A    About 18, about $1800.00 or something like that.
13    Q    How do you feel today?
14    A    Just sitting here like I am now, I feel all right.
15    Q    What are the things that you can't do now
16    that you could do prior to December 2nd, 2007, because of
17    your injury?
18    A    Well, maintenance around the house. Like these
19    ceiling tiles if I was to take it out and put it back in,
20    after doing it I would have pain, which I didn't have
21    before, you know. And I would have to stop and wait and
22    then go back to doing it. I have pain reaching and
23    sometimes in sleeping at night in certain positions.
24    Q    Anything else?
25    A    That is basically it.

Page 63

1    Q    I am sorry.
2    A    That is basically it.
3    Q    I have no more questions. Thank you.
4    A    My wife said she was deprived for a couple of months
5    and she said what about her.
6    RE-CROSS EXAMINATION BY MR. TIERNEY:
7    Q    Sir, once again, name is John Tierney. I
8    represent Industriaplex in this accident. Do you
9    know what company Industriaplex is?
10    A    No, I don't. I really don't know exactly, no.
11    Q    Okay. The ice and snow condition that
12    you've indicated that you slipped on at the Circuit City,
13    can you describe the dimension of this ice and snow patch
14    in terms of feet? Inches?
15    A    In dimension, let's see to describe it, I don't
16    know, maybe almost the size of this table, that area.
17    Q    The entire table?
18    A    Yes, that area. I didn't slip on the entire, but
19    that area that had ice on it was a little more than half the
20    size of this table.
21    Q    So would you agree with me, sir, that a
22    little more than half the size of this table would be
23    approximately a snow and ice patch of four to five feet
24    by six feet?
25    A    I can't say the whole area had the snow and ice,

Page 64

1    the whole area. Where I slipped at, would have been the
2    size of half of the table, where I slipped.
3    Q    Would you estimate that to be approximately
4    four to five feet by six feet?
5    A    Yes, where I slipped at.
6    Q    Is that yes?
7    A    That is yes, the part that I slipped on.
8    Q    Okay. Do you have a specific personal
9    knowledge of when that snow and ice condition occurred on
10    the specific ramp that you fell on?
11    A    No.
12    Q    Now, once again, I am going to ask that
13    you refer to I believe it is Fouskey-2.
14    MR. ZEMSKY: The picture?
15    MR. TIERNEY: No, the answers to
16    interrogatories.
17    MR. ZEMSKY: That is Fouskey-2.
18    MR. TIERNEY: May I approach, Alisa?
19    MS. NUNNO DiCHIARA: Sure.
20    MR. TIERNEY: Where is the pen?
21    MR. ZEMSKY: Off the record.
22    (A discussion is held off the record.)
23    MR. TIERNEY: Back on the record.
24    Q    Okay. Reading from the 2008 Edition of
25    the Rules Governing the Court, Appendix II, Interrogatory

Page 65

1    Forms, Form A. I am going to ask you to read number 9
2    and read it slowly so the court reporter understands
3    each word, number 9, sir.
4    A    If a previous injury, disease, illness or
5    condition is claimed to have been aggravated, accelerated
6    or exacerbated, specify in detail the nature of each and
7    the name and present address of each health care provider,
8    if any, who ever provided treatment for the condition.
9    Q    Okay. Looking at Fouskey-2, which you
10    have identified as your answers to uniform interrogatories.
11    Correct?
12    A    Yes.
13    Q    Looking at number 9, what is the answer
14    to corresponding number 9 in your answers to
15    interrogatories?
16    A    It says no.
17    Q    Okay. And that would be true?
18    A    You have got to give me the question again.
19    Q    Please read once again from the Appendix II,
20    Form A, read that to yourself again and let me
21    know when you are finished, sir.
22    A    No.
23    Q    Your answer to that question number 9 on Form
24    A is still no?
25    A    No.

