```
                    UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF VIRGINIA


IN RE:                    .    Case No. 08-35653(KRH)
                          .
                          .
CIRCUIT CITY STORES,      .
INC., et al.,             .    701 East Broad Street
                          .    Richmond, VA  23219
                          .
         Debtors.         .    July 12, 2010
. . . . . . . . . . . . . .    2:04 p.m.



                    TRANSCRIPT OF HEARING
           BEFORE HONORABLE KEVIN R. HUENNEKENS
           UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:

For the Debtors:          McGuireWoods, LLP
                          By:  DOUGLAS FOLEY, ESQ.
                               DANIEL F. BLANKS, ESQ.
                          9000 World Trade Center
                          101 W. Main Street
                          Norfolk, VA  23510

                          McGuireWoods, LLP
                          By:  SARAH B. BOEHM, ESQ.
                          One James Center
                          901 East Cary Street
                          Richmond, VA  23219

For the Committee:        Tavenner & Beran, PLC
                          By:  PAULA S. BERAN, ESQ.
                          20 North Eighth Street, Second Floor
                          Richmond, VA  23219


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

(609) 586-2311    Fax No. (609) 587-3599

2

```
APPEARANCES (Cont'd.):

For Ryan, Inc.:          Redmon, Peyton & Braswell, L.L.P.
                         By:  ROBERT M. MARINO, ESQ.
                         510 King Street, Suite 301
                         Alexandria, VA   22314

                         Cantey Hanger, LLP
                         By:  BRUCE W. AKERLY, ESQ.
                         3330 Harwood Center
                         1999 Bryan Street
                         Dallas, TX  75201

For Schimenti           Robinson & Cole, LLP
Construction Co.:        By:  PETER E. STRNISTE, JR., ESQ.
                         280 Trumbull Street
                         Hartford, CT  06103-3597

                         LeClairRyan
                         By:  CHRISTOPHER L. PERKINS, ESQ.
                         Riverfront Plaza - East Tower
                         951 East Byrd Street, Eighth Floor
                         Richmond, VA   23219


TELEPHONIC APPEARANCE:

For the Committee:       Pachulski, Stang, Ziehl & Jones, LLP
                         By:  JOHN MORRIS, ESQ.
                         780 Third Avenue
                         36th Floor
                         New York, NY   10017-2024
```

1          THE CLERK:  All rise.  The United States Bankruptcy

2  Court for the Eastern District of Virginia is now in session.

3  The Honorable Kevin R. Huennekens presiding.  Please be seated

4  and come to order.

5          In the matter of Circuit City Stores, Incorporated,

6  hearing on Items 1 through 20 as set out on debtor's agenda.

7          MR. FOLEY:  Good afternoon, Your Honor.  Doug Foley

8  with McGuireWoods on behalf of the debtors.

9          THE COURT:  Good afternoon.

10          MR. FOLEY:  Good afternoon.  With me at counsel table

11  today is Dan Blanks from my firm and Sarah Boehm from my firm.

12          Ian Fredericks from Skadden Arps is also here in the

13  courtroom today as well as Katie Bradshaw, who's the Vice

14  President and Controller of Circuit City, as well as Jeff

15  McDonald, who's the Vice President of Tax and Treasurer.

16          Also, as a guest of our firm today, Your Honor, we

17  have Brandon Boykin, who is a student at Furman University,

18  who's a legal intern for us this summer, is trying to learn a

19  little bit about the law, and notwithstanding that, we invited

20  him to the hearing today.

21          THE COURT:  All right, Mr. Foley.  Thank you.  Mr.

22  Boykin, welcome to the court, sir.

23          MR. BOYKIN:  Thank you.

24          MR. FOLEY:  Your Honor, we have 20 items on the

25  agenda today and only two of them are contested.  I'd like to,

**J&J COURT TRANSCRIBERS, INC.**

4

1  if we could, go through the uncontested matters first and give

2  the Court an update with respect to those.

3          Item Number 1, Your Honor, is the Mondragon motion

4  reconsider.  That has been agreed to be continued until the

5  September 27th hearing by consent of the parties.

6          THE COURT:  All right.

7          MR. FOLEY:  Your Honor, Item Number 2, this is the

8  Gentry motion to substitute counsel.  It is an uncontested

9  matter.  We understand that counsel has contacted chambers, and

10 we'll be submitting an appropriate order to take care of that

11 matter.

12          THE COURT:  Yes, I didn't see any reason to have a

13 hearing on that.

14          MR. FOLEY:  Yes.  Your Honor, Item Number 3 is our

15 37th omnibus objection to various tax claims, as you know, has

16 been pending for a while.  Just to advise the Court on where we

17 are with respect to the resolution of those claims, many of

18 which are alleged to be secured and also accrue interest, so

19 we're trying to get those resolved as soon as we can.  We

20 originally started with 120 claims at a file value of

21 approximately $4.6 million, trying to get that reduced to a

22 total of $2.3 million.

23          We've been moderately successful in resolving many of

24 those claims.  We're down to 54 of the 120 that are unresolved

25 at a filed amount of approximately $1.3 million, and we're

1  trying to get that amount reduced to approximately 539,000.  We

2  are in active negotiations with every one of the taxing

3  authorities that are subject to that objection, and we hope to

4  make additional progress, if not complete progress, by the July

5  22nd hearing date at 10, so we would ask that that matter be

6  adjourned to that date, which is when the rest of the claims

7  are up for status hearing.

8           THE COURT:  All right, and will that be a continued

9  status on the 22nd or are we going to go forward with that?

10           MR. FOLEY:  No, status only, Your Honor.

11           THE COURT:  Okay.  Very good.

12           MR. FOLEY:  Your Honor, Number 4 is our adversary

13  proceeding complaint against LG.  We're pleased to report to

14  the Court that we have completely resolved that matter and will

15  be resolve -- will be submitting an appropriate dismissal

16  order.  The 503(b)(9) claim was reduced to zero, which was

17  originally filed in the amount of $5.4 million as a result of

18  some receivables we had to set off against that.

19           We also had additional receivables to set off against

20  the general unsecured claim that reduced their general

21  unsecured claim to approximately $35 million, so that has been

22  a favorable resolution to the estate, so it can be removed from

23  the docket, and we'll submit a dismissal order.

24           Item Number 5, Your Honor, is the Signature adversary

25  proceeding.  That's -- Signature is the remaining defendant.

1  Mr. Epps represents them.  If you'll recall, Your Honor, they

2  originally defaulted on the original complaint.  They've logged

3  a answer.  We have made a settlement proposal to Mr. Epps.  He

4  was out last week on vacation and is trying to get a hold of

5  his client to counter that offer, and we've agreed to adjourn

6  this matter, both the default and the pretrial, until the July

7  22nd hearing date at 10.

8          THE COURT:  All right.

9          MR. FOLEY:  Your Honor, Item Number 6, this is our

10  complaint against Mitsubishi.  We have been working with Phil

11  Baxa and Thad Wilson, counsel for Mitsubishi with respect to a

12  scheduling order and trying to get trial dates.  We have

13  recently heard from the co-defendant, the Insurance Company of

14  the State of Pennsylvania, who has requested additional time to

15  file an answer.  We've consented to that until July 21st, so we

16  would ask the Court to adjourn the pretrial conference until

17  the July 22nd hearing date at 10, by which time we should have

18  appropriate calendars and trial dates for all the parties, so

19  we can go forward with a scheduling order at that point.

20          THE COURT:  All right.  I noticed that there was a

21  motion to dismiss Count 6 filed in connection with that

22  adversary, but it hasn't been noticed or anything of that sort.

23  Has that been resolved?  Is that going to be an issue?

24          MR. FOLEY:  It has not been resolved, and I think it

25  might be Count 4, but it may be Count 6.  But we are aware of

1  that, and we were going to --

2          THE COURT:  Well, I won't claim to know Roman

3  numerals well enough.

4          MR. FOLEY:  We were going to set that for hearing on

5  the 22nd, but given the fact that the insurance company wants

6  an opportunity to get involved, we'll probably at that hearing

7  on the 22nd go forward with setting that count -- that motion

8  to dismiss, that count, for a hearing and then a pretrial

9  conference with the balance of the complaint --

10          THE COURT:  All right.

11          MR. FOLEY:  -- so that we can get it on the calendar,

12  because we know the Court's calendar six months out, you know,

13  can fill up pretty fast, especially if we have a multi-day

14  trial schedule.

15          THE COURT:  All right.  Very good.

16          MR. FOLEY:  Your Honor, Items Number 7, 8, 9, and 10,

17  those are the contested matters.  If we could skip over those

18  for the moment?

19          THE COURT:  Yes.

20          MR. FOLEY:  Item Number 11 is the Avenues and Leather

21  complaint.  We have resolved that complaint and have a

22  settlement agreement out to them for signature.  It is agreed

23  to.  It's documented.  They're going to be paying us

24  approximately $150,000, and so this matter can be removed from

25  the docket as soon as that settlement agreement is signed.

**J&J COURT TRANSCRIBERS, INC.**

1 We'll submit an appropriate dismissal order, Your Honor.

2         Your Honor, Ms. Boehm and Ms. Beran will address

3 Items 17 through 20, which I believe are the professional fee

4 applications.

5         THE COURT:  Good afternoon.

6         MS. BOEHM:   Good afternoon, Your Honor.  Sarah Boehm

7 on behalf of Circuit City.  Item Number 12 through 17 on the

8 agenda are the debtor's fee applications.  Item 12 is

9 McGuireWoods sixth interim fee app.  Item 13 is FTI's sixth

10 interim fee app.  Item 14 is Ernst & Young's sixth interim fee

11 app.  Item 15 is KPMG's fifth interim fee app.  Item 16 is DJM

12 Realty Services, LLC's sixth interim fee app, and Item 17 is

13 Skadden Arps' sixth interim fee application.

14         These were filed.  No objections have been received.

15 We have received no objections from the Office of the United

16 States Trustee or any other party, and we would ask that the

17 Court enter the orders granting these fees and expenses as set

18 forth in the applications on an interim basis.

19         THE COURT:  Does any party wish to be heard in

20 connection with any of these fee applications?

21                   (No audible response)

22         THE COURT:  All right, Ms. Boehm, there being no

23 objection, the Court has reviewed each of the fee applications.

24 I found the applications to be in order, and I find that the

25 fees and the amounts requested are reasonable, and so the Court

1  will approve each of the applications and ask you to please

2  submit an order to that effect.

3         MS. BOEHM:  Thank you, Your Honor.

4         MS. BERAN:  Good afternoon, Your Honor.  For the

5  record, Paula Beran of the law firm of Tavenner & Beran, who's

6  co-counsel to the Official Committee of Unsecured Creditors in

7  these bankruptcy cases.  Similarly, Your Honor, the three

8  applications on behalf of professionals for the Committee cover

9  the period February 1st through April 30th.

