UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                      .      Case No. 08-35653(KRH)
                            .
                            .
CIRCUIT CITY STORES,        .
INC.,                       .      701 East Broad Street
                            .      Richmond, VA 23219
                            .
          Debtor.           .      July 22, 2010
. . . . . . . . . . . . ..          10:06 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:             McGuire Woods, LLP
                            By:  DOUGLAS FOLEY, ESQ.
                            9000 World Trade Center
                            101 W. Main Street
                            Norfolk, VA 23510

                            McGuire Woods, LLP
                            By:  SARAH H. BOEHM, ESQ.
                            One James Center
                            901 East Cary Street
                            Richmond, VA 23219

                            Skadden Arps Slate Meagher & Flom LLP
                            By:  GREGG M. GALARDI, ESQ.
                                 IAN S. FREDERICKS, ESQ.
                            P.O. Box 636
                            Wilmington, DE 19899


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES:

| | |
|---|---|
| For Graphic<br>Communications: | Bean, Kinney & Korman, P.C.<br>By:  THOMAS W. REPCZYNSKI, ESQ.<br>2300 Wilson Boulevard<br>Suite 700<br>Arlington, VA 22201 |
| For Mitsubishi and the<br>Insurance Company of<br>the State of<br>Pennsylvania: | Mercer Trigiani, LLP<br>By:  PHILIP CLARK BAXA, ESQ.<br>16 South Second Street<br>Richmond, VA 23219 |
| For Mitsubishi: | King & Spalding<br>By:  JOHN F. ISBELL, ESQ.<br>1180 Peachtree Street NorthEast<br>Atlanta, GA 30309 |
| For Creditors'<br>Committee: | Tavenner & Beran, PLC<br>By:  LYNN L. TAVENNER, ESQ.<br>20 North Eighth Street<br>Second Floor<br>Richmond, VA 23219 |

TELEPHONIC APPEARANCES:

| | |
|---|---|
| For the Insurance Co.<br>of the State of<br>Pennsylvania: | SilvermanAcampora LLP<br>By:  LON J. SEIDMAN, ESQ.<br>100 Jericho Quadrangle<br>Suite 300<br>Jericho, NY 11753 |
| For Ryan, Inc.: | Redmon, Peyton, & Braswell, L.L.P.<br>By:  ROBERT M. MARINO, ESQ.<br>510 King Street<br>Suite 301<br>Alexandria, VA 22314 |
| | Cantey Hanger LLP<br>By:  BRUCE W. AKERLY, ESQ.<br>1999 Bryan Street, #3330<br>Dallas, TX 75201 |
| For Creditors'<br>Committee: | Pachulski Stang Ziehl & Jones, LLP<br>By:  JEFFREY N. POMERANTZ, ESQ.<br>10100 Santa Monica Blvd., 11th Floor<br>Los Angeles, CA 90067 |

- - -

**J&J COURT TRANSCRIBERS, INC.**

1           COURT CLERK:  All rise.  United States Bankruptcy

2  Court for the Eastern District of Virginia is now in session.

3  The Honorable Kevin R. Huennekens is presiding.  Please be

4  seated and come to order.

5           COURTROOM DEPUTY:  In the matter of Circuit City

6  Stores, Incorporated, hearing on Items 1 through 46 as set out

7  on debtor's proposed agenda.

8           MR. FOLEY:  Good morning, Your Honor.  Doug Foley

9  with McGuire Woods on behalf of the debtors.  Also with me from

10 my firm is Sarah Boehm.  With me at counsel table is Gregg

11 Galardi and Ian Fredericks from Skadden Arps.  From the company

12 today, Your Honor, is Kay Bradshaw who's vice president and

13 controller, and Jeff McDonald who is vice president and

14 treasurer of the company.

15          Your Honor, we have 45 items on the agenda, but we

16 only have a couple matters that will need the Court's attention

17 this morning.  And the -- we've made a lot of progress to

18 report to the Court on a variety of matters.  Just to take the

19 matters in order on the agenda, if the Court please.  Matter

20 Number 1 and 2, this is the Motorola 503(b)(9) claim as well as

21 the General Instruments' 503(b)(9) claim motion.

22          We're pleased to report to the Court that we have

23 finally been able to resolve those matters.  We filed a

24 stipulation documenting the settlement.  The deadline to object

25 is the 27th of July after which time the settlement will be

4

1   finalized.  We don't anticipate any objections.

2            Item Number 3, Your Honor, is the Towne Square late

3   claim motion.  We've also settled and filed a stipulation with

4   respect to that motion.  It can be removed from the docket.

5   Item Number 4, Your Honor, is a carryover from our last

6   hearing.  This is -- was our motion to pay certain

7   administrative claims.  We are withdrawing that motion without

8   prejudice at this time.

9            THE COURT:  Oh, all right.

10           MR. FOLEY:  Item Numbers 5 and 6, Your Honor, these

11  are the Madcow motions, one for an admin claim and one for a

12  503(b)(9) claim.  I'm pleased to report to the Court we finally

13  settled those, as well.  We filed a documented stipulation.

14  The time period to object to that expires on August 4th and we

15  don't anticipate any objections.

16           THE COURT:  Okay.

17           MR. FOLEY:  Item Number 7, Your Honor, is the motion

18  by Site A to allow a late file claim.  We're exchanging

19  documents and information with their counsel, Mr. Campson, and

20  are going to try to see if we can't reach a resolution, but

21  they've requested and we've agreed to adjourn their motion

22  until the August 31st hearing date.

23           THE COURT:  All right.  Do you -- is that going to be

24  a status that day or are we going to go forward with that?

25           MR. FOLEY:  We anticipate that will be a status, Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor, because we're -- we think we'll be able to resolve it

2  and -- prior to that date.

3        THE COURT:  All right.  Very good.

4        MR. FOLEY:  Item Number 8, this is our objection to

5  the New York State Department of Tax claim.  We're in the

6  process of documenting a settlement with respect to that

7  objection, so we would ask for a short adjournment of our

8  objection until the August 4th hearing date.

9        THE COURT:  All right.

10       MR. FOLEY:  Item Number 9, Your Honor, is a new

11  motion filed by Metra Electronics for a late file claim.  We're

12  beginning to work with them on trying to resolve that, but we

13  would ask that that matter be adjourned until the August 31st

14  hearing date.

15       THE COURT:  It will be.

16       MR. FOLEY:  Item Number 10 and 11, Your Honor.  Item

17  Number 10 is our objection to Quebecor World (USA)'s claim.

18  And Item Number 11 which we show was adjourned, but I'd like

19  the Court to take that out because I don't believe there's any

20  objections to it.  It is our motion to seal certain exhibits at

21  the request of Quebecor.

22       Quebecor has asked to have their matter adjourned

23  until the August 4th hearing date pending the resolution of the

24  matter that will go forward today which is Graphic

25  Communications.  They're very similar issues.  And so, in order

6

1  to save time, cost and money we've agreed to adjourn Item

2  Number 10 until the August 4th hearing date.  But, with respect

3  to Item Number 11, which is the motion to seal certain

4  exhibits, we would ask the Court to grant that motion.  There's

5  been no objections.

6          THE COURT:  Do I have copies of those exhibits at

7  this point?

8          MR. FOLEY:  I believe we have submitted them.  If we

9  haven't we can certainly have that provided to chambers today.

10          THE COURT:  All right.  Well, I just wanted to know

11  where they physically were.  I certainly will seal them --

12          MR. FOLEY:  Okay.

13          THE COURT:  -- and grant your motion.

14          MR. FOLEY:  All right.  Thank you, Your Honor.  Items

15  Number 12 we could pass over.  Item Number 12 actually is a

16  similar motion with respect to Graphic Communications to seal

17  their exhibits.  We would ask the Court to grant that, as well.

18          THE COURT:  All right.  And obviously I have those

19  and they will be sealed.

20          MR. REPCZYNSKI:  Your Honor, Thomas Repczynski on

21  behalf of Graphic.  We have no objection and we'd ask that

22  those be sealed.

23          THE COURT:  All right.

24          MR. FOLEY:  Your Honor, Item Number 13 is our motion

25  to extend the time to remove certain actions under 2080 U.S.C.

7

1 1452 and Federal Rule of Bankruptcy Procedure 9027.  The motion

2 is not been objected to.  It request similar relief as we've

3 sought in the past to extend that deadline until October 4th or

4 30 days after an order is entered granting motion for relief

5 from the automatic stay.

6         THE COURT:  Okay.  That'll be granted.

7         MR. FOLEY:  Your Honor, if we could pass over Item

8 Number 14 for the moment.  This is the fifth omnibus objection

9 and -- in which the Graphic Communications claim objection will

10 be addressed.

11         THE COURT:  All right.

12         MR. FOLEY:  If we could pass over for the moment

13 Items Number 15 through 39.  Ms. Boehm will be addressing those

14 shortly.

15         THE COURT:  Okay.

16         MR. FOLEY:  Item Number 40.  This is our adversary

17 proceeding against USDR and Signature.  We have been working

18 with Mr. Epps and counsel for Signature who is the party that

19 was in default and has a motion -- we have a motion to default

20 them to try to resolve this consensually.  We are very close to

21 a settlement.  In fact, we may have -- we may reach a

22 settlement this morning.  I was talking to Mr. Epps last night,

23 so we think we are very close.  We're just waiting to hear back

24 from their client.  So, we would ask that this matter be

25 adjourned until the August 4th hearing date, Your Honor, so

1  that we can hopefully document it before we have to address the

2  default motion.

3              THE COURT:  All right.

4              THE COURT:  Item Number 41, Your Honor.  Counsel is

5  here for Mitsubishi and this is the pretrial conference with

6  respect to our complaint.  What we need to do, Your Honor, is

7  pick a trial date six months out or so.  We think that the

8  trial will be no more than a one-day trial a this point.  We

9  also need to schedule, however, the motion to dismiss Count 6

10 of the complaint which we'd like to set for the August 23rd

11 hearing date.  And as far as calendar goes, we'll obviously

12 defer to the Court as to when the Court has a day available.

13 Probably in January is what we're thinking.

14             THE COURT:  All right.  Very good.  Mr. Baxa.

15             MR. BAXA:  Good morning, Your Honor.  It's Phil Baxa,

16 local counsel for Mitsubishi and for the Insurance Company of

17 the State of Pennsylvania which is a co-defendant.  And I have

18 John Isbell here from the King & Spalding firm who is lead

19 counsel for Mitsubishi.  Also on the phone I believe is a

20 gentleman named Lon Seidman who is counsel for the insurance

21 company, as well.

22             THE COURT:  Good morning, Mr. Isbell.

23             MR. ISBELL:  Good morning, Your Honor.  Mr. Foley and

24 I spoke this morning and we've reached agreement with the

25 August 23rd date for the motion to dismiss.  I also understand

1    that the debtor anticipates filing a motion for summary

2    judgment as to one of the affirmative defenses shortly and that

3    would also be set for the same date.  And that is agreeable

4    with us, as well.  On trial dates, we were talking about that,

5    and I believe that a February trial date would actually work

6    best for us.  If the Court has time in February that would be

7    ideal, I believe.

8          MR. FOLEY:  We have no objection to that, Your Honor.

9    And I did fail to mention the motion for partial summary

10   judgment that we intend to file and have heard on the August

11   23rd hearing date will address the affirmative defense of

12   503(b)(9) claims and whether or not that can be used for new

13   value defense or a preference action.

14         And so, it's a very narrow legal issue.  But, we

15   think that would go a long way to getting things resolved.  And

16   we've also discussed the possibility in any event potentially

17   mediating this one prior to the trial date.  So, we have no

18   problem with a February trial date, Your Honor.

19         THE COURT:  All right.  Very good.  Okay.  The Court

20   was looking at February 7 and 8.  How many days do you need to

21   try this, just one?

