
EXHIBIT C

## SEPARATION AGREEMENT

THIS SEPARATION AGREEMENT, dated as of May 21, 2002, by and between Circuit City Stores, Inc., a Virginia corporation ("Circuit City Stores"), and CarMax, Inc., a Virginia corporation ("CarMax");

WHEREAS, CarMax is a direct wholly owned Subsidiary of Circuit City Stores, and the CarMax Subsidiaries are direct or indirect wholly owned Subsidiaries of CarMax;

WHEREAS, Circuit City Stores has filed under the Securities Act with the Securities and Exchange Commission a registration statement on Form S-4 (File No. 333-85240) (as amended, the "Registration Statement");

WHEREAS, Circuit City Stores will distribute to all Circuit City Stockholders the proxy statement/prospectus (the "Proxy/Prospectus") included in the Registration Statement soliciting Circuit City Stockholders' approval, among other things, of a comprehensive plan (including an amendment to the Articles necessary to effect such plan (the "Amendment")) to separate CarMax from Circuit City Stores so that CarMax would become an independent, separately traded public company (the "Separation");

WHEREAS, the Separation will be effected by (i) the redemption of all CarMax Group Stock by Circuit City Stores in exchange for shares of common stock, par value $.50 per share, of CarMax, Inc. (the "CarMax Common Stock") in accordance with paragraph B(5)(b)(i) of Article V of the Articles (the "Redemption") and (ii) the distribution of CarMax Common Stock as a dividend by Circuit City Stores to all holders of its Circuit City Group Stock (the "Distribution");

WHEREAS, Circuit City Stores and CarMax wish to provide for certain payments to be made by CarMax to Circuit City Stores in connection with the Separation and for certain relationships to exist between Circuit City Stores and CarMax after the Separation;

WHEREAS, the Board has determined that the Separation will, among other things, allow Circuit City Stores and CarMax to better focus on their respective businesses by (i) alleviating capital restraints currently imposed on CarMax because of its affiliation with Circuit City Stores, (ii) allowing Circuit City Stores and CarMax to establish the most appropriate capital structures for their respective businesses, (iii) allowing Circuit City Stores and CarMax to create appropriate retirement arrangements for the employees of each business and (iv) allowing CarMax to conduct business with the most appropriate vendors;

WHEREAS, the Board has unanimously approved and declared the advisability of this Agreement and the transactions and future actions contemplated hereby, including, without limitation, the Separation, the Redemption, the Distribution and the Amendment;

WHEREAS, it is the intention of Circuit City Stores and CarMax that the Separation be a tax-free transaction under Section 355 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder;

Case 08-35653-KRH    Doc 8347-3    Filed 08/24/10    Entered 08/24/10 18:09:42    Desc
Exhibit(s) Exhibit C    part 1 of 2    Page 2 of 14

2

WHEREAS, Morgan Stanley & Co. Incorporated has rendered to the Board an opinion respecting the fairness from a financial point of view of the Separation to the holders of Circuit City Group Stock and the holders of CarMax Group Stock;

WHEREAS, paragraph B(5)(b)(i) of Article V of the Articles permits the Board at any time at which all of the assets and liabilities attributed to the CarMax Group (and no other assets or liabilities of Circuit City Stores or any subsidiary thereof) are held directly or indirectly by a wholly owned subsidiary of Circuit City Stores, to redeem all of its outstanding CarMax Group Stock in exchange for the number of shares of common stock of such subsidiary equal to the number of such shares to be outstanding immediately following such exchange of shares multiplied by the "Outstanding CarMax Fraction" (as defined in the Articles);

WHEREAS, Circuit City Stores and the Board intend that all of the assets and liabilities of Circuit City Stores and its subsidiaries attributed to the CarMax Group (and no other assets or liabilities of Circuit City Stores or any subsidiary thereof) will be held by CarMax or one of the CarMax Subsidiaries at or prior to the time the Separation is consummated; and

WHEREAS, when the Amendment becomes effective, the CarMax Group Assets and the CarMax Group Liabilities will constitute, pursuant to the Articles, all of the assets and liabilities attributed to the CarMax Group (and no other assets or liabilities of Circuit City Stores or any subsidiary thereof);

NOW, THEREFORE, in consideration of the foregoing and the mutual promises set forth hereinafter, the parties hereby agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1    Definitions.

"Affiliate" of any Person shall mean any Person directly or indirectly controlling, controlled by, or under common control with, such Person; *provided* that, for the purposes of this definition, "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or partnership interests, by contract or otherwise.

