## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| Circuit City Stores, Inc., <u>et al</u>., | : | Case No. 08-35653 (KRH) |
| | : | |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### MEMORANDUM IN SUPPORT OF SECOND AMENDED JOINT PLAN OF LIQUIDATION OF CIRCUIT CITY STORES, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION AND ITS OFFICIAL COMMITTEE OF CREDITORS HOLDING GENERAL UNSECURED CLAIMS

Dated:  Richmond, Virginia
        September 3, 2010

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Gregg M. Galardi, Esq.
Ian S. Fredericks, Esq.
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

– and –

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Chris L. Dickerson, Esq.
155 North Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

– and –

MCGUIREWOODS LLP
Douglas Foley (VSB No. 34364)
Sarah B. Boehm (VSB No. 45201)
One James Center
901 E. Cary Street
Richmond, Virginia 23219
(804) 775-1000

Counsel for Debtors and Debtors in Possession

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski, Esq.
Jeffrey N. Pomerantz, Esq.
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, California 90067-4100

– and –

PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein, Esq.
780 Third Avenue, 36th Floor
New York, NY 10017-2024

– and –

TAVENNER & BERAN, PLC
Lynn L. Tavenner, Esq. (VSB No. 30083)
Paula S. Beran, Esq. (VSB No. 34679)
20 North Eighth Street
Second Floor
Richmond, Virginia 23219

Counsel for the Creditors' Committee

# Table of Contents

Page

PRELIMINARY STATEMENT ......................................................................................2

I.    BACKGROUND AND HIGHLIGHTS OF THE PLAN. ...................................................3

    A.    Background and Events Leading up to the Commencement of These Cases.
          ......................................................................................................................3

        1.    Business Overview.......................................................................4

        2.    Events Leading to the Chapter 11 Filings....................................5

        3.    GOB Sales and Liquidation. .......................................................6

    B.    Progress of the Chapter 11 Cases..........................................................8

    C.    The First Amended Plan. ......................................................................9

    D.    The Supplement. .................................................................................10

    E.    Overview of the Plan. .........................................................................10

    F.    Acceptance of Plan. ............................................................................11

II.    MODIFICATIONS TO THE PLAN. ..............................................................................12

    A.    Modifications to the First Amended Plan. ...........................................12

    B.    Modifications to the Plan. ...................................................................12

    C.    The Modifications Are Neither Material Nor Adverse And Do Not
          Require Re-solicitation. ......................................................................14

III.    THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER
        SECTION 1129 OF THE BANKRUPTCY CODE...........................................................17

    A.    The Plan Complies With the Applicable Provisions of Title 11 (Section
          1129(a)(1)). .......................................................................................18

        1.    Classification of Claims and Interests (Section 1122)...............19

        2.    Mandatory Contents of the Plan. ..............................................21

3.    Discretionary Contents of the Plan (1123(b)).............................................25

4.    Substantive Consolidation of the Consolidated Debtors. .........................26

5.    Executory Contracts and Unexpired Leases. .............................................36

B.    Compliance of Plan Proponents with the Applicable Provisions of Title 11
(Section 1129(a)(2)).....................................................................................37

C.    Good Faith (Section 1129(a)(3))..................................................................39

D.    Payments for Services and Expenses (Section 1129(a)(4)). ....................42

E.    Identification of Directors, Officers and Insiders (Section 1129(a)(5)). ...............43

F.    Rate Changes (Section 1129(a)(6))..............................................................46

G.    The "Best Interests" Test (Section 1129(a)(7)). ........................................46

H.    Acceptance by Impaired Classes (Section 1129(a)(8))..............................49

I.    Treatment of Priority Claims (Section 1129(a)(9)). ..................................50

J.    Acceptance of at Least One Impaired Class (Section 1129(a)(10)). ......................53

K.    Feasibility (Section 1129(a)(11))..................................................................53

L.    Payment of Certain Fees (Section 1129(a)(12)). ........................................55

M.    Continuation of Retiree Benefits (Section 1129(a)(13))...........................56

IV.    THE PLAN SATISFIES THE "CRAMDOWN" REQUIREMENTS. ............................56

A.    The Plan Does Not Unfairly Discriminate....................................................57

B.    The Plan is Fair and Equitable. ....................................................................58

C.    The Plan With Respect to InterTAN and Ventoux. ......................................60

V.    ALL OBJECTIONS TO THE PLAN HAVE EITHER BEEN RESOLVED BY
AGREEMENT BETWEEN THE PARTIES OR SHOULD BE OVERRULED.............61

# TABLE OF AUTHORITIES

## CASES

Matter of 47th and Belleview Partners, 95 B.R. 117 (Bankr. W.D. Mo. 1988) ...........................54

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Ltd. P'ship,
    526 U.S. 434 (1999)...........................................................................................................58

In re 203 N. LaSalle St. Ltd. Partnership,
    190 B.R. 567 (Bankr. N.D. Ill. 1995), aff'd, 195 B.R. 692 (N.D. Ill. 1996), aff'd,
    126 F.3d 955 (7th Cir. 1997), rev'd on other grounds sub nom. Bank of Am. Nat'l
    Trust & Sav. Ass'n v. 203 N. LaSalle St. Ltd. P'ship, 526 U.S. 434 (1999).....................57

In re 203 N. LaSalle St. Partnership,
    126 F.3d 955 (7th Cir. 1997), rev'd on other grounds sub nom. Bank of Am. Nat'l
    Trust & Sav. Ass'n v. 203 N LaSalle St. P'ship, 526 U.S. 434 (1999) .................17, 40, 47

In re Adamson Co., Inc., 42 B.R. 169 (Bankr. E.D. Va. 1984) ...............................................54, 56

In re Armstrong World Industrial, Inc., 348 B.R. 136 (D. Del. 2006) .........................................18

In re Avia Energy Development, L.L.C.,
    2007 WL 2238039 (Bankr. N.D. Tex. Aug. 2, 2007)......................................................20

In re Aztec Co., 107 B.R. 585 (Bankr. M.D. Tenn. 1989)............................................................57

In re Bally Total Fitness of Greater New York, Inc.,
    2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)....................................................17

Bartel v. Bar Harbor Airways, Inc., 196 B.R. 268 (S.D.N.Y. 1996) ...........................................28

In re Bond, 1994 U.S. App. LEXIS 1282 (4th Cir. 1994) ...........................................................28

In re Brotby, 303 B.R. 177 (B.A.P. 9th Cir. 2003).......................................................................54

In re Byrd Foods, Inc., 253 B.R. 196 (Bankr. E.D. Va. 2000) ....................................................17

Campbell v. Cathcart (In re Derivium Capital, LLC), 380 B.R. 429 (Bankr. D.S.C. 2006) ...30, 32

In re Catron, 186 B.R. 194 (Bankr. E.D. Va. 1995) ....................................................................56

In re Century Glove, Inc., 1993 WL 239489 (D. Del. Feb. 10, 1993)..........................................40

In re Crowthers McCall Pattern, Inc., 120 B.R. 279 (Bankr. S.D.N.Y. 1990) .............................47

In re Deltacorp, Inc., 179 B.R. 773 (Bankr. S.D.N.Y. 1995)..........................................................30

In re DeLuca, 1996 WL 910908 (Bankr. E.D. Va. Apr. 12, 1996).................................................54

In re Drexel Burnham Lambert Group Inc., 138 B.R. 723 (Bankr. S.D.N.Y. 1992)....................43

In re Eagle-Picher Industrial, Inc., 203 B.R. 256 (S.D. Ohio 1996)..............................................42

Eastgroup Properties v. S. Motel Association, Ltd., 935 F.2d 245 (11th Cir. 1991)....................31

In re Econ. Cast Stone Co., 16 B.R. 647 (Bankr. E.D. Va. 1981) ...........................................49, 53

In re Enron Corp., 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004) ...........................14

In re Exide Techs., 303 B.R. 48 (Bankr. D. Del. 2003).........................................................20, 59

F.D.I.C. v. Colonial Realty Co., 966 F.2d 57 (2d Cir. 1992)..........................................................29

In re Fas Mart Convenience Stores, Inc., 320 B.R. 587 (Bankr. E.D. Va. 2004) .........................31

Federal-Mogul Global v. Federal-Mogul Global Inc. (In re Federal-Mogul Global),
    402 B.R. 625 (D. Del. 2009) ..................................................................................................18

Finance Sec. Assur. Inc. v. T-H New Orleans Ltd. Partnership (In re T-H New Orleans
    Ltd. Partnership), 116 F.3d 790 (5th Cir. 1997) .................................................................40

Fogel v. Zell, 221 F.3d 955 (7th Cir. 2000)....................................................................................28

In re Freymiller Trucking, Inc., 190 B.R. 913 (Bankr. W.D. Okla. 1996) ....................................57

In re Frye, 216 B.R. 166 (E.D. Va. 1997)........................................................................................28

In re Future Energy Corp., 83 B.R. 470 (Bankr. S.D. Ohio 1988) ......................................40, 42, 47

In re Genesis Health Ventures, Inc., 266 B.R. 591 (Bankr. D. Del. 2001)....................................59

In re Granite Broad. Corp., 369 B.R. 120 (Bankr. S.D.N.Y. 2007)...............................................59

Hanson v. First Bank of South Dakota, N.A., 828 F.2d 1310 (8th Cir. 1987) ..............................40

In re Heritage Organization, LLC, 375 B.R. 230 (Bankr. N.D. Tex. 2007) ..................................55

In re Hibbard Brown & Co., Inc., 217 B.R. 41 (Bankr. S.D.N.Y. 1998).......................................29

In re Jasmine, Ltd., 258 B.R. 119 (D.N.J. 2000) ...........................................................................29

John Hancock Mutual Life Insurance Co. v. Route 37 Bus. Park Associates,
    987 F.2d 154 (3d Cir. 1993)...............................................................................19

Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) ........................................47

In re Kmart Corp., 2006 Bankr. LEXIS 542 (Bankr. N.D. Ill. Apr. 11, 2006)..............16

Koelbl v. Glessing (In re Koelbl), 751 F.2d 137 (2d Cir. 1984)....................................40

In re Leslie Fay Cos., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) .................................47, 57

Liberty National Enterprises v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La
    Mesa Ltd. Partnership), 115 F.3d 650 (9th Cir. 1997).................................47, 57

In re Machne Menachem, Inc., 233 F. App'x. 119, 120 (3d Cir. 2007).........................18

In re Madison Hotel Assocs., 749 F.2d 410, 424-25 (7th Cir. 1984)............................40

In re Martin, 91 F.3d 389 (3d Cir. 1996) ..............................................................28, 29

In re Mason & Dixon Lines, Inc., 71 B.R. 300 (Bankr. M.D.N.C. 1987) .....................52

Menard-Sanford v. Mabey, 880 F.2d 694 (4th Cir. 1989)............................................16

Mercury Capital Corp. v. Milford Conn. Associate, L.P., 354 B.R. 1 (D. Conn. 2006) ..............54

In re Merrimack Valley Oil Co., 32 B.R. 485 (Bankr. D. Mass. 1983)........................54

In re Mirant Corp., 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ............18, 20

Nellis v. Shugrue, 165 B.R. 115 (S.D.N.Y. 1994)........................................................29

Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988)........................................58

In re Owens Corning, 419 F.3d 195 (3d Cir. 2005)........................................................

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000).................................................37

In re Peramco International, Inc., 242 B.R. 313 (E.D. Va. 2000),
    rev'd on other grounds, 2001 U.S. App. LEXIS 1845 (4th Cir. 2001) .............32

In re Pero Brothers Farms, Inc., 90 B.R. 562 (Bankr. S.D. Fla. 1988).........................54

iii

Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) ...............................................................................28, 29

In re Proveaux, 2008 Bankr. LEXIS 1325 (Bankr. D.S.C. Apr. 4, 2008) ........................................

In re Radco Properties, Inc., 402 B.R. 666 (Bankr. E.D.N.C. 2009)...............................................16

In re Resorts International, Inc., 145 B.R. 412 (Bankr. D.N.J. 1990) ...........................................43

In re Rivers End Apts., Ltd., 167 B.R. 470 (Bankr. S.D. Ohio 1994) ...........................................57

Schnelling v. Crawford (In re James River Coal Co., Inc.), 360 B.R. 139 (Bankr. E.D. Va. 2007) ...............................................................30

In re Schwarzmann, 203 B.R. 919 (Bankr. E.D. Va. 1995)...................................................17, 56

In re Sentinel Management Group, 398 B.R. 281 (Bankr. N.D. Ill. 2008)............................15, 16

In re Sherwood Square Associates, 107 B.R. 872 (Bankr. D. Md. 1989) ....................................44

SK-Palladin Partners, L.P. v. Platinum Entm't, Inc., No. 01 C 7202, 2001 WL 1593154 (N.D. Ill. Dec. 13, 2001)....................................................................47

In re Smith, 2009 WL 1241316 (Bankr. E.D.N.C. Apr. 29, 2009).................................................32

In re Standard Brands Paint Co., 154 B.R. 563 (Bankr. C.D. Cal. 1993)....................................30

In re Stations Holding Co., No. 02-10882, 2002 WL 31947022 (Bankr. D. Del. Sept. 30, 2002) .....................................................................................................................................37

Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.), 84 B.R. 167 (9th Cir. B.A.P. 1988)................41

In re Stone & Webster, Inc., 286 B.R. 532 (Bankr. D. Del. 2002) ...............................................30

In re Telesphere Communications, Inc., 179 B.R. 544 (Bankr. N.D. Ill. 1994)...........................29

In re Terex Corp., 984 F.2d 170 (6th Cir. 1993).........................................................................52

In re Texaco Inc., 84 B.R. 893 (Bankr. S.D.N.Y. 1988).............................................................37

In re Thomas, 261 B.R. 848 (Bankr. E.D. Va. 2001), rev'd on other grounds, 274 B.R. 450 (E.D. Va. 2001) .....................................................32

In re Trans. World Airlines, Inc., 185 B.R. 302, In re Stations Holding Co., No. 02-10882, 2002 WL. 31947022 (Bankr. D. Del. Sept. 30, 2002) .....................................................37

Travelers Insurance Co. v. Bryson Porps., XVIII (In re Bryson Properties, XVIII),
    961 F.2d 496 (4th Cir. 1992) ....................................................................19, 56

Union Savingss Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),
    860 F.2d 515 (2d Cir. 1988).........................................................29, 30, 31, 32

United States ex. Rel. Rahman v. Oncology Associate, P.C., 269 B.R. 139 (D. Md. 2001).........28

United States v. TM Building Products, Ltd., 231 B.R. 364 (S.D. Fla. 1998) .............................52

In re Vecco Construction Industrial, Inc., 4 B.R. 407 (Bankr. E.D. Va. 1980) ............................32

In re Victory Construction Co., 42 B.R. 145 (Bankr. C.D. Cal. 1984).........................................47

In re Walker, 165 B.R. 994 (E.D. Va. 1994) ...................................................................40, 47, 54

In re Whittaker Mem'l Hospital Association, Inc., 149 B.R. 812 (Bankr. E.D. Va. 1993) ...........54

**STATUTES AND RULES**

11 U.S.C. § 105(a) ....................................................................................................................30

11 U.S.C. § 365 .........................................................................................................................36

11 U.S.C. § 1122 ..........................................................................................................18, 19, 21

11 U.S.C. § 1122(a) ..................................................................................................................19

11 U.S.C. § 1123 ..................................................................................................................18, 21

11 U.S.C. § 1123(a) ..............................................................................21, 22, 23, 24, 25, 30

11 U.S.C. § 1123(b) ............................................................................................................25, 26

