UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                      .   Case No. 08-35653 (KRH)
                            .
                            .   Chapter 11
                            .   Jointly Administered
CIRCUIT CITY STORES,        .
INC., et al.,               .   701 East Broad Street
                            .   Richmond, VA 23219
                            .
          Debtor.           .   August 31, 2010
. . . . . . . . . . . . . . .   10:04 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:           McGuireWoods, LLP
                          By: DOUGLAS M. FOLEY, ESQ.
                          By: SARAH B. BOEHM, ESQ.
                          By: COLLIN DRESHER, ESQ.
                          One James Center
                          901 E. Cary Street
                          Richmond, VA 23219

                          Skadden Arps Slate Meagher & Flom, LLP
                          By:  GREGG M. GALARDI, ESQ.
                          By:  IAN FREDERICKS, ESQ.
                          One Rodney Square
                          Wilmington, DE 19899

For Tennessee             Office of the Attorney General
Department of Treasury    Bankruptcy Division
Unclaimed Property        By:  GINA BAKER HANTEL, ESQ.
Division:                 P.O. Box 20207
                          Nashville, TN 37202


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Con't):

For Mitsubishi and          Sands Anderson PC
Insurance Company           By:  PHILIP C. BAXA, ESQ.
of Pennsylvania:            1111 E. Main Street, Suite 2400
                            Richmond, VA 23219

                            King & Spalding
                            By:  JOHN F. ISBELL, ESQ.
                            1180 Peachtree Street NE
                            Atlanta, GA 30309


TELEPHONIC APPEARANCES:

For the Creditor's          Pachulski Stang Ziehl & Jones LLP
Committee:                  By:  JEFFREY N. POMERANTZ, ESQ.
                            10100 Santa Monica Boulevard
                            11th Floor
                            Los Angeles, CA 90067

1          THE CLERK:  In the matter of Circuit City Stores,

2  Incorporated, hearing on Items 1 through 9 as set out on the

3  proposed agenda.

4          MR. FOLEY:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. FOLEY:  Doug Foley with McGuireWoods on behalf of

7  the debtors.  With me here today from my firm is Sarah Boehm

8  and also Collin Dresher (phonetic) who is -- just started with

9  us yesterday after finishing a clerkship with Judge St. John.

10          THE COURT:  Very good.

11          MR. FOLEY:  Also with me at counsel table is Gregg

12  Galardi and Ian Fredericks from Skadden Arps.

13          Today, Your Honor, from the company we have Brandy

14  Bose (phonetic) as well as Jeff McDonald who is head of their

15  tax department.

16          Your Honor, the items on the agenda today, we only

17  have nine items, but we have a couple matters obviously that

18  are important that will be going forward.  The first three

19  items, Your Honor, are matters that have been carried over from

20  previous hearings.  The first one is the Site A motion, and

21  we're in the process of negotiating with Mr. Campson with

22  respect to that claim, and so that's a late claim motion.

23          And they had requested and we've agreed to carry that

24  matter over to the September 27th hearing date, too.

25          THE COURT:  All right.

4

1        MR. FOLEY:  The second item, Your Honor, is a new --

2   a newer motion by Metra, and it's in a similar posture.  We're

3   negotiating with them to see if we can't resolve it as part of

4   a global resolution with some other claims that they have, and

5   they've requested and we've agreed to adjourn that matter until

6   the September 27th hearing date, too.

7        THE COURT:  All right.

8        MR. FOLEY:  Your Honor, Item Number 3, this is the

9   Quebecor matter.  It's similarly situated to the Graphics

10  Communication matter that Your Honor has already ruled on.

11  We're very close to a resolution with them to negotiate a

12  settlement.  They have requested and we've agreed again to

13  adjourn that matter until the September 27th hearing date, too.

14       THE COURT:  All right.  Very good.

15       MR. FOLEY:  Your Honor, Item Number 4 Mr. Fredericks

16  will address, items Number 5, 6 and 7 Ms. Boehm will address,

17  and Items Number 8 and 9 Mr. Galardi will address.

18       THE COURT:  All right.

19       MR. FOLEY:  Thank you, Your Honor.

20       THE COURT:  Thank you.

21       MR. FREDERICKS:  Good morning, Your Honor.  Ian

22  Fredericks with Skadden Arps on behalf of the debtors.

23       THE COURT:  Good morning.

24       MR. FREDERICKS:  We're here today on the -- Matter

25  Number 4 on the agenda which is the debtor's motion to approve

1  termination of certain employee benefit plans and an amendment

2  to the 401(k) plan.

3          In the courtroom today, Your Honor, is Jeff McDonald

4  who is the vice president of tax.  And by way of background

5  this motion relates to various employee benefits the debtors

6  had in place when they filed bankruptcy and that this Court

7  approved going forward after the debtors filed bankruptcy.

8  Once they commenced their going-out-of-business sales, the

9  debtors term -- well, effectively ceased the employee benefits

10 and instead sought this Court's approval of a stipend motion

11 which allowed employees that remained with the debtor to

12 receive a biweekly stipend where they could go out and purchase

13 certain employee benefits such as health insurance.

14         The debtors also terminated their -- or ceased their

15 401(k) plan, and no contributions have been made to that plan

16 for over a year.  If called as a witness, Mr. McDonald would

17 testify to the facts in the motion which basically -- which

18 essentially in summary form state, Your Honor, that there is no

19 further need for these benefits.

20         The debtors ceased using them following the GOB

21 sales.  There is currently $21,000 of forfeited 401(k) funds

22 that the debtors are proposing to amend the 401(k) plan to use

23 those funds to pay plan expenses.  And following the final

24 audit of the 401(k) plan, which I believe will occur at the end

25 of this year, the 401(k) plan would then be terminated.  All

6

1  the other benefits plans have no use and the debtors would

2  propose terminating those.

3        That would conclude Mr. McDonald's proffer.

4        THE COURT:  All right.  Very good.  Does any party

5  wish to examine the proffered witness?  All right.  The proffer

6  is accepted, Mr. Fredericks.

7        MR. FREDERICKS:  Thank you, Your Honor.  Based on

8  that, the debtors submit that they have articulated a sound

9  business reason to terminate the benefit plans and amend the

10 401(k) plan and would request that this Court enter an order

11 approving that relief.

12        THE COURT:  Does any party wish to be heard in

13 connection with the debtor's motion?  All right.  There being

14 no objection, the Court has reviewed the motion and, you know,

15 based on the testimony that's been proffered here this morning,

16 the Court agrees there is a sound business reason and the Court

17 will approve the motion.  Please submit an order to that

18 effect.

19        MR. FREDERICKS:  Thank you, Your Honor.  With that

20 I'll turn the agenda over to Ms. Boehm.  Thank you.

21        MS. BOEHM:  Good morning, Your Honor.  Sarah Boehm

22 from McGuireWoods on behalf of Circuit City.

23        Item 5 on the agenda is the debtor's forty-third

24 omnibus objection to claims.  We are going forward on the

25 merits today with the Department of Treasury from Tennessee

7

1  which will be an excusable neglect legal argument, which we'll

2  just drop down for a few minutes and go through the other

3  remaining omnibus objections.

4          THE COURT:  All right.

5          MS. BOEHM:  Item 6 is the debtor's eightieth omnibus

6  objection to claim.  This is on for status for the first time

7  today.  It sought the reclassification of certain misclassified

8  claims and misclassified wage claims.  This objection included

9  91 claims for approximately $2.2 million.  We did receive three

10 responses.  One has been resolved in principle subject to

11 settlement documentation.  As set forth on Exhibit A in the

12 agenda, we would propose to adjourn those three responses to

13 the September 27th hearing at 2:00 o'clock, and for all non-

14 responding claimants reclassify the claims as set forth in the

15 objection.

16         THE COURT:  All right.  Does any party wish to be

17 heard in connection with the omnibus objection?  All right.

18 Those objections will be sustained and then the three matters

19 will be carried over.

20         MS. BOEHM:  Thank you, Your Honor.  Item 7 is the

21 debtor's eighty-first omnibus objection, also for status on the

22 first time today.  This sought the reduction of partially

23 invalid claims and the disallowance of other claims.  This

24 included 24 claims for approximately $5.4 million which seeks

25 the reduction down to approximately $3.8 million.

1       There were three responses received.  One has already

2  been resolved and a stipulation has been filed.  A second has

3  been resolved in principle subject to settlement documentation.

4  At this time we would propose to adjourn anyone who filed a

5  response to the September 27th hearing at 2:00 p.m., and for

6  any non-responder disallow or partially disallow the claims as

7  set forth in the objection.

8       THE COURT:  All right.  Does any party wish to be

9  heard in connection with the debtor's eighty-first omnibus

10 objection?  All right.  That will be granted, as well.

11      MS. BOEHM:  Your Honor, if we could go back to the

12 forty-third omnibus objection which is Item 5 on the agenda,

13 this is the hearing on the merits with respect to the Tennessee

14 Department of Treasury, Division of Unclaimed Properties late

15 claim.

16      The facts in this case are basically agreed to.  It's

17 just a purely legal argument today on excusable neglect.  The

18 bar date for government claims was May 11th, 2009, and

19 Tennessee filed its late claim on August 20th, 2009.  It does

20 not dispute the affidavit that was filed with our reply showing

21 that Tennessee was served with the bar date objection and they

22 did receive the notice and the proof of claim form.

23      They simply received it from another division and

24 misplaced it, and when they realized that they had missed the

25 bar date, they went ahead and filed their claim.  They did not

9

1  file a motion seeking the allowance of the late claim.  We're

2  here on the late claim objection.

3          The basic legal issue is under <u>Pioneer</u>, the factors

4  to be considered, we would just highlight that the most

5  important factor that the courts consider is the reason for the

6  delay.  And in this case, excessive workload and administrative

7  failure on the part of the claimant do not rise to the level of

8  excusable neglect.  And this Court's opinion in the <u>EDC</u> case is

9  very similar, as well as the other cases that were cited in our

10 brief.  So rather than belabor that, we just rest on our

11 papers.  Unless Ms. Hantel, who is here from Tennessee, raises

12 any new issues, we would just ask the Court to sustain the

13 forty-third omnibus objection disallowing Tennessee's late

14 claim.

15         THE COURT:  All right.  Thank you, Ms. Boehm.

16         MS. HANTEL:  Good morning, Your Honor.

17         THE COURT:  Good morning.

18         MS. HANTEL:  I'm Gina Hantel.  I'm representing the

19 Department of Treasury, Unclaimed Property Division.

20         I'm here today because of a mistake that our office

21 made that resulted in a late filed proof of claim in this case,

22 and we apologize to the Court for that.  Because that claim

23 represents over 4,500 Tennessee consumers who otherwise have

24 been denied participation in this case, I am urging Your Honor

25 to consider all the facts and circumstances surrounding this in

1    finding that it rises to the level of excusable neglect.  The

2    claim is for $200,545.  It represents rebate holders.  It is a

3    result of an audit that was performed.

4         The audit arrived in our office in the form of a

5    letter introducing that around August 19th, and we know that

6    from a date stamp on the letter.  On August 19th, around

7    August 19th, it was discovered, immediately addressed, put on

8    our system and overnighted to the Court and filed the next day,

9    August 20th.

10        Our office files claims on behalf of any state agency

11   that has any money owed to it from any person in bankruptcy, so

12   we have many state agencies.  Unlike most claim information

13   coming in, the front page was a letter instead of a claim

14   summary which our clerks are used to seeing.  The filing was

15   due to inadvertence.  There was certainly nothing deliberate

16   about it, and we acted with haste to get it filed when it was

17   discovered.

18        Furthermore, Treasury is not a usual client like

19   revenue for taxes or TSAT for student loans.  In fact, in

20   almost two years, this is the only claim that we've had for

21   Treasury.  And in my recollection, Kmart may have been the last

22   case that we had, and that's many years ago.

23        And I respectfully submit to Your Honor that this is

24   excusable neglect.  And I know that you're well-versed in

25   excusable neglect, and you're often cited for your rulings on

1  it, and I recognize that you do not generally look on office

2  inadequacies as excusable neglect.  Courts have held that mere

3  inadvertence alone can be enough to constitute excusable

4  neglect, and that excusable neglect is not limited to omissions

5  caused by circumstances beyond the control of the movement.

6  That was <u>Raymond v. International Business Machines</u>, 148 F.3d,

7  63.

8          I submit to the Court that this case involves much

9  more and is distinguishable due to all the facts and

10 circumstances.  Of course, the <u>Pioneer</u> case is the premier case

11 with the factors determining excusable neglect.  One is whether

12 it's -- whether the neglect is excusable.  Of course, prejudice

13 to the debtor is one.

14         The Court in <u>In re R.H. Macy & Co</u>, 166 B.R. 799,

15 which is Southern District of New York, a '94 case, the Court

16 held that the determination of prejudice depends on

17 circumstances that include the size of the claim in relation to

18 the estate, the disruptive effect on a plan close to

19 completion.  And the Courts in <u>In re Alexanders, Inc.</u>, which is

20 176 B.R. 715, Southern District of New York, '95, and also the

21 <u>Keene</u> court, same district, 188 B.R. 903, same year, added the

22 expectation that a creditor would file a claim.

23         When this petition was filed, when the bankruptcy was

24 filed, the debtors gave notice to many state treasury offices.

25 The rebate holders were contemplated.  There was a conscious

1 decision made at that time, as indicated in a motion filed

2 earlier this year to deem publication adequate for that, not to

3 notice these rebate claim holders.

4          Schedule F that was filed in 2008 listed Treasury

5 three times, the Tennessee Department of Treasury three times.

6 The debtors assert that they noticed Treasury repeatedly.  The

7 amount of the claim is tiny in comparison to the estate and

8 represents a small fraction of even the estimated general

9 unsecured claims which on the statements and schedules total

10 almost $2 billion.  The plan has not been confirmed, so it was

11 nowhere near completion.

12          THE COURT:  But we're only a week away.

13          MS. HANTEL:  I'm sorry, Your Honor?

14          THE COURT:  But we're only a week away.

15          MS. HANTEL:  Yes, Your Honor.  However, the claim was

16 filed before even the disclosure statement or the plan were

17 filed.

