# CIRCUIT CITY STORES, INC.
## SEVERANCE PLAN

Circuit City Stores, Inc. (the "Company") hereby adopts the Circuit City Stores, Inc. Severance Plan (the "Plan") for the benefit of certain employees of the Company on the terms and conditions hereinafter stated.

The Plan, as set forth herein, is intended to help retain qualified employees, maintain a stable work environment, provide guidelines for the payment of Severance Pay (as hereinafter defined), and alleviate in part or in full any financial hardship which may be experienced by certain of those Employees of the Company in the event of a Severance (as hereinafter defined) of employment under certain enumerated circumstances. The Plan applies to covered employees whose employment is terminated on and after the Effective Date, as hereinafter defined. There is, however, no legal requirement that the Company pay any Severance Pay and the Company reserves the right not to pay Severance Pay or to pay a lesser amount of Severance Pay than is set forth in these guidelines. Rather, these guidelines confirm the Company's general philosophy of assisting its employees in difficult circumstances wherever it reasonably can.

This document serves as the Plan document for the Company and, other than the Summary Plan Description, there are no other Plan documents. This Plan supersedes any and all prior plans, policies or practices, written or oral, with respect to severance or severance pay, which may have previously applied.

The Plan, as a "severance pay arrangement" within the meaning of Section 3(2)(B)(i) of ERISA, is intended to be excepted from the definitions of "employee pension benefit plan" and "pension plan" set forth under Section 3(2) of ERISA, and is intended to meet the descriptive requirements of a plan constituting a "severance pay plan" within the meaning of regulations published by the Secretary of Labor at Title 29, Code of Federal Regulations, § 2510.3-2(b).

SECTION 1. DEFINITIONS. As hereinafter used:

1.1 "Board" means the Board of Directors of the Company.

1.2 "Company" means Circuit City Stores, Inc. and, where applicable, shall include its subsidiaries and affiliates.

1.3 "Effective Date" means October 20, 2008.

1.4 "Employee" means a person who regularly is employed by the Company, excluding (i) any person who is included in a unit of employees covered by a collective bargaining agreement unless otherwise provided pursuant to agreement between the Company and such person's collective bargaining representative, (ii) any person who enters into and is

subject to an individual employment or severance agreement with the Company, and (iii) any temporary, occasional or seasonal employee.

1.5    "ERISA" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time.

1.6    "Hourly Employee" means an Employee whose Pay is calculated based on the number of hours worked each week.

1.7    "Pay" means an amount equal to an Employee's Salary, calculated in terms of a "day rate." For Salaried Employees, a "Week of Pay" shall mean the amount of Salary such employee would be paid over the course of seven consecutive calendar days. For Hourly Employees, a "Week of Pay" shall mean the amount of Salary such employee would be paid over the course of five consecutive business days. With respect to Hourly Employees, the "day rate" shall be calculated such that (i) there are 8 hours in a day for Employees classified as full-time employees and (ii) there are 4 hours in a day for Employees classified as part-time employees.

1.8    "Plan" means the Circuit City Stores, Inc. Severance Plan as set forth herein, as may be amended from time to time.

1.9    "Plan Administrator" means the Compensation and Personnel Committee of the Board or such other person or persons appointed by the Board to administer the Plan.

1.10    "Salary" means an Employee's annual base salary or base hourly wage, as applicable, as in effect on his or her Severance Date. Salary does not include overtime, shift differential, bonus, commission or any other remuneration.

1.11    "Salaried Employee" means an "exempt" Employee.

1.12    "Service" means the Employee's most recent period of continuous employment with the Company.

1.13    "Severance" means the termination of an Employee's employment by the Company on or after the Effective Date due to (i) an elimination of a position, (ii) a closing of a division, or (iii) any other restructuring of the Company, in each case as determined by the Company in its sole discretion. An Employee will not have incurred a Severance under this Plan if his or her employment is discontinued for any other reason, including, but not limited to, termination of employment on account of (i) poor performance or a violation of Company policy, as determined by the Company in its sole discretion; (ii) voluntary retirement; (iii) death; (iv) a physical or mental condition causing the Employee's inability substantially to perform his or her duties with the Company, including, without limitation, such condition entitling him or her to benefits under any sick pay or disability income policy or program of the Company; or (v) a sale of assets, sale of stock, any licensing arrangement or any other arrangement, whereby control of the unit, subunit or division of the Company in which the Employee works, is transferred from the Company to another company, if the Employee is offered employment by

2

the acquiring company, whether or not on the same terms and conditions of employment and whether or not the Employee actually accepts such offer of employment.

1.14    "Severance Date" means the date on which an Employee incurs a Severance.

1.15    "Severance Multiplier" means the number of weeks of Pay per Year of Service (as set forth on Schedule 2.1) that a Severed Employee may be entitled to under Section 2.1.

1.16    "Severance Pay" means payments made to Employees pursuant to Sections 2.1 and 2.2 hereof.

1.17    "Severed Employee" means an Employee who has experienced a Severance.

1.18    "WARN Act" means the Worker Adjustment and Retraining Notification Act.

1.19    "Year of Service" shall mean each 365-day period of the Employee's Service, commencing on the Employee's date of hire, or the anniversary of such date of hire, as applicable.

SECTION 2. Severance Pay.

2.1    Subject to Sections 2.3, 2.4, 2.5 and 2.6 hereof (a) each Employee who incurs a Severance shall be entitled to receive Severance Pay, which shall be calculated by multiplying the applicable Severance Multiplier by each full Year of Service (which, for purposes of determining Severance Pay hereunder, shall be rounded down to the nearest whole number in the event that of a fractional Year of Service), to determine the total number of weeks of Pay that a Severed Employee is entitled to receive; (b) such amount shall be increased or decreased in accordance with the Minimum Severance Pay and Maximum Severance Pay amounts, as set forth in Schedule 2.1 below and (c) such amount shall be paid less all applicable payroll taxes and authorized withholdings.  Notwithstanding the foregoing, (i) if an Employee is rehired by the Company prior to his or her Severance Date, such Employee shall no longer be eligible to receive Severance Pay and no such payments shall be made, and (ii) if an Employee is rehired by the Company following his or her Severance Date, such Employee shall no longer be eligible to receive Severance Pay and, effective as of the Employee's date of rehire, no further payments shall be made.

3

### Schedule 2.1

| Division | Position / Level | Severance Multiplier | Minimum Severance Pay | Maximum Severance Pay |
|---|---|---|---|---|
| **Store Support Center** | Levels 9 – 13 | 2 weeks of Pay per Year of Service | 12 weeks of Pay | 24 weeks of Pay |
| | Levels 7 – 8 | 2 weeks of Pay per Year of Service | 4 weeks of Pay | 8 weeks of Pay |
| | Levels 4 – 6 | 2 weeks of Pay per Year of Service | 4 weeks of Pay | 4 weeks of Pay |
| | Levels 1 – 3 | 1 week of Pay per Year of Service | 2 weeks of Pay | 4 weeks of Pay |
| **Field Region and District** | S13 – S15 | 2 weeks of Pay per Year of Service | 12 weeks of Pay | 24 weeks of Pay |
| | S10 – S12 | 2 weeks of Pay per Year of Service | 4 weeks of Pay | 8 weeks of Pay |
| **Stores** | Store Directors | 2 weeks of Pay per Year of Service | 2 weeks of Pay | 8 weeks of Pay |
| | Department Managers and all other Exempt Employees | 2 weeks of Pay per Year of Service | 2 weeks of Pay | 4 weeks of Pay |
| | Exempt Employees with at least 10 years of Service | N/A | N/A | 12 weeks of Pay |
| | All Hourly Associates | 1 week of Pay per Year of Service | 2 weeks of Pay | 4 weeks of Pay |
| | Non-Exempt Employees with at least 10 Years of Service | N/A | N/A | 8 weeks of Pay |

2.2     A Severed Employee's Severance Pay shall be paid in the form of salary continuation payments in accordance with the Company's regular payroll cycles for the number of weeks of Pay such Severed Employee is entitled to under Section 2.1; provided, however, that if a Severed Employee is an Hourly Employee, such Hourly Employee's Severance Pay shall be paid in a lump sum.  Payment shall commence or shall be made as soon as practicable but in no

4

event later than 60 days following the Employee's Release Effective Date (as hereinafter defined).

