Premises are then subject to a Mortgage, which consent shall not be unreasonably withheld or delayed provided such award or payment is applied in accordance with this Lease.

13. Insurance.

(a) Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i) Insurance against loss or damage to the Improvements under an All Risk Policy, which shall include flood insurance and earthquake insurance, each to the extent applicable and which may contain such exclusions as are standard in the industry, in amounts to prevent Landlord or Tenant from becoming a co-insurer under the applicable policies, and in any event in amounts not less than the actual replacement cost of the Improvements (excluding footings and foundations and parts of the Improvements which are not insurable).

(ii) Contractual and comprehensive general liability insurance against claims for bodily injury, death or property damage occurring on, in or about any of the Leased Premises or the Adjoining Property, which insurance shall be written on a so-called "occurrence basis," and shall provide minimum protection with a combined single limit in an amount not less than Five Million ($5,000,000) Dollars (or in such increased limits from time to time to reflect declines in the purchasing power of the dollar as Landlord may reasonably request).

(iii) Worker's compensation insurance covering all persons employed by Tenant on the Leased Premises in connection with any work done on or about any of the Leased Premises.

(b) During such time as no Event of Default is outstanding hereunder, and the tangible net worth of Tenant shall be not less than Two Hundred Million ($200,000,000.00) Dollars as determined in accordance with generally accepted accounting principles consistently applied, Tenant may self-insure the coverage referred to in Paragraph 13(a), provided that the self insurance program of this subparagraph (b) does not violate any Legal Requirements applicable to the Leased Premises or Tenant.

(c) The insurance required by Paragraph 13(a) shall be written by companies having an investment grade claims-paying ability during such time as Tenant is not self-insuring in accordance with the provisions of Paragraph 13.(b). All companies providing insurance required by Paragraph 13.(a) shall be authorized to do an insurance business in the State or otherwise agreed to by Landlord and Lender. Sums due from Tenant in lieu of insurance proceeds because of such self-insurance programs shall be treated as insurance proceeds for all purposes under this Lease. The insurance policies shall be for a term of not less than one year, and shall (except for worker's compensation insurance) name Landlord, Tenant and any Lender as additional insured parties, as their respective interests may appear. If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void or unsafe by reason of the failure or impairment of the capital of any insurer, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and Lender.

(d) Each insurance policy referred to above shall, to the extent applicable, contain standard non-contributory mortgagee clauses in favor of any Lender. The certificate delivered by Tenant in respect of each policy shall provide that the policy may not be cancelled except after 30 days prior notice to Landlord and any Lender. The certificate delivered by Tenant in respect of each policy shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Lender pursuant to any provision of the Mortgage upon the happening of an event of default therein, or (iv) any change in title or ownership of any of the Leased Premises.

(e) Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 13, shall renew or replace each policy, and shall deliver to Landlord and Lender, a certificate or other evidence (reasonably satisfactory to Lender and Landlord) of the existing policy and such renewal or replacement policy within 30 days following such renewal or replacement. The certificate delivered by Tenant in respect of each such policy shall

7763\circuit\ccp8\lease.nc

19

provide that the policy shall not expire until the Landlord and Lender shall receive a notice from the insurer to the effect that a policy will expire on a date (the "Policy Expiration Date") which shall be thirty (30) days following the date of notice to Landlord and Lender. In the event of Tenant's failure to comply with any of the foregoing requirements of this Paragraph 13 within five (5) days of written notice from Landlord, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(f) Anything in this Paragraph 13 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 13(a) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 13. In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender a certified copy of those provisions of the blanket policy that pertain to the Leased Premises, if any, to evidence the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 13.

14. Damage, Destruction.

(a) In the event of any casualty loss exceeding $100,000, Tenant shall give Landlord immediate notice thereof. Tenant shall adjust, collect and compromise any and all such claims, with the consent of Lender and Landlord, not to be unreasonably withheld or delayed and Landlord and Lender shall have the right to join with Tenant therein. If the estimated cost of Restoration or repair shall be Five Hundred Thousand ($500,000.00) Dollars or less, all proceeds of any insurance required under Paragraph 13(a) shall be payable to Tenant, provided that Tenant at such time shall have a tangible net worth of not less than Two Hundred Million Dollars ($200,000,000.00) as determined in accordance with generally accepted accounting principles, consistently applied, and in all other events to a Trustee which shall be a federally insured bank or other financial institution, selected by Landlord and Tenant and

reasonably satisfactory to Lender (the "Trustee"). If the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee. Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant hereby appoints such Trustee as Tenant's attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease after approval by Tenant of such Trustee, if Trustee is other than Lender, such approval not to be unreasonably withheld or delayed.

(b)  In the event of any casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder. The Net Proceeds of such insurance payment shall be retained by the above-mentioned Trustee and, promptly after such casualty, Tenant shall commence and diligently continue to perform the Restoration to the Leased Premises. Upon payment to the Trustee of such Net Proceeds, the Trustee shall, to the extent available, make the Net Proceeds available to Tenant for restoration, in accordance with the provisions of Paragraph 15. Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace the Improvements as nearly as possible to their value and condition and character immediately prior to such event and otherwise in accordance with all Insurance Requirements and Legal Requirements and the provisions of this Lease (including Tenant's making any desired Alterations allowed hereunder) and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof.

