# EXHIBIT B Part 2

# EXHIBIT "E"

SIGN PLANS AND CRITERIA

(attached)

423568 v7 (00051.00138.000)



1- Ex "E"



**D/F PYLON SIGN**    SCALE: 3/16"=1'-0"

( 1 ) REQUIRED - MFR. AND INSTALL

**END VIEW**

**EXACT COLORS TO BE
VERIFIED BY CUSTOMER**

**PRELIMINARY
DESIGN "C"**

1 – Ex "E-1"

## EXHIBIT "F"

PERMITTED ENCUMBRANCES

I.    Exclusive Use:

1.    **Border's** - Per Amendment: Subject to rights under existing leases and not including the premises identified as Major F on Exhibit "A" if such premises is leased to Venture Stores, Inc. (or its successors or assigns) even if Venture Stores, Inc. has not executed its lease with Landlord at the time of execution of this lease, Landlord will not, during the term of this lease, permit any other tenant in the Shopping Center (including, without limitation, any subtenant, licensee, concessionaire or occupant of any portion of the Shopping Center) to engage in the sale of books (including books on tape or any future format), periodicals and/or recorded video products, e.g. VHS format video tape and laser disc movies and other video presentations unless the sale of such items is incidental to the primary use of their premises and not more than 212.5 square feet of shelf surface display area is devoted to the retail display of such items, and the retail display of recorded music products, e.g. - recorded music on cassette tape or compact disc (in any current or future format).

From Original Lease:  Shelf surface display area shall mean the actual square footage of the display surface, e.g. a shelf that is six feet long and twelve inches deep equals six square feet of shelf surface display area.  Nothing contained in the foregoing shall prohibit the operation of a store the primary business of which is video rental products or limit or apply to the operation of retail establishments which are grocery stores, drug stores or discount department stores.  In the event that tenant shall have abandoned any of the uses to which it has exclusive rights under Article 21, subject to the limitations of Article 21, for twelve consecutive months, such exclusive rights shall terminate; provided however, such rights shall not terminate if during such twelve consecutive months, tenant shall deliver written notice to Landlord advising Landlord that tenant will resume such use within six months of the date of such notice and such use is resumed within such six month period.  Such exclusive rights shall also terminate if Landlord has repossessed the demised premises or has terminated tenant's right of possession pursuant to the terms of this lease.  For purposes of Article 21, tenant will be deemed to have 'abandoned" an exclusive use if tenant devotes less than a material portion of its retail square footage to such use.

Notwithstanding the foregoing, Tenant has entered into a letter agreement with Borders, Inc. attached hereto as Exhibit "F-1" with respect to the operation and co-existence of their respective stores in the Shopping Center and the exclusive use set forth in this paragraph as well as Tenant's exclusive set forth in paragraph 19(a)(vi) of the Lease, shall be subject to the terms of such letter agreement.  As long as Tenant shall be in compliance with such letter agreement with Borders, Inc., and letter agreement shall remain in affect, Landlord hereby waives the provisions of this paragraph as the same apply to Tenant to the extent of the terms of such letter agreement

2. **Houston Cellular/Cingular Wireless** – SECTION 26.20 Exclusive Use.

(a) Non-competition.  Subject to the rights of tenants under permitted leases during the term of this lease and any renewal, Landlord shall not permit any portion of the Shopping Center, other than the leased premises, to be used by a Competing Business.

(b) Definitions.  The following terms, as used herein, shall have the indicated meanings:

(i) "Exclusive Use shall mean sale, service and/or installation of 'Wireless Communications Equipment".  As used herein, the term "Wireless Communications Equipment" shall mean any telephone device which is capable of employing or otherwise utilizing any and all service authorized by the FCC under Part 22 of its Rules and Regulations, as amended, and the cellular orders set forth in An Inquire into the Use of the Bands 825-845 MHz and 870-890 MHz for Cellular Communications Systems; and Amendment to Parts 2 and 22 of the Commission's Rules Relative to Cellular Communications Systems (CC Docket No. 79-318), 86 FCC 2nd 469 (1981) modified as set forth in reconsideration order 89 FCC 2d 58 (1982), and further modified as set forth in reconsideration order 90 FCC 2d 571 (released July 8, 1992).

(ii) "Competing Business" shall mean any tenant, other than tenant, whose premises at the Shopping Center is a "Store Used Primarily for the Exclusive Use", excluding however, the following:

(a) any business leasing premises directly or (as an assignee, subleases or concessionaire) indirectly under a Permitted Lease;

(b) any store engaging in the Exclusive Use in accordance with rights granted to it pursuant to an order of a bankruptcy court with jurisdiction.

(iii) "Permitted Lease" shall mean any lease that was executed prior to the execution of the lease (a "Prior Lease"), any renewal or extension of a Prior Lease, or any

2 – Ex "F"

423568 v7 (00051.00138.000)

new lease that is executed by a business that leased or occupied premises in the Shopping Center directly or indirectly under a Prior Lease (provided that, in the case of a new lease, such new lease does not grant greater rights to use the leased premises for the Exclusive Use than did the Prior Lease).

(iv)   Store Use Primarily for the Exclusive Use" shall mean any premises at the Shopping Center that devotes more than twenty-five percent (25%) of the floor area of such premises to the sale, service and/or installation of "Wireless Communications Equipment".

3.   **Bed, Bath & Beyond** - Section 22.  Exclusive in Center.  To induce tenant to execute this lease, Landlord covenants and agrees that, for so long as bed, bath, linen and houseware items (the "Bed and Bath Items") are being sold in the premises, Landlord will not lease, rent or occupy or to the extent it has any legal authority to do so, will not permit any other premises in the Shopping Center to be occupied for the sale of Bed and Bath Items, provided that such restrictions (i) shall not prohibit any other tenant of the Shopping Center from selling Bed and Bath Items as an incidental portion of its business and so long as the total area in any such other tenant's premises devoted to the sale and display of Bed and Bath Items does not exceed three thousand (3,000) square feet of gross area (or 10,000 square feet in the aggregate), (ii) shall not be applicable to those leases of premises in the Shopping Center leased by Landlord pursuant to any lease in effect as of the date of this lease or executed by Landlord prior to the date hereof and eventually signed by tenant pursuant to which Landlord may not prohibit the sale of Bed and Bath Items during the term of such lease, and (iii) shall not, in any event prohibit the lease of space in the Shopping Center for operation of the following stores or types of stores, as applicable: Williams-Sonoma; Crate and Barrel; Pier 1; an arts and crafts store selling items similar to those sold by Michael's; a catalog showroom selling items similar to those sold by Service Merchandise; a discount department store selling items similar to those sold by Target; a baby store; or a discount drug store selling items similar to those sold by Phar-Mor, and (iv) shall not be applicable to those premises in the Shopping Center leased (or to be leased) by Landlord to J.C. Penney, Palais Royal, Marshall's, Service Merchandise, Venture, T.J. Maxx, Whole Foods or Baby Super Store (or similar major tenants in substitution thereof for similar uses).

