# EXHIBIT B Part 3

## EXHIBIT "G"

After recording return to:

### SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

### (MORTGAGE)

This   SUBORDINATION,   NON-DISTURBANCE   AND   ATTORNMENT AGREEMENT, dated the _____ day of April, 2004, between _____, a _____ ("Mortgagee"), and CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant").

### W I T N E S S E T H :

(a)      Tenant has entered into a certain lease (the "Lease") dated April ___, 2004, with RONUS MEYERLAND PLAZA, L.P. ("Landlord"), covering premises located within that certain property known as Meyerland Plaza Shopping Center, located in the City of Houston, Harris County, Texas, and more particularly described in Schedule A hereto; and

(b)      Mortgagee has made a loan to Landlord as evidenced and secured by a Deed of Trust recorded _____, 2004 in the land records of Harris County, Texas, in Book _____ at page _____ (the "Mortgage"), encumbering the property described in Schedule A; and the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

NOW, THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.      The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of the principal sum secured thereby and interest thereon.

2.      Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of foreclosure, the successors and assigns of such purchasers, as its Landlord for

423568 v7 (00051.00138.000)

the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease.

3.    In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the material terms, covenants, or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.    Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.    In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

(a)    liable for any act or omission of any prior lessor (including Landlord); or

(b)    liable for the return of any security deposits unless delivered to Mortgagee; or

(c)    bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(d)    bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

6.    Notwithstanding the foregoing, Mortgagee acknowledges and agrees that if Mortgagee shall succeed to the interest of Landlord under this Lease, Mortgagee shall be subject to Tenant's remedies properly exercised under the Lease, including but not limited to Tenant's rights of self-help and/or setoff for any default, obligation, act or omission of any prior lessor (including Landlord) as provided in the Lease and that such rights of Tenant are not limited or impaired in any way by the terms and provisions of this Agreement.

7.    Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Landlord defaults in the payment of the Tenant Improvement Allowance, as defined in the Lease, and Mortgagee acquires title to the Shopping Center by foreclosure or otherwise, Mortgagee shall

423568 v7 (00051.00138.000)

become liable for payment of the Tenant Improvement Allowance to Tenant, and Tenant shall otherwise be entitled to effect a Transfer all in accordance with the terms of the Lease.

8. Mortgagee, Landlord and Tenant, respectively, represent and warrant to each other that each has the requisite power and authority to enter into this Agreement; that all necessary and appropriate approvals, authorizations and other steps have been taken to effect the legality of this Agreement; that the signatories executing this Agreement on behalf of Mortgagee, Landlord and Tenant have been duly authorized and empowered to execute this Agreement on behalf of Mortgagee, Landlord and Tenant, respectively; and that this Agreement is valid and shall be binding upon and enforceable against Mortgagee, Landlord and Tenant shall inure to the benefit of the parties hereto, and their successors and assigns and shall inure to the benefit of Mortgagee.

9. Tenant hereby agrees that, upon the occurrence of an Event of Default (as defined in the Lease), Mortgagee shall have the same time period for cure of such default as is given Landlord in accordance with the terms of the Lease, following notice given by Tenant to Mortgagee at the following address, in the same method for notice as is required under the Lease:

10. All notices between the parties hereto shall be in writing and comply with the terms of paragraph 32 of the Lease.

IN WITNESS WHEREOF, the parties hereto have executed these presents the day and year first above written.

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

_____

Its: _____

By: _____
Thomas C. Nolan, Vice President

MORTGAGEE:

ATTEST:

_____

Its: _____

By: _____
Name: _____
Title: _____

[Note: Attach appropriate notary blocks for the State]

3 – Ex "G"

423568 v7 (00051.00138.000)

## EXHIBIT "H"

After recording, return to:
Kane, Russell, Coleman & Logan, P.C.
3700 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201
Attention: Robert J. Riek, Esq.

### MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE is made this _____ day of May 2004, between **RONUS MEYERLAND PLAZA, L.P.**, a Georgia limited partnership, having an address of Piazza at Paces, 3290 Northside Parkway, Suite 250, Atlanta, Georgia 30327 (hereinafter referred to as "Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address of Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 (hereinafter referred to as "Tenant").

### W I T N E S S E T H :

Landlord and Tenant have entered into a Lease (the "Lease") dated May 18, 2004, whereby Landlord has leased to Tenant a portion of the real property (the "Property") commonly known as the Meyerland Plaza Shopping Center in Houston, Harris County, Texas, the legal description of which Property is set forth on Exhibit "A-1" attached hereto, together with certain non-exclusive easements in, over, upon, across, under and through certain areas of the Property defined in the Lease as Landlord's Premises, and all easements and rights pertaining thereto, including, without limitation, those certain rights and non-exclusive easements granted to or inuring to the benefit of Landlord under that certain (OEA and other easement estates of record) recorded in Book _____, beginning at Page _____ of the real property records of Harris County, Texas, in, over, upon, across, under and through the land described therein. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.    Term. The term of the Lease is for a period of ten (10) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease

to renew and extend the term of the Lease for three (3) successive periods of five (5) years each.

II.   <u>Exclusive Use Rights</u>. The Lease provides that Tenant shall enjoy the sole and exclusive privilege within the Property to sell, rent, service, repair or rent to own consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video and audio recorders and players and cameras), computer hardware and software and related software services, including internet access services, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment), cellular and wireless telephones and telecommunication devices and related goods, and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and the renting, servicing, repairing and warehousing of the Products.  Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the preceding sentence.  As used herein, "Incidental Sale" shall mean the lesser of (i) four hundred (400) square feet, or (ii) twenty percent (20%) of such occupant's or tenant's display area.  In the event Tenant shall have abandoned the foregoing use to which it has exclusive rights under this subparagraph, for twelve (12) consecutive months, such exclusive rights shall terminate, provided however, such rights shall not terminate if during such twelve (12) consecutive months, Tenant shall deliver written notice to Landlord advising Landlord that Tenant will resume such use within six (6) months of the date of such notice and such use is resumed within such six (6) month period.  Further, the exclusive granted Tenant shall not apply to, bind or restrict the operation of a national warehouse store, such as "Costco", or "Sam's Club", a full-line department store, such as a "JC Penny" or "Sears," or, a national home improvement store, such as a "Home Depot," or "Lowe's."  In addition, Landlord shall be permitted to replace tenants under leases or other occupancy agreements existing as of the date hereof with tenants utilizing the approximately same size (not to increase more than 5%) for the same use as the prior tenant (e.g., Landlord shall be permitted to replace an existing tenant engaged in the primary business of selling cellular telephones with a replacement

423568 v7 (00051.00138.000)

tenant whose primary business is selling cellular telephones), provided such replacement tenants shall not be relocated within three hundred feet (300') of the Premises.

III.    <u>Successors</u>.  The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

IV.    <u>Incorporation of Lease</u>.  All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

V.    <u>Conflicts with Lease</u>.  This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter, modify, expand, diminish or supplement the provisions of the Lease.  In the event of any inconsistency between the provisions of this Memorandum of Lease and the provisions of the Lease, the provisions of the Lease shall govern.

    423568 v7 (00051.00138.000)

IN WITNESS WHEREOF, this Memorandum of Lease has been duly executed by the parties hereto as of the day and year first above written.

LANDLORD

Witnesses:

**RONUS MEYERLAND PLAZA, L.P.,**
a Georgia limited partnership

_____
Printed Name:_____

_____          By:    Ronus Meyerland, Inc.,
Printed Name:_____                 a Georgia corporation, its general partner

                                                       By:_____
                                                       Name: _____
                                                       Title: _____

**Note: Attach appropriate notary block for the State]**

4 – Ex "H"

Witnesses:

TENANT:

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

_____
Printed Name:_____

_____
Printed Name: _____

By:_____
       Thomas C. Nolan, Vice President

COMMONWEALTH OF VIRGINIA          )
                                  ) ss.
COUNTY OF HENRICO                 )

    I certify that on May ___, 2004, before me, the undersigned, a Notary Public in and for said State, personally appeared Thomas C. Nolan, Vice President of **CIRCUIT CITY STORES, INC.**, a Virginia corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and on oath acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person or the entity upon behalf of which he acted executed the instrument.

    **WITNESS** my hand and official seal.

_____
Notary Public in and for the Commonwealth of
Virginia, residing at _____
My commission expires: _____
_____
[Type or Print Notary Name]

423568 v7 (00051.00138.000)

## EXHIBIT "I"

### COMMENCEMENT DATE AGREEMENT

This COMMENCEMENT DATE AGREEMENT, made as of this ____ day of May 2004, between **RONUS MEYERLAND PLAZA, L.P.**, a Georgia limited partnership (herein called "Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation (herein called "Tenant").

### W I T N E S S E T H :

WHEREAS, Landlord is the owner of certain premises situated in Houston, Harris County, Texas (herein called the "Premises"); and

WHEREAS, by that certain Lease dated May 18, 2004 (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of Harris County, Texas on the ____ day of May, 2004, in Book ____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 2004. The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2.    The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the third Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the

423568 v7 (00051.00138.000)

Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**RONUS MEYERLAND PLAZA, L.P.,**
a Georgia limited partnership

By:    Ronus Meyerland, Inc.,
       a Georgia corporation, its general partner

       By:_____
       Name: _____
       Title: _____

TENANT:

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By:_____
       Thomas C. Nolan, Vice President

423568 v7 (00051.00138.000)

## EXHIBIT "J"

### INDEMNIFICATION AGREEMENT

This INDEMNIFICATION AGREEMENT is made this _____ day of May, 2004, between **RONUS MEYERLAND PLAZA, L.P.**, a Georgia limited partnership (hereinafter referred to as "Landlord") and **CIRCUIT CITY STORES, INC.**, a Virginia corporation (hereinafter referred to as "Tenant").

### W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated May 18, 2004, whereby Landlord has leased to Tenant a portion of the real property located in Houston, Harris County, Texas (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Tenant Improvement Allowance as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.      Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

EXECUTED this _____ day of May, 2004.

**RONUS MEYERLAND PLAZA, L.P.**,
a Georgia limited partnership

By:     Ronus Meyerland, Inc.,
        a Georgia corporation, its general partner

        By:_____
        Name: _____
        Title: _____

423568 v7 (00051.00138.000)

<u>TENANT</u>

CIRCUIT CITY STORES, INC.,
a Virginia corporation


By:_____
            Thomas C. Nolan, Vice President

423568 v7 (00051.00138.000)

## EXHIBIT "K"

PROHIBITED USES

**No portion of the Shopping Center, including the Premises, shall be used for any use or purpose which is contrary to or in violation of any of the following:**

A.   **PROHIBITED USES**

1.     1.     No bar, pub, tavern, nightclub, discotheque, music or dance hall or ballroom and no restaurant with sales of alcoholic beverages exceeding forty percent (40%) of its gross sales or containing a dance floor or live entertainment or selling alcoholic beverages for off-premises consumption shall be permitted.

2.     No bowling alley, skating rink, amusement center, park or gallery, entertainment facility, carnival, circus, gymnasium, sporting event or sports or game facility, arcade, pinball, video game room, poolroom or billiard hall (but this shall not prohibit the operation of a first class pool or billiard hall such as or similar to those operated by Dave & Busters, Chuck E Cheese or PlayLand USA), bingo parlor, flea market, pawn shop, shooting gallery, or gun range shall be permitted; provided that the foregoing shall not be deemed to limit or restrict the operation of pinball machines or video or other similar coin operated amusement machines which are consistent with the operation of a first-class theater or a family-style restaurant located in the Shopping Center.

2.     No operation whose principal use is a massage parlor shall be permitted; provided this shall not prohibit massages in connection with a beauty salon or health club or athletic facility (unless such uses are otherwise prohibited hereunder).

3.     No veterinary hospital or animal raising or boarding facilities shall be permitted (except that this restriction shall not be deemed to preclude the operation of pet shops or pet supply superstores such as PETsMART that offer veterinary services as an incidental use, unless such pet shop is otherwise prohibited hereunder).

4.     No funeral home, mortuary or similar establishment shall be permitted.

5.     No establishment shall be permitted which stocks, displays, sells, rents or offers for sale or rent any (i) pornographic or obscene material, as determined by community standards for the area in which the Shopping Center is located (provided that this shall not prohibit the operation of a first-class bookstore of the type customarily located in comparable shopping centers (unless otherwise prohibited hereunder)); or (ii) any merchandise or material commonly used or intended for use with or in consumption of any narcotic, dangerous drug or other controlled substance, including without limitation, any hashish pipe, waterpipe, bong, cilium, pipe screens, rolling papers, rolling devices, coke spoons or roach clips.

           423568 v7 (00051.00138.000)

6.      No tattoo parlors shall be permitted.

7.      No gambling facility or operation, including but not limited to, off-track or sports betting parlor; table games such as black-jack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not apply to governmental sponsored gambling activities or charitable gambling activities, so long as such governmental and/or charitable activities are incidental to the business operation being conducted by the occupant.

8.      No portion of the Shopping Center or the Premises shall be used as a mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during any periods of construction, reconstruction or maintenance).

9.      No selling, leasing or display of new or used automobiles, trucks, trailers, boats, recreational vehicles or mobile homes shall be permitted, nor shall any automotive repair, servicing or body shop operation (provided that car stereo installation facilities which are ancillary to any permitted retail use by a tenant, including Circuit City, shall not be prohibited), any car wash, tire, muffler, brake, transmission shop or convenience store be permitted.

10.     No gas stations shall be permitted (except with Landlord's and Circuit City's prior approval).

11.     No use that is illegal or dangerous, constitutes a public or private nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center shall be permitted.

12.     Except on outparcels, no non-retail uses shall be permitted, including service-oriented offices (except for a full service bank, savings and loan association or credit union and offices and storage facilities incidental to a primary retail operation, such permitted office use not to exceed an aggregate number of square feet equal to ten percent (10%) of the total square feet of leasable space within the Shopping Center and none of such offices shall be located within fifty (50) feet of Tenant's Building).

13.     No portion of the Shopping Center or Premises shall be used as a banquet hall, auditorium or other place of public assembly, or for warehouse use, storage or for any assembling, manufacturing, wholesale operations, industrial use, distilling (except for a brewpub restaurant not otherwise prohibited hereunder), refining, smelting, processing or rendering, agricultural or mining operation; provided that this prohibition shall not exclude assembly, manufacture, distillation and the like that may be carried on as an incident to a retail sales or service operation, such as, by way of illustration and not by way of limitation, assembly of toys or crafts, glassblowing or on-premises sale, manufacture or assembly of optical, dental or similar products, nor shall it exclude an operation similar to that operated by

Lenscrafters or a typical dentist office, subject to the limitations contained in Item 12 above.

14. No church use, school, day care center, educational or training facility, reading room (except in connection with a bookstore) be permitted, including but not limited to, beauty schools, barber colleges, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, that this prohibition shall not be applicable to on-site employee or customer training by an occupant incidental to the conduct of its business at the Shopping Center.

15. No portion of the Shopping Center or Premises shall be used for a hotel or residential use, including but not limited to, single-family dwellings, townhouses, condominiums, other multi-family units and other forms of living quarters, sleeping apartments or lodging rooms.

16. No cinema, movie theater or live performance theater shall be permitted within 500 feet of the Premises.

17. No "second-hand" store whose principal business is selling used or defective merchandise shall be permitted, specifically including any thrift shops, salvation army-type stores, "goodwill" type stores, and similar businesses, or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods (except for first-class multi-store tenants selling used merchandise such as "Play It Again Sports," "Once Upon a Child" or a similar-type national or regional retailer commonly found in first-class shopping centers, such tenants not to exceed an aggregate of 8,000 square feet within the Shopping Center, and provided that this restriction shall not prohibit TJMaxx, Marshall's, Stein Mart or other similar national retailers selling surplus or overstocked merchandise).

18. No gymnasium, sport or health club or spa shall be permitted in the Shopping Center within 500 feet of the Premises.

19. No dumping, disposing, incinerating, or reducing of garbage shall be permitted (exclusive of dumpsters for the temporary storage of garbage and any garbage compactors, in each case which are regularly emptied so as to minimize offensive odors).

20. No central laundry, dry cleaning plant, or Laundromat shall be permitted; provided, however, this restriction shall not apply to any dry cleaning facility providing on-site service oriented to pickup and delivery by the ultimate consumer, including nominal supporting facilities.

21. No use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any building in the Shopping Center shall be permitted (Tenant's car stereo installation facility is exempt from this restriction), nor shall

    423568 v7 (00051.00138.000)

any use which permits any noxious, toxic, caustic or corrosive fuel or gas be permitted.

22. Emission of microwave, radio wave, or other similar electronic, light or noise radiation at levels which are dangerous to health or which interfere with the proper operation of electronic, telephone, computer or other business equipment of tenants of the Shopping Center shall be prohibited.

23. No dust, dirt or fly ash in excessive quantities shall be permitted.

24. No unusual fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks shall be permitted.

25. No fire, going out of business, relocation, bankruptcy (unless pursuant to a court order) or similar sales or any auction house shall be permitted.

26. No plant nursery, greenhouse, day care center, liquor store, discount furniture warehouse, plasma center, abortion clinic, counseling office or AIDS testing or treatment facility shall be permitted.

27. No lumber yard shall be permitted, except in connection with a home improvement center.

## B. SITE COVENANTS

No portion of the Shopping Center shall be used for any use or purpose which is contrary to or in violation of the following:

1. No restaurant or bookstore shall be permitted within any building which is immediately adjacent to the Circuit City store (as shown on the Site Plan) or which is located within 200 feet of the nearest wall of the Circuit City store. Notwithstanding the foregoing, facilities serving prepared food and beverages and offering limited service, seating and kitchen facilities, including, without limitation, ice cream shops, donut shops, bagel shops and sandwich shops shall be permitted within any building which abuts the Circuit City store but not within 50 feet of the nearest wall of the Circuit City store.

2. No building adjacent to the Circuit City store shall exceed the height of the Circuit City store, nor shall it be positioned so as to project beyond the portion of the front wall of the Circuit City store immediately adjacent thereto, except as shown on the Site Plan.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Circuit City's Preferred Area (shown on Site Plan).

3. No development shall occur within the area labeled "Tenant Preferred Area" of the Shopping Center as shown on the Site Plan and Landlord shall make no changes to the remainder of the Shopping Center that adversely affects Tenant's

423568 v7 (00051.00138.000)

access, visibility or parking. The Common Areas shall be configured as shown thereon.

4.  Subject to the terms of the OEA, after the first Lease Year, no exterior construction and no construction staging shall be permitted in the southern one-half (1/2) of the Shopping Center during the months of October, November and December except for emergency (including casualty) repairs. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view.

5.  There shall be no changes to Tenant's Preferred Area as shown on the Site Plan except as may be required by applicable laws (including changes in the location of curbcuts, drive aisles, roadways, or parking spaces or reduction of the parking ratio specified in paragraph B(2)(b)), without Circuit City's express written consent.

6.  No advertisements or signs shall be erected in any Common Areas, except for (a) any pylon or monument signs erected by Landlord (b) any traffic control signs, or (c) directional signage.

7.  No merchandise shall be displayed, sold or offered for sale in any portion of the Common Areas, except as permitted in this Lease.

8.  No loudspeakers shall be operated, nor shall any other sound be electronically amplified so as to be heard in the Common Areas.

9.  No charge shall be imposed for parking within any portion of the Shopping Center.

10. No cellular telephone or other telecommunications tower shall be operated for use by any party not an occupant of the Shopping Center.

11. No employees except Tenant's employees shall park within Tenant's Preferred Area, to the extent within Landlord's control.

423568 v7 (00051.00138.000)

EXHIBIT "L"

OPERATION AND EASEMENT AGREEMENT

BETWEEN

TARGET CORPORATION

AND

RONUS MEYERLAND PLAZA, L.P.

For
Meyerland Plaza Shopping Center
Houston, Texas

080366 000048 DALLAS 1645692.6 - April 26, 2004

# OPERATION AND EASEMENT AGREEMENT

## TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.1    Approving Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   1.2    Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.3    Building Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.4    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.5    Common Area Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.6    Common Area Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.7    Constant Dollars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   1.8    Floor Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   1.9    Governmental Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   1.10   Governmental Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   1.11   Occupant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   1.12   Operator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   1.13   Outside Sales Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
   1.14   Party . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   1.15   Permittee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5 6
   1.16   Person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   1.17   Pre-Existing Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   1.18   Primary Building Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.19   Restaurant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.20   Rights of Pre-Existing Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.21   Target Primary Parking Field . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.22   Target Redevelopment Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.23   Target Zone of Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.24   Tract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   1.25   Utility Lines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARTICLE II - EASEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   2.1    Ingress, Egress and Parking . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   2.2    Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   2.3    Construction, Maintenance and Reconstruction . . . . . . . . . . . . . . . 15
   2.4    Sign Easement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   2.5    Restriction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARTICLE III - CONSTRUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   3.1    General Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   3.2    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   3.3    Building Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

ARTICLE IV - MAINTENANCE AND REPAIR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 **33**
    4.1    Utility Lines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 **33**
    4.2    Common Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32 **33**
    4.3    Building and Outside Sales Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

ARTICLE V - OPERATION OF THE SHOPPING CENTER . . . . . . . . . . . . . . . . . . . . . 44 **45**
    5.1    Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44 **45**
    5.2    Lighting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49 **50**
    5.3    Occupant Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
    5.4    Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53 **56**
    5.5    Taxes and Assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58 **61**

ARTICLE VI - MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59 **61**
    6.1    Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59 **61**
    6.2    Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61 **64**
    6.3    Estoppel Certificate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62 **64**
    6.4    Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63 **65**
    6.5    Approval Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63 **66**
    6.6    Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64 **66**
    6.7    Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64 **67**
    6.8    Construction and Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65 **67**
    6.9    Negation of Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66 **68**
    6.10   Not a Public Dedication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66 **68**
    6.11   Excusable Delays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66 **68**
    6.12   Mitigation of Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67 **69**
    6.13   OEA Shall Continue Notwithstanding Breach . . . . . . . . . . . . . . . . . . . . . . . 67 **69**
    6.14   Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67 **69**
    6.15   No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67 **69**
    6.16   Developer's Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67 **69**
    6.17   Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67 **70**
    6.18   Pre-Existing Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67 **70**
    6.19   Limitation of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68 **70**
    6.20   Platting; Conveyance of Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68 **70**

ARTICLE VII - TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69 **71**
    7.1    Term of this OEA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69 **71**

ARTICLE VIII - EXCULPATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69 **71**
    8.1    <u>Certain Limitations on Remedies</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69 **71**

## EXHIBITS

**Exhibit A**  Legal Description of Target Tract

**Exhibit B**  Legal Description of Developer Tract

**Exhibit C**  Design of Signs

**Exhibit D**  Architectural Theme

**Exhibit E**  Submission Guidelines

**Exhibit F**  Pre-Existing Tenants

**Exhibit G**  Target Redevelopment Plans

**Exhibit H**  Common and Separate Utility Lines

**Exhibit X**  Site Plan

## OPERATION AND EASEMENT AGREEMENT

THIS OPERATION AND EASEMENT AGREEMENT ("**OEA**") is made and entered into as of the _____ day of _____, 2004, between TARGET CORPORATION, a Minnesota corporation ("**Target**"), and RONUS MEYERLAND PLAZA, L.P., a Georgia limited partnership ("**Developer**").

