# EXHIBIT B Part 1

# LEGAL DOCUMENTS

**Merchant Name (Legal):**   Circuit City Stores, Inc.

**Trade Name:**   Circuit City

**Shopping Center:**   Johnson City Crossing

| DOCUMENT | DATE |
|---|---|
| | September 17, 1996 |
| 1. Lease Agreement | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | |
| 7. | |
| 8. | |
| 9. | |
| 10. | |

## JOHNSON CITY CROSSING -
## CIRCUIT CITY STORES, INC.  LEASE SUMMARY

A.    **PARTIES (¶1):**

      1.    Landlord:        Johnson City Crossing, L.P.

      2.    Tenant:          Circuit City Stores, Inc., a Virginia corporation

B.    **PREMISES (¶1):**  Approximately 27,889 square feet.

C.    **TERM (¶3):**

      1.    The term shall commence on the earlier to occur of (w) one hundred eighty (180) days after Landlord's delivery of the Land or (x) Tenant's opening for business to the public, but in no event shall the Commencement Date occur prior to the later of (y) the date on which Landlord makes payment of the Tenant Improvement Allowance and (z) the date on which the opening co-tenancy requirement is satisfied (as described in ¶C(4) below of this summary).  The term shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.  The term is subject to four (4) five (5) year renewal options as provided in ¶D of this summary.

      2.    The delivery of the Land shall occur upon the satisfaction of the following requirements:

          (a)    Landlord has verified its proposed development of the Shopping Center and compliance of its civil engineering plans with Tenant's Soils Report, as modified by certain specified letters from S&ME.

          (b)    Landlord has caused the Land to be free and clear of obstructions, foundations, etc.

          (c)    Landlord has completed grading of the Land and the common areas in accordance with the Soils Reports and the standards for grading work and with the Grading Plans, as modified by the S&ME letters.

---

***NOTE:  By its nature, this abstract is a summary of detailed provisions of the Lease.  While every effort has been take to ensure that this abstract is accurate, the actual provisions of the Lease should be consulted before taking action.***

(d)     Landlord has completed Tenant's building pad strictly in accordance with Tenant's geotechnical report, as modified by the S&ME letters.

(e)     Landlord has obtained approvals for all curb cuts indicated on the Grading Plans and all on- and off-site permits required for any work to be performed by Landlord necessary to develop Landlord's Parcel, which permits may be a prerequisite for issuance of Tenant's building permit.

(f)     Landlord has completed all curb cuts corresponding to the all weather construction road, a 20,000 staging area to either be paved or stoned to provide for all weather use and an all weather construction access road to the land and the staging area of not less than twenty-four (24) feet in width.

(g)     Landlord has obtained site plan approval and conditional use approval permitting Tenant's construction of the Premises.

(h)     Landlord has completed any and all other site work and off-site improvements which are required as a condition to any governmental approvals or permits required in connection with Tenant's construction.

(i)     Provision of temporary utilities to within five (5) feet of the building pad (with the exception of temporary telephone service which shall be provided within one hundred (100) feet of the building pad).

3.     Deadlines for completion of Landlord's construction activities:

(a)     If Landlord fails to achieve delivery of the Land by September 15, 1996, Tenant shall be entitled to one (1) day's free rent for each day of delay until October 15, 1996 and two (2) day's free rent for each day of delay thereafter. These deadlines are not extendable on account of force majeure.

(b)     If Landlord fails to accomplish delivery of the Land by November 1, 1996 or to complete any other element of Landlord's Work within forty-five (45) days of the completion date specified in Attachment 5 to Exhibit C, Tenant may exercise self-help and offset the amounts expended by Tenant. This deadline is extendable on account of force majeure.

(c)     If Landlord shall fail to complete delivery of the Land by November 15, 1996, Tenant shall be entitled to terminate this Lease and receive compensation for its out of pocket expenses, not to exceed $100,000. This deadline is not extendable by force majeure.

(d)     If Landlord fails to deliver the Land as of November 30, 1996, Tenant may delay opening of its store for nine (9) months. In such event, Landlord shall pay Tenant an amount equal to all costs incurred by Tenant in the development of its store facility. This deadline is not extendable on account of force majeure.

(e)     All of the aforementioned deadlines are extendable in the event that a delay was solely attributable to Tenant's acts or omissions. Landlord is required to provide Tenant notice of any such Tenant Delay within forty-eight (48) hours of its occurrence. The failure to provide such notice results in a reduction of the Tenant Delay on a day-for-day basis.

4.     The opening co-tenancy (¶39) provision requires that Home Depot shall have acquired title to the Home Depot Parcel and no less than 50,000 square feet of additional gross leaseable area in the Shopping Center shall be opened or be opening simultaneously for business to the public. If Tenant opens notwithstanding the fact that the opening co-tenancy requirement is not satisfied, Tenant shall receive a sixty percent (60%) abatement of Base Rent.

D.     **OPTIONS TO EXTEND TERM (¶3):** Tenant has four (4) options to extend the term for five (5) years each exercisable by one hundred eighty (180) days prior notice. If Tenant fails to provide timely notice, Tenant shall still have the right to extend until the expiration of ten (10) days from receipt of a reminder notice from Landlord.

E.     **BASE RENT (¶4):** $10.62 per square foot per annum for the first five (5) years with the Base Rent being increased each five (5) years thereafter at a rate equal to the lesser of ten percent (10%) or three (3) times the percentage increase in the CPI.

F.     **CAM (¶7):**

1.     The definition of CAM Charges is fairly typical and include Landlord's reasonable overhead expenses for administering the common areas in an amount not to exceed five percent (5%) of the total CAM Charges (excluding insurance, capital expenditures, real estate taxes and utilities). In addition, parking lot repairs or replacements of a capital nature may be included after the expiration of the first ten (10) CAM years provided that Tenant has reasonably approved a budget therefor.

2.     Limitations on CAM Charges:

(a)     CAM Charges (both Ordinary CAM Charges and Non-Ordinary CAM Charges) shall not exceed $.98 per square foot during the first Lease Year.

(b)     CAM Charges (both Ordinary CAM Charges and Non-Ordinary CAM Charges) shall not exceed $1.00 per square foot during the second Lease Year.

(c)    Ordinary CAM Charges for the third Lease Year shall not exceed the lesser of one hundred five percent (105%) of Ordinary CAM Charges for the second Lease Year or $1.05 per square foot.

(d)    Ordinary CAM Charges for any subsequent Lease Year shall not increase by more than five percent (5%) per Lease Year on a cumulative basis.

(e)    Ordinary CAM Charges means all CAM Charges except for the cost of utilities exclusively serving the parking lot, snow removal, insurance obligations and includable CAM Charges relating to the cost of replacing the Shopping Center parking lot.

3.    Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant a statement showing in detail the amount of the CAM Charges.

4.    Tenant's Pro Rata Share:

(a)    Tenant's Pro Rata Share shall be determined by dividing the ground floor gross leaseable area of the Building by the ground floor gross leaseable area of all buildings in the Shopping Center.  For these purposes, gross leaseable area shall exclude loading docks, any outside sales areas of Tenant and the garden center on the Home Depot Parcel provided that such garden center is not covered by a roof and enclosed by four (4) walls.

(b)    If the owner of the Home Depot Parcel elects to maintain the common areas located thereon, then the gross leaseable area of the buildings located thereon shall be excluded from the gross leaseable area of the Shopping Center for purposes of computing Tenant's pro rata share and no common area maintenance as to the Home Depot Parcel shall be included in the CAM Charges.  Nevertheless, if the owner of the Home Depot Parcel benefits in any way from any of the common areas located on the remainder of the Shopping Center (such as a retention pond), then Tenant's share of the costs related to such component of the common areas shall be determined with reference to the gross leaseable area of the entire Shopping Center.

(c)    In no event shall the denominator in the fraction for determining Tenant's pro rata share be less than ninety percent (90%) of the leaseable area as shown on the Site Plan.

5.    The gross leaseable area of the Outparcels shall not be included in the denominator of the fraction except as to those components of CAM Charges as to which the owner of such Outparcel benefits.

6.    Tenant shall have the right to audit Landlord's books, but no later than three (3) years after the end of any calendar year.  If Tenant fails to elect to exercise such

audit right, the amounts of CAM Charges reflected in such prior years' statements shall be final and conclusive. Landlord shall pay Tenant's audit costs in the event such audit reveals an overpayment by Tenant of more than three percent (3%).

G.   **TAXES (¶9):**

   1.   Tenant's pro rata share shall be computed in the same manner as for CAM Charges except that the denominator shall be limited to the gross leaseable area of Landlord's Parcel.

   2.   Tenant shall pay its pro rata share within thirty (30) days after receipt of Landlord's statement accompanied by a tax bill.

   3.   Tenant shall have the right to contest real estate taxes.

H.   **INSURANCE CONTRIBUTIONS (¶14(e)):**   Tenant pays only the cost of Landlord's commercial general liability insurance coverage as to the common areas (included in CAM Charges). Tenant shall have no obligation whatsoever to contribute as to the cost of Landlord's other insurance in light of the fact that Tenant will be insuring its own Building.

I.   **PERCENTAGE RENT (¶4(b)):**

   1.   Any assignee or subtenant of Tenant (but not Tenant) shall pay Percentage Rent equal to two percent (2.0%) of gross sales in excess of a natural breakpoint (determined on the basis of base rent payable as to the entire Premises). Accordingly, for purposes of this Lease, in the event of a partial sublease, the Subtenant will pay Percentage Rent only to the extent that its gross sales exceed a natural breakpoint as to the entire Premises.

   2.   Percentage Rent shall be payable annually in arrears.

J.   **COMMON AREAS (¶¶6 and 7):**

   1.   Tenant is granted a common area easement to use all of the common areas of the Shopping Center; provided, however, the easement as to the use of the Outparcels shall not include easements for parking, access (except as to the pylon sign to be located on Outparcel D) or future utilities not installed in connection with the initial development of the Shopping Center. In addition, Tenant has the right to conduct sidewalk sales and to use the parking field directly in front of the Premises for seasonal and promotional sales provided that no more than ten (10) parking spaces are used at any one time and such sale shall be limited to no more than three (3) times in any calendar year, subject to the rights of Existing Tenants to object thereto.

2.     Site Covenants (¶19(a)(ix)):

(a)     No building located to the north of the southern demising wall of Major Tenant D (Service Merchandise) shall exceed the height of Tenant's Building (except that architectural elements can exceed the height of the building provided that same do not exceed thirty-two feet (32') in height as measured from grade level), nor shall any such building be positioned so as to project beyond the portion of the front wall of the Tenant's Building.

(b)     No barriers, buildings, kiosks or other structures shall be located within Tenant's Preferred Area.

(c)     There is no limitation as to the height of buildings located on Outparcels A or D except that no building can be located on Outparcel A having a height of more than twenty-five feet (25'). Any buildings located on the additional Outparcels will be limited to eighteen feet (18') in height.

(d)     No construction shall be permitted in Tenant's Preferred Area during the months of November and December after the first Lease Year except for interior alterations and except for emergency repairs or repairs required by applicable law.

(e)     No building or similar improvement shall be built in areas other than the Permissible Building Areas as shown on the site plan.

(f)     Except to the extent required by law, there shall be no changes in Tenant's Preferred Area (including without limitation, to changes in the location of curb cuts, parking aisles, drive aisles, roadways, truck access, sidewalks and parking spaces). In no event shall the common areas located outside of Tenant's Preferred Area be changed in any manner so as to adversely affect the visibility of the Premises or any of Tenant's signs or access.

(g)     The following activities are prohibited in the common areas: (i) advertisements or signs except for pylon and/or monument signs; (ii) display or sale of merchandise except for sidewalk sales of similar nature of those permitted hereunder; (iii) operation of loud speakers; (iv) imposition of a charge for parking.

(h)     Employees of tenants of the Shopping Center shall park in the Employee Parking Area designated on the site plan.

Note: The site covenants described in paragraphs (a) through (h) above do not apply to the Existing Tenants specified on Exhibit F to the Lease to the extent that such tenants are not subject to comparable limitations in their leases (¶5, page 14).

K.   **REQUIRED INSURANCE (¶14):**

1.   Tenant's Insurance : Tenant shall insure the Building located on the Premises and shall carry commercial general liability insurance. Provided that Tenant's net worth is $75,000,000 or more (with such minimum net worth being increased beginning as of the first day of the sixth Lease Year and each succeeding five (5) Lease Years thereafter commensurate with increases in the CPI), Tenant may elect to self-insure such risks.

2.   Landlord's Insurance: Landlord shall carry commercial general liability insurance and fire and extended coverage insurance as to the common areas and any other portions of Landlord's Parcel as to which Landlord has a present possessory right ("Additional Areas").

3.   The Lease contains a waiver of subrogation provision which meshes with the self-insurance provision.

4.   Landlord is required upon delivery of the Land to provide a certificate of insurance as to its liability insurance coverage.

5.   Tenant indemnifies Landlord for all damages occurring on the Premises, except if arising from the negligence or willful acts of Landlord. Landlord indemnifies Tenant for all claims occurring in the Shopping Center (exclusive of the Premises) unless caused by the negligent or willful acts of Tenant.

L.   **REPAIR AND MAINTENANCE (¶10):**

1.   Except to the extent caused by any negligent act or omission or willful misconduct of Landlord or covered by Landlord's insurance, Tenant shall be responsible for maintaining the exterior and interior of non-structural elements of the Building, including but not limited to, plumbing, heating, electrical and air-conditioning systems. During the last five (5) years of the term, Tenant shall not be obligated to install or construct alterations or incur capital expenditures unless Landlord agrees to reimburse Tenant for the unamortized amount of any such costs as of the expiration of the term.

2.   Landlord shall maintain all structural elements of the Premises, including without limitation, the roof, roof structure, flooring systems (but not including non-structural floor coverings), floor slab, foundation, the Shared Footings, load-bearing walls, structural components of the Party Wall and exterior structural walls.

3.   In the event of a default as to either party's maintenance obligations, the other party may exercise self-help after having provided thirty (30) days' notice and cure (except in the case of an emergency).

M.   **SIGNS (¶ 8(A)):**

1.     Landlord shall construct two (2) pylon sign structures in the locations depicted on the site plan and substantially as depicted in the plans referred to in Exhibit E.

2.     Landlord approves Tenant's prototypical face panels and Tenant's building signage, as depicted on Exhibit E.  Tenant has the right, without Landlord's consent, but subject to governmental requirements and the size limitation provided in Exhibit E, to replace any and all signs with signage consistent with Tenant's then-current prototypical site plans.  In the case of an assignment, the assignee or subtenant shall obtain Landlord's reasonable consent as to the specific design of its signage.

3.     Tenant shall reimburse Landlord for Tenant's proportionate share of the actual costs incurred by Landlord in constructing the pylon signs, subject, however, to a cap in the amount of $10,000.

N.   **COMPLIANCE WITH LAWS (¶33):**

1.     Landlord shall be required to make any alterations or improvements necessary to comply with laws of general applicability and any alterations or improvements to the structure of the Building, regardless of whether such laws are of general applicability or arise due to Tenant's specific use or manner of use of the Premises.  Tenant shall be required to make any other alterations or improvements required by virtue of Tenant's specific manner or use of the Premises.

