# EXHIBIT B Part 2

business therein, ordinary wear and tear, casualty and condemnation excepted. Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises. No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at 115% of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

27. "For Rent" Signs. Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, on the parking lot of the Shopping Center. Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28. Force Majeure. Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions.

29. <u>Events of Tenant's Default</u>. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a) <u>Failure to Pay Rent; Breach.</u>  (i) Tenant's failure to make any payment of money required by this Lease (including, without limitation, Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so

103

long as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b) <u>Bankruptcy</u>. Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

30. <u>Landlord's Remedies</u>. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a) <u>Continue Lease</u>. Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due, including any sums due for any Option Period for which a Renewal Option has been exercised. In the alternative, Landlord shall have the right to peaceably re-enter the Premises on the terms set forth in subparagraph (b) below, without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof. Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Premises in excess of the rent provided in this Lease, but such excess shall reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b) <u>Terminate Lease</u>. Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than fifteen (15) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination,

105

Landlord shall be entitled to recover from Tenant all of the following:

(i) The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii) The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until what would have been the expiration of the then-current Term (which shall not include any unexercised Renewal Options) exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 30(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of six percent (6%) for past due obligations, and a discount rate to net present value computed using a discount rate equal to the then effective rate on obligations of the U.S. Treasury having a maturity closest to the number of months remaining in the then-current Term (which shall not include any unexercised Renewal Options) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.  In the event this Lease or Tenant's right to possession shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

persons and property therefrom, by summary dispossession proceedings. Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)  <u>Reimbursement of Landlord's Costs in Exercising Remedies</u>. Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, such reasonable and actual expenses as Landlord may incur in recovering possession of the Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)  <u>Remedies Are Cumulative</u>.  The various rights and remedies reserved to Landlord herein, are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease). Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

dispossess tenants from commercial properties without the benefit of judicial review.   Anything contained in this Lease to the contrary notwithstanding (including, without limitation, paragraphs 30(a) and (b) above), Landlord shall not have the right to re-enter the Premises, relet the Premises or terminate this Lease in the event of an immaterial Event of Default.

(e)   <u>Self-help</u>.   In addition to the foregoing remedies of Landlord, upon the occurrence of an Event of Default by Tenant respecting Tenant's failure to carry the insurance required by paragraph 14 above only and provided that Tenant has not elected to self-insure any such insurance obligations pursuant to paragraph 14 above and provided further that LandLord shall have sent Tenant a second notice of Tenant's failure to obtain such insurance specifying that Landlord will obtain such insurance at Tenant's cost if Tenant fails to obtain such insurance within fifteen (15) days after Tenant's receipt of such second notice, then Landlord, at Landlord's option, may obtain such insurance on Tenant's behalf. In such event, Tenant shall reimburse Landlord, as additional rent, for the actual and reasonable cost of such insurance premium(s) within thirty (30) days after Tenant's receipt of the required insurance policy(ies) and a paid receipt with respect to the insurance premium(s).

31.   <u>Events of Landlord's Default; Tenant's Remedies</u>.   Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (a) Landlord's failure to make any payments of money due Tenant hereunder within ten (10) days

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate); or (b) Landlord's failure to perform any material nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances.

Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable and actual cost of performance, including any and all transaction costs and attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder, provided that Tenant's right to offset any amounts due by Landlord to Tenant against Base Rent due under this Lease shall be limited to fifty percent (50%) of the installment of Base Rent

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

that is due and payable at any particular time, until the total amount due by Landlord to Tenant has been repaid in full plus interest as aforesaid, subject to Tenant's being able to re-coup all amounts due to Tenant prior to the expiration of the Term (without regard to the exercise of any additional Renewal Options, however, if Tenant is not able to re-coup such amounts prior to the expiration of the Term, the amount of the maximum offset shall be increased pro-rata) or (ii) in the event of a material Event of Default only, withhold Base Rent, CAM Charges and any other payments due to Landlord under this Lease until the earlier of (y) one (1) year from the date of the Event of Default or (z) such Event of Default, including payment of interest and transaction costs specified in subsection (i) above, is cured by Landlord, provided that if the Event of Default is not cured at the end of such one-year period, then Tenant shall either resume the payment of Base Rent, CAM Charges and other payments due Landlord under this Lease (not including amounts withheld from Landlord if the Event of Default is not yet cured) or terminate this Lease (in which event Tenant may sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above), or (iii) terminate this Lease and sue for damages, including interest, transaction costs and attorneys' fees as specified in subsection (i) above. Notwithstanding clause (iii) above, Tenant shall have no right to terminate this Lease in the event of an immaterial default by Landlord, and, in the event of a Landlord default where Tenant has the right to terminate this

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Lease, Tenant shall not terminate this Lease unless Tenant shall have provided any Mortgagee with whom Tenant has entered into a subordination, non-disturbance and attornment agreement with notice and an additional thirty-day opportunity to cure such default.  If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in the Construction Provisions in addition to those provided herein; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.  All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in Landlord's Parcel (which liens shall be subordinate to any Mortgage now existing or hereafter created provided that there is a subordination, non-disturbance and attornment agreement in effect between Tenant and such Mortgagee) which may be enforced by non-judicial means available under State law, or any other applicable proceedings.  The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.

32.  <u>Waiver</u>.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease.  Either party may accept late payment or performance by

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

the other without waiving any Event of Default which may then have accrued.

33. <u>Compliance with Applicable Laws</u>.    During the Term, Landlord and Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters, respecting Tenant's use and occupancy of the Improvements.    As between Landlord and Tenant, Landlord shall be required to make any alterations or improvements to the Premises necessary to comply with laws of general applicability and any alterations or improvements to the structure of the Building, whether necessary to comply with laws of general applicability or due to Tenant's specific use or manner of use of the Premises, and Tenant shall be required to make such alterations or improvements (other than structural alterations or improvements which Landlord shall be required to make) required by virtue of Tenant's specific manner or use of the Premises.    In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent.    In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from installments of Base Rent, provided that Tenant's right to offset any amounts due by Landlord to Tenant against Base Rent due under this Lease shall be limited to fifty percent (50%) of the installment of Base Rent that is due and payable at any particular time, until the total amount due by Landlord to Tenant has been repaid in full plus interest as aforesaid, subject to Tenant's being able to re-coup all amounts due to Tenant prior to the expiration of the Term (without regard to the exercise of any additional Renewal Options, however, if Tenant is not able to re-coup such amounts prior to the expiration of the Term, the amount of the maximum offset shall be increased pro-rata).    Nothing herein shall negate Tenant's or Landlord's right to challenge any such law or other requirement in administrative and/or judicial proceedings and Tenant or Landlord, as applicable, may defer compliance pending the outcome of such challenge provided that such challenge does not jeopardize the

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

rights or operations of the other party and/or the failure to perform such work during the period of such challenge does not result in there being an unsafe condition. Landlord and Tenant, as applicable, shall reasonably cooperate with each other in any such challenge, at no cost to the cooperating party.

34. <u>Notices</u>. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

```
If to Tenant:        CIRCUIT CITY STORES, INC.
                     9950 Mayland Drive
                     Richmond, Virginia 23233
                     Attention:  Corporate Secretary

with a copy to:      CIRCUIT CITY STORES, INC.
                     9950 Mayland Drive
                     Richmond, Virginia 23233
                     Attention:  Vice President of Real Estate


If to Landlord:      JOHNSON CITY CROSSING, L.P.
                     c/o Ben Carter Properties, Inc.
                     950 Paces Ferry Road
                     Suite 975
                     Atlanta, Georgia 30326

with a copy to:      SUTHERLAND, ASBILL & BRENNAN
                     999 Peachtree Street, N.E.
                     Atlanta, Georgia 30309-3996
                     Attention:  James B. Jordan, Esq.
```

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

35. <u>Brokers</u>. Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Jones Realty & Construction Corporation. Landlord shall be responsible, pursuant to a separate written agreement for any commission due any third party including, without limitation, the Broker (but excluding any claims resulting from a breach of Tenant's indemnity provided immediately below). Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses hereunder claiming under the indemnifying party, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder claiming by, through or under the indemnifying party. Landlord shall provide Tenant with a copy of all brokerage agreements executed in connection with this Lease.

36. <u>Miscellaneous</u>.

(a) <u>Headings and Gender</u>. All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease. The masculine, feminine or neuter gender and the singular or plural

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

number shall be deemed to include the others whenever the context so requires or indicates.

(b) <u>Construction</u>. The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c) <u>Waiver of Jury Trial</u>. In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d) <u>Relationship of Landlord-Tenant</u>. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e) <u>Entire Agreement; Merger</u>. This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein. This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f) <u>Attorneys' Fees</u>. In the event either party shall be required to commence or defend any action or proceeding against any

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

(g)  Partial Invalidity.  If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)  Consents.  Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)  Holidays.  If the day on which rent or any other payment due hereunder is payable falls on a Sunday or on a legal holiday, it shall be payable on the following business day.

(j)  Applicable Law.  This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(k)  <u>Successors and Assigns</u>.  All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)  <u>Counterparts</u>.  This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)  <u>Trademarks and Trade Names</u>.  All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

37.  <u>Effectiveness of Lease; Tenant's Right to Terminate</u>. Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)  Tenant's receipt, simultaneously with or prior to the execution hereof, of: (i) a commitment for leasehold policy of title insurance for the Shopping Center; (ii) copies of all underlying documents referred to in said commitment for title insurance; and (iii) Landlord's most current survey and, if applicable, an aerial photograph of the Shopping Center and Tenant's approval of the foregoing in writing within thirty (30) days hereof.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(b)   Landlord's   delivery   of   subordination,   non-disturbance and attornment agreements executed by any and all existing Mortgagees and Ground Lessors in a form satisfactory to Tenant simultaneously with the execution hereof.

(c)   Landlord's delivery of the Land by ~~September 15~~, *Nov. 1* 1996 and in the condition specified in the Construction Provisions.

(d)   Tenant's obtaining: (i) written confirmation from appropriate local authorities, within thirty (30) days of execution hereof, that current zoning, subdivision and use regulations allow construction of the Improvements on the Premises; and (ii) the required City, County and State permits and approvals to construct said Improvements on the Premises no later than thirty (30) days from the date hereof.  Tenant agrees to apply for such permits promptly as provided herein, to use due diligence and to expend any necessary application or other fees to secure such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval, or require Tenant to obtain any approval or permit Landlord is required to obtain pursuant to this Lease (including, without limitation, permits and approvals for the Landlord Work).

(e)   Landlord's   representations,   warranties   and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate in all material respects as of the date of delivery of the Land (as defined in the Construction Provisions).

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(f)   Prior to delivery of the Land to Tenant, Tenant's obtaining from Landlord copies of soils and Hazardous Substances reports satisfactory to Tenant.   It is acknowledged by the parties that the condition set forth in this clause "(f)" has been satisfied.

(g)   Tenant's obtaining satisfactory assurances, within thirty (30) days of execution hereof, that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto in amounts sufficient to support Tenant's operations.

(h)   Tenant's obtaining satisfactory assurances that all necessary approvals and consents, including approvals or consents from other tenants in the Shopping Center, and all necessary reciprocal use and easement agreements have been obtained prior to the date of execution hereof.   It its acknowledged by the parties that the condition set forth in this clause "(h)" has been satisfied by Landlord's representations and warranties set forth in paragraphs 19(a)(xiii) and (xv) above.

(i)   Tenant's obtaining satisfactory written assurances that Landlord has obtained financing adequate to fund the Tenant Improvement Allowance and development of the remainder of the Shopping Center.

With respect to Tenant's approval of any of the items referenced in (a), (b), (g), and (i), Tenant shall be deemed to have approved same if Tenant has not disapproved same within the

120

time period provided therein, or, if no time period for approval is expressly provided, Tenant shall be deemed to have approved same if Tenant has not disapproved same within fifteen (15) days after Tenant's receipt of the particular item.

The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event that any of conditions (b), (c), (e), or (i) shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions.  In the event that any of conditions (a), (d) or (g) shall not be met, satisfied or waived within thirty (30) days of the execution hereof, Tenant may either terminate this Lease in the same manner as provided above, or waive such conditions.  If Tenant fails to terminate this Lease as provided in the preceding sentence within such thirty-day period, Tenant shall be deemed to have waived its right to terminate this Lease as to conditions (a), (d) and (g) of this paragraph 37.  In the event of termination pursuant to this paragraph 37, the rights and

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord.

The delivery of this executed lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 37. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord, without delay, execute and return same to Tenant in accordance with any instructions delivered by Tenant or its legal counsel. In the event Landlord fails to immediately execute and return the Lease, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

38. Confidentiality. The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction. This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

on behalf of the parties hereto. The parties hereto agree to use their best reasonable efforts to avoid discussing with, or disclosing to, any third parties (except those parties listed above) any of the terms, conditions or particulars in connection with this transaction. It is specifically agreed by way of illustration, but not by limitation, that the covenant of confidentiality set forth herein shall not be breached if such information is disclosed in connection with or due to any governmental law or ordinance, but this covenant of confidentiality shall be breached if Landlord, or any of Landlord's developers, bankers, accountants, agents, lenders, lawyers or other similar parties, discloses the content of, or delivers a copy of this Lease to, any third party without the express written consent of all parties to this Lease. Any breach of this confidentiality agreement shall constitute an Event of Default under the terms and provisions of this Lease.

39. Opening Co-tenancy. Prior to the Commencement Date, Home Depot shall have acquired title to the Home Depot Parcel and no less than 50,000 square feet of additional gross leasable area in the Shopping Center (exclusive of Home Depot and Tenant) shall be open, or be opening simultaneously, for business to the public ("Opening Co-Tenancy Requirement"). Anything contained in this Lease to the contrary notwithstanding, Tenant shall not be obligated to open its store for business to the public until the Opening Co-Tenancy Requirement has been satisfied. However, Tenant shall have the right, in its absolute and sole discretion, to open

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

its store prior to the satisfaction of the Opening Co-Tenancy Requirement, in which event Tenant shall receive a sixty percent (60%) abatement of Base Rent.  Such abatement shall automatically cease from and after the date that the Opening Co-Tenancy Requirement is satisfied.

