IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| CIRCUIT CITY STORES, INC., et. al. | ) | Case No. 08-35653 (KRH) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## RESPONSE TO LIQUIDATING TRUST'S TWENTIETH OMNIBUS
## OBJECTION TO LANDLORD CLAIMS

COMES NOW Monica Teplis, Dr. Paul Teplis, Mrs. Belle Teplis, and Sharon
Rose Friedman (hereinafter "Claimants"), holder of claim number 7825 and creditors in
the above-styled bankruptcy case, and submits their Response to the Liquidating Trust's
Twentieth Omnibus Objection to Landlord Claims (hereinafter "the Objection"). In
support of their Response, Claimants show the Court as follows:

1.

On April 26, 1989 the Debtor, Circuit City Stores, Inc., (hereinafter "Debtor")
entered into a lease agreement to occupy as tenant certain property consisting of 34,947
square feet at the intersection of Memorial Drive and I-285 in DeKalb County, Georgia
(hereinafter "Property").

2.

The Claimants were the owners and the landlord under said lease. Pertinent
portions of the lease are attached hereto as Exhibit "A."

3.

The lease was to end at midnight on May 1, 2009.

4.

On or before June 22, 2006 the Debtor vacated the property.

5.

With the permission of the Claimants, the Debtor on June 30, 2006 entered into a

sublease of the Property at a reduced rate with New Avenues Lease Ownership, LLC as

subtenant (hereinafter "Subtenant").  A copy of the pertinent portions of said sublease is

attached hereto as Exhibit "B."

6.

Subtenant paid the reduced rent to the Debtor monthly along with $1/12^{th}$ of the

annual property taxes. Through October 2008 the Debtor continued to pay the rental

amount in the main lease and annually paid the property taxes to Claimants.

7.

In November of 2008, the Debtor failed to pay the monthly rental pursuant to the

main lease.

8.

Beginning in December 2008, the Subtenant paid the rental under the sublease

directly to Claimants.  This was done for the months of December, January and February.

The main lease ended after February 2009.

9.

Debtor failed to pay real estate taxes under the lease for the year 2008 in the sum

of $33,364.41.

2

10.

The Claimants seek the rental amount under the main lease in the sum $24,600.57

for the month of November 2008 plus the difference in the sublease and the main lease

for the months of December 2008, January 2009 and February 2009 in the sum of

$9,331.21 for a total of $27,993.63.  In addition they seek the 2008 real estate taxes in the

sum of $33,364.41 for a grand total of their claim in the sum of $85,958.61.

WHEREFORE, Claimants pray that their claim be allowed and for

such other and further relief as to the Court may seem proper.

Respectfully Submitted,

John C. Pennington
Georgia Bar No. 571400
Attorney for Claimants

John C. Pennington, P.C.
P. O. Box 275
Helen, GA 30545
(706) 878-0033

3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In Re: | Chapter 11 |
| CIRCUIT CITY STORES, INC., et. al. | Case No. 08-35653 (KRH) |
| Debtors. | Jointly Administered |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this date served a true and correct copy of the foregoing **RESPONSE TO LIQUIDATING TRUST'S TWENTIETH OMNIBUS OBJECTION TO LANDLORD CLAIMS** by Federal Express via overnight delivery with sufficient funds and properly addressed to:

Clerk of the Bankruptcy Court
United States Bankruptcy Court
701 East Broad Street – Room 4000
Richmond, Virginia 23219

Jeffrey N. Pomerantz, Esq.
Andrew W. Cain, Esq.
PACHULSKI STANG ZIEHL & JONES, LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100

Lynn L. Tavenner, Esq.
Paula S. Beran, Esq.
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219

This 6 day of April 2011.

John C. Pennington

John C. Pennington, P.C.
P.O. Box 275
Helen, GA 30545
(706) 878-0033

4

EXHIBIT "A"

MEMORIAL DRIVE, ATLANTA, GEORGIA LEASE

| SECTION | | PAGE |
|---|---|---|
| 1. | Leased Property | 1 |
| 2. | Construction of Building and Improvements | 2 |
| 3. | Easements | 4 |
| 4. | Lease Term | 11 |
| 5. | Rent and Charges | 12 |
| 6. | Alterations | 14 |
| 7. | Maintenance, Repairs and Replacements | 15 |
| 8. | Signs | 16 |
| 9. | Tenant's Property and Waiver of Landlord's Lien | 17 |
| 10. | Insurance | 18 |
| 11. | Assignment and Subletting | 22 |
| 12. | Compliance with Applicable Laws | 25 |
| 13. | Payment of Utility Bills | 25 |
| 14. | Taxes | 25 |
| 15. | Condemnation | 29 |
| 16. | Damages to the Premises or Shopping Center by Fire or Other Casualty | 32 |
| 17. | Holding Over | 38 |
| 18. | "For Rent" Signs | 38 |
| 19. | Events of Tenant's Default | 38 |
| 20. | Landlord's Remedies | 40 |
| 21. | Events of Landlord's Default | 44 |
| 22. | Waiver | 45 |
| 23. | Successors and Assigns | 45 |
| 24. | Landlord's Warranties and Representations | 45 |
| 25. | Holidays | 49 |

26. Applicable Law ..................................... 49

27. Notices ............................................ 49

28. Merger ............................................. 50

29. Captions ........................................... 50

30. Subordination and Attornment ...................... 51

31. Estoppel Certificates ............................. 53

32. Mechanics' Liens .................................. 54

33. Use ............................................... 54

34. Rules and Regulations ............................. 55

35. Memorandum of Lease; Commencement Date Agreement .... 56

36. Force Majeure ..................................... 56

37. Brokers ........................................... 56

38. Change of Landlord ................................ 57

39. Development and Maintenance of Shopping Center by
    Landlord ........................................... 57

40. Common Area Maintenance ........................... 58

41. Miscellaneous ..................................... 61

42. Effectiveness of Lease; Tenant's Right to Terminate .. 65

43. Landlord Liability ................................ 67

44. Relocation Option ................................. 68

Memdrive.lse
Building Lease
Draft 4/26/89

## LEASE

THIS LEASE is made as of the 26th day of April, 1989, by and

between NATHAN TEPLIS, DR. PAUL TEPLIS, MRS. BELLE TEPLIS FRANK

and MISS SHARON ROSLYN FRIEDMAN, having an address of c/o Robert

M. Bush, 750 Hammond Drive, Suite 100, Building 19, Atlanta, GA

30328, (the "Landlord") and CIRCUIT CITY STORES, INC., a Virginia

corporation, having an address at 2040 Thalbro Street, Richmond,

Virginia  23230 (the "Tenant").

