Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

*Counsel for the Circuit City Stores, Inc.*
*Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| In re: | **:** Chapter 11 |
| | **:** |
| CIRCUIT CITY STORES, INC., et al., | **:** Case No. 08-35653-KRH |
| | **:** |
| Debtors. | **:** (Jointly Administered) |
| | **:** |
| | **:** |

## NOTICE OF LIQUIDATING TRUST'S OBJECTION TO
## CLAIMS FILED BY DIRLEY BALL

**PLEASE TAKE NOTICE** that the Circuit City Stores, Inc. Liquidating Trust (the "Liquidating Trust" and/or "Trust"), through Alfred H. Siegel, the duly appointed trustee of the Trust (the "Trustee"), pursuant to the Second Amended Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in Possession and its Official Committee of Creditors Holding General Unsecured Claims in the above-captioned cases of the above referenced estates of Circuit City Stores, Inc. et al. (collectively, the "Debtors") filed the *Liquidating Trust's Objection to Claims of Dirley Ball on the Grounds that the Workers' Compensation Claim is Recoverable Only From the Insurance Carrier; the Special Cash Retention Claim Is Not Entitled to Priority and the Conditions Necessary to Allowance of the Short Term Incentive Claim and Long-Term Incentive Claim Have Not Been Met* (the "Objection") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").  A copy of the Objection is attached to this notice (this "Notice") as Exhibit 1.  By the Objection, the Liquidating Trust is seeking to disallow the Workers' Compensation Claim, reclassify the CRP Claim to a general unsecured claim, disallow the STIP Claim and disallow the LTIP Claim.

**PLEASE TAKE FURTHER NOTICE THAT** on April 1, 2009, the Bankruptcy Court entered the Order Establishing Omnibus Objection Procedures and Approving the Form and Manner of the Notice of Omnibus Objections (Docket No. 2881) (the "Order"), by which the Bankruptcy Court approved procedures for filing omnibus objections to proofs of claim and requests for allowance and payment of administrative expenses and/or cure claims (collectively,

the "Claims") in connection with the above-captioned chapter 11 cases (the "Omnibus Objection Procedures"). Furthermore, this Objection is being filed pursuant to the *Order on Debtors' Eighth Omnibus Objection to Certain Claims as it Relates to Claims of Dirley L. Ball* (the "Dirley Ball Order").

**YOU ARE RECEIVING THIS NOTICE BECAUSE THE PROOF(S) OF CLAIM LISTED HEREIN THAT YOU FILED AGAINST ONE OR MORE OF THE DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES ARE SUBJECT TO THE OBJECTION.  <u>YOUR RIGHTS MAY BE AFFECTED BY THE OBJECTION</u>. THEREFORE, YOU SHOULD READ THIS NOTICE (INCLUDING THE OBJECTION AND OTHER ATTACHMENTS) CAREFULLY AND DISCUSS THEM WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

**MOREOVER, PURSUANT TO RULE 3007-1 OF THE LOCAL RULES OF THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA AND THE OMNIBUS OBJECTION PROCEDURES, UNLESS A WRITTEN RESPONSE AND A REQUEST FOR A HEARING ARE FILED WITH THE CLERK OF THE COURT AND SERVED ON THE OBJECTING PARTY BY <u>4:00 P.M. (EASTERN TIME) ON JUNE 2, 2011</u>, THE COURT MAY DEEM ANY OPPOSITION WAIVED, TREAT THE OBJECTION AS CONCEDED AND ENTER AN ORDER GRANTING THE RELIEF REQUESTED WITHOUT A HEARING.**

<u>**Critical Information for Claimants
Choosing to File a Response to the Objection**</u>

<u>Who Needs to File a Response</u>:  If you oppose the relief requested in the Objection and if you are unable to resolve the Objection with the Liquidating Trust before the deadline to respond, then you must file and serve a written response (the "Response") to the Objection in accordance with this Notice.

If you do not oppose the relief requested in the Objection, then you do not need to file a written Response to the Objection and you do not need to appear at the hearing.

<u>Response Deadline</u>:  The Response Deadline is **<u>4:00 p.m. (Eastern Time) on June 2, 2011 (the "Response Deadline")</u>**.

**THE BANKRUPTCY COURT WILL ONLY CONSIDER YOUR RESPONSE IF YOUR RESPONSE IS FILED, SERVED <u>AND</u> RECEIVED BY THE RESPONSE DEADLINE.**

Your Response will be deemed timely filed only if the Response is **<u>actually</u> <u>received</u>** on or before the Response Deadline by the Bankruptcy Court at the following address:

Clerk of the Bankruptcy Court
United States Bankruptcy Court

> 701 East Broad Street – Room 4000
> Richmond, Virginia 23219

Your Response will be deemed timely served only if a copy of the Response is actually received on or before the Response Deadline by the Liquidating Trust's attorneys:

| | |
|---|---|
| Jeffrey N. Pomerantz, Esq. | Lynn L. Tavenner, Esq. (VA Bar No. 30083) |
| Andrew W. Caine, Esq. | Paula S. Beran, Esq. (VA Bar No. 34679) |
| (admitted *pro hac vice*) | TAVENNER & BERAN, PLC |
| PACHULSKI STANG ZIEHL & JONES LLP | 20 North Eighth Street, 2nd Floor |
| 10100 Santa Monica Boulevard | Richmond, Virginia 23219 |
| Los Angeles, California 90067-4100 | Telephone: (804) 783-8300 |
| Telephone: (310) 277-6910 | Telecopy:   (804) 783-0178 |
| Telecopy:   (310) 201-0760 | |

The status hearing on the Objection will be held at **2:00 p.m. (Eastern Time) on June 9, 2011 at:**

> United States Bankruptcy Court
> 701 East Broad Street – Courtroom 5000
> Richmond, Virginia 23219

If you file a timely Response, in accordance with the Objection Procedures, you do <u>not</u> need to appear at the status hearing on the Objection.

<u>**Procedures for Filing a Timely Response and
Information Regarding the Hearing on the Objection**</u>

<u>**Contents**</u>.  To facilitate a speedy and non-judicial resolution of a Claim subject to the Objection, any claimant filing a Response shall use its best efforts to include the following (at a minimum) in its filed Response, to the extent such materials are not attached to its proof of claim:

> a.    a caption setting forth the name of the Bankruptcy Court, the name of the Debtors, the case number and the title of the Objection to which the Response is directed;

> b.    the claimant's name and an explanation for the amount of the Claim;

> c.    a concise statement, executed by (or identifying by name, address and telephone number) a person with personal knowledge of the relevant facts that support the Response, setting forth the reasons why the Bankruptcy Court should overrule the Objection as to the claimant's claim, including, without limitation (to the extent not set forth in its proof of claim), the specific factual and legal bases upon which the claimant intends to rely in support of its Response and its underlying Claim;

d.       a copy of or identification of any other documentation or other evidence of the Claim, to the extent not already included with the Claim that the claimant presently intends to introduce into evidence in support of its Claim at the hearing; provided, however, that for a Response filed in support of a Claim arising out of a lease of real property, the Response need not attach such lease if the claimant indicates its willingness to provide such documentation upon request;

e.       a declaration of a person with personal knowledge of the relevant facts that support the Response;

f.       the claimant's address, telephone number and facsimile number and/or the name, address, telephone number and facsimile number of the claimant's attorney and/or designated representative to whom the attorneys for the Debtors should serve a reply to the Response, if any (collectively, the "Notice Address").  If a Response contains Notice Address that is different from the name and/or address listed on the Claim, the Notice Address will control and will become the service address for future service of papers with respect to all of the claimant's Claims listed in the Objection (including all Claims to be reduced or disallowed) and only for those Claims in the Objection; and

g.       to the extent such person differs from the person identified pursuant to subjection e, above, the name, address, telephone number, facsimile number, and electronic mail address of the representative of the claimant (which representative may be the claimant's counsel) party with authority to reconcile, settle or otherwise resolve the Objection on the claimant's behalf (collectively, the "Additional Addresses").  Unless the Additional Addresses are the same as the Notice Addresses, the Additional Address will not become the service address for future service of papers.

**Additional Information**.  To facilitate a resolution of the Objection, your Response should also include the name, address, telephone number and facsimile number of the party with authority to reconcile, settle or otherwise resolve the Objection on the claimant's behalf.  Unless the Additional Addresses are the same as the Notice Addresses, the Additional Addresses will not become the service address for future service of papers.

**Failure to File Your Timely Response**.  If you fail to file and serve your Response on or before the Response Deadline in compliance with the procedures set forth in this Notice, the Liquidating Trust will present to the Bankruptcy Court an appropriate order granting the relief requested in the Objection without further notice to you.

**Each Objection Is a Contested Matter**. Each Claim subject to the Objection and the Response thereto shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014, and any order entered by the Bankruptcy Court will be deemed a separate order with respect to such claim.

## Additional Information

**Requests for Information**.  You may also obtain a copy of the Objection or related documents on the internet, by accessing the website of www.kccllc.net/circuitcity.

**Reservation of Rights**.  Nothing in this Notice or the Objection constitutes a waiver of the Debtors' and/or the Trust's right to assert any claims, counterclaims, rights of offset or recoupment, preference actions, fraudulent-transfer actions or any other claims against you by the Liquidating Trust.  Unless the Bankruptcy Court allows your Claims or specifically orders otherwise, the Liquidating Trust has the right to object on any grounds to the Claims (or to any other Claims or causes of action you may have filed or that have been scheduled by the Debtors) at a later date on any grounds or bases.  In such event, you will receive a separate notice of any such objections.

