# STEVENS & LEE
## LAWYERS & CONSULTANTS

1105 North Market Street
7th Floor
Wilmington, DE 19801
(302) 654-5180  Fax (302) 654-5181
www.stevenslee.com

| | |
|---|---|
| Direct Dial: | (302) 425-3308 |
| Email: | jdd@stevenslee.com |
| Direct Fax: | (610) 371-8515 |

June 29, 2009

**VIA FEDERAL EXPRESS**
Circuit City Stores, Inc. *et al.*
Claims Processing Department
Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

> **Re:** ***Circuit City Stores, Inc., et al.*, Case No. 08-35653 (KRH);
> Administrative Claim request of 19th Street Investors, Inc.
> Related to Lease of Premises (Store #848) located at
> Bal Harbour Square Shopping Center, Fort Lauderdale, Florida**

Dear Sir or Madam:

Enclosed for filing is the original *REQUEST OF 19th STREET INVESTORS, INC. FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM* of 19th Street Investors, Inc., in connection with an unexpired non-residential real property lease for premises (Store #848) located at the Bal Harbour Square Shopping Center, Fort Lauderdale, Florida.  Also enclosed is a copy of the Request, which we ask that you time-stamp upon receipt, and return to us in the self-addressed, stamped envelope provided.

Please do not hesitate to contact me if there are any questions.

Sincerely,

STEVENS & LEE

John D. Demmy

cc:    John Ortega
       Joe Carosella
       *(each by electronic mail delivery)*

Philadelphia   •   Reading   •   Valley Forge   •   Lehigh Valley   •   Harrisburg   •   Lancaster   •   Scranton
Williamsport   •   Wilkes-Barre   •   Princeton   •   Cherry Hill   •   New York   •   Wilmington

A PROFESSIONAL CORPORATION

SL1 914668v1/104068.00002

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

---------------------------------------------------x
:
In re:                                           :          Chapter 11
:
CIRCUIT CITY STORES, INC., *et al.*,             :          Case No. 08-35653 (KRH)
:
:          (Jointly Administered)
Debtors.         :
:
---------------------------------------------------x

**REQUEST OF 19th STREET INVESTORS, INC. FOR**
**ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

19th Street Investors, by counsel, requests that the Court enter an order allowing it, and

directing Debtors to pay, administrative expense claims (this "Administrative Expense

Request"); and, in support, respectfully states as follows:

1.      On November 10, 2008 (the "Petition Date"), Debtors commenced their cases

under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") that are pending

with the Court.  Debtors' cases are being jointly administered.

2.      On May 15, 2009, the Court entered an order requiring administrative claims

accrued during the period from the Petition Date through April 30, 2009, to be submitted to

Debtors' claims agent, Kurtzman Carson Consultants, LLC by June 30, 2009 (the

"Administrative Claim Bar Date").

3.      19th Street Investors, Inc. ("Landlord"), as lessor, and Circuit City Stores, Inc.

("Circuit City"), as lessee, entered into a non-residential real property lease dated March 29, 2001

(the "Lease") for certain premises described in the Lease (the "Premises") located at the Bal

SL1 929331v1/000000.00000

Harbour Square Shopping Center in Fort Lauderdale, Florida (the Shopping Center"). On information and belief, Debtors identified the Premises as their store number 848. A true and correct copy of the Lease is attached to Landlord's Proof of Claim, which is attached hereto as Exhibit A.[1] The Lease was an unexpired non-residential real property lease within the meaning of section 365 of the Bankruptcy Code as of the Petition Date.

4.      Debtors have rejected the Lease; and, on or about April 8, 2009, Landlord timely filed its proof of claim, a true and correct copy of which is attached hereto as Exhibit A.

5.      As set forth in its Proof of Claim, and herein, Landlord has administrative expense claims based on Debtors' post-petition possession and use of the Premises under and pursuant to the Lease, as follows:

(a)      Stub Rent Administrative Claim Under 11 U.S.C. §§ 365(d)(3) and/or 503(b):

6.      Debtors failed to pay monthly rent due for November 2008. The "stub" rent portion of November 2008 rent due and owing to 19th Street Investors, which is an administrative (or *quasi* administrative claim under sections 503(b) and/or 365(d)(3) of the Bankruptcy Code), is in the amount of $63,890.44.

(b)      CAM Charges:

7.      Debtors are obligated under the Lease to pay common area maintenance ("CAM") expenses. *See* Lease at ¶7. Under and pursuant to the Lease, CAM charges are estimated for a calendar year and based on such estimates the Lease requires payment of one-twelfth of the

---

[1]      The statements herein regarding the Lease are provided for convenience only and is not intended to nor do they alter the terms of the Lease, which terms control the lessor's and lessee's respective rights, obligations and remedies thereunder. Such statements further are not intended to nor do they waive any rights or remedies Landlord has under the Bankruptcy Code or applicable law.

SL1 929331v1/000000.00000

annual estimated CAM charges by the lessee, monthly, along with base rent payments.  After the end of the calendar year the actual CAM charges for the year are totaled and reconciled against the estimated amounts paid during the calendar year.  The lessee under the Lease is required to pay any amount by which its estimated monthly payments for the year come short of the actual CAM charges upon lessor providing a CAM reconciliation statement to lessee.  In addition, monthly amounts due under the Lease are adjusted based on the CAM reconciliation.

8.    Under the terms of the Lease, Debtors are obligated to pay, in full: (i) the 2008 CAM shortfall that came due in full under and pursuant to the terms of the Lease after the Petition Date and (ii) the aggregate increases in the monthly CAM charge for 2008 based on the new estimate in accordance with the CAM reconciliation.  Attached to its Proof of Claim as Exhibit B is 19th Street Investors' CAM reconciliation statement and its communication to Debtors with respect to the $19,690.45 shortfall (for 2008) and the aggregate true-up (for 2009) amount of $3,811.83 for January, February and March (through the 10th) 2009, now due and owing under the Lease.

\*        \*        \*

9.    Accordingly, 19th Street Investors is entitled to allowance and payment of an administrative expense claim in the aggregate amount of $87,392.72.

3

WHEREFORE, Landlord respectfully requests that the Court:

(a)     Allow the administrative claim of Landlord as set forth above;

(b)     Order the Debtors to pay the Claim; and

(c)     Grant it such other and further relief as this Court deems just and proper.

Dated:  June 29, 2009                    STEVENS & LEE, P.C.

                                         _____
                                         John D. Demmy (DE Bar No. 2802)
                                         1105 N. Market Street, 7th Floor
                                         Wilmington, Delaware 19801
                                         Phone: (302) 425-3308
                                         Facsimile: (610)371-8515
                                         E-mail: jdd@stevenslee.com
                                         *Counsel for 19th Street Investors*

4

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June, 2009, a true and correct copy of the *REQUEST OF 19th STREET INVESTORS, INC. FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM* was served on the parties identified below, in the manner indicated:

***Via Overnight Delivery:***
Circuit City Stores, Inc.
c/o:  Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245

By: _____
    John D. Demmy

5

A

FORM B10 (Official Form 10) (10/05)

| United States Bankruptcy Court For The Eastern District of Virginia | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number |
|---|---|
| Circuit City Stores, Inc. | 08-35653 (KRH) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name of Creditor** (The person or other entity to whom the debtor owes money or property)
**19th Street Investors, inc.**

Name and Address where notices should be sent:
John Ortega, Chief Financial Officer
Retail Property Group
101 Plaza Real South, Suite 200
Boca Raton Florida 33432
and to:
John D. Demmy, Esquire
Stevens & Lee, P.C.
620 Freedom Business Center, Suite 200
King of Prussia, PA 19406

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Last four digits of account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends a previously filed claim, dated: _____

**1. Basis for Claim**
☐ Goods sold
☒ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)
Last four digits of your Social Security number: _____
Unpaid compensation for services performed
from _____ to _____
     (date)      (date)

**2. Date debt was incurred:** *See attached Statement*

**3. If court judgment, date obtained:**

**4. Total Amount Of Claim At Time Case Filed:**

| $2,636,827.75 | $ 87,392.72 | | $2,636,827.75 |
|---|---|---|---|
| (unsecured) | (secured) | (priority) | (Total) |

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attached itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other

Value of Collateral:

Amount of arrearages and other charges <u>at time case filed</u> included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim.**
☐ Check this box if (a) there is no collateral or lien securing your claim, or (b) your claim exceeds the value of the property security it or (c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim, all or part of which is entitled to priority.
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),*earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier. 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family or household use - 11 U.S.C. § 507(a)(7).
☐ Domestic support obligations under – 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Taxes or penalties of governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - specify applicable paragraph of 11 U.S.C. § 507(a)

*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8*

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS.* If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date: | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| April 7, 2009 | John D. Demmy |
| | *[signature]* |
| | Counsel for 19th Street Investors, Inc. |

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.*

TO:    Circuit City Stores, Inc. *et al.* Claims Processing Department
Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245

<u>STATEMENT IN CONNECTION WITH PROOF OF CLAIM</u>

The claims evidenced by this proof of claim arise in connection with an unexpired lease of non-residential real property dated March 29, 2001 (the "Lease") for certain premises described in the Lease (the "Premises") located at the Bal Harbour Square Shopping Center in Fort Lauderdale, Florida (the "Shopping Center"). Circuit City Stores, Inc. ("Circuit City"), one of the debtors in the captioned cases (the "Debtors"), is lessee, and 19th Street Investors, Inc. ("19th Street Investors") is lessor, under the Lease. On information and belief, Debtors identify the Premises as their store number 848. A true and correct copy of the Lease is attached hereto as <u>Exhibit A</u>.[1] On or about March 10, 2009, Debtors rejected the Lease, and, thus, 19th Street Investors has 30 days thereafter, or until April 9, 2009, in which to submit this proof of claim. Subject to the reservation of rights set forth below, the foregoing proof of claim includes the following items:

1.    <u>Administrative Claim Under 11 U.S.C. §§ 365(d)(3) and/or 503(b)</u>:

<u>"Stub" November 2008 Rent</u>:

Debtors failed to pay monthly rent due for November 2008. Subject to 19th Street Investors' reservation of rights and its right to seek, by motion or claim proceeding, allowance of the post-petition portion of November rent and any additional November 2008 rents due as an administrative claim under 11 U.S.C. § 503(b) in the amount of $63,890.44, the full amount of November 2008 rent (inclusive of common area maintenance "CAM", tax and insurance amounts) also is included herein as part of 19th Street Investors' claim under 11 U.S.C. § 502. The inclusion of all rent and additional rent obligations for November 2008 in 19th Street Investors' claim pursuant to 11 U.S.C. § 502 is without prejudice to 19th Street Investors right to seek allowance of the post-petition portions thereof as an administrative claim under 11 U.S.C. § 503(b) in the amount of $63,890.44.

<u>CAM Charges</u>:

In addition to the "stub" portion of rent and any additional rent due for November 2008, 19th Street Investors also asserts an administrative claim under 11 U.S.C. § 503(b) on account of Debtors' CAM obligations under the Lease. *See* Lease at ¶7. Under and pursuant to the Lease, CAM charges are estimated for a calendar year and based on such estimates are required to be paid by the lessee monthly with base rent payments made during the calendar year. After the end of the calendar year the actual CAM charges for the year are totaled and reconciled against the estimated amounts paid during the calendar year. The lessee under the Lease is required to pay any amount by which its estimated monthly payments for the year come short of the actual CAM charges upon lessor providing a CAM reconciliation statement to lessee. In addition, monthly amounts due under the Lease are adjusted based on the CAM reconciliation. Under the terms of the Lease, Debtors are now obligated to pay, in full, the 2008 CAM shortfall and the aggregate increases in the monthly CAM charge for 2008 based on the new estimate in accordance with the CAM reconciliation. Attached hereto is <u>Exhibit B</u> is 19th Street Investors' CAM reconciliation statement and its communication to Debtors with respect to the $19,690.45 shortfall (for 2008) and the aggregate true-up (for 2009) amount of $3,811.83 for January, February and March (through the 10th) 2009, now due and owing under the Lease. However, as with the November 2008 rent claim, and subject to 19th Street Investors' reservation of rights, 19th Street Investors also has included these amounts in its claim pursuant to 11 U.S.C. § 502; and inclusion of such amounts in its claim

---

[1]    This statement is provided for convenience only and is not intended to nor does it alter the terms of the Lease, which terms control the lessor's rights, obligations and remedies thereunder. This statement further is not intended to nor does it waive any rights or remedies 19th Street has under the Bankruptcy Code or applicable law.

pursuant to 11 U.S.C. § 502 is without prejudice to 19th Street Investors' right to seek, by motion or claim proceeding, allowance of these amounts as an administrative claim under 11 U.S.C. § 503(b).

2.    Claim Under 11 U.S.C. § 502(b)(6):

Attached hereto as Exhibit C is a calculation showing 19th Street Investors' claim for rejection of the Lease, in the amount of $2,490,401.21.

3.    Attorney's Fees:

Under the Lease, 19th Street Investors is entitled to reimbursement of its attorney's fees and costs. *See* Lease at ¶ 34(f). As of this date, 19th Street Investors has incurred attorney's fees and costs and reasonably anticipates incurring additional attorney's fees and costs up to approximately $2500. 19th Street Investors further reserves the right to amend this proof of claim to add additional attorney's fees and costs incurred.

4.    Reservation of Rights:

19th Street submits that the post-petition "stub" portion of November 2008 rent and additional rent amounts due, in the amount of $63,890.44; the 2008 CAM reconciliation shortfall of $19,690.45 and the 2009 CAM "true-up" amounts aggregating $3,811.83, all are post-petition administrative claims under 11 U.S.C. § 365(d)(3) and/or 11 U.S.C. § 503(b). 19th Street Investors hereby fully reserves its right to seek allowance and payment of such amounts as administrative claims under 11 U.S.C. § 365(d)(3) and/or 11 U.S.C. § 503(b). However, under compulsion of the bar date pursuant to rejection of the Lease, 19th Street Investors is filing this proof of claim inclusive of such amounts, out of an abundance of caution, and as a precautionary matter, so as to not waive such claims or any portion thereof to the extent the Bankruptcy Court subsequently may not allow such claims, either in part or in full, as administrative claims under 11 U.S.C. § 365(d)(3) and/or 11 U.S.C. § 503(b).

