# **<u>EXHIBIT B</u>**

COPY

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA | PROOF OF CLAIM |

**Debtor against which claim is asserted:** (Check only **one** box below):

| | | |
|---|---|---|
| ☒ Circuit City Stores, Inc. (Case No. 08-35653) | ☐ CC Distribution Company of Virginia, Inc. (Case No. 08-35659) | ☐ Abbott Advertising, Inc. (Case No. 08-35665) |
| ☐ Circuit City Stores West Coast, Inc. (Case No. 08-35654) | ☐ Circuit City Stores PR, LLC (Case No. 08-35660) | ☐ Mayland MN, LLC (Case No. 08-35666) |
| ☐ InterTAN, Inc. (Case No. 08-35655) | ☐ Circuit City Properties, LLC (Case No. 08-35661) | ☐ Patapsco Designs, Inc. (Case No. 08-35667) |
| ☐ Ventoux International, Inc. (Case No. 08-35656) | ☐ Orbyx Electronics, LLC (Case No. 08-35662) | ☐ Sky Venture Corporation (Case No. 08-35668) |
| ☐ Circuit City Purchasing Company, LLC (Case No. 08-35657) | ☐ Kinzer Technology, LLC (Case No. 08-35663) | ☐ XSStuff, LLC (Case No. 08-35669) |
| ☐ CC Aviation, LLC (Case No. 08-35658) | ☐ Courchevel, LLC (Case No. 08-35664) | ☐ PRAHS, Inc. (Case No. 08-35670) |

**NOTE:** *This form should not be used to make a claim for administrative expenses arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503(a).*

| | |
|---|---|
| **Name of Creditor** (the person or other entity to whom the debtor owes money or property):<br>CP NORD DU LAC JV, LLC | ☐ Check this box to indicate that this claim amends a previously filed claim.<br>**Court Claim Number:** _____<br>*(If known)*<br>Filed on: _____ |
| **Name and address where notices should be sent:**<br>CP NORD DU LAC JV, LLC<br>c/o Heather A. Lee<br>Burr & Forman LLP<br>420 N. 20th Street, Suite 3400<br>Birmingham, AL 35203          Telephone number: (205) 251-3000 | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| **Name and address where payment should be sent** (if different from above):<br><br>Telephone number: | ☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**          $    974,851.79 | **5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount. |
| If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4. | |
| If all or part of your claim is entitled to priority, complete item 5. | Specify the priority of the claim. |
| ☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:**  Rejection of Lease<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4) |
| **3. Last four digits of any number by which creditor identifies debtor:** _____ | |
| **3a. Debtor may have scheduled account as:** _____<br>(See instruction #3a on reverse side.) | ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5). |
| **4. Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br>**Nature of property or right of setoff:** ☐ Real Estate   ☐ Motor Vehicle   ☐ Other<br>Describe:<br>**Value of Property:** $_____ **Annual Interest Rate** ____%<br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br>if any: $_____ **Basis for perfection:** _____<br>**Amount of Secured Claim:** $_____ **Amount Unsecured:** $_____ | ☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).<br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).<br>☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(__).<br>**Amount entitled to priority:**<br>$_____ |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | |
| **7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br>If the documents are not available, please explain: | *Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment |

| | |
|---|---|
| **Date:** 1-28-2009 | **Signature:** the person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>_[signature]_<br>Attorney for CP NORD DU LAC JV, LLC |

FOR COURT USE ONLY
RECEIVED
FEB 02 2009
KURTZMANCARSONCONSULTANTS

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

COPY

**CP NORD DU LAC JV, LLC**
**Circuit City Stores, Inc.**
Lease Rejection Damages Calculation

|  | ANNUAL CHARGES | TOTAL CHARGED OVER LEASE TERM |
|---|---|---|
| Minimum Rent |  |  |
| Years 1-5 | $304,500.00 | $1,522,500.00 |
| Years 6-10 | $324,800.00 | $1,624,000.00 |
| Years 11-15 | $345,100.00 | $1,725,500.00 |
|  |  |  |
| TOTAL MINIMUM RENT |  | $4,872,000.00 |
|  |  |  |
| Additional Charges (based on 20,300 square feet) |  |  |
|  |  |  |
| Common Area Maintenance ($1.50/square foot) |  |  |
| Partial First Year | $10,150.00 |  |
| Year 1 | $30,450.00 ^ |  |
| Year 2 | $31,363.50 ^ |  |
| Year 3 | $32,304.41 ^ |  |
| Year 4 | $33,273.54 ^ |  |
| Year 5 | $34,271.74 ^ |  |
| Year 6 | $35,299.90 ^ |  |
| Year 7 | $36,358.89 ^ |  |
| Year 8 | $37,449.66 ^ |  |
| Year 9 | $38,573.15 ^ |  |
| Year 10 | $39,730.34 ^ |  |
| Year 11 | $40,922.25 ^ |  |
| Year 12 | $42,149.92 ^ |  |
| Year 13 | $43,414.42 ^ |  |
| Year 14 | $44,716.85 ^ |  |
| Year 15 | $46,058.36 ^ |  |
| Total Common Area Maintenance |  | $576,486.93 |
|  |  |  |
| Insurance Cost ($0.45/square foot) | $9,135.00 * | $137,025.00 |
|  |  |  |
| Taxes ($1.50/square foot) | $30,450.00 * | $456,750.00 |
|  |  |  |
| Tenant's Contribution to CDD Levy ($1.50/square foot) | $30,450.00 * | $456,750.00 |
|  |  |  |
| TOTAL ADDITIONAL CHARGES |  | $1,050,525.00 |
|  |  |  |
| Total Charges Due Under the Lease |  | $6,499,011.93 |
|  |  |  |
| FIFTEEN PERCENT (15%) OF THE TOTAL CHARGES DUE UNDER THE LEASE |  | $974,851.79 |

^ Amounts based on 3% annual increase provided in lease.
* Amounts based on initial costs in lease.

COVINGTON, LA



**LEASE AGREEMENT**

by and between

**CP NORD DU LAC JV, LLC**

as Landlord

and

**CIRCUIT CITY STORES, INC.**

as Tenant

**COLONIAL PINNACLE NORD du LAC SHOPPING CENTER**

Table of Contents

Page

ARTICLE I       FUNDAMENTAL LEASE PROVISIONS ........................................................ 1
        Section 1.01     Definitions: ..................................................................................... 1
ARTICLE II      LEASE OF PREMISES - TERM OF LEASE............................................. 4
        Section 2.01     Demise ............................................................................................ 4
        Section 2.02     Extension Periods............................................................................ 4
        Section 2.03     Commencement Date and Landlord Reimbursement ........................ 5
        Section 2.04     Possession Date............................................................................... 5
        Section 2.05     Expected Possession Date................................................................ 6
        Section 2.06     Possession Date During Slack Delivery Period ................................ 7
        Section 2.07     Delayed Possession ......................................................................... 7
        Section 2.08     Early Entry ...................................................................................... 7
        Section 2.09     Measurement.................................................................................... 7
        Section 2.10     Commencement Date Agreement ..................................................... 8
        Section 2.11     Tenant's Permits Contingency ......................................................... 8
        Section 2.12     Rule Against Perpetuities Savings Clause ........................................ 8
ARTICLE III     INITIAL CONSTRUCTION ...................................................................... 9
        Section 3.01     Landlord's and Tenant's Work ......................................................... 9
ARTICLE IV      RENT....................................................................................................... 9
        Section 4.01     Annual Minimum Rent .................................................................... 9
        Section 4.02     Additional Rent................................................................................ 9
        Section 4.03     Rent; Method of Payment ................................................................ 9
ARTICLE V      COMMON AREA MAINTENANCE AND COST ...................................... 10
        Section 5.01     Maintenance................................................................................... 10
        Section 5.02     Construction Clean-up and Post-Possession Work........................... 10
        Section 5.03     CAM Costs..................................................................................... 11
        Section 5.04     Tenant's Share of CAM Costs ........................................................ 11
        Section 5.05     Payment of CAM Costs .................................................................. 11
        Section 5.06     CAM Costs Increases...................................................................... 11
ARTICLE VI      TAXES.................................................................................................... 12
        Section 6.01     Taxes.............................................................................................. 12
        Section 6.02     Payment of Taxes........................................................................... 12
        Section 6.03     Exclusions from Taxes.................................................................... 12

Table of Contents
(continued)

| | | Page |
|---|---|---|
| Section 6.04 | Right to Contest | 12 |
| Section 6.05 | Tenant's Contribution Towards Payment of CDD Levy | 13 |
| ARTICLE VII | UTILITIES | 13 |
| Section 7.01 | Utilities | 13 |
| Section 7.02 | Interruption | 13 |
| ARTICLE VIII | USE OF PREMISES | 14 |
| Section 8.01 | Permitted Use | 14 |
| Section 8.02 | Conduct of Operations | 14 |
| Section 8.03 | Leasing Restrictions | 14 |
| Section 8.04 | Tenant's Exclusive | 14 |
| Section 8.05 | Exclusives Applicable To Tenant | 16 |
| Section 8.06 | Key Tenants | 16 |
| ARTICLE IX | REPAIRS | 17 |
| Section 9.01 | Landlord Obligations | 17 |
| Section 9.02 | Tenant's Obligations | 17 |
| Section 9.03 | Hazardous Materials | 18 |
| Section 9.04 | Surrender of the Premises | 20 |
| ARTICLE X | REQUIREMENTS OF LAW | 20 |
| Section 10.01 | Landlord's Obligations | 20 |
| Section 10.02 | Tenant's Obligations | 20 |
| Section 10.03 | Right to Contest | 20 |
| ARTICLE XI | INSURANCE | 20 |
| Section 11.01 | Landlord's Insurance | 20 |
| Section 11.02 | Tenant's Insurance | 21 |
| Section 11.03 | Insurance Requirements Generally | 22 |
| Section 11.04 | Landlord's Insurance Cost | 22 |
| Section 11.05 | Indemnity | 23 |
| Section 11.06 | Mutual Waiver of Subrogation | 23 |
| Section 11.07 | Affiliate | 24 |
| ARTICLE XII | DAMAGE OR DESTRUCTION | 24 |
| Section 12.01 | Landlord's Obligation to Rebuild | 24 |

Table of Contents
(continued)

|  |  | Page |
|---|---|---|
| Section 12.02 | Tenant's Obligation to Rebuild | 24 |
| Section 12.03 | Termination | 24 |
| ARTICLE XIII | CONDEMNATION | 26 |
| Section 13.01 | Taking | 26 |
| Section 13.02 | Restoration and Rent Adjustment | 26 |
| Section 13.03 | Award | 26 |
| ARTICLE XIV | ALTERATIONS AND MECHANICS' LIENS | 27 |
| Section 14.01 | Tenant's Alteration Rights | 27 |
| Section 14.02 | Mechanics' Liens | 28 |
| ARTICLE XV | SIGNS | 28 |
| Section 15.01 | Tenant's Signs | 28 |
| Section 15.02 | Pylon Signs | 28 |
| Section 15.03 | Replacement | 29 |
| ARTICLE XVI | TENANT'S PROPERTY | 29 |
| Section 16.01 | Tenant's Property | 29 |
| ARTICLE XVII | ASSIGNMENT AND SUBLETTING | 29 |
| Section 17.01 | Assignment and Subletting Rights | 29 |
| Section 17.02 | Collateral Assignment | 30 |
| Section 17.03 | Cure Rights of Original Tenant | 30 |
| Section 17.04 | Recognition Agreement | 30 |
| ARTICLE XVIII | DEFAULT | 30 |
| Section 18.01 | Tenant's Default | 30 |
| Section 18.02 | Additional Landlord Remedies Due to Construction Delays by Tenant | 32 |
| Section 18.03 | Landlord's Default | 33 |
| Section 18.04 | Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord | 34 |
| Section 18.05 | Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement | 35 |
| Section 18.06 | Waiver; Non-Exclusive Remedies | 35 |
| ARTICLE XIX | SUBORDINATION, TRANSFER OF INTEREST | 36 |
| Section 19.01 | Subordination | 36 |

Table of Contents
(continued)

|  |  |  | Page |
|---|---|---|---|
| Section 19.02 | Existing Mortgages and Ground Leases | | 36 |
| Section 19.03 | Transfer of Interest | | 37 |
| Section 19.04 | Tenant Estoppel Certificates | | 37 |
| Section 19.05 | Landlord Estoppel Certificates | | 37 |
| Section 19.06 | Payments | | 37 |
| ARTICLE XX | LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS | | 38 |
| Section 20.01 | Quiet Enjoyment | | 38 |
| Section 20.02 | Representations, Warranties and Covenants | | 38 |
| Section 20.03 | Site Covenants | | 40 |
| Section 20.04 | OEA | | 40 |
| ARTICLE XXI | HOLDING OVER | | 40 |
| Section 21.01 | Holding Over | | 40 |
| ARTICLE XXII | NOTICE | | 41 |
| Section 22.01 | Where and How Given | | 41 |
| Section 22.02 | When Given | | 42 |
| ARTICLE XXIII | MISCELLANEOUS | | 42 |
| Section 23.01 | Rent Proration | | 42 |
| Section 23.02 | Construction | | 42 |
| Section 23.03 | Section Headings | | 42 |
| Section 23.04 | Partial Invalidity | | 42 |
| Section 23.05 | Waiver | | 42 |
| Section 23.06 | Governing Law | | 42 |
| Section 23.07 | Successors and Assigns | | 43 |
| Section 23.08 | No Broker | | 43 |
| Section 23.09 | Memorandum of Lease | | 43 |
| Section 23.10 | Entire Agreement | | 43 |
| Section 23.11 | Relationship of Parties | | 43 |
| Section 23.12 | Force Majeure | | 43 |
| Section 23.13 | Limitation of Landlord's Liability | | 43 |
| Section 23.14 | Limitation of Tenant's Liability | | 44 |

Table of Contents
(continued)

| | | Page |
|---|---|---|
| Section 23.15 | Consents | 44 |
| Section 23.16 | Costs | 44 |
| Section 23.17 | Attorneys' Fees | 44 |
| Section 23.18 | Survival of Obligations | 44 |
| Section 23.19 | Joint and Several Liability | 45 |
| Section 23.20 | Definition of Hereunder, Herein, etc. | 45 |
| Section 23.21 | Tenant's Trade Name | 45 |
| Section 23.22 | Counterparts | 45 |

## EXHIBITS

| | |
|---|---|
| EXHIBIT A | Site Plan |
| EXHIBIT B | Legal Description of the Shopping Center |
| EXHIBIT C | Site Design Requirements |
| EXHIBIT C-1 | Possession Date Notice |
| EXHIBIT D | W-9 Form |
| EXHIBIT E | Commencement Date and Expiration Date Agreement |
| EXHIBIT F | Prohibited Uses |
| EXHIBIT G | Reserved |
| EXHIBIT H | Existing Exclusives |
| EXHIBIT I | Recognition Agreement |
| EXHIBIT J | Subordination, Non-Disturbance and Attornment Agreement |
| EXHIBIT K | Permitted Exceptions |
| EXHIBIT L | Memorandum of Lease |
| EXHIBIT M | Indemnity Agreement |
| EXHIBIT N | Pylon Sign Rendering |
| EXHIBIT O | Landlord's Construction Rules and Regulations |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease"), dated as of the 31st day of January, 2008 ("Effective Date"), by and between **CP NORD DU LAC JV, LLC,** a Delaware limited liabilitly company, ("Landlord") with an office at 2101 6th Avenue North, Suite 750, Birmingham, AL 35203, and **CIRCUIT CITY STORES, INC.,** a Virginia corporation ("Tenant") with an office at 9950 Mayland Drive, Richmond, Virginia 23233.

## W I T N E S S E T H:

In consideration of the rents and covenants set forth in this Lease, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises (as defined in Section 1.01(P)) upon the following terms and conditions:

### ARTICLE I

### FUNDAMENTAL LEASE PROVISIONS

SECTION 1.01  Definitions:

A.    **Additional Charges:**

1.    Initial CAM Costs:  One and 50/100 Dollars ($1.50) per square foot of Floor Area (as defined below)

2.    Estimated Initial Insurance Cost: Forty-Five  Cents ($0.45) per square foot of Floor Area.

3.    Initial Taxes: One and 50/100 Dollars ($ 1.50) per square foot of Floor Area.

4.    Tenant's Contribution Towards Payment of CDD Levy:  One and 50/100 Dollars ($ 1.50) per square foot of Floor Area.

B.    **Alternative Rent:**  An amount equal to fifty percent (50%) of the Annual Minimum Rent (as defined below) that would have otherwise been due during the period of time that Tenant is entitled to pay Alternative Rent.

C.    **Annual Minimum Rent** (subject to adjustment pursuant to Section 2.09):

| Period | Rent p.s.f. | Annual Rent | Monthly Installments |
|---|---|---|---|
| Initial Lease Term: | | | |
| Commencement Date through end of fifth (5th) Lease Year (as defined in Section 1.01(J)) | $15.00 | $304,500.00 | $25,375.00 |

| | | | |
|---|---|---|---|
| Lease Year 6 through end of Lease Year 10 | $16.00 | $324,800.00 | $27,066.67 |
| Lease Year 11 through end of Lease Year 15 | $17.00 | $345,100.00 | $28,758.33 |
| 1st Extension Period (as defined in Section 1.01(F)): | $18.00 | $365,400.00 | $30,450.00 |
| 2nd Extension Period: | $19.00 | $385,700.00 | $32,141.67 |

D.   **Broker:** Millennium Retail Partners, LLC.

E.   **Delivery Dates:**   1.    Anticipated Possession Date: April 13, 2009

                               2.    Outside Possession Date: May 18, 2009.

F.   **Extension Periods:** Two (2) periods of five (5) years each.

G.   **Floor Area:** The actual number of square feet of space contained on all floors within any building area in a particular leased premises (including the Premises) within the Shopping Center (as defined below), or in the Shopping Center, as applicable. All measurements shall be from the exterior of outside walls or store front and/or to the centerline of any common walls, but in no event shall Floor Area include any non-selling or storage space areas within any mezzanine, lower floor, second floor or, except as set forth above, any exterior areas.

H.   **Initial Lease Term:** Fifteen (15) Lease Years, plus the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

I.   **Key Tenants:** Kohl's; Barnes & Noble, Border's or Books-A-Million; Dillards; and Dick's, or comparable tenants in Circuit City's reasonable business judgment and other retailers commonly found in first class shopping centers.

J.   **Lease Year:** Each period within the Term (as defined below) commencing on February 1 and ending the next succeeding January 31, except that Lease Year 1 shall include the partial Lease Year commencing on the Commencement Date and ending on the January 31 immediately thereafter.

K.   **Minimum Ongoing Cotenancy Percentage:** Retail tenants, open for business during normal business hours, occupying at least fifty percent (50%) of the Floor Area of the Shopping Center, exclusive of the premises occupied by the Key Tenants and the Premises.

L.   **Minimum Initial Cotenancy Percentage:** Retail tenants, open for business during normal business hours, occupying at least fifty percent (50%) of the Floor Area of the

Shopping Center, exclusive of the premises occupied by the Key Tenants and the Premises.

M. **Minimum Parking Ratios:** Within the entire Shopping Center: Four and one-half (4.5) full-size parking spaces for each one thousand (1,000) square feet of Floor Area in the Shopping Center; in addition, Landlord covenants that there will be at least one hundred (100) full-size parking spaces within Tenant's Preferred Area (as defined in Section 2.01(b)), ; each parking space referred to hereinabove shall be at least nine (9) feet in width and eighteen (18) feet in length and for full-sized automobiles.

N. **Opening Requirement:** All of the Key Tenants are open for business and the Minimum Initial Cotenancy Percentage is met.

O. **Permitted Use:** The sale, rental, installation, servicing and repairing of consumer, office and automotive electronics products (collectively, the "Products"); and/or for any other lawful retail use not specifically prohibited by the provisions of Section 8.01. The term "Products" shall include, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; furniture and appliances (including, without limitation, household appliances such as, by way of example only, ovens, refrigerators, freezers, dishwashers, washers, dryers, microwave ovens, toasters and blenders), and technological evolutions of the foregoing.

P. **Premises:** The store building to be constructed by Tenant as part of Tenant's Work (as defined in Section 3.01), containing approximately 20,300 square feet of Floor Area, including  140 feet of frontage, as crosshatched on the site plan attached hereto as Exhibit A (the "Site Plan"), in the shopping center known as Colonial Pinnacle Nord du Lac Shopping Center, containing approximately 899,000 square feet of Floor Area and located at the corner of I-12 and Hwy 21 in Covington, Louisiana (the "State"), as more particularly described in Exhibit B (the "Shopping Center").

Q. **Slack Delivery Period:** Periods of time beginning on May 5 and ending on the following July 5, and November 1 and ending on the following March 1.

R. **Slack Season:** The period of time beginning on November 1st and ending on the following January 1.

S. **Tenant' s Share:** A fraction, the numerator of which shall be the Floor Area of the Premises and the denominator of which shall be the Floor Area of all buildings in the Shopping Center. In no event shall the denominator of the fraction by which Tenant's Share is determined be less than ninety percent (90%) of the Floor Area of the building areas shown on the Site Plan.

T. **Term:** The Initial Lease Term plus the Extension Periods, if the option for any such Extension Period is exercised.

# ARTICLE II

## LEASE OF PREMISES - TERM OF LEASE

SECTION 2.01 <u>Demise</u>.

(a)     Landlord does hereby lease and demise to Tenant, and Tenant does hereby hire from Landlord, the Premises, together with the licenses, rights, privileges and easements appurtenant to the Premises; provided, however, that in the event Landlord has not acquired title to the Shopping Center on or before January 1, 2009, Landlord may terminate this Lease by giving written notice of such termination to Tenant on or before January 10, 2009, whereupon this Lease shall have no further force or effect and neither party shall have any further liabilities or obligations one to the other hereunder.

(b)     Tenant and its employees, invitees, agents, customers, concessionaires and licensees shall have the nonexclusive right, in common with Landlord and other tenants and other occupants of the Shopping Center, to use all Shopping Center sidewalks, paved parking areas, paved service areas, signs, traffic controls, lighting and all means of ingress, egress, acceleration, deceleration and stacking lanes and circulation for the aforesaid parking and service areas of the Shopping Center to and from public streets and roads bordering the Shopping Center (collectively, the "<u>Common Areas</u>") now or hereafter made available or maintained by Landlord in the Shopping Center. Tenant's right to use the Common Areas may be subject to such reasonable regulations (consistent with Tenant's rights under this Lease) as may from time to time be imposed upon, and equally applicable to, all tenants of the Shopping Center by Landlord or its agents. Landlord shall provide Tenant with at least sixty (60) days prior notice of any such rules and regulations, which notice shall contain a copy of such rules and regulations.

(c)     Tenant shall have the exclusive right to use, on a "24 hour a day", "365 days a year" basis and without any additional charge, the loading facilities serving the Premises, the customer pick-up area, car stereo parking areas, four (4) web order customer pick-up parking spaces, trash compactor area and transformer pad area (collectively, the "<u>Other Improvements</u>"), all as shown on the Site Plan. Tenant shall have the right to erect a sign identifying Tenant's customer pick-up area and/or Tenant's car stereo parking areas and Tenant shall also have the right to erect signage, stripe, and print on the four (4) web order customer pick-up parking spaces in order to so identify such parking spaces. In addition, Tenant shall have the right to have a truck or other vehicle parked in "Tenant's Preferred Area" as shown on the Site Plan ("<u>Tenant's Preferred Area</u>"), for up to seven (7) consecutive days in duration for each occurrence, for the purpose of promoting and displaying merchandise (each occurrence up to seven (7) days in duration is referred to as a "<u>Tenant Promotion</u>"). Tenant may have up to six (6) Tenant Promotions during Lease Year 1, and up to five (5) Tenant Promotions for each subsequent Lease Year.

SECTION 2.02 <u>Extension Periods</u>. Provided Tenant is not then in default of any material terms or provisions this Lease, after the lapse of all applicable grace periods, Tenant shall have the option to extend the Term for the number of Extension Periods shown in Section 1.01(F), upon all the terms and conditions contained in this Lease. Each such option is exercisable by Tenant giving notice to Landlord (a) at least one hundred eighty (180) days prior

to the expiration of the Initial Lease Term, or of the preceding Extension Period, as the case may be, or (b) if Tenant fails to give Landlord such notice, then within twenty (20) days after receipt of notice from Landlord that Tenant has failed to exercise its option to extend within the time period provided in (a) above.

SECTION 2.03 Commencement Date and Landlord Reimbursement. "Commencement Date" shall mean the date on which Landlord makes payment of the Landlord Reimbursement in accordance with this Lease. "Landlord Reimbursement" shall mean the product obtained by multiplying Sixty Dollars ($60.00) by the Floor Area of the Premises as determined by the Floor Area Certification (as defined below). Upon Substantial Completion (as defined in the site design requirements attached hereto as Exhibit C ["Site Design Requirements"]) and Tenant's furnishing to Landlord (a) the certificates of insurance required under Article 11, (b) an indemnity in the form of Exhibit M attached to this Lease with respect to mechanics' liens arising out of Tenant's construction, and (c) a square footage building perimeter survey certified to Tenant and Landlord (the "Floor Area Certification"), Landlord shall pay to Tenant the Landlord Reimbursement. The Landlord Reimbursement shall be payable by wire transfer of funds by Landlord to Tenant's account no later than thirty (30) days after Substantial Completion and receipt of items (a), (b) and (c) above. However, if the Commencement Date shall occur during the Slack Season or prior to the date on which the Opening Requirement is met, and Tenant elects to delay the opening of its store, then, notwithstanding that the Commencement Date shall have occurred, Rent (as defined in Section 4.03) shall fully abate until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met. However, if Tenant elects, at its discretion, to open for business during the Slack Season or prior to the date that the Opening Requirement is met, then Tenant shall pay, in lieu of Annual Minimum Rent, Alternative Rent until the later to occur of (i) the first (1st) day following the end of the Slack Season, or (ii) the date on which the Opening Requirement is met. In no event shall Tenant's election to delay opening its store in any way delay or modify the date on which the Landlord Reimbursement is required to be paid by Landlord to Tenant. Upon Substantial Completion and payment of the Landlord Reimbursement from Landlord to Tenant, Landlord shall be the owner of the Building (as defined in the Site Design Requirements, but not including any of Tenant's Property, as defined in Section 16.01) and Landlord shall be entitled to depreciate the Building for tax purposes. Tenant shall have the right to deliver to Landlord, a bill of sale evidencing the conveyance of the Building from Tenant to Landlord. Landlord shall also have the right to require Tenant to deliver to Landlord such a bill of sale. However, the conveyance of the Building shall be deemed to have occurred notwithstanding that a bill of sale was not so delivered.

SECTION 2.04 Possession Date. "Possession Date" shall mean the date on which the last of the following conditions shall have been satisfied:

(a)     Landlord shall have caused the Delivery of the Land (as defined in the Site Design Requirements) to occur;

(b)     Landlord shall have delivered the soils engineer's and surveyor's certifications as required by Circuit City's Specifications (as defined in the Site Design Requirements);

(c)      Landlord shall have delivered to Tenant (and Tenant shall have approved, in its reasonable discretion) a current ALTA survey of the Shopping Center and a current title commitment covering the Shopping Center (the term "current" meaning dated as of a date no earlier than three (3) months prior to the Possession Date);

(d)      Landlord shall have delivered to Tenant (and Tenant shall have approved in its reasonable discretion, but subject to the terms of Section 20.04 below) cross-access easement agreements executed and recorded as necessary to allow access and parking over all of the Common Area, notwithstanding that Landlord may have sold portions of the Shopping Center;

(e)      The representations and warranties of Landlord set forth in Sections 9.03 and 20.02 below shall then be true and in effect in all material respects, and Landlord shall not then be in violation of any of the Site Covenants (as defined in Section 20.03);

(f)      Landlord shall have delivered to Tenant a fully-executed original counterpart of a non-disturbance and/or recognition agreement, as applicable, from each Mortgagee and Ground Lessor (as such terms are defined in Section 19.01), as more fully set forth in Section 19.02;

(g)      Landlord shall have entered into contracts of sale or leases with each of the Key Tenants for terms of at least ten (10) years each; and

(h)      Landlord shall have delivered to Tenant the W-9 form attached hereto as Exhibit D.

Landlord currently anticipates that the Possession Date will occur on the Anticipated Possession Date, subject to the provisions of Section 2.05 below.  In no event shall the Possession Date occur prior to the Expected Possession Date (as defined in Section 2.05).

SECTION 2.05  Expected Possession Date.

(a)      Landlord shall give Tenant no less than one hundred fifty (150) days notice of the date on which the Possession Date (including, without limitation, the Delivery of the Land) shall occur, using the form of Possession Date Notice attached hereto as Exhibit C-1 (the "Possession Date Notice").  The date specified in such notice shall be defined as the "Expected Possession Date".

(b)      If Landlord fails to accomplish the Possession Date by the Expected Possession Date (subject to Force Majeure, as defined in Section 23.12, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand Tenant's actual out-of-pocket costs that Tenant will incur as a result of any such delay, up to the sum of: Fifty Thousand Dollars ($50,000), plus an amount equal to two (2) days of Annual Minimum Rent for each day that the Possession Date is delayed.  If Landlord fails to complete any other element of Landlord's Work (as defined in Section 3.01) on or before the date required therefor in the Construction Schedule (as defined in the Site Design Requirements), subject to Force Majeure (but in no event shall the aggregate of any and all extensions as a result of a Force Majeure

delay(s) exceed a period of thirty (30) days), then Landlord shall pay to Tenant on demand, as a liquidated reimbursement (and not as a penalty) for all of the damages that Tenant will suffer as a result of any such delay, an amount equal to two (2) days of Annual Minimum Rent for each day that such component of Landlord's Work is delayed. The foregoing liquidated reimbursements represent the parties' good faith agreement as to an agreed upon amount which shall have been incurred by Tenant and which shall otherwise not be susceptible of exact ascertainment.

SECTION 2.06 <u>Possession Date During Slack Delivery Period</u>. Anything contained in this Lease to the contrary notwithstanding, if the Possession Date occurs during the Slack Delivery Period, then Tenant may refuse to accept the Premises. In that event, the Possession Date shall be delayed and shall not be deemed to occur until the first (1st) day following the end of the applicable Slack Delivery Period, subject to the other provisions of this Lease (including, without limitation, Sections 2.04 and 2.05).

SECTION 2.07 <u>Delayed Possession</u>. If the Possession Date does not occur before the Outside Possession Date (subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of thirty (30) days), then Tenant shall have the right to (a) terminate this Lease, or (b) delay opening its store facility for a period of not to exceed nine (9) months, which right shall be exercised by Tenant upon notice to Landlord at any time prior to the Possession Date. If Tenant terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, <u>except</u>: (i) for those obligations that expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable third-party costs and expenses incurred in connection with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000). If Tenant elects to delay opening its store facility, then Landlord shall cause the Possession Date (including, without limitation, the Delivery of the Land) to occur on the date subsequently required by Tenant, and Landlord shall pay to Tenant on demand an amount equal to all additional costs incurred by Tenant in the development of its store facility including, but not limited to, costs of materials and all engineering, architectural, legal fees, and costs of delay resulting from Landlord's failure to timely deliver.

SECTION 2.08 <u>Early Entry</u>. Any time prior to the Delivery of the Land, Tenant shall have the right to enter the Premises to (a) inspect the physical condition of the Land (as defined in the Site Design Requirements) and conduct its due diligence investigation of the Land to determine the suitability of the Land for Tenant's intended development, construction, use and operation and (b) inspect Landlord's Work; <u>provided</u>, <u>however</u>, that such entry may not unreasonably interfere with Landlord's Work. Such entry shall not be construed as an acceptance of the Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.

SECTION 2.09 <u>Measurement</u>. If the Floor Area Certification shall disclose that the Premises contains more or less than the Floor Area shown in Section 1.01(P), then Landlord and

Tenant agree to amend this Lease to adjust all Rent to account for the actual Floor Area of the Premises.

SECTION 2.10  Commencement Date Agreement.  When the Commencement Date has been determined, Landlord and Tenant shall execute a memorandum, in the form of Exhibit E, which shall expressly confirm the Commencement Date and the expiration date of the Initial Lease Term, and which shall also ratify and affirm all of the terms and provisions of this Lease.

SECTION 2.11  Tenant's Permits Contingency.

(a)    Anything contained in this Lease to the contrary notwithstanding, if the Permit Condition (as defined below) is not satisfied on or before April 13, 2009 (the "Permit Contingency Date"), then Tenant shall have the right (at its option) to terminate this Lease at any time thereafter and prior to the satisfaction of the Permit Condition.  Tenant agrees to use diligent efforts to satisfy the Permit Condition by the Permit Contingency Date; provided, however, the foregoing shall not be deemed to require Tenant to initiate litigation or agree to any commercially reasonable condition imposed upon the issuance of any Tenant's Permits (as defined below). "Permit Condition" shall mean the final and unconditional issuance of Tenant's Permits free and clear of any governmental ban, bar or moratorium and with all appeal periods having expired. "Tenant's Permits" shall mean any and all permits, approvals, licenses and the like necessary to perform Tenant's Work.

(b)    If the Permit Condition has not been satisfied within thirty (30) days after the Permit Contingency Date for any reason other than Landlord's failure to perform or observe any of its obligations under this Lease, then Landlord shall have the option to obtain same (upon terms reasonable to Tenant), at Landlord's cost except as to the permit fee, for sixty (60) days, failing which Landlord shall have the option, upon notice given to Tenant prior to the satisfaction of the Permit Condition, to terminate this Lease, provided, however, Tenant shall have the right to void Landlord's termination notice by giving notice to Landlord, within fifteen (15) days after receiving Landlord's termination notice, of Tenant's waiver of its rights under Section 2.11, whereupon Landlord's termination notice shall be rendered null and void.

(c)    If Tenant or Landlord terminates this Lease under this Section 2.11, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 2.12  Rule Against Perpetuities Savings Clause.  Notwithstanding the fact that the Term will commence at a date subsequent to the execution of this Lease by Landlord and Tenant, the parties intend that each shall have vested rights immediately upon the signing of this instrument and that this instrument shall be fully binding and in full force and effect from and after execution hereof.  In the event that the Term shall not have, in fact, commenced on or before December 31, 2010 (and if this Lease shall not theretofore have been canceled as herein permitted), then this Lease shall thereupon be automatically null and void and of no further force and effect, and neither party shall have any further obligation or liability hereunder, except for those obligations that expressly survive the expiration or other termination of this Lease.

## ARTICLE III

## INITIAL CONSTRUCTION

SECTION 3.01 Landlord's and Tenant's Work. Landlord shall perform Landlord's work in accordance with the Site Design Requirements and as otherwise required by this Lease ("Landlord's Work"). Tenant shall construct the Building and storefront sidewalk in accordance with the Site Design Requirements ("Tenant's Work") for which Landlord shall pay to Tenant the Landlord Reimbursement. Landlord and Tenant acknowledge receipt of the Site Design Requirements and each agrees to comply with the provisions thereof relating to their respective work. In connection with Tenant's performance of Tenant's Work and during any other periods of construction during the Term, Tenant shall have the right to use as a construction staging area approximately 20,000 square feet of the Common Areas in the location identified on the Site Plan as "Staging Area." Tenant agrees to comply with Landlord's construction rules and regulations attached hereto as Exhibit O.

