# EXHIBIT A – PART 1

LOCATION: Woodbury, Minnesota

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP

as Landlord

dated ___12/4/95___

**Tamarack Village Shopping Center**

227314 7

# TABLE OF CONTENTS

**PAGE**

1.  Leased Property ................................................................ 1

2.  Construction of Building and Improvements ................................. 2

3.  Lease Term ..................................................................... 3

4.  Rent. ........................................................................... 4

5.  Development of Shopping Center by Landlord ............................... 6

6.  Easements ...................................................................... 7

7.  Common Areas and Common Area Maintenance ............................. 9

8.  Signs and Communications Equipment ...................................... 16

9.  Taxes ........................................................................... 18

10.  Maintenance, Repairs and Replacements ................................... 20

11.  Payment of Utility Bills ..................................................... 22

12.  Alterations .................................................................... 22

13.  Mechanics' Liens ............................................................. 23

14.  Insurance ...................................................................... 24

15.  Damage by Fire or Other Casualty ......................................... 30

16.  Condemnation ................................................................. 36

17.  Assignment and Subletting .................................................. 38

18.  Use ............................................................................. 39

19.  Warranties and Representations ............................................ 40

20.  Estoppel Certificates. ....................................................... 51

227314.7

- i -

## TABLE OF CONTENTS (cont'd)

**PAGE**

| | | |
|---|---|---|
| 21. | Subordination, Non-Disturbance and Attornment | 51 |
| 22. | Change of Landlord | 53 |
| 23. | Tenant's Financing | 53 |
| 24. | Tenant's Property and Waiver of Landlord's Lien | 54 |
| 25. | Memorandum of Lease; Commencement Date Agreement | 54 |
| 26. | Expiration of Term and Holding Over | 55 |
| 27. | "For Rent" Signs | 55 |
| 28. | Force Majeure | 56 |
| 29. | Events of Tenant's Default | 56 |
| 30. | Landlord's Remedies | 57 |
| 31. | Events of Landlord's Default; Tenant's Remedies | 59 |
| 32. | Waiver | 60 |
| 33. | Compliance with Applicable Laws | 61 |
| 34. | Notices | 61 |
| 35. | Brokers | 62 |
| 36. | Miscellaneous | 63 |
| 37. | Effectiveness of Lease; Tenant's Right to Terminate | 64 |
| 38. | Effectiveness of Lease; Landlord's Right to Terminate | 67 |
| 39. | Confidentiality | 68 |
| 40. | Financial Reports | 68 |

## EXHIBITS

| | |
|---|---|
| "A" | Site Plan |
| "A-1" | Shopping Center Legal Description |
| "B" | Index of Definitions |
| "C" | Construction Provisions |
| "D" | Removable Trade Fixtures |
| "E" | Sign Plans |
| "F" | Permitted Encumbrances |
| "G" | Subordination, Non-Disturbance and Attornment Agreement |
| "H" | Memorandum of Lease |
| "I" | Commencement Date Agreement |
| "J" | Indemnification Agreement |
| "K" | Building Elevations |

227314.7

Tamarack Village
Woodbury, Minnesota

### LEASE

This LEASE is made as of the ____ day of _____, 1995, by and between TAMARACK VILLAGE SHOPPING CENTER, A LIMITED PARTNERSHIP a Minnesota limited partnership, having an address at c/o Robert C. Muir Co., 2850 Metro Drive, Suite 503, Bloomington, Minnesota 55425 ("Landlord"), and CIRCUIT CITY STORES, INC., a Virginia corporation having an address at 9950 Mayland Drive, Richmond, Virginia 23233 ("Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Leased Property.  Landlord demises and leases to Tenant and Tenant leases and takes from Landlord, commencing on Landlord's delivery of the "Land" (as defined below) to Tenant, all those certain "Premises" consisting of the "Building" and "Other Improvements" (both as defined in paragraph 2), as and when same are constructed and that approximately 25,540 square foot parcel (the "Land"), on which the Building and Other Improvements are or will be located, as more particularly shown (approximately) outlined in red on Exhibit "A" hereto (the "Site Plan"), together with exclusive rights in the three (3) parking spaces labelled "Customer Pick-Up" adjacent to the Building as shown on the Site Plan and with the easements described in paragraph 6 below, all located in the "Shopping Center" (herein so called), which consists of that certain real property with buildings and improvements to be constructed thereon, located along Radio Drive lying and being in the City of Woodbury (the "City"), County of Washington, State of Minnesota (the "State"), and more particularly shown on the Site Plan and described by metes and bounds or platted lot legal description on Exhibit "A-1" attached hereto and made a part hereof for all purposes.  All of the Shopping Center exclusive of the Premises is "Landlord's Premises".  The description of the Premises may be adjusted in accordance with

