# EXHIBIT A – PART 3

separate awards to Tenant for moving expenses, business interruption losses and loss of fixtures and leasehold improvements which do not reduce Landlord's award.

(c)    Tenant's Rights Upon Less Than Substantial Taking.  In the event of a Taking of less than Substantially All of the Premises, Base Rent and other charges shall be reduced in accordance with the portion of the Premises condemned or taken, effective as of the Date of Taking, Tenant shall make all necessary restorations to the Improvements so that the portions of the Improvements not taken constitute a complete architectural unit and the portion of Landlord's award allocable to the Premises shall be made available to Tenant for such restoration.  If required by a Mortgagee, such awards shall be escrowed and disbursed in accordance with the procedure set forth in paragraph 15(a) above.  If the Taking occurs within the last two (2) years of the Main Term or of any Option Period and has a material impact on Tenant's ability to conduct business, this Lease shall terminate at Tenant's option, such option to be exercised by Tenant giving not less than thirty (30) days' prior written notice to Landlord.

(d)    Landlord's Obligations Upon Any Taking.  In the event of any Taking following which the Lease continues in effect, Landlord shall make all necessary restorations to all portions of the Common Areas in Tenant's Preferred Area and Additional Areas in the Southwest Quadrant such that they each constitute a complete architectural unit and serve the function originally intended and that, with respect to any portion of the Shopping Center or the Mervyn's Parcel that is not reconstructed, the damaged portion and/or the balance of any damaged building improvement shall be demolished and the cleared area will be restored to either a hard surface or a landscaped condition and, thereafter, maintained as Common Area until a replacement building is erected

(e)    Rights Upon Temporary Taking.  In the event of a Taking of the Premises, the Common Areas and/or any other area within the Shopping Center, or any portion thereof, for temporary use (specifically one not exceeding 60 days in duration), without the taking of the fee simple title thereto, this Lease shall remain in full force and effect.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such Taking relating to the Premises, or relating to the Common Areas but reasonably attributable to the Premises, for

227314.7                                    -37-

periods prior to the expiration of the Lease shall be payable to Tenant. All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord. Anything contained herein to the contrary notwithstanding, a temporary Taking for any period in excess of sixty (60) days may, at Tenant's option, be deemed a permanent Taking and shall be governed by subparagraph (b) or (c) above, as applicable.

(f)    Taking of the Pylon Sign(s). In the event of a taking, whether permanent or temporary, of Tenant's Shared Pylon, subject to applicable laws and ordinances, Landlord shall provide a substitute site (reasonably acceptable to Tenant) therefor, with adequate electrical power, located so as to be visible to vehicular traffic or roadways adjacent to the Shopping Center and/or at entrances to the Shopping Center, and Landlord shall replace and/or rebuild any of such signage so taken at the cost of all tenants whose sign panels are installed on the pylon sign structure, such costs to be shared by such tenants on a pro rata basis.

(g)    Tenant's Right Upon Condemnation. In the event of a Taking described in subparagraph (b) or (c) above, Tenant shall be entitled to claim compensation from the condemning authority for the value of its unamortized leasehold improvements paid for by Tenant, relocation expenses and any other items to which Tenant is entitled under applicable law which do not reduce Landlord's award.

17.    Assignment and Subletting. Tenant shall have the right to sublet, assign, transfer reassign and grant concessions or licenses (a "Transfer") in all or any part of the Premises and any of Tenant's rights and obligations under this Lease during the Term, without Landlord's prior consent. In the event of such a Transfer, Tenant shall remain liable for all of Tenant's obligations to Landlord originally arising hereunder but shall not be liable for any additional obligations agreed to by the Transferee if this Lease is changed, modified or amended in any respect by Landlord and such Transferee.

Any assignment or subletting of this Lease by Tenant shall be executed by Tenant and the assignee or sublessee. Each assignee or sublessee, for the benefit of Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant, including the restrictions on the use of the Premises set forth in

paragraph 18(b) below. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

    18.    Use.

    (a)    Tenant shall initially open the Premises as a fully stocked and fully staffed Circuit City store within two hundred seventy (270) days after delivery of the Land (which period of time shall be extended, day for day, for every day during such two hundred seventy (270) day period which falls between November 15 and March 1 of any year) for (i) the sale of consumer, office and automotive electronics products, computers and related hardware and software, entertainment software and entertainment media, cellular telephones, household appliances, and related goods and the sale and installation of motor vehicle audio, stereo and telephone systems (all of such items being herein collectively referred to as the "Products"), and (ii) renting, servicing, repairing and warehousing of the Products.

