# EXHIBIT A – PART 5

Tamarack Village

## EXHIBIT "C"

### CONSTRUCTION PROVISIONS

THESE CONSTRUCTION PROVISIONS (herein so called) are hereby made a part of the Lease between Landlord and Tenant to which these Construction Provisions are attached as Exhibit "C". All defined terms shall have the meanings attributed to them in the Lease unless otherwise specifically defined in these Construction Provisions.

1.    Landlord's Delivery of the Land; Other Landlord Work.

All of the work set forth in subparagraphs (a), (b) and (c) below is, collectively, the "Landlord Work":

(a)    Hazardous Substances. Landlord shall deliver the Land to Tenant free of any pollution or contamination from toxic or hazardous substances, asbestos or any other chemicals or substances in amounts which exceed standards for public health or welfare as established and regulated by any local governmental authority, the State or the United States Government (herein collectively referred to as "Hazardous Substances"). Landlord has heretofore granted Tenant and its agent access to the Premises and Shopping Center to enable Tenant to conduct, at Tenant's cost and expense, such soil and environmental tests as it deems necessary. Tenant agrees to provide Landlord with a copy of any reports as to such tests received by Tenant, free of charge. Tenant hereby acknowledges without modifying Landlord's representations, covenants or warranties made in this Lease, that it has made the tests it deemed necessary and that the results thereof are acceptable to Tenant.

(b)    Site Work. Landlord, at its sole cost and expense shall: (i) verify its proposed development of the Shopping Center and compliance of its civil engineering plans with Tenant's geotechnical evaluation of the Land dated March 14, 1995 and prepared by STS Consultants, Ltd. (the "Soils Report") with the "Scope of Geotechnical Evaluation" shown on Attachment "2" attached hereto; (ii) cause the Land to be free and clear of any known or unknown (which, but for Landlord's failure to discover same, should be removed prior to

delivery of the Land to Tenant) obstructions, foundations, footings, utilities, easements, improvements and tenancies; (iii) complete grading of the Land and the Common Areas in the Southwest Quadrant in accordance with the "Standards for Grading Work" attached hereto as Attachment "3", and with the final plans prepared by Landlord's civil engineer (the "Grading Plans"), which Grading Plans are attached as Attachment "4" hereto and are hereby approved by Tenant; (iv) complete Tenant's building pad strictly in accordance with Landlord's geotechnical report, once same has been confirmed by Tenant to be consistent with Attachment "2"; (v) obtain approvals for all curbcuts indicated on the Grading Plans and all on and off-site permits required for any work to be performed by Landlord necessary to develop the Shopping Center which permits may be a prerequisite for issuance of Tenant's building permit; (vi) complete (A) all curbcuts for Tenant's Preferred Area, (B) the Staging Area and (C) a gravel all-weather construction access road to the Land no less than twenty (20) feet in width, connecting either Radio Drive or Tamarack Road with the Land, all in accordance with the Grading Plans; and (vii) use best efforts to obtain, by not later than **December 31, 1995** site plan approval and conditional use approval, if any, from governmental authorities having jurisdiction over the Shopping Center, permitting Tenant's construction of the Premises (subject to issuance of Tenant's building permit). All of the work described in (i) through (vii) above is, collectively, the "Site Work". No changes shall be made to any of the Site Work pertaining to Tenant's building pad or the drive aisles and/or parking areas in Tenant's Preferred Area, including but not limited to any plans and specifications therefor, without Tenant's prior written consent. Changes to other categories of Site Work may be made by Landlord, upon contemporaneous notice to Tenant, provided that any material changes thereto shall require Tenant's prior written consent, which shall not be unreasonably withheld so long as such changes do not adversely affect Tenant's proposed construction, use and operation of the Premises. The Site Work shall be performed in accordance with the construction schedule attached hereto as Attachment "5" (sometimes referred to herein as the "Construction Schedule"). Tenant acknowledges and agrees that any reasonably unforeseeable problems or delays Landlord encounters in grading the Premises in satisfaction of the Site Work requirements set forth above



as a result of the condition of the soils, including unforeseen or reasonably unforeseeable environmental or hazardous waste issues, subsidence sinking, surface waters, subsurface waters, site conditions or the like shall constitute a force majeure delay, but in no event shall the cost associated with such problems or conditions be passed on to Tenant in any manner.

