```
                    UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF VIRGINIA


IN RE:                    .    Case No. 08-35653 (KRH)
                          .
CIRCUIT CITY STORES,      .
INC., et al.,             .
                          .    701 East Broad Street
                          .    Richmond, VA  23219
          Debtors.        .
                          .    November 21, 2011
. . . . . . . . . . . . ..     2:05 p.m.

                    TRANSCRIPT OF HEARING
              BEFORE HONORABLE KEVIN R. HUENNEKENS
              UNITED STATES BANKRUPTCY COURT JUDGE



APPEARANCES:

For the Debtors:          Tavenner and Beran, PLC
                          By: LYNN L. TAVENNER, ESQ.
                              PAULA S. BERAN, ESQ.
                          20 North Eighth Street, 2nd Floor
                          Richmond, VA  23219


TELEPHONIC APPEARANCES:

For the Claimants:        KEITH ALLEN, Pro Se

                          WILLARD M. ELLIOTT, Pro Se
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609)586-2311    Fax No. (609) 587-3599**

1          COURTROOM DEPUTY:  All rise.  United States

2     Bankruptcy Court for the Eastern District of Virginia is now in

3     session.  The Honorable Kevin R. Huennekens presiding.  Please

4     be seated and come to order.

5          COURT CLERK:  In the matter of Circuit City Stores,

6     Incorporated, hearing on Items 1 through 9 as set out on

7     proposed agenda.

8          MS. TAVENNER:  Good afternoon, Your Honor.

9          THE COURT:  Good afternoon, Ms. Tavenner.

10          MS. TAVENNER:  For the record, Lynn Tavenner of the

11     law firm of Tavenner and Beran together with my partner, Paula

12     Beran who's seated at counsel table.  We're here today on

13     behalf of the Circuit City Stores, Inc. Liquidating Trust.

14     Also at counsel table is Ms. Catherine Bradshaw, excuse me, the

15     senior trust representative, as well as Ms. Ann Pietrantoni who

16     is the reporting HR and landlord claims manager for the trust.

17          I'm pleased to report, Your Honor, that we thought

18     today might be a little longer than it's actually going to be,

19     and I would like to start with proceeding down the agenda in

20     order.

21          THE COURT:  You may.

22          MS. TAVENNER:  The first item on the agenda, Your

23     Honor, is a motion that we talked about a little the last time.

24     It's Siegel against DIRECTV, Inc., a motion to authorize and to

25     schedule mediation, to conduct mediation in California.  Your

 1   Honor, I'm happy to report that the parties are still in

 2   negotiations, are hopeful that they can resolve the matter.  As

 3   a result, we would respectfully request that this be set over

 4   again until Your Honor's December 8th date.

 5          Your Honor, that also would correspond, you would

 6   make note in the agenda, with an objection deadline for the

 7   trust.  If the need arises to file a response, we have put that

 8   down as December 1 of 2011.,

 9          THE COURT:  All right, so the objection deadline

10   would be December 1 and this matter would be continued to

11   December 8.

12          MS. TAVENNER:  Thank you, Your Honor.  The next

13   matter is Item 2 is the motion for 2004 exam of the records

14   custodian of the Washington State Workers Compensation Fund.

15          Your Honor, this motion was filed pursuant to Rule

16   2004 and Local Rule 2004(1) requesting you to enter an order

17   authorizing the examination of the custodian of records for the

18   State of Washington Workers Compensation Fund, and to also

19   authorize the production of certain records that are defined in

20   the motion itself.

21          Your Honor, the trust is seeking this documentation

22   in order to assist it with some reconciliation that's occurring

23   with the debtors' excess carrier, Old Republic Insurance

24   Company.  The trust and Old Republic have tried to obtain this

25   information from the Workers Compensation Fund, and to date

4

1    have not been able to get that documentation.

2           By way of background, Your Honor, Circuit City prior

3    to the Chapter 11 case was self-insured with respect to workers

4    compensation claims, had a bond with Old Republic Insurance

5    Company that was in place with respect to the same.  When the

6    Chapter 11 was filed, the bond kicked in and then certain of

7    those funds were used to pay claims.

8           The trust believes that the amount of the bond is

9    actually much greater than the amount of paid claims.  Old

10   Republic is now holding collateral as security for any claim

11   payments that it may have to make within the deductible layer

12   of the excess policies.  The trust needs to know the amount

13   from the Workers Compensation Board that would potentially fall

14   within that excess layer in order to help determine the

15   appropriate amount of collateral to be held by Old Republic.

16   We want to, in essence, do a true-up and hopefully lower the

17   amounts there.

18           THE COURT:  What's the run rate on these claims?  How

19   long do you have to go before, you know, claims cannot be filed

20   against the bond?

21           MS. TAVENNER:  I do not know the outside date.  We're

22   looking for documentation beginning back in 2003.  There are

23   still claims that are out there pending, though the amount at

24   this point is less, I believe, than $25,000, so it's fairly

25   small.  That's why we need to get this true up because the bond

1  is more excessive than that.

2         The documentation that we've requested is fairly

3  defined.  There are only two narrow categories and we believe

4  that after receipt of that documentation, it's very likely that

5  the trust will not even need to actually conduct an examination

6  under oath of anybody from the Workers Compensation Board.

7         However, the order that we would propose to submit

8  does include an outside date for such examination unless the

9  parties agree to some date beyond that.  So, we do have that in

10 there, though we're hopeful it's not necessary.

11        Mr. Andy Caine, counsel for the trust, has been in

12 contact with an attorney from the AG's office since we filed

13 the motion.  I think I heard from them the next morning after

14 the motion was filed and they have been in dialogue since that

15 time.  They're attempting to work the matter out without the

16 need for the official order to be served.  Nevertheless, Your

17 Honor, we believe it is important at this point to go ahead,

18 get the order, have it in place in the event that we're not

19 able to get it all worked out.

20        Ms. Bradshaw who is here today is intimately familiar

21 with the matter.  If necessary, she could testify to Your Honor

22 with regard to any additional specifics.  But, we certainly

23 believe at this point if we can just get the documentation, we

24 can do the reconciliation, the true-up and it will not be

25 burdensome to the Washington AG's office, at all.  So we would

1   respectfully request that you enter the order.

2          THE COURT:  Does any party wish to be heard in

3   connection with the motion for 2004 examination?

4                  (No audible response)

5          THE COURT:  All right, there being no objection, the

6   Court will grant that motion and I'll look for that order.

7          MS. TAVENNER:  Thank you, Your Honor.

8          The next matter on the docket is substantially

9   identical to the one we just discussed, except that it relates

10  to the Ohio Workers Compensation Board.  We're asking for the

11  identical type of information, and for the same reasons we'd

12  respectfully request that you enter an order.  I did want to

13  alert the Court.  I'm not sure if it's on the Court's docket at

14  this point, but after the close of business on Friday, I did

15  receive a written response from the Ohio's AG's office from Ms.

16  Victoria Geary (phonetic).  In essence, the response says that

17  the 2004 motion is inappropriate due to the fact that the trust

18  has actually filed a claims objection with respect to certain

19  claims that the Ohio Board has filed in this case.

20  Nevertheless, the AG says it's prepared to provide certain

21  responses to reasonable requests.

22          Your Honor, I want to make sure it's clear that the

23  information requested with respect to the 2004 motion is

24  entirely independent of the matters related to the workers comp

25  claim.  We're seeking information relating to the potential

1  exposure over and above the self-employed retention that might

2  implicate the Old Republic excess coverage.  If we can reduce

3  that excess exposure, we can get collateral back.  So, it's

4  certainly completely different from the matter that is being

5  addressed in conjunction with the claims resolution process.

