IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re:<br><br>CIRCUIT CITY STORES, INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 08-35653 (KRH)<br>(Jointly Administered) |

### AFFIDAVIT OF RICK PARKER

STATE OF COLORADO

CITY/COUNTY OF EL PASO

Rick Parker, being duly sworn, upon his oath, deposes and states:

1. I am a founding member of Tech For Less LLC ("*Tech*") and served as the Vice President of TFL Enterprises LLC, a Delaware limited liability company ("*TFL*"), and the successor-in-interest to Tech. I was employed by Tech and/or TFL for the time period beginning October 1, 2001 through May 31, 2010.

2. I submit this declaration in support of TFL's administrative proof of claim against Circuit City Stores, Inc. (the "*Debtor*") in the amount of $104,986.36 (Claim No. 13947, the "*Administrative Claim*") and in response to the Liquidating Trust's Seventh Omnibus Objection To Claims (Reduction Of Certain Partially Invalid Claims, Disallowance Of Certain Invalid Claims And Reclassification of Certain Incorrectly Classified Claims) [Docket No. 10045] (the "*Objection*") and its accompanying reply brief filed on December 13, 2011 [Docket No. 11566] (the "*Reply*").

1

EXHIBIT A

3. The facts set forth in this Affidavit are based upon either my personal knowledge, information and belief, or in certain cases, upon the records of Tech and/or TFL (collectively referred to hereafter as "*Tech*") kept in the ordinary course of business. If called upon to testify concerning the facts stated in this Affidavit, I would testify to the same facts in the manner set forth herein.

4. Throughout 2008, Tech participated in numerous of the online auctions for the Debtor's liquidated inventory.

5. I placed bids on behalf of Tech in at least [illegible] of the aforementioned online auctions in 2008 for the Debtor's liquidated inventory. As a result, I have personal knowledge of the Debtor's online bidding and auction process.

6. On December 9, 2008, I, on behalf of Tech, submitted the winning bid at the Debtor's online auction (the "*December 9 Auction*"). The Administrative Claim relates to the December 9 Auction, pursuant to which the Debtor agreed to sell a bulk lot of certain store return items (the "*Liquidated Inventory*") to Tech.

7. In the course of the aforementioned online auctions, and specifically with respect to the December 9 Auction, I, on behalf of Tech, did not see or accept, nor was I otherwise aware of, the Electronics Merchandise Liquidation Agreement which is attached as an exhibit to the Reply.

8. With respect to the December 9 Auction, the Debtor had previously created a manifest or bill of lading (the "*Manifest*") that listed each item of the Liquidated Inventory to be sold at auction. The Manifest was available prior to the December 9 Auction for potential bidders such as Tech to review and to make a determination whether to bid on the Liquidated Inventory.

9. Pursuant to the parties' prior course of dealing, in the event that Tech submitted the winning bid at an online auction, Tech would then hire a freight carrier to pick up and deliver the purchased merchandise from the Debtor's premises to Tech's Colorado Springs, CO location.

10. Also pursuant to the parties' prior course of dealing, the Debtor agreed and consented to making purchased merchandise available for pick up/receipt by Tech's freight carrier. The Debtor also agreed and consented to using its employees to load purchased merchandise onto the freight carrier's truck(s).

11. Furthermore, Tech typically purchased thousands of merchandise items at the Debtor's online auctions. Thus, in order to accurately audit, inspect, and catalogue the large volume of such merchandise, Tech used its proprietary computer software and scanning system to inventory such merchandise. Inspecting and cataloguing large volumes of merchandise at the Debtor's premises was impractical, difficult, and burdensome for the Debtor and for Tech. Thus, pursuant to the parties' prior course of dealing, the Debtor consented to and agreed that Tech's inspection of purchased merchandise would occur once such merchandise was actually delivered to Tech's premises. Once Tech had completed its inventory of purchased merchandise, Tech would immediately notify the Debtor of any problems or issues with such merchandise.

12. With respect to the Liquidated Inventory, the Debtor and Tech adhered to the parties' prior course of dealing as outlined above in paragraphs 9 through 11.

13. Beginning on December 12, 2008 and completing on December 15, 2008, the Debtor made what it represented as the complete amount of the Liquidated Inventory available

for pick up and receipt by Tech's authorized freight carriers. The Liquidated Inventory made available by the Debtor during that time filled five (5) carrier trucks.

