UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA


IN RE:                        .    Case No. 08-35653(KRH)
                              .
                              .
CIRCUIT CITY STORES           .    701 East Broad Street
INC., et al.,                 .    Richmond, VA 23219
                              .
          Debtors.            .    December 20, 2011
. . . . . . . . . . . . . .    .    2:15 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Circuit City        Tavenner & Beran, PLC
Stores, Inc.                By:  PAULA S. BERAN, ESQ.
Liquidating Trust:               LYNN L. TAVENNER, ESQ.
                            20 North Eighth Street, 2nd Floor
                            Richmond, VA 23219


For the Directors           Sands Anderson
and Officers                By:  WILLIAM A. GRAY, ESQ.
Defendants:                 1111 E. Main Street, Suite 2400
                            Richmond, VA 23219-3500


For TFL Enterprises,        Hirschler Fleischer
LLC:                        By:  MS. SHEILA DELA CRUZ, ESQ.
                            The Edgeworth Building
                            2100 East Cary Street
                            Richmond, VA 23223


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

<u>**I N D E X**</u>

|                                              | PAGE |
|----------------------------------------------|------|
| <u>**WITNESSES FOR THE TRUST**</u>           |      |
| HEATHER FERGUSON                             |      |
|   Direct Examination by Ms. Beran  | 46   |
|   Cross Examination by Ms. deLa Cruz | 55 |

| **EXHIBITS** | | ID. | EVD. |
|--------------|--------------------------|-----|------|
| Circuit City 1 | TFL's Claim | 7 | 7 |
| Circuit City 2 | Electronic Merchandise | | |
| | Liquidation Agreement | 52 | 52 |
| Claimant's A | Rick Parker's Affidavit | 43 | -- |
| Claimant's B | Paul Furlow's Affidavit | 44 | -- |

1          COURTROOM DEPUTY:  All rise.  The court is now in

2  session.  Please be seated and come to order.

3          MS. BERAN:  In the matter of Circuit City Stores,

4  Inc. hearing on Items 1 and 2 as set out on proposed agenda.

5  Good afternoon, Your Honor.

6          THE COURT:  Good afternoon.

7          MS. BERAN:  For the record Paula Beran of the law

8  firm of Tavenner & Beran.  With me this afternoon at counsel's

9  table, Your Honor, is Mr. Jeffrey McDonald who is the client

10 rep today given that Ms. Bradshaw is out for the week and Your

11 Honor has previously established that she cannot be in more

12 than two places at one time so.

13         THE COURT:  I think we've established that as a

14 matter of law.

15         MS. BERAN:  So Mr. McDonald is stepping in today for

16 Ms. Bradshaw.  In addition, Your Honor, at counsel's table with

17 me this afternoon is Ms. Heather Ferguson.  She also is

18 employed by the Circuit City Liquidating Trust and I do believe

19 Ms. Tavenner is in the courtroom as well today.

20         THE COURT:  She is.  I recognize her.

21         MS. BERAN:  Your Honor, as it relates to today's

22 agenda there are only two items on the agenda and at the

23 request of Mr. Gray we respectfully request that we go out of

24 order and take the second item first.

25         THE COURT:  Okay.

1             MS. BERAN:  In connection with that matter, Your

2    Honor, it's a motion to dismiss in the underlying adversary

3    proceeding of <u>Siegel v. Michael E. Foss, et al.</u>  In connection

4    with the adversary proceeding, Your Honor, the parties do

5    intend to and are establishing the parameters and exchange of

6    information as it relates to mediating the underlying adversary

7    proceeding.

8             So in connection with the same, Your Honor, we'd

9    respectfully request that this motion be continued again until

10   -- for a status hearing until the February 21st omnibus hearing

11   date in this case.

12            THE COURT:  All right.  Mr. Gray?

13            MR. GRAY:  Thank you, Your Honor.  Good afternoon.

14   William Gray with Sands Anderson on behalf of the director and

15   officers defendants and moving party.

16            That is correct.  We do ask that it be set over for a

17   status to February 21st.  I believe mediation is set for

18   January 23rd I believe.

19            At the February 21st hearing we do anticipate if it

20   hasn't been settled that we ask for a final hearing on our

21   motion.

22            THE COURT:  All right.  Very good.  So that will be a

23   substantive hearing on the 21st that we're going to --

24            MR. GRAY:  No.  No, Your Honor.  The 21st will be a

25   status --

1          THE COURT:  Status.

2          MR. GRAY:  -- again.  And then we would ask for a

3  final hearing, substantive hearing.  On the 21st we'll ask for

4  that final hearing.

5          THE COURT:  Okay.  Very good.  I got it.  Okay.

6  Thank you very much.

7          MR. GRAY:  Thank you.

8          THE COURT:  All right.  So this matter will be

9  continued until the 21st.

10          MS. BERAN:  Thank you, Your Honor.  Your Honor, then

11  that brings us to the first item on today's agenda and, Your

12  Honor, I apologize.  I neglected to indicate to the Court that

13  an amended agenda was filed earlier this morning.

14          In connection with that amended agenda it merely

15  lists certain documents that were filed by the claimant in

16  connection with this Item Number 1.  They were filed Friday and

17  I inadvertently did not include them in yesterday's agenda so

18  an amended agenda was filed today.

19          THE COURT:  Okay.  I have not seen the amended

20  agenda.  Do I need to see it or is it?

21          MS. BERAN:  Your Honor, as it relates to the amended

22  agenda it just merely indicates the affidavits that were filed

23  Friday evening -- Friday afternoon by Ms. deLa Cruz.

24          THE COURT:  Okay.  And I have seen the affidavits.

25          MS. BERAN:  That I would represent to the Court is

1  the only difference in the agenda.

2            THE COURT:  Okay.  Very good.

3            MS. BERAN:  Thank you, Your Honor.  Your Honor, that

4  brings us to Item Number 1 which is the notice and objection to

5  claim.  The liquidating trust's seventh omnibus objection to

6  claims (reduction of certain partially invalid claims,

7  disallowance of certain invalid claims, and reclassification of

8  certain incorrectly classified claims).

9            And specifically, Your Honor, as it relates to the

10  seventh omnibus objection pursuant to procedures previously

11  approved by Your Honor, the objection as it relates to one

12  specific claim in that omnibus objection was noticed for

13  substantive hearing at the omnibus hearing in November.  But by

14  agreement of parties it was continued until this omnibus

15  hearing date.

16            So we are standing before Your Honor as it relates to

17  the objection of that one claim filed by Tech For Less, LLC and

18  the trust's objection to that one claim.

19            In connection with that matter, Your Honor, the

20  liquidating trust objected to an administrative claim in the

21  amount of $104,986.36 filed by Tech For Less, LLC or TFL on the

22  grounds that the debtor's books and records showed no liability

23  to the claimant.

24            Your Honor, a true and correct copy of the claim has

25  been previously submitted to the Court, but I do have a copy

1    today for Your Honor's ease of reference and/or for evidentiary

2    purposes to the extent the same is necessary.

3              THE COURT:  All right.

4              MS. BERAN:  Your Honor --

5              THE COURT:  I assume that the claimant has no

6    objection to the receipt of the proof of claim?

7              MS. DELA CRUZ:  No, Your Honor, we had it as Exhibit

8    A to ours too so.

9              THE COURT:  Okay.  So this will be marked as Circuit

10   City Exhibit 1.

11             MS. BERAN:  Thank you, Your Honor.  Your Honor, as

12   alleged in the claim and its response, TFL's basis for the

13   claim is that it purchased a bulk quantity of electronic goods

14   from the debtor pursuant to an online auction and allegedly did

15   not obtain the correct amount of goods.

16             In connection with the same, Your Honor, the trust

17   submits that the evidence today will demonstrate that back in

18   December of 2008 TFL did place a winning bid of $530,000, no,

19   $530,020 for end of life return or salvaged merchandise with

20   the retail value of $2,765,971.62.

21             The evidence will also demonstrate that before TFL

22   could make a bid and again before TFL could be awarded as

23   winning purchasers, the computer system/program required TFL to

24   accept a set of terms and conditions.

25             In connection with those terms and conditions, Your

1  Honor, the terms and conditions as articulated in the trust

2  reply specifically provide at Section 3, delivery and removal

3  of merchandise.

4        The merchandise shall be made available to purchaser

5  for receipt during normal business hours at the Circuit City

6  facility identified in the invoice relating to such

7  merchandise.

8        Purchaser shall be solely responsible for the removal

9  of the merchandise from Circuit City's premises and for all

10 shipping arrangements (including without limitations permits

11 and licenses), expenses, and labor.

12       Purchaser's employees, equipment, and property and

13 that of purchaser's agent's, enter and remain on Circuit City's

14 premises entirely at purchaser's risk as regards any and all

15 hazardous excepting only those found to be caused by Circuit

16 City's sole negligence.

17       While on Circuit City's premises purchasers,

18 employees, and agents must observe Circuit City's rules and

19 regulations.

20       Similarly, Your Honor, pursuant to those terms and

21 conditions found at Section 4, the title and risk of loss

22 provision provided, title to the merchandise shall remain with

23 Circuit City until purchaser takes possession of the

24 merchandise at Circuit City's location identified on the

25 invoice.

1          Purchaser expressly acknowledges that the risk of

2     loss and liability for the merchandise shall pass to purchaser

3     upon purchaser or its agent's receipt of the merchandise at

4     Circuit City's premises.

5          Purchaser or its agent shall have the right to

6     inspect the merchandise prior to accepting possession to ensure

7     compliance with the terms of the invoice.

8          Purchaser expressly acknowledges and agrees that it

9     shall have no right to refuse or return the merchandise after

10    accepting possession of the merchandise at Circuit City's

11    premises.

12         Your Honor, the evidence will also establish that

13    thereafter, and I don't think that this is disputed in any way,

14    shape or form, that TFL paid for the goods, took delivery of

15    the goods.

16         And then six months after the auction ended, after

17    Circuit City had announced its complete liquidation, after

18    Circuit City had let go of a majority of its employees, did TFL

19    allege that it did a reconciliation and claims it was shortened

20    items alleging that the retail value of those items it actually

21    received and accepted totaled only $2,218,980.03 and not the

22    $2,765,971.62.

23         The evidence will thereafter demonstrate that TFL

24    then filed an administrative claim for $104,900.86 -- $986.36.

25    I apologize.  I'm having trouble articulating my numbers today.

1    But that's 104,986.36.  Which amount represents the percentage

2    of claims shortfall of merchandise.

3         Your Honor, the trust's position is relatively simple

4    and straightforward as it relates to this administrative claim.

5    We believe the evidence today will demonstrate that this claim

6    should be denied for the following reasons.

7         First and foremost, Your Honor, pursuant to the

8    agreement between the parties the purchaser had the ability to

9    inspect, had the requirement to inspect at Circuit City's

10   location.

11        If it did so or if it did not it assumed the risk of

12   loss at that point in time and therefore pursuant to the

13   party's own contract this claim is without merit.

