(d)  The various rights and remedies reserved to Landlord herein, are cumulative, the rights and remedies described in Paragraph 20(a)-(c) shall survive termination of this Lease and Landlord may pursue any and all such rights and remedies and any other available to Landlord under applicable law or equity, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease); provided, however, that no remedy of termination shall be available to Landlord except as expressly set forth in Paragraph 20(b) after the occurrence of an Event of Default.  Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Leased Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

21.    Notices.  All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes  three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or one (1) day after having been sent by

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

Federal Express or other nationally recognized air courier service, to the Addresses stated below:

      (a) If to Landlord, at the address set forth on the first page of this Lease.

      (b) If to Tenant, at the address set forth on the first page of this Lease, Attention: Corporate Secretary,

With a copy to:      McGuire, Woods, Battle & Boothe LLP
                  One James Center
                  Richmond, Virginia 23219
                  Attention: Robert L. Burrus, Jr.

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and stating in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall serve a copy of such Notice upon Lender in the manner aforesaid. For the purposes of this Paragraph, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above.

      22.   <u>Memorandum of Lease; Estoppel Certificates</u>.   Tenant shall execute, deliver and record, file or register from time to time all such instruments as may be required by any present or future law in order to evidence the respective interests of Landlord and Tenant in any of the Leased Premises, and shall cause a memorandum of this Lease, and any supplement hereto or to such other instrument, if any, as may be appropriate, to be recorded, filed or registered and re-recorded, refiled or re-registered in such manner and in such places as may be required by any present or future law in order to give public notice and protect the validity of this Lease. In the event of any discrepancy between the provisions of said recorded memorandum of this Lease or any other recorded instrument referring to this Lease and the provisions of this Lease, the provisions of this Lease shall prevail. Landlord and Tenant shall, at any time and from time to time, upon not less than twenty days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, executed by

Landlord or Tenant or, if other than an individual, by a President, Vice President or authorized general partner, principal officer or agent certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent payable hereunder has been paid, (iii) that to the knowledge of the party executing such certificate no default by either Landlord or Tenant exists hereunder or specifying each such of which such party may have knowledge; (iv) the remaining Term hereof; and (v) with respect to a certificate signed by Tenant, that to the knowledge of the party executing such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said party's knowledge, specifying and describing the same.  It is intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective mortgagee, purchaser, assignee or subtenant of the Leased Premises.

           23.   <u>Surrender and Holding Over</u>.  Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord in the same condition in which the Leased Premises were originally received from Landlord at the commencement of this Lease, except as to any repair or Alteration as permitted or required by any provision of this Lease, and except for ordinary wear and tear and damage by fire, casualty or condemnation which Tenant is not required to repair hereunder.  Tenant may remove at Tenant's sole cost and expense from the Leased Premises on or prior to such expiration or earlier termination Tenant's Trade Fixtures and personal property which are owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal.  Tenant's Trade Fixtures and personal property not so removed at the end of the Term or within thirty days after

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises. Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination. Upon such expiration or earlier termination, no party shall have any further rights or obligations hereunder except as specifically provided herein.

Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the Term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as tenancy from month to month only, at one hundred fifty percent (150%) of the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease. Notwithstanding the foregoing, any holding over without Landlord's consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred fifty percent (150%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 20.

24.    No Merger of Title.  There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (ii) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership. No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (x) this Lease or the leasehold estate created by this Lease and (y) the fee estate in or ownership of the Leased Premises including, without limitation, Lender's interest therein, or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

25.    Landlord Exculpation.    Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in Leased Premises and shall not be enforced against the Landlord individually or personally.

26.    Hazardous Substances.

(a)    Tenant represents and warrants that it will not on, about, or under the Leased Premises, make, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 et seq. (the "Act"), but the foregoing shall not prevent the use to the extent necessary and customary in normal retail operations of any such substances in accordance with applicable laws and regulations and Tenant represents and warrants that it will at all times comply with the Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials. Hazardous Materials as used herein shall include, without limitation, all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, et seq.; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, et seq., any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136¡ et seq., any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, et seq., any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes or any modifications thereof or successor statutes thereto; any explosives, radioactive material, and

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

(b)    To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the initial Term or any extension or renewal Term thereof. Tenant shall and hereby does agree to defend, indemnify and hold Lender and Landlord, their officers, directors, shareholders, partners and employees harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, attorneys' fees and costs of litigation, arising out of or in any manner connected with (i) the violation of any applicable federal, state or local environmental law with respect to the Leased Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this Paragraph 26, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) from the Leased Premises or any portion or portions thereof, now or hereafter existing during the initial Term and any extension or renewal Term whether or not arising out of or in any manner connected with Tenants' occupancy of the Leased Premises during the initial Term or any extension or renewal Term. No provision of this paragraph shall have any effect on Landlord's rights under paragraph 34.

(c)    The Tenant represents and warrants that it will not install any underground storage tank without specific, prior written approval from the Landlord and Lender, which may be withheld in the sole discretion of either. The Tenant will not store combustible or flammable materials on the Leased Premises in violation of the Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials.

42

27.    <u>Entry by Landlord</u>.  Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than 48 hours except in the case of emergency) to enter the Leased Premises at all reasonable business hours, (and at all other times in the event of an emergency), for (i) the purpose of inspecting the same or for the purpose of doing any work under Paragraph 9, and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), provided further that if an Event of Default has occurred and is continuing, such inspections and work shall be at Tenant's sole cost and expense, and (ii) the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within twelve (12) months prior to the expiration of the Term of this Lease for the purpose of showing the same to prospective tenants.  No such entry shall constitute an eviction of Tenant but any such entry shall be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

28.    <u>Statements</u>.  Tenant named herein shall submit to Lender and Landlord (i) within 45 days of the end of each fiscal quarter, quarterly balance sheets, income and cash flow statements for Tenant named herein certified by Tenant's chief financial officer; (ii) within 90 days of the end of each fiscal year, annual audited balance sheets, income and cash flow statements for Tenant named herein, and (iii) except at such times as Tenant is a reporting company under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Act"), or has complied with the requirements for exemption from registration as set forth in Rule 12g3-2(b) under the Act, such financial or other information as Lender may reasonably determine is required for Lender to comply with the requirements of Rule 144A, promulgated under the Act, as amended.    Quarterly 10Qs as filed with the Securities and Exchange Commission shall satisfy the requirements contained in (i) herein.  Copies of the 10Ks filed with the Securities and Exchange Commission will satisfy the requirement contained in (ii)

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

herein. The obligations of Tenant named herein shall continue whether or not this Lease shall have been assigned.

