UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| IN RE: | . | Case No. 08-35653(KRH) |
| | . | |
| | . | |
| CIRCUIT CITY STORES, | . | |
| INC., | . | 701 East Broad Street |
| | . | Richmond, VA 23219 |
| | . | |
| Debtor. | . | December 5, 2008 |
| . . . . . . . . . . . . .. | | 11:05 a.m. |

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN R. HUENNEKENS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | McGuire Woods, LLP |
| | By:  DOUGLAS FOLEY, ESQ. |
| | 9000 World Trade Center |
| | 101 W. Main Street |
| | Norfolk, VA 23510 |
| | |
| | Skadden Arps Slate Meagher & Flom LLP |
| | By:  GREGG M. GALARDI, ESQ. |
| | IAN S. FREDERICKS, ESQ. |
| | P.O. Box 636 |
| | Wilmington, DE 19899 |
| | |
| For Creditors' Committee: | Pachulski Stang Ziehl & Jones, LLP |
| | By:  ROBERT J. FEINSTEIN, ESQ. |
| | 780 Third Avenue |
| | New York, NY 10017 |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311   Fax No. (609) 587-3599**

APPEARANCES (Cont'd):

| | |
|---|---|
| For Bethesda Softworks LLC: | McKenna Long & Aldridge LLP<br>By:  JOHN GOODE McJUNKIN, ESQ.<br>        DANIEL CARRIGAN, ESQ.<br>1900 K Street NW<br>Washington, DC 20006 |
| For Panasonic: | Hunton & Williams LLP<br>By:  J.R. SMITH, ESQ.<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Richmond, VA 23219<br><br>Schulte Roth & Zabel LLP<br>By:  DAVID M. HILLMAN, ESQ.<br>919 Third Avenue<br>New York, NY 10022 |
| For Bank of America: | LeClairRyan<br>By:  BRUCE H. MATSON, ESQ.<br>Riverfront Plaza, East Tower<br>951 East Byrd Street<br>Eighth Floor<br>Richmond, VA 23219 |
| For Shopping.com, Inc. | Kutak Rock LLP<br>By:  MICHAEL A. CONDYLES, ESQ.<br>1111 East Main Street<br>Suite 800<br>Richmond, VA 23219<br><br>Cooley Godward & Kronish LLP<br>By:  JEFFREY COHEN, ESQ.<br>The Grace Building<br>1114 Avenue of the Americas<br>New York, NY 10036 |
| For the Internal Revenue Service: | Internal Revenue Service<br>By:  RICHARD F. STEIN, ESQ.<br>400 North 8th, Suite 636<br>Mail Box 77<br>Richmond, VA 23219 |
| For Alvarez & Marsal Canada, ULC: | Allen & Overy LLP<br>By:  KEN COLEMAN, ESQ.<br>1221 Avenue of the Americas<br>New York, NY 10020 |

```
APPEARANCES (Cont'd):

For Alliance              Whiteford Taylor & Preston, L.L.P.
Entertainment Corp.:      By:  BRADFORD F. ENGLANDER, ESQ.
                          Suite 300
                          3190 Fairview Park Drive
                          Falls Church, VA 22042

For Carrollton Arms,      Canfield, Baer, Heller & Johnston, LLP
LLC:                      By:  PAUL McCOURT CURLEY, ESQ.
                          2201 Libbie Avenue, Suite 200
                          Richmond, VA 23230

                          Giarmarco Mullins & Horton
                          By:  GARY H. CUNNINGHAM, ESQ.
                          101 W. Big Beaver Road
                          Floor 10
                          Troy, MI 48084

For Lexmark               Christian & Barton, L.L.P.
International, Inc.:       By:  AUGUSTUS C. EPPS, JR., ESQ.
                          909 E. Main Street
                          Suite 1200
                          Richmond, VA 23219

Dentici Family Limited    Spotts Fain PC
Partnership:              By:  NEIL E. McCULLAGH, ESQ.
                          P.O. Box 1555
                          Richmond, VA 23218

Prince George's Station   Akerman Senterfitt
Retail, LLC:              By:  WILLIAM C. CRENSHAW, ESQ.
                          750 9th Street NW
                          Suite 750
                          Washington, DC 20001

Burbank Mall Associates   Williams, Mullen, Clark & Dobbins
LLC:                      By:  PAUL S. BLILEY, JR., ESQ.
                          1021 East Cary Street
                          P.O. Box 1320
                          Richmond, VA 23218

For Interested Party:     By:  TROY WOOD, ESQ.
```

```
APPEARANCES (Cont'd):

For 502-12 86th Street     Hirschler Fleischer, P.C.
LLC:                       By:  MICHAEL P. FALZONE, ESQ.
                           P.O. Box 500
                           Richmond, VA 23218

For Pan Am Equities:       Law Offices of David A. Greer PLC
                           By:  DAVID A. GREER, ESQ.
                           500 East Main Street
                           Suite 1200
                           Norfolk, VA 23510

For Galleria and          Hirschler Fleischer, P.C.
Taubman Auburn Hills      By:  ROBERT S. WESTERMANN, ESQ.
Associates:               2100 East Cary Street
                           The Edgeworth Building
                           Richmond, VA 23223

TELEPHONIC APPEARANCE:

For VIWI Limited           Blank Rome LLP
Partnership:               By:  JOHN E. LUCIAN, ESQ.
                           One Logan Square
                           130 N. 18th St
                           Philadelphia, PA 19103

                    -  -  -
```

1             (Poor recording – audio not very clear)

2             COURT CLERK:  United States Bankruptcy Court for the

3    Eastern District of Virginia is now in session.  The Honorable

4    Kevin R. Huennekens is presiding.  Please be seated and come to

5    order.

6             COURTROOM DEPUTY:  In the matter of Circuit City

7    Stores, Incorporated, Case Number 08-35653.  Hearing on Items 1

8    through 33 as set out on today's docket.

9             THE COURT:  A lot of people.

10            MR. FOLEY:  Good morning, Your Honor.  Doug Foley

11   with McGuire Woods on behalf of the debtors.  First I wanted to

12   thank the Court for the opportunities for the last hour or so

13   to try to see if we could work out some additional resolutions

14   of some of the items on the agenda and I believe we had done

15   so.

16            Today, Your Honor, with me at counsel table is Gregg

17   Galardi and Ian Fredericks from the law firm of Skadden Arps as

18   restructuring counsel for the debtors.  And here from the

19   company today, Your Honor, sitting in the front row is Mr. Jim

20   Marcum who's the chief executive officer of the company, as

21   well as Bruce Besanko who is the chief financial officer of the

22   company, Reggie Hedgebeth who is the general counsel of the

23   company.  Also we have Chris Crowe (phonetic) who's the

24   director of real estate who's here with the company as well,

25   Your Honor.

1          THE COURT:  All right.

2          MR. FOLEY:  Your Honor, we did file an amended agenda

3     last night.  If Your Honor doesn't have a copy we were going to

4     try to mostly file that agenda.  We would like --

5          THE COURT:  I do have a copy.

6          MR. FOLEY:  Okay.  We would essentially like to file

7     that agenda, Your Honor, with a couple of exceptions of some

8     citings we'd like to leave up so that counsel can leave the

9     courtroom after we announce those resolutions.  But, just to go

10    through, starting, Your Honor, with Agenda Item Number 1.  This

11    is an unopposed motion to extend the time to file schedules and

12    statements that we filed, Your Honor.

13         We've requested until December 30th but our

14    anticipation is to file the schedules next week so that we can

15    send out notices and (indiscernible) notices and proof of claim

16    forms to creditors by December 19th.  So, although we've asked

17    for until the end of the month we anticipate filing the

18    schedules next week.  And the motion has not been opposed.  We

19    would ask permission to submit an order after the hearing.

20         THE COURT:  And that'd be granted.

21         MR. FOLEY:  Thank you, Your Honor.  With respect to

22    Items Number 2, 3, 4 and 7, these are professional employment

23    applications, the first one for our firm as co-counsel for the

24    debtors under 327(a), Your Honor, and also with respect to Item

25    Number 3.  It's the application for Kirkland & Ellis to be

1  employed as special financing counsel to deal with financing

2  issues for the company.  That also has not been opposed, Your

3  Honor.  And then also Skadden Arps' employment application was

4  the restructuring counsel, Item Number 7.  None of those

5  applications have been opposed.

6      We also had, Your Honor, no employment application

7  for Ernst & Young as tax accountants and consultants for the

8  company.  We would ask the Court -- we have consulted with the

9  U.S. Trustee in (indiscernible) there's been no objections with

10  respect to those applications and we would ask the Court for

11  permission to submit orders after the hearing today.

12      THE COURT:  Does any party wish to be heard in

13  connection with the proposed applications?

14              (No audible response)

15      THE COURT:  All right.  They will be granted.

16      MR. FOLEY:  Thank you, Your Honor.  With respect to

17  the applications of Rothschild as investment banker and FTI as

18  financial advisor, as the agenda reflects, Your Honor, the

19  Committee had until yesterday afternoon to file an objection.

20  We had been working through their issues and I believe they've

21  reached a resolution of their issues and I defer to Mr.

22  Feinstein to describe that.  But, what we would like, Your

23  Honor, is to be able to -- with the U.S. Trustee's endorsement

24  upon these orders, to submit those orders after the hearing, as

25  well.

1          THE COURT:  All right.

2          MR. FEINSTEIN:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4          MR. FEINSTEIN:  Robert Feinstein, Pachulski Stang

5    Ziehl & Jones.  We are proposed committee counsel to the

6    creditors' committee.  We have worked diligently with debtor's

7    professionals, including directly with FTI and Rothschild on

8    modified terms for their attention, essentially changing, and

9    in many cases reducing the proposed compensation structure.

10   It's consistent in all part of a whole, Your Honor, the

11   approach the Committee's taking in this case in which you'll

12   see reflected in a number of pleadings we filed.  And if I --

13   if Your Honor would indulge me for just a moment.

14          We are trying to do our best, all the constituents,

15   to preserve Circuit City's going concern Enterprise.  And

16   you'll see in a number of the positions the Committee has taken

17   we are trying to reduce the administrative burden on the estate

18   to make sure that any dollars that don't need to go out the

19   door don't go out the door today.  Some of those are -- some

20   are controversial I guess because in many cases if you were to

21   see sales tax payments and employee payments and so forth,

22   we're obviously in a challenging time.

23          And with that in mind, on a number of the

24   applications, including these two professional applications,

25   the Committee has weighed in with a larger goal preserving the

1  Enterprise.  The specific terms of Rothschild and FTI that we

2  agreed to would be reflected in forms of order that we're

3  working on, and we would propose to submit those on consent of

4  the Committee and the debtor, Your Honor, if that's acceptable.

5       THE COURT:  All right.  Very good.  Any other party

6  wish to be heard?

7            (No audible response)

8       THE COURT:  All right, then with the consent of the

9  Committee and the approval of the Office of the U.S. Trustee

10  the Court will approve those applications.

11       MR. FEINSTEIN:  Thank you, Your Honor.  Item Number 8

12  on the agenda is a motion to file certain documents under seal

13  by Shopping.com.  If I could just pass over that one, Your

14  Honor, for a moment because the underlying motion is contested

15  and then this one's not and we'd like to deal with those

16  together.

17       Item Number 9, Your Honor, is the motion to establish

18  interim compensation procedures.  And that motion is also not

19  opposed, but there's one amendment to the procedures relating

20  to reimbursement of certain expenses of committee members.  And

21  we have spoken with the Office of the United States Trustee

22  today before the hearing and we're going to make an amendment

23  to that order with their endorsement and submit that after the

24  hearing, Your Honor, if that's acceptable to the Court.

25       THE COURT:  Any party wish to be heard in connection

1  with that motion?

2                    (No audible response)

3          THE COURT:  All right.  The Court will approve that

4  as amended with the endorsement of the Office of the U.S.

5  Trustee.

6          MR. FEINSTEIN:  Thank you, Your Honor.  With respect

7  to Item Numbers 10 and 11 -- or 10 on the docket, Your Honor,

8  this is a matter involving our motion to set procedures

9  relating to trading, claims and equity securities.  We have

10  resolved one of the objections.  We have not resolved the other

11  objection that the Committee has raised but we are looking

12  through that and under the procedures order we'd ask that this

13  matter be adjourned to a December 22nd docket, Your Honor.

14          THE COURT:  It will be adjourned.

15          MR. FEINSTEIN:  Thank you, Your Honor.  With respect

16  to matter Number 11 which is the debtor-in-possession financing

17  motion, Your Honor, there had been significant objections to

18  that.  We're also working with the Committee with respect to

19  their issues and trying to work through those as well and ask

20  -- we would ask that everything related to matter Number 11 be

21  adjourned to the December 22nd hearing.

22          MR. GALARDI:  Your Honor, just to give Your Honor and

23  other parties -- we've been working with the Committee and we

24  understand that there are various objections to that financing.

25  We met with them yesterday and we've also been working very

1  cooperatively with the bank group.  We are currently putting it

2  over to the 22nd.  There was some discovery that we've

3  consensually agreed to stay that would start out today, but we

4  are, again, working on a further adjournment and they actually

5  come back on January 16th.  I think that's another omnibus date

6  that we have.

7         I wanted to give Your Honor notice of that because we

8  may just simply file a notice saying that it is further

9  adjourned so people in the courtroom know that we may not be

10 here on the 22nd.  Again, I think we've had -- as Mr. Feinstein

11 said we've had a lot of progress with respect to negotiations

12 between ourselves, the Committee and the financial wherewithal

13 of this company and the banks have been supportive.  So, we may

14 actually be adjourning that further, but for now we just wanted

15 to put it on for December 22nd.

16        THE COURT:  All right.  It'll be adjourned to the

17 22nd.

18        MR. GALARDI:  Thank you.

19        MR. McJUNKIN:  Your Honor, if we could be heard on

20 that, please.

21        THE COURT:  Yes.

22        MR. McJUNKIN:  Good morning, Your Honor.  John

23 McJunkin, McKenna Long & Aldridge on behalf of Bethesda

24 Softworks, LLC in --

25        THE COURT:  Bethesda Softworks?

1        MR. McJUNKIN:  Softworks, LLC in connection with this

2   matter.  And I'd also like to raise the motion to admit pro hac

3   vice Daniel Carrigan, my partner, who's been working on this

4   matter.  It's a pending order, and I think we've got to get it

5   uploaded for you so Mr. Carrigan could be heard.

6        THE COURT:  He can be heard.

7        MR. CARRIGAN:  Good morning, Your Honor.  Daniel

8   Carrigan --

9        THE COURT:  Carrigan?

10       MR. CARRIGAN:  Yes, Your Honor.

11       THE COURT:  Thank you, sir.

12       MR. CARRIGAN:  And that's with a C, Your Honor.  The

13  Wrong Way Corrigan, not Nancy Kerrigan.

14       Your Honor, our particular observation on this on --

15  what's on the agenda is if I have the -- actually the

16  (indiscernible) in the agenda was Article Number 12 on Page 9.

17  It's -- our response to another motion is listed as an

18  objection to this motion, and I noted in the debtor's omnibus

19  response filed in response to the reclamation procedures motion

20  that our response is listed here in the DIP motion.  It was not

21  addressed.  All we're saying is that we believe that this

22  should come up at the time that the reclamation motion should

23  -- is going to be addressed by the Court if it is to be

24  addressed by the Court.

25       THE COURT:  All right.  If we address that today then

13

1    I'm going to assume it will be taken up at that time.  All

2    right.

3              MR. CARRIGAN:  Thank you, Your Honor.

4              THE COURT:  All right.  So, for the record, this

5    matter, then, is adjourned to the next omnibus date.

6              MR. CARRIGAN:  Thank you, Your Honor.  One item we

7    would like to take out of order here relates to the motion --

8    the 9019 motion to approve a settlement with Panasonic which is

9    Item Number 31 on the agenda.  The Committee filed an objection

10   to that settlement, but late last night I believe a settlement

11   has been worked out with respect to that and counsel for both

12   Panasonic and for the Committee are here and they can discuss

13   the terms of that settlement.

14             THE COURT:  All right.

15             MR. FEINSTEIN:  Good morning, Your Honor, again.  The

16   the modifications --

17             THE COURT:  Just for the record, I know you've

18   already identified yourself, but when you come to the podium if

19   you can just identify yourself so we've got it on the record

20   who's speaking.

21             MR. FEINSTEIN:  Certainly.  Robert Feinstein for the

22   creditors' committee.  Your Honor, the amendment that we've

23   made that would be reflected in an amended form of agreement

24   with Panasonic and the debtor that would be attached to a form

25   of consent order to be submitted essentially makes two

1 important changes. One is to address the treatment of

2 Panasonic's claim in respect of consigned merchandise that was

3 sold pre-petition.

4          Under the initial motion and agreement there was to

5 be a payment to Panasonic of that amount, and as sort of a quid

6 pro quo there was an agreement by Panasonic to sell goods on

7 credit terms going forward, and both of those provisions are

8 out. So, all I'd say reserved with respect to the pre-petition

9 consignment amount, there's no obligation of Panasonic's part

10 to sell on credit and they will be selling on CIA terms.

