**Response of CWCapital Asset Management, LLC to the Liquidating Trust's Twenty-eighth
Omnibus Objection to Landlord Claims**

# Exhibit B

B10 (Official Form 10) (12/08)

| United States Bankruptcy Court - Eastern District of Virginia | PROOF OF CLAIM |
|---|---|

| Name of Debtor:<br>Circuit City Stores, Inc. | Case Number:<br>08-35653 (KRH) |
|---|---|

*NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (The person or other entity to whom the debtor owes money or property):
CWCapital Asset Management LLC as Special Servicer for Bank of America, N.A. (successor by merger to LaSalle Bank, N.A.), as Trustee for the Holders of Nomura Asset Securities Corporation, Commercial Mortgage Pass-Through Certificates Series 1998-D6

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:** _____
*(If known)*

Filed on: _____

Name and address where notices should be sent:
Demetrios Morakis
CWCapital Asset Management LLC
701 13th Street, NW
Suite 1000
Washington, DC 20005
Telephone number: 202-715-9546

Name and address where payment should be sent (if different from above):
Capmark Finance, Inc.
c/o Demetrios Morakis
CWCapital Asset Management LLC
701 13th Street NW, Suite 1000
Washington, DC 20005
Telephone number: 202-715-9546

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:** $819,066.00

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

■ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:** Pre-Petition Rent and Rejection Damages
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

**3a. Debtor may have scheduled account as:** Store No. 3331
(See instruction #3a on reverse side.)

**4. Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

**Nature of property or right of setoff:** ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**

**Value of Property:**$_____ **Annual Interest Rate** _____

**Amount of arrearage and other charges as of time case filed included in secured claim, if any:** $_____ **Basis for perfection:** _____

**Amount of Secured Claim:** $_____ **Amount Unsecured:** $_____

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

**Amount entitled to priority:**

$_____

*\* Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See instruction 7 and definition of "redacted" on reverse side.)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**FOR COURT USE ONLY**

| Date:<br>4/29/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Kristen E. Burgers, Esq. |
|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

### Attachment to the Proof of Claim of
### CWCapital Asset Management LLC, as Special Servicer for Bank of
### America, N.A. (successor by merger to LaSalle Bank, N.A.), as Trustee for
### the Holders of Nomura Asset Securities Corporation,
### Commercial Mortgage Pass-Through Certificates Series 1998-D6

On or about November 10, 2008 (the "Petition Date"), Circuit City Stores, Inc. and seventeen of its subsidiaries (collectively, the "Debtor") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Pursuant to §§ 1107 and 1108 of the Bankruptcy Code, the Debtor is continuing to operate its business and manage its affairs as a debtor-in-possession. The Debtor is a retailer of consumer electronics and operates large nationwide electronics stores that sell, among other things, televisions, home theatre systems, computers, camcorders, furniture, software, imaging and telecommunications products, and other audio and video electronics. As of the Petition Date, the Debtor operated approximately 712 Superstores and 9 outlet stores under the Circuit City name throughout the United States and Puerto Rico. The Debtor operates a retail store on the real property located at 7701 North Division Street, Spokane, Washington ("Store 3331"), hereinafter referred to as the "Store".

Bank of America, N.A., successor by merger to LaSalle Bank, N.A. is the Trustee for a trust fund, the beneficial ownership of which is evidenced by various classes of mortgage pass-through certificates known as the Nomura Asset Securities Corporation, Commercial Mortgage Pass-Through Certificates Series 1998-D6 (the "Trust"). CWCapital Asset Management LLC is the Special Servicer for the Trust.

As of February 4, 1998, Larry J. Rietz MP, L.L.C. (the "Borrower") executed a Promissory Note (the "Note") in favor of Nomura Asset Capital Corporation in the original principal amount of $4,302,912.00 (the "Loan"). The Note was secured by, among other things, a certain piece of real property located at 7701 North Division Street, Spokane, Washington (the "Collateral Property") pursuant to a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of February 4, 1998 (the "Deed of Trust"). In addition,

the Borrower executed an Assignment of Leases and Rents dated February 4, 1998
(the "Assignment of Leases and Rents"). The Note, Deed of Trust and Assignment
of Leases and Rents are hereinafter collectively referred to as the "Loan
Documents".

Pursuant to the terms of the Loan Documents, the Trust has a lien on
all rights, title and interest in and to the Collateral Property, including but not
limited to all buildings, structures, improvements and tenements thereon, all
easements, rights-of-way, appurtenances, leases, rents, issues, proceeds, profits,
and all fixtures, machinery, motors, elevators, radiators, and all plumbing, heating,
lighting ventilating, refrigerating, air conditioning and sprinkler equipment, and
other interests as set forth in the Deed of Trust.

The Debtor leased Store 3331 from the Borrower. Pursuant to the
terms of a lease dated February 4, 1998 (the "Lease") and any guaranty related
thereto, the Debtor is obligated to make monthly rental payments to the Borrower.
A copy of the Lease is attached hereto as Exhibit A. To the extent that the Debtor
owes the Borrower for any pre-petition rents, the Trust possesses a first priority
lien on those rents. In addition, the Debtor continued to occupy the Store post-
petition and, pursuant to the Lease, is obligated to pay such rent and related
payments as an administrative expense of the estate. The Trust specifically
reserves any and all administrative expense claims with respect to such post-
petition rent and related payments due under the Lease. To the extent that the
Debtor removed and/or sold fixtures from the Store or damaged the property, the
Trust will possess additional claims.

### Pre-Petition Rent Claim

On the Petition Date, upon information and belief[1], the Debtor owed
rent of $11,268.89 for the period November 1, 2008 to November 10, 2008. In
addition to the rent, the Debtor owed penalties and interest in the amount of

---

[1] The pre-petition rent claim is subject to the taking of discovery from the Debtor to determine all
pre-petition amounts outstanding.

MC1#277804

$18.78.  Interest is calculated at the Prime Rate (4.0%) plus 2% for the ten (10) day period between November 1, 2008 and November 10, 2008.  In addition, the Debtor owed real estate taxes in the amount of $44,433.72.  The total amount of pre-petition rent and related payments due is $55,721.39.

### Claim for Rejection Damages

The Debtor rejected the Lease pursuant to an order entered by the Bankruptcy Court on February 19, 2009 [Docket Entry No. 2242].  To the extent that the Borrower has a claim against the Debtor for rejection damages, the Trust possesses a first priority lien on that claim.

The Trust has prepared the following calculations in support of its claim for rejection damages pursuant to Section 502(b)(6) of the Bankruptcy Code.

| | |
|---|---|
| Effective Date of Rejection | 3/4/2009 |
| Remaining Lease Term (calculated from the petition date) | 4128 days (11/10/08 – 2/29/20) |
| 15% of Remaining Lease Term[2] | 619 days |
| Annual Base Rent | $405,680.00 |
| Real Estate Taxes (annual, based on 2008 Real Estate tax bill) | $44,433.72 |
| Additional Rent Charges (annual) | $0[3] |
| Total Rent on an annual basis | $450,113.72 |
| Total Rent on a per diem basis | $1,233.19 |
| Total Rent for 15% of Remaining Lease Term | $763,344.61 |

---

[2] The calculation of the damages cap under Section 502(b)(6)  is based on 15% of the remaining lease term, which is less than three years.

[3] The portion of the rejection claim related to additional rent charges is subject to the taking of discovery from the Debtor to determine the amounts, on an annual basis, of all such additional rent charges.

MC1#277804

Pursuant to Section 502(b)(6), the Trust is entitled to a claim for the rent reserved by the Lease for the greater of one year or 15 percent of the remaining lease term, not to exceed three years. Based on the above calculations, the Trust is entitled to a claim for rejection damages based on the total rent for 15% of the remaining lease term, as calculated from the petition date, in the amount of $763,344.61.

<u>Summary</u>

Based on the foregoing, Claimant hereby files this proof of claim in the total amount of $819,066.00. Claimant reserves the right to amend this proof of claim in the future.

4

# EXHIBIT A

LOCATION:
7701 North Division Street
Spokane Washington
Store No. 3331

# LEASE

between

## CIRCUIT CITY STORES, INC.,

as Tenant

and

## LARRY J. RIETZ, MP, L.L.C.

as Landlord

dated February 4, 1998

MWBB February 3, 1998

# TABLE OF CONTENTS

PAGE

1.   Certain Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.   Demise of Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

3.   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4.   Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5.   Net Lease: True Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

6.   Title and Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

7.   Taxes: Insurance and Legal Requirements . . . . . . . . . . . . . . . . . . . . 10

8.   Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9.   Maintenance and Repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

10.  Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

11.  Alterations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

12.  Condemnation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

13.  Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

14.  Damage, Destruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

15.  Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

16.  Subordination to Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

17.  Assignment, Subleasing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

18.  Permitted Contests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

19.  Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

20.  Landlord's Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

i

21.   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

22.   Memorandum of Lease; Estoppel Certificates . . . . . . . . . . . . . . . . . . . . . 38

23.   Surrender and Holding Over . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

24.   No Merger of Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

25.   Landlord Exculpation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

26.   Hazardous Substances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

27.   Entry by Landlord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

28.   Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

29.   No Usury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

30.   Broker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

31.   Waiver of Landlord's Lien . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

32.   No Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

33.   Separability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

34.   Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

35.   Tenant to Comply With Reciprocal Easement Agreement. . . . . . . . . . . . . . . 45

36.   Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

37.   Modifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

38.   Successors, Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

39.   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

40.   Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

41.   Lender as Third Party Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

MWBB February 3, 1998
MWBB CRAB PLAZA 11998

THIS LEASE AGREEMENT is made as of this 4th day of February, 1998, by and between **LARRY J. RIETZ, MP, L.L.C.**, a Minnesota limited liability company, having an office at 108 Park Square West, P. O. Box 1054, Owatonna, Minnesota 55060 ("Landlord"), and **CIRCUIT CITY STORES, INC.**, a Virginia corporation, having its principal office at 9950 Mayland Drive, Richmond, Virginia 23233-1464 ("Tenant").

In consideration of the rents and provisions herein stipulated to be paid and performed, Landlord and Tenant hereby covenant and agree as follows:

1.    Certain Definitions.

(a)    "Additional Rent" shall mean all sums required to be paid by Tenant to Landlord hereunder other than Basic Rent, which sums shall constitute rental hereunder.

(b)    "Adjoining Property" shall mean all sidewalks, curbs, gores and vault spaces adjoining any of the Leased Premises.

(c)    "Alteration" or "Alterations" shall mean any or all changes, additions, improvements, reconstructions or replacements of any of the Improvements, both interior or exterior, and ordinary and extraordinary.

(d)    "Basic Rent" shall mean Basic Rent as defined in Paragraph 4.

(e)    "Basic Rent Payment Dates" shall mean the Basic Rent Payment Dates as defined in Paragraph 4.

(f)    "Commencement Date" shall mean the Commencement Date as defined in Paragraph 3.

(g)    "Condemnation" shall mean a Taking and/or a Requisition.

(h)    "Default Rate" shall mean an annual rate of interest equal to the lesser of (a) two percent (2%) above the rate of interest announced publicly by Citibank, N.A. or its successor, from time to time, as Citibank, N.A.'s or such successor's base rate or, if there is no such base rate, then the rate of interest charged by Citibank, N.A. or such successor to its most creditworthy customers on commercial loans having a 90-day duration, but in no event less

1

than the rate per annum equal to the prime rate, as set forth in the "Money Rates" section of The Wall Street Journal, Eastern Edition, plus one percent (1%), or (b) the maximum rate permitted by applicable law.

(i)   "Event of Default" shall mean an Event of Default as defined in Paragraph 19.

(j)   "Insurance Requirement" or "Insurance Requirements" shall mean, as the case may be, any one or more of the terms of each insurance policy required to be carried by Tenant under this Lease and the requirements of the issuer of such policy, and whenever Tenant shall be engaged in making any Alteration or Alterations, repairs or construction work of any kind (collectively, "Work"), the term "Insurance Requirement" or "Insurance Requirements" shall be deemed to include a requirement that Tenant obtain or cause its contractor to obtain completed value builder's risk insurance when the estimated cost of the Work in any one instance exceeds the sum of One Hundred Thousand ($100,000.00) Dollars and that Tenant or its contractor shall obtain worker's compensation insurance or other adequate insurance coverage covering all persons employed in connection with the Work, whether by Tenant, its contractors or subcontractors and with respect to whom death or bodily injury claims could be asserted against Landlord.

(k)   "Law" shall mean any constitution, statute or rule of law.

(l)   "Legal Requirement" or "Legal Requirements" shall mean, as the case may be, any one or more of all present and future laws, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations and requirements, even if unforeseen or extraordinary, of every duly constituted governmental authority or agency (but excluding those which by their terms are not applicable to and do not impose any obligation on Tenant, Landlord or the Leased Premises) and all covenants, restrictions and conditions now or hereafter of record which may be applicable to Tenant, to Landlord or to any of the Leased Premises, or to the use, manner of use, occupancy, possession, operation, maintenance, alteration, repair or

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

reconstruction of any of the Leased Premises, even if compliance therewith (i) necessitates structural changes or improvements (including changes required to comply with the "Americans with Disabilities Act") or results in interference with the use or enjoyment of any of the Leased Premises or (ii) requires Tenant to carry insurance other than as required by the provisions of this Lease.

(m)    "Lender" shall mean the entity identified to Tenant as such in writing, which makes a Loan to Landlord, secured in whole or in part by a Mortgage and evidenced by a Note or which is the holder of a Mortgage and Note as a result of an assignment thereof, and when a Mortgage secures multiple Notes held by one or more noteholders, the trustee acting on behalf of such holders, provided such trustee has been identified as such in writing to Tenant.

(n)    "Loan" shall mean a loan made by a Lender to Landlord secured in whole or in part by a Mortgage and evidenced by a Note or Notes.

(o)    "Mortgage" shall mean a first priority mortgage or similar security instrument hereafter executed covering the Leased Premises from Landlord to Lender.

(p)    "Net Award" shall mean the entire award payable to Landlord by reason of a Condemnation, less any actual and reasonable expenses incurred by Landlord in collecting such award.

(q)    "Net Proceeds" shall mean the entire proceeds of any property casualty insurance required under Paragraph 13.(a), less any actual and reasonable expenses incurred by Landlord in collecting such proceeds.

(r)    "Note" or "Notes" shall mean a promissory note or notes hereafter executed from Landlord to Lender, which Note or Notes will be secured in whole or in part by a Mortgage and an assignment of leases and rents.

(s)    "Permitted Encumbrances" shall mean those covenants, restrictions, reservations, liens, conditions, encroachments, easements and other matters of title that affect the Leased Premises as of Landlord's acquisition thereof, excepting, however, any such matters

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

arising from the acts of Landlord without the written consent of Tenant (such as liens arising as a result of judgments against Landlord).

(t)    "Requisition" shall mean any temporary condemnation or confiscation of the use or occupancy of any of the Leased Premises by any governmental authority, civil or military, whether pursuant to an agreement with such governmental authority in settlement of or under threat of any such requisition or confiscation, or otherwise.

(u)    "Restoration" shall mean the restoration of the Leased Premises after any Taking or damage by casualty as nearly as possible to their value, condition and character existing immediately prior to such Taking or damage.

(v)    "State" shall mean the State or Commonwealth in which the Leased Premises are situate.

(w)    "Taking" shall mean any taking of any of the Leased Premises in or by condemnation or other eminent domain proceedings pursuant to any law, general or special, or by reason of any agreement with any condemnor in settlement of or under threat of any such condemnation or other eminent domain proceedings or by any other means, or any *de facto* condemnation.

(x)    "Taxes" shall mean taxes of every kind and nature (including real, *ad valorem* and personal property, income, franchise, withholding, profits and gross receipts taxes), all charges and/or taxes for any easement or agreement maintained for the benefit of any of the Leased Premises, all general and special assessments, levies, permits, inspection and license fees, all utility charges, all ground rents, and all other public charges and/or taxes whether of a like or different nature, even if unforeseen or extraordinary, imposed upon or assessed, prior to or during the Term, against Landlord, Tenant or any of the Leased Premises as a result of or arising in respect of the occupancy, leasing, use, maintenance, operation, management, repair or possession thereof, or any activity conducted on the Leased Premises, or the Basic Rent or Additional Rent, including without limitation, any gross income tax, sales tax,

4

occupancy tax or excise tax levied by any governmental body on or with respect to such Basic Rent or Additional Rent.

(aa)   "Term" shall mean the initial term of this Lease, as extended pursuant to any renewal that has become effective.

(bb)   "Termination Date" shall mean the Termination Date as defined in Paragraph 12.(b).

(cc)   "Trade Fixtures" shall mean all warehouse racking systems, counters, cases, shelving and similar fixtures, which are owned by Tenant and used in the operation of the business conducted on the Leased Premises.

