**Response of CWCapital Asset Management, LLC to the Liquidating Trust's Twenty-eighth
Omnibus Objection to Landlord Claims**

# Exhibit D

19798

**LARRY J. RIETZ MP, L.L.C.**
(Borrower)

to

**NOMURA ASSET CAPITAL CORPORATION**
(Lender)

**LOAN AGREEMENT**

Dated:  As of February 4, 1998

Property Location:  Circuit City
7701 North Division Street
Spokane, Washington

DOCUMENT PREPARED BY:

Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, New York  10038
Attention:  William P. McInerney, Esq.

# TABLE OF CONTENTS

Page

I.    DEFINITIONS; PRINCIPLES OF CONSTRUCTION ....................................... 1
      Section 1.1      Definitions ....................................................................... 1
      Section 1.2      Principles of Construction ................................................ 9

II.   GENERAL ..................................................................................................... 9
      Section 2.1      The Loan ........................................................................ 9
      Section 2.2      Required Payments ......................................................... 10
      Section 2.3      Prepayment and Defeasance ........................................... 11
      Section 2.4      Release of Property ........................................................ 13
      Section 2.5      Payments and Computations ............................................ 14
      Section 2.6      Cash Management Account ............................................. 14
      Section 2.7      Payments Received in the Cash Management Account ........ 15

III.  CONDITIONS PRECEDENT ........................................................................ 16
      Section 3.1      Conditions Precedent to the Loan ..................................... 16

IV.   REPRESENTATIONS AND WARRANTIES ................................................. 19
      Section 4.1      Borrower Representations ................................................ 19
      Section 4.2      Survival of Representations ............................................. 28

V.    AFFIRMATIVE COVENANTS ..................................................................... 29
      Section 5.1      Borrower Covenants ....................................................... 29

VI.   NEGATIVE COVENANTS ........................................................................... 35
      Section 6.1      Borrower's Negative Covenants ....................................... 35

VII.  CASUALTY; CONDEMNATION; ESCROWS .............................................. 37
      Section 7.1      Insurance ........................................................................ 37
      Section 7.2      Casualty and Application of Proceeds ............................... 39
      Section 7.3      Condemnation ................................................................. 41
      Section 7.4      Impounds ........................................................................ 43

VIII. DEFAULTS ................................................................................................... 44
      Section 8.1      Event of Default ............................................................. 44
      Section 8.2      Remedies ........................................................................ 46
      Section 8.3      Remedies Cumulative ...................................................... 47

IX.   SPECIAL PROVISIONS ............................................................................... 48
      Section 9.1      Securitization ................................................................. 48

|            | Section 9.2  | Securitization Indemnification | 49 |
|            | Section 9.3  | Intentionally Omitted | 52 |
|            | Section 9.4  | Exculpation | 52 |
|            | Section 9.5  | Retention of Servicer | 53 |
| X.         | MISCELLANEOUS | | 54 |
|            | Section 10.1  | Survival | 54 |
|            | Section 10.2  | Lender's Discretion | 54 |
|            | Section 10.3  | Governing Law | 54 |
|            | Section 10.4  | Modification, Waiver in Writing | 55 |
|            | Section 10.5  | Delay Not a Waiver | 56 |
|            | Section 10.6  | Notices | 56 |
|            | Section 10.7  | Trial by Jury | 57 |
|            | Section 10.8  | Headings | 57 |
|            | Section 10.9  | Severability | 58 |
|            | Section 10.10 | Preferences | 58 |
|            | Section 10.11 | Waiver of Notice | 58 |
|            | Section 10.12 | Remedies of Borrower | 58 |
|            | Section 10.13 | Expenses; Indemnity | 58 |
|            | Section 10.14 | Exhibits Incorporated | 60 |
|            | Section 10.15 | Offsets, Counterclaims and Defenses | 60 |
|            | Section 10.16 | No Joint Venture or Partnership | 60 |
|            | Section 10.17 | Publicity | 60 |
|            | Section 10.18 | Waiver of Marshalling of Assets | 60 |
|            | Section 10.19 | Waiver of Counterclaim | 60 |
|            | Section 10.20 | Conflict; Construction of Documents | 60 |
|            | Section 10.21 | Brokers and Financial Advisors | 61 |
|            | Section 10.22 | No Third Party Beneficiaries | 61 |
|            | Section 10.23 | Prior Agreements | 61 |
|            | Section 10.24 | Lender Estoppel | 61 |

# LOAN AGREEMENT

LOAN AGREEMENT dated as of February 4, 1998 between **LARRY J. RIETZ MP, L.L.C.**, a limited liability company duly organized and validly existing under the laws of the State of Minnesota ("Borrower"), and **NOMURA ASSET CAPITAL CORPORATION**, a corporation organized under the laws of the State of Delaware (together with its permitted successors and assigns, "**Lender**").

All capitalized terms used herein shall have the respective meanings set forth in Section 1 hereof.

## WITNESSETH:

WHEREAS, Borrower desires to obtain the Loan from Lender;

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents;

NOW, THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## I.   DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1   Definitions**.   For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

"**ALTA**" shall mean the American Land Title Association, or any successor thereto.

"**Assignment of Leases**" shall mean, with respect to the Property, that certain first priority Assignment of Leases and Rents dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender as security for the Loan, to the extent assignable under law, all of Borrower's interest in and to the Rents and Leases for the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall have the meaning set forth in Section 7.3(b).

"**Borrower**" shall mean Larry J. Rietz MP, L.L.C. together with its permitted successors and assigns.

"**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which national banks in New York are not open for business.

"**Cash Management Account**" shall have the meaning set forth in Section 2.6.

"**Casualty/Condemnation Prepayments**" shall have the meaning set forth in Section 2.3(b).

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall have the meaning set forth in Section 7.3(a).

"**Condemnation Restoration**" shall have the meaning set forth in Section 7.3(d).

"**Control**" (including "Controlled by") shall mean with respect to any Person either (i) ownership, directly or through other entities, of more than 50% of all beneficial equity interest in such Person, and (ii) the power to direct the management, operation and business of such Person.

"**Credit Lease**" shall mean that certain lease, dated February 4, 1998, between Borrower, as landlord, and Credit Tenant, as tenant, together with any extensions, renewals, amendments or modifications thereof.

"**Credit Tenant**" shall mean Circuit City Stores, Inc., a Virginia corporation and its successors or assigns.

"**Current Month**" shall mean, as of the date of determination, the then current calendar month.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, the Note, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan, including the Yield Maintenance Premium and any sums due under the Note, this Agreement, the Mortgage or in any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled principal and interest payments under the Note.

"**Debt Service Coverage Ratio**" shall mean, as of any date, a ratio in which (a) the numerator is the rent payable under the Credit Lease for the month in which such date occurs, and (b) the denominator is the sum of (i) the aggregate amount of principal and interest

actually due and payable on the Note for such month and (ii) any applicable trustee and servicing fees.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) two percent (2%) above the rate of interest announced publicly by Citibank, N.A. or its successor, from time to time, as Citibank, N.A.'s or such successor's base rate or, if there is no such base rate, then the rate of interest charged by Citibank, N.A. or such successor to its most creditworthy customers on commercial loans having a 90-day duration, but in no event less than the Servicer Rate, or (b) the maximum rate permitted by applicable law.

"**Defeasance**" shall have the meaning set forth in Section 2.3(c) hereof.

"**Defeasance Date**" shall have the meaning set forth in Section 2.3(c) hereof.

"**Defeasance Deposit**" shall mean an amount equal to the sum of the remaining principal amount of the Note, the Yield Maintenance Premium, any costs and expenses incurred or to be incurred in the purchase of U.S. Obligations necessary to meet the Scheduled Defeasance Payments and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note, or otherwise required to accomplish the agreements of Sections 2.3 and 2.4 hereof.

"**Environmental Indemnity**" shall mean that certain Environmental and Hazardous Substance Indemnification Agreement executed by Borrower in connection with the Loan for the benefit of Lender.

"**ERISA**" shall have the meaning set forth in Section 4.1(i).

"**Event of Default**" shall have the meaning set forth in Section 8.1(a).

"**Exchange Act**" shall have the meaning set forth in Section 9.2(a).

"**Fiscal Year**" shall mean each twelve month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Improvements**" shall have the meaning set forth in the Mortgage.

"**Including**" shall mean "including, without limitation".

"**Indebtedness**" means, for any Person, without duplication: (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable, if such amounts were advanced under the credit facility, (c) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (d) all indebtedness guaranteed by such Person, directly or indirectly, (e) all obligations under leases that constitute capital leases for which such Person is liable, and (f) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Insolvency Opinion**" shall have the meaning set forth in Section 4.1(dd)(xix).

"**Insurance Premiums**" shall have the meaning set forth in Section 7.1(c) hereof.

"**Insured Casualty**" shall have the meaning specified in Section 7.1(e).

"**Interest Rate**" shall mean a rate of interest equal to 7.64% per annum.

"**Lease**" shall mean any lease, or, to the extent of the interest therein of Borrower, any sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, sub-sublease, or other agreement entered into in connection with such lease, sublease, sub-sublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, and shall include the Credit Lease.

"**Legal Requirements**" shall mean, with respect to the Property, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including any which may (i) require

repairs, modifications or alterations in or to the Property or any part thereof, or (ii) in any way limit the use and enjoyment thereof.

"**Lender**" shall mean Nomura Asset Capital Corporation, together with its successors and assigns.

"**Liabilities**" shall have the meaning set forth in Section 9.2(b).

"**Licenses**" shall have the meaning set forth in Section 4.1(w).

"**Lien**" shall mean, with respect to the Property, any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof or Borrower, or any interest therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Loan**" shall mean the loan made to Borrower by Lender pursuant hereto in the original principal amount of $4,302,912.00 and evidenced by the Note and secured by the Mortgage and the other Loan Documents.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Environmental Indemnity, and all other documents, agreements and instruments evidencing, securing or delivered to Lender in connection with the Loan.

"**Management Agreement**" shall mean, with respect to the Property, a management agreement in form and substance reasonably acceptable to Lender that may be entered into by and between Borrower and a property manager reasonably acceptable to Lender, pursuant to which such manager is to provide management and other services with respect to the Property.

"**Management Fee**" shall mean the fee payable to a property manager pursuant to a Management Agreement.

"**Maturity Date**" shall mean February 11, 2020 or such other date on which the final payment of principal of the Note becomes due and payable as therein provided, whether at the stated maturity date, by declaration of acceleration, or otherwise.

"**Monthly Debt Service Payment Amount**" shall have the meaning set forth in the Note.

"**Mortgage**" shall mean that certain mortgage or deed of trust, as applicable, executed and delivered by Borrower as security for the Loan and encumbering the Property, as

the same may be amended, restated, replaced, supplemented, consolidated or otherwise modified from time to time.

"**NACC**" shall mean Nomura Asset Capital Corporation, a Delaware corporation.

"**Nomura**" shall mean Lender and the affiliates of Nomura Securities International, Inc.

"**Note**" shall mean that certain Note of even date herewith, made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented, consolidated or otherwise modified from time to time.

"**Offering Document**" shall have the meaning set forth in Section 9.2(a).

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by a manager of Borrower.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Payment Date**" shall mean the eleventh (11th) day of each calendar month or, if in any month the eleventh (11th) day is not a Business Day, then the Payment Date for such month shall be the first Business Day thereafter.

"**Permitted Encumbrances**" shall mean, with respect to the Property, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy relating to the Property or any part thereof, (c) Liens, if any, for Taxes or Other Charges not yet payable or delinquent, and (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion.

"**Permitted Indebtedness**" shall mean the Debt.

"**Person**" shall mean any individual, corporation, partnership, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Policies**" shall have the meaning specified in Section 7.1(c).

"**Pooling and Servicing Agreement**" shall mean the servicing agreement entered into with the Servicer in connection with any Securitization of the Loan.

"**Premises**" shall have the meaning set forth in the first "Whereas Clause" of the Mortgage encumbering the Property.

"**Property**" shall mean that certain parcel of real property and improvements thereon owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and improvements, as more particularly described in the Granting Clauses of the Mortgage and referred to therein as the "Property" or the "Mortgaged Property", as the case may be, and commonly known as 7701 North Division Street, Spokane, Washington.

"**Qualified Survey**" shall mean a current title survey, certified to the title company and Lender and their successors and assigns, that (A) is in form and content satisfactory to Lender, (B) is prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the 1992 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys, (C) meets the classification of an "Urban Survey" and includes the following additional items from the list of "Optional Survey Responsibilities and Specifications" (Table A): 2, 3, 4, 6, 8, 9, 10, 11 and 13, (D) reflects the same legal description contained in the Title Insurance Policy relating to the Property, (E) includes, among other things, a metes and bounds description of the real property comprising part of the Property reasonably satisfactory to Lender and (F) contains a certification in form and substance acceptable to Lender.

"**Qualified Title Insurance Policy**" shall mean a Title Insurance Policy issued by Chicago Title Insurance Company or another title company acceptable to Lender, which Title Insurance Policy shall (A) provide coverage in amounts satisfactory to Lender, (B) insure Lender that the Mortgage creates a valid first lien on the Property encumbered thereby, free and clear of all exceptions from coverage other than Permitted Encumbrances, (C) contain such endorsements and affirmative coverages as Lender may reasonably request, (D) name Lender as the insured and (E) be assignable.

"**Rating Agency**" shall mean each of Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc., Moody's Investors Service, Inc., Duff & Phelps Credit Rating Co. and Fitch Investors Service, Inc. or any other nationally-recognized statistical rating agency which has been approved by Lender.

"**Registration Statement**" shall have the meaning set forth in Section 9.2(b).

"**Release Date**" shall mean the earlier of (i) the date that is two (2) years from the "startup day" within the meaning of Section 860G(a)(9) of the Code of the REMIC Trust and (ii) four (4) years after the Closing Date.

"**REMIC**" shall mean a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

"**REMIC Trust**" shall mean a REMIC which holds the Note.

"**Rents**" shall mean, with respect to the Property, all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property, including all amounts payable under the Credit Lease, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property and proceeds, if any, from business interruption or other loss of income insurance, to the extent Borrower receives or is entitled to receive the same.

"**Required Records**" shall have the meaning set forth in Section 5.1(l)(iv) hereof.

"**Restoration**" shall have the meaning set forth in Section 7.2(b).

"**Scheduled Defeasance Payments**" shall have the meaning set forth in Section 2.3(d).

"**Securities**" shall have the meaning set forth in Section 9.1.

"**Securities Act**" shall have the meaning set forth in Section 9.2(a).

"**Securitization**" shall have the meaning set forth in Section 9.1.

"**Securitization Information**" shall have the meaning set forth in Section 9.1.

"**Security Agreement**" shall have the meaning set forth in Section 2.3(c)(i)(F).

"**Servicer**" shall mean the entity appointed by Lender to service the Loan or its successor in interest, or if any successor servicer is appointed pursuant to the Pooling and Servicing Agreement, such successor servicer.

"**Servicer Rate**" shall mean a rate per annum equal to the prime rate, as set forth in the "Money Rates" section of The Wall Street Journal, Eastern Edition, plus one percent (1%).

"**State**" shall mean the state or commonwealth in which the Property is located.

"**Successor Borrower**" shall have the meaning set forth in Section 2.3(e).

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof.

"**Term**" shall mean the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

"**Title Insurance Policy**" shall mean, with respect to the Property, the ALTA mortgagee title insurance policy in the form acceptable to Lender issued with respect to the Property and insuring the lien of the Mortgage encumbering the Property.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State.

"**Underwriter Group**" shall have the meaning set forth in Section 9.2(b).

"**U.S. Obligation**" shall mean direct non-callable obligations of the United States of America.

"**Yield Maintenance Premium**" shall mean the amount (if any) which, when added to the remaining principal amount of the Note would be sufficient to purchase U.S. Obligations providing the required Scheduled Defeasance Payments.

Section 1.2   **Principles of Construction**.  All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP, as modified herein.

## II.   GENERAL

Section 2.1   **The Loan**.

(a)      **Commitment**.  Subject to and upon the terms and conditions set forth herein, including the conditions precedent set forth in Section 3.1, Lender hereby agrees to make the Loan to Borrower on the Closing Date, in the aggregate original principal amount set forth in the Note and which Loan shall mature on the Maturity Date.  Borrower hereby agrees

to accept the Loan on the Closing Date, subject to and upon the terms and conditions set forth herein.

(b)    **Disbursement to Borrower**.    Borrower may request and receive only one borrowing hereunder in respect of the Loan.    Borrower shall receive the Loan upon the Closing Date, subject to the direction given by Borrower as to the application of Loan proceeds for the uses set forth in Section 2.1(d).    Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

(c)    **The Note**.    The Loan shall be evidenced by the Note, in the aggregate original principal amount of the Loan.    The Note shall bear interest as provided therein.    The Note shall be subject to repayment as provided in Section 2.3, shall be entitled to the benefits of this Agreement and shall be secured by the Mortgage and the other Loan Documents.

(d)    **Use of Proceeds of Loan**.    Borrower shall use the proceeds of the Loan to (i) acquire the Property, and (ii) pay costs and expenses incurred in connection with the closing of the Loan, including legal fees, as approved by Lender.

### Section 2.2  Required Payments.

(a)    **Interest and Principal**.    The Loan shall be paid in accordance with the terms and provisions of the Note.

(b)    **Maturity**.    On the Maturity Date, Borrower shall pay to Lender all outstanding principal, accrued and unpaid interest, default interest, late charges and any and all other amounts due under the Loan Documents.

(c)    **Default Rate**.    Upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay to Lender interest on the entire unpaid principal sum and any other amounts due at the Default Rate.    Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due).    Interest at the Default Rate shall be added to the Debt and shall be secured by the Mortgage.    This section, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

(d)    **Late Payment Charge**.    If any principal, interest or any other sums due under the Loan Documents is not paid by Borrower on the date it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.    Any such amount shall be secured by the Mortgage and the other Loan Documents.

### Section 2.3  **Prepayment and Defeasance**.

(a)     **Prepayment**.    Borrower shall repay any outstanding principal indebtedness of the Loan in full on the Maturity Date of the Loan, together with interest thereon to (but excluding) the date of repayment.  Other than as set forth in Sections 2.3(b) and 2.3(c) below and in the Note, Borrower shall have no right to prepay all or any portion of Loan.

(b)     **Mandatory Prepayments**.    The Loan is subject to mandatory prepayment, without premium or penalty except as may be provided in Sections 7.2 and 7.3, in certain instances of Insured Casualty or Condemnation (each a "**Casualty/Condemnation Prepayment**"), in the manner and to the extent set forth in Sections 7.2 and 7.3 hereof.  Each Casualty/Condemnation Prepayment shall be made on a Payment Date and include all accrued and unpaid interest on the amount prepaid up to but not including such Payment Date or, if not paid on a Payment Date, include interest that would have accrued on the amount prepaid to but not including the next Payment Date.

(c)     **Voluntary Defeasance of the Note**.

(i)     Subject to the terms and conditions set forth in this Section 2.3(c), Borrower may defease all of the Loan evidenced by the Note (hereinafter, a "**Defeasance**"); provided that no such Defeasance may occur prior to the Release Date.  Each Defeasance shall be subject, in each case, to the satisfaction of the following conditions precedent:

(A)     Borrower shall provide not less than thirty (30) days prior written notice to Lender specifying a Payment Date (the "**Defeasance Date**") on which the Defeasance is to occur.

(B)     Borrower shall pay to Lender all accrued and unpaid interest on the principal balance of the Note to but not including the Defeasance Date.  If for any reason the Defeasance Date is not a Payment Date, Borrower shall also pay interest that would have accrued on the Note to but not including the next Payment Date.

(C)     Borrower shall pay to Lender all other sums, not including scheduled interest or principal payments, then due under the Note, this Agreement, the Mortgage and the other Loan Documents.

(D)     No Event of Default shall exist.

(E)     Borrower shall pay to Lender the required Defeasance Deposit for the Defeasance.

(F)    Borrower shall execute and deliver a security agreement, in form and substance reasonably satisfactory to Lender, creating a first priority lien on the Defeasance Deposit and the U.S. Obligations purchased with the Defeasance Deposit in accordance with this provision of this Section 2.3(c) (the "**Security Agreement**").

(G)    Borrower shall deliver an opinion of counsel for Borrower in form reasonably satisfactory to Lender stating, among other things, that Borrower has legally and validly transferred and assigned the U.S. Obligations and all obligations, rights and duties under and to the Note to the Successor Borrower, that Lender has a perfected first priority security interest subject to customary limitations in the Defeasance Deposit and the U.S. Obligations delivered by Borrower, and, if applicable, that any REMIC Trust formed pursuant to a Securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such Defeasance;

(H)    Borrower shall deliver evidence in writing from the applicable Rating Agencies to the effect that such release will not result in a downgrading, withdrawal or qualification of the respective ratings in effect immediately prior to such Defeasance for the Securities issued in connection with the Securitization which are then outstanding. If required by the applicable Rating Agencies, the Borrower shall also deliver or cause to be delivered a non-consolidation opinion with respect to the Successor Borrower in form and substance satisfactory to Lender and the applicable Rating Agencies;

(I)    Borrower shall deliver an Officer's Certificate certifying that the requirements set forth in this Section 2.3(c)(i) have been satisfied.

(J)    A certificate of a "big six" or other nationally recognized public accounting firm, acceptable to Lender certifying that the U.S. Obligations purchased with the Defeasance Deposit generate monthly amounts equal to or greater than the required Scheduled Defeasance Payments;

(K)    Borrower shall deliver such other certificates, documents or instruments as Lender may reasonably request.

(L)    Borrower shall pay all reasonable costs and expenses of Lender incurred in the Defeasance, including any costs and expenses

associated with a release of Lien as provided in Section 2.4 hereof and reasonable attorney's fees and expenses.

(d)    In connection with each Defeasance of the Note, Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations which provide payments on or prior to, but as close as possible to, all successive Payment Dates after the Defeasance Date and in amounts equal to the scheduled payments due on such dates under the Note (the "**Scheduled Defeasance Payments**"). Borrower, pursuant to the Security Agreement or other appropriate document, shall irrevocably authorize and direct that the payments received from the U.S. Obligations may be made directly to Lender and applied to satisfy the obligations of Borrower under the Note. Any portion of the Defeasance Deposit in excess of the amount necessary to purchase the U.S. Obligations required by a Defeasance and satisfy Borrower's obligations under Sections 2.3 or 2.4 shall be remitted to Borrower. Any amounts received in respect of the U.S. Obligations in excess of the amounts necessary to make monthly payments pursuant to Section 2.2 shall be retained by Lender until payment in full of the Loan, at which time any such amounts shall be paid to Borrower.

