B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA | PROOF OF CLAIM |
|---|---|

**Debtor against which claim is asserted :** (Check only **one** box below):

- ☒ Circuit City Stores, Inc. (Case No. 08-35653)
- ☐ Circuit City Stores West Coast, Inc. (Case No. 08-35654)
- ☐ InterTAN, Inc. (Case No. 08-35655)
- ☐ Ventoux International, Inc. (Case No. 08-35656)
- ☐ Circuit City Purchasing Company, LLC (Case No. 08-35657)
- ☐ CC Aviation, LLC (Case No. 08-35658)

- ☐ CC Distribution Company of Virginia, Inc. (Case No. 08-35659)
- ☐ Circuit City Stores PR, LLC (Case No. 08-35660)
- ☐ Circuit City Properties, LLC (Case No. 08-35661)
- ☐ Orbyx Electronics, LLC (Case No. 08-35662)
- ☐ Kinzer Technology, LLC (Case No. 08-35663)
- ☐ Courchevel, LLC (Case No. 08-35664)

- ☐ Abbott Advertising, Inc. (Case No. 08-35665)
- ☐ Mayland MN, LLC (Case No. 08-35666)
- ☐ Patapsco Designs, Inc. (Case No. 08-35667)
- ☐ Sky Venture Corporation (Case No. 08-35668)
- ☐ XSStuff, LLC (Case No. 08-35669)
- ☐ PRAHS, INC. (Case No. 08-35670)

NOTE: *This form should not be used to make a claim for administrative expenses arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503(a).*

| | |
|---|---|
| **Name of Creditor** (The person or other entity to whom the debtor owes money or property):<br>SILVERSTEIN TRUSTEE, RAYMOND | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| **Name and address where notices should be sent:**      NameID: 4528748      PackID: 293243<br><br>SILVERSTEIN TRUSTEE, RAYMOND<br>131A GAITHER DR<br>C/O THE GOODMAN GROUP<br>MT LAUREL NJ 08054<br>                  Telephone number:<br>                  **(856) 795-1600** | **Court Claim Number:**_____<br>(If known)<br><br>Filed on:_____ |
| **Name and address where payment should be sent (if different from above):**<br><br>                  COPY<br>                  Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**    $ 1,530,934.99<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | **5. Amount of Claim Entitled to Priority under 11 U.S.C. § 507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| **2. Basis for Claim:** obligations on lease<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). |
| **3. Last four digits of any number by which creditor identifies debtor:**_____<br><br>   **3a. Debtor may have scheduled account as:**_____<br>   (See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtors business, whichever is earlier — 11 U.S.C. § 507(a)(4). |
| **4. Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>**Nature of property or right of setoff:** ☐ Real Estate  ☐ Motor Vehicle  ☐ Other<br>**Describe:**<br><br>**Value of Property:** $_____  **Annual Interest Rate**___%<br><br>**Amount of arrearage and other charges as of time case filed included in secured claim,**<br><br>**if any:** $_____  **Basis for perfection:**_____<br><br>**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____ | ☐ Contributions to an employee benefit plan — 11 U.S.C. § 507(a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use — 11 U.S.C. § 507(a)(7).<br><br>☐ Taxes or penalties owed to governmental units — 11 U.S.C. § 507(a)(8).<br><br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.<br><br>**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | **Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment* |

| | | |
|---|---|---|
| **Date:**<br>01/13/09 | **Signature:** the person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>[signature]<br>RAYMOND SILVERSTEIN<br>TRUSTEE OF SHAFFER,<br>HARROW, TARTE AND<br>ROSEMAN TRUST | **FOR COURT USE ONLY**<br>**RECEIVED**<br>**JAN 28 2009**<br>KURTZMAN CARSON CONSULTANTS |

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*


0835653081208104023007856

### Proof Of Claim Addendum

Debtor:                    Circuit City Stores, Inc.

United States Bankruptcy Court-Eastern District of Virginia
Bankruptcy Case No. 08-35653/KRH
Chapter 11

Filing Date:               November 10, 2008

Creditor:                  Raymond Silverstein, Trustee c/o The Goodman Group
131A Gaither Drive
Mt. Laurel, NJ 08054

*Circuit City Location #6054 located at 2128 Route 38, Cherry Hill, NJ*

Account #:                 Not Applicable

Account Type:              Landlord

Balance at Filing Date: $1,530,934.99 (as itemized in Schedule A and calculated pursuant to 11 USC §502(g))

Pursuant to Paragraph 9, Official Bankruptcy Form 10, Proof of Claim, in lieu of attaching voluminous account documents, a summary of the account, compiled from the account databases of Raymond Silverstein, Trustee, c/o The Goodman Group, is provided. (See Instructions to Official Form 10). This debt arises from rental due and other obligations due to the Landlord arising out of the January 18, 1989 Lease for Circuit City Location # 6054 located at 2128 Route 38, Cherry Hill, New Jersey. Relevant documents are as follows:

A.      January 18, 1989 Lease for Circuit City Location #6054 located at 2128 Route 38, Cherry Hill, NJ (as attached as Schedule B);

B.      August 9, 1991 Deed from Jerome S. Goodman and the Estate of William G. Rohrer t/a Wiljer Company;

C.      Deed of Trust dated April 1, 1993;

D.      June 24, 1993 Deed from Jerome S. Goodman to Edward N. Barol, Trustee under Deed of Trust dated April 1, 1993 Wherein Sheri Shaffer, Amy Harrow, Karen Tarte and Lynn Roseman are Settlors;

E.      June 24, 1993 Assignment and Assumption of Lease from Jerome S. Goodman to Edward N. Barol, Trustee;

F.      May 10, 1999 Decree of the Court of Common Pleas of Montgomery County, Pennsylvania-Orphans Court Division appointing Raymond Silverstein as Successor Trustee;

G.      December 17, 2008 Repair Proposal by General Contractor-Richmond Roofing ($419,000.00);

H.      2008 Account Quick Report for Sewer Rent ($175.00) with attached Cherry Hill Township Sewer Rent Invoices due for May 1, 2008 and November 1, 2008 paid by Landlord; and

I.      2008 Account Quick Report for Real Estate Taxes ($141,225.00) with attached Cherry Hill Township Tax Bills for 2008 paid by Landlord.

Lease documents were provided to the Debtor pre-petition. Copies of the above documents will be provided upon request

C:\F-Drive\Joint Clients\Goodman, Jerome - GB 1139 M\Circuit City Bankruptcy\POC attachment 01 13 09.wpd

# SCHEDULE A

**Schedule A**

Proof of Claim of Raymond Silverstein, Trustee of Shaffer, Harrow, Tarte and Roseman Trust
Re
Circuit City Location #6054
2128 Route 38
Cherry Hill, NJ

Remaining Rent

| | |
|---|---:|
| 15 months @$36,119.00 | $ 541,785.00 |
| Real Estate Taxes (using 2008 Taxes) $26,605.00 per quarter | $ 133,024.99 |
| Sewer | $ 175.00 |
| Water | $ 4,000.00 |
| Electric $1,150.00 per month PSE&G | $ 14,950.00 |
| Heat | |
| Insurance (All Risk) | $ 40,000.00 |
| MUA $200.00 per month | $ 3,000.00 |

Maintenance and Repair Obligations

| | |
|---|---:|
| New Roof | $ 160,000.00 |
| Paint Exterior of Building & Graffiti Removal, and Drivit Repair | $ 75,000.00 |
| Exterior Lighting Replacement and Repair | $ 2,000.00 |
| Removal of Circuit City Logo Entrance and Repair | $ 75,000.00 |
| Replacement of Ceiling Tiles (33,000 square feet) | $ 90,000.00 |
| Repair Bathrooms | $ 50,000.00 |
| Carpet Replacement (33,000 square feet) | $ 105,000.00 |
| Air Conditioning Replacement and Repair | $ 147,000.00 |
| Landscaping Repair, Replacement, Striping fo Parking Lot and Parking Bumper Replacement | $ 90,000.00 |

| | |
|---|---:|
| TOTAL DAMAGES | $1,530,934.99 |

# SCHEDULE B

LEASE

SECTION                                                          PAGE

1.  Leased Property..................................................1

2.  Construction or Renovation of Building & Improvements...2

3.  Easements.........................................................4

4.  Lease Term.......................................................11

5.  Rent and Charges................................................12

6.  Alterations......................................................16

7.  Maintenance, Repairs & Replacements....................17

8.  Signs..............................................................17

9.  Tenant's Property & Waiver of Landlord's Lien.........19

10. Insurance........................................................19

11. Assignment & Subletting...................................24

12. Compliance with Applicable Laws........................25

13. Payment of Utility Bills.....................................26

14. Taxes.............................................................26

15. Condemnation...................................................30

16. Damages to the Premises by Fire or Other Casualty......33

17. Holding Over....................................................37

18. "For Rent" Signs...............................................37

19. Events of Tenant's Default..................................38

20. Landlord's Remedies..........................................40

21. Events of Landlord's Default...............................44

22. Waiver............................................................45

23. Successors and Assigns.......................................45

24. Landlord's Warranties & Representations...............45

25. Holidays.........................................................51

26. Applicable Law.................................................51

27. Notices.............................................51

28. Merger..............................................52

29. Captions............................................52

30. Subordination & Attornment..........................52

31. Estoppel Certificates...............................54

32. Mechanics' Liens....................................55

33. Use.................................................56

34. Rules & Regulations.................................56

35. Memorandum of Lease; Commencement Date Agreement......57

36. Force Majeure.......................................57

37. Brokers.............................................58

38. Change of Landlord..................................58

39. Maintenance of Shopping Center by Landlord..........58

40. Common Area Maintenance.............................59

41. Miscellaneous.......................................61

42. Effectiveness of Lease; Tenant's Right to Terminate....63

43. Tenant's Right of First Refusal to Purchase
    Shopping Center....................................66

## EXHIBITS

Exhibit A - Legal Description

Exhibit B - Site Plan

Exhibit C - Construction Provisions

Exhibit D - Trade Fixtures

Exhibit E - Concept Plan

Exhibit F - Permitted Encumbrances

Exhibit G - Subordination, Nondisturbance & Attornment Agreement

Exhibit H - Memorandum of Lease

Exhibit I - Commencement Date Agreement

<u>LEASE</u>

THIS LEASE is made as of the _18th_ day of _January_ 1989, by
and between Jerome S. Goodman and William Rohrer d/b/a Wiljer
Company, having an address at 921 Pleasant Valley Avenue, Mount
Laurel, N.J.  08054 (the "Landlord"), and CIRCUIT CITY STORES,
INC., a Virginia corporation, having an address at 2040 Thalbro
Street, Richmond, Virginia 23230 (the "Tenant").

W I T N E S S E T H :

That for and in consideration of the mutual covenants herein
contained and other good and valuable considerations, the receipt
and sufficiency of which are hereby acknowledged, the parties
hereto agree as follows:

1.   <u>Leased Property</u>.  Landlord demises and leases to Tenant
and Tenant leases and takes from Landlord, commencing on the Rent
Commencement Date (defined below), a particular site consisting
of approximately 4.1 acres including a portion of that certain
building and other leased improvements currently located or to be
located on the site (the "Land") and more particularly described
on Exhibit "A" hereto and shown (approximately) outlined in red
on Exhibit "B" hereto, together with the easements described in
paragraph 3 below, all located in the "Shopping Center", which
shall be defined as those parcels of real property, which in the
aggregate approximate 5.1 acres, with buildings and improvements

constructed on or to be constructed thereon, located at Route 38
in Cherry Hill, lying and being in the County of Camden, State of
New Jersey, and more particularly shown on that Site Plan
attached hereto as Exhibit "B" and incorporated herein by this
reference.  The Land, the leased portion of the building and
other leased improvements, fixtures, appurtenances and property
all as more particularly set forth herein are sometimes collec-
tively referred to as the "Premises".  All of the Shopping Center
exclusive of the Premises is "Landlord's Premises".  The descrip-
tion of the Premises may be adjusted in accordance with Tenant's
as-built survey to be attached hereto as Exhibit "B-1" upon com-
pletion of the construction or renovation of the building on the
Premises.

     2.  <u>Construction or Renovation of Building and Improvements.</u>
Tenant shall cause to be constructed on the Premises and may
remodel a portion of the existing building by certain improve-
ments (the "Improvements"), such that, when completed, the por-
tion of the building included on the Premises shall consist of a
one-story retail facility with mezzanine space containing approx-
imately 32,000 square feet of leasable floor space plus mezza-
nine, with provisions for customer pickup, delivery and installa-
tion facilities for motor vehicle audio, stereo and telephone
systems together with loading ramps, sidewalks, trash compactor
and other such appurtenances for storage, service and loading
facilities, all as more particularly set forth in the construc-
tion provisions attached hereto as Exhibit "C" (the "Construction
Provisions") and incorporated herein by reference. Landlord
acknowledges and agrees to perform those obligations stated as

being Landlord's responsibility in the Construction Provisions.
The Improvements shall be constructed or remodelled in accordance
with Tenant's plans and specifications which are subject to the
reasonable approval of Landlord, provided, however, that Landlord
shall not require Tenant to alter its standard entrance tower,
customer pickup area or use of Alucobond and red trim on the
exterior of the building on the Premises, all as specified in the
Construction Provisions. Except as otherwise provided herein, the
Improvements shall belong to Landlord upon the expiration or ter-
mination of this Lease including any extensions thereof, provided
that Tenant may remove any trade fixtures, movable partitions,
lighting or personal property upon said expiration or termination
so long as said removal does not damage the structural integrity
of the building or Improvements on the Premises.  In the event
any damage shall occur as a result of said removal, it shall be
promptly repaired by Tenant, at its sole cost and expense.  A
nonexclusive list of items which are deemed personal property and
trade fixtures is attached as Exhibit "D." Landlord hereby
appoints and constitutes Tenant the Landlord's true and lawful
attorney-in-fact in Tenant's name to apply for and secure from
any governmental authority having jurisdiction thereover any
approvals, permits or licenses which may be necessary in connec-
tion with the construction or renovation of the building or
Improvements on the Premises or the making of any alterations,
additions, changes or repairs to the building or Improvements;
and Landlord agrees upon request by Tenant to execute or join in
the execution of any application for such approvals, permits or
licenses.  All fees in connection with such approvals, permits or

licenses shall be paid by Tenant.