17 (Pages 62 to 65)

Page 66

1    Q    Would you like to clarify that answer?
2    A    All right. Aggravated, I didn't say any -- I never
3    said anything was aggravated.
4    Q    Accelerated or exacerbated, you are saying
5    that no injury, condition or illness was aggravated,
6    exacerbated or accelerated?
7    A    No. Basically I said no.
8    Q    So your answer on Fouskey-2 for number 9 being
9    no, is correct, would you agree with that?
10    A    Yeah, basically no.
11    Q    Okay. You seem to be hedging.
12    A    Because I -- there is nothing -- there is basically
13    nothing that, any condition that, you know, that I am
14    claiming to have that it was aggravated. I am just
15    concerned with what happened when I fell.
16    Q    So you are saying that there is no prior
17    condition to your left shoulder that was aggravated?
18    A    Oh, no, because I never had nothing. No, my left
19    shoulder, no.
20    Q    You mean, no, you are claiming that it was
21    aggravated. Correct? Do you understand the question?
22    Let me withdraw the question.
23    A    I didn't have no previous injury to my shoulder to be
24    aggravated.
25    Q    That is what I am asking you?

Page 67

1    A    Yes.
2    Q    So your answer to number 9 is if I was going
3    to explain it out further, no, I did not have a prior
4    illness, condition or injury to my left shoulder that was
5    aggravated, accelerated or exacerbated, agreed?
6    A    Yes, I guess. Agreed as far as I had no problem
7    with my left shoulder.
8    Q    Prior to the accident?
9    A    Prior to the accident I had no problem with it, so
10    I would have to say I had no problem with my shoulder.
11    Q    Okay. When you had this month's time off
12    after the surgery, did you use any vacation time or were
13    you entitled to any vacation time?
14    A    No. Part-time, there is no vacation.
15    Q    Have you received payment of money from
16    any source as result of your injury to your left shoulder
17    in this case?
18    A    No.
19    Q    Did you apply for disability?
20    A    No.
21    Q    Now, you've indicated that the first part
22    of your body to fall and strike the ground on
23    December 2nd, 2007, was your left shoulder?
24    A    Yes.
25    Q    Did you suffer any bruising or swelling

Page 68

1    immediately after the accident to that area?
2    A    After a couple of days you could see bruising.
3    Q    But not in the first day, agreed?
4    A    No, in the first day, I didn't see much. After I
5    could see bruising there, in a couple of days.
6    Q    You agree you did not seek medical attention
7    whatsoever on the date of the accident. True?
8    A    On the day of the accident?
9    Q    Yes.
10    A    No.
11    Q    Now, I want to be specific, did you
12    ever have any complaints or pain to any part of your
13    left shoulder prior to the accident of December 2nd,
14    2007?
15    A    No.
16    Q    Did you ever have any injury or stiffness
17    to any part of your left shoulder prior to the accident
18    of December 2nd, 2007?
19    A    No.
20    Q    Did you ever have any prior complaints,
21    pain or stiffness to the front of your left shoulder
22    before the injury of December 2nd, 2007?
23    A    No.
24    Q    Did you have any prior complaints, pain
25    or stiffness to the outside or far left of your left

Page 69

1    shoulder before the injury?
2    A    No.
3    Q    Did you have any prior complaints, pain
4    or stiffness to the back or rear of your left shoulder
5    prior to the accident?
6    A    No.
7    Q    Did you ever have any history of weakness or
8    clicking in your left shoulder prior to the accident?
9    A    No.
10    Q    Did you have any prior accidents or
11    injuries to your left shoulder at any time before the
12    accident of December 2nd, 2007?
13    A    No.
14    Q    Prior to and on the date of the accident,
15    December 2nd 2007, did you ever have any prior medical
16    history which would have affected your focus or attention in
17    proceeding on the date of the accident?
18    A    No.
19    Q    On the date of the accident, were you
20    taking any medications which could have affected your
21    focus or attention?
22    A    No.
23    Q    You are right hand dominant, agreed, sir?
24    A    Yes.
25    Q    Did you have any problems or difficulty