10         Item Number 18 on the Court's docket is the sixth

11  interim application of Pachulski, Stang, Ziehl & Jones.  Item

12  Number 19 is the sixth interim application of the law firm of

13  Tavenner & Beran, and Item Number 20 is the sixth interim

14  application of Protiviti, Inc.

15         In connection with these applications, Your Honor, I

16  can represent that they were filed on and noticed up to all

17  requisite parties.  To date, there have been no objections

18  received.

19         To the extent Your Honor has any questions or anyone

20  else in the courtroom has any questions, I would note that I am

21  here to answer any as it relates to Tavenner & Beran.  On the

22  line this afternoon is Mr. John Morris of the law firm of

23  Pachulski Stang and in the courtroom this afternoon, Your

24  Honor, is Rob Smith of Protiviti to answer any questions of the

25  Court or any other party in interest may have as it relates to

1  the  specific fee applications.

2           THE COURT:  All right.  Very good.  And the last time

3  we were here I had asked a question about the Protiviti

4  application, and the answer was that they are working primarily

5  on the claims objections and doing that analysis for benefit of

6  the creditors, and I note that that's the bulk of what they're

7  continuing to do.  So I assume that the answer is the same as

8  far as that's concerned.

9           MS. BERAN:  Yes, Your Honor, the answer is the same.

10 Although it's in the category of claims analysis, it is claims

11 analysis, but as Your Honor will recall from last time's

12 explanation, there is an overlap in the plan feasibility and

13 issues associated with the plan, so they -- it all has been

14 itemized in claims objection with the overlap.  But, yes, Your

15 Honor, that is still the same.

16           THE COURT:  All right.  Very good.  Does any party

17 wish to be heard in connection with any of these three fee

18 applications?

19                (No audible response)

20           THE COURT:  All right.  The Court has reviewed the

21 applications.  The applications look to be entirely in order,

22 and the Court will approve the fees requested in the

23 application as being reasonable in this case and ask you to

24 please submit an order to that effect.

25           MS. BERAN:  Thank you, Your Honor.


                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. FOLEY:  Thank you, Your Honor.  That leaves the

2    two motions to dismiss, Your Honor.  Mr. Blanks will be

3    addressing the Ryan complaint, and I'll be addressing the Court

4    with respect to the Schimenti complaint.

5          THE COURT:  Okay.

6          MR. BLANKS:  Good morning, Your Honor.  Dan Blanks on

7    behalf of the debtors.  The next item on the agenda is the

8    debtor's motion to dismiss the Ryan amended complaint.

9          Your Honor, just to give a little bit of background

10   on this and where we stand at this point, as Your Honor I'm

11   sure recalls, Ryan initially filed a motion to compel the

12   assumption of its contract with the debtors.  The debtors

13   simultaneously are following that, filed a motion to reject the

14   Ryan contract.  Following a hearing on that matter, the -- Your

15   Honor entered an order approving the rejection of the Ryan

16   contract.

17         Following that, Ryan filed a motion to reconsider,

18   which followed a hearing.  After -- following that hearing,

19   Your Honor issued an order denying Ryan's motion to reconsider.

20   Following the entry of that order, Ryan appealed that, and that

21   is currently on appeal with the District Court.  Subsequent to

22   that, Ryan initiated the pending adversary proceeding by its

23   amended complaint, which gives rise to our motion to dismiss,

24   where we are today, Your Honor.

25         As an initial matter, Your Honor, to survive a

**J&J COURT TRANSCRIBERS, INC.**

1  12(b)(6) motion, a complaint must contain sufficient facts that

2  are accepted as true to state a claim that is plausible on its

3  face.   The debtors assert that not one of the causes of action

4  that are contained in the amended complaint are plausible at

5  all on their face at this time.   The amended complaint is

6  comprised of four causes of action.

7       Count 1 is a declaratory judgment.   Effectively, Your

8  Honor, it's a declaratory judgment that Ryan is entitled to one

9  third of any fees that Circuit City may receive on account of

10  the appeal pending in Hawaii.

11       Count 2 is an injunction of the debtors.

12  Effectively, Your Honor, Ryan is seeking an order from Your

13  Honor that would prevent Circuit City -- enjoin Circuit City

14  from using its tax strategies that it effectively has created.

15       Count 3, Your Honor, is an action for the turnover of

16  certain information.   Count 4 is just a -- is an action for

17  certain attorney's fees that Ryan asserts that it may be

18  entitled to.

19       Every single one of these counts that is included in

20  this complaint are variations on Ryan's submissions of what the

21  claims it should receive from the estate in this case.   None of

22  them are independent causes of action.   They give rise to

23  anything other than what would be included in their claim.

24       With respect to Count 1, Your Honor, it's a -- Ryan

25  effectively is seeking an advisory opinion from Your Honor that

1  it would be entitled to one third of any monies that it would

2  be entitled to under the contract provided that Circuit City

3  ever received those refunds in the State of Hawaii.  As Your

4  Honor knows from previous testimony, at this time Circuit City

5  and the debtors have not received one penny on account of those

6  appeals that are pending in Hawaii.

7          The contract that's attached to our motion as well as

8  attached to the original complaint provides systematically

9  throughout the agreement that in the event Circuit City ever

10 received these refunds Ryan would be entitled to 33 and a third

11 or 40 percent, depending on the litigation and what transpired

12 in the course of that action.  It's stipulated in the

13 complaint, as well as Ryan's response, that at this time

14 Circuit City has not received  a penny on account of those

15 appeals, so effectively what they're seeking by framing this is

16 a declaratory judgment action, effectively an advisory opinion

17 from Your Honor that in the event we ever receive this money,

18 Ryan is entitled to 33 and a third, notwithstanding the fact

19 that whether they would be entitled to administrative priority,

20 notwithstanding the fact of whether that would be entitled to a

21 general unsecured claim or the like.

22         The other three counts flow directly from that

23 initial cause of action.  With respect to Count 2, which is the

24 injunction not to use the tax strategies, Circuit City  is not

25 in possession of any tangible item that Ryan ever created.

1   There's not a manual.  There's not a pamphlet.  There's not

2   documents that are the subject of this appeal.

3          Effectively, Your Honor, what we have is there are

4   Circuit City tax appeals -- tax returns and amended tax returns

5   that Ryan assisted Circuit City in preparing and which we have

6   filed with the -- with Hawaii.  There's no manual, there's no

7   documents, there's no other tangible information that we are in

8   possession of, so what they're effectively seeking here is the

9   injunction from us using our own tax returns.

10          Count 3 is the turnover of again the count --

11          THE COURT:  They want you to unfile the tax returns

12   that you filed?

13          MR. BLANKS:  That's our interpretation, Your Honor,

14   is that it seeks an injunction for our use of these tax

15   returns.  These tax returns are on appeal with the State of

16   Hawaii, and my reading and our reading of this complaint is

17   that they are seeking the injunction from us using our own --

18   our very own work product and our very own tax returns.

19          Number 3 -- Count 3, Your Honor, is the turnover of

20   the same information.  So in Count 2 they're seeking to enjoin

21   us from using it.  Count 3 is effectively their turnover

22   action, a generic -- they would like us to turn over this

23   intangible information.  There is no documents or pamphlets or

24   other material out there, Your Honor.  This is effectively just

25   our intangible tax strategy that Ryan asserts that it created

1   for the benefit of Circuit City.

2           Count 4 again, Your Honor, is just a simple

3   allegation, cause of action for attorney's fees without

4   recitation to anything in the agreement, and, frankly, Your

5   Honor, I think that one can read the agreement, and it clearly

6   provides that there is no -- there's no allowance for any

7   attorney's fees.

8           Turning back to the last three, Your Honor, they have

9   simply made vague allegations regarding the tax strategy that

10  they have allegedly created that are in the custody or control

11  of Circuit City at this time.  Again, we are not in the custody

12  or control of anything tangible.  These are all intangible

13  items.  That it is an impossibility for us to physically return

14  over to them or to turn over for them.

15          Secondly, Your Honor, Ryan in their response

16  intimates that we are -- that they would somehow be harmed by

17  this, because Circuit City would somehow be able to transfer

18  this information to third parties who otherwise use it.  As

19  Your Honor knows, we are a liquidated company.  We are no

20  longer doing business in Hawaii or any other state.  It's an

21  impossibility for us to transfer this over to anyone else and

22  for this to ever come up again.

23          Third, Your Honor --

24          THE COURT:  What if the debtor was to go out and hire

25  a new accounting firm to represent them in connection with

1  this?

2          MR. BLANKS:  The tax -- at this time, Your Honor, if

3  we were to do that and if we were not to retain Ryan and we

4  would go out to hire a brand new company in Hawaii and did the

5  -- and to continue with this appeal, all of the work product,

6  every single document that's available, aside from the tax

7  returns -- so tax returns are not publicly filed on the docket,

8  but all of the pleadings that are the subject of the Hawaiian

9  appeal are on file.  They're public information.  They're on

10  the docket.  So someone could utilize that, but, frankly, Your

11  Honor, another -- one of our former competitors can use that

12  information today.  It's available to the public on the docket,

13  so whatever tax strategy that Ryan allegedly created is in the

14  public domain now, and they can't take it back.  It is already

15  out there for anyone to read.

16          Third, Your Honor, this -- the irreparable harm that

17  they maintain that they're -- that they would suffer here is

18  there is no merit to that.  That the tax appeal that's the

19  subject of all of this is closed at this time.  The tax period

20  that's the subject of this appeal has closed.  If a party is no

21  -- is currently not involved in that appeal, they are not

22  permitted to go into it now.  So it's an impossibility for the

23  debtors to go out and seek a third party to join this appeal

24  and to join in this windfall that Ryan assumes is going to

25  occur at some point in the future.

1          So whoever -- the parties that are the subject of the

2    appeal is closed at this time.  It's an impossibility as a

3    matter of fact and law for any other party to be joined in that

4    appeal process.  So there is no irreparable harm that anyone

5    can suffer at this time with respect to that.

6          Your Honor, again turning to all of this, all of the

7    allegations that Ryan has alleged in their complaint as well as

8    their response, all are part and parcel of their claim of

9    rejection.  As we set forth in the pleadings, Ryan has filed

10   four claims to date in this case, one of which is an

11   administrative claim that was objected to and disallowed.

12   Secondly, Your Honor, they filed a general unsecured claim that

13   was filed after the bar date, which we objected to and was

14   disallowed as late.

15         Currently pending, that are not under objection, is

16   an administrative claim in the amount of $245,196.48.  That

17   asserts a 503 priority claim.  As we set forth in our

18   pleadings, we do not believe that -- we are reviewing that

19   claim at this point, and we believe that it will be under

20   objection in the very near future.  Based upon Mr. Akerly's

21   recitation to the Court at the last hearing, he has stipulated

22   that they are not entitled to a 503(b) administrative claim, so

23   accordingly, we think that at some point we would object to

24   that claim and it should be disallowed.