22         MR. ISBELL:  We believe one day, Your Honor.

23         THE COURT:  Okay.  Well, how about February 8 then?

24         MR. FOLEY:  That's fine with the debtors, Your Honor.

25         THE COURT:  Okay.

1            MR. ISBELL:  That works, Your Honor.  And the -- we

2    have made significant progress in the last couple of months of

3    reconciling the claims, Your Honor, all the (indiscernible).

4    So, we think that when we get to trial, if a trial is

5    necessary, we're hopeful that either a settlement, and once the

6    parties or a mediation will result in a settlement, but if we

7    get the trial we anticipate that the -- probably the only

8    witnesses, but that would be called would be expert witnesses

9    on preference defenses.

10            THE COURT:  All right.  Very good.  The -- if you do

11   decide to mediate it do it well in advance so that we don't

12   lose the trial date because the Court's not inclined to extend

13   the trial date.  I will issue my normal pretrial order.

14            MR. FOLEY:  That's fine, Your Honor.  Thank you.

15            THE COURT:  Fine.

16            MR. ISBELL:  Thank you, Your Honor.

17            THE COURT:  We'll hear the motions on the 23rd.

18            MR. FOLEY:  Okay.  Thank you, Your Honor.

19            MR. ISBELL:  Thank you.

20            MR. FOLEY:  Now, Items Number 42 and 43 on the docket

21   is the complaint by Ryan and our motion to dismiss the

22   complaint without prejudice that the Court heard last time.  I

23   believe counsel is on the phone.  The Court recalls raising

24   concern about the rightness of the complaint.  And at the

25   conclusion of the last hearing we discussed the possibility of

                    **J&J COURT TRANSCRIBERS, INC.**

1 including some language and any plan confirmation order that

2 would preserve Ryan's right to argue the ownership question of

3 if and when any refund is -- materializes that they have an

4 ownership interest in that race.

5 And we've proposed language that would state, and

6 I'll read it into the record, that "Notwithstanding anything

7 contained herein to the contrary," this would be in the

8 confirmation order, "subject to any subsequent order of the

9 Court the transfer and conveyance of all assets of each of the

10 debtors and the estates to the liquidating trust on the

11 effective date shall be without prejudice to the rights of Ryan

12 to seek determination that it owns or possesses an interest or

13 portion thereof in certain contingent assets only if and after

14 they become assets and the right for such determination shall

15 be and hereby is preserved in its entirety and jurisdiction of

16 such termination is specifically retained by the bankruptcy

17 court."

18 We proposed that language to counsel for Ryan to

19 satisfy that concern that they raised and the Court raised at

20 the last hearing.  Apparently that's unacceptable to them at

21 this point, but -- and so, we intend to put that language in

22 the confirmation order no matter what.  At this point I think

23 both parties would simply ask the Court to make a ruling on the

24 motion to dismiss.

25 THE COURT:  All right.  Is there --

1          MR. MARINO:  Good morning, Your Honor.  Robert Marino

2     appearing on behalf of Ryan, Inc.  And with me also on the

3     telephone is Bruce W. Akerly of the law firm of Cantey Hanger

4     who is also -- who had previously been admitted pro hac vice.

5     We both very much appreciate the Court's accommodating us to

6     participate telephonically.  I'll defer to Mr. Akerly.

7          THE COURT:  Okay.  Mr. Akerly, you wish to address

8     the Court?

9          MR. AKERLY:  Good morning, Your Honor.  I think Mr.

10    Foley has accurately stated the status, but I will let the

11    Court know that we have not commented on his language.  If you

12    will recall, and my recollection is after the last hearing that

13    was on last Monday that we agreed to go back to the clients to

14    determine if the clients would be amenable to placing language

15    in a plan or otherwise that would essentially preserve the

16    ownership issue for a later date.

17         My client after discussing it with them determined

18    that they were not amenable to that process and would like the

19    Court to rule on the motion to dismiss.  And I think -- I

20    believe I sent a letter to chambers to that effect, Your Honor,

21    so I believe the only thing before the Court now at this time

22    would be the ruling -- the necessary ruling on the motion to

23    dismiss.

24         THE COURT:  All right.  Thank you, Mr. Akerly.  And

25    the Court obviously is very familiar with this matter.  I've

13

1   read all of the papers in this case.  I did receive your

2   subsequent correspondence, Mr. Akerly.  The Court is prepared

3   to rule.

4           The ruling of the Court is, I'm going to dismiss the

5   complaint for a lack of ripeness.  I don't think that it's ripe

6   for the Court to address at this time.  My concern at the last

7   hearing was the preservation of the claim so that it

8   wouldn't -- the issue wouldn't be precluded as a result of plan

9   confirmation.

10          I am comfortable with the language that's been

11  proposed by the debtor that they say that they're going to

12  insert into the plan that it will preserve any claim that Ryan

13  might have in the future if it ever does become ripe.  And so,

14  with that, that'll be the Court's ruling and, Mr. Foley, I'd

15  ask you to please present an order to the Court for its

16  consideration to that effect.

17          MR. AKERLY:  If I may, Your Honor.  I appreciate the

18  Court's ruling.  We have not had an opportunity to weigh in on

19  that language.  Have not weighed in on it.  And I just want to

20  make sure that I understand that that language is planned to be

21  put in a confirmation order as opposed to the plan of

22  reorganization, is that correct?  My point is, at some point I

23  would like an opportunity to object to the language that's

24  being proposed and/or ask that it be modified, you know, in

25  some respects for my -- to protect my client's rights.

1           THE COURT:  Okay.  Mr. Akerly, that oral motion is

2  overruled.  The Court is satisfied with the language that was

3  presented to the Court this morning.  The Court's made its

4  ruling, and so that's going to be the determination made by the

5  Court.

6           MR. AKERLY:  Thank you, Your Honor.

7           THE COURT:  You're welcome.

8           MR. FOLEY:  Thank you, Your Honor.  We'll submit a

9  proposed order for the Court's consideration.  The other items

10 on the agenda, Your Honor, Ms. Boehm will address, Items 15

11 through 39, and Mr. Galardi will address Items Number 14 which

12 is the Graphic Communication's matter, as well as the Items 44

13 and 45 which is the update with respect to the plan and the

14 mediation that we conducted.

15          THE COURT:  All right.  Thank you.

16          MR. MARINO:  Excuse me, Your Honor.  May we be

17 excused from the hearing?

18          THE COURT:  Yes, you may, Mr. Marino.  Thank you.

19          MS. BOEHM:  Good morning, Your Honor.  Sarah Boehm on

20 behalf of the debtors.  Item 14 on the agenda is the debtor's

21 fifth omnibus objection.  We only have one remaining claim in

22 omni five and that is Graphic Communications, Inc.  And Mr.

23 Galardi will be addressing the substantive argument which will

24 drop down to the end for the contested matters.

25          THE COURT:  All right.  That would be appropriate.

**J&J COURT TRANSCRIBERS, INC.**

1           MS. BOEHM:   Item 15 is the debtor's seventh omnibus

2   objection to certain late claims.  We have noticed a hearing to

3   go forward on the merits with respect to Mr. Dino Bazdar, so

4   we'll drop that matter to the end of the docket for a contested

5   hearing.  And the other remaining -- one other remaining

6   claimant in omni seven we'll ask the Court to adjourn for

7   status on August 4th at 2 p.m.

8           THE COURT:   What's the remaining claimant?

9           MS. BOEHM:   Mr. (indiscernible).

10          THE COURT:   Okay.  Very good.

11          MS. BOEHM:   Item 16 is the debtor's eighth omnibus

12  objection to late claims.  We have three claims remaining in

13  that and we would ask the Court to adjourn that for status on

14  August 23rd at 2 p.m.

15          THE COURT:   It'll be adjourned.

16          MS. BOEHM:   Item 17 is the ninth omnibus objection to

17  the late claims.  We have notices for a hearing on the merits

18  with respect to Mr. Lyle Epps.  And we will drop that to the

19  end for a contested hearing and ask that the remaining

20  claimants be adjourned for status on August 23rd.

21          THE COURT:   Okay.  Adjourned to the 23rd.

22          MS. BOEHM:   Item 18 is the nineteenth omnibus

23  objection.  Mr. Foley referenced earlier the Motorola and

24  General Instrument stipulation that was filed resolved several

25  claims in omni 19.  The deadline to object to that stipulation

1  has not yet run and the other three remaining claims we ask to

2  adjourn to August 23rd at two o'clock.

3          THE COURT:  That'll be adjourned to the 23rd.

4          MS. BOEHM:  Items 19, 20, 21 and 22 are the debtor's

5  twentieth omnibus, twenty-second omnibus, twenty-third omnibus,

6  and the thirtieth omnibus.  We ask that all of those remaining

7  claimants be adjourned for status to August 23rd at two

8  o'clock.

9          THE COURT:  That'll be adjourned to the 23rd.

10         MS. BOEHM:  Item 22 -- oh, we did that.  Item 22 was

11 the thirtieth.  Item 23 is the thirty-first omnibus objection.

12 That includes PNY Technologies which is proceeding in

13 accordance with a scheduling order and the adversary

14 proceeding.  And the remaining claimants we would ask to be

15 adjourned to August 23rd.

16         THE COURT:  All right.

17         MS. BOEHM:  The debtors --

18         THE COURT:  Have we set the PNY Technologies

19 adversary proceeding for trial at this point?

20         MS. BOEHM:  We have.

21         THE COURT:  All right.  Thank you.

22         MS. BOEHM:  Item 24 is the thirty-third omnibus

23 objection.  We recently filed a stipulation with Lexmark

24 International resolving their claims.  And there is one

25 remaining claimant that we would ask to adjourn to August 23rd

                    **J&J COURT TRANSCRIBERS, INC.**

1  at two o'clock.

2            THE COURT:  And which claimant is that?

3            MS. BOEHM:  Sensormatic Electronic Corp.

4            THE COURT:  Thank you.

5            MS. BOEHM:  Item 25 is the thirty-fourth omnibus

6  objection.  That also included Motorola and General Instrument,

7  and assuming there are no objections their claims will be

8  resolved.  Audiovox is the one remaining claimant in that

9  objection and we would ask that that matter be adjourned to

10 August 23rd.

11           THE COURT:  Okay.  The Audiovox will be adjourned to

12 the 23rd.

13           MS. BOEHM:  Item 26 is the thirty-sixth omnibus

14 objection.  We would ask that all of those be adjourned to

15 August 23rd.

16           THE COURT:  Be adjourned to the 23rd.

17           MS. BOEHM:  Item 27 is the thirty-seventh omnibus

18 objection to the PAX claims.  We have recently filed

19 stipulations with Kitsap County, the City of Chesapeake, and

20 Escambia County.  And for some of those the objection deadline

21 has run.  Escambia County runs tomorrow.  For all other claims

22 we would ask that they be adjourned to August 23rd.

23           THE COURT:  Those will be adjourned to the 23rd.

24           MS. BOEHM:  Item 28 is the forty-third omnibus

25 objection.  There are only two claimants remaining in that

1  objection.  The claim of Rusty Santangelo (phonetic) has been

2  resolved.  There were no objections and that deadline has run.

3  We had noticed a hearing on the merits with respect to the

4  Tennessee Department of Treasury, however, they requested a

5  brief adjournment and we have agreed to adjourn that to August

6  4th at two o'clock.

7            THE COURT:  August 4th.  All right.

8            MS. BOEHM:  And that's for a hearing on the merits.

9            THE COURT:  Okay.

10           MS. BOEHM:  Item 29 is the forty-fourth omnibus

11  objection.  This also included Motorola and General Instrument.

12  If no objections are received by the 27th those will -- then

13  those objection will be fully resolved.