"Action" shall mean any action, claim (whether or not filed), suit, arbitration, inquiry, demand, proceeding or investigation.

"Agreement" shall mean this Separation Agreement.

"Allocation Policies" shall mean those certain allocation policies adopted by the Board since October 14, 1996 with respect to the Circuit City Group and the CarMax Group.

Case 08-35653-KRH    Doc 8347-3    Filed 08/24/10    Entered 08/24/10 18:09:42    Desc
Exhibit(s) Exhibit C    part 1 of 2    Page 3 of 14

3

"Amendment" shall have the meaning given to such term in the recitals of this Agreement.

"Ancillary Contracts" shall mean the Tax Allocation Agreement, the Transition Services Agreement, the Employee Benefits Agreement and the Confidentiality Agreement.

"Articles" shall mean the Amended and Restated Articles of Incorporation of Circuit City Stores, as amended.

"Beneficial Assets" shall have the meaning given to such term in Section 2.8 of this Agreement.

"Board" shall mean the Board of Directors of Circuit City Stores.

"Business Day" shall mean a day other than a Saturday, a Sunday or a day on which banks in New York, New York or Richmond, Virginia are permitted or required to close.

"CarMax" shall have the meaning given to such term in the recitals of this Agreement.

"CarMax Action" shall have the meaning given to such term in Section 8.4(b) of this Agreement.

"CarMax Common Stock" shall have the meaning given to such term in the recitals to this Agreement.

"CarMax Group" shall mean, as of any date (i) all assets and liabilities of Circuit City Stores and its Subsidiaries attributed by the Board to the CarMax Group, (ii) all properties and assets transferred to the CarMax Group from the Circuit City Group pursuant to transactions in the ordinary course of business of the Circuit City Group and the CarMax Group or otherwise as the Board may have directed as permitted by the Articles and (iii) the interest of Circuit City Stores or any of its Subsidiaries in any business or asset acquired and any liabilities assumed by Circuit City Stores or any of its Subsidiaries outside of the ordinary course of business and attributed to the CarMax Group, as determined by the Board.

"CarMax Group Assets" shall mean all of the following assets of Circuit City Stores and its Subsidiaries: (i) all assets held by CarMax or one of the CarMax Subsidiaries on the date hereof which are assets of the CarMax Group under clauses (i), (ii), (iii), (iv) or (v) of paragraph B(7)(a) of Article V of the Articles; (ii) to the extent not included in other clauses of this definition, all assets attributed or transferred after the date hereof and on or before the Redemption Date, to the CarMax Group pursuant to action of the Board under paragraph B(7)(a) of Article V of the Articles; and (iii) to the extent not included in other clauses of this definition, any asset or assets arising after the Redemption Date that would have been attributed or transferred to the CarMax Group in accordance with paragraph B(7)(a) of Article V of the Articles had such asset or assets arisen prior to the Redemption Date; with such changes to the assets described in the clauses of this definition (including additions and subtractions) as are

4

contemplated by this Agreement or otherwise shall have occurred or shall occur in the ordinary course of the business of the CarMax Group after the date hereof.

"CarMax Group Liabilities" shall mean all of the following liabilities of Circuit City Stores and its Subsidiaries: (i) liabilities held by CarMax or one of the CarMax Subsidiaries on the date hereof which are liabilities of the CarMax Group under clauses (i), (ii) or (v) of paragraph B(7)(a) of Article V of the Articles; (ii) to the extent not included in other clauses of this definition, all liabilities attributed, after the date hereof and on or prior to the Redemption Date, to the CarMax Group pursuant to action of the Board under paragraph B(7)(a) of Article V of the Articles; and (iii) to the extent not included in the other clauses of this definition, any liability or liabilities arising after the Redemption Date that would have been attributed or transferred to the CarMax Group in accordance with paragraph B(7)(a) of Article V of the Articles had such liability or liabilities arisen prior to the Redemption Date; with such changes to the liabilities described in the clauses of this definition (including additions and subtractions) as are contemplated by this Agreement or otherwise shall have occurred or shall occur in the ordinary course of the business of the CarMax Group after the date hereof.

"CarMax Group Stock" shall mean Circuit City Stores, Inc.–CarMax Group Common Stock, par value $.50 per share.

"CarMax Subsidiaries" shall mean all of the Subsidiaries of CarMax, which Subsidiaries are listed on Schedule 1.1 hereto.

"Circuit City Action" shall have the meaning given to such term in Section 8.4(a) of this Agreement.