11 U.S.C. § 1125 .........................................................................................................14, 38, 39

11 U.S.C. § 1125(a) ..................................................................................................................14

11 U.S.C. § 1125(b) ............................................................................................................14, 38

11 U.S.C.  §1126.......................................................................................................................49

11 U.S.C.  §1126(f).................................................................................................................49

v

11 U.S.C. §1126(g) ...................................................................................................50, 56

11 U.S.C. §1127(a) ...................................................................................................14, 15

11 U.S.C. §1129(a) ................................................................................................... passim

11 U.S.C. §1129(b) ...............................................................18, 49, 50, 56, 57, 58, 59

28 U.S.C. § 1930...........................................................................................................55

Fed. R. Bankr. P. 3017..................................................................................................39

Fed. R. Bankr. P. 3018..................................................................................................39

Fed. R. Bankr. P. 3019...............................................................................................14, 15

Fed. R. Bankr. P. 9019...............................................................................................28, 36

## MISCELLANEOUS

7 Collier on Bankruptcy ¶ 1129.02[11] (Alan N. Resnick & Henry J. Sommer, eds., 16th
ed. 2009) ..............................................................................................................54, 55

H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368 ...............18, 37

S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 ........................18

## **Table of Exhibits**

| | |
|---|---|
| Exhibit A | Redline Showing Modifications To First Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims |
| Exhibit B | Redline Showing Modifications To Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims |
| Exhibit C | Liquidation Analysis as of September 3, 2010 |
| Exhibit D-1 | Table of Unresolved Objections to Confirmation |
| Exhibit D-2 | Table of Resolved Objections to Confirmation |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re:                                              :          Chapter 11
                                                    :
Circuit City Stores, Inc., et al.,                  :          Case No. 08-35653 (KRH)
                                                    :
                             Debtors.    :          (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM IN SUPPORT OF SECOND AMENDED JOINT PLAN OF
LIQUIDATION OF CIRCUIT CITY STORES, INC. AND ITS AFFILIATED DEBTORS
AND DEBTORS IN POSSESSION AND ITS OFFICIAL COMMITTEE OF CREDITORS
HOLDING GENERAL UNSECURED CLAIMS**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors") [1] and the Official Committee of Creditors Holding General Unsecured Claims (the

"Creditors' Committee" and together with the Debtors, the "Plan Proponents"), hereby submit

this memorandum (the "Memorandum") in support of confirmation of the Second Amended

Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in

Possession and its Official Committee of Creditors Holding General Unsecured Claims (as may

be amended, supplemented or otherwise modified, the "Plan"),[2] pursuant to section 1129 of title

11 of the United States Code (the "Bankruptcy Code").  In support thereof, the Plan Proponents

respectfully state as follows:

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Circuit
       City Stores, Inc. (3875), Circuit City Stores West Coast, Inc. (0785), InterTAN, Inc. (0875), Ventoux
       International, Inc. (1838), Circuit City Purchasing Company, LLC (5170), CC Aviation, LLC (0841), CC
       Distribution Company of Virginia, Inc. (2821), Circuit City Properties, LLC (3353), Kinzer Technology, LLC
       (2157), Abbott Advertising Agency, Inc. (4659), Patapsco Designs, Inc.(6796), Sky Venture Corp. (0311),
       Prahs, Inc.(n/a), XSStuff, LLC (9263), Mayland MN, LLC (6116), Courcheval, LLC (n/a), Orbyx Electronics,
       LLC (3360), and Circuit City Stores PR, LLC (5512).  The address for the Debtors is 4951 Lake Brook Drive,
       Suite #500, Glen Allen, VA 23060.

[2]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Plan.

## PRELIMINARY STATEMENT

The Plan represents the culmination of efforts by the Debtors and the Creditors'

Committee and their respective professionals and advisors to achieve a prompt and cost-effective

distribution of the remaining assets of the Debtors' Estates that maximizes value for the Debtors'

stakeholders.  As set forth below, since filing their chapter 11 cases (the "Chapter 11 Cases") on

November 10, 2008 (the "Petition Date"), the Debtors have strived to maximize value for the

benefit of all stakeholders.  The Debtors ultimately concluded that a sale of substantially all of

their assets was the strategy most likely to maximize stakeholder recoveries.  Because the

Debtors did not receive a feasible proposal to purchase the Company's assets as a going concern,

the Debtors determined that liquidation was the best alternative for all parties in interest.

Accordingly, on January 16, 2009, the Court authorized the Debtors, among other things, to

commence liquidation and conduct going out of business sales, which sales have now concluded.

As a result of the going out of business sales and a number of other asset sales, the Debtors have

liquidated substantially all of their assets.  In addition, the Debtors have taken significant steps to

reconcile and reduce Claims, and in particular Administrative Claims, including 503(b)(9)

Claims, against the Debtors' Estates.

The Plan Proponents believe, as demonstrated by the liquidation analysis dated as

of September 3, 2010, a copy of which is attached hereto as Exhibit C (the "Liquidation

Analysis"),[3] that the Plan presents the best possible means under the circumstances by which to

distribute the proceeds of the liquidation of the Debtors' assets to stakeholders and is consistent

with the statutory priorities contained in the Bankruptcy Code.  The liquidation pursuant to

---

[3]    The Liquidation Analysis attached hereto is substantially similar to the liquidation analysis attached as
Appendix D to the Supplement except that footnote 14 has been corrected.

chapter 11 proposed in the Plan will avoid unnecessary delay and additional costs that would be

incurred if the Chapter 11 Cases were converted to chapter 7.

Sixty-six objections were filed to the Plan Proponents' Plan (the "Objections")

and all but 12 of them have been resolved.  As plainly evidenced by the Plan formulation process,

the Plan voting results and the resolution of the majority of substantive objections to the Plan, the

Plan is in the best interests of the Debtors' Estates, Creditors and other stakeholders.

Notwithstanding the overwhelming acceptance of the Plan, the Plan Proponents recognize their

obligation under the Bankruptcy Code to demonstrate by a preponderance of the evidence that

the Plan satisfies all requirements of section 1129 of the Bankruptcy Code.

This Memorandum is divided into four parts.  The first part describes the

background of these cases and provides a summary of the key terms of the Plan.  The second part

describes certain proposed nonmaterial and/or nonadverse modifications to the Plan.  In the third

part, the Plan Proponents demonstrate that the Plan satisfies section 1129 of the Bankruptcy

Code.  Finally, the Plan Proponents address certain objections to confirmation that have not been

resolved prior to the date hereof.

The Plan Proponents submit that this Memorandum, together with additional

evidence to be adduced at the Confirmation Hearing, demonstrate that the Plan satisfies all of the

requisite elements of sections 1122, 1123 and 1129 of the Bankruptcy Code and, therefore, the

Plan should be confirmed.

## I.    BACKGROUND AND HIGHLIGHTS OF THE PLAN.

### A.    Background and Events Leading up to the Commencement of These Cases.

A complete factual background regarding the Debtors, including their business

operations, their capital and debt structure, and the events leading to the filing of these

bankruptcy cases, is set forth in detail in the Disclosure Statement.  A summary is set forth below.

1.    **Business Overview.**

Founded in 1949 and based in Richmond, Virginia, Circuit City Stores, Inc.

("Circuit City" and, together with the other Debtors, the "Company") was a leading national

specialty retailer of consumer electronics and operated large consumer electronics stores that

sold, among other things, televisions, home theatre systems, computers, imaging and

telecommunications products, including cameras and camcorders, software, furniture, and other

audio and video electronics and accessories.  The major brand names sold by the Company

included Sony, Hewlett-Packard, Samsung, Toshiba, LG, Canon, Apple, Panasonic, Nikon and

Garmin.

As of the Petition Date, the Company operated approximately 712 Superstores

and 9 outlet stores under the Circuit City name throughout the United States and Puerto Rico.

The Company also maintained two websites for, among other things, online product sales,

product information, customer service, and investor information, as well as a phone-order call

center for, among other things, telephone product sales and customer service.

The Company operated its business under the Circuit City trade name throughout

the United States and Puerto Rico and employed a large, diverse workforce.  As of the Petition

Date, this workforce was comprised of approximately 39,600 full and part-time employees in the

Company's retail stores, distribution centers, call centers and the corporate headquarters in

Richmond.  In addition, the Company used various independent contractors to perform, among

other services, home installation and repair services.

Circuit City also maintained an international presence through InterTAN Canada,

Ltd.  ("InterTAN Canada").  Headquartered in Barrie, Ontario, InterTAN Canada was engaged in

the business of selling consumer electronics and accessories in Canada under the trade name The

Source By Circuit City[SM].  InterTAN Canada's operations consisted of 770 retail stores and

4

dealer outlets in Alberta, British Columbia, Manitoba, Newfoundland, Northwest Territories,

Nova Scotia, Nunavut, Ontario, Prince Edward Island, Quebec, Saskatchewan, and the Yukon.

Additionally, InterTAN Canada maintained a website to sell products similar to those sold on the

Company's site.  InterTAN Canada and its Canadian affiliates are not part of the Chapter 11

Cases.

### 2.    Events Leading to the Chapter 11 Filings.

Notwithstanding the Company's efforts prior to the Petition Date, as set forth

more fully herein, the Company was forced to commence the Chapter 11 Cases to attempt to

restore positive financial performance and continue its turnaround efforts.  In large part, the

chapter 11 filings were due to three factors, all of which contributed to a liquidity crisis that

prevented the Company from completing its turnaround goals outside of formal proceedings:  (i)

erosion of vendor confidence; (ii) decreased liquidity; and (iii) a global economic crisis.

Although the Company worked hard to preserve and, in some instances, enhance

vendor relations, given the impact of the global economic crisis, its efforts did not instill the

widespread vendor confidence the Company needed.  Many of the Company's merchandise and

other vendors altered their relationships with the Company to the Company's detriment.

Specifically, various merchandise vendors restricted the Company's available trade credit and

reduced payment terms; in some instances, the Company's terms were changed to cash in

advance.  This factor alone significantly strained operations because the Company found it more

difficult to sustain adequate product inventory and other store supply levels.

Faced with these circumstances, the Company also found that additional liquidity

was not available through traditional channels, such as the credit markets.  This was due to the

widespread liquidity crisis among all major banks and other lending institutions throughout the

5

country.  Accordingly, the Company could not access additional liquidity from third party sources.

Lastly, the Company found itself – like all other businesses at that time – entrenched in the worst economic crisis since the Great Depression.  As fallouts from the mortgage crisis rippled through the United States economy, the Company witnessed firsthand the significant negative effects.  These effects have taken many forms, not the least of which was decreased customer traffic in stores.  During the months leading up to the Petition Date, consumers were increasingly concerned about rising unemployment and the general tightening of the credit markets, in which they were unable to borrow funds through credit cards, let alone home equity loans, to purchase household and other electronics products.  This credit crisis had a drastic effect on sales because 70% of the Company's sales were generated through credit card purchases.

These external events, coupled with the Company's overall poor performance, necessitated further restructuring initiatives, which the Company determined could only be accomplished under chapter 11 of the Bankruptcy Code.

### 3.    GOB Sales and Liquidation.

Prior to and after the Petition Date, the Debtors, together with their advisors, pursued various restructuring alternatives, including a stand-alone plan, transactions with strategic partners and sales of all or certain aspects of their business.  The Debtors ultimately determined that a sale of the Debtors' assets, whether as a going concern or for liquidation, represented the Debtors' best option for maximizing the value of the Estates for their Creditors and parties in interest.

Accordingly, on January 9, 2009, the Debtors' unsealed their Motion for Orders Pursuant to Bankruptcy Code Sections 105, 363 and 364 (I)(A) Approving Procedures in

Connection with Sale of All or Substantially All of the Business (B) Authorizing Debtors to

Enter into Stalking Horse Agreements in Connection with Store Closing and Miscellaneous

Asset Sales or Stalking Horse or Financing Agreements in Connection with Going Concern

Transactions, (C) Approving Payment of Termination Fees in Connection Therewith, and (D)

Setting Auction and Hearing Dates, (II) Approving Sale of Debtors Assets Free and Clear of All

Interests and (III) Granting Related Relief (the "Sale Motion," Docket No. 1423), seeking

authorization to conduct auctions for a sale or sales of the Debtors' businesses as a going concern

or for liquidation, or of miscellaneous assets of the Debtors.

On January 12, 2009, the Court entered its Order (I) Approving Procedures in

Connection with Sale of All or Substantially All of the Business, (II) Authorizing Debtors to

Enter into Stalking Horse Agreements in Connection with Store Closing and Miscellaneous

Asset Sales or Stalking Horse or Financing Agreements in Connection with Going Concern

Transactions, (III) Approving Payment of Termination Fees in Connection Therewith, (IV)

Setting Auction and Hearing Dates Pursuant to Bankruptcy Code Sections 105 and 363 and (V)

Granting Related Relief (the "Sale Procedures Order," Docket No. 1460), approving the bidding

procedures set forth in the Sale Motion.  Pursuant to this order, the Debtors held an auction on

January 13, 14 and 15, 2009.

Based on certain indications of interest, the Debtors were hopeful that they would

receive a bid contemplating a sale of the Debtors' businesses as a going concern.  Unfortunately,

the auction did not yield a feasible going concern bid.  Instead, the Debtors, in consultation with

the Creditors' Committee and the agent under the DIP Credit Agreement (the "DIP Agent"),

determined that the highest and best value alternative was to pursue a liquidation of the Debtors'

businesses.  Accordingly, the Debtors' determined that the highest or otherwise best bid received

7

at the auction was that of Great American Group WF, LLC, Hudson Capital Partners, LLC, SB

Capital Group, LLC, and Tiger Capital Group, LLC (collectively, the "GOB Sale Agent").  The

Debtors entered into an agency agreement (the "GOB Sales Agency Agreement") with the GOB

Sale Agent on January 15, 2009.

On January 16, 2009, the Court approved the GOB Sales Agency Agreement and

authorized the Debtors to conduct going-out-of-business sales at the Debtors' remaining stores

(Docket No. 1634).  The GOB Sales Agent commenced going-out-of-business sales (the "GOB

Sales") at the Debtors' remaining stores on January 17, 2009 and concluded those sales by

March 8, 2009.

**B.      Progress of the Chapter 11 Cases.**

In the period following the Debtors' determination to pursue a liquidation, the

Debtors have made tremendous progress in winding down the Debtors' affairs and selling

substantially all of their assets.  The Debtors' efforts have served to maximize value for the

Debtors' Estates and Creditors.  In particular, in addition to entry into the GOB Sales Agency

Agreement and completion of the GOB Sales, as discussed above:

- All of the Debtors' unexpired nonresidential real property leases have
  been either assumed and assigned to a purchaser, terminated or rejected;

- The Debtors have sold approximately thirteen parcels of real property for
  a combined price of approximately $38.5 million;

- The Debtors approved the sale by their wholly owned subsidiary,
  InterTAN Canada, of substantially all of its assets, as a going concern, and
  sold certain additional assets in connection with the sale (the "Canadian
  Sale").  As further discussed in the Supplement (as defined herein), the
  Debtors anticipate that they will receive significant proceeds as a result of
  the sale;

- The Debtors have sold substantially all of their intellectual property and
  internet assets for a combined price of approximately $17.9 million with

8

the potential for additional payments from the revenues from the intellectual property rights;

- The Debtors have recovered, through cash payments and setoff against Administrative Claims, including 503(b)(9) Claims, approximately $132 million;

- The Debtors have sold a variety of other miscellaneous assets, including corporate aircraft, certain defective inventory and other de minimis assets; and

- The Debtors have commenced and have made very significant progress to date in the Claims reconciliation process, as further detailed in the Supplement.