18          THE COURT:  Back in August of 2009?

19          MS. HANTEL:  Yes, Your Honor, so creditors had notice

20 of the claim and so forth.  The second factor is the length of

21 the delay and the impact on the judicial proceedings.  I submit

22 to Your Honor that the 90 days that the claim was late in this

23 case really has no effect, even if it had been filed the day

24 after; that the claim was filed prior to the disclosure

25 statement and plan; and that the plan is not confirmed.

13

1        There has been no distribution, and I submit it would

2   have very negligible effect on distribution when we still are

3   not even sure what the general unsecureds are going to get, and

4   even if we did know, again it's such a small fraction that it

5   would have no effect.  And the debtors again have been aware of

6   these claims all along, as early as 2007 when these audits

7   began.  And the claim again was filed before the disclosure

8   statement and plan, so there has been notice all along to

9   creditors and parties in interest.

10        THE COURT:  Now, why didn't you file a motion to

11  allow the late filed claim at the time you filed it back in

12  December -- in August of 2009?

13        MS. HANTEL:  Your Honor, I think that we were just so

14  wanting to get the claim filed that we just did it without even

15  considering that we should have done that motion, and I would

16  ask Your Honor to treat this objection as that motion.

17        THE COURT:  Well, I mean, should I consider the fact

18  that, you know, here we are now a year later finally, you know,

19  having for the first time considered, you know, whether we

20  should allow the late filed claim as opposed to having dealt

21  with this, you know, way back at the beginning when the late

22  filed claim was filed.  And is that part of the prejudice that

23  I should take into account under the Pioneer standard?

24        MS. HANTEL:  Your Honor, I don't believe that it will

25  have an effect in this case because it has been dealt with.  It

1  has been known all along, and the -- again the claim is so

2  small, I don't think that it will have an effect one way or the

3  other.

4          The third factor is the reason for the delay, which I

5  submit is mere inadvertence.  It was not deliberate, but it was

6  not just inadvertence.  There were several factors that make

7  that rise to excusable neglect, Your Honor -- the mere volume

8  of the work, the changes in our offices processes and

9  procedures, and the unusual issue of having a treasury claim to

10  begin with.

11          I did file an affidavit, Your Honor, and I would like

12  for that to be entered into evidence if I could.  I won't read

13  the affidavit, but I would like to point out a few things on

14  it.  Does the Court need another copy of that?

15          THE COURT:  Well, let me ask first, Ms. Boehm, is

16  there any objection to the Court's receiving the affidavit as

17  evidence in this proceeding?

18          MS. BOEHM:  No, Your Honor.

19          THE COURT:  Okay.  Then yes, I would like you to hand

20  up a copy of the affidavit.

21          MS. HANTEL:  All right.

22          THE COURT:  I have looked at it previously.  I just

23  want to be able to have it in front of me.

24          MS. HANTEL:  Yes, Your Honor.  Thank you.  This

25  affidavit was given by Martha Davis who is our supervising

1  attorney in our office.  We have 10 attorneys and 17 support

2  staff.  We currently have 15,184 active cases.  From April to

3  August of '09, this period, this claim period, our office

4  received over 42,000 pieces of paper mail, and from May to

5  December of that year we had over 219,000 electronic mail

6  pieces.  And in 2009 our office filed 4,162 claims, 589 of

7  those out of state, only one of those for the Department of

8  Treasury.

9         Another factor adding to the workload and the

10 confusion was that our office was converting paper files over

11 to electronic files and various workloads were being

12 distributed differently.

13        I would ask the Court to consider also the debtor's

14 actions in denying the rebate holders' participation in the

15 case from the inception by not noticing the claimants and then

16 by trying to get retroactive Court approval of that decision.

17 These claimants have no other representative in this case other

18 than Treasury's claim.

19        THE COURT:  Couldn't each of them file their own

20 claim?

21        MS. HANTEL:  That would be the alternative that I

22 would suggest to Your Honor if the claim is disallowed would be

23 to urge you to require Circuit City to notice at least these

24 4,500 Tennessee claimants.  Yes, Your Honor.  They have not

25 been noticed.

1          And I guess what I'm -- the other alternative I'm

2    suggesting is that I think it would make more judicial

3    expedience to allow the claim and let our claim be the

4    representative of those claimants to be able to argue the

5    claims on the merits.

6          And then, of course, the final factor is the good-

7    faith, and as I've already said, immediately when the claim

8    information was discovered, we acted with haste and got it

9    filed.

10         I just urge you to consider all of these facts and

11   circumstances in finding excusable neglect.  The defendant has

12   not been prejudiced but rather has taken steps to make sure

13   that the rebate holders are denied participation.  If the claim

14   is disallowed, I would submit that the debtor should have to

15   notify the Tennessee claimants and give them the proper due

16   process.

17         THE COURT:  All right.  I've got just a couple of

18   questions for you.

19         MS. HANTEL:  Sure.

20         THE COURT:  The first is there is no dispute that you

21   actually received the proof of claim and were aware that you

22   had to file a proof of claim by the May 11, 2009 deadline, well

23   in advance of that deadline.

24         MS. HANTEL:  Your Honor, our first introduction to

25   this, to the claim, was the receipt from Treasury.  That was

1    our first notice that Treasury actually had a claim and that

2    the bar date applied to Treasury, that -- April 19th, yes.

3         THE COURT:  Well, I guess that sort begs the

4    question, you know, well, you know, when we start talking about

5    excusable neglect, who -- where did the neglect come from?  Did

6    it come -- it may very well not have come from your office at

7    all, but it could have been the Treasury didn't do what they

8    were supposed to do.  And that's what I was looking for in the

9    affidavit and in the papers that were filed.  There is a gap

10   there and I don't see -- what did Treasury do?  What were they

11   responsible for doing?

12        MS. HANTEL:  If --

13        THE COURT:  Why didn't they do what they were

14   supposed to do when they got it and such, and why is their

15   neglect excusable?

16        MS. HANTEL:  The letter to Treasury, they sent over

17   the day that they got it because it -- it was a company

18   outside, an audit company, that sent this letter to Treasury

19   saying, you have an audit, you have this figure owed to you.

20   They forwarded it to our office that day because of the date

21   stamp on there.

22        THE COURT:  And what's the date stamp?

23        MS. HANTEL:  They received it that day.

24        THE COURT:  What's the date stamp?

25        MS. HANTEL:  April 19th.

18

1          THE COURT:  Okay.  So it was received on April 19th?

2          MS. HANTEL:  Yes, Your Honor.

3          THE COURT:  All right.  And so now what happened

4  then?  I mean, what was the neglect that happened that nothing

5  was done then?  Because I understand then you discovered it on

6  August 19th.

7          MS. HANTEL:  On April 19th, apparently they sent it

8  to our office because the date stamp on the papers from our

9  office, it says the 19th or 20th.  I can't remember.

10          THE COURT:  Okay.

11          MS. HANTEL:  But it came into our office that day or

12  the next day, and that is where I -- I don't know.  In all the

13  confusion I just don't know.  I can't tell Your Honor where

14  that piece of paper went.

15          THE COURT:  All right.

16          MS. HANTEL:  The next introduction to that that we

17  had was when we found it on August 20th.

18          THE COURT:  All right.  Now, as far as these

19  claimants are concerned, the -- has your office let them know

20  that you were filing something on their behalf that they would

21  have sat on their --

22          MS. HANTEL:  We have let our -- back in February we

23  were involved also in our Attorney General's office with our

24  Consumer Protection Division, so yes, the body that represents

25  consumers has been, but I'm -- I don't know if they sent out a

1  broad notice to the claimants.  I really -- I don't --

2              THE COURT:  Okay.

3              MS. HANTEL:  -- I doubt honestly.

4              THE COURT:  All right.  Now, and what is your

5  argument for why Circuit City should be required to notify

6  these -- the people that you would be representing?  Are you

7  suggesting that they were somehow known creditors?

8              MS. HANTEL:  Yes, Your Honor, they were.  These are

9  people that actual checks had been issued to, yes.

10             THE COURT:  Okay.  All right.  Anything further?

11             MS. HANTEL:  No.  The only thing that I would add is

12 that, Your Honor, that gets into the merits of the claim

13 because I think that may be one thing that they would argue.

14 So I think it's very important that somehow the merits of the

15 claim get to be determined.

16             THE COURT:  All right.  Thank you.

17             MS. HANTEL:  Thank you.

18             MS. BOEHM:  Your Honor, just to touch on the merits

19 of the claim, the debtors do dispute the underlying liability

20 in the claim.  Apparently this was the result of an audit that

21 was done of a third-party administrator of a rebate program.

22 We have never seen the results of the audit.  These are not

23 known creditors to the debtors, and we do dispute and listed

24 them as disputed in the schedules with a zero claim amount.

25             THE COURT:  All right.  You didn't list each of the

1  rebate holders because you didn't know who they were.

2         MS. BOEHM:  We don't know who they are, and we

3  obviously did a publication notice to everyone which is why we

4  had felt that that was adequate notice for all the unknown

5  creditors, which is all that's constitutionally required.

6         THE COURT:  I understand.  All right.  Very good.

7  Anything further, Ms. Boehm?

8         MS. BOEHM:  No, Your Honor.  We would just submit

9  that again administrative failure on the part of the government

10  does not rise to the level of excusable neglect and ask the

11  Court to sustain the forty-third omnibus objection to

12  Tennessee's late claim.

13         THE COURT:  All right.  Thank you.  All right.  The

14  Court has before it the objection to the claim of the Tennessee

15  Department of Treasury as being late filed.  Under the standard

16  set forth by the Supreme Court in Pioneer and this Court's

17  prior decisions, the claimant has to be able to show excusable

18  neglect and no lack of prejudice to the debtor.  The Court does

19  not find that there is excusable neglect in this case.

20  Inadvertence is -- cannot arise to that level.

21         I certainly appreciate, Ms. Hantel, the volume of

22  claims that the Tennessee Attorney General is handling and, you

23  know, that -- and such, but the fact that it was misplaced and

24  just nothing happened, and then even when it was discovered in

25  August of 2009 and the claim was filed, there was no

1  accompanying motion asking for the Court to allow the claim as

2  filed late at that point in time.  This didn't even come up

3  until the objection was filed, you know, by the debtor to the

4  late filed nature of the claim.  So the Court, you know, for

5  all of the reasons set forth in the <u>Pioneer</u> standard finds that

6  there is -- the claim would have to be disallowed, and so the

7  Court is going to sustain the objection.

8          With regard to the individuals, they may very well be

9  able to file claims in this case.  The fact that they're

10  unknown to the debtor at the time of the filing publication

11  notice may very well be sufficient, and they may have received

12  on an individual basis actual notice, but I don't have that

13  before me.

14          If one of the individuals were to file a claim and

15  claim, you know, from a constitutional standpoint that they had

16  not received the proper due process notice, I'd take that up in

17  that context and consider that at that point in time.  But I'm

18  not going to require the debtor to expend its scarce resources

19  at this time notifying unknown claimants.  If those claimants

20  think they have a claim, they can certainly file it.

21          So that's the Court's ruling.  Ms. Boehm, I would ask

22  you to please prepare an order to that effect.  Are there any

23  questions regarding the Court's ruling?  All right.  Thank you

24  both.

25          MR. GALARDI:  Your Honor, I believe that now brings

1  us -- for the record, Gregg Galardi on behalf of the debtors.

2  I think that now brings us to Matters 8 and 9.  I believe 8 is

3  a motion to dismiss filed by Mitsubishi, and so I would turn

4  the podium up to Mitsubishi on that one.

5           THE COURT:  All right.

6           MR. BAXA:  Your Honor, it's Phil Baxa from Sands

7  Anderson.  I'm local counsel for Mitsubishi and for the other

8  defendant, Insurance Company of Pennsylvania.  Lead counsel

9  today is going to handle the argument; that's John Isbell from

10  King & Spalding in Atlanta.  He has previously been admitted

11  pro hac vice in the case, and the Insurance Company of

12  Pennsylvania is going to rely on the papers filed by Mitsubishi

13  and the argument that Mr. Isbell is going to present today.

14           THE COURT:  All right, Mr. Baxa.  Thank you very

15  much.

16           MR. BAXA:  Thank you, Your Honor.

17           THE COURT:  Good morning, Mr. Isbell.  Welcome to the

18  court.

19           MR. ISBELL:  Thank you, Your Honor.  Nice to be here

20  again.  As Mr. Baxa explained, my name is John Isbell here on

21  behalf of Mitsubishi Digital Electronics of America, Inc., and

22  we're here on our motion to dismiss Count 6 of the complaint

23  which is for unjust enrichment.

24           Your Honor, the grounds for the motion are pretty

25  simple.  In the complaint the debtors allege numerous contracts

1  exist that govern the terms of the parties' relationships.

2  They then claim that Mitsubishi breached those contracts, and

3  they list that as a breach of contract claim and then basically

4  they re-plead the exact same facts and change the title to one

5  of unjust enrichment.

6        We cite numerous cases in our papers that demonstrate

7  that you can't do that as a pleading requirement; that you can

8  plead alternative theories for relief, but they actually have

9  to be alternative.  In other words, you have to allege that

10 there is some infirmity in the contract or there is a reason

11 why the contract is not valid and binding.

12       They have not done so.  In fact, they said based upon

13 their performance under the contracts, they've conferred a

14 benefit for which they should be paid.  Well, that's not

15 sufficient to plead an unjust enrichment claim, so they haven't

16 pled an alternative for relief.  What they pled is another

17 breach of contract claim with a title of unjust enrichment.

18       The cases are in our papers, and I'm happy to cite

19 them, but I think that there is also --

20       THE COURT:  I've read your papers.

21       MR. ISBELL:  Okay.  I think there is also a practical

22 solution here, Judge.  We believe that all the claims existing

23 between the parties arise under contracts.  The one thing that

24 was not clear on the complaint was specifically what claims

25 they're alleging it was under which contracts.  But we believe

1  that contracts govern the parties' relationship.  What we

2  really don't want to do is get into discovery and have

3  discovery on equitable grounds and unjust enrichment claims

4  only to find out after spending significant time and expense

5  that what we really have are just contracts that govern the

6  parties' relationship.