2.3     No Employee who incurs a Severance shall be eligible to receive any payments under the Plan unless he or she first executes a Release Agreement (substantially in the form of Exhibit A to the Plan, or in such other form as is required to comply with applicable law) releasing all claims of any kind against the Company and others set forth on Exhibit A (and, among other things, confirming the Employee's obligation not to disclose any of the Company's confidential information), no later than the date specified by the Company (which shall be at least 45 days but no more than 90 days following the Employee's receipt of a copy of the Release Agreement); provided that the Employee may not sign the Release Agreement prior to the Severance Date.  If the Employee executes the Release Agreement in accordance with the requirements of this Section 2.3, and does not revoke it within seven days, the Release Agreement will become effective on the eighth day following the Employee's execution (the "Release Effective Date).  If the Employee does not execute and return such Release Agreement, or if the Employee revokes the Release Agreement within seven days following execution, such that it does not become effective within the aforesaid period, the Employee shall not be entitled to any payments under this Plan.

2.4     Where the Company provides an Employee with advance notice of a Severance, the Employee will be eligible to receive Severance Pay under the Plan only if he or she remains employed by the Company until the Employee's Severance Date as specified by the Company .  Without limiting the generality of the foregoing, if an Employee transfers to another position within the Company or terminates employment with the Company prior to his or her Severance Date on account of (i) a voluntary resignation, or (ii) poor performance or a violation of a Company policy, as determined by the Company in its sole discretion, such Employee shall not be eligible to receive Severance Pay under the Plan.

2.5     In the event of the Severed Employee's death after the Severance Date, but prior to full payment of Severance Pay, any unpaid portion of the Severance Pay will be paid to the Severed Employee's designated beneficiary (or to the Severed Employee's estate if no beneficiary is designated) as if the Severed Employee had survived under the same terms and conditions provided hereunder, except that such payment will be made in a lump sum as soon as practicable, but in no event later than 45 days after the Company receives notice of such Employee's death.

2.6     Notwithstanding anything in this Plan to the contrary, the Company expressly reserves the right not to pay Severance Pay or to pay a lesser amount of Severance Pay than is set forth in this Plan.

SECTION 3. PLAN ADMINISTRATION.

3.1     The Plan shall be interpreted, administered and operated by the Plan Administrator, which shall have complete authority in its sole discretion subject to the express provisions of the Plan, to determine who shall be eligible for Severance Pay, to interpret the Plan, to prescribe, amend and rescind such rules and regulations relating to the Plan as it shall

5

deem necessary or appropriate, and to make all other determinations necessary or advisable for the administration of the Plan.

        3.2     All questions of any character whatsoever arising in connection with the interpretation of the Plan or its administration or operation shall be submitted to and settled and determined by the Plan Administrator in accordance with the procedure for claims and appeals described in Section 6. Any such settlement and determination shall be final and conclusive, and shall bind and may be relied upon by the Company, each of the Employees and all other parties in interest.

        3.3     The Plan Administrator may delegate any of its duties hereunder to such person or persons from time to time as it may designate.

        3.4     The Plan Administrator is empowered, on behalf of the Plan, to engage accountants, legal counsel and such other personnel as it deems necessary or advisable to assist it in the performance of its duties under the Plan. The functions of any such persons engaged by the Plan Administrator shall be limited to the specified services and duties for which they are engaged, and such persons shall have no other duties, obligations or responsibilities under the Plan. Such persons shall exercise no discretionary authority or discretionary control respecting the management of the Plan. All reasonable expenses thereof shall be borne by the Company.

        3.5     In no event shall the Plan Administrator be personally liable for any action, determination or interpretation made in good faith with respect to the Plan. The Plan Administrator shall be indemnified and held harmless by the Company against any cost or expense (including counsel fees) reasonably incurred by the Plan Administrator or liability (including any sum paid in settlement of a claim with the approval of the Company) arising out of any act or omission to act in connection with this Plan, unless arising out of the Plan Administrator's own fraud or bad faith. Such indemnification shall be in addition to any rights of indemnification the Plan Administrator may have as an officer or director or otherwise under the bylaws of the Company.

SECTION 4. PLAN MODIFICATION OR TERMINATION.

        4.1     The Plan may be modified, amended or terminated by the Board at any time.

        4.2     The benefits provided for in this Plan are not vested benefits and the Plan shall not be funded. No Employee shall have any right to or interest in any assets of the Company or other rights under this Plan.

SECTION 5. GENERAL PROVISIONS.

        5.1     Nothing in the Plan shall be deemed to give any Employee the right to be retained in the employ of the Company or any subsidiary thereof, or to interfere with the right of the Company to discharge him or her at any time and for any reason, with or without notice or cause.

5.2     Except as otherwise provided herein or by law, no right or interest of any Employee under the Plan shall be assignable or transferable, in whole or in part, either directly or by operation of law or otherwise, including without limitation by execution, levy, garnishment, attachment, pledge or in any manner; no attempted assignment or transfer thereof shall be effective; and no right or interest of any Employee under the Plan shall be liable for, or subject to, any obligation or liability of such Employee.  When a payment is due under this Plan to an Employee who is unable to care for his or her affairs, payment may be made directly to his or her legal guardian or personal representative.

5.3     If the Company is obligated by law (including the WARN Act or any similar state or foreign law) or by contract to pay severance pay, a termination indemnity, notice pay, or the like, or if the Company is obligated by law or by contract to provide advance notice of separation, then the Company may elect to reduce any Severance Pay hereunder by the amount of any such severance pay, termination indemnity, notice pay or the like, as applicable.

5.4     If any provision of the Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and the Plan shall be construed and enforced as if such provisions had not been included.

5.5     The Company intends that this Plan constitute a "welfare plan" as such term is defined under ERISA. The Plan shall be governed by and construed in accordance with ERISA and all applicable rules and regulations thereunder and to the extent not pre-empted by ERISA, the laws of the Commonwealth of Virginia.

5.6     The Plan shall be effective as of the Effective Date and shall remain in effect unless and until terminated by the Board pursuant to Section 4.1 hereof.

5.7     Section 409A.  It is intended that the Plan constitute a "separation pay plan," as defined in Section 409A of the Internal Revenue Code ("Section 409A"), and that each of the Severance payments constitute separate payments for purposes of Section 409A. Accordingly, to the maximum extent permitted, the payments under this Plan shall be interpreted and administered in a manner such that they do not constitute deferred compensation within the meaning of Section 409A.  No Severance Pay shall be paid later than the last day of the second taxable year of the Employee following the taxable year of the Employee in which the Employee's Severance occurs.

SECTION 6.  CLAIMS, INQUIRIES, APPEALS.

6.1     Applications for Benefits and Inquiries. Any application for benefits, inquiries about the Plan or inquiries about present or future rights under the Plan must be submitted to the Plan Administrator in writing, as follows:

7

Plan Administrator
Circuit City Stores, Inc.
9950 Maryland Drive
Richmond, Virginia 23233
Attention:  Vice President, Human Resources

6.2     Denial of Claims.  In the event that any application for benefits is denied in whole or in part, the Plan Administrator must notify the applicant, in writing, of the denial of the application, and of the applicant's right to review the denial.  The written notice of denial will be set forth in a manner designed to be understood by the employee, and will include specific reasons for the denial, specific references to the Plan provision upon which the denial is based, a description of any information or material that the Plan Administrator needs to complete the review and an explanation of the Plan's review procedure.