(c)  In the event that any damage or destruction shall be subject to the self insurance provisions provided for in 13(b), Tenant shall pay to the Trustee the amount of the proceeds that would have been payable had such self insurance program not been in effect (the "Tenant Insurance Payment").

15.  Restoration. The Net Proceeds, Restoration Award and Tenant Insurance Payment (the aggregate of which being herein defined as the "Restoration Fund") paid to the Trustee shall be disbursed by the Trustee in accordance with the following conditions:

(a) At the time of any disbursement, no Event of Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged and unbonded.

(b) If the cost of Restoration exceeds $250,000 prior to commencement of the Restoration, the architects, contracts, contractors, plans and specifications for the Restoration shall have been approved by Landlord, which approval shall not be unreasonably withheld or delayed.

(c) Each request for disbursement shall be accompanied by a certificate of Tenant, signed by the President, Treasurer or any Vice President of Tenant, describing the completed work for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been completed and complies with the applicable requirements of this Lease and all Legal Requirements and Insurance Requirements.

(d) Disbursements shall be made from time to time in an amount not exceeding the cost of the work completed since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates, of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications approved by Landlord, (2) waivers of liens, (3) a satisfactory bring down of title insurance, and (4) other evidence of cost and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed in place and free and clear of mechanics' lien claims.

(e) The Trustee may retain ten percent from each disbursement of the Restoration Fund until the Restoration is fully completed and the Leased Premises are available for their intended use, in the reasonable judgment of the Lender, including the issuance of any necessary certificate of occupancy.

(f) The Restoration Fund shall be kept in a separate interest-bearing account federally insured to the extent applicable by the Trustee or by Lender.

7763\circuit\ccp8\lease.nc

22

Prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord or Lender, exceeds the amount of the Restoration Fund, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund prior to any further disbursement or Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration. Except for the payment to Landlord of the net surplus award, referred to in Paragraph 12(c), any sum in the Restoration Fund which remains in the Restoration Fund upon the completion of Restoration shall be paid to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or the Restoration Award shall be deemed to be disbursed prior to any amount added by Tenant.

16.  Subordination to Financing.

(a)  Subject to the following provisions of this Paragraph 16(a), Tenant agrees that this Lease shall, upon Landlord's and Lender's (if any) written request, be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination. So long as no Event of Default shall be outstanding, Tenant's tenancy shall not be disturbed, nor shall this Lease be affected by any default under such Mortgage, and in the event of a foreclosure or other enforcement of any such Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the Term of this Lease and any extensions thereof, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default by Tenant has occurred and is continuing. So long as no Event of Default by Tenant has occurred and is continuing, Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law. Any Mortgage to which this Lease is now or hereafter subordinate shall provide, in effect, that during the time this Lease is in force all insurance proceeds and condemnation awards shall be permitted to be used for restoration in accordance with the provisions of this Lease. Notwithstanding an Event of Default, the provisions of this Paragraph

16.(a) shall continue to apply for the benefit of any Qualified Subtenant referred to in Paragraph 17.(c).

    (b)    Notwithstanding the provisions of subdivision (a) of this Paragraph 16, the holder of the Mortgage to which this Lease is subject and subordinate, as provided in said subdivision (a), shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to this Lease by recording a unilateral declaration to such effect.

    (c)    At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16(a) above, to attorn, from time to time, to any such owner or Lender, upon the then executory terms and conditions of this Lease, for the remainder of the term originally demised in this Lease and for any renewal term, provided that such owner or Lender shall then be entitled to possession of the Leased Premises subject to the provisions of this Lease. The provisions of this subdivision (c) shall enure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

    (d)    Each of Tenant, Landlord and Lender agrees that, if requested by any of the others, each shall, without charge, enter into (i) a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Lender, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of subparagraph (a), and (ii) an agreement with Lender whereby Tenant shall agree for the benefit of Lender that Tenant will not, without in each case the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed, (a) amend, modify, cancel or surrender the term of this Lease except as expressly permitted by the provisions of this Lease, or enter into any agreement with Landlord so to do, or (b) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

    17.    <u>Assignment, Subleasing.</u>

7763\circuit\ccp8\lease.nc

24

(a)  Tenant is currently in occupancy and is operating its business at the Leased Premises. Tenant may assign its interest in this Lease without the prior written consent of Landlord. No sublease under, or assignment of this Lease shall relieve Tenant of its obligations hereunder, which shall continue as the obligations of a principal and not as the obligations of a surety or a guarantor.

(b)  Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease. Tenant agrees that in the case of an assignment, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Landlord (i) a duplicate original of such assignment in recordable form and (ii) an agreement executed and acknowledged by the assignee in recordable form wherein the assignee shall agree to assume and agree to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such assignment, and, in the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord a duplicate original of such sublease.