4.   **Jos. A Banks** - SECTION 7.1 Use of leased premises.  Notwithstanding the foregoing, (i) during the term of this lease, (ii) so long as tenant is not in default beyond any

applicable notice and cure period as set forth in this lease, (iii) so long as tenant or an approved or permitted sublessee or assignee is operating a Jos. A. Bank Clothier store at the premises and (iv) subject to the terms and provisions of all other currently existing leases at the Shopping Center, Landlord agrees that it will not lease any space in the Pad Sites (the buildings located on Pad Sites A, B, C, D and E, are hereinafter collectively known as the "Pad Sites") to another men's clothing store whose primary business is the sale of men's suits and sports coats. The preceding sentence shall not preclude or in any way prevent Landlord from leasing the following businesses in any of the Pad Sites: any tuxedo store or formal clothing store (similar to Al's Formal Wear), any men's or boys casual clothing store (similar to Structure), any general men's clothing store (similar to Eddie Bauer or the Gap), and any men's designer store (similar to Armani's, Ralph Lauren [Polo], or Gucci). The term "primary business' shall mean that thirty percent (30%) or more of the gross floor area of the premises is being used for a particular business or use. The restrictions contained in this Section 7.1 shall apply only to the Pad Sites and shall not apply to any other portion of the Shopping Center.

5. **Escalante's Mexican Grill** - SECTION 7.1. Exclusive Use. So long as tenant in not in default under the terms of this lease, Landlord shall not during the primary term or any extension thereof, lease to another Mexican restaurant in the area shown as Exclusive Area on Exhibit "B-1". Further, Landlord will agree not to lease space in the balance of the Shopping Center to another Mexican restaurant for the initial five (5) years of the lease term or until tenant achieves $3,700,000 in gross sales, whichever is the earlier to occur. Said restaurant shall not have in excess of 2,000 square feet and shall be self-service only.

6. **Bridesmart** - SECTION 27.19. Exclusive. Provided that there is no event of default hereunder, or circumstances which, with the passing of time, giving of notice, or both, would constitute an event of default, and provided that tenant is actually using the leased premises for the retail sale and rental of women's and children's bridal and formal wear, tuxedos, and men's formal wear (the 'Exclusive Items"), Landlord shall not hereafter enter into a lease with any tenant at the Shopping Center whose principal and primary business is the retail sale and rental of the Exclusive Items; provided, however, the incidental sale of any of the Exclusive Items by any tenant or occupant of the Shopping Center (which sale is incidental to the principal and primary business of such tenant or occupant) shall not constitute a violation thereof.

423568 v7 (00051.00138.000)

7.    **Palais Royal** - SECTION 17.15. Landlord's Covenants.  Provided tenant is not in default or breach of any of its obligations under this lease and is then open for business and is occupying the premises for purposes of running a 'Palais Royal' store, and subject to rights and uses granted to existing tenants, Landlord shall not lease space within the Shopping Center (other than the space currently leased to J.C. Penney) to any tenant occupying more than 25,000 square feet of space if (i) any of such tenant's customer entrances would face Beechnut Street, and (ii) such tenant's principal business is the sale of any one or more of the following: men's, women's or children's apparel, or shoes or accessories; excluding for purposes of this subsection (b) Oshman's -or a similar type sporting goods store and further excluding for purposes of this subsection (b) a complex of three or more of the retail establishments which are members of The Limited family of stores.

8.    **J. Renee Shoes** - Section 7.1.  Use of premises.  Landlord agrees that during the term of this lease and in any renewal options, so long as tenant is not in default, Landlord will not lease space in the area of the Shopping Center between Palais Royal and Major Tenant "C" to include Pad "A" to a tenant whose primary business is the sale of ladies shoes.

9.    **Al's Formal Wear** - SECTION 27.19. Exclusive.  Provided that there is no event of default hereunder, or circumstances which, with the passing of time, giving of notice, or both, would constitute an event of default, and provided that tenant is actually using the leased premises for the retail sale and rental of tuxedos and men's and boy's formal wear (the "Exclusive Items"), Landlord shall not hereafter enter into a lease with any tenant at the Shopping Center whose principal and primary business is the retail sale and rental of the Exclusive Items; provided, however, the incidental sale of any of the Exclusive Items by any tenant or occupant of the Shopping Center (which sale is incidental to the principal and primary business of such tenant or occupant) shall not constitute a violation thereof.  Should Landlord breach this exclusive covenant with tenant, then tenant shall, at its option, be entitled to terminate this lease, effective on the date set forth in tenant's notice to Landlord of its termination election.

10.    **Beauty First** - SECTION 27-20 Exclusive Use  (a) Non-Competition.  Subject to the rights of tenants under permitted leases during the term of this lease and any renewal and so long as tenant is not in default hereunder, Landlord shall not permit any portion of the Shopping Center, other than the leased premises, to be used by a Competing Business or Competitor.

(a)      _Definitions_.  The following terms, as used herein, shall have the indicated meanings:

(i)      "Exclusive Use" shall mean a retail establishment whose sole business is the operation of a Professional Supply Store concurrently and in connection with the operation of a Beauty Salon.

(ii)      A "Professional Beauty Supply Store" shall mean a retail business (i) offering and selling only professional beauty products (i.e., hair care products, nail products, and makeup, which are not available to the public except through selected beauty salons [e.g., such beauty products are not available in grocery stores, drug stores, department stores, or other establishments except for selected beauty salons and (ii) deriving at least seventy-five percent (75 %) of its Gross Sales from the sale of such professional beauty products.

(iii)      A "Beauty Salon" shall mean a full service beauty salon which (i) employs professional, full-time hair stylists and manicurists and other personnel related thereto and (ii) which is operated in a first class manner (as determined solely by Landlord in its good faith business judgment).