### W I T N E S S E T H

WHEREAS, Target is the owner of a certain tract of land legally described in <u>Exhibit A</u> attached hereto and identified as the "**Target Tract**" (herein so called) on <u>Exhibit X</u> (the "**Site Plan**") attached hereto; and

WHEREAS, Developer is the owner of a certain tract of land legally described in <u>Exhibit B</u> attached hereto and identified as the "**Developer Tract**" (herein so called) on the Site Plan; and

WHEREAS, the Target Tract and the Developer Tract (collectively, the "**Shopping Center**") are contiguous and adjacent to each other as shown on the Site Plan; and

WHEREAS, the signatories hereto intend to develop and operate their respective Tracts in conjunction with each other as integral parts of a retail shopping complex, but not a planned or common interest development/community, and in order to effectuate the common use and operation of their respective Tracts they desire to enter into certain covenants and agreements, and to grant to each other certain reciprocal easements, in, to, over, and across their respective Tracts.

NOW, THEREFORE, in consideration of the premises, the covenants and agreements hereinafter set forth and in furtherance of the parties' understanding, it is agreed as follows:

### ARTICLE I

### DEFINITIONS

1.1    <u>Approving Party</u>. "**Approving Party**" shall mean the Party designated from time to time to make certain decisions and/or give certain approvals pursuant to the terms of this OEA. There shall be one (1) Approving Party representing the Developer Tract and one (1) Approving Party representing the Target Tract. Each Approving Party shall have absolute discretion to make the decisions and/or give the approvals expressly designated to be made and/or given on behalf of the real estate represented by such position regardless of whether the Approving Party then owns all or less than all of the Developer Tract or the Target Tract, as the case may be. The Party designated as Approving Party for the Developer Tract shall have the right to assign such status to any other Party owning a Tract within the Developer Tract; provided, however, if such assignment is not made

in writing, then the status of Approving Party for the Developer Tract shall automatically be deemed assigned to the Party acquiring the last portion of the Developer Tract owned by the Party then holding the status of Approving Party for the Developer Tract. The Party designated as Approving Party for the Target Tract shall have the right to assign such status to any other Party owning a Tract within the Target Tract; provided, however, if such assignment is not made in writing, then the status of Approving Party for the Target Tract shall automatically be deemed assigned to the Party acquiring the last portion of the Target Tract owned by the Party then holding the status of Approving Party for the Target Tract. Developer shall be the initial Approving Party for the Developer Tract; and Target shall be the initial Approving Party for the Target Tract.

1.2    Building.    "**Building**" shall mean any permanently enclosed structure placed, constructed or located on a Tract.

1.3    Building Area. "**Building Area**" shall mean the limited areas of the Shopping Center within which Buildings may be constructed, placed or located. Building Areas are designated on the Site Plan. One or more Buildings may be located within a Building Area.

1.4    Common Area. "**Common Area**" shall mean all areas within the exterior boundaries of the Shopping Center, exclusive of (i) any Building and (ii) any Outside Sales Area during the period such area is used for sales, display and/or storage purposes.

1.5    Common Area Insurance. "**Common Area Insurance**" shall mean the Commercial General Liability Insurance carried by Developer pursuant to Section 5.4(A) below with respect to the Common Area of the Shopping Center, together with any deductibles actually paid by Developer; provided, however, Common Area Insurance shall not include any insurance (liability or otherwise) carried with respect to any Building or other improvement or the land on which any such Building or other improvement is located.

1.6    Common Area Taxes. "**Common Area Taxes**" shall mean all ad valorem taxes assessed against the Common Area of the Shopping Center; provided, however, Common Area Taxes shall not include any taxes assessed against any Building or taxes assessed against any other improvements within the exclusive control of an Occupant (as hereinafter defined), or the land on which any Building or such other improvements within the exclusive control of an Occupant is located.

1.7    Constant Dollars. "**Constant Dollars**" shall mean the value of the U.S. dollar to which such phrase refers, as adjusted from time to time. An adjustment shall occur on the 1st day

of June of the sixth (6th) full calendar year following the date of this OEA, and thereafter at five (5) year intervals. Constant Dollars shall be determined by multiplying the dollar amount to be adjusted by a fraction, the numerator of which is the Current Index Number and the denominator of which is the Base Index Number. The "**Base Index Number**" shall be the level of the Index for the year this OEA commences; the "**Current Index Number**" shall be the level of the Index for the year preceding the adjustment year; the "**Index**" shall be the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics of the United States Department of Labor for U.S. City Average, All Items (1982-84=100), or any successor index thereto as hereinafter provided. If publication of the Index is discontinued, or if the basis of calculating the Index is materially changed, then the Approving Parties shall substitute for the Index comparable statistics as computed by an agency of the United States Government or, if none, by a substantial and responsible periodical or publication of recognized authority most closely approximating the result that would have been achieved by the Index.

1.8     Floor Area. "**Floor Area**" shall mean the aggregate of the actual number of square feet of space (i) contained on each floor within a Building, including any mezzanine or basement space (except for mezzanine or basement space used exclusively for storage), as measured from the exterior faces of the exterior walls or store front and/or the center line of any common walls (provided, however, that the following areas shall be excluded from such calculation: space attributable to any multi-deck, platform, rack or other multi-level system used solely for the storage of merchandise that is located above ground floor or in a basement, and any space used solely for Building utilities or mechanical equipment); (ii) exceeding fifteen thousand (15,000) square feet within an Outside Sales Area; and (iii) **in excess of ten thousand (10,000) square feet, in the aggregate,** used permanently (i.e., regularly and continuously) for outdoor seating for customers of Restaurants and/or other food service businesses. Within thirty (30) days after receipt of a request therefor, a Party shall certify to the requesting Party the amount of Floor Area applicable to such Party's Tract. If any Party causes an as-built survey to be prepared with respect to any portion of the Shopping Center, such Party shall furnish a copy of such survey to the other Parties for informational purposes only.

During any period of rebuilding, repairing, replacement or reconstruction of a Building, the Floor Area previously attributable to that Tract shall be deemed to be the same as existed immediately prior to such period. Upon completion of such rebuilding, repairing, replacement or

reconstruction, the Party owning such Tract shall cause a new determination of Floor Area for such Tract to be made in the manner described above, and such determination shall be sent to any other Party requesting the same.

1.9     Governmental Authorities.  "**Governmental Authorities**" shall mean any federal, state, county, city or local governmental or quasi-governmental authority, entity or body (or any departmental agency thereof) exercising jurisdiction over a particular subject matter.

1.10    Governmental Requirements.  "**Governmental Requirements**" shall mean all applicable laws, statutes, ordinances, codes, rules, regulations, orders, and applicable judicial decisions or decrees, as presently existing and hereafter amended, of any Governmental Authorities.

1.11    Occupant.  "**Occupant**" shall mean any Person from time to time entitled to the use and occupancy of any portion of a Building in the Shopping Center under an ownership right or under any lease, sublease, license, concession, or other similar agreement.

1.12    Operator.  "**Operator**" shall mean the Person, if any, designated from time to time by the Approving Parties to maintain and operate the Common Area of the Shopping Center.  The Person designated as Operator shall serve in such capacity until he resigns upon 60 days' prior written notice, or is removed by the Approving Parties.  The Approving Parties hereby designate Developer as the initial Operator, and Developer hereby accepts such appointment.  During any period an Operator is not designated, each Party shall maintain and operate its own Tract pursuant to Article IV hereof.

1.13    Outside Sales Area.  "**Outside Sales Area**" shall mean those areas, if any, designated on the Site Plan that from time to time may be used for sales, display and/or storage purposes; provided, however, with respect to any Outside Sales Area located outside of a Building Area, the Parties acknowledge and agree that the actual location of such Outside Sales Area may vary from time to time, subject to the approval of the Approving Parties.  During the period an Outside Sales Area is:  (i) used for sales, display and/or storage purposes, such area shall not be considered part of the Common Area, and (ii) not used for sales, display and/or storage purposes, such area shall be considered part of the Common Area; provided, however, if the Outside Sales Area is located within a Building Area, such area may be used for the location of Buildings.  The Parties acknowledge that, as of the date hereof, agreements with Pre-Existing Tenants (as hereinafter defined) require that the Common Area be used on a non-exclusive basis, thereby effectively prohibiting any Outside Sales Area within the Common Area. ~~[KEVIN: please provide names of such tenants.]~~; **therefore,**

**notwithstanding anything to the contrary contained herein, unless otherwise agreed to by the Approving Parties, no Outside Sales Area or any other portion of the Common Area shall be used for sales, display and/or storage purposes.**

1.14    Party.  "**Party**" shall mean each signatory hereto and its respective successors and assigns during the period of such Person's fee ownership of any portion of the Shopping Center.  A Party transferring all or any portion of its fee interest in the Shopping Center shall give notice to all other Parties and the Operator, if any, of such transfer and shall include in such notice at least the following information:

(i)    The name and address of the new Party;

(ii)    A copy of the legal description of the portion of the Tract transferred by such Party; and

(iii)    If the new Party is the designated Approving Party.

Each Party shall be liable for the performance of all covenants, obligations and undertakings applicable to the Tract or portion thereof owned by it that accrue during the period of such ownership, and such liability shall continue with respect to any portion of the Tract transferred by such Party until the notice of transfer set forth above is given.  Until such notice of transfer is given, the transferring Party shall (for the purpose of this OEA only) be the transferee's agent.  Once the notice of transfer is given, the transferring Party shall be released from all obligations pertaining to the portion of the Tract transferred arising subsequent to the notice of transfer.  For the purpose of this Section only, if the notice of transfer is given pursuant to the provisions of Section 6.4, the effective date of such notice shall be the date such notice is sent.  Notwithstanding anything to the contrary, if a notice of transfer is given, any payment made by a Party to the transferor within thirty (30) days of such notice shall be deemed properly paid, and the transferor and transferee shall resolve any necessary adjustments and/or prorations regarding such payment between themselves.

If a Tract is owned by more than one (1) Party, the Party or Parties holding at least fifty-one percent (51%) of the ownership interest in such Tract shall designate in writing one (1) Person to represent all owners of the Tract and such designated Person shall be deemed the Person authorized to give consents and/or approvals pursuant to this OEA for such Tract.

Nothing contained herein to the contrary shall affect the existence, priority, validity or enforceability of any lien permitted hereunder that is recorded against the transferred portion of the Shopping Center prior to receipt of such notice of transfer by the Party filing such lien.

1.15    Permittee.    "**Permittee**" shall mean all Occupants and the officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees, licensees, subtenants, and concessionaires of Occupants insofar as their activities relate to the intended development, use and occupancy of the Shopping Center.    Persons engaged in civic, public, charitable or political activities within the Shopping Center, including but not limited to the activities set forth below, shall not be considered Permittees:

(i)      Exhibiting any placard, sign or notice.

(ii)     Distributing any circular, handbill, placard or booklet.

(iii)    Soliciting memberships or contributions for private, civic, public charitable or political purposes.

(iv)    Parading, picketing or demonstrating.

(v)     Failing to follow regulations established by the Parties relating to the use and operation of the Shopping Center.

1.16    Person.    "**Person**" shall mean any individual, partnership, firm, association, corporation, limited liability company, trust, or any other form of business or Governmental Authority.

1.17    Pre-Existing Tenant.    "**Pre-Existing Tenant**" shall mean each of the tenants listed on Exhibit F attached hereto, and shall be deemed to include any affiliate of a listed tenant but shall not include or be deemed to include any successor or assign of a listed tenant except (i) a successor by merger or by sale of substantially all of such tenant's assets, or (ii) an assignee of all of such tenant's interests under the applicable lease, or (iii) a sublessee of a portion of the space covered by such tenant's lease, where such assignment or sublease is permitted without the landlord's consent or approval under the terms of such lease as of the date of this OEA, or (iv) a sublease of a portion of the space covered by such tenant's lease where such assignment or sublease requires the landlord's consent or approval under the terms of such lease as of the date of this OEA, but such lease sets forth criteria under which the landlord's consent must be given to such assignment or sublease and such criteria has been met, or (v) where the landlord under such lease is required as a matter of law or court order to consent to such assignment or sublease.    For the purposes of this paragraph, the term "**affiliate**" shall mean an entity that controls, is controlled by, or is under common control with such listed tenant. ~~[Note:  Developer needs to attach Schedule of Existing Tenants that includes the lease term expiration date and describes all renewal options for each lease.]~~

1.18    Primary Building Area.  "**Primary Building Area**" shall mean those specifically designated Building Areas on the Site Plan that collectively provide protection for an "unlimited area" building.

1.19    Restaurant.  "**Restaurant**" shall mean any operation or business that requires a governmental permit, license and/or authorization to prepare and/or serve food for either on or off-site consumption; provided, however, notwithstanding anything contained herein to the contrary, a supermarket, grocery store or similar operation shall not be deemed a Restaurant.

1.20    Rights of Pre-Existing Tenants.  "**Rights of Pre-Existing Tenants**" shall mean the rights of each Pre-Existing Tenant under its lease as described in Exhibit F attached hereto, but no amendment, extension or renewal of any such lease except pursuant to an extension or renewal right expressly granted under the terms of such lease as of the date of this OEA or such extension or renewal that is granted as a matter of law or court order.

1.21    Target Primary Parking Field.  "**Target Primary Parking Field**" shall mean the portion of the Developer Tract designated as such on the Site Plan over which Target shall have a perpetual easement for access and parking.

1.22    Target Redevelopment Plans.  "**Target Redevelopment Plans**" shall mean the plans and specifications that are listed on Exhibit G attached to and made a part of this OEA.

1.23    Target Zone of Control.  "**Target Zone of Control**" shall mean the portion of the Developer Tract designated as such on the Site Plan over which, among other things, Target shall have certain approval rights as more particularly described in this OEA.

1.24    Tract.  "**Tract**" shall mean that portion of the Shopping Center owned by a Party.

1.25    Utility Lines.  "**Utility Lines**" shall mean those facilities and systems for the transmission of utility services, including the drainage and storage of surface water. "**Common Utility Lines**" shall mean those Utility Lines that are installed to provide the applicable service to both the Developer Tract and the Target Tract. "**Separate Utility Lines**" shall mean those Utility Lines installed to provide the applicable service to either the Developer Tract or the Target Tract. The Common Utility Lines and the Separate Utility Lines are identified on Exhibit H attached hereto and made a part hereof.  For the purpose of this OEA, the portion of a Utility Line extending between a Common Utility Line and a Building shall be considered a Separate Utility Line.  Utility Lines installed pursuant to this OEA shall only provide service necessary for the development and/or

operation of the Shopping Center. *[Developer to prepare exhibit showing and/or describing the Common Utility Lines and the Separate Utility Lines.]*

ARTICLE II

EASEMENTS

2.1    <u>Ingress, Egress and Parking</u>.

(A)    During the term of this OEA, each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive easement for the passage and parking of vehicles over and across the parking and driveway areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use, and for the passage and accommodation of pedestrians over and across the parking, driveways and sidewalk areas of the grantor's Tract, as the same may from time to time be constructed and maintained for such use. The easement herein established shall be appurtenant to and for the benefit of each grantee's Tract, and shall be binding on, enforceable against and burden each grantor's Tract. Such easement rights shall be subject to the following reservations as well as the other applicable provisions contained in this OEA:

(i)    Developer reserves the right to close-off any portion of its Tract for such reasonable period of time as may be legally necessary, in the opinion of its counsel, to prevent the acquisition of prescriptive rights by anyone; provided, however, that prior to closing off any portion of the Target Primary Parking Field or access thereto, Developer shall give written notice to Target of its intention to do so, and shall coordinate such closing off with Target so that no unreasonable interference with the passage of pedestrians or vehicles shall occur;

(ii)    Each Party reserves the right at any time and from time to time to exclude and restrain any Person who is not a Permittee from using its Tract; and

(iii)    Each Party reserves the right to temporarily erect or place barriers in and around areas on its Tract that are being constructed and/or repaired in order to insure either safety of Persons or protection of property.

(B)    In addition to the general easement specified in Section 2.1(A), Developer hereby grants and conveys to Target for its use and for the use of its Permittees, in common with others entitled to use the same, and subject to the reservations set forth in Section 2.1(A)(i) and (ii), a non-exclusive, perpetual easement for the passage and accommodation of pedestrians and vehicles (but not for parking purposes) upon, over and across that portion of the Developer Tract designated

on the Site Plan as a Front Drive or Service Drive; each such Front Drive to be approximately thirty (30) feet wide (curb to curb or curb to parking aisle) and to contain two (2) lanes, one in each direction. The easement herein established shall be appurtenant to and for the benefit of the Target Tract, and shall be binding on, enforceable against and a burden upon the Developer Tract. During the term of this OEA, each portion of the Front Drive(s) and Service Drive(s) shall be maintained in accordance with the provisions governing the maintenance of the parking and driveways on the Developer Tract, and such Front Drive(s) and Service Drive(s) shall not be relocated without the approval of Target. After the termination of this OEA, Developer may, at its expense, relocate the portion of a Front Drive or Service Drive located upon its Tract so long as the relocated portion remains reasonably direct and ties into/connects with the other portions of the Front Drive or Service Drive to provide access to the Target Tract. Developer shall provide Target with written notice of such relocation at least thirty (30) days prior to relocation of such Front Drive or Service Drive.

After the termination of this OEA, those portions of the Developer Tract on which the Front Drive(s) or Service Drive(s) are located shall be maintained in a safe, clean and good state of repair and condition by Developer, at its sole cost and expense. In the event Developer shall fail to perform the required maintenance of the Front Drive(s) or Service Drive(s), Target, after at least thirty (30) days' prior notice, shall have the right, but not the obligation, to cause such maintenance to be performed. If such curative measures are taken by Target, then Developer shall, upon written demand, promptly pay to Target all costs and expenses incurred with respect to such curative action. In addition, Target shall have the right to create a lien upon the Developer Tract in order to secure payment of the amount expended by Target to perform such maintenance, plus Interest at the rate set forth in Section 6.2 hereof.

(C)    In addition to the general easement specified in Section 2.1(A), Developer hereby grants and conveys to Target for its use and for the use of its Permittees, in common with others entitled to use the same, and subject to the reservations set forth in Section 2.1(A)(i) and (ii), a non-exclusive, perpetual easement for the passage and parking of vehicles over and across the Target Primary Parking Field designated on the Site Plan, and for the passage and accommodation of pedestrians over and across the Target Primary Parking Field. Notwithstanding that this easement is "non-exclusive", Developer acknowledges and agrees that (i) the parking spaces within the Target Primary Parking Field are primarily for use by Target and its Permittees, (ii) Target shall be entitled to utilize the parking spaces within the Target Primary Parking Field when determining compliance

by the Target Tract with Governmental Requirements and the parking requirements of this OEA, and (iii) neither Developer nor any Occupant of the Developer Tract shall be entitled to utilize the count of the parking spaces within the Target Primary Parking Field when determining the count of parking spaces needed to comply by all or any part of the Developer Tract with the parking requirements of this OEA. The easement herein established shall be appurtenant to and for the benefit of the Target Tract, and shall be binding on, enforceable against and burden the Developer Tract. During the term of this OEA, the Target Primary Parking Field shall be maintained in accordance with the provisions contained herein governing the maintenance of the parking areas and driveways on a Tract. After the termination of this OEA, the Target Primary Parking Field shall be maintained in a safe, clean and good state of repair and condition by Developer, at its sole cost and expense; provided, however, within thirty (30) days after its receipt of written demand therefor (which demand shall include supporting documentation reasonably acceptable to Target), Target shall reimburse Developer for _____% of such costs and expenses. In addition, Developer shall have the right to create a lien upon the Target Tract in order to secure payment of the amount expended by Developer to perform such maintenance plus Interest at the rate set forth in Section 6.2 hereof. In the event Developer shall fail to perform the required maintenance, Target, after at least thirty (30) days' prior notice to Developer, shall have the right, but not the obligation, to cause such maintenance to be performed. If such curative measures are taken by Target, then Developer shall, upon written demand (which demand shall include supporting documentation reasonably acceptable to Developer), promptly pay to Target all costs and expenses incurred with respect to such curative action. In addition, Target shall have the right to create a lien upon the Developer Tract in order to secure payment of the amount expended by Target to perform such maintenance, plus Interest at the rate set forth in Section 6.2 hereof.

(D)    Developer hereby grants and conveys to Target, for its use and for the use of the Permittees of the Building located upon the Target Tract, a non-exclusive, perpetual easement for the passage and accommodation of pedestrians over and across that portion of the Developer Tract identified on the Site Plan as the "**Pedestrian Access Area**". Such easement shall be the greater of either six (6) feet in width (measured perpendicular to the boundary line of the Target Tract), or such minimum width as is necessary to fulfill applicable legal requirements from time to time in effect, including those under any life safety, or fire or building code applicable to building exits. The foregoing easement shall be appurtenant to and for the benefit of the Target Tract, shall be binding

on and burden the Developer Tract, and shall continue in effect for the term of this OEA and thereafter for so long as the Building on the Target Tract utilizes the easement area for access purposes (including a reasonable period of time to permit reconstruction or replacement of such Building if the same is be destroyed, damaged or demolished). Target shall have the right to construct, install, maintain, repair and replace steps and/or a hard surface within the Pedestrian Access Area.

In the event Developer elects to enclose the Pedestrian Access Area beyond the extent that it is enclosed as of the date of this OEA, Developer shall, at its expense, install any required lighting, signs, railings, steps, flooring or paving, HVAC systems and all other construction components necessary or required to permit such enclosure and the use thereof by pedestrians, including a security door at the outside exit to prevent entrance thereto from the Common Area. Developer hereby grants to Target the right to install security cameras and/or other surveillance equipment, including wiring and cables to the Building on the Target Tract, necessary to monitor use of the enclosed Pedestrian Access Area. Developer shall cause the enclosed Pedestrian Access Area to be maintained as part of the Common Area. The Pedestrian Access Area may be utilized for the delivery of merchandise to Occupants of the adjoining Buildings only if such delivery does not jeopardize the qualifying and/or use of such easement area as a fire exit for the Building on the Target Tract.