2.     If Tenant fails to comply with any law to be complied with by Tenant within thirty (30) days from written notice of non-compliance from Landlord, Landlord may comply with such law and charge Tenant for the cost of compliance as additional rent.  If Landlord fails to comply with any law to be complied with by Landlord after a comparable notice and cure period (except in the case of an emergency), Tenant shall be entitled to exercise self-help and receive a right of set off, limited, however, to fifty percent (50%) of the amount of Base Rent due at any particular time (subject to Tenant's ability to recoup the entire cost of such compliance; otherwise, Tenant's right of set off shall be increased proportionately).

O.   **ALTERATIONS (¶ 12):**

1.     Circuit City shall have the right, at its discretion and without Landlord's consent, to make any alterations or modifications (including exterior modifications) necessary or desirable to bring the Premises into conformity with Tenant's prototype and any interior non-structural alterations or modifications it may desire; provided, however, in no event will the height limitations of the Petsmart Lease (forty feet (40')) or the Service Merchandise Lease (unclear but apparently requiring overall consistency in building heights) be violated.

2.     Any assignee or a subtenant who is a national or regional retailer operating at least ten (10) stores shall have the right to make the same alterations and modifications without Landlord's consent, including exterior alterations, but must use materials that are at least equal to the quality of the materials used in the initial construction of the Shopping Center or any subsequent renovation, utilize architectural elements that are consistent within the architectural theme of the Shopping Center and not cause the height of the Building to be increased over its then-existing height.

3.     Otherwise, the general rule is that Tenant shall not make any alterations to the exterior structure of the Building without Landlord's reasonable consent.  Landlord's consent shall be reasonable only as to architectural consistency and effect on structural integrity of the Building.  If Landlord's consent is required, it shall be deemed to have been given unless Landlord responds negatively within fifteen (15) business days provided that Tenant's request for approval refers to paragraph 12 of the Lease and states that Landlord's failure to respond shall be deemed to constitute approval.

P.     **ASSIGNMENT AND SUBLETTING (¶17):**

1.     General Rule:  Tenant can sublease or assign without Landlord's consent.  Tenant shall remain liable to the extent that the Lease is changed, modified or amended by Landlord and any transferee without Tenant's prior written consent.

2.     Landlord has a right to recapture the Premises by paying to Tenant the unamortized amount of the costs incurred in connection with expenditures made by Tenant in making leasehold improvements to the Premises (the "Unamortized Amount").  Such recapture notice must be sent to Tenant within thirty (30) days after receipt of Tenant's notice of the proposed assignment or sublease.  The recapture provision applies equally well in the case of a sublease of less than substantially all of the Premises, with Landlord's obligation to pay Tenant the Unamortized Amount being reduced on a pro rata basis and with all rental obligations being reduced on a pro rata basis.  The recapture right shall not apply to any transfer to a subsidiary, affiliate or related party, a transfer involving more than one (1) store or the granting of a concession or license.

3.     In no event will Tenant subdivide the Building into more than two (2) separate independent stores.

Q.     **CASUALTY (¶15):**

1.     Less Than Twenty-Five Percent (25%):  In the event of a fire or other casualty which results in damage which results in repair and reconstruction cost of less than twenty-five percent (25%) of the total replacement cost of the Improvements or repair and reconstruction costs of less than forty percent (40%) of the total replacement costs of other unoccupied premises (the "Additional Areas") or the common areas, this Lease shall continue

and rent shall be continued to be paid by Tenant.  In such event, Tenant shall complete reconstruction of the Building and Landlord shall complete reconstruction of the common areas located within Tenant's Preferred Area and at least 100,000 square feet of the gross leaseable area of the Additional Areas and such additional common areas as are required to serve the portion of the Additional Areas so restored.  In the event the required restoration is not completed within two hundred forty (240) days after the receipt of permits, the party not responsible for restoration may perform the restoration using the insurance proceeds or self-insurance proceeds of the other party to complete such restoration.

        2.      Twenty-Five Percent (25%) or More:  In the event of a casualty which results in a repair and reconstruction cost of twenty-five percent (25%) or more of the reconstruction costs of the Improvements or a repair and reconstruction cost of forty percent (40%) or more of the cost of the common areas and/or Additional Areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  If Tenant terminates, Tenant shall make available to Landlord all applicable insurance or self-insurance proceeds.  Landlord may nullify Tenant's termination in the event of an uninsured casualty by funding the cost of restoration which is not insured.

        3.      Last Two (2) Years of Term:  In the event of a casualty during the last two (2) years of the term which has a material impact on Tenant's business for a period of sixty (60) days or more, Tenant shall have the right to terminate the Lease.  In the event of a casualty during the last two (2) years of the term resulting in a repair and reconstruction cost of at least twenty-five percent (25%) of the replacement cost of the Improvements, then either Landlord or Tenant may terminate this Lease, with Tenant having the right to nullify Landlord's termination by exercising any remaining renewal option.  In the event Tenant terminates, Tenant shall pay Landlord the amount of any insurance or self-insurance proceeds.

    R.    **CONDEMNATION (¶16):**

        1.      For purposes of the condemnation provisions, a Taking of Substantially All of the Premises shall mean a taking of:  (i) so much of the Improvements and/or Landlord's Parcel as leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant; (ii) so many of the parking spaces within the Shopping Center as to reduce the parking ratio below the greater of 4.75 spaces per 1,000 square feet or the ratio required by applicable zoning ordinance and Landlord's failure to provide substantially equivalent alternative parking; or (iii) so much of the common area easement located within Tenant's Preferred Area that access of the Premises is impeded; or (iv) so much of the common area easement located outside of Tenant's Preferred Area such that access to the Premises is materially impeded and renders unsuitable the continued feasible and economic operation of the Premises by Tenant, provided that Landlord does not provide substantially equivalent access within sixty (60) days.

2.     In the event of a taking of Substantially All of the Premises, Tenant may terminate the Lease and in the event of such taking within the last two (2) years of the term, Landlord may terminate this Lease, subject to Tenant's nullification of such termination right by the exercise of any remaining renewal option.

3.     In the event of taking of less than Substantially All of the Premises, rent shall be reduced fairly and equitably and Tenant shall make all necessary restorations to the Improvements so as to constitute a complete architectural unit, provided that the cost to Tenant shall not exceed the proceeds of Tenant's condemnation award.  In the event of such a taking in the last two (2) years of the term which has a material impact on Tenant's ability to conduct business for a period in excess of sixty (60) days, as reasonably determined by Tenant, Tenant shall be entitled to terminate the Lease.

4.     Following any taking, Landlord shall make all necessary restorations to all of the common areas within Tenant's Preferred Area, at least 100,000 square feet of the gross leaseable area in the Additional Areas and such additional common areas serving such Additional Areas.

5.     In the event of a taking, Tenant shall have the right to claim compensation for the value of its leasehold interest, its unamortized leasehold improvements, relocation expenses and other costs.

## S.     DEFAULT AND REMEDIES:

1.     Tenant's Default (¶29):

(a)     Tenant is entitled to ten (10) days' notice and cure as to monetary defaults and thirty (30) days' notice and cure as to non-monetary defaults or such longer period as may be required in the event that such default is not susceptible of being cured within thirty (30) days.

(b)     Landlord's exclusive remedies are as follows:

(i)     Relet the Premises with the reletting proceeds being applied first to the expenses of reletting including renovation and alterations and thereafter to amounts due Landlord.  Tenant shall be responsible for any remaining sums.  Landlord shall be obligated to mitigate its damages in such event.

(ii)     Landlord may terminate the Lease upon at least fifteen (15) days' notice to Tenant.  In such event, Landlord shall be entitled to receive all rents owed through the date of such termination plus the present value (computed using a discount rate equal to the effective rate and obligations of the U.S. Treasury and having a maturity closest to the number of months remaining in the term) of the difference between rent due under the

Lease and the amounts which Landlord has (or Tenant proves Landlord could have) received in mitigation.

        (iii)    Exercise self-help remedy as to failure to provide insurance.

    2.    Landlord's Default (¶31):

        (a)    Landlord shall be entitled to ten (10) days' notice and cure as to monetary defaults and thirty (30) days' notice and cure as to non-monetary defaults or such longer period as may be required in the event that such default is not susceptible of being cured within thirty (30) days.

        (b)    Tenant's remedies shall be as follows:

        (i)    Exercise self-help and offset the amount expended by Tenant against Base Rent, subject, however, to a limitation of fifty percent (50%) of the installment of Base Rent then due and payable (provided, however, if Tenant is not able to recoup the entire amount so spent prior to the expiration of the term given such limitation, the amount of the maximum offset shall be increased pro rata); or

        (ii)    In the event of a material event of default (with a material event of default not being defined further), withhold base rent, CAM Charges and other payments due Landlord until the earlier of one (1) year from the date of the event of default or the cure of such default; or

        (iii)    Terminate the Lease in the event of a material event of default. Tenant shall not terminate the Lease unless Tenant shall have provided any mortgagee with whom Tenant has entered into a Subordination, Non-Disturbance and Attornment Agreement thirty (30) days' notice and opportunity to cure such default.

    T.    **SUBORDINATION (¶21):**

    1.    Landlord shall provide Tenant with a Subordination, Non-Disturbance and Attornment Agreement from First Union and the Sells (the holders of a deed of trust on Outparcel D).

    2.    The Lease shall be subordinate to future mortgages provided that Tenant delivers Landlord a non-disturbance agreement in the form of Exhibit G attached to the Lease.

    U.    **CO-TENANCY PROVISIONS**

    1.    Opening Co-Tenancy:  See subparagraph C(4) above.

2.      Continuing Co-Tenancy:  None.

## V.      UNDERLINE USE (¶ 18):

1.      Exclusive Use Right (¶19(a)(vi)):  Tenant is granted an exclusive use right as to the Products (as defined in Paragraph W(1) below), but only as to the Michaels store and only so long as Tenant is subject to the Michaels exclusive.  Tenant agrees that Michaels shall not be deemed in violation of Tenant's exclusive provided that Michaels stores is operated and merchandised in substantially the same manner as other Michaels stores are operated and merchandised on a national basis as of March 15, 1996.

2.      In no event shall Tenant use the Premises for any prohibited use described in paragraph Z(3) of this abstract, on Exhibit K attached to the Lease or in violation of the restrictive covenants as to exclusive use described in Exhibit F to the Lease.

## W.      OPENING AND OPERATING COVENANTS:

1.      Tenant shall initially maintain and operate the Premises as the retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products, all ancillary to the sale of the Products.  Thereafter, Tenant shall have the right to use the Premises for any lawful use (which shall be a retail or retail service use so long as more than forty percent (40%) of the gross leaseable area of Landlord's Parcel is then used for retail uses), subject to the restrictions referenced in ¶V(2) above.

2.      Tenant covenants to open a fully-stocked Circuit City store within two hundred ten (210) days after the delivery of the Land provided the tenant improvement allowance is paid and the opening co-tenancy requirement is met.  If operations are thereafter permanently ceased in ninety-five percent (95%) or more of the Building for more than six (6) consecutive months, Landlord shall have the right to terminate the Lease by sending Tenant a termination notice within sixty (60) days following the expiration of such six (6) month period.  If Landlord fails to exercise its right of termination, then Landlord shall be deemed to have waived such termination right unless operations are later recommenced and Tenant again goes dark.  Landlord shall be required to pay to Tenant the Unamortized Amount (as defined in ¶P(2) above).  The effective date of the Lease termination shall be a date selected by Tenant within fifteen (15) days after Tenant's receipt of Landlord's termination notice (which

termination date shall be not less than thirty (30) days and not more than sixty (60) days after Tenant's receipt of Landlord's termination notice).  Notwithstanding the foregoing, Landlord's termination notice shall be null and void if Tenant notifies Landlord that it will reopen within thirty (30) days after receipt of Landlord's notice and operations are, in fact, recommenced within sixty (60) days of such notice.

X.      **CONSTRUCTION PROVISIONS (Exhibit C):**

1.      Landlord's Work consists of:

(a)      Landlord shall deliver the Land to Tenant free of any Hazardous Substances.

(b)      Landlord shall perform the Site Work (see ¶¶C(2)(a) through (h) above).

(c)      Paving, lighting, utilities, landscaping and drainage:  Landlord shall cause a contractor to complete:  (i) installation of temporary utilities; (ii) the construction and installation within five (5) feet of the Building of permanent telephone service and permanent utilities; (iii) construction installation and storm water drainage system; (iv) the construction and installation of paving and curbing for parking areas, vehicular access and service roads and driveways; (v) the completion of landscaping; (vi) the construction and installation of lighting; (vii) installation of pylon sign; (viii) construction of Peoples Street and a dedication and acceptance of Peoples Street by the City of Johnson City; (ix) construction of the party wall and shared footings; and (x) any and all other Site Work and outside improvements which shall be required by governmental authorities in connection with development of Landlord's Parcel.

(d)      All of such work shall be performed no later than the dates specified in Attachment 5 to Exhibit C.

2.      Tenant Improvements:

(a)      Tenant agrees to use reasonable efforts and due diligence to achieve Substantial Completion within six (6) months from the delivery of the Land.

(b)      Tenant shall prepare Plans and Specifications incorporating the items shown in the Schematic Floor Plan attached as Attachment 11 and the elevation drawing, together with a list of front facade materials attached as Attachment 12.

(c)      Upon substantial completion and Tenant's furnishing to Landlord of the certificates of insurance required by ¶14, an indemnity in favor of Landlord and its lender as to liens, confirmation that Landlord holds title to the Improvements, an AIA

certification of substantial completion, a certificate signed by Tenant's architect and general contractor stating that the improvements were constructed in accordance with the Plans and Specifications and copies of all warranties relating to Tenant's construction, Landlord shall pay to Tenant a Tenant Improvement Allowance of $50.93 per square foot within the Building.

(d)     If Landlord fails to pay Tenant the Tenant Improvement Allowance, Tenant shall be entitled either to offset the unpaid amount of the Tenant Improvement Allowance against Base Rent or, if such sum is not paid within one (1) year, convert the Lease to a ground lease providing for ground rent of $75,000 in Year 1, $50,000 in Year 2 and $25,000 in Year 3.

3.     Construction Delays:

(a)     If Landlord fails to accomplish delivery of the land for whatever reason (including force majeure) by September 15, 1996, Tenant shall be entitled to one (1) day's free rent for each day of delay until November 15, 1996, after which the Tenant shall be entitled to two (2) days free rent for each day of further delay.

(b)     If, subject to force majeure, Landlord shall fail to accomplish delivery of the Land by November 1, 1996 or to complete any other element of Landlord's Work prior to the expiration of forty-five (45) days after the completion date established therefor in Attachment 5, Tenant may exercise self-help. In such event, Tenant shall be able to offset the amounts expended by Tenant against Base Rent and CAM Charges without limitation.

(c)     If Landlord fails to complete delivery of the Land by November 15, 1996, for any reason (including force majeure), Tenant shall be entitled to terminate this Lease and receive reimbursement of its actual out of pocket expenses subject to a cap of $100,000.