WITNESS the following signatures and seals:

LANDLORD

JOHNSON CITY CROSSING L.P.,
a Georgia limited partnership

By:  JC Crossing, LLC, a Georgia limited liability company, as sole general partner

ATTEST (WITNESS):

By: _____
Name: Steven Cadranel
Title: Vice President

TENANT

CIRCUIT CITY STORES, INC.,
a Virginia corporation

ATTEST:

Its: Assistant Secretary

By: _____
Name: BENJAMIN B. CUMMINGS, JR.
Title: VICE PRESIDENT

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

## EXHIBIT "A"

### SITE PLAN

Components:    Shopping Center

Landlord's Parcel

Gross leasable area of Landlord's Parcel

Premises (outlined in red)

Tenant's Preferred Area

Permissible Building Areas

Customer Pick-Up

Car Stereo Parking

Home Depot Parcel

Gross leasable area of Home Depot Parcel

Pylon/Monument Signage

Truck Well(s)/Trash Compactor

Outparcels "A" and "D"

Sign Parcel

Pylon Sign 1

Major Tenant "C"

Major Tenant "D"

Buildings between Major Tenant "C" and Major Tenant "D"

Employee Parking Areas

Access point located on the Home Depot Parcel along Peoples Street immediately to the north boundary between Landlord's Parcel and the Home Depot Parcel

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]



## EXHIBIT "A-1"

### SHOPPING CENTER LEGAL DESCRIPTION

Lots 1 and 2 of Johnson City Crossing, Phase I and Lots 3, 4 and 5 of Johnson City Crossing Phase II as of Plat thereof recorded in Plat Book 13, Page 201, Register's Office for Washington County, Tennessee, less and except any portion of the aforesaid Lot 3 lying within the right of way of Peoples Street.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

### EXHIBIT "A-2"

LANDLORD's PARCEL LEGAL DESCRIPTION

Lot 1 of Johnson City Crossing, Phase I and Lots 3, 4 and 5 of Johnson City Crossing Phase II as of Plat thereof recorded in Plat Book 13, Page 201, Register's Office for Washington County, Tennessee, less and except any portion of the aforesaid Lot 3 lying within the right of way of Peoples Street.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

EXHIBIT "B"

INDEX OF DEFINITIONS

| **Term** | **Paragraph where defined** |
|---|---|
| Additional Areas | 14(e) |
| Adjacent Premises | 6(b) |
| Adjacent Premises Items | 6(b) |
| Assessment(s) | Ex. "C", para. 1(a) |
| Base Rent | 4(a) |
| Beneficial Component | 7(c) |
| Beneficial Component Charges | 7(c) |
| Building | 2 |
| CAM Charges | 7(b) |
| CAM Year | 7(c) |
| Certificate | 15(b) |
| ~~Cities~~---------------------------------~~7(b)~~ | |
| City | 1 |
| Commencement Date | 4 |
| Common Area Easement | 6(d) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Construction Term | 3 |
| Costs | 17 |
| CPI-U | 4(a)(iii) |
| Critical Net Worth | 14(d) |
| Date of Taking | 16(a) |

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

| | |
|---|---|
| Default Rate | 9(b) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Elevation Drawing | Ex. "C", para. 2(b) |
| Escrow Agent | 15(b) |
| Event of Default (Landlord) | 31 |
| Event of Default (Tenant) | 29 |
| Exhibit "C" Transfer | Ex. "C", para. 3 |
| Existing Lease | Ex. "F" |
| Existing Tenant | Ex. "F" |
| Foreclosure | 21 |
| GLA | 2 |
| Grading Plans | Ex. "C", para. 1(b) |
| Ground Lessor | 21 |
| Hazardous Substances | Ex. "C", para. 1(a) |
| Home Depot Exclusive | Ex. "F" |
| Improvements | 2 |
| Land | 1 |
| Landlord | Introduction |
| Landlord's Parcel | 1 |
| Landlord's Premises | 1 |
| Landlord's Subject Portion Termination Notice | 17(c) |
| Landlord's Termination Notice | 17 |
| Landlord Work | Ex. "C", para. 1(d) |
| Lease Year | 3 |
| Main Term | 3 |

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

| Term | Paragraph where defined |
|------|------------------------|
| Michaels Exclusive | Ex. F |
| Mortgage | 21 |
| Mortgagee | 21 |
| Non-Ordinary CAM Charges | 7(c) |
| Occupant | 4(b) |
| Opening Co-Tenancy Requirement | 39 |
| Option Periods | 3 |
| Ordinary CAM Charges | 7(c) |
| Other Improvements | 2 |
| Sign Parcel | 6(d) |
| Party Wall | 6(b) |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 23 |
| Plans and Specifications | Ex. "C", para. 2(b) |
| Premises | 1 |
| Pylon Sign 1 Easement | 6(d) |
| Real Estate Taxes | 9(a) |
| Remaining Premises | 17(c) |
| Renewal Option | 3 |
| Re-Opening Notice | 18(c) |
| Restoration Cost | 15(b) |
| Restoration Work | 15(b) |
| Schematic Floor Plan | |

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

| Term | Paragraph where defined |
|------|------------------------|
| and Elevation | Ex. "C", para. 2(b) |
| Shared Footings | 6(b) |
| Shop Space | 19(a)(viii) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Work | Ex. "C", para. 1(b) |
| Site Plan | 1 |
| Soils Report | Ex. "C", para 1(b) |
| Staging Area | 6(a) |
| Standard Proctor | Ex. "C", para. 2(a) |
| State | 1 |
| Subject Portion | 17(c) |
| Subject Portion Unamortized Amount | 17(c) |
| Substantial Completion | Ex. "C", para. 2(e) |
| Substantially All of the Premises | 16(a) |
| Successor | 22 |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Notice | 17 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Tenant's Subject Portion Notice | 17(c) |
| Term | 3 |

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

| **Term** | **Paragraph where defined** |
|---|---|
| Trade Area | 7(b) |
| Transfer | 17 |
| Unamortized Amount | 17 |
| Utility and Drainage Plan | Ex. "C", para. 1(c) |
| Worth at the time of the award | 30(b) |

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Johnson City, Tennessee

EXHIBIT "C"

CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as <u>Exhibit "C"</u>. All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.   <u>Landlord's Delivery of the Land; Other Landlord Work</u>. All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)   <u>Hazardous Substances</u>.   Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances").   Landlord hereby grants Tenant and its agent access to the Premises and Landlord's Parcel to enable Tenant to conduct such soil and environmental tests as its deems necessary.

Landlord, at its sole cost and expense, shall provide a copy of Landlord's environmental site assessment(s) (the "Assessment(s)") of the Premises, prepared by a qualified third-

1

party environmental engineer, in the form commonly known as a "Phase I" or "Phase II" assessment, as appropriate, including a concise presentation of all information gathered during the investigation and organized in a logical progression, as well as a description of the methodology used by the preparer. The Assessment shall summarize the significant findings and shall identify and evaluate actual and potential environmental impairment, risks and liabilities. Landlord shall cause the preparer of the Assessment to provide a certification to Tenant substantially in the form attached hereto as <u>Attachment "1"</u>. If such certification is not timely received by Tenant, Tenant may obtain same at Landlord's expense. At Tenant's election, Tenant may obtain an environmental assessment of the Premises and Landlord shall reimburse Tenant the cost thereof. Tenant acknowledges receipt of a satisfactory environmental report and the certification referred to above .

(b)  <u>Site Work</u>. Landlord, at its sole cost and expense, shall: (i) verify its proposed development of the Shopping Center and compliance of its civil engineering plans with Tenant's geotechnical evaluation of the Land dated April 12, 1996 and prepared by Engineering Consulting Services, Ltd. (the "Soils Report"), as modified by the letters from S&ME, Inc. attached hereto as <u>Attachment "13"</u> , (the "S&ME Letters") with the "Scope of Geotechnical Evaluation" shown on <u>Attachment "2"</u> attached hereto; (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be

2

removed prior to delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements, improvements and tenancies; (iii) complete grading of the Land and the Common Areas in accordance with the Soils Report (as modified by the S&ME Letters) and the "Standards for Grading Work" attached hereto as Attachment "3", and with the final plans prepared by the civil engineer approved by Tenant (the "Grading Plans"), which Grading Plans are described on Attachment "4" hereto, and which are subject to Tenant's written approval, which approval shall not be unreasonably withheld or delayed; (iv) completion of Tenant's building pad strictly in accordance with Tenant's geotechnical report, as modified by the S&ME Letters; (v) obtain approvals for all curbcuts indicated on the Grading Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop Landlord's Parcel which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all curbcuts corresponding to the all-weather construction access road, (B) 20,000 square feet of Staging Area outside of but adjacent to the building pad area (subject to relocation pursuant to and to the extent permitted by paragraph 6(a) of the Lease) to either be paved or stone to provide for all weather use and (C) an all-weather construction access road to the Land, the Staging Area and around the Building no less than twenty-four (24) feet in width, connecting the existing dedicated roadway adjacent to Landlord's Parcel with the Land, all in accordance with the Grading Plans; (vii) obtain site plan approval and conditional use approval, if

3

any, from governmental authorities having jurisdiction over Landlord's Parcel, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit); and (viii) complete any and all other site work and off-site improvements which are required as a condition to any of the governmental approvals, permits, licenses and the like required in connection with the construction of the Improvements by Tenant. All of the work described in (i) through (viii) above is, collectively, the "Site Work". No changes shall be made to any of the Site Work, including but not limited to any plans and specifications therefor, without Tenant's prior written consent. The Site Work shall be performed in accordance with the construction schedule attached hereto as Attachment "5" (sometimes referred to herein as the "Construction Schedule"). Landlord specifically covenants and agrees that any problems or delays it encounters in grading the Premises in satisfaction of the Site Work requirements set forth above in connection with the condition of the soils, including environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, unforeseen site conditions or the like shall be its sole responsibility, shall not cause a force majeure delay, and in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner. Landlord and Tenant acknowledge that certain requirements and/or recommendations of the Soils Report are modified by the S&ME Letters. Any increase in Tenant's construction costs incurred as a result of Landlord's delivery of the Land in accordance with the

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

S&ME Letters, rather than with the Soils Report shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00). Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and to provide temporary utilities to within five (5) feet of the building pad, with the exception of temporary telephone service which Landlord shall provide to within one hundred (100) feet of the building pad, at Tenant's designated points of entry as set forth in the Plans and Specifications, as contemplated in paragraph 1(c) below, in accordance with the dates established therefor in Attachment "5", to the end that promptly upon completion of such requirements (collectively "delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of

5

Landlord's Parcel.  Landlord agrees that delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees and assessments, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit.  Landlord agrees to keep Tenant advised in writing on a monthly basis as to Landlord's progress in completing the Site Work.  Upon the delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached hereto as <u>Attachment "6"</u>.  Landlord and Tenant agree to coordinate all construction activities taking place after delivery of the Land.

Should the Site Work require minor adjustments in order to be in accordance with <u>Attachments "3"</u> and/or <u>"4"</u>, Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).  Further, if utilities are not located as provided on <u>Attachment "7"</u> hereto, then Tenant shall be entitled to bring such utilities to the pad at Landlord's sole cost and expense.

(c)  <u>Paving, Lighting, Utilities, Landscaping and Drainage</u>.  Landlord, at its sole cost and expense, and in accordance with <u>Attachment "5"</u>, shall cause a contractor licensed in the State to complete (i) installation of temporary utilities,

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

as described in the "Utilities Specifications" attached hereto as
Attachment "7"; (ii) the construction and installation within five
(5) feet of the Building, of permanent telephone service and
permanent utilities, including but not limited to gas, electric,
domestic water and fire water (in size sufficient to satisfy local
fire codes), as described in the Utilities Specifications, each at
Tenant's required entry points shown in the "Utility and Drainage
Plan" described on Attachment "8" hereto (the "Utility and Drainage
Plan"), and at depths adequate for Tenant's tie-in without
additional cost above that contemplated by the "Plans and
Specifications" (as defined in paragraph 2(b) below); (iii) the
construction and installation of the storm water drainage system at
Tenant's required location shown on the Utility and Drainage Plan;
(iv) the construction and installation of paving (including heavy-
duty paving), and curbing for parking areas (including sidewalk
curb in front of the Building), vehicular access and service roads,
and driveways, in accordance with the letter from S&ME, Inc. dated
July 19, 1996, and the "Paving Specifications" both attached hereto
as Attachment "9" (in the event of any inconsistency between the
aforesaid letter and the remainder of Attachment "9", the remainder
of Attachment "9" shall be deemed to control); (v) the completion
of landscaping at Landlord's Parcel in accordance with Landlord's
governmentally approved landscaping plan; (vi) the construction and
installation of lighting in Landlord's Parcel to standards no less
than those set forth in the "Shopping Center Lighting
Specifications" attached hereto as Attachment "10"; (vii)

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Landlord's installation of the pylon sign(s) identifying the Shopping Center as described in paragraph 8 of the Lease; (viii) construction of "Peoples Street" as shown on the Site Plan in accordance with plans and specifications approved by the appropriate governing bodies, and the dedication and acceptance of Peoples Street by the City of Johnson City; (ix) any and all other site work and off-site improvements which are required by governmental authorities or applicable law in connection with the development of Landlord's Parcel or as a condition to any of the governmental approvals, permits, licenses and the like required in connection with the development of Landlord's Parcel, all no later than the dates established therefor in Attachment "5"; and (x) complete construction of the Party Wall and Shared Footings in accordance with these Construction Provisions and paragraph 6(b) of the Lease.  Notwithstanding the foregoing, in the event any site work or off-site improvements are included in both clauses (viii) of paragraph 1(b) above and clause (ix) of this paragraph 1(c), then such site work or off-site improvements shall be deemed to be Site Work and governed by the provisions of paragraph 1(b) above. Landlord agrees that in the event that the Party Wall and Shared Footings are not completed by the date of delivery of the Land, Landlord will cause all construction activities related to the development of the Shopping Center to occur in an area located outside of the area of Tenant's building pad.