## W I T N E S S E T H :

That for and in consideration of the mutual covenants herein

contained and other good and valuable considerations, the receipt

and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

1.  Leased Property.  Landlord demises and leases to Tenant

and Tenant leases and takes from Landlord, commencing on the Rent

Commencement Date (defined below), all that certain Building and

Improvements (defined below) consisting of approximately 34,947

square feet, to be located on that particular site (the "Land")

more particularly described in Exhibit "A" hereto and shown

(approximately) outlined in red on Exhibit "B" hereto, together

with the easements described in Paragraph 3 below, all located in

the Service Merchandise Plaza (the "Shopping Center,") which shall be defined as those parcels of real property with buildings and improvements constructed or to be constructed thereon, located at Memorial Drive and I-285, lying and being in the County of DeKalb, State of Georgia, and more particularly shown on that Site Plan attached hereto as Exhibit "B" and incorporated herein by this reference.  The Land and Building, Improvements, fixtures and appurtenances are sometimes collectively referred to as the "Premises."  All of the Shopping Center exclusive of the Premises is "Landlord's Premises."  The description of the Premises may be adjusted in accordance with Tenant's as-built survey to be attached hereto as Exhibit "B-1" upon completion of the Building (as described in Section 2 below), provided that any adjustment to the description of the Premises shall be subject to Landlord's approval.

2.  Construction of Building and Improvements.  Commencing immediately, Tenant shall have the right to remodel or renovate the Building and/or construct on the Land certain improvements (the "Improvements"), namely a one-story retail building with mezzanine space containing approximately 34,947 square feet of ground floor space plus mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor and other such appurtenances, as more particularly set forth in the construction provisions attached hereto as Exhibit "C" (the "Construction Provisions") and incorporated herein by this reference.  The Improvements shall be constructed in accordance with Tenant's

-2-

plans and specifications approved by Landlord as specif
Construction Provisions. Except as otherwise provided h
Improvements shall belong to Landlord upon the expiratic
lier termination of this Lease, provided that Tenant may
any trade fixtures, movable partitions, lighting or pers
property upon said expiration or termination, in accorda
the provisions of paragraph 9 below, so long as said rem
not damage said Improvements, and so long as, at the time
removal, Tenant is not in default hereunder beyond any ap
cure period. A nonexclusive list of items which are deem
sonal property and trade fixtures is attached as Exhibit
Landlord shall, throughout the Term and Option periods, c
with Tenant to apply for and secure from any governmental
ity having jurisdiction thereover any approvals, permits o
licenses which may be necessary in connection with the ren
or construction of the Building or Improvements or the mak
any alterations, additions, changes or repairs to the Build
Improvements permitted hereunder; and Landlord agrees upon
request by Tenant to execute or join in the execution of an
application for such approvals, permits or licenses. All f
connection with such approvals, permits or licenses, and all
costs incurred by Landlord in cooperating with Tenant as pro
herein shall be paid by Tenant.

Pursuant to Sections 2(e) and 3 of the Construction Prov
sions, upon "substantial completion" (as defined therein) of
Improvements, Landlord shall pay to Tenant a tenant improveme
allowance in the amount of Five Hundred Thousand and No/100 D
lars ($500,000.00) (the "Tenant Improvement Allowance").

-3-

3.  **Easements.**  From the date hereof and during the term of
this Lease and any extensions or renewals thereof, Landlord
hereby grants, or shall cause to be granted unto Tenant, nonex-
clusive easements for construction, footings and foundations,
utilities, encroachments, vehicular parking and vehicular, pedes-
trian and service ingress and egress to and from the Premises
over, under, upon and across the parking areas, driveways and
access ways, sidewalks and walkways, exits and entrances, and
other common areas, as specified in Paragraph 40 below, as said
areas (the "Common Areas") now or shall hereafter exist in the
Shopping Center, which areas are those shown on Exhibit "B"
except for the Premises and portions of Landlord's Premises
designated "Permissible Building Areas."  The term "Site" as used
herein shall mean, as to Landlord, the Common Areas or Landlord's
Premises, and as to Tenant, the Land and/or the Premises.  Land-
lord reserves for itself and those claiming by, through or under
Landlord, a nonexclusive easement for utilities, vehicular and
pedestrian ingress and egress to, over, under, upon and across
the Common Areas for the benefit of buildings located within
Landlord's Premises; provided, however, that Landlord shall not
interfere with Tenant's construction or use of the Land, Building
or Improvements.

(a)  **Successors and Assigns.**  Wherever a party (sometimes
referred to as a "grantor") to this Lease grants an easement or
license, it is intended that the grant shall bind and include not
only such party, but its heirs, successors and assigns as well.
Similarly, wherever a party (sometimes referred to as a "gran-
tee") to this Lease is granted an easement or license, it is

intended that the grant shall benefit and include not only such
party, but its heirs, successors and assigns as well.

(b)    Interpretation.    The word "in", in respect of an ease-
ment granted "in" a particular Site means, as the context may
require, "in," "to," "on," "over," "through," "upon," "across,"
and/or "under."