Dated:   May 2, 2011

*/s/ Paula S. Beran*
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
TAVENNER & BERAN, P.L.C.
20 North Eighth Street, 2nd Floor
Richmond, Virginia  23219
Telephone:  804-783-8300
Facsimile:  804-783-0178
Email:  ltavenner@tb-lawfirm.com
          pberan@tb-lawfirm.com

-and-

Jeffrey N. Pomerantz (admitted *pro hac vice*)
Andrew W. Caine (admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd.
11th Floor
Los Angeles, California  90067-4100
Telephone: 805-123-4567
Facsimile:  310/201-0760
E-mail: jpomerantz@pszjlaw.com
          acaine@pszjlaw.com

*Counsel for the Circuit City Stores, Inc.
Liquidating Trust*

EXHIBIT 1

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 08-35653-KRH |
| | ) | |
| CIRCUIT CITY STORES, INC.[1], et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## LIQUIDATING TRUST'S OBJECTION TO CLAIMS OF DIRLEY BALL ON THE GROUNDS THAT THE WORKERS' COMPENSATION CLAIM IS RECOVERABLE ONLY FROM THE INSURANCE CARRIER; THE SPECIAL CASH RETENTION CLAIM IS NOT ENTITLED TO PRIORITY AND THE CONDITIONS NECESSARY TO ALLOWANCE OF THE SHORT TERM INCENTIVE CLAIM AND LONG-TERM INCENTIVE CLAIM HAVE NOT BEEN MET

The Circuit City Stores, Inc. Liquidating Trust (the "Liquidating Trust"), through Alfred

H. Siegel, the duly appointed trustee of the Liquidating Trust, pursuant to the *Second Amended*

*Joint Plan of Liquidation of Circuit City Stores, Inc. and its Affiliated Debtors and Debtors in*

*Possession and its Official Committee of Creditors Holding General Unsecured Claims* (the

"Plan") in the above-captioned cases, hereby files this *Liquidating Trust's Objection to Claims of*

---

[1] The Debtors in these cases include: Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., InterTAN, Inc., Ventoux International, Inc., Circuit City Purchasing Company, LLC, CC Aviation, LLC, CC Distribution Company of Virginia, Inc., Circuit City Properties, LLC, Kinzer Technology, LLC, Abbott Advertising Agency, Inc., Patapsco Designs, Inc., Sky Venture Corp, Prahs, Inc., XSStuff, LLC, Mayland MN, LLC, Courchevel, LLC, Orbyx Electronics, LLC, and Circuit City Stores PR, LLC.

*Dirley Ball on the Grounds that the Workers' Compensation Claim is Recoverable Only From the Insurance Carrier; the Special Cash Retention Claim Is Not Entitled to Priority and the Conditions Necessary to Allowance of the Short Term Incentive Claim and Long-Term Incentive Claim Have Not Been Met* (the "Objection"), and hereby moves this court (the "Court"), pursuant to sections 105 and 502 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Bankruptcy Rule 3007-1, for entry of an order in the form attached hereto as **Exhibit A**, granting the relief sought by this Objection, and in support thereof states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Objection under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Objection in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are Bankruptcy Code sections 105 and 502, Bankruptcy Rule 3007 and Local Bankruptcy Rule 3007-1.

2.      With respect to the Workers' Compensation Claim, this Court has jurisdiction to determination that the Claim should be disallowed notwithstanding the fact that the Claim alleges a personal injury.  *See also In re Chateaugay Corp.*, 146 B.R. 339, 343 (S.D.N.Y. 1992) ("Bankruptcy Court has jurisdiction to disallow legally deficient personal injury tort and wrongful death claims in the first instance"), *aff'd in part and reversed on other*

*grounds*, 961 F.2d 378 (2d Cir. 1992).  *Accord In re UAL Corp.*, 310 B.R. 373 (Bankr. D. Ill. 2004).

## SUMMARY OF RELIEF REQUESTED

3.     The Objection relates to four claims (the "Claims") filed by Dirley Ball (the "Claimant").  The Claims are listed on **Exhibit B,** attached hereto.  This Objection is based on a review of the Claims, the Debtors' books and records and other relevant records.

### A.     The Workers' Compensation Claim Should Be Disallowed

4.     Claim No. 11102 (the "Workers' Compensation Claim") asserts the right to payment in an unliquidated amount on a priority basis for "personal injury/workers' compensation."  This Workers'Compensation Claim should be disallowed because it is recoverable solely through the Debtor's workers' compensation insurance carrier, Old Republic Insurance Company ("Old Republic"), as administered through Sedgwick Claims Management Services, Inc. ("Sedgwick").

5.     Furthermore, the Workers' Compensation Claim asserts an injury that occurred more than 180 days before the Petition Date.  Therefore, to the extent the Liquidating Trust were liable, which it is not, any payment would be payable solely on a general unsecured basis.

6.     Based on the foregoing, the Liquidating Trust requests an Order, in the form set forth on **Exhibit A**, disallowing the Workers' Compensation Claim without prejudice to the Claimant's ability to pursue her statutory remedies through Sedgwick and Old Republic.

**B.    The CRP Claim Should Be Reclassified as a General Unsecured Claim**

7.    Claim No. 11103 (the "CRP Claim") asserts the right to payment under the Cash Retention Program (defined below) that Circuit City Stores, Inc. ("Circuit City") offered to certain eligible employees.  The CRP Claim asserts the right to payment on a priority basis in the amount of $10,950 pursuant to section 507(a)(4) of the Bankruptcy Code and on a general unsecured basis in the amount of $29,050.

8.    The CRP Claim is based on a right to payment that was "earned," within the meaning of section 507(a)(4), more than 180 days before the Petition Date (the "Priority Period"), which is May 13, 2008 to November 10, 2008.  Therefore, the CRP Claim is not entitled to payment on a priority basis.

9.    Based on the foregoing, the Liquidating Trust requests an Order, in the form set forth on **Exhibit A,** reclassifying the CRP Claim to a general unsecured claim.

**C.    The STIP Claim Should Be Disallowed**

10.    Claim No. 11104 (the "STIP Claim") asserts the right to payment under a Short-Term Incentive Program (defined below).  The STIP Claim asserts the right to payment on a priority basis in the amount of $10,950 pursuant to section 507(a)(4) of the Bankruptcy Code and on a general unsecured basis in the amount of $34,675.

11.    The STIP Claim should be disallowed on two grounds.  First, Circuit City's obligation to make payments pursuant to the Short-Term Incentive Program was conditioned on continued employment through the applicable pay-out date, as described more fully below.  As part of the Debtors' liquidation of its assets, closing of its stores, and wind down

of its business operations, the Claimant did not remain employed with the Debtors as of the

applicable pay-out date.  Therefore, a necessary condition to the obligation to make a payment to

the Claimant pursuant to the Short-Term Incentive Program was not met.

12.    Second, participants in the Short-Term Incentive Program were not

entitled to a Short-Term Incentive Award (defined below) unless a set of company-wide and

individual performance goals were achieved.  These criteria were placed in a performance

evaluation online program.  The Debtors cancelled this online program after the Debtors had

finished their going out of business sales and had closed the remaining set of stores in March

2009.  It was standard procedure for each Short-Term Incentive Program Participant to print out

the applicable goals.  The STIP Claim fails to identify the criteria that the Claimant was required

to meet in order to be entitled to a Short-Term Incentive Award (defined below).  Despite a good

faith search, the Liquidating Trustee has been unable to identify these specific criteria.

13.    Given this lack of evidence, the STIP Claim cannot be treated as *prima

facie* valid.  Further, given the difficulty in achieving these goals, coupled with Circuit City's

financial failure, it is unlikely that any of the criteria were met.  This may explain why the

Claimant has failed to identify the criteria and show that they were met.

14.    Based on the foregoing, the Liquidating Trust requests an Order, in the

form set forth on **Exhibit A,** disallowing the STIP Claim, in its entirety.

### D.    The LTIP Claim Should Be Disallowed

15.    Claim No. 11105 (the "LTIP Claim") asserts the right to payment on a

priority basis pursuant to section 507(a)(4) of the Bankruptcy Code in the amount of $10,950 and

on a general unsecured basis in an unliquidated amount.   The LTIP Claims asserts the rights to these payments pursuant to a long-term incentive program (the "Long-Term Incentive Program") that Circuit City had offered to certain eligible employees.   As set forth below, Circuit City's obligation to make payments pursuant to the Long-Term Incentive Program was conditioned on (1) available credit under Circuit City's credit facility on the first vesting date and (2) the price of Circuit City's stock on the second and third vesting dates.

16.   The LTIP Claim should be disallowed because there was no available credit on the first vesting date and the price of Circuit City's stock did not reach the necessary price on the second and third vesting dates.   In the alternative, to the extent that the Court allows any part of the LTIP Claim on a priority basis, the Liquidating Trust reserves the right to reduce the allowed priority amount of the LTIP Claim to the extent that such allowance, combined with any other payments received by the Claimant, would cause the Claimant to receive more than the $10,950 statutory cap set forth in section 507(a)(4) of the Bankruptcy Code.

17.   Accordingly, the Liquidating Trust requests an Order disallowing the LTIP Claim, set forth on **Exhibit A**, in its entirety.

### E.   Alternative Relief

18.   To the extent that the Court allows any of the Claims on a priority basis, the Liquidating Trust requests an Order reducing the priority amount to the extent necessary to ensure that the Claimant does not receive more than the statutory cap set forth in section 507(a)(4) of the Bankruptcy Code.

## FACTUAL BACKGROUND

19.     On November 10, 2008 (the "Petition Date"), the debtors in the above-captioned cases (the "Debtors") filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.

20.     On the Petition Date, the Court entered the *Order Pursuant to Bankruptcy Code Section 105(a), 363, 507(a), 541, 1107(a) and 1108 and Bankruptcy Rules 6003 Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits* (the "Wage Order") [Docket No. 6].  Pursuant to the Wage Order, the Debtors paid to the holders of the Reduced CRP Claims pre-petition wages that were earned within 180 days of the Petition Date.