# EXHIBIT A

FT. LAUDERDALE, FL

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## 19TH STREET INVESTORS, INC.,

as Landlord

dated March 29th, 2001

BAL HARBOUR SQUARE SHOPPING CENTER

257430 v13 (00051-44)[12023]

## TABLE OF CONTENTS

Paragraph                                                                                    Page

1.    Leased Property ................................................... 1

2.    Construction of Building and Improvements .................................... 1

3.    Lease Term ...................................................... 2

4.    Base Rent ....................................................... 3

5.    Development of Shopping Center by Landlord ................................. 4

6.    Easements ...................................................... 5

7.    Common Areas and Common Area Maintenance ............................. 6

8.    Signs and Communications Equipment ................................... 11

9.    Taxes ......................................................... 12

10.   Maintenance, Repairs and Replacements .................................. 15

11.   Utility Service Provider:  Payment of Utility Bills ............................. 16

12.   Alterations ...................................................... 17

13.   Mechanics' Liens .................................................. 17

14.   Insurance ....................................................... 18

15.   Damages by Fire or Other Casualty ..................................... 22

16.   Condemnation .................................................... 24

17.   Assignment and Subletting ............................................ 27

18.   Use ........................................................... 28

19.   Warranties, Representations and Covenants ................................ 29

20.   Estoppel Certificates ............................................... 38

i

257430 v13 (00051-44)(12023)

Paragraph                                                                                          Page

21.   Subordination, Non-Disturbance and Attornment . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

22.   Tenant's Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

23.   Tenant's Property and Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

24.   Memorandum of Lease; Commencement Date Agreement . . . . . . . . . . . . . . . . . . . . . . .  41

25.   Expiration of Term and Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

26.   Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

27.   Events of Tenant's Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

28.   Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

29.   Events of Landlord's Default; Tenant's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

30.   Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

31.   Compliance with Applicable Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

32.   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

33.   Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

34.   Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

35.   Conditions Precedent to Effectiveness of Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

36.   Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

37.   Radon Gas/Florida . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

38.   Limitation of Right of Recovery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

39.   Deliveries and Garbage Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

40.   Entry and Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

41.   Theft . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

257430 v13 (00051-44)[12023]

Paragraph                                                                                                Page

42.     Lien Waivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

43.     "For Rent" Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

257430 v13 (00051-44)[12023]

<u>EXHIBITS</u>

"A"      Site Plan

"A-1"   Shopping Center Legal Description

"B"      Index of Definitions

"C"      Construction Provisions

"C-1"   Design and Construction Specifications

"C-2"   Landlord's Civil Plans

"D"      Removable Trade Fixtures

"E"      Sign Plans

"F"      Permitted Encumbrances

"G"      Subordination, Non-Disturbance and Attornment Agreement

"H"      Memorandum of Lease

"I"      Commencement Date Agreement

"J"      Mechanics' Liens Indemnification Agreement

"K"      Beverages & More Lease Indemnification Agreement

257430 v13 (00051-44)(12023)

FT. LAUDERDALE, FL

<u>LEASE</u>

This LEASE is made as of the _29ᵀᴴ_ day of March, 2001, by and between **19TH STREET INVESTORS, INC.**, a Florida corporation, having an address at 4901 North Federal Highway, Suite 400, Fort Lauderdale, Florida 33308 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an address at Deep Run I, 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H :

The parties hereto agree as follows:

1.    <u>Leased Property</u>. Landlord leases to Tenant all those certain "Premises" (as defined in paragraph 2), when same are delivered in accordance with the terms of this Lease on that approximately 33,027 square foot parcel (the "Land"), cross-hatched or outlined in red on <u>Exhibit "A"</u> (the "Site Plan"), together with exclusive rights in the two (2) automobile loading stalls labeled "Customer Pick-Up" adjacent to the Premises as shown on the Site Plan, non-exclusive rights in the six (6) parking spaces labeled "Car Stereo Parking" at the rear of the Building as shown on the Site Plan and with the easements described in paragraph 6 below; all located in Bal Harbour Square shopping center (herein referred to as the "Shopping Center"), located at in the northeast quadrant of the intersection of U.S. Route 1 (Federal Highway) and N.E. 16th Court, in the City of Fort Lauderdale (the "City"), County of Broward ("County"), State of Florida (the "State"), shown on the Site Plan and described by metes and bounds or platted lot legal description on <u>Exhibit "A-1"</u> attached hereto. All of the Shopping Center exclusive of the Premises is "Landlord's Premises".

2.    <u>Construction of Building and Improvements</u>. Commencing immediately upon "Delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as <u>Exhibit "C"</u> and incorporated herein by reference for all purposes), Tenant shall construct within the Shopping Center a one-story retail building, containing approximately 33,027 square feet of ground-floor gross leasable area (the "Ground Floor GLA"), with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly

1

257430 v13 {00051-44}{12023}

set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed to completion by Tenant with due diligence in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Title to the Improvements shall be deemed transferred to Landlord upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions. The Improvements and the Land are referred to herein as the "Premises".

      3.    <u>Lease Term</u>. Subject to paragraph 35, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's Delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below). The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.

      In addition to the Main Term, Tenant shall have the option (each such right referred to herein as a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (each such period referred to as an "Option Period" and collectively as the "Option Periods") immediately following the Main Term, at the rent specified below. Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Main Term or any then-current Option Period, as applicable, provided, however, if, during the aforementioned one hundred eighty (180) day period, Tenant does not give Landlord written notice of its intent not to exercise its Renewal Option, Tenant's right to exercise such Renewal Option shall continue, as shall its tenancy hereunder, until ten (10) business days after Landlord has given Tenant written notice of Landlord's election to terminate the Renewal Option, during which ten (10) business day period Tenant may exercise its Renewal Option, whereupon the Term (defined below) of this Lease shall be renewed and extended as if such notice had been given prior to such expiration of the one hundred eighty (180) day period described above.

      The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall

2

commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

4.    Base Rent.  During the Construction Term, Tenant shall pay no rent or Real Estate Tax or CAM Charges or any similar costs, fees, rentals or expenses.  Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to paragraph 3 of the Construction Provisions) on the date on which Landlord makes full payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

Landlord shall give Tenant written notice of a change of address or change of the party to whom such rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder.  Unless adjusted as provided below or in paragraph 3 of the Construction Provisions, Base Rent shall be paid in equal monthly installments in advance on the first day of each succeeding calendar month throughout the Term, to the address given for Landlord in paragraph 32, pursuant to the following schedule:

(i)    First Five Years.  During the first five (5) Lease Years, Tenant shall pay annual Base Rent for the Ground Floor GLA in the amount of Eight Hundred Forty-Two Thousand One Hundred Eighty-Eight and 50/100 Dollars ($842,188.50), payable in equal monthly installments of Seventy Thousand One Hundred Eighty-Two and 37/100 Dollars ($70,182.37).

(ii)    Adjustment in Base Rent.  Notwithstanding the Base Rent provisions, in the event that the Ground Floor GLA of the Building when constructed does not equal 33,027 square feet, annual Base Rent during the first five (5) Lease Years shall be the sum of the product of the Ground Floor GLA (as shown on the as-built survey and the Plans and Specifications), multiplied by $25.50.  In determining the ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below.  Nothing herein shall be construed as permitting a material variance in the dimensions or area as set forth in the Plans and Specifications; provided, an increase or decrease of up to five percent (5%) of the Ground Floor GLA shall be deemed immaterial. For purposes of determining Base Rent and the Tenant Improvement Allowance, however, the Ground Floor GLA shall never be greater than 34,678 nor less than 31,375 square feet.  If any Lease Year is other than twelve (12) months in length, annual

3                                 257430 v13 (00051-44)[12023]

Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)    <u>Increases in Base Rent</u>.  Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the annual Base Rent in effect during the preceding five (5) Lease Years, Base Rent by the lesser of ten percent (10%) or three (3) times the percentage increase in the "CPI-U" (as defined below) during the five (5) year period ending on October 31 of the sixth (or, as applicable, any succeeding fifth) Lease Year.  As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average.  If at any time during the Term the CPI-U shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another similar index most nearly equivalent to the CPI-U.

5.    <u>Development of Shopping Center by Landlord</u>.  Landlord covenants to continue to operate a first-class shopping center comparable to other first-class shopping centers located in Broward County, Florida (hereinafter "First-Class Shopping Center").  The location of buildings and other tenant space therein will only be within the "Permissible Building Areas" designated on the Site Plan, <u>Exhibit "C"</u> (Construction Provisions) and <u>Exhibit "C-1"</u> (Standard Design and Construction Specifications).  The parking ratio for the Shopping Center shall initially be at least as shown on the Site Plan, but in no event shall said ratio ever be less than the greater of (i) that required by applicable zoning ordinances, or (ii) four (4) spaces per 1,000 square feet of gross leasable area for that area within Phase I and Phase II shown on the Site Plan (and herein so called), and five (5) spaces per 1,000 square feet of gross leasable area for that area within Phase III (for full or mid-sized automobiles, i.e. at 8' 8" wide and 18' deep, except for those spaces located on the north side of the Building, which may be for compact automobiles, i.e. at least 8' 8" wide and 16' deep), as shown on the Civil Plans.  All parking shall be at ground level.  Landlord shall construct or cause such improvements to be constructed in a good and workmanlike manner, free of mechanics' and materialmen's liens, and Landlord agrees to indemnify, defend and hold Tenant harmless from any

4

loss or damage suffered by Tenant as a result of Landlord's construction. Landlord's construction shall not unreasonably interfere with the conduct of Tenant's business or delay Tenant's construction.

6.        Easements. Landlord also grants to Tenant those nonexclusive leasehold easements which shall run as covenants with Landlord's Premises and the Premises during the Term, over Landlord's Premises, which are useful and appropriate for the construction, operation and maintenance of the Premises, including but not limited to:

(a)        Construction Easements. During the Construction Term, and any period of renovation or reconstruction thereafter, Landlord grants to Tenant (i) a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for construction access to the Premises, as well as an exclusive easement for a construction staging area (the "Staging Area") of approximately 20,000 square feet, in a portion of the Common Areas at a mutually agreeable location within a reasonable distance of the Land for Tenant's use in constructing the Improvements, (ii) an easement for such additional underground, public or private utility easements as Tenant deems reasonably necessary, without unreasonably interfering with the use by Landlord of the Common Areas, for the benefit of the Premises. For the purpose of exercising the rights granted in this paragraph 6, Tenant and/or the utility provider shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord for the benefit of the Premises.

(b)        Common Area Easements. Landlord does hereby additionally grant to Tenant a non-exclusive easement (the "Common Area Easement") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the Common Areas for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, without payment of any fee or other charge therefor. The foregoing notwithstanding, Tenant shall prohibit its employees from parking in general customer parking and

5                    257430 v13 (00051-44)[12023]

shall require its employees to park in the designated employee parking area outlined on Exhibit "A" or as re-designated by Landlord and Tenant from time to time. Landlord shall cause employees of other occupants of the Shopping Center to not park in Tenant's Preferred Area. It is specifically agreed that with respect to the two (2) automobile loading stalls designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall have the right, from time to time, subject to Landlord's approval which shall not be unreasonably withheld or delayed, to relocate the two (2) automobile loading stalls to other areas adjacent to either the west or south side of Tenant's Building, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such automobile loading stalls shall be used exclusively by Tenant's customers, invitees and patrons. Tenant shall also have the right to use such Common Areas immediately adjacent to Tenant's Improvements and within Tenant's Preferred Area as shown on the Site Plan for "sidewalk sales", seasonal and promotional demonstrations and sales and other events customary to Tenant's business operations and for Tenant's "Customer Pick Up" used exclusively for Tenant's customers, invitees and patrons.  In the event that Tenant conducts "sidewalk sales", seasonal and promotional demonstrations and sales and other events, Tenant agrees and covenants to keep and maintain the sidewalk sale area and all areas and sidewalks immediately adjacent to the Building free from clutter and to keep and maintain adjacent sidewalks and areas in reasonably neat and orderly condition. Furthermore, Tenant covenants and agrees to hold Landlord harmless and indemnify Landlord from any loss or damage from injury to persons or property or otherwise caused by Tenant's sidewalk sale, seasonal and promotional demonstrations and sales and other events.

       7.    <u>Common Areas and Common Area Maintenance</u>.

         (a)    <u>Definition of Common Areas</u>. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, Landlord's pylon sign(s), directional, traffic and monument sign structure(s) and shared utility facilities located in all elements of the Shopping Center (including any such areas and facilities contained within outparcels and adjacent tracts but reserved to the benefit of the Shopping Center occupants) and which are intended and available for the common use of all of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward

6

"CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a first-class manner similar to other first-class shopping centers located in Broward County, Florida, including, but not limited to, cleaning, maintenance of Landlord's pylon and other sign structure(s), parking lot and sidewalk sweeping, removal of Common Area trash and garbage, procure cleaning, painting, security (although Landlord does not represent that there will or will not be security at the Shopping Center), roof repairs, reasonable seasonal holiday lights and decorations, repairs to storm drainage systems, irrigation systems, lighting, repairing, repaving and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance".

(b)     CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (i) Landlord's reasonable and proper direct costs and expenses of operating and maintaining the Common Areas and (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) which shall be seven and one-half percent (7.5%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures, Real Estate Taxes and utilities serving the Common Areas). Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1)     real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2)     any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3)     maintenance, repairs or replacements to the Common Areas (but no other portions of the Shopping Center), necessitated by the negligent or wrongful act of Landlord or made to correct any construction, defect or condition to any buildings (including the roof or exterior walls thereof) or utility systems not part of the Common Areas;

7

(4)     repairs or replacements necessitated by the negligence or the wrongful action of Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications) or any other tenant or made to correct any initial construction defect or condition in existence prior to the Commencement Date of this Lease or to correct damage caused by subsidence or adverse or substandard soil conditions;

(5)     amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6)     amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7;

(7)     premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8)     repairs or replacements of a capital nature (whether or not capitalized), except if such capital improvement is required by a law enacted after the Effective Date or designed to protect the health or safety of the Shopping Center tenants or their patrons, and the cost thereof is amortized over the useful life of the improvements;

(9)     improvements, repairs or replacements (other than patching, striping, sealing, seal coat striping, curbing, parking stops and similar minor periodic maintenance) to the parking lot within Tenant's Preferred Area during the first ten (10) "CAM Years" (as defined below);

(10)    reserves for anticipated future expenses;

(11)    interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner;

(12)    Landlord's personnel, overhead, home office or administrative expenses except as set forth in subparagraph (b)(ii) above;

(13)    amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions);

(14)    any new improvements to the Shopping Center or Common Areas, including but not limited to renovations to the facade of the Shopping Center and improvements to landscaped

8

areas (other than replanting or replacing landscaping, not resulting from negligent acts of Landlord or its agents) of the Shopping Center:

(15)    amounts incurred to monitor or maintain fire protection systems in the Shopping Center if Tenant separately monitors and maintains its own premises; or

(16)    other maintenance expenses not considered normal and customary under generally accepted accounting principles or shopping center industry standards. CAM Charges shall be in an amount consistent with the costs incurred by other landlords of similar first-class shopping centers in Broward County, Florida (but not greater than as described in this paragraph 7(b)), and in all events such charges shall be obtained at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year.

(c)    Tenant Payments. Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall initially pay to Landlord $1.25 per square foot of Ground Floor GLA per annum, payable in equal monthly installments, as its estimated share of CAM Charges. The foregoing notwithstanding, it is understood by Tenant that the estimated share of CAM Charges provided for herein is an initial estimate only and is not intended to be fixed charges and is subject to adjustment as provided for herein. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period, including the first Lease Year, is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, on the first day of each month during such CAM Year. CAM Charges (excluding costs of Landlord's insurance required to be maintained hereunder and utilities for the Common Areas) shall not exceed by more than five percent (5%) those in effect during the preceding CAM Year (the "CAM Cap"), on a cumulative basis. "On a cumulative basis" shall mean that if in any CAM Year the CAM Charges increase by more than the CAM Cap and Landlord, by the terms hereof, may only charge Tenant an amount up to the CAM Cap, thereby limiting the increase, in any subsequent CAM Year(s), if the CAM Charge increase is less than the CAM Cap, Landlord may include the increases which would have been billed in prior years but for the CAM Cap; provided, the total increase in any one CAM Year shall not exceed ten percent (10%) over and above the preceding CAM Year. For any period within the Term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the

9

257430 v13 (00051-44)[12023]

first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with such substantiating documentation as Tenant may reasonably request) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of gross leasable area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. The foregoing notwithstanding, Landlord's failure to provide a detailed statement of CAM Charges or a Common Area Maintenance budget by the dates provided in this Section 7(c) shall in no way exclude Tenant from its obligation to pay its Pro-Rata Share of CAM Charges as defined herein or constitute a waiver of Landlord's right to bill and collect such Pro-Rata Share of CAM Charges from Tenant in accordance with this section. Subject to adjustments as herein contemplated, Tenant's share (such fraction being referred to herein as "Tenant's Pro Rata Share") of CAM Charges shall always be the product of the CAM Charges multiplied by a fraction, the numerator of which is the number of square feet of the ground-floor gross leasable area in the Building and the denominator of which is the number of square feet of the gross leasable area (including the area of any permanent outside sales area exclusive to a single occupant) in the Shopping Center. In determining the gross leasable area of any building in the Shopping Center (including the Building), measurement shall be made from the centerline of any common walls and from the outside of any exterior walls. The gross leasable area of any outside sales area shall be measured from the outside of the exterior wall of any adjacent building to the actual exterior perimeters of such outside sales area, including any aisles, fences or walls included therein. Changes in applicable floor areas shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 120,000 square feet. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

(d)     Examination of Landlord's Records. Tenant shall have the right, but not more often than once as to any CAM Year and no later than three (3) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. If the examination discloses any overcharge by Landlord, Landlord shall reimburse Tenant within

10

257430 v13 (00051-44)[12023]

ten (10) days for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of three percent (3%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit, not to exceed $3,000.00. The foregoing notwithstanding, should Tenant elect to inspect and examine Landlord's books and records pertaining to CAM Charges, such inspection and examination shall be conducted by Tenant or an independent accounting firm. Pending a determination of any dispute, Tenant shall make all payments when due, including but not limited to monthly payments and all increases of CAM pursuant to Landlord's notice without prejudice to Tenant's position.