## ARTICLE IV

## RENT

SECTION 4.01 Annual Minimum Rent. Commencing on the Commencement Date, Tenant shall pay to Landlord monthly installments of Annual Minimum Rent without setoff or deductions, except as otherwise provided for in this Lease, on the first (1st) day of each calendar month during the Term. However, if the Commencement Date occurs on a day other than the first (1st) day of a calendar month, then the monthly installment of Annual Minimum Rent and other charges shall be prorated for the remaining days of that calendar month. Anything contained in this Lease to the contrary notwithstanding, if Tenant shall be paying Alternative Rent, Ground Rent (as defined in Section 18.02(a)) or any other ground rent in lieu of Annual Minimum Rent as permitted under this Lease during such time as Tenant shall be entitled to an abatement, deduction from or setoff against Annual Minimum Rent, then Tenant shall be entitled to the same abatement, deduction from or setoff against Alternative Rent, Ground Rent or the other ground rent.

SECTION 4.02 Additional Rent. The term "Additional Rent" shall mean all amounts required to be paid by Tenant under this Lease other than Annual Minimum Rent. Wherever an item of Additional Rent is payable "on demand" or no time period for payment of an item of Additional Rent is specifically provided for in this Lease, such item of Additional Rent shall be paid by Tenant within thirty (30) days after Tenant's receipt of Landlord's invoice therefor, accompanied by the appropriate back-up documentation.

SECTION 4.03 Rent; Method of Payment. The term "Rent" shall mean, collectively, Annual Minimum Rent and Additional Rent. All payments of Rent shall be made by check payable to Landlord, mailed or delivered to the address listed in Section 22.01 or to such other person or place as Landlord shall designate by notice to Tenant, or by such other reasonable method of payment (such as by wire transfer).

# ARTICLE V

## COMMON AREA MAINTENANCE AND COST

SECTION 5.01 <u>Maintenance</u>. Landlord shall operate, maintain, insure, repair and replace the Common Areas or cause the same to be done in a manner so as to maintain the Shopping Center in good, first-class order, repair and condition. Without limiting the generality of the foregoing, Landlord shall be solely responsible, and Tenant shall have no obligation (except to reimburse Landlord for Tenant's Share of the cost thereof, as provided below), for the maintenance, repair or replacement of the parking areas (including, without limitation, any necessary repaving and restriping), parking lot lighting, utility systems and connections, access ways and other Common Areas and for the clearing of snow and ice from the Common Areas. Landlord may at any time, except between October 1 and January 1, close temporarily any Common Areas to make repairs, to prevent the acquisition of public rights therein or discourage non-customer parking. Between October 1 and January 1, Landlord may temporarily close parts of the Common Areas, but only to make repairs of an emergency nature. However, in any instance of such emergency repairs Landlord shall use all reasonable efforts to perform the necessary repairs in the most expeditious manner possible and in such a way and at such times as to cause the least interference possible with ingress and egress to and from the Premises. In order to reduce interference with Tenant's business operation during such period, Landlord shall effect temporary repairs, where feasible, and complete the permanent repairs after January 1.

SECTION 5.02 <u>Construction Clean-up and Post-Possession Work</u>. Following the Possession Date, any construction by Landlord or other tenants or occupants of the Shopping Center affecting any portion of the Shopping Center shall be subject to the following terms and conditions (in addition to any other applicable provisions of this Lease, such as, by way of example only, Section 20.03(g)):

      (a)    staging and storage of materials and parking of construction vehicles shall not occur in Tenant's Preferred Area;

      (b)    Landlord shall diligently ensure that, from and after Tenant's opening for business to the public, no ingress, egress or passage of any construction, delivery and related vehicles engaged in the performance of such work or other construction activities shall take place except through the entrance/exit drive designated as the "<u>Construction Drive</u>" on the Site Plan or a commercially reasonable substitute therefor in the event Landlord has reasonable need to relocate same;

      (c)    Landlord shall maintain the Shopping Center in a clean, safe, and sightly condition, and shall use reasonable efforts to ensure that such construction shall not materially adversely interfere with the normal conduct of any business operations in the Premises; and

      (d)    Landlord shall clear all rubble and debris from the Premises and Common Areas resulting from any construction by Landlord or any other tenant or occupant of the Shopping Center.

SECTION 5.03  CAM Costs.  "CAM Costs" shall mean the actual amount (without profit or "mark up" by Landlord or any Affiliate, as defined in Section 11.07, of Landlord) of all necessary, competitive and reasonable costs and expenses actually incurred by Landlord in operating, insuring and maintaining the Common Areas in an appropriate manner commensurate with good business practice and first-class shopping centers, and, in addition thereto, in lieu of any cost(s) or expense(s) relating to the administration and management of the Common Areas, an administrative fee (the "Administrative Fee") equal to five percent (5%) of the CAM Costs for the calendar year in question.

SECTION 5.04  Tenant's Share of CAM Costs and Insurance Costs.  Tenant shall pay to Landlord Tenant's Share of CAM Costs and Insurance Costs in each calendar year during the Term.  Tenant's Share of CAM Costs and Insurance Costs shall be appropriately prorated for partial calendar years at the beginning and at the end of the Term.  Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of CAM Costs in the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial CAM Costs, and in no event shall Tenant's Share of the  cost of Landlord's insurance obligations exceed the Estimated Initial Insurance Cost.

SECTION 5.05  Payment of CAM Costs and Insurance Costs.  Tenant's Share of CAM Costs and Insurance Costs shall be payable in equal monthly installments on the first (1st) day of each month.  Such monthly installments shall be at the rate of one-twelfth (1/12th) of Tenant's Share of CAM Costs and Insurance Costs for the preceding calendar year increased as set forth in Section 5.06 below.  Within ninety (90) days after the end of each calendar year, Landlord shall furnish Tenant with a detailed statement certified by an authorized representative of Landlord of the actual amount of insurance and utilities charges applicable to the Common Areas and of Tenant's Share thereof for the preceding calendar year (including the basis of allocation to Tenant).  Within thirty (30) days after receipt of such statement by Tenant, Tenant shall pay to Landlord any deficiency due.  Any surplus paid by Tenant shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  Landlord's records of the utilities component of CAM Costs and of  Common Area insurance costs for each year shall be available for inspection by Tenant for a period of three (3) years after Landlord notifies Tenant of Tenant's Share thereof for the year in question.  Tenant may, during such three (3) year period, upon ten (10) days' prior notice to Landlord, have an audit made of such insurance costs and utilities CAM Costs and the allocations thereof to Tenant including, without limitation, reviewing copies of paid bills and other records substantiating its expenditures ("CAM Records").  In addition, Landlord agrees to forward copies of CAM Records to Tenant or its representative within ten (10) days of a request therefor.  Any overcharges shown by any such audit shall, at Tenant's option, be credited against the next installment(s) of Rent or be refunded to Tenant forthwith.  If any such audit shows that Tenant's Share of Common Area insurance costs or the utilities component of CAM Costs have been overstated by more than three percent (3%), then Landlord shall immediately pay to Tenant the reasonable cost of such audit.

SECTION 5.06  CAM Costs Increases.  For all calendar years subsequent to the first (1st) full calendar year of the Term, Tenant's Share of CAM Costs shall increase from any calendar year to the immediately succeeding calendar year by three percent (3%), exclusive of costs of insurance and utilities.

## ARTICLE VI

## TAXES

SECTION 6.01 <u>Taxes</u>. Landlord shall pay when due all real estate taxes and assessments levied and assessed against the land, improvements and buildings comprising the Shopping Center. Except as hereinafter provided to the contrary, for each calendar year or part thereof during the Term, Tenant shall pay Tenant's Share of the net amount (after reflecting all discounts for early payment, refunds and credits and after excluding all penalties, interest, late charges and real estate taxes and assessments levied against free-standing buildings which are separately assessed) of all real estate taxes and assessments (collectively, "<u>Taxes</u>") levied and assessed against the land, improvements and buildings comprising the Shopping Center; the term "Taxes" shall specifically exclude levies of the Community Development District created pursuant to the Community Development District Act, Chapter 27_B of Title 33 of Louisiana Revised Statutes as amended. Tenant's Share of Taxes shall be equitably adjusted if the use or value of any portion (other than the Premises) of any buildings in the Shopping Center included in computing Tenant's allocation cause Taxes attributable to such buildings to be assessed at a disproportionately higher rate. Notwithstanding anything contained in this Lease to the contrary, in no event shall Tenant's Share of Taxes for the first (1st) full calendar year of the Term (including the prior partial year, if any) exceed the Initial Taxes.

SECTION 6.02 <u>Payment of Taxes</u>. Tenant shall be liable for and shall pay Tenant's Share of Taxes only with respect to Taxes accruing during the Term, regardless of when such Taxes are billed or become due and payable. Tenant's Share of Taxes shall be appropriately prorated for partial fiscal tax years at the beginning and at the end of the Term. Tenant shall pay Tenant's Share of Taxes (a) within thirty (30) days after Landlord submits to Tenant proof of payment of Taxes by Landlord, a tax bill for such Taxes and a statement setting forth the manner in which Tenant's Share of Taxes is calculated, or (b) ten (10) days before the same are due and payable, whichever is later.

SECTION 6.03 <u>Exclusions from Taxes</u>. Notwithstanding anything contained in this Lease to the contrary with respect to betterments or other extraordinary or special assessments, Tenant's obligations shall apply only to the extent such assessments (and interest thereon) are payable in respect of the Term, and Tenant's Share of any such assessments shall be determined as if such assessments are payable in installments over the longest payment period permitted by law for the particular assessment, in which case Tenant shall pay only those installments payable in respect of the Term. Further, Taxes shall not include any: (i) income, excise, profits, estate, inheritance, succession, gift, transfer, franchise, capital, or other tax or assessment upon Landlord or upon the rentals payable under this Lease; (ii) taxes on rents (other than to the extent that such taxes are customarily paid by retail tenants in the State), gross receipts or revenues of Landlord from the Premises; or (iii) fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay, unless such late payment was solely attributable to late payment by Tenant of Tenant's Share of Taxes.

SECTION 6.04 <u>Right to Contest</u>. At Tenant's request, Landlord shall contest the amount or validity of any assessed valuation or Taxes, failing which Tenant may contest the assessed valuation or Taxes by appropriate proceedings conducted in good faith. If Tenant initiates such

contest, then Landlord shall cooperate with Tenant in a commercially reasonable manner, including, without limitation, executing any and all documents required in connection therewith and, if required by any governmental authority having jurisdiction, joining with Tenant in the prosecution thereof; provided, however, that Tenant shall appropriately bond such contest and shall not subject Landlord to any fines, expenses, or criminal liability. If any rebate or refund of Taxes is received as a result of any contest or otherwise, then Tenant shall be entitled to Tenant's Share thereof (after reasonable and customary expenses incurred by Landlord and/or Tenant in connection with such contest are paid to the party which incurred such expense). Tenant shall have the right to defer payment of Tenant's Share of Taxes during any such Tax contest if permitted under Laws (as defined in Section 10.01).

SECTION 6.05 Tenant's Contribution Towards Payment of CDD Levy. Anything hereinabove to the contrary notwithstanding, it is specifically understood and agreed that Tenant's obligation to pay to Landlord its proportionate share of all Taxes as set forth hereinabove does not include any payment with respect to "benefit special assessments" as provided for in connection with the Colonial Pinnacle Community Development District which is organized and existing under the provisions of Chapter 27-B of Title 33 of the Louisiana Revised Statutes of 1950, as amended (the "CDD Levy"). Commencing on the Commencement Date and continuing throughout the Initial Term of this Lease and all Extension Periods, Tenant shall pay to Landlord, a contribution towards Landlord's payment of the CDD Levy equal to One and Fifty One Hundredths Dollars ($1.50) per square foot per annum, payable monthly together with payments of Monthly Base Rent. At such time as the CDD Levy shall be discontinued, Tenant shall have no further obligation to make such a contribution towards Landlord's payment of the CDD Levy.

## ARTICLE VII

## UTILITIES

SECTION 7.01 Utilities. Landlord covenants and agrees that the Premises shall be properly serviced with gas, electric, telephone, water, sewer and other utilities sufficient to meet Tenant's requirements in accordance with the Site Design Requirements. Landlord, as part of Landlord's Work, shall cause all such utilities to the Premises to be separately metered at Landlord's sole cost and expense, but the cost of the meters themselves shall be a part of Tenant's Work. Tenant shall pay, as same become due and payable, all charges for utility services furnished to the Premises during the Term. If at any time during the Term, for any reason, Landlord shall provide utility service to the Premises, Tenant's cost for such utility service shall not exceed the lesser of (a) Landlord's actual cost for such utility service, or (b) the cost of the same service if Tenant had obtained such service directly from such utility provider. In addition, Tenant shall have the right to install a test meter to verify its utility usage. Notwithstanding anything contained in this Lease to the contrary, Tenant shall be entitled to select the utility service providers to the Premises including the telecommunication provider. Landlord shall permit full and free access to all available conduits in the Shopping Center for the applicable utility service subject to such reasonable requirements as Landlord may impose.

SECTION 7.02 Interruption. If utilities serving the Premises are disrupted due to the acts or omissions of Landlord, its agents, contractors, servants or employees, then Landlord shall

promptly restore the affected utilities at Landlord's sole cost and expense. If such disrupted utilities are not restored within twenty-four (24) hours after the Landlord has knowledge of such disruption and Tenant is unable to conduct its normal business in the Premises as a result of such disruption, then Rent shall be equitably abated during the period of disruption.

## ARTICLE VIII

## USE OF PREMISES

SECTION 8.01 Permitted Use. The Premises may be used and occupied for any Permitted Use. However, Tenant shall not use the Premises for any of the Prohibited Uses (as defined in Exhibit F) or in violation of the "Existing Exclusives" set forth in Exhibit H.

SECTION 8.02 Conduct of Operations. Subject to the other provisions of this Lease (including, without limitation, Article II), Tenant shall initially open its store for business to the public in the Premises for at least one (1) day, not later than the date (the "Outside Rent Start Date") which is August 1, 2010; provided, however, that the Outside Rent Start Date shall be extended on a day for day basis for each day past the Outside Possession Date that Landlord has failed to accomplish the Possession Date. Anything in this Lease to the contrary notwithstanding, provided Delivery of the Land occurs on or before the Anticipated Possession Date, Tenant shall use all commercially reasonable efforts to open for business at the Premises by October 1, 2009. Other than as expressly set forth in the preceding sentences, Tenant shall have no obligation to open or operate any business in the Premises, and shall have the right, at any time, to cease to conduct any business operations in the Premises, and Tenant shall incur no liability to Landlord by reason thereof.

SECTION 8.03 Leasing Restrictions. Landlord shall construct, lease, operate, maintain and manage the Shopping Center as a first-class shopping center comparable to other first-class shopping centers in the State. In that regard, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any portion of the Shopping Center for any of the Prohibited Uses. In addition, Landlord shall not lease, rent or occupy, or permit to be leased, rented or occupied, any building within three hundred (300) feet of the front entrance of the Premises for use as a restaurant. Upon any breach of the immediately preceding sentence in this Section 8.03(a), Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue.

SECTION 8.04 Tenant's Exclusive.

(a)    Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Shopping Center, or on any land owned or controlled by Landlord or any of its Affiliates within a one (1) mile radius of the Shopping Center during the Term ("Affiliated Land") for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products (except for furniture and appliances, which shall be permitted without restriction in the Shopping Center). The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a). "Incidental Sale" shall mean sales of the Products (except for furniture and appliances, which shall be permitted without restriction in the Shopping Center) in

the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such tenant's or occupant's, or Landlord's or any of its Affiliate's display area. The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(b)   The Exclusive Use Protection shall also not apply to a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Dillard's, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's, Belk, or Target), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) contain at least 80,000 square feet of Floor Area. The foregoing to the contrary notwithstanding, the Exclusive Use Protection shall not prohibit Landlord from selling or leasing space to one (1) cellular or wireless communications store and one (1) video game retailer within the Shopping Center such as GameStop, so long as neither such store is located within three hundred (300) feet of the Premises, nor shall it apply to any use in the "Lifestyle Center" portion of the Shopping Center as depicted on the Site Plan with respect to: (i) any premises containing 3,000 square feet or less (other than Radio Shack); (ii) any premises containing 5,000 square feet or less which are leased to electronics users which are National Tenants or Regional Tenants (other than Radio Shack); or (iii) any or all of the following stores of whatever size: Apple, Brookstone, Sharper Image, Sony, or Bose.

(c)   Upon any violation of the Exclusive Use Protection, Tenant may elect to pay Alternative Rent in lieu of Annual Minimum Rent for so long as such violation shall continue. If such breach shall continue for more than sixty (60) days, then Tenant shall have the right to terminate this Lease at any time thereafter, in which event the applicable provisions of Section 8.04(f) shall control.

(d)   However, if any tenant or other occupant of the Shopping Center violates the Exclusive Use Protection and such violation also constitutes a default under its lease with Landlord, then Tenant's right to pay Alternative Rent pursuant to Section 8.04 (d) shall be tolled provided that Landlord shall have promptly commenced appropriate legal proceedings against such tenant or occupant, and shall thereafter diligently prosecute such proceedings to completion so as to enjoin and prohibit any such violation. If Landlord shall have failed to promptly commence such proceedings, or shall fail thereafter to diligently prosecute the same, or if the violation does not cease within one hundred eighty (180) days after Landlord shall have been made aware of such violation, then Tenant's right to pay Alternative Rent shall apply for as long as such violation exists. In addition, Tenant shall have the right (i) to conduct and prosecute such legal proceedings (including an action for injunctive relief) in its own name, at Landlord's expense, or (ii) in the event the right set forth in clause (i) above is not permitted to be exercised under Laws, to conduct and prosecute such legal proceedings in the name of Landlord, at Landlord's expense, and Landlord shall cooperate with Tenant with respect to such prosecution (including executing any documentation or authorization reasonably required by Tenant in connection with such prosecution and by appearing at any hearing or trial with respect to such prosecution). If Tenant shall have paid Alternative Rent pursuant to this Section 8.04(d) for twenty-four (24) consecutive months, then Tenant shall have the rights to terminate this Lease subject to and in accordance with the provisions of Section 8.04(e).

(e)    If Tenant: (A) shall have elected not to open in accordance with the provisions of Section 2.03, and such election to not open shall have been ongoing for twenty-four (24) full consecutive months or, (B) having opened, shall have paid Alternative Rent pursuant to Sections 8.04(c) or (d) for twenty-four (24) full consecutive months, then Tenant must elect either to (i) terminate this Lease, or (ii) resume paying Annual Minimum Rent from and after the expiration of the thirty (30) day period following the end of such twenty-four (24) month period.  Tenant shall make such election by notice to Landlord within thirty (30) days after the expiration of such twenty-four (24) month period.  If Tenant fails to make such an election, then Tenant shall be deemed to have elected to proceed under clause (ii) above.  If Tenant elects to terminate this Lease pursuant to Sections 8.04(d) or (e), then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (x) for those obligations which expressly survive the expiration or other termination of this Lease, (y) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the then unamortized costs (amortized on a straight-line basis over the Term) of any alterations or improvements made by Tenant to the Premises (the "Unamortized Costs"), and (z) Tenant reserves all claims against Landlord for damages resulting from the violation of the Exclusive Use Protection.

SECTION 8.05  Exclusives Applicable To Tenant.  Landlord represents and warrants that there are (and will be) no exclusives or use restrictions in effect which would apply to Tenant or any other occupant of the Premises except as set forth in Exhibits F, H and K, and Landlord covenants to indemnify, defend and hold Tenant harmless from and against all loss, cost, liability or expense (including, without limitation, reasonable legal fees) incurred by Tenant by reason of the enforcement by any person or entity of such other exclusive or other use restriction.

SECTION 8.06  Key Tenants.  Landlord represents and warrants that it has entered into leases and/or operating agreements with the Key Tenants for initial terms expiring no sooner than the expiration of the Initial Lease Term. If, from and after the satisfaction of the Opening Requirement, fewer than all of the Key Tenants are open for regular business or the Minimum Ongoing Cotenancy Percentage is not met, then Tenant shall have the option to pay Alternative Rent in lieu of Annual Minimum Rent until such time as all of the Key Tenants are open for regular business and the Minimum Ongoing Cotenancy Percentage is met . If such Key Tenant(s) ceases operations for a period of twelve (12) consecutive months or more, or if the Minimum Ongoing Cotenancy Percentage is not met for a period of twelve (12) consecutive months or more, then Tenant shall have the right to terminate this Lease upon thirty (30) days notice to Landlord, such notice to be given at any time prior to the date the condition giving rise to such termination right has been satisfied. If Tenant shall elect to terminate this Lease, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (a) for those obligations which expressly survive the expiration or other termination of this Lease, and (b) Landlord shall (which obligation shall survive the termination of this Lease), within thirty (30) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Costs. If Tenant does not terminate this Lease within thirty (30) days after the expiration of such twelve (12) month period, then commencing on the day following the end of such thirty (30) day period, Tenant shall resume paying full Annual Minimum Rent. However, Tenant shall again be entitled to exercise its rights under this Section 8.06 each time another Key

Tenant ceases operations or the number of retail tenants occupying less than the Minimum Ongoing Cotenancy Percentage worsens by more than five percent (5%). It is hereby understood and acknowledged by Landlord that a Key Tenant may only be replaced, for the purposes of this Section 8.06 only, by a National Tenant or Regional Tenant of comparable use, size and quality of merchandise.  "National Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least seventy-five (75) retail stores in the continental United States under a single trade name in first-class shopping centers, and "Regional Tenant(s)" shall mean a tenant(s) operating, as of the applicable date, at least thirty-five (35) retail stores in first-class shopping centers in any of the following states under a single trade name:  Louisiana, Oklahoma, Mississippi, Texas, Alabama, Florida, Georgia, and Arkansas.

## ARTICLE IX

## REPAIRS

SECTION 9.01  Landlord Obligations.  Landlord shall, at Landlord's sole expense (and not included in CAM Costs), keep and maintain in good order, condition and repair (including replacements, if necessary) and in a safe condition (a) the roof of the Premises (to be maintained in a watertight condition at all times), all utility systems and lines (including, without limitation, electrical, plumbing, mechanical and/or alarm systems) serving the Premises (from the point of connection at the Premises to the public utility mains), the exterior of the Premises (including, without limitation, the walls and Other Improvements, but excluding window glass, doors and frames) and the structural portions of the Premises including, without limitation, footings and foundation, floor slab, and structural walls, columns and beams, and (b) any damage to the Premises or the Shopping Center which is caused by (i) defects in Landlord's Work, or (ii) the act or omission of Landlord, its employees, agents or contractors.  Landlord's obligations under this Section 9.01 shall be subject to the provisions of Articles XII and XIII.  Landlord shall perform any and all repairs and replacements to be performed under this Lease without material interference with or disruption to the normal conduct of any business operations in the Premises.  Landlord shall give Tenant at least five (5) days prior notice of any repairs or replacements to the Premises (except in the case of an emergency posing imminent risk of material harm to persons or property, in which event Landlord shall only be required to give such notice as is reasonable under the circumstances).  If, in Tenant's reasonable judgment, Landlord's repairs would materially interfere with or disrupt the normal conduct of any business operations in the Premises, then Landlord shall perform such repairs only after the regular hours of operation of the Premises.

SECTION 9.02  Tenant's Obligations.

(a)     Subject to Landlord's obligations under Section 9.01, Tenant shall at all times during the Term, at Tenant's sole expense, keep and maintain in good order, condition and repair and in a safe condition (i) the non-structural, interior elements of the Premises (including painting, window glass, doors and frames, and the heating, ventilation and air conditioning ["HVAC"] units, and the electrical, plumbing, mechanical, and/or alarm systems located in and serving exclusively the Premises), (ii) any damage to the Premises or the Shopping Center which is caused by the act or omission of Tenant, its employees, agents or contractors, and (iii) all aspects of the interior of the Premises which are not a part of Landlord Obligations as set forth in

Section 9.01. Tenant's obligations under this Section 9.02 shall also be subject to the provisions of Articles XII and XIII and to Landlord's obligation to clear the Premises of all dirt and debris following completion of Landlord's Work pursuant to Section 5.02.

(b)     If any HVAC units must be repaired or replaced during the last five (5) years of the Term, then in light of the fact that same will require a substantial expenditure by Tenant and will result in a benefit to Landlord following the expiration of the Term, upon the expiration or earlier termination of this Lease (unless such termination results from Tenant's default of its obligations under this Lease), Landlord shall reimburse Tenant for the unamortized portion of the reasonable expenses incurred by Tenant in connection with the replacement of such equipment during the last five (5) years of the Term, based on (i) the date of the installation of such new equipment, and (ii) the useful life of said equipment. The provisions of this Section 9.02(b) shall survive the expiration or earlier termination of this Lease.

SECTION 9.03  Hazardous Materials.

(a)     Landlord represents and warrants that, to Landlord's knowledge, as of the Effective Date (and as of the Possession Date), there are (and will be) no Hazardous Materials present in the Shopping Center, and Landlord agrees that the removal or neutralization of any Hazardous Materials that become present or become known to be present at the Shopping Center during the Term shall be at the sole cost and expense of Landlord (and not included in CAM Costs), other than the presence of any Hazardous Materials at the Shopping Center (including the Premises) permitted or caused by Tenant, its agents or employees, or which were brought onto the Premises as a part of Tenant's Work. "Hazardous Materials" shall mean (i) any waste, material or substance (whether in the form of a liquid, a solid, or a gas and whether or not air-borne) which is deemed to be a pollutant or a contaminant, or to be hazardous, toxic, ignitable, reactive, infectious, explosive, corrosive, dangerous, harmful or injurious to public health or to the environment, and which is now or becomes regulated in the future by or under the authority of any applicable local, state or federal laws, judgments, ordinances, orders, rules, regulations, codes or other governmental restrictions or requirements, any amendments or successor(s) thereto, replacements thereof or publications promulgated pursuant thereto (collectively, "Environmental Regulations", and individually, "Environmental Regulation"); (ii) petroleum; (iii) asbestos and asbestos containing materials; (iv) any polychlorinated biphenyl; and (v) any radioactive material, in quantities or used in a manner violating applicable laws. In addition to the foregoing, the term "Environmental Regulations" shall be deemed to include, without limitation, local, state and federal laws, judgments, ordinances, orders, rules, regulations, codes and other governmental restrictions and requirements, any amendments and successors thereto, replacements thereof and publications promulgated pursuant thereto, which deal with or otherwise in any manner relate to, environmental matters of any kind.

(b)     Landlord and Tenant each agree that neither Landlord nor Tenant shall cause or permit any Hazardous Materials to exist on, or to escape, seep, leak, spill or be discharged, emitted or released from the Shopping Center during the Term in violation of any applicable Environmental Regulation.

(c)     Landlord hereby indemnifies Tenant and its successors and assigns, and agrees to hold Tenant and its successors and assigns harmless from and against any and all

losses, liabilities, damages, injuries, penalties, fines, costs, expenses and claims of any and every kind whatsoever, including attorneys' fees and costs (collectively, "Environmental Liabilities") paid, incurred or suffered by, or asserted against, Tenant or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Shopping Center of any Hazardous Materials which were brought into the Shopping Center by Landlord, its agents, employees or their respective predecessors-in-interest, or (ii) a breach by Landlord, its agents, employees or their respective predecessors-in-interest of any Environmental Regulation to which Landlord is subject.

(d)    Tenant hereby indemnifies Landlord and its successors and assigns, and agrees to hold Landlord and its successors and assigns harmless from and against any and all Environmental Liabilities paid, incurred or suffered by, or asserted against, Landlord or its successors and assigns with respect to, or as a direct or indirect result of (i) the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release from the Premises of any Hazardous Materials which were permitted or caused by Tenant, its agents or employees, or which were brought onto the Premises as a part of Tenant's Work), or (ii) a breach by Tenant, its agents or employees of any Environmental Regulation to which Tenant is subject.

(e)    With respect to Hazardous Materials which are or become present at the Shopping Center as the result of any cause whatsoever (other than the presence of any Hazardous Materials at the Shopping Center (including the Premises) permitted or caused by Tenant, its agents or employees, or which were brought onto the Premises as a part of Tenant's Work), Landlord shall, at Landlord's sole cost (and not included in CAM Costs), in a good, workmanlike and expeditious manner, and in compliance with Environmental Regulations, perform all work necessary to clean-up, remove and otherwise remediate such Hazardous Materials in compliance with Environmental Regulations. Should the presence of such Hazardous Materials render the Premises Unusable (as defined below) or should Tenant be required to close during the removal or neutralization of such Hazardous Materials by Landlord, Tenant shall notify Landlord and all Rent shall be immediately abated until such time as Tenant can safely resume normal business operations. If such work is not commenced within thirty (30) days after the date (the "Notification Date") that Tenant notifies Landlord of Hazardous Materials rendering the Premises Unusable (or such additional period as may be reasonably required to engage environmental consultants and/or engineers and obtain permits and licenses) or if such work is not completed within ninety (90) days after the Notification Date (or such additional period as may reasonably be required given the nature of the work, provided that Landlord diligently pursues same to completion), then Tenant shall have the right, at any time thereafter, to terminate this Lease. However, Tenant's option to terminate this Lease pursuant to this Section 9.03(e) shall cease (if not exercised prior thereto) at any time the Premises are no longer Unusable. If Tenant shall elect to terminate this Lease, then the Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of Landlord or Tenant, except: (i) for those obligations which survive the expiration or other termination of this Lease pursuant to the express terms of this Lease, (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days after receiving a statement from Tenant showing the Unamortized Costs, reimburse Tenant for the Unamortized Cost, and (iii) Tenant reserves all claims against Landlord for damages resulting from a default by Landlord under this

Section 9.03. For the purpose of this Section 9.03(e), "Unusable" means that the Tenant does not have access to at least ninety percent (90%) of the Premises because of the enforcement of any Environmental Regulation or the remediation of any Hazardous Materials, or because use of the Premises would represent a risk to the health or safety of Tenant, Tenant's employees, agents or invitees.

SECTION 9.04  Surrender of the Premises.  At the expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord free of any Hazardous Substances in or on the Premises which were permitted or caused by Tenant, its agents or employees, or which were brought onto the Premises as a part of Tenant's Work, and in the same condition as it is required to be maintained by Tenant pursuant to Section 9.02 above; excepting, however, reasonable wear and tear, damage by fire or other casualty, and the effects of a Taking (as defined in Section 13.01).

## ARTICLE X

## REQUIREMENTS OF LAW

SECTION 10.01  Landlord's Obligations.  As part of Landlord's Work and throughout the Term, Landlord shall be responsible, at Landlord's sole cost and expense (and not included in CAM Costs), for complying with all applicable laws, statutes, ordinances and regulations of federal, state, county and municipal authorities (collectively, "Laws") affecting the Shopping Center including, without limitation, the Premises, except as specifically provided in Section 10.02.

SECTION 10.02  Tenant's Obligations.  Throughout the Term, Tenant shall be responsible, at Tenant's sole cost and expense, for complying with all Laws affecting the Premises if such compliance is required solely as a result of Tenant's use of the Premises and relates to the interior elements of the Premises which are neither structural nor comprise the major building systems serving the Premises.

SECTION 10.03  Right to Contest.  The party responsible for compliance pursuant to Section 10.01 or 10.02 shall have the right to contest the validity of any Law at the expense of the party responsible for compliance, unless such contest would result in any criminal liability imposed upon the other party or subject such other party to any fine or penalty.

## ARTICLE XI

## INSURANCE

SECTION 11.01  Landlord's Insurance.

(a)    Landlord shall maintain in full force and effect from and after the Effective Date and throughout the Term:

(i)    Commercial general liability insurance with regard to the Common Areas protecting and insuring Landlord, naming Tenant as "additional insured-lessee" for claims arising out of the use or occupancy of the Common Areas and the obligations

assumed by Landlord under this Lease, and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

       (ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of all of the buildings (other than the Premises) and other insurable improvements in the Shopping Center (exclusive of excavation, footings and foundations), including, without limitation, the Common Areas.

       (b)    Landlord may carry any of its insurance under "blanket policies" covering the Shopping Center and other properties it or any Affiliate of Landlord owns, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI. All proceeds from such policies required to be maintained by Landlord pursuant to this Section 11.01 shall be held by Landlord in trust and disbursed only in accordance with the provisions of, and for the purposes set forth in, Article XII.

       (c)    Landlord shall be permitted to maintain a deductible as a part of any insurance policy carried by it in compliance with this Section 11.01. However, in no event shall any deductible with regard to the insurance described in Sections 11.01(a)(i) or 11.01(a)(ii) exceed Twenty-Five Thousand Dollars ($25,000), without Tenant's consent.

SECTION 11.02  Tenant's Insurance.

       (a)    Tenant shall maintain in full force and effect throughout the Term:

       (i)    Commercial general liability insurance protecting and insuring Tenant, naming Landlord as "additional insured-lessor" for claims arising out of the use or occupancy of the Premises by Tenant and having a combined single limit of liability of not less than Five Million Dollars ($5,000,000) for bodily injury, death and property damage liability; and

       (ii)    Special Form (formerly known as "All-Risk") property insurance, on a replacement cost basis, in an amount adequate to cover the full insurable replacement value of the Premises, exclusive of excavation, footings and foundations, naming Landlord as "additional insured-lessor".

       (b)    Construction Insurance. Prior to the commencement of any construction of the Tenant's Work, Tenant or its general contractor shall take out and maintain an all builder's risk insurance policy in the amount of the full insurable value of improvements constructed and materials stored at the Premises.

Upon Landlord's request, Tenant shall also name the Mortgagee as an additional insured, as its interest may appear, on the insurance policies described in Section 11.02(a).

(c)     Tenant may carry any of its insurance under "umbrella policies" and/or "blanket policies" covering the Premises and other locations it or any Affiliate of Tenant owns or leases, provided that: (i) the total amount of the insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and (ii) in all other respects, any such policy or policies shall comply with the applicable provisions of this Article XI.

(d)     All insurance required to be maintained under this Section 11.02 may be provided under a plan of self-insurance provided that Tenant maintains, during the period of such self-insurance, a tangible net worth of at least One Hundred Million Dollars ($100,000,000). To the extent any deductible is maintained as a part of any insurance policy carried by Tenant in compliance with this Section 11.02, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance.

SECTION 11.03  Insurance Requirements Generally.

(a)     All insurance required to be maintained by Landlord and Tenant under this Lease shall be maintained with insurance companies qualified to do business in the State, and rated at least A-/VIII by the most current Best's Key Rating Guide (or its equivalent, if such Guide ceases to be published). Each party shall use its diligent efforts to have its insurers provide thirty (30) days (ten (10) days in the event of non-payment of premium) prior notice to the other party of cancellation or non-renewal of any policy required hereunder. Each party shall provide to the other duly executed certificates evidencing the insurance coverage described in Sections 11.01 and 11.02 above, respectively.

(b)     The liability insurance requirements under Sections 11.01(a)(i) and 11.02(a)(i) shall be reviewed by Landlord and Tenant every five (5) years for the purpose of mutually increasing (in consultation with their respective insurance advisors) the minimum limits of such insurance to limits which shall be reasonable and customary for similar facilities of like size and operation in accordance with generally accepted insurance industry standards. The replacement value of the buildings and other insurable improvements constituting the Shopping Center shall be re-evaluated from time to time at the request of either Landlord or Tenant.