227314 7

Tenant's final bid set of Plans and Specifications as described in Exhibit "C" attached hereto. The tract on Exhibit "A" labelled "Mervyn's Parcel" is owned by Mervyn's, a California corporation ("Mervyn's") and is not included within the definition of "Shopping Center" as utilized in this Lease. The rights and obligations of Mervyn's and the Landlord with respect to the Shopping Center and the Mervyn's Parcel shall be set forth in an Operation and Easement Agreement by and between Mervyn's and Landlord (the "OEA"), a July 20, 1995 draft of which has been delivered to Tenant (the "July Draft"). Tenant acknowledges that, provided the July Draft is the final recorded OEA, or any changes thereto are either approved in writing by Tenant, which approval shall not be unreasonably withheld, or do not (i) affect Tenant's rights or obligations under the OEA, (ii) impose any additional restrictions on the use of or operation of businesses on the Southwest Quadrant (as hereinafter defined) or (iii) affect Tenant's Preferred Area (as shown on Exhibit "A"), Tenant's rights and obligations hereunder shall be subject to the OEA. To the extent that this Lease and the OEA create conflicting obligations between Landlord and Tenant, the provisions of this Lease shall control the obligations of Landlord and Tenant, one to the other.

    2.    <u>Construction of Building and Improvements</u>.  Commencing immediately upon "delivery of the Land" (as defined in the Construction Provisions (herein so called) attached hereto as Exhibit "C" and incorporated herein by reference for all purposes), Tenant shall have the right to construct within the Shopping Center a one-story retail building, containing approximately 25,540 square feet of ground-floor gross leasable area plus non-retail mezzanine, with provisions for customer pickup, delivery and car stereo installation facilities, initially for use as a Circuit City Superstore (the "Building"), together with loading ramps, sidewalks, trash compactor, transformer pad and other such appurtenances and improvements (collectively, the "Other Improvements"), as more particularly set forth in the Construction Provisions. The Building and Other Improvements are sometimes collectively referred to herein as the "Improvements". The Improvements shall be constructed in accordance with the "Plans and Specifications" to be prepared by Tenant as specified in the Construction Provisions. Except as otherwise provided herein, title to the Improvements shall be deemed transferred to Landlord

upon full payment of the "Tenant Improvement Allowance", as defined in the Construction Provisions.

3.   Lease Term.   Subject to the conditions to the effectiveness of this Lease set forth in paragraph 37, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant in accordance with, and in the condition specified in, the Construction Provisions, and shall end on the "Commencement Date" (as defined in paragraph 4 below).   The main term (the "Main Term") of the Lease shall commence on the Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Commencement Date.   Notwithstanding the foregoing, Tenant shall not be required to accept delivery of the Land prior to April 1, 1996.

In addition to the Main Term, Tenant shall have the option (a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (the "Option Periods") immediately following the Main Term, at the rent specified below.   Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least two hundred seventy (270) days prior to the expiration of the Main Term or any then-current Option Period, as applicable; provided, however, that in order to avoid any forfeiture or inadvertent lapse of such Renewal Option, if Tenant shall fail to give any such notice within the two hundred seventy (270) day time limit and shall not have given Landlord prior written notice of its intent not to exercise its Renewal Option, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Main Term or then-current Option Period shall have expired), until ten (10) business days after Landlord shall have given Tenant a written notice of Landlord's election to terminate the Renewal Option, during which period Tenant may exercise its Renewal Option at any time prior to the expiration of such ten (10) business day period.   Upon the giving of notice of renewal and extension in accordance with the foregoing provisions, the Term (defined below) of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

The Construction Term, Main Term and Option Periods are, collectively, the "Term". The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the first Lease Year shall commence on the Commencement Date and shall end on the last day of January following the first anniversary of the Commencement Date.