    (b)    Thereafter, Tenant shall have the right to use the Premises for any lawful retail use; provided, however, that the Premises shall not be used (i) for any illegal purpose, (ii) for any use prohibited under paragraph 19(a)(viii) below, (iii) in violation of any exclusive use restriction granted in a lease or in restrictive covenants to a tenant or other occupant of the Shopping Center and specifically permitted on Exhibit "F" or (iv) in violation of any other applicable provision of the "Permitted Encumbrances" contained in Exhibit "F".

    (c)    Except as may be expressly set forth in this paragraph 18, nothing contained in this Lease shall be construed to require Tenant to operate the Premises continuously either for the use first stated or for any other use.

    (d)    If Tenant shall cease doing business in the Premises for reasons other than a temporary closing due to alterations, remodelling, repairs or reconstruction after a fire or casualty, and such cessation shall continue for more than one hundred eighty (180) days, then Landlord shall have the right to terminate this Lease by written notice to Tenant on a date not less than thirty (30) nor more than ninety (90) days after the date of Landlord's notice. If such notice is given by Landlord, then, unless within thirty (30) days after such notice, Tenant advises Landlord that either Tenant or an assignee or subtenant shall reopen the Premises for business

in not more than ninety (90) days (and covenants to so open and subsequently so opens), this Lease shall terminate on the date specified in Landlord's notice and neither party shall thereafter have any liability to the other for obligations arising after the date of termination.

    19.    <u>Warranties and Representations</u>.

        (a)    Landlord represents, warrants and covenants to Tenant that:

            (i)    <u>Quiet and Peaceful Enjoyment</u>.    Landlord and those persons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obligations hereunder, and Landlord warrants, represents and covenants that, so long as Tenant is not in default hereunder beyond any applicable cure period, Tenant shall have quiet and peaceful use, enjoyment and occupancy of the Premises.

            (ii)    <u>Title</u>.  Landlord currently has contracted to acquire fee simple title to the Shopping Center.  Upon acquisition of the Shopping Center, Landlord's fee simple interest in the Shopping Center shall be free and clear of any mortgages, deeds, encumbrances, declarations, easements, agreements or restrictions, except those matters set forth on <u>Exhibit "F"</u> attached hereto and entitled "Permitted Encumbrances", or any other encumbrances which would restrict in any manner whatsoever Tenant's use of the Premises for the sale of Products or Tenant's right to use Tenant's Preferred Area, or would otherwise materially restrict the right of Tenant, its employees, customers and invitees to use the Common Areas in accordance with the terms of this Lease.  Tenant understands that the mortgages (the "Temporary Mortgages") listed as items C.6 and C.7 on <u>Exhibit "F"</u> will be satisfied and removed as an encumbrance against the Shopping Center by Landlord on or before **February 1, 1996**.  Landlord specifically covenants and warrants that except as specifically disclosed in this Lease (including any Exhibit attached hereto), and except for applicable governmental agencies, to the best of Landlord's knowledge, no third party, including but not limited to any other occupant of the Shopping Center, has the right to object to Tenant's tenancy hereunder, to prohibit the selling, renting, servicing, repairing or warehousing of the Products, or to consent to any

227314.7

feature of the Improvements or Tenant's signage provided that they are constructed as provided in this Lease. This representation and warranty is a material inducement to the Tenant's execution of this Lease.

(iii)    Certificate of Authority.   Landlord covenants that it is a duly constituted limited partnership under the laws of the State of Minnesota, and that its general partner who is acting as its signatory in this Lease is duly authorized and empowered to act for and on behalf of the limited partnership. Landlord has furnished Tenant prior hereto with evidence of (a) the existence of the limited partnership, and (b) the authority of the partner to bind the limited partnership as contemplated herein.

(iv)    No Litigation.   There are no judicial, quasi-judicial, administrative or other orders, injunctions, moratoria or pending proceedings against Landlord or the Shopping Center which preclude or interfere with, or would preclude or interfere with, the construction contemplated in paragraph 2 hereof or the occupancy and use of the Premises for the purposes herein contemplated.

(v)    Hazardous or Toxic Materials.   Subject to the state of facts shown in the report prepared for Robert Muir Company by B.A. Liesch Associates, Inc. dated April ____, 1995", a copy of which has previously been furnished to Tenant, and in the report entitled Draft Phase I Environmental Site Assessment dated March 14, 1995 prepared for Tenant by STS Consultants, Ltd., a copy of which has been previously furnished to Landlord, Landlord has not used, discharged, dumped, spilled or stored any Hazardous Substances (as defined in the Construction Provisions) on or about the Shopping Center, whether accidentally or intentionally, legally or illegally, and has received no notice and has no knowledge that any such condition exists at the Shopping Center. If any claim is ever made against Tenant relating to Hazardous Substances present at or around the Shopping Center, whether or not such substances are present as of the date hereof or are alluded to in said Assessments, or any such Hazardous Substances are hereafter discovered at the Shopping Center (unless introduced by Tenant, its agents or employees), subject to Landlord's right, under Paragraph 7(b)(13) to include