Landlord will maintain the construction access road in good condition throughout the construction of the Common Areas. If the items of Site Work to be performed on the Land are completed earlier than forty-five (45) days prior to Tenant's scheduled commencement of construction of the Improvements (as provided below), the Land shall be overbuilt and sloped to drain and, within such forty-five (45) day period, shall be regraded and recompacted.

Subject to force majeure and to the satisfaction or waiver of the contingency to Landlord's obligations set forth in paragraph 38, Landlord covenants and agrees to complete, at its sole cost and expense, each item of the Site Work and, at its sole cost and expense, to provide temporary utilities or a suitable substitute at no cost to Tenant (i.e., a sufficiently sized water tank rather than temporary water, which tank shall be refilled by Landlord as required by Tenant) to within five (5) feet of the building pad at Tenant's designated points of entry as set forth in the Plans and Specifications, as contemplated in paragraph 1(c) below, in accordance with the dates established therefor in Attachment "5", to the end that promptly upon completion of such requirements (collectively "delivery of the Land"), Tenant shall be able, subject to issuance of its building permit and matters within Tenant's control, to commence construction of the Improvements.

Landlord acknowledges that Tenant's ability to obtain a building permit for its construction may be delayed due to the failure by Landlord to obtain necessary approvals or permits or to pay necessary fees for its construction and development of the Shopping Center. Landlord agrees that delivery of the Land shall not be deemed to have occurred until all such aforesaid approvals and permits shall have been obtained and all such fees, including but not limited to impact fees, shall have been paid, if and to the extent that such approvals, permits and fees for Landlord's construction shall be prerequisites to the issuance of Tenant's building permit. Landlord agrees to keep Tenant advised in writing, upon request, as to Landlord's

progress in completing the Site Work. Upon the delivery of the Land, Landlord shall certify to Tenant that all elements of the Site Work have been completed in the form of the Site Work Certificate attached hereto as Attachment "6".

Should the Site Work require minor adjustments in order to be in accordance with Attachments "3" and/or "4", Tenant shall notify Landlord of such adjustments and if Landlord fails to make same within ten (10) days after such written notice, Tenant may direct its contractor to make such adjustments, the total cost of which shall be reimbursed by Landlord to Tenant upon demand in a sum not to exceed Five Thousand Dollars ($5,000.00).

(c)     Paving, Lighting, Utilities, Landscaping and Drainage. Landlord, at its sole cost and expense, and in accordance with Attachment "5", shall cause a contractor licensed in the State to complete (i) installation of temporary utilities, as described in the "Utilities Specifications" attached hereto as Attachment "7"; (ii) the construction and installation within five (5) feet of the Building, of the permanent utilities necessary to service the Premises, i.e., gas, electric, sanitary sewer, domestic water and fire water (in size sufficient to satisfy local fire codes), each at Tenant's required entry points shown in the "Utility and Drainage Plan" described on Attachment "8" hereto (the "Utility and Drainage Plan"), at depths adequate for Tenant's tie-in without additional cost above that contemplated by the "Plans and Specifications" (as defined in paragraph 2(b) below); (iii) the construction and installation of the storm water drainage system at Tenant's required location shown on the Utility and Drainage Plan; (iv) the construction and installation of paving (including heavy-duty paving), and curbing for parking areas (including sidewalk curb in front of the Building), vehicular access and service roads, and driveways, in accordance with the "Paving Specifications" attached hereto as Attachment "9"; (v) the completion of landscaping at the Shopping Center in accordance with Landlord's governmentally approved landscaping plan; (vi) the construction and installation of lighting in the Shopping Center to standards no less than those set forth in the "Shopping Center Lighting Specifications" attached hereto as Attachment "10"; and (vii) Landlord's installation of Tenant's Shared Pylon as described in paragraph 8 of the Lease, all no later than the dates established therefor in Attachment "5".

232355.7                                            -4-



  (d) <u>Landlord Work</u>.  All of the work described to be performed by Landlord in this paragraph 1 is collectively referred to as the "Landlord Work"  All Landlord Work shall be performed in accordance with all applicable laws and this Lease, in a good and workmanlike manner, as appropriate by engineers, surveyors, architects and consultants, who are bondable, licensed in the State and of good reputation. Landlord's general contractor shall be experienced in shopping center development and in phasing and coordinating construction schedules with major anchors and national retailers.