6          As a result, we would submit that the matter is

7  appropriate and, again, would request that the Court enter an

8  order approving the same.

9          THE COURT:  All right, I've not seen the response.

10  We -- ECF was upgraded over the weekend and so I have not had

11  -- and they're getting it on line.  They're doing, actually, a

12  pretty good job with that.  So, if it was filed late Friday,

13  that's the reason I didn't get a chance to look at it this

14  weekend, but I would like to do that.  Is there any party that

15  wishes to be heard in connection with this motion?

16                    (No audible response)

17          THE COURT:  All right.  What I'm going to do, Ms.

18  Tavenner, on this one, the Court is inclined to grant your

19  motion, but I do want to read the response.  So, what I'm going

20  to do is take this under advisement.  I'm going to ask you to

21  submit your order --

22          MS. TAVENNER:  Certainly.

23          THE COURT:  -- and if I don't have any problem, I'll

24  just enter the order.

25          MS. TAVENNER:  Thank you, Your Honor.  I do have a

1  copy of what was e-mailed to me.  I'm not certain that it has

2  been filed electronically yet.

3           THE COURT:  If you could hand that up -- do you have

4  a copy for the Court?

5           MS. TAVENNER:  I have a copy that the Court may have,

6  though I will tell you that I have, in my handwriting, Ohio at

7  the top.

8           THE COURT:  All right, I'll ignore that.

9           MS. TAVENNER:  Thank you.

10          THE COURT:  All right, thank you, Ms. Tavenner.

11          MS. TAVENNER:  Thank you, Your Honor.  We will submit

12  the order.

13          And, Your Honor, I would respectfully request at this

14  point that you indulge me to go out of order at this point.

15  There's one additional matter that I have been handling and in

16  order to just not disrupt the process of having Ms. Beran and I

17  playing musical chairs, I would respectfully request that we

18  move to Item 7 on the Court's docket.

19          THE COURT:  All right, you may.

20          MS. TAVENNER:  Thank you, Your Honor.  That matter is

21  the Liquidating Trust's Eleventh Omnibus Objection to Claims

22  requesting to reclassify to general unsecured claims, to reduce

23  to the statutory cap or to disallow as applicable with respect

24  to the Special Cash Retention Program.  It's Docket Number

25  10049.

1          Your Honor may have noted that the agenda reflects

2    that a substantive response was filed by a claimant, Mr. Joshua

3    Loveall.  I'm happy to report that the Trust has resolved the

4    matter with respect to Mr. Loveall.

5          In addition, Your Honor, as the agenda reflected, the

6    Trust has also resolved the matter with respect to the

7    following claimants: David Tolliver, Jakob Joffe, Michael

8    Alexander, Michael Beam, Kenneth Duda, Joseph Edward Dudley,

9    Roland Finch, Jaime Gonzalez, Louis Jones, III, Virgil Lynn and

10   Brandon Rowberry.  With that, Your Honor, there are only two

11   outstanding claims that were addressed in this objection that

12   were not resolved prior to today.  Those are the claims of

13   Willard Mark Elliott and Keith Allen.  Your Honor, both of

14   these claimants have filed requests pro se to appear

15   telephonically today and I do believe that they may be on the

16   line this afternoon so I wanted to advise you of that.

17          THE COURT:  All right.

18          MS. TAVENNER:  Both of these claims, Your Honor, are

19   filed in the identical amount of $40,000 and they are also

20   identified in the proof of claim as priority claims under

21   507(a)(4).  Your Honor, these claims and all of the claims in

22   the objection related to Circuit City Special Cash Retention

23   Program.  More than 180 days prior to the petition date the

24   debtors implemented this program pursuant to which certain

25   employees were awarded cash that was payable over a two to

1  three-year period beginning in 2009, subject to the specified

2  terms of the program.

3          Circuit City notified each of the participants in the

4  program through an award letter that set forth those terms

5  which, in essence, Circuit City agreed to pay the participants

6  a cash amount if they remained employed by Circuit City through

7  certain vesting dates.  Now, that program, Your Honor, also

8  provided that if employed by Circuit City when a, quote, change

9  in control occurred, then the cash award would become fully

10  payable.

11          A change in control under the definition included the

12  sale of all or substantially all of Circuit City's assets.  As

13  Your Honor knows, Circuit City completed its going of business

14  sales and closed its remaining stores around March 8th of 2009.

15  And, Your Honor, the remaining two claimants were employed

16  after that date.

17          Ultimately, the Special Cash Retention Program at

18  issue was terminated and then officially rejected pursuant to

19  the Court-approved plan of liquidation.  Based upon previous

20  rulings of this Court on several occasions now, the only issue

21  before this Court today would be whether or not the two claims

22  for the rejected program could qualify as a priority claim

23  under 507(a)(4).  As I indicated earlier, Your Honor, we have

24  resolved the vast majority of these claims and as it relates to

25  the remaining two, the trust has proposed to allow their claims

1 as a priority claim up to the amount of the statutory cap and a

2 general unsecured claim for amounts over and above that cap.

3       The trust understands, Your Honor, that the claimants

4 believe that they are entitled to something more, but the trust

5 has agreed to pay to the two claimants as much as they would be

6 entitled under the Bankruptcy Code.  And so, Your Honor, we

7 would request the Court to approve that proposed treatment.

8       Ms. Pietrantoni, the Trust H.R. claims manager, has

9 spoken with these claimants.  She's prepared to testify that

10 they were participants in the Special Cash Retention Program

11 and that the trust is prepared to pay both claimants under that

12 program the amounts that they have requested, but with such

13 amount to be given priority under 507(a)(4) to the extent that

14 they have not already received priority payments to date.  And,

15 Your Honor, I would advise the Court that each of them has

16 received some payments under 507(a)(4) already.  But, the Trust

17 is prepared to pay them the difference and then the remainder

18 would go into the general unsecured category.

19       Based upon that, Your Honor, the trust would

20 respectfully request that Your Honor enter an order authorizing

21 the Trust to allow those claims, as requested, and to pay them

22 the amount that is left as a priority and then the remainder

23 would go into the general unsecured category.  I do believe

24 that the claimants are on the phone.

25       THE COURT:  All right.  Is Mr. Allen or anybody on

1  his behalf on the phone that wishes to address the Court on

2  this issue?

3          MR. ALLEN:  This is Mr. Allen, Your Honor.

4          THE COURT:  All right.  Mr. Allen, I'm going to

5  permit you to proceed by telephone today and what I would like

6  you to do first, sir, is please identify yourself on the

7  record.  We are making a record of this.  There will be a

8  transcript available in case either party needs it.  And so

9  what I would like you to do is state your full name and your

10  address on the record.

11          MR. ALLEN:  Thank you, Your Honor.  My full name is

12  Keith Allen.  My address is 489 Millwood Boulevard.  That's in

13  Marysville, Ohio 43040.

14          THE COURT:  All right, Mr. Allen.  You've heard what

15  Ms. Tavenner has just said about your claim, and this is your

16  opportunity to respond to that.  What is your response?  And,

17  by the way, I have seen your written response that you have

18  filed in this case and I have read it.

19          MR. ALLEN:  Thank you, Your Honor.  May I just start

20  with -- obviously, I'm in disagreement with the Trust's

21  position.  They've notified me on several occasions with Ms.