14. With respect to shipping the Liquidated Inventory, Tech's insurance carrier required Tech to take measures to prevent against theft or loss during the shipping process. Specifically:

    a. After the Debtor's employees completed loading the Liquidated Inventory into each of the freight carrier's trucks, the driver of each truck used a one-time, tamper-resistant lock (which lock contained a tracking number) to lock the truck's cargo area.

    b. The driver of each truck then recorded the lock's tracking number and communicated the same number to Tech. The lock could only be opened once, after which point the lock became inoperable and a new lock would need to be used.

    c. Once each lock was in place, the cargo area for the 5 trucks of Liquidated Inventory remained unopened for the duration of the trip to Tech's premises.

    d. The locks for the 5 trucks were only opened upon delivery of the Liquidated Inventory to Tech's premises, at which point Tech matched the locks with the tracking numbers originally provided to it by the trucks' drivers.

    e. This process allowed Tech not only to satisfy its insurance carrier's requirements, but also to ensure that none of the Liquidated Inventory was lost or stolen during shippping.

15. Once the Liquidated Inventory was delivered to Tech's premises, Tech took other measures to protect such inventory against theft or loss. Specifically:

    a. Tech's warehouse in which the Liquidated Inventory was stored is secured by an alarm system.

    b. Tech's warehouse in which the Liquidated Inventory was stored also has cameras in place to monitor each exit or entry way.

    c. Only authorized Tech employees were able to access such warehouse using his or her individual employee passcode, which passcodes allowed Tech to monitor when each employee entered or exited the warehouse.

16. Furthermore, the Liquidated Inventory was comprised of several thousand pieces of inventory. Tech's audit and inspection of the Liquidated Inventory revealed that the Debtor

had shorted Tech by approximately 1,757 items. The sheer volume of the missing Liquidated Inventory would have filled one (1) freight carrier truck. Based on the security system and measures in place at Tech's premises, it would have been difficult, if not impossible, for one or more of Tech's employees to steal or lose such a large volume of Liquidated Inventory without notice.

17. With respect to Tech's inspection and inventory process, Tech used its proprietary computer software and scanning system to accurately and efficiently inspect, audit, and catalogue the Liquidated Inventory. Specifically:

    a. Tech downloaded the Manifest of the Liquidated Inventory into its computer program. The computer program allowed Tech's inspection team (i.e., 3 to 5 employees) to view a modified version of the Manifest, which displayed the various types of merchandise that needed to be inventoried.

    b. However, the modified version of the Manifest used by the inspection team did not include the actual quantity for each type of merchandise in order to eliminate instances (if any) of employee theft. Only Tech's directors and officers could view the complete Manifest.

    c. Tech's inspection team electronically scanned the stock-keeping unit ("*SKU*") number for each item of the Liquidated Inventory.

    d. As items of the Liquidated Inventory was scanned, Tech's computer program would match the items with the type and amount of items listed on the original Manifest.

    e. During the entire inventory/audit process, Tech's directors and officers monitored and tracked the progress of the inventory using the proprietary computer software.

    f. Tech's computer program also assigned a unique tracking number to each scanned item of Liquidated Inventory which allowed Tech's directors and officers to track the item from the time such item was scanned to the point of sale. The unique tracking number further minimized the loss or theft of each item.

18. Tech completed its inventory audit and reconciliation of the Liquidated Inventory on June 5, 2009, approximately six (6) months after the December 9 Auction. Given the vast

5

number of Liquidated Inventory items, the disorganized manner in which such items were packaged for delivery by the Debtor's employees, and the fact that the Liquidated Inventory consisted largely of store returns in varied conditions, Tech was required to conduct a full inspection of each piece of Liquidated Inventory, a substantial undertaking requiring considerable time and effort to complete. Accordingly, the 6-month inspection and audit of the Liquidated Inventory was reasonable and necessary.

I hereby certify that the statements contained herein are true to the best of my knowledge and belief and I am aware that I am subject to punishments if any of the statements made herein are willfully false.

Executed on this 16 day of December, 2011

_____
Rick Parker

Subscribed and sworn to before me this 16th day of December, 2011

My commission expires: My Commission Expires 09-02-13

_____
Notary Public

[Notary Seal: SANDRA J. TABRON, NOTARY PUBLIC, STATE OF COLORADO]