14        Secondly, Your Honor, the trust would submit that as

15   it relates to the Uniform Commercial Code, that the Uniform

16   Commercial Code makes it clear that merchandise is accepted

17   unless within a reasonable period of time the items are

18   rejected.

19        The trust would respectfully submit that a six month

20   period to allege that you did not receive over 20 percent of

21   what you thought you were buying, and I think, you know, that

22   would be you were buying four truckloads, five truckloads and

23   only received four truckloads, that a reasonable amount of time

24   is not six months to make the determination that you were

25   allegedly shorted and entire truckload of goods.

1          So by the terms of the contract, Your Honor, as well

2    as by the Uniform Commercial Code, the trust would respectfully

3    request or submit that this claim should be denied.

4          Furthermore, Your Honor, the trust's position is TFL

5    hasn't even alleged, let alone submitted enough allegations

6    and/or be able to present evidence to demonstrate that it was

7    somehow Circuit City's fault that it no longer, six months

8    later, has possession of these goods.

9          For example, Your Honor, what happened in those six

10   months?  That's not Circuit City's burden.  Circuit City's

11   burden was to deliver possession of these goods at location.

12   Six months later, who knows?  There could have been employee

13   loss, there could have been employee theft.

14         Every company has some type of inventory loss and

15   there is nothing as it relates to that inventory loss or other

16   type of employee theft in connection and therefore we

17   respectfully request that on those grounds, even the

18   allegations in and of themself by TFL, are insufficient to

19   establish a claim.

20         And finally, Your Honor, as it relates to the trust's

21   position on this claim.  To the extent Your Honor were to

22   determine those three things were not to be ruled in favor of

23   the trust, and we're specifically just pleading this in the

24   alternative, Your Honor, because we feel strongly as it relates

25   to our position on those three arguments.

12

1          It's undisputed TFL says that the variance was a plus

2     or minus five percent.  And so if Your Honor were to determine

3     that there was no contract between the parties and that the --

4     that six months was a reasonable period of time and that TFL

5     has established that it acted reasonably and with requisite due

6     diligence in rejecting these goods six months later, their

7     claim would only be from a percentage perspective, $82,000 --

8     excuse me -- $82,620.12.

9          In connection with this as we've discussed, Your

10    Honor, on Friday evening TFL filed certain affidavits in

11    support of its claim.

12         Your Honor, the trust is not standing before you

13    trying to play hide the ball.  In fact in other instances the

14    trust has even agreed, consented to the admission of

15    affidavits.

16         But unfortunately it cannot do so in this instance

17    and in fact we stand before Your Honor vehemently objecting to

18    the admissions of these affidavits.

19         If an affidavit asserts certain facts and they don't

20    contain hearsay and they're undisputed and/or the trust doesn't

21    have any reason to doubt the facts therein, the trust wants

22    Your Honor to have the facts before it and ascertain what the

23    law provides according to those facts.  And in previous

24    instances we have allowed such affidavits and not objected to

25    them.

1          However, in this instance we never alleged that we

2    would accept affidavits, the trust never alluded that it would

3    accept affidavits, and stands before you today saying that the

4    very nature of these affidavits are what the law provides for

5    and protects in saying that are inherently untrustworthy of

6    affidavits.

7          Specifically, Your Honor, the affidavits must be

8    struck from the record and not considered evidence in this

9    instance for the very reasons affidavits, declarations are not

10   normally accepted.

11         They contain hearsay and the trust has not been given

12   an opportunity to cross examine the declarant, thus making

13   these affidavits extremely prejudicial as to what they don't

14   say as well as to clarifications what was said by the

15   declarants therein.

16         Based on that, Your Honor, we would respectfully

17   request the affidavits be not considered today, not accepted

18   into evidence, and specifically noted from the Court's record

19   to the extent there was appeal that they were not considered

20   because in some instances when things go up on appeal if they

21   were merely filed on the Court's docket Appellate Courts have

22   looked at those as evidence that the Court could have

23   considered and in this instance we would specifically request a

24   finding that they weren't considered.

25         In support of its objection, Your Honor, the trust is

1  prepared to call a witness with firsthand knowledge of the

2  facts of this matter and in connection with that the trust

3  would call Ms. Ferguson.  But I will step aside so that Ms.

4  deLa Cruz has a chance for opening.

5          THE COURT:  Before you cede the podium the Court has

6  a question.

7          MS. BERAN:  Certainly, Your Honor.

8          THE COURT:  And it deals with your objection to the

9  affidavits.

10         MS. BERAN:  Yes, Your Honor.

11         THE COURT:  How does your objection reconcile with

12  Rule 9017 of the Federal Rules of Bankruptcy Procedure?

13         MS. BERAN:  Your Honor, from our perspective as it

14  relates to these affidavits, in connection with the Rules and

15  incorporating motions for summary judgment and that, if they

16  are probative and do not contain hearsay and/or the trust has

17  had some reasonable opportunity to cross examine the declarant,

18  we wouldn't stand before Your Honor objecting.

19         But in this instance they were filed Friday evening,

20  the trust has had no opportunity to cross examine the

21  declarant, and we believe they contain hearsay.

22         THE COURT:  And then --

23         MS. BERAN:  And we're not standing --

24         THE COURT:  Because this is a contested matter of

25  claim objection.

1          MS. BERAN:  Correct, Your Honor.

2          THE COURT:  All right.  And so clearly Rule 9017

3  would apply.

4          MS. BERAN:  Right, but Courts have viewed 9017 as it

5  relates to the probative and prejudicial nature of affidavits.

6  When a motion -- and, Your Honor, specifically when a motion

7  relies on facts outside the record the Court may hear the

8  matter on affidavits or may hear it wholly or partially on oral

9  testimony or on deposition.

10         May.  The Court is not required to hear it on

11 affidavits.  And in connection with hearing an affidavit the

12 Courts have looked to whether the affidavits themself contain

13 hearsay and/or whether this is an instance where from a summary

14 judgment perspective whether there was an opportunity, you

15 know, they've analyzed it whether there was an opportunity for

16 the declarant to be cross examined.  And in this instance the

17 trust has had neither opportunity.

18         THE COURT: All right.  Thank you.  Ms. deLa Cruz?

19         MS. DELA CRUZ:  Sheila deLa Cruz here on behalf of

20 TFL Enterprises, LLC.  Your Honor, just as a housekeeping

21 matter I also have the administrative claim of my client as an

22 exhibit.  I don't know if you want to take it at this time or

23 rule that as a joint exhibit, the claim that you've already

24 received, but I have it available.

25         THE COURT:  I don't need to receive it twice into

1    evidence.  It is --

2                  MS. DELA CRUZ:  Understood.

3                  THE COURT:  -- an exhibit and you can refer to it.

4    It's been marked as Circuit City Number 1 and it is a part of

5    the official record.

6                  MS. DELA CRUZ:  Your Honor, just to open, there are

7    facts that are not in dispute here.  For example, the trust's

8    objection and their subsequent reply brief do not raise any

9    objections to TFL's claim on the basis of its classification.

10                 There were certain groupings that the trust

11   recognized claims as either needing to be reclassified,

12   reduced, invalid, et cetera.

13                 So, Your Honor, in this case should the Court make

14   the determination that TFL is entitled to all or part of its

15   claim, I'd ask that the Court rule it as an admin expense under

16   503(b) of the Bankruptcy Code because it simply was not

17   disputed in the objection or the reply brief by the trust.

18                 It's also undisputed that TFL paid $530,020 for the

19   liquidated inventory in question.  And, Your Honor, I'd ask

20   that that fact also be deemed as undisputed.

21                 To my understanding, Your Honor, the trust initially

22   objected just because its books and records did not contain

23   that amount as due and owing to TFL Enterprises.  That was the

24   basis of their objection and a week before --

25                 THE COURT:  Well not that amount but the --

17

1          MS. DELA CRUZ:  The 100 --

2          THE COURT:  -- 104,900.

3          MS. DELA CRUZ:  Correct.  The administrative claim

4  amount which is roughly $104,000.  You know, Your Honor, a week

5  before this hearing they did file a reply brief that seemed to

6  also then outline four additional arguments to bolster its

7  original objection, Your Honor.

8          And to my understanding that's, one, there is this

9  contract called an Electronic Merchandise Liquidation Agreement

10 that purportedly governs the parties' transactions and in this

11 case it related to the December 9th auction.

12         Your Honor, I would also object to the admissibility

13 of this agreement depending upon what their witness has to say

14 because if you read the agreement it is an absolute boilerplate

15 contract that doesn't identify the parties, it doesn't identify

16 the transaction, the date.

17         It also mentions an Exhibit A which is supposed to

18 show you what items are being sold at this auction.  And the

19 copy that was provided by the trust, that agreement does not

20 have an Exhibit A and I believe, Your Honor, that the Exhibit A

21 is explicitly mentioned I think in Section 1 of the agreement.

22         The agreement purports to apply to this transaction

23 but essentially has no markers that, aside from the witness's

24 word, that this agreement ever applied to the December 9

25 transaction.

1          As a result I believe that it is hearsay and not

2    admissible as evidence in this hearing.  And again I understand

3    that they're going to put on a witness so that may be a

4    determination Your Honor has to make.

5          THE COURT:  That would be the time to object.

6          MS. DELA CRUZ:  Correct.  Your Honor, even if the

7    agreement is allowed into evidence, we're not saying that it

8    even applies here because the claim that TFL is making is an

9    administrative expense claim for items that it did not receive,

10   not for items that it accepted.  TFL doesn't have an issue with

11   inventory that was accepted.

12         So, similarly, the UCC provisions that are stated by

13   the trust also aren't really applicable here because we're not

14   actually objecting to what we got, we're objecting to what was

15   not given and that's the basis for the administrative expense

16   claim.

17         Now, Your Honor, the agreement if you were to

18   consider it as evidence in this case, the agreement also has

19   obligations that flow from Circuit City to the purchaser and in

20   this case TFL Enterprises.  And that is Section 1 says that

21   they shall sell the inventory listed in Exhibit A, which they

22   did not do.  Obviously we don't even have the Exhibit A so who

23   can be certain?

24         Section 3 says the merchandise shall be made

25   available to the purchaser for receipt during normal business

1    hours.   And our contention, Your Honor, is that those

2    obligations initially on Circuit City's part were not met.

3           And where Circuit City is the first party to breach

4    material terms of this agreement, under well established

5    Virginia law, the first breaching party cannot then turn around

6    and use the contract that they breached against the other party

7    to the contract.

8           And, Your Honor, I am happy to cite you to cases with

9    respect to the first breach rule.  I also do have a copy of a

10   Bankruptcy Court case out of the Western District of Virginia

11   to that effect.

12          So, Your Honor, even if the agreement does apply,

13   we're not even saying that we're objecting to liquidated

14   inventory that we received.  It's basically the breach of

15   Circuit City initially by not making those other items of

16   inventory available for our receipt that we are objecting to

17   and that that's the basis of our claim.  Your Honor, so even

18   if this agreement does apply, they were the first breaching

19   party.