29.    No Usury.  The intention of the parties being to conform strictly to the usury laws now in force in the State, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

30.    Broker.  Landlord and Tenant represent and warrant to each other that neither party negotiated with any broker in connection with this Lease and that this Lease was negotiated directly by Landlord and Tenant.  Each party hereby agrees to indemnify the other against all claims, damages, costs and expenses incurred by the indemnified party as a result of the breach of the foregoing representation or warranty by the indemnifying party.

31.    Waiver of Landlord's Lien.  Landlord hereby waives any right to distrain Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is created or otherwise.  Landlord agrees, at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant.  Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and entities at such times and for such purposes as Tenant may reasonably request that Trade Fixtures are Tenant's property and not part of Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

32.    No Waiver.  No delay or failure by either party to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.

33.    Separability.  If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

34. Indemnification. Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused and whenever caused, arising from any of the Leased Premises or Adjoining Property or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of any of or otherwise relating to, the Leased Premises or Adjoining Property, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon (collectively, "Losses"), whether or not Landlord has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said Loss. In case any action or proceeding is brought against Landlord or Lender by reason of any such Loss, Tenant covenants upon notice from Landlord or Lender to defend Landlord or Lender in such action, with the expenses of such defense paid by Tenant, and Landlord or Lender will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant. All obligations of Tenant under this Paragraph 34 shall survive any termination of this Lease with respect to Losses identified in reasonable detail, by the Claim Deadline, as defined below, of the intent to make a claim upon Tenant under such indemnity. The "Claim Deadline" shall be:

(a)      to the extent of any indemnification obligation arising as a result of the claim by a third party against Landlord or Lender, or the claim of a third party against the Leased Premises (any of the foregoing being a "Third Party Obligation"), the date that is 30 days after the later of (i) the expiration of the period during which such third party claim

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

may be brought under the applicable statute of limitations, as established by judicial determination (pursuant to declaratory judgment proceeding initiated by either of the parties hereunder for the purpose of establishing such date, or otherwise), or (ii) the date which is two (2) years after the expiration or earlier termination of this Lease;

(b)    with respect to any indemnification obligation of Tenant not described in subparagraph (a) above, the day that is two years after the expiration or earlier termination of this Lease. There shall be no Claim Deadline applicable to any Third Party Obligation if there is no statute of limitations to the underlying claim given rise to the Third Party Obligation.

35.    <u>Tenant to Comply With Reciprocal Easement Agreement</u>.

(a)    Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any reciprocal easement agreement or any other agreement or document of record now affecting the Leased Premises, herein referred to collectively as "REA", and that Tenant shall comply with all of the terms and conditions of the REA during the Term of this Lease.

(b)    Provided that at such time Tenant shall have a tangible net worth of not less than Two Hundred Million Dollars ($200,000,000.00) as determined in accordance with generally accepted accounting principles, consistently applied, Tenant shall have the right to grant consents and approvals under and amend the REA as from time to time it, in its sole discretion, deems necessary, and Landlord hereby grants Tenant a limited power of attorney to act for and on behalf of Landlord for purposes of such approvals, consents and amendments, except in any instance where either (x) money will be paid to Tenant in consideration for Tenant amending the REA, or (y) Tenant is granted any concessions with respect to any site (other than the Leased Premises). Tenant shall give Notice to Landlord and Lender within twenty (20) days of the execution of any amendment to the REA. During any time that Tenant shall have a tangible net

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

worth of less than Two Hundred Million Dollars ($200,000,000.00), Tenant shall not grant consents or approvals or enter into any amendments to the REA without the prior written consent of Landlord which shall not be unreasonably withheld, conditioned or delayed if the consent, approval or amendment proposed by Tenant (a) will not adversely affect the value of the Leased Premises and (b) does not result in any remuneration to Tenant. Tenant's request for any such consent shall include (i) a copy of the most recent draft of the proposed consent, approval or amendment, (ii) a metes and bounds description of the portion of the Leased Premises to be affected by such approval or amendment, and (iii) Tenant's written undertaking acknowledging that Tenant shall remain liable hereunder as a principal and not merely as a surety or guarantor notwithstanding the consent, approval or amendment. Tenant shall supply Landlord and Lender with any other documentation or information then available to Tenant relating to such consent, approval or amendment that is reasonably requested by Lender or Landlord. Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Lender against any claim, loss or damage suffered by Landlord or Lender by reason of (i) any action under this Paragraph 35 which results in a diminution in value of Landlord's reversionary interest in the Leased Premises or (ii) Tenant's failure to perform any obligations or pay any expenses as required under any REA or comply with the terms and conditions of any REA as hereinabove provided during the term of this Lease.

(c)    Landlord agrees to enter into with Tenant, at Tenant's expense, such easements, covenants, waivers, approvals or restrictions for utilities, parking or other matters as desirable for operation of the Leased Premises or properties adjacent thereto (collectively "Easement") as requested by Tenant, subject to Lender's and Landlord's approval of the form thereof, not to be unreasonably withheld or delayed; provided, however, that no such Easement shall result in any diminution in the value or utility of the Leased Premises for use a retail store site and further provided that no such Easement shall render the use of the Leased Premises dependent upon any other property or condition the use of the Leased Premises upon the use of any other property, each of which Tenant shall certify to Landlord and Lender in writing delivered with

47

Tenant's request with respect to such Easement. Tenant's request shall also include (i) a copy of the most recent draft of the proposed Easement, (ii) a metes and bounds description of the portion of the Leased Premises to be affected by such Easement, and (iii) Tenant's written undertaking acknowledging that Tenant shall remain liable hereunder as a principal and not merely as a surety or guarantor notwithstanding the establishment of any Easement. Tenant shall supply Landlord and Lender with any other documentation or information then available to Tenant relating to such Easement that is reasonably requested by Lender or Landlord. If either Landlord or Lender shall fail to approve or disapprove the form of any such Easement, within a period of thirty (30) days from their respective receipt of same, then either Landlord or Lender, as the case may be, shall be deemed to have approved the form of any such Easement, and Landlord grants to Tenant a limited power of attorney to acknowledge, execute and deliver on Landlord's behalf any such Easement upon the failure of either Landlord or Lender to respond within such period of time.