11          But, in all other respects the agreement will be

12 respected in that there is provision in the agreement for the

13 sell down of the remaining consigned merchandise that's still

14 in the debtor's possession with (indiscernible) and reporting

15 requirements. And the agreement that we'll submit to Your

16 Honor addresses all that and I believe that's the essence of

17 the settlement.

18          THE COURT: All right. Very good. Thank you. Any

19 other party wish to be heard?

20          MR. SMITH: Good morning, Your Honor. J.R. Smith

21 from Hunton & Williams on behalf of Panasonic. Here with me

22 today is Mr. David Hillman from the Schulte law firm and he was

23 a pending pro hac motion. I would ask that you hear him this

24 morning.

25          THE COURT: All right. Thank you.

1          MR. SMITH:  Thank you.

2          MR. HILLMAN:  Thank you, Your Honor.  Good morning.

3   I heard what Mr. Feinstein had to say regarding the settlement

4   agreement.  I think everything he said was accurate.  However,

5   we did take great pains last night and this morning to

6   memorialize the changes to the settlement agreement and to the

7   order.  And to the best of my knowledge there is no dispute or

8   issue or any open issue with respect to either the settlement

9   agreement or the order and we're simply at a housekeeping stage

10  now where the order would need to be submitted.  So there's, to

11  my knowledge, no further negotiation that needs to take place.

12  It's just a housekeeping matter at this point.

13         THE COURT:  All right.  Very good.  Thank you.

14         MR. HILLMAN:  Thank you, Your Honor.

15         MR. FEINSTEIN:  I think that's absolutely right, Your

16  Honor.  I think I left out one thing that I'm sure Mr. Hillman

17  would appreciate me saying.  We are in discussions but

18  nothing's been formulated or resolved to develop a program to

19  provide trade support and induce trade support for the company,

20  and if one is developed Panasonic will certainly be invited to

21  participate.

22         THE COURT:  Very good.

23         MR. FEINSTEIN:  Thank you.

24         THE COURT:  Thank you.  Mr. Matson?

25         MR. MATSON:  Good morning, Your Honor.  Bruce Matson

1  here on behalf of Bank of America, the agent for the bank

2  group.  We -- this happened very recently and we did have an

3  issue as it related to this depending on how it was resolved

4  and we just would like to be able to look at the final order.

5  We don't think we're going to have any issue but Mr. Galardi

6  assured me that we don't have an issue but we just would like

7  to look at the order before it gets entered.

8           THE COURT:  All right.

9           MR. GALARDI:  Your Honor, just so Your Honor has some

10  background, we would've needed amendment if we would pay down

11  the pre-petition debt.  The banks were waiting to see how the

12  Committee reacted.  This happened late last night around one

13  o'clock.  So, I've had conversations with Mr. Berman but -- and

14  since there's no pre-petition debt being paid down I don't

15  think we need an amendment.  I think it'll be fine.  But, I

16  wanted to (indiscernible) the courtesy that the bank will also

17  review the proposed order obviously.

18           THE COURT:  All right.  Very good.  Thank you.  All

19  right.  So, then with the amendments as stated on the record

20  then the Court will approve that order when it comes in.

21           MR. GALARDI:  Thank you, Your Honor.  That was Item

22  31 on the docket, we'll be submitting an order on that.  Your

23  Honor, the next two items we'd like to take up involve the

24  Shopping.com motion and -- two motions; motion to file

25  documents under seal and motion for adequate assurance.  Those

1    are Items Number 8 which is unopposed and Item Number 26 which,

2    Your Honor, we filed an opposition to yesterday.  And Mr. Cohen

3    is here for Shopping.com and can present his arguments to the

4    Court.

5            THE COURT:  All right.  Thank you.

6            MR. CONDYLES:  Good morning, Your Honor.  Michael

7    Condyles on behalf of Shopping.com.  I'd like to present to the

8    Court, Jeff Cohen of Cooley Godward & Kronish who have

9    submitted a pro hac vice motion for which an order has not yet

10   been entered but I would ask that he be presented to the Court

11   and allowed to be admitted pro hac vice.

12           THE COURT:  He may.

13           MR. CONDYLES:  Thank you.

14           THE COURT:  Mr. Cohen?

15           MR. COHEN:  Good morning, Your Honor.  Jeffrey Cohen,

16   Cooley Godward & Kronish on behalf of Shopping.com and

17   (indiscernible), Inc.  Your Honor, I realize the Court has a

18   rather large diary today.  I think this argument will be pretty

19   short.  In essence, our motion is a request for adequate

20   assurance and additional payments and the acknowledgment from

21   the debtors and the Court that any additional services provided

22   would qualify additional expense and a variety of other

23   requests in the alternative (indiscernible).  I'm not going to

24   go through the laundry list.  I think we can narrow it down.

25           Basically Shopping.com is an online comparison

1    website.  It permits the debtors to post advertisements of sale

2    items on the Shopping.com website.  Depending on what the

3    debtors pay or bid to pay Shopping.com dictates where their ads

4    would be placed on the site.  The higher the priority they want

5    visibility.  In fact, the higher the priority the more

6    likelihood that the Circuitcity.com logo will appear next to

7    the sale as opposed to just a link saying this TV is this price

8    it would have a logo.  When they click on that logo they go to

9    Circuitcity.com and that incurs a fee which Circuitcity.com

10   would then owe Shopping.com for every click.

11            In addition to that Shopping.com, in working with the

12   debtors, were to optimize the relationship.  By doing that the

13   debtors will instruct them to negotiate deals with third party

14   vendors on behalf of the debtors.  For example, not many people

15   go directly to Shopping.com but they go to Google and they put

16   in a television -- a flat panel television that they'd like to

17   see what the various sale prices are across the internet.  And

18   Shopping.com will negotiate with Google that when that item was

19   searched on Google the Shopping.com listing will have a more

20   permanent higher priority on the first page or toward the top

21   of the first page.  And in addition, when you click on the

22   Shopping.com on Google and you go to Shopping.com Circuit City

23   will be highly listed.

24            So, Shopping.com incurs costs in negotiating with the

25   third party vendors.  It pays them, and then when a consumer

1  clicks on that link on Shopping.com it was ultimately charged

2  to the estates.   Shopping.com then gets reimbursed for what

3  they paid out on behalf of Circuit City and keeps the

4  (indiscernible) additional.

5       What we are asking for today, and it seems that the

6  debtor at least acknowledged in part in that objection is at a

7  minimum an order acknowledging that post-petition services will

8  characterize those as any click by a consumer on Shopping.com

9  that results in being routed to the Circuitcity.com website

10 will qualify as an administrative expense claim.

11      The debtors do say in their objection they have no

12 objection to that if we can prove that in addition to a

13 transaction with the estate there's a benefit, then Your Honor,

14 I believe if you review Paragraph 18 of the debtor's objection,

15 benefit is admission -- is omitted as a part of the admission

16 by the debtor's clear statement that the debtors would be

17 severely prejudiced if Shopping.com (indiscernible) terminate

18 the agreement.

19      The debtor's success for reorganization is dependent

20 upon maintaining a high level of sales, particularly during the

21 holiday season, the internet in general, and Shopping.com in

22 particular provide crucial avenues by which the debtors reach

23 potential customers.  Absent Shopping.com services the debtors

24 expect that they will experience a decline in sales at their

25 online stores, thereby impairing the debtor's reorganization

1  efforts.

2          So, I think there's not much of a dispute over the

3  benefit that this agreement provides the estates, so I think at

4  a minimum an acknowledgment that post-petition services will

5  qualify as an administration expense claim, and I, of course,

6  wait for the debtor's response, but I don't believe that would

7  be a disputed issue.

8          What Shopping.com now requests in addition to that

9  acknowledgment from the debtor is not the long list of items

10 that I mentioned in the motion.  I'm not going to ask Your

11 Honor today to give us a (indiscernible) order to terminate the

12 agreement.  I don't think that benefits my client.  I certainly

13 don't think it benefits the estates.  That's not a course that

14 would be right at this time.

15          What I do ask, Your Honor, is because unlike your

16 typical relationship with a vendor or a service provider, since

17 Shopping.com is going out and expending costs on behalf of the

18 estates and issues bills on a same day basis, so at the end of

19 the month they'll issue a bill by the 15th of the month, then

20 there's 30-day terms, it often results in Shopping.com

21 expending resources, and sometimes waiting 60 to 90 days or

22 providing 60 to 90 days worth of services before we would know

23 whether payment on that first bill for the first month would be

24 made in a timely manner.

25          So, what Shopping.com would request is a deposit not

1  too different from the treatment of the utility provider.  As

2  an internet service provider and logging into the

3  Circuitcity.com website, I think you can draw a parallel

4  between the service of Shopping.com and the utilities provide,

5  Your Honor consider a utility motion under these cases which

6  provide a two-week deposit.  If utilities could provide

7  services prohibiting from terminating services, but don't know

8  until a few months down the road if they're not going to get

9  paid for that first month.  So, Shopping.com would make a

10  similar request for a deposit to protect them, especially in

11  light of the out-of-pocket costs will incur.

12        In addition, Your Honor, there's now a best

13  practices, though they're not explicitly I think defined in the

14  motion (indiscernible) that we bill every 30 days with 30-day

15  terms.  That's not including (indiscernible) and actually

16  mirrors our obligation to go out and pay on behalf of the

17  estates as something you do as a matter of course but it's not

18  an obligation in the agreement.

19        What I would ask Your Honor to do is permit

20  Shopping.com to issue a bill every 15 days and maintain the

21  30-day terms.  This way we're just trying to figure out

22  different avenues of providing Shopping.com with just a little

23  bit more protection while maintaining the use of the services

24  for Circuit City in the critical holiday season, and in light

25  of electronics (indiscernible) the Super Bowl, so November,

1  December and January.

2          We want to make sure that they can continue the

3  services being prominently listed, and Shopping.com doesn't go

4  out-of-pocket for a few months worth of services.  And I know

5  that (indiscernible) may be administratively solvent or not.  I

6  imagine (indiscernible) will be but that shouldn't be a risk

7  that Shopping.com is blamed when they go in their own pocket

8  and buy service on behalf of the estate.

9          THE COURT:  All right.  Thank you, Mr. Cohen.

10          MR. COHEN:  Thank you.

11          MR. FOLEY:  Your Honor, Doug Foley on behalf of the

12  debtors.  Here we filed a response which shows that the

13  arguments in the papers that -- request for relief in the

14  motion, although we appreciate Mr. Cohen backing off some of

15  the request that was in the motion.  It's still essentially

16  enough for (indiscernible) rewrite the contract.  And

17  notwithstanding that the motion clearly admits that <u>Bildisco</u>

18  standard applies that the counter parties (indiscernible) are

19  obligated to perform even if the debtor's not current on its

20  post-petition obligations.

21          They admit that they're not seeking 365(d)(2) relief

22  to compel us to assume or reject this contract early is because

23  they admit it's too early for us to do that.  They admit that

24  in papers.  That's really their only avenue for relief.

25  They're not seeking relief from stay for cause.  They admit

23

1 it's premature to make a decision with respect to this

2 contract.   The -- essentially, you know, they want to rewrite

3 the contract and we oppose rewriting the contract.

4         If they were to send us bills more often they're free

5 to send us bills more often as long as we're not obligated to

6 pay them more often.   Your Honor, what they've asked for is,

7 and point it out to the Court, is no different than any other

8 contract party.   Two related manufacturers have to pay third

9 party vendors to get the parts to make the TVs.

10        So, there really isn't anything that distinguishes

11 Shopping.com from -- as far as extending cost or credit to

12 provide the service or the product that they're providing to

13 the debtor's estate or they want critical (indiscernible)

14 relief.   We don't have that in this case, Your Honor.   Or they

15 want 366 relief which is covered by statute, we're not a

16 utility.   I mean we're sympathetic to their position but

17 they're no different than anybody else, and so our position is

18 that we would oppose rewriting the contract.   We would ask the

19 Court to deny the relief.

20        THE COURT:   And what does the contract say about the

21 billing cycle?

22        MR. FOLEY:   It is every 30 days I believe.   Thirty-

23 day (indiscernible) 15 days thereafter.   Of course it'll be --

24 it's not -- there's no specific terms, so we end up

25 (indiscernible) practices the 30-day (indiscernible) and 15-day

1 | pay after that.

2 |      THE COURT:  All right.  Thank you.

3 |      UNIDENTIFIED ATTORNEY:  Thirty days (indiscernible).

4 |      MR. FOLEY:  Oh, 30-day -- I apologize, Your Honor.

5 | Thirty days for the bill, 30 days to pay.  And, Your Honor,

6 | with respect to the request for administrative expense status

7 | for the post-petition clicks, the clicks were fees that include

8 | post-petition.  Mr. Cohen is correct.  We won't oppose if those

9 | were entitled to administrative status.

10 |      THE COURT:  All right.  Thank you.  Is there any

11 | other party that wish to be heard in connection with this

12 | matter?  Mr. Cohen, you wish to reply?

13 |      MR. COHEN:  Thank you, Your Honor.  Jeffrey Cohen,

14 | and I'll be brief.  Just to address those points, with regard

15 | to the Bildisco standard and that we're obligated to perform

16 | under the contract, I completely agree with that.  However, the

17 | contract does not require that we go out and pay third party

18 | providers to list this listing on their websites.  We actually

19 | do that at the instruction of Circuitcity.com.  Their account

20 | manager talks to our account manager.  They request that we go

21 | out and make a payment to somebody so they're higher -- they're

22 | listed higher in priority on that entity's website.  So, I

23 | think that distinguishes us in that regard.  We are obligated

24 | to perform.  We will.  We have no obligation to negotiate with

25 | third party vendors for higher placement on the websites.  We

1  do have the request of the company.  Critical vendors --

2          THE COURT:  With regard to that, though, what are you

3  asking me to do?  Isn't that just a matter of business

4  negotiation and -- between you and Circuit City?

5          MR. COHEN:  Well, all I'm asking Your Honor to do is

6  protect us in the posting of a deposit.  If Circuit City wants

7  to pay us in advance and say I'm willing to pay you to go pay

8  them, that's fine, too.  But, I think it's less burdensome on

9  Circuit City to post a two-week deposit and then won't be able

10 to run up credit with us on terms as opposed to us delaying the

11 listing by demanding cash in advance.

12         THE COURT:  But, isn't that something that you can

13 negotiate directly with Circuit City?  That's not something

14 that the Court should impose, is it?

15         MR. COHEN:  Your Honor, I believe we can negotiate

16 directly with them, and I advised my client of that.  I think

17 in these economic times people are looking for a certain level

18 of comfort.  They've seen comfort given to other similarly

19 situated creditors.  If you look at the utility motion, there

20 are non-utilities included, there's a third party vendor who

21 consolidates the utility bills.  That vendor does not qualify

22 as a utility but he's getting a deposit.  There's the foreign

23 vendor motion which grants a motion of status to people just to

24 live in the comfort that it's there.

25         I think what my client is looking for is the comfort

1   that maybe out-of-pocket they have something protecting them,

2   that they'll, in fact, get reimbursed.  So, if a debtor fails

3   to pay the bill they have a deposit they could draw down on.

4         And lastly, debtors arguably are different from the

5   utility.  I think I just touched on that.  The utility motion

6   includes non-utilities.  We are a unique counter-party in this

7   regard.  We are critical (indiscernible) online services.

8         Your Honor, there's not only black Friday, there's

9   cyber Monday.  To impact the debtor's ability to operate online

10   would be significant.  It's not something we want.  A request

11   for a two-week deposit.  There's a hundred thousand dollar

12   issue in a multi-billion dollar case.  We think it would be

13   extraordinarily beneficial for the debtor to be willing to --

14   or able to post that deposit.

15         THE COURT:  All right.  Anything further?

16         MR. FOLEY:  I appreciate your time, Your Honor.

17         THE COURT:  All right.  Thank you.  All right.  The

18   Court will grant the motion for filing documents under seal.

19   That's uncontested with regard to the motion for adequate

20   assurance of payment.  The Court is going to deny that motion.

21   I'm not going to require a two-week deposit and I think the

22   parties are in agreement that post-click transactions,

23   post-petition transactions are entitled to administrative

24   expense status, and to the extent the Court receives an order

25   to that effect the Court will grant that relief.

1          MR. FOLEY:  Thank you, Your Honor.  We'll submit an

2    order after the hearing.  Your Honor, the next item involves --

3          MR. COHEN:  Your Honor, (indiscernible).  If I can be

4    excused.

5          THE COURT:  You may be excused.

6          MR. COHEN:  Thank you.

7          THE COURT:  Thank you, Mr. Cohen.

8          MR. FOLEY:  Your Honor, the next item on the agenda

9    is Item Number 12 involving the wage motion and the WARN Act

10   claims and Mr. Galardi will be addressing the Court on that.