2.   <u>Demise of Premises</u>.   Landlord hereby demises and lets to Tenant and Tenant hereby takes and leases from Landlord for the Term and upon the provisions hereinafter specified the following described property (collectively, the "Leased Premises"):   the premises described in **Exhibit A** attached hereto and made a part hereof together with the easements, rights and appurtenances thereunto belonging or appertaining (collectively, the "Land"); the buildings, structures, fixtures and other improvements constructed and to be constructed on the Land (collectively, the "Improvements"), together with all additions and accessions thereto, substitutions therefor and replacements thereof permitted by this Lease excepting therefrom Tenant's Trade Fixtures and excepting all property other than plumbing, electrical and HVAC systems that does not constitute real property under the laws of the State.

3.   <u>Term</u>.   Tenant shall have and hold the Leased Premises for an initial term commencing on February 4, 1998 (the "Commencement Date") and ending on February 29, 2020 (the "Expiration Date").   Provided the Lease shall not have been terminated pursuant to the provisions hereof, this Lease and the term thereof shall be automatically extended for two (2) renewal terms of ten (10) years each upon condition that Tenant may cancel any renewal term by giving notice, in accordance with the provisions of Paragraph 21, to Landlord at least twelve (12) months prior to the expiration of the then current Term.   Upon the giving of

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

such notice this Lease and the term thereof shall terminate and come to an end on the Expiration Date of the then current Term.  Any such extension or renewal of the Term shall be subject to all of the provisions of this Lease, and all such provisions shall continue in full force and effect, except that the Basic Rent for each renewal term shall be the amounts determined in accordance with the schedule set forth in **Exhibit B** attached hereto and made a part hereof.  In the event that Tenant exercises its option to cancel any renewal Term as hereinabove provided, then Landlord shall have the right in addition to any rights granted in Paragraph 27, during the remainder of the Term then in effect to (i) advertise the availability of the Leased Premises for sale or for reletting, and (ii) show the Leased Premises to prospective purchasers, lenders or tenants at such reasonable times during normal business hours as Landlord may select.  If Tenant shall timely give such notice of its election to cancel any renewal option, then all options with regard to subsequent extensions or renewals of the Term shall expire and be null and void.

    4.    <u>Rent</u>.

    (a)    Tenant shall pay to Landlord or Lender, if directed by Landlord, as annual rent for the Leased Premises during the Term, including, without limitation, during any Requisition Period, the amounts determined in accordance with the schedule set forth in **Exhibit B** attached hereto and made a part hereof ("Basic Rent"), which rent shall be paid in equal monthly installments commencing on the last business day of the first month next following the Commencement Date and continuing on the last business day of each month thereafter during the Term (the said days being called the "Basic Rent Payment Dates"), and shall pay the same at Landlord's address set forth below, or at such other place or to such other person or persons (not exceeding four (4) in number) and in such proportions as Landlord from time to time may designate to Tenant in writing, in funds which at the time of such payment shall be legal tender for the payment of public or private debts in the United States of America and if required by Lender by wire transfer in immediately available federal funds to such account in such bank as Lender shall designate from time to time.  Pro rata Basic Rent for the period from the

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Commencement Date to the first day of the month next following the Commencement Date shall be computed as set forth in **Exhibit B** and shall be paid in advance on the Commencement Date, except that if the Commencement Date shall occur on the first day of a calendar month, the full monthly installment of Basic Rent shall be paid on the last business day of the month in which the Commencement Date shall occur.

(b)     If any installment of Basic Rent is not paid on the date due, Tenant shall pay Landlord interest on such overdue payment at the Default Rate, accruing from the due date of such payment until the same is paid.

(c)     Tenant shall pay and discharge before the imposition of any fine, lien, interest or penalty may be added thereto for late payment thereof, as Additional Rent during the Term, including but not limited to, any Requisition Period, all other amounts and obligations which Tenant assumes or agrees to pay or discharge pursuant to this Lease, together with every fine, penalty, interest and cost which may be added by the party to whom such payment is due for nonpayment or late payment thereof.  In the event of any failure by Tenant to pay or discharge any of the foregoing, Landlord shall have all rights, powers and remedies provided herein, by law or otherwise, in the event of nonpayment of Basic Rent.

5.     <u>Net Lease; True Lease</u>.  (a) It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, and that Basic Rent, Additional Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events, and that the obligations of Tenant hereunder shall continue unaffected, unless the requirement to pay or perform the same shall have been terminated pursuant to an express provision of this Lease.  This is a net Lease and Basic Rent, Additional Rent and all other sums payable hereunder by Tenant shall be paid without notice or demand, and without setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense.  This Lease shall not terminate and Tenant shall not have any right to terminate this Lease, during the Term (except as otherwise expressly provided herein).  Tenant agrees that,

7

except as otherwise expressly provided herein, it shall not take any action to terminate, rescind or avoid this Lease notwithstanding (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Landlord, (ii) the exercise of any remedy, including foreclosure, under the Mortgage, (iii) any action with respect to this Lease (including the disaffirmance hereof) which may be taken by Landlord under the Federal Bankruptcy Code or by any trustee, receiver or liquidator of Landlord or by any court under the Federal Bankruptcy Code or otherwise, (iv) the Taking of the Leased Premises or any portion thereof (except as specifically provided in Paragraph 12(b) below), (v) the prohibition or restriction of Tenant's use of the Leased Premises under any Legal Requirement or otherwise, (vi) the destruction of the Leased Premises or any portion thereof, (vii) the eviction of Tenant from possession of the Leased Premises, by paramount title or otherwise, or (viii) default by Landlord hereunder or under any other agreement between Landlord and Tenant.  Tenant waives all rights which are not expressly stated herein but which may now or hereafter otherwise be conferred by law to quit, terminate or surrender this Lease or any of the Leased Premises; to any setoff, counterclaim, recoupment, abatement, suspension, deferment, diminution, deduction, reduction or defense of or to Basic Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided herein; and for any statutory lien or offset right against Landlord or its property.

(b) It is the intent of Landlord and Tenant agree that this Lease be a true lease and that the Lease does not represent a financing arrangement.  Each party shall reflect the transaction represented hereby in all applicable books, records and reports (including income tax filings) in a manner consistent with "true lease" treatment rather than "financing" treatment.

(c) Tenant shall pay directly to the proper authorities charged with the collection thereof all charges for water, sewer, gas, oil, electricity, telephone and other utilities or services used or consumed on the Leased Premises during the Term, whether designated as a charge, tax, assessment, fee or otherwise, including, without limitation, water and sewer use

8

charges and taxes, if any, all such charges to be paid as the same from time to time become due. It is understood and agreed that Tenant shall make its own arrangements for the installation or provision of all such utilities and that Landlord shall be under no obligation to furnish any utilities to the Leased Premises and shall not be liable for any interruption or failure in the supply of any such utilities to the Leased Premises.

6.    <u>Title and Condition</u>.

(a)    The Leased Premises are demised and let subject to the Permitted Encumbrances and all Legal Requirements and Insurance Requirements, including any existing violation of any thereof; without representation or warranty by Landlord; it being understood and agreed, however, that the recital of the Permitted Encumbrances herein shall not be construed as a revival of any thereof which for any reason may have expired.

(b)    Without limiting the effect of Landlord's covenant set forth in Paragraph 8(c), the Landlord makes no, and expressly hereby denies any, representations or warranties regarding the condition or suitability of, or title to, the Leased Premises. Tenant agrees that it takes the Leased Premises "as is," without any such representation or warranty.

(c)    Landlord hereby conditionally assigns, without recourse or warranty whatsoever, to Tenant, all warranties, guaranties and indemnities, express or implied, and similar rights which Landlord may have against any manufacturer, seller, engineer, contractor or builder in respect of any of the Leased Premises, including, but not limited to, any rights and remedies existing under contract or pursuant to the Uniform Commercial Code (collectively, the "guaranties"). Such assignment shall remain in effect so long as no Event of Default exists hereunder or until the termination of this Lease. Landlord shall also retain the right to enforce any guaranties so assigned in the name of Tenant upon the occurrence of an Event of Default. Landlord hereby agrees to execute and deliver at Tenant's sole cost and expense such further documents, including powers of attorney, as Tenant may reasonably request (and which in the good faith judgment of Landlord, do not adversely affect a substantial general interest of

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Landlord), in order that Tenant may have the full benefit of the assignment effected or intended to be effected by this Paragraph 6. Upon the occurrence of an Event of Default or termination of this Lease, the guaranties shall automatically revert to Landlord. The foregoing provision of reversion shall be self-operative and no further instrument of reassignment shall be required. In confirmation of such reassignment Tenant shall execute and deliver promptly any certificate or other instrument which Landlord may request at Tenant's sole cost and expense. Any monies collected by Tenant under any of the guaranties after the occurrence of and during the continuation of an Event of Default shall be held in trust by Tenant and promptly paid over to Landlord.

   7. <u>Taxes; Insurance and Legal Requirements</u>.

   (a) Tenant shall, subject to the provisions of Paragraph 18 hereof relating to contests, before interest or penalties are due thereon, pay and discharge all Taxes. Landlord shall promptly deliver to Tenant any bill or invoice it receives with respect to any Tax. Nothing herein shall obligate Tenant to pay, and the term "Taxes" shall exclude, federal, state or local (i) franchise, capital stock or similar taxes if any, of Landlord, (ii) income, excess profits or other taxes, if any, of Landlord, determined on the basis of or measured by its net income, or (iii) any estate, inheritance, succession, gift, capital levy or similar taxes unless the taxes referred to in clauses (i) and (ii) above are in lieu of or a substitute for any other tax or assessment upon or with respect to any of the Leased Premises which, if such other tax or assessment were in effect at the commencement of the Term, would be payable by Tenant. In the event that any assessment against any of the Leased Premises may be paid in installments, Tenant shall have the option to pay such assessment in installments; and in such event, Tenant shall be liable only for those installments (and all resulting interest thereon) which become due and payable in respect of the Term. Tenant shall prepare and file all tax reports required by governmental authorities which relate to the Taxes. Tenant shall deliver to Landlord, within thirty (30) days of Landlord's request therefor, copies of all settlements and notices pertaining

10

to the Taxes which may be issued by any governmental authority and receipts for payments of all Taxes made during each calendar year of the Term, within thirty (30) days after payment. In the event the Leased Premises do not constitute a separate tax parcel as assessed by the local jurisdiction, Tenant shall diligently take such action as is necessary to have the Leased Premises so designated and, if necessary to prevent the enforcement of a lien on the Leased Premises for non-payment of Taxes, shall pay all Taxes assessed upon the tax parcel of which the Leased Premises are a part.

(b)    Tenant shall promptly comply with and conform to all of the Legal Requirements and Insurance Requirements, subject to the provisions of Paragraph 18 hereof.

8.    Use.

(a)    Tenant may use the Leased Premises for any lawful purpose other than any use that will (i) have a material adverse effect on the value of the Leased Premises, (ii) materially increase the likelihood that Tenant, Landlord or Lender would incur liability under any provisions of the Act referred to in Paragraph 26 of this Lease, or (iii) result or give rise to any material environmental deterioration or degradation of the Leased Premises. In no event shall the Leased Premises be used for any purpose which shall violate any of the provisions of any recorded covenants, restrictions or agreements applicable to the Leased Premises or to any shopping center of which the Leased Premises may be a part. Tenant agrees that with respect to any such recorded covenants, restrictions or agreements, Tenant shall observe, perform and comply with and carry out the provisions thereof required therein to be observed and performed by Landlord.

(b)    Subject to Tenant's rights of contest under Paragraph 18 hereof, Tenant shall not permit any unlawful occupation, business or trade to be conducted on any of the Leased Premises or any use to be made thereof contrary to applicable Legal Requirements or Insurance Requirements. Subject to Tenant's rights of contest under Paragraph 18 hereof, Tenant shall not use, occupy or permit any of the Leased Premises to be used or occupied, nor

11

do or permit anything to be done in or on any of the Leased Premises, in a manner which would (i) violate any certificate of occupancy or equivalent certificate affecting any of the Leased Premises, (ii) make void or voidable any insurance which Tenant is required hereunder to maintain then in force with respect to any of the Leased Premises, (iii) affect in any manner the ability of Tenant to obtain any insurance which Tenant is required to furnish hereunder, (iv) cause any injury or damage to any of the Improvements unless pursuant to Alterations permitted under Paragraph 11 hereof, or (v) constitute a public or private nuisance or waste.

(c)    Subject to all of the provisions of this Lease, so long as no Event of Default exists hereunder, Landlord covenants that neither it nor any party claiming by, through or under it, shall do any act to disturb the peaceful and quiet occupation and enjoyment of the Leased Premises by Tenant. Landlord may enter upon and examine any of the Leased Premises at reasonable times after reasonable notice and during business hours and exercise any rights and privileges granted to Landlord under the provisions of this Lease.

9.    Maintenance and Repair.

(a)    Except for any Alterations that Tenant is permitted to make hereunder, Tenant shall at all times, including, but not limited to, any Requisition Period, put, keep and maintain the Leased Premises, including, without limitation, the roof, landscaping, parking areas, walls (interior and exterior), footings, foundations and structural components of the Leased Premises, and the Adjoining Property, in good repair and appearance, and shall promptly make all repairs and replacements (substantially equivalent in quality and workmanship to the original work) of every kind and nature, whether foreseen or unforeseen, which may be required to be made upon or in connection with any of the Leased Premises in order to keep and maintain the Leased Premises in good repair and appearance. Tenant shall do or cause others to do all shoring of the Leased Premises or Adjoining Property or of foundations and walls of the Improvements and every other act necessary or appropriate for preservation and safety thereof, by reason of or in connection with any excavation or other building operation upon any of the

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Leased Premises or Adjoining Property, whether or not Landlord shall, by reason of any Legal Requirements or Insurance Requirements, be required to take such action or be liable for failure to do so. Landlord shall not be required to make any repair, whether foreseen or unforeseen, or to maintain any of the Leased Premises or Adjoining Property in any way, and Tenant hereby expressly waives the right to make repairs at the expense of the Landlord, which right may otherwise be provided for in any law now or hereafter in effect. Nothing in the preceding sentence shall be deemed to preclude Tenant from being entitled to insurance proceeds or condemnation awards for Restoration pursuant to the terms of this Lease. Tenant shall, in all events, make all repairs for which it is responsible hereunder promptly, and all repairs shall be in a good, proper and workmanlike manner.

      (b)    If Tenant shall be in default under any of the provisions of this Paragraph 9, Landlord may, after thirty (30) days notice to Tenant and failure of Tenant to commence to cure during said period or to diligently prosecute such cure to completion once begun, but immediately upon notice in the event of an emergency (that is, imminent danger of injury to persons or property), do whatever is necessary to cure such default as may be reasonable under the circumstances for the account of and at the expense of Tenant. In the event of an emergency, before Landlord may avail itself of its rights under this Paragraph 9(b), Landlord shall send notice to Tenant of the situation by phone or other available communication. All actual and reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) so incurred by Landlord, together with interest thereon at the Default Rate from the date of payment or incurring the expense, shall constitute Additional Rent payable by Tenant under this Lease and shall be paid by Tenant to Landlord on demand. Landlord and Tenant agree that, in the event of an emergency, expenditures which might otherwise be unreasonable (such as overtime) may nevertheless be reasonable under the circumstances.

      (c)    Tenant shall from time to time replace with other operational equipment or parts any of the mechanical systems or other equipment included in the

13

Improvements which shall have become worn out, obsolete or unusable for the purpose for which it is intended, been taken by a Condemnation as provided in Paragraph 12, or been lost, stolen, damaged or destroyed as provided in Paragraph 14. Tenant shall repair at its sole cost and expense all damage to the Leased Premises caused by the removal of equipment or any other personal property of Tenant at any time, including upon expiration or termination of the Lease.

      10.   <u>Liens</u>. Tenant shall not, directly or indirectly, create or permit to be created or to remain, and shall promptly discharge, any lien on any of the Leased Premises, on the Basic Rent, Additional Rent or on any other sums payable by Tenant under this Lease, other than the Mortgage (and any assignment of leases, rents or profits collateral thereto), the Permitted Encumbrances and any mortgage, lien, encumbrance or other charge created by or resulting from any act or omission by Landlord or those claiming by, through or under Landlord (except Tenant).