(e)    Borrower may, or if requested by Lender shall, in connection with any Defeasance under this Section 2.3 establish or designate a successor entity (the "**Successor Borrower**") which shall be a single purpose bankruptcy remote entity approved by Lender, and Borrower shall transfer and assign all obligations, rights and duties under and to the Note, together with the pledged U.S. Obligations, to such Successor Borrower. The obligation of NACC to establish or designate a Successor Borrower shall be retained by NACC notwithstanding the sale or transfer of this Agreement unless such obligation is specifically assumed by the transferee. Such Successor Borrower shall assume the obligations under the Note, and the Security Agreement and Borrower shall be relieved of its obligations thereunder. Borrower shall pay $1,000 to any such Successor Borrower as consideration for assuming the obligations under the Note and the Security Agreement. Notwithstanding anything in this Agreement to the contrary, no other assumption fee shall be payable upon a transfer of the Note pursuant to a Defeasance, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses, incurred in connection therewith.

**Section 2.4    Release of Property**. (a) Except as set forth in this Section 2.4, no repayment, prepayment or defeasance of all or any portion of the Note shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Mortgage on the Property.

(b)    If Borrower has elected to defease the Note in its entirety, and the requirements of Section 2.3 have been satisfied, the Property shall be released from the Lien of the Mortgage and the U.S. Obligations, pledged pursuant to the Security Agreement, shall be the sole source of collateral securing the Note.

(c)    In connection with the release of the Lien, Borrower shall submit to Lender, not less than thirty (30) days prior to the Defeasance Date, a release of Lien (and related Loan Documents) for the Property (for execution by Lender) in a form appropriate in the State satisfactory to Lender in its reasonable discretion and all other documentation Lender reasonably requires to be delivered by Borrower in connection with such release, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements, and (ii) will effect such release in accordance with the terms of this Agreement.

(d)    Lender shall, upon the written request and at the expense of Borrower, upon payment in full of all principal and interest on the Loan and all other amounts due and payable under the Loan Documents in accordance with the terms thereof, release the Lien of the Mortgage if not theretofore released, terminate any financing statements filed in connection with the Mortgage and cancel the Note.

## Section 2.5  Payments and Computations.

(a)    **Making of Payments**.  Each payment by Borrower hereunder or under the Note shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 3:00 p.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any payment hereunder or under the Note shall be stated to be due on a day which is not a Business Day, such payment shall be made on the first Business Day thereafter.

(b)    **Computations**.  Interest payable hereunder or under the Note by Borrower shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

Section 2.6  **Cash Management Account**.  (a)  Borrower hereby authorizes and directs the Credit Tenant under the Credit Lease and any other tenants under Leases and all lease guarantors to pay over to Lender or such other party as Lender directs all Rents and all sums due Borrower under the Credit Lease and any other Lease to be deposited in an account designated and controlled by Lender (the "**Cash Management Account**").  Borrower agrees to cause Credit Tenant under the Credit Lease, and any other tenant under Lease, to make such payments directly to Lender as required hereunder in lieu of making such payments to Borrower.  Borrower hereby designates Lender to receive duplicate original copies of all notices, undertakings, demands, statements, offers, documents and other instruments and communications which Credit Tenant or any other tenant is or may be required or permitted to give, make, deliver to or serve upon Borrower under the Credit Lease or any other Lease.  Borrower hereby directs Credit Tenant or any other tenant to deliver to Lender at its address set forth below or at such other address as Lender shall designate, duplicate original copies of all such notices, undertakings, demands, statements, documents and other communications and no delivery thereof by Credit Tenant or any other tenant shall be of any force or effect unless made to Lender and Borrower.  Amounts deposited into the Cash Management Account in

accordance herewith shall be disbursed in accordance with this Section. Upon the occurrence of an Event of Default, Lender may apply any sums then held in the Cash Management Account to the payment of the Debt in any order in its sole discretion. Until expended or applied, amounts held in the Cash Management Account shall constitute additional security for the Debt. Borrower shall cause Credit Tenant not to seek to recover from Lender for any reason whatsoever any moneys paid to Lender by virtue of this Agreement and the Assignment of Rents and Leases.

(b)    All sums payable to Lender pursuant to this Section shall be paid to Lender in immediately available funds on the due date thereof by wire transfer to Mellon Bank Pittsburgh, ABA #043000261, Credit: Nomura Asset Capital Corp. (P&I Remittances), Credit Account #091-0944, Ref.: Larry J. Rietz MP, L.L.C./Circuit City Stores, Inc., Spokane, Washington, or at such other address and/or account as shall be designated by Lender by written notice to Credit Tenant. Borrower agrees that no payment made by Credit Tenant shall be effective to discharge the obligations of Credit Tenant under the Credit Lease or any other Lease, as applicable, to make such payments or be of any other force or effect unless paid to Lender. Borrower shall, simultaneously with receipt or delivery thereof, deliver to Lender duplicate original copies of all notices, undertakings, demands, statements, offers, documents and other instruments or communications which are given, made, served or delivered pursuant to the Credit Lease or which it receives from the Credit Tenant under the Credit Lease.

(c)    Provided no Event of Default shall have occurred and be continuing, on the each Payment Date all funds on deposit in the Cash Management Account shall be applied by Lender to the payment of the following items in the order indicated:

(i)    First, if applicable, payments to the Tax and Insurance Escrow Fund in accordance with the terms and conditions of Section 7.4 hereof;

(ii)    Second, payment of the Monthly Debt Service Payment Amount applied first to the payment of interest with the remainder applied to the reduction of the outstanding principal balance of the Note;

(iii)    Third, if applicable, payment to the Lender of any other amounts then due and payable under the Loan Documents; and

(iv)    Lastly, payment of any excess amounts to Borrower.

(d)    The insufficiency of funds on deposit in the Cash Management Account shall not absolve Borrower of the obligation to make any payments, as and when due pursuant to this Agreement, the Note and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

**Section 2.7    Payments Received in the Cash Management Account.** Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents, and provided no Event of Default has occurred and is continuing, Borrower's

obligations, with respect to the monthly payment of principal and interest and, if applicable, amounts due for the Tax and Insurance Escrow Fund, and any other payment reserves established pursuant to this Agreement or any other Loan Document shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account established pursuant to Section 2.6 to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

## III.    CONDITIONS PRECEDENT

Section 3.1  **Conditions Precedent to the Loan**.  The obligation of Lender to make the Loan hereunder is subject to the fulfillment by Borrower or waiver by Lender of the following conditions precedent no later than the Closing Date:

(a)    *Representation and Warranties: Compliance with Conditions*.    The representations and warranties of Borrower contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and no Default or Event of Default shall have occurred and be continuing; and Borrower shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

(b)    *Loan Agreement and Note*.    Lender shall have received a copy of this Agreement and the Note, in each case, duly executed and delivered on behalf of Borrower.

(c)    *Delivery of Loan Documents: Title Insurance: Reports: Leases*.

(i)    *Mortgage, Assignments of Agreements*.    Lender shall have received from Borrower fully executed and acknowledged counterparts of the Mortgage, the Assignment of Leases and evidence that counterparts of the Mortgage and the Assignment of Leases have been delivered to the title company for recording, in the reasonable judgment of Lender, so as to effectively create upon such recording valid and enforceable Liens upon the Property, of the requisite priority, in favor of Lender (or such other trustee as may be required or desired under local law), subject only to the Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents.  Lender shall have also received from Borrower fully executed counterparts of the Environmental Indemnity.

(ii)    *Title Insurance*.    Lender shall have received a Qualified Title Insurance Policy for the Property and evidence that the premium in respect of such Title Insurance Policy has been paid.

(iii)    *Survey*.  Lender shall have received a Qualified Survey for the Property.

(iv)    *Insurance*.    Lender shall have received valid certificates of insurance for the policies of insurance required hereunder, satisfactory to Lender in its reasonable discretion or, if Credit Tenant is self-insuring in accordance with the provisions of the Credit Lease, a certificate of Credit Tenant stating that Credit Tenant has elected to so self-insure, together with evidence of Credit Tenant's net worth.

(v)    *Environmental Reports*.    Lender shall have received an environmental report and a reliance letter in form and substance reasonably satisfactory to Lender with respect to the Property.

(vi)    *Zoning; Compliance with Laws*.  With respect to the Property, Lender shall have received certificates of occupancy and reasonable evidence of compliance with applicable laws, including zoning laws.  Such evidence with respect to zoning shall include (i) letters or other evidence with respect to the Property from the appropriate municipal authorities (or other Persons) concerning applicable zoning and building laws, (ii) an ALTA 3.1 zoning endorsement to the Title Insurance Policy, or (iii) a zoning opinion letter, in substance reasonably satisfactory to Lender.

(vii)   *Encumbrances*.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected Lien as of the Closing Date with respect to the Mortgage on the Property, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Lender shall have received satisfactory evidence thereof.

(d)    *Related Documents*.    Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall have been duly authorized, executed and delivered by all parties thereto and Lender shall have received and approved certified copies thereof.

(e)    *Delivery of Organizational Documents*.  On or before the Closing Date, Borrower shall deliver or cause to be delivered to Lender copies certified by Borrower of all organizational documentation related to Borrower and/or its formation, structure, existence, good standing and/or qualification to do business, as Lender may request in its reasonable discretion, including such good standing certificates, qualifications to do business in the

appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender.

(f)　　*Opinions of Counsel*.　Lender shall have received (i) opinions of Borrower's counsel and/or local counsel (A) with respect to non- consolidation issues, and (B) with respect to the due execution, authority, enforceability of the Loan Documents and such other matters as Lender may require, and (ii) opinions of Credit Tenant's counsel with respect to the due execution of and authority of Credit Tenant to enter into the Credit Lease and (iii) opinions of local counsel with respect to the enforceability of the Credit Lease, all such opinions in form, scope and substance satisfactory to Lender and Lender's counsel in their reasonable discretion.

(g)　　*Completion of Proceedings*.　All trust and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Lender, and Lender shall have received all such counterpart originals or certified copies of such documents as Lender may reasonably request.

(h)　　*Credit Lease*.　Borrower shall have provided Lender with an executed copy of the Credit Lease certified as true and correct by Borrower, which shall be a fully bondable lease in accordance with Lender's requirements, together with (i) all financial information for Credit Tenant as is requested by any Rating Agency in order to establish the credit strength of Credit Tenant, (ii) an estoppel certificate in form and substance reasonably acceptable to Lender from Credit Tenant, and (iii) a subordination, non-disturbance and attornment agreement in form reasonably satisfactory to Lender from Credit Tenant.

(i)　　*Debt Service Coverage Ratio*.　The Debt Service Coverage Ratio shall be at least 1.0 to 1.

(j)　　*Loan to Value Ratio; Appraisals*.　Lender shall have received an appraisal for the Property reasonably satisfactory to Lender indicating that the original principal balance of the Loan is not more than one hundred percent (100%) of the fair market value of the Property as of the date hereof.

(k)　　*Contracts and Permits*.　Borrower shall have provided Lender with copies of all material contracts and permits affecting the Property either in its possession or to which it is a party.

(l)　　*Utilities; Separate Tax Lot*.　Borrower shall have provided to Lender evidence reasonably satisfactory to Lender that all utility services required for the Property are available and that the Property is a separate and independent tax lot.

(m)　　*Basic Carrying Costs*.　Borrower shall have paid or caused to be paid all Taxes and Insurance Premiums relating to the Property which are in arrears.

(n) *Transaction Costs*. Borrower shall have paid or reimbursed Lender for all title insurance premiums and recording and filing fees incurred in connection with the origination of the Loan.

(o) *Material Adverse Change*. There shall have been no material adverse change in the financial condition or business condition of Borrower, the Credit Tenant or the Property since the date of the most recent financial statements delivered to Lender. The income and expenses of the Property, the occupancy Leases thereof, the Credit Lease and all other features of the transaction shall be as represented to Lender without material adverse change. Borrower shall not be the subject of any bankruptcy, reorganization, or insolvency proceeding.

(p) *Physical Conditions Reports*. Lender shall have received Physical Conditions Reports with respect to the Property, which reports shall be reasonably satisfactory in form and substance to Lender.

(q) *Further Documents*. Lender or its counsel shall have received such other approvals, opinions, documents and information as Lender or its counsel may have reasonably requested.

## IV.   REPRESENTATIONS AND WARRANTIES

**Section 4.1 Borrower Representations**. Borrower represents and warrants as of the date hereof and as of the Closing Date that:

(a) *Organization*. Borrower has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged. Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations. Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is as described in Section 4.1(dd)(i).

(b) *Proceedings*. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and such other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(c) *No Conflicts*. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a

breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement or other agreement or instrument to which Borrower is a party or by which Borrower's property or assets is subject, nor, to Borrower's knowledge, will such action result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over Borrower or any of its properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such regulatory authority or other governmental agency or body required for the execution, delivery and performance by any Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

(d)    _Litigation_.  There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency pending against Borrower or the Property with respect to which Borrower has received service or, to Borrower's knowledge, which are otherwise now pending or threatened against or affecting Borrower or the Property, which actions, suits or proceedings, if determined against Borrower or the Property, might materially adversely affect the condition (financial or otherwise) or business of Borrower or the condition or ownership of the Property.

(e)    _Agreements_.  Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

(f)    _Title_.  Borrower has good and indefeasible title in fee to the real property comprising part of the Property, and good title to the balance of the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents.  The Mortgage intended to encumber the Property, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will, to Borrower's knowledge, create (i) a valid and perfected priority lien on the Property prior to all liens other than the Permitted Encumbrances and the Liens created by the Loan Documents and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created or permitted by the Loan Documents.  To Borrower's knowledge after independent inquiry, the Permitted Encumbrances do not materially adversely affect the value or current use of the Property, or Borrower's ability to repay the Loan.  To Borrower's knowledge, there are no claims for

payment for work, labor or materials affecting the Property which are or may become a lien prior to, or of equal priority with, the Liens created by the Loan Documents.

(g)    *No Bankruptcy Filing*.  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of its assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against it.

(h)    *Full and Accurate Disclosure*.  No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no material fact presently known to Borrower which has not been disclosed to Lender which materially and adversely affects, nor as far as Borrower can reasonably foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower.

(i)    *ERISA*.  (i)  As of the date hereof and throughout the term of the Loan, (A) Borrower is not and will not be an "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA, and (B) the assets of Borrower do not and will not constitute "plan assets" of one or more such plans for purposes of Title I of ERISA; and (ii) As of the date hereof and throughout the term of the Loan (A) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA and (B) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of and fiduciary obligations with respect to governmental plans.

(j)    *Compliance*.  Borrower and, to Borrower's knowledge after independent inquiry, the Property and the use thereof comply in all material respects with all applicable Legal Requirements, including building and zoning ordinances and codes.  To Borrower's knowledge after independent inquiry, Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower.  There has not been committed by Borrower or, to Borrower's knowledge, any other person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, knowingly permit or knowingly suffer to exist any act or omission affording such right of forfeiture.

(k)    *Contracts*.  Borrower is not a party to any contracts (except the Leases) affecting the Property which are not terminable on one month's notice or less without cause and without penalty or premium.  To Borrower's knowledge, all contracts affecting the

Property to which Borrower is a party have been entered into at arms-length and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

(l)   *Financial Information*.   All financial data, if any, that have been delivered to Lender in respect of the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the periods covered, except as disclosed therein.   Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long- term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof, except as referred to or reflected in said financial statements.   Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or, to Borrower's knowledge, Credit Tenant, from that set forth in said financial statements.

(m)   *Condemnation*.   To Borrower's knowledge after independent inquiry, no Condemnation or other proceeding has been commenced or, to Borrower's knowledge, is contemplated with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

(n)   *Federal Reserve Regulations*.   No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

(o)   *Utilities and Public Access*.   To Borrower's knowledge following independent inquiry, (i) the Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the Property for its respective intended uses, (ii) all public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right-of-way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property (except where appropriate easements over such other property exist) and (iii) all roads necessary for the use of the Property for their current respective purposes have been completed and dedicated to public use and accepted by all Governmental Authorities.

(p)   *Not a Foreign Person*.   Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

(q)   *Separate Lots*.   To Borrower's knowledge following independent inquiry, the Property is comprised of one (1) or more parcels which constitutes one or more

separate tax lots, and does not constitute a portion of any other tax lot not a part of the Property.

(r)     *Assessments*.   To Borrower's knowledge following independent inquiry, there are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor are there any contemplated improvements to the Property that may result in such special or other assessments.

(s)     *Enforceability*.   The Loan Documents are not subject to any right of rescission, set- off, counterclaim or defense by Borrower, including the defense of usury, nor would the exercise of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable although the exercise of certain rights of Lender may render certain other rights unavailable (but will not substantially interfere with the realization of the principal benefits and/or security provided thereby), and Borrower has not asserted any right of rescission, set- off, counterclaim or defense with respect thereto.

(t)     *No Prior Assignment*.   There are no prior assignments of the Credit Lease or any portion of the Rents due and payable or to become due and payable thereunder which are presently outstanding.

(u)     *Insurance*.   Borrower has obtained or caused Credit Tenant to obtain and has delivered to Lender insurance certificates reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.

(v)     *Use of Property*.   The Property is used exclusively as a Circuit City electronics retail store and for other appurtenant and related uses.

(w)     *Certificate of Occupancy; Licenses*.   To Borrower's knowledge after independent inquiry, all certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the **"Licenses"**), have been obtained and are in full force and effect.  In accordance with the terms of the Credit Lease, Borrower shall keep and maintain, and exercise all rights and remedies available to it under the Credit Lease (short of terminating the same) to cause Credit Tenant to keep and maintain, all licenses necessary for the operation of the Property.   To Borrower's knowledge after independent inquiry, the use being made of the Property is in conformity with the certificate of occupancy issued for the Property.

(x)     *Flood Zone*.   To Borrower's knowledge after independent inquiry, (i) none of the Improvements on the Property are located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, or (ii) if any portion of a Property is located in such an area and flood insurance is available, a flood insurance policy meeting the current guidelines of the Federal Insurance Administration is in effect.

(y)     *Physical Condition*.   To Borrower's knowledge after independent inquiry, the Property, including all buildings, improvements, parking facilities, sidewalks,

storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components, are in good condition, order and repair in all material respects; and there exist no structural or other material defects or damages in the Property, whether latent or otherwise. Neither Borrower nor, to Borrower's knowledge, Credit Tenant, has received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

(z)     *Appraised Value*. To Borrower's knowledge, after having reviewed the survey delivered in connection with the origination of the Loan (and except as may be disclosed on such survey), (i) all of the improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, (ii) no improvements on adjoining properties encroach upon the Property, and (iii) no easements or other encumbrances upon the Property encroach upon any of the improvements so as to affect the value or marketability of the Property, except those which are insured against by title insurance.

(aa)    *Leases*. The only Lease affecting the Property is the Credit Lease, and (i) the Credit Lease is in full force and effect and the term thereof expires on February 29, 2020; (ii) the Credit Tenant has accepted possession of and is in occupancy of the premises demised under the Credit Lease, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Credit Lease have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under the Credit Lease is $33,806.66 per month and there is no claim or basis for a claim by Credit Tenant for an adjustment to the rent; (v) Credit Tenant has not made any claim against the landlord under the Credit Lease which remains outstanding and there are no defaults on the part of the landlord under such Lease and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such default; (vi) there is no present material default by Credit Tenant under the Credit Lease; and (vii) Borrower does not hold any security deposits under the Credit Lease. Except to the extent, if any, expressly provided in Paragraph 12 of the Credit Lease, the Credit Lease does not contain any option to purchase or right of first refusal to purchase the Property or any part thereof. The Credit Lease has not been assigned or pledged except to Lender, and no other person whatsoever has any interest therein except Credit Tenant.

(bb)    *Survey*. To Borrower's knowledge, the survey for the Property delivered to Lender in connection with this Agreement does not fail to reflect any material matter affecting the Property or the title thereto.

(cc)    *Filing and Recording Taxes*. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the

Property to Borrower have been paid. All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including the Mortgage, have been paid.

        (dd)   *Single-Purpose*.   Borrower represents, warrants and covenants as follows:

        (i)   The purpose for which the Borrower is organized shall be limited solely to (A) owning, holding, selling, leasing, transferring, exchanging, operating and managing the Property, (B) entering into the Loan with the Lender, (C) refinancing the Property in connection with a permitted repayment of the Loan and (D) transacting any and all lawful business for which a Borrower may be organized under its constitutive law that is incident, necessary and appropriate to accomplish the foregoing.

        (ii)   Borrower does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for and used or to be used in connection with the ownership or operation of the Property.

        (iii)   Borrower will not engage in any business other than the business for which it is organized under clause (i) above.

        (iv)   Borrower will not enter into any contract or agreement with any Affiliate of the Borrower, any owner of the Borrower, any guarantor or any Affiliate of any owner or guarantor, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arms-length basis with third parties not affiliated with the Borrower.

        (v)   Borrower has not incurred and will not incur any Indebtedness other than (i) the Loan, (ii) trade and operational debt incurred in the ordinary course of business with trade creditors and in amounts as are normal and reasonable under the circumstances, provided such debt is not evidenced by a note and is paid when due, and (iii) Indebtedness incurred in the financing of equipment and other personal property used on the Property. No Indebtedness other than the Loan may be secured (subordinate or pari passu) by the Property.

        (vi)   Borrower has not made and will not make any loans or advances to any entity or person (including any Affiliate or any guarantor or any Affiliate of any guarantor), shall not buy or hold evidence of indebtedness issued by any other person or entity (other than cash and investment-grade securities) and shall not acquire obligations or securities of its Affiliates or owners, including partners, members, beneficiaries or shareholders, as appropriate.

(vii)    Borrower is and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(viii)    Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not, nor will Borrower permit any Affiliate of Borrower or any guarantor to amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of Borrower or any SPC Party without the prior written consent of Lender.

(ix)    Borrower will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any other person or entity.  Borrower's assets will not be listed as assets on the financial statement of any other entity.  Borrower, if required by law to file a separate tax return, will file its own tax returns and will not file a consolidated federal income tax return with any other corporation.  Borrower shall maintain its books, records, resolutions and agreements as official records.

(x)    Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of Borrower or any Affiliate of any guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or part of the other and shall maintain and utilize separate stationery, invoices and checks.

(xi)    Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(xii)    Neither Borrower nor any Affiliate will seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, or the sale of material assets of the Borrower.

(xiii)    Borrower will not commingle the funds and other assets of Borrower with those of any Affiliate or any guarantor, or any Affiliate of any guarantor, or any other person, and will not participate in any cash management system with any such party.

(xiv)    Borrower will not commingle its assets with those of any other person or entity and will hold all of its assets in its own name;

(xv)    Borrower will not guarantee or become obligated for the debts of any other entity or person and does not and will not hold itself out as being responsible for the debts or obligations of any other person.