Tenant will construct or renovate the building for a standard Circuit City Superstore on the Premises at its sole cost, in general conformity with the "Concept Plans" attached hereto as Exhibit "E".

3.  <u>Easements</u>.  From the date hereof and during the term of this Lease and any extensions or renewals thereof, Landlord hereby grants, or shall cause to be granted unto Tenant, nonexclusive easements for constructing or renovating the building and other leased Improvements on the Premises, or the making of any alterations, additions, changes or repairs to same, encroachments, vehicular parking and vehicular, pedestrian and service ingress and egress to and from the Premises over, under, upon and across the parking areas, driveways and access ways, sidewalks and walkways, exits and entrances, and other common areas, as specified in Paragraph 40 below, as said areas (the "Common Areas") now or shall hereafter exist in the Shopping Center.  The term "Site" as used herein shall mean, as to Landlord, the Common Areas on Landlord's Premises, and as to Tenant, the Premises. Landlord reserves for itself and those claiming by, through or under Landlord, a nonexclusive easement for utilities, vehicular and pedestrian ingress and egress to, over, under, upon and across the Common Areas for the benefit of the portion of the building located within Landlord's Premises; provided, however, that Landlord and those claiming by, through or under Landlord do not interfere with Tenant's construction or use of the Land, building or Improvements.

(a)  <u>Successors and Assigns</u>.  Wherever a party (sometimes

-4-

referred to as a "grantor") to this Lease grants an easement or
license, it is intended that the grant shall bind and include not
only such party, but its heirs, successors and assigns as well.
Similarly, wherever a party (sometimes referred to as a "gran-
tee") to this Lease is granted an easement or license, it is
intended that the grant shall benefit and include not only such
party, but its heirs, successors and assigns as well.

(b)  <u>Interpretation</u>.  The word "in", in respect of an ease-
ment granted "in" a particular Site means, as the context may
require, "in," "to," "on," "over," "through," "upon," "across,"
and/or "under."

(c) <u>Construction Easement</u>.  For the term of this Lease and
any extensions and renewals thereof, Landlord hereby grants to
Tenant a nonexclusive easement in the Common Areas as shown cross-
hatched on Exhibit "B", attached hereto and incorporated herein
by reference, for the purpose of the development, construction,
repairs and reconstruction of the Premises.  The use of such
easement by Tenant shall not result in damage or injury to the
buildings or other improvements of Landlord, and shall not unrea-
sonably interfere with the business operations conducted by Land-
lord and/or its tenants, and said easement shall be subject to
such other reasonable conditions as Landlord shall require from
time to time.  Tenant will indemnify and hold the Landlord harm-
less from such damage or injury to the buildings, roads, utili-
ties, landscaping or other improvements of the Landlord, from
unreasonable interference with the business or construction oper-
ations conducted by the Landlord arising herein, and from any and
all claims, liability, costs or expenses in connection with death

-5-

or personal injury resulting from Tenant's use of this easement.
After the initial construction of the Improvements, Tenant shall
not request Landlord to consent to the use of the Common Areas
for the above-stated purposes of this subparagraph 3(c), includ-
ing access for construction vehicles, if reasonable alternatives
are available on the Land.

(d)  <u>Footing and Foundation Easements</u>.  Landlord hereby
grants to Tenant, its successors and assigns, and Tenant hereby
grants to Landlord, its successors and assigns, such easements
and rights in, their respective Sites, (i) for the construction
and maintenance of foundations, footings, supports and walls rea-
sonably necessary in connection with the construction of their
respective improvements on their respective Sites; provided same
does not adversely affect existing construction on the other's
Site; and, provided the same does not affect the separate insur-
ance rating of the other party's Site, (ii) to allow their
respective improvements to abut and connect, and (iii) for a roof
projection allowing the grantee to tie its building into the
adjoining building by flashing and reglets. No such attachment or
connection shall be made, however, unless detailed plans therefor
shall have been timely submitted to and approved by the party to
whose building the attachment is to be made.  The grantee shall
repair, at its sole expense, any damage to any building of the
grantor caused in making or maintaining said attachment and shall
indemnify and hold the grantor harmless from any and all claims,
liability, costs and expenses, whether in connection with death,
personal injury, or property damage, which result or arise out of
the making or maintenance of such attachment. The parties will

-6-

cooperate and cause their respective contractors to cooperate
with each other in the coordination of construction schedules so
as to facilitate the construction of the improvements of their
respective Sites.  The easements set forth in this subparagraph
3(d) shall apply only to initial construction and any reconstruc-
tion as provided for in this Lease, specifically including the
construction contemplated and permitted by Tenant pursuant to
subparagraph 33(b).

(e)  Utility Easements.  From and after the date hereof,
Landlord hereby grants to Tenant, its successors and assigns, for
the benefit of the Premises, such easements as are necessary,
without unreasonably interfering with the use by Landlord of the
Common Areas as provided in this Lease, to provide rights-of-way
for public or private underground utilities services for the
benefit of the Premises, and access to and use of gas (if any),
electrical, telephone, water, storm and sanitary sewer systems,
and for the drainage of surface and underground storm water and
the like (the "Utility Easements").  The Utility Easements shall
be for the purposes of installing, using, operating, maintaining,
repairing, relocating, replacing or enlarging any such utility.
In order to effectuate the purposes of such Utility Easements,
Tenant may convey such easements to the appropriate providers of
such utilities.  Any such Utility Easement may, however, be relo-
cated by Landlord, at any time or from time to time at the
expense of Landlord, provided that such relocation shall not
interfere with, increase the cost of, or diminish Tenant's util-
ity services, and that such relocated Utility Easement shall be
subject to the provisions of this easement and may also be used

-7-

by Tenant.  For the purpose of exercising the rights granted in this subparagraph 3(e), Tenant, and its respective employees, agents and contractors, shall have the right to enter upon and use the Common Areas to install the utility systems, to such extent and so long as reasonably necessary to accomplish such purpose, subject to the following conditions and requirements:

(i) No less than ten (10) days' prior written notice shall be given to Landlord that Tenant anticipates doing such work, together with notification of the nature and extent of such work, the proposed area of such work, and the anticipated starting date of such work; but if the work involved is emergency repair work, only such advance notice, written or oral, as is reasonably practicable need by given;

(ii) After such work, the utility system, pipes or lines affected thereby shall be underground and shall not lie beneath or within five feet (5') of the floor area of any existing building within the Shopping Center, but this subparagraph (ii) shall not require the moving of any pipes or lines theretofore installed not in violation of this Lease;

(iii)  After the completion of work, the grantee or other entity requiring the Utility Easement shall restore the affected portion of the grantor's Site and improvements so used to the same or as good condition as existed immediately before the commencement of such work; and

(iv)  Any work performed under this subparagraph 3(e), and the restoration of the Site after work is completed shall be done at the sole cost of the grantee or other entity requiring the same and shall be performed in such a manner

-8-

as not to cause any interruption of or undue interference with
the business conducted on the Site and the business conducted by
Tenant.  To the extent possible, no such work shall be performed
on weekends or during holiday seasons.

(f)  Common Area Easements.  Landlord hereby grants to
Tenant, its successors and assigns, for the benefit of the Pre-
mises, as herein described, the nonexclusive right, privilege and
easement (the "Common Area Easement") for the full term of this
Lease, including Option Periods (as defined in Paragraph 4), to
use the Common Areas for their intended purposes and to permit
its employees, agents, subtenants, assignees, licensees, suppli-
ers, customers and invitees to use the same, in common with Land-
lord, its heirs, successors, assigns, employees, agents, lessees,
licensees, suppliers, customers and invitees and all persons
claiming by or through them, for, among other purposes, parking
and pedestrian, service and vehicular access, ingress and egress
to, from and between the Premises and the Landlord's Premises and
the streets and highways abutting and adjacent to the Shopping
Center, without payment of any fee or other charge therefor.

Subject to the limitations contained in Paragraph 40(e),
Landlord reserves the right, from time to time, without obtaining
the consent or approval of Tenant, to make any reasonable and
nonmaterial changes, modifications or alterations to those por-
tions of Landlord's Premises which are subject to the foregoing
Common Area Easement, provided that the accessibility of the Pre-
mises and visibility of the building on the Premises to pedes-
trian and vehicular traffic are not unreasonably nor materially
restricted thereby and the flow of vehicular traffic thereon is

-9-

not materially affected, and provided further, that the parking
ratio is not reduced below five (5) spaces per 1000 square feet
of gross leasable area in the Shopping Center.  Notwithstanding
this subparagraph 3(f) to the contrary, Landlord shall not make
any changes in the area marked on Exhibit "B" as "Tenant's Pre-
ferred Area" without Tenant's written consent.

(g)  Encroachments.  While it is the intention of the parties
to confine their improvements to the limits of their respective
Sites, it is recognized that this result is not always achieved
in a shopping center developed by multiple parties.  Accordingly,
each party grants to the other an easement, not to exceed twenty-
four inches (24") or such greater amount as may be shown on plans
and specifications approved by the grantor, permitting the
maintenance of canopies, decorative fascia, roofs and other over-
hangs, awnings, utility vaults, staircases, signs, lights, pil-
lars and other like projections and encroachments over and across
the grantor's Site to the extent that such projections and
encroachments shall exist after completion of all construction or
reconstruction (if any part is damaged or destroyed and then
rebuilt).

(h)  Installation Responsibility.  Except as otherwise spe-
cifically provided in this Lease, the grantee of any of the ease-
ments provided herein shall be responsible for the installation,
maintenance and repair of all facilities which are the subject of
such easements.

(i)  Right to Temporarily Block Easement to Common Area.  At
least once in each calendar year Landlord shall have the right to
temporarily block off access to the Common Areas within the Shop-

ping Center in order to avoid the possibility of dedicating the same for public use or creating prescriptive rights therein as a matter of law, such barriers to be temporarily erected for such purpose, if possible, at a time or upon a day when the Shopping Center is not open for business, and then for only the minimum time required to accomplish such purpose.

(j)  <u>Non-Dedication</u>.  None of the easements granted by the parties in this Lease is intended, nor shall any of them be con- strued, as a dedication of any portion of the parties' respective Sites for public use, and the parties will refrain from taking any action which would cause such a dedication and will take whatever steps may be necessary to avoid any such dedication, except as may be agreed upon in writing by all the parties hereto or their respective successors or assigns.

4.  <u>Lease Term</u>.  Subject to the conditions upon the effec- tiveness of this Lease set forth below, the construction term (the "Construction Term") of this Lease shall commence on the date of Landlord's delivery of the Land to Tenant, which is esti- mated to be no later than January 1, 1989, and shall end on the "Rent Commencement Date" (as defined in Paragraph 5(a) below). The main term (the "Term") of the Lease shall commence on the Rent Commencement Date and shall end on the last day of January following the twentieth (20th) anniversary of the Rent Commence- ment Date.  The term "Lease Year" shall mean each successive period of twelve (12) consecutive calendar months, commencing on the first day of each February during the Term, except that the First Lease Year shall commence on the Rent Commencement Date and shall end on the last day of January following the first anniver-

sary of the Rent Commencement Date.

In addition to the Term, Tenant shall have the option (a "Renewal Option") to renew and extend the Lease for four (4) consecutive five (5) year periods (the "Option Periods") immediately following the Term, at the rent below specified.  Tenant shall give Landlord written notice of its election to exercise any Renewal Option at least one hundred eighty (180) days prior to the expiration of the Term or any then-current Option Period, as applicable, of this Lease; provided, however, that in order to avoid any forfeiture or inadvertent lapse of any right to renew or extend as aforesaid, if Tenant shall fail to give any such notice within the aforesaid time limit and shall not have given Landlord prior written notice of its intention not to renew or extend as aforesaid, then and as often as the same shall occur, Tenant's right to exercise such Renewal Option shall nevertheless continue, as shall its tenancy hereunder (under the same terms and conditions as theretofore in effect and notwithstanding that the Term or any Option Period shall have expired) until ten (10) business days after Landlord shall have given Tenant notice of Landlord's election to terminate the Renewal Option, and Tenant may exercise its Renewal Option at any time prior to expiration of said ten (10) business day period.  Upon the giving of notice of renewal and extension in accordance with the foregoing provisions of this Paragraph 4, the Term of this Lease shall thereupon be renewed and extended in accordance with such notice without further act by Landlord or Tenant, the same as if such notice had been timely given hereunder.