18 (Pages 66 to 69)

Page 70

1  in walking whatsoever, prior to the date of December 2nd,
2  2007?
3  A    No.
4     Q    Did you have any problem with dexterity in
5  walking prior to the accident date?
6  A    No.
7     Q    Did you have any problems with feeling
8  in your legs or feet prior to the accident of December 2nd?
9  A    No.
10    Q    After you underwent your surgery, do you
11  recall the specific instructions given to you for your
12  shoulder to heal properly?
13  A    The instruction was to wear a sling, which I did,
14  that I was in.
15    Q    Did you follow those instructions strictly?
16  A    Yes.
17    Q    So you were instructed to wear a sling?
18  A    I was instructed to wear a sling and take the
19  antibiotic that he had prescribed for me and I did all
20  of that.
21    Q    You followed those rules strictly, agreed?
22  A    Yes.
23    Q    Did you do anything against the instructions
24  to allow the shoulder to heal at any time?
25  A    No.

Page 71

1     Q    Did you try to use your shoulder earlier than
2  what was directed to you?
3  A    No.
4     Q    Were you diagnosed with arthritis to any
5  part of your body prior to the accident date of December
6  2nd, 2007?
7  A    Yes.
8     Q    What body part?
9  A    My back.
10    Q    What parts of your back?
11  A    The lower disk.
12    Q    That is the only arthritis that was
13  indicated by a doctor prior to the accident date, was your
14  lower back?
15  A    Yes.
16    Q    Okay. Do you recall treating a couple of
17  days after the accident on December 5th, 2007, with a
18  Dr. Greenblum?
19  A    Yeah, I remember Dr. Greenblum.
20    Q    Specifically, Orthopedic Associates on
21  Broadway in Fair Lawn, do you remember that?
22  A    Yes. Yes.
23    Q    Do you recall being asked by Dr. Greenblum's
24  office on December 5th, 2007, whether there were any
25  activities or hobbies that you could not perform as of that

Page 72

1  date because of pain or injury?
2  A    I don't remember him asking me.
3     Q    You don't remember that?
4  A    No.
5     Q    Do you remember being offered examples of
6  such activities or hobbies that you could not or may not
7  be able to perform as of December 5th, 2007, such as
8  gardening or sports, do you remember being asked that?
9  A    No.
10    Q    Do you recall replying no, to the
11  question whether there were any activities or hobbies
12  that you could not perform as of December 5th, 2007,
13  because of pain or injury?
14  A    No, I don't remember him asking me.
15    Q    Okay.
16       MR. TIERNEY: I am going to ask that a
17    five-page document dated December 5th, entitled
18    Orthopedic Associates be marked as Fouskey-4, I
19    believe. And I will show them to Alisa.
20       (Whereupon, the document was marked.)
21    Q    Sir, I am showing you Fouskey-4. The first
22  page of Fouskey-4 where the sticker marked Fouskey-4 is
23  located, do you recognize the handwriting on that?
24  A    Yes.
25    Q    Whose handwriting is that?

Page 73

1  A    This here?
2     Q    Yes, on the first page of Fouskey-4.
3  A    This handwriting is Dr. Sharma's, I guess.
4     Q    That is not your handwriting on page 1 of
5  Fouskey-4, agreed?
6  A    No, it is not.
7     Q    The signature on the bottom of the second
8  page of Fouskey-4, that is you as well. Right?
9  A    No.
10    Q    The third page of Fouskey-4, do
11  you recognize any of the handwriting whatsoever on this
12  page, and the top of this third page says cc colon, that is
13  how it begins, do you recognize any of the handwriting on
14  that paper?
15  A    No.
16    Q    How about down?
17  A    Yeah, I recognize that. That is mine.
18    Q    So immediately below the script handwriting
19  on top of the third page of Fouskey-4 there indicates
20  history form and then there is your name and the
21  date?
22  A    Right.
23    Q    Did you fill that out?
24  A    I filled this out, yeah.
25    Q    So you filled out the portion below history