25         With respect to the -- with respect to the general

**J&J COURT TRANSCRIBERS, INC.**

1  unsecured claim, that appears to be -- that was filed on -- the

2  administrative that was recently filed, it was filed on June

3  10th, 2010, which is approximately 90 days after Your Honor

4  entered the order rejecting their contract.  So on the face of

5  it, as we have not objected to it at this time, but Your

6  Honor's order provided that Ryan would have 30 days to file a

7  claim with respect to the rejection damages claim.  From the

8  docket and our initial review, it appears that that claim is

9  now late and may be under objection in the near future.

10       But in any event, Your Honor, all of the causes of

11 action included in the complaint, every single one of them, all

12 are part and parcel as to what Ryan is entitled to from the

13 debtor's estates, and whether that's a 503(b)(9) claim -- 503

14 claim or a 502 claim, it's still a claim.  They have framed

15 this in the -- in a manner of an adversary proceeding that they

16 think are trying to elevate the claim objection to something

17 other than what it is on its face, which is what Ryan asserts

18 it is entitled to from the debtor's estate.

19       THE COURT:  Well, they're saying that the debtor

20 actually assigned a portion of the tax refund to them, and so,

21 therefore, they have a property interest in the tax refund.

22       MR. BLANKS:  They are asserting that they -- that it

23 was assigned to them under the agreement, which is a rejected

24 contract.  At this time we are -- at this time we are not in

25 possession of a single dollar from that tax return.  So if Ryan

1   is entitled to any money, it would still come from the estate,

2   and it would come from whether we properly assigned that claim

3   to them.  We do not believe we did, but whether -- and what

4   amount of money -- to the extent of that priority claim that

5   Ryan is entitled to from the debtor's estates.

6          If in the future we were to receive a refund from the

7   State of Hawaii, then at that time it may be ripe for Your

8   Honor to seek a -- for them to seek a declaratory judgment that

9   is entitled to certain monies from that refund when we were in

10  possession of it.  At this time we're not in possession of it.

11         That question is just not ripe for determination at

12  this time.  It's effectively an advisory opinion seeking Your

13  Honor's opinion as to if we are ever to get any money from the

14  State of Hawaii, what entitled they would have in that money.

15  At this time it's not ripe, and it's simply their attempt to

16  put the cart in front of the horse and to have their claim

17  objection ruled upon and for them to receive an opinion as to

18  what claim they may receive in the future provided the State of

19  Hawaii ever returns any money to us.

20         With that, Your Honor, we'll answer any questions you

21  may have and we'll respond to Ryan.

22         THE COURT:  Thank you very much.  Mr. Akerly.

23         MR. MARINO:  Good afternoon, Your Honor.  Robert

24  Marino.  I am with the law firm of Redmon, Peyton & Braswell

25  acting as local counsel for Ryan, Inc., and I do appreciate the

1  Court's accommodating my schedule and permitting me to appear

2  by telephone today.  In the courtroom I hope is Bruce Akerly of

3  the law firm of Cantey Hanger --

4          THE COURT:  Yes, and he's familiar to the Court.

5          MR. MARINO:  -- LLP, who's acting as lead counsel in

6  this case.  He's previously been admitted pro hac vice, and I

7  would defer to him for the presentation today.

8          THE COURT:  All right.  Thank you, sir.

9          MR. MARINO:  Thank you, Your Honor.

10         THE COURT:  Mr. Akerly, welcome back.

11         MR. AKERLY:  Thank you, Your Honor.  Good afternoon.

12 Bruce Akerly, for the record, with the law firm of Cantey

13 Hanger out of Dallas, Texas representing Ryan, Inc.

14         Your Honor, I guess it should go without saying that

15 nothing that Mr. Blanks has said certainly constitutes

16 evidence, and most of what he said, certainly, I don't think

17 really addresses the issue that's before the Court.  I do find

18 something interesting.  He just sais that they do believe that

19 there has not been a proper assignment of any portion of any

20 fee to Ryan, and I think that obviously frames the issue in the

21 dispute.  There is a dispute between the parties, but let me

22 sort of bring things back down to earth a little bit, if I may.

23         What we have before the Court is a motion to dismiss

24 under Rule 12(b)(6).  The starting point, as the Court knows,

25 in reviewing a motion to dismiss under Rule 12 is the

1  complaint, and we have attached the complaint to our response

2  as well as we've quoted extensively in the response to the

3  complaint to the factual allegations in the complaint.

4        THE COURT:  I've reviewed your complaint.

5        MR. AKERLY:  Yes, thank you.  And Rule -- Federal

6  Rule of Civil Procedure 8 requires only a short and plain

7  statement of a claim showing the pleader is entitled to relief.

8  Now, the claims -- Mr. Blanks has correctly stated the claims

9  in the complaint are four, declaratory relief, injunctive

10  relief, turnover, and attorney's fees.  Now, the injunctive,

11  turnover, and attorney's fees relief causes of action are

12  corollary or ancillary to the declaratory relief section, and

13  the injunctive relief and the turnover actually pretty much

14  deal with the intellectual property, work product, strategy

15  side I'll get to in a minute.

16        But there are two claims that we're clearly making in

17  the declaratory judgment relief cause of action.  One is that

18  we own a portion of any refund that may ultimately be

19  recovered.  This is in dispute.  They don't think we own it.

20  It has nothing to do with the proof of claim filed before the

21  Court.  It's not an amount of claim issue.  It's an ownership

22  issue.  It's not property of the bankruptcy estate, and,

23  actually, Your Honor, it's very important that this issue be

24  resolved, because (a) it's not disclosed in the disclosure

25  statement.  It's not disclosed in the plan, although we have

1 objected to the plan on that basis.

2       The refund issue, the potential that a significant

3 tax refund is not disclosed in the debtor's disclosure

4 statement or in the plan of reorganization.  The refund issue

5 exists out there, and I've not heard the debtor say we are not

6 going to pursue that refund issue.  In fact, at the last

7 hearing Mr. Foley specifically said we are going to pursue it

8 or we have -- we've reserved the right to pursue it, and we

9 might even hire Ryan to do it, or we might hire a third party

10 to do it.

11      So it is out there, and it's very  important that

12 everyone knows that if it's out there, two things might occur.

13 One is that a third of that fee or we believe even 40 percent

14 of whatever the refund is -- the refund clam is may go to Ryan.

15 So whoever takes on that refund work is going to need to know

16 that.

17      The second is they're going to need to know that

18 certain strategies, arguments, positions taken by Ryan, which

19 are very unique --this is not your typical prototypical use,

20 sales tax use, audit refund situation.  There's very

21 interesting, very unique strategies that are in play here that

22 were essentially developed by Ryan and prosecuted by Ryan on

23 behalf of a number of clients including Circuit City, and this

24 new third party or whoever comes in needs to know that there

25 may be a problem with going forward and using those positions

1   and arguments.

2          Now --

3          THE COURT:  Well, Mr. Blanks makes the argument that,

4   you know, those are all intangible items and how in the world

5   can they give that back to Ryan.  And he makes the second point

6   that well, wait a second, it's all a matter of public record

7   now.  Anybody who wants to can go down to the courthouse and

8   read it and know what these arguments are --

9          MR. AKERLY:  Right.

10          THE COURT:  -- and how do you address those two

11   issues?

12          MR. AKERLY:  Well, we're asking for a declaration

13   that certain tax strategies and certain things of that nature,

14   arguments that have been made by Ryan before the Hawaii Supreme

15   Court and the taxing authorities are -- belong to Ryan.  We

16   came up with those strategies and those arguments.  We

17   approached Circuit City with those, and before they would even

18   hire us, okay -- I'm sorry.  Before we would tell them what

19   they were, they had to hire us, okay, then we disclosed those.

20          Now, they are intangible.  I agree, but we're asking

21   the Court to not allow a third person to use those strategies.

22   The fact that they've been disclosed to Circuit --

23          THE COURT:  So you want me to enjoin some third party

24   that's not here?

25          MR. AKERLY:  They can't use our arguments.  Why

1  should they be able to use our strategies and our theories and

2  our arguments, basically take our whole process and essentially

3  take the ball and run with it?

4          THE COURT:  Well, when you cite a case to me, aren't

5  you using other attorney's work product and that standpoint or

6  the Court's as far as, you know, what has been said in these

7  cases?  Isn't that the same thing?  Why can't accounting firm

8  XYZ go to Hawaii, read what your client wrote, and then say,

9  hey, we think that's a pretty good idea and why can't they use

10 it?  They don't have to pay for that.  Do --

11         MR. AKERLY:  I understand it's very difficult -- it

12 is very difficult to get your arms around, Your Honor, and  the

13 bulk -- I will admit the bulk of my -- the bulk of our

14 declaratory judgment action centers around the assignment of

15 fee, but we are very concerned that we came up with this

16 process, and there -- and that's why we have in the agreement,

17 which is attached to the response -- the agreement provides for

18 that to protect that, because what's going to happen is then

19 those folks are going to take that and use it on -- in other

20 cases, in other situations.  It's  very competitive.  The sales

21 use tax industry is very competitive, and we've --

22         THE COURT:  But how do I do that?  That's my

23 question.  Let's assume that you're right on that, and, you

24 know, hasn't that barn door been left open at this point, and,

25 you know, all the animals are gone?

 1            MR. AKERLY:  Well, a couple things.  One is you --

 2  again coming back we're looking at the face of the complaint

 3  and the allegations we've made not the merits, obviously, of

 4  whether we're going to succeed or not.  We need the opportunity

 5  to present to the Court what those theories are, what those

 6  arguments are, what those things -- and why are they

 7  proprietary.  Why are they unique to Ryan?  What -- for

 8  example, what has Ryan kept to itself it hasn't disclosed to

 9  Circuit City?  Ryan --

10            THE COURT:  Well, you can keep that.

11            MR. AKERLY:  There are documents -- what's that?

12            THE COURT:  You don't have to turn that over to

13  Circuit City.

14            MR. AKERLY:  But -- no, but what I'm saying is you --

15  if another -- if a third party comes in and can glean those

16  strategies and glean those arguments from that, that's

17  essentially using Ryan's work product.  Again, I understand,

18  Your Honor, when we get into the merits of that, we can examine

19  the discovery, examine what goes into that.  But here the

20  question really is have we alleged a valid cause of action --

21  plausible cause of action.  I think so, certainly with respect

22  to the ownership and certainly with respect to the intangible

23  and tangible property that's involved, and that's the key.

24  They key really is is -- as Mr. Blanks has correctly pointed

25  out in <u>Twombly</u>, you know, the Court said that, you know, we're

1  entitled -- we're entitled to a denial of the motion to dismiss

2  if we can show, through taking all of the allegations in the

3  complaint as true and all the inferences obviously in favor of

4  us, that a plausible factual allegation has been set out in the

5  complaint.

6          Now, again, this is not about an admin claim.  This

7  is not about a proof of claim.  This is not about rejection of

8  damages.  All of those things are about dollars and cents.