14           THE COURT:  All right.

15           MS. BOEHM:  Item 30 is the debtor's forty-ninth

16  omnibus.  Item 31 is the debtor's fiftieth omnibus.  We would

17  ask that all the claims in those be adjourned to August 23rd.

18           THE COURT:  All right.

19           MS. BOEHM:  Item 32 is the fifty-fourth omnibus

20  objection.  This had one remaining claimant, Mr. Gregg Nagi

21  (phonetic).  We have filed a stipulation resolving that

22  objection and the objection deadline runs tomorrow.  If there

23  are no objections then this objection will be fully resolved.

24           THE COURT:  All right.  Very good.

25           MS. BOEHM:  Item 33 is the sixtieth omnibus.  We

**J&J COURT TRANSCRIBERS, INC.**

1  would ask that all of those remaining claimants be adjourned to

2  August 23rd.

3              THE COURT:  All right.

4              MS. BOEHM:  Item 34 is the seventieth omnibus

5  objection.  We have filed a stipulation with Universal Display

6  and Fixtures.  The objection deadline runs tomorrow.  If there

7  are no objections that Universal will be resolved.  And for the

8  remaining claimants we would ask to be adjourned to August

9  23rd.

10             THE COURT:  All right.

11             MS. BOEHM:  Item 35 is the seventy-second omnibus

12 objection and we have submitted a supplemental order that has

13 previously been entered by the Court that fully resolve this

14 objection.

15             THE COURT:  All right.

16             MS. BOEHM:  Item 36 is the seventy-fourth omnibus

17 objection and we would ask that all of those matters be

18 adjourned to August 23rd.

19             THE COURT:  All right.

20             MS. BOEHM:  Item 37 is the seventy-sixth omnibus

21 objection.  There are three claims remaining that we would ask

22 to be adjourned to August 23rd.  And Item 38 is the

23 seventy-eighth omnibus objection and which has two remaining

24 claimants, so we would ask to be adjourned to August 23rd.

25             THE COURT:  All right.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. BOEHM:  Item 39 is the debtor's seventy-ninth

2   omnibus objection that seeks the disallowance of certain legal

3   claims.  This is on for status for the first time.  This

4   objection included 165 claims for approximately $56 million.

5   We did receive approximately 20 responses that are set forth on

6   Exhibit A.  We would ask the Court to disallow any claims for

7   which no response was received, and for any claimant who did

8   file a response we will adjourn this for status to the August

9   23rd hearing.

10          THE COURT:  All right.  That will be granted.

11          MS. BOEHM:  Thank you.  And that concludes the

12   general omnibus objection matters.  We do have omni 5, 7 and 9

13   with hearings going forward on the merits after the

14   confirmation status update.

15          THE COURT:  Okay.

16          MS. BOEHM:  Thank you.

17          THE COURT:  It sounds like you're making good

18   progress.

19          MS. BOEHM:  Thank you, Your Honor.

20          MR. GALARDI:  Your Honor, first on the confirmation

21   update.  As Your Honor knows and scheduled mediation for last

22   week, the parties met in Norfolk for two days with Judge

23   Santoro.  I know Your Honor has already heard this but for the

24   public record.  We are pleased to announce that we had mediated

25   our way to an agreement regarding the plan of reorganization

**J&J COURT TRANSCRIBERS, INC.**

1  between the committee, and so we will be proceeding with the

2  joint plan.

3       Your Honor, just to go back to one of the matters as

4  part of that, the administrative motion that we filed as Your

5  Honor may recall, we were not allowed to withdraw that without

6  committee consent.  I don't know if that was clear, but the

7  committee has consented that was one of the things that we, in

8  fact, resolved after we resolved the plan.

9       THE COURT:  I noticed Ms. Tavenner didn't jump up

10  when you --

11       MR. GALARDI:  I was hoping she would, but yes, it was

12  with their consent, so she didn't jump up -- I thought she

13  would jump up and say, yes, we've agreed to withdraw it.  You

14  were concerned that she would -- you can't do that, but we

15  have, so to speak, kissed and made up on this.  With respect to

16  the joint plan, Your Honor, I believe that you have been

17  provided separately with the terms of the agreement for

18  mediation.

19       THE COURT:  I have.

20       MR. GALARDI:  We've agreed with the committee not to

21  go into details, but suffice it to say that, (1) we are in the

22  process and today's a delivery date that we would be revising

23  various documents and deliver them to the committee.  They will

24  have a period to respond and to look at those comments.  And

25  then we have a period to revise those.

1          The idea is hopefully and subject to Your Honor's

2   calendar to have a confirmation hearing scheduled at the first

3   day Your Honor is available after September 6th.  I think that

4   poses an interesting question for Your Honor because I think we

5   have an omnibus scheduled for September 8th.  It begins at two.

6          THE COURT:  You do?

7          MR. GALARDI:  And also one later in the month.  The

8   day escapes me right now.  Again, scheduled at two.

9          THE COURT:  It's on the 27th I believe.

10          MR. GALARDI:  Your Honor, again, first available is

11   the 8th.  I don't know if Your Honor wants the full hearing on

12   that date or whether we wanted to schedule a separate date or

13   whether we wanted to put it to the end of September.  That's

14   the first question for Your Honor's scheduling.

15          Your Honor, also, just as it dawned on me, and the

16   September 8th is fine by us if that's available to Your Honor.

17   One of the issues and Your Honor may have seen it in the

18   stipulation is, there's going to be some -- I mean, since it's

19   been a year since the disclosure statement has been out there

20   we're going to update some numbers.

21          The debtors and the committee don't believe that that

22   requires a re-solicitation, but we are going to do that.  I

23   would hope that that would be on file the first week of August,

24   but after -- perhaps after our first hearing in August -- we

25   could proceed, and again this goes to Your Honor.  If Your

**J&J COURT TRANSCRIBERS, INC.**

1  Honor had concerns we're going to take the position that no

2  re-solicitation is required.

3          We think all of the information, though helpful and

4  useful, actually is very favorable to all of the creditors, and

5  so there's not a material downgrading of anybody's recovery,

6  indeed it's an upgrading of recoveries, and our idea is to get

7  that on, let's just say for the sake of argument, by August

8  15th.  That may influence Your Honor which September date.

9          Again, I have no objection to September 8th date, but

10  it may influence Your Honor how long you want that statement on

11  file and go to a confirmation hearing.  Again, we don't think

12  it's a material modification.  We will make that argument

13  either in a separate hearing if Your Honor wants it before we

14  go to confirmation or at the time of the confirmation.  I just

15  lay that out for Your Honor.

16          And I haven't discussed that with the committee.  It

17  just dawned on me this morning.  So, I think Mr. Feinstein or

18  Mr. Pomerantz may be on the call or Lynn can be on it.  But, I

19  put that for one of the things for Your Honor to consider

20  because I do think those documents should be on file no later

21  than August 15th which to me gives plenty of time for

22  September 6th, so we can make the argument and take the risk,

23  or I leave it to Your Honor.

24          The other thing about that stipulation, Your Honor,

25  is -- I'm sorry, one more thing.  You jumped up that time.

**J&J COURT TRANSCRIBERS, INC.**

1   Again, the stipulation still reserves jurisdiction for Judge

2   Santoro to go to mediation so that certain developments such as

3   the Canadian tax ruling still be in abeyance.  We're still

4   hoping any day now to get the revised ruling which would not

5   slow down confirmation, but that is just one other aspect of

6   this that could throw off the timing.  But, I don't think it

7   should change Your Honor's view of scheduling the confirmation

8   hearing for the earliest date that Your Honor is comfortable

9   with.  Now I'll turn it over to --

10          MR. POMERANTZ:  Your Honor, it's Jeff Pomerantz.  I'm

11  on the phone.  May I respond?

12          THE COURT:  Yes, you may.  I learned yesterday, Mr.

13  Pomerantz, there are actually two Mr. Pomerantzs in your firm

14  who are unrelated to each other which I took -- well, it came

15  to some surprise, but in any event, it's good to hear from you.

16          MR. POMERANTZ:  There actually are, and there are

17  several Pomerantzs on the west coast which there weren't in the

18  east coast when I lived there, but that is correct.

19          Your Honor, I agree what Mr. Galardi says with a

20  couple of qualifications, (1) the material that is to be filed

21  with respect to an updated disclosure issues and an updated

22  plan per the mediation statement is to be filed by August 9th.

23  We fully expect to be able to make that.  Such to the extent

24  Your Honor has any concerns with notice in terms of scheduling

25  a confirmation hearing we would, if Your Honor's available on

1 | the 8th and thinks we can do it then, we would prefer to have

2 | it on September 8th rather than September 27th or alternatively

3 | some date in between.  We would rather not go another three

4 | plus weeks because as Your Honor knows the committee has been

5 | anxious to get the confirmation.

6 | With respect to Mr. Galardi's comments about the

7 | mediators getting involved, that is true, and we have potential

8 | for needing to go back to mediation, but I just wanted to

9 | apprise the Court of.  As Your Honor knows we've been waiting

10 | for the Canadian revenue ruling, and as Mr. Galardi said, we

11 | hope that that will come within the next several days and will

12 | be positive.

13 | If it does not come in the next several weeks or if

14 | for some reason it does not come back favorable we may have

15 | issues on how to proceed and we may have to go back to

16 | mediation.  So, while we are hopeful that that's not the case

17 | we wanted to apprise Your Honor of that so if in a few weeks we

18 | come back to you and say that there are disputes that have to

19 | be mediated Your Honor won't be surprised.

20 | THE COURT:  All right.  Thank you.

21 | MR. POMERANTZ:  But, other than that the mediation

22 | was successful.  We think we've resolved the issues.  We're

23 | looking forward to receiving the documents and we're very

24 | hopeful that we could proceed with a confirmed -- a

25 | confirmation hearing in early September.

1          THE COURT:  All right.  What the Court's preference

2     is is that I would like to see Mr. Galardi, Mr. Fredericks, Mr.

3     Foley, Ms. Tavenner, Mr. Van Arsdale.  And if you can phone

4     back in when we're done with this hearing in chambers because

5     the Court does have some questions that I'd just like to ask

6     and I'd like to do it in that fashion.

7          MS. TAVENNER:  Certainly.

8          MR. POMERANTZ:  I've available, Your Honor.

9          UNIDENTIFIED ATTORNEY:  That's fine with us, Your

10    Honor.

11         THE COURT:  All right.

12         MR. GALARDI:  Your Honor, that then takes care of all

13    matters, I think it was 44 to 48 at the end of the agenda,

14    which now going back to claims objection so that I -- handling

15    one which is matter 14 on the agenda.

16         THE COURT:  Right.

17         MR. GALARDI:  So, I will -- I think it's -- I'll move

18    to that one and then we can go back to the others that are

19    still remaining.  All right.  Your Honor, matter 14 on the

20    agenda was the debtor's objection to the claim 1053 of Graphic

21    Communications.

22         Your Honor, papers have been submitted with respect

23    to this claim and there's a stipulation of facts that Your

24    Honor has before you.  There is also a -- in addition to the

25    objection we had a supplemental objection, an answer to that

1  essentially, and a reply to that.  If Your Honor -- I would

2  just proceed on oral argument with respect to those matters and

3  let the gentleman respond to that and seek a reply.

4          THE COURT:  All right.  You may proceed as you

5  desire.

6          MR. GALARDI:  Your Honor, as I think our papers make

7  clear we see two basic legal issues; the need to resolve based

8  on the statement of facts.  The first issue is whether this is

9  a contract for goods or services.  Your Honor's previously

10 ruled that the predominant purpose should be used there.  And

11 with respect to the predominant purpose I think the parties

12 agree that it's really a three-part approach and it's just a

13 matter of how Your Honor looks at that contract vis-a-vis

14 that -- those factors.