"Circuit City Group" shall mean, as of any date (i) the interest of Circuit City Stores or any of its Subsidiaries on such date in all of the assets, liabilities and businesses of Circuit City Stores or any of its Subsidiaries (and any successor companies), other than any assets, liabilities and businesses attributed in accordance with the Articles to the CarMax Group, (ii) all properties and assets transferred to the Circuit City Group from the CarMax Group pursuant to transactions in the ordinary course of business of both the Circuit City Group and the CarMax Group or otherwise as the Board may have directed as permitted by the Articles and (iii) the interest of Circuit City Stores or any of its Subsidiaries in any business or asset acquired and any liabilities assumed by Circuit City Stores or any of its Subsidiaries outside of the ordinary course of business and attributed to the Circuit City Group, as determined by the Board.

"Circuit City Group Stock" shall mean Circuit City Stores, Inc.–Circuit City Group Common Stock, par value $.50 per share.

"Circuit City Indemnified Persons" shall have the meaning given to such term in Section 4.1 of this Agreement.

"Circuit City Stockholders" shall mean, collectively, the holders of the Circuit City Group Stock and the holders of the CarMax Group Stock.

"Circuit City Stores" shall have the meaning given to such term in the recitals of this Agreement.

"Circuit City Stores Information" shall mean (i) all information contained in the Proxy/Prospectus under the captions "Circuit City Stores, Inc.—Selected Historical Consolidated Financial Information," "Circuit City Group Selected Historical Financial Information," "Circuit City Stores, Inc. Selected Unaudited Pro Forma Consolidated Financial Information," "Risk Factors—Risk Factors Relating to the Circuit City Business," "Information about Circuit City Stores after the Separation" and (ii) all information not explicitly relating to CarMax or to the CarMax Group contained in the Proxy/Prospectus under the captions "Management's Discussion and Analysis of Financial Condition and Results of Operations of Circuit City Stores, Inc.," "Special Note Regarding Forward-Looking Statements" and "Annex E—Circuit City Stores, Inc. Historical Consolidated Financial Statements."

"Circuit City Subsidiaries" shall mean the Subsidiaries of Circuit City Stores other than CarMax and the CarMax Subsidiaries.

"Closing" shall have the meaning given to such term in Section 9.1 of this Agreement.

"Closing Intercompany Amount" shall have the meaning given to such term in Section 2.6(b) of this Agreement.

"Confidentiality Agreement" shall have the meaning given to such term in Section 7.2 of this Agreement.

"Corporate Contract" shall have the meaning given to such term in Section 8.1 of this Agreement.

"Deeds and Assignments" shall have the meaning given to such term in Section 2.3 hereof.

"Dispute" shall have the meaning given to such term in Section 10.1(a) hereof.

"Dispute Notice" shall have the meaning given to such term in Section 10.1(a) hereof.

"Distribution" shall have the meaning given to such term in the recitals of this Agreement.

"Effective Date" shall have the meaning given to such term in Section 2.1 of this Agreement.

"Employee Benefits Agreement" shall have the meaning given to such term in Section 6.1.

6

"Excluded Liabilities" shall have the meaning given to such term in Section 2.4 hereof.

"Fairness Opinion" shall have the meaning given to such term in the recitals of this Agreement.

"Final Intercompany Amount" shall have the meaning given to such term in Section 2.6(d) of this Agreement.

"Governmental Authority" shall mean any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of the United States or any domestic or foreign state, county, city or other political subdivision.

"Indemnified Party" shall have the meaning given to such term in Section 4.4(b) of this Agreement.

"Indemnifying Party" shall have the meaning given to such term in Section 4.4(b) of this Agreement.

"Instruments of Assumption" shall have the meaning given to such term in Section 2.5 hereof.

"Insurance Administration" shall mean, with respect to each Joint Insurance Arrangement, (i) the accounting for premiums, retrospectively rated premiums, defense costs, indemnity payments, deductibles and retentions, as appropriate under the terms and conditions of each of the Joint Insurance Arrangements, (ii) the reporting to Insurers of any losses or claims that may cause the per occurrence, per claim or aggregate limits of any Joint Insurance Arrangement to be exceeded and (iii) the processing of claims made under the Joint Insurance Arrangements, including, without limitation, the reporting of claims to the Insurers' management and defense of claims and providing for appropriate releases upon settlement of claims.

"Insurance Arrangements" shall mean insurance policies and insurance contracts of any kind (other than insurance policies and insurance contracts which are employee benefit plans or as provided by the Employee Benefits Agreement), including, without limitation, primary and excess policies, commercial general liability policies, automobile policies, product liability policies, directors' and officers' liability policies, fiduciary liability policies, workers' compensation policies, and self-insurance programs and captive insurance company arrangements, together with the rights, benefits and privileges thereunder.