As the foregoing demonstrates, despite significant hurdles, the Chapter 11 Cases have proceeded apace, and, in September of 2009, the Plan Proponents filed the First Amended Plan.

### C.    The First Amended Plan.

On August 24, 2009, the Plan Proponents filed the Disclosure Statement with Respect to the Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors In Possession and its Official Committee of Creditors Holding General Unsecured Claims (the "Disclosure Statement") and the Joint Plan Of Liquidation Of Circuit City Stores, Inc. And Its Affiliated Debtors And Debtors In Possession And Its Official Committee Of Creditors Holding General Unsecured Claims.  On September 22, 2009, the Bankruptcy Court approved the Disclosure Statement, and authorized the Plan Proponents to commence solicitation. Additionally, the Bankruptcy Court scheduled the hearing on confirmation for November 23, 2009 (as adjourned from time to time, the "Confirmation Hearing").

On September 29, 2009, the Plan Proponents filed the First Amended Joint Plan Of Liquidation Of Circuit City Stores, Inc. And Its Affiliated Debtors And Debtors In Possession And Its Official Committee Of Creditors Holding General Unsecured Claims (the "First

9

Amended Plan"). Thereafter, the Plan Proponents commenced and completed solicitation of the First Amended Plan. Although sufficient acceptances of the First Amended Plan were solicited, the Plan Proponents adjourned the Confirmation Hearing from time to time and did not hold the Confirmation Hearing with respect to the First Amended Plan.

### D.    The Supplement.

Concurrently with the filing of the Plan, the Plan Proponents filed the Supplemental Disclosure with Respect to Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors In Possession and its Official Committee of Creditors Holding General Unsecured Claims (the "Supplement"), outlining the revisions to the First Amended Plan incorporated in the Plan and providing background and analysis with respect thereto. In particular, the Supplement includes (i) background related to the Canadian Sale and other significant events since the filing of the First Amended Plan, (ii) a summary of revisions to the Plan, (iii) an updated analysis of the effects of substantive consolidation of the Consolidated Debtors, (iv) an updated summary of estimated recoveries under the Plan and (v) an updated analysis of the effect of liquidation under chapter 7 of the Bankruptcy Code. The Plan Proponents hereby incorporate by reference, as though fully set forth herein, all information contained in the Supplement.

### E.    Overview of the Plan.

The Plan is, despite certain setbacks, the result of a collaborative process between the Debtors and the Creditors' Committee. As discussed above, the Debtors have sold substantially all of their assets. The Debtors and the Creditors' Committee, as joint proponents of the Plan, have determined that liquidation pursuant to chapter 11 of the Bankruptcy Code would result in greater and more prompt recoveries to stakeholders than liquidation pursuant to chapter 7 of the Bankruptcy Code. The Plan accomplishes these goals.

The Plan provides for the orderly liquidation of the remaining assets of the Debtors and the distribution of the proceeds of the liquidation of the Debtors' assets according to the priorities set forth in the Bankruptcy Code.  More specifically, the Plan provides for the creation of a Liquidating Trust that will administer and liquidate all remaining property of the Consolidated Debtors, including Causes of Action, not sold, transferred or otherwise waived or released before the Effective Date of the Plan and for the funding of such Liquidating Trust.

The Plan also provides for Distributions to certain Holders of Administrative Claims and Priority Claims and to other Claimholders.  In addition, the Plan provides for the termination of all Interests in the Consolidated Debtors, the substantive consolidation of Consolidated Debtors, and the transfer of any remaining Estate Assets of the Consolidated Debtors to the Liquidating Trust.  Finally, the Plan provides for the wind-up of the affairs of InterTAN and Ventoux and implements certain corporate actions to attempt to maximize value that may be realized from the CCAA Proceedings.

The Plan Proponents believe that the Plan achieves their ultimate goal of maximizing recoveries to all stakeholders on a fair and equitable basis as quickly as is reasonably practicable.

F.    **Acceptance of Plan.**

As described above, the Plan is the result of extensive negotiations between the Plan Proponents.  As indicated in the Declaration of Evan Gershbein Regarding Tabulation of Ballots with Respect to Vote on First Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and Its Affiliated Debtors  (Docket No. 6188) (the "Voting Declaration") and illustrated in the table below, the Holders of Claims in Class 3 and Class 4 that were entitled to vote on the Plan overwhelmingly voted in favor of the Plan.

**Voting Results Summary**

|  | % of Number to Accept the Plan | % of Number to Reject the Plan | % of Amount to Accept the Plan | % of Amount to Reject the Plan |
|---|---|---|---|---|
| Class 3:   Convenience Claims | 96.06% | 3.94% | 96.00% | 4.00% |
| Class 4:   General Unsecured Claims | 82.11% | 17.89% | 76.85% | 23.15% |

Although the Plan includes certain revisions added since solicitation of the First Amended Plan, as discussed further below, the Plan Proponents submit that no re-solicitation is required.

## II.    MODIFICATIONS TO THE PLAN.

### A.    Modifications to the First Amended Plan.

As set forth in the Supplement, the First Amended Plan was modified for two primary reasons:  (1) to maximize value that may be realized from the CCAA Proceedings; and (2) to address objections to the First Amended Plan.  All such modifications are nonmaterial and/or nonadverse and are shown in the redlined Plan attached hereto as Exhibit A.

### B.    Modifications to the Plan.

In addition to the modifications to the First Amended Plan, the Plan Proponents intend to make certain additional nonmaterial and/or nonadverse modifications to the Plan to address certain issues raised by the Objections and other minor corrections and clarifications, all of which are shown in the redlined Plan attached hereto as Exhibit B.  In particular,

(i)    to address certain concerns of the Securities and Exchange Commission, Article V.B.8 has been revised as follows:

From and after the Effective Date, notwithstanding anything to the contrary in this Plan, the Debtors shall be deemed to have suspended and terminated their further reporting obligations with the Securities and Exchange Commission and their statutory or regulatory obligations as a publicly traded company and shall be deemed to have deregistered the Debtors' public securities and consented to revocation of the registration of the Debtors' securities pursuant to Section 12(j)

~~of the Exchange Act.  To~~to the extent required by the Securities and Exchange Commission or other regulatory agency, the Liquidating Trustee shall take any and all actions necessary to evidence the suspension of the Debtors' further reporting obligations with the Securities and Exchange Commission or their statutory or regulatory obligations as a publicly traded company, including, but not limited to, seeking to deregister the Debtors' public securities or consenting to an action or proceeding to revoke the registration of the Debtors' securities pursuant to Section 12(j) of the Exchange Act.

(ii)    to address certain concerns of the Securities and Exchange Commission, Article XII.E. has been revised as follows:

Notwithstanding anything to the contrary in this Plan, this Plan shall not be construed to preclude the Securities and Exchange Commission from taking any action in any forum against any Entity that is required for the Securities and Exchange Commission to fulfill its statutory duties.

(iii)    To address concerns of certain taxing authorities, Article III.B.1 has been revised as follows:

If an Allowed Miscellaneous Secured Claim is secured by property the value of which is greater than the amount of such Allowed Miscellaneous Secured Claim, the Holder of such Allowed Miscellaneous Secured Claim shall be paid interest on the Allowed Miscellaneous Secured Claim to the extent provided by Bankruptcy Code section 506(b) at the rate of interest determined under applicable nonbankruptcy law as of the calendar month in which Confirmation occurs and, to the extent provided by Bankruptcy Code section 506(b), such reasonable fees, costs or charges as are provided for under the agreement or State statute under which such Allowed Miscellaneous Secured Claim arose.

(iv)    Article V.B.3 has been revised as follows:

Except as expressly provided in Article XI of the Liquidating Trust Agreement, Ventoux shall continue to exist for all purposes to the same extent as it existed prior to the Effective Date.  ~~[_____]~~Alan M. Jacobs shall be the sole director and officer of Ventoux from and after the Effective Date.

(v)    Article V.B.4 has been revised to include the following:

From and after the Ventoux Effective Date, Ventoux shall not issue any non-voting securities and the prohibition on issuance of non-voting securities shall be deemed to be included in the charter of Ventoux.

(vi)    Article V.E.4 has been revised as follows:

On the Effective Date, the Liquidating Trustee shall fund the Liquidating Trust Operating Reserve in ~~the~~an amount ~~of $[_____],~~ which the Plan Proponents reasonably believe to be sufficient to pay the fees and expenses of the Liquidating

Trustee and the Liquidating Trustee Professionals, in light of any anticipated
recovery from the sale of assets of the Estates and/or Causes of Action.

**C.    The Modifications Are Neither Material Nor Adverse And Do Not Require
Re-solicitation.**

Bankruptcy Code section 1127(a) allows a proponent of the plan to modify the

plan at any time before confirmation so long as the modified plan meets the requirements of

sections 1122 and 1123.  11 U.S.C. § 1127(a).  Bankruptcy Code section 1127(c) further requires

any plan modification to comply with Bankruptcy Code section 1125.  11 U.S.C. § 1127(c).

Bankruptcy Code section 1125(b), in turn, prohibits post-petition solicitation of a

plan unless the plan proponents transmit the plan and "a written disclosure statement approved,

after notice and a hearing, by the court as containing adequate information" to those persons

whose votes are being solicited.  Section 1125 defines "adequate information" as: "[I]nformation

of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and

history of the debtors and the condition of the debtor's books and records . . . that would enable a

hypothetical investor of the relevant class to make an informed judgment about the plan . . . ."

11 U.S.C. § 1125(a)(1).

Additionally, Bankruptcy Rule 3019(a) provides that if the modification "does not

adversely change the treatment of the claim of any creditor . . . who has not accepted in writing

the modification, it shall be deemed accepted by all creditors . . . who have previously accepted

the plan."  Fed. R. Bankr. P. 3019(a); see also In re Enron Corp., 2004 Bankr. LEXIS 2549, at

*259 (Bankr. S.D.N.Y. July 15, 2004) ("The best test is whether the modification so affects any

creditor or interest holder who accepted the plan that such entity, if it knew of the modification,

would be likely to reconsider its acceptance.").

Moreover, the Plan authorizes modification before confirmation.  Specifically, the

Plan states that "[t]he Plan Proponents may alter, amend or modify the Plan or any Exhibits

thereto under Bankruptcy Code section 1127(a) at any time prior to the Confirmation Date."
Plan at Article XII.A.  In addition, the Plan states that the Court has jurisdiction to hear and
decide any Plan modification.  Plan at Article XI.H.

   Here, the modifications to the Plan set forth above, in the Supplement and shown
in the redlined Plans attached hereto as Exhibits A and B are neither material nor adverse and
would not cause any Creditor to reconsider its acceptance of the Plan.  Moreover, the
modifications do not diminish the adequacy of information contained in the Disclosure Statement.
Finally, the Plan continues to comply with Bankruptcy Code sections 1122 and 1123 to the same
extent as prior to the modifications.  See 11 U.S.C. § 1127(a).

   Importantly, the modifications do not diminish the recovery of any Creditor under
the Plan.  To the contrary, Creditor recoveries under the Plan, as amended, are greater than
estimated recoveries under the First Amended Plan.  See Supplement at § II.C.3.  In particular,
the modifications enable the completion of the transactions set out in the CRA Ruling, which
will potentially lead to the repatriation of the Canadian Proceeds under favorable tax treatment
and thereby increase the value of Debtors' Estates for distribution to the Creditors.  In addition,
the modifications provide for the inclusion of the Reserves, which should help ensure that
sufficient Cash is available for distribution to Creditors whose Claims are Allowed after the
Effective Date.  Finally, the modifications are designed to address certain objections to
confirmation of the First Amended Plan.  Thus, the Plan modifications do not adversely affect
any Creditor Class and would not cause any Creditors to reconsider their votes.  See Bankruptcy
Rule 3019(a); see also In re Sentinel Mgmt. Group, Inc., 398 B.R. 281, 301-03 (Bankr. N.D. Ill.
2008) (approving a plan modification causing a $0.01 reduction in recovery for creditors as
adverse but not material and holding that the modification would not cause the creditors to

reconsider their vote); In re Kmart Corp., 2006 Bankr. LEXIS 542, at *99-101 (Bankr. N.D. Ill.

Apr. 11, 2006) (approving a modified plan over a critical vendor's objection because the vendor

received the same pro-rata distributions under the unmodified and modified plans).

Consequently, the modifications are immaterial and do not adversely change the treatment of

Creditors and the Plan should be deemed accepted by all parties who accepted the First Amended

Plan.

Finally, to the extent the modifications to the Plan make it necessary for one or

more of the Debtors to cast votes concerning the Plan, each such Debtor shall be deemed to have

cast a vote to accept the Plan.  Thus, the modifications are permitted by Bankruptcy Code section

1127 and Bankruptcy Rule 3019(a) and no re-solicitation is required.

Likewise, the information included in the Disclosure Statement remains adequate.

The adequacy of information in a disclosure statement is determined "on a case by case basis."

Menard-Sanford v. Mabey, 880 F.2d 694, 696 (4th Cir. 1989); In re Radco Properties, Inc., 402

B.R. 666, 682 (Bankr. E.D.N.C. 2009) ("Adequate information was vaguely defined by Congress

so that courts could view the circumstances of each particular case.").  Where a plan is modified,

courts have held that "if the amendments are material and adversely affect the way creditors are

treated, § 1127 requires a new disclosure statement and balloting of the amended plan."  In re

Proveaux, 2008 Bankr. LEXIS 1325, at *8 (Bankr. D.S.C. Apr. 4, 2008).  But, "a new disclosure

statement is not required in every instance where a modification is made; if the modification is

minor, the existing disclosure statement will suffice."  Sentinel Mgmt. Group, 398 B.R. at 301-

03.

The Court has previously held that the Disclosure Statement contains adequate

information.  (Docket No. 5090).  The Disclosure Statement will continue to provide adequate

information concerning the modified Plan.  In particular, the background information about the

history of the Debtors' operations, the events leading to the Chapter 11 Cases, and the key events

during the Chapter 11 Cases are unchanged.  Additionally, the sections concerning the risk

factors to be considered, the federal tax consequences of the Plan and the feasibility of the Plan

also remain unaltered.  Indeed, the only information contained in the Disclosure Statement that

has been altered in light of the modifications are the "Summary of Treatment of Claims and

Interests Under the Plan" section and the "Summary of the Plan of Liquidation" section.  In each

case, however, the modifications to the Plan improve or leave unaltered Creditor recoveries.

Accordingly, the Disclosure Statement contains adequate information and no further disclosure is

required.

On the basis of the foregoing, the Court should conclude that the impact of the

proposed modifications on the Classes that were solicited to vote is not "material" or "adverse"

and thus does not warrant re-solicitation.

## III.    THE PLAN MEETS THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129 OF THE BANKRUPTCY CODE.

To confirm the Plan, the Court must find, by a preponderance the evidence, that

both the Plan and the Plan Proponents are in compliance with each of the requirements of section

1129(a) of the Bankruptcy Code.  See In re Byrd Foods, Inc., 253 B.R. 196, 199 (Bankr. E.D. Va.

2000) (the debtors must demonstrate by a preponderance of the evidence that it meets all section

1129 requirements); In re Schwarzmann, 203 B.R. 919 (Bankr. E.D. Va. 1995) (a chapter 11 plan

must meet all of the elements of section 1129 to be confirmed); see also In re Bally Total Fitness

of Greater New York, Inc., 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The

Debtors, as proponents of the Plan, have the burden of proving the satisfaction of the elements of

Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); In re

203 N. LaSalle St. P'ship, 126 F.3d 955, 960 (7th Cir. 1997) (the plan's proponent must show

that the plan satisfies all the requirements of section 1129(a)), rev'd on other grounds sub nom.