7          So Your Honor certainly has the authority to grant

8  the motion without prejudice to leave to amend if it turns out

9  that indeed contracts do not govern the parties' relationship,

10 and that's perfectly acceptable to Mitsubishi.  We merely just

11 don't want to go through the expense and time of taking

12 discovery and defending these claims when we truly believe that

13 there is no basis for an unjust enrichment claim and that's --

14         THE COURT:  And that really gets to the heart of the

15 question that I wanted to ask you which is, you know, whether

16 this motion is premature at this time.  In other words, because

17 I anticipate that I'm going to get exactly the opposite

18 argument from Mr. Galardi.  He's going to say, well, Judge, we

19 ought to do some limited discovery to find out, you know, what

20 -- you know, what the facts are, and then we can deal with

21 this.

22         Because if they're governed by contract, well, then

23 pretty clearly you would be right.  If they're not governed by,

24 you know, the contract, then he would say, well, maybe we can,

25 you know, raise this type of claim.  So why should I close it

1  off at this point in time with leave to amend as opposed to

2  allowing it to go forward with giving you the right just to

3  bring this up at a later stage?

4          MR. ISBELL:  Well, I think it goes to the expense and

5  cost of going through that other route, Judge.  If you deny --

6  I mean if you grant the motion with leave to amend, then it

7  only becomes an issue that we spend money and resources on in

8  discovery if it turns out that those contracts, in fact, do not

9  govern.

10         We can proceed under the theory that I think

11 everybody in this room holds which is that contracts govern the

12 parties' relationship.  And so we go under the actual facts and

13 narrow discovery as opposed to going under hypothetical facts

14 and having broad, very wide-ranging discovery that's going to

15 take a lot of time and resources that frankly Mitsubishi nor

16 the debtors should want to expend.

17         You know, I think the solution of denying -- of

18 granting the motion with leave to amend if necessary

19 accomplishes both concerns in that it narrows the issues for

20 discovery and it preserves the claim for the debtor in the

21 event there are facts that arise that support the claim.  But

22 as pled in this complaint it's not there, and so I think at a

23 minimum, if this Court were to deny the motion, it would have

24 to grant leave to amend -- I mean it would have to grant the

25 motion with leave to amend immediately to correct the pleading

26

1  infirmities.  I think we can do that later on if indeed the

2  need ever arises.

3          THE COURT:   All right.  Thank you.

4          MR. ISBELL:  Thank you, Your Honor.

5          MR. GALARDI:  Your Honor, you obviously raised the

6  point I was going to make, but again we could have avoided this

7  had they not in their answer denied exactly what he's now

8  offering to say are contracts.  If you look at our Pleading 26,

9  it says that we entered into the dealer agreement.  They admit

10 that.  If you then look at Pleading 28 of ours, we then say the

11 dealer agreement is governed by Delaware law, and they very

12 cleverly -- and I think it's too cute -- purports to be

13 governed.  They don't really say it's Delaware law.  They say

14 it purports be governed by Delaware law, so let's just -- you

15 know, it's not -- it's their pleading response that gives us

16 concern.

17         But then we offer up at our Allegation 30, over the

18 course of the parties' business relationship, Circuit City and

19 Mitsubishi entered into numerous side agreements, addenda,

20 letter agreements, both subject to and outside the terms of the

21 dealer agreement.  And then Mitsubishi admits that during the

22 course of the -- course of the business relationship with the

23 debtors, they entered into various agreements from time to

24 time.  Mitsubishi is without knowledge or information

25 sufficient to form a belief as to the truth of the remainder of

1   the allegations.  The problem here -- and then we go to 31 --

2   pursuant to the Mitsubishi agreements which we defined as this

3   collective, Circuit City purchased certain goods from

4   Mitsubishi for resale by Circuit City through its retail

5   channels.

6        Mitsubishi answers, it is without knowledge or

7   information sufficient to form a belief as to the truth of the

8   allegations contained in Paragraph 31 of the complaint with

9   respect to the Mitsubishi agreements.  Mitsubishi admits that

10  pursuant to the dealer agreement, Circuit City did purchase

11  goods from Mitsubishi for resale.

12       So given the concern about the binding enforceable

13  nature of these side letters, these addendums, these

14  agreements, if they're not binding contracts -- and there is,

15  of course, a dealing or quasi contract -- unjust enrichment is

16  proper.  He comes up now and says, but they're all contracts

17  and we agree that they're contracts, but that's not what we got

18  as our answer.

19       So again, whether you strike it and then say

20  re-plead, but given their pleadings to date they've not even

21  said that they're binding contracts.  We can ask a contention

22  interrogatory and discovery and say admit that this is a

23  binding agreement.  We go through each one, and if they admit

24  it, we're done.  We'll agree there is no unjust enrichment

25  claim if everything we're saying is a binding agreement.  But

1  so far to date they haven't agreed that these are binding,

2  enforceable agreements.

3       If you look at the affirmative defenses, I will also

4  note that the affirmative defenses call into question a number

5  of things.  I think one of them is that we breached -- the

6  claim for breach of contact alleges barred because of prior

7  breach of the obligations under such contracts.  So if they

8  treat that breach as a material breach, that's the sixth

9  affirmative defense, for example.  If they treat it as a breach

10 but we continue to perform on some side letters or otherwise,

11 there may be a quasi-contract claim for unjust enrichment.

12      Again, it's a discovery issue.  If they say, well, it

13 was breach but it's not a material breach so we didn't teach it

14 as terminated but then we still have a claim, then we don't

15 have an issue.  But right now on a motion to dismiss it would

16 be premature to judge an unjust enrichment claim that we can do

17 in the alternative should there not be a binding contract under

18 which we can proceed, and so we would suggest that the motion

19 not be dismissed.

20      If through discovery we find out that these are all

21 binding agreements and they agree and they're not trying to

22 take the position that there was no agreement there, then that

23 claim can be dismissed at that point.  It's not really any -- a

24 saving of discovery because we're going to have to go through

25 those agreements.  We're going to have to find out whether or

29

1   not those agreements are admittedly binding.  And if they're

2   admittedly binding, then we'll probably withdraw that claim or

3   agree to stipulate that it's no longer a claim.

4           But should they keep up the defenses of the sort that

5   they say -- material breach, alleged breaches, that there

6   wasn't part of the dealer agreement -- we don't even know if

7   Delaware law applies to all of them because they say some of

8   the agreements are out.  And it says Delaware law purports, but

9   is it a conflict of laws or not?  And if it's a quasi-contract,

10  Delaware law may not apply at all.  It may be a different law.

11  So we think it's premature to grant the motion to dismiss on

12  the unjust enrichment claim.

13          THE COURT:  All right.  Thank you, Mr. Galardi.

14          MR. GALARDI:  Thank you.

15          MR. ISBELL:  Judge, I note that in the complaint they

16  say numerous side letters, numerous agreements.  We'll define

17  all those as the Mitsubishi agreements.  And then they expect

18  Mitsubishi to say, oh yeah, that's the agreements that governs

19  the terms under which you are seeking a claim now.  The problem

20  with the pleading that they're referencing, Judge, is their own

21  inartful pleadings.  They didn't reference the specific

22  contracts.  Mitsubishi isn't contending that contracts don't

23  govern the relationships.  We just don't know based upon their

24  complaint which contracts they're referencing.

25          THE COURT:  Do they have to allege that in their

1  complaint which exact contracts?  I mean, even under the new

2  Twombly standard, isn't this sufficient as far as setting forth

3  a plausible claim that would survive?

4        MR. ISBELL:  I think it's plausible for a breach of

5  contract claim, Your Honor.  I don't think it's plausible for

6  an unjust enrichment claim.

7        THE COURT:  But if you deny that they're enforceable

8  contracts and they performed under them anyway, as Mr. Galardi

9  said, why wouldn't they be able to at least assert that they

10  had a claim for a quasi-contract?

11        MR. ISBELL:  We haven't denied that they have

12  performed, Your Honor.  What we said is based upon your use of

13  this definition to include contracts that you haven't

14  specifically referenced, we don't know which contracts you're

15  referring to for which claims.  That's all we've said.  He's

16  reading much more into our answer than we could possibly ever

17  fit in with an ink pen, Your Honor.

18        What is pled is not a description of the specific

19  contracts.  The answer conformed with inartful pleading of not

20  listing the specific contracts.  That is the problem, Your

21  Honor.  Everything else is a contract claim.  Even as stated in

22  their unjust enrichment claim, it's a breach of contract claim.

23  Either way they have to amend, either now or later, and we

24  think it much more efficient to make them amend later, if

25  needed, and I don't think it will be needed.

 1          THE COURT:  All right.  Thank you.  All right.  The

 2  Court has before it Mitsubishi's motion to dismiss the count,

 3  and I think at this point it's premature to grant that motion.

 4  I think that it is a discovery issue to ferret out what side

 5  agreements, what documents, whether the parties are at issue

 6  about whether or not they're enforceable or even exist, and so

 7  I'm going to for the time being deny the motion.  But it can

 8  certainly be renewed at any time after discovery has ferreted

 9  these things out and we know what we're talking about here.  I

10  just think it's more efficient to go -- let this be a discovery

11  issue rather than to cut it off at this point in time.  So the

12  motion is denied.

13          MR. GALARDI:  Your Honor, I guess that now brings us

14  to the debtor's motion for summary judgment which I will

15  address.

16          Your Honor, I'm sure you've read the pleadings and I

17  need not rehearse those arguments again.  But first I think we

18  all agree on the summary judgment standard.  Second, what we

19  have, and I think it's important, especially given new pleading

20  rules and then having just been accused of inartful pleading,

21  will become relevant as the argument unfolds, is --

22          THE COURT:  Or perhaps very artful pleading.

23          MR. GALARDI:  Or perhaps very artful pleading

24  intentionally for that -- for a purpose.  We're really talking

25  about what they have asserted as the ninth affirmative defense;

1  namely, the alleged transfers are not avoidable because

2  subsequent to the alleged transfers, Mitsubishi provided new

3  value consistent with Bankruptcy Code Section 547(c)(4).

4       Your Honor, first I want to go to the ripeness

5  argument because I think it's one that this Court has to

6  consider to move on to the merits, and then we think that the

7  Chevrolet case resolves the issue in our favor if we get to the

8  merits.

9       Your Honor, the argument by Mitsubishi is that there

10 is no evidence in the record such that this is not ripe for

11 decision.  Your Honor, we believe there is adequate evidence in

12 the record that summary judgment is appropriate, even at this

13 early stage on this matter, and we point to the following.

14      First, we have pled the elements of a preference

15 action, and as I think Your Honor understands all too well, we

16 need only plead the elements, and the new value defense like

17 the ordinary course defense is properly speaking an affirmative

18 defense.  It in essence says take all of those facts as true,

19 and if they're true, nonetheless the transfer cannot be avoided

20 because we provided new value.  That's what they've done in the

21 ninth affirmative defense.

22      In addition, Your Honor, as set forth in our summary

23 judgment and in the stipulation that Your Honor has seen, we

24 have also stipulated that they have a 503(b)(9) claim for a

25 certain amount.  Pursuant to Your Honor's earlier ruling, it's

1  been temporarily disallowed for the exact purpose of figuring

2  out how you deal with the 503(b)(9) issue in the context of the

3  preference claim.

4         Importantly, when you look at that claim, and as

5  obvious from the -- it's a 503(b)(9) claim, the value that is

6  asserted there was asserted within the last 20 days prior to

7  the filing.  So if you take our complaint which alleges the

8  transfers, and there is an Exhibit B, and you look at all of

9  those transfers -- as they refer to them the alleged transfers

10 in that ninth affirmative defense -- those all happened within

11 the last 90 days of the bankruptcy.  And indeed by my

12 calculation about $2.2 million of those alleged transfers even

13 happened in the 20 days prior to the filing.

14         Then if you look at the facts in the stipulation as

15 to what's the allowed proof -- 503(b)(9) claim, the value is

16 after those transfers, and their affirmative defense says the

17 alleged transfers are not avoidable because subsequent to the

18 alleged transfers -- it doesn't say subsequent to certain of

19 the alleged transfers; it says subsequent to the alleged

20 transfers -- Mitsubishi provided new value.  Well, the only new

21 value it could have provided is exactly the same value that

22 they have asserted a 503(b)(9) claim.  That is in evidence.  It

23 is stipulated.  It is an amount.  It has not been allowed

24 because it can't be allowed because of our earlier court

25 rulings with respect to 502 and 503(b)(9).

34

1            And so we think that there are adequate facts in the

2   record to raise what I think is a simple legal argument.  The

3   simple legal argument is can you assert an affirmative defense

4   with respect to 503(b)(9) -- with respect to new value if you

5   also are going to seek payment of that allowed amount for

6   503(b)(9)?

7            Your Honor has the facts pled that there is a

8   preference.  Your Honor has uncontested facts that if they get

9   a 503(b)(9) claim, it will be these transfers for these

10  amounts.  Those transfers are subsequent to certain of the

11  alleged preferential transfers, and we're simply seeking to

12  eliminate that ninth affirmative defense.

13            Now, Your Honor, interesting that you mentioned

14  Twombly, and so I want to add one fact that I have just learned

15  about.  The Eastern District has said when you -- and it's a

16  July 31st ruling on Lexis here in a case called Francisco v.

17  Verizon South, but I now understand it to be the majority

18  opinion by the Eastern District, July 29th.  We talk about

19  inartful pleading, 210 US District Court Lexis 77083.

20            What the Eastern District has said, and what they

21  seem to be relying on is the following:  Well, we said there

22  was a ninth affirmative defense, but there is a factual issue

23  here.  We've never said that the 503(b)(9) is what we're using

24  for the new value defense.  We've got to take some discovery.

25  Well, Your Honor, the problem with that is now in the Eastern

35

1   District, when you assert affirmative defense, you have a

2   minimum <u>Twombly</u> pleading standard.

3        That -- so I could have struck this defense.  I could

4   have moved to strike it and say, now artfully plead your

5   defense, give me which of the new values.  But they're trying

6   as you just said maybe artfully to go on both sides of the

7   fence so as to say there is a genuine issue of material fact.