This written notice will be given to the employee within 90 days after the Plan Administrator receives the application, unless special circumstances require an extension of time, in which case, the Plan Administrator has up to an additional 90 days for processing the application.  If an extension of time for processing is required, written notice of the extension will be furnished to the applicant before the end of the initial 90-day period.

This notice of extension will describe the special circumstances necessitating the additional time and the date by which the Plan Administrator is to render his or her decision on the application.  If written notice of denial of the application for benefits is not furnished within the specified time, the application shall be deemed to be denied.  The applicant will then be permitted to appeal the denial in accordance with the Review Procedure described below.

Request for a Review.  Any person (or that person's authorized representative) for whom an application for benefits is denied (or deemed denied), in whole or in part, may appeal the denial by submitting a request for a review to the Plan Administrator within 60 days after the application is denied (or deemed denied).  The Plan Administrator will give the applicant (or his or her representative) an opportunity to review pertinent documents in preparing a request for a review and submit written comments, documents, records and other information relating to the claim.  A request for a review shall be in writing and shall be addressed to:

Plan Administrator
Circuit City Stores, Inc.
9950 Maryland Drive
Richmond, Virginia 23233
Attention:  Vice President, Human Resources

A request for review must set forth all of the grounds on which it is based, all facts in support of the request and any other matters that the applicant feels are pertinent.  The Plan Administrator may require the applicant to submit additional facts, documents or other material as he or she may find necessary or appropriate in making his or her review.

6.3     Decision on Review.  The Plan Administrator will act on each request for review within 60 days after receipt of the request, unless special circumstances require an

extension of time (not to exceed an additional 60 days), for processing the request for a review. If an extension for review is required, written notice of the extension will be furnished to the applicant within the initial 60-day period.  The Plan Administrator will give prompt, written notice of his or her decision to the applicant.  In the event that the Plan Administrator confirms the denial of the application for benefits in whole or in part, the notice will outline, in a manner calculated to be understood by the applicant, the specific Plan provisions upon which the decision is based.  If written notice of the Plan Administrator's decision is not given to the applicant within the time prescribed in this Section 6.4 the application will be deemed denied on review.

   6.4 <u>Rules and Procedures</u>.  The Plan Administrator may establish rules and procedures, consistent with the Plan and with ERISA, as necessary and appropriate in carrying out his or her responsibilities in reviewing benefit claims.  The Plan Administrator may require an applicant who wishes to submit additional information in connection with an appeal from the denial (or deemed denial) of benefits to do so at the applicant's own expense.

   6.5 <u>Exhaustion of Remedies</u>.  No legal action for benefits under the Plan may be brought until the claimant (a) has submitted a written application for benefits in accordance with the procedures described by Section 6.1 above, (b) has been notified by the Plan Administrator that the application is denied (or the application is deemed denied due to the Plan Administrator's failure to act on it within the established time period), (c) has filed a written request for a review of the application in accordance with the appeal procedure described in Section 6.3 above and (d) has been notified in writing that the Plan Administrator has denied the appeal (or the appeal is deemed to be denied due to the Plan Administrator's failure to take any action on the claim within the time prescribed by Section 6.4 above).

**EXHIBIT A**

**[DATE]**

**[EMPLOYEE NAME]**
**[ADDRESS]**
**[ADDRESS]**

        Re:    **Release Agreement**

       This letter confirms that your employment with Circuit City Stores, Inc. (the "Company") will terminate on **[DATE]** (your termination date).  This Release Agreement below is being provided for your review and consideration.  Do not sign this Release Agreement before your termination date.

       1.    Subject to your execution and continued compliance with the terms and conditions of this Release Agreement, the Company has agreed to provide you with severance in an amount equal to _____ weeks of your base pay, totaling $_____ (gross), less all applicable payroll taxes and withholdings, pursuant to the Circuit City Stores, Inc. Severance Plan of October 2008 (the "Plan")[1].

       2.    Hourly associates will be paid their severance in a lump sum.  Salaried associates will be paid their severance in the form of salary continuation payments, on a bi-weekly basis, consistent with the Company's regular payroll practices.  Such payments shall commence or be paid as soon as practicable but no later than 60 days following the Release Effective Date (as defined in Paragraph 10 below).  If you are offered and accept another employment opportunity with the Company before severance payments have been made or commenced, you will no longer be eligible for severance pay under the Plan, and this Release Agreement will be null and void.  Further, if severance payments have been made or commenced pursuant to the Plan, and you are then offered re-employment with the Company, the Company will have the right to require you to return the severance you received as a condition of re-employment and not provide you with any additional severance, in which case this Release Agreement will be null and void.  In order to be eligible for severance you must remain employed by the Company through your termination date.  If you transfer to another position within the Company prior to your termination date, or your employment is terminated prior to your termination date on account of your voluntary resignation or your poor performance or a violation of a Company policy, as determined by the Company in its sole discretion, you will not be eligible to receive severance.  You understand and agree that the Plan and the payments provided thereunder shall in no way be deemed to constitute or give rise to a continuing employment relationship between you and the Company after your termination date or entitle you to any other benefits to which employees of the Company may be entitled after your termination date.  Severance payments under the Plan are in addition to all wages and unused paid time off accrued through the date of termination.

---

[1]     A Summary Plan Description describing the Plan will be made available to you.

A-1

3.    You acknowledge and agree that you are not otherwise entitled to receive the payments under the Plan unless you agree to the terms of this Release Agreement.  In exchange for the payments under the Plan, you, on behalf of yourself and your heirs, executors, administrators, successors and assigns, hereby knowingly and voluntarily release the Company and all of its affiliated or related companies, together with each of their officers, stockholders, directors, employees, agents, insurers and reinsurers, attorneys and representatives, and all of their, predecessors, successors, heirs, and assigns (collectively, the "Releasees"), from all claims, demands, causes of action, obligations, damages and liabilities of every kind or character whatsoever, whether presently known or unknown, suspected or unsuspected, both in law and equity ("Claims"),which you ever had, now have or may hereafter claim to have against any of the Releasees by reason of any matter, cause or thing whatsoever arising from the beginning of time until the date you sign this Release Agreement (the "Release").  This Release includes, without limitation, any Claims in connection with your employment and/or the termination of your employment; Claims of libel, slander, wrongful discharge, intentional infliction of emotional harm, fraud or any other state or federal tort; Claims under any statute or regulation, including but not limited to, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Americans with Disabilities Act of 1990, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, Sections 1981 through 1988 of Title 42 of the United States Code, the Employee Retirement Income Security Act of 1974, the Worker Adjustment and Retraining Notification Act of 1988, the Sarbanes Oxley Act of 2002, each as amended, or under any other federal, state or local law, regulation, ordinance or common law; and all Claims under any policy, agreement, understanding or promise, written or oral, formal or informal, between you and the Company or any of the other Releasees.  The parties recognize, however, that nothing contained in this Release shall (i) release any claim that cannot be waived under applicable law, including but not limited to, any rights to indemnification under applicable state law, (ii) affect any vested employee benefits or pension payments to which you may be entitled under any existing employee benefit plans of the Company, or (iii) be construed to prohibit you from instituting legal action to enforce any of the provisions of the Plan or this Release Agreement.  By signing this Release Agreement, you represent that neither you nor your heirs, executors, administrators, successors or assigns shall be entitled to any personal recovery in any action or proceeding that may be commenced on your behalf arising out of the matters released above.

4.    You acknowledge and agree that except as specified in Paragraph 1 above, all compensation, benefits, and other obligations due you by the Company, whether by contract or law, have been paid or otherwise satisfied in full.

5.    You expressly acknowledge that the Release set forth in Paragraph 2 above is intended to include in its effect, without limitation, all claims which you do not know or suspect to exist in your favor at the time of execution hereof, and that the Release contemplates the extinguishment of any such claim or claims.

For California Associates, it is further understood and agreed that all rights under Section 1542 of the California Civil Code, or any statutory or common law principle of similar effect, are hereby expressly waived by you.  Said Section 1542 reads as follows:

A-2

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."**

6.      You represent that you have returned to the Company all of its property that you received in connection with your employment with the Company.