(c)  Landlord recognizes that there may currently be constructed or Tenant may intend to construct certain leasable space (the "Spec Space") at the Leased Premises other than the portion of the Leased Premises currently operated as a Circuit City Store, which Spec Space is or shall be either a separate building or connected to the other Improvements but separated therefrom by a demising wall, for the specific purpose of generating sublease income to the Tenant. Any such additional Spec Space shall be constructed at Tenant's sole cost and expense, and such construction shall be deemed an Alteration under this Lease and shall be performed in accordance with the terms of this Lease, however, Landlord agrees that Paragraph 11(vi) shall not apply to the construction of the Spec Space. The provisions of Paragraph 11 relating to the value of the Leased Premises shall not apply to any Alteration of the Spec Space. Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into a nondisturbance and attornment agreement with any Qualified Subtenant, as defined below, of the Spec Space (a "Shop Tenant") or any Qualified Subtenant of the entire portion (the "Anchor Space") of the Leased Premises currently operated by Circuit City as a Circuit City

retail store (an "Anchor Tenant") upon the terms described below, pursuant to which Landlord shall agree, for so long as such Qualified Subtenant is not in default under its Qualified Sublease, as defined below, that the Qualified Sublease shall not be terminated as a result of any termination of this Lease and such Qualified Subtenant's use and occupancy of the premises demised pursuant to the Qualified Sublease shall not be disturbed by Landlord, and pursuant to which such Qualified Subtenant shall agree to attorn to Landlord or its successor as landlord under the Qualified Sublease upon any termination of this Lease. Said agreement shall further provide that nothing therein contained shall impose any obligation on the Landlord, the then owner or the Lender or their respective successors to (a) return or apply any security deposited under such sublease, unless such security shall be transferred and turned over to the Landlord, such then owner or Lender, (b) expend any sums to make any installations or alterations provided to be made by the sublessor under said sublease or reimburse the subtenant under said sublease for any installations or alterations made by it, (c) be liable for any act or omission of any prior sublessor except that the foregoing shall not prevent any subtenant's exercising any right of termination (and, with respect to any Shop Tenant, any right of substitute cure and resulting offsets against rent) as the result of any continuing default of the prior sublessor relating to its repair, maintenance or service obligations under the Qualified Sublease, (d) be subject to any offsets or defense which such subtenant might have against any prior sublessor, (e) be bound by any rent or additional rent which such subtenant might have paid for more than the current rent to any prior landlord, or (f) be bound by any amendment or modification of the sublease made without the prior written consent of Landlord, the terms of which amendment or modification if included in the original sublease would have prevented such sublease from meeting the criteria for a Qualified Sublease. Any subtenant under a Qualified Sublease, as defined below, is a "Qualified Subtenant." With respect to any Spec Space, a "Qualified Sublease" shall be any sublease of the Spec Space, or any portion thereof that (x) requires the tenant thereunder to pay at least its pro rata share (based on the portion of the gross leasable area at the Leased Premises demised under the Qualified Sublease) of Taxes assessed against the Leased Premises and common area maintenance costs incurred with respect to the Leased Premises (which payment amounts may be included in the rent such Qualified Subtenant is

required to pay), (y) exculpates the Landlord, its successor and assigns (including any mortgagee of Landlord or purchaser at sale pursuant to foreclosure under any mortgage granted by Landlord) from all personal liability whatsoever under the Qualified Sublease regardless of whether Landlord or such successor or assign becomes the landlord under the Qualified Sublease, and (z) requires such Qualified Subtenant to maintain the nonstructural components of the premises demised under the Qualified Sublease in accordance with the maintenance standards set forth in this Lease. With respect to the Anchor Space, a "Qualified Sublease" shall be any "bond" or "absolute net" sublease (that is, a sublease that requires the uninterrupted payment of rent without offset or diminution and that places no obligations upon the sublessor thereunder other than those of the type placed upon Landlord hereunder) of the entire Anchor Space pursuant to which the subtenant thereunder had, at the time such sublease was entered into, a Standard & Poor's investment grade rating of at least BBB- or a Moody's investment grade rating of at least Baa3 (or equivalent rating of any other generally recognized rating organization) and was not on credit watch and pursuant to which the subtenant thereunder is required to fulfill all of the obligations of Tenant hereunder with respect to the anchor space, including, without limitation, payment of rent at a rate equal to or greater than the rate at which Tenant is required to pay rent (including all Additional Rent) hereunder.

(d) Upon the occurrence of an Event of Default under this Lease, Landlord shall have the right to collect and enjoy all rents and other sums of money payable under any sublease of any of the Leased Premises, and Tenant hereby irrevocably and unconditionally assigns such rents and money to Landlord, which assignment may be exercised upon and after (but not before) the occurrence of an Event of Default.

18. Permitted Contests. Notwithstanding any provision of this Lease to the contrary, after prior written notice to Landlord, Tenant shall not be required to (i) pay any Tax, (ii) comply with any Legal Requirement, or (iii) discharge or remove any lien, so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (v) the collection of, or other realization upon, the Tax or lien so contested, (w) the sale, forfeiture or