(iv)      "Competing Business" shall mean any tenant, other than tenant, whose premises at the Shopping Center is a "Store Used Primarily for the Exclusive Use", excluding however, the following:

(1)      any business leasing premises directly or (as an assignee, subleases or concessionaire) indirectly under a Permitted Lease;

(2)      any store engaging in the Exclusive Use in accordance with rights granted to it pursuant to an order of a bankruptcy court with jurisdiction.

(3)      a full service hair salon for men or women selling professional beauty supplies as an incidental portion of their sales so long as such tenant is not located in the area crosshatched as shown on Exhibit "B" attached hereto.

(v)      "Competitor" shall mean any of the following tenants or other tenants similar thereto: The Beauty Store, Ulta 3, Trade Secrets, Beauty Express, Beauty Mart, Super Cuts, TGF Precision Haircutters, Fantastic Sams or Beauty Lines.

(vi)      "Permitted Lease" shall mean any lease that was executed prior to the execution of the lease (a 'Prior Lease'), any renewal or extension of a Prior Lease, or any new lease that is executed by a business that leased or occupied premises in the Shopping Center

423568 v7 (00051.00138.000)

directly or indirectly under a Prior Lease (provided that, in the case of a new lease, such new lease does not grant greater rights to use the leased premises for the Exclusive Use than did the Prior Lease).

(vii)   "Store Use Primarily for the Exclusive Use" shall mean any premises at the Shopping Center that devotes more than fifty percent (50%) of the floor area of such premises for the operation of a Professional Beauty Supply Store concurrently in connection with the operation of a Beauty Salon.

(b)   The agreement by Landlord not to enter into a lease agreement with any Competing Business or Competitor shall if (i) tenant or any permitted assignee or permitted sublessee violates any provision of this lease that is not cured within any applicable time periods set forth in the lease; and (ii) tenant or any permitted assignee or permitted sublessee discontinues using all of the leased premises as a Beauty Salon and Professional Beauty Supply Store for more than thirty (30) days, whether or not consecutive.

11.   **Office Max** - During the initial term of this lease or during any renewal period hereunder, no portion of the Shopping Center (excluding the demised premises):

(a)   Leased to or occupied by any individual tenant or occupant who leases or occupies floor area equal to or greater than twenty-five thousand (25,000) square feet shall be used for the primary purpose of the sale of a general mix of office, home office, school or business products; computers and computer products; office, home office, school or business supplies or equipment; office furniture; and electronics (including by way of example those businesses operated by Office Depot, Staples, Office Shop Warehouse, and Workplace), or for use as a copy center or "Kinko" type of operation (all of which are hereinafter referred to as the Prohibited Uses); and

(b)   Leased to or occupied by any individual tenant or occupant who leases or occupies floor area of less than twenty-five thousand (25,000) square feet shall be used for any purpose which would permit more than three thousand (3,000) square feet of floor area to be used for any of the Prohibited Uses.

Notwithstanding the foregoing:

(c)   The restrictions set forth above shall not be applicable to those existing leases with tenants at the Shopping Center which are set forth in Exhibit "E" to the lease, to the extent such existing leases permit the use of the premises for the Prohibited Uses; provided,

423568 v7 (00051.00138.000)

however, upon any assignment or subletting under such leases, Landlord shall enforce tenant's rights set forth above unless (A) such assignment or subletting is for a purpose presently permitted by such leases and (B) (1) Landlord is not presently permitted, pursuant to the terms of such lease, to enforce tenant's rights hereunder in connection with such assignment or sublease, or (2) the enforcement of such rights would be unreasonable under the terms of any such existing lease for which Landlord's consent is required to be reasonable with respect to any assignment or sublease under such existing lease.    Nothing herein shall require Landlord to exercise any recapture or termination rights under any such leases.

(d)    In addition, the restrictions set forth above shall not be applicable to any leases executed by Landlord after the date of execution hereof with a proposed tenant whose primary and principal use (and that of any assignee or subtenant of such tenant) is the sale of consumer electronics (including by way of example the product mix sold by those businesses operated by Best Buy, Service Merchandise, Circuit City, Fretter, and Radio Shack).    For purposes of this paragraph (iv), "consumer electronics' shall mean the sale of televisions, VCRs, radios, answering machines, camcorders, stereos, electronic games, telephones, kitchen and laundry appliances, and other electronics intended primarily for residential consumer use.

(e)    The restrictions set forth above shall not be applicable to any leases executed by Landlord after the date of execution hereof with (A) CompU.S.A. or Computer City, (B) a national or regional chain tenant who primarily sells computer products, or (C) a tenant who sells computer products only on an "incidental basis" (which shall mean the sale of computer products from less than ten percent (10%) of such tenant's floor area).

(f)    Notwithstanding any other provision of this Article 21, a lease may be executed with a tenant for purposes of the Prohibited Uses upon the satisfaction of the following conditions:

(i)    Tenant shall discontinue its operations in the demised premises for a continuous period in excess of six (6) months (excluding any such discontinuance due to damage or destruction of the demised premises or condemnation);

(ii)    Landlord shall have delivered written notice to tenant of such proposed lease, which notice shall also set forth the proposed use by such tenant and the actual "use" clause contained in such proposed lease, to the extent such clause has been negotiated by Landlord (the "Proposed Use"); and

8 – Ex "F"                                                   423568 v7 (00051.00138.000)

(iii)    Within fifteen (15) days after receipt of such written notice from Landlord, tenant shall not have delivered written notice to Landlord either that (1) tenant shall reopen for business in the demised premises for a period of no less than six (6) months, within sixty (60) days after the date of such written notice to Landlord, or (2) tenant has assigned the lease or sublet the demised premises to an assignee or subtenant who shall reopen for business in the demised premises within sixty (60) days after the date of such written notice to Landlord.