After the termination of this OEA, the Developer shall maintain, at its sole cost and expense, the enclosed Pedestrian Access Area in a safe, clean and good state of repair and condition, including compliance with Governmental Requirements pertaining to enclosed exits, necessary for the Building on the Target Tract; provided, however, within thirty (30) days after its receipt of written demand therefor (which demand shall include supporting documentation reasonably acceptable to Target), Target shall reimburse Developer for ____% of such costs and expenses. In addition, Developer shall have the right to create a lien upon the Target Tract in order to secure payment of the amount expended by Developer to perform such maintenance plus Interest at the rate set forth in Section 6.2 hereof. In the event the Developer shall fail to perform the required maintenance, the Party owning the Target Tract, after at least thirty (30) days prior notice to Developer, shall have the right, but not the obligation, to cause such maintenance to be performed. If such curative measures are taken, Developer shall, upon written demand (which demand shall include supporting documentation reasonably acceptable to Developer), promptly pay to such Party curing the default,

all costs and expenses incurred with respect to such curative action. In addition, such curing Party shall have the right to create a lien upon the Developer Tract in order to secure payment of the amount expended by such Party to perform such maintenance, plus Interest at the rate set forth in Section 6.2.

(E)    Target hereby grants to Developer, for the benefit of the Developer Tract, a non-exclusive easement for the encroachment of the existing parking ramp that, as shown on the Site Plan, encroaches over the west and north lines of the Target Tract into the airspace above the passageway which currently exists along the west and north walls of the Building on the Target Tract, which parking ramp shall be used by the Party that owns the Developer Tract and its Permittees for vehicular and pedestrian traffic. This easement shall continue in effect for the term of this OEA and thereafter for so long as the parking ramp utilizing the easement area exists (including a reasonable period to permit reconstruction or replacement of such parking ramp if the same shall be destroyed, damaged or demolished).

**(F)    Target hereby grants to Developer, for the benefit of the Developer Tract, non-exclusive easements for a trash container and a golf cart charging station in the locations shown on the Site Plan, which trash container and golf cart charging station shall be used by the Party that owns the Developer Tract.**

2.2    Utilities.

(A)    Each Party hereby grants and conveys to each other Party non-exclusive, perpetual easements in, to, over, under, along and across those portions of the Common Area of the grantor's Tract (exclusive of any portion located within Building Areas) necessary for the installation, operation, flow, passage, use, maintenance, connection, repair, relocation, and removal of Utility Lines serving the grantee's Tract. Such easement area shall be no wider than necessary to reasonably satisfy the requirements of a private or public utility company, or five (5) feet on each side of the centerline if the easement is granted to a Party. The grantee shall provide to the grantor a copy of an as-built survey showing the location of such Utility Line. All Utility Lines shall be underground except:

(i)    Ground mounted electrical transformers;

(ii)    As may be necessary during periods of construction, reconstruction, repair or temporary service;

(iii)    As may be required by Governmental Authorities;

(iv)    As may be required by the provider of such utility service; and

(v)    Fire hydrants.

Notwithstanding the foregoing, nothing in this OEA shall require or be deemed to require Developer to move, relocate, bury, or otherwise alter any Utility Lines in existence as of the date of this OEA.

At least thirty (30) days prior to utilizing the easement granted herein, the grantee shall provide the grantor with a written statement describing the need for such easement, shall identify the proposed location of the Utility Line, the nature of the service to be provided, the anticipated commencement and completion dates for the work. Prior to commencing any work on a grantor's Tract, including any emergency work, the grantee shall provide to the grantor evidence of insurance coverage as required by Section 5.4(B).

(B)    Any Party electing to install a Separate Utility Line shall obtain all permits and approvals and shall pay all costs and expenses with respect to the initial construction and all subsequent maintenance, relocation or abandonment of the Separate Utility Line. The Separate Utility Line shall be maintained in a safe, clean and good state of repair and condition. The grantee shall perform such work in compliance with all Governmental Requirements, as quickly as possible and after normal business hours whenever possible. Except in the case of a maintenance emergency where such work may be initiated after reasonable notice, the grantee shall provide the grantor with at least fifteen (15) days' prior notice before commencement of any work. The grantee of any Separate Utility Line agrees to defend, protect, indemnify and hold harmless the grantor from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from the exercise of the right to install, maintain and operate the Separate Utility Line; provided, however, the foregoing obligation shall not apply to claims or demands based on the negligence or the willful act or omission of the grantor.

(C)    Except as may otherwise be agreed, the Parties (the "**Cooperating Parties**") electing to install a Common Utility Line shall obtain all permits and approvals and shall pay all costs and expenses with respect to the initial construction thereof. Once constructed, Operator shall maintain, replace and/or relocate the Common Utility Line in a safe, clean and good state of repair and condition, and in compliance with all Governmental Requirements, as quickly as possible and after normal business hours whenever possible. If there is no Operator, then any Cooperating Party shall have the right to maintain, repair or replace the Common Utility Line without submission of a

Budget or estimate of expenditures, except as hereinafter provided. If a Cooperating Party, in performing maintenance, repair or replacement of a Common Utility Line, is likely to incur costs of more than Twenty Thousand Dollars ($20,000) in Constant Dollars for such work in any one instance (or series of related or repeated circumstances), such Cooperating Party shall first notify the other Cooperating Parties required to pay a portion of such costs, in which case the Cooperating Parties shall prepare a list of qualified bidders, shall seek competitive bids from the list of qualified bidders before performing the work and shall select the lowest, responsive qualified bidder to perform the work. If a list of bidders is not jointly prepared within fifteen (15) days of the request for bidders, the Cooperating Party desiring to perform the work may prepare the list (containing not less than three bidders) for such other Cooperating Parties' approval, which approval shall not be unreasonably withheld, from which bids will be solicited. After a Cooperating Party has incurred any costs for maintaining, repairing or replacing a Common Utility Line, it may send a statement of such costs, increased by an amount equal to the Administration Fee (defined in Section 4.2(B)), together with a copy of any invoice reflecting any charge exceeding $500.00 to each Cooperating Party benefitting from such Common Utility Line. Each Cooperating Party shall pay within thirty (30) days after receipt of the statement of costs either its allocable share of such costs as agreed upon when the Common Utility Line was installed, or if no separate cost sharing agreement was made, then in accordance with the sharing of Common Area Maintenance Costs. Except in the case of a maintenance emergency where such work may be initiated after reasonable notice, the grantor shall be provided with at least fifteen (15) days' prior notice before commencement of any work.

(D)    Each Party hereby grants and conveys to each other Party owning an adjacent Tract the perpetual right and easement to discharge surface storm water drainage and/or runoff from the grantee's Tract over, upon and across the Common Area of the grantor's Tract, upon the following conditions and terms:

(i)    Subject to the Rights of Pre-Existing Tenants, no Party shall alter or permit to be altered the surface of the Common Area or the drainage/retention system constructed on its Tract if such alteration would materially increase the flow of surface water onto an adjacent Tract either within the aggregate or by directing the flow of surface water to a limited area. All surface water collection, retention and distribution facilities shall be deemed a Common Utility Line. Any Party altering the surface of the Common Area or the drainage/retention system constructed on its Tract or located elsewhere but serving its Tract shall do so at its sole cost and expense and in full

compliance with all applicable Governmental Requirements. Notwithstanding anything to the contrary contained herein, Target may redevelop the Target Tract and the Building located thereon, the Target Primary Parking Field and the portions of the Developer Tract which are adjacent to the Target Tract and/or the Target Primary Parking Field in accordance with the Target Redevelopment Plans, which Target Redevelopment Plans have been reviewed and approved by Developer.

(E)    In the event a Party fails to perform its obligations under Section 2.2, any grantor shall have the right to claim a default pursuant to Section 6.1 and avail itself of all the provisions therein contained, including the right to lien a Defaulting Party's Tract, and receive Interest at the rate set forth in Section 6.2 hereof on all sums expended to cure such default.

2.3    Construction, Maintenance and Reconstruction.

(A)    In order to accommodate any Building improvements that may inadvertently be constructed beyond a Tract's boundary line, each Party grants to each other Party owning an adjacent Tract, an easement, not to exceed a maximum lateral distance of six (6) inches, in, to, over, under, and across that portion of the grantor's Tract adjacent to such common boundary line for the maintenance and replacement of such encroaching Building improvements.

(B)    In the event a constructing Party (the "**Constructing Party**") determines that it is necessary to place underground piers, footings and/or foundations ("**Subsurface Construction Elements**") across the boundary line of its Tract, the Constructing Party shall advise the Party owning the adjacent Tract (the "**Adjacent Party**") of the Constructing Party's construction requirements and shall provide plans and specifications relating thereto to the Adjacent Party, including proposed construction techniques for the Subsurface Construction Elements. Each Adjacent Party hereby grants and conveys to each Constructing Party for the benefit of its Tract an easement, not to exceed a maximum lateral distance of five (5) feet, in, to, under, and across that portion of the Adjacent Party's Tract not theretofore occupied by any then existing structure, for the installation, maintenance and replacement of such Subsurface Construction Elements; provided, however, that the Constructing Party shall have no right to use such easement if the Adjacent Party is able to provide the Constructing Party a reasonable alternative construction method for the placement of the Subsurface Construction Elements entirely on the Constructing Party's Tract.

The Adjacent Party reserves the right to require the Constructing Party to modify the design specifications for the Subsurface Construction Elements in order to permit the Adjacent Party the opportunity to utilize the same in connection with the construction of its Building so that each Party

shall be able to place its Building immediately adjacent to the common boundary line. If a common Subsurface Construction Element is used by the Constructing Party and the Adjacent Party, each shall assume and pay its reasonable share of the cost and expense of the design and construction thereof. In the event any Building utilizing a common Subsurface Construction Element is destroyed and not replaced or is removed, the common Subsurface Construction Element shall remain in place for the benefit of the other Building utilizing the same.

(C)    The easements established under Section 2.3(A) and (B) shall be appurtenant to and for the benefit of each grantee's Tract, and shall be binding on, enforceable against and burden each grantor's Tract. Notwithstanding such easement grant, nothing herein shall diminish or waive the right of a grantor to recover damages resulting from a grantee's failure to construct its Building within its Tract in the case of Section 2.3(A), or within the easement area limits in the case of Section 2.3(B). Such easements in each instance shall:

(i)    Continue in effect for the term of this OEA and thereafter for so long as the Building utilizing the easement area exists (including a reasonable period to permit reconstruction or replacement of such Building if the same shall be destroyed, damaged or demolished).

(ii)    Include the reasonable right of access necessary to exercise and enjoy such grant upon terms and with the limitations described in Section 3.1(E).

(D)    With respect to Buildings constructed along the common boundary line between Tracts, nothing herein shall be deemed to create or establish:

(i)    A "common" or "party" wall to be shared with the adjacent Building.

(ii)    The right for a Building to receive support from or apply pressure to the adjacent Building.

2.4    Sign Easement.

(A)    Developer hereby grants and conveys to Target, its successors and assigns as the owner of the Target Tract, a perpetual easement for the right and privilege to place or affix identification panel(s) in the position (both sides) formerly used by Kmart as shown on Exhibit C to the sign structure (the "**Existing Pylon Sign**") that is located on that portion of the Developer Tract near the intersection of 610 Service Road and Jackwood Street identified on the Site Plan as the "**Existing Sign Area**"; the easement grant shall include reasonable access over, across and upon the Developer Tract to permit such panel(s) to be installed, replaced, maintained and operated. The Parties acknowledge and agree that, subject to obtaining the applicable Governmental Approvals

(which approvals Developer shall diligently seek to obtain), Developer will demolish the Existing Pylon Sign at its sole cost and expense and replace the Existing Pylon Sign with a replacement pylon sign (the "**Replacement Pylon Sign**") that will be constructed no later than January 1, 2005 within the Existing Sign Area and the design for which shall be as specified on Exhibit C attached hereto (for the purposes hereof, the Existing Pylon Sign and the Replacement Pylon Sign may collectively be referred to as the "**Jackwood Street Pylon Sign**"). Target (i) shall provide its own identification panel for the Jackwood Street Pylon Sign and (ii) shall reimburse Developer for Target's pro rata share of the cost of the Replacement Pylon Sign structure within thirty (30) days after Developer completes construction of the Replacement Pylon Sign and submits an invoice to Target for its pro rata share of the cost of the Replacement Pylon Sign structure, which pro rata share shall be based upon a fraction, the numerator of which shall be the panel area allocated to Target on the Replacement Pylon Sign and the denominator of which shall be the sum of the panel areas allocated to Target and Developer on the Replacement Pylon Sign, all pursuant to Exhibit C attached hereto; provided, however, the panel area for the "Meyerland Shopping Center" sign shall not be included in the denominator. Developer reserves the right to grant additional panel easements, subject to the restrictions set forth in Section 5.3(A), for the remaining panel areas specified on Exhibit C attached hereto, and each such additional grant shall recognize the easement right and privileges granted herein to Target, and shall specify which panel space on the Jackwood Street Pylon Sign is the subject of the easement grant. A copy of such easement grant shall be delivered to Target and each other Person holding a prior panel easement with respect to the Jackwood Street Pylon Sign. In the event a sign structure is not in place within the Existing Sign Area during the term of the OEA, or at any time thereafter, then the aforesaid easement grant shall also include the right for Target to construct, reconstruct, replace, maintain and operate a sign structure within the Existing Sign Area, together with reasonable access over, under, upon, through and across the Developer Tract to install, replace, maintain, repair and operate a Separate Utility Line pursuant to the terms and provisions set forth in Section 2.2 above in order to provide such sign structure and panels with power. If Target elects to construct the sign structure (which sign structure is also referred to herein as the Jackwood Street Pylon Sign), the design thereof shall be as specified on Exhibit C attached hereto, or another design approved either during the term of the OEA by the Approving Parties and the Parties entitled to place panels on the Jackwood Street Pylon Sign pursuant to Section 5.3(A), or following the expiration of the OEA, by the Persons entitled to place panels on the Jackwood Street Pylon Sign

pursuant to easement grants. The foregoing easement, together with all rights and privileges specified, shall be for the benefit of the Target Tract and shall be binding on, enforceable against and burden the Developer Tract. Target shall have the right to release the easement, and upon such release Target shall remove its panel(s) and thereafter have no further rights, duties or responsibilities with respect to the Jackwood Street Pylon Sign.

During the term of this OEA, the right of other Occupants to place panels on the Jackwood Street Pylon Sign, the maintenance and/or replacement of the Jackwood Street Pylon Sign, and any relocation of the Jackwood Street Pylon Sign shall be governed by the provisions of Section 5.3(A) hereof. Developer (or Target if it constructs the Replacement Pylon Sign) shall be entitled to receive the portion of any condemnation award relating to the Jackwood Street Pylon Sign, including any relocation benefits and, to the extent it is able to obtain the applicable Governmental Approvals, the Person receiving the award shall cause a new sign structure to be constructed in accordance with Exhibit C attached hereto in a replacement location acceptable to the Approving Parties. If the award received for the sign structure is less than the cost to replace the sign structure, the Parties entitled to place panels on the sign structure shall pay the deficiency based on the panel area allocated to each pursuant to Exhibit C attached hereto, or the then approved design, even if such panel area is not used. The award (whether paid separately or as part of a lump sum) attributable to each panel taken shall belong to the owner thereof.

Following the termination of this OEA, the maintenance and/or replacement of the Jackwood Street Pylon Sign shall be performed by a Person designated by the majority of the grantees entitled to place panels on the Jackwood Street Pylon Sign, and all maintenance (including cost of providing power) and/or replacement costs shall be separately billed to the grantees based on the panel area allocated to each, even if such panel area is not used. Each Person attaching a panel to the Jackwood Street Pylon Sign shall cause such panel to be maintained at its sole cost and expense in a safe condition and in a good state of repair and pursuant to Governmental Requirements. In the event the area upon which the Jackwood Street Pylon Sign structure is located is taken by condemnation, the owner of the land upon which the Jackwood Street Pylon Sign structure is located shall designate a replacement area with comparable visibility as close to the original location as is reasonably possible. The Person then maintaining the Jackwood Street Pylon Sign structure shall be entitled to receive the portion of the condemnation award relating to the Jackwood Street Pylon Sign structure taken, including any relocation benefits, and such Person shall cause a new sign structure

to be constructed in the replacement location in accordance with the design criteria set forth in Exhibit C attached hereto, or any other design criteria approved by the grantees entitled to place panels on the Jackwood Street Pylon Sign pursuant to the easement grants. If the award received for the Jackwood Street Pylon Sign structure is less than the cost to replace the sign structure, the grantees entitled to place panels on the Jackwood Street Pylon Sign shall pay the deficiency based on the panel area allocated to each pursuant to the easement grants, even if such panel area is not used. The award (whether paid separately or as part of a lump sum) attributable to each panel taken shall belong to the owner thereof.

(B)    Developer hereby grants and conveys to Target, its successors and assigns as the owner of the Target Tract, a perpetual easement for the right and privilege to place or affix identification panel(s) in the position (both sides) formerly used by Kmart as shown on Exhibit C to the sign structure (the "**Target Shared Monument Sign**") that is located on that portion of the Developer Tract identified on the Site Plan as the "**Target Shared Monument Sign Area**"; the easement grant shall include reasonable access over, across and upon the Developer Tract to permit such panel(s) to be installed, replaced, maintained and operated. The Parties acknowledge and agree that Developer will renovate the identification panels on the Target Shared Monument Sign at its sole cost and expense no later than January 1, 2005 in accordance with the design specified on Exhibit C attached hereto, which renovation by Developer shall include providing and installing Target's identification panel and verifying that the Steinmart panel has not faded. Target shall reimburse Developer for the cost of renovating the identification panels on the Target Shared Monument Sign structure within thirty (30) days after Developer completes the renovation of the Panels on the Target Shared Monument Sign and submits an invoice to Target for the cost of such renovation of the panels on the Target Shared Monument Sign structure. Developer reserves the right to grant additional panel easements, subject to the restrictions set forth in Section 5.3(A), for the remaining panel area specified on Exhibit C attached hereto, and each such additional grant shall recognize the easement right and privileges granted herein to Target, and shall specify which panel space on the Target Shared Monument Sign is the subject of the easement grant. A copy of such easement grant shall be delivered to Target and each other Person holding a prior panel easement with respect to the Target Shared Monument Sign. In the event a sign structure is not in place within the Target Shared Monument Sign Area during the term of the OEA, or at any time thereafter, then the aforesaid easement grant shall also include the right for Target to construct, reconstruct, replace,

19

maintain and operate a sign structure within the Target Shared Monument Sign Area, together with reasonable access over, under, upon, through and across the Developer Tract to install, replace, maintain, repair and operate a Separate Utility Line pursuant to the terms and provisions set forth in Section 2.2 above in order to provide such sign structure and panels with power. If Target elects to construct the sign structure which is referred to herein as the Target Shared Monument Sign, the design thereof shall be as specified on Exhibit C attached hereto, or another design approved either during the term of the OEA by the Approving Parties and the Parties entitled to place panels on the Target Shared Monument Sign pursuant to Section 5.3(A), or following the expiration of the OEA, by the Persons entitled to place panels on the Target Shared Monument Sign pursuant to easement grants. The foregoing easement, together with all rights and privileges specified, shall be for the benefit of the Target Tract and shall be binding on, enforceable against and burden the Developer Tract. Target shall have the right to release the easement, and upon such release Target shall remove its panel(s) and thereafter have no further rights, duties or responsibilities with respect to the Target Shared Monument Sign.

During the term of this OEA, the right of other Occupants to place panels on the Target Shared Monument Sign, the maintenance and/or replacement of the Target Shared Monument Sign, and any relocation of the Target Shared Monument Sign shall be governed by the provisions of Section 5.3(A) hereof. Developer (or Target if it constructs the Target Shared Monument Sign) shall be entitled to receive the portion of any condemnation award relating to the Target Shared Monument Sign, including any relocation benefits and, to the extent it is able to obtain the applicable Governmental Approvals, the Person receiving the award shall cause a new sign structure to be constructed in accordance with Exhibit C attached hereto in a replacement location acceptable to the Approving Parties. If the award received for the sign structure is less than the cost to replace the sign structure, the Parties entitled to place panels on the sign structure shall pay the deficiency based on the panel area allocated to each pursuant to Exhibit C attached hereto, or the then approved design, even if such panel area is not used. The award (whether paid separately or as part of a lump sum) attributable to each panel taken shall belong to the owner thereof.

Following the termination of this OEA, the maintenance and/or replacement of the Target Shared Monument Sign shall be performed by a Person designated by the majority of the grantees entitled to place panels on the Target Shared Monument Sign, and all maintenance (including cost of providing power) and/or replacement costs shall be separately billed to the grantees based on the

panel area allocated to each, even if such panel area is not used. Each Person attaching a panel to the Target Shared Monument Sign shall cause such panel to be maintained at its sole cost and expense in a safe condition and in a good state of repair and pursuant to Governmental Requirements. In the event the area upon which the Target Shared Monument Sign structure is located is taken by condemnation, the owner of the land upon which the Target Shared Monument Sign structure is located shall designate a replacement area with comparable visibility as close to the original location as is reasonably possible. The Person then maintaining the Target Shared Monument Sign structure shall be entitled to receive the portion of the condemnation award relating to the Target Shared Monument Sign structure taken, including any relocation benefits, and such Person shall cause a new sign structure to be constructed in the replacement location in accordance with the design criteria set forth in Exhibit C attached hereto, or any other design criteria approved by the grantees entitled to place panels on the Target Shared Monument Sign pursuant to the easement grants. If the award received for the Target Shared Monument Sign structure is less than the cost to replace the sign structure, the grantees entitled to place panels on the Target Shared Monument Sign shall pay the deficiency based on the panel area allocated to each pursuant to the easement grants, even if such panel area is not used. The award (whether paid separately or as part of a lump sum) attributable to each panel taken shall belong to the owner thereof.

2.5    Restriction.  No Party shall grant any easement for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of easements by a Party on its Tract to Governmental Authorities or to public utility companies.

ARTICLE III

CONSTRUCTION

3.1    General Requirements.

(A)    Each Party agrees that all future construction activities performed or authorized by it within the Shopping Center shall be performed in compliance with all Governmental Requirements. All future construction shall utilize new materials and shall be performed in a good, safe, workman-like manner.

(B)    Each Party further agrees that any construction activities performed or authorized by it shall not:

(i)    Cause any unreasonable increase in the cost of constructing improvements upon another Party's Tract.

(ii)    Unreasonably interfere with construction work being performed on any other part of the Shopping Center.

(iii)    Unreasonably interfere with the use, occupancy or enjoyment of any part of the remainder of the Shopping Center by any other Party or its Permittees.

(iv)    Cause any Building located on another Tract to be in violation of any Governmental Requirements.

(C)    Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims and demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from any construction activities performed or authorized by such indemnifying Party; provided, however, that the foregoing shall not be applicable to either events or circumstances caused by the negligence or willful act or omission of such indemnified Party, its licensees, concessionaires, agents, servants, employees, or anyone claiming by, through, or under any of them, or claims covered by the release set forth in Section 5.4(C).