(d)     If Landlord fails to deliver the Land as of November 30, 1996, regardless of force majeure, Tenant may elect to delay opening the store facility for up to nine (9) months. In such event, Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility.

(e)     Any delay in meeting any of the deadlines which was solely attributable to Tenant's acts or omissions shall result in an extension of the deadline on a day-for-day basis. Landlord is required to provide Tenant notice of any such Tenant Delay within 48 hours of its occurrence.

4.     Construction Easements: Landlord grants to Tenant an exclusive easement for a construction staging area of approximately 20,000 square feet. After the first

LOCATION: Johnson City, Tennessee
DATED: ~~August~~   , 1996
*September 17*

# LEASE

between

**CIRCUIT CITY STORES, INC.,**

as Tenant

and

**JOHNSON CITY CROSSING, L.P.,**

as Landlord

dated *September 17*, 1996

**JOHNSON CITY CROSSING SHOPPING CENTER**

TABLE OF CONTENTS

1.   Leased Property . . . . . . . . . . . . . . . . .   1

2.   Construction of Building and Improvements . . . . .   3

3.   Lease Term . . . . . . . . . . . . . . . . . . .   4

4.   Rent. . . . . . . . . . . . . . . . . . . . . .   5

5.   Development of Shopping Center by Landlord . . . . .  13

6.   Easements . . . . . . . . . . . . . . . . . . .  15

7.   Common Areas and Common Area Maintenance . . . . . .  25

8.   Signs and Communications Equipment . . . . . . . .  36

9.   Taxes . . . . . . . . . . . . . . . . . . . . .  38

10.  Maintenance, Repairs and Replacements . . . . . . .  42

11.  Payment of Utility Bills . . . . . . . . . . . . .  44

12.  Alterations . . . . . . . . . . . . . . . . . .  45

13.  Mechanics' Liens . . . . . . . . . . . . . . . .  47

14.  Insurance . . . . . . . . . . . . . . . . . . .  48

15.  Damages by Fire or Other Casualty . . . . . . . . .  55

16.  Condemnation . . . . . . . . . . . . . . . . . .  62

17.  Assignment and Subletting . . . . . . . . . . . .  67

18.  Use . . . . . . . . . . . . . . . . . . . . . .  74

19.  Warranties and Representations . . . . . . . . . .  77

20.  Estoppel Certificates. . . . . . . . . . . . . .  96

21.  Subordination, Non-Disturbance and Attornment . . . .  96

22.  Change of Landlord . . . . . . . . . . . . . . .  98

23.  Tenant's Financing . . . . . . . . . . . . . . .  99

24.  Tenant's Property and Waiver of Landlord's Lien . . . . 100

25.  Memorandum of Lease; Commencement Date Agreement . . . . 100

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

26.  Expiration of Term and Holding Over  . . . . . . . . . . 101

27.  "For Rent" Signs . . . . . . . . . . . . . . . . . . . 102

28.  Force Majeure . . . . . . . . . . . . . . . . . . . . 102

29.  Events of Tenant's Default . . . . . . . . . . . . . . 103

30.  Landlord's Remedies . . . . . . . . . . . . . . . . . 104

31.  Events of Landlord's Default; Tenant's Remedies  . . . . 108

32.  Waiver . . . . . . . . . . . . . . . . . . . . . . . . 111

33.  Compliance with Applicable Laws . . . . . . . . . . . . 112

34.  Notices . . . . . . . . . . . . . . . . . . . . . . . 114

35.  Brokers . . . . . . . . . . . . . . . . . . . . . . . 115

36.  Miscellaneous . . . . . . . . . . . . . . . . . . . . 115

37.  Effectiveness of Lease; Tenant's Right to Terminate  . . 118

38.  Confidentiality . . . . . . . . . . . . . . . . . . . 122

39.  Opening Co-tenancy . . . . . . . . . . . . . . . . . . 123

EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "A-2" | Landlord's Parcel Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |
| "K" | Existing Prohibited Uses |

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Johnson City, Tennessee

## LEASE

This LEASE is made as of the _17th_ day of _September_ 1996, by and between JOHNSON CITY CROSSING, L.P. a Georgia limited partnership, having an address at 950 E. Paces Ferry Road, Suite 975, Atlanta, Georgia 30324 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" (as defined below) to Tenant, all those certain "Premises" consisting of the "Building" and "Other Improvements" (both as defined in paragraph 2), as and when same are constructed or renovated and that approximately 27,889 square foot parcel (the "Land"), on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on Exhibit "A" hereto (the "Site Plan"), together with four (4) designated parking spaces labelled "Customer Pick-Up" adjacent to the Building as shown on the Site Plan, six (6) designated parking spaces labelled "Car Stereo

Parking" at the rear of the Building as shown on the Site Plan, and with the easements described in paragraph 6 below, all located in the "Shopping Center" (herein so called) which consists of that certain real property with buildings and improvements constructed or to be constructed thereon, located on Peoples Street lying and being in Johnson City (the "City"), County of Washington, State of Tennessee (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes.  All of the Shopping Center exclusive of the Premises and the "Home Depot Parcel" (as depicted on the Site Plan) is "Landlord's Premises", and all of the Shopping Center exclusive of the Home Depot Parcel is "Landlord's Parcel."  Landlord's Parcel is more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-2" which is attached hereto and made a part hereof for all purposes.  The description of the Premises may be adjusted with Landlord's reasonable consent in accordance with Tenant's final bid set of Plans and Specifications as described in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes).  Landlord hereby grants to Tenant all of those certain rights, in common with others, granted Landlord under that certain Reciprocal Easement and Operation Agreement dated March 15, 1996 and executed by Landlord and Home Depot U.S.A., Inc. and recorded in Roll 90, Image 96-118

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

in the official records of Washington County, Tennessee on May 7, 1996 (the "REA").

2.  <u>Construction of Building and Improvements</u>.  Commencing immediately upon "delivery of the Land" (as defined in the Construction Provisions), Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing approximately 27,889 square feet of ground-floor gross leasable area, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City store (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions.  The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements".  The Improvements shall be constructed in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.  Upon Landlord's request, Tenant agrees to execute a bill of sale or deed serving to convey to Landlord title to the Improvements, which bill of sale or deed shall (a) be subject to Tenant's reasonable approval as to both form and substance, (b) contain no representations or warranties on the part of Tenant, and (c) not be delivered to Landlord prior to payment of the Tenant

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Improvement Allowance. Landlord shall be responsible for any recording fees and transfer taxes payable with respect to such bill of sale.

3.  <u>Lease Term</u>. Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the one hundred eighty (180) day time limit and shall not have given Landlord prior written notice of its

4

intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period. Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the "Term" (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.   Rent.

(a)   Base Rent. During the Construction Term, Tenant shall have no rental obligations nor shall Tenant be responsible for any "Real Estate Taxes" (as defined in paragraph 9) or "CAM

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Charges" (as defined in paragraph 7) or any similar costs, fees, rentals or expenses. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 4 of the Construction Provisions) on the earlier to occur of (w) one hundred-eighty (180) days after Landlord's delivery of the Land, or (x) Tenant's opening for business to the public (the earlier being <del>the date on which the earlier to occur of "(w)" or "(x)" above shall have occurred is</del> the "Commencement Date"). In no event, however, shall the Commencement Date occur prior to the later to occur of: (y) the date on which Landlord makes payment of the Tenant Improvement Allowance, and (z) the date on which the "Opening Co-Tenancy Requirement" (as defined in paragraph 39 below) is satisfied.

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

(i) <u>First Five Years</u>. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of TWO

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

HUNDRED NINETY-THREE THOUSAND EIGHT HUNDRED SIXTY-SIX and 02/100 Dollars ($293,866.02) payable in equal monthly installments of TWENTY-FOUR THOUSAND FOUR HUNDRED EIGHTY-EIGHT and 84/100 Dollars ($24,488.84).

(ii) <u>Adjustment in Base Rent</u>. Notwithstanding the Base Rent provisions, in the event that the ground-floor gross leasable area of the Building when constructed does not equal 27,889 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the actual ground-floor gross leasable area of the Building multiplied by $10.62; however, in no event shall the ground-floor gross leasable area of the Building be deemed to be less than 27,000 square feet for the purpose of determining the Base Rent and "Tenant's Pro Rata Share" (as defined in paragraph 7(c) below). In determining the aforesaid ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii) <u>Increases in Base Rent</u>. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the Base Rent charged hereunder for the preceding five-year period by the lesser of ten percent (10%) or three (3) times the percentage increase in the "CPI-U" (as defined below) during the five (5) year period ending on October 31 of the

fifth (and, as applicable, any succeeding fifth) Lease Year.  As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average.  If at any time during the Term the CPI-U shall be discontinued or substantially changed, Landlord and Tenant shall substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U.

(b)  <u>Percentage Rent</u>.  Anything contained in this Lease to the contrary notwithstanding, Tenant named herein (<u>i.e.</u>, Circuit City) shall not be obligated to pay "Percentage Rent" (as defined below).  If, however, Circuit City assigns all or a portion of its interest in this Lease or subleases all or a portion of the Premises and Circuit City ceases operating in the Premises, such assignee or sublessee (such assignee or sublessee is referred to as the "Occupant") shall pay to Landlord as percentage rent ("Percentage Rent") for each Lease Year during which the Occupant occupies all of the Premises an amount equal to two percent (2%) of the Occupant's "Gross Sales" (as defined below) in excess of the "Percentage Rent Breakpoint".  The Percentage Rent Breakpoint shall be determined by dividing the Base Rent then payable under this Lease for the corresponding Lease Year by .02.  Percentage Rent shall be computed and payable annually on or before the ninetieth (90th) day immediately following the end of each Lease Year.  Within ninety (90) days after the end of each Lease Year, the Occupant shall furnish to Landlord a detailed statement (certified

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

or a related party (as contemplated in paragraph 17(g) below)

by an officer of the Occupant) showing the Gross Sales during the applicable Lease Year.

(i)  Gross Sales.  For purposes of this paragraph 4(b), Gross Sales shall be defined as the selling price of all merchandise sold and delivered and services performed in, at, on or from any part of the Premises by the Occupant, including sales and charges for cash or credit (subject to collection, as limited by subparagraph (L) below), but excluding or deducting therefrom, as the case may be:

(A)  service charges paid by customers or other charges for extending credit to customers, and amounts in excess of the Occupant's cash sales price charged to customers on sales made on credit or under a time payment plan;

(B)  sales to employees of the Occupant at discount;

(C)  returns to and refunds made by the Occupant;

(D)  exchanges of merchandise between stores or warehouses of the Occupant where such exchange is made solely for the convenient operation of the business of the Occupant and not for the purpose of consummating a sale which has been made at the Premises;

(E)  city, county, state or federal sales, luxury or excise taxes (if otherwise included in the calculation of Gross Sales) on such sales which is both added to the selling price (or absorbed therein) and paid to the

9

taxing authority by the Occupant (but not by any vendor of the Occupant);

(F) sums and credits received in the settlement of claims for loss of or damage to merchandise;

(G) receipts for incidental items, such as cigarettes and candy, from snack bars, cafeterias and vending machines operated primarily for the use of the Occupant's employees and receipts from public or private pay telephones;

(H) charges for repair and/or servicing of merchandise, including sales of service contracts;

(I) delivery and installation charges relating to work performed outside the Premises;

(J) exchanges of merchandise, but only to the extent of the value of the merchandise returned for exchange;

(K) sales of store fixtures and equipment used at the Premises and not sold in the ordinary course of business; and

(L) sales which are uncollectible and written off the Occupant's books as uncollectible.

Notwithstanding the foregoing, the selling price of all services performed in, at, on or from any part of the Premises by the Occupant shall be excluded from Gross Sales up to an amount equal to ten percent (10%) of such Occupant's Gross Sales for the applicable Lease Year, but shall be included as to all such amounts

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

exceeding ten percent (10%) of such Occupant's Gross Sales for the applicable Lease Year.

(ii) Books; Records; Audit.  The Occupant shall keep and maintain at its corporate headquarters books of accounts covering all sales of merchandise at the Premises for a period of at least thirty-six (36) months from and after the end of the month in which such transactions occur.  Upon request of Landlord no more than once each Lease Year and at any reasonable time during regular business hours, and upon reasonable written notice to the Occupant, the books of accounts of the Occupant (as they relate to the Occupant's operations at the Premises) shall be made available to Landlord or Landlord's auditor at the Occupant's offices for an examination, inspection or audit; provided, however, that the maximum period which can be examined, inspected or audited shall never exceed the thirty-six (36) month period immediately preceding the month in which such examination, inspection or audit is conducted.  If an audit conducted by Landlord or Landlord's auditor should determine that any previously submitted statement or statements of the Occupant for the immediately preceding thirty-six (36) month period were inaccurate, and that Percentage Rent has thus been erroneously overpaid or unpaid, there shall be an adjustment to the end that the correct amount of Percentage Rent will have been paid by the Occupant.  In the event that an audit discloses an intentional understatement of Gross Sales by the Occupant in excess of five percent (5%) of the amount theretofore reported and, as a result thereof, Percentage Rent has been

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

underpaid, the Occupant shall pay the actual and reasonable out-of-pocket cost of such audit as well as interest on the unpaid amount of Percentage Rent at the "Default Rate" (as defined in paragraph 9(b) below) from the date upon which such amount should have been paid. All reports submitted to Landlord pursuant to this paragraph 4(b)(ii) shall be prepared in accordance with the accounting standards utilized by the Occupant in connection with the preparation of its internal reports and information.

(iii) <u>No liability on part of Circuit City</u>. If the Occupant shall be a sublessee, then the sublease shall specifically obligate such sublessee to comply with the provisions of this paragraph 4(b) (or similar provisions specifically set forth in the sublease) and pay Percentage Rent directly to Landlord and shall provide that Landlord shall be deemed a third-party beneficiary of such provisions with the express right to sue the sublessee to collect any Percentage Rent. In no event, however, shall Circuit City be deemed to be in default under this Lease or in any way be liable for, or obligated to collect, any Percentage Rent that may be owed to Landlord by such sublessee.

If the Occupant shall be an assignee of this Lease and such assignee shall be in default of its obligation to pay Percentage Rent to Landlord, then, notwithstanding anything contained in this Lease to the contrary (including, without limitation, the provisions of paragraphs 17, 29 and 30 below), (y) Circuit City shall in no event be deemed to be in default under this Lease or in any way liable for any amounts owed by such assignee as "Tenant"

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

hereunder as a result of such assignee's default (including, without limitation, such Percentage Rent) and (z) Landlord shall only be permitted to re-possess or relet the Premises or terminate this Lease on account of the failure of such assignee to pay Percentage Rent with the consent of Circuit City (which consent shall not be unreasonably withheld as long as Circuit City has not retained any right, title or interest in and to this Lease or the Premises (such as, by way of example only a right of re-assignment or a leasehold mortgage). Nothing herein, however, shall preclude Landlord from bringing a separate action against assignee (but not Circuit City) in order to recover any damages incurred by Landlord as a result of such default (including, without limitation, any amounts owed as Percentage Rent).