(d)  Landlord Work.  All of the work described to be performed by Landlord in this paragraph 1 is collectively referred

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

to as the "Landlord Work".  All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation.  Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers.  In the event that Landlord defaults at any time in completion of any component of the Landlord Work, Tenant shall have the right, but not the obligation, to perform at Landlord's sole cost and expense, all or any part of Landlord Work.  Tenant shall exercise this right by providing Landlord with written notice thereof, which notice shall reasonably detail those portions of the Landlord Work which Tenant elects to complete.  Tenant may exercise the rights set forth in this paragraph 1(d) from time to time so long as Tenant provides Landlord notice specified herein (i) within a reasonable amount of time prior to the date upon which Landlord would otherwise commence that portion of the Landlord Work, or (ii) at such other time where it is feasible for Tenant to take over that portion of the Landlord Work from Landlord.  Tenant, however, may not actually commence such work required to cure Landlord's default unless and until Landlord has failed to cure such default within ten (10) days after Landlord's receipt of Tenant's notice as aforesaid.  In the event and to the extent that Tenant exercises its right hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can

9

complete said portions of the Landlord Work.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of the Landlord Work which Tenant is in the process of completing within five (5) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed.  In the event that the Landlord does not timely reimburse Tenant as hereinabove contemplated, Tenant shall be entitled to deduct the costs of such Landlord Work from rentals and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure by Tenant until paid in full.

    2.   <u>Tenant Improvements</u>.

    (a)  <u>Building Construction</u>.  Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by <u>Attachment "3"</u>) of delivery of the Land in the form of <u>Attachment "6"</u>.  Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction, provided the Tenant does not elect its self-help remedies set forth in this Lease.  Upon completion of any such previously unmet requirements, Tenant shall promptly commence and pursue to completion with due diligence the construction of the Improvements.  The construction work on the Improvements shall be performed by a duly licensed contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

applicable laws and in substantial accordance with the "Plans and Specifications" (defined below).   Tenant shall obtain from its contractor and the suppliers of all equipment incorporated into the Improvements all customary warranties, which shall be assignable to Landlord.   Such contractor shall be bondable, licensed in the State, of good reputation and experienced in retail development and in phasing and coordinating construction schedules with shopping center developers.   Provided that the Land is delivered on or before the date set forth on <u>Attachment "5"</u>, Tenant covenants and agrees to use reasonable efforts and due diligence to achieve "Substantial Completion" (as defined below) on or before the date which is six (6) months thereafter.                  (b)   <u>P l a n s    a n d Specifications</u>.   Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications and building elevations (the "Plans and Specifications") for the construction of the Building and Other Improvements, incorporating therein the items specified and shown in the "Schematic Floor Plan", attached hereto as   <u>Attachment "11"</u> and the elevation drawing (the "Elevation Drawing") referred to (together with the list of front facade materials) on <u>Attachment "12"</u> (both of which are hereby approved by Landlord).   Landlord agrees that it will approve the Plans and Specifications, so long as they are materially consistent with the Schematic Floor Plan and Elevation Drawing, within ten (10) business days after receipt thereof.   In no event shall Landlord require Tenant to alter its building

11

elevations, standard entrance tower, customer pickup area or use of Alucobond and red trim on the front exterior of the Building all as depicted on the Elevation Drawing. If Landlord requests that Tenant modify the Plans and Specifications in order to accommodate the Shopping Center-wide motif and such modifications are approved by Tenant in its sole and absolute discretion, then, notwithstanding anything contained in the Lease to the contrary, Landlord shall reimburse Tenant for any and all costs, expenses and fees incurred by Tenant in making such modifications (including, without limitation, the cost of materials, labor and any design changes including revisions to Tenant's Plans and Specifications). Such reimbursement shall be made to Tenant within ten (10) days after demand provided that Tenant has provided Landlord with reasonable documentation of such costs, fees and expenses. If Landlord does not timely reimburse Tenant as provided herein, then Tenant shall be entitled to deduct the costs, fees and expenses incurred in making such modifications from Base Rent and other payments due under the Lease, together with interest at the Default Rate from the date of expenditure of Tenant, until paid in full. If the Plans and Specifications are not disapproved by Landlord within fifteen (15) days of delivery thereof to Landlord, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Within a reasonable time of Substantial Completion, Tenant shall deliver to Landlord a reproducible set of as-built plans and specifications; however, the delivery of such as-built plans shall not be a condition to payment of the Tenant Improvement Allowance pursuant to paragraph 3 below.

12

(c) <u>Permits</u>.    Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications. Landlord, at Tenant's cost, agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates.  Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d) <u>Landlord Inspections</u>.    During the course of construction of the Improvements, Landlord may, at its own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction.

(e) <u>Substantial Completion</u>.  Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority. The foregoing shall not be deemed to relieve Tenant of its responsibility to complete the Improvements in accordance with the Plans and Specifications.

3. <u>Costs</u>.  Upon Substantial Completion and Tenant's furnishing to Landlord (i) the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the form of <u>Exhibit</u>

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

"J" attached hereto against any exception in Landlord's or its
Mortgagee's policy of title insurance with respect to mechanics'
liens arising out of Tenant's construction, (iii) if requested by
Landlord, confirmation from Tenant that Landlord holds title to the
Improvements (in form reasonably acceptable to Landlord and
Tenant), and (iv) ~~an AIA form Certificate of Substantial Completion~~
a certificate from Tenant's Vice President of Construction
~~signed by Tenant's architect, a certificate signed by Tenant's~~
~~architect and general contractor~~ stating that the Improvements were
constructed in accordance with the Plans and Specifications, ~~a~~
~~reproducible set of as-built plans and specifications and copies of~~
~~all warranties relating to Tenant's construction which will be~~
~~assigned to Landlord pursuant to paragraph 10 of the Lease,~~
Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an
amount equal to FIFTY and 93/100 Dollars ($50.93) per square foot
of ground-floor gross leasable area within the Building (excluding
loading docks and outside sales areas), as measured in accordance
with the specifications set forth in paragraph 7(c) of the Lease,
payable by wire transfer of funds by Landlord to Tenant's account
no later than thirty (30) days after Substantial Completion.  If
the Base Rent is increased or decreased pursuant to paragraph
4(a)(ii) of the Lease, the Tenant Improvement Allowance shall
likewise be proportionately increased or decreased.  If Landlord
fails to pay the Tenant Improvement Allowance in full within thirty
(30) days after Substantial Completion and receipt of items (i),
(ii) and (iii) above, then Landlord shall be in default hereunder,
no Base Rent or CAM Charges shall be due or owing to Landlord until

14

the same is paid to Tenant, and interest shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Tenant Improvement Allowance; provided, however, that if Landlord has not tendered payment of the Tenant Improvement Allowance by that date which is one (1) year from Substantial Completion and receipt of items (i), (ii) and (iii) above (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Base Rent shall be reduced to ground rent equal to Seventy-Five Thousand and No/100 Dollars ($75,000.00) per annum during the first year following the Substantial Completion Anniversary, Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the second year following the Substantial Completion Anniversary, and Twenty-Five Thousand and No/100 Dollars ($25,000.00) per annum thereafter during the Term of the Lease; and (iii) this Lease shall be converted to a ground lease, with ownership of the Improvements remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in paragraph 14(a) of the Lease. Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

15

Notwithstanding the foregoing, at any time following the Substantial Completion Anniversary and upon thirty (30) days prior written notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Tenant Improvement Allowance, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, "Exhibit 'C' Transfer") Tenant's interest in the Building, the Improvements and the Lease. Such right shall be in addition to the rights of Tenant set forth in paragraph 21 of the Lease.

Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Exhibit "C" Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Exhibit "C" Transfer. Notwithstanding such Exhibit "C" Transfer, Tenant shall continue to pay the ground rentals described herein during the remainder of the Term.

4. <u>Construction Delays</u>.

(a) <u>Delays by Landlord</u>. In the event Landlord shall fail to complete the Site Work and accomplish delivery of the Land in the condition specified by the date set forth on <u>Attachment "5"</u> hereto for whatever reason (including force majeure), Landlord agrees that it shall provide Tenant with one (1) day's free rent, (<u>i.e.</u> Base Rent) until October 15, 1996 for each day of Landlord's delay in delivering the Land to Tenant. For each day beyond October 15, 1996 that Landlord delays in delivering the Land for

16

whatever reason (including force majeure), Landlord agrees that it shall provide Tenant with two (2) day's free rent (i.e. Base Rent) until the date on which Landlord delivers the Land.

In the event, subject to force majeure, Landlord shall fail to accomplish delivery of the Land by November 1, 1996, or to complete any element of the Landlord Work prior to the expiration of forty-five (45) days after the completion date established therefor in Attachment "5", Tenant, at its option and upon five (5) days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter Landlord's Parcel and perform any task required for delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers to the extent necessary to allow Tenant to exercise its rights provided under this Lease (including, without limitation, this paragraph).  If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may

17

offset such amounts against Base Rent and CAM Charges otherwise due until such costs and accrued interest are reimbursed in full.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete delivery of the Land to Tenant by November 15, 1996, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00). In addition to any other rights and remedies set forth herein, if the Landlord fails to timely deliver the Land or any element of the Site Work as of November 30, 1996, and regardless of force majeure, Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Base Rent, Real Estate Taxes or CAM Charges. In such event, Landlord shall deliver the Land and complete the Site Work on the date required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural and legal fees, as compensation to Tenant for the loss of store revenues due to Landlord's delays hereunder.

(b)  If Landlord is delayed in meeting any of the milestones set forth on Attachment "5" or in clause (a) above and such delay was solely attributable to Tenant's acts or omissions not permitted

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

or contemplated by this Lease, then the applicable milestone shall be extended one (1) day for each day of such delay provided that Landlord sends a notice to Tenant within forty-eight (48) hours of the act or omission of Tenant that Landlord is claiming to solely caused such delay.  If Landlord fails to provide such notice with such forty-eight hour period, then the extension of the applicable milestone granted hereby shall be reduced one (1) day for each one (1) day of delay by Landlord in providing such notice.

(c)  _Miscellaneous_.  Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies.  All sums owing to Tenant under paragraph 1 hereof and/or subparagraph (a) above shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges otherwise due hereunder.  All sums owing to Landlord under subparagraph (b) above shall, to the extent applicable and except for Base Rent and CAM Charges, be deducted from the Tenant Improvement Allowance.

Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule.  In the event that the Landlord

19

fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth in this Exhibit "C" and the Lease.

    5.   Attachments.

"1"  Environmental Certification

"2"  Scope of Geotechnical Evaluation

"3"  Standards for Grading Work

"4"  Grading Plans

"5"  Construction Schedule

"6"  Site Work Certification

"7"  Utilities Specifications

"8"  Utility and Drainage Plan

"9"  Paving Specifications

"10" Shopping Center Lighting Specifications

"11" Schematic Floor Plan and Elevation

"12" Elevation Drawing and Front Facade Materials List

"13" Letters from S&ME, dated April 26, 1996 and October 23, 1995 regarding Rock Fill Beneath Structures; and August 15, 1996 regarding Status of Circuit City Building Pad

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "1"

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA  23233

ATTN:

This letter is written with respect to paragraph 1(a) of Exhibit
"C", which are the Construction Provisions to your lease with
_____, dated _____, 199___ (the "Lease"). We have
been retained by _____ to provide an environmental site
assessment report concerning any potential environmental hazards
present on or about the shopping center property which is the
subject of the Lease.  We understand that the provision of a report
in form and substance satisfactory to Circuit City is a condition
of the Lease.  Please be advised that Circuit City can rely on our
environmental site assessment report entitled _____, dated
_____, subject to the limitations and qualifications
contained therein (the "Report").  The Report meets the
requirements of the Phase I (and/or Phase II) Environmental
Assessment as described in the Lease, a copy of the relevant
portions of which have been delivered to us.  Attached to this
letter as Enclosure 1 is a description of our professional
liability insurance coverages, including the name of the carriers
and the amount of the coverages.

Sincerely,


_____    (Name of consultant)

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "2"

Scope of Geotechnical Evaluation

I.  **GENERAL**

    A.  All borings shall comply with all applicable codes and regulations.

    B.  Circuit City shall be informed, by phone, of the job progress and of any unexpected or special conditions.

    C.  Soil samples shall be retained by the soil testing firm for at least: Six (6) months on projects where shallow foundations are recommended; twelve (12) months on projects where deep foundations are recommended. (Differing periods may be acceptable. If deviations from the specified periods are proposed, state proposed periods, and state any additional cost to comply with the specified periods).

    D.  The time required to complete the soil boring, testing, and investigation report following authorization to proceed shall be twenty-one (21) calendar days or less.

    E.  At the end of the agreed upon time period, submit to Circuit City six copies of the report including black line prints of all logs, charts, diagrams, drawings, etc. on 8-1/2" x 11" sheets.

    F.  All reports are to be sealed by an Engineer licensed in the State in which the work is performed.

    G.  Evidence of suitable levels of Professional Liability, General Liability and Workmen's Compensation Insurance Coverage is required before commencing work.

II.  Within 21 days after notification by Circuit City Stores, the developer or A/E firm shall furnish a Report of Subsurface Investigation, which shall be performed by an independent soils engineer approved by Circuit City, and shall include the following:

    A.  <u>Visual Description and Report</u>: Describe the Shopping Center site as to existing conditions noting in particular any unique or unusual features which might affect any proposed construction.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

B.    Soil borings shall be as follows:

    1.    In granular soils, borings shall be standard penetration tests employing a 140 lb. hammer having a free fall of 30" and using a 2" outside diameter (1-3/8" ID) split spoon, ASTM Method D-1586.

    2.    In cohesive soils, standard penetration test ASTM-D-1586 or thin wall tube sampling of soils ASTM D-1587 may be employed.

C.    Soil samples shall be taken at 2'-6" intervals up to 10' depth and at 5' or at each change of strata thereafter.

D.    Indicate as accurately as possible the water line in all holes, at the time of boring and twenty-four (24) hours later.

E.    Intentionally deleted.

F.    Where rock is encountered, rock core samples of a minimum 1-1/4" diameter and minimum 5'-0" length shall be obtained, recovery ratios shall be given as well as a clear description of the type of rock, in particular, the means required to excavate same.