(c)    Construction Easement. For the period of Tenant's con-
struction of the Improvements, Landlord hereby grants to Tenant a
nonexclusive temporary easement in the Common Areas for the pur-
pose of the development, construction, repairs and reconstruction
of the Building and Improvements.    The use of such easement by
Tenant shall not result in damage or injury to the buildings or
other improvements of Landlord, and shall not unreasonably inter-
fere with the business operations conducted by Landlord and/or
its tenants, and said easement shall be subject to such other
reasonable conditions as Landlord shall require from time to
time.    In addition to the foregoing, Landlord shall grant to
Tenant an exclusive easement for a construction staging area (the
"Staging Area") to be located in the Common Areas at a mutually
agreeable location within a reasonable distance of the Premises
for Tenant's use in storing its construction equipment, trailers,
materials and other items to be used by Tenant in the course of
its construction, for which items Tenant shall be solely respon-
sible.    Tenant will indemnify and hold Landlord harmless from
such damage or injury to the buildings, roads, utilities, lands-
caping or other improvements of Landlord, from unreasonable
interference with the business or construction operations con-
ducted by Landlord and other tenants in the Shopping Center, and

-5-

from any and all claims, liability, costs or expenses in connection with death or personal injury resulting from the Tenant's use of this easement.  After the initial construction of the Building and Improvements, these easements shall automatically terminate, and Tenant shall not request Landlord to consent to the use of the Common Areas for the above-stated purposes of this subparagraph 3(c), including access for construction vehicles, if reasonable alternatives are available on the Premises; provided, however, Landlord agrees to grant Tenant equivalent construction easements in connection with any required, approved or permitted reconstruction, alteration or repairs as provided herein.  The initial construction easement contained in this subparagraph (c) shall expire on March 31, 1990.

(d)  Footing and Foundation Easements.  Landlord hereby grants to Tenant, its successors and assigns, and Tenant hereby grants to Landlord, its successors and assigns, such easements and rights in, its respective Site, (i) for the construction and maintenance of foundations, footings, supports and walls reasonably necessary in connection with the construction of their respective improvements on their respective Sites; provided same does not adversely affect existing construction on the other's Site; and, provided the same does not affect the separate insurance rating of the other party's building, (ii) to allow their respective buildings to abut and connect (but not bear structurally upon each other unless and except as otherwise provided herein), (iii) for a roof projection allowing the grantee to tie its building into the adjoining building by flashing and reglets. No such attachment or connection shall be made, however, unless

-6-

detailed plans therefor shall have been timely submitted to and
approved by the party to whose building the attachment is to be
made.   The grantee shall repair, at its sole expense, any damage
to any building of the grantor caused in making or maintaining
said attachment and shall indemnify and hold the grantor harmless
from any and all claims, liability, costs and expenses, whether
in connection with death, personal injury, or property damage,
which result or arise out of the making or maintenance of such
attachment. The parties will cooperate and cause their respective
contractors to cooperate with each other in the coordination of
construction schedules so as to facilitate the construction of
the improvements of their respective Sites and the connection of
other buildings in the Shopping Center.  The Building shall not
be used by Landlord for loadbearing purposes nor shall the Land-
lord's buildings be used by Tenant for loadbearing purposes.  The
easements set forth in this subparagraph 3(d) shall apply only to
initial construction and any reconstruction as provided for in
this Lease.

    (e)  <u>Utility Easements</u>.  From and after the date hereof,
Landlord hereby grants to Tenant, its successors and assigns, for
the benefit of the Premises, such easements as are necessary,
without unreasonably interfering with the use by Landlord <u>or
other tenants in the Shopping Center</u> of the Common Areas as pro-
vided in this Lease, to provide rights-of-way for public or pri-
vate underground utilities services for the benefit of the Pre-
mises, and access to and use of gas (if any), electrical, tele-
phone, water, storm and sanitary sewer systems, and for the
drainage of surface and underground storm water and the like (the

-7-

"Utility Easements").  The Utility Easements shall be for the purposes of installing, using, operating, maintaining, repairing, relocating, replacing or enlarging any such utility. In order to effectuate the purposes of such Utility Easements, Tenant may convey such easements to the appropriate providers of such utilities.  Any such Utility Easement may, however, be relocated by Landlord, at any time or from time to time at the expense of Landlord, provided that such relocation shall not interfere with, increase the cost of, or diminish Tenant's utility services, and that such relocated Utility Easement shall be subject to the provisions of this easement and may also be used by Tenant.  For the purpose of exercising the rights granted in this subparagraph 3(e), Tenant, and its respective employees, agents and contractors, shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to the following conditions and requirements:

(i) No less than ten (10) days' prior written notice shall be given to Landlord that Tenant anticipates doing such work, together with notification of the nature and extent of such work, the proposed area of such work, and the anticipated date of start of such work; but if the work involved is emergency repair work, only such advance notice, written or oral, as is reasonably practicable need be given;

(ii) After such work, the utility system, pipes or lines affected thereby shall be underground and shall not lie beneath or within five feet (5') of the floor area of any existing building within the Shopping Center, but this subpara-

-8-

graph (ii) shall not require the moving of any pipes or lines
theretofore installed not in violation of this Lease;

(iii)   After the completion of work, Tenant or
the other entity requiring the Utility Easement shall restore the
affected portion of the Landlord's Site and improvements so used
to the same or as good condition as existed immediately before
the commencement of such work; and

(iv)   Any work performed under this subpara-
graph 3(e), and the restoration of the Site after work is com-
pleted shall be done at the sole cost of Tenant or the other
entity requiring the same and shall be performed in such a manner
as not to cause any interruption of or undue interference with
the business conducted on the Landlord's Premises and the busi-
ness conducted by Tenant.   To the extent possible, no such work
shall be performed on weekends or during holiday seasons.