21.     On November 12, 2008, the Office of the United States Trustee for the Eastern District of Virginia appointed a statutory committee of unsecured creditors (the "Creditors' Committee").

22.     On November 12, 2008, the Court appointed Kurtzman Carson Consultants LLC ("KCC") as claims, noticing, and balloting agent for the Debtors in these chapter 11 cases pursuant to 28 U.S.C. § 156(c).

23.     On December 10, 2008, the Court entered that certain *Order Pursuant to Bankruptcy Code Sections 105 and 502 and Bankruptcy Rules 2002, 3003(c)(3), and 9007 (I) Setting General Bar Date and Procedures for Filing Proofs of Claim; and (II) Approving Form and Manner of Notice Thereof* (Docket No. 890) (the "Claims Bar Date Order").

24.     Pursuant to the Claims Bar Date Order, the deadline for filing all "claims"

(as defined in 11 U.S.C. § 105(5)) arising before November 10, 2008 against the Debtors by any

non-governmental entity was 5:00 p.m. (Pacific) on January 30, 2009.  The deadline for

governmental units to file claims that arose before November 10, 2008 was 5:00 p.m. (Pacific)

on May 11, 2009.  Pursuant to the Claims Bar Date Order, this Court approved the form and

manner of the claims bar date notice, which was attached as Exhibit A to the Claims Bar Date

Order (the "Claims Bar Date Notice").

25.     On December 17 and 19, 2008, KCC served a copy of the Claims Bar

Date Notice on all parties who filed notices of appearance pursuant to Bankruptcy Rule 2002, all

of the Debtors' scheduled creditors in these cases, the Debtors' equity holders, and certain other

parties (Docket No. 1314).  In addition, the Debtors published the Claims Bar Date Notice in The

Wall Street Journal (Docket No. 1395) and The Richmond Times-Dispatch (Docket No. 1394).

26.     On January 16, 2009, the Court authorized the Debtors, among other

things, to conduct going out of business sales at the Debtors' remaining 567 stores pursuant to an

agency agreement (the "Agency Agreement") between the Debtors and a joint venture, as agent

(the "Agent").  On January 17, 2009, the Agent commenced going out of business sales pursuant

to the Agency Agreement at the Debtors remaining stores.  As of March 8, 2009, the going out of

business sales at the Debtors' remaining stores had been completed.

27.     On April 1, 2009, this Court entered an *Order Establishing Omnibus

Objection Procedures and Approving the Form and Manner of Notice of Omnibus Objections*

(Docket No. 2881) (the "Omnibus Objection Procedures Order").

28.     On August 9, 2010, the Debtors and the Creditors' Committee filed the

Plan, which provides for the liquidation of the Debtors' assets and distribution of the proceeds

thereof under chapter 11 of the Bankruptcy Code.

29.     On September 10, 2010, the United States Bankruptcy Court, Eastern

District of Virginia, signed an Order confirming the Plan.

30.     The Plan became effective on November 1, 2010 (the "Effective Date"),

and pursuant to the Plan and Liquidating Trust Agreement approved therewith, the Liquidating

Trust assumed the right and responsibility to liquidate the Debtors' remaining assets and

distribute the proceeds to creditors, including objections to claims.  Under the Plan, objections to

priority claims must be filed within 120 days of the Effective Date.

A.     **The DIP Credit Facility**

31.     On the Petition Date, the Court granted the Debtors interim authority to

enter into that certain *Senior Secured, Super-Priority, Debtor in Possession Credit Agreement*

(the "DIP Credit Facility").  *See* Order entered on November 10, 2008 (Docket No. 78).  *See also*

Order entered on December 23, 2008 (approving the DIP Credit Facility on a final basis) (Docket

No. 1262).  The DIP Credit Facility superseded all of the Debtors' pre-petition credit facilities.

32.     On February 17, 2009, the Court entered an Order approving a third and

final amendment to the DIP Credit Facility (the "Amended DIP Order") (Docket 2252).

Pursuant to the Amended DIP Order, the lenders' commitment under the DIP Credit Facility

would reduce to zero and the Debtors were obligated to pay all indebtedness under the DIP

Credit Facility by April 30, 2009.

33.    This wind down of the DIP Credit Facility coincided with the Debtors'

wind down of its business operations.  The Debtors paid all obligations under the DIP Credit

Facility in February 2009.  They completed their going out of business sales and closed their last

set of remaining stores in March 2009.  The DIP lenders' commitments to provide further credit

pursuant to the DIP Credit Facility ended in April 30, 2009.

**B.    The Delisting of Circuit City's Stock from the New York Stock Exchange**

34.    In November 2008, the New York Stock Exchange delisted Circuit City's

stock after it had traded for less than a dollar on average in October 2008.  After Circuit City's

stock was delisted, it continued to trade over the counter "on pink slips."  However, during 2010,

which is the relevant time period for purposes of this Objection, the stock price never exceeded

15 cents a share.

**C.    The Workers' Compensation Insurance Program**

35.    At the time of Claimant's asserted injury, the Debtors maintained a policy

of workers' compensation insurance with Old Republic.  Sedgwick administers all workers'

compensation claims against the Debtors.  Sedgwick is continuing to administer and pay

(through Old Republic) valid workers' compensation claims.

36.    The Debtors books and records and the records of Sedgwick disclose that

the Claimant asserted that in December 2005 she was injured in one of the Debtors' parking lots

in Virginia.  The records further disclose that with respect to her asserted injury, $3,987 in

medical bills was paid on behalf of the Claimant through Sedgwick and Old Republic for the

period December 2005 through November 2006.  No further claims were asserted after

November 2006.

37.    The Plan provides that claims covered by insurance, such as the Workers'

Compensation Claim, shall be paid from insurance and will only be paid by the Liquidating Trust

to the extent of any deductible.  Plan, Article III.F.  The Debtor does not have to pay a deductible

with respect to the Workers' Compensation Claim.

### D.    The Cash Retention Program

38.    More than 180 days prior to the Petition Date, the Debtors implemented a

special cash retention award program (the "Cash Retention Program"), pursuant to which certain

employees (the "CRP Participants") were awarded cash that was payable over two to three years,

beginning in 2009, subject to the terms of the Cash Retention Program.  The letter to Claimant

setting forth the terms of the Cash Retention Program (the "CRP Letter") is attached hereto as

**Exhibit C**.  Pursuant to the Cash Retention Program, a cash amount was awarded (the "Cash

Award") to the Claimant on January 1, 2008 (the "Award Date").  Fifty percent of the Cash

Award was payable on January 1, 2009 and fifty percent was payable on January 1, 2010 (the

"Vesting Dates").  *See* CRP Letter, **Exh. C**.

39.    To become a CRP Participant, each eligible employee was required to sign

and return the letter setting out the terms of the applicable Cash Retention Program, with such

letter constituting a separate agreement between the CRP Participant and the Debtors (each, a

"CRP Agreement").  *See* CRP Letter, **Exh. C**.  The Claimant had to sign the CRP Agreement

before February 1, 2008 in order for the CRP Agreement to be effective.  *See* CRP Letter, **Exh. C** at 3.  This date is before the Priority Period.

### E.    **The Short-Term Incentive Program**

40.    Prior to the Petition Date, Circuit City had an annual short-term performance-based incentive program (the "Short-Term Incentive Program), which began each year in March, and pursuant to which certain employees, previously defined in this Objection as the Short-Term Incentive Program Participant, were eligible to earn cash incentive awards ("Short-Term Incentive Award") based on (1) company performance criteria, (2) individual performance, in certain cases, and (3) continued employment by Circuit City through the date on which Circuit City was obligated to make a Short-Term Incentive Award (the "Pay-Out Date").  The company performance criteria and the applicability of individual performance criteria depended on the Short-Term Incentive Program Participant's position at Circuit City.  However, the requirement to remain employed with Circuit City through the Pay-Out Date applied to each Short-Term Incentive Program Participant.

41.    In the case of Claimant, the Short-Term Incentive Program ran from March 1, 2008 through February 28, 2009 and the Pay-Out Date was May 15, 2009.  A sample copy of the terms (the "Plan Terms") of the Short-Term Incentive Program is attached hereto as **Exhibit D**.  The Plan Terms state, "[A]s a condition of receiving an incentive pay out, an associate must remain employed with the Company [Circuit City] on a full-time basis through and including the date of pay out."  *See* Plan Terms, **Exh. D** at 5.  The Plan Terms also clarified that while the company was encouraging Short-Term Incentive Program Participants to stay with

Circuit City, each Participant's "employment with the Company [Circuit City] is at will and is terminable at any time, with or without cause, and with or without notice. The plan shall not be construed to create a contract of employment for a specified period of time between the Company and the participant." *See* Plan Terms, **Exh. D** at 5.

42.     Despite a good faith effort, the Liquidating Trust has not located the specific performance criteria that apply to the STIP Claim. They were listed in an online performance evaluation program that the Debtors cancelled after the completion of their store closings in March, 2009. However, the Liquidating Trustee has determined that these criteria were developed in conjunction with the Short-Term Incentive Program Participants and that it was standard for the Short-Term Incentive Program Participant to print out these goals.

43.     The Liquidating Trust has also determined that the performance criteria – both company-wide and individual – were intended to be "stretch" criteria that had a less than 50% percent chance of being met. The challenging nature of these criteria was communicated to the Short-Term Program Participants.

### F.     The Long-Term Incentive Program.

44.     Prior to the Petition Date, on or about October 9, 2008, Circuit City implemented the Long-Term Incentive Program pursuant to which certain employees (the "Long-Term Incentive Program Participants") were eligible to receive cash incentive awards payable on three vesting dates: July 1, 2009; January 1, 2010; and July 1, 2010. The Long-Term Incentive Program intended to reward certain employees provided that Circuit City achieved two financial benchmarks: (1) credit availability and (2) stock value. The letter to Claimant setting

forth the terms of the Long-Term Incentive Program (the "<u>Long-Term Incentive Program Letter</u>") is attached hereto as **Exhibit E**.