     8.    Signs and Communications Equipment.

     (a)    Signs. Landlord, at its sole cost and expense, no later than the date set forth on Attachment "1" to the Construction Provisions, shall construct and install upon the Common Areas at the location in front of the Premises so shown on the Site Plan, a pylon sign structure (with electrical wired box installed), as depicted on the rendering attached hereto as Exhibit "E", having sufficient space thereon in the top tenant position for inclusion of doublesided "face panels" identifying Tenant's store, which face panels shall be constructed and installed at Tenant's sole cost and expense and shall be at least as large as the panels of any other occupant of the Shopping Center as outlined on Exhibit "E". No other occupant within the Shopping Center shall have an identification panel on more than one (1) pylon sign (except for the small directional monument sign on N.E. 19th Street identifying Linens 'N Things and Beverages & More thereon) unless Tenant also does (unless Tenant has been offered use of the additional sign panel space and has declined to use it) and no identification panel of any other tenant within the Shopping Center shall be larger than Tenant's face panels, except for the top two (2) panels on the pylon sign existing within the Shopping Center as of the Effective Date. Landlord has submitted to Tenant plans and specifications for such pylon signs (including colors, design, dimensions, type of lighting and position of tenant panels), as depicted on the rendering attached hereto as Exhibit "E", which have been approved by Tenant, which is evidenced by Tenant's execution of this Lease. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical face panels and for Tenant's building signage, which Landlord hereby approves upon its execution of this Lease. Notwithstanding the foregoing, Tenant, its successors, subtenants and assigns shall be entitled without Landlord's consent,

257430 v13 (00051-44)[12023]

but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's (or its successors' subtenants' or assigns') then-current prototypical sign plans.

        (b)    Communications Equipment. Tenant may install, maintain and/or replace any satellite dishes, antennas cellular and PCS towers and poles (collectively, "Communication Equipment") on the roof and/or exterior walls or parapet of the Building as Tenant deems necessary or desirable, provided same shall not adversely and materially affect the roof or the structural elements thereof and the same has been approved by all necessary governmental authorities. The installation of all Communication Equipment shall be subject to all local codes and ordinances. Furthermore, Tenant shall indemnify and hold Landlord harmless from any damage to the roof area or liability to Landlord arising out of the installation and roof area use of Communication Equipment. Upon the termination of this Lease, Tenant shall remove all Communication Equipment as provided for herein and patch and repair any damage caused to the roof or exterior walls due to such removal.

        9.    Taxes.

        (a)    Taxes Contemplated Hereunder. The term "Real Estate Taxes" shall mean all general real estate taxes and general and special assessments and other ad valorem taxes, rates and levies paid upon or with respect to the Shopping Center, including the Premises and personal property taxes for the pylon signs, for a calendar year or a portion thereof to any governmental agency or authority and all charges specifically imposed in lieu of any such taxes. Nothing contained in this Lease shall require Tenant to pay any local, county, municipal, state or federal income, franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any local, county, municipal, state or federal income, profits, gross receipts, sales or renewal tax or charge upon the rent (except the Florida state rent sales tax) or other charges payable by Tenant under this Lease. Tenant shall pay to Landlord, however, any applicable Florida state sales tax due and payable to any governmental authority as a tax on Base Rent, CAM Charges, Real Estate Taxes, Common Area insurance or any additional rent paid hereunder, so long as such taxes are uniformly paid by all occupants of the Shopping Center to Landlord or directly to the taxing authority.

257430 v13 (00051-44)(12023)

(b)    Payment of Real Estate Taxes. At such intervals as Landlord is required to pay the Real Estate Taxes to either the County or Landlord's lender, if so required, but not more frequently than monthly, Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes (calculated in the same manner as Tenant's Pro Rata Share of CAM Charges in paragraph 7(c); *provided*, in the event that a single occupant holds a separate tax parcel identification number and therefore pays Real Estate Taxes directly to the County, then the square footage used in calculating the gross leasable area of the Shopping Center shall not include the area within such separate tax parcel) levied against the tax parcel or parcels comprising the Shopping Center (the "Tax Parcel"). Tenant's Pro Rata Share of Real Estate Taxes shall be net of any early-payment discounts available at the time Tenant's payment is due. The foregoing notwithstanding, nothing contained herein shall obligate Landlord to avail itself to any available tax discounts for early payments thereof, so long as Landlord is unable, under its leases with other tenants, to require payment of taxes so as to take advantage of an early payment discount, and so long as Tenant's payment is not due prior to the latest date that any other tenant's tax payment is due. Tenant shall pay Tenant's Pro Rata Share of Real Estate Taxes within thirty (30) days after Tenant's receipt of Landlord's statement therefor, accompanied by the tax bill on the basis of which such statement is rendered. Landlord shall pay, or cause the payment of, all Real Estate Taxes before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof. In no event shall Tenant be liable for any discount forfeited or penalty incurred as a result of late payment by another tenant or by Landlord. Real Estate Taxes shall be prorated as of the Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises. Landlord shall remain primarily responsible for such payment notwithstanding the fact that such payment may be made by a tenant of Landlord's Premises or other third party pursuant to an agreement to which Tenant is not a party. In addition, should Landlord fail to pay such Real Estate Taxes before same become delinquent, Tenant shall have the right, at its election, to cure such failure by payment of delinquent Real Estate Taxes and any interest and penalties due thereon and in such event Tenant may deduct the cost thereof, plus interest at the lesser of fifteen percent (15%) per

13                          257430 v13 (00051-44)(12023)

annum or the highest rate permitted by State law (the "Default Rate"), from the next installment(s) of Base Rent and other charges due hereunder.

      (c)     <u>Contest of Real Estate Taxes and/or Assessed Valuation of Property</u>.  If occupants of the majority of the leasable area of the Shopping Center so request, Landlord will contest the amount or validity of any assessed valuation of Real Estate Taxes.  Landlord, within thirty (30) days of rendering a statement, shall be reimbursed on a pro rata basis by all tenants (calculated in the same manner as Tenant's Pro Rata Share) for all reasonable costs, fees and expenses it incurs in such protest or reassessment from the year's tax savings, if any, obtained as a result of Landlord's protest, to the extent not reimbursed by the tax authority as part of the protest award. Tenant shall have the right, at Tenant's sole expense, to contest the amount or validity, or otherwise seek an exemption or abatement, of any Real Estate Taxes or to seek a reduction in the valuation of the Premises assessed for Real Estate Tax purposes, by appropriate proceedings diligently conducted in good faith, provided that Tenant shall first have notified Landlord of its intent to do so and Landlord shall have failed to notify Tenant in writing, within five (5) days of receipt of Tenant's notice, that Landlord intends to contest such Real Estate Taxes or seek such a reduction. In any instance where any such action or proceeding is being undertaken by Tenant, Landlord shall cooperate with Tenant, execute any and all reasonable documents required in connection therewith and, if required by any law, rule or regulation of the taxing authority, shall join with Tenant in the prosecution thereof.

      (d)     <u>Payment Following Appeal</u>. Upon the termination of the proceedings set forth in subparagraph (c) above (unless the taxing authority requires that Real Estate Taxes be paid under protest prior to commencement of such proceedings), Tenant shall pay Tenant's Pro Rata Share of such Real Estate Taxes as finally determined in such proceedings, the payment or partial payment of which may have been deferred during the prosecution of such proceedings.  Tenant shall be entitled to a refund of any overpayment of Real Estate Taxes relating or allocable to the Premises, as well as a reimbursement from the appropriate taxing authority of all costs, fees and expenses it incurs in such protest or reassessment, and if not reimbursed by the taxing authority, then from the amount of the year's tax savings, if any, resulting from Tenant's protest. As used in this subparagraph and subparagraph (c) immediately preceding, "tax savings" means those Real Estate Taxes paid, or,

     257430 v13 (00051-44)[12023]

if not yet paid, shown on the tax statement as due, by Landlord in the year for which the protest is undertaken less the amount ultimately determined by the taxing authority to be due.

     10.   Maintenance, Repairs and Replacements. Except (i) for costs covered by Landlord's insurance required to be maintained hereunder, (ii) for condemnation proceeds to be received by Tenant, (iii) for obligations arising from the negligent acts or omissions or willful misconduct of Landlord (or its agents, employees or other tenants), or (iv) as otherwise set forth in this Lease, Tenant shall be solely responsible for maintenance of the exterior and interior non-structural elements of the Building, including but not limited to the HVAC systems, mechanical, electrical and plumbing systems, windows, signs and all necessary replacement, painting and decorating, and all glass including the windows, doors, store fronts, fixtures and skylights located within the Premises, exterior painting and pressure cleaning consistent with other first-class shopping centers in Broward County, Florida. Furthermore, Tenant shall be responsible to keep the Premises equipped with all safety appliances required because of Tenant's use; to procure any licenses and permits required for Tenant's use; and to comply with the reasonable recommendations and requirements of Tenant's insurance carriers and their underwriters, with respect to Tenant's use of the Building. In addition, Tenant agrees to keep and maintain in force a standard air conditioning maintenance agreement with a company reasonably acceptable to Landlord and provide Landlord with a copy of an inspection service report, upon written request of Landlord, no more than once annually. Notwithstanding anything contained above to the contrary, if, during the last five (5) Lease Years, Tenant is required to expend any sum in satisfaction of its replacement obligations hereunder, and if the resulting improvement to the Improvements cannot be fully amortized in accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations, over the remainder of the Term (without consideration to the exercise of any additional Renewal Options), Tenant shall so notify Landlord and Landlord shall either (a) direct Tenant that Landlord elects not to cause Tenant to make such capital expenditure and Tenant shall thereby be relieved of any liability for such replacement obligation (unless such capital expenditure involves a Building system critical to the operation of Tenant's business, in which event Landlord shall be deemed to have elected (b) immediately following), or (b) direct Tenant to make such capital expenditure, in which event Tenant shall be reimbursed by Landlord at the end of the Term by that amount of the cost associated with such

15

257430 v13 (00051-44)[12023]

replacement, construction or alteration (but not repair costs) for the period beyond the remainder of the Term (with consideration to the exercise of any additional Renewal Options). Landlord shall maintain all structural elements of the Premises (whether or not same serve only the Premises), including, without limitation, the roof, roof structure, floor slab, foundation, and other structural elements of the floor and slab, load bearing walls and exterior structural walls. In addition, Landlord agrees to maintain the Other Improvements immediately surrounding the Building, as well as sidewalks and landscaping. Should either party fail to perform its obligations under this paragraph 10, the other party may, at its option, effect such maintenance, replacements or repairs, provided that such curing party shall have given the nonperforming party thirty (30) days' prior written notice, except in the case of emergencies (in which event only such notice as may be reasonable under the circumstances shall be required); but further provided that such thirty (30) day period (or reasonable period in event of emergencies) shall be extended in respect of any cure that cannot with reasonable diligence be accomplished within such period so long as the party required to effect such cure has commenced such cure within such thirty (30) day period (or reasonable period in event of emergencies) and thereafter diligently prosecutes such cure to completion. The nonperforming party shall reimburse the other party on demand for the reasonable and actual amount so expended (as evidenced by detailed invoice), plus interest at the Default Rate. However, in the event of emergency repairs, no interest shall accrue if reimbursed within thirty (30) days of request (including detailed invoice) for reimbursement. All maintenance, repairs or replacements shall be done by Tenant or Landlord free from mechanic and materialmen liens and in a good and workmanlike manner consistent with the quality of labor and materials used in originally constructing the Improvements and in accordance with all applicable law. In order for Landlord and Tenant to effectively perform their maintenance, repair and replacement obligations hereunder, Tenant and Landlord, as applicable, shall provide to the other party any and all manufacturers' and contractors' warranties relating to such work performed on behalf of the other party to the party who is required to maintain same under the Lease.

11.    Utility Service Provider; Payment of Utility Bills. Tenant shall be entitled, subject to State law, to select the utility service provider which shall provide water, electric, gas, cable, and telecommunication services to the Premises. Tenant will pay directly to the appropriate utility

257430 v13 (00051-44)(12023)

company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Improvements. Landlord shall pay when due all utility charges incurred in the operation of the Common Areas and the Shopping Center.

12. Alterations. During the Term, Tenant shall have the right, at its discretion and its sole cost, without Landlord's consent, to make (i) any alterations or modifications necessary or desirable in order to bring the Premises into conformity with Tenant's then-current prototype for similarly sized stores, provided, no such change may raise the height of the Building or impair the structural integrity of the Building or modify the footprint of the Building, and shall be consistent with the architectural scheme (including colors) of the Shopping Center, and (ii) any interior nonstructural alterations or modifications it may desire. With Landlord's consent, which shall not be unreasonably withheld, conditioned or delayed, Tenant shall otherwise have the right, at its sole cost, to otherwise alter, modify or reconstruct the interior, exterior and/or structure of the Building or Other Improvements. Landlord's withholding of consent as to any exterior or structural alteration or modification shall be deemed reasonable only if same is materially inconsistent with the criteria set forth in section 12(i) above. Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Landlord shall be deemed to have consented to such work if written notice of disapproval, with reasons specified, is not received by Tenant within fifteen (15) business days following Tenant's delivery of such plans and specifications to Landlord. Without cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building permits, certificates of occupancy or other governmental approvals which may be required in connection with any such modifications or alterations, and Landlord shall execute, acknowledge and deliver any documents reasonably required in furtherance of such purposes.

13. Mechanics' Liens. Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center as a result of nonpayment for, or disputes with respect to, labor or materials furnished to the Premises or the Shopping Center for or on behalf of Tenant, Landlord or any party claiming by, through, or under Tenant or Landlord, nor shall either party permit any judgment, lien or attachment to lie, as applicable, against the Premises

257430 v13 (00051-44)(12023)

or the Shopping Center. Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien, cause said lien to be removed, or otherwise protected against execution during good faith contest, by substitution of collateral, posting a bond therefor, escrowing of adequate funds to cover the claim and related transaction costs or such other method as may be permissible under applicable title insurance regulations and reasonably acceptable to the other party hereto.

     14.   <u>Insurance.</u>

     (a)   <u>Property Damage</u>. During the Construction Term, Tenant shall keep or require its general contractor to keep, in full force and effect, a policy of builder's risk insurance covering loss or damage to the Improvements for the full replacement value of all such construction and general liability insurance with bodily injury and property damage coverages. Upon request by Landlord, Tenant's general contractor shall furnish a certificate of insurance to Landlord, including naming Landlord as an additional insured. In addition, if so required by Landlord's lender, Tenant shall cause its general contractor to provide a payment and performance bond in a commercially reasonable amount. During the Main Term and all Option Periods, Tenant shall keep the Premises insured against loss or damage by fire and the perils covered under standard "all risk" or "special form" coverage in the amount of full replacement value of the Building, exclusive of excavation, footings and foundations (which initial amount shall be not less than Tenant Improvement Allowance), with a commercially reasonable deductible, for which Tenant shall be fully responsible. Landlord and Landlord's first "Mortgagee" (as defined in paragraph 21 below), shall be named in such policy or policies as additional insureds as their respective interests may appear and shall be provided with thirty (30) days' prior notice of cancellation. Landlord shall not construct, or permit to be constructed, any improvement in the Shopping Center, nor conduct any activity, or permit the conduct of any activity, in the Shopping Center which will prevent Tenant from being able to obtain insurance coverage at commercially reasonable rates in South Florida. Should Landlord cause or permit any insurance rate increase to occur, Landlord will reimburse Tenant for the additional premium required, subject to Tenant's right to self-insure (in which event Landlord will contribute to Tenant's self insurance fund to cover increased actuarial risks).

257430 v13 (00051-44)[12023]

(b)    <u>Liability Insurance</u>. During the Term, Tenant shall keep in full force a policy of commercial general liability insurance with bodily injury and property damage coverage with respect to the Premises and business operated by Tenant, which shall name Landlord and Landlord's first Mortgagee as additional insureds as their respective interests may appear. The limits of such commercial general liability policy shall be not less than $2,000,000.00 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.

(c)    <u>Workers' Compensation Insurance</u>. To the extent required by law, Landlord and Tenant shall maintain workers' compensation insurance covering their respective employees in statutory limits, or maintain such alternate coverages or arrangements as legally permissible.

(d)    <u>Self-Insurance</u>. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (b) (and to the extent then permitted by law, (c)) above, provided Tenant has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Twenty-Five Million Dollars ($125,000,000).