SECTION 11.04  Landlord's Insurance Cost.

(a)     The reasonable insurance premiums attributable to the policies required to be maintained by Landlord pursuant to Section 11.01(a)(i) shall be paid in accordance with the terms of Article V above at the same time as CAM Costs. If Landlord carries blanket insurance covering the Shopping Center together with other property owned by Landlord, then Landlord shall obtain evidence reasonably satisfactory to Tenant of the cost of such insurance allocable to the Shopping Center and the amount so allocable shall be included for the purposes of determining Tenant's Share of any insurance premium.

(b)     If the rates for any insurance Landlord is required to carry are increased as a result of the use or other activity of any other occupant of the Shopping Center, then the amount of such increase shall be excluded from Tenant's Share of such costs. To the extent that Landlord receives a dividend, credit, rebate or other return of a premium which had previously

been included in Tenant's Share of insurance costs, Landlord shall promptly refund to Tenant Tenant's Share of such dividend, credit, rebate, or return.

(c)     The provisions of this Section 11.04 shall survive the expiration or earlier termination of this Lease.

SECTION 11.05  Indemnity.

(a)     Except as otherwise provided in Section 11.06, Tenant covenants to defend and indemnify Landlord and hold Landlord harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon the Premises, or any part thereof, or (ii) occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Landlord, its agents, contractors, licensees, employees, or other tenants and occupants, or for which any of said parties may be statutorily liable.

(b)     Except as otherwise provided in Section 11.06, Landlord covenants to defend and indemnify Tenant and hold Tenant harmless from and against any and all claims, actions, damages, liabilities and expenses, including reasonable attorneys' fees, (i) in connection with loss of life, personal injury and/or damage to property arising from or out of any occurrence in or upon any portion(s) of the Shopping Center (excluding the Premises), or (ii) occasioned wholly or in part by any act or omission of Landlord, its agents, contractors, employees, servants, tenants (other than Tenant), occupants or licensees, except to the extent such claims, actions, damages, liability and expense are caused by the acts or omissions of Tenant, its agents, contractors, licensees or employees, or for which any of said parties may be statutorily liable.

SECTION 11.06  Mutual Waiver of Subrogation.

(a)     Landlord and Tenant, on their own behalf and on behalf of anyone claiming under or through either one by way of subrogation, hereby release and waive all rights of recovery and causes of action against each other and their respective Affiliates arising from any and all liability for any loss or damage to property or resulting from damage to such property (and, in either case, any resulting loss of business or rental income), whether caused by the negligence or fault of the other party, which is normally insured under Special Form property insurance (formerly known as "All-Risk") and time element insurance required to be maintained hereunder or under any other property or time element insurance maintained by either party.  If either Landlord or Tenant is a self-insurer or maintains a deductible (as either may be permitted under this Lease), then the self-insuring party or the party maintaining the deductible hereby releases the other party from any liability arising from any event which would have been covered had the required insurance been obtained and/or the deductible not been maintained.

(b)     Landlord and Tenant shall cause each property insurance policy carried by either of them insuring the Premises, the contents thereof, or the Shopping Center, to provide that the insurer waives all rights of recovery by way of subrogation or otherwise against the other party hereto (and all of such other party's Affiliates) in connection with any loss or damage

which is covered by such policy or that such policy shall otherwise permit, and shall not be voided by the releases provided above.

SECTION 11.07 <u>Affiliate</u>. "<u>Affiliate</u>" shall mean a corporation, partnership, person or other entity which is controlling, controlled by, or under common control with, Landlord or Tenant, as the case may be. As used in the definition of Affiliate, "<u>control</u>" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities or rights, by contract, or otherwise.

# ARTICLE XII

# DAMAGE OR DESTRUCTION

SECTION 12.01 <u>Landlord's Obligation to Rebuild</u>. If all or any part of the Shopping Center (including, without limitation, the Premises) is damaged or destroyed by fire, the elements or other casualty, then Landlord shall promptly repair all damage and restore the Shopping Center, other than the Premises, to its condition immediately prior to such damage or destruction. Without limiting Landlord's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Landlord pursuant to Section 11.01 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.01 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.02 <u>Tenant's Obligation to Rebuild</u>. If all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty, then Tenant shall promptly repair all damage and restore the Premises to its condition immediately prior to such damage or destruction (subject to any changes to the Premises that Tenant shall desire to make to the extent same shall otherwise be permitted under Section 14.01). Without limiting Tenant's obligations under this Article XII, the proceeds of the policies required to be obtained and maintained by Tenant pursuant to Section 11.02 shall, to the extent necessary, be used for the performance of such rebuilding and restoration work. The provisions of this Section 12.02 shall not apply if Landlord or Tenant terminates this Lease pursuant to provision this Article XII.

SECTION 12.03 <u>Termination</u>.

(a)     Tenant shall have the right to terminate this Lease:

(i)     if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last three (3) years of the Term, and the restoration period is reasonably estimated by Tenant to be in excess of one hundred eighty (180) days,

(ii)     if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty during the last year of the Term, or

(iii)     if all or any part of the Premises is damaged or destroyed by fire, the elements or other casualty at any time during the Term and such damage or

destructions is not covered under the insurance policy(ies) required to be maintained by Tenant under Sections 11.02(a)(ii) or 11.02(b), whether or not such risks are part of any self-insurance plan.

Tenant shall notify Landlord of its exercise of such option within forty-five (45) days following the occurrence of such casualty.

(b)    If (i) Landlord fails to commence in good faith Landlord's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Landlord fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Tenant shall have the option, upon notice to Landlord, to elect (y) to complete the repair and restoration to the Tenant's Preferred Area and No Change Areas within the Common Areas and (1) to receive reimbursement therefor in full from Landlord on demand and/or (2) to offset the cost and expense thereof against the payment of Rent and, at Tenant's option, to extend the Term until such time as Tenant, through such offsets, has recouped the entire cost and expense to Tenant of such repair and restoration, or (z) to terminate this Lease effective as of the date of such damage or destruction. The time periods referenced in this Section 12.03(b) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(c)    If (i) Tenant fails to commence in good faith Tenant's repair and restoration obligations within ninety (90) days after any damage or destruction, or (ii) Tenant fails to timely complete such repair and restoration within two hundred forty (240) days after such damage or destruction, then Landlord shall have the option, upon notice to Tenant, to elect to complete the repair and restoration to the Premises and to receive reimbursement therefor in full from Tenant on demand. The time periods referenced in this Section 12.03(c) shall be subject to Force Majeure, but in no event shall the aggregate of any and all extensions as a result of a Force Majeure delay(s) exceed a period of ninety (90) days.

(d)    If this Lease is terminated, then this Lease shall terminate on the date set forth in Tenant's notice of termination without further liability on the part of either Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) only in the case where Tenant terminates this Lease, Tenant shall thereupon make available to Landlord (1) all insurance proceeds paid by Tenant's insurance carrier, or (2) if self-insured, an amount equal to the reconstruction costs of the Premises or, if the Premises are not being reconstructed, an amount equal to the actual value of the Premises (not to exceed, however, an amount equal to the reconstruction costs of the Premises), to the extent such amounts would have been payable under the insurance outlined in Section 11.02(a)(ii).

## ARTICLE XIII

## CONDEMNATION

SECTION 13.01 Taking.

(a)    In the event of condemnation by eminent domain or similar law, including a sale in lieu thereof to an authority or other entity having the power of eminent domain (a

"Taking"), of all or any portion of the Shopping Center, which (i) results in a Taking of (x) any part of the Premises, (y) more than ten percent (10%) of the Common Areas, or (z) more than two (2) of the parking spaces in either Tenant's Preferred Area or more than ten (10) of the parking spaces in the Shopping Center, (ii) materially and adversely affects ingress or egress to the Premises or the Shopping Center, or (iii) materially prohibits or inhibits Tenant's use of the Premises for a period in excess of sixty (60) days, then Tenant may terminate this Lease by giving notice to Landlord not more than ninety (90) days after the later of the date on which title vests in the condemning authority or the date Tenant receives notice of said vesting.

(b)     In the event of a Taking of all of the Premises, this Lease shall terminate as of the date of vesting of title or transfer of the Premises, whichever is earlier, without further liability on the part of either Landlord or Tenant, except for those obligations which expressly survive the expiration or other termination of this Lease.

(c)     In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding sixty (60) days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect. All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by Section 13.01 (a) or (b), as applicable.

SECTION 13.02  Restoration and Rent Adjustment.  In the event of a Taking, if this Lease is not terminated by Tenant pursuant to Section 13.01, then (a) Landlord shall promptly restore the Shopping Center as nearly as practicable to a complete unit of like quality and character as existed prior to the Taking, which restoration shall, as applicable, include all of Tenant's Work and all other leasehold improvements performed by Tenant, but shall not include Tenant's Property, and (b) if a portion of the Premises is Taken, then from and after the date on which title vests in the condemning authority, the Rent shall be equitably reduced in proportion to the area of the Premises subject to the Taking.

SECTION 13.03  Award.  In the event of any Taking, Tenant shall be entitled to an amount of the award or compensation paid for such Taking equal to the Unamortized Costs, if any, and the balance shall belong to Landlord. Tenant shall also have the right to claim and recover from the condemning authority such compensation as may be separately awarded or recoverable by Tenant on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might be put in moving Tenant's Property, or for any other damages compensable separately to Tenant; provided, however, that no such award shall reduce the award payable to Landlord for its fee interest in the Premises. The provisions of this Section 13.03 shall be subject to the provisions of Section 13.01(c) with respect to a temporary Taking.

## ARTICLE XIV

## ALTERATIONS AND MECHANICS' LIENS

SECTION 14.01  <u>Tenant's Alteration Rights.</u>

(a)     Tenant shall not perform any structural or exterior alterations or improvements to the Premises (except to the extent same pertain to Tenant's Work) without the prior approval of Landlord; <u>provided</u>, <u>however</u>, that Tenant's alteration of the exterior of the Premises to conform to Tenant's (or any subtenant's) then-current prototypical elevation shall not require Landlord's consent.  The provisions of this Section 14.01(a) shall not apply to Tenant's building signage, which shall be governed by the applicable provisions of Article XV.

(b)     Tenant may, from time to time, without the prior approval of Landlord, make non-structural interior alterations and improvements to the Premises as Tenant deems necessary or desirable including, but not limited to, the electrical systems, the HVAC and other mechanical systems, installation of fixtures and equipment, painting, and wall and floor coverings.

(c)     Tenant shall have the right to erect and maintain an antenna, a satellite dish and/or related equipment on the roof of the Premises, provided that Tenant: (i) uses a contractor approved by Landlord for all roof penetrations so as not to violate or invalidate any roof warranties maintained by Landlord (and Tenant shall bear all responsibility and cost due to any roof warranty violation caused by such equipment), (ii) repairs any damage to the roof caused by the making of the roof penetrations, and (iii) erects and maintains such equipment in accordance with Laws.  Tenant shall indemnify Landlord and be solely responsible for the maintenance and repair of such equipment and any liability arising from damage to the roof caused by Tenant's installation or maintenance of such equipment.

(d)     Landlord shall execute and return to Tenant all appropriately completed building department or equivalent applications within ten (10) days after Tenant's request therefor, and will reasonably cooperate with Tenant in the permitting process.  If any violation of Laws which is noted against the Shopping Center or the Premises (other than a violation caused by Tenant) prevents Tenant from obtaining a building permit for any alterations or a certificate of occupancy, then, upon request by Tenant, Landlord shall promptly and diligently cause such violation to be removed of record to the extent required to permit Tenant to obtain its building permit or certificate of occupancy, as the case may be.  However, if the violation was not caused by Landlord (or any of Landlord's agents, contractors, employees or invitees), then Landlord's obligations under this Section 14.01(d) shall be satisfied by Landlord using diligent, good faith and commercially reasonable efforts to have the responsible party remove such violation of record.

(e)     Landlord shall not make any alterations to the Premises (including, without limitation, changing the design, color or materials of the exterior of the Premises) nor shall Landlord construct an additional floor or floors above or below the Premises.  Landlord shall neither make nor permit to be made any alterations to the exterior architectural theme of the remainder of the Shopping Center which would be inconsistent with a first-class shopping center

in the State (exclusive of other National Tenants' or Regional Tenants' entrance features), without the prior consent of Tenant.

SECTION 14.02 <u>Mechanics' Liens</u>. Tenant covenants that Tenant shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed against the Premises or all or any part of the Shopping Center for any work, labor, services or materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Tenant, or at the insistence of Tenant, or anyone acting for, through or under Tenant. Similarly, Landlord covenants that Landlord shall promptly discharge of record (by payment, bond, order of a court of competent jurisdiction or otherwise) any mechanic's lien filed any lien against the Premises or all or any part of the Shopping Center for any work, labor, services, materials claimed to have been performed at, or furnished to, the Premises or the Shopping Center, for or on behalf of Landlord, or at the insistence of Landlord, or anyone acting for, through or under Landlord. If either party shall fail to cause any such lien to be discharged within sixty (60) days after the other party shall demand that the former party remove same, then, the demanding party may discharge the same by paying the amount claimed to be due, by bonding or by any other proceeding deemed appropriate by such demanding party, and the amount so paid by such demanding party and/or all costs and expenses including reasonable attorneys' fees incurred by such demanding party in procuring the discharge of such lien shall be reimbursed by the other party upon demand. Nothing contained in this Lease shall be construed as a consent on the part of the Landlord to subject Landlord's estate in the Premises to any lien or liability under any law relating to liens.

**ARTICLE XV**

**SIGNS**

SECTION 15.01 <u>Tenant's Signs</u>. Tenant shall have the exclusive right during the Term to erect, maintain, and replace on the storefront and exterior walls of the Premises, and on the side walls of any entrance design element, if any, signs (including, without limitation, under-canopy or blade signs), banners (including temporary banners placed on the storefront of the Premises and such other walls of the Premises as selected by Tenant), awnings, and flags of such size, design and color as Tenant, from time to time, may desire, subject to compliance with Laws. Tenant may erect and maintain in the interior of the Premises any signs it may desire.

SECTION 15.02 <u>Pylon Signs</u>. Landlord shall provide pylons and monuments at the locations shown on the Site Plan. Landlord, as part of Landlord's Work, shall obtain all governmental approvals and permits for such pylons and monuments (including Tenant's sign panels on all sides of such pylons and monuments). Tenant's sign panels shall be procured and installed at Tenant's cost. A rendering of such pylon(s)/monument(s) showing the dimensions of the pylon/monument(s) and the size and position of all panels to be installed thereon, including Tenant's panel, is attached to this Lease as Exhibit N. Landlord shall not change or alter the pylons or monuments bearing Tenant's sign panel(s) without obtaining Tenant's prior consent. The cost of maintaining all pylons and monuments bearing Tenant's sign panel(s) (but not the cost of individual tenants' signs thereon or the cost of the construction of the pylons and monuments) and the cost of any electricity used to illuminate them, shall be includable in CAM Costs. If at any time during the Term there becomes available a face panel on any of the

Shopping Center pylon or monument signs which would permit Tenant's presence in the Shopping Center to be designated in a higher pylon or monument panel position, then Tenant shall have the right to relocate its pylon or monument sign panel to such higher sign position.

SECTION 15.03  Replacement. Tenant and its subtenants shall be entitled, without Landlord's consent but subject to complying with Laws, to replace all of its signs with signage consistent with Tenant's and/or its subtenant's then-current prototypical sign plans. Any signage which is not consistent with such prototypical sign plans shall be subject to Landlord's approval, not to unreasonably withheld.

## ARTICLE XVI

## TENANT'S PROPERTY

SECTION 16.01  Tenant's Property. All of Tenant's movable trade fixtures, ornate light fixtures, equipment, furniture, inventory and other property owned by Tenant and located at, on or in the Premises including, without limitation, computer display and storage area showcases, partitions, mezzanine, shelving, wall cases and signs (collectively, "Tenant's Property") shall remain the property of Tenant, exempt from the claims of Landlord or any Mortgagee or Ground Lessor, without regard to the means by which or the persons by whom Tenant's Property is installed or attached. Tenant shall have the right at any time and from time to time to remove Tenant's Property, provided that if removal of any of Tenant's Property permanently damages any part of the Premises, Tenant shall repair such damage.

## ARTICLE XVII

## ASSIGNMENT AND SUBLETTING

SECTION 17.01  Assignment and Subletting Rights. Tenant shall have the right from time to time, without the consent of Landlord, to assign Tenant's interest in this Lease and/or to sublet, concession or license all or any portion of the Premises, subject to all of the terms and conditions of this Lease. Unless otherwise agreed to in writing by Landlord, no assignment, subletting, licensing or concessioning by Tenant shall reduce the liability of Tenant under this Lease to the extent that such liability is not increased as a result of any amendment or modification to this Lease between Landlord and any assignee. However, in the event of an assignment by Tenant to an assignee having an Adequate Net Worth (as defined below), or to an assignee whose obligations under this Lease are guaranteed by a guarantor having an Adequate Net Worth, all liability of the assigning Tenant under this Lease accruing from and after the effective date of such assignment shall terminate. "Adequate Net Worth" shall mean a tangible net worth, as of the effective date of such assignment, of at least One Hundred Million Dollars ($100,000,000).

SECTION 17.02  Collateral Assignment. In addition to Tenant's other rights set forth in this Article XVII, a collateral assignment of Tenant's interest in this Lease by Tenant to one (1) or more Lenders (hereinafter defined), as collateral security for an indebtedness or other obligation of Tenant or its Affiliates shall be permitted and Landlord shall execute all documentation reasonably requested by Tenant or any such Lender in connection therewith. In

addition, Tenant shall have the right, without Landlord's consent, to grant to an Affiliate of Tenant a license to operate all of Tenant's business operations at the Premises, without such Affiliate having assumed any liability for the performance of Tenant's obligations under this Lease. "Lender" shall mean a state or federally regulated: bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender.

SECTION 17.03 <u>Cure Rights of Original Tenant</u>. If Tenant assigns Tenant's interest in this Lease and the assignor remains liable under this Lease following such assignment, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also give a copy of such notice to the Tenant originally named in this Lease or its Affiliate (collectively, the "<u>Original Tenant</u>"), and no notice of default shall be effective until a copy thereof is so given to Original Tenant. Original Tenant shall have the right (but not the obligation) to cure such default, which cure period shall be thirty (30) days longer than the cure period applicable to Tenant.

SECTION 17.04 <u>Recognition Agreement</u>. If Tenant subleases all or any portion of the Premises for a term of at least five (5) years, then, notwithstanding any other provisions of this Lease, Landlord shall, upon Tenant's request, execute and deliver an agreement among Landlord, Tenant and each such subtenant in the form of <u>Exhibit I</u>, in recordable form (the "<u>Recognition Agreement</u>").

## ARTICLE XVIII

## DEFAULT

SECTION 18.01 <u>Tenant's Default</u>.

(a)     If Tenant defaults in the payment of any installment of Rent and such default is not cured within fifteen (15) days after receipt of notice from Landlord thereof or if Tenant defaults in the observance of any other material covenant or agreement herein contained and Tenant shall not, within thirty (30) days after receipt of notice thereof from Landlord, cure or commence to cure such default (it being intended in connection with a default not susceptible of being cured with due diligence within said thirty (30) day period that the time allowed Tenant within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), then Landlord may, by giving notice to Tenant at any time thereafter during the continuance of such default:

(i)     <u>Terminate Lease</u>. Landlord may terminate this Lease by written notice to Tenant specifying a date, which shall be no sooner than thirty (30) days following receipt of such notice by Tenant, and this Lease shall then terminate on the date so specified. In the event of such termination, Landlord shall be entitled to recover from Tenant all of the following:

(aa)     the "worth at the time of the award" (defined below) of any obligation which has accrued prior to the date of termination; and

(bb)    The "worth at the time of the award" of the amount by which the unpaid Base Rent and all other charges which would have accrued after termination until the time of award exceeds the amount of any sums which Landlord has (or Tenant proves that Landlord could have) received in mitigation. Landlord shall use "reasonable efforts" to mitigate damages. "Reasonable Efforts" shall mean that Landlord shall market the Premises in a commercially reasonable manner.

As used in this paragraph 18.01(a)(i), the term "worth at the time of the award" shall be computed by allowing simple interest at an accrual rate of eight percent (8%) for past-due obligations, and a discount rate to net present value of eight percent (8%) on anticipated future obligations on the amount of the obligations payable on the date of such calculation. In the event this Lease shall be terminated as provided above, by summary or other judicial proceeding, Landlord, its agents, servants or representatives, may immediately or at any time thereafter peaceably re-enter and resume possession of the Premises and remove all persons and property therefrom, by summary disposition proceedings. Landlord shall never be entitled to recover from Tenant any consequential, punitive or incidental damages (including, without limitation, lost business opportunity), or to dispossess Tenant of the Premises pursuant to any "lock-out" or other non-judicial remedy.; or

(ii)    Continue Lease. Landlord may, at its option continue this Lease in full force and effect, and terminate Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect Rent and all other charges when due. Landlord shall also have the right, in Landlord's exercise of commercially reasonable efforts to mitigate its damages (which Landlord agrees to make), at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including, without limitation, necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord.

(b)    If the Premises is at the time of default sublet or leased by Tenant to others, Landlord may, as Tenant's agent, collect rents due from any subtenant or other tenant and apply such rents to Rent due hereunder. Any monthly deficiencies payable by Tenant shall be paid monthly on the date herein provided for the payment of Annual Minimum Rent. If, after the lapse of all applicable grace periods, Landlord reasonably expends any money to cure a default by Tenant, then Tenant shall, on demand, pay Landlord the amount so paid by Landlord together with interest thereon at the rate which is two points over the rate which is the "prime rate" as stated in The Wall Street Journal (the "Default Rate"), but no more than the maximum interest rate permitted by law.

(c)    Landlord shall also be entitled to all other rights and remedies available to Landlord at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Landlord expressly waives (i) any right to accelerate any element of Rent except as expressly set

forth in Section 18.01(a)(i) above, (ii) any right to recover consequential, punitive or incidental damages (including, without limitation, lost business opportunities) as a result of a Tenant default or any other act or omission of Tenant, and (iii) all rights to any so-called "landlord's lien" or any similar statutory lien, granting Landlord a lien on any of Tenant's Property for the performance of any obligations of Tenant. At the request of Tenant, Landlord shall promptly confirm such waiver(s) by a writing in form satisfactory to Tenant. Anything contained in this Lease to the contrary notwithstanding, Landlord shall use all reasonable efforts to relet the Premises or any portion thereof to mitigate Landlord's damages to which Landlord would otherwise be entitled to as a result of a Tenant default.

(d)    If Tenant shall fail to pay Rent to Landlord on the date when due as provided for in this Lease, such unpaid amounts shall bear interest, from the due date thereof to the date of payment, at the Default Rate. In addition, all Rent which is not paid within fifteen (15) days of the date due shall bear a late charge equal to the lesser of: (i) four percent (4%) of such past due amount; or (ii) the maximum amount allowed by law. The purpose of the late charge is to compensate Landlord for liquidated damages incurred for the additional time and expense of collecting late payments. This late charge is in addition to, not in lieu of, payment of interest at the Default Rate and is in addition to any other remedies available to Landlord under this Lease. Anything hereinabove to the contrary notwithstanding, for the first four (4) occasions during each calendar year during the term of this Lease, such late charge shall not apply.

SECTION 18.02  Additional Landlord Remedies Due to Construction Delays by Tenant.

(a)    If Tenant shall fail to achieve Substantial Completion by that date which is two hundred forty (240) days following Delivery of the Land, then Landlord, at its option, upon prior notice to Tenant, may require Tenant to commence payment of Ground Rent (as defined below) on the date which is two hundred forty (240) days following Delivery of the Land. "Ground Rent" shall mean One Hundred Eighty-Two Thousand Seven Hundred Dollars ($182,700.00) annually, shall be payable in lieu of Annual Minimum Rent, and shall be payable in equal monthly installments of 1/12 each and in the same manner as Annual Minimum Rent.

(b)    If Tenant shall fail to achieve Substantial Completion by that date which is one (1) year following Delivery of the Land, then Landlord shall be entitled, as its sole remedy, to terminate this Lease upon sixty (60) days prior notice to Tenant unless Tenant, within such sixty (60) day period, achieves Substantial Completion. If Landlord terminates this Lease, then there shall be no further liability on the part of Landlord or Tenant, except for those obligations that expressly survive the expiration or other termination of this Lease.

SECTION 18.03  Landlord's Default.

(a)    If Landlord shall (i) default in the observance of any material covenant or agreement herein contained, breach any material representation or warranty under this Lease, or shall fail to pay any charges or other amounts required to be paid by Landlord under this Lease (including, without limitation, any insurance premiums or any reimbursements due to Tenant) and Landlord does not cure such default within fifteen (15) days (as to a monetary default) or thirty (30) days (as to a non-monetary default), as applicable, after notice thereof by Tenant (it being intended in connection with a non-monetary default not susceptible of being cured with

due diligence within said thirty (30) day period that the time allowed Landlord within which to cure same shall be extended for such period as may be necessary to complete same with all due diligence), or (ii) fail to pay when due any Taxes, ground rent or any other charge or assessment, the lien of which is prior to the lien of this Lease, then Tenant shall have the right (but shall not be obligated) to:

        (w)    perform such obligation(s) of Landlord in accordance with the applicable provisions of this Lease on behalf of, and at the expense of Landlord;

        (x)    bring suit for the collection of any amounts for which Landlord is in default, seek injunctive relief, or seek specific performance for any other covenant or agreement of Landlord;

        (y)    offset against the Rent all amounts owed by Landlord to Tenant and/or the amounts reasonably expended by Tenant performing Landlord's obligations under this Lease, including costs and reasonable attorneys' fees, together with interest thereon at the Default Rate from the date of the outlay until paid, and, at Tenant's option, extend the Term if necessary for Tenant to fully recoup all amounts owed by Landlord to Tenant; and/or

        (z)    terminate this Lease, without waiving its rights to damages for Landlord's Default, provided that: (1) Landlord's default materially interferes with the normal conduct of any business operations in the Premises, (2) Landlord's default is not reasonably capable of being cured by Tenant, and (3) subject to Section 18.02(b), Tenant gives notice of Landlord's default to any Mortgagee of whom Landlord shall have previously given Tenant notice (including its address), and such Mortgagee shall not have cured Landlord's default within the time period provided in Section 18.02(b).

Notwithstanding the foregoing, Tenant's right of offset under clause (y) above shall be limited to fifty percent (50%) of each installment of Rent next becoming due unless insufficient Term remains to fully recoup the amounts owed by Landlord to Tenant on the amounts expended by Tenant, together with interest as provided above, in which event the amount of Tenant's offset shall be increased so that Tenant is able to fully recoup all such amounts expended by Tenant, together with interest as aforesaid, prior to the expiration of the Term. Anything herein to the contrary notwithstanding, Tenant shall never be entitled to recover from Landlord any consequential, punitive or incidental damages (including, without limitation, lost business opportunity) except with respect to Landlord defaults relating to Hazardous Materials or Tenant's Exclusive Use Protection; provided, with respect to violations of Tenant's Exclusive Use Protection, Tenant shall not be entitled to consequential, punitive or incidental damages if Landlord has bound the party violating the exclusive with Tenant's Exclusive Use and provided industry-standard and appropriate remedies for such violator's default (including injunctive relief and lease termination), which have been promptly and diligently pursued, including judicial proceedings.

        (b)    If a Mortgagee shall have notified Tenant in writing that it is the holder of such lien on the Shopping Center and shall so request, then Tenant shall give a similar notice to such Mortgagee and such Mortgagee shall have the same time period allowed to Landlord under this Lease to correct or remedy such default.

(c)     Tenant shall also be entitled to all other rights and remedies available to Tenant at law, in equity or otherwise, except as otherwise expressly set forth in this Lease. Tenant expressly waives any right to recover consequential or punitive damages as a result of a Landlord default or any other act or omission of Landlord, except with respect to a Landlord default relating to Tenant's Exclusive Use Protection or Hazardous Materials.

(d)     Notwithstanding the foregoing, if, in Tenant's reasonable judgment, a condition posing imminent risk of liability or material harm to persons or property or material disruption to the normal conduct of any business operations in the Premises shall exist, then Tenant may exercise, at its election and without prior notice to Landlord, any or all of the remedies set forth in clauses (w), (x) and (y) above.

SECTION 18.04  Additional Tenant Self-help, Equitable and Legal Remedies Due to Construction Delays by Landlord.  If Landlord defaults at any time in the timely completion of any component of Landlord's Work (including, without limitation, Delivery of the Land) and Landlord does not cure such default within five (5) days after notice thereof by Tenant (provided, however, such five (5) day notice shall be reduced to one (1) day in the event the default relates to any element of the Site Delivery Work), then Tenant shall have the right, but not the obligation, to:

(a)     perform, at Landlord's sole cost and expense, all or any part of Landlord's Work, provided Tenant coordinates such work with other contractors performing work at the Shopping Center so as to not interfere with other parties' construction activities.  If and to the extent that Tenant exercises its right under this Section 18.04(a), Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete such portions of Landlord's Work.  Landlord hereby grants Tenant the right, as its agent, to directly contact and contract with Landlord's contractors, on behalf of Landlord, to complete such work, all at Landlord's cost and expense.  Landlord covenants, upon Tenant's request, to provide Tenant with duplicate sets of all plans, specifications and contracts prepared in connection with the construction of the Shopping Center, as well as schedules of all contractors, subcontractors and suppliers.  Landlord agrees to reimburse Tenant for any and all costs incurred by Tenant in connection with any portion of Landlord's Work which Tenant completes within ten (10) days after receipt of request therefor from Tenant, which request shall be reasonably supported by invoices and/or written description of Landlord's Work performed.  If Landlord does not timely reimburse Tenant as contemplated above, then Tenant shall be entitled to deduct the costs of such work from Rent, together with interest at the Default Rate from the date of expenditure by Tenant, until paid in full;

(b)     seek injunctive relief, specific performance or other equitable remedies against Landlord to require Landlord to perform its obligations under this Lease (including, without limitation, the Site Design Requirements), the costs of which litigation shall be borne by Landlord including, without limitation, attorneys' fees and court's costs; and/or

(c)     seek legal remedies available to Tenant, the costs of which shall be borne by Landlord, including, without limitation, attorneys' fees and court costs.

SECTION 18.05  Additional Tenant Remedies Due to Landlord's Failure to Pay the Landlord Reimbursement.

(a)     If Landlord fails to pay the Landlord Reimbursement in full on or before its due date, then Landlord shall be in default under this Lease, and no Rent shall be due or owing to Landlord until the Landlord Reimbursement is paid to Tenant, together with interest which shall accrue on the unpaid Landlord Reimbursement at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion until the date of payment of the Landlord Reimbursement.  However, if Landlord has not tendered payment of the Landlord Reimbursement and interest by that date which is one (1) year from Substantial Completion (the "Substantial Completion Anniversary"), then (i) such date shall become the Commencement Date; (ii) Annual Minimum Rent shall be reduced to ground rent equal to Fifty Thousand and No/100 Dollars ($50,000.00) per annum during the Term; and (iii) this Lease shall be converted to a ground lease, with ownership of the Building remaining with Tenant, and Landlord's and any Mortgagees' names being removed as additional insureds or mortgagees on any casualty insurance described in Section 11.02.  Landlord and Tenant covenant and agree that upon the reasonable written request of either Tenant or Landlord, Landlord and Tenant shall execute such documentation as necessary to formalize the conversion of this Lease to a ground lease upon the Substantial Completion Anniversary.

(b)     At any time following the Substantial Completion Anniversary and upon thirty (30) days prior notice, Tenant shall have the right at Tenant's sole election, but not the obligation, in lieu of the requirement that Landlord pay to Tenant the Landlord Reimbursement, to mortgage, sell, convey, assign, lease or otherwise encumber (collectively, a "Financing Transfer") Tenant's interest in the Building and this Lease.  Landlord covenants to (i) execute all documents necessary to permit Tenant to effect the Financing Transfer described herein, and (ii) cause any Mortgagee to specifically acknowledge the rights of Tenant's lender and third parties arising as a result of such Financing Transfer.  Notwithstanding such Financing Transfer, Tenant shall continue to pay the ground rentals described in Section 18.05(a) during the remainder of the Term.

SECTION 18.06  Waiver; Non-Exclusive Remedies.  The parties hereby waive trial by jury in any action, proceeding or counterclaim brought by either of them against the other on any matters arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage.  Tenant hereby expressly waives any and all rights of redemption granted by or under any present of future law if this Lease is terminated or Tenant is evicted or dispossessed by reason of violation by Tenant of any of the provisions of this Lease.  Except as otherwise expressly set forth in this Lease, no right or remedy herein conferred upon or reserved to Landlord or Tenant is intended to be exclusive of any other right or remedy in this Lease or by law or in equity provided, but each shall be cumulative and in addition to every other right or remedy given in this Lease or now or hereafter existing at law or in equity or otherwise.

## ARTICLE XIX

## SUBORDINATION, TRANSFER OF INTEREST

SECTION 19.01 Subordination. Landlord reserves the right to subject and subordinate this Lease at all times to the lien of any first mortgage or deed of trust for the benefit of any Mortgagee hereafter encumbering or affecting all or any portion of the Shopping Center, as well as to any future ground or underlying leases encumbering or affecting all or any part of the Shopping Center; provided, however, that (a) each Mortgagee shall first execute and deliver to Tenant a subordination, non-disturbance and attornment agreement in substantially the form attached as Exhibit J hereto, in recordable form, and (b) any Ground Lessor shall execute (and shall obtain the written consent of any Mortgagee) and deliver to Tenant a fee owner recognition agreement in a form reasonably satisfactory to Tenant, which shall include the following provisions: (i) so long as Tenant is not in default of any of the terms or provisions of this Lease past applicable notice and cure periods, the Ground Lessor will not, in the exercise of any of the rights arising or which may arise out of such lease, disturb or deprive Tenant in or of its possession or its rights to possession of the Premises or of any right or privilege granted to or inuring to the benefit of Tenant under this Lease; (ii) in the event of the termination of the Ground Lease (as defined below), Tenant shall not be made a party in any removal or eviction action or proceeding, nor shall Tenant be evicted or removed of its possession or its right of possession of the Premises, and this Lease shall continue in full force and effect as a direct lease between the Ground Lessor and Tenant for the remainder of the Term and on the same terms and conditions as contained herein, without the necessity of executing a new lease; and (iii) Landlord and Tenant shall have the right to execute any amendment to this Lease which is specifically required hereunder and the Ground Lessor shall recognize and be bound thereto. "Ground Lessor" shall mean the landlord under any existing or future ground or underlying lease(s) affecting all or any part of the Shopping Center (such ground or underlying lease(s) is referred to as the "Ground Lease(s)"). "Mortgagee" shall mean any state or federally regulated bank, savings and loan association, insurance company, pension fund, credit union, real estate investment trust, or other institutional lender, which is not an Affiliate of Landlord, and which holds a mortgage on the Shopping Center or is the beneficiary under a deed of trust encumbering the Shopping Center (such mortgage or deed of trust is referred to as the "Mortgage").