    4.    <u>Rent.</u>

    (a)    <u>Ground Rent</u>. Tenant agrees to pay ground rent ("Ground Rent") for the Premises in the amount of One Hundred Fourteen Thousand Nine Hundred Thirty and No/Dollars ($114,930.00) per annum (calculated at the rate of $4.50 per square foot of the ground-floor gross leasable area of the Premises, as shown in the Plans and Specifications and as measured in accordance with the requirements of paragraph 7(c) below), commencing (subject to paragraphs 2 and 4 of <u>Exhibit "C"</u>) two hundred ten (210) days following the beginning of the Construction Term and ending on the day preceding the Commencement Date. Tenant shall pay Ground Rent in equal monthly installments of $9,577.50, in advance on the first day of each calendar month, with appropriate proration for any partial calendar month, to the address given for Landlord in paragraph 34 hereof. Except for the payment of Ground Rent, Tenant shall have no rental obligations during the Construction Term, nor shall Tenant be responsible for any Real Estate Taxes (as defined in paragraph 9) or CAM Charges (as defined in paragraph 7) or any similar costs, fees, rentals or expenses during the Construction Term.

    (b)    <u>Base Rent</u>. Tenant agrees to pay base rent ("Base Rent") for the Premises in the amounts and in the manner specified hereunder, commencing (subject to the provisions of paragraph 4 of the Construction Provisions) on the date on which Landlord makes payment of the Tenant Improvement Allowance as set forth in the Construction Provisions (the "Commencement Date").

Tenant shall pay Base Rent in equal monthly installments, in advance on the first day of each succeeding calendar month throughout the Term, with appropriate proration for any partial calendar month or Lease Year, to the address given for Landlord in paragraph 34 hereof, unless Landlord shall give Tenant written notice of a change of address or of the party to whom such

rents shall be payable along with written documentation reasonably satisfactory to Tenant of such party's right to receive payment hereunder. Unless adjusted as provided in paragraph 3 of the Construction Provisions, Base Rent shall be paid pursuant to the following schedule:

(i)     First Five Years. During the first five (5) Lease Years, Tenant shall pay annual Base Rent in the amount of Two Hundred Forty-Nine Thousand Fifteen and 00/100 Dollars ($249,015.00), payable in equal monthly installments of Twenty Thousand Seven Hundred Fifty-One and 25/100 Dollars ($20,751.25).

(ii)    Change in Base Rent. Notwithstanding the Base Rent provisions:

(A)    In the event that the ground-floor gross leasable area of the Building when constructed does not equal 25,540 square feet, annual Base Rent during the first five (5) Lease Years shall be the product of the greater of the actual ground-floor gross leasable area of the Building or 25,000 square feet, multiplied by $9.75; and

(B)     In the event the portion of Tenant's Pro Rata Share of Real Estate Taxes attributable to assessments related to the initial development of the Shopping Center (the "Initial Special Assessments") is less than $.45 per square foot of Floor Area of the Building, the $9.75 amount utilized to calculate annual Base Rent during the Lease Years in which the Initial Special Assessments are included in Tenant's Pro Rata Share of Real Estate Taxes shall be increased by the difference between $.45 per square foot and the actual per square foot amount included in Tenant's Pro Rata Share of Real Estate Taxes and allocable to the Initial Special Assessments in such Lease Years (e.g., if the per square foot allocation of the Initial Special Assessments is $.40 [versus $.45], $9.75 shall be increased to $9.80 and the Base Rent adjusted accordingly). In determining the aforesaid ground-floor gross leasable area, measurements shall be made in accordance with the specifications set forth in paragraph 7(c) below. If any Lease Year is other than twelve (12) months in length, annual Base Rent during such Lease Year shall be the product of the applicable monthly Base Rent times the number of months in such Lease Year, with appropriate proration for any partial calendar month therein.