up to $500.00 per year in Tenant's CAM Charges, all costs of removal incurred by, all liability imposed upon, or damages suffered by, Tenant because of the same shall be borne by Landlord, and Landlord hereby indemnifies and agrees to defend and hold Tenant harmless from and against all such costs, losses, liabilities and damages, including, without limitation, all third-party claims (including sums paid in settlement thereof, with or without legal proceedings) for personal injury or property damage and other claims, actions, administrative proceedings, judgments, compensatory and punitive damages, lost profits, penalties, fines, costs, losses, attorneys' fees and expenses (through all levels of proceedings), consultants or experts fees and all costs incurred in enforcing this indemnity. The representation, warranty and indemnity of Landlord described in this paragraph 19(a)(v) shall survive the termination or expiration of this Lease.

(vi)    <u>Tenant's Exclusive Use</u>. Unless otherwise agreed to by Tenant pursuant to written agreements entered into by Tenant with other tenants or occupants of the Shopping Center or as otherwise provided on <u>Exhibit "F"</u>, so long as the Premises is open and operating as a store selling (a) consumer, office or automotive electronic products, (b) major appliances, and/or (c) computer hardware, no other tenant or occupant of the Shopping Center shall be entitled to sell or rent any type of Product falling within the categories described in (a) through (c) except as follows: a tenant or occupant of the Shopping Center whose primary business is not the sale of the Products or any one or more categories of the Products described in (a) through (c) above may sell or rent any combination of such categories of Products described in (a) though (c) above in up to but not more than the lesser of (X) 15,000 square feet of Floor Area of its premises dedicated to sales, rather than warehousing or support functions ("Sales Floor Area") or (Y) twenty-five percent (25%) of the Sales Floor Area of its premises (the foregoing limitation on other tenants' use is hereinafter referred to as "Tenant's Exclusive"). If Tenant ceases selling (or does not sell) Products falling within one of the categories described in (a) through (c) for a period of at least six (6) months (excluding

cessations of less than six (6) months due to remodeling or restoration of the Premises),
then, provided that Tenant has not resumed selling (or begun to sell) Products in that
category, Landlord shall thereafter have the right to enter into leases or other agreements
permitting, without restriction as to square footage, the sale of Products in such category
in the Shopping Center. For example, if Tenant does not sell major appliances at the
Premises for more than six (6) months, Landlord can lease space in the Shopping Center
to an appliance store so long as, prior to the execution of such lease, Tenant does not
begin selling major appliances at the Premises. Notwithstanding anything to the contrary
provided in this Section 19(a)(vi): (A) the 15,000 square foot limitation set forth in
clause (X) above shall not be applicable to a premises in the Northwest Quadrant leased
or purchased by either Sears, Roebuck & Co. or Montgomery Wards although such
premises shall be subject to the limitation imposed in clause (Y) above which, provided
a tenant's primary business is not the sale of the Products or any one or more of the
Products described in (a) through (c) above, permits the sale or rent of any combination
of the categories of Products described in (a) through (c) above in up to but not more
than twenty-five percent (25%) of the Sales Floor Area of its premises, (B) in the event
Landlord enters into a lease with Office Max, Inc. or Staples, Inc., such tenant shall not
be subject to the Tenant's Exclusive provided such tenant agrees in its lease that so long
as Tenant, or Tenant's successor, subtenants or assigns under the Lease, is operating as
a consumer electronics and/or household appliance store in the Premises neither such
tenant nor its successors, subtenants or assigns shall at any time use its premises at the
Shopping Center for a store having as its primary business the sale of consumer
electronics and automotive electronics products, household appliances, and related goods,
the warehousing and servicing of same, and/or for the installation into motor vehicles of
car stereo, audio and telephone systems, and similar electronics equipment, such as is
operated by Tenant as of the date of such lease in a majority of its stores, and (C) in the
event Landlord desires to enter into a lease with Office Depot, Inc., such tenant shall not
be subject to the Tenant's Exclusive provided such tenant agrees in its lease that so long

as a consumer electronics and/or household appliance store has not ceased to be operating on the Premises for a continuous period in excess of six months (excepting any periods during which remodeling or restoration work is being conducted with due diligence), no portion of such tenant's premises shall be used for a store having as its primary business the sale of consumer electronics and automotive electronics products, household appliances, and related goods, the warehousing and servicing of same, and/or for the installation into motor vehicles of car stereo, audio and telephone systems, and similar electronics equipment. The foregoing shall not be deemed to prohibit Office Depot, Inc., its subtenants, transferees and assigns, from using its premises in whole or in part for the operation of a standard Office Depot retail facility or other similar store for the sale of office products and services (inclusive of office electronics). Tenant's Exclusive shall not apply to the premises labeled "Mervyn's," "Cub Foods," or "Home Depot" on the Site Plan. Landlord warrants and represents that, except as set forth in this Section 19(a)(vi) and on Exhibit "F",