  2. <u>Tenant Improvements</u>.

  (a) <u>Building Construction</u>.   Upon completion of all requirements therefor, Landlord shall give Tenant written notice (which shall include any required certifications, including but not limited to those required by <u>Attachment "3"</u>) of delivery of the Land in the form of <u>Attachment "6"</u>.  Tenant shall promptly notify Landlord if any such requirement has not been met to Tenant's reasonable satisfaction.  Upon completion of any such previously unmet requirements, Tenant shall promptly commence and pursue to completion with due diligence the construction of the Improvements.   The construction work on the Improvements shall be performed by a duly licensed union contractor chosen by Tenant, shall be done in a good and workmanlike manner, in compliance with all applicable laws and in substantial accordance with the "Plans and Specifications" (defined below).  Landlord shall not be entitled to participate in the selection process for Tenant's contractor, provided that Landlord shall have the right to review and propose additions to the bid list of contractors attached hereto as Attachment "12" from whom Tenant intends to solicit bids for construction of the Building.

  (b) <u>Plans and Specifications</u>.  Tenant shall prepare and furnish to Landlord for its approval, not to be unreasonably withheld, conditioned or delayed, complete architectural drawings and specifications (the "Plans and Specifications") for the construction of the Building and Other Improvements, which shall conform in all material respects to the building elevations attached hereto and made a part hereof as <u>Exhibit "K"</u> and shall also incorporate therein, to the extent not inconsistent with such building elevations, the items specified and shown in Tenant's "Floor Plans" attached hereto as <u>Attachment "11"</u>.  Landlord agrees that it will approve the

Plans and Specifications, so long as they are reasonably consistent with such building elevations and, to the extent not inconsistent with the building elevations, the Floor Plans, within ten (10) business days after receipt thereof. Under no circumstances shall Landlord require Tenant to alter the attached building elevations or the entrance tower, customer pick-up area or use of Alucobond and red trim on the front exterior of the Building as shown on such elevations. If the Plans and Specifications are not disapproved by Landlord within fifteen (15) days of delivery thereof to Landlord, they will be deemed approved. The Plans and Specifications shall not be substantially changed by Tenant without the prior written consent of the Landlord, which consent shall not be unreasonably withheld, conditioned or delayed.

(c)    Permits. Tenant, at its sole cost and expense, shall obtain or cause to be obtained those certain building permits, licenses, other governmental approvals and temporary and permanent certificates of occupancy which may be required for the lawful construction and occupancy of the Premises as a retail shopping facility in accordance with the Plans and Specifications. Landlord agrees to assist and cooperate fully with Tenant in obtaining such permits, licenses, approvals and certificates. Landlord shall be responsible for any other permits necessary for the development of the Shopping Center.

(d)    Landlord Inspections. During the course of construction of the Improvements, Landlord (and Landlord's lender) may, at its own risk and in cooperation with Tenant's contractor, enter upon the Land for purposes of inspecting the work, provided that such inspections shall not interfere with Tenant's construction. Tenant shall use good faith efforts to cause its architects and engineers to cooperate with Landlord and its Mortgagee to furnish such documentation as is reasonably and customarily required of such parties in connection with construction financing. In no event shall Tenant's architects, engineers or other professionals be required to provide Landlord or its Mortgagee with a Certificate of Substantial Completion.

(e)    Substantial Completion. Substantial completion of the Improvements ("Substantial Completion") shall be deemed to occur when a certificate of occupancy, whether temporary and subject to minor items to be completed, or permanent, as the case may be, has been issued by the applicable governmental authority, or Tenant has opened its store facility for

232355 7                                    -6-

business with the public.   The foregoing shall not be deemed to relieve Tenant of its
responsibility to complete the Improvements in accordance with the Plans and Specifications.