22  Pietrantoni's -- I apologize if I'm pronouncing that

23  incorrectly -- but I've been, you know, contacted several times

24  by her asking me to settle this claim.  Each time I have stated

25  my position, and most recently was told I was trying to get

1  something that I was not due.  Obviously, I disagree with that

2  and told them that I would like to take this before the judge.

3       My position is simply this.  There was an earnings

4  call with Circuit City some time during the end of the third

5  quarter/beginning of fourth business quarter with Circuit City

6  where the stock price dropped dramatically.  Very shortly after

7  that there was a conference call with all the leadership of the

8  organization, including Danny Clark and Phil Schoonover, and on

9  this call they tried to put the field leadership, if you will,

10  at ease about the company's position and their commitment to

11  bring this company through a complete turnaround.

12       On this call they also announced that they would be

13  putting together an award, cash retention award program, that

14  each one of us on the call would be, you know, that would -- we

15  would have in our arsenal, if you would, for if the company

16  failed to come out of the position they were in.  They did

17  this.  They told us directly that they wanted to retain their

18  talents which made sense.  I, along with I don't know how many

19  folks were on the call, but I was one of the district managers

20  in a very important market.  I was well thought of and was

21  being sought after by other organizations.

22       We were told on this call we would have this cash

23  retention award if we would stay employed through January of

24  2010.  Many of us on this call, and one of us voiced, hey, well

25  what happens if you, you know, if you go out of business?  This

1  really doesn't do us any good.  We were told at that time, hey,

2  there's a change of control clause in this agreement, that you

3  are safe.  If the company goes out of business, you'll be paid

4  $40,000.  Obviously, they wanted to retain talent.

5       So, I guess my first argument would be you had to

6  stay through the vesting period before this money was available

7  to you.  So, in the trustee's argument they say that this money

8  was earned in 2008.  The reason this would not be true is that

9  if I had made the decision to leave or terminate my employment

10  with Circuit City in say September of 2008, zero monies would

11  be due to me.  This award was for a staying -- a retention, so

12  I had to stay with the organization.  In addition to that, at

13  change of control all these monies would be due.

14       There is a part of me that says this company probably

15  had, you know, they should have had reasonable thought that the

16  company could be insolvent.  So, if they make this agreement

17  with me promising to pay me $40,000, they should have had

18  reasonable knowledge that if this truly could be changed to a

19  pennies-on-the-dollar general unsecured claim, had they told us

20  that, I believe many of us would not have stayed.  I think it

21  was -- I'll go on the limb of saying there may have -- this may

22  have been a fraudulent promise that was made.

23       In addition to that, the case law that the trust has

24  used, and I have spent a lot of time trying to find case law to

25  support the trustee's position, I could find none.  The two

1  cases they cite do not line up with any type of cash retention

2  award with any other company, nor could I find any, and I

3  actually paid an attorney to try and find, and could not.  I

4  believe that the trustee is trying to stretch this.

5          And lastly, I would just say if this is allowed --

6  and I think this is stated in my letter -- if this is allowed,

7  what would stop any company from making these types of promises

8  to employees?  There's no way I would have known.  I'm a -- you

9  know, I'm just a district manager.  I'm just an employee at a

10 big company.  How the heck would I know that this money could

11 go to general unsecured, unless they revealed that to me?  They

12 did not, and I can assure you they didn't with anybody else.

13         In fact, I can tell you I have four children, a

14 mortgage.  My wife was going through cancer at the time.  I had

15 companies that were seeking me out.  I was the number one

16 district manager with this company.  I certainly could have had

17 another job had I started looking.  I didn't because I was told

18 you don't have anything to worry about, Keith.  You have

19 $40,000 coming.  Don't worry about your mortgage.  Don't worry

20 about your wife.  Don't worry about your children.  And let me

21 tell you, that was all false if this is allowed.

22         And I got on my feet.  It took me awhile.  I got on

23 my feet.  So, I actually took offense to Ann Pietrantoni

24 telling me that I was trying to get something that I wasn't

25 due.  I talked to several of my co-workers, and when I asked

1  them why did you settle, most of them didn't settle.  What they

2  did is, you get a piece of mail every other month from the

3  Court two-and-a-half, three years later, that stuff is going in

4  a drawer and people don't even know it.

5        And then I know if they were trying -- if somebody

6  had tried to bully them like they did me the last two months

7  trying to get me to give up my claim, I think that's what they

8  did because what I was told directly, Your Honor, was, hey, if

9  you don't take this settlement that we're offering that the

10  lady just told you about, I was told if I didn't take that, the

11  judge might get mad and I might get everything in general

12  unsecured.  And I said, well, I'm going to take my chances with

13  the judge.

14        And that's my argument, Your Honor.  I apologize if I

15  sound a little emotional.  This has been three years that I

16  honestly believe I was wronged.  I believe I was made a false

17  promise.  I think they knew it ahead of time.  And I don't

18  think that this is a precedence that should be set for other

19  people in a similar position with companies that are in

20  financial trouble.

21        THE COURT:  All right, thank you very much, Mr.

22  Allen.  And I can assure you that the Court does not get mad.

23  This is the opportunity for both parties to present their

24  issues, and then the Court obviously needs to decide these

25  issues based on the law and the facts of the case.

1          Now, before deciding this, though, I want to ask, is

2     Mr. Willard Elliott or anyone on his behalf on the phone?

3          MR. ELLIOTT:  Yes, Your Honor.  This is Mr. Elliott.

4          THE COURT:  All right, Mr. Elliott, your situation is

5     similar to that to Mr. Allen and you've also heard Ms.

6     Tavenner's objection to your claim and you've heard Mr. Allen's

7     response.  I've also read the response you filed with the

8     Court, but this is your time now to address the Court and I'm

9     going to let you do the same just as Mr. Allen did.  Before you

10    do that though, sir, what I would like you to do is please

11    identify yourself on the record by stating your full name and

12    address.

13         MR. ELLIOTT:  Certainly, Your Honor, thank you.  My

14    name is Willard Mark Elliott.  My address is 49622 Woodland

15    Drive, East Liverpool, Ohio 43920.

16         THE COURT:  All right, Mr. Elliott, and the Court

17    obviously is going to let you address the Court telephonically,

18    so you may now respond to Ms. Tavenner's objection.

19         MR. ELLIOTT:  Very good.  Thank you, Your Honor.

20         My circumstances are very similar to Mr. Allen's, as

21    a matter of fact, almost exactly the same.  You know, Keith and

22    I were both ranked in the top five of the organization

23    throughout this period of the cash retention award.  And, you

24    know, to set it up, you know, it really did.  It started during

25    the third quarter's earnings announcement in December of 2007.

1    Basically, what happened was the company fell far short of

2    earnings projections, and as we listened to the earnings call

3    that day, we basically sat and watched the stock tumble down

4    into the mid $1 range.

5             Later on that afternoon Danny Clark, who was the

6    executive vice president of stores at the time, called a

7    conference call for all company leadership and during that

8    conference call he gave us assurances that everything was being

9    done by the organization to right the ship and make sure that

10   we were going to be able to successfully enter the turnaround

11   phase of Circuit City.