20          Subsequent to that, the parties' related business

21   dealings, the course of performance that we see here, I believe

22   are sufficient to modify the terms of the express agreement if

23   it were to apply and should control.

24          In Virginia terms of an agreement can be modified by

25   the parties' subsequent course of dealing or performance.   I

1  cite the Court to <u>In Re Franklin Company</u>, 418 B.R. 176 and

2  that's (Bankr. E.D. Va. 2009) in this district for that

3  premise.

4        The parol evidence rule would typically exclude

5  extrinsic evidence as to course of dealing doesn't apply in

6  this case where in light of all of the circumstances the

7  parties' course of dealing after the contract indicates a

8  departure from the express terms of the agreement.

9        And here we're not disputing that we were responsible

10 for delivering or shipping the goods, but what the trust hasn't

11 disputed is that we were talking a lot about a lot of goods

12 here.

13       I believe Ms. Beran previously mentioned five

14 truckloads of goods that were shipped by TFL.  Five truckloads

15 of goods would have made it not only impractical, but

16 burdensome and disruptive for Circuit City if TFL were to

17 conduct their audit and inspection of the goods at Circuit

18 City's location.

19       If you had to follow the letter of the agreement,

20 this Electronic Merchandise Liquidation Agreement, if you

21 followed it to a T, TFL would have been on Circuit City's

22 location, premises, for five to six months versus getting out

23 of Circuit City's way.  We all know they were liquidating

24 inventory.  This was not the only sale going on.  It was around

25 the holiday season.

1          TFL and the debtor consented to this course of

2   conduct which allowed TFL to ship the goods that were made

3   available to it, not all, but what was made available to them,

4   to TFL's site at which point they were able to use their own

5   computer system, their proprietary software, to do the audit.

6          Now I would submit to the Court, Your Honor, that it

7   was for the benefit of the debtor and it was also for the

8   benefit of TFL to carry out the shipping, the delivery, the

9   transport of the goods and the subsequent inspection in this

10  process.  Did it follow this agreement?  No.  But the course of

11  dealing and the practicality of the situation made it so.

12         And I would argue to the Court that this course of

13  dealing and performance of the parties did modify the agreement

14  and was for the benefit of those parties.

15         Your Honor, Ms. Beran did mention that UCC, in

16  particular Sections 2-602 and 2-606, control here.  I would

17  disagree with Ms. Beran respectfully in that if you look at

18  those sections it would support the Court's ruling in favor of

19  TFL because it says, the rejection of goods must be within a

20  reasonable time after delivery.  That's Section 2-602.

21  Delivery means the voluntary transfer of the goods to wherever

22  the location is.

23         Section 2-601 very similarly also says, acceptance of

24  goods occur when the buyer after a reasonable opportunity to

25  inspect the goods signifies that they will accept the goods or

1 despite any non-conformity they'll accept the goods or if the

2 buyer fails to make an effective rejection that the acceptance

3 of the goods doesn't incur until after the buyer has had a

4 reasonable opportunity to inspect the goods.

5          As counsel has already mentioned, we're talking about

6 five freight carrier loads, five loads of goods.  They were

7 items that were customer returns, there were open packages,

8 they were shipped in a highly disorganized manner with the

9 loading done by Circuit City's employees.

10          And, Your Honor, it is not unusual and it's not

11 unreasonable that especially when the shipment, et cetera, took

12 place around the holiday season that it would take several

13 months to catalogue and properly audit and reconcile five

14 truckloads of goods.

15          The trust has pointed to no case law that references

16 that this was an unreasonable time given the circumstances and

17 I would submit to Your Honor that in fact five to six months

18 was a reasonable turnaround to determine what inventory was

19 there and what was not.

20          And at any rate, we're not contesting the acceptance

21 of goods that were already received.  We're here because we did

22 not receive goods.  How can TFL accept goods that were never

23 made available to it for pickup and delivery?

24          In addition to those sections of the UCC, Your Honor,

25 also like to point out a couple of different other sections.

23

1  Section 2-507 of the UCC states that the tender of delivery is

2  a condition precedent to the buyer's duty to accept the goods.

3       Again, the administrative claim is not based on goods

4  it received, it's based on goods that were not made available

5  to TFL for delivery and shipping.  And we've stated in our

6  administrative claim and/or our response to the objection that

7  we did not receive almost 1800 items of inventory.

8       Furthermore, the trust seems to skip over what the

9  debtor's obligations are under Section 2-503 and that is with

10  respect to delivery it requires the debtor to put and hold

11  conforming goods at the buyer's disposition and to give the

12  buyer any notification that's reasonably necessary to allow the

13  buyer to take delivery.

14       Here the debtor did not make 1,757 items that TFL

15  purchased available for receipt and delivery.  They should not

16  now be entitled to receive a windfall for selling items that it

17  didn't actually provide.  And this is even if you took in the

18  five percent plus or minus variance.  It would be a huge

19  windfall, approximately $104,000.

20       And finally with respect to the UCC.  Assuming that

21  the Court finds that TFL did accept the liquidated inventory,

22  even inventory that was not made available to it for delivery,

23  TFL can rightfully revoke that acceptance under UCC Section

24  2-608.  And that section provides that a buyer can revoke

25  acceptance of goods whose non-conformity substantially impairs

1  its value to the buyer if the buyer were to accept it.

2         It also says on the reasonable assumption that its

3  non-conformity would be cured or without discovery -- or

4  without discovery of the non-conformity if the buyer's

5  acceptance was reasonably induced either by the difficulty of

6  discovering that non-conformity before acceptance.

7         And again, Your Honor, here we are talking about

8  truckloads of goods.  It would be next to impossible to wholly

9  accept all of those goods without being able to do an

10  inspection and properly audit those goods.

11         Under these circumstances and under UCC 2-608 TFL is

12  allowed to revoke any acceptance that the debtor perceives it

13  was given once it was finally able to inspect the goods.

14         Finally, Your Honor, the trust then throws out the

15  allegations that it's somehow TFL's fault that it's missing

16  almost 1800 items of liquidated inventory.  Your Honor, there

17  is no basis to even think that that amount of goods was somehow

18  lost, misplaced or stolen.

19         Under Bankruptcy Rule 3001(f) TFL's administrative

20  claim is prima facie evidence of the claim's validity and its

21  amount.  The exhibits --

22         THE COURT:  Well until there's an objection filed.

23         MS. DELA CRUZ:  Correct, Your Honor.

24         THE COURT:  Once an objection is filed then the

25  burden shifts to you.  You have the burden of going forward.

1          MS. DELA CRUZ:  Well and I would argue, Your Honor,

2   that the burden doesn't shift to me yet because the trust as

3   the objecting party has to provide enough evidence to overcome

4   that prima facie validity in amount of the claim and --

5          THE COURT:  And where does it say that?

6          MS. DELA CRUZ:  Your Honor, I would cite you to a

7   couple of cases.  McGee v. O'Connor out of the Fifth Circuit.

8   In that case it provides that the moving or the objecting party

9   to the claim bears the burden of presenting enough evidence to

10  overcome the prima facie effect of the claim.

11         Also there is a case out of the Third Circuit, In Re

12  Allegheny International.  The objector must present evidence

13  that is equal enforced to the prima facie evidence supporting

14  the claim before the burden shifts back to the claimant.

15         And in this case to throw out allegations that TFL is

16  somehow responsible for the loss of this amount of goods

17  without any type of factual support or basis I would submit is

18  not sufficient to overcome the presumptive validity of TFL's

19  administrative claim.

20         In fact we set forth in the claim substantial detail

21  and supporting documentation regarding liquidated inventory and

22  our reconciliation of it which showed a missing, a large amount

23  of missing items.  None of these are refuted in terms of the

24  rejection.  Now they're just saying those items must have just

25  been lost.

26

1          Well and I know we're going to get to this.  The

2  affidavits that I did file on Friday, particularly the

3  affidavit of Rick Parker --

4          THE COURT:  Well before we get to the affidavits --

5          MS. DELA CRUZ:  Yes.

6          THE COURT:  -- I want to focus on this burden of

7  proof thing here and drill down on that.  The cases that you

8  cited to me do not deal with administrative claims.  Those deal

9  with regular general unsecured claims don't they?

10         MS. DELA CRUZ:  I don't know that there is a

11 difference between an administrative claim filed and another

12 proof of claim filed.  I believe the Bankruptcy Rule -- and we

13 did file this as a proof of claim with the debtor's claimed

14 agent -- Bankruptcy Rule 3001(f) refers to the claims that are

15 filed but doesn't make a distinction between what types of

16 claim.

17         So I would submit, Your Honor, that it's the trust as

18 the objecting party that has to provide you with enough

19 evidence to overcome the presumptive validity of the claim.

20         THE COURT:  Well hasn't the Fourth Circuit said that

21 with regard to actually they refer to as a request for payment

22 under 503 as opposed to proofs of claim under 502 that the

23 party making the request bears a heightened burden of proof

24 with regard to administrative claims.

25         MS. DELA CRUZ:  And, Your Honor, even under the

**WWW.JJCOURT.COM**

1    heightened burden, for the trust to basically just throw out

2    unsupported allegations that it is somehow TFL's fault that

3    this -- this size of inventory was either lost or stolen

4    without any type of basis whatsoever, I would submit to the

5    Court is just that, baseless allegations.

6         THE COURT:  All right.  Now you can move on to the

7    affidavit.

8         MS. DELA CRUZ:  Your Honor, we submitted -- we filed

9    with the Court two affidavits.  The first one was for Paul

10   Furlow who is still at TFL Enterprises and serves as one of

11   their officers at the company.

12        The second affidavit is with respect to a gentleman

13   named Rick Parker.  He was one of the founding members of Tech

14   For Less and Tech For Less was the original party to this

15   transaction.  TFL Enterprises is an affiliate and Tech For Less

16   timely and properly transferred their claim to TFL Enterprises

17   just so there's no confusion.

18        Mr. Parker was a founding member and vice president

19   of the company and was also a member of Tech For Less up until

20   very recently when he moved on to other employment.

21        Specifically with respect to the trust's allegations

22   that the inventory must have been lost or stolen or somehow

23   misplaced, the Parker affidavit in Paragraphs 14 to 17 -- and

24   just for your ease of reference, Your Honor, I have the

25   original affidavits if you need to flip to them very quickly.

1          THE COURT:  I've got them right in front of me.

2          MS. DELA CRUZ:  Okay.  Paragraphs 14 through 17 of

3    the Parker affidavit outlines why the probability is that the

4    inventory simply was not received versus lost or stolen.  Like

5    most other companies for insurance purposes they were required

6    by their insurance carrier to insure that against or protect

7    against theft or a loss during the transit of the goods.