(d)    Landlord hereby grants a limited power of attorney to Tenant to acknowledge, deliver and execute on Landlord's behalf any proposed agreement affecting the Leased Premises if such agreement is in the nature of an easement and (i) is specifically stated to encumber the Leased Premises only while Tenant is in possession of the Leased Premises or (ii) shall, by the terms of the agreement, end with the termination of this Lease. Upon the execution of any such agreement, Tenant shall deliver, within twenty (20) days thereof, a copy of such agreement to Landlord.

36.    Headings.    The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

37.    Modifications.    This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

38.    <u>Successors, Assigns</u>.  The covenants of this Lease shall run with the Land and bind Tenant, the heirs, distributees, personal representatives, successors and permitted assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns. In the event there is more than one Tenant, the obligation of each shall be joint and several. The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Leased Premises or holder of the Mortgage in possession at the time in question of the Leased Premises and in the event of any transfer or transfers of the title of the Leased Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all personal liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed.

39.    <u>Counterparts</u>.  This Lease may be executed in several counterparts, which together shall be deemed one and the same instrument.

40.    <u>Governing Law</u>.    This Lease shall be governed by and construed according to the laws of the State.

41.    <u>Lender as Third Party Beneficiary</u>.  Lender shall be deemed a third party beneficiary with respect to all provisions of this Lease that purport to confer benefits upon Lender or impose obligations upon Tenant or Landlord in order to protect the interests of Lender.

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

LANDLORD:

Signed in the presence of:

CC INVESTORS #17, L.P.,
a Texas limited partnership

Kathryn D. Mahlwein
Printed Name: Kathryn D. Mahlwein

By: _____
Title: _____

M. Scott Kipp
Vice President

Gwen G. Jones
Printed Name: Gwen G. Jones

STATE OF Texas
CITY/COUNTY OF Dallas    :

Before me, a Notary Public in and for the aforesaid county and state personally appeared the above named M. Scott Kipp as Vice President of CC Investors #17, L.P., a Texas limited partnership, who acknowledged that he did sign the foregoing instrument and the same is the free act and deed of said partnership.

IN WITNESS WHEREOF I have hereunto set my hand and official seal this 16th day of June, 1999 at 8411 Preston Rd.

My commission expires: 6/17/02

JEANETTE BARRETT
MY COMMISSION EXPIRES
JUNE 17, 2002

Jeanette Barrett
Notary Public
Jeanette Barrett
Printed or typed name of
Notary

50
49

TENANT:

CIRCUIT CITY STORES, INC., a Virginia corporation

Signed in the presence of:

By: _P Dunn_

Title: Controller/Vice President/Treasurer

Printed Name: C. HULBERT

Printed Name: Landon Gill

STATE OF VIRGINIA:
COUNTY OF HENRICO:

Before me, a Notary Public in and for the aforesaid county and state personally appeared the above named Circuit City Stores, Inc. by Philip J. Dunn, its Controller/Vice President/Treasurer, who acknowledged that he did sign the foregoing instrument and the same is the free act and deed of said corporation.

IN WITNESS WHEREOF I have hereunto set my hand and official seal this 16th day of June, 1999 at Richmond, Virginia.

My commission expires: _01/31/2003_

Notary Public

Joseph S. Shocket

Printed or typed name of Notary

51

## EXHIBIT A

### (Legal Description)

THE FOLLOWING TRACT OF LAND IS SITUATE ON THE SOUTHERLY SIDE OF MALL DRIVE (FORMERLY EAST-WEST DRIVE), CITY OF STEUBENVILLE, SECTION 12, TOWNSHIP 6, RANGE 2, CROSS CREEK TOWNSHIP, JEFFERSON COUNTY, OHIO, AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN IN THE SOUTHERLY LINE OF MALL DRIVE (FORMERLY EAST-WEST DRIVE), SAID BEGINNING POINT BEING LOCATED THE FOLLOWING SIX (6) COURSES AND DISTANCES FROM A POINT IN THE WESTERLY LINE OF JOHN SCOTT MEMORIAL HIGHWAY: (SAID POINT BEING LOCATED SOUTH 78° 59' 00" WEST 63.70 FEET FROM CENTERLINE STATION 18+05.06) 1) SOUTH 78° 59' 00" WEST 50.49 FEET TO A POINT; 2) THENCE WITH A CURVE TO THE LEFT HAVING A RADIUS OF 710.00 FEET AN ARC DISTANCE OF 99.62 FEET TO A POINT, SAID CURVE HAVING A CHORD BEARING OF SOUTH 74° 57' 50" WEST AND A DISTANCE OF 99.54 FEET; 3) THENCE SOUTH 13° 00' 00" EAST 91.32 FEET TO A POINT; 4) THENCE WITH A CURVE TO THE LEFT HAVING A RADIUS OF 565.00 FEET AND AN ARC DISTANCE OF 189.51 FEET TO A POINT, SAID CURVE HAVING A CHORD BEARING OF SOUTH 54° 22' 32" WEST AND A DISTANCE OF 188.62 FEET; 5) THENCE SOUTH 54° 46' 00" WEST 323.14 FEET TO A POINT; 6) THENCE SOUTH 35° 14' 00" EAST 60.00 FEET CROSSING MALL DRIVE TO AN IRON PIN AT THE TRUE PLACE OF BEGINNING; THENCE FROM SAID TRUE POINT OF BEGINNING, ALONG THE SOUTHERLY LINE OF MALL DRIVE THE FOLLOWING TWO (2) COURSES AND DISTANCES 1) NORTH 54° 46' 00" EAST, 323.14 FEET TO AN IRON PIN; 2)THENCE WITH A CURVE TO THE RIGHT HAVING A RADIUS OF 505.00 FEET AN ARC DISTANCE OF 166.25 FEET TO AN IRON PIN, SAID CURVE HAVING A CHORD BEARING OF NORTH 64° 11' 56" EAST AND A DISTANCE OF 165.50 FEET; THENCE ALONG THE LINE DIVIDING LANDS OF MAGNUS PROPERTIES INC. AND LANDS OF HUBERTA MINING COMPANY THE FOLLOWING TWO (2) COURSES AND DISTANCES: 1) SOUTH 21° 13' 21" WEST 418.47 FEET TO AN IRON PIN; 2). THENCE ALONG SAME SOUTH 35° 14' 00" EAST 41.64 FEET TO AN IRON PIN; THENCE THROUGH LANDS OF HUBERTA MINING COMPANY SOUTH 54° 46' 00" WEST 137.62 FEET TO AN IRON PIN; THENCE CONTINUING THROUGH LANDS OF HUBERT MINING COMPANY AND ALONG LINE DIVIDING SAME AND LANDS OF ALDI INC. NORTH 35° 14' 00" WEST 300.00 FEET TO AN IRON PIN, AT THE TRUE PLACE OF BEGINNING.