11         THE COURT:  All right.  Thank you.  Mr. Galardi.

12         MR. GALARDI:  Good morning, Your Honor.  Gregg

13   Galardi on behalf of the debtors.  Your Honor, the next motion

14   is Item Number 12, Your Honor.  We had addressed this on the

15   first day.  As I pointed out to Your Honor the first day I did

16   point out what I think is probably the most controversial

17   (indiscernible).  In particular as I pointed out, Your Honor, I

18   will proffer the testimony of James Marcum who is the acting

19   CEO and president for this and I think the Committee agrees

20   that we can do this by proffer.  They'll be free to cross if

21   they so desire.

22         Mr. Marcum is the acting CEO and president of the

23   company and the vice chairman of the board and thought it was

24   important enough today to express his position on why we

25   continue to support our former employees and our request for

1  continuing what we have called the WARN Act payments.  But, as

2  I pointed out, Your Honor, there are two decisions that have

3  been recently rendered which would say that these are

4  pre-petition obligations, probably entitled to priority, and

5  probably not entitled to administrative expense.

6       As I noted to Your Honor in the first day we

7  acknowledge that, and we still believed for other reasons that

8  these payments were important for Circuit City to make.  And

9  Mr. Marcum, if called as a witness, would advise Your Honor

10 that there were 700 positions that were, in fact, terminated

11 and given notice of terminations, I think it was the Thursday

12 and Friday before we eventually filed our petition for relief

13 in these cases, and each of those employees was notified that

14 they were being terminated and I know it received wide press

15 coverage here in that Richmond area as well as nationwide.

16      But, there were 580 people that were terminated at

17 that point, and as I advised Your Honor the first day we

18 believed that there was roughly $1.1 million a week to be paid

19 to these terminated employees as we went forward that therefore

20 for the 60-day period I believe I -- and Mr. Marcum would

21 confirm that it would be approximately $8 million of total

22 payments.

23      Mr. Marcum would also testify that as I stand here

24 today approximately 4.4 million or half has already been paid

25 to those employees since the date of the petition date.  Your

1  Honor, Mr. Marcum would say that he still believes that the

2  relief is in the best interest of the company notwithstanding

3  the fact that the claims may be only entitled to priority or

4  even to some extent unsecured on the following basis.

5          Called as a witness he will testify that many of the

6  people have given significant time and effort, and in some

7  instances their lives to Circuit City and have worked for their

8  lives at Circuit City.  That is an unfortunate fact that the

9  company had to take the cuts nonetheless and that he believes

10  that these employees and that the wages are still in the best

11  interest and reasonably necessary to the reorganization for at

12  least two reasons, and they can have sub-reasons.

13          First of all, Your Honor, that these people are in

14  the community and still loyal customers of Circuit City, and it

15  is important for us to continue with the customer loyalty and

16  the goodwill of these employees, and so therefore they are very

17  important to us, both in this market and other markets to treat

18  them -- and to treat them what we believe is right.

19          Importantly, Your Honor, (indiscernible) and Mr.

20  Marcum would testify that it also is critical to the morale and

21  there's still 30 or 33,000 people still at Circuit City.  And

22  indeed, Your Honor, there's been many questions, and as Your

23  Honor understands and as Mr. Marcum -- and we've had -- Mr.

24  Marcum would testify, there have been many meetings with people

25  who are still employed concerned about their own wages,

WWW.JJCOURT.COM

1    benefits and termination rights.

2          Your Honor is all too familiar and Mr. Marcum is

3    familiar having been in this situation before with the fact

4    that contracts become unenforceable, that there are benefits

5    and other programs who don't have a retention program in this

6    company at this particular point in time.  And Mr. Marcum would

7    testify that we have limited availability of liquidity, but

8    nonetheless Mr. Marcum would still testify that what he felt

9    was in the best interest and that the company determined was in

10   the best interest to treat these employees the way that they

11   did because of the need to continue to have the 30,000

12   workforce still believe in the company and still believe that

13   the company believes in their employees, that they are

14   instrumental in the company making and achieving the business

15   plan that will keep the liquidity of these companies, and that

16   therefore he believed it was still in the best interest

17   notwithstanding the four million that has gone out the door and

18   notwithstanding the fact that we are still requesting an

19   additional four million to go out the door because it would

20   have a spillover effect not only on the customer base by those

21   customers in the community but also negative impact on those

22   employees that are suing the company.  And at this critical

23   time and at this critical time of the year that making these

24   payments and making a statement to these employees that are

25   valued may not be required under the law that the $4 million

1   should still be paid.

2          Finally, Your Honor, we would also note and Mr.

3   Marcum if called to testify noticed that there was a somewhat

4   fortuitous nature or accidental nature that we gave similar

5   notices as Your Honor knows with respect to store closing

6   employees, but because they were actually store closing

7   employees, those people actually are going to be paid

8   essentially the same WARN notice, but they fortunately will be

9   able to work out their entire time as store-level employees.

10          The store closings have gone on slightly longer, so

11   it looks like all those employees would get essentially the

12   equivalent of the WARN Act notice, although they were, too,

13   notified prior to the bankruptcy that their jobs would be

14   terminated, but they continue to work at the store level and

15   we'll be making these payments.

16          Your Honor, again, Mr. Marcum would further testify

17   that these payments were in the budget that we presented to the

18   Court in the context of the testimony, that they were

19   negotiated with the lenders, that the lenders understood the

20   company's position and accommodated the company's position.

21          So, then, again, Your Honor, Mr. Marcum would testify

22   that he believes that it is in the best interest of the company

23   and at this time to make the business plan achievable that we

24   continue to make these payments and make the balance of those

25   $4 million payments.  That would be Mr. Marcum's testimony, and

32

1   I can pass him to Mr. Feinstein if he would want to cross

2   examine.

3          THE COURT:  Does any party wish to examine Mr. Marcum

4   to proffer testimony?

5                    (No audible response)

6          THE COURT:  Okay.  The Court will accept the proffer.

7          MR. GALARDI:  Your Honor, I guess it comes, then, to

8   legal argument.  Your Honor, the legal argument I think fails

9   us here in the fact that unless Your Honor wants to go against

10  the two opinions that we've seen there are two clear opinions

11  out there today which said that if you give notice termination,

12  and we're not contesting those facts.  We gave notice of the

13  termination prior to the filing, and those two opinions would

14  say that if you terminated there's a part that's pre-petition

15  that's priority perhaps up to the 10,000 and I think these

16  people got that amount or close to it.  So, there's another

17  balance that would be an unsecured claim.

18         Again, if you look strictly at the employees that's

19  probably the lot.  But, as to 105 relief and whether they're

20  necessary for the reorganization, Your Honor, we think this

21  Court has the power to authorize those payments, and as Mr.

22  Marcum's testimony would be, that I can't put intangible when

23  you get $4 million more in benefits or $5 million in benefits,

24  the goodwill of these employees, the loyalty of these

25  employees, the dissimilar treatment, although (indiscernible),

1  but they are not the same as the store-level employees because

2  these were corporate headquarter employees, and then the

3  (indiscernible) sense to the rest of the corporate employees

4  who are being asked during this period which is a difficult

5  period to keep their head in the games and still maximize value

6  and achieve a business plan when it is obvious to them that

7  currently the kinds of benefits, programs that they had counted

8  on, the contracts, all of those things that Your Honor knows we

9  cut back significantly on, severance payments, those sorts of

10  things may not be available even for those employees currently,

11  but to send a signal that we are going to do everything for our

12  employees is an important one.  And so, although their legal

13  rights may not be there with respect to the actual priority or

14  503(b) claim based on a doctrine of necessity, we would ask

15  Your Honor to continue the relief.

16         THE COURT:  All right.  Thank you.

17         MR. FEINSTEIN:  Once again, Robert Feinstein for the

18  official creditors' committee.  Your Honor, the Committee's

19  objection for this motion was not taken lightly.  We are

20  sympathetic with the employees.  We understand the hardship

21  that this might cause.  We appreciate that some of the money's

22  already gone to them so it's not all or nothing at all, but as

23  the representatives of the creditors of this enterprise,

24  looking out for all the constituents, vendors, landlords, the

25  current employees, the 30 some odd thousand employees who would

34

1  be devastated if Circuit City doesn't survive Chapter 11.

2       We felt it necessary to take a position on this and a

3  number of other motions today as I alluded to at the outset

4  that it's difficult.  It's difficult to understand, you know,

5  the consequences of withholding payments to not just employees

6  but the taxing authorities, to landlords who (indiscernible)

7  today are going to move one of their motions out a couple weeks

8  to pay sub-rent, Panasonic that wanted to get paid nine

9  million.

10      Your Honor, it's kind of a trite saying but eight

11  million here, nine million there, 13 million here, pretty soon

12  we're talking about (indiscernible) money, and we live in very

13  uncertain times.  Mr. Cohen said before this is a very

14  challenging economic environment and all one needs to do is

15  read the newspapers every day to see the kind of challenges

16  that Circuit City is facing, that other retailers are facing,

17  that the vendors and landlords are facing.

18      Everybody's got some real hardship here.  We're

19  trying to pull together with some shared pain if you will in a

20  concerted effort to make sure that Circuit City remains as a

21  viable, going concern enterprise for the benefit of the 30 some

22  odd thousand employees who are still employed and for the

23  benefit of vendors who are looking for a good customer in

24  Circuit City, for the benefit of landlords who don't want

25  empty, dark stores.

1          So, this is a very difficult endeavor and it is

2     unfortunate that, you know, some people along the way will feel

3     hardship, and it's a shared hardship, Your Honor, and this is

4     not a step that we took lightly.  The Committee is comprised

5     not simply of vendors but some landlords and the PPGC and a

6     class action on behalf of employees.  And all of them

7     unanimously agreed and supported the filing of this objection.

8     It's not something that, as I said, we did lightly.

9          In terms of the legal argument and as Mr. Galardi

10    noted there's the <u>First Magnus</u> case and the <u>Powermate</u> case that

11    said these are pre-petition claims.  And consistent with the

12    approach we've taken on all matters before Your Honor today.

13    We are trying to conserve liquidity for this company.

14         THE COURT:  And those cases aren't binding on this

15    court (indiscernible) in this jurisdiction.

16         MR. FEINSTEIN:  That's understood, Your Honor.  This

17    is a case of first impression here.  And Your Honor is free to

18    follow those cases or not, and we're asking Your Honor today to

19    follow those cases on the law.  And as a matter of the doctrine

20    of necessity, I would certainly make the argument here, Your

21    Honor, that it's -- necessity, it really takes in the other

22    direction, that we not spend any money that we don't certainly

23    have to in order for the greater good to be pursued, that we

24    preserve Circuit City as a going concern enterprise.  So, we're

25    respectfully and reluctantly, Your Honor, asking that Your

1   Honor deny the motion.

2          THE COURT:  Well, if I do deny the motion then I'm

3   (indiscernible) that if the WARN Act (indiscernible) coming

4   into this court I'm going to have to decide the issues and

5   we're going to have to litigate those issues, and that's going

6   to distract the company.  Aren't those things things that the

7   Court should take into consideration as well on, you know,

8   putting together this reorganization and trying to preserve

9   this going concern?

10         MR. FEINSTEIN:  But, there are any number of legal

11  issues that would be raised before Your Honor that will consume

12  the time of company counsel and company management.  This is a

13  discreet issue and one of many, many.  I don't know that it's

14  particularly burdensome on the company to have to deal with

15  this issue if Your Honor follows <u>First Magnus</u> and <u>Powermate</u> I

16  think it's -- these would end up as priority and unsecured

17  claims, they'll be treated in the order of priority that the

18  bankruptcy code dictates.  I don't know that there's really

19  much more than a discreet legal issue for the lawyers to

20  address and for Your Honor to decide.

21         THE COURT:  All right.  Thank you.

22         MR. FEINSTEIN:  Thank you.

23         THE COURT:  Does any other party wish to be heard in

24  opposition for the motion?  All right, Mr. Galardi.

25         MR. GALARDI:  Your Honor, there is the distraction

1  argument.  I would also note that though those cases would

2  technically apply in a legal principle those were liquidating

3  cases, announced liquidating cases, and one of the things that

4  we considered, and that's why we looked to, and as Mr. Marcum

5  testified by my proffer, is that we were actually looking to

6  what effect this would have on the current employees and that's

7  why we're relying to a large extent on the doctrine of

8  necessity.

9       Your Honor points to another aspect of this.  You're

10 absolutely right, there's time, there's distraction.  There is

11 with any pre-petition claim, but the reason those cases got

12 brought was because the (indiscernible) didn't pay this you had

13 class actions in the first days of the case.  Now, they took

14 all these things into consideration when they made these

15 decisions.  They made the decision that we were going into the

16 Thursday.  That's to make this achievable business plan and to

17 make sure that when you're next to (indiscernible) go out in

18 this company.

19      This was a major layoff as Your Honor knows.  There

20 was 500 people at the corporate headquarters right here, and so

21 all of those considerations, they may be not legally technical

22 and that's what the doctrine of necessity goes to, it's

23 reasonably necessary to an effective reorganization.  We are

24 not liquidating right now.  We are not hoping to ever liquidate

25 right now.  And as you'll see when we get to the landlord

 1  matters we are all really trying to and I believe the Committee

 2  is reorganized.  With that as the motivation I think there is

 3  legal authority under 105, even if Your Honor wanted to follow

 4  the strict reading of the two other cases, to still authorize

 5  the relief.

 6          There's plenty of relief that we have done first day

 7  that is not strictly within the bankruptcy code.  The question

 8  is a reasonable, necessary to a reorganization and the

 9  company's position is this is reasonably necessary to have this

10  company have an opportunity to reorganize and I would ask you

11  to grant the relief.

12          THE COURT:  All right.  Thank you.  Any other party

13  wish to be heard?

14              (No audible response)

15          THE COURT:  All right.  And the Court has read the

16  papers and that have been filed and considered the testimony

17  after today and the argument of counsel.  The Court agrees with

18  the company and exercise of its business judgment.  I think it

19  will be disruptive.  I'm not going to rule today on whether the

20  WARN Act claims would be entitled to administrative expense

21  status, but that remains an open issue.  We wanted -- you know,

22  weighs heavily on the Court in making this decision and that

23  this would come back in any event.

24          And I think that given the testimony, proffered

25  testimony would indicate a large number of people remain in the

1  company to -- for its existing employees' morale, that the

2  Court will approve the motion and overrule the objection of the

3  Committee.  I do not take the Committee's suggestion lightly.

4  This is a very difficult question and I think that you present

5  very strong arguments.  I just think in this case that the

6  motion should be granted.

7           MR. GALARDI:  Thank you, Your Honor.  Your Honor, I

8  would ask permission if Mr. Marcum or other representatives of

9  the company had to leave -- Mr. Marcum if you would -- he be

10  excused.  If he might be able to go back to the --

11           THE COURT:  If he doesn't have anything further --

12           MR. GALARDI:  Yes.

13           THE COURT:  -- today he may be excused.

14           MR. GALARDI:  He has other things to do today but not

15  with us hopefully, Your Honor.

16           THE COURT:  (Indiscernible).

17           MR. GALARDI:  That's true.  Thank you, Your Honor.

18  Your Honor, now with respect to the next motion on the agenda,

19  and I think I'll be dealing with most of the rest of them,

20  matter Number 13 on the agenda is, again, one of the first day

21  motions I think the Committee has looked seriously to.  It is

22  the motion to pay sales use and trust fund and other taxes.

23  There were multiple bases for these payments, but, Your Honor,

24  we then filed an amendment to -- or an amended motion to seek

25  payment of -- I think it's approximately an additional $10

1  million payments.

2        What I believe we've agreed to if the Committee is --

3  and again, we are not trying to pay things that we don't

4  (indiscernible) and the Committee has raised a very valid

5  objection to the payment of sales use and other taxes that have

6  been up and running.  We've been working on money funds.  We

7  have not been able to provide the (indiscernible) information

8  with respect to these amended taxes.

9        So, what we have agreed to do is to have an agreement

10 (indiscernible) separate order or otherwise whereby we will not

11 pay the sales use and other taxes until we give the Committee

12 the information, and whether the trust fund taxes or there are

13 other reasons, until the Committee agrees that we can pay

14 those.  And should we have a dispute we'll come back on the

15 22nd with respect to any disputed taxes we're hopeful that we

16 would not have any issues with that.  But, we would like to be

17 able to convince the Committee either that their trust fund

18 taxes or there's some other reason that they should pay because

19 I don't think the committee wants us -- if it's trust fund

20 taxes it's not property of the estate.

21        So we've agreed to do that and we would give them

22 five days notice of that kind of information prior to paying.

23 If there's an objection in that five days we would not pay it.

24 If there is no objection then we would be authorized to pay it,

25 and that's how we would deal with it.  Any money -- and I'm not

1    just going to limit to the supplemental relief -- to the extent

2    that there is any money from the original budget that had not

3    gone out or with respect to even this additional money, we

4    would apply that procedure.  And I think Mr. Feinstein is okay

5    with that procedure.

6            THE COURT:  All right.  Mr. Feinstein?

7            MR. FEINSTEIN:  Yes, Your Honor, I can confirm that

8    we're okay with that procedure.  As with any of a number of

9    these matters we are trying to work things out with the debtor.