      11.   <u>Alterations</u>. Tenant shall not make any Alterations which would result, after giving consideration to the completed alteration, in a diminution in the value of the Leased Premises without Landlord's written consent. Tenant may make any other Alterations without the prior written consent of the Landlord provided such Alterations comply with all of the provisions of the following sentence. In the event that Landlord gives its prior written consent to any Alterations, or if such consent is not required, Tenant agrees that in connection with any Alteration (i) all such Alterations shall be performed in a good and workmanlike manner, and shall be expeditiously completed in compliance with all Legal Requirements, (ii) all work done in connection with any such Alteration shall comply with all Insurance Requirements, (iii) Tenant shall promptly pay all costs and expenses of any such Alteration, and shall discharge all liens filed against any of the Leased Premises arising out of the same, (iv) Tenant shall procure and pay for all permits and licenses required in connection with any such Alteration, (v) all such Alterations shall be the property of Landlord and shall be subject to this Lease, and (vi) any Alteration the estimated cost of which in any one instance exceeds Two Hundred Fifty Thousand

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Dollars ($250,000.00) shall be made under the supervision of a licensed architect or engineer in accordance with detailed plans and specifications which shall be submitted to Landlord at least ten (10) days prior to the commencement of the Alterations. Upon completion of any Alteration in excess of $250,000 Tenant will provide as-built plans and specifications or record drawings to Landlord and Lender.

  12. <u>Condemnation</u>.

    (a) Immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, Tenant shall notify Landlord thereof and Landlord shall be entitled to participate in any Condemnation proceeding at Tenant's expense. Landlord, immediately upon obtaining knowledge of the institution of any proceeding for Condemnation, shall notify Tenant thereof and Tenant shall have the right to participate in such proceedings at its own expense. Subject to the provisions of this Paragraph 12 and Paragraph 15, Tenant hereby irrevocably assigns to Lender or to Landlord, in that order, any award or payment in respect of any Condemnation of Landlord's interest in the Leased Premises, except that nothing in this Lease shall be deemed to require (i) the assignment to Landlord or Lender of any award or payment on account of Tenant's leasehold interest hereunder, Tenant's Trade Fixtures, or other tangible personal property, moving expenses and similar claims, if available, to the extent Tenant shall have a right to make a separate claim therefor against the condemnor or (ii) any act or circumstance that impairs Tenant's right to any such award or payment, it being agreed, however, that Tenant shall in no event be entitled to any payment that reduces the award to which Landlord is or would be entitled for the condemnation of Landlord's interest in the Leased Premises. Notwithstanding the foregoing, Tenant shall be entitled to any award or payment on account of Tenant's leasehold interest hereunder only in the event of a Condemnation described in Paragraph 12(b) below and then only to the extent that when such award, added to other awards to which Tenant is entitled hereunder, is subtracted from the entire award or payment in respect to

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

all interests in the Leased Premises (that is the aggregate award to be shared by Tenant, Landlord and Lender, or their successors and assigns), the remainder exceeds $4,840,000.00.

(b)    If (i) the entire Leased Premises or (ii) at least ten percent (10%) of the Land or the building constructed on the Land, the loss of which even after restoration would, in Tenant's reasonable business judgment, be substantially and materially adverse to the business operations of Tenant, shall be subject of a Taking by a duly constituted authority or agency having jurisdiction, then Tenant shall, not later than sixty (60) days after a Taking has occurred, serve notice upon Landlord ("Tenant's Termination Notice") of its intention to terminate this Lease on any Basic Rent Payment Date specified in such notice, which date (the "Termination Date") shall be no sooner than the first Basic Rent Payment Date occurring at least thirty (30) days after the date of Tenant's Termination Notice. In the event that during the initial term Tenant shall serve such notice upon Landlord of its intention to terminate this Lease on the Termination Date, Tenant shall, as part of such notice, offer (which offer may be rejected by Landlord as set forth below) to purchase the Leased Premises and the award, or if no part of the Leased Premises shall remain, the entire award for the applicable price computed in accordance with the schedule annexed hereto and marked **Exhibit C** (the "Purchase Price") plus all other amounts which may be due and owing to Lender or Landlord by reason of any default by Tenant in complying with its obligations under this Lease (the "Additions to Purchase Price"). If Landlord and Lender shall not elect to accept Tenant's said offer to purchase, Landlord shall give notice rejecting such offer to Tenant within thirty (30) days after the giving of Tenant's Termination Notice, in which case this Lease shall be terminated as above provided and the entire award made in the Condemnation proceeding shall be paid to Lender, or if there is no Lender, to Landlord. Landlord's notice to reject Tenant's said offer to purchase shall be void and of no effect unless accompanied by the written notice of Lender to the effect that Lender also elects not to accept Tenant's said offer to purchase. Should said notices of Landlord and Lender rejecting Tenant's said offer to purchase not be served within said period of thirty (30) days, then and in

16

that event, the said offer shall be deemed accepted. In the event that Landlord and Lender shall accept or be deemed to have accepted Tenant's offer to purchase, title shall close and Purchase Price and Additions to Purchase Price shall be paid as hereinafter provided and in such event Tenant shall be entitled to and shall receive any and all awards then or thereafter made in the Condemnation proceeding and Landlord shall assign or in case of any award previously made, deliver to Tenant on the Closing Date such award as may be made.

In the event Landlord and Lender shall accept Tenant's offer to purchase, or be deemed to have accepted Tenant's offer, title shall close on the Termination Date hereinbefore defined (the "Closing Date"), at noon at the local office of Landlord's counsel, or at such other time and place as the parties hereto may agree upon, this Lease shall be automatically extended to and including the Closing Date (or, if applicable, the extended Closing Date hereinafter described) and Tenant shall pay the Purchase Price and Additions to Purchase Price by transferring immediately available federal funds to such account or accounts and in such bank or banks as Lender or Landlord, in that order, shall designate, upon delivery of a special warranty deed conveying the Leased Premises and all other required documents including an assignment of any award in connection with such Taking. The special warranty deed shall convey a good and clear record and marketable title, free from encumbrances other than (i) exceptions to title existing on the date hereof or otherwise entered into or consented to by Tenant, (ii) liens or encumbrances created or suffered through or by Tenant failing to observe or perform any of the terms, covenants or agreements herein provided to be observed and performed by Tenant, (iii) any installments of Taxes due and payable after the Closing Date, and (iv) this Lease. Such deed shall contain an agreement by grantee to observe and perform all of the covenants, conditions and restrictions contained in any instruments of record which were assumed by Landlord or deemed to have been assumed by Landlord on its acquisition of title. The acceptance of a deed by Tenant shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Landlord to be performed pursuant to the provisions hereof. Tenant shall pay all

17

conveyance, transfer, sales and like taxes, recording charges and fees, and title charges for any policy of title insurance required by Tenant, required in connection with the purchase. If on the Closing Date, there may be any liens or encumbrances which Landlord is obligated to remove, Landlord shall use reasonable efforts to remove the same, and the Closing Date shall be extended for a reasonable period to permit Landlord to discharge such liens or encumbrances. If by said extended Closing Date such liens or encumbrances shall not be removed and such liens or encumbrances shall be subordinate to a Mortgage, Tenant shall seek to purchase the Mortgage from the holder thereof at a price which shall in no event exceed the Purchase Price and Additions to Purchase Price, and the Leased Premises shall be conveyed by Landlord to Tenant subject to the Mortgage and in such event the amount payable by Tenant to the holder of the Mortgage shall be deducted from the Purchase Price and Additions to the Purchase Price payable to Landlord. Landlord shall not be obligated to discharge any such lien or encumbrance if Tenant's title insurance company shall issue affirmative insurance to the effect that the same shall not be collected from or enforced against the insured premises. If there be any liens or encumbrances against the Leased Premises which Landlord is obligated to remove, upon request made a reasonable time before the Closing Date, Landlord shall provide at the Closing separate funds for the foregoing, payable to the holder of such lien or encumbrances.

In the event that during any renewal term Tenant shall serve Tenant's Termination Notice upon Landlord, this Lease and the Term hereof shall terminate on the Termination Date. In such event the entire award made in Condemnation proceeding shall be paid to Lender, or to Landlord, in that order.

(c)    In the event of any Condemnation of part of the Leased Premises which does not result in a Termination of this Lease, subject to the requirements of Paragraph 15, the Net Award of such Condemnation shall be retained by Landlord and, promptly after such Condemnation, Tenant shall commence and diligently continue to perform the Restoration whether or not the Net Award shall be sufficient to do so.

18

Upon the payment to Landlord of the Net Award of a Taking which falls within the provisions of this subparagraph (c), Landlord and Lender shall, to the extent received, make that portion of the Net Award equal to the cost of Restoration (the "Restoration Award") available to Tenant for Restoration, in accordance with the provisions of Paragraph 15 and all Rent shall continue unabated. The balance remaining (the "net surplus award") shall be applied as follows: Tenant shall be entitled to that portion of the net surplus award equal to the present value (calculated at a discount rate of 7.64% per annum) of the following hypothetical streams of income: (a) a monthly payment at the end of each month during the initial term hereof in the amount of 1/12 of 9.22% of the net surplus award; (b) a monthly payment at the end of each month during the first renewal term in the amount of 1/12 of 10.14% of the net surplus award; and (c) a monthly payment at the end of each month during the second renewal term hereof in the amount of 1/12 of 11.06% of the net surplus award. The remainder of the net surplus award in excess of that to which Tenant is entitled as set forth above shall be delivered to and become the property of Lender and Landlord, in that order.

In the event of a Requisition of any of the Leased Premises, Landlord shall apply the Net Award of such Requisition, to the extent available, to the installments of Basic Rent, Additional Rent or other sums payable by Tenant hereunder thereafter payable and Tenant shall pay the balance remaining thereafter. Upon the expiration of the Term, any portion of such Net Award that shall not previously have been credited to Tenant on account of the Basic Rent and Additional Rent shall be retained by Landlord, and all Rent shall continue unabated.

(d)     Except with respect to an award or payment to which Tenant is entitled pursuant to the foregoing provisions of this Paragraph 12, no agreement with any condemnor in settlement of or under threat of any Condemnation shall be made by either Landlord or Tenant without the written consent of the other, and of Lender, if the Leased Premises are then subject to a Mortgage, which consent shall not be unreasonably withheld or delayed provided such award or payment is applied in accordance with this Lease.

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

13.    <u>Insurance</u>.

(a)    Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises:

(i)    Insurance against loss or damage to the Improvements under an All Risk Policy, which shall include flood insurance and earthquake insurance, each to the extent applicable and which may contain such exclusions as are standard in the industry, in amounts to prevent Landlord or Tenant from becoming a co-insurer under the applicable policies, and in any event in amounts not less than the actual replacement cost of the Improvements (excluding footings and foundations and parts of the Improvements which are not insurable).

(ii)    Contractual and commercial general liability insurance against claims for bodily injury, death or property damage occurring on, in or about any of the Leased Premises or the Adjoining Property, which insurance shall be written on a so-called "occurrence basis," and shall provide minimum protection with a combined single limit in an amount not less than Five Million ($5,000,000) Dollars (or in such increased limits from time to time to reflect declines in the purchasing power of the dollar as Landlord may reasonably request).

(iii) Worker's compensation insurance covering all persons employed by Tenant on the Leased Premises in connection with any work done on or about any of the Leased Premises.

(b)    During such time as no Event of Default is outstanding hereunder, and the tangible net worth of Tenant shall be not less than Seven Hundred Fifty Million ($750,000,000.00) Dollars as determined in accordance with generally accepted accounting principles consistently applied, Tenant may self-insure the coverage referred to in Paragraph 13(a), provided that the self insurance program of this subparagraph (b) does not violate any Legal Requirements applicable to the Leased Premises or Tenant, and further provided that

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Tenant shall, at the commencement of any such self-insurance, deliver to Landlord a certificate stating that Tenant has elected to so self-insure together with evidence of Tenant's net worth.

(c)   The insurance required by Paragraph 13(a) shall be written by companies having an investment grade claims-paying ability or higher, as such ratings are ascribed by Standard & Poor's rating service, during such time as Tenant is not self-insuring in accordance with the provisions of Paragraph 13.(b).  All companies providing insurance required by Paragraph 13.(a) shall be authorized to do an insurance business in the State or otherwise agreed to by Landlord and Lender.  Sums due from Tenant in lieu of insurance proceeds because of such self-insurance programs shall be treated as insurance proceeds for all purposes under this Lease.  The insurance policies shall be for a term of not less than one year, and shall (except for worker's compensation insurance) name Landlord, Tenant and any Lender as additional insured parties, as their respective interests may appear.  If said insurance or any part thereof shall expire, be withdrawn, become void by breach of any condition thereof by Tenant or become void for any other reason, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord and Lender.

(d)   Each insurance policy referred to above shall, to the extent applicable, contain standard non-contributory mortgagee clauses in favor of any Lender.  Each policy required to be carried by Tenant shall also provide that any loss otherwise payable thereunder shall be payable notwithstanding (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment, (ii) the occupation or use of any of the Leased Premises for purposes more hazardous than permitted by the provisions of such policy, (iii) any foreclosure or other action or proceeding taken by any Lender pursuant to any provision of the Mortgage upon the happening of an event of default therein, or (iv) any change in title or ownership of any of the Leased Premises.

(e)   Tenant shall pay as they become due all premiums for the insurance required by this Paragraph 13, shall renew or replace each policy on or prior to the expiration

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

date stated on the policy then in effect, and shall deliver to Landlord and Lender, a certificate or other evidence (reasonably satisfactory to Lender and Landlord) of the existing policy and such renewal or replacement policy simultaneously with such renewal or replacement. In the event of Tenant's failure to comply with any of the foregoing requirements of this Paragraph 13, Landlord shall be entitled to procure such insurance. Any sums expended by Landlord in procuring such insurance shall be Additional Rent and shall be repaid by Tenant, together with interest thereon at the Default Rate, from the time of payment by Landlord until fully paid by Tenant immediately upon written demand therefor by Landlord.

(f)     Anything in this Paragraph 13 to the contrary notwithstanding, any insurance which Tenant is required to obtain pursuant to Paragraph 13(a)(i) may be carried under a "blanket" policy or policies covering other properties or liabilities of Tenant, provided that such "blanket" policy or policies otherwise comply with the provisions of this Paragraph 13. In the event any such insurance is carried under a blanket policy, Tenant shall deliver to Landlord and Lender a certified copy of those provisions of the blanket policy that pertain to the Leased Premises, if any, to evidence the issuance and effectiveness of the policy, the amount and character of the coverage with respect to the Leased Premises and the presence in the policy of provisions of the character required in the above sections of this Paragraph 13.

14.     Damage, Destruction.

(a)     In the event of any casualty loss exceeding $100,000, Tenant shall give Landlord immediate notice thereof. Tenant shall adjust, collect and compromise any and all such claims, with the consent of Lender and Landlord, not to be unreasonably withheld or delayed and Landlord and Lender shall have the right to join with Tenant therein. If the estimated cost of Restoration or repair shall be Five Hundred Thousand ($500,000.00) Dollars or less, all proceeds of any insurance required under Paragraph 13(a) shall be payable to Tenant, provided that Circuit City Stores, Inc., at such time shall have a tangible net worth of not less than Two Hundred Million Dollars ($200,000,000.00) as determined in accordance with

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

generally accepted accounting principles, consistently applied, and in all other events all proceeds shall be paid to a Trustee which shall be a federally insured bank or other financial institution, selected by Landlord and Tenant and reasonably satisfactory to Lender (the "Trustee"). If the Leased Premises shall be covered by a Mortgage, Lender, if it so desires, shall be the Trustee. Each insurer is hereby authorized and directed to make payment under said policies directly to such Trustee instead of to Landlord and Tenant jointly; and Tenant hereby appoints such Trustee as Tenant's attorney-in-fact to endorse any draft therefor for the purposes set forth in this Lease after approval by Tenant of such Trustee, if Trustee is other than Lender, such approval not to be unreasonably withheld or delayed.

(b)    In the event of any casualty (whether or not insured against) resulting in damage to the Leased Premises or any part thereof, the Term shall nevertheless continue and there shall be no abatement or reduction of Basic Rent, Additional Rent or any other sums payable by Tenant hereunder.  The Net Proceeds of such insurance payment shall be retained by the above-mentioned Trustee and, promptly after such casualty, Tenant shall commence and diligently continue to perform the Restoration to the Leased Premises.  Upon payment to the Trustee of such Net Proceeds, the Trustee shall, to the extent available, make the Net Proceeds available to Tenant for restoration, in accordance with the provisions of Paragraph 15.  Tenant shall, whether or not the Net Proceeds are sufficient for the purpose, promptly repair or replace the Improvements as nearly as possible to their value and condition and character immediately prior to such event and otherwise in accordance with all Insurance Requirements and Legal Requirements and the provisions of this Lease (including Tenant's making any desired Alterations allowed hereunder) and the Net Proceeds of such loss shall thereupon be payable to Tenant, subject to the provisions of Paragraph 15 hereof.

(c)    In the event that any damage or destruction shall be subject to the self insurance provisions provided for in 13(b), Tenant shall pay to the Trustee the amount of the

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

proceeds that would have been payable had such self insurance program not been in effect (the "Tenant Insurance Payment").