(xvi)    If Borrower is a limited partnership or a limited liability company, each general partner or managing member (each, an "**SPC Party**") shall be a corporation whose sole asset is its interest in Borrower and each such SPC Party will at all times comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in this Section 4.1(dd) as if such representation, warranty or covenant was made directly by such SPC Party.

(xvii)   Borrower shall at all times cause there to be at least one duly appointed member of the board of directors (an "**Independent Director**") of each SPC Party in Borrower reasonably satisfactory to Lender who is not at the time of initial appointment and has not been at any time during the preceding five (5) years:   (a) a stockholder, director, officer, employee, partner, attorney or counsel of the corporation, the Borrower or any Affiliate of either of them; (b) a customer, supplier or other person who derives more than 10% of its purchases or revenues from its activities with the corporation, the Borrower or any Affiliate of either of them; (c) a person or other entity controlling or under common control with any such stockholder, partner, customer, supplier or other person; or (d) a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other person.  (As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise).  If Borrower is a trust, there shall at all times be one independent trustee reasonably satisfactory to Lender who at all times meets the criteria for an Independent Director.

(xviii)  Borrower shall not cause or permit the board of directors of each SPC Party in Borrower to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock, requires the vote of any SPC Party in Borrower unless at the time of such action there shall be at least one member who is an Independent Director.  If Borrower is a trust, Borrower shall not cause or permit the Borrower to take any action which under the terms of the trust agreement requires the vote of the independent trustee unless at the time of such action there shall be at least one independent trustee who meets the criteria for an Independent Director.

(xix)    Borrower shall conduct its business so that the assumptions made with respect to Borrower in that certain opinion letter dated February 4, 1998 (the "**Insolvency Opinion**") delivered by Hiersche, Martens, Hayward, Drakeley & Urbach, P.C. in connection with the Loan shall be true and correct in all respects.

(xx)    Borrower shall allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate.

(xxi)   The stationery, invoices, and checks utilized by Borrower or utilized to collect its funds or pay its expenses shall bear its own name and shall not bear the name of any other entity unless such entity is clearly designated as being Borrower's agent.

(xxii)  Borrower shall not pledge its assets for the benefit of any other person or entity, other than with respect to the Loan.

(xxiii)  Borrower shall not identify itself as a division of any other person or entity.

(xxiv)  Borrower shall pay the salaries of its own employees from its own funds.

(xxvi)  Borrower shall maintain a sufficient number of employees in light of its contemplated business operations.

(ee)  *Investment Company Act*.  Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(ff)  *Fraudulent Transfer*.  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  To Borrower's knowledge after independent inquiry, giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets equals or exceeds and will, immediately following the execution and delivery of the Loan Documents, equal or exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities.  To Borrower's knowledge, the fair saleable value of Borrower's assets is and will, immediately following the execution and delivery of the Loan Documents, be equal or greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  Immediately following the closing of the Loan, Borrower will own no assets other than the Property and the landlord's interest in the Credit Lease and will have no liabilities other than the Debt, its obligations under the Credit Lease and its obligation to pay a $1000 annual fee to the Delaware trustee under its trust agreement.  Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents, will not constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

**Section 4.2  Survival of Representations**.  Borrower agrees that all of the representations and warranties of Borrower set forth in Section 4.1 and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains

owing to Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## V.    AFFIRMATIVE COVENANTS

Section 5.1 **Borrower Covenants**. From the date hereof and until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lender that:

(a)    *Existence; Compliance with Legal Requirements; Insurance*. Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it. Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business.

(b)    *Maintenance of Property; Compliance with Law*. Borrower shall keep the Property in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Mortgage. Borrower shall comply with all Legal Requirements applicable to the Property. Borrower shall be deemed to be in compliance with the provisions of this Section 5.1(b) so long as the Credit Lease is in full force and effect and Credit Tenant is in full compliance with Paragraph 9 of the Credit Lease.

(c)    *Taxes and Other Charges*. Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof prior to delinquency. Borrower will deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than thirty (30) days after the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. Borrower shall be deemed to be in compliance with the provisions of this Section 5.1(c) so long as the Credit Lease is in full force and effect and Credit Tenant is in full compliance with Paragraphs 7 and 10 of the Credit Lease. Credit Tenant shall have such rights as are provided in the Credit Lease to contest taxes and other charges in accordance with the provisions of such Lease and in connection therewith, Credit Tenant shall provide to Lender, as security for such contest, the cash, bond or other security, if any, required under the Lease. Lender shall have the right to pay such Taxes and Other Charges, and use the security provided therefor, subject, however, to the provisions of the Credit Lease. Borrower

shall provide to Lender evidence of the payment of the Taxes and Other Charges by the Credit Tenant promptly upon receipt thereof.

(d)  *Litigation*.  Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened against Borrower or, to Borrower's knowledge, Credit Tenant, which might materially adversely affect the condition (financial or otherwise) or business of Borrower or Credit Tenant or the Property.

(e)  *Premises*.  Subject to the provisions of the Credit Lease, Borrower shall permit agents, representatives and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice.

(f)  *Notice of Default*.  Borrower shall promptly advise Lender of any material adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

(g)  *Cooperate in Legal Proceedings*.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

(h)  *Perform Loan Documents*.  Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower.

(i)  *Insurance Benefits*.  Subject to the provisions of the Credit Lease and the rights of the Credit Tenant thereunder, Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the expense of an appraisal on behalf of Lender in case of a fire or other casualty affecting the Property or any part thereof) out of such Insurance Proceeds.

(j)  *Further Assurances*.  Borrower shall, at Borrower's sole cost and expense:

a)  furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by it pursuant to the terms of the Loan Documents; provided, however, that with respect to those of such items that are in the possession of Credit Tenant and not Borrower,

Borrower shall request that Credit Tenant deliver the same to Lender and shall exercise all rights and remedies available to it under the Credit Lease (short of terminating the same) or any other agreement with Credit Tenant to obtain the same and deliver them to Lender;

b) execute and deliver, or cause to be executed and delivered, to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure its obligations under the Loan Documents, as Lender may reasonably require; and

c) do and execute, or cause to be executed, all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

(k)    *Supplemental Mortgage Affidavits*.    As of the date hereof, Borrower represents that it has paid all state, county and municipal recording and all other taxes imposed upon the execution and recordation of the Mortgage.  If at any time Lender determines, based on applicable law, that Lender is not being afforded the maximum amount of security available from the Property as a direct or indirect result of applicable taxes not having been paid with respect to the Property, Borrower agrees that Borrower will execute, acknowledge and deliver to Lender, immediately upon Lender's request, supplemental affidavits increasing the amount of the Debt attributable to the Property to the amount of the Debt and Borrower shall, on demand, pay any additional mortgage taxes.

(l)    *Financial Reporting*.

(i)    Borrower will, to the extent it is necessary to so do (and in any event at any time that the Credit Lease is not in full force and effect), keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property and in connection with any services, equipment or furnishings provided in connection with the operation of the Property, whether such income or expense be realized by Borrower or by any other Person whatsoever, excepting lessees unrelated to and unaffiliated with Borrower who have leased from Borrower portions of the Property for the purpose of occupying the same.  Lender shall have the right from time to time at all times during normal

business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire. After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall reasonably determine to be necessary or appropriate in the protection of Lender's interest.

(ii)    Borrower will furnish to Lender or cause Credit Tenant to furnish to Lender such financial information or reports as Credit Tenant is required to deliver to Lender and Borrower pursuant to Paragraph 28 of the Credit Lease.

(iii)    At the same time as Borrower is required to deliver Credit Tenant's annual financial statements, Borrower shall furnish to Lender an Officer's Certificate certifying as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(iv)    Borrower shall furnish to Lender, within thirty (30) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender or any applicable Rating Agency, and, with respect to any such information not otherwise available to Borrower, Borrower shall use reasonable efforts to obtain the same from Credit Tenant if the Credit Lease is in full force and effect. Borrower's failure to provide to Lender or its designee any of the financial statements, certificates, reports or information (the **"Required Records"**) required by this Section 5.1(l) and which are available to Borrower within thirty (30) days after the date upon which such Required Record is due shall constitute an Event of Default hereunder.

(v)    Borrower shall furnish to Lender, promptly following request therefor, such other financial information with respect to Credit Tenant as may be required by the applicable Rating Agencies to monitor the credit of Credit Tenant, to the extent the same is available to Borrower pursuant to the Credit Lease or otherwise.

(m)    *Business and Operations*.    Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.    Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

(n)    *Title to the Property*.    Borrower will warrant and defend (i) the title to the Property and every part thereof, subject only to Liens permitted under the Loan Documents (including Permitted Encumbrances), and (ii) the validity and priority of the Lien of the Mortgage, subject only to Liens permitted under the Loan Documents (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever.    Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

(o)    *Costs of Enforcement*.    In the event (i) that the Mortgage is foreclosed in whole or in part or is put into the hands of an attorney for collection, suit, action or foreclosure, (ii) of the foreclosure of any mortgage prior to or subsequent to the Mortgage encumbering the Property in which proceeding Lender is made a party, or (iii) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or an assignment by Borrower for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees in connection therewith and in connection with any appellate proceeding or post- judgment action involved therein, which shall be due and payable together with all required service or use taxes.

(p)    *Estoppel Statement*.

(i)    After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement, duly acknowledged and certified, setting forth (A) the unpaid principal amount of the Note, (B) the Interest Rate of the Note, (C) the date installments of interest and/or principal were last paid, (D) any offsets or defenses to the payment of the Debt, if any, and (E) that the Note, this Agreement, the Mortgage and the other Loan Documents are valid, legal and binding obligations and have not been modified or, if modified, giving particulars of such modification.

(ii)    After request by Lender (but no more frequently than twice in any year), Borrower shall within ten (10) days furnish Lender with a certificate reaffirming all representations and warranties of Borrower set forth herein and in the other Loan Documents as of

the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes.

(iii)    Borrower shall deliver to Lender upon request tenant estoppel certificates from each tenant at the Property in form and substance reasonably satisfactory to Lender, provided that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year and further provided that any estoppel from Credit Tenant meeting the requirements of Paragraph 22 of the Credit Lease shall be deemed to be in a form satisfactory to Lender.

(q)    *Loan Proceeds*.  Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in Section 2.1(d).

(r)    *Performance by Borrower*.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, and shall exercise all rights and enforce all remedies available to it under the Credit Lease to cause Credit Tenant to comply with the Credit Lease, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

(s)    *Confirmation of Representations*.  In addition to and not in limitation of the covenants and agreements of Borrower contained in Section 4.1, Borrower shall deliver, in connection with any Securitization, one or more Officer's Certificates certifying as to the accuracy of all representations made by Borrower in the Loan Documents as of the date of the closing of such Securitization, or to the extent of any changes to any such representations and warranties, so stating such changes.

(t)    *No Joint Assessment*.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

(u)    *Leasing Matters*.  Borrower shall not, without Lender's prior written consent, enter into, modify, amend or renew the Credit Lease or any other Lease or consent to Credit Tenant's entry into, or modification, amendment or renewal of, any Lease other than a Lease, modification, amendment or renewal to which Borrower is obligated to consent pursuant to the Credit Lease. Borrower shall have the right to respond to requests from Credit Tenant for consents and approvals with respect to matters affecting the Property, provided that Borrower shall not grant its consent or approval to anything that could reasonably be expected (i) to decrease the rights or increase the obligations or liabilities of Borrower under the Credit

Lease or otherwise with respect to the Property, (ii) to decrease the obligations or liabilities of Credit Tenant under the Credit Lease or (iii) have an adverse impact on the Property or its condition or value.  In the event Borrower requests the consent of Lender to any Lease or modification or amendment thereof, or to any action to be taken by Borrower in response to any request by Credit Tenant under the Credit Lease, Lender shall respond within a reasonable time following such request, and in any event within thirty (30) days (or such shorter period of time as may be set forth in the Credit Lease for the Borrower to respond) if Lender has received all information Lender requires in connection with such request.  Borrower shall specify in any such request that a response is required within thirty (30) days or such shorter period of time as may be set forth in the Credit Lease for Borrower to respond.  In the event that Lender fails to respond within thirty (30) days or such shorter period of time as may be set forth in the Credit Lease for Borrower to respond after it receives all information it reasonably requires in connection with the request, Lender's consent to the requested action shall be deemed granted.  In no event shall Lender have any liability to Borrower for failure to respond prior to the end of such thirty (30) day period or such shorter period of time as may be set forth in the Credit Lease for Borrower to respond, regardless of whether Lender may reasonably have been able to respond sooner.

(v)     *Principal Place of Business*.  Borrower shall not change its principal place of business set forth on the first page of this Agreement without first giving Lender thirty (30) days prior written notice.

(w)     *Management Agreement*.  If the Credit Lease shall not be in full force and effect, Borrower shall, upon request by Lender, hire an experienced, professional property manager reasonably acceptable to Lender to manage the Property.  In the event that Borrower does not propose such a manager to Lender for its approval within thirty (30) days after the request to do so, Lender may propose two or more such property managers for Borrower's consideration.  If Borrower then fails to select and hire one of such property managers within five (5) business days thereafter, Lender shall have the right to select a property manager and to enter into a management agreement with such manager, in its own name or in the name of Borrower.  Borrower hereby appoints Lender its attorney-in-fact, which appointment is coupled with an interest, for the purpose of entering into such management agreement.  The management agreement entered into between Borrower and any Manager shall be in form and substance reasonably acceptable to Lender.

## VI.   NEGATIVE COVENANTS

### Section 6.1  Borrower's Negative Covenants.

From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage in accordance with the terms of this Agreement and the other Loan Documents, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

(a)    *Operation of Property*.    Borrower shall not, without Lender's prior consent:  (i) enter into any management agreements with respect to the Property or surrender, terminate or cancel any management agreement entered into pursuant to Section 5.1, (ii) reduce or consent to the reduction of the term of any Management Agreement; (iii) increase or consent to the increase of the amount of any charges under any Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Management Agreement in any material respect.

(b)    *Liens*.    Borrower shall not, without the prior written consent of Lender, create, incur, assume or suffer to exist any Lien on any portion of the Property or on any interest in Borrower, or permit any such action to be taken, except (i) Permitted Encumbrances, (ii) Liens created by or permitted pursuant to the Loan Documents, (iii) Liens for Taxes or Other Charges not yet due and (iv) Liens being contested by Credit Tenant in accordance with, or otherwise permitted by, the Credit Lease.

(c)    *Dissolution*.    Borrower shall not dissolve, terminate, liquidate, merge with or consolidate into another Person.

(d)    *Change In Business*.    Borrower shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

(e)    *Debt Cancellation*.    Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment.

(f)    *Affiliate Transactions*.    Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower except in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's- length transaction with an unrelated third party.

(g)    *Zoning*.    Subject to Borrower's obligations under the Credit Lease, Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender.

(h)    *Assets*.    Borrower shall not purchase or own any properties other than the Property.

(i)    *Debt*.    Borrower shall not create, incur or assume any debt other than the Debt and other than Permitted Indebtedness.

## VII.    CASUALTY; CONDEMNATION; ESCROWS

### Section 7.1    Insurance.

(a)    Borrower, at its sole cost and expense, for the mutual benefit of Borrower and Lender, shall keep the Property insured and obtain and maintain during the Term policies of insurance insuring against loss or damage by standard, "all-risk" perils.  Such insurance (i) shall be in an amount equal to the greater of (A) the then full replacement cost of the Property without deduction for physical depreciation, and (B) such amount that the insurer would not deem Borrower a co- insurer under said policies, and (ii) and shall have deductibles no greater than five percent (5%) of the full replacement cost of the Property.  The policies of insurance carried in accordance with this paragraph shall be paid annually in advance and shall contain a "Replacement Cost Endorsement" with a waiver of depreciation.

(b)    Borrower, at its sole cost and expense, for the mutual benefit of Borrower and Lender, shall also obtain and maintain during the Term the following policies of insurance or shall cause Credit Tenant to obtain and maintain such policies:

(i)    Flood insurance if any part of the Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Program in an amount at least equal to the Debt or the maximum limit of coverage available with respect to the Property under said program, whichever is less.

(ii)    Commercial general liability insurance, including broad form property damage, blanket contractual and personal injuries (including death resulting therefrom) coverages and containing a minimum combined single limit of $5,000,000 or such greater amount as may be required under the Credit Lease.  In addition, at least $10,000,000 excess and/or umbrella liability insurance shall be obtained and maintained for any and all claims, including all legal liability imposed upon Borrower and all court costs and attorneys' fees incurred in connection with the ownership, operation and maintenance of the Property.

(iii)    Insurance against loss or damage from (A) leakage of sprinkler systems and (B) explosion of steam boilers, air conditioning equipment, high pressure piping, machinery and equipment, pressure vessels or similar apparatus now or hereafter installed in any of the Improvements (without exclusion for explosions), in an amount at least equal to $2,000,000 for the Property.

(iv)    Worker's compensation insurance with respect to any employees of Borrower or Credit Tenant, as required by any governmental authority or legal requirement.

(v)    During any period of repair or restoration, builder's "all risk" insurance in an amount equal to not less than the full insurable value of the Property against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as Lender may request, in form and substance acceptable to Lender.

(vi)    Coverage to compensate for the cost of demolition and the increased cost of construction for the Property in an amount satisfactory to Lender.

(vii)    Such other insurance, including earthquake insurance, as may from time to time be reasonably required by Lender in order to protect its interests.

(c)    All policies of insurance (the "**Policies**") required pursuant to this Section 7.1 (i) shall be issued by companies approved by Lender and licensed to do business in the State, with a rating of "A-X" or better as established by Best's Rating Guide and having a claims paying ability rating of "AA" or better by at least two (2) of the Rating Agencies; (ii) shall name Lender and its successors and/or assigns as their interest may appear as the mortgagee; (iii) shall contain a Non- Contributory Standard Lender Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the person to which all payments made by such insurance company shall be paid; (iv) shall contain a waiver of subrogation against Lender; (v) shall be maintained throughout the Term without cost to Lender; (vi) shall be assigned and the originals thereof delivered to Lender; (vii) shall contain such provisions as Lender deems reasonably necessary or desirable to protect its interest including endorsements providing that neither Borrower, Lender, Credit Tenant nor any other party shall be a co-insurer under said Policies and that Lender shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation of any of the Policies; and (viii) shall be reasonably satisfactory in form and substance to Lender and shall be approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds. Borrower shall pay the premiums for such Policies (the "**Insurance Premiums**") as the same become due and payable and shall furnish to Lender evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Lender. If Borrower or Credit Tenant does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then, after five (5) days notice to Borrower, Lender may procure, but shall not be obligated to procure, such insurance and pay the Insurance Premiums therefor, and Borrower agrees to reimburse Lender for the cost of such Insurance Premiums promptly on demand. Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as

may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

(d)    So long as the Credit Lease is in full force and effect and there is full compliance by Credit Tenant with the provisions of Paragraph 13 of the Credit Lease, Borrower shall be deemed to be in compliance with Subsections 7.1(a), (b) and (c) hereof.

(e)    If any Property is damaged or destroyed, in whole or in part, by fire or other casualty (an "**Insured Casualty**"), Borrower shall give prompt notice thereof to Lender. Following the occurrence of an Insured Casualty (regardless of whether insurance proceeds are available), Borrower shall promptly proceed, or cause Credit Tenant to promptly proceed, to restore, repair, replace or rebuild the affected Property to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with Legal Requirements. The expenses incurred by Lender in the adjustment and collection of insurance proceeds shall become part of the Debt and be secured hereby and shall be reimbursed by Borrower to Lender upon demand. So long as the Credit Lease is in full force and effect and there is full compliance by Credit Tenant with the provisions of Paragraph 14 of the Credit Lease, Borrower shall be deemed in compliance with this Section 7.1(e).

### Section 7.2 Casualty and Application of Proceeds.

(a)    In case of loss or damages covered by any of the Policies and notwithstanding anything to the contrary contained in this entire Section 7.2, for so long as the Credit Lease is in full force and effect, all insurance proceeds required to be applied to restoration and repair of the Property under the Credit Lease shall be disbursed in accordance with the provisions of the Credit Lease for such restoration and repair. If the Credit Lease is no longer in full force and effect, the following provisions shall apply:

(i)    If an Insured Casualty does not exceed $100,000, Borrower may settle and adjust any claim without the consent of Lender; provided that such adjustment is carried out in a competent and timely manner. In such case, Borrower is hereby authorized to collect and receipt for any such insurance proceeds.

(ii)    If an Insured Casualty shall equal or exceed $100,000, Lender may settle and adjust any claim without the consent of Borrower and agree with the insurance company or companies on the amount to be paid on the loss and the proceeds of any such policy shall be due and payable solely to Lender and held in escrow by Lender in accordance with the terms hereof.

(b)    In the event of an Insured Casualty where the loss is in an aggregate amount less than $1,000,000, and if, in the reasonable judgment of Lender, the Property can be restored within six (6) months and prior to the maturity of the Note to an economic unit not

less valuable and not less useful than the same was prior to the Insured Casualty, and after such restoration will adequately secure the Debt, then, if no Default or Event of Default shall have occurred and be then continuing, the proceeds of insurance (after reimbursement of any expenses incurred by Lender) shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property or part thereof subject to the Insured Casualty (the "**Restoration**") in the manner set forth herein. Borrower hereby covenants and agrees to commence and diligently prosecute such Restoration; provided that (i) Borrower shall pay all costs (and if required by Lender, Borrower shall deposit the total thereof with Lender in advance) of such Restoration in excess of the net proceeds of insurance made available pursuant to the terms hereof; (ii) the Restoration shall be done in compliance with all Legal Requirements; and (iii) Lender shall have received evidence reasonably satisfactory to it that, during the period of the Restoration, the sum of (A) income derived from the Property, as reasonably determined by Lender, plus (B) proceeds of rent loss insurance or business interruption insurance, if any, to be paid will equal or exceed the sum of (I) expenses in connection with the operation of the Property and (II) the debt service under the Loan.

(c)     Except as provided above, the proceeds of insurance collected upon any Insured Casualty shall, at the option of Lender in its sole discretion, be applied to the payment of the Debt or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth below. Any such application to the Debt shall be without any prepayment consideration except that if an Event of Default has occurred and is continuing at the time the insurance proceeds are received, then Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that would be required under Section 2.3(c) hereof if a Defeasance Deposit was to be made by Borrower. Any such application to the Debt shall be applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments.