5.   <u>Rent and Charges</u>.

(a) Base Rent.  Tenant agrees to pay base rent ("Base Rent")
for the Premises, without setoff or withholding except as other-
wise expressly provided for herein, commencing on that date which
is, subject to "force majeure" (as defined in Paragraph 36) and
"Landlord Delay" (as defined in Paragraph 3 of the Construction
Provisions), the earlier of (i) July 1, 1989, or (ii) Tenant's
opening for business (the "Rent Commencement Date").  Notwith-
standing the foregoing, in the event that Landlord fails to
deliver the Premises in the condition set forth in Exhibit "C,"
on or before March 1, 1989, the Rent Commencement Date shall be
the later of (i) November 1, 1989 or (ii) eight (8) months after
delivery of the Premises to Tenant, unless Tenant elects to open
for business at the Premises earlier than the aforesaid date, in
which event the Rent Commencement Date shall be the date on which
Tenant opens for business.

Tenant shall pay Base Rent in equal monthly installments, in
advance on the first day of each succeeding calendar month
throughout the Term as it may be extended except that Tenant
shall pay the first month's rent upon full execution of this
Lease.  Unless adjusted as provided in (iii) below, Base Rent
shall be paid pursuant to the following schedule:

(i) First Three Years.  During the first three
(3) Lease Years, Tenant shall pay annual Base Rent in the amount
of Two Hundred Twenty-Four Thousand Dollars ($224,000.00), pay-
able in monthly installments of Eighteen Thousand Six Hundred
Sixty-Seven and 00/100 Dollars ($18,667.00).

(ii) Increases in Base Rent.  Base Rent shall
increase on the first day of the Fourth, Sixth, Seventh and each

Lease Year thereafter so that Base Rent during the Term and Option Periods shall be as follows:

| Lease Years | Annual Rent | Monthly Rent |
|---|---|---|
| 1-3 | $224,000 | $18,667. |
| 4-5 | 256,000 | 21,333. |
| 6 | 288,000 | 24,000. |
| 7 | 304,000 | 25,333. |
| 8 | 313,120 | 26,093 |
| 9 | 322,514 | 26,876 |
| 10 | 332,189 | 27,682 |
| 11 | 342,155 | 28,513 |
| 12 | 352,420 | 29,368 |
| 13 | 362,993 | 30,249 |
| 14 | 373,883 | 31,157 |
| 15 | 385,099 | 32,092 |
| 16 | 396,652 | 33,054 |
| 17 | 408,552 | 34,046 |
| 18 | 420,809 | 35,067 |
| 19 | 433,433 | 36,119 |
| 20 | 446,436 | 37,203 |
| 21 | 459,829 | 38,319 |
| 22 | 473,624 | 39,467 |
| 23 | 487,832 | 40,653 |
| 24 | 502,467 | 41,872 |
| 25 | 517,541 | 43,128 |
| 26 | 533,067 | 44,422 |
| 27 | 549,059 | 45,755 |
| 28 | 565,531 | 47,128 |

| | | |
|---|---|---|
| 29 | 582,497 | 48,541 |
| 30 | 599,972 | 49,998 |
| 31 | 617,971 | 51,498 |
| 32 | 636,510 | 53,043 |
| 33 | 655,605 | 54,634 |
| 34 | 675,273 | 56,273 |
| 35 | 695,531 | 57,961 |
| 36 | 716,397 | 59,700 |
| 37 | 737,889 | 61,491 |
| 38 | 760,026 | 63,335 |
| 39 | 782,827 | 65,236 |
| 40 | 806,312 | 67,193 |

(b)  Rent/Additional Rent.  All sums payable by Tenant to Landlord under this Lease shall constitute rent.  All payments under this Lease other than Base Rent, including but not limited to, payments of Tenant's Pro Rata Share of real estate taxes (as defined below), shall constitute additional rent ("Additional Rent") hereunder.

(c) Late Charges.  If Tenant fails to pay any installment of Base Rent within ten (10) days after said payment is due, Landlord shall be entitled to a late charge equal to Two Hundred Dollars ($200.00) upon giving Tenant written notice that same is due and owing; provided however, that in the event Tenant is more than ten (10) days late three (3) times within any given Lease Year, Landlord shall be entitled to a late charge equal to five percent (5%) of the installment of Base Rent which is past due for the third late payment and each subsequent one, if any, dur-

ing the given Lease Year upon giving Tenant written notice that same is due and owing.

6. _Alterations._  During the Term and Option Periods, Tenant shall have the right, at its discretion, and without obtaining the prior consent of Landlord, from time to time as Tenant shall desire, to alter, modify, reconstruct and remodel the interior of the building on the Premises and to alter and reconstruct the exterior of the building or Improvements thereon including structural alterations, provided that Tenant shall not make any alterations which (i) materially reduce the value of the existing building on the Premises as well as that portion of the building currently occupied by Eyelab (collectively the "Building"), (ii) impact in any materially and permanently adverse way on the physical tie-in with improvements constructed in the Shopping Center, (iii) materially change the exterior appearance of the Building, (iv) adversely impact the structure of the Building or the Building's mechanical systems, or (v) alter the "footprint" of the Improvements on the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld or delayed.  Tenant shall cause all such alterations to be lien-free and made and completed at the cost of the Tenant in a workmanlike manner and in compliance with all applicable law.  Tenant shall promptly pay all costs and expenses incurred for such alterations.  Should Landlord's consent be required, conceptual plans and specifications for such work shall be provided to Landlord prior to commencement of any such work. Without material out-of-pocket cost or expense to Landlord, Landlord shall cooperate with Tenant in the obtaining of any and all licenses, building per-

mits, certificates of occupancy or other governmental approvals
which may be required in connection with any such alterations,
and Landlord shall execute, acknowledge and deliver any documents
reasonably required in furtherance of such purposes.

   7.   <u>Maintenance, Repairs and Replacements</u>.  Except as arising
from Landlord's (or its agents', employees' or other tenants')
negligent acts or omissions or willful misconduct, Tenant shall
be solely responsible for (i) maintenance of the interior and
exterior, both structural and nonstructural, of the building on
the Premises, including, but not limited to, repairs and/or
replacements to the roof, plumbing, heating, electrical and air
conditioning systems, plate glass and windows, and (ii) mainte-
nance of those areas contemplated in subparagraph 40(b) below.
Landlord shall have no responsibility for maintenance, repair or
replacements to the Premises or any part thereof except as other-
wise provided herein and in Subparagraph 40(a) below; but should
Tenant fail to perform its obligations under this Paragraph 7,
Landlord may, but without obligation to do so, and only after
thirty (30) days' prior written notice to Tenant, except in the
case of emergencies (in which event only such notice as may be
reasonable under the circumstances shall be required), effect
such maintenance or repairs, and Tenant shall reimburse Landlord
for the reasonable and actual amount expended on demand. All
maintenance, repairs or replacements shall be done by Tenant or
Landlord in a manner consistent with the then-existing Shopping
Center of which the Building is a part.

   8.   <u>Signs</u>.  Subject to city, county and state approvals, if
any, Tenant at its sole cost and expense and no later than

October 15, 1989, shall construct and install upon the Common
Area at a location as shown on Exhibit "B," a pylon sign struc-
ture (with electrical wired box installed) having sufficient
space thereon for inclusion of double-sided "face panels" and a
"readerboard" identifying Tenant's store (and Eyelab if consis-
tent with subparagraph 8(iii) below), which face panels and rea-
derboard shall be constructed and installed at Tenant's sole cost
and expense; provided, however, that (i) Tenant shall submit to
Landlord proposed plans and specifications for said pylon sign
(including colors, design, size and type of lighting and position
of tenant panels) prior to construction and installation thereof
for Landlord's written approval, which approval shall not be
unreasonably withheld or delayed, (ii) Tenant shall submit to
Landlord proposed plans and specifications for said face panels
(including colors, design, size and type of lighting) prior to
construction and installation thereof for the Landlord's written
approval, which approval shall not be unreasonably withheld or
delayed and (iii) Eyelab shall be allowed to occupy a portion of
said pylon so long as it agrees to pay a pro rata portion of the
maintenance expenses for said pylon based on the percentage of
square footage it occupies.  Tenant shall, upon installation of
such panels, be responsible for of the repair, maintenance and
utility charges for the pylon sign.  Tenant shall also be per-
mitted to have signs on the exterior of Tenant's building, con-
ceptual plans for which are attached hereto as Exhibit "E."
Tenant's exterior building sign plans and specifications shall be
submitted to and approved by Landlord, which approval shall not
be unreasonably withheld or delayed.  All such signs shall be in

-18-

compliance with all applicable governmental requirements. How-
ever, should Tenant desire to alter or add additional signs after
the date hereof, Tenant shall submit plans and specifications for
such signs to Landlord for Landlord's approval, which approval
shall not be unreasonably withheld or delayed.

   9.  Tenant's Property and Waiver of Landlord's Lien.  All
Tenant's trade fixtures and personal property (a nonexclusive
list of which is attached as Exhibit "D") shall be, and remain,
the personal property of Tenant and removable by Tenant at any
time prior to, or within thirty (30) days after, the expiration
or earlier termination of this Lease and shall be so removed by
Tenant at the request of Landlord within said thirty (30) days
after the expiration or termination of this Lease.  Those
improvements that are integrated into the physical structure of
the building on the Premises shall not be removed and shall
become the property of Landlord.  Tenant agrees promptly to
repair any damage to the Premises occasioned by the removal of
Tenant's trade fixtures, furnishings and equipment (except for
small holes caused by nails, fasteners and the like).  Landlord
waives its statutory or common law landlord's lien with regard to
the aforesaid property of Tenant on the Premises, and further
agrees to execute at any time or times hereafter, upon the
request of Tenant, all instruments evidencing such waiver.

   10.  Insurance.

   (a)  Property Damage.  Tenant shall, from the date of full
lease execution and during the Term as it may be extended, keep
in full force and effect, and in a form reasonably acceptable to
Landlord or Landlord's first mortgagee, a policy of fire and

-19-

extended coverage insurance covering loss or damage to the Premises in the amount of the full replacement value of the building thereon including the Improvements and any other alterations or Tenant installed betterments, exclusive of excavation, footings and foundations, which initial amount shall be not less than replacement cost as reasonably determined by Tenant's insurer, and which may have a commercially reasonable deductible. Landlord and Landlord's first Mortgagee shall be named as an additional insureds as their respective interests may appear under such policy or policies. Tenant shall furnish to Landlord upon Landlord's request a duplicate certificate of insurance showing insurance existing in such amount from an insurance carrier licensed to do business in the State of New Jersey.

(b) <u>Liability Insurance</u>.   (i) Tenant shall, from the date of full lease execution and during the Term as it may be extended, keep in full force in a form reasonably acceptable to Landlord or Landlord's first mortgagee, a policy of comprehensive general liability insurance with bodily injury and property damage insurance including contractural liability and completed operations coverage with respect to the Premises and business operated by Tenant and shall name Landlord and Landlord's first mortgagee, if any, as additional insureds as their respective interests may appear. The limits of such comprehensive general liability policy shall be not less than $5,000,000 combined single limit for bodily injury and property damage, with a commercially reasonable deductible.  Tenant shall furnish to Landlord upon Landlord's request a duplicate certificate of insurance showing insurance existing in such amount from an insurance carrier licensed to do

business in the State of New Jersey. (ii) Tenant shall, during the Term as it may be extended, keep in full force in a form reasonably acceptable to Landlord or Landlord's first mortgagee, a policy of business interruption insurance covering a twelve (12) month period and naming Landlord and Landlord's first mortgagee, if any, as additional insureds as their respective interests may appear.

(c) <u>Workers' Compensation Insurance</u>.  Tenant shall maintain workers' compensation insurance in statutory limits.

(d) <u>Self-Insurance</u>.  Notwithstanding anything to the contrary contained herein, Tenant shall have the right to self-insure against any of the risks or portions thereof set forth in subparagraphs (a) and (c) above, to the extent permitted by law, provided Tenant is then occupying the Premises and has a reported net worth, as of the end of Tenant's most recent quarterly reporting period, of not less than One Hundred Fifty Million Dollars ($150,000,000), as computed in accordance with generally accepted accounting principles consistently applied.

(e) <u>Common Area Liability Insurance</u>.  Landlord shall, during the Term as it may be extended, keep in full force and effect, in a form reasonably acceptable to Tenant, a policy of comprehensive general liability insurance with bodily injury and property damage insurance with respect to the Common Areas on Landlord's Premises and shall name Tenant as an additional insured.  The limits of such policy shall be the same as those set forth in (b) above.  Landlord shall furnish to Tenant upon Tenant's request a duplicate certificate of insurance showing insurance existing in such amount from an insurance carrier licensed to do business in

the State of New Jersey.