Page 74

1  form on this third page?
2  A    Um-hum.
3      Q    Is that a "yes", sir?
4  A    Yes.
5      Q    Okay.  Now, the fourth page of Fouskey-4,
6  do you see the handwriting where it says, X-ray where?
7  A    Yeah, I filled that out.
8      Q    St. Joseph's in Wayne, agreed?
9  A    Right.
10     Q    And on the bottom of that page it says,
11 if you are over 50 years old have you ever had a bone
12 density test, if yes, when and it indicates no, agreed?
13 A    No, yes.
14     Q    Did you fill out that page?
15 A    Yes, I filled it out, sir.
16     Q    Okay.  The last page of Fouskey-4 begins,
17 does your neck pain or back pain go into your arms or
18 legs, underneath that can you read the next lines and
19 your answer slowly so the court reporter can hear
20 it?
21 A    Does your neck pain -- neck or back pain --
22     Q    Go into your, circle arms or legs, and nothing
23 is filled out, agreed?
24 A    No, because --
25     Q    I am just asking if that part is filled out.

Page 75

1  It is not.  Right?
2  A    No.  My back pain --
3      MS. NUNNO DiCHIARA: Wait for the question.
4      Q    Wait for the question.  Sir, the neck or back
5  pain, you didn't circle either one, agreed?
6  A    Yeah.
7      Q    Okay.  What I am asking you to read very
8  slowly for the court reporter to hear is the next line
9  and your answer.
10 A    Are there any activities, hobbies that you cannot
11 perform now because of pain or injury, it says no.
12 What pain or injury?
13     Q    And it also says example colon gardening slash
14 sports, et cetera?
15 A    I don't do no gardening.
16     Q    Does it say "no", sir?
17 A    Yes, it says no.  But I don't do gardening.
18     Q    You would agree that Fouskey-4 is dated
19 December 5th, agreed, sir?
20 A    Is December 5th of what?  I don't know.
21     Q    Did you ever see Dr. Greenblum prior to the
22 accident of December 2nd, 2007?
23 A    I saw Dr. -- I saw him after the accident, yes.
24     Q    So this would have to be after the accident
25 of December 2nd, 2007?

Page 76

1  A    Yes.
2      Q    So would you agree that 12/5, although it
3  is omitted it is probably 2007?
4  A    Yes, it would be.
5      Q    So that would be three days after the
6  accident, agreed?
7      MR. ZEMSKY: If you look at the next page, it
8  does say 12/5/07.
9      MR. TIERNEY: Okay.
10     Q    The signature line on the next page is
11 dated 12/5/07, agreed?
12 A    Yeah.
13     MR. ZEMSKY: And on the history form as well on
14 the next page.
15     MR. TIERNEY: Okay.
16     Q    When is the last time that you took any
17 prescription pain medication as a result of your surgery or
18 pain to your shoulder?
19 A    The last time I took pain medication, I took some
20 -- I take Aleve.
21     Q    When is the last time that you took
22 prescription pain medication as a result of this
23 incident?
24 A    I haven't taken any prescription pain medication
25 since after I came out of the hospital.