9  Obviously, if the Court -- if they want to object to our

10 rejection of damages claim, they can.  The Court will hear

11 that.  The Court will say you either have a dollar amount of

12 claim or you don't.  That's fine, but that dollar claim is

13 based upon our theory, okay, that we own it.  That theory is

14 contested.  You can't tackle that issue.  You just cannot

15 tackle that issue in a claims objection process.

16         They aren't offering that.  What they want the Court

17 to do is they want the Court to dismiss the complaint with

18 prejudice.  Okay?  That is not allow us to essentially make the

19 argument of ownership and allow them to go over then and object

20 to the claim and say you're not entitled to the claim when one

21 of the bases of the claim is we have ownership.

22         See, in other words, we'll be -- you've got a

23 procedural issue on the rejection side that is untimely.  Okay?

24 That's basically their argument, untimely.  Over here we have a

25 substantive argument.  That is what does the contract provide?

1  The contract provides for an assignment.  We own a percentage

2  of whatever refund that might come in.  Okay?  What they want

3  to do is knock that ownership interest issue out, and

4  essentially, way over here which is a straight procedural

5  issue, and that's certainly not fair.  And we have clearly,

6  clearly pled a cause of action here.  It's clearly in dispute.

7  They deny everything that we're asking for.

8        THE COURT:  How do you address the ripeness issue,

9  because, you know, aren't we talking about a property interest

10 that we don't know whether it exists or doesn't exist?  I mean,

11 you know, it's sort of like arguing about, you know, if you're

12 going to discover oil or something and you haven't drilled the

13 well yet.

14       MR. AKERLY:  Right.  Well, but what you've done is

15 you've done a lot of homework.  Okay?  Here, a couple things.

16 One is we've done a lot of homework.  We did all the work, and

17 granted, a lot of that work was done pre-petition.  We did a

18 lot of work.  We submitted the claim -- the refund claim to the

19 State of Hawaii.  The State of Hawaii initially denied it based

20 upon the current law before the State of Hawaii which is now

21 being challenged in the Comp USA case.  Okay?

22       The second thing is, is they aren't denying that the

23 refund claim exists.  Okay?  Now, I've -- what I'm saying is

24 the -- even though it's not scheduled, the potential of the

25 refund, a million dollar plus refund, it's not scheduled.  It's

1  not in the plan, and it's not in the disclosure statement.

2  Okay?  But they're not saying it doesn't exist.  In fact,

3  they're coming before -- they're saying it does exist.  They're

4  saying we don't want you to help us on it.  We might hire a

5  third person on it.  It's out there.  They've never said we are

6  not going after that refund.  They're not saying either way, so

7  my --

8       THE COURT:  They're just saying, well, we're going to

9  sit back and wait and see what happens.

10      MR. AKERLY:  Wait and see -- yes, exactly, but here's

11 the problem, as I mentioned earlier in my argument is, okay,

12 waiting to see what happened, everyone needs to know that my

13 client owns a third of whatever comes in.  Okay?  Because you

14 can't wait -- you can't just wait and see what happens.  You're

15 going to have to act on it.

16      THE COURT:  Well, that's where I'm coming from on

17 this ripeness thing.  It seems to me that we're a little bit

18 premature.  Aren't we?  We're arguing about something we don't

19 know whether it exists.  I mean this may go away completely if

20 the State -- Supreme Court of Hawaii says there is no refund,

21 then we're done.  Everybody can go home.  But if the State of

22 Hawaii comes back and the Supreme Court says there is, well,

23 then perhaps it's ripe to litigate that dispute.

24      MR. AKERLY:  Sure.  I understand.  I understand, Your

25 Honor, and I'm not admitting that it's premature, but I do

1  understand the dilemma.  If the Court were to say, Ryan, your

2  right of action is preserved, okay, all right, notwithstanding

3  the silence in the plan, the silence in the disclosure

4  statement, I mean if we could get something -- and I think I

5  maybe even -- we may have mentioned this to Mr. Foley earlier

6  on many, many months ago, was if we could get something in the

7  plan that says Ryan's, you know, right of action is preserved

8  with respect to its fee, I understand, but I'm not -- I don't

9  think it's premature, because I think what happens here is, is

10 you have the issue of someone -- everyone needs to know that

11 that refund right is subject to, that is subject to the claim

12 of Ryan, and they -- Mr. Blanks stood up here and said we don't

13 believe they have a proper assignment.

14      So I can't believe they're going to preserve that.

15 We've got to -- and we can't take that issue up in the proof of

16 claim objection, so what's going to happen there?  When they

17 object to the proof of claim, okay, I guess we liquidate the

18 amount of the claim, and whatever -- a third of some number --

19 we know what the refund number is.  We know what we've asked

20 the State of Hawaii for.

21      All right.  So we know what that -- approximately

22 what that number is.  I think it's the number we've bandied

23 here, 275/280 thousand dollars.  And so, you know, if we

24 preserve the claim, okay, (a) do we get a distribution from the

25 bankruptcy estate?  Do we wait for the refund?  You know, we

1    need those issues decided now.  We shouldn't have to wait to

2    know whether -- I mean if we own it, we'll wait for the refund.

3    If we don't own it, we may very well have a claim against the

4    bankruptcy estate for some amount that we can get the

5    distribution on.  So we've got to have these issues determined.

6            My suggestion was that we just combine everything.

7    We combine the complaint with the objection to the fee, put

8    them all together, and just determine it all, and the Court can

9    declare the rights of the parties to -- under the underlying

10   contracts.

11           THE COURT:  Well, you've got two claims that have

12   been asserted, an admin claim and a general unsecured claim.

13           MR. AKERLY:  Oh, well, there's no general unsecured

14   claim.  It was late.

15           THE COURT:  Oh, okay, that --

16           MR. AKERLY:  It was a very small claim.  I don't

17   know.  It was 5 or 7 thousand dollars.  The client got it in

18   late, and it was clearly -- it was objected to and it was late.

19   We filed two admin claims.  We filed a small one, and then we

20   supplemented it.  Okay.  The small one was for 100 something

21   thousand, then we supplemented it to 275,000.  And  I believe

22   that -- and you guys can correct me if I'm wrong.  I believe

23   the smaller one was -- is gone, and they've recently objected -

24   - I think you guys objected to the other one.  And I will tell

25   the Court in all honesty I'm talking to my client about

**J&J COURT TRANSCRIBERS, INC.**

1  withdrawing the admin claim completely.

2        So what you have really -- I think what you really

3  have before the Court is just the rejection damages claim,

4  okay, based on the Court's ruling rejecting the contract and

5  the adversary.  So I think that -- in all honesty I think

6  that's what you have to deal with is a rejection damages claim,

7  which as of now has not been objected to, and the complaint.

8        THE COURT:  All right, so the rejected damages claim

9  would be for that 275,000, whatever it is, and that, of course,

10  would be contingent upon somebody in Hawaii ruling that the

11  debtor is, in fact, entitled to the refund.

12        MR. AKERLY:  Yes, and subject to the ownership issue

13  and -- yes.  But it's liquidating the claim.  The contract's

14  still there.  And, as the Court knows, you know, rejection, you

15  know, doesn't get rid of the contract.  It just means that the

16  contract's deemed a breach as of the filing date.

17        So, you know, we have the dollar amount, but now we

18  have the contract, which actually sets forth substantive rights

19  of the parties, and that's what we're trying to decide.  Are we

20  -- do we actually own it or are we subject to or relegated to a

21  class under the plan, an unsecured -- general unsecured claim

22  under the plan?  And we need that issue decided, so we know how

23  -- what our treatment's going to be.

24        In addition to other folks who might taken on the

25  task of the audit refund later, we'll certainly want to know if

J&J COURT TRANSCRIBERS, INC.

1  anybody else has a claim or -- against the refund itself.

2  Thank you, Your Honor.

3           THE COURT:  All right.  Thank you.

4           MR. BLANKS:  Your Honor, just as a housekeeping

5  matter before I address some other items.  Since Your Honor was

6  inquiring with Mr. Akerly, just to correct the record I

7  believe where it stands at this point, Ryan has to date and in

8  this case filed four claims, two admin claims, two general

9  unsecured claims.  Currently on file and not under objection

10 and not disallowed by this Court is an admin claim that's Claim

11 Number 14326 that's in the amount of $245,000 -- 245,196.48.

12 I'm sorry, Your Honor.  That's the one that's been disallowed.

13 My apologies.  At this time Claim Number 14234 is the admin

14 claim that is currently on file.  In addition to that, on June

15 10th, 2010 Ryan filed an unliquidated general unsecured claim

16 on account of the rejection damages claim from the order that

17 was entered by Your Honor on March 12th, 2010, so as a

18 housekeeping -- those are the claims that are out there at this

19 time.

20          With respect to Mr. Akerly's arguments throughout

21 this, since he has -- seems to have backed away a little bit

22 from three of the four counts, I'll focus primarily just on the

23 first count, which is primarily the one that he seems to

24 address.

25          THE COURT:  And that's what I'd like you to do, and

1  specifically, why isn't this adversary proceeding a -- really

2  just part of the rejection damages claim but with a twist.  As

3  Mr. Akerly says, you know, they want to actually, the can't

4  actually assert an ownership interest, you know, through their

5  -- or at least to their contract rejection damage claim, but

6  they want to be able to assert that, and the rules seem to

7  suggest that, you know, if you -- that you could combine --

8  when you have relief that you've requested in addition to a

9  claim, that you can do it as an adversary proceeding.

10       MR. BLANKS:  Your Honor, a couple different points on

11  that.  First, to correct one of Mr. Akerly's underlying

12  assumptions here, the current plan that is currently before

13  Your Honor and the one that's -- that will be up for

14  confirmation at this time in the near future provides that all

15  of the debtor's property, all of the property of the estate,

16  will be transferred over to the liquidating trust.  If we don't

17  have the property, it's not transferred over to the liquidating

18  trust.  So we're not transferring any property of any other

19  third party to any other entity.

20       So if a third party has property, it will not be

21  distributed to other creditors.  And so if Mr. Akerly's client

22  does have an ownership interest in some property, it cannot and

23  is not contemplated under the plan to be transferred over to

24  certain creditors.

25       THE COURT:  But how does he protect himself.  I mean

1 he can't -- he goes to the State of Hawaii and says, okay, a

2 third of that is mine, give it to me, you're going to say,

3 well, wait a second, he's violated the automatic stay and that

4 he can't do that.  So he's got to have some sort of a mechanism

5 somewhere, either we've got to give him relief from stay that

6 he can go determine that in Hawaii, or we need to do it in some

7 other forum.  Don't we?

8          MR. BLANKS:  We have to do it in another forum, but

9 at this time we don't know whether we have any money there.  We

10 don't know if we're going to get one dollar, zero dollars, or

11 one million dollars.  That is completely contingent at this

12 point.  We certainly hope that we will get a big refund in the

13 future, but at this time we don't know what we're entitled to,

14 so it's just --

15          THE COURT:  So you think it's premature at this

16 point.