15         With respect to those factors, Your Honor, the

16 three-prong approach is that you look to the language of the

17 contract itself, the nature of the business, and then the

18 intrinsic worth of the materials that are supplied pursuant to

19 that contract.  Your Honor, our view is that the predominant

20 purpose of this contract is clearly one for services and that

21 any goods were incidental to that.

22         With respect to that Your Honor has before you I

23 think four documents with respect to the contract, so I'd like

24 to take the first prong up first.  Some of this is highlighted

25 in the stipulation of facts, some I will -- I would just like

1 to walk through.

2       The first document is the master services agreement

3 that is between Circuit City and Graphic Communications.  Your

4 Honor, this agreement governs as Your Honor knows, the master

5 service agreement and what we call SOW 1, 2 and 3 which is the

6 Statements of Work pursuant to which Graphic is seeking its

7 claim.  And first, just to take a very superficial look at the

8 contract, the first thing that points out is the purpose of the

9 contract says as we've highlighted in 1.1 that a supplier will

10 provide services with a capital S.  So, we think that's one

11 point in our favor with respect to this.

12       And I point out for later that 2.2 of that section

13 says, "To the extent anything may conflict later on this

14 contract governs."  I would also point to Your Honor the

15 definition section in that same master agreement which is

16 Section 3.0, definitions of deliverables.  When you look at

17 this deliverables, Your Honor, it's interesting to see that the

18 supplier deliverables and the supplier being Graphic are broken

19 into two things; any items or work.  It never uses the word

20 goods here.  It uses items or work.

21       And importantly, then, if you look at Section 3.3 in

22 the definitions, it doesn't include items.  It says, "Any

23 reasonable effort extended by the party or their personnel to

24 perform the work described in SOW."  It doesn't really use that

25 capitalized term to refer to items.  So, one of the arguments

1  right off the master contract, Your Honor, is, there's a

2  distinction between item don't use the word good and work and

3  services which is capitalized which is the entire intent of the

4  contract is for work performed.

5      Your Honor, then if you turn to Statement of Work

6  Number 1 which we've also included in the stipulation of facts,

7  if you look at the very first provision it says, "For the

8  supplier's performance of services."  In this instance there is

9  a conflict between the two documents because services here is

10  used in the capital S, but later if you looked at the project

11  scope it says, "Service -- Circuit City wishes to engage in the

12  service as little as a supplier for the purposes described in

13  Section 3," and services is defined again.

14      Now, that would've been a big deal, but if you look

15  at the actual description of services in Section 3, it's a list

16  of bullet point.  And it says, "The following are basically

17  services to review last date for changes, review requirements,

18  manage paper inventory."  It doesn't say purchase paper, manage

19  it.  Ensure.  Reporting.  Any possible printing needs.

20  Coordination.  Coordination.  Store ad distributer.

21      And then the deliverables are, "Ensure that there's

22  an adequate supply."  It doesn't say provide an adequate

23  supply.  Monitor printers.  Help printers to achieve acceptable

24  quality standards.  Help in monitoring a timely delivery.

25  Provide suggestions.  It doesn't say sell goods.  It doesn't

1  even say sell items.

2           So, under SOW 1, Your Honor, again, though there may

3  be a distinction about services, it's clear that these are all

4  service items.  There's no real production as I can see yet of

5  items or goods to be delivered.  I'd also note that every one

6  of these contracts does not have anything that say anything

7  that says this shall be governed by the UCC or subject to

8  interpretation of the UCC.  There's nothing in there about that

9  and goods.

10          Your Honor, if you then turn to statement Number 2

11 which is also at issue, again, we get the witness, and then in

12 the third line there it says, "Terms and conditions for

13 suppliers' performance of services."  Again, I go back to the

14 master agreement.  This time it's not defined.  That's the work

15 performed.  It's not items delivered on behalf.

16          Then you look at the project scope.  It does say that

17 the supplier will provide paper, print and logistical services,

18 but then if you go through the description of services, this

19 is -- both parties are providing it, but you look to the

20 supplier of services which start on Page D, "Supplier will

21 supply," the operative word there, "the specified paper, print,

22 or distribute in each event.  It doesn't say they'll sell the

23 paper, the print and distribute it.  It shall supply it.

24          And then it says, "Supplier warrants that the

25 work" -- it doesn't say that the items, the goods will be

1  performed.  And, you know, it's the services.  And there's

2  nothing that really warrants the items, the paper supposedly.

3  And if you look, then (g); "Supplier will be responsible for

4  any defective work."  It doesn't say defective goods.

5          And if you look at the next one, "Will absorb the

6  cost of late insertion penalties."  That's what their job was,

7  to get these things printed and give them to the newspapers,

8  "And the supplier agrees to satisfy the quality

9  specifications."  Again, Your Honor, it doesn't look like

10 there's an item, a sale of goods in this contract.

11         Finally, if you go to Statement of Work 3, Your

12 Honor, it's essentially the same as Statement of Work 2.  Big

13 capital S, Services.  Go back to the master agreement.  That's

14 for work.  Project, scope, the supplier will provide, not

15 supply this time, paper, print, services in support of the

16 domestic advertising circulars.  And when you look at

17 description of services again, (d) has, will supply the stuff.

18 Supplier warrants again the work, not the items.  Supplier

19 shall be responsible for defective work, loss or damage to

20 inserts.  Supplier will be responsible to absorb the late

21 insertion of penalties and agrees to satisfy.

22         So, Your Honor, our first argument will be on the

23 basis of the contracts themselves.  These were intended and the

24 predominant purpose of these contracts was not the sale of

25 goods.  There was no sale of goods here.  It was the supply of

1   services with an incidental being that certain items, paper,

2   had to be used to perform the function.

3          Your Honor, the next part of this is the nature of

4   the business, and I think if you go to the stipulation of facts

5   as we point out, the advertising of theirs in the website, it

6   clearly provides that there's a printing company.  The paper

7   is -- you know, the revenues are a billion dollars and they're

8   far exceeded by the services to be performed as opposed to the

9   actual sale of the paper products.  So, we think the nature of

10  that business itself plus the nature of the business given to

11  us is to predominantly provide services.

12         Your Honor, and finally I think it's critical to even

13  think about this analysis.  We paid for the paper.  We bought

14  it.  We paid for it.  It's not a dispute here.  It's not like

15  my plastic case where there was a -- something that we didn't

16  pay and the service like salt put on a road.  We paid for the

17  paper.  We gave it back.  They printed on it.  We took the

18  graphic arts.  It was our graphic arts.  We sent them a PDF.

19  They put it on a circular.

20         So, Your Honor, again -- and if you look at the cost

21  relative to the claim, most of the claim that is out there,

22  predominantly if not everything but a de minimis amount, is for

23  the services that they performed in getting these inserts to

24  the carriers to ultimately get to the newspapers.

25         And so, we think the intrinsic worth of the

**J&J COURT TRANSCRIBERS, INC.**

1    "materials" here is de minimis, minimal and negligible, and

2    therefore based upon the predominant purpose test as followed

3    in this jurisdiction our view would be that this is simply not

4    a contract for the sale of goods as required by 503(b)(9), but

5    rather the predominant purpose is to provide services.  The

6    services were basically to take our materials, the paper, take

7    our artwork and to put that artwork on the paper and get it

8    delivered to the newspaper.

9         Your Honor, with respect to the second argument is

10   simply that, well, okay, even if you were to assume these were

11   goods, and there's -- the cases that they cite to say, well,

12   look, certain types of materials when you do a print

13   advertising are goods.  The key is the movability of this.

14   Let's take that argument.  Well, then it has to be receipt by

15   the debtor.  And our argument is simply that it is not receipt

16   by the debtor.  503(b)(9) requires that it be received by the

17   debtor within 20 days.

18        Now, the argument is shifted, I think, between our

19   supplemental reply to their reply to our reply a little bit.

20   Initially the argument was, clearly their view was when they

21   delivered it to the common carrier it was delivery to the

22   goods.  The problem with that argument is every court seems to

23   reject, or most courts seem to reject the argument that when

24   you deliver to a common carrier that's our authorized

25   representative or agent.  And for good reason, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

1          The notion of agency, and I happened to pull out the

2    second jurisprudence of something on agency just to check my

3    recollection, it's not the case that any time a party enters

4    into a contract with a third party an agency relationship is

5    created, and there's a very good reason for that.

6          One of the definitive factors about an agency

7    agreement is that the person who acts as your agent acts on

8    behalf of you, not just simply for your benefit.  Contracts

9    obviously are for your benefit.  What has not been established

10   here is -- and if it's on behalf of you a fiduciary

11   relationship has to be established between you and your agent

12   so that if they're negligent, you're negligent.  If they're

13   responsible for some act, you're responsible for your act.

14         Well, we do not dispute that there is a

15   transportation agreement.  But, the transportation agreement

16   itself, again, these are in the documents, makes clear that the

17   common carrier was not our agent, it was simply a contract

18   party.  Indeed it says in the contract, for example, there are,

19   and I'll just use the Elex logistics, Section 2, liability for

20   damage to cargo.  Elex assumes the liability for actual loss or

21   injury to CCS's cargo.  That's not an agency relationship.

22   It's a divvying up of responsibilities.  They get paid a fee.

23   They take responsibility.

24         There is another section, 2.11, where the Elex agrees

25   that its sole expense and subject to any lawful limitations to

1 a defendant (indiscernible) CCS and to affiliates.  So, it's

2 taking liability from us.  And then on 4, in Section 4.1, it

3 says it's a common carrier.  It's a motor carrier.  In 4.2 it

4 says, "In the event of any shipment is refused by the receiver

5 or consignee, the motor carrier is otherwise unable to deliver

6 it.  Liability for loss or damage under this section shall

7 continue until shipment has been properly placed at a public

8 warehouse."

9        So, they've assumed the liability.  It's a contract.

10 It's not solely for the benefit of us.  It's not on benefit of

11 us.  The transportation common carrier is simply not a

12 fiduciary relationship and therefore could not be our agent.

13        Your Honor, and in this jurisdiction, I'll point this

14 out, and I have a case to cite to Your Honor.  It's <u>Carrie E.</u>

15 <u>Rainy and Robert W. Rainy v. Barnst Lumber</u> (phonetic).  It's

16 Supreme Court Appeals of Virginia (1954).  But -- and that

17 supreme court case says the following.  "Agency has been

18 defined as the relationship which results from the

19 manifestation of consent by one person to another that the

20 other shall act on his behalf and subject to his control."  And

21 I cite that -- "and the agreement by the others to so act."

22 It's a restatement second agency, one of the reasons we pulled

23 it out for today.  There is no presumption that agency exists.

24 And the Court goes on to say, "And the burden falls upon him

25 who alleges an agency to prove it."

1          So, Your Honor, we have -- first of all, we don't

2    think that there's been enough facts, even in a stipulation of

3    facts to show that the common carrier has an agency

4    relationship.  And indeed, the contracts and an understanding

5    of what it is to act on behalf of as opposed to merely for the

6    benefit of which both parties gets benefits on contract is not

7    satisfied by the transportation agreement.

8          So, we would say Step 1, and I think it's almost

9    conceded by the reply to go to the newspaper, that there is no

10   agency agreement between us and the common carriers.  That is

11   the predominant law.  Now, let's take the newspaper carrier.

12   Your Honor, for exactly the same reasons, whether there's a

13   contract or not, there can be no facts, and there's none

14   certainly established, and it's given the burden I think they

15   fail as a matter of law, but there are no facts to show that

16   even the newspaper to which it was delivered is our agent.

17         The fact of the matter is, Your Honor, they can --

18   first of all, it's not a delivery, so you have to stretch the

19   language of 503(b)(9) as follows.  You have to say deliver --

20   receipt by a debtor, actual possession of -- by the debtor can

21   be actual possession by an authorized representative, i.e., its

22   agent.  So, you'd have to establish that that newspaper was the

23   agent.  There's no contract that has been put into facts.  But,

24   even if there was a contract this is a relationship of benefit.