"Insurance Proceeds" shall mean those monies received by an insured from an Insurer or paid by an Insurer on behalf of an insured, in either case net of any applicable premium adjustment, retrospectively rated premium, deductible, retention or cost of reserve paid or held by or for the benefit of such insured.

"Insured Claims" shall mean those liabilities which, individually or in the aggregate, are covered within the terms and conditions of any of the Joint Insurance

Case 08-35653-KRH    Doc 8347-3    Filed 08/24/10    Entered 08/24/10 18:09:42    Desc
Exhibit(s) Exhibit C    part 1 of 2    Page 7 of 14

7

Arrangements, whether or not subject to deductibles, co-insurance, uncollectability or retrospectively rated premium adjustments.

"Insurer" shall mean a third party insurance carrier.

"Intellectual Property" shall mean all patents, trademarks, trade names, service marks, copyrights together with any registrations and applications therefor, Internet domain names, net lists, schematics, inventories, technology, trade secrets, source codes, know-how, computer software programs or applications, including, without limitation, all object and source codes and tangible or intangible proprietary information or material.

"Intercompany Amount" shall have the meaning given to such term in Section 2.6(a) of this Agreement.

"Joint Insurance Arrangements" shall mean the Insurance Arrangements of Circuit City Stores or any of its Subsidiaries existing at the Redemption Date and/or prior thereto that are owned or maintained by or on behalf of Circuit City Stores or any of its Subsidiaries and that relate to both (a) the Circuit City Group and/or any of the assets or liabilities thereof and (b) the CarMax Group and/or any of the CarMax Group Assets or any of the CarMax Group Liabilities.

"Liability" shall mean any liability, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, and whether or not the same that is or would properly be reflected on a balance sheet of Circuit City Stores or the Circuit City Group or the CarMax Group, or the notes thereto, including all costs and expenses relating thereto.

"Losses" shall have the meaning given to such term in Section 4.1 of this Agreement.

"Notice of Redemption" shall mean the Notice of Redemption to be sent to holders of CarMax Group Stock pursuant to paragraph B(5)(d)(vi) of Article V of the Articles.

"Person" shall mean and include an association, an individual, a partnership, a joint venture, a joint stock company, a corporation, a trust, an unincorporated organization, a limited liability company, a group, a government or other department or agency thereof and any other entity.

"Property Rights" shall have the meaning given to such term in Section 8.2(b) of this Agreement.

"Proxy/Prospectus" shall have the meaning given to such term in the recitals of this Agreement.

"Real Property" shall have the meaning given to such term in Section 2.2(a) of this Agreement.

Case 08-35653-KRH   Doc 8347-3   Filed 08/24/10   Entered 08/24/10 18:09:42   Desc
Exhibit(s) Exhibit C   part 1 of 2   Page 8 of 14

8

"Real Property Rights" shall have the meaning given to such term in Section 8.2(a) of this Agreement.

"Redemption" shall have the meaning given to such term in the recitals of this Agreement.

"Redemption Date" shall mean the date on which the Redemption occurs.

"Registration Statement" shall have the meaning given to such term in the recitals of this Agreement.

"Released Parties" shall have the meaning given such term in Section 3.1 of this Agreement.

"Response" shall have the meaning given to such term in Section 10.1(a) hereof.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the Rules and Regulations promulgated thereunder.

"Senior Party Representative" shall have the meaning given to such term in Section 10.1(a) hereof.

"Separation" shall have the meaning given to such term in the recitals of this Agreement.

"Special Dividend" shall have the meaning given to such term in Section 8.6 of this Agreement.

"Spincos" shall mean CarMax and the CarMax Subsidiaries.

"Spinco Indemnified Persons" shall have the meaning given to such term in Section 4.2 of this Agreement.

"Subsidiary" shall mean, with respect to any Person, (x) any partnership of which such Person or any of its subsidiaries is a general partner or (y) any other entity in which such Person or any of its subsidiaries owns or has the power to vote more than 50% of the equity interests in such entity having general voting power to participate in the election of the governing body of such entity.

"Tax" shall mean all Federal, state, local and foreign tax or taxes, and other assessments of a similar nature (whether imposed directly or through a withholding), including any interest, additions to tax or penalties applicable thereto.

"Tax Allocation Agreement" shall have the meaning given to such term in Section 8.7.

"Transition Services Agreement" shall have the meaning given to such term in Section 8.8.