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N LaSalle St. P'ship, 526 U.S. 434 (1999).

Further, the Court may confirm a chapter 11 plan if all of the requirements of subsection 1129(a)

are met, with the exception of subsection (a)(8), and the requirements of section 1129(b) of the

Bankruptcy Code are satisfied.  As set forth below, the Plan should be confirmed because the

Debtors meet the requirements of sections 1129(a) and (b) of the Bankruptcy Code.

> **A.**    **The Plan Complies With the Applicable Provisions of Title 11 (Section 1129(a)(1)).**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the

"applicable provisions" of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  In re Machne

Menachem, Inc., 233 F. App'x. 119, 120 (3d Cir. 2007); Fed.-Mogul Global v. Fed.-Mogul

Global Inc. (In re Fed.-Mogul Global), 402 B.R. 625, 629 n.7 (D. Del. 2009); In re Armstrong

World Indus., Inc., 348 B.R. 136, 158 (D. Del. 2006).  The legislative history of section

1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123

of the Bankruptcy Code, which govern classification of claims and interests and the contents of

the plan, respectively.  See S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N.

5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368;

see also In re Mirant Corp., 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (finding

that the objective of section 1129(a)(1) is to ensure compliance with the Bankruptcy Code

provisions regarding classification of claims or interests and plan contents).  Accordingly, the

determination of whether the Plan complies with section 1129(a)(1) requires an analysis of

sections 1122 and 1123 of the Bankruptcy Code.  As explained below, the Plan complies with

sections 1122 and 1123 in all respects.

1.      **Classification of Claims and Interests (Section 1122).**

The Plan satisfies section 1122, which provides that "a plan may place a claim or

an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class."  11 U.S.C. § 1122(a).  Courts in this Circuit and elsewhere

have recognized that, under section 1122 of the Bankruptcy Code, plan proponents have

significant flexibility in placing claims into different classes under Section 1122, provided there

is a rational legal or factual basis to do so and all claims or interests within a particular class are

substantially similar.  See, e.g., Travelers Ins. Co. v. Bryson Porps., XVIII (In re Bryson Props.,

XVIII), 961 F.2d 496, 503 (4th Cir. 1992) (holding that section 1122 of the Bankruptcy Code

grants the proponent of a plan "considerable discretion to classify claims and interests according

to the facts and circumstances of the case" (internal quotations omitted)); see also John Hancock

Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 159 (3d Cir. 1993) (noting that a

classification scheme is permissible if a legal difference exists between the classes).

Article III of the Plan provides for the separate classification of Claims and

Interests with respect to the Debtors based upon differences in the legal nature or priority of such

Claims and Interests.  Aside from Administrative Claims and Priority Tax Claims, which are not

required to be classified, the Claims against and Interests in the Debtors have been assigned to

separate numbered Classes, as detailed in the chart below, based on the type of Claim or Interest

involved.

The classification of Claims against and Interests in the Debtors is as follows:

| Class | | Status | Voting Rights |
|---|---|---|---|
| 1A-1C | Miscellaneous Secured Claims | Unimpaired | Not entitled to vote |
| 2A-2C | Non-Tax Priority Claims | Unimpaired | Not entitled to vote |
| 3A | Convenience Claims | Impaired | Entitled to vote |
| 4A-4C | General Unsecured Claims | Impaired | Entitled to vote |
| 5A | Intercompany Claims | Impaired | Not entitled to vote |
| 6A | Subordinated 510(c) Claims | Impaired | Not entitled to vote |
| 7A | Subordinated 510(b) Claims | Impaired | Not entitled to vote |
| 8A | Consolidated Debtor Interests | Impaired | Not entitled to vote |
| 8B | Ventoux Interests | Unimpaired | Not entitled to vote |
| 8C | InterTAN Interests | Unimpaired | Not entitled to vote |

In part, the Plan's classification scheme follows the Debtors' capital structure, with secured debt classified separately from unsecured debt, and Interests classified separately from Claims.  Likewise, other aspects of the classification scheme are reasonably related to the different legal or factual nature of each type of Claim.  For example, Non-Tax Priority Claims (Class 2) are classified separately due to their required treatment under the Bankruptcy Code. See In re Mirant Corp., 2007 WL 1258932, at *7 (permitting separate classification because holders of claims had different legal interests in the debtor's estate); In re Avia Energy Dev., L.L.C., 2007 WL 2238039, at *2 (Bankr. N.D. Tex. Aug. 2, 2007) (permitting separate classification based on valid business, factual and legal reasons); In re Exide Techs., 303 B.R. 48, 76 (Bankr. D. Del. 2003) (finding that the classification of claims and interests was proper because it took into account the Bankruptcy Code's priority rules and general principles of equitable subordination from section 510(b) of the Bankruptcy Code).  Unsecured Claims are rationally separated into Class 3 (Convenience Claims), Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims), Class 6 (Subordinated 510(c) Claims) and Class 7 (Subordinated 510(b) Claims) according to the separate factual nature of each type of Claim.  Finally, Claims

are classified differently based on the Debtor or Debtor group against which they are asserted.

By recognizing the differing legal and equitable rights of the Holders of Claims and Interests, the

Plan Proponents propose a classification scheme that fits well within the flexible standard of

section 1122 of the Bankruptcy Code.

The Claims or Interests within a particular Class are substantially similar to the

other Claims or Interests in the Class.  The treatment of each Claim or Interest within a Class is

the same as the treatment of each other Claim or Interest in such Class, unless the Holder of a

Claim or Interest agrees to less favorable treatment on account of its Claim or Interest.

Moreover, valid business, factual and legal reasons exist for separately classifying the various

Classes of Claims and Interests under the Plan.  Thus, the Plan satisfies section 1122 and

1123(a)(1) of the Bankruptcy Code, as described more fully below.

## 2.    Mandatory Contents of the Plan.

Section 1123(a) of the Bankruptcy Code identifies seven requirements for the

contents of a company's plan of reorganization.[4]  Specifically, this section requires that a plan: (1)

designate classes of claims and interests; (2) specify unimpaired classes of claims and interests;

(3) specify treatment of impaired classes of claims and interests; (4) provide for equality of

treatment within each class; (5) provide adequate means for the plan's implementation; (6)

provide for the prohibition of nonvoting equity securities and provide an appropriate distribution

of voting power among the classes of securities; and (7) contain only provisions that are

consistent with the interests of the debtors' creditors and equity security holders and with public

policy with respect to the manner of selection of the reorganized company's officers and

---

[4]    Bankruptcy Code section 1123(a)(8) also includes an eighth requirement which is applicable only in cases in which the debtor is an individual.  This Memorandum will not address section 1123(a)(8) as it is not applicable in these Chapter 11 Cases.

directors.  See 11 U.S.C. § 1123(a).  The Plan fully complies with each requirement of section 1123(a).

First, as previously noted with respect to the Plan's compliance with section 1122, Article III of the Plan designates Classes of Claims and Interests, as required by section 1123(a)(1) of the Bankruptcy Code.  As set forth below, the Plan also complies with sections 1123(a)(2)–(7) of the Bankruptcy Code.

Second, section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  Article III.B. and Article IV.C. of the Plan specify that Class 1 and Class 2 are Unimpaired.  Therefore, section 1123(a)(2) of the Bankruptcy Code is satisfied.

Third, section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C. § 1123(a)(3).  The Plan designates Classes 3A, 4A through 4C, 5A, 6A, 7A and 8A through 8C as Impaired.  Articles III.B and III.C. of the Plan specify the treatment for each of these Impaired Classes.  Therefore, section 1123(a)(3) of the Bankruptcy Code is satisfied.

Fourth, section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Article III of the Plan specifies that Holders of Claims and Interests in all Classes will receive the same treatment within each Class, unless the Holder of a particular Claim has agreed to less favorable treatment with respect to such Claim.  Therefore, section 1123(a)(4) of the Bankruptcy Code is satisfied.

Fifth, section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. 11 U.S.C. § 1123(a)(5). Article V of the Plan, entitled "Means for Implementation of the Plan," sets forth numerous provisions to facilitate implementation of the Plan, including, among others, provisions concerning the Global Plan Settlement and substantive consolidation of the Consolidated Debtors, the transfer of all property of the Consolidated Debtors' Estates to the Liquidating Trust, the dissolution of the Consolidated Debtors, the establishment, rights and obligations of the Liquidating Trust, the appointment, rights and obligations of the Liquidating Trustee, the required corporate actions of InterTAN and Ventoux, cancellation of securities, instruments and agreements evidencing Claims and Interests except the InterTAN and Ventoux Interests, and generally allows for all corporate action necessary to effectuate the Plan. (See also Article VI (Provisions Governing Distributions and Article VI (Treatment of Executory Contracts and Unexpired Leases).) Therefore, section 1123(a)(5) of the Bankruptcy Code is satisfied.

Sixth, section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities. Pursuant to Article V.B.1 of the Plan, the Consolidated Debtors will be dissolved on the Effective Date and the Consolidated Debtors' assets will be transferred to the Liquidating Trust. Moreover, under Article V.B.7 of the Plan, all Interests in the Consolidated Debtors will be cancelled on the Effective Date. Pursuant to Article V.B.5 of the Plan, InterTAN will enter into an assumption and assignment agreement with Tourmalet on the Effective Date and, thereafter, be deemed to be dissolved. Accordingly, as of the Effective Date, the Consolidated Debtors and InterTAN will cease to exist and will have no constituent documents or equity securities, and section 1123(a)(6) of the Bankruptcy Code is inapplicable to such Debtors.

With respect to Ventoux, as set forth above, Article V.B.4 of the Plan has been revised to provide that Ventoux shall not issue any non-voting securities and, to the extent necessary, shall include such provision in its charter. Accordingly, section 1123(a)(6) of the Bankruptcy Code has been satisfied with respect to Ventoux.

Seventh, section 1123(a)(7) of the Bankruptcy Code requires that the Plan's provisions with respect to the manner of selection of any director, officer, or trustee, or any successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." 11 U.S.C. § 1123(a)(7). As previously noted, pursuant to Article V.B.1 of the Plan, the Consolidated Debtors will be dissolved on the Effective Date and the Consolidated Debtors' assets will be transferred to the Liquidating Trust. Accordingly, the Plan does not provide for the selection of directors or officers of the Consolidated Debtors. Article 1.112 of the Plan, however, provides that the Liquidating Trustee will be Alfred H. Siegel. Mr. Siegel was selected after negotiations between the Plan Proponents and after meetings between the Plan Proponents and Mr. Siegel. Mr. Siegel has significant experience in similar situations and served as Chief Restructuring Officer of the Debtors between March and June of 2010.

InterTAN will also be dissolved on the Effective Date of the Plan and its assets will be transferred to Tourmalet. Accordingly, the Plan does not provide for the selection of directors or officers of InterTAN.

Finally, Ventoux will continue to exist after the Effective Date, until it is dissolved in accordance with the Plan. Accordingly, Article V.B.3 of the Plan, as modified as set forth in Section II.B. hereof, further provides that the sole officer and director of Ventoux shall be Alan M. Jacobs. Mr. Jacobs was selected by the Creditors' Committee. Mr. Jacobs has

significant experience in similar situations and is well-qualified to serve as director and officer of

Ventoux.

Thus, the Plan Proponents submit that the foregoing provisions are consistent with

the interests of Creditors and Interest Holders and with public policy.  Accordingly, the Plan

provisions satisfy the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 3.    Discretionary Contents of the Plan (1123(b)).

Section 1123(b) of the Bankruptcy Code identifies various discretionary

provisions that may be included in a plan of reorganization, but are not required.  For example, a

plan may impair or leave unimpaired any class of claims or interests and provide for the

assumption or rejection of executory contracts and unexpired leases.  11 U.S.C. § 1123(b)(1),(2).

A plan also may provide for:  (i) "the settlement or adjustment of any claim or interest belonging

to the debtor or to the estate," (ii) "the retention and enforcement by the debtor, by the trustee, or

by a representative of the estate appointed for such purpose, of any such claim or interest," or (iii)

"the sale of all or substantially all of the property of the estate, and the distribution of the

proceeds of such sale among holders of claims or interests."  Id. § 1123(b)(3)(A)-(B), 1123(b)(4).

Finally, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims,

or leave unaffected the rights of holders of any class of claims" and may "include any other

appropriate provision not inconsistent with the applicable provisions of [Title 11]."  Id. §

1123(b)(5)-(6).

As described above, the Plan provides for (i) the impairment of certain Classes of

Claims and Interests, while leaving others Unimpaired, thereby modifying the rights of the

Holders of certain Claims and Interests and leaving the rights of others unaffected (Article III of

25

the Plan),[5] and (ii) the rejection of executory contracts and unexpired leases to which the Debtors

are parties (Article VII of the Plan).

    In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan includes

additional appropriate provisions that are not inconsistent with applicable provisions of the

Bankruptcy Code, including: (i) the provisions of Article V of the Plan regarding the means for

implementation of the Plan, including substantive consolidation of the Consolidated Debtors, as

described below; (ii) the provisions of Article VI of the Plan governing distributions on account

of Allowed Claims; (iii) the provisions of Article X regarding certain releases, injunctions and

exculpation, as described below; and (iv) the provisions of Article XI of the Plan regarding

retention of jurisdiction by the Court over certain matters after the Effective Date.

### 4.    Substantive Consolidation of the Consolidated Debtors.

    Article VIII.A.2. of the Plan provides that Confirmation of the Plan is conditioned

upon entry of an order by this Court approving the Global Plan Settlement.  The Global Plan

Settlement is set out in Article V.A of the Plan and provides for the substantive consolidation of

the Consolidated Debtors under the Plan.  Pursuant to the Global Plan Settlement, the Individual

Debtors shall not be substantively consolidated and none of the Consolidated Debtors and the

Individual Debtors shall be consolidated with each other.

    Specifically, the Global Plan Settlement provides that, on the Effective Date, (i)

all Intercompany Claims by, between and among the Consolidated Debtors shall be eliminated,

(ii) all Assets and liabilities of the Consolidated Debtors shall be merged or treated as if they

were merged with the Assets and liabilities of Circuit City, (iii) any obligation of a Consolidated

---

[5]    The following Classes are Impaired: Classes 3A, 4A through 4C, 5A, 6A, 7A and 8A.  The following Classes
are Unimpaired: Classes 1A through C, Classes 2A through C, Classes 8B and 8C.

Debtor and all guarantees thereof by one or more of the other Consolidated Debtors, including

the Landlord Guaranty Claims, shall be deemed to be one obligation of Circuit City, (iv) the

Interests in the Consolidated Debtors shall be cancelled, and (v) each Claim filed or to be filed

against any Consolidated Debtor shall be deemed filed only against Circuit City and shall be

deemed a single Claim against and a single obligation of Circuit City.  On the Effective Date, the

Global Plan Settlement further provides that, in accordance with the terms of the Plan, including

the Global Plan Settlement, and the consolidation of the assets and liabilities of the Consolidated

Debtors, all Claims based upon guarantees of collection, payment, or performance made by any

Consolidated Debtor as to the obligations of another Consolidated Debtor, including the

Landlord Guaranty Claims, shall be released and of no further force and effect.  Lastly, on the

Effective Date, the Global Plan Settlement further provides that an Allowed Landlord

Guaranteed Claim shall be deemed to have a value equal to the Landlord Guaranteed Claim

Consolidation Amount.