8        One, I don't believe there is a genuine issue of

9   material fact because they use the words subsequent to the

10  alleged transfers.  They didn't cleverly say subsequent to

11  certain alleged transfers.  They said subsequent to the alleged

12  transfers.  And had they pled it the way you have to plead it

13  in the Eastern District, they would have had to at least

14  minimally say, well, which of the ones, which of the new value

15  am I using?

16       So I think they're trying to have it both ways here,

17  Your Honor.  The issue is ripe for decision.  The facts are in

18  the pleadings and stipulated documents, and so I think we need

19  only get to the legal issue, can you use both -- can you get an

20  allowed 503(b)(9) claim and use any payment that you -- can you

21  then still use that same value for a new value defense?

22       Now, with respect to that matter, Your Honor, we rely

23  just directly on the case of <u>Chevrolet</u> in this circuit.  The

24  question is whether the allowed 503(b)(9) claim is an otherwise

25  unavoidable claim.  The fact of the matter --

36

1          THE COURT:  And that comes from the plain language of

2     the statute.

3          MR. GALARDI:  That comes from the plain language of

4     the statute.  Now, there is a split in authority as to whether

5     or not you cut off on the petition date.  So if you got a

6     subsequent payment, some courts will say, no, as long as it

7     remains unpaid on that petition date.  And that's the case that

8     they relied.  As long as it's in the Sixth Circuit.  As long as

9     it's unpaid on that date, it doesn't matter that you get paid

10    subsequent.

11         Unfortunately for them, the Fourth Circuit has said

12    that's not the law in the Fourth Circuit.  It's whether it's

13    otherwise unavoidable.  And if you got the allowed 503(b)(9)

14    claim -- this Court orders it; it's paid -- regardless of

15    whether it was paid before the filing, which obviously it can't

16    because it's an administrative claim, or afterwards, it's an

17    otherwise unavoidable claim.  It's an allowed 503(b)(9) claim.

18         Consequently, if we pay you for the 503(b)(9) claim,

19    you can't use it as the new value.  Alternatively, if you want

20    to use it at the new value, fine.  Then we don't pay you your

21    503(b)(9) claim.  We don't care which way it goes -- it's two

22    sides of the same coin -- but you can't have it both ways.  So,

23    Your Honor, we think under --

24         THE COURT:  You're saying that they're entitled to

25    that credit.  It's just they're only entitled to it once.

1          MR. GALARDI:  They're only entitled to it once.  You

2    either get it paid in cash or you reduce your preference

3    exposure.  Whatever you want to do, you're still getting a full

4    dollar's credit for that.  Okay.  But that's -- that's not

5    permissible to get two dollars' value.  That is both deny the

6    estate the preference liability by saying, by the way, I gave

7    you 503(b)(9) value in the 20 days before, and then also say,

8    but by the way, you've got to pay me for that value, as well.

9    That in essence is depriving the estate of one of its

10   recoveries.  It's either depriving it of the cash on the

11   503(b)(9) to pay it or it's depriving it of the preference

12   liability.

13          Your Honor, then to just go to the example and --

14   that they use, and the example in their case just is simply

15   incorrect as a matter of law, especially with Your Honor's

16   ruling.  If Your Honor looks at their brief -- and I think I'll

17   get this right -- they argue that before BAPCPA, if I got a --

18   you know, I have an unsecured claim and I pay 25 percent on it

19   and you get $2.50.  Then I could have gotten that money, plus I

20   could have gotten to use it as a new value.

21          But that's actually not correct, especially with Your

22   Honor's ruling.  You should never have gotten paid on that

23   first unsecured claim given 502(d) because you didn't have an

24   allowed unsecured claim in that example.  You have to first

25   deal with your preference liability, and only after you return

1 what was the $20 and assert your new value defense, then what

2 the bankruptcy code says is you then get the unsecured claim

3 for the difference.

4         So there's no change here in the bankruptcy code.

5 It's not as if a distribution -- in that case that he says, I'd

6 say the debtor made a big mistake.  The debtor gave you a

7 distribution under a plan as an allowed claim, and that's why

8 you have all this law out there that once you allow a claim,

9 you're very much at risk asserting a preference defense because

10 you may very well have waived your arguments to that.  So I

11 don't think that example shows anything.  And what the

12 bankruptcy code does now is simply what the bankruptcy code has

13 always done.

14         Your Honor has ruled that 502(d) can apply to a

15 prefer -- a 503(b)(9) claim, and if it can be applied, then

16 it's a single recovery.  And the estate has to decide -- or the

17 creditor has to decide do I want to use it for new value or do

18 I want to be paid?  We would prefer not to pay.  So if they

19 want to use it for new value and reduce their exposure, that's

20 fine by us.  If we're prepared to pay and set aside reserves as

21 we go into confirmation to pay it, then we should be able to

22 collect on the new value.  And until we decide which one of

23 those it is, then -- you know, then you can't get both.

24         So we think the issue is ripe.  We think the record

25 is clear.  We think at the worst case, if the record is not

39

1  clear, it's a result of their pleading infirmity in this

2  district with respect to the affirmative defense not to come

3  out and say which of the new value am I intending to use, and

4  that's intentional.  They didn't want to say it because then

5  the issue would have been ripe and Your Honor could have

6  decided it.  I think it's ripe anyway, but I think it would

7  have been specifically in front of us, here are the new value

8  that we're relying on as our affirmative defense, and it would

9  have been absolutely, positively clear that it's some of that

10 503(b)(9).  So we think Your Honor has a ripe issue.  It can be

11 adjudicated.  It's a straightforward legal issue and no further

12 discovery is necessary.

13         THE COURT:  Before you leave the podium, I'm just

14 anticipating what I might hear in just a moment from

15 Mr. Isbell.  You know, it seems to me that his concern is going

16 to be, well, you know, that's all very fine and good except

17 that, you know, if I don't get to take my new value and then

18 later on you object to my claim on some other grounds, you

19 know, I may not get the benefit of this new value that Congress

20 has said that I should be entitled to at this point in time.

21         Don't we need to consolidate somehow these two issues

22 so that we decide them at the same time just to make sure that

23 the debtor's not -- I mean the creditor is not going to be

24 whipsawed between them?

25         MR. GALARDI:  Yeah.  It's all in -- I mean, Your

1    Honor, I don't understand in this particular circumstance with

2    Mitsubishi why it's not consolidated, why we've gone through

3    the whole point --

4             THE COURT:  It is.

5             MR. GALARDI:  -- of saying that it's a consolidated.

6    Yes, with respect -- but that's why we did it that way, to

7    avoid exactly Your Honor's question are we whipsawing a

8    creditor.  Well, that's why we filed the complaint.  That's why

9    we've gone through reconciling what we think would be the

10   503(b)(9) claim so that we can exactly crystallize the issue so

11   we only have this legal issue here.

12            With other creditors that may be the case, and I

13   think it's a fair criticism if we were to whipsaw and say, oh

14   no, now you've objected to 503(b)(9), and it's not fixed but

15   now you're objecting to the new value.  We are prepared to say

16   here's your 503(b)(9) claim.  If that's what you want to be

17   paid and we want to reserve a confirmation in that amount, then

18   Your Honor should say fine, to the extent you get paid here, I

19   can make a legal determination that whatever is there, knock it

20   out of your new value defense.

21            That doesn't mean you don't have any new value

22   defense.  You may have a new value defense for stuff that you

23   delivered prior to the 20 days prior to the bankruptcy.  We're

24   not saying you don't have any new value defense.  What we're

25   saying is you can't rely on your 503(b)(9) allowed amount.  So

1  I think that's the crystallized -- and then the discovery will

2  simply go, okay, now that we've eliminated that, we'll pay you

3  the 503(b)(9), we can deem it allowed, you can get it on

4  confirmation, then we'll go after the preference liability.  So

5  I think you're right that it's a whipsaw, but I think here

6  they're all consolidated in one matter so it's not an actual

7  concern for this matter.

8           THE COURT:  That's what I wanted to make sure.  Thank

9  you.

10          MR. GALARDI:  Yes.

11          MR. ISBELL:  Can I get some water, Your Honor?

12          THE COURT:  Oh, certainly.  That's why it's there.

13          MR. ISBELL:  Thank you, Your Honor.  John Isbell

14  again on behalf of Mitsubishi Digital Electronics of America,

15  Inc.  In some respects I feel like I'm on the opposite side of

16  the last hearing, but here we are nonetheless.

17          THE COURT:  I knew that that was what you were going

18  to open with, but that's fine.

19          MR. ISBELL:  You know, I agree that the first place

20  to start with is whether or not there is actually an issue

21  properly before this court.  It was described as both being

22  ripeness issues, but I think it's actually two issues.  I think

23  one is ripeness, and I think two is just whether or not they've

24  actually met the requirements for Rule 56 in submitting their

25  motion for summary judgment, and I'll go through both of those.

1    But I did want to touch on one thing that was said

2  just a second ago and it's -- and it was that had our answer

3  identified what specific new value we were serving, that this

4  issue would be ripe for adjudication.  Had we done something,

5  it would be ripe.  It sounds to me like an admission that it's

6  not ripe, Your Honor.  I think that you also have the issue

7  then is had they actually allowed Mitsubishi's claim, and had

8  the new value been analyzed, and actually had they demonstrated

9  sufficient facts to meet the prima facie case of a preference,

10  then yeah, this issue would be ripe for adjudication.

11    They can solve that.  They can allow Mitsubishi's

12  claim and they can file their motion to force Mitsubishi to

13  re-plead the affirmative defenses in more detail.  That's the

14  resolution.  But sitting right here, by their own admission at

15  the podium and in Page 5 of the reply brief, the issue is not

16  ripe.  In Page 5 of the reply brief they say, you know, the

17  only material fact that is not clearly in evidence is the new

18  value that is asserted by Mitsubishi.  Well, that kills their

19  case right there, Your Honor.

20    THE COURT:  But you know what your new value is,

21  right?

22    MR. ISBELL:  No.  Actually, Your Honor, we don't.

23  And the reason why we don't is because we don't know what our

24  allowed 503(b)(9) claim is at this point.  And the reason

25  why --

43

1          THE COURT:  Well, what Mr. Galardi says and in the

2  papers it says that the parties have agreed on the amount of

3  you 503(b)(9) claim.  Is that not correct?

4          MR. ISBELL:  We've agreed to the dollar amount --

5          THE COURT:  Okay.

6          MR. ISBELL:  -- but it is disputed right now and, in

7  fact, they're seeking to reduce it to zero.

8          THE COURT:  What is the dollar amount that the

9  parties have agreed to?

10         MR. ISBELL:  It's 4.9 million and change, a little

11  bit under 5 million.

12         THE COURT:  All right.

13         MR. ISBELL:  And, Your Honor, the parties, the reason

14  why they're trying to reduce it to zero is because they want to

15  set off their receivables claim against the 503(b)(9) claim.

16  We are actually in the process right now of reconciling on an

17  invoice-by-invoice, contract-by-contract basis which

18  receivables go against the 503(b)(9) claim and which

19  receivables go against the general unsecured claim that

20  Mitsubishi has in an amount of about $10 million.  And once

21  that rec --

22         THE COURT:  But haven't I already ruled that they get

23  to decide how they're going to apply their claims against --

24  they can decide whether they want to apply it against your

25  503(b)(9) claim or against your general unsecured claim?

1          MR. ISBELL:  Well, one, you haven't ruled on it

2    against Mitsubishi.  You've ruled on it in another case with a

3    different creditor, so I don't think that's binding.

4          THE COURT:  So you're anticipating I'm going to reach

5    a different decision here?

6          MR. ISBELL:  Well, I think so, Your Honor.  And I

7    think so because what you ruled on was setoff.  You did not

8    address recoupment, and recoupment is contract-by-contract,

9    invoice-by-invoice.  Under your ruling, if they just have

10   claims and we have claims, you can set them off however you

11   want.

12         Under binding authority, recoupment analysis requires

13   you to go contract-by-contract or same transaction, and that's

14   what the parties are trying to do right now.  And once that

15   analysis is done, Your Honor, assuming we can agree to numbers,

16   which is not always easier said than done, but assuming we

17   agree to numbers, then the 503(b) claim amount will be allowed

18   in some amount.  Could be zero; could be something north of

19   zero.  The unsecured claim will be reduced, and their

20   receivables claim will be satisfied.  And then we'll have a

21   legitimate ripe issue before the Court under all the cases that

22   they have cited and under just the fact that we need a case for

23   controversy.  Because if the 503(b)(9) claim is reduced and not

24   allowed or allowed in zero dollars, then there is no new value

25   issue for this Court to consider.

45

1              So I think that all just highlights the fact that

2    this is not ripe.  And it may be that if we can't reach

3    agreement on it, that those issues on the allowed new value

4    aren't decided until trial.  I think that we'll get them

5    decided frankly rather soon since we've made significant

6    progress already, but that is when it would be decided

7    ultimately.  And that's when this issue of whether or not the

8    503(b)(9) claim can actually be used for new value will

9    actually arise because we won't know until then whether or not

10   we have to use the 503(b)(9) claim as new value or not because

11   we don't know whether we have one.  So that is the ripeness

12   issue, Your Honor.

13            THE COURT:  Well, why can't I decide the pure legal

14   issue which is if you have a 503(b)(9) claim, you can't assert

15   it twice as -- both as new value and as an administrative

16   claim?

17            MR. ISBELL:  Well, I mean, I -- if I think I'm

18   understanding Your Honor, you're saying if you have a 503(b)(9)

19   claim, does that itself constitute a destruction of the new

20   value defense or a setoff or reduction.

21            THE COURT:  Right.  Assume that it's, you know,

22   whatever the number is, something between zero and $5 million,

23   whether it's one dollar or whether it's five million, you know,

24   that there is going to be some amount that you're going to want

25   to assert as new value that is also a part of the 503(b)(9)

46

1 claim.  Why can't I decide at this point in time whether or

2 not, as a matter of law, that can be done?

3        MR. ISBELL:  Well, I think let's start with the

4 statute.  It says that under 547(c)(4)(b) it says on account of

5 which new value the debtor did not make an otherwise

6 unavoidable transfer to or for the benefit of such creditor.