7.      You agree to keep confidential and not disclose any of the terms or provisions of this Release Agreement to anyone other than your immediate family or as may be required for obtaining legal or tax advice, unless such disclosure is required by law or consented to in writing by the Company.

8.      You are also reminded that you are still bound under the Circuit City Code of Business Conduct and you agree that at all times in the future you will not use or disclose to any person or entity Circuit City's confidential information learned during the course of your employment.

9.      If any clause or provision of this Release Agreement is illegal, invalid or unenforceable under present or future laws, then the remainder of this Release Agreement shall not be affected thereby, and in lieu of each clause or provision of this Release Agreement which is illegal, invalid or unenforceable, there shall be added, as part of this Release Agreement, a clause or provision as similar in terms to such illegal, invalid, or unenforceable clause or provision as may be possible and as may be legal, valid and enforceable.

10.      A waiver by any party of a breach of any of the provisions of this Release Agreement shall not operate or be construed as a waiver of any other provision of this Release Agreement or of any subsequent breach of the same or any other provision of this Release Agreement. The understandings and representations of the parties set forth in this Release Agreement shall survive any breach of this Release Agreement and be enforceable by any non-breaching party.

11.      You understand that you have at least forty-five (45) days following your receipt of this Release Agreement to review this Release Agreement and its terms and to reflect upon them and consider whether you want to sign it, although you may sign it sooner; provided, however, that you may not sign this Release Agreement prior to your termination date. If you sign this Release Agreement, you will have seven (7) days from the date of execution to revoke your acceptance of its terms. If no such revocation occurs, this Release Agreement will become effective on the eighth (8th) day following your execution of this Release Agreement (the "Release Effective Date").

12.      This Release Agreement does not waive any rights or claims that may arise after the date you sign this Release Agreement.

A-3

13.    The Company advises you to consult with an attorney of your choosing prior to signing this Release Agreement. By signing this Release Agreement, you are confirming that you entered into this Release Agreement and specifically, the Release in Paragraph 2, knowingly and voluntarily, in exchange for valuable consideration, after having had adequate time to consider it and have been given the opportunity to discuss it with an attorney of your choice. You acknowledge and agree that the payments provided under the Plan are sufficient consideration to require you to abide with your obligations under this Release Agreement, including but not limited to the Release set forth in Paragraph 2.

14.    The Plan and this Release Agreement are being offered to you in connection with a group termination. In accordance with 29 C.F.R. § 1625.22, attached hereto as Attachment 1 is a listing of the ages and job titles of persons who were selected for this severance program and persons in the same decisional unit who were not selected for this severance program. You represent that you have read and fully understand the information provided on Attachment A and have been given the opportunity to discuss it with an attorney of your choice.

15.    To revoke your acceptance of this Release Agreement you must deliver your revocation in writing to Circuit City Stores, Inc., c/o Manager, HR Administration, 9954 Mayland Drive, Deep Run III, 2nd Floor, Richmond, Virginia 23233, within seven (7) days from the date of your signature. In the event that you properly revoke this Release Agreement, it shall become null and void and shall not become effective and you will not be entitled to the severance payments described in the Plan.

16.    The Plan and this Release Agreement set forth the entire agreement between you and the Company relating to your employment and termination and supersedes any other prior agreements or understandings between you and the Company.

17.    This Release Agreement shall be construed, interpreted, and enforced according to Virginia law, without regard to the choice of law provisions thereof.

18.    This Release Agreement expires ninety (90) days from the date of this Release Agreement. If it is not signed and returned within this time period, you will no longer be eligible for severance pay and this Release Agreement will be null and void.

Very truly yours,

[                    ]

A-4

I will not sign this Release Agreement before the last day of my employment with Circuit City.
By signing below, I agree to the above terms.


_____
Print Name


_____
Signature

Date:_____

**\*\*Return this signed agreement in the enclosed self-addressed stamped envelope to Circuit City Stores, Inc., HR Administration, 9954 Mayland Drive, Deep Run III, Second Floor, Richmond, VA 23233.**

A-5

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

*Counsel for the Circuit City Stores, Inc.*
*Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | **:** | Chapter 11 |
| | **:** | |
| CIRCUIT CITY STORES, INC., et al., | **:** | Case No. 08-35653-KRH |
| | **:** | |
| Debtors. | **:** | (Jointly Administered) |
| | **:** | |
| | **:** | |

## NOTICE OF LIQUIDATING TRUST'S SIXTEENTH OMNIBUS OBJECTION TO
## CERTAIN HR CLAIMS: RECLASSIFY; REDUCE
## (PHANTOM STOCK PROGRAM)

**PLEASE TAKE NOTICE** that the Circuit City Stores, Inc. Liquidating Trust (the "Liquidating Trust" and/or "Trust"), through Alfred H. Siegel, the duly appointed trustee of the Trust (the "Trustee"), pursuant to the Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims in the above-captioned cases of the above referenced estates of Circuit City Stores, Inc. et al. (collectively, the "Debtors") filed the *Liquidating Trust's Sixteenth Omnibus Objection to Certain HR Claims: Reclassify; Reduce (Phantom Stock Program)* (the "Objection") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").  A copy of the Objection is attached to this notice (this "Notice") as Exhibit 1.  By the Objection, the Liquidating Trust is seeking to reclassify certain claims and reduce certain claims.

**PLEASE TAKE FURTHER NOTICE THAT** on April 1, 2009, the Bankruptcy Court entered the Order Establishing Omnibus Objection Procedures and Approving the Form and Manner of the Notice of Omnibus Objections (Docket No. 2881) (the "Order"), by which the Bankruptcy Court approved procedures for filing omnibus objections to proofs of claim and requests for allowance and payment of administrative expenses and/or cure claims (collectively, the "Claims") in connection with the above-captioned chapter 11 cases (the "Omnibus Objection Procedures").



0835653110228000000000007

Specifically, the Objection seeks to reduce, disallow, or reclassify certain claims, including your claim(s), listed below, all as set forth in the Objection.

| TO: | Claim Number | Claim Amount | Reference Objection |
|---|---|---|---|

SPECIFIC INFORMATION PROVIDED ON INDIVIDUALIZED NOTICE

**YOU ARE RECEIVING THIS NOTICE BECAUSE THE PROOF(S) OF CLAIM LISTED HEREIN THAT YOU FILED AGAINST ONE OR MORE OF THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES ARE SUBJECT TO THE OBJECTION.  YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION. THEREFORE, YOU SHOULD READ THIS NOTICE (INCLUDING THE OBJECTION AND OTHER ATTACHMENTS) CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

**MOREOVER, PURSUANT TO RULE 3007-1 OF THE LOCAL RULES OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA AND THE OMNIBUS OBJECTION PROCEDURES, UNLESS A WRITTEN RESPONSE AND A REQUEST FOR A HEARING ARE FILED WITH THE CLERK OF THE COURT AND SERVED ON THE OBJECTING PARTY BY 4:00 P.M. (EASTERN TIME) ON APRIL 7, 2011, THE COURT MAY DEEM ANY OPPOSITION WAIVED, TREAT THE OBJECTION AS CONCEDED AND ENTER AN ORDER GRANTING THE RELIEF REQUESTED WITHOUT A HEARING.**

<u>**Critical Information for Claimants Choosing to File a Response to the Objection**</u>

<u>Who Needs to File a Response</u>:  If you oppose the relief requested in the Objection and if you are unable to resolve the Objection with the Liquidating Trust before the deadline to respond, then you must file and serve a written response (the "Response") to the Objection in accordance with this Notice.

If you do not oppose the relief requested in the Objection, then you do not need to file a written Response to the Objection and you do not need to appear at the hearing.

<u>Response Deadline</u>:  The Response Deadline is **4:00 p.m. (Eastern Time) on April 7, 2011 (the "Response Deadline")**.