If all of the conditions set forth in (A)-(C) above are satisfied, then such proposed lease may be executed with such proposed tenant for purposes of the Proposed Use, and the restrictions set forth in paragraphs (i)-(ii) above shall not be applicable to such proposed lease to the extent the Proposed Use permits the use of such premises by such tenant for purposes of the Prohibited Uses; provided, however, upon any assignment or subletting under such lease, Landlord shall enforce tenant's rights set forth above unless (A) such assignment or subletting is for a purpose permitted by such lease and (B) (1) Landlord is not permitted, pursuant to the terms of such lease, to enforce tenant's rights hereunder in connection with such assignment or sublease, or (2) the enforcement of such rights would be unreasonable under the terms of any such lease for which Landlord's consent is required to be reasonable with respect to any assignment or sublease under such lease.  Nothing herein shall require Landlord to exercise any recapture or termination rights under any such lease.  Notwithstanding the foregoing, if Landlord does not execute such proposed lease within one hundred eighty (180) days after the expiration of tenant's fifteen (15) day notice period set forth in (C) above, or if the use of the premises by such proposed tenant is materially changed or modified from the Proposed Use set forth in Landlord's notice to tenant under (B) above, then Landlord shall again deliver the written notice to tenant of such proposed lease in accordance with (B) above prior to the execution of such proposed lease by Landlord, and the execution of such proposed lease shall again be subject to the terms and conditions of (A)-(C) above.

(g)    If tenant assigns this lease or subleases the entire demised premises as permitted hereunder for any use other than the Prohibited Uses, the restrictions set forth above shall terminate and be of no further force or effect, so long as Landlord grants to tenant's assignee or subtenant an exclusive with respect to such assignee's or subtenant's primary use; provided, however, that Landlord shall have no obligation to grant any such exclusive to such assignee or subtenant.  The description of the primary use subject to such exclusive shall be'

9 – Ex "F"

subject to the approval of Landlord and such assignee or subtenant, and the scope of such exclusive shall otherwise be on the same terms and conditions, and with the same exceptions, as that contained in this Article 21, including, without limitation, the remedies granted to tenant hereunder for a violation of such exclusive.  Such exclusive shall commence as of the effective date that Landlord and such assignee or subtenant agree upon the description of such exclusive. Any existing tenant or other occupant of the Shopping Center as of such effective date shall not be bound by the exclusive granted to tenant's assignee or subtenant as set forth above, to the extent such existing lease and/or other agreement with such tenant or occupant permits such tenant or occupant to use, or does not prohibit such tenant or occupant (or any assignee or sublessee) from using, its respective premises for purposes of the uses prohibited by such exclusive.

(h)     Commencing from and after the date that at least six (6) retail tenants occupying a minimum floor area of twenty-five thousand (25,000) square feet are open and operating in the Shopping Center, Landlord shall have the right to execute a lease with a copy center or "Kinko" type of operation, provided that the floor area occupied by any such tenant does not exceed five thousand (5,000) square feet.

In addition, during the initial term of this lease or during any renewal period hereunder no portion of the Shopping Center located within one hundred linear feet (100') of the demising walls of the demised premises shall be used as a restaurant, delicatessen, nightclub or other entertainment facility, or for office purposes (such as medical or office uses), (all of which are hereinafter referred to as the "Restricted Uses"), provided that nothing contained herein shall be deemed to prohibit the use of employee lunch rooms or vending machines within the Shopping Center.

The restrictions set forth in above shall be deemed to be covenants running with the land and shall bind and burden the Shopping Center and shall inure to the benefit of the demised premises and tenant.  In the event of a violation by Landlord of the foregoing restrictions which is not cured within sixty (60) days after written notice thereof from tenant to Landlord, tenant shall have the right to terminate this lease upon sixty (60) days advance written notice to Landlord; provided, however, if tenant does not so immediately terminate this lease, then so long as such Prohibited Use and/or Restricted Use continues, tenant shall have the right (i) to pay as rent hereunder either (A) the minimum rent herein provided for less the total rental paid by the

423568 v7 (00051.00138.000)

tenant or tenants (or their assignees, subtenants, licensees, concessionaires, or other occupants) using their premises (or any portion thereof) for the Prohibited Use or Restricted Use for such period, or (B) one percent (1%) of gross sales from the demised premises during such period, and (ii) to terminate this lease at any time such Prohibited Use or Restricted Use continues upon sixty (60) days advance written notice to Landlord.  If tenant fails to deliver written notice of termination to Landlord with respect to any such violation within one (1) year after the date such Prohibited Use and/or Restricted Use commenced, then tenant shall have no further right to terminate this lease or pursue any other remedy against Landlord as a result of such violation, or to initiate any other remedy with respect to such violation.

Notwithstanding anything to the contrary set forth above, if any tenant or occupant of the Shopping Center uses its premises for any of the Prohibited Uses and/or Restricted Uses in violation of its lease or occupancy agreement, then so long as Landlord promptly after notice thereof commences and diligently pursues all rights and remedies available to Landlord under its lease or other agreement with such tenant or occupant, or otherwise available at law or in equity, to cause such violation to cease, tenant shall not have the right to terminate this lease or pay alternative rent as set forth above as a result of such violation.  In addition, tenant shall have the right, at tenant's expense to participate in any and all proceedings instituted by Landlord against such tenant or occupant or to pursue tenant's separate rights and remedies against such tenant or occupant as result of such violation, and Landlord shall cooperate with tenant for such purposes.

If at any time during the term of this lease (and any renewals hereunder) Landlord (or any entity in which Landlord owns or controls a beneficial interest, or any affiliate of Landlord) shall purchase, acquire, lease, or otherwise obtain the ownership or beneficial use of any property within a one (1) mile radius of the Shopping Center, the restrictions set forth in this Article 21 shall be deemed to be covenants running with such additional property and shall bind and burden such additional property and shall inure to the benefit of the demised premises and tenant to the same extent that such additional property would have been subject to such restrictions if it were part of the "Shopping Center" as of the date of execution hereof.

12.    **Wraps** - SECTION 7.1. Use of leased premises.  Landlord agrees that during the term of this lease including the renewal option, so long as tenant is not in default, Landlord will not lease space to another tenant whose business is the sale of Mexican and gourmet burritos for on and off premises consumption, except Landlord may lease to a full service restaurant who

sells burritos.  In addition, Landlord agrees not to lease space in Pad "A' to a concept similar to Smoothie King.

13.    **GNC** - SECTION 7.1. Use of leased premises.  Landlord agrees that during the term of this lease including the renewal option, so long as tenant is not in default, Landlord will not lease space in the Shopping Center to another tenant whose primary business is the sale of vitamins and supplements.