(D)    In connection with any future construction, reconstruction, repair or maintenance on its Tract, and to the extent permitted under the terms of the leases or occupancy agreements with the Pre-Existing Tenants, each Party reserves the right, at its expense, to create a temporary staging and/or storage area on its Tract at such location as will not unreasonably interfere with access between such Tract and the other areas of the Shopping Center. Prior to the commencement of any work that requires the establishment of a staging and/or storage area on its Tract, a Party shall give at least thirty (30) days' prior notice to the Approving Parties, for their approval, of the proposed location of such staging and/or storage area. Notwithstanding anything to the contrary contained herein, the Approving Parties hereby approve the staging area designated in the Target Redevelopment Plans for use by Target in the expansion and renovation of its Building and related Common Area improvements. The constructing Party shall, at the request of any Approving Party, fence such staging and/or storage area. Notwithstanding the foregoing, if a business is operating on the Target Tract, then no other Party's staging and/or storage area shall be located on the Target Tract or within the Target Primary Parking Field. If the Approving Parties do not approve the proposed location of the staging and/or storage area, the requesting Party shall modify the proposed

location of the staging and/or storage area to satisfy the reasonable requirements of the Approving Parties. All storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only on the constructing Party's Tract, and all laborers, suppliers, contractors and others connected with such construction activities shall use only the access points located upon the constructing Party's Tract. Upon completion of such work, the constructing Party shall, at its expense, restore any damaged Common Area to a condition equal to or better than that existing prior to commencement of such work.

(E)    Each Party hereby grants and conveys to each other Party and to such Party's contractors, materialmen and laborers a temporary license for access and/or use over and across the Common Area of the grantor's Tract as shall be reasonably necessary for the grantee to construct and/or maintain improvements upon the grantee's Tract; provided, however, that such license shall be in effect only during such periods of time when actual construction and/or maintenance is being performed and provided further that the use of such license shall not unreasonably interfere with the use and operation of the Common Area by the other Parties or their Permittees. Prior to exercising the rights granted herein, the grantee shall first provide the grantor with a written statement describing the need for such license and shall identify the area of use. Each grantee physically using a portion of the grantor's Tract in connection with the construction and/or maintenance of the grantee's Tract shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by Section 5.4(B), shall promptly pay all costs and expenses associated with such work, shall diligently complete such work as quickly as possible, and shall promptly clean the area, and restore and/or repair the affected portion of the grantor's Tract to a condition that is equal to or better than the condition that existed prior to the commencement of such work. Notwithstanding the foregoing, in the event a dispute exists between the contractors, laborers, suppliers and/or others connected with such construction activities, each Party shall have the right to prohibit the contractors, laborers, suppliers and/or others working for another Party from using the Common Area on its Tract.

(F)    Developer ~~hereby~~ hereby grants and conveys to Target and to Target's contractors, materialmen and laborers a temporary license for access and/or use over and across the Common Area of the Developer Tract as shall be reasonably necessary for Target to renovate and expand the existing Building on the Target Tract in accordance with the Target Redevelopment Plans (including specifically, but without limitation, [i] the installation of fire sprinklers in the passageway abutting

the west and north walls of the Building on the Target Tract, [ii] the relocation of [a] the waterline that runs along or near the south line of the Target Tract **(and the installation of a new waterline that runs from such relocated waterline to the Building on the Target Tract)** and [b] the sanitary sewer line which is currently located near the southwest corner of the Target Tract, [iii] the installation of a new storm sewer that runs from the front of the Building on the Target Tract to an existing storm sewer line in the Target Primary Parking Area, [iv] the ~~installation of a new water line that runs from _____ to the Building on~~ **reconstruction of the roof drainage collection system along the north line of the Target Tract that connects into the existing stormwater collection system on the Developer Tract, [v] the construction of a 25,000 gallon water tank and the installation of a fire pump for fire protection purposes at the southeast corner of** the Target Tract, and [~~v~~ **vi**] the exclusive use of the staging areas designated in the Target Redevelopment Plans); provided, however, that the use of such license shall not unreasonably interfere with the use and operation of the Common Area of the Developer Tract by ~~Target~~ **Developer** or its Permittees**, or utility service to Occupants of the Developer Tract**.

3.2    Common Area.  The Parties agree that the Shopping Center is or will be constructed and the Common Area is currently or will be constructed as shown on the Site Plan; provided, however, no fence or other barrier that would prevent or unreasonably obstruct the passage of pedestrian or vehicular travel shall be erected or permitted within or across the Common Area, exclusive of the limited curbing and other forms of traffic control depicted on the Site Plan, permitted staging and/or storage areas and Outside Sales Areas.  Target hereby approves the changes to the Common Area as shown on the Site Plan to permit the addition of shop space within the area of the Developer Tract labeled "Future Expansion Area" on the Site Plan.  Contemporaneously with the construction of a Building upon its Tract, the ~~constructing~~ **Constructing** Party shall cause the Common Area on its Tract to be substantially completed no later than the day the first Occupant of such Tract opens for business with the public.  Such work shall be done in accordance with Governmental Requirements, in a good and workmanlike manner and in accordance with good engineering standards; provided, however (subject to the provisions in Section 3.2 (G) below), the following minimum general design standards shall be complied with throughout the term of this OEA:

(A)    The lighting system shall use a lamp source of metal halide, and shall be designed to produce a minimum maintained lighting intensity measured at grade at all points of at least:

(i)     5.0 footcandles at curb in front of the entrance to any Building.

(ii)    5.0 footcandles at entry drives to the Shopping Center.

(iii)   5.0 footcandles in the general parking areas.

(iv)    3.0 footcandles at the perimeter of the parking areas.

Each party may elect to control the lighting system located on its Tract. The type and design of the Common Area light standards shall be approved by the Approving Parties. Target shall maintain the wallpack lighting on its Building during all hours of darkness.

(B)     The slope in the parking area shall not exceed a maximum of three percent (3%) nor be less than a minimum of one and one-half percent (1½%), and the slope at all entrances to the Shopping Center shall not exceed a maximum of five percent (5%), unless the Approving Parties agree to a different standard; provided, however, the slope at the entrance to the Shopping Center off Endicott which is the second entrance from the southwest corner of the Shopping Center may have a slope not to exceed eight percent (8%).

(C)     All sidewalks and pedestrian aisles shall be concrete or other materials approved by the Approving Parties; the automobile parking areas, driveways, and access roads shall be designed in conformity with the recommendations of a licensed soils engineer approved by the Approving Parties, which design shall require the installation of a suitable base and surfacing with an asphaltic concrete or concrete-wearing material.

(D)     Utility Lines that are placed underground shall be at depths designated by consultants approved by the Approving Parties. If surface water retention and/or detention areas are located outside of the general parking areas, such retention and/or detention areas shall be fenced or otherwise secured to impede public access thereto.

(E)     The parking area on the Target Tract (specifically including, while not part of the Target Tract, the Target Primary Parking Field) and on each separate Tract and/or legally subdivided parcel of land (regardless of ownership) comprising the Developer Tract shall contain sufficient ground level parking spaces, without reliance on parking spaces that may be available on another portion of the Shopping Center (provided, however, for the purposes of determining compliance with this Section 3.2(E), the Target Tract [and not the Developer Tract] shall be considered to include the parking spaces located within the Target Primary Parking Field), in order to comply with the greater of Governmental Requirements or the following minimum requirements:

(i)      Four and seven-tenths (4.7) parking spaces for each one thousand (1,000) square feet of retail Floor Area, and

(ii)     One (1) parking space per seven thousand (7,000) square feet of warehouse space.

In the event of a condemnation of part of a Tract or a sale or transfer in lieu thereof that reduces the number of usable parking spaces on such Tract below the number required herein, the Party whose Tract is so affected shall use its best efforts (including using proceeds from the condemnation award or settlement) to restore and/or substitute ground-level parking spaces in order to comply with the parking requirements set forth in this OEA.  If such compliance is not reasonably possible, such Party shall not be deemed in default hereunder, but such Party shall not be permitted to expand the amount of Floor Area located on its Tract.  If such Floor Area is thereafter reduced other than by casualty, then the Floor Area on such Tract may not subsequently be increased unless the parking requirements set forth above are satisfied.

Temporary unavailability of parking spaces caused by uses or promotions permitted under this OEA shall not result in or be deemed a violation of this Section 3.2(E).

(F)      Developer shall not make changes to the improved Common Area within the Target Zone of Control shown on the Site Plan without first obtaining the written approval of Target. Developer hereby reserves the right, from time to time without obtaining the consent or approval of Target, to make changes to its Tract (other than within the Target Zone of Control) and to make at its own expense any insignificant change, modification or alteration in the portion of the Common Area within the Target Zone of Control (other than within the Target Primary Parking Field), including the installation of convenience facilities such as mailboxes, public telephones, cart corrals, benches, bike racks, directional and/or parking information signs, provided that:

(i)      The accessibility of the Common Area within the Target Primary Parking Field for pedestrian and vehicular traffic (as it relates to the remainder of the Shopping Center) is not unreasonably restricted or hindered, and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on the Site Plan.

(ii)     There shall be maintained at all times within such Common Area a sufficient number of vehicular parking spaces to meet the parking requirements set forth in Section 3.2(E); provided, however, that no more than two percent (2%) of the parking spaces within the Target Primary Parking Field depicted on the Site Plan shall be eliminated.

(iii)    No Governmental Requirements shall be violated as a result of such action; any and all Governmental Requirements applicable to such modifications shall be satisfied by the Party performing the same; and such action shall not result in any other Party being in violation of any Governmental Requirements.

(iv)    No change shall be made in the access points between the Target Tract, the Common Area and the adjacent public streets; provided, however, that additional access points may be created with the approval of the Approving Parties.

(v)    At least thirty (30) days prior to making any such change, modification or alteration, the Party desiring to do such work shall deliver to each Approving Party copies of the plans therefor, and provided further that such work shall not occur during the months of October, November, December or January.

The provisions of this Section 3.2(F) do not apply to any changes, modifications or alterations of Common Area located within Building Areas that result from or arise out of the construction, expansion or maintenance of Buildings or Outside Sales Areas.

(G)    Notwithstanding the foregoing or any other provision of this OEA to the contrary, (i) the provisions of this Section 3.2 shall be applicable only to the Target Tract and to any Common Area and related facilities and improvements established upon or with respect to the Developer Tract (the "**Developer Tract Common Area Improvements**") after the date of this OEA, and (ii) nothing in this OEA shall require or be deemed to require Developer to modify, relocate, or otherwise alter any Developer Tract Common Area Improvements existing as of the date of this OEA (the "**Pre-Existing Developer Tract Common Area Improvements**"), including without limitation existing curbing, fencing, and barriers for traffic control; lighting systems; slopes of parking areas and entrances to the Shopping Center; sidewalks; pedestrian aisles; parking areas; driveways and access roads; utility lines; surface water retention and/or detention areas; and number of parking spaces; provided, however, that if and to the extent that Developer modifies, relocates, or otherwise alters any of the Pre-Existing Developer Tract Common Area Improvements, (x) Developer shall use its best efforts to cause such portion(s) of the Developer Tract to come into compliance with the provisions of this Section 3.2 and (y) in no event shall Developer cause or permit such portion(s) of the Developer Tract to deviate from the standards set forth in this Section 3.2 to any greater degree than they do as of the date of this OEA.

3.3    Building Improvements.

(A)    Building(s) shall only be located within the Building Areas designated on the Site Plan. Target hereby consents to the new Building Area shown on the Site Plan and labeled "Future Expansion Area." While it is acknowledged and agreed that no Party shall have an obligation to commence construction of any Building on its Tract, each Party agrees that once it has commenced construction of a Building, such Building shall be completed within a reasonable time. The Floor Area designations on the Site Plan shall not be exceeded for each of the following Building Areas on the Developer Tract: _____.

If the number of "square feet" of building space within the Shopping Center is restricted by Governmental Requirements, the Parties hereby allocate the permitted square footage as follows: (i) to the Target Tract, the number of square feet necessary to accommodate 116,500 square feet of Floor Area; and (ii) to the Developer Tract, the balance of such permitted square footage. The Parties understand that the calculation of Building sizes shown on the Site Plan is based on the definition of "Floor Area" set forth in this OEA, and further that such term is unique to this OEA and is not intended to mirror the definition of "square feet" set forth in codes/regulations established by the local Governmental Authorities.

(B)    The Approving Parties have agreed upon an architecturally compatible theme for the exterior of all Buildings to be constructed, placed or located within the Shopping Center, as represented by the Building elevations (the "**Theme**") attached hereto as <u>Exhibit D</u>. Each Party agrees that any Building constructed, remodeled, or renovated on its Tract after the date of this OEA (in any such case, a "**New Building**") shall comply with such Theme, shall not have backlit lighting for any awning or canopy forming a part thereof, and shall comply with the other requirements of this OEA. In order to insure compliance with such Theme, each Party shall, at least thirty (30) days prior to the commencement of any work on its Tract, submit to the Approving Parties for approval detailed plans ("**Plans**") as required by <u>Exhibit E</u> attached hereto covering the initial construction of each New Building and any additions, remodeling, reconstruction or other alteration thereto that changes the exterior thereof; provided, however, the Approving Parties waive the requirement for the submission of Plans for the expansion and renovation of the existing Building on the Target Tract so long as such expansion and renovation is conducted substantially in accordance with the Target Redevelopment Plans. If an Approving Party should reject the Plans for not complying with the Theme, the submitting Party and the Approving Parties shall mutually consult to establish approved Plans for the proposed work. The Approving Parties shall not withhold approval of or recommend

changes in the Plans if the Plans conform to the Theme and the other requirements of this OEA. In no event shall an Approving Party require any other Party to utilize design standards superior to those utilized by the Approving Party in the construction of any Buildings on its Tract. Approval of Plans by the Approving Parties shall not constitute assumption of responsibility for the accuracy, sufficiency or propriety thereof, nor shall such approval constitute a representation or warranty that the Plans comply with Governmental Requirements. No material deviation shall be made from the approved Plans. *[KEVIN: Target envisions that the Theme shall consist of architectural elevations of (i) the expanded and renovated Building on the Target Tract, (ii) Developer's new addition and (iii) to the extent available, Developer's existing Buildings.]*

(C)    Subject to the other terms and provisions of this OEA, the Parties hereby specifically consent to the placement of New Buildings along their respective common boundary lines, and each Party agrees to support any request by another Party for a side-yard or setback variance if the same is required in order to accommodate such construction. The second Party to construct a New Building along a common boundary line shall:

(i)    Cause such construction to be completed in such a manner that the improvements on the adjoining Tract are not damaged, and so that the wall, roof, foundation or other structure portion of one Building does not receive support from, nor apply pressure to the other New Building.

(ii)    Undertake and assume the obligation of completing and maintaining the nominal attachment (flashing and seal) of its New Building to that of the existing New Building on the adjoining Tract, it being the intent of the Parties to establish and maintain the appearance of one (1) continuous Building complex.

Along the common boundary line between the Developer Tract and the Target Tract, the separation of Building walls shall be no less than two inches. Subject to the remainder of this paragraph, Target agrees to use reasonable efforts to locate any New Building wall on the Target Tract at least one inch from the common boundary line, but in no event more than two inches therefrom. Subject to the remainder of this paragraph, Developer agrees to use reasonable efforts to locate any New Building wall on its Tract at least one inch from the common boundary line, but in no event more than two inches therefrom. Target and Developer acknowledge that (i) a gap approximately _____ (___) feet wide currently exists between the Building on the Target Tract and the Building located on the Developer Tract immediately to the west of the Target Tract and (ii) a

gap approximately _____ (__) feet wide currently exists between the Building on the Target Tract and the Building located on the Developer Tract immediately to the north of the Target Tract, and Target and Developer agree that, notwithstanding anything to the contrary contained in this paragraph, any renovation or rebuilding of any Building or construction of a New Building on the Target Tract or the Developer Tract which abuts these gaps shall be done in a manner so as not to cause an existing "unlimited area" building thereon to no longer be in conformance with applicable building code requirements.

(D)    The Parties acknowledge that Target initially proposes to construct on the Target Tract a Building that is classified as an "unlimited area" building under certain building codes (by way of explanation, but not limitation, an "unlimited area" building is designated II-N or V-N under the Uniform Building Code.)  The Parties agree that all Buildings constructed within the Primary Building Area shall comply with the following requirements:

(i)    No New Building shall be constructed within sixty (60) feet of the Building Area on an adjoining Tract unless such Building, hereinafter referred to as the "**Adjacent Building**," shall be located immediately adjacent to the common boundary line and is attached to the Building, if any, on the adjacent Tract in accordance with Section 3.3(C) .

(ii)    If an Adjacent Building exists, then no Building shall be located within sixty (60) feet of the Adjacent Building unless such Building is attached to the Adjacent Building in accordance with Section 3.3(C); the Adjacent Building and all other Buildings on the Tract that are attached to the Adjacent Building and to each other are hereinafter referred to as the "**Building Group**".

(iii)    Any Building that is not part of the Building Group shall be located at least sixty (60) feet distant from the Building Group.

(iv)    The Adjacent Building or the Building Group, as the case may be, shall comply with the building code requirements applicable to an "unlimited area" building, including without limitation the installation of an approved sprinkler system for fire protection.

In addition to the requirements set forth above, the Parties agree that no Building shall initially be placed or constructed on their respective Tracts in a manner that will, based on then existing Governmental Requirements, either preclude the construction on the Primary Building Areas of an "unlimited area" building, or cause an existing "unlimited area" building thereon to no longer be in conformance with applicable building code requirements, it being understood and agreed,

however, that subsequent changes in Governmental Requirements shall not obligate a Party to modify or alter its existing Building.

If required by any Governmental Authorities, each Party agrees to join in a recordable declaration that confirms the existence of a sixty (60) foot clear area around the Primary Building Areas.

As set forth above, the Parties acknowledge that a gap approximately _____ (__) feet wide currently exists between the Building on the Target Tract and the Building located on the Developer Tract immediately to the west of the Target Tract, which Building located on the Developer Tract immediately to the west of the Target Tract is currently occupied by J. C. Penney. Notwithstanding the proximity of the Building currently occupied by J. C. Penney being within sixty (60) feet of the Building on the Target Tract, Developer shall be permitted to renovate such Building currently occupied by J. C. Penney without demolishing it provided (i) such Building is brought into compliance with applicable fire rating codes as set forth in the applicable building codes and (ii) such renovation shall not cause any existing "unlimited area" building located on the Target Tract or the Developer Tract to no longer be in conformance with applicable building code requirements. *[KEVIN: While we have attempted to meet both Target's needs and Developer's concerns while revising Sections 3.3(C) and (D), these provisions remain subject to review by Target's architect.]*

(E)    No Building shall be constructed or renovated after the date of this OEA so as to exceed one (1) story **(with the exception of the second floor storage area to be constructed in the northwest corner of the Building on the Target Tract in accordance with the Target Redevelopment Plans)**, or the following height restrictions:

(i)    On the Target Tract    -    forty feet (40') *[MITCH:  Final height of Target Building (including 2nd floor storage area) needs to be verified; Developer thinks that Kmart Building may be 42' tall]*; and

(ii)    On the Developer Tract -    forty feet (40'); provided, however, that any Building adjacent to the Building on the Target Tract shall not exceed the height of the adjacent portion of the Building on the Target Tract within fifty feet (50') of the Building on the Target Tract.

The height of any Building shall be measured perpendicular from the finished floor elevation to the top of the roof structure, including any screening, parapet, penthouse, mechanical equipment or similar appurtenance located on the roof of such Building.  Any Party shall have the right to install, maintain, repair, replace and remove Communications Equipment (defined below) on the top of the Building on its Tract that may extend above the height limits established above; provided, however, such Communications Equipment shall be set back from the front of the Building to reduce visibility thereof by customers and provided further, that such Communications Equipment does not interfere with Communications Equipment previously installed at the Shopping Center as of the date of this OEA.  As used herein, the phrase "**Communications Equipment**" means such things as satellite and microwave dishes, antennas and laser heads, together with associated equipment and cable.

The Parties acknowledge that the Building currently occupied by the movie theater within the Future Expansion Area on the Developer Tract may be demolished by Developer.  In the event Developer demolishes the Building occupied by the movie theater, Developer shall be permitted to relocate the sixty (60) foot tower located thereon to the roof top of the Building that Developer may construct on the Developer Tract in the Future Expansion Area.

3.4     Liens.  In the event any mechanic's lien is recorded against the Tract of one Party as a result of services performed or materials furnished for the use of another Party, the Party permitting or causing such lien to be so recorded agrees to cause such lien to be discharged within fifteen (15) days after the entry of a final judgment (after all appeals) for the foreclosure of such lien.  Notwithstanding the foregoing, upon request of the Party whose Tract is subject to such lien, the Party permitting or causing such lien to be recorded agrees to promptly cause such lien to be released and discharged of record, either by paying the indebtedness that gave rise to such lien or by posting bond or other security as shall be required by law to obtain such release and discharge.  Nothing herein shall prevent the Party permitting or causing such lien to be recorded from contesting the validity thereof in any manner such Party chooses so long as such contest is pursued with reasonable diligence.  In the event such contest is determined adversely (allowing for appeal to the highest appellate court), such Party shall promptly pay in full the required amount, together with any interest, penalties, costs, or other charges necessary to release such lien of record.  The Party permitting or causing such lien agrees to defend, protect, indemnify and hold harmless the other Party and its Tract from and against all claims and demands, including any action or proceeding brought thereon, and

all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from such lien.

ARTICLE IV

MAINTENANCE AND REPAIR

4.1     <u>Utility Lines</u>. Utility Lines shall be maintained as provided in Section 2.2.

4.2     <u>Common Area</u>.

(A)     Subject to the joint maintenance provision set forth in Section 4.2(B), each Party shall cause to be operated and maintained, including any replacement due to ordinary wear and tear, at its sole cost and expense, the Common Area on its Tract in a sightly, safe condition and good state of repair. The unimproved Common Area shall be mowed and kept litter-free. The minimum standard of maintenance for the improved Common Area shall be comparable to the standard of maintenance followed in other first class retail developments of comparable size and age in the Houston, Texas metropolitan area; notwithstanding the foregoing, however, the Common Area shall be operated and maintained in compliance with all applicable Governmental Requirements, and the provisions of this OEA. All Common Area improvements shall be repaired or replaced with materials at least equal to the quality of the materials being repaired or replaced so as to maintain the architectural and aesthetic harmony of the Shopping Center as a whole. Such operation, maintenance and repair obligation shall include but not be limited to the following:

(i)     *Drive and Parking Areas*. Maintaining all paved surfaces and curbs in a smooth and evenly covered condition, including, without limitation, replacement of base, skin patch, resurfacing and resealing. (For the purpose of this Section, an overlay of the drives and parking areas shall be considered a maintenance item.)