(iv) <u>Bonus Rent.</u>  Notwithstanding anything contained herein to the contrary, Tenant shall not be obligated to share with Landlord any bonus rent or other consideration received in connection with any assignment of this Lease or sublease of the Premises.

5.  <u>Development of Shopping Center by Landlord.</u>  Landlord covenants to construct and develop a first-class shopping center. The location of buildings and other tenant space on Landlord's Parcel will only be within the "Permissible Building Areas" designated on the Site Plan as building footprints, and the parking ratio for the Shopping Center shall be at least as shown thereon, but in no event shall said ratio be less than the greater of (i) 4.75 spaces (for full-sized automobiles) per 1,000 square feet of

13

ground-floor gross leasable area or (ii) that required by applicable zoning requirements. All such parking shall be at ground level and there shall be a sufficient number of parking spaces located on each of Outparcel "A" and Outparcel "D" (together, the "Outparcels"), as shown on the Site Plan, to accommodate any and all buildings located thereon in accordance with the parking ratio described above without the use of any parking spaces in the balance of the Shopping Center. Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord shall not permit construction traffic over the Premises, and Landlord shall refrain from interfering with the conduct of Tenant's business. Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, on Landlord's Parcel any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii); subject, however, to the rights of any tenant listed on Exhibit "F" ("Existing Tenants") under any "Existing Lease" (as defined on Exhibit "F") as of the date of the execution of this Lease (without regard to any amendments thereto

14

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

made after the date of the execution of this Lease) which does not include the same or similar prohibitions. To the extent, however, that Landlord is reasonably able to enforce the Site Covenants and prohibited activities contained in this Lease against such Existing Tenants, Landlord agrees to do so.

6. <u>Easements</u>. In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a) <u>Construction Easements</u>. During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the "Common Areas" (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises. In addition, Landlord grants to Tenant an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas as provided in the Construction Provisions. Landlord, after the first seventy-five (75) days of the Construction Term and at Tenant's sole cost and expense, may require Tenant to relocate the Staging Area once, upon at least five (5) days' written notice, to another comparably located area which shall be adjacent to Tenant's

15

Building pad area, of sufficient size to accommodate four (4) forty (40) foot trailers, and subject to Tenant's reasonable approval. If Landlord requires Tenant to relocate the Staging Area during the first seventy-five (75) days of the Construction Term, then Landlord shall be responsible for one hundred percent (100%) of the costs related thereto.

(b)  <u>Footing and Foundation Easements</u>.  Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) to allow their respective buildings to abut and connect and with respect to the "Party Wall" and "Shared Footings" (as such terms are defined below) to bear structurally upon each other; (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above.  No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made, which approval shall not be unreasonably withheld.

Landlord and Tenant acknowledge and agree that the southern wall of the Building and the northern-most wall of the adjacent premises (the "Adjacent Premises") shall be a party wall ("the Party Wall") and the Adjacent Premises and the Building shall share

16

a common foundation and footings (collectively, "Shared Footings").
Landlord shall construct the Party Wall and the Shared Footings,
and Tenant shall be permitted to extend the Party Wall to the rear
of the Premises, beyond the Adjacent Premises, as shown on the
Plans and Specifications, all in accordance with the applicable
provisions of the Construction Provisions and with the following:

(A)   The Party Wall and Shared Footings shall be
constructed in accordance with Tenant's Plans and Specifications
and at depths as required for Tenant's finished floor elevation.

(B)   Landlord hereby grants Tenant an easement for the
Term in and across the Party Wall and the Shared Footings to the
extent necessary for Tenant to exercise its rights and perform its
obligations under this Lease.

(C)   Tenant shall, at its sole cost and expense, be
allowed to make such additions and improvements to the Party Wall
and/or Shared Footings as are necessary to construct the Building
including, without limitation, installing column footings, columns,
joists, crossbeams, studs and other structural components, pipes,
conduit and the like; provided, however, that (i) such additions
and improvements shall not damage or impair the structural
integrity of the Party Wall, the Shared Footings or the Adjacent
Premises (ii) no joists, crossbeams, studs or other structural
components used in the construction of the Building will penetrate
further than the lesser of six inches (6") or halfway through the
Party Wall, and (iii) ~~the other party~~ Landlord shall have approved detailed
plans and specifications therefor.  The last party to construct its

17

respective building shall be responsible for constructing any attachments, flashings and the like in order to give the Building and the Adjacent Premises the appearance of one building structure, which attachments and the like shall be made pursuant to detailed plans and specifications approved by ~~the other party~~ Landlord.

(D)    Neither Tenant nor Landlord shall make or provide any openings in the Party Wall or alterations to the Shared Footings of any nature (except in accordance with "(C)" above) whatsoever without the prior written consent of the other party, which consent may be withheld in such party's sole and absolute discretion.

(E)    Landlord grants to Tenant from time to time, an easement during normal business hours (except in the event of an emergency), subject to the requirements of clause "(I)" below, to enter upon the Adjacent Premises to the extent necessary to exercise Tenant's rights and perform its obligations with respect to the Premises (including, without limitation, to construct the Building).    Tenant shall provide at least ten (10) days advance notice to Landlord prior to exercising such right, except in the event of an emergency, in which case only such notice as may be reasonable under ordinary circumstances shall be required.

(F)    All costs, expenses and fees relating to the construction of the Party Wall and Shared Footings shall be borne equally by Landlord and Tenant, except as provided in the last sentence of clause "(C)" above.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(G)   All additions and improvements to the interior portion of the Party Wall shall be the property of the party, owner or occupant making such additions or improvements.

(H)   The Party Wall (including any utility or electrical lines located therein and any wall board attached to studs facing the Adjacent Premises) and the Shared Footings, when constructed, shall constitute part of the Premises, and Tenant, at Tenant's sole cost and expense, shall insure the Party Wall in the manner and the amounts set forth in paragraph 14 below, subject to Tenant's right to self-insure as provided in paragraph 14(d) below.   Anything contained in this Lease to the contrary notwithstanding, Tenant shall have no obligation to insure the Shared Footings or any non-structural additions, improvements or attachments made to the Party Wall by Landlord or the occupant of the Adjacent Premises (including, without limitation, any wall paper, painting, panelling or other wall covering, or any fixture, equipment or personal property attached to the portion of the Party Wall facing into the Adjacent Premises) or any structural changes made to the Party Wall by Landlord or the occupant of the Adjacent Premises (including without limitation, the addition or alteration of joists, crossbeams, studs and other structural components, pipes, conduits or the like) (the foregoing items which Tenant is not obligated to insure are collectively referred to as the "Adjacent Premises Items").

(I)   After the opening of either Tenant's store or the Adjacent Premises for business to the public, the party performing

19

any and all construction, maintenance or repair on or to the Adjacent Premises, the Building, the Party Wall and/or the Shared Footings, shall take all reasonable steps necessary to minimize any interference with and disruption to the operations of other tenants' businesses.

(J) In the event all or a portion of the Building or the Adjacent Premises is damaged or destroyed by fire or other casualty, and if the repair, restoration or rebuilding of the Building or Adjacent Premises requires alteration of or modification to the Party Wall or the Shared Footings, or any other property owned by ~~the other party,~~ Landlord or Tenant, the constructing party shall submit to the other party plans and specifications for such alteration or modification and such plans and specification shall be subject to the other party's prior written approval, as the case may be, which approval is not to be unreasonably withheld or delayed. In the event the Party Wall and/or the Shared Footings are destroyed in whole or in part by fire or other casualty and Tenant is required, or elects, to reconstruct the Building pursuant to paragraph 15 below, the Party Wall shall be restored by Tenant and the Shared Footings shall be restored by Landlord, and the restored wall and footings and foundation shall be deemed to be the Party Wall and the Shared Footings, as applicable, and all terms and conditions set forth in this paragraph 6(b), including all easements granted herein, shall remain in full force and effect and shall be applicable to such restored Party Wall and/or Shared Footings. Anything contained in this Lease to the contrary

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

notwithstanding, Tenant shall not be obligated to reconstruct any of the Adjacent Premises Items, and if any portion of the restoration cost of the Party Wall is not covered by the insurance that Tenant is obligated to maintain under this Lease, then Landlord shall reimburse Tenant for one-half of the costs and expenses incurred by Tenant in restoring the Party Wall. In the event of a conflict between the provisions of this clause "(J)" and paragraph 15 below regarding the parties' respective rights and obligations respecting the restoration of the Party Wall and the Shared Footings in the event of a fire or other casualty, the provisions of this clause "(J)" shall control.

(c) <u>Utility Easements</u>. During the Term, upon prior reasonable request of Tenant (following the initial "Landlord Work" as set forth in the Construction Provisions), Landlord agrees to obtain, at Tenant's cost, such underground, public or private utility easements as Tenant deems necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. Tenant agrees to use reasonable efforts to use existing easements where sufficient and adequate capacity is available for Tenant's use. For the purpose of exercising the rights granted in this subparagraph 6(c), Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(d)    <u>Common Area Easement</u>.    During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive, irrevocable, right, privilege and easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor.    Landlord represents and warrants that the location of "Pylon Sign 1" as identified on the Site Plan is on real property owned by Landlord and identified on the Site Plan as the "Sign Parcel," and the Common Area Easement shall include an easement to operate, use, maintain, repair and replace Pylon Sign 1 and the panels thereon and for all utilities servicing same ("Pylon Sign 1 Easement").    The Pylon Sign 1 Easement shall also include an easement, for the benefit of Tenant or any occupant of the Premises, to erect, maintain, repair and replace, from time to time, identification panels thereon.    Landlord covenants and agrees that should Landlord sell the Sign Parcel prior to the delivery of the Land, then such sale shall be subject to the Pylon Sign 1

22

Easement, which Pylon Sign 1 Easement shall be a first and paramount recorded property right in favor of Landlord, Tenant and Landlord's Parcel; however, Landlord shall have the right to relocate the Pylon Sign 1 Easement onto any portion of the Sign Parcel retained by Landlord provided that Tenant approves of such location in its sole discretion.  It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up" and "Car Stereo Parking", (i) Tenant shall have the right, from time to time and with Landlord's reasonable approval, to relocate the same to other areas adjacent to the Improvements and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such parking spaces shall be designated for use by Tenant's customers, invitees and patrons.  In addition, Tenant shall have the right to use the sidewalks located in such Common Areas as are immediately adjacent to and abutting Tenant's Improvements as shown on the Site Plan for "sidewalk sales", seasonal and promotional sales and other sales customary to Tenant's business operations provided that such sales shall not unduly restrict pedestrian traffic to and from other stores over such sidewalks.  Tenant shall also have the right to use the parking field directly in front of the Premises for seasonal and promotional sales (such as, by way of example only, for a "Bose" truck) provided that (y) no more than ten (10) parking spaces are used at any one time and (z) such sales are limited to no more than three (3) times in any calendar year (not to exceed five (5) days each time).  However, if any Existing Tenant has the

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

right to object (and, in fact, objects) to the aforesaid promotional sales in such parking field under its Existing Lease, as of the date of execution of this Lease (without regard to any amendments thereto made after the date of execution of this Lease), then Tenant agrees to relocate such sales area to an acceptable location. Anything contained in this Lease to the contrary notwithstanding, the Common Area Easement shall not include easements over the Outparcels for parking, access (except as to the pylon sign to be located on Outparcel "D") or future utilities not installed in connection with the initial development of the Shopping Center, and Landlord covenants and agrees that no current or future owners or occupants of the Outparcels shall have any parking easements over the balance of the Shopping Center, nor shall any current or future owners or occupants of the Outparcels have any utility easements over the balance of the Shopping Center, except that underground utility easements which do not materially and adversely interfere with Tenant's use and enjoyment of the Common Areas shall be permitted. It is understood and agreed that any and all easements necessary for the construction, use, operation, maintenance, repair and replacement of the pylon sign to be located on Outparcel "D" shall be included within the Common Area Easement.

(e) Non-Dedication. None of the easements granted by the parties to this Lease is intended, nor shall any of them be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action

24

which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.  In furtherance of the foregoing but not in limitation thereof, Landlord shall have the right to temporarily block-off access to the Common Areas, but no more often than is reasonably deemed to be legally necessary, based upon the legal opinion of an outside law firm which shall be subject to Tenant's reasonable approval, in order to avoid the implication of dedication of the same for public use or to perform necessary repairs.  Any such barriers shall be temporarily erected for such purpose, if possible, at a time or on a day when the Shopping Center is not open for business and then only for the minimum time required to accomplish such purpose.    Notwithstanding the foregoing, in no event shall Landlord be permitted to close any of the Common Areas within Tenant's Preferred Area.

     7.    <u>Common Areas and Common Area Maintenance</u>.

     (a)    <u>Definition of Common Areas</u>.  The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, elevators, escalators, ramps, stairways, detention and related drainage facilities, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s) (including, without limitation, the Pylon Sign 1 Easement), directional, traffic and monument sign structure(s) and shared utility facilities located in the Shopping Center (including any such areas and facilities

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining and repairing the Common Areas in a first-class manner, including cleaning and maintenance of Landlord's pylon and other sign structure(s), drainage facilities, snow removal and ice treatment, utilities exclusively serving the Common Areas, removal of Common Area trash and garbage, lighting, repairing, repaving, resealing and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)   CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in an amount not to exceed five percent (5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Common Areas).  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)  real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels (other than maintenance of the Home Depot Parcel to the extent provided in paragraph 7(c) below) or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of the Landlord or made to correct any construction, defect or condition, to any interior mall space or to any buildings (including exterior walls thereof) or utility systems not part of the Common Areas;

(4) repairs or replacements necessitated by any governmental entity or by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

27

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8) repairs or replacements of a capital nature (whether or not capitalized), unless the costs of same are amortized over the entire useful life of such repairs or replacements and provided that repairs or replacements are not the direct result of initial defects in materials or workmanship and, with respect to improvements, repairs or replacements (other than patching and similar minor periodic maintenance) of the parking lot or other paved areas, provided that Tenant shall have first approved the budget therefor and same occurs after the expiration of the first ten (10) "CAM Years" (as defined below); Tenant agrees not to unreasonably withhold its approval of any such budget, and if Tenant fails to approve or disapprove such budget within fifteen (15) days from receipt thereof, Tenant shall be deemed conclusively to

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

have approved such budget, provided that such budget contains a conspicuous notice stating that unless such budget is disapproved within fifteen (15) days, such budget shall be deemed approved by Tenant.;

(9) improvements, repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) CAM Years;

(10) reserves for anticipated future expenses;

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12) Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions); or

(14) other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards.

CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar shopping centers in the Eastern Tennessee/Western Virginia Area (the "Trade Area") ~~Knoxville, Tennessee, Ashville, Tennessee, Roanoke, Virginia, Winston-Salem, North Carolina and Charlotte, North Carolina (collectively, the "Cities")~~ (but not greater than as

29

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a Common Area maintenance budget detailing the projected CAM Charges delivered to Tenant on or before the end of each CAM Year.