G.    At least five (5) borings should be taken within the Building Area limit lines on the Circuit City Parcel (with one at each extreme corner).    The specific information required includes:

    1.    Allowable bearing pressure under footings for dead load, dead plus live load and dead plus lateral loads.

    2.    Intentionally deleted.

    3.    Intentionally deleted.

    4.    Equivalent fluid pressure to be used for retaining wall design.

    5.    Intentionally deleted.

    6.    Evaluation of the suitability of on-site material for engineered fill.

    7.    The typical loads for a Circuit City building vary from location to location; however, the following general criteria is provided:

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

| SNOW LOAD (PSF) | MAX. INT. COL. LOAD (KIPS)[*1] | MAX. EXT. COL. LOAD (KIPS)[*2] | MAX. EXT. NON-LOAD BEARING WALL (KIPS/FT)[*3] |
|---|---|---|---|
| 0 | 46 | 26 | |
| 20 | 58 | 33 | |
| 25 | 65 | 37 | |
| 30 | 71 | 41 | 3.0 |
| 35 | 78 | 45 | |
| 40 | 85 | 48 | |

(*1) Assumes tributary area of 1326 sq. ft.
(*2) Assumes tributary area of 750 sq. ft.
(*3) Assumes 12" normal weight block reinforced at 24" o.c.

8.  Comment on effect of expansive soil and recommended footing depth to minimize effect of expansive soil. When material has a plastic index greater than twenty, swell tests shall be performed.

9.  Recommendation for slab construction; including thickness, reinforcing, moisture barrier, and capillary break.

10. Intentionally deleted.

11. Intentionally deleted.

12. The report shall include a statement describing the field investigation technique and laboratory procedures. Include a commentary on the site in general as well as on the subsurface conditions.

13. Test data shall be illustrated on table, charts, graphs, etc., as required to summarize the results.

14. Final boring logs shall give a detailed description of the various soil strata and they shall include the group symbol based on the Uniform Soil Classification System.

15. Intentionally deleted.

16. Provide an indication of how susceptible the on-site materials are to moisture damage during the construction season at the proposed subgrade

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

elevations and what recommended procedures should be taken to alleviate possible problems.

C.   <u>Pavement Design</u>:  Perform soils borings and any other field investigations necessary to provide a recommendation for the design of pavement sections for a 20 year life span and various traffic indices.

If poor subgrade material is encountered, recommend an alternate paving design using a reinforcing fabric (such as Mirafi 500X) and a thickened paving base, including thickness and material specifications for topping, asphaltic base, primer (if required) and reinforcing fabric and an estimated in-place cost per square yard for both the paving and fabric system.

Recommend both a heavy and light duty paving system, including thickness and material specification for topping, asphaltic base primer (if required) and granular sub-base.  Light duty paving should be based on an estimated 500 automobiles per day and general parking.  Heavy duty paving should be based on 500 automobiles per day, plus 3 tractor trailers per day with 9000 lb. wheel loads.  Provide an estimated cost per square yard for both the paving and base in-place.

D.   <u>Foundation Investigation Recommendations and Evaluations</u>:

   1.   Grading and Earthwork.  Described recommended procedures relating to:

      (a)   Stripping.
      (b)   Excavations.
      (c)   Fills (import and on-site material).
      (d)   Suitability of on-site top soil material for landscaping.
      (e)   Grading operations.
      (f)   Compaction.
      (g)   Stockpiling on-site materials.

   2.   Footings/Foundations:

      (a)   Described suitable foundation systems and attendant requirements.
      (b)   Describe advantages and disadvantages of any logical and/or feasible alternative systems.
      (c)   Bearing values.
      (d)   Setting depths.
      (e)   Soil preparation.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

    (f)   Anticipated settlement or movement (in inches). The maximum differential movement shall be 1/2 inch.

    (g)   Foundation drainage system, if required.

3.    Non-structural Slab on Grade.   Describe recommended procedures relating to:

    (a)   Soil preparation.

    (b)   Slab reinforcement.

    (c)   Slab underlayment with particular attention to capillary breaks or moisture problems.

    (d)   Anticipated settlement or movement (in inches). The maximum differential movement shall be 1/2 inch.

    (e)   Underslab drainage system, if required.

4.    Retaining Walls.   Information will be provided as needed.

5.    Light pole bases or similar pole structures:   Provide design requirement/parameters for capabilities of soil to support these structures.   (See paragraph D.2 above).

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "3"

Standards for Grading Work

1.  The Land and the Shopping Center shall be graded in accordance with the following:

(a)  The Grading Plan shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations.  Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b)  The Building will be accessible by grade level parking only.  Steps and stairs are not permitted.

(c)  Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All water shall be sheet drained away from the Tenant's doors.

(d)  Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 5.0%. Entrances and access drives shall have a maximum slope of 6.0%, with the exception of the rear service drive which shall have a maximum slope of 8.0%.

(e)  Surface drainage swales will not be allowed without prior approval of Tenant.  Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

(f)  The cut and fill on the Shopping Center site should be balanced, if practical.  All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

(g)  No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant.

2.  "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls, the truck dock

1

and ramp area and the Customer Pick-Up parking spaces, or to the back of curbing around the Building, whichever is further.   The Site Work shall comply with the following additional requirements:

(a)   Landlord shall be responsible for preparing the Tenant's Pad Area subgrades to within plus or minus one-tenth of a foot as set by Tenant's architect.   Tenant's subgrades are typically 8"-10" below finished floor elevation.   Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-eight percent (98%) of the standard proctor soil test for water content and compaction levels ("Standard Proctor") on the Land, so as to enable Landlord to perform construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard footings and without the necessity of pilings or spread footings or other extraordinary foundation work. Tenant's minimum slab thickness and under slab fill will be established in accordance with the report of an independent professional soils engineer.   Such report will be obtained by Landlord at its sole expense.   All compacted areas of the site shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with the soils report shall be furnished to Tenant upon completion of the Site Work.

(b)   Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot with foundation strata in accordance with local building codes.   Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

(c)   During the preparation of Tenant's Pad Area, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of Tenant's Pad Area in accordance with the independent soils engineer's report referenced in Attachment "2" (II) above.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

The greater of three in-place compaction tests per work day or one in-place compaction test per 5,000 square feet of pad area must be completed.

(d)   On or before September 15, 1996, Landlord shall provide Tenant with:

(i)   An independent soils engineer's written certification that all pad work was completed in accordance with the Grading Plans and the Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.

(ii) A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey which shall accompany such certification and shall show thereon elevation shots taken on a 50-foot-grid minimum including pad perimeter and building corners. Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying monuments.

(e)   Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

(f)   Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

(g)   All material, including native and fill, within 3 feet of any surface of the building including foundation concrete, shall be in conformance with the letters from S&ME dated April 26, 1996 and August 15, 1996 (as same regards Tenant's Pad Area), attached to the Construction Provisions as <u>Attachment "13"</u>.

(h)   The Grading Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.

(i)   All outlots or future building areas shall be rough graded and planted with grass seed.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "4"

Grading Plans

Circuit City Store Type B1, Mini Superstore No. 3247, Project No. 96044, prepared by Good Fulton and Farrell Architects, dated August 21, 1996.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "5"

Construction Schedule

| **Landlord's Task** | **Completion Date** |
|---|---|
| 1. Construction of all-weather construction access to the Premises, 20,000 sq. ft. staging area and curbcuts in Tenant's Preferred Area. | September 15, 1996 |
| 2. Landlord's dates for offsite improvements/ obtaining permits, etc. pursuant to paragraph 1(b). | September 15, 1996 |
| 3. Installation of temporary utilities, including temporary water trucks. | September 15, 1996 |
| 4. Installation of temporary water as defined in Attachment "7". | October 15, 1996 |
| 5. Completion of Site Work including approval of all curbcuts. | September 15, 1996 |
| 6. Landlord's delivery of the Land to Tenant. | September 15, 1996 |
| 7. Construction and installation of permanent utilities including permanent telephone service. | November 15, 1996 |
| 8. Construction and installation of storm water drainage. | November 15, 1996 |
| 9. Construction and installation of paving (including heavy-duty paving) and curbing. | January 15, 1997 |
| 10. Completion of landscaping at Shopping Center. | January 15, 1997 |
| 11. Construction and installation of exterior lighting in the Shopping Center. | January 15, 1997 |
| 12. Completion of striping and signage. | January 15, 1997 |
| 13. Construction and installation of pylon sign(s) identifying the Shopping Center. | December 15, 1996 |

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

14. Construction of Peoples Street                January 15, 1997

15. Dedication of and Acceptance of
    Peoples Street by the City of Johnson City  January 15, 1997

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "6"

Site Work Certification


To:  Circuit City Stores
     9950 Mayland Drive
     Richmond, Virginia  23233
     Attention:  Vice President-Real Estate


     Re: Circuit City Store/[Location]-Lease Agreement dated _____
_____

Ladies and Gentlemen:

     The undersigned, as Landlord under the Lease has caused
"delivery of the Land" to occur, and accordingly, completion of the
Site Work, all in accordance with the terms of the Lease.
Specifically the undersigned hereby certifies that:  (i) the
grading of the Land and Common Areas has occurred in accordance
with the Standards for Grading Work, attached as Attachment "3" to
the Lease, and Tenant's building pad has been prepared strictly in
accordance with your geotechnical report and Exhibit "C" of the
Lease; (ii) the Staging Area has been completed and (iii) an all-
weather construction access road to the Land no less than 24 feet
width has been prepared and is ready for your use.

     All conditions precedent to issuance of your building permit
have been satisfied by the Landlord, and we certify that all
elements of the Site Work and delivery of the Land have been
satisfied in accordance with the Lease.

                                        [LANDLORD]

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

## Attachment "7"

### Utilities Specifications

Landlord will provide the following temporary utilities no later than the date for completion of such temporary utilities set forth in the Construction Schedule:

> (a) water to within five (5) feet of the Premises (2" line, with sufficient pressure that pumping is not necessary);
>
> (b) electric power to within five (5) feet of the Premise (200 amps, 1-phase, 4-wire, 120 volts, with weatherproof and rainproof fused disconnect switch) for use by Tenant in its construction of the Improvements; and
>
> (c) telephone to within one hundred (100) feet of the Premises.

Landlord will provide the following permanent utilities to within five (5) feet of the Premises at Tenant's identified entry points no later than the date for completion of such permanent utilities set forth in the Construction Schedule:

> gas (if available), telephone, permanent electricity (adequate for ~~600~~ 800-amp panel, 3-phase, 277/480 volt), sanitary sewer (6" line), domestic water (2" line), fire protection water (8" line, 50 pounds per square inch residual pressure, 2000 gallons per minute or at least sufficient capacity to service Tenant's sprinkler system without the need for any fire pump, as approved by Tenant's fire protection consultant).

1

<u>Attachment "8"</u>

**Utility and Drainage**

Circuit City Store Type B1, Mini Superstore No. 3247, Project No. 96044, prepared by Good Fulton and Farrell Architects, dated August 21, 1996.

Attachment "9"

Paving Specifications

1.   With respect to parking area and roadway surfacing:

(a)   Pavement design shall be based on a "Design Period" of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Tenant and compensated by Landlord.

(b)   All pavement design shall be as specified in the letter from S&ME dated July 19, 1996, attached as a portion of this Attachment "9".

(c)   Consideration must be given to heavier use in main drives and service area.

2.   With respect to sidewalks and curbs:

(a)   Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks.   Tenant shall provide sidewalks immediately adjacent to the Building.

(b)   All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building.   All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture (as approved by the Landlord's architect with respect to the Common Area), over a suitable granular base.   Salt finish is not acceptable.

(c)   Entrance and access roads and other areas as required for suitable drainage, shall have six (6) inch curbs with 18-inch gutters; however, next to sidewalks and buildings when drainage is not a factor a straight curb six (6) inches (without gutters) above the finished paving shall be permitted.   Parking lot islands and landscape enclosures shall be vertical barrier-type curbs and all integral-type curbs and gutters and vertical barrier-type curbs shall be concrete.   Extruded asphalt or concrete curbing may not be used.

1



July 19, 1996

CNM Associates
3350 Cumberland Circle
Suite 1500
Atlanta, Georgia 50039

Attention:        Mr. Kevin Kilgore

Reference:        **REVIEW OF PAVEMENT RECOMMENDATIONS**
                  Johnson City Crossings
                  Johnson City, Tennessee
                  S&ME Project No. 1403-94-288-E

Dear Mr. Kilgore:

As requested by you, S&ME has reviewed our pavement recommendations for the proposed project. Our recommendations for pavement presented in the Report of Geotechnical Exploration (S&ME Project No. 1401-94-288-B, dated September 21, 1995) included the Home Depot portion of the site. Because the Home Depot will have its own entrances and exits, you do not feel that the previous pavement recommendations should apply to the entire shopping center area.

You have indicated that you intend to use the following pavement sections for the remaining portions of the shopping center.



S&ME, Inc. P.O. Box 1118 TCAS, 2153 Highway 75 Blountville, Tennessee 37617, (423) 323-2101, Fax (423) 323-5272

07/19/96 09:20

Review of Pavement Recommendations               S&ME No. 1403-94-288-E
Johnson City Crossings                                    July 19, 1996

## Proposed Pavement Sections

| Material | Coefficient | Reference | Thickness (Inches) | |
| --- | --- | --- | --- | --- |
| | | | Light Duty (EAL = 10,000) | Heavy Duty (EAL = 250,000) |
| Aggregate Base Course | 0.13 | Section 302 | 6.0 | 8.0 |
| Binder Course | 0.42 | Section 407 | — | 2.0 |
| Bituminous Surface Course | 0.42 | Section 407 | 2.0 | 1.5 |

On the basis of these pavement sections, we have used the same assumptions used in the original pavement design to estimate the traffic volumes that these sections will support. This included the use of the AASHTO method of flexible pavement design (1986), a 20-year design life, a terminal serviceability index of 2.0 and a reliability of 85 percent. A design CBR value for 4 (four percent) has been selected to evaluate these pavement sections.