(f)  Common Area Easements.  Landlord hereby grants to
Tenant, its successors and assigns, for the benefit of the Pre-
mises, as herein described, the nonexclusive right, privilege and
easement (the "Common Area Easement") for the full term of this
Lease, including Option Periods (as defined in Paragraph 4), to
use the Common Areas for their intended purposes and to permit
its employees, agents, subtenants, assignees, licensees, suppli-
ers, customers and invitees to use the same, in common with Land-
lord, its heirs, successors, assigns, employees, agents, lessees,
licensees, suppliers, customers and invitees and all persons
claiming by or through them, for, among other purposes, parking
and pedestrian, service and vehicular access, ingress and egress
to, from and between the Premises and the Landlord's Premises and

the streets and highways abutting and adjacent to the Shopping

Center, without payment of any fee or other charge therefor.

Subject to the limitations contained in Paragraph 40(d),

Landlord reserves the right, from time to time, without obtaining

the consent or approval of Tenant, to make any reasonable and

nonmaterial changes, modifications or alterations to those por-

tions of Landlord's Premises which are subject to the foregoing

Common Area Easement, provided that the accessibility of the Pre-

mises and visibility of the Building to pedestrian and vehicular

traffic are not unreasonably nor materially and adversely

restricted thereby and the flow of vehicular traffic thereon is

not materially and adversely affected, and provided further, that

the parking ratio is not reduced below five (5) spaces per 1000

square feet of gross leasable area in the Shopping Center. Not-

withstanding this subparagraph 3(f) ⬛ to the contrary, Landlord

shall not make any changes in the area marked on Exhibit "B" as

"Tenant's Preferred Area" without Tenant's written consent.

(g) Encroachments. While it is the intention of the parties

to confine their improvements to the limits of their respective

Sites, it is recognized that this result is not always achieved

in a shopping center developed by multiple parties. Accordingly,

each party grants to the other an easement, not to exceed twenty-

four inches (24") or such greater amount as may be shown on plans

and specifications approved by the grantor, permitting the

maintenance of canopies, decorative fascia, roofs and other over-

hangs, awnings, utility vaults, staircases, signs, lights, pil-

lars and other like projections and encroachments over and across

the grantor's Site to the extent that such projections and

-10-

encroachments shall exist after completion of all construction or
reconstruction (if any part is damaged or destroyed and then
rebuilt).

(h)  <u>Installation Responsibility</u>.  Except as otherwise spe-
cifically provided in this Lease, the grantee of any of the ease-
ments provided herein shall be responsible for the installation,
maintenance and repair of all facilities which are the subject of
such easements.

(i)  <u>Right to Temporarily Block Easement to Common Area</u>.  At
least once in each calendar year Landlord shall have the right to
temporarily block off access to the Common Areas within the Shop-
ping Center in order to avoid the possibility of dedicating the
same for public use or creating prescriptive rights therein as a
matter of law, such barriers to be temporarily erected for such
purpose, if possible, at a time or upon a day when the Shopping
Center is not open for business, and then for only the minimum
time required to accomplish such purpose.

(j)  <u>Non-Dedication</u>.  None of the easements granted by the
parties in this Lease is intended, nor shall any of them be con-
strued, as a dedication of any portion of the parties' respective
sites for public use, and the parties will refrain from taking
any action which would cause such a dedication and will take
whatever steps may be <u>reasonably</u> necessary <u>under the circum-
stances</u> to avoid any such dedication, except as may be agreed
upon in writing by all the parties hereto or their respective
successors or assigns.

4.  <u>Lease Term</u>.  Subject to the conditions upon the effec-
tiveness of this Lease set forth below, the construction term

-11-

(the "Construction Term") of this Lease shall commence on the
date of Landlord's delivery of the Land and the Building to
Tenant, which is estimated to be May 1, 1989 and shall end on
the "Rent Commencement Date" (as defined in Paragraph 5(a)
below). The main term (the "Term") of the Lease shall commence
on the Rent Commencement Date and shall end on the last day of
May following the twentieth (20th) anniversary of the Rent Com-
mencement Date. The term "Lease Year" shall mean each successive
period of twelve (12) consecutive calendar months, commencing on
the first day of each June during the Term. In addition to the
Term, Tenant shall have the option (a "Renewal Option") to renew
and extend the Lease for four (4) consecutive five (5) year peri-
ods (the "Option Periods") immediately following the Term, at the
rent below specified. Tenant shall give Landlord written notice
of its election to exercise any Renewal Option at least one
hundred eighty (180) days prior to the expiration of the Term or
any then-current Option Period, as applicable, of this Lease.

5.   Rent and Charges.

     (a)   Base Rent.  Tenant agrees to pay base rent ("Base Rent")
for the Premises, commencing on that date which is, subject to
"force majeure" (as defined in Paragraph 36) and "Landlord Delay"
(as defined in Paragraph 4 of the Construction Provisions), the
earlier of (i) June 1, 1989, or (ii) Tenant's opening for busi-
ness (the "Rent Commencement Date"). Tenant shall pay Base Rent
in equal monthly installments, in advance on the first day of
each succeeding calendar month throughout the Term as it may be
extended. Unless adjusted as provided in (iii) below, Base Rent
shall be paid pursuant to the following schedule:

(i) <u>First Five Years</u>.  During the first five
(5) Lease Years, Tenant shall pay Base Rent in the annual amount
of One Hundred <u>Thirty</u> Nine Thousand <u>Seven</u> Hundred Eighty-<u>Eight</u>
and No/100 Dollars ($139,788.00), payable in <u>advance</u> monthly
installments of <u>Eleven</u> Thousand <u>Six</u> Hundred and Forty-Nine and
No/100 Dollars ($11,649.00).