45.    Payment on the first vesting date of July 1, 2009 was conditioned on "maintaining excess availability under all of the Company's[2] existing or future credit facilities in effect as of February 28, 2009." *See* Long-Term Incentive Program Letter.  **Exh. E**, p. 1.  Under the DIP Credit Facility, which was in effect as of February 28, 2009, "excess availability" referred to the amount by which the lenders' commitment or the Debtors' borrowing base (whichever was less) exceeded the amount outstanding under the DIP Credit Facility.  *See* DIP Credit Facility at 19, filed with the Court on November 26, 2008 [Docket No. 425].  Thus, Circuit City was obligated to pay a Long-Term Incentive Program Participant on the first vesting date if Circuit City had available credit under its credit facility on that date.

46.    Payment on the second vesting date of January 1, 2010 was conditioned on the Debtors' stock price exceeding $2.99 a share on that date.  Payment on the third vesting date of July 1, 2010 was conditioned on the Debtor's stock price exceeding $3.99 a share on that date.

<u>**OBJECTION**</u>

A.    <u>**Burden of Proof**</u>

47.    Pursuant to 11 U.S.C. § 502(a) and Bankruptcy Rule 3001(f), a properly filed and complete proof of claim is *prima facie* evidence of the validity of the claim, which raises a presumption of the claim's validity.  However, when an objection to a proof of claim

---

[2] The term Company referred to Circuit City.  *See* Long-Term Incentive Program Letter **Exh. E** at 1.

raises sufficient evidence, the burden of proof shifts to the claimant to establish that the claim is

allowable.  *See In re Garvida*, 347 B.R. 697 (9th Cir. BAP 2006); *In re Stoecker*, 143 B.R. 879,

883 (N.D. Ill. 1992).  Moreover, the holder of a claim always bears the burden of persuasion.  *Id.*

48.     Furthermore, if a claim does not comply with Bankruptcy Rule 3001(f),

then it is not presumptively valid and the burden of proof remains initially with the claimant.  *See*

*In re Plourde*, 397 B.R. 207 (Bankr. D. N.H. 2008):

> Rule 3001 . . . provides an evidentiary benefit to creditors who
> comply with the Rule and withholds that benefit from creditors
> who do not comply with the Rule.  If the Creditors have not
> substantially complied with the requirements of Rule 3001, the
> Claims are not entitled to the evidentiary benefit under Rule
> 3001(f).

*Id.*, at 218, *overruled on other grounds,*, 418 B.R. 495 (BAP 1st Cir. 2009).  To comply with

Rule 3001:

> A proof of claim is required to conform substantially to Official
> Form 10; must be signed by the creditor or the creditor's authorized
> agent; and, when the claim is based on a writing, must have a copy
> of the writing attached.

*In re US Airways, Inc.*, 2007 WL 3231573 *2 (Bankr. E.D. Va. 2007).  Thus, where a claim is

based on a writing, but no such writing is attached, the claim is not entitled to *prima facie*

validity and "both the burden of initially producing evidence and the ultimate burden of

persuasion therefore falls squarely" on the claimant.  *Id.*

49.     As set forth below, the Claimant cannot meet either her burden of proof or

her burden of persuasion.

B.      **The Workers' Compensation Claim Should Be Disallowed**

50.     Pursuant to the Virginia Workers' Compensation Act (sections 65.2-100 *et seq.* of the Code of Virginia), employers are immune from direct claims for personal injury such as the Claimant's that occur in the course of employment.  Instead, the employee recovers from the insurance policy.  The Workers' Compensation Claim does not set forth any facts that would show that her Claim is excepted from the statutory framework.

51.     In this case, Old Republic has already paid medical expenses on behalf of the Claimant for treatments that she received as a result of the injury asserted in the Workers' Compensation Claim.  To the extent, the Claimant is entitled to any further treatments or payments, that entitlement should be brought to the attention of Sedgwick, which is the third party administrator of workers' compensation claims relating to the Debtors.

52.     Accordingly, the Workers' Compensation Claim should be denied without prejudice to the Claimant's ability to pursue her statutory remedies and recover payments from Old Republic, through Sedgwick.

C.      **The CRP Claim Should Be Reclassified as a General Unsecured Claim**

53.     Section 507(a)(4) of the Bankruptcy Code accords priority status to "wages, salaries, or commissions . . . *earned*" within 180 days before the filing date.  (Emphasis added.)  *See In re Cardinal Indus. Inc.*, 160 B.R. 83 (Bankr. S.D. Ohio 1993) (for purposes of priority under section 507(a), a bonus is "earned" when the right to the bonus is established, even though the bonus is not payable until a later date).  *See also* 4 COLLIER ON BANKRUPTCY ¶507.06[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("The general rule is that wages,

salaries and commissions are earned when the employee obtains a right to payment under the

employment contract rather than at the time that payment is to be made.").  As Collier further

states with respect to whether a bonus is "earned" within the 180 days prior to a petition date as

required by section 507(a)(4) of the Bankruptcy Code, "If a bonus is awarded in December, but

not payable until the following March, the bonus was earned in December."  COLLIER ON

BANKRUPTCY at 507.06[5].

54.    In this case, the Cash Award was awarded and the CRP Agreement was

signed before the Priority Period.  Therefore, the Cash Award was earned, within the meaning of

section 507(a)(4), before the Priority Period and is not entitled to priority.

55.    Cases construing when a claim arises bolster the point that the CRP Claim

arose before the Priority Period and is not entitled to priority payment.  The definition of "claim"

in section 101(5) of the Bankruptcy Code includes "a right to payment" that is "contingent."  11

U.S.C. § 101(5)(A).  *See Grady v. AH Robins Co.*, 839 F.2d 198, 202 (4th Cir. 1988), *cert.*

*dismissed sub nom. Joynes v. AH Robins Co*., 487 US 1260 (1988) (defining "contingent" as

"conditioned upon the occurrence of some future event which is itself uncertain, or

questionable.").  The CRP Claim was contingent because the right to payment was conditioned

upon the Claimant pant remaining employed with the Debtors through the vesting dates.

56.    In the Fourth Circuit, a contingent claim arises when the event or conduct

underlying the claim first occurs.  *See A.H. Robins Co*., 839 F.2d at 201-02; *In re U.S. Airways*,

2007 WL 3231573, *3 (Bankr. E.D. Va. 2007) ("A debt 'arises,' for bankruptcy purposes, not

when the effects are felt but when the act giving rise to the liability occurs.").[3] *See also In re Bentley Funding Group, LLC,* 2001 WL 34054525 (Bankr. E.D. Va. Feb. 2, 2001) (surety's right to indemnity existed as a contingent claim from the date the indemnity agreement was executed); *Thompson v. Board of Trustees of Fairfax City. Police Officers Retirement Sys. (In re Thompson),* 182 B.R. 140, 153 (Bankr. E.D. Va. 1995), *aff'd,* 92 F.3d 1182 (4th Cir. 1996) (claim for retirement benefits arose when the employee first joined the program– not when the retirement payments became due in 25-years). As the *Thompson* Court explained, the "25-year requirement was merely a contingency [that] Thompson had to meet in order to have an immediate right to payment." *Id.*

57.    With respect to the CRP Claim, the Debtor incurred a contingent liability when the Claimant signed the CRP Agreement, which occurred before the Priority Period. Therefore, the CRP Claim arose before the Priority Period and is not entitled to priority under section 507(a). Instead, the CRP Claim should be reclassified as a general unsecured claim.

**D.    The STIP Claim Should Be Disallowed**

58.    As set forth above, the obligation to make payment to the Short-Term Incentive Program Participants depended on the continued employment of the Participant through the Pay-Out Date. With respect to the Claimant, this condition was not met because as of the Pay-Out Date because she did not remain employed by the Debtors. Accordingly, the STIP Claim should be disallowed in its entirety.

---

[3] In *A.H. Robins,* the court held that a contingent claim arose when the debtor's birth control device had been implanted and before the plaintiff manifested any injury. *Id.,* 839 B.R. 198.

59.     Furthermore, as set forth above, it was standard procedure for the Short-Term Incentive Program Participants to print out from the on-line performance evaluation tool, the list of the company-wide and individual performance goals that they had to meet in order to be entitled to a Short-Term Incentive Award.  Nonetheless, the STIP Claim fails to identify the specific performance criteria that had to be met and fails to show that these criteria were met.

60.     The Liquidating Trust has not been able to locate the performance criteria particular to the Claimant, despite a good faith effort to do so.  However, the performance criteria – both company-wide and individual – were ambitious and would have been difficult to meet even under the best of circumstances.  The circumstances, however, were quite poor.  By the Pay-Out Date in May 2009, the Debtors had liquidated their assets and closed their stores.  It is, therefore, extremely unlikely that any of the performance criteria applicable to the STIP Claim were met.  This near certain fact may explain why the Claimant fails to identify the criteria or allege that they had met the criteria.

61.     Accordingly, the STIP Claim should be disallowed in its entirety.

**E.     The LTIP Claim Should Be Disallowed Because the Conditions Necessary to Payment Were Not Met.**

62.     As set forth above, the obligation to make the first payment pursuant to the Long-Term Incentive Program Participants was contingent on the availability of credit under Circuit City's credit facilities.  This condition was not met because on the first vesting date, July 1, 2009, Circuit City had no available credit under the DIP Credit Facility.  Months earlier, on April 30, 2009, the lenders' commitments under the DIP Credit Facility ended pursuant to the terms of the Amended DIP Order.  The Amended DIP Order also set a deadline of April 30, 2009

for the Debtors to pay all obligations under the DIP Credit Facility.  The Debtors paid these obligations in February, 2009.