(e)    <u>Common Area, Additional Area and Third Party Tenant Insurance and Insurance During Landlord's Construction</u>. During the Term, Landlord shall keep in full force and effect policies of (1) commercial general liability insurance, and (2) property insurance insuring against loss or damage by fire, wind and the perils covered under standard "all risk" or "special form" coverage, with respect to the Common Areas and with respect to all other areas of the Shopping Center over which Landlord from time to time has present possessory rights (or has the right under any lease to provide insurance coverage because of a tenant's failure to maintain such required coverage) but which do not constitute a portion of the Common Areas (such areas here sometimes collectively referred to as the "Additional Areas"). The Additional Areas shall include, without limitation: (i) as yet unconstructed portions of the Shopping Center intended for tenant occupancy, (ii) constructed but unoccupied portions of the Shopping Center, (iii) vacated or otherwise uninsured tenant space, whether by reason of lease expiration, default or otherwise, and (iv) constructed and occupied portions of the Shopping Center. Said policies shall name Tenant, and any lender, which is designated by Tenant from time to time, as an additional insured to the fullest extent Tenant and such stakeholder have insurable interests. The limits of such policies shall be the same as those set

19

forth in subparagraphs (a) and (b) above, as applicable. The cost of the premiums for coverages relating to Common Areas shall be an element of CAM Charges, provided that Tenant shall not be liable for its pro rata share of any premium for coverage in excess of that coverage which is customary among owners of like first-class shopping centers in Broward County, Florida. Any deductible amount for Common Area insurance coverage shall be reasonable in amount given the nature of the risk insured and probable frequency of claims made under such coverage, but in no event shall such deductible amount exceed a commercially reasonable amount for Common Area liability coverage. Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center, including the Additional Areas and areas leased to third party tenants or sold to third party occupants, are insured with substantially similar coverages to those required for the Premises and the Common Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever Tenant may be assured that the Shopping Center will be reconstructed in equal or superior condition within the time frame set forth in paragraph 15. During any period in which Landlord is conducting construction activities at the Shopping Center, Landlord shall keep, or cause its general contractor to keep, in full force and effect, with regard to the Shopping Center, in form reasonably acceptable to Tenant, at least the minimum insurance coverages set forth below:

1)    Workers' Compensation - Statutory Limits;
       Employers Liability - $100,000;

2)    Automobile Liability for all vehicles with limits of $2,000,000; and

3)    Commercial General Liability to include premises operations and products/completed operations coverage with limits of $2,000,000.

Additionally, Landlord shall keep or require its general contractor to keep in full force and effect a policy of builder's risk insurance covering loss or damage to Phase III of the Shopping Center for the full replacement value of all such construction. To the fullest extent Tenant has an insurable interest, such liability policy shall name Tenant an additional insured and such builder's risk policy shall name Tenant a loss payee.

20

257430 v13 (00051-44)[12023]

(f)    <u>Policy Provisions</u>.  All policies of insurance (other than self-insurance) enumerated above shall be provided by insurance carriers with a Best rating of not less than A-VIII. Any insurance coverage enumerated above may be effected by a blanket policy or policies of insurance or under so-called "all risk" or "multi-peril" insurance policies, provided that the total amount of insurance available with respect to the Premises and Tenant's or Landlord's liability hereunder shall be at least the equivalent of separate policies in the amounts herein required, and provided further that in other respects any such policy or policies shall comply with the provisions of this paragraph 14.  Landlord shall not be entitled to self-insure against any of the risks recited herein, except the amount of any commercially reasonable deductible shall not be deemed to be self-insurance.  An increased coverage or "umbrella" policy may be provided and utilized by either party to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate coverage provided by all such policies with respect to the limits required herein shall be satisfactory provided that such policies otherwise comply with the provisions of this paragraph 14.

(g)    <u>Waiver of Right of Recovery and Subrogation</u>.  To the extent that insurance proceeds are actually received in satisfaction of a loss which is required to be covered by insurance or is self-insured hereunder (with the deductible under any policy being deemed to be self-insured), Landlord and Tenant hereby waive any and all rights of recovery against each other for any loss or damage to the Premises or the contents contained therein, for loss of income on account of fire or other casualty, or for injury sustained on the Premises or the Common Areas; and each party's aforesaid policies of insurance shall contain appropriate provisions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h)    <u>Evidence of Insurance</u>.  Subject to Tenant's right to self-insure hereunder, upon (i) commencement of the Main Term (as to property insurance), (ii) upon Delivery of the Land (as to liability insurance) and (iii) prior to expiration thereof, Tenant and Landlord shall cause to be issued to each other in lieu of the original policy, a duplicate of such policy or appropriate certificates of insurance reasonably acceptable to the other party and evidencing compliance with the applicable covenants of this paragraph 14.  Each such certificate shall provide that coverage shall not be cancelled without thirty (30) days notice to the certificate-holder (and any Mortgagee, if applicable).

257430 v13 (00051-44)(12023)

(i)    Indemnities. Except if arising from the negligent or willful acts of Landlord or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Tenant hereby agrees to indemnify, defend and hold Landlord harmless from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from Tenant's use thereof.

Except if arising from the negligent or willful acts of Tenant or its agents or employees (to the extent that paragraph 14(g) is inapplicable thereto), Landlord agrees to indemnify, defend and hold Tenant harmless from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Shopping Center, exclusive of the Premises, or other buildings within Landlord's Premises or resulting from the use thereof by Landlord, its agents or employees.

15.    Damages by Fire or Other Casualty.

(a)    Less Than Forty Percent (40%). In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of less than forty percent (40%) of the then-total replacement cost of any of the Improvements, Common Areas and/or Additional Areas, this Lease shall not terminate except as expressly set forth herein, and Base Rent and other charges shall continue to be paid by Tenant pursuant to the terms of paragraph 4 hereof. Within a reasonable time after such casualty, subject to force majeure, applicable building codes, the procurement of building permits and the receipt of insurance proceeds (unless self-insured) to the extent of the damage to the Premises, or the Common Areas or Additional Areas, as applicable, Tenant shall complete reconstruction of the Building and Other Improvements, and Landlord shall complete reconstruction of the Common Areas and Additional Areas (including substantially equivalent value in equipment, furniture and fixtures), to that condition existing immediately prior to such casualty, in the reconstructing party's reasonable discretion, with, in event of any Tenant reconstruction, such alterations as may be permitted under paragraph 12 hereof. In the event, subject to force majeure, the Premises, Common Areas and/or Additional Areas, as applicable, are not substantially repaired and reconstructed, and equipment, furniture and fixtures restored or replaced, by the party with repair and restoration obligations within two hundred forty (240) days after receipt of any required

22

257430 v13 (00051-44)[12023]

governmental permits, for which permits the party with repair obligations shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured), then the other party, at its option, by giving written notice to the party with repair obligations, within thirty (30) days after the expiration of said period, may undertake completion of such reconstruction, in which event the party with repair obligations shall make available to the notifying party all insurance proceeds received by the non-performing party for such reconstruction (including any applicable deductible) or, if self-insured, the amount necessary for such reconstruction.

(b)    Forty Percent (40%) or More.  In the event of an insured fire, earthquake or other casualty, causing destruction or damage to the Improvements, Common Areas and/or Additional Areas, which has a repair and reconstruction cost of forty percent (40%) or more of the then-total reconstruction cost of any of said areas, or in the event of any uninsured casualty, Tenant shall have the option of terminating this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord (i) all insurance proceeds paid by the insurance carrier issuing the policy of insurance required to be maintained pursuant to paragraph 14(a) above, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above.  In the event Tenant does not elect to terminate this Lease as set forth above, then, subject to force majeure, within two hundred forty (240) days after receipt by Tenant of the required governmental permits for restoration, for which permits Tenant shall make prompt application following such destruction or damage, and insurance proceeds (if not self-insured) with regard to such damage or destruction, Tenant shall complete reconstruction of the Improvements to their condition existing immediately prior to such damage, in Tenant's reasonable discretion, with such alterations as may be permitted under paragraph 12, and shall restore the Premises (including equipment, furniture and fixtures).  Should Tenant elect to maintain this Lease in full force and effect, rent shall not abate hereunder and Landlord shall reconstruct all Common Areas and Additional Areas in the manner specified by subparagraph (a) above regardless of the amount of damage to same.  Additionally, Landlord shall assure (through

23

parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any destruction or damage to any portion of the Shopping Center whatsoever, in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center as a whole will be reconstructed in accordance with this paragraph 15.

(c)    Last Two (2) Years of Main Term or Option Period.  Notwithstanding the foregoing, if any such damage or destruction occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, as reasonably determined by Tenant, Tenant shall be under no obligation to restore the Improvements, in which case this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord, and Landlord shall receive (i) the proceeds of any insurance (together with any applicable deductible) which are paid by the insurance carrier issuing the policy of insurance required to be maintained pursuant to paragraph 14(a) above, or (ii) if self-insured, an amount equal to the reconstruction costs of the Improvements or, if the Improvements are not being reconstructed, an amount equal to the actual value of the Improvements (not to exceed, however, an amount equal to the reconstruction costs of the Improvements), to the extent such amounts would have been payable under the insurance outlined in paragraph 14(a) above.

16.    Condemnation.

(a)    Definition of Taking and Substantial Taking.  For the purpose of this Lease, a "Taking" shall mean any condemnation or exercise of the power of eminent domain by any authority vested with such power or any other taking for public use, including a private purchase in lieu of condemnation by an authority vested with the power of eminent domain; the "Date of Taking" shall mean the earlier of the date upon which title to the Premises, the Shopping Center or any portion thereof so taken is vested in the condemning authority or the date upon which possession of the Premises, the Shopping Center, or any portion thereof is taken by the condemning authority; and "Substantially All of the Premises" shall mean (i) so much of the Improvements and/or Shopping Center and Common Areas as, when taken, leaves the untaken portion unsuitable, in Tenant's

24

257430 v13 (00051-44)(12023)

reasonable opinion, for the continued feasible and economic operation of the Premises by Tenant for the same purposes as immediately prior to such Taking or as contemplated herein, (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of four (4) spaces for Phases I and II and 4.5 spaces for Phase III, per 1000 square feet of ground-floor gross leasable area (with the same size of spaces required in paragraph 5 above) or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and Landlord's failure to provide substantially equivalent alternative parking reasonably acceptable to Tenant within sixty (60) days after such Taking, or (iii) so much of the Common Area Easement described in paragraph 6 above that access to the Premises is impeded.

(b)    <u>Tenant's Rights Upon Taking or Substantial Taking</u>. In the event of a Taking of Substantially All of the Premises, Tenant, at its option upon thirty (30) days' written notice to Landlord, which shall be given no later than sixty (60) days following the Taking, shall have the right to terminate this Lease. All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the Date of Taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such Taking.

(c)    <u>Tenant's Rights Upon Less Than Substantial Taking</u>. In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced fairly and equitably in accordance with the portion condemned or taken, effective as of the Date of Taking, and Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit, provided that the cost thereof to Tenant shall not exceed the proceeds of Tenant's condemnation award (to the extent that such relates to the Improvements and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto) and the portion of Landlord's award allocable to the Premises, which Landlord shall make available to Tenant for such restoration. If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

25

257430 v13 (00051-44)[12023]

(d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, then, upon receipt of the condemnation award proceeds, Landlord shall make all necessary restorations to all portions of the Common Areas and Additional Areas such that they each constitute a complete architectural unit and serve the function originally intended.  Additionally, Landlord shall assure (through parallel lease provisions or otherwise) that all areas of the Shopping Center leased to third party tenants or sold to third party occupants are subject to substantially similar reconstruction obligations to those of the Premises, Common Areas and Additional Areas, such that in the event of any condemnation of any portion of the Shopping Center whatsoever, and in the event Tenant elects to maintain this Lease in force, Tenant shall be assured that the Shopping Center will be reconstructed to its former condition within reasonable time.

(e)    Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)    Taking of the Pylon Sign(s).  In the event of a taking, whether permanent or temporary, of any pylon or monument sign (as contemplated by paragraph 8) on which Tenant has installed identification panels, Landlord shall provide within ninety (90) days a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic from Federal Highway, and Landlord shall replace and/or rebuild any of such signage so taken at its sole cost.

26

(g)    Tenant's Right Upon Condemnation.  In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its leasehold interest in the Premises, its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law.

17.    Assignment and Subletting.  Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term so long as the same is used for retail purposes only and does not violate any of the use provisions outlined in paragraph 18(b) herein, without Landlord's prior consent.  In the event of such a Transfer, Tenant shall remain primarily liable for all of Tenant's obligations to Landlord arising hereunder so long as Tenant's obligations are not enlarged or extended by any act or agreement between Landlord and any transferee, which has not been consented to by Tenant. Transfers to subsidiaries, affiliates, or related parties, and Transfers involving beneficial ownership interests in Tenant, shall not be deemed a Transfer hereunder and same may be effected without Landlord's knowledge or consent.  Tenant agrees, however, to not subdivide the Premises into more than three (3) independently operating spaces.

Notwithstanding the foregoing, in the event Tenant desires to assign or sublease all or a portion of the Premises to an unrelated third party, Tenant shall give Landlord written notice of such proposed assignment or sublease along with a copy of the proposed assignment of lease document or proposed sublease document and Landlord shall notify Tenant of its disapproval or approval of such proposed assignment or sublease within twenty (20) days of Landlord's receipt of said document. Landlord's failure to timely respond to Tenant's notice shall be deemed acceptance by Landlord of the proposed assignment or sublease. If Landlord disapproves of such transaction within such twenty (20) day period, the Lease covering the portion of the Premises affected thereby shall be terminated and Landlord shall recapture all or such portion of the Premises in accordance with this paragraph 17. Landlord's full or partial termination of this Lease pursuant to this paragraph 17 shall be effective on the date of Tenant's proposed assignment or sublease set forth in Tenant's notice. Tenant shall thereafter have no liability under this Lease with respect to the portion of the Premises recaptured by Landlord. In the event of a partial termination of the Lease, this Lease shall

27

be reformed to exclude the portion of the Premises that were recaptured by Landlord and Tenant's payment and other obligations hereunder shall be reformed to reflect the remainder of the Premises still occupied by Tenant. In the event Landlord exercises its option to terminate all or a portion of this Lease as provided in this paragraph 17, Landlord shall be obligated to pay Tenant its unamortized cost of the portion of the Building and Improvements recaptured by Landlord to the date of such termination, including the unamortized cost of all renovations made by Tenant to the applicable portion of the Building from and after the date hereof, said sum not to exceed $500,000.00.

18.    Use.

(a)    Tenant may initially maintain, use and operate the Premises as a retail store for (i) the sale of consumer, office and automotive electronics products (which include, but shall not be limited to, televisions, stereos, speakers and video recorders and players), computer hardware and software, entertainment software and entertainment media (which include, but shall not be limited to, records, game cartridges, video tapes, cassettes and compact discs), cellular and wireless telephones and telecommunication devices, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems and technological evolutions of the foregoing (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

(b)    Tenant shall also have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted a tenant or other occupant of the Shopping Center pursuant to a lease or restrictive covenants executed prior to this Lease and shown on Exhibit "F", or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

(c)    Nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use. In the event that Tenant ceases its business operations at the Premises, such cessation shall not be deemed to be an event of default hereunder, nor shall such cessation relieve Tenant of any of its liabilities or obligations under and pursuant to this Lease. Upon its determination to cease operation, Tenant shall notify Landlord

28

257430 v13 (00051-44)[12023]

in writing of such decision ("Tenant's Notice"), whereupon Landlord shall have the option of recapturing the Premises by terminating this Lease. Such option shall be exercisable by Landlord from and after the date which is two hundred seventy (270) days following the date of Tenant's Notice until the date one (1) year following Landlord's receipt of Tenant's Notice, provided that prior to exercise by Landlord of its option herein granted, Tenant has not effected an assignment or subletting pursuant to paragraph 17 or recommenced operations in the Premises. Landlord shall exercise such option by delivering notice to Tenant that it intends to terminate this Lease (the "Landlord's Notice"), in which event this Lease shall terminate entirely on the date contained in Tenant's Notice unless the aforementioned assignment, subletting or recommencement has occurred. If Landlord fails to timely exercise said option to terminate, and Tenant (or any assignee or sublessee) thereafter reopens, Landlord shall once again have such right if the occupant of the Premises once again ceases operating for the two hundred seventy (270) day period described above. Upon such termination, Tenant and Landlord shall be relieved of and from any and all further liability or obligation to the other under and pursuant to this Lease, and further, Landlord shall pay to Tenant the value of its unamortized improvements made to the Premises, which amount shall not exceed $500,000.00 and shall include the unamortized amount of Tenant Improvement Allowance only if Landlord has not paid such amount pursuant to the Construction Provisions. Notwithstanding anything contained herein to the contrary, Landlord's obligation to reimburse Tenant for its unamortized improvements shall survive the expiration or termination of Lease. For purposes of this paragraph, "cessation" of operation at the Premises shall not mean or include any period during which Tenant is not operating within the Premises due to a casualty event, condemnation, reconstruction, alterations, modifications, maintenance or repair, or preparing the Premises for occupation by an assignee or subtenant.