SECTION 19.02 Existing Mortgages and Ground Leases. If a Mortgage or any Ground Lease encumbers the Shopping Center or any part thereof on the Effective Date, then, simultaneously with the execution of this Lease, Landlord shall deliver to Tenant, in recordable form: (a) a subordination, non-disturbance and attornment agreement substantially in the form attached as Exhibit J, in recordable form, executed by each and every Mortgagee, and (b) a fee owner recognition agreement in the form and content described in Section 19.01(b), in recordable form, executed by any Ground Lessor (and, as may be required, consented to by the Mortgagee). Should Landlord fail to so deliver such instrument(s) as provided above, Tenant shall have the right, by notice given to Landlord at any time prior to the date on which such instrument(s) are delivered, to terminate this Lease without further liability on the part of Landlord or Tenant, except: (i) for those obligations which expressly survive the expiration or other termination of this Lease, and (ii) Landlord shall (which obligation shall survive the termination of this Lease), within three (3) business days following Tenant's termination notice, reimburse Tenant for all its reasonable, third-party costs and expenses incurred in connection

with this Lease (including, without limitation, costs associated with the preparation and review of plans and specifications, the performance of Tenant's Work, and attorneys' fees), not to exceed Seventy-Five Thousand Dollars ($75,000).

SECTION 19.03  Transfer of Interest.  Landlord shall provide Tenant with notice upon or immediately after any sale or transfer of Landlord's interest in the Shopping Center. Landlord shall require the buyer or transferee to assume in writing all of the obligations of Landlord under this Lease. Notwithstanding Section 23.13, Landlord shall continue to remain liable for all accrued liability, if any, up to the date of such sale or transfer. Notwithstanding anything contained herein to the contrary, Landlord shall continue to remain liable hereunder after such sale or transfer unless the buyer or transferee has expressly assumed in writing all of the obligations of Landlord under this Lease.

SECTION 19.04  Tenant Estoppel Certificates.  Tenant agrees, within thirty (30) days of Landlord's request, to execute and deliver to Landlord or any Mortgagee, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Tenant's actual knowledge and belief that the Landlord is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.05  Landlord Estoppel Certificates.  Landlord agrees, within thirty (30) days of Tenant's request, to execute and deliver to Tenant or any assignee, transferee, subtenant or Lender, on a form prepared by or on behalf of the party so requesting, an estoppel certificate (a) ratifying this Lease and confirming that there are no modifications or amendments to this Lease, except as may be stated in the certificate, (b) confirming the commencement and expiration dates of this Lease, (c) certifying to Landlord's actual knowledge and belief that Tenant is not in default under this Lease, and that there are no offsets or defenses to enforcement of this Lease, except as may be stated in the certificate, and (d) stating the date through which Annual Minimum Rent and other charges payable by Tenant have been paid.

SECTION 19.06  Payments.  If Landlord shall request Tenant to execute more than one (1) subordination, attornment and recognition agreement or more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Tenant's obligations under Sections 19.01 or 19.04, as the case may be, Landlord shall pay to Tenant One Thousand Dollars ($1,000) for each subsequent request for a subordination, attornment and recognition agreement or an estoppel certificate within such twelve (12) month period. If Tenant shall request Landlord to execute more than one (1) estoppel certificate in any twelve (12) month period, then, as a condition to Landlord's obligations under Section 19.05, Tenant shall pay to Landlord One Thousand Dollars ($1,000) for each subsequent request for an estoppel certificate within such twelve (12) month period.

## ARTICLE XX

### LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS

SECTION 20.01 <u>Quiet Enjoyment</u>. Landlord covenants and agrees that, subject to Landlord's remedies properly exercised hereunder following a default by Tenant of any of the terms or provisions of this Lease past applicable notice and cure periods, Tenant, during the Term, shall freely, peacefully, and quietly occupy and enjoy the use and possession of the Premises without disturbance, molestation, hindrance or ejectment of any kind whatsoever.

SECTION 20.02 <u>Representations, Warranties and Covenants</u>. In order to induce Tenant to execute this Lease and in consideration thereof, Landlord covenants, warrants and represents to Tenant as follows:

(a)    As of the Possession Date, Landlord shall own the fee simple title to the Shopping Center free and clear of all easements, restrictions, liens, encumbrances, leases and the like, except as described on <u>Exhibit K</u>; that the Shopping Center, as of the Possession Date, is not (and will not be) subject to the lien of any Mortgage (except such instruments where the lienor has entered into an agreement in favor of Tenant, as described in Sections 19.01 and 19.02); that Landlord has the full power, right and authority to make this Lease for the Term without the consent, joinder, or approval of any other party; and that Landlord will put Tenant into complete and exclusive possession of the Premises free from all orders, restrictions, covenants, agreements, leases, easements, laws, codes, ordinances, regulations or decrees (including, without limitation, those matters described on <u>Exhibit K</u>) which would, in any way, prevent or inhibit the use of the Premises for the uses thereof by Tenant as contemplated by this Lease, or use of the Common Areas or ingress and egress to and from I-12 and Hwy 21.

(b)    Landlord shall, on or before the Possession Date, have caused the Delivery of the Land to occur in accordance with this Lease.

(c)    The Shopping Center shall, at the time of commencement of construction by Landlord, be properly zoned for the operation and maintenance of a store similar to other stores operated by Tenant and for its contemplated use, and that all necessary governmental consents, permits and approvals allowing for the Premises to be occupied for such use shall have been obtained by Landlord.

(d)    As of the Effective Date there is no Affiliated Land in existence and as of the Possession Date there will not be any Affiliated Land in existence (or, if there shall be Affiliated Land in existence, Landlord shall promptly notify Tenant thereof and promptly execute any recordable instrument reasonably requested by Tenant which memorializes the provisions of this Lease pertaining to or otherwise affecting Affiliated Land).

SECTION 20.03 <u>Site Covenants</u>. In order to induce Tenant to enter into this Lease, Landlord covenants to Tenant as follows (the "Site Covenants"):

(a)    Landlord shall not construct (or permit to be constructed) any buildings or other improvements in the area identified on the Site Plan as the "No-Build Area" (the "<u>No-Build Area</u>").

(b)     Landlord shall not construct (or permit to be constructed) any projections either vertical or horizontal (other than Tenant's signs or identifications) which will project along the front or rear of the building in which the Premises are situated in such a manner as to obstruct the view of Tenant's signs or its store front in any manner.

(c)     The number of paved, full-size parking spaces in the Shopping Center shall be the greater of (i) the ratio listed in Section 1.01(M) or (ii) the amount of spaces required by Laws (without variance), and, without limiting the generality of the foregoing, the number of spaces contained in Tenant's Preferred Area shall be the same number of spaces as shown on the Site Plan.

(d)     Landlord shall not erect (or permit to be erected) any building or other structures (including, without limitation, kiosks) in any outparcel except as and where shown on the Site Plan, and all outparcel buildings constructed in Pad 12, 13, 14, 15, 16 or 17 shall (i) not exceed a height of twenty-four(24) feet above the finished floor of the Premises (provided that roof top mechanicals, projections, and architectural treatments and embellishments may be permitted not to exceed twenty-eight (28) feet), (ii) not exceed 8,000 square feet of Floor Area, and (iii) be used solely for retail purposes; and the front door of the building constructed on Pad 14 shall face south.

(e)     Landlord shall not use (or permit the use of) all or any portion of the Common Areas for retail sales or for promotional purposes, subject to Tenant's rights under Section 2.01(c).

(f)     Landlord shall not make (and shall not permit there to be made) any changes to those Common Areas identified as "No-Change Area" on the Site Plan (the "No-Change Area") including, without limitation, changes in the location of curbcuts, drive aisles, entrances, access points, roadways, sidewalks or parking spaces or reduction of the parking ratio specified in Section 20.03(c), without Tenant's consent, which may be withheld in Tenant's sole discretion. Landlord shall not make (and shall not permit to be made) any other changes to the Common Areas which adversely affects Tenant's access to the Premises or the Shopping Center or the visibility of the Premises or of any of Tenant's signage, without Tenant's consent, which may be withheld in Tenant's sole discretion. Any other changes to the Common Areas may be made without Tenant's consent.

(g)     Following Tenant's opening for business at the Premises, (a) Landlord shall control any noise and dust at the Shopping Center (including, without limitation, during any periods of permitted construction within the Shopping Center) such that neither interferes with the normal operation of Tenant's business, and (b) Landlord shall not perform (and shall not permit there to be performed) any exterior construction in the Shopping Center during the months of October, November, December and January, except to the extent permitted under Section 5.01.

(h)     Landlord shall not permit any solicitation, distribution of handbills, picketing, or other public demonstration in the Common Areas, except as otherwise may be mandated by Laws.

(i)     No transmission and/or reception towers for wireless telephone or internet communications shall be permitted within the Shopping Center.

(j)     Landlord shall not knowingly install or permit to be installed by any other tenant or other person anywhere in the Shopping Center any structure or equipment which would cause any interference with satellite, radio, telecommunications or television reception or transmission in or from the Building.

SECTION 20.04 OEA.  Tenant hereby acknowledges that Landlord may wish to burden the Shopping Center, or any portion thereof, with terms of a declaration or restrictive covenants subsequent to the Effective Date.  Tenant hereby agrees that this Lease shall be subordinate to such future agreements recorded against the Shopping Center, without need for execution by Tenant of any consent or subordination thereto, so long as the terms thereof do not diminish any rights granted Tenant hereunder, impose any costs on Tenant, impair Landlord's ability to perform its obligations hereunder, or contain any terms which conflict with the terms of this Lease, and Tenant has approved the terms of such documents, Tenant's approval not to be unreasonably withheld.  If requested by Landlord, however, Tenant shall execute a consent and/or subordination agreement in recordable form, agreeing to be bound by the terms thereof, within thirty (30) days following Tenant's approval of the documents.

## ARTICLE XXI

## HOLDING OVER

SECTION 21.01 Holding Over.  If Tenant remains in possession of the Premises after the expiration of the Term without having duly exercised its right, if any, to extend or further extend the Term, such continuing possession shall create a month-to-month tenancy on the terms herein specified and such tenancy may be terminated at the end of any month thereafter by either party by giving at least thirty (30) days notice thereof to the other party; provided, however, that no such extension shall continue for more than one (1) year following the expiration of the Term.  During such holdover and provided that Landlord and Tenant are not in good faith negotiations with regard to the renewal or extension of this Lease or the entering into a new lease for premises within the Shopping Center, Tenant shall be liable for Annual Minimum Rent on a monthly basis (or, if applicable, on a prorated daily basis) in an amount equal to one hundred fifteen percent (115%) of the amount thereof payable by Tenant for the month immediately preceding the last day of the Term, as well as for all Additional Rent payable by Tenant under this Lease.  Should Tenant or any party claiming under Tenant remain in possession of the Premises, or any part thereof, for more than one (1) year following the expiration of the Term, or after Landlord has terminated the month-to-month tenancy as set forth hereinabove, no tenancy or interest in the Premises shall result therefrom but such holding over shall be an unlawful detainer and all such parties shall be subject to immediate eviction and removal (provided, however, that no such eviction shall occur without a judicial order authorizing same), and Tenant covenants and agrees to pay Landlord, without demand, a sum equal to one hundred fifty percent (150%) the Rent as specified herein, for any period during which Tenant shall hold the Premises after such termination.

## ARTICLE XXII

### NOTICE

SECTION 22.01 <u>Where and How Given</u>.  All notices or demands which either party hereto either is required to or may desire to serve upon the other shall be in writing and shall be sufficiently served upon such other party, by (a) mailing a copy thereof by certified or registered mail, postage prepaid, return receipt requested, addressed to the party to whom the notice is directed at the "Notice Address" of such party, or (b) by a reliable overnight courier (such as Federal Express), all charges prepaid, furnishing a receipt upon delivery, and addressed to the party to whom the notice is addressed at the Notice Address of the party.  The Notice Address of each party is:

|  |  |
|---|---|
| a)  Landlord: | CP Nord Du Lac JV, LLC<br>c/o Colonial Properties Trust<br>2101 Sixth Avenue, North, Suite 750<br>Birmingham, Alabama 35203<br>ATTN: Richard Yeilding |
| WITH A COPY TO: | Burr & Forman LLP<br>420 North 20th Street, Suite 3400<br>Birmingham, Alabama 35203<br>ATTN: W. Benjamin Johnson |
| LANDLORD'S PLACE TO PAY RENT: | |
| | CP Nord Du Lac JV, LLC<br>c/o Colonial Properties Trust<br>P.O. Box 55966, Department 2065<br>Birmingham, Alabama 35255-5966 |
| b)  Tenant: | Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention: Vice President of Real Estate |
| with a copy to: | Circuit City Stores, Inc.<br>9950 Mayland Drive<br>Richmond, Virginia 23233<br>Attention:  General Counsel |
| with a copy to: | Kostas & Birne, LLP<br>530 One Turtle Creek Village<br>3878 Oak Lawn Avenue<br>Dallas, Texas 75219<br>Attention:  Pamela G. Kostas |

The addresses to which notices and demands shall be delivered or sent may be changed from time to time by notice served, as hereinbefore provided, by either party upon the other party.

SECTION 22.02  When Given.  Unless otherwise provided for herein, notice shall be deemed to have been served at the earlier of the date received, refused or returned as undeliverable. However, if such notice pertains to the change of address of either of the parties hereto, then such notice shall be deemed to have been served upon receipt thereof by the party to whom such notice is given.

## ARTICLE XXIII

## MISCELLANEOUS

SECTION 23.01  Rent Proration.  If this Lease is terminated prior to its natural expiration date for any reason other than a Tenant default, then Landlord shall promptly reimburse Tenant for any Rent prepaid by Tenant for periods subsequent to such termination date. This Section 23.01 shall survive the termination of this Lease.

SECTION 23.02  Construction.  In construing this Lease, feminine or neuter pronouns shall be substituted for those masculine in form and vice versa, and plural terms shall be substituted for singular and singular for plural in any place in which the context so requires. This Lease shall be construed without regard to: (a) the identity of the party who drafted the various provisions hereof, and (b) the addition or deletion of text made during the negotiation of this Lease. Moreover, each and every provision of this Lease shall be construed as though all parties hereto participated equally in the drafting thereof. As a result of the foregoing, any rule or construction that a document is to be construed against the drafting party shall not be applicable hereto.

SECTION 23.03  Section Headings.  The section headings in this Lease are for convenience only and do not in any way limit or simplify the terms and provisions of this Lease, nor should they be used to determine the intent of the parties.

SECTION 23.04  Partial Invalidity.  If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, then the remainder of this Lease or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant, condition and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

SECTION 23.05  Waiver.  The failure of either party to seek redress for violation of, or to insist upon strict performance of, any term, covenant or condition contained in this Lease shall not prevent a similar subsequent act from constituting a default under this Lease.

SECTION 23.06  Governing Law.  This Lease shall be governed and construed in accordance with the laws of the State.

SECTION 23.07  Successors and Assigns.  This Lease shall inure to the benefit of and be binding upon the heirs, executors, administrators, successors and assigns of Landlord and the successors and assigns of Tenant.

SECTION 23.08  No Broker.  Landlord and Tenant represent to each other that no broker or person is entitled to any commission by reason of the negotiation and execution of this Lease, other than the Broker identified in Section 1.01(D), and Landlord agrees that Landlord shall be solely responsible for the fees and commissions of the Broker.  Landlord and Tenant agree to indemnify, defend and hold each other harmless against any and all claims by any other person for brokerage commissions or fees arising out of any conversation, negotiations or other dealings held by the other party with any other broker regarding this Lease.

SECTION 23.09  Memorandum of Lease.  Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, substantially similar to that attached as Exhibit L, setting forth such provisions hereof as may be required by State law.  If so requested by Tenant, Landlord shall execute such Memorandum of Lease simultaneously with the execution of this Lease.  Recording costs associated with such Memorandum of Lease shall be borne by Tenant.  The provisions of this Lease shall control with regard to any omissions from, or provisions which may be in conflict with, the Memorandum of Lease.

SECTION 23.10  Entire Agreement.  This instrument contains the entire and only agreement between the parties and no oral statements or representations or written matter not contained in this instrument shall have any force or effect.  This Lease shall not be amended or modified in any way except by a writing executed by both parties.  All of the exhibits attached to this Lease are incorporated into this Lease by reference and for all purposes are a part of this Lease.

SECTION 23.11  Relationship of Parties.  The relationship between the parties hereto is solely that of landlord and tenant and nothing in this Lease shall be construed as creating a partnership or joint venture between the parties hereto, it being the express intent of Landlord and Tenant that the business of Tenant on the Premises and elsewhere, and the good will thereof, shall be and remain the sole property of Tenant.

SECTION 23.12  Force Majeure.  If either party hereto shall be delayed or hindered in, or prevented from, the performance of any act required under this Lease by reason of acts of God, extreme weather events such as tornados and hurricanes, strikes, lockouts, labor troubles, failure of power, riots, insurrection, war or other reasons of a like nature beyond the reasonable control of the party delayed in performing works or doing acts required under the terms of this Lease (any such delay, hindrance or prevention is referred to as "Force Majeure"), then performance of such act shall be excused for the period of the delay, and the period of the performance of any such act shall be extended for a period equivalent to the period of such delay, except as otherwise specifically provided herein to the contrary.  The provisions of this Section 23.12 shall not be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

SECTION 23.13  Limitation of Landlord's Liability.  Except with respect to (a) insurance proceeds or condemnation awards received by Landlord which are required by the terms of this

Lease to be applied to the repair or restoration of the Premises or the Shopping Center, (b) Landlord's failure to pay the Landlord Reimbursement in accordance with this Lease, and (c) any monies owed by Landlord to Tenant in connection with Landlord's default in performing Landlord's Work, Tenant shall, on and after the Commencement Date, look only to Landlord's estate and property in the Shopping Center (or the proceeds from the sale, financing or refinancing of all or any portion thereof) and net income derived from the Shopping Center for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord hereunder, and no other property or assets of Landlord, its officers, directors, stockholders, members or partners shall be subject to levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies under or with respect to this Lease. Except with respect to the limitation on personal liability hereinabove set forth, the provisions of this Section 23.13 shall not be deemed or construed to limit Tenant's rights and remedies pursuant to this Lease or which may be available at law, in equity or otherwise.

SECTION 23.14  Limitation of Tenant's Liability.  Landlord, its successors and assigns, shall look solely to the assets, if any, of Tenant and its successors and assigns, for the satisfaction of any claim arising from or under this Lease and shall not seek to impose personal liability on any shareholder, officer, director, member or employee of Tenant or any of its Affiliates.

SECTION 23.15  Consents.  Except as may be otherwise expressly set forth in this Lease, whenever under this Lease provision is made for either party's securing the consent or approval of the other party, (a) such consent or approval shall be in writing and shall not be unreasonably withheld, delayed or conditioned, and (b) in all matters contained herein, both parties shall have an implied obligation of reasonableness.

SECTION 23.16  Costs.  Whenever this Lease requires the performance of an act by a party, such party shall perform the act at its own cost and expense, unless otherwise expressly provided to the contrary in this Lease.

SECTION 23.17  Attorneys' Fees.  In any action or proceeding hereunder (whether to enforce the terms and provisions of an indemnity or otherwise), the prevailing party shall be entitled to recover from the other party the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees, costs and expenses. Except as otherwise set forth herein, if either party is sued by a third party as a result of a violation of a covenant, representation or warranty herein contained by the other party hereto, then the party who has violated the covenant, representation or warranty shall be responsible for the reasonable costs and expenses in such action or proceeding against the non-violating party, including reasonable attorneys' fees, costs and expenses.

SECTION 23.18  Survival of Obligations.  The obligation to pay any sums due to either party from the other that by the terms herein would not be payable, or are incapable of calculation, until after the expiration or sooner termination of this Lease shall survive and remain a continuing obligation until paid. All indemnity obligations under this Lease shall survive the expiration or earlier termination of this Lease.

SECTION 23.19 <u>Joint and Several Liability</u>. If either party consists of more than one person, then the persons constituting such party shall be jointly and severally liable hereunder.

SECTION 23.20 <u>Definition of Hereunder, Herein, etc.</u>. Unless the context clearly indicates to the contrary, the words "herein," "hereof," "hereunder," "hereafter," and words of similar import refer to this Lease and all of the Exhibits attached hereto as a whole and not to any particular section, subsection, or paragraph hereof.

SECTION 23.21 <u>Tenant's Trade Name</u>. Landlord shall not make use of Tenant's trade name (*i.e.*, "Circuit City"®) in any advertising or marketing material including, without limitation, on any internet website, without obtaining Tenant's prior written approval, which may be withheld in Tenant's sole and absolute discretion. Notwithstanding the foregoing, Landlord may use Tenant's trade name on Landlord's website and in informational brochures, but only for the purposes of identifying Tenant as a tenant of the Shopping Center.

SECTION 23.22 <u>Counterparts</u>. This instrument may be executed in several counterparts, each of which shall be deemed an original. The signatures to this instrument may be executed and notarized on separate pages, and when attached to this instrument, shall constitute one complete document.

[Signature page follows]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and delivered in their respective names as of the date first above written.

LANDLORD:

**CP NORD DU LAC JV, LLC,** a Delaware limited liability company

BY: _____

Attest/Witness:                           John L. Moss
                                          Its:  Authorized Manager

_____

TENANT:

**CIRCUIT CITY STORES, INC.,** a Virginia corporation

Date: December 10 2009

By: _____

John B. Mulcahy
Vice President, Real Estate and Construction

Tenant's counsel:

Approved for Signature:

Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas 75219

_____ Responsible Atty.

_____ RE Manager

1604683 v6                              47

## EXHIBIT A

### Site Plan

Premises – crosshatched, with Floor Area and frontage thereof (Section 1.01P)
All buildings within the Shopping Center and Floor Area thereof (Section 1.01S)
Customer Pick-Up Areas (Section 2.01(c))
Car Stereo Parking Areas (Section 2.01(c))
Trash Compactor Area (Section 2.01(c))
Web Order Pick-Up Parking Spaces (Section 2.01(c))
Transformer Pad Area (Section 2.01(c))
Tenant's Preferred Area (Section 2.01(c))
Staging Area (Section 3.01)
Construction Drive (Section 5.02(b))
Pylon Sign(s) (Section 15.02)
Public Thoroughfares (Section 20.02(a))
No Build Area (Section 20.03(a))
Parking Spaces In Tenant's Preferred Area (Section 20.03(c))
Landlord's permitted outparcel build-out area (Section 22.03(d))
No-Change Area (Section 20.03(f))
"Lifestyle Center"

A-1



OVERALL SITE PLAN - EXHIBIT "A"



**OVERALL SITE PLAN – EXHIBIT "A1"**
1"=120'

EXHIBIT B

<u>Legal Description of the Shopping Center</u>

**(Tracts A, B, C & E)**

**<u>TRACT "A" (DILLARD TRACT)</u>**

A CERTAIN PIECE OR PORTION OF LAND SITUATED IN SECTION 47, TOWNSHIP 7 SOUTH, RANGE 11 EAST, ST. TAMMANY PARISH, LOUISIANA BEING MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING FROM THE CORNER COMMON TO SECTIONS 12, 13 & 46 TOWNSHIP 7 SOUTH, RANGE 10 EAST, ST. TAMMANY PARISH, LOUISIANA RUN NORTH 00 DEGREES 40 MINUTES 50 SECONDS EAST FOR A DISTANCE OF 1423.63 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 23 MINUTES 30 SECONDS EAST FOR A DISTANCE OF 1109.12 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 14 MINUTES 55 SECONDS EAST FOR A DISTANCE OF 95.62 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 17 MINUTES 06 SECONDS EAST FOR A DISTANCE OF 700.84' TO A POINT ON THE NORTH RIGHT-OF-WAY OF INTERSTATE 12 AND THE EAST RIGHT-OF-WAY OF LOUISIANA HIGHWAY 21; THENCE RUN ALONG SAID NORTH RIGHT-OF-WAY OF INTERSTATE 12 SOUTH 48 DEGREES 43 MINUTES 29 SECONDS EAST FOR A DISTANCE OF 326.61 FEET TO A POINT; THENCE RUN SOUTH 10 DEGREES 45 MINUTES 52 SECONDS EAST FOR A DISTANCE OF 243.47 FEET TO A POINT; THENCE RUN NORTH 51 DEGREES 51 MINUTES 57 SECONDS EAST FOR A DISTANCE OF 368.91 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY OF PINNACLE PARKWAY, SAID POINT BEING A POINT ON A CURVE TO THE RIGHT (CLOCKWISE & NON-TANGENT); THENCE RUN ALONG SAID RIGHT-OF-WAY AND CURVE WITH A RADIUS OF 353.09 FEET, AND AN ARC LENGTH OF 448.26 FEET, A CHORD BEARING OF SOUTH 33 DEGREES 52 MINUTES 00 SECONDS EAST AND A CHORD LENGTH OF 418.76 FEET TO A POINT; THENCE LEAVING SAID RIGHT-OF-WAY, RUN SOUTH 86 DEGREES 14 MINUTES 10 SECONDS EAST FOR A DISTANCE OF 120.07 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY OF PINNACLE PARKWAY, SAID POINT BEING ON A CURVE TO THE LEFT (COUNTERCLOCKWISE & NON-TANGENT); THENCE RUN ALONG SAID NORTHERLY RIGHT-OF-WAY AND CURVE WITH A RADIUS OF 451.09 FEET, AN ARC

B-1

LENGTH OF 522.22 FEET, A CHORD BEARING OF NORTH 30 DEGREES 01 MINUTES
18 SECONDS WEST AND A CHORD LENGTH OF 493.54 FEET TO A POINT; THENCE
CONTINUE ALONG SAID RIGHT-OF-WAY, NORTH 65 DEGREES 54 MINUTES 56
SECONDS WEST FOR A DISTANCE OF 91.00 FEET TO A POINT ON A CURVE TO THE
RIGHT (CLOCKWISE & TANGENT); THENCE RUN ALONG SAID CURVE WITH A
RADIUS OF 360.00 FEET, AND AN ARC LENGTH OF 228.33 FEET, A CHORD BEARING
OF NORTH 47 DEGREES 44 MINUTES 46 SECONDS WEST AND A CHORD LENGTH OF
224.52 FEET TO A POINT; THENCE CONTINUE ALONG SAID RIGHT-OF-WAY, NORTH
29 DEGREES 34 MINUTES 34 SECONDS WEST FOR A DISTANCE OF 63.58 FEET TO A
POINT; THENCE LEAVING SAID RIGHT-OF-WAY RUN NORTH 34 DEGREES 02
MINUTES 02 SECONDS EAST FOR A DISTANCE OF 11.19 FEET TO A POINT; THENCE
RUN SOUTH 29 DEGREES 34 MINUTES 34 SECONDS EAST FOR A DISTANCE OF 68.57
FEET TO A POINT ON A CURVE TO THE LEFT (COUNTERCLOCKWISE & TANGENT);
THENCE RUN ALONG SAID CURVE WITH A RADIUS OF 350.00 FEET, AND AN ARC
LENGTH OF 37.75 FEET, A CHORD BEARING OF SOUTH 32 DEGREES 37 MINUTES 59
SECONDS EAST AND A CHORD LENGTH OF 37.73 FEET TO A POINT; THENCE RUN
NORTH 89 DEGREES 15 MINUTES 56 SECONDS EAST FOR A DISTANCE OF 1352.83
FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 01 MINUTES 52 SECONDS
WEST FOR A DISTANCE OF 395.34 FEET TO THE POINT OF BEGINNING.
FROM THE POINT OF BEGINNING CONTINUE SOUTH 21 DEGREES 01 MINUTES 52
SECONDS WEST FOR A DISTANCE OF 495.93 FEET TO A POINT; THENCE RUN
SOUTH 59 DEGREES 10 MINUTES 25 SECONDS WEST FOR A DISTANCE OF 112.99
FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 08 MINUTES 46 SECONDS
WEST FOR A DISTANCE OF 229.85 FEET TO A POINT; THENCE RUN NORTH 68
DEGREES 59 MINUTES 35 SECONDS WEST FOR A DISTANCE OF 237.96 FEET TO A
POINT; THENCE RUN NORTH 21 DEGREES 00 MINUTES 56 SECONDS EAST FOR A
DISTANCE OF 247.62 FEET TO A POINT; THENCE RUN NORTH 24 DEGREES 40
MINUTES 25 SECONDS WEST FOR A DISTANCE OF 59.58 FEET TO A POINT; THENCE
RUN NORTH 68 DEGREES 58 MINUTES 08 SECONDS WEST FOR A DISTANCE OF
127.90 FEET TO A POINT; THENCE RUN NORTH 69 DEGREES 07 MINUTES 11
SECONDS WEST FOR A DISTANCE OF 103.10 FEET TO A POINT; THENCE RUN
NORTH 04 DEGREES 04 MINUTES 39 SECONDS EAST FOR A DISTANCE OF 66.20

FEET TO A POINT ON A CURVE TO THE LEFT (COUNTERCLOCKWISE & TANGENT);
THENCE RUN ALONG SAID CURVE WITH A RADIUS OF 486.48 FEET, AND AN ARC
LENGTH OF 275.39 FEET, A CHORD BEARING OF NORTH 12 DEGREES 08 MINUTES
30 SECONDS WEST AND A CHORD LENGTH OF 271.73 FEET TO A POINT; THENCE
RUN NORTH 57 DEGREES 49 MINUTES 05 SECONDS EAST FOR A DISTANCE OF
143.37 FEET TO A POINT ON A CURVE TO THE RIGHT (CLOCKWISE & TANGENT);
THENCE RUN ALONG SAID CURVE WITH A RADIUS OF 289.48 FEET, AND AN ARC
LENGTH OF 263.02 FEET, A CHORD BEARING OF NORTH 84 DEGREES 04 MINUTES
39 SECONDS EAST AND A CHORD LENGTH OF 254.07 FEET TO A POINT ON A
CURVE TO THE RIGHT (CLOCKWISE & TANGENT); THENCE RUN ALONG SAID
CURVE WITH A RADIUS OF 1162.13 FEET, AND AN ARC LENGTH OF 151.01 FEET, A
CHORD BEARING OF SOUTH 70 DEGREES 53 MINUTES 01 SECONDS EAST AND A
CHORD LENGTH OF 150.91 FEET TO A POINT; THENCE RUN SOUTH 68 DEGREES 58
MINUTES 08 SECONDS EAST FOR A DISTANCE OF 220.37 FEET TO A POINT;
THENCE RUN NORTH 20 DEGREES 49 MINUTES 31 SECONDS EAST FOR A
DISTANCE OF 28.45 FEET TO A POINT; THENCE RUN SOUTH 68 DEREES 59 MINUTES
27 SECONDS EAST FOR A DISTANCE OF 66.49 FEET BACK TO THE POINT OF
BEGINNING.
SAID PARCEL OF LAND CONTAINS 9.46 ACRES (411,867 SQ. FT.) MORE OR LESS.

### TRACT "B" (KOHL'S TRACT)

A CERTAIN PIECE OR PORTION OF LAND SITUATED IN SECTION 47, TOWNSHIP 7
SOUTH, RANGE 11 EAST, ST. TAMMANY PARISH, LOUISIANA BEING MORE FULLY
DESCRIBED AS FOLLOWS:
COMMENCING FROM THE CORNER COMMON TO SECTIONS 12, 13 & 46 TOWNSHIP
7 SOUTH, RANGE 10 EAST, ST. TAMMANY PARISH, LOUISIANA RUN NORTH 00
DEGREES 40 MINUTES 50 SECONDS EAST FOR A DISTANCE OF 1423.63 FEET TO A
POINT; THENCE RUN NORTH 89 DEGREES 23 MINUTES 30 SECONDS EAST FOR A
DISTANCE OF 1109.12 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 14
MINUTES 55 SECONDS EAST FOR A DISTANCE OF 95.62 FEET TO A POINT; THENCE
RUN NORTH 89 DEGREES 17 MINUTES 06 SECONDS EAST FOR A DISTANCE OF
700.84' TO A POINT ON THE NORTH RIGHT-OF-WAY OF INTERSTATE 12 AND THE

EAST RIGHT-OF-WAY OF LOUISIANA HIGHWAY 21; THENCE RUN ALONG SAID
NORTH RIGHT-OF-WAY OF INTERSTATE 12 SOUTH 48 DEGREES 43 MINUTES 29
SECONDS EAST FOR A DISTANCE OF 326.61 FEET TO A POINT; THENCE RUN
SOUTH 10 DEGREES 45 MINUTES 52 SECONDS EAST FOR A DISTANCE OF 243.47
FEET TO A POINT; THENCE RUN NORTH 51 DEGREES 51 MINUTES 57 SECONDS
EAST FOR A DISTANCE OF 368.91 FEET TO A POINT ON THE SOUTHERLY RIGHT-
OF-WAY OF PINNACLE PARKWAY, SAID POINT BEING A POINT ON A CURVE TO
THE RIGHT (CLOCKWISE & NON-TANGENT); THENCE RUN ALONG SAID RIGHT-OF-
WAY AND CURVE WITH A RADIUS OF 353.09 FEET, AND AN ARC LENGTH OF 448.26
FEET, A CHORD BEARING OF SOUTH 33 DEGREES 52 MINUTES 00 SECONDS EAST
AND A CHORD LENGTH OF 418.76 FEET TO A POINT; THENCE LEAVING SAID
RIGHT-OF-WAY RUN SOUTH 86 DEGREES 14 MINUTES 10 SECONDS EAST FOR A
DISTANCE OF 120.07 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY OF
PINNACLE PARKWAY, SAID POINT BEING ON A CURVE TO THE LEFT
(COUNTERCLOCKWISE & NON-TANGENT); THENCE RUN ALONG SAID
NORTHERLY RIGHT-OF-WAY AND CURVE WITH A RADIUS OF 451.09 FEET, AND
AN ARC LENGTH OF 522.22 FEET, A CHORD BEARING OF NORTH 30 DEGREES 01
MINUTES 18 SECONDS WEST AND A CHORD LENGTH OF 493.54 FEET TO A POINT;
THENCE CONTINUE ALONG SAID RIGHT-OF-WAY, NORTH 65 DEGREES 54
MINUTES 56 SECONDS WEST FOR A DISTANCE OF 91.00 FEET TO A POINT ON A
CURVE TO THE RIGHT (CLOCKWISE & TANGENT); THENCE RUN ALONG SAID
CURVE WITH A RADIUS OF 360.00 FEET, AND AN ARC LENGTH OF 228.33 FEET, A
CHORD BEARING OF NORTH 47 DEGREES 44 MINUTES 46 SECONDS WEST AND A
CHORD LENGTH OF 224.52 FEET TO A POINT; THENCE CONTINUE ALONG SAID
RIGHT-OF-WAY, NORTH 29 DEGREES 34 MINUTES 34 SECONDS WEST FOR A
DISTANCE OF 63.58 FEET TO A POINT; THENCE LEAVING SAID RIGHT-OF-WAY
RUN NORTH 34 DEGREES 02 MINUTES 02 SECONDS EAST FOR A DISTANCE OF 11.19
FEET TO A POINT; THENCE RUN SOUTH 29 DEGREES 34 MINUTES 34 SECONDS
EAST FOR A DISTANCE OF 68.57 FEET TO A POINT ON A CURVE TO THE LEFT
(COUNTERCLOCKWISE & TANGENT); THENCE RUN ALONG SAID CURVE WITH A
RADIUS OF 350.00 FEET, AND AN ARC LENGTH OF 37.75 FEET, A CHORD BEARING
OF SOUTH 32 DEGREES 37 MINUTES 59 SECONDS EAST AND A CHORD LENGTH OF

B-4

37.73 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 15 MINUTES 56 SECONDS EAST FOR A DISTANCE OF 2228.44 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 01 MINUTES 24 SECONDS WEST FOR A DISTANCE OF 288.34 FEET TO A POINT; THENCE RUN SOUTH 24 DEGREES 03 MINUTES 50 SECONDS EAST FOR A DISTANCE OF 129.53 FEET TO A POINT; THENCE RUN SOUTH 68 DEGREES 58 MINUTES 39 SECONDS EAST FOR A DISTANCE OF 76.41 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 01 MINUTES 52 SECONDS WEST FOR A DISTANCE OF 268.29 FEET TO THE POINT OF BEGINNING.