(iii)   Increases in Base Rent. Annual Base Rent shall increase on the first day of the sixth and every succeeding fifth Lease Year, over the Base Rent in effect for the



227314.7                                                           -5-

preceding five (5) Lease Year period by the lesser of ten percent (10%) or twice the percentage increase in the "CPI-U" (as defined below) during the five (5) year period ending on June 30 of the fifth (or, as applicable, any succeeding fifth) Lease Year. Notwithstanding the foregoing, if, Tenant's Pro Rata Share of the Initial Special Assessments is less than $.45 per square foot of Floor Area and, as a result, the Base Rent has been increased pursuant to paragraph 4(b)(ii)(B) above, the amount of the increase in the Annual Base Rent payable under this paragraph 4(b)(iii) in the sixth, eleventh and sixteenth Lease Years shall be calculated utilizing the Base Rent net of such adjustment (e.g., if the Base Rent for the prior five (5) years was, as a result of an adjustment under clause (B) of paragraph 4(b)(iii) above, calculated using $9.80 per square foot versus $9.75, the increase under this Section 4(b)(iii) shall be determined using a Base Rental calculated with the $9.75 amount). As used herein, the CPI-U shall be the United States Department of Labor, Bureau of Labor Statistics Consumer Price Index For all Urban Consumers, Minneapolis, Minnesota. If at any time during the Term the CPI-U for Minneapolis shall be discontinued, Landlord and Tenant shall mutually and reasonably agree to substitute an existing official index published by the Bureau of Labor Statistics or its successor or another, similar governmental agency, which index is most nearly equivalent to the CPI-U for Minneapolis.

5.    Development of Shopping Center by Landlord. Landlord covenants to construct and develop a high-class shopping center, which shall be comparable to other "power" shopping centers in the Minneapolis and St. Paul, Minnesota areas (hereinafter "Twin City area"). The location of buildings and other tenant space in the Southwest Quadrant (as depicted on the Site Plan) will only be within the "Permissible Building Areas" as shown on the Site Plan, and the parking ratio (a) for the Shopping Center shall in no event be less than the greater of (i) 4.5 spaces (ninety percent (90%) of which spaces shall be for full-sized automobiles) per 1,000 square feet of gross leasable area or (ii) that required by applicable zoning requirements, and (b) for the Southwest Quadrant the parking ratio shall in no event be less than 4.25 spaces (ninety percent (90%) of which spaces shall be for full-sized automobiles) per 1,000 square feet of gross leasable area. All such parking shall be at ground level. Landlord shall construct or

227314 7                                    - 6 -

cause such improvements to be constructed in a good and workmanlike manner, lien-free in accordance with paragraph 13 below, and Landlord hereby agrees to indemnify, defend and hold Tenant harmless from any loss or damage suffered by Tenant as a result of Landlord's construction. Landlord shall not permit construction traffic over the Premises, and Landlord shall refrain from interfering with the conduct of Tenant's business. Landlord shall keep and maintain or cause the improvements and the "Common Areas" (as defined in paragraph 7(a)) in the Shopping Center to be kept and maintained in good condition and repair and shall not operate, or permit to be operated, in the Shopping Center any activity which constitutes a nuisance, overburdens the available utilities, or violates any of the "Site Covenants" contained in subparagraph 19(a)(ix) or the prohibited activities set forth in subparagraph 19(a)(viii).

6.    Easements.  In addition to and simultaneously with the lease of the Premises, Landlord grants to Tenant certain nonexclusive leasehold easements over or upon certain areas of Landlord's Premises, as set forth below, which easements shall run as covenants with Landlord's Premises and the Premises during the Term and shall expire or terminate simultaneously with this Lease, except as provided below.

(a)    Construction Easements.  For the period of Tenant's construction of the Improvements, and any renovation or reconstruction thereof, Landlord grants to Tenant a nonexclusive easement across a mutually agreeable designated route, providing access to and from the public roadways nearest to the Land, over the Common Areas (as defined in paragraph 7(a) below) for the purpose of construction access to the Premises. In addition, Landlord grants to Tenant for the period of Tenant's construction of the Improvements an exclusive easement for a construction staging area to be used for a period not exceeding one hundred eighty (180) days (the "Staging Area") of approximately 15,000 square feet, in a portion of the Common Areas in the location shown on the Site Plan, for Tenant's use in constructing the Improvements.

(b)    Footing and Foundation Easements.  Landlord grants to Tenant, and Tenant grants to Landlord, easements and rights in Landlord's Premises and the Premises, as appropriate (i) for the construction and maintenance of foundations, footings, supports and demising walls; (ii) to allow their respective buildings to abut and connect (but not to bear

structurally upon each other unless and except as approved by the parties); (iii) for roof projections, allowing the grantee to tie its building into the adjoining building by flashing and reglets; and (iv) for encroachments which reasonably occur in the construction of the building components set forth in subparagraphs (i) through (iii) above. No such attachment or connection shall be made, however, unless detailed plans therefor shall have been timely submitted to and approved by the party to whose building the attachment is to be made, which approval shall not be unreasonably withheld.