     (i)    No other owner or occupant of any portion of the Shopping Center has been or will be granted any exclusive right other than an exclusive use right with respect to such owner or occupant's primary use of its premises,

     (ii)    Except for Cub Foods' exclusive regarding the operation of a drugstore, supermarket, grocery store and food store, Tenant is not and will not be prohibited by any exclusive rights granted to another tenant or owner with respect to a product or combination of products from utilizing up to twenty-five percent (25%) of the Sales Floor Area of the Premises for the sale of any such product or combination of products, and

     (iii)    Except as specifically set forth in the OEA, neither the owners or occupants of the Mervyn's Parcel or the portion of the Shopping Center designated on the Site Plan as the Home Depot Parcel have or will be granted any exclusives or use restrictions which limit Tenant's use of the Premises.

227314.7

(vii)   <u>Zoning and Subdivision</u>.  Subject to satisfaction of the conditions and requirements in paragraphs 37(d), 37(h) and 38 of this Lease, the Premises and the Shopping Center are presently properly subdivided, in conformity with all applicable laws and zoned so as to permit (A) the development and operation of the Premises and the Shopping Center in accordance with the provisions of this Lease; and (B) the initial use of the Premises described in paragraph 18 of this Lease.

(viii)   <u>Prohibited Activities</u>.  Landlord shall not operate or lease (or permit to be operated or leased) any building or tenant space in the Shopping Center for any use prohibited in the OEA or for use as:

(A) a bar, pub, nightclub, music hall or disco in which less than fifty percent (50%) of its space or revenue is devoted to and derived from food service;

(B) a bowling alley;

(C) a billiard or bingo parlor;

(D) a flea market;

(E) a massage parlor or tatoo parlor;

(F) a funeral home;

(G) a facility for the sale of paraphernalia for use with illicit drugs;

(H) any "adult bookstore", night club, discotheque, massage parlor, any establishment which provides live "adult" entertainment or any establishment which sells, rents, licenses or exhibits drug-related paraphernalia or pornographic or obscene materials, except that this provision shall not prohibit (X) videotape sale and rental stores which sell or rent primarily non- "X-rated" videotapes (that is, "G" to "R"-rated videotapes) but which also rent or sell "X-rated or non-rated videotapes" for off-premises viewing only, provided such X-rated or similar videotapes, and the place and procedure for selection thereof, precludes viewing or selection by minors and with no promotional, advertising or other depiction or description in respect of any "X-rated" or non-rated or similar videotape displayed or utilized within or outside the store or (Y) book stores and other stores such as drug stores which sell primarily general audience books and other reading, listening, and/or other materials which are not perceived to be, or hold themselves out as "adult book" stores, ·but which incidentally sell books, magazines and other periodicals, records, CD's and tapes which may contain pornographic materials so long as such sale is not from any special or segregated section in the store;

(I) an off-track betting parlor;

(J) a carnival, amusement park or circus;

(K) a gas station, car wash in the Southwest Quadrant or an auto repair (except auto repair incidental to a regional or national auto parts supply chain or department or discount store) or body shop (the parties specifically acknowledging that Tenant's car stereo installation facility is not included in this prohibition (K));

(L) a facility for the sale of new or used motor vehicles, trailers or mobile homes;

(M) a facility for any use which is illegal or dangerous or constitutes a nuisance;

(N) a skating rink in the Southwest Quadrant;

(O) an arcade, pinball or computer gameroom in the Southwest Quadrant (provided that retail facilities in the Southwest Quadrant of the Shopping Center may operate electronic games incidentally to their primary operations);

(P) service-oriented offices (such as, by way of example, medical or employment offices, travel agencies, real estate agencies or dry cleaning establishments) in more than twenty percent (20%) of the gross leasable area of the Shopping Center, or other nonretail uses except for offices and storage facilities incidental to a primary retail operation;

(Q) a banquet hall, auditorium or other place of public assembly;

(R) a training or educational facility (including, without limitation, a beauty school, barber college, reading room, school or other facility catering primarily to students or trainees rather than customers), provided, however, this prohibition shall not be applicable to on-site employee training by an occupant or tenant incidental to the conduct of its business at the Shopping Center or to incidental instruction, such as music lessons, in connection with the use which is otherwise primarily retail;

(S) a theater of any kind;

(T) a gymnasium;

(U) a sporting event facility or other sport facility;

(V) a children's entertainment center within two hundred fifty (250) feet of the Premises;

(W) a sport or health club or spa in the Southwest Quadrant;

(X) a veterinary hospital, animal raising or boarding facility except to the extent such use is incidental to the primary use of such premises (e.g., a "pet superstore");

(Y) a church;

(Z) a central laundry; or

(AA) a dry cleaning plant or laundromat.