    3.  Costs.  Upon Substantial Completion and Tenant's furnishing to Landlord (except in
the case of (vii) below which shall be escrowed with Landlord's attorney until the Tenant
Improvement Allowance is released), to the extent not previously provided, the following: (i)
the certificates of insurance required under paragraph 14 of the Lease, (ii) an indemnity in the
form of Exhibit "J" attached hereto against any exception in Landlord's or its Mortgagee's
policy of title insurance with respect to mechanics' liens arising out of Tenant's construction,
(iii) a bill of sale conveying title to the Improvements to Landlord, (iv) a copy of Tenant's
construction contract with all amendments or addenda thereto, (v) estoppel certificate by Tenant
in the form to be attached hereto as Attachment "13" (it being understood that Tenant's delivery
of such estoppel shall satisfy this condition regardless of the disclosures contained therein); (vi)
a Subordination, Non-Disturbance and Attornment Agreement signed by Tenant in the form to
be attached hereto as Attachment "14", and (vii) a document acknowledging receipt by Tenant
of the Tenant Improvement Allowance in the form to be attached hereto as Attachment "15" .
Landlord shall pay to Tenant a "Tenant Improvement Allowance" in an amount equal to One
Million Three Hundred and Twelve Thousand Three Hundred Ten and No/100 Dollars

($1,312,310.00), payable by wire transfer of funds by Landlord to Tenant's account no later than
thirty (30) days after Substantial Completion and receipt of items (i) through (vii) above.  In
addition to the items set forth in (i) through (vii) above, Tenant shall, within ninety (90) days
after Substantial Completion, furnish Landlord with field-modified working drawings for the
Improvements, originals of all construction warranties for those items to be maintained by
Landlord and reproducible vellum "as built" plans or record drawings for the Improvements, but
the delivery of such drawings and plans shall not be a condition to payment of the Tenant
Improvement Allowance.  If the Base Rent is increased or decreased pursuant to paragraph
4(b)(ii) of the Lease in connection with the calculation of the actual ground-floor gross leasable
area of the Building, the Tenant Improvement Allowance shall  be increased or decreased to an
amount equal to $35,310 plus the product of $50.00 multiplied by the ground-floor gross

38,244
1st RMT 08)

leasable area of the Building utilized to adjust rent in paragraph 4(b)(ii) above. If Landlord fails to pay the Tenant Improvement Allowance in full within thirty (30) days after Substantial Completion and receipt of items (i) through (vii) above, Landlord shall be in default hereunder, and Tenant shall have the right to draw down against the loan commitment or letter of credit furnished by Landlord pursuant to paragraph 37. If for any reason such loan commitment or letter of credit has expired or otherwise is not available to reimburse Tenant for the Tenant Improvement Allowance, Tenant shall have the right to offset the Tenant Improvement Allowance against one hundred percent (100%) of the Ground Rent, Base Rent or CAM Charges due or owing to Landlord until the full Tenant Improvement Allowance is paid to Tenant. Interest shall accrue on the unpaid Tenant Improvement Allowance at the Default Rate commencing on the thirty-first (31st) day following Substantial Completion and delivery of items (i) through (vii) until the date of payment of the Tenant Improvement Allowance and also shall be recoverable by offset as provided above.

    4.  <u>Construction Delays</u>.

    (a)  <u>Delays by Landlord</u> In the event, subject to force majeure, Landlord shall fail to complete the Site Work and accomplish delivery of the Land in the condition specified by **May 15, 1996,** Landlord agrees that it shall reimburse Tenant for its fixed and ascertainable costs incurred as a result thereof in the exercise of all reasonable efforts to open for business by **November 1, 1996,** <u>provided that</u> such costs shall not exceed Seventy-Five Thousand Dollars ($75,000) and that Tenant in fact opens for business by not later than **November 20, 1996.** Such costs shall be limited to Tenant's out-of-pocket expenses of construction overtime, acceleration charges and bonuses paid to Tenant's contractors or subcontractors and charges for the scheduling of construction crews on days on which work cannot be performed due to the delays by Landlord.