12            Again, to Mr. Allen's point, we all have families to

13   be concerned with, we all have careers to be concerned with so

14   it was a large leap of faith on our part to have continued

15   staying with the organization.  And in researching for today, I

16   find a CNN money article from December 24th of 2007 where Phil

17   Schoonover basically addressed several things.  He addressed

18   the drop in the stock price due to the third quarter earnings

19   announcement, but then he also addressed the need for a cash

20   retention award to be put in place for leadership of the

21   organization.  They understood that they needed leaders who

22   knew the business, who knew the leadership in the stores and

23   also knew the market dynamics to carry forth in a turnaround

24   procedure for Circuit City.

25            So, by doing that, on January 1st of 2008 the cash

1   award retention program was written and it was delivered to us

2   and, again, we had another conference call.  During that

3   conference call they outlined the details of the cash retention

4   award.  Basically, how it worked out was, there were really

5   three phases that were of concern to us as leaders, the first

6   being the vesting phase, you know, outlining when does it pay

7   and what percentages are paid during each vesting period.  For

8   the cash retention award there were two vesting periods,

9   January 1st of 2009, January 1st of 2010.  So, that's the first

10  piece.

11          The second piece was forfeiture.  We would forfeit

12  our right to this cash retention award, again, to Mr. Allen's

13  point, if at any point in time we terminated our employment, or

14  death or disability caused us not to be able to adhere to our

15  terms of our contracts, our employment contracts.  So that was

16  said, that was the next piece.

17          The third piece was change of control because we all

18  understood what the condition of the organization was in.  We

19  saw two roads really in front of us.  Either we were going to

20  be successful in our turnaround venture, either as a standalone

21  entity, or we were going to take on partners, or we saw the

22  company basically go into bankruptcy.  Unfortunately, the

23  second is what happened.  But, to allay our concerns, if you

24  refer to the document, the cash retention award, and look at

25  Section 2 and then Part 4, it clearly outlines the consummation

1  of plan of complete liquidation dissolution or sale of

2  substantially all of the assets of the company constitutes a

3  change of control.  At change of control, what happened was the

4  cash retention award was to pay out completely, so at that

5  point in time we would receive a lump sum of the full retention

6  award which in this case would be $40,000.

7         So, during this time frame several things happened.

8  We continued to work hard because I believed in the

9  organization but, more importantly, I believed in the people

10 that worked for me.  I refused to let down for them, okay?  We

11 were going to keep charging hard for the results to be the best

12 we possibly could in the organization.  We did that.  We did

13 that to the best of our abilities.

14        The second thing that happened during that time was I

15 turned down multiple job offers because, again, to Keith's

16 point, him and I were both ranked in the top five of the

17 organization.  We were continually having recruiters call us

18 because during that time other organizations knew the

19 circumstances of Circuit City.  They were trying to take top

20 talent.

21        One of the things that kept me inside of the

22 organization, really the only thing that kept me inside of the

23 organization from a financial standpoint for my family, was

24 this cash retention award, and that's what made me stay.  I had

25 conversations with other retailers and at each turn I let them

1  know that I am staying based upon this cash retention award

2  because we believed in what the leaders were saying and we also

3  believed in the legal document that we signed and returned

4  under change of control, forfeiture and the vesting period.

5          So, long story short, whenever the news came on

6  January 16th that Circuit City was no longer an entity and we

7  were being liquidated as an organization, as district managers,

8  we were basically told that today was our last day of reporting

9  to work.  Our employment contracts held until March 24th, so I

10  was employed until March 24th of 2009 as a full-time employee

11  of Circuit City because I still upheld my contract to the

12  letter of what was required of me even during the liquidation

13  process which was communication of the liquidating assets, plan

14  and the moving of the stores and the merchandise that

15  accompanied that.

16          But, I feel there's two things.  I either deserve the

17  full amount of $40,000 to remain in priority status based upon

18  the lettering of the cash attention (sic) reward and the change

19  of control clause, but I also clearly met the first vesting

20  period.  I was full-time employed until January 1st, 2009 which

21  was the first vesting period of $20,000.  So, you know, my

22  argument would be two things; I deserve the full 40 based upon

23  the change of control by upholding my end of the contract and

24  the way it was written and conveyed to us as leadership by our

25  leadership of Circuit City.

1           And then the last point was, you know, same as Keith

2   stated, I've spoken to several people from the liquidating

3   trust regarding our concerns and the settlement agreement.

4   Most have been very, very nice and very accommodating.  I can't

5   say that I spoke to an attorney, an Attorney Caine who

6   basically told me the exact same thing that Keith stated to

7   Your Honor that if I refused not to participate in the

8   settlement agreement, that I was trying to get something that

9   wasn't deserved to me and also that I would make Your Honor

10  upset, the Court upset and might possibly have to appear in

11  person, or I might end up losing everything that's sitting in

12  front of me now as far as the settlement agreement.

13          And at that point, Your Honor, I had serious

14  reservations.  I was thinking about signing the settlement

15  agreement.  But, then when he said that I was trying to get

16  something that I didn't deserve, I truly do not feel that

17  because when you look at this agreement and you look at the

18  risk I put my family in because of this agreement, I'm not

19  trying for something I don't deserve.  I'm trying for something

20  that I earned, that truly belongs to me and I hope Your Honor

21  sees a way to understand mine and Keith's position that we

22  worked for this, we earned this, this was promised to us and we

23  risked our families' livelihoods based upon this document.

24          So, Your Honor, thank you very much for giving me an

25  opportunity to speak today, and I'm anxious for your decision

1  and thank you.

2         THE COURT:  Thank you, Mr. Elliott.  All right, Ms.

3  Tavenner, you've heard the responses of the two claimants.  Do

4  you have any rebuttal you wish to offer at this time?

5         MS. TAVENNER:  Just briefly, Your Honor.  The Trust

6  sympathizes with Mr. Elliott and Mr. Allen, however, the Trust

7  also has a fiduciary duty.  And with respect to the Bankruptcy

8  Code, there are certain parameters within which claims must be

9  allowed and disallowed.

10        To that end, Your Honor, this same special cash

11 retention program has been before Your Honor on several times.

12 Your Honor has discussed it with Mr. Galardi, Your Honor has

13 discussed it in conjunction with Debtors' Omni 56, Debtors'

14 Omni 74.  With respect to the same, Your Honor has looked at

15 it.  Your Honor has suggested that the only way that  this

16 could be anything other than a general unsecured claim is if it

17 is a priority claim.

18        To that end, Your Honor, the Trust, through Ms.

19 Pietrantoni with respect to claimants that were not represented

20 by counsel, tried to reach out and assist the claimants in

21 getting a resolution sooner rather than later.  And it is true,

22 Your Honor, in fact, there are settlement agreements in place

23 with the other claimants that were identified with respect to

24 the objection that's before Your Honor today, and to the extent

25 that there is priority claim availability, they will be

1   receiving checks for those amounts in the very near future.

2          I apologize to the Court if the claimants in any way

3   felt that we were trying to do anything untoward.  In fact, the

4   method was nothing but trying to get them what we believed

5   they were due under the Bankruptcy Code in the quickest fashion

6   possible, and that's what Ms. Pietrantoni was trying to convey

7   to them.

8          We do not take issue with respect to the language in

9   the documents themselves.  We just do not agree with their

10  interpretation from a legal perspective of the appropriate way

11  in which they must be paid out in accordance with the

12  Bankruptcy Code scheme.  And because of that, Your Honor, the

13  trust is not objecting to the $40,000 number in the amount of

14  each of the claims.  It's only, though, the amount that is

15  entitled to priority under 507(a)(4), which is clearly defined

16  in the Bankruptcy Code as $10,950 at the time that this case

17  was filed.