8          And in this particular case they utilized one-time

9    locks that were designed to be tamper resistant to lock each

10   truck as it was completely loaded and ready to transport the

11   liquidated inventory to TFL's site.  The locks were only broken

12   once the goods made it to TFL's premises.

13         And then the Parker affidavit in Paragraphs 14

14   through 17 then discuss what happens to the liquidated

15   inventory once it gets to Tech's site.  And that is it's placed

16   in a secured warehouse equipped with an alarm system, video

17   cameras to monitor exit and entry points.

18         And employee's themselves have unique passcodes to

19   enter the building so those passcodes were also used to monitor

20   those employees that moved in and out of the building.

21         And, Your Honor, this amount of goods, 1,757 items,

22   the pure bulk of that would make it difficult, next to

23   impossible for employees to take out a little bit of time.

24   That amount is roughly equivalent to one truckload of goods.

25         So it is highly improbable according to the Parker

1   affidavit that these goods were stolen by employees, that they

2   were lost during shipment.

3        And once they are inventoried and scanned into TFL's

4   computer system, the items are -- TFL is able to track each

5   item from the time it enters the warehouse and it's scanned to

6   the point of sale to a third party.

7        According to Mr. Parker who has extensive knowledge

8   of this process, it is highly unlikely that this amount of

9   inventory was lost or stolen without TFL's insurance carrier or

10  TFL itself becoming aware of that situation.

11       I would like to very briefly just address the

12  objection to the affidavits.  Your Honor, I do agree with

13  respect to Rule 9017 that allows you to accept into evidence

14  depositions or affidavits made outside of the court for

15  purposes of a contested hearing.  I would also like to --

16       THE COURT:  It says for purposes of a motion.

17       MS. DELA CRUZ:  Well and, Your Honor, I do agree with

18  your previous statement that this is a contested -- it is a

19  contested hearing.  The objection I believe can be construed as

20  a motion effectively to dismiss or disallow my client's claim

21  and --

22       THE COURT:  That's the ultimate question, isn't it?

23  Whether this is a motion or whether it's something different.

24       MS. DELA CRUZ:  I believe, Your Honor, that they have

25  moved to dismiss and disallow my client's claim and I would

1    submit --

2              THE COURT:  Well they have objected to your claim.

3              MS. DELA CRUZ:  Correct.  It is an objection and

4    seeks to wholly disallow my client's claim which I would

5    construe as a motion with respect to the Court.

6              THE COURT:  Why isn't Mr. Parker here today?

7              MS. DELA CRUZ:  Mr. Parker is no longer employed by

8    TFL and I simply did not have the ability to persuade him to

9    fly down for purposes of this hearing.  And it's also my

10   understanding that the Court does not generally allow witnesses

11   to be cross examined by telephone for good reason.

12             THE COURT:  No, I would not, but you could have taken

13   a de bene esse deposition wherever he is.

14             MS. DELA CRUZ:  To that point, Your Honor, this

15   claim, we've had the past nine months to try and resolve this

16   claim and during this resolution process TFL's counsel did

17   raise the issue of conducting discovery.

18             And ironically it was I believe, and I'm not saying

19   that it was Ms. Beran or Ms. Tavenner in the situation, but my

20   understanding is that the trust did not believe that discovery

21   at this point was necessary.

22             We offered discovery and the opportunity to find out

23   these particular facts and in the nine months that the parties

24   were trying to resolve this issue we weren't taken up on our

25   offer in terms of discovery in that these were largely legal

1   issues that could be argued.

2          THE COURT:  Yes, but you can depose your own

3   witnesses and for purposes of presenting.  You put the other

4   side on notice that, you know, somebody lives 100 miles outside

5   the jurisdiction and that you need to have this testimony in

6   and so therefore you notice up a de bene esse deposition and

7   they can either appear or not appear and you can get your

8   evidence in under oath and they have the opportunity to cross

9   examine and then you can submit that deposition.  And Courts

10  accept that kind of deposition in these kinds of hearings.  So

11  I'm just curious why you didn't do that.

12         MS. DELA CRUZ:  Your Honor, if I had been involved in

13  the past nine months with respect to this claim, I assure you

14  that that would have been an option that I could have explored.

15         And at this point in time with respect to whether or

16  not this particular party was made available for a deposition,

17  I also am not opposed to the suggestion of taking this under

18  advisement or continuance for purposes of allowing cross

19  examination.  However, I suspect that the trust is probably not

20  inclined to continue the hearing based on that.

21         I would like to point out to the Court, Your Honor,

22  that not only under 9017 can you accept the affidavits, but I

23  would also like to point out Rule 807 which is the residual

24  exception to the hearsay rule.

25         And, Your Honor, in terms of that rule it discusses

1   that the statement is offered as evidence of a material fact.

2   The statement is more probative on the points for which it's

3   offered than any other evidence which, as we just discussed,

4   the trust has not provided any evidence whatsoever with respect

5   to their allegation that the items were lost, misplaced,

6   stolen, and as such this affidavit does provide the Court with

7   probative evidence to that particular point and others.

8          And that the general purposes of the rules and the

9   interest of justice will be best served by admission of the

10  statement into evidence.

11         Your Honor, I believe that the facts that are

12  contained in both Mr. Furlow's affidavit and Mr. Parker's are

13  substantial in nature, they balance the playing field and allow

14  the Court an understanding of the circumstances that this

15  transaction took place under.

16         And, Your Honor, I do take your point with respect to

17  a de bene esse deposition and had I been able to become

18  involved in this case earlier, I assure you that would have

19  occurred.

20         However, I would just submit to Your Honor that

21  another basis to allow these affidavits is the residual

22  exception rule.  And if the affidavits are not allowed it is

23  extremely prejudicial to my client because of their side of the

24  story here.

25         And, again, the trust's baseless allegations about

1  the items being lost or stolen, we can shed some light on that

2  with respect to these affidavits.

3          THE COURT:  Now why isn't Mr. Furlow here?

4          MS. DELA CRUZ:  Mr. Furlow with respect to these

5  particular issues did not have personal knowledge of the theft

6  or loss or these procedures in place.  So my primary concern is

7  with the information that Mr. Parker could have provided.  And

8  I was fortunate to be able to get him to sign this affidavit

9  under penalty of perjury and have it notarized.

10         THE COURT:  Okay.  So Mr. Furlow doesn't have the

11 personal knowledge, so how can I accept the information in the

12 affidavit in any event?

13         MS. DELA CRUZ:  Mr. Furlow doesn't have personal

14 knowledge of the particular loss or theft measures that I just

15 discussed.  That is all in Mr. Parker's affidavit.

16         Mr. Furlow and actually Mr. Parker's affidavit do,

17 however, explain that they both have personal knowledge of the

18 online bidding process that was employed by Circuit City and

19 specifically their online website Trading Circuit.

20         Both men have actually bid personally at these

21 auctions and both then have personal knowledge as to the

22 processes that take place when you submit your bid.  As a --

23         THE COURT:  Okay.  Because I had asked why he wasn't

24 here.  You had said because he doesn't have personal knowledge

25 of these facts.

1          MS. DELA CRUZ:  I mis --

2          THE COURT:  And so why don't we go back to that

3    question then.

4          MS. DELA CRUZ:  -- I misspoke with -- I was referring

5    specifically to the loss and theft issue.

6          THE COURT:  I understand.  Okay.

7          MS. DELA CRUZ:  The information contained in both of

8    their respective affidavits, they in fact do have personal

9    knowledge of those statements, they just differ from man to

10   man.

11         THE COURT:  Okay.  Now why isn't he here though?

12         MS. DELA CRUZ:  Mr. Furlow is not here because of

13   from my understanding the company's financial situation and

14   inability to provide the cost to actually get him here.  And

15   the next best thing upon my involvement was to be able to take

16   -- submit these affidavits.

17         THE COURT:  All right.

18         MS. DELA CRUZ:  So unfortunately, Your Honor, it was

19   more of a cost effectiveness measure for Mr. Furlow.

20         THE COURT:  All right.  And then also going to the

21   affidavits, let's talk first about the Rick Parker affidavit.

22   Who prepared this affidavit?

23         MS. DELA CRUZ:  Your Honor, I prepared the affidavit

24   based on my discussions with Mr. Parker and what he had told me

25   about the processes with respect to protecting the inventory,

1 et cetera.

2          I asked him to review the affidavit for accuracy

3 which he did and after he reviewed it I requested that if he

4 was comfortable that he sign and notarize the affidavit.

5          But he did provide that information to me.  He did

6 review the affidavit and did sign and have it notarized to that

7 effect.  And the same goes with Mr. Furlow's testimony.

8          THE COURT:  You prepared that one as well?

9          MS. DELA CRUZ:  I did as well.

10          THE COURT:  Okay.  Anything further?

11          MS. DELA CRUZ:  The last argument with respect to the

12 five percent variance in terms of the administrative claim.

13 Your Honor, my client actually does not have an issue with

14 taking into account that five percent variance should the Court

15 make the ruling that there is some portion of admin expenses

16 owed to TFL.

17          However, my calculations differ from the trust's

18 calculation.  I show that with the five percent the

19 administrative claim would be reduced to 99,749.76 and not

20 82,630.12 as submitted by the trust.

21          And I calculated that number simply by going through

22 the original calculations that gave rise to the original

23 administrative claim amount.  So it's a reduction of about

24 $5,236 from the administrative claim which is five percent.

25          So we differ in amount but not in terms of allowing

1  for the five percent variance if that's how Your Honor would

2  rule.

3          THE COURT:  All right.  Very good.  Anything further?

4          MS. DELA CRUZ:  No, Your Honor.

5          THE COURT:  All right.  Before we proceed I want to

6  address the burden of proof issue just so that the parties know

7  where the Court is coming from on this.

8          With regard to a claim, once an objection has been

9  filed, the Court has ruled previously that there is no prima

10 facie value to the claim.  The claimant always bears the burden

11 of proof with regard to its claim.

12         And then with respect to administrative claims, it's

13 a heightened burden of proof and so the claimant in this case

14 has a heightened burden of proof that it must bear in this

15 proceeding.

16         So I just wanted you to know that that is the

17 backdrop that I'm going to be proceeding on as we go forward

18 with the hearing today.

19         Now and then I will rule specifically with regard to

20 the admission of any evidence at the time that the actual

21 document or evidence is offered.

22         Who's going to go first with regard to the evidence

23 today?

24         MS. DELA CRUZ:  It's your objection.

25         MS. BERAN:  Your Honor, the trust is prepared to put

37

1  a witness on.  But as it relates to what Your Honor just

2  indicated as it relates to the burden, I believe the burden is

3  on the claimant.  But I'm happy to proceed.

4        THE COURT:  I agree.  Do you have evidence that

5  you're going to offer?

6        MS. DELA CRUZ:  Your Honor, we have already --

7        THE COURT:  Your proof of claim is already in.

8        MS. DELA CRUZ:  Yes.

9        THE COURT:  So that is in evidence.

10        MS. DELA CRUZ:  We have already addressed the

11  evidentiary concerns here.  The only other evidence that I do

12  have would be the original affidavits and then true copies of

13  those affidavits and --

14        THE COURT:  You wish to offer one of the affidavits

15  at this time?