HAVING AN AREA OF 89,611 Sq. FL (2.06 ACRES)

## EXHIBIT B

1.  Basic Rent for the initial term shall be at the annual rate of $307,100.00.

2.  Basic Rent for the first renewal term shall be at the annual rate of $337,810.00.

3.  Basic Rent for the second renewal term shall be at the annual rate of $368,520.00.

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

## STEUBENVILLE, OH

Column A: Month
Column B: Repurchase Price

| Column A | Column B | Column A | Column B |
|---|---|---|---|
| 1 | 3,320,000 | 41 | 3,187,522 |
| 2 | 3,317,160 | 42 | 3,183,660 |
| 3 | 3,314,298 | 43 | 3,179,769 |
| 4 | 3,311,414 | 44 | 3,175,848 |
| 5 | 3,308,507 | 45 | 3,171,897 |
| 6 | 3,305,578 | 46 | 3,167,915 |
| 7 | 3,302,627 | 47 | 3,163,902 |
| 8 | 3,299,653 | 48 | 3,159,859 |
| 9 | 3,296,656 | 49 | 3,155,784 |
| 10 | 3,293,636 | 50 | 3,151,678 |
| 11 | 3,290,592 | 51 | 3,147,540 |
| 12 | 3,287,525 | 52 | 3,143,371 |
| 13 | 3,284,435 | 53 | 3,139,169 |
| 14 | 3,281,320 | 54 | 3,134,935 |
| 15 | 3,278,182 | 55 | 3,130,668 |
| 16 | 3,275,019 | 56 | 3,126,369 |
| 17 | 3,271,833 | 57 | 3,122,036 |
| 18 | 3,268,621 | 58 | 3,117,670 |
| 19 | 3,265,385 | 59 | 3,113,270 |
| 20 | 3,262,124 | 60 | 3,108,836 |
| 21 | 3,258,837 | 61 | 3,104,368 |
| 22 | 3,255,526 | 62 | 3,099,866 |
| 23 | 3,252,188 | 63 | 3,095,329 |
| 24 | 3,248,825 | 64 | 3,090,757 |
| 25 | 3,245,437 | 65 | 3,086,149 |
| 26 | 3,242,022 | 66 | 3,081,506 |
| 27 | 3,238,580 | 67 | 3,076,828 |
| 28 | 3,235,112 | 68 | 3,072,113 |
| 29 | 3,231,618 | 69 | 3,067,362 |
| 30 | 3,228,096 | 70 | 3,062,575 |
| 31 | 3,224,548 | 71 | 3,057,750 |
| 32 | 3,220,972 | 72 | 3,052,888 |
| 33 | 3,217,368 | 73 | 3,047,989 |
| 34 | 3,213,737 | 74 | 3,043,052 |
| 35 | 3,210,078 | 75 | 3,038,077 |
| 36 | 3,206,390 | 76 | 3,033,064 |
| 37 | 3,202,674 | 77 | 3,028,012 |
| 38 | 3,198,930 | 78 | 3,022,921 |
| 39 | 3,195,156 | 79 | 3,017,791 |
| 40 | 3,191,354 | 80 | 3,012,621 |

## STEUBENVILLE, OH

Column A: Month
Column B: Repurchase Price

| Column A | Column B | Column A | Column B |
|---|---|---|---|
| 81 | 3,007,411 | 121 | 2,762,543 |
| 82 | 3,002,161 | 122 | 2,755,405 |
| 83 | 2,996,871 | 123 | 2,748,213 |
| 84 | 2,991,540 | 124 | 2,740,965 |
| 85 | 2,986,168 | 125 | 2,733,662 |
| 86 | 2,980,755 | 126 | 2,726,302 |
| 87 | 2,975,299 | 127 | 2,718,885 |
| 88 | 2,969,802 | 128 | 2,711,412 |
| 89 | 2,964,263 | 129 | 2,703,880 |
| 90 | 2,958,680 | 130 | 2,696,291 |
| 91 | 2,953,055 | 131 | 2,688,643 |
| 92 | 2,947,386 | 132 | 2,680,936 |
| 93 | 2,941,674 | 133 | 2,673,169 |
| 94 | 2,935,917 | 134 | 2,665,343 |
| 95 | 2,930,116 | 135 | 2,657,457 |
| 96 | 2,924,271 | 136 | 2,649,509 |
| 97 | 2,918,380 | 137 | 2,641,501 |
| 98 | 2,912,444 | 138 | 2,633,431 |
| 99 | 2,906,462 | 139 | 2,625,298 |
| 100 | 2,900,434 | 140 | 2,617,103 |
| 101 | 2,894,360 | 141 | 2,608,844 |
| 102 | 2,888,239 | 142 | 2,600,522 |
| 103 | 2,882,070 | 143 | 2,592,136 |
| 104 | 2,875,855 | 144 | 2,583,685 |
| 105 | 2,869,591 | 145 | 2,575,169 |
| 106 | 2,863,279 | 146 | 2,566,588 |
| 107 | 2,856,918 | 147 | 2,557,940 |
| 108 | 2,850,508 | 148 | 2,549,226 |
| 109 | 2,844,049 | 149 | 2,540,444 |
| 110 | 2,837,540 | 150 | 2,531,595 |
| 111 | 2,830,981 | 151 | 2,522,677 |
| 112 | 2,824,371 | 152 | 2,513,691 |
| 113 | 2,817,710 | 153 | 2,504,635 |
| 114 | 2,810,998 | 154 | 2,495,510 |
| 115 | 2,804,234 | 155 | 2,486,314 |
| 116 | 2,797,419 | 156 | 2,477,048 |
| 117 | 2,790,550 | 157 | 2,467,710 |
| 118 | 2,783,629 | 158 | 2,458,300 |
| 119 | 2,776,654 | 159 | 2,448,818 |
| 120 | 2,769,625 | 160 | 2,439,262 |
| Column A | Column B | Column A | Column B |