10   I do want to just signal that what we are -- the position we

11   continue to take is that if these are demonstrably trust fund

12   taxes and not property of the estate it would be inappropriate

13   for the debtor to retain them.  But, if it's any other kind of

14   non trust fund payment of a pre-petition claim we're going to

15   oppose it.  Thank you.

16           THE COURT:  All right, so then that will be approved

17   as modified.

18           MR. GALARDI:  And, Your Honor, I think -- and again,

19   as Mr. --

20           THE COURT:  I'm sorry.  Mr. Stein I think wants to

21   weigh in on it.

22           MR. GALARDI:  Oh, I'm sorry.

23           MR. STEIN:  Richard Stein on behalf of the Internal

24   Revenue Service, Your Honor.

25           I'm a little bit at a -- excuse me -- at a loss on

1  this one because when I read it what's been described here

2  today seems to be a little bit different than, at least, my

3  reading.  And it wouldn't be the first time that I'm wrong.

4  But, I have a great problem if the company intends on not

5  paying over on a -- the 941 taxes, both certainly the trust

6  fund portion, as well as the corporate payment of your 941

7  taxes, so that to the extent that it doesn't deal with each

8  time there is a salary payment made to any employee the company

9  pays into the federal government or to their depository account

10 payments.

11         If they're going to continue to do that I have no

12 problem.  Otherwise I have a great deal of problem with any

13 kind of order that would allow it to authorize the nonpayment

14 of taxes.

15         THE COURT:  This order doesn't authorize the

16 nonpayment of taxes.  The order that I previously entered

17 authorized the debtor to pay these types of taxes --

18         MR. STEIN:  Okay.

19         THE COURT:  -- and now that's being modified.  It was

20 only that the debtor is going to give five days notice to the

21 committee before they make the payment.  Then if the committee

22 objects to it then you have to discuss it with the committee

23 and if nobody agrees then you can come back and then I can make

24 a ruling.  But ,right now I'm not authorizing the nonpayment of

25 anything.

1          MR. STEIN:  Okay, very good.

2          THE COURT:  I think it would be irrelevant.

3          MR. STEIN:  Okay, thank you.  I apologize.

4          THE COURT:  Well, you made a good point.

5          MR. GALARDI:  Your Honor, we understood it.  It's

6    just the authorization that you gave us is subject to committee

7    approval on those matters and the committee is clear on its

8    position.  Your Honor, that then takes us to Matter 14, which

9    is our motion for --

10         THE COURT:  Well, for the record, Mr. Galardi, then I

11   will approve that with the amendment as you've described it.

12         MR. GALARDI:  And, Your Honor, what I think the

13   committee and we anticipate doing -- I think it would probably

14   be more effective than going back and modifying order that Your

15   Honor had already entered -- we have had a proposed stipulation

16   that would address all the first day relief so you'll see that

17   the committee had certain concerns about notice before we take

18   certain actions of counting.  What I will do is then add this

19   one to that order and hopefully we'll be submitting under

20   separate cover to Your Honor an order that says, here's how the

21   committee and the debtors are going to go forward with any of

22   what I've called the bankruptcy pre-petition relief, whether

23   it's notice, whether it's reporting, we're working on that

24   order, but we just don't have it today.

25         THE COURT:  All right, very good.

1    MR. GALARDI:  All right, Your Honor, the next one on

2  the Agenda is Matter Number 14, which was the debtor's motion

3  for utility services procedures.  Your Honor may recall we did

4  this the first day and I asked Mr. Johnson was the one who had

5  raised a concern about that.  We carved him out.  We have since

6  carved out a number of other entities.  I believe that this

7  motion is fully resolved, although we'll see when I finish.

8    The first change, Your Honor, is we had spoken about

9  a blocked account.  After going back and forth many times about

10  a blocked account, a separate escrow, essentially what will

11  happen is the banks will set up a reserve that we do not have

12  access to that funds.  It just makes it easier like most

13  reserves.  And then if somebody makes a request that reserve

14  will be funded subject to the availability.  And we'll let the

15  Court know if somehow we're getting so low on our availability

16  that the utilities wouldn't have that.  That was one first

17  clarification we wanted to maker to the order.

18    And then additionally I see there's been notices of

19  appeals taken on the procedures, motion to vacate.  We are

20  trying to work out stipulations with all of those parties,

21  either by way of paying them a deposit or more importantly I

22  think we've stipulated that this order does not apply to them,

23  very much like Mr. Johnson.  It doesn't apply to them so we

24  have Entergy (phonetic) with respect to that stipulation, and

25  there are others that are listed.

1    In addition, Your Honor, as we said in the relief, we

2  have negotiated -- I've said there was a secret other line that

3  I would use to do deposits for various persons.  We have

4  negotiated settlements with most, if not all, of the utilities

5  -- I don't think anyone is still out there who is objecting.  I

6  have one adjourned that I know of -- whereby we would either

7  pay them in advance or give them a deposit.

8    And then as we had talked about, Your Honor, and one

9  of the things that we'll have for the next hearing or for the

10 final hearing is that $5 million reserve, that two week

11 reserve, will be adjusted accordingly since I think Mr. Johnson

12 probably represents every utility that I can think of.  That

13 reserve will become much smaller a (indiscernible), we have

14 resolved his objections.

15    I think then we have resolved all of the objections

16 to this motion, that the order can stand with that one

17 modification to the order that says instead of a blocked

18 account it would be a reserve established by the bank.  I don't

19 want the order to not become final today so we will say this is

20 a final order today and people's rights to appeal the order as

21 a final order would run from today.

22    But, I think we have no parties contesting or asking

23 for any other adequate assurance.  The one party is Accent

24 Energy who asked that this motion with respect to it be

25 adjourned over to December 22nd.  So, we would essentially

1  carve them out from the relief for this.  It will not apply to

2  them as a utility.  But, the same procedures would apply to

3  them if we resolve it or contest it on December 22nd.  I don't

4  know if there is ay other party that wants to be heard.

5          THE COURT:  Does any other party wish to be heard in

6  connection with the utility motions?  Mr. Matson?

7          MR. MATSON:  Good morning, Your Honor.  Bruce Matson

8  again for Bank of America.  I don't think we have any issues at

9  all and I think we just want to see a final order.  There were

10 some protections in the first order as relating to the bank's

11 relationship and a blocked account and it's changed a little

12 bit.  I don't think there's going to be any issue.  Thank you.

13         THE COURT:  All right, very good.

14         MR. GALARDI:  That's correct.  We are working out

15 that language with Mr. Matson and Mr. Berman of the banks.

16         THE COURT:  All right.  So, then the motion of Accent

17 Energy will be carried over to the next omnibus date.  And will

18 you be submitting a new order then?

19         MR. GALARDI:  I think we'll have to submit an amended

20 -- but we'll call it a final order -- the final utility order,

21 but it will have the language that we need to do with respect

22 to the blocked account and make it absolutely clear.

23         THE COURT:  All right.  The Court will look through

24 that and will enter it.

25         MR. GALARDI:  Thank you, Your Honor.

1            Your Honor, the next matter on the Agenda is Matter

2    15, again of this first day relief the committee filed a

3    limited objection.  It goes to the stipulation that we are

4    working on.  Again, it is an explanation of what has gone out

5    to date, what has not gone out to date and then sort of a

6    notice provision or a reporting position.  I think that

7    resolves the committee's objection.  There wouldn't have to be

8    a revision to this order, rather it would be superceded by our

9    stipulation.  And there were no other objections.

10           UNIDENTIFIED ATTORNEY:  That's correct, Your Honor.

11           THE COURT:  All right, very good.

12           MR. GALARDI:  The next matter is -- 16 is the matter

13   for the first day motion with respect to contractors and

14   satisfaction of liens.  Again, we've agreed the same thing, it

15   will be part of the committee's stipulation, there will be a

16   reporting mechanism, an explanation mechanism, that we are

17   working out language, and so this order can go final and our

18   separate order with the committee would govern any issues

19   between the committee and the debtors.

20           THE COURT:  All right, it's approved.

21           MR. GALARDI:  Similarly with respect to Number 17 on

22   the Agenda, Your Honor, that is the motion of the debtors to

23   pay certain foreign vendors and service providers.  Similar

24   objection by the committee, similar response, we would have a

25   stipulation that would govern.

1          THE COURT:  That will be approved.

2          MR. GALARDI:  Your Honor, the next matter on the

3   agenda is the motion for granting administrative expense for

4   the post-petition delivery of goods, the matter for reclamation

5   and establishing procedures for reclamations.  Your Honor, we

6   received three objections.  One was Warner Home Video, the

7   other was the limited objection of the Alliance Entertainment.

8   And then finally (indiscernible) source filed an objection.  I

9   think we have resolved those will all clarifications to

10  language that we could put in the order which would be

11  circulated to counsel.

12          I don't know if there was any other objection, but I

13  think they have all been resolved by language worked out to

14  clarify the reclamation.  We're not trying to prejudice

15  anybody's rights.  We're not trying to expand our rights.

16  We're not trying to limit their rights.  And so everybody's

17  rights are reserved, but lawyers being what they are wanted to

18  make sure we were not doing any of those things.

19          THE COURT:  Does anybody wish to be heard in

20  connection with this motion?

21          MR. ENGLANDER:  Good morning, Your Honor.  Brad

22  Englander on behalf of Alliance.  Our concern -- I think that

23  the language the debtors proposed moves the ball forward and

24  helps.  We think it needs to go just a step further.  And the

25  problem is this, what the order does is it picks pieces of the

49

1    language of 546(h) and inserts in the order some of the

2    language, but not all of it.  And the salient provisions in

3    Section 546(h) -- oh, I'm sorry, now there's been -- I haven't

4    --

5            UNIDENTIFIED ATTORNEY:  I'm sorry, I thought you

6    knew.

7            MR. ENGLANDER:  No.  I'm sorry, I was unaware that

8    this language was now added.  And I see that the language has

9    been added.

10           THE COURT:  (Indiscernible).

11           MR. ENGLANDER:  This is my best argument ever, Your

12   Honor.  Thank you.  The language -- just so Your Honor is

13   clear, there's always this concern whether we can give back

14   goods without the consent.  We have put in the language that

15   you can only give back the goods with the consent of the

16   creditor, and it tracks the language in 546(h) and that

17   resolved the objection.  Again, timing is everything.

18           THE COURT:  All right, very good.

19           MR. CARRIGAN:  Daniel Carrigan, Your Honor, for

20   Bethesda Software LLC -- Softworks LLC.  Your Honor, we filed a

21   response to this motion.  I believe it's 47 on the Court's

22   docket.  Our response went beyond just the issue that's been

23   addressed on the return under Section 546(h), although that was

24   a part of our response as well.  Our response is more global in

25   the sense of the reclamation -- the whole reclamation issue.

1    The debtor as we see now has taken the position that

2    reclamation is -- reclamation creditors have merely a general

3    unsecured claim, if anything, for the goods that were delivered

4    during the 45 days that were in the debtor's possession and so

5    forth.  This is all about the valueless argument that's been

6    argued throughout the northeast, in New York, Delaware and

7    elsewhere.  And I'm not sure that that's what's on  before the

8    Court today, although I'm prepared to address it if the Court

9    would like to.

10            THE COURT:  As I understand it no -- nothing has been

11    resolved (indiscernible) on a substantive basis based on this

12    motion.  This is just purely procedural.

13            MR. GALARDI:  Absolutely correct, Your Honor.  We

14    have not set -- I want it to be very important that reclamation

15    claims are worthless, that pre-petition security interests

16    extend beyond and that there's no value as I know the arguments

17    from Delaware and New York.  We're not making that argument.

18    We have not made that argument.  We've not even made a

19    representation or inclination to make such a representation.

20    We are not saying reclamation claims are out of the money.

21            What our procedures essentially did is said you have

22    the right to go and exercise your reclamation rights as a

23    secured creditor since the Bankruptcy Code changed.  We're not

24    expanding it, we're not limiting it, we're going to address it.

25    Just tell us when you're going to do it.

1          MR. CARRIGAN:  With all due respect, Your Honor,

2     that's not the case.

3          THE COURT:  Well show me what it is that --

4          MR. CARRIGAN:  Your Honor -- if Your Honor would turn

5     to the motion that was filed at Page 11, the debtors -- and it

6     reads at the top of the page the third line in the carryover

7     paragraph from the previous page, the debtors submit that the

8     reclamation claimants are not entitled to administrative

9     expense treatment with respect to any asserted reclamation

10    claim, but instead are general nonpriority unsecured claims

11    subject to the debtor's right to object to such unsecured

12    claims on an grounds that governing law permits.

13         THE COURT:  That's in the motion.

14         MR. CARRIGAN:  It is in the motion.

15         THE COURT:  It's not in the order?

16         MR. CARRIGAN:  It doesn't - however, Your Honor, it's

17    also in the omnibus reply that was filed last night and it's in

18    substantially more detail.  And it's couched in terms of that

19    reclamation creditors are not entitled to adequate protection.

20    However, if the Court would turn its attention to the omnibus

21    response that was filed -- and I'm sorry, I don't have the

22    docket number --

23         THE COURT:  I've got it in front of me.  What page?

24         MR. CARRIGAN:  It doesn't have a page number, Your

25    Honor.  It's Paragraph 13.

1          THE COURT:  All right.

2          MR. CARRIGAN:  Your Honor, the cases that were cited

3    Dairy Mart, Pester, McCloud, Nitrum (phonetic), Dairy Mart,

4    they are all the same.  These are the cases.  These are the

5    valueless -- so-called valueless cases, Your Honor.  Obviously

6    the debtor is taking the position that these claims are not

7    entitled to any treatment other than as a general unsecured

8    claim.

9          THE COURT:  You would expect them to take that

10   position?

11         MR. CARRIGAN:  I would expect them to take that

12   position.

13         THE COURT:  But that's not what we're adjudicating in

14   the motion.  All we're doing is establishing procedures as I

15   understand it.

16         MR. CARRIGAN:  But these procedures have a

17   substantive effect, Your Honor.  As counsel acknowledged it at

18   the original hearing, is that the current 546(c) remedy is

19   strictly a return of goods and those goods are being sold even

20   as we speak, so that when we get 120 days down the road is

21   there going to be anything to reclaim.  The goods will all be

22   sold through.  What we asked in our motion -- what we suggested

23   in our motion is the kind of reclamation procedures motion

24   that's been entered Winn-Dixie, it's been entered in other

25   cases up in New York and has been considered in other contexts

1  along with trade lien programs, that would basically say that

2  if the debtor is going to get a holiday on responding to and

3  dealing with reclamation claims to not have to address them in

4  the interim then the passage of time should not adversely

5  affect the rights.

6       Things that happen because the reclamation creditors

7  are not able to get their goods back, that is assume the goods

8  were sold, or as the structure of this motion had it before

9  that the debtor could return goods after 120 days or at some

10 point without the creditor's consent, which has been changed

11 and it's now clarified, that there would be nothing to get back

12 except that which the debtor no longer wanted, those which were

13 broken, those which didn't sell.  And we're going through a

14 selling period now as was said in the declarant's affidavit at

15 the first day and as has been reiterated again.  We are in the

16 peak season.  It was reiterated in the omnibus reply.  We're in

17 the peak season.  These goods are being sold through.  And by

18 the time we ever get around to a resolution the goods have all

19 been -- anything that is worth having is going to be already

20 sold.  So this procedural motion has substantive impacts.

21      The debtor also asks in here, I believe, for

22 clarification that the automatic stay applies here.  Now the

23 citations that are in the record, the parentheticals at least,

24 suggest that it's only self help, but the breadth of the

25 commentary, the breadth of the argument, is that any kind of --

54

1  because what they want is or they say they want -- they don't

2  want distractions.  And this goes back to the fundamental

3  remedy that we have under reclamation.  That's the remedy.  The

4  remedy under reclamation is that the notice was given and what

5  typically would happen outside bankruptcy would be that the

6  reclamation creditor or the reclamation claimant, whatever the

7  designation, would file a lawsuit to try to obtain the

8  reclamation.  They would see a temporary restraining order, a

9  preliminary injunction requiring the debtor to marshal the

10 goods in a place where they could be recovered and then we

11 recover the goods.

12         Now during that process -- and this is all outlined

13 actually in a case that's referenced in this omnibus reply.  If

14 the Court were to refer to In re Pester Refining Company, that

15 case is based on another case.  Pester is an Eighth Circuit

16 case.  It is based on an older case called Westwood Bank.

17 Westwood Bank is the Fifth Circuit's ruling on reclamation

18 outside of bankruptcy.  And what Pester and Westside Bank(sic)

19 say is that the sine qua non for eliminating reclamation is

20 foreclosure by the secured creditor and use of the proceeds

21 from that foreclosure sale to pay down the secured debt.

22         And what the debtor was concerned about is that --

23 perhaps justifiably, is that we don't even know how many total

24 reclamation claims there are in this case.  In Winn-Dixie and

25 in Fleming we at least knew how many there were.  In Dana we

1   knew how many there were.  There was a process, there was

2   disclosure, there was -- at least you knew going along what was

3   happening with the reclamation claims.  There's no disclosure

4   provided for here.