15.    Restoration. The Net Proceeds and the Tenant Insurance Payment (together being herein defined as the "Restoration Fund") paid to the Trustee shall be disbursed by the Trustee in accordance with the following conditions:

(a)    At the time of any disbursement, no Event of Default shall exist and no mechanics' or materialmen's liens shall have been filed and remain undischarged and unbonded.

(b)    If the cost of Restoration exceeds $250,000 prior to commencement of the Restoration, the architects, contracts, contractors, plans and specifications for the Restoration shall have been approved by Landlord, which approval shall not be unreasonably withheld or delayed.

(c)    Each request for disbursement shall be accompanied by a certificate of Tenant, signed by the President, Treasurer or any Vice President of Tenant, describing the completed work for which payment is requested, stating the cost incurred in connection therewith and stating that Tenant has not previously received payment for such work and the certificate to be delivered by Tenant upon completion of the work shall, in addition, state that the work has been completed and complies with the applicable requirements of this Lease and all Legal Requirements and Insurance Requirements.

(d) Disbursements shall be made from time to time in an amount not exceeding the cost of the work completed since the last disbursement upon receipt of (1) satisfactory evidence, including architects' certificates, of the stage of completion, of the estimated cost of completion and of performance of the work to date in a good and workmanlike manner in accordance with the contracts, plans and specifications approved by Landlord, (2) waivers of liens, (3) a satisfactory bring down of title insurance, and (4) other evidence of cost

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

and payment so that Landlord can verify that the amounts disbursed from time to time are represented by work that is completed in place and free and clear of mechanics' lien claims.

(e)    The Trustee may retain ten percent from each disbursement of the Restoration Fund until the Restoration is fully completed and the Leased Premises are available for their intended use, in the reasonable judgment of the Lender, including the issuance of any necessary certificate of occupancy.

(f)    The Restoration Fund shall be kept in a separate interest-bearing account federally insured to the extent applicable by the Trustee or by Lender.

Prior to commencement of Restoration and at any time during Restoration, if the estimated cost of Restoration, as reasonably determined by Landlord or Lender, exceeds the amount of the Restoration Fund, the amount of such excess shall be paid by Tenant to the Trustee to be added to the Restoration Fund prior to any further disbursement or Tenant shall fund at its own expense the costs of such Restoration until the remaining Restoration Fund is sufficient for the completion of the Restoration. Except for the payment to Landlord or Lender of the net surplus award referred to in Paragraph 12(c), any sum in the Restoration Fund which remains in the Restoration Fund upon the completion of Restoration shall be paid to Tenant. For purposes of determining the source of funds with respect to the disposition of funds remaining after the completion of Restoration, the Net Proceeds or the Restoration Award shall be deemed to be disbursed prior to any amount added by Tenant.

16.    Subordination to Financing.

(a)    Subject to the following provisions of this Paragraph 16(a), Tenant agrees that this Lease shall at all times be subject and subordinate to the lien of any Mortgage, and Tenant agrees, upon demand, without cost, to execute instruments as may be required to further effectuate or confirm such subordination. So long as no Event of Default shall be outstanding, Tenant's tenancy shall not be disturbed, nor shall this Lease be affected by any default under such Mortgage, and in the event of a foreclosure or other enforcement of any such

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Mortgage, or sale in lieu thereof, the purchaser at such foreclosure sale shall be bound to Tenant for the Term of this Lease and any extensions thereof, the rights of Tenant hereunder shall expressly survive, and this Lease shall in all respects continue in full force and effect so long as no Event of Default by Tenant has occurred and is continuing. So long as no Event of Default by Tenant has occurred and is continuing, Tenant shall not be named as a party defendant in any such foreclosure suit, except as may be required by law. Any Mortgage to which this Lease is now or hereafter subordinate shall provide, in effect, that during the time this Lease is in force all insurance proceeds and condemnation awards shall be permitted to be used for restoration in accordance with the provisions of this Lease. Upon any foreclosure, or the delivery of a deed in lieu thereof or any other enforcement of the Mortgage, neither Lender, its successor nor any purchaser at foreclosure shall disturb the tenancy of any Qualified Subtenant referred to in Paragraph 17(c) below that is entitled to nondisturbance as set forth in such subparagraph (and for whom nondisturbance has been requested at any time before Landlord or Lender has elected to terminate this Lease as a result of the occurrence of an Event of Default by Tenant); provided, however, that the nondisturbance of such Qualified Subtenant shall be subject in all cases to the conditions and limitations set forth in Paragraph 17(c) below.

(b)     Notwithstanding the provisions of subdivision (a) of this Paragraph 16, the holder of the Mortgage to which this Lease is subject and subordinate, as provided in said subdivision (a), shall have the right, at its sole option, at any time, to subordinate and subject the Mortgage, in whole or in part, to this Lease by recording a unilateral declaration to such effect.

(c)     At any time prior to the expiration of the Term, Tenant agrees, at the election and upon demand of any owner of the Leased Premises, or of Lender who has granted non-disturbance to Tenant pursuant to Paragraph 16(a) above, to attorn, from time to time, to any such owner or Lender, upon the then executory terms and conditions of this Lease, for the remainder of the term originally demised in this Lease and for any renewal term, provided

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

that such owner or Lender shall then be entitled to possession of the Leased Premises subject to the provisions of this Lease. The provisions of this subdivision (c) shall enure to the benefit of any such owner or Lender, shall apply notwithstanding that, as a matter of law, this Lease may terminate upon the foreclosure of the Mortgage, shall be self-operative upon any such demand, and no further instrument shall be required to give effect to said provisions.

(d)    Each of Tenant, Landlord and Lender agrees that, if requested by any of the others, each shall, without charge, enter into a Subordination, Non-Disturbance and Attornment Agreement reasonably requested by Lender, provided such agreement contains provisions relating to non-disturbance in accordance with the provisions of subparagraph (a) and Tenant hereby agrees for the benefit of Lender that Tenant will not, without in each case the prior written consent of Lender, which shall not be unreasonably withheld, conditioned or delayed, (a) amend or modify the Lease (provided, however, Lender, in Lender's sole discretion may withhold or condition its consent to any amendment or modification which would or could (i) alter in any way the amount or time for payment of any Base Rent, Additional Rent or other sum payable hereunder, (ii) alter in any way the absolute and unconditional nature of Tenant's obligations hereunder or materially diminish any such obligations, (iii) result in any termination hereof prior to the end of the scheduled term, or (iv) otherwise, in Lender's reasonable judgment, affect the rights or obligations of Landlord or Tenant hereunder), or enter into any agreement with Landlord so to do, (b) without the prior written consent of Lender in Lender's sole discretion, cancel or surrender or seek to cancel or surrender the term hereof, or enter into any agreement with Landlord to do so (the parties agreeing that the foregoing shall not be construed to affect the rights or obligations of Tenant, Landlord or Lender with respect to any termination permitted under the express terms hereof in connection with an offer to purchase the Property following certain events of condemnation as provided in Section 12 hereof), or (c) pay any installment of Basic Rent more than one (1) month in advance of the due date thereof or otherwise than in the manner provided for in this Lease.

17.    <u>Assignment, Subleasing</u>.

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

(a)   Tenant or its wholly owned subsidiary is currently in occupancy and is operating its business at the Leased Premises.  Tenant may assign its interest in this Lease without the prior written consent of Landlord.  Tenant shall, however, give Landlord and Lender prior written notice of Tenant's intent to assign its interest in this Lease or sublease any portion of the Leased Premises promptly upon electing to do so.  No sublease under, including, but not limited to, a Qualified Sublease (as defined in Section 17(c) herein), or assignment of this Lease (or any rejection in bankruptcy or other default by any assignee or sublessee hereunder) shall relieve the original Tenant hereunder of its obligations hereunder, for which it shall remain primarily liable, and upon any assignment or sublease hereunder, including, but not limited to, a Qualified Sublease (as defined in Section 17(c) herein), the original Tenant shall acknowledge in writing in favor of Landlord and Lender that such obligations are not affected by such assignment or sublease.

(b)   Each sublease of the Leased Premises or any part thereof shall be subject and subordinate to the provisions of this Lease.  Tenant agrees that in the case of an assignment, Tenant shall, within fifteen (15) days after the execution and delivery of any such assignment, deliver to Landlord (i) a duplicate original of such assignment in recordable form and (ii) an agreement executed and acknowledged by the assignee in recordable form wherein the assignee shall agree to assume and agree to observe and perform all of the terms and provisions of this Lease on the part of the Tenant to be observed and performed from and after the date of such assignment, and, in the case of a sublease, Tenant shall, within fifteen (15) days after the execution and delivery of such sublease, deliver to Landlord a duplicate original of such sublease.

(c)   Landlord recognizes that there may currently be constructed or Tenant may intend to construct certain leasable space (the "Spec Space") at the Leased Premises other than the portion of the Leased Premises as of the date hereof operated as a Circuit City Store, which Spec Space is or shall be either a separate building or connected to the other Improvements but separated therefrom by a demising wall, for the specific purpose of generating sublease income

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

to the Tenant. Any such additional Spec Space shall be constructed at Tenant's sole cost and expense, and such construction shall be deemed an Alteration under this Lease and shall be performed in accordance with the terms of this Lease, however, Landlord agrees that Paragraph 11(v) shall not apply to the construction of the Spec Space. Landlord agrees for itself, its successors and assigns, promptly upon Tenant's request, to enter into a nondisturbance and attornment agreement (containing the provisions set forth below and otherwise in form satisfactory to Lender in its reasonable judgment) with any Qualified Subtenant, as defined below, of the Spec Space (a "Shop Tenant") or any Qualified Subtenant of the entire portion (the "Anchor Space") of the Leased Premises currently operated by Tenant as a Circuit City retail store (an "Anchor Tenant") upon the terms described below, pursuant to which Landlord shall agree, for so long as such Qualified Subtenant is not in default under its Qualified Sublease, as defined below, that the Qualified Sublease shall not be terminated as a result of any termination of this Lease and such Qualified Subtenant's use and occupancy of the premises demised pursuant to the Qualified Sublease shall not be disturbed by Landlord, and pursuant to which such Qualified Subtenant shall agree to attorn to Landlord or its successor as landlord under the Qualified Sublease upon any termination of this Lease. Said agreement shall be substantially to the same effect as any similar agreement then existing between Landlord, Tenant and Lender, and shall further provide that nothing therein contained shall impose any obligation on the Landlord, the then owner or the Lender or their respective successors to (i) return or apply any security deposited under such sublease, unless such security shall be transferred and turned over to the Landlord, such then owner or Lender, (ii) expend any sums to make any installations or alterations provided to be made by the sublessor under said sublease or reimburse the subtenant under said sublease for any installations or alterations made by it, (iii) be liable for any act or omission of any prior sublessor except that the foregoing shall not prevent any Shop Tenant's exercising any right of termination or any right of substitute cure and resulting offsets against rent as the result of any continuing default of the prior sublessor relating to its repair, maintenance or service obligations under the Qualified

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Sublease, (iv) be subject to any offsets or defense which such subtenant might have against any prior sublessor, (v) be bound by any rent or additional rent which such subtenant might have paid for more than the current rent to any prior landlord, or (vi) be bound by any amendment or modification of the sublease made without the prior written consent of Landlord, the terms of which amendment or modification if included in the original sublease would have prevented such sublease from meeting the criteria for a Qualified Sublease.   Any subtenant under a Qualified Sublease, as defined below, is a "Qualified Subtenant."   With respect to any Spec Space, a "Qualified Sublease" shall be any sublease of the Spec Space, or any portion thereof that (x) requires the tenant thereunder to pay at least its pro rata share (based on the portion of the gross leasable area at the Leased Premises demised under the Qualified Sublease) of Taxes assessed against the Leased Premises and common area maintenance costs incurred with respect to the Leased Premises (which payment amounts may be included in the rent such Qualified Subtenant is required to pay), (y) exculpates the Landlord, its successor and assigns (including any mortgagee of Landlord or purchaser at sale pursuant to foreclosure under any mortgage granted by Landlord) from all personal liability whatsoever (regardless when arising) under the Qualified Sublease regardless of whether Landlord or such successor or assign becomes the landlord under the Qualified Sublease, and (z) requires such Qualified Subtenant to maintain the nonstructural components of the premises demised under the Qualified Sublease in accordance with the maintenance standards set forth in this Lease.   With respect to the Anchor Space, a "Qualified Sublease" shall be any absolute net sublease (that is, a sublease that requires the uninterrupted payment of rent without offset or diminution, that confers all rights to condemnation awards (other than a separate award for moving expenses and subtenant's fixtures) upon the sublessor, and that places no obligations upon the sublessor thereunder other than those of the type placed upon Landlord hereunder) of the entire Anchor Space that has a term expiring before or simultaneously with the expiration of the Term hereof, pursuant to which the subtenant thereunder had, at the time such sublease was entered into, a Standard & Poor's investment grade rating of at least BBB- or a

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

Moody's investment grade rating of at least Baa3 (or equivalent rating of any other generally recognized rating organization) and was not on credit watch and pursuant to which the subtenant thereunder is required to fulfill all of the obligations of Tenant hereunder, including, without limitation, payment of rent which shall at all times be equal to or greater than the rent which Tenant is required to pay (including all Base Rent and Additional Rent) hereunder and at the same times that installments of Base Rent and payments of Additional Rent are due hereunder.

(d)    Upon the occurrence of an Event of Default under this Lease, Landlord shall have the right to collect and enjoy all rents and other sums of money payable under any sublease of any of the Leased Premises, and Tenant hereby irrevocably and unconditionally assigns all rights under any such sublease including such rents and money to Landlord, which assignment may be exercised upon and after (but not before) the occurrence of an Event of Default.

18.    Permitted Contests.  Notwithstanding any provision of this Lease to the contrary, after prior written notice to Landlord, Tenant shall not be required to (i) pay any Tax, (ii) comply with any Legal Requirement, or (iii) discharge or remove any lien, so long as Tenant shall contest, in good faith and at its expense, the existence, the amount or the validity thereof, the amount of the damages caused thereby, or the extent of its or Landlord's liability therefor, by appropriate proceedings which shall operate during the pendency thereof to prevent (v) the collection of, or other realization upon, the Tax or lien so contested, (w) the sale, forfeiture or loss of any of the Leased Premises, any Basic Rent or any Additional Rent to satisfy the same or to pay any damages caused by the violation of the same, (x) any interference with the use, occupancy, sale or financing of any of the Leased Premises, (y) any interference with the payment of any Basic Rent or any Additional Rent, and (z) the cancellation of any fire or other insurance policy.  In no event shall Tenant pursue any contest with respect to any Tax, Legal Requirement, or lien referred to above in such manner that exposes Landlord to any criminal or material civil liability, penalty or sanction for which Tenant has not made provisions reasonably

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

acceptable to Landlord and Lender.  Tenant shall be deemed to have made provisions reasonably acceptable to Landlord and Lender if Tenant shall have provided Lender or Landlord in that order as security for such contest, an amount of cash or bond equal to 125% of the amount being contested, or other security satisfactory in the reasonable opinion of Lender or Landlord in that order, in assuring the payment, compliance, discharge, removal or other action, including all costs, attorneys' fees, interest and penalties, in the event that the contest is unsuccessful.  No such security shall be required if the amount involved in the contest shall not exceed one tenth (1/10th) of one percent (1%) of the tangible net worth of the original Tenant hereunder, computed in accordance with generally accepted accounting principles consistently applied as determined by its most recent publicly filed financial statements (10Q and 10K) if Tenant is a publicly held company.  While any such proceedings are pending and the required security is held by Lender or Landlord, in that order, Lender or Landlord, as the case may be, shall not have the right to pay, remove or cause to be discharged the Tax, Legal Requirement or lien thereby being contested unless Landlord or Lender reasonably believes that any one or more of the conditions in subdivisions (v) through (z) shall not be prevented during the pendency of the contest.  Tenant further agrees that each such contest shall be promptly and diligently prosecuted to a final conclusion, except that Tenant shall, so long as all of the conditions of the first sentence of this Paragraph 18 are at all times complied with, have the right to attempt to settle or compromise such contest through negotiations.  Tenant shall pay any and all judgments, decrees and costs (including all attorneys' fees and expenses) in connection with any such contest and shall, promptly after the final determination of such contest, fully pay and discharge the amounts which shall be levied, assessed, charged or imposed or be determined to be payable therein or in connection therewith, together with all penalties, fines, interest, costs and expenses thereof or in connection therewith, and perform all acts the performance of which shall be ordered or decreed as a result thereof.

32

19.    <u>Default</u>.  The occurrence of any one or more of the following events shall constitute an Event of Default under this Lease:

(a)    Tenant's failure to make any payment of Basic Rent when due which continues unremedied for a period of five (5) days after notice thereof from Landlord or Lender.