(d)     If Borrower is entitled to reimbursement out of insurance proceeds held by Lender, such proceeds shall be deposited by Lender into the Casualty/Condemnation Subaccount (as described in the Cash Collateral Agreement) and disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (1) evidence satisfactory to it of the estimated cost of completion of the Restoration, (2) funds or, at Lender's option, assurances satisfactory to Lender that such funds are available, sufficient in addition to the proceeds of insurance to complete the proposed Restoration, (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of cost, payment and performance as Lender may reasonably require and approve, and (4) all plans and specifications for such Restoration, such plans and specifications to be approved by Lender prior to commencement of any work. In addition, no payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than proceeds of insurance shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by

or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all liens or claims for lien. Any surplus which may remain out of insurance proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower.

### Section 7.3  Condemnation.

(a)    Borrower shall promptly give Lender written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation (regardless of whether an Award is available), Borrower shall promptly proceed, or cause the Credit Tenant to promptly proceed, to restore, repair, replace or rebuild the Property to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation or otherwise in accordance with the Credit Lease, all to be effected in accordance with Legal Requirements; provided that such restoration shall not be required if the Property is being purchased by Credit Tenant pursuant to Paragraph 12(b) of the Credit Lease.

(b)    So long as the Credit Lease is in full force and effect and notwithstanding anything to the contrary contained in this entire Section 7.3, all condemnation awards or payments ("**Awards**") required to be applied to restoration and repair of the Property under the Credit Lease shall be disbursed in accordance with the provisions of the Credit Lease. So long as the Credit Lease remains in full force and effect following a Condemnation and Credit Tenant is obligated to pay the full rent thereunder, all Awards not required to be disbursed for repair and restoration of the Property or delivered to Credit Tenant pursuant to the provisions of the Credit Lease shall be paid as provided in the Credit Lease. If paid to Lender, such payment may be applied to reduce the Debt or remitted to Borrower, in Lender's discretion. If the Credit Lease is terminated as a result of such Condemnation, all Awards not required to be delivered to Credit Tenant shall be paid to Lender to be applied to the payment of the Debt (whether or not the same is due and payable). Any such application to the Debt shall be without any prepayment consideration except that if an Event of Default has occurred and is continuing at the time the Award is received, then Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that would be required under Section 2.3(c) hereof if a Defeasance Deposit was to be made by Borrower. Any such application to the Debt shall be applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments. Notwithstanding any Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Note, in this Agreement and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided

in the Note. At such time as the Credit Lease is not in full force and effect, the provisions of subsections (c) through (f) below shall apply.

(c)     Lender is hereby irrevocably appointed as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Section. Notwithstanding any Condemnation by any public or quasi-public authority (including any transfer made in lieu of or in anticipation of such a Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Note, in this Agreement and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender.

(d)     In the event of any Condemnation where the Award is in an aggregate amount less than $1,000,000, and if, in the reasonable judgment of Lender, the Property can be restored within six (6) months and prior to maturity of the Note to an economic unit not less valuable and not less useful than the same was prior to the Condemnation, and after such restoration will adequately secure the Debt, then, if no Default or Event of Default shall have occurred and be then continuing, the proceeds of the Award (after reimbursement of any expenses incurred by Lender) shall be applied to reimburse Borrower for the cost of restoring, repairing, replacing or rebuilding the Property or part thereof subject to Condemnation (the "**Condemnation Restoration**") in the manner set forth below. Borrower hereby covenants and agrees to commence and diligently to prosecute such Condemnation Restoration; provided that (i) Borrower shall pay all costs (and if required by Lender, Borrower shall deposit the total thereof with Lender in advance) of such Condemnation Restoration in excess of the Award made available pursuant to the terms hereof; (ii) the Condemnation Restoration shall be done in compliance with all Legal Requirements; and (iii) Lender shall have received evidence reasonably satisfactory to it that, during the period of the Condemnation Restoration, the sum of (A) income derived from the Property, as reasonably determined by Lender, plus (B) proceeds of rent loss insurance or business interruption insurance, if any, to be paid will equal or exceed the sum of (I) expenses in connection with the operation of the Property and (II) the debt service under the Loan.

(e)     Except as provided above, the Award collected upon any Condemnation shall, at the option of Lender in its sole discretion, be applied to the payment of the Debt or applied to reimburse Borrower for the cost of the Condemnation Restoration in the manner set forth below. Any such application to the Debt shall be without any prepayment consideration except that if an Event of Default has occurred and is continuing at the time the Award is received, then Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that would be required under Section 2.3(c) hereof if a Defeasance Deposit was to be made by Borrower. Any such application to the Debt shall be

applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the Debt.

(f)    In the event Borrower is entitled to reimbursement out of the Award received by Lender, such proceeds shall be disbursed from time to time upon Lender being furnished with (1) evidence satisfactory to it of the estimated cost of completion of the Condemnation Restoration, (2) funds or, at Lender's option, assurances satisfactory to Lender that such funds are available, sufficient in addition to the proceeds of the Award to complete the Condemnation Restoration, (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of costs, payment and performance as Lender may reasonably require and approve; and (4) all plans and specifications for such Condemnation Restoration, such plans and specifications to be approved by Lender prior to commencement of work. In addition, no payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety percent (90%) of the value of the work performed from time to time; (5) funds other than proceeds of the Award shall be disbursed prior to disbursement of such proceeds; and (6) at all times, the undisbursed balance of such proceeds remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the costs of completion of the Condemnation Restoration free and clear of all liens or claims for lien. Any surplus which may remain out of the Award received by Lender after payment of such costs of restoration, repair, replacement or rebuilding shall, in the sole and absolute discretion of Lender, be retained by Lender and applied to payment of the Debt.

**Section 7.4    Impounds**. Borrower shall, unless the Credit Tenant is paying Taxes and Insurance Premiums directly pursuant to the Credit Lease, deposit with Lender, monthly, (a) one- twelfth (1/12th) of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates, and (b) one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the insurance policies required by Lender upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to expiration (said amounts in (a) and (b) above hereinafter called the "**Tax and Insurance Escrow Fund**"). Unless the Credit Tenant is paying Taxes and Insurance Premiums directly pursuant to the Credit Lease at or before the advance of the Loan, Borrower shall deposit with Lender a sum of money which together with the monthly installments will be sufficient to make each of such payments thirty (30) days prior to the date any delinquency or penalty becomes due with respect to such payments. Deposits, if required, shall be made on the basis of Lender's estimate from time to time of the charges for the current year (after

giving effect to any reassessment or, at Lender's election, on the basis of the charges for the prior year, with adjustments when the charges are fixed for the then current year). All funds so deposited shall be held by Lender, without interest, and may be commingled with Lender's general funds. Borrower hereby grants to Lender a security interest in all funds so deposited with Lender for the purpose of securing the Loan. While an Event of Default exists, the funds deposited may be applied in payment of the charges for which such funds have been deposited, or to the payment of the Loan or any other charges affecting the security of Lender, as Lender may elect, but no such application shall be deemed to have been made by operation of law or otherwise until actually made by Lender. Borrower shall furnish Lender with bills for the charges for which such deposits are required at least thirty (30) days prior to the date on which the charges first become payable. If at any time the amount on deposit with Lender, together with amounts to be deposited by Borrower before such charges are payable, is insufficient to pay such charges, Borrower shall deposit any deficiency with Lender immediately upon demand. Lender shall pay such charges when the amount on deposit with Lender is sufficient to pay such charges and Lender has received a bill for such charges.

## VIII.  DEFAULTS

### Section 8.1  Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (each, an "**Event of Default**"):

(i)    if any portion of the Debt is not paid when due;

(ii)    if any of the Taxes or Other Charges are not paid when the same are due and payable (subject to Credit Tenant's right to contest such Taxes or Other Charges in accordance with Paragraph 18 of the Credit Lease) and such default shall continue for a period of fifteen (15) days after notice by Lender to Borrower;

(iii)    if the Policies are not maintained in accordance with the terms and provisions of Section 7.1 hereof;

(iv)    if, without Lender's prior written consent, except as permitted under the terms and provisions of the Mortgage, (A) Borrower transfers or encumbers any portion of the Property or (B) the beneficial interest in Borrower is transferred or assigned;

(v)    if any representation or warranty made by Borrower herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower in connection with this Agreement or any other Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made,

provided, however, no Event of Default shall arise under this subsection (v) if (A) the facts which give rise to the incorrect representation or warranty are capable of being cured by Borrower and (B) such underlying facts are cured by Borrower within thirty (30) days of Borrower's knowledge of the existence of such incorrect representation or warranty;

(vi)   if a receiver, liquidator or trustee shall be appointed for Borrower or if Borrower shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, or if any proceeding for the dissolution or liquidation of Borrower shall be instituted; and if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, the same is not discharged, stayed or dismissed within sixty (60) days;

(vii)   if Borrower breaches any of its respective negative covenants contained in Section 6.1 (other than those set forth in Section 6.1(b) and (f)) or any covenant contained in Section 4.1(dd) hereof or if any of the assumptions contained in the Insolvency Opinion, or in any other "non-consolidation" opinion delivered to Lender in connection with the Loan, or in any other "non-consolidation" opinion relating to the Loan delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect;

(viii)   if an Event of Default as defined or described in any of the other Loan Documents occurs, whether as to Borrower or the Property, or if any other such event shall occur or condition shall exist, if the effect of such event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt;

(ix)   if Borrower shall be in default under any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period after the giving of such notice or the expiration of such grace period;

(x)   if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (ix) above, for ten (10) days after notice to Borrower from Lender, in the case of any failure to pay sums due

Lender hereunder or under any other Loan Document, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such 30-day period and provided further that Borrower shall have commenced to cure such Default within such 30-day period and thereafter diligently and expeditiously proceeds to cure the same, such 30-day period shall be extended for an additional period of time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days and provided further that if the Default by Borrower is due solely to a failure by Credit Tenant to perform or observe any provision of the Credit Lease which Credit Tenant has the right to cure under Paragraph 19(c) of the Credit Lease, then the period for Borrower to cure such Default shall be the time Credit Tenant has to cure its failure under Paragraph 19(c) of the Credit Lease plus two (2) additional Business Days; and

(xi)   if there shall occur an Event of Default (as defined in the Credit Lease) under the Credit Lease, or if the Credit Lease shall cease to be in full force and effect for any reason or be modified, amended or terminated without Lender's consent.

(b)   Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi), (vii) or (viii) above) and at any time thereafter Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi), (vii) or (viii) above, the Debt and all other obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

## Section 8.2 Remedies

(a)   Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or

not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

(b)     Lender shall have the right from time to time to partially foreclose the Mortgage in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower defaults in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Mortgage to recover so much of the principal balance of the Loan as Lender may accelerate.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Mortgage to secure payment of sums secured by the Mortgage and not previously recovered.

(c)     Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power unless an Event of Default has occurred and is continuing.

Section 8.3   **Remedies Cumulative**.   The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as

Lender may determine in Lender's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## IX. SPECIAL PROVISIONS

### Section 9.1 Securitization.

At the request of the holder of the Note and, to the extent not already required to be provided by Borrower under this Agreement, Borrower shall (subject to any limitations contained in the Credit Lease) use reasonable efforts to satisfy, or cause Credit Tenant to satisfy, the market standards to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with the sale of the Note or participation therein or the first successful securitization (such sale and/or securitization, the "**Securitization**") of rated single or multi-class securities (the "**Securities**") secured by or evidencing ownership interests in the Note and the Mortgage, including, without limitation, to:

(a)　(i)　provide such financial and other information with respect to the Property, the Borrower, the Credit Tenant (including any information regarding the credit history of the Credit Tenant), the Credit Lease, and the Manager,

(ii)　provide budgets relating to the Property and the Credit Lease, and

(iii)　to perform or permit or cause to be performed or permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), engineering reports and other due diligence investigations of the Property, as may be reasonably requested by the holder of the Note or the Rating Agencies or as may be necessary or appropriate in connection with the Securitization (the "**Securitization Information**");

(b)　at Borrower's expense, cause counsel to render opinions, which may be relied upon by the holder of the Note, the Rating Agencies and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance, and true sale or any other opinion customary in securitization transactions with respect to the Property, the Credit Lease, and Borrower and its Affiliates, which counsel and opinions shall be reasonably satisfactory to the holder of the Note and the Rating Agencies;

(c)　make such representations and warranties as of the closing date of the Securitization with respect to the Property, Credit Lease, Borrower, Credit Tenant and the

Loan Documents as are customarily provided in securitization transactions or as may be reasonably requested by the holder of the Note or the Rating Agencies (each of which shall be reasonably satisfactory to Borrower) and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents; and

(d)    execute such amendments to the Loan Documents and organizational documents as may be requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization; provided, however, that the Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, or (ii) modify or amend any other material economic term of the Loan.

All reasonable third party costs and expenses incurred by Borrower in connection with Borrower's complying with requests made under Sections 9.1 and 9.2 shall be paid by the Lender or reimbursed to Borrower.

### Section 9.2  Securitization Indemnification.

(a)    Borrower understands that certain of the Securitization Information and the financial reports relating to the Property may be included in disclosure documents in connection with the Securitization, including, without limitation, a prospectus, prospectus supplement or private placement memorandum (each, an "**Offering Document**") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Securitization. In the event that the Offering Document is required to be revised prior to the sale of all Securities, the Borrower will cooperate with the holder of the Note in updating the Offering Document by providing all current information necessary to keep the Offering Document accurate and complete in all material respects.

(b)    Borrower agrees to provide in connection with each of (i) a preliminary and a private placement memorandum or (ii) a preliminary and final prospectus or prospectus supplement, as applicable, an indemnification certificate (A) certifying that Borrower has carefully examined such memorandum or prospectus, as applicable, including without limitation, the sections entitled "Special Considerations," "Description of the Mortgages," "Description of the Mortgage Loans and Mortgaged Properties," "The Manager," "The Borrower" and "Certain Legal Aspects of the Mortgage Loan," and such sections (and any other sections reasonably requested) to Borrower's knowledge do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, (B) indemnifying Lender (and for purposes of this Section 9.2, Lender hereunder shall include its officers and directors), any affiliate of Lender that has filed or may file the

registration statement relating to the securitization (the "**Registration Statement**"), each of its directors, each of its officers who have signed the Registration Statement and each person or entity who controls the affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act , and Lender, each of its directors and each person who controls Lender within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "**Underwriter Group**") for any losses, claims, damages or liabilities (the "**Liabilities**") to which Lender, or the Underwriter Group may become subject insofar as the Liabilities are a direct result of any untrue statement of any material fact contained in such sections or are a direct result of the omission to state therein a material fact required to be stated in such sections or necessary in order to make the statements in such sections or in light of the circumstances under which they were made, not misleading and (C) agreeing to reimburse Lender and the Underwriter Group for any legal or other expenses reasonably incurred by Lender in connection with investigating or defending the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (B) or (C) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the debt, including, without limitation, financial statements of Borrower, operating statements, rent rolls, environmental site assessment reports and property condition reports with respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have.

(c)     In connection with filings under the Exchange Act, Borrower agrees to (i) indemnify Lender, and the Underwriter Group for Liabilities to which Lender, or the Underwriter Group may become subject insofar as the Liabilities are a direct result of the omission to state in the Securitization Information or financial reports relating to the Property a material fact required to be stated in the Securitization Information or financial reports relating to the Property in order to make the statements in the Securitization Information or financial reports relating to the Property, in light of the circumstances under which they were made not misleading and (ii) reimburse Lender or the Underwriter Group for any legal or other expenses reasonably incurred by Lender or the Underwriter Group in connection with defending or investigating the Liabilities; provided, however, that Borrower will be liable in any such case under clauses (i) or (ii) above only to the extent that any such loss claim, damage or liability arises out of or is based upon any such untrue statement or omission made therein in reliance upon and in conformity with information furnished to Lender by or on behalf of Borrower in connection with the preparation of the memorandum or prospectus or in connection with the underwriting of the debt, including, without limitation, financial statements of Borrower, operating statements, rent rolls, environmental site assessment reports and property condition reports with respect to the Property. This indemnity agreement will be in addition to any liability which Borrower may otherwise have.

(d)     Promptly after receipt by an indemnified party under this Section 9.2 of notice of the commencement of any action, such indemnified party will, if a claim in respect

thereof is to be made against the indemnifying party under this Section 9.2, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and its notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After notice from the indemnifying party to such indemnified party under this Section 9.2 for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party to parties. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(e)    In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.2(b) or (c) is for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.2(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) Lender's and Borrower's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(f)    The liabilities and obligations of both Borrower and Lender under this Section 9.2 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**Section 9.3  Intentionally Omitted**.

**Section 9.4  Exculpation**.

Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Mortgage or the other Loan Documents.  The provisions of this section shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; (f) constitute a prohibition against Lender commencing any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Mortgage or to exercise its remedies against the Property; or (g) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

    (i)      fraud or material or intentional misrepresentation by Borrower in connection with the Loan;

    (ii)      the breach of any provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Borrower to Lender or in the Mortgage concerning environmental laws, hazardous substances and asbestos and any indemnification of Lender with respect thereto in either document; provided, however, that Borrower shall have personal liability under this clause (iii) only in the event that, at the time Lender is seeking recourse hereunder, the Credit Lease is not in effect.

(iii)   physical waste of the Property by the Borrower;

(iv)   the removal or disposal of any portion of the Property by the Borrower;

(v)   the misapplication or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Property, or (C) any Rents following an Event of Default;

(vi)   subject to the terms and provisions of the Credit Lease, failure to pay charges incurred by Borrower for labor or materials or other charges that can create liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof; and

(vii)   any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that:   (i) Borrower knowingly fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions of, this Loan Agreement and the Mortgage; (ii) Borrower fails to obtain Lender's prior written consent to any subordinate financing encumbering the Property other than a Permitted Encumbrance; or (iii) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage.

**Section 9.5   Retention of Servicer**.   Lender reserves the right to retain the Servicer to act as its agent hereunder with such powers as are specifically delegated to the Servicer by Lender, whether pursuant to the terms of this Agreement, the Pooling and Servicing Agreement or the Cash Collateral Agreement or otherwise, together with such other powers as are reasonably incidental thereto.   Borrower shall pay any reasonable fees and

expenses of the Servicer in connection with a Defeasance of the Note, release of the Property, assumption or modification of the Loan or enforcement of the Loan Documents.

## X.   MISCELLANEOUS

Section 10.1   **Survival**.   This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid (but the accuracy thereof shall be determined as of the Closing Date). Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.   All covenants, promises and agreements in this Agreement contained, by or on behalf of Borrower, shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

Section 10.2   **Lender's Discretion**.   Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

Section 10.3 **Governing Law**.

**(A)   THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE APPLICABLE INDIVIDUAL PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST**

EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(B)   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.   BORROWER DOES HEREBY DESIGNATE AND APPOINT C/O GOLDFARB & FLEECE, 345 PARK AVENUE, NEW YORK, NEW YORK  10154, ATTN.:  STEVEN B, SHORE, ES.Q, AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.   BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

Section 10.4 **Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the

specific instance, and for the purpose, for which given.    Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 10.5  <u>Delay Not a Waiver</u>.    Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.    In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 10.6  <u>Notices</u>.    All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and either shall be mailed by certified mail, postage prepaid, return receipt requested, or sent by overnight air courier service, or personally delivered to a representative of the receiving party, or sent by telecopy (provided an identical notice is also sent simultaneously by mail, overnight courier, or personal delivery as otherwise provided in this Section 10.6).    All such communications shall be mailed, sent or delivered, addressed to the party for whom it is intended at its address set forth below.

If to Lender:

        Nomura Asset Capital Corporation
        5005 LBJ Freeway
        Suite 1050
        Dallas, Texas  75244
        Attention:    David Martin
        Telecopier: 972-855-4101

with a copy to:

        Nomura Asset Capital Corporation
        Two World Financial Center
        Building B
        New York, New York  10281
        Attention:    Barry Funt, Esq., General Counsel
        Telecopier: 212-667-1567

If to Borrower:

        Larry J. Rietz
        1355 Lemond Road
        Owatonna, Minnesota  55060
        Telecopier:  507-421-3205

with a copy to:

        Goldfarb & Fleece
        345 Park Avenue, 33rd Floor
        New York, New York  11054
        Attention:    Steven B. Shore, Esq.
        Telecopier:  212-891-3738

Any communication so addressed and mailed shall be deemed to be given on the earliest of (a) when actually delivered, (b) on the first Business Day after deposit with an overnight air courier service, or (c) on the third Business Day after deposit in the United States mail, postage prepaid, in each case to the address of the intended addressee, and any communication so delivered in person shall be deemed to be given when receipted for by, or actually received by Lender or Borrower, as the case may be.  If given by telecopy, a notice shall be deemed given and received when the telecopy is transmitted to the party's telecopy number specified above and confirmation of complete receipt is received by the transmitting party during normal business hours or on the next Business Day if not confirmed during normal business hours. Either party may designate a change of address by written notice to the other by giving at least ten (10) days prior written notice of such change of address.

        **Section 10.7  Trial by Jury**.  BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.    LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

        **Section 10.8  Headings**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9    **Severability**.    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10    **Preferences**.    Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder.    To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11    **Waiver of Notice**.    Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.    Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 10.12    **Remedies of Borrower**.    In the event that a claim or adjudication is made that Lender or its agents, including Servicer, have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.    The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment; provided, however, that if Lender has acted in bad faith in any instance where Lender was required to act otherwise by law or under this Agreement or the other Loan Documents, then the waiver of damages continued in this Section 10.12 shall be of no force and effect with respect to such action.

Section 10.13    **Expenses; Indemnity**.

(a)    Borrower covenants and agrees to reimburse Lender (or the holder of the Loan, as applicable) upon receipt of written notice from such holder for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and

the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property (other than in connection with a Securitization)); (ii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (iii) Borrower complying with any requests made pursuant to Section 9.1 hereof (subject to the limitations contained in such section); (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; and (vi) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Property or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender. Any costs and expenses due and payable to Lender hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in the Cash Management Account, with notice thereof to Borrower.

      (b)    Borrower shall indemnify, defend and hold harmless Lender from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against Lender in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan, (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Lender. To the extent that the undertaking to indemnify and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lender.

**Section 10.14   Exhibits Incorporated**.  The Exhibits annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 10.15    Offsets, Counterclaims and Defenses**.   Any assignee of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 10.16   No Joint Venture or Partnership**.  Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.   Nothing herein or therein is intended to create a joint venture, partnership, tenancy- in- common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee or lender.

**Section 10.17    Publicity**.   All news releases, publicity or advertising by Borrower or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender, Nomura, the Loan purchaser, the Servicer or the trustee in a Securitization shall be subject to the prior written approval of Lender, which shall not be unreasonably withheld.