(f)  <u>Policy Provisions</u>.  Tenant's insurance coverage may be
effected by a blanket policy or policies of insurance or under
so-called "all risk" or "multi-peril" insurance policies, pro-
vided that the total amount of insurance available with respect
to the building on the Premises and Tenant's liability hereunder
shall be at least the equivalent of separate policies in the
amounts herein required, and provided further that in other
respects any such policy or policies shall comply with the provi-
sions of this Paragraph 10.  An increased coverage or "umbrella"
policy may be provided and utilized by Tenant to increase the
coverage provided by individual or blanket policies in lower
amounts, and the aggregate coverage provided by all such policies
with respect to the building on the Premises and Tenant's liabil-
ity hereunder shall be satisfactory provided that such policies
otherwise comply with the provisions of this Paragraph 10.  It
shall not be necessary for Tenant to deliver the original of any
such blanket policy to Landlord, but Landlord shall be furnished
with a certificate or duplicate of such policy reasonably accept-
able to Landlord upon request.

(g)  <u>Waiver of Subrogation</u>.  Landlord and Tenant hereby agree
that to the extent that a loss is covered by insurance or is
self-insured, including any deductible, they hereby waive any and
all rights of recovery against each other for any loss or damage
to the Premises or the contents contained therein, for loss of
income on account of fire or other casualty, or for injury sus-
tained on the Premises or the Common Areas; and each party's
aforesaid policies of insurance shall contain appropriate provi-

-22-

sions recognizing this mutual release and waiving all rights of subrogation by the respective insurance carriers.

(h) <u>Evidence of Insurance</u>.  Subject to Tenant's right to self-insure hereunder, Tenant and Landlord shall cause to be issued to the other appropriate certificates of insurance evidencing compliance with the applicable covenants of this Paragraph 10.  Each of said certificates shall provide that no cancellation or material change in the insurance evidenced by the particular certificate shall be effective unless thirty (30) days' unconditional notice of such cancellation or material change shall have been given to the certificate-holder or Landlord's mortgagee, if applicable.

(i) <u>Indemnities</u>.  Except if arising from the sole negligent or willful acts of Landlord or its agents or employees, Tenant hereby agrees to indemnify Landlord from all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring on the Premises or resulting from the use thereof.

Except if arising from the sole negligent or willful acts of Tenant or its agents or employees, Landlord agrees to indemnify Tenant from any and all claims, costs, liability, damage or expense, including attorneys' fees, for any death, damage or injury to persons or property occurring in, on or around the Common Areas or other buildings within Landlord's Premises or resulting from the use thereof.

Tenant agrees not to engage in any activity which would cause the building on the Premises to be uninsurable or cause an increase in the cost of insurance on the Premises or Landlord's

-23-

foregoing deductions shall in no event preclude Tenant from receiving in its entirety any separate payment from the Proposed Party specifically for existing Tenant Improvements. Tenant may also grant licenses and/or concessions without the consent of Landlord. Nothing herein shall be construed to entitle Landlord to share in any rents charged or to be charged by Tenant in the event Tenant develops additional leaseable space consistent with the provisions of subparagraph 33(b).

Any assignment or subletting of this Lease shall be executed by the assignor or sublessor and the assignee or sublessee. Each assignee or sublessee, for the benefit of the Landlord, shall agree to assume, be bound by, and perform all terms, covenants, and conditions of this Lease to be kept and performed by Tenant. After execution of the assignment or sublease, Tenant will forward a completed copy thereof to Landlord.

12. <u>Compliance with Applicable Laws</u>. During the Term as it may be extended, to the extent that the Premises are affected thereby, Tenant shall comply with all lawful requirements of the local, county and state health boards, police and fire departments, municipal and state authorities including environmental authorities and any other governmental authorities with jurisdiction over the Premises and of the board of fire underwriters and any reasonable insurance company requirements, respecting Tenant's use and occupancy of the Premises. If Tenant, after notice ordering performance of any such work which Tenant is required to perform hereunder, fails to perform same with reasonable promptness, Landlord, after thirty (30) days' prior written notice to Tenant (except in the case of an emergency in which

event only such notice as is reasonable under the circumstances shall be required) and Tenant's failure to cure or commence to cure and diligently prosecute the cure to completion, may perform said work and collect the reasonable cost thereof from Tenant with the next installment or installments of Base Rent.

13.  Payment of Utility Bills.  Tenant shall, at its sole cost, cause any gas, water and electricity to be separately metered or submetered and billed to Tenant.  Tenant will pay directly to the appropriate utility company or governmental agency, when due, all bills for gas, water, sanitary sewer, electricity, telephone and other public or private utilities used by Tenant with regard to the Premises.

14.  Taxes.

(a)  Real Estate Taxes.  The term "Real Estate Taxes" shall mean all general and special real estate taxes, special assessments and other ad valorem taxes, rates, levies and assessments paid upon or with respect to the Premises for a calendar year or a portion thereof to any governmental agency or authority and all taxes specifically imposed in lieu of any such taxes.

(b)  Tenant's Taxes Separately Assessed.  If the Premises are separately assessed, Tenant shall pay any and all Real Estate Taxes solely levied, imposed upon or attributable to the Premises and all business license fees and sales taxes applicable to its own operations thereon before same become delinquent and before any fine, penalty, interest or cost may be added thereto, become due or be imposed by operation of law for the nonpayment or late payment thereof, but if such taxes or assessments may be paid in installments without penalty, then Tenant may pay only such

-26-

installment(s) as may be currently due and owing prior to delinquency, and Tenant shall furnish Landlord with a photostatic copy of the receipt therefor (or other proof of payment) upon written request by Landlord. Should Landlord receive any notice as to any such tax, it will promptly deliver the notice to Tenant for payment in accordance with the notice provisions contained in Paragraph 27.

Tenant shall have the right to protest and contest in good faith any tax made against the Premises in accordance with any governmental procedures established therefor and, if so permitted by such procedures, to defer payment of same during such contest provided Tenant indemnifies and holds Landlord harmless there-from, including any penalty and interest due thereon, and pays any interest or penalty charges resulting from such deferred pay-ment. Regardless of whether this Lease has been terminated, Tenant shall be entitled to a pro rata refund of any taxes returned to Landlord or Tenant for any reason whatsoever (if, and to the extent that, such taxes were paid by Tenant pursuant to the provisions of this Lease). If Tenant shall fail to pay any of such Real Estate Taxes before the same become delinquent, Landlord may, at its election, pay such Real Estate Taxes with any interest and penalties due thereon, and the amount so paid by Landlord, plus interest at a rate equal to the highest rate per-mitted by New Jersey law, shall constitute Additional Rent due from Tenant on demand. Nothing contained in this Lease shall, however, require Tenant to pay any franchise, corporate, estate, inheritance, succession, capital levy, business or transfer tax of Landlord, or any income, profits, gross receipts or renewal

-27-

tax or charge upon the rent payable by Tenant under this Lease. Taxes shall be prorated as of the Rent Commencement Date and the expiration or earlier termination of this Lease, and Landlord shall promptly return to Tenant any overpayment made by Tenant not attributable to the period of Tenant's possession of the Premises.

(c)   Tenant's Taxes Not Separately Assessed.   Landlord shall use its best efforts to obtain a separate assessment and tax bill for Tenant.   In the event that a separate assessment for Tenant cannot be obtained, Tenant shall pay its pro rata share of the Real Estate Taxes levied against the tax parcel which includes the Premises (the "tax parcel").   Tenant's pro rata share shall be calculated by multiplying the total tax assessed by a fraction, the numerator of which is the square footage of the leasable floor area of the building on the Premises and the denominator of which is the square footage of the leasable floor area of all buildings located in the tax parcel, including any outside sales area and specifically including the Premises; said pro-rata share currently estimated to be approximately 76.87%.   Tenant shall pay said pro rata share of taxes within fifteen (15) days after Tenant's receipt of Landlord's statement therefor (but in no event more than fifteen (15) days before the same shall become delinquent), accompanied by the tax bill on the basis of which such statement is rendered and the receipted tax bill for the previous payment period. In addition to the foregoing pro-rata share of taxes, Tenant shall pay, at its sole expense, any added assessments of taxes directly attributable to Tenant's Improvements constructed on the Premises.   As long as Tenant has made

-28-

payment of taxes to Landlord, Landlord shall pay, or cause the
payment of, all Real Estate Taxes affecting the Shopping Center
before any fine, penalty, interest or cost may be added thereto,
become due or be imposed by operation of law for the nonpayment
or late payment thereof. Landlord shall remain primarily respon-
sible for such payment notwithstanding the fact that such payment
may be made by a tenant of Landlord's Premises or other third
party pursuant to an agreement to which Tenant is not a party.
Tenant shall have the right to contest the amount of, validity,
or otherwise seek an exemption or abatement of, any Real Estate
Taxes, by appropriate proceedings diligently conducted in good
faith, in accordance with the procedure set forth in (d) below.
In addition, should Landlord fail to pay such Real Estate Taxes
before same become delinquent, Tenant shall have the same right
to cure as that afforded Landlord in subparagraph (b) above and
may deduct the cost thereof, plus interest at the aforesaid rate,
from the next installment of Base Rent due hereunder.

(d)   Reduction in Assessed Valuation of Property.  Tenant, at
its sole cost and expense, shall have the right to seek a reduc-
tion in the valuation of the Premises assessed for Real Estate
Tax purposes. In any instance where any such action or proceeding
is being undertaken by Tenant, Landlord shall cooperate with
Tenant, execute any and all documents required in connection
therewith and, if required by any law, rule or regulation, shall
join with Tenant in the prosecution thereof.  Upon the termina-
tion of any such proceedings, Tenant shall pay its pro rata share
of such Real Estate Taxes as finally determined in such proceed-
ings, the payment or partial payment of which may have been

deferred during the prosecution of such proceedings.  In addi-
tion, Tenant shall be solely responsible for any costs, fees,
interest, penalties or other liabilities incurred in connection
with such proceedings.  In the event that the Premises are not
separately assessed, Tenant shall be entitled to a full refund of
any overpayment of Real Estate Taxes relating to the Premises and
costs, fees, penalties or interest thereon received by Tenant or
Landlord, whether or not such refund was a result of proceedings
instituted by Tenant, which taxes and other costs have either
been paid by Tenant, or paid by Landlord on behalf of Tenant (for
which Landlord has been reimbursed by Tenant).

15.  <u>Condemnation</u>.

(a) <u>Definition of Taking and Substantial Taking</u>.  For the
purpose of this Lease, "taking" shall mean any condemnation or
exercise of the power of eminent domain by any public authority
vested with such power and any taking in any other manner for
public use, including a private purchase in lieu of condemnation
by a public authority vested with the power of eminent domain;
the "date of any taking" shall mean the earlier of the date upon
which title to the Premises or the Shopping Center or any por-
tions thereof taken is vested in the condemning authority, or the
date upon which possession of the Premises or the Shopping Cen-
ter, or any portions thereof is taken by the condemning author-
ity; and "substantially all of the Premises" shall mean (i) so
much of the building on the Premises as, when taken, leaves the
untaken portion unsuitable, in Tenant's reasonable opinion, for
the continued feasible and economic operation of the Premises by
Tenant for the same purposes as immediately prior to such taking

-30-

or as contemplated herein, or (ii) so many of the parking spaces within the Shopping Center as reduces the parking ratio below the greater of five (5.0) spaces per 1000 square feet of gross leasable area or that ratio which is required by the zoning ordinance applicable to the Shopping Center, and the failure of Landlord to provide substantially similar alternative parking reasonably acceptable to Tenant within sixty (60) days after such taking; or (iii) so much of the Common Area Easements for ingress and egress granted by Landlord to Tenant and described in Paragraph 3 above that access to the Premises is impeded.

(b)  <u>Rights Upon Taking or Substantial Taking</u>.  In the event of a taking of all or substantially all of the Premises as defined in subparagraph 15(a) hereinabove, Tenant may at its option upon sixty (60) days' written notice to Landlord have the right to terminate this Lease.  All Base Rent and other sums payable by Tenant hereunder shall be apportioned and paid through and including the date of such taking, and neither Landlord nor Tenant shall have any rights in any compensation or damages payable to the other in connection with such condemnation.

(c)  <u>Rights Upon Less Than Substantial Taking</u>.  In the event of a taking of a portion of the Premises which is less than substantially all of the Premises, Base Rent and Additional Rent shall be reduced fairly and justly in accordance with the portion condemned or taken, effective as of the vesting of title or transfer of possession, and Landlord shall, at its own cost and expense, make all necessary restorations to the Premises so that the portion of the Premises not taken constitute a complete architectural unit, provided that the cost thereof to Landlord

shall not exceed the proceeds of the Landlord's condemnation award and of Tenant's condemnation award (to the extent that such relates to the Premises and not to Tenant's personal property, intangibles or out-of-pocket expenses unrelated thereto), which Tenant shall make available to Landlord for such restorations. If such condemnation loss occurs within the last two (2) years of the Term or of any Option Period and has a material impact on Tenant's ability to conduct business as reasonably determined by Tenant, this Lease shall terminate at Tenant's option.

(d)  <u>Rights Upon Temporary Taking</u>.  In the event of a taking of the Premises or any portion of the Premises for temporary use, without the taking of the fee simple title therein, then this Lease shall remain in full force and effect, and such taking shall not relieve Tenant from its duty and obligation fully and completely to keep, observe, perform, satisfy and comply with each and every agreement, term, covenant, condition, requirement, provision, and restriction of this Lease.  All awards, damages, compensation and proceeds payable by the condemnor by reason of such taking of the Premises for periods prior to the expiration of the Lease shall be payable to Tenant.  All such awards, damages, compensation and proceeds for periods after the expiration of the Lease shall be payable to Landlord.  Anything contained herein to the contrary notwithstanding, a temporary taking for any period in excess of six (6) months may, at Tenant's option, be deemed a permanent taking and shall be governed by (b) or (c) above, as applicable.