Page 77

1      Q    So approximately July of 2008?
2  A    Yes.
3      Q    When is the last time that you took an
4  over-the-counter pain medication as a result of your left
5  shoulder injury or complaint?
6  A    I don't know, I take Aleve.  But I don't take it
7  unless I am really falling out.  I don't take pills.
8      Q    Do you remember the last time that you took
9  Aleve for your shoulder?
10 A    I took some maybe a couple of times this week.  I
11 took some today, I did.
12     Q    Okay.  Before a couple of times this week
13 and today, do you remember the last time that you took any
14 Aleve for your shoulder?
15 A    The week before that.
16     Q    How often would you take Aleve for your
17 shoulder?
18 A    Well, I usually take Aleve, I take it a couple of
19 times a week.
20     Q    Is that just for your shoulder or is it for
21 other complaints too?
22 A    Well, overall, due to the shoulder or whatever.
23     Q    So when you take Aleve it is not always
24 because of shoulder pain, it could be because of other
25 physical complaints?

Page 78

1   A    Yeah.
2        Q    Yes?
3   A    Yes.
4        Q    Okay. Just to go back for a moment, have
5   you ever been convicted of a crime at any time in your
6   life?
7   A    (No verbal response.)
8        Q    That is a "no"? You are shaking your head
9   no?
10  A    No. No.
11       Q    Okay. It is just a question and we ask it
12  every day.
13  A    No, this is the biggest crime right here. No, I have
14  never been convicted of a crime.
15       Q    Have you ever filed any other personal injury
16  lawsuits other than this case?
17  A    No.
18       Q    Have you ever filed any other claims for
19  personal injury that didn't go into a lawsuit for personal
20  injuries?
21  A    No.
22       Q    Have you ever gone by any other names other
23  than your current name?
24  A    No.
25       Q    Okay. You are not aware of the names of any

Page 79

1   witnesses to your fall, agreed?
2   A    No.
3        Q    Have you paid out-of-pocket, meaning by
4   check, cash, money order, for any of your medical treatment
5   in this case?
6   A    I am not sure. I might have made out -- I might
7   have paid out a few bills that they were annoying me.
8   I might have paid them out. My wife writes the checks
9   out. I am not sure.
10       Q    Would you say if you paid any out-of-pocket,
11  it would be less than $100.00? More than $100.00?
12  A    It wouldn't more than $100.00 out-of-pocket.
13       Q    The only photograph you took in this case
14  of the alleged accident scene was the photo marked today
15  Fouskey-1?
16  A    Yeah, basically I think. I think that is the only
17  one.
18       Q    There was another photo which showed
19  stitching on your shoulder, did you take that photo or did
20  somebody else?
21  A    I took it. My wife took it.
22       Q    So that is your recollection you and/or
23  your wife took two photos in this case?
24  A    I have a couple of other photos of like that
25  there.

Page 80

1        Q    Okay. Like Fouskey-1?
2   A    Yes.
3        MR. TIERNEY: I call for production of all
4   photographs taken by Mr. Fouskey of the alleged
5   accident scene similar to Fouskey-1.
6        MS. NUNNO DiCHIARA: Okay. I don't know if I
7   have anything.
8        MR. TIERNEY: I just call for the production.
9        Q    Would you be willing to give them to your
10  attorney, the other photos?
11  A    Sure.
12       Q    The other photos that you described, were they
13  also taken on the same day as Fouskey-1?
14  A    Yes.
15       Q    So the day after the accident?
16  A    Yes.
17       Q    Okay. Now, when is the last time
18  that you actually treated at a medical facility for your
19  left shoulder?
20  A    Now, when you say "treated at a medical facility",
21  the last time that I went to the doctor for my left
22  shoulder?
23       Q    Yes.
24  A    I went to Dr. Pizzillo after I had the operation last
25  year. I don't know the exact date.

Page 81

1        Q    Okay. Was it within weeks or a month of the
2   surgery or something else?
3   A    After the surgery maybe three weeks I had to go
4   back to him. And then after that, then I went back to
5   him again to ask him about the -- he was checking with
6   the physical therapy and whatnot. I have been to him a
7   couple of times.
8        Q    Since the surgery?
9   A    Yes.
10       Q    Let me just be specific, you saw Dr. Pizzillo
11  approximately three weeks after the surgery in the summer of
12  2008, agreed?
13  A    Yes, something like that.
14       Q    And then you saw him one other time for
15  him to check up on the physical therapy, agreed?
16  A    Yes.
17       Q    How soon after the first follow-up after
18  your surgery with Dr. Pizzillo, did your final date with
19  Dr. Pizzillo occur?
20  A    I am not sure.
21       Q    Was it before the fall of 2008 or the
22  winter of 2008 and 2009?
23  A    I am not even sure about the dates at all.
24       Q    Have you seen Dr. Pizzillo in the year
25  2009?