17          MR. BLANKS:  It's completely premature at this time.

18 What Mr. Akerly argues is he believes that they are -- that

19 Ryan is entitled to some claim from the -- from -- on account

20 of this contract.  At this time, Your Honor, that contract has

21 been rejected.  Any claim that Ryan would be entitled to, if

22 any, is a contingent, unliquidated general unsecured claim on

23 effect of the rejection of that contract.  And going to the

24 underlying --

25          THE COURT:  Well, he says he has an ownership

1  interest in the raise.

2          MR. BLANKS:  And that doesn't -- yes, Your Honor, and

3  that's the fundamental point that we fundamentally disagree

4  with Ryan, and it's completely contrary to the contract itself.

5  Mr. Akerly has quoted extensively from the or has stated the

6  assignment language that's included in the contract.  As

7  attached to the contract, in ever paragraph in which it talks

8  about the payment of the fees or the assignment or any other

9  information, it is the prefatory language in each and every one

10 of those sentences in the event -- in the event they obtain any

11 tax refunds, in the event they are able to get any fees.  In

12 the event they ever receive any credit or reduction as a result

13 of any of the proceedings.  At this time none of that has

14 happened, so this contract has been rejected at this time.

15         At the time of the rejection, we were not in

16 possession of any tax refunds.  We were not in possession of

17 any credits or even reductions, so at the time that the

18 contract was a rejection, and, in fat, today, Your Honor --

19 even today we are not -- we are not in possession of any money

20 or even reductions from these amounts.  So, as a matter of fact

21 and as law, at this moment Ryan is not entitled to anything,

22 because no assignment has taken place, and no monies have been

23 received.

24         And so it's -- Your Honor, we -- it's impossible for

25 us to own something and to be able to assign it if it doesn't

1  exist.  At the time in which this was rejected Circuit City and

2  the debtors were not in possession of any refunds from the

3  State of Hawaii.  Accordingly, it was impossible for us to

4  assign such interest to Ryan at the time the contract was

5  entered or today.

6      And just to point this out, Mr. Akerly intimates that

7  something should be occurring in the very near future, and that

8  this is -- will be ripe -- if not now, will be ripe in the very

9  near future.  The contract itself is dated June 8, 2005.  So

10 the debtors and Ryan have been engaging in this very appeal for

11 more than five years and to this -- and at this time we do not

12 have any monies coming in the door from the State of Hawaii,

13 and as is stipulated by Mr. Akerly at  previous hearings -- as

14 Your Honor knows, we filed this case on November 10th, 2008.

15     Since that time, so during the entire pendency of the

16 cases, Ryan and the debtors did not perform any meaningful work

17 on this appeal, which is evidence that there's nothing

18 happening in Hawaii at this time, and it may be a very long

19 time if -- no one has any idea how long it will be before we

20 ever receive any refunds from the State of Hawaii, in what

21 action the State of Hawaii will take with respect to these

22 appeals.  All of that is contingent.  All of that is up in the

23 air, which further goes to the point of it's not a very good

24 use of judicial resources to get an advisory opinion on

25 something that may not occur or may not happen for a very long

1  time in the future.

2          THE COURT:  If the debtor's plan is confirmed, does

3  Mr. Akerly's client lose its right to be able to pursue this

4  cause of action should it become ripe in the future?

5          MR. BLANKS:  No, Your Honor.  And not to advise them

6  on what they should or shouldn't do, but they could certainly

7  amend their claim into sort of a contingent secured claim to

8  protect his interest.  We could object to it, but they would

9  preserve their rights, and that would -- we could dismiss --

10 that would dismiss this complaint in its entirety.

11         THE COURT:  He doesn't claim a security interest.  He

12 claims an ownership interest.

13         MR. BLANKS:  Ownership -- I mean, apparently, I mean

14 if I were holding the property, I would hold it -- effectively,

15 maybe they're arguing that it's held in trust for their

16 benefit, but they would need to file a claim to preserve that

17 right.  And so there are a number of mechanisms by which they

18 can accomplish what they were trying to accomplish today in

19 lieu of having a declaratory judgment advisory opinion action

20 pending today on one count  on whether they're entitled to any

21 money if in the future certain events happen to occur.  But at

22 this point those incidents have not occurred, and this is just

23 not ripe, and it's a -- not a proper use of anybody's time or

24 resources at this time.

25         THE COURT:  All right.  Thank you.

1             MR. AKERLY:  Your Honor, if I may just real quick?

2             THE COURT:  Yes, you may.

3             MR. AKERLY:  Just real quick, Your Honor, I -- again

4   I think it's interesting.  I still have not heard anything to

5   the effect that they are abandoning the refund claim.  In fact,

6   you know, we --

7             THE COURT:  I don't think they are.

8             MR. AKERLY:  That's right, and, in fact, we made an

9   offer to buy it at one point, and we just didn't -- the

10  discussions broke down.  And the key here is if this issue is

11  not determined and that plan is confirmed, okay, Ryan's

12  ownership rights will go away I mean because that's -- it's res

13  judicata.  If there's not a determination that Ryan owns those,

14  Ryan's going to be bound by the plan.  The plan provides

15  nothing with respect to, except that as Mr. Blanks said, that

16  asset, that refund right is going to the liquidating trust.

17  Okay?

18            Well, if we don't get some determination or some

19  reservation or preservation of rights with respect to our

20  ownership claims, okay, and our -- and to the extent it's a

21  nominal issue perhaps that our ownership of the intellectual

22  side as well, the proprietary side -- if we don't get that now,

23  once that plan's confirmed, we're bound by res judicata.  We're

24  -- and then sure enough we're going to -- if it's a year out or

25  two years or three years out and we go make a claim for that, I

1  can tell you you're going to hear it now.  You're going to hear

2  it.  Where were you?  You know, you didn't -- you're bound by

3  the plan, res judicata, and we know where that's going to go.

4  So I just want to make sure it's -- it is very critical that we

5  get this issue decided, whether it's decided in the context --

6  as the Court noted, in the context of the rejection damages

7  claim or it's decided in the adversary.  We can combine the

8  two, but I think we need to get that issue determined.

9         THE COURT:  But how is it ripe for me to make a

10  decision with regard to ownership interest in property that

11  doesn't exist?

12         MR. AKERLY:  Well, the issue is not --

13         THE COURT:  And I understand your, but maybe it's

14  better that you get relief from stay, so that you can go to

15  Hawaii and get the Supreme Court there to make the

16  determination.

17         MR. AKERLY:  Yes, I'm not sure that -- I haven't

18  thought through that, Your Honor, but I -- I think what's going

19  to happen -- I got to have -- I got to have some decision with

20  respect to the ownership right, because, like I said, if that

21  plan's confirmed, there's no -- the contract's gone.  It's been

22  rejected.  It's not -- there's no right preserved.  That

23  ownership right is not preserved in the confirmation order or

24  the plan, and -- or the Court hasn't made a decision.  I'm

25  stuck.  My client's stuck on that issue.  Thank you.

1           THE COURT:  All right.  Thank you.  All right.  The -

2  - I've come in very bothered by the ripeness issue, but Mr.

3  Akerly's comments have given me some pause.  I want to read

4  these papers again and go back through that, and I'll issue a

5  decision in a few days on this matter.  Thank you.

6           MR. AKERLY:  Thank you very much, Your Honor.  May I

7  be excused?

8           THE COURT:  You may.  Thank you, Mr. Akerly.

9           MR. MORRIS:  May I also be excused, Your Honor?

10          THE COURT:  Yes, you may.  Thank you, sir.

11          MR. MORRIS:  Thank you very much.  Thank you.

12          MR. FOLEY:  Mr. Akerly -- before Mr. Akerly left, I

13  just wanted to confirm I spoke with --

14          MR. AKERLY:  With the pretrial.

15          MR. FOLEY:  -- with co-counsel -- yes, do we --

16          MR. AKERLY:  I think that we can do the pretrial

17  issues.

18          MR. FOLEY:  Okay.  My --

19          THE COURT:  We'll continue the pretrial --

20          MR. FOLEY:  Until the 22nd of --

21          THE COURT:  Yes.

22          MR. FOLEY:  -- July.  Okay.  My only comment was

23  going to be to the extent that it's necessary to put any

24  paragraph in the confirmation order preserving the right to

25  assert an ownership interest in any tax refund we get in the

1    future, we have no objection to that.  I don't know if that's

2    what he's looking for -- that's what he's looking for or if

3    that's what the -- what would make the Court feel comfortable.

4    We intend to do that generally with respect to any property we

5    don't own.  We'll obviously preserve the right to say, well, we

6    dispute the issue, but if he's worried about res judicata or

7    collateral estoppel with some broad confirmation language,

8    we'll put in whatever reasonable stipulated language he would

9    like in the confirmation order to take care of that.

10              THE COURT:  Well, I would strongly suggest the two of

11   you talk about that, because that's the issue the Court's

12   concerned about.

13              MR. FOLEY:  Okay, that's what -- I assume -- I picked

14   that up from the Court's question, but that's --

15              MR. AKERLY:  I'd be happy to talk to Mr. Foley about

16   that.

17              MR. FOLEY:  That's fine.

18              MR. AKERLY:  Maybe tomorrow or the next day.

19              THE COURT:  All right, and I'll withhold issuing any

20   decision until I hear from the two of you.

21              MR. AKERLY:  Okay.

22              MR. FOLEY:  Thank you, Your Honor.

23              MR. AKERLY:  Thank you, Your Honor.

24              MR. FOLEY:  Your Honor, this brings us to --

25              THE COURT:  You may be excused again.

1                MR. AKERLY:  Okay.  Thank you.

2                MR. FOLEY:  Your Honor, this brings us to the last

3    item on the agenda, which is I think 9 -- or 10 and 11 -- 9 and

4    10 or -- the Schimenti complaint.  There has been some activity

5    in this case so far, Your Honor, with respect to Schimenti

6    Construction in the North Plainfield store in addition to the

7    New York.  The North Plainfield store, if Your Honor recalls,

8    was a new construction contract that was not quite finished

9    before we filed the bankruptcy.  The  lease with respect to the

10   store has been rejected.  The construction contract, which is

11   the subject of this dispute and these claims, hasn't been

12   rejected yet, but will be rejected by default as part of the

13   plan confirmation process.

14                The complaint alleges four counts, Your Honor.  Count

15   1 is a declaratory judgment request asking Your Honor to

16   declare an express trust or, in the alternative, a constructive

17   trust.  Count 2 is a request for injunctive relief, which, in

18   our view, is really more of a remedy tied to Count 1 than an

19   independent cause of action.

20                Count 3 is a breach of contract claim with respect to

21   the construction contract, and Count 4 is a conversion count, a

22   cause of action for failure to turn over alleged property that

23   belongs to Schimenti, but again we believe that's tied to Count

24   1.