25         We don't specify who at the newspaper inserts the

1  papers.  You know, we do specify a date.  We do specify the

2  terms that it is.  We don't say you have to put it in between

3  Section C or D.  We don't tell you various other things, how to

4  do it upside down, backwards or the other way, and importantly,

5  the newspaper still has liability if it fails to do so, and D,

6  even under the contracts of the transportation, the only

7  evidence it specifies that they could receive, but the

8  newspaper could even review that -- could refuse the delivery

9  of the insert and then the common carrier has a certain

10 responsibility.  Our agent couldn't refuse that sort of

11 delivery, and indeed if it did so, our claim would not be for a

12 breach of agency against ourself, it would be for a breach or

13 contract against the newspaper.

14        So, Your Honor, we'd say that, (1) no goods,

15 predominant purpose fails, (2) even if Your Honor was inclined

16 to say that there were somehow goods because there was a

17 moveable insert here which is about the strongest argument I

18 could come up with, it's not -- it has not been delivered to

19 the debtor because it's not been delivered to the debtor itself

20 or the debtor's agent, but a third party, and therefore there

21 can't be a 503(b)(9) claim.

22        THE COURT:  All right.  Two questions.  Let's go to

23 the moveable insert comment.  Why isn't the moveable insert a

24 specialty manufactured good as would be -- as that term would

25 be used to the UCC?

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GALARDI:  A manufactured good.  Because again,

2    Your Honor, what's a manufactured good?  I make some --

3          THE COURT:  If you ordered green widgets, you know,

4    and you say, well, they're delivered to me, but, you know, the

5    fact that they made them green, that's a service.  You know,

6    what point do you parse this down and say --

7          MR. GALARDI:  Well, take a widget.  Now, I never knew

8    what a widget was, but here it's a gear.

9          THE COURT:  I don't either, that's why I used --

10         MR. GALARDI:  So, let's take a gear because it seemed

11   to be a lot like a gear.  If I gave you a slab of steel and

12   said make it into a gear with the following, you know, ring

13   configuration, certain width, certain -- and you did that,

14   that's a good.  To me that is a good and you're moving it.

15   It's the sale of a good.

16         What did we do here?  We said manage paper.  We'll

17   buy it.  We'll give it to you.  Said take our artistic work,

18   and there's all these provisions of -- put it on there.  So, do

19   all that.  Make sure you always have paper.  Make sure you have

20   the artwork and the colors and the dyes and everything to do

21   this, and when we tell you to perform the service, i.e., put it

22   on this with these dates, that, do it and deliver it.

23         That to me is not doing anything of other than taking

24   all of our stuff and performing a service and putting it on.

25   It's not cutting it to specifications.  There's not -- there's

**J&J COURT TRANSCRIBERS, INC.**

1  probably a technical expertise as to how to get the printers to

2  do what they do, but that's managing the printers, monitoring

3  the printers, just as I read, controlling the printers --

4        THE COURT:  What Circuit City wanted was the

5  circular.  I mean, you know, you wanted to have that thing that

6  could go into the newspaper that could be distributed to your

7  customers.

8        MR. GALARDI:  I agree with you.  And then, therefore,

9  almost anything would be a thing under that circumstance.  If I

10  gave you all the pieces and you put it all together are you

11  performing a service for me or are you actually making the

12  thing?  It's hard --

13        THE COURT:  No, this snow removal wouldn't be a -- it

14  wouldn't clearly be a service then.  I mean, you know, we're

15  not selling salt.  You know, we're providing a service.

16        MR. GALARDI:  I'm glad you say that and I'd love to

17  have had the snow removal matter in front of you, Your Honor,

18  but others have disagreed.

19        THE COURT:  I understand.  but, you know, I guess we

20  have to figure out, you know, because in this case we actually

21  do have a thing.  When we get to the end of the --

22        MR. GALARDI:  At the end of the day you absolutely

23  have a thing.

24        THE COURT:  And, you know, the question is, you know,

25  whether or not, you know, that falls within the definition of

1   goods as a specially manufactured good or whether it was your

2   thing all along and they just provided a service by coloring it

3   or --

4           MR. GALARDI:  And I think -- here's another example

5   that I think I lost on it in Detroit, but I still to this day

6   don't -- take a watch, okay?  I get a gear from here, I get a

7   face from here, I get all this.  I get the bands, I get the --

8   all the gears.  And I say, please put that together.  That's

9   exactly what we have here.

10          Now, putting it together to me is not the

11  manufacturing of a thing.  At the end of the day I have a

12  watch.  And you may send me a watch or you may send it to a

13  third party, but that to me is performing a service.  You have

14  an intellectual knowledge of how to put these pieces together.

15  I don't believe that that's the creation of a good for sale.

16          THE COURT:  I used to represent a company that made

17  fire trucks --

18          MR. GALARDI:  I knew I'd get myself in trouble.

19          THE COURT:  -- and they would buy the engines from

20  this company and they'd buy the chassis from that company and

21  they'd buy the bodies from a third company and they'd take them

22  and they'd put them altogether.  And really the only thing they

23  did was put them together and paint them red and --

24          MR. GALARDI:  But, then did they sell you the trucks

25  or did they charge you for the services of doing the --

**J&J COURT TRANSCRIBERS, INC.**

41

1          THE COURT:  They sold trucks.

2          MR. GALARDI:  Well, but that's different.  They're

3  not selling the trucks.  They're not selling the inserts to

4  anybody.  They were selling me the services.  If you're -- in

5  your exact example, or the watch person, they're not selling

6  you the watch.  They sold me -- they basically said for a fee.

7  This is what they did.  For a fee I'll take your artwork, I'll

8  take the paper that you bought, I'll put it together, fold it,

9  color it and make sure that the printers are all working, and

10 then I'll deliver it to somebody else.

11         They didn't make, you know, or manufacture a single

12 thing in that process.  They did a service.  They put things

13 together in the right order in the right way, and then they

14 delivered it.  And so, it's not -- but they didn't deliver it

15 and say, okay, now at the end of the day I'll sell you the

16 circular.

17         There's not a sale or goods for the circular.  It's

18 not like they said, let us do all this stuff and I'll sell you

19 a circular.  If you like it you get it, if you don't like it,

20 right?  You had to like it because we did the artwork.  We

21 bought the paper.  We did this.

22         I think your fire truck is different because it makes

23 all the difference in the world whether at the end of the day

24 I'm not going to buy a fire truck.  So, let's assume you had a

25 cost overrun on the fire truck.  You'd lose on that sale.  This

**J&J COURT TRANSCRIBERS, INC.**

1  is a little bit different.  We're getting services now.

2  They took responsibility for certain things but it was still

3  the know how of how to put things together and make it work.

4  It wasn't that they manufactured something, took risks on that.

5  They didn't take a risk on my art, I don't like my artwork.  If

6  they painted the fire truck red and white and blue, you didn't

7  have to buy it.  That's different.  There's an artistic element

8  or there's a sale of a good at the end of the day.  That's not

9  what we have here.  It didn't sell to the newspaper.  It didn't

10 sell to me the insert.  It wasn't on a per piece basis.  It was

11 here's what we're charging you for the services and, yes, there

12 was an incidental cost with the paper which we paid for.

13       There was an incidental -- they didn't charge me for

14 the inks and all that.  They charged me a fee for doing these

15 things and that's what this contract seems to provide to me if

16 you read through the services, the monitor, and that contract

17 distinguished between an item and work.  I don't think your

18 fire truck company distinguished between the working and

19 putting together the ladder, the hooks, the hoses, and

20 everything else and selling you at the end of the day the fire

21 truck because you bought the fire truck.

22       So, you know, we sort of were talking about if I did

23 that with the car and I got a Midas muffler and I got this,

24 that, and the other thing and I had a Ford, and that was my

25 car, that's different if I just paid them for putting it

1  together.  But if they sold me the Ford at the end of the day,

2  then I'd say it's a sale of goods and it's what did I pay for

3  at the end of the day?  What I paid for at the end of the day

4  was for you to do these things that you specify in your

5  contracts as services, not the items.  The items were

6  incidental.

7        THE COURT:  So, it's sort of like the contractor

8  that's putting in windows in my house right now, is that, you

9  know, I bought the windows from the manufacturer and he's

10  putting the windows into my house.  He's performing a service.

11  He's not selling me windows.  That's what you're talking about?

12        MR. GALARDI:  He's a general contractor and that's

13  how I've seen those services and the cases go to that.  So,

14  I've had, you know, the cases that did the predominant purpose.

15  If I buy all the pieces for a well and somebody goes and fixes

16  my well, that's a service under the predominant purpose.  Yeah,

17  you bought the parts.  That to me is the same thing as the

18  person who goes out and buys a part to fix my watch.  If he

19  goes out and fixes my watch, I'll certainly get charged for

20  that part but most of the charge is for the service and he's a

21  watch repairman.  He's not a watch salesman.  And, you know,

22  they may do that too.  But what I'm getting is the service when

23  I bring it in and pick my watch up and there will be pieces

24  that they'll buy but that's not a sale of goods to me.  It's

25  not like they're just selling that.  They're doing the services

1 to put them in and make it work right and give me a warranty

2 for the work; not for the part but for the work.  And I think

3 that's why I wanted to point out the warranty for work

4 exception.

5         THE COURT:  All right.  Now, the second question that

6 I had goes to your second argument about received and I

7 understand your agency argument completely.  But my question is

8 can the entity that receives the goods be something less than

9 an agent or does it have to be the agent or the debtor in your

10 argument?  In other words, could it be, instead of an agent, a

11 consignee, could it be a designated, you know, recipient?  Can

12 it be something less than an agent?

13         MR. GALARDI:  Well, I sort of started thinking about

14 what's the authorized representative language meaning for this

15 and can it be less than an agent of a fiduciary?  Probably yes.

16 I haven't seen a circumstance.  But can it simply be my

17 designee as a third party drop person?  I don't think that

18 works if the third party designee is just simply a designee by

19 contract.

20         THE COURT:  Well, if it was a customer, it certainly

21 would probably qualify, wouldn't it?

22         MR. GALARDI:  I'm not sure that that's the case.  We

23 sort of played around with that one this morning too.  Why, if

24 I --

25         THE COURT:  I wasn't privy to that.

1          MR. GALARDI:  Because we were trying to figure out

2     how you would ask me that question.  So, again, I think --

3     here's what I would have done and, again, we'll probably change

4     some law here, right?  If the customer took it as my designee

5     and on -- you know, and the contract provided, for example,

6     I'll do this for you and I'll deliver it to third party but you

7     shall be deemed to have received it for that purpose?  That's a

8     different situation in my contractual world.

9          Customers may be closer to that situation because I

10    may do it but it's not clear to me that this is on my behalf.

11    I can -- you know, I can mail order and send to somebody --

12    say, Mr. Fredericks.  If I bought something and I had it

13    delivered to you, can you reclaim it from Mr. Fredericks?  I

14    don't think so.  Now, this is -- I go back to this is a

15    reclamation.  I don't think you can reclaim it from Mr.

16    Fredericks.  Now, he may have a claim against me for an

17    unsecured claim because he did everything I asked but I don't

18    think you can go to Mr. Fredericks' house under either the UCC

19    or bankruptcy law and say, okay, I delivered that t.v.  Mr.

20    Galardi has now gone bankrupt, give me that t.v. back, and then

21    transport Mr. -- their unsecured claim to Mr. Fredericks.  He's

22    got the t.v.