017665-0006-02256-NY01.2145772.11
CORP-121832.1

Case 08-35653-KRH    Doc 8347-3    Filed 08/24/10    Entered 08/24/10 18:09:42    Desc
Exhibit(s) Exhibit C    part 1 of 2    Page 9 of 14

9

"Transaction Liabilities" shall have the meaning given to such term in Section 4.1(b) of this Agreement.

## ARTICLE II
## TRANSFER OF ASSETS AND LIABILITIES

Section 2.1    Effective Date. This Agreement shall become effective upon the date that the Proxy/Prospectus is first mailed to Circuit City Stockholders (the "Effective Date").

Section 2.2    CarMax Group Assets to Be Contributed to Spincos on or Prior to the Redemption Date. On or prior to the Redemption Date, Circuit City Stores will, or will cause the Circuit City Subsidiaries to, transfer, convey, assign and deliver to one of the Spincos designated by CarMax any remaining CarMax Group Assets held by Circuit City Stores or any Circuit City Subsidiary, including, without limitation:

    (a)    all interests in real property set forth on Schedule 2.2(a) (the "Real Property");

    (b)    all interests in Intellectual Property set forth on Schedule 2.2(b) hereto.

Notwithstanding the foregoing, the CarMax Group Assets shall not include any assets attributed to the Circuit City Group; and on or prior to the Redemption Date, CarMax will, or will cause the CarMax Subsidiaries to, transfer, convey, assign and deliver to Circuit City Stores or one of the Circuit City Subsidiaries designated by Circuit City Stores any assets held by any of the Spincos that are not CarMax Group Assets (other than rights under this Agreement and the Ancillary Contracts).

Section 2.3    Instruments of Conveyance. Any conveyance of CarMax Group Assets pursuant to this Agreement shall be effected by the execution and delivery by Circuit City Stores or the applicable Circuit City Subsidiary to CarMax or the applicable CarMax Subsidiary of (i) one or more appropriate deeds conveying all of Circuit City Stores' or the applicable Circuit City Subsidiary's right, title and interest in and to all applicable Real Property, (ii) one or more appropriate bills of sale or assignments evidencing the assignment of all personal property included in the applicable CarMax Group Assets, including Intellectual Property; and (iii) such other documents as shall be reasonably necessary or appropriate to vest in or confirm to CarMax or the applicable CarMax Subsidiary title to such conveyed CarMax Group Assets (collectively, the "Deeds and Assignments").

Section 2.4    CarMax Group Liabilities to Be Assumed by Spincos on or Prior to the Redemption Date. On or prior to the Redemption Date, CarMax or another Spinco designated by CarMax will assume, upon the terms and subject to the conditions set forth herein, or agree to perform or satisfy, any remaining CarMax Group Liabilities not previously assumed by, or an obligation of, a Spinco, including, without limitation:

    (a)    any and all liabilities arising out of or that are expressly contemplated by this Agreement or any Ancillary Contract as liabilities to be assumed by a Spinco, and all

Case 08-35653-KRH   Doc 8347-3   Filed 08/24/10   Entered 08/24/10 18:09:42   Desc
Exhibit(s) Exhibit C   part 1 of 2   Page 10 of 14

10

agreements, obligations and liabilities of such Spinco under this Agreement or any of the Ancillary Contracts; and

(b)   any third-party fees and expenses arising out of or relating to this Agreement or the Ancillary Contracts (or the transactions contemplated thereby).

Notwithstanding the foregoing, the CarMax Group Liabilities shall not include (i) any liability attributed to the Circuit City Group, (ii) any third-party fees and expenses allocated to Circuit City Stores by this Agreement or the Ancillary Contracts, (iii) any liability resulting from claims by the holders of Circuit City Group Stock or the creditors of Circuit City Stores based on the transactions contemplated by this Agreement or the Ancillary Contracts (or the transactions contemplated thereby) or (iv) any indebtedness for borrowed money of Circuit City Stores or any of the Circuit City Subsidiaries to a third party except to the extent reflected in the calculation of the Intercompany Amount (collectively, the "Excluded Liabilities"); and on or prior to the Redemption Date, Circuit City Stores will, or will cause the Circuit City Subsidiaries to, assume, or agree to perform and satisfy, any liabilities held by any of the Spincos that are not CarMax Group Liabilities (other than obligations under this Agreement and the Ancillary Contracts).