        In summary, this substantive consolidation has three major effects.  First, it

releases the Intercompany Claims by, between and among the Consolidated Debtors without the

need for distributions in respect of such Claims.  Second, it eliminates guarantees of the

obligations of one Consolidated Debtor by another.  Thus, any joint and several liability of any

of the Consolidated Debtors shall be deemed to be one obligation of the Consolidated Debtors.

As compensation, however, for the elimination of certain guarantees provided to landlords, the

Global Plan Settlement provides for payment of the Landlord Guaranteed Claim Consolidation

Amount.  Finally, each Claim filed against any of the Consolidated Debtors would be considered

to be a single Claim against the Consolidated Debtors.

Substantive consolidation of the Consolidated Debtors' Estates pursuant to the

Global Plan Settlement is warranted under Bankruptcy Rule 9019 and the criteria established by

courts addressing substantive consolidation in this District and elsewhere.

Bankruptcy Rule 9019 provides that the Court "may approve a compromise or

settlement." Compromises are tools for expediting the administration of the case and reducing

administrative costs, and are favored in bankruptcy. See In re Bond, 1994 U.S. App. Lexis 1282,

*9-*14 (4th Cir. 1994)("To minimize litigation and expedite the administration of a bankruptcy

estate, 'compromises are favored in bankruptcy'."); Fogel v. Zell, 221 F.3d 955, 960 (7th Cir.

2000); In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). Various courts have endorsed the use of

Bankruptcy Rule 9019. See, e.g., Bartel v. Bar Harbor Airways, Inc., 196 B.R. 268 (S.D.N.Y.

1996).

The standards by which a court should evaluate a settlement are well established.

In addition to considering the proposed terms of the settlement, the court should consider the

following factors:

(a)     the probability of success in litigation;

(b)     the difficulty in collecting any judgment that may be obtained;

(c)     the complexity of the litigation involved, and the expense, inconvenience
        and delay necessarily attendant to it; and

(d)     the interest of creditors and stockholders and a proper deference to their
        reasonable views of the settlement.

See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S.

414, 424-425 (1968); In re Frye, 216 B.R. 166, 174 (E.D. Va. 1997); United States ex. rel.

Rahman v. Oncology Assocs., P.C., 269 B.R. 139, 152 (D. Md. 2001).

The decision to approve a settlement or compromise is within the discretion of the

court and is warranted where the settlement is found to be reasonable and fair in light of the

28

particular circumstances of the case.  See TMT Trailer Ferry, 390 U.S. at 424-25.  The settlement

need not be the best that the debtor could have achieved, but need only fall "within the

reasonable range of litigation possibilities."  In re Telesphere Communications, Inc., 179 B.R.

544, 553 (Bankr. N.D. Ill. 1994).  In making its determination, a court should not substitute its

own judgment for that of the debtor and should defer to the debtor so long as there is a

reasonable business justification.  See In re Martin, 91 F.3d at 395; In re Jasmine, Ltd., 258 B.R.

119, 123 (D.N.J. 2000).  The court should exercise its discretion "in light of the general public

policy favoring settlements."  In re Hibbard Brown & Co., Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y.

1998); Nellis v. Shugrue, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("[T]he general rule [is] that

settlements are favored and, in fact, encouraged by the approval process outlined above.").

Here, approval of the Global Plan Settlement, including substantive consolidation

of the Consolidated Debtors, is warranted because each factor in TMT Trailer Ferry weighs in

favor of approving the Global Plan Settlement or is neutral and is in the best interests of all of the

Consolidated Debtors' Estates for several reasons.  Specifically, and as set forth at length below,

the Plan Proponents believe that the process of and any litigation associated with disentangling

the Consolidated Debtors' Estates will be extremely time consuming, complicated and costly, to

the detriment of all Creditors.  Moreover, the outcome of any such litigation is highly uncertain.

Substantive consolidation of two or more debtors' estates generally results in the

consolidation of the assets and liabilities of the debtors, the elimination of intercompany claims,

subsidiary equity ownership interests, multiple and duplicative creditor claims, joint and several

liability claims and guarantees, and the payment of allowed claims from a common fund.  See

F.D.I.C. v. Colonial Realty Co., 966 F.2d 57, 58-59 (2d Cir. 1992); Union Sav. Bank v.

Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 (2d Cir. 1988).

Substantive consolidation of multiple debtors under a plan is expressly permitted by section 1123(a)(5)(C) of the Bankruptcy Code.  <u>See</u> 11 U.S.C. § 1123(a)(5)(C) ("[A] plan shall – . . . provide adequate means for the plan's implementation, such as – . . . merger or consolidation of the debtors with one or more persons . . ."); <u>see also</u> <u>In re Stone & Webster, Inc.</u>, 286 B.R. 532, 546 (Bankr. D. Del. 2002) ("§ 1123(a)(5)(C) clearly authorizes a bankruptcy court to confirm a Chapter 11 plan containing a provision [that] substantively consolidates the estates of [] two or more debtors."); <u>Schnelling v. Crawford (In re James River Coal Co., Inc.)</u>, 360 B.R. 139, 148, n.1 (Bankr. E.D. Va. 2007) (Huennekens, J.) (noting that "it is not unusual for bankruptcy courts to confirm plans of reorganization [that] call for the 'substantive consolidation' of the different corporate entities comprising the corporate group").  Moreover, numerous courts have held that section 105(a) of the Bankruptcy Code, which provides, in pertinent part, that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), empowers a bankruptcy court to authorize substantive consolidation.  <u>See</u> <u>Augie/Restivo</u>, 860 F.2d at 518 n.l; <u>Campbell v. Cathcart (In re Derivium Capital, LLC)</u>, 380 B.R. 429, 442 (Bankr. D.S.C. 2006); <u>In re Deltacorp, Inc.</u>, 179 B.R. 773, 777 (Bankr. S.D.N.Y. 1995); <u>In re Standard Brands Paint Co.</u>, 154 B.R. 563, 567 (Bankr. C.D. Cal. 1993).

The propriety of substantive consolidation must be evaluated on a case-by-case basis.  In deciding whether to consolidate, courts historically relied on the presence or absence of certain fact-intensive "elements" that are similar to factors relevant to piercing the corporate veil under applicable state law.  These elements have included, but are not limited to:

- the degree of difficulty in segregating and ascertaining the individual assets and liabilities of the entities to be consolidated;

- the presence or absence of consolidated financial statements among the entities to be consolidated;

- the commingling of assets and business function among the entities to be consolidated;

- the unity of interests and ownership among the various entities;

- the existence of parent and intercorporate guarantees on loans to the various entities; and

- the transfer of assets to and from the various entities without formal observance of corporate formalities.

These factors are "examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit." Eastgroup Props v. S. Motel Ass'n, Ltd., 935 F.2d 245, 250 (11th Cir. 1991).

More recent cases, while not ignoring the numerous elements of the Eastgroup test, have applied a less mechanical approach set forth by the Second Circuit Court of Appeals in Union Savings Bank v. Augie/Restivo Baking Co. Ltd. (In re Augie/Restivo Baking Co., Ltd.), 860 F.2d 515 (2d Cir. 1988). This second test recognizes that the extensive list of elements and factors frequently cited and relied upon by some courts in determining the propriety of substantive consolidation are variations of two critical factors, namely (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit or (2) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors. Under the Augie/Restivo test, the presence of either factor is a sufficient basis for the court to order substantive consolidation.

While the Fourth Circuit Court of Appeals has not directly enunciated a standard, courts in the Fourth Circuit have generally followed the approach set forth in Augie/Restivo. See In re Fas Mart Convenience Stores, Inc., 320 B.R. 587, 594 (Bankr. E.D. Va. 2004) (applying

31

Augie/Restivo standard to determine appropriateness of substantive consolidation); In re Smith,

2009 WL 1241316, at *1 (Bankr. E.D.N.C. Apr. 29, 2009) (same); Derivium Capital, 380 B.R. at

442 (same).[6]

Thus, courts in the Fourth Circuit have examined the two prongs of the

Augie/Restivo test in deciding whether to substantively consolidate two or more estates.  In

particular, this Court has described two tests for substantive consolidation:

> The first is whether the debtors had so intermingled their financial affairs that it is
> difficult to unravel them or is unfair to creditors to treat them as separate estates.
> The second test is the prejudice to the creditors if the estates are consolidated.
> While there will usually be some prejudice to some creditors when two estates are
> substantively consolidated, the extent of the prejudice must be balanced against
> the benefit to all creditors.  The balance is an equitable balance.

In re Thomas, 261 B.R. 848, 861 (Bankr. E.D. Va. 2001), rev'd on other grounds, 274 B.R. 450

(E.D. Va. 2001); see also In re Peramco Int'l, Inc., 242 B.R. 313, 317 n.5 (E.D. Va. 2000), rev'd

on other grounds, 2001 U.S. App. LEXIS 1845 (4th Cir. 2001).  Courts in this Circuit have also

recognized the increased possibility of entanglement in the corporate context, given the

"widespread use of interrelated corporate structures . . . for tax and business planning purposes."

In re Vecco Constr. Indus., Inc., 4 B.R. 407, 409 (Bankr. E.D. Va. 1980).

Here, the Plan Proponents have engaged in extensive analysis of the Consolidated

Debtors' Estates and the facts underlying the decision whether to substantively consolidate.

Based on this analysis, as further set forth immediately below, the Plan Proponents have

---

[6]    Courts in the Fourth Circuit have continued to apply the Augie/Restivo test notwithstanding the Third Circuit
Court of Appeals' subsequent decision in In re Owens Corning, 419 F.3d 195 (3d Cir. 2005).  The Owens
Corning court opined that substantive consolidation is appropriate if (i) the debtors pre-petition disregarded
separateness such that creditors relied on the breakdown of entity borders and treated them as one legal entity or
(ii) post-petition the debtors' assets and liabilities are so intertwined that separating them is prohibitive and
hurts all creditors.  Id., at 209, 211-212.

determined that the facts of these cases support the substantive consolidation of the Consolidated Debtors' Estates.

Historically, the Company has maintained its domestic retail store operations through three operating companies, which are Circuit City, and its wholly-owned subsidiaries, West Coast and Circuit City Stores PR, LLC ("CCPR").  Circuit City is also the parent company to numerous other corporations, the majority of whose primary objective was to provide services to the operating companies of Circuit City, West Coast and CCPR.

Circuit City, as parent of the Subsidiary Debtors, performed certain administrative services on behalf of the Subsidiary Debtors and, in certain instances, acted on behalf of the Subsidiary Debtors for the purchases of goods and services.  Circuit City also performed other administrative functions on behalf of the Subsidiary Debtors, including cash management, payroll services, tax services, risk management and financial reporting.  Historically, Circuit City had an established practice of charging an administrative fee to reflect the cost of services performed on behalf of the Subsidiary Debtors.  This practice was discontinued in fiscal year 2000, although the administrative and agency services continued to be performed.  In addition, in connection with its role as agent and its performance of administrative services on behalf of the Subsidiary Debtors, Circuit City issued purchase orders under Circuit City's name and made disbursements of operating costs, including payroll, on behalf of the Subsidiary Debtors on disbursement accounts and checks written under Circuit City's name.  As a result, vendors and service providers often had no knowledge of the Debtor entity to which they were providing services.

Further, for tax planning purposes, West Coast owned the proprietary rights to the Debtors' intellectual property (i.e. trademarks, trade names).  As such, West Coast charged a

royalty to Circuit City for its use of the intellectual property in the operations of its retail stores, which represented the majority of domestic stores. Historically, a royalty rate was established based upon independent transfer pricing studies. That practice ceased in later years despite the significant growth in the business over the past 20 years, leaving in question the appropriateness of the charge among the Debtors' Estates.

Circuit City maintained an elaborate system of intercompany accounts to track activity between both the parent and subsidiaries and among the subsidiaries. Such intercompany accounting was managed on a net basis, the result of which has made it very difficult to ascertain intercompany debtor/creditor relationships among the parent and individual subsidiaries.

The Consolidated Debtors and their advisors have spent a significant amount of time trying to accurately reconstruct the books and records of the Consolidated Debtors' Estates to reflect an appropriate level of royalty charges and an appropriate charge for administrative services amongst the Debtor companies and to ascertain, as a result, the proper intercompany debtor/creditor relationships between Circuit City and the Consolidated Debtors.

While these analyses necessarily relied on the use of significant high-level assumptions, the analyses suggest that recoveries would be similar for substantially all of the Consolidated Debtors' Creditors either on a consolidated or non-consolidated basis, with one exception. Specifically, it appears that Creditors holding Claims against CCPR may have an argument that such Creditors would receive a greater distribution on account of their Claims if the assets and liabilities of CCPR were not consolidated with the assets and liabilities of all of the other Consolidated Debtors. The Plan Proponents believe that there are substantial defenses to any such arguments and that litigation over such issues would be complex, time consuming

34

and extremely costly and would involve disputes regarding appropriate assumptions to be made
with respect to Intercompany Claims and/or success on various potential litigation positions.
Moreover, the process of disentangling the Estates would be both time consuming and extremely
costly, assuming the Estates could be disentangled, and these costs would likely outweigh any
benefits of pursuing the disentanglement.

In summary, the factors supporting substantive consolidation of the Consolidated
Debtors' Estates pursuant to the Global Plan Settlement include:

- Vendors and service providers often had no knowledge of the Debtor entity to
  which they were providing services.

- Circuit City performed administrative functions on behalf of the Subsidiary
  Debtors for which it ceased charging a fee.

- Intercompany accounting was managed on a net basis, the result of which has
  made it very difficult to ascertain intercompany debtor/creditor relationships
  among the parent and individual subsidiaries.

- The process of disentangling the Estates would be both time consuming and
  extremely costly, assuming the Estates could be disentangled.

- Litigation by any Consolidated Debtor, including CCPR, with respect to
  substantive consolidation would be complex, time consuming and extremely
  costly and would involve disputes regarding appropriate assumptions to be made
  with respect to Intercompany Claims and/or success on various potential litigation
  positions and the outcome of any such litigation is uncertain.

Based on the foregoing, non-consolidation in these cases is not practical based on
the pervasive and historical intermingling of the Consolidated Debtors' financial and corporate
affairs and the difficulty associated with unraveling those affairs.  Indeed, failing to consolidate
these Debtors would prejudice the Creditor body as a whole, in light of the economic
interdependence among the Consolidated Debtors and the Creditors' historical reliance on the
value and creditworthiness of the Debtors' consolidated enterprise.  Thus, for the foregoing

reasons, and the reasons set forth in the Disclosure Statement[7] and the Supplement,[8] the

standards for substantive consolidation have been met here.

Based on the foregoing, the Plan Proponents submit that the Global Plan

Settlement, which provides for the substantive consolidation of the Consolidated Debtors, is

beneficial to and in the best interests of the Consolidated Debtors' Estates and their Creditors.

The Global Plan Settlement represents a compromise that is fair and equitable, falls well within

the range of reasonableness, and satisfies the standards for approval under applicable law.

Accordingly, for the reasons detailed herein, approval of the Global Plan

Settlement is warranted under Bankruptcy Rule 9019, the Bankruptcy Code and applicable case

law.