7 It talks about transfer, not a claim, so you can't decide

8 whether or not the 547(c)(4)(b) applies until you know whether

9 or not a transfer has been made.  They say, oh, but a transfer

10 will be made if there is a claim allowed, and if that claim

11 that's allowed actually supports the new value.  There is just

12 too --

13        THE COURT:  So you're saying that what I have to do

14 is have them actually make the payment to you of the 503(b)(9)

15 claim before I can apply Section 547(c)(4)?

16        MR. ISBELL:  I think -- I'm not sure that payment has

17 to be made, but a transfer has to be made.  And whether or not

18 that transfer is to put in a earmarked account or a trust

19 account in our benefit that cannot be attacked for anybody

20 else, and that is only subject to us.  In other words, it's not

21 subject to disallowance or reduction; it is our money.  It's a

22 transfer for our benefit.  And that surprised us, and that's

23 what was done in the TI acquisition case.  It was actually set

24 aside for the benefit of the creditor on an allowed claim.

25 Here it's not an allowed claim.  That --

1        THE COURT:  Because they're still shooting at it from

2  the standpoint of making offsets against it and that sort of

3  thing.

4        MR. ISBELL:  That's correct, Your Honor.  And I note

5  also this is not in the pleadings but, you know, we have a very

6  good relationship with opposing counsel and we speak

7  frequently.  And my understanding is that they believe that the

8  new value defense that would be reduced in this case is

9  significantly less than what the 503(b)(9) claim totals.  And

10  so it's not that if you rule against us we lose $5 million of

11  new value; we lose something much smaller.

12        So if there is a reduction, it's possible that that

13  reduction, even though it's allowed in an amount of several

14  million dollars, that that reduction would eliminate the issue

15  that they're saying will be in controversy.  It's not currently

16  in controversy, but the issue that they say will be in

17  controversy.  So again we don't know yet whether or not we're

18  fighting over anything that's going to have an actual impact on

19  this case.  And there is just too many ifs right now for this

20  Court to find that the issue is ripe and subject to

21  adjudication.

22        I think if we go to the merits of the case, I think

23  that -- although I don't think this Court should, and I'm happy

24  to allow the Court to rule on the ripeness issue before we

25  discuss the merits because I don't want to waste anyone's time.

1   But I think even under the merits they have several problems,

2   Your Honor.  And the first is they rely now exclusively on the

3   J.K. Chevrolet case, and they say that that is binding on this

4   Court, and that it says that they get to use post-petition

5   transfers to reduce new value.  And they say that's the holding

6   of that case, and that's the holding of the case that

7   conveniently was put in Footnote 6 of that opinion.  Well, Your

8   Honor, most courts don't put their holdings in footnotes, and

9   the Fourth Circuit case is no different.

10          The Fourth Circuit case in J.K. Chevrolet actually

11  had three holdings.  The first was it dealt with a hypothetical

12  Chapter 7 analysis of Section 547(b)(5).  That's not an issue

13  currently before the Court.  The second holding was it dealt

14  with whether subsequent new value has to remain unpaid or

15  whether it can before it -- for it to count, or whether it's

16  only reduced by an otherwise unavoidable transfer by the

17  debtor.

18          The third holding was that a transfer is avoidable if

19  it indeed is subject to avoidance.  And so if the trustee, as

20  in the J.K. Chevrolet case, failed to timely object or bring

21  claims I should say for the avoidance of those transfers, the

22  trustee was out of luck.  In this case, the J.K. Chevrolet

23  case, the Court recognized that the creditor was going to keep

24  those avoidable transfers because the trustee was time barred

25  from asserting them and was asserting those as new value, as a

1    new value defense.  The Court said, I realize that that is a

2    harsh result for the trustee, but that's what the statute

3    provides.

4          The Court then threw him an olive branch and said,

5    well, it's not before me what is an otherwise unavoidable

6    transfer.  Although I think all these transfers are avoidable,

7    it may be that some of those are unavoidable.  But I'm not the

8    right person to decide that.  That should be decided by the

9    bankruptcy court.  And then in a footnote I note there are also

10   some post-petition payments, and under the <u>Logan</u> case which is

11   an Illinois bankruptcy court opinion, the Court may consider

12   those transfers in determining whether or not they're

13   avoidable.  That wasn't a holding, Your Honor.  That was dicta

14   and giving the trustee an olive branch which he could possibly

15   go back and say, you know, maybe there's something here.  Maybe

16   these transfers were actually unavoidable and now I can use

17   that to reduce the new value defense.

18         But even the Court said in the footnote this issue

19   hasn't been briefed.  It certainly wasn't argued anywhere in

20   the opinion or demonstrated that it was argued in the opinion,

21   and it wasn't cited anywhere else except when the Court said

22   this issue has -- isn't before me, but I note that it may be an

23   issue that they should consider.

24         Well, that's not the holding, and so the holding of

25   that case for purposes of what we're her for today is that one

1  limited issue of whether or not subsequent new value has to be

2  -- either remain unpaid or paid within an otherwise unavoidable

3  transfer by the debtor.  That's now well established in the

4  Fourth Circuit, so that's the only holding of that case that

5  has input here.  You then have to look --

6          THE COURT:  No, but they did say in Footnote 6 that

7  post-petition transfers could be considered for purposes of

8  Section 547(c)(4)(b).  The only thing that the Court said as

9  far as -- you know, is that they didn't have -- needed a party

10  to address whether or not these particular post-petition

11  transfers were unavoidable.  For instance, they may not have

12  been authorized by the Court or by statute which the debtor in

13  its papers say in this case, you know, it would be authorized

14  by the Court and by statute both, and so therefore a 503(b)(9)

15  payment would by definition not be avoidable.

16          MR. ISBELL:  Well, Judge, first of all, I'll get to

17  the statute in a second.

18          THE COURT:  Okay.

19          MR. ISBELL:  But by court, this is the court that

20  they're relying on, and this is not the holding of that case.

21  It is a footnote that says while post-petition transfers may be

22  considered under Section 547(c)(4)(b), see Login Brothers Book

23  Company, Inc., 294 B.R. 297, 300, Northern District of

24  Illinois, 2003.  Neither party has addressed whether the post-

25  petition transfers that occurred in the instant case were

51

1  unavoidable.  So that's great, that's good dicta, it supports

2  their case, it says what it says, but it is dicta.  It is not

3  the holding of that case.  It was not in dispute, it was not

4  addressed, and it was not key to the opinion issued by the

5  Court.  So then you have to step back --

6         THE COURT:  But don't you think I'm going to listen

7  to what the Fourth Circuit is telling me?

8         MR. ISBELL:  I think so, Judge.

9         THE COURT:  Okay.

10         MR. ISBELL:  And I think that although it's dicta,

11 it's certainly dicta from the Fourth Circuit.  But then let's

12 look at 547 and see what it actually says.

13         THE COURT:  All right.

14         MR. ISBELL:  547(b) says that the trustee may avoid

15 any transfer of an interest of the debtor in property.  The

16 trustee is also defined under 1107 to include debtor-in-

17 possession, so that would be Circuit City, on a post-petition

18 basis, debtor-in-possession.  And you go then down and it says

19 that -- under C that the trustee may not avoid such transfer if

20 the transfer was to or for the benefit of a creditor to the

21 extent that after such transfer, such creditor gave new value

22 to and for the benefit of the debtor.

23         And under B it says on account of which new value the

24 debtor did not make an otherwise unavoidable transfer to or for

25 the benefit of such creditor.  It doesn't say the debtor or the

1  trustee, and clearly any 503(b)(9) claims here would be made by

2  the trustee or the debtor-in-possession.  So Congress could

3  have said that it doesn't matter if it's pre- or post-petition

4  by saying the debtor or the trustee but they didn't.  They just

5  said the debtor.  And in the same statute they say the trustee

6  may avoid, so the trustee may avoid to -- unless the transfer

7  -- excuse me.   The trustee may avoid, unless the creditor

8  provided new value, and unless that new value was paid with the

9  otherwise unavoidable transfer by the debtor, not by the

10  trustee.  So that's one issue.

11           THE COURT:  So what you're saying is there is a

12  difference between -- when Congress is talking here between

13  debtor-in-possession and debtor, and that they're not the same

14  entity.

15           MR. ISBELL:  That's right, Your Honor.  And, in fact,

16  debtor is defined in 101 to include person or a municipality

17  that files a case in bankruptcy.  That's the pre-petition

18  debtor.

19           THE COURT:  And a debtor-in-possession is a separate

20  entity from the debtor?

21           MR. ISBELL:  That's correct, Your Honor, same as a

22  trustee in Chapter 7 or Chapter 11.  They're a different entity

23  which is why there is a definitional difference in the code.

24  One is a trustee; one is a debtor.  And that supports the --

25  well, excuse me, Your Honor.  I'm getting ahead of myself.

1            And I also note that under Section 547(c)(4), Your
2    Honor, it talks about the defense of new value, and it says
3    that if you provide the new value and it's not paid by an
4    otherwise unavoidable transfer by the debtor, you get to use
5    that as a defense against preference liability.  In other
6    words, in fact, the trustee can't avoid that claim, can't avoid
7    that transfer.  It doesn't say you can set off against that
8    transfer.  It says the trustee can't avoid it, and so what's
9    left then is to go through the claims priority process and
10   figure out where that claim falls.

11           You've used it as a defense and now you have it as a
12   claim, and that's exactly what they said at the podium just a
13   second ago.  They said, well, you know, I can temporarily
14   disallow the claim under 502(d), but after you resolve the
15   preference liability with setting off that new value, you still
16   have your unsecured claim.  And that is what is contemplated by
17   this section.  Otherwise, it would say you can use the new
18   value but you no longer have the claim because you've set it
19   off.  They could have said -- they could have required a setoff
20   mechanism here for new value but they didn't.  They allowed you
21   to keep your claim.

22           So now you look at the priority scheme for what claim
23   you actually have.  Before BAPCPA you had a general unsecured
24   claim or a priority claim or a secured claim, although that has
25   different issues in the preference scheme.  But most likely a

1  priority claim or a general unsecured claim.  You got paid on

2  that claim, or at least you got an allowed claim, and it may

3  get zero but it may get 50 cents, it may get a quarter.  I cite

4  an example in my papers of how pre-BAPCPA, if you got a $30

5  preference and you provide $10 in new value under a 25-cent

6  case, you get to reduce that preference exposure by the new

7  value, taking your liability down to 20, and then you get paid

8  2.50 on the claim.

9        Well, what they're trying to do here today is saying,

10 well, you can either reduce that new value -- I mean reduce the

11 preference by the new value or you can get paid by the claim,

12 but either way you're only getting $10.  So they're taking it

13 down 20 and you're not getting the 2.50 that you got before

14 BAPCPA and before 503(b)(9).

15       THE COURT:  Well, if -- under your example, I mean,

16 just to think out loud for a second, if you have a $30

17 preference and you didn't apply any of the new value to it, you

18 would -- in a 25-percent distribution you would get actually a

19 dividend on your unsecured claim of $7.50 on your claim because

20 Section 502(h) I think it is provides that you have a general

21 unsecured claim for the amount of whatever preference you have

22 to pay back to the estate.

23       Now, if we take the $30, okay, and subtract the $7.50

24 plus subtract the $10 that you'll get on account of your claim,

25 don't you come out to exactly the same spot as if it was -- I

1  mean, it doesn't improve your position, granted, but it doesn't

2  make it any worse, does it?

3           MR. ISBELL:  Well, it may based on timing issues, but

4  as far as dollars -- and that's what the example was intended

5  to highlight -- yeah, if you add in --

6           THE COURT:  It all works out to be exactly the same.

7           MR. ISBELL:  Under 502(h) analysis, yes, that

8  analysis is the same.  And that takes us back to the statute

9  itself.  Is 503(b)(9) intended to treat creditors exactly the

10 same as they were before BAPCPA was enacted or was it intended

11 to elevate those claims to a higher power to ensure that they

12 got paid in full before unsecured creditors got paid anything?

13          THE COURT:  Definitely to elevate.  I agree with

14 that.  But the question here is not whether or not you're

15 getting allowed that claim.  The question is how has preference

16 law changed because what we're trying to do is make sure that

17 similarly situated creditors are treated similarly, and that's

18 what -- and preference law I agree is counter-intuitive to most

19 people, but it does have a place, a very -- and, you know, in

20 the code and it's had one for -- in the act.  It's been around

21 for a long, long time, and Congress didn't change that.

22          MR. ISBELL:  I agree.

23          THE COURT:  Okay.

24          MR. ISBELL:  They didn't, and that's part of the

25 point here.  They didn't change preference law.  They didn't

1   change 547©.   In other words, you still get to use that defense

2   and you still get your claim.   What Circuit City is arguing is

3   that that has changed, that now that claim has to come back and

4   be set off against your new value defense.   They're saying that

5   you can't get paid on your claim and still have a new value

6   defense, but before BAPCPA you could.

7          THE COURT:   But when we just went through the math a

8   second ago I told you -- and I thought we agreed -- you come

9   out to exactly the same place before and now.

10         MR. ISBELL:   You come back to the same economical

11  place, but you get there differently because --

12         THE COURT:   Right.

13         MR. ISBELL:   -- under pre-BAPCPA you would have an

14  unsecured claim that you got paid on, and you get to reduce

15  your claim by your new value.

16         THE COURT:   But then that result is --

17         MR. ISBELL:   Now they're saying you can't reduce --

18         THE COURT:   But then that result is the same.

19         MR. ISBELL:   Well, under the example the net recovery

20  should be the same --

21         THE COURT:   Right.

22         MR. ISBELL:   -- although the timing might be

23  different.   But the preference analysis -- like you just said,

24  Your Honor, the preference analysis is now different.   You're

25  getting to the same result as a general unsecured creditor

1 would have had pre-BAPCPA, but you've changed the preference

2 analysis to get there.  You're now saying that post-petition

3 claims set off your new value where before you weren't saying

4 that.  And Circuit City's reply is telling on this issue as to

5 what it is that they're asserting.  They're asserting that,

6 well, if you get paid on that unsecured claim, well, then in

7 fact that does reduce your unsecured claim because it's an

8 otherwise unavoidable transfer.