**THE BANKRUPTCY COURT WILL ONLY CONSIDER YOUR RESPONSE IF YOUR RESPONSE IS FILED, SERVED <u>AND</u> RECEIVED BY THE RESPONSE DEADLINE.**

Your Response will be deemed timely filed only if the Response is **actually received** on or before the Response Deadline by the Bankruptcy Court at the following address:

Clerk of the Bankruptcy Court
United States Bankruptcy Court
701 East Broad Street – Room 4000
Richmond, Virginia 23219

Your Response will be deemed timely served only if a copy of the Response is actually received on or before the Response Deadline by the Liquidating Trust's attorneys:

| | |
|---|---|
| Jeffrey N. Pomerantz, Esq. | Lynn L. Tavenner, Esq. (VA Bar No. 30083 |
| Andrew W. Caine, Esq. | Paula S. Beran, Esq. (VA Bar No. 34679) |
| (admitted *pro hac vice*) | TAVENNER & BERAN, PLC |
| PACHULSKI STANG ZIEHL & JONES LLP | 20 North Eighth Street, 2nd Floor |
| 10100 Santa Monica Boulevard | Richmond, Virginia 23219 |
| Los Angeles, California 90067-4100 | Telephone: (804) 783-8300 |
| Telephone: (310) 277-6910 | Telecopy:  (804) 783-0178 |
| Telecopy:  (310) 201-0760 | |

The status hearing on the Objection will be held at **2:00 p.m. (Eastern Time) on April 14, 2011 at:**

United States Bankruptcy Court
701 East Broad Street – Courtroom 5000
Richmond, Virginia 23219

If you file a timely Response, in accordance with the Objection Procedures, you do <u>not</u> need to appear at the status hearing on the Objection.

<u>**Procedures for Filing a Timely Response and
Information Regarding the Hearing on the Objection**</u>

**Contents**.  To facilitate a speedy and non-judicial resolution of a Claim subject to the Objection, any claimant filing a Response shall use its best efforts to include the following (at a minimum) in its filed Response, to the extent such materials are not attached to its proof of claim:

a. a caption setting forth the name of the Bankruptcy Court, the name of the Debtors, the case number and the title of the Objection to which the Response is directed;

b. the claimant's name and an explanation for the amount of the Claim;

c. a concise statement, executed by (or identifying by name, address and telephone number) a person with personal knowledge of the relevant facts that support the Response, setting forth the reasons why the Bankruptcy Court should overrule the Objection as to the claimant's claim, including, without limitation (to the extent not set forth in its proof of claim), the

specific factual and legal bases upon which the claimant intends to rely in support of its Response and its underlying Claim;

d.       a copy of or identification of any other documentation or other evidence of the Claim, to the extent not already included with the Claim that the claimant presently intends to introduce into evidence in support of its Claim at the hearing; provided, however, that for a Response filed in support of a Claim arising out of a lease of real property, the Response need not attach such lease if the claimant indicates its willingness to provide such documentation upon request;

e.       a declaration of a person with personal knowledge of the relevant facts that support the Response;

f.       the claimant's address, telephone number and facsimile number and/or the name, address, telephone number and facsimile number of the claimant's attorney and/or designated representative to whom the attorneys for the Debtors should serve a reply to the Response, if any (collectively, the "Notice Address"). If a Response contains Notice Address that is different from the name and/or address listed on the Claim, the Notice Address will control and will become the service address for future service of papers with respect to all of the claimant's Claims listed in the Objection (including all Claims to be reduced or disallowed) and only for those Claims in the Objection; and

g.       to the extent such person differs from the person identified pursuant to subjection e, above, the name, address, telephone number, facsimile number, and electronic mail address of the representative of the claimant (which representative may be the claimant's counsel) party with authority to reconcile, settle or otherwise resolve the Objection on the claimant's behalf (collectively, the "Additional Addresses"). Unless the Additional Addresses are the same as the Notice Addresses, the Additional Address will not become the service address for future service of papers.

**Additional Information**.  To facilitate a resolution of the Objection, your Response should also include the name, address, telephone number and facsimile number of the party with authority to reconcile, settle or otherwise resolve the Objection on the claimant's behalf.  Unless the Additional Addresses are the same as the Notice Addresses, the Additional Addresses will not become the service address for future service of papers.

**Failure to File Your Timely Response**.  If you fail to file and serve your Response on or before the Response Deadline in compliance with the procedures set forth in this Notice, the Liquidating Trust will present to the Bankruptcy Court an appropriate order granting the relief requested in the Objection without further notice to you.

**Each Objection Is a Contested Matter**. Each Claim subject to the Objection and the Response thereto shall constitute a separate contested matter as contemplated by Bankruptcy

Rule 9014, and any order entered by the Bankruptcy Court will be deemed a separate order with respect to such claim.

**Additional Information**

**Requests for Information**.  You may also obtain a copy of the Objection or related documents on the internet, by accessing the website of www.kccllc.net/circuitcity.

**Reservation of Rights**.  Nothing in this Notice or the Objection constitutes a waiver of the Debtors' and/or the Trust's right to assert any claims, counterclaims, rights of offset or recoupment, preference actions, fraudulent-transfer actions or any other claims against you by the Liquidating Trust.  Unless the Bankruptcy Court allows your Claims or specifically orders otherwise, the Liquidating Trust has the right to object on any grounds to the Claims (or to any other Claims or causes of action you may have filed or that have been scheduled by the Debtors) at a later date on any grounds or bases.  In such event, you will receive a separate notice of any such objections.


Dated:    February 27, 2011

*/s/ Paula S. Beran*
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
TAVENNER & BERAN, P.L.C.
20 North Eighth Street, 2nd Floor
Richmond, Virginia  23219
Telephone:  804-783-8300
Facsimile:  804-783-0178
Email:  ltavenner@tb-lawfirm.com
            pberan@tb-lawfirm.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Andrew W. Caine (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd.
11th Floor
Los Angeles, California  90067-4100
Telephone: 805-123-4567
Facsimile:  310/201-0760
E-mail: jpomerantz@pszjlaw.com
            acaine@pszjlaw.com

*Counsel for the Circuit City Stores, Inc.
Liquidating Trust*

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | ) Case No. 08-35653-KRH |
| | ) |
| | ) Chapter 11 |
| CIRCUIT CITY STORES, INC.[1], et al., | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

## LIQUIDATING TRUST'S SIXTEENTH OMNIBUS OBJECTION TO
## CERTAIN HR CLAIMS: RECLASSIFY; REDUCE
## (PHANTOM STOCK PROGRAM)

## CLAIMANTS RECEIVING THIS OBJECTION SHOULD LOCATE THEIR NAMES

## AND CLAIMS IN THE EXHIBITS ATTACHED HERETO.

The Circuit City Stores, Inc. Liquidating Trust (the "Liquidating Trust"), through

Alfred H. Siegel, the duly appointed trustee of the Liquidating Trust, pursuant to the *Second*

*Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and*

*Debtors in Possession and its Official Committee of Creditors Holding General Unsecured*

*Claims* (the "Plan") in the above-captioned cases, hereby files this *Liquidating Trust's Sixteenth*

---

[1] The Debtors in these cases include: Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., InterTAN, Inc., Ventoux International, Inc., Circuit City Purchasing Company, LLC, CC Aviation, LLC, CC Distribution Company of Virginia, Inc., Circuit City Properties, LLC, Kinzer Technology, LLC, Abbott Advertising Agency, Inc., Patapsco Designs, Inc., Sky Venture Corp, Prahs, Inc., XSStuff, LLC, Mayland MN, LLC, Courchevel, LLC, Orbyx Electronics, LLC, and Circuit City Stores PR, LLC.

*Omnibus Objection to Certain HR Claims: Reclassify; Reduce (Phantom Stock Program)* (the

"Objection"), and hereby moves this court (the "Court"), pursuant to sections 105 and 502 of

title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy

Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Local Bankruptcy Rule 3007-1, for entry of an order in the form attached hereto as **Exhibit A**,

granting the relief sought by this Objection, and in support thereof states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Objection under 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and

this Objection in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and

legal predicates for the relief requested herein are Bankruptcy Code sections 105 and 502,

Bankruptcy Rule 3007 and Local Bankruptcy Rule 3007-1.