14.    **ICBY/Juice Works/Smoothie King** - Modification of Section 7.1.  "Exclusive Use".  So long as tenant is not in default under the terms of this lease and subject to the rights under existing leases, Landlord shall not, during the primary term or any extension term of this lease, (i) lease space in the portion of the Shopping Center designated as the "Exclusive Area" on Exhibit "B-1" to this lease to another tenant whose primary business is the sale of juices, smoothies, yogurt and ice cream, or (ii) lease space in the remainder of the Shopping Center to another tenant whose primary business is the sale of juices, smoothies, yogurt and ice cream until the date on which tenant first achieves $400,000.00 in gross sales for the preceding 12-month period.

15.    **TSO** - SECTION 7. 1. Use of premises.  Landlord agrees that during the term of this lease, so long as tenant is not in default, Landlord will not lease space in the area of the Shopping Center between Palais Royal and Major C to a tenant whose primary business is the retail sale of eyewear and eye examinations.

16.    **Café Express** - ARTICLE VII, CONDUCT OF BUSINESS BY TENANT. SECTION 7.1. Use of leased premises. During the term that tenant is operating (except for periods of time where tenant is closed due to fire, accident, other casualty. repair, remodeling, condemnation or acts of God, as permitted herein), a Cafe Express in the leased premises and provided tenant is not in default under the terms hereof beyond applicable cure periods, Landlord agrees that it will not lease other space in the Shopping Center within one hundred fifty feet (150') from the east wall of the leased premises for the operation of a self-service restaurant. Additionally, during the term and any renewals of the term of this lease, for so long as tenant is open for business (except for periods of time where tenant is closed due to fire, accident, other casualty, remodeling, condemnation or acts of God, as permitted herein) as a Cafe Express and not in default under the terms hereof beyond any applicable cure period, Landlord covenants and agrees that Landlord shall not lease space in the Shopping Center within the building of which

423568 v7 (00051.00138.000)

the leased premises are a part for a self-service restaurant containing more than one thousand five hundred (1,500) square feet nor will Landlord lease space 100 feet of the front door of the leased premises for any 'bar' (which for purposes of this paragraph only means an establishment that derives greater than seventy-five percent (75 %) of its gross revenue from the sale of alcoholic beverages for on-premises consumption).    The prohibitions set forth above shall not preclude Landlord from leasing any space for a sit-down restaurant within the Restricted Areas.

17.    **Dress Barn** - SECTION 18.06. Limited additional right of tenant.  So long as tenant is not in default hereunder and tenant has continuously operated in the premises in good faith in accordance with the lease for the permitted use, Landlord shall not lease anew any premises in the Jackwood building of the Shopping Center, which is shown single hatched on the Exhibit "B-1" Site Plan, to any tenant whose primary business is sale of "plus size" ladies apparel.  Notwithstanding anything to the contrary, the Exclusive Use shall not apply to (a) any tenant whose lease permits the assignment thereof or the subletting of the premises without the Landlord's express written approval; b) any tenant whose premises are in excess of 15000 square feet; c) any tenant with a lease predating this lease with a use clause not prohibiting the sale of "plus size" women's clothing; d) any tenant currently in occupancy at the Shopping Center; e) or any tenant devoting less than 2000 square feet of their GLA or deriving less than 20% of their gross receipts from goods and services within the Exclusive Use.

18.    **Rack Room** - SECTION 18.02. Limited additional right of tenant.  Landlord shall not lease anew any premises in the areas single hatched on Exhibit "B-2" in the Shopping Center, to any tenant whose primary business is a family shoe store.  Notwithstanding anything to the contrary, the Exclusive Use shall not apply to (a) any tenant whose lease permits the assignment thereof or the subletting of the premises without the Landlord's express written approval; b) any tenant whose premises are in excess of 25000 square feet; c) any tenant with a lease predating this lease whose permitted use would otherwise violate tenant's Exclusive Use; d) intentionally omitted; e) or any tenant devoting less than 25% of their GLA or deriving less than 25% of their gross receipts from goods and services within the Exclusive Use; f) any tenant who sells exclusively athletic shoes, or g) any tenant who exclusively sells children's shoes.

19.    **Starbuck's** - Section 6.1-Landlord agrees not to lease space to another tenant in the area marked on Exhibit "B-1" to the lease who sells whole or ground coffee beans or espresso based beverages.  Notwithstanding the above, any full service sit down restaurant and up to two

423568 v7 (00051.00138.000)

other 3000 square foot food service operations shall be permitted to sell espresso based beverages provided that such sales in any such space do not exceed 5% of such tenant's gross sales. The above restrictions shall not apply to Border's Books, Bagel Express, or any replacement of either tenant.

20.     **Chick Fil A** - Section 32:  Covenant Not to Compete:  Landlord covenants and agrees that no "outparcel" or free standing building on the Adjoining Property or within the Meyerland Plaza Center as shown on Exhibit "B" to the lease shall hereafter be leased, used or occupied as a restaurant selling or serving chicken as a principal menu item.  For purposes hereof, "principal menu item" shall mean any restaurant deriving 25% or more of its gross sales from the sale of chicken.

II.     Permitted Title Exceptions:

1.  Utility easement Ten (10) feet in width, together with an aerial easement adjoining thereto Five (5) feet in width from a plane Twenty (20) feet above the ground upward, as described by instrument dated April 23, 1957, executed by Meyerland Company granted to Houston Lighting and Power Company filed for record on June 25, 1957 in Volume 3340, Page 320 (File No. 1757274) of the Deed Records of Harris County, Texas. Said easement subject to Consent to Encroachment dated April 2, 1982, executed by Houston Lighting and Power Company and accepted by Meyerland Company, filed for record on April 29, 1982 under Harris County Clerk's File No. H427103, and partial release thereof as set forth in instrument recorded under Harris County Clerk's File No. T087136.  (As to Tract 1)

2.  A water main and lateral water line easement Five (5) feet in width, as described by instrument dated January 18, 1957, executed by Meyerland Company granted to the City of Houston filed for record on June 19, 1957 in Volume 3353, Page 92 (File No. 1767627) of the Deed Records of Harris County, Texas. A portion of said easement abandoned by City Ordinance No. 95-234 dated March 1, 1995 executed by the City of Houston filed for record on May 1, 1995 under Harris County Clerk's File No. R374708.  (As to Tract 1)

3.  A water main and lateral water line easement Five (5) feet in width, as described by instrument dated June 25, 1957, executed by Meyerland Company granted to the City of Houston filed for record on September 10, 1959 in Volume 3385, Page 4 (File No. 1794297) of the Deed Records of Harris County, Texas. A portion of said easement abandoned by City Ordinance No.