(ii)     *Debris and Refuse*. Periodically removing papers, debris, filth, refuse, trash, ice and snow (2" on surface), including vacuuming and broom-sweeping at least five (5) times per week, but in any event to the extent necessary to keep the Common Area in a first-class, clean and orderly condition; provided, however, that trash and/or garbage removal from a Party's Building **(as opposed to trash and/or garbage removal from the Common Area)** shall not be considered a Common Area Maintenance Cost (defined below) since such removal obligation is covered by Section 4.3(A). All sweeping shall be at appropriate intervals during such times as shall not interfere with the conduct of business or use of the Common Area by Permittees.

(iii)    *Directional Signs and Markers.*  Maintaining, cleaning and replacing any appropriate directional, stop or handicapped parking signs or markers; restriping parking lots and drive lanes at least every twenty-four (24) months, but in any event as necessary to maintain parking space designation and traffic direction; and keeping clearly marked fire lanes, loading zones, no parking areas and pedestrian cross-walks; and maintaining and replacing all Shopping Center signage but excluding tenant sign panels.

(iv)    *Utilities.*  Maintaining, cleaning and replacing Common Area lighting facilities, including light standards, wires, conduits, lamps, ballasts and lenses, time clocks and circuit breakers, illuminating the Common Area pursuant to Section 5.2(A) and illuminating exterior Building lighting fixtures, including any lighting fixtures associated with a canopy or other architectural feature forming a part of such Building, and the cost of all utilities serving the Common Area of the Shopping Center, including gas, water, and electricity.  The Parties hereto agree that the Operator shall reimburse Target $600 per annum in Constant Dollars for the cost of illuminating the wallpack lighting on the Building on the Target Tract.

(v)    *Landscaping.*  Maintaining and replacing all landscape plantings, trees, shrubs and seasonal flowers and landscaping customarily found in similar first-class retail shopping centers in the Houston metropolitan area, throughout the Common Area of the Shopping Center in an attractive and thriving condition, trimmed and weed-free; maintaining and replacing landscape planters, including but not limited to those adjacent to exterior walls of Buildings, in sidewalks adjacent to the exterior walls of Buildings, and adjacent to the Shopping Center pylon sign; providing water for landscape irrigation through a properly maintained system, including performing any seasonal (start-up and/or winterization) maintenance thereto, and any modifications to such system to satisfy governmental water allocation or emergency requirements.

(vi)    *Obstructions.*  Subject to the Rights of Pre-Existing Tenants, keeping the Common Area free from any obstructions, including those caused by the sale or display of merchandise, unless such obstruction is permitted under the provisions of this OEA.

(vii)    *Sidewalks and Common Facilities.*  Maintaining, cleaning and replacing sidewalks, including those adjacent and contiguous to Buildings.  Sidewalks on or immediately adjacent to the Target Tract shall be steam-cleaned **or pressure washed** at least monthly ~~and pressure washed periodically at intervals reasonably determined by Developer consistent with first-class retail shopping centers in the Houston metropolitan area~~.  Sidewalks on the Developer

Tract shall be periodically pressure washed at intervals reasonably determined by Developer consistent with first-class shopping centers in the Houston metropolitan area. All of the sidewalks shall be swept at appropriate intervals during such time as shall not interfere with the conduct of business or use of the Common Area, and shall be cleared of ice or snow (after each snow fall of 2" or more). Maintaining and cleaning all Common Area amenities including elevators, loading docks, ramp areas **(including truck ramps and truck parking areas)**, sidewalks, railings, **benches,** bike racks, and trash receptacles that serve the Shopping Center, including the cost of equipment and supplies to perform such service (including specifically, but without limitation, the elevators, loading docks, ramp areas, sidewalks, railings, bike racks, and trash receptacles serving the Target Tract within the Target Tract and the adjacent Common Area including, without limitation, the Target Primary Parking Field and any Front Drive or Service Drive adjacent thereto), but excluding therefrom the cost of any item that is the obligation of an individual tenant to maintain. To assist Developer in its obligation to maintain and clean the loading docks and ramp areas on the Target Tract, the Operator of the Target Tract agrees to keep any pallets located thereon neatly stacked and periodically removed.

(viii)   *Security Measures.* Providing security measures, including personnel, for the Common Area.

(ix)   *Supervisory Personnel and Maintenance Personnel.* Providing of professional supervisory and maintenance personnel for the Common Area, if reasonably required, but not leasing personnel.

(x)   *Traffic.* Supervising traffic at entrances and exits to the Shopping Center and within the Shopping Center as conditions reasonably require in order to maintain an orderly and proper traffic flow.

Notwithstanding anything contained herein to the contrary, each Party shall have the obligation to operate, maintain, and repair, at its sole cost and expense, in a clean, sightly and safe condition, the following items (if any) located on its Tract: any exterior shipping/receiving dock area; ~~any truck ramp or truck parking area~~; any recycling center or similarly designated area for the collection of items intended for recycling; and any refuse, compactor or dumpster area**; provided, however, it is agreed by Target and Developer that the only such areas on the Target Tract are located within the Target Truck Dock/Compactor Area designated on the Site Plan**.

(B)    Prior to Operator commencing any operation and/or maintenance duties, Operator shall obtain, and thereafter maintain during the period of such operation and/or maintenance performance, the insurance required by Section 5.4(D).  Commencing on the earlier of thirty (30) days prior to the date specified by the Occupant of the Target Tract that it intends to open for business with the general public, or the date the Approving Parties designate in writing, Operator shall operate and maintain the Common Area of the Shopping Center in accordance with the requirements of Section 4.2(A), exclusive of any replacement of "capital" improvements due to ordinary wear and tear, which replacement shall be the responsibility of the Party owning the affected Tract.  At least 30 days prior to any major work in the parking lots or drive areas (which for the purposes hereof, shall mean the closure of any portion of the Target Primary Parking Field, the Front Drive(s), or the Service Drive(s) to perform such work), Operator shall advise the Approving Parties of the scope thereof, and the proposed commencement and completion dates; except in an emergency, such major work shall not be performed between October and the following January.  Operator shall expend only such funds as are commercially reasonable for the operation and maintenance of the Common Area, including the performance of other obligations imposed on Operator pursuant to Section 5.3(A) hereof, and shall promptly pay such costs ("**Common Area Maintenance Costs**") when incurred. Within thirty (30) days following the commencement of such maintenance and operation, Operator shall provide the Approving Parties an estimated budget for the balance of the current calendar year containing the information required by Section 4.2(C), and each Party agrees to pay its share of Common Area Maintenance Costs actually incurred during the balance of such year, plus the Administration Fee (defined below) and Common Area Taxes, in accordance with Section 4.2(D).  Operator may hire companies affiliated with it to perform the maintenance and operation of the Common Area, but only if the rates charged by such affiliates are competitive with those of other companies furnishing similar services in the metropolitan area in which the Shopping Center is located, it being agreed that this provision shall be construed strictly against Operator.  Each Party hereby grants to Operator, its agents, contractors and employees, a license to enter upon such Party's Tract to discharge Operator's duties to operate, maintain and repair the Common Area.  For the purpose of this OEA, Common Area Maintenance Costs shall not include:

(i)    Any late charges or fees; any cost, fee, fine, penalty or similar charge arising out of or resulting from any violation by Operator or anyone else relating to the Shopping Center.

(ii)      Any charge for electricity to an Occupant that separately pays the cost of power to illuminate the Common Area on its Tract.

(iii)      Any charge for water to an Occupant that separately pays the cost of water for irrigating the landscaping upon its Tract.

(iv)      Any costs for promotional, marketing, or seasonal or holiday events of any type (including, without limitation, costs of promotional equipment, banners, decorations and/or lighting, or the cost of set up, take down or storing of any of the foregoing).

(v)      Any costs to clean up or repair the Common Area resulting from any promotional, marketing, seasonal or holiday activities, or from construction, maintenance or replacement of a Party's Buildings; any cost to remove trash and/or garbage from a Building, such removal obligation being the responsibility of the Party owning the Building.

(vi)      Any costs resulting from or arising out of the repair or replacement of items covered by warranties or guaranties including, but not limited to, such as site improvements, signs, trees, plants or other landscaping.

(vii)      Real property taxes and assessments on the Common Area (including, without limitation, the Common Area Taxes).

(viii)      Operator's profit, administrative and overhead costs including, but not limited to: office space, equipment and utilities; legal, insurance, accounting and administrative service; Operator's personnel who are not permanently located at the Shopping Center; premiums relating to bonding over mechanic's liens; and costs relating to hiring, training, screening, drug testing and/or background checks of personnel.

(ix)      Any fee or charge relating to the management and/or supervision of the operation of the Common Area, or any part thereof, paid to a third party, commercial management company or similar provider.

(x)      Entertainment, transportation, meals and lodging of anyone (but excluding reasonable mileage reimbursement for trips made as a part of Operator's Common Area Maintenance obligations as set forth herein).

(xi)      Cost of maintaining the Signs **(as such term is defined in Section 5.3(A) below)**; Operator shall maintain the Signs and allocate the cost for each sign in accordance with Section 5.3(A).

(xii)    Any fee, assessment or charge to a Party that separately pays such kind of imposition for fire hydrants located on its Tract.

(xiii)    Common Area Insurance.

In lieu of Operator's profit, administrative, indirect and overhead costs, Operator shall be permitted to charge an amount ("**Administration Fee**") computed by multiplying the Common Area Maintenance Costs (exclusive of taxes, insurance premiums, capital expenditures, fees paid to a third party who performs the Common Area operation and maintenance on Operator's behalf, and utility charges) by five percent (5%). If any of Operator's personnel at the Shopping Center perform services, functions or tasks in addition to Common Area duties, then the cost of such personnel shall be equitably allocated according to time spent performing such duties.

(C)    Operator shall, at least sixty (60) days prior to the beginning of each calendar year during the term of this OEA, submit to the Approving Parties an estimated budget ("**Budget**") for the Common Area Maintenance Costs and the Administration Fee for operating and maintaining the Common Area for the ensuing calendar year and the estimated Common Area Taxes for the ensuing calendar year. In the event an Approving Party reasonably believes the charge for a particular function is excessive, such Approving Party shall notify Operator of such belief within thirty (30) days after receipt of the estimated Budget, and thereupon Operator shall obtain no fewer than two (2) competitive bids for such function. Unless the existing provider's cost is lower, the lowest acceptable bidder shall be utilized as soon as the contract with the existing provider can be terminated without penalty **and without material disruption to service**. The Budget shall be in a form and content reasonably acceptable to the Approving Parties and shall identify separate cost estimates for at least the categories specified under Section 4.2(A), plus:

(i)    The Administration Fee.

(ii)    Rental or purchase of equipment and supplies used in maintaining or repairing the Common Area.

(iii)    Depreciation or trade-in allowance applicable to items purchased for Common Area purposes.

(iv)    Maintenance of sign structure(s) pursuant to Section 5.3(A).

(v)    Maintenance of Common Utility Line(s) pursuant to Section 2.2(C).

(vi)    Common Area Insurance pursuant to Section 1.5.

(vii)    Common Area Taxes pursuant to Section 1.6.

If an item of maintenance or replacement is to be accomplished in phases over a period of calendar years during the term of this OEA, such as resurfacing of the drive and/or parking areas, then the Budget shall separately identify the cost attributable to the applicable calendar year (including the portion of the Common Area affected) and shall note the anticipated cost and timing (indicating the portion of the Common Area affected) of such phased work during succeeding calendar years. The cost of approved "phased" work shall be paid by the Parties approving the same, or their successors or assigns, as the case may be, notwithstanding that when such work is performed a Party may not then be participating in the joint maintenance of the Common Area.

If an Approving Party disapproves the proposed Budget, it shall consult with the other Approving Party and Operator to establish a final approved Budget. The Approving Parties agree not to unreasonably withhold their approval of a proposed Budget. If a Budget is not approved by December 1st of any calendar year, Operator shall have the right to terminate its maintenance obligation with respect to the Common Area located on the Tract of the disapproving Approving Party by written notice given prior to December 10th of such calendar year. If such notice is given, then, commencing on the following April 1st, Target shall (i) maintain and operate the Common Area on its Tract and the Target Primary Parking Field at its expense; and (ii) contribute towards the costs of the specified maintenance and operation functions performed by Operator set forth in Section 4.2(G) as though it was a withdrawing Party; and Operator shall maintain and operate the balance of the Common Area of the Shopping Center (including the cost of maintaining the Front Drive(s) and Service Drive(s)) covered by its maintenance obligations; during the period from January 1st to March 31st, Target shall pay its share of maintenance of the Common Area pursuant to Section 4.2(G). If such notice is not given, then Operator shall continue to maintain and operate all of the Common Area for the next calendar year, based on the prior year's Budget until such time as a Budget for such calendar year can be agreed upon by Operator and the Approving Parties, except that Operator may make increased expenditures, as required, for utilities ~~and insurance premiums~~, **Common Area Insurance and Common Area Taxes**. Approval of the Budget, or any of the line items comprising a part thereof, shall not be considered a waiver of a Party's right to audit and/or contest, challenge or dispute the Reconciliation (defined in Section 4.2D).

Operator shall use its diligent, good faith efforts to operate and maintain the Common Area of the Shopping Center in accordance with the Budget. Notwithstanding the foregoing, Operator shall have the right to make emergency repairs to the Common Area to prevent injury or damage to

Persons or property, it being understood that Operator shall nevertheless advise each Party of such emergency condition as soon as reasonably possible, including the corrective measures taken and the cost thereof. If the cost of the emergency action exceeds $10,000.00 in Constant Dollars, then Operator shall submit a supplemental billing to each Party, together with evidence supporting such cost, and each Party shall pay its share thereof within thirty (30) days after receipt of such billing. If the cost limitation set forth above is not exceeded then such costs shall be included as part of the Common Area Maintenance Costs at the year end.

(D)    Common Area Maintenance Costs, the Administration Fee, Common Area Insurance, and Common Area Taxes shall be allocated based on the Floor Area on each Tract (provided, however, for so long as Developer's existing leases for portions of the Developer Tract to J. C. Penney Corporation, Inc., Palais Royal, and Compass Bank provide that such Pre-Existing Tenants are not to be charged CAM thereunder for the rentable area of their respective leased spaces that are located on the second level, such second level rentable area shall not be considered to be Floor Area for the purpose of this allocation), as follows:

(i)    To the Developer Tract    ___%

(ii)    To the Target Tract    ___%

*[KEVIN: How do you propose to allocate Common Area Insurance? Will Developer have a policy which covers just the Common Area of the Shopping Center which can be allocated the same as the other allocable costs, or will Developer's liability insurance policy also cover some or all of the Buildings in the Shopping Center for which Target should not be obligated to pay a share of? Developer advises that there may end up being a separate sharing percentage for Common Area Taxes.]*

In the event an existing Tract is divided, the Party causing such division shall, at its expense, prorate the allocation of Common Area Maintenance Costs, the Administration Fee, Common Area Insurance, and Common Area Taxes attributable to the original Tract between the newly created Tracts, file a recorded declaration confirming such allocation and deliver a copy of such declaration to Operator and each other Party. Each Party shall pay to the Operator in equal monthly payments, in advance, the share of the Common Area Maintenance Costs, the Administration Fee, and Common Area Insurance, attributable to such Party's Tract based either upon the amount set forth in the approved Budget or, if a Budget is not approved, then the lesser of the amount set forth in the unapproved Budget or the monthly payment established for such Party for the prior year.

Notwithstanding the provision for determining the amount of payment set forth in the immediately preceding sentence, in the event a Budget is not approved because Operator elected not to submit a Budget for consideration, and such election continues so that no Budget is submitted at least sixty (60) days prior to the beginning of the calendar year, then each Approving Party not receiving a Budget shall have the right to use its reasonable judgment to determine the amount of the Budget for the next calendar year, and each Party represented by such Approving Party shall pay to Operator monthly payments attributable to such Party's Tract based on the amount of the Budget established by that Approving Party. In addition, Target shall pay to Developer, on an annual basis, the portion of the Common Area Taxes allocated to the Target Tract in accordance with the first sentence of this Section 4.2(D); such payment shall be made by Target within thirty (30) days after Target's receipt of written demand therefor, which demand shall include copies of all applicable tax bills, a copy of Developer's determination of which portion(s) of such tax bills are Common Area Taxes, and such other supporting documentation as Target may require in its reasonable judgment; provided, however, Target shall not be required to make such payment more than thirty (30) days prior to the date on which the Common Area Taxes would be past due and subject to any late charges. Within ninety (90) days after the end of each calendar year, Operator shall provide each Party with a statement certified by an authorized Person, together with supporting invoices and other materials setting forth the actual Common Area Maintenance Costs paid by Operator for the operation and maintenance of the Common Area and the actual Common Area Insurance and Common Area Taxes paid (such statement and supporting data are collectively called the **"Reconciliation"**), the Administration Fee, and the share of the aggregate thereof that is attributable to each Party's Tract. The Reconciliation shall separately identify cost categories specified in Sections 4.2(A) and 4.2(C), and shall be in a form reasonably acceptable to the Approving Parties. If the amount paid with respect to a Tract for such calendar year shall have exceeded the share allocable to such Tract, Operator shall refund by check the excess to the Party owning such Tract at the time the Reconciliation is delivered, or if the amount paid with respect to a Tract for such calendar year shall be less than the share allocable to such Tract, the Party owning such Tract at the time such Reconciliation is delivered shall pay the balance of such Party's share to Operator within sixty (60) days after receipt of such Reconciliation, less any amounts disputed in writing, it being understood and agreed that the 60-day period only establishes the period for payment, and is not to be construed as an acceptance of the Reconciliation. If Operator does not timely submit the Reconciliation, then

such Party's payment period shall be extended an additional 60 days.  If Operator does not refund amounts shown by the Reconciliation to be owed a Party, then such Party may offset the refund owed, plus Interest, against payments for Common Area Maintenance Costs, the Administration Fee, Common Area Insurance, and Common Area Taxes due for any future period.  Notwithstanding anything contained herein to the contrary, if during a calendar year the Operator resigns or is replaced, the replacement Operator shall be responsible for the Reconciliation adjustments, including any reimbursement due to a Party for such calendar year; in addition, for a period of sixty (60) days after a substitution of Operator is made, any payment made by a Party to the prior Operator shall be deemed properly paid, and the old and new Operators shall resolve any necessary adjustments and/or prorations regarding such payments between themselves.

Within three (3) years after the date of receipt of a Reconciliation, each Party shall have the right to audit Operator's books and records pertaining to the operation and maintenance of the Common Area for the calendar year covered by such Reconciliation.  A Party shall notify Operator of such Party's intent to audit at least fifteen (15) days prior to the designated audit date.  If such audit shall disclose any error in the determination of the Common Area Maintenance Costs, the Administration Fee, Common Area Insurance, Common Area Taxes or any allocation thereof to a particular Tract, the auditing Party shall provide Operator with a copy of the audit, and an appropriate adjustment shall be made forthwith.  Notwithstanding anything to the contrary, the approval of a prior Reconciliation, or any line item comprising a part thereof, shall not be a waiver of a Party's right to challenge subsequent Reconciliations regarding such line item.  The cost of any audit shall be assumed by the auditing Party unless such Party shall be entitled to a refund in excess of three percent (3%) of the amount calculated by Operator as such Party's share for the applicable calendar year, in which case Operator shall pay the cost of such audit; provided, however, that Operator's liability for payment of the fees of the auditor for any particular audit shall be limited to $5,000 in Constant Dollars.  If Operator does not respond to the results of such audit within ninety (90) days after receipt of the audit, then the auditing Party shall have the right to offset the refund claimed, plus Interest, from the date Operator receives the audit, plus costs of the audit if appropriate, against subsequent payments due Operator; provided, however, Operator shall retain the right to dispute the results of such audit for a period of six (6) months following receipt of such audit, and Operator's election not to contest the results of such audit during the 6-month period shall be deemed

acceptance of such audit. Any audit performed shall be performed during normal business hours at the offices of Operator or such other office as agreed to by Operator and Target.

(E)    Operator agrees to defend, indemnify and hold each Party harmless from and against any mechanic's, materialmen's and/or laborer's liens, and all costs, expenses and liabilities in connection therewith, including reasonable attorney's fees and court costs incurred, arising out of the maintenance and operation by Operator of the Common Area, and if any Tract shall become subject to any such lien, Operator shall promptly cause such lien to be released and discharged of record, either by paying the indebtedness that gave rise to such lien or by posting such bond or other security as shall be required by law to obtain such release and discharge.

(F)    Subject to the provisions of Section 2.2(C) regarding Common Utility Lines and Section 2.4 regarding sign structures, if any portion of the Common Area is damaged or destroyed by any cause whatsoever, whether insured or uninsured, during the term of this OEA, other than damage caused by ordinary use or wear and tear, the Party upon whose Tract such Common Area is located shall repair or restore such Common Area at its sole cost and expense with all due diligence; provided, however, that no Party shall be required to expend more than $250,000 in Constant Dollars in excess of insurance proceeds that may be available (or that would have been available except for such Party's election of deductibles or self-insurance, which amount such Party shall be responsible to contribute) for such repair or restoration. Notwithstanding the limitation set forth in the preceding sentence, a Party may require the Party upon whose Tract such Common Area is located to do such restoration work if the requiring Party has agreed in writing to pay the costs in excess of $250,000.00. Except to the extent limited by Section 5.4(C), if such damage or destruction of Common Area on a Tract is caused in whole or in part by another Party or a third Person, the Party obligated to make such repair or restoration reserves and retains the right to proceed against such other Party or third Person for indemnity, contribution and/or damages.

(G)    In the event of a default by Operator hereunder, Target shall have the right, upon giving not less than sixty (60) days written notice to Operator, to take-over and assume the maintenance of the Common Area upon the Target Tract and the Target Primary Parking Field. Following the effective date of such take-over and assumption, Target shall maintain the Common Area on its Tract and on the Target Primary Parking Field in accordance with the standards set forth in this OEA, and shall pay all costs and expenses incurred in connection therewith; provided, however, Operator shall continue to (i) maintain the Common Utility Lines of the Shopping Center,

including any detention/retention ponds, regardless of location, (ii) maintain the Common Area security program, if any and (iii) maintain any Sign upon which a Target panel is attached. Upon such take-over and assumption, Target shall be released from the obligation to contribute towards Common Area Maintenance Costs, except with respect to those functions identified above for which continued participation is mandatory or elected. Target's share of such costs shall be paid in accordance with the allocation set forth in Section 4.2(D) or, with respect to Signs, Section 5.3(A). Operator shall continue to maintain the balance of the Common Area in accordance with the standards set forth herein.