Anything contained in this Lease to the contrary notwithstanding, CAM Charges shall not include any Common Area Maintenance or other similar operation, maintenance, insurance, repair or replacement cost respecting the parking and other areas on the Outparcels except as to the costs incurred in connection with the Common Area Maintenance of any Common Area Easement over, through or under any Outparcel which benefits the balance of the Shopping Center or Tenant (such as, by way of example, the Common Area Easements on Outparcel "D" relating to the pylon sign); however, Landlord shall nevertheless be responsible for causing such areas on the Outparcels to be operated, maintained, insured, repaired and replaced as if same were included within the Common Area Maintenance of the balance of the Shopping Center.

(c)  <u>Tenant Payments</u>.  Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord a fee (which Landlord estimates to be $0.85 per square foot of ground-floor gross leasable area in the Building per annum (including, without limitation, Landlord's premiums for insurance charges for the Common Areas), payable in equal monthly installments, as its share of CAM Charges.  The

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

annual CAM Charges shall be computed on the basis of calendar years (each such year is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year.  Annual adjustments to CAM Charges shall take into account actual expenses incurred and which are included in CAM Charges pursuant to this Lease. Anything contained herein to the contrary notwithstanding, in no event shall: (w) CAM Charges (including "Ordinary CAM Charges", as defined below, and "non-Ordinary CAM Charges", as defined below) for the first Lease Year exceed $0.98 per square foot of ground-floor gross leasable area of the Building regardless of the actual amount thereof, (x) CAM Charges (including Ordinary CAM Charges and non-Ordinary CAM Charges) for the second Lease Year exceed the lesser of (A) the actual CAM Charges for the second Lease Year or (B) $1.00 per square foot of ground-floor gross leasable area in the Building, (y) CAM Charges (excluding non-Ordinary CAM Charges) for the third Lease Year exceed the lesser of (aa) one hundred five percent (105%) of the actual CAM Charges for the second Lease Year (excluding non-Ordinary CAM Charges) or (bb) $1.05 per square foot of ground-floor gross leasable area of the Building, or (z) CAM Charges (excluding non-Ordinary CAM Charges) for any subsequent Lease Year increase by more than five percent (5%) per CAM Year on a cumulative basis (i.e., in no event shall the amount of Ordinary CAM Charges payable during any such subsequent CAM Year exceed the amount of the Ordinary CAM Charges for the third full Lease Year (subject to the cap established by clause (y) above) increased at

31

the rate of five (5) percent per annum thereafter).  "Ordinary CAM
Charges" shall mean all CAM Charges excluding the non-Ordinary CAM
Charges.    "Non-Ordinary CAM Charges" shall mean the cost of
utilities exclusively serving the parking lot within the Common
Areas, snow removal from the Common Areas, insurance obligations
under this Lease relating to the Common Areas, and CAM Charges, if
any, applicable to the amortized cost of replacing the Shopping
Center parking lot (provided that such cost is permitted to be
included in CAM Charges as provided above in this paragraph 7),
provided that such costs are the actual costs, under bona fide
competitive third-party contracts and are consistent with similarly
situated shopping centers in the ~~Cities~~ Trade Area.  For any period within the
Term which is less than a full CAM Year, the annual charge shall be
appropriately prorated.   Within ninety (90) days after the end of
the first CAM Year and each CAM Year thereafter, Landlord will
furnish to Tenant a statement showing in detail (with such
substantiating documentation as Tenant may reasonably request) the
amount of the CAM Charges for the preceding CAM Year and the then-
current number of square feet of ground-floor gross leasable area
in the Shopping Center.  Any necessary adjustment with respect to
amounts owed by either party for such preceding CAM Year shall
thereupon be made; and the monthly payments to be made by Tenant
for the ensuing year shall be estimated according to the Common
Area maintenance budget prepared by Landlord and delivered to
Tenant.   Subject to adjustments as herein contemplated, Tenant's
share (such fraction being referred to herein as "Tenant's Pro Rata

32

Share") of CAM Charges after the first CAM Year shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building, excluding loading docks and outside sales areas, and the denominator of which is the number of square feet of the ground-floor gross leasable area (including the area of any outside sales area exclusive to a single occupant, but excluding the garden center on the Home Depot Parcel provided that such garden center is not covered by a roof and enclosed by four (4) walls) in the Shopping Center. For the purposes of determining Tenant's Pro Rata Share of CAM Charges, the denominator shall not include the ground-floor leasable area of the Outparcels except as to those components of CAM Charges from which any owner or occupant of any of the Outparcels benefits.

If the owner or occupant of the Home Depot Parcel elects to maintain the Common Areas located on the Home Depot Parcel, then the ground-floor gross leasable area of the building(s) located thereon shall be excluded from the ground-floor gross leasable area of the Shopping Center for purposes of calculating CAM Charges, and no Common Area Maintenance on or with respect to the Home Depot Parcel shall be included in the CAM Charges. If, notwithstanding its election to maintain the Common Areas located on the Home Depot Parcel, the owner or occupant of the Home Depot Parcel benefits in any way from any of the Common Areas located on the remainder of the Shopping Center (such as, by way of example only, a retention pond), then the CAM Charges associated with maintaining and

33

operating such component of the Common Areas from which the occupant of the Home Depot Parcel benefits ("Beneficial Component") shall be removed from the calculation of Tenant's Pro Rata Share. Tenant's share of the CAM Charges for maintaining and operating any and all Beneficial Components ("Beneficial Component Charges") shall be the product of the Beneficial Component Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building, excluding loading docks and outside sales areas, and the denominator of which is the number of square feet of the ground-floor gross leasable area in the Shopping Center (including the area of any outside sales area exclusive to a single occupant, but excluding the garden center on the Home Depot Parcel provided that such garden center is not covered by a roof and enclosed by four (4) walls).   It is understood and agreed that the term "Shopping Center" shall include the ground-floor gross leasable of the building(s) located on the Home Depot Parcel for the purposes of determining Tenant's share of the Beneficial Component Charges.

In determining the ground-floor gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The ground-floor gross leasable area of any outside sales area which is included in the aforesaid calculations shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

or walls included therein.  Changes in applicable floor areas shall
result in corresponding adjustments to Tenant's Pro Rata Share (or
share of Beneficial Component Charges), but in no event shall the
denominator of the fraction by which Tenant's Pro Rata Share (or
Tenant's share of Beneficial Component Charges) is determined be
less than the sum of (aa) ninety percent (90%) of the ground-floor
gross leasable area of Landlord's Parcel as shown on the Site Plan,
plus (bb) the ground-floor gross leasable area of the building(s)
located on the Home Depot Parcel as shown on the Site Plan to the
extent same are included in the denominator as aforesaid.  The
remainder of CAM Charges and/or Beneficial Component Charges and/or
other similar charges shall be borne by Landlord, the owner or
occupant of the Home Depot Parcel, the Outparcels and/or other
tenants.

    (d)  <u>Examination of Landlord's Records</u>.  Tenant shall
have the right, from time to time, but not more often than once as
to any CAM Year and no later than three (3) years after the end of
such CAM Year, to examine and make copies of the records pertaining
to CAM Charges or Beneficial Component Charges for such CAM Year.
Any such examination shall pertain only to the most recent three
(3) CAM Years, with the amount of CAM Charges or Beneficial
Component Charges for any CAM Year prior to such most recent three
(3) CAM Years being final and conclusive as between the parties.
Tenant's right of examination shall be exercised during reasonable
business hours at Landlord's principal records office on reasonable
prior notice to Landlord.  If such examination shall disclose any

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges or Beneficial Component Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges or Beneficial Component Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit.    Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

    8.    <u>Signs and Communications Equipment</u>.

    (a)    <u>Signs</u>.    Landlord, at its sole cost and expense but subject to reimbursement by Tenant as provided below, no later than the date set forth on Attachment "5" to the Construction Provisions, shall construct and install upon the Common Areas and at other location(s) so shown on the Site Plan, no fewer than two (2) pylon sign structure(s) (with electrical wired box installed), each having sufficient space thereon for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense. The pylon signs (including colors, design, dimensions, type of lighting and position of tenant panels) shall be substantially as shown on the pylon sign rendering attached hereto and made a part hereof as <u>Exhibit "E"</u>.    In addition to the foregoing and not in limitation thereof, Tenant shall also have the right to install illuminated and other signs on the exterior of the Building. Attached as a portion of <u>Exhibit "E"</u> are plans and specifications for Tenant's current prototypical face panels and for Tenant's

36

building signage, which Landlord hereby approves upon its execution of this Lease.    Notwithstanding the foregoing, Tenant shall be entitled without Landlord's consent, but subject to governmental requirements and the size limitation provided on Exhibit "E", as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans.    In the event of an assignment or subletting as a result of which Tenant is no longer occupying any portion of the Premises, Tenant's signs may be replaced by signs identifying the appropriate assignee or subtenant, provided that the specific design of such signage shall be subject to Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed.

Tenant shall reimburse Landlord for Tenant's proportionate share of the actual cost reasonably incurred by Landlord in constructing the pylon sign(s) on which Tenant's identification panels are to be placed.    Tenant's proportionate share of such cost shall be determined by multiplying such cost by a fraction, the numerator of which is the area (expressed in square feet) of Tenant's panel and the denominator of which is the area (expressed in square feet) of all panels on the applicable pylon sign (excluding the area of the panel identifying the name of the Shopping Center, if any); provided, however, Tenant's proportionate share shall in no event exceed an amount equal to Ten Thousand Dollars ($10,000.00).    Tenant shall make such reimbursement to Landlord at the time Landlord pays Tenant the Tenant Improvement Allowance or such later time as (i) Landlord shall have fully

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

constructed and installed the pylon sign structure(s); (ii) Landlord shall have furnished Tenant with evidence of the cost of such pylon sign structure(s) and a determination of Tenant's proportionate share thereof; and (iii) Landlord shall have fully completed all of the Landlord Work as provided in the Construction Provisions.

(b)    Communications Equipment.    Tenant may, from time to time, install, maintain and/or replace any satellite dishes or antennas on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely affect the roof or the structural elements thereof.    Tenant agrees that the initial installation of its satellite dishes and/or antennas shall be pursuant to the plans and specifications previously delivered to Landlord.    Upon removal by Tenant of any satellite dishes or antennas, Tenant shall repair any damage done in connection with such removal.

9.    Taxes.

(a)    Taxes Contemplated Hereunder.    The term "Real Estate Taxes" shall mean all general real estate taxes and assessments and other ad valorem taxes, rates and levies paid upon or with respect to Landlord's Parcel, including the Premises, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent or other charges payable by Tenant under this Lease, or any roll-back tax or similar taxes resulting from the change of use of the real property comprising the Shopping Center. For the purposes of this paragraph 9 only, the term "Landlord's Parcel" shall not include, if separately assessed for real estate tax purposes, the Outparcels, and Landlord covenants to pay (or caused to be paid) the Real Estate Taxes assessed against the Outparcels to the extent that the nonpayment thereof would create lien on the Landlord's Parcel.

(b)  <u>Payment of Real Estate Taxes</u>.  At such intervals as Landlord is required to pay the Real Estate Taxes, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c), except that the denominator shall be the number of square feet of the ground-floor gross leasable area [including the area of any outside sales area exclusive to a single occupant] in Landlord's Parcel) levied against the tax parcel or parcels comprising Landlord's Parcel (the "Tax Parcel").  Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due and paid. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered.  Landlord shall pay, or cause the

39

payment of, all Real Estate Taxes (and real estate taxes assessed against the Outparcels if same are separately assessed) before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof.    In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord.  Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.    Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Parcel or other third party pursuant to an agreement to which Tenant is not a party.    In addition, should Landlord fail to pay such Real Estate Taxes before the expiration of ten (10) days after notice from Tenant that same have become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

(c)  <u>Contest of Real Estate Taxes    and/or    Assessed Valuation of Property</u>.  Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek

40

an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation or assessment of the real property included within the Tax Parcel containing the Premises for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within ten (10) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction.  In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.  In addition, such contest shall be jointly prosecuted with other tenants having the right to and electing to contest such taxes.

(d)  Payment Following Appeal.  Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings.  Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement of all reasonable costs, fees

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

and expenses it incurs in such protest or reassessment, provided that such reimbursement shall not be in excess of the amount of the reduction in Real Estate Taxes.

10. <u>Maintenance, Repairs and Replacements</u>.  Except (i) for costs covered by the Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including, but not limited to, repairs and/or replacements to plumbing, heating, electrical and air conditioning systems which serve only the Premises; however, Tenant shall not be obligated to maintain the surface of the Party Wall facing the Adjacent Premises or any of the Adjacent Premises Items.  During the last five (5) years of the Term of the Lease (without consideration to the exercise of any additional Renewal Options) · Tenant shall not be obligated to install or construct alterations or incur capital expenditures pursuant to this paragraph, unless Landlord agrees to reimburse Tenant for the unamortized amount of the cost associated with such repairs, construction or alteration as of the expiration of the Term (taking into consideration the exercise of any Renewal Options).  Any such amortization shall be in accordance with generally accepted accounting principles or the Internal Revenue Code and Regulations.  Landlord shall maintain all structural

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof, roof structure, flooring system (but not including non-structural floor coverings), floor slab, foundation, the Shared Footings, load bearing walls, the structural components of the Party Wall and exterior structural walls, but shall have no other responsibility for maintenance, repair or replacements to the Premises or any part thereof; provided, however, this provision is in no way intended to limit Landlord's obligation to maintain, repair and replace any and all elements, both structural and non-structural, of the Common Areas pursuant to the terms of this Lease.  In addition to Landlord's maintenance and repair obligations set forth herein and otherwise set forth in this Lease, Landlord agrees to maintain the Other Improvements (other than the trash compactor) immediately surrounding the Building, including sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such

43

thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion.  The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate.  However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement.  All maintenance, repairs or replacements shall be done by Tenant or Landlord lien-free and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law.  In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant, upon payment by Landlord of the Tenant Improvement Allowance, and Landlord, as applicable, shall assign to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.  Payment of Utility Bills.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for separately metered gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements.  Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and Landlord's Parcel.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

12.  <u>Alterations</u>.  During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores and (ii) any interior nonstructural alterations or modifications it may desire.  Notwithstanding the foregoing or the following provisions of this paragraph 12, Landlord shall have no consent rights with respect to any alteration or modification referred to in "(i)" above notwithstanding that same may impact the structure or exterior provided that (a) Circuit City or, in the event of an assignment or subletting, a national or regional retailer (which shall be defined for the purpose of this paragraph 12 only as a retailer operating at least ten (10) stores) is making such alterations or modifications, (b) Tenant shall provide Landlord with the plans and specifications therefor for informational purposes only, (c) such alterations and modifications are performed in a manner that will not adversely affect the structural integrity of the Building, and (d) for as long as the Existing Lease between Landlord and PetsMart is in full force and effect, such alterations or modifications will not increase the height of the Building to over forty (40) feet, and (e) for as long as the Existing Lease between Landlord and Service Merchandise is in full force and effect, such alterations or modifications will not increase the height of the Building so as to violate the restriction currently contained in such Existing Lease, which restriction is attached

45

hereto as <u>Exhibit "L"</u>.   However, any assignee or sublessee which
is not related to or affiliated with Circuit City seeking to make
any alteration or modification pursuant to "(i)" above, whether or
not such assignee or sublessee is a national or regional retailer,
shall, as a condition to making such alterations or modifications
without the consent of Landlord, (x) use materials that are at
least equal to the quality of the materials used in the initial
construction of the Shopping Center or in any subsequent renovation
of the Shopping Center, (y) utilize architectural elements that are
consistent with the then-architectural theme of the Shopping Center
and (z) not cause the height of the Building to exceed the height
of the Building (exclusive of prototypical architectural elements
and mechanicals) immediately prior to such modification or
alteration.   With Landlord's consent, which shall not be
unreasonably withheld, conditioned or delayed, Tenant shall have
the right, at its sole cost, to alter, modify or reconstruct the
exterior and/or structure of the Building or Other Improvements.
Landlord's withholding of consent as to any structural alteration
or modification shall be deemed reasonable only if same is
materially inconsistent with the then-existing architecture of the
Shopping Center or adversely affects the structural integrity of
the Building or, for as long as the Existing Lease between Landlord
and PetsMart is in full force and effect, such alteration or
modification increases the height of the Building to over forty
(40) feet, or for so long as the Existing Lease between Landlord
and Service Merchandise is in full force and effect, increases the

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

height of the Building so as to violate the restriction currently contained in such Existing Lease, which restriction is attached hereto as Exhibit "L". Tenant shall cause all such alterations to be lien-free (in accordance with paragraph 13) and made and completed at Tenant's cost in a workmanlike manner and in compliance with all applicable law. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) business days following Tenant's delivery of such plans and specifications to Landlord provided that Tenant's request for approval refers to this paragraph 12 and states that Landlord's failure to respond will be deemed an approval. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13.  Mechanics' Liens.  Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Land-

47

lord or any party claiming by, through, or under Tenant or Land-lord, nor shall either party permit any judgment, lien or attach-ment to lie, as applicable, against the Premises or the Shopping Center.  Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

14.  <u>Insurance</u>.