The traffic volumes that can be supported by these pavement sections have been estimated as follows:

    Automobiles - 1000 per day
    Delivery Trucks (single-axle) - 25 per day
    Semi-trucks (medium load)(tandem-axle truck and trailer) - 4 per day

As indicated in our original geotechnical report, any off-site borrow used at the project site should have a CBR value of at least 4 (four percent) in order to use the pavement sections presented above. Field CBR tests should be performed during the construction

2

Review of Pavement Recommendations                    S&ME No. 1403-94-298-E
Johnson City Crossings                                         July 19, 1996

phase of the project to verify the design CBR value. All materials and pavement construction methods should comply with the latest revision of the Tennessee Department of Transportation's Standard Specifications for Road and Bridge Construction. In addition, performance of pavement sections is directly dependent on the stability and uniformity of the soil subgrade, thus strict adherence to the specifications and our geotechnical recommendations regarding soil subgrade construction and preparation is expected.

S&ME appreciates this opportunity to be of continued service on this project. If you have any questions regarding this correspondence, or if we can be of additional service, please contact us at your convenience.

Sincerely,

S&ME, Inc.

J. Russell Ashburn III, P.E.
Geotechnical Engineering Manager
TN Registration No. 23415

Reviewed by:

James J. Belgeri, P.E.
Vice President
Tennessee Registration No. 12430

cc      Joe Blackwood - Metric Constructors, Inc.

JRA/JJB/malshare

3

Attachment "10"

Shopping Center Lighting Specifications

Minimum design standards for lighting of the Shopping Center are as follows:

1.   The Developer shall prepare and submit plans showing the location and height of all light poles, fixtures, type of fixture shielding (if any), circuiting and details of the complete lighting arrangement and equipment.

2.   Illumination as measured at pavement shall be:

   a.   Intentionally deleted.

   b.   One and one-half (1 1/2) foot candles average maintained, measured at grade.

   c.   2.0 foot candles minimum maintained on entry drives.

3.   Twenty-five percent (25%) of the overall lighting shall be designated as security lighting (i.e., remains on from dusk to dawn).  The security lighting layout and pattern shall be subject to Tenant's approval.

4.   Landlord shall install a seven-day time switch to control all parking area lighting wired to a common house panel. All security lighting shall be placed on photo-cell switching.

5.   The control of parking area lights shall be accessible to Tenant's local store management due to late-night and holiday sales.

6.   Notwithstanding anything contained in this Attachment "10" to the contrary, Landlord shall permit Tenant to install lighting so that a minimum of 4.0 foot candles is maintained at the entrance of Tenant's Building provided that such lighting shall be installed in accordance with Exhibit "E" of Zoning Ordinance No. 3298, which exhibit attached to this Attachment "10".

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

JUL-06-1995  23:53                                                    P.02

## EXHIBIT "E"

### Proposed Site Lighting:

Parking lot lighting will be provided by means of 1000 watt Metal Halide light fixtures on 40'-0" high poles. The average lighting level will be approximately 1½-2 foot candles and may vary slightly due to tenant lighting requirements.

The light fixtures will be "cut-off" type luminaries with baffles attached to the exterior of the fixtures on the perimeter of the parking lot to restrict the light to inside the project only.

Typical poles in the parking lot will have two light fixtures each, and poles will be located approximately 180' apart.

Attachment "11"

## Schematic Floor Plan

Circuit City Store Type B1, Mini Superstore No. 3247, Project No. 96044, prepared by Good Fulton and Farrell Architects, dated August 21, 1996.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "12"

**Elevation Drawing and Front Facade Materials List**

Circuit City Store Type B1, Mini Superstore No. 3247, Project No. 96044, prepared by Good Fulton and Farrell Architects, dated August 21, 1996.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Front Facade Materials List

Tower: Alucobond - Circuit City Red

5'-4" Wainscot: Modular Face Brick - "Seton Hall Regent" by General Shale Brick

Wall above Wainscot: Exterior Insulation Finish System Color- to match Natural White #103, by Dryvit.

Pilasters: Exterior Insulation Finish System Color - to match China White #130, by Dryvit.

Side and Rear Walls: Painted CMU to match Natural White #103 Dryvit

Exterior Metal & Doors: Painted to match Natural White #103 Dryvit.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Attachment "13"

Letters from S&ME, dated April 26, 1996 and October 23, 1995 regarding Rock Fill Beneath Structures; and August 15, 1996 regarding Status of Circuit City Building Pad

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

*Attachment "13"*



April 26, 1996

CNM Associates
8350 Cumberland Circle
Suite 1590
Atlanta, Georgia 50039

Attention:        Mr. Jim Woodcox

Reference:        **ROCK FILL BENEATH STRUCTURES**
                  Johnson City Crossings
                  Johnson City, Tennessee
                  S&ME Project No. 1403-94-268-E

Dear Mr. Woodcox:

S&ME is presenting this correspondence to clarify our position on the placement of rock fill beneath structures at this project. As you are aware, in our Report of Geotechnical Exploration for this project (dated September 21, 1995), S&ME indicated that rock fill should not be placed beneath the structures. That recommendation was made to prevent indiscriminate or intermittent use of rock in fill areas under structures. There is no reason not to use a tightly-specified, durable rock fill to support the structural loads. This was indicated in our letter to you dated October 23, 1995.

The rock fill that has been placed under the Home Depot building has been placed according to the recommendations presented on pages 26 and 27 of the September 21, 1995, report and the modifications presented in the October 23, 1995, letter. Also, as indicated in the October 23, 1995, letter we indicated that a sufficient soil cover should be placed over the rock fill such that no excavations for any items (ie, foundations,

Construction Phase Testing Issues                    S&ME No. 1403-94-269-E
Johnson City Crossings                                            April 10, 1996

utilities, etc.) would penetrate the rock fill and the separation layer between the rock fill
and the soil fill. On the basis of conversations with the contractors and designers of the
building, this depth of cover has been agreed to be five feet below the finished floor
elevation of the structure.

Use of the rock fill beneath the building not only will allow for more timely grading of the
building pad (due to the wet nature of the on-site soils) but will reduce the amount of
compressible soil beneath the front portion of the building. This in turn should reduce the
amount of time required for settlement of this compressible layer and should reduce the
potential for differential settlements in the building area.

S&ME appreciates the opportunity to provide continued service on this project. If you
have any questions regarding this correspondence, please contact us at your
convenience.

Sincerely,

S&ME, INC.

J. Russell Ashburn III, P.E.
Geotechnical Engineering Manager


cc:    George Kakunes, Pharr Engineering

2



August 15, 1996

CNM Associates
One Atlanta Place
950 East Paces Ferry Road NE
Suite 900
Atlanta, Georgia  30326

Attention:          Mr. Jim Woodcox

Reference:          **STATUS OF THE CIRCUIT CITY BUILDING PAD**
                    Johnson City Crossings
                    Johnson City, Tennessee
                    S&ME Project No. 1403-94-288-E

Dear Mr. Woodcox:

This letter is presented to provide a status of the condition of the building for the Circuit City Store.  The pad has been undercut approximately three feet below finished subgrade and has been backfilled with fine rock material.  This material is typically less than six inches in maximum dimension.  This material has been placed in thin lifts and rolled with heavy compaction equipment until stabilized.

This material is consistent with the specifications for the site work construction of the entire center (Technical Specifications for Sitework Construction, Revision 1, dated April 19, 1996, prepared by Pharr Engineering, Inc.); however, this material is not consistent with Circuit City's site specifications.  As indicated in Attachment "3", Standards for Grading Work, Section 2(g), materials placed within three feet of any surface of the building will be:  nonexpansive with a plasticity index (PI) of 12 or less;  have sufficient


Recycled Paper

S&ME, Inc. P.O. Box 1118 TCAS, 2153 Highway 75  Blountville, Tennessee 37617, (423) 323-2101, Fax (423) 323-5272

Status of Circuit City Building Pad                           S&ME No. 1403-94-288-E
Johnson City Crossings                                               August 15, 1996

cohesion to stand vertically for three feet;  no materials greater than 6 inches in diameter;
and, not more than 15 percent shall be greater than 2.5 inches in diameter.  There was
not any on-site soil tested either by S&ME or by Circuit City's geotechnical consultant that
indicated soils with a PI of 12 or less; but, the fine rock fill will have a PI of 12 or less.
The fine rock fill currently may include some isolated particles greater than six inches in
diameter and very likely has more than 15 percent of the material greater than 2.5 inches
in diameter.

The fine rock fill material in-place,  will provide a uniform and stable subgrade for support
of the foundations and floor slab for the building.  Except for its ability to stand vertically
for three feet in height, this material is basically equivalent to the material specified in the
Circuit City specifications.

S&ME appreciates this opportunity to be of continued service on this project.  If you have
any questions regarding this correspondence, or if we can be of additional service, please
contact us at your convenience.

Sincerely,

**S&ME, Inc.**

J. Russell Ashburn III, P.E.
Geotechnical Engineering Manager

James J. Belgeri, P.E.
Vice President

JRA/JJB/mc/share

2

Fee: JC/H.4



October 23, 1995

CNM Associates
Suite 1500
3350 Cumberland Circle
Atlanta, Georgia 30339

Attention:          Mr. James V. Woodcox
                    Vice President/Design & Construction

Reference:          **ROCK FILL BENEATH STRUCTURES**
                    Johnson City Crossing
                    Johnson City, Tennessee
                    S&ME Proposal No. 1401-94-288-B

Dear Mr. Woodcox:

On the basis of our telephone conversation on Wednesday, October 18, 1995, this letter confirms our conversations with you and with Mr. Billy Chandler of Summers-Taylor (Grading Contractor) regarding the placement of rock fill beneath the proposed Home Depot structure.

As you are aware, in our Report of Geotechnical Exploration for this project, dated September 21, 1995, S&ME indicated that rock fill should not be placed beneath structures. That recommendation was made to prevent the indiscriminate or intermittent use of rock in fill areas under construction. In fact, there is no reason not to use a tightly-specified, durable rock fill to support the structural loads. Given the recent suggestion

Rock Fill Beneath Structures                                    S&ME No. 1401-94-288-B
Johnson City Crossings                                          October 23, 1995

that grading in building pad of the Home Depot will be conducted during the coming fall
and winter months, the use of a continuous rock fill seems to be desirable.

The rock fill should be placed according to the rock fill placement specifications outlined
on pages 26 and 27 of the September 21, 1995, report, with the following modifications.
Depending on the type of material available to choke off the upper layer of the fill
material, a geotextile separation fabric such as Mirafi 140N or equivalent, may be needed
over the rock fill area to reduce the potential of soil migration into the rock fill. Also, the
settlement monitoring plates should have a metal casing instead of a PVC casing to
protect the monitoring rods from the rock fill. A revised typical section is attached for
your convenience.

Building and site designers should carefully evaluate the excavation requirements within
the area of the proposed rock fill area, so that rock fill is not placed at elevations such
that excavations for any items will penetrate into the rock fill. This information should be
provided to the grading contractor so that a sufficient soil cover can be placed over the
rock fill in these areas. Provided that the rock fill is placed in general accordance with
these specifications, the time period for monitoring settlements should be reduced to
about 30 days after completion of the fill embankment. The actual time will be based on
the measured rates and magnitudes of settlement which occur during the construction
of this embankment.

2

Rock Fill Beneath Structures                                S&ME No. 1401-94-288-B
Johnson City Crossings                                          October 23, 1995

S&ME, Inc. appreciates this opportunity to work with you on this project. If there are any
questions regarding this correspondence or if we can be of additional service, please
contact us at your convenience.

Sincerely,

S&ME, INC.

J. Russell Ashburn III, P.E.
Senior Geotechnical Engineer

James J. Belgeri, P.E.
Vice President

cc:     Mr. Billy Chandler - Summers-Taylor

JRA/JJB/mc/59

3



Extend as Necessary up Through Fill

3" Metal Casing
(to Protect Interior Rod)
Should be Placed on Plate
Around Interior Rod

Extend Pipe as Necessary up Through Fill

1/2" Galvanized Pipe
or Threaded Rod

1/2" Galvanized Nipple Welded to
Plate to Accept Galvanized Pipe
or Threaded Rod

2' x 2' x 1/2" Thick Steel Plate

Settlement Monitoring Plate
Typical Section - SMP-1 (Revised)

| PROJECT: | | SCALE: | NTS |
| SETTLEMENT MONITORING PLATE DETAIL JOHNSON CITY CROSSING JOHNSON CITY, TENNESSEE | **S&ME** ENVIRONMENTAL SERVICES ENGINEERING TESTING | JOB NO: | 1401-94-288-B |
| | | FIG NO | Figure SMP-1 |

Report of Geotechnical Exploration                     S&ME No. 1401-94-256-B
Johnson City Crossing                                   September 21, 1995

## 5.2  GENERAL EARTHWORK AND GRADING

General earthwork and grading will consist typically of excavation of materials from the eastern and southern portions of the site and placement of the excavated materials as structural fill in the western and northern areas of the site.  Based upon the soil test boring data, significant quantities of rock will be encountered during excavation.  The pinnacle type weathering of the limestone, which is common to the Valley and Ridge Physiographic and Geologic Province, makes the rock surface very erratic.  Intact bedrock is expected to be encountered above the subgrade elevations at many locations intermittent of the boring locations.  Blasting will be required to excavate the intact rock, and blast schedules and plans should be approved by the geotechnical and design engineers prior to initiation of rock excavation.

Intact rock encountered within the building area should be removed to a depth of at least one foot below the foundation bearing elevation.  This is done so that all foundations are bearing on soil or crushed stone and so that rock is not encountered during installation of utilities beneath the floor slab.  This can be handled in the field by excavating all rock within the building area to a depth of one foot below the lowest foundation level or by designating areas within the building area for differential rock excavation.