(ii)  <u>Increases in Base Rent</u>.  Base Rent shall
increase on the first day of the Sixth and every succeeding Fifth
Lease Year so that Base Rent during the Term and Option Periods
shall be as follows:

| <u>Lease Years</u> | <u>Annual Rent</u> | <u>Monthly Rent</u> |
|---|---|---|
| 1-5 | $139,788.00 | $11,649.00 |
| 6-10 | $156,563.00 | 13,047.00 |
| 11-15 | $180,047.00 | 15,004.00 |
| 16-20 | $207,054.00 | 17,254.00 |
| Option 1 | $243,288.00 | 20,274.00 |
| Option 2 | $285,863.00 | 23,822.00 |
| Option 3 | $343,036.00 | 28,586.00 |
| Option 4 | $411,643.00 | 34,304.00 |

(iii).  <u>Adjustment to Base Rent</u>.  Notwithstand-
ing the provisions of (i) and (ii) above, in the event that the
ground floor gross leasable area of the Building when delivered
does not equal 34,947 square feet, annual Base Rent during the
first five (5) Lease Years shall be the product of the actual
ground floor gross leasable area of the Building times $4.00. For
purposes of this lease, ground floor gross leasable area (<u>and</u>
<u>similar terms</u>) shall be measured from the outside surface of
exterior walls and from the center line of common walls.  Annual

-13-

Base Rent shall increase by the same percentage over the then-
current Base Rent every five Lease Years as the percentage
increase on the schedule set forth in (ii) above.

(iv)  <u>Interim Rent</u>.  Notwithstanding the pro-
visions of (i) and (ii) above, Tenant shall pay to Landlord
interim rent in the amount of Two Thousand Five Hundred Dollars
($2,500.00) per month from February 1, 1989 until the earlier of
Tenant's opening for business or May 1, 1989, along with
Tenant's share of Landlord's Operating Cost of the Common Areas
(as herein defined) and Real Estate Taxes.

(v)  <u>Supplemental Rent</u>.  Commencing on the
date which is one day after Landlord's payment of the Tenant
Improvement Allowance (as herein defined) to Tenant and conti-
nuing for twenty (20) years thereafter, Tenant shall pay to Land-
lord, in <u>240</u> equal monthly installments of $5,505.43 along with
the Base Rent, the annual sum of Sixty Six Thousand and Sixty
Five Dollars ($66,065.00) as Supplemental Rent. *The number of monthly*

(b)  <u>Rent/Additional Rent</u>.  All sums payable by Tenant to
Landlord under this Lease shall constitute rent.  All payments
under this Lease other than Base Rent, including but not limited
to, payments of Tenant's Pro Rata Share of Landlord's Operating
Cost of the Common Areas (as defined below) and taxes, shall con-
stitute additional rent ("Additional Rent") hereunder.

6.  <u>Alterations</u>.  During the Term and Option Periods, Tenant
shall have the right, at its discretion, and without obtaining
the prior consent from Landlord, from time to time as Tenant
shall desire, to alter, modify, reconstruct and remodel the inte-
rior of the Building and to alter and reconstruct the exterior of
*installments of Supplemental Rent, the amount of such installments and
the annual sum of such installments shall be adjusted as
provided in Exhibit "J" hereto*

-14-

12.  <u>Compliance with Applicable Laws</u>.  During the Term as it
may be extended, to the extent that the Premises are affected
thereby, Tenant shall comply with all lawful requirements of the
local, county and state health boards, police and fire depart-
ments, municipal and state authorities and any other governmental
authorities with jurisdiction over the Improvements, and of the
board of fire underwriters, respecting Tenant's use and occupancy
of the Improvements.  If Tenant, after notice ordering perfor-
mance of any such work which Tenant is required to perform
hereunder, fails to perform same with reasonable promptness,
Landlord, after thirty (30) days' prior written notice to Tenant
(except in the case of an emergency in which event only such
notice as is reasonable under the circumstances shall be
required) and Tenant's failure to cure or commence to cure and
diligently prosecute the cure to completion, may perform said
work and collect the actual cost thereof from Tenant with the
next installment or installments of Base Rent.

13.  <u>Payment of Utility Bills</u>.  Tenant will pay directly to
the appropriate utility company or governmental agency, when due,
all bills for gas, water, sanitary sewer, electricity, telephone
and other public or private utilities used by Tenant with regard
to the Improvements.

14.  <u>Taxes</u>.

(a)  <u>Real Estate Taxes</u>.  The term "Real Estate Taxes" shall
mean all general and special real estate taxes, special assess-
ments and other ad valorem taxes, rates, rent taxes, levies and
assessments paid upon or with respect to the Premises for a cal-
endar year or a portion thereof to any governmental agency or

-25-

authority and all taxes specifically imposed in lieu of any such
taxes.

(b)    <u>Tenant's Taxes Separately Assessed</u>.    If the Premises are
separately assessed, Tenant shall pay any and all Real Estate
Taxes solely levied, imposed upon or attributable to the Premises
and all business license fees and sales taxes applicable to its
own operations thereon before same become delinquent and before
any fine, penalty, interest or cost may be added thereto, become
due or be imposed by operation of law for the nonpayment or late
payment thereof, but if such taxes or assessments may be paid in
installments without penalty, then Tenant may pay only such
installment(s) as may be currently due and owing prior to delin-
quency, and Tenant shall furnish Landlord with a photostatic copy
of the receipt therefor (or other proof of payment) upon written
request by Landlord.    Should Landlord receive any notice as to
any such tax, it will promptly deliver the notice to Tenant for
payment in accordance with the notice provisions contained in
Paragraph 27.