63.    In light of these facts, Circuit City did not have "excess availability" under the DIP Credit Facility on the first vesting date of July 1, 2009.  In fact, Circuit City did not have a credit facility as of July 1, 2009.  Therefore, Circuit City was not obligated to make the first payment under the Long-Term Incentive Program.

64.    Under the Long-Term Incentive Program, (i) a second payment would be made on January 1, 2010 (the second vesting date) if Circuit City's stock price exceeded $2.99 on that date, and (ii) a third payment would be made on July 1, 2010 (the third vesting date) if Circuit City's stock price exceeded $3.99 on that date.  *See* Long-Term Incentive Letter **Exh. E** at p. 2.

65.    In 2010, Circuit City's stock price consistently traded for 15 cents or less. Therefore, the conditions necessary to payment on the second and third vesting dates (stock prices in excess of $2.99 and $3.99 on those dates, respectively) did not occur and Circuit City was not obligated to make the second and third payments under the Long-Term Incentive Program.

66.    In summary, Circuit City was not obligated to pay the Claimant on the first vesting date because the condition necessary to this obligation – credit availability under a credit facility– was not met.  It had no credit availability under its credit facility.  Circuit City was not obligated to pay the Claimant on the second and third vesting dates because the conditions necessary to these obligations – stock prices in excess of $2.99 and $3.99 on the respective vesting dates – were not met.  Circuit City's stock traded well below these prices.

Accordingly, no amount is owing with respect to the LTIP Claim and the LTIP Claim should be disallowed in its entirety.

> **F.     To the Extent Any of the Claims Are Allowed on a Priority Basis, They Should Be Reduced to Ensure that the Claimant Does Not Receive More Than the Statutory Cap**

67.     Each of the Claims asserts the right to payment on a priority basis in the amount of $10,950.  While the Liquidating Trust believes that none of the Claims should be allowed on a priority basis, in any amount, to the extent the Court rules otherwise, the allowed priority amount should be adjusted so that the Claimant does not receive more than $10,950 on a priority basis.

68.     The amount payable on a priority basis pursuant to section 507(a)(4) of the Bankruptcy Code is capped by the statute and this cap is changed every three years.  In this case, the capped priority amount is $10,950.  *See* 11 U.S.C. § 104 (providing for adjustments in the section 507(a)(4) statutory cap every three years); 72 FR 7082 (priority cap under 11 U.S.C. § 507(a)(4) adjusted to $10,950 for cases filed on or after April 1, 2007); 75 FR 8747 (priority cap under 11 U.S.C. § 507(a)(4) adjusted to $11,725 for cases filed on or after April 1, 2010).  These cases were commenced on November 10, 2008.  Therefore, the applicable statutory cap is $10,950.

69.     An individual may not receive more than the statutory cap on account of any claims that are allowed under section 507(a)(4).  *See In re LandAmerica Financial Group*, 435 B.R. 343 (Bankr. E.D. VA 2010) (this court allowed section 507(a)(4) priority claim up to the statutory cap, less priority amounts previously received); *In re Share Bldg. Products, Inc.,*

2010 WL 2402882 (June 10, 2010 Bankr. E.D. WI) (individual's claims for wages and

commissions were reduced so that aggregate claim did not exceed $10,950; remaining claims in

excess of this amount were reclassified as general unsecured basis). *See also* 4 COLLIER ON

BANKRUPTCY ¶ 507.06 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("The maximum

dollar limit on the priority is [$10,950][4] for each individual and corporation.  Any excess claim

for wages, salaries and commissions will be a general unsecured claim.").

70.    Pursuant to the Wage Order, the Debtors may have paid pre-petition

wages to the Claimant, which accrued shortly before the Petition Date and, therefore, were

entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code.  Furthermore, if more

than one of the Claims is allowed on a priority basis, without any adjustment, then the Claimant

would have allowed priority claims that exceed the statutory cap.

71.    If any of the Claims are allowed on a priority basis without any reduction

for these earlier priority payments, or if no reduction is made in the event any other Claims is

also allowed on a priority basis, then the Claimant will receive more than $10,950 on account of

her section 507(a)(4) claims.  Therefore, if the Court allows any of the Claims on a priority basis

– which as set forth above, should not occur – then the Claim(s) should be allowed on a priority

basis, only up to the statutory cap, less any amounts paid in wages pursuant to the Wage Order,

and after accounting for any priority payments authorized with respect to any other Claim held

by the Claimant.  The remaining balance would then be reclassified as a general unsecured

claim.

---

[4] As set forth herein, the statutory cap adjusts every three years.

## RESERVATION OF RIGHTS

72.    As noted above, the Liquidating Trust reserves the right to file objections to the Claims at a later time on any grounds that bankruptcy or non-bankruptcy law permits.  The Liquidating Trust likewise reserves the right to modify, supplement and/or amend this Objection as it pertains to any claim or claimant herein.  In particular, but not by way of limitation, the Liquidating Trust reserves the right to establish that the Claimant has already received payments that should be applied to any claim that is allowed and entitled to priority pursuant to section 507(a)(4) of the Bankruptcy Code.

## NOTICE AND PROCEDURE

73.    Notice of this Objection has been provided to the Claimant and to parties-in-interest in accordance with the Court's *Supplemental Order Pursuant to Bankruptcy Code Sections 102 and 105, Bankruptcy Rules 2002 and 9007, and Local Bankruptcy Rules 2002-1 and 9013-1 Establishing Certain Notice, Case Management and Administrative Procedures* (entered on December 30, 2009 at Docket No. 6208) (the "Case Management Order").  The Liquidating Trust submits that the following methods of service upon the Claimant should be deemed by the Court to constitute due and sufficient service of this Objection:  (a) service in accordance with Federal Rule of Bankruptcy Procedure 7004 and the applicable provisions of Federal Rule of Civil Procedure 4; (b) to the extent counsel for the Claimant is not known to the Liquidating Trust, by first class mail, postage prepaid, on the signatory of the Claimant's proof of claim form or other representative identified in the proof of claim form or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the

Claimant's behalf in the Debtors' bankruptcy cases.  The Liquidating Trust is serving the

Claimant with this Objection and with the exhibit on which the Claims are listed.

74.    To the extent the Claimant timely files and properly serves a response to

this Objection by 4:00 P.M. (Eastern) on June 2, 2011 as required by the Case Management

Order and under applicable law, and the parties are unable to otherwise resolve the Objection,

the Liquidating Trust requests that the Court conduct a status conference  with respect to any

such responding claimant at 2:00 p.m.  (Eastern) on June 9,  2011 and thereafter schedule the

matter for a future hearing as to the merits of such claim.  However, to the extent the Claimant

fails to timely file and properly serve a response to this Objection as required by the Case

Management Order and applicable law, the Liquidating Trust requests that the Court enter an

order, substantially in the form attached hereto as **Exhibit A**, disallowing the Workers'

Compensation Claim, reclassifying the CRP Claim to a general unsecured claim, disallowing the

STIP Claim and disallowing the LTIP Claim.

## COMPLIANCE WITH BANKRUPTCY RULE 3007 AND <br> THE OMNIBUS OBJECTION PROCEDURES ORDER

75.    This Objection complies with Bankruptcy Rule 3007(e).  Additionally, the

Liquidating Trust submits that this Objection is filed in accordance with the Omnibus Objection

Procedures Order.

## WAIVER OF MEMORANDUM OF LAW

76.    Pursuant to Local Bankruptcy Rule 9013-1(G), and because there are no

novel issues of law presented in the Motion, the Liquidating Trust requests that the requirement

that all motions be accompanied by a written memorandum of law be waived.

**NO PRIOR RELIEF**

77.    In the *Debtors' Eighth Omnibus Objection to Certain Late Claims,* filed on June 3, 2009, [Docket No. 3507], the Debtors sought to disallow the Claims on the ground that they were filed late.  Pursuant to the *Order on Debtors' Eighth Omnibus Objection to Certain Claims as it Relates to Claims of Dirley L. Ball* (the "Dirley Ball Order"), entered on April 1, 2011 [Docket No. 10243], the Court denied the Eighth Omnibus Objection [Docket No. 10243], but allowed the Liquidating Trust to assert further objections to the Claims.  This Objection is filed pursuant to the Dirley Ball Order.

[*This Objection continues on the next page.*]

WHEREFORE, the Liquidating Trust respectfully requests that the Court enter an Order sustaining this Objection and granting such other and further relief as the Court deems appropriate.