19.    Warranties, Representations and Covenants.

(a)    Landlord represents, warrants and covenants to Tenant that:

(i)    Quiet and Peaceful Enjoyment. Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

(ii)    Title. Landlord owns fee simple title to all of the Shopping Center except for the Fraser Ground Lease Parcel (defined in paragraph 21(a) below and shown as Parcel

257430 v13 (00051-44)(12023)

3 on the Site Plan). Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict Tenant's use of the Premises for the sale of Products or would restrict in any respect the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease. Nothing contained in this Lease, including the Permitted Encumbrances and other matters disclosed on Exhibit "F", shall restrict Tenant's rights under this Lease, including but not limited to the right to operate its business in the Premises. Landlord specifically covenants and warrants that no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, prohibit the selling, renting, servicing, repairing or warehousing of the Products, or the right to consent to any feature of the Improvements or Tenant's signage, except governmental authorities. Landlord further represents and warrants to Tenant that no approvals or consents are prerequisite to Tenant's construction contemplated hereunder except issuance of Tenant's building permit (including signage) by governmental entities charged with such issuance. This representation, warranty and covenant is a material inducement to Tenant's execution of this Lease.

(iii)   Certificate of Authority.   Landlord covenants that it is a duly constituted corporation under the laws of the State of Florida, and that its President who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the corporation. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the corporation, and (b) the authority of the President to bind the corporation as contemplated herein.

(iv)   No Litigation.   There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated herein or the occupancy and use of the Premises for the purposes herein contemplated.

(v)   Hazardous or Toxic Materials.   With the exception of those matters set forth in that certain environmental report dated June 16, 2000 prepared by Solutech, Inc., and that certain "No Further Action Letter" dated November 13, 2000 from the Department of Environmental

257430 v13 (00051-44)[12023]

30

Protection, true and correct copies of which Landlord has heretofore delivered to Tenant, to the best of Landlord's actual knowledge and belief, Landlord or other tenants in the Shopping Center have not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. Landlord specifically covenants to remediate and cause to be removed from the Shopping Center on or before the Delivery Date, all Hazardous Substances. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof, or any Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

      (vi)    <u>Tenant's Exclusive Use</u>. So long as the Premises are used for the initial uses set forth in paragraph 18, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent (or rent to own) any of the Products, subject only to rights granted any such tenants under leases in existence as of the date of this Lease and described on <u>Exhibit "F"</u>. Notwithstanding the foregoing, Landlord may allow operation within the Shopping Center of (i) a Staples, Office Max, Office Depot, Borders Bookstore, Barnes & Noble, Books-A-Million, CompUSA, and Blockbuster Music and/or Video Store so long as such retailer is operating within the Shopping Center in the same manner as it is operating as of the Effective Date, and (ii) those retailers with whom Tenant, at the time of a proposed lease by Landlord of space within the

31

257430 v13 (00051-44)(12023)

Shopping Center, enters into a "live and let live" national agreement with Tenant upon terms satisfactory to Tenant and substantially similar to prior such agreements between such retailer and Tenant, which Tenant agrees to use good faith efforts to negotiate. Additionally, the Incidental Sale (as hereinafter defined) of the Products in connection with the overall business of another occupant or tenant shall not be deemed a violation of the first sentence in this paragraph. As used herein, "Incidental Sale" shall mean the lesser of (i) two hundred (200) square feet, or (ii) five percent (5%) of such operator or tenant's display area. Notwithstanding anything contained herein to the contrary, in the event any existing tenant leases provide that the tenant thereunder may change its use, Landlord, to the extent it has a right to do so under such lease, will exercise any approval rights in favor of protecting Tenant's exclusive use provided above and the prohibited uses set forth below.

(vii)    <u>Zoning and Subdivision</u>. The Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)    <u>Prohibited Activities</u>. Subject to the terms of existing leases of the Shopping Center as of the Effective Date and described on <u>Exhibit "F"</u>, and only for such time as such leases are in force and effect, Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in Tenant Preferred Area or elsewhere in the Shopping Center for use as:

(A)    within 400 feet from the Premises, a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service; *provided*, such prohibition is not intended to apply to restaurants such as Friday's, Chile's, Ruby Tuesday's, Outback Steakhouse or similar restaurants as operated as of the Effective Date, unless otherwise prohibited by the terms of this Lease;
(B)·    a bowling alley;
(C)    within 300 feet of the Premises, a billiard or bingo parlor and any such parlor within the Shopping Center must be a first-class operation;
(D)    a flea market;
(E)    a massage parlor;
(F)    a funeral home;
(G)    a facility for the sale of paraphernalia for use with illicit drugs;

257430 v13 (00051-44)[12023]

(H)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(I)    an off-track betting parlor;

(J)    a carnival, amusement park or circus;

(K)    a gas station (except located where Pier I is currently located as shown on the Site Plan), car wash (except one as part of the foregoing gas station) or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M)    a facility for any use which is illegal or causes a threat of imminent harm to persons or property, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(N)    a skating rink;

(O)    an arcade, pinball or computer gameroom (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(P)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other nonretail uses except for offices and storage facilities incidental to a primary retail operation except that fifteen percent (15%) of the Shopping Center and the entire building designated as the "Law Building" on Exhibit "A" may be used for general service-oriented office use, unless Landlord elects at any time to re-develop the Law Building (or demolish and reconstruct a building within the area shown on the Site Plan as the Law Building), in which event such building may not be utilized for non-retail purposes;

(Q)    a banquet hall, auditorium or other place of public assembly;

(R)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(S)    a theater of any kind;

(T)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods; or

(U)    a gymnasium, sport or health club or spa, except for a fitness store or club (as currently operating as the existing LA Fitness store) located as shown on the Site Plan.

In addition to the foregoing, (i) except for the Lone Star restaurant in the location shown on the Site Plan, and, if constructed, a restaurant to be located within the Permissible Building Area therefor shown on the Restaurant Alternate Site Plan attached as page 5 of Exhibit "A", which shall not be larger than 7,500 square feet in area and whose primary entrance shall be located on the west side or western half of the north side of said building, and in which event no other improvements

33

257430 v13 (00051-44)(12023)

shall be located on Parcel 6 except that portion of the building located thereon, Landlord shall not operate, lease or permit to be operated or leased any restaurant or bookstore within any building on Landlord's Premises which is located within three hundred (300) feet of the front entrance to the Building, except a bookstore may be located in the building shown on the Site Plan for Beverages & More; (ii) no auction, fire or going-out-of-business sale shall be conducted in the Shopping Center; (iii) the center of the customer entrance and exit door to the space shown on the Site Plan for Beverages and More (which is now and will always be the only customer entrance or exit) will never be located closer to the entrance of the Building than it is as of the Effective Date, as shown on the Site Plan, i.e. center of the front of said building; however, in the event a second user of the Beverages & More building ever subleases or is assigned less than 8,500 square feet of said building area, such user's entrance may be located anywhere along the western side of said building; and (iv) with respect to the Lone Star restaurant building shown on the Site Plan, the only customer entrance and exit door to said building will always be either on the west or north side of said building, not on the east or south side of said building, and landscaped area around the southwest corner of said building will always be landscaped or fenced in such a way as to discourage customers of said building from parking in the parking field on the south side of said building.

   (ix) <u>Site Covenants</u>.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations, warranties and covenants (the "Site Covenants"):

     (A) <u>Building Height and Location</u>.  No building in the Shopping Center shall be taller than twenty-eight and one-half (28 1/2) feet to the top of its parapet, including forty-five and one-half (45 1/2) feet to the top of its architectural features, except as to any building as it currently exists at the Shopping Center as of the Effective Date, and except, if the Law Building or the building shown on the Site Plan as being occupied by Lone Star Restaurant, is ever rebuilt, neither of such building(s) may be taller than twenty-four (24) feet to the top of its parapet, including thirty-five (35) feet to the top of its architectural features (i.e. architectural features being limited to one-third (1/3) the width of the front of said building).  No development shall occur within the Shopping Center except as shown on the Site

34

257430 v13 (00051-44)[12023]

Plan. In addition, nothing herein shall obligate or require Landlord to build or demolish a building or any type of structure on the portion of Parcel 6 not part of the Premises.

(B)    Construction and Alterations. Following the end of the first Lease Year, no exterior construction and no construction staging shall be permitted in the Shopping Center during the weeks of October 15 through December 31, except for emergency repairs. In the event of any construction within the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Shopping Center and shall require erection of safety barriers as necessary and an opaque wall around the site of such construction of a size necessary to screen such construction from ground level view. With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally imposed impact fees, and shall be responsible for other similar construction-related charges. The foregoing notwithstanding, Landlord shall not be responsible for any imposed impact fee, hookup, connection or installation fee or similar construction-related charge associated with the Premises. Landlord shall make no changes in Tenant's Preferred Area as shown on the Site Plan (including, without limitation, changes in the location of curbcuts, drive aisles, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in paragraph 5) without Tenant's express written consent, which Tenant may, in its sole discretion, withhold. Landlord shall not make any other changes to the Common Areas which affect Tenant's visibility or access, or materially affect Tenant's parking, without Tenant's consent. Any other changes to the Common Areas may be made only upon receipt of Tenant's express written consent, which consent shall not be unreasonably withheld, delayed or conditioned.

(C)    Prohibited Uses in Common Area. Landlord covenants that it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas: (1) advertisements or signs (except for the pylon

35                          257430 v13 (00051-44)[12023]

and/or monument signs described in paragraph 8, the "for rent" or "for lease" signs described in paragraph 45 and traffic control signs); (2) display or sale of merchandise (except if in connection with or incidental to sidewalk sales, seasonal and promotional demonstrations and other events affecting only a small portion of the Common Area adjacent to an occupant's premises); (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas; (4) imposition of a charge for parking; or (5) operation of cellular telephone or other telecommunication tower for use by any other party not an occupant of the Shopping Center, except one (1) such tower shall be permitted if located in the northeast corner of the Shopping Center. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements of four (4) spaces per 1,000 square feet of gross leasable area for retail or ten (10) spaces per 1,000 square feet of gross leasable area for any new restaurant within the Shopping Center. Parking by employees of Tenant, Landlord and other occupants of the Shopping Center shall be designated "employee parking" areas, as set forth on Exhibit "A".

    (D)   Easements. Landlord shall not subdivide, parcel or otherwise divide the Shopping Center or create any easements in the Common Areas without Tenant's prior written consent, except utility easements granted to utility companies, so long as Tenant's business or utility service is not affected thereby, and easements, dedications, right-of-ways, grants and similar encumbrances as set forth on the Carosella Plat (defined in paragraph 35(g) below) and Landlord's Civil Plans described on Exhibit "C-2".

    (x)   Interference with Tenant's Reception/Transmission. Landlord shall not install or permit to be installed by any other tenant or other person anywhere in the Shopping Center, any structure or equipment which would cause any interference with satellite, radio or television reception or transmission in or from the Building.

    (xi)   Notices Affecting the Premises. Landlord shall promptly forward to Tenant any notice or other communication affecting the Premises received by Landlord from any

36

257430 v13 (00051-44)[12023]

owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

   (xii) <u>Constructive Trust</u>. Landlord covenants that all sums paid by Tenant to Landlord and intended for payment by Landlord to a third party (such as, by way of example, taxes, insurance and certain elements of CAM Charges) are given to Landlord in trust and shall be applied only for such third-party payments, as and when due.

   (xiii) <u>Ground Lease</u>. Landlord represents to Tenant that a certain portion of the Common Areas north of Tenant's Preferred Area ("Fraser Ground Lease Parcel") is controlled by Landlord pursuant to the ground lease ("Fraser Ground Lease") described on <u>Exhibit "F"</u>. Landlord represents and covenants to Tenant that the Fraser Ground Lease is in good standing and neither Landlord or the ground lessor is in default with respect to same. Landlord further represents and covenants to Tenant that all rent and other sums due and payable under the Fraser Ground Lease have been prepaid for one (1) year (through November 1, 2001) in advance, that Landlord has exercised all renewal options under the Fraser Ground Lease so that such lease now expires as of November 1, 2014, and that Landlord has provided to Tenant a true, correct and complete copy of the Fraser Ground Lease, and all amendments or modifications thereto.

   (b) Tenant represents, warrants and covenants to Landlord that:

   (i) <u>Tenant's Authority</u>. Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia and licensed to do business in the State of Florida and it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so. Tenant has furnished to Landlord prior hereto with evidence of (a) the existence of the corporation and its authority to do business in the State of Florida, and (b) the authority of the Vice President to bind the corporation as contemplated herein.

   (ii) <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>. As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous

257430 v13 (00051-44)[12023]

Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In addition to such other remedies as may be accorded Tenant at law, in equity (including but not limited to an injunction or writ of specific performance) or under the terms of this Lease, (i) in the event that any of the representations, warranties and covenants set forth in this paragraph 19 are untrue or incorrect, or (ii) in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    <u>Estoppel Certificates</u>. Without charge, at any time and from time to time hereafter, within thirty (30) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. In addition, without charge, at any time any from time to time hereafter, within thirty (30) days after receipt of written request of Tenant, Landlord shall deliver an estoppel certificate to Tenant's assignee or subtenant that states in the event Tenant defaults under any of its obligations under this Lease following the date of any assignment or subletting hereunder, Landlord will permit such assignee or subtenant to satisfy obligations of Tenant hereunder, including but not limited to the direct payment of rentals to Landlord. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

257430 v13 {00051-44}[12023]

21.   <u>Subordination, Non-Disturbance and Attornment</u>.

(a)     Landlord shall deliver to Tenant with regard to any and all Mortgages (as defined below) encumbering the Shopping Center and placed thereon by Landlord, a non-disturbance and attornment agreement in substantially the form of <u>Exhibit "G"</u> hereto attached, executed by Landlord under the holder of such Mortgage ("Mortgagee"). In addition, throughout the term, Landlord shall deliver to Tenant a non-disturbance and attornment agreement substantially in the form of <u>Exhibit "G"</u> executed by Mortgagee with regard to all future Mortgages and with regard to all renewals, modifications, replacements and extensions of such Mortgages. Such Agreement shall contain, at a minimum, the following: (i) the Lease shall not terminate by reason of a foreclosure or deed in lieu thereof ("Foreclosure"), (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Shopping Center available for restoration of the Improvements in accordance with the terms hereof, and (vi) that the Lease shall at all times be subordinate to the corresponding Mortgage. Upon Tenant's receipt and execution of said subordination, non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage. Landlord shall cause any present or future Mortgagee to deliver a subordination, non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Shopping Center, as set forth in paragraph 35(b) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Shopping Center or any part thereof. After the delivery by Landlord of the non-disturbance and attornment agreement issued by the Mortgagee providing the Tenant Improvement Allowance, Landlord agrees to pay Tenant's reasonable attorney's fees in excess of the first $2,000.00 thereof incurred by Tenant in negotiating any additional non-disturbance and

257430 v13 (00051-44)[12023]

attornment agreements, reciprocal easement agreements or other documents required in the event Landlord sells, finances or refinances the Premises or Shopping Center, or enters into any other transaction requiring the execution of same, including the reasonable equivalent of such fees in the event Tenant elects to utilize in-house legal counsel for the provision of such services, the payment of which fees shall be a condition precedent to the effectiveness of Tenant's execution of such non-disturbance and attornment agreement, reciprocal easement agreement or other document. Tenant acknowledges that Landlord has advised Tenant that it will be unable to obtain a subordination, nondisturbance and attornment agreement, estoppel, written documentation or otherwise from the ground lessor of the Fraser Ground Lease. Landlord hereby agrees to exercise any remaining renewal or option periods available to Landlord under the Fraser Ground Lease and to indemnify, defend and hold Tenant harmless from any losses, claims, damages or sums of any nature incurred by Tenant as the result of Landlord's failure to exercise such renewal options and/or inability to obtain any such document from said ground lessor. Landlord further agrees that, upon termination of the Fraser Ground Lease for any reason other than expiration in accordance with its terms, Tenant may terminate this Lease in the event such termination of the Fraser Ground Lease results in the termination of cross-access to the Premises through the Fraser Ground Lease Parcel as shown on the Site Plan or results in any modification to the layout of the common area or building areas of the Shopping Center from that shown on the Site Plan or modifies Tenant's ability to use any of the Common Areas within the area covered by the Fraser Ground Lease, or results in any use of the Fraser Ground Lease Parcel (being Parcel 3 shown on the Site Plan) in any manner inconsistent with the provisions of this Lease. If, upon expiration of the Fraser Ground Lease in accordance with its terms, cross-access to the Premises over the Fraser Ground Lease Parcel is no longer permitted, Tenant may terminate this Lease.