FROM THE POINT OF BEGINNING RUN SOUTH 68 DEGREES 58 MINUTES 00 SECONDS EAST FOR A DISTANCE OF 334.34 FEET TO A POINT ON A CURVE TO THE RIGHT (CLOCKWISE & TANGENT); THENCE RUN ALONG SAID CURVE WITH A RADIUS OF 319.85 FEET, AND AN ARC LENGTH OF 291.86 FEET, A CHORD BEARING OF SOUTH 42 DEGREES 18 MINUTES 45 SECONDS EAST AND A CHORD LENGTH OF 281.84 FEET TO A POINT; THENCE RUN SOUTH 85 DEGREES 01 MINUTES 52 SECONDS WEST FOR A DISTANCE OF 24.66 FEET TO A POINT; THENCE RUN SOUTH 84 DEGREES 52 MINUTES 34 SECONDS WEST FOR A DISTANCE OF 186.96 FEET TO A POINT; THENCE RUN NORTH 68 DEGREES 58 MINUTES 08 SECONDS WEST FOR A DISTANCE OF 28.48 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 14 MINUTES 14 SECONDS WEST FOR A DISTANCE OF 165.51 FEET TO A POINT; THENCE RUN SOUTH 68 DEGREES 58 MINUTES 08 SECONDS EAST FOR A DISTANCE OF 60.77 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 01 MINUTES 52 SECONDS WEST FOR A DISTANCE OF 248.50 FEET TO A POINT; THENCE RUN NORTH 68 DEGREES 58 MINUTES 39 SECONDS WEST FOR A DISTANCE OF 57.20 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 00 MINUTES 56 SECONDS WEST FOR A DISTANCE OF 136.10 FEET TO A POINT; THENCE RUN NORTH 68 DEGREES 58 MINUTES 14 SECONDS WEST FOR A DISTANCE OF 324.29 FEET TO A POINT; THENCE RUN NORTH 21 DEGREES 00 MINUTES 56 SECONDS EAST FOR A DISTANCE OF 136.11 FEET TO A POINT; THENCE RUN NORTH 21 DEGREES 02 MINUTES 37 SECONDS EAST FOR A DISTANCE OF 248.51 FEET TO A POINT; THENCE RUN NORTH 20 DEGREES 59 MINUTES 04 SECONDS EAST FOR A DISTANCE OF 223.34 FEET TO A POINT; THENCE RUN NORTH 68 DEGREES 58 MINUTES 08 SECONDS WEST FOR A

B-5

DISTANCE OF 9.82 FEET TO A POINT; THENCE RUN NORTH 21 DEGREES 01 MINUTES 52 SECONDS EAST FOR A DISTANCE OF 58.17 FEET TO A POINT; THENCE RUN NORTH 68 DEGREES 58 MINUTES 08 SECONDS WEST FOR A DISTANCE OF 36.50 FEET TO A POINT; THENCE RUN NORTH 21 DEGREES 01 MINUTES 52 SECONDS EAST FOR A DISTANCE OF 103.69 FEET BACK TO THE POINT OF BEGINNING.

SAID PARCEL OF LAND CONTAINS 6.83 ACRES (297,471 SQ. FT.) MORE OR LESS.

TRACT "C" (DEVELOPER TRACT)

A CERTAIN PIECE OR PORTION OF LAND BEING A 108.36 ACRE TRACT SITUATED IN SECTION 47, TOWNSHIP 7 SOUTH, RANGE 11 EAST, ST. TAMMANY PARISH, LOUISIANA BEING MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING FROM THE CORNER COMMON TO SECTIONS 12, 13 & 46 TOWNSHIP 7 SOUTH, RANGE 10 EAST, ST. TAMMANY PARISH, LOUISIANA RUN NORTH 00 DEGREES 40 MINUTES 50 SECONDS EAST FOR A DISTANCE OF 1423.63 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 23 MINUTES 30 SECONDS EAST FOR A DISTANCE OF 1109.12 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 14 MINUTES 55 SECONDS EAST FOR A DISTANCE OF 95.62 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 17 MINUTES 06 SECONDS EAST FOR A DISTANCE OF 700.84' TO A POINT ON THE NORTH RIGHT-OF-WAY OF INTERSTATE 12 AND THE EAST RIGHT-OF-WAY OF LOUISIANA HIGHWAY 21; THENCE RUN ALONG SAID NORTH RIGHT-OF-WAY OF INTERSTATE 12 SOUTH 48 DEGREES 43 MINUTES 29 SECONDS EAST FOR A DISTANCE OF 326.61 FEET TO A POINT; THENCE RUN SOUTH 10 DEGREES 45 MINUTES 52 SECONDS EAST FOR A DISTANCE OF 243.47 FEET TO A POINT; THENCE RUN NORTH 51 DEGREES 51 MINUTES 57 SECONDS EAST FOR A DISTANCE OF 367.15 FEET TO THE POINT OF BEGINNING.

FROM THE POINT OF BEGINNING RUN NORTH 51 DEGREES 51 MINUTES 57 SECONDS EAST FOR A DISTANCE OF 1.76 FEET TO A POINT ON THE SOUTHERLY RIGHT-OF-WAY OF PINNACLE PARKWAY, SAID POINT BEING A POINT ON A CURVE TO THE RIGHT (CLOCKWISE & NON-TANGENT); THENCE RUN ALONG SAID RIGHT-OF-WAY AND CURVE WITH A RADIUS OF 353.09 FEET AND AN ARC LENGTH OF 448.26 FEET, A CHORD BEARING OF SOUTH 33 DEGREES 52 MINUTES

B-6

00 SECONDS EAST AND A CHORD LENGTH OF 418.76 FEET TO A POINT; THENCE LEAVING SAID RIGHT-OF-WAY, RUN SOUTH 86 DEGREES 14 MINUTES 10 SECONDS EAST A DISTANCE OF 120.07 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY OF PINNACLE PARKWAY AND A CURVE TO THE LEFT (COUNTERCLOCKWISE & NON-TANGENT); THENCE RUN ALONG SAID RIGHT-OF-WAY AND CURVE WITH A RADIUS OF 451.09 FEET AND AN ARC LENGTH OF 522.22 FEET, A CHORD BEARING OF NORTH 30 DEGREES 01 MINUTES 18 SECONDS WEST AND A CHORD LENGTH OF 493.54 FEET TO A POINT; THENCE CONTINUE ALONG SAID RIGHT-OF-WAY NORTH 65 DEGREES 54 MINUTES 56 SECONDS WEST A DISTANCE OF 91.00 FEET TO A POINT ON A CURVE TO THE RIGHT (CLOCKWISE & TANGENT); THENCE CONTINUE ALONG SAID RIGHT-OF-WAY AND CURVE WITH A RADIUS OF 360.00 FEET AND AN ARC LENGTH OF 228.33 FEET, A CHORD BEARING NORTH 47 DEGREES 44 MINUTES 46 SECONDS WEST AND A CHORD LENGTH OF 224.52 FEET TO A POINT; THENCE CONTINUE ALONG SAID RIGHT-OF-WAY NORTH 29 DEGREES 34 MINUTES 34 SECONDS WEST A DISTANCE OF 63.58 FEET TO A POINT; THENCE LEAVING SAID RIGHT-OF-WAY, RUN NORTH 34 DEGREES 02 MINUTES 02 SECONDS EAST A DISTANCE OF 11.19 FEET TO A POINT; THENCE RUN SOUTH 29 DEGREES 34 MINUTES 34 SECONDS EAST A DISTANCE OF 68.57 FEET TO A POINT ON A CURVE TO THE LEFT (COUNTERCLOCKWISE & TANGENT); THENCE RUN ALONG SAID CURVE WITH A RADIUS OF 350.00 FEET AND AN ARC LENGTH OF 37.75 FEET, A CHORD BEARING SOUTH 32 DEGREES 37 MINUTES 59 SECONDS EAST AND A CHORD LENGTH OF 37.73 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 15 MINUTES 56 SECONDS EAST A DISTANCE OF 2228.44 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 01 MINUTES 24 SECONDS WEST A DISTANCE OF 288.34 FEET TO A POINT; THENCE RUN SOUTH 24 DEGREES 03 MINUTES 50 SECONDS EAST A DISTANCE OF 129.53 FEET TO A POINT; THENCE RUN SOUTH 68 DEGREES 58 MINUTES 39 SECONDS EAST A DISTANCE OF 2372.21 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 01 MINUTES 30 SECONDS WEST A DISTANCE OF 675.48 FEET TO A POINT; THENCE RUN NORTH 68 DEGREES 58 MINUTES 39 SECONDS WEST A DISTANCE OF 446.91 FEET TO A POINT; THENCE RUN SOUTH 21 DEGREES 01 MINUTES 21 SECONDS WEST A DISTANCE OF 220.05 FEET TO A POINT ON THE NORTHERLY RIGHT-OF-WAY INTERSTATE 12 AND SAID POINT BEING ON A

CURVE TO THE LEFT (COUNTERCLOCKWISE & NON-TANGENT); THENCE RUN
ALONG SAID CURVE WITH A RADIUS OF 1498.00 FEET, AN ARC LENGTH OF 171.48
FEET, A CHORD BEARING OF NORTH 75 DEGREES 13 MINUTES 41 SECONDS WEST
AND A CHORD LENGTH OF 171.38 FEET TO A POINT; THENCE RUN SOUTH 11
DEGREES 29 MINUTES 34 SECONDS WEST FOR A DISTANCE OF 188.00 FEET TO A
POINT ON A CURVE TO THE RIGHT (CLOCKWISE & NON-TANGENT); THENCE RUN
ALONG SAID CURVE WITH A RADIUS OF 1310.00 FEET, AN ARC LENGTH OF 253.96
FEET, A CHORD BEARING OF SOUTH 72 DEGREES 57 MINUTES 13 SECONDS EAST
AND A CHORD LENGTH OF 253.56 FEET TO A POINT; THENCE RUN SOUTH 20
DEGREES 52 MINUTES 52 SECONDS WEST FOR A DISTANCE OF 44.99 FEET TO A
POINT; THENCE RUN SOUTH 67 DEGREES 31 MINUTES 58 SECONDS WEST A
DISTANCE OF 415.14 FEET TO A POINT; THENCE RUN NORTH 68 DEGREES 56
MINUTES 31 SECONDS WEST A DISTANCE OF 2148.28 FEET TO A POINT ON A
CURVE TO THE RIGHT (CLOCKWISE & TANGENT); THENCE CONTINUE ALONG
SAID RIGHT-OF-WAY AND CURVE WITH A RADIUS OF 23068.31 FEET AND AN ARC
LENGTH OF 252.24 FEET, A CHORD BEARING OF NORTH 69 DEGREES 13 MINUTES
51 SECONDS WEST AND A CHORD LENGTH OF 252.24 FEET TO A POINT; THENCE
CONTINUE ALONG SAID RIGHT-OF-WAY NORTH 64 DEGREES 20 MINUTES 14
SECONDS WEST A DISTANCE OF 101.17 FEET TO A POINT; THENCE CONTINUE
ALONG SAID RIGHT-OF-WAY NORTH 69 DEGREES 53 MINUTES 37 SECONDS WEST
A DISTANCE OF 347.51 FEET TO A POINT ON A CURVE TO THE RIGHT (CLOCKWISE
& TANGENT); THENCE RUN ALONG SAID CURVE WITH A RADIUS OF 507.33 FEET
AND AN ARC LENGTH OF 632.12 FEET, A CHORD BEARING NORTH 32 DEGREES 13
MINUTES 10 SECONDS WEST AND A CHORD LENGTH OF 592.02 FEET TO A POINT;
THENCE RUN NORTH 02 DEGREES 52 MINUTES 54 SECONDS EAST A DISTANCE OF
67.97 FEET TO A POINT ON A CURVE TO THE RIGHT (CLOCKWISE & TANGENT);
THENCE RUN ALONG SAID CURVE WITH RADIUS OF 5015.08 FEET AND AN ARC
LENGTH OF 116.12 FEET, A CHORD BEARING NORTH 03 DEGREES 09 MINUTES 02
SECONDS EAST AND A CHORD LENGTH OF 116.12 FEET TO A POINT ON A CURVE
TO THE LEFT (COUNTERCLOCKWISE & TANGENT); THENCE RUN ALONG SAID
CURVE WITH RADIUS OF 373.48 FEET AND AN ARC LENGTH OF 396.69 FEET, A
CHORD BEARING NORTH 26 DEGREES 54 MINUTES 27 SECONDS WEST AND A

CHORD LENGTH OF 378.31 FEET TO A POINT ON A CURVE TO THE LEFT
(COUNTERCLOCKWISE & TANGENT); THENCE RUN ALONG SAID CURVE WITH A
RADIUS OF 100.00 FEET AND AN ARC LENGTH OF 12.24 FEET, A CHORD BEARING
NORTH 60 DEGREES 50 MINUTES 31 SECONDS WEST AND A CHORD LENGTH OF
12.23 FEET TO A POINT ON A CURVE TO THE LEFT (COUNTERCLOCKWISE &
TANGENT); THENCE RUN ALONG SAID CURVE WITH A RADIUS OF 330.71 FEET
AND AN ARC LENGTH OF 37.45 FEET, A CHORD BEARING NORTH 67 DEGREES 35
MINUTES 35 SECONDS WEST AND A CHORD LENGTH OF 37.43 FEET BACK TO THE
POINT OF BEGINNING.

SAID PARCEL OF LAND CONTAINS 124.65 ACRES (5,429,640 SQ. FT.) MORE OR LESS.
LESS AND EXCEPT TRACT "A" BEING 9.46 ACRES AND TRACT "B" BEING 6.83
ACRES.

**TRACT "E" (OUTPARCELS TRACT)**

A CERTAIN PIECE OR PORTION OF LAND SITUATED IN SECTION 47, TOWNSHIP 7
SOUTH, RANGE 11 EAST, ST. TAMMANY PARISH, LOUISIANA BEING MORE FULLY
DESCRIBED AS FOLLOWS:

COMMENCING FROM THE CORNER COMMON TO SECTIONS 12, 13 & 46 TOWNSHIP
7 SOUTH, RANGE 10 EAST, ST. TAMMANY PARISH, LOUISIANA RUN NORTH 00
DEGREES 40 MINUTES 50 SECONDS EAST FOR A DISTANCE OF 1423.63 FEET TO A
POINT; THENCE RUN NORTH 89 DEGREES 23 MINUTES 30 SECONDS EAST FOR A
DISTANCE OF 1109.12 FEET TO A POINT; THENCE RUN NORTH 89 DEGREES 14
MINUTES 55 SECONDS EAST FOR A DISTANCE OF 95.62 FEET TO A POINT; THENCE
RUN NORTH 89 DEGREES 17 MINUTES 06 SECONDS EAST FOR A DISTANCE OF
700.84' TO A POINT ON THE NORTH RIGHT-OF-WAY OF INTERSTATE 12 AND THE
EAST RIGHT-OF-WAY OF LOUISIANA HIGHWAY 21; THENCE RUN ALONG SAID
NORTH RIGHT-OF-WAY OF INTERSTATE 12 SOUTH 48 DEGREES 43 MINUTES 29
SECONDS EAST FOR A DISTANCE OF 326.61 FEET TO A POINT; THENCE RUN
SOUTH 10 DEGREES 45 MINUTES 52 SECONDS EAST FOR A DISTANCE OF 243.47
FEET TO THE POINT OF BEGINNING.

FROM THE POINT OF BEGINNING RUN NORTH 51 DEGREES 51 MINUTES 57
SECONDS EAST FOR A DISTANCE OF 367.15 FEET TO A POINT ON A CURVE TO THE

RIGHT (CLOCKWISE & NON-TANGENT); THENCE RUN ALONG SAID CURVE WITH A
RADIUS OF 330.71 FEET AND AN ARC LENGTH OF 37.45 FEET, A CHORD BEARING
OF SOUTH 67 DEGREES 35 MINUTES 35 SECONDS EAST AND A CHORD LENGTH OF
37.43 FEET TO A POINT ON A CURVE TO THE RIGHT (CLOCKWISE & TANGENT);
CONTINUE ALONG SAID CURVE WITH A RADIUS OF 100.00 FEET AND AN ARC
LENGTH OF 12.24 FEET, A CHORD BEARING OF SOUTH 60 DEGREES 50 MINUTES 31
SECONDS EAST AND A CHORD LENGTH OF 12.23 FEET TO A POINT ON A CURVE TO
THE RIGHT (CLOCKWISE & TANGENT); CONTINUE ALONG SAID CURVE WITH A
RADIUS OF 373.48 FEET AND AN ARC LENGTH OF 396.69 FEET, A CHORD BEARING
OF SOUTH 26 DEGREES 54 MINUTES 27 SECONDS EAST AND A CHORD LENGTH OF
378.31 FEET TO A POINT ON A CURVE TO THE LEFT (COUNTERCLOCKWISE &
TANGENT); CONTINUE ALONG SAID CURVE WITH A RADIUS OF 5015.08 FEET AND
AN ARC LENGTH OF 116.12 FEET, A CHORD BEARING OF SOUTH 03 DEGREES 09
MINUTES 02 SECONDS WEST AND A CHORD LENGTH OF 116.12 FEET TO A POINT;
THENCE RUN SOUTH 02 DEGREES 52 MINUTES 54 SECONDS WEST A DISTANCE OF
67.97 FEET TO A POINT ON A CURVE TO THE LEFT (COUNTERCLOCKWISE &
TANGENT); CONTINUE ALONG SAID CURVE WITH A RADIUS OF 507.33 FEET AND
AN ARC LENGTH OF 632.12 FEET, A CHORD BEARING OF SOUTH 32 DEGREES 13
MINUTES 10 SECONDS EAST AND A CHORD LENGTH OF 592.02 FEET TO A POINT
ON THE NORTHERLY RIGHT-OF-WAY OF INTERSTATE 12; THENCE CONTINUE
ALONG SAID RIGHT-OF-WAY NORTH 69 DEGREES 53 MINUTES 37 SECONDS WEST
A DISTANCE OF 356.81 FEET TO A POINT; THENCE CONTINUE ALONG SAID RIGHT-
OF-WAY, NORTH 55 DEGREES 10 MINUTES 42 SECONDS WEST A DISTANCE OF
315.27 FEET TO A POINT; THENCE CONTINUE ALONG SAID RIGHT-OF-WAY, NORTH
36 DEGREES 18 MINUTES 47 SECONDS WEST A DISTANCE OF 272.27 FEET TO A
POINT; THENCE CONTINUE ALONG SAID RIGHT-OF-WAY, NORTH 10 DEGREES 45
MINUTES 52 SECONDS WEST A DISTANCE OF 298.56 FEET BACK TO THE POINT OF
BEGINNING.
SAID PARCEL OF LAND CONTAINS 7.57 ACRES (329,630 SQ. FT.) MORE OR LESS.



# EXHIBIT C

## Site Design Requirements

**Site Design Requirements**                  **Reverse Build to Suit Deals**
Circuit City Stores, Inc.                Covington, LA              Store#3886      11/6/2007

These Site Design Requirements (SDR's) are attached to and made part of the Lease Agreement. These SDR's are intended to allocate responsibility between Landlord and Circuit City for the work needed to prepare the Premises for Circuit City's occupancy. Terms with capital letters which are defined in the Lease Agreement and used in the SDR's shall have the same meaning.

# 1. Landlord's Work

Landlord shall be responsible for all work as described in Section 1, "Landlord's Work". Landlord's Work shall be preformed in a good and workmanlike manner. Landlord's engineers, surveyors, architects, consultants and contractors shall be bondable, all licensed in the state where the shopping center is located, and of good reputation. Landlord's Work shall be performed at Landlord's sole cost and expense, and in accordance with all applicable laws and regulations, these SDR's, the Construction Schedule (Attachment 2), and the Civil Plans (Attachment 7).

In the event that any portion of the Landlord's Work requires minor adjustments in order to satisfy the requirements of these SDR's, Circuit City may direct its contractor to make such minor adjustments, the total cost of which shall be reimbursed by Landlord to Circuit City upon demand in a sum not to exceed Five Thousand and no/100 Dollars ($5,000.00).

**A. Site Delivery Work**    - All of the Landlord Work described in one (1) though twelve (12) below is referred to collectively as the "Site Delivery Work". Upon completion of the Site Delivery Work, Landlord shall deliver to Circuit City the "Site Work Certificate" (Attachment "3"), at which time "Delivery of Land" as described in the Lease shall be deemed to have occurred. If any portion of the Site Delivery Work has not been completed to Circuit City's satisfaction, Circuit City shall promptly notify Landlord, and Landlord shall be obligated to correct any incomplete or unacceptable work as a condition precedent to Delivery of the Land.

1. Provide the Geotechnical Reports and Geotechnical Reliance Letter (Attachment "8").
2. Provide the Environmental Reports and Environmental Reliance Letter (Attachment "9").
3. Cause the proposed development of the Shopping Center and its Civil Plans to comply with the Geotechnical Report and with the Circuit City Specifications (Attachment "1").
4. Cause the land upon which the Circuit City building will be constructed (which includes the areas occupied by the Building, loading dock well, trash compactor, and sidewalks) to be free and clear of all obstructions, foundations, rock, footings, utilities, easements, improvements, and tenancies. Any rock removal performed by the Landlord must be completed as described in the Circuit City Specifications. The Circuit City Specifications shall take precedent over the Geotechnical Report with regards to rock removal.
5. Cause the land on which the Shopping Center is situated, including the Building Pad, to be delivered free of all Hazardous Materials.
6. Cause the land on which the Shopping Center is situated, including the Building Pad, to be graded in accordance with the Geotechnical Report, the Civil Plans, and the Circuit City Specifications.
7. Complete the Building Pad in accordance with the Geotechnical Report, the Civil Plans, and the Circuit City Specifications. If there are discrepancies between the Circuit City Specifications and the Geotechnical Report or Civil Plans, the Circuit City Specifications shall take precedent. The term "Building Pad" shall mean the footprint of the Circuit City Building plus a minimum of fifteen (15) feet beyond such footprint (except when the fifteen feet falls within the building pad of an adjacent tenant), and the areas occupied by the loading dock well, trash compactor, and sidewalks.  Geotechnical Report takes president with regards to soil bearing loads..
8. Obtain governmental approvals necessary to complete all on-site and off-site work shown on the Civil Plans, including all approvals, which must be obtained as a condition to issuance of Circuit City's building permit.

**Site Design Requirements**          **Reverse Build to Suit Deals**
Circuit City Stores, Inc.               Covington, LA          Store#3886    11/6/2007

9. Obtain all planning and zoning approvals, if any, from governmental authorities having jurisdiction over the Shopping Center which are necessary to allow the issuance of Circuit City's building permit and the completion of the Circuit City building.

10. Complete: (a) all curb cuts for the Tenant's Preferred Area, (b) 20,000 square feet of Staging Area outside of but adjacent to the Building Pad, to either be paved or stone to provide for all weather use, and (c) a twenty four (24) foot wide all-weather construction access road connecting the existing adjacent roadway to the Building Pad, to be maintained by the Landlord in good condition throughout the construction of the Common Areas.

11. Provide temporary utilities as described in the Circuit City Specifications to within five (5) feet of the Staging Area, at locations designated by Circuit City, and in accordance with the dates on the Construction Schedule.

12. Satisfy the additional requirements set forth in "Approvals and Payment of Fees" below.

**B. Additional Landlord's Work.**   - In addition to the Site Delivery Work, Landlord shall complete the following as part of Landlord's Work:

1. The construction and installation of Circuit City's permanent utilities in accordance with the Circuit City Specifications.

2. The construction and installation of paving, (light duty and heavy duty), sidewalks, curbing, landscaping, and exterior lighting in accordance with the Geotechnical Report, the Civil Plans, and Circuit City Specifications.

3. The construction and installation of the monument and pylon signs in accordance with the Civil Plans, and Circuit City Specifications.

**C. Approvals and Payment of Fees**   - As a condition of completing the Site Delivery Work, Landlord shall be obligated (a) to obtain all governmental and third party approvals, permits, and authorizations which must be obtained prior to the issuance of a building permit for the construction of the Circuit City building, and (b) to pay all fees and assessments, including impact fees and site approval fees (regardless of how such fees may be defined or described) which must be paid as a condition to issuance of a building permit for the construction of the Circuit City building. Circuit City will be responsible for the building permit fee.

**D. Survey**   - Landlord shall provide Circuit City with a current ALTA survey, and provide the ALTA survey Certificate (Attachment "6") in accordance with the Construction Schedule.

**E. Civil Plans**   - Landlord shall deliver to Circuit City full and complete Civil Plans in accordance with the Construction Schedule. The Civil Plans will be attached to these SDR's as Attachment "7". The Civil Plans shall be subject to Circuit City's approval. Approval within 15 days. Circuit City's approval of the Civil Plans shall be for compliance with the Circuit City Specifications only, and for no other purpose. To the extent that there is a conflict between the Civil Plans and the Circuit City Specifications, the Circuit City Specifications shall control.

**F. Sign Plans**   - Landlord shall submit to Circuit City all plans and specifications for the pylon and monument signs contained or to be constructed within the Shopping Center, for Circuit City's written approval, which shall not be unreasonably withheld. Landlord shall submit to Circuit City any signage plans and design criteria that may impact Circuit City's building signs, and the monument and pylon signs. Attached as Attachment "5" are the Sign Plans and Specifications plans for Circuit City's building, pylon and monument signage, which Landlord hereby approves.

**G. Landlord Deliverables**   - The Landlord shall provide the deliverables as described in the Circuit City Development Process (Attachment "10").

**Site Design Requirements**          **Reverse Build to Suit Deals**

Circuit City Stores, Inc.                    Covington, LA              Store#3886      11/6/2007

## 2. Circuit City's Work

**A. Building Construction**  - Following Delivery of the Land, Circuit City shall commence and pursue to completion the construction of the Circuit City building described in the Lease as the "Premises". Except as otherwise expressly provided in the SDR's or the Lease, and subject to the terms of the Lease regarding payment of the Landlord Reimbursement, all costs and expenses incurred by Circuit City in connection with constructing the Premises shall be borne by Circuit City.

**B. Plans and Specifications**  - Circuit City shall prepare plans and specifications for the construction of the Premises which shall be submitted to the Landlord for its approval in accordance with these SDR's. Landlord shall respond to Circuit City's request for approval within ten (10) business days, and shall be obligated to approve Tenant's plans and specifications so long as they are consistent with Circuit City's current prototype and the Floor Plans and Elevations (Attachment "4"). In the event that the Landlord does not notify Circuit City that it disapproves the plans and specifications within ten (10) business days, the plans and specifications shall be deemed approved. Circuit City's plans and specifications shall not be changed by Circuit City without the prior written consent of Landlord, provided that any changes made by Circuit City to its prototypical store design shall not be subject to Landlord's prior approval and shall be deemed approved by the Landlord. Following Landlord's approval of the Circuit City's plans and specifications, any changes requested by Landlord shall be subject to Circuit City's approval, which approval may be withheld in Circuit City's sole discretion for any reason or no reason, and if approved by Circuit City, any incremental costs associated with such changes shall be made at Landlord's sole cost and expense.

**C. Permits**  - Circuit City shall obtain the general building permit, licenses, other governmental approvals, and temporary and permanent certificates of occupancy which may be required for the lawful construction of the Premises (excluding Landlord's Work) in accordance with these SDR's. Landlord shall be obligated to assist and cooperate fully with Circuit City in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for all other permits necessary for the development of the Shopping Center, related to site improvements and site approvals.

## 3. Attachments

**A. Attachments**  - The following are attached to these SDR's and made a part hereof for all purposes.

1. Circuit City Specifications
2. Construction Schedule
3. Site Work Certificate
4. Floor Plan and Elevations
5. Sign Plans and Specifications
6. ALTA Survey Certificate
7. Civil Plans
8. Geotechnical Reliance Letter
9. Environmental Reliance Letter
10. Circuit City Development Process

## Site Design Requirements          Reverse Build to Suit Deals
Circuit City Stores, Inc.                    Covington, LA                    Store#3886     11/6/2007

## Attachment "1" – Circuit City Specifications

1. Grading Specifications
2. Utility Specifications
3. Paving and Lighting Specifications

(to be attached)

Site Design Requirements
Circuit City Stores, Inc.

Reverse Build to Suit Deals
Store#3336    11/6/2007
Covington, LA

# GRADING SPECIFICATIONS – REVERSE BUILD TO SUIT DEALS

## GRADING SPECIFICATIONS – Grading Requirements:

- The Civil Plans shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing and final elevations.

- The Building will be accessible by grade over parking level only. Steps and stairs are not permitted.

- Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All Water shall be sheet drained away from the Circuit City doors.

- Asphalt parking areas will be graded to avoid ponding water, with slopes of no less than 1.5% and no more than 4.0%. Entrances and access drives shall have a maximum slope of 6.0%.

- Surface drainage swales will not be allowed without prior approval of Circuit City. Such swales must have a grade of no more than 3.5% and shall be constructed of concrete.

- No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Circuit City.

## GRADING SPECIFICATIONS – Building Pad

- Landlord shall be responsible for preparing the Building Pad subgrade to within plus or minus one-tenth of a foot as set by Circuit City's architect. Circuit City's subgrades are 8" below finished floor elevation.

- Compaction of the building pad shall be no less than ninety-five percent (95%) of the modified proctor soil test for water content and compaction levels (Modified Proctor) on the Land, so as to enable Circuit City to perform construction work necessary to provide improvements in accordance with the Plans and Specifications with standard spread footings and without the necessity of pilings or other extraordinary foundation work. Per Geotechnical Recommendations.

- All compacted areas of the Land shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with Landlord's Soils Report shall be furnished to Circuit City upon completion of the Site Delivery Work.

- The Building Pad soil shall have a minimum bearing capacity of 2,500 pounds per square foot, with a maximum differential settlement of ½" and a maximum total settlement of 1". Earth stabilization and/or replacement shall be performed by the Landlord as necessary to meet this minimum requirement.  Per soil / Geotechnical Recommendations.

- During the preparation of the Building pad, Landlord shall take an exception have an independent professional soils engineering test laboratory perform test borings in connection with the preparation of the Building Pad in accordance with Landlord's soils Report. Landlord shall perform one in-place compaction test per 5,000 square feet of pad area per lift.

- All material, including native and fill, within the five feet of the any surface of the Building including foundation concrete, shall be non-expansive with a plasticity index of 12 or less. The material shall also have a sufficient cohesion to stand vertical for three feet. No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2 ½" diameter. Landlord must remove any existing rock within five feet of Circuit City's proposed foundation prior to pad delivery, so that construction of the Building can be completed without any rock excavation by Circuit City.

- The Civil Plans shall not be materially changed by Landlord without the prior consent of Circuit City, which consent shall not be unreasonably withheld or delayed.

- All outlots or future building areas shall be rough graded and planted with grass seed.



POND #4
+/- .338 ACRES

## Site Design Requirements

Circuit City Stores, Inc.

Reverse Build to Suit Deals
Stores53866
Covington, LA
11/6/2007

# UTILITIES SPECIFICATIONS – REVERSE BUILD TO SUIT DEALS

**Temporary Utilities:**

- Landlord will provide the following temporary utilities to the Staging Area, in a location selected by Circuit City, no later than the date for completion of such temporary utilities set forth in the Construction Schedule (Attachment "2"):

- 200 amps, 1 phase, 4-wire, 120 volt electric power, with weatherproof and rainproof disconnect switch.

- 2" water line with sufficient pressure that pumping is not necessary

- Telephone service Note: This is for temporary phone service only. (Conduit for telephone service only.) New Service requested by Circuit City.

**Permanent Utilities:**

- Landlord will provide the following permanent utilities to within five (5) feet of the Building (unless provided otherwise within the Circuit City's designated entry points as shown on the drawing. Paving shall not cover the stub points for those utilities. All utilities will be provided no later than the date set forth on the Construction Schedule (Attachment "2"):

- 2" Gas Service and Meter

- 4" Telephone Conduit

- Cable TV

- Secondary electric service to Circuit City's designated point of termination within the Building, adequate for an 800 amp panel (1600 amp for H20 prototype), 3-phase, 277/480 volt service.

- Storm Sewer System to locations as shown on the Civil Plans

- 6" Sanitary Sewer line

- 2" Domestic Water line

- If fire protection water line with a minimum of 50 pounds per square inch residual pressure at 2000 gallons per minute flow, with sufficient capacity to service Circuit City's fire protection system without the need for a fire pump, as approved by Circuit City's fire protection consultant. The line should be provided to Circuit City's designated point of termination within the Building. The line shall have a flanged and capped outlet located 12" above the finished floor and 18" from the pipe's centerline to the inside face of the exterior wall. The location shall be coordinated with Circuit City's sprinkler contractor and shall conform to the requirements of all authorities having jurisdiction. It is expected that Developer will provide fire protection water line with adequate pressure and flow such that Circuit City will not have to provide a fire pump for their store.



2" TELEPHONE CONDUIT
2" CABLE CONDUIT

2" DOMESTIC W.
LINE WITH 1 1/2"
METER
8" MINIMUM FIR
LINE

2. P.S.I.G. 200Ø
HIGH GAS SERV
AND METER

277/480 VOLT
600 AMP PRIMAF
ELECTRIC SERVIC
AND TRANSFORM
SECONDARY ELEC
CONDUIT AND "CE

4" MIN. SANITARY
SEWER LINE W/
STEPPED DOWN
FOOTING

W:\CC\53\LA\007366 Covington LA 35653 DJ\A\ASGNOT166 Plus\RBTS SOR 11-06-07 Client copy.doc

Site Design Requirements
Circuit City Stores, Inc.

Reverse Build to Suit Deals
Store#3865
Covington, LA
1/16/2007

# PAVING AND LIGHTING SPECIFICATIONS – REVERSE BUILD TO SUIT DEALS

## PAVING SPECIFICATIONS:   Parking Area and Roadway Surfaces

- Paving design shall be based on a design period of twenty (20) years for the traffic indices specified by an independent civil engineer approved by Circuit City and compensated by Landlord.

- All pavement design shall be subject to review and approval by Circuit City, and shall conform to the recommendations of Landlord's Soils Report.

- Heavy duty paving must be used in the main drives and service areas as required by Landlord's Soils Report.

## PAVING SPECIFICATIONS:   Sidewalks and Curbs

- Landlord shall provide and install all curbs and sidewalks including perimeter curbs and sidewalks, except for the sidewalk directly in front of the Building.