(c)    <u>Utility Easements</u>.    If utility lines are required to be installed in the Common Areas in order to service the Premises and a utility provider and/or the City requires an easement over the Common Areas prior to making such service available to the Premises, Landlord agrees to grant such underground, public or private utility easements as shall be reasonably necessary to provide such utility service for the benefit of the Premises. Tenant and/or the utility provider and/or the City shall have the right, without unreasonably interfering with the use by Landlord of the Common Areas, to enter upon and use the Common Areas to install such utility lines, to such extent and so long as reasonably necessary to accomplish such purpose, subject to restoration of the Common Areas following such installation and any other reasonable conditions and requirements imposed by Landlord.

(d)    <u>Common Area Rights</u>.    During the Term, Landlord grants to Tenant, for the benefit of the Premises, the nonexclusive right and privilege (the "Common Area Right") to use the Common Areas for their intended purposes and to permit Tenant and its employees, agents, subtenants, assignees, licensees, suppliers, customers and invitees to use the same, in common with Landlord, its successors, assigns, employees, agents, lessees, licensees, suppliers, customers and invitees and all other persons claiming by or through them, for the purposes (without limitation) of parking and pedestrian, service and vehicular access, ingress and egress to, from and between the Premises and the Landlord's Premises and the streets and highways abutting and adjacent to the Shopping Center, in accordance with the Site Covenants, without payment of any fee or other charge therefor. It is specifically agreed that with respect to the parking spaces designated on the Site Plan as Tenant's "Customer Pick-Up", (i) Tenant shall

have the right, from time to time, to relocate the same to other areas adjacent to the Improvements, subject to Landlord's prior written consent which shall not be unreasonably withheld or delayed so long as the relocation of the Customer Pick-up parking spaces does not interfere with traffic flow in the Shopping Center or violate other leases in the Shopping Center, and (ii) notwithstanding the fact the same are in, and constitute a part of, the "Common Areas", such parking spaces shall be used exclusively by Tenant's customers, invitees and patrons. With prior written notice to Landlord, Tenant shall, subject to the provisions of the Section 5.1(D) of the OEA, be entitled to hold (i) "sidewalk sales" on the sidewalk immediately in front of the Premises which sales in front of the Premises may include cash registers on the sidewalks, and (ii) provided Tenant obtains the consent of the other tenants occupying space in the Southwest Quadrant, sales in the parking lot in the Southwest Quadrant. Sales will be conducted in a professional manner in accordance with all municipal and other requirements.

      (e)   <u>Non-Dedication</u>. None of the easements granted by the parties to this Lease is intended, nor shall any of them (other than any utility easement granted pursuant to 6(c) above) be construed, as a dedication of any portion of the Shopping Center for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by the parties hereto or their respective successors or assigns.

     7.   <u>Common Areas and Common Area Maintenance</u>.

      (a)   <u>Definition of Common Areas</u>. The term "Common Areas" shall be defined to include the parking areas, lanes, drives, entrances, truck passageways, sidewalks, ramps, stairways, landscaped and other unpaved areas, parking lot lighting facilities and equipment, directional, traffic and monument sign structure(s), "Environmental Areas" (as defined in Section 1.5 of the OEA), maintenance areas, and shared utility facilities located in the Shopping Center (including any such areas and facilities contained within outparcels (if any) and adjacent tracts but reserved to the benefit of the Shopping Center occupants, but excluding those portions of the Environmental Areas located outside the boundary lines of the Shopping Center (as set forth in Exhibit A-1) unless Landlord is now or subsequently required to maintain such excluded

227314 7                                   -9-

Environmental Areas under the terms of its zoning or other governmental approvals as a condition to the continued operation of the Shopping Center) and intended and available for the common use of the tenants within the Shopping Center (including any outparcel and other adjacent occupants which contribute toward "CAM Charges" (as defined below) and which are not responsible for separate maintenance of such outparcels or tracts), their subtenants, licensees, and business invitees. Landlord shall be responsible for operating, maintaining, repairing and replacing the Common Areas in a manner consistent with the maintenance standards of other "power" shopping centers in the Twin City area, including cleaning, repair and maintenance of Landlord's sign structure(s) (other than pylon signage), snow removal and ice treatment, removal of Common Area trash and garbage, lighting, repairing, repaving, replacing and restriping the parking area, and maintaining, replanting and replacing landscaping, all such work to be referred to collectively as "Common Area Maintenance". Notwithstanding any provision to the contrary herein, any security that may be provided by Landlord is intended solely for the operation and benefit of the Common Areas of the Shopping Center and not for the benefit or protection of any leased premises, and Landlord shall not be liable in any manner whatsoever to Tenant or any third party solely by reason of Landlord's act or failure to act in providing or maintaining any security in the Shopping Center.