(BB) and a "second hand" store or "surplus" store except that a high class new and used merchandise store, such as Play-It-Again Sports or Once Upon A Child, as now conducted, shall be allowed.

In addition to the foregoing, Landlord shall not operate, lease or permit to be operated or leased any restaurant within any building on Landlord's Premises which abuts "Tenant's Preferred Area" (as shown on the Site Plan) or which is located within three hundred (300) feet of the front entrance to the Building.

(ix)     Site Covenants.  With regard to the development of the Shopping Center and the uses and operations of the Common Areas, Landlord makes the following representations and warranties (the "Site Covenants"):

(A)     Building Height and Location.  No building adjacent to the Premises shall be positioned so as to project beyond the portion of the front wall of the Building immediately adjacent thereto.  No outparcels, barriers, buildings, kiosks or other structures, either temporary or permanent, shall be located within Tenant's Preferred Area, and no building located in the Central Area or in the area depicted as the "CCS Height Restriction Area" on the Site Plan  shall exceed one story or twenty-five (25) feet in height.

(B)     Construction and Alterations.  Following the end of the first Lease Year, no non-emergency construction shall be permitted in the Southwest Quadrant of the Shopping Center during the months of November and December, except for interior alterations not affecting the operations of any other occupant of the Southwest Quadrant of the Shopping Center and except for emergency repairs.  In the event of any construction within the Southwest Quadrant of the Shopping Center, Landlord shall designate a construction access route, staging and parking areas located so as to minimize interference with customers or the operations of other occupants of the Southwest Quadrant of the Shopping Center and shall require erection of safety barriers as necessary.  With regard to any construction on Landlord's Premises, Landlord shall be solely responsible for any governmentally-imposed impact fees, hook-up, connection, installation or tap-in fees and other, similar construction-related charges.  Except to the extent required by any governmental authority having jurisdiction over the Shopping Center,

whether in connection with a Taking or otherwise, (i) Landlord shall make no changes to Tenant's Preferred Area (including, without limitation, changes in the truck access to the Premises, access to Tenant's Customer Pick-up area or parking spaces within Tenant's Preferred Area but excluding modifications to landscaping provided such landscaping modifications do not adversely affect access to or visibility of the Premises), (ii) Landlord shall not make any other material or substantial changes in the Common Areas in the Southwest Quadrant outside of Tenant's Preferred Area (including, without limitation, location of curbcuts, drive aisles, roadways, sidewalks, or reduction of the overall parking ratio for the Shopping Center specified in paragraph 5) which would affect the parking ratio or access to or the visibility of the Premises without Tenant's express written consent, which Tenant shall not unreasonably withhold, condition or delay, and (iii) Landlord shall not construct any structures directly behind the Building or any improvements in a location which would adversely affect truck turning areas behind the Building or truck access to and from Tenant's loading docks in the rear of the Building (Tenant agrees that the construction of the loading docks for Toys "R" Us and Home Place in the locations depicted in the Site Plan shall not violate the foregoing restriction).

(C)    <u>Prohibited Uses in Common Areas</u>.  Landlord covenants that, subject to Tenant's rights under Section 6.1(d) above, it shall not, without Tenant's express written consent, permit the following uses or activities to occur in the Common Areas:  (1) advertisements or signs except for signs permitted in the OEA, the "for rent" signs described in paragraph 27 and traffic control signs; (2) display or sale of merchandise in the Common Areas in the Southwest Quadrant, except that seasonal sales and sidewalk sales shall be permitted to be conducted by other tenants of the Shopping Center, subject to Section 5.1(D) of the OEA; (3) operation of loudspeakers or other sound electronically amplified so as to be heard in the Common Areas of the Southwest Quadrant, except for

227314.7

-48-

Common Area music supplied by Landlord; or (4) imposition of a charge for parking. Landlord further covenants that it will not seek, nor permit any other occupant of the Shopping Center to seek, a variance or waiver from the minimum parking requirements applicable to the Shopping Center to less than 4.5 spaces per thousand square feet of gross leasable area. Parking by employees of Tenant, Landlord and other occupants of the Southwest Quadrant of the Shopping Center shall be in designated "employee parking" areas, the location of which shall be in the Southwest Quadrant and determined by Landlord but in no event in the front of the Building within a radius of two hundred seventy-five feet (275) from the main public front entrance to the Building or in the area behind the Premises labeled "No Employee Parking" on the Site Plan.

(D)    Easements. Landlord shall not subdivide, parcel or otherwise divide the Southwest Quadrant of the Shopping Center or create any easements (other than utility easements benefiting the Shopping Center) in Tenant's Preferred Area without Tenant's prior written consent, which consent shall not be unreasonably withheld or delayed. Any portion of the Shopping Center which is subdivided shall, to the extent applicable, continue to be subject to the terms of this Lease.