    In the event, subject to force majeure, Landlord shall fail to accomplish delivery of the Land by **May 15, 1996,** or to complete any element of the Landlord Work by the completion date established therefor in <u>Attachment "5"</u>, Tenant, at its option and upon fifteen (15) days' prior written notice to Landlord (which notice may be given prior to or at any time after the

232355.7                                  -8-

applicable date for performance and shall reasonably detail those portions of the Landlord Work which Tenant elects to complete) may in addition to any other rights and remedies set forth herein, enter the Shopping Center and perform any task required for delivery of the Land or, as applicable, any element of the Landlord Work which has not been timely completed, and Landlord shall reimburse Tenant for its reasonable and actual costs thereof, including interest on such costs at the Default Rate, within thirty (30) days after receipt of written request from Tenant, which request shall be reasonably supported by invoices and/or written description of the Landlord Work performed. If such costs are not reimbursed to Tenant prior to the Commencement Date, Tenant may offset such amounts against Base Rent otherwise due until such costs and accrued interest are reimbursed in full. In the event and to the extent that Tenant exercises its rights hereunder, Landlord agrees to cooperate in good faith and provide Tenant with reasonable assistance so that Tenant can complete said portions of the Landlord Work.

In the event, for any reason whatsoever (except for the failure of Landlord's contingency for obtaining permits and financing described in paragraph 38 to be satisfied) and regardless of force majeure, Landlord shall fail to complete delivery of the Land to Tenant by **September 1, 1996**, Tenant shall be entitled to terminate this Lease at any time prior to such delivery and receive from Landlord promptly thereafter a sum equal to the actual out-of-pocket and substantiated third-party legal, architectural and engineering costs incurred by Tenant to the date of termination, not to exceed One Hundred Thousand and No/100 Dollars ($100,000.00).

In addition to any other rights and remedies set forth herein, if Landlord fails to deliver the Land by **June 15, 1996**, regardless of force majeure, Tenant shall have no obligation to commence construction of its store facility until after the period from November 15 to March 1, and Tenant shall pay no Ground Rent until the later to occur of **March 2, 1997** or 210 days following delivery of the Land, and shall pay no Base Rent, Taxes or CAM Charges with respect to such period from November 15 to March 1, notwithstanding any provisions to the contrary set forth in this Lease; provided, however that the foregoing shall in no event limit Tenant's obligation to pay rent and other obligations from and after the date Tenant opens for business in the Premises. In such event, Landlord shall pay to Tenant on demand an amount

equal to all costs not to exceed Twenty-Five Thousand and No/100 Dollars ($25,000.00) incurred by Tenant for architectural and engineering fees expended in redrawing the Plans and Specifications, if such redrawing is required in order to conform the Building to Tenant's then current prototype store building. The foregoing reimbursement for architectural and engineering fees shall be payable to Tenant only if Landlord's delay in delivering the Land is not attributable to delays in obtaining governmental approvals for the Shopping Center.

(b) <u>Delays by Tenant</u>. If, subject to force majeure and Landlord's delivery of the Land prior to **June 15, 1996,** Tenant shall fail to commence its construction by that date which is two hundred ten (210) days following delivery of the Land, Landlord at its option, upon thirty (30) days' prior written notice to Tenant, shall be entitled to terminate this Lease, unless during such thirty (30) day period Tenant commences construction by commencing work for the installation of footings and/or foundations.

(c) <u>Miscellaneous</u>. Notwithstanding the foregoing, a delay by any party in exercising its cure rights or other remedies hereunder shall not be deemed an event of force majeure for purposes of extending the date(s) established for performance by the party whose actions or omissions gave rise to such cure rights or remedies. All sums owing to Tenant under paragraph 1 hereof and/or subparagraph (a) above shall, to the extent applicable, be added to the Tenant Improvement Allowance and paid simultaneously therewith; and, if not so paid, Tenant shall be entitled to offset all such costs, plus interest at the Default Rate, against Ground Rent and Base Rent otherwise due hereunder.

5. In the event Tenant's construction of the Improvements is not completed by the time other tenants in the Shopping Center have opened for business to the public, Tenant agrees to use commercially reasonable efforts to minimize any disruption to or interference with the business operations of such other tenants. In addition, Tenant shall repair any damage to completed Common Areas caused by Tenant or its contractors.

6. <u>Attachments</u>.