18         So, Your Honor, again, we would request that in

19  conjunction with these two claimants -- and I do want to advise

20  the Court, as well, that with respect to at least one of them,

21  we had understood that there was potentially an attorney

22  involved, an attorney with whom I have left multiple messages

23  and not heard back from, and because of that, Ms. Pietrantoni

24  did attempt and spoke with them.  But, we believe, Your Honor,

25  that based upon the Bankruptcy Code itself, the Trust is

1  constrained, and because of that we certainly do not take issue

2  with the $40,000, but would respectfully request that that

3  $40,000 be given the priority that it's entitled under

4  507(a)(4).

5          To the extent that each of the claimants had not

6  received the full amount of that priority, the Trust is

7  prepared to make payment in that amount and then the remainder

8  would be classified as a general unsecured claim to be

9  distributed at a later date.

10          THE COURT:  All right, thank you, Ms. Tavenner.

11          MR. ALLEN:  Your Honor?

12          THE COURT:  Yes.  Who is speaking?

13          MR. ALLEN:  This is Keith Allen.  I know I've already

14  spoken, but I just want to address one point that Ms. Tavenner

15  just made.  She said that they've tried to reach out to my

16  lawyer several times.  When I called Ann, my lawyer had been

17  out of town and I decided I would handle it myself.  When I

18  called Ms. Tavenner's office to talk to her, I was told, hey,

19  you're being represented by counsel, Ms. Tavenner is not

20  allowed to speak with you, and that's where we're at today.

21          And as far as receiving payment, I have not received

22  any payment.  This is the third time I've been told that I have

23  received payment.  I have not received any payment for this

24  $40,000.

25          THE COURT:  All right, thank you, Mr. Allen.

1          All right, the Court has before it the objection,

2    Liquidating Trust's Eleventh Omnibus Objection to Claims to

3    either reclassify to general unsecured claims, reduce to a

4    statutory cap or disallow as applicable and specifically,

5    before me now the two claims of Keith Allen and Willard

6    Elliott.

7          The Court has reviewed the pleadings in this case.

8    The Court has reviewed the objection filed by the Trust.  The

9    Court has reviewed the responses that were filed by Mr. Allen

10   and Mr. Elliott.  The Court has reviewed the agreement which is

11   the subject of this dispute, and the Court has heard the

12   argument today.

13         And based thereon, the Court certainly understands

14   that nobody is seeking something that they don't deserve.

15   Certainly, the two claimants are very deserving in this case

16   and for the reasons they articulated, but that's not the

17   Trust's dispute.  And as I understand it, the Trust is not

18   disputing that $40,000 is owed to each of the two claimants.

19   The question before the Court is, to what extent is a priority

20   status allowed for the amount of the very valid claim.  And

21   there, the Court has to look to the Bankruptcy Code in Section

22   507, specifically 507(a)(4) of the Bankruptcy Code.  507 sets

23   out priorities in a bankruptcy case.

24         And in this case we've got a contract that was

25   entered into pre-petition.  And what the case law holds, and

1  it's not in dispute, is that a pre-petition contract would

2  generally be a general unsecured claim.  It doesn't matter when

3  the time for the contract vested or when the right actually

4  became fixed.  It's when the contract -- when the claim arose

5  in the first instance and that's when the contract was

6  executed.  And so it would be, but for Section 507,

7  a pre-petition general unsecured claim.  But, in this instance,

8  since the pre-petition contract was rejected, this Court has

9  ruled in other cases and in this case, that Section 507(a)(4)

10  is implicated, and to the extent that it involves wages which

11  the Court finds that this does, that there is a statutory

12  priority that Congress has provided.

13       Now, unfortunately, Congress has capped that priority

14  and the Court cannot just, you know, willy nilly decide what it

15  would like to do in these kinds of cases.  And while I'm very

16  sympathetic to Mr. Elliott and Mr. Allen and would like to

17  award more, I cannot.  I can only do what Congress has said I

18  can do, and in this case Congress has said that I can award

19  priority status up to a statutory cap which when this case was

20  filed was $10,959, and so that's what the Court is going to do.

21  The Court is going to award a priority claim in each of these

22  cases up to that cap, and the Court is going to allow the

23  balance of the claim as a general unsecured claim.

24       Now, when I say that, Mr. Elliott and Mr. Allen, you

25  have to understand that if you have received pre-petition wages

1   already, and I heard Mr. Allen say he's not received anything,

2   but if you've received -- it could be under this contract, or

3   another contract or just wages that were not paid and were paid

4   to you late, that that will have to be factored in because the

5   cap is the cap.  It's an absolute amount that Congress has set,

6   and so all payments have to be taken into account.

7            If there is a dispute between the parties over what

8   that amount is, then the Court will certainly hear you on a

9   subsequent motion and determine, you know, what that is or what

10  it should be.  But, I would strongly encourage you to discuss

11  that amongst yourselves and resolve that because the numbers

12  should be the numbers.

13           All right, that's the Court's ruling.  Are there any

14  questions regarding the Court's ruling?

15           MR. ALLEN:  Your Honor?

16           THE COURT:  Yes?  Who's speaking please?

17           MR. ALLEN:  Ruling under 507(4) did you say?

18           THE COURT:  507(a)(4).  I'm saying that this is an

19  allowed unsecured claim for wages under (a)(4)(A) and would be

20  allowed as a priority payment under that section.

21           MR. ALLEN:  Okay, without my belaboring the Court, is

22  this considered wages -- and I may be dumb here -- but for me,

23  wages is, you know, you go to work and you earn money.  This

24  was a cash retention award which is probably why I couldn't

25  find case law for it when I was looking for it.  I guess I

1  didn't know that the Court would see it as a wage or a contract

2  that was due at time of liquidation.

3       THE COURT:  Mr. Allen, it's the only way I can allow

4  it as a priority is if I do find it as a wage, and I'm doing

5  that because it's to your advantage for me to do it.  And I

6  think that when I look at this kind of a contract, I most

7  closely construe it in that regard as a form of payment for

8  services rendered in however you want to describe it.  So

9  that's the Court's ruling.

10       Now, I will tell Mr. Allen and Mr. Elliott, the Court

11  will enter an order to this effect.  It'll be one of those

12  pieces of mail you will get that you don't want to just put in

13  a drawer, as someone has already suggested.  Look at it because

14  you do have a right to appeal my ruling if you disagree with

15  me, but you'll have only a short period of time to do that.

16  There will be 14 days from when the order is actually entered,

17  not from today.  So there'll be some additional time.  So when

18  you get that order, if you want to appeal, please understand

19  that your time clock will run, okay?

20       MR. ALLEN:  Thank you, Your Honor.

21       THE COURT:  All right, thank you both.  All right,

22  Ms. Tavenner, you may call the next matter.

23       MS. TAVENNER:  Thank you, Your Honor, and I would

24  respectfully request that the parties on the telephone be

25  excused if they so desire.

1          THE COURT:  Yes.  Mr. Allen, Mr. Elliott, while

2  you're welcome to stay on the phone, you're excused.  You don't

3  have to.

4          MR. ALLEN:  Thank you.

5          MR. ELLIOTT:  Thank you, Your Honor.

6          MS. TAVENNER:  Your Honor, that brings us to the next

7  matter on the agenda, Item 4, which Ms. Beran will handle.