16        MS. DELA CRUZ:  I wish to actually offer both of the

17  affidavits.

18        THE COURT:  Well I assume there's going to be an

19  objection so why don't we do it the right way.

20        MS. DELA CRUZ:  Sure.

21        THE COURT:  Offer an affidavit and then, you know,

22  you can tell me why I should accept it and Ms. Beran will tell

23  me why I should not.

24        All right.  I've been handed the affidavit of Rick

25  Parker and you wish now to offer that into evidence as an

1    exhibit?

2                    MS. DELA CRUZ:  Yes, Your Honor, as Exhibit B.

3                    THE COURT:  Okay.  Any objection?

4                    MS. BERAN:  Yes, Your Honor.

5                    THE COURT:  All right.

6                    MS. BERAN:  The trust would object.  Your Honor, we'd

7    object first and foremost on the basis that the affidavits are

8    not appropriate means of evidence before Your Honor here today.

9    Specifically Your Honor asked about 9017 and in connection with

10   9017 I specifically reference (c) but I would bring Your

11   Honor's attention as well to 9017(a).

12           And specifically in getting to that I would

13   respectfully submit to Your Honor if you look at 9014(d) as in

14   dog, 9014 specifically provides, testimony of witnesses with

15   respect to disputed material factual issues shall be taken in

16   the same manner as testimony in an adversary proceeding.

17           And then going back to Rule 9017 which incorporates

18   their Rules of Civil Procedure Rule 43, at trial witness

19   testimony must be taken in open court unless excused by a

20   federal statute, federal reg or other federal Rules of Civil

21   Procedure.

22           In this instance I don't believe there's been any

23   representation that live testimony has been excused as could

24   potentially be excused under certain exceptions such as, and

25   what I was referencing to before, Your Honor, was the case law

1  that goes to motions for summary judgement and the like and I

2  was trying to make it akin to that and the weighing that Courts

3  do in connection with that.

4         But even before you get to that I would respectfully

5  submit that this is not the type of motion practice,  instead

6  as indicated by the rules it's testimony of witnesses.

7         THE COURT:  And even there if there is a conflict in

8  the affidavits then there would be a fact in dispute that has

9  to be heard at trial.

10        MS. BERAN:  Correct, Your Honor, it deals with the

11  material fact and we really do have material facts in dispute.

12  To the extent -- and once again so that would be the overriding

13  objection as it relates to the affidavit.

14        Specifically then, Your Honor, to the extent Your

15  Honor were to determine that affidavits in and of themselves

16  were appropriate, we respectfully request as it relates to an

17  objection to the affidavit on the basis of foundation, I think

18  the only foundation in this is it's based on either his

19  personal knowledge, information, and belief or in certain

20  instances upon the records of TFL kept in the ordinary course

21  of business.

22        It really doesn't talk about what role he had at the

23  company, what involvement he had in these actions, what type of

24  due diligence he did in these actions, the very types of things

25  that go to the foundation that the rules beg for live testimony

1 so that those things can be ascertained through cross

2 examination of the witness.

3        So based on that, Your Honor, we object to the

4 admission of this affidavit on the basis of lack of foundation.

5 Furthermore, Your Honor, we would object to the admission of

6 these affidavits on the basis of hearsay.  By the very nature

7 of them they are hearsay.  We would also based on the basis of

8 hearsay within hearsay.

9        Even if Your Honor were to determine that the

10 affidavit was acceptable, to the extent it has hearsay

11 contained herein that is inadmissible under the Federal Rules

12 of Evidence.

13        And lastly, Your Honor, with all due respect to Ms.

14 deLa Cruz, I refrained from objecting because I don't

15 necessarily think objection is appropriate during opening

16 argument, but so the record is clear.

17        To the extent the affidavits are admitted into

18 evidence over all those objections, the affidavits speak for

19 themself, Your Honor, and Ms. deLa Cruz' representations as to

20 what the affidavits say is not the appropriate thing.

21        I do believe in certain instances there were things

22 alleged or represented that aren't necessarily in these

23 affidavits.  And that could have been based on other

24 discussions Ms. deLa Cruz had.

25        But nonetheless, the affidavits to the extent

1  therein, they speak for themself and only as it relates to the

2  items that are referenced therein.

3          For those reasons, Your Honor, we would respectfully

4  request that the affidavit of Mr. Paul Furlow not be accepted

5  into evidence.

6          THE COURT:  Parker.

7          MS. BERAN:  I apologize then, Your Honor.  Parker,

8  oh, Parker, Your Honor, I apologize.  I have even more

9  objections to Parker.

10         Mr. Parker's foundation is even more astonishing as

11 it relates to the things he alleges.  I mean once again from a

12 foundation perspective, was Mr. Parker personally on the truck

13 to witness that this lock was put onto the truck?  Was Mr.

14 Parker personally there when the truck arrived at the location?

15 Did Mr. Parker have personal knowledge as it relates to all

16 these things?

17         Mr. Parker makes a lot of summary conclusions in

18 connection with this affidavit and once again the trust has no

19 ability to cross examine him and to ascertain what his actual

20 personal involvement was in connection with all the facts that

21 Mr. Parker puts on this affidavit.

22         So from that perspective in addition to the other

23 reasons I've previously articulated, we respectfully request

24 that the Court not allow into evidence the Parker affidavit.

25         THE COURT:  Okay.  Thank you.  Anything further, Ms.

1  deLa Cruz?

2          MS. DELA CRUZ:  Your Honor, with respect to the

3  hearsay rule, again I'd ask that the Court do consider Rule 807

4  which is the residual exception in terms of information

5  materials that do carry probative evidence.

6          Your Honor, in terms of the Parker affidavit

7  specifically, the affidavit does say that he was a founding

8  member vice president of Tech For Less and, I'm sorry, the

9  founding member of Tech For Less and the vice president of TFL

10 Enterprises.

11         As a director and officer, Your Honor, he did submit

12 this affidavit based on his personal knowledge of the overall

13 workings of the company which does include satisfying insurer

14 obligations with respect to large shipments and so forth.

15         He did run the day to day operations of the company.

16 I do submit that while he doesn't have explicit personal

17 knowledge as actually picking up a box and putting it in the

18 truck, he does have personal knowledge as to how these

19 shipments took place, what measures were taken to ensure

20 against theft or loss, what measures were taken in terms of the

21 warehouse and his employees to protect the merchandise.

22         And I submit that that is sufficient foundation for

23 this particular affidavit and what it seeks to do which is to

24 explain to the Court how it is highly improbable that this

25 amount of items simply were lost, mishandled or stolen, Your

1    Honor.

2           And again I'd submit to the Court that this is a

3    contested matter very similar to a motion for summary judgment

4    in terms of Rule 9014 and Rule 9017(c) does allow you the

5    discretion to take affidavits in particular that were made

6    outside of the court.

7           THE COURT:  Do you wish to address Rule 9014(d)?

8           MS. DELA CRUZ:  Again, as I said previously, Your

9    Honor, the parties did have the nine months to engage in the

10   discovery.  We were willing to engage in discovery and make

11   these types of facts, witnesses, information, et cetera,

12   available and that opportunity was missed.

13          THE COURT:  All right.  Thank you.  All right.  With

14   regard to the affidavit of Rick Parker the Court is going to

15   sustain the objection that has been made to the admissibility

16   of the affidavit.

17          The Court is not going to consider the affidavit of

18   Mr. Parker pursuant to Rule 9014(d).  It does contain disputed

19   material, factual material and those issues are in dispute as I

20   said.  And so it's clearly inadmissible for this purpose.

21          For the purposes of the record, I'm going to have the

22   affidavit of Mr. Parker marked for identification purposes only

23   as Claimant's Exhibit A.

24          MS. DELA CRUZ:  Your Honor, with respect to the

25   affidavit of Mr. Furlow I will save the Court the trouble with

1  respect to that particular affidavit because I suspect, unless

2  Your Honor tells me otherwise, that it would render -- you

3  would render the same result with respect to that affidavit.

4          THE COURT:  The ruling is going to be the same but

5  you may tender the affidavit if you would like to have it

6  marked for purposes of identification only to be part of the

7  record.

8          MS. DELA CRUZ:  Your Honor, the affidavits as they

9  were filed with the Court I believe are already part of the

10  record.  But I will enter -- I will admit it just for

11  identification purposes to be consistent.

12          THE COURT:  Okay.  Do you wish to hand that up?

13  Okay.  The Court is now in receipt of the affidavit of Paul

14  Furlow and for the reasons that the Court has just announced on

15  the record concerning the affidavit of Mr. Parker, the Court

16  will sustain the objection to the receipt of the affidavit of

17  Mr. Furlow.

18          The Court will, however, mark the Furlow affidavit as

19  Claimant's Exhibit B for identification purposes only.

20          MS. DELA CRUZ:  Your Honor, with respect to the UCC

21  provisions that are in play, I just have copies of each of

22  those provisions that were either cited by the trust counsel or

23  by myself and I'd ask that the Court take judicial notice of

24  those sections and for ease of reference I have copies of those

25  UCC provisions.

1          THE COURT:  The Court will receive them and I don't

2   think they need to be admitted as exhibits as they are --

3          MS. DELA CRUZ:  Just as to judicial notice and --

4          THE COURT:  -- matter of law and, you know, the Court

5   of course is bound to apply the law.

6          MS. BERAN:  Your Honor, from the trust's perspective

7   the trust has -- I believe Your Honor has articulated the

8   trust's position.  To the extent Your Honor is going to review

9   the facts as Your Honor determines them and then apply it to

10  the applicable law and to the extent Your Honor finds a

11  particular provision applicable, Your Honor will apply it.

12         THE COURT:  All right.

13         MS. DELA CRUZ:  It's mostly for ease of reference for

14  you.

15         THE COURT:  And for which I thank you.  And the Court

16  is well familiar with Article 2 of the UCC as well.

17         MS. DELA CRUZ:  Your Honor, at this time that

18  concludes the evidence the claimant's already admitted and

19  we've discussed the affidavits.

20         THE COURT:  All right.  Very good.  Thank you.  Ms.

21  Beran, you wish to proceed?

22         MS. BERAN:  Yes, Your Honor.  Your Honor, just for

23  the record, at this point in time the trust would respectfully

24  submit that the movant has not met its burden that is required

25  as it relates to establishing its claim.  With that being

1   preserved, we would call Ms. Heather Ferguson.

2           THE COURT:  Okay.  Ms. Ferguson, please come forward

3   and be sworn.

4           HEATHER FERGUSON, TRUST'S WITNESS, SWORN

5                   DIRECT EXAMINATION

6   BY MS. BERAN:

7   A    Good afternoon.

8   Q    Good afternoon, Ms. Ferguson.  Could you please state your

9   name and address for the record?