## STEUBENVILLE, OH

Column A: Month

Column B: Repurchase Price

| | | | | |
|---|---|---|---|---|
| 161 | 2,429,633 | | 201 | 1,977,026 |
| 162 | 2,419,929 | | 202 | 1,963,834 |
| 163 | 2,410,151 | | 203 | 1,950,540 |
| 164 | 2,400,297 | | 204 | 1,937,143 |
| 165 | 2,390,368 | | 205 | 1,923,644 |
| 166 | 2,380,362 | | 206 | 1,910,040 |
| 167 | 2,370,278 | | 207 | 1,896,331 |
| 168 | 2,360,117 | | 208 | 1,882,517 |
| 169 | 2,349,878 | | 209 | 1,868,596 |
| 170 | 2,339,560 | | 210 | 1,854,568 |
| 171 | 2,329,162 | | 211 | 1,840,432 |
| 172 | 2,318,684 | | 212 | 1,826,187 |
| 173 | 2,308,126 | | 213 | 1,811,832 |
| 174 | 2,297,485 | | 214 | 1,797,366 |
| 175 | 2,286,763 | | 215 | 1,782,789 |
| 176 | 2,275,959 | | 216 | 1,768,099 |
| 177 | 2,265,071 | | 217 | 1,753,296 |
| 178 | 2,254,099 | | 218 | 1,738,379 |
| 179 | 2,243,042 | | 219 | 1,723,348 |
| 180 | 2,231,900 | | 220 | 1,708,200 |
| 181 | 2,220,673 | | 221 | 1,692,935 |
| 182 | 2,209,359 | | 222 | 1,677,553 |
| 183 | 2,197,957 | | 223 | 1,662,052 |
| 184 | 2,186,468 | | 224 | 1,646,432 |
| 185 | 2,174,890 | | 225 | 1,630,692 |
| 186 | 2,163,223 | | 226 | 1,614,830 |
| 187 | 2,151,466 | | 227 | 1,598,845 |
| 188 | 2,139,618 | | 228 | 1,582,738 |
| 189 | 2,127,679 | | 229 | 1,566,506 |
| 190 | 2,115,648 | | 230 | 1,550,150 |
| 191 | 2,103,524 | | 231 | 1,533,667 |
| 192 | 2,091,307 | | 232 | 1,517,057 |
| 193 | 2,078,996 | | 233 | 1,500,319 |
| 194 | 2,066,590 | | 234 | 1,483,452 |
| 195 | 2,054,088 | | 235 | 1,466,455 |
| 196 | 2,041,489 | | 236 | 1,449,327 |
| 197 | 2,028,794 | | 237 | 1,432,067 |
| 198 | 2,016,001 | | 238 | 1,414,674 |
| 199 | 2,003,109 | | 239 | 1,397,147 |
| 200 | 1,990,118 | | 240 | 1,379,485 |

## STEUBENVILLE, OH

Column A: Month
Column B: Repurchase Price

| Column A | Column B | | Column A | Column B |
|---|---|---|---|---|
| 241 | 1,361,687 | | 281 | 525,104 |
| 242 | 1,343,751 | | 282 | 500,720 |
| 243 | 1,325,677 | | 283 | 476,148 |
| 244 | 1,307,464 | | 284 | 451,386 |
| 245 | 1,289,111 | | 285 | 426,434 |
| 246 | 1,270,616 | | 286 | 401,289 |
| 247 | 1,251,978 | | 287 | 375,950 |
| 248 | 1,233,197 | | 288 | 350,416 |
| 249 | 1,214,271 | | 289 | 324,685 |
| 250 | 1,195,199 | | 290 | 298,756 |
| 251 | 1,175,980 | | 291 | 272,627 |
| 252 | 1,156,613 | | 292 | 246,297 |
| 253 | 1,137,097 | | 293 | 219,764 |
| 254 | 1,117,430 | | 294 | 193,026 |
| 255 | 1,097,612 | | 295 | 166,082 |
| 256 | 1,077,641 | | 296 | 138,930 |
| 257 | 1,057,515 | | 297 | 111,569 |
| 258 | 1,037,235 | | 298 | 83,997 |
| 259 | 1,016,799 | | 299 | 56,213 |
| 260 | 996,205 | | 300 | 28,214 |
| 261 | 975,452 | | 301 | 0 |
| 262 | 954,539 | | | |
| 263 | 933,465 | | | |
| 264 | 912,229 | | | |
| 265 | 890,829 | | | |
| 266 | 869,264 | | | |
| 267 | 847,532 | | | |
| 268 | 825,633 | | | |
| 269 | 803,566 | | | |
| 270 | 781,328 | | | |
| 271 | 758,919 | | | |
| 272 | 736,337 | | | |
| 273 | 713,581 | | | |
| 274 | 690,650 | | | |
| 275 | 667,542 | | | |
| 276 | 644,255 | | | |
| 277 | 620,790 | | | |
| 278 | 597,143 | | | |
| 279 | 573,314 | | | |
| 280 | 549,302 | | | |

After the 300th month through the end of the second renewal period, the rejectable offer shall be zero (0).

## EXHIBIT D

## SUBORDINATION NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is entered into as of this _____ day of _____ _____, by and among CIRCUIT CITY STORES, INC., a Virginia corporation ("Tenant"), _____ ("Lender"), and _____, a _____ ("Landlord").

### RECITALS

A.    Pursuant to a lease dated _____ ___, ____ (the "Lease") between Landlord and Tenant, Tenant is a tenant of a certain building (the "Building") on certain real property located in the City of _____, County _____, State of _____ (the "Land"). Landlord's interest in the Building and the Land shall be referred to herein as the "Property" (see attached Exhibit "A" for Legal Description).

B.    Lender is making a Loan to Landlord in the amount of $_____ with interest thereon (the "Loan"), evidenced by a promissory note secured in part by a mortgage or deed of trust dated as of the date hereof (the "Mortgage") constituting a valid lien upon the Property and secured in part by an assignment of Landlord's interest in the Lease as more particularly set forth in a certain assignment of leases and rents dated as of the date hereof (the "Assignment").