5          The order in addition to the substantive effect on

6   the substantive rights also has no governing procedures or

7   standards or anything else with respect to when the creditor

8   will -- when the debtor will or will not honor a reclamation

9   claim.  There's a provision that if they settle with a

10  reclamation vendor they can either pay them or give the goods

11  back.  Well, who monitors that?  Who approves that?  How do the

12  reclamation creditors know that they're all being treated the

13  same across the board?  If what the debtor wants is a one size

14  fits all program what we've suggested in our response is a one

15  size fist all program that takes into account the fact that the

16  passage of time is going to affect the reclamation creditor's

17  rights.

18         And it's also a situation that is if the debtor

19  really believes that these claims are valueless under the <u>Dairy</u>

20  <u>Mart</u> and other standards that are out there -- and there's no

21  denying it, they absolutely are out there -- and what those

22  cases do is they take as a proxy for foreclosure and use of the

23  proceeds for pay down of the secured debt.  The proxy for that

24  is a, quote, valuation, much like a valuation under 506, as to

25  what's a secured claim and not a secured claim.

1          So what they've done is start a proxy.  And the

2   assumption is that as you move through every single claim or

3   every single reclamation demand that the lender's lien is

4   always going to be greater than that particular one, that the

5   lender will go forward, that it will foreclose and it would use

6   the proceeds to pay down the rent, pay down the unsecured debt.

7   But is that realistic, is that practical, is that what happens

8   commonly?  And the answer is, no, it hardly ever happens like

9   that.  It only happens like that in a liquidation scenario,

10  perhaps.

11         And that's our concern, Judge, is that when we get to

12  the end of this process unless there's some kind of stay of the

13  effect of these procedures we're not going to know what's

14  happening with other reclamation creditors and it could

15  effectively turn into a critical <u>Linden</u> (phonetic) motion.  But

16  they could pay for whatever reason, come to a solution and not

17  even have to bring it to the Court or disclose it to any of the

18  other reclamation creditors.

19         Your Honor, in the other cases at least -- and

20  counsel for the committee, who was counsel in the <u>Dana</u> case and

21  has also been counsel for some of the cases up in Delaware --

22  at least there was a process where they would have a

23  reclamation report which would identify all the claims that

24  would identify those which had been essentially reduced because

25  of the various reclamation claims, whether it's sell through,

57

1    whether it's a notice date issue, whether it's a partial day

2    issue because the bankruptcy was filed say at midday and there

3    were deliveries before or after midday.

4           All those kinds of things sort of moot reclamation

5    issues.  And then what has happened in most of those cases is

6    you get to the end of that whole process, you spend a lot of

7    time and money evaluating and looking at these things, you get

8    to the end and what do you have.  You have a valueless

9    objection.

10          Now if we're going to go through this exercise over

11   the next three, three-and-a-half months and we're going to come

12   to the end and we're going to have a valueless objection what

13   is the point of spending the money that the creditors committee

14   is concerned about, that all the vendors are concerned about,

15   that everybody else is concerned about, what is the point of

16   that exercise?  Yes, there needs to be a process, no question

17   about it.  We don't disagree.  And we suggested a process in

18   our response.  But our concern is that the process -- the

19   so-called process is going to affect substantive rights.  And

20   the process has no transparency.  And that it could, if abused,

21   if manipulated, as Judge Mayer has said and as Judge Tyson has

22   described about the doctrine of necessity and the things where

23   you go off the -- go outside of the rules -- and frankly, most

24   of the cases these days, and this is not unusual, there's this

25   turning rules upside down.

1          The Mayu (phonetic) case years ago in the Fourth

2     Circuit was all about you wait until confirmation of the plan

3     and then you pay in the order of priorities.  Well, we have in

4     cases today, these great big cases, and it happens in Produce

5     Pride, it happens with virtually anyone that (indiscernible),

6     is that almost everybody gets paid at the front end, including,

7     for example, with respect to 503(b)(9) claims.  503(b)(9)

8     claims have a second priority after the costs and expenses in

9     the administration of the Chapter 11 case.

10          Now, the Chapter 11 costs of administration and all

11     of the operating costs are being paid on an ongoing basis.  The

12     employees -- and we did not object to the employees' motion.

13     God knows, we didn't want the employees to be adversely

14     affected or the former employees, so we don't have any

15     objection to that.  But, frankly, they're behind us on a

16     503(b)(9) claim and they're getting paid.  And various taxes

17     that are behind us are getting paid.  And various -- these

18     foreign vendors are getting paid and they're behind us.  And

19     the vendors whose products are generating the money for these

20     -- for the debtor's operations right now, or at least some of

21     it, are the ones who are having a standstill and wait over a

22     period of time and we may not ever get them -- we don't even

23     get those claims back and the debtor comes back in 120 days and

24     says sorry, we don't have them any more or here's what we got

25     left, you can have them.  Respectfully, Your Honor, the

 1  procedures drive substantive results and that's the problem

 2  with the motion and the process as it is structured right now.

 3          THE COURT:  Within a 503 claim, isn't that what you

 4  have, is administrative expense claim?

 5          MR. CARRIGAN:  Your Honor, the 503(b)(9) is an

 6  administrative expense claims, but it is not -- there's no time

 7  that's specified for when it's paid.  But what it does say is

 8  that it is senior to most of the other priority claims that are

 9  already being paid in this case.  And that's important.  I mean

10  how can you justify jumping off the entire train, if you will,

11  of the absolute priority rule of the process that you don't pay

12  pre-petition claims until the confirmation.

13          When you get off that rule -- and it may be a problem

14  for the Legislature more so -- it gets dumped in the lap of the

15  courts because you're here on the first day, you're here three

16  weeks later.  And the answer is this is a very tenuous

17  situation.  The economy is dreadful.  We've got hundreds, if

18  not thousands, of people who depend on this company for their

19  jobs.  And let's remember as pointed out in the declaration,

20  there are hundreds, if not thousands, of vendors that are

21  dependent upon this country -- upon this company.  A two

22  million -- a $5 million account receivable from these people is

23  just -- can be just as dramatic if unpaid -- have just as

24  dramatic effect upon -- on smaller companies.

25          So the trickle down effect, if you will, that's

1  described in the first day affidavit is very much applicable to

2  the vendors that are out there.  And that's why it's such a

3  serious problem.  And the fact is -- I don't think there's any

4  dispute -- that there was -- although again, the debtors

5  haven't told us how many reclamation vendors.  In <u>Fleming</u> the

6  debtors told us, in <u>Winn-Dixie</u> the debtors told us.  And they

7  estimated the amounts that would come in.  In <u>Dana</u> the amounts

8  were known and the numbers were known, at some point at least.

9      And you could say yes, it's a very large number and

10  if the debtor had to pay all that money right now they'd be

11  dead in the water.  Vendors understand that.  On the other

12  hand, it's one thing to say you understand it and will work

13  with the debtor and will engage in a trade lien program, as I

14  think was being suggested by counsel for the committee.  It is

15  a whole different thing to say that time goes by, we'll work

16  with you, but trust us, and then at the end the goods are all

17  gone.  With respect -- that's why trade vendors tend to look at

18  these things with some skepticism, because there's been too

19  many cases -- if I remember the numbers correctly -- and

20  counsel can correct me -- there were hundreds of millions of

21  reclamation claims made, and of course those were not all

22  valid.  That number is going to come down because they're just

23  overstated.

24      But there are hundreds of millions of claims made in

25  <u>Dana</u>, there were hundreds of millions of claims made in

1   <u>Fleming</u>.   In <u>Fleming</u> I can say that when we got to the final

2   numbers that came out of the debtor's reclamation points it had

3   gone from hundreds of millions down to about 20 million, and

4   part of that was because the stuff had been sold through, and

5   it wasn't there any more, we couldn't claim it.   And because

6   there was no stay in the process the argument was is that what

7   was a couple hundred million dollars was now a 20 million

8   dollar claim.   And by the way that was valueless because the

9   value of the inventory was not greater than the amount of the

10  secured debt secured by that inventory.   We're not fighting the

11  secured creditors here.   We're not really trying to fight the

12  debtor.   What we're saying is don't eliminate our rights under

13  the name of a procedure.

14          THE COURT:   All right, thank you.

15          MR. CARRIGAN:   Thank you, Your Honor.

16          MR. GALARDI:   Your Honor, I've never had a procedure

17  objected to so vehemently.   So I will do what I did with the

18  utility, I will carve him out, these procedures do not apply to

19  him.

20          MR. CARRIGAN:   Your Honor, that's a facile, but it's

21  sophistry.   The answer is we did not ask to be carved out.   We

22  asked for a fair and equitable procedure.   If counsel wishes to

23  carve us out then counsel should give us a fair and equitable

24  procedure.   If counsel does not wish to do that then the Court

25  merely will have to rule up or down on it.

1          THE COURT:  Well if you are not bound by the

2   procedures on this procedural order then you have all of the

3   rights that you had coming in and nothing has been compromised

4   today and you can proceed by motion or whatever you -- remedy

5   you want this Court to grant to you.  You're just not bound by

6   it.

7          MR. CARRIGAN:  Your Honor, that's a facile.

8   Superficially I'd say that's correct.  As a practical matter

9   what's going to happen?  If our client is -- has a

10  three-and-a-half million dollar claim -- and again, Your Honor,

11  we didn't ask to be carved out.  What we said to the Court is

12  the problem with this order is that it is unfair.  It has a

13  substantive impact and it diminishes substantive rights.

14         THE COURT:  But if you're not -- if it's not

15  impacting you how --

16         MR. CARRIGAN:  It does impact us, Your Honor, because

17  it --

18         THE COURT:  Not if you're not part of it.

19         MR. CARRIGAN:  Well, Your Honor, this would be like

20  if the debtor came to you and said we have a motion that we're

21  going to apply to a whole class of creditors except this one.

22  Now that's obviously discriminatory and that's on --

23         THE COURT:  Well, but you're asking -- I don't

24  understand.  If you wanted to be excepted from the order you

25  can.  If you want to be a part of the order you can.  So it's

1    not discriminatory.  You get to pick which way you want to go.

2           MR. CARRIGAN:  It's not a question of picking, Your

3    Honor.  And, frankly, it's -- let's examine what would happen

4    if we were on our own and the practicality of the situation.

5    If we were on our own then we would have the right to go in and

6    file a reclamation claim with this Court -- file an action with

7    this Court for reclamation.  We would then have to go through

8    the preliminary injunction and TRO process.

9           THE COURT:  Exactly.

10          MR. CARRIGAN:  And then the bank for three million

11   dollars or two million dollars or whatever is left of our

12   product can foreclose upon us and use the money to pay down

13   while every other of the hundreds, perhaps, or however many

14   reclamation debtors out there are going to be sitting there and

15   hoping that one day the debtor will have to do it.  We're at a

16   loss if we're all by ourselves in this.  I mean that's the

17   functional answer to this.

18          Debtors asked for a one size fits all solution.  Our

19   response was yes, a one size fits all makes sense, but it needs

20   these kinds of modifications.  We're not here to consent to be

21   carved out.  If we -- and we were very careful to ask for in

22   our motion not to be carved out.  What we asked for was a fair

23   process.  If the fair process is not going to be afforded or --

24   what we believe is a fair process, the Court, of course, can

25   decide that it is a fair process, and if they do the Court can

1   impose it on us and we certainly will obey the Court's orders.

2          But, carve out is not a realistic -- again, Your

3   Honor, it's a piece of the debtor's sophistry.  I mean,

4   frankly, the debtor filed this motion and in it they asked for

5   relief under Section 546(h) and it included all the elements of

6   546(h).  It made it subject to the rights of the secured

7   creditors, it made it subject to a lot of other things, but

8   they left out the consent of the affected creditor.  Now what

9   were they going to do when it comes back later?  Were they

10  going to say anybody who didn't object to this motion has

11  consented to get their goods back whenever they get them back

12  and whatever they are?  That's the danger of these things is

13  that this process offers the opportunity for the debtor to one

14  off people and not even have to disclose it to anybody.

15         And, frankly, Your Honor, no, we don't want -- we

16  will not consent to being carved out.  If the Court carves us

17  out the Court carves us out.  If the Court overrules our

18  objection the Court overrules our objection.  But our problem

19  is the debtor wanted a one size fits all process and published

20  it as a process.  It not only is a process, it also has

21  substantive effects.  And we suggested a process that has

22  proven out and has worked in other cases that would be

23  applicable to all reclamation vendors.  And if the Court

24  chooses to disregard that or rules that it's inappropriate or

25  unfair we'll respect and we will honor the Court's judgment.

1  Thank you, Your Honor.

2          THE COURT:  Thank you.  Mr. Galardi.

3          MR. GALARDI:  Your Honor, both with respect to the

4  process and with respect to not the process, I think Your Honor

5  has weeded through the brief.  Again, you may very well take

6  the position -- but again, I find the process somewhat illusory

7  in the first instance for the following reason, reclamation

8  claimants are secured creditors under the modification of the

9  code.  They have secured creditor rights if they can be

10 asserted and they have the right to come in and -- with lifting

11 the stay and pursuing those.  What we've done is instead of

12 having Your Honor deal with all of those protective orders, as

13 we said give us notice and then we're going to go to

14 procedures, it's a first day motion, to try to avoid being in

15 court every few days, work out procedures normally with the

16 committee.

17          I understand that a lot of times at the end of the

18 day you're selling goods.  Why we draft the procedures the way

19 we do and why it is very clear about neither limiting nor

20 expanding the rights -- we don't want to lure anybody to sleep.

21 If they're not comfortable with these  procedures -- I don't

22 want to say please, but you are entitled to file a lawsuit, a

23 request for the stay, a temporary injunction, because we do

24 understand.  This is just like outside of bankruptcy.  Everyday

25 those goods get sold their reclamation claims may become less.

1  They can protect their rights.

2          This was a mechanism to give us notice so we can have

3  a conversation.  But if people are concerned about that then

4  either we carve them out of the motion or the -- in particular,

5  which used to be the case, is you'd stay those kind of motions.

6  This doesn't even stay their filing an action, getting a TRO,

7  getting a preliminary injunction, and circling up the trucks

8  and getting their goods.

9          So in that context our brief is actually helping

10 creditors to understand they have rights now as secured

11 creditors.  They can opt to be in the procedures, know the

12 risks, but if you don't want to be in the procedures here's

13 what the code says -- and by the way, the procedures don't

14 preclude you from doing what the code says or what lawyers do,

15 namely file a complaint, get a TRO.  So whether he wants to be

16 in or out I think the consequence is the same.  If you're not

17 happy you should come in and protect your rights.

18         The debtor is not going to protect all of those

19 rights.  We're going to try to work with the committee, we're

20 going to try to come up with a process.  We do support our

21 vendors, but this was sort of to get a notice to a specific

22 person so that we can start talking about those kind of things.

23 But it doesn't preclude anybody that's unhappy from coming in

24 to the Court ans asking for relief.  So we'd ask Your Honor to

25 overrule the objection.

67

1          THE COURT:  The Court is going to overrule the

2   objection.  I will approve the procedures and with the caveat

3   that if a creditor wants to opt out of the order, it may.

4          MR. GALARDI:  Thank you, Your Honor.  Your Honor, we

5   now come to Matter 19, which would look like it would take a

6   long time.  One, Your Honor, I think we very much appreciate

7   Your Honor indulging us for the two hours or so, I think it

8   was, before we came in and then an adjournment before we came

9   out.  I am very hopeful to say that we have resolved all but

10  one objection who is going back to a client on one matter.  I

11  think we have resolved these objections.  And I think this goes

12  to Number 19, Number 20, and I believe there is one other one

13  in the back, and there's a number of motions to compel the

14  payment of stub rent.  I'm going to say some very general

15  things about what we think we've agreed to and I'm sure there's

16  plenty of landlord counsels behind us -- behind me that may

17  come up, but this is also with the effort and the suggestion of

18  the committee who, as the committee noted, has two very large

19  landlords that have no leases.  And it also goes to the bar

20  date objection, so we actually sort of held a meeting with the

21  landlords.

22          The first thing that we will agree to, Your Honor --

23  and you'll see from our brief, as Your Honor knows, there's a

24  split in authority between billing date and accrual date.  What

25  we would agree is with every single objecting landlord we will

1    agree that the accrual method applies.  So therefore, if you --

2    and we have a number of leases which will go as -- and as I

3    explained to the parties -- and one reason we've gotten so many

4    objections to 365(d)(4) is because of the complicated lease

5    structure that we have.  And, Your Honor, I think I explained

6    the first day we had what we call the surplus leases that were

7    already rejected and we put it on our rejection motion.

8            Then we have the going forward leases that are store

9    closing leases, so we're concerned about whether we're getting

10    out December and how the accrual method works versus the

11    billing date.  We have the stores that we had no intention to

12    leave at this particular time.  And among those stores there's

13    a nuance to those.  Some are paid in advance, but unfortunately

14    some are paid in arrears.  So there's an objection out there

15    today that somebody will be paid rent on November 30th, but it

16    would go back to November 1st.