(b)    Tenant's failure to make payment of Additional Rent or other sum herein required to be paid by Tenant and such default shall continue for a period of fifteen (15) days after notice by Landlord or Lender to Tenant.

(c)    Tenant's failure to duly perform and observe, or Tenant's violation or breach of, any other provision hereof if such failure shall continue for a period of thirty (30) days after notice thereof from Landlord or Lender, or if such failure cannot be cured within such period of thirty (30) days, such period shall be extended for such longer time as reasonably necessary provided that Tenant has commenced to cure such default within said period of thirty (30) days and is actively, diligently and in good faith proceeding with continuity to remedy such failure.

(d)    The original Tenant hereunder shall (i) voluntarily be adjudicated a bankrupt or insolvent, or (ii) consent to the appointment of a receiver or trustee for itself or for any of the Leased Premises, (iii) file a petition seeking relief under the bankruptcy or other similar laws of the United States, any state or any jurisdiction, or (iv) make a general assignment for the benefit of creditors.

(e)    By the order of a court of competent jurisdiction, a receiver or liquidator of Tenant or of all or substantially all of the assets of Tenant or the Leased Premises shall be appointed and not be dismissed within sixty (60) days after such appointment, or if by decree of such court Tenant shall be adjudicated a debtor or insolvent or the Leased Premises or any of Tenant's property shall have been sequestered, and such decree shall have continued undischarged and unstayed for sixty (60) days after the entry thereof; or if any proceeding under

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

the Federal Bankruptcy Code, Title 11, United States Code (including Chapters 7, 11 or 13 thereof, or any amendment thereto or any successor thereof) or any similar statute applicable to Tenant (including state insolvency statutes), as now or hereinafter in effect, shall be instituted against Tenant and shall not have been dismissed within sixty (60) consecutive days after such filing, or if Tenant shall institute any such proceeding or shall consent to the institution of any such proceeding against it under any such law.

(f)  The original Tenant hereunder shall in any insolvency proceedings be liquidated or dissolved or shall begin proceedings towards its liquidation or  dissolution.

(g)  The estate or interest of Tenant in any of the Leased Premises shall be levied upon or attached in any proceeding and such estate or interest is about to be sold or transferred or such process shall not be vacated or discharged within sixty (60) days after such levy or attachment.

20.    Landlord's Remedies. After the occurrence of an Event of Default by Tenant, Landlord shall have the right to exercise the following remedies:

(a)  Landlord may, at its option, continue this Lease in full force and effect, without terminating Tenant's right to possession of the Leased Premises, in which event Landlord shall have the right to collect Basic Rent and all other Rent and charges when due.  In the alternative, Landlord shall have the right to peaceably re-enter the Leased Premises on the terms set forth in subparagraph (b) below, but without such re-entry being deemed a termination of the Lease or an acceptance by Landlord of a surrender thereof.  Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Leased Premises, or any part thereof, with or without legal process, as the agent, and for the account, of Tenant upon such terms and conditions as Landlord may deem advisable (which terms may be materially different from the terms of this Lease), in which event the rents received on such reletting shall be applied (i) first to the reasonable and actual expenses of such reletting and collection, including without limitation necessary renovation and alterations of the Leased

34  .

Premises, reasonable and actual attorneys' fees and any reasonable and actual real estate commissions paid, and (ii) thereafter toward payment of all sums due or to become due Landlord hereunder. If a sufficient amount to pay such expenses and sums shall not be realized or secured, then Tenant shall pay Landlord any such deficiency monthly, and Landlord may bring an action therefor as such monthly deficiency shall arise. Landlord shall not, in any event, be required to pay Tenant any sums received by Landlord on a reletting of the Leased Premises in excess of the rent provided in this Lease, but such excess shall, notwithstanding the provisions of Paragraph 5, reduce any accrued present or future obligations of Tenant hereunder. Landlord's re-entry and reletting of the Leased Premises without termination of this Lease shall not preclude Landlord from subsequently terminating this Lease as set forth below.

(b)   Landlord may terminate this Lease by written notice to Tenant specifying a date therefor, which shall be no sooner than twenty (20) days following notice to Tenant, and this Lease shall then terminate on the date so specified as if such date had been originally fixed as the expiration date of the Term. In the event of such termination, Tenant shall pay the following to Landlord on such date:

(i)   Any obligation which has accrued prior to the date of termination.

(ii)   The amount by which the unpaid Basic Rent and all other charges which would have accrued for the balance of the Term (excluding any option periods or portions thereof) exceeds the amount of the fair and reasonable rental value of the Leased Premises in respect of such period, in each case, after discounting same to present value at a discount rate equal to the Default Rate.

Landlord shall not have any duty to mitigate its damages hereunder (including, but not limited to, any duty to relet or re-lease The Leased Premises). The amount of rent reserved by Landlord in any reletting of the Leased Premises, or any portion thereof, the costs of such reletting and any lost rent during the period after the Event of Default giving rise to termination,

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

shall be considered in ascertaining the "fair and reasonable rental value" of the Leased Premises, or such portion thereof, as the case may be. Following the date of termination, interest shall accrue on the sums payable by Tenant at the Default Rate.

In the event this Lease shall be terminated as provided above, by summary proceedings or otherwise, Landlord, its agents, servants or representatives may immediately or at any time thereafter peaceably re-enter and resume possession of the Leased Premises and remove all persons and property therefrom, by summary dispossession proceedings. Except as provided in Paragraph 9 or 13(e), at any time upon prior notice to Tenant, Landlord and Lender shall have the right, but shall not be required, to pay such sums or do any act which requires the expenditure of monies which may be necessary or appropriate by reason of the failure or neglect of Tenant to comply with any of its obligations under this Lease (Landlord and Lender shall not, however, exercise any such rights unless the failure or neglect shall have ripened into an Event of Default), and in the event of the exercise of such right by Landlord or Lender, Tenant agrees to pay to Landlord or Lender forthwith upon demand, as Additional Rent, all such sums including reasonable attorneys fees, together with interest thereon at the Default Rate.

(c)     Landlord may recover from Tenant, and Tenant shall pay to Landlord upon demand, as Additional Rent such reasonable and actual expenses as Landlord may incur in recovering possession of the Leased Premises, placing the same in good order and condition and repairing the same for reletting, and all other reasonable and actual expenses, commissions and charges incurred by Landlord in exercising any remedy provided herein or as a result of any Event of Default by Tenant hereunder (including without limitation attorneys' fees), provided that in no event shall Tenant be obligated to compensate Landlord for any speculative or consequential damages caused by Tenant's failure to perform its obligations under this Lease.

(d)   The various rights and remedies reserved to Landlord herein, are cumulative, the rights and remedies described in Paragraph 20.(a)-(c) shall survive termination

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

of this Lease and Landlord may pursue any and all such rights and remedies and any other available to Landlord under applicable law or equity, whether at the same time or otherwise (to the extent not inconsistent with specific provisions of this Lease); provided, however, that no remedy of termination shall be available to Landlord except as expressly set forth in paragraph 20(b) after the occurrence of an Event of Default.  Notwithstanding anything herein to the contrary, Landlord expressly waives its right to forcibly dispossess Tenant from the Leased Premises, whether peaceably or otherwise, without judicial process, such that Landlord shall not be entitled to any "commercial lockout" or any other provisions of applicable law which permit landlords to dispossess tenants from commercial properties without the benefit of judicial review.

21.   Notices.  All notices, demands, requests, consents, approvals, offers, statements and other instruments or communications required or permitted to be given pursuant to the provisions of this Lease (collectively "Notice" or "Notices") shall be in writing and shall be deemed to have been given for all purposes  three (3) days after having been sent by United States mail, by registered or certified mail, return receipt requested, postage prepaid, addressed to the other party at its address as stated below, or one (1) day after having been sent by Federal Express or other nationally recognized air courier service, to the Addresses stated below:

(a)  If to Landlord, at the address set forth on the first page of this Lease.

(b)  If to Tenant, at the address set forth on the first page of this Lease, Attention:  Corporate Secretary,

With a copy to:            McGuire, Woods, Battle & Boothe LLP
                          One James Center
                          Richmond, Virginia 23219
                          Attention:  Robert L. Burrus, Jr.

If any Lender shall have advised Tenant by Notice in the manner aforesaid that it is the holder of a Mortgage and stating in said Notice its address for the receipt of Notices, then simultaneously with the giving of any Notice by Tenant to Landlord, Tenant shall serve a copy

37

of such Notice upon Lender in the manner aforesaid.  For the purposes of this Paragraph, any party may substitute its address by giving fifteen days' notice to the other party in the manner provided above.

      22.    <u>Memorandum of Lease: Estoppel Certificates</u>.  Tenant shall execute, deliver and record, file or register from time to time all such instruments as may be required by any present or future law in order to evidence the respective interests of Landlord and Tenant in any of the Leased Premises, and shall cause a memorandum of this Lease, and any supplement hereto or to such other instrument, if any, as may be appropriate, to be recorded, filed or registered and re-recorded, refiled or re-registered in such manner and in such places as may be required by any present or future law in order to give public notice and protect the validity of this Lease.  In the event of any discrepancy between the provisions of said recorded memorandum of this Lease or any other recorded instrument referring to this Lease and the provisions of this Lease, the provisions of this Lease shall prevail.  Landlord and Tenant shall, at any time and from time to time, upon not less than twenty days' prior written request by the other, execute, acknowledge and deliver to the other a statement in writing, executed by Landlord or Tenant or, if other than an individual, by a President, Vice President or authorized general partner, principal officer or agent certifying (i) that this Lease is unmodified and in full effect (or, if there have been modifications, that this Lease is in full effect as modified, setting forth such modifications), (ii) the dates to which Basic Rent payable hereunder has been paid, (iii) that to the knowledge of the party executing such certificate no default by either Landlord or Tenant exists hereunder or specifying each such of which such party may have knowledge; (iv) the remaining Term hereof; and (v) with respect to a certificate signed by Tenant, that to the knowledge of the party executing such certificate, there are no proceedings pending or threatened against Tenant before or by any court or administrative agency which if adversely decided would materially and adversely affect the financial condition and operations of Tenant or if any such proceedings are pending or threatened to said party's knowledge, specifying and describing the same.  It is

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

intended that any such statements may be relied upon by Lender, the recipient of such statements or their assignees or by any prospective mortgagee, purchaser, assignee or subtenant of the Leased Premises.

      23.    <u>Surrender and Holding Over</u>.  Upon the expiration or earlier termination of this Lease, Tenant shall peaceably leave and surrender the Leased Premises (except as to any portion thereof with respect to which this Lease has previously terminated) to Landlord in the same condition in which the Leased Premises were originally received from Landlord at the commencement of this Lease, except as to any repair or Alteration as permitted or required by any provision of this Lease, and except for ordinary wear and tear and damage by fire, casualty or condemnation which Tenant is not required to repair hereunder.  Tenant may remove at Tenant's sole cost and expense from the Leased Premises on or prior to such expiration or earlier termination Tenant's Trade Fixtures and personal property which are owned by Tenant or third parties other than Landlord, and Tenant at its expense shall, on or prior to such expiration or earlier termination, repair any damage caused by such removal.  Tenant's Trade Fixtures and personal property not so removed at the end of the Term or within thirty days after the earlier termination of the Term for any reason whatsoever shall become the property of Landlord, and Landlord may thereafter cause such property to be removed from the Leased Premises.  Landlord shall not in any manner or to any extent be obligated to reimburse Tenant for any property which becomes the property of Landlord as a result of such expiration or earlier termination.  Upon such expiration or earlier termination, no party shall have any further rights or obligations hereunder except as specifically provided herein.

      Any holding over by Tenant of the Leased Premises after the expiration or earlier termination of the term of this Lease or any extensions thereof, with the consent of Landlord, shall operate and be construed as tenancy from month to month only, at one hundred fifty percent (150%) of the Basic Rent reserved herein and upon the same terms and conditions as contained in this Lease.  Notwithstanding the foregoing, any holding over without Landlord's

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

consent shall entitle Landlord, in addition to collecting Basic Rent at a rate of one hundred fifty percent (150%) thereof, to exercise all rights and remedies provided by law or in equity, including the remedies of Paragraph 20.

24.   <u>No Merger of Title</u>.   There shall be no merger of this Lease nor of the leasehold estate created by this Lease with the fee estate in or ownership of any of the Leased Premises by reason of the fact that the same person, corporation, firm or other entity may acquire or hold or own, directly or indirectly, (i) this Lease or the leasehold estate created by this Lease or any interest in this Lease or in such leasehold estate and (ii) the fee estate or ownership of any of the Leased Premises or any interest in such fee estate or ownership.   No such merger shall occur unless and until all persons, corporations, firms and other entities having any interest in (x) this Lease or the leasehold estate created by this Lease and (y) the fee estate in or ownership of the Leased Premises including, without limitation, Lender's interest therein, or any part thereof sought to be merged shall join in a written instrument effecting such merger and shall duly record the same.

25.   <u>Landlord Exculpation</u>.   Anything contained herein to the contrary notwithstanding, any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Landlord's interest in Leased Premises and shall not be enforced against the Landlord individually or personally.

26.   <u>Hazardous Substances</u>.

(a)   Tenant represents and warrants that it will not on, about, or under the Leased Premises, make, treat or dispose of any "hazardous substances" as that term is defined in the Comprehensive Environmental Response, Compensation and Liability Act, and the rules and regulations promulgated pursuant thereto, as from time to time amended, 42 U.S.C. § 9601 *et seq.* (the "Act"), but the foregoing shall not prevent the use to the extent necessary and customary in normal retail operations of any such substances in accordance with applicable laws and regulations and Tenant represents and warrants that it will at all times comply with the Act

40 .

and any other federal, state or local laws, rules or regulations governing Hazardous Materials. Hazardous Materials as used herein shall include, without limitation, all chemicals, petroleum, crude oil or any fraction thereof, hydrocarbons, polychlorinated biphenyls (PCBs), asbestos, asbestos-containing materials and/or products, urea formaldehyde, or any substances which are classified as "hazardous" or "toxic" under the Act; hazardous waste as defined under the Solid Waste Disposal Act, as amended 42 U.S.C. § 6901; air pollutants regulated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.*; pollutants as defined under the Clean Water Act, as amended, 33 U.S.C. § 1251, *et seq.*, any pesticide as defined by Federal Insecticide, Fungicide, and Rodenticide Act, as amended, 7 U.S.C. § 136, *et seq.*, any hazardous chemical substance or mixture or imminently hazardous substance or mixture regulated by the Toxic Substances Control Act, as amended, 15 U.S.C. § 2601, *et seq.*, any substance listed in the United States Department of Transportation Table at 45 CFR 172.101; any chemicals included in regulations promulgated under the above listed statutes or any modifications thereof or successor statutes thereto; any explosives, radioactive material, and any chemical regulated by state statutes similar to the federal statutes listed above and regulations promulgated under such state statutes.

(b)   To the extent required by the Act and/or any federal, state or local laws, rules or regulations governing Hazardous Materials, Tenant shall remove any hazardous substances (as defined in the Act) and Hazardous Materials (as defined above) whether now or hereafter existing on the Leased Premises and whether or not arising out of or in any manner connected with Tenant's occupancy of the Leased Premises during the Initial Term or any extension or renewal Term thereof. Tenant shall and hereby does agree to defend, indemnify and hold Lender and Landlord, their officers, directors, shareholders, partners, members, managers, governors and employees harmless from and against any and all causes of actions, suits, demands or judgments of any nature whatsoever, losses, damages, penalties, expenses, fees, claims, costs (including response and remedial costs), and liabilities, including, but not limited to, attorneys'

41

fees and costs of litigation, arising out of or in any manner connected with (i) the violation of any applicable federal, state or local environmental law with respect to the Leased Premises; (ii) the "release" or "threatened release" of or failure to remove, as required by this Paragraph 26, "hazardous substances" (as defined in the Act) and Hazardous Materials (as defined above) from the Leased Premises or any portion or portions thereof, now or hereafter existing during the Initial Term and any extension or renewal Term whether or not arising out of or in any manner connected with Tenants' occupancy of the Leased Premises during the Initial Term or any extension or renewal Term. No provision of this paragraph shall have any effect on Landlord's rights under paragraph 34.

(c)    The Tenant represents and warrants that it will not install any underground storage tank without specific, prior written approval from the Landlord and Lender, which may be withheld in the sole discretion of either. The Tenant will not store combustible or flammable materials on the Leased Premises in violation of the Act and any other federal, state or local laws, rules or regulations governing Hazardous Materials.