**Section 10.18    Waiver of Marshalling of Assets**.   To the fullest extent Borrower may legally do so, Borrower waives all rights to a marshalling of the assets of Borrower, Borrower's partners, if any, and others with interests in Borrower, and of Borrower's properties, or to a sale in inverse order of alienation in the event of foreclosure of the interests hereby created, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the related indebtedness without any prior or different resort for collection, of the right of Lender or any deed of trust trustee to the payment of the related indebtedness out of the net proceeds of the Property in preference to every other claimant whatsoever.

**Section 10.19   Waiver of Counterclaim**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer.

**Section 10.20   Conflict; Construction of Documents**.   In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.   The parties hereto acknowledge that they were

represented by counsel in connection with the negotiation and drafting of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.

Section 10.21 **Brokers and Financial Advisors**. Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower and Lender hereby agree to indemnify and hold the other harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way relating to or arising from a claim by any other Person that such Person acted on behalf of the indemnifying party in connection with the transactions contemplated herein. The provisions of this Section 10.21 shall survive the expiration and termination of this Agreement and the repayment of the Debt.

Section 10.22 **No Third Party Beneficiaries**. This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 10.23 **Prior Agreements**. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

Section 10.24 **Lender Estoppel**. After request by Borrower, Lender shall within twenty (20) days furnish Borrower with a statement, duly certified, setting forth (a) the unpaid principal amount of the Note, (b) the interest rate of the Note, (c) the date installments of interest and/or principal were last paid, and (d) whether to Lender's knowledge any Default or Event of Default exists under the Loan Documents.

IN WITNESS WHEREOF, the parties hereto have caused this Loan Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

LARRY J. RIETZ MP, L.L.C., a Minnesota limited
liability company

By:    North Division CC, Inc., a Minnesota corporation,
its Chief Manager

By: _____
Name: *Larry J. Rietz*
Title: *President*

NOMURA ASSET CAPITAL CORPORATION, a
Delaware corporation

By: _____
Name: *David C. Martin*
Title: *Vice President*

0212176.01

**Response of CWCapital Asset Management, LLC to the Liquidating Trust's Twenty-eighth
Omnibus Objection to Landlord Claims**

# Exhibit E

**4185592**
Page:   1 of 36
02/06/1998  02:04P
PIONEER. TITLE COMPANY    DT    $43.00    Spokane Co. WA

**DOCUMENT PREPARED BY:**

**Cadwalader, Wickersham & Taft**
**100 Maiden Lane**
**New York, New York  10038**
**Attention:  William P. McInerney, Esq.**

*Pa455.52*

### LARRY J. RIETZ MP, L.L.C.
(Trustor)

to

### PIONEER TITLE COMPANY OF WASHINGTON
(Trustee)

and

### NOMURA ASSET CAPITAL CORPORATION
(Beneficiary)

### DEED OF TRUST

Dated:  As of February 4, 1998

Property Location:  Circuit City
                    7701 North Division Street
                    Spokane, Washington

Tax Parcel No.:    36301.9002    *Tract A, SP95-1025*
*PORTION NE4 30-26-43*

0213054.02\SPOKANE, WA

*1002|224|162  1998*



4185592
Page:    2 of 36
02/06/1998 02:04P
PIONEER TITLE COMPANY    DT    $43.00    Spokane Co. WA

## TABLE OF CONTENTS

Page

### PART I

### GENERAL PROVISIONS

| | | |
|---|---|---|
| 1. | Payment of Debt and Incorporation of Covenants, Conditions and Agreements | 5 |
| 2. | Warranty of Title | 5 |
| 3. | Insurance | 5 |
| 4. | Payment of Taxes, Etc. | 6 |
| 5. | Condemnation | 6 |
| 6. | Leases and Rents | 6 |
| 7. | Maintenance of Property | 8 |
| 8. | Transfer or Encumbrance of the Property | 8 |
| 9. | Changes in Laws Regarding Taxation | 10 |
| 10. | No Credits on Account of the Debt | 11 |
| 11. | Documentary Stamps | 11 |
| 12. | Controlling Agreement | 11 |
| 13. | Performance of Other Agreements | 11 |
| 14. | Further Acts, Etc | 12 |
| 15. | Recording of Deed of Trust, Etc. | 12 |
| 16. | Reporting Requirements | 12 |
| 17. | Events of Default | 13 |
| 18. | Late Payment Charge | 13 |
| 19. | Right To Cure Defaults | 13 |
| 20. | Remedies | 13 |
| 21. | Right of Entry | 17 |
| 22. | Security Agreement | 17 |
| 23. | Actions and Proceedings | 18 |
| 24. | Waiver of Setoff and Counterclaim | 19 |
| 25. | Recovery of Sums Required to be Paid | 19 |
| 26. | Marshalling and Other Matters | 19 |
| 27. | Hazardous Substances | 19 |
| 28. | Asbestos | 21 |
| 29. | Environmental Monitoring | 21 |
| 30. | Handicapped Access | 22 |
| 31. | Indemnification | 23 |
| 32. | Notices | 24 |
| 33. | Authority | 24 |
| 34. | Waiver of Notice | 24 |
| 35. | Non-Waiver | 24 |
| 36. | No Oral Change | 25 |
| 37. | Liability | 25 |

4185592
Page:    3 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY    DT    $43.00    Spokane Co, WA

| 38. | Inapplicable Provisions | 25 |
| 39. | Headings, Etc | 25 |
| 40. | Duplicate Originals | 25 |
| 41. | Definitions | 25 |
| 42. | Homestead | 25 |
| 43. | Assignments | 26 |
| 44. | Waiver of Jury Trial | 26 |
| 45. | Trustee's Fees; Substitute Trustee | 26 |
| 46. | Power of Sale | 27 |
| 47. | Defeasance | 28 |
| 48. | No Election of Remedies | 28 |
| 49. | Exculpation | 29 |
| 50. | Governing Law | 29 |
| 51. | Miscellaneous | 29 |

## PART II

## SPECIAL STATE PROVISIONS

| 52. | Construction of Deed of Trust | 29 |

4185592
Page:   4 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY   DT   $43.00   Spokane Co, WA

THIS DEED OF TRUST, also known as a DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING (the "**Deed of Trust**"), made as of February 4, 1998, by **LARRY J. RIETZ MP, L.L.C.**, a Minnesota limited liability company, ("**Trustor**") having an address at 1355 Lemond Road, Owatonna, Minnesota 55060, to **PIONEER TITLE COMPANY OF WASHINGTON**, the trustee hereunder, (together with its successors and assigns, shall hereafter be referred to as "**Trustee**"), having an address at 521 West First Avenue, Spokane, Washington 99204 and to **NOMURA ASSET CAPITAL CORPORATION**, a Delaware corporation (together with its successors and assigns, shall hereafter be referred to as "**Beneficiary**"), having its principal place of business at Two World Financial Center, Building B, New York, New York 10281.

## W I T N E S S E T H :

**WHEREAS:**

A.    Trustor is the owner of a fee simple title to that certain parcel of real property (the "**Premises**") described in <u>Exhibit A</u> attached hereto, and the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon (the "**Improvements**");

B.    Trustor has leased the Premises and Improvements to Circuit City Stores, Inc. ("**Credit Tenant**") pursuant to a Lease of even date herewith (the "**Credit Lease**");

C.    Trustor and Beneficiary have entered into a certain Loan Agreement dated as of the date hereof (as amended, modified, restated, consolidated or supplemented from time to time, the "**Loan Agreement**") pursuant to which Beneficiary has agreed to make a secured deed of trust loan to Trustor.   Capitalized terms used herein and not herein defined shall have the meanings assigned to such terms in the Loan Agreement.

D.    Pursuant to the Loan Agreement, Beneficiary is making a loan to Trustor in the aggregate original principal amount of FOUR MILLION THREE HUNDRED TWO THOUSAND NINE HUNDRED TWELVE and NO/100 Dollars ($4,302,912.00) (the "**Loan**") and Trustor has executed the Note in the principal amount of $4,302,912.00, with a final payment of the outstanding principal balance and accrued and unpaid interest being due on   February 11, 2020 (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "**Note**").   The Note is secured by, <u>inter alia</u>, this Deed of Trust and the other Loan Documents (as hereinafter defined).

E.    To induce Beneficiary to make the Loan and to secure payment of the Note, together with interest thereon, Trustor has agreed to the execution and delivery of this Deed of Trust.

4185592
Page:    5 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY      DT        $43.00   Spokane Co, WA

**NOW, THEREFORE,** in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and legal sufficiency whereof are hereby acknowledged, and as an inducement to Beneficiary to enter into the Loan Agreement, and to secure the payment of all sums which may or shall become due hereunder or under the Note or any of the other documents evidencing, securing or executed in connection with the Loan (such other documents, including, without limitation, the Loan Agreement, that certain Assignment of Leases and Rents of even date herewith given by Trustor to Beneficiary with respect to the Premises (as such assignment may be amended from time to time, the "**Assignment of Leases**"), together with the Note and this Deed of Trust (as any of the same may, from time to time, be modified, amended or supplemented) being hereinafter collectively referred to as the "**Loan Documents**"), and including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Trustor for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) and (ii) the costs and expenses of enforcing any provision of the Note, this Deed of Trust or any of the other Loan Documents (all such sums being hereinafter collectively referred to as the "**Debt**"), and in order to charge with such performance and with such payments the Premises and the Improvements and other property hereinafter described and the rents, revenues, issues, income and profits thereof, Trustor has DEEDED, MORTGAGED AND WARRANTED, GIVEN, GRANTED, BARGAINED, SOLD, ALIENATED, ENFEOFFED, CONVEYED, CONFIRMED, PLEDGED, ASSIGNED, AND HYPOTHECATED, and by these presents does hereby DEED, MORTGAGE AND WARRANT, GIVE, GRANT, BARGAIN, SELL, ALIENATE, ENFEOFF, CONVEY, CONFIRM, PLEDGE, ASSIGN AND HYPOTHECATE unto Trustee (in trust), the Premises and Improvements;

**TOGETHER WITH:** all right, title, interest and estate of Trustor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "**Property**"):

(a)    all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, all rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Trustor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

4185592
Page: 6 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY   DT        $43.00   Spokane Co, WA

(b)      all machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory and articles of personal property and accessions thereof and renewals and replacements thereof and substitutions therefor, if any, and other property of every kind and nature, whether tangible or intangible, whatsoever owned by Trustor, or in which Trustor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Trustor, or in which Trustor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation, enjoyment and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the **"Equipment"**), including any leases of any of the foregoing, any deposits existing at any time in connection with any of the foregoing, and the proceeds of any sale or transfer of the foregoing, and the right, title and interest of Trustor in and to any of the Equipment that may be subject to any "security interests" as defined in the Uniform Commercial Code, as adopted and enacted by the State where the Property is located (the **"Uniform Commercial Code"**), superior in lien to the lien of this Deed of Trust;

(c)      all awards or payments, including interest thereon, that may heretofore and hereafter be made with respect to the Premises and the Improvements, whether from the exercise of the right of eminent domain or condemnation (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of said rights), or for a change of grade, or for any other injury to or decrease in the value of the Premises and Improvements;

(d)      all leases, subleases, and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises and the Improvements, including any extensions, renewals, modifications or amendments thereof, including, without limitation, the Credit Lease, and all guarantees thereof (hereinafter collectively referred to as the **"Leases"**) and all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Trustor or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements, including, without limitation, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property and proceeds, if any, from business interruption or other loss of income insurance (hereinafter collectively referred to as the **"Rents"**), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;



4185592
Page:     7 of 36
02/06/1998  02:04P
PIONEER TITLE COMPANY    DT        $43.00   Spokane Co, WA

(e)     all proceeds of and any unearned premiums on any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(f)     the right, in the name and on behalf of Trustor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Beneficiary in the Property;

(g)     all accounts (including, without limitation, reserve accounts, escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, surveys, title insurance policies, permits, consents, licenses, management agreements, contract rights (including, without limitation, any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair, or other work upon the Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Property), and causes of action that now or hereafter relate to, are derived from or are used in connection with the Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "**Intangibles**"); and

(h)     all proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing (other than proceeds of a sale of the Property which is permitted hereunder).

Without limiting the generality of any of the foregoing, in the event that a proceeding under Title 11 of the United States Code (the "**Bankruptcy Code**") is commenced by or against Trustor, pursuant to Section 552(b)(2) of the Bankruptcy Code, the security interest granted by this Deed of Trust shall automatically extend to all Rents acquired by the Trustor after the commencement of the case and shall constitute cash collateral under Section 363(a) of the Bankruptcy Code.

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Trustee and its successors and assigns, for the benefit of Beneficiary, forever.

IN TRUST, WITH POWER OF SALE, to secure the payment to Beneficiary of the Debt at the time and in the manner provided for its payment in the Note and in this Deed of Trust;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Trustor shall well and truly pay to Beneficiary the Debt at the time and in the manner provided

4185592
Page:    8 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY    DT    $43.00    Spokane Co, WA

in the Note, the Loan Agreement and this Deed of Trust and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note, the Loan Agreement and in the other Loan Documents in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

AND Trustor represents and warrants to and covenants and agrees with Beneficiary and Trustee as follows:

## PART I

### GENERAL PROVISIONS

**1.    Payment of Debt and Incorporation of Covenants, Conditions and Agreements**.  Trustor shall pay the Debt at the time and in the manner provided in the Note, the Loan Agreement and this Deed of Trust.  All the covenants, conditions and agreements contained in the Note, the Loan Agreement, or the other Loan Documents are hereby made a part of this Deed of Trust to the same extent and with the same force as if fully set forth herein.

**2.    Warranty of Title**.  Trustor warrants that Trustor has good, marketable and insurable title to the Property and has the full power, authority and right to execute, deliver and perform its obligations under this Deed of Trust and to deed, encumber, mortgage and warrant, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign and hypothecate the same and that Trustor possesses an unencumbered fee simple estate in the Premises and the Improvements and that it owns the Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Deed of Trust and taxes not yet due and payable and that to Trustor's knowledge this Deed of Trust is and will remain a valid and enforceable first lien on and security interest in the Property, subject only to said exceptions.  Trustor shall forever warrant, defend and preserve such title and the validity and priority of the lien of this Deed of Trust and shall forever warrant and defend the same to Beneficiary against the claims of all persons whomsoever.

**3.    Insurance**.  (a)  Trustor, at its sole cost and expense, for the mutual benefit of Trustor and Beneficiary, shall keep the Property insured and obtain and maintain during the entire term of this Deed of Trust policies of insurance against loss or damage by fire and lightning and against loss or damage by all other risks and hazards as required and in accordance with the terms and provisions of Section 7.1 of the Loan Agreement.  If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "Casualty"), and Trustor shall receive notice of the same, Trustor shall give prompt notice thereof to Beneficiary.  All amounts to be paid in connection with a Casualty under such policies shall be governed by the terms and provisions of the Loan Agreement.



4185592
Page:    9 of 36
02/06/1998   02:04P
PIONEER. TITLE COMPANY    DT    $43.00    Spokane Co, WA

**4.** **Payment of Taxes, Etc.** Trustor shall pay, or cause Credit Tenant to pay, all taxes, assessments, water rates and sewer rents, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "**Taxes**") and all ground rents, maintenance charges, other impositions, and other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Premises, now or hereafter levied or assessed or imposed against the Property or any part thereof (the "**Other Charges**") as the same become due and payable.  Trustor shall be deemed in compliance with this Section 4 so long as the Credit Lease is in full force and effect and Credit Tenant is in full compliance with Paragraphs 7 and 10 thereof.

**5.** **Condemnation**.  (a)  Promptly after Trustor receives notice, Trustor shall promptly give Beneficiary written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding with respect to the Property (a "**Condemnation**") and shall deliver to Beneficiary copies of any and all papers served in connection with such Condemnation.  Any award or payment ("**Award**") for any taking accomplished through a Condemnation shall be applied as provided in Section 7.3 of the Loan Agreement.  All amounts to be paid in connection with a Condemnation shall be governed by the terms and provisions of the Loan Agreement.

**6.** **Leases and Rents**.  (a)  Trustor does hereby absolutely and unconditionally assign to Beneficiary, all of Trustor's right, title and interest in all current and future Leases and Rents, it being intended by Trustor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Such assignment to Beneficiary shall not be construed to bind Beneficiary to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise impose any obligation upon Beneficiary.  Trustor agrees to execute and deliver to Beneficiary such additional instruments, in form and substance reasonably satisfactory to Beneficiary, as may hereafter be requested by Beneficiary to further evidence and confirm such assignment.  Nevertheless, subject to the terms of this paragraph and Section 2.6 of the Loan Agreement, Beneficiary grants to Trustor a revocable license to operate and manage the Property and to collect the Rents, which license shall not be revoked so long as there is no Event of Default hereunder.  Upon an Event of Default (as hereinafter defined), without the need for notice or demand, the license granted to Trustor herein shall automatically be revoked, and Beneficiary shall immediately be entitled to possession of all Rents, whether or not Beneficiary enters upon or takes control of the Property.  Beneficiary and Trustee are hereby granted and assigned by Trustor the right, at its option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents.  Any Rents collected after the revocation of the license may be applied toward payment of the Debt in such priority and proportions as Beneficiary in its sole discretion shall deem proper.

(b)  Except as expressly permitted under the Loan Agreement, Trustor (A) shall not alter, modify or change the terms of the Leases without the prior written consent of Beneficiary; (B) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property or of any interest therein so as to effect a merger of the estates and rights of, or a



4185592
Page:   10 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY   DT          $43.00   Spokane Co, WA

termination or diminution of the obligations of, tenants under the Leases; (C) shall not consent to any assignment of or subletting under the Leases except if Trustor may not withhold its consent under the applicable Lease, without the prior written consent of Beneficiary; and (D) shall not cancel or terminate the Leases or accept a surrender thereof.  Upon request, Trustor shall furnish Beneficiary with executed copies of all Leases.  All Leases shall provide that they are subordinate to this Deed of Trust and that the tenant agrees to attorn to Beneficiary. Subject to the subleasing rights of Credit Tenant under the Credit Lease, none of the Leases shall contain any option to purchase, any right of first refusal to lease or purchase, any right to terminate the lease term (except to the extent, if any, expressly provided in Paragraph 12 of the Credit Lease), any nondisturbance or similar recognition agreement or any other similar provisions which adversely affect the Property or which might adversely affect the rights of any holder of the Loan without the prior written consent of Beneficiary.  Each tenant shall conduct business only in that portion of the Property covered by its Lease.

(c)     Trustor (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Beneficiary of all notices of default which Trustor shall send or receive thereunder; (iii) shall enforce all the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; (iv) shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents (except as contemplated in the Loan Documents); and (vi) shall execute and deliver at the request of Beneficiary all such further assurances, confirmations and assignments in connection with the Property as Beneficiary shall from time to time reasonably require.

(d)     All security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Trustor and, if cash, shall be deposited by Trustor at such commercial or savings bank or banks as may be reasonably satisfactory to Beneficiary.  Any bond or other instrument which Trustor is permitted to hold in lieu of cash security deposits under any applicable legal requirements shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as hereinabove described, shall be issued by an institution reasonably satisfactory to Beneficiary, shall, if permitted pursuant to any legal requirements, name Beneficiary as payee or mortgagee thereunder (or at Beneficiary's option, be fully assignable to Beneficiary) and shall, in all respects, comply with any applicable legal requirements and otherwise be reasonably satisfactory to Beneficiary.  Trustor shall, upon request, provide Beneficiary with evidence reasonably satisfactory to Beneficiary of Trustor's compliance with the foregoing.  Following the occurrence and during the continuance of any Event of Default, Trustor shall, upon Beneficiary's request, if permitted by any applicable legal requirements, turn over to Beneficiary the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Property, to be held by Beneficiary subject to the terms of the Leases.

4185592
Page:   11 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY   DT      $43.00   Spokane Co, WA

**7.**   **Maintenance of Property**.   Trustor shall cause the Property to be maintained in a good and safe condition and repair.   The Improvements and the Equipment shall not be removed, demolished or materially altered (except for normal replacement of the Equipment) without the consent of Beneficiary.   Trustor shall promptly comply, or cause Credit Tenant to comply with all laws, orders and ordinances affecting the Property, or the use thereof.   Trustor shall, or shall cause Credit Tenant to, promptly repair, replace or rebuild any part of the Property that is destroyed by any casualty, or becomes damaged, worn or dilapidated or that is affected by any proceeding of the character referred to in Paragraph 5 hereof and shall complete and pay for any structure at any time in the process of construction or repair on the Premises.   Trustor shall be deemed to be in compliance with the foregoing provisions of this Paragraph 7 so long as the Credit Lease is in full force and effect and Credit Tenant is in full compliance with Paragraphs 7, 9, 11 and 14 of the Credit Lease.   Except as permitted pursuant to the Loan Agreement, Trustor shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property or any part thereof.   If under applicable zoning provisions the use of all or any portion of the Property is or shall become a nonconforming use, Trustor will not cause or permit such nonconforming use to be discontinued or abandoned without the express written consent of Beneficiary. Subject to the provisions of the Credit Lease, Trustor shall not (i) change the use of the Property, (ii) permit or suffer to occur any waste on or to the Property or to any portion thereof or (iii) take any steps whatsoever to convert the Property, or any portion thereof, to a condominium or cooperative form of management.   Trustor will not install or permit to be installed on the Premises any underground storage tank, except as may be expressly permitted in the Credit Lease.

**8.**   **Transfer or Encumbrance of the Property**.   (a)   Trustor acknowledges that Beneficiary has examined and relied on the creditworthiness and experience of Trustor in owning and operating properties such as the Property in agreeing to make the Loan, and that Beneficiary will continue to rely on Trustor's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt.   Trustor acknowledges that Beneficiary has a valid interest in maintaining the value of the Property so as to ensure that, should Trustor default in the repayment of the Debt, Beneficiary can recover the Debt by a sale of the Property.   Trustor shall not, without the prior written consent of Beneficiary, sell, convey, alienate, deed of trust, encumber, pledge or otherwise transfer the Property or any part thereof, or permit the Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred other than in connection with a release of the Property pursuant to Section 2.4 of the Loan Agreement.

(b)   A sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer within the meaning of this Paragraph 8 shall be deemed to include (i) an installment sales agreement wherein Trustor agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Trustor leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Trustor's right, title and interest in and



to any Leases or any Rents; (iii) if Trustor or any general partner of Trustor is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which an aggregate of more than 10% of such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation; (iv) if Trustor or any general partner of Trustor is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, managing partner, limited partner, joint venturer or member or the transfer of the partnership interest of any general partner, managing partner or limited partner or the transfer of the interest of any joint venturer or member; and (v) if Trustor is a trust, the transfer or encumbrance of the beneficial interest in such trust or, except as specifically provided under the terms of any applicable trust agreement, the transfer, change, removal or resignation of any trustee of the trust.