(e)  <u>Tenant's Right Upon Condemnation</u>.  In the event of a taking described in subparagraph (b) or (c) above, then Tenant

shall be entitled to claim compensation from the condemning
authority for the value of its unamortized leasehold improvements
paid for by Tenant, relocation expenses and any other items to
which Tenant is entitled under applicable law.  No claim by
Tenant shall diminish any award which is by law directly related
to Landlord's interest.

16.  Damages to the Premises by Fire or Other Casualty.

(a)  Less Than Fifty Percent (50%).  In the event of
destruction or damage to the building on the Premises by fire,
earthquake, or other casualty which has a repair and reconstruc-
tion cost of less than fifty percent (50%) of the then total
replacement cost of the Premises, this Lease shall not terminate
except as expressly set forth herein, and Base Rent and Addi-
tional Rent shall continue to be paid by Tenant pursuant to the
terms of Paragraph 5 hereof with an appropriate abatement. Tenant
shall, within a reasonable time after said event of damage or
destruction, subject to force majeure, applicable building codes,
and the procurement of building permits, complete reconstruction
of the Premises as nearly possible to their condition and charac-
ter immediately prior to such damage, with such alterations as
may be permitted under Paragraph 6 hereof, and shall restore the
Premises.  In the event, subject to force majeure, the Premises
are not substantially repaired and reconstructed by Tenant within
two hundred seventy (270) days after receipt by Tenant of the
required governmental permits for restoration with regard to such
destruction or damage, for which permits Tenant shall make prompt
application following such destruction or damage, then Landlord
may, at its option, by giving written notice to Tenant within

-33-

thirty (30) days after the expiration of said period, undertake
completion of such reconstruction, in which event Tenant shall
make all applicable insurance proceeds (including any applicable
deductible) or the amount reasonably estimated to be necessary
for such reconstruction, available to Landlord for such recon-
struction.   Notwithstanding the provisions for abatement of rent
in this subparagraph 16(a), in no event shall said abatement
exceed a period of twelve (12) consecutive months for each casu-
alty occurrence under this subparagraph.

     (i) <u>Application of Funds</u>.  All insurance (or self-
insurance) proceeds received on account of such damage or
destruction, less the cost, if any, of such recovery, shall be
applied pursuant to the terms of this Lease to the payment of the
cost of such restoration, repair, replacement, rebuilding, or
alteration (the "Work"), including expenditures made for tempo-
rary repairs or for the protection of property pending the com-
pletion of permanent restoration, repair, replacement, rebuild-
ing, or alteration to the Premises and, if required by
Landlord's first or second mortgagee, shall be held by Landlord's
first or second mortgagee or a mutually agreeable third-party
escrow agent, in an interest-bearing account in a federally
insured financial institution, to be paid out, as hereinafter
provided, from time to time (but no more often than once
monthly), as the Work progresses, upon Tenant's written
request, accompanied by a certificate of the architect or engi-
neer in charge of the Work (the "certificate"), dated not more
than seven (7) days prior to such request, setting forth that the
sum then requested either has been paid by Tenant or is justly

-34-

due to contractors, subcontractors, materialmen, engineers, architects, or other persons (whose names and addresses shall be stated), who have rendered services or furnished materials for certain portions of the Work.  The certificate shall give a brief description of such services and materials, shall list the several amounts so paid or owing to each of such persons, shall state the cost of the Work at the date of the requisition, and shall state that no part of such expenditures has been or is being made the basis for any other request for payment.  The certificate shall state also that, except for the amounts listed therein, there is no outstanding indebtedness known to such architect or engineer, after due inquiry, which is then due for labor, wages, materials, supplies, or services in connection with the Work which, if unpaid, might become the basis of a vendor's, mechanic's, laborer's, materialman's, or similar lien upon the Work or upon the Premises or any part thereof.

(ii) _Disbursement_.  Upon compliance with the foregoing provisions of subparagraph 16(a)(i), the escrow agent or mortgagee, as applicable, shall, out of such insurance proceeds, pay to the persons named in such certificate the respective amounts stated to be due to them or shall pay to Tenant the amount stated to have been paid by Tenant provided, however, that such payments shall not exceed in amount the cost of the relevant Work as stated in the certificate.  If the insurance proceeds or reconstruction funds paid by Tenant to the escrow agent or mortgagee exceed the amount required to pay the total cost of the Work, Tenant after payment of all costs of the Work, shall be entitled to receive or retain, as applicable, such excess.

-35-

(b)  Fifty Percent (50%) or More.  In the event of destruction or damage to the building on the Premises by fire, earthquake, or other casualty which has a repair and reconstruction cost of fifty percent (50%) or more of the then total reconstruction cost of the Premises Tenant shall have the option to terminate this Lease.  Tenant shall notify Landlord of its exercise of such option within sixty (60) days following the occurrence of such casualty and shall thereupon make available to Landlord all insurance proceeds or reconstruction costs as set forth in subparagraph (a) above.  In the event Tenant does not elect to terminate this Lease as set forth in the preceding two (2) sentences Base Rent and Additional Rent shall continue to be paid by Tenant pursuant to the terms of paragraph 5 hereof with an appropriate abatement and Tenant shall, within two hundred seventy (270) days after receipt by Tenant of the required governmental permits for restoration with regard to such damage or destruction, for which permits Tenant shall make prompt application following such destruction or damage, subject to force majeure, complete reconstruction of the building on the Premises as nearly as possible to its condition and character immediately prior to such damage, with such alterations as may be permitted under Paragraph 6, and shall restore the Premises.  Notwithstanding the provisions for abatement of rent in this subparagraph 16(b), in no event shall said  abatement exceed a period of twelve (12) consecutive months for each casualty occurrence under this subparagraph.

(c)  Last Two (2) Years of Term or Option Period.  Notwithstanding the foregoing, if such casualty loss as referred to in subparagraphs (a) and (b) above occurs within the last two (2)

years of the Term or of any Option Period and has a material

impact on Tenant's ability to conduct business, as reasonably

determined by Tenant, Tenant shall be under no obligation to

restore the Premises, in which case this Lease shall ter-

minate at Tenant's option, and Landlord shall receive the pro-

ceeds of any insurance (together with any applicable deductible)

which may be payable with regard to such destruction or damage

or, in the event Tenant self-insures, the amount reasonably esti-

mated to be necessary for reconstruction of the Premises.

17. <u>Holding Over</u>.  Tenant agrees that at the expiration of

this Lease, it will deliver to Landlord peaceable possession of

the Premises.  No holding over by Tenant nor acceptance of Base

Rent or Additional Rent by Landlord shall operate as a renewal or

extension of the Lease without the written consent of Landlord

and Tenant. Should Tenant hold over without the consent of Land-

lord, this Lease shall continue in force from month to month,

subject to all of the provisions hereof and at one hundred fifty

percent (150%) of the monthly Base Rent Tenant had been paying

during the preceding Lease Year.

18. <u>"For Rent" Signs</u>.  Tenant hereby permits Landlord during

the last one hundred seventy (170) days of the Term or of any

Option Period, as the case may be (provided that no applicable

Renewal Option has been exercised or deemed exercised), to place

one (1) "For Rent" or "For Sale" sign, not exceeding four (4)

feet by four (4) feet in size, on the parking lot of the Shopping

Center.  Tenant will also allow Landlord or its agents, accompa-

nied by a representative of Tenant designated by Tenant, to show

the Premises, exterior and interior, to prospective tenants, pur-

chasers, or mortgagees during reasonable business hours by prior
appointment, provided same does not interfere with the conduct of
Tenant's business.

19.  <u>Events of Tenant's Default</u>.  Any of the following occur-
rences, conditions or acts shall constitute an "Event of Default"
under this Lease:

(a)  <u>Failure to Pay Rent; Breach.</u>  (i) Tenant shall fail to
make any payments of money provided hereunder and then owing,
including, without limitation, Base Rent or Additional Rent,
within ten (10) days after the receipt of written notice from
Landlord to Tenant and Tenant's Mortgagee (defined below), if
any, that same is overdue; or (ii) Tenant shall fail to observe
or perform any other material provisions of this Lease and such
failure shall continue for thirty (30) days after receipt of
written notice from Landlord to Tenant and Tenant's Mortgagee (if
any) specifying such default and demanding that the same be cured
(unless such default cannot be cured solely by the payment of
money and cannot with due diligence be wholly cured within such
period of thirty (30) days, in which case Tenant shall have such
longer period as is reasonably necessary to cure the default, so
long as Tenant proceeds promptly to commence the cure of same
within such thirty (30) day period and diligently prosecutes the
cure to completion).

Notwithstanding anything to the contrary set forth in this
Lease, if Tenant has been declared in default under this Lease
and fails to cure the Event of Default within the period of time
provided herein, Landlord, upon the written request of Tenant or
Tenant's Mortgagee, shall (i) consent to the assignment of

-38-

Tenant's interest under this Lease to Tenant's Mortgagee, subject to Tenant's Mortgagee's curing in full all of the then-existing Events of Default and continuing to make all payments due hereunder, or (ii) accept the prompt cure of such Event(s) of Default by Tenant's Mortgagee.  Further, should Tenant be declared by Tenant's Mortgagee to be in default under any mortgage, deed of trust or any mortgage-related documentation which provides Tenant's Mortgagee with the right of foreclosure, Landlord will consent to the assignment of Tenant's interest under this Lease in such instance to Tenant's Mortgagee, subject to Tenant's Mortgagee's curing in full all the then-existing Events of Default. "Tenant's Mortgagee" shall be any lender holding a priority real or personal property security interest in Tenant's interest in this Lease.

(b)   Bankruptcy.  (i) Tenant shall be adjudicated bankrupt or insolvent, or a receiver, trustee in involuntary bankruptcy or other, similar officer shall be appointed to take charge of any substantial part of Tenant's property, and such proceeding is not dismissed within sixty (60) days after it is begun; or (ii) Tenant voluntarily files a petition in bankruptcy or for reorganization under any provisions of the Bankruptcy Code now or hereafter enacted, and providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts; or (iii) Tenant shall voluntarily make an assignment for the benefit of its creditors; and as a result of any of the foregoing occurrences, the covenants on the part of Tenant to be performed under this Lease (including the covenant to pay rent) are not being performed by Tenant or a party claiming under Tenant.

20.  <u>Landlord's Remedies</u>.  After the occurrence of an Event of Default which shall not have been cured as provided in Paragraph 19 hereinabove, Landlord shall have the right, after proper notice and the expiration of any applicable cure period, to exercise the following remedies:

(a)  <u>Continue Lease</u>.  Landlord may, at its option, continue this Lease in full force and effect and not terminate the Tenant's right to possession of the Premises, in which event Landlord shall have the right to collect rent and additional charges when due, including that due for any Option Periods for which a Renewal Option has been exercised.  In addition, Landlord shall have the right to peaceably re-enter the Premises on the terms set forth in subparagraph (b) below, without such re-entry's being deemed an acceptance by Landlord of a surrender of this Lease.  Landlord shall also have the right, at its option, from time to time, without terminating this Lease, to relet the Premises, or any part thereof, with or without legal process, as the agent and for the account of Tenant upon such terms and conditions as Landlord may deem advisable or satisfactory, in which event the rents received on such reletting shall be applied first to the reasonable and actual expenses of such reletting and collection, including, but not limited to, necessary renovation and alterations of the Premises, reasonable and actual attorneys' fees, any reasonable and actual real estate commissions paid, and thereafter toward payment of all sums due or to become due Landlord hereunder; and, if a sufficient sum shall not be thus realized or secured, in Landlord's exercise of reasonable efforts to mitigate its damages, to pay such sums and other charges, (i) at

-40-

Landlord's option, Tenant shall pay Landlord any deficiency
monthly and Landlord may bring an action therefor as such monthly
deficiency shall arise, or (ii) at Landlord's option, the entire
deficiency which is subject to ascertainment for the remaining
Term (including any Option Periods for which a Renewal Option has
been exercised) shall be immediately due and payable by Tenant
subject to determination of the "worth at the time of the award,"
as defined in (b) below.  Nothing herein, however, shall be con-
strued to require Landlord to re-enter and relet in any event,
except as provided by New Jersey law.  The Landlord shall not,
in any event, be required to pay Tenant any surplus of any sums
received by Landlord on a reletting of the Premises in excess of
the rent provided in this Lease, but such excess will reduce any
accrued present or future obligations of Tenant hereunder.  Land-
lord's re-entry and reletting of the Premises without termination
of this Lease shall not preclude Landlord from subsequently
terminating this Lease as set forth below.

(b)  Terminate Lease.  Landlord may terminate this Lease by
written notice to Tenant specifying a date therefor, which shall
be no sooner than thirty (30) days following receipt of such
notice by Tenant, and this Lease shall then terminate on the date
so specified as if such date had been originally fixed as the
expiration date of the Term.  In the event of such termination,
Landlord shall be entitled to recover from Tenant:

(i)  The worth at the time of award of any
obligation which has accrued prior to the date of termination;
and

(ii)  The worth at the time of the award of

-41-

the amount by which the unpaid rent and Additional Rent which
would have been earned after termination until the time of award
exceeds the amount of such rental loss which Tenant proves could
have been reasonably avoided; and

(iii)  The worth at the time of award of the
amount by which the unpaid Base Rent and Additional Rent for the
balance of the Term after the time of award exceeds the amount of
such rental loss that Tenant proves could be reasonably avoided.