JEAN E. DOLAN ASSOCIATES, LLC

Page 82

1   A   No.
2        Q   Did you see Dr. Pizzillo at any time in
3   December of 2008, meaning last Christmas season or holiday
4   season?
5   A   I am not sure about that either. No, I am not sure.
6        Q   Your best estimate, do you think it was
7   before December of 2008 the last time that you saw him?
8   A   It might have been, yes.
9        Q   Now, you've indicated you have your wife's
10  insurance due to her position as a schoolteacher?
11  A   Yes.
12       Q   And that is Horizon Blue Cross Blue Shield?
13  A   Yes.
14       Q   Did Horizon Blue Cross Blue Shield cover all
15  of your expenses medically in this case?
16  A   Basically, yes. Well, yes, they did.
17       Q   Are you aware whether Medicare paid anything
18  for your medical treatment in this case?
19  A   Medicare makes them the primary. So Medicare,
20  being that they are the primary, I don't know if Medicare
21  paid anything. They might have paid something.
22       Q   Are you aware whether or not any lien was
23  asserted against any settlement for a verdict in this case
24  by Medicare to repay any expenses paid by Medicare?
25  A   I don't know. I turned it in to Medicare, you know,

Page 83

1   to make sure they had the two insurances. I made sure that
2   I wouldn't be -- they wouldn't be harassing me.
3        Q   So for your medical providers you supplied
4   to them or you applied for both Horizon Blue Cross Blue
5   Shield coverage and Medicare?
6   A   The way it is I give them both. I give them the
7   primary and I give them the other. Where they get the
8   money from, that is up to them.
9        Q   Okay. What activities do you do socially
10  now, physically socially?
11  A   I don't do a lot of activities now. I used to
12  bowl.
13       Q   You used to bowl before the accident?
14  A   Yeah, I used to bowl.
15       Q   How often did you bowl before the accident?
16  A   Maybe once or twice a month.
17       Q   Okay. When is the last time that you
18  bowled?
19  A   I just haven't been in the last year or so.
20       Q   So would you agree that your complaints or
21  injuries in this case do not stop you from bowling, you just
22  haven't --
23  A   No. No. I just know that I can't support a lot
24  of weight with this here arm now. I do know that. Because
25  even now when my wife goes shopping I will carry the

Page 84

1   groceries, but I have to use mainly the right hand.
2   Because even when I went for therapy, like they tested
3   it and I can't support a lot with the left hand.
4        Q   On the date of your accident, you didn't
5   take any pain pills on the date of the accident, agreed?
6   A   No. The first day of the accident?
7        Q   Yes.
8   A   No.
9        Q   Okay. Now, you also indicated that you
10  went back to the scene of the accident at Circuit City the
11  day after the accident on 12/3/07. Right?
12  A   Yes.
13       Q   What time of the day did you go back to take
14  the photographs in this case?
15  A   Maybe in the afternoon.
16       Q   Okay. Did you go to take the photographs
17  of the Circuit City before or after you sought medical
18  treatment on December 3rd, if you recall?
19  A   I have might have taken the pictures. I don't
20  remember. I really don't remember.
21       Q   So you might have taken the photographs
22  including Fouskey-1, before you sought medical treatment?
23  A   I am not sure.
24       Q   Now, you said approximately five people helped
25  you up?