25                So in our view, Your Honor, and in the motion to

1    dismiss, we've sort of laid out what we think is the core issue

2    here, which is whether or not Schimenti can allege --  has

3    alleged or can allege any plausible argument factually based,

4    which, in our view, they haven't done yet, to determine that

5    monies that are in our general operating account, which we paid

6    this creditor as work was done, is somehow not property of the

7    estate under Section 541 of the Bankruptcy Code.  If Your Honor

8    finds that it is property of the estate under 541 of the

9    Bankruptcy Code, we think the complaint must be dismissed,

10   because it's just a debtor-creditor relationship, and they have

11   a claim filed in the case, and we'll deal with it in the

12   ordinary course of the claims resolution process.

13          Again, Your Honor, we don't think that the facts as

14   alleged, especially given the fact that they've attached the

15   contract and the payment application request --

16          THE COURT:  The contract was attached, and that was

17   something I wanted to ask both counsel about, because I can

18   review the contract now that it's been attached.  Right?

19          MR. FOLEY:  Absolutely, the contract is the --

20   interpreting a contract is a legal matter not a factual one,

21   and Your Honor can read that, and Your Honor will find in

22   reading that there's --

23          THE COURT:  I have read it.  That's why I wanted to

24   ask that question.

25          MR. FOLEY:  There is a complete absence of any

1    language in there to suggest or imply an intent of the parties

2    to create any kind of a trust relationship with respect to any

3    dealings between the parties.

4           Similarly, there's no language that conclusively says

5    there wasn't, and so we would say that the facts are very

6    similar to what Your Honor dealt with in <u>Land America</u>, and we

7    don't think there's any facts that can be alleged or have been

8    alleged --

9           THE COURT:  Well, in <u>Land America</u> they had a

10   provision in the contract that says that it wasn't.  They had

11   disclaimed all right, title, and interest, if I recall.

12          MR. FOLEY:  Well, they had to do that, because the

13   money came from the creditor.  The money here did not come from

14   Schimenti Construction.  The money was in our general operating

15   account, and we paid them as they did work.  There was no third

16   party escrow.  There wasn't a bond or a surety bond set aside

17   to protect them.  This was typical construction law contract in

18   which the owner who contracts with the construction company

19   holds back payment of certain amounts until everything's done

20   to make sure that it's nothing that needs to be fixed or wasn't

21   done properly.  It's security for us, and they're trying to

22   turn it into a constructive or a literal express trust for them

23   to elevate the priority of their claim.

24          And again there are not specific facts alleged to

25   suggest that there was any express trust intended between the

1  parties, and, in fact, the documents attached and incorporated

2  by reference in the complaint suggest otherwise.  So, Your

3  Honor, we think under the applicable standards and including

4  the previous precedence of the Court, that this complaint can

5  be dismissed, because it's really a debtor-creditor

6  relationship, and it can be resolved.  The claims relating to

7  the rejection of this contract in any amounts that they are

8  owed can be dealt with in the claims resolution process just

9  like any other creditor in the case.

10          THE COURT:  All right.  Thank you.

11          MR. PERKINS:  Good afternoon, Your Honor.  Chris

12  Perkins for Schimenti Construction.  I'm joined by my co-

13  counsel Peter Strniste of the law firm Robinson & Cole --

14          THE COURT:  Stranisi (sic)?

15          MR. PERKINS:  Strniste.

16          THE COURT:  Okay.  Thank you.

17          MR. PERKINS:  Mr. Strniste has previously been

18  admitted pro hac vice in this matter and will handle the

19  argument for Schimenti today.

20          THE COURT:  All right.  Thank you.  Mr. Strniste,

21  welcome to the court.

22          MR. STRNISTE:  Thank you, Your Honor.  Good

23  afternoon.  Your Honor, Mr. Foley is correct.  This is a

24  typical construction contract, and in a typical construction

25  contract like this one, a construction manager like Schimenti

1    Construction Company acts as a conduit.  Schimenti Construction

2    Company doesn't self-perform work.  It's simply a conduit

3    between Circuit City and the subcontractors and suppliers on

4    the project who build the project.  Information flows up from

5    the subcontractors through Schimenti through Circuit City's

6    construction department and then back down to subcontractors.

7    Requests for payment flow up the chain.  Payments flow back

8    down the chain.

9         In this situation we have a situation on our hands

10   where several of these subcontractors didn't receive payment of

11   their retainage, and, in fact, their last requisition payment,

12   because Schimenti never received that from Circuit City.  And

13   Schimenti has separate subcontracts with each of these

14   entities, and they've made demand for these retainage payments,

15   and arguably, Schimenti may be on the hook to pay these

16   subcontractors and suppliers for these retainage trust monies.

17        But if I could back up, Your Honor, and just go into

18   the majority of my argument here, the -- this is a motion to

19   dismiss.  We filed an adversary complaint.  We believe we

20   complied with Federal Rule of Civil Procedure 8(a)(2), which

21   only requires a short and plain statement of the claim showing

22   that the pleader's entitled to the relief in order to give the

23   defendant notice of the claim.  We've --

24        THE COURT:  As it's been amplified by <u>Iqbal</u> and a

25   couple of other recent --

1              MR. STRNISTE:  Right.

2              THE COURT:  -- opinions.

3              MR. STRNISTE:  It's been amplified in terms of this

4  plausible requirement, which is the new requirement.  But

5  plausible doesn't mean probable.  We don't have to prove that

6  we're going to succeed here on the merits.  If you look at

7  Circuit City's motion to dismiss, they bring in all kinds of

8  extrinsic facts that aren't even in the complaint.  They're

9  talking about where these funds are.  You heard Mr. Foley say

10  that they've been commingled.  They were never paid.  Well,

11  those are all facts, Your Honor.  I don't know where those

12  funds were, and I don't even agree that it's a requirement that

13  they not be commingled.  In fact, there's Virginia law on point

14  on that, that states -- I think it was the <u>Daber</u> case -- the

15  <u>Dameron</u> case which --

16              THE COURT:  <u>Dameron</u>.  Okay.

17              MR. STRNISTE:  -- which basically says that you look

18  to federal law, and there's several -- there's a certain test

19  that you would apply to determine whether you can trace the

20  funds.  But in terms of the standard, if you look at the

21  complaint, the four corners of the complaint, we clearly allege

22  all the elements for all four claims, and we went further.  We

23  attached the contract.  We detail -- we go into detail within

24  the body of the complaint explaining what provisions of the

25  contract are applicable, and that just -- as a footnote --

1            THE COURT:  And you did.  You said -- okay.  You said

2    look at Section 6.2 of the terms and conditions attached as

3    Exhibit A to your contract, okay, and I go and I read that, and

4    it doesn't say monies -- the retainage is held in trust.  It

5    doesn't say anything about trust.  The word trust is not there.

6    And then I go back and I read the rest of the contract, and

7    I've got it right here, and I don't see the word trust used

8    anywhere in this contract.  So when you say that you've

9    alleged, you have to have -- allege a plausible fact that

10   establishes a express trust where -- what facts are you

11   alleging that establish that?

12           MR. STRNISTE:  That's a fair question, Your Honor,

13   and let me just drop a footnote.  We had a -- there was some

14   discussion about whether or not Your Honor could consider this

15   contract.  Just so the record is clear, this is not the total

16   contract between the parties.  This document on its face

17   incorporates by reference plans, specifications, general

18   conditions.  There are form documents that Circuit City

19   prepared that are also a part of this contract.

20           By way of example, the application for payment form

21   that Circuit City required its contractors to use was an

22   exhibit to the original contract.  The notice to proceed was an

23   exhibit.  You know, the bid documents, those were exhibits.  So

24   you don't have a full contract before you, Your Honor.  You

25   have the main document that references other documents that are

1  also a part of the contract.  But I -- you can certainly

2  consider the contract for purposes of the motion to dismiss

3  that you have in front of you, the document that was marked as

4  an exhibit.

5          The more important document, to answer your question,

6  Your Honor, is Exhibit 2 to the complaint, which is arguably a

7  contract document, and I actually have a copy of that that's

8  easier to read, Your Honor.  If I could just approach?

9          THE COURT:  If you'd hand it to the Court Security

10 Officer, please?

11         MR. STRNISTE:  This is the actual application for

12 payment Number 3 that was submitted by Schimenti Construction

13 Company on this project, Your Honor, and this application is

14 dated September 30th, 2008.  This is a Circuit City form

15 document.  It's a part of the complaint.  It's a document they

16 created, they required us to use.  It forms the agreement

17 between the parties, because in determining, Your Honor,

18 whether there's an express trust and in determining whether

19 there's a constructive trust, we're not just -- we don't just

20 have to be focused on the document itself.  We could look at

21 the relationship between these parties and the circumstances,

22 Your Honor.  The case law is clear.  We don't -- we are not

23 bound just by the contract.

24         And as another footnote, Your Honor, Your Honor had

25 mentioned whether the word trust appeared anywhere in the

**J&J COURT TRANSCRIBERS, INC.**

1  contract, and it doesn't appear in the context of their

2  retainage chest, but there is an interesting provision in the

3  contract that Circuit City did not cite in their brief, and

4  they had made the argument on the constructive trust theory

5  that there was no fiduciary relationship.  Well, there is a

6  fiduciary relationship.

7          If you look at Article 2.1 of the contract, it says,

8  "The relationship of contractor with owner should be that of an

9  independent contractor, however, contractor recognizes the

10 relationship of trust and confidence established by the

11 agreement," and then it goes on to say, "The contractor will

12 use his best skill and judgment."  So this is a situation where

13 Circuit City required Schimenti Construction Company to be

14 somewhat of a fiduciary.

15         But turning back, Your Honor, I don't mean to --

16         THE COURT:  Well, wouldn't your argument be better if

17 it was Circuit City that was the fiduciary?

18         MR. STRNISTE:  Well, I believe it's the parties, Your

19 Honor.  I don't think -- it says, "The contractor recognizes

20 the relationship of trust and confidence established by the

21 agreement."  It doesn't say who's the fiduciary.  It doesn't

22 say, you know -- I think that provision is broad enough to --

23 to make an argument with additional discovery, which is what we

24 need in this case, that the fiduciary relationship went both

25 ways.

1          THE COURT:  But if we read the second half of that

2  sentence, it talks about it agreeing, it being the contractor,

3  and, you know, pursue the best interests of owner.  I mean the

4  way that I construed that section was one where it was

5  Schimenti that was agreeing not necessarily to the -- this

6  special relationship, maybe a little bit more than just

7  independent contractor other than -- and not Circuit City.