23          Now, I don't know if that's -- it's not -- I don't

24    have the legal theory but I don't think reclamation law works

25    like that and why?  And I think it's -- well, I may have a

1  contract to sell Mr. Fredericks the t.v. but I sold him the

2  t.v., I got his money, I'm bankrupt now.  He's the creditor

3  that's happy.  This is the creditor that's not.  And I don't

4  think it's -- and I think it's because, though I had a benefit,

5  again, it's not -- he might not have been my agent.  He may

6  have been my designee recipient but I -- there's not sufficient

7  control and relationship in my view to say that merely because

8  I designate a third party to receive the goods, I think that's

9  what unfortunately a seller is going to have to be more

10 concerned about, but merely because I said you put it there or

11 there, like a common carrier delivers it to X or Y, that's not

12 a reclamation claim so I don't think it's a 503(b)(9) claim.

13       What more is required?  There's various levels of

14 agency.  As I read through the jurisprudence today, it's not

15 necessarily master servant but it's not merely contractual.

16 What it is between those places -- master, subservant, whatever

17 -- if that person has been authorized and I say, yes, this

18 person does it and then what my relationship and what can

19 happen once it's in Mr. Fredericks' possession or a third

20 party, seems to me to go closer to what that middle ground is.

21       What I know here, though, is there is no middle

22 ground or any facts to establish a middle ground.  There is

23 nothing other -- I mean, there's not even facts to say, you

24 know, other than we'll admit we designate it to go, deliver it

25 to the third party, there's nothing other -- there's no

contractual relationship.  There's nothing to say anything --
maybe there's an oral contract or representation.  There's
nothing -- and, again, there's a shifting sands here to the
third party but there's nothing to say it's anything more than
a mere contractual relationship.  And so I go back to the
common carrier.

Where there's -- you know, I don't know if there's
something more but when a common carrier who does things by
independent contract isn't liable in the first instance, then
just because you happened to deliver it to a third party, it
can't be that all of a sudden that happened.  And had it
delivered to us in the 20 days?  Yes, then there would be a
claim.  But it didn't deliver it to us.  So, it's like it was
delivered to the common carrier and since I know common carrier
laws and independent contractor, not my agent, I can't see how
a third party who is no more than a common carrier or is no
more than a contractual relationship, is the same as me.

Whether there's something else, if it was my
warehouse under common control of a third party, then that may
be closer to an agency agreement, though it may not be quite
the same daily warehouse receipt.  I don't know.  To my secured
creditor as collateral, maybe I can come up with another way to
think of that.  In the instance where I had a joint venture in
Plastek with a JCI entity and we're building the cars together,
though it's not in my physical possession but we're doing

1  something in a joint venture and it's not technically a debtor,

2  maybe you get some facts there.  But I just don't know -- I

3  know we didn't with the newspapers, and you can look at the

4  invoice and the newspapers -- you know, it's the Herald Times,

5  it's a bunch of Dallas newspapers.  There's no joint venture.

6  There's nothing more than an agreement for them for which they

7  could be liable to go ahead and insert it.  I didn't control

8  who inserted it.  I didn't -- what shift it happened on, what

9  time, all of those things that makes this a pure, contractual

10 thou shalt insert, thou shalt mail by a certain day, that's it,

11 and everything else those newspapers control.

12        THE COURT:  But they were certainly the designee that

13 you had for the receipt of this, if they were goods.

14        MR. GALARDI:  Absolutely a designee but so was the

15 common carrier a designee.  Right.  And they knew it was the

16 designee.  So, merely being a designee under the existing case

17 law can't be a sufficient condition for finding I had actual

18 possession.  There's no facts that go beyond that with respect

19 to the newspaper, not that I was there.  You know, did we have

20 Circuit City people at the newspaper to make sure that they

21 were neatly folded, put it in this way and hand it over, even

22 though I was, you know, not controlling who they used.  We sort

23 of -- you know, there are circumstances.  I can see where

24 somebody was more tightly inter -- you know, interconnected

25 with the recipient and made a better argument but there are no

1  facts here and, look, the common carrier contract is clear.

2  Give it to my common carrier.  The case law is clear.  When you

3  give it to a common carrier, that's not sufficient.  So, unless

4  they can come up with something more, I don't think there's --

5  you know, the burden is with them under Virginia law.  I don't

6  think there's a way to argue that this is somehow more than a

7  mere designee and it's not even, you know -- they were my

8  designee but it wasn't necessarily my designee to these service

9  providers.  Right.  Their designee was the common carrier.

10  They didn't know, go to the Dallas Times or the Herald or this

11  paper or that paper.  That's not their issue.  Theirs was

12  produce a quantity, give it to a common carrier, and be done

13  with it.

14          So, you know, they even have a further step removed

15  because, again, with the designee, I say here's my list of

16  carriers, or here's one of my carriers.  All right.  They can't

17  say, well, I knew you were giving it to him so they must have

18  been your agent.  It's hard to make an agency argument when you

19  don't even know the ultimate newspaper to which the inserts

20  were going.

21          THE COURT:  All right.  Thank you, Mr. Galardi.

22          MR. GALARDI:  Thank you.

23          MR. REPCZYNSKI:  Your Honor, Tom Repczynski on behalf

24  of Graphic.  Unless the Court has an objection, I'd actually

25  like to start with the second issue first that we were just

50

1  talking about and move back to the goods.

2          THE COURT:  You may proceed as you prefer.

3          MR. REPCZYNSKI:  First of all, I agree with Mr.

4  Galardi's having set out the test that applies.  There's no

5  question here.  The Court in this very case has ruled that the

6  predominant purpose test applies, that the UCC applies, and

7  that the two issues that we have here before the Court today

8  are both as to whether or not we are dealing with goods and

9  whether or not those goods were received.

10          With regard then to received and backing up to what

11  it was that was actually received, the Court has, I think, by

12  virtue of the questioning of Mr. Galardi, recognized what we

13  set forth in our papers with regard to the UCC's defining for

14  us here what, in fact, means received.  Mr. Galardi does --

15  talks about it in his brief but didn't touch on it here in the

16  discussion so I'll focus the discussion on Section 8.2-705.  At

17  least that's the UCC as enacted in Virginia so UCC Section

18  2-705, where the court -- where the UCC deals with, for

19  purposes of goods and delivery, the question of when are goods

20  received.  And so, as is pointed out by Mr. Galardi in the

21  papers, there's a question here for purposes of this section,

22  what about goods in transit.  Right.  That's what we're

23  focusing on, are goods in transit and we have to decide

24  relative rights.  But the relative rights under this section,

25  and I'm looking specifically now at Section 2, as between the

51

1  buyer and the seller of these goods, the question is whether or

2  not the seller may stop delivery and up until what point.  And

3  it says, "(a) receipt of the goods by the buyer".  In this

4  case, I don't think there's any question that the buyer of

5  whether or not goods or services, as they might be, but the

6  buyer here is Circuit City.  So, when is Circuit City deemed to

7  have received the goods?  That's obviously -- the question is,

8  did Circuit City receive the goods?

9        The answer must necessarily be yes because the UCC in

10  Comment (2) to this section, in official Comment (2) to this

11  section, helps us by saying, well, what is meant by this

12  Section 2(a) and, in Comment (2), it deals specifically with

13  receipt by the buyer, and that's what we're dealing with here.

14  When has the buyer received it?  And, so, in the definition, it

15  says, "includes receipt by the buyer's designated

16  representative", in this case referred to as the sub-purchaser,

17  "when shipment is made direct to him and the buyer himself

18  never receives the goods."

19        So, when we talk about actual receipt, actual receipt

20  here is specifically contemplated to be actual receipt by one

21  designated by the buyer to be the recipient of the goods

22  purchased whereas here, and I believe I heard Mr. Galardi

23  concede that the actual designee was, in fact, the newspapers,

24  but sought somehow to challenge whether or not my client,

25  Graphic, could rely on the fact that they were only the

1  designee by virtue of a contractual arrangement with the common

2  carrier transporter, Elites Transportation.  There is nothing

3  in the UCC or in 503(b)(9) that would put us anywhere near

4  there but rather instead, in line with where the Court's

5  questioning brought Mr. Galardi, does it have to be a level of

6  agency?  No.  Quite clearly, it's defined right here as saying

7  the buyer's designated representative.  Is this a designated

8  representative?  Well, yes.

9         Looking at the transportation agreement that was

10  signed with the Elites, we see in Section 2.2 that language

11  used by -- not Graphic because it wasn't a party to this

12  contract, but language used by Circuit City with its carrier,

13  in Section 2.2 referring to the carrier's responsibilities,

14  directs the carrier with reasonable dispatch to deliver each

15  shipment in good order and condition to the designated

16  receivers.  That's Circuit City's language.  It actually was

17  using language similar to what we see in the UCC to designate

18  the receivers of these goods.

19         THE COURT:  Now, let's draw down on that just a

20  little bit before we leave it because I think this is

21  important.  I have said in the previous opinion, I talked about

22  the word received in Section 503(b)(9) and what it means and I

23  relied on the UCC's definition of the word receipt because

24  received is not defined in the Code.  It's not defined in the

25  UCC either but receipt was sort of close enough.

53

1         Now, we've got another phrase though we're looking at

2    here which is receipt by the -- by the seller -- no, receipt by

3    the buyer.  And in the UCC -- I mean, in the 503(b)(9), it's

4    received by the debtor.  And, of course, debtor is going to be

5    a defined term.  Does that mean I can't use this definition or

6    is that definition broad enough to allow me to be able to

7    construe it the way you're telling me I need to construe it?

8         MR. REPCZYNSKI:  It's necessarily broad enough, Your

9    Honor, because the reason it is set out here in commenting on

10   Section 2-705 of the UCC, is to give us the definition of that

11   actual receipt.  If we have to make decisions under the UCC as

12   to what we do -- what rights belong to the seller, what rights

13   belong to the buyer, we have to determine whether or not a

14   buyer has received goods.  Under 2-705, it says, well, what

15   about the realities that we face when we're in a common carrier

16   potential situation and we're going to face delivery of those

17   goods.  What rights exist as between buyer and seller?

18   Interestingly, Your Honor, 2-705, Section 1, it sets forth at

19   the very end of that section, why we need to have these rights.

20        If the Court looks to the last line, if for any other

21   reason or -- if for any other reason the seller has a right to

22   withhold or reclaim the goods, this section, Section 2-705,

23   Section 1, is establishing why we need, under the UCC, to even

24   have this definition, why we need to understand do we have

25   receipt for UCC purposes by the buyer?  In this case, it's

1  Circuit City, the debtor in this case.  So, the two are equated

2  for purposes of a UCC analysis.

3        If the Court hadn't already determined and the

4  parties hadn't already agreed that the definition of goods and

5  the definition of received as applied under the UCC were

6  relevant, then I would say, well, perhaps not.  Perhaps,

7  looking to 503(b)(9), and we're talking about the use of

8  receipt by the debtor, we might look somewhere else.  But where

9  we are forced to look to the UCC to know what goods means and

10 what received means, to find what received means in the

11 purposes of did Circuit City receive them, here's where we have

12 our answer.  Circuit City received them by definition because,

13 as the buyer, once they were received by the buyer's designated

14 representative, as here, the newspapers, which are acknowledged

15 in the last paragraph of our stipulated facts to have received

16 them, so there's no additional facts the Court would need to

17 see to establish whether or not that were the case, and in the

18 agreement itself, those newspapers were the designated parties

19 by the buyer.  We have receipt.  We have actual receipt by the

20 debtor as defined by the UCC.

21        So, the question now then is, the goods.  As the

22 Court has pointed out, they are goods.  They are items.  They

23 are specially manufactured items.  And looking to the Court's

24 prior decision on September 22, all things including specially

25 manufactured goods which are movable at the time of

1   identification to the contract for sale would apply under the

2   definition of goods.  So, we've met that first part.

3          Are they manufactured goods?  Mr. Galardi hesitated,

4   was unwilling to go there, and eventually got around to

5   distinguishing between why they are not actually goods created.