Section 2.5   Instruments of Assumption.   Any assumption by any of the Spincos of CarMax Group Liabilities pursuant to this Agreement shall be effected by the execution and the delivery to Circuit City Stores or the applicable Circuit City Subsidiary by such Spinco of one or more instruments of assumption and such other documents as shall be reasonably necessary or appropriate to evidence the assumption by such Spinco of such CarMax Group Liabilities (collectively, the "Instruments of Assumption").

Section 2.6   Resolution of Intercompany Amount.

(a)   For purposes of this Agreement, the term "Intercompany Amount" shall mean, as of the end of any fiscal month of Circuit City Stores, the difference between (i) the sum of (A) the aggregate amount of indebtedness of Circuit City Stores and the Circuit City Subsidiaries attributed to the CarMax Group that is reflected as a liability of the CarMax Group in the most recent publicly filed financial statements of Circuit City Stores and its Subsidiaries or (to the extent changed or arising thereafter) would be so reflected in a subsequent filing of such financial statements as determined in accordance with the Allocation Policies applied consistently with past practices but that is not otherwise assumed by one of the Spincos as part of the CarMax Group Liabilities (as of the end of the prior fiscal month) and (B) any items which increase the liabilities of the CarMax Group in the intergroup accounts identified on Schedule 2.6 hereto since the end of such prior fiscal month minus (ii) any items which decrease the liabilities of the CarMax Group in the intergroup accounts identified on Schedule 2.6 hereto since the end of such prior fiscal month.

(b)   Not less than five Business Days prior to the then scheduled Redemption Date, Circuit City Stores shall deliver to CarMax its good faith determination of the Intercompany Amount as of the end of the immediately preceding fiscal month (such amount, the "Closing Intercompany Amount"), together with the calculation of the Closing Intercompany Amount and all necessary supporting documentation.

11

(c)     Immediately prior to the Redemption, CarMax shall pay to Circuit City Stores an aggregate amount in cash equal to the Closing Intercompany Amount.

(d)     As soon as practicable, but in no event later than 30 days following the Redemption Date, Circuit City Stores shall, on a basis consistent with past practice and the calculation of the Closing Intercompany Amount, prepare and deliver to CarMax an itemized calculation of the Intercompany Amount as of the Redemption Date (as finally determined pursuant to this paragraph, the "Final Intercompany Amount"). Following the determination of the Final Intercompany Amount, Circuit City Stores shall provide CarMax and its authorized representatives with full access to the books and records of Circuit City Stores necessary to review the calculation of the Final Intercompany Amount and cooperate fully with CarMax's authorized representatives in connection with such review. If CarMax objects to Circuit City Stores' calculation of the Final Intercompany Amount, it shall provide a detailed analysis of any such objection(s) on or prior to the 30th day following the delivery by Circuit City Stores of its determination of the Final Intercompany Amount (in which case any such disputes shall be resolved in the manner contemplated by Section 10.1 hereof). If CarMax does not object to Circuit City Stores' calculation of the Final Intercompany Amount within such 30-day period, then Circuit City Stores' calculation of the Final Intercompany Amount shall be final and binding on the parties for the purposes hereunder.

(e)     In the event that the Final Intercompany Amount is less than the Closing Intercompany Amount, then Circuit City Stores shall pay to CarMax an amount in cash equal to the amount of any such difference within five Business Days of the time that such determination becomes final pursuant to paragraph (d) above and Section 10.1. In the event that the Final Intercompany Amount is greater than the Closing Intercompany Amount, then CarMax shall pay to Circuit City Stores an amount in cash equal to the amount of any such difference within five Business Days of the time that such determination becomes final pursuant to paragraph (d) above and Section 10.1. Any payment made pursuant to this paragraph (e) shall be accompanied by interest at the prime rate as announced from time to time by Citibank N.A., accrued from the Redemption Date.

Section 2.7    Further Assurances.

(a)     In addition to the actions specifically provided for elsewhere in this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable laws, regulations and agreements to consummate and make effective the transactions contemplated by this Agreement. Without limiting the foregoing, each party hereto shall cooperate with the other party, and execute and deliver, or use commercially reasonable efforts to cause to be executed and delivered, all instruments, including instruments of conveyance, assignment, transfer and assumption, and to make all filings with, and to obtain all consents, approvals or authorizations of, any governmental or regulatory authority or any other Person under any permit, license, agreement, indenture or other instrument, and take all such other actions as such party may reasonably be requested to take by the other party hereto from time to time, consistent with the terms of this Agreement and the Ancillary Contracts, in order to

12

effectuate the provisions and purposes of this Agreement and the transfers of assets and assumptions of liabilities and the other transactions contemplated hereby.