## 5.    Executory Contracts and Unexpired Leases.

The Debtors submit that they have exercised appropriate business judgment in

determining whether to assume or reject each of their executory contracts and unexpired leases

as set forth in the Plan.  The Debtors do not believe that any of the remaining pre-petition

executory contracts or unexpired leases have any value to the Debtors, their Estates, or the

Liquidating Trust.  Accordingly, Article VII of the Plan provides that the Confirmation Order

shall constitute an order under Bankruptcy Code section 365 rejecting all pre-petition executory

contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or

leases are executory contracts or unexpired leases, on and subject to the occurrence of the

Effective Date, unless such contract or lease (i) has been previously assumed or rejected by order

of the Bankruptcy Court, (ii) previously expired pursuant to its own terms before the Effective

---

[7]    See Disclosure Statement at Section VIII.B.

[8]    See Supplement at Section II.B.

Date, or (iii) is identified in the Plan Supplement as an insurance agreement, as the same may be

amended or modified at any time prior to the Confirmation Hearing.

In the Plan Supplement, the Debtors identified certain insurance agreements. See

Exhibit C to Plan. With the exception of these insurance agreements, the Debtors request that

the Confirmation Order provide for the rejection of all other executory contracts (excluding any

executory contracts with respect to which a motion to assume is pending as of the date of the

Confirmation Hearing) as of, and subject to the occurrence of, the Effective Date.

**B.     Compliance of Plan Proponents with the Applicable Provisions of Title 11 (Section 1129(a)(2)).**

Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to

comply with the applicable provisions of the Bankruptcy Code. The principal purpose of section

1129(a)(2) is to ensure that a plan proponent has complied with the requirements of the

Bankruptcy Code regarding solicitation of acceptances of the plan. See, e.g., In re PWS Holding

Corp., 228 F.3d 224, 248 n.23 (3d Cir. 2000) (noting that "'[t]he principal purpose of section

1129(a)(2) of the Bankruptcy Code is to assure that the plan proponents have complied with the

disclosure requirements of section 1125 of the Bankruptcy Code in connection with solicitation

of acceptances of the plan.'" (quoting In re Trans. World Airlines, Inc., 185 B.R. 302, 313

(Bankr. E.D. Mo. 1995))); In re Stations Holding Co., No. 02-10882, 2002 WL 31947022, at *3

(Bankr. D. Del. Sept. 30, 2002) (finding that the debtor had complied with section 1129(a)(2) of

the Bankruptcy Code because, "[i]n particular, the solicitation of acceptances or rejections of the

Plan was solicited after disclosure . . . of 'adequate information'"); In re Texaco Inc., 84 B.R.

893, 906-07 (Bankr. S.D.N.Y. 1988) (holding that the "principal purpose of Section 1129(a)(2) is

to assure that the proponents have complied with the requirements of section 1125 in the

solicitation of acceptances to the plan"); see also H.R. Rep. No. 95-595, at 412 (1977), as

reprinted in 1978 U.S.C.C.A.N. 5963, 6368.  The Plan Proponents have complied with the

applicable provisions of Title 11, including the provisions of section 1125 regarding disclosure

and plan solicitation.

Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or

rejections of a chapter 11 plan from holders of claims or interests "unless, at the time of or before

such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a

written disclosure statement approved . . . by the court as containing adequate information."  11

U.S.C. § 1125(b).  In these cases, the Court approved the Disclosure Statement by an order dated

September 24, 2009 (the "Solicitation Procedures Order"), which, among other things,

specifically found that the Disclosure Statement contained adequate information within the

meaning of section 1125 of the Bankruptcy Code.  In addition, the Court considered and, in the

Solicitation Procedures Order, approved (a) all materials to be transmitted to those holders of

Claims entitled to vote on the Plan (collectively, the "Solicitation Materials"), (b) the timing and

method of delivery of the Solicitation Materials, and (c) the rules for tabulating votes to accept or

reject the Plan.

Thereafter, the Plan Proponents and their representatives transmitted solicitation

packages to Holders of Claims entitled to vote in Class 3A and Classes 4A through 4C[9]

(collectively, the "Voting Classes") and the parties on the 2002 List and the Core Group (each as

defined in the Supplemental Order Pursuant to Bankruptcy Code Sections 102 and 105,

Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing

---

[9]  Note that Classes 4A through 4C were consolidated as Class 4 under the First Amended Plan and voted as a
consolidated Class.  Class 4 voted as a Class to accept the Plan.  The amendments incorporated in the Plan
dividing Class 4 into Classes 4A, 4B and 4C did not adversely impact any Class 4 Creditor's recovery and,
moreover, the Plan Proponents do not believe that there are any Creditors with valid Claims in Classes 4B or 4C.

Certain Notice, Case Management, and Administrative Procedures (D.I. 6208; the "Case

Management Order")), which contained: (a) for Classes 3 and 4 only, a Ballot for the appropriate

class in which the Creditor is entitled to vote and (b) a CD-ROM containing (i) the Confirmation

Hearing Notice, (ii) the Disclosure Statement, (ii) the Plan and (iv) the Solicitation Procedures

Order (with exhibits); and the materials appended thereto (the "Solicitation Packages").  In

addition, the Confirmation Hearing Notice and a notice of unimpaired status in lieu of a Ballot

were sent to each Holder of an Unimpaired Claim in Classes 1 and 2.  The Confirmation Hearing

Notice and a notice of nonvoting status in lieu of a Ballot were sent to each Holder of a Claim or

Interest in Classes 5, 6, 7 and 8.  These Solicitation Materials were distributed promptly after the

entry of the Solicitation Procedures Order and on or prior to September 30, 2009, in accordance

with the Court's instructions.[10]  In addition, the Plan Proponents caused the Confirmation

Hearing Notice to be published in The New York Times and the Richmond Times Dispatch on

September 29, 2009 and in the The Wall Street Journal (Global Edition) on September 30,

2009.[11]

Accordingly, the Plan Proponents have satisfied the solicitation requirements

imposed by section 1125 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.  The

Plan thus satisfies the requirements of section 1129(a)(2) of the Bankruptcy Code.

### C.      Good Faith (Section 1129(a)(3)).

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization

be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  In

---

[10]   See Affidavit of Service of Solicitation Packages (Docket No. 5309).

[11]   See Affidavit of Publication of Alice Weber in the New York Times (Docket No. 5219); Affidavit of
Publication of Raymond W. McDowell in the Richmond Times-Dispatch (Docket No. 5324); Affidavit of
Publication of Erin Ostenson in the Wall Street Journal (Docket No. 5218).

the context of section 1129(a)(3), good faith is not some free-floating conception of ethics or

morality, but rather the measure of good faith is whether "there is a reasonable likelihood that the

plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."

In re Walker, 165 B.R. 994, 1001 (E.D. Va. 1994) (quoting Hanson v. First Bank of S.D., N.A.,

828 F.2d 1310, 1315 (8th Cir. 1987)); see also 203 N. LaSalle, 126 F.3d at 969, ("'Though the

term "good faith," as used in section 1129(a)(3), is not defined in the Bankruptcy Code, . . .  the

term is generally interpreted to mean that there exists a "reasonable likelihood that the plan will

achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" (alteration

in original) (quoting In re Madison Hotel Assocs., 749 F.2d 410, 424-25 (7th  Cir. 1984))).

In determining whether a plan will succeed and accomplish goals consistent with

the Bankruptcy Code, courts look to the terms of the plan and determine, in light of the particular

facts and circumstances, whether the plan will fairly achieve a result consistent with the

Bankruptcy Code.  See, e.g., In re Future Energy Corp., 83 B.R. 470, 486 (Bankr. S.D. Ohio

1988) (noting that while the term "good faith" is not specifically defined in the Bankruptcy Code,

a plan is proposed in good faith when there is a reasonable likelihood that the plan will achieve a

result consistent with the objectives and purposes of the Bankruptcy Code).  The plan proponent

must show, therefore, that the plan has not been proposed by any means forbidden by law and

that the plan has a reasonable likelihood of success.  See In re Century Glove, Inc., 1993 WL

239489, at *4 (D. Del. Feb. 10, 1993) ("'[W]here the plan is proposed with the legitimate and

honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of

section 1129(a)(3) is satisfied.'" (citation omitted)); see also Fin. Sec. Assur. Inc. v. T-H New

Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 802 (5th Cir. 1997)

(same); Koelbl v. Glessing (In re Koelbl), 751 F.2d 137, 139 (2d Cir. 1984) (noting that plan

40

provisions may not contravene any law, including state law, and a plan must have been proposed with a basis for expecting that the proposed plan can be implemented).

The Debtors filed the Chapter 11 Cases to restructure their capital structure and operational footprint or, in the alternative, maximize the value of their assets for Creditors and Interest Holders through a sale or similar transaction.  As discussed more fully above, the Debtors have since determined that liquidation represented the best option for maximizing returns to their Creditors and stakeholders and have liquidated substantially all of their assets through a number of Court-approved sales.

The Plan has been proposed by the Debtors and the Creditors' Committee in good faith, with the legitimate and honest purpose of cost-effectively distributing the proceeds of these sales to Creditors.  As described in the Disclosure Statement, the Supplement and herein, the Plan Proponents believe that the value of the Debtors' Estates is greater under the proposed Plan than in any other form of liquidation, including liquidation under chapter 7 of the Bankruptcy Code.  Accordingly, the Plan Proponents believe that the Plan will result in the greatest possible recoveries to Creditors.

To arrive at this stage in these Chapter 11 Cases, the Debtors actively involved their Creditor constituencies.  As this Court is aware, the Plan formulation process was marked by extensive arms-length negotiations between the Debtors and the Creditors' Committee, including through Court-ordered mediation.  The Plan is the culmination of those negotiations and is jointly proposed by the Debtors and the Creditors' Committee.  As a result, the Plan Proponents believe that the Plan represents the fairest and most efficient means of distribution of the Debtors' remaining assets.  See Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.), 84 B.R. 167,

172 (B.A.P. 9th Cir. 1988) (holding that good faith in proposing a plan "also requires a

fundamental fairness in dealing with one's creditors").

Moreover, the support of the Debtors' primary constituencies and the

overwhelming acceptance of the Plan by Holders of Claims that cast Ballots reflect the overall

fairness of the Plan and the acknowledgment by the Debtors' Claimholders that the Plan has

been proposed in good faith and for proper purposes.  See In re Eagle-Picher Indus., Inc., 203

B.R. 256, 274 (S.D. Ohio 1996) (finding that a chapter 11 plan was proposed in good faith when,

among other things, it was based on extensive arms' length negotiations among the plan

proponents and other parties in interest).  In light of the foregoing, the Plan Proponents submit

that they acted in good faith in proposing and pursuing confirmation of the Plan and that the Plan

is not proposed by any means forbidden by law.  Therefore, the good faith requirement of section

1129(a)(3) of the Bankruptcy Code has been satisfied.

> **D.    Payments for Services and Expenses (Section 1129(a)(4)).**

Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a
> person issuing securities or acquiring property under the plan, for services
> or for costs and expenses in or in connection with the case, or in
> connection with the plan and incident to the case, has been approved by,
> or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all fees promised or

received in connection with or in contemplation of a chapter 11 case must be disclosed and

approved, or subject to approval, by the court.  In re Eagle-Picher Indus., 203 B.R. at 274; Future

Energy, 83 B.R. at 487-88 (noting that certain payments, as detailed in section 1129(a)(4), are

subject to approval by the bankruptcy court).

Section 1129(a)(4) of the Bankruptcy Code has been construed to require that all

payments of professional fees that are made from estate assets be subject to review and approval

by the court as to their reasonableness.  See, e.g., In re Drexel Burnham Lambert Group Inc., 138

B.R. 723, 760 (Bankr. S.D.N.Y. 1992).  The Court-appointed professionals in these cases are

subject to the requirements of sections 330 and 331 of the Bankruptcy Code and, therefore, have

been approved by or are subject to approval of the Court as reasonable.  Further, article IX.A.  of

the Plan provides that all unpaid Professional Fees incurred prior to the Effective Date shall be

subject to final allowance or disallowance upon application to the Bankruptcy Court pursuant to

the Bankruptcy Code.  In addition, Article XI of the Plan provides that the Court will retain

jurisdiction after the Effective Date to hear and determine all applications for allowance of

reasonable compensation and reimbursement of expenses of Professionals under the Plan or

under Bankruptcy Code sections 330, 331, 503(b), 1103, and 1129(a)(4).  These procedures for

the Court's review and ultimate determination of the reasonable fees, costs, and expenses to be

paid by the Debtors satisfy the requirements of section 1129(a)(4).  In re Resorts Int'l, Inc., 145

B.R. 412, 475-76 (Bankr. D.N.J. 1990) (as long as fees, costs and expenses are subject to final

approval of court, section 1129(a)(4) is satisfied).  Accordingly, the Plan fully complies with the

requirements of section 1129(a)(4) of the Bankruptcy Code.

> **E.**     **Identification of Directors, Officers and Insiders (Section 1129(a)(5)).**

Section 1129(a)(5) of the Bankruptcy Code requires a debtor to disclose the

identity of certain individuals who will hold positions with the reorganized debtors after

confirmation of the Plan.  See 11 U.S.C. § 1129(a)(5).  Pursuant to section 1129(a)(5)(A)(i) of

the Bankruptcy Code, the proponent of a plan must disclose the "identity and affiliations of any

individual proposed to serve, after confirmation of the plan, as a director, officer, or voting

trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a

successor to the debtor under the plan."  11 U.S.C. § 1129(a)(5)(A)(i).  Section 1129(a)(5)(A)(ii)

of the Bankruptcy Code further requires that the service of such individuals be "consistent with

the interests of creditors and equity security holders and with public policy." Id. §

1129(a)(5)(A)(ii).  Section 1129(a)(5)(B) of the Bankruptcy Code requires that the plan

proponent disclose the "identity of any insider that will be employed or retained by the

reorganized debtor, and the nature of any compensation for such insider."  Id. § 1129(a)(5)(B).

In determining whether the post-confirmation management of a debtor or its

successor is consistent with the interests of creditors, equity security holders and public policy, a

court must consider proposed management's competence, discretion, experience and affiliation

with entities having interests adverse to the debtor.  See In re Sherwood Square Assocs., 107 B.R.

872, 878 (Bankr. D. Md. 1989).

As discussed above, the Plan provides for the liquidation and dissolution of the

Consolidated Debtors and InterTAN.  As of the Effective Date, pursuant to Article V.B., the

members of the board of directors, managers, or partners, as the case may be, of each of the

Debtors shall be deemed to have resigned and the Consolidated Debtors and InterTAN will cease

to have any management.

The Plan further provides that the Liquidating Trustee shall serve as trustee of the

Liquidating Trust, which shall carry out the provisions of the Plan with respect to the

Consolidated Debtors after the Effective Date, following dissolution of the Consolidated Debtors.

The Plan Proponents have identified the Liquidating Trustee.  Specifically, the Liquidating

Trustee shall be Alfred Siegel, who was selected by the Plan Proponents.  Mr. Siegel is

competent, has relevant and significant business and industry experience and will ably represent

the Debtors' Creditors in his management of the Liquidating Trust in conjunction with the

Liquidating Trust Oversight Committee.  Moreover, Mr. Siegel served as the Chief Restructuring

Officer ("CRO") of the Debtors between March and June of 2010.  See Docket No. 6795

(approving the Debtors retention of Mr. Siegel as CRO).  Given Mr. Siegel's experience,

together with knowledge of the Debtors through his tenure as CRO, the employment of the

Liquidating Trustee is consistent with the interests of Creditors as it will help ensure a swift

resolution and the most efficient distribution of the Debtors' assets to their Creditors.  Mr. Siegel

shall receive compensation for his services as the Liquidating Trustee on an hourly basis at his

standard rate, which, as of March, 2010, was $550 per hour.