9        So that 25 cents, the $2.50 that you get under that

10 example under their reading of the statute means that you only

11 get $7.50 of new value as a defense, not the $10.  So either

12 the statute has changed or they're taking the reading of it to

13 a level that no court has ever gone before.  In fact, I'm not

14 aware of anybody even making the argument before.

15        THE COURT:  I just have trouble with the math because

16 I'm coming out on both sides of the equation to exactly the

17 same number.  But, you know, be that as it may, what you're

18 saying is you should be better off than that now under the new

19 change under 503(b)(9).

20        MR. ISBELL:  Yes, Your Honor.  But let me -- let me

21 back up because I want to be clear.  What they're saying is

22 that a transfer made post-petition, whether it's a priority

23 claim or a general unsecured claim, is a transfer that reduces

24 your new value.  So under pre-BAPCPA it was generally

25 considered although --

58

1              THE COURT:  If it's unavoidable.

2              MR. ISBELL:  If it's unavoidable.  But pre-BAPCPA,

3  most courts -- in fact, every court I'm aware of and every

4  practitioner I'm aware of would agree that you got to keep that

5  $2.50 and you got to reduce your preference exposure.

6              THE COURT:  You do but you get to the same number is

7  what I'm saying.

8              MR. ISBELL:  Not anymore, not under Circuit City's

9  argument, Judge.  Because now they're saying that $2.50 now

10  goes and reduces your new value, and so now you've only got

11  $7.50 in new value and now you have an extra $2.50 502(h)

12  claim.  And so you get paid 25 cents on that extra $2.50, which

13  gets you, what, 62 and a half cents.  So you're now worse off

14  under their reading of 547 than you were under everybody else's

15  understanding of how the preference claim and claim

16  distribution scheme worked up until this point.  Do you follow

17  the analysis, Judge?

18              THE COURT:  I just don't agree with the math.  I'm --

19  when I apply the figures, I come up with exactly the same.  As

20  I say, you have a $30 preference.  Okay.  Don't apply any new

21  value to it even though you've provided a 503(b)(9) $10 claim.

22  Okay.  And you've got that claim, so you're not subtracting

23  anything from it.  Okay?

24              MR. ISBELL:  Yeah.

25              THE COURT:  You've got to pay $30 into the estate on

1 account of your preference.

2          MR. ISBELL:  All right.

3          THE COURT:  Okay.  So now you're 30 to the bad.  All

4 right.  What do you get?  Okay.  You're going to get paid $10

5 on your 503(b)(9) claim, and you're going to get a general

6 unsecured claim for the $30 you had to pay in pursuant to

7 Section 502(h) and so -- and that claim is worth $7.50.  So if

8 I subtract $7.50 and $10 from your $30 claim, what, I get

9 somewhere around $12.50.

10          MR. ISBELL:  Well, 12 -- yeah, $12.50.

11          THE COURT:  And if I do it the other way, you come

12 out to exactly the same number.

13          MR. ISBELL:  Not under their current reading, and

14 let's --

15          THE COURT:  Well, it's the way I just described it.

16 You're saying that's not how they're saying it?

17          MR. ISBELL:  Well, the way you described it is how

18 they're saying it for a 503(b)(9) claim but that's not how

19 they're saying it now for a general unsecured claim.

20          THE COURT:  Well, let's walk it through exactly the

21 same analysis for a general unsecured claim.

22          MR. ISBELL:  Okay.

23          THE COURT:  You have a $30 preference exposure.

24 Okay.  You're going to apply $10 new value.  Okay.  So now you

25 only have 20.

1          MR. ISBELL:  Not under what they're saying now,

2   Judge.

3          THE COURT:  Well, let's just do it the way you did it

4   in your former.

5          MR. ISBELL:  Yeah, that was -- that's the way I did

6   it in my papers.

7          THE COURT:  Okay.  Well, let's walk it through

8   because we know we get to the same number, because if I

9   subtract the $10 and you've got a $20 preference claim.  Okay.

10  All right.  And now you're $20 to the bad.  All right.  But

11  what is your claim?  Your claim is the $20 preference you had

12  to put in plus your $10 of your pre-petition claim that you had

13  before, so you have a $30 claim.  You get a $7.50 dividend on

14  that.  Subtract $7.50 from your $20 and you come to 12.50.

15  That's what I'm saying.  I'm coming to exactly the same number.

16         MR. ISBELL:  And Judge, that's the example that I put

17  in my papers, but in the reply brief --

18         THE COURT:  But if you get -- if you're getting 12.50

19  pre-BAPCPA and you're getting 12.50 now under the analysis that

20  I just did, how are you saying you're worse off?

21         MR. ISBELL:  I'm saying under the analysis that

22  you're saying right there, under my understanding of what

23  BAPCPA was -- pre-BAPCPA was and what they're trying to do now,

24  you would be the same.  But that's not what they're saying in

25  their reply brief, and that's what I'm trying to get to, Your

1   Honor.

2           THE COURT:  Okay.  Tell me what -- because that's

3   what I thought they were saying in the reply brief --

4           MR. ISBELL:  No.

5           THE COURT:  -- is that you got to use the -- you

6   could either get paid your $10 or you could reduce your

7   preference exposure, one or the other, and you get to decide.

8   And, you know, but you're going to get to exactly the same

9   $12.50, you know, net whether it was pre-BAPCPA or post.  But

10  -- and you're saying that that's not what they're saying?

11          MR. ISBELL:  I'm saying that what -- I'm saying that

12  it won't be the same under what -- how they're doing the

13  analysis in the reply brief, and let me explain.  You get the

14  $12.50 that you referenced for the -- for now, the 503(b)(9)

15  claim.  But what they're saying is that what you and I agree

16  was the analysis pre-BAPCPA is not really the analysis.  What

17  they are saying is that any transfer of -- an avoidable

18  transfer of the debtor, whether it be a priority claim, an

19  admin claim, or a general unsecured claim, will reduce the new

20  value.

21          So you either get your $2.50 on your unsecured claim,

22  or you have to reduce your new value by that same $2.50.  So

23  under the example that we were talking about -- sorry, Your

24  Honor -- where you have $10 in new value that you're going to

25  get paid $2.50 on later on in the case, you've got a $30

1  preference, $2.50 of that new value is now offset to where you

2  only get $7.50 new value credit.  So you have a net preference

3  now of 22.50 that you have to pay in.

4         You then get paid on it $2.50 later, meaning that

5  your net contribution was 20 bucks.  So it's different than

6  what you and I would have envisioned would be the analysis

7  under BAPCPA to what they're saying now.  Because now they're

8  saying that any transfer on a post-petition basis, whether it's

9  503(b)(9), priority or general unsecured, reduces your new

10 value defense because it's an otherwise unavoidable transfer by

11 the debtor.

12        And so they're saying that the preference analysis is

13 different than what you and I grew up believing it was.

14 They're saying that ordinary general unsecured creditor claims

15 reduce new value analysis, new value defense because it is a

16 payment of an otherwise unavoidable transfer by the debtor.

17 And that's not what anybody else believes, I don't believe,

18 Your Honor.  And that is the logical end result to this

19 argument.

20        BAPCPA was intended to elevate claims.  You and I

21 agree that that is clear.  It was intended to elevate claims

22 above general unsecured creditors.  And they wanted them to get

23 paid before -- before the general unsecured creditors got paid

24 anything, and that was a policy reason to make them pay -- get

25 paid on a higher priority.

1          Similarly, Congress wanted to prefer trade vendors

2   who continued to do business with creditors.  They wanted to

3   keep people who provided goods after getting payments to

4   distressed companies, they wanted to prefer them in the general

5   distribution scheme.  These two concepts are separate, but they

6   clearly show the intent of Congress to prefer vendors who

7   continue to do business with the debtor when it's in a

8   distressed stated.

9          Now, at best what the debtors can argue is that

10  despite that clear intent of Congress to prefer, when you are

11  hit with a preference, you're really no better off than you

12  were pre-BAPCPA.  That's the best argument that they can make.

13         THE COURT:  Okay.  And I agree with that.  You're not

14  any worse off, though, but you're exactly the same as the way

15  you were before if you have a preference.

16         MR. ISBELL:  Well, I think that's the best argument

17  they can make.  I think that you actually can be worse off

18  because of some of the -- both timing, and I think that under

19  their -- it's possible actually under their reading of 547 now

20  as far as saying that it applies to general -- the defense is

21  reduced by payments made to general unsecured claims.

22         I think you could actually even be slightly better

23  off because I think those general unsecured claim creditors are

24  now going to get hit with claim objections and preference hear

25  -- summary judgment hearings like this saying that they can't

1  use that new value defense because it was made with an

2  otherwise unavoidable transfer by the debtor.

3        But they have to make that argument because otherwise

4  there is no way to get to the conclusion that they're reaching

5  which is that somehow there is just an imaginary line out there

6  that cuts off the transfers of an otherwise avoidable interest

7  of the debtor at some point after 503(b)(9) claims were paid.

8  You have to have it at the petition date or not at all.

9        What they're trying to -- if I were them, I think

10  what you have to try to do is say it just only applies to

11  503(b)(9) claims.  But that's not what they're saying.  They're

12  saying it applies to all claims, and that's just not a logical

13  result.  It clear doesn't -- it clearly changes the analysis

14  that every practitioner I know of has thought of preference

15  before this date.

16        Your Honor, there is cases that were cited in the

17  papers.  I went through the <u>J.K. Chevrolet</u> case.  That was not

18  the holding.  We talked about the (indiscernible 11:33:26*)

19  Operations case.  We talked about the <u>T.I. Acquisitions</u> case,

20  All very well-known judges who I and I know Your Honor respects

21  very well.

22        I think that when you look at the analysis though of

23  what the payments are and what actually is an otherwise

24  unavoidable transfer by the debtor, I think that that leads you

25  to the logical conclusion that in order to give effect to the

1  503(b)(9) statute, you have to say that a claim is a claim and

2  it does not get offset by a defense, and conversely a defense

3  doesn't get offset by the claim.

4          They have two separate intents by Congress.  One is

5  to keep trade creditors doing business with the debtor so that

6  they can offset the new value provided to the debtor, assuming

7  it's otherwise unavoidable.  And the other is for the 20 days,

8  specifically the 20 days prior to the petition date, we want to

9  give these other creditors an elevated claim to the extent they

10 provided value to the debtor or goods to the debtor during that

11 20-day period.

12         So there are two separate things -- one is a claim;

13 one is a defense.  There is nowhere -- no -- before BAPCPA

14 there was never any claim that a general unsecured claim should

15 reduce new value.  Now maybe there is because the debtors have

16 suddenly found new light in the meaning of 547(c)(4).  I don't

17 think there is, Your Honor, and I don't think that they can get

18 there on the merits.

19         I also just, you know, point out that I still don't

20 think that they get there on the ripeness issue, and I don't

21 think that they have actually presented any evidence in their

22 case suggesting that they have made a prima facie case for

23 preference in the first instance.  And they admit that they

24 haven't identified the new value that it is they're seeking to

25 avoid.  So I think you have ripeness issues, and I think on the

1   merits that there is no way that they can get there under the

2   reading of the bankruptcy code.

3          THE COURT:  All right.  Thank you.

4          MR. GALARDI:  Your Honor, I'm going to go sort of

5   machine gun, one step at a time, to try to knock out some

6   points.

7          First, I know Your Honor knows this but let me go to

8   Definitions 101 -- 1101.  In this chapter, quote, "debtor-in-

9   possession" means debtor, except when a person that is

10  qualified under Section 322 of this title is serving as a

11  trustee in the case.  I think that ends the definition that

12  every time we use the word debtor it's debtor-in-possession, so

13  that's one point.

14         Second, Your Honor, Footnote 6 and what the holding

15  of J.K. Chevrolet is.  Admittedly, in Footnote 6 there is the

16  statement that post-petition transfers, but the whole

17  discussion is that the Court has got it wrong in the first

18  place.  You don't look to whether it's pre-petition or post-

19  petition.  You look at whether the payment is otherwise

20  unavoidable, and then there may be a factual issue of whether a

21  post-petition payment is unavoidable or avoidable or not.  So

22  though the footnote clarifies, maybe it's dicta.

23         The issue that we're relying on is the question is

24  whether the payment that we are seeking is otherwise

25  unavoidable, and our argument as under 503(b)(9) in a court

1   order, it would be otherwise unavoidable.  And there are cases.

2   Indeed, I would even argue, and this goes to 547, it says

3   otherwise unavoidable.  Well, everyone is forgetting that one

4   of the avoidance sections, 549, allows you to avoid post-

5   petition transfers.  So if I made a payment that was not in the

6   ordinary course of business and I just willy-nilly paid and I

7   wasn't allowed to pay, that's an otherwise avoidable post-

8   petition transfer.  And so if I did that and tried to use it,

9   no, I can't use that as my defense.

10          Now, Your Honor, let's take the example, because I

11  guess my -- one of my expressions is you put the rabbit in the

12  hat with the example.  And we are not saying, Your Honor, the

13  way you did the math -- I was confused by both of them, but the

14  way you did the math is the way we've been always thinking

15  about it.  But I think his example is the thing that causes the

16  problem here, and I'm going to take his example and a separate

17  example.

18          So if we turn to Page 6, it says assume that a

19  creditor provided new value of $10 after receipt of 30

20  preferential payment and now holds a general unsecured claim of

21  $10 at the petition date.  Okay.  Well, let's start with the

22  problem that the $10 of new value for which they didn't get

23  paid has a general claim of $10 as of the petition date.  Okay.

24  So that's what they're asserting.  Also assume that under the

25  debtor's plan, an unsecured creditor receives 25 percent.

68

1           Under this example a creditor receives 2.50 of new --

2    for that new value.  Well, first of all, that's false; 502(d)

3    that person doesn't get paid, so we're not changing the law.

4    So the real question, now we go back to your math.  Under the

5    example, the creditor receives 2.50.  Oh, I'm going to pay him

6    on the unsecured claim but then I'm going to sue him later on.

7    That's not the case.

8           Now, let's assume though that that $10 claim wasn't a

9    new value claim.  Let's assume it was an unpaid invoice 89 days

10   or 200 days out, and they're not using it for new value.  Okay.