## SUMMARY OF RELIEF REQUESTED

2.      Each of the claims (the "Phantom Stock Claims") listed on **Exhibit B,**

attached hereto, asserts the right to payment under the Phantom Stock Program (defined below)

on a priority basis pursuant to section 507(a) of the Bankruptcy Code.  This Objection is based

on a review of the Phantom Stock Claims and of the Debtors' books and records.

3.      The Liquidating Trustee has categorized the Phantom Stock Claims into

two categories: (1) the Phantom Stock Claims listed on **Exhibit C**, attached hereto (the "Pre-

Priority Period Phantom Stock Claims") and (2) the Phantom Stock Claims listed on **Exhibit D**,

attached hereto (the "Reduced Phantom Stock Claims").

4.      The Pre-Priority Period Phantom Stock Claims are not entitled to payment

on a priority basis under section 507(a) of the Bankruptcy Code and each Pre-Priority Period

Phantom Stock Claim should be reclassified as a general unsecured claim.  Each Pre-Priority

Period Phantom Stock Claim is based on a right to payment that was "earned," within the

meaning of section 507(a), more than 180 days before the Petition Date (the "<u>Priority Period</u>"),

which is May 13, 2008 to November 10, 2008.  Accordingly, the Liquidating Trustee requests

that each Pre-Priority Period Phantom Stock Claim be reclassified as a general unsecured claim.

5.       The Reduced Phantom Stock Claims are not entitled to priority payment in

the full amount asserted in the Reduced Phantom Stock Claims.  As set forth more fully below,

Circuit City Stores, Inc. ("Circuit City") was obligated to make a payment based on the closing

share price of Circuit City's stock.  In the case of the Reduced Phantom Stock Claims, the

operative date for the share price was March 8, 2009.  Based on Circuit City's share price on that

date, the amount owing to the holders of the Reduced Phantom Stock Claims is lower than the

amount set forth in the Reduced Phantom Stock Claims.  Accordingly, the Liquidating Trustee

requests that each Reduced Phantom Stock Claim be allowed on a priority basis in the reduced

amount set forth in **Exhibit D,** attached hereto.  The balance of the Reduced Phantom Stock

Claims should be denied.

6.       The Liquidating Trust is continuing its review of claims and of the

Debtors' books and records and reserves the right to further object to the Phantom Stock Claims

after they are reclassified as general unsecured claims.

## **<u>BACKGROUND</u>**

7.       On November 10, 2008 (the "<u>Petition Date</u>"), the debtors in the above-

captioned cases (the "<u>Debtors</u>") filed voluntary petitions in this Court for relief under chapter 11

of the Bankruptcy Code.

8.      On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").

9.      On November 12, 2008, the Court appointed Kurtzman Carson Consultants LLC ("KCC") as claims, noticing, and balloting agent for the Debtors in these chapter 11 cases pursuant to 28 U.S.C. § 156(c).

10.     On December 10, 2008, the Court entered that certain *Order Pursuant to Bankruptcy Code Sections 105 and 502 and Bankruptcy Rules 2002, 3003(c)(3), and 9007 (I) Setting General Bar Date and Procedures for Filing Proofs of Claim; and (II) Approving Form and Manner of Notice Thereof* (Docket No. 890) (the "Claims Bar Date Order").

11.     Pursuant to the Claims Bar Date Order, the deadline for filing all "claims" (as defined in 11 U.S.C. § 105(5)) arising before November 10, 2008 against the Debtors by any non-governmental entity was 5:00 p.m. (Pacific) on January 30, 2009.  The deadline for governmental units to file claims that arose before November 10, 2008 was 5:00 p.m. (Pacific) on May 11, 2009.  Pursuant to the Claims Bar Date Order, this Court approved the form and manner of the claims bar date notice, which was attached as Exhibit A to the Claims Bar Date Order (the "Claims Bar Date Notice").

12.     On December 17 and 19, 2008, KCC served a copy of the Claims Bar Date Notice on all parties who filed notices of appearance pursuant to Bankruptcy Rule 2002, all of the Debtors' scheduled creditors in these cases, the Debtors' equity holders, and certain other parties (Docket No. 1314).  In addition, the Debtors published the Claims Bar Date Notice in The Wall Street Journal (Docket No. 1395) and The Richmond Times-Dispatch (Docket No. 1394).

13.     On January 16, 2009, the Court authorized the Debtors, among other things, to conduct going out of business sales at the Debtors' remaining 567 stores pursuant to an agency agreement (the "<u>Agency Agreement</u>") between the Debtors and a joint venture, as agent (the "<u>Agent</u>").  On January 17, 2009, the Agent commenced going out of business sales pursuant to the Agency Agreement at the Debtors remaining stores.  As of March 8, 2009, the going out of business sales at the Debtors' remaining stores had been completed.

14.     On April 1, 2009, this Court entered an *Order Establishing Omnibus Objection Procedures and Approving the Form and Manner of Notice of Omnibus Objections* (Docket No. 2881) (the "<u>Omnibus Objection Procedures Order</u>").

15.     On August 9, 2010, the Debtors and the Creditors' Committee filed the Plan, which provides for the liquidation of the Debtors' assets and distribution of the proceeds thereof under chapter 11 of the Bankruptcy Code.

16.     On September 10, 2010, the United States Bankruptcy Court, Eastern District of Virginia, signed an Order confirming the Plan.

17.     The Plan became effective on November 1, 2010 (the "<u>Effective Date</u>"), and pursuant to the Plan and Liquidating Trust Agreement approved therewith, the Liquidating Trust assumed the right and responsibility to liquidate the Debtors' remaining assets and distribute the proceeds to creditors, including objections to claims.  Under the Plan, objections to priority claims must be filed within 120 days of the Effective Date.

A.      **The Phantom Award Plan**

18.     More than 180 days prior to the Petition Date, the Debtors implemented a phantom stock award program (the "<u>Phantom Stock Program</u>") pursuant to which certain employees (the "<u>Phantom Stock Program Participants</u>") were eligible to earn incentive awards

staggered over the following three years, beginning in 2009, in the form of "phantom stock

units" (the "Phantom Stock Awards").  A sample letter setting forth the terms of the Phantom

Stock Program is attached hereto as **Exhibit E**.

19.    To become a Phantom Stock Program Participant, the holders of the Pre-

Priority Period Phantom Stock Claims were required to sign and return the letter setting out the

terms of the Phantom Stock Program by February 1, 2008, which is before the Priority Period.

Each signed letter constituted a separate agreement between the Phantom Stock Program

Participant and the Debtors (each a "Phantom Stock Program Agreement").  *See* Phantom Stock

Program Sample Letter at 2, **Exh. E**.  The Liquidating Trustee has determined that the holders of

the Pre-Priority Phantom Stock Claims signed the Phantom Stock Program Agreement before the

Priority Period.

20.    Pursuant to the Phantom Stock Program, each phantom stock unit awarded

to a Phantom Stock Program Participant had a value that was equal to one share of Circuit City

common stock.  The share price of Circuit City common stock would be determined on certain

dates (the "Stock Price Dates").  A percentage of the value of those units would be payable on

each vesting date (the "Vesting Dates").  *See* Phantom Stock Program Sample Letter, **Exh. E**.

21.    To illustrate, the Phantom Stock Program Participant shown in the

Phantom Stock Program Sample Letter had been awarded 9,625 phantom stock units.  Each unit

represented one share of Circuit City common stock.  On the first vesting date, June 1, 2009, the

Phantom Stock Program Participant was entitled to payment of 33.3% of the value of the

phantom stock units awarded.  The value of the phantom stock units was measured by the

closing share price of Circuit City on May 31, 2009.  Thus, on June 1, 2009, the Phantom Stock

Program Participant was entitled to receive 33.3% of the share price of Circuit City on May 31, 2009 multiplied by 9,625.