423568 v7 (00051.00138.000)

95-234 dated March 1, 1995 executed by the City of Houston filed for record on May 1, 1995 under Harris County Clerk's File No. R374708. (As to Tract 1)

4. An easement Ten (10) feet in width for the use of public utilities as described by instrument dated October 22, 1964, executed by Meyerland Company granted to the City of Houston recorded on December 28, 1964 in Volume 5766, Page 313 (File No. C012121) of the Deed Records of Harris County, Texas. A portion of said easement abandoned by City Ordinance No. 95-234 dated March 1, 1995 executed by the City of Houston filed for record on May 1, 1995 under Harris County Clerk's File No. R374708. (As to Tracts 1 and 4)

5. An easement Ten (10) feet in width, together with an aerial easement Five (5) feet wide, Twenty (20) feet above the ground upward adjacent thereto, and Thirteen (13) foot by Twelve (12) foot transformer station, as described by instrument dated January 12, 1965, executed by Meyerland Company granted to Houston Lighting and Power Company filed for record on January 22, 1965 in Volume 5795, Page 202 (File No. C025763) of the Deed Records of Harris County, Texas. (As to Tracts 1 and 4)

6. Electrical easement Five (5) feet in width, together with an aerial easement Five (5) feet wide from a plane Twenty (20) feet above the ground upward adjacent thereto, as described by instrument dated December 6, 1954, executed by Meyerland Company granted to Houston Lighting and Power Company filed for record on December 10, 1954 in Volume 2866, Page 189, (File No. 1352445) of the Deed Records of Harris County, Texas. (As to Tracts 2 and 4)

7. A Three (3) foot wide, Twenty-five (25) foot long guy easement, as described by instrument dated June 20, 1960, executed by Meyerland Company granted to the City of Houston filed for record October 31, 1960 in Volume 4186, Page 71 (File No. B251695) of the Deed Records of Harris County, Texas. (As to Tract 1)

8. A Ten (10) foot wide easement, as described by instrument dated February 20, 1969, executed by Meyerland Company granted to Houston Lighting and Power Company filed for record March 10, 1969 in Volume 7536, Page 102 (File No. C875410) of the Deed Records of Harris County, Texas. (As to Tract 1)

9. A Ten (10) foot wide water line easement, as described by instrument dated January 25, 1969, executed by Meyerland Company granted to the City of Houston filed for record

423568 v7 (00051.00138.000)

October 22, 1969 in Volume 7797, Page 559 (File No. D004966) of the Deed Records of Harris County, Texas. (As to Tract 1)

10. A Ten (10) foot wide water line easement, as described by instrument dated February 18, 1969, executed by J.C. Penny Company, Inc. granted to the City of Houston filed for record October 22, 1969 in Volume 7797, Page 565 (File No. D004968) of the Deed Records of Harris County, Texas. A portion of said. easement abandoned by City Ordinance No. 95-234 dated March 1, 1995 executed by the City of Houston filed for record on May 1, 1995 under Harris County Clerk's File No. R374708. (As to Tract 1)

11. Permission to Build over City Easement (Ordinance No. 9873) dated September 22, 1970 executed by the City of Houston and accepted by Meyerland Company filed for record on September 30, 1970 recorded in Volume 8161, Page 527 (File No. D189125) of the Deed Records of Harris County, Texas.

12. Storm and sanitary sewer easement, as described by instrument dated July 6, 1970, executed by Meyerland Company granted to J.C. Penny Company, Inc. filed for record on August 10, 1970 in Volume 8102, Page 207 (File No. D158271) of the Deed Records of Harris County, Texas. (As to Tract 1)

13. A Ten (10) foot wide water meter easement Twenty (20) feet long, as described by instrument dated January 7, 1970, executed by Meyerland Company, granted to the City of Houston filed for record on November 13, 1970 in Volume 8213, Page 149 (File No. D215749) of the Deed Records of Harris County, Texas. (As to Tract 1)

14. A Ten (10) foot wide water meter easement Twenty (20) feet long, as described by instrument dated January 7, 1970, executed by Meyerland Company, granted to the City of Houston filed for record on November 13, 1970 in Volume 8213, Page 152 (File No. D215750) of the Deed Records of Harris County, Texas. (As to Tract 1)

15. A Ten (10) foot wide water meter easement Twenty (20) feet long, as described by instrument dated September 22, 1970, executed by J.C. Penny Company, Inc., granted to the City of Houston filed for record on April 23, 1971 in Volume 8397, Page 49 (File No. D311588) of the Deed Records of Harris County, Texas. (As to Tract 3)

423568 v7 (00051.00138.000)

16. A Ten (10) foot utility easement, as described by instrument dated June 20, 1960, executed by Meyerland Company, to the City of Houston filed for record on October 31, 1960 in Volume 4186, Page 73 (File No. B251696) of the Deed Records of Harris County, Texas. (As to Tract 3)

17. A Ten (10) foot wide easement, together with an aerial easement Twenty (20) feet above the ground upward adjacent thereto, as described by instrument dated January 14, 1969, executed by Meyerland Company granted to Houston Lighting and Power Company filed for record on March 4, 1969, in Volume 7530, Page 156 (File No. C872212) of the Deed Records of Harris County, Texas. (As to Tract 3)

18. Ten (10) foot building lines along all street right of ways for all of the subject property, as reflected by the plat filed for record on October 28, 1955 in Volume 50, Page 54 of the Map records of Harris County, Texas. (As to all tracts)

19. Water meter easement Ten (10) feet in width and Twenty (20) feet in length, as described by instrument dated September 1, 1994, executed by Anchises Venture Corporation granted to the City of Houston filed for record on January 18, 1995 under Harris County Clerk's File No. R235736. (As to Tract 1)

20. Water meter easement Ten (10) feet in width and Five (5) feet in length, as described by instrument dated September 1, 1994, executed by Anchises Venture Corporation granted to the City of Houston filed for record on January 18, 1995 under Harris County Clerk's File No. R235737. (As to Tract 1)

21. Underground electrical distribution system easement as described by instrument dated December 12, 1994 executed by Anchises Venture Corporation granted to Houston Lighting and Power Company filed for record on January 17, 1995 under Harris County Clerk's File No. R231694. (As to Tract 1)