Target shall have the right to cause Operator to resume the operation and maintenance of the Common Area on the Target Tract and on the Target Primary Parking Field upon the satisfaction of the following conditions:

(i) Target shall give Operator at least sixty (60) days' prior written notice of Target's intention to have Operator resume the operation and maintenance of the Common Area on the Target Tract and on the Target Primary Parking Field; provided, however, such date for resumption shall always be the first day of a calendar quarter; and

(ii) Prior to the date established for Operator to resume the maintenance and operation thereof, Target shall, at its sole cost and expense, cause the Common Area on its Tract and on the Target Primary Parking Field to be at least equal to the same condition of maintenance then existing on the other portions of the Common Area then being maintained by Operator.

Provided the above conditions are satisfied, concurrently with the designated date, Operator shall resume full operation and maintenance of the Common Area located on the Target Tract and on the Target Primary Parking Field, and Target shall be responsible for its share of Common Area Maintenance Costs as set forth in Section 4.2(D).

4.3    Building and Outside Sales Area.

(A)    After completion of construction, each Party covenants and agrees to maintain and keep the exterior portion of the Buildings and Outside Sales Area, if any, located on its Tract in first-class condition and state of repair, in compliance with all Governmental Requirements, and in compliance with the provisions of this OEA, including either the Theme or the exterior architectural concept approved for such Building by the Approving Parties. Each Party further agrees to store all trash and garbage on its Tract in adequate containers and to arrange for regular removal of such trash or garbage.

(B)    In the event any of the Buildings in the Shopping Center are damaged by fire or other casualty (whether insured or not), the Party upon whose Tract such Building is located shall, subject to Governmental Requirements and/or insurance adjustment delays, promptly remove the debris resulting from such casualty and provide a sightly barrier, and within a reasonable time thereafter shall either (i) repair or restore the Building so damaged to a complete unit, such repair or restoration to be performed in accordance with all provisions of this OEA, or (ii) erect another Building in such location, such construction to be performed in accordance with all provisions of this OEA, or (iii) demolish the damaged portion and/or the balance of such Building and restore the cleared area to either a hard surface condition or a landscaped condition in which event the area shall be Common Area until a replacement Building is erected. Such Party shall have the option to choose which of the foregoing alternatives to perform, but such Party shall be obligated to perform one (1) of such alternatives. Such Party shall give notice to each other Party within ninety (90) days from the date of such casualty of which alternative such Party elects.

ARTICLE V

OPERATION OF THE SHOPPING CENTER

5.1    Uses.

(A)    Subject to the Rights of Pre-Existing Tenants, the Shopping Center shall be used only for retail sales, offices, Restaurants or other permitted commercial purposes. "**Business Office**" shall mean an office that does not provide services directly to consumers; "**Retail Office**" shall mean an office that provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerage and title companies, travel and insurance agencies, and medical, dental and legal clinics. No more than ~~ten~~ **twenty** percent ~~(10%)~~**(20%)** of the Floor Area in the Developer Tract may be used for Retail Office and/or Business Office purposes, and no more than ~~ten~~ **twenty** percent ~~(10%)~~**(20%)** of the Floor Area in the Target Tract may be used for Retail Office and/or Business Office purposes; provided, however, that office space used by an Occupant for administrative purposes, that does not exceed 500 square feet, and that is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.

(B)    Subject to the Rights of Pre-Existing Tenants, no use shall be permitted in the Shopping Center that is inconsistent with the operation of a first-class retail shopping center. Without limiting the generality of the foregoing, but subject to the Rights of Pre-Existing Tenants, the following uses shall not be permitted:

(i)    Any use that emits an obnoxious odor, noise or sound that can be heard or smelled outside of any Building in the Shopping Center.

(ii)    Any operation primarily used as a storage warehouse operation or for any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation; provided, however, this provision shall not prohibit one or more Occupants from storing goods and other materials ancillary to such Occupant's primary business purpose within the second floor storage area designated on the Site Plan.

(iii)    Any "second hand" store, "surplus" store, or pawn shop, but excluding first-class consignment shops and first-class retailers of gently-used secondhand goods such as Terri's Consign and Design Furnishings.

(iv)    Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(v)    Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building.

(vi)    Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(vii)    Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer as the same may be found in retail shopping centers in the metropolitan area where the Shopping Center is located.

(viii)    Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation.

(ix)    Any bowling alley or skating rink.

(x)    Any movie theater or live performance theater that (a) is located in the Target Zone of Control and/or (b) has an entrance and/or exit on the south side of the Building containing such theater or otherwise so as to give patrons of such theater direct access to the parking areas within the Target Zone of Control.

(xi)     Any hotel, motel, short or long term residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms.

(xii)    Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops or pet supply stores such as PETsMART or Petco. Notwithstanding the foregoing exception, any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; the boarding of pets as a separate customer service shall be prohibited; all kennels, runs and pens shall be located inside the Building; and the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(xiii)   Any mortuary or funeral home.

(xiv)   Any establishment selling or exhibiting "pornographic" material.

(xv)    Any establishment selling or exhibiting drug-related paraphernalia or that exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff.

(xvi)   Any bar, tavern, Restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on premises consumption exceeds ~~thirty~~ **forty** percent ~~(30%)~~**(40%)** of the gross revenues of such business**; provided, however, no bar, tavern or Restaurant shall be permitted on the Developer Tract** within two hundred feet (200') of the **front (i.e., south) wall of the** Building ~~Area~~ on the Target Tract.

(xvii)  Any health spa, fitness center or workout facility; any massage parlors or similar establishments; provided, however, this provision shall not prohibit one (1) health spa, fitness center or workout facility, not to exceed _____ thousand (_____) square feet of Floor Area, in the area designated as "Permitted Spa Area" on the Site Plan.

(xviii)  Any flea market, amusement or video arcade, pool or billiard hall, car wash or dance hall; provided, however, this provision shall not prohibit (a) a family-oriented amusement arcade such as is currently operated by ~~Chuckee~~ **Chuck E.** Cheese or (b) one (1) first class pool or billiard hall **ancillary to a Restaurant, which pool or billiard hall shall** not ~~to~~ exceed _____ (_____) square feet of Floor Area~~;~~ **and shall be located** in the area designated as "Permitted Billiard/Pool Hall Area" on the Site Plan.

(xix)   Any training or educational facility, including but not limited to:  beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily

to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to (a) on-site employee training by an Occupant incidental to the conduct of its business at the Shopping Center or (b) up to _____ such schools, none of which shall exceed _____ square feet of Floor Area, and none of which shall be located within two hundred feet (200') of the **front (i.e., south) wall of the Building on the** Target Tract.

      (xx)    Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant.

    (C)    No Party shall use, or permit the use of, Hazardous Materials on, about, under or in its Tract, or the balance of the Shopping Center, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws. Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including but not limited to costs of investigation, remedial or removal response, and reasonable attorneys' fees and cost of suit, arising out of or resulting from any Hazardous Material used or permitted to be used by such Party, whether or not in the ordinary course of business.

    For the purpose of this Section 5.1(C), the term (i) "**Hazardous Materials**" shall mean and refer to the following: petroleum products and fractions thereof, asbestos, asbestos containing materials, urea formaldehyde, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials, substances and wastes listed or identified in, or regulated by, any Environmental Law, and (ii) "**Environmental Laws**" shall mean and refer to the following: all federal, state, county, municipal, local and other statutes, laws, ordinances and regulations that relate to or deal with human health or the environment, all as may be amended from time to time.

    (D)    Subject to the Rights of Pre-Existing Tenants, no merchandise, equipment or services, including but not limited to vending machines, promotional devices and similar items, shall be displayed, offered for sale or lease, or stored within the Common Area; provided, however, the

foregoing prohibition shall not be applicable to (i) the storage of shopping carts in cart corrals on the Target Tract; (ii) the installation of an "ATM" banking facility within an exterior wall of any Building; (iii) the seasonal display and sale on the Target Tract of bedding plants on the sidewalk immediately in front of the Target Building; (iv) the placement of bicycle racks, benches, trash receptacles, and landscaping planters on the sidewalk in front of any Building; (v) the placement of spherical bollards (Target's brand) on the sidewalk in front of any Building on the Target Tract; (vi) temporary Shopping Center promotions, except that no promotional activities will be allowed within the Target Zone of Control without the prior written approval of Target; (vii) any recycling center required by law, the location of which shall be subject to the approval of the Approving Parties; (viii) outdoor seating shown on the Site Plan; or (ix) any designated Outside Sales Area; provided, however, with respect to any Outside Sales Area that is not included within a Building Area, such space may be used not more than three (3) times per calendar year, and the duration of such use shall be subject to the following limitations: during the period commencing on October 15th and ending on December 27th -- no limitation on the number of days of consecutive use; during the period commencing February 15th and ending on July 10th -- not more than one hundred twenty-five (125) consecutive days of use; and, during any other period -- not more than thirty (30) consecutive days of use.

(E)    Subject to the Rights of Pre-Existing Tenants, the following use and occupancy restrictions shall be applicable to the Developer Tract:

(i)    No Restaurant shall be located thereon that is both within the Target Zone of Control and within two hundred (200) feet of the Building Area located on the Target Tract.

(ii)    No drug store selling or offering for sale any pharmaceutical products requiring the services of a licensed pharmacist shall be permitted; provided, however, this restriction shall apply only to regional or national drug store operators such as, by way of example but not limitation, Rite Aid, Eckerd, or Walgreens, but it shall not apply to any pharmacy that is operated within a full-service grocery store.

(iii)    No gas/service station and/or other facility that dispenses gasoline, diesel or other petroleum products as fuel shall be permitted.

(iv)    No liquor store offering off-premises sale of alcoholic beverages shall be permitted thereon that is both within the Target Zone of Control and within four hundred (400) feet

of the Building Area on the Target Tract, nor shall any liquor store offering off-premises sale of alcoholic beverages exceeding 10,000 square feet of Floor Area be permitted.

(v)    No general merchandise discount retail store such as Wal-Mart or Kmart containing Floor Area in excess of 75,000 square feet (but excluding such stores as Sears, Kohls, and warehouse club stores such as Costco or Sam's), so long as a general merchandise discount retail store on the Target Tract has not been discontinued for greater than twenty-four (24) months (thirty-six (36) months in the event of damage or destruction, or corporate merger or takeover) and thereafter, within six (6) months after Target receives written notice from Developer that Developer intends to lease or sell another part of the Shopping Center for such use, a general merchandise discount retail store has not reopened on the Target Tract.

(F)    The names "Target", "Greatland", "SuperTarget" or any variation using the name "Target" shall not be used to identify the Shopping Center or any business or trade conducted on the Developer Tract. Until the Approving Parties agree upon a name change, the Shopping Center shall be called "Meyerland Plaza Shopping Center."

(G)    Except to the extent required by law, no Permittee shall be charged for the right to use the Common Area; provided, however, for the purpose of this provision, a tax assessment or other form of charge applicable to parking spaces or parking lots shall be deemed by the Approving Parties an imposition required by law.

(H)    This OEA is not intended to, and does not, create or impose any obligation on a Party to operate, continuously operate, or cause to be operated a business or any particular business at the Shopping Center or on any Tract.

5.2    Lighting

(A)    After completion of the Common Area lighting system on its Tract, each Party hereby covenants and agrees to keep its Tract fully illuminated from dusk to at least 1:00 a.m. unless the Approving Parties agree upon a different time. Each Party further agrees to keep any exterior Building security lights on from dusk until dawn. During the term of this OEA, each Party grants an irrevocable license to each other Party for the purpose of permitting the lighting from one Tract to incidentally shine on the adjoining Tract.

(B)    It is recognized that Occupants within the Shopping Center may be open for business at different hours, and that a Party may wish to have the Common Area lights on another Tract be illuminated before or after the required time period. Accordingly, a Party ("**Requesting Party**")

shall have the right, at any time, to require the Party that controls the lighting on such Tract ("**Requested Party**") to keep the Common Area lights it controls operating as stipulated by the Requesting Party, provided that **(i)** the Requesting Party notifies the Requested Party of such request not less than fifteen (15) days in advance **and (ii) Target, as the Requesting Party, shall also have the right to require Developer to keep the Common Area lights which light the Target Employee Parking Area designated on the Site Plan (but not any other Common Area lights) operating as stipulated by Target as the Requesting Party**. The Requesting Party shall state the period during which it wishes such Common Area lights to be kept operating and shall pay to the Requested Party a prepayment as follows:

(i)      If the period is less than thirty (30) days, then the prepayment shall be one hundred ten percent (110%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower), as estimated by the Requested Party; and

(ii)     If the period is thirty (30) days or longer, then the prepayment shall be one hundred ten percent (110%) of the reasonable cost for such additional operation (including electrical power, bulbs and manpower) for thirty (30) days, as estimated by the Requested Party, and the Requesting Party shall renew such prepayment at the end of each thirty (30) day period.

If the Requesting Party is of the opinion that the estimated prepayment established by the Requested Party is greater than one hundred ten percent (110%) of such additional operation, the Parties shall attempt to agree upon the cost of such additional operation but if they cannot do so, then the amount the Requesting Party is obligated to pay shall be estimated by the electrical utility company furnishing such power, or if the electrical utility company elects not to do so, by a reputable electrical engineer. Upon the failure of a Requesting Party to pay the estimated amount or renew a prepayment as required hereby, the Requested Party shall have the right to discontinue such additional lighting and to exercise any other remedies herein provided. Any such request for additional lighting may be withdrawn or terminated at any time by written notice from the Requesting Party, and a new request or requests for changed hours of additional operation may be made from time to time.

5.3    <u>Occupant Signs</u>.

(A)     No freestanding sign **(each being a "Sign")** shall be permitted within the Shopping Center unless constructed in one of the specific areas designated on the Site Plan (each being a "**Sign Area**") and only one (1) such sign structure may be located in each Sign Area. If a Sign Area is no

longer available for use because of condemnation or Governmental Requirements, a replacement Sign Area may be approved by the Approving Parties, subject to the consent, which shall not be unreasonably withheld, of the Party owning the Tract to be burdened by the replacement Sign Area location.  Each sign structure at the Shopping Center shall be utilized as follows:

"**Jackwood Street Pylon Sign**":  Target shall have the right to place one (1) identification panel (for up to two Occupants of the Target Tract) in the position formerly used by Kmart on the Existing Pylon Sign located within the Existing Sign Area shown on the Site Plan and, when constructed, on the Replacement Pylon Sign in the position shown on Exhibit C attached hereto.  Developer shall have the right to attach one (1) identification panel to the Jackwood Street Pylon Sign for each of up to ____ Occupants of the Developer Tract. The design criteria for the Existing Pylon Sign and the Replacement Pylon Sign, and the identification panel designations, are shown on Exhibit C attached hereto.

"**Target Shared Monument Sign**":  Target shall have the right to place one (1) identification panel (for up to two Occupants of the Target Tract) in the position formerly used by Kmart on the Target Shared Monument Sign located within the Target Shared Monument Sign Area shown on the Site Plan.  Developer shall have the right to attach one (1) identification panel to the Target Shared Monument Sign for an Occupant of the Developer Tract. The design criteria for the Target Shared Monument Sign, and the identification panel designations, are shown on Exhibit C attached hereto.

[DESCRIPTIONS OF EACH OTHER FREE-STANDING SIGN TO BE INSERTED HERE.]

Operator shall maintain the Jackwood Street Pylon Sign and the Target Shared Monument Sign and such costs (including cost of providing power) shall be included in Common Area Maintenance Costs**"Shopping Center Sign": Developer shall have the right to place on the Shopping Center Sign located in the Shopping Center Sign Area shown on the Site Plan (i) the "M" logo for the Shopping Center, (ii) one (1) identification panel for the Shopping Center name and (iii) a reader board which shall be utilized by Developer for Occupant and Shopping Center promotions**; provided, however, if there is no Operator, then such maintenance shall be performed by a Person designated by the majority of Parties entitled to place panels on the applicable sign and all costs **Developer shall permit Target to utilize the reader board at least ____ days per calendar month. The design criteria for the Shopping Center Sign, the "M" logo, the Shopping Center identification panel and the reader board are shown on Exhibit C attached hereto.**

"Existing Bank Pylon Sign": Developer shall have the right to place on the Existing Bank Pylon Sign located in the Existing Bank Pylon Sign Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for the Existing Bank Pylon Sign, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign A": Developer shall have the right to place on Monument Sign A located in the Monument Sign A Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign A, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign B": Developer shall have the right to place on Monument Sign B located in the Monument Sign B Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign B, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign C": Developer shall have the right to place on Monument Sign C located in the Monument Sign C Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign C, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign D": Developer shall have the right to place on Monument Sign D located in the Monument Sign D Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign D, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign E": Developer shall have the right to place on Monument Sign E located in the Monument Sign E Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign E, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign F": Developer shall have the right to place on Monument Sign F located in the Monument Sign F Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign F, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign G": Developer shall have the right to place on Monument Sign G located in the Monument Sign G Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign G, and the identification panel designations, are shown on Exhibit C attached hereto.

"Monument Sign H": Developer shall have the right to place on Monument Sign H located in the Monument Sign H Area shown on the Site Plan one (1) identification panel for each of _____ (___) Occupants of the Developer Tract. The design criteria for Monument Sign H, and the identification panel designations, are shown on Exhibit C attached hereto.

*[DESCRIPTIONS OF EACH OTHER FREE-STANDING SIGN, IF ANY, TO BE INSERTED HERE.]*

Operator shall maintain all of the Signs (except for the identification panels thereon) and the costs of maintaining the Signs (including cost of providing power) shall be charged to Developer; provided, however, (i) the costs of maintaining the Jackwood Street Pylon Sign, the Target Shared Monument Sign and the Shopping Center Sign (including cost of providing power) shall be included in Common Area Maintenance Costs, and (ii) if there is no Operator, then such maintenance shall be performed by a Person designated by the majority of Parties entitled to place panels on the applicable Sign and all costs (including cost of providing power) expended for such purpose shall be separately billed to each Party based on the identification panel area allocated to each on such ~~sign~~ **Sign**, even if such panel area is not used.

Each Party shall cause the identification panel of its Occupant attached to or forming a part of the sign structure to be maintained at its sole cost and expense pursuant to Governmental Regulations, in a safe condition and in a good state of repair.

The Parties hereby approve the design of the sign structures shown on Exhibit C and any identification panels indicated thereon. To the extent not shown on Exhibit C, the Approving Parties

shall have the right to approve the design and size of all sign structures located within the Shopping Center, including the identification panels to be attached thereto; provided, however, that the identification panel for an Occupant of more than sixty thousand (60,000) square feet of Floor Area shall not be subject to the approval of the Approving Parties so long as such identification panel is the standard prototype panel for said Occupant, as the same exists from time to time. No "reader board" type sign shall be permitted within the Shopping Center **except for the reader board on the Shopping Center Sign**.

 (B) *[KEVIN: Following is Target's standard sign criteria for Building signage; if Developer has a written sign criteria for this Shopping Center, Target is willing to review it to see if it could be used in place of Target's sign criteria and/or how Target's sign criteria can be modified to work with Developer's sign criteria].* Subject to the Rights of Pre-Existing Tenants, any Occupant occupying less than twenty-five thousand (25,000) square feet of Floor Area may have only one (1) identification sign placed on the exterior of the Building it occupies; provided, however, that if the space occupied by any such Occupant is located at a corner of a Building or is the entire Building, then such Occupant may have one (1) identification sign on each of two (2) sides of the Building. Any Occupant occupying at least twenty-five thousand (25,000) square feet of Floor Area may have more than one (1) identification sign placed on the exterior of the Building it occupies.

 (C) Subject to the Rights of Pre-Existing Tenants, no identification sign attached to the exterior of a Building shall be:

  (i) Placed on canopy roofs extending above the Building roof, placed on penthouse walls, or placed so as to project more than two (2) feet above the parapet, canopy or top of the wall upon which it is mounted.

  (ii) Placed at any angle to the Building; provided, however, the foregoing shall not apply to any sign located under a sidewalk canopy if such sign is at least eight (8) feet above the sidewalk.

  (iii) Painted on the surface of any Building.

  (iv) Flashing, moving or audible.

  (v) Made utilizing exposed ballast boxes, or exposed transformers.

  (vi) Made of paper or cardboard, or be temporary in nature (exclusive of contractor signs or signs advertising "Grand Opening" or "Coming Soon"), or be a sticker or decal; provided, however, the foregoing shall not prohibit the placement at the entrance of each Occupant's space of

a small sticker or decal indicating hours of business, emergency telephone numbers, acceptance of credit cards and other similar items of information.

Subject to the Rights of Pre-Existing Tenants, no Occupant of less than sixty thousand (60,000) square feet of Floor Area shall have an exterior sign that identifies leased departments and/or concessionaires operating under such Occupant's business or trade name, nor shall such sign identify specific brands or products for sale or services offered within a business establishment, unless such identification is used as part of the Occupant's trade name.

(C)     Notwithstanding anything contained herein to the contrary, each Party shall be permitted to place within the Common Area located on its Tract the temporary display of leasing information and the temporary erection of one (1) sign identifying each contractor working on a construction job on its Tract. Each Party shall have the obligation to operate, maintain and repair, in a clean, sightly and safe condition, all signs, including components thereof, located upon its Tract pursuant to Section 5.3(B) or the provisions hereof.

(D)     Subject to the Rights of Pre-Existing Tenants, and exclusive of signs permitted by Section 5.3(B) and (C), no other form of exterior expressions, including, but not limited to, pennants, pictures, notices, writings, lettering, designs or graphics, shall be placed on or attached to the exterior of any Building.  The foregoing prohibitions shall not, however, preclude Developer from **(i)** displaying seasonal decorations on any Building on, or within the Common Area of, the Developer Tract (provided such decorations are removed within thirty [30] days after the end of the applicable holiday and/or season) ~~nor shall such prohibition preclude Developer from~~**, (ii)** displaying an American flag (approximately ——**15½** feet wide by ——**10** feet tall) on the east face of a Building on the Developer Tract between the Buildings currently occupied by Marshall's and Ross as shown on the Site Plan **or (iii) displaying the "M" logo for Meyerland Plaza in relief by molding same into the exterior surface of walls of Buildings on the Developer Tract**.

5.4     Insurance.

(A)     Each Party (as to its Tract only) shall maintain or cause to be maintained in full force and effect at least the minimum insurance coverages in Constant Dollars set forth below:

(i)     Commercial General Liability Insurance with a combined single limit of liability of Five Million Dollars ($5,000,000.00) in Constant Dollars for bodily injury, personal injury and property damage, arising out of any one occurrence. The other Parties shall be "additional insureds" under such policy as it applies to the insuring Party's Tract.

(ii)     Workers' compensation and employer's liability insurance:

(a)     Worker's compensation insurance as required by any applicable law or regulation.