(a)  <u>Property Damage</u>.  During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction.  During the Main Term and all Option Periods, Tenant shall keep in full force and effect a policy of fire and extended coverage insurance covering loss or damage to the Premises in an amount equal to the full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than the Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible.  Landlord and

48

Landlord's first and second "Mortgagees" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear. Landlord shall not construct, or permit to be constructed, any improvement in Landlord's Parcel, nor conduct any activity, or permit the conduct of any activity, in Landlord's Parcel which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates, including, without limitation, a fully-sprinklered fire insurance rate. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks as long as Landlord is not required to pay more than the additional premium that Landlord would have been required to pay if Tenant was carrying the aforesaid insurance, as opposed to Tenant self-insuring such risks).

(b) <u>Liability Insurance</u>. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first and second Mortgagees as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $3,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(c)  Workers' Compensation Insurance.  To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)  Self-Insurance.  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than the "Critical Net Worth" (as defined below) as computed in accordance with generally accepted accounting principles, consistently applied, as determinable from Tenant's public disclosures and/or regularly maintained corporate balance sheets which are generally available to shareholders (no right of Landlord to audit or conduct independent investigations being implied by this provision).  If Tenant self-insures, then Tenant shall be responsible for paying for the risks that would have been covered by the insurance that Tenant would otherwise have been obligated to maintain under this Lease.  The "Critical Net Worth" shall initially be Seventy-Five Million Dollars ($75,000,000), which Critical Net Worth shall automatically increase on the first day of the sixth Lease Year and each succeeding fifth Lease Year over the Critical Net Worth in effect for the preceding five-year period by the percentage

50

increase in the CPI-U during the five-year period ending on October 31 of the fifth (and, as applicable, any succeeding fifth) Lease Year.

(e)   <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction.</u>  During the Term, Landlord shall keep in full force and effect, in form reasonably acceptable to Tenant, policies of (1) commercial general liability insurance, and (2) fire and extended coverage insurance, with respect to the Common Areas and with respect to all other areas of Landlord's Parcel over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas").  The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of Landlord's Parcel intended for tenant occupancy, (ii) constructed but unoccupied portions of Landlord's Parcel, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of Landlord's Parcel.  Said policies shall name Tenant, and any lender or other stakeholder which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests.  The limits of such policies shall be the same as those set forth in subparagraphs (a) and (b) above, as applicable.  The cost of the

51

premiums for coverages relating to Common Areas shall be an element of CAM Charges (except for the cost of the premiums for coverages relating to Common Areas on the Home Depot Parcel unless insured by Landlord, in which case the insurance component of CAM Charges shall be treated as a Beneficial Component), provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like shopping centers in the ~~Cities~~ Trade Area. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of Landlord's Parcel, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of Landlord's Parcel whatsoever Tenant may be assured that Landlord's Parcel will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15.  During any period in which Landlord is conducting construction activities at Landlord's Parcel, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to Landlord's Parcel, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)   Workers' Compensation - Statutory Limits;
     Employers Liability - $500,000;

2)   Automotive Liability for all vehicles with limits of
     $2,000,000; and

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

3)    Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to Landlord's Parcel for the full replacement value of all such construction.   To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

(f)  Policy Provisions.   All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VI.   Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.   Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall be deemed to be self-insurance.   An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

policies with respect to the Premises and Tenant's or Landlord's liability hereunder shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g) <u>Waiver of Right of Recovery and Subrogation</u>. To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h) <u>Evidence of Insurance</u>. Subject to Tenant's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon delivery of the Land (as to liability insurance) and (iii) no less than annually thereafter, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14. Each such certificate shall provide that no expiration, cancellation or material change in the insurance evidenced thereby shall be effective unless thirty (30) days' unconditional

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

notice of such expiration, cancellation or material change shall have been given to the certificate-holder (and any Mortgagee, if applicable).

    (i)  <u>Indemnities</u>.  Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto),  Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

Anything contained herein to the contrary notwithstanding, Tenant's indemnity and insurance shall not cover, and Landlord's indemnity and insurance shall cover at no cost to Tenant, the Shared Footings and the Adjacent Premises Items (including, without limitation, any claims, costs, liability, damage or expense arising in connection with the Adjacent Premises Items).

    15.  <u>Damages by Fire or Other Casualty</u>.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(a)  <u>Less Than Twenty-Five Percent (25%)</u>.  In the event
of an insured fire, earthquake or other casualty, causing
destruction or damage to the Improvements, Common Areas and/or
Additional Areas, which has a repair and reconstruction cost of
less than twenty-five percent (25%) of the then-total replacement
cost of any of the Improvements or a repair and reconstruction cost
of less than forty percent (40%) of the then-total replacement cost
of the Common Areas and/or Additional Areas, this Lease shall not
terminate except as expressly set forth herein, and Base Rent and
other charges shall continue to be paid by Tenant pursuant to the
terms of paragraph 4 hereof.  Within a reasonable time after such
casualty, subject to force majeure, applicable building codes, the
procurement of building permits and the receipt of insurance pro-
ceeds (unless self-insured) to the extent of the damage to the
Premises, or the Common Areas or Additional Areas, as applicable,
Tenant shall complete reconstruction of the Building and Other
Improvements, and Landlord shall complete reconstruction of all of
the Common Areas within Tenant's Preferred Area and on which the
pylon sign(s) are located, at least 100,000 square feet (exclusive
of the Premises) of the ground-floor gross leasable area in the
Additional Areas and such additional Common Areas as are required
to serve the portion of the Additional Areas so restored (including
substantially equivalent value in equipment, furniture and
fixtures), to that condition existing immediately prior to such
casualty, in the reconstructing party's reasonable discretion,
with, in event of any Tenant reconstruction, such alterations as

56

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

may be permitted under paragraph 12 hereof. In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all applicable insurance proceeds for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)  Twenty-Five Percent (25%) or More.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of twenty-five percent (25%) or more of the then-total reconstruction cost of any of the Improvements or a repair and reconstruction cost of forty percent (40%) or more of the then-total reconstruction cost of the Common Areas and/or Additional Areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

this Lease. Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord all insurance proceeds or reconstruction costs as set forth in subparagraph (a) above if the risk is self-insured and such risks would have been covered under the insurance that Tenant would have otherwise been required to maintain under this Lease. In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condi-tion existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures). Should Tenant elect to maintain this Lease in full force and effect, Landlord shall complete reconstruction of all of the Common Areas within Tenant's Preferred Area and on which the pylon sign(s) are located, at least 100,000 square feet (exclusive of the Premises) of ground-floor gross leasable area in the Additional Areas and such additional Common Areas as are required to serve the portion of the Additional Areas so restored in the manner specified by subparagraph (a) above regardless of the amount of damage to same. Additionally, Landlord

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

shall assure (through parallel lease provisions or otherwise) that all areas of Landlord's Parcel leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of Landlord's Parcel whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that Landlord's Parcel will be reconstructed in accordance with this paragraph 15.

Notwithstanding the foregoing, if Tenant terminates this Lease because of an uninsured casualty only, then Landlord shall be permitted to nullify such termination by notice to Tenant within seven (7) days after Landlord's receipt of Tenant's termination notice, TIME BEING OF THE ESSENCE, and the failure of Landlord to send such notice within such seven-day period shall be deemed to mean that has waived its right to nullify Tenant's termination. If Landlord sends the aforesaid nullification notice within such seven-day period, then Landlord shall be deemed to have agreed to pay for full cost ("Restoration Cost") of repairing and reconstructing the Improvements to their condition existing immediately prior to such damage ("Restoration Work"), and Landlord, within three (3) business days after Landlord's receipt of Tenant's good faith estimate of the Restoration Cost, shall deposit an amount equal to such estimate with a mutually agreeable third-party escrow agent (which is, for these purposes, the "Escrow Agent"). The Escrow Agent shall hold such monies in an interest-

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

bearing account reasonably acceptable to Tenant to be paid out, as provided below, from time to time as the Restoration Work progresses, upon Tenant's written request. Tenant's request shall be accompanied by a certificate of Tenant or Tenant's architect or engineer (the "Certificate"), dated not more than seven (7) days prior to such request, stating that the sum then requested either has been incurred or paid by Tenant or is justly due to the named contractors, subcontractors, materialmen, engineers, architects or other persons (whose addresses shall also be stated) who have rendered services or furnished materials for certain portions of the Restoration Work. Upon compliance with the provisions of the immediately preceding, the Escrow Agent shall pay, out of the escrowed funds, to Tenant or the persons named in the Certificate, as applicable, the respective amounts stated therein. If the reconstruction funds paid by Landlord to the Escrow Agent exceed the actual Reconstruction Cost, then Landlord, upon the completion of the Restoration Work, shall be entitled to receive or retain, as applicable, such excess. If the reconstruction funds paid by Landlord to the Escrow Agent are not enough to pay for the actual Reconstruction Cost, then Landlord shall, upon demand, deposit with the Escrow Agent an amount equal to such deficiency.

(c)  <u>Last Two (2) Years of Main Term or Option Period</u>.

Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business for a period in excess of sixty (60)

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

days, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive the proceeds of any insurance (together with any applicable deductible) which may be payable with regard to such destruction or damage or, in the event Tenant self-insures, the amount necessary for reconstruction of the Improvements.   Further, if the Improvements are damaged or destroyed within the last two (2) years of the Main Term or of any Option Period and same has a repair and reconstruction cost of at least twenty-five percent (25%) of the then-total replacement cost of the Improvements, then this Lease shall terminate at Landlord's or Tenant's option, such option to be exercised by notice to the other within thirty (30) days after such damage or destruction (however, at Tenant's option, Tenant may delay such termination for a period not to exceed ninety (90) days after Tenant's receipt or sending of such notice), and Landlord shall receive the proceeds of any insurance (together with any applicable deductible) which may be payable with regard to such destruction or damage or, in the event Tenant self-insures, the amount necessary for reconstruction of the Improvements.   However, if Landlord exercises such termination option, then Tenant shall have the right to nullify such termination by notifying Landlord that Tenant will exercise at least one (1) Renewal Option, which notice shall be made by Tenant

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

within sixty (60) days after Tenant's receipt of Landlord's termination notice.

    16.  <u>Condemnation</u>.

    (a)  <u>Definition of Taking and Substantial Taking</u>.  For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, Landlord's Parcel or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, Landlord's Parcel or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Landlord's Parcel and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, and, with respect to any Common Areas located outside of Tenant's Preferred Area, Landlord's failure to provide substantially equivalent alternative Common Areas reasonably acceptable to Tenant within sixty (60) days after such Taking, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of 4.75 spaces (for full-sized automobiles) per 1000 square feet of ground-floor gross leasable area or that

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, (iii) so much of the Common Area Easement described in paragraph 6(d) above located within Tenant's Preferred Area that access to the Premises is impeded; or (iv) so much of the Common Area Easement described in paragraph 6(d) above located outside of Tenant's Preferred Area such that access to the Premises is materially impeded and renders unsuitable, in Tenant's reasonable opinion, the continued feasible and economic operation of the Premises by Tenant for the same purpose as immediately prior to such Taking or as contemplated herein provided Landlord does not provide a substantially equivalent access outside of Tenant's Preferred Area within sixty (60) days after such Taking.

(b)  <u>Tenant's Rights Upon Taking or Substantial Taking</u>. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.  Further, if there is a Taking of Substantially All of the Premises within the last two (2) years of the Main Term or of

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

any Option Period, then this Lease shall terminate at Landlord's or Tenant's option, such option to be exercised by notice to the other within thirty (30) days after such Taking of Substantially All of the Premises (however, at Tenant's option, Tenant may delay such termination for a period not to exceed ninety (90) days after Tenant's receipt or sending of such notice). However, if Landlord exercises such termination option, then Tenant shall have the right to nullify such termination by notifying Landlord that Tenant will exercise at least one (1) Renewal Option, which notice shall be made by Tenant within sixty (60) days after Tenant's receipt of Landlord's termination notice.

(c) <u>Tenant's Rights Upon Less Than Substantial Taking</u>. In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration. If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

ability to conduct business for a period in excess of sixty (60) days, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)  <u>Landlord's Obligations Upon Any Taking</u>.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all of the Common Areas within Tenant's Preferred Area, at least 100,000 square feet (exclusive of the Premises) of the ground-floor gross leasable area in the Additional Areas and such additional Common Areas as are required to serve the portion of the Additional Areas so restored such that they constitute a complete architectural unit and serve the function originally intended.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of Landlord's Parcel leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of Landlord's Parcel whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Landlord's Parcel will be reconstructed to its former condition within reasonable time.

(e)  <u>Rights Upon Temporary Taking</u>.  In the event of a Taking of the Premises, the Common Areas and/or any other area

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

within the Landlord's Parcel or any portion thereof, for temporary use (specifically one not exceeding ninety (90) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect without any abatement or reduction in rent.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of ninety (90) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)  <u>Taking of the Pylon Sign(s)</u>.  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, including, without limitation Pylon Sign 1 and the Pylon Sign 1 Easement, Landlord shall provide a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(g)   Tenant's Right Upon Condemnation.   In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

17.   Assignment and Subletting.

(a)   Tenant shall have the right to sublet, assign, transfer, reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent.   In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord arising hereunder (except as otherwise provided in paragraph 4(b) above) to the extent that this Lease is not changed, modified or amended in any respect by Landlord and any transferee without Tenant's written consent (which may be withheld for any or no reason).