Due to the amount of fill needed to develop the site, "shot" rock excavated from the site can be utilized in fill only in the parking areas of the site.  The shot rock should not be used as fill under the structures.  It will be necessary to construct fills such that the shot rock fill is not "sandwiched" between soil fill and should be placed in areas that can free drain such as the exterior portions of embankments.  If not a drainage system should be installed to provide drainage without saturating surrounding soils.  In other words, the shot rock fill should be placed directly on the approved residual subgrades, with soil fill

26

TOTAL P.19

Report of Geotechnical Exploration                              S&ME No. 1401-94-288-B
Johnson City Crossing                                              September 21, 1995

placed on top of the shot rock after the surface of the shot rock fill is prepared for soil fill
as described herein. Likewise, shot rock fill must not be intermixed with fine soils except
as discussed in the following paragraph.

Rock used for fill should be no larger than 18 inches in maximum dimension and no
smaller than four inches in maximum dimension and should be placed in loose lifts of two
feet or less. Rock fill should contain no more than about 15 percent fines in order to
maintain rock to rock contact in the rock fill areas. Each lift of the rock fill should be
leveled and densified by tracking with crawler tractors of comparable size to a Cat D-9
with dozer blade attachment and a vibratory roller having a static weight of at least twenty
tons. A test section of the shot rock fill should be constructed prior to initiation of the
production fill to develop more definitive field placement and compaction criteria. Once
the rock fill is complete, the upper layer of rock fill should be "choked" off with smaller
shot-rock if available, or "surge" stone, or a dense-graded aggregate containing more fine
material.

Soil excavation can be performed with scrapers, front-loaders, and other conventional
earthmoving equipment. If soft soils near the soil/rock interface are encountered near
or immediately below the foundation level, these soils should be undercut and replaced
with well-compacted fill soils or crushed stone, such as No. 57.

On-site soils, other than topsoil, roots, and other organically-laden materials are suitable
for reuse as structural fill materials. Based upon laboratory moisture content
determinations, the on-site soils are typically very wet of optimum moisture content and
continuous drying by aeration will be required during the soil fill placement.

27

04/30 '96 15:55

## EXHIBIT "D"

STORE FIXTURES
ALL STORAGE RACKING
ALL SECURITY SYSTEM ITEMS
TELEPHONES AND PAGING SYSTEMS
COMPUTER SYSTEM
OFFICE FURNITURE AND TRASH RECEPTACLES
BATTERY CHARGER
TRASH COMPACTOR
SIGNS (INTERIOR/EXTERIOR)
ANTENNA SYSTEM
ELECTRONIC SWITCHING
AIR COMPRESSOR (ROADSHOP)
SAFE
CONVEYOR
MEDECO CYLINDER LOCKS (5)
REFRIGERATOR AND MICROWAVE USED BY EMPLOYEES
TACK BOARDS
WATER COOLER
FIRE EXTINGUISHERS
AUDIO ROOM FIXTURES AND SWITCHGEAR
PICTURES
WAREHOUSE AND MATERIAL HANDLING EQUIPMENT (MOVABLE LADDERS,
DOLLIES, ETC.)
TRACK LIGHTS (CANS ONLY, NOT TRACKS)

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]



Johnson City
CROSSING

THE HOME DEPOT

SERVICE
MERCHANDISE

SteinMart

MICHAEL'S

CIRCUIT CITY

READING CHINA
& MORE

GENERAL
MERCHANDISE

PETsMART

45'-0"

2'-4"

8'-0"

14'-8"

**Snyder Signs**

2918 CREEKMORE DRIVE
JOHNSON CITY, TN  37601
423-282-6221    FAX 423-282-6222

PROSPECT: J.C. CROSSSING
ADDRESS:
CITY / STATE:
LOCATION:
CONTACT:
SALES REP: SANDRA WALLS

DESIGNER: TED M. TUBBS
DESIGN #: 4028
SCALE: 3\16" = 1'
DATE: 3-29-96
NOTES:

CUSTOMER APPROVAL
SIGNED:
TITLE:
DATE:

This design is the exclusive
property of Snyder Signs, Inc.,
and is not to be used in whole or in
part without written permission from
Snyder Signs, Inc.

## EXHIBIT "F"

### PERMITTED ENCUMBRANCES

A.    Exclusive uses in favor of other owners or tenants of the Shopping Center:

1.    The "Home Depot Exclusive" - No store shall contain 15,000 square feet or less specializing primarily in the sale of any of the following:  hardware items, plumbing supplies, electrical supplies, paint, wallpaper, carpeting, floor coverings, cabinets, siding, ceiling fans, gardening supplies or nursery products.

2.    The "Michaels Exclusive" -  In no event shall the Premises be used for any of the following:  the operation of a "Craft Store," "frame store," or store selling artificial flowers, artificial floral arrangements, wedding or party goods (except apparel), or any store similar to Michaels in merchandising as Michaels is merchandised as of March 15, 1996; provided however, this exclusive shall not apply to the incidental sales of the aforementioned items unless the total floor space devoted to the aforementioned products or services exceeds 1,000 leasable square feet or 1,500 leasable square feet if party goods is the sole product or service sold at the Premises.

B.    Existing Tenants and Existing Leases

1.    Lease, effective April 4, 1996, between Johnson City Crossing, L.P., as Landlord and Michael's Stores, Inc., as Tenant; as amended by that certain First Amendment to Lease, dated May 3, 1996.

2.    Lease, dated March 11, 1996, between Johnson City Crossing, L.P., as Landlord and Stein Mart, Inc., as Tenant, as amended by that certain First Amendment to Lease dated July 23, 1996.

3.    Shopping Center Lease, dated January 27, 1996, between Johnson City Crossing, L.P., as Landlord and PETsMART, INC., as Tenant; as amended by that certain First Amendment to Shopping Center Lease dated March 15, 1996, as further amended by that certain Second Amendment to Shopping Center Lease dated April 17, 1996; as further amended by that certain Third Amendment to Shopping Center Lease dated May 31, 1996.

1

24. Lease, dated March XX, 1996, between Johnson City Crossing, L.P., as Landlord and Reading China and Glass, Inc., as Tenant.

5. Lease, dated April 5, 1996, between Johnson City Crossing, L.P., as Landlord and Service Merchandise Company, as Tenant; as amended by that certain First Amendment to Lease dated May 2, 1996; as further amended by that certain Second Amendment to Lease, dated June XX, 1996.

C.   Permitted Title Exceptions

1.   Right-of-Way Agreement dated April 17, 1963, between Charles D. Krouse, J.C. Krouse and Ruth P. Krouse, and East Tennessee Natural Gas Company, of record in Misc. Book 41, Page 144, Register's Office for Washington County, Tennessee.

2.   Right-of-Way Easement dated October 29, 1970, between J.C. Krouse and Mrs. Wanda Krouse, and the City of Johnson City, Tennessee (Johnson City Power Board), of record in Misc. Book 58, Page 226, Register's Office for Washington County, Tennessee.

3.   Grant of Transmission Line Easement dated April 6, 1959, by C.D. Krouse, Ruth Krouse, J.C. Krouse, James H. Krouse, and Charles J. Krouse, of record in Misc. Book 31, Page 473, Register's Office for Washington County, Tennessee.

4.   Grant of Transmission Line Easement dated April 16, 1959, by C.D. Krouse, Ruth Krouse, J.C. Krouse, James H. Krouse, and Charles J. Krouse, of record in Misc. Book 31, Page 475, Register's Office for Washington County, Tennessee.

5.   Application for Greenbelt Assessment dated April 5, 1993, of record in Roll 28, Image 1688, Register's Office for Washington County, Tennessee.

NOTE:   The land has been classified as Greenbelt for tax assessment, levy and collection purposes, and may be subjected to substantial roll-back taxes as defined in Tennessee Code Annotated, Section 67-5-1001 et seq. (Pursuant to paragraph 9(a) of the Lease, any such roll-back taxes are Landlord's responsibility).

6.   Right-of-Way Easement to the City of Johnson City (Johnson City Power Board) dated May 13, 1971, of record in Misc. Book 59, Page 386, Register's Office for Washington County, Tennessee.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

7.   Right-of-Way Easement to the City of Johnson City (Johnson City Power Board) dated May 13, 1971, of record in Misc. Book 59, Page 387, in the aforesaid Register's Office.

8.   Right-of-Way Agreement dated October 22, 1963, to East Tennessee Natural Gas, of record in Misc. Book 42, Page 423, Register's Office for Washington County, Tennessee.

9.   Declaration of Taking by United States of America (TVA) dated June 28, 1963, of record in Misc. Book 41, Page 435, Register's Office for Washington County, Tennessee.

10.   Declaration of Taking by United States of America (TVA) dated April 4, 1962, of record in Misc. Book 38, Page 114, in the aforesaid Register's Office.

11.   Right-of-Way Easement to the City of Johnson City (Johnson City Power Board) dated January 11, 1957, of record in Misc. Book 26, Page 329, in the aforesaid Register's Office.

12.   Grant of Transmission Line Easement dated May 20, 1959, by Azile E. Peoples to the United States of America, of record in Misc. Book 31, Page 467, Register's Office for Washington County, Tennessee.

13.   Right-of-Way Easement dated December 9, 1940 from Azile E. Peoples to Tennessee Eastern Electric Company, of record in Misc. Book 10, page 270, Register's Office for Washington County, Tennessee.

14.   General Permit dated February 20, 1957, between Marion Sell and Inter-Mountain Telephone Company for construction and maintenance of telephone and telegraph lines, of record in Misc. Book 27, Page 54, in the aforesaid Register's Office.

15.   Right-of-Way Agreement dated February 28, 1963, between Azile E. Peoples and East Tennessee Natural Gas Company, of record in Misc. Book 41, Page 123, in the aforesaid Register's Office.

16.   Right-of-Way Agreement dated August 24, 1993, between Hoover Hobbs and Sandra Lynn Hobbs, and East Tennessee Natural Gas Company, of record in Roll 37, Page 1383, in the aforesaid Register's Office.

17.   Right-of-Way Easement dated May 4, 1971, from Azile E. Peoples to the City of Johnson (Johnson City Power Board) of record in Misc. Book 59, Page 382, in the Register's Office for Washington County, Tennessee.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

18.   Easement Agreement dated March 14, 1996, from Johnson City Crossing, L.P. to Home Depot USA, Inc., of record in Roll 86, Image 2018, in the aforesaid Register's Office.

19.   Development Agreement between Johnson City Crossing, L.P. and Home Depot USA, Inc., of record in Roll 86, Image 2343 and re-recorded in Roll 90, Image 129, in the aforesaid Register's Office.

20.   Memorandum of Lease dated March 11, 1996, between Johnson City Crossings, L.P. ("Lessor") and Stein Mart, Inc., ("Lessee") in-and-to approximately 36,000.00 square feet in Johnson City Crossing Shopping Center of Record in Roll 87, Image 2593, Register's Office for Washington County, Tennessee.

21.   Right of Way Agreement dated July 29, 1993, by and between Stanley R. Keebler and East Tennessee Natural Gas of Record in Roll 36, Image 2198, Register's Office for Washington County, Tennessee.

22.   Reciprocal Easement and Operation Agreement dated March 15, 1996, between Johnson City Crossing, L.P. and Home Depot USA, Inc., of record in Roll 90, Image 96, in the Register's Office for Washington County, Tennessee.

23.   Construction Mortgage Deed of Trust, Security and Fixture Filing Agreement, and Assignment of Leases and Rents dated May 1, 1996, from Johnson City Crossing, L.P., to Elizabeth S. Tonkin, Trustee securing First Union National Bank of Georgia in the stated amount of $15,797,625.00, of record in Roll 90, Image 146, in the aforesaid Register's Office.

24.   Uniform Commercial Code Financing Statement from Johnson City Crossing, L.P. to First Union National Bank securing indebtedness as recorded in Roll 90, Image 146, in the stated amount of $15,797.625.00, of record in Roll 90, Image 200, in the Register's Office for Washington County, Tennessee.

25.   Drainage, utility easements and building restrictions as shown on map or plat of survey of Johnson City Crossing, of record in Plat Book 13, Page 115, Register's Office for Washington County, Tennessee.

26.   Drainage, utility easements and building restrictions as shown on map or of survey of Johnson City Crossing, Phase I, of record in Plat Book 13, Page 179, in the aforesaid Register's Office.

27.   Drainage, utility easements and building restrictions as shown on map or plat of survey of Johnson City Crossing, Phase II, of record in Plat Book 13, Page 179, in the aforesaid Register's Office.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

28.    Drainage, utility easements and building restrictions as shown on Plat and Replat of Johnson City Crossing Phase II recorded at Plat Book 13, page 201 in the aforesaid Register's Office.

29.    Drainage, utility easements and building restrictions as shown on Replat of Lot 12 of Jim Allen Property recorded at Plat Book 13, Page 206 in the aforesaid Register's Office.

30.    Memorandum of Lease dated June 29, 1996, by and between Johnson City Crossings L.P. and PetsMart, Inc. of record in Roll 94, Image 528 in the Register's Office for Washington County, Tennessee.

31.    Memorandum of Lease dated July 8, 1996, by and between Johnson City Crossings L.P. and Service Merchandise Company, of record in Roll 94, Image 1437 in the Register's Office for Washington County, Tennessee.

32.    Deed of Trust dated May 1, 1996, executed by Johnson City Crossings L.P. to Rowland Verran, Trustee securing Franklin D. Sell and Marion P. Sell, Jr. in the stated amount of $350,000.00 of record in Roll 90, Image 205, Register's Office for Washington County, Tennessee.

33.    Subordination, Non-Disturbance and Attornment Agreement dated May 1, 1996, by and between First Union National Bank of Georgia ("Lender"), Johnson City Crossings L.P. ("Borrower") and Service Merchandise Company, Inc. ("Tenant") of record in Roll 90, Image 2205 in the Register's Office for Washington County, Tennessee.

34.    Subordination, Non-Disturbance and Attornment Agreement dated May 1, 1996, by and between First Union National Bank of Georgia ("Lender"), Johnson City Crossings L.P. ("Borrower") and Stein Mart, Inc. ("Tenant") of record in Roll 90, Image 2214 in the Register's Office for Washington County, Tennessee.

35.    Subordination, Non-Disturbance and Attornment Agreement dated May 1, 1996, by and between First Union National Bank of Georgia ("Lender"), Johnson City Crossings L.P. ("Borrower") and Reading China and Glass, Inc. ("Tenant") of record in Roll 90, Image 2224 in the Register's Office for Washington County, Tennessee.