Tenant shall have the right to protest and contest in good
faith any tax made against the Premises in accordance with any
governmental procedures established therefor and, if so permitted
by such procedures, to defer payment of same during such contest
provided Tenant indemnifies and holds Landlord harmless there-
from, including any penalty and interest due thereon, and pays
any interest or penalty charges resulting from such deferred pay-
ment.    Regardless of whether this Lease has been terminated,
Tenant shall be entitled to a pro rata refund of any taxes
returned to Landlord or Tenant for any reason whatsoever (if, and

-26-

to the extent that, such taxes were paid by Tenant pursuant to
the provisions of this Lease). If Tenant shall fail to pay any
of such Real Estate Taxes before the same become delinquent,
Landlord may, at its election, pay such Real Estate Taxes with
any interest and penalties due thereon, and the amount so paid by
Landlord, plus interest at a rate/of three percent (3%) per
annum, plus the prime rate of interest from time to time charged
by Manufacturer's Hanover Bank, New York, New York, for loans to
its most credit-worthy borrowers for short term unsecured loans
(the "Default Rate"), shall constitute Additional Rent due from
Tenant on demand. Nothing contained in this Lease shall, however,
require Tenant to pay any franchise, corporate, estate, inheri-
tance, succession, capital levy, business or transfer tax of
Landlord, or any income, profits, or gross receipts or renewal
tax. Taxes shall be prorated as of the Interim Rent commencement
date and the expiration or earlier termination of this Lease, and
Landlord shall promptly return to Tenant any overpayment made by
Tenant not attributable to the period of Tenant's possession of
the Premises.

    (c)  Tenant's Taxes Not Separately Assessed. Landlord shall
endeavor to obtain a separate assessment and tax bill for Tenant.
In the event that a separate assessment for Tenant cannot be
obtained, Tenant shall pay its pro rata share of the Real Estate
Taxes levied against the tax parcel which includes the Premises
(the "tax parcel"). Tenant's pro rata share shall be calculated
by multiplying the total tax assessed by a fraction, the numera-
tor of which is the square footage of the ground floor area of
the Building, and the denominator of which is the square footage

-27-

of the ground floor area of all buildings located in the tax par-
cel, including any outside sales area <u>over 5,000 square feet</u> and
specifically including the Building.  Tenant shall pay said pro
rata share of taxes within fifteen (15) days after Tenant's
receipt of Landlord's statement therefor (but in no event more
than fifteen (15) days before the same shall become delinquent),
accompanied by the tax bill on the basis of which such statement
is rendered and the receipted tax bill for the previous payment
period. Landlord shall pay, or cause the payment of, all Real
Estate Taxes affecting the Premises before any fine, penalty,
interest or cost may be added thereto, become due or be imposed
by operation of law for the nonpayment or late payment thereof.
Landlord shall remain primarily responsible for such payment not-
withstanding the fact that such payment may be made by a tenant
of Landlord's Premises or other third party pursuant to an agree-
ment to which Tenant is not a party.  Tenant as well as Landlord,
shall have the right to contest the amount of, validity, or
otherwise seek an exemption or abatement of, any real estate
taxes, by appropriate proceedings diligently conducted in good
faith, in accordance with the procedure set forth in (d) below.
In addition, should Landlord fail to pay such Real Estate Taxes
before same become delinquent, Tenant shall have the same right
to cure as that afforded Landlord in subparagraph (b) above and
may deduct the cost thereof, plus interest at the aforesaid rate,
from the next installment of Base Rent due hereunder.

(d)  <u>Reduction in Assessed Valuation of Property</u>.  Tenant, at
its sole cost and expense, shall have the right to seek a reduc-
tion in the valuation of the Premises assessed for Real Estate

-28-

**WITNESS the following signatures and seals:**

**LANDLORD:**

*Nathan Teplis*    5-18-89
NATHAN TEPLIS

    5-18-89
DR. PAUL TEPLIS

*Mrs. Belle Teplis Frank*    5-18-89
MRS. BELLE TEPLIS FRANK

*Miss Sharon Roslyn Friedman*    5-18-89
MISS SHARON ROSLYN FRIEDMAN

**TENANT:**                    CIRCUIT CITY STORES, INC.,
                              a Virginia corporation

**ATTEST:**

*Susan S. Williams*          By: *B.B. Cummings Jr.*
Ass't Secretary              Its: *Ass't V.P. - Real Estate*

**(SEAL)**

-69-

# EXHIBIT "B"

CIRCUIT CITY STORES, INC.,

Sublandlord

TO

NEW AVENUES LEASE OWNERSHIP, LLC

Subtenant

SUBLEASE

Dated: June 30th, 2006

Property:

4572 Memorial Drive
Decatur, Georgia

# TABLE OF CONTENTS

Page

1.  PREMISES. .......................................................................... 1
2.  TERM. ................................................................................ 1
3.  RENT. ................................................................................. 2
4.  SECURITY DEPOSIT. ........................................................ 3
5.  CONDITION OF PREMISES. ............................................. 4
6.  USE. ................................................................................... 4
7.  PARKING AND COMMON AREAS. .................................. 5
8.  UTILITIES. ......................................................................... 5
9.  REPAIRS AND MAINTENANCE. ....................................... 6
10. ALTERATIONS. .................................................................. 7
11. SIGNS. ............................................................................... 8
12. ASSIGNMENT AND SUBLETTING. .................................. 9
13. ACCESS TO PREMISES. .................................................. 10
14. INDEMNITY. ...................................................................... 11
15. INSURANCE. ..................................................................... 12
16. SUBORDINATE TO PRIME LEASE. ................................ 14
17. TERMINATION, DESTRUCTION, CONDEMNATION. ....... 15
18. NOTICES. .......................................................................... 16
19. DEFAULT. ......................................................................... 17
20. WAIVER OF JURY TRIAL AND RIGHT TO COUNTERCLAIM. ... 20
21. END OF TERM. ................................................................. 20
22. HOLDOVER. ...................................................................... 20
23. BROKERAGE. .................................................................... 21
24. FINANCIAL STATEMENTS AND ESTOPPEL CERTIFICATES. ... 21
25. AMERICANS WITH DISABILITIES ACT. .......................... 22
26. HAZARDOUS SUBSTANCES. ........................................... 22
27. MISCELLANEOUS COVENANTS. ..................................... 24

EXHIBITS TO SUBLEASE

EXHIBIT A  -   Property Description
EXHIBIT B  -   Rules and Regulations
EXHIBIT C  -   Fire Monitoring Contacts
EXHIBIT D  -   Description of Initial Alterations
EXHIBIT E  -   Guaranty

i

THIS SUBLEASE, dated the 30th day of June, 2006, between CIRCUIT CITY STORES, INC., a Virginia corporation, having an office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Sublandlord") and NEW AVENUES LEASE OWNERSHIP, LLC, a Georgia limited liability company, having an office at 3440 Preston Ridge Road, Suite 500, Alpharetta, Georgia 30005 ("Subtenant").