Dated: Richmond, Virginia
     May 2, 2011

TAVENNER & BERAN, PLC


_____*/s/ Paula S. Beran*_____
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
(804) 783-8300

- and -

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
(310) 277-6910

- and –

PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
(212) 561-7700

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

Exhibit A

Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
(admitted *pro hac vice*)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Telecopy:  (310) 201-0760

Lynn L. Tavenner, Esq. (VA Bar No. 30083)
Paula S. Beran, Esq. (VA Bar No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
Telephone: (804) 783-8300
Telecopy:  (804) 783-0178

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 08-35653-KRH |
| | ) | |
| CIRCUIT CITY STORES, INC.[1], et al., | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER SUSTAINING LIQUIDATING TRUST'S OBJECTION**
**TO CLAIMS OF DIRLEY BALL ON THE GROUNDS THAT THE WORKERS'**
**COMPENSATION CLAIM IS RECOVERABLE ONLY FROM THE INSURANCE**
**CARRIER; THE SPECIAL CASH RETENTION CLAIM IS NOT ENTITLED TO**
**PRIORITY AND THE CONDITIONS NECESSARY TO ALLOWANCE OF THE**
**SHORT TERM INCENTIVE CLAIM AND LONG-TERM INCENTIVE CLAIM HAVE**
**NOT BEEN MET**

THIS MATTER having come before the Court on the *Liquidating Trust's*

*Omnibus Objection to Claims of Dirley Ball on the Grounds that the Workers' Compensation*

*Claim is Recoverable Only From the Insurance Carrier; the Special Cash Retention Claim Is*

*Not Entitled to Priority and the Conditions Necessary to Allowance of the Short Term Incentive*

*Claim and Long-Term Incentive Claim Have Not Been Met* (the "Objection"),[2] which requested,

---

[1] The Debtors in these cases include: Circuit City Stores, Inc., Circuit City Stores West Coast, Inc., InterTAN, Inc., Ventoux International, Inc., Circuit City Purchasing Company, LLC, CC Aviation, LLC, CC Distribution Company of Virginia, Inc., Circuit City Properties, LLC, Kinzer Technology, LLC, Abbott Advertising Agency, Inc., Patapsco Designs, Inc., Sky Venture Corp, Prahs, Inc., XSStuff, LLC, Mayland MN, LLC, Courchevel, LLC, Orbyx Electronics, LLC, and Circuit City Stores PR, LLC.
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Objection.

among other things, that the claims specifically identified on Exhibit B attached to the Objection

be reclassified and/or disallowed for those reasons set forth in the Objection; and it appearing

that due and proper notice and service of the Objection as set forth therein was good and

sufficient and that no other further notice or service of the Objection need be given; and it further

appearing that no response was timely filed or properly served by the Claimant being affected by

this Order; and it appearing that the relief requested on the Objection is in the best interest of the

Liquidating Trust, the Debtors' estates and creditors and other parties-in-interest; and after due

deliberation thereon good and sufficient cause exists for the granting of the relief as set forth

herein,

　　　　　IT IS HEREBY ORDERED ADJUDGED AND DECREED THAT:

　　　　　1.　　　The Objection is SUSTAINED.

　　　　　2.　　　The Workers' Compensation Claim identified on Exhibit B as attached

hereto and incorporated herein is forever disallowed in its entirety for all purposes in these

bankruptcy cases.

　　　　　3.　　　The CRP Claim identified on Exhibit B as attached hereto and

incorporated herein is reclassified in its entirety as a general unsecured claim for all purposes in

these bankruptcy cases.

　　　　　4.　　　The STIP Claim identified on Exhibit B as attached hereto and

incorporated herein is forever disallowed in its entirety for all purposes in these bankruptcy

cases.

5.      The LTIP Claim identified on <u>Exhibit B</u> as attached hereto and incorporated herein is forever disallowed in its entirety for all purposes in these bankruptcy cases.

6.      The Liquidating Trust's rights to object to any claim including (without limitation) the Claims subject to the Objection, on any grounds that applicable law permits, are not waived and are expressly reserved.

7.      The Liquidating Trust shall serve a copy of this Order on the Claimant included on the exhibits to this Order on or before five (5) business days from the entry of this Order.

8.      This Court shall retain jurisdiction to hear and determine all matters arising from or relating to this Order.

Dated: Richmond, Virginia
            _____, 2011


            _____
            HONORABLE KEVIN R. HUENNEKENS
            UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

TAVENNER & BERAN, PLC


_____
Lynn L. Tavenner (VA Bar No. 30083)
Paula S. Beran (VA Bar No. 34679)
20 North Eighth Street, 2nd Floor
Richmond, Virginia 23219
(804) 783-8300
                        - and -

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz, Esq.
Andrew W. Caine, Esq.
10100 Santa Monica Boulevard
Los Angeles, California 90067-4100
(310) 277-6910
                        - and –

PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein, Esq.
780 Third Avenue, 36th Floor
New York, New York 10017
(212) 561-7700

*Counsel to the Circuit City Stores, Inc.*
*Liquidating Trust*



### CERTIFICATION OF ENDORSEMENT UNDER LOCAL RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ Lynn L. Tavenner
Lynn L. Tavenner

In re Circuit City Stores, Inc, et al.
Case No. 08-35653 (KRH)
**EXHIBIT B TO OBJECTION TO CLAIMS OF DIRLEY BALL**

| Date Filed | Claim Number | Claimant Name and Address | Claim Amount as filed | Pages listed in Objection |
|---|---|---|---|---|
| 2/2/2009 | 11102 | Ball, Dirley L.<br>14029 Rockbasket Place<br>Chester, VA 23836 | Unliquidated | See Page 3, Page 16. |
| 2/2/2009 | 11103 | Ball, Dirley L.<br>14029 Rockbasket Place<br>Chester, VA 23836 | $10,950 (priority)<br>$29,050 (general unsecured) | See Page 4, Pages 16-18. |
| 2/2/2009 | 11104 | Ball, Dirley L.<br>14029 Rockbasket Place<br>Chester, VA 23836 | $10,950 (priority)<br>$34,675 (general unsecured) | See Pages 4-5, Pages 18-19. |
| 2/2/2009 | 11105 | Ball, Dirley L.<br>14029 Rockbasket Place<br>Chester, VA 23836 | $10,950 (priority)<br>Unliquidated (general unsecured) | See Pages 5-6, Pages 19-21. |

# **Exhibit C**

10054574,Ball,Dirley L
N/A, 1/1/2008, Cash



Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

January 3, 2008

Dirley L Ball
1804 Cambridge Drive
Richmond, VA  232380000

Dear Dirley L:

Congratulations!  The Compensation and Personnel Committee of the Board of Directors (the "Committee") has awarded you a special cash retention award (the "Award") subject to the terms of this Award letter.  The purpose of this Award is to reward, motivate and retain management personnel who are key to the Company's turnaround efforts and long term success.  To accept this Award, please sign the enclosed copy of this letter, and return it as indicated in item 6 below.

Subject to the requirements and limitations set forth in this Award letter, your Award, Award Date, and Vesting Dates are as follows:

| | |
|---|---|
| Total Cash Retention Award: | $40,000 |
| Award Date: | January 1, 2008 |

| Vesting Dates | Vesting % |
|---|---|
| January 1, 2009 | 50% |
| January 1, 2010 | 50% |

For purposes of this Award letter, "Company" means Circuit City Stores, Inc. or a parent or subsidiary of Circuit City Stores, Inc. within the meaning of section 424(e) and (f) of the Internal Revenue Code of 1986, as amended.

Your right to receive the portion of your Award corresponding to the above Vesting Dates is contingent on (i) your agreeing to the terms of this Award by signing and returning the enclosed copy of this letter, and (ii) your remaining continuously employed on a full-time active basis with the Company through and including the corresponding Vesting Date.  If you satisfy these requirements, the portion of your Award that becomes vested will be paid to you in a single lump sum cash payment within 75 days following the Vesting Date.  Your right to this Award is not contingent on corporate or individual performance.

Forfeiture.  If prior to becoming fully vested in your Award, (i) your employment with the Company terminates for any reason other than your death or permanent disability, or (ii) your employment status with the Company changes to part-time, or (iii) you retire from the Company, then the unvested portion of your Award will be forfeited as of the date of your termination, change in status, or retirement, as the case may be.

If your employment with the Company terminates on or before a Vesting Date because you die or become permanently disabled, then the portion of your Award scheduled to vest on such Vesting Date will vest as of the date of your death or termination for disability (assuming you otherwise meet the requirements under this Award letter), and any portion of your Award that would have vested on a subsequent Vesting Date will be forfeited. For example, if your employment terminates under these circumstances on or before January 1, 2009, the portion of your Award scheduled to vest on that date will vest, and any portion that would have vested on a subsequent Vesting Date will be forfeited.

The Committee will determine whether a permanent disability exists for purposes of the foregoing, and such determination will be conclusive and binding.

Other terms relevant to this Award letter are set forth below.

1. **Modification**. The Committee may unilaterally modify the terms of this Award letter after the Award Date provided that your consent is obtained with respect to any modification that would be detrimental to your rights hereunder, except that your consent will not be required to the extent any such modification is to comply with applicable law.

2. **Change of Control**. If you remain continuously employed on a full-time active basis with the Company through and including the date on which a Change of Control of the Company occurs, then notwithstanding any provision herein to the contrary, any restrictions hereunder on your outstanding Award shall lapse as of such date. For this purpose, "Change of Control" has the meaning set forth in the Circuit City Stores, Inc. 2003 Stock Incentive Plan, as amended and restated, effective December 14, 2006, and that definition is incorporated by reference into, and made a part of, this Award letter. Generally, a Change of Control will be deemed to occur upon any of the following events: (i) the acquisition by any person or entity of 35% or more of either the Company's outstanding shares or the combined voting power of the then outstanding securities of the Company entitled to vote generally in the election of directors (but excluding certain acquisitions involving the Company or an affiliate, or by any benefit plan sponsored by the Company); (ii) the incumbent members of the Board of Directors of the Company (including any future directors whose election is approved by a majority of the incumbent members) cease to constitute a majority of the Board of Directors; (iii) the consummation of a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company (with certain exceptions, as described in the 2003 Stock Incentive Plan); or (iv) the consummation of a plan of complete liquidation, dissolution, or sale of substantially all the assets of the Company.

3. **Withholding Taxes**. On the Vesting Date, you will have taxable income equal to the amount of your vested Award, and the Company will withhold the amount of taxes required to be withheld or paid.

4. **Interpretation**. The interpretation and construction of any provision or term of this Award letter by the Committee will be final and conclusive. The terms of this Award letter and all actions taken hereunder will be governed by the laws of the

Commonwealth of Virginia, without regard to the conflict of law provisions of any jurisdiction.

5. **Miscellaneous**.

a. This Award letter is the entire agreement between you and the Company concerning the Award granted hereunder. If you are a party to an Employment Agreement with the Company, you agree that in the case of a conflict between the Employment Agreement and this Award letter, the terms of this Award letter will control.

b. Nothing in this Award letter confers any right to continued employment with the Company, or affects the Company's right to terminate an associate's employment at any time, with or without notice, and with or without cause.

c. The Company has no obligation to contribute any assets to a trust or other entity or otherwise to segregate any assets, or maintain separate accounts for the purpose of satisfying the Award obligation hereunder.