(b)    Landlord shall, from time to time, upon the request of Tenant, enter into agreements with Tenant and its subtenants providing, in part, that, in the event of any termination of this Lease, all of the rights of any such subtenant(s) under its sublease will be recognized so long as any such subtenant is not in default under its sublease beyond notice and cure periods, provided that as a pre-condition thereto such subtenant agrees that it will attorn to Landlord and will execute and deliver such instrument as Landlord shall reasonably request to confirm such attornment.

257430 v13 (00051-44)[12023]

22.    <u>Tenant's Financing</u>. Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness. Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder (including time to foreclose or otherwise take possession of the Premises, if necessary to effect such cure).

23.    <u>Tenant's Property and Waiver of Landlord's Lien</u>. All of the Personalty shall be and remain the personal property of Tenant and shall be removable by Tenant any time prior to, or within thirty (30) days after, the expiration or earlier termination of this Lease. (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as <u>Exhibit "D"</u>.) Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request. Tenant agrees that upon surrender or abandonment, as defined in the Florida statutes, Landlord shall not be liable or responsible for storage or disposition of Personalty.

24.    <u>Memorandum of Lease; Commencement Date Agreement</u>. Landlord and Tenant agree, at the other's request, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as <u>Exhibit "I"</u>, once the Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same. The provisions of this Lease shall control, however, with regard to any omissions from,

41

257430 v13 (00051-44)[12023]

or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

25.    Expiration of Term and Holding Over. At the expiration or earlier termination of the Lease Tenant shall surrender the Premises in a broom clean condition. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

26.    Force Majeure. Except as otherwise specifically contemplated in this Lease or in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, including, without limitation, a hurricane rated as "Category 2" or greater (meaning winds of 90 m.p.h. or greater), so long as the force majeure delay therefrom is not more than 90 days, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraphs 28(d) and 29(c) of this Lease.

27.    Events of Tenant's Default. Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)    Failure to Pay Rent; Breach. (i) Tenant's failure to make any payment of money required by this Lease (including without limitation Base Rent, CAM Charges or Real Estate Taxes) (subject to Tenant's right of good faith contest), within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue; or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of written notice from Landlord to Tenant specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Tenant shall have such longer period as is reasonably necessary to cure the default, so long

42                    257430 v13 (00051-44)(12023)

as Tenant proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion. In the case of an emergency, Landlord shall be required to give only such notice as is reasonable under the circumstances.

(b)     Bankruptcy.    Tenant's adjudication as bankrupt or insolvent, or the appointment of a receiver, trustee in involuntary bankruptcy or other, similar officer to take charge of any substantial part of Tenant's property, which proceeding is not dismissed within one hundred twenty (120) days after it is begun.

28.    Landlord's Remedies.    After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)     Continue Lease.    Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Base Rent and other charges when due. Landlord shall also have the right, in Landlord's exercise of reasonable efforts to mitigate its damages (which Landlord hereby agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder.

(b)     Terminate Lease.    Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(i)     The "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(ii)     The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination through the

43                                257430 v13 (00051-44)[12023]

expiration of the Lease Term, less amounts of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation.

As used in this paragraph 28(b), the term, "worth at the time of the award", shall be computed by allowing simple interest at an accrual rate of ten percent (10%) for past due obligations, and a discount rate to net present value of ten percent (10%) on anticipated future obligations, on the amount of the obligations payable on the date of such calculation.  In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary dispossession proceedings.  Landlord shall never be entitled to dispossess Tenant of the Premises pursuant to any "lock-out" or other nonjudicial remedy.

(c)     Remedies Are Cumulative.  The various rights and remedies reserved to Landlord herein are cumulative, and Landlord may pursue any and all such rights and remedies (but no others), whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease), including, without limitation, specific performance.  Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

(d)     Additional Landlord Remedies Due to Construction Delays by Tenant.  If, subject to force majeure, Tenant shall fail to commence its construction by that date which is ninety (90) days following Delivery of the Land, Landlord at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction and commence payment of Ground Rent (as hereinafter defined) and CAM Charges, Common Area insurance charges and Real Estate Taxes on the date which is one hundred eighty (180) days following Delivery of the Land.

If, subject to force majeure, Tenant shall fail to complete its construction by that date which is one hundred eighty (180) days following Delivery of the Land, Landlord, at its option, upon prior written notice to Tenant, may require Tenant to proceed with its construction, commence payment

44

257430 v13 (00051-44)[12023]

of Ground Rent, CAM Charges, Common Area insurance charges and Real Estate Taxes on the date which is one hundred eighty (180) days following Delivery of the Land, and also reimburse Landlord for its fixed and ascertainable costs incurred as a result of Tenant's delay. Such costs shall be limited to Landlord's out-of-pocket expenses of construction overtime and acceleration charges paid to Landlord's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed on account of the aforesaid delays by Tenant, the cost of erecting barricades around Tenant's unfinished work and construction period interest charges to the extent that such charges exceed those which would have accrued without such delay.

In the event, for any reason whatsoever and regardless of force majeure, Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, Landlord shall be entitled to terminate this Lease upon sixty (60) days prior written notice to Tenant, during which sixty (60) day period Tenant may cure any such default hereunder.

For purposes hereof, annual Ground Rent shall equal $300,000.00 during the first six (6) months it is due, and $675,000.00 thereafter, payable monthly on the first day of each month in equal installments of 1/12 each of the amount of the annual Ground Rent, in lieu of Base Rent, for so long as Tenant's failure continues. Whenever Ground Rent is payable, CAM Charges, Common Area insurance charges and Real Estate Taxes shall also be payable.

29.    Events of Landlord's Default; Tenant's Remedies.

(a)    Default by Landlord. Any of the following occurrences, conditions or acts by Landlord shall constitute an "Event of Default": (i) Landlord's failure to make any payments of money due Tenant or any third party, including but not limited to the payment of the brokerage commissions pursuant to paragraph 33 hereof, within ten (10) days after the receipt of written notice from Tenant that same is overdue (in which event the delinquent amount shall accrue interest from the due date at the Default Rate); or (ii) Landlord's failure to perform any nonmonetary obligation of Landlord hereunder within thirty (30) days after receipt of written notice from Tenant to Landlord specifying such default and demanding that the same be cured; provided that, if such default cannot with due diligence be wholly cured within such thirty (30) day period, Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes

257430 v13 (00051-44)(12023)

the cure to completion and provided further that in the case of an emergency, Tenant shall be required to give only such notice as is reasonable under the circumstances. Notwithstanding the foregoing, with respect to any event of default described in subparagraph (c) below, Tenant shall not be obligated to deliver any notice of default nor any opportunity to cure such default, it being agreed that with respect to the dates set forth therein time is of the essence, except that, with respect to specific construction-related matters, for which Tenant shall give Landlord three (3) days' notice and opportunity to cure before exercising any of Tenant's remedies.

(b)    Remedies Upon Landlord's Default.  Upon the occurrence of an Event of Default by Landlord, at Tenant's option, in addition to any and all other remedies which it may have at law and/or in equity, and without its actions being deemed an election of remedies or a cure of Landlord's default, Tenant may do all or any of the following: (i) pay or perform such obligations and offset Tenant's reasonable cost of performance, including any and all transaction costs and reasonable attorneys' fees, plus interest at the Default Rate, against the Base Rent, CAM Charges and any and all other amounts and charges due Landlord hereunder or (ii) terminate this Lease and sue for damages, including interest, transaction costs and reasonable attorneys' fees as specified in subsection (i) above.  If Landlord fails to pay Tenant the Tenant Improvement Allowance in a timely manner, Tenant shall be entitled to the rights and remedies set forth in this paragraph and the Construction Provisions; and, as to a breach of the warranties and representations contained in paragraph 19, Tenant shall be entitled to the remedies provided therein, in addition to those remedies provided herein.  All amounts, including interest, transaction costs and attorneys' fees, arising out of uncured defaults of Landlord shall constitute liens against Landlord's interest in the Shopping Center, which may be enforced by non-judicial means available under State law, or any other applicable proceedings.  The various rights and remedies reserved to Tenant herein are cumulative, and Tenant may pursue any and all rights and remedies, whether at the same time or otherwise.

(c)    Additional Tenant Remedies Due to Construction Delays by Landlord.  In the event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish Delivery of the Land in the condition specified herein by June 15, 2001 (the "Delivery Date"), Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by November 15, 2001.  Such

46                                    257430 v13 {00051-44}{12023}

costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors, charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord and construction period interest charges actually incurred to the extent that such charges exceed those which would have accrued without such delay, such costs not to exceed $25,000.00. As an additional remedy to Tenant for Landlord's failure as set forth in this subparagraph, Tenant shall be entitled to two (2) days of free Base Rent for every day of Landlord's delay in meeting the completion dates set forth on Attachment "1" of Exhibit "C", such free rent credits to be applied when Base Rent hereunder first becomes due, or to be applied against Ground Rent should Ground Rent first become due.

In the event, subject to force majeure, Landlord shall fail to accomplish Delivery of the Land by the date which is fifteen (15) days following the Delivery Date, or to complete any subsequent element of the Landlord Work by the completion date established therefor in Attachment "1" of Exhibit "C" attached hereto (the Construction Schedule), Tenant, at its option and upon five (5) business days' prior written notice to Landlord, which notice may be given prior to or at any time after the applicable date for performance, may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for Delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its actual reasonable costs thereof, including interest on such costs at the Default Rate. Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's reasonable cost and expense. Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the preparation of the Land, as well as schedules of all contractors, subcontractors and suppliers. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent and CAM Charges and other sums otherwise due until such costs and accrued interest are reimbursed in full. As an additional remedy to Tenant for Landlord's failure as set forth in this subparagraph, Tenant shall be entitled to two (2) days of free Base Rent for every day of Landlord's delay in meeting the completion dates set forth on Attachment "1" of Exhibit "C", such free rent

47

257430 v13 (00051-44)[12023]

credits to be applied when Base Rent hereunder first becomes due, or to be applied against Ground Rent should Ground Rent first become due.

In the event, for any reason whatsoever and regardless of force majeure, Landlord shall fail to complete Delivery of the Land to Tenant by the date which is ninety (90) days from the Delivery Date, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket expenses and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00) or Tenant may elect to delay opening of its store facility for a period not to exceed nine (9) months, during which time Tenant shall pay no Ground Rent, Base Rent, Real Estate Taxes or CAM Charges, and shall be entitled to the free rent described in the two (2) preceding subparagraphs from the Delivery Date to the new date of delivery. In such event, Landlord shall deliver the Land and complete the Site Work on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all costs incurred by Tenant in the development of its store facility, including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

(d)    Exercise of Remedies. Notwithstanding the foregoing, a delay by Tenant in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by Landlord. All sums owing to Tenant under paragraph 29 hereof shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Base Rent and CAM Charges and other sums otherwise due hereunder.

(e)    Time is of the Essence. Notwithstanding anything contained herein to the contrary, Landlord covenants that it shall complete its construction and delivery obligations in accordance with the "Completion Dates" set forth in the Construction Schedule. In the event that Landlord fails to complete its construction and delivery obligations in accordance with such Completion Dates, Tenant may, at its sole election, exercise such remedies as are set forth herein.

48                            257430 v13 (00051-44)[12023]

30.    <u>Waiver</u>.  If either Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present or future, of this Lease.  Either party may accept late payment or performance by the other without waiving any Event of Default which may then have accrued.

31.    <u>Compliance with Applicable Laws</u>.  During the Term, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities and any other governmental authorities with jurisdiction over the Improvements, and of the board of fire underwriters (collectively, the "Lawful Requirements") respecting Tenant's use and occupancy of the Improvements, and Landlord shall comply with all Lawful Requirements otherwise relating to the Improvements.  In the event that Tenant, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Landlord or any such authority ordering performance of any such work which Tenant is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Landlord may perform said work and collect the reasonable cost thereof plus interest at the Default Rate from Tenant with the next installment or installments of Base Rent.  In the event that Landlord, within thirty (30) prior days' written notice (except in the case of an emergency, in which event only such notice as is reasonable under the circumstances shall be required) from Tenant or any such authority ordering performance of any such work which Landlord is required to perform in order to remain in, or come into, compliance with any such requirement, fails to perform or diligently commence performance of same with reasonable promptness, Tenant may perform said work and deduct the reasonable cost thereof plus interest at the Default Rate from Landlord with the next installment or installments of Base Rent.

32.    <u>Notices</u>.  Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service (with proof of receipt available), addressed to the parties as follows:

49

257430 v13 (00051-44)(12023)

| If to Tenant: | CIRCUIT CITY STORES, INC. |
| | Deep Run I |
| | 9950 Mayland Drive |
| | Richmond, Virginia 23233 |
| | Attention:  Corporate Secretary |

| with a copy to: | CIRCUIT CITY STORES, INC. |
| | Deep Run I |
| | 9950 Mayland Drive |
| | Richmond, Virginia 23233 |
| | Attention:  Vice President of Real Estate |

| If to Landlord: | 19TH STREET INVESTORS, INC. |
| | 4901 North Federal Highway, Suite 400 |
| | Fort Lauderdale, Florida 33308 |
| | Attention:  Joseph Carosella, President |

or to such other addressees as any party hereto shall from time to time give notice to the other party in accordance with this paragraph.

     33.   <u>Brokers</u>.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Jeffrie Hood of Centennial American ("Broker"), which shall be paid a commission by Landlord pursuant to their separate written agreement in an amount equal to $2.00 per square foot of the Building, one-half (1/2) payable upon Tenant's receipt of its building permit and the remainder due within thirty (30) days following the Commencement Date.  Landlord agrees that, if Landlord fails to pay such Broker its commission when due, Tenant may pay same and offset such amount against the amounts then next becoming due from Tenant to Landlord hereunder.  Landlord agrees that Broker is representing Tenant with respect to this leasing transaction, and, although Landlord is responsible for payment to Broker of the Broker's commission, the Broker owes no fiduciary's, agent's or other duty whatsoever to Landlord. Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable and actual attorneys' fees (through all levels of proceedings), resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party either has or is purported to have dealt.

50

34.    Miscellaneous.

(a)    Headings and Gender.  All paragraph headings, titles or captions contained in this Lease are for convenience only and shall not be deemed a part of this Lease and shall not in any way limit or amplify the terms and provisions of this Lease.  The masculine, feminine or neuter gender and the singular or plural number shall be deemed to include the others whenever the context so requires or indicates.

(b)    Construction.  The parties hereto agree that all the provisions hereof are to be construed as covenants and agreements as though the words importing such covenants and agreements were used in each separate paragraph hereof.

(c)    Waiver of Jury Trial.  In the event of any court action arising out of this Lease, each party hereby expressly waives its right to trial by jury.

(d)    Relationship of Landlord-Tenant.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, partnership, joint venture, or any other association between Landlord and Tenant other than the landlord-tenant relationship described herein.

(e)    Entire Agreement; Merger.  This Lease, including all exhibits hereto (which are hereby incorporated herein by reference for all purposes), contains the full and final agreement of every kind and nature whatsoever between the parties hereto concerning the subject matter of this Lease, and all preliminary negotiations and agreements of whatsoever kind or nature between Landlord and Tenant are merged herein.  This Lease cannot be changed or modified in any manner other than by a written amendment or modification executed by Landlord and Tenant.

(f)    Attorneys' Fees.  In the event either party shall be required to commence or defend any action or proceeding against any other party by reason of any breach or claimed breach of any provision of this Lease, to commence or defend any action or proceeding in any way connected with this Lease or to seek a judicial declaration of rights under this Lease, the party prevailing in such action or proceeding shall be entitled to recover from or to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs through all levels of proceedings.

257430 v13 {00051-44}{12023}

(g)     Partial Invalidity. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the fullest extent permitted by law as though such invalid or unenforceable provision was never a part hereof.