- All sidewalks and curbs shall be constructed of concrete and shall have a minimum slope of 1.5% and a maximum slope of 3.0% away from the Building. All sidewalks and curbs shall be a minimum of four (4) inches thick, with a rough non-skid texture, over a suitable granular base. Salt finish is not acceptable.

- Entrance and access roads shall have six (6) inch curbs with eighteen (18) inch gutters. However, next to sidewalks and buildings when drainage is not a factor, a straight six (6) inch curb without gutters shall be permitted. Parking lot islands and landscape enclosures shall have vertical type curbs. All curbs, and curb and gutters shall be concrete. Extruded asphalt curbing shall not be used.



## SHOPPING CENTER LIGHTING SPECIFICATIONS:   Design Standards

- Landlord shall prepare and submit plans to Circuit City that show the photometrics, location and height of all light poles, type of fixtures, fixture details (if any), and details of the canopies lighting arrangement and equipment.

- Illuminations as measured at the pavement shall be:
  entry: 5.0 foot candles minimum maintained throughout the parking lot and drives, with light level at property line not to exceed 1.0 footcandle.
  10.0 foot candles minimum maintained within 50 feet of the Building

- Landlord shall allow Circuit City to illuminate the entry soffit up to a minimum of 40 foot candles, and to illuminate the entry area with four (4) 1000 watt metal halide light fixtures mounted on a 25' high metal poles on a 3' high 24" diameter concrete pedestal, located on the center line of Circuit City's entry, approximately 100' from the Building.

- Twenty-five percent (25%) of the overall lighting shall be designated as security lighting, and shall remain on from dusk until dawn. Security Lighting must be within St. Tammany Parish Parking Lot Lighting Regulations. The security lighting layout and pattern shall be subject to Circuit City's approval.

- Selection of fixture types for both the parking lot lights and the building facades shall be subject to Circuit City's review and approval prior to design and circuiting.

- Landlord shall install a seven-day time switch to control all parking lot lighting wired to a common house panel. All security lighting shall be placed on photo-cell switching.

- The control of parking area lights shall be accessible to Circuit City's local store management due to later-night and holiday sales.

W:\CCS\LA\0037865 Covington LA 3865\0 CAPXA\CKCC\11/16 Files\MSTL SDR 11-06-07 Clean copy.doc

**Site Design Requirements**          **Reverse Build to Suit Deals**
Circuit City Stores, Inc.                    Covington, LA                Store#3886      11/6/2007

## Attachment "2" – Construction Schedule

| Landlord's Tasks | Completion Date |
|---|---|
| **I SITE DELIVERY WORK** | |
| Landlord's delivery of the Geotechnical Report. | 10/31/2007 |
| Landlord's delivery of the Environmental Report. | 10/31/2007 |
| Landlord's delivery of the Geotechnical Reliance Letter (Attachment "8"). | 10/31/2007 |
| Landlord's delivery of the Environmental Reliance Letter (Attachment "9"). | 10/31/2007 |
| Landlord's delivery of Complete Civil Plans. | 5/30/2008 |
| Landlord's completion of the Site Work including delivery of the Site Work Certificate (Attachment "3"); construction of staging area, all-weather construction access road, and installation of temporary utilities. | 1/5/2009 |
| **II ADDITIONAL LANDLORD'S WORK** | |
| Construction and installation of permanent utilities. | 3/31/2009 |
| Construction and installation of: paving, curbing, sidewalks, landscaping, and exterior lighting. | 3/31/2009 |
| Construction and installation of pylon and monument signs identifying the Shopping Center. | 3/31/2009 |

Please provide the currently plan dates for this shopping center.

**Site Design Requirements**     **Reverse Build to Suit Deals**

Circuit City Stores, Inc.        Covington, LA      Store#3886    11/6/2007

## Attachment "3" – Site Work Certificate

To:    Circuit City Stores, Inc.
       Deep Run I
       9950 Mayland Drive
       Richmond, Virginia 23233
       Attention: Vice President-Construction

      Re:    Circuit City Store/[Location]

Ladies and Gentlemen:

      The undersigned, as Landlord has completed all Site Work and has caused "Delivery of the Land" to occur on _____, ____, all in accordance with the terms of the Site Design Requirements dated _____, ____. Specifically, the undersigned hereby certifies that:

- Grading of the Land and the Common Areas has occurred in accordance with the Site Design Requirements.

- Landlord has provided an independent soils engineer's written certification that all pad work was completed in accordance with the Soil Report, the Civil Plans, and Circuit City's Plans and Specifications. This report shall include the results of all compaction and other tests performed during the pad preparation phase, and any tests performed prior to the date of such certification. A copy of such certification shall be delivered to Circuit City's Vice President – Construction at Circuit City's address.

- Landlord has provided a surveyor's written certification stating that the Building Pad is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based upon an "as-prepared" survey that shall accompany such certification and shall show thereon elevation shots taken on a 50 foot grid minimum, including pad perimeter and building corners. Promptly upon completion of the Site Delivery Work, Landlord shall cause its surveyor to designate the corners of the Building Pad by means of standard surveying markers.

- The finished floor elevation is _____. The pad elevation is _____.

- The Staging Area has been completed.

- An all-weather construction access road to the Land no less than 24' in width has been prepared and is ready for use.

      All conditions precedent to issuance of your building permit have been satisfied by Landlord, and we certify that all elements of the Site Delivery Work and Delivery of the Land have been satisfied in accordance with the Site Design Requirements.

               LANDLORD:   _____,

                        a _____

By:    _____
Name:   _____
Title:    _____



CIRCUIT CITY STORES, INC.
#3886 – COVINGTON, LA.
10/05/07

Site Design Requirements    Reverse Build to Suit Deals
Circuit City Stores, Inc.    Covington, LA    Store#3886    11/6/2007
Attachment "#" – Floor Plan and Elevations

FLOOR PLAN



Site Design Requirements    Reverse Build to Suit Deals
Circuit City Stores, Inc.    Covington, LA

Store#3886    11/6/2007

SOUTH ELEVATION

EAST ELEVATION

CIRCUIT CITY STORES, INC.
#3886 – COVINGTON, LA.
10/05/07

Site Design Requirements     Reverse Build to Suit Deals
Circuit City Stores, Inc.     Covington, LA
Store#3886     1/16/2007

WEST ELEVATION

NORTH ELEVATION

CIRCUIT CITY STORES, INC.
#3886 – COVINGTON, LA.
10/05/07

**Site Design Requirements**
Circuit City Stores, Inc.

**Reverse Build to Suit Deals**
Covington, LA

Store#3886    11/6/2007

## Attachment "5" – Sign Plans and Specifications



## Site Design Requirements    Reverse Build to Suit Deals

**Circuit City Stores, Inc.**    Covington, LA    Store#3886    11/6/2007



Total = 240.05 Sq. Ft.

16'-0"

1'-0"

15'-0"

Area = πR² = 3.14159 x 8
= 3.14159 x 64 = 201.06 Sq. Ft.

2'-8"

2.66' x 14.66' = 38.99 Sq. Ft.

14'-8"

5"

**LOGO LAYOUT - SIGN 1 ( SOUTH ELEVATION )**
Scale 3/16" = 1'-0"

**END ELEVATION :**
Scale 3/16" = 1'-0"

### GENERAL SPECIFICATIONS

*Illuminated single-sided logo.*
Fabricated aluminum construction cabinet with zero bleed retaining system. Painted matte white # N-202 acrylic polyurethane from Matthews paint. Translucent white flexible substrate (3M Panaflex or equal) with digitally printed graphics. Internally illuminated with H.O. fluorescent lamps. Logo to be flush mounted to building fascia with fasteners & mounting hardware as req'd.

*Non-illuminated reverse pan letters.*
Fabricated .090" aluminum letter returns & faces. Brushed aluminum finish. Letters to be mounted to building fascia with fasteners & mounting hardware as req'd.

* (1) Set req'd.

## Site Design Requirements     Reverse Build to Suit Deals

Circuit City Stores, Inc.          Covington, LA          Store#3886     11/6/2007



**LOGO LAYOUT - SIGN 2 (SOUTH ELEVATION) :** Scale 3/8" = 1'-0"

**END ELEVATION :** Scale 3-8" = 1'-0

*Note: Sign to be installed 6-0" ± from the roofline to the top of sign.*
*\* Field verify*

### GENERAL SPECIFICATIONS

*Illuminated channel logo.*
Fabricated aluminum logo & letter returns & backs. #7328 White Plexiglas faces. "z" with Red vinyl 3M 3630-33 overlay-1st surface. 1" jewelite face retainers. Internally illuminated with LED powered by low voltage remote electronic transformers contain in metal transformer box. All wiring & materials used will be U.L. approved. Logo & Letters to be mounted to building fascia with fasteners & mounting hardware as req'd.

### COLOR SCHEME

Red "z" return & trimcap
#7328 White Plex. w/ Red vinyl 3630-33 overlay
Red LED

#7328 White Plex. letter faces
White LED

Black returns & trimcap

Section detail labels:
.040" aluminum return
1" jewelite
3/16" Plexiglas face
U.L. Shut off switch
LED modules
Low voltage transformer
.063" aluminum back
Non corrosive fasteners as req'd
1/4" weep holes
Building fascia
Primary elect. ckt.

**SECTION DETAIL**

## Site Design Requirements

**Reverse Build to Suit Deals**

Circuit City Stores, Inc.                    Covington, LA            Store#3886      11/6/2007



**GENERAL SPECIFICATIONS**

Illuminated channel logo & letters.
Fabricated aluminum logo & letter returns & backs. 3/16" white acrylic faces. 1" jewelite face retainers. Internally illuminated with white LED powered by low voltage remote electronic transformers contain in metal transformer box. All wiring & materials used will be U.L. approved. Logo & Letters to be mounted to building fascia with fasteners & mounting hardware as req'd.

* (1) Set req'd.

**COLOR SCHEME**

Black returns & jewelite

Green PMS # 376C
3M Brilliant Green 3630-106

White acrylic &
White LED

## Site Design Requirements

### Reverse Build to Suit Deals

Circuit City Stores, Inc.            Covington, LA            Store#3886      11/6/2007



Total = 135.09 Sq. Ft.

12'-0"

12'-0"

Area = $\pi R^2 = 3.14159 \times 6$
= 3.14159 × 36 = 113.09 Sq. Ft.

2.0' × 11.0' = 22.0 Sq. Ft.
11'-0"

1'-0"

5"

**LOGO LAYOUT - SIGN 4 ( EAST ELEVATION )**
Scale 3/16" = 1'-0

**END ELEVATION :**
Scale 3/16" = 1'-0

### GENERAL SPECIFICATIONS

*Illuminated single-sided logo.*
Fabricated aluminum construction cabinet with zero bleed retaining system. Painted matte white # N-202 acrylic polyurethane from Matthews paint. Translucent white flexible substrate (3M Panaflex or equal) with digitally printed graphics. Internally illuminated with H.O. fluorescent lamps. Logo to be flush mounted to building fascia with fasteners & mounting hardware as req'd.

*Non-illuminated reverse pan letters.*
Fabricated .090" aluminum letter returns & faces. Brushed aluminum finish. Letters to be mounted to building fascia with fasteners & mounting hardware as req'd.

* (1) Set req'd.

**Site Design Requirements**          **Reverse Build to Suit Deals**
Circuit City Stores, Inc.                Covington, LA          Store#3886      11/6/2007



NON-ILLUMINATED SINGLE-FACE WALL SIGN :

SIGN 5 - NORTH ELEVATION

SIDE VIEW
3/4" = 1'-0"

GENERAL SPECIFICATIONS

.090" Aluminum panel with 2" returns.
Paint background & edges Matthews STN-202 matte white.
Logo is digitally printed Scotchprint on white vinyl.
Copy is 3M # 220-13 Tomato red vinyl.
Mount sign against wall with concealed fasteners as shown.

3/8" aluminum bolt w/washer
.090" aluminum
1/4" lags and shields
Concealed aluminum clip
drilled & tapped

DETAIL
n.t.s.

**Site Design Requirements**     **Reverse Build to Suit Deals**

Circuit City Stores, Inc.      Covington, LA      Store#3886    11/6/2007

## Attachment "6" – ALTA Survey Certificate

Certified to Circuit City Stores, Inc., a Virginia corporation ("Landlord"), _____, a _____ ("Title Company"), and _____ _____, a _____ corporation ("Title Agent"). The undersigned _____ (the "Surveyor") hereby certifies that (a) the Survey Plat dated _____, 20____, prepared by the undersigned, of that certain tract of land consisting of _____ sq. ft., or _____ acres, in the _____ _____, in the City of _____, County of _____, State of _____, and the metes and bounds description set forth thereon are true and correct and prepared from an actual on-the-ground survey of the real property (the "Property") shown thereon and has been made in accordance with "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys", jointly established and adopted by ALTA and ACSM in 2005, and includes items 1 through 14 and 16 through 18 of Table A thereof, and pursuant to the Accuracy Standards (as adopted by ALTA and ACSM and in effect on the date of this certification) of an Urban Survey; (b) such survey was conducted by the Surveyor or under his supervision; (c) all monuments shown thereon actually exist, and the location and type of material thereof are correctly shown; (d) the location of all streets, roads, highways and easements are as shown thereon; (e) except as shown thereon, there are no encroachments onto the Property or protrusions there from, there are no improvements on the Property, there are no visible easements or rights-of-way on the Property, there are no visible discrepancies, conflicts, shortages in area or boundary line conflicts; (f) the distance from the nearest intersection street or road is as shown; (g) all recorded easements have been correctly platted thereon; (h) the boundaries, dimensions and other details shown thereon are true and correct; and (i) the Property is not located in a 100-year flood plain as presently designated by the U.S. Corps of Engineers, or in an identified "flood prone area" as defined by the U.S. Department of Housing and Urban Development, pursuant to the Flood Disaster Protection Act of 1973, as amended, except as shown. **[Note: If no portion of the Property is in a flood plain, delete "except as shown" and put a period after "amended".]**

EXECUTED this _____ day of _____, 20____.

Signature _____

Printed Name:_____

R.P.L.S. No._____

| Site Design Requirements | | Reverse Build to Suit Deals | |
|---|---|---|---|
| Circuit City Stores, Inc. | Covington, LA | Store#3886 | 11/6/2007 |

## Attachment "7" Civil Plans

**NOR DU LAC - SHEET INDEX**

| | | |
|---|---|---|
| 1. | | COVER SHEET |
| 2. | | TOPOGRAPHIC AND BOUNDARY SURVEY (1 OF 3) |
| 3. | | TOPOGRAPHIC AND BOUNDARY SURVEY (2 OF 3) |
| 4. | | TOPOGRAPHIC AND BOUNDARY SURVEY (3 OF 3) |
| 5. | ES-1 | PHASE 1 EROSION AND SEDIMENTATION CONTROL PLAN SITE MAP |
| 6. | ES-2A | PHASE 2 "A" EROSION AND SEDIMENTATION CONTROL PLAN SITE MAP |
| 7. | ES-2B | PHASE 2 "B" EROSION AND SEDIMENTATION CONTROL PLAN SITE MAP |
| 8. | C-1 | OVERALL SITE PLAN |
| 9. | C-1A | SECTION "A" SITE PLAN |
| 10. | C-1B | SECTION "B" SITE PLAN |
| 11. | C-1C | SECTION "C" SITE PLAN |
| 12. | C-1D | SECTION "D" SITE PLAN |
| 13. | C-2 | OVERALL GRADING PLAN |
| 14. | C-2A | SECTION "A" GRADING PLAN |
| 15. | C-2B | SECTION "B" GRADING PLAN |
| 16. | C-2C | SECTION "C" GRADING PLAN |
| 17. | C-2D | SECTION "D" GRADING PLAN |
| 18. | C-3 | OVERALL UTILITY PLAN |
| 19. | C-3A | SECTION "A" UTILITY PLAN |
| 20. | C-3B | SECTION "B" UTILITY PLAN |
| 21. | C-3C | SECTION "C" UTILITY PLAN |
| 22. | C-3D | SECTION "D" UTILITY PLAN |
| 23. | C-3.1 | OFFSITE UTILITY PLAN |
| 24. | C-4 | OVERALL STAKING PLAN |
| 25. | C-4A | SECTION "A" STAKING PLAN |
| 26. | C-4B | SECTION "B" STAKING PLAN |
| 27. | C-4C | SECTION "C" STAKING PLAN |
| 28. | C-4D | SECTION "D" STAKING PLAN |
| 29. | C-4.1 | OFFSITE STAKING PLAN |
| 30. | C-4.2 | ISLAND DETAILS |
| 31. | C-4.3 | ISLAND DETAILS |
| 32. | ST-1 | STORM SEWER PROFILES |
| 33. | ST-2 | STORM SEWER PROFILES |
| 34. | ST-3 | STORM SEWER PROFILES |
| 35. | ST-4 | STORM SEWER PROFILES |
| 36. | ST-5 | STORM SEWER PROFILES |
| 37. | ST-6 | STORM SEWER PROFILES |
| 38. | ST-7 | STORM SEWER PROFILES |
| 39. | ST-8 | STORM SEWER PROFILES |
| 40. | SS-1 | SANITARY SEWER PROFILES |
| 41. | SS-2 | SANITARY SEWER PROFILES |
| 42. | SS-3 | SANITARY SEWER PROFILES |
| 43. | SS-4 | SANITARY SEWER PROFILES |
| 44. | SS-5 | SANITARY SEWER PROFILES |
| 45. | SS-6 | SANITARY SEWER PROFILES |
| 46. | D-1 | DETAIL SHEET |
| 47. | D-2 | DETAIL SHEET |
| 48. | D-3 | DETAIL SHEET |
| 49. | D-4 | DETAIL SHEET |
| 50. | D-5 | DETAIL SHEET |
| 51. | L-1A | PLANTING PLAN |
| 52. | L-1B | PLANTING PLAN |
| 53. | L-2A | IRRIATION PLAN |
| 54. | L-2B | IRRIGATION PLAN |
| 55. | RD-1 | ROADWAY PLAN & PROFILES |
| 56. | RD-2 | ROADWAY PLAN & PROFILES |
| 57. | RD-3 | ROADWAY PLAN & PROFILES |
| 58. | RD-4 | ROADWAY PLAN & PROFILES |
| 59. | RD-5 | ROADWAY PLAN & PROFILES |

## Site Design Requirements    Reverse Build to Suit Deals

Circuit City Stores, Inc.              Covington, LA          Store#3886      11/6/2007

| | | |
|---|---|---|
| 60. | RD-6 | ROADWAY PLAN & PROFILES |
| 61. | RD-7 | ROADWAY PLAN & PROFILES |
| 62. | RD-8 | ROADWAY PLAN & PROFILES |
| 63. | RD-9 | ROADWAY PLAN & PROFILES |
| 64. | | TRAFFIC SINGAL PLANS COVER SHEET |
| 65. | SD1-RO | TRAFFIC SIGNAL LAYOUT |
| 66. | SD2-RO | TRAFFIC SIGNAL LAYOUT |
| 67. | SD3-RO | TRAFFIC SIGNAL DETAILS |
| 68. | SD4-RO | TRAFFIC SIGNAL DETAILS |

**Site Design Requirements**    **Reverse Build to Suit Deals**

Circuit City Stores, Inc.                    Covington, LA                    Store#3886    11/6/2007

**Site Design Requirements     Reverse Build to Suit Deals**

Circuit City Stores, Inc. _____ Covington, LA _____ Store#3886   11/6/2007

## Attachment "8" Geotechnical Reliance Letter

GEOTECHNICAL RELIANCE  LETTER

_____, 200__

Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention:  Vice President – Real Estate

      Re: _____ (the "Report")
           Project Name: Circuit City Store/[Store Location]
           Job Number: _____

Dear _____:

     This will serve to confirm that _____ ("Consultant") will allow Circuit City Stores, Inc. ("Circuit City") to rely on the Report in connection with the assessment and evaluation of the subject property as fully and completely as if the Report had been prepared for and was addressed to Circuit City.  Consultant acknowledges that Consultant shall not look to Circuit City for any liability of Consultant's primary client under the _____, the underlying agreement between Consultant and its primary client.

     This reliance letter is given in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, receipt of which is hereby acknowledged. Please indicate your acceptance of these terms by signing in the space provided below and returning a copy to me.

               Very truly yours,

               _____

               By:_____
               Its:_____

Agreed this _____ day of _____, 200___.

Circuit City Stores, Inc.
By:_____
Its:_____

**Site Design Requirements     Reverse Build to Suit Deals**
Circuit City Stores, Inc.              Covington, LA          Store#3886     11/6/2007

## Attachment "9"   -   Environmental Reliance Letter

ENVIRONMENTAL RELIANCE LETTER

_____, 200__

Circuit City Stores, Inc.
Deep Run I
9950 Mayland Drive
Richmond, Virginia 23233
Attention: Vice President – Real Estate

Re:     _____(the "Report")
        Project Name: Circuit City Store/[Store Location]
        Job Number: _____

Dear _____:

    This will serve to confirm that _____ ("Consultant") will allow Circuit City Stores, Inc. ("Circuit City") to rely on the Report in connection with the assessment and evaluation of the subject property as fully and completely as if the Report had been prepared for and was addressed to Circuit City. Consultant acknowledges that Consultant shall not look to Circuit City for any liability of Consultant's primary client under the _____, the underlying agreement between Consultant and its primary client.

    This reliance letter is given in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration, receipt of which is hereby acknowledged. Please indicate your acceptance of these terms by signing in the space provided below and returning a copy to me.

Very truly yours,

_____

By:_____
Its:_____

Agreed this _____ day of _____, 200__.
Circuit City Stores, Inc.
By:_____
Its:_____

**Site Design Requirements**          **Reverse Build to Suit Deals**
Circuit City Stores, Inc.                    Covington, LA              Store#3886    11/6/2007

## Attachment "10" – Circuit City Development / Design Process



| CIRCUIT CITY DEVELOPMENT PROCESS | LANDLORD DELIVERABLES |
|---|---|
| **SCHEMATIC SITE PLAN** | • Information as required to complete Circuit City's Project Information Sheet.<br>• Work with Circuit City's design staff to develop the schematic site plan. |
| **DUE DILIGENCE INVESTIGATION** | • Meet on site with Circuit City's Development Manager and architect to provide information as required to complete Circuit City's Feasibility Report |
| **DESIGN DEVELOPMENT** | • ALTA Survey and Surveyor's Certificate<br>• Geotechnical Report and Geotechnical Reliance Letter.<br>• Environmental Report and Environmental Reliance Letter.<br>• Civil Plans<br>• All approvals that may be a pre-requisite for Circuit City's permits.<br>• Shopping Center building elevations, material boards and design requirements.<br>• Signage drawings and signage design guidelines.<br>• Schedules and updates for all Landlord Work.<br>• Schedules and updates for all planning and zoning approvals and permits.<br>• Information about governmental conditions or restrictions that impact permits.<br>• Help with coordination between utility companies and Circuit City.<br>• Help in pursuing local incentive programs. |
| **SITE DELIVERY WORK** | • Site Work Certificate<br>• Circuit City's staging area<br>• All weather construction access road to Circuit City's building pad<br>• Circuit City's temporary utilities |
| **REMAINDER OF LANDLORD WORK** | • Circuit City's permanent utilities<br>• Paving, curbing and sidewalks<br>• Exterior lighting<br>• Landscaping<br>• Pylon and monument signs |

Site Design Requirements        Reverse Build to Suit Deals
Circuit City Stores, Inc.        Covington, LA        Store #3886    11/6/2007



## EXHIBIT C-1

### Possession Date Notice

[Letterhead of Landlord]

_____, 200__

[via overnight courier
service per Article XXII of the Lease]

Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23233
Attention: Vice President of Real Estate

Re:    Lease Agreement dated as of _____, 200__ (the "**Lease**"), between **CP NORD DU LAC JV, LLC**, a Delaware limited liability company, as landlord ("**Landlord**"), and **CIRCUIT CITY STORES, INC.**, as tenant ("**Tenant**"), with respect to certain retail premises (the "**Premises**") located in the Colonial Pinnacle Nord du Lac Shopping Center, Covington, LA.

Gentlemen:

In accordance with the provisions of Section 2.05(a) of the Lease, Landlord hereby informs the Tenant that the Possession Date (including, without limitation, the Delivery of the Land) shall take place at 8:00 A.M. on _____, 200__. This notice shall constitute the Possession Date Notice referred to in Section 2.05 of the Lease. All capitalized terms as used in this Possession Date Notice shall have the same meaning as set forth in the Lease, unless otherwise defined in this Possession Date Notice.

**CP NORD DU LAC JV, LLC**, a Delaware limited liability company

BY:_____
William A. Leitner, III
Its: Authorized Manager

Attest/Witness:

_____

cc:    Circuit City Stores, Inc.
9950 Mayland Drive
Richmond, Virginia 23233
Attention: General Counsel
[_____, Esq.]

C-1-1

## EXHIBIT D

### W-9 Form

---

## Circuit City Stores, Inc.    Substitute W-9 Form

According to federal tax law, we are required to obtain taxpayer identification numbers for all individuals & businesses to whom reportable payments are made. If you do not provide us with this information, your payments may be subject to federal income tax backup withholding. You may also be subject to a $50 penalty imposed by the Internal Revenue Service under section 6723. Federal law on backup withholding preempts any state or local law remedies such as any right to a mechanic's lien. If you do not furnish a valid TIN or if you are subject to backup withholding, the payor is required to withhold taxes from its payment to you. Backup withholding is not a failure to pay you. It is an advance tax payment. You should report all backup withholding as a credit for taxes paid on your federal income tax return.

**Instructions:**

1. Complete Part 1 by printing your tax information in the boxes that correspond to your tax status.
2. Complete Part 2 if you are exempt from Form 1099 Reporting
3. Complete Part 3 by filling in all lines
4. Fax this form to  [ENTER YOUR FAX NUMBER HERE] or mail to Circuit City Stores, Inc. 9954 Mayland Drive, Richmond, VA  23233. Attn: [ENTER YOUR NAME HERE]

Use this form only if you are a U.S. person (including U.S. resident alien).

If you are a foreign person, use the appropriate form W-8. If you are a nonresident alien and have now become a resident alien, read the note below and attach a statement if necessary.

**Note to U.S. Resident Aliens who formerly were Nonresident Aliens:**

If there is a tax treaty between the U.S. and your country and it contains a "saving clause" to exempt certain types of income from U.S. tax even after you have become a resident Alien, and you want to claim that exemption, fill out all of this form AND attach a page showing:

1 The treaty country
2. The treaty article about the income
3. The article number for the "saving clause"
4. The type and amount of the income that qualifies for the saving clause

... saving clause applies

---

**Part 1 - Tax Status:    (complete only one row of boxes)**

**Individuals:**
(Fill out this row)

| Individual Name (first name, middle initial, last name) | Individual's Social Security Number |
|---|---|
|  | _ _ _ - _ _ - _ _ _ _ |

**Sole Proprietor (or an LLC with one owner):**
(Fill out this row)

A sole proprietorship may have a "doing business as" trade name, but the legal name is the name of the business owner.

| Business Owners Name (REQUIRED) | Business Owner's Social Security Number |
|---|---|
|  |  |
| Business or Trade Name (Required if checks should be issued to this name) | OR   Employer Identification Number |

**Partnership (or an LLC with multiple owners):**
(Fill out this row)

| Partnership's Name on IRS records (see IRS Mailing Label) | Partnership's Employer Identification Number |
|---|---|
|  |  |
| Business or Trade Name (Required if checks should be issued to this name) |  |

**Corporation or Tax-Exempt Entity:**
(Fill out this row)

A Corporation may use an abbreviated name or its initials, but its legal name is the name on the articles of incorporation.

| Name of Corporation or Entity | Employer Identification Number |
|---|---|
|  |  |
| Business or Trade Name (Required if payment should be made to this name) |  |

---

**Part 2 - Exemption:** If exempt from Form 1099 reporting, check your qualifying exemption reason below.

- [ ] Corporation - Note that there is no corporate exemption for medical & healthcare payments or payments for legal services
- [ ] Tax Exempt Entity under 501(e) (includes 501(c)(3) or IRA
- [ ] The United States or any of its agencies or instrumentality's

D-1

## EXHIBIT E

### Commencement Date and Expiration Date Agreement

THIS COMMENCEMENT DATE AND EXPIRATION DATE AGREEMENT, made as of the ____ day of _____, 200___, by and between **CP NORD DU LAC JV, LLC,** a Delaware limited liability company ("**Landlord**") and **CIRCUIT CITY STORES, INC.,** a Virginia corporation ("**Tenant**").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of a certain shopping center known as Colonial Pinnacle Nord du Lac Shopping Center (the "**Shopping Center**"), situated in Covington, Louisiana;

WHEREAS, by that certain Lease Agreement dated as of _____ __, 200__ (the "**Lease**"), Landlord leased a portion (the "**Premises**") of the Shopping Center to Tenant;

WHEREAS, Tenant is in possession of the Premises and the Term of the Lease has commenced; and

WHEREAS, under Section 2.10 of the Lease, Landlord and Tenant agreed to enter into an agreement setting forth certain information in respect of the Premises and the Lease.

NOW, THEREFORE, Landlord and Tenant agree as follows:

1.    The Commencement Date occurred on _____, 200___.

2.    The **Initial Lease Term** shall expire on January 31, 20___, unless Tenant exercises any option to extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

3.    The date of commencement of the **first Extension Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

4.    The date of commencement of the **second Extension Period** shall be February 1, 20___, if Tenant effectively exercises its option in respect thereof, and if Tenant does so, the Term of the Lease shall expire on January 31, 20___, unless Tenant exercises any option to further extend the Term of the Lease or unless the Lease terminates earlier as provided in the Lease.

5.    Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the Lease.

E-1

IN WITNESS WHEREOF, the parties hereto have caused this Commencement Date and Expiration Date Agreement to be executed the date and year first above written.

**LANDLORD:**

Witness/Attest:

**CP NORD DU LAC JV, LLC,** a Delaware limited liability company

_____

By:_____
      William A. Leitner, III
Its:    Authorized Manager

**TENANT:**

Witness/Attest:

**CIRCUIT CITY STORES, INC.,** a Virginia corporation

_____

By:_____
    John B. Mulleady
    Vice President, Real Estate and Construction

E-2

## EXHIBIT F

### Prohibited Uses

"Prohibited Uses" shall mean any one or more of the following uses:

    (a)    a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

    (b)    a bowling alley;

    (c)    a billiard or bingo parlor;

    (d)    a flea market;

    (e)    a massage parlor; provided, however, that this prohibition shall not be applicable to a full-service, professional day spa of the type customarily operated in first-class shopping centers in the majority metropolitan areas of the southeastern U.S.;

    (f)    a funeral home;

    (g)    a facility for the sale of paraphernalia for use with illicit drugs;

    (h)    a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

    (i)    an off-track betting parlor;

    (j)    a carnival, amusement park or circus;

    (k)    a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (k));

    (l)    a facility for the sale of new or used motor vehicles, trailers or mobile homes;

    (m)    a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

    (n)    a skating rink;

    (o)    an arcade, pinball or computer game room (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

    (p)    service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation;

F-1

(q)    a banquet hall, auditorium or other place of public assembly;

(r)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(s)    a theater of any kind;

(t)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods;

(u)    a gymnasium, sport or health club or spa; provided, however, that this prohibition shall not be applicable to a full-service, professional day spa of the type customarily operated in first-class shopping centers in the majority metropolitan areas of the southeastern U.S.; or

(v)    hotel or residential facility; provided, however, the foregoing restriction shall not apply to a hotel in the "Lifestyle Center" portion of the Shopping Center.

F-2

**EXHIBIT G**

<u>Reserved</u>

G-1

# EXHIBIT H

## EXCLUSIVES & PROHIBITED USES

### A.    EXCLUSIVES

**BARNES & NOBLE (revision of draft dated 5/1/07)**

7.5    Landlord, and its successors and assigns, shall not (a) operate or permit under any circumstances to be operated within the Shopping Center or the Outparcels any other store or "Kiosk" (as hereinafter defined) selling or displaying for sale or rental any (i) books, magazines, periodicals and newspapers in print, (ii) books, magazines, periodicals and newspapers on tape, disk, CD-ROM, DVD and/or any other media, as well as any items which are technological evolution of any of the foregoing items, together with various media and merchandise incidental thereto, and/or (iii) audio compact discs and other forms of recorded music (collectively, the "Exclusive Items"), (b) operate or permit under any circumstances to be operated within the Shopping Center (including within a Kiosk) any separately demised newsstand or magazine rack, regardless of size, or (c) operate or permit under any circumstances to be operated within the Shopping Center any other Coffee Shop, except there may be one (1) additional Coffee Shop not exceeding 2,000 Leasable Square Feet in the area shown and labeled on the Site Plan as the "East Permitted Coffee Area" and one (1) additional Coffee Shop not exceeding 2,000 Leasable Square Feet in the area shown and labeled on the Site Plan as the "West Permitted Coffee Area". The Incidental Sale (as hereinafter defined) of one, all or any combination of the Exclusive Items in connection with the overall business of another operator or tenant, or the sale of coffee, tea or other beverages by a non-Coffee Shop restaurant operator or tenant as an incidental part of its general restaurant operation, shall not be deemed a violation of this Paragraph 7.5. As used herein, "Incidental Sale" shall mean the lesser of (x) ten percent (10%) in the aggregate of such operator's or tenant's display area and (y) five hundred (500) square feet in the aggregate of such operator's or tenant's display area (inclusive of allocable aisle space). Landlord hereby covenants and agrees with Tenant that neither Landlord nor any affiliate of Landlord shall operate or lease, or permit to be operated or leased, any other store located in the Adjacent Parcels (defined below) which (1) is a bookstore such as that operated by Barnes & Noble Booksellers, Borders Books or Books 'A' Million, as the same may evolve over time or (2) devotes more than forty percent (40%) of the display area in their leased premises to the display for sale and/or rental of the Exclusive Items. As used herein, the term "Adjacent Parcels" shall mean and refer to any land that is now or hereafter owned or controlled by Landlord (or, as the case may be, Landlord's affiliate) that is contiguous or adjacent to the Shopping Center, but for any intervening road, street, alley or highway. Notwithstanding the foregoing, for so long as Dillard's, Dick's Sporting Goods, Bed, Bath & Beyond, Circuit City, and Kohl's each operate in the Shopping Center in a manner consistent with their respective operations in a majority of their stores operated under the same tradename in the domestic United States, each such operator shall be excluded from Landlord's obligations under this Paragraph 7.5.

**CIRCUIT CITY (from draft dated 10/11/07)**
Section 8.04

(a)    Landlord shall not lease, rent or occupy, or permit to be leased, rented, occupied, any other premises in the Shopping Center, or on any land owned or controlled by Landlord or any of its Affiliates within a one (1) mile radius of the Shopping Center during the Term ("Affiliated Land") for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of the Products (except for furniture and appliances, which shall be permitted without restriction in the Shopping Center). The Incidental Sale (as defined below) of the Products in connection with the overall business of another tenant shall not be deemed a violation this Section 8.04(a). "Incidental Sale" shall mean sales of the Products (except for furniture and appliances, which shall be permitted without restriction in the Shopping Center) in the lesser of (i) two hundred (200) square feet, or (ii) ten percent (10%) of such

H-1

tenant's or occupant's, or Landlord's or any of its Affiliate's display area. The exclusive use rights granted to Tenant in this Section 8.04(a) (the "Exclusive Use Protection") shall inure to the benefit of any assignee of Tenant's interest in this Lease and to any sublessee of all or part of the Premises.