(b)    CAM Charges. For the purpose of this paragraph 7, the cost of Common Area Maintenance (the "CAM Charges") shall include (subject to the limitations set forth below), (i) Landlord's reasonable and proper direct costs and expenses of operating, maintaining, repairing and replacing the Common Areas, including Common Area utility costs, the costs of compliance with hereinafter enacted governmental regulations requiring changes to the Common Areas, the cost of uniforms, tools, equipment (including vehicles) and wages and benefits of on-site employees, which wages and benefits shall be equitably prorated among all other properties supervised by such employees, the cost of Common Area seasonal decorations and the cost of Shopping Center recycling facilities, the cost of repairs or replacements of a capital nature, but only to the extent such capital costs are amortized over the useful life of such repair or replacement (but in no event shorter than seven (7) years as to Common Areas and any light

227314 7                                    -10-

poles located in the Common Areas or longer than ten (10) years as to parking lot and other paved areas) and in all events subject to the limitation set forth in subparagraph (9) below with respect to the parking lot and other paved areas, (ii) Landlord's overhead expenses for administering same (or in lieu thereof a management fee) in the amount of ten percent (10%) of the total of such costs (specifically excluding from such total the amounts paid by Landlord and Tenant for insurance, capital expenditures and real estate taxes with respect to the Common Areas), and (iii) premiums paid by Landlord for insurance coverage carried by Landlord pursuant to paragraph 14(a)(ii) (subject to limitations on Tenant's reimbursement obligations set forth in paragraph 14(a)(ii)) and the amount of any commercially reasonable deductible paid by Landlord in connection with a casualty to the Common Areas.  Notwithstanding the foregoing, the following shall not be included in the CAM Charges:

(1) real estate taxes paid, and maintenance performed, on separately assessed and/or maintained outparcels or other adjacent tracts not reserved to the benefit of the Shopping Center occupants;

(2) any dues or charges for a merchants' or other association of the tenants in the Shopping Center;

(3) maintenance, repairs or replacements to (i) the Common Areas necessitated by the negligent or wrongful act of the Landlord (including failure to construct any portion of the Shopping Center in accordance with plans or specifications therefor) or made to correct any construction defect or condition discovered by Tenant during the first Lease Year and promptly reported to Landlord, or (ii) any buildings (including exterior walls thereof) in the Shopping Center or (iii) any utility lines or utility systems which are for the exclusive use of one tenant or occupant and not used in common by one or more tenants or occupants in the Shopping Center;

(4) repairs or replacements necessitated by (i) any governmental entity based on legal requirements existing on the date of this Lease or (ii) the negligence or wrongful action of any other tenant to the extent Landlord recovers

the cost of such repair or replacement from such tenant (Landlord hereby covenanting and agreeing to use commercially reasonable efforts to pursue such tenant to obtain such recovery, which, when received, shall be credited against CAM Charges), or (iii) damage caused by subsidence or adverse or substandard soil conditions;

(5) amounts paid to entities related to Landlord in excess of the cost of such services from any competitive source;

(6) amounts reimbursable from insurance proceeds, under warranty or by Tenant, any other tenant in the Shopping Center or any other third party other than pursuant to a Common Area expense provision similar to this paragraph 7 (provided, however, commercially reasonable insurance deductibles may be included in the CAM Charges);

(7) premiums for Common Area liability insurance for coverage in excess of the limits established in paragraph 14(e) below;

(8) the cost of constructing, maintaining and operating (including utility costs) pylon signs A through F as set forth on the Site Plan at the Shopping Center;

(9) improvements, capital repairs or replacements (other than patching and similar minor periodic maintenance) to the parking lot or other paved areas during the first ten (10) "CAM Years" (as defined below);