(x)    Interference with Tenant's Reception/Transmission. Landlord shall not obstruct, or permit any party under its control (not including other tenants) to obstruct, satellite, radio or television reception or transmission in or from the Building.

(xi)    Notices Affecting the Premises. Landlord shall promptly forward to Tenant any notice or other communication directly or materially affecting the Premises or Tenant's rights in the Shopping Center received by Landlord from any owner of property adjoining, adjacent or nearby to the Premises or the Shopping Center or from any municipal or governmental authority, in connection with any hearing or other administrative procedure relating to the use or occupancy of the Premises, Shopping Center or any such neighboring property.

(b)    Tenant represents, warrants and covenants to Landlord that:

(i)    <u>Tenant's Authority</u>.    Tenant is a duly constituted corporation organized under the laws of the Commonwealth of Virginia; it has the power to enter into this Lease and perform Tenant's obligations hereunder; and the Vice President executing this Lease on Tenant's behalf has the right and lawful authority to do so.

(ii)    <u>Tenant's Warranty as to Hazardous or Toxic Materials</u>.    As to Tenant's use and occupancy of the Premises and use of the Common Areas, Tenant will not introduce, discharge, dump, spill or store within the Premises or the Shopping Center any Hazardous Substances; and Tenant indemnifies and agrees to hold Landlord harmless from and against all costs, liability and damages as a result thereof, to the same extent that Landlord indemnifies and holds Tenant harmless in subparagraph (a)(v) above. The warranty and indemnity of Tenant described in this paragraph 19(b)(ii) shall survive the termination of this Lease.

(c)    In the event there is a condition at variance with the foregoing representations and warranties of Landlord with respect to the Premises or the Shopping Center which prevents or in any material way inhibits the use of the Premises or any part thereof or the Common Areas for their intended purposes by Tenant or Tenant's employees, licensees, agents, suppliers, customers or invitees, or if Landlord shall default in the observance or performance of any of the foregoing representations and warranties, then, in addition to such other remedies as may be accorded Tenant at law, in equity or under the terms of this Lease, Tenant may, in addition to its other remedies under this Lease, after thirty (30) days' notice to Landlord, obtain an injunction or writ of specific performance to enforce such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such variance or default. In addition, in the event that any of the representations, warranties and covenants of Landlord set forth in this paragraph 19 are untrue or incorrect, and in the event that Tenant suffers any loss, cost, liability or damage as a result of the breach of any of such covenants, representations and warranties, Landlord shall

defend, indemnify and hold Tenant harmless from any of such loss, costs, liability or damage incurred as a result of Landlord's breach hereunder.

20.    Estoppel Certificates.    Without charge, at any time and from time to time hereafter, within ten (10) days after receipt of written request by either party, the other party shall certify, by written and duly executed instrument, to any other entity ("Person") specified in such request: (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, to the certifying party's best knowledge; (c) as to the existence of any default hereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses hereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the Term; and (f) as to any other matters which may reasonably be so requested. Any such certificate may be relied upon by the party requesting it and any Person to whom the same may be exhibited or delivered, and the contents of such certificate shall be binding on the party executing same.

21.    Subordination, Non-Disturbance and Attornment.

(a)    Simultaneously with the execution hereof, Landlord shall deliver to Tenant with regard to any and all Mortgages (as defined below) encumbering the Premises (other than the Temporary Mortgages) and placed thereon by Landlord, a non-disturbance and attornment agreement substantially in the form of Exhibit "G" hereto attached with such changes as shall be reasonably required by the Mortgagee, executed by the holder of such Mortgage ("Mortgagee"). In addition, throughout the term, Landlord shall deliver to Tenant with respect to all future mortgages a non-disturbance and attornment agreement substantially in the form of Exhibit "G" with such changes as shall be reasonably required by the applicable Mortgagees executed by such Mortgagees, which nondisturbance and attornment agreement shall be applicable to such Mortgagees' Mortgages, and all renewals, modifications, replacements and extensions of such Mortgages. Upon Tenant's receipt of the non-disturbance and attornment agreement, this Lease shall be subordinate to the corresponding Mortgage. Landlord shall not be required to deliver non-disturbance and attornment agreements from a Mortgagee which

227314.7

-51-

recognizes in writing that its Mortgage is subordinate to Tenant's rights under this Lease (hereinafter a "Subordinate Mortgagee").