"1" Intentionally Deleted

"2" Scope of Geotechnical Evaluation

232355 7                                            -10-




"3"    Standards for Grading Work

"4"    Grading Plans

"5"    Construction Schedule

"6"    Site Work Certification

"7"    Utilities Specifications

"8"    Utility and Drainage Plan

"9"    Paving Specifications

"10"    Shopping Center Lighting Specifications

"11"    Floor Plans

"12"    Approved Contractor List

"13"    Estoppel Certificate

"14"    SNDA

"15"    Acknowledgement of Tenant Improvement Allowance

<u>Attachment "1"</u>

<u>Intentionally Omitted</u>

232355.7

Attachment "2"

Scope of Geotechnical Evaluation

I.    **GENERAL**

    A.    All borings shall comply with all applicable codes and regulations.

    B.    Circuit City shall be informed, by phone, of the job progress and of any unexpected or special conditions.

    C.    Soil samples shall be retained by the soil testing firm for at least: Six (6) months on projects where shallow foundations are recommended; twelve (12) months on projects where deep foundations are recommended. (Differing periods may be acceptable. If deviations from the specified periods are proposed, state proposed periods, and state any additional cost to comply with the specified periods).

    D.    The time required to complete the soil boring, testing, and investigation report following authorization to proceed shall be twenty-one (21) calendar days or less.

    E.    At the end of the agreed upon time period, submit to Circuit City six copies of the report including black line prints of all logs, charts, diagrams, drawings, etc. on 8-1/2" x 11" sheets.

    F.    All reports are to be sealed by an Engineer licensed in the State in which the work is performed.

    G.    Evidence of suitable levels of Professional Liability, General Liability and Workmen's Compensation Insurance Coverage is required before commencing work.

II.   Within 21 days after notification by Circuit City Stores, the developer or A/E firm shall furnish a Report of Subsurface Investigation, which shall be performed by an independent soils engineer approved by Circuit City, and shall include the following:

    A.    Visual Description and Report: Describe the Shopping Center site as to existing conditions noting in particular any unique or unusual features which might affect any proposed construction.

232355.7

B.   Soil borings shall be as follows:

    1.   In granular soils, borings shall be standard penetration tests employing a 140 lb. hammer having a free fall of 30" and using a 2" outside diameter (1-3/8" ID) split spoon, ASTM Method D-1586.

    2.   In cohesive soils, standard penetration test ASTM-D-1586 or thin wall tube sampling of soils ASTM D-1587 may be employed.

C.   Soil samples shall be taken at 2'-6" intervals up to 10' depth and at 5' or at each change of strata thereafter.

D.   Indicate as accurately as possible the water line in all holes, at the time of boring and twenty-four (24) hours later.

E.   Where fill is encountered trenching or other explanatory procedures should be employed. Fill shall be described in great detail, including such information as approximate amount of organic material, topsoil, wood, or other decaying matter, loose or well compacted, amount of moisture, amount and type of debris, where compactible or to be removed, etc.

F.   Where rock is encountered, rock core samples of a minimum 1-1/4" diameter and minimum 5'-0" length shall be obtained, recovery ratios shall be given as well as a clear description of the type of rock, in particular, the means required to excavate same.

G.   At least five (5) borings should be taken within the Building Area limit lines on the Circuit City Parcel (with one at each extreme corner). The specific information required includes:

    1.   Allowable bearing pressure under footings for dead load, dead plus live load and dead plus lateral loads.

    2.   Friction value for lateral load-soil to footing.

    3.   Friction value for drilled caissons for uplift.

    4.   Equivalent fluid pressure to be used for retaining wall design.

    5.   Allowable passive resistance of soil-for lateral loads on drilled caissons and footings.

232355.7

6.   Evaluation of the suitability of on-site material for engineered fill.

7.   The typical loads for a Circuit City building vary from location to location; however, the following general criteria is provided:

| SNOW LOAD (PSF) | MAX. INT. COL. LOAD (KIPS) | MAX. EXT. COL. LOAD (KIPS) | MAX. EXT. NON-LOAD BEARING WALL (KIPS/FT) |
|---|---|---|---|
| 0 | 46 | 26 | |
| 20 | 58 | 33 | |
| 25 | 65 | 37 | |
| 30 | 71 | 41 | 3.0 |
| 35 | 78 | 45 | |
| 40 | 85 | 48 | |

1.   Assumes tributary area of 1326 ft.
2.   Assumes tributary area of 750 ft.
3.   Assumes 12" normal weight block reinforced at 24" o.c.