8          THE COURT:  All right, Ms. Beran.

9          MS. BERAN:  May it please the Court.  For the record,

10  Your Honor, Paula Beran of the law firm of Tavenner and Beran.

11          As it relates to Item Number 4, Item Number 4 is the

12  Liquidating Trust's motion for an order approving payment of

13  claims related to the Short-Term Incentive Program.  Your Honor

14  may recall Your Honor has previously heard on a number of

15  additional hearings issues, objections, matters related to the

16  Short-Term Incentive Program, specifically, unfortunately,

17  we've been before Your Honor as it relates to the claim of Mr.

18  Beam and his entitlements under the Short-Term Incentive

19  Program.

20          In connection with this motion that's currently

21  before Your Honor the Trust believes that it has the authority

22  to make the proposed payments.  However, given the

23  circumstances, the Trust believes that it's best to make

24  complete disclosure to this Court and to all creditors and then

25  proceed.  As Your Honor may recall as it relates to the

1  Short-Term Incentive Program, on August 21st, 2009 the debtors

2  filed the debtors' Thirty-Sixth Omnibus Objection to Claims.

3  In the thirty-six omnibus objection the debtors sought the

4  disallowance of claims seeking payment of bonuses that were due

5  under the Short-Term Incentive Program on the grounds that

6  claimants had not established that they had met the

7  company-wide and personal performance goals that were necessary

8  conditions to receiving a bonus under the Short-Term Incentive

9  Program.

10         Thereafter, this Court entered orders in connection

11  with the debtors' Thirty-Sixth Omnibus Objection disallowing

12  and expunging claims for bonuses under the short-term

13  incentive.

14         On October 21st, 2009 the debtors filed the debtors'

15  Fifty-Sixth Omnibus Objection to Claims.  In the debtors'

16  Fifty-Sixth Omnibus Objection, the debtors sought to disallow

17  certain administrative claims filed relating to the Short-Term

18  Incentive Program.  Thereafter, on May 6th, 2010 the debtors

19  filed the debtors' Seventy-Fourth Omnibus Objection to Claims.

20  In the Seventy-Fourth Omnibus Objection the debtors sought to

21  reclassify certain administrative claims filed relating to the

22  Short-Term Incentive Program.

23         On March 25th, 2010 this Court determined, among

24  other things, that claims filed pursuant to the Short-Term

25  Incentive Program were not entitled to administrative status.

1   Thereafter, the supplemental Fifty-Sixth Omnibus Objection

2   order and the Seventy-Fourth Omnibus Objection order were

3   respectfully entered in these cases.  By these two orders the

4   Court reclassified contingent claims for bonuses under the

5   Short-Term Incentive Program from administrative priority to

6   unsecured claims.

7           On March 22nd, 2011 in connection with the hearing on

8   the objections related to Short-Term Incentive Programs, the

9   Court concluded that, one, if an employee was employed at

10  Circuit City on May 15th, 2009 and he or she had established

11  that he or she had met the personal criteria, then that

12  claimant was entitled to a claim for the personal criteria

13  portion of the Short-Term Incentive Program.  The applicable

14  priority for these qualified claims was not resolved.

15          On October 19th, 2011 in connection with a further

16  hearing on the objections related to the Short-Term Incentive

17  Program, the Court held that the qualified claims were not

18  entitled to administrative status and continued for hearing

19  until today's date whether such claims should be classified as

20  priority or general unsecured claims.  Following the October

21  19th hearing the Trust further reviewed all administrative and

22  priority claims filed relating to the Short-Term Incentive

23  Program to, first and foremost, confirm which individuals were

24  employed at Circuit City on May 15th, 2009 and, secondly, to

25  determine which of these individuals had also met or

1   established the personal criteria.

2          Given the Court's prior rulings, entered orders and

3   statements from the bench and the total amount at issue, the

4   trust believes in the exercise of its business judgment that it

5   is prudent to allow all Short-Term Incentive Program claims

6   filed by STIP-qualified claimant -- and when I say

7   STIP-qualified claimant, it's pursuant to what Your Honor has

8   already ruled here on 5/15/09 -- and met the personal criteria,

9   up to the personal criteria portion of such claim.  The

10  priority amount shall be subject to the statutory cap of 11

11  U.S.C. Section 507(a)(4), and anything over the statutory cap

12  shall be allowed as a general unsecured claim.

13         In connection with this, notwithstanding

14  previously entered orders, the Trust went back, made a

15  determination of all such criteria -- I mean, all such

16  claimants who met that criteria, and the Trust stands before

17  Your Honor today proposing to pay all such claims to ensure

18  that similarly-situated creditors are treated equally and/or

19  fairly as provided under the Bankruptcy Code.

20         To the extent necessary, the Trust is prepared today

21  to call and/or would proffer the testimony of Ms. Ann

22  Pietrantoni to the stand.  Specifically, she would testify that

23  because of a variety of circumstances there is currently

24  different treatment for similarly-situated creditors.  Ms.

25  Pietrantoni would also testify that in the exercise of the

34

1   Trust's business judgment the Trust believes it appropriate to

2   pay these creditors under similar terms and conditions.

3         Furthermore, Ms. Pietrantoni would testify that she

4   understands, as does the entire Trust personnel, as well as the

5   Trust as an entity, in and of itself, that a fundamental

6   principle of bankruptcy is to treat similarly-situated

7   creditors equally.  Ms. Pietrantoni would testify if called to

8   the stand that she has personally reviewed all claims filed

9   under the STIP Program as administrative and priority, that she

10  has confirmed those -- that the individuals that were there on

11  5/15/09, as well as those that have established and/or met the

12  personal criteria.

13        Ms. Pietrantoni would also testify that the total

14  amount of the STIP priority claims that would be subject to

15  this category is approximately $109,000.  She would further

16  testify that the total amount of the STIP guts, i.e. that

17  portion of the STIP claim that is where the individual meets

18  the cap and it rolls over to the general unsecured claims is

19  approximately $259,000, subject to, of course, Your Honor,

20  whatever the ultimate percentage distribution is paid to

21  general unsecured claims.

22        Ms. Pietrantoni would also testify that she compiled

23  a chart that lists every employee employed on 5/15 and filed a

24  STIP claim seeking administrative or priority treatment.  Ms.

25  Pietrantoni would indicate that the chart -- she actually was

1  the author of this chart and we are happy to tender the same to

2  the Court.  However, Your Honor, we would respectfully request

3  that this be an in-camera review of this document in that it

4  does provide detailed employee compensation, as well as

5  compensation they previously received, in order to ascertain

6  the statutory cap amount and then that amount which would roll

7  over into the general unsecured claims.

8         In addition, Your Honor, in full disclosure to this

9  Court and all parties-in-interest, there is -- we have also

10 highlighted for the Court those employees that are currently

11 employed by the Trust, so that there is no appearance of

12 impropriety.  Everybody is being treated similarly as

13 similarly-situated creditors under the Trust proposal.

14        THE COURT:  You may hand that up.

15        MS. BERAN:  Your Honor, in connection with this

16 motion --

17        THE COURT:  I note that Mr. Beam is listed on here.

18        MS. BERAN:  Mr. Beam is listed on here, Your Honor,

19 but if you look at Mr. Beam, and he was really one of the main

20 reasons that all of these parties are going to benefit from it

21 because it's really his claim that focused the Trust to look at

22 all the different treatments, and Your Honor may notice as it

23 relates to Mr. Beam, and I'm trying to find him myself, is that

24 as proposed herein, he would not receive anything as priority,

25 but all of his would be allowed as a general unsecured.