10  A    Yes, ma'am, it's Heather Ferguson, 3174 Old Church Road,

11  Mechanicsville, Virginia, 23111.

12  Q    Thank you.  Ms. Ferguson, where are you currently employed

13  and in what capacity?

14  A    I am currently employed with the Circuit City Liquidating

15  Trust.  I'm the vendor claims manager there.

16  Q    And as vendor claims manager what types of

17  responsibilities are -- what are your responsibilities?

18  A    I oversee the reconciliation and review of the claims

19  filed by our vendors, both expense vendors, merchandise

20  vendors, service parts, miscellaneous claims.

21  Q    Were you ever employed by the Circuit City stores, and if

22  so, in what capacity?

23  A    Yes, I was.  I was hired with Circuit City in April of

24  1997.  My last title with Circuit City was accounting group

25  manager, payables and receivables.  And I was with Circuit City

Ferguson - Direct/Beran                                        47

1   through the confirmation last fall when we became the trust.

2   Q    And in connection with your various capacities at Circuit

3   City, what if any familiarity did you have with what is

4   commonly referred to as Circuit City's Trading Circuit?

5   A    I was familiar with Trading Circuit.  Trading Circuit is

6   basically a business that Circuit City operated in order to be

7   able to conduct sales, online auctions of inventory that was

8   just overstocked or maybe becoming obsolete, customer returns.

9        So I was familiar with the actual startup of that

10  process and of that business.  I oversaw and actually developed

11  the processes for the initial reconciliation of how we would

12  determine that we received both sales and then subsequent

13  payments from PayPal for that business.

14  Q    And what if any involvement did you have with the staff or

15  the team of -- at Circuit City's Trading Circuit?

16  A    Well when any new business enterprise was launched we

17  would become -- the accounting team would get involved with the

18  business owners in order to understand how are the sales going

19  to work, how are we going to record it, where the credit was

20  being given.

21       I also became very involved as I managed the credit

22  card charge back area of Circuit City.  I wanted to understand

23  what kind of precautions as a matter of accounting and legal

24  guidelines would be in place to protect us from any kinds of

25  charge backs with sales.

1          So I met with the business owners of Trading Circuit

2   on a number of occasions and generally just worked with them

3   monthly for the reconciliation to ensure that they did get

4   credit for their sales and more importantly that we got the

5   cash from PayPal for those sales as well.

6   Q    And in connection with this interaction, could you please

7   describe for the Court what Circuit City's Trading Circuit was?

8   A    Yeah, it was the business that we operated online.  It was

9   an online auction that was available for bidders to be approved

10  with Trading Circuit's business owners and they could bid on

11  products that were available.

12          They would log into our Trading Circuit website and

13  place bids and if they won the auction then they would receive

14  an email notification saying that they had won and arrange

15  payment through PayPal.

16  Q    Ms. Ferguson, do you recognize the document that has just

17  been handed to you?

18  A    Yes, ma'am, I do.

19  Q    And, Ms. Ferguson, what is that document and how do you

20  recognize it?

21  A    It's our Electronic Merchandise Liquidation Agreement.

22  Basically this is the agreement, the terms and agreements that

23  were online on Trading Circuit.  For any bidder to access the

24  Trading Circuit website they had to acknowledge and agree and

25  accept.

1          Just like any other online purchase, you know when

2    you go online to make a purchase you have to click at the

3    bottom the I accept, you could not advance past the initial

4    screen of our website without acknowledging these terms and

5    agreements.

6          Furthermore, for any bidder to actually complete a

7    bid to, you know, to look at a group of inventory and say yes I

8    want this, here's how much, they had to again agree and accept

9    to the terms and agreements.

10         These were part of our accounting legal controls, I

11   mean just standard business practices for us.  And it was

12   online.  These were provided to me in the normal course from

13   the business operators of Trading Circuit and again it was a

14   systematic process.  You simply had to click I accept in order

15   to make any sort of bid.

16         MS. BERAN:  Your Honor, at this point in time the

17   trust would respectfully submit into evidence or ask for the

18   admission into evidence the Electronic Merchandise Liquidation

19   Agreement.  And I apologize, Your Honor, it does say Exhibit C

20   up top because it was attached as an exhibit to our reply last

21   week.  But I believe if so admitted it would be identified as

22   the Trust Exhibit Number 2.

23         THE COURT:  Any objection, Ms. deLa Cruz?

24         MS. DELA CRUZ:  Your Honor, again I object with

25   respect to this particular agreement in that it appears to be

Ferguson - Direct/Beran                                    50

1  incomplete with respect to the December 9 auction that is the

2  basis of the administrative claim.  It purports to have an

3  Exhibit A that would be attached to it, which isn't, that would

4  have identified the liquidated inventory sold.

5          And there has been no testimony with respect to the

6  time frame of when this process or when this agreement was

7  utilized to actually give any further light as to whether it

8  was in place and therefore binding against the parties, Your

9  Honor.

10          Also this just appears to be the boilerplate

11  agreement that does not identify this purchase that we have in

12  front of us by any means, Your Honor.  So again I object on the

13  basis of hearsay and a continuing lack of a foundation.

14          THE COURT:  All right.  Anything further, Ms. Beran?

15          MS. BERAN:  Your Honor, I would respectfully submit

16  that the proper foundation has been laid as to her personal

17  knowledge of this and it being part of the system of the

18  Trading Circuit.

19          I would ask if I can ask Ms. Ferguson one additional

20  question to tighten up the foundation.

21          THE COURT:  You may.

22  Q   Ms. Ferguson, based on your experience with Trading

23  Circuit and your involvement in the process there, do you know

24  if this agreement would have been part of the electronic

25  processing that was taking place in or on or about -- I

1  apologize, one moment -- December 9th, 2008?

2  A    Yes, ma'am, it was part of every Trading Circuit sale.

3         MS. BERAN:  Your Honor, based on that we once again

4  respectfully request into evidence, as well as the previous

5  foundation laid by Ms. Ferguson, what has been marked as Trust

6  Exhibit Number 2.

7         THE COURT:  Do you wish to address the issue that Ms.

8  deLa Cruz has raised with regard to the attached Exhibit A

9  referenced in Paragraph 1 of the agreement which she says is

10 because that exhibit is not here it's an incomplete exhibit.

11        MS. BERAN:  Certainly, Your Honor.

12 Q    Ms. Ferguson, in connection with your involvement in the

13 process of Trading Circuit, was it common practice for Trading

14 Circuit to keep any type of paper documentation of each and

15 every transaction that was generated online through the auction

16 bidding process at Trading Circuit?

17 A    We did maintain records of the transactions, but not of

18 the actual acceptance of these agreements.

19 Q    And why did the Circuit City Trading Circuit not maintain

20 any type of documentation of a specific acceptance?

21 A    You simply could not get around it.  I mean you had to

22 click you accept or it -- it wasn't subject to human error, it

23 was just systematic.  You had to click I accept and agree to

24 the terms in order to advance in the website.

25        MS. BERAN:  Your Honor, based on the same we'd

Ferguson - Direct/Beran                                52

1  respectfully request entry into evidence of Exhibit 2.

2          THE COURT:  All right.  Anything further, Ms. deLa

3  Cruz?

4          MS. DELA CRUZ:  Your Honor, I assume now that this

5  just goes to the weight and credibility of the evidence.  But

6  again this appears to be an incomplete exhibit in connection

7  with this particular transaction which is important that there

8  is no exhibit attached to this.

9          I again submit that there has been no knowledge laid

10 in terms of personal knowledge with respect to this transaction

11 and why this is an incomplete exhibit.  So I stand on my

12 objection.

13         THE COURT:  Thank you.  And the Court is going to

14 admit the exhibit.  The Court does, you know, find it goes to

15 the weight of the evidence and certainly, Ms. deLa Cruz, you'll

16 have an opportunity to cross examine the witness at the

17 appropriate time.  So this is going to be marked as Circuit

18 City Number 2.

19         MS. BERAN:  Thank you, Your Honor.

20 Q    Ms. Ferguson, based on your experience with the Circuit

21 City Trading Circuit, are you aware of any variances to the

22 computer generated terms and conditions acceptance?

23 A    No, ma'am, I'm not.

24 Q    And why is that?

25 A    You just simply could not get around it.  It was a true

Ferguson - Direct/Beran                                        53

1   false.   You could not pass without accepting the terms and

2   agreements.

3   Q     Ms. Ferguson, what if any involvement did you have in

4   connection with your employment at Circuit City with Trading

5   Circuit's account reconciliations?

6   A     Monthly we reconciled the receivables to ensure that all

7   of the sales that were reported that we actually received the

8   cash from PayPal.

9         Bidders would go online and when they did win the bid

10  all payments had to be processed through PayPal.   They would

11  transfer wires into our bank account.   We would book those

12  receivables and then ensure -- there are actually three

13  different locations where the merchandise was stored where the

14  winning bidder could come and pick up their product.

15        And we would allocate sales and revenue and credit

16  basically monthly to those locations.

17  Q     In connection with your involvement in this process, if

18  amounts or a refund were owed, how would they be so noted and

19  then how would they thereafter be paid?

20  A     I also managed the expense payable department and any

21  credits, any refunds that would have been due to a vendor would

22  have been processed through that area.

23        In addition with the credit card charge back

24  receivable responsibilities, we maintained a terminal, an

25  actual point of sale terminal to swipe credit cards or to be

Ferguson - Direct/Beran                          54

1  able to issue refunds.

2          So any type of refund like that that would have

3  needed to have been manually processed would have gone through

4  my team.

5  Q    What if any opportunity have you had to review the Circuit

6  City's stores books and records as it relates to refunds and/or

7  reconciliations in connection with the Trading Circuit

8  operations?

9  A    When we reviewed and reconciled Claim 13947 filed by Tech

10  For Less, we reviewed our books and records.  I searched for

11  any indication of any liability at all due to this company or

12  related to this transaction.  I was unable to find any

13  documentation, any hint at all of anything going wrong with

14  this transaction.

15          To just even give them the benefit of the doubt, I

16  reached out and contacted one of the former business owners

17  that was directly involved with Trading Circuit from the

18  internet sales, like managing the internet sales perspective,

19  and inquired if he had any emails and was aware of any

20  documentation or just was aware of any dispute at all.  He had

21  no emails, was not aware of any documentation or dispute from

22  Tech For Less.

23          MS. BERAN:  Your Honor, if I may beg the Court's

24  indulgence, I wanted to confer with Ms. Tavenner on one item.

25          THE COURT:  You may.

Ferguson - Cross/deLa Cruz                                    55

1            MS. BERAN:  Thank you, Your Honor.  Ms. Ferguson, I

2    have no additional questions for you right now.  If you could

3    please answer any questions that Ms. deLa Cruz may have and/or

4    that the Court may have.  Thank you.

5            THE COURT:  Do you wish to cross examine this

6    witness?