C.    As a condition precedent to making the Loan, Lender has required that Landlord and Tenant make certain agreements with Lender with respect to the Lease, which Landlord and Tenant have agreed to make in confirmation of these agreements contained in the Lease.

NOW THEREFORE, in consideration of the foregoing acts and mutual covenants contained herein, the parties hereto do hereby agree as follows:

1.    Assignment: Payment.  Tenant hereby acknowledges and agrees that it has notice that the Lease and the rent and all other sums due thereunder have been assigned or are to be assigned to Lender as security for the obligations secured by the Mortgage and agrees to such assignment. [IF APPLICABLE- Tenant shall pay such sums due under the Lease directly to Lender. Landlord hereby permits said direct payments to be made and further agrees to indemnify and hold Tenant harmless from and against any and all loss, claim, damage or

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

liability arising out of Tenant's compliance with such requirement. Tenant shall be entitled to full credit under the Lease of any rents paid to Lender in accordance with the provisions of this paragraph to the same extent as if rents were paid directly to Landlord.]

2.     <u>Subordination</u>. Tenant acknowledges that the Lease, by operation of Paragraph 16(a) of the Lease and upon the terms set forth therein, shall at all times be subject and subordinate to the lien of the Mortgage in favor of Lender, and any renewals, modifications, consolidations, replacements and extensions thereof. Notwithstanding the foregoing, Lender shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to the Lease by recording a unilateral declaration to such effect.

3.     <u>Nondisturbance</u>. So long as no Event of Default (as such term is defined in the Lease) shall be outstanding under the Lease, Tenant's tenancy thereunder shall not be disturbed, nor shall the Lease be affected by any default under the Mortgage, and in the event of a foreclosure or other enforcement of the Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the remaining term of the Lease and any extensions thereof, the rights of Tenant thereunder shall expressly survive, and the Lease shall in all respects continue in full force and effect so long as Tenant fully performs all of its obligation thereunder. So long as no Event of Default by Tenant has occurred and is continuing under the Lease, Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law. Lender agrees, and the Mortgagee shall provide, in effect, that during the time the Lease is in force all insurance proceeds and condemnation awards shall be permitted to be used for restoration in accordance with the provisions of the Lease. Notwithstanding an Event of Default under the Lease, the provisions of Paragraph 16(a) thereof shall continue to apply for the benefit of any Qualified Subtenant defined and referred to in Paragraph 17(c) of the Lease, and any such Qualified Subtenant's possession shall not be disturbed, in the absence of a default under its sublease beyond applicable cure periods, regardless of the termination of the Lease.

4.     <u>Attornment</u>. At any time prior to expiration of the term of the Lease, Tenant agrees, at the election and upon demand of any owner of the Property or of Lender, to attorn, from time to time, to any such owner or Lender, upon the then executory terms and conditions of the Lease, for the remainder of the term originally demised in the Lease and for any renewal terms, provided that such owner or Lender shall then be entitled to possession of the Property subject to the provision of the Lease. The provisions of this section 4 shall inure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, the Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect of said provisions. Additionally, in such event, Tenant shall be bound to Lender, and Lender shall be bound to

3

Tenant, subject to the terms of the Lease, under all of the terms, covenants and conditions of the Lease, and Lender and Tenant shall, from and after Lender's succession to the interest of Landlord under the Lease, have the same remedies against each other for the breach of any provision contained in the Lease that they might have had under the Lease against each other if Lender were the original landlord under the Lease, except as provided in section 5(c) below.

     5.    Additional Agreements.  Tenant hereby agrees to and with Lender:

     (a)    Tenant shall not, without in each case the prior written consent of Lender which shall not be unreasonably withheld, conditioned or delayed, amend, modify, cancel or surrender the term of this Lease except as expressly permitted by the provisions of this Lease, or enter into any agreement with Landlord so to do;

     (b)    Tenant shall not pay any installment of Basic Rent (as defined in the Lease) more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in the Lease;

     (c)    Lender shall not, upon assuming title to the Property, be liable for any act or omission of any prior landlord (including Landlord), be subject to any offsets or defenses which Tenant may have against any prior landlord, be bound by any rent or additional rent paid for more than the then current period to any prior landlord, or be bound by any agreement or modification of this Lease made without such Lender's consent after Tenant has been given written notice of such Lender's interest; and

     (d)    If Tenant should acquire a fee estate in the Property there shall be no merger of the leasehold and fee estates so long as the Mortgage securing payment of the Note remains outstanding and unreleased□

     6.    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the state in which the Property is located.□

     7.    Binding Effect: Definitions.  The provisions of this Agreement shall be covenants running with the Property, and shall be binding upon and inure to the benefit of the respective parties hereto and their respective heirs, legatees, executors, administrators, beneficiaries,

4

successors and assigns, including without limitation (a) any person who shall obtain, directly or by assignment or conveyances, any interest in the Mortgage; (b) any transferee; or (c) any person who shall obtain any interest in the Property, whether through foreclosure or otherwise. Without limiting the foregoing, Mortgagee agrees that any Qualified Subtenant (as defined in the Lease) that has, by virtue of the provisions of Paragraph 17(c) of the Lease, been granted nondisturbance by Landlord, shall be entitled to nondisturbance by Mortgagee upon the same terms and conditions set forth herein upon Tenant's request. As used herein, the term "Tenant" shall include Tenant, its successors and assigns; the words "foreclosure" and "foreclosure sale" as used herein shall be deemed to include the acquisition of Landlord's estate in the Property by voluntary deed (or assignment) in lieu of foreclosure; and the word "Lender" shall include Lender herein specifically named and any of its successors and assigns, including anyone who shall have succeeded to Landlord's interest in the Property by, through and under foreclosure of the Mortgage.☐

    8.    Entire Agreement. This Agreement shall be the whole and only agreement between the parties hereto with regard to the subordination of the Lease and leasehold interest of Tenant to the Mortgage in favor of Lender, and, with respect to Lender and Tenant only, shall supersede and cancel any prior agreements as to such, or any, subordination, excluding, however, those provisions contained in the Lease which provide for the subordination of this Lease and leasehold interest of Tenant to a deed or deeds of trust or to a mortgage or mortgages to be thereafter executed, and shall not be modified or amended except in writing signed by all parties hereto.