17            So with the landlord's help -- and there's another

18    landlord here -- we believe that regardless of the way your

19    lease works if you've objected we'll apply the accrual method

20    with respect to you.  Any landlord who is not an objecting

21    party we will not agree to that.  We'll reserve our rights to

22    argue otherwise.  We understand that the Circuit may add the

23    accrual method.  I understand that, but we will reserve our

24    right to say otherwise, to take appeals or do whatever we need

25    to do.  But we are -- with respect to any objecting landlord

1  that's in the room we're agreeing the accrual method applies.

2  And that applies -- importantly, because this was a compromise

3  -- it applies not only to those that pay in advance, but also

4  in arrears.

5       So for example, there is one landlord in here that

6  has a November 30th payment that would go back.  They've agreed

7  I don't have to go back all the way to November 1st.  I am only

8  going back to November 10th and paying that rent.  And to stay

9  consistent with 365(d)(3) we're going to actually pay -- that's

10  one of the accruals that we will actually pay.  That was the

11  first -- that was one of the main points that we did.

12       Your Honor, the second part of this -- and we'll go

13  through 365(d)(4) and then we'll see where we are.  We also

14  agreed with the landlords that we amended the 365(d)(4)

15  extension for the reasons set forth in the record the first day

16  with respect to the lease reserves and there is a DIP default

17  if we don't get the 365(d)(4) extension.  We have agreed with

18  the landlords, I think we have resolved every objection but the

19  365(d)(4) motion, but to make clear there are carve outs to

20  that 365(b()4).  And again, we didn't realize the carve out

21  when we made the carve outs.  In particular, if you were what

22  we call the surplus lease, we didn't have any inventory, this

23  motion does not apply to you.  You are carved out.  I still

24  have my 120 days with my rights to ask for an additional 90

25  days.

1          If you were in a GOD store because we're liquidating

2    the inventory in those stores that are going -- I'd have to say

3    store closing store -- they're not going out of business -- if

4    you're in one of those since we liquidate the inventory, again,

5    we're not exceeding the 365(d)(4) extension.  What came to my

6    attention and the banks have agreed to is where some leases

7    were within the construction leases.  Well obviously we didn't

8    have inventory, but we didn't know and they were on our list of

9    extensions of 365(d)(4) deadlines.  We are not seeking an

10   extension with respect to the in construction non-inventory,

11   because again the lenders are concerned about their liquidation

12   of the inventory.

13          Your Honor, we agreed that we would, again -- and I

14   understand that this is an issue in this jurisdiction in

15   particular which I learned the nuances of this morning -- is

16   that there is an issue of timely obligations and the accrual of

17   stub rent.  Landlords are very concerned about the stub rent

18   and if we don't pay stub rent right now there will be, you

19   know, consequences and they may be deleted or have deletion

20   some day at the end of the day.  What we've agreed, at least

21   for this purpose -- and there are reasons for business reasons

22   that we've been working with the committee is, any of the

23   requests -- or maybe one -- any of the requests to have

24   immediate payment of stub rent, whether that's in the form of a

25   motion, or in the form of an objection to our rejection, or in

1    the form of an objection to the 365(d)(4), we're saying you

2    don't need to make a motion if you have already done it in one

3    of those three papers and all such objections are going to be

4    adjourned over to December 22nd.

5         That said, because we've accrued to the accrual

6    method, we'll agree that they are administrative claims.  And

7    we're really talking about what's the timing of the payment of

8    those claims.  And then -- and people can talk about, I guess

9    it's (indiscernible), and I'm going to embarrass myself -- but

10   I guess the concern here is that if they delay the payment of

11   it they are -- we would ask Your Honor to enter an order that

12   protects them for the delay of any payment right now at least

13   for these periods of time, that says if they're paid they're

14   not subject to dilution or disgorgement at the end of the case.

15   Because my understanding is if they received an order tomorrow

16   -- and this is today -- saying you have to immediately pay it

17   they're out of that disgorgement dilution issue should we ever

18   turn out to be administratively insolvent.  So they were very

19   concerned about that and that's what prompted a number of the

20   motions and reactions.

21        We've agreed that if Your Honor agrees that to help

22   get us to that December 22nd date to not fight the issue of

23   what the timing of that payment is and then hopefully if we get

24   beyond that to not fight that issue.  But at least from now to

25   December 22nd when we fight that issue that the fact that they

72

1   have delayed -- not delayed -- we've asked for a delay -- the

2   fact that we're not paying it now shall not subject them to

3   dilution, disgorgement of anything else, and we'll come back on

4   the 22nd to discuss the stub rent issue.

5           In addition, Your Honor, and as I've told the

6   landlords, with respect to stub rent, Your Honor, we have two

7   types of leases in essence right now.  We have the leases that

8   the stores are liquidating their inventory.  Under the agency

9   agreement, although they are not third party beneficiaries of

10  that agreement, we have agreed to pay -- because we are being

11  paid by the agent we have agreed to pay that rent, so as we get

12  it we'll pay it.

13          Again, if you live by the accrual method you're going

14  to de by the accrual method.  So that means -- and they've all

15  agreed from my understanding -- is that if we stay only through

16  mid December instead of having to pay December 1st all rent

17  we'll have rent -- if we actually vacate, surrender the

18  premises -- and we're working on what that means -- then we'd

19  only pay for the two weeks.  So I don't have to pay the full

20  December, chase them, the landlords are agreeing to that sort

21  of method.

22          I think -- and I know I jumped around because I got

23  to go back to the rejection motion, but it all goes as one big

24  piece -- those were the major concerns that resolve the

25  365(d)(4) -- thought of one more.  Your Honor, our motion and

1 order may read incorrectly so I want to be clear on the record.

2 We would have to actually assume or actually reject by the

3 earlier of the confirmation date or the two hundred and tenth

4 day.  It's not that we would file a motion on the two hundredth

5 date to extend that time period.  And it's - they would have to

6 assume.

7        Now with respect to confirmation, we would have to

8 make a notice that we were assuming on confirmation, but as is

9 normal we would not have those go effective until the effective

10 date, and they have agreed to that.  But you can't change and

11 play a game between confirmation and the effective date to say

12 haha we have assumed you here, but now we're rejecting you.  So

13 I think that was another issue that they had that we have

14 resolved.

15        Your Honor, the other things that we had resolved

16 with respect to some of the properties is --and I'll wait until

17 they come up -- there were a number of people that objected to

18 the rejection.  And the issue comes down to a number of issues,

19 which we just wanted to sort of streamline today, and leave for

20 everybody to fight.  This is where I think there is one

21 outstanding objection.  We have two problems and most of them

22 come from did we give the keys back, did we surrender the

23 premises, did we give the building code.  We have a witness

24 that would be available to testify.  I don't know if they do.

25 But we said do we really have to fight about this.

1           What I thought we would do in that case is argue that

2    everybody's rights are reserved.  If you've raised the

3    objection that the effective date of our rejection or we didn't

4    surrender the premise, for whatever reason, was not November

5    10th or November 12th or November 19th, as long as you agree

6    that it was by November 30th, so we put a parameter around that

7    date, and all rights are reserved to argue whether there was an

8    effective surrender or not, then we've agreed to that.

9           We're not going to put on evidence today as to

10   whether the keys or the surrender -- we're going to try to

11   resolve that in that context.  Again, that would be a stub rent

12   claim, if we were wrong, if it was not of the effective date we

13   have our position, they'll have theirs, and then we'll talk

14   about whether it's two days, three days, four days stub rent,

15   and it will be treated like all the other stub rent claims, the

16   failure to pay it now would not be subject to dissolution and

17   all of those issues.  I think that's resolved, the fight.  So

18   I'll find out when I cede the podium whether there's any fights

19   on that.

20           Your Honor, then we have sublease issue.  We've seen

21   a number of objections from landlords that either they are the

22   overlord or they are the sub-lessee.  I believe that we are

23   agreed except in one situation where I think they're going to

24   their client, that because we gave notice of the rejection to

25   both the overlord and the sub-lessee, they'll agree that both

1  have been rejected.

2         Nonetheless, you saw a number of them come out

3  because we couldn't do all this before bankruptcy, but we still

4  want to do -- we want to do a deal.  We are letting them have

5  more time in order to effectuate a deal, as I've told them.

6  They probably don't want to pay our rates to help them to do

7  that.  We will be glad to help them, but we'll sort of suspend

8  this to December 22nd.  If they can work out deals, we have no

9  problem with people working out deals as long as we're clear

10  that there has been a rejection and those people could still

11  fight what the date of the keys were, but it's not that the

12  sub-tenant is still in there.  One landlord still may have an

13  issue on that.

14         Your Honor, then we have the unfortunate

15  circumstances for them, perhaps fortunate for us, is some of

16  the sub-lessees paid rent for the month of November on the 1st,

17  and we didn't pay rent to the landlord.  Since we have monies

18  prepetition co-mingled, put into our accounts, we told them we

19  are unfortunately unable to pay that money back just

20  consensually, so we've agreed that if they want to come in and

21  argue that point we can do that with Your Honor.  Your Honor

22  can grant relief.  We'll obviously oppose it if they could be

23  given back pre-petition money.  We understand if they want to

24  do an unjust re-fall, or an inequitable payment, but we can't

25  without an order of the Court say by the way, we got sub-lease,

1   you get back your money.  That's something that the Court will

2   just have to decide.  We would oppose it, and if the committee

3   will oppose it again in the theme of let's save the money of

4   the estate, but landlords are free to argue that.  We're not

5   resolving that today.

6          But, as a compromise on the other side, some

7   sub-landlords did, in fact, make the December payment.  We

8   didn't pay December rent because we thought they were rejected.

9   What we told the landlords is, we're not going to try to make a

10  windfall in the post-petition period since we're already on

11  record.  That's just an accounting problem.  We would if we got

12  it give the money to the landlord or back to the tenant,

13  depending upon the circumstance, if that's what they want,

14  because we do think the lease has been rejected, so we

15  shouldn't keep that money.

16         Again, the only instance is there's one landlord that

17  may say because the sub-tenant was still in there and he got

18  the rent, we're not giving you back the rent and have the

19  argument that the sub-tenant is there so it was not an

20  effective rejection, so that's carved out.  But, everybody

21  else, I think, has agreed to that provision.

22         We then got to the bid procedures, Your Honor.  And,

23  again, we got pretty far on all of these and then I'll

24  hopefully cede the podium to some of the landlord counsels that

25  remember many more of the agreements that I might have put out

1 other than this.

2        There was a concern about notifications with respect

3 to bid procedures, adequate assurances and I'm only hoping that

4 we sell leases and have adequate assurances in this

5 environment.  But, as a precaution, what we have agreed to do

6 is I think that there is a November -- a December 17th date by

7 which we would have to give notification to the parties as to

8 the bidders of the property, we'd try to give adequate

9 assurance information.

10        We would by Friday noon post on a website, and

11 hopefully send out to the landlords, if there is a bid on their

12 property we would notify them of the potential bidder, and they

13 can maybe work out before -- I think the hearing is December

14 22nd, so the idea is give them notice of that.

15        We would modify the bid requirements of anyone who

16 wants to bid on a lease, I think this was a good idea, that

17 they would have to provide us at least some or all of the

18 information they can for adequate assurances purposes so that

19 we can, in fact, give on a timely basis to the landlords as

20 soon as possible if there is a chosen bidder, give them and

21 pass that information on.

22        That we would -- that the leases, there's this

23 provision in there that we would deem rejection.  So if we

24 don't get a bid, we're going to give them five days notice of

25 the date of rejection, but the rejection would be effective --

1    and again this goes to what constitutes surrender -- we would

2    give an unequivocal notice.  That was clear.  There is a

3    desire, and we would work -- and we'd give five days notice to

4    turn over or shut off the alarm, turn over the alarm code.  And

5    I said we'd make commercially reasonable efforts to give them

6    the alarm code, turn over the keys and to deactivate the system

7    if we're not going to be there, and then the rejection would be

8    effective.

9        And that with respect to third parties, we've tried

10   to abandon property and they're very concerned that if you

11   abandon somebody's property, that there's a right in it, we're

12   only aware of perhaps the collateral of the banks.  But, what

13   we would do is try to give notice and we'd do the best that we

14   can to all third parties that we believe have property in

15   there.  In that same five-day notice say, take it or it will be

16   given to the landlords and abandoned to the landlords free and

17   clear so they don't have a liability, should they get it,

18   should they clean it, should they throw it out or should they

19   sell it.

20       We also agreed, Your Honor, that it was really not

21   appropriate until the actual sale of a property that Section

22   6004 and 6006 that would give the period of time that the order

23   may become immediately effective.  That would be reserved for

24   the sale hearing which would be December 22nd, if we're in the

25   position to make those.

1              Finally, Your Honor, I think on December 22nd what we

2  agreed to is we would only go forward on the uncontested sales

3  of leases, and if there was a contested matter with respect to

4  the sales and the leases and the parties couldn't agree to go

5  forward on December 22nd, we would come up with some hearing if

6  Your Honor -- if we needed to do it before year end for some

7  reason, we would ask Your Honor at that time for that and Your

8  Honor could judge.  But, at least we'll agree temporarily not

9  to try to force if parties are not prepared to go forward on

10 December 22nd, given that I think it's the 17th, 18th if it

11 comes to -- goes to the weekend and then you're back here so it

12 was just -- we would agree to that.

13             I'm going to test my memory and see if there are any

14 others.  Now, my understanding, Your Honor, is with respect to

15 all the parties, other than I think two parties, one of them a

16 unique issue on the sublease and the rejection which was

17 checking with a client and one trying to determine whether the

18 putting off of a motion to compel could be done until the 22nd.

19 I actually think that resolved all of the objections to the

20 rejection motion which was Motion Number 19, and I'll ask

21 counsel to come up.

22             And then I'll talk about 20 because it resolves a lot

23 of objections to 20, as well, Your Honor, but there's some

24 extra points on that.

25             It resolves, I believe, all of the objections with

1  respect to the motion listed on 21, which is the extension of

2  the 365(d)(4) deadline.  And those were the two and then I can

3  go through, but I don't frankly know the numbers, but I think

4  we should probably stop there and let the other counsel go.  I

5  will mention -- go back to one other.

6         Motion 20 which is the agency agreement and it is

7  resolved by, I believe, most of those provisions, and I see Mr.

8  Branch (phonetic) coming up.  But, in addition, Your Honor, we

9  wanted to make clear in a modified order, as Your Honor is

10 probably familiar, the agent has been dealing with landlords on

11 signage on all of those issues.  We wanted to make clear that

12 the agent could cut separate deals with the landlords' letter

13 agreements.  We think that they're enforceable.  They are our

14 agent for this purpose.  I didn't want to have to come back to

15 bankruptcy court and they're often sometimes sensitive with

16 respect to that.  We wanted to make sure that the agent could

17 have the authority to do so, that those letter agreements could

18 be approved.

19        And then finally, that the sale of the FF&E would be

20 free and clear of all liens, claims and encumbrances.  Again,

21 the bank group had agreed to the original motion to do that.

22 If there's an issue with the bank group because, again, things

23 have been moving, that we would, in fact, make sure that that

24 is comfortable with the bank on that aspect.

25        I will now go to the landlord's counsel to see what I

1  forgot.

2                    (Attorney discussion)

3          MR. GALARDI:  Your Honor, maybe it's best to see if I

4  missed some parts of my script before we're all caught up here.

5  Is there parts of my script I missed?  Could we --

6          THE COURT:  Mr. Galardi, let me ask this question.

7  How long do you think we're going to be going today?  Should we

8  plan a lunch break?  Would it make sense to, you know, talk a

9  little bit -- if you did take a break right now, you could talk

10  to some of the landlords and see if there was something not put

11  on the record, because it sounds like you made tremendous

12  progress this morning in just one hour.  And does it make sense

13  for us to take a break or do you want to push through and try

14  to get things --

15          MR. GALARDI:  I think, Your Honor, it makes sense to

16  take a break, but if I might just pass through the agenda, I'm

17  not even sure there are many other matters.

18          THE COURT:  I don't think there are either.  I just

19  see a line a mile long.

20          MR. GALARDI:  That's why I think it might be shorter

21  but it may be worth a break in any event.  Let me go through.

22  22 is a motion to compel rent so I don't think that that

23  needed to be resolved if they'd be the one.

24  23 is the same, 24 is the same, 25 is the same.  Your Honor has

25  already disposed of 26.  28 has -- 27 is, again, a motion to

1  compel rent.  28, Your Honor has disposed of because it's the

2  supplemental of sales use.

3      Your Honor, I believe with one change to Number 29,

4  that is also resolved.  The landlords have asked for

5  clarification on that, as well.  It's the later of -- they

6  don't have to file a general bar date.  It is also the date by

7  which it's 30 days after rejection, whatever is the later of

8  those two.  So, they don't have to put in all the prepetition

9  damage claims and I did correct -- and there's many taxing

10  authorities -- there is an outstanding objection, but I'll just

11  put it on the record while I'm passing.  We agree with the

12  government -- the agency's government that it's going to be 180

13  days.  I'm not going to fight and try to shorten the government

14  unit date.