27.    Entry by Landlord. Landlord and its authorized representatives shall have the right upon reasonable notice (which shall be not less than 48 hours except in the case of emergency) to enter the Leased Premises at all reasonable business hours, (and at all other times in the event of an emergency), for (i) the purpose of inspecting the same or for the purpose of doing any work under Paragraph 9, and may take all such action thereon as may be necessary or appropriate for any such purpose (but nothing contained in this Lease or otherwise shall create or imply any duty upon the part of Landlord to make any such inspection or do any such work), provided further that if an Event of Default has occurred and is continuing, such inspections and work shall be at Tenant's sole cost and expense, and (ii) the purpose of showing the Leased Premises to prospective purchasers and mortgagees and, at any time within twelve (12) months prior to the expiration of the term of this Lease for the purpose of showing the same to prospective tenants. No such entry shall constitute an eviction of Tenant but any such entry shall

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

be done by Landlord in such reasonable manner as to minimize any disruption of Tenant's business operation.

28.   Statements.  Tenant named herein shall submit to Lender and Landlord within 45 days of the end of each fiscal quarter, quarterly balance sheets, income and cash flow statements for Tenant named herein certified by Tenant's chief financial officer;  within 90 days of the end of each fiscal year, annual audited balance sheets, income and cash flow statements for Tenant named herein. Quarterly 10Qs as filed with the Securities and Exchange Commission shall satisfy the requirements contained in (i) herein. Copies of the 10Ks filed with the Securities and Exchange Commission will satisfy the requirement contained in (ii) herein. The obligations of Tenant named herein shall continue whether or not this Lease shall have been assigned.

29.   No Usury.  The intention of the parties being to conform strictly to the usury laws now in force in the State, whenever any provision herein provides for payment by Tenant to Landlord of interest at a rate in excess of the legal rate permitted to be charged, such rate herein provided to be paid shall be deemed reduced to such legal rate.

30.   Broker.  Landlord and Tenant represent and warrant to each other that neither party negotiated with any broker in connection with this Lease and that this Lease was negotiated directly by Landlord and Tenant. Each party hereby agrees to indemnify the other against all claims, damages, costs and expenses incurred by the indemnified party as a result of the breach of the foregoing representation or warranty by the indemnifying party.

31.   Waiver of Landlord's Lien.  Landlord hereby waives any right to distrain Trade Fixtures or any property of Tenant and any Landlord's lien or similar lien upon Trade Fixtures and any other property of Tenant regardless of whether such lien is created or otherwise. Landlord agrees, at the request of Tenant, to execute a waiver of any Landlord's or similar lien for the benefit of any present or future holder of a security interest in or lessor of any of Trade Fixtures or any other personal property of Tenant. Landlord acknowledges and agrees in the future to acknowledge (in a written form reasonably satisfactory to Tenant) to such persons and

43

entities at such times and for such purposes as Tenant may reasonably request that Trade Fixtures are Tenant's property and not part of Improvements (regardless of whether or to what extent such Trade Fixtures are affixed to the Improvements) or otherwise subject to the terms of this Lease.

32.    No Waiver.  No delay or failure by either party to enforce its rights hereunder shall be construed as a waiver, modification or relinquishment thereof.

33.    Separability.  If any term or provision of this Lease or the application thereof to any provision of this Lease or the application thereof to any person or circumstances shall to any extent be invalid and unenforceable, the remainder of this Lease, or the application of such term or provision to person or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and shall be enforced to the extent permitted by law.

34.    Indemnification.  Tenant agrees to defend, pay, protect, indemnify, save and hold harmless Landlord and Lender from and against any and all liabilities, losses, damages, penalties, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature whatsoever, howsoever caused and whenever caused, arising from any of the Leased Premises or Adjoining Property or the use, non-use, occupancy, condition, design, construction, maintenance, repair or rebuilding of any of or otherwise relating to, the Leased Premises or Adjoining Property, and any injury to or death of any person or persons or any loss of or damage to any property, real or personal, in any manner arising therefrom connected therewith or occurring thereon (collectively, "Losses"), whether or not Landlord has or should have knowledge or notice of the defect or conditions, if any, causing or contributing to said Loss.  In case any action or proceeding is brought against Landlord or Lender by reason of any such Loss, Tenant covenants upon notice from Landlord or Lender to defend Landlord or Lender in such action, with the expenses of such defense paid by Tenant, and Landlord or Lender will cooperate and assist in the defense of such action or proceeding if reasonably requested so to do by Tenant.  All obligations of Tenant under this Paragraph 34 shall

44

survive any termination of this Lease with respect to Losses identified in reasonable detail, by the Claim Deadline, as defined below, of the intent to make a claim upon Tenant under such indemnity. The "Claim Deadline" shall be:

(a)    to the extent of any indemnification obligation arising as a result of the claim by a third party against Landlord or Lender, or the claim of a third party against the Leased Premises (any of the foregoing being a "Third Party Obligation"), the date that is 30 days after the later of (i) the expiration of the period during which such third party claim may be brought under the applicable statute of limitations, as established by judicial determination (pursuant to declaratory judgment proceeding initiated by either of the parties hereunder for the purpose of establishing such date, or otherwise), or (ii) the date which is two (2) years after the expiration or earlier termination of this Lease;

(b)    with respect to any indemnification obligation of Tenant not described in subparagraph (a) above, the day that is two years after the expiration or earlier termination of this Lease. There shall be no Claim Deadline applicable to any Third Party Obligation if there is no statute of limitations to the underlying claim given rise to the Third Party Obligation.

35.    <u>Tenant to Comply With Reciprocal Easement Agreement</u>.

(a)    Tenant agrees that Tenant is obligated to and shall perform all obligations of the owner of the Leased Premises and pay all expenses which the owner of the Leased Premises may be required to pay in accordance with any reciprocal easement agreement or any other agreement or document of record now affecting the Leased Premises, herein referred to collectively as "REA", and that Tenant shall comply with all of the terms and conditions of the REA during the Term of this Lease.

(b)    Provided that at such time Tenant shall have a tangible net worth of not less than Two Hundred Million Dollars ($200,000,000.00) as determined in accordance with generally accepted accounting principles, consistently applied, Tenant shall have the right to grant

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

consents and approvals under and amend the REA as from time to time it, in its sole discretion, deems necessary, and Landlord hereby grants Tenant a limited power of attorney to act for and on behalf of Landlord for purposes of such approvals, consents and amendments, except in any instance where either (x) money will be paid to Tenant in consideration for Tenant amending the REA, or (y) Tenant is granted any concessions with respect to any site (other than the Leased Premises). Tenant shall give Notice to Landlord and Lender within twenty (20) days of the execution of any amendment to the REA. During any time that Tenant shall have a tangible net worth of less than Two Hundred Million Dollars ($200,000,000.00), Tenant shall not grant consents or approvals or enter into any amendments to the REA without the prior written consent of Landlord which shall not be unreasonably withheld, conditioned or delayed if the consent, approval or amendment proposed by Tenant (a) will not adversely affect the value of the Leased Premises and (b) does not result in any remuneration to Tenant. Tenant's request for any such consent shall include (i) a copy of the most recent draft of the proposed consent, approval or amendment, (ii) a metes and bounds description of the portion of the Leased Premises to be affected by such approval or amendment, and (iii) Tenant's written undertaking acknowledging that Tenant shall remain liable hereunder as a principal and not merely as a surety or guarantor notwithstanding the consent, approval or amendment. Tenant shall supply Landlord and Lender with any other documentation or information then available to Tenant relating to such consent, approval or amendment that is reasonably requested by Lender or Landlord. Tenant further covenants and agrees to indemnify, defend and hold harmless Landlord and Lender against any claim, loss or damage suffered by Landlord or Lender by reason of (i) any action under this Paragraph 35 which results in a diminution in value of Landlord's reversionary interest in the Leased Premises or (ii) Tenant's failure to perform any obligations or pay any expenses as required under any REA or comply with the terms and conditions of any REA as hereinabove provided during the term of this Lease.

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

(c)    Landlord agrees to enter into with Tenant, at Tenant's expense, such easements, covenants, waivers, approvals or restrictions for utilities, parking or other matters as desirable for operation of the Leased Premises or properties adjacent thereto (collectively "Easement") as requested by Tenant, subject to Lender's and Landlord's approval of the form thereof, not to be unreasonably withheld or delayed; provided, however, that no such Easement shall result in any diminution in the value or utility of the Leased Premises for use a retail store site and further provided that no such Easement shall render the use of the Leased Premises dependent upon any other property or condition the use of the Leased Premises upon the use of any other property, each of which Tenant shall certify to Landlord and Lender in writing delivered with Tenant's request with respect to such Easement. Tenant's request shall also include (i) a copy of the most recent draft of the proposed Easement, (ii) a metes and bounds description of the portion of the Leased Premises to be affected by such Easement, and (iii) Tenant's written undertaking acknowledging that Tenant shall remain liable hereunder as a principal and not merely as a surety or guarantor notwithstanding the establishment of any Easement. Tenant shall supply Landlord and Lender with any other documentation or information then available to Tenant relating to such Easement that is reasonably requested by Lender or Landlord. If either Landlord or Lender shall fail to approve or disapprove the form of any such Easement, within a period of thirty (30) days from their respective receipt of same, then either Landlord or Lender, as the case may be, shall be deemed to have approved the form of any such Easement, and Landlord grants to Tenant a limited power of attorney to acknowledge, execute and deliver on Landlord's behalf any such Easement upon the failure of either Landlord or Lender to respond within such period of time.

(d)    Landlord hereby grants a limited power of attorney to Tenant to acknowledge, deliver and execute on Landlord's behalf any proposed agreement affecting the Leased Premises if such agreement is in the nature of an easement and (i) is specifically stated to encumber the Leased Premises only while Tenant is in possession of the Leased Premises or (ii) shall, by the terms of the agreement, end with the termination of this Lease. Upon the execution

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

of any such agreement, Tenant shall deliver, within twenty (20) days thereof, a copy of such agreement to Landlord.

36.    Headings.    The paragraph headings in this Lease are used only for convenience in finding the subject matters and are not part of this Lease or to be used in determining the intent of the parties or otherwise interpreting this Lease.

37.    Modifications.    This Lease may be modified, amended, discharged or waived only by an agreement in writing signed by the party against whom enforcement of any such modification, amendment, discharge or waiver is sought.

38.    Successors, Assigns.    The covenants of this Lease shall run with the Land and bind Tenant, the heirs, distributees, personal representatives, successors and permitted assigns of Tenant and all present and subsequent encumbrances and subtenants of any of the Leased Premises, and shall inure to the benefit of and bind Landlord, its successors and assigns. In the event there is more than one Tenant, the obligation of each shall be joint and several. The term "Landlord" as used in this Lease, so far as covenants or obligations on the part of Landlord are concerned, shall be limited to mean and include only the owner or owners of the Leased Premises or holder of the Mortgage in possession at the time in question of the Leased Premises and in the event of any transfer or transfers of the title of the Leased Premises, the Landlord herein named (and in case of any subsequent transfers or conveyances, the then grantor) shall be automatically freed and relieved from and after the date of such transfer and conveyance of all personal liability as respects the performance of any covenants or obligations on the part of Landlord contained in this Lease thereafter to be performed.

39.    Counterparts.    This Lease may be executed in several counterparts, which together shall be deemed one and the same instrument.

40.    Governing Law.    This Lease shall be governed by and construed according to the laws of the State.

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

41.    <u>Lender as Third Party Beneficiary</u>. Lender shall be deemed a third party beneficiary with respect to all provisions of this Lease that purport to confer benefits upon Lender or impose obligations upon Tenant or Landlord in order to protect the interests of Lender.

IN WITNESS WHEREOF, Landlord and Tenant have caused this instrument to be executed under seal as of the day and year first above written.

LANDLORD:

LARRY J. RIETZ, MP, L.L.C., a Minnesota limited liability company

By North Division CC, Inc., a Minnesota corporation, Chief Manager

By: _____
    Larry J. Rietz, President

TENANT:

CIRCUIT CITY STORES, INC.

By: _____
Title:  Vice President, Controller and Treasurer

49

## EXHIBIT A

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

## EXHIBIT A

## LEGAL DESCRIPTION

PARCEL 1:

That portion of the South half of the North half of the Northeast quarter of the Northeast quarter of Section 30, Township 26 North, Range 43 East, W.M., in Spokane County, Washington, described as follows:

BEGINNING at the intersection of the North line of said South half and the West right-of-way line of Division Street;
Thence South 00°14'39" East, along said West right-of-way line, 221.89 feet;
Thence South 12°03'28" West, 70.40 feet;
Thence South 60°08'34" West, 27.28 feet;
Thence South 89°45'21" West, 312.29 feet;
Thence North 00°14'39" West, 139.70 feet;
Thence North 07°28'25" East, 142.56 feet;
Thence North 00°14'39" West, 33.00 feet to the North line of said South half;
Thence South 88°32'59" East, along said North line, 332.00 feet to the Point of Beginning, also being known as;

Tract "A" of Short Plat No. SP-1025-95 according to Plat recorded in Volume 14 of Short Plats, Pages 21-22, in Spokane County, Washington.

PARCEL 2:

An easement for a sanitary sewer system as set forth in that certain Private Sewer System TIE-IN Easement Agreement filed for record on April 18, 1997, as Spokane County Auditor's No. 4095144.

PARCEL 3:

That certain non-exclusive easement and the rights and obligations pertaining thereto as set forth in that certain Declaration of Covenants, Conditions and Restrictions and Grant of Reciprocal Easements filed for record on April 18, 1997 as Spokane County Auditor's No. 4095143.

## EXHIBIT B

1.  Basic Rent for the initial term shall be at the annual rate of $405,680.00.

2.  Basic Rent for the first renewal term shall be at the annual rate of $446,248.00.

3.  Basic Rent for the second renewal term shall be at the annual rate of $486,816.00.

51

# EXHIBIT C

Rejectable Offer Schedule

MWBB February 3, 1998
C:\CIRCUIT\LEASE.WA

## Cardinal February 98
## Rejectable Offer Schedule

**Input Data:**

| | |
|---|---|
| Initial Sale Price: | $ 4,400,000 |
| Interest rate: | 9.22% |

## Amortization Schedule

| Payment | Principal | Interest | Balance | Period | Repurchase Price |
|---|---|---|---|---|---|
| | | | 100.00 | 1 | $ 4,400,000 |
| 0.89 | 0.12 | 0.77 | 99.88 | 2 | $ 4,394,833 |
| 0.89 | 0.12 | 0.77 | 99.76 | 3 | $ 4,389,627 |
| 0.89 | 0.12 | 0.77 | 99.65 | 4 | $ 4,384,381 |
| 0.89 | 0.12 | 0.77 | 99.52 | 5 | $ 4,379,094 |
| 0.89 | 0.12 | 0.76 | 99.40 | 6 | $ 4,373,767 |
| 0.89 | 0.12 | 0.76 | 99.28 | 7 | $ 4,368,398 |
| 0.89 | 0.12 | 0.76 | 99.16 | 8 | $ 4,362,989 |
| 0.89 | 0.12 | 0.76 | 99.03 | 9 | $ 4,357,538 |
| 0.89 | 0.12 | 0.76 | 98.91 | 10 | $ 4,352,045 |
| 0.89 | 0.13 | 0.76 | 98.78 | 11 | $ 4,346,510 |
| 0.89 | 0.13 | 0.76 | 98.66 | 12 | $ 4,340,932 |
| 0.89 | 0.13 | 0.76 | 98.53 | 13 | $ 4,335,312 |
| 0.89 | 0.13 | 0.76 | 98.40 | 14 | $ 4,329,648 |
| 0.89 | 0.13 | 0.76 | 98.27 | 15 | $ 4,323,941 |
| 0.89 | 0.13 | 0.76 | 98.14 | 16 | $ 4,318,190 |
| 0.89 | 0.13 | 0.75 | 98.01 | 17 | $ 4,312,394 |
| 0.89 | 0.13 | 0.75 | 97.88 | 18 | $ 4,306,554 |
| 0.89 | 0.13 | 0.75 | 97.74 | 19 | $ 4,300,670 |
| 0.89 | 0.13 | 0.75 | 97.61 | 20 | $ 4,294,740 |
| 0.89 | 0.14 | 0.75 | 97.47 | 21 | $ 4,288,765 |
| 0.89 | 0.14 | 0.75 | 97.34 | 22 | $ 4,282,743 |
| 0.89 | 0.14 | 0.75 | 97.20 | 23 | $ 4,276,676 |
| 0.89 | 0.14 | 0.75 | 97.06 | 24 | $ 4,270,561 |
| 0.89 | 0.14 | 0.75 | 96.92 | 25 | $ 4,264,400 |
| 0.89 | 0.14 | 0.74 | 96.78 | 26 | $ 4,258,192 |
| 0.89 | 0.14 | 0.74 | 96.63 | 27 | $ 4,251,935 |
| 0.89 | 0.14 | 0.74 | 96.49 | 28 | $ 4,245,631 |
| 0.89 | 0.14 | 0.74 | 96.35 | 29 | $ 4,239,278 |
| 0.89 | 0.15 | 0.74 | 96.20 | 30 | $ 4,232,877 |
| 0.89 | 0.15 | 0.74 | 96.06 | 31 | $ 4,226,426 |
| 0.89 | 0.15 | 0.74 | 95.91 | 32 | $ 4,219,926 |
| 0.89 | 0.15 | 0.74 | 95.76 | 33 | $ 4,213,375 |
| 0.89 | 0.15 | 0.74 | 95.61 | 34 | $ 4,206,775 |
| 0.89 | 0.15 | 0.73 | 95.46 | 35 | $ 4,200,124 |
| 0.89 | 0.15 | 0.73 | 95.31 | 36 | $ 4,193,421 |
| 0.89 | 0.15 | 0.73 | 95.15 | 37 | $ 4,186,667 |
| 0.89 | 0.15 | 0.73 | 95.00 | 38 | $ 4,179,861 |
| 0.89 | 0.16 | 0.73 | 94.84 | 39 | $ 4,173,003 |
| 0.89 | 0.16 | 0.73 | 94.68 | 40 | $ 4,166,093 |
| 0.89 | 0.16 | 0.73 | 94.53 | 41 | $ 4,159,129 |
| 0.89 | 0.16 | 0.73 | 94.37 | 42 | $ 4,152,111 |
| 0.89 | 0.16 | 0.73 | 94.21 | 43 | $ 4,145,040 |
| 0.89 | 0.16 | 0.72 | 94.04 | 44 | $ 4,137,914 |
| 0.89 | 0.16 | 0.72 | 93.88 | 45 | $ 4,130,734 |
| 0.89 | 0.16 | 0.72 | 93.72 | 46 | $ 4,123,499 |
| 0.89 | 0.17 | 0.72 | 93.55 | 47 | $ 4,116,207 |
| 0.89 | 0.17 | 0.72 | 93.38 | 48 | $ 4,108,860 |
| 0.89 | 0.17 | 0.72 | 93.21 | 49 | $ 4,101,457 |
| 0.89 | 0.17 | 0.72 | 93.05 | 50 | $ 4,093,996 |
| 0.89 | 0.17 | 0.71 | 92.87 | 51 | $ 4,086,478 |
| 0.89 | 0.17 | 0.71 | 92.70 | 52 | $ 4,078,903 |
| 0.89 | 0.17 | 0.71 | 92.53 | 53 | $ 4,071,269 |
| 0.89 | 0.17 | 0.71 | 92.35 | 54 | $ 4,063,577 |
| 0.89 | 0.18 | 0.71 | 92.18 | 55 | $ 4,055,825 |
| 0.89 | 0.18 | 0.71 | 92.00 | 56 | $ 4,048,014 |
| 0.89 | 0.18 | 0.71 | 91.82 | 57 | $ 4,040,143 |
| 0.89 | 0.18 | 0.71 | 91.64 | 58 | $ 4,032,211 |