(c)    Beneficiary shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Trustor's sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property without Beneficiary's consent.  This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property regardless of whether voluntary or not, or whether or not Beneficiary has consented to any previous sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property.

(d)    Beneficiary's consent to one sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property shall not be deemed to be a waiver of Beneficiary's right to require such consent to any future occurrence of same.   Any sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property made in contravention of this paragraph shall be null and void and of no force and effect.

(e)    Trustor agrees to bear and shall pay or reimburse Beneficiary on demand for all reasonable expenses (including, without limitation, reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Beneficiary in connection with the review, approval and documentation of any such sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer.

(f)    Beneficiary's consent to the sale or transfer of the Property or the transfer of the beneficial interest in Trustor (or the transfer of the trustee's interest that is not in accordance with the terms of the applicable trust agreement) will not be unreasonably withheld after consideration of all relevant factors, provided that:

(i)    no Event of Default shall have occurred and remain uncured;

4185592
Page:   13 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY   DT       $43.00  Spokane Co, WA

(ii)     the proposed transferee ("Transferee") shall be a reputable entity or person of good character, creditworthy, with sufficient financial worth considering the obligations assumed and undertaken, as evidenced by financial statements and other information reasonably requested by Beneficiary;

(iii)    In the event that the Credit Lease is no longer in full force and effect, the Transferee and its property manager (if applicable) shall have sufficient experience in the ownership and management of properties similar to the Property, and Beneficiary shall be provided with reasonable evidence thereof (and Beneficiary reserves the right to approve the Transferee without approving the substitution of the property manager, if applicable);

(iv)     Beneficiary shall have received evidence satisfactory to it (which shall include a legal non-consolidation opinion acceptable to Beneficiary) that the single purpose nature and bankruptcy remoteness of Trustor its shareholders, partners, members, beneficial interests or trustees, as the case may be, following such transfer are in accordance with the standards of the Rating Agencies;

(v)      the Transferee and Trustor shall have executed and delivered to Beneficiary an assumption agreement in form and substance reasonably acceptable to Beneficiary, evidencing such Transferee's agreement to abide and be bound by the terms of the Note, this Deed of Trust and the other Loan Documents and releasing Trustor from the obligations of the Loan Documents to the extent that Transferee has assumed such obligations (except as provided in the Hazardous Materials Indemnity Agreement), together with such legal opinions and title insurance endorsements as may be reasonably requested by Beneficiary; and

(vi)     Beneficiary shall have received payment of all costs and expenses incurred by Beneficiary in connection with such transfer (including, without limitation, reasonable attorney's fees and costs).

**9.     Changes in Laws Regarding Taxation**.   If any law is enacted or adopted or amended after the date of this Deed of Trust which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Beneficiary's interest in the Property, Trustor will pay such tax, with interest and penalties thereon, if any.  In the event Beneficiary is advised by counsel chosen by it that the payment of such tax or interest and penalties by Trustor would be unlawful or taxable to Beneficiary or unenforceable or provide the basis for a defense of usury, then in any such event, Beneficiary shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.



4185592
Page: 14 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY      DT           $43.00      Spokane Co, WA

**10.  No Credits on Account of the Debt.**  Trustor will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Deed of Trust or the Debt.  In the event such claim, credit or deduction shall be required by law, Beneficiary shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**11.  Documentary Stamps.**  If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or this Deed of Trust, or impose any other tax or charge on the same, Trustor will pay for the same, with interest and penalties thereon, if any.

**12.  Controlling Agreement.**  It is expressly stipulated and agreed to be the intent of Trustor and Beneficiary at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Beneficiary to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Paragraph 12 shall control every other covenant and agreement in this Deed of Trust and the other Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Beneficiary's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Trustor results in Trustor having paid any interest in excess of that permitted by applicable law, then it is Trustor's and Beneficiary's express intent that all excess amounts theretofore collected by Beneficiary be credited on the principal balance of the Note and all other Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Trustor), and the provisions of the Note, this Deed of Trust and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder.  All sums paid or agreed to be paid to Beneficiary for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Beneficiary to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**13.  Performance of Other Agreements.**  Subject to the provisions of the Credit Lease, Trustor shall observe and perform, and cause Credit Tenant to observe and perform, each and every term to be observed or performed by Trustor pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Property.



4185592
Page:    15 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY    DT    $43.00    Spokane Co, WA

**14.    Further Acts, Etc.**    Trustor will, at the cost of Trustor, and without expense to Beneficiary, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices of assignment, Uniform Commercial Code financing statements or continuation statements, transfers and assurances as Beneficiary shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Beneficiary the property and rights hereby given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Trustor may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms of this Deed of Trust or for filing, registering or recording this Deed of Trust.  Trustor, on demand, will execute and deliver and hereby authorizes Beneficiary to execute in the name of Trustor or without the signature of Trustor to the extent Beneficiary may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to evidence more effectively the security interest of Beneficiary in the Property.    Upon foreclosure, the appointment of a receiver or any other relevant action, Trustor will, at the cost of Trustor and without expense to Beneficiary, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Property.    Provided an Event of Default has occurred and is continuing, Trustor grants to Beneficiary and Trustee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Beneficiary and Trustee at law and in equity, including, without limitation, such rights and remedies available to Beneficiary and Trustee pursuant to this paragraph.

**15.    Recording of Deed of Trust, Etc.**    Trustor forthwith upon the execution and delivery of this Deed of Trust and thereafter, from time to time, will cause this Deed of Trust, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Beneficiary in, the Property.  Trustor will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of this Deed of Trust, any deed of trust supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Deed of Trust, any deed of trust supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, except where prohibited by law so to do.  Trustor shall hold harmless and indemnify Beneficiary, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of this Deed of Trust.

**16.    Reporting Requirements.**    Trustor agrees to give prompt notice to Beneficiary of the insolvency or bankruptcy filing of Trustor.



4185592
Page:    16 of 36
02/06/1998  02:04P
PIONEER TITLE COMPANY      DT          $43.00   Spokane Co, WA

**17.**   **Events of Default**.  The Debt shall become immediately due and payable at the option of Beneficiary upon the happening of any one or more of the "Events of Default" defined in the Loan Agreement.

**18.**   **Late Payment Charge**.  If any portion of the Debt is not paid on the date on which it is due, Trustor shall pay to Beneficiary upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray the expenses incurred by Beneficiary in handling and processing such delinquent payment and to compensate Beneficiary for the loss of the use of such delinquent payment.  Any such amount shall be secured by this Deed of Trust and the other Loan Documents.

**19.**   **Right To Cure Defaults**.  Upon the occurrence of any Event of Default, Beneficiary may, but without any obligation to do so and without notice to or demand on Trustor and without releasing Trustor from any obligation hereunder, make or do the same in such manner and to such extent as Beneficiary may deem necessary to protect the security hereof.  Beneficiary is authorized to enter upon the Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Deed of Trust or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Beneficiary that such cost or expense was incurred to the date of payment to Beneficiary, shall constitute a portion of the Debt, shall be secured by this Deed of Trust and the other Loan Documents and shall be due and payable to Beneficiary upon demand.

**20.**   **Remedies**.  (a)   Upon the occurrence of any Event of Default, Beneficiary or Trustee may take such action, without notice or demand, as Beneficiary deems advisable to protect and enforce Beneficiary's rights against Trustor and in and to the Property by Beneficiary itself or through Trustee or otherwise, including, without limitation, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Beneficiary may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Beneficiary:

      (i)   declare the entire Debt to be immediately due and payable;

      (ii)   foreclose this Deed of Trust in the manner provided by law for the foreclosure of deed of trusts on real property without right of reinstatement by the Trustor;

      (iii)   with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Deed of Trust for the portion of the Debt then due and payable,

Case 08-35653-KRH    Doc 11746-2    Filed 02/24/12    Entered 02/24/12 16:05:27    Desc
Exhibit(s) D-F    Page 84 of 116
Page:  17 of 36
02/06/1998  02:04P

PIONEER, TITLE COMPANY    DT    $43.00    Spokane Co, WA

subject to the continuing lien of this Deed of Trust for the balance of the Debt not then due;

(iv)     institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, or in any of the other Loan Documents;

(v)      sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Trustor therein and rights of redemption thereof, pursuant to the power of sale contained herein or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(vi)     to the extent permitted by applicable law, recover judgment on the Note either before, during or after any proceedings for the enforcement of this Deed of Trust;

(vii)    apply for the appointment of a trustee, receiver, liquidator or conservator of the Property, as a matter of strict right, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Trustor or of any person, firm or other entity liable for the payment of the Debt, and Trustor does hereby irrevocably consent to such appointment.    Any such receiver shall have all the usual powers and duties of receivers in similar cases, including the full power to rent, maintain or otherwise operate the Property upon such terms as may be approved by the court, and shall apply Rents, at the option of Beneficiary, to the Debt as determined by Beneficiary in its sole discretion;

(viii)   enforce Beneficiary's interest in the Leases and Rents and enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Trustor and its agents and servants therefrom, and thereupon Beneficiary may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (B) complete any construction on the Property in such manner and form as Beneficiary deems advisable;

4185592
Page:    18 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY      DT            $43.00   Spokane Co, WA

(C) make alterations, additions, renewals, replacements and improvements to or on the Property; (D) exercise all rights and powers of Trustor with respect to the Property, whether in the name of Trustor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents; and (E) apply the receipts from the Property to the payment of the Debt, after deducting therefrom all expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, insurance and other charges in connection with the Property, as well as just and reasonable compensation for the services of Beneficiary, its counsel, agents and employees;

(ix)     require Trustor to pay monthly in advance to Beneficiary, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Property occupied by Trustor and require Trustor to vacate and surrender possession to Beneficiary of the Property or to such receiver and, in default thereof, evict Trustor by summary proceedings or otherwise; or

(x)      pursue such other rights and remedies as may be available at law or in equity or under the Uniform Commercial Code, including, without limitation, the right to receive and/or establish a lock box for all Rents and proceeds from the Intangibles and any other receivables or rights to payments of Trustor relating to the Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Property, this Deed of Trust shall continue as a lien on the remaining portion of the Property.

(b)     To the extent permitted by law, the proceeds of any sale made under or by virtue of this paragraph, together with any other sums which then may be held by Beneficiary under this Deed of Trust, whether under the provisions of this paragraph or otherwise, shall be applied by Beneficiary to the payment of the Debt in such priority and proportion as Beneficiary in its sole discretion shall deem proper.

(c)     Intentionally Omitted.

(d)     Upon the completion of any sale or sales pursuant hereto, Beneficiary, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser



4185592
Page:    19 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY   DT        $43.00   Spokane Co, WA

or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold.  In addition to the powers granted to Beneficiary is hereby irrevocably appointed the true and lawful attorney of Trustor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Property and rights so sold and for that purpose Beneficiary may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Trustor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof; provided, however, Beneficiary shall not execute such instruments under such power unless an Event of Default has occurred and is continuing.  To the extent permitted by law, any sale or sales made under or by virtue of this paragraph, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Trustor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Trustor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under Trustor.

(e)     Upon any sale made under or by virtue of this paragraph, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Beneficiary may bid for and acquire the Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Beneficiary is authorized to deduct under this Deed of Trust.  In such event this Deed of Trust, the Note and the other Loan Documents evidencing expenditures secured hereby shall be presented to the person or persons conducting the sale in order that the amount so used or applied may be credited upon the net sales price as hereinabove described.

(f)     No recovery of any judgment by Beneficiary and no levy of an execution under any judgment upon the Property or upon any other property of Trustor shall affect in any manner or to any extent the lien of this Deed of Trust upon the Property or any part thereof, or any liens, rights, powers or remedies of Beneficiary hereunder, but such liens, rights, powers and remedies of Beneficiary shall continue unimpaired as before.

(g)     Beneficiary may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Paragraph 20 at any time before the conclusion thereof, as determined in Beneficiary's sole discretion and without prejudice to Beneficiary.

(h)     Beneficiary or Trustee may resort to any remedies and the security given by the Note, this Deed of Trust or in any of the other Loan Documents in whole or in part, and in such portions and in such order as determined by Beneficiary's sole discretion.  No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or

4185592
Page:   20 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY   DT        $43.00   Spokane Co, WA

provided by the Note, this Deed of Trust or in any of the other Loan Documents.  The failure
of Beneficiary or Trustee to exercise any right, remedy or option provided in the Note, this
Deed of Trust or any of the other Loan Documents shall not be deemed a waiver of such right,
remedy or option or of any covenant or obligation secured by the Note, this Deed of Trust or
any of the other Loan Documents.  No acceptance by Beneficiary of any payment after the
occurrence of any Event of Default and no payment by Beneficiary of any obligation for which
Trustor is liable hereunder shall be deemed to waive or cure any Event of Default with respect
to Trustor, or Trustor's liability to pay such obligation.  No sale of all or any portion of the
Property, no forbearance on the part of Beneficiary or Trustee, and no extension of time for
the payment of the whole or any portion of the Debt or any other indulgence given by
Beneficiary or Trustee to Trustor, shall operate to release or in any manner affect the interest
of Beneficiary in the remaining Property or the liability of Trustor to pay the Debt.  No waiver
by Beneficiary or Trustee shall be effective unless it is in writing and then only to the extent
specifically stated.  All costs and expenses of Beneficiary in exercising its rights and remedies
under this Paragraph 20 (including reasonable attorneys' fees and disbursements to the extent
permitted by law), shall be paid by Trustor immediately upon notice from Beneficiary or
Trustee, with interest at the Default Rate for the period after notice from Beneficiary or
Trustee and such costs and expenses shall constitute a portion of the Debt and shall be secured
by this Deed of Trust.

      (i)    The interests and rights of Beneficiary under the Note, this Deed of
Trust or any of the other Loan Documents shall not be impaired by any indulgence, including
(i) any renewal, extension or modification which Beneficiary may grant with respect to any of
the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution
which Beneficiary may grant with respect to the Property or any portion thereof; or (iii) any
release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

      **21.**    **Right of Entry**.  In addition to any other rights or remedies granted
under this Deed of Trust, Beneficiary, Trustee and their agents shall have the right, subject to
the Credit Lease, to enter and inspect the Property at any reasonable time during the term of
this Deed of Trust.  The cost of such inspections or audits shall be borne by Trustor should
Beneficiary determine that an Event of Default exists, including the cost of all follow up or
additional investigations or inquiries deemed reasonably necessary by Beneficiary.  The cost of
such inspections, if not paid for by Trustor following demand, may be added to the principal
balance of the sums due under the Note and this Deed of Trust and shall bear interest thereafter
until paid at the Default Rate.

      **22.**    **Security Agreement**.  This Deed of Trust is both a real property deed of
trust and a "security agreement" within the meaning of the Uniform Commercial Code.  The
Property includes both real and personal property and all other rights and interests, whether
tangible or intangible in nature, of Trustor in the Property.  Trustor by executing and
delivering this Deed of Trust has granted and hereby grants to Beneficiary and Trustee, as
security for the Debt, a security interest in the Property to the full extent that the Property may
be subject to the Uniform Commercial Code (said portion of the Property so subject to the

4185592
Page:   21 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY   DT   $43.00   Spokane Co, WA

Uniform Commercial Code being called in this paragraph the "**Collateral**"). Trustor hereby agrees with Beneficiary to execute and deliver to Beneficiary, in form and substance reasonably satisfactory to Beneficiary, such financing statements and such further assurances as Beneficiary may from time to time, reasonably consider necessary to create, perfect, and preserve Beneficiary's security interest herein granted. This Deed of Trust shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code. As such, this Deed of Trust covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Deed of Trust. If an Event of Default shall occur, Beneficiary and Trustee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Beneficiary or Trustee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Beneficiary or Trustee, Trustor shall at its expense assemble the Collateral and make it available to Beneficiary and Trustee at a convenient place reasonably acceptable to Beneficiary. Trustor shall pay to Beneficiary and Trustee on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Beneficiary and Trustee in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Beneficiary and Trustee with respect to the Collateral sent to Trustor in accordance with the provisions hereof at least thirty (30) days prior to such action, shall constitute commercially reasonable notice to Trustor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Beneficiary to the payment of the Debt in such priority and proportions as Beneficiary in its sole discretion shall deem proper. In the event of any change in name, identity or structure of any Trustor, such Trustor shall notify Beneficiary and Trustee thereof and promptly after request shall execute, file and record such Uniform Commercial Code forms as are necessary to maintain the priority of Beneficiary's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Beneficiary shall require the filing or recording of additional Uniform Commercial Code forms or continuation statements, Trustor shall, promptly after request, execute, file and record such Uniform Commercial Code forms or continuation statements as Beneficiary shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Trustor's obligations under the Note, this Deed of Trust and the other Loan Documents. Trustor hereby irrevocably appoints Beneficiary as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements signed only by Beneficiary, as secured party, in connection with the Collateral covered by this Deed of Trust.

       23.   **Actions and Proceedings**. If Trustor fails to act within a reasonable time, Beneficiary or Trustee has the right to appear in and defend any action or proceeding



4185592
Page:   22 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY    DT    $43.00    Spokane Co, WA

brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Trustor, which Beneficiary, in its sole discretion, decides should be brought to protect their interest in the Property. Beneficiary shall, at its option, be subrogated to the lien of any deed of trust or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

**24.    Waiver of Setoff and Counterclaim**.  All amounts due under this Deed of Trust, the Note and the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Trustor hereby waives the right to assert a setoff, counterclaim (other than a mandatory or compulsory counterclaim) or deduction in any action or proceeding in which Beneficiary is a participant, or arising out of or in any way connected with this Deed of Trust, the Note, any of the other Loan Documents, or the Debt.

**25.    Recovery of Sums Required to be Paid**.  Beneficiary shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Beneficiary thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Trustor existing at the time such earlier action was commenced.

**26.    Marshalling and Other Matters**.  (a) Trustor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Trustor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Deed of Trust on behalf of Trustor, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Deed of Trust and on behalf of all persons to the extent permitted by applicable law.

(b)    Trustor acknowledges that this Deed of Trust secures the Debt. Trustor agrees that the lien of this Deed of Trust shall be absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of Beneficiary and, without limiting the generality of the foregoing, the lien hereof shall not be impaired by any acceptance by Beneficiary of any other security for any portion of the Debt, or by any failure, neglect or omission on the part of Beneficiary to realize upon or protect any portion of the Debt or any collateral security therefor. The lien of this Deed of Trust shall not in any manner be impaired or affected by any release (except as to the property released), sale, pledge, surrender, compromise, settlement, renewal, extension, indulgence, alteration, changing, modification or disposition of any portion of the Debt or of any of the collateral security therefor.

**27.    Hazardous Substances**.  Trustor hereby represents and warrants to Beneficiary that, to Trustor's knowledge, following review of the environmental report

4185592
Page:    23 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY    DT        $43.00    Spokane Co, WA

obtained by Trustor in connection with the acquisition and delivered to Beneficiary (the "**Report**"), except as disclosed in the Report:  (a) the Property is not in direct or indirect violation of any local, state, federal or other governmental authority, statute, ordinance, code, order, decree, law, rule or regulation pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("**CERCLA**"), the Resource Conservation and Recovery Act, as amended ("**RCRA**"), the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Hazardous Substances Transportation Act, as amended, the Solid Waste Disposal Act, as amended, the Clean Water Act, as amended, the Clean Air Act, as amended, the Toxic Substance Control Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, any state super-lien and environmental clean-up statutes and all regulations, orders and guidelines adopted in respect of the foregoing laws whether presently in force or coming into being and/or effectiveness hereafter (collectively, "**Environmental Laws**"); (b) the Property is not subject to any private or governmental lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous and/or toxic, dangerous and/or regulated, substances, wastes, materials, raw materials which include hazardous constituents, pollutants or contaminants including, without limitation, petroleum, tremolite, anthlophylie, actinolite or polychlorinated biphenyls and any other substances or materials which are included under or regulated by Environmental Laws or which are considered by scientific opinion to be otherwise dangerous in terms of the health, safety and welfare of humans (collectively, "**Hazardous Substances**"); (c) no Hazardous Substances are or have been (including during the period prior to Trustor's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (d) no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; and (e) no underground storage tanks exist on any of the Property.  So long as Trustor owns or is in possession of the Property, Trustor (i) shall keep or cause the Property to be kept free from Hazardous Substances and in compliance with all Environmental Laws, (ii) shall promptly notify Beneficiary if Trustor shall become aware of any Hazardous Substances on or near the Property and/or if Trustor shall become aware that the Property is in direct or indirect violation of any Environmental Laws and/or if Trustor shall become aware of any condition on or near the Property which shall pose a threat to the health, safety or welfare of humans, and (iii) shall remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law, promptly after Trustor becomes aware of same, at Trustor's sole expense.  Trustor shall be deemed in compliance with clauses (i) and (iii) of this Paragraph 27 so long as the Credit Lease is in full force and effect and Credit Tenant is in full compliance with Paragraph 26 thereof.  Nothing herein shall prevent Trustor from recovering such expenses from any other party that may be liable for such removal or cure.  The obligations and liabilities of Trustor under this Paragraph 27 shall, subject to Section 9.4 of the Loan Agreement, survive any termination, satisfaction, or assignment of this Deed of Trust and the exercise by Beneficiary of any of its rights or remedies hereunder, including, without

-20-

limitation, the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**28.**   **Asbestos**. Trustor represents and warrants that, to Trustor's knowledge, after reviewing the Report, no asbestos or any substance or material containing asbestos ("**Asbestos**") is located on the Property except as may have been disclosed in the Report. Trustor shall not install in the Property, nor permit to be installed in the Property, Asbestos and shall remove any Asbestos promptly upon discovery to the satisfaction of Beneficiary, at Trustor's sole expense. Trustor shall in all instances comply with, and ensure compliance by all occupants of the Property with, all applicable federal, state and local laws, ordinances, rules and regulations with respect to Asbestos, and shall keep the Property free and clear of any liens imposed pursuant to such laws, ordinances, rules or regulations, subject to Trustor's right to contest the same in accordance with Section 5.1(b) of the Loan Agreement. Trustor shall be deemed in compliance with the foregoing provisions of this Paragraph 28 so long as the Credit Lease is in full force and effect and Credit Tenant is in full compliance with Paragraph 26 thereof. In the event that Trustor receives any notice or advice from any governmental agency or any source whatsoever with respect to Asbestos on, affecting or installed on the Property, Trustor shall immediately notify Beneficiary. The obligations and liabilities of Trustor under this Paragraph 28 shall, subject to Section 9.4 of the Loan Agreement, survive any termination, satisfaction, or assignment of this Deed of Trust and the exercise by Beneficiary of any of its rights or remedies hereunder, including but not limited to, the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**29.**   **Environmental Monitoring**. Trustor shall give, and shall exercise all rights and remedies, if any, available to it under the Credit Lease (short of termination thereof), to cause Credit Tenant to give, prompt written notices to Beneficiary of: (a) any proceeding or inquiry by any party with respect to the presence of any Hazardous Substance or Asbestos on, under, from or about the Property, (b) all claims made or threatened by any third party against Trustor or the Property relating to any loss or injury resulting from any Hazardous Substance or Asbestos, and (c) Trustor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Trustor shall permit Beneficiary to join and participate in, as a party if it so elects, any legal proceedings or actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Trustor shall pay all attorneys' fees and disbursements incurred by Beneficiary in connection therewith. Upon Beneficiary's request, at any time and from time to time while this Deed of Trust is in effect and so long as Beneficiary has determined (in the exercise of its good faith judgment) that reasonable cause exists for the performance of an environmental inspection or audit of the Property, Trustor shall provide at Trustor's sole expense, to the extent permitted under the Credit Lease (i) an inspection or audit of the Property prepared by a licensed hydrogeologist or licensed environmental engineer approved by Beneficiary indicating the presence or absence of Hazardous Substances and/or the violation or threatened violation of any Environmental Laws on, in or near the Property, and (ii) an inspection or audit of the Property prepared by a duly qualified engineering or consulting firm

Case 08-35653-KRH    Doc 11746-2    Filed 02/24/12    Entered 02/24/12 16:35:27    Desc
Exhibit(s) D-F    Page of

4185592
Page:    26 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY    DT    $43.00    Spokane Co, WA

approved by Beneficiary, indicating the presence or absence of Asbestos on the Property. If Trustor fails to provide such inspection or audit within thirty (30) days after such request, Beneficiary may order same, and Trustor hereby grants to Beneficiary and its employees and agents, subject to the terms of the Credit Lease, access to the Property and a license to undertake such inspection or audit. The cost of such inspection or audit may be added to the Debt and shall bear interest thereafter until paid at the Default Rate. In the event that any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for Asbestos or any Hazardous Substance, Trustor shall cause such operations and maintenance plan to be prepared and implemented at Trustor's expense upon request of Beneficiary. In the event that any investigation, testing, assessment, audit, site monitoring, containment cleanup, removal, restoration or other work of any kind is reasonably necessary or desirable under any applicable Environmental Law or otherwise required under this Deed of Trust in connection with any Hazardous Substance or Asbestos (the "**Remedial Work**"), Trustor shall commence and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. All Remedial Work shall be performed by contractors reasonably approved in advance by Beneficiary, and under the supervision of a consulting engineer reasonably approved by Beneficiary. All costs and expenses of such Remedial Work shall be paid by Trustor including, without limitation, Beneficiary's reasonable attorneys' fees and disbursements incurred in connection with monitoring or review of such Remedial Work. In the event Trustor shall fail to timely commence, or cause to be commenced, or fail to diligently prosecute to completion, such Remedial Work, Beneficiary may, but shall not be required to, cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, may be added to the Debt and shall bear interest thereafter until paid at the Default Rate.