As used in clauses (i) and (ii) of this subparagraph 20(b)
the term "worth at the time of the award" shall be computed by
allowing interest at the rate of ten percent (10%) per annum on
the amount of the obligations set forth therein and, as used in
clause (iii) of this subparagraph 20(b), the term "worth at the
time of the award" shall be computed by discounting such amount
at the rate of ten percent (10%) per annum.  In the event this
Lease shall be terminated as provided above or by summary
proceedings or otherwise, Landlord, its agents, servants or rep-
resentatives may immediately or at any time thereafter peaceably
re-enter and resume possession of the Premises and remove all
persons and property therefrom, either by summary dispossess pro-
ceedings or by other suitable action or proceeding at law without
liability for damages therefor.

(c)  Reimbursement of Landlord's Costs in Exercising
Remedies.  Landlord may recover from Tenant, and Tenant shall pay
to Landlord upon demand, such reasonable and actual expenses as
Landlord may incur in recovering possession of the Premises,
placing the same in good order and condition and repairing the
same for reletting, all other reasonable and actual expenses,

-42-

commissions and charges incurred by Landlord in exercising any
remedy provided herein or as a result of any Event of Default
by Tenant hereunder (including, but not limited to, reasonable
and actual attorneys' fees), and any other amount necessary to
compensate Landlord for any detriment proximately caused by
Tenant's failure to perform Tenant's obligations under this
Lease.

(d)  Remedies Are Cumulative.  The various rights and reme-
dies reserved to Landlord herein, including those not specifi-
cally described by statutory law in force and effect at the time
of the execution hereof, are cumulative, and Landlord may pursue
any and all of such rights and remedies, whether at the same time
or otherwise.

(f)  Landlord Waiver.  One or more waivers by Landlord of any
breach, default or Event of Default shall not be a waiver of any
other breach, default, or Event of Default of the same or any
other provision.  Landlord's consent to or approval of any act by
Tenant requiring Landlord's consent or approval shall not be
deemed to waive or render unnecessary Landlord's consent or
approval involving any subsequent similar act by Tenant.

(i)  The receipt by Landlord of any rent or
other payment, with or without knowledge of the breach of any
provision hereof, shall not be deemed a waiver of any such
breach; provided, however, that the receipt and acceptance by
Landlord of any delinquent rent and/or other sum which may be due
hereunder shall constitute a waiver of said breach of timely pay-
ment for the particular payment involved (but not as to any other
breach), and no waiver by Landlord of any sum due hereunder or

-43-

any provision hereof shall be deemed to have been made unless expressed in writing and signed by Landlord.

(ii)  No delay or omission in the exercise of any right or remedy accruing to Landlord upon any breach by Tenant under this Lease shall impair such right or remedy nor be construed as a waiver of any such breach of any provision of this Lease and shall not be deemed to be a waiver of any subsequent breach of the same or any other provision herein contained.

21. Events of Landlord's Default.  If Landlord fails to perform any of its obligations hereunder for a period of ten (10) days after the receipt of written notice from Tenant in the event of a monetary default or, except in the case of emergency (in which case only such notice as is reasonable under the circumstances shall be required), for a period of thirty (30) days after receipt of written notice from Tenant to Landlord specifying a nonmonetary default and demanding that the same be cured (unless such default cannot be cured solely by the payment of money and cannot with due diligence be wholly cured within such period of thirty (30) days, in which case Landlord shall have such longer period as may be reasonably necessary to cure the default, so long as Landlord proceeds promptly to commence the cure of same within such thirty (30) day period and diligently prosecutes the cure to completion), Tenant may, at its option, after providing a second written notice to Landlord and affording Landlord an additional ten (10) days to cure in the event of a nonmonetary default, and in addition to any other remedies which it may have, and without Tenant's actions being deemed a cure of Landlord's default, do all or any of the following: (i) pay or

-44-

perform such obligations, and Tenant's reasonable cost of perfor-mance, plus interest at the rate of fifteen percent (15%) per annum shall be offset against the Base Rent and Additional Rent due Landlord hereunder or (ii) sue for damages.

22.  Waiver.  If Landlord or Tenant fails to insist on the strict observance by the other of any provisions of this Lease, neither shall thereby be precluded from enforcing nor be held to have waived any of the obligations, past, present and future, of this Lease.

23.  Successors and Assigns.  All rights and liabilities herein given to or imposed upon any party hereto shall extend to the permitted successors and assigns of such party.

24.  Landlord's Warranties and Representations.  Landlord represents, warrants and covenants to Tenant that:

(a)  Quiet and Peaceful Enjoyment.  Landlord and those per-sons executing this Lease on its behalf have the right and lawful authority to enter into this Lease and perform Landlord's obliga-tions hereunder, and Landlord warrants and represents that, so long as Tenant is not in default hereunder beyond any applicable cure period, it shall have quiet and peaceful enjoyment and occu-pancy of the Premises.

(b)  Title.  Landlord's fee simple interest in the Shopping Center is free and clear of any mortgages, deeds, declarations, agreements, leases, tenancies or restrictions, except those matters set forth on Exhibit "F" attached hereto and entitled "Permitted Encumbrances," or any matters which would restrict Tenant's use of the Premises for the sale of items specifically referred to in Paragraph 33 hereof or would restrict in any

-45-

respect the right of Tenant, its employees, customers, and invi-
tees to use the Common Areas in accordance with the terms of this
Lease.

(c)   <u>Operation and Maintenance of Common Areas</u>.   Landlord
shall operate and maintain the Common Areas of the Shopping Cen-
ter in accordance with the provisions of Paragraph 40 hereof.

(d)   <u>Zoning and Subdivision</u>.   The Premises and the Shopping
Center are presently zoned, subdivided to the extent required and
are in conformity with all applicable laws, so as to permit (i)
the improvement and operation of the Premises and the Shopping
Center in accordance with Exhibit "B" hereto; and (ii) the ini-
tial use of the Premises as described in Paragraph 33 of this
Lease.

(e)   <u>Hazardous or Toxic Materials</u>.   Landlord has not used,
discharged, dumped, spilled or stored any Hazardous Substances
(as defined in Exhibit "C" hereto) on or about the Shopping Cen-
ter, whether accidentally or intentionally, legally or illegally,
and has received no notice and has no knowledge of the same
except as set forth in the report by Northeastern Analytical
Corp. entitled "Analytical Audit", dated October 24, 1988 and
previously furnished to Tenant.   Landlord covenants and agrees
that it will in a manner approved by law perform, at its sole
cost and expense, and complete all environmental remediation
required as a result of the discovery of excessive levels of
petroleum hydrocarbons in the vicinity of the underground storage
tank including the removal and replacement of the tank if neces-
sary. Completion of all environmental remediation by Landlord
shall occur prior to the Rent Commencement Date and Landlord

-46-

shall furnish Tenant with a written certified report evidencing
compliance with Landlord's obligations under this subparagraph
24(e) prior to said date.  If any other such Hazardous Substances
are discovered at the Shopping Center and it is established that
they existed on same prior to the Delivery Date of the Premises
and were not due to the acts or negligence of Tenant, its agents
or employees, all costs of removal, all liabilities imposed upon,
or damages suffered by Tenant because of the same, shall be borne
by Landlord, and Landlord hereby indemnifies and agrees to hold
Tenant harmless from and against all such costs, liability and
damages, including, without limitation, all third party claims
for personal injury or property damage, actions, administrative
proceedings, judgments, damages, punitive damages, penalties,
fines, costs, liabilities, (including sums paid in settlement of
claims) losses, attorney's fees, consultant's or expert's fees
and all costs incurred in enforcing this indemnity.  Tenant
hereby grants to Landlord a reciprocal indemnification provision
to the foregoing for Hazardous Substances discharged, dumped,
spilled or stored upon the Premises after the Delivery Date of
the Premises and during the Term of this Lease and including any
extensions hereof except if due to the acts or negligence of
Landlord, its agents or employees.  These representations, war-
ranties and indemnifications shall survive the termination of
this Lease.  Tenant shall be liable for compliance with any envi-
ronmental requirements upon its termination of the Lease but
Landlord shall agree to cooperate and supply Tenant with any
information which may be necessary in conjunction with Tenant's
compliance with any environmental regulations.  In the event the

-47-

Premises are sold or transferred by Landlord, Landlord shall com-
ply with all environmental requirements and Tenant agrees to
cooperate and furnish to Landlord such information as Landlord
shall require from Tenant in conjunction with Landlord's environ-
mental compliance.

(f)  Prohibited Activities.  Landlord shall not operate,
lease or permit to be leased any building or tenant space in the
Shopping Center for use as a bar, a discotheque in which less
than fifty percent (50%) of its space or revenue is devoted to or
derived from food service, a bowling alley, a place of public
entertainment or recreation facility, a computer game room or
amusement center, a theatre of any kind, an auditorium or other
similar place of general assembly, a health club, a billiard par-
lor, a flea market, a massage parlor, a skating rink, a gymna-
sium, a training or educational facility (including, but not lim-
ited to a beauty school, barber college, reading room, place of
instruction or any other operation catering primarily to students
or trainees rather than customers), or for the sale of drug par-
aphernalia or the sale or display of pornographic material (as
determined by community standards for the area in which the Shop-
ping Center is located).  Landlord shall not operate, lease or
permit to be operated or leased any restaurant within any build-
ing on Landlord's Premises which abuts Tenant's Preferred Area.

(g)  Height Limitations on Preferred Area Buildings.  Land-
lord shall not permit the height of buildings located within
Tenant's Preferred Area as particularly delineated on Exhibit "B"
to exceed fourteen (14) feet above existing grade.

(h)  Certificate of Authority.  Landlord covenants that it is

-48-

a duly constituted _____ under the laws of the

State of New Jersey and that its _____ who is acting

as its signatory in this Lease is duly authorized and empowered

to act for and on behalf of the _____.  Landlord

has furnished Tenant prior hereto with evidence of (a) the

existence of the _____, and (b) the authority of

the _____ to bind the _____ as contem-

plated herein.

    (i)  <u>Interference With Tenant's Reception/Transmission</u>.  Land-

lord shall not install or permit to be installed by Landlord, any

other tenant or other person anywhere in the Shopping Center, any

audio, video or radio transmitting equipment, diathermy equip-

ment, X-ray equipment, or other devices which would cause any

interference with radio or television reception or transmission

in or from the building on the Premises.

    (j)  <u>Delivery of Nondisturbance and Attornment Agreement</u>.

Landlord covenants that it shall deliver a nondisturbance and

attornment agreement executed by the holder of any existing Mort-

gage in a form satisfactory to Tenant within forty-five (45) days

following the execution of this Lease; provided however, that

Landlord shall have the right to extend said forty-five (45) day

period as is reasonably necessary to obtain said agreements so

long as (i) Landlord promptly requests same and diligently pur-

sues their delivery and (ii) Landlord agrees in writing to

indemnify and hold Tenant harmless from any loss or damage of

whatever nature which results from Landlord's failure to timely

deliver said agreements.  Notwithstanding the foregoing, in no

event shall Landlord extend the forty-five (45) day period beyond

-49-

one hundred fifty (150) days from the date hereof.  Tenant may,
in its sole discretion, terminate this Lease in the event Land-
lord fails to deliver the referenced agreements within the time
prescribed, including the extension contemplated hereinabove.

(k) Exclusive Use Grant.  During the Term as it may be
extended, so long as the Premises are used either by Tenant or
for the use first described in paragraph 33 below, no other
tenant or occupant of land or space within the Shopping Center
shall be permitted to operate a retail store for the sale of
televisions, major appliances, audio electronics equipment and
the servicing and warehousing of same, or the installation of
motor vehicle audio, stereo and telephone systems.  The foregoing
grant of exclusive use shall not prohibit the sale of such items
as an incidental part of the operation of another business within
the Shopping Center, provided that the floor area devoted to the
sale of such items shall not exceed two hundred (200) square
feet.

In the event there is a condition at material variance with
the foregoing representations and warranties with respect to the
Premises or the Shopping Center which prevents or in any material
way inhibits the use of the Premises or any part thereof or the
Shopping Center for its intended purposes by Tenant or Tenant's
employees, licensees, agents, suppliers, customers or invitees,
or if Landlord shall default in the observance or performance of
any term or covenant on Landlord's part to be performed under
this Lease, then and in any such event, in addition to such other
remedies as may be accorded Tenant at law, in equity or under the
terms of this Lease, Tenant may, after thirty (30) days' notice

to Landlord, obtain an injunction to specifically enforce the performance of such term or covenant, the parties hereby acknowledging the inadequacy of Tenant's legal remedy and the irreparable harm which would be caused to Tenant by any such default.

25. _Holidays_. If the day on which rent is payable falls on a Sunday or on a legal holiday, it shall be payable on the following secular day.

26. _Applicable Law_. This Lease shall be construed in accordance with the laws of the State of New Jersey.