Page 85

1   A   No, I didn't -- oh, okay.
2        Q   Do you need to clarify your prior answer?
3   A   Yeah, my answer was that I sought medical treatment,
4   but the pictures had nothing to do with that.
5        Q   I understand. I am just asking you
6   chronologically whether you took the photos before or
7   after you sought medical treatment on December 3rd?
8   A   No, I don't know. I am not sure.
9        Q   You've indicated previously that five people
10  helped you up after the fall?
11  A   Yes.
12       Q   Were they surrounding you in helping you up?
13  A   Well, one -- yeah. Yeah, to help me up, yeah.
14       Q   Well, to physically assist you to get up
15  they would have to be around your body?
16  A   Yes, they were.
17       Q   Did any of those five people fall?
18  A   Those five people weren't on the ice.
19       Q   Well, they had to pick you up from the
20  location you fell?
21  A   Yes, I was on the ice and they weren't. Because
22  they hadn't been -- if they had been on -- if I hadn't
23  been on the ice, I wouldn't have fell. I would have managed
24  to get up myself.
25       Q   Sir, I am not asking what you could have

22 (Pages 82 to 85)

Page 86

1   done or what you might have done. I am asking you, were
2   there five people surrounding you and touching you to assist
3   you to get up?
4   A    Yes.
5        Q    And none of them slipped. Right?
6   A    No, they were standing behind me. They weren't
7   standing on the ice.
8        Q    Okay. One moment, please. Now, you also
9   indicated that the reason why you took the photographs
10  including Fouskey-1, was that so you could explain and show
11  exactly where you fell?
12  A    Yes.
13       Q    And that was on December 3rd, 2007?
14  A    Yes.
15       Q    Okay. Would you agree then that you were
16  considering filing a personal injury lawsuit the day after
17  the accident?
18  A    I was considering making sure that the hospital bills
19  got paid, because when I went to the hospital when I went to
20  get treatment, they wanted to know what happened. So I told
21  them, I fell down on the ice at Circuit City.
22       Q    Who did you intend to show the photograph
23  Fouskey-1 and others to?
24  A    Well, I intended to show that to the lawyer, or
25  either them there.

Page 87

1        Q    Who is "them there"?
2   A    The people that --
3        Q    Circuit City?
4   A    Circuit City. Because they told me that they're
5   not going to cover the bills if I fell someplace else.
6   They said they are not going to pay and I would be obligated
7   to pay the bills.
8        Q    Now, you've indicated -- strike that. As
9   you walked out of Circuit City and immediately before
10  you felt yourself starting to slip, do you specifically
11  have a recollection of where you were looking?
12  A    I was looking straight ahead.
13       Q    Okay. I am asking you in your mind's eye,
14  do you specifically recall what direction and where you
15  were looking immediately before you started to slip?
16  A    Yeah, I was looking ahead.
17       Q    When you say, "looking ahead" is that
18  eye level? Is that waist level? Is that towards the
19  ground? Please be more specific.
20  A    Well, eye level.
21       Q    One moment, please. I just want to be
22  specific as to activities. I want to differentiate,
23  what activities did you use to do regularly before the
24  accident that as you sit here today, you can't do at all,
25  you physically cannot do them at all, are there any

Page 88

1   activities like that?
2   A    Before the accident I did mostly all of the
3   maintenance in my house. Like I got about -- I had to have
4   something done to my dishwasher. And before I had taken the
5   ceiling tiles out. And after the accident I never did put
6   them back yet, because I have the pain in my arm when I
7   try to replace them and hold my arm up for a period of
8   time. Bringing the groceries in the house, my wife brings
9   them in the house mostly.
10       With the right hand I could take some. But
11  before I could take groceries in both hands and bring them
12  in the house. I used to use -- my grass, I cut my grass.
13  I used to cut my grass meaning myself, and I don't do that
14  no more.
15       Q    Any other activities that you used to do
16  prior to the accident regularly that you can't do at all
17  now that you haven't described?
18  A    That is basically -- play with the grand kids,
19  you know. I used to play a little ball with the grand kids
20  or whatever and I don't do that no more.
21       Q    Is that because of the shoulder injury or
22  something else?
23  A    Well, basically if I aggravate this arm a lot
24  and then it will start to hurt some. So I don't even
25  bother with doing it.