8          MR. STRNISTE:  Well, I mean with all due respect,

9  Your Honor, I think it could've been clearer if that was the

10  intent, because the way it's written it says, "contractor

11  recognizes the relationship of trust and confidence," so I mean

12  this is --

13          THE COURT:  That's fair.

14          MR. STRNISTE:  -- this is Circuit City's document.

15  They drafted it.  You know, any ambiguity should be interpreted

16  against them, but that --

17          THE COURT:  But we don't have orphans and widows

18  here.  We've got, you know, pretty much, you know, equal

19  bargaining positions.

20          MR. STRNISTE:  I wouldn't go that far on some of

21  these, you know, retail contracts, Your Honor, but most of the

22  time it's take or leave it.  In any event, that was a point I

23  wanted to make on the constructive trust.  I want to back up,

24  Your Honor, and focus on this application and certificate of

25  payment.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Please do.

2          MR. STRNISTE:  Okay.  This document you have before

3   you is a common document that's used in the construction

4   industry, because retainage is commonly withheld, and retainage

5   is withheld from earned funds.  It's taken from earned proceeds

6   before the contractor, before the funds are released.

7          In this situation, Schimenti's -- according to the

8   contract and according to what happened on the project,

9   Schimenti would submit an application for payment on the 25th

10  day of every month, and that application for payment would

11  capture the percentage of work that was performed in the last

12  30 days.  Schimenti would submit the application on this form.

13  It would detail on the attached schedule of values exactly what

14  work was performed down to the percentage, what work was

15  remaining to be performed, and from what work the retainage,

16  from the money that was due, was going to be withheld.

17         And you're looking at the last application for

18  payment here, Your -- Application Number 3, Your Honor.

19         THE COURT:  This is the one that wasn't paid.

20         MR. STRNISTE:  Yes, Your Honor, this one was not

21  paid, and but this one is significant, because if you look at

22  the schedule of values, this is September 30th, 2008.

23  Schimenti Construction Company had performed all its work on

24  this project.  Every work item is at 100 percent.  There's no

25  work left to be done.  Schimenti Construction is done, and that

1   coincides, Your Honor, with the contract.  If you look at the

2   contract, on Page 2 it has as date of substantial completion

3   turnover of September 30th, 2008.  That's the same date as this

4   application.

5          So significantly, Schimenti was finished with its

6   work September 30th of 2008, and the payment on this

7   application, the final payment that's referred to by Circuit

8   City in its brief, the final payment of 458,623.62 would've

9   been due 25 days later.  The final payment provision that

10  Circuit City relies on doesn't have the word retainage anywhere

11  in there.  The retain -- Circuit City breached this  agreement,

12  Your Honor.  It materially breached this contract pre --

13         THE COURT:  Well, I don't think that they dispute

14  that.

15         MR. STRNISTE:  -- pre-petition --

16         THE COURT:  Right.

17         MR. STRNISTE:  -- and by breaching this agreement,

18  they can't now say, oh, the terms of final payment never

19  occurred, so, therefore, the retainage should not have been

20  released.  The retainage is due Schimenti -- it's Schimenti

21  Construction's property.  If there is a termination of this

22  agreement, a breach of this agreement, or a completion of the

23  project, that retainage comes back to Schimenti, so it could

24  pay its subcontractors and suppliers.  It's Schimenti's

25  property.

1        THE COURT:  Well, how does it -- I understand your

2   concept that it was earned by Schimenti, and that they were due

3   this money.  That doesn't bother me at all.  That makes good

4   sense to me.  Where I have a problem is figuring out how you

5   claim that it was -- you had an ownership interest in the

6   property.  Isn't it merely a debtor-creditor  relationship?

7        MR. STRNISTE:  Not at all, Your Honor.  It is a

8   debtor-creditor relationship for the $458,000 that was invoiced

9   with this invoice, but it's not a debtor-creditor relationship

10  for the monies that were withheld from previous invoices that

11  were earned.  Throughout the course --

12       THE COURT:  Well, why was the 458,000 any less earned

13  than the prior retainage?

14       MR. STRNISTE:  This was the invoice for the 458.

15       THE COURT:  I understand.

16       MR. STRNISTE:  So for -- so if this hadn't been the

17  final invoice, you know, there would be additional work to be

18  done, what would've happened is the amount that was sought in

19  the invoice would've been paid, but the other earned money that

20  constituted retainage -- earned money would've been held and

21  set aside and detailed within the app.  That's what happened

22  throughout the whole course of construction.  Every time an

23  application for payment was submitted, they figured out how

24  much work Schimenti did, how much was earned, and from the

25  earned amount -- because once it's earned, it belongs to

1  Schimenti.  It's it property.

2          THE COURT:  That's where I'm having a problem.  Why?

3          MR. STRNISTE:  Because --

4          THE COURT:  Why any different than somebody that sold

5  widgets to Circuit City and Circuit City took their widgets,

6  they fully performed, and they said you owe us the money for

7  our widgets now, and they don't get paid?  How is it any

8  different?

9          MR. STRNISTE:  Because it's security.  Using Your

10 Honor's widget example, if someone made widgets and sold them

11 to Circuit City and they didn't get paid for all of the

12 widgets, well, I can see that's an unsecured claim.  That's a

13 commercial relationship.  But what if they held that -- what if

14 they were furnished with the widgets -- they got the widgets

15 and they paid everything but 10 percent and decided they wanted

16 to put this 10 percent aside in trust and just hold it to

17 guarantee that those widgets were going to work, and they would

18 give it back, you know, as long as the widgets did whatever

19 they -- the widgets were supposed to do?

20          That's a situation we have here, where we have

21 Schimenti Construction earning, you know, a percentage of money

22 every pay application, earning, it belongs to Schimenti, and

23 now Circuit City comes along.  We're going to hold 10 percent

24 of that earned money from you, Schimenti, to make sure that you

25 perform, to make sure, Schimenti, that you pay your

 1    subcontractors and suppliers.  Because, remember, Schimenti is

 2    a conduit.  Any money that comes from Circuit City to Schimenti

 3    has got to be passed down to subcontractors and suppliers.  If

 4    Schimenti doesn't pay its subs and suppliers, Circuit City

 5    wants to be able to say, well, we've got this retainage.  We're

 6    going to now use it.

 7           See, Circuit City has more of a contingent right in

 8    the retainage than anything else.  They don't have an ownership

 9    interest in the retainage.  They're holding that money as

10    security to make sure Schimenti performs all of its

11    obligations, and in this case Schimenti did perform all of its

12    obligations.

13           But, Your Honor, there are so many facts that Circuit

14    City's brought in to their motion to dismiss, that we dispute,

15    that we think are just dead wrong, and we want to take

16    discovery.  We've got a colorable -- we've got a good claim

17    here.  We've got a very thorough complaint.  We attached a part

18    of the contract.  We attached this application for payment,

19    which highlights and is very specific about what monies are

20    retainage, what monies came from earned funds.  I mean we've

21    met our burden here on this motion to dismiss, Your Honor.

22           THE COURT:  Okay, well, then I want you to tell me

23    this.  What are the facts -- because I don't see the word trust

24    used in here -- in the contract, what are the facts that you're

25    relying on to plausibly state a cause of action for an express

**J&J COURT TRANSCRIBERS, INC.**

1 trust?

2       MR. STRNISTE:  Your Honor, the standard for express

3 trust is very clear.  We've got Virginia law here.  The

4 contract dictates Virginia law.  The <u>Peal vs. Luther</u> is cited

5 in there.  "Created when the parties affirmatively manifest an

6 intention that certain property be held in trust for the

7 benefit by a third party."  We're not --

8       THE COURT:  Where do I have that intention?

9       MR. STRNISTE:  Your Honor, we're not -- it's a

10 factual issue.  We're not locked in by this agreement.  There's

11 nothing in this agreement that says they weren't supposed to

12 hold it in trust.  In fact, our argument is that this payment

13 application, which has retainage from earned funds on a

14 separate line segregated and set aside, indicates that that was

15 their intention, but I think we can easily get a hold of some

16 of their policy and procedure manuals, where we're going to

17 find information dictating that.  I think we're going to be

18 able to ask their construction professionals -- keep in mind

19 they've got a whole construction department.  They're almost in

20 the business of construction as much as they are selling TVs,

21 Your Honor.  They're across the whole country doing this.

22       So I mean I think if we take -- we need to take more

23 discovery to prove this.  We don't have to prove it at this

24 level.  All we've got to do is allege, you know, allegations

25 that --

1              THE COURT:  Plausible facts.

2              MR. STRNISTE:  -- are plausible --

3              THE COURT:  Okay.

4              MR. STRNISTE:  -- and I think we've done that, Your

5    Honor.

6              THE COURT:  Well, can you allege that there was a

7    manual that, you know -- then say these are the words that were

8    used and this is what was done?

9              MR. STRNISTE:  I don't have the manual.  I suspect

10   there's a manual.  I mean they have a construction department.

11   I've asked for a lot of documents I haven't received in

12   connection with a Rule 2004 motion.

13             THE COURT:  Well, how is that any different than the

14   Iqbal case where I mean you had all of those allegations that

15   were raised against the Attorney General and such, and, you

16   know, but the Court said no, that's not enough?  You have to

17   suggest some facts.  You can't just go on your fishing

18   expedition at this point to go and develop that.

19             MR. STRNISTE:  Well, in that case, Your Honor, the

20   Court cautioned trial judges that when there are well pled

21   factual allegations, they need to assume their veracity and

22   determine whether they plausibly give rise to entitlement to

23   relief.

24             THE COURT:  I agree, and that's what I'm asking you.

25   Where is that?

1          MR. STRNISTE:  It's -- well, let me pull out the

2   complaint, Your Honor.

3          THE COURT:  I've got it right here in front of me.

4          MR. STRNISTE:  In response to your question, the

5   first thing which we just ran through was the contract.  I

6   believe there's language in the contract supporting a trust

7   theory.  The payment provisions in the contract which detail

8   how the retainage is going to be withheld in addition to the

9   retainage provisions, the --

10          THE COURT:  You're talking about 6.3.

11          MR. STRNISTE:  I'm talking about -- it's 6.3 or 6.2.

12  I'm talking about the monthly application process, which is a

13  different paragraph, Your Honor.  That paragraph is 6.2 and

14  6.3.  There's also provisions in the document, Your Honor, that

15  require Schimenti to pay its subcontractors and suppliers.  The

16  whole document taken as a whole supports the intention of the

17  parties that these retention funds were going to be taken away

18  from earned proceeds, set aside, held in trust to guarantee

19  Schimenti's performance on the project.  The whole contract as

20  a whole does that, Your Honor, including documents that we

21  don't -- might not have in front of us, including the

22  applications for payment.  We don't have the universe of the

23  documents in this case before us today.  And the complaint also

24  alleges a cause of action for a constructive trust.

25          THE COURT:  I was going to get to that in a minute.

1          MR. STRNISTE:  Oh, okay.

2          THE COURT:  I was just trying to deal with the

3   express trust first.