6   He referred -- nice, but not entirely accurate with the facts.

7   He referred several times, I caught the phrase, we bought the

8   paper and then we gave it back.  That's not what happened here.

9   My client, Graphic Communications, is a paper company, Your

10  Honor.  Its parent company, Unisource, is a paper company.

11  Incidental to what it did here was it gave the printing

12  services along with it in order to provide what it was asked to

13  provide, newspaper inserts.  All of these contracts, as the

14  Court points out, were designed for purposes of creating

15  inserts under a program, a lengthy program.  It went on for at

16  least the better part of a year.  We see a schedule of what was

17  to be produced when and the notion of the paper being

18  incidental to what was actually received, as set forth in my

19  papers, Your Honor, the paper, the incidental paper, was over

20  -- cost over $900,000 towards this project.  The $175,000

21  otherwise primary purpose as it were, $175,000 is what it cost.

22  But once they had the paper, decided what paper was needed to

23  accomplish what Circuit City needed, it then took that paper

24  and did the printing of incidentally what it was provided by

25  Circuit City, saying, here, this is what we want put on our

56

1 paper to sell, to get out there, as newspaper inserts and then

2 delivered to the other parties.  They're right --

3       THE COURT:  That's a pretty big fact that we have in

4 contest here.  Is this included in the stipulation anywhere,

5 the joint stipulation, as far as that is concerned?

6       MR. REPCZYNSKI:  It is, Your Honor.  The stipulation

7 -- the stipulation talks about the separate contracts, the

8 separate contracts for paper having been paid for, and you'll

9 see -- well, frankly, Mr. Galardi conceded it but, if you look

10 to Paragraph 39 of the stipulation, you'll see the exhibits K

11 and L referenced there, "true and correct copies of the

12 invoices and proof of payment are attached hereto as Exhibits K

13 and L."  These are among the documents, Your Honor, that the

14 Court has agreed to put under seal but the amounts from those

15 contracts, the totals, are set forth in our papers, Your Honor,

16 where there were three separate invoices for paper, more than

17 400,000, more than 300,000 and more than another 100,000, for a

18 total of over $900,000 worth of paper as part of what newspaper

19 inserts that were being purchased pursuant to this program with

20 the incidental costs being the cost of printing, storing,

21 moving, bundling.  These issues that we see about the cost,

22 they would have the incidental costs being, I think it's 1600

23 or so dollars that appear on the actual invoices in question

24 here, those bundling costs, if you will, the twine if they were

25 actually bundled by twine.  I doubt it, but the incidental

1  nature when taken through that view, taken through that prism,

2  clearly the bundling were the charges that are incidental to

3  that invoice.  But that invoice is only one part of the project

4  which they refer to and recognize as a program of providing

5  news -- they don't like the work providing so I can't say that

6  they agreed to use the word provide -- but of providing

7  newspaper inserts for this particular date and this particular

8  -- I don't know what they call it -- program I know appears in

9  at least one location so --

10       THE COURT:  Okay.  But what you're saying is that the

11  -- under the master services agreement, that you were selling

12  the paper as well?

13       MR. REPCZYNSKI:  Absolutely, Your Honor, and there's

14  no question, except that under the master services agreement,

15  you have then separate soughs as they refer to as one, two, and

16  three.  So, the master services agreement sets out the

17  relationship of the parties.  Then there are separate soughs

18  that deal with what it is that the different -- that Graphics

19  is going to provide.  I can't take issue with the fact that SOW

20  number one reads the way that it does.  SOW number one is this

21  overriding, look, they outsourced their paper needs.  They're

22  not a paper company.  We're a paper company.  So, someone had

23  to manage their needs with regard to having newspaper inserts

24  available to them on the weekly program that they wanted them

25  to be delivered.  So, we will out-source the management of that

1    program to you and make sure you got everything you need for

2    the incidentals associated with doing that.  When the time

3    comes, we don't want you to provide the service of graphic arts

4    and everything else.  We don't need that.  We're going to give

5    it to you.  That's ours.  We'll do that for you.  So, we're not

6    engaging you for advertising services or the development of a

7    flyer that we might like, like an advertising firm might be

8    hired to do.  No.  We want newspaper inserts and we've decided

9    that you, Graphic, are the company to do it for us at the right

10   price, the goods that we want to be put in those papers.  So,

11   that's what ends up happening.  Under SOW one, we define better

12   under the MSA.  Under SOW one, we turn around and say, okay,

13   what is it that you're going to manage and coordinate and

14   oversee.  But, when we get to SOW number two and SOW number

15   three, we get to here's what we want.  Here's the product.

16   Here's the goods, the inserts that we need, and they are set

17   forth.

18         We talked about -- or Mr. Galardi talked about the

19   language that appears in the Statement of Work.  Looking now at

20   Number 2, under Section 3(d), yes, it is description of

21   services but it's talking about supplying the specified paper,

22   print, and then distribute to each event.  Well, as the facts

23   set forth and as Mr. Galardi said, although distribute is

24   included here, distribute was distribute to the printing

25   services, the printing areas, where these flyers were to be

**J&J COURT TRANSCRIBERS, INC.**

1 printed, not distribute them, the flyers, across the country

2 because, as Mr. Galardi points out, that was handled by Elites

3 and that was handled according to the terms that they had

4 established as to where those were going to be delivered.

5        So, what do we have here?  We have a focus on what

6 the supplier maintained responsibility for.  Work, yes.  That's

7 what Mr. Galardi repeated several times.  But if you look at

8 Section 3(g), "Supplier shall be responsible not just for any

9 defective work but loss or damage to inserts."  The work is

10 incidental to the creation of these inserts and it's getting

11 those inserts from here into newspapers and, more importantly,

12 into the homes of the people who read those newspapers, that

13 ultimately is what Circuit City needed to have happen.  So, who

14 was liable if those inserts didn't make it there?  The supplier

15 in this sense but not a supplier of services; a supplier of

16 inserts.

17        We talk about replacing the inserts under that same

18 Section 3(g) and then again under the Statement of Work, Number

19 3 we use exactly the same language.  And it changes.  He noted

20 that it changes from provide inserts to supply inserts.   I

21 don't think it matters.  I'm not sure he thinks it matters

22 either but it showed that they weren't precise necessarily in

23 choosing one word or the other here because what they did was

24 they defined both deliverables and services.

25        Focusing then on the deliverables aspect of what that

1 | means under the contract between the parties, Mr. Galardi would
2 | have the Court gloss over the fact that there was, in fact,
3 | deliverables involved here, not just services provided.  But
4 | the services are necessarily -- my reading of it and I hope the
5 | Court's as well -- but pointing you then to the definition
6 | section in the MSA with regard to the difference between
7 | deliverables being defined and services being defined, supply
8 | or deliverables are any items or work prepared.  Okay.  Items
9 | or work.  Prepared.  You prepare work.  You prepare an item.
10 | You prepare a work.  I believe those two words are being used
11 | here interchangeably to suggest that we have something that we
12 | are producing and we are preparing it and providing it
13 | ultimately.

14 | What is services?  Any reasonable effort expended by
15 | the parties or their personnel to perform that work, meaning to
16 | create that thing.  To suggest that they're not providing
17 | service incidental to what they did would belie the fact that
18 | there are necessarily service involved in the creation of these
19 | goods.  But the Court recognizes the description of those
20 | services just as well or better than I could set them out.  To
21 | make -- to go from plain paper to a newspaper insert in the
22 | newspaper that you or I pick up on the stand, some service had
23 | to be provided somewhere along the way.  But that's what
24 | Circuit City was asking for here.  It's true; they hired my
25 | client to oversee the whole project for them.  But then, when

1  they had their individual Statements of Work -- Attachment A to

2  these individuals Statements of Work, Your Honor, set out very

3  specific pricing and the pricing is all inclusive.  The number

4  that it says per sheet, if you will, or per copy, or whatever

5  term they choose, it is not merely the price that is included

6  on the invoices in question here.  It's not that we see prices

7  on Attachment A and we multiply that by the number of prints

8  and we get only the printing cost.  The prices that we see on

9  Attachment A as to Statement of Work Number 2 and Statement of

10 Work Number 3, is the pricing that included the 900,000 plus

11 that they paid for in the separate invoices for the paper and

12 the 175,000 or so that is at issue here with regard to the

13 printing services.  But with regard to Attachment A on these,

14 it doesn't break out the paper cost versus the printing cost.

15 It talks about what's the cost going to be for you to run so

16 many newspaper inserts for us and the fact then that they were

17 separately invoiced for the paper is not definitive at all in

18 terms of what the costs of the newspaper inserts was.  And

19 that, I believe, is edified by what you see in Section 6 of the

20 Statements of Work where it talks about fees in terms of

21 engagement.  It talks about pricing for the product in both

22 Statement of Work Number 2 and Number 3.  It said, pricing as

23 listed includes --

24            THE COURT:  I'm sorry.  Where are you pointing me

25 now?

1           MR. REPCZYNSKI:  Sorry, Your Honor.  In both

2    Statement of Work Number 2 and Statement of Work Number 3.

3           THE COURT:  Okay.  I'm in the Statement of Work.

4    Okay.

5           MR. REPCZYNSKI:  It talks about pricing for the

6    product contemplated herein.  And the product --

7           THE COURT:  Which paragraph am I looking at?

8           MR. REPCZYNSKI:  Section 6, Page 3 of 3.

9           THE COURT:  All right.

10           MR. REPCZYNSKI:  The product contemplated, Your

11   Honor, the good -- if a product isn't a good, I'm not sure what

12   else it could be.  But the product is said here to include

13   what?  It doesn't use the term now incidentals but it's saying

14   we have a product and it includes charges for these services.

15   These services are necessarily incidental to the overall cost

16   of the project, the fact that you have 900,000 plus worth of

17   charges that were separately paid for and acknowledged in the

18   stipulation under separate invoices K and L, does not mean that

19   you get to exclude those for purposes of determining under the

20   test, the predominant purpose test, what is incidental to the

21   project.  It's not incidental to the printing.  It's incidental

22   to the cost of the product as defined here and that product is

23   the newspaper inserts.

24           Unless the Court has any further questions for me,

25   Your Honor, that states our opinion, our position.

1          THE COURT:  Thank you very much.

2          MR. GALARDI:  Your Honor, let me start with the first

3   question you asked, Your Honor.  You asked 503(b)(9) and the

4   relationship to 2-705.  I do not think Your Honor is -- the

5   words in the statute 503(b)(9) are received by the debtor.

6   Admittedly, there's Comment (2) to the UCC 2-705.  I don't

7   think there's anything that requires Your Honor to say buyer or

8   its designated representative and then read that back into

9   503(b)(9) debtor or its representative.

10          The reason I say that is two; one is the words aren't

11  there and, two, it is an administrative claim.  Administrative

12  claims can be construed narrowly and therefore to broaden it to

13  include words, you have a good argument under the general law

14  about administrative claims that, you know, Congress could have

15  said that.  They didn't say that.  So, therefore, it's not and

16  its representatives.  Again --

17          THE COURT:  It could have said to or on behalf of the

18  debtor.

19          MR. GALARDI:  To or on behalf of the debtor and done.

20  And also, if you look at the lead in to that, it's the value of

21  the goods received by the debtor, and so I think it's not the

22  value of the goods received by the debtor or its representative

23  because the value received by its representative might not have

24  been property of the estate.  So, I think there are good

25  arguments.  Again, we sort of -- there is no legislative

1  history to what Congress was thinking here.  I'm sure it never

2  thought of all or any of these things so it really comes down

3  to what Your Honor is essentially comfortable with given your

4  prior rulings.

5         We relied on the UCC for the word receipt.  There's a

6  different word.  It's received.  The question is, okay, do I

7  use bankruptcy law to interpret now?  Do I add those words or

8  not?  But there's no absolute reason that you have to rely on

9  comment -- to 2-705 on that matter.