(b) If any transfer of assets or assumption of liabilities contemplated by this Agreement is not consummated prior to or at the time of Redemption, then the party hereto retaining such asset or liability shall continue to take the actions required by this Section 2.7 to consummate and make effective such transfer as soon as commercially practicable after the Redemption Date and, in the case of assets, shall use its commercially reasonable efforts to preserve the value of such assets until the time of transfer. If and when any such asset or liability becomes transferable, such transfer shall be effected forthwith. The parties hereto agree that, no later than the Redemption Date, each party hereto shall be deemed to have acquired complete and sole beneficial ownership to all of the assets, together with all rights, powers and privileges incident thereto, and shall be deemed to have assumed in accordance with the terms of this Agreement and the Ancillary Contracts all of the liabilities, and all duties, obligations and responsibilities incident thereto, that such party is entitled or required to hold or assume pursuant to this Agreement.

(c) If subsequent to the Redemption Date, Circuit City Stores shall either (i) receive written notice from CarMax or (ii) determine that certain specified assets of Circuit City Stores or a Circuit City Subsidiary that properly constitute CarMax Group Assets were not transferred to a Spinco on or prior to the Redemption Date, then, as soon as commercially practicable thereafter, Circuit City Stores shall transfer and deliver, or shall cause the applicable Circuit City Subsidiary to transfer and deliver, any and all of such assets to the applicable Spinco without the payment by such Spinco of any consideration therefor. If subsequent to the Redemption Date, CarMax shall either (i) receive written notice from Circuit City Stores or (ii) determine that certain specified assets of CarMax or a Spinco that do not properly constitute CarMax Group Assets were transferred to or held by a Spinco on or prior to the Redemption Date, then as soon as commercially practicable thereafter, CarMax shall transfer and deliver, or shall cause such Spinco to transfer and deliver, any and all of such assets to Circuit City Stores or the Circuit City Subsidiary designated by Circuit City Stores without the payment by Circuit City Stores or such Circuit City Subsidiary of any consideration therefor.

(d) If subsequent to the Redemption Date, Circuit City Stores shall either (i) receive written notice from CarMax or (ii) determine that certain specified liabilities of Circuit City Stores or a Circuit City Subsidiary that properly constitute CarMax Group Liabilities were not assumed by a Spinco on or prior to the Redemption Date, then, as soon as commercially practicable thereafter, Circuit City Stores shall permit, or shall cause the applicable Circuit City Subsidiary to permit, a Spinco to assume (and such Spinco as soon as commercially practicable shall assume) such liabilities without payment by Circuit City or any Circuit City Subsidiary of any consideration for such assumption. If subsequent to the Redemption Date, CarMax shall either (i) receive written notice from Circuit City Stores or (ii) determine that certain specified liabilities of a Spinco that do not properly constitute CarMax Group Liabilities were assumed by a Spinco on or prior to the Redemption Date, then, as soon as commercially practicable thereafter, CarMax shall permit, or shall cause the applicable CarMax Subsidiary to permit, Circuit City Stores or a Circuit City Subsidiary to assume (and Circuit City Stores or such Circuit

Case 08-35653-KRH    Doc 8347-3    Filed 08/24/10    Entered 08/24/10 18:09:42    Desc
              Exhibit(s) Exhibit C    part 1 of 2    Page 13 of 14

13

City Subsidiary as soon as commercially practicable shall assume) such liabilities without the payment by any Spinco of any consideration for such assumption.

(e) Any disagreement regarding whether or not any asset or liability was or should have been a CarMax Group Asset or CarMax Group Liability shall be resolved in accordance with the provisions of Section 10.1.

(f) Circuit City Stores will cooperate with CarMax and its advisers in calculating the current and accumulated earnings and profits of the Spincos and in making estimates of such amount as of the Redemption Date. Not less than five Business Days prior to the Redemption Date, Circuit City Stores shall deliver to CarMax combined trial balances for the CarMax Group (including supporting schedules that combine the separate trial balances of each Spinco, together with any other adjustments, that are used in arriving at such CarMax Group combined trial balances) which shall reflect the results of the Carmax Group from the start of the current fiscal year through the end of the second to last full month immediately preceding the Redemption Date. Such combined trial balances shall be prepared consistently with the past practices of the CarMax Group and shall also be adjusted to take into account transactions that are expected to occur on or before the Redemption Date.