In addition, the Plan Proponents have identified the members of the Liquidating

Trust Oversight Committee.  Specifically, the Liquidating Trust Oversight Committee shall be

comprised of Hewlett Packard Company, Simon Property Group, Inc., Weidler Settlement Class,

Paramount Home Entertainment, Inc., Developers Diversified Realty Corp., each of which were

members of the Creditors' Committee, Peter Kravitz and Michelle O. Mosier, a former officer

and director of various Debtors.   The Liquidating Trust Agreement identifies the compensation

to be paid to the members of the Liquidating Trust Oversight Committee.

Although the Liquidating Trust Oversight Committee includes certain significant

Creditors that have had or currently have actual or potential conflicts of interest with respect to

various controversial issues in the Debtors' cases, the bylaws of the Liquidating Trust Oversight

Committee set forth procedures for recusing members of the Liquidating Trust Oversight

Committee from decisions in which they have or may have an interest.  In addition, to address

certain of the Debtors' concerns regarding actual or potential conflicts of interest, the Debtors

have entered into a side letter agreement with Paramount specifically setting out those matters as

to which Paramount is deemed conflicted until its Claims are fully and finally resolved.

The Plan provides that Ventoux shall continue to exist after the Effective Date

until it is dissolved in accordance with the Plan.  Accordingly, Article V.B.3 of the Plan, as

modified as set forth in Section II.B. hereof, further provides that the sole officer and director of

Ventoux shall be Alan M. Jacobs.  Mr. Jacobs has over twenty-five years experience in business

turnaround and insolvency, corporate restructuring and reorganization, corporate finance and

dispute resolution.  Mr. Jacobs shall receive compensation for his services as the sole director

and officer of Ventoux in the amount of $5000 per month.

Accordingly, the Plan Proponents have satisfied the requirements of section

1129(a)(5) of the Bankruptcy Code.

**F.      Rate Changes (Section 1129(a)(6)).**

Section 1129(a)(6) of the Bankruptcy Code requires, with respect to a debtor

whose rates are subject to governmental regulation following confirmation, that appropriate

governmental approval has been obtained for any rate change provided for in the plan, or that

such rate change be expressly conditioned on such approval.  Section 1129(a)(6) of the

Bankruptcy Code is satisfied because the Plan does not provide for any change in rates over

which a governmental regulatory commission has jurisdiction.

**G.      The "Best Interests" Test (Section 1129(a)(7)).**

The Bankruptcy Code protects creditors and equity security holders who are

impaired by the Plan and who have not voted to accept the Plan through the "best interests" test

of section 1129(a)(7) of the Bankruptcy Code, which provides that the court shall confirm a plan

of reorganization if, with respect to each impaired class of claims or interests:

(A)     each holder of a claim or interest of such class –
    (i)     has accepted the plan; or
    (ii)    will receive or retain under the plan on account of such claim or
        interest property of a value, as of the effective date of the plan, that
        is not less than the amount that such holder would so receive or
        retain if the debtor were liquidated under chapter 7 of this title on
        such date.

11 U.S.C. § 1129(a)(7).  Thus, through the "best interest of creditors" test of section 1129(a)(7),

the Bankruptcy Code protects non-consenting members of impaired, accepting classes by

ensuring that each dissenting member of the impaired class receives at least what the dissenting

member would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

203 N. LaSalle, 126 F.3d at 969; SK-Palladin Partners, L.P. v. Platinum Entm't, Inc., No. 01 C

7202, 2001 WL 1593154, at *4 (N.D. Ill. Dec. 13, 2001); Walker, 165 B.R. at 1005 (the "best

interests" test requires that all creditors receive as much pursuant to a chapter 11 plan as they

would from a chapter 7 liquidation).  If the Court finds that each non-consenting member of an

impaired class will receive at least as much under the Plan as it would receive in a chapter 7

liquidation, the Plan satisfies the "best interests" test.  See Future Energy, 83 B.R. at 490 (finding

that section 1129(a)(7) was satisfied when the dissenting impaired classes would not have

received more under a chapter 7 liquidation than they received under the proposed plan); accord

Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship), 115

F.3d 650, 657 (9th Cir. 1997); Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d. Cir. 1988);

In re Leslie Fay Cos., 207 B.R. 764, 787 (Bankr. S.D.N.Y. 1997).

        A court, in considering whether a plan is in the "best interests" of creditors, is not

required to consider any alternative to the plan other than the dividend projected in a liquidation

of all of the debtor's assets under chapter 7 of the Bankruptcy Code.  See, e.g., Future Energy, 83

B.R. at 489-90 (suggesting that the "best interests" test requires looking at the plan as compared

with a chapter 7 liquidation); In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 297 (Bankr.

S.D.N.Y. 1990); In re Victory Constr. Co., 42 B.R. 145, 151 (Bankr. C.D. Cal. 1984).  As section

1129(a)(7) makes clear, the best interests of creditors test is applicable only to nonaccepting

holders of impaired claims and interests.  See 11 U.S.C. § 1129(a)(7).  The test requires that each

Holder of a Claim or Interest either accepts the Plan or will receive or retain under the Plan

property having a present value, as of the Effective Date, not less than the amount that such

Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy

Code.

The Debtors have liquidated substantially all of their assets through asset sales

during the Chapter 11 Cases.  The Plan Proponents believe that liquidation under chapter 11 is

more beneficial to the Holders of Claims than a liquidation under chapter 7 because the Plan

allows the Debtors' remaining assets to be promptly administered.  Additionally, if these cases

were to be converted to chapter 7 cases, the Debtors' Estates would incur the costs of payment of

a statutorily allowed commission to the chapter 7 trustee, as well as the costs of counsel and

other professionals retained by the trustee, and could require payment, pursuant to Bankruptcy

Code section 726(a), of certain late-filed Administrative and Priority Claims.  The Plan

Proponents believe such amount would exceed the amount of expenses that would be incurred in

implementing the Plan and winding up the affairs of the Debtors.  Conversion also would likely

delay the liquidation process and ultimately distribution to unsecured Creditors.  The Debtors'

Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during these

Chapter 11 Cases (such as compensation for professionals), which are allowed in the chapter 7

cases.  Accordingly, the Plan Proponents believe that Holders of Allowed Claims would receive

less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases.

In particular, the Liquidation Analysis annexed hereto as <u>Exhibit C</u> shows that in a Chapter 7

liquidation, general unsecured Creditors would receive a recovery of between 9% and 30%.

Holders of Claims and Interests included in Classes 5A, 6A, 7A and 8A would receive no

recovery.  Under the Plan, general unsecured Creditors are expected to receive a recovery of

between 10% and 32%.  Holders of Claims and Interests included in Classes 5A, 6A, 7A and 8A

would receive no recovery.

Accordingly, each dissenting Holder of a Claim or Interest in each Impaired Class

will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as

of the Effective Date of the Plan, that is not less than the amount that it would receive in a

chapter 7 liquidation of the Debtors' assets on such date.  As a result, the Plan satisfies the

requirements of section 1129(a)(7) of the Bankruptcy Code.

**H.    Acceptance by Impaired Classes (Section 1129(a)(8)).**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests under a plan either has accepted the plan or is not impaired by the plan.  A class of

claims or interests that is not impaired under a plan is "conclusively presumed" to have accepted

the plan and need not be further examined under section 1129(a)(8).  11 U.S.C. § 1126(f); <u>see</u>

<u>also</u> <u>In re Econ. Cast Stone Co.</u>, 16 B.R. 647, 651 (Bankr. E.D. Va. 1981).  Even if certain

impaired classes of claims or interests do not accept a plan and therefore the requirements of

section 1129(a)(8) are not satisfied, the plan nevertheless may be confirmed over such

nonacceptance pursuant to the "cramdown" provisions of section 1129(b)(1) of the Bankruptcy

Code.  As a result, the confirmation requirement contained in section 1129(a)(8) is the only

section 1129(a) condition that is not necessary for confirmation of a plan of reorganization or

liquidation.

Acceptance of a plan by an impaired class of claims or interests is determined by

reference to section 1126 of the Bankruptcy Code, which identifies the members of a class that

may vote on a plan and the number and amount of votes necessary for the acceptance of a plan

by a class of claims or interests.  In particular, section 1126 provides that a plan is accepted (a)

by an impaired class of claims if the class members accepting hold at least two-thirds in amount

and more than one-half in number of the claims held by the class members that have cast votes

on the plan and (b) by a class of impaired interests if the class members accepting hold at least

two-thirds in amount of the interests held by the class members that have cast votes on the plan.

Under section 1126(g) of the Bankruptcy Code, however, impaired classes that neither receive

nor retain property under the plan are deemed to have rejected the plan.

      As discussed above, Class 3A and Classes 4A through 4C[12] were entitled to vote

on the Plan and have voted to accept the plan, thus satisfying section 1126(c) of the Bankruptcy

Code with respect to those classes.  Classes 5A, 6A, 7A and 8A will neither receive nor retain

any property under the Plan and, therefore, are deemed to have rejected the Plan.  As discussed

more fully below, the Debtors have met the "cramdown" requirements in section 1129(b) of the

Bankruptcy Code necessary to obtain Confirmation of the Plan notwithstanding the deemed

rejection of the Plan by Classes 5A through 8A.

**I.      Treatment of Priority Claims (Section 1129(a)(9)).**

      Section 1129(a)(9) of the Bankruptcy Code contains a number of requirements

concerning the payment of priority claims.  First, section 1129(a)(9)(A) requires that claims of a

kind specified in section 507(a)(2), which gives second priority to certain administrative

expenses, be paid in full in cash on the effective date of the plan.[13]  Second, section 1129(a)(9)(B)

requires that claims of a kind specified in sections 507(a)(1) and 507(a)(4) through 507(a)(7) of

the Bankruptcy Code – generally, wage, employee benefit and deposit claims entitled to priority

---

[12]    Note that Classes 4A through 4C were consolidated as Class 4 under the First Amended Plan and voted as a consolidated Class.  Class 4 voted as a Class to accept the Plan.  The amendments incorporated in the Plan dividing Class 4 into Classes 4A, 4B and 4C did not adversely impact any Class 4 Creditor's recovery and, moreover, the Plan Proponents do not believe that there are any Creditors with valid Claims in Classes 4B or 4C.

[13]    Section 1129(a)(9)(A) also requires claims of a kind specified in section 507(a)(3), which gives third priority to certain claims arising in involuntary cases, be paid in full in cash on the effective date of the plan.  Because these Chapter 11 Cases are not involuntary cases, this portion of section 1129(a)(9)(A) is not applicable.

– receive deferred cash payments equal, as of the effective date of the plan, to the allowed

amount of such claims if the class has accepted the plan or, if the class has not accepted the plan,

cash on the effective date equal to the allowed amount of such claims.

The Plan satisfies these requirements.  First, Article III.A.1. of the Plan provides

that,

> Provided that an Administrative Claim has not been paid prior to the Effective
> Date, on, or as soon as reasonably practicable after the Distribution Date
> immediately following the date an Administrative Claim becomes an Allowed
> Administrative Claim, a Holder of an Allowed Administrative Claim shall receive,
> in full and final satisfaction, settlement and release of and in exchange for such
> Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such
> Allowed Administrative Claim to be paid out of the Administrative Claims
> Reserve or (ii) such other treatment as to which such Holder and the Debtors
> and/or the Liquidating Trustee shall have agreed upon in writing; provided,
> however, that Allowed Administrative Claims with respect to liabilities incurred
> by a Debtor in the ordinary course of business during the Chapter 11 Cases may
> be paid in the ordinary course of business in accordance with the terms and
> conditions of any agreements relating thereto (i) prior to the Effective Date, by the
> Debtors and (ii) subsequent to the Effective Date, by the Liquidating Trustee.

Second, Article III.B.2. of the Plan provides that,

> Provided that an Non-Tax Priority Claim has not been paid prior to the Effective
> Date, on, or as soon as reasonably practicable after, the Distribution Date
> immediately following the date a Non-Tax Priority Claim becomes an Allowed
> Non-Tax Priority Claim, a Holder of an Allowed Non-Tax Priority Claim shall
> receive, in full and final satisfaction, settlement and release of and in exchange for
> such Allowed Non-Tax Priority Claim, (i) Cash equal to the unpaid portion of
> such Allowed Non-Tax Priority Claim to be paid out of the Non-Tax Priority
> Claims Reserve or (ii) such other treatment as to which such Holder and the
> Debtors and/or the Liquidating Trustee shall have agreed upon in writing.

Thus, all Administrative Claims and Non-Tax Priority Claims that are Allowed

Claims on the Effective Date will be paid on the Initial Distribution Date.  Article 1.89 defines

the Initial Distribution Date as "the Effective Date or as soon thereafter as may be reasonably

practicable, but in any event no later than the fifth (5th) Business Day following the Effective

Date."  Accordingly, all Allowed Administrative and Non-Tax Priority Claims will receive cash

in full on the Effective Date of the Plan or as soon as reasonably practicable thereafter.  The Plan

Proponents therefore submit that the Plan satisfies the requirements set forth in section 1129(a)(9)

of the Bankruptcy Code with respect to the payment of these Claims.

　　　　　In addition, Bankruptcy Code section 1129(a)(9)(C) requires that claims of a kind

specified in section 507(a)(8), which gives priority to certain tax claims of governmental units,

receive regular installment payments in cash that (i) are equal to the total value, as of the

effective date, of such claim, (ii) extend over a period not to exceed five years after the petition

date, and (iii) are in a manner not less favorable than the most favored non-priority unsecured

claim provided for in the plan.[14]  See In re Terex Corp., 984 F.2d 170, 174-175 (6th Cir. 1993);

U.S. v. TM Bldg. Prods., Ltd., 231 B.R. 364, 372 (S.D. Fla. 1998) (stating that the term

"deferred cash payments" means periodic payments, the interval of which is determined by

balancing the circumstances of the debtor with the reasonable right of the creditor to receive

prompt payment of its claim); In re Mason & Dixon Lines, Inc., 71 B.R. 300, 303 (Bankr.

M.D.N.C. 1987) (same).

　　　　　This requirement is also satisfied.  Article III.A.2. of the Plan provides that,

> Provided that an Priority Tax Claim has not been paid prior to the Effective Date,
> on, or as soon as reasonably practicable after, the Distribution Date immediately
> following the date a Priority Tax Claim becomes an Allowed Priority Tax Claim,
> but in no event later than the date that is five (5) years after the Petition Date, a
> Holder of an Allowed Priority Tax Claim shall receive, in full and final
> satisfaction, settlement and release of and in exchange for such Allowed Priority
> Tax Claim, (i) Cash in an amount equal to the aggregate principal amount of the
> unpaid portion of such Allowed Priority Tax Claim, plus interest on the unpaid
> portion of such Allowed Priority Tax Claim from the Effective Date through the
> date of payment at the rate of interest determined under applicable nonbankruptcy
> law as of the calendar month in which Confirmation occurs, to be paid out of the
> Priority Tax Claims Reserve or (ii) such other treatment as to which such Holder

---

[14]    Section 1129(a)(9)(D) of the Bankruptcy Code makes clear that a secured tax claim must receive the same
treatment afforded to unsecured priority tax claims under 1129(a)(9)(C).

and the Debtors and/or the Liquidating Trustee shall have agreed upon in writing; provided, however, that the Liquidating Trustee shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty.

Accordingly, the Plan Proponents believe that the Plan satisfies the requirements set forth in section 1129(a)(9) of the Bankruptcy Code with respect to the payment of these Claims.