11   It's still disallowed until you have the preference claim, but

12   we're not saying that if for some reason the debtor made a

13   distribution on that claim and they're not asserting it as new

14   value, they don't get paid on that claim.  We're not doing it.

15          What we're saying is that there is a uniqueness to

16   the 503(b)(9) is that it happens to be the new value defense

17   and you're trying to use it both ways.  So in this example that

18   $10 new value is really, one, it shouldn't get paid; two, it

19   should do the math as you said.  Well, no, you have your

20   choice.  You can go ahead and pay me 30, then get the

21   distribution on the two.  Or you could reduce it and get your

22   distribution on the 20, but under BAPCPA or under this it makes

23   no difference.

24          Indeed, and BAPCPA does elevate.  So let's assume

25   that only -- in his example only two million of the six million

1  503(b)(9) claim is being used for new value.  Well, then take

2  that two million.  It doesn't mean he doesn't get the four

3  million payment on the 503(b)(9).  And he gets real dollars.

4  He doesn't get the itty-bitty little bankruptcy dollars of the

5  unsecured.  So Congress's intent is still -- we're still doing

6  everything that is consistent with Congress's intent.

7       It doesn't mean you have to use the whole 503(b)(9).

8  In fact, you might not factually be able because there may be a

9  payment we made after the 20 days but, you know, within that 20

10 days -- let's call it day ten -- but you supplied a good on day

11 19, that you're entitled to 503(b)(9) which doesn't satisfy a

12 new value.  You can't use it to offset something.  Suppose you

13 only had one.  You're going to get your allowed claim.

14      Now let's talk about all the other defenses we have

15 with the receivables, but this I think is exactly why Your

16 Honor said we have to put this all in one proceeding.  We need

17 to know the law so that we need to know whether or not -- and

18 Your Honor has ruled before that we get to choose when to use

19 the receivables.

20      Well, maybe we want to use a receivable against the

21 503(b)(9) claim if it's an allowed 503(b)(9) claim.  But maybe

22 if they're going to use it as a preference claim, and as a

23 defense to the preference claim I might not want to use the

24 receivable there.  I may want to use it in a different place.

25 The whole point of the summary judgment proceeding here is to

1  figure out can they assert this defense, the new value defense,

2  and seek payment in full so that we can determine what we're

3  shooting at here with respect to the new value and how much

4  they need to use.  And we think that issue is ripe.

5          Now, he keeps referring to my pleading, but I hate to

6  do this to a friendly colleague, but Paragraph 5 he seems to

7  leave out -- Page 5 he seems to leave out one word, and I

8  thought it was a rather important word.  And I think Your Honor

9  read it but I'm just going to point it out.

10         THE COURT:  Am I looking at your complaint or your --

11         MR. GALARDI:  No, you're looking at my response where

12 he keeps telling me that I have admitted that this is not ripe.

13         THE COURT:  Okay.  I've got it right in front of me.

14         MR. GALARDI:  The sentence actually reads, thus the

15 only material fact that is argue -- that arguably is not in the

16 pleadings -- we didn't admit anything; we said it's arguably

17 not in the pleadings.  And then as I went through before, we

18 believe it's in the pleadings.  We think it's their affirmative

19 defense.  We think it's in the stipulation.  We think it's in

20 our alleged facts.  We believe that we have the fact that

21 they're using the new value.

22         As I pointed out in the beginning, it's in the

23 pleadings.  But even if it weren't in the pleadings, Your

24 Honor, then we rely on Rule 59(e), and 59(e) is pretty express

25 that opposing parties cannot rest on mere denials.  And so I go

1    to 7059 -- 7056.  I'm sorry, 7056, and it reads, opposing

2    party's obligation to respond.  When a motion for summary

3    judgment is properly made and supported, we think we have --

4    this is an affirmative defense.  You take all of our facts as

5    true.  An opposing party may not rely on allegations or denials

6    in its own pleading.  Rather, its response must, by affidavits

7    or otherwise -- I haven't seen an affidavit and I haven't seen

8    otherwise provided in the rule -- set out specific facts that's

9    showing a genuine issue for trial.

10          There is nothing that they've said is -- there is no

11   new value that we're using here.  Indeed, we've pled -- as you

12   said, they've been very artful in their pleading.  We don't

13   know, we don't know, but the facts are all in their control.

14   They can say when we asserted this defense and when I signed

15   this pleading, I must have thought I knew something about what

16   the new value defense was.  I must have known what transfers I

17   was doing.  That's why Twombly is now being applied to

18   affirmative defenses so that we can have a fair answer.

19          But the fact of the matter is the new value with the

20   stipulation is clearly the 503(b)(9).  They have not come

21   forward by affidavit or otherwise and said, no, no, no, we're

22   not using 503(b)(9) two ways to get an allowed claim and a

23   defense.  They could have; they didn't.  The inference should

24   be that they are, and indeed what he's told you throughout the

25   pleadings is we're allowed to.

1          This is what the old law said we could do so we're

2    allowed to, so the issue is ripe.  And so we go to J.K.

3    Chevrolet, and the issue simply is -- and we have made a

4    transfer, Your Honor.  We have stipulated and put money -- we

5    will put money into a reserve.  That's a transfer for their

6    benefit.  So whether we do the transfer or the idea that I have

7    to pay them first only to receive it, remember there is a

8    stipulation that we've agreed that a certain amount of money

9    is, in fact, earmarked for Mitsubishi if it has the allowed

10   claim.

11         And we've gone all the way to the full amount of the

12   four point -- or nearly five million, which we can still

13   whittle down.  But there is money that's available, and if they

14   have that allowed claim there is a transfer for their benefit,

15   and on confirmation that money is set aside for them.  So I

16   don't think we have to wait for that.  I don't think we have to

17   let the horse out of the barn so to speak.

18         So, Your Honor, we think the issue is ripe.  We think

19   any payment of a 503(b)(9) would be an otherwise unavoidable

20   transfer.  If they don't want to use payment on the 503(b)(9),

21   if they want to use it as a new value defense, then they

22   themselves should reduce the 503(b)(9) claim.  But you can't

23   get both the new value defense, which is what their example

24   says they get, a 25-cent -- and that's exactly the problem, and

25   no bankruptcy court should have ever allowed that kind of

73

1  double recovery with new value, whether it's an unsecured claim

2  or an elevated 503(b)(9) claim.  That example is just incorrect

3  as a matter of law.  Indeed, you shouldn't have made any

4  distribution until the preference claim was resolved, and

5  that's what 502(d) says.

6          I don't know if Your Honor has any further questions

7  for me.

8          THE COURT:  No, I do not.  Thank you.

9          MR. GALARDI:  Thank you, Your Honor.

10          THE COURT:  Anything further, Mr. Isbell?

11          MR. ISBELL:  Yes, Your Honor.  I'll try to hit on all

12  these, but hopefully I'm not missing anything.  You know, the

13  last thing he said is that the claim on -- under my example,

14  the unsecured claim shouldn't be paid under 502(d) until after

15  the preference is resolved.  All that's a timing issue, Judge.

16  You resolve your preference and then you get paid, but it's

17  still getting paid with an otherwise unavoidable transfer.

18          I don't think he was disputing the fact that under

19  his reading of the statute that that payment that would be set

20  aside for that unsecured creditor goes to reduce new value.  I

21  don't think that's been disputed, and I think the papers that

22  they filed suggest that that's not disputed.  That is now a new

23  standard that they are advocating.

24          Speaking of new standards, they're also trying to

25  invent new standards for summary judgment.  Under the summary

74

1    judgment standard, the burden is on the moving party to

2    demonstrate through admissible evidence that there is no

3    material facts in dispute.   There is no admissible evidence in

4    this case.   There is only a complaint.   They say that they've

5    made allegations in the complaint.   Allegations is not evidence

6    for use in summary judgment.   The only way --

7             THE COURT:   Well, unless you deny them.   If you don't

8    deny it, then it certainly is admiss -- is admitted, right?

9             MR. ISBELL:   And it's denied in our answer.   And so

10   what they're saying now is that you can file a complaint, file

11   a motion for summary judgment, and now the burden is on the

12   defense to produce evidence when you've produced none.   That's

13   not the standard for summary judgment.   You actually have to

14   produce admissible evidence, whether it be in admissions,

15   through the pleadings which is the complaint and the answer

16   which would admit the prima facie case of a preference, and

17   also the existence of the new value that he admits is not

18   identified in any of the evidence before the Court, which is

19   none.

20            Those are the burdens of the debtor, and only under

21   five -- excuse me, Rule 56, only when the debtor or the movant

22   meets that burden does the burden shift to the non-moving party

23   to produce evidence.   We didn't have to produce affidavits

24   because there is no evidence to rebut in producing the

25   affidavits.

1          THE COURT:  Well, it says -- I'm just looking at it

2     and the very first sentence says a party claiming relief may

3     move with or without supporting affidavits for summary judgment

4     on all or a part of the claim.  Isn't that what they're doing?

5          MR. ISBELL:  That is, but in that case if you're

6     moving without affidavits then you have to rely on the evidence

7     which is the admissions contained in the complaint --

8          THE COURT:  Well, they rely on the facts that they've

9     pled.  They say this is the fact, and then, you know, you have

10    to say, no, it's not the fact, and then I have a fact that's in

11    dispute.

12         MR. ISBELL:  Well, Judge, the requirement that they

13    cited in their papers under <u>Celotex</u> suggests that they have to

14    show that there is no material fact in dispute.  They can't

15    just rely on their allegations in the complaint unless they're

16    admitted.  In this case the answer did not admit the

17    allegations of the complaint with regard to preference or with

18    regard -- or there wasn't any allegations in the complaint

19    regarding new value so there wasn't anything to admit or deny

20    in regards to new value which is an affirmative defense.

21         Those are prima -- those are the debtor's burden to

22    produce evidence as to those transfers.  They could have

23    submitted discovery and request for admissions, admit you got

24    these transfers, admit that they're -- we've all seen the form

25    discovery response -- form discovery request.  They could have

1  taken a deposition.  They could have submitted an affidavit

2  from their account saying, here is the transfers that were

3  made.  These were made from this account which was property of

4  the estate.  They didn't do that.  They haven't met their

5  evidentiary burden in moving for summary judgment, and now

6  they're trying to shift that burden to the non-moving party

7  which they can't do unless they have met their initial burden

8  which is to prove that there is no material fact in dispute.

9  They haven't done that.

10        THE COURT:  Well, I mean, just looking -- you've got

11  the rule in front of you.  Just looking at the rule it says,

12  you know, that the party claiming relief, which is them, may

13  move with or without supporting affidavits, so they've done it

14  -- agreed without for summary judgment on all or part of the

15  claim.  Here it's just a part of the claim.  And then we go

16  down to (e)(2) and it says opposing to when a motion for

17  summary judgment is properly made and supported.  Well, here

18  it's been made.  They're just claiming that there is no fact in

19  dispute with regard to whether or not on this narrow legal

20  issue an opposing party may not merely rely on allegations or

21  denials but must respond by affidavits or otherwise.  Now,

22  that's all Mr. Galardi is saying.

23        MR. ISBELL:  Right.  It's the supported prop -- word

24  that's the problem, Judge, that properly made, they can make it

25  at any time they want.  That's true.  It has to be supported,

1  and that -- what that word is, supported means supported with

2  evidence demonstrating that there is no material fact in

3  dispute.

4           THE COURT:  Well, where does it say that though?

5           MR. ISBELL:  Well, it doesn't say it in the rule,

6  Judge.

7           THE COURT:  Okay.

8           MR. ISBELL:  You have to read the cases.  But it does

9  say supported.  Here it's not supported by anything other than

10 blanket allegations and a pleading that were denied.  So they

11 haven't met their prima facie case.  They also say that --

12          THE COURT:  But <u>Celotex</u> also said with or without

13 supporting affidavits.

14          MR. ISBELL:  Right.  And I'm not saying they have to

15 have affidavits.  If we would have admitted in our answer that

16 they made their prima facie case for preference, that would

17 have been sufficient.  Or if they would have taken discovery

18 and submitted request for admissions and filed those, that

19 would be sufficient.  You don't have to have affidavits, but

20 you have to have support.

21          THE COURT:  Okay.  Well, on the narrow issue of

22 whether or not you're entitled to assert new value defense for

23 -- and use a 503(b)(9) claim and get it -- use it both as a new

24 value defense and as a -- and get the claim paid as an

25 administrative expense, are you saying that that's not an issue

78

1  that's in dispute between the parties at this time that can be

2  resolved on summary judgment?

3          MR. ISBELL:  No.  I'm saying that that is an issue

4  that is in dispute because --

5          THE COURT:  So what is the issue that I can't decide?

6  If I can decide that issue, isn't that all Mr. Galardi is

7  asking me to do?

8          MR. ISBELL:  Well, it is.  I think he's asking you to

9  jump over the prima facie case requirement, as well, but let's

10  just focus on that for a second.  He says that if we get a new

11  503(b)(9) claim -- big if -- if we get it allowed, then they've

12  set it aside.  That's not a transfer, Judge.  That -- they

13  still reserve their objection to our claims, and in fact they

14  are seeking to reduce it to zero in their pleadings.

15          THE COURT:  But he wants to get a ruling on a fine

16  point of law which is just whether or not you can get -- use

17  the 503(b)(9) claim for both purposes.  In other words, to be

18  paid as an administrative claim and use it as new value.  And

19  what he's saying is we're going to combine that into one

20  proceeding so that we make sure that it's all resolved in one

21  place.

22          And then, you know, when we say, well, is there a

23  transfer?  A transfer is also defined, and it's defined very,

24  very broadly and, you know, if the claim is going to be set

25  aside and earmarked for Mitsubishi, whatever the amount is,

1  whether it be $1 or $5 million, why haven't we got something

2  that we can say, okay, from a legal standpoint we can decide

3  this issue?

4           MR. ISBELL:  Because what he's asking this Court to

5  do on that issue is issue an advisory opinion because it's not

6  currently a case or controversy that's in dispute.

7           THE COURT:  But don't I have to necessarily resolve

8  that in this case?

9           MR. ISBELL:  No, you don't, Your Honor, because --

10          THE COURT:  Well, tell me how you would suggest I

11 solve it then.