22.    The Phantom Stock Program Agreement required that the Phantom Stock Program Participant remain employed by Circuit City through the Vesting Dates, in order to be entitled to payment on the Vesting Dates.  *See* Phantom Stock Program Sample Letter, **Exh. E**, ¶ p.1.  However, if a "change in control" occurred, then the amounts provided in the Phantom Stock Program Agreement would become fully payable and the Phantom Stock Program Participant would not have to wait for the Vesting Dates to be paid.  The Phantom Stock Program Agreement stated:

> If you remain continuously employed in a full-time active position
> with [Circuit City] through and including the date a "Change of
> Control" of [Circuit City] occurs, then any portion of your award
> that has not yet vested will vest as of such Change of Control date.

Phantom Stock Program Agreement, **Exh. E**, p. 2.

23.    A "Change of Control" included the sale of all or substantially all of Circuit City's assets.  *See* Phantom Stock Program Sample Letter, **Exh. E**, p. 2.  Circuit City had completed its going out of business sales and closed its remaining stores by March 8, 2009.

24.    The Liquidating Trustee has determined that each holder of a Reduced Phantom Stock Claim was employed by Circuit City through March 8, 2009.

25.    The Liquidating Trustee has ascertained the share price of Circuit City on March 6, 2009[2] and has determined that the amount owing on the Reduced Phantom Stock Claims is less than the amount set forth in such Claims.  The share price of the Circuit City stock on March 6, 2009 is shown on **Exhibit F**, attached hereto.  The amounts that the Liquidating

---

[2] March 8, 2009 was a Sunday.  Therefore, the Liquidating Trustee referred to the Circuit City share price on March 6, 2009.

Trustee has calculated as owing to the holders of the Reduced Phantom Stock Claims is set forth

in **Exhibit C**.

## **OBJECTION**

A.      **The Pre-Priority Period Phantom Stock Claims Are Not Allowable as Priority Expense Claims Because They Arose Prior to the 180-Day Priority Period.**

26.      Section 507(a)(4) which accords priority status to "wages, salaries, or

commissions . . . *earned*" within 180 days before the filing date.  (Emphasis added.)  *See In re*

*Cardinal Indus. Inc*., 160 B.R. 83 (Bankr. S.D. Ohio 1993) (for purposes of priority under

section 507(a), a bonus is "earned" when the right to the bonus is established, even though the

bonus is not payable until a later date).  *See also* 4 COLLIER ON BANKRUPTCY ¶507.06[5] (Alan

N. Resnick & Henry J. Sommer eds., 16th ed.) ("The general rule is that wages, salaries and

commissions are earned when the employee obtains a right to payment under the employment

contract rather than at the time that payment is to be made.").  As Collier further states with

respect to whether a bonus is "earned" within the 180 days prior to a petition date as required by

section 507(a)(4) of the Bankruptcy Code, "If a bonus is awarded in December, but not payable

until the following March, the bonus was earned in December."  4 COLLIER ON BANKRUPTCY at

¶ 507.06[5].

27.      In the case of the Pre-Priority Phantom Stock Claims, the Phantom Stock

Awards were awarded and the Phantom Stock Agreements were signed before the Priority

Period.  Therefore, the Phantom Stock Awards were earned, within the meaning of section

507(a)(4), before the Priority Period and are not entitled to priority.

28.      Cases construing when a claim arises bolster the point that the Pre-Priority

Phantom Stock Claims arose before the Priority Period and are not entitled to priority payment.

The definition of "claim" in section 101(5) of the Bankruptcy Code includes "a right to

payment" that is "contingent."  11 U.S.C. § 101(5)(A).  *See Grady v. A.H. Robins Co.*, 839 F.2d

198, 202 (4th Cir. 1988), *cert. dismissed sub nom.  Joynes v. A.H. Robins Co.*, 487 US 1260

(1988) (defining "contingent" as "conditioned upon the occurrence of some future event which is

itself uncertain, or questionable.").  The Pre-Priority Period Phantom Stock Claims were

contingent because the right to payment was conditioned upon the Phantom Stock Program

Participant remaining employed with the Debtors through the vesting dates.

        29.      In the Fourth Circuit, a contingent claim arises when the event or conduct

underlying the claim first occurs.  *See A.H. Robins Co.*, 839 F.2d at 201-02; *In re U.S. Airways*,

2007 WL 3231573, *3 (Bankr. E.D. Va. 2007) ("A debt 'arises,' for bankruptcy purposes, not

when the effects are felt but when the act giving rise to the liability occurs.").[3]  *See also In re*

*Bentley Funding Group, LLC,* 2001 WL 34054525 (Bankr. E.D. Va. Feb. 2, 2001) (surety's right

to indemnity existed as a contingent claim from the date the indemnity agreement was executed);

*Thompson v. Board of Trustees of Fairfax Cty. Police Officers Retirement Sys. (In re Thompson),*

182 B.R. 140, 153 (Bankr. E.D. Va. 1995), *aff'd*, 92 F.3d 1182 (4th Cir. 1996) (claim for

retirement benefits arose when the employee first joined the program– not when the retirement

payments became due in 25 years).  As the *Thompson* Court explained, the "25-year requirement

was merely a contingency [that] Thompson had to meet in order to have an immediate right to

payment." *Id*.

        30.      With respect to the Phantom Stock Program, the Debtors incurred a

contingent liability when the Phantom Stock Program Participant signed the Phantom Stock

Agreement, which in the case of each Pre-Priority Period Phantom Stock Claim listed on **Exhibit**

**C**, had to occur before the Priority Period in order to be effective.  Therefore, each Pre-Priority

---

[3] In *A.H. Robins*, the court held that a contingent claim arose when the debtor's birth control device had been
implanted and before the plaintiff manifested any injury.  *Id.*, 839 B.R. 198.

Period Phantom Stock Claim arose before the Priority Period and is not entitled to priority under section 507(a).

31.     At this time, the Liquidating Trust has not completed its review of the validity of all claims/expenses filed against the Debtors' estates, including the Pre-Priority Period Phantom Stock Claims.  Accordingly, the Pre-Priority Phantom Stock Claims may be the subject of additional subsequently filed objections.  To that end, the Liquidating Trust reserves the right to further object to any and all claims, whether or not the subject of this Objection, for allowance and/or distribution purposes, and on any other grounds.  Furthermore, the Liquidating Trust reserves the right to modify, supplement and/or amend this Objection as it pertains to any Claim or Claimant herein.

### B.     <u>The Reduced Phantom Stock Claims Should Be Allowed in a Reduced Amount</u>

32.     As set forth above, the Phantom Stock Program Participants were employed by Circuit City when the Debtors completed their going out of business sales and closed their stores on March 8, 2009.  Therefore, they are entitled to payment pursuant to the Phantom Stock Program.  The amount of each payment is based on the share price of Circuit City on March 6, 2009.[4]  After running this calculation, the Liquidating Trustee has determined that the Reduced Phantom Stock Claims should be reduced to the amounts set forth in **Exhibit D**.

33.     At this time, the Liquidating Trust has not completed its review of the validity of all claims/expenses filed against the Debtors' estates, including the Reduced Phantom Stock Claims.  Accordingly, the Reduced Phantom Stock Claims may be the subject of additional subsequently filed objections.  To that end, the Liquidating Trust reserves the right to

---

[4] March 8, 2009 was a Sunday.  Therefore, the Liquidating Trustee used the Circuit City share price as of March 6, 2009.

further object to any and all claims, whether or not the subject of this Objection, for allowance

and/or distribution purposes, and on any other grounds.  Furthermore, the Liquidating Trust

reserves the right to modify, supplement and/or amend this Objection as it pertains to any claim

or claimant herein.

## RESERVATION OF RIGHTS

34.     As noted above, the Liquidating Trust reserves the right to file objections

to these Claims at a later time on any grounds that bankruptcy or non-bankruptcy law permits.