22. An easement Ten (10) feet in width and an easement Fifteen (15) feet in width and Fifteen (15) feet in length, as described by instrument dated January 20, 1995, executed by Anchises Venture Corporation granted to Houston Lighting and Power Company filed for record on February 17, 1995 under Harris County Clerk's File No. R260852. (As to Tract 1)

23.  An easement Ten (10) feet in Three (3) separate locations together with an aerial easement adjacent thereto, as described by instrument dated April 12, 1995, executed by Anchises Venture Corporation granted to Houston Lighting and Power Company filed for record on May 11, 1995 under Harris County Clerk's File No. R391592. (As to Tracts 1 and 4)

24.  Water line and sanitary sewer easements (4) granted and described by instrument dated February 8, 1995, executed by Anchises Venture Corporation granted to the City of Houston filed for record on March 27, 1995 under Harris County Clerk's File No. R326894. (As to Tract 1)

25.  A reserve one (1) foot in width to prevent rear drive access from lots in Meyerland, Section One, as reflected by the plat filed for record on October 26, 1955 in Volume 50, Page 54 of the Map Records of Harris County, Texas. (As to Tract 4)

26.  Terms, conditions and stipulations contained in Proposed Encroachment Agreement, filed for record under Harris County Clerk's File No. U703033. (As to Tract 4)

27.  Terms, conditions and stipulations contained in Southwestern Bell Telephone Company Easement For Telecommunication Facilities, filed for record under Harris County Clerk's File No. V215910. (As to Tract 5)

28.  Right to occupy the "demised premises", as evidenced by that certain Notice of Lease, dated February 27, 1962, between Meyerland Company, as landlord, and Meyerland State Bank, as tenant, recorded March 6, 1962, under Clerk's File No. B467527 in Volume 1422, beginning at Page 254 of the real property records of Harris County, Texas, and that certain Memorandum of Lease, dated April 4, 1974, between Meyerland Company, as landlord, and Meyerland Bank, as tenant, recorded April 8, 1974, under Clerk's File No. E123336 in the real property records of Harris County, Texas.

29.  Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated January 18, 1971, between Meyerland Company, as landlord, and Palais-Meyerland, Inc., as tenant, recorded January 20, 1971, under Clerk's File No. D251070 in Volume 2345, beginning at Page 445 of the real property records of Harris County, Texas.

30.  Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated September 1, 1972, between Meyerland Company, as landlord, and J.C. Penney

423568 v7 (00051.00138.000)

Company, Inc., as tenant, recorded September 28, 1972, under Clerk's File No. D700980 in the real property records of Harris County, Texas, as amended by that certain Amended and Restated Memorandum of Lease and Agreement and Termination of Operating Agreement, dated July 30, 1993, between Meyerland Plaza Venture, as landlord, and J.C. Penney Company, Inc., as tenant, recorded August 2, 1993, under Clerk's File No. P371306 in the real property records of Harris County, Texas.

31.  Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated March 31, 1994, between Anchises Venture Corporation, as landlord, and Bed Bath & Beyond of Meyerland, Inc., as tenant, recorded May 27, 1994, under Clerk's File No. P881512 in the real property records of Harris County, Texas.

32.  Right to occupy the "demised premises", as evidenced by that certain Short Form Lease for Recording, dated November 3, 1993, between Anchises Venture Corporation, as landlord, and Marshalls Department Store of Houston-Beechnut, TX, Inc., as tenant, recorded August 3, 1994, under Clerk's File No. P994510 in the real property records of Harris County, Texas.

33.  Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated March 28, 1995, between Anchises Venture Corporation, as landlord, and Stein Mart, Inc., as tenant, recorded May 1, 1995, under Clerk's File No. R373647 in the real property records of Harris County, Texas.

34.  Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated May 29, 1996, between Anchises Venture Corporation, as landlord, and Dupey Management Corporation, as tenant, recorded June 17, 1996, under Clerk's File No. R978246 in the real property records of Harris County, Texas.

35.  Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated July 22, 1996, between Anchises Venture Corporation, as landlord, and The Gap, Inc., as tenant, recorded August 1, 1996, under Clerk's File No. S045344 in the real property records of Harris County, Texas.

36.  Right to occupy the "demised premises", as evidenced by that certain Memorandum of Ground Lease, dated July 25, 1997, between Meyerland Plaza Venture, as landlord, and

423568 v7 (00051.00138.000)

S.P.P., Inc., as tenant, recorded September 3, 1997, under Clerk's File No. S618761 in the real property records of Harris County, Texas.

37.   Right to occupy the "demised premises", as evidenced by that certain Short Form Lease, dated August 17, 1999, between Ronus Meyerland Plaza, L.P., as landlord, and Chick-Fil-A, Inc., as tenant, recorded August 20, 1999, under Clerk's File No. T919997 in the real property records of Harris County, Texas.

38.   Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated July 21, 2000, between Ronus Meyerland Plaza, L.P., as landlord, and 24 Hour Fitness, Inc., as tenant, recorded January 1, 2001, under Clerk's File No. U847133 in the real property records of Harris County, Texas.

39.   Right to occupy the "demised premises", as evidenced by that certain Memorandum of Lease, dated April 16, 2003, between Ronus Meyerland Plaza, L.P., as landlord, and Ross Stores Texas, L.P., as tenant, recorded May 13, 2003, under Clerk's File No. W661284 in the real property records of Harris County, Texas, and re-recorded August 18, 2003, under Clerk's File No. W935843 in the real property records of Harris County, Texas.

40.   Right to occupy the "demised premises" by tenants under unrecorded leases.

41.   Deed of Trust, Assignment, Security Agreement and Financing Statement, dated May 11, 1998, executed and delivered by Ronus Meyerland Plaza, L.P., as mortgagor, to NationsBank, N.A., as mortgagee, recorded May 13, 1998, under Clerk's File No. T018103 in the real property records of Harris County, Texas, as secured by that certain Collateral Assignment of Lessor's Interest in Leases, dated May 11, 1998, executed and delivered by Ronus Meyerland Plaza, L.P., as assignor, to NationsBank, N.A., as assignee, recorded May 13, 1998, under Clerk's File No. T018104 in the real property records of Harris County, Texas, and that certain UCC Financing Statement recorded May 13, 1998, under Clerk's File No. T018105 in the real property records of Harris County, Texas, as assigned by that certain _____, dated ____, executed and delivered by NationsBank, N.A., as assignor, to Citicorp Real Estate, Inc., as assignee, recorded ____ under Clerk's File No. T311389 in the real property records of Harris County, Texas, as modified by that certain Deed of Trust and Security Modification Agreement, dated September 29, 1998, executed and delivered by Ronus Meyerland Plaza, L.P., as mortgagor, to Citicorp Real Estate, Inc., as mortgagee, recorded October 7, 1998, under Clerk's