(b)     Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(iii)    Automobile Liability Insurance for owned, hired and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage.

Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims or demands, including any action or proceedings brought thereon, and all costs, losses, expenses and liability of any kind relating thereto, including reasonable attorneys' fees and cost of suit, arising out of or resulting from the injury to or death of any Person, or damage to the property of any Person located on the Tract owned by each indemnifying Party; provided, however, the foregoing obligation shall not apply to claims or demands based on the negligence or willful act or omission of such other Party, its licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any licensee or concessionaire thereof. In the event it is determined that such other Party was not at fault, then the indemnifying Party shall reimburse such other Party for all reasonable costs and/or expenses incurred by it defending against such claim or demand.

(B)     Prior to commencing any construction within the Shopping Center, each Party and Operator, as the case may be, shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages in Constant Dollars set forth below:

(i)     Workers' compensation and employer's liability insurance:

(a)     Worker's compensation insurance as required by any applicable law or regulation.

(b)     Employer's liability insurance in the amount of $1,000,000 each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(ii)     Commercial General Liability insurance covering all operations by or on behalf of the contractor, which shall include the following minimum limits of liability and coverages:

      (a)     Required coverages:

          (1)     Premises and Operations.

          (2)     Products and Completed Operations.

          (3)     Contractual Liability, insuring the indemnity obligations assumed by contractor under the contract documents.

          (4)     Broad Form Property Damage (including Completed Operations).

          (5)     Explosion, Collapse and Underground Hazards.

          (6)     Personal Injury Liability.

      (b)     Minimum limits of liability:

          (1)     $1,000,000 each occurrence (for bodily injury and property damage).

          (2)     $1,000,000 for Personal Injury Liability.

          (3)     $2,000,000 aggregate for Products and Completed Operations.

          (4)     $2,000,000 general aggregate applying separately to this project.

      (iii)     Automobile liability insurance including coverage for owned, hired and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage. The contractor shall require each of his subcontractors to include in their liability insurance policies coverage for automobile contractual liability.

      (iv)     The contractor shall also carry umbrella/excess liability insurance in the amount of $5,000,000. If there is no per project aggregate under the Commercial General Liability policy, the limit shall be $10,000,000.

If the construction activities involve the use of another Tract, then the constructing Person shall cause (x) the owner of such Tract to be an additional insured on each policy (for the Commercial General Liability policy pursuant to a CG 2010 11-85 version Form B endorsement, or equivalent), (y) with respect to the work on such other Tract, the coverage set forth in (ii)-(b)-(3) above to be extended for a three (3) year period following final completion of work, and (z) each such policy to provide that the same shall not be cancelled, allowed to expire, nor reduced in amount or coverage below the requirements set forth above without at least thirty (30) days' prior written

notice to each insured. If any of the insurance policies are cancelled, expire or the amount or coverage thereof is reduced below the level required, then the constructing Person shall immediately stop all work on and use of the other Tract until either the required insurance is reinstated, or replacement insurance is obtained, and evidence thereof is given to the owner of such other Tract.

(C)    Effective upon the commencement of construction of any Building on its Tract and so long as such Building exists, a Party shall carry, or cause to be carried, property insurance with "Special Form" coverage, in the amount of one hundred percent (100%) of full replacement cost thereof (excluding footings, foundations and excavations).

Each Party (the "**Releasing Party**") hereby releases and waives for itself, and each Person claiming by, through or under it, each other Party (the "**Released Party**") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Shopping Center, which loss or damage is of the type covered by the insurance required to be maintained under Section 5.4(C), irrespective either of (i) any NEGLIGENCE or STRICT LIABILITY on the part of the Released Party that may have contributed to or caused such loss or (ii) the amount of such insurance required or actually carried, including any deductible or self insurance reserve. Each Releasing Party agrees to use its reasonable efforts to obtain, if needed, appropriate endorsements to its policies of insurance, and to the policies of insurance carried by its Occupants, with respect to the foregoing release; provided, however, that failure to obtain such endorsements shall not affect the release and waiver hereinabove given.

Each Party agrees to defend, protect, indemnify and hold harmless each other Party from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind relating thereto, including reasonable attorneys' fees and cost of suit asserted by or through any Occupant of the indemnifying Party's Tract for any loss or damage to the property of such Occupant located upon the indemnifying Party's Tract, which loss or damage would have been covered by the insurance required to be maintained under Section 5.4(C), irrespective of any NEGLIGENCE or STRICT LIABILITY on the part of any other Party that may have contributed to or caused such loss.

(D)    During the period, if any, Operator is maintaining the Common Area, Operator shall maintain or cause to be maintained in full force and effect at least the minimum insurance coverages in Constant Dollars set forth below:

(i)    Commercial General Liability Insurance with a combined single limit of liability of Two Million Dollars ($2,000,000.00) for bodily injury, personal injury and property damage, arising out of any one occurrence.  Each Party shall be an "additional insured" under such policy applied as to Operator's operation and maintenance obligations under this OEA.

(ii)    Workers' Compensation and Employer's Liability Insurance:

(a)    Worker's compensation insurance as required by any applicable law or regulation.

(b)    Employer's liability insurance in the amount of $1,000,000 for each accident for bodily injury, $1,000,000 policy limit for bodily injury by disease and $1,000,000 each employee for bodily injury by disease.

(iii)    Automobile Liability Insurance for owned, hired and non-owned automobiles. The limits of liability shall not be less than $1,000,000 combined single limit each accident for bodily injury and property damage.

Operator agrees to defend, protect, indemnify and hold harmless each Party from and against all claims or demands, including any action or proceeding brought thereon, and all costs, losses, expenses and liabilities of any kind, including reasonable attorneys' fees and cost of suit, asserted or incurred in connection with or arising out of the performance, or failure to perform, by Operator of its duties or obligations under this OEA with respect to the maintenance and operation of the Common Area; provided, however, the foregoing obligation shall not apply to claims or demands based on the negligence or the willful act or omission of the Party to be indemnified. In the event it is determined that such Party was not at fault, then the Operator shall reimburse such other Party for all reasonable expenses and/or costs incurred by such Party defending against such claim or demand.

All insurance required by a Person pursuant to Section 5.4 shall be written on an occurrence basis and procured from companies rated by Best's Rating Guide not less than A-/X and that are authorized to do business in the state where the Shopping Center is located. All insurance may be provided under (i) an individual policy covering the Shopping Center, (ii) a blanket policy or policies that includes other liabilities, properties and locations of such Party; provided, however, that if such blanket commercial general liability insurance policy or policies contain a general policy aggregate of less than $20,000,000 in Constant Dollars, then such insuring Party shall also maintain excess liability coverage necessary to establish a total liability insurance limit of $20,000,000 in Constant

Dollars, (iii) a plan of self-insurance, provided that any Party so self-insuring notifies the other Parties of its intent to self-insure and agrees that upon request it shall deliver to such other Parties each calendar year a copy of its annual report that is audited by an independent certified public accountant that discloses that such Party has $250,000,000 in Constant Dollars of both net worth and net current assets, or (iv) a combination of any of the foregoing insurance programs. To the extent any deductible is permitted or allowed as a part of any insurance policy carried by a Party in compliance with Section 5.4, such Party shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed $50,000.00 in Constant Dollars unless such Party complies with the requirements regarding self-insurance pursuant to (iii) above. Each Party and Operator, if any, agree to furnish to any Person requesting the same, a certificate(s) of insurance, or statement of self-insurance, as the case may be, or the Web address where such insurance information is contained, evidencing that the insurance required to be carried by such Party or Operator, as the case may be, is in full force and effect.

Any insurance provision that requires another Person to be added as an "additional insured" shall include the following provisions:

(i)     Shall provide that the policy shall not be cancelled or reduced in amount or coverage below the requirements of this OEA, nor shall such policy be allowed to expire without at least thirty (30) days' prior written notice by the insurer to each insured and to each additional insured.

(ii)     Shall provide for severability of interests.

(iii)     Shall provide that an act or omission of one (1) of the insureds or additional insureds that would void or otherwise reduce coverage, shall not reduce or void the coverage as to the other insureds.

(iv)     Shall provide for contractual liability coverage with respect to any indemnity obligation set forth therein.

[Note: We need to confirm insurance requirements are approved by Developer.]

5.5     <u>Taxes and Assessments</u>.  Each Party shall pay, or cause to be paid prior to delinquency, all taxes and assessments with respect to its Tract, the Building, and other improvements located thereon, and any personal property owned or leased by such Party in the Shopping Center; provided, however, that (i) if any such taxes or assessments or any part thereof may be paid in installments, each Party may pay each such installment as and when the same

becomes due and payable, and (ii) Target shall, as set forth in Section 4.2(D), pay to Developer, on an annual basis, the portion of the Common Area Taxes allocable to the Target Tract.  Nothing contained herein shall prevent any Party from contesting at its cost and expense any taxes and assessments with respect to its Tract in any manner such Party elects, so long as such contest is maintained with reasonable diligence and in good faith.  At the time such contest is concluded (allowing for appeal to the highest appellate court), the contesting Party shall promptly pay all taxes and assessments determined to be owing, together with all interest, penalties and costs thereon.

ARTICLE VI

MISCELLANEOUS

6.1    Default.

(A)    The occurrence of any one or more of the following events shall constitute a material default and breach of this OEA by the non-performing Party (the "**Defaulting Party**"):

(i)    The failure to make any payment required to be made hereunder within ten (10) days after the due date.

(ii)    The failure to observe or perform any of the covenants, conditions or obligations of this OEA, other than as described in (i) above, within thirty (30) days after the issuance of a notice by another Party or Operator, as the case may be (the "**Non-Defaulting Party**") specifying the nature of the default claimed; however, if such claimed default is curable, but cannot be reasonably cured within the thirty (30) day period, and the Defaulting Party begins to cure such default within the 30-day period, then the aforesaid 30-day period shall extend so long as such curative efforts are diligently pursued to include the reasonable additional time to effectuate such cure..

(B)    With respect to any default under Section 6.1(A)(ii), any Non-Defaulting Party shall have the right following the expiration of any applicable cure period, if any, but not the obligation, to cure such default by the payment of money or the performance of some other action for the account of and at the expense of the Defaulting Party; provided, however, that in the event such default shall constitute an emergency condition, the Non-Defaulting Party, acting in good faith, shall have the right to cure such default upon such advance notice as is reasonably possible under the circumstances or, if necessary, without advance notice, so long as notice is given as soon as possible thereafter.  To effectuate any such cure, the Non-Defaulting Party shall have the right to enter upon the Tract of the Defaulting Party (but not into any Building) to perform any necessary work or

furnish any necessary materials or services to cure the default of the Defaulting Party. Each Party shall be responsible for the default of its Occupants. In the event any Non-Defaulting Party shall cure a default, the Defaulting Party shall reimburse the Non-Defaulting Party for all reasonable costs and expenses incurred in connection with such curative action, plus Interest as provided herein, within ten (10) days after receipt of demand therefor, together with reasonable documentation supporting the expenditures made. In the event the Defaulting Party does not reimburse the Non-Defaulting Party as set forth above, in addition to any other remedy available, the Non-Defaulting Party shall have the right to offset such amount owed against any current or future sum of money due the Defaulting Party until the full amount owed is recovered.

The right to cure the default of another Party shall not be deemed to:

(i)    Impose any obligation on a Non-Defaulting Party to do so.

(ii)    Render the Non-Defaulting Party liable to the Defaulting Party or any third party for an election not to do so.

(iii)    Relieve the Defaulting Party from any performance obligation hereunder.

(iv)    Relieve the Defaulting Party from any indemnity obligation as provided in this OEA.

(C)    Costs, expenses and Interest accruing and/or assessed pursuant to Section 6.1(A)(i) and/or Section 6.1(B) above shall constitute a lien against the Defaulting Party's Tract. Such lien shall attach and take effect only upon recordation of a claim of lien in the office of the Recorder of the County of the State in which the Shopping Center is located by the Party making such claim. The claim of lien shall include the following:

(i)    The name of the lien claimant.

(ii)    A statement concerning the basis for the claim of lien and identifying the lien claimant as a Non-Defaulting Party.

(iii)    An identification of the owner or reputed owner of the Tract or interest therein against which the lien is claimed.

(iv)    A description of the Tract against which the lien is claimed.

(v)    A description of the work performed that has given rise to the claim of lien and a statement itemizing the amount thereof.

(vi)    A statement that the lien is claimed pursuant to the provisions of this OEA, reciting the date and document number of recordation hereof. The notice shall be duly verified,

acknowledged and contain a certificate that a copy thereof has been served upon the Party against whom the lien is claimed, by personal service or by mailing pursuant to Section 6.4 below. The lien so claimed shall attach from the date of recordation solely in the amount claimed thereby and may be enforced in any judicial proceedings allowed by law, including without limitation, a suit in the nature of a suit to foreclose a mortgage/deed of trust or mechanic's lien under the applicable provisions of the law of the State in which the Shopping Center is located.

(D)     No waiver by any Party of any default under this OEA shall be effective or binding on such Party unless made in writing by such Party, and no such waiver shall be implied from any omission by a Party to take action in respect to such default. No express written waiver of any default shall affect any other default or cover any other period of time other than any default and/or period of time specified in such express waiver. One or more written waivers of any default under any provision of this OEA shall not be deemed to be a waiver of any subsequent default in the performance of the same provision or any other term or provision contained in this OEA.

(E)     Each Non-Defaulting Party shall have the right to prosecute any proceedings at law or in equity against any Defaulting Party hereto, or any other Person, violating or attempting to violate or defaulting upon any of the provisions contained in this OEA, and to recover damages for any such violation or default. Such proceeding shall include the right to restrain by injunction any violation or threatened violation by another Party or Person of any of the terms, covenants or conditions of this OEA, or to obtain a decree to compel performance of any such terms, covenants or conditions, it being agreed that the remedy at law for a breach of any such term, covenant or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate. All of the remedies permitted or available to a Party under this OEA or at law or in equity shall be cumulative and not alternative, and the invocation of any such right or remedy shall not constitute a waiver or election of remedies with respect to any other permitted or available right or remedy.

6.2     Interest. Any time a Party or Operator, if any, shall not pay any sum payable hereunder to another Party within five (5) days of the due date, such delinquent Party or Operator shall pay interest on such amount from the due date to and including the date such payment is received by the Party entitled thereto, at the lesser of:

(i)     The highest rate permitted by law to be either paid on such type of obligation by the Party obligated to make such payment or charged by the Party to whom such payment is due, whichever is less.

(ii)    The prime rate, plus three percent (3%). As used herein, "**prime rate**" shall mean the rate of interest published from time to time as the "Prime Rate" in *The Wall Street Journal* under the heading "Money Rates"; provided, however, that (i) if more than one such rate is published therein the prime rate shall be the highest such rate and (ii) if such rate is no longer published in *The Wall Street Journal* or is otherwise unavailable, the prime rate shall be a substantially comparable index of short term loan interest rates charged by U.S. banks to corporate borrowers selected by the Approving Parties.

6.3    Estoppel Certificate. Each Party and Operator, if any, agree that upon written request (which shall not be more frequent than three (3) times during any calendar year) of any other Party or Operator, it will issue within thirty (30) days after receipt of such request to such Party, or its prospective mortgagee or successor, an estoppel certificate stating to the best of the issuer's knowledge as of such date:

(i)    Whether it knows of any default under this OEA by the requesting Party, and if there are known defaults, specifying the nature thereof in reasonable detail.

(ii)    Whether this OEA has been assigned, modified or amended in any way by it and if so, then stating the nature thereof in reasonable detail.

(iii)    Whether this OEA is in full force and effect.

Such estoppel certificate shall act to estop the issuer from asserting a claim or defense against a bona fide encumbrancer or purchaser for value to the extent that such claim or defense is based upon facts known to the issuer as of the date of the estoppel certificate that are contrary to the facts contained therein, and such bona fide purchaser or encumbrancer has acted in reasonable reliance upon such estoppel certificate without knowledge of facts to the contrary. The issuance of an estoppel certificate shall in no event subject the issuer to any liability for the negligent or inadvertent failure of the issuer to disclose correct and/or relevant information, nor shall such issuance be construed to waive any rights of the issuer to perform an audit or obtain an adjustment with respect to Common Area Maintenance Costs or Common Area Taxes for any year it is entitled to do so, or to challenge acts committed by other Parties for which approval by the Approving Parties was required but not sought or obtained.

6.4    Notices. All notices, demands and requests (each, a "**notice**") required or permitted to be given under this OEA must be in writing and shall be deemed to have been given as of the date such notice is (i) delivered to the Party intended, (ii) delivered to the then designated address of the

Party intended, (iii) rejected at the then designated address of the Party intended, provided such notice was sent prepaid, or (iv) sent by nationally recognized overnight courier with delivery instructions for "next business day" service, or by United States certified mail, return receipt requested, postage prepaid and addressed to the then designated address of the Party intended. The initial addresses of the Parties shall be:

|  |  |
|---|---|
| Target: | Target Corporation |
|  | Property Development |
|  | Attn: Property Administration |
|  | 1000 Nicollet Mall |
|  | Minneapolis, MN 55403 |
|  |  |
| Developer: | Ronus Meyerland Plaza, L.P. |
|  | Piazza at Paces |
|  | 3290 Northside Parkway, Suite 250 |
|  | Atlanta, GA 30327 |
|  | Attn: _____ |
|  |  |
| with a copy to: | Hartman, Simons, Spielman & Wood, LLP |
|  | 6400 Powers Ferry Road, N.W., Suite 400 |
|  | Atlanta, Georgia 30339 |
|  | Attn: Peter M. Hartman, Esq. |
|  |  |
| with respect to any "notice" to Operator: | As from time to time designated. |

Upon at least ten (10) days' prior written notice, each Party shall have the right to change its address to any other address within the United States of America.

6.5     Approval Rights.

(A)     Except as otherwise provided herein, with respect to any matter as to which a Party has specifically been granted an approval right under this OEA, nothing contained in this OEA shall limit the right of a Party to exercise its business judgment, in its sole discretion. whether or not "objectively" reasonable under the circumstances, and any such decision shall not be deemed inconsistent with any covenant of good faith and fair dealing that may be implied by law to be part of this OEA. The Parties intend by this OEA to set forth their entire understanding with respect to the terms, covenants, conditions and standards pursuant to which their obligations are to be judged and their performance measured.

(B)    Unless provision is made for a specific time period, each response to a request for an approval or consent required to be considered pursuant to this OEA shall be given by the Party to whom directed within thirty (30) days after receipt thereof. Each disapproval shall be in writing and, subject to Section 6.5 (A), the reasons therefor shall be clearly stated. If a response is not given within the required time period, the requested Party shall be deemed to have given its approval if the original notice stated in capitalized letters that failure to respond within the applicable time period will be deemed an approval. Notwithstanding anything contained herein to the contrary, the provisions of this paragraph (B) do not apply in any manner or fashion to any request that requires an amendment to this OEA, such requests being governed solely by the provisions of Section 6.8(E).

(C)    Unless otherwise specifically provided herein, if the Approving Parties' approval is requested, unanimous approval must be given.

6.6    <u>Condemnation</u>. In the event any portion of the Shopping Center shall be condemned, or conveyed under threat of condemnation, the award shall be paid to the Party owning the Tract or the improvements taken, and the other Parties hereby waive and release any right to recover any value attributable to the property interest so taken, except that (i) if the taking includes improvements belonging to more than one (1) Party, such as Utility Lines or Signs, the portion of the award allocable thereto shall be used to relocate, replace or restore such jointly owned improvements to a useful condition, and (ii) if the taking includes easement rights that are intended to extend beyond the term of this OEA, the portion of the award allocable to each such easement right shall be paid to the respective grantees thereof. In addition to the foregoing, if a separate claim can be filed for the taking of any other property interest existing pursuant to this OEA that does not reduce or diminish the amount paid to the Party owning the Tract or the improvement taken, then the owner of such other property interest shall have the right to seek an award for the taking thereof. Except to the extent they burden the land taken, no easement or license set forth in this OEA shall expire or terminate based solely upon such taking.

6.7    <u>Binding Effect</u>. The terms of this OEA and all easements granted hereunder shall constitute covenants running with the land and shall bind the Tracts described herein and inure to the benefit of and be binding upon each Party. This OEA is not intended to supersede, modify, amend or otherwise change the provisions of any prior instrument affecting the land burdened hereby.

6.8    <u>Construction and Interpretation</u>.

(A)    This OEA and the Exhibits hereto contain all the representations and the entire agreement between the Parties with respect to the subject matter hereof. Any prior negotiations, correspondence, memoranda or agreements are superseded in total by this OEA and the Exhibits attached hereto. This OEA has been fully negotiated at arms length between the signatories hereto, and after advice by counsel and other representatives chosen by such Parties, and such Parties are fully informed with respect thereto; no such Party shall be deemed the scrivener of this OEA; and, based on the foregoing, the provisions of this OEA and the Exhibits hereto shall be construed as a whole according to their common meaning and not strictly for or against any Party.

(B)    Whenever required by the context of this OEA, (i) the singular shall include the plural, and vice versa, and the masculine shall include the feminine and neuter genders, and vice versa, and (ii) use of the words "including", "such as", or words of similar import, when following any general term, statement or matter shall not be construed to limit such statement, term or matter to specific items, whether or not language of non-limitation, such as "without limitation", or "but not limited to", are used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest scope of such statement, term or matter.

(C)    The captions preceding the text of each article and section of this OEA are included only for convenience of reference. Captions shall be disregarded in the construction and interpretation of this OEA. Capitalized terms are also selected only for convenience of reference and do not necessarily have any connection to the meaning that might otherwise be attached to such term in a context outside of this OEA.

(D)    Invalidation of any of the provisions contained in this OEA, or of the application thereof to any Person by judgment or court order, shall in no way affect any of the other provisions hereof or the application thereof to any other Person and the same shall remain in full force and effect.

(E)    This OEA may be amended by, and only by, a written agreement signed by all of the then current Approving Parties and shall be effective only when recorded in the county and state where the Shopping Center is located; provided, however, that no such amendment shall impose any materially greater obligation on, or materially impair any right of, a Party or its Tract without the consent of such Party. No agreement to any amendment of this OEA shall ever be required of any Occupant or Person other than the Parties, nor shall any Occupant or Person other than the Parties have any right to enforce any of the provisions hereof. Since the submission of a proposed

amendment to the Parties is not an item of "consent" or "approval", each Party may consider any proposed amendment to this OEA in its sole and absolute discretion without regard to reasonableness or timeliness.

(F)    This OEA may be executed in several counterparts, each of which shall be deemed an original. The signatures to this OEA may be executed and notarized on separate pages, and when attached to this OEA shall constitute one (1) complete document.