(b)   Notwithstanding the foregoing, if Tenant desires to enter into an isolated transaction involving the Premises only and such transaction involves the assignment of the Lease or a subletting of substantially all of the Premises (as opposed to less than substantially all of the Premises, which is not subject to the provisions of this paragraph 17(b)) and such assignment or subletting constitutes a Transfer, then the provisions of this paragraph 17(b) shall apply.   Tenant shall first notify Landlord

67

("Tenant's Notice") and Landlord shall have the right to terminate
this Lease pursuant to the provisions of this paragraph 17(b).
Landlord shall have thirty (30) days after Landlord's receipt of
Tenant's Notice in which to notify Tenant that Landlord elects to
terminate this Lease ("Landlord's Termination Notice"), TIME BEING
OF THE ESSENCE. If Landlord fails to send Landlord's Termination
Notice to Tenant within such thirty-day period, then Landlord shall
be deemed to have waived its right to terminate this Lease pursuant
to the provisions of this paragraph 17(b), and Tenant shall
thereafter be free to assign this Lease or sublease substantially
all of the Premises provided such sublease or assignment is entered
into within one (1) year of Tenant's Notice. If Landlord sends
Landlord's Termination Notice within such thirty-day period, then
(i) this Lease shall terminate on a date selected by Tenant in a
notice sent by Tenant to Landlord within fifteen (15) days after
Tenant's receipt of Landlord's Termination Notice (which
termination date shall not be less than thirty (30) days and not
more than two hundred-seventy (270) days after Tenant's receipt of
Landlord's Termination Notice) and (ii) Landlord shall pay to
Tenant, on or before such termination date, the "Unamortized
Amount" (as defined below); and thereupon this Lease shall
terminate as if such termination date was the natural expiration
date of this Lease. The term "Unamortized Amount" shall mean the
amount equal to the then unamortized amount of the "Costs" (as
defined below) as of the date of termination. The term "Costs"
shall mean the amount which is equal to the expenditures made by

68

Tenant in making leasehold improvements (other than furniture, fixtures and equipment) to the Premises during the Term in excess of the Tenant Improvement Allowance.  It is understood and agreed that the provisions of this paragraph 17(b) below shall not apply to any assignment or subletting which is covered by the provisions of paragraph 17(c) below, unless expressly provided for in paragraph 17(c).

(c)  (i) Furthermore, if Tenant desires, from time to time, to enter into an isolated transaction involving the Premises only and such transaction involves a subletting of less than substantially all of the Premises and such subletting constitutes a Transfer then the provisions of this paragraph 17(c) shall apply. Tenant shall first notify Landlord ("Tenant's Subject Portion Notice") as to the portion of the Premises Tenant intends to sublet ("Subject Portion"), and Landlord shall have the right to terminate this Lease only with respect to the Subject Portion.  Landlord shall have thirty (30) days after Landlord's receipt of Tenant's Subject Portion Notice in which to notify Tenant that Landlord elects to terminate this Lease as to the Subject Portion ("Landlord's Subject Portion Termination Notice"), TIME BEING OF THE ESSENCE.  If Landlord fails to send Landlord's Subject Portion Termination Notice to Tenant within such thirty-day period, then Landlord shall be deemed to have waived its right to terminate this Lease pursuant to the provisions of this paragraph 17(c) as to the subject subletting, and Tenant shall thereafter be free to enter into a sublease for the Subject Portion, provided such sublease is

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

entered into within one (1) year of the date of such Tenant's Subject Portion Notice.

(ii) If Landlord sends Landlord's Subject Portion Termination Notice within such thirty-day period, then this Lease shall terminate as to the Subject Portion on a date selected by Tenant in a notice sent by Tenant to Landlord within fifteen (15) days after Tenant's receipt of Landlord's Subject Portion Termination Notice (which termination date shall not be less than thirty (30) days and not more than two hundred seventy (270) days after Tenant's receipt of Landlord's Subject Portion Termination Notice), and Landlord shall pay to Tenant the "Subject Portion Unamortized Amount" (as defined below) on or before such termination date. Effective as of such termination date, the Subject Portion shall be deemed deleted from the Premises, the Improvements and the Building; the Base Rent shall be the product of (xx) the Base Rent immediately preceding such termination, and (yy) a fraction, the numerator of which shall be the ground-floor gross leasable area of the remaining Building after such termination, and the denominator of which shall be the ground-floor gross leasable area of the Building immediately preceding such termination; and all other charges payable by Tenant hereunder based upon square footage or leasable area shall be based upon the ground-floor gross leasable area of the remaining Building. Effective as of such termination date, neither Landlord nor Tenant shall have any further obligations under this Lease with respect to the Subject Portion, except for those accruing prior to such

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

termination date.   On or before such termination date, Landlord (and/or any Mortgagee and "Ground Lessor" [as defined in paragraph 21 below] if and to the extent any of their consent to a termination of this Lease may be required pursuant to any agreements between Tenant and Mortgagee, or Tenant and Ground Lessor) shall deliver to Tenant an instrument, in recordable form, confirming the release of Tenant from all liability under this Lease with respect to the Subject Portion accruing after such termination date.   If not previously performed by Tenant, Landlord shall, at its own cost and expense, on or before such termination date, divide the Subject Portion from the remainder of the Improvements.   If such work had been previously performed by Tenant, then the cost and expense thereof shall be added to and payable together with the Subject Portion Unamortized Amount. Landlord and Tenant shall execute, acknowledge and exchange joint easements necessary for the continued operation of the Premises as independent store premises.   The "Subject Portion Unamortized Amount" shall equal the Unamortized Amount multiplied by a fraction, the numerator of which shall be the ground-floor gross leasable area of the Subject Portion, and the denominator of which shall the ground-floor gross leasable area of the Building immediately prior to the such termination.

(iii)   Anything contained in this Lease to the contrary notwithstanding,

(A)   if Landlord fails to send Landlord's Subject Termination Notice within such thirty-day period and Tenant entered into

71

a sublease for the Subject Portion and Tenant subsequently desires to assign this Lease or sublease all or any portion of the remaining Premises ("Remaining Premises") and such assignment or subletting constitutes a Transfer, then the provisions of this paragraph 17(c) shall apply to such assignment or subletting and the Subject Portion of the Remaining Premises shall be treated as a new Subject Portion for the purposes of this paragraph 17(c), it being understood and agreed that if Landlord elects to terminate this Lease, this Lease shall terminate as to the Remaining Premises only and the Subject Portion Unamortized Amount shall be based upon the ground-floor gross leasable area of the Remaining Premises, and this Lease shall remain in full force and effect as to the initial Subject Portion except as modified pursuant to the provisions of paragraph 17(c)(ii) above; and

(B)   if Landlord terminates this Lease as to the initial Subject Portion as provided in paragraph 17(c)(ii) above and Tenant subsequently desires to assign this Lease or sublease all or any portion of the Remaining Premises and such assignment or subletting constitutes a Transfer, then the provisions of paragraph 17(b) above shall apply to such assignment or subletting, except that the Unamortized Amount shall be the Subject Portion Unamortized Amount based upon the ground-floor gross leasable area of the Remaining Premises.

(d)   Tenant agrees that Tenant will not subdivide the Building into more than two (2) separate and independent stores in

72

connection with a subleasing of the Premises without Landlord's consent, which consent shall not be unreasonably withheld.

(e)  For the purpose of this paragraph 17 only, "substantially all of the Premises" shall mean at least ninety-five percent (95%) of the Building.

(f)  Notwithstanding the foregoing, the thirty-day period for Landlord to send Landlord's Termination Notice or Landlord's Subject Portion Termination Notice shall be automatically reduced to a fifteen-day period, TIME BEING OF THE ESSENCE, if Tenant's Notice or Tenant's Subject Portion Notice, as applicable, is sent at any time after Landlord has waived Landlord's termination right pursuant to paragraph 18(c) below.

(g)  Anything contained in this Lease to the contrary notwithstanding, Transfers to subsidiaries, affiliates, or related parties, Transfers involving beneficial ownership interests in Tenant, Transfers of more than one (1) of Tenant's stores, and Transfers involving concessions and licenses shall not be deemed a "Transfer" for the purposes of subparagraph (b), (c) and (d) above, and same may be effected without Landlord's knowledge or consent and without triggering Landlord's termination right(s) as provided above.

(h)  Any assignment or subletting of this Lease by Tenant shall be executed by Tenant and the assignee or sublessee.  Each assignee or sublessee, for the benefit of Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant.  After

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

18.  Use.

(a)  Tenant shall initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products, all ancillary to the sale of the Products.

(b)  Thereafter, Tenant shall have the right to use the Premises for any lawful use (which use shall be a retail or retail service use as long as more than forty percent (40%) of the gross leasable area of Landlord's Parcel is then used for retail uses); provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below or described on Exhibit "K" attached hereto provided that Landlord and all of the tenants and occupants of the

74

Shopping Center are subject to such restrictions or, as to any Existing Tenant, as of the date of this Lease, are exempt therefrom under the terms and provisions of their respective leases with Landlord, as of the date of this Lease, by virtue of their locations within the Shopping Center, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenant executed prior to this Lease and shown on <u>Exhibit "F"</u>, or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in <u>Exhibit "F"</u>.

(c)  Tenant covenants to open a fully stocked Circuit City store within two hundred ten (210) days after the delivery of the Land provided that the Tenant Improvement Allowance is paid and the Opening Co-Tenancy Requirement and other conditions set forth in this Lease have been satisfied, and, in all events, subject to force majeure.  However, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.  If operations are permanently ceased in substantially all of the Premises (which for the purposes of this paragraph 18(c), shall mean at least ninety-five percent (95%) of entire the Building), regardless of whether a portion thereof is subleased, unless Landlord has terminated the Lease as to a portion of the Premises as provided in paragraph 17(c) above) for more than six (6) consecutive months, then Landlord shall have the right to terminate the Lease by sending Tenant a termination notice within the sixty-

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

day period immediately after the expiration of such six-month
period, TIME BEING OF THE ESSENCE.  If Landlord fails to send such
termination notice to Tenant within such sixty-day period, then
Landlord shall be deemed to have waived its right to terminate this
Lease pursuant to the provisions of this paragraph 18(c) unless
operations are recommenced and then again permanently ceased in all
of the Premises for more than six (6) consecutive months, Landlord
having the termination right provided by this subparagraph 18(c) as
to each permanent cessation of operations in all of the Premises
for more than six (6) consecutive months.  If Landlord sends such
termination notice within such sixty-day period, then (i) this
Lease shall terminate on a date selected by Tenant in a notice sent
by Tenant to Landlord within fifteen (15) days after Tenant's
receipt of Landlord's termination notice (which termination date
shall not be less than thirty (30) days and not more than sixty
(60) days after Tenant's receipt of Landlord's termination notice)
and   (ii) Landlord shall pay to Tenant, on or before such
termination date, the Unamortized Amount less any sums paid by
Landlord pursuant to paragraph 17 above in the event of a partial
subletting; and thereupon this Lease shall terminate as if such
termination date was the natural expiration date of this Lease.
Anything contained in this Lease to the contrary notwithstanding,
(w) Landlord's termination notice as provided above shall be null
and void if Tenant gives notice to Landlord (the "Re-opening
Notice") within thirty (30) days after receipt of Landlord's
termination notice of Tenant's intention to reopen the Premises

76

and, in fact, operations are recommenced within sixty (60) days of such Re-opening Notice; (x) Landlord's termination right as set forth in this paragraph 18(c) shall not apply if operations are ceased on a temporary basis (such as, by way of example only, because of a fire or other casualty, condemnation, remodelling or in connection with a Transfer provided that Tenant or the then-occupant of all or a portion of the Premises is proceeding with due diligence in attempting to cause operations to be recommenced; (y) Landlord's termination right as set forth in this paragraph 18(c) shall not apply if operations are ceased in some, but not all, of the entire Premises; and (z) Landlord's termination right as set forth in this paragraph 18(c) shall not apply if Tenant shall have sent Tenant's Notice to Landlord pursuant to paragraph 17 above provided that Tenant is proceeding with due diligence in attempting to consummate such assignment or subletting.

19.    <u>Warranties and Representations</u>.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    <u>Quiet and Peaceful Enjoyment</u>.    Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(ii) <u>Title</u>.   Landlord's fee simple interest in Landlord's Parcel is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except the REA and those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on <u>Exhibit "F"</u>, shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises.   Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage.   This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii)    <u>Certificate of Authority</u>.   Landlord covenants that it is a duly constituted limited partnership under the laws of the State of Georgia, and that its general partner who is acting as its signatory in this Lease is duly

78

authorized and empowered to act for and on behalf of the limited partnership. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the limited partnership, and (b) the authority of the general partner to bind the limited partnership as contemplated herein.

(iv) <u>No Litigation</u>. There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or Landlord's Parcel which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v) <u>Hazardous or Toxic Materials</u>. Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents, contractors or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity.  The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi) <u>Tenant's Exclusive Use</u>.   So long as the Premises are used for the initial uses set forth in paragraph 18 (including, without limitation, any period when restoration or remodelling work is being conducted) and Tenant is subject to the "Michaels Exclusive" (as defined in <u>Exhibit "F"</u> annexed hereto and made a part hereof), the store to be operated by Michaels in the Shopping Center shall not be entitled to sell or rent (or rent to own) any of the Products.  Notwithstanding the exclusive rights of Tenant as set forth herein, Michaels shall not be deemed in violation thereof provided that the Michaels store is operated and merchandised in substantially

80

the same manner as other Michaels stores are operated and merchandised on a national basis as of March 15, 1996.