36.    Subordination, Non-Disturbance and Attornment Agreement dated May 1, 1996, by and between First Union National Bank of Georgia ("Lender"), Johnson City Crossings L.P. ("Borrower") and Michaels Stores, Inc. ("Tenant") of record in Roll 90, Image 2234 in the Register's Office for Washington County, Tennessee.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Notwithstanding anything contained in this <u>Exhibit "F"</u> to the contrary, nothing contained herein shall be construed to prohibit the exercise of the rights and privileges granted to the Tenant under the Lease including, but not limited to, Tenant's exclusive use rights set forth in paragraph 18 and 19(a)(vi) of the Lease.

6

EXHIBIT "G"

SUBORDINATION, NON-DISTURBANCE AND
ATTORNMENT AGREEMENT

**THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT** (the "Agreement"), dated the _____ day of _____, 1996, among **FIRST UNION NATIONAL BANK OF GEORGIA** ("Mortgagee"), **JOHNSON CITY CROSSING, L.P.** ("Landlord") and **CIRCUIT CITY STORES, INC.**, a Virginia corporation ("Tenant").

W I T N E S S E T H :

**WHEREAS**, Tenant has entered into a certain lease (the "Lease") dated as of _Sep6. 17, 1996_ with Landlord covering premises located within that certain property known as Johnson City Crossing Shopping Center, located in Washington County, Tennessee and more particularly described in Exhibit A hereto (the "Property"); and

**WHEREAS**, Mortgagee has made a loan to Landlord as evidenced and secured by a Construction Mortgage, Deed of Trust, Security and Fixture Filing Agreement and Assignment of Rents dated May 1, 1996, recorded or to be recorded in the deed records of Washington County, Tennessee (the "Mortgage"), encumbering the property described on Exhibit A; and

**WHEREAS**, the parties hereto desire to set forth their agreement with regard to the priority of the Mortgage and the effect thereof on Tenant and its leasehold interest in the aforesaid premises, as set forth below.

**NOW, THEREFORE**, in consideration of the premises and of the sum of One Dollar ($1.00) by each party in hand paid to the other, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.    The Lease is and shall be subject and subordinate to the lien of the Mortgage insofar as it affects the real property of which the premises form a part, and to all renewals, modifications, consolidations, replacements and extensions thereof, to the full extent of all advances heretofore and hereafter made by Mortgagee and secured by the Mortgage together with all interest thereon. This Agreement shall constitute written notice from Mortgagee to Tenant that Mortgagee is the first mortgage lien holder of the Property, if any such notice is required or permitted by the terms of the Lease.

2.    Tenant agrees that it will attorn to and recognize any purchaser at a foreclosure sale under the Mortgage, any transferee who acquires the premises by deed in lieu of

-1-

foreclosure, the successors and assigns of such purchasers, as its Landlord for the unexpired balance (and any extensions, if exercised) of the term of the Lease upon the same terms and conditions set forth in the Lease. This provision shall operate automatically without further acknowledgment or instrument of attornment.

3.    In the event that it should become necessary to foreclose the Mortgage, Mortgagee thereunder will not terminate the Lease nor join Tenant in summary or foreclosure proceedings so long as Tenant is not in default under any of the terms, covenants or conditions of the Lease, beyond any applicable cure period provided in the Lease.

4.    Mortgagee consents to the application of casualty and condemnation proceeds in accordance with paragraphs 15 and 16 of the Lease between Landlord and Tenant, whether or not the Mortgage is then foreclosed.

5.    In the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be:

(a)    Liable for any act or omission of any prior lessor (including Landlord); or

(b)    Liable for the return of any security deposits unless delivered to Mortgagee; or

(c)    Subject to any offsets or defenses which Tenant might have against any prior lessor (including Landlord) unless Mortgagee has received notice of an opportunity to cure pursuant to paragraph 6 below and in no event shall the cumulative amount of any such offset or defense exceed $148,000; or

(d)    Bound by any rent or other periodic payments which Tenant might have paid for more than the current month to any prior lessor (including Landlord); or

(e)    Bound by any amendment or modification of the Lease made without its consent, which consent shall not be unreasonably withheld or delayed.

(f)    Liable for the completion of any Improvements (as defined in Section 2 of the Lease).

Nothing contained in this paragraph 5 shall be deemed to modify or amend the Lease or preclude Tenant from exercising its rights thereunder in the event of a default by Landlord, subject to the provisions of paragraph 6 of this Agreement. Notwithstanding anything contained herein to the contrary, it is expressly understood and agreed that in the event that Tenant is entitled to receive the Tenant Improvement Allowance (as defined in the Lease) pursuant to the terms of the Lease, Landlord defaults in the payment of the Tenant

Improvement Allowance and Mortgagee acquires title to all or a portion of Landlord's Parcel (as defined in the Lease) by foreclosure or otherwise, Mortgagee shall become liable for the payment of the Tenant Improvement Allowance to Tenant and Tenant otherwise be entitled to effect a Transfer, all in accordance with the terms of the Lease.

      6.    So long as the Mortgage remains outstanding and unsatisfied, Tenant agrees to give prompt written notice ("Default Notice") to Mortgagee of any default by Landlord of its obligations under the Lease which would entitle Tenant to terminate the Lease, reduce rents or to credit or offset any amounts against rents or other payments, specifying the nature of the default. After receipt of a Default Notice, Mortgagee shall have until the expiration of thirty (30) days following receipt from Tenant of written notice that Landlord has failed to cure, within the cure periods available to Landlord under the Lease, the default specified in the Default Notice, in which to correct or cure the default of Landlord. Until the expiration of such period within which Mortgagee may correct or cure the default, Tenant agrees to take no action to terminate the Lease or reduce rents or to credit or offset any amounts against rents or other payments due under the Lease. Nothing in this paragraph shall be deemed to impose any obligation on Mortgagee to correct or cure any such default by Landlord. Any such cure affected by Mortgagee shall be as effective for purposes of curing such default as if the same had been performed or accomplished by Landlord. Notwithstanding the foregoing, Tenant shall have the right, without prior notice to Mortgagee, to make repairs if Tenant determines in good faith that a bona fide emergency precludes the giving of such notice. In the event of such an emergency, Tenant may present to Landlord a demand for reimbursement to the extent permitted under the Lease, but Tenant shall not make deductions from or reductions in rental to recoup such expenses until Tenant has given Mortgagee written notice of such repairs and such demand and a thirty (30) days period to cause such reimbursement to be made.

      7.    Landlord and Tenant agree that Tenant, after receiving notice from Mortgagee that the Property is subject to the ownership or control of Mortgagee pursuant to rights granted to Mortgagee in the Mortgage or otherwise, shall pay to Mortgagee, or to such other person or entity as may be designated by Mortgagee, all rent, additional rent or other monies and payments thereafter due and to become due to Landlord under the Lease. A person or entity who exercises a right arising under the Mortgage, or otherwise, to receive rents payable by Tenant under the Lease shall thereby become obligated to Tenant for the performance of the terms, covenants, conditions or agreements of Landlord under the Lease at such time as such person or entity comes into control, possession or ownership of the Property.

      8.    Tenant understands that the Lease has been assigned as collateral security to Mortgagee for the loan secured by the Mortgage and that the Mortgage and other security instruments executed by Landlord in connection with said loan contain (among others) restrictions on Landlord that, without Mortgagee's prior consent, Landlord shall not modify, terminate or accept a surrender of the Lease except as provided in the Lease and, except as specifically contemplated in this Lease, shall not reduce, abate or accept prepayment of any rent (except the regular monthly rental payments required by the Lease to be paid in advance);

-3-

accordingly, Tenant agrees that, in the event that Mortgagee shall succeed to the interest of Landlord under the Lease, Mortgagee shall not be bound by any such modifications, termination, surrender, abatement or prepayment unless Landlord has first obtained Mortgagee's consent thereto, which consent shall not be unreasonably withheld or delayed.

9.    Whenever any notice, demand or request is required or permitted hereunder, such notice, demand or request shall be hand delivered in person or sent by United States mail, registered or certified, postage prepaid, or by overnight courier service which delivers only upon signed receipt of the addressee, to the addresses set forth below:

| | |
|---|---|
| If to Lender: | If by hand delivery or overnight courier: |
| | First Union National Bank of Georgia<br>999 Peachtree Street, N.E.<br>Atlanta, Georgia  30309<br>Attn:  Michael Smith |
| | If by U.S. mail: |
| | First Union National Bank of Georgia<br>Mail Code 9047<br>P.O. Box 740074<br>Atlanta, Georgia  30374<br>Attn:  Michael Smith |
| If to Landlord: | Johnson City Crossing, L.P.<br>c/o CNM Associates<br>950 E. Paces Ferry Road<br>Suite 900<br>Atlanta, Georgia  30326<br>Attn:  Ben Carter |
| If to Tenant: | Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, Virginia  23233<br>Attn:  Corporate Secretary |
| With a copy to: | Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, Virginia  23233<br>Attn:  Vice President, Real Estate |

10.     As used herein, the word "Mortgagee" includes any persons claiming by, through or under Mortgagee or the Mortgage, including but not limited to any purchaser at foreclosure sale, any grantee of the Property or to such other successor to Landlord's estate, and the words "Tenant" and "Landlord" shall include their respective successors and assigns. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, successors-in-title and assigns.

**IN WITNESS WHEREOF,** the parties hereto have executed these presents the day and year first above written.

**TENANT:**

**CIRCUIT CITY STORES, INC.,** a
Virginia corporation

Signed, sealed and delivered in the
presence of:

_____
Witness

_____
Notary Public

My commission expires: _9/30/00_

[NOTARIAL SEAL]

By: _____
Name: __BENJAMIN B. CUMMINGS, JR.__
Title: _____VICE PRESIDENT_____

[CORPORATE SEAL]

**MORTGAGEE:**

**FIRST UNION NATIONAL BANK OF
GEORGIA**

Signed, sealed and delivered in the
presence of:

_____
Witness

_____
Notary Public

My commission expires: _____

[NOTARIAL SEAL]

By: _____
Name: _____
Its: _____

**LANDLORD**:

Signed, sealed and delivered in the
presence of:

**JOHNSON CITY CROSSING, L.P.**, a
Georgia limited partnership

_____

Witness

By:   JC Crossing, LLC, a Georgia
limited liability company, as sole
general partner

_Robyn E Garrison_
Notary Public

My commission expires: _4/5/99_

By: _____

Name: _Steven Cadranel_

Its: _V.P._

[NOTARIAL SEAL]

TENANT'S ACKNOWLEDGEMENT

STATE OF _____

COUNTY OF_____

      Personally came before me _____, a Notary Public in and for said County and State, Benjamin B. Cummings, Jr., with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the Vice President - Real Estate of the maker or a constituent of the maker and is authorized by the maker or by its constituent, the constituent being authorized by the maker, to execute this instrument on behalf of the maker.

      Witness my hand, at office, this _____day of _____, 1996.

                                           _____
                                         Notary Public

My commission expires:_____

MORTGAGEE'S ACKNOWLEDGMENT

STATE OF _____

COUNTY OF_____

      Personally came before me _____, a Notary Public in and for said County and State, _____ _____, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the _____ of the maker or a constituent of the maker and is authorized by the maker or by its constituent, the constituent being authorized by the maker, to execute this instrument on behalf of the maker.

      Witness my hand, at office, this _____day of _____, 1996.

                                           _____
                                         Notary Public

My commission expires:_____

LANDLORD'S ACKNOWLEDGMENT

STATE OF _____

COUNTY OF_____

      Personally came before me _____, a Notary Public in and for said County and State, _____ _____, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the _____ of the maker or a constituent of the maker and is authorized by the maker or by its constituent, the constituent being authorized by the maker, to execute this instrument on behalf of the maker.

      Witness my hand, at office, this _____day of _____, 1996.


                                      _____
                                        Notary Public

My commission expires:_____

Exhibit "A"
Legal Description

## LEGAL DESCRIPTION OF THE PROPERTY

Lot 1 of Johnson City Crossing, Phase I and Lots 3, 4 and 5 of Johnson City Crossing Phase II as of Plat thereof recorded in Plat Book 13, Page 201, Register's Office for Washington County, Tennessee, less and except any portion of the aforesaid Lot 3 lying within the right of way of Peoples Street.

## EXHIBIT "H"

MEMORANDUM OF LEASE

This Memorandum of Lease is made this _____ day of _____, 199___, between JOHNSON CITY CROSSING, L.P., a Georgia, limited partnership (hereinafter referred to as "Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter referred to as "Tenant").

W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease") dated _____, 199___, whereby Landlord has leased to Tenant a portion of the real property (the "Property"), located in Johnson City, _____ County, Tennessee, the legal description of which Property is set forth on Exhibit "A-1" attached hereto. The Lease contains provisions and rights appurtenant to the Property, some of which are as follows:

I.    Term.  The term of the Lease is for a period of twenty (20) years, commencing on the Commencement Date (as established in the Lease based upon the substantial completion of the improvements upon the Property). Thereafter, Tenant has the right under the Lease to renew and extend the term of the Lease for four (4) successive periods of five (5) years each.

II.   Exclusive Use Rights.   So long as the Premises (as defined in the Lease) are used as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular telephones, household appliances (which include, but shall not be limited to, refrigerators, freezers, stoves, microwave ovens, vacuum cleaners and dishwashers) and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products (including, without limitation, any period when restoration or remodelling work is being conducted) and Circuit City is subject to the "Michaels Exclusive" (as defined in Exhibit "F" of the Lease, the store to be operated by Michaels in the Shopping Center shall not be

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

entitled to sell or rent (or rent to own) any of the Products (as defined in the Lease). Notwithstanding the exclusive rights of Circuit City as set forth herein, Michaels shall not be deemed in violation thereof provided that the Michaels store is operated and merchandised in substantially the same manner as other Michaels stores are operated and merchandised on a national basis as of March 15, 1996.