## WITNESSETH:

1.    PREMISES.

Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, those certain premises ("Premises") crosshatched on Exhibit A attached hereto and made a part hereof, consisting of approximately 34,947 rentable square feet of ground floor space in the building (the "Building") located at 4572 Memorial Drive, Decatur, Georgia, within the shopping center known as Service Merchandise Plaza (the "Shopping Center") and being a part of the premises which were leased to Sublandlord under the Prime Lease dated April 26, 1989, between Nathan Teplis, Dr. Paul Teplis, Mrs. Belle Teplis Frank, and Miss Sharon Roslyn Friedman, as landlord ("Landlord") and Sublandlord, as tenant. This Sublease does not include any right under the Prime Lease to (i) extend the term of the Prime Lease, (ii) purchase the Premises, or (iii) terminate the Prime Lease, all of which rights are reserved to Sublandlord.

2.    TERM.

A.    Term.  The term of this Sublease ("Term") shall be the period of approximately approximately three (3) years, commencing July 1, 2006 ("Commencement Date"), and ending at midnight on May 30, 2009 ("Expiration Date"), unless sooner terminated as herein provided.

B.    Possession.  Sublandlord shall tender possession of the Premises to Subtenant within five (5) business days following the (i) execution and delivery of this Sublease by both parties, (ii) the delivery by Subtenant to Sublandlord of all insurance certificates required pursuant to Section 15 hereof, and (iii) payment by Subtenant of the Security Deposit, as hereinafter defined, and the first month's Base Rent. If Subtenant shall fail to deliver the items required under clauses (ii) and (iii) above, Sublandlord shall have the right to withhold possession of the Premises until delivery by Subtenant of such items and sums, but the Commencement Date and the Rent Commencement Date shall not be delayed. This Sublease is subject to the approval of Landlord; if Sublandlord does not receive Landlord's consent on or before June 30, 2006, either party shall have the right to terminate this Sublease upon written notice to the other. Such termination right shall be deemed waived if not exercised prior to the receipt of Landlord's consent by Sublandlord.

C.    Agreement.  Subtenant shall execute and deliver to Sublandlord an agreement setting forth the Commencement Date and Rent Commencement Date within five (5) business days after Sublandlord's request therefor.

2

D.    Delay. If Sublandlord is unable to deliver possession of the Premises to Subtenant on the date specified above notwithstanding Subtenant's delivery of the items required to be delivered by Subtenant under Subsection B, Sublandlord shall not be liable or responsible for any claims, damages, liability or losses arising in connection with any delay in the delivery of possession, and Subtenant shall not be excused or released from any obligation under this Sublease as a result of any such delay. In such event, the Commencement Date shall be extended to the date Sublandlord delivers possession of the Premises to Subtenant. In the event Sublandlord fails to tender possession of the Premises on or before the date that is thirty (30) days after delivery by Subtenant of the items required under Subsection B, then Subtenant shall have the right to terminate this Sublease by written notice to Sublandlord, in which event the Security Deposit and prepaid Base Rent shall be returned to Subtenant and the parties shall have no further obligation to one another.

3.    RENT.

A.    Base Rent. Commencing on the Rent Commencement Date, as hereinafter defined, Subtenant shall pay to Sublandlord rent ("Base Rent") in the amounts set forth in the Base Rent Schedule below. Each monthly installment of Base Rent shall be payable in advance on the first day of each month during the Term. Base Rent for November, 2006 shall be payable at the time of execution of this Sublease by Subtenant. The "Rent Commencement Date" shall be November 1, 2006. In consideration for Subtenant's performance of its obligations under this Sublease, Sublandlord has conditionally agreed to abate Base Rent and Operating Expenses, as hereinafter defined, for the period from the Commencement Date until the day before the Rent Commencement Date, provided there is no Event of Default (as defined in Section 19). If an Event of Default occurs at any time during the Term, then Base Rent shall automatically be deemed to have commenced on the Commencement Date at the initial Base Rent set forth in the schedule below, and the total sum of Base Rent so conditionally abated shall be immediately due and payable by Subtenant to Sublandlord.

Base Rent Schedule

| Period | | | Annual | Monthly | PSF (approx) |
|---|---|---|---|---|---|
| 11/1/06 | to | 10/31/07 | $122,314.50 | $10,192.88 | $3.50 |
| 11/1/07 | to | 10/31/08 | $125,983.94 | $10,498.66 | $3.61 |
| 11/1/08 | to | 5/30/09 | $129,763.45 | $10,813.62 | $3.71 |

B.    Payments. Base Rent and all other amounts payable by Subtenant to Sublandlord under this Sublease ("Additional Rent ") shall be paid when due, without notice or demand, and without deduction, abatement, counterclaim or setoff, at the address of Sublandlord set forth in Section 18 or to such other person and/or at such other address as Sublandlord may from time to

3

time designate by notice to Subtenant. No payment by Subtenant of any amount less than the amount stipulated to be paid hereunder shall be deemed other than on account of the earliest stipulated Base Rent or Additional Rent; nor shall any endorsement or statement on any check or letter be deemed an accord and satisfaction, and Sublandlord may accept any check or payment without prejudice to Sublandlord's right to recover the balance due or to pursue any other remedy available to Sublandlord. Rent for partial months shall be prorated on the basis of the number of days in such month. If the Rent Commencement Date is not the first day of a calendar month, Base Rent for the partial month in which the Rent Commencement Date occurs shall be paid on the Rent Commencement Date.