6. **Acceptance of this Award**. In order for your Award to become effective, you must accept it by signing and faxing a copy of this entire letter as soon as possible, but in no event later than February 1, 2008 to **757-299-8412**.

Your signature will also constitute your agreement to the terms and conditions contained in this letter.

Sincerely,

Eric A. Jonas, Jr.
Senior Vice President
Human Resources

ACCEPTED:

_____
Associate Signature

_____
Printed Name

_____
Date

# Exhibit D

## Circuit City
## Turnaround Incentive Plan

| | |
|---|---|
| Plan Number: | CC05 |
| Effective Date: | March 1, 2008 to February 28, 2009 |
| Eligibility: | Vice Presidents    Professionals in Level 4 or higher |
| | Directors    Regional HR Directors |
| | Managers    Asset Protection |
| Incentive Target: | Varies by position |

### Objective
The goal of the incentive plan is to align your pay at risk with the company goals and drive a positive return for our shareholders.

### Measures
The incentive plan includes:

| | Based on | Weight | Performance Period |
|---|---|---|---|
| Team | 2 – 3 measures that vary by team | 50% | 10/1/08 – 2/28/09 |
| Individual | Individual Performance | 50% | 3/1/08 – 2/28/09 |

### Team Measures
Results will be based on the performance measures assigned by team below and reported by the finance department for the period 10/1/08 – 2/28/2009.

#### Retail and The City Teams
Company Gross Margin $
Company Expense Reduction
Customer Experience

#### Multi-Channel & Services Teams
Company Gross Margin $
Company Expense Reduction

#### Merchandising Team
Company Gross Margin $
Payable Days
In Stock

#### Inventory & Space Planning Team
Company Gross Margin $
Company Reduction in At Risk & Distressed Inventory
In Stock

#### Support Team (Asset Protection, Communications, Construction, Distribution, Finance, HR, IT, Legal, Logistics, Marketing, Procurement, Real Estate)
EBITDA
Company Expense Reduction

Incentive Calculation
- The incentive payout will be calculated using the incentive grids appearing on page 2 and following.
- Payout percentage is interpolated between the levels on the incentive grid (except for Grids presented as a range) if actual attainment falls between the levels noted on each grid. Achievement will be determined based on actual results. All determinations regarding the achievement of the performance goal will be made by the Compensation Committee of the Board.
- Results may be adjusted to back out the full year impact related to material one-time or non-recurring events (e.g. sale of Intertan) or material charges (e.g. restructure charge). A change or benefit is deemed to be a material nonrecurring event if it is classified as a discontinued operation or characterized as such in filings with the SEC or it the event would significantly alter the incentive payout calculation. Store openings and closings will be budgeted in accordance with the real estate plan. Material variances created by more/less openings/closings than planned may be adjusted so that they will not affect the payout. All material unbudgeted events will be included or excluded at the discretion and approval of the Compensation Committee.

### Confidential & Proprietary

## Team Measures: Incentive Grids

**EBITDA** – Domestic earnings before interest, taxes, depreciation & amortization (generally – cash flow generation)

| Payout % | EBITDA % Attainment |
|----------|---------------------|
| 25% | Below Revised Business Plan |
| 50% | Below Revised Business Plan |
| 75% | 100% of Revised Business Plan |
| 100% | Above Revised Business Plan |
| 125% | Above Revised Business Plan |

Note: The actual metrics for this performance measure will be provided to your management team and our progress will be shared with you on an ongoing basis.

**Company Gross Margin $** – Domestic sales revenue minus cost of goods sold to include discounts, coupons, rebates, promotional finance cost, vendor funding offsets, and inventory adjustment cost.

| Payout % | Attainment % |
|----------|--------------|
| 25% | 85% |
| 50% | 93% |
| 75% | 100% |
| 100% | 105% |
| 125% | 110% |

**Company Expense Reduction** – Measured against budgeted operating expenses (Domestic SG&A or Selling, General & Administrative expenses)

| Payout % | Attainment % |
|----------|--------------|
| 25% | 102% |
| 50% | 101% |
| 75% | 100% |
| 100% | 97% |
| 125% | 95% |

Note: If every Director and above reduced expense by $100,000 we could achieve a payout of 75% or higher. Each of us can greatly impact this measure.

**In Stock** – Percentage of time that products classified as key items, never out of stock skus, or promotional skus are available in stores for customers.
In Stock is defined based on:
1.  Actual Display Units >= Planogram Display Units, and
2.  Total Closed Box On-Hand Units >= 1 Sellable Closed Box Unit

| Payout % | Attainment Range – Promo / Key Item Never Out |
|----------|-----------------------------------------------|
| 25% | 90% - 91.5% |
| 50% | 91.6% - 93% |
| 75% | 93.1% - 94.5% |
| 100% | 94.6% - 96% |
| 125% | >96.1% |

**At Risk / Distressed Inventory**
- At Risk/Distressed Inventory defined as On Planogram Not Replenished or Not on Planogram Not Replenished
- Average Attainment Goal $ are based on the average of five months of Planned At Risk/Distressed Inventory levels.
- Actual Data extracted from the EDW inventory tables

| Payout % | Average Attainment Goal % |
|----------|---------------------------|
| 25% | 83.5% to 87.1% |
| 50% | 87.2% to 91.1% |
| 75% | 91.2% to 95.5% |
| 100% | 95.6% to 100% |
| 125% | >100% |

**Payable Days**
Domestic Merchandise Days Payables as calculated below:

$$\frac{\text{Average of Beginning of Period \& End of Period Merchandise Payables}}{\text{Domestic Cost of Goods Sold for Period}} \times \text{\# of Days}$$

Note:
- Payable days will be measured against Q3 results and Q4 results separately and the resulting payout % of both will be averaged.
- Merchants should attempt to negotiate seasonal dating "longer payment terms" with vendors for shipments that support holiday sales. These payment terms would revert back to the normal payment days for any orders placed after 12/31/08.

| Payout % | Attainment % |
|----------|--------------|
| 25% | 88% |
| 50% | 94% |
| 75% | 100% |
| 100% | 106% |
| 125% | 112% |

**Customer Experience**
- Based on mystery shop scores that incorporate 5 new or modified questions based on the Store Execution Plan. As many as 10 mystery shops per store will be completed; the measure is based on total company results.
- Metric will be based on improvement over November baseline.
- **Note:** The grid will be finalized once the baseline is established and can be reviewed with the Compensation Committee.

| Payout % | Improvement Over November Baseline |
|----------|-------------------------------------|
| 25% | TBD |
| 50% | TBD |
| 75% | TBD |
| 100% | TBD |
| 125% | TBD |

**Team Measures –Calculation**
- Annual Incentive Target $ = FY09 Eligible Earnings x Incentive Target as of December 1st
- Team Measure Incentive Target $ = 25% each (2 Team Measures) or 16.67% each (3 Team Measures) x Annual Incentive Target $
- Team Measure Incentive Payout $ (For each Team Measure) = Team Measure Incentive Target $ x payout percent  based on achievement against incentive grid

**Example assuming revised business plan goal is achieved (100% of goal achievement = 75% payout percentage)**
- Annual Incentive Target $ =                                                          $60,000 x 10% = $6,000
- Team Measure Target $ =                                                             $6,000 x 50% = $3,000
- Individual Team Measure  $ Targets (2 Measures) =                     $3,000  x  50% = $1,500
- Team Measure 1 Payout =                                                            $1,500 x  75% = $1,200
- Team Measure 2 Payout =                                                            $1,500 x 75% = $1,200
- Total Team Measure Payout  $ =                                                $1,200 + $1,200 = $2,400


## Individual Performance

An individual's performance will be based on achievement against a documented performance plan that is in writing and submitted by the individual's manager through the performance evaluation (PE) system.  Lack of a submitted performance plan may result in exclusion for this measure of the plan.  The final rating will be used to calculate the incentive payout based on the table below.  The final overall rating must be a 3, 4 or 5 to remain eligible for a payout under any measure (team or individual) of the plan.

Source of Performance Data
- Performance evaluation as reported in the performance evaluation system

Formula
- The payout will be calculated using the following matrix.
- The "individual payout %" shown below is based on a normal distribution of PE ratings.  If the performance distribution is skewed with a higher number of 4's and 5's than anticipated then an adjustment to all payouts may need to be made to ensure the total overall payout is funded.

| Final Overall Rating | Individual Payout % |
|---|---|
| 5 | 120% |
| 4 | 110% |
| 3 | 100% |
| 2 | 0% |
| 1 | 0% |

Calculation
- Annual Incentive Target $ = FY09 Eligible Earnings x Incentive Target as of December 1st
- Individual Performance Payout $ = Annual Incentive Target $ x Individual Payout % x Weight (50%) x Adjustment (if necessary)

Example assuming a Final Rating of 3
- Annual Incentive Target $ =                                                          $60,000 x 10% = $6,000
- Individual Performance Payout $ =                                            $6,000 x 100% x 50% = $3,000


**Management Incentive Plan Total Payout $**
Team Measure Payout $ + Individual Performance Payout $ = $2,400 + $3,000 = $5,400

**Confidential & Proprietary**

## Administrative Guidelines

Following are the administrative guidelines that apply to the plan.

**Performance Period**

Payments are calculated for a specified and fixed period of time (the "Performance Period") and performance is measured only at the end of the Performance Period. The Performance Period for the Team measures is October 1, 2008 to February 28, 2009, with the exception of payable days which will be measured based on full Q3 and Q4 performance. For the individual measures the performance period is March 1, 2008 to February 28, 2009.

**Eligible Earnings and Incentive Target**

- Eligible Earnings are defined as regular base pay earned during the Performance Period. It does not include any premium or differential, cost of living, or other items such as incentive pay, sign-on bonuses, short-term disability, etc.