(h)     Consents. Any consent or approval granted by either party hereunder shall be deemed a consent only as to the matter on which such consent was requested and shall not waive the consenting party's right to give or withhold consent to any subsequent matter.

(i)     Holidays. If the day on which rent or any other payment due hereunder is payable falls on a Saturday, Sunday or on a legal holiday, it shall be payable on the following business day.

(j)     Applicable Law. This Lease shall be construed in accordance with the laws of the State, and the parties agree that jurisdiction for all actions hereunder shall lie therein.

(k)     Successors and Assigns. All rights, obligations and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

(l)     Counterparts. This Lease may be executed in one or more identical counterparts, and as so executed by all parties hereto shall constitute a single instrument for purposes of the effectiveness of this Lease.

(m)     Trademarks and Trade Names. All trademarks, trade names, service marks, signs and all other marks of identification used by Tenant in its business shall at all times remain the exclusive property of Tenant, and Landlord shall have no right, interest in, or title to any of Tenant's trademarks, trade names, service marks, signs or other marks of identification.

(n)     Exhibits. All of the exhibits to this Lease are hereby incorporated herein by reference for all purposes and are part of this Lease.

(o)     No Construction Against Either Party. This Agreement shall be interpreted to give it fair meaning and shall not be construed against either party.

(p)     Effective Date. This Lease shall be deemed executed on the date (the "Effective Date") on which it is fully executed by all parties.

257430 v13 (00051-44)(12023)

35.    <u>Conditions Precedent to Effectiveness of Lease</u>.  Notwithstanding the execution of this Lease or any provision hereof to the contrary, the parties agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a)    Landlord's delivery of subordination, non-disturbance and attornment agreements and estoppel letters executed by any and all existing Mortgagees in a form satisfactory to Tenant simultaneously with the execution hereof, subject to the exception regarding the Fraser Ground Lease set forth in paragraph 21 above, by April 30, 2001.

(b)    Landlord's Delivery of the Land by the date and in the condition specified in the Construction Provisions.

(c)    Tenant's obtaining the required governmental building permit to construct said Improvements on the Premises, no later than May 30, 2001.  Tenant agrees to apply for such permit no later than sixty (60) days from Landlord obtaining final Development Review Committee ("DRC") approval as provided herein, to use due diligence and commercially reasonable efforts to prosecute all necessary applications and pay all fees for such permits and approvals; provided, however, that the foregoing shall not be deemed to require Tenant to initiate litigation or to agree to any conditions imposed upon issuance of any such permit or approval.

(d)    Landlord's representations, warranties and covenants, including but not limited to those set forth in paragraph 19 herein, being true and accurate as of the date of Delivery of the Land (as defined in the Construction Provisions).

(e)    Landlord's accomplishing plat approval and recordation in the appropriate public records of the County of the plat of Phase III approved by Tenant (the "Carosella Plat"), on or before Delivery of the Land, Landlord hereby covenanting to Tenant that Landlord will use commercially reasonable efforts to accomplish or cause to be accomplished such recordation as soon as possible following the Effective Date, but in any event on or before the Delivery Date. Landlord hereby agrees to indemnify, defend and hold Tenant harmless from all costs, losses, damages and claims in the event Tenant is unable to open or operate its store for business in the Premises, or if Tenant's construction or operation is delayed in any manner, as the result of the Carosella Plat not being recorded at any time, and no Base Rent, Ground Rent, CAM Charges, Real Estate Taxes or

257430 v13 (00051-44)[12023]

other sums shall be payable to Landlord by Tenant under this Lease during such time period. Additionally, Tenant shall be entitled to two (2) days of free Base Rent for every day of delay in Tenant's construction or operation caused by the Carosella Plat not having been recorded prior to the Delivery Date.

        (f)     Delivery to Tenant by Landlord on or before April 30, 2001 of the fully executed draw payment agreement described in paragraph 3 of Exhibit "C".

      The existence of the foregoing conditions is solely for the benefit of Tenant, and Tenant may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which specifically states the condition(s) being waived by Tenant.

      Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole and absolute discretion at anytime prior to the satisfaction or waiver of any such condition by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions. In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect and the parties shall have no further liability one to the other (except that the indemnifications set forth in paragraphs 14(i), 19(a)(v) and 19(b)(ii) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord. All conditions contained in this paragraph except subparagraphs (e) and (h) unless previously waived or satisfied, shall expire as of the date of Tenant's store opening for business to the public, and all such conditions shall continue nonetheless as covenants of the party charged therewith.

      The delivery of this executed Lease by Tenant to Landlord constitutes the offer of Tenant to Landlord to bind Landlord and Tenant to the provisions of this Lease, subject to the conditions set forth in this paragraph 35. It is a further condition to the effectiveness of this Lease that upon receipt of the executed Lease from Tenant, Landlord execute and return same to Tenant within ten (10) days following receipt thereof by Landlord. In the event Landlord fails to execute and return the Lease within such ten (10) day period, Tenant may at any time after delivery of the Lease provide written notice to Landlord that Tenant revokes its delivery of the executed Lease and thereupon Landlord

54

shall be immediately obligated to return to Tenant all executed original counterparts as well as any copies of this Lease in the possession of Landlord, and this Lease shall thereafter be null and void.

36.    Confidentiality.  The parties hereto, including, but not limited to, their heirs, successors, assigns and legal representatives, agree that this Lease may not be recorded and that all such parties hereby agree to use their best reasonable efforts to preserve the confidentiality of this transaction.    This confidentiality agreement extends to any developers, bankers, lawyers, accountants, employees, agents or any other persons acting on behalf of the parties hereto.  Any breach of this confidentiality agreement shall constitute an automatic Event of Default without notice or cure provided, for which either party may recover damages as their sole remedy and for which neither party can terminate this Lease.

37.    Radon Gas/Florida.  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risk to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from the county public health unit.

38.    Limitation of Right of Recovery.  It is specifically understood and agreed that following payment to Tenant of the Tenant Improvement Allowance (defined in Exhibit "C") there shall be no personal liability of Landlord with respect to any of the covenants, conditions or provisions of this Lease; provided that Landlord shall at all times maintain at least 25% equity in the Shopping Center.  In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to Landlord's interest in the Shopping Center and Landlord's equity, including all rents, profits and proceeds (including, without limitation, those from insurance, condemnation, sales and financing or refinancing) in the Shopping Center for the satisfaction of Tenant's remedies.  Notwithstanding anything contained in this paragraph, however, the limitation of personal liability set forth herein shall not be applicable to events occurring due to Landlord's willful misconduct, fraud or intentional acts.

39.    Deliveries and Garbage Removal.  Tenant agrees that all receiving and delivery of goods and merchandise and all removal of garbage and refuse shall be made only by way of the services areas and rear doors provided for such purposes.  Tenant shall, at its own cost and expense,

257430 v13 (00051-44)[12023]

pay all charges when due for garbage removal. In the event that additional screening is ever required in order to properly enclose Tenant's dumpster, then Tenant shall be fully responsible for the construction and payment of the same. All plans and drawings of dumpster enclosure and the placement thereof, shall be subject to Landlord's review and approval, which will not be unreasonably withheld, conditioned or delayed.

40.   <u>Entry and Inspection</u>. Landlord and its authorized representative shall have the right to enter upon the Premises at all reasonable hours to inspect the Premises or for making repairs, additions or alterations to the Premises required under this Lease, upon no less than forty-eight (48) hours' prior written notice to the store's on-site manager, except in the case of emergency where such delay would cause injury to persons or property.

41.   <u>Theft</u>. Landlord shall not be liable for any damage to, removal of or loss of any property of Tenant occasioned by any theft, burglary, robbery or larceny of any kind ("Theft") unless committed by Landlord, its employees or agents, or arising out of any negligence or omission by Landlord. Tenant will carry sufficient insurance for its own protection and for the protection of the Premises in connection with damage or loss of property and expense for any damage or loss caused to the Premises, inclusive of any damage caused to the roof or interior ceiling, as a result of any such Theft. A report of any such Theft to police or other proper authority shall be deemed conclusive that such occurrence or attempt was made.

42.   <u>Lien Waivers</u>. Subsequent to the date which is one (1) year following commencement of operation by Tenant in the Premises, Landlord may, in writing and in compliance with the notice provisions of this Lease, request from Tenant copies of lien waivers and releases of lien from Tenant's general contractor and any subcontractor which performed work at Tenant's request with respect to the Improvements. Tenant agrees, within a reasonable time following receipt of such request, to deliver such copies to Landlord, except with respect to any lien which may be the subject of a dispute, with respect to which Tenant will nonetheless comply with the terms of paragraph 13 hereof. Landlord and Tenant expressly acknowledge and agree that neither Tenant nor any one claiming by, through or under Tenant, including, without limitation, contractors, subcontractors, materialmen, mechanics and laborers, shall have the right to file or place any mechanic's or materialmen's liens of any kind whatsoever upon the Premises nor upon any building or

56

257430 v13 (00051-44)[12023]

improvement thereon; on the contrary, any such liens are specifically prohibited. All parties with whom Tenant may deal are hereby put on notice that any kind or character of any persons dealing with Tenant must look solely to the credit of Tenant for payment and not to Landlord's interest in the Premises or otherwise.

43. "For Rent" Signs. Tenant hereby permits Landlord during the last ninety (90) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding four (4) feet by four (4) feet in size, in the portion of the parking lot of the Shopping Center in Tenant's Preferred Area. During said ninety (90) day period, Tenant will also allow Landlord or its agents, upon prior written notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

WITNESS the following signatures and seals:

LANDLORD

Witnesses:

19TH STREET INVESTORS, INC.,
a Florida corporation

Printed Name: ARMANDO RAMIREZ

By: _____
Joe Carosella, President

Printed Name: LOUIS CAROSELLA

257430 v13 (00051-44)[12023]

57

Witnesses:

Printed Name: _Michael J. Seiler_

Printed Name: _Daniel T. Kincaid_

TENANT

<u>CIRCUIT CITY STORES, INC.,</u>
a Virginia corporation

By: _____
    Benjamin B. Cummings, Jr., Vice President

[Ft. Lauderdale, FL/Lease]

EXHIBIT "A"

SITE PLAN
(6 pages)

Components:      Premises (cross-hatched and outlined in red) - 33,027 square feet

Tenant's Preferred Area

Permissible Building Areas - page 3 of Site Plan

Customer Pick-Up

Pylon/Monument Signage

Truck Well(s)/Trash Compactor

Car Stereo Parking

Shopping Center

Employee Parking Area

Phase I

Phase II

Phase III

Law Building

Lone Star restaurant

Parcel 3

Parcel 6

Restaurant Alternate Site Plan - Page 5 of Site Plan

Office Alternate Site Plan - Page 6 of Site Plan

1 - Ex. "A"           257430 v13 (00051-44)[12023]



North

Premises (outlined in red and crosshatched)
Tenant's Preferred Area
Customer Pick-Up
Pylon/Monument Signage
Truck Well(s)/Trash Compactor
Car Stereo Parking
Shopping Center
Employee Parking Area

Exhibit "A"
Page 1 of 6



Exhibit "A"
Page 2 of 6

North



Exhibit "A"
Page 3 of 6



North

Permissible Building Area

aggregate GLA within this Permissible Building Area cannot exceed 17,000 s.f. of retail and/or office use

aggregate GLA within this Permissible Building Area cannot exceed 14,160 s.f. of retail and/or office use, or 7,500 s.f. of Restaurant use

Exhibit "A"
Page 4 of 6



North



Restaurant Alternate
Site Plan
(affects Parcel 6 only)

Exhibit "A"
Page 5 of 6



North

Exhibit "A"
Page 6 of 6

Office Alternate
Site Plan
(affects Parcel 6 only)

EXHIBIT "A-1"

LEGAL DESCRIPTION

PARCEL 1:

That part of Northwest one-quarter (NW 1/4) and that part of the North one half (N 1/2) of
Government Lot 3 of Section 36, Township 49 South, Range 42 East, Broward County, Florida;
described as follows:

Commence at the intersection of the East Right-of-Way line of North Federal Highway (U.S.
Highway No. 1) and the South Right-of-Way line of Northeast 19th Street, as shown on the plat of
BAL HARBOUR, recorded in Plat Book 40, Page 47 of the Public Records of Broward County,
Florida; thence North 89° 08' 14" East, a distance of 414.92 feet to the Westerly boundary of the plat
of said BAL HARBOUR; thence South 14° 32' 18" West, a distance of 150.00 feet to the POINT
OF BEGINNING; thence continuing South 14° 32' 18" West, a distance of 349.07 feet; thence South
89° 08' 14" West, a distance of 414.92 feet to the East Right-of-Way line of said North Federal
Highway; thence North 14° 32' 18" East, a distance of 349.07 feet; thence North 89° 08' 14" East,
a distance of 414.92 feet to the POINT OF BEGINNING; and that parcel of property bounded on the
South by a line parallel to the south Right-of-Way line of N.E. 19th Street and 525 feet from said
Right-of-Way line measured along the Easterly Right-of-Way line of the Federal Highway; on the
North by a line parallel to and 25 feet North of said South boundary; said 25 feet being measured at
right angles, on the West by the Easterly Right-of-Way line of the Federal Highway, and on the East
by the Westerly boundary of said subdivision of BAL HARBOUR, said lands being a portion of the
Northwest one-quarter (NW 1/4) of the Northwest one-quarter (NW 1/4) and the North one-half (N
1/2) of Government Lot 3, all in Section 36, Township 49 South, Range 42 East.

The above being a portion of Parcel "A" of F.V.S. PLAT No. 2, as recorded in Plat Book 123, Page
9, of the public records of Broward County, Florida.

PARCEL 2:

That part of Northwest one-quarter (NW 1/4) and that part of the North one-half (N 1/2) of
Government Lot 3 of Section 36, Township 49 South, Range 42 East, Broward County, Florida;
described as follows:

Commence at the intersection of the East Right-of-Way line of North Federal Highway (U.S.
Highway No. 1) and the South Right-of-Way line of Northeast 19th Street as shown on the plat of
BAL HARBOUR, recorded in Plat Book 40, Page 47 of the Public Records of Broward County,
Florida; thence North 89° 08' 14" East, a distance of 150.00 feet to the POINT OF BEGINNING;
thence continuing North 89° 08' 14" East a distance of 264.92 feet to the Westerly boundary of the
plat of said BAL HARBOUR, thence South 14° 32' 18" West, a distance of 150.00 feet; thence

257430 v13 (00051-44)[12023]

South 89° 08' 14" West, a distance of 264.92 feet; thence North 14° 32' 18 East, a distance of 150.00 feet to the POINT OF BEGINNING.

PARCEL 3:

A parcel of land lying in the Northwest one-quarter (NW 1/4) of Section 36, Township 49 South, Range 42 East, lying East of U.S. No. 1 more fully described as follows:

Commencing at the Northwest corner of said Section 36; thence Easterly along the North line of the said Northwest one-quarter (NW 1/4) of Section 36, a distance of 1012.21 feet to an intersection with the East Right-of-Way line of said U.S. Highway No. 1; thence Southerly along the said East right-of-way line making an angle of 74° 36' 56" in the Southwest Quadrant, a distance of 587.23 feet to the POINT OF BEGINNING; thence continuing Southerly along the said East Right-of-Way line, a distance of 201.93 feet; thence Easterly making an included angle of 74° 22' 04" a distance of 415.36 feet; thence Northerly along a line which is 400 feet East of and parallel to (as measured at right angles) the said East Right-of-Way line, making an included angle of 105° 37' 56" a distance of 200.20 feet; thence Westerly, making an included angle of 74° 35' 56", a distance of 414.92 feet to the POINT OF BEGINNING.

Said lands situate, lying and being in Broward County, Florida, and that parcel of property bounded on the North by a line parallel to the South Right-of-Way line of N.E. 19th Street and 525 feet from said Right-of-Way line measured along the Easterly Right-of-Way line of the Federal Highway; on the South by a line parallel to and 25 feet South of said North boundary, said 25 feet being measured at right angles; on the West by the Easterly Right-of-Way line of the Federal Highway; and on the East by the Westerly boundary of said subdivision of BAL HARBOUR, said lands being a portion of the Northwest one-quarter (NW 1/4) of the Northwest one quarter (NW 1/4) and the North one-half (N 1/2) of Government Lot 3, all in Section 36, Township 49 South, Range 42 East.