(b)     The Exclusive Use Protection shall also not apply to a full-line: supermarket (for example, Safeway, Winn-Dixie, or Stop & Shop), department store or discount department store (for example, Dillard's, Wal-Mart, K-Mart, J.C. Penney, Macy's, Kohl's, Belk, or Target), or discount club (for example, Costco, BJ's Wholesale Club, or Sam's Club); provided, however, that, as to each of the foregoing, such stores (i) are National Tenants or Regional Tenants (as such terms are defined in Section 8.06), (ii) contain at least 80,000 square feet of Floor Area. The foregoing to the contrary notwithstanding, the Exclusive Use Protection shall not prohibit Landlord from selling or leasing space to one (1) cellular or wireless communications store and one (1) video game retailer within the Shopping Center such as GameStop, so long as neither such store is located within three hundred (300) feet of the Premises, nor shall it apply to any use in the "Lifestyle Center" portion of the Shopping Center as depicted on the Site Plan with respect to: (i) any premises containing 3,000 square feet or less (other than Radio Shack); (ii) any premises containing 5,000 square feet or less which are leased to electronics users which are National Tenants or Regional Tenants (other than Radio Shack); or (iii) any or all of the following stores of whatever size: Apple, Brookstone, Sharper Image, Sony, or Bose.

## DICK'S SPORTING GOODS (from draft dated 11/12/07)
Section 1.5

(a)     Landlord warrants and agrees that, during the term of this Lease, it will not, nor will any entity under common control with Landlord, enter into any lease, license agreement or other similar agreement nor permit any premises in the Shopping Center (other than the Demised Premises) (the Shopping Center (other than the Demised Premises) is herein referred to as the "Restricted Property"), or otherwise transfer or allow a possessory interest in the Restricted Property to an Occupant to be used for the sale, rental and/or distribution, either singly or in any combination, of (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear ("Precluded Use Activity(ies)").

(b)     Notwithstanding the foregoing Precluded Use Activity(ies) set forth in Subsection (a) above, the retail sale and/or distribution of sporting goods and/or sporting equipment shall be permitted by:

(i)     any Occupant of the Restricted Property in the greater (A) five percent (5%) in the aggregate of any such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to the sales floor area devoted to such use) or (B) two thousand (2,000) square feet in the aggregate of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to the sales floor area devoted to such use); or

(ii)     Dillard's, Kohl's, any Occupant of the Restricted Property that operates any of the following: (a) a Backpacker, Inc.; (b) Lids; (c) Journey's; (d) GNC; (e) Vitamin Shoppe; (f) licensed apparel store (not to exceed 2,500 of LFA); (g) an athletic shoe stores in the "Lifestyle Center" portion of the Shopping Center (as depicted on the Lease Plan), so long as there are not more than two such stores, and so long as neither such store exceeds 4,000 of LFA; (h) tennis store; (i) Finish Line; (j) one large shoe store such as DSW or Shoe Dept.; (k) one Massey's Outerwear store of not more than seven thousand five hundred (7,500) square feet of LFA.

H-2

**PETSMART (from draft dated 10/10/07)**
Exhibit G

**Tenant's Exclusive Rights.** As used in the Lease, the term "Tenant's Primary Business" shall mean the retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) pet food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as grooming, boarding, pet day care, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment and (v) educational products and services related to any of the foregoing and office and storage uses incidental to the foregoing. So long as Tenant is open and operating at the Premises for the Tenant's Primary Business (unless this Lease has been terminated as a result of Tenant's default hereunder), Tenant shall have the exclusive right in the Shopping Center to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of this Section 2. All other tenants or other occupants of any portion of the Shopping Center, excluding any existing retail operations which have executed leases dated prior to the date of this Lease (as listed on Exhibit G-2), shall be prohibited from engaging in any portion of such Primary Business described in clauses (i), (ii) and (iii) of this Section 2, except on a basis which is incidental to an otherwise permitted use. For purposes of this Section 2, the term "incidental" shall mean that the use occupies the lesser of (a) five hundred (500) square feet of Gross Floor area, or (b) five percent (5%) of the sales area in the subject premises.

**ULTA SALON, COSMETICS & FRAGRANCE (from draft dated 10/12/07)**
Sections 4.1 and 4.6

As used herein, the term "Tenant's Primary Business" shall mean (i) the retail sale of cosmetics, fragrances, health and beauty products, hair care products such as shampoos, conditioners, gels and accessories; personal care appliances; skin care products, and body care products; (ii) the operation of a full service beauty salon; (iii) the operation of a nail salon; (iv) the operation of a professional day spa; and (v) the sale of related goods and services.

During the Term of the Lease, Tenant shall have the exclusive right to conduct any portion of Tenant's Primary Business in the Shopping Center and any land adjacent or contiguous (but for roadways or access ways) to the Shopping Center which is owned or otherwise controlled by Landlord or a parent, subsidiary or affiliate of Landlord or in which any officer, partner, director or owner of Landlord has any interest, and all other tenants or other occupants of any portion of the Shopping Center or any adjacent or contiguous land (provided such land is owned or otherwise controlled by Landlord, as provided above) shall be prohibited from engaging in any portion of such Primary Business. Further, Landlord covenants that it will not lease any space in the Shopping Center or any adjacent or contiguous land (provided such land is owned or otherwise controlled by Landlord, as provided above) to tenants whose primary use is substantially similar to Tenant's Primary Business, such as: Beauty Brands, Beauty First, Pure Beauty, or Trade Secret. Notwithstanding the foregoing, Tenant's exclusive right shall not apply to uses associated with (a) existing tenants in the Shopping Center who are entitled to sell such products and/or provide the services that are covered by Tenant's exclusive rights, (b) family hair care such as Great Clips, Fantastic Sam's, or other similar value oriented type operations, (c) any national retail tenant in excess of twenty-five thousand (25,000) square feet that sells the goods and/or provides the services that are covered by Tenant's exclusive rights as a part of its normal business operations, but not as its primary use, or (d) incidental sales (less than 200 square feet total of such tenant's premises is used to sell of the products that comprise Tenant's Primary Business).

H-3

## B.   PROHIBITED USES

**BARNES & NOBLE (revision of draft dated 5/1/07)**

7.4   Landlord shall not lease or permit the use of space in the Shopping Center or within the Outparcels (and Tenant will not use or permit any permitted sublessee or assignee to use any portion of the Premises) for the following:  (i) any bowling alley; (ii) any arcade; (iii) any tavern or bar, except within the "Hotel" (as hereinafter defined) or to the extent incidental to a restaurant operated primarily for on-premises consumption; (iv) any health club, spa or gymnasium, except that (A) within the Lifestyle Area Landlord may permit the operation of up to two (2) upscale spas so long as the Leasable Square Footage of any one (1) such spa does not exceed 5,000 and the Leasable Square Footage of both such spas does not exceed 8,000 in the aggregate and (B) this clause (iv) shall not be applicable to operations located within the "Power Center" (as shown and labeled on the Site Plan); (v) any night club or discotheque; (vi) any second hand or surplus store; (vii) any mobile home park or trailer court (except that this provision shall not prohibit the temporary use of construction trailers); (viii) any dumping, disposing, incineration or reduction of garbage (exclusive of appropriately screened dumpsters located in the rear of any building); (ix) any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation, (x) any central laundry or dry cleaning plant or laundromat (except that this prohibition shall not be applicable to on-site service provided solely for pickup and delivery by the ultimate consumer, including nominal supporting facilities); (xi) any automobile, truck, trailer or R.V. sales, leasing, display or repair; (xii) any skating rink; (xiii) any living quarters, sleeping apartments or lodging rooms, except for the "Hotel" (herein so called) so long as such Hotel is located only in an Outparcel or above Buildings B, C and/or E (as shown and labeled on the Site Plan), does not have more than 120 guest rooms, if located above Buildings B, C and/or E, the primary entrance to the Hotel (and all guest and employee parking for the Hotel) is on the north side of such Buildings and the Hotel does not have more than 12,000 Leasable Square Feet of banquet and meeting facilities;  (xiv) any veterinary hospital, animal raising facilities or pet shop (except that this prohibition only prohibits a pet shop if it is adjacent to the Premises); (xv) any mortuary; (xvi) any establishment selling or exhibiting pornographic materials; (xvii) any office use (except (A) incidental offices within and supporting a retail or restaurant operation or the Hotel and (B) within the Outparcels); (xviii) any movie theater within three hundred feet (300') of the Premises; (xix) any training or educational facility, including, but not limited to, beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers (except that this prohibition shall not prohibit a tenant or other operator from offering to the general public, as an incidental part of its primary retail use, activities such as book readings and computer-training sessions); (xx) any auto parts store or gas or service station; provided, that this restriction shall not prohibit Circuit City from selling, installing and repairing equipment in a manner consistent with its operations in a majority of their stores operated under the same tradename in the domestic United States; (xxi) any church, temple, synagogue or other place of worship; (xxii) any auditorium, meeting hall or other place of public assembly; (xxiii) any gambling facility or operation, including, but not limited to, off-track or sports betting parlor, table games such as black-jack or poker, slot machines, video poker/black-jack/keno machines or similar devices, or bingo parlor; (xxiv) any massage parlor (excluding any upscale spas as permitted under 7.4 (iv) above), topless club or "strip joint"; (xxv) any operation primarily used as a storage warehouse operation; (xxvi) any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation; (xxvii) any nail salon within one hundred feet (100') of the storefront of the Premises; (xxviii) any use which is a public or private nuisance; or (xxix) any of those uses set forth in the "COREA Prohibited Uses" set forth in Exhibit N hereto.  Additionally, no exterior identification signs attached to any building of the Shopping Center shall be: (1) flashing, moving or audible signs; (2) signs employing exposed raceways (provided that Tenant and other tenants of the Shopping Center shall have the right to employ the foregoing only for the installation of internally illuminated self-contained channel letters), exposed neon tubes, exposed ballast boxes, or exposed transformers; or (3) paper or cardboard signs (other than professionally-ballast boxes, or exposed transformers; or (3) paper or cardboard signs (other than professionally-prepared interior window signs advertising special sales within the subject premises), temporary signs

H-4

(other than contractor's signs and grand opening signs), stickers or decals; provided, however, that the foregoing shall not prohibit the placement at the entrance of each such premises of (A) a small sticker or decal which indicates hours of business, emergency telephone numbers, credit cards accepted and other similar information and/or (B) a small sticker or decal which contains the words "No Solicitation" or words of like import. Notwithstanding the foregoing, for so long as Dillard's and Kohl's each operate in the Shopping Center in a manner consistent with their respective operations in a majority of their stores operated under the same tradename in the domestic United States, each such operator shall be excluded from Landlord's obligations under this Paragraph 7.4.

## CIRCUIT CITY (from draft dated 10/11/07)

Exhibit F

"Prohibited Uses" shall mean any one or more of the following uses:

a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(v)     a bowling alley;

(w)     a billiard or bingo parlor;

(x)     a flea market;

(y)     a massage parlor; provided, however, that this prohibition shall not be applicable to a full-service, professional day spa of the type customarily operated in first-class shopping centers in the majority metropolitan areas of the southeastern U.S.;

(z)     a funeral home;

(aa)     a facility for the sale of paraphernalia for use with illicit drugs;

(bb)     a facility for the sale or display of pornographic material (as determined by community standards for the area in which the Shopping Center is located);

(cc)     an off-track betting parlor;

(dd)     a carnival, amusement park or circus;

(ee)     a gas station, car wash or auto repair or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (k));

(ff)     a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(gg)     a facility for any use which is illegal or dangerous, constitutes a nuisance or is inconsistent with an integrated, community-oriented retail and commercial shopping center;

(hh)     a skating rink;

(ii)     an arcade, pinball or computer game room (provided that retail facilities in the Shopping Center may operate no more than four (4) such electronic games incidentally to their primary operations);

(jj)     service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) or other non-retail uses except for offices and storage facilities incidental to a primary retail operation;

(kk)     a banquet hall, auditorium or other place of public assembly;

H-5

(ll)    a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers);

(mm)    a theater of any kind;

(nn)    a facility for the sale or rental of used goods (including thrift shops, secondhand or consignment stores) or any facility selling new or used merchandise as a wholesale operation, a liquidation operation, odd lots, lot sales, factory close-outs or imperfect goods;

(oo)    a gymnasium, sport or health club or spa; provided, however, that this prohibition shall not be applicable to a full-service, professional day spa of the type customarily operated in first-class shopping centers in the majority metropolitan areas of the southeastern U.S.; or

(pp)    hotel or residential facility; provided, however, the foregoing restriction shall not apply to a hotel in the "Lifestyle Center" portion of the Shopping Center.

## DICK'S SPORTING GOODS (from draft dated 11/12/07)
Section 1.4

Landlord agrees that, during the term of this Lease and as long as any retail sales activity shall be conducted in the Demised Premises (excluding interruptions (a) not exceeding one hundred eighty (180) consecutive days or (b) due to alterations, restoration, casualty, taking and/or a Force Majeure Event(s), which shall be deemed to be the conduct of retail sales activity for purposes of this section), the Shopping Center shall not be used for any purpose that is inconsistent with a first-class shopping center, the OEA and matters set forth in Exhibit I, and specifically the Shopping Center shall not be used:

(i)    for any non-retail purposes (repairs, alterations, storage and offices incidental to retailing, and banks and small loan offices, shall be deemed retail);

(ii)    for any entertainment purposes such as a bowling alley, skating rink, bar (except for any bar located within a restaurant otherwise permitted under this Section 1.4, the sales of which bar account for less than forty percent (40%) of the gross sales of such restaurant), night club, discotheque, amusement gallery, cinema (except for any cinema located on the east side of the roadway located adjacent to Pad 14, Pad 15 and Circuit City, as shown on the Lease Plan), poolroom, health club or day spa (except for any health club or day spa located more than three hundred (300) lineal feet from the Demised Premises) (except this restriction shall not apply to incidental services provided by Ulta, its successor and assigns, massage parlor (except for therapeutic massage given in connection with the operation of a day spa or health club otherwise be permitted under this Section 1.4), sporting event, sports or game facility or off-track betting club;

(iii)    for any establishment which sells or displays pornographic materials;

(iv)    for any establishment which sells or displays used merchandise or second hand goods; or

(v)    for a restaurant or establishment selling food prepared on premises for consumption on or off premises located within three hundred (300) lineal feet of the Demised Premises (however, a restaurant may be permitted within three hundred (300) lineal feet of the Demised Premises if such restaurant is on an out-parcel with self-contained parking with at least fifteen (15) parking spaces for so-called standard size American automobiles, and driveways and footways incidental thereto, for each one thousand (1,000) square feet of leasable floor area).

Landlord agrees that the Shopping Center shall not be used for any purpose that is not permitted under the Title Matters, specifically including, without limitation, the OEA, and that Landlord will

H-6

enforce the provisions of the Title Matters and the OEA against the parties to the OEA and other Occupants.

## OLD NAVY (from draft dated 12/27/07)

### 13.3    Prohibited Uses

(A)    Landlord covenants that no portion of the Shopping Center shall be used for any of the following purposes: a bowling alley; a video or amusement arcade (other than as an incidental use); the sale of alcoholic beverages within five hundred (500) feet of the Premises; a movie theatre within one thousand (1,000) feet of the Premises; a fitness center, gymnasium, aerobics studio or weightlifting center within five hundred (500) feet of the Premises; the sale of automotive parts including tires (other than as an incidental use) or automotive services including repair services (provided that this restriction shall not prohibit Circuit City from selling, installing and repairing equipment in a manner consistent with its operations in a majority of stores operated under the same tradename in the domestic United States); the sale, rental or display of materials that are pornographic in nature (provided that this restriction shall not prohibit a full line bookstore, music store or video store such as Barnes & Noble, Borders, Books-a-Million, or Blockbuster from selling adult books and videos); any unusual fire, explosive or dangerous hazards (including the storage, display or sale of explosives or fireworks other than "sparklers"); a restaurant adjacent to the Premises; a carnival or amusement park; the sale of Christmas trees or pumpkins within the Protected Area; an assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation; storage (other than as an incidental use); a commercial laundry or dry cleaning plant; a laundromat; a mortuary or funeral establishment; the sale of coffins or caskets; a pawn shop; a flea market; a shooting gallery; any use that permits a pest infestation without prompt action to eliminate the infestation; any use within five hundred (500) feet of the Premises that permits music or sounds to be heard outside of the premises when all doors are closed; any use that permits noxious odors to be smelled outside of the premises; and any use that permits vibrations to be felt within five hundred (500) feet outside of said premises. Landlord shall immediately take all prudent actions to ensure that such uses are prohibited, including, without limitation, listing such prohibitions in the leases and occupancy agreements with all tenants of the Shopping Center and taking prompt legal action as necessary or prudent to enforce such prohibitions. If Landlord fails to take such actions within one (1) month after notice from Tenant, Tenant shall have the right to take such actions on behalf of, and at the cost and expense of, Landlord. Tenant covenants that no portion of the Premises shall be used for any of the purposes described in this Section 13.3 except for those purposes that are prohibited in certain proximity to the Premises under this Section 13.3 or otherwise permitted in certain areas of the Shopping Center under this Section 13.3.

(B)    In addition, Landlord covenants that, during the Term, no portion of the Shopping Center shall be used for any of the prohibited uses contained in a lease or operating agreement for another tenant or occupant of the Shopping Center. Tenant covenants that Tenant shall be bound by each prohibited use set forth on Exhibit G to the extent it applies to the Premises until the earlier to occur of (1) the date on which the lease or operating agreement containing the prohibited use expires, is terminated or modified to remove such prohibited use, or (2) the date on which another party at the Shopping Center uses or is permitted to use its premises for such prohibited use.

## PETSMART (from draft dated 10/10/07)
Exhibit G

**Prohibited Uses.**  The following uses (collectively referred to as "Prohibited Uses" and individually as a "Prohibited Use") are prohibited during the Term of the Lease: nuisance; any use causing loud noises or offensive odors (including any business using exterior loud speakers); manufacturing facility; dry cleaner (except facilities for drop off and pick up of clothing cleaned at another location); any facility for the sale, lease or rental of automobiles, trucks, motorcycles, recreational

H-7

vehicles, boats or other vehicles; automobile repair shop or service station or any facility storing or selling gasoline or diesel fuel in or from tanks; used clothing or thrift store or liquidation outlet; massage parlor (except for therapeutic massages given in connection with the operation of a day spa or health club which may otherwise be permitted under this Lease); adult book shop or adult movie house; mortuary or funeral parlor; coin operated laundry; cocktail lounge, bar or tavern or sale of alcoholic beverages, whether or not packaged, except in conjunction with a restaurant permitted hereunder; night club; cinema or theater; place of recreation (including but not limited to bowling alley, skating rink, carnival, game arcade or health spa [except that a health spa shall be permitted provided located at least three hundred (300) feet from the Premises, and this restriction shall not apply to incidental services provided by Ulta, its successors and assigns]); church; or any other use inconsistent with the operation of a high quality retail shopping center. No restaurants of any size shall be located within two hundred fifty (250) feet of the Premises. The above notwithstanding, nothing herein shall prohibit the operation in the Shopping Center Premises. The above notwithstanding, nothing herein shall prohibit the operation in the Shopping Center of book stores similar in nature to Borders, Books-A-Million, Barnes & Noble or Walden Books. In addition, the following uses must first be approved in writing by Tenant if located within the Restricted Area as shown on Exhibit A: drive-throughs; children's recreational, educational or day-care facility; restaurants occupying more than twenty-five hundred (2,500) square feet of Gross Floor Area; offices; professional uses; and schools of any nature except in conjunction with animal training or obedience training classes associated with Tenant's Primary Business. As used herein, "school" includes, but is not limited to, a beauty school, barber college, reading room, place of instruction or any other operation serving primarily students or trainees rather than retail customers.

## ULTA SALON, COSMETICS & FRAGRANCE (from draft dated 10/12/07)
Exhibit G - To be prepared and inserted into lease based on the information contained in this document.

## DILLARD COREA (from draft dated 10/22/07)
**Section 9.1  Use and Operation of Lifestyle Center and Power Center.** Dillard covenants and agrees with Developer (but not with Kohl's) for the benefit of the Developer Tracts, and Kohl's covenants and agrees with Developer (but not with Dillard) for the benefit of the Developer Tracts, that until the Developer Buildings are not being operated during the Term in accordance with the terms and conditions of this Agreement and the respective Major's Separate Agreement, and Developer covenants and agrees for the benefit of the Dillard Tract and the Kohl's Tract that until the Dillard Building or Kohl's Building, respectively, is not being operated during the Term in accordance with the terms and conditions of this Agreement and the respective Major's Separate Agreement, no part of the covenanting Party's Tract may be used for any purpose other than (i) retail, (ii) commercial businesses compatible with the highest generally accepted standards of operation for other open-air regional shopping centers in the State of Louisiana (each Major hereby agreeing that the use of the Hotel for the operation of a Hilton Garden Inn and other hotels of similar or higher quality such as, but not limited to, Marriott Courtyard and Hampton Inn And Suites, is compatible with such standards), or (iii) any use or operation that is obnoxious to or inconsistent with the development or operation of an integrated open-air regional shopping center consistent with such standards; provided, however, that none of the following uses or operations shall be made, conducted or permitted by any covenanting Party on or with respect to all or any part of its Tract:

> any public or private nuisance;
>
> any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness;
>
> any obnoxious odor;
>
> any noxious, toxic, caustic or corrosive fuel or gas;

H-8

any dust, dirt or fly ash in excessive quantities;

any fire, explosion or other damaging or dangerous hazard (including the storage, display or sale of explosives or fireworks); provided, however, that this prohibition shall not prohibit the lawful and customary use of cleaning and other products that are intended for the maintenance of any Occupant's premises, the Common Areas or any other portion of the Shopping Center;

any warehouse use (use of any area within a Building for the storage of goods intended to be sold or consumed at any establishment in the Shopping Center will not be deemed to be a warehouse use);

assembling, manufacturing, distilling, refining, smelting, agriculture or mining operation or drilling for oil, gas or other minerals;

any second hand store, flea market, fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, laundry (other than the laundry in the Hotel for the operation of the Hotel), animal hospital, cemetery, mortuary or crematorium or other funeral establishment, or living quarters other than the Hotel;

any car wash, service station or automobile, truck, trailer or recreational vehicle sales, leasing, display, body shop or repair station;

any movie theater, night club or live performance theater (this prohibition shall not prohibit live performances as special events in the Shopping Center);

any distribution, sale, viewing or use of pornographic material; provided, however, that (i) NC-17 movies shall not be deemed pornographic, and (ii) nothing in this Section 9.1 shall prohibit the distribution or sale of any movie or other materials for viewing and use in the guest rooms of the Hotel;

any manufacture, use, storage or release of any Hazardous Substances except to the extent expressly permitted by Section 25.27;

any emission of any substance, gas, particulate matter, audio, radio, or infrared electromagnetic wave frequency or other form of radiation that materially interferes with the business of any Occupant;

any bingo parlor, off-track betting facility, casino or other gambling facility or operation, including off-track betting and sports betting parlors, table games such as black-jack and poker, slot machines, video gambling machines and similar gambling devices (but this subparagraph shall not prohibit government-sponsored gambling activities or charitable gambling activities if such activities are incidental the business operation being conducted by the Occupant);

any tavern, bar, night club, dance hall, discotheque or any establishment selling alcoholic beverages for on-premises consumption, other than incidental to the operation of restaurants or bars located inside restaurants (but this paragraph shall not prohibit any restaurant or other establishment merely because the word "tavern" is contained in the name of such restaurant or other establishment);

H-9

any bowling alley or skating rink other than (i) bowling alleys in any family entertainment center located in any Permissible Building Area east of the roadway designated on the Plot Plan as the "North-South Roadway", and (ii) bowling alleys or skating rinks in any retail store in the Shopping Center that are incidental to the operation of such retail store;

any pool or billiard parlor or hall (billiard tables as part of the operation of a restaurant or retail store are not prohibited), game room, game arcade or amusement center located within _____ feet of the Kohl's Building or Dillard Building, a laser tag or virtual reality facility or computer game-room (but the provisions of this subparagraph shall not prohibit a restaurant from having up to three (3) video games as an incidental use to its operations);

any health spa, fitness center or athletic facility which occupies more than 5,000 square feet of Floor Area except those located more than _____ feet from the Kohl's Building or the Dillard Building;

any massage parlor or tattoo parlor (but this subparagraph shall not prohibit massages in connection within beauty salons, athletic facilities, health clubs or fitness centers);

any training or educational facility, including a beauty school, barber college, reading room, places of instruction or other operations catering primarily to students or trainees rather than to customers (but this subparagraph shall not prohibit on-site employee training by an Occupant incidental to the conduct of its business whether for employment at the Shopping Center or at another business location of such Occupant);

any church, church school or related religious or educational facility; and

any day-care center (except this subparagraph shall not prohibit any Developer or any Occupant from providing baby-sitting facilities for the convenience of customers while such customers shop in the Shopping Center).

Each of the Parties agrees that none of its leases with Occupants of its Building or Buildings will permit uses prohibited by this Section 9.1.

Developer agrees that without the prior written consent of Dillard, the Hotel may be used only for hotel purposes until the expiration or earlier termination of the "Dillard Operating Covenant" (as that term is defined in the Dillard Separate Agreement). Thereafter, the Hotel may continue to be used for any of the following purposes or any combination thereof (including uses related thereto): (a) as such a hotel; (b) office purposes; and/or (c) apartment and/or condominium residential purposes provided that any such apartments and/or condominiums shall be at "market-rate" rather than subsidized. The interior and exterior of the Hotel may be remodeled as appropriate to accommodate any and all of the foregoing.

## KOHL'S COREA (from draft dated 10/22/07)
### Section 9.1  Use and Operation of Lifestyle Center and Power Center. Kohl's covenants and agrees with Developer for the benefit of the Developer Tracts that until the Developer Buildings are not being operated during the Term in accordance with the terms and conditions of this Agreement and the Separate Agreements, and Developer covenants and agrees for the benefit of the Kohl's Tract that until the Kohl's Building is not being operated during the Term in accordance with the terms and conditions of this Agreement and the Separate Agreements, no part of the covenanting Party's Tract may be used for any purpose other than (i) retail, (ii) commercial businesses compatible with the highest generally accepted standards of operation for other open-air regional shopping centers in the State of Louisiana (Kohl's hereby agreeing that the use of the Hotel for the operation of a Hilton Garden Inn and other hotels

H-10

of similar or higher quality such as, but not limited to, Marriott Courtyard and Hampton Inn And Suites, is compatible with such standards), or (iii) any use or operation that is obnoxious to or inconsistent with the development or operation of an integrated open-air regional shopping center consistent with such standards; provided, however, that none of the following uses or operations shall be made, conducted or permitted by any covenanting Party on or with respect to all or any part of its Tract:

any public or private nuisance;

any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness;

any obnoxious odor;

any noxious, toxic, caustic or corrosive fuel or gas;

any dust, dirt or fly ash in excessive quantities;

any fire, explosion or other damaging or dangerous hazard (including the storage, display or sale of explosives or fireworks); provided, however, that this prohibition shall not prohibit the lawful and customary use of cleaning and other products that are intended for the maintenance of any Occupant's premises, the Common Areas or any other portion of the Shopping Center;

any warehouse use (use of any area within a Building for the storage of goods intended to be sold or consumed at any establishment in the Shopping Center will not be deemed to be a warehouse use);

assembling, manufacturing, distilling, refining, smelting, agriculture or mining operation or drilling for oil, gas or other minerals;

any second hand store, flea market, fire sale, bankruptcy sale (unless pursuant to a court order), auction house operation, laundry (other than the laundry in the Hotel for the operation of the Hotel), animal hospital, cemetery, mortuary or crematorium or other funeral establishment, or living quarters other than the Hotel;

any car wash, service station or automobile, truck, trailer or recreational vehicle sales, leasing, display, body shop or repair station;

any movie theater, night club or live performance theater (this prohibition shall not prohibit live performances as special events in the Shopping Center);

any distribution, sale, viewing or use of pornographic material; provided, however, that (i) NC-17 movies shall not be deemed pornographic, and (ii) nothing in this Section 9.1 shall prohibit the distribution or sale of any movie or other materials for viewing and use in the guest rooms of the Hotel;

any manufacture, use, storage or release of any Hazardous Substances except to the extent expressly permitted by Section 25.27;

any emission of any substance, gas, particulate matter, audio, radio, or infrared electromagnetic wave frequency or other form of radiation that materially interferes with the business of

H-11

any Occupant;

any bingo parlor, off-track betting facility, casino or other gambling facility or operation, including off-track betting and sports betting parlors, table games such as black-jack and poker, slot machines, video gambling machines and similar gambling devices (but this subparagraph shall not prohibit government-sponsored gambling activities or charitable gambling activities if such activities are incidental the business operation being conducted by the Occupant);

any tavern, bar, night club, dance hall, discotheque or any establishment selling alcoholic beverages for on-premises consumption, other than incidental to the operation of restaurants or bars located inside restaurants (but this paragraph shall not prohibit any restaurant or other establishment merely because the word "tavern" is contained in the name of such restaurant or other establishment);

any bowling alley or skating rink other than (i) bowling alleys in any family entertainment center located in any Permissible Building Area east of the roadway designated on the Plot Plan as the "North-South Roadway", and (ii) bowling alleys or skating rinks in any retail store in the Shopping Center that are incidental to the operation of such retail store;

any pool or billiard parlor or hall (billiard tables as part of the operation of a restaurant or retail store are not prohibited), game room, game arcade or amusement center located within ___ feet of the Kohl's Building or Dillard Building, a laser tag or virtual reality facility or computer game-room (but the provisions of this subparagraph shall not prohibit a restaurant from having up to three (3) video games as an incidental use to its operations);

any health spa, fitness center or athletic facility which occupies more than 5,000 square feet of Floor Area except those located more than ___ feet from the Kohl's Building or the Dillard Building;

any massage parlor or tattoo parlor (but this subparagraph shall not prohibit massages in connection within beauty salons, athletic facilities, health clubs or fitness centers);

any training or educational facility, including a beauty school, barber college, reading room, places of instruction or other operations catering primarily to students or trainees rather than to customers (but this subparagraph shall not prohibit on-site employee training by an Occupant incidental to the conduct of its business whether for employment at the Shopping Center or at another business location of such Occupant);

any church, church school or related religious or educational facility; and

any day-care center (except this subparagraph shall not prohibit any Developer or any Occupant from providing baby-sitting facilities for the convenience of customers while such customers shop in the Shopping Center.

Each of the Parties agrees that none of its leases with Occupants of its Building or Buildings will permit uses prohibited by this Section 9.1.

Developer agrees that without the prior written consent of Kohl's, the Hotel may be used only for hotel purposes until the expiration or earlier termination of the "Kohl's Operating Covenant" (as that term is defined in the Separate Agreements). Thereafter, the Hotel may continue to be used for any of the

H-12

following purposes or any combination thereof (including uses related thereto): (a) as such a hotel; (b) office purposes; and/or (c) apartment and/or condominium residential purposes provided that any such apartments and/or condominiums shall be at "market-rate" rather than subsidized. The interior and exterior of the Hotel may be remodeled as appropriate to accommodate any and all of the foregoing.

## EXCLUSIVES FOR INLINE SHOPS AND OUTPARCELS
### (as of 7/13/07)

### 1.   INLINE SHOPS

**FINISH LINE** - Landlord will not enter into a Lease with another tenant whose primary use is for the sale of athletic footwear, defined as a tenant who uses 50% ore more of its premises for the sale of branded athletic shoes manufactured by athletic shoe manufacturers with their specific identifying symbol, name or logo.

**JOS A BANK** - Landlord will not lease to Brooks Brothers, Talbots for Men and any Discount Store that sells menswear or any store that sells tailored clothing (suits, sportcoats, dress trousers and topcoats). Excludes traditional department stores of 30,000 square feet or more.  Men's Wearhouse can be in buildings N or P of power center only.

**KAY JEWELERS**  -  So long as (i) subject to Articles V and XXIX, Tenant continuously operates its business from the Premises for the Permitted Use only; (ii) Tenant is not in default under the terms of this Lease beyond all applicable notice and cure periods; and (iii) Tenant has not sublet the Premises or assigned or transferred its interest under this Lease in violation of Article XXIII hereof, Landlord agrees that Tenant shall be entitled to the remedies stated hereinbelow in the event Landlord leases any portion of the Shopping Center, other than the Premises and one (1) other location within the Shopping Center, to any "Competing Business" (hereinafter a "Triggering Event").  For purposes of this Section 42.01, "Competing Business" shall mean a business which uses more than thirty (30%) percent of it sales floor area primarily for the sale of 10K or better gold, white gold, silver, platinum and precious stones and operates during substantially the same hours as the Tenant (the "Exclusive Use").

Notwithstanding the foregoing, the Tenant shall not be entitled to any remedies if any of the following documents allow and/or any of the following tenants conduct the Competing Business: (i) Major Tenants (as defined in Section 10.02); or (ii) any department store or junior department store; (iii) any existing tenants at the Shopping Center or their successors, assigns or replacements; or (iv) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (v) tenants whose sale of jewelry comprises less than thirty percent (30%) of such tenant's floor area, or (vi) the tenant known as Mignon Faget.  In the event Mignon Faget shall cease operation in the Shopping Center, Landlord shall not lease the Premises to a Competing Business.

**LEARNING EXPRESS** – Landlord will not have another store selling children's toys and games in the Lifestyle portion of the shopping center, excluding major tenants and electronic games stores, such as Gamestop. (Lease Outline not approved as of 7/13/07.)

**LEE MICHAELS JEWELERS** - Except for Kay Jewelers or its assigns or replacements, Landlord will not lease to another "guild jeweler".

**SELECT COMFORT** - Adjustable air controlled specialty sleep systems as its primary business.

H-13

**SUNGLASS HUT** - Landlord will not lease to another business in the Lifestyle portion of the Shopping Center whose primary business is the sale of sunglasses

2.  **OUTPARCELS**

**COPELAND'S CHEESECAKE BISTRO** - Other restaurants or retailers will be allowed to serve not more than 3 different types of cheesecakes, which includes toppings.

**CHILI'S** - Landlord will not allow to operate in the Center the following restaurants:  Applebee's, O'Charley's or Ruby Tuesday's.

**TEXAS ROADHOUSE** - Prohibits the sale or lease of any property retained by Landlord against the following: Logan's, Outback, Longhorn, Ryan's, Golden Corral, Lone Star, Roadhouse Grill or Colton's

**OLIVE GARDEN** - Landlord will not lease or convey to Macaroni Grill, Johnny Carino's or Carrabba's, nor add more than one additional full service Italian concept in the development.  This does not affect Landlord's rights to add a quick service pizza restaurant as in inline tenant.

**RUTH'S CHRIS** - Landlord shall not lease or any other parcel/premises in the center to another "white tablecloth" restaurant serving steak as a primary menu item similar to Ruth's Chris Steak House including Morton's or Fleming's but not including a family oriented steak house such as Outback, Steak & Ale or Logans.