(10) reserves for anticipated future expenses and any amounts paid to acquire or improve land for additional parking spaces;

(11) interest, late charges or penalties incurred as a result of Landlord's failure to pay bills in a timely manner, unless caused by Tenant;

(12) Landlord's personnel, overhead, home office or administrative expenses, including the "Administrative Fee" set forth in the OEA, except as set forth in subparagraph (b)(i) and (ii) above;

227314.7

(13) amounts incurred to remediate any Hazardous Substances (as defined in the Construction Provisions) except the cost, Tenant's pro rata share of which shall not exceed Five Hundred Dollars ($500.00) per annum in Constant Dollars (as defined in the OEA), to remediate Hazardous Substances introduced onto the Shopping Center after the Commencement Date by persons other than Landlord, its agents or employees or any Occupant (as defined in Section 1.7 of the OEA) of the Shopping Center or the Mervyn's Parcel.

(14) amounts incurred to initially establish or initially construct the Environmental Areas and, to the extent any portion of the Environmental Areas is initially improperly completed or is defective, any amounts necessary to correct, repair, re-establish or reconstruct the Environmental Areas; or

(15) any amounts included in "Common Area Maintenance Costs" payable by Landlord pursuant to the OEA which would not be included in CAM Charges hereunder if incurred directly by Landlord.

CAM Charges shall be at competitive rates pursuant to a proposed Common Area maintenance budget delivered to Tenant on or before the end of each CAM Year. Each third party performing Common Area Maintenance duties costing in excess of fifteen percent (15%) of the total Common Area Maintenance budget shall be selected by competitive bidding.

(c)    Tenant Payments.    Commencing on the Commencement Date and continuing until the expiration of the first Lease Year, Tenant shall pay to Landlord a fee (which Landlord estimates to be $1.00 per square foot of Floor Area in the Building per annum), payable in equal monthly installments, as its share of CAM Charges. Thereafter, the annual charge shall be computed on the basis of periods of twelve (12) consecutive calendar months, as designated by Landlord (each such period is a "CAM Year"), and shall be paid by Tenant in equal monthly installments, in advance, on the first day of each month during such CAM Year. For any period within the term which is less than a full CAM Year, the annual charge shall be appropriately prorated. Within ninety (90) days after the end of the first CAM Year and each CAM Year thereafter, Landlord will furnish to Tenant a statement showing in detail (with

Tenant having the right to review at Landlord's offices in the State of Minnesota all documentation as Tenant may reasonably require) the amount of the CAM Charges for the preceding CAM Year and the then-current number of square feet of Floor Area in the Shopping Center. Any necessary adjustment with respect to amounts owed by either party for such preceding CAM Year shall thereupon be made; and the monthly payments to be made by Tenant for the ensuing year shall be estimated according to the Common Area maintenance budget prepared by Landlord and delivered to Tenant. Subject to adjustments as herein contemplated, Tenant's share of CAM Charges after the first CAM Year shall always be the product of the CAM Charges multiplied by a fraction (such fraction being referred to herein as "Tenant's Pro Rata Share"), the numerator of which is the number of square feet of the Floor Area (excluding outside sales areas and outside loading docks) in the Building and the denominator of which is the number of square feet of the Floor Area (excluding outside sales areas and outside loading docks) in the Shopping Center. For purposes hereof, "Floor Area" shall mean the actual number of square feet of space contained in each floor within a building, including, in the case of the Northeast Quadrant (as depicted on the Site Plan), any mezzanine or basement space, and, in the case of the Central Area (as depicted on the Site Plan) and the other Quadrants (as depicted on the Site Plan), excluding any mezzanine or basement space unless the same is used for retail purposes, as measured from the exterior faces of the exterior walls or store front and/or the center line of any common walls; provided, however, that the following areas shall not be included in such calculations; space attributable to any multi-deck, platform, rack or other multi-level system used solely for the storage of merchandise which is located vertically above ground floor; common trash rooms and common utility rooms; enclosed trash areas; enclosed loading dock areas; and any building or portion thereof exclusively used for maintenance of the Common Areas, not exceeding 3,500 square feet in the aggregate. Changes in applicable Floor Area shall result in corresponding adjustments of Tenant's Pro Rata Share, but in no event shall the denominator of the fraction by which Tenant's Pro Rata Share is determined be less than 400,000 square feet of Floor Area, unless the Floor Area of the Shopping Center is reduced

below that amount as a result of a Taking pursuant to paragraph 16. The remainder of CAM Charges shall be borne by Landlord and/or other tenants.