In the event of a foreclosure of any Mortgage, Tenant shall attorn to a Mortgagee or any purchaser at a foreclosure sale (any such foreclosure, or deed in lieu thereof, shall be referred to as a "Foreclosure") of a Mortgage only if such Mortgagee or purchaser executes (or has previously executed) a writing in favor of Tenant which states the following (provided Tenant is not in uncured material default beyond the expiration of any applicable grace periods): (i) this Lease shall not terminate by reason of such Foreclosure, (ii) Tenant's possession of the Premises shall not be disturbed, (iii) the Mortgagee or purchaser upon such Foreclosure shall recognize Tenant and all its rights hereunder and shall be obligated to fully and completely perform Landlord's duties and obligations under the Lease arising from and after the date of such Foreclosure, including but not limited to an obligation to make all payments to Tenant and satisfy all construction obligations set forth in this Lease, (iv) Tenant shall not be named as a party in any action for foreclosure, and (v) the Mortgagee, whether or not the Mortgage is foreclosed, shall make all proceeds arising from a casualty or condemnation loss to the Premises available to Tenant for restoration of the Improvements in accordance with the terms hereof.

Except for a Subordinate Mortgagee Landlord shall cause any present or future Mortgagee to deliver a non-disturbance and attornment agreement in accordance with this paragraph 21 at or prior to the time which the lien of the Mortgage is filed against record title to the Premises, as set forth in paragraph 37(b) below. As used in this paragraph 21, the term "Mortgage" shall mean any mortgage, deed to secure debt, deed of trust, trust deed or other collateral conveyance of, or lien or encumbrance against, the Premises.

(b)    If requested by any Mortgagee, from time to time during the Term, Tenant agrees to execute such subordination, non-disturbance and attornment agreement, which shall include Tenant's agreement to provide to such Mortgagee (simultaneously with notice to Landlord) notice of Landlord's defaults and the same periods for such Mortgagee to cure such defaults as those provided Landlord herein, and such other agreements as may be satisfactory to Tenant and as are typically found in subordination, non-disturbance and attornment

227314 7                                    -52-

agreements with institutional lenders. Upon request of Landlord, Tenant shall also agree to give any Subordinate Mortgagee (simultaneously with notice to Landlord) notice of Landlord's defaults and the same period to cure such defaults as those provided to Landlord herein.

22. <u>Change of Landlord</u>. Subject to paragraph 21 above, in the event Landlord's interest in the Premises passes to a successor (the "Successor") by sale, lease, Foreclosure or in any other manner, Tenant shall be bound to the Successor under all of the terms of this Lease for the balance of the Term with the same force and effect as if the Successor were the landlord under the Lease, and Tenant hereby agrees to attorn to the Successor as its Landlord, such attornment to be effective upon written notice thereof given by Landlord to Tenant. Landlord agrees to indemnify, defend and hold Tenant harmless from and against all costs, claims, loss, liability or damage suffered by Tenant as a result of Landlord's failure to provide Tenant with notice of such Successor. Notwithstanding any provision herein to the contrary, Tenant agrees that if Landlord is in default of this Lease, Tenant shall look solely to the interest of Landlord in the Shopping Center and the rents and profits issuing therefrom, and the Landlord, its partners, directors, officers, employees, agents or representatives, shall not have any personal liability to pay any indebtedness hereunder or to perform any covenant contained herein, and that no personal liability or personal responsibility of any sort is assumed by, nor shall any at any time be asserted or enforceable against, Landlord, its partners, directors, officers, employees, agents or representatives. Tenant and all persons claiming by, through or under Tenant hereby expressly waive and release all such personal liability. Nothing contained in this section 22 shall prevent Tenant from bringing a suit for specific performance or seeking injunctive relief against Landlord in an appropriate case, and after obtaining a judgment against Landlord, from attaching rents and profits, sales proceeds, insurance or condemnation awards derived from the Shopping Center, nor limit Tenant's right to any other action or remedy (not involving the personal liability of Landlord, its partners, principals or joint venturers) which may be accorded Tenant by law. Nothing contained herein shall be deemed a waiver of any default by Landlord nor an assumption by Tenant of any liability of Landlord, its partners, principals or joint venturers.

23.    <u>Tenant's Financing</u>.  Notwithstanding any other provisions of this Lease, Tenant may, without Landlord's consent, from time to time, secure financing or general credit lines and grant the lenders thereof, as security therefor, (i) a security interest in Tenant's fixtures, personalty, inventory and equipment (collectively, "Personalty"), (ii) the right to enter the Premises during the Lease Term to realize upon any Personalty so pledged, and/or (iii) a collateral assignment of Tenant's leasehold interest in the Premises, with rights of reassignment; provided, however, such collateral assignment may be made solely for the purpose of securing Tenant's indebtedness.  Upon Tenant providing notice of such financing to Landlord, Landlord agrees to evidence its consent in writing to such security interest and agreement and to give such lenders the same notice and opportunity to cure any default of Tenant as is provided Tenant hereunder.  In addition, upon separate request of Tenant, Landlord agrees to cause any Mortgagee specifically to acknowledge the rights of Tenant's lenders described herein and in paragraph 24 below.