8.   Comment on effect of expansive soil and recommended footing depth to minimize effect of expansive soil. When material has a plastic index greater than twenty, swell tests shall be performed.

9.   Recommendation for slab construction; including thickness, reinforcing, moisture barrier, and capillary break.

10.   Recommendations on the need for geological and/or seismic investigations of the site or surrounding area.

11.   Recommendations on the need for additional boring samples based on the consistency of the boring data previously obtained.

12.   The report shall include a statement describing the field investigation technique and laboratory procedures. Include a commentary on the site in general as well as on the subsurface conditions.

13.     Test data shall be illustrated on table, charts, graphs, etc., as required to summarize the results.

14.     Final boring logs shall give a detailed description of the various soil strata and they shall include the group symbol based on the Uniform Soil Classification System.

15.     Recommended specification for materials and placement of any required off site fill including granular and cohesive materials. Estimated cost per cubic yard installed for these materials.

16.     Provide an indication of how susceptible the on-site materials are to moisture damage during the construction season at the proposed subgrade elevations and what recommended procedures should be taken to alleviate possible problems.

C.      Pavement Design:  Perform soils borings and any other field investigations necessary to provide a recommendation for the design of pavement sections for a 20 year life span and various traffic indices.

If poor subgrade material is encountered, recommend an alternate paving design using a reinforcing fabric (such as Mirafi 500X) and a thickened paving base, including thickness and material specifications for topping, asphaltic base, primer (if required) and reinforcing fabric and an estimated in-place cost per square yard for both the paving and fabric system.

Recommend both a heavy and light duty paving system, including thickness and material specification for topping, asphaltic base primer (if required) and granular sub-base. Light duty paving should be based on an estimated 500 automobiles per day and general parking. Heavy duty paving should be based on 500 automobiles per day, plus 3 tractor trailers per day with 9000 lb. wheel loads. Provide an estimated cost per square yard for both the paving and base in-place.

D.      Foundation Investigation Recommendations and Evaluations:

1.      Grading and Earthwork. Described recommended procedures relating to:

        (a)     Stripping.
        (b)     Excavations.
        (c)     Fills (import and on-site material).
        (d)     Suitability of on-site top soil material for landscaping.
        (e)     Grading operations.

232355.7                                    -4-

(f)     Compaction.
(g)     Stockpiling on-site materials.

2.     Footings/Foundations:

(a)     Described suitable foundation systems and attendant requirements.
(b)     Describe advantages and disadvantages of any logical and/or feasible alternative systems.
(c)     Bearing values.
(d)     Setting depths.
(e)     Soil preparation.
(f)     Anticipated settlement or movement (in inches).   The maximum differential movement shall be 1/2 inch.
(g)     Foundation drainage system, if required.

3.     Non-structural Slab on Grade.  Describe recommended procedures relating to:

(a)     Soil preparation.
(b)     Slab reinforcement.
(c)     Slab underlayment with particular attention to capillary breaks or moisture problems.
(d)     Anticipated settlement or movement (in inches).   The maximum differential movement shall be 1/2 inch.
(e)     Underslab drainage system, if required.

4.     Retaining Walls.  Design requirements/parameters for:

(a)     Equivalent fluid pressure.
(b)     Backfills.
(c)     Drainage.
(d)     Provide design requirements/parameters for capabilities of soil to support these structures.

5.     Light    pole    bases    or    similar    pole    structures:    Provide    design requirement/parameters for capabilities of soil to support these structures.

232355.7                                                    -5-

<u>Attachment "3"</u>

Standards for Grading Work

1.      The Land and the Shopping Center shall be graded in accordance with the following:

(a)      The Grading Plan shall show contours in accordance with standard engineering practice and these contours shall be shown with the existing (shown as a dashed line) and final (shown as a solid line) elevations. Whether existing or proposed, all buildings, improvements, roads and highways, including those adjacent to the Shopping Center, shall be shown in their true locations.

(b)      The Building will be accessible by grade level parking only. Steps and stairs are not permitted.

(c)      Sidewalk at the Building will slope away from the Building with grade of no less than 1.5% and no more than 3.0%. All water shall be sheet drained away from the Tenant's doors.