1  And the reason for that, Your Honor, is that Mr. Beam was also

2  the subject of the objection that Ms. Tavenner addressed and so

3  his priority amount is reached through the Special Cash

4  Retention Program, as opposed to this STIP.  But, his STIP as

5  proposed in this motion would -- STIP claim would be treated as

6  allowed as a general unsecured claim.

7         All of that has been explained to Mr. Beam.  Mr. Beam

8  is fine with that.  In fact, Mr. Beam has actually signed the

9  agreement so that we can make an allowed distribution under the

10 claims registry process to him in connection with his priority.

11 And although Ms. Tavenner didn't address that, that is one of

12 the main reasons why we -- from the Trust's perspective that we

13 had these agreements so that that agreement could be given to

14 KCC, the claims agent, because they take their responsibility

15 seriously and they only make -- you know, adjust the claims'

16 registry accordingly, and then payments can be made to the

17 allowed claims.

18         THE COURT:  All right.

19         MS. BERAN:  But, yes, Your Honor, Mr. Beam is on

20 here.  I apologize.  I went through and probably gave Your

21 Honor too much information, but the Trust tries to provide more

22 than less disclosure.

23         THE COURT:  That's very good, Ms. Beran.

24         MS. BERAN:  In connection with this motion, Your

25 Honor, it was noticed to all -- not all parties, but the

1   general service list has provided under the Court's case

2   management procedures order.  In connection with that, the

3   trust has received no objections.  Based on the same, Your

4   Honor, the Trust would respectfully request approval of its

5   proposal to allow and pay at the appropriate time the STIP

6   priority claims and the STIP guts, notwithstanding any order

7   previously entered to the contrary.

8           THE COURT:  All right, does any party wish to be

9   heard in connection with the Liquidating Trust's motion for an

10  order approving the payment of the claims related to the

11  Short-Term Incentive Program?

12                  (No audible response)

13          THE COURT:  All right.  Ms. Beran, the Court applauds

14  the Trust's efforts in this regard to go back and reconcile

15  this and look at the other claimants who may have been treated

16  similarly to make sure that we do have an equitable treatment

17  of similarly-situated creditors in the case.  The Court does

18  believe that these claims will be entitled to the priority

19  amount established under 507(a)(4), and so the Court is going

20  to grant your motion and approve this.

21          MS. BERAN:  Thank you, Your Honor.

22          THE COURT:  And I thank you for going back and taking

23  another look at it and getting this right.  That's excellent.

24          MS. BERAN:  Thank you, Your Honor.

25          Your Honor, Item Number 5 on the Court's agenda is

1  the --

2           THE COURT:  At this point this chart was tendered to

3  the Court for in-camera inspection.  The Court doesn't feel

4  like it needs to retain this document and I'd like to hand it

5  back to counsel just so that we --

6           MS. BERAN:  Thank you, Your Honor.

7           THE COURT:  -- make sure that it --

8           MS. BERAN:  Thank you, Your Honor.

9           Your Honor, turning now to the Item Number 5 which is

10  the Liquidating Trust's Seventh Omnibus Objection to Claims.

11  In connection with that omnibus objection under the procedures

12  previously established with Your Honor, the Trust did notice up

13  for substantive hearing one claim in connection with that

14  omnibus objection.  That was the claim of TFL Enterprises, LLC;

15  Tech for Less.  By agreement of the parties, Your Honor, this

16  matter has been continued until the December 20th omnibus

17  hearing at two o'clock.  It will be a substantive hearing on

18  the 20th, Your Honor, unless the matter is otherwise resolved.

19           THE COURT:  All right, very good.  So, I'll continue

20  this to December 20 for a substantive hearing.

21           MS. BERAN:  Thank you, Your Honor.  The objection --

22  just out of abundance of caution so we don't cause panic

23  amongst the other claimants subject to the Seventh Omnibus

24  Objection, for the record, the objection as it relates to all

25  other claims is still set for status hearing on January 5th,

1  2012.

2        THE COURT:  Very good, and the Court makes note of

3  that as well that the other claims will be carried over to

4  January 5 for status.

5        MS. BERAN:  Thank you, Your Honor.  Your Honor, Item

6  Number 6 is the Liquidating Trust's Tenth Omnibus Objection to

7  disallow certain claims.  Specifically, this dealt with

8  short-term incentive.  The objection remained outstanding as to

9  the remaining claims of Christina A. Sparks and Deborah Angel

10 Williams.  Given Your Honor's ruling as it relates to Item

11 Number 4, this objection is now moot and may be withdrawn from

12 the Court's docket.

13       THE COURT:  All right.

14       MS. BERAN:  That then brings us to Item Number 8

15 which is the Liquidating Trust's Nineteenth Omnibus Objection

16 to certain employee claims.  In connection with that omnibus

17 objection, Your Honor, there were two claims that were set for

18 substantive hearing, specifically -- actually, there are a

19 number of claims, but the two that I will first address are the

20 claims of Ms. Brandi Michelle Evans Fose and Mr. Jeffrey A.

21 McDonald.  Based on Your Honor's ruling in connection with Item

22 Number 4, the objection as it relates to those two individual

23 claims is now moot, and they may be removed from the Court's

24 docket.

25       THE COURT:  All right, the claims of Evans -- of Ms.

1  Fose and Mr. McDonald will be removed as moot.

2        MS. BERAN:  Thank you, Your Honor.

3        Your Honor, the next claim under that omnibus

4  objection which has been noticed for substantive hearing today

5  is the claim of Robyn Davis.  The Trust understands that

6  claimant, Ms. Robyn Davis, will not contest the relief sought

7  in the objection in any manner other than the filing of her

8  response.  This was confirmed in an e-mail from her counsel,

9  Ms. Jen MacLamore (phonetic) to myself.  The Trust does

10 respectfully request that the Court sustain the objection as it

11 relates to Ms. Robyn Davis.

12       THE COURT:  All right.  Does any party wish to be

13 heard in connection with the response of Robyn Davis to the

14 objection filed by the Liquidating Trust?

15                    (No audible response)

16       MS. BERAN:  Your Honor, just for the record and so

17 that there is a record, I don't believe there will be any

18 appeal of this, but I do think there needs to be a record even

19 for Ms. Davis' purposes.  In connection with that, I do have

20 Ms. Davis' claim for Your Honor.

21       THE COURT:  This is Claim Number 1756?

22       MS. BERAN:  Yes, Your Honor.

23       THE COURT:  All right.

24       MS. BERAN:  I'm trying to see where that's stamped on

25 this claim.  That is the claim at issue, Your Honor.

1          THE COURT:  All right.

2          MS. BERAN:  As it relates -- yes, Your Honor, it is

3  1756 and apparently, that got cut off when I printed it.

4          THE COURT:  All right, very good.

5          MS. BERAN:  In support of its objection to this claim

6  to the extent necessary, the Trust would proffer the testimony

7  of Ms. Pietrantoni and to the extent necessary at this point,

8  would call her to the stand.  Ms. Pietrantoni would testify

9  that Circuit City and Ms. Davis entered into a settlement

10  agreement pre-petition, that the amount sought in that claim is

11  -- are based on amounts due and owing under the settlement

12  agreement.  Based upon the same, Your Honor, the Trust would

13  respectfully request the Court sustain the objection and

14  reclassify the amount sought in that claim to a general

15  unsecured claim.

16          THE COURT:  All right, and basically, this was based

17  on an EEOC settlement and the -- so the Trust's position is

18  that these were not wages that were earned within the priority

19  time frame?