7            MS. DELA CRUZ:  Yes, Your Honor.

8                        CROSS EXAMINATION

9    BY MS. DELA CRUZ:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    I didn't hear you reference any personal involvement with

13   the -- with respect to the December 9th auction.  Is that

14   because you did not directly oversee that particular bidding

15   process?

16   A    Correct.  I didn't have any role in accepting which bids

17   won or any direct involvement in that aspect of it.

18   Q    So until this claim came up you were not aware of TFL

19   Enterprises or anything having to do with this transaction on a

20   personal level, is that right?

21   A    Well, no, the sale would have gone through my monthly

22   reconciliation process.  I was not aware of any sort of dispute

23   over the quantity or the goods received until the claim was

24   filed.

25   Q    Because it was undisputed that they actually paid $530,020

1  for the inventory that was supposed to be purchased, isn't that

2  right?

3  A    That is correct.

4  Q    With respect to this Electronic Merchandise Liquidation

5  Agreement, where is the Exhibit A that would have been attached

6  to this agreement and that would have been binding on this

7  particular transaction?  Do you have any knowledge as to where

8  it is?

9  A    Well let me see if I can kind of help with that.  What

10 this agreement is, is it is the template agreement in order to

11 be able to place bids or to complete a bid online.

12        The way that it actually reads is it says that, let

13 me see, under Bullet Point 1, sale and purchase.  Circuit City

14 shall sell and purchaser shall purchase the merchandise as more

15 particularly set forth in an invoice provided by Circuit City

16 to purchaser substantially in the form of Exhibit A attached

17 hereto.

18        I believe Exhibit A was simply a template, like a

19 boiler, to show an example of what an invoice would look like.

20 Q    But to your knowledge you don't have any copies of

21 invoices that would have been a part of this agreement?  Do you

22 have that with you today?

23 A    I do not have that with me today.

24 Q    Were you aware that TFL Enterprises had been making online

25 bids on Trading Circuit since 2006?

Ferguson - Cross/deLa Cruz                              57

1  A    Not really.

2  Q    Is it possible that in checking on this that you couldn't

3  contact every person who could have possibly had dealings with

4  TFL to determine the issues relating to this particular

5  reconciliation, any people that they had direct contact with

6  over at Trading Circuit?

7  A    No, I contacted the actual manager who would have been

8  involved with any type of dispute.

9  Q    Isn't it possible that there was more than one person that

10 would have been involved in this dispute with respect to the

11 shipping and delivery and loading issues that had to be

12 coordinated between TFL and Circuit City?

13 A    I won't say that anything is impossible, but it's highly

14 improbable that this employee would not have been aware of a

15 dispute of this magnitude.

16 Q    But it is possible that there could have been more than

17 one -- more than two people involved in the coordination of

18 more than five truckloads of goods, isn't that right?

19 A    Well I think that's a different question.  There certainly

20 could have been more people involved with the coordination of

21 the goods and delivery of the goods in the warehouses for TFL

22 to pick up.

23 Q    That could have been involved in this particular

24 transaction including the account manager, correct?

25 A    Involved in the transaction, yes.  But involved in the

Ferguson - Cross/deLa Cruz                               58

1   dispute, highly, highly improbable that this manager would not

2   have been aware of a dispute of this magnitude.

3   Q     Is the manager still employed by the trust along with you?

4   A     No, he is not.

5   Q     Okay.

6           MS. DELA CRUZ:  That's all I have, Your Honor.

7           THE COURT:  Anything further for this witness?

8           MS. BERAN:  No, I do not have anything additional,

9   Your Honor.

10          THE COURT:  Okay.  You may step down, Ms. Ferguson.

11          MS. FERGUSON:  Thank you.

12          THE COURT:  Thank you for your testimony this

13  afternoon.

14          MS. FERGUSON:  Thank you.

15          THE COURT:  Do you have any further evidence?

16          MS. BERAN:  No, Your Honor.

17          THE COURT:  Okay.  Ms. deLa Cruz, I'll hear your

18  argument.

19          MS. DELA CRUZ:  Your Honor, it's very simply, because

20  I know that we've taken up a lot of your time this afternoon,

21  with respect to the Electronic Liquidation Merchandise

22  Agreement.  The fact that it may have been the governing

23  contract against the parties does not take away from the

24  obligations that the debtor had at the time to uphold its end

25  of the contract and that specifically to make the liquidated

1 inventory that was purchased by TFL available for receipt and

2 for delivery.

3        Your Honor, in this case not only the agreement but

4 also the provisions of the UCC that we had previously gone over

5 would support the Court's ruling that it wouldn't be possible

6 for TFL to accept goods that were never provided to it, that

7 were never made available to the debtor -- from the debtor for

8 delivery, Your Honor.

9        So even with respect to this agreement, I submit,

10 Your Honor, that the debtor, not Tech For Less, actually

11 breached the terms of this agreement and under Virginia law

12 they should not be entitled to enforce the provisions of the

13 agreement against Tech For Less at this time.

14        It was a material breach, Your Honor, on the part of

15 the debtor by not making all of the liquidated inventory, give

16 or take the five percent variance, available for pickup and

17 delivery.

18        So I would submit, Your Honor, that the agreement

19 itself does not bear a whole lot of weight in terms of whether

20 or not TFL is entitled to this administrative expense claim.

21 And even if it was, the course of dealing that the parties

22 undertook in this particular circumstance would modify the

23 terms just for practicality reasons.

24        Again, we're talking about a very large number of

25 items that were to be delivered to TFL Enterprise's location

1   and in order to be able to do that efficiently and to not be a

2   burden or disruptive to the debtor, because they were also at

3   the debtor's location, the delivery was made very quickly, Your

4   Honor, in order to allow TFL to then at its own location to

5   inspect, audit, and reconcile the inventory.

6           Ms. Beran did allude to an argument that the five to

7   six months was too long to do an inventory, to do a

8   reconciliation.  And again, Your Honor, I point to the

9   circumstances of the transaction of the case itself.

10          Again, Circuit City was in bankruptcy by that point.

11  They were liquidating as much inventory as they could and it

12  was around the holiday season.  We're talking about five

13  truckloads of goods that actually were delivered, should have

14  been six, but the sheer volume of this delivery -- and I don't

15  think it's disputed between the parties that Trading Circuit

16  did sell items in less than pristine condition and that is

17  store returned items, opened packages, et cetera.

18          Tech For Less did purchase these items and it took

19  quite awhile to catalogue and inventory several thousand items

20  to come to the decision that there was -- that there were a

21  significant amount, about 20 percent, of the inventory that was

22  simply not there, Your Honor.

23          With respect to that amount, it is highly improbable

24  that 20 percent of these items, roughly 1,757 pieces of

25  liquidated inventory would have been lost or stolen.  It is

1  more likely, Your Honor, that the goods were just not made

2  available at the debtor's location.

3       THE COURT:  Help me with that because I'm having a

4  hard time.  And I understand your argument that, you know, how

5  could, you know, 1700 items just disappear from a warehouse?

6  But how can 1700 items just not get delivered and not get

7  noticed?  Isn't it exactly the same argument?

8       MS. DELA CRUZ:  No, that's the crux, Your Honor.  The

9  distinction here is we're not arguing as to the goods we

10 actually got delivered and accepted.  That is fine.

11      But the issue is that at the debtor's location this

12 remaining shipment of goods, the 1757 give or take, were not

13 made available to actually load into the trucks and to deliver.

14 So we're not even talking about delivery of goods and then

15 acceptance and then rejecting.  We're saying that we could

16 never accept goods that were never made available to us for

17 receipt and for delivery.

18      Either under the UCC or this Electronic Liquidating

19 Merchandise Agreement, the onus to make items simply available

20 for receipt is on the debtor.  So, Your Honor, I would submit

21 that the fact that this amount of goods were missing from the

22 five shipments that were eventually made is an indicator that

23 they simply were not shipped, that they were not made available

24 by the debtor at the time of receipt and pickup, Your Honor.

25      THE COURT:  Why did it take six months for you to

1  notice that a fifth of the merchandise or a sixth of the

2  merchandise had not been delivered?

3        MS. DELA CRUZ:  Your Honor, the disarray in which or

4  damaged conditions that these items came in.  Again, these were

5  store return items, these were opened packages, they were in

6  various conditions and it's five freight carrier truckloads

7  worth of inventory.

8        And it's not unreasonable to take several months to

9  go through thousands and thousands of pieces of inventory to

10 make the determination that there are missing items.  And, you

11 know, the shipments also were not neatly organized by skew and

12 I mean those things took time to physically scan every single

13 item to make the determination from the manifest that certain

14 items were missing.

15       So as TFL did begin its physical scanning of every

16 single item, it was only at the conclusion of the

17 reconciliation that it was determined that a significant

18 portion was missing.

19       And even if they noticed that there should have been

20 another truckload or whatnot, the missing inventory items

21 specifically would not have been known until the reconciliation

22 itself had been made.

23       For example, 300 Samsung DVD players, et cetera.

24 Those types of information you wouldn't know until you actually

25 did the final audit.

1          So, Your Honor, I would submit that the delay or lag

2     time in terms of getting a final reconciliation is not

3     unreasonable under the UCC when you're dealing with a massive

4     amount such as we have here.

5          And again, the issue is not acceptance of the goods

6     as much as the trust argues, it's the lack of the goods that

7     were made available.

8          And the bottom line is that TFL paid $530,020 for

9     this liquidated inventory and the trust, the debtor, will be

10    receiving a windfall of almost -- of about $104,000 because

11    they simply didn't provide the inventory that TFL had purchased

12    and contracted for apparently.

13         So, Your Honor, this is also an equitable argument in

14    the sense that the debtor at this point is being unjustly

15    enriched by being allowed to keep TFL's funds for items that it

16    never delivered or never made available for delivery.  And that

17    burden is solely on the debtor under the UCC provisions cited

18    earlier.

19         And, Your Honor, again, even if TFL is deemed to have

20    accepted the goods, whether or not they were conforming, that

21    type of acceptance based on the difficulty of discovering the

22    non-conformity, in this case because there was such a huge

23    amount of inventory to go through, that acceptance can be

24    revoked under UCC 2-608.

25         And I submit to the Court that that provision was

1   drafted keeping instances like this in mind where it could be a

2   few months before the non-conforming issues arise and that's

3   simply because of bulk and the nature of the delivery.

4           In closing, Your Honor, this is very simple from

5   TFL's perspective.  It paid more than half a million dollars

6   for this liquidated inventory which the inventory list itself

7   that's listed as an exhibit to the claim is not disputed.  The

8   actual reconciliation and the missing items is not disputed.

9   It simply seeks to have its administrative claim allowed for

10  money that it didn't get its value for.

11          With respect to the five percent variance, again, my

12  calculations differ from the trust's with respect to what that

13  five percent reduces the total to.  But if the Court were to

14  allow this claim, again, under those terms TFL would not have

15  any objection to the five percent reduction.