    9.    Invalidity or Unenforceability. If any term, covenant or condition of this Agreement is held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

    10.    Number and Gender. The use of the neuter gender in this Agreement shall be deemed to include any other gender, and words in the singular number shall be held to include the plural, when the sense requires.
        ☐

    11.    Notice. Any notice required or allowed by this Agreement shall be in writing and its delivery and receipt shall be as set forth in the Lease; addressed to the party intended to receive the same at the address set forth below:

    If to Tenant:            Circuit City Stores, Inc.
                            9950 Mayland Drive
                            Richmond, Virginia 23233

5

Attention:  Corporate Secretary

With a copy to:                          McGuire, Woods, Battle & Boothe LLP
                                         One James Center
                                         Richmond, Virginia 23219
                                         Attention:  Robert L. Burrus, Jr.

If to Landlord:                          _____
                                         _____
                                         _____
                                         _____

If to Lender:                            _____
                                         _____
                                         _____
                                         _____

     The parties may, by written notice to the others, designate a different mailing address for notices.

6

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

LANDLORD:

_____

By: _____
Name: _____
Title: _____


TENANT:

CIRCUIT CITY STORES, INC.

By: _____
Name: _____
Title: _____

MWBB June 9, 1999
U:\CIRCUIT\SLC99\LEASE-OH.WPD

**LENDER:**

_____

**By:** _____
**Name:** _____
**Title:** _____

[ATTACH APPROPRIATE NOTARIAL ACKNOWLEDGMENTS]

8

# Exhibit B

## ASSIGNMENT AND ASSUMPTION OF LEASE

**AGREEMENT** made as of the        day of March        , 2000, between CC INVESTORS #17, L.P., a Texas limited partnership, having its principal office at 8411 Preston Road, 8th Floor, Dallas, Texas 75225 (herein referred to as "Assignor") and **DEBORAH LANDMAN, ELI LANDMAN, ZOLTAN SCHWARTZ and ANNA SCHWARTZ**, as Tenants-in-Common, having addresses at 617 North Detroit Street, Los Angeles, California 90036, (herein collectively referred to as "Assignee");

## WITNESSETH:

**WHEREAS,**

1.     Under date of June 18, 1999, Assignor, as landlord, entered into a lease (the "Lease") with Circuit City Stores, Inc., as Tenant, for premises located at Steubenville, Ohio, more particularly described in Exhibit A attached hereto and in the Lease, a memorandum of which has been recorded with the Clerk in Volume 328, Page 393.

1.     Assignor now desires to assign its interest as landlord under the Lease to Assignee and Assignee desires to succeed to the interest of Assignor as landlord under the Lease and is willing to assume the observance and performance of the obligations of landlord under the Lease.

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

**FIRST:** Assignor hereby assigns, transfers and sets over unto Assignee all of Assignor's right, title and interest as landlord under the Lease as of the date of this Agreement.

**SECOND:** Assignee, for the benefit of Assignor, hereby agrees to assume, keep, observe and perform each and every one of the terms, covenants and conditions of the Lease on the landlord's part to be observed or performed under the Lease with the same force and effect as if Assignee had executed the Lease as the landlord named therein.

**THIRD:** Assignor hereby indemnifies and agrees to save Assignee its successors and assigns, harmless of and from all loss, cost, damage, liability and expense, including, but not limited to reasonable counsel fees, arising from or connected with Assignor's obligations with respect to the Lease which accrued prior to the date hereof.

**FOURTH**: Assignee hereby indemnifies and agrees to save Assignor its successors and assigns, harmless of and from all loss, cost, damage, liability and expense, including, but not limited to reasonable counsel fees, arising from or connected with Assignee's obligations with respect to the Lease which accrue on or after the date hereof.

**FIFTH**: Except as expressly modified by the foregoing provisions of this Agreement, the Lease is hereby ratified and confirmed in all respects by each of the parties to this Agreement.

**SIXTH**: The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and assigns.

**SEVENTH**: This Agreement may be executed in any number of counterparts all of which together shall constitute the Agreement.

(SIGNATURE PAGES AND ACKNOWLEDGMENTS TO FOLLOW)

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the day and year first above written.

Signed and acknowledged
in the presence of:

**ASSIGNOR:**

**CC INVESTORS #17, LP**, a Texas limited
partnership

Printed Name: _____

By:   CCP Investors GP, Inc.,
      a Texas corporation, general partner

Printed Name: _____

By: _____
    Name: M. Scott Kipp
    Title:        Vice President

STATE OF TEXAS            )
                          )
COUNTY OF DALLAS          )

The foregoing instrument was acknowledged before me this ____ day of March, 2000, M Scott Kipp, a Vice President of CCP Investors GP, Inc., the general partner of CC investors #17, L.P., a Texas limited partnership on behalf of said limited partnership.

My Commission Expires:

_____

Notary Public
State of _____

_____
Printed or Typed Name of Notary

(SIGNATURE PAGES AND ACKNOWLEDGMENTS TO THE
ASSIGNMENT AND ASSUMPTION OF LEASE TO FOLLOW)

ASSIGNEE:

Signed and acknowledged
in the presence of:

DEBORAH LANDMAN

Printed Name

Printed Name:

STATE OF                    )
                           )
COUNTY OF                  )

Before me, a Notary Public in and for said County and State, personally appeared
_____, by me known, who acknowledged execution of the foregoing
instrument.

My Commission Expires:

Notary Public
State of

Printed or Typed Name of Notary

(SIGNATURE PAGES AND ACKNOWLEDGMENTS TO THE
ASSIGNMENT AND ASSUMPTION OF LEASE TO FOLLOW)

ASSIGNEE:

Signed and acknowledged
in the presence of

                               ELI LANDMAN

Printed Name: _____

Printed Name _____

STATE OF                )

COUNTY OF           )

       Before me, a Notary Public in and for said County and State, personally appeared _____, by me known, who acknowledged execution of the foregoing instrument.