15      That then gets to 30.  I believe that would be a

16  matter that we would be hopefully resolving.  31, Your Honor

17  has already handled.  32, would be addressed in 33 so, Your

18  Honor, I do think a break at this point we might clean the

19  whole agenda except for maybe a couple of objections to the bar

20  date motion.

21      THE COURT:  All right, why don't we go ahead and do

22  that?  How long do you want to break?

23      MR. CURLEY:  Judge, if I could before you take a

24  break.  Paul Curley on behalf of Carrollton Arms.

25      I want to introduce the Court to Gary Cunningham

1  who's been admitted pro hac vice.  I have an obligation this

2  afternoon.  I was going to ask that Mr. Cunningham be able to

3  appear without me being present in the courtroom.

4            THE COURT:  Certainly, that will be granted.

5            MR. CURLEY:  Thank you, Your Honor

6            THE COURT:  So,, do you want to break for an hour or

7  you want to break for less than that?

8            MR. GALARDI:  Your Honor, if you wanted to take a

9  lunch break now, it's one o'clock.  I mean to two o'clock would

10 that still give everybody to make appropriate flights?

11           THE COURT:  That's what I was concerned about,

12 everybody can make flights and such if we do that.

13           MR. GALARDI:  I think break to two o'clock and we

14 could work the language and I think that gives your staff time

15 to have lunch and we could finish this up.

16           THE COURT:  All right, why don't we stand adjourned

17 then until two o'clock?

18           MR. GALARDI:  Thank you, Your Honor.

19           THE COURT:  Thank you.

20           COURTROOM DEPUTY:  All rise.  The Court is now in

21 recess.

22                    (Recess)

23           COURTROOM DEPUTY:  All rise.  The Court is now in

24 session.  Please be seated and come to order.

25           THE COURT:  I see everybody is back.  Is that a

1  (indiscernible) sign?

2       MR. GALARDI:  No, I don't think it is.  I think they

3  just want to make sure that I'm going to say the other parts

4  that I forgot the last time.  I think we have actually resolved

5  all the landlord issues and people have been able to get

6  through with their clients.

7       Your Honor, so why don't we turn to Number 19?  I

8  believe that what I had said with -- oh, I'm sorry, Your Honor,

9  may I do something?  There's been a gentleman that has been

10 patiently waiting.  It's not on the agenda.  He represents the

11 monitor in Canada and I thought I should take that first before

12 we go back on the docket.

13      THE COURT:  Who in Canada?

14      MR. GALARDI:  He represents the monitor.  As you

15 know, we filed a CCAA proceeding and they appoint a monitor and

16 the gentleman representing the monitor is here.  He just wanted

17 to say a few words to the Court.

18      THE COURT:  Yes, thank you.

19      MR. GALARDI:  My apologies.

20      MR. SMITH:  Good afternoon, Your Honor.  Thank you

21 for indulging us.  J.R. Smith from Hunton and Williams on

22 behalf Alvarez Marsal Canada ULC.  With me today is Mr. Ken

23 Coleman from the law firm of Allen Overy who has a pending pro

24 hac motion.  I would ask that you allow him to be heard this

25 morning -- this afternoon.

1          THE COURT:  It would be a privilege.

2          MR. SMITH:  Thank you.

3          MR. COLEMAN:  Thank you, Your Honor.

4          THE COURT:  Welcome.

5          MR. COLEMAN:  Thank you very much.  I'll be very

6    brief.  I don't want to delay your calendar and people are

7    anxious to be done with the hearing.  We represent Alvarez and

8    Marsal in the Canadian proceeding of two subsidiaries, InterTAN

9    Canada Limited and Twin Ray (phonetic).  Those proceedings were

10   commenced in Canada on the same day that these Chapter 11 cases

11   were commenced under the Canadian CCAA statute which is

12   Canada's principal restructuring statute.  We represent the

13   monitor who is a plaintiff in that proceeding.  As Your Honor

14   may be aware, the appointment of a monitor is required under

15   that statute.

16          There's a good deal of attention being paid in the

17   Canadian proceeding to these proceedings, not least because

18   these two businesses are now more closely linked than they were

19   prepetition given the fact that they are now co-borrowers and

20   there's cross collaterization by virtue of the DIP financing.

21   That was extraordinary relief granted in Canada, for obvious

22   reasons, to facilitate not only the Canadian proceeding, but

23   also the restructuring before Your Honor.

24          Very briefly, I just wanted to outline a couple of

25   points to the Court.  One is the monitor's role in the Canadian

1 proceeding.  The monitor is an officer of the court.  It is not

2 a party to the proceeding.  It is independent, mutual and

3 intended to assist the company and the creditors to achieve a

4 restructuring.  One of the functions of the monitor is to file

5 periodic reports.  That's the principal means of communication

6 with the Court that appointed the monitor and the principal

7 means of communication with the creditor constituencies in the

8 proceeding.

9       We have done a fair amount of work representing

10 monitors in U.S. cases, and some courts have found it helpful

11 to receive copies of those reports to be filed in the U.S.

12 proceeding.  We're happy to do that here if Your Honor would

13 think that would be of interest or somehow informative.  We

14 would file it on the docket.  It would be available to

15 creditors, and we would be happy to proceed on that basis if

16 you think that would be helpful to the Court in any way.

17       Of note later today, I think in about an hour's time

18 there's a hearing before the Canadian court, Justice Morawetz,

19 to, among other things, approve a sale process and that is

20 designed to be a dual process, either a standalone process for

21 a sale of the Canadian business or in conjunction with a larger

22 transaction which may take shape in the United States.

23       That process in Canada is on a pretty fast track.

24 Indicative bids are due by the 17th of December.  Proposals are

25 due -- firm proposals are due by the 15th of January.  And it

1  is intended or at least proposed in the order that will be

2  submitted today that the monitor have full participation in

3  that process along with World (indiscernible) Canada who are

4  leading the effort on behalf of the company.

5         That transaction, if it goes forward, would require

6  approval of the Canadian court.  And depending on the other

7  aspects of the deal, particularly if there are some U.S.

8  elements to it, there may indeed be a need for coordination and

9  cooperation between this Court and the Canadian Court.  And it

10  may be useful in that regard for the two courts to have

11  court-to-court communication, and we would make available to

12  your chambers the contact information for Justice Morawetz if

13  Your Honor would feel it appropriate to communicate directly

14  with him on any matter.

15         And just very briefly, Your Honor, the other two

16  items up for today in Canada are an extension of the stay.

17  That was part of the initial order.  The proposal was to extend

18  that out to January 30, as well as to make certain other

19  modifications to the initial order that Justice Morawetz

20  granted on the first day.

21         And depending on how Your Honor would like us to be

22  informative and helpful to this Court, we can file those

23  pleadings and those orders along with monitor's reports as you

24  wish and provide as much or as little information as Your Honor

25  would desire to see.  Those are my comments.  Thank you very

1  much.

2         THE COURT:  I thank you very much.  Mr. Galardi, do

3  you think it would be helpful to have the reports or any of

4  those pleadings filed in connection with this case?

5         MR. GALARDI:  Your Honor, I have no objection

6  (indiscernible) if people have an interest in finding and the

7  Committee as well for a report to be filed on the docket of the

8  monitor's report I think it would be useful just to have that

9  information available to people.

10        THE COURT:  That is the Court's inclination.  I don't

11  know if we would have the pleadings filed.  I would think

12  obviously that they would make arrangements to provide them to

13  you and to counsel.

14        MR. GALARDI:  That's correct, Your Honor.  So Your

15  Honor knows, we have been involved with the monitor.  We have

16  obviously Canadian counsel.  We have discussed the sale process

17  and how it overrides -- how it coincides with the process here

18  in the United States.  We've had a meeting already with the

19  monitor.  I think having the report that they do is a good

20  idea.  I think we have plenty of pleadings in this case right

21  now to have a docket with Canadian pleadings in addition

22  probably would be more confusing than worthwhile at this point.

23        Obviously, if there's some pleading that they thought

24  was really important, they could always file it.  He's here.  I

25  think he's put in a notice of appearance in this matter anyway,

89

1 so clearly that'll be it.  But, the reports might be a good

2 idea to get into the docket.

3          MR. COLEMAN:  That's fine, Your Honor, thank you.

4 We'll do exactly that.

5          THE COURT:  Thank you.

6          MR. GALARDI:  Your Honor, moving back to, and I give

7 you, notwithstanding most of the people behind me, I do believe

8 that we have resolved all of what I'll call the landlord-type

9 motions and all of the issues.

10          I will turn to Matter 19.  Matter 19 is the motion of

11 us to reject leases and abandon property.  I guess I missed a

12 couple of things that I'd like to put on the record with

13 respect to this that I think finalizes it.  There are three

14 objections by just pure sub-lessees, Golf Galaxy, Dick's

15 Sporting Good and Dollar Tree.  We have agreed to adjourn their

16 objection to rejection over to the January 29th date.

17          THE COURT:  Those are Golf Galaxy, Dick's Sporting

18 Goods and Dollar Tree?

19          MR. GALARDI:  Dollar Tree, yes.  They're sub-tenants

20 actually, but they're objectors.

21          THE COURT:  Okay, I apologize.

22          MR. GALARDI:  There are also agreements between

23 landlords and sub-tenants that we're going to have side deals

24 where there will be assumption and assignments as opposed to --

25 they would have challenged our business judgment, but we have

1  now at least made it neutral or gotten positive value I believe

2  with landlords.  And shall we be putting the names on the

3  record, or is it unnecessary?

4           UNIDENTIFIED ATTORNEY:  I think that's fine.

5           MR. GALARDI:  We have three.  One will be Cardinal

6  Distribution would be the landlord and GE I believe is the

7  sub-tenant doing business as CE Transportation Systems.  The

8  second would be OLP 6609 Grand LLC with Lazy Boy as the

9  sub-tenant.  And then I have I think it's BAM CCI Delaware

10 Business Trust with DHL.  So, we would seek to have those

11 agreements, side agreements, done with the landlord.  And as I

12 mentioned, Your Honor, we're getting out of the chain of title,

13 but we facilitated it.  And either it's cash neutral to us, or

14 there may be some additional benefit to us, but at least we get

15 rid of the rejection damage claim.  So, I think that's that

16 aspect.

17         Then again it came up and I probably didn't make

18 myself express.  Your Honor, with respect to the actual date of

19 rejection as well as, you know, you've seen a lot of landlords

20 say we damaged the property, the property is damaged.  With

21 respect to the types of claims they may have in addition to

22 sub-rent, all rights are reserved with that.  We're not trying

23 to say that there's not an administrative claim.  We're not

24 saying that there is.  We're just reserving our rights for

25 people to make any claims they want out of this, including a

1  claim for sub-rent and contesting whether we actually are

2  entitled to the date of the rejection.

3        If I'm not mistaken, that resolves all of the

4  objections to Matter 19.

5        THE COURT:  Now, does anybody wish to be heard in

6  connection with the motion authorizing the rejection of

7  unexpired leases?

8        MR. WESTERMANN:  Good afternoon, Your Honor.

9        THE COURT:  Good afternoon.

10       MR. WESTERMANN:  May it please the Court.  Robbie

11 Westermann on behalf of Galleria.  Your Honor, we filed a

12 joinder in the objection of -- Dick's Sporting Goods filed.  We

13 filed it late yesterday evening.  The Dick's objection is

14 Docket Number 275, I believe, and I just wanted to make it

15 clear we just simply joined in that objection.  We're the

16 primary landlord with respect to that lease and so we have no

17 problem with carrying that objection and our joinder over to

18 the 29th.  Thank you.

19       THE COURT:  All right, thank you.

20       MR. GALARDI:  Your Honor, there was one lease that's

21 in Detroit that we have not moved to reject or didn't

22 apparently have on our lease a sub-lease rejection which we

23 agreed with this counsel that we would do.  I'll let you state

24 what it was.

25       MR. CUNNINGHAM:  For the record, Your Honor, Gary

1  Cunningham appearing on behalf of Carrollton Arms, the landlord

2  in Detroit, the center for Circuit City in that geographic

3  location.   There is a sub-tenant.   Apparently, there was a

4  sub-tenant lease that we weren't a party to that was directly

5  between Circuit City as the sub-landlord and an entity called

6  Basketball Planet was the sub-tenant.   They have not received,

7  the best we can tell, any kind of notification of what's

8  happening here in this Chapter 11 proceeding.   Counsel for the

9  debtor and I have agreed that that needs to be resolved, as

10  well.   And I believe the debtor will take those steps necessary

11  in order to give notice and file a motion in order to reject

12  that sub-lease that it's a party to.

13         UNIDENTIFIED ATTORNEY:   That is correct, Your Honor.

14         MR. CUNNINGHAM:   And we also agree, Your Honor, as

15  the other landlords have, on the proration method being the law

16  of the case here.   The only other issue we have is our damage

17  claims and we've agreed that we would preserve those the same

18  as the debtors agreed, and I think that resolves everything

19  with Carrollton this afternoon.

20         MR. GALARDI:   That's my understanding, Your Honor.

21  Just law of the case -- I'd say law of the case with respect to

22  the objecting landlords.

23         MR. CUNNINGHAM:   Correct.

24         THE COURT:   Very good.   What is the docket number on

25  -- is it on -- did you file an objection?

1           MR. CUNNINGHAM:  We did, Your Honor.  We filed

2    through our Docket Numbers 260, and I'm not certain what the

3    amendment was.  The original one was at 260.

4           THE COURT:  All right, that's sufficient.  Thank you.

5           MR. CUNNINGHAM:  Thank you, Your Honor.

6           MR. GALARDI:  Your Honor, the other one is -- there

7    is an objection.  I think it's Docket Number 368, the Home

8    Family Trust.  We have reached an agreement with counsel to the

9    Home Family Trust.  I don't know if I need to put anything

10   further on the record.  He said, no, so I think that resolves

11   all of the objections on Number 19.  And we -- what we intend

12   to do is we've worked on an order.  We will circulate an order

13   Monday morning.  I will start circulating orders to the parties

14   so that they can review those orders, make sure I've gotten

15   everything in there that we've said.

16          THE COURT:  So, you anticipate that there will be one

17   order for every landlord, or are you going to circulate

18   separate orders for each of the landlords that have objected?

19          MR. GALARDI:  Good question.  I think we'll try --

20   well, I think what we will do is resolving the objections, Your

21   Honor, because remember this was a motion to reject, they

22   objected to that so we will either circulate to them or if they

23   need a separate order, we'll do a separate order trying to get

24   on record any agreements if necessary.  If they're comfortable

25   with my representations on the record, then I would prefer not

1  to inundate the Court's docket with orders and agreements and

2  let's see how that -- they can contact us if they want an order

3  for them.

4        THE COURT:  Very good.

5        MR. GALARDI:  Your Honor, may I have permission

6  though if we don't need to file an order but we have an

7  agreement by e-mail or other way that that would be sufficient

8  that I confirm what I put on the record instead of filing an

9  order or stipulation if landlords are comfortable with that as

10  opposed to having a filed stipulation?

11        THE COURT:  That's fine with the Court.

12        MR. GALARDI:  Thank you, Your Honor.

13        Your Honor, then moving to Matter 20, I believe that

14  this is the motion for -- with respect to the Gordon Brothers.

15  Your Honor, I neglected to say, although I mentioned that there

16  was FF&E that was being sold.  Your Honor, we amended the

17  agreement with respect to the sale of FF&E.  We attached a

18  letter agreement.

19        What had happened was, we had decided to go away from

20  Gordon Brothers and Hilco because we thought we had a better

21  deal.  It was our option to do so.  Then once we received the

22  better deal, we then circulated that deal and Hilco and Gordon

23  Brothers made us a higher proposal which is reflected in the

24  letter agreement.  We've shown that letter agreement with the

25  creditor's committee.  So we would like to have the approval to

1  go settle the FF&E and it actually makes more sense on our time

2  frame, although they are tagging it, to approve them.  I wanted

3  to bring back to the Court's attention, since I haven't done

4  that, we'd ask for approval to proceed that way.

5           In addition, Your Honor, I missed a number of little

6  -- I won't say little points, they're big points to everyone.

7  First, the landlords will be authorized to appear at the

8  auction whether they bid or not.  Second is that landlords

9  would be entitled to credit bid.  We have the right to contest

10 whether it's a valid amount, but they are allowed to credit bid

11 any valid amounts at the auction on their leases.  And those

12 credit bids can include both prepetition and post-petition

13 accruals again with respect to the landlords bidding.

14          In addition, the landlords, if they're bidding on

15 their own lease, will not have to make a good faith deposit on

16 their own lease.  It is their own lease.  Obviously, if they go

17 for somebody else's lease, they'd be treated like any other

18 bidder.