| Payment | Principal | Interest | Balance | Period | | Repurchase Price |
|---|---|---|---|---|---|---|
| 0.89 | 0.18 | 0.70 | 91.46 | 59 | $ | 4,024,219 |
| 0.89 | 0.18 | 0.70 | 91.28 | 60 | $ | 4,016,165 |
| 0.89 | 0.18 | 0.70 | 91.09 | 61 | $ | 4,008,049 |
| 0.89 | 0.19 | 0.70 | 90.91 | 62 | $ | 3,999,871 |
| 0.89 | 0.19 | 0.70 | 90.72 | 63 | $ | 3,991,630 |
| 0.89 | 0.19 | 0.70 | 90.53 | 64 | $ | 3,983,325 |
| 0.89 | 0.19 | 0.70 | 90.34 | 65 | $ | 3,974,957 |
| 0.89 | 0.19 | 0.69 | 90.15 | 66 | $ | 3,966,525 |
| 0.89 | 0.19 | 0.69 | 89.96 | 67 | $ | 3,958,028 |
| 0.89 | 0.19 | 0.69 | 89.76 | 68 | $ | 3,949,465 |
| 0.89 | 0.20 | 0.69 | 89.56 | 69 | $ | 3,940,837 |
| 0.89 | 0.20 | 0.69 | 89.37 | 70 | $ | 3,932,142 |
| 0.89 | 0.20 | 0.69 | 89.17 | 71 | $ | 3,923,381 |
| 0.89 | 0.20 | 0.69 | 88.97 | 72 | $ | 3,914,552 |
| 0.89 | 0.20 | 0.68 | 88.76 | 73 | $ | 3,905,656 |
| 0.89 | 0.20 | 0.68 | 88.56 | 74 | $ | 3,896,691 |
| 0.89 | 0.21 | 0.68 | 88.36 | 75 | $ | 3,887,657 |
| 0.89 | 0.21 | 0.68 | 88.15 | 76 | $ | 3,878,554 |
| 0.89 | 0.21 | 0.68 | 87.94 | 77 | $ | 3,869,381 |
| 0.89 | 0.21 | 0.68 | 87.73 | 78 | $ | 3,860,137 |
| 0.89 | 0.21 | 0.67 | 87.52 | 79 | $ | 3,850,822 |
| 0.89 | 0.21 | 0.67 | 87.31 | 80 | $ | 3,841,436 |
| 0.89 | 0.21 | 0.67 | 87.09 | 81 | $ | 3,831,978 |
| 0.89 | 0.22 | 0.67 | 86.87 | 82 | $ | 3,822,447 |
| 0.89 | 0.22 | 0.67 | 86.66 | 83 | $ | 3,812,843 |
| 0.89 | 0.22 | 0.67 | 86.44 | 84 | $ | 3,803,165 |
| 0.89 | 0.22 | 0.66 | 86.21 | 85 | $ | 3,793,412 |
| 0.89 | 0.22 | 0.66 | 85.99 | 86 | $ | 3,783,585 |
| 0.89 | 0.23 | 0.66 | 85.77 | 87 | $ | 3,773,682 |
| 0.89 | 0.23 | 0.66 | 85.54 | 88 | $ | 3,763,703 |
| 0.89 | 0.23 | 0.66 | 85.31 | 89 | $ | 3,753,648 |
| 0.89 | 0.23 | 0.66 | 85.08 | 90 | $ | 3,743,515 |
| 0.89 | 0.23 | 0.65 | 84.85 | 91 | $ | 3,733,304 |
| 0.89 | 0.23 | 0.65 | 84.61 | 92 | $ | 3,723,015 |
| 0.89 | 0.24 | 0.65 | 84.38 | 93 | $ | 3,712,647 |
| 0.89 | 0.24 | 0.65 | 84.14 | 94 | $ | 3,702,199 |
| 0.89 | 0.24 | 0.65 | 83.90 | 95 | $ | 3,691,671 |
| 0.89 | 0.24 | 0.64 | 83.66 | 96 | $ | 3,681,062 |
| 0.89 | 0.24 | 0.64 | 83.42 | 97 | $ | 3,670,371 |
| 0.89 | 0.24 | 0.64 | 83.17 | 98 | $ | 3,659,599 |
| 0.89 | 0.25 | 0.64 | 82.93 | 99 | $ | 3,648,743 |
| 0.89 | 0.25 | 0.64 | 82.68 | 100 | $ | 3,637,805 |
| 0.89 | 0.25 | 0.64 | 82.43 | 101 | $ | 3,626,782 |
| 0.89 | 0.25 | 0.63 | 82.17 | 102 | $ | 3,615,674 |
| 0.89 | 0.25 | 0.63 | 81.92 | 103 | $ | 3,604,481 |
| 0.89 | 0.26 | 0.63 | 81.66 | 104 | $ | 3,593,202 |
| 0.89 | 0.26 | 0.63 | 81.41 | 105 | $ | 3,581,837 |
| 0.89 | 0.26 | 0.63 | 81.15 | 106 | $ | 3,570,384 |
| 0.89 | 0.26 | 0.62 | 80.88 | 107 | $ | 3,558,843 |
| 0.89 | 0.26 | 0.62 | 80.62 | 108 | $ | 3,547,213 |
| 0.89 | 0.27 | 0.62 | 80.35 | 109 | $ | 3,535,494 |
| 0.89 | 0.27 | 0.62 | 80.08 | 110 | $ | 3,523,685 |
| 0.89 | 0.27 | 0.62 | 79.81 | 111 | $ | 3,511,786 |
| 0.89 | 0.27 | 0.61 | 79.54 | 112 | $ | 3,499,795 |
| 0.89 | 0.27 | 0.61 | 79.27 | 113 | $ | 3,487,711 |
| 0.89 | 0.28 | 0.61 | 78.99 | 114 | $ | 3,475,535 |
| 0.89 | 0.28 | 0.61 | 78.71 | 115 | $ | 3,463,266 |
| 0.89 | 0.28 | 0.60 | 78.43 | 116 | $ | 3,450,902 |
| 0.89 | 0.28 | 0.60 | 78.15 | 117 | $ | 3,438,443 |
| 0.89 | 0.29 | 0.60 | 77.86 | 118 | $ | 3,425,888 |
| 0.89 | 0.29 | 0.60 | 77.57 | 119 | $ | 3,413,237 |
| 0.89 | 0.29 | 0.60 | 77.28 | 120 | $ | 3,400,489 |
| 0.89 | 0.29 | 0.59 | 76.99 | 121 | $ | 3,387,642 |
| 0.89 | 0.29 | 0.59 | 76.70 | 122 | $ | 3,374,697 |
| 0.89 | 0.30 | 0.59 | 76.40 | 123 | $ | 3,361,653 |
| 0.89 | 0.30 | 0.59 | 76.10 | 124 | $ | 3,348,508 |
| 0.89 | 0.30 | 0.58 | 75.80 | 125 | $ | 3,335,263 |
| 0.89 | 0.30 | 0.58 | 75.50 | 126 | $ | 3,321,915 |
| 0.89 | 0.31 | 0.58 | 75.19 | 127 | $ | 3,308,465 |
| 0.89 | 0.31 | 0.58 | 74.88 | 128 | $ | 3,294,912 |

| Payment | Principal | Interest | Balance | Period | Repurchase Price |
|---------|-----------|----------|---------|--------|------------------|
| 0.89 | 0.31 | 0.58 | 74.57 | 129 | $ 3,281,255 |
| 0.89 | 0.31 | 0.57 | 74.26 | 130 | $ 3,267,492 |
| 0.89 | 0.32 | 0.57 | 73.95 | 131 | $ 3,253,624 |
| 0.89 | 0.32 | 0.57 | 73.63 | 132 | $ 3,239,649 |
| 0.89 | 0.32 | 0.57 | 73.31 | 133 | $ 3,225,567 |
| 0.89 | 0.32 | 0.56 | 72.99 | 134 | $ 3,211,377 |
| 0.89 | 0.32 | 0.56 | 72.66 | 135 | $ 3,197,078 |
| 0.89 | 0.33 | 0.56 | 72.33 | 136 | $ 3,182,669 |
| 0.89 | 0.33 | 0.56 | 72.00 | 137 | $ 3,168,149 |
| 0.89 | 0.33 | 0.55 | 71.67 | 138 | $ 3,153,517 |
| 0.89 | 0.34 | 0.55 | 71.34 | 139 | $ 3,138,774 |
| 0.89 | 0.34 | 0.55 | 71.00 | 140 | $ 3,123,916 |
| 0.89 | 0.34 | 0.55 | 70.66 | 141 | $ 3,108,945 |
| 0.89 | 0.34 | 0.54 | 70.31 | 142 | $ 3,093,859 |
| 0.89 | 0.35 | 0.54 | 69.97 | 143 | $ 3,078,657 |
| 0.89 | 0.35 | 0.54 | 69.62 | 144 | $ 3,063,338 |
| 0.89 | 0.35 | 0.53 | 69.27 | 145 | $ 3,047,901 |
| 0.89 | 0.35 | 0.53 | 68.92 | 146 | $ 3,032,346 |
| 0.89 | 0.36 | 0.53 | 68.56 | 147 | $ 3,016,671 |
| 0.89 | 0.36 | 0.53 | 68.20 | 148 | $ 3,000,876 |
| 0.89 | 0.36 | 0.52 | 67.84 | 149 | $ 2,984,959 |
| 0.89 | 0.36 | 0.52 | 67.48 | 150 | $ 2,968,920 |
| 0.89 | 0.37 | 0.52 | 67.11 | 151 | $ 2,952,758 |
| 0.89 | 0.37 | 0.52 | 66.74 | 152 | $ 2,936,472 |
| 0.89 | 0.37 | 0.51 | 66.37 | 153 | $ 2,920,060 |
| 0.89 | 0.38 | 0.51 | 65.99 | 154 | $ 2,903,523 |
| 0.89 | 0.38 | 0.51 | 65.61 | 155 | $ 2,886,858 |
| 0.89 | 0.38 | 0.50 | 65.23 | 156 | $ 2,870,065 |
| 0.89 | 0.38 | 0.50 | 64.84 | 157 | $ 2,853,144 |
| 0.89 | 0.39 | 0.50 | 64.46 | 158 | $ 2,836,092 |
| 0.89 | 0.39 | 0.50 | 64.07 | 159 | $ 2,818,909 |
| 0.89 | 0.39 | 0.49 | 63.67 | 160 | $ 2,801,595 |
| 0.89 | 0.40 | 0.49 | 63.28 | 161 | $ 2,784,147 |
| 0.89 | 0.40 | 0.49 | 62.88 | 162 | $ 2,766,565 |
| 0.89 | 0.40 | 0.48 | 62.47 | 163 | $ 2,748,848 |
| 0.89 | 0.41 | 0.48 | 62.07 | 164 | $ 2,730,995 |
| 0.89 | 0.41 | 0.48 | 61.66 | 165 | $ 2,713,005 |
| 0.89 | 0.41 | 0.47 | 61.25 | 166 | $ 2,694,876 |
| 0.89 | 0.42 | 0.47 | 60.83 | 167 | $ 2,676,609 |
| 0.89 | 0.42 | 0.47 | 60.41 | 168 | $ 2,658,201 |
| 0.89 | 0.42 | 0.46 | 59.99 | 169 | $ 2,639,651 |
| 0.89 | 0.42 | 0.46 | 59.57 | 170 | $ 2,620,959 |
| 0.89 | 0.43 | 0.46 | 59.14 | 171 | $ 2,602,123 |
| 0.89 | 0.43 | 0.45 | 58.71 | 172 | $ 2,583,143 |
| 0.89 | 0.43 | 0.45 | 58.27 | 173 | $ 2,564,017 |
| 0.89 | 0.44 | 0.45 | 57.84 | 174 | $ 2,544,744 |
| 0.89 | 0.44 | 0.44 | 57.39 | 175 | $ 2,525,322 |
| 0.89 | 0.44 | 0.44 | 56.95 | 176 | $ 2,505,752 |
| 0.89 | 0.45 | 0.44 | 56.50 | 177 | $ 2,486,031 |
| 0.89 | 0.45 | 0.43 | 56.05 | 178 | $ 2,466,159 |
| 0.89 | 0.46 | 0.43 | 55.59 | 179 | $ 2,446,134 |
| 0.89 | 0.46 | 0.43 | 55.14 | 180 | $ 2,425,955 |
| 0.89 | 0.46 | 0.42 | 54.67 | 181 | $ 2,405,621 |
| 0.89 | 0.47 | 0.42 | 54.21 | 182 | $ 2,385,131 |
| 0.89 | 0.47 | 0.42 | 53.74 | 183 | $ 2,364,483 |
| 0.89 | 0.47 | 0.41 | 53.27 | 184 | $ 2,343,677 |
| 0.89 | 0.48 | 0.41 | 52.79 | 185 | $ 2,322,711 |
| 0.89 | 0.48 | 0.41 | 52.31 | 186 | $ 2,301,584 |
| 0.89 | 0.48 | 0.40 | 51.82 | 187 | $ 2,280,294 |
| 0.89 | 0.49 | 0.40 | 51.34 | 188 | $ 2,258,841 |
| 0.89 | 0.49 | 0.39 | 50.85 | 189 | $ 2,237,223 |
| 0.89 | 0.50 | 0.39 | 50.35 | 190 | $ 2,215,439 |
| 0.89 | 0.50 | 0.39 | 49.85 | 191 | $ 2,193,488 |
| 0.89 | 0.50 | 0.38 | 49.35 | 192 | $ 2,171,368 |
| 0.89 | 0.51 | 0.38 | 48.84 | 193 | $ 2,149,078 |
| 0.89 | 0.51 | 0.38 | 48.33 | 194 | $ 2,126,616 |
| 0.89 | 0.51 | 0.37 | 47.82 | 195 | $ 2,103,983 |
| 0.89 | 0.52 | 0.37 | 47.30 | 196 | $ 2,081,175 |
| 0.89 | 0.52 | 0.36 | 46.78 | 197 | $ 2,058,192 |
| 0.89 | 0.53 | 0.36 | 46.25 | 198 | $ 2,035,032 |