30. **Handicapped Access**. (a) Trustor agrees that the Property shall at all times strictly comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988 (if applicable), all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "**Access Laws**").

(b)    Notwithstanding any provisions set forth herein or in any other document regarding Beneficiary's approval of alterations of the Property, Trustor shall not alter the Property in any manner which would increase Trustor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Beneficiary. The foregoing shall apply to tenant improvements constructed by Trustor. Beneficiary may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person reasonably acceptable to Beneficiary.

(c)    Trustor agrees to give upon receipt by Trustor, prompt notice to Beneficiary of the receipt by Trustor of any complaints related to violation of any Access Laws

Case 08-35653-KRH   Doc 11746-2   Filed 02/24/12   Entered 02/24/12 16:35:27   Desc
Exhibit(s) D-F   Page 26 of 36

4185592
Page:   26 of 36
02/06/1998 02:04P

PIONEER, TITLE COMPANY     DT        $43.00    Spokane Co, WA

and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

**31.   Indemnification.**   In addition to any other indemnifications provided herein or in the other Loan Documents, Trustor shall protect, defend, indemnify and hold harmless Beneficiary and Trustee from and against all liabilities, obligations, claims, demands, damages, penalties, causes of action, losses, fines, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements), imposed upon or incurred by or asserted against Beneficiary or Trustee by reason of (a) ownership of this Deed of Trust, the Property or any interest therein or receipt of any Rents; (b) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) any use, nonuse or condition in, on or about the Property or any part thereof or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any failure on the part of Trustor or Trustee to perform or comply with any of the terms of this Deed of Trust; (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (f) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance or Asbestos on, from, or affecting the Property; (g) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance or Asbestos; (h) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance or Asbestos; (i) any violation of the Environmental Laws, which are based upon or in any way related to such Hazardous Substance or Asbestos, including, without limitation, the costs and expenses of any Remedial Work, reasonable attorney and consultant fees and disbursements, investigation and laboratory fees, court costs, and litigation expenses; (j) any failure of the Property to comply with any Access Laws; (k) any representation or warranty made in the Note, this Deed of Trust or any of the other Loan Documents being false or misleading in any material respect as of the date such representation or warranty was made; (l) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof under any legal requirement or any liability asserted against Beneficiary with respect thereto; and (m) the claims of any lessee of any or any portion of the Property or any person acting through or under any lessee or otherwise arising under or as a consequence of any Lease.   Any amounts payable to Beneficiary or Trustee by reason of the application of this paragraph shall be secured by this Deed of Trust and shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Beneficiary or Trustee until paid. The obligations and liabilities of Trustor under this Paragraph 31 shall, subject to Section 9.4 of the Loan Agreement survive the termination, satisfaction, or assignment of this Deed of Trust and the exercise by Beneficiary of any of its rights or remedies hereunder, including, but not limited to, the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

4185592
Page:   27 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY      DT      $43.00   Spokane Co, WA

**32.**   **Notices**.  Any notice required or permitted to be given under this Deed of Trust shall be (a) in writing, (b) sent in the manner set forth in the Loan Agreement, and effective in accordance with the terms of the Loan Agreement.

**33.**   **Authority**.  (a)  Trustor (and the undersigned representative of Trustor, if any) represent and warrant that it (or they, as the case may be) has full power, authority and right to execute, deliver and perform its obligations pursuant to this Deed of Trust, and to deed, mortgage and warrant, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, hypothecate and assign the Property pursuant to the terms hereof and to keep and observe all of the terms of this Deed of Trust on Trustor's part to be performed; and (b) Trustor represents and warrants that Trustor is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

**34.**   **Waiver of Notice**.  Trustor shall not be entitled to any notices of any nature whatsoever from Beneficiary except with respect to matters for which this Deed of Trust specifically and expressly provides for the giving of notice by Beneficiary to Trustor and except with respect to matters for which Beneficiary is required by applicable law to give notice.  To the extent permitted by applicable law, Trustor hereby expressly waives the right to receive any notice from Beneficiary with respect to any matter for which this Deed of Trust does not specifically and expressly provide for the giving of notice by Beneficiary to Trustor.

**35.**   **Non-Waiver**.  The failure of Beneficiary or Trustee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Deed of Trust.  Trustor shall not be relieved of Trustor's obligations hereunder by reason of (a) the failure of Beneficiary or Trustee to comply with any request of Trustor to take any action to foreclose this Deed of Trust or otherwise enforce any of the provisions hereof or of the Note, or any of the other Loan Documents, (b) except in connection with the full repayment (or complete defeasance) of the Debt, the release, regardless of consideration, of the whole or any part of the Property, or of any person liable for the Debt or any portion thereof, or (c) any agreement or stipulation by Beneficiary extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Deed of Trust or any of the other Loan Documents.  Beneficiary may resort for the payment of the Debt to any other security of Trustor held by Beneficiary in such order and manner as Beneficiary, in its sole discretion, may elect.  Beneficiary or Trustee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Beneficiary or Trustee thereafter to foreclose this Deed of Trust.  The rights and remedies of Beneficiary or Trustee under this Deed of Trust shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Beneficiary or Trustee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Beneficiary and Trustee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

4185592
Page:    28 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY      DT        $43.00    Spokane Co, WA

**36.    No Oral Change**.  This Deed of Trust, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Trustor or Beneficiary, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

**37.    Liability**.  If Trustor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several.  Subject to the provisions hereof requiring Beneficiary's consent to any transfer of the Property, this Deed of Trust shall be binding upon and inure to the benefit of Trustor and Beneficiary and their respective successors and assigns forever.

**38.    Inapplicable Provisions**.  If any term, covenant or condition of the Note or this Deed of Trust is held to be invalid, illegal or unenforceable in any respect, the Note and this Deed of Trust shall be construed without such provision.

**39.    Headings, Etc.**  The headings and captions of various paragraphs of this Deed of Trust are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

**40.    Duplicate Originals**.  This Deed of Trust may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

**41.    Definitions**.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Deed of Trust may be used interchangeably in singular or plural form and the word "**Trustor**" shall mean "each Trustor and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "**Beneficiary**" shall mean "Beneficiary and any subsequent holder of the Note," the word "**Trustee**" shall mean "Trustee and any subsequent holder of this Deed of Trust," the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by this Deed of Trust," the word "**person**" shall include an individual, corporation, partnership, trust, unincorporated association, government, governmental authority, and any other entity, and the words "**Property**" shall include any portion of the Property and any interest therein and the words "**attorneys' fees**" shall include any and all attorneys' fees, paralegal and law clerk fees, including, without limitation, fees at the pre-trial, trial and appellate levels incurred or paid by Beneficiary in protecting its interest in the Property and Collateral and enforcing its rights hereunder.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

**42.    Homestead**.  To the extent permitted by law, Trustor hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the

4185592
Page:   29 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY    DT                $43.00    Spokane Co, WA

United States and of any state, in and to the Property as against the collection of the Debt, or any part hereof.

**43.    Assignments**. Beneficiary shall have the right to assign or transfer its rights under this Deed of Trust without limitation. Any assignee or transferee shall be entitled to all the benefits afforded Beneficiary under this Deed of Trust.

**44.    Waiver of Jury Trial**. TRUSTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS DEED OF TRUST, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY TRUSTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. BENEFICIARY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY TRUSTOR.

**45.    Trustee's Fees; Substitute Trustee**. (a) Trustor shall pay all costs, fees and expenses incurred by Trustee and Trustee's agents and counsel in connection with the performance by Trustee of Trustee's duties hereunder and all such costs, fees and expenses shall be secured by this Deed of Trust.

(b)    Trustee shall be under no duty to take any action hereunder except as expressly required hereunder or by law, or to perform any act which would involve Trustee in any expense or liability or to institute or defend any suit in respect hereof, unless properly indemnified to Trustee's reasonable satisfaction. Trustee, by acceptance of this Deed of Trust, covenants to perform and fulfill the trust herein created, being liable, however, only for willful negligence or misconduct, and hereby waives any statutory fee and agrees to accept reasonable compensation, in lieu thereof, for any services rendered by Trustee in accordance with the terms hereof. Trustee may resign at any time upon giving thirty (30) days' notice to Trustor and to Beneficiary. Beneficiary may remove Trustee at any time or from time to time and select a successor trustee. In the event of the death, removal, resignation, refusal to act, or inability to act of Trustee, or in its sole discretion for any reason whatsoever, Beneficiary may, without notice and without specifying any reason therefor and without applying to any court, select and appoint a successor trustee, by an instrument recorded wherever this Deed of Trust is recorded and all powers, rights, duties and authority of Trustee, as aforesaid, shall thereupon become vested in such successor. Such substitute trustee shall not be required to give bond for the faithful performance of the duties of Trustee hereunder unless required by Beneficiary. The procedure provided for in this paragraph for substitution of Trustee shall be

4185592
Page:   30 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY      DT      $43.00   Spokane Co, WA

in addition to and not in exclusion of any other provisions for substitution, by law or otherwise.

**46.   Power of Sale**.   (a)   Upon the occurrence of an Event of Default, Trustee, or the agent or successor of Trustee, at the request of Beneficiary, shall sell or offer for sale the Property in such portions, order and parcels as Beneficiary may determine with or without having first taken possession of same, to the highest bidder for cash at one or more public auctions in accordance with the terms and provisions of the law of the State in which the Property is located.   Such sale shall be made at the area within the courthouse of the county in which the Property (or any portion thereof to be sold) is situated (whether the parts or parcels thereof, if any, in different counties are contiguous or not, and without the necessity of having any personal property hereby secured present at such sale) which is designated by the applicable court of such County as the area in which public sales are to take place, or, if no such area is designated, at the area at the courthouse designated in the notice of sale as the area in which the sale will take place, on such day and at such times as permitted under applicable law of the State where the Property is located, after advertising the time, place and terms of sale and that portion of the Property in accordance with such law, and after having served written or printed notice of the proposed sale by certified mail on each Trustor obligated to pay the Note and other secured indebtedness secured by the Deed of Trust according to the records of Beneficiary in accordance with applicable law.   The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service.

At any such public sale, Trustee may execute and deliver in the name of Trustor to the purchaser a conveyance of the Property or any part of the Property in fee simple.   In the event of any sale under this Deed of Trust by virtue of the exercise of the powers herein granted, or pursuant to any order in any judicial proceeding or otherwise, the Property may be sold in its entirety or in separate parcels and in such manner or order as Beneficiary in its sole discretion may elect, and if Beneficiary so elects, Trustee may sell the personal property covered by this Deed of Trust at one or more separate sales in any manner permitted by the Uniform Commercial Code of the State in which the Property is located, and one or more exercises of the powers herein granted no extinguish or exhaust such powers, until all the Property is sold or the Note and other secured indebtedness is paid in full.   If the Note and other secured indebtedness is now or hereafter further secured by any chattel deeds of trusts, pledges, contracts or guaranty, assignments of lease, or other security instruments, Beneficiary at its option may exhaust the remedies granted under any of said security instruments either concurrently or independently, and in such order as Beneficiary may determine.

(b)   Upon any foreclosure sale or sales of all or any portion of the Property under the power herein granted, Beneficiary may bid for and purchase the Property and shall be entitled to apply all or any part of the Debt as a credit to the purchase price.

(c)   In the event of a foreclosure or a sale of all portion of the Property under the power herein granted, the proceeds of said sale shall be applied, in whatever order

4185592
Page: 31 of 36
02/06/1998 02:04P
PIONEER TITLE COMPANY   DT   $43.00   Spokane Co, WA

Beneficiary in its sole discretion may decide, to the expenses of such sale and of all proceedings in connection therewith (including without limitation, attorneys' fees and expenses), to fees and expenses of Trustee (including, without limitation, Trustee's attorneys' fees and expenses), to insurance premiums, liens, assessments, taxes and charges (including, without limitation, utility charges advanced by Beneficiary), to payment of the outstanding principal balance of the Debt, and to the accrued interest on all of the foregoing; and the remainder, if any, shall be paid to Trustor, or to the person or entity lawfully entitled thereto.

47.   **Defeasance**.  Provided no Event of Default exists, this Deed of Trust will be satisfied and discharged of record by Beneficiary prior to the Maturity Date only in accordance with the terms and provisions set forth in Sections 2.3 and 2.4 of the Loan Agreement and upon satisfaction by Trustor of all the terms and conditions contained therein.

48.   **No Election of Remedies**.  (a)  Without limiting any other right or remedy provided to Beneficiary or Trustee in this Deed of Trust or the other Loan Documents, in the case of an Event of Default (i) Beneficiary and Trustee shall have the right to pursue all of their rights and remedies under this Deed of Trust and the Loan Documents, at law and/or in equity, in one proceeding, or separately and independently in separate proceedings from time to time, as Beneficiary, in its sole and absolute discretion, shall determine from time to time, (ii) Neither Beneficiary nor Trustee shall be required to either marshall assets, sell the Property in any particular order of alienation (and may sell the same simultaneously and together or separately), or be subject to any "one action" or "election of remedies" law or rule with respect to the Property, (iii) the exercise by Beneficiary or Trustee of any remedies against any one item of Property will not impede Beneficiary or Trustee from subsequently or simultaneously exercising remedies against any other item of Property, (iv) all liens and other rights, remedies or privileges provided to Beneficiary and Trustee herein shall remain in full force and effect until Beneficiary and Trustee have exhausted all of their remedies against the Property and all Property has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt, and (v) Beneficiary itself, or through Trustee, may resort for the payment of the Debt to any security held by Beneficiary in such order and manner as Beneficiary, in its discretion, may elect and Beneficiary itself, or through Trustee, may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Beneficiary or Trustee thereafter to foreclose this Deed of Trust.

(b)   Without notice to or consent of Trustor and without impairment of the lien and rights created by this Deed of Trust, Beneficiary may, at any time (in its sole and absolute discretion, but Beneficiary shall have no obligation to), execute and deliver to Trustor a written instrument releasing and reconveying all or a portion of the lien of this Deed of Trust as security for any or all of the obligations of Trustor now existing or hereafter arising under or in respect of the Note, the Loan Agreement and each of the other Loan Documents, whereupon following the execution and delivery by Beneficiary to Trustor of any such written instrument of release, this Deed of Trust shall no longer secure such obligations of Trustor so released.

4185592
Page:   32 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY    DT    $43.00    Spokane Co, WA

**49.**  **Exculpation**.  Notwithstanding anything herein to the contrary, Beneficiary shall not enforce the liability and obligations contained in the Note, the Loan Agreement, this Deed of Trust or the other Loan Documents except as provided in Section 9.4 of the Loan Agreement.

**50.**  **Governing Law**.  THIS DEED OF TRUST SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF SECTION 10.3 OF THE LOAN AGREEMENT.

**51.**  **Miscellaneous**.  (a)  Any consent or approval by Beneficiary in any single instance shall not be deemed or construed to be Beneficiary's consent or approval in any like matter arising at a subsequent date, and the failure of Beneficiary to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Beneficiary be estopped from exercising such right, power, remedy, consent or approval at a later date.  Any consent or approval requested of and granted by Beneficiary pursuant hereto shall be narrowly construed to be applicable only to Trustor and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Beneficiary a venturer or partner with Trustor nor shall privity of contract be presumed to have been established with any such third party.  If Beneficiary deems it to be in its best interest to retain assistance of persons, firms or corporations (including, without limitation, attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Trustor shall reimburse Beneficiary for all costs reasonably incurred in connection with the employment of such persons, firms or corporations.

(b)  The Loan Documents contain the entire agreement between Trustor and Beneficiary relating to or connected with the Loan.  Any other agreements relating to or connected with the Loan not expressly set forth in the Loan Documents are null and void and superseded in their entirety by the provisions of the Loan Documents.

**PART II**

**SPECIAL STATE PROVISIONS**

**52.**  **Construction of Deed of Trust**.  In the event of any conflict between the terms and provisions of Part I and Part II of this Deed of Trust, the terms and provisions of Part II shall govern and control.

**53.**  At the end of the second paragraph of Recital E which begins with "NOW THEREFORE", add the following paragraph:

"The foregoing notwithstanding, this Deed of Trust does not secure any guaranty or indemnification of Trustor or any third party to the extent the instrument evidencing the same states that such obligations are not so secured.  Trustor's indemnities in

4185592
Page: 33 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY   DT   $43.00   Spokane Co, WA

this Deed of Trust shall be limited to the actual and consequential damages incurred by Beneficiary, including all advances or payments paid or agreed to be paid by Beneficiary pursuant to its rights to require environmental assessments, join or participate in any proceedings, cure Trustor's default or enforce its remedies (a) prior to and after any judicial foreclosure of this Deed of Trust or deed delivered and accepted in lieu thereof, or (b) prior to any nonjudicial foreclosure of this Deed of Trust or deed delivered and accepted in lieu thereof. The obligations of Trustor under this Section shall be mutually exclusive of any liabilities arising after a nonjudicial foreclosure of this Deed of Trust or the delivery and acceptance of a deed in lieu of such nonjudicial foreclosure which are evidenced by the Hazardous Materials Indemnity Agreement;"

**54.   Additional Representation and Warranty concerning the Loan**. Trustor represents, warrants and covenants that the Property is not and will not be used principally for agricultural or farming purposes.

**55.   Washington Hazardous Substance Laws**. The following language is hereby added to the fourteenth line of Paragraph 27 immediately following the phrase "the Occupational Safety and Health Act, as amended,": "the Washington Model Toxic Control Act (RCW Chapter 70.105D), and the Washington Hazardous Waste Management Act (RCW Chapter 70.105),".

**56.   Reconveyance of Property**. Upon the performance of all obligations and the payment in full of all sums secured by this Deed of Trust, Beneficiary shall request Trustee to reconvey the Property. Upon payment of its fees and any other sums owing to it under this Deed of Trust, Trustee shall reconvey the Property without warranty to the person or persons legally entitled thereto. Such person or persons shall pay all costs of recordation, if any. The recitals and such conveyance of any matters or facts shall be conclusive of the truthfulness thereof. The grantee in such reconveyance may be described as "the person or persons legally entitled thereto."

4185592
Page:    34 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY      DT         $43.00   Spokane Co, WA

IN WITNESS WHEREOF, the Trustor has caused this Deed of Trust to be duly
executed by its duly authorized representative, as of the day and year first above written.

LARRY J. RIETZ MP, L.L.C., a Minnesota limited
liability company

By:    North Division CC, Inc., a Minnesota corporation,
its Chief Manager

By: _____

Name: Larry J. Rietz

Title: President

4185592
Page:   35 of 36
02/06/1998  02:04P
PIONEER, TITLE COMPANY    DT        $43.00    Spokane Co, WA

STATE OF _Minnesota_ )
                     ) ss.
COUNTY OF _Steele_   )


I certify that I know of or have satisfactory evidence that _Larry J. Rietz_, the _President_ of North Division CC, Inc., a Minnesota corporation, which is the Chief Manager of Larry J. Rietz MP, L.L.C., a Minnesota limited liability company, is the person who appeared before me, and said person acknowledged that he signed this instrument on behalf of the corporation in its capacity as Chief Manager of the limited liability company, acknowledged it to be the free and voluntary act of the company for the uses and purposes mentioned in this instrument, and on oath stated that he was authorized to execute this instrument.