27. _Notices_. Any notice permitted or required to be given pursuant to this Lease shall be deemed to have been given, if such notice is to be given by Landlord to Tenant, three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service addressed to Tenant as follows:

> CIRCUIT CITY STORES, INC.
> 2040 Thalbro Street
> Richmond, Virginia 23230
> Attention:  Corporate Secretary

with a copy to:      Vice President of Real Estate
                     Circuit City Stores, Inc.
                     1508 Willow Lawn Drive
                     Richmond, Virginia 23230

and if notice is to be given by Tenant to Landlord, three (3) business days after mailing a written notice by certified mail, postage prepaid, return receipt requested, or one (1) business day after sending by Federal Express or other comparable overnight express courier service to Landlord as follows:

-51-

                          Jerome S. Goodman
                          921 Pleasant Valley Road
                          Mount Laurel NJ  08054

with a copy to:           Jubanyik, Varbalow, Tedesco, Shaw &
                             Shaffer
                          1701 Route 70 East
                          Cherry Hill, NJ  08003
                          Attention:  Hal Shaffer, Esq.

or to such other addressees (including Tenant's Mortgagee) as any

party hereto shall from time to time give notice thereof to any

other party.

     28.  Merger.  This Lease represents the final understanding

between Landlord and Tenant and cannot be changed or modified by

anyone except by a writing signed by Landlord and Tenant and

endorsed or attached hereto.

     29.  Captions.  Any section headings, paragraph titles or

captions contained in this Lease are for convenience only and

shall not be deemed a part of the context of this Lease.

     30.  Subordination and Attornment.

     (a)  This Lease shall be subject and subordinate to the lien

of any and all Mortgages (as hereinafter defined) now or hereaf-

ter encumbering the Premises and placed thereon by Landlord and

to all renewals, modifications, replacements and extensions of

such Mortgages; provided, however, that the subordination herein

contained shall not be effective with respect to any Mortgage

unless the holder of such Mortgage shall execute and deliver a

nondisturbance and attornment agreement, in form satisfactory to

Tenant, providing that, in the event the Mortgage shall be fore-

closed, so long as Tenant shall not then be in default beyond any

cure period provided herein, and so long as Tenant shall attorn

to the purchaser upon foreclosure, and so long as Tenant contin-

                              -52-

ues to fully and completely perform Tenant's duties and obliga-
tions under this Lease within the periods provided therefor, (i)
the Lease shall not terminate by reason of such foreclosure, (ii)
Tenant's possession of the Premises shall not be disturbed, (iii)
the purchaser upon such foreclosure, its or his successors or
assigns, shall recognize Tenant and shall be obligated to fully
and completely perform Landlord's duties and obligations under
this Lease arising from and after the date of such foreclosure
and (iv) the holder of any such Mortgage, shall make all net pro-
ceeds arising from casualty or condemnation loss to the Premises
available to Tenant for restoration of the Premises in accordance
with the terms hereof. As used in this Paragraph, the term "Mort-
gage" shall mean any mortgage, deed to secure debt, deed of
trust, trust deed or other collateral conveyance of, or lien or
encumbrance against, the Premises.  An example of a nondistur-
bance and attornment agreement acceptable to Tenant is attached
hereto as Exhibit "G."

     (b)  As a part of such nondisturbance and attornment agree-
ment, which Tenant agrees to execute from time to time during the
Term as it may be extended, if requested by the holder of any
Mortgage, Tenant shall agree to provide to such holder (simulta-
neously with notice to Landlord) notice of Landlord's defaults
and the same periods for such holder to cure such defaults as
those provided Landlord herein, together with such agreements as
are typically found in nondisturbance and attornment agreements
with institutional lenders as may be reasonably satisfactory to
Tenant.

     (c) In the event the Landlord's interest in the Premises

passes to a successor ("Successor") by sale, lease, foreclosure
or in any other manner, Tenant shall be bound to the Successor
under all of the terms of this Lease for the balance of the Term
thereof remaining with the same force and effect as if the Suc-
cessor were the Landlord under the Lease, and the Tenant hereby
agrees to attorn to the Successor as its Landlord, such attorn-
ment to be effective immediately upon the receipt by Tenant of
written notice signed by Landlord and the Successor advising
Tenant of the Successor's succeeding to the interest of Landlord
under the Lease; provided, however, that in order for the fore-
going to be effective against Tenant, such Successor must be
bound to Tenant in respect of all of Landlord's duties and obli-
gations hereunder, such binding effect on the Successor to be
effective and self-operative without the execution of any further
instrument on the part of either of the parties hereto, immedi-
ately upon the Successor's succeeding to the interest, duties and
obligations of Landlord under this Lease; otherwise, such agree-
ment to subordinate or attorn shall be of no force and effect. In
the event that Landlord's interest in the Premises passes to a
Successor and such Successor is bound unto Tenant as set forth
above, Landlord shall be released from all obligations to Tenant
hereunder arising after the date Landlord's interest so passes.

31.  <u>Estoppel Certificates</u>.  Either party, without charge, at
any time and from time to time hereafter, within ten (10) days
after receipt of written request by the other, shall certify by
written instrument duly executed to any present or proposed mort-
gagee, purchaser, sublessee or assignee, any other individual,
partnership, corporation, trust, unincorporated association or

joint venture, government or any department or agency thereof, or any other entity ("Person") specified in such request:  (a) as to whether this Lease has been supplemented or amended, and, if so, the substance and manner of such supplement or amendment; (b) as to the validity, force and effect of this Lease, in accordance with its tenor as then constituted, to the best knowledge of the party so certifying; (c) as to the existence of any default thereunder, to the certifying party's best knowledge; (d) as to the existence of any offsets, counterclaims, or defenses thereto on the part of such other party, to the certifying party's best knowledge; (e) as to the commencement and expiration dates of the term of this Lease; and (f) as to any other matters which may reasonably be so requested.  Any such certificate may be relied upon by the party requesting it and any person to whom the same may be exhibited or delivered, and the contents of such certifi-cate shall be binding on the party executing same.

32.  <u>Mechanics' Liens</u>.  Landlord and Tenant covenant to each other that they will not permit any lien to be filed against the Premises or the Shopping Center on account of nonpayment or dis-putes with respect to labor or materials furnished to the Pre-mises or the Shopping Center for or on behalf of Landlord, Tenant or any party claiming by, through, or under Landlord or Tenant, nor shall either party permit any judgment, lien or attachment to lie against the Premises or the Shopping Center.  Should any lien of any nature, including but not limited to the foregoing, be filed against the Premises or Shopping Center, the party on account of whose actions such lien has been filed shall, within thirty (30) days after receipt of written notice of such lien,

cause said lien to be removed by substitution of collateral,
posting a bond therefor or such other method as may be reasonably
acceptable to the other party hereto.

33. <u>Use</u>.

(a) Tenant shall initially maintain, use and operate the Pre-
mises as a retail store for the sales of consumer electronics
products, household appliances and related goods, for the servic-
ing and warehousing of same, and for the installation of motor
vehicle audio, stereo and telephone systems.  Thereafter, Tenant
shall have the right to use the Premises for any lawful retail
use; provided, however, that the Premises shall not be used (i)
for any illegal purpose, (ii) for any use prohibited under Para-
graph 24(f) above, or (iii) in violation of any applicable provi-
sion of the Permitted Exceptions.

(b) Notwithstanding the provisions of subparagraph (a) imme-
diately above, Tenant shall have the right to develop additional
retail or office space on the Premises, at its sole expense and
in accordance with governmental regulations.  Tenant shall be
entitled to lease any and all additional space and retain all
rents and other receipts generated therefrom and shall pay Land-
lord, upon completion of said space and as Additional Rent, Two
Dollars ($2.00) per square foot of ground leasable floor area
created by such development.

34. <u>Rules and Regulations</u>.  Tenant agrees to comply with all
reasonable rules and regulations adopted by Landlord which are
consistently and uniformly promulgated to and enforced against
all tenants in the Shopping Center, provided the same are not in
conflict with any of the express provisions hereof.  However,

-56-

such rules and regulations shall not impose any advertising or promotional obligations on Tenant. Landlord shall not commit or permit any nuisance of any kind on the Premises or the Shopping Center. No auction, fire sale or going-out-of-business sale may be conducted in the Shopping Center by Tenant or any other tenant of the Shopping Center.

35. <u>Memorandum of Lease; Commencement Date Agreement</u>. Landlord and Tenant agree to execute a Memorandum of Lease in recordable form, attached hereto as Exhibit "H," simultaneously with the execution of this Lease, setting forth such provisions hereof as are required by New Jersey law. In addition, Landlord and Tenant shall execute a Commencement Date Agreement in the form attached hereto as Exhibit "I," once the Rent Commencement Date has been established. Recording costs for either or both documents shall be borne by the party requesting recordation of the same.

36. <u>Force Majeure</u>. Except as contemplated in the Construction Provisions, in the event that Landlord or Tenant shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, delay by the other party, failure of power, riots, insurrection, war or other reason of a like nature not the fault of such parties or not within their control, then performance of such act shall be excused for the period of delay; and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay; provided, however, that in connection with the construction or reconstruction of the Improvements, in no event

-57-

shall such period of delay exceed twelve (12) consecutive months from the date that would have otherwise been the date of performance.

37. <u>Brokers</u>.  Landlord and Tenant each covenant that they have not dealt with any real estate broker or finder with respect to this Lease, except for Markeim-Chalmers, Inc. and Mertz Corporation.  Landlord shall be responsible for any commission due Markeim-Chalmers, Inc. and for a commission not to exceed Thirty Thousand Dollars ($30,000) to Mertz Corporation.  Except for the foregoing, each party shall hold the other party harmless from all damages, claims, liabilities or expenses, including reasonable attorneys' fees, resulting from any claims that may be asserted against the other party by any real estate broker or finder with whom the indemnifying party has or purportedly has dealt.

38. <u>Change of Landlord</u>.  Tenant shall continue to make the payments provided hereunder to Landlord until such time as Tenant receives written notice signed by Landlord of a change in the identity of Landlord or of the appointment of a management agent to collect rents due hereunder, which notice directs Tenant to make said payments to Landlord's successor or management agent, as applicable.  Landlord agrees to indemnify and hold Tenant harmless from and against all claims, loss or damage suffered by Tenant as a result of the failure to provide Tenant with such notice.

39. <u>Maintenance of Shopping Center by Landlord</u>.  Landlord covenants to maintain a first-class shopping center.  The loca-

tion of improvements by Landlord, if any, will be within the
"Permissible Building Areas" as shown on the Site Plan which is
attached hereto as Exhibit "B," and the parking ratio for the
Shopping Center shall be at least as shown on Exhibit "B," but in
no event shall said ratio be less than five (5) spaces per 1,000
square feet of gross leasable area nor less than the applicable
zoning requirements.   Landlord shall construct or cause such
improvements to be constructed in a good and workmanlike manner,
lien-free, and shall indemnify and hold Tenant harmless for any
loss or damage suffered by Tenant as a result of Landlord's con-
struction, if any.   Landlord shall not permit construction traf-
fic over the Premises and Landlord shall refrain from interfering
with the conduct of Tenant's business.   Landlord shall keep and
maintain or cause the improvements in the Shopping Center,
including the parking lot and lighting to be kept and maintained
in good condition and repair consistent with paragraph 40 below.

   40.   Common Area Maintenance.

   (a) Landlord shall maintain and repair at its sole expense,
the Common Areas (including cleaning, snow removal and ice treat-
ment, removal of common area trash and garbage, lighting, repair-
ing, repaving and restriping the parking area and replanting and
replacing landscaping) on that portion of the Shopping Center,
which is located to the southwest of the rear wall of the Eyelab
premises, all as more particularly outlined in blue on Exhibit
"B", attached hereto and made a part hereof.

   (b) Tenant shall maintain and repair, at its sole expense,
the balance of the Common Areas (including cleaning, snow removal
and ice treatment, removal of common area trash and garbage,

lighting, repairing, repaving and restriping the parking area and
replanting and replacing landscaping) located on the Premises,
together with the pylon sign, all as more particularly outlined
in red on Exhibit "B", attached hereto and made a part hereof.

(c) Definition of Common Areas.  The term "Common Areas"
shall be defined to include the parking areas, lanes, drives,
entrances, truck passageways, sidewalks, elevators, escalators
and/or ramps, stairways, landscaped areas, parking lot lighting
facilities and equipment, and shared utility facilities located
in the Shopping Center and intended and available for the common
use of all of the tenants within the Shopping Center, their
subtenants, licensees, and business invitees.

(d)  Prohibited Uses.  Landlord covenants that it shall not,
without Tenant's express written consent, permit the following
uses or activities to occur in the Common Areas:  (1) advertise-
ments or signs except for the pylon sign(s) described in Paragraph
8 and traffic control signs; (2) display or sale of merchandise;
(3) operation of loudspeakers; or (4) imposition of a charge for
parking.

(e)  Alterations.  Landlord covenants that it shall not mate-
rially change or alter the location of curbcuts, roadways, access
aisles or sidewalks, or any other feature of Tenant's Preferred
Areas shown crosshatched on Exhibit "B", attached hereto and
incorporated by reference, which change or alteration would
adversely affect the visibility of or access to the Premises,
without Tenant's prior written consent, nor shall it construct
any barrier, building or other structure, either temporary or
permanent, in Tenant's Preferred Area.

-60-

41.  <u>Miscellaneous</u>.