Page 89

1        Q    The only area of your body that you are
2   claiming injury as a result of this fall is your left
3   shoulder, would you agree with that?
4   A    That is all.
5        Q    I have nothing further. Thank you.
6   MR. ZEMSKY: I just have a quick question.
7   RE-DIRECT EXAMINATION BY MR. ZEMSKY:
8        Q    With regard to the other photographs that you
9   took on December 3rd, 2007 outside of Circuit City, were
10  they at different angles?
11  A    No, basically the same angle.
12       Q    Did you get out of your car?
13  A    No.
14       Q    So out of all of the photographs you never got
15  out of your car?
16  A    Yeah, one of them I might have gotten out of the
17  car. It was basically like that there.
18       Q    When you got out of your car, did you walk up
19  to the entrance to take a picture?
20  A    I had one that I might have walked up to the
21  entrance. I don't remember.
22       Q    Okay. No more questions.
23  MS. NUNNO DiCHIARA: I have a few questions.
24  CROSS EXAMINATION BY MS. NUNNO DiCHIARA:
25       Q    With regard to Fouskey-1, you said you took

23 (Pages 86 to 89)

Page 90

1  this picture the next day?
2  A    Yes.
3       Q    And the snow accumulation shown in this
4  picture?
5  A    About the same.
6       Q    As the day before?
7  A    Yes.
8       Q    Was there any way to exit the Circuit City
9  sidewalk and get back to your car without -- was there any
10  clear path to get back to your car?
11  A    No. The only way that you could go was here and I
12  looked in this area --
13       Q    Just one second. You are indicating the
14  ramp?
15  A    Yes, I looked at this here.
16       Q    Which is where the car is?
17  A    Where the car is and that was worse, you know.
18  I know there was a buildup there, so I wasn't going
19  there.
20       Q    A buildup of?
21  A    Snow.
22       Q    Okay.
23  A    And ice. So here I thought was the best possible way
24  to come.
25       Q    Indicating the ramp?

Page 91

1  A    Yes. This is the way you come out if you are
2  getting a purchase and you can park there to pick it up.
3  But that is the only way, is that.
4       Q    And to your knowledge was there any area
5  completely free of snow and ice as you exited before your
6  fall?
7  A    No.
8       Q    That is all I have.
9       MR. TIERNEY: I have nothing.
10       MR. ZEMSKY: You are done. Thank you very
11  much.
12       (Whereupon, the witness is excused.)
13       (Whereupon, the deposition is concluded.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 92

1              C E R T I F I C A T E
2
3       I, DEBORAH EVENNOU a Notary Public and
4  Certified Court Reporter of the State of New Jersey, do
5  hereby certify that prior to the commencement of the
6  examinations, JAMES FOUSKEY was duly sworn by me to testify
7  to the truth, the whole truth and nothing but the truth.
8       I DO FURTHER CERTIFY that the foregoing is a
9  true and accurate transcript of the testimony as taken
10  stenographically by and before me at the time, place and on
11  the date hereinbefore set forth.
12       I DO FURTHER CERTIFY that I am neither a
13  relative, nor employee, nor attorney, nor counsel of any of
14  the parties to this action, and that I am neither a relative
15  nor employee of such attorney or counsel, and that I am not
16  financially interested in the action.
17
18
19       _____
20       DEBORAH EVENNOU, C. C. R.
         Certified Court Reporter
         Notary Public of the State
21           of New Jersey
22
23  My commission expires 11/13
24
25

JEAN E. DOLAN ASSOCIATES, LLC