4          MR. STRNISTE:  Okay.  And I think this case, Your

5   Honor, is -- you know, as we had some discussion about the Land

6   America case, and Your Honor made a good point.  I mean there's

7   nothing in the contract.  If we were just focused on the

8   contract, there's nothing in the contract that says that the

9   parties aren't creating a trust, and that was how Land America

10  can be easily distinguished from this case.

11         But in the complaint, if you look at the paragraphs

12  in the factual background, we get into industry custom, Your

13  Honor, and we cite a case in our brief as to why that can be

14  considered by the Court.  In many states, Your Honor, there's -

15  - they take the common law regarding trust retainage issues and

16  they build it into statute.  New York has a trust fund statute

17  that captures all of this that basically says the contract

18  proceeds, retainer, that sort of thing, that's trust for the

19  subs and suppliers, because if that money's not released to

20  Schimenti, then Schimenti could conceivably on the hook to have

21  to pay its subs and suppliers the retainage without ever

22  receiving the retainage from Circuit City.

23         THE COURT:  Now what is the law that this contract's

24  supposed to be construed under?

25         MR. STRNISTE:  This contract is construed under

1  Virginia law, Your Honor, and that's why we've been focused on

2  the trust cases -- the express trust cases and the constructive

3  trust cases in Virginia, which I think have some favorable law

4  dealing with these issues.  And I mean in terms of the -- so

5  what you really need on the express trust argument, Your Honor,

6  is an affirmative intention by and between the parties that the

7  proceeds will be held in trust.  It's -- you know, it's not

8  about the contract.  It's not just the contract.

9         There was something in the contract that said, like

10  Land America, you know, these aren't intended to be trust

11  funds.  You know, these are -- we don't have any interest in

12  them.  If that was in this agreement, it would be an open and

13  shut case just like Land America was.

14         But in this case we've got -- you know, the contract

15  has language that arguably supports this trust theory, so I

16  think we've got to in this case go beyond that, and the law is

17  clear in Virginia that we will go beyond it, and we'll look at

18  what the intention of the parties is.  That's a factual issue.

19         I'm entitled to take some discovery on that, Your

20  Honor, to  depose the project manager, depose the head of

21  construction at Circuit City to find out what was his

22  intention.  I mean that's a factual issue.  It's not to be

23  determined here on

24  a motion to dismiss.

25         THE COURT:  All right.  Let's talk about constructive

**J&J COURT TRANSCRIBERS, INC.**

1   trust.  How are the allegations that you've alleged amount to a

2   cause of action for constructive trust as opposed to just

3   breach of contract?  And in conceding, you know, that there was

4   -- the contract was clearly breached by the debtor for sake of

5   our argument.

6           MR. STRNISTE:  Okay, Your Honor.  The <u>Leonard</u> case,

7   "You have a constructive trust whenever one holding property is

8   subject to an equitable duty to convey it on the ground that

9   would be unjustly enriched if he were permitted  to retain it,"

10  and that's what we've got here.  Circuit City would be unjustly

11  enriched, because these proceeds were earned.  Circuit City got

12  the benefit of the work.  That Circuit City store was done.

13          No one ever -- it didn't open for business, but it

14  was done, and there's nothing more to do on it.  You know, all

15  the fixtures were in.  It was finished.  Circuit City got that

16  benefit.  They strung my client along as they were leading up

17  to the filing of the bankruptcy.  Keep working.  You'll get

18  paid.  Keep working.  You'll get paid.

19          And they received the benefit of Schimenti's work.

20  Schimenti, you know, had entered into sub -- separate

21  subcontracts.  The subcontractors performed the work.

22  Schimenti had to pay some of the subcontractors for money that

23  it may not ever get paid from Circuit City, so there's clearly

24  an unjust enrichment here, and I think we've  alleged that in

25  the complaint.  It's in the complaint.

1              If you look at Paragraph 9, "We allege 10 percent

2    retainage was to be held in trust to assure Schimenti's

3    performance."  Paragraph 10, "We allege Schimenti incurred

4    substantial costs in completing the work."  Paragraph 10, "We

5    also allege that Schimenti entered into these numerous

6    subcontracts."  Paragraph 10, "We also allege that Schimenti

7    Construction may face potential liability to subcontractors for

8    the retainage funds," and Paragraph 10, "We allege Schimenti

9    completed all of its work on the project."  We attach the

10   application for payment, Your Honor, to the complaint, which

11   indicates that Schimenti completed all of its work on the

12   project.  I think we've gone well beyond plausible in this

13   case.

14             I won't spend much -- any time, Your Honor, on the

15   other claims, because I agree with Mr. Foley that this all

16   really centers around the trust theories, the declaratory

17   judgment we're seeking from Your Honor.  But I will say, you

18   know, with respect to the injunction claim, we've got the same

19   concern that the attorney before us had.  We don't want the

20   plan to be approved without some kind of mechanism to protect

21   our trust monies, so that they're not disbursed to  other

22   creditors.  We've objected to the plan, and we'll follow that

23   process through, but we also think an injunction is an

24   appropriate remedy, and we believe that Your Honor has the

25   authority and power to order -- to craft such an order.  Unless

1  Your Honor has any further questions -- if Your Honor does, I'm

2  happy to address them.

3              THE COURT:  No, thank you very much.

4              MR. STRNISTE:  Thank you, Your Honor.

5              THE COURT:  I appreciate it.

6              MR. FOLEY:  I'll be brief, Your Honor.  We don't have

7  a whole lot to add to what we've put in the pleadings and some

8  of the questions that Your Honor's already asked, but just to

9  reiterate a couple of points.  The questions that the Court has

10 asked about the pleading standard, we have -- we still have the

11 same questions.

12             I mean counsel just recited Paragraphs 9 and 10 to

13 the Court, and I go back and I read the language from the

14 Twombly case, which says that the plaintiff must, "nudge their

15 claims across the line from conceivable to plausible."

16             The Court also ruled also ruled that, "A plaintiff's

17 obligations to provide the grounds of his entitlement to relief

18 requires more than labels and conclusions and a formulaic

19 recitation of the elements of a cause of action will not do."

20             And in Iqbal they actually had some factual

21 allegations, but they said that the sheer possibility that a

22 defendant has acted unlawfully won't be sufficient, because the

23 plausibility test has to follow on well pled facts.  We don't

24 even have well pled facts here, Your Honor.  Your Honor asked

25 that question several times.  They attach a contract that

1  doesn't provide for the facts necessary to satisfy the pleading

2  standard.

3       In this case, unlike <u>Twombly</u> and <u>Iqbal</u>, we did have a

4  2004 exam motion pending, and it was resolved and withdrawn,

5  because we provided thousands of pages of documents from our

6  construction files to counsel, thousands of pages of documents,

7  everything they wanted.  The only thing I don't think they got

8  was e-mails, because we hadn't been able to pull those.  It

9  would've took more time to pull those, but they certainly have

10 the other side of those e-mails.

11      So if there was any factual basis upon which to

12 allege a trust relationship, which they haven't alleged,

13 again, Paragraph 9, you know, "Stipulated contract provides

14 that the contractor to retain 10 percent to be held in trust."

15 Where in the contract does it say that?  "In completing its

16 obligations they incurred costs?"  We breached the contract.

17 We admit we breached the contract.  We breached a lot of

18 contracts.  We owe a lot of people a lot of money when we filed

19 bankruptcy.

20      They have a claim in the case.  We'll object to that

21 claim or we'll resolve it one way or the other.  We have a

22 claim against them for preferential transfer.  We'll resolve

23 that as part of that adversary proceeding.  But you've heard

24 nothing that gets past the pleading standard.  There's nothing

25 in the contract that gets past the pleading standard, and

1  there's no specific facts in this complaint that satisfy the

2  pleading standard, and we think the Court should dismiss the

3  complaint, because if they had something, you would presume it

4  would be in the complaint.

5          THE COURT:  All right.  Thank you, Mr. Foley.

6          MR. STRNISTE:  Nothing further, Your Honor.

7          THE COURT:  All right.  Thank you.  All right.  The

8  Court has before it the debtor's motion to dismiss the

9  complaint if Schimenti under Rule 12(b)(6).  The Court is going

10 to grant that motion.  The Court does not think that

11 sufficient facts have been alleged to a plausible set of facts

12 as required by the new standard under _Iqbal_ and _Twombly_ have

13 been alleged other than just conclusory type of pleading that

14 there was a trust.

15         The Court has reviewed the contract.  I don't see

16 anything in the contract that would give rise to suggestion

17 that it was a trust relationship.  Rather, it appears to be a

18 rather garden variety construction contract.

19         The -- now, the Court is going to grant the debtor's

20 motion, but that's with leave to the plaintiff to amend its

21 complaint to allege specific facts to be able to meet the

22 heightened pleading standard.  If there are other elements of

23 this contract that I don't have before me, then you can allege

24 those -- those provisions, but the Court is certainly going to

25 abide by the standard -- plausible pleading standard provided

1  by Twombly and by Iqbal in the Supreme Court's most recent

2  pronouncements and as the Fourth Circuit has just very recently

3  admonished.

4           So that's the Court's ruling.  Any question regarding

5  the Court's ruling?

6              UNIDENTIFIED ATTORNEY:  No, thank you, Your Honor.

7              UNIDENTIFIED ATTORNEY:  No, Your Honor.

8              THE COURT:  And, Mr. Foley, I'd ask you please submit

9  an order to that effect.

10             MR. FOLEY:  We will, Your Honor.  There's nothing

11 left on the agenda today, Your Honor, but just to advise the

12 Court with respect to the scheduled mediation with respect to

13 the plan issues with the Committee, we have those scheduled for

14 -- with Judge Santoro at 1:30 this Wednesday in my office in

15 Norfolk to carry over throughout Thursday, and we'll obviously

16 -- Judge Santoro will report back to you as to the outcome of

17 that -- those efforts.

18             THE COURT:  Well, and hopefully, favorably.  Well,

19 one thing in the order, if you would please confer with counsel

20 and agree upon a date upon which the amended complaint would

21 need to be filed --

22             MR. FOLEY:  We will, Your Honor.

23             THE COURT:  -- and just include that in the order.

24             MR. FOLEY:  We will, Your Honor.

25             THE COURT:  All right.  Thank you.


                    **J&J COURT TRANSCRIBERS, INC.**

1    MR. FOLEY:  Thank you.

2    COURT CLERK:  All rise.  Court is now adjourned.

3        * * * * *

4     **C E R T I F I C A T I O N**

5    I, PATRICIA C. REPKO, court approved transcriber,

6 certify that the foregoing is a correct transcript from the

7 official electronic sound recording of the proceedings in the

8 above-entitled matter, and to the best of my ability.

9

10 /s/ Patricia C. Repko

11 PATRICIA C. REPKO

12 J&J COURT TRANSCRIBERS, INC.   DATE:  July 26, 2010

13

14

15

16

17

18

19

20

21

22

23

24

25

       **J&J COURT TRANSCRIBERS, INC.**