10        Your Honor, just so that it's clear where the

11 comments about this paper issue, which I actually think is a

12 distinction without a difference, but if you look at exactly to

13 Section 6 that they're speaking -- that he was speaking about

14 in, I guess, it's Exhibit I which is the SOW filed under seal,

15 it says, "Pricing for the product contemplated herein is as

16 specified in the attachment.  Pricing is listed and includes

17 all vendor charges related to supplying and storing paper."

18 They stored our paper so that's -- and if you look at the

19 attachment, we bought that paper.  There's no dispute we bought

20 the paper.  We paid for the paper.  That's not what they're

21 seeking money for.  What sounded like there was a little bit of

22 a question is whether we gave them back that paper or whether

23 they had it there and they were printing it.  But we bought the

24 paper.  They had to store it for us.  We didn't just buy all

25 the paper and then ship it back.  That would have -- this is

1  the cost.  And, indeed, if you look at Exhibit --

2           THE COURT:  Well, Mr. Repczynski says that you bought

3  the paper pursuant to the Master Service Agreement.

4           MR. GALARDI:  Well, we bought the paper, paid for the

5  paper separately invoiced.  It was our paper. Then we gave it

6  to them to do Statement of Work 1, 2, and 3.

7           THE COURT:  Well, going back to my contractor

8  example, I might pay separately for the windows and pay

9  separately for the work the contractor performed for the

10 windows because it's all part of one contract.  But --

11          MR. GALARDI:  As a master agreement, you're right.

12 You contract with your contractor.

13          THE COURT:  So for the predominant purpose test,

14 don't I have to look at the master agreement rather than break

15 out the different parts and just say what was the overall

16 intent of this agreement?  Was it to supply services --

17          MR. GALARDI:  Well, yes, and --

18          THE COURT:  -- or was it to supply goods?  And then,

19 if I find out under the whole contract that it was one or the

20 other, then I say, okay, now I'm not going to parse it.  I'm

21 not going to just add up the goods.  I'm not going to -- you

22 know, if the overall purpose was to supply an item, then it

23 satisfies the definition.

24          MR. GALARDI:  Okay.  And I'll do it a little bit

25 backwards but I think generally yes.  The master agreement is

1  like -- you know, think about leases which I'm more familiar

2  with, where you have equipment leases.  You have your master

3  agreement and then you have your leases.  It's not the master

4  agreement.  That's, like, common terms.  As you look at the

5  SOWs and then those are incorporated SOWs so I would go, look

6  at the SOWs, determine what each particular SOW, the

7  predominant purpose is, and understand that the master

8  agreement are common terms.  And you'll buy the paper for that.

9  You'll buy the goods.  But look at what you're doing under the

10 SOWs to determine, not look at the master agreement and then

11 say these other things follow.  That may be a distinction

12 without a difference but I think it's very important here

13 because I'm focusing on what each SOW for which they are

14 seeking compensation sought.

15         THE COURT:  Okay.  And which SOWs are you saying

16 they're not entitled to for payment and which SOWs do you say

17 they are entitled to?

18         MR. GALARDI:  I don't think under any of them.  I

19 think all --

20         THE COURT:  All right.  So, what's the distinction?

21         MR. GALARDI:  Well, the distinction is if you were to

22 -- again, what concerns me is if you looked at the master

23 agreement, it says, "Thou shalt buy paper and services."  You

24 might not be able to come up with a predominant purpose.

25 What's better defined is when you look at the SOWs and it says,

1 yeah, I agreed to buy paper and products but here what I'm

2 doing predominantly is buying your services.

3        Now -- and let me also just point out one other fact,

4 just so that I can get some facts out.  If you look at Exhibit

5 J, the last page, there is a -- the 2008 master insert

6 schedule.  There's a line that says, "Paper" and it says,

7 "30 number newsprint, supplied by Circuit City."

8        MR. REPCZYNSKI:  I'm sorry.  Where were you looking?

9        MR. GALARDI:  Exhibit J, I think it's SOW-3, last

10 page, which is an attachment that you were pointing out.

11        MR. REPCZYNSKI:  Thank you.

12        MR. GALARDI:  And it's "Paper, No. 30 newsprint,

13 supplied by Circuit City, Brian Hargrove."  So, again, I'm not

14 wedded to the idea that who supplied the paper.  It's whose

15 paper was it.  We had title to the paper, whether it was in

16 their possession or not and we say it was incidental.  We paid

17 for it and we're really still talking about are you being

18 compensated for the service part.  That question, to me, goes

19 to well, was the SOW with the terms and conditions of the

20 master agreement embodied into it, was that predominantly a

21 service contract or was it predominantly a purchase of goods

22 contract.  And our argument is, with respect to each of those,

23 it's predominantly the services.  And if you read them, the

24 predominant purposes were the services and that's why I went

25 through the bullet points and the deliveries.

1            I'm not disputing that there was an item delivered at

2   the end of the day.  I'm just saying that's not what we

3   purchased.  If somebody went up to Circuit City and said, well,

4   what are you getting from these people, we're getting the

5   services.  We're getting -- you know, yeah, but I'm not buying

6   at the end of the day.  There's no purchase price here that

7   says thou shalt buy the insert for X dollars per insert.

8   That's not here.  That's a goods contract to me and that's what

9   we don't have here.  What you're buying here is the services.

10           So, really, two arguments on the debtor.  It has to

11  be received by the debtor so Your Honor can stop that and say,

12  look, I'm going to read narrowly under 503(b) law that says the

13  debtor.  If Congress wanted to go debtor or its designated

14  person, it could have done so.  It didn't so therefore we're

15  done.  That's illegal.

16           If you want to say you go broader, I think then you

17  can look at the UCC law that says merely because you deliver it

18  to a common carrier, that's not sufficient, it is a designated

19  -- sometimes it's designated and sometimes it's not.  There's

20  nothing in this contract that says thou shalt deliver to X.

21  It's a separate contract that somebody happened to come back

22  and pick up these goods.  Okay.  It's not a designated in their

23  contract to deliver it and they admit that so I don't think

24  it's the designated.  It's a common carrier to deliver and

25  again we think, again consistent with 503(b) law, consistent

1  with the case law that says common carrier is not a designee,

2  that neither the newspaper nor the common -- just by being the

3  contract party that happens to pick the goods up by a separate

4  third party contract with Circuit City or happens to have it

5  delivered to them as a separate contract with Circuit City,

6  that's not a designated representative from their perspective

7  and therefore it doesn't complete the UCC -- the UCC analysis,

8  even if you wanted to go beyond the words by the debtor.

9          I don't know if you have any other questions for me,

10  Your Honor.

11          THE COURT:  I don't but your counsel has.

12          MR. GALARDI:  He wants to correct me on something,

13  I'm sure.

14                     (Pause)

15          MR. GALARDI:  Again, I think we pointed it out, Your

16  Honor, but on the invoices for which they're seeking

17  compensation, even though the dollar amount of total paper cost

18  was significant, they're not on the invoices for which they're

19  seeking payment and they're not -- those have been paid.  So,

20  again, I go to the distinction between goods and services.

21  There may have been a goods contract with its parent or anybody

22  to buy it.  It was to store it and this is for what I think

23  these SOWs are, to take that paper which they had supplied by

24  the master agreement but which is incidental to this and to put

25  the services together -- put the leaflets together.  Thank you.

1              THE COURT:  All right.  Thank you.  Anything further,

2    Mr. Repczynski?

3              MR. REPCZYNSKI:  Not unless the Court has any

4    question for me, Your Honor.

5              THE COURT:  Okay.  All right.  The Court has before

6    it the debtor's objection to Claim No. 1053 of Graphic

7    Communication Holdings, Inc. and under Section 503(b)(3) of the

8    Bankruptcy Code.  The Court understands the requirement to

9    construe administrative claims narrowly.  The Court has

10   previously ruled that the predominant purpose test will be

11   applied to contracts for goods and services and in determining

12   whether the items provided were goods or were they services,

13   in this case, advertising circulars that were provided by

14   Graphic.

15             The Court, in construing the predominant purpose

16   test, thinks you have to look at the contract between the

17   parties and take a holistic approach to it about what it was,

18   whether or not the delivery of specific items was the purpose,

19   or whether the -- rather the predominant purpose was the

20   delivery of services.  In this case, I think that it's a very,

21   very close case, as both counsel know, with regard to the goods

22   issue and the Court finds that the newspaper circulars were in

23   the nature of special manufactured goods.  They were a movable

24   item as defined in the UCC and as the Court has previously

25   adopted the definition of goods.  And the Court finds that the

1  newspaper circulars -- that the overall predominant purpose of

2  this contract was the delivery of the quote "deliverables" or

3  the advertising inserts.  So, the Court finds that the

4  predominant purpose of the contract was for the delivery of

5  goods and so it meets the definition in Section 503(b)(9).

6          The next question is whether or not these goods were

7  received by the debtor.  Again, the Court is going to defer to

8  the definition of goods of receipt once again in the UCC, and

9  especially Comment (2) to Section 8.2-107 which provides that

10  --

11          MR. REPCZYNSKI:  Clarify, Your Honor?

12          THE COURT:  I'm sorry.  Seven oh -- I'm sorry.

13          MR. REPCZYNSKI:  The 8.2 is actually the Virginia

14  codification with the 2-7.

15          THE COURT:  2-7.  But this contract says specifically

16  it's to be construed under Virginia law.

17          MR. REPCZYNSKI:  Yes.

18          THE COURT:  So wouldn't I have to construe it under

19  the Virginia version of the UCC?

20          MR. REPCZYNSKI:  That is our position.

21          THE COURT:  Okay.  Well, that, again, is another

22  finding the Court will make, is that it was to be construed and

23  so the Court has to rely on Virginia UCC and that it provides

24  receipt of the goods by the buyer.  It can be the designee of

25  the buyer and the Court finds that the newspapers in this case

72

1  was the designee of Circuit City in this case.

2          So, the Court is going to overrule the objection to

3  the claim in this case on those grounds and the claim will be

4  allowed as a 503(b)(9) claim.  The Court doesn't have to then

5  look at the various invoices under the contract to see if this

6  particular invoice was for the service part or the goods part.

7  I think that once the Court has established that the overall

8  contract is predominantly for the delivery of the goods, as

9  this Court has found, that then all of the items are then

10 included within the contract and are included within the

11 definition of 503(b)(9) and so be allowed as an administrative

12 claim.

13         Mr. Repczynski, I would ask you please to prepare

14 appropriate findings and conclusions to that effect in a form

15 order for the Court to review.  It is not my intention to write

16 a memorandum opinion in this case unless the debtor wants to

17 appeal.  If you do decide to appeal the Court's decision, just

18 let my chambers know and then I will prepare a formal

19 memorandum opinion in the case.

20         Any questions regarding the Court's ruling on this?

21         MR. REPCZYNSKI:  Thank you, Your Honor.

22         MR. GALARDI:  No, Your Honor.

23         THE COURT:  Thank you both for your very capable

24 arguments.

25         MR. FOLEY:  Your Honor, that concludes the matters on

73

1  the agenda other than the chambers conference that you asked

2  for.

3                    *    *    *    *    *

4              **C E R T I F I C A T I O N**

5          We, KATHLEEN BETZ and CECILIA ASHBOCK, court approved

6  transcribers, certify that the foregoing is a correct

7  transcript from the official electronic sound recording of the

8  proceedings in the above-entitled matter, and to the best of

9  our ability.

10

11  /s/ Kathleen Betz

12  KATHLEEN BETZ

13

14

15

16  /s/ Cecilia Ashbock    DATE:  July 27, 2010

17  CECILIA ASHBOCK

18  J&J COURT TRANSCRIBERS, INC.

19

20

21

22

23

24

25