Section 2.8    Unassignable Assets. Notwithstanding anything in this Agreement to the contrary, neither this Agreement nor any of the Deeds and Assignments shall constitute an agreement to assign any CarMax Group Asset without the consent of another Person if an assignment or attempted assignment thereof without the consent of such Person would constitute a breach thereof or in any way impair the rights thereunder. If any such consent is not obtained or if an attempted assignment thereof would be ineffective or would impair any party's rights with respect to such CarMax Group Asset so that a Spinco would not receive all such rights, then Circuit City Stores and CarMax will cooperate in commercially reasonable arrangements to provide or cause to be provided to the Spincos the benefits of any such CarMax Group Asset (the "Beneficial Assets"), subject to the burdens thereof. In addition, Circuit City Stores shall take such other actions as may be reasonably requested by CarMax in order to place the Spincos, insofar as reasonably possible, in the same position as if such Beneficial Asset had been transferred as contemplated hereby, so that all the benefits and burdens relating thereto shall inure to the Spincos. If and when any such consents and approvals are obtained, the transfer of the applicable Beneficial Asset shall be promptly effected in accordance with the terms of this Agreement.

ARTICLE III
MUTUAL RELEASE; LIMITED REPRESENTATIONS AND WARRANTIES

Section 3.1    Mutual Release. From and after the Redemption Date, CarMax, on the one hand, and Circuit City Stores, on the other hand, releases and forever discharges the other and its Subsidiaries and each of their respective officers, directors, agents, Affiliates, record and beneficial security holders (including, without limitation, trustees and beneficiaries of trusts holding such securities), advisors and representatives and their respective successors and assigns (collectively "Released Parties"), of and from all debts, demands, actions, causes of action, suits,

14

accounts, covenants, contracts, agreements, damages, claims and liabilities whatsoever of every name and nature, both in law and in equity, which the releasing party has or ever had, which arise out of or relate to, in whole or in part, events, circumstances or actions, whether known or unknown, taken by such other party occurring or failing to occur or any conditions existing on or prior to the Redemption Date, but only to the extent any of the foregoing have been resolved in accordance with the Allocation Policies prior to the Redemption Date; *provided, however*, that the foregoing general release shall not apply to (a) any CarMax Group Liabilities, any liabilities attributed to the Circuit City Group or any liabilities or obligations under the Ancillary Contracts; (b) any party's rights to enforce this Agreement or any of the instruments delivered pursuant to this Agreement; and (c) any liability the release of which would result in the release of any Person other than a Released Party (provided that the parties agree not to bring suit or permit any of their Affiliates to bring suit against any Released Party with respect to any liability to the extent such Released Party would be released with respect to such liability by this Section 3.1 but for this clause (c)). The parties hereto acknowledge that the foregoing general release shall not apply to any liabilities or obligations assigned by the parties to third parties prior to the Redemption Date. In addition, each of the parties hereto separately acknowledges, and shall be deemed by operation of this Section 3.1 to have acknowledged, that the foregoing mutual release was separately bargained for and a key element of the transaction of which this mutual release is a part, and expressly waives (i) the benefits of the provisions of Section 1542 of the California Civil Code, which provides that "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor" and (ii) the benefits of any similar, comparable or equivalent law, statute, regulation or legal principle of any other jurisdiction.

Section 3.2   Waiver of Conflict. The parties acknowledge that each of the Spincos, on the one hand, and Circuit City Stores and the Circuit City Subsidiaries, on the other hand, are both currently represented by members of Circuit City Stores' legal department and Circuit City Stores' outside counsel. Each of CarMax (on behalf of the Spincos), on the one hand, and Circuit City Stores (on behalf of itself and the Circuit City Subsidiaries), on the other hand, waives any conflict with respect to such common representation that may arise before, at or after the Closing Date.

Section 3.3   Limited Representations and Warranties.

(a)   CarMax agrees and acknowledges that neither Circuit City Stores nor any of the Circuit City Subsidiaries nor any of their respective Affiliates is, in this Agreement or in any other agreement or document, making any representation or warranty to the Spincos as to any aspect of the CarMax Group, the CarMax Group Assets or the CarMax Group Liabilities or as to any consents or approvals required in connection with the consummation of the transactions contemplated by this Agreement, it being understood and agreed that each of the Spincos shall take the CarMax Group Assets, and shall assume, perform and discharge the CarMax Group Liabilities, on an "AS IS, WHERE IS" basis. The Spincos shall bear the economic and legal risk that any conveyance of CarMax Group Assets contemplated hereby shall be insufficient to convey anything more than all of Circuit City Stores' or the applicable Circuit City Subsidiary's right, title and interest to the applicable CarMax Group Assets.

017665-0006-02256-NY01.2145772.11
CORP 121832.1