**J.      Acceptance of at Least One Impaired Class (Section 1129(a)(10)).**

Section 1129(a)(10) of the Bankruptcy Code provides:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10); see also In re Econ. Cast Stone Co., 16 B.R. at 651 (under section 1129(a)(10), at least one impaired class must actively accept the plan).

The Plan Proponents have satisfied this requirement.  Specifically, Classes 3A and 4A through 4C have voted to accept the Plan and, to the best of the Debtors' knowledge, such classes do not contain any significant number of insiders.  Thus, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.  Accordingly, the requirement of section 1129(a)(10) of the Bankruptcy Code has been met.

**K.      Feasibility (Section 1129(a)(11)).**

Section 1129(a)(11) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan."  11 U.S.C. § 1129(a)(11).

One commentator has stated that this section "requires courts to scrutinize carefully the plan to determine whether it offers a reasonable prospect of success and is workable." 7 <u>Collier on Bankruptcy</u> ¶ 1129.02[11] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2009); <u>see also</u> <u>In re DeLuca</u>, 1996 WL 910908, at *17 (Bankr. E.D. Va. Apr. 12, 1996) ("[I]t is not necessary that success be guaranteed, but only that the plan presents a workable scheme of reorganization and operation from which there may be a reasonable expectation of success."); <u>Walker</u>, 165 B.R. at 1004 (same); <u>In re Adamson Co., Inc.</u>, 42 B.R. 169, 174 (Bankr. E.D. Va. 1984) (same).

To satisfy section 1129(a)(11) of the Bankruptcy Code, a debtor need not warrant or prove to a mathematical certainty the future success of the plan.  See <u>In re Whittaker Mem'l Hosp. Ass'n, Inc.</u>, 149 B.R. 812, 816 (Bankr. E.D. Va 1993) (holding with respect to the debtor's obligation to provide feasibility, that "[i]t is not a blanket guarantee which is required, but rather a reasonable likelihood of success."); <u>see also</u> <u>Mercury Capital Corp. v. Milford Conn. Assoc., L.P.</u>, 354 B.R. 1, 9 (D. Conn. 2006) ("A 'relatively low threshold of proof' will satisfy the feasibility requirement." (quoting <u>In re Brotby</u>, 303 B.R. 177, 191-92 (B.A.P. 9th Cir. 2003))).  Rather, a plan is feasible and should be confirmed if it "offers a reasonably workable prospect of success and is not a visionary scheme." <u>In re Merrimack Valley Oil Co.</u>, 32 B.R. 485, 488 (Bankr. D. Mass. 1983).

Moreover, some courts have held that, where a plan proposes liquidation, section 1129(a)(11) is inapplicable.  See, <u>e.g.</u>, <u>In re Pero Bros. Farms, Inc.</u>, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan."); <u>Matter of 47th and Belleview Partners</u>, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) ("[F]easibility, under the literal wording of § 1129(a)(11) of the Bankruptcy Code, is unnecessary to be shown when

'liquidation . . . is proposed in the plan.'"").  Other courts, however, take a different approach and

"apply the feasibility test to plans of liquidation, focusing their analysis on whether the

liquidation itself, as proposed in the plan, is feasible."  In re Heritage Organization, LLC, 375

B.R. 230, 311 (Bankr. N.D. Tex. 2007) (collecting cases).  Indeed, Collier notes that, with

respect to feasibility, "[l]iquidating plans provide somewhat different considerations [than

reorganizing plans].  Although simply labeling a liquidating plan as such does not exempt such a

plan from the requirements of section 1129(a)(11),  it does mean that there is less emphasis on

future performance."  7 Collier on Bankruptcy ¶ 1129.02[11] (Alan N. Resnick & Henry J.

Sommer, eds., 16th ed. 2009).

   The Plan is feasible because, as demonstrated in the Liquidation Analysis and the

Supplement, the proceeds realized by the Debtors in the sale of substantially all of their assets

will be sufficient to satisfy all Allowed Administrative and Priority Claims in full.  While the

Canadian Proceeds, if repatriated, will increase returns to unsecured Creditors, such proceeds are

not necessary for the Plan to be feasible and unsecured Creditors will receive a material recovery

regardless.  In addition, the Plan provides for the creation of the Reserves to help ensure that

adequate funds will be available for distribution to Administrative, Priority and Secured

Claimants.  Thus, there is a reasonable probability that the provisions of the Plan will be

performed and confirmation is not likely to be followed by the need for further financial

reorganization of the Debtors.  Therefore, the Plan satisfies section 1129(a)(11).

### L.  Payment of Certain Fees (Section 1129(a)(12)).

   Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28

U.S.C. § 1930, determined by the court at the hearing on confirmation of a plan, be paid or that

provision be made for their payment.  All fees due and payable on or prior to the Effective Date

pursuant to 28 U.S.C. § 1930, as determined by the Court at the Confirmation Hearing, shall be

paid on or before the Effective Date by the Debtors and all such fees that become due and

payable thereafter by a Debtor shall be paid by the Liquidating Trustee pursuant to Article XII.D.

of the Plan. Thus, section 1129(a)(12) of the Bankruptcy Code is satisfied.

> **M. Continuation of Retiree Benefits (Section 1129(a)(13)).**

Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the

continuation of retiree benefits, at levels established pursuant to section 1114 of the Bankruptcy

Code, for the duration of the period that the debtor has obligated itself to provide such benefits.

The retirement plan provided by the Debtors – the Retirement Plan of Circuit City Stores Inc.

(the "Retirement Plan") – was terminated by agreement between the Debtors and the PBGC,

effective March 31, 2009, and the PBGC was appointed trustee of the Retirement Plan.

Accordingly, at this time, the Debtors have no further obligation to provide retiree benefits.

Thus, the requirements of section 1129(a)(13) of the Bankruptcy Code are satisfied.

## IV. THE PLAN SATISFIES THE "CRAMDOWN" REQUIREMENTS.

Section 1129(b) of the Bankruptcy Code, the so-called cramdown provision,

provides that if all of the applicable confirmation requirements of section 1129(a) other than

subsection (8) (requiring all impaired classes to accept the plan) are met, the court, on request of

the plan proponent, shall confirm the plan if it does not "discriminate unfairly" and is "fair and

equitable" with respect to the non-accepting impaired classes. See 11 U.S.C. § 1129(b)(1); see

also Bryson Props., 961 F.2d at 500; In re Catron, 186 B.R. 194, 197 (Bankr. E.D. Va. 1995);

Schwarzmann, 203 B.R. at 923, 925; Adamson, 42 B.R. at 173-74. Because the Holders of

Claims and Interests in Classes 5A through 8A neither receive nor retain any property under the

Plan, these Classes are deemed to have rejected the Plan. See 11 U.S.C. § 1126(g). As discussed

below, the Consolidated Debtors meet the "cramdown" requirements with respect to these

Classes.

A.    **The Plan Does Not Unfairly Discriminate.**

The Plan does not discriminate unfairly with respect to the Impaired Classes that have been deemed to reject the Plan.  Indeed, the "unfair discrimination" standard of section 1129(b) does not prohibit all types of discrimination among holders of claims and interests; it merely prohibits <u>unfair</u> discrimination.  <u>See</u> <u>In re Leslie Fay Cos.</u>, 207 B.R. at 791 n.37; <u>In re Rivers End Apts., Ltd.</u>, 167 B.R. 470, 487 (Bankr. S.D. Ohio 1994).  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.  <u>See</u> <u>In re 203 N. LaSalle St. Ltd. P'ship</u>, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), <u>aff'd</u>, 195 B.R. 692 (N.D. Ill. 1996), <u>aff'd</u>, 126 F.3d 955 (7th Cir. 1997), <u>rev'd on other grounds</u> <u>sub nom.</u> <u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Ltd. P'ship</u>, 526 U.S. 434 (1999).

Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.  <u>See</u>, <u>e.g.</u>, <u>In re Freymiller Trucking, Inc.</u>, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); <u>In re Aztec Co.</u>, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination").  At a minimum, however, the "unfair discrimination" standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justification for doing so.  <u>See</u>, <u>e.g.</u>, <u>Aztec</u>, 107 B.R. at 589-91; <u>Ambanc La Mesa</u>, 115 F.3d at 656.

The Plan Proponents submit that there is no unfair discrimination under the Plan. Class 5A consists of the Consolidated Debtor Intercompany Claims. Because the Consolidated Debtors are substantively consolidated under the Plan, as discussed further below, the Consolidated Debtor Intercompany Claims are eliminated under the Plan. Classes 6A and 7A consist of Claims against the Consolidated Debtors subordinated pursuant to sections 510(b) and 510(c) of the Bankruptcy Code. Holders of Class 6A and Class 7A Claims will not receive any distribution under the Plan. Because such Claims are subordinated, they are not entitled to payment under the absolute priority rule until all senior Creditors have been paid in full. Finally, Class 8A consists of Interests in the Consolidated Debtors, whose Holders will not receive any distribution under the Plan. Likewise, Class 8A is not entitled to payment under the absolute priority rule until all senior Creditors have been paid in full. Accordingly, the Plan complies with the absolute priority rule and does not discriminate unfairly.

B.    The Plan is Fair and Equitable.

Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain any property under the plan on account of such junior claim or interest. This central tenet of bankruptcy law—the absolute priority rule—requires that if the holders of claims in a particular class receive less than full value for their claims, no holders of claims or interests in a junior class may receive property under a plan. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988) (the absolute priority rule, "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." (citations omitted)); 203 N. LaSalle St., 526 U.S. at 441 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair

and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or,

in the alternative, if 'the holder of any claim or interest that is junior to the claims of such

[impaired unsecured] class will not receive or retain under the plan on account of such junior

claim or interest any property,' § 1129(b)(2)(B)(ii). That latter condition is the core of what is

known as the 'absolute priority rule.'"").  The corollary of the absolute priority rule is that senior

classes cannot receive more than a 100 percent recovery for their claims.  See In re Granite

Broad. Corp., 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (citing In re Exide Techs., 303 B.R. 48,

61 (Bankr. D. Del. 2003)); In re Genesis Health Ventures, Inc., 266 B.R. 591, 612 (Bankr. D. Del.

2001).

   The Plan satisfies the absolute priority rule with respect to all Claims and Interests.

As set forth in the Plan and Disclosure Statement, no junior Holder of a Claim or Interest will

receive any distribution unless the Holders of higher priority Claims receive the full value of

their Claims or have consented to such treatment.  Claims in Class 3A and 4A are Impaired and

Holders of Allowed Claims in such Classes will receive, on account of their Claims, a fixed

amount, for Class 3A, or pro rata share, for Class 4A, of Available Cash, if any, of the

Consolidated Debtors.  Holders of Class 5A, 6A and 7A Claims and Class 8A Interests are not

entitled to receive any recovery under the absolute priority rule and will not receive or retain any

Distribution or other property on account of such Interests.

   In sum, the Consolidated Debtors have met the requirements for cramdown of

Classes 5A through 8A.  Accordingly, the Plan should be confirmed despite the deemed rejection

of these Classes.

C.       **The Plan With Respect to InterTAN and Ventoux.**

With respect to InterTAN and Ventoux, no Classes are deemed to reject the Plan and each Class entitled to vote has voted to accept the Plan.  Specifically, Classes 1 and 2 are deemed to have accepted the Plan.

Classes 4B and 4C – General Unsecured Claims against Ventoux and InterTAN, respectively – were entitled to vote as part of Class 4 to accept the First Amended Plan.[15]  While the Plan amends the treatment provided to Holders of Class 4B and 4C Claims to a certain extent, such treatment is no less favorable than the treatment provided under the First Amended Plan.  Importantly, the Plan Proponents do not believe there to be any valid Claims in Class 4B or 4C.  To the extent such Claims do exist, however, each Holder of a Class 4B Claim will receive such Holder's Pro Rata share in Cash of any distribution(s), through dividend, return of capital, or otherwise, to Ventoux on account of the Tourmalet Common Stock.  Each Holder of a Class 4C Claim will receive such Holder's Pro Rata share (i) in Cash of any distribution(s), through dividend, return of capital, or otherwise, to Tourmalet on account of Tourmalet's Interests in InterTAN Canada or (ii) of Cash held by the successor by amalgamation, merger, or other consolidation of InterTAN Canada and Tourmalet.  This recovery will provide Holders of Class 4B and 4C Claims, if any, with a recovery of between 0% and 100%, potentially far in excess of the 0% to 13.5% recovery predicted under the First Amended Plan.

Finally, Holders of Interests in Classes 8B and 8C are deemed to have accepted the Plan.  Such Holders will receive a recovery equal to the value of their Interests.  If Holders of Claims in Classes 1, 2 and 4B or 4C, as the case may be, do not receive payment in full, the

---

[15]    Only one Ballot was submitted by a Claimholder asserting a Claim against either InterTAN or Ventoux, which Claim was later withdrawn.

Interests will be valueless and Class 8B and 8C Interest Holders will receive no recovery.  If

Holders of Claims in Classes 1, 2 and 4B or 4C, as the case may be, are paid in full, Class 8B

and 8C Interest Holders will receive a recovery equal to the residual value of Ventoux and

InterTAN, respectively.

Accordingly, while the cramdown provisions are not implicated with respect to

InterTAN and Ventoux, the Plan does not discriminate unfairly against Holders of Claims and

Interests in InterTAN or Ventoux and the Plan is fair and equitable.

**V.      ALL OBJECTIONS TO THE PLAN HAVE EITHER BEEN RESOLVED BY
AGREEMENT BETWEEN THE PARTIES OR SHOULD BE OVERRULED.**

All but 12 of the Objections have been resolved.  Attached hereto as Exhibit D-1

is a chart listing the unresolved Objections and the Plan Proponents' response thereto.  For the

reasons set forth in the chart, the Plan Proponents assert that each of the remaining objections is

without merit and should be overruled.  Attached hereto as Exhibit D-2 is a chart of the resolved

Objections.

## CONCLUSION

For the foregoing reasons, the Court should (i) confirm the Plan and (ii) grant the

Plan Proponents such other and further relief as is just and proper.

Dated:   September 3, 2010
         Richmond, Virginia

| | |
|---|---|
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP<br>Gregg M. Galardi, Esq.<br>Ian S. Fredericks, Esq.<br>P.O. Box 636<br>Wilmington, Delaware 19899-0636<br>(302) 651-3000 | PACHULSKI STANG ZIEHL & JONES LLP<br>Richard M. Pachulski, Esq.<br>Jeffrey N. Pomerantz, Esq.<br>10100 Santa Monica Boulevard, 11th Floor<br>Los Angeles, California 90067-4100 |
| – and – | – and – |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP<br>Chris L. Dickerson, Esq.<br>Jessica S. Kumar, Esq.<br>155 North Wacker Drive<br>Chicago, Illinois 60606<br>(312) 407-0700 | PACHULSKI STANG ZIEHL & JONES LLP<br>Robert J. Feinstein, Esq.<br>780 Third Avenue, 36th Floor<br>New York, NY 10017-2024 |
| – and – | – and – |
| MCGUIREWOODS LLP | TAVENNER & BERAN, PLC |
| /s/ Douglas M. Foley            .<br>Douglas Foley (VSB No. 34364)<br>Sarah B. Boehm (VSB No. 45201)<br>One James Center<br>901 E. Cary Street<br>Richmond, Virginia 23219<br>(804) 775-1000 | /s/ Lynn L. Tavenner            .<br>Lynn L. Tavenner, Esq. (VSB No. 30083)<br>Paula S. Beran, Esq. (VSB No. 34679)<br>20 North Eighth Street<br>Second Floor<br>Richmond, Virginia 23219 |
| Counsel for Debtors and Debtors in Possession | Counsel for the Creditors' Committee |