12          MR. ISBELL:  Okay.  I think that, one, like I said,

13 the parties are trying to resolve out of court the 503(b)(9)

14 claim and the receivables claim and the unsecured claim.  When

15 that is resolved, it will be clear to everybody in the court

16 when we come back what is being asserted as new value and

17 whether or not it also is being asserted as a 503(b)(9) claim.

18 In that case there may not be any new value that is being

19 asserted as both because currently we don't know what the set

20 of facts are going to be after the 503(b)(9) claim is resolved.

21          THE COURT:  So what you're saying is if it does -- if

22 the 503(b)(9) claim gets reduced to zero, then it will never be

23 used as an affirmative defense under (c)(4) because there would

24 be no new value, and therefore whatever I'm deciding right now

25 is merely advisory.

1      MR. ISBELL:  Well, the last part I agree with.  I'm

2  not sure I agree with how you get there.  If it's reduced to

3  zero, then we get our new value defense because we don't have

4  an allowed 503(b)(9) claim.

5      THE COURT:  Exactly.  Yes, okay.

6      MR. ISBELL:  Okay.

7      THE COURT:  I understand.  Okay.

8      MR. ISBELL:  Yeah.  The way you said it was really

9  concerning.  I think you took it on both ends.

10      THE COURT:  I did it backwards.

11      MR. ISBELL:  But, you know, what you said, Your

12  Honor, actually, you know, raises a point that I heard for the

13  first time in -- on rebuttal which was that they said how are

14  they going to pay the 503(b)(9), and they said, well, maybe

15  we'll set it off or maybe we won't.  Well, in their papers what

16  they say is we've objected on grounds of setoff, and if it's

17  reduced to zero then you get your 503(b)(9) claim, and if it's

18  -- if you get your 503(b)(9) claim, then you don't get your new

19  value defense.

20      I'm not sure if this is what he is saying or not, or

21  what he intends to say, but if what he is saying is that you

22  can set off against that claim and that is paid for purposes of

23  a 503(b)(9) claim and then you don't get your new value

24  analysis, well, that creates a much bigger issue, Judge,

25  because as I said, we are tracing transfer to transfer on these

1    claims that they have asserted as receivables.  And so if they

2    have a receivable claim that relates to a claim that was 200

3    days prior to the bankruptcy case, they're now going to try to

4    set that off against 503(b)(9) and destroy new value, and how

5    is that possible or equitable?

6          I don't know that that's what they're trying to do,

7    but if so then that is really a new issue that has not been

8    presented in any of the papers I've seen.  And maybe we can

9    clear that up real quick, but that is one thing I wanted to

10   make sure it's clear.  Because if that is the case, then I

11   think we need to completely reassess and re-brief the issue

12   because that's not what was in the briefs.  What was in the

13   briefs is if it's reduced you can use it, or if it's not

14   reduced and you have it as a 503(b)(9) claim, you don't use it

15   as a new value claim.

16         As far as the definitional issues, Judge, I note that

17   debtor-in-possession is debtor except when trustee -- 547 uses

18   the term trustee.  It could also use the term trustee, and the

19   547(c)(4) trustee includes the debtor-in-possession.  I think

20   that if you look at the way the terms are used, debtor does not

21   -- is defined and it does not include the definition of debtor-

22   in-possession or trustee.  And trustee is defined -- or excuse

23   me, debtor -- trustee is defined in 11 -- or excuse me, debtor-

24   in-possession in 11 -- excuse me, 1107 includes the powers of a

25   trustee.  You know, I --

1              THE COURT:  It doesn't mean the trustee.

2              MR. ISBELL:  Right.  It doesn't mean the trustee.

3    But I think that between the definitional issues that frankly

4    are somewhat circular, but I think if you look at the specific

5    definitions used, they don't use debtor-in-possession and say

6    that means debtor; they use debtor.  So I think that that's an

7    issue which frankly I haven't had time to brief, but I think

8    that is still an issue.  And I think more importantly the

9    otherwise unavoidable transfer should not contemplate -- by the

10   debtor should not contemplate transfers that are authorized

11   under the bankruptcy code.

12             What my colleague used as an example was 549, and

13   that's a statute that's used to recover unauthorized or

14   unpermitted transfers.  We're not talking about that here.

15   We're talking about when a transfer that Congress specifically

16   intended to convey 503(b)(9) which is essentially the same,

17   although in higher priority is what they intended to convey to

18   general unsecured creditors which is a claim.  The claim that

19   can be used after use of setoff in a preference case.  And I

20   think that is the fundamental issue on the merits.  Again, I

21   think there are ripeness issues that have to be addressed

22   before you get there, but I think that's the case, Your Honor.

23             THE COURT:  All right.  Thank you.

24             MR. GALARDI:  Can I make one --

25             THE COURT:  You may

1          MR. GALARDI:  I'm sorry, Your Honor.  It really goes

2    to the ripeness point, and I may have been too subtle.  Two

3    things.  One, if Your Honor looks at the facts, we think

4    there's facts and no genuine issue of facts.  But I also want

5    to make the more subtle point that because the new value is an

6    affirmative defense, you don't even have to look at that.

7          There is a case in this jurisdiction, Fourth Circuit,

8    Emergency One v. American Fire Eagle Engine Company that I

9    think will help me explain my point.  It says the following:

10   An affirmative defense is the defendant's assertion raising new

11   facts and arguments that if true will defeat the plaintiff's or

12   prosecution's claim even if all the allegations in the

13   complaint are true.  Then they cite Saks v. Franklin Covey,

14   Second Circuit, in Black's Law Dictionary.

15         Why that's important is they've raised the new value

16   as an affirmative defense.  As I started my argument, our legal

17   argument is it can't be an affirmative defense to the extent

18   that they use 503(b)(9).  Whether the facts are true in some

19   sense in this instance for summary judgment is largely

20   irrelevant because we're trying to strike the affirmative

21   defense to the extent they use 503(b)(9).  I think that's

22   important for the ripeness issue, Your Honor, and I just wanted

23   to point that out.

24         Inartfully they've pled everything as an a

25   affirmative defense, but I do know five -- but I do know the

1  new value is you've established your claim but what that is is

2  an affirmative defense.  Everything you can say is true, you

3  could have been insolvent, I could have gotten more, I could

4  have done this, this and this, but here's my new value so you

5  can't take it.  That's why I think this issue is ripe with

6  respect to the striking of an affirmative defense or qualifying

7  to what extent the affirmative defense is proper.  Thank you.

8          THE COURT:  All right.  Thank you.  You may.

9          MR. ISBELL:  I just wanted to -- I haven't seen the

10 case, Your Honor, but I would --

11         THE COURT:  And I haven't either.  I have to -- most

12 of -- you know, it surprises me, but I don't recall it right

13 offhand.

14         MR. ISBELL:  Yeah.

15         THE COURT:  Apparently a copy has just been put on

16 your table.

17         MR. ISBELL:  Okay.  But my statement is it's an

18 affirmative defense.  If I were moving for summary judgment on

19 our affirmative defense, we would assume that the complaint --

20 the allegations of the prima facie case are true.  When they

21 are moving for summary judgment on my affirmative defense, it's

22 their burden to demonstrate that those facts are true.  That's

23 my only point, Your Honor.

24         THE COURT:  All right.  Thank you.  All right.  The

25 Court has heard very good arguments this morning.  The Court is

1    -- unfortunately, I do want to look at a couple of the issues

2    that have been raised, and so I'm not going to make a ruling

3    here today but will take the matter under advisement and get

4    back to you promptly, and thank both counsel for very capable

5    presentations here this morning.

6              MR. GALARDI:  Thank you, Your Honor.

7              THE COURT:  Mr. Galardi?

8              MR. GALARDI:  Your Honor, there is nothing left on

9    the agenda, but I know you would like to know about

10   confirmation.

11             THE COURT:  Yes.

12             MR. GALARDI:  So I thought I would address that next.

13             THE COURT:  I wasn't going to let you get out of the

14   courtroom.

15             MR. GALARDI:  No.  And I think Mr. Pomerantz has been

16   sitting silently waiting for it.  The good news is, Your Honor,

17   we will be proceeding to confirmation on September 8th.  The

18   bad news, Your Honor, is that we do not have the CRA ruling in

19   hand, and although our mediation statement said that we need

20   not proceed, we and the committee have agreed to proceed with

21   Your Honor -- as long as we advised Your Honor, Your Honor is

22   comfortable, and then I'll talk about the Canadian case, as

23   well.

24             We are very, very hopeful, and I know I've said this

25   before but I'll say I'm even more hopeful than I've been before

1  that we will get the ruling, if not on September 7th or 8th or

2  shortly thereafter, that we had to revise the ruling.  We think

3  that the CRA has indicated every intention to grant the ruling.

4  It just may be holiday over not Labor Day but the last week in

5  August.

6        We think then it would be better to proceed to

7  confirmation.  That is an issue to effectiveness.  After all of

8  the argument I don't want to talk about advisory opinions, but

9  nonetheless we would go forward with confirmation with a

10  condition to effectiveness that that ruling be granted.  I hope

11  to announce on September 8th that we have the ruling in hand,

12  but even if we don't we think we can proceed.

13        We had a conversation yesterday with the monitor,

14  Your Honor, with respect to proceeding in that light, and Your

15  Honor knows that we had entered into a protocol for a joint

16  hearing thinking we would have to do certain things with

17  respect to the amalgamation and the transactions.  The monitor

18  was comfortable that the United States court, and that we

19  didn't put Judge -- Justice Morowitz in an uncomfortable

20  position by proceeding without a joint hearing.

21        I don't know if Mr. Pomerantz knows -- my counsel

22  told me late last night -- that they actually had gotten to

23  Judge Morowitz, that at least he's not uncomfortable but he's

24  available to talk to Your Honor about that and if you wanted to

25  reach out after I advised you that our intention and desire

1  would be to go forward.  No offense to Judge Morowitz.  We

2  don't think we're putting him in an awkward position because of

3  the way in which we've now structured the transaction to go

4  forward with confirmation on the 8th he won't feel whipsawed.

5  But again that's for you to confirm and make yourself

6  comfortable.

7          The worst case is that we don't have the ruling and

8  it's a condition to effectiveness.  The best case is we have

9  the ruling at the September -- on September 7th as it's been

10 suggested we may have.  We may have it on the 8th, but we may

11 have it a few days later.  The worst case is we don't get it,

12 but I think we're getting it from all indications and I think

13 we're prepared to proceed to confirmation and then go effective

14 sometime at the end of September once that decision is rendered

15 and our ducks are all in a row.

16         There will be a hearing in Canada between our hearing

17 and that going effective, and I think we're in a position to

18 move forward on September 8th, unless Your Honor has concerns

19 or wants to talk to Judge Morowitz.  But my channels say that

20 he has no concerns with us moving unilaterally forward first

21 with the understanding of where we stand.

22         The monitor supports that, which is where we spent

23 some time yesterday.  I know the committee supports it.

24 Mr. Pomerantz is on the phone.  We support it.  Our board is

25 comfortable moving forward under the conditions of that ruling,

1 and we'd like to go to confirmation as I know Your Honor would.

2        THE COURT:  All right.  Thank you, Mr. Galardi.

3        Mr. Pomerantz, do you wish to be heard on this issue?

4        MR. POMERANTZ:  Yes, Your Honor, just briefly.  I

5 agree with what Mr. Galardi has said.  I think what puts us in

6 a different position now -- and Mr. Galardi alluded to it --

7 than we have been over the last several months is that as a

8 result of truly painstaking efforts by the debtor's

9 professionals and the committee's professionals and working

10 with the CRA in Canada, we have resolved all issues that they

11 have identified in a series of conversations.

12        We presented to them a revenue ruling which we are

13 highly confident will get approved.  And if we weren't highly

14 confident that that would happen, we would not be seeking

15 authority to proceed with confirmation.  And Mr. Galardi is

16 correct that we've been given communications from the CRA that

17 we might receive the ruling as early as the 7th.  It might come

18 in a day or two after, but we are comfortable proceeding with

19 confirmation subject to the obtaining of the revenue ruling

20 being a condition of precedent to the effective date.

21        And similarly, as Mr. Galardi mentioned, we've had

22 discussions with the monitor, and based upon those discussions

23 and communications with the judge in Canada that I understand

24 occurred yesterday, we are also comfortable that proceeding in

25 this manner and not having a joint hearing is the appropriate

1  way and won't step on anyone's toes in Canada.  So we are

2  pleased to be in this position, and we look forward to a

3  confirmation hearing on the 8th.

4         THE COURT:  All right.  Very good.  Thank you, sir.

5  All right.  Mr. Galardi, that's welcome news as far as the

6  Court is concerned.  I'm glad that we're going to be proceeding

7  to confirmation.  I have no problem proceeding as you've

8  indicated.  I will reach out to Judge Morowitz just as a matter

9  of courtesy and touch base with him.  If for any reason he's

10 got a different rule or view than was suggested here today, I

11 will contact counsel immediately.

12        MR. GALARDI:  Okay.

13        THE COURT:  But I would hope to be able to do that

14 promptly, depending on his availability.

15        MR. GALARDI:  And I think that's how Judge Morowitz

16 left it with it with our counsel in Canada, so that would be

17 appreciated and he'll probably be expecting your call.  What

18 I'm going to do is tell our counsel what I said I would do

19 we've done and that you would probably be reaching out to Judge

20 Morowitz just to make sure there is no miscommunication.

21        THE COURT:  Very good.  All right.

22        MR. GALARDI:  Thank you, Your Honor.  So that does

23 now conclude the hearing.

24        THE COURT:  All right.  Thank you very much for that

25 favorable report.  Anything -- nothing else then today?

90

1        MR. GALARDI:  Nothing else today, Your Honor.

2        THE COURT:  All right.  Thank you all.

3                    * * * * *

4            **C E R T I F I C A T I O N**

5        I, ILENE M. WATSON, court approved transcriber,

6   certify that the foregoing is a correct transcript from the

7   official electronic sound recording of the proceedings in the

8   above-entitled matter, and to the best of my ability.

9

10  /s/ Ilene M. Watson            DATE:  April 12, 2010

11  ILENE M. WATSON

12  J&J COURT TRANSCRIBERS, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25