The Liquidating Trust likewise reserves the right to modify, supplement and/or amend this

Objection as it pertains to any claim or claimant herein.

## NOTICE AND PROCEDURE

35.     Notice of this Objection has been provided to the holders of the Phantom

Stock Claims (the "Phantom Stock Claimants") identified on **Exhibit B**, and to parties-in-interest

in accordance with the Court's *Supplemental Order Pursuant to Bankruptcy Code Sections 102*

*and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1*

*Establishing Certain Notice, Case Management and Administrative Procedures* (entered on

December 30, 2009 at Docket No. 6208) (the "Case Management Order").  The Liquidating

Trust submits that the following methods of service upon the Phantom Stock Claimants should

be deemed by the Court to constitute due and sufficient notice and service of this Objection:  (a)

service in accordance with Federal Rule of Bankruptcy Procedure 7004 and the applicable

provisions of Federal Rule of Civil Procedure 4; (b) to the extent counsel for the Phantom Stock

Claimants is not known to the Liquidating Trust, by first class mail, postage prepaid, on the

signatory of the Phantom Stock Claimant's proof of claim form or other representative identified

in the proof of claim form or any attachment thereto; or (c) by first class mail, postage prepaid,

on any counsel that has appeared on the Phantom Stock Claimant's behalf in the Debtors'

bankruptcy cases.  The Liquidating Trust is serving each Phantom Stock Claimant with this

Objection and the exhibit on which the Phantom Stock Claimant's claim is listed.

36.    To the extent any Phantom Stock Claimant timely files and properly

serves a response to this Objection by **4:00 P.M. (Eastern) on April 7, 2011** as required by the

Case Management Order and under applicable law, and the parties are unable to otherwise

resolve the Objection, the Liquidating Trust requests that the Court conduct a status conference

with respect to any such responding claimant at **2:00 p.m. (Eastern) on April 14, 2011** and

thereafter schedule the matter for a future hearing as to the merits of such claim.  However, to the

extent any Phantom Stock Claimant fails to timely file and properly serve a response to this

Objection as required by the Case Management Order and applicable law, the Liquidating Trust

requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**,

reclassifying the Pre-Priority Period Phantom Stock Claims to general unsecured claims, as set

forth in **Exhibit C** and reducing the Reduced Phantom Stock Claims as set forth in **Exhibit D**,

attached hereto.

### COMPLIANCE WITH BANKRUPTCY RULE 3007 AND THE OMNIBUS OBJECTION PROCEDURES ORDER

37.    This Objection complies with Bankruptcy Rule 3007(e).  Additionally, the

Liquidating Trust submits that this Objection is filed in accordance with the Omnibus Objection

Procedures Order.

### WAIVER OF MEMORANDUM OF LAW

38.    Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no

novel issues of law presented in the Motion, the Liquidating Trust requests that the requirement

that all motions be accompanied by a written memorandum of law be waived.

## **NO PRIOR RELIEF**

39.     No previous request for the relief sought herein has been made to this

Court or any other court.

*[The Objection continues on the next page]*

WHEREFORE, the Liquidating Trust respectfully requests that the Court enter an

Order sustaining this Objection and granting such other and further relief as the Court deems

appropriate.

Dated: Richmond, Virginia                    TAVENNER & BERAN, PLC
          February 27, 2011

                                             __/s/ Paula S. Beran_____
                                             Lynn L. Tavenner (VA Bar No. 30083)
                                             Paula S. Beran (VA Bar No. 34679)
                                             20 North Eighth Street, 2nd Floor
                                             Richmond, Virginia 23219
                                             (804) 783-8300

                                                    - and -

                                             PACHULSKI STANG ZIEHL & JONES LLP
                                             Jeffrey N. Pomerantz, Esq.
                                             Andrew W. Caine, Esq.
                                             10100 Santa Monica Boulevard
                                             Los Angeles, California 90067-4100
                                             (310) 277-6910

                                                    - and –

                                             PACHULSKI STANG ZIEHL & JONES LLP
                                             Robert J. Feinstein, Esq.
                                             780 Third Avenue, 36th Floor
                                             New York, New York 10017
                                             (212) 561-7700

                                             *Counsel to the Circuit City Stores, Inc.*
                                             *Liquidating Trust*

March 6, 2008

### Re: Retention Letter Agreement

Dear ███████████ :

Circuit City Stores, Inc. ("the Company") has made a business decision to relocate its Philadelphia Service Center.  When the Philadelphia location closes, you will be eligible to receive a Separation Package if you remain employed with the Company through its closing date.  Your Separation Package will be discussed with you separately.

In addition, the Company desires that you remain employed on an at-will basis, at the same compensation and benefits, through the closing date of the Philadelphia location or when you are released by the Company for reasons other than poor performance or violation of Company policy prior to that date.  We will provide you notice of your final day of employment as soon as it is finalized.  To recognize your value to the Company, and to provide an incentive to remain with the Company on an at-will basis until you are released from the Company, Circuit City would like to propose the following terms to you.

If you remain employed from the date of this letter until the Philadelphia Service Center closes, you will receive a Retention Bonus of $███████

This bonus will not be prorated.  Therefore, for example, if your last day of employment with the Company is prior to the date your manager releases you from the company you will not receive this bonus.

To receive the Retention Bonus, you must continue to perform your work in a satisfactory manner, meet performance standards, and comply with Company policies and procedures.  You will not be eligible to receive the Retention Bonus if your employment is terminated for poor performance or violation of Company policy; or if you voluntarily leave the company before being released by the facility manager.

The retention bonus will be paid within thirty days from the date of your release of employment. The Company will deduct the necessary federal and state withholding taxes and FICA from this bonus payment.

Notwithstanding anything contained in this Letter Agreement, you are and shall continue to be employed by the Company on an at-will basis and not for any definite term.  The Letter Agreement shall in no way void, alter, change, or modify any terms and conditions of your employment except to the extent such terms are the specific subject matter of this Letter Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Letter Agreement to be duly executed as of the date first written above.  Please sign below, initial page one, and return a copy in the self-addressed return envelope provided not later than **April 7, 2008**.

**CIRCUIT CITY STORES, INC.**

Eric A. Jonas, Jr.
Senior Vice President
Human Resources

**ASSOCIATE:**

May 7, 2007



Re: <u>Workforce Reduction Notification</u>

Dear ███

Circuit City has made a business decision to cease operations at Location 0045, Philadelphia
SRV Center. As a result of this decision, your employment with the Company will be terminated
July 1, 2008. In order to ease your transition into the job market, you are being offered a
separation package that is outlined below.

Based on your hire date of June 3, 2004, you are eligible for four (4) weeks (160 hours) of
separation pay at your current hourly rate of $████/hour. The gross amount of this separation pay
is $███████. Your separation pay will be processed as a lump sum payment within thirty days of
your termination date. If you have chosen direct deposit previously, it will be direct deposited and
the pay stub mailed to your home address via U.S. mail. If you do not have direct deposit, your
check will be mailed to your home.

In order to receive separation pay, you must continue to work through your scheduled termination
date and meet performance standards for your position between now and then. You will not be
eligible for separation pay if <u>any</u> of the following occur:

1. You leave the Company voluntarily prior to your scheduled termination date.
2. You transfer to another position within Circuit City or any of our divisions or subsidiaries
   prior to your scheduled termination date.
3. Your employment is terminated for performance issues or violation of Company policy
   prior to your scheduled termination date.

Enclosed are handouts, "What Happens to Your Benefits When Your Employment Ends,"
COBRA information, a Contact information sheet and an Employee Verification Letter. If you
have any questions relating to your specific benefits choices, please call the Benefits Helpline at
1-800-288-6353.

We thank you for your service to Circuit City, and sincerely wish you the best of luck in all your
future endeavors.

Sincerely,

Eric A. Jonas, Jr.
Sr. Vice President
Human Resources