423568 v7 (00051.00138.000)

File No. T311391 in the real property records of Harris County, Texas, as secured by that certain Amended and Restated Assignment of Lessor's Interest in Leases, dated September 29, 1998, executed and delivered by Ronus Meyerland Plaza, L.P., as assignor, to Citicorp Real Estate, Inc., as assignee, recorded October 7, 1998, under Clerk's File No. T311392 in the real property records of Harris County, Texas, and that certain UCC Financing Statement recorded October 7, 1998, under Clerk's File No. T311393 in the real property records of Harris County, Texas, as assigned, as evidenced by that certain Assignment of Deed of Trust and Assignment of Lessor's Interest in Leases, dated November 8, 2001, executed and delivered by Citicorp Real Estate, Inc., as assignor, to Regency Savings Bank, FSB, as assignee, recorded November 12, 2001, under Clerk's File No. V417417 in the real property records of Harris County, Texas, and re-recorded January 2, 2002, under Clerk's File No. V513646 in the real property records of Harris County, Texas.

Subject to the terms of the Lease, notwithstanding anything contained in this Exhibit "F" to the contrary, nothing contained herein shall be construed to prohibit the exercise of the rights and privileges granted to Tenant under the Lease, including but not limited to Tenant's exclusive use rights set forth in paragraph 18 of the Lease.

423568 v7 (00051.00138.000)

# EXHIBIT "F-1"

BORDER'S LETTER AGREEMENT

423568 v7 (00051.00138.000)



Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

April 13, 2004

Vice President, Real Estate
Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

Vice President – Development
Borders, Inc.
100 Phoenix Drive
Ann Arbor, MI 48108-2202

Re:    Modifications of Exclusive Use Provisions as to Circuit City Stores, Inc. ("Circuit City")
and Borders, Inc. ("Borders"), with respect to premises in Meyerland Plaza, Houston, TX.

To Whom It May Concern:

This letter, when executed by both parties, will confirm the agreement ("Agreement") between
Circuit City and Borders to modify the parties' existing exclusive use provisions ("Exclusives")
contained in their respective leases for the separate premises currently occupied by Borders
("Borders Premises") and Circuit City ("Circuit City Premises"), respectively, in the Shopping
Center, as set forth below:

1.    **Inapplicability of Exclusives**.  The respective Exclusives in favor of Circuit City and
Borders for the Shopping Center shall not be applicable to the other party (or its respective
corporate successor) and the provisions of paragraphs 2 and 3 below shall govern all Exclusives
with respect to the Shopping Center as between Circuit City and Borders.

2.    **Modified Borders Exclusive**.  Except as set forth in this paragraph 2, no portion of the
Circuit City Premises shall be used for the sale of books or periodicals in any current or future
format.  In addition, no portion of the Circuit City Premises shall be utilized for the operation of
a "coffee bar" in any format, whether as an incidental or primary use.  The foregoing shall not
restrict or prohibit (i) the incidental sale of books or periodicals on the Circuit City Premises or
(ii) the incidental operation of a "coffee bar" on the Circuit City Premises, provided that an
aggregate of not more than ten percent (10%) of the floor area in the Circuit City Premises is
dedicated, collectively with respect to (i) and (ii), to such operation and such sales.  This
provision shall not restrict the sale of professionally pre-recorded and packaged video
entertainment and music in all current and future formats, CD-ROM, or other multi-media
computer software, at the Circuit City Premises.  The modified exclusive set forth in this
paragraph 2 shall remain in effect only so long as the Circuit City Premises is used under any
trade name for all or any of the following primary purposes (subject to temporary cessations not
to exceed ten (10) months): the sale of consumer, business and automotive electronic products,
computers and related hardware and software, cellular telephones, and/or household appliances.
In the event of the termination of this modified exclusive due to the Circuit City Premises not
being used for the foregoing primary purposes, the existing Exclusive in Borders' Lease shall be
deemed applicable to the Circuit City Premises (a copy of that existing exclusive is attached
hereto as Exhibit "A").

3.    **Modified Circuit City Exclusive**.  Except as set forth in this paragraph 3, no portion of
the Borders Premises shall be used for the sale or rental (including rent to own) of consumer,
office or automotive electronics products (which include, but shall not be limited to, televisions,
stereos, speakers, and video recorders and players), computers and related hardware and
software, entertainment software and entertainment media (which include, but shall not be

1

limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers), or the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"). The foregoing shall not restrict or prohibit the incidental sales of the Products on the Borders Premises provided not more than an aggregate of ten percent (10%) of the floor area is dedicated to retail sales of such Products, with the exception that no restriction shall apply to the sale of professionally pre-recorded and packaged video entertainment and music in all current and future formats, CD-ROM, or other multi-media computer software at the Borders Premises. The modified exclusive set forth in this paragraph 3 shall remain in effect only so long as the Borders Premises is used under any trade name for all or any of the following primary purposes (subject to temporary cessation not to exceed ten (10) months): the sale of (i) books, (ii) periodicals, (iii) video or pre-recorded movie products, and/or (iv) music products (in any current or future format of such enumerated items). In the event of the termination of this modified exclusive due to the Borders Premises not being used for the foregoing primary purposes, the existing Exclusive in Circuit City's Lease shall be deemed applicable to the Borders Premises (a copy of that existing Exclusive is attached hereto as Exhibit "B") except that Borders' successors as occupant of the Borders Premises shall, in all events, be permitted to sell the Products on an incidental basis but not as a primary use.

4.    **Miscellaneous**. This Agreement shall be binding upon and the inure to the benefit of the parties hereto and their respective successors and assigns. The terms of this Agreement shall be included in any lease, sublease, assignment agreement or other instrument transferring a party's interest in its lease or its premises at the Shopping Center.

Dated: ___4/14/04___                    Circuit City Stores, Inc.

                                         By: _____
                                             Thomas C. Nolan
                                         Its: Vice President, Real Estate

Dated: ___4-19-04___                     Borders, Inc.

                                         By: _____

                                         Its: Vice President - Development