6.9    Negation of Partnership. None of the terms or provisions of this OEA shall be deemed to create a partnership between or among the Parties in their respective businesses or otherwise, nor shall it cause them to be considered joint venturers or members of any joint enterprise. Each Party shall be considered a separate owner, and no Party shall have the right to act as an agent for another Party, unless expressly authorized to do so herein or by separate written instrument signed by the Party to be charged.

6.10    Not a Public Dedication. Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center or of any Tract or portion thereof to the general public, or for any public use or purpose whatsoever. Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third-party Person, nor shall any third-party Person be deemed to be a beneficiary of any of the provisions contained herein.

6.11    Excusable Delays. Whenever performance is required of any Party hereunder, such Party shall use all due diligence to perform and take all necessary measures in good faith to perform; provided, however, that if completion of performance shall be delayed at any time by reason of acts of God, war, civil commotion, riots, strikes, picketing or other labor disputes, unavailability of labor or materials, damage to work in progress by reason of fire or other casualty, or any cause beyond the reasonable control of such Party, then the time for performance as herein specified shall be appropriately extended by the amount of the delay actually so caused. The provisions of this Section shall not operate to excuse any Party from the prompt payment of any monies required by this OEA.

6.12    Mitigation of Damages. In all situations arising out of this OEA, each Party and Operator, if any, shall attempt to avoid and mitigate the damages resulting from the conduct of any other Party. Each Party shall take all reasonable measures to effectuate the provisions of this OEA.

6.13    OEA Shall Continue Notwithstanding Breach. It is expressly agreed that no breach of this OEA shall (i) entitle any Party to cancel, rescind, or otherwise terminate this OEA, or (ii) defeat or render invalid the lien of any mortgage or trust deed made in good faith and for value as

to any part of the Shopping Center.  However, such limitation shall not affect in any manner any other rights or remedies that a Party may have hereunder by reason of any such breach.

      6.14   Time.  Time is of the essence of this OEA.

      6.15   No Waiver.  The failure of any Party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies that that Party may have hereunder, at law or in equity, and shall not be deemed a waiver of any subsequent breach or default in any of such terms, covenants or conditions.  No waiver by any Party of any default under this OEA shall be effective or binding on such Party unless made in writing by such Party and no such waiver shall be implied from any omission by a Party to take action in respect to such default.  No express written waiver of any default shall affect any other default or cover any other period of time other than any default and/or period of time specified in such express waiver.  One (1) or more written waivers of any default under any provision of this OEA shall not be deemed to be a waiver of any subsequent default in the performance of the same provision or any other term or provision contained in this OEA.  The failure of a Party to provide a Reconciliation or statement for amounts owed within a specified time shall not act as a waiver of such Party's right to collect such amount upon the later issuance of the required Reconciliation or statement.

      6.16   Developer's Authority.  Developer hereby represents and warrants to Target that (i) Developer is the sole owner of the Developer Tract, (ii) except for Regency Savings Bank, a _____, the holder of an existing deed of trust lien on the Developer Tract, no other party need execute this OEA for it to be binding upon the Developer Tract, and (iii) the person executing this OEA on Developer's behalf has all requisite authority to do so.

      6.17   Governing Law.  This OEA shall be governed by, and its terms and provisions shall be construed in accordance with, the laws of the State of Texas.

      6.18   Pre-Existing Tenants.  The terms and provisions of this OEA shall be subject to the Rights of the Pre-Existing Tenants under the terms and provisions of their respective leases (listed on Exhibit F attached hereto) as such Rights of Pre-Existing Tenants exist as of the date of this OEA, provided, however, that any amendments thereto or modifications thereof executed after the date of this OEA shall be subject to the terms and provisions of this OEA..

      6.19   Limitation of Liability.  Except as specifically provided below, there shall be absolutely no corporate or personal liability of persons, firms, corporations, or entities who constitute a Party hereto, including, but not limited to, officers, directors, employees, or agents of a Party

hereto, with respect to any of the terms, covenants, conditions, and provisions of this OEA.  In the event of default by a Defaulting Party hereunder (as defined in Section 6.1), any Non-Defaulting Party (as defined in Section 6.1 hereof) who seeks recovery from a Defaulting Party hereto shall look solely to the interest of such Defaulting Party, its successors and assigns, in the Shopping Center and in the rent and other income and the proceeds of insurance and condemnation derived from such interest in the Shopping Center for the satisfaction of each and every remedy of the Non-Defaulting Party; provided, however, the foregoing shall not reduce or limit the liability of a Party for the failure of such Party to maintain the insurance required to be maintained by such Party under Section 5.4 hereof, and the foregoing shall not in any way impair, limit or prejudice the right of any Party:

(i)      to pursue equitable relief in connection with any term, covenant or condition of this OEA, including a proceeding for temporary restraining order, preliminary injunction, permanent injunction or specific performance; and/or

(ii)     to recover from another Party all losses suffered, liabilities incurred or costs imposed arising out of or in connection with, or on account of, such Party (or its guarantor) not funding its self-insurance obligations which were assumed pursuant to Section 5.4 above.

6.20    Platting; Conveyance of Access.  In the event it is ever necessary or desirable for the Target Tract to be platted as a separate lot, and it is necessary for the Target Tract to abut a public right of way in order for it to be platted, Developer, upon Target's written request, will convey to Target the Front Drive designated as the "Target Front Drive" on the Site Plan (which Target Front Drive shall connect the Target Tract with a public right-of-way); provided, however, Developer may reserve unto itself an easement for ingress and egress, and for underground utility lines, over, under and across the Target Front Drive.

ARTICLE VII

TERM

7.1    Term of this OEA.  This OEA shall be effective as of the date first above written and shall continue in full force and effect until 11:59 p.m. on April 30, 2070; provided, however, that (i) the easements referred to in Article II hereof that are specified as being perpetual or as continuing beyond the term of this OEA shall continue in full force and effect as provided herein and (ii) the building covenants and restrictions set forth in Section 3.3(D) hereof shall continue in full force and effect so long as an "unlimited area" Building exists within the Primary Building Area.  Upon the

termination of this OEA, all rights and privileges derived from and all duties and obligations created and imposed by the provisions of this OEA, except as relates to the easements mentioned above, shall terminate and have no further force or effect; provided, however, that the termination of this OEA shall not limit or affect any remedy at law or in equity that a Party may have against any other Party with respect to any liability or obligation arising or to be performed under this OEA prior to the date of such termination.

ARTICLE VIII

EXCULPATION

8.1     Certain Limitations on Remedies.  None of the Persons comprising a Party (whether partners, shareholders, officers, directors, members, trustees, employees, beneficiaries or otherwise) shall ever be personally liable for any judgment obtained against a Party.  Each Party agrees to look solely to the interest in the Shopping Center of a defaulting Party for recovery of damages for any breach of this OEA; provided, however, the foregoing shall not in any way impair, limit or prejudice the right of a Party:

(i)     Casualty Insurance and Condemnation Proceeds.  To recover from another Party all damages and costs on account of, or in connection with, casualty insurance or condemnation proceeds that are not applied or used in accordance with the terms of this OEA.

(ii)     Hazardous Substances.  To recover from another Party all damages and costs arising out of or in connection with, or on account of, a breach by such Party of its obligations under Section 5.1(C).

(iii)     Liability Insurance.  To recover from another Party all damages and costs arising out of or in connection with, or on account of, a breach by such Party of its obligations under Section 5.4.

(iv)     Taxes, Assessments and Liens.  To recover from a Party all damages and costs arising out of or in connection with, or on account of, the failure by such Party to pay when due any tax, assessment or lien as specified in Section 3.4 and Section 5.5.

(v)     Fraud or Misrepresentation.  To recover from another Party all damages and costs as a result of any fraud or misrepresentation by such Party in connection with any term, covenant or condition in this OEA.

(vi)     Equitable Relief; Costs.  To pursue equitable relief in connection with any term, covenant or condition of this OEA, including a proceeding for temporary restraining order,

preliminary injunction, permanent injunction or specific performance, and recover all costs, including Interest thereon, relating to such enforcement action.

*[Remainder of page intentionally left blank; signature pages follow]*

DEVELOPER'S SIGNATURE PAGE

FOR

OPERATION AND EASEMENT AGREEMENT

BETWEEN

TARGET CORPORATION

AND

RONUS MEYERLAND PLAZA, L.P.

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

**"DEVELOPER"**

RONUS MEYERLAND PLAZA, L.P., a Georgia limited partnership

By: _____, a
_____**Ronus Meyerland,
Inc., a** _____ **corporation**, its
general partner

By:_____
   Name:_____
   Title:_____

STATE OF _____  )
                                       )
COUNTY OF _____  )

This instrument was acknowledged before me on _____ \_\_\_, 2004 by _____ (known to me), _____ of _____, a _____**Ronus Meyerland, Inc., a** _____ **corporation**, on behalf of said _____**corporation** in its capacity as general partner of Ronus Meyerland Plaza, L.P., a Georgia limited partnership, on behalf of said limited partnership.

_____
Notary Public**, State of** _____
My commission expires: _____

TARGET'S SIGNATURE PAGE

FOR

OPERATION AND EASEMENT AGREEMENT

BETWEEN

TARGET CORPORATION

AND

RONUS MEYERLAND PLAZA, L.P.

     IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

**"TARGET"**

TARGET CORPORATION, a Minnesota corporation


By:_____
    Name:_____
    Title:_____

THE STATE OF MINNESOTA     )
                              )
COUNTY OF HENNEPIN        )

     BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared _____, known to me (or proved to me on the oath of _____ or through _____) to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said Target Corporation, a Minnesota corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _____ day of _____, 2004.


                       _____
                       Notary Public, State of Minnesota


                       _____
My commission expires:               (printed name)

_____

CONSENT AND AGREEMENT OF LENDER

TO

OPERATION AND EASEMENT AGREEMENT

BETWEEN

TARGET CORPORATION

AND

RONUS MEYERLAND PLAZA, L.P.

Regency Savings Bank, a _____, the owner and holder of indebtedness secured by a first-lien deed of trust (the "**Deed of Trust**") on the Developer Tract, executes this Operation and Easement Agreement to evidence its consent thereto and its agreement to be bound by the terms hereof and to subordinate the lien of the Deed of Trust thereto.

REGENCY   SAVINGS   BANK,   a

_____

By:_____
    Name:_____
    Title:_____

STATE OF _____  )
                     )
COUNTY OF _____  )

This instrument was acknowledged before me on _____ ___, 2004 by _____(known to me),_____ of Regency Savings Bank, a _____, on behalf of said _____.

_____
Notary Public, State of _____

My commission expires: _____

# EXHIBIT A
## LEGAL DESCRIPTION OF TARGET TRACT

# EXHIBIT B
## LEGAL DESCRIPTION OF DEVELOPER TRACT

EXHIBIT C
DESIGN OF SIGNS

EXHIBIT D
ARCHITECTURAL THEME

# EXHIBIT E
## SUBMISSION GUIDELINES

1.    During the conceptual design phase, the constructing party shall submit to the other parties the following:

    A.    Site Design Documents to Indicate the Following:
- Parking configurations and car parking count
- Typical bay width and stall dimensions
- Drive widths
- Setbacks
- Curb cuts
- Spot elevations or rough contours
- Rough landscape scope
- Lighting pole locations
- Preliminary utility strategies

    B.    Building Design Single Line Plans to Indicate the Following:
- Exterior wall configuration
- Doors and store front extent
- Canopies and overhangs
- Probable column locations at exterior and abutting our building on interior

    C.    Exterior Elevation Drawings to Indicate the Following:
- Opaque wall areas with doors and store fronts

2.    After approval has been granted of conceptual design phase submitted in accordance with the guidelines specified in 1 above, the constructing party shall submit final design phase plans to the other parties as follows:

    A.    Site Design Documents Delineating Information Outlined in the Concept Phase with the Following Added Detail:
- Refined grading plans
- Selected lighting fixtures and resultant lighting levels in foot candles
- Landscaping showing generic planting materials and locations
- Proposed paving section designs and location
- Utility layouts including hydrants and sizes proposed
- Proposed details for curbs, site structures, manholes, etc.
- Proposed site signage designs and locations

    B.    Building Design Plans Delineating Information Outlined in the Concept Phase with the Following Added Detail:
- Exterior wall thicknesses

o     Structural columns or bearing walls at building exterior and proposed foundation design at adjoining wall between abutting buildings

o     Where common footings are to be shared provide wall or column load information for design of that footing

o     Proposed roof plan showing slopes and location of penthouses or other major mechanical equipment

o     References of key flashing details of roof to adjoining building

C.     Exterior Elevation Drawings Delineating Information Outlined in the Concept Phase with the Following Added Detail:

o     Proposed building sign standards

o     Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the elevations)

o     Proposed large scale details of key section conditions to show exterior design intent

o     Major penthouses or rooftop equipment profiles

o     Features such as special masonry patterns, bands or special materials and textures

o     Rain leaders or scuppers

o     Wall sections at various exterior locations including at the demising wall to the adjoining building with key vertical dimensioning

3.     If a building is to have a through-the-wall pedestrian access connection to an adjoining building, then the final design phase submission shall also include (to the owner of such adjoining building) the following:

o     Plans of the pedestrian mall circulation showing any variations in floor elevations

o     Elevations/sections of the proposed mall space showing store front sign bulkheads and key dimensions

o     Proposed ceiling design including special features such as variations in height or skylights

o     Floor material patterns

o     Landscaping and mall seating areas

o     Proposed interior sign guidelines

o     Paint color chips and samples of other materials such as brick or concrete aggregates (glass or aluminum finishes may be annotated on the plans or elevations)

o     Proposed large scale details of key section conditions to show interior design intent

4.     The constructing party shall provide the other parties with a complete set of bid documents for the building and/or improvements to be located upon its Tract.

EXHIBIT F
PRE-EXISTING TENANTS

| Suite | Tenant | Sf | End Date | Option(s) | Notice Date |
|-------|--------|-----|----------|-----------|-------------|
| 250 | Dress Barn | 9,725 | 09/30/04 | 3 - 5 year stated | 7/1/2004 |
| 728 | LiL Miyako | 2,098 | 10/31/04 | 1 - 5 year stated | 5/4/2004 |
| 560 | Planet Music | 27,524 | 12/31/04 | 5 - 5 year stated | 4/4/2004 |
| 570 | Borders | 24,909 | 12/31/04 | 5 - 5 year stated | 4/1/2004 |
| 370 | GNC | 1,260 | 04/30/05 | 1 - 5 year stated | 11/1/2004 |
| 660 | Lane Bryant | 5,669 | 07/31/05 | 2 - 5 year-set rate | 2/1/2005 |
| 724 | Texas State Optical | 2,187 | 08/31/05 | NO | |
| 210 | Cafe Express | 5,379 | 12/31/05 | 1 - 5 year stated | 4/1/2005 |
| 220 | Hallmark | 4,332 | 01/31/06 | NO | |
| 640 | Express | 7,366 | 02/28/06 | NO | |
| 714 | R. Renee Shoes & More | 2,649 | 06/30/06 | NO | |
| 232 | Cingular Wireless | 2,666 | 07/31/06 | NO | |
| 400 | Bridsmart | 8,390 | 09/30/06 | 1 - 5 year stated | 1/1/2006 |
| 564 | Formal Wear | 1,400 | 09/30/06 | 2 - 5 year stated | 4/1/2006 |
| 680 | Beauty First | 2,797 | 10/31/06 | NO | |
| 726 | Palais Royal | 34,781 | 01/31/07 | 3 - 5 year stated | 5/6/2006 |
| 726A | Palais Royal | 2,523 | 01/31/07 | 3 - 5 year stated | |
| 726B | Palais Royal | 42,858 | 01/31/07 | 3 - 5 year stated | |
| 726C | Palais Royal | 22,453 | 01/31/07 | 3 - 5 year stated | |
| 750 | Compass Bank | 14,420 | 02/28/07 | 2 - 5 year stated | 9/1/2006 |
| 710 | Starbuck's Coffee | 1,571 | 03/01/07 | 2 - 5 yr stated | 9/2/2006 |
| 708 | Wraps International | 1,182 | 05/31/07 | NO | |
| 238 | Today's Vision | 2,700 | 06/30/07 | NO | None |
| 394 | Claires | 1,274 | 08/31/07 | 1 - 5 year stated | 3/4/2007 |
| 398 | Wolf Camera | 2,261 | 08/31/07 | 1 - 5 year stated | 3/4/2007 |
| 712 | Antone's | 2,019 | 11/04/07 | NO | |
| 620 | LA Madelene | 3,664 | 11/30/07 | 1 - 5 year stated | 6/3/2007 |
| 450 | Carlson Wagonlit Travel | 2,350 | 11/30/07 | NO | |
| 730 | JC Penney | 201,872 | 11/30/07 | 4 - 5 year stated | 8/2/2007 |
| 590 | Escalantes | 6,970 | 02/29/08 | 2 - 5 year stated | 9/2/2007 |
| 706 | Oreck Vacuums | 1,010 | 03/15/08 | NO | |
| 360 | Singer | 1,362 | 04/30/08 | NO | |

| Suite | Tenant | Sf | End Date | Option(s) | Notice Date |
|---|---|---|---|---|---|
| 716 | Argenta Silver Jewelry | 1,538 | 10/31/08 | NO | |
| 562 | Smoothie King | 1,086 | 10/31/08 | NO | |
| 500 | Talbots | 11,790 | 01/31/09 | 1 - 5 year stated | 8/4/2008 |
| 600 | JOS. A. Bank | 4,400 | 01/31/09 | 1 - 5 year stated | 10/3/2008 |
| 260 | Old Navy | 27,633 | 05/31/09 | 1 - 5 year stated | 12/2/2008 |
| 240 | Rack Room | 6,250 | 07/31/09 | 1- 5 year stated | 5/1/2009 |
| 550 | Marshall's | 29,900 | 01/31/10 | 2 - 5 year stated | 8/1/2009 |
| 700 | Bed, Bath, & Beyond | 59,252 | 01/31/10 | 2 - 5 year stated | 8/4/2009 |
| 270 | OfficeMax | 23,324 | 02/28/10 | 3 - 5 year stated | 3/1/2009 |
| 290 | Stein Mart | 33,733 | 04/07/10 | 3 - 5 year stated | 10/9/2009 |
| 520 | Saltgrass Steakhouse | 6,601 | 06/30/10 | 2 - 5 year stated | 9/15/2009 |
| 565 | The Children's Place | 1,314 | 01/31/12 | 2 - 5 year stated | 7/31/2011 |
| 566 | The Children's Place | 2,496 | 01/13/13 | 2-5 year stated | 7/17/2012 |
| 540A | Ross | 33,853 | 01/31/14 | 4-5 year stated | 7/31/2013 |
| 5100 | Chick-Fil-A | 3,822 | 12/31/14 | 3 - 5  year stated | 9/1/2014 |
| 630 | Bank of America | 3,233 | 04/30/15 | 2 - 5 year stated | 8/1/2015 |
| 8650 | 24 Hour Fitness | 36,498 | 05/31/16 | 2 - 5 year stated | 11/13/2015 |
| 530 | James Coney Island | 3,063 | 03/09/18 | 2 - 5 year stated | 3/9/2017 |
| 420 | Management Office | 1,494 | | | |
| 430 | Vacant | 284 | | | |
| 100 | Vacant | 61,000 | | | |
| 300 | Target | 107,602 | | | |
| 722 | Motherhood Maternity | 2,598 | 03/31/14 | 1 - 5 year stated rate | |
| 380 | Chico's | 3,874 | 03/31/09 | 1 - 5 year stated rate | |
| 713 | Vacant | 618 | | | |

updated     April     1,
2004[Insert descriptions of the Pre-Existing Tenants'
lease agreements, as same are modified as of the date
of this OEA, including, without limitation, the
expiration of the current term thereof and any renewal
options.]

EXHIBIT G
TARGET REDEVELOPMENT PLANS

[Insert list of plans covering all work which Target intends to undertake in connection with the expansion and renovation of the existing Building on the Target Tract including, without limitation, all staging plans, utility relocation and/or construction plans, and fire sprinkler plans.]

EXHIBIT H
## COMMON UTILITY LINES AND SEPARATE UTILITY LINES

[Attach site plan showing or description of which Utility Lines are Common Utility Lines and which Utility Lines are Separate Utility Lines.]

*[KEVIN: While we would need to get Target's approval, one way to make the preparation of this exhibit easier would be to specifically specify the Common Utility Lines and then say that all other Utility Lines are Separate Utility Lines. As you know, only those Utility Lines which provide service to both the Developer Tract and the Target Tract are Common Utility Lines.]*

EXHIBIT X
SITE PLAN

List of OEA designations to be shown on Exhibit X (Site Plan):

| Section | Item Designated |
|---------|-----------------|
| Recital | Target Tract |
| Recital | Developer Tract |
| 1.3 & 3.3(A) | Building Area |
| 1.13 | Outside Sales Area |
| 1.18 | Primary Building Area |
| 1.21 & 2.1(C) | Target Primary Parking Field |
| 1.23 & 3.2(F) | Target Zone of Control |
| 2.1(B) | Front Drive(s) and Service Drive(s) |
| 2.1(D) | Pedestrian Access Area |
| 2.1(E) | Parking Ramp Encroachment |
| **2.1(F)** | **Developer trash container** |
| **2.1(F)** | **Golf cart charging station** |
| 2.4(A)&(B) & 5.3(A) | Existing Sign Area; Target Shared Monument Sign Area |
| 3.2 | Common Area |
| 3.2 & 3.3(A) | Future Expansion Area |
| 3.2(F)(i) & (ii) | Parking stalls and rows, and traffic lanes |
| 3.3(A) | Maximum Floor Area Designations on Developer Tract, if any |
| **4.2(A)** | **Target Truck Dock/Compactor Area (area to be maintained by Target)** |
| 5.1(B)(ii) | Second Floor Storage Area on Developer Tract |
| 5.1(B)(xvii) | Permitted Spa Area |
| 5.1(B)(xviii) | Permitted Billiard/Pool Hall Area |
| 5.1(D) | Outdoor seating |
| **5.2(B)** | **Target Employee Parking Area (area to be lighted all night during holidays)** |
| **5.3(A)** | **Existing Pylon Sign, Target Shared Monument Sign, Shopping Center Sign, Existing Bank Pylon Sign, Monument Signs A - H, and "Areas" for each Sign** |

| | |
|---|---|
| 5.3(D) | American Flag Location |
| 6.20 | Target Front Drive |

080366 000048 DALLAS 1645692.6 - April 26, 2004

This redlined draft, generated by CompareRite (TM) - The Instant Redliner, shows the differences between -

original document   : C:\TEMP\DALLAS_1645692_5

and revised document: C:\TEMP\DALLAS_1645692_6


CompareRite found   95 change(s) in the text


Deletions appear as Strikethrough text

Additions appear as Bold+Dbl Underline text