(vii)     <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)     <u>Prohibited Activities</u>. Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in Landlord's Parcel for any of the prohibited uses listed on <u>Exhibit "K"</u> attached hereto, which uses Landlord represents are the only uses prohibited by the Existing Leases as of the date hereof, or for use as:

(A) a bar, pub, nightclub, music hall or disco in which less than sixty percent (60%) of its space or revenue is devoted to and derived from food service;
(B) a bowling alley;
(C) a billiard or bingo parlor;
(D) a flea market;
(E) a massage parlor;
(F) a funeral home;
(G) a facility for the sale of paraphernalia for use with illicit drugs;
(H) a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);
(I) an off-track betting parlor;
(J) a carnival, amusement park or circus;
(K) a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K); however, one (1) gas station (with or without an ancillary convenience store and/or

81

ancillary car wash) or one (1) auto repair facility shall be permitted either on Outparcel A or D (but not both) provided that, in the case of an auto repair facility such facility is owned and operated by a national auto repair chain;

(L) a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M) a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community oriented retail and commercial shopping center or the operation of a high quality retail facility;

(N) a skating rink;

(O) a laser tag or virtual reality facility, an arcade, pinball or computer gameroom, provided that retail facilities in the Shopping Center may display for sale [but not solely for entertainment purposes] electronic games incidental to their primary operations); however, a Discovery Zone, Chuck E. Cheese, Showbiz Pizza or other similar operation shall be permitted provided same is located more than 300 feet from the front entrance of the Building;

(P) service-oriented offices (such as, by way of example, medical or employment offices or dry cleaning establishments) and other nonretail uses except for offices and storage facilities incidental to a primary operation; provided, however, (aa) travel, real estate and insurance agencies and satellite dry cleaning establishments (i.e., drop-off and pick-up only with no cleaning and laundering facilities on premises) and banks and brokerage houses shall be permitted anywhere on Landlord's Parcel, and (bb) other service oriented offices and medical and employment offices shall be permitted provided same are at least three hundred (300) feet from the front entrance of the Building, and provided further that agencies, establishments and offices permitted under (aa) and (bb) above do not exceed, in the aggregate, ten percent (10%) or more of the ground-floor gross leasable area of Landlord's Premises;

(Q) a banquet hall, auditorium or other place of public assembly;

(R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers); provided however that an ancillary training facility providing infrequent training^in connection with a permitted retail use shall not be deemed a violation of this clause (R); 

(S) a theater of any kind; or

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]


and having no more than sixty (60) students at one time

(T) a gymnasium, karate studio, sport or health club or spa; however, a karate studio, sport or health club or spa, but not a gymnasium, shall be permitted provided same is not located within three hundred (300) feet from the front entrance of the Building.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building on Landlord's Parcel which is located in the space identified as Major Tenant "C" as identified on the Site Plan or within the building(s) to be located between Major Tenant "C" and Major Tenant "D" as identified on the Site Plan ("Shop Space"); however one (1) "Subway" sub-shop or similar-type operation containing fewer than 2,400 square feet of ground-floor gross leasable area shall be permitted in the Shop Space.  In addition, no auction, fire or going-out-of-business sale shall be conducted on Landlord's Premises.

In no event shall the foregoing restrictions and prohibitions apply to the Existing Tenants under the Existing Leases as of the date of the execution of this Lease (without regard to any amendments thereto made after the date of the execution of this Lease) which do not contain comparable restrictions or prohibitions.

Anything contained herein to the contrary notwithstanding, Landlord and Tenant shall not be in violation of this Lease if Landlord uses any portion of Landlord's Parcel and/or Tenant uses any portion of the Premises for any use set forth on Exhibit "K" if such use is not prohibited by the terms of an Existing Lease as of the date of the execution

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

of this Lease (without regard to any amendments thereto made after the date of the execution of this Lease), unless such use is otherwise prohibited by the terms and provisions of this Lease (such as, by way of example, if a theater is prohibited by virtue of an Existing Lease in all of the Shopping Center except for that part of the Shopping Center to the south of Major Tenant "D" as shown on the Site Plan, Landlord would still not be permitted to have a theater in such portion of the Shopping Center since paragraph 19(a)(viii)(S) prohibits a theater anywhere on Landlord's Parcel).

(ix) <u>Site Covenants</u>. With regard to the development of Landlord's Premises and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)   <u>Building Height and Location.</u> No building within Landlord's Premises located to the north of the southern demising wall of Major Tenant "D" (Service Merchandise) shall exceed the height of the Building (except that architectural elements, including parapets, can exceed the height of the Building provided same do not exceed thirty-two (32) feet in height as measured from grade level) as measured from the grade level of each building, regardless of any grade differential, nor shall any such building (including any appurtenance thereto, such as, by way of example, a canopy affixed

84

thereto) be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area and no building located on an outparcel elsewhere in the Shopping Center shall exceed one story or eighteen (18) feet in height; however, the eighteen-foot height restriction shall not apply to Outparcel D and Outparcel A provided, as to Outparcel A only, the height of any building constructed thereon shall not exceed twenty-five (25) feet in height. Nor shall any building located on any outparcel (including, without limitation, the Outparcels) exceed the size necessary for such outparcel to maintain, within its boundaries, the parking ratio required for its use under the applicable zoning code without use of parking spaces located in the Common Areas.

(B)   Construction and Alterations.  Following the end of the first Lease Year, no construction shall be permitted in Tenant's Preferred Area during the months of November and December, except for interior alterations not affecting the operations of any other occupant of the Shopping Center and except for emergency repairs or repairs initiated by and required by governmental bodies pursuant to applicable law.  Landlord may permit or

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

undertake construction on areas outside of Tenant's Preferred Area at any time provided that such construction does not adversely affect the visibility of Tenant's Building or any of Tenant's signage, access to and from the Premises and Landlord's Parcel, or Tenant's operations or business at the Premises. In the event of any construction within Landlord's Parcel, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of Landlord's Parcel and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view. With regard to any construction on Landlord's Parcel, Landlord shall be solely responsible for any governmentally imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges. The development of Landlord's Premises shall be subject to the following limitations, in addition to other limitations and restrictions set forth in this Lease: (x) no building or similar improvements shall be built in areas other than the "Permissible Building Areas" depicted on the Site Plan; (y) except to the extent required (other than because of development occurring in Landlord's Parcel) by applicable law, the Common Area

86

(including, without limitation, changes in the location of curbcuts, parking aisles, drive aisles, roadways, truck access, sidewalks and parking spaces or reduction of the parking ratio specified in paragraph 5) located within Tenant's Preferred Area shall not be changed without Tenant's express written consent, which Tenant may, in its sole discretion, withhold; the Common Areas located outside of Tenant's Preferred Area shall not be changed in any manner so act to adversely affect the visibility of the Premises or any of Tenant's signs or access (including, without limitation, customer and truck) to the Premises and the Shopping Center.

(C)   Prohibited Uses in Common Areas. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas on Landlord's Parcel:   (1) advertisements or signs except for the pylon and/or monument signs described in paragraph 8, pylon or other signs on Outparcels provided same do not adversely affect the visibility of any of Tenant's signs (including, without limitation, any of Tenant's panels on pylon signs) or the Premises, temporary signs announcing the construction of the Shopping Center, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise, except for sidewalk sales similar in nature and duration to those permitted to be

87

conducted by Tenant pursuant to paragraph 6(d) above; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas (the parties hereby acknowledging that such loudspeakers may be utilized on the Home Depot Parcel); or (4) imposition of a charge for parking.  Landlord further covenants that it will not seek, nor permit any other occupant of Landlord's Parcel (other than the owner or occupant of the Outparcels, it being understood and agreed that the owner or occupant of the Outparcels are not permitted to use any of the parking spaces in the balance of the Shopping Center to satisfy any of its parking requirements) to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center under the zoning code or other applicable ordinance establishing the ratio of parking spaces to building area or otherwise mandating the number of parking spaces required for the Shopping Center and the uses contained therein (unless the need for such variance arises solely from a taking by virtue of eminent domain). Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be agreed upon by Landlord and Tenant.  Until such time as Landlord and Tenant agree otherwise, the location of such

88

employee parking areas shall be ~~a~~ as depicted on the Site

Plan.

(D)  Easements.  Landlord shall not subdivide (other than the Outparcels), parcel or otherwise divide Landlord's Parcel or create any easements in the Common Areas located on Landlord's Parcel without Tenant's prior written consent, except for the granting of customary underground utility easements and the like which do not affect Tenant's rights as to the Common Areas.

(x)  Interference with Tenant's Reception/Transmission.  Landlord shall not knowingly install or permit to be installed by Landlord, any other tenant or other person anywhere in the Shopping Center, any radio or other transmitting equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

(xi) Notices Affecting the Premises.  Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises or the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(xii)      Constructive Trust.   Landlord covenants
that all sums paid by Tenant to Landlord and intended for
payment by Landlord to a third party (such as, by way of
example, taxes and certain elements of CAM Charges) are given
to Landlord in trust and shall be applied only for such third-
party payments, as and when due.

(xiii)    REA.

(A)  The REA is in full force and effect; Landlord
has not received any notice of any default under the REA,
nor notice of any condition or circumstances which, with
notice or the lapse of time, or both, could become a
default under the REA; and the REA has not been modified
or amended in any regard except for the amendment
contemplated by paragraph 37(j) below.

(B) Tenant shall have and enjoy, and Landlord hereby
grants to Tenant, all of the rights, benefits, easements,
privileges and the like which are granted to Landlord
under the REA.

(C)  Landlord covenants and agrees to carry out and
perform all of the terms, covenants and conditions of the
REA on Landlord's part to be performed.

(D)  Landlord agrees to defend and indemnify Tenant,
and hold Tenant harmless, from and against any and all
claims, demands, causes of actions, suits, damages,
liabilities and expenses of any nature whatsoever arising
out of or in connection with a claimed breach of the REA

90

by Landlord, or any covenant, term, condition or provision thereof, or in connection with the termination of the REA.

(E) Landlord agrees, on notice from Tenant, to enforce the provisions of the REA against all parties and other persons that are subject thereto. In the event that Landlord fails to enforce the REA as provided in this subparagraph, Tenant shall have the right, after fifteen (15) days notice to Landlord requesting enforcement of the REA, to enforce the REA on Landlord's behalf as its agent and/or attorney-in-fact. Tenant shall be permitted to offset any costs incurred in the enforcement of the REA, together with interest thereon at the Default Rate, against Base Rent, CAM Charges and any and all other amounts and charges due Landlord under this Lease, provided that Tenant's right to offset any amounts due by Landlord to Tenant against Base Rent due under this Lease shall be limited to fifty percent (50%) of the installment of Base Rent that is due and payable at any particular time, until the total amount due by Landlord to Tenant has been repaid in full plus interest as aforesaid, subject to Tenant's being able to re-coup all amounts due to Tenant prior to the expiration of the Term (without regard to the exercise of any additional Renewal Options, however, if Tenant is not able to re-coup such

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

amounts prior to the expiration of the Term, the amount of the maximum offset shall be increased pro-rata).

(F)  Whenever, pursuant to the REA, consent shall be required by or requested from Landlord, or an election made by Landlord, and such consent or election would affect, in any manner, Tenant's Preferred Area or the access point located on the Home Depot Parcel along Peoples Street immediately to the north of the boundary between Landlord's Parcel and the Home Depot Parcel or the drive aisle connecting the Home Depot Parcel and Landlord's Parcel, such consent shall not be granted nor election made without the prior consent of Tenant (which consent may be withheld at Tenant's sole discretion). Landlord further agrees that whenever, pursuant to the REA, consent shall be required by or requested from Landlord, or an election made by Landlord, and such consent or election would likely affect areas of the Shopping Center outside of Tenant's Preferred Area and the aforesaid access point or drive aisle, such consent shall not be granted nor election made without the prior consent of Tenant (which consent may be withheld at Tenant's sole discretion) if the granting of such consent or election would have an adverse affect on the visibility of Tenant's Building or any of Tenant's signage, access to and from the Premises and Landlord's Parcel, the parking ratio required to be maintained

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

pursuant to paragraph 5 above, Tenant's operations or business at the Premises or Tenant's rights under this Lease.

(G)    Landlord shall not amend or modify the REA without the prior consent of Tenant (which consent may be withheld at Tenant's sole discretion) if such amendment or modification would affect Tenant's Preferred Area in any manner or, with respect to areas outside of Tenant's Preferred Area, would adversely affect the visibility of Tenant's Building or any of Tenant's signage, access to and from the Premises and Landlord's Parcel, the parking ratio required to be maintained pursuant to paragraph 5 above, Tenant's operations or business at the Premises, or Tenant's rights under this Lease.  Landlord shall not terminate the REA without the prior consent of Tenant (which consent may be withheld at Tenant's sole discretion).

(H)    Landlord shall provide Tenant copies of all notices (including, without limitation, default notices) received by it or which are sent by it (concurrently with the sending thereof) in connection with the REA.

(xiv)    <u>Height of Building</u>.    Landlord represents and warrants that the proposed height of the Building, as shown on Attachment "11" of the Construction Provisions, does not violate the restriction attached hereto as <u>Exhibit "L"</u>, and Landlord further agrees that

93

Landlord's approval of the Plans and Specifications shall be deemed an affirmation of such representation and warranty as to the height of the Building as shown on the Plans and Specifications.

(xv) <u>Third-Party Approvals</u>. Landlord represents and warrants that there are no approvals and consents, including approvals or consents from other tenants in the Shopping Center, necessary in connection with the entering into this Lease or the performance by Tenant of any of its rights under this Lease.

(b) Tenant represents, warrants and covenants to Landlord that:

(i) <u>Tenant's Authority</u>. Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii) <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant

94

harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)  In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or per-formance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

20. <u>Estoppel Certificates.</u>  Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested.  Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.  <u>Subordination, Non-Disturbance and Attornment</u>.

Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all "Ground Leases" (as defined below) and any and all "Mortgages" (as defined below) encumbering the Premises and placed thereon by Landlord, a non-disturbance and attornment agreement in the form of <u>Exhibit "G"</u> hereto attached, executed by the Landlord under any such Ground Lease ("Ground Lessor") or the holder of such Mortgage

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

("Mortgagee"), as applicable. In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement in the form of Exhibit "G" executed by Ground Lessor or Mortgagee (as applicable) with regard to all future Ground Leases and Mortgages and with regard to all renewals, modifications, replacements and extensions of such Ground Leases or Mortgages. Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Ground Lease or Mortgage.

In the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes a writing in favor of Tenant which states the following (provided Tenant is not in uncured material default beyond the expiration of any applicable grace periods): (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof. In the event of termination of the Ground Lease, Tenant shall attorn to any Ground Lessor from whom Tenant has received a non-disturbance agreement in accordance with this paragraph 21. In the event of a conflict between the terms of this subparagraph and the terms of a subordination, non-disturbance and attornment agreement previously executed by Tenant, the terms of such previously executed subordination, non-disturbance and attornment agreement (as executed by Tenant) shall prevail as to the Mortgagee that is a party to such subordination, non-disturbance and attornment agreement.

Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37(b) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises, and the term "Ground Lease" shall mean any ground lease or master lease affecting the Premises.

22. <u>Change of Landlord</u>. Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

under this Lease for a particular Mortgagee

terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. In the event that Landlord's interest in the Premises passes to a Successor and such Successor is bound unto Tenant as set forth above, Landlord shall be released from all obligations to Tenant hereunder arising after the date Landlord's interest so passes, except that Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's transfer of its interests hereunder and/or Landlord's failure to provide Tenant with notice of such Successor. Notwithstanding the foregoing, in no event shall Landlord's indemnity hereunder apply to the acts of a Successor after the date of transfer.

23. <u>Tenant's Financing</u>. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including a reasonable period of time to foreclose or otherwise take possession of the Premises in a diligent manner, if necessary to effect such cure). In addition, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.  <u>Tenant's Property and Waiver of Landlord's Lien</u>.  All of the Personalty shall be and remain the personal property of Tenant. Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.

25.  <u>Memorandum of Lease; Commencement Date Agreement</u>. Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto

100

as Exhibit "I", once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  The provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26. Expiration of Term and Holding Over.  All of the Personalty shall be removable by Tenant any time prior to, or within fifteen (15) days after, the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within fifteen (15) days after the expiration or termination of this Lease.  In the event Tenant fails to remove any or all of its Personalty within the said fifteen (15) day period, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be placed into storage and thereafter charge Tenant the cost of such removal and storage, together with interest thereon at the Default Rate.  Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord.  (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".)  Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]