III. <u>Pylon Sign</u>. "Pylon Sign 1" (as defined in the Lease) is located on real property owned by Landlord and more particularly described on <u>Exhibit "B"</u> attached hereto (Sign Parcel). "The Common Area Easement" (as defined in the Lease) granted by Landlord to Tenant in the Lease includes an easement to construct, operate, use, maintain, repair and replace Pylon Sign 1 and the panels thereon and for all utilities servicing same. Landlord has covenanted and agreed that should Landlord sell the Sign Parcel prior to the "delivery of the Land" (as defined in the Lease), then such sale shall be subject to such easement which shall be a first and paramount recorded property right; however, Landlord shall have the right to relocate such easement onto any portion of the Sign Parcel retained by Landlord provided that Tenant approves of such location in its sole discretion.

IV. <u>Successors</u>. The covenants, conditions and agreements made and entered into by the parties hereto shall be binding upon and inure to the benefits of their respective heirs, administrators, executors, representatives, successors and assigns.

V. <u>Incorporation of Lease</u>. All terms and conditions of the Lease are hereby incorporated herein by reference as if fully set forth herein.

VI. <u>Conflicts with Lease</u>. This Memorandum of Lease is solely for notice and recording purposes and shall not be construed to alter modify, expand, diminish or supplement the provisions of the Lease. In the event of any inconsistency between the provisions of this Memorandum

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

of Lease and the provisions of the Lease, the provisions
of the Lease shall govern.

    IN WITNESS WHEREOF, this Memorandum of Lease has been duly
executed by the parties hereto as of the day and year first above
written.

JOHNSON CITY CROSSING L.P.,
a Georgia limited partnership

By: JC Crossing, LLC, a Georgia
limited liability company, as
sole general partner
a Georgia limited partnership

Attest:

By:_____
    Secretary

By:_____
Name:_____
Title:_____


CIRCUIT CITY STORES, INC.,
a Virginia corporation

Attest:

By:_____
    Secretary

By:_____
Name:_____
Title:_____

3

STATE OF _____

COUNTY OF_____

     Personally came before me _____, a Notary Public in and for said County and State, _____ _____, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the _____ of the maker or a constituent of the maker and is authorized by the maker or by its constituent, the constituent being authorized by the maker, to execute this instrument on behalf of the maker.

     Witness my hand, at office, this _____day of _____, 1996.

                                      _____

                                      Notary Public

My commission expires:_____

STATE OF _____

COUNTY OF_____

     Personally came before me _____, a Notary Public in and for said County and State, _____ _____, with whom I am personally acquainted, and who acknowledged that he executed the within instrument for the purposes therein contained, and who further acknowledged that he is the _____ of the maker or a constituent of the maker and is authorized by the maker or by its constituent, the constituent being authorized by the maker, to execute this instrument on behalf of the maker.

     Witness my hand, at office, this _____day of _____, 1996.

                                      _____

                                      Notary Public

My commission expires:_____

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Exhibit "A-1"
Legal Description

### LANDLORD'S PARCEL LEGAL DESCRIPTION

Lot 1 of Johnson City Crossing, Phase I and Lots 3, 4 and 5 of
Johnson City Crossing Phase II as of Plat thereof recorded in
Plat Book 13, Page 201, Register's Office for Washington
County, Tennessee, less and except any portion of the
aforesaid Lot 3 lying within the right of way of Peoples
Street.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

Exhibit "B"
Sign Parcel

Lot 12 of Johnson City Crossing Phase II as per the plat
thereof recorded in Plat Book 13, Page 201, Register's Office
for Washington County, Tennessee.

6

## EXHIBIT "I"

### COMMENCEMENT DATE AGREEMENT

THIS AGREEMENT, made as of this ____ day of _____, 19__, between JOHNSON CITY CROSSING, L.P. (herein called "Landlord"), and CIRCUIT CITY STORES, INC. (herein called "Tenant").

### W I T N E S S E T H:

WHEREAS, Landlord is the owner of certain premises situated in Johnson City, _____ County, Tennessee_ (herein called the "Premises"); and

WHEREAS, by that certain lease dated _____ __, 19__ (herein called the "Lease"), Landlord leased the Premises to Tenant; and

WHEREAS, a memorandum or short form lease in respect of the Lease was recorded in the office of the Clerk of _____ County, _____, on the ____ day of _____, 19__, in Book _____ at Page ____; and

WHEREAS, Tenant is in possession of the Premises and the term of the Lease has commenced; and

WHEREAS, under Paragraph 25 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease;

NOW, THEREFORE, Landlord and Tenant agree as follows:

1. The term of the Lease commenced on, and the Commencement Date (as such term is defined in the Lease) was, _____, 19__.  The term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to extend the term of the Lease or unless the Lease terminates earlier as provided in the Lease.

2. The date of commencement of the first "Option Period" (as such term is defined in the Lease) shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, ____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

3. The date of commencement of the second Option Period shall be February 1, ____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall

1

expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

4. The date of commencement of the third Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

5. The date of commencement of the fourth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless Tenant exercises any option to further extend the term of the Lease or the Lease terminates earlier as provided in the Lease.

6. The date of commencement of the fifth Option Period shall be February 1, _____ if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the term of the Lease shall expire on January 31, _____ unless the Lease terminates earlier as provided in the Lease.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

JOHNSON CITY CROSSING L.P.,
a Georgia limited partnership

By: JC Crossing, LLC, a Georgia limited liability company, as sole general partner

Attest or Witness:

_____     By_____

Attest:                              CIRCUIT CITY STORES, INC.

_____     By_____
Assistant Secretary                       Vice President

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

## EXHIBIT "J"

### INDEMNIFICATION AGREEMENT

This Indemnification Agreement is made this _____ day of
_____, 199__, between JOHNSON CITY CROSSING, L.P., a
Georgia limited partnership (hereinafter referred to as "Landlord")
and CIRCUIT CITY STORES, INC., a Virginia corporation (hereinafter
referred to as "Tenant").

### WITNESSETH

Landlord and Tenant have entered into a Lease (the "Lease")
dated _____ whereby Landlord has leased to Tenant a
portion of the real property located in Johnson City,
_____ County, Tennessee (the "Shopping Center") and
Tenant has constructed on such real property a store premises (the
"Premises").   NOW, THEREFORE, in consideration of the payment of
the Tenant Improvement Allowance as defined in the Lease and other
good and valuable consideration, the receipt of which is hereby
acknowledged, the parties hereto agree as follows:

1.   The Tenant hereby indemnifies and agrees to hold
Landlord, First Union National Bank of Georgia, its lender, and
Commonwealth Land Title Insurance Company harmless from any loss,
payment, claim or expense as the result of mechanics and
materialmen filing liens or otherwise making claims against
Landlord's interest in the Premises and the Shopping Center.   In
the event that any mechanic, materialman or other claimant makes
claim against the Premises or Shopping Center based upon materials
or services provided under contract with the Tenant, the Tenant
shall hold harmless and protect the Landlord from any loss,
payment, claim or expense related thereto.

2.   The Tenant reserves the right to contest in good faith
the amount of any claim or lien assessed against the Premises or
the Shopping Center by any of such claimants; provided, however,
should the holder or holders of such claim or lien attempt to

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

enforce their lien by foreclosure by any other means, the Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center.  This indemnity and hold harmless shall not apply to any liens or claims caused by the Landlord or Landlord's agents.

EXECUTED this _____ day of _____, 199___.

**LANDLORD**

JOHNSON CITY CROSSING L.P.,
a Georgia limited partnership

By: JC Crossing, LLC, a Georgia
limited liability company, as
sole general partner

By:_____
Name:_____
Title:_____

**TENANT**

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By:_____
Name:_____
Title:_____

2

## EXHIBIT "K"

JOHNSON CITY CROSSING
Existing Prohibited Uses

1.  any business or use which creates strong, unusual or offensive odors, fumes, dust or vapors, is a public or private nuisance, emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness, or creates unusual fire, explosive or other hazards; provided however that Tenant's use of the Premises for the installation of car stereos and/or other audio and telecommunications equipment in motor vehicles shall not be deemed a violation of this provision;

2.  funeral parlor or establishment or mortuary;

3.  automobile dealerships or other automobile sale or leasing facilities;

4.  automobile repair shop, service station or any facility for the storage or sale of gasoline or diesel fuel in or from tanks; provided however that Tenant's use of the Premises for the installation of car stereos and/or other audio and telecommunications equipment in motor vehicles shall not be deemed a violation of this provision;

5.  auction or bankruptcy sale;

6.  sale or repair of boats, trailers or mobile homes;

7.  pawn shop;

8.  outdoor circus, carnival or amusement park or other outdoor entertainment facility or for outdoor meetings; provided however that Tenant's occasional use of the Premises for outdoor promotions (such as, by way of example only, the Bose truck) shall not be deemed a violation of this provision;

9.  any manufacturing, industrial manufacturing, wholesale or non-retail operation (i.e., an operation not catering to the general public);

10. offices;

11. lumber yard (except a home improvement center, such as Lowes or Home Depot);

1

12. dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location) or coin operated laundry;

13. church, kiosk or other like-kind structure;

14. pool or billiard parlor or establishment;

15. shooting gallery;

16. flea market or auction house;

17. body and fender shop;

18. place of recreation (including, but not limited to bowling alley, skating, ice or roller rink, carnival, any business using exterior loud speakers or amusement or game arcade or health spa; provided that the foregoing shall not prohibit a children's recreational entertainment or day care center, except as otherwise hereinafter expressly provided) or Tenant's display of electronic games incidental to Tenant's primary operation;

19. off-track betting (provided that state sponsored lottery tickets shall not be prohibited);

20. refinery;

21. adult bookstore or facility selling or exhibiting pornographic materials, or a store offering for exhibition, sale or rental video cassettes or other media capable of projecting, transmitting or reproducing, independently or in conjunction with another device, machine or equipment, an image or series of images, the content of which is pornographic; provided, however, that the foregoing (i) shall not be deemed to prohibit the sale of books, magazines or other publications of an adult nature if the sale of such items is incidental to the operation of a general book store, (ii) shall not be deemed to prohibit the sale or rental of video tapes of adult nature so long as such sale or rental is incidental to the operation of a full line video store or full line video department within a store and such are not openly advertised or prominently displayed, and (iii) shall not be deemed to prohibit the operation of a movie theater to the extent the same is otherwise permitted as indicated below so long as such theater shows films commonly shown by national or regional movie theater chains and is not operated as what is commonly referred to as an "adult movie theater." As used herein, an "adult book store of facility selling or displaying pornographic materials" shall include, without limitation, a store displaying for sale or exhibit books, magazine or other

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

publications containing any combination of photographs, drawing, or sketches of a sexual nature which are not primarily scientific or educational (collectively, "Sex Magazines") (it being acknowledged however, that "Playboy," "Playgirl," and "Penthouse" are not deemed to be Sex Magazines);

22. massage parlor or so-called "head shop";

23. any residential use, including but not limited to living quarters, sleeping apartment or lodging rooms;

24. auditorium, meeting hall, ballroom, banquet hall, school or other place of public assembly;

25. unemployment agency, service or commission;

26. sporting event or other sports facility, gymnasium, health club, exercise or dance studio;

27. [intentionally omitted];

28. cinema, theater or movie theater;

29. night club or dance hall;

30. cocktail lounge, bar, pub, tavern, or other establishment serving alcohol for on-premises consumption (except for those operated ancillary to a full-service restaurant which derives not more than 50% of its gross receipts from the sale of alcoholic beverages);

31. discotheque;

32. a social encounter restaurant, except this shall not prohibit a restaurant which derives not more than 50% of its gross receipts from the sale of alcoholic beverages or a restaurant which does not serve alcoholic beverages from being located within the Shopping Center and on the Outparcels. The term "social encounter restaurant" as used herein shall mean a restaurant one of whose primary objectives is the sale of beer, wine and alcoholic beverages in an atmosphere that encourages social mixing and mingling. The term "restaurant" shall not be deemed to include (i) bakery, yogurt, ice cream, donut, cookie, candy/nut and other shops selling specialty food items which are not primarily for full meal dining; (ii) delicatessens providing counter seating and less than 10 table seats; (iii) stores selling food products which are not prepared on such premises and which are intended for off-premises consumption, including groceries, meats, fresh fruits, vegetables, and frozen foods, and such uses shall not

3

be restricted and (iv) a "Depot Diner" or other similar food service operation operated as an ancillary use and service in connection with the operation of a larger non-food retail use. The term restaurant shall include fast food operations (except as provided in subparagraph (iv) above) and any establishment serving alcoholic beverages for on-premises consumption;

33. restaurant (including but not limited to pizza, ice cream and yogurt operations);

34. bingo or similar games of chance, but lottery tickets and other items commonly sold in retail establishments may be sold as an incidental part of business;

35. video game, amusement center or arcade or game room (excluding Discovery Zone, Chuck E. Cheese, Showbiz Pizza or other similar operators) except that the foregoing shall not be deemed to prohibit Tenant's display of electronic games incidental to Tenant's primary operation;

36. car wash;

37. second hand or used clothing or thrift store or liquidation store [other than a first class operation which is a regional chain having its own trade name and customer recognition and typically located in high quality retail shopping centers in the metropolitan area in which the Shopping Center is located (e.g., "Once Upon a Child")];

38. non-retail use (which shall not prohibit in the Shopping Center such uses commonly referred to as "quasi-retail" or "service retail" such as a travel agency, real estate office, insurance agency, accounting service, or other similar uses commonly found in first class shopping centers in the marketplace, so long as same do not exceed 10% of the Leasable Square Feet of the Shopping Center) or any other use inconsistent with the operation of a high quality retail Shopping Center;

39. [intentionally omitted];

40. liquor store;

41. entertainment facility;

42. children's recreational, entertainment or day care centers;

43. drive-throughs;

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

44.   restaurant or fast food operation incorporating coin-operated
      amusements or showing movies to its customers thereof other
      than as an incidental or immaterial part of its business.

[J:\013363\176\lease7a.W51]
[08/27/96 2:06pm; SCHWARTZ_B]

## Exhibit "L"

All buildings within the Landlord's Parcel shall collectively be consistent in height and no building within the Shopping Center shall be more than ten percent (10%) higher in elevation than the collective height of the store buildings, without prior approval of Service Merchandise.

1