C.    Subtenant's Pro Rata Share. For purposes of this Section 3, "Subtenant's Pro Rata Share" shall be one hundred percent (100%). Subtenant's Pro Rata Share shall be equitably prorated for any partial calendar year during the Term.

D.    Operating Expenses and CAM Charges. Beginning on the Rent Commencement Date (subject to abatement from the Rent Commencement Date to the Commencement Date as set forth in Section 3A), Subtenant shall pay to Sublandlord, as Additional Rent, Subtenant's Pro Rata Share of (i) the amount required to be paid under Section 40 of the Prime Lease as the tenant's share of Landlord's Operating Cost of the Common Areas, as defined in the Prime Lease, (ii) the Real Estate Taxes, as defined in the Prime Lease, payable under the terms of the Prime Lease, (iii) the cost of the insurance carried by Sublandlord pursuant to Section 15 hereof, and (iv) the cost of maintenance of the Fire Safety Systems, as defined in Section 9 (items (i) through (iv) being collectively, the "Operating Expenses"). Subtenant's estimated initial Pro Rata Share of Operating Expenses shall be $4,455.74 per month, payable in advance, beginning on the Rent Commencement Date. Sublandlord may notify Subtenant from time to time setting forth an adjustment to estimated Operating Expenses, and Subtenant's Pro Rata Share thereof, if Sublandlord determines that Subtenant's payments are insufficient to meet estimated costs. Following the end of each calendar year, Sublandlord shall determine the actual Operating Expenses for such year. If Sublandlord determines that Subtenant's Pro Rata Share of actual Operating Expenses exceeds the amount paid by Subtenant, then Subtenant shall pay the difference within thirty (30) days after Sublandlord delivers to Subtenant a statement showing such costs; if Subtenant's payments exceed the amount of Subtenant's Pro Rata Share of actual Operating Expenses, Subtenant shall receive a credit toward the next installment of such Additional Rent in the amount of such overpayment. Subtenant's obligation to pay Subtenant's Pro Rata Share of Operating Expenses, and Sublandlord's obligation to refund overpayments, shall survive expiration or termination of this Sublease.

4.    SECURITY DEPOSIT.

Upon or prior to execution of this Sublease by Subtenant, Subtenant shall deposit with Sublandlord the sum of $10,192.88 (the "Security Deposit") as security for the payment and performance by Subtenant of Subtenant's obligations under this Sublease. Sublandlord shall have the right, without notice to Subtenant, and regardless of the exercise of any other remedy Sublandlord may have by reason of a default, to apply all or any part of the Security Deposit to

4

I.    No Partnership.  Nothing contained in this Sublease shall be deemed or construed to create a partnership or joint venture of or between Sublandlord and Subtenant, or to create any relationship other than that of sublandlord and subtenant.

J.    No Representations.  Neither Sublandlord nor any agent of Sublandlord has made any representations or promises with respect to the Premises, the Building or the Shopping Center except as expressly set forth in this Sublease, and no rights, privileges, easements or licenses are granted to Subtenant except as expressly set forth in this Sublease.

K.    Complete Agreement, Counterparts.  There are no representations, agreements, arrangements or understandings, oral or written, between the parties relating to the subject matter of this Sublease which are not fully expressed in this Sublease.  This Sublease cannot be changed or terminated orally or in any manner other than by a written agreement executed by both parties. This Sublease may be executed in two or more counterparts, all of which taken together shall constitute a single instrument.

28.    GUARANTY

All of Subtenant's obligations hereunder shall be fully and unconditionally guaranteed by Select Management Resources, LLC.  Subtenant shall deliver such Guaranty in the form attached hereto as Exhibit E to Sublandlord at the time of delivery of the executed Sublease to Sublandlord.  Failure of Subtenant to deliver such Guaranty, or the subsequent insolvency or bankruptcy of any such guarantor under any applicable federal or state bankruptcy or insolvency law, shall be an event of default hereunder.

IN WITNESS WHEREOF, Sublandlord and Subtenant have hereunto executed this Sublease as of the day and year first above written.

SUBLANDLORD:

CIRCUIT CITY STORES, INC.

By: _____
Its: _____

27

NEW AVENUES LEASE OWNERSHIP,
LLC, a Georgia limited liability company

By: _____

Vice President

# JOHN C. PENNINGTON, P.C.

### ATTORNEYS AT LAW
18 YONAH STREET
HELEN, GEORGIA 30545

JOHN C. PENNINGTON
jcppc@windstream.net

KATHLEEN STEIL
Katejcppc@gmail.com

MAILING ADDRESS
P.O. BOX 275
HELEN, GEORGIA 30545

TELEPHONE (706) 878-0033
TELECOPIER (706) 878-9916

April 6, 2011

**SENT VIA FEDEX**
**PRIORITY OVERNIGHT**

Clerk of the Bankruptcy Court
United States Bankruptcy Court
701 East Broad Street – Room 4000
Richmond, Virginia 23219

**RE:    In Re: Circuit City Stores, Inc., et. al.**
        **Case No. 08-35653 (KRH)**

To Whom It May Concern:

Please find enclosed the original Response to the Liquidating Trust's Twentieth Omnibus Objection to Landlord Claims in the above referenced case and one copy.

We respectfully request that your office file and scan in the original document and return the file marked copy to our office via the enclosed self-addressed stamped envelope.

Please do not hesitate to call if you have any questions or concerns. Thank you for your attention to this matter.

Sincerely,

Kathleen Steil

Enclosures