- The incentive target as of December 1st will be used to calculate the incentive payout. The incentive target is represented as a percentage and is based on the salary level of your position.

**Eligibility**

- Status: only full-time associates who are in an incentive eligible position, as of December 1st, are eligible to participate in the plan. Associates hired on or after December 1st are not eligible.

- Termination: The plan is intended to attract and retain associates. Therefore, as a condition of receiving an incentive payout, an associate must remain employed with the Company on a full-time basis through and including the date of payout. An associate who terminates employment for any reason or changes to part-time status prior to the date of payout will not receive a payout, except to the extent required by law.

- Associates on an approved leave of absence of any type on the date of payment may be eligible for incentive payout upon the return to work. As allowed by law, associates who fail to return to work for any reason following an approved leave of absence will not receive a payment under the plan.

- Associates must receive a final overall rating of 3, 4 or 5 to remain eligible for a payout.

**Timing and General Terms**

- Payments are calculated and targeted for distribution to associates no later than 2 ½ months after the end of the Performance Period.

- Payroll taxes will be withheld from incentive payments in accordance with federal, state and local law.

- 401(k) and ESPP plan contributions will be deducted from an incentive payment in accordance with an associate's election under each plan and subject to the respective plan limits.

- Health and Welfare deductions will not be taken from an incentive payment.

**General Conditions of the Plan**

The Company reserves the right to terminate, amend, modify and/or restate the plan (in whole or in part) at any time and without advance notice.

An eligible participant's employment with the Company is at will and is terminable at any time, with or without cause, and with or without notice. The plan shall not be construed to create a contract of employment for a specified period of time between the Company and the participant.

No incentive will be earned for a Performance Period in which it has been determined that an associate has manipulated the plan, falsified information or engaged in any other conduct that in the opinion of the Company has attempted to thwart, subvert, or contravene the intent of the plan or any other measure or condition of the plan.

Due to the complex nature of variable pay plans it is impossible to cover every aspect. The clarification and resolution of any issue not clear from this plan will be determined at the sole discretion of the President & CEO and/or Senior Vice President of Human Resources.

# **Exhibit E**

10054574 , Ball , Dirley L.
N/A, 9/29/2008, CASH



Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, VA 23233-1464

October 9, 2008

Dirley L. Ball
14029 Rockbasket Place
Chester, VA  23836

Dear Dirley L.:

Congratulations!  The Compensation and Personnel Committee of the Board of Directors (the "Committee") has awarded you a long-term cash incentive award (the "Award") subject to the terms of this Award letter.  The purpose of this Award is to reward, motivate and retain associates who are key to our turnaround efforts and long term success of Circuit City Stores, Inc. (the "Company").  To accept this Award, please sign this letter, and fax it as instructed in Section 6 below.

Subject to the requirements and limitations set forth in this Award letter, your Target Cash Incentive Award, Maximum Cash Incentive Award, and Award Date are as follows:

Target Cash Incentive Award:             $40,000

Maximum Cash Incentive Award:          $80,000

Award Date:                    September 29, 2008

This Award is based on performance of the Company over time and the amount that you can earn at each Vest Date under the Award is subject to meeting the Performance Conditions as outlined below. For purposes of the Performance Conditions, the following definitions apply:

Minimum Availability:  maintaining excess availability under all of the Company's existing or future credit facilities in effect as of February 28, 2009, as such existing or future credit facilities may be amended, modified, superseded or supplemented, through February 28, 2009; and

Closing Stock Price:  closing stock price as reported by the exchange or market on which the Company's common stock generally has the greatest trading volume.

The schedule of Vest Dates, the corresponding target amounts and Performance Conditions for each date are as follows:

1st Vest Date:                     July 1, 2009
Targeted Amount Vesting:          $13,333
Performance Condition:          Minimum Availability

- 1 -

2nd Vest Date:                          January 1, 2010
Targeted Amount Vesting:                $13,333
Performance Condition:                  Total shareholder return based on the following
                                        stock prices:

| Closing Stock Price on Dec. 31, 2009 | % Payout of Targeted Amount Vesting |
|---|---|
| less than $3.00 | 0% |
| $3.00–$3.99 | 75% |
| $4.00–$4.99 | 100% |
| $5.00–$5.99 | 125% |
| $6.00–$6.99 | 175% |
| $7.00–$7.99 | 200% |
| $8.00–$8.99 | 225% |
| $9.00 or greater | 250% |

3rd Vest Date:                          July 1, 2010
Targeted Amount Vesting:                $13,333
Performance Condition:                  Total shareholder return based on the following
                                        stock prices:

| Closing Stock Price on Vest Date | % Payout of Targeted Amount Vesting |
|---|---|
| less than $4.00 | 0% |
| $4.00–$4.99 | 75% |
| $5.00–$5.99 | 100% |
| $6.00–$6.99 | 125% |
| $7.00–$7.99 | 175% |
| $8.00–$8.99 | 200% |
| $9.00–$9.99 | 225% |
| $10.00 or greater | 250% |

If on the specified Vest Date no amount is earned or an amount less than the Targeted Amount is earned, the unearned portion of the Targeted Cash Incentive Amount for that Vest Date will roll-forward to the next Vest Date and may be earned if the minimum Performance Condition for the next Vest Date is achieved. Any amounts that are rolled forward to the next Vest Date are not eligible for more than a Target (100%) payout.

For purposes of the vesting and forfeiture requirements that follow, your employment with the "Company" includes your employment with Circuit City Stores, Inc. or with a parent or subsidiary of Circuit City Stores, Inc. within the meaning of section 424(e) and (f) of the Internal Revenue Code of 1986, as amended.

Your right to receive the portion of your Award corresponding to each of the above Vest Dates is contingent on (i) your agreeing to the terms of this Award by signing and faxing this letter, and (ii) your remaining continuously employed on a full-time active basis with the Company through and including the corresponding Vest Date. If you satisfy these

- 2 -

requirements, the portion of your Award that becomes vested will be paid to you in a single lump sum cash payment within 75 days following the Vest Date. In the event that you are on a leave of absence on the Vest Date, the portion of your Award that would have vested on that date will not vest until you return to active full-time employment with the Company and will then be paid within 75 days after your return.

Forfeiture. If prior to becoming fully vested in your Award, (i) your employment with the Company terminates for any reason other than your death or permanent disability, or (ii) your employment status with the Company changes to part-time, or (iii) you retire from the Company, then the unvested portion of your Award will be forfeited as of the date of your termination, change in status, or retirement, as the case may be

If your employment with the Company terminates on or before a Vest Date because of death or permanent disability, then the portion of your Target Cash Incentive Award that is scheduled to vest on a future Vest Date will vest as of the date of your death or termination for disability (assuming you otherwise meet the requirements under this Award letter), and will be paid out in a lump sum cash payment within 75 days after your death or disability.

The Committee will determine whether a permanent disability exists for purposes of the foregoing, and such determination will be conclusive and binding.

Other terms relevant to this Award letter are set forth below.

1. **Modification**. The Committee may unilaterally modify the terms of this Award letter after the Award Date provided that your consent is obtained with respect to any modification that would be detrimental to your rights hereunder, except that your consent will not be required to the extent any such modification is to comply with applicable law.

2. **Change of Control**. If you remain continuously employed on a full-time active basis with the Company through and including the date on which a Change of Control of the Company occurs, then any unvested portion of your outstanding Target Cash Incentive Award will vest as of such date and will be paid to you in a lump sum cash payment within 75 days thereafter. For this purpose, "Change of Control" has the meaning set forth in the Circuit City Stores, Inc. 2003 Stock Incentive Plan, as amended and restated, effective December 14, 2006, and that definition is incorporated by reference, and made a part of this Award letter.

The following provides a brief summary of the definition of Change of Control under the 2003 Stock Plan. This is intended only as a summary, and any determination of whether a Change of Control has actually occurred will be subject to the full definition set forth in the 2003 Stock Plan. In general, a Change of Control will occur upon any of the following events: (i) a third party acquires 35% of the Company's outstanding stock; (ii) the incumbent members of the Company's Board of Directors cease to be a majority of the Board (for this purpose, "incumbent members" includes directors whose election was approved by a majority of the Board); (iii) a reorganization, merger or consolidation of the Company or sale or other disposition of all or substantially all of the assets of the Company; or (iv) the consummation of a plan of complete liquidation or dissolution of the Company.

- 3 -

3. **Withholding Taxes.**  On the Vest Date, you will have taxable income equal to the amount of your vested Award, and the Company will withhold the amount of taxes required to be withheld or paid.

4. **Interpretation.**  The interpretation and construction of any provision or term of this Award letter by the Committee will be final and conclusive. The terms of this Award letter and all actions taken hereunder will be governed by the laws of the Commonwealth of Virginia, without regard to the conflict of law provisions of any jurisdiction.

5. **Miscellaneous.**

a. This Award letter is the entire agreement between you and the Company concerning the Award granted hereunder.

b. Nothing in this Award letter confers any right to continued employment with the Company, or affects the Company's right to terminate an associate's employment at any time, with or without notice, and with or without cause.

c. The Company has no obligation to contribute any assets to a trust or other entity or otherwise to segregate any assets, or maintain separate accounts, for the purpose of satisfying the Award obligation hereunder.

6. **Acceptance of this Award**.  In order for your Award to become effective, you must accept it by signing this letter and faxing the entire letter as soon as possible, but in no event later than November 1, 2008 to **757-299-8412.**

Your signature will also constitute your agreement to the terms and conditions contained in this letter.

Sincerely,

Eric A. Jonas, Jr.
Senior Vice President
Human Resources

ACCEPTED:

Associate Signature

Dirley L. Ball

_____
Printed Name

_____
Date        10/17/08

- 4 -