Said lands situated, lying and being in Broward County, Florida.

The above being a portion of Parcel "A" of F.V.S. PLAT No. 2, as recorded in Plat Book 123, Page 9, of the public records of Broward County, Florida.

PARCEL 4:

All that certain parcel of land lying and being in the county of Broward and State of Florida, more particularly described as follows:

A portion of the Northwest one-quarter (NW 1/4) of the Northwest one-quarter (NW 1/4) of Section 36, Township 49 South, Range 42 East, Broward County, Florida, more fully described as follows:

Beginning at the intersection of the East Right-of-Way line of North Federal Highway (U.S. No. 1) and the South Right-of-Way line of N.E. 19th Street; as shown on the Plat of BAL HARBOUR,

257430 v13 (00051-44)[12023]

recorded in Plat Book 40, Page 47, of the Public Records of Broward County, Florida; thence North 89° 08' 14" East along the said South Right-of-Way line (said South Right-of-Way line being parallel to and 35 feet South of the North line of said Section 36), a distance of 150.00 feet; thence South 14° 32' 18" West parallel to the said East Right-of-Way line of North Federal Highway, a distance of 150.0 feet; thence South 89° 08' 14" West and parallel to the said South Right-of-Way line of N.E. 19th Street, a distance of 150.0 feet to a point on the said East Right-of-Way line of North Federal Highway; thence North 14° 32' 18" East along the said East Right-of-Way line, a distance of 150.0 feet to the POINT OF BEGINNING; LESS the Right-of-Way for N.W. 19th Street as shown on the "1860 PLAT", as recorded in Plat Book 162, Page 34, of the public records of Broward County, Florida.

Said parcel also described as:

Parcel "A" of 1860 PLAT, according to the plat thereof as recorded in Plat Book 162, Page 34 of the public records of Broward County, Florida.

PARCEL 5:

A part of an unsubdivided tract of land, which tract is bounded by Northeast 16th Court, North Federal Highway, Northeast 19th Street, and the Westerly boundary of the subdivision of BAL HARBOUR, and which is delineated on the plat of the subdivision of BAL HARBOUR which is recorded in Plat Book 40, at Page 47 of the Public Records of Broward County, Florida, being described as follows:

Commencing at the intersection of the North right-of-way line of Northeast 16th Court with the Easterly right-of-way line of North Federal Highway; thence Northeasterly along the Easterly right-of-way line of North Federal Highway a distance of 100 feet to the Point of Beginning; thence continuing Northeasterly along the said Easterly right-of-way line of North Federal Highway, a distance of 299.96 feet; thence East along a line parallel to the North right-of-way line of Northeast 16th Court to the intersection with the boundary of said subdivision of BAL HARBOUR; thence Southwesterly along the Westerly boundary of said subdivision a distance of 300.40 feet; thence West along a line parallel to the North right-of-way line of Northeast 16th Court to the Point of Beginning; said lands being a portion of the Northwest one-quarter (NW-1/4) of the Northwest one-quarter (NW-1/4) and the North half (N-1/2) of Government Lot 3, all in Section 36, Township 49 South, Range 42 East.

PARCEL 6:

A part of an unsubdivided tract of land, which tract is bounded by N. E. 16th Court, North Federal Highway, N.E. 19th St. and the Westerly boundary of the subdivision of BAL HARBOUR, and which is delineated on the Plat of the subdivision of BAL HARBOUR which is recorded in Plat Book 40, at Page 47, of the Public Records of Broward County, Florida, being described as follows:

3 - Ex. "A-1"

Beginning at the intersection of the North right-of-way line of N.E. 16th Court with the Easterly right-of-way line of North Federal Highway; thence Northeasterly along the Easterly right-of-way line of North Federal Highway a distance of 100 feet; thence East along a line parallel to the North right-of-way line of N.E. 16th Court to the intersection with the Westerly boundary of said subdivision of BAL HARBOUR; thence Southwesterly along the Westerly boundary of said subdivision to the intersection with the North right-of-way line of N.E. 16th Court; thence West along the North right-of-way line of N.E. 16th Court to the Point of Beginning; said lands being a portion of the Northwest quarter of the Northwest quarter and the North one-half of Government Lot 3, all in Section 36, Township 49 South, Range 42 East.

4 - Ex. "A-1"

257430 v13 (00051-44)[12023]

EXHIBIT "B"

INDEX OF DEFINITIONS

| Term | Paragraph where defined |
|---|---|
| Additional Areas | 14(e) |
| Base Rent | 4 |
| Building | 2 |
| CAM Cap | 7(c) |
| CAM Charges | 7(b) |
| CAM Year(s) | 7(c) |
| Carosella Plat | 35(h) |
| City | 1 |
| Civil Plans | Ex. "C", para. 1(b) |
| Commencement Date | 4 |
| Common Area Easement | 6(a) |
| Common Area Maintenance | 7(a) |
| Common Areas | 7(a) |
| Communication Equipment | 8(b) |
| Construction Term | 3 |
| CPI-U | 4(iii) |
| Date of Taking | 16(a) |
| DRC | 35(d) |
| Default Rate | 9(b) |
| Delivery Date | 29(c) |
| Delivery of the Land | Ex. "C", para. 1(b) |
| Effective Date | 34(p) |
| Event of Default (Landlord) | 29 |
| Event of Default (Tenant) | 27 |

257430 v13 (00051-44)[12023]

| Term | Paragraph where defined |
|------|------------------------|
| First-Class Shopping Center | 5 |
| Foreclosure | 21(a) |
| Fraser Ground Lease | 19(a)(xiii) |
| Fraser Ground Lease Parcel | 19(a)(xiii) |
| Ground Floor GLA | 2 |
| Ground Lease | 21 |
| Ground Lessor | 21(a) |
| Hazardous Substances | Ex. "C", para. 1(a) |
| Improvements | 2 |
| Incidental Sale | 19(a)(vi) |
| Land | 1 |
| Landlord | Introduction |
| Landlord Work | Ex. "C", para. 1(d) |
| Landlord's Premises | 1 |
| Lawful Requirements | 31 |
| Lease Year | 3 |
| Main Term | 3 |
| Mortgage | 21(a) |
| Mortgagee | 21(a) |
| Offer | 37 |
| Option Period(s) | 3 |
| Other Improvements | 2 |
| Permissible Building Areas | Ex. "A" |
| Permitted Encumbrances | Ex. "F" |
| Person | 20 |
| Personalty | 22 |
| Plans and Specifications | Ex. "C", para. 2(b) |

2 – Ex. "B"

257430 v13 (00051-44)[12023]

| Term | Paragraph where defined |
|------|------------------------|
| Premises | 2 |
| Products | 18(a) |
| REA | 1 |
| Real Estate Taxes | 9(a) |
| Renewal Option | 3 |
| Schematic Floor Plan and Elevation | Ex. "C", para. 2(b) |
| Shopping Center | 1 |
| Site Covenants | 19(a)(ix) |
| Site Plan | 1 |
| Site Work | Ex. "C", para. 1(b) |
| Staging Area | 6(a) |
| Standard Specifications | Ex. "C", para. 1(b) |
| State | 1 |
| Substantial Completion | Ex. "C", para. 2(d) |
| Substantial Completion Anniversary | Ex. "C", para. 3 |
| Substantially All of the Premises | 16(a) |
| Taking | 16(a) |
| Tax Parcel | 9(b) |
| Tenant | Introduction |
| Tenant Improvement Allowance | Ex. "C", para. 3 |
| Tenant's Preferred Area | Ex. "A" |
| Tenant's Pro Rata Share | 7(c) |
| Tenant's Soils Report | Ex. "C", para. 1(b) |
| Term | 3 |
| Theft | 42 |
| Transfer | Ex. "C", para. 3 |
| worth at the time of the award | 28(b) |

3 - Ex. "B"

257430 v13 (00051-44)(12023)

# EXHIBIT B

# 19th Street Investors, Inc.
### 101 Plaza Real South, Suite 200
### Boca Raton, FL 33432

TEL (561) 961-1733          JOrtega@rpg123.com          FAX (961) 961-1744

April 6, 2009

*Sent Via E-mail*
Belinda_Eldridge@circuitcity.com

Store     Circuit City          Store # 848
Attn:     Belinda Eldridge
          Lease Administrator
          9950 Mayland Drive
          Richmond, VA 23233-1464

RE: 19th Street Investors, Inc., Ft Lauderdale, FL
      2008 CAM RECONCILIATION & 2009 RENT TRUE UP

Attached is the reconciliation of the Common Area Maintenance ("CAM"), Insurance and Real Estate Tax
expenses for the year ending December 31, 2008.

Your share of the actual CAM, Real Estate Taxes and Insurance for 2008 exceeded the
estimated payments you made for 2008 by:                                                $  19,690.45

*Additionally, the 2007 CAM Reconciliation billing remains unpaid:*                         24,588.60

Also, 2009 rental payments, adjusted to 2008 actual expenses reflect:

|                          | Jan-09      | Feb-09      | 3/1 -3/10/09 | TOTAL 2009    |
|--------------------------|-------------|-------------|--------------|---------------|
| Base Rent                | $ 77,200.62 | $ 77,200.62 | 24,903.43  $ | 179,304.67    |
| Insurance                | 1,944.09    | 1,944.09    | 627.13       | 4,515.31      |
| RE Tax                   | 7,796.27    | 7,796.27    | 2,514.92     | 18,107.46     |
| Common Area Maintenance  | 5,018.33    | 5,018.33    | 1,618.82     | 11,655.48     |
| Sales Tax - 6.0%         | 5,517.56    | 5,517.56    | 1,779.86     | 12,814.98     |
| Total Payment            | $ 97,476.87 | $ 97,476.87 | 31,444.15  $ | 226,397.89    |
| Less:Rent Paid By Tenant | (95,835.66) | (95,835.66) | (30,914.74)  | (222,586.06)  |

Total Rent Due To Landlord for 2009:                                                       3,811.83

Accordingly, the combined amount due for the 2007, 2008 Reconciliations and the 2009 True-up is:     48,090.88

Additionally, the November 2008 rent payment was not made                                  95,835.66

TOTAL RENT BALANCE DUE THROUGH 03/10/2009                                               $ 143,926.54

We appreciate your attention to the foregoing. Please give me a call directly should you have any
questions or require additional information.

Sincerely,

*John Ortega*
John Ortega, Chief Financial Officer

*Attachments:*
2008 CAM Reconciliation
2008 CAM General Ledger Detail
2008 Real Estate Tax Worksheet
2008 Insurance Worksheets and Backup

# EXHIBIT C

## 19TH STREET INVESTORS, INC.
### FUTURE CIRCUIT CITY RENTS - LEASE REJECTION CALCULATION
### 3/10/2009 through 1/31/2022

*LEASE REJECTION CLAIM - INCLUDING SCHEDULED BASE RENT INCREASES*

|    | | BASE RENT | CAM | RE TAX | INS | SALES TAX | TOTAL RENT |
|----|------------|-----------|----------|----------|----------|----------|------------|
|    | 3/11/2009  | 52,297.19 | 3,562.48 | 5,255.56 | 1,192.66 | 3,738.47 | 66,046.37 |
| 1  | 4/1/2009   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 2  | 5/1/2009   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 3  | 6/1/2009   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 4  | 7/1/2009   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 5  | 8/1/2009   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 6  | 9/1/2009   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 7  | 10/1/2009  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 8  | 11/1/2009  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 9  | 12/1/2009  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 10 | 1/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 11 | 2/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 12 | 3/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 13 | 4/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 14 | 5/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 15 | 6/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 16 | 7/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 17 | 8/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 18 | 9/1/2010   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 19 | 10/1/2010  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 20 | 11/1/2010  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 21 | 12/1/2010  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 22 | 1/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 23 | 2/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 24 | 3/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 25 | 4/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 26 | 5/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 27 | 6/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 28 | 7/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 29 | 8/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 30 | 9/1/2011   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 31 | 10/1/2011  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 32 | 11/1/2011  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 33 | 12/1/2011  | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 34 | 1/1/2012   | 77,200.62 | 5,258.90 | 7,758.21 | 1,760.59 | 5,518.70 | 97,497.02 |
| 35 | 2/1/2012   | +10% 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 36 | 3/1/2012   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 37 | 4/1/2012   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 38 | 5/1/2012   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 39 | 6/1/2012   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 40 | 7/1/2012   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 41 | 8/1/2012   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 42 | 9/1/2012   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 43 | 10/1/2012  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 44 | 11/1/2012  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 45 | 12/1/2012  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 46 | 1/1/2013   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 47 | 2/1/2013   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 48 | 3/1/2013   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 49 | 4/1/2013   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 50 | 5/1/2013   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 51 | 6/1/2013   | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |

## 19TH STREET INVESTORS, INC.
### FUTURE CIRCUIT CITY RENTS - LEASE REJECTION CALCULATION
### 3/10/2009 through 1/31/2022

|     |           | BASE RENT | CAM | RE TAX | INS | SALES TAX | TOTAL RENT |
|-----|-----------|-----------|-----|--------|-----|-----------|------------|
| 52  | 7/1/2013  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 53  | 8/1/2013  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 54  | 9/1/2013  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 55  | 10/1/2013 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 56  | 11/1/2013 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 57  | 12/1/2013 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 58  | 1/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 59  | 2/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 60  | 3/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 61  | 4/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 62  | 5/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 63  | 6/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 64  | 7/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 65  | 8/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 66  | 9/1/2014  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 67  | 10/1/2014 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 68  | 11/1/2014 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 69  | 12/1/2014 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 70  | 1/1/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 71  | 2/1/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 72  | 3/2/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 73  | 4/2/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 74  | 5/2/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 75  | 6/2/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 76  | 7/2/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 77  | 8/2/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 78  | 9/2/2015  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 79  | 10/2/2015 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 80  | 11/2/2015 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 81  | 12/2/2015 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 82  | 1/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 83  | 2/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 84  | 3/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 85  | 4/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 86  | 5/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 87  | 6/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 88  | 7/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 89  | 8/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 90  | 9/1/2016  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 91  | 10/1/2016 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 92  | 11/1/2016 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 93  | 12/1/2016 | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 94  | 1/1/2017  | 84,920.68 | 5,258.90 | 7,758.21 | 1,760.59 | 5,981.90 | 105,680.28 |
| 95  | 2/1/2017  | +10% 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 96  | 3/1/2017  | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 97  | 4/1/2017  | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 98  | 5/1/2017  | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 99  | 6/1/2017  | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 100 | 7/1/2017  | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 101 | 8/1/2017  | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 102 | 9/1/2017  | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 103 | 10/1/2017 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 104 | 11/1/2017 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 105 | 12/1/2017 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |

## 19TH STREET INVESTORS, INC.
## FUTURE CIRCUIT CITY RENTS - LEASE REJECTION CALCULATION
### 3/10/2009 through 1/31/2022

| | | BASE RENT | CAM | RE TAX | INS | SALES TAX | TOTAL RENT |
|---|---|---|---|---|---|---|---|
| 106 | 1/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 107 | 2/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 108 | 3/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 109 | 4/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 110 | 5/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 111 | 6/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 112 | 7/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 113 | 8/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 114 | 9/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 115 | 10/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 116 | 11/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 117 | 12/1/2018 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 118 | 1/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 119 | 2/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 120 | 3/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 121 | 4/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 122 | 5/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 123 | 6/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 124 | 7/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 125 | 8/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 126 | 9/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 127 | 10/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 128 | 11/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 129 | 12/1/2019 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 130 | 1/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 131 | 2/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 132 | 3/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 133 | 4/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 134 | 5/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 135 | 6/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 136 | 7/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 137 | 8/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 138 | 9/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 139 | 10/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 140 | 11/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 141 | 12/1/2020 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 142 | 1/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 143 | 2/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 144 | 3/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 145 | 4/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 146 | 5/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 147 | 6/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 148 | 7/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 149 | 8/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 150 | 9/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 151 | 10/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 152 | 11/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 153 | 12/1/2021 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| 154 | 1/1/2022 | 93,412.75 | 5,258.90 | 7,758.21 | 1,760.59 | 6,491.43 | 114,681.88 |
| | | 13,377,124.21 | 813,433.08 | 1,200,019.90 | 272,323.52 | 939,774.04 | 16,602,674.75 |

15%
2,490,401.21

| | |
|---|---|
| 1 yr current rent | 1,169,964.23 |
| 3 yrs current rent | 3,509,892.69 |