H-14

## EXHIBIT I

<u>Recognition Agreement</u>

THIS RECOGNITION AGREEMENT, made as of the _____ day of _____, 200__, by and between **CP NORD DU LAC JV, LLC**, a Delaware limited liability company, having an address at 2101 6th Avenue North, Suite 750, Birmingham, AL 35203 ("<u>Landlord</u>"); **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having an office at, 9950 Mayland Drive, Richmond, Virginia 23233 ("<u>Tenant</u>"); and _____, a [_____] **[corporation] [limited] [general] [partnership]**, having an address at _____ ("<u>Subtenant</u>").

R E C I T A L S:

A.    Landlord and Tenant have entered into a certain Lease Agreement (the "<u>Lease</u>") dated as of _____, 200__, a short form of which has been recorded in _____, which demises certain premises (the "<u>Premises</u>") located in the Colonial Pinnacle Nord du Lac Shopping Center, Covington, LA, which Shopping Center is more particularly described on Exhibit A annexed hereto and made a part hereof.

B.    Section 17.04 of the Lease provides that in the event Tenant subleases all or a portion of the Premises for a term of at least five (5) years, Landlord shall, upon Tenant's request, execute and deliver a Recognition Agreement among Landlord, Tenant and each such subtenant in the form attached to the Lease, in recordable form.

C.    Pursuant to a Sublease dated as of _____ (the "<u>Sublease</u>"), Tenant has subleased **[a portion of]** the Premises to Subtenant (the "<u>Subleased Premises</u>").

D.    The parties hereto desire to effectuate the provisions of Section 17.04 of the Lease with respect to the Sublease and the Subleased Premises.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.    Landlord warrants and represents as follows:

(a)    that it is the fee owner of the Premises,

(b)    that the Lease is unmodified (except as may be otherwise set forth in Exhibit B annexed hereto, if any) and is in full force and effect,

(c)    that the term of the Lease expires on _____, but is subject to _____ [__] renewal periods of **[five (5)]** years each, and

(d)    that Tenant is not in default under the Lease nor has any event occurred which would after notice to Tenant and the passage of time become a default of Tenant under the Lease.

I-1

2.    Landlord hereby acknowledges receipt of a copy of, and consents to and approves, the Sublease and all of the terms, covenants and provisions thereof, and agrees that the exercise by Subtenant of any of its rights, remedies and options contained therein shall not constitute a default under the Lease.

3.    Landlord agrees that whenever it has an obligation with respect to the Premises, or its consent or approval is required for any action of Tenant under the Lease, then, to the extent such obligation, consent or approval relates to the Subleased Premises or Subtenant's use and occupation thereof, it will perform such obligation in accordance with the terms and conditions of the Lease, and, subject to the applicable terms of the Lease, will not unreasonably withhold or unduly delay such consent or approval.

4.    Landlord shall not, in the exercise of any of the rights arising or which may arise out of the Lease or of any instrument modifying or amending the same or entered into in substitution or replacement thereof (whether as a result of Tenant's default or otherwise), disturb or deprive Subtenant in or of its possession or its rights to possession of the Subleased Premises or of any right or privilege granted to or inuring to the benefit of Subtenant under the Sublease, provided that Subtenant is not in default under the Sublease beyond the expiration of any applicable notice and cure period.

5.    In the event of the termination of the Lease by reentry, notice, conditional limitation, surrender, summary proceeding or other action or proceeding, or otherwise, or, if the Lease shall terminate or expire for any reason before any of the dates provided in the Sublease for the termination of the initial or renewal terms of the Sublease and if immediately prior to such surrender, termination or expiration the Sublease shall be in full force and effect, Subtenant shall not be made a party in any removal or eviction action or proceeding nor shall Subtenant be evicted or removed of its possession or its right of possession of the Subleased Premises be disturbed or in any way interfered with, and the Sublease shall continue in full force and effect as a direct lease between Landlord and Subtenant (provided, that in such event, Subtenant shall, for the then remainder of the term of the Sublease, pay fixed rent and additional rent in an amount equal to the greater of (x) the Annual Minimum Rent and Additional Rent then payable under the Lease, prorated on the basis of the ratio which the Floor Area of the Subleased Premises bears to the Floor Area of the Premises, or (y) the annual minimum rent and additional rent then payable under the Sublease).

6.    Landlord hereby waives and relinquishes any and all rights or remedies against Subtenant, pursuant to any lien, statutory or otherwise, that it may have against the property, goods or chattels of Subtenant in or on the Subleased Premises.

7.    Any notices, consents, approvals, submissions, demands or other communications (hereinafter collectively referred to as "Notice") given under this Agreement shall be in writing. Unless otherwise required by law or governmental regulation, Notices shall be deemed given if sent by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid (a) to Landlord, at the address of Landlord as hereinabove set forth or such other address or persons as Landlord may designate by Notice to the other parties hereto, (b) to Tenant, to CIRCUIT CITY STORES, INC., 9950 Mayland Drive, Richmond, Virginia 23233, Attention: Vice President of Real Estate, with duplicate copies to

I-2

CIRCUIT CITY STORES, INC., 9950 Mayland Drive, Richmond, Virginia 23233, Attention: General Counsel, and _____, or such other address or persons as Tenant may designate by Notice to the other parties hereto, and (c) to Subtenant, at the address of Subtenant as hereinabove set forth or such other address or persons as Subtenant may designate by Notice to the other parties hereto. During the period of any postal strike or other interference with the mails, personal delivery shall be substituted for registered or certified mail. All Notices shall become effective only on the receipt or rejection of same by the proper parties.

8.     No modification, amendment, waiver or release of any provision of this Agreement or of any right, obligation, claim or cause of action arising hereunder shall be valid or binding for any purpose whatsoever unless in writing and duly executed by the party against whom the same is sought to be asserted.

9.     This Agreement shall be binding on and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors, assigns and sublessees.

[Signature Page Follows]

I-3

IN WITNESS WHEREOF, the parties have caused this Recognition Agreement to be executed under seal the date first above written.

**LANDLORD:**

Witness/Attest:

**CP NORD DU LAC JV, LLC,** a Delaware limited liability company

_____ [print name]

By: _____

_____ [print name]

    William A. Leitner, III

Its:    Authorized Manager

**TENANT:**

Witness:

**CIRCUIT CITY STORES, INC.,** a Virginia corporation

_____ [print name]

By: _____

_____ [print name]

    John B. Mulleady

    Vice President, Real Estate and Construction

**SUBTENANT:**

Witness:

_____

_____ [print name]

By: _____

_____ [print name]

Name: _____

Title: _____

I-4

STATE OF _____

COUNTY OF _____

BE IT KNOWN, that on this _____ day of _____, 2007, before me, the undersigned Notary Public, duly commissioned, qualified and sworn within and for the State and County aforesaid, personally came and appeared John B. Mulleady, who declared and acknowledged to me, Notary, in the presence of the undersigned competent witnesses, that he is the Vice President, Real Estate and Construction of **CIRCUIT CITY STORES, INC.**, a Virginia corporation, that the instrument was signed on behalf of the corporation by the authority of its Board of Directors and that he executed the above and foregoing instrument of his own free will, as his own act and deed, for the uses, purposes and benefits therein expressed.

_____
NOTARY PUBLIC

Notary Seal

My Commission Expires:

_____

STATE OF ALABAMA

COUNTY OF JEFFERSON

BE IT KNOWN, that on this _____ day of _____, 2008, before me, the undersigned Notary Public, duly commissioned, qualified and sworn within and for the State and County aforesaid, personally came and appeared William A. Leitner, III, who declared and acknowledged to me, Notary, in the presence of the undersigned competent witnesses, that he is the Authorized Manager of CP Nord Du Lac JV, LLC, a Delaware limited liability company, that the instrument was signed on behalf of the company, and that he executed the above and foregoing instrument of his own free will, as his own act and deed, for the uses, purposes and benefits therein expressed.

_____
NOTARY PUBLIC

Notary Seal

My Commission Expires:

_____

I-5

STATE OF _____)

COUNTY OF _____)

  BE IT KNOWN, that on this _____ day of _____, 2007, before me, the undersigned Notary Public, duly commissioned, qualified and sworn within and for the State and County aforesaid, personally came and appeared _____, who declared and acknowledged to me, Notary, in the presence of the undersigned competent witnesses, that he/she is the _____ of _____, a _____ corporation, that the instrument was signed on behalf of the corporation by the authority of its Board of Directors and that he/she executed the above and foregoing instrument of his/her own free will, as his/her own act and deed, for the uses, purposes and benefits therein expressed.


_____
NOTARY PUBLIC

            Notary Seal

My Commission Expires:

_____

I-6

EXHIBIT J

After recording, return to:
Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas 75219

<u>Subordination, Non-Disturbance and Attornment Agreement</u>

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT, made as of the _____ day of _____, 200__, by and between _____, a _____ [corporation] [limited] [general] [partnership] [national banking association], having an office at _____ _____ (the "<u>Mortgagee</u>") and CIRCUIT CITY STORES, INC., a Virginia corporation, having an office at, 9950 Mayland Drive, Richmond, Virginia 23233 (the "<u>Tenant</u>").

W I T N E S S E T H :

WHEREAS, Mortgagee is the holder of a mortgage (the "<u>Mortgage</u>") covering a parcel of land owned by CP NORD DU LAC JV, LLC, a Delaware limited liability company (the "<u>Landlord</u>") together with the improvements [to be] erected thereon (said parcel of land and improvements thereon being hereinafter referred to as the "<u>Shopping Center</u>" and being more particularly described on <u>Exhibit A</u> attached hereto and made a part hereof); and

WHEREAS, by a certain Lease Agreement heretofore entered into between Landlord and Tenant dated as of _____ (the "<u>Lease</u>"), Landlord leased to Tenant a portion of the Shopping Center, as more particularly described in the Lease (the "<u>Premises</u>"); and

WHEREAS, a copy of the Lease has been delivered to Mortgagee, the receipt of which is hereby acknowledged; and

[For mortgages existing as of the date Lease is executed: WHEREAS, as an inducement to Tenant to enter into the Lease, [Section 2.04(f)/Section 19.02] thereof provides that the Lease is conditioned upon Landlord obtaining this Agreement from Mortgagee; and

WHEREAS, the parties desire to satisfy the foregoing condition and to provide for the non-disturbance of Tenant by the holder of the Mortgage; and]

[For mortgages occurring after the Lease is executed: WHEREAS, Section 19.01 of the Lease provides that the Lease shall become subject and subordinate to a mortgage encumbering the fee interest of Landlord in and to the Shopping Center if and when a non-disturbance agreement is entered into with respect to such mortgage; and

WHEREAS, the parties hereto desire to effect the subordination of the Lease to the Mortgage and to provide for the non-disturbance of Tenant by Mortgagee.]

J-1

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Mortgagee hereby consents to and approves the Lease and the term thereof, including the options to extend the term as set forth in the Lease, and covenants and agrees that the exercise by Tenant of any of the rights, remedies and options therein contained shall not constitute a default under the Mortgage.

2.     Tenant covenants and agrees with Mortgagee that the Lease is made and shall continue hereafter to be subject and subordinate to the lien of the Mortgage, and to all modifications and extensions thereof (and such subordination shall not lessen or diminish Tenant's rights under the Lease), subject, however, to the provisions of this Agreement.

3.     Mortgagee agrees that so long as the Lease shall be in full force and effect, and so long as Tenant shall not be in default under the Lease beyond any applicable notice and grace period:

(a)     Tenant shall not be named or joined as a party or otherwise in any suit, action or proceeding for the foreclosure of the Mortgage or to enforce any rights under the Mortgage or the bond or note or other obligation secured thereby;

(b)     The possession by Tenant of the Premises and Tenant's rights thereto shall not be disturbed, affected or impaired by, nor will the Lease or the term thereof be terminated or otherwise affected by (i) any suit, action or proceeding brought upon the Mortgage or the bond or note or other obligation secured thereby, or for the foreclosure of the Mortgage or the enforcement of any rights under the Mortgage, or by any judicial sale or execution or other sale of the Premises or the Shopping Center, or any deed given in lieu of foreclosure, or by the exercise of any other rights given to any holder of the Mortgage or other documents as a matter of law, or (ii) any default under the Mortgage or the bond or note or other obligation secured thereby; and

(c)     All condemnation awards and insurance proceeds paid or payable with respect to the Premises or any other part of the Shopping Center shall be applied and paid in the manner set forth in the Lease.

4.     If Mortgagee or any future holder of the Mortgage shall become the owner of the Shopping Center by reason of foreclosure of the Mortgage or otherwise, or if the Shopping Center shall be sold as a result of any action or proceeding to foreclose the Mortgage, or transfer of ownership by deed given in lieu of foreclosure, the Lease shall continue in full force and effect, without necessity for executing any new lease, as a direct lease between Tenant and the then owner of the Shopping Center, as "landlord", upon all of the same terms, covenants and provisions contained in the Lease, and in such event:

(a)     Tenant shall be bound to such new owner under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Extension Periods, if Tenant elects or has elected to exercise its options to extend the term) and Tenant

J-2

hereby agrees to attorn to such new owner and to recognize such new owner as "<u>Landlord</u>" under the Lease; and

(b)     Such new owner shall be bound to Tenant under all of the terms, covenants and provisions of the Lease for the remainder of the term thereof (including the Extension Periods, if Tenant elects or has elected to exercise its options to extend the term) which such new owner hereby agrees to assume and perform and Tenant shall, from and after the date such new owner succeeds to the interest of "landlord" under the Lease, have the same remedies against such new owner for the breach of any covenant contained in the Lease that Tenant might have had under the Lease against Landlord if such new owner had not succeeded to the interest of "landlord"; <u>provided</u>, <u>however</u>, that such new owner shall not be:

(i)     liable for any act or omission of any prior landlord (including Landlord) unless such act or omission continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(ii)     subject to any defenses which Tenant may have against any prior landlord (including Landlord) unless resulting from any default or breach by such prior landlord which continues from and after the date upon which the new owner succeeds to the interest of such prior landlord;

(iii)     subject to any offsets which Tenant may have against any prior landlord, except to the extent such offsets are expressly provided under the Lease and Mortgagee has received notice thereof and the opportunity to cure within the applicable time periods set forth in the Lease (it being further agreed that offsets under the Lease that were deducted by Tenant prior to the date upon which the new owner succeeds to the interest of such prior landlord shall not be subject to challenge);

(iv)     bound by any annual minimum rent or additional rent which Tenant might have paid for more than one month in advance of its due date under the Lease to any prior landlord (including Landlord), unless such additional rent is paid in accordance with the applicable provisions of the Lease; or

(v)     bound by any amendment or modification of the Lease made without its consent; notwithstanding the foregoing, Mortgagee acknowledges that the Lease specifically provides for amendments thereof upon the occurrence of certain events described in the Lease (such as, for example, an amendment to the Lease confirming the measurement of the Premises), and, by its execution below, Mortgagee agrees to recognize such amendments as part of the Lease, and Mortgagee further agrees that such new owner shall also be bound by such amendment(s) to the Lease, without any consent on the part of Mortgagee or such new owner.

(c)     Tenant's obligations hereunder shall be effective only so long as Mortgagee is bound to Mortgagee's obligations hereunder.

5.     Tenant will notify Mortgagee of any default by Landlord under the Lease which would entitle Tenant to terminate the Lease or abate the rent payable thereunder and agrees that notwithstanding any provision of the Lease, no notice of termination thereof nor any abatement shall be effective unless Mortgagee has received the aforesaid notice and has failed to cure the

J-3

subject default within the same time period allowed Landlord under the Lease. It is understood that the abatement provisions of this Section relate to abatements by reason of Landlord's default and do not apply to provisions of the Lease whereby Tenant has the automatic right to abate rentals such as, for example, abatement upon casualty or condemnation.

6.       Neither the Mortgage nor any other security instrument executed in connection therewith shall encumber or be construed as subjecting in any manner to the lien thereof, any trade fixtures, signs or other personal property at any time furnished or installed by or for Tenant or its subtenants or licensees on the aforementioned property regardless of the manner or mode of attachment thereof.

7.       Any notices of communications given under this Agreement shall be in writing and shall be given by registered or certified mail, return receipt requested, or by any recognized overnight mail carrier, with proof of delivery slip, postage prepaid, (a) if to Mortgagee, at the address of Mortgagee as hereinabove set forth or at such other address or persons as Mortgagee may designate by notice in the manner herein set forth, or (b) if to Tenant, to CIRCUIT CITY STORES, INC., 9950 Mayland Drive, Richmond, Virginia 23233, Attention: Vice President of Real Estate, with duplicate copies to CIRCUIT CITY STORES, INC., 9950 Mayland Drive, Richmond, Virginia 23233, Attention: General Counsel, and _____, or such other address or persons as Tenant may designate by notice in the manner herein set forth. All notices given in accordance with the provisions of this Section shall be effective upon receipt (or refusal of receipt) at the address of the addressee.

8.       This Agreement shall bind and inure to the benefit of and be binding upon and enforceable by the parties hereto and their respective successors, assigns, and sublessees.

9.       This Agreement contains the entire agreement between the parties and cannot be changed, modified, waived or canceled except by an agreement in writing executed by the party against whom enforcement of such modification, change, waiver or cancellation is sought.

10.       This Agreement and the covenants herein contained are intended to run with and bind all lands affected thereby.

[to add if Tenant's memorandum of lease has been recorded prior to the subject mortgage] NOTE: THIS AGREEMENT BY TENANT SHALL NOT BE EFFECTIVE UNLESS AND UNTIL ANY PRIOR MORTGAGES ON THIS PROPERTY HAVE BEEN SATISFIED SO THAT TENANT'S PRIOR AGREEMENTS TO ATTORN TO SAID MORTGAGES AND/OR TO SUBORDINATE ITS LEASE TO SAID MORTGAGES SHALL HAVE BEEN EXTINGUISHED.

IN WITNESS WHEREOF, the parties hereto have duly executed this Subordination, Non-Disturbance and Attornment Agreement as of the day and year first above written.

-Signature Page Follows-

J-4

**MORTGAGEE:**

Witness:

_____

_____[print name]

_____[print name]

By:_____

Name:_____

Title:_____

**TENANT:**

Witness:

**CIRCUIT CITY STORES, INC.**, a Virginia corporation

_____

_____[print name]

By:_____

_____[print name]

John B. Mulleady
Vice President, Real Estate and Construction

STATE OF _____

COUNTY OF _____

BE IT KNOWN, that on this _____ day of _____, 2007, before me, the undersigned Notary Public, duly commissioned, qualified and sworn within and for the State and County aforesaid, personally came and appeared John B. Mulleady, who declared and acknowledged to me, Notary, in the presence of the undersigned competent witnesses, that he is the Vice President, Real Estate and Construction of **CIRCUIT CITY STORES, INC.**, a Virginia corporation, that the instrument was signed on behalf of the corporation by the authority of its Board of Directors and that he executed the above and foregoing instrument of his own free will, as his own act and deed, for the uses, purposes and benefits therein expressed.

_____
NOTARY PUBLIC

My Commission Expires:                    Notary Seal

_____

[add lender acknowledgment]

J-5

# EXHIBIT K

## Permitted Exceptions

Tract A (as described on Exhibit B) is to be owned by The Higbee Company.

Tract B (as described on Exhibit B) is to be owned by Kohl's Department Stores, Inc.

As of the Effective Date, Landlord has not finalized title and survey matters relating to the Shopping Center.  No title exceptions or encumbrances are permitted under this Lease unless agreed to by Tenant and Landlord and inserted in this Exhibit "K" following the Effective Date. Notwithstanding the foregoing, no title exceptions shall be permitted which reflect easements under, over or on the Land, would limit or prohibit any rights granted Tenant hereunder, or create any liability or burden on Tenant.

**EXHIBIT L**

_____

_____

(The Above Space for Recorder's Use Only)

After recording, return to:
Pamela G. Kostas
Kostas & Birne, LLP
530 One Turtle Creek Village
3878 Oak Lawn Avenue
Dallas, Texas 75219

## MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE, made as of _____, 200__ by and between **CP NORD DU LAC JV, LLC,** a Delaware limited liability company, having an office at 2101 6th Avenue North, Suite 750, Birmingham, AL 35203 ("**Landlord**"), and **CIRCUIT CITY STORES, INC.,** a Virginia corporation, having an office at 9950 Mayland Drive, Richmond, Virginia 23233 ("**Tenant**").

### Preliminary Statement

Landlord is the fee owner of certain real property located in the Parish of St. Tammany, State of Louisiana, as more particularly described on <u>Exhibit A</u> hereto annexed, together with improvements constructed or to be constructed thereon (the "**Shopping Center**"). Landlord and Tenant, as of the date hereof, have entered into a lease (the "**Lease**") demising a portion of the Shopping Center as more particularly described therein (the "**Premises**") to Tenant. In connection therewith, Landlord and Tenant have entered into this Memorandum to confirm the demise of the Premises and to provide notice to any interested party of such demise and of the terms and provisions of the Lease.

NOW, THEREFORE, the parties state as follows:

1.    All capitalized terms used, but not otherwise defined, herein shall have the meanings ascribed to them in the Lease.

2.    The date of the Lease is _____, 200__.

3.    The terms and conditions of the Lease are incorporated herein as though set forth in full, whereby Tenant may have and hold the Premises together with any and all rights, benefits, privileges and easements, now or hereafter appurtenant thereto, at the rental and upon the terms and conditions therein stated, for an initial term of approximately fifteen (15) years commencing on the Commencement Date (the "**Initial Lease Term**").

4.    Under the terms of the Lease, Tenant has the right to extend the Initial Lease Term for two (2) separate and additional periods of five (5) years each after the expiration of the Initial Lease Term.

L-1

5.    This Memorandum of Lease is executed for the purpose of recordation in order to give notice of all of the terms, provisions and conditions of the Lease, including, without limitation:

(i)    that, subject to certain exceptions more particularly set forth in the Lease, Landlord shall not lease, rent or occupy or permit any other premises in the Shopping Center or on any "**Affiliated Land**" (defined in the Lease) to be occupied, for the sale, rental, installation, servicing and/or repairing, either singly or in any combination, of consumer, office and/or automotive electronics products, including, without limitation, televisions, stereos, speakers, video and audio recorders and players and cameras; computer hardware and software and related software services (which include internet access services, entertainment software and entertainment media [such as, by way of example only, game cartridges, video tapes, cassettes, compact discs, DVD's and DVD equipment]); cellular and wireless telephones and telecommunication devices and related accessories; motor vehicle audio, stereo and telephone systems; and technological evolutions of the foregoing;

(ii)    the restrictions set forth therein on Landlord's ability to lease certain portions of the Shopping Center for certain uses which are otherwise prohibited by the terms of the Lease;

(iii)    provisions set forth therein regarding Tenant's right to install and maintain signage upon the exterior of the Premises and upon a pylon and/or monument sign located at the Shopping Center;

(iv)    provisions set forth therein regarding Tenant's right to use (and to permit Tenant's customers, employees, agents and contractors to use) certain common areas of the Shopping Center (such as, without limitation, the parking facilities of the Shopping Center); and

(v)    provisions set forth therein regarding certain areas in the Shopping Center in which no improvements are to be constructed, or changes made without the consent of the Tenant.

9.    In addition to those terms hereinabove set forth, the Lease contains numerous other terms, covenants and conditions which likewise affect not only the Premises but also the Shopping Center, and notice is hereby given that reference should be had to the Lease directly with respect to the details of such terms, covenants and conditions. The Lease and exhibits thereto are hereby incorporated by reference in this Memorandum of Lease and the parties hereby ratify and confirm the Lease as if said Lease were being re-executed by them and recorded. In the event of any conflict between the provisions of this instrument and the Lease, the provisions of the Lease shall control.

**[Signatures on following page.]**

L-2

**IN WITNESS WHEREOF,** the parties hereto have executed this Memorandum of Lease as of the day and year first above written.

**TENANT:**

**CIRCUIT CITY STORES, INC.,**
a Virginia corporation

**WITNESSES:**

By:_____
    John B. Mulleady, Vice President,
    Real Estate and Construction

_____
_____[print name]

_____
_____[print name]

STATE OF _____

COUNTY OF _____

BE IT KNOWN, that on this _____ day of _____, 2007, before me, the undersigned Notary Public, duly commissioned, qualified and sworn within and for the State and County aforesaid, personally came and appeared John B. Mulleady, who declared and acknowledged to me, Notary, in the presence of the undersigned competent witnesses, that he is the Vice President, Real Estate and Construction of **CIRCUIT CITY STORES, INC.,** a Virginia corporation, that the instrument was signed on behalf of the corporation by the authority of its Board of Directors and that he executed the above and foregoing instrument of his own free will, as his own act and deed, for the uses, purposes and benefits therein expressed.

_____
NOTARY PUBLIC

Notary Seal

My Commission Expires:

_____

L-3

WITNESSES:

**LANDLORD:**

**CP NORD DU LAC JV, LLC**, a Delaware limited liability company

By:_____

    William A. Leitner, III
Its:  Authorized Manager

_____
               [print name]

_____
               [print name]

STATE OF ALABAMA

COUNTY OF JEFFERSON

      BE IT KNOWN, that on this _____ day of _____, 2008, before me, the undersigned Notary Public, duly commissioned, qualified and sworn within and for the State and County aforesaid, personally came and appeared William A. Leitner, III, who declared and acknowledged to me, Notary, in the presence of the undersigned competent witnesses, that he is the Authorized Manager of CP Nord Du Lac JV, LLC, a Delaware limited liability company, that the instrument was signed on behalf of the company, and that he executed the above and foregoing instrument of his own free will, as his own act and deed, for the uses, purposes and benefits therein expressed.

_____
              NOTARY PUBLIC

                                     Notary Seal

My Commission Expires:

_____

L-4

# <u>EXHIBIT A</u>

Legal Description of the Shopping Center

# EXHIBIT M

## Indemnification Agreement

This INDEMNIFICATION AGREEMENT is made this _____ day of _____, _____, between **CP NORD DU LAC JV, LLC,** a Delaware limited liability company (hereinafter referred to as "Landlord") and **CIRCUIT CITY STORES, INC.,** a Virginia corporation (hereinafter referred to as "Tenant").

## W I T N E S S E T H:

Landlord and Tenant have entered into a Lease (the "Lease"), dated _____ whereby Landlord has leased to Tenant a portion of the real property located in Covington, St. Tammany Parish, Louisiana (the "Shopping Center") and Tenant has constructed on such real property a store premises (the "Premises").

NOW, THEREFORE, in consideration of the payment of the Landlord Reimbursement as defined in the Lease and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  Tenant hereby indemnifies and agrees to hold Landlord harmless from any loss, payment, claim or expense as the result of mechanics and materialmen filing liens or otherwise making claims against Landlord's interest in the Premises and the Shopping Center as a result of Tenant's construction activities at the Shopping Center. In the event that any mechanic, materialman or other claimant makes claim against the Premises or Shopping Center based upon materials or services provided under contract with Tenant, Tenant shall hold harmless and protect Landlord from any loss, payment, claim or expense related thereto.

2.  Tenant reserves the right to contest in good faith the amount of any claim or lien assessed against the Premises or the Shopping Center by any of such claimants; provided, however, should the holder or holders of such claim or lien attempt to enforce their lien by foreclosure or by any other means, Tenant shall bond around, pay or remove such lien by any manner reasonably necessary to protect Landlord's interest in the Premises and the Shopping Center. This indemnity and hold harmless shall not apply to any liens or claims caused by Landlord or Landlord's agents.

M-1

EXECUTED this _____ day of _____, _____.

LANDLORD:

**CP NORD DU LAC JV, LLC**, a Delaware limited
liability company

Date: _____

By:_____

    William A. Leitner, III

Its:   Authorized Manager

TENANT:

**CIRCUIT CITY STORES, INC.**,
a Virginia corporation

Date: _____

By:   _____

    John B. Mulleady
    Vice President, Real Estate and Construction

M-2

EXHIBIT N

Pylon Sign Rendering

See attachment #5 of Exhibit C attached hereto.

EXHIBIT O

## CONSTRUCTION RULES AND GUIDELINES

### COLONIAL PINACLE Nord-du-LAc

Tenant agrees to comply with Landlord's construction rules and regulations attached hereto as Exhibit "O."

### RULES AND PROCEDURES
- Prior to commencement of the project, Contractor will present to the Tenant Coordinator:
  Craig Harris, Senior Construction Manager -- Retail
  2101 6th Avenue North, Suite 750
  Birmingham, AL 35203
  Phone: 205-250-8785
  FAX:  205-250-8890
  EMAIL:  charris@colonialprop.com

One complete set of pre-approved construction documents.

Evidence of Tenant's building permit.

Certificates of insurance required by the lease documents, naming _____, and___ _____, 2101 6th Avenue North, Birmingham, AL 35203 as additional named insured for all coverages.

Contractor's Federal I.D. Number. -- See Attached Form

Names and phone numbers of all of Contractor's supervisory personnel, as well as the phone number and/or fax number for the jobsite. -- See Attached Form
- Contractor must arrange to have all deliveries received and signed for by his own personnel.
- Contractor is responsible for making arrangements for storage space outside the premises, when needed. Storage space on site may not be available. Storage will be within the staging area as agreed in the SDR.
- Contractor is responsible for any security manpower required during construction.
- Contractor must maintain the areas in which he is working in a clean and orderly manner, daily. At the completion of his work, Contractor must clean and remove from the site, and any storage facilities used, all rubbish and debris before leaving the project.
- Contractor shall be responsible for any damage to existing work, to include patching, repair and/or replacement of such damage
- Contractor shall obtain all necessary permits and pay associated fees required by local authorities and utility companies for Tenant's Work.
- Contractor will furnish Tenant and Landlord a Certificate of Occupancy, issued by the local building authorities, along with an affidavit that work has been completed in accordance with approved drawings, and all sub-contractors and material suppliers have been paid in-full, through the receipt of lien waivers from all parties involved. Landlord's receipt of these documents is mandatory prior to refund of Construction Deposit to Contractor, and/or payment of any Tenant Allowance to Tenant.

O-1

- Contractor will coordinate with Landlord's General Contractor in regards to work required outside tenant space. (plumbing work etc...)
- Upon completion of construction, Contractor will schedule and inspection appointment with Landlord's representative, to ensure work is constructed in accordance with Landlord's minimum requirements and applicable codes.
- Tenant, or Tenant's contractor, will submit one (1) copy of as-built plans, prepared by Tenant to Landlord.
- 

## WORK PRACTICES STRICTLY PROHIBITED
Circuit City is building this building and can not agree to wording based on working in the LL 's shell building.

## BUILDING LAYOUT
- Contractor shall immediately, upon entering the project site, locate all general reference points and take necessary action to prevent their destruction; lay out his own work and be responsible for all lines, elevations and measurements of building, utilities and other work executed by him under his contract.
- Contractor must exercise proper precautions to verify figures shown on the drawings before layout work and will be held responsible for any error resulting from his failure to exercise such precautions.
- Any discrepancies will be brought to the attention of the Site Contractor.
- 

## SAFETY AND HEALTH STANDARDS
- The performance of all construction shall conform to the Federal Occupational Safety and Health Standards.
- Contractor and sub-contractors shall comply with all local, state, and national codes and ordinances and Landlord's requirements, as set forth in lease documents.
- Contractor will ensure that all Contractor's and sub-contractor's personnel comply with Landlord's requirement that drugs and drug use on the premises are strictly prohibited.

**ARTICLE I**
**RULES**

## CHECK-IN
- All Tenant Contractors are required to check-in at the job trailer for a pre-construction meeting with Landlord's Tenant Coordinator. Contractor will at that time turn over to Landlord all submittals, as defined in Paragraph A of these guidelines, before work may be commenced.

## WORK AREA
- All of contractor's work, storage, construction office, etc. must be confined within the premises or approved staging area for RBTS.
- No material may be left on service docks or in service hallways, at any time.
- If additional space on site has been made available to Contractor for storage during construction, Contractor must obtain approval from Landlord to use that space for any construction activities if outside the scope of reasonable construction practices.
- Use of service hallways, loading docks, mall entrances or any other areas for fabrication or other construction activities is not allowed.

O-2

DELIVERIES
- Deliveries will be made in accordance with Tenant's Lease Document.
- Deliveries will be made through designated entrances and routes, only. Designated entrances and routes may have to be changed from time to time, with permission from Landlord.

SERVICE ROADS / ACCESS ROADS
- All service and access roads will be kept clear of materials, equipment, debris and trash at all times. If necessary, Landlord will clear roads of any and all such items, without notice to Contractor, and charge Contractor for such removal.

TRASH REMOVAL
- Contractor will coordinate location of construction dumpster. There is limited space and a location must be determined before a dumpster is ordered.
- Accumulation of trash or debris within the lease space, mall common area, corridors or loading courts will be removed by Landlord, and Contractor will be charged for such removal.

PARKING
- During the pre-construction meeting, designated employee parking areas will be shown to Contractor. Except for limited time during delivery of materials or equipment, **Contractor and his sub-contractors will park in those designated areas only.**

TEMPORARY UTILITIES AND SERVICE

As per scope outlined in the Site Design Requirements

- All utilities are the responsibility of the Contractor. Listed below are the utility providers:

Water Sewer :Utilities, Inc
201 Holiday Blvd
Covington, LA 70433
985-893-5772
Delos Williams
Cleco Power LLC
2900 E. Causeway Approach, Ste. C
Mandeville, LA 70448
Phone: 985-624-3233
Fax: 985-674-0902

Bellsouth Telecommunications, Inc.
72337 Industry Park
Covington, LA 70435
Phone: 985-867-1285
Fax: 985-867-1281

O-3

Gas: Atmos Energy
663 Brownswitch, Ste. 1
Slidell, LA 70458
Phone: 985-649-7188
Fax: 985-649-3983

### FIRE PROTECTION AND FIRE ALARM

- Contractor will provide approved fire extinguishers within the premises, as required by local ordinance and Landlord's insurance carrier.

### WORK PRACTICES

- Contractor and sub-contractors must perform work in keeping with Landlord's accepted standards. Upon notice that any unreasonable work practices, or personnel, are unacceptable, Contractor will immediately terminate such practices and/or the immediate removal of said personnel from the property.

### PROTECTION OF WORK AND PROPERTY

- Tenant and Contractor will protect their work from damage and protect the work of other Tenants and Landlord from damage by Tenant's personnel, Contractor or sub-contractors.

### FIRE SYSTEM DRAINAGE FEES

Shutdown of Shopping Center sprinkler systems must be scheduled with the Shopping Center Management office at least forty-eight (48) hours in advance. Tenant's Contractor prior to the time of the shutdown will pay a charge of $200.00 for each shutdown

O-4

## TENANT CONTRACTOR
## INFORMATION

**Company:**
Company Name: _____

Physical Address: _____

Mailing Address: _____

Main Telephone Number: _____
Federal ID Number: _____

**Primary Contact Person:**
Name: _____
Telephone: _____
Fax: _____
Cell: _____
Nextel I.D.: _____
Email: _____

**Back-up Contact Person:**
Name: _____
Telephone: _____
Fax: _____
Cell: _____
Nextel I.D.: _____
Email: _____

O-5

## SUB CONTRACTOR LIST
### INFORMATION

| Company Name | Contact Person | Telephone Number |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

O-6

WO 445485.2