Notwithstanding any other provision of this Lease to the contrary, as to the Tenant's Pro Rata Share of any expense to be prorated pursuant to this Lease, if any tenant of the Shopping Center maintains its "fair and equitable" portion of the Common Areas of the Shopping Center in whole or in part, or any facilities thereon or furnishes any services which would otherwise be included as CAM charges or pays directly for costs which would otherwise be prorated pursuant to this Lease, the Floor Area of such tenant's leased area and any costs so paid directly or work done directly shall be excluded in determining Tenant's Pro Rata Share as to the work so incurred or as to the costs incurred or paid directly.

(d)    Examination of Landlord's Records.    Tenant shall have the right, at Tenant's expense, from time to time, but not more often than once as to any CAM Year and no later than two (2) years after the end of such CAM Year, to examine and make copies of the records pertaining to CAM Charges for such CAM Year. Tenant's right of examination shall be exercised during reasonable business hours at Landlord's principal records office on reasonable prior notice to Landlord. If such examination shall disclose any overcharge by Landlord, Landlord shall promptly reimburse Tenant for any overpayment of Tenant's Pro Rata Share of CAM Charges; and if such overpayment by Tenant is in excess of five percent (5%) of the actual Tenant's Pro Rata Share of CAM Charges, Landlord shall reimburse Tenant for the reasonable cost of such examination or audit. Tenant shall promptly reimburse Landlord for any underpayment disclosed by such examination.

(e)    Common Area Rules.  Tenant shall abide by reasonable non-discriminatory rules and regulations established by Landlord for the Shopping Center from time to time. Tenant agrees to keep its loading area free of trash and pallets, to arrange for trash removal from the Premises and in no event to store shopping carts, pallets, or other property in the Common Area of the Shopping Center. If Tenant violates the terms of the preceding sentence and does not remedy such violation within five (5) business days after notice from Landlord, Landlord shall have the right to remove any items stored in violation of the foregoing and

227314.7

-15-

dispose of the same. Tenant shall be obligated to reimburse Landlord for all reasonable costs incurred pursuant to the provisions of the preceding sentence.

8.    Signs and Communications Equipment.

(a)    Signs. Landlord, no later than the date set forth on Attachment "5" to the Construction Provisions, shall construct and install upon the Common Areas at the location shown on the Site Plan, one (1) pylon sign structure including Tenant's face panel (with electrical wired box installed) (the "Tenant's Shared Pylon"). Tenant's Shared Pylon shall be located in the area designated as "Pylon B" on Exhibit "A" and shall be as shown on Exhibit "E" attached hereto and made a part hereof. Tenant shall pay its pro rata share (i.e., one-third (1/3rd)) of the cost of constructing, operating (including utility costs) and maintaining Tenant's Shared Pylon and Tenant's face panel. In no event shall Tenant's pro rata share of the cost of initially constructing Tenant's Shared Pylon exceed $8,333.33. To the extent not otherwise included in insurance or condemnation proceeds received by Landlord, Tenant shall also pay its prorata share of replacing or relocating Tenant's Shared Pylon following a casualty or condemnation. Furthermore, in the event tenants occupying a majority of the signage square footage on Tenant's Shared Pylon agree that said pylon sign needs to be replaced, Tenant shall pay its pro rata share of the cost of replacing Tenant's Shared Pylon sign with a new pylon approved by Landlord and all of the occupants of Tenant's Shared Pylon. Attached as a portion of Exhibit "E" are plans and specifications for Tenant's current prototypical building signage, which Landlord hereby approves upon its execution of this Lease. Landlord warrants that Tenant's Shared Pylon, including Tenant's face panels, have been approved by Mervyn's under the OEA and that, subject to obtaining required governmental approvals, no other approvals are required. Notwithstanding the foregoing, Tenant at its expense shall be entitled without Landlord's consent, but subject to governmental requirements, as aforesaid, to replace any and all of its signs with signage consistent with Tenant's then-current prototypical sign plans so long as all signs which are affixed to the exterior of the Building (with the exclusion of the box signs used to designate the Customer Pick-up area and car stereo installation area) use individually lit letters mounted directly on the Building, without exposed raceways. Any additional box signs