24.    <u>Tenant's Property and Waiver of Landlord's Lien</u>.  All of the Personalty shall be and remain the personal property of Tenant.  Landlord expressly waives its statutory or common law landlord's liens (as same may be enacted or may exist from time to time) and any and all rights granted under any present or future laws to levy or distrain for rent (whether in arrears or in advance) against the aforesaid property of Tenant on the Premises and further agrees to execute any reasonable instruments evidencing such waiver, at any time or times hereafter upon Tenant's request.  The foregoing waiver shall not include monetary judgments secured from any court having jurisdiction.

25.    <u>Memorandum of Lease; Commencement Date Agreement</u>.  Landlord and Tenant agree, at the other's request and at the sole expense of the requesting party, to execute a Memorandum of Lease in recordable form, substantially similar to that attached hereto as <u>Exhibit "H"</u>, setting forth such provisions hereof as may be required by State law.  In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as <u>Exhibit "I"</u>, once the Commencement Date has been established.  Recording costs for either or both documents shall be borne by the party requesting recordation of the same.  The

provisions of this Lease shall control, however, with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease or Commencement Date Agreement.

26.    Expiration of Term and Holding Over.  All of the Personalty shall be removable by Tenant any time prior to the expiration or earlier termination of this Lease and shall be so removed by Tenant at the request of Landlord within thirty (30) days after the expiration or termination of this Lease.  In the event Tenant fails to remove any or all of its Personalty within the said thirty (30) day period after such request, Landlord may remove such Personalty, or the balance thereof, cause such Personalty to be disposed of and thereafter charge Tenant the cost of such removal, storage and disposal, if any, together with interest thereon at the Default Rate. During the thirty (30) day period following termination or expiration of this Lease, Tenant shall continue to be obligated to pay monthly Base Rent at the rate it had been paying during the preceding Lease Year together with any other amounts which would have been payable by Tenant if the Lease had not expired or been terminated.  Those improvements that are integrated into the physical structure of the Building, except any of Tenant's trade fixtures, shall not be removed and shall become the property of Landlord.  (A nonexclusive list of Tenant's removable trade fixtures is attached hereto as Exhibit "D".)  Tenant agrees promptly to repair any damage to the Premises occasioned by the removal of Tenant's trade fixtures, furnishings and equipment (except for small holes caused by nails, fasteners and the like) and to surrender the Premises broom clean, in as good condition as on the date of Tenant's opening for business therein, ordinary wear and tear, casualty and condemnation excepted.  Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises.  No holding over by Tenant nor acceptance of Base Rent or other charges by Landlord shall operate as a renewal or extension of the Lease without the written consent of Landlord and Tenant. Should Tenant hold over without the consent of Landlord, this Lease shall continue in force from month to month, subject to all of the provisions hereof and at one hundred twenty-five percent (125%) of the monthly Base Rent Tenant had been paying during the preceding Lease Year.

227314 7

27.   "For Rent" Signs.  Tenant hereby permits Landlord during the last one hundred eighty (180) days of the Main Term or of any Option Period, as the case may be (provided that no applicable Renewal Option has been exercised or deemed exercised), to place one (1) "For Rent" or "For Sale" sign, not exceeding eight (8) feet by four (4) feet in size, on the parking lot of the Shopping Center.  Tenant will also allow Landlord or its agents, at any time during the Term, upon reasonable prior notice and accompanied by a representative of Tenant designated by Tenant, to show the Premises, exterior and interior, to prospective tenants, purchasers, insurers, or mortgagees during reasonable business hours by prior appointment, provided same does not interfere with the conduct of Tenant's business.

28.   Force Majeure.  Except as otherwise specifically contemplated in this Lease or in paragraph 4 of the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in, or prevented from, the performance of any act required hereunder by reason of strikes, lockouts, labor troubles, inability to procure materials, delay by the other party, failure of power or unavailability of utilities, riots, insurrection, war or other reason of a like nature not the fault of such party or not within its control, then performance of such act shall be excused for the period of delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction of the Improvements, the consequences of delays by the other party shall be governed by paragraph 4 of the Construction Provisions.  In no event shall this paragraph apply to monetary obligations.

29.   Events of Tenant's Default.  Any of the following occurrences, conditions or acts by Tenant shall constitute an "Event of Default" under this Lease:

(a)   Failure to Pay Rent; Breach.  (i) Tenant's wrongful failure to make any payment of money required by this Lease (including without limitation Ground Rent, Base Rent, CAM Charges or Real Estate Taxes) within ten (10) days after the receipt of written notice from Landlord to Tenant that same is overdue (in which event the delinquent amount shall accrue interest at the Default Rate after such ten (10) day period); or (ii) Tenant's failure to observe or perform any other material provision of this Lease within thirty (30) days after receipt of