(d)      Asphalt paving areas will be graded to avoid ponding water with slopes no less than 1.5% and no more than 4.0%. Entrances and access drives shall have a maximum slope of 6.0%.

(e)      Surface drainage swales will not be allowed without prior approval of Tenant. Such swales must have a grade of not less than 0.5% and no more than 3.5% and shall be constructed of concrete.

(f)      The cut and fill on the Shopping Center site should be balanced, if practical. All fill material must be of a select grade and sources for acquisition of fill material, as well as locations for cut material, must be identified.

(g)      No retaining walls or embankments causing breaks in grade shall be permitted unless specifically approved by Tenant, except for the ponding area and along the rear of the Shopping Center, as shown on the Site Plan.

232355.7

2.    "Tenant's Pad Area" shall be defined as the area extending five (5) feet beyond the Building walls and truck dock and ramp area, or to the back of curbing around the Building, whichever is further. The Site Work shall comply with the following additional requirements:

(a)    Landlord shall be responsible for preparing the Tenant's Pad Area subgrades to within plus or minus one-tenth of a foot as set by Tenant's architect. Tenant's subgrades are typically 8"-10" below finish floor elevation. Landlord will complete compaction in accordance with the appropriate engineering standards and building code requirements, but in no event less than ninety-five percent (95%) of the modified proctor soil test for water content and compaction levels ("Modified Proctor") on the Land, so as to enable Landlord to perform construction work necessary to provide completed Improvements in accordance with the "Plans and Specifications" (defined in the Construction Provisions), with standard footings and without the necessity of pilings or spread footings or other extraordinary foundation work. Tenant's minimum slab thickness and under slab fill will be established in accordance with the report of an independent professional soils engineer. Such report will be obtained by Landlord at its sole expense. All compacted areas of the site shall be verified by an independent professional soils engineering test laboratory and a certificate from such independent laboratory indicating compliance with the soils report shall be furnished to Tenant upon completion of the Site Work.

(b)    Tenant's Pad Area soil shall have a minimum bearing capacity of 2,500 pounds per square foot. Earth stabilization and/or replacement shall be performed by Landlord as necessary to meet this minimum requirement.

(c)    During the preparation of Tenant's Pad Area, Landlord shall at its expense have an independent professional soils engineering test laboratory monitor and certify the preparation of Tenant's Pad Area in accordance with the independent soils engineer's report referenced in Attachment "2" (II) above. The greater of three in-place compaction tests per work day or one in-place compaction test per 5,000 square feet of pad area must be completed.

(d)    On or before May 1, 1996, Landlord shall provide Tenant with:

(i)    An independent soils engineer's written certification that all pad work was completed in accordance with the Grading Plans and the Plans and Specifications.

232355 7                                          -2-

This report shall include the results of all compaction and other tests performed during the pad preparation phase and any tests performed prior to the date of such certification.

(ii)    A surveyor's written elevation certification stating that Tenant's Pad Area is at the prescribed elevation within the stated tolerance of plus or minus one-tenth of a foot. This certification shall be based on elevation shots taken on a 50-foot-grid minimum including pad perimeter and corners. Promptly upon completion of the Site Work, Landlord shall cause its surveyor or engineer to designate the corners of the Land by means of standard surveying monuments.

(e)    Landscaping slopes and berms shall be set by Landlord to preserve the integrity of the slopes as determined by an independent soils engineer. However, in no case may the slope of a landscaping berm exceed 3 to 1 in turf areas, or 2 to 1 in ground cover and shrub areas.

(f)    Top soil excavated during grading of the Shopping Center shall be stockpiled by Landlord and made available for use during final landscaping operations including landscaping inside perimeter sidewalks around the Building, if found agronomically suitable by an independent soils analysis lab. Other excavated soil material shall be stockpiled and made available for use as backfill if required, but only if a soil report indicates it is suitable.

(g)    All material, including native and fill, within 3 feet of any surface of the building including foundation concrete, shall be nonexpansive with a plasticity index of 12 or less. No oversize material or lumps greater than 6" in diameter will be allowed and not more than 15% of the material shall be greater than 2-1/2" diameter.

(h)    The Grading Plans shall not be materially changed by Landlord without the prior consent of Tenant, which consent shall not be unreasonably withheld or delayed.