20          MS. BERAN:  Your Honor, the claim was filed as it

21  relates to an administrative claim.

22          THE COURT:  Right.

23          MS. BERAN:  And in connection with that, it was on

24  the basis of a settlement as it related to many claims that Ms.

25  Davis had made, including an EEOC claim, but other claims in

1  addition to claims brought from that perspective.  And in

2  connection with that, there was a pre-petition settlement and

3  so based on the same, the Trust believes that it's not an

4  administrative claim, but rather it should be reclassified to

5  general unsecured.

6          THE COURT:  All right, but I mean --

7          MS. BERAN:  And, yes, it's --

8          THE COURT:  -- I guess what I was getting to, it

9  shouldn't be classified as a priority claim either?

10         MS. BERAN:  Correct, Your Honor, correct.

11         THE COURT:  So many of these we've been looking at

12  and I've been saying, well, wait a second, shouldn't it be as a

13  priority claim.  I agree with you.  It's not an administrative

14  claim.  And what I was -- I wasn't connecting the dots very

15  well, but I was also suggesting that it's not a priority claim.

16  I've looked at the response, Ms. MacLamore's file, and I am

17  going to grant the -- or sustain the trustee's objection with

18  regard to Ms. Davis.  It'll be allowed as a general unsecured

19  claim.

20         MS. BERAN:  Thank you, Your Honor.

21        Your Honor, that then brings us to two additional

22  claims that were noticed for substantive hearing for today's

23  date and that is the claims of Anne Thumann and Patricia

24  Giordano.  In this instance, Your Honor, both of these claims

25  were filed on June 30th, 2009 seeking administrative status for

1  amounts allegedly due and owing under employment plans,

2  specifically, ironically today, they are -- we're seeking

3  amounts due and owing under the Special Cash Retention, as well

4  as the Short-Term Incentive Program.  As everybody is

5  well-aware, Your Honor has previously ruled that said plans do

6  not rise to the level of administrative entitlement.  Based on

7  that, Your Honor, we would indicate that these should be

8  reclassified to general unsecured claims.

9          Then, Your Honor, there's the issue of these were

10  filed on June 30th.  The bar date for general unsecured claims

11  -- for unsecured claims was May 11th, therefore these claims

12  should be disallowed as untimely filed.

13          Two points as it relates to that.  First and

14  foremost, while that may seem a bit harsh on its face, the

15  Trust does believe in the exercise of its fiduciary duty that

16  it has the -- that it should object to the lateness of the

17  claims for another fundamental bankruptcy principle and that

18  being that there is a bar date for a reason as established by

19  Congress and claimants who believe that there is a reason why

20  they were not able to file a claim by the bar date have redress

21  as articulated by the Fourth Circuit under certain standards so

22  you should not be able to do at the backdoor what you can't do

23  at the front door and that is file something before an

24  administrative bar date which is traditionally after the

25  general unsecured claims' bar date and then in connection with

1  the free classification, have that be a general unsecured

2  claim.  So, the trustee stands before you in connection with

3  its fiduciary duty and believes it is appropriate to object on

4  that basis.

5          Fortunately, I can represent to Your Honor that the

6  Trust is even happy not to just have to stand on that because

7  in this instance, both of these claimants did file general

8  unsecured claims for the same programs and those claims are

9  still outstanding and will be reviewed in connection with the

10  Trust's claims review process.  And when I say that, I would

11  also just note for the record, Your Honor, just so you know

12  that neither one of these employees were there on 5/15/09,

13  therefore, under your Court's previous --

14          THE COURT:  You took my sheets back.  I can't look at

15  that at this point and see whether they're on that sheet.

16          MS. BERAN:  Yes, Your Honor, neither one of them

17  were.

18          THE COURT:  Okay, but what you're saying is that

19  their claims have not been reviewed yet and that to the extent

20  that they would qualify under that other program, that they

21  would be treated the same way, as the ones that were on that

22  sheet if they're entitled to a priority claim, they would be

23  granted priority status.

24          MS. BERAN:  Correct, Your Honor.  Those -- they're

25  not the claims before Your Honor today.

1          THE COURT:  I understand.

2          MS. BERAN:  And I just added that because it did

3   appear kind of harsh, initially, and that we wanted to disclose

4   but nonetheless we felt we had a fiduciary duty to object on

5   that basis, but also to say we're not as harsh as it may

6   appear, there still are outstanding claims filed by these

7   claimants and we will review them and we will treat

8   similarly-situated creditors equally.  The Trust wants to make

9   sure that it does that going forward.

10          THE COURT:  All right.  And as I indicated earlier, I

11   applaud the Trust for that.

12          The Court has previously entered orders with regard

13   to late file of claims and, you know, the standard is excusable

14   neglect in order to establish or allow them as being

15   late-filed.  So the Court is going to deny these claims on that

16   ground, but that does not impact the general unsecured claims

17   that were filed by these claimants.

18          MS. BERAN:  Correct, Your Honor.

19          THE COURT:  All right, very good.

20          MS. BERAN:  Thank you, Your Honor.  Your Honor, that

21   brings us to the last matter, and maybe it's kind of an

22   appropriate tribute to Mr. Beam.  The Trust's objection to Mr.

23   Beam's claim unfortunately given the scenario of events, the

24   objection should be sustained technically from a procedural

25   standpoint because in connection with the matter that Ms.

1  Tavenner addressed, he will reach his statutory cap under the

2  Special Cash Retention Program, therefore, under the STIP

3  program which is the subject of this objection in the

4  classification of what that should be treated as, it should be

5  treated as a general unsecured claim.  So he would have, as it

6  relates to this employee program, a general unsecured claim in

7  the full amount of his personal criteria portion.

8           THE COURT:  All right, because he's being paid up to

9  the statutory cap under a separate program?

10          MS. BERAN:  Yes, Your Honor.

11          THE COURT:  All right, and does any party wish to be

12 heard on behalf of Mr. Beam?

13                   (No audible response)

14          THE COURT:  All right.  Te Court will sustain the

15 objection and by that, that means that the claim will be

16 reclassified to a general unsecured claim because he's already

17 reached the statutory cap.

18          MS. BERAN:  Yes, Your Honor.

19          THE COURT:  All right, very good.

20          MS. BERAN:  Your Honor, that concludes the items on

21 the Court's docket from the Trust's perspective, but the Trust

22 is happy to answer any additional questions Your Honor may

23 have.

24          THE COURT:  All right, is there any other business

25 that we need to take up in Circuit City today?

47

1          MS. BERAN:  Not from the Trust's perspective, Your

2    Honor.

3          THE COURT:  Okay, very good.  The Court doesn't have

4    any issues that it wants to raise other than to wish you a very

5    Happy Thanksgiving, and I extend that to the other parties that

6    are on the phone and in the courtroom.  Thank you.

7          MS. BERAN:  Thank you, Your Honor.

8          COURTROOM DEPUTY:  All rise.  The court is now

9    adjourned.

10                        *  *  *  *  *

11                 **C E R T I F I C A T I O N**

12          I, MARY POLITO, court approved transcriber, certify

13   that the foregoing is a correct transcript from the official

14   electronic sound recording of the proceedings in the

15   above-entitled matter, and to the best of my ability.

16

17   /s/ Mary Polito

18   MARY POLITO

19   J&J COURT TRANSCRIBERS, INC.        DATE:  December 5, 2011

20

21

22

23

24

25