16          THE COURT:  Okay.  Now you don't take issue with the

17  fact that the Electronic Merchandise Liquidation Agreement

18  provides that it's the purchaser that's responsible for the

19  removal of the merchandise from Circuit City?

20          MS. DELA CRUZ:  Well and again, that same agreement

21  says that the merchandise shall be made available for removal

22  and delivery.  And the making of the merchandise available for

23  receipt and removal and delivery, that burden is on the debtor.

24  It's not on TFL to hunt down every single piece of several

25  thousands worth of liquidating inventory in a warehouse that's

65

1  not theirs.

2          THE COURT:  But didn't it give the purchaser the

3  right to inspect the merchandise before agreeing to accept it?

4          MS. DELA CRUZ:  And again, Your Honor, with respect

5  to the parties' course of dealing, because we're talking about

6  such a huge amount of items it would have been disruptive, it

7  would have been burdensome, and impractical to inspect several

8  thousand items for several months on the debtor's premises

9  particularly when they have other online auctions taking place,

10 other shipments, et cetera.

11         So the parties did consent and I would submit

12 modified the terms of the agreement by their course of conduct

13 which was it makes sense, it was practical, to allow the

14 shipments to take place and then to do the reconciliation where

15 TFL could use its own equipment, could use its own scanners,

16 and stay out of the debtor's hair in terms of getting this

17 done.

18         THE COURT:  All right.  And you took possession at

19 the premises of Circuit City?

20         MS. DELA CRUZ:  Yes.

21         THE COURT:  All right.  And the risk of loss passed

22 at that time.

23         MS. DELA CRUZ:  And again, the argument isn't that we

24 have a problem with what we took.  We're fine with what was

25 delivered.  The issue is what we did not take possession of,

1   what was not made available for receipt and removal.

2           The inventory that we have we accept and that is

3   fine.  It's really the issue comes down to were the other items

4   that we're disputing made available so that we could actually

5   pick them up and remove them and that's the crux of this

6   dispute, Your Honor.

7           It's not the goods that we took that we are objecting

8   as non-conforming, it's the goods that weren't made available

9   to us for receipt that were non-conforming.

10          THE COURT:  Well I guess what I'm struggling with is

11  this timing issue, you know, because how would Circuit City

12  ever know, you know, that somebody -- if all this was supposed

13  to occur according to the Electronic Merchandise Liquidation

14  Agreement at the time that, you know, you go in and pick up

15  this stuff and take it back, how is Circuit City supposed to

16  know that there's some claim for an undelivered piece of

17  merchandise?

18          I mean because then it's out of its control, it's

19  gone.  Isn't that supposed to happen -- as I read this

20  agreement that you had two days after you had actually accepted

21  the merchandise to pay for it.

22          And so not only did you have a pre-acceptance right

23  to inspect it and to look at it and say, yes, this is, you

24  know, what we want, then you were responsible for accepting it.

25  Risk of loss passes.  You're responsible for then, you know,

1    shipping it from Circuit City back to your premises.  And then

2    two days later you had the obligation to pay for it.

3         Why doesn't this obligation to say, wait a second,

4    we're missing, you know, a sixth of what we thought we bought,

5    you know, come up in that context?

6         MS. DELA CRUZ:  Your Honor, again it comes down to a

7    practical matter of being able to coordinate the shipping to

8    receive, you know, to be delivered to TFL's location this bulk.

9    We have five trucks of goods in various condition, in various

10   forms, basically dumped at TFL Enterprises' location.  Now to

11   go --

12        THE COURT:  No, you went and picked it up.

13        MS. DELA CRUZ:  Correct.  However, it was impossible

14   to tell at the time of pickup if there were items that were not

15   made available.

16        Again, it's not a matter of taking a piece of paper

17   and checking off exactly what's there.  It involves a very

18   difficult process of cataloging it, scanning it via computer to

19   log it, to track each piece of inventory.

20        And it simply could not occur on the debtor's

21   premises which is why when the parties did arrange and TFL did

22   accept responsibility of actually picking up the items and

23   removing them, the inspection, the audit, the reconciliation

24   did occur at TFL's site as fast as they could do it.  It's not

25   unreasonable that five freight carrier trucks of inventory

1   would take several months to go through.

2          Now in terms of notice, the reconciliation was done

3   on June 5th I believe.  This claim request was filed within the

4   same month which indicates to me that this wasn't simply we

5   found missing items and then slept on our rights.  We found it,

6   we filed our claim to get it on the record, and here we are,

7   Your Honor.

8          It's again this boilerplate, which is a boilerplate

9   agreement, I don't think anyone can dispute that, obviously did

10  not take into account huge bulk shipments and the coordination

11  that it would take to actually ensure that the goods that were

12  purchased were the goods that were actually made available for

13  pickup and delivery.

14         So again, with respect to the liquidated inventory

15  that we have, that wasn't the issue.  The issue was where did

16  the rest of the inventory go if it wasn't made available to the

17  debtor -- by the debtor to Tech For Less?

18         And I believe that that's the crux of this issue is

19  the debtor first breached this contract.  The debtor had the

20  obligation to make these items available and it didn't happen.

21         THE COURT:  All right.  Thank you.

22         MS. BERAN:  Your Honor, briefly in closing in

23  connection with this.  It's the very nature of the sale here

24  before Your Honor in connection -- this is returned, damaged

25  goods and TFL's was in, it is in the purchasing at huge

1  discounts.  The discount percentage of 500,000 for $2.7 million

2  retail value.  That's their business.  They purchased this and

3  then resell to whatever forum.

4         Trading Circuit exact product was the products at

5  issue here.  So this isn't an isolated incident in connection

6  with TFL and/or Trading Circuit from a product standpoint.

7  This was the nature of Trading Circuit.  This was the avenue

8  that Circuit City used to sell its damaged, returned, and other

9  similarly situated product.

10        In connection with this, Your Honor, we'd

11 respectfully submit that the claimant has not met their burden.

12 There is absolutely no evidence before Your Honor that these

13 goods were not delivered.  There is no evidence of breach.

14 They took possession.  There was never any indication that 20

15 percent, 25 percent of the goods weren't there.

16        If you think getting a certain amount of goods, you

17 don't need to line item for six months to say, wait a minute,

18 I'm missing 20 percent.  You can notify immediately within that

19 48 hours saying, wait a minute, only four trucks arrived, it

20 should have been five.  What's the issue here?  There was never

21 that.

22        The only evidence before Your Honor is six months

23 later after Circuit City has done its liquidation, after

24 Circuit City has let go of its employees, the claimant files a

25 claim with this Court saying we didn't get around 20 percent of

1    the goods.

2         At that point in time it's not Circuit City's burden

3    to go back in and demonstrate what happened to these goods.

4    They came in, they accepted possession, they had the ability

5    onsite to come in, to examine, make note, do whatever.  That's

6    the nature of their business.

7         There is absolutely no evidence before Your Honor as

8    it relates to course of dealings where this was historically we

9    had an arrangement with Circuit City where we could take it

10   offsite for six months, review it for six months, and

11   notwithstanding the terms and conditions we agreed to on a

12   computer in connection with accepting these goods, that we then

13   could make a claim.

14        Similarly, Your Honor, under the UCC, we'd

15   respectfully submit that six months is not a reasonable time

16   period.

17        And, once again, don't mean to keep reiterating, but

18   then as it relates to the reconciliation we don't believe that

19   the course of dealing that there is any evidence to demonstrate

20   that Circuit City agreed to some modification.

21        No person has been referenced at Circuit City to

22   agreeing to such a thing and no document, no emails, no nothing

23   has been submitted in connection with any type of altering of

24   the contract.

25        Finally as it relates to this windfall argument,

71

1   there's this suggestion that there would be a windfall to

2   Circuit City.  Well there's only a windfall if Circuit City

3   intentionally withheld those items, then Circuit City took

4   those items, sold them, and got that money.

5        Based on that, Your Honor, and for the reasons stated

6   in opening as well as the evidence that was submitted to Your

7   Honor and presented today, the trust would respectfully request

8   that the Court sustain its objection to this claim.

9        THE COURT:  All right.  Thank you.  All right.  The

10  Court has before it the liquidating trust's objection to the

11  administrative claim filed by Tech For Less, LLC.

12       The Court finds that Tech For Less has failed to meet

13  its burden of proof.  The Court does not have any evidence that

14  1,757 items of merchandise that were purchased through Trading

15  Circuit were not delivered as required by the contract.

16       The Court finds that the terms of the Electronics

17  Merchandise Liquidation Agreement control the transaction in

18  this case.  The Court notes that that agreement specifically

19  provides that the purchaser or its agent had the right to

20  inspect the merchandise prior to accepting possession to ensure

21  compliance with the terms of the invoice.

22       And that would certainly include compliance with a

23  number of items that were being accepted pursuant to the terms

24  of the invoice.

25       And that delivery was to take place at Circuit City.

1   That risk of loss shifted upon acceptance and delivery which

2   occurred at Circuit City and that the purchaser was responsible

3   for all shipping arrangements and removal of the merchandise

4   from Circuit City's premises and that payment was to occur two

5   days later.

6          There has been no rejection of the acceptance in this

7   case.  There was an acceptance, there was payment, and at this

8   late date the Court has absolutely no evidence that would

9   justify some sort of revocation of that acceptance or anything

10  else.

11         So and then given the very heightened nature of the

12  burden that an administrative claimant has under the laws as

13  adopted by the Fourth Circuit Court of Appeals, the Court finds

14  that there is no basis for an administrative claim in the

15  amount of $104,986.36 or in any other amount.  And accordingly

16  the objection will be sustained and the administrative claim

17  will be disallowed.  Any questions regarding the Court's

18  ruling?

19         MS. BERAN:  No, Your Honor.

20         MS. DELA CRUZ:  No, Your Honor.

21         THE COURT:  Okay.  I'm going to ask, Ms. Beran,

22  please submit an order to that effect.

23         MS. BERAN:  Certainly, Your Honor.

24         THE COURT:  All right.  Is there any other business

25  we need to take up in Circuit City?

73

1          MS. BERAN:  Your Honor, from the trust's perspective

2    there is not.

3          THE COURT:  All right.  Very good.  We will be

4    adjourned.

5          MS. BERAN:  Thank you, Your Honor.

6          THE COURT:  Have a nice holiday.

7          MS. BERAN:  Thank you.

8          MS. DELA CRUZ:  Thank you.

9          COURTROOM DEPUTY:  All rise.

10                        * * * * *

11                **C E R T I F I C A T I O N**

12          I, JANET D. PERSONS, court approved transcriber,

13   certify that the foregoing is a correct transcript from the

14   official electronic sound recording of the proceedings in the

15   above-entitled matter, and to the best of my ability.

16

17   /s/ Janet D. Persons            DATE:  December 29, 2011

18   JANET D. PERSONS

19   J&J COURT TRANSCRIBERS, INC.

20

21

22

23

24

25

                         **WWW.JJCOURT.COM**