My Commission Expires:

_____

                                     Notary Public
                                     State of _____

                                     Printed or Typed Name of Notary

                     (SIGNATURE PAGES AND ACKNOWLEDGMENTS TO THE
ASSIGNMENT AND ASSUMPTION OF LEASE TO FOLLOW)

# Exhibit C

*Exhibit C*
*Amounts Due and Owing to Anna Schwartz, Zoltan Schwartz, Deborah Landman*
*and Eli Landman*

| Pre-Petition Rent Claim | Type of Claim | Amount ($) |
|---|---|---|
| Oct-08 | General Unsecured Claim | 25,591.67 |
| Nov-08 | General Unsecured Claim | 7,677.50 |
| | | |
| **Pre-Petition Real Estate Taxes** | | |
| First Half of 2008 Accrued but Unpaid Taxes | General Unsecured Claim | 10,568.19 |
| Second Half of 2008 Accrued but Unpaid Taxes (Pre-Petition) | General Unsecured Claim | 7,556.98 |
| | | |
| **Post-Petition Real Estate Taxes** | | |
| Second Half of 2008 Accrued but Unpaid Taxes (Post-Petition) | Administrative Expense Claim | 3,011.21 |
| 2009 Accrued but Unpaid Taxes Through Rejection Date | Administrative Expense Claim | 3,127.03 |

| Maximum Rejection Claim Based on 502(b)(6) | Calculated As Follows | Amount ($) |
|---|---|---|
| Rent for the Remaining Term | 148.25 months x $25,591.67 per month | 3,793,965.08 |
| Taxes for the Remaining Term | 148.25 months x $1,768.37 per month | 262,160.85 |
| Insurance for the Remaining Term | 148.25 months x $1,132.25 per month | 167,856.06 |
| Utilities for the Remaining Term | 148.25 months x $800 per month (approx.) | 118,600.00 |
| Management Services for the Remaining Term | 148.25 months x $500 per month (approx.) | 74,125.00 |
| Maintenance for the Remaining Term | 148.25 months x $500 per month (approx.) | 74,125.00 |
| | | |
| Total Amount for the Remaining Term | | 4,490,831.99 |
| **15% of Total Amount for the Remaining Term** | | **673,624.80** |

| | | |
|---|---|---|
| One Year's Rent, Taxes, Insurance, Utilities, Management and Maintenance | | 363,867.48 |
| Three Years' Rent, Taxes, Insurance, Utilities, Management and Maintenance | | 1,091,602.44 |

# Exhibit D

Commercial Construction & Renovations,
Inc.
P.O. Box 289
Byesville, OH 43723

# Invoice

| DATE | INVOICE NO. |
|------|------------|
| 3/10/2009 | 793 |

| BILL TO | SHIP TO |
|---------|---------|
| Deborah Landman<br>c/o Michael Schwartz<br>617 North Detroit Street<br>Los Angeles, CA 90036 | Steubenville CCSI #3733<br>4130 Mall Drive<br>Steubenville, OH 43952<br>(740) 266-6083 |

| P.O. NO. | TERMS | SHIP DATE |
|----------|-------|-----------|
| per Deborah Land... | Due on receipt | 3/10/2009 |

| ITEM | DESCRIPTION | QTY | RATE | AMOUNT |
|------|-------------|-----|------|--------|
| Inspection | Inspect vacant property and turn off electric & water that was left running. | | | |
| Door Hardware | Re-Key building. | | | |
| Labor | Total Number of Man Hours for Invoice (2 Men @ 3 hours each) | 6 | 50.00 | 300.00 |
| Estimate | Provide a written estimate of work requested to be performed via hard copy mail or e-mail.  E-mailed to Michael Schwartz 3/11/2009. | | 150.00 | 150.00 |

| | **Total** | $450.00 |
|--|-----------|---------|

# Exhibit E

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212.309.6000
Fax: 212.309.6001
Fed Tax ID: 23-0891050
www.morganlewis.com

# Morgan Lewis
### COUNSELORS AT LAW

December 17, 2008

Invoice No. 2104863
Account No.  066910-0002

Dr. Michael Schwartz
Schwartz Family Trust
2818 Avenue P
Brooklyn, New York 11229

**Summary of Services for the period ended November 30, 2008:**

Re:  **Circuit City**

| | | |
|---|---|---|
| Fees | $ | 568.00 |
| **Total Current Period Charges** | $ | **568.00** |

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212.309.6000
Fax: 212.309.6001
Fed Tax ID: 23-0891050
www.morganlewis.com



January 13, 2009

Invoice No. 2113473
Account No.  066910-0002

Dr. Michael Schwartz
Schwartz Family Trust
2818 Avenue P
Brooklyn, New York 11229

**Summary of Services for the period ended December 31, 2008:**

**Re:  Circuit City**

| | | |
|---|---|---|
| Fees | $ | 968.00 |
| Disbursements and Other Related Charges | | 15.57 |
| **Total Current Period Charges** | **$** | **983.57** |

Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212.309.6000
Fax: 212.309.6001
Fed Tax ID: 23-0891050
www.morganlewis.com

# Morgan Lewis
COUNSELORS AT LAW

February 5, 2009

Invoice No. 2123163
Account No.  066910-0002

Dr. Michael Schwartz
Schwartz Family Trust
2818 Avenue P
Brooklyn, New York 11229

**Summary of Services for the period ended January 31, 2009:**

      **Re:  Circuit City**

| | | |
|---|---|---|
| Fees | $ | 284.00 |
| **Total Current Period Charges** | $ | **284.00** |

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Tel: 212.309.6000
Fax: 212.309.6001
Fed Tax ID: 23-0891050
www.morganlewis.com

# Morgan Lewis
C O U N S E L O R S   A T   L A W

March 5, 2009

Invoice No. 2135626
Account No.  066910-0002

Dr. Michael Schwartz
Schwartz Family Trust
2818 Avenue P
Brooklyn, New York 11229

**Summary of Services for the period ended February 28, 2009:**

Re:  **Circuit City**

| | | |
|---|---|---|
| Fees | $ | 1,590.00 |
| Disbursements and Other Related Charges | | 3.86 |
| **Total Current Period Charges** | $ | **1,593.86** |

# <u>Exhibit F</u>

*Exhibit F*
*Estimated Costs of Repair of Existing Damages*

| Existing Damages | Estimated Cost ($) |
|---|---|
| Cleaning of Parking Lot & Lawn Area | 300.00 |
| Cleaning of Building Interior (Fixture Removal) | 2,500.00 |
| Replacement of Damaged Wallboard | 4,500.00 |
| Dumpster Rental | 1,200.00 |
| Replacement and Drilling of Floor for Racks | 35,000.00 |
| Replacement of Garbage Compactor | 18,000.00 |
| Electrical Safety Disconnects | 8,000.00 |
| Sign Removal from Building Exterior | 11,000.00 |
| **Total Amount of Existing Damages** | **80,500.00** |