19          I may have misspoken that the adequate assurance

20 information to be transmitted is actually December 16th.  And

21 then I have the obligation is to by November 19th at noon to

22 put on the record where these properties have gone and I'm

23 losing my notes on the December 17th date that I --

24          UNIDENTIFIED ATTORNEY:  The cure objection date.

25          MR. GALARDI:  -- the cure objection deadline which I

1  didn't refer to.  Currently, there is a shorter cure period.

2  Without modifying this order, that's going to be modified over

3  the weekend so we'll be delayed to send it out.  There's

4  already a deadline, but we're essentially extending the

5  deadline for persons to make objection to the cure.  We already

6  have a motion out there that fixes those, but we'll give

7  landlords more time to calculate the cures and make the

8  objections.

9       And then any amounts, if we do sell the properties

10 and we have an agreement or to the extent we have an agreement,

11 oftentimes we'll have one percent, they'll have a higher

12 percent, we will pay out the amount.  We're not going to hold

13 the landlords hostage to the full amount being resolved unless

14 there's such a gigantic difference that we can't agree and then

15 there will be no choice not to assume but I can't imagine that

16 will be the case.  We will pay the uncontested amounts out in

17 cure at that point and then we can resolve any other additional

18 amounts at a later point.

19       I believe that then resolves all of the objections to

20 Number 20, and on this one what we will do, and counsel to the

21 landlords has been very helpful here, we have modified the

22 order to try to reflect all of my comments, these additional

23 comments.  The idea would be to circulate this order to the

24 objecting parties.  We'd ask if they don't have their e-mails

25 on something that we already have, to give us the e-mails to

1    circulate that order on Monday morning and then to get all

2    comments around noon or one o'clock and then try to circulate

3    and file that order for Your Honor by the end of the day

4    Monday.  It may slip to Tuesday, but then we can serve and get

5    these deadlines out there as notice.

6          THE COURT:  All right, very good.  Does any party

7    wish to be heard in connection with this motion?

8          MR. GALARDI:  Your Honor -- go ahead.

9          MR. FEINSTEIN:  Just one thing.  Robert Feinstein for

10   the creditor's committee.  We just ask, even though we didn't

11   object to this, that we be included in the drafts of all these

12   orders that are being circulated.

13         MR. GALARDI:  That goes without saying.

14         THE COURT:  I would assume you'd be included in

15   everything, at least that would be my hope.

16         MR. GALARDI:  I thought I'd get one by him.

17         Your Honor, no objection to having it to the counsel

18   to the committee.  Your Honor, I think on the hearing -- I

19   think we have the whole day scheduled for the 22nd?

20         THE COURT:  You do.

21         MR. GALARDI:  What I would suggest is at least this

22   matter be scheduled for the afternoon.  If we have a big enough

23   calendar, I'd maybe deal with other things in the morning, but

24   at least this matter would be scheduled at one o'clock in the

25   afternoon if that's acceptable so that landlords can come in in

1  the morning if they need to because there's an auction period

2  and all of that.  And maybe we can resolve some objections, but

3  then they don't all have to stand here if I have a calendar on

4  some other matters if that's acceptable.

5         THE COURT:  That's acceptable, so we'll set this

6  matter down for one o'clock.

7         MR. GALARDI:  That would be great, Your Honor, thank

8  you.

9         Your Honor, now we turn to Matter 21 on the agenda

10 which is the debtor's motion to extend the time to Section --

11 under Section 365(d)(4).  As I had already mentioned, Your

12 Honor, we would be extending the time, but it would all be for

13 the 210 days that it would have to be done, either assumed or

14 rejected.

15        Clarification on the record, Your Honor.  We would

16 put in the order a paragraph that provides that we will make

17 time -- we will satisfy -- go forward, satisfying our timely

18 obligations as required by 365(d)(3).  And then the way that we

19 worked out a procedure is that landlords, if they believe we

20 have not done so, they will give us five days notice.  We will

21 have five days to either fix it or we agree to have to come

22 into the court on an expedited basis.  We have no objection.  I

23 think that resolves all of the objections with respect to --

24 and the other things that I said earlier with respect to the

25 365(d)(4).  I think that is the thing that I missed earlier.

1          THE COURT:  Very good.  Any party wish to be heard in

2  connection with the motion to extend time within which they may

3  assume or reject (indiscernible)?

4          MR. EPPS:  Good afternoon, Your Honor.  A.C. Epps,

5  Jr., on behalf of many of the objecting landlords.

6          I have asked Mr. Galardi, and he's given me

7  permission to clarify something that was said earlier about the

8  timing.  And our group of landlords and a number of others had

9  objected to referral of the cure payment -- excuse me --

10  payments for the (indiscernible) during a period of time based

11  on the Track RO language it was quoted from Pudgie's, and the

12  Court is probably familiar with it.  It says that landlords

13  have to ask and get paid in a timely manner in order to avoid

14  being put into the general administrative expense claim pot,

15  they only paid at the end of the case.

16          We have agreed that as to the objecting landlords,

17  our request for that such payment is considered to be made as

18  of today whether or not it's heard at some other day, and that

19  issue will not be raised as to us.  The fact that we were not

20  here on a timely basis within the meaning of Track RO

21  (phonetic) and Pudgie's.  That was spoken with regard to a

22  little bit before lunch, but I wanted to clarify this and make

23  sure the Court knew exactly what we were worried about it and

24  that we do have agreement on that issue.

25          THE COURT:  Very good.

1          MR. EPPS:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MR. McCULLAGH:  Good afternoon, Your Honor.

4          THE COURT:  Good afternoon.

5          MR. McCULLAGH:  Neil McCullagh of the firm of Cantor

6   Arkema.  I have filed a motion to admit pro hac vice the

7   gentleman who is with me here today, counsel William Wood of

8   the firm of Bracewell and Giuliani from Houston.  We're here

9   for one of the landlords, Raymond and Main Retail, LLC.  I'd

10  request the Court to allow Mr. Wood to address the Court on

11  this motion.  Thank you.

12         THE COURT:  That's approved.  Mr. Wood?

13         MR. WOOD:  Thank you, Your Honor.  Troy Wood on

14  behalf of Raymond and Main.  Your Honor, our lease was one of

15  the construction -- under construction leases, no inventory,

16  that originally was on the extension list and now has been

17  taken out.  We appreciate that.  The debtor in --  today's

18  counsel said that the current date now will be March 10th as a

19  drop dead date for assuming or rejecting.  We realize that and

20  the debtor reserved its rights to extend that time and we

21  realize that.  But, we just want the record to be clear in

22  court that we're reserving all rights to seek a shorter period

23  and to perhaps compel an oral rejection, not today, but we're

24  reserving our rights to do so.

25         We have about approximately $736,000 unpaid

1 contractors' liens on this particular lease, and under

2 California law they have a time limit within which they can

3 perfect that, and some of those time limits are going to be

4 coming due, certainly will be coming due before March 10th.

5 Some will be coming due this month.  We've already had one --

6 we've actually have had two filed against the property.  We

7 anticipate a lot more.

8         The parties are working on a termination agreement

9 and I hope that the parties will resolve this through a

10 business channel.  But if not, we may be back as soon as

11 December 22nd telling that this needs to be compelled,

12 rejection or assumption to cure these M&M liens.  I don't want

13 the Court to be surprised by that, and so we're reserving our

14 rights to do that.

15         THE COURT:  All right, thank you.

16         MR. WOOD:  Thank you, Your Honor.

17         MR. CRENSHAW:  Good afternoon, Your Honor.  William

18 Crenshaw from Powell Goldstein on behalf of the various

19 landlords and particularly with regard to Objection 607 in

20 Gould Investors LP.  We have a distribution center in

21 Livermore, California, where our rent is due in arrears, and

22 we've agreed with the debtor with a payment that was due on

23 November 30th.  We've agreed to prorate that from the

24 post-petition period with the understanding that in the event

25 that the lease is subsequently rejected, we would also be

1 entitled to rent on a prorated basis.  So, in the event that

2 they reject it on the 15th of the month, then we would get half

3 of the rent for that month even though the rent wasn't due till

4 later.  So we just wanted to clarify that for the record.

5          THE COURT:  All right, thank you.

6          MR. CRENSHAW:  Thank you.

7          MR. GALARDI:  Your Honor, the clarifications on the

8 proration are absolutely fine.  One other clarification.  I

9 guess the benefit of being an objector is hearing some of the

10 arguments from other counsel, so I'll make it clear one more

11 time.  If you're an objector, even if you didn't ask for your

12 stub rent in any one of the three documents but you're herein

13 objecting on one of those three motions, you still have the

14 right and you don't have to file a motion on stub rent.  You

15 can make and make argument and get whatever benefit or downside

16 it is with respect to stub rent on the December 22nd hearing.

17          THE COURT:  That's what I understood you said before

18 we took a break for lunch.

19          MR. GALARDI:  And, Your Honor, finally on the 365,

20 obviously (d)(3) motions to compel are motions to shorten time,

21 we reserve all of our rights, legal or otherwise, whether there

22 are such rights and I'm compelled to oppose such rights.  I

23 think that was --

24          MR. LUCIAN:  Your Honor, if I may be heard

25 telephonically?

1            THE COURT:  Who's speaking, please?

2            MR. LUCIAN:  Your Honor, this is John Lucian from

3   Blank Rome.  I represent VIWY Limited Partnership.  We filed a

4   joinder objection.  I believe it's Docket Number 711 with

5   respect to this matter.  Mr. Galardi said earlier that the deal

6   that was set forth on the record related to landlords in the

7   room and he just said a moment ago landlords who were there.  I

8   just want to make sure it covers landlords who are

9   participating telephonically, such as my client, VIWY Limited

10  Partnership.

11           MR. GALARDI:  As long as Mr. Lucian stays on the

12  phone and doesn't come to the room, he can have the extension.

13           MR. LUCIAN:  That was the deal we cut in our last

14  case together, Your Honor, so that's fine.

15           MR. GALARDI:  That's fine.  I mean, anybody who's

16  filed an objection, Your Honor.

17           THE COURT:  All right.

18           MR. GALARDI:  Your Honor, I think that resolves all

19  of the objections to 21, so we will be putting in an order with

20  respect to that.

21           Your Honor, I haven't identified every counsel with

22  every lease, but I think Number 22 is therefore now adjourned

23  over to the December 22nd hearing which is the motion of

24  Burbank Mall Associates to have post-petition rent.

25           MR. BLILEY:  I'm Paul Bliley.  I represent Burbank

1  Mall, that's correct.  I'm also involved with Number 23, Crown

2  CCI.

3           THE COURT:  And that's going to be carried over to

4  the 22nd of December, as well?

5           MR. BLILEY:  Yes, sir.

6           THE COURT:  That'll be -- both matters will be set at

7  the one o'clock time, is that correct?

8           UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

9           MR. GALARDI:  If it makes it easier for our landlord

10 counsel to do their matters at one o'clock, and whatever else

11 we can do in the morning, I think that's appropriate.

12          THE COURT:  That's what I thought you had said.  I

13 just wanted to make sure I understood.

14          MR. GALARDI:  You were ahead of me.  I didn't think

15 about the motions to compel rent, but that's fine.  I think

16 it's the best way to do it.

17          I think that took care of matter Number 23 as well,

18 Your Honor.

19          Now, I'm up to Matter 24 which is also a motion to

20 compel rent under -- to pay administrative rent by Woodlawn

21 Trustees.  Again, I don't know which counsel represented them,

22 but my understanding is there's an agreement to adjourn.

23          THE COURT:  Mr. Falzone?

24          MR. FALZONE:  Good afternoon, Judge.  Michael

25 Falzone.  I represent Woodlawn Trustees.  I also represent

1 Docket Number 25, 502-12 86th Street, and Number 27, Basile

2 Limited Liability Company, and we do agree to the adjournment

3 to the 22nd.

4       THE COURT:  Okay, and that will be at one o'clock,

5 also.

6       MR. FALZONE:  Yes, Your Honor.

7       THE COURT:  Very good.

8       MR. GALARDI:  On my count, Your Honor, that's Number

9 24, Number 25.  Number 26 on the docket, Your Honor, is already

10 handled and I think we just moved Number 27 to December 22nd.

11       THE COURT:  That's correct.

12       MR. GALARDI:  28, Your Honor has already addressed

13 which brings us to Matter 29 which is the debtor's motion for a

14 bar date.  There were a number of objections filed.  I know

15 that there were a number of landlord objections and there were

16 a number of taxing authority objections.  I think the landlord

17 objections are now resolved by the language that I thought I

18 put on but I will make it clear that it is the later of -- they

19 don't have to file any claims until the later of the bar date,

20 30 days after the rejection, or as otherwise provided in any

21 order of the Court.

22       I don't know if there are other parties in the

23 courtroom that had other objections to the bar date notice or

24 order that are appearing, Your Honor.  And I don't know if Your

25 Honor had any other concerns.

1          THE COURT:  Does any party wish to speak to the

2    motion of setting the general bar date?

3                    (No audible response)

4          THE COURT:  It appears that you've resolved all of

5    the objections, and the Court has found.

6          MR. GALARDI:  Thank you, Your Honor.  We will submit

7    an order reflecting those changes, again with the revisions.

8    Your Honor, I think with -- I will turn to Matter 30 which is

9    the bidding on the auction on the leases.  Again, I think with

10   all of the representations I've put on the record and the

11   proposed form of order, I believe I have now resolved or we've

12   resolved along with the collective efforts with the landlords,

13   all of the matters listed under Number 30.

14         THE COURT:  Does any party wish to be heard in

15   connection with the debtor's motion before it's approved

16   bidding auction procedures for the sale of unexpired leases?

17                    (No audible response)

18         THE COURT:  (Indiscernible).

19         MR. GALARDI:  Your Honor -- I'm sorry.

20         THE COURT:  It's quite all right.

21         MR. GREER:  David Greer for Pan Am Equities.  I

22   really have more of a procedural question on next Monday on the

23   22nd.  I have filed in some of my motions requested joinder

24   with other landlords that don't have a substantive objection as

25   to the information of adequate assurance but may want the

1  joinder at the time of payment.  Would the Court entertain my,

2  and other landlords similarly situated just one party just to

3  piggyback in with other counsel for the same issue and let them

4  argue the issue and abide by the Court's ruling in that regard?

5          THE COURT:  Certainly.

6          MR. GREER:  Thank you.

7          MR. GALARDI:  It pays to be here.

8          31 is the Panasonic motion, Your Honor.  Your Honor

9  has already ruled on that matter.  32, Your Honor, is another

10  motion to compel the immediate payment of stub rent.

11          MR. WESTERMANN:  Your Honor?  My understanding is

12  that that has been resolved, Your Honor.

13          THE COURT:  Which one are we referring to now?

14          MR. WESTERMANN:  That's correct.  Actually, I think I

15  have last night's agenda.  I think it's Matter 32.

16          THE COURT:  I'm sorry, you need to identify yourself

17  so we know who --

18          MR. WESTERMANN:  I'm sorry, Robbie Westermann on

19  behalf of Taubman.

20          THE COURT:  Thank you.

21          MR. WESTERMANN:  It's Docket Number 471, Your Honor.

22  It was a motion to compel payment of rent.  I think it may be

23  matter Number 31 on the revised agenda.

24          MR. GALARDI:  I have it as 32, Your Honor.

25          THE COURT:  Yes, I have it as Number 32.

1           MR. WESTERMANN:  That matter -- we've resolved that,

2    and that can be removed from the docket.

3           THE COURT:  All right, so Number 32 has been

4    resolved?

5           MR. WESTERMANN:  Yes, sir.  We had a prior objection,

6    as well, that's been resolved and that can be taken off, as

7    well.

8           THE COURT:  All right.

9           MR. WESTERMANN:  Thank you.

10          MR. GALARDI:  Your Honor, which brings us to the last

11   matter on the agenda which was the demand by Green 521 Fifth

12   Avenue, for the performance of -- and I believe this is again a

13   stub rent issue and I believe that it is resolved.  Actually, I

14   will say we are putting it over to December 22nd, as opposed to

15   resolved.

16          THE COURT:  Okay, so we'll put that over to 12/22 at

17   one o'clock.

18          MR. GALARDI:  That concludes the matters on the

19   agenda, Your Honor, and I appreciate all the time for being

20   able to resolve this.

21          THE COURT:  I compliment counsel on being able to

22   resolve these many complicated issues.  Obviously, the hour

23   this morning was well spent.  Thank you.

24          COURTROOM DEPUTY:  All rise.  The court is now

25   adjourned.

1                        *  *  *  *  *

2                 **C E R T I F I C A T I O N**

3          We, KATHLEEN BETZ, LORI AULETTA and MARY POLITO,

4  court approved transcribers, certify that the foregoing is a

5  correct transcript from the official electronic sound recording

6  of the proceedings in the above-entitled matter, and to the

7  best of our ability.

8

9  /s/ Kathleen Betz

10 KATHLEEN BETZ

11

12 /s/ Lori Auletta

13 LORI AULETTA

14

15 /s/ Mary Polito

16 MARY POLITO

17 J&J COURT TRANSCRIBERS, INC.    DATE:  February 15, 2012

18

19

20

21

22

23

24

25