| Payment | Principal | Interest | Balance | Period | | Repurchase Price |
|---|---|---|---|---|---|---|
| 0.89 | 0.53 | 0.36 | 45.72 | 199 | $ | 2,011,695 |
| 0.89 | 0.53 | 0.35 | 45.19 | 200 | $ | 1,988,178 |
| 0.89 | 0.54 | 0.35 | 44.65 | 201 | $ | 1,964,480 |
| 0.89 | 0.54 | 0.34 | 44.10 | 202 | $ | 1,940,601 |
| 0.89 | 0.55 | 0.34 | 43.56 | 203 | $ | 1,916,538 |
| 0.89 | 0.55 | 0.33 | 43.01 | 204 | $ | 1,892,290 |
| 0.89 | 0.56 | 0.33 | 42.45 | 205 | $ | 1,867,856 |
| 0.89 | 0.56 | 0.33 | 41.89 | 206 | $ | 1,843,234 |
| 0.89 | 0.56 | 0.32 | 41.33 | 207 | $ | 1,818,422 |
| 0.89 | 0.57 | 0.32 | 40.76 | 208 | $ | 1,793,421 |
| 0.89 | 0.57 | 0.31 | 40.19 | 209 | $ | 1,768,227 |
| 0.89 | 0.58 | 0.31 | 39.61 | 210 | $ | 1,742,839 |
| 0.89 | 0.58 | 0.30 | 39.03 | 211 | $ | 1,717,257 |
| 0.89 | 0.59 | 0.30 | 38.44 | 212 | $ | 1,691,478 |
| 0.89 | 0.59 | 0.30 | 37.85 | 213 | $ | 1,665,500 |
| 0.89 | 0.59 | 0.29 | 37.26 | 214 | $ | 1,639,324 |
| 0.89 | 0.60 | 0.29 | 36.66 | 215 | $ | 1,612,946 |
| 0.89 | 0.60 | 0.28 | 36.05 | 216 | $ | 1,586,365 |
| 0.89 | 0.61 | 0.28 | 35.45 | 217 | $ | 1,559,580 |
| 0.89 | 0.61 | 0.27 | 34.83 | 218 | $ | 1,532,590 |
| 0.89 | 0.62 | 0.27 | 34.21 | 219 | $ | 1,505,392 |
| 0.89 | 0.62 | 0.26 | 33.59 | 220 | $ | 1,477,985 |
| 0.89 | 0.63 | 0.26 | 32.96 | 221 | $ | 1,450,368 |
| 0.89 | 0.63 | 0.25 | 32.33 | 222 | $ | 1,422,538 |
| 0.89 | 0.64 | 0.25 | 31.69 | 223 | $ | 1,394,494 |
| 0.89 | 0.64 | 0.24 | 31.05 | 224 | $ | 1,366,235 |
| 0.89 | 0.65 | 0.24 | 30.40 | 225 | $ | 1,337,759 |
| 0.89 | 0.65 | 0.23 | 29.75 | 226 | $ | 1,309,064 |
| 0.89 | 0.66 | 0.23 | 29.09 | 227 | $ | 1,280,149 |
| 0.89 | 0.66 | 0.22 | 28.43 | 228 | $ | 1,251,011 |
| 0.89 | 0.67 | 0.22 | 27.76 | 229 | $ | 1,221,650 |
| 0.89 | 0.67 | 0.21 | 27.09 | 230 | $ | 1,192,063 |
| 0.89 | 0.68 | 0.21 | 26.41 | 231 | $ | 1,162,249 |
| 0.89 | 0.68 | 0.20 | 25.73 | 232 | $ | 1,132,205 |
| 0.89 | 0.69 | 0.20 | 25.04 | 233 | $ | 1,101,931 |
| 0.89 | 0.69 | 0.19 | 24.35 | 234 | $ | 1,071,424 |
| 0.89 | 0.70 | 0.19 | 23.65 | 235 | $ | 1,040,683 |
| 0.89 | 0.70 | 0.18 | 22.95 | 236 | $ | 1,009,705 |
| 0.89 | 0.71 | 0.18 | 22.24 | 237 | $ | 978,490 |
| 0.89 | 0.71 | 0.17 | 21.52 | 238 | $ | 947,035 |
| 0.89 | 0.72 | 0.17 | 20.80 | 239 | $ | 915,338 |
| 0.89 | 0.73 | 0.16 | 20.08 | 240 | $ | 883,397 |
| 0.89 | 0.73 | 0.15 | 19.35 | 241 | $ | 851,211 |
| 0.89 | 0.74 | 0.15 | 18.61 | 242 | $ | 818,778 |
| 0.89 | 0.74 | 0.14 | 17.87 | 243 | $ | 786,096 |
| 0.89 | 0.75 | 0.14 | 17.12 | 244 | $ | 753,162 |
| 0.89 | 0.75 | 0.13 | 16.36 | 245 | $ | 719,976 |
| 0.89 | 0.76 | 0.13 | 15.60 | 246 | $ | 686,534 |
| 0.89 | 0.77 | 0.12 | 14.84 | 247 | $ | 652,836 |
| 0.89 | 0.77 | 0.11 | 14.07 | 248 | $ | 618,878 |
| 0.89 | 0.78 | 0.11 | 13.29 | 249 | $ | 584,660 |
| 0.89 | 0.78 | 0.10 | 12.50 | 250 | $ | 550,179 |
| 0.89 | 0.79 | 0.10 | 11.71 | 251 | $ | 515,433 |
| 0.89 | 0.80 | 0.09 | 10.92 | 252 | $ | 480,420 |
| 0.89 | 0.80 | 0.08 | 10.12 | 253 | $ | 445,137 |
| 0.89 | 0.81 | 0.08 | 9.31 | 254 | $ | 409,584 |
| 0.89 | 0.81 | 0.07 | 8.49 | 255 | $ | 373,758 |
| 0.89 | 0.82 | 0.07 | 7.67 | 256 | $ | 337,656 |
| 0.89 | 0.83 | 0.06 | 6.85 | 257 | $ | 301,277 |
| 0.89 | 0.83 | 0.05 | 6.01 | 258 | $ | 264,619 |
| 0.89 | 0.84 | 0.05 | 5.17 | 259 | $ | 227,678 |
| 0.89 | 0.85 | 0.04 | 4.33 | 260 | $ | 190,454 |
| 0.89 | 0.85 | 0.03 | 3.48 | 261 | $ | 152,944 |
| 0.89 | 0.86 | 0.03 | 2.62 | 262 | $ | 115,146 |
| 0.89 | 0.87 | 0.02 | 1.75 | 263 | $ | 77,057 |
| 0.89 | 0.87 | 0.01 | 0.88 | 264 | $ | 38,676 |
| 0.89 | 0.88 | 0.01 | 0.00 | 265 | $ | - |

**Response of CWCapital Asset Management, LLC to the Liquidating Trust's Twenty-eighth
Omnibus Objection to Landlord Claims**

# Exhibit C

**NOTE**

$4,302,912.00                                                                 February 4, 1998

   For value received, **LARRY J. RIETZ MP, L.L.C.**, a limited liability
company duly organized and validly existing under the laws of the State of Minnesota, having
its principal place of business at 1355 Lemond Road, Owatonna, Minnesota 55060 (hereinafter
referred to as "**Maker**"), promises to pay to the order of **NOMURA ASSET CAPITAL
CORPORATION**, a corporation organized under the laws of the State of Delaware, at its
principal place of business at Two World Financial Center, Building B, New York, New York
10281 (hereinafter referred to as "**Payee**"), or at such place as the holder hereof may from
time to time designate in writing, the principal sum of FOUR MILLION THREE HUNDRED
TWO THOUSAND NINE HUNDRED TWELVE and NO/100 Dollars ($4,302,912.00), in
lawful money of the United States of America, with interest thereon to be computed on the
unpaid principal balance from time to time outstanding at the Applicable Interest Rate (as
hereinafter defined), and to be paid in installments as follows:

  1.  A payment of interest only on February 11, 1998;

  2.  A constant payment of $33,705.55, on the eleventh day of
     March, 1998 and on the eleventh day of each calendar month
     thereafter up to and including the eleventh day of February, 2020
     ("**Monthly Debt Service Payment Amount**"); each of such
     payments to be applied (a) to the payment of interest computed at
     the rate aforesaid; and (b) the balance applied toward the
     reduction of the principal sum;

and the balance of said principal sum together with all accrued and unpaid interest thereon
shall be due and payable on the eleventh day of February, 2020 (the "**Maturity Date**").
Interest on the principal sum of this Note shall be calculated on the basis of a three-hundred
sixty (360) day year consisting of twelve 30 day months. The constant payment required
hereunder is based on an amortization schedule of two hundred sixty-four (264) months (the
"**Amortization Term**"). The first interest accrual period hereunder shall commence on and
include the date that principal is advanced hereunder and shall end on and include the next
tenth (10th) day of a calendar month; unless principal is advanced on the tenth (10th) day of a
month, in which case the first interest accrual period shall consist of only such tenth (10th)
day. Each interest accrual period thereafter shall commence on the eleventh (11th) day of each
calendar month during the term of this Note and shall end on and include the tenth (10th) day
of the next occurring calendar month. All amounts due under this Note shall be payable
without setoff, counterclaim or any other deduction whatsoever.

   The term "**Applicable Interest Rate**" as used in this Note shall mean from the
date of this Note through and including the Maturity Date, a rate of 7.64% per annum.

This Note is evidence of that certain loan made by Payee to Maker contemporaneously herewith (the "**Loan**") pursuant to a Loan Agreement of even date herewith (the "**Loan Agreement**"). This Note is secured by (a) a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith in the amount of this Note given by Maker for the use and benefit of Payee covering the fee estate of Maker in certain premises as more particularly described therein (the "**Mortgage**"), (b) an Assignment of Leases and Rents of even date herewith executed by Maker in favor of Payee (the "**Assignment of Leases**"), and (c) the other Loan Documents (as hereinafter defined). The term "**Loan Documents**" as used in this Note refers collectively to this Note, the Loan Agreement, the Mortgage, the Assignment of Leases and any and all other documents securing, evidencing, or guaranteeing all or any portion of the Loan or otherwise executed and/or delivered in connection with this Note and the Loan.

If any sum payable under this Note is not paid on the date on which it is due, Maker shall pay to Payee upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray a portion of the expenses incurred by Payee in handling and processing such delinquent payment and to compensate Payee for the loss of the use of such delinquent payment. If the day when any payment required under this Note is due is not a Business Day (as hereinafter defined), then payment shall be due on the first Business Day thereafter. The term "**Business Day**" shall mean a day other than (i) a Saturday or Sunday, or (ii) any day on which banking and savings and loan institutions in New York are authorized or obligated by law or executive order to be closed.

The whole of the principal sum of this Note, together with all interest accrued and unpaid thereon and all other sums due under the Loan Documents (all such sums hereinafter collectively referred to as the "**Debt**"), or any portion thereof, shall without notice become immediately due and payable at the option of Payee if any payment required in this Note is not paid on the date on which it is due or upon the happening of any other Event of Default (as defined in the Loan Agreement). In the event that it should become necessary to employ counsel to collect or enforce the Debt or to protect or foreclose the security therefor, Maker also shall pay on demand all costs of collection incurred by Payee, including attorneys' fees and costs reasonably incurred for the services of counsel whether or not suit be brought.

Upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay to Lender interest on the entire unpaid principal sum and any other amounts due at the Default Rate (hereinafter defined). Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due). Interest at the Default Rate shall be added to the Debt and shall be secured by the Mortgage. This paragraph however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default. As used herein, (i) the "**Default Rate**" shall mean a rate equal to the lesser of (a) two percent (2%) above the Prime Rate (hereinafter defined), but in no event less than the Servicer Rate (hereinafter defined) or (b) the maximum rate permitted by applicable law;

(ii) **"Prime Rate"** shall mean the rate of interest announced publicly by Citibank, N.A. or its successor, from time to time, as Citibank, N.A.'s or such successor's base rate or, if there is no such base rate, then the rate of interest charged by Citibank, N.A. or such successor to its most creditworthy customers on commercial loans having a 90-day duration; and (iii) **"Servicer Rate"** means a rate per annum equal to the "prime rate", as set forth in the "Money Rates" section of the Wall Street Journal, Eastern Edition, plus one percent (1%).

   This Note may not be prepaid prior to the Maturity Date; provided, however, Maker shall have the right and option to release the Property (as defined in the Mortgage) from the lien of the Mortgage in accordance with the terms and provisions set forth in Sections 2.3 and 2.4 of the Loan Agreement (the **"Defeasance Option"**). Notwithstanding the foregoing sentence, Maker shall have the privilege to prepay the entire principal balance of this Note and any other amounts outstanding on any scheduled payment date during the three (3) months preceding the Maturity Date without payment of any Yield Maintenance Premium (as defined in the Loan Agreement) or any other prepayment consideration. If following the occurrence of any Event of Default, Maker shall tender payment of an amount sufficient to satisfy the Debt at any time prior to a sale of the Property, either through foreclosure or the exercise of the other remedies available to Payee under the Mortgage, such tender by Maker shall be deemed to be voluntary and Maker shall pay, in addition to the Debt, an amount equal to the Yield Maintenance Premium that would be required if a Defeasance (as defined in the Loan Agreement) had occurred in an amount equal to the outstanding principal amount of the Loan to be satisfied; provided, however, if the Release Date (as defined in the Loan Agreement) has not occurred the Yield Maintenance Premium due in connection with such tender shall not be less than one percent (1%) of the outstanding principal amount of the Loan to be satisfied.

   It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Payee to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this paragraph shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Payee's exercise of the option to accelerate the Maturity Date, or if any prepayment or the exercise of any Defeasance Option by Maker results in Maker having paid any interest in excess of that permitted by applicable law, then it is Payee's express intent that all excess amounts theretofore collected by Payee shall be credited on the principal balance of this Note and all other Debt and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Payee for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt

for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Payee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought. Whenever used, the singular number shall include the plural, the plural the singular, and the words "**Payee**" and "**Maker**" shall include their respective successors, assigns, heirs, executors and administrators. If Maker consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

Maker and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration. No release of any security for the Debt or any person liable for payment of the Debt, no extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of the Loan Documents made by agreement between Payee and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Maker, and any other person or party who may become liable under the Loan Documents for the payment of all or any part of the Debt.

Maker (and the undersigned representative of Maker, if any) represents that Maker has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note, the Loan Agreement, the Mortgage and the other Loan Documents and that this Note, the Loan Agreement, the Mortgage and the other Loan Documents constitute valid and binding obligations of Maker.

All notices or other communications required or permitted to be given pursuant hereto shall be given in the manner specified in the Loan Agreement directed to the parties at their respective addresses as provided therein.

**MAKER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MAKER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. PAYEE IS**

**HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MAKER.**

The personal liability of Maker hereunder is limited to the extent set forth in Section 9.4 of the Loan Agreement.

This Note shall be governed by and construed in accordance with the terms and provisions set forth in Section 10.3 of the Loan Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**

Maker has duly executed this Note the day and year first above written.

**MAKER:**

LARRY J. RIETZ MP, L.L.C., a Minnesota limited
  liability company

By: North Division CC, Inc., a Minnesota corporation,
   its Chief Manager


By: _Larry J. Rietz_
 Name: Larry J. Rietz
 Title: President


Pay to the order of _____,
without recourse.


NOMURA ASSET CAPITAL CORPORATION, a
 Delaware corporation


By:_____
 Name:
 Title:

## ALLONGE TO NOTE
## ENDORSEMENT SEPARATE FROM INSTRUMENT

**TITLE OF INSTRUMENT:**　　　　　**Note**

**PAYOR:**　　　　　**Larry J. Reitz MP, L.L.C.**

**PAYEE:**　　　　　**NOMURA ASSET CAPITAL CORPORATION**

**DATE OF NOTE:**　　　　　**February 4, 1998**

**ORIGINAL PRINCIPAL AMOUNT:**　　　　　**$ 4,302,912.00**

This Allonge made this _____ day of _____ ,199_ shall be and remain attached to and constitute and integral part of the above-described Note, as heretofore or hereafter amended, modified or supplemented (the "Note") form and after the date hereof.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Payee hereby agrees as follows:

1.　　The Note shall be deemed to be endorsed by the Payee as follows:　　"Pay to the order of _____ , without recourse".

2.　　This endorsement shall become effective as of the date of this Allonge.

IN WITNESS WHEREOF, the Payee has caused this Allonge to be duly executed as of the _____ , day of_____,_____ .

NOMURA ASSET CAPITAL CORPORATION
a Delaware corporation

By:_____

Name: Lance W. Haberin
Title:　Vice President