DATED: _January 30, 1998_   _Kimberly Jo Nordlund_
                                     (Notary Signature)


_Kimberly Jo Nordlund_
            (Type or Print Name of Notary)
NOTARY PUBLIC for the State of
_Minnesota_ , residing at _____
_Owatonna, MN_

My appointment expires:
_Jan 31, 2000_


KIMBERLY JO NORDLUND
NOTARY PUBLIC - MINNESOTA
STEELE COUNTY
My Commission Expires Jan. 31, 2000


0212180.01

4185592
Page: 36 of 36
02/06/1998 02:04P
PIONEER, TITLE COMPANY      DT          $43.00   Spokane Co, WA

## EXHIBIT A

### LEGAL DESCRIPTION

PARCEL 1:

That portion of the South half of the North half of the Northeast quarter of the Northeast quarter of Section 30, Township 26 North, Range 43 East, W.M., in Spokane County, Washington, described as follows:

BEGINNING at the intersection of the North line of said South half and the West right-of-way line of Division Street;
Thence South 00°14'39" East, along said West right-of-way line, 221.89 feet;
Thence South 12°03'28" West, 70.40 feet;
Thence South 60°08'34" West, 27.28 feet;
Thence South 89°45'21" West, 312.29 feet;
Thence North 00°14'39" West, 139.70 feet;
Thence North 07°28'25" East, 142.56 feet;
Thence North 00°14'39" West, 33.00 feet to the North line of said South half;
Thence South 88°32'59" East, along said North line, 332.00 feet to the Point of Beginning, also being known as;

Tract "A" of Short Plat No. SP-1025-95 according to Plat recorded in Volume 14 of Short Plats, Pages 21-22, in Spokane County, Washington.

PARCEL 2:

An easement for a sanitary sewer system as set forth in that certain Private Sewer System TIE-IN Easement Agreement filed for record on April 18, 1997, as Spokane County Auditor's No. 4095144.

PARCEL 3:

That certain non-exclusive easement and the rights and obligations pertaining thereto as set forth in that certain Declaration of Covenants, Conditions and Restrictions and Grant of Reciprocal Easements filed for record on April 18, 1997 as Spokane County Auditor's No. 4095143.

**Response of CWCapital Asset Management, LLC to the Liquidating Trust's Twenty-eighth
Omnibus Objection to Landlord Claims**

# Exhibit F



PIONEER, TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA
4185593    Page: 1 of 12    02/06/1998  02:04P

DOCUMENT PREPARED BY:

Cadwalader, Wickersham & Taft
100 Maiden Lane
New York, New York  10038
Attention:  William P. McInerney, Esq.



PIONEER, TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA
4185594    Page: 1 of 12    02/06/1998  02:04P

P245552

## LARRY J. RIETZ MP, L.L.C.
a Minnesota limited liability company,
as Assignor

to

## NOMURA ASSET CAPITAL CORPORATION
a Delaware corporation,
as Assignee

---

### ASSIGNMENT OF LEASES AND RENTS

---

Dated:  As of February 4, 1998

Property Location:  Circuit City
7701 North Division Street
Spokane, Washington

Tax Parcel No.:    36301.9002    *Tract A, SP 95-1025*

*ptn. SE¼ 30-26-43*

---

0213077.02\SPOKANE, WA

R.E. Excise Tax Exempt
Date: 2/6         19 98
Spokane County Treasurer
By: *meh*

1002/224/162                                 019798



4185593
Page:    2 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY    ASSGN    $19.00  Spokane Co, WA

THIS ASSIGNMENT OF LEASES AND RENTS (this "**Assignment**") dated and effective as of the 4th day of February, 1998 made by **LARRY J. RIETZ MP, L.L.C.**, a limited liability company duly organized under the laws of the State of Minnesota, having an office at 1355 Lemond Road, Owatonna, Minnesota 55060 ("**Assignor**") to **NOMURA ASSET CAPITAL CORPORATION**, a corporation organized under the laws of the State of Delaware, having an office at Two World Financial Center, Building B, New York, New York 10281.

## W I T N E S S E T H :

WHEREAS, Assignor is the owner of a fee simple title to that certain parcel of real property (the "**Premises**") described in <u>Exhibit A</u> attached hereto, together with the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and other improvements now or hereafter located thereon (collectively, the "**Property**");

WHEREAS, Assignor and Assignee have entered into a certain Loan Agreement dated as of the date hereof (as amended, modified, restated, consolidated or supplemented from time to time, the "**Loan Agreement**") pursuant to which Assignee has agreed to make a secured mortgage loan to Assignor;

WHEREAS, Assignor has leased the Premises and the Property to Circuit City Stores, Inc. ("**Credit Tenant**") pursuant to a Lease of even date herewith (the "**Credit Lease**");

WHEREAS, pursuant to the Loan Agreement, Assignee is making a Loan to Assignor in the aggregate original principal amount of $4,302,912.00 (the "**Loan**") and Assignor has executed a promissory note in the principal amount of $4,302,912.00 (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "**Note**"). The Note is secured by, <u>inter alia</u>, that certain deed of trust, assignment of leases and rents and security agreement (as amended from time to time, the "**Mortgage**") on the Premises and Property;

WHEREAS, it is a condition to the obligation of the Assignee to make the Loan to the Assignor pursuant to the Loan Agreement that Assignor execute and deliver this Assignment;

WHEREAS, Assignor and Assignee contemplate that Assignee's interest in and to, <u>inter alia</u>, the Loan, the Note and this Assignment may be assigned by Assignee to a trustee for the benefit of all holders of the Securities issued in connection with the Securitization;

WHEREAS, this Assignment is being given as additional security for the Loan; and



4185594
Page:    2 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY    ASSGN    $19.00  Spokane Co, WA

**4185593**
Page:    3 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA

WHEREAS, capitalized terms used in this Assignment without definition have the respective meanings assigned to such terms in the Loan Agreement or the Mortgage as the case may be, the terms of each of which are specifically incorporated by reference herein.

NOW, THEREFORE, for good and valuable consideration, receipt of which by the parties hereto is hereby acknowledged, and additionally for the purpose of additionally securing the Debt, Assignor hereby assigns, transfers, conveys and sets over unto the Assignee, all right, title and interest of Assignor in and to (i) all Leases (as hereinafter defined) and (ii) all Rents (as hereinafter defined);

TO HAVE AND TO HOLD the same unto the Assignee, and its successors and assigns forever, upon the terms and conditions and for the uses hereinafter set forth.

And Assignor hereby further agrees as follows:

**Section 1.  Definitions.**

As used herein, the following terms shall have the following meanings:

(a)  **"Leases"** shall mean any and all leases, or, to the extent of the interest therein of Assignor, subleases or sub-subleases, lettings, licenses, concessions or other agreements (whether written or oral and whether now or hereafter in effect) pursuant to which any person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, including, without limitation, the Credit Lease, and any guarantee thereof, and every modification, amendment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

(b)  **"Rents"** shall mean all rents, rent equivalents, monies payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, proceeds, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Assignor or its agents or employees from any and all sources arising from or attributable to the Property, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property and proceeds, if any, from business interruption or other loss of income insurance, but shall include amounts payable under subleases of the Property only to the extent of Assignor's right, title and interest therein.



**4185594**
Page:    3 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA

PIONEER, TITLE COMPANY      ASSGN      $19.00

## Section 2.  Certain Representations, Warranties and Covenants.

Assignor represents, warrants and covenants to the Assignee that:

(a)    The payment of the Rents to accrue under any Lease will not be waived, released, reduced, discounted or otherwise discharged or compromised by Assignor except as permitted in the Mortgage.  Assignor waives any rights of set off against any tenant under any Lease.  Assignor agrees that it will not assign any of the Rents except to a purchaser or grantee of the Property permitted under the Loan Agreement or as expressly contemplated by the other Loan Documents;

(b)    Assignor has not performed, and will not perform, any acts, and has not executed, and will not execute, any instrument that would prevent Assignee from exercising its rights under this Assignment; and

(c)    Assignor hereby authorizes and directs any tenant under any of the Leases and any successor to all or any part of the interests of any such tenant to pay directly to the Lender in accordance with Section 2.6 of the Loan Agreement, the Rents due and to become due under the Leases and such authorization and direction shall be sufficient warrant to the tenant to make future payments of Rents directly to the Cash Management Account in accordance with Section 2.6 of the Loan Agreement without the necessity for further consent by the Assignor.

(d)    Borrower and Lender have agreed, pursuant to Section 2.6 of the Loan Agreement, for the Rent paid pursuant to the Credit Lease and any other Leases to be deposited directly into the Cash Management Account.  Section 2.6 of the Loan Agreement is hereby incorporated in its entirety into this Agreement by reference.  Lender is hereby granted and assigned by Borrower the right, at its option, upon an Event of Default to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents.  Any Rents collected after an Event of Default may be applied toward payment of the Debt (as defined in the Loan Agreement) in such priority and proportion as Lender, in its discretion, shall deem proper.

## Section 3.  Deferred Exercise of Rights.

(a)    As part of the consideration for the indebtedness evidenced by the Note, Assignor does hereby absolutely and unconditionally assign to Assignee all right, title and interest of Assignor in and to all present and future Leases and Rents, and this Assignment constitutes a present and absolute assignment and is intended to be unconditional and not as an assignment for additional security only.  It is further intended that it not be necessary for Assignee to institute legal proceedings, absent any requirements of law or regulation to the contrary, to enforce the provisions hereof.  Assignor hereby authorizes Assignee or its agents to collect the aforesaid Rents in accordance with Section 2.6 of the Loan Agreement and hereby directs each tenant of the Property to pay such Rents directly to the Cash Management

4185594
Page:   4 of 12
02/06/1998  02:04P
Spokane Co, WA
PIONEER, TITLE COMPANY      ASSGN      $19.00



PIONEER TITLE COMPANY   ASSGN   $19.00   Spokane Co, WA

Account, in accordance with such Section 2.6; provided, however, that prior to notice from Assignee to Assignor of an Event of Default by Assignor hereunder or under any other Loan Documents and subject at all times to the payments and deposits of Rent required to be made directly to the Cash Management Account pursuant to Section 2.6 of the Loan Agreement, Assignor shall have a license, but limited as provided in this Assignment and in any of the other Loan Documents: (i) to collect, as trustee for the benefit of Assignee, all of the Rents for not more than one monthly installment in advance, other than a prepayment of the final monthly installment of Rent under any Lease or the security deposit under any Lease, and Assignor shall cause all such Rents collected to be deposited directly to the Cash Management Account; and (ii) to otherwise deal with, and enjoy the rights of the lessor under, the Leases or in each of the foregoing cases, as otherwise permitted by the Loan Agreement.

(b)      Upon the occurrence and during the continuance of an Event of Default, and without the necessity of Assignee entering upon and taking and maintaining full control of the Property in person, by agent or by court-appointed receiver, the license referred to in paragraph (a) above shall immediately be revoked and Assignee shall have the right at its option, to exercise all rights and remedies contained in the Loan Agreement or any of the other Loan Documents, or otherwise available at law or in equity.

(c)      Any Rents held or received by Assignor at any time shall be held or received by Assignor as trustee for the benefit of Assignee only and shall immediately be deposited directly to the Cash Management Account in accordance with Section 2.6 of the Loan Agreement.

### Section 4.  **Effect on Rights Under Other Documents.**

Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the powers and rights granted it hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Loan Agreement or any of the other Loan Documents, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms of the Loan Agreement or any of the other Loan Documents.  The rights of Assignee under the other Loan Documents may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.  This Assignment is intended to be supplementary to and not in substitution for or in derogation of any assignment of rents or grant of a security interest contained in the Mortgage or in any of the other Loan Documents.

### Section 5.  **Event of Default.**

Upon or at any time after the occurrence and during the continuance of an Event of Default, then in addition to and without limiting any of the Assignee's rights and remedies hereunder and under the other Loan Documents and as otherwise available at law or in equity:



PIONEER, TITLE COMPANY   ASSGN   $19.00   Spokane Co, WA



4185593
Page:    6 of 12
02/06/1998  02:04P
PIONEER TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA

    (a)    Assignee may, at its option, without waiving such Event of Default and without regard to the adequacy of the security for the Debt, either in person or by agent, without bringing any action or proceeding, or by a receiver appointed by a court, without taking possession of the Property in its own name, demand, sue for or otherwise collect and receive all Rents, including those past-due and unpaid, for application to the payment of the Debt in accordance with the terms of the Loan Agreement and Assignee may enter into, and to the extent that Assignor would have the right to do so, cancel, enforce or modify any Lease. The exercise by Assignee of the option granted it in this Section and the collection of the Rents and the application thereof as herein provided shall not be considered a waiver of any Event of Default by Assignor under the Loan Agreement or any other Loan Document;

    (b)    Assignor hereby acknowledges and agrees that payment of any item by a Person to the Assignee as hereinabove provided shall constitute payment in full of such item of Rent by such Person, as fully and with the same effect as if it had been paid to Assignor; and

    (c)    Assignee in respect of the Leases and Rents shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as in effect in the State in which such rights and remedies are asserted and additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted.

### Section 6. <u>Application of Rents and Proceeds</u>.

    After the occurrence and during the continuance of an Event of Default, rents received or held by Assignor or Assignee shall be applied in accordance with the terms of the Loan Agreement or the other Loan Documents.

### Section 7. <u>Attorney-in-Fact</u>.

    Upon the occurrence and during the continuance of any Event of Default, Assignor hereby appoints Assignee the attorney-in-fact of Assignor to take any action and execute any instruments that Assignor is obligated, or has covenanted and agreed under the Loan Agreement or the other Loan Documents to take or execute, which appointment as attorney-in-fact is irrevocable and coupled with an interest. Without limiting the generality of the foregoing provisions of this Section 7, upon the occurrence and during the continuance of an Event of Default, Assignor does hereby irrevocably appoint the Assignee as its attorney-in-fact with full power, in the name and stead of Assignor to demand, collect, receive and give complete acquittance for any and all of the Rents now due or that may hereafter become due, and at the Assignee's discretion, to file any claim, to take any other action, to institute any proceeding or to make any settlement of any claim, either in its own name or in the name of Assignor or otherwise, which the Assignee may deem necessary or desirable in order to collect and enforce the payment of Rents.



4185594
Page:    6 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA

4185593
Page:   7 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA

### Section 8.  Termination.

The Assignee, by the acceptance of this Assignment, agrees that when all of the Debt shall have been paid in full this Assignment shall terminate, and the Assignee shall execute and deliver to Assignor, upon such termination such instruments of re-assignment and Uniform Commercial Code termination statements, all without recourse and without any representation or warranty whatsoever, as shall be reasonably requested by Assignor.

### Section 9.  Expenses.

Assignor agrees to pay to the Assignee all out-of-pocket expenses (including reasonable expenses for attorneys' fees and costs of every kind) of, or incident to, the enforcement of any of the provisions of this Assignment or performance by the Assignee of any obligation of Assignor hereunder which Assignor has failed or refused to perform.

### Section 10.  Further Assurances.

Assignor agrees that, from time to time upon the written request of the Assignee, it will give, execute, deliver, file and/or record any financing statements, notice, instrument, document, agreement or other papers and do such other acts and things that may be necessary and desirable (in the reasonable judgment of the Assignee) to create, preserve, perfect or validate this Assignment, to enable Assignee to exercise and enforce its rights hereunder with respect to this Assignment or to otherwise carry out the purposes and intent of this Assignment.

### Section 11.  No Obligation by the Assignee.

(a)    By virtue of this Assignment, the Assignee shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under any of the Leases.

(b)    This Assignment shall not operate to place responsibility for the control, care, management or repair of the Property upon the Assignee, nor shall it operate to make the Assignee responsible or liable for any waste committed on the Property by any tenant or other party in possession or for any dangerous or defective condition of the Property or for any negligence in the management, upkeep, repair or control thereof.

### Section 12.  Miscellaneous.

(a)    No failure on the part of the Assignee or any of its agents to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Assignee or any of its agents of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies herein are cumulative and are not exclusive of any remedies provided by law.



4185594
Page:   7 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY    ASSGN    $19.00    Spokane Co, WA

4185593
Page:    8 of 12
02/06/1998 02:04P
PIONEER. TITLE COMPANY     ASSGN     $19.00   Spokane Co, WA

(b)     This Assignment shall be governed by and construed in accordance with the terms and provisions of Section 10.3 of the Loan Agreement.

(c)     All rights and remedies set forth in this Assignment are cumulative, and the Assignee may recover judgment thereon, issue execution therefor, and resort to every other right or remedy available at law or in equity, without first exhausting and without affecting or impairing the security of any right or remedy afforded hereby; and no such right or remedy set forth in this Assignment shall be deemed exclusive of any of the remedies or rights granted to the Assignee in any of the Loan Documents.  Nothing contained in this Assignment shall be deemed to limit or restrict the rights and remedies of the Assignee under the Loan Agreement or any of the other Loan Documents.

(d)     Until the indebtedness and all other obligations secured by the Loan Documents is paid in full, Assignor will, upon request, deliver from time to time to the Assignee executed originals to the extent available, otherwise photocopies certified by Assignor as true, correct and complete, of executed originals, of any and all existing Leases to which Assignor is a party, and executed originals, or photocopies of executed originals, so certified by Assignor, if an executed original is not available, of all other and future Leases to which Assignor is a party upon all or any part of the Property and upon request of Assignee, will specifically transfer and assign to Assignee such other and future Leases upon the same terms and conditions as herein contained.

(e)     Assignor represents that it:  (i) has been advised that Assignee engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Assignor or its affiliates; (ii) is represented by competent counsel and has consulted counsel before executing this Assignment; and (iii) has relied solely on its own judgment and on its counsel and advisors in entering into the transaction(s) contemplated hereby without relying in any manner on any statements, representations or recommendations of Assignee or any parent, subsidiary or affiliate of Assignee.

(f)     <u>WAIVER OF NOTICE OF EXERCISE OF ASSIGNMENT OF RENTS</u>.  ASSIGNOR HEREBY WAIVES ANY RIGHT TO NOTICE, AND WAIVES ANY RIGHT TO ANY HEARING, JUDICIAL OR OTHERWISE, PRIOR TO ASSIGNEE'S EXERCISE OF ITS RIGHTS UNDER THIS ASSIGNMENT AND/OR THE MORTGAGE WITH RESPECT TO THE ASSIGNMENT OF RENTS HEREUNDER OR UNDER THE MORTGAGE.

### Section 13.  <u>No Oral Change.</u>

This Assignment may not be amended except by an instrument in writing signed by Assignor and Assignee.



4185594
Page:    8 of 12
02/06/1998 02:04P
PIONEER. TITLE COMPANY     ASSGN     $19.00   Spokane Co, WA



**Section 14. <u>Successors and Assigns</u>.**

Assignor may not assign its rights under this Assignment except as permitted under the Loan Agreement. Subject to the foregoing, this Assignment shall be binding upon, and shall inure to the benefit of, Assignor and Assignee and their respective successors and assigns.

**Section 15. <u>Notices</u>.**

All notices, requests and other communications provided for herein shall be given or made in writing in the manner specified in the Loan Agreement.

**Section 16. <u>Limitation of Liability</u>.** The personal liability of Assignor hereunder is limited to the extent set forth in Section 9.4 of the Loan Agreement.

**[NO FURTHER TEXT ON THIS PAGE]**



4185593
Page:   10 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY      ASSGN      $19.00    Spokane Co, WA

IN WITNESS WHEREOF, the Assignor has caused this Assignment to be duly
executed by its duly authorized representative, as of the day and year first above written.

LARRY J. RIETZ MP, L.L.C., a Minnesota limited
liability company

By:    North Division CC, Inc., a Minnesota corporation,
its Chief Manager

By:
Name:  Larry J. Rietz
Title:  President

4185594
Page:   10 of 12
02/06/1998  02:04P
PIONEER, TITLE COMPANY      ASSGN      $19.00    Spokane Co, WA

0212181.01

4185593
Page: 11 of 12
02/06/1998 .02:04P
Spokane Co, WA

PIONEER, TITLE COMPANY   ASSGN   $19.00

STATE OF _Minnesota_ )
                         ) ss.
COUNTY OF _Steele_ )

    I certify that I know of or have satisfactory evidence that _Larry J. Rietz_, the _President_ of North Division CC, Inc., a Minnesota corporation, which is the Chief Manager of Larry J. Rietz MP, L.L.C., a Minnesota limited liability company, is the person who appeared before me, and said person acknowledged that he signed this instrument on behalf of the corporation in its capacity as Chief Manager of the limited liability company, acknowledged it to be the free and voluntary act of the company for the uses and purposes mentioned in this instrument, and on oath stated that he was authorized to execute this instrument.

DATED: _January 30, 1998_   _Kimberly Jo Nordlund_
                                            (Notary Signature)

_Kimberly Jo Nordlund_
(Type or Print Name of Notary)
NOTARY PUBLIC for the State of
_Minnesota_ , residing at _____
_Owatonna, MN_

My appointment expires:
_Jan. 31, 2000_



KIMBERLY JO NORDLUND
NOTARY PUBLIC - MINNESOTA
STEELE COUNTY
My Commission Expires Jan. 31, 2000

4185594
Page: 11 of 12
02/06/1998 02:04P
Spokane Co, WA

PIONEER, TITLE COMPANY   ASSGN   $19.00

0212181.01



PIONEER, TITLE COMPANY    ASSGN    $19.00
4185593
Page:   12 of 12
02/06/1998  02:04P
Spokane Co, WA

## EXHIBIT A

## LEGAL DESCRIPTION

**PARCEL 1:**

That portion of the South half of the North half of the Northeast quarter of the Northeast quarter of Section 30, Township 26 North, Range 43 East, W.M., in Spokane County, Washington, described as follows:

BEGINNING at the intersection of the North line of said South half and the West right-of-way line of Division Street;
Thence South 00°14'39" East, along said West right-of-way line, 221.89 feet;
Thence South 12°03'28" West, 70.40 feet;
Thence South 60°08'34" West, 27.28 feet;
Thence South 89°45'21" West, 312.29 feet;
Thence North 00°14'39" West, 139.70 feet;
Thence North 07°28'25" East, 142.56 feet;
Thence North 00°14'39" West, 33.00 feet to the North line of said South half;
Thence South 88°32'59" East, along said North line, 332.00 feet to the Point of Beginning, also being known as;

Tract "A" of Short Plat No. SP-1025-95 according to Plat recorded in Volume 14 of Short Plats, Pages 21-22, in Spokane County, Washington.

**PARCEL 2:**

An easement for a sanitary sewer system as set forth in that certain Private Sewer System TIE-IN Easement Agreement filed for record on April 18, 1997, as Spokane County Auditor's No. 4095144.

**PARCEL 3:**

That certain non-exclusive easement and the rights and obligations pertaining thereto as set forth in that certain Declaration of Covenants, Conditions and Restrictions and Grant of Reciprocal Easements filed for record on April 18, 1997 as Spokane County Auditor's No. 4095143.

PIONEER, TITLE COMPANY    ASSGN    $19.00
4185594
Page:   12 of 12
02/06/1998  02:04P
Spokane Co, WA