(a)  <u>Headings and Gender</u>.  The captions of sections of this
Lease are for convenience only and are not a part of this Lease
and do not in any way limit or amplify the terms and provisions
of this Lease.  The masculine, feminine or neuter gender and the
singular or plural number shall be deemed to include the others
whenever the context so requires or indicates.

(b)  <u>Construction</u>.  The parties hereto agree that all the
provisions hereof are to be construed as covenants and agreements
as though the words importing such covenants and agreements were
used in each separate paragraph hereof.

(c)  <u>Waiver of Jury Trial</u>.  In the event of any court action
arising out of this Lease, each party hereby expressly waives its
right to trial by jury.

(d)  <u>Relationship of Landlord-Tenant</u>.  Nothing contained in
this Lease shall be deemed or construed by the parties hereto or
by any third person to create the relationship of principal and
agent or of partnership or of joint venture or of any association
between Landlord and Tenant other than the landlord-tenant rela-
tionship.

(e)  <u>Entire Agreement</u>.  This Lease covers, in full, each and
every agreement of every kind and nature whatsoever between the
parties hereto concerning the subject matter of this Lease, and
all preliminary negotiations and agreements of whatsoever kind or
nature are merged herein.

(f)  <u>Waiver of Certain Landlord Rights</u>.  Landlord hereby
expressly waives any and all rights granted by or under any
present or future laws to levy or distrain for rent, in arrears,

-61-

in advance or both, upon all goods, merchandise, equipment, fix-
tures, furniture and other personal property of Tenant or of any
subtenant or licensee of Tenant in the Premises, delivered or to
be delivered thereto.

(g)  <u>Notices Affecting the Premises</u>.  Landlord shall promptly
forward to Tenant any notice or other communication affecting the
Premises or the Shopping Center, received by Landlord from any
owner of property adjoining, adjacent or nearby to the Premises
or the Shopping Center or from any municipal or governmental
authority, in connection with any hearing or other administrative
procedure relating to the use of the Premises, Shopping Center or
any such neighboring property.

(h)  <u>Installation of Antennas, Maintenance and Removal</u>.
Tenant may, from time to time, install, maintain and/or replace
any antennas on the roof and/or exterior walls or parapet of the
building on the Premises as Tenant deems necessary or desirable,
provided same shall not adversely and materially affect the roof
or the structural elements thereof and is in conformance with any
and all applicable governmental regulations.  Upon removal by
Tenant of any antennas, Tenant shall repair any damage done in
connection with such removal.

(i)  <u>Attorneys' Fees</u>.  In the event either party shall be
required to commence or defend any action or proceeding against
any other party by reason of any breach or claimed breach of any
provision of this Lease, to commence or defend any action or pro-
ceeding in any way connected with this Lease or to seek a judi-
cial declaration of rights under this Lease, the party prevailing
in such action or proceeding shall be entitled to recover from or

to be reimbursed by the other party for the prevailing party's reasonable and actual attorneys' fees and costs.

(j) <u>Counterparts</u>. This Lease may be executed in one or more counterparts each of which shall be deemed to be an original but all of which shall together constitute one and the same Lease.

(k) <u>Partial Invalidity</u>. If any provision of this Lease or the application thereof to any person or circumstance shall be deemed invalid or unenforceable, the remainder of this Lease and its application to other persons or circumstances shall not be affected by such partial invalidity but shall be enforced to the extent permitted by law.

42. <u>Effectiveness of Lease; Tenant's Right to Terminate</u>. Notwithstanding the execution of this Lease or any provision of this Lease to the contrary, the parties hereto agree that the effectiveness of this Lease is expressly conditioned upon the complete satisfaction (or waiver) of each and all of the following conditions:

(a) Tenant's receipt of (i) a currently dated preliminary title report for the Shopping Center, issued by a title company satisfactory to Tenant; (ii) copies of all underlying documents referred to in said title report; and (iii) a currently dated ALTA survey of the Shopping Center; all of which shall be approved or disapproved by Tenant in writing within thirty (30) days after receiving all of said documents.

(b) Landlord's delivery of subordination, nondisturbance and attornment agreements executed by the holders of any and all existing Mortgages in a form satisfactory to Tenant within forty-five (45) days of the date hereof; provided however, that Land-

lord shall have the right to extend said forty-five (45) day
period as is reasonably necessary to obtain said agreements so
long as (i) Landlord promptly requests same and diligently pur-
sues their delivery and (ii) Landlord agrees in writing to indem-
nify and hold Tenant harmless from any loss or damage of whatever
nature which results from Landlord's failure to timely deliver
said agreements.  Notwithstanding the foregoing, in no event
shall Landlord extend the forty-five (45) day period beyond one
hundred fifty (150) days from the date hereof.  Tenant may, in
its sole discretion, terminate this Lease in the event Landlord
fails to deliver the referenced agreements, within the time pre-
scribed, including the extension contemplated hereinabove.

     (c)  Landlord's delivery to Tenant of the Land and Tenant's
obtaining (i) written confirmation from appropriate local author-
ities that current zoning and use regulations allow construction
of the Improvements on the Premises; (ii) the required City,
County and State permits and approvals to construct said Improve-
ments on the Premises and (iii) a final nonappealable variance to
permit the construction and use of a free standing pylon sign and
wall mounted signs substantially in accordance with the criteria
set forth in Exhibit "E" annexed hereto and incorporated herein by
reference.  Tenant agrees to apply for such permits and variance
promptly as provided herein, to use due diligence and to expend
necessary application or other fees to secure such permits,
approvals and variance.  In the event Tenant has not obtained the
final and nonappealable variance within one hundred fifty (150)
days from the date of full execution of this Lease by all
parties, it shall have the right to terminate this Lease by pro-

-64-

viding Landlord with written notice within three (3) business days after the expiration of said one hundred fifty (150) day period.

(d)   Landlord's representations, warranties and covenants, as set forth in Paragraphs 24 and 39 herein, being true and accurate as of the date of execution.

(e)   Prior to delivery of the Land to Tenant, Tenant's obtaining from Landlord copies of soils and Hazardous Substances reports satisfactory to Tenant.   Tenant shall, upon receipt of said reports, have ten (10) business days to notify Landlord in writing of the acceptability of the reports.

(f)   Tenant's obtaining satisfactory assurances that adequate utility services (including gas, electricity, telephone, domestic water, fire protection water, storm sewer and sanitary sewer) are available for connection at the Premises or in close proximity thereto.   Tenant shall have thirty (30) days from the date of full execution of this Lease to obtain said assurances.   If they cannot be obtained, or are unsatisfactory, Tenant shall notify Landlord in writing within five (5) business days following said thirty (30) day period.

The existence of the foregoing conditions is solely for the benefit of Tenant, which may waive any such condition at its sole discretion by delivering to Landlord a written notice signed by Tenant which states the condition(s) being waived by Tenant.

Notwithstanding any other provision in this Lease to the contrary, in the event any of the foregoing conditions shall not be met, satisfied or waived, the parties hereto expressly agree that Tenant shall have the right to terminate this Lease in its sole

and absolute discretion by delivering to Landlord a written notice signed by Tenant which states that Tenant is terminating this Lease on account of the failure of one or more of the foregoing conditions.  In the event of any such termination, the rights and obligations of the parties shall be of no further force and effect (and the parties shall have no further liability except that the indemnification set forth in Paragraph 10(i) hereof shall survive such termination) upon Tenant's delivery of said notice to Landlord; provided, however, that in the event of termination as a result of the failure of conditions (b) or (d) above, Landlord shall pay to Tenant promptly after termination a sum equal to the actual out-of-pocket and substantiated third-party architectural and engineering costs incurred by Tenant to the date of termination, not to exceed $50,000.00 (the "Termination Payment"); provided, further, however, that in the event Tenant enters into a lease agreement for all or part of the Premises within one (1) year of the termination of this Lease, Tenant shall promptly reimburse Landlord the amount of the Termination Payment.  In addition to Tenant's right to terminate the Lease hereunder, Tenant shall be entitled to exercise any and all other rights and remedies available to Tenant under this Lease or at law.

43. <u>Tenant's Right of First Refusal to Purchase Shopping Center</u>. In the event Landlord decides to dispose of its interest in the Shopping Center, Landlord agrees to grant Tenant a first right of refusal to purchase the Shopping Center on the same terms and conditions as any bona fide offer received by and acceptable to Landlord.  In the event of a proposed disposition

-66-

of the Shopping Center, Landlord shall immediately provide Tenant
with written notice of same, and inform Tenant of any bona fide
offers received.  If Landlord finds an offer to be acceptable, it
shall provide Tenant with written notice including the terms and
conditions of the offer (the "Notice").  Thereafter, Tenant shall
have thirty (30) business days from receipt of any Notice to
notify Landlord in writing of its decision regarding the pur-
chase.  If Tenant fails to notify Landlord within the time pre-
scribed or if it notifies Landlord that it does not wish to exer-
cise its first right of refusal, Landlord shall be free to accept
the offer.  However, if Landlord and the proposed purchasers fail
to close the transaction for whatever reason, Tenant shall have
the same first right of refusal with regard to any other offers
received by and acceptable to Landlord.

WITNESS the following signatures and seals:

LANDLORD:                          _____, a

                                   _____

ATTEST (WITNESS):

_____          By: _____

                                   Its: _____

TENANT:                            CIRCUIT CITY STORES, INC.,

                                   a Virginia corporation

ATTEST:

_____          By: _____
                                       Benjamin B. Cummings, Jr.

                                   Its: Assistant Vice President,
                                        Real Estate

(SEAL)

WITNESS the following signatures and seals:


LANDLORD:

WITNESS: *Catherine Jones*

Jerome S. Goodman

William G. Rohrer

Jointly d/b/a Wiljer Company


TENANT:

ATTEST:

*Susan S. Williams*
Ass't Secretary

CIRCUIT CITY STORES, INC.,
a Virginia corporation

By: *Benjamin B. Cummings Jr.*
Benjamin B. Cummings, Jr.

Its: Assistant Vice President,
Real Estate


(SEAL)

Prepared by: _____
                S. Brodrick Peters, Jr.

## MEMORANDUM OF LEASE AGREEMENT


THIS AGREEMENT is made as of the 18th day of January, 1989,
by and between Jerome S. Goodman and William G. Rohrer, d/b/a
Wiljer Company ("Lessor"), and CIRCUIT CITY STORES, INC., a
Virginia corporation ("Lessee").


RECITALS


1.   Lessor and Lessee have entered into a Lease, dated
January 18, 1989 (the "Lease"), whereby Lessor has let to Lessee
a portion of that certain parcel of land located at 2128 Route 38
in Cherry Hill, Camden County, New Jersey, and more particularly
described on Exhibit "A" attached hereto (the "Premises"),
including the improvements, appurtenances, licenses, easements
and fixtures related to such Premises, a copy of which Lease is
held by each party thereto at the addresses shown below.

2.   The addresses of the Lessor and Lessee are as follows:


Lessor:          Jerome S. Goodman and William Rohrer
                 d/b/a Wiljer Company
                 921 Pleasant Valley Avenue
                 Mount Laurel, NJ  08054

Lessee:          Circuit City Stores, Inc.
                 2040 Thalbro Street
                 Richmond, Virginia 23230
                 Attn:  Corporate Secretary


DB4418-0585

3.   Lessor and Lessee desire to enter into this Memorandum of Lease, which is to be recorded, in order that third parties may have notice of Lessee's interest in the Premises and of the existence of the Lease.

AGREEMENT

NOW, THEREFORE, in consideration of the rents, covenants and agreements on the part of Lessee to be paid and performed under the Lease, Lessor hereby demises and conveys to Lessee the Premises, in accordance with the terms of the Lease, which includes the following provisions:

1.   The term of said Lease shall commence on January 18, 1989 and shall terminate on January 31, 2010.

2.   Lessee has the right, at its option, to extend the Lease term for four (4) consecutive terms of five (5) years each, subject to the conditions set forth in the Lease.

All of the terms, conditions, provisions and covenants of the Lease are incorporated into this Memorandum of Lease by reference as though written out at length herein, and the Lease and this Memorandum of Lease shall be deemed to constitute a single instrument or document, provided, however, that in the event of a conflict between this Memorandum of Lease and the Lease, the terms and conditions of the Lease shall govern.

IN WITNESS WHEREOF, the undersigned, on behalf of and with authority for their respective entities, have hereunto set their hands and delivered these presents on this _10th_ day of _August_ _____, 1989.

Signed, sealed and delivered
in the presence of:

_Jean A. Travis_
(Unofficial Witness)

_Jacquelyn Licchetto_
(Notary Public)

Notary Public,

My Commission Expires: _____

JACQUELYN LICCKETTO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires October 30, 1992

_____
(Unofficial Witness) (for Lessee)

_Gertrude M. Gibson_
(Notary Public) (for Lessee)

Notary Public,
Virginia, State at Large
My Commission Expires: _11-8-91_

LESSOR:   _Jerome S. Goodman_
          Jerome S. Goodman

          _William G. Rohrer, Attorney in fact_
          William G. Rohrer

          Jointly d/b/a
          Wiljer Company

LESSEE:   CIRCUIT CITY
          STORES, INC., a
          Virginia corporation

By: _Benjamin B. Cummings Jr._
    